AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| SOFCO ERECTORS, INC. | : | Case No: 01-18-0001-3790 |
| | : | JS Case No: 4510 |
| "Employer" | : | |
| | : | |
| And | : | |
| | : | **EMPLOYER SOFCO ERECTORS INC.'S** |
| | : | **MOTION FOR SUMMARY JUDGMENT** |
| OHIO OPERATING ENGINEERS | : | |
| PENSION FUND | : | |
| | : | |
| "Fund" | : | |
| | : | |
| | : | |

The Employer, Sofco Erectors, Inc. ("Sofco") requests summary judgment in its favor and that the Arbitrator set aside the Ohio Operating Engineers' Pension Fund's (the "Fund") complete and partial withdrawal liability assessments. The Fund's complete withdrawal liability assessment is clearly erroneous because Sofco never continued work in Local 18's jurisdiction for which contributions to the Fund were previously required. The Fund's partial withdrawal liability assessment is clearly erroneous because the Fund applied the wrong statutory formula in finding a partial withdrawal, and Sofco's work continued for more than an insubstantial portion during the years in question.

Or, if either or both assessments are correct, which Sofco denies, the Fund incorrectly calculated Sofco's withdrawal liability. The Fund erred when it considered Sofco's predecessor's contribution history, and it incorrectly used the Segal Blend interest rate in calculating unfunded vested benefits instead of the higher interest rate it used to determine funding. Sofco's arguments are fully set forth in the attached memorandum in support.

Respectfully submitted,

/s/ Gary L. Greenberg
Gary L. Greenberg
Mark B. Gerano
Jackson Lewis P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202
(513) 873-2103
Gary.Greenberg@jacksonlewis.com
Mark.Gerano@jacksonlewis.com

*Attorneys for Sofco Erectors, Inc.*

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| SOFCO ERECTORS, INC. | : | Case No: 01-18-0001-3790 |
| | : | |
| "Employer" | : | |
| | : | |
| And | : | |
| | : | **MEMORANDUM IN SUPPORT OF** |
| | : | **EMPLOYER SOFCO ERECTORS INC.'S** |
| OHIO OPERATING ENGINEERS | : | **MOTION FOR SUMMARY JUDGMENT** |
| PENSION FUND | : | |
| | : | |
| "Fund" | : | |
| | : | |
| | : | |

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................ 1

II.  UNDISPUTED FACTS ........................................................ 3

  A.  The Company. ............................................................... 3

  B.  The Work. ..................................................................... 4

    1.  Crane Work. ............................................................... 4

    2.  Forklift Work ............................................................. 5

    3.  Shop Work .................................................................. 8

  C.  Local 18 Acquiesces to Sofco Assigning Forklift Work to Ironworkers ........................... 8

  D.  Sofco Cancels Its Agreement With Local 18 ...................................... 9

  E.  The Fund's Withdrawal Liability Assessment ....................................... 9

III.  LEGAL ARGUMENT ........................................................ 11

  A.  The Fund's Complete Withdrawal Liability Assessment is Clearly Erroneous Because Sofco Did Not Continue Work in Local 18's Jurisdiction for Which Contributions Were Previously Required After it Terminated its Agreement with Local 18. ................................. 11

1. Forklift work was, at the most, within overlapping jurisdictions of the Ironworkers and Local 18, and because Sofco could assign the work to whichever union it wished, the work Sofco assigned Ironworkers after it terminated the Local 18 CBA was not work for which "contributions were required" to the Fund. ........................................................................ 12

2. Local 18 waived any claim it had to the forklift work. .................................................. 13

3. Had Local 18 sought a jurisdictional determination, the work would have been awarded to the Ironworkers anyway. ...................................................................................... 14

B. The Fund's Partial Withdrawal Liability Assessment is Clearly Erroneous Because the Fund Used the Incorrect Statutory Definition and Sofco's Contributions During the Years in Question Were Not Insubstantial. ........................................................................................ 16

1. Sofco's work continued for more than an insubstantial portion during the years in question. ................................................................................................................ 16

2. The Fund unlawfully failed to consider that Sofco's contributions decreased because it subcontracted crane work to other contractors that employed Local 18 members. The construction industry exemption was designed to avoid a withdrawal assessment in this situation. ................................................................................................................ 18

C. Even if Withdrawal Liability Should Be Assessed, the Fund's Withdrawal Liability Calculations are Wrong. .................................................................................................... 19

1. The Fund unlawfully considered Sofco's predecessor's contribution history. .............. 19

2. The Fund unlawfully used the Segal Blend instead of the interest rate it used to determine funding. ................................................................................................... 20

IV. CONCLUSION .......................................................................................................... 23

## I.     INTRODUCTION

The Fund's withdrawal liability assessments against Sofco Erectors, Inc. ("Sofco") are clearly erroneous and should be set aside.  This proceeding arises under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").  That statute requires a participating employer that withdraws from the plan to pay its proportional share of the plan's unfunded vested benefits calculated in accordance with MPPAA's terms.  More specifically, because this case involves a construction industry dispute, ERISA's construction industry exemption applies, which provides that a complete withdrawal takes place only if an employer that "ceases to have an obligation to contribute under the plan (i) continues to perform *work in the jurisdiction of the collective bargaining agreement* of the type for *which contributions were previously required*; or (ii) resumes *such work* within 5 years after the date on which the obligation to contribute under the plan ceases . . ."  ERISA Section 4203(b)(2)(B)(emphasis added).

Sofco is a construction industry employer that erects steel and precast primarily for commercial buildings and hospitals.  Sofco's work requires the use of cranes, forklifts, and other machinery.  Sofco relies primarily on members of various Ironworkers locals to perform its on-site work.  Sofco also previously utilized members of the International Union of Operating Engineers Local 18 ("Local 18") to perform work on its projects.  Although the majority of work Local 18 historically performed on Sofco sites involved crane operation, this case centers on Sofco's forklift and shop work.

The Fund contends that forklift operation and shop work fall within Local 18's jurisdiction and were the type of work for which contributions were required, and that therefore when Sofco continued performing such work after it terminated its CBA with Local 18, Sofco became liable

1

for complete withdrawal.  The Fund is wrong.  Shop work has never been within Local 18's exclusive jurisdiction, and Local 18 has never suggested that it was until this dispute arose. Moreover, forklift work is within the Ironworkers' jurisdiction, not Local 18's.  For years, Sofco assigned nearly all of its forklift work to Ironworkers, and Local 18 failed to ever seek a final and binding determination that the work belonged to it.  Indeed, while occasionally assigned to Local 18 members, the work never belonged to Local 18, it belonged to the Ironworkers.  Accordingly, Sofco has not performed work within Local 18's jurisdiction of the type for which contributions were required after it cancelled the CBA, and the Fund's complete withdrawal assessment is clearly erroneous.

The Fund's partial withdrawal liability assessment is also clearly erroneous because the Fund applied the wrong statutory formula in finding a partial withdrawal, and Sofco's work during the years in question was more than insubstantial.  Rather than utilize the required statutory language to determine whether Sofco partially withdrew, the Fund used the language that applies to non-construction industry employers.  Its decision to do so was contrary to the law.

Moreover, the Fund used unlawful methods to calculate Sofco's alleged withdrawal liability (and Sofco has none).  First, the Fund erred when it considered Sofco's predecessor's contribution history.  This transaction was not structured under 29 U.S.C. § 1384, which puts the asset purchaser "in the shoes" of the seller when the parties comply with its terms.  Because the transaction was not so structured, Sofco is only responsible for its own contribution history.  The Fund also unlawfully used the Segal Blend interest rate in calculating unfunded vested benefits instead of the much higher interest rate it used to determine funding.  Had the Fund used the funding interest rate, Sofco's alleged withdrawal liability would be zero.  Using the Segal Blend was contrary to MPPAA's requirements.

2

The withdrawal liability assessments were nothing more than Local 18 using the Fund as a cat's paw to retaliate against Sofco for consistently complying with the Ironworkers' jurisdiction over forklift work. The Fund ignored the law, made unreasonable assumptions, and arbitrarily assessed nearly a million dollars in withdrawal liability against Sofco. Congress did not create the MPPAA as a weapon for a disgruntled union to retaliate against a construction-industry employer that cancels a collective bargaining agreement and appropriately continues to assign disputed work to a different construction union. The withdrawal liability assessment should be set aside.

## II.    UNDISPUTED FACTS

### A.  The Company.

Sofco began operations on April 1, 2004, when it purchased its predecessor's (also called Socfo Erectors, Inc. ("Old Sofco")) assets.[1]  (Hesford Aff. ¶ 2, attached as Exhibit A.)[2]  John Hesford ("Hesford"), Dan Powell ("Powell"), Dave Schmitt ("Schmitt") and Jim Ludwig ("Ludwig") owned Sofco initially.[3]  (Hesford Aff. ¶ 4.)  Hesford, Powell, and Ludwig all worked at Old Sofco, but none held any ownership interest in it.  (Hesford Aff. ¶ 5.)  None of Sofco's ownership held any ownership interest in Sofco's predecessor.  (Hesford Aff. ¶ 5; Gates Nov. 6, 2018 Aff. ¶ 2, attached as Exhibit B.)[4]  When Sofco was formed, it was wholly different entity from Old Sofco.

---

[1] The original owners formed an entity called Sofco Erectors Acquisition, Inc. to facilitate the purchase of Old Sofco's assets, including the name Sofco Erectors, Inc.  Once the asset purchase was complete, the owners dissolved Sofco Erectors Acquisition, Inc. and formally adopted the name Sofco Erectors, Inc.

[2] All exhibits referenced herein are included within the attached Appendix A.  All deposition transcripts cited herein are included within the attached Appendix B.  All authorities cited herein are included in the attached Appendix C.

[3] Ludwig and Schmitt no longer own any interest in Sofco.

[4] Sofco's predecessor was a wholly owned subsidiary of Southern Ohio Fabricators, Inc.  (Gates Sept. 11, 2018 Aff. ¶ 4, attached as Exhibit C.)

The Asset Purchase Agreement did not include an assumption of Old Sofco's obligations to the Fund, or its contribution history. (Hesford Aff. ¶ 3, Ex. A to the Affidavit.) No bond was posted, and Old Sofco did not agree to secondary liability to the Fund. (Hesford Aff. ¶ 3.)

Sofco erects steel and precast primarily for commercial buildings and hospitals. (Hesford Aff. ¶ 6.) In doing so, it employs members of the International Association of Bridge, Structural, Ornamental, and Reinforcing Ironworkers (the "Ironworkers"). (*Id.*) Sofco operates in three primary locations within Ohio: Greater Cincinnati, Ohio, Greater Columbus, Ohio, and Greater Dayton, Ohio. (Hesford Aff. ¶ 7.) Hesford is the CEO and runs the Cincinnati and Dayton operations and Powell is the COO and runs the Columbus operation. (Hesford Aff. ¶ 7; Powell Dep. 10-11.)

Sofco is currently and since 2004 has been a signatory to collective bargaining agreements with three different Ironworkers locals that cover the Cincinnati, Dayton, and Columbus areas. (Hesford Aff. ¶ 8.) Until April 30, 2017, Sofco was also a signatory to a series of collective bargaining agreements with Local 18, the last of which was effective from May 8, 2013 to April 30, 2017. (Hesford Aff. ¶ 9.) In accordance with the Local 18 bargaining agreement, Sofco made contributions to the Fund for its employees who were Local 18 members.

**B. The Work.**

**1. Crane Work.**

Sofco was a signatory to the Local 18 CBA because it employed Local 18 members to operate cranes both owned by Sofco and rented. (Hesford Aff. ¶ 10.) Sofco rented cranes originally either operated by Sofco or the rental companies, all of which employed Local 18 members as crane operators. (Hesford Aff. ¶ 10.) Sofco contributed to the Fund for thousands of

4

hours of crane operator work both directly and indirectly (when it used contractors that employed only Local 18 members to operate cranes). (Hesford Aff. ¶ 10.)

In the mid to late 2000's, the crane contractors began to stop renting cranes "bare" (unoperated). (Hesford Aff. ¶ 11.) They required their cranes be run by their employees who were Local 18 members. (*Id.*) By 2015, all rented craned were operated by the crane contractors. (*Id.*) Sofco continued to operate its own cranes until 2016. (*Id.*) Local 18 members (on Sofco's payroll) operated the cranes before this change, and Local 18 members (on the crane companies' payroll) operated the cranes after the change. (Byers Dep. 18-19.) Accordingly, the Fund suffered no material change in contribution levels as the result of Sofco subcontracting the crane work; the Fund received the same contributions for the same hours from a different company.

### 2. Forklift Work.

Sofco utilizes many different erection methods and equipment to erect steel and precast including cranes, forklifts, roustabouts, duct hoists, chain falls, jacks, etc. (Hesford Aff. ¶ 12.) Sofco historically assigned forklift work primarily to Ironworkers. (*Id.*) Sofco prefers to assign the forklift work to Ironworkers for the purpose of efficiency, and its past practice has always been to do so. (Hesford Aff. ¶ 12, 17.) In some instances, Sofco assigned forklift work to Local 18 members. (Hesford Aff. ¶ 12.) One example of a situation where Sofco would assign a Local 18 member to operate a forklift would be where Sofco employed a Local 18 crane operator, but there was a gap between projects for the crane and Sofco wanted to keep the crane operator on its payroll. (Hesford Aff. ¶ 12.) Sofco also occasionally assigned forklift work to Local 18 members when it did not have enough Ironworkers to do the work or to settle a grievance with Local 18. (*Id.*)

Forlikft work falls within the jurisdiction of each Ironworkers agreement to which Sofco is a signatory. All of Sofco's forklift work in the state of Ohio has been covered by one of the

three Ironworkers agreements.  (Hesford Aff. ¶ 12.)  The applicable contract provisions are as follows:

    **i.**       **Ironworkers Local 44 Agreement (Cincinnati, Ohio area)(Hesford Aff.**
           **¶ 8; Byers Dep. Ex. N)**
             **APPENDIX B**

**Craft jurisdiction**:

The International Association claims for its members all work (any new technology, processes, materials and type of substitute materials) including but not limited to all:  …. Erection . . . Installation, Layout . . . Placing . . . Raising . . . . Setting . . . Unloading . . . all processes and materials.

. . .

. . . Forklift Operation; Forklifts . . .

(*See* Byers Dep, Ex. N, pp. 17-18.)

    **ii.**      **Ironworkers Local 290 Agreement (Dayton, Ohio area)(Hesford Aff. ¶**
           **8; Byers Dep. Ex. K.)**

Local Union # 290 claims the following work . . .

(a) Work in connection with the field, fabrication, handling, racking, sorting, cutting, bending, hoisting, placing, burning, welding and tying of all materials used to reinforce concrete construction except loading and unloading by hand and carrying to a centralized point adjacent to or upon the site of the project on which materials are to be used.  (p. 19)

Jacks, rollers, chain falls, sling chokers, forklifts, air tuggers and other types of power equipment are considered tools of the trade having jurisdiction of the work being done and as such the Ironworker when using the equipment shall operate the equipment and perform job site servicing.  (p. 20)

    **iii.**     **Ironworkers Local 172 Agreement (Columbus, Ohio area)(Hesford**
           **Aff. ¶ 8; Byers Dep. Ex. L; Powell Dep. 83-85, Ex. 15.)**

SECTION 7.  This Local Union claims for its members the fabrication, production, erection and construction of all iron, steel, ornamental lead, bronze, brass, copper, aluminum . . .

1.      The assembly and erection of all metal shapes, sheets, pieces, studs . . .

3.     The lay out and erection of all exterior wall systems including the anchors, framing, supporting members . . .

5.     The fabrication, maintenance, repair, rigging, and setting of all metal intermodal transportation containers . . .

6.     The unloading handling, hoisting distribution, placing and tying of all metal reinforcing bars . . . for reinforcing cast in place concrete.

7.     The unloading and erection of all power operated walkways . . .

9.     The unloading, distribution and erection of all metallic door frames . . .

Each of these involve forklift use.  (Powell Dep. 85.)

Sofco assigns forklift work to members of Ironworker locals because it is within their jurisdiction, and because Sofco preferred to do so for the sake of efficiency.  (Hesford Aff. ¶¶ 12, 17.)  To the extent Sofco did so, it was either because Local 18 occasionally complained and Sofco wanted to keep the peace, or because of some other circumstance that warranted it.  (Hesford Aff. ¶ 12.)  Sofco's data proves this.[5]  (Hesford Aff. ¶ 13, Ex. B to the Affidavit.)  From August 1, 2016 until July 31, 2017, out of the more than 18,608 estimated (8,000 Sofco-owned forklift hours + 10,608 rented forklift hours) man hours that Sofco used forklifts, Sofco only paid 48 hours to a member of Local 18.  (Hesford Aff. ¶ 13, Ex. B.)  In the prior twelve-month period, out of the more than 15,000 hours of forklift work, only 1,158 were worked by Local 18 members.  (Hesford Aff. ¶ 13, Ex. B.)  Indeed, it cannot be disputed that but for special circumstances, including

_____

[5] Sofco owns multiple forklifts, which are operated by Ironworkers on projects.  When Sofco needs additional forklifts, Sofco rents them.  If Sofco rents a forklift, it can be presumed that Sofco's forklifts are already being used (Sofco wouldn't spend money to rent a forklift when it had one sitting there to use).  Sofco does track the number of hours it rents forklifts.  To identify how many hours Ironworkers operated forklifts versus Local 18 members, I took the estimated hours Sofco's own forklifts are used (2,000 man hours per year x 4 forklifts = 8,000 hours per year), I added that number to the total hours forklifts were rented, and then I subtracted the number of Local 18 forklift hours paid in that year.  Any forklift hours beyond those that the Local 18 members worked were worked by Ironworkers.  (Hesford Aff. ¶ 13.)

keeping the peace with Local 18, Sofco assigned the forklift work to the Ironworkers locals because it was within their jurisdiction and because Sofco preferred this for the sake of efficiency. (Hesford Aff. ¶¶ 12, 17, Ex. B.)

### 3. Shop Work.

Sofco also employs individuals to perform shop work. Shop duties are performed on or out of Sofco's facilities, and include cleaning, organizing, making deliveries, or any other duties management assigns. (Hesford Aff. ¶ 14; Powell Dep. 88.) The shop work is not within the exclusive jurisdiction of any collective bargaining agreement. And to that end, several individuals perform it including members of the Laborers union and several non-union individuals. (Hesford Aff. ¶ 14.) At times, Sofco employed Local 18 members to perform shop work. (Hesford Aff. ¶ 14.) Sofco understood this work to be outside the Local 18 CBA, but because some individuals happened to be Local 18 members, Sofco voluntarily paid contributions to the Fund so those individuals could have benefits. (Hesford Aff. ¶ 14.) This is expressly allowed under the Fund's pension plan governing document. (Fund 30(b)(6) Dep. 28, Ex. E.) The fact that Sofco voluntarily paid into the Fund for Local 18 members performing shop work does not put shop work within Local 18's jurisdiction.

### C. **Local 18 Acquiesces to Sofco Assigning Forklift Work to Ironworkers.**

For years, Sofco assigned forklift work to Ironworkers, and Local 18 acquiesced. Indeed, although it occasionally filed a grievance, Local 18 never sought a final resolution that forklift work belonged to it.[6] (Byers Dep. 80-91, Exs. Q, R, S, T, U; Powell Dep. 100-101.) Local 18 settled all but the very last grievance it filed against Sofco by agreeing that Sofco would assign

---

[6] Local 18 has never alleged until this dispute that shop work is within its jurisdiction. Moreover, Local 18 never filed a grievance related to shop work that was performed by non-Local 18 members. (Hesford Aff. ¶ 14.)

some work to Local 18. (*Id.*) On the very last grievance, though, Sofco dug its heels in and insisted that its continuous practice of assigning forklift work to Ironworkers was correct. (Hesford Aff. ¶ 15.) To that end, on January 26, 2017 Local 18 filed a grievance against Sofco because it assigned individuals other than Local 18 members on forklifts at a job site located on Hetzel Street (the "Hetzel Street Job"). (Byers Dep. 89-90, Ex. U.) When Sofco refused to settle, the grievance went through its normal procedure. (*Id.*) Although Local 18 could have pressed forward to arbitration in order to win the disputed forklift work, Local 18 backed down and did not do so. (*Id.* at 92-95.)

### D. Sofco Cancels Its Agreement With Local 18.

Sofco terminated its collective bargaining agreement and relationship with Local 18 effective April 30, 2017. (Byers Dep. Ex. A.) Since then, all of Sofco's on-site construction work has been performed by the following and no others: (1) Sofco employees covered by its collective bargaining agreements with Ironworkers Local Nos. 44, 172, and 290; (b) crane operators covered by the Local 18's CBA and its successors and employed by crane leasing companies that have contracted with Sofco to provide cranes and crane operators for these projects; and (c) licensed surveyors to establish building lines mainly for precast installations. (Hesford Aff. ¶ 16.) Indeed, Sofco performed no work within Local 18's jurisdiction after it terminated its CBA with Local 18. Now, forklift work is being performed by members of the Ironworkers locals, consistent with Sofco's contracts with those locals. (Hesford Aff. ¶ 16.)

### E. The Fund's Withdrawal Liability Assessment.

In a letter dated August 31, 2017, the Fund alleged that Sofco's termination of its relationship with Local 18 resulted in liability for complete withdrawal, and it assessed complete withdrawal liability for the Plan year ending July 31, 2017, in the amount of $368,315 ($605,591 less credit for partial withdrawal assessments). (*See* August 31, 2017 Withdrawal Liability

9

Assessment, attached as Exhibit D.) In the same letter, the Fund also alleged that fluctuations in Sofco's Local 18 bargaining unit hours in previous plan years resulted in liability for partial withdrawals, and the Fund assessed partial withdrawal liability for the Plan year ending in July 31, 2011 in the amount of $244,627, partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,357, and partial withdrawal liability for the Plan year ending July 31, 2013 in the amount of $0 (after giving Sofco credit for partial withdrawal assessments in the prior years). (*Id.*) In assessing partial withdrawal liability, the Fund's actuary stated "[u]nder Section 4205(b)(1) of ERISA [29 U.S.C. § 1383(b)(1)] a partial withdrawal occurs when contribution hours in each of three consecutive years (the "three-year testing period") are at least 70% less than the average of the two highest years of contribution hours during the five years preceding the three-year testing period." (*See* Segal's August 29, 2017 calculations in the August 31, 2017 Assessment, p.1.) The actuary then stated that under "Section 4208(d)(1) of ERISA [29 U.S.C. § 1388(d)(1)], for construction industry employers in construction industry plans, partial withdrawal liability is assessable when work continued for an insubstantial portion of the employer's work in the jurisdiction of the collective bargaining agreement." (*Id.*, p. 2.) After it laid out the two standards for construction industry employers, the Fund's actuary "defer[red] to Fund's Counsel's interpretation as to whether partial withdrawal liability [was] assessable to [Sofco]." (*Id.*) To date, the Fund has still not clearly provided the standard it used other than the statutory formula applicable to non-construction industry employers.

In calculating Sofco's alleged withdrawal liability, the Fund considered Old Sofco's contribution history even though Sofco purchased that company's assets in 2004. (*Id.*) This raised Sofco's Preliminary Allocable Amount of Unfunded Vested Benefits from $451,061 to $605,591. (*See* Report of Michael Libman dated September 7, 2018, attached as Exhibit E.) Also, the Fund

used the "Segal Blend" interest rate to calculate the withdrawal liability instead of the rate it used to determine its funding level for ERISA minimum funding requirements, which also resulted in a significantly higher withdrawal liability assessment. (Ciner Dep. 20-25; Report of Michael Libman dated September 7, 2018, attached as Exhibit F[7].) Had the Fund used the interest rate it used to determine funding, Sofco's withdrawal liability would be zero. (*Id.*) Sofco timely requested review of the Fund's assessment and ultimately initiated the instant arbitration to set aside the Fund's withdrawal liability assessment.

### III.    LEGAL ARGUMENT

### A.    The Fund's Complete Withdrawal Liability Assessment is Clearly Erroneous Because Sofco Did Not Continue Work in Local 18's Jurisdiction for Which Contributions Were Previously Required After it Terminated its Agreement with Local 18.

The MPPAA provides that withdrawal liability only attaches to work that is (1) in the jurisdiction of the collective bargaining agreement; and (2) of the type for which contributions were previously required. 29 U.S.C. § 1383(b)(2)(B). If the Fund "does not show that the CBA *required* contributions for work [also] within the jurisdiction of another union," the Fund cannot impose withdrawal liability upon Sofco for assigning the work to the other union. *Stevens Eng'rs & Constructors, Inc. v. Local 17 Ironworkers Pension Fund*, 877 F.3d 663, 670-71 (6th Cir. 2017). Stated differently, a Fund cannot impose withdrawal liability upon a construction-industry employer for continuing to perform work for which contributions were not required by the terminated CBA.

---

[7] The Fund contends that withdrawal liability remains even when the plan becomes fully funded, and that certain withdrawal liability "pools" remain. Sofco disagrees with the Fund's methodology, however, to the extent the Arbitrator agrees, Sofco's withdrawal liability assessment should be still be significantly reduced. (*See* December 18 Report of Michael Libman, attached as Exhibit G.)

1. **Forklift work was, at the most, within overlapping jurisdictions of the Ironworkers and Local 18, and because Sofco could assign the work to whichever union it wished, the work Sofco assigned Ironworkers after it terminated the Local 18 CBA was not work for which "contributions were required" to the Fund.**

Forklift operation, without question, is work within the Ironworkers' jurisdiction. (*See* Section II(B)(2), *supra*.) As a result, Sofco was well within its rights to assign the work to the Ironworkers. Local 18 argues the forklift work is also within its jurisdiction. Although Sofco disagrees the work is within Local 18's jurisdiction at all, to the extent it is, the work is not within Local 18's *exclusive* jurisdiction (which would require Sofco to assign all forklift work to Local 18), but instead is within the *overlapping* jurisdiction of the Ironworkers and Local 18.

Since the forklift work was within the overlapping jurisdiction of the two unions, and because no jurisdictional determination was ever made, Sofco was within its rights to assign the forklift work to whichever union it wanted. When Sofco assigned forklift work to Local 18 members, Sofco appropriately made contributions for those hours to the Fund. But where Sofco did not assign the forklift work to Local 18 members and instead assigned it to Ironworkers, no contributions to the Fund were required. *Stevens Eng'rs & Constructors, Inc. v. Iron Workers Local 17 Pension Fund*, 2016 U.S. Dist. LEXIS 114028, *55 (N.D. Ohio 2016)("since the work at issue was assigned to [the competing union] it is not work for which contributions had ever been required to the Fund. It follows that the Fund may not assess withdrawal liability based upon work which is not within its jurisdiction and for which contribution to the Fund had never been required."). The district court further explained that "[t]here [was] no dispute that [the company] had assigned the [disputed work] to ironworkers instead of [the competing union] in the past . . . The Court could find no case in which a pension fund sought to impose withdrawal liability based upon an employer's assignment of assignable work to another craft union." *Id.* at 55, n. 11. Absent

any jurisdictional determination to the contrary, Sofco properly assigned the forklift work to the Ironworkers. The forklift work assigned to Ironworkers—the only forklift work Sofco continues to perform—is therefore not work for which contributions were required to the Fund. Thus, Sofco's decision to continue assigning forklift work to Ironworkers and not Local 18 members cannot serve as the basis for a withdrawal liability assessment. *Id.*

### 2. Local 18 waived any claim it had to the forklift work.

Moreover, even if Local 18 had a claim to the forklift work, it waived any such claim when it failed to pursue a determination that the work belonged to it. Where two unions both claim certain work and a union fails to submit its jurisdictional challenge to secure a determination as to which union the work belongs to, the union abandons its claim to the work. *See Stevens Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund*, Opinion and Order p. 25 (Sands, J. 2015). Just like in *Stevens*, prior to Sofco terminating its CBA, Local 18 failed to seek out a final determination as to whether the forklift work belonged to Local 18 or to the Ironworkers. (Byers Dep. 95.) Local 18 was well aware that Sofco primarily assigned forklift work to the Ironworkers. (Byers Dep. 85.) Indeed, Local 18 filed several grievances over the issue. (*Id.* at Exhs. Q, R, S, T.) And although Sofco and Local 18 often worked out solutions to keep the peace, Sofco ultimately dug its feet in and maintained its position that forklift work belonged to the Ironworkers in early 2017 on the Hetzel Street Job. (Hesford Aff. ¶ 15.) When Sofco refused to resolve the grievance Local 18 filed about the Hetzel Street Job, it created a standoff as to whether the forklift work fell within Local 18's jurisdiction or the Ironworkers' jurisdiction. Rather than push the matter to arbitration or otherwise seek a final and binding determination that forklift work belonged to Local 18—and therefore was work for which contributions would be required to the Fund—Local 18 abandoned its claim to the work. Under *Stevens*, the Fund cannot now claim that

the terminated CBA required contributions for this work. *See also Trs. of the B.A.C. Local 32 Ins. Fund v. Ohio Ceiling & Partition Co.*, 48 Fed. Appx. 188, 198 (6th Cir. 2002)("Looking at the basis for the protections afforded to ERISA plans under § 515, nothing suggests that it was intended to afford ERISA fiduciaries a weapon against employers in undeclared jurisdictional disputes with competing unions.").

### 3. Had Local 18 sought a jurisdictional determination, the work would have been awarded to the Ironworkers anyway.

Although no jurisdictional determination was ever made as to which union forklift work belonged (because Local 18 acquiesced to Sofco's assignment of work to Ironworkers), any such jurisdictional dispute would have resulted in a determination that forklift work belonged to the Ironworkers. Where work is awarded to one union after a jurisdictional dispute, the decision means that contributions to the other union's fund for that work were never required. *See Precision Environmental Company v. Ohio Operating Engineers Pension Fund*, AAA No. 01-16-000-39530 (Goldberg, Arb.)(2018)(determining the employer had no obligation to contribute to the Fund for forklift and steer work where a NLRB 10(k) dispute was resolved in favor of the Laborers, not Local 18)(Byers Dep. Ex. O.). In such a case, if no contributions were ever required (because the work belonged to a different union all along), there can be no withdrawal liability.

Here, because Local 18 never sought a jurisdictional determination, in order to determine whether contributions were ever required, the Arbitrator may determine whether the work belonged to Local 18 or the Ironworkers.[8] To determine jurisdiction, the Labor Board considers five key factors: (1) the collective bargaining agreements; (2) employer preference, current

---

[8] If the Arbitrator finds Sofco was not required to contribute to the Fund for forklift work based upon Sofco's arguments in Sections III(A)(1) or III(A)(2), the Arbitrator need not perform this analysis.

assignment, and past practice; (3) area and industry practice; (4) relative skills and training; and (5) economy and efficiency of operations. *Local 876 International Brotherhood of Electrical Workers (IBEW), AFL-CIO and Newkirk Electric Associates, Inc. and Local 324, International Union of Operating Engineers, AFL-CIO*, 2017 NLRB LEXIS 269 (2017).

These factors overwhelmingly favor of the Ironworkers performing the forklift work. The Ironworkers' collective bargaining agreements contain provisions that indicate forklift work is within the Ironworkers' jurisdiction. (*See* Byers Dep. Exs. K, L, N.) Although it argues forklift work falls within its jurisdiction, Local 18's collective bargaining agreement's scope of work mentions nothing about forklift work, although the position is included in the wage schedule. (*See* Byers Dep. Ex. F, pp. 4-5.) However, even if the language in the Local 18's CBA implies forklift work, this factor does not tilt in favor of either party. As for the second factor, it is not disputed that Sofco prefers to assign forklift work to the Ironworkers, and that its past practice is to do so. (Hesford Aff. ¶ 17.) Employer preference should be given substantial weight. *See Laborers Local 265 (AMS Construction)*, 356 NLRB 306, 310 (2010)(according weight to employer's stated preference and also considering its current assignment of work in dispute). Third, it is the general practice in the erection industry to assign forklift work to Ironworkers. (Hesford Aff. ¶ 17.) Other contractors that perform work similar to Sofco's utilize Ironworkers to perform forklift work. (*Id.*) Fourth, evidence exists that both Local 18 members and Ironworkers have the necessary training to operate forklifts. (Hesford Aff. ¶ 17.) Accordingly, this factor does not tilt either way. Lastly, economy, efficiency, and operations favor awarding the work to the Ironworkers. Utilizing Ironworkers is more efficient because the forklift work is often intermittent, and it would not make sense for Sofco to employ a Local 18 forklift operator to sit idly all day when it could just use an

Ironworker for the intermittent work. (Hesford Aff. ¶ 12.) Paying employees to sit idle all day is obviously not efficient or economical. This factor also favors the Ironworkers.

Had a jurisdictional dispute resolution taken place—whether in multi-union arbitration or before the Board—the forklift work would have been awarded to the Ironworkers. Since the work belonged to the Ironworkers all along, the forklift work was not work for which contributions to the Fund were "required," which means Sofco cannot be subject to withdrawal liability now for assigning the work to the Ironworkers. *See Precision Environmental Company v. Ohio Operating Engineers Pension Fund*, AAA No. 01-16-000-39530 (Goldberg, Arb., 2017).

**B.     The Fund's Partial Withdrawal Liability Assessment is Clearly Erroneous Because the Fund Used the Incorrect Statutory Definition and Sofco's Contributions During the Years in Question Were Not Insubstantial.**

**1.  Sofco's work continued for more than an insubstantial portion during the years in question.**

The Fund's assessment of partial withdrawal liability is erroneous because during the years in question, Sofco's work continued for more than an insubstantial portion. Under 28 U.S.C. § 1388(d)(1), a construction industry employer is only liable for partial withdrawal "if the employer's obligation to contribute under the plan is continued for no more than an *insubstantial portion* of its work in the craft and area jurisdiction of the collective bargaining agreement of the type for which contributions are required." Neither the statute nor the PBGC have expressly defined what "insubstantial portion" means, but Sofco clearly continued work for more than an insubstantial portion during the years in question. The Fund's actuary used a "three-year testing period" to determine whether partial withdrawal occurred, and it calculated partial withdrawal liability when the contribution hours "in *each* of the three consecutive years" were at least 70% less than the average of the two highest years of contribution hours during the five years preceding

the three-year period. (*See* Segal August 29, 2017 Calculation attached to the August 31, 2017 Assessment, p. 1.) Indeed, in the years in question, Sofco's contribution ratios were far more than insubstantial.[9] (*Id.*)

Although the statute and PBGC have not defined "insubstantial portion," the term must mean a decline in contributions greater than the "70% decline" formula set forth in the provision applicable outside the construction industry. *See* 29 U.S.C. § 1385(a)(1). Where the text of a statute is ambiguous, courts look to persuasive authority including other statutes, legislative history, and policy rationales in order to ascertain the statute's meaning. *Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 986 (6th Cir. 2009). Each consideration weighs in favor of Sofco's interpretation: "insubstantial portion" means something much lower than the 70% decline formula, and must mean something close to a full cessation in contributions. First, if Congress intended for the 70% decline formula to apply both inside and outside the construction industry, it would make no sense to have a separate provision in the statute that states "insubstantial portion." If 70% applied to the construction industry too, why have a separate provision for "insubstantial portion?" Second, other statutes have defined the term "insubstantial" to be something much less than 30%. For instance, the IRS defines the term as 2% or less. *See* IRS Publication 1771.

---

[9] In determining whether partial withdrawal occurred, the Fund evaluates whether the "decline" occurred during three consecutive years during the five year lookback period. Sofco's contributions during the Fund's first five year lookback period (as of July 31, 2011) were: 13% (2009); 4% (2010); 9% (2011). (Segal August 19, 2017 Calculation, Ex. A (the exhibits referred to in this footnote are the exhibits attached to the Segal Calculation document.)) During the second lookback period (as of July 2012) the contributions were: 4% (2010); 9% (2011); and 18% (2012). (Segal August 19, 2017 Calculation, Ex. F.) And during the last of the lookback periods (as of July 31, 2013), the contributions were 9% (2011); 18% (2012); and 28% (2013). The Fund uses a three year testing period to determine the amount of a decline, which requires the Fund to evaluate the decrease in *each* of the three consecutive years. Stated differently, if in one year of the three year testing period the contributions were not "insubstantial," no partial withdrawal should be assessed. Sofco's contributions highest contribution years during each of the three year testing periods were 13%, 18%, and 28%, far more than any reasonable definition of "insubstantial."

17

In this case, the Fund unlawfully used the statutory formula applicable to non-construction industry employers and now contends that "insubstantial portion" means whatever the Fund says it means. Specifically, the Fund contends it has the discretion to determine what constitutes "insubstantial portion" and that Sofco's contributions "did not constitute a substantial portion of Sofco's work." (*See* Fund's Response to Sofco's Second Interrogatory, attached as Exhibit H.) The Fund's position—that it picks whatever it thinks constitutes "insubstantial"—is contrary to the cannons of statutory construction, is completely arbitrary, and if allowed by the statute would be an unconstitutional deprivation of property without due process. *See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 626 (1993).

> **2. The Fund unlawfully failed to consider that Sofco's contributions decreased because it subcontracted crane work to other contractors that employed Local 18 members. The construction industry exemption was designed to avoid a withdrawal assessment in this situation.**

The Fund also incorrectly evaluated Sofco's contribution rates during the years in question because it failed to recognize that part of Sofco's decline in contributions was attributable to subcontracting crane operator work to other companies who employed Local 18 members to perform the work. The construction industry exemption is in place because when a construction employer stops performing work in a particular labor jurisdiction (because it closes up shop or moves out of town), another employer typically brings on the union members and continues making contributions on the members' behalf. *See Structure Tone, Inc. v. New York City Dist. Council of Carpenters Pension Fund*, 2018 U.S. Dist. LEXIS 55919, * 13 (S.D.N.Y 2018)(explaining purpose behind the construction industry exemption). In these instances, under the construction industry exemption, the former employer has no withdrawal liability since the Fund is not losing any contributions; where one employer left off, another one picked up and the

Fund keeps getting its money. The Fund's assessment of partial withdrawal in this situation is nothing more than a workaround to the construction industry exemption and an attempt to double dip. The Fund received, and continues to receive, all of the contributions it would have received if Sofco had continued performing crane work. The statute does not permit the Fund to double dip in this manner; there were no unfunded liabilities to collect from during the years in question because another employer paid the contributions Sofco used to pay.

Because Sofco's contributions continued for more than an insubstantial portion of its work, and (as a separate and independent reason) because the Fund incorrectly failed to consider Sofco's subcontracting of work to contractors employing and contributing on behalf of Local 18 members, the partial withdrawal liability assessment is clearly erroneous and should be set aside.

C.   **Even if Withdrawal Liability Should Be Assessed, the Fund's Withdrawal Liability Calculations are Wrong**.[10]

1.  **The Fund unlawfully considered Sofco's predecessor's contribution history.**

When the Fund calculated Sofco's alleged withdrawal liability, its calculations took into account both Sofco's contribution history <u>and</u> Sofco's predecessor's contribution history prior to 2004. (Ciner Dep. 37-39.) The fact that the Fund used Sofco's predecessor's contribution history to calculate the assessment meant that the assessed amount was much higher than it would have been if the Fund had only considered Sofco's contribution history. (*Id.* at 38.)

The Fund's decision to include the predecessor's contribution history was erroneous as a matter of law. When a company purchases another company's assets, the predecessor's contribution history does not transfer to the new company, unless the transaction was structured

_____

[10] The Arbitrator need not consider this section unless he overrules Sofco's arguments as to the validity of the complete or partial withdrawal assessments.

under 29 U.S.C. § 1384, which did not occur here. *CenTra, Inc. v. Cent. States*, 578 F.3d 592, 601-02 (7th Cir. 2009); *Richland Industries, Ltd. v. Robbins*, 617 F.Supp. 639, 644 (N.D. Ill. 1985)(" Section 1384 (in tandem with Section 1383(a)) establishes that an arms' length sale of assets normally occasions a complete withdrawal from the plan by the seller. That subjects the seller to full withdrawal liability. And the purchaser undertakes no liability at all for the seller's contribution history, unless the purchaser posts a special bond and the seller agrees contractually to assume secondary liability for its contribution history.").[11]

In this case, Sofco was a new company that started on a clean slate after it purchased another company's assets. None of the individuals that formed Sofco owned any portion of the predecessor company. (Hesford Aff. ¶ 4; Gates September 11, 2018 Aff. ¶¶ 3-5; Gates November 6, 2018 Aff. ¶ 2; Ludwig Aff. ¶ 3, attached as Exhibit I.) Sofco purchased its predecessor's assets in an arms-length transaction and paid a fair price for the assets. (Hesford Aff. ¶ 2, Ex. A) The predecessor company and Sofco are two wholly different entities, and Sofco should not be bound by the predecessor company's contribution history. The Fund's inclusion of the predecessor's contribution history was error as a matter of law. The Arbitrator should reduce the Fund's withdrawal liability assessment accordingly.[12]

> **2. The Fund unlawfully used the Segal Blend instead of the interest rate it used to determine funding.**

---

[11] Here, the seller, Old Sofco, went out of business, so it incurred no withdrawal liability. (Gates Sept. 11, 2018 Aff. ¶ 6.)

[12] When the predecessor's contribution history is excluded, the Preliminary Allocable Amount of Unfunded Vested Benefits reduces from $605,591 to $451,061. (*See* September 7, 2018 Report of Michael Libman, attached as Ex. E.) If the Arbitrator finds it was inappropriate to include the predecessor's contribution history, the Arbitrator should order the Fund to recompute any withdrawal liability assessment accordingly.

When the Fund computed the withdrawal liability assessment, it used the Segal Blend interest rate to determine unfunded vested benefits instead of using the 7.25% interest rate the Fund uses for determining its funding levels. (Ciner Dep. 20-25.) The result is that the withdrawal assessment is substantially higher than if the Fund had used its funding interest rate.

When calculating an "employer's withdrawal liability, 'actuarial assumptions and methods' must, 'in the aggregate, [be] reasonable (taking into account the experience of the plan and reasonable expectations) and which, <u>in combination, offer the actuary's best estimate of anticipated experience under the plan.</u>'" *New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 303 F.Supp. 3d 236, 255 (S.D.N.Y. 2018)(citing 29 U.S.C. § 1393(a)(1)(emphasis added)). In *New York Times,* the Fund actuary testified that a 7.5% percent assumption was her "best estimate of how the Pension Fund's assets . . . will on average perform over the long term." *Id.* The district court reasoned that "if 7.5% was the Fund actuary's 'best estimate,' it strains reason to see how the Segal Blend, a 6.5% rate derived by blending that 7.5% 'best estimate' assumption with lower, no-risk PBGC bond rates, can be accepted as the anticipated plan experience." *Id.* The court held that use of the Segal Blend was unreasonable, and reversed the arbitrator's decision approving the Fund's use of it. *Id.*[13] This case is no different than *New York Times.* Here, the Fund made the same mistake that the fund made in *New York Times.* The Fund's actuary testified that 7.25% rate is based upon "a review of past experience and future expectations taking into account the plan's asset allocation and expected returns." (Ciner Dep. 19.) In a nutshell, the 7.25% rate is how the Fund expects the plan to perform. Nevertheless, like

---

[13] The *New York Times* case is currently on appeal before the Second Circuit Court of Appeals. *See* Case No. 18-1140. A different district court approved use of the Segal Blend based on reasoning persuasively rejected by the district court in *New York Times. See Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F.Supp.3d 365 (D. N.J. 2018).

in *New York Times*, the Fund ignored the rate it believes represents how the plan will perform, and instead used the much lower Segal Blend to calculate Sofco's withdrawal liability. In doing so, the Fund failed to follow the law, which requires the Fund to use an interest rate based upon the plan's anticipated performance. *See* 29 U.S.C. § 1393(a)(1).

Moreover, an interpretation of ERISA that would permit the Fund to use the Segal Blend would mean that section of ERISA runs afoul of the Fifth Amendment's Due Process Clause. In *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, the Supreme Court addressed this very issue. 508 U.S. 602 (1993). *Concrete Pipe*, like this case, involved a withdrawal liability assessment. *Id.* at 605. ERISA imposes a presumption in favor of the plan actuary's withdrawal liability calculations, and the employer argued that the presumption violated the Fifth Amendment's Due Process Clause. *Id.* at 620. Specifically, the employer argued that the presumption insulates the actuary's assumptions, which are naturally inclined to be biased against the withdrawing employer, from *de novo* review, thus depriving the withdrawing employer of an impartial adjudicator. *Id.*

The Court found the presumption to be constitutional. *Id.* at 631-33. The Court reasoned the statute was constitutional because "the technical nature of the actuary's assumptions and methods, and the necessity for applying the same assumptions in more than one context, as a practical matter limit the opportunity the actuary might otherwise have to act unfairly toward the withdrawing employer." *Id.* The Court further stated that "the statutory requirement is not unique to the withdrawal liability context, for the statute employs identical language . . . to describe the actuarial assumptions and methods to be used in determining whether a plan has satisfied the minimum funding requirements." *Id.* at 632. The Court reasoned that the presumption of accuracy passed constitutional muster because it required the actuary calculating withdrawal liability (who

could be biased toward an employer) to use the "critical interest rate assumption *that must be used for other purposes as well.*" *Id.* at 633. The Court in *Concrete Pipe* was clear: in order to pass constitutional muster, the plan must use the same rate for funding assumptions and withdrawal liability calculations. Because ERISA does not permit the Fund to use different rates for funding and withdrawal liability under *Concrete Pipe*, the Fund's use of the Segal Blend was erroneous. Even if withdrawal liability were appropriately assessed, the Fund's calculations are incorrect, and the Arbitrator should reduce the withdrawal liability assessment accordingly.[14]

## IV.    CONCLUSION

For each and every of the foregoing reasons, Sofco Erectors, Inc. respectfully requests the Arbitrator grant Sofco's Motion for Summary Judgment, set aside the Fund's Withdrawal Liability Assessment and order the Fund to return Sofco's quarterly payments, with interest, and award Sofco its fees and costs in this matter.

Respectfully submitted,
*/s/ Gary L. Greenberg*
Gary L. Greenberg
Mark B. Gerano
Jackson Lewis P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202
(513) 873-2103
Gary.Greenberg@jacksonlewis.com
Mark.Gerano@jacksonlewis.com

*Attorneys for Sofco Erectors, Inc.*

---

[14] As of July 31, 2014, the Fund's assets exceeded Withdrawal Liability. (*See* September 7, 2018 Report of Michael Libman, attached as Exhibit E.) Under the withdrawal liability method chosen by the Fund, all previous withdrawal liability bases are set to zero when this occurs. (*Id.*) Assets again exceeded withdrawal liability on July 31, 2015, so no new withdrawal liability base was established on that date. (*Id.*) As of July 31, 2016, a withdrawal liability base was established, but since the amount allocated to Sofco was less than the *de minimis* amount for this situation, the withdrawal liability is equal to zero. (*Id.*) Because usage of the funding interest rate equates to Sofco's withdrawal liability being zero, to the extent the Arbitrator finds withdrawal liability appropriately assessed, Sofco's assessment should be zero.

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of February, 2019, a true and accurate copy of the foregoing was served upon the following via email:

Daniel J. Clark
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
djclark@vorys.com

and

Allen S. Kinzer
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
askinzer@vorys.com

*Attorneys for the Ohio Operating Engineers Pension Fund*

*/s Gary L. Greenberg*
Gary L. Greenberg

4821-0300-7112, v. 3

24