AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| SOFCO ERECTORS, INC. | : | Case No: 01-18-0001-3790 |
| | : | JS Case No. 4510 |
| "Employer" | : | |
| | : | |
| And | : | |
| | : | **AFFIDAVIT OF JOHN HESFORD** |
| | : | |
| OHIO OPERATING ENGINEERS | : | |
| PENSION FUND | : | |
| | : | |
| "Fund" | : | |
| | : | |
| | : | |
| | : | |

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| | ) SS: | |
| COUNTY OF HAMILTON | ) | |

John Hesford, being first duly sworn, deposes and says that:

1. I am John Hesford. I am over the age of 18, and I am competent to testify to the matters set forth herein.

2. Sofco Erectors, Inc. ("Sofco") began operations on April 1, 2004, when it purchased its predecessor's (also called Sofco Erectors, Inc. ("Old Sofco")) assets. A true and accurate copy of the Asset Purchase Agreement is attached as Exhibit A.

3. The Asset Purchase Agreement did not include an assumption of Old Sofco's obligations to the Fund, or its contribution history. No bond was posted, and Old Sofco did not agree to secondary liability to the Fund.

4. Dan Powell ("Powell"), Dave Schmitt ("Schmitt"), Jim Ludwig ("Ludwig") and I owned Sofco initially.[1]

---

[1] The owners formed an entity called Sofco Erectors Acquisition, Inc. to facilitate the purchase of Old Sofco's assets, including the name Sofco Erectors, Inc. Once the asset purchase was complete, the owners dissolved Sofco Erectors Acquisition, Inc. and formally adopted the name Sofco Erectors, Inc.

5. Powell, Ludwig, and I all worked at Old Sofco, but none of the new ownership held any ownership interest in it.

6. Sofco erects steel and precast primarily for commercial buildings and hospitals. In doing so, Sofco employs members of the International Association of Bridge, Structural, Ornamental, and Reinforcing Ironworkers (the "Ironworkers").

7. Sofco operates in three primary locations within Local 18's geographic jurisdiction: Greater Cincinnati, Ohio, Greater Columbus, Ohio, and Greater Dayton, Ohio. I am the CEO and run the Cincinnati and Dayton operations, and Powell is the COO and runs the Columbus operation.

8. Sofco is currently and since 2004 has been a signatory to collective bargaining agreements with three different Ironworkers locals that cover the Cincinnati, Dayton, and Columbus areas. Exhibit K to the Deposition of Tom Byers is a true and accurate copy of Sofco's contract with the Ironworkers Local 290, which covers the Greater Dayton area. Exhibit L to the Deposition of Tom Byers is a true and accurate copy of Sofco's contract with the Ironworkers Local 172, which covers the Greater Columbus area. Exhibit N to the Deposition of Tom Byers is a true and accurate copy of Sofco's contract with the Ironworkers Local 44, which covers the Greater Cincinnati area.

9. Sofco was a signatory to a series of collective bargaining agreements with Local 18, the last of which was effective from May 8, 2013 to April 30, 2017. Exhibit F to the Deposition of Tom Byers is a true and accurate copy of the last Local 18 agreement to which Sofco was a signatory.

10. Sofco was a signatory to the Local 18 CBA because it employed Local 18 members to operate cranes both owned by Sofco and rented. Sofco rented cranes originally either operated by Sofco or the rental companies, all of which employed Local 18 members as crane operators. Sofco contributed to the Fund for thousands of hours of crane operator work both directly and indirectly (when it used contractors that employed Local 18 members).

11. In the mid to late 2000's, the crane contractors began to stop renting cranes "bare" (unoperated). They required their cranes be run by their employees who were Local 18 members. By 2015, all rented cranes were operated by the crane contractors. Sofco continued to operate its own cranes until 2016 with Local 18 members.

12. Sofco utilizes many different erection methods and equipment to erect steel and precast. They include cranes, forklifts, roustabouts, duct hoists, chain falls, jacks, etc. Whether owned or rented, the cranes have been exclusively operated by Local 18 members. Forklifts have been primarily assigned to Ironworkers for the sake of efficiency. But, they were also assigned to Local 18 members as circumstance warranted. All other

equipment is exclusively operated by Ironworkers. Sofco assigned forklift work to Local 18 members when there was a gap between projects for Sofco's crane and Sofco wanted to keep a Local 18 member on the payroll between projects. Sofco would also assign forklift work to Local 18 members when Sofco had abnormally large projects and was short on Ironworkers to run the forklifts. Sofco also assigned forklift work to Local 18 members for short times in order to settle minor grievances, which periodically came along.

13. Sofco owns multiple forklifts, which are operated by Ironworkers on projects. When Sofco needs additional forklifts, Sofco rents them. If Sofco rents a forklift, it can be presumed that Sofco's forklifts are already being used (Sofco wouldn't spend money to rent a forklift when it had one sitting there to use). Sofco does track the number of hours it rents forklifts. To identify how many hours Ironworkers operated forklifts versus Local 18 members, I took the estimated hours Sofco's own forklifts are used (2,000 man hours per year x 4 forklifts = 8,000 hours per year), I added that number to the total hours forklifts were rented, and then I subtracted the number of Local 18 forklift hours paid in that year. Any forklift hours beyond those that the Local 18 members worked were worked by Ironworkers. Exhibit B attached hereto is a true and accurate summary of the forklift rental data and Local 18 work hours data, which was compiled based upon a review of Sofco's records, which are maintained in the ordinary course of business.

14. Sofco also employs individuals to perform shop work. Shop duties are performed on or out of Sofco's facilities, and include cleaning, organizing, making deliveries, maintaining equipment, or any other duties management assigns. Several individuals perform shop work including members of the Laborers union and several non-union individuals. At times, Sofco employed Local 18 members to perform shop work. Sofco understood this work to be outside the Local 18 CBA, but because some individuals happened to be Local 18 members, Sofco voluntarily paid contributions to the Fund so those individuals could have benefits. Local 18 has never alleged until this dispute that shop work is within its jurisdiction. Moreover, Local 18 never filed a grievance related to shop work that was performed by non-Local 18 members.

15. Local 18 brought an occasional grievance over Sofco assigning forklift work to the Ironworkers. Sofco and Local 18 settled some of these grievances in order to keep the peace. On the very last grievance, though, Sofco dug its heels in and insisted that its continuous practice of assigning forklift work to Ironworkers was correct.

16. Sofco terminated its collective bargaining agreement with Local 18 effective April 30, 2017. Since then, all of Sofco's on-site construction work has been performed by the following and no others: (1) Sofco employees covered by its collective bargaining agreements with Ironworkers Local Nos. 44, 172, and 290; (b) crane operators covered by the Local 18's CBA and its successors, and employed by crane leasing companies

that have contracted with Sofco to provide cranes and crane operators for these projects; and (c) licensed surveyors to establish building lines for precast installations only. Now, forklift work is being performed by members of the Ironworkers locals, consistent with Sofco's contracts with those locals.

17. Sofco prefers to assign forklift work to the Ironworkers, and its past practice is to do so. Indeed, it is the general practice in the erection industry that Ironworkers operate forklifts. Other contractors that perform similar work use Ironworkers to operate forklifts. Members of the Ironworkers locals have the required training, certifications, and experience to operate forklifts.

FURTHER AFFIANT SAYETH NAUGHT.

_____
John Hesford

Sworn and subscribed to before me this 22nd day of February, 2019.

Notary public: _____

My commission expires: _____

4817-5394-5480, v. 1

CAROLINE JEAN RILEY
NOTARY PUBLIC
IN AND FOR THE
STATE OF OHIO
MY COMMISSION EXPIRES
NOVEMBER 1, 2020

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is made this __*11*__ day of __*March*__, 2004, among SOFCO ERECTORS, INC., an Ohio corporation ("Seller") and SOFCO Erectors Acquisition, Inc., an Ohio corporation ("Buyer"). This Asset Purchase Agreement, including all exhibits to be attached hereto shall be referred to as the "Agreement."

### RECITALS

A.  Seller is the owner of the land, building and business where Seller conducts business known as "Sofco Erectors"; and

B.  Subject to the terms in this Agreement, Seller wishes to sell, and Buyer wishes to buy, all of Seller's assets, business and operations conducted under the name Sofco Erectors (the "Business"), including the land and building where the Business operates.

### AGREEMENT

NOW, THEREFORE, the parties agree as follows:

1.  <u>PURCHASE AND SALE</u>.

1.1  <u>Purchase of Assets</u>.  At the Closing (as defined below), Seller will sell, transfer, and convey to Buyer, and Buyer will purchase from Seller, all of Seller's right, title and interest in and to (a) the Business as a going concern, (b) the name "Sofco Erectors" and all goodwill associated therewith, and (c) all of the assets and rights of Seller constituting the Business or used therein, of every kind and description, including the real estate and building where the Business operates, personal, tangible and intangible assets, wherever situated relating to the Business (collectively, the "Assets"), except the assets retained by Seller, identified in Exhibit 1.2 as the assets "Retained by Seller", which include Cash, Intercompany Receivables, Deferred Tax Assets, Prepaid Income Taxes and Deferred Federal Income Taxes (the "Excluded Assets").

1.2  <u>Included Assets</u>.  The Assets shall include without limitation the following assets, properties and rights of Seller used directly or indirectly in the conduct of, or generated by or constituting, the Business, except the Excluded Assets identified in Exhibit 1.2:

(a)  <u>Receivables</u>.  All prepaid items, unbilled costs and fees, and accounts notes and other receivables;

(b)  <u>Personal Property</u>.  All tangible personal property, including all machinery, equipment, tools, vehicles, furniture, furnishings, office equipment, computers, leasehold improvements and other goods;

(c)  <u>Inventories</u>.  All supplies and inventories of the Business including work-in-progress, office supplies, and all such items shipped or to be shipped from vendors on or prior to the Closing Date but not yet received by Seller;



(d)    Intellectual Property.  All intellectual property used in and for the Business, defined to include without limitation, all of the following: (i) all rights under any United States and foreign patent, trademark, service mark, trade name, copyright or mask work right, whether registered or unregistered, and any applications therefor, (ii) all technologies, websites (including the content thereof), domain names, methods, formulations, data bases, trade secrets, know-how and inventions used by, in or owned by the Business, whether developed or under development, (iii) all computer software, including documentation and related object and source codes, developed by the Business or which the Business has the right to transfer, and (iv) any website, domain name and related technology and data, owned or maintained by Seller's parent, Southern Ohio Fabricator's Inc., which relates to the Business (collectively, the "Intellectual Property"). Notwithstanding the above, Seller is only aware of Intellectual Property consisting of its website and will take whatever action is required to transfer any portion of the website, domain name and related technology and data to Buyer, at Buyer's expense;

(e)    Contracts and Licenses.  To the extent permitted by applicable law, all rights under any written or oral contract, license or other instrument;

(f)    Government Permits and Licenses.  All government permits, authorizations and licenses, to the extent transferable;

(g)    Claims.  All rights and claims of Seller against any third parties, including without limitation, all rights under express or implied warranties relating to the Assets;

(h)    Books and Records.  All information, files, records, dates, plans, contracts and recorded information relating to the Business or the Assets; and

(i)    Real Estate.  The land located at 10360 Wayne Avenue, Cincinnati, Ohio 45215, together with all buildings, improvements, appurtenant rights and fixtures thereon (the "Real Estate"), as more particularly described on the attached Exhibit 1.2 (i).

Corporate Documents.  With respect to corporate seals, certificates of incorporation, minute books, stock books, tax returns or other records having to do with the corporate organization of Seller ("Corporate Documents"), Buyer may review such Corporate Documents and make and retain copies of same. All such original Corporate Documents shall remain the property of Seller.

1.3    Purchase Price.

(a)    The purchase price for the Assets (the "Purchase Price") shall equal an amount determined from the balance sheet of Seller as of the close of business on the date of the Closing using the following formula:

2

Purchase Price equals sixty nine percent (69%) of the Total Assets (except 100% of other assets which are cash deposits) purchased by Buyer less one hundred percent (100%) of the Total Current Liabilities assumed by Buyer.

By way of example only, the above formula, using the November 30, 2003, balance sheet of Seller, would produce a purchase price equal to $3,005,573.00, as described on the attached Exhibit 1.2. As of the Closing Date, the Purchase Price will initially be calculated using the balance sheet of Seller as of the last day of the month immediately preceding the month of the Closing Date (the "Estimated Purchase Price"). Approximately one month after the Closing Date, the Estimated Purchase Price shall be recalculated based on Seller's balance sheet existing as of the close of business the day before the Closing Date (the "Final Purchase Price"). If the Final Purchase Price exceeds the Estimated Purchase Price, the excess of the Final Purchase Price over the Estimated Purchase Price shall be paid from Buyer to Seller within one (1) week of the determination of the Final Purchase Price. If the Final Purchase Price is less than the Estimated Purchase Price, the excess of the Estimated Purchase Price over the Final Purchase Price shall be paid from Seller to Buyer within one (1) week of the determination of the Final Purchase Price. In the event there is a dispute between Seller and Buyer as to the calculation or recalculation of either the Estimated Purchase Price or the Final Purchase Price, both parties agree to submit such dispute to binding arbitration pursuant to Section 8.6, below.

(b)     Simultaneous with the execution of this Agreement, Buyer shall pay earnest money in the amount of Fifty Thousand Dollars ($50,000.00) (the "Deposit"), in the form of a cashier's check or by wire transfer check to a non interest bearing escrow account to be held by J. Neal Gardner, Esq., or his law firm's title company, as "Escrow Agent"; provided however Hyde Park Title Agency, LLC, shall perform all title work regarding the purchase of the Real Estate and shall handle the closing of the transaction contemplated hereby. The Deposit shall be retained by the Escrow Agent as earnest money to be used in the following ways: (a) applied at Closing as a credit toward the Purchase Price paid by the Buyer, or (b) if the sale shall fail to timely close by reason of a breach or default of this Agreement by Buyer, the Deposit shall be paid to Seller as liquidated damages and the parties shall be forever relieved of any obligations hereunder; or (c) if the sale shall fail to timely close by reason of a breach or default of the Agreement by Seller, the Deposit shall be refunded to the Buyer and Buyer shall have any other remedies available to it at law or in equity, or (d) the Deposit shall be paid to Buyer if this Agreement does not close for any of the reasons enumerated in Section 7.1, below.

(c)     The Purchase Price shall further be adjusted to reflect prorations for real estate taxes and assessments and personal property taxes (collectively "Taxes"). Seller shall be responsible for all Taxes accrued through the Closing Date and Buyer shall be responsible for all Taxes accruing after the Closing Date.

(d)     Payment of Purchase Price.   The Estimated Purchase Price shall be paid to Seller at the Closing by cashier's check or wire transfer, subject to the prorations described in Section 1.3(c), above, and subject to the Holdback and Real Estate Holdback described in Sections 1.3(e) and 1.3 (f) below.

3

(e)    Holdback.    Notwithstanding anything herein to the contrary, the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) shall be held back from the Estimated Purchase Price (the "Holdback") as security for Buyer in the event the Final Purchase Price is less than the Estimated Purchase Price. In the event the Final Purchase Price is less than the Estimated Purchase Price, the Holdback shall be paid to Seller less the dollar amount that the Final Purchase Price is less than the Estimated Purchase Price, which amount shall be retained by Buyer.

(f)    Real Estate Closing.    Notwithstanding anything herein to the contrary, the closing on the purchase and sale of the Real Estate shall not occur simultaneously with the Closing; rather, the closing on the purchase and sale of the Real Estate (the "Real Estate Closing") shall be delayed until such time as Seller has performed its obligations set forth in Section 3.16, below, regarding the clean up of the oil contamination on the Real Estate, to the satisfaction of Buyer. As a result, the Estimated Purchase Price shall be reduced by One Hundred Fifty Thousand Dollars ($150,000.00) as security for Seller's performance of its obligations set forth in Section 3.16 (the "Real Estate Holdback"). Beginning with the Closing and continuing until the Real Estate Closing, Buyer shall lease from Seller the Real Estate and all improvements thereon, at the rental amount of $1,800.00 per month, which shall be prorated for any partial month. The lease shall be a "triple net" lease. If Seller has not performed its obligations set forth in Section 3.16, below, within six (6) months following the Closing, Buyer shall have the option to perform Seller's obligations set forth in Section 3.16. In such event, Buyer may use monies from the Real Estate Holdback to reimburse Buyer for any costs incurred by Buyer as a result of performing Seller's obligations. At the Real Estate Closing, the Real Estate Holdback, less and monies paid from the Real Estate Holdback to Buyer for costs incurred by Buyer in performing Seller's obligations, shall be paid to Seller.

1.4    No Assumption of Liabilities.

(a)    Except as provided in Section 1.4(b) and 1.4(c) hereof, Buyer does not assume, shall not be liable for, and does not acquire the Assets subject to, any liability or obligation of, or claim, action or cause of action against Seller or the Assets of any nature whatsoever and Seller shall indemnify and defend Buyer against and hold Buyer harmless from any and all claims, losses, damages, costs or expenses of any nature, brought against or incurred by Buyer with respect to any such liability or obligation of, or claim, action or cause of action against Seller or the Assets.

(b)    Without limiting the generality of Section 1.4 (a), Buyer shall not assume or otherwise become a sponsor of, maintain or continue any "Benefit Plan", as defined below, maintained by Seller or any "Related Party", as defined below, and no assets or liabilities of any of the Benefit Plans or any fiduciary, as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, with respect to such Benefit Plans, will be transferred to or assumed by Buyer. For purposes of this Section 1.4 (b), the term "Benefit Plan" means any pension plan, profit sharing plan, life insurance plan, severance pay plan, vacation pay plan, supplemental unemployment benefit plan, deferred compensation plan, fringe benefit plan, medical plan, disability plan, salary continuation plan, bonus plan, dependent care plan, incentive plan, or other

4

similar arrangement, whether or not such plans or programs are employee benefit plans within the meaning of Section 3 (3) of ERISA, whether funded or unfunded, and whether or not maintained pursuant to a collective bargaining agreement. For purposes of this Section 1.4 (b) the term "Related Party" means Seller and any trade or business (whether or not incorporated) which together with Seller would be considered a single employer under Titles I, II, III or IV of ERISA.

(c)     Notwithstanding anything herein to the contrary, Buyer shall assume the following liabilities of Seller as described on the attached Exhibit 1.2; to wit: Accounts Payable; Overbillings; and limited Accrued Expenses (officer bonus/accrual only). In addition, Buyer may assume certain operating leases of Seller as identified by Buyer in due diligence and approved by Seller and Buyer for assumption by Buyer (the "Assumed Leases"). Any Assumed Leases shall be attached hereto as Exhibit 1.4(c).

1.5     Allocation of Purchase Price.     The Purchase Price for the Assets as finally determined shall be allocated among the Assets as described on Exhibit 1.5, which will be prepared by Buyer's accountants and attached to this Agreement after Closing, subject to Seller's reasonable approval. No party to this Agreement will take a position on any federal or state tax return, before any governmental agency charged with the collection of any income tax, or in any judicial proceeding that is in any way inconsistent with Exhibit 1.5.

2.     CLOSING

2.1     The Closing.     The Closing of the purchase of the Assets (the "Closing") shall be held at the offices of Finney, Stagnaro, Saba & Klusmeier Co., L.P.A., 2623 Erie Avenue Cincinnati, Ohio 45208, at such time as mutually agreed between the parties but no later than March 31, 2004, provided all conditions precedent to Closing have been waived or satisfied (the "Closing Date").

2.2     Items to be Delivered at Closing.

(a)     Transfer of Assets.     At the Closing or Real Estate Closing, whichever is applicable, Seller will take all actions reasonably necessary and appropriate to transfer, assign and convey the Assets to Buyer, including execution and delivery of a bill of sale, trademark assignments, contract assignments, general warranty deed and other appropriate documents in form and content reasonably satisfactory to Buyer and its counsel. Seller also shall take all such steps as may be required to put Buyer in actual possession and operating control of the Assets.

(b)     Payment of Purchase Price.     At the Closing or the Real Estate Closing, whichever is applicable, Buyer shall deliver to Seller the Estimated Purchase Price via a cashier's check or wire transfer, subject to any prorations described in Section 1.3(c), above, the Holdback and the Real Estate Holdback.

(c)     Other Documents.     At the Closing, the parties also shall deliver to each other

5

the agreements, opinions, certificates and other documents referred to in Section 7 of this Agreement.

2.3     Third Party Consents.   To the extent that Seller's rights under any agreement, contract, commitment, lease, or other Asset to be assigned to Buyer hereunder may not be assigned without the consent of another person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its best efforts to obtain any such required consent(s) as promptly as possible.  If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by law and the Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

2.4     Further Assurances.   Following the Closing, each of the parties will cooperate with and execute and deliver to the other parties such other instruments and documents and take such actions as may be reasonably requested from time to time as necessary to carry out, evidence and confirm the intended purposes of this Agreement.  In particular, at Buyer's request, Seller will execute, acknowledge and deliver to Buyer such other instruments of conveyance and transfer, certificate and other documents, and will take such other actions, as Buyer may reasonably require in order to vest more effectively in Buyer, or to put Buyer more fully in possession of, any of the Assets, to obtain permits and licenses required by any governmental agency.

3.     REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller represents and warrants to Buyer as follows:

3.1     Authority, Approval and Enforceability.

(a)     Corporate Existence.  Seller is a corporation duly organized, validly existing and in good standing under the laws of Ohio.  Seller is licensed to transact business in the State of Ohio.  Seller has all requisite corporate power and authority to own, lease and operate its properties and to carry on the Business as conducted before the Closing.  Seller has delivered to Buyer true and complete copies of its Articles and Bylaws.

(b)     Power to Execute Agreement.  Seller has all required corporate power and authority to sell the Assets and prior to the Closing Date, will have, full power and authority to execute, deliver and perform its obligations under this Agreement.

(c)     Absence of Conflicts.  The execution and delivery by Seller of this Agreement does not, and the completion of the transactions contemplated by this Agreement will

6

not, result in any conflict with, breach of, or termination or forfeiture under (or upon the failure to give notice or the lapse of time, or both, result in any conflict with, breach of, or termination or forfeiture under) any terms or provisions of the charter documents, as amended, of Seller or any statute, rule, regulation, judicial or governmental decree, order, judgment, agreement, lease, loan agreement, debenture, indenture, mortgage or other instrument to which Seller is a party or to which any of the Assets are subject.

          (d)   Enforceability. Upon the due execution and delivery by the parties, this Agreement will be a binding obligation of Seller enforceable against Seller in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

        3.2   No Third Party Options. There are no existing agreements, options, commitments or rights with, of or to any person to acquire any of the Assets or rights included in the Assets or any interest therein.

        3.3   Required Consents and Approvals. Exhibit 3.3 lists all governmental and other third party consents or approvals required to consummate the transactions contemplated herein.

        3.4   Financial Statements. Seller has delivered to Buyer copies of its audited financial statements for the years ended December 31, 2000, through December 31, 2002, and its unaudited financial statements for the period January 1, 2003, through November 30, 2003, (collectively the "Financial Statements"). All such Financial Statements (i) are in accordance with the books and records of Seller, (ii) have been prepared in accordance with consistently applied accounting principles, (iii) are accurate in all material respects, and (iv) present fairly the financial position of the Business as of the dates indicated and the results of operations and changes in financial position for the period indicated. There has been no material adverse change in the Business or the Assets since January 1, 2004, through the Closing.

        3.5   Taxes. Seller has timely filed within the time period for filing or any extension granted with respect thereto any and all federal, foreign, state, local and other returns, reports and estimates ("Returns") which Seller is required to file with respect to any and all taxes or other governmental charges, obligations or fees, including but not limited to any income, business, occupation, franchise, sales or use, withholding and secondary or transferee liability for taxes and any related interest or penalties thereon ("Tax" or "Taxes") attributable to or connected with the Business or the Assets. All such Tax Returns are true and correct and have been completed in accordance with applicable law. Seller has paid all Taxes shown to be due and payable on such Returns and has withheld all amounts it is required to withhold with respect to its employees. There are no pending or, to the best of Seller's knowledge, threatened audits, examinations, assessments, asserted deficiencies or claims for additional Taxes. There are (and as of immediately following the Closing there will be) no liens or similar encumbrances on the Assets, except for liens for current real or personal property taxes not yet due and payable. Seller has no knowledge of any basis for the assertion of any claim with respect to Taxes which would result in a lien or similar

encumbrance on the Assets or otherwise adversely affect the Buyer.

3.6     Title to Assets.  Seller has and will transfer to Buyer good and marketable title to the Assets.  The Assets are free and clear of restrictions on or conditions to transfer or assignment.  The Assets will be transferred to Buyer free and clear of mortgages, liens, encumbrances, claims and restrictions, except as listed in Exhibit 3.6 and liens for current real or personal property taxes not yet due and payable.  The Assets are not held under any leases, security agreements, conditional sales contracts, or other title retention arrangements.  The Assets include all equipment, intellectual property, inventory and other tangible and intangible assets now used in the Business and necessary for the conduct of the Business in the manner and to the extent presently conducted and operated.

3.7     Tangible Assets.  All material items or tangible property included in the Assets are in good operating condition and repair, subject to normal wear and maintenance, and are usable in the ordinary course of business.

3.8     Accounts and Notes Receivable.  Exhibit 3.8 contains a complete list of all outstanding accounts and notes receivable with aging (the "Accounts"), such list to be updated at Closing.  All Accounts reflected on the Financial Statements and/or listed on Exhibit 3.8 are (i) valid, genuine and subsisting, (ii) subject to no defenses, setoffs, or counterclaims, and (iii) expected to be paid in full.  No person has any lien on such Accounts or any part thereof, no agreement for deduction, free goods, discount or other deferred price for quantity adjustment has been made with respect to any of such Accounts; and no customer with an account receivable balance is known to Seller to be involved in voluntary or involuntary bankruptcy proceedings, is otherwise insolvent, or has notified Seller orally or in writing that such customer will not pay its Account.

3.9     Trade Names and Trademarks.  Seller owns or holds licenses or other rights to use all trademarks, service marks and trade names necessary for the conduct of the Business.  To the best of Seller's knowledge, Seller has not infringed, and is not now infringing, on any trade name, trademark or service mark belonging to any other person, firm or corporation.  Seller is not a party to any license, agreement, or arrangement, whether as licensor, licensee, or otherwise, with respect to any trademarks, service marks, trade names associated with the Business or applications for them.

3.10     Agreements.  Exhibit 3.10 sets forth a complete and accurate list of all agreements, written and oral, to which Seller is a party, or of which Seller is aware, included within the following categories (the "Agreements"):

        (i)     purchase agreement, warranty, maintenance agreement, or equipment lease pertaining to any of the tangible Assets;

        (ii)     agreement settling or compromising any claims or rights held or asserted by Seller with respect to the Assets;

8

(iii)     promissory note, loan agreement, guarantee or other agreement or commitment for the borrowing of money which is secured in part or in whole by any of the Assets, or which requires the other party to consent to the proposed sale of Assets;

(iv)     license, franchise, purchase or other agreement which relates to the ownership, scope or use of the Intellectual Property;

(v)     agreement or commitment for persons other than Seller's employees to perform continuing or future services for the Business;

(vi)     noncompetition or similar agreement which restricts the Business or, to the best of Seller's knowledge, any of Seller's employees from engaging in any activity, including any noncompetition agreement.

(vii)     joint venture or partnership agreements involving Seller;

(viii)     any other agreement involving commitments of $500.00 or more by Seller, or otherwise material to the Business.

Seller has provided Buyer complete and accurate copies of all written Agreements and summaries of all oral Agreements. Seller has in all material respects performed all the obligations required to be performed by it to date under the Agreements. Neither Seller nor, to Seller's knowledge, any of the other parties to the Agreements is in, or alleged to be in, material default under any of the Agreements, commitments, instruments or obligations, and there exists no event, condition or occurrence which, after notice or lapse of time, would constitute such a material default by Seller of any Agreements.

3.12  Intellectual Property Rights.

(a)     The Intellectual Property is sufficient in all material respects to conduct the Business as presently conducted. Seller in the conduct of the Business did not and does not utilize any patent, copyright, software, trade secret, know-how or mask work of others right except for those listed in Exhibit 3.12.

(b)     Except in each case as set forth in Exhibit 3.12:

(i)  Seller owns, or by the Closing Date will own, all right, title and interest in and to all of the Intellectual Property;

(ii)  Seller has the exclusive right to use, sell, license and dispose of, the exclusive right to bring actions for the infringement of, and otherwise exercise, all of the rights pertaining to the Intellectual Property;

9

(iii)   The execution, delivery and performance of this Agreement will not breach or conflict with any instrument or agreement governing any of the Intellectual Property, or impair the right of Buyer to use, sell, license or dispose of the Intellectual Property, or to bring any action for the infringement of the Intellectual Property;

(iv)   The manufacture, marketing, license, sale or use of Seller's software does not violate any license or agreement with any third party or infringe the intellectual property rights of any third party;

(v)   To the best knowledge of Seller, no third party is infringing any of the Intellectual Property; and

(vi)   Seller has taken all reasonable steps necessary or appropriate to safeguard and maintain the secrecy and confidentiality of, and establish Seller's proprietary rights in, all of the Intellectual Property.

(c)   Seller has in all material respects performed, or is now performing, the obligations of Seller in all material respects pursuant to each and every license or agreement concerning the Intellectual Property. All such licenses and agreements are in full force and effect and are a valid and enforceable obligation against the other party or parties thereto in accordance with their terms (subject to the enforcement of remedies). To the best knowledge of Seller, no other party to such licenses and agreements is in default in any material respect.

3.13   Compliance with Applicable Laws. Seller has duly complied with all applicable laws, rules, regulations, ordinances, and all judgments, orders, rulings, and decrees of all federal, state and local governmental authorities (collectively, "Laws"), subject to such exceptions as shall have no material adverse affect on the Assets or the Business. Seller has not received notification of any asserted present or past failure to so comply with any Laws. Seller is not aware of any proposed laws, ordinances or regulations, or any pending or threatened legal or administrative proceedings or investigations, which if determined adversely to Seller, would result in any material adverse change to the Business or to any of the Assets or would materially affect the ability of Seller to perform its obligations hereunder.

3.14   Licenses and Other Rights.   Exhibit 3.14 lists all permits and licenses from governmental authorities held by Seller. To the best of Seller's knowledge, no other permits or licenses are necessary for the conduct of the Business as presently conducted. Seller is not in default under any of such permits or licenses.

3.15   Litigation. There is no suit, action (equitable, legal, administrative or otherwise), proceeding or investigation of any kind pending or, to the best of Seller's knowledge, threatened against Seller, nor does Seller know of any reasonably likely basis for any such suit, action, proceeding or investigation except as shown in Exhibit 3.15.

10

3.16 <u>Absence of Environmental Liabilities</u>. Except as otherwise stated on Exhibit 3.16 and to the best of Seller's knowledge, Seller's business and the use of the Assets are now, and at all times in the past have been, conducted in full compliance with all applicable federal, state or local statutes, laws, regulations, rules, ordinances or codes (collectively, the "Environmental Laws") which prohibit, regulate or otherwise relate to the use, treatment, storage, handling, transport, disposal or discharge of chemicals, chemical solvents, gases, pollutants or "hazardous substances" (as that term is hereinafter defined) or otherwise relate to industrial hygiene or to the protection of the environment. The term "Hazardous Substances" shall mean any substance or material which has been determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety or property.

To the best of Seller's knowledge, the Real Estate owned by Seller is not, or as of the Closing will not be in violation of any Environmental Laws and no current use of the Real Estate constitutes a public or private nuisance. Seller has not used, stored, transported, discharged or disposed of any Hazardous Substances, except as listed on the Disclosure Schedule. No chemicals, chemical solvents or Hazardous Substances have been emitted by Seller in violation of Environmental Laws, or have been released or discharged into any source whatsoever. Seller has received no notification of release of a hazardous substance on the Real Estate. No wastes generated by Seller in operating the Business have ever been sent directly or indirectly to any site listed or formally proposed for listing on the National Priority List promulgated pursuant to CERCLA or to any site listed on any state list of hazardous substances sites requiring investigation or clean-up. Seller has not received from any governmental authority or third party any requests for information, notices of claim, demand letters or other notification that they are or may be potentially responsible with respect to any investigation or cleanup of hazardous substances.

Notwithstanding anything herein to the contrary, pursuant to the recommendation contained in the Preliminary Determination of Potential Environmental Concerns prepared by Civil & Environmental Consultants, Inc., dated February 2, 2004, Seller agrees, at Seller's cost, to identify the source producing the oil that was discovered on the creek that runs along the east side of the Real Estate, eliminate the oil contamination, perform the steps necessary to prevent the reoccurrence of the oil contamination and obtain a groundwater sample using a Geoprobe to evaluate whether groundwater coming onto the Real Estate is contaminated. In the event it is determined the groundwater on or about the Real Estate is contaminated, Seller shall pay all costs necessary to remediate such contamination.

3.17 <u>Employee Benefit Plans</u>. Exhibit 3.17 lists each employee benefit plan sponsored or maintained by Seller, whether formal or informal, whether or not set forth in writing, and whether covering one person or more than one person. As used here, the term "employee benefit plan" includes all plans, funds, programs, policies, arrangements, practices, customs and understandings providing benefits of economic value to any employee, former employee, or present or former beneficiary, dependent or assignee of any such employee or former employee other than regular salary, wages or commissions paid substantially concurrently with the performance of the services for which paid. "Employee benefit plan" includes all employee welfare benefit plans within the

meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and all employee pension benefit plans within the meaning of Section 3(2) of ERISA.

3.18 <u>Labor Relations</u>. There are no strikes, work stoppages, material grievance proceedings or other material controversies pending or threatened between Seller and any of its employees or any union or other collective bargaining unit representing such employees.

3.19 <u>Brokers</u>. Seller has not dealt with any investment bankers, finders or brokers in connection with this transaction except FMI Corporation.

3.20 <u>Disclosure</u>. No representation or warranty by Seller contained in this Agreement and no statement contained in any certificate, schedule or exhibit or list furnished to Buyer in connection with this Agreement or the transactions contemplated hereby contains or at the Closing Date will contain any untrue statement of fact or omits to state a material fact necessary to make the statements or information therein not misleading.

4. <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer represents and warrants to Seller as follows:

4.1 <u>Approval, Authorization and Enforceability</u>.

(a) <u>Power to Execute Agreement</u>. Buyer has full power and authority to execute, deliver and perform its obligations under this Agreement. All actions of Buyer necessary for such execution, delivery and performance have been, or, as of the Closing Date, will have been duly taken.

(b) <u>Absence of Conflicts</u>. The execution and delivery by Buyer of this Agreement does not, and the performance and consummation of the transactions contemplated by this Agreement will not, result in any conflict with, breach or violation of or default, termination or forfeiture under (or upon the failure to give notice or the lapse of time, or both, result in any conflict with, breach or violation of, or default, termination or forfeiture under) any statute, rule, regulation, judicial or governmental decree, order, judgment, agreement, lease, loan agreement, debenture, indenture, mortgage or other instrument binding upon Buyer or to which Buyer is a party.

(c) <u>Enforceability</u>. Upon the due execution and delivery by the parties, this Agreement will be a binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

4.2 <u>Litigation</u>. There is no suit, action (equitable, legal, administrative or otherwise), proceeding or investigation of any kind pending or threatened against Buyer, and there is no factual basis for any such suit, action, proceeding or investigation of which Buyer is aware which could materially affect the ability of Buyer to carry out the transactions contemplated hereunder in

12

accordance with the terms hereof.

4.3 Required Consents and Approvals. All governmental and other third part consents or approvals required to be obtained by Buyer to consummate the transactions contemplated hereby have been obtained or will be obtained by the Closing Date.

5. ADDITIONAL AGREEMENTS RELATING TO THE PURCHASE OF ASSETS.

5.1 Cooperation by All Parties. Each party will take all reasonable actions necessary to obtain (and will cooperate with the other parties in obtaining) any consent, approval, order or authorization of, or any registration, declaration or filing with, any governmental entity or other person required to be obtained or made by Seller or by Buyer in connection with the taking of any action contemplated by this Agreement. No party will take any action that would or might result in any of its representations and warranties set forth in this Agreement becoming untrue or in any of the conditions of the Closing not being satisfied.

5.2 Conduct of Business. Until the Closing Date Seller will carry on its Business in substantially the same manner as it has been conducted. Seller will use all reasonable efforts consistent with past practice and policies to preserve intact its present business organization, to preserve its relationships with officers, key employees, customers, suppliers and others having business dealings with it, to maintain and preserve the Assets, and to comply with all laws and regulations applicable to the Business, to the end that the Assets and Business shall be unimpaired at the Closing Date. Seller will not enter into any commitments to shareholders, creditors, employees, suppliers or others which are out of the ordinary or which would interfere with the proposed transaction. Prior to the Closing, Seller will make no distributions, payments or commitments to the Shareholders other than base salary and reimbursement of business expenses in accordance with standard practices.

5.3 Notice to Buyer; Updates to Exhibits. Seller will promptly advise Buyer of any event that may have a material adverse effect on the Business or the Assets, or that would impair Seller's ability to perform its obligations under this Agreement. Seller shall promptly disclose to Buyer any information contained in its representations, warranties or Seller's Exhibits which, because of any event occurring after the date of this Agreement, is incomplete or is no longer correct; provided, however, that none of such disclosures shall be deemed to modify, amend, or supplement Seller's representations, warranties or Exhibits for the purposes of Section 7 hereof unless Buyer shall have consented thereto in writing.

5.4 Exclusivity. Seller shall not, directly or indirectly, sell or encumber any part or all of the Assets, other than in the ordinary course of business consistent with past practice, or initiate or participate in any discussions or negotiations or enter into any agreement for any sale of assets or any other transaction inconsistent with the transaction set forth in this Agreement.

5.5 Access. Seller shall give Buyer and Buyer's representatives full access to and the

13

right to inspect, during normal business hours, all of the premises, properties, assets, records, contracts and other documents relating to the Business or the Assets and shall permit them to consult with Seller's officers, employees, accountants and other agents for the purposes of making such investigation of the Business and Assets as Buyer may reasonably wish to make, provided that such investigations hall not unreasonably interfere with Seller's business operations.

     5.6    <u>Press Releases</u>. Except as required by applicable law, no party to this Agreement shall give notice to third parties or otherwise make any public statement or press release concerning this Agreement or the transactions contemplated by this Agreement except with the prior written approval of the other, which approval shall not be unreasonably withheld.

     5.7    <u>Confidentiality</u>. Seller will hold in confidence and use reasonable efforts to have all its employees, consultants, agents and representatives hold in confidence all confidential information related to the Business or the Assets, and not disclose, or use such information or permit others to do so.

6.    <u>COVENANTS RELATING TO POST-CLOSING MATTERS</u>.

     6.1    <u>Use of Business Name</u>. After the Closing Date, Seller shall not use the name "Sofco Erectors" or any variation or combination thereof or any name confusingly similar thereto.

     6.2    <u>Non-Solicitation</u>. As of the Closing Date and/or immediately thereafter, Buyer may offer employment to, and Seller shall use its best efforts to assist Buyer in employing as new employees of Buyer, all persons presently engaged in the Business whom Buyer desires to rehire. Seller shall terminate effective as of the Closing Date all employment agreements it has with any of the employees and shall take all steps necessary to comply with all local, state and federal laws, statutes and regulations governing the termination of such employees. Until the third anniversary of the Closing Date, Seller will not directly or indirectly solicit or offer employment to any Employee (i) who did not become an employee of Buyer, (ii) who is then an employee of Buyer, or (iii) who has terminated such employment without the consent of Buyer within 180 days of such solicitation or offer. Buyer agrees to use its best efforts to negotiate with any former employees of Seller hired by Buyer to have such former employees of Seller waive any rights for accrued vacation.

     6.3    <u>Maintenance of Books and Records</u>. Each of Seller and Buyer shall preserve until the fifth anniversary of the Closing Date all records possessed or to be possessed by such party relating to any of the assets, liabilities or business of the Business prior to the Closing Date. After the Closing Date, where there is a legitimate purpose, such party shall provide the other parties with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to (i) the officers and employees of such party and (ii) the books of account and records of such party, but, in each case, only to the extent relating to the assets, liabilities or business of the Business prior to the Closing Date, and the other parties and their representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of

14

access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of such party; and further, provided, that, as to so much of such information as constitutes trade secrets or confidential business information of such party, the requesting party and its officers, directors and representatives will use due care to not disclose such information except (i) as required by law, (ii) with the prior written consent of such party, which consent shall not be unreasonably withheld, or (iii) where such information becomes available to the public generally, or becomes generally known to competitors of such party, through sources other than the requesting party, its affiliates or its officers, directors or representatives. Such records may nevertheless be destroyed by a party if such party sends to the other parties written notice of its intent to destroy records, specifying with particularity the contents of the records to be destroyed. Such records may then be destroyed after the 30th day after such notice is given unless the other party objects to the destruction in which case the party seeking to destroy the records shall deliver such records to the objecting party.

6.4    Covenant Not to Compete. Seller agrees that for a period of five years after the Closing Date, neither it nor any of its affiliates will, directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation or control of, any business whether in corporate, proprietorship or partnership form or otherwise where such business is competitive with the Business. This Agreement shall apply in each state and county in the United States. The parties hereto specifically acknowledge and agree that the remedy at law for any breach of the foregoing will be inadequate and that the Buyer, in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage. In the event that the provisions of this Section 6.4 should ever be deemed to exceed the limitation provided by applicable law, then the parties agree that such provisions shall be reformed to set forth the maximum limitations permitted.

7.    CONDITIONS TO CLOSING.

7.1    Buyer's Conditions to Closing. The obligations of Buyer under this Agreement are subject to the satisfaction of the following conditions, unless waived by Buyer:

(a)    Representations and Warranties True as of the Closing Date. The representations and warranties of Seller set forth in this Agreement shall have been true and correct in all material respects on the date of this Agreement without regard to any Exhibit updates furnished by Seller after the date hereof and shall be true on the Closing Date in all material respects as though made as of such date.

(b)    Compliance with this Agreement. Seller shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)    Government Approvals. All consents, approvals, orders, authorizations, registrations, declarations and filings with any domestic or foreign governmental entity necessary

15

for the consummation of the transactions contemplated by this Agreement, if any, shall have been obtained or filed.

(d) <u>Third Party Consents</u>. Buyer shall have been furnished with satisfactory evidence of the consent, approval or notification of other parties whose consent, approval or notification shall be required in order to permit the sale, conveyance and assignment of the Assets.

(e) <u>No Threatened or Pending Litigation</u>. On the Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or pending before any court or governmental or regulatory authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with the Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened.

(f) <u>Financing.</u> Buyer shall have obtained financing to acquire the Assets upon terms acceptable to Buyer in Buyer's sole absolute discretion on or before 5:00 p.m., Friday, March 19, 2004.

(g) <u>Adverse Changes</u>. Between the date of this Agreement and the Closing Date there shall not have been any material adverse change in the Business, the Assets or the prospects of the Business.

(h) <u>UC Contract</u>. Buyer shall have negotiated with Seller, to Buyer's satisfaction, the terms and conditions under which Buyer shall be paid for services rendered on behalf of Southern Ohio Fabricators, Inc., with respect to any projects relating to the University of Cincinnati, for the period from April 1, 2004, through the completion of such projects.

7.2 <u>Seller's Conditions to Closing</u>. The obligations of Seller under this Agreement are subject to the satisfaction of the following conditions, unless waived by Seller:

(a) <u>Representations and Warranties True as of the Closing Date</u>. The representations and warranties of Buyer set forth in this Agreement shall have been true and correct in all material respects on the date of this Agreement without regard to any Exhibit updates furnished by Seller after the date hereof and shall be true on the Closing Date in all material respects as though made as of such date.

(b) <u>Compliance with this Agreement</u>. Buyer shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c) <u>No Threatened or Pending Litigation</u>. On the Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or pending

16

before any court or governmental or regulatory authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with the Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened.

(d)     Approval of Counsel; Corporate Matters.     All action, proceedings, resolutions, instruments and documents required to carry out this Agreement or incidental hereto and all other related legal matters shall have been approved on the Closing Date by counsel for Seller, in the exercise of their reasonable business judgment. Buyer shall have delivered to Seller such other documents, instruments, certifications and further assurances as such counsel may reasonably require.

8.     INDEMNIFICATION AND RELATED MATTERS.

8.1     Indemnification of Buyer. Seller will indemnify and hold harmless Buyer and any permitted assignee from and against any claims, actions, damage, expense, liability, loss or deficiency, including without limitation, reasonable attorneys' fees and other costs and expenses incident to any suit, action, claim or proceeding (collectively, the "Damages"), arising out of or resulting from:

(i)     any inaccuracy in any representation or the breach of any warranty made by Seller in this Agreement;

(ii)     any failure of Seller to perform or observe any term of this Agreement; and

(iii)     any liabilities or obligations of Seller not purchased by Buyer.

8.2     Indemnification of Seller. Buyer will indemnify and hold harmless Seller and any permitted assignee from and against any claims, actions, damage, expense, liability, loss or deficiency, including without limitation, reasonable attorneys' fees and other costs and expenses incident to any suit, action, claim or proceeding (collectively, the "Damages"), arising out of or resulting from:

(i)     any inaccuracy in any representation or the breach of any warranty made by Buyer in this Agreement;

(ii)     any failure of Buyer to perform or observe any term of this Agreement; and

(iii)     any liabilities or obligations of Seller specifically assumed by Buyer in writing pursuant to this Agreement:

17

8.3     Survival of Representations and Warranties. The representations and warranties of the parties shall survive until two years after the Closing Date, except for representations and warranties concerning Taxes, which shall survive until the applicable statute of limitations has expired.

8.4     Third Party Actions.

(a)     All claims for indemnification under Sections 8.1 and 8.2 involving third party actions or demands shall be made in accordance with the procedure set forth in this Section 8.4.

(b)     Promptly after receipt by an indemnified party of notice of any third party action or demand which gives rise to Damages, such indemnified party shall notify the indemnifying party. Failure so to notify the indemnifying party shall relieve it of any liability that it may have to any indemnified party to the extent that the defense of such action is materially prejudiced by such failure, provided the indemnifying party did not receive or otherwise have actual notice thereof.

(c)     The indemnifying party shall be entitled to participate in the defense of the third party action or demand and, at its option, to assume the defense thereof with counsel satisfactory to the indemnified party provided (i) that the indemnifying party confirm that the action or demand is covered by its indemnification obligation, and (ii) Buyer reserves the right to retain control of the defense of any action or demand which could reasonably be expected to materially affect Buyer's on-going operations or which could potentially exceed Twenty Five Thousand Dollars ($25,000.00) in Damages. If the indemnifying party receives notice of any action or demand, it shall promptly notify the indemnified party as to whether it intends to control the defense thereof.

(d)     If an indemnifying party defends an action, (i) no compromise or settlement thereof may be effected by the indemnifying party without the indemnified party's consent (which shall not be unreasonably withheld) unless the sole relief provided is monetary damages that are paid in full by the indemnifying party and (ii) the indemnified party shall have no liability with respect to any compromise or settlement thereof effected without its consent.

(e)     If notice is given to an indemnifying party of the commencement of any action and it does not, within twenty (20) days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense thereof, the indemnified party shall be entitled to assume the defense thereof. In such event, the indemnifying party shall not be bound by any compromise or settlement thereof effected by the indemnified party without its consent, which shall not be unreasonably withheld.

8.5     Method for Asserting Claims. Any claim for Damages under this Section 8 shall be

18

made in writing and shall state in detail the basis on which the claim for Damages is made. Claims for Damages must be made on or before two years from the Closing Date, except claims for breaches of representations or warranties concerning taxes and claims arising out of intentional fraud. The indemnified party may not take legal action against the indemnifying party or offset Damages against payments due the indemnifying party unless such written claim has been given. Payment of any claim for Damages for which indemnification is due shall be made within thirty (30) days of the date of the claim. Disputes regarding liability for Damages under this Section 8 shall be resolved as set forth in Section 8.6.

8.6    Arbitration.

(a)    All disputes under this Section 8 shall be settled by arbitration in Hamilton County, Ohio before a single arbitrator pursuant to the rules of the American Arbitration Association. Arbitration may be commenced at any time by any party hereto giving written notice to the other party to a dispute that such dispute has been referred to arbitration under this Section 8.6. The arbitrator shall be selected by the joint agreement of Seller and Buyer, but if they do not so agree within twenty (20) days after the date of the notice referred to above, each party shall select one arbitrator. The two arbitrators selected by the parties shall select a third arbitrator and the three arbitrators shall serve as the arbitration panel. Any award rendered by the arbitrator, or arbitrators, whichever the case, shall be conclusive and binding upon the parties hereto; provided, however, that any such award shall be accompanied by a written opinion giving the reasons for the award. This provision for arbitration shall be specifically enforceable by the parties and the decision of the arbitrators in accordance herewith shall be final and binding and there shall be no right of appeal therefrom. Each party shall pay its own expenses of arbitration and the expenses of the arbitrators shall be equally shared; provided, however, that if in the opinion of the arbitrators any claim for indemnification or any defense or objection thereto was unreasonable, the arbitrators may assess, as part of the award, all or any part of the arbitration expenses of the other party (including reasonable attorneys' fees) and of the arbitrators against the party raising such unreasonable claim, defense or objection.

(b)    To the extent that arbitration may not be legally permitted hereunder and the parties to any dispute hereunder may not at the time of such dispute mutually agree to submit such dispute to arbitration any party may commence a civil action in a court of appropriate jurisdiction to solve disputes hereunder. Nothing contained in this Section 8.6 shall prevent the parties from settling any dispute by mutual agreement at any time.

8.7    Compliance with Bulk Sales Laws. Buyer and Seller hereby waive compliance by Buyer and Seller with the bulk sales law and any other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Seller shall indemnify Buyer from, and hold it harmless against, any liabilities, damages, costs and expenses resulting from or arising out of (i) the parties' failure to comply with any of such laws in respect of the transactions contemplated by this Agreement, or (ii) any action brought or levy made as a result thereof.

19

8.8    Other Rights and Remedies Not Affected.  The indemnification rights of the parties under this Section 8 are independent of and in addition to such rights and remedies as the parties may have at law or in equity or otherwise for any misrepresentation, breach of warranty or failure to fulfill any agreement or covenant hereunder on the part of any party hereto, including without limitation the right to seek specific performance, rescission or restitution, none of which rights or remedies shall be affected or diminished hereby.

9.    TERMINATION    This Agreement may be terminated and abandoned only as follows:

(a)    at any time by the written agreement of Buyer and Seller;

(b)    by Buyer, (i) at any time if the representations and warranties of Seller contained in Section 3 hereof were incorrect in any material respect when made or at any time thereafter, or (ii) so long as Buyer is not then in default hereunder, if any of the conditions provided in Section 7.1 shall not have been satisfied or performed in any material respect on or before the date required to be satisfied or performed, and Buyer shall not have waived in writing such failure of satisfaction or nonperformance.

(c)    by Seller, (i) at any time if the representations and warranties of Buyer contained in Section 4 hereof were incorrect in any material respect when made or at any time thereafter, or (ii) so long as Seller is not then in default hereunder, if any of the conditions provided in Section 7.2 shall not have been satisfied or performed in any material respect on or before the date required to be satisfied or performed, and Seller shall not have waived in writing such failure of satisfaction or nonperformance.

In the event of any termination pursuant to this Section 9 (other than pursuant to Section (a)), written notice setting forth the reasons therefor shall forthwith be given by the terminating party.

10.    MISCELLANEOUS.

10.1    Sales and Use Taxes on the Assets.  Seller will pay the cost of any sales, use, transfer or similar taxes payable in connection with the sale, assignment, and transfer of the Assets.

10.2    Expenses.  Except as otherwise provided in this Agreement, each party shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby, including legal, accounting and any investment banker or finder fees or commissions.

10.3    Notices.  All notices and other communications hereunder shall be in writing. Notices shall be delivered personally, by registered or certified mail, or by commercial courier, return receipt requested.  Notices shall be delivered to the addresses listed below or such new

20

address as an addressee may designate by notice to the other parties.  Notices shall be effective upon delivery when delivered in this manner.

If to Buyer, to:

> Armor Metal Group, Inc.
> 3280 Hageman Street
> Cincinnati, Ohio 45241
> Attn: David K. Schmitt, President

with a copy to:

> Finney, Stagnaro, Saba & Klusmeier Co., L.P.A.
> 2623 Erie Avenue
> Cincinnati, OH 45208
> Attn: Jeffrey G. Stagnaro, Esq.

If to Seller, to:

> Southern Ohio Fabricators, Inc.
> _____
> Cincinnati, OH 45263
> Attn: _____

with a copy to:

> Keating, Muething & Klekamp, P.L.L.
> 1400 Provident Tower
> One East Fourth Street
> Cincinnati, Ohio 45202
> Attn: J. Neal Gardner, Esq.

10.4   Entire Agreement; Amendment and Waiver.  This Agreement, and the Exhibits attached hereto, constitute the entire agreement and supersede all prior and contemporaneous agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.  This Agreement may be amended by the parties only by an instrument in writing signed on behalf of each of the parties.  Terms of this Agreement may be waived only by the party entitled to the benefit thereof by a written instrument duly executed by such party.

10.5   Assignment and Binding Effect.  This Agreement may not be assigned prior to Closing by any party whether by operation of law or otherwise without the prior written consent of the other parties except that Buyer may assign its rights and obligations under this Agreement to an entity whereby Buyer guarantees the performance of the assigned. Subject to the foregoing, this

21

Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

10.6 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio applied without reference to choice of laws.

10.7 <u>Severability of Provisions</u>. If any provision of this Agreement shall be held invalid or unenforceable, the remaining provisions of this Agreement shall not be affected thereby.

10.8 <u>No Benefit to Others</u>. This Agreement is for the sole benefit of the parties hereto and their heirs, executors, legal representatives, successors and assigns, and shall not be construed to confer any rights on any other persons.

10.9 <u>Buyer's Specific Performance</u>. The parties acknowledge that damages would be an inadequate remedy for any breach of the provisions of this Agreement by Seller and agree that the obligations of Seller hereunder shall be specifically enforceable.

10.10 <u>Announcements</u>. Except as required by law, neither party will make any public disclosure of this Agreement without the prior consent of the other party.

10.11 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

10.12 <u>Expiration of Offer.</u> This Agreement, as executed by Buyer, shall constitute an offer to purchase the Assets, which offer shall expire at 6:00 p.m. on Thursday, March 11, 2004 ("Expiration Time"), in the event this Agreement is not executed by Seller and delivered to Buyer prior to the Expiration Time.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

"SELLER"

SOFCO ERECTORS, INC.

By: _____
Print: LEONARD Z. EPPEL
Title: AGREED PARTY

"BUYER"

SOFCO Erectors Acquisition, INC.

By: _____
David K. Schmitt
Title: Shareholder

22

Rented Forklift per job / hours

Operator Forklift hours

## CINCINNATI - Valndalia/United/Eqip Depot
### 8/1/2017 — 7/31/2018

| Invoice Number | Invoice Date | job | dates | hrs |
|---|---|---|---|---|
| 1222864-0004 | 8/2/2017 | Heartland | 7/5 - 8/2/17 | 160 |
| 1229035-002 | 8/14/2017 | Empire Foods | 7/17 - 8/14/17 | 160 |
| 1232422-0001 | 8/21/2017 | Mane Inc | 7/24 - 8/21/17 | 160 |
| 1222864-0005 | 8/30/2017 | Heartland | 8/2 - 8/30/17 | 160 |
| 149384809-001 | 9/2/2017 | Summit park | 8/17 - 9/14/17 | 160 |
| 1229035-0003 | 9/11/2017 | Empire Foods | 8/14 - 9/11/17 | 160 |
| 1222864-0006 | 9/27/2017 | Empire Foods | 8/30 - 9/27/17 | 160 |
| 1229035-0004 | 10/9/2017 | Empire Foods | 9/11 - 10/9/17 | 160 |
| 150735848-001 | 10/20/2017 | Caresource | 10/3 - 10/31/17 | 160 |
| 1222864-0007 | 10/25/2017 | Heartland | 9/27 - 10/25/17 | 160 |
| 1229035-0005 | 11/2/2017 | Empire Foods | 10/9 - 11/2/17 | 160 |
| 150735848-002 | 11/16/2017 | Caresource | 10/31 - 11/28/17 | 160 |
| 1222864-0008 | 11/22/2017 | Heartland | 10/25 - 11/22/17 | 160 |
| 150735848-003 | 12/14/2017 | Caresource | 11/28 - 12/26/17 | 160 |
| 1222864-0009 | 12/20/2017 | Heartland | 11/22 - 12/20/17 | 160 |
| 150735848-004 | 1/11/2018 | Caresource | 12/26 - 1/23/18 | 160 |
| 1222864-0010 | 1/17/2018 | Heartland | 12/20 - 1/17/18 | 160 |
| 150735848-005 | 2/8/2018 | Caresource | 1/23 - 2/20/18 | 160 |
| 1222864-011 | 2/14/2018 | Heartland | 1/17 - 2/14/18 | 160 |
| 1222864-0012 | 3/14/2018 | Heartland | 2/14 - 3/14/18 | 160 |
| 155281594-001 | 3/27/2018 | Heartland | 3/12 - 4/9/18 | 160 |
| 1222864-0013 | 4/11/2018 | Heartland | 3/14 - 4/11/18 | 160 |
| 155281594-002 | 4/24/2018 | Heartland | 4/9 - 5/7/18 | 160 |
| 1222864-0014 | 5/9/2018 | Heartland | 4/11 - 5/9/18 | 160 |
| 1222864-0015 | 6/6/2018 | Heartland | 5/9 - 6/6/18 | 160 |
| 1222864-0016 | 7/4/2018 | Heartland | 6/6 - 7/4/18 | 160 |

## COLUMBUS - Sunbelt Rental
### 8/1/2017 — 7/31/2018

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 69834070-0002 | 8/1/2017 | UPS | 7/11 - 7/31/17 | 120 | 280 |
| 67730674-0007 | 8/9/2017 | Sofidel | 7/13 - 8/9/17 | 160 | 320 |
| 67815235-0005 | 8/12/2017 | Sofidel | 7/17 - 8/13/17 | 160 | 320 |
| 68117299-0005 | 8/23/2017 | Sofidel | 7/27 - 8/23/17 | 160 | 320 |
| 717486168-000: | 8/23/2017 | Childrens Amb | 8/23 - 8/23/17 | 8 | 168 |
| 71350066-0001 | 8/24/2017 | SADC | 8/8 - 9/4/17 | 160 | 320 |
| 67730674-0008 | 9/6/2017 | Sofidel | 8/10 - 9/6/17 | 160 | 320 |
| 67815235-0006 | 9/9/2017 | Sofidel | 8/14 - 9/10/17 | 160 | 320 |
| 68117299-0006 | 9/20/2017 | Sofidel | 8/24 - 9/20/17 | 160 | 320 |
| 70338054-0004 | 9/21/2017 | Duke 674 | 8/25 - 9/21/17 | 160 | 320 |
| 72069608-0002 | 9/21/2017 | Big Lots | 9/5 - 10/2/17 | 160 | 320 |
| 72069636-0001 | 9/21/2017 | Duke 674 | 9/5 - 9/20/17 | 160 | 320 |
| 72179531-0001 | 9/23/2017 | Duke 674 | 9/7 - 10/4/17 | 160 | 320 |
| 7135066-0002 | 10/2/2017 | UPS | 9/5 - 10/2/17 | 160 | 320 |
| 70338054-0005 | 10/3/2017 | Duke 674 | 9/22 - 9/29/17 | 48 | 208 |
| 67730674-0009 | 10/4/2017 | Sofidel | 9/7 - 10/4/17 | 160 | 320 |
| 67815235-0007 | 10/7/2017 | Sofidel | 9/11 - 10/8/17 | 160 | 320 |
| 67730674-0010 | 10/9/2017 | Sofidel | 10/5 - 10/6/17 | 16 | 176 |
| 72610846-0002 | 10/10/2017 | Obetz | 9/22 - 9/23/17 | 8 | 168 |
| 71350066-0003 | 10/11/2017 | UPS | 10/3 - 10/10/17 | 48 | 208 |
| 72774337-0001 | 10/16/2017 | Big Lots | 9/28 - 10/25/17 | 160 | 320 |
| 68117299-0007 | 10/18/2017 | Sofidel | 9/21 - 10/18/17 | 160 | 320 |
| 72179531-0002 | 10/25/2017 | Duke 674 | 10/5 - 10/20/17 | 96 | 256 |
| 67815235-0008 | 11/4/2017 | Sofidel | 10/9 - 11/5/17 | 160 | 320 |
| 73634394-0001 | 11/16/2017 | Axium | 10/24 - 11/20/17 | 160 | 320 |
| 72774337-0003 | 11/22/2017 | Sofidel | 10/19 - 11/15/17 | 160 | 320 |
| 74007362-0002 | 11/25/2017 | SADC | 10/27 - 11/1/17 | 40 | 40 |
| 74002637-0001 | 11/27/2017 | MEI | 10/26 - 11/22/17 | 160 | 160 |
| 72774337-0004 | 11/27/2017 | MEI | 11/9 - 12/6/17 | 160 | 160 |
| 74337337-0004 | 11/29/2017 | 11917MT | 11/23 - 11/27/17 | 160 | 160 |
| 67815235-0009 | 12/2/2017 | MEI | 11/6 - 12/3/17 | 160 | 160 |
| 75007362-0003 | 12/9/2017 | MEI | 12/7 - 12/7/17 | 24 | 24 |
| 68117299-0009 | 12/13/2017 | Sofidel | 11/16 - 12/13/17 | 160 | 160 |
| 67815235-0010 | 12/19/2017 | Sofidel | 12/4 - 12/15/17 | 160 | 160 |
| 68117299-0010 | 12/19/2017 | Sofidel | 12/14 - 12/15/17 | 8 | 8 |
| 75081386-0001 | 1/8/2018 | Meritex | 12/21 - 1/17/18 | 160 | 160 |
| 75428704-0001 | 1/15/2018 | delaware airport | 1/10 - 1/11/18 | 16 | 16 |
| 75411088-0001 | 1/27/2018 | Delaware Co Car | 1/10 - 2/6/18 | 160 | 160 |
| 75081386-0002 | 1/31/2018 | Acadia | 1/18 - 1/30/18 | 72 | 72 |
| 75791711-0001 | 2/1/2018 | Mt Carmel | 1/25 - 1/31/18 | 40 | 40 |
| 76025154-0001 | 2/21/2018 | Acadia | 2/5 - 3/4/18 | 160 | 160 |
| 76388229-0001 | 2/26/2018 | Childrens Amb | 2/19 - 2/23/18 | 40 | 40 |
| 76299443-0001 | 2/28/2018 | New Childrens | 2/16 - 2/26/18 | 56 | 56 |
| 76494115-0001 | 2/28/2018 | Rouge Fitenss | 2/27 - 2/27/18 | 8 | 8 |

SOFCO002370



**Rented Forklift per job / hours**

## CINCINNATI - Vandalia/United/Eqip Depot

| Invoice Number | Invoice Date | job | dates | hrs |
|---|---|---|---|---|
| 8/1/2016 | 7/31/2017 | | | |
| 1421779975-001 | 11/18/2016 | Grant Career | 11/15/2016 | 8 |
| 141965326-001 | 11/23/2016 | Cinepolis | 11/7 - 12/5/16 | 160 |
| 141965326-003 | 12/21/2016 | Cinepolis | 12/5 - 1/2/17 | 160 |
| 143114352-001 | 1/8/2017 | Hotel | 1/8/2017 | 160 |
| 143039033-001 | 1/6/2017 | 10900 Bldg | 12/21 - 1/18/17 | 160 |
| 141965326-004 | 1/19/2017 | Cinepolis | 1/2 - 1/30/17 | 160 |
| 143576005-001 | 1/20/2017 | 1075 Lowell St | 1/18/2017 | 8 |
| 143714210-001 | 1/27/2017 | Keectrics | 1/27/2017 | 40 |
| 143039033-002 | 2/3/2017 | 10900 Bldg | 1/18 - 2/15/17 | 160 |
| 143114352-002 | 2/5/2017 | Hotel | 1/20 - 2/17/17 | 160 |
| 143990382-001 | 2/6/2017 | 7 Hills | 2/3/2017 | 8 |
| 144019497-001 | 2/9/2017 | 7 Hills | 2/6/2017 | 8 |
| 141965326-005 | 2/15/2017 | Cinepolis | 1/30 - 2/27/17 | 160 |
| 143039033-003 | 3/3/2017 | 10900 Bldg | 2/15 - 3/15/17 | 160 |
| 143114352-003 | 3/5/2017 | Hotel | 2/17 - 3/17/17 | 160 |
| 144759830-002 | 3/23/2017 | crossroads | 3/7 - 4/4/17 | 160 |
| 143039093-004 | 3/31/2017 | 10900 Bldg | 3/15 - 4/12/17 | 160 |
| 143114352-004 | 4/2/2017 | Hotel | 3/17 - 4/14/17 | 160 |
| 144759830-003 | 4/20/2017 | crossroads | 4/4 - 5/2/17 | 160 |
| | | | | 4160 |

## COLUMBUS - Sunbelt Rental

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 75411088-0004 | 3/6/2018 | AEP | 2/7 - 3/6/18 | 160 | 160 |
| 75411088-0005 | 3/14/2018 | Delaware Co Car | 3/7 - 3/9/18 | 24 | 24 |
| 76578908-0001 | 3/15/2018 | Childrens Amb | 2/27 - 3/26/18 | 160 | 160 |
| 76698562-0001 | 3/20/2018 | AEP | 3/2 - 3/29/18 | 160 | 160 |
| 76794286-0002 | 3/28/2018 | Rick West | 3/12 - 4/8/18 | 160 | 160 |
| 76655593-0001 | 3/29/2018 | Rick West | 3/12 - 4/8/18 | 160 | 160 |
| 76974485-0001 | 3/30/2018 | Rick West | 3/13 - 4/9/18 | 160 | 160 |
| 77104770-0001 | 4/5/2018 | Delaware Co Car | 3/19 - 4/15/18 | 160 | 160 |
| 76794286-0003 | 4/12/2018 | Rick West | 4/9 - 4/11/18 | 24 | 24 |
| 77725431-0001 | 4/16/2018 | Axium | 4/10 - 4/31/18 | 40 | 40 |
| 76578908-0002 | 4/23/2018 | Childrens Amb | 3/27 - 4/23/18 | 160 | 160 |
| 76698562-0002 | 4/26/2018 | AEP | 3/30 - 4/26/18 | 160 | 160 |
| 76655593-0002 | 4/30/2018 | Rick West | 4/9 - 4/27/18 | 160 | 160 |
| 76974485-0001 | 5/7/2018 | Rick West | 4/10 - 5/8/18 | 144 | 144 |
| 78604362-0001 | 5/11/2018 | New Childrens | 5/9 - 5/10/18 | 8 | 8 |
| 76578908-0003 | 5/21/2018 | Childrens Amb | 4/24 - 5/21/18 | 160 | 160 |
| 76698562-0003 | 5/24/2018 | AEP | 4/27 - 5/24/18 | 160 | 160 |
| 78884721-0001 | 5/24/2018 | Meritex | 5/21 - 5/23/18 | 40 | 40 |
| 76042797-0009 | 6/4/2018 | Block Tree Offie | 5/28 - 6/2/18 | 40 | 40 |
| 76578908-0004 | 6/18/2018 | Childrens Amb | 5/22 - 6/18/18 | 160 | 160 |
| 76698562-0004 | 6/21/2018 | AEP | 5/25 - 6/21/18 | 160 | 160 |
| 80179191-0001 | 7/3/2018 | Delaware Co Car | 6/30 - 7/1/18 | 8 | 8 |
| 80147113-0001 | 7/10/2018 | Mt Carmel | 6/29 - 7/2/18 | 40 | 40 |
| 80297736-0001 | 7/12/2018 | Delaware Co Car | 7/5 - 7/10/18 | 40 | 40 |
| | | | | 7664 | 11824 |

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 8/1/2016 | 7/31/2017 | | | | 8 |
| 61843407-001 | 8/1/16 | ikea | 7/16-8/12 | 160 | 320 |
| 60458041-003 | 8/11/16 | ikea | 7/15-8/11 | 160 | 320 |
| 62273644-001 | 8/15/16 | micro center | 8/3-8/12 | 64 | 224 |
| 58821102-006 | 8/27/16 | rogue | 8/1-8/28 | 160 | 320 |
| 61513429-002 | 8/29/16 | creekside 17 | 8/2-8/10 | 56 | 215 |
| 61847837-002 | 9/1/16 | ikea | 8/15-9/11 | 160 | 168 |
| 60458041-004 | 9/8/16 | ikea | 8/12-9/8 | 160 | 200 |
| 61843407-002 | 9/9/16 | ikea | 8/13-9/9 | 160 | 320 |
| 58821102-007 | 9/12/16 | rogue | 8/29-9/9 | 80 | 240 |
| 61843407-003 | 9/13/16 | ikea | 9/10-9/12 | 24 | 32 |
| 62955778-001 | 9/17/16 | multi tenant | 8/31-9/27 | 160 | 168 |
| 63523026-001 | 9/29/16 | rick 567 | 9/23-9/28 | 40 | 200 |
| 62955778-002 | 10/4/16 | multi tenant | 9/28-10/3 | 32 | 192 |
| 62455709-001 | 10/25/16 | rick 567 | 10/19-10/20 | 8 | 168 |
| 64524626-001 | 11/2/16 | ccl | 10/31-11/1 | 16 | 176 |
| 60458041-006 | 11/3/16 | ikea | 10/7-11/3 | 160 | 320 |
| 64404676-001 | 11/11/16 | hyperlogistics | 10/26-11/22 | 160 | 320 |
| 60458041-007 | 11/23/16 | ikea | 11/4-11/22 | 104 | 264 |

**Operator Forklift hours**

0

SOFCO002371

**Rented Forklift per job / hours** — CINCINNATI - Valndalia/United/Eqip Depot

| Job # | Date | Location | Dates | Hours |
|---|---|---|---|---|
| 143039033-005 | 4/28/2017 | 10900 Bldg | 4/12 - 5/10/17 | 160 |
| 143114352-005 | 4/30/2017 | Hotel | 4/14 - 5/12/17 | 160 |
| 12228644-0001 | 5/10/2017 | Heartland | 4/12 - 5/10/17 | 160 |
| 144759830-005 | 5/18/2017 | crossroads | 5/2 - 5/30/17 | 160 |
| 143039033-006 | 5/26/2017 | 10900 Bldg | 5/10 - 6/7/17 | 160 |
| 12228644-0002 | 6/7/2017 | Heartland | 5/10 - 6/7/17 | 160 |
| 146863599-001 | 6/8/2017 | Hotel | 5/23 - 6/20/17 | 160 |
| 12228644-0003 | 7/5/2017 | Heartland | 6/7 - 7/5/17 | 160 |
| 146863599-002 | 7/6/2017 | CRT Addiction ctr | 6/20 - 7/18/17 | 160 |
| 1229035-0001 | 7/17/2017 | Empire Foods | 6/19 - 7/17/17 | 160 |
| | | | | 3912 |

**Operator Forklift hours** — COLUMBUS - Sunbelt Rental

| Job # | Date | Location | Dates | Hours | Total |
|---|---|---|---|---|---|
| 65062247-001 | 11/25/16 | osu newark | 11/18-11/21 | 8 | 168 |
| 65332043-001 | 12/13/16 | genco | 12/2-12/9 | 48 | 208 |
| 65718507-001 | 12/23/16 | roxanne | 12/20 - 12/22/16 | 40 | 200 |
| 65844202-0001 | 1/2/17 | Point at polaris | 12/27 - 12/28/16 | 8 | 168 |
| 65818158-001 | 1/2/17 | Ikea | 12/27 - 12/3/016 | 40 | 200 |
| 65684775-0001 | 1/2/17 | roxanne | 12/19 - 12/30/16 | 80 | 240 |
| 65848578-0001 | 1/13/17 | Hilliard Data | 12/30 - 1/12/17 | 80 | 240 |
| 66203073-0001 | 2/2/17 | roxanne | 1/16 - 2/12/17 | 160 | 320 |
| 66781300-0001 | 2/15/17 | childrens hosp | 2/14 - 2/15/17 | 8 | 168 |
| 66632831-0001 | 2/21/17 | New Albany Data | 2/3 - 3/2/17 | 160 | 320 |
| 65547707-0001 | 2/23/17 | Hilliard Data | 2/6 - 3/5/17 | 160 | 160 |
| 65530544-0001 | 2/25/2017 | Big Lots | 2/8 - 3/7/17 | 160 | 160 |
| 66203073-0002 | 2/27/17 | Delaware County | 2/13 - 2/24/17 | 80 | 80 |
| 66954548-0001 | 3/7/17 | Dublin Data | 2/20 - 3/19/17 | 160 | 160 |
| 66952351-0002 | 3/9/17 | Dublin Data | 2/20 - 3/19/17 | 160 | 160 |
| 67018677-0001 | 3/10/17 | Mt Carmel West | 2/21 - 3/20/17 | 160 | 160 |
| 66632831-002 | 3/14/17 | NADC | 3/3 - 3/13/17 | 56 | 56 |
| 66952351-0003 | 3/28/17 | Dublin Data | 3/20 - 3/27/17 | 48 | 48 |
| 65547707-0002 | 4/1/17 | Delaware County | 3/6 - 4/2/17 | 160 | 160 |
| 67730674-0001 | 4/10/17 | Sofidel | 3/23 - 4/19/17 | 160 | 160 |
| 67815235-0001 | 4/12/17 | Sofidel | 3/27 - 4/23/17 | 160 | 160 |
| 67797667-001 | 4/13/17 | UPS | 3/27 - 4/23/17 | 160 | 160 |
| 68033712-001 | 4/18/17 | childrens hosp | 4/4 - 4/18/17 | 80 | 80 |
| 65547707-0003 | 4/19/17 | Delaware Airport | 4/3 - 4/18/17 | 96 | 96 |
| 68117299-001 | 4/24/17 | Sofidel | 4/6 - 5/3/17 | 160 | 160 |
| 68450401-001 | 5/3/17 | Dublin Data | 4/21 - 5/2/17 | 80 | 80 |
| 68394023-001 | 5/5/17 | 1 - business | 4/18 - 5/15/17 | 160 | 160 |
| 67797667-002 | 5/8/17 | UPS | 4/24 - 5/5/17 | 80 | 80 |
| 67730674-002 | 5/18/17 | Sofidel | 4/20 - 5/17/17 | 160 | 160 |
| 67815235-002 | 5/20/17 | Sofidel | 4/24 - 5/21/17 | 160 | 160 |
| 69070731-001 | 5/24/17 | Big Lots | 5/16 - 5/23/17 | 40 | 40 |
| 69041031-001 | 5/26/17 | Delaware County | 5/15 - 5/25/17 | 80 | 80 |
| 68117299-002 | 5/31/17 | Sofidel | 5/4 - 5/31/17 | 160 | 160 |
| 69485279-001 | 6/1/17 | UPS | 5/31 - 5/31/17 | 8 | 8 |
| 69398581-001 | 6/13/17 | New Albany Data | 5/26 - 6/22/17 | 160 | 160 |
| 67730674-004 | 6/14/17 | Sofidel | 5/18 - 6/14/17 | 160 | 160 |
| 69878934-002 | 6/15/17 | Tri Village | 6/14 - 6/14/17 | 8 | 8 |
| 67815235-003 | 6/19/17 | Sofidel | 5/22 - 6/18/17 | 160 | 160 |
| 68117299-0003 | 6/28/17 | Sofidel | 6/1 - 6/28/17 | 160 | 160 |
| 69398581-0002 | 6/29/17 | Bocchi | 6/23 - 6/27/17 | 24 | 24 |
| 69834070-0001 | 6/30/17 | UPS | 6/13 - 7/10/17 | 160 | 160 |
| 70117894-0001 | 7/8/17 | Big lots | 6/22 - 7/19/17 | 160 | 160 |
| 67815235-0004 | 7/15/17 | Sofidel | 6/19 - 7/16/17 | 160 | 160 |
| 68117299-0004 | 7/26/17 | Sofidel | 6/29 - 7/26/17 | 150 | 150 |
| | | | | 6696 | 10608 |

8/1/2015

7/31/2016

8/1/2015

7/31/2016

7/31/2015

48

SOFCO002372

Operator Forklift: hours

**Rented Forklift per job / hours**

### CINCINNATI - Vandalia/United/Eqip Depot

| Invoice Number | Invoice Date | job | dates | hrs |
|---|---|---|---|---|
| 11010579 | 9/30/2015 | World Park | 9/25 - 9/26/15 | 8 |
| 11018616 | 10/20/2015 | Masters Ph | 10/6 - 11/3/15 | 160 |
| 11030876 | 11/17/2015 | Advics | 11/3 -12/1/15 | 160 |
| 11076519 | 3/3/2016 | Alkermes | 2/23 - 3/3/16 | 64 |

### COLUMBUS - Sunbelt Rental

| Invoice Number | Invoice Date | job | dates | hrs | Total Total |
|---|---|---|---|---|---|
| 54008433-001 | 8/12/2015 | new albany data | 7/29 - 8/11 | 120 | 128 |
| 54685821-001 | 8/28/2015 | childrens | 8/27-8/28 | 8 | 168 |
| 52883828-003 | 8/28/2015 | aep | 8/1-8/28 | 160 | 320 |
| 54440068-001 | 9/3/2015 | northpoint | 8/17-9/13 | 160 | 224 |
| 54447706-002 | 9/5/2015 | northpoint | 8/20-9/16 | 160 | 160 |
| 54471021-001 | 9/5/2015 | groveport 482 | 8/24-9/15 | 136 | 136 |
| 54598637-001 | 9/10/2015 | northpoint | 8/31-9/20 | 120 | 120 |
| 54689152-001 | 9/12/2015 | groveport 482 | 8/26-9/22 | 160 | 160 |
| 54937620-001 | 9/24/2015 | duke 421 | 9/8-10/5 | 160 | 160 |
| 54471021-002 | 9/25/2015 | groveport 482 | 9/16-9/25 | 64 | 64 |
| 54951939-002 | 9/28/2015 | duke 421 | 9/10-9/29 | 112 | 112 |
| 55075526-001 | 10/1/2015 | duke 421 | 9/14-10/11 | 160 | 160 |
| 54440068-002 | 10/9/2015 | northpoint | 9/14-10/8 | 152 | 152 |
| 54447706-004 | 10/14/2015 | northpoint | 9/17-10/14 | 160 | 160 |
| 54689152-002 | 10/14/2015 | groveport 482 | 9/23-10/13 | 120 | 120 |
| 55401471-001 | 10/15/2015 | northpoint | 9/28-10/25 | 160 | 160 |
| 55794129-001 | 10/15/2015 | conv ctr | 10/14-10/14 | 8 | 8 |
| 55787099-001 | 10/15/2015 | conv ctr | 10/13 - 10/14/15 | 16 | 16 |
| 54598637-003 | 10/17/2015 | creekside | 9/21-10/2 | 80 | 80 |
| 55965185-001 | 10/29/2015 | conv ctr | 10/21-10/23 | 16 | 16 |
| 55956389-001 | 10/29/2015 | conv ctr | 10/21-10/23 | 16 | 16 |
| 24990500003 | 10/30/2015 | tanger outlet | 10/14-11/11 | 160 | 160 |
| 56190048-001 | 11/2/2015 | conv ctr | 10/30-10/31 | 8 | 8 |
| 55401471-002 | 11/3/2015 | northpoint | 10/26-11/2 | 48 | 48 |
| 56194943-001 | 11/4/2015 | conv ctr | 10/30 - 10/31/15 | 16 | 16 |
| 56252331-001 | 11/17/2015 | grandview yard | 11/2-11/29 | 160 | 160 |
| 56577630-001 | 11/20/2015 | lasalle | 11/17-11/18 | 16 | 16 |
| 56703097-002 | 12/9/2015 | l brands | 11/23-12/20 | 160 | 160 |
| 56252331-003 | 12/26/2015 | grandview yard | 11/30-12/27 | 160 | 160 |
| 56703097-003 | 12/21/2015 | l brands | 12/21/2015 | 8 | 8 |
| 57528006-003 | 1/13/16 | greenpoint | 1/7-1/8 | 16 | 16 |
| 57726004-001 | 1/15/16 | axium | 15-Jan | 80 | 80 |
| 57397913-001 | 1/20/16 | eddys | 1/4-1/31 | 160 | 160 |
| 57388185-002 | 1/20/16 | eddys | 1/4-1/31 | 160 | 160 |
| 57494779-002 | 1/22/16 | eddys | 1/5-2/2 | 160 | 160 |
| 56552331-003 | 1/23/16 | grandview yard | 12/28-1/24 | 160 | 160 |
| 57546974-001 | 1/27/16 | tanger outlet | 1/11-2/7 | 160 | 160 |
| 57535790-001 | 1/28/16 | brew dog | 1/11-2/7 | 160 | 160 |
| 57815657-001 | 2/1/16 | eddys | 1/22-1/28 | 40 | 40 |
| 57494779-003 | 2/5/16 | eddys | 2/3-2/4 | 16 | 16 |
| 58094406-001 | 2/5/16 | axiom | 4-Feb | 8 | 8 |
| 57535790-002 | 2/18/16 | brew dog | 2/8-2/12 | 40 | 40 |
| 57388185-003 | 2/27/16 | eddys | 2/1-2/28 | 160 | 160 |
| 57546974-002 | 3/5/16 | tanger outlet | 2/8-3/6 | 160 | 160 |
| 57388185-004 | 3/26/16 | eddys | 2/29-3/27 | 160 | 160 |
| 58917294-001 | 3/30/16 | etna | 3/16-3/30 | 88 | 88 |

SOFCO002373

Rented Forklift per job / hours

Operator Forklift hours

## CINCINNATI - Valndalia/United/Eqip Depot

| Invoice Number | Invoice Date | job | dates | hrs |
|---|---|---|---|---|
| 8/1/2014 | 7/31/2015 | | | |
| 10836558 | 8/6/2014 | UGN | 7/23 - 8/20/14 | 160 |
| 10838938 | 8/13/2014 | miami Sports | 7/30 - 8/27/14 | 160 |
| 121915582-001 | 8/27/2014 | Fairfield | 8/14 - 8/26/14 | 80 |
| 10845557 | 8/28/2014 | KLW | 8/11 - 8/21/14 | 160 |
| 10847877 | 9/3/2014 | UGN | 8/20 - 8/30/14 | 160 |
| 10850268 | 9/10/2014 | miami Sports | 8/27 -9/24/14 | 160 |
| 10862232 | 10/8/2014 | miami Sports | 9/24 -10/22/14 | 160 |
| 12329534-001 | 10/10/2014 | Montg cty trans | 10/6 - 10/9/14 | 40 |
| 10874153 | 11/5/2014 | miami Sports | 10/22 - 11/19/14 | 160 |
| 10885467 | 12/3/2014 | miami Sports | 11/19 -12/17/14 | 160 |
| 10894853 | 12/31/2014 | miami Sports | 12/17 - 1/14/15 | 160 |
| 125226588-001 | 1/2/2015 | Wright state | 12/29/2014 | 8 |
| 125470196-001 | 1/27/2015 | DRT | 1/12 - 2/9/15 | 160 |
| 10907449 | 1/28/2015 | miami Sports | 1/14 - 2/11/15 | 160 |
| 125535098-001 | 2/5/2015 | Mazak | 1/14 - 2/11/15 | 160 |
| 10936148 | 4/7/2015 | DRT | 3/31 - 4/1/15 | 16 |
| 127340325-001 | 4/17/2015 | Northcreek | 4/2 - 4/30/15 | 160 |
| 127972947-004 | 5/15/2015 | Liberty Center | 4/29 - 5/13/5 | 160 |
| | | | | 392 |

## COLUMBUS - Sunbelt Rental

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 8/1/2014 | 7/31/2015 | | | | |
| 47110407-001 | 8/15/2014 | project viper | 7/30-8/26 | 160 | 160 |
| 47122208-001 | 8/15/2014 | project viper | 7/30-8/26 | 160 | 240 |
| 47201679-001 | 8/18/2014 | healthy new alb | 8/4-8/11 | 40 | 320 |
| 47212655-001 | 8/20/2014 | project viper | 8/4-8/31 | 160 | 320 |
| 47314359-001 | 8/21/2014 | rick 717 | 8/12-8/14 | 16 | 176 |
| 47420516-001 | 8/30/2014 | rick 717 | 8/14-9/10 | 160 | 200 |
| 47545230-001 | 9/6/2014 | american showa | 8/21-9/17 | 160 | 320 |
| 47212655-002 | 9/19/2014 | project viper | 9/1-9/19 | 112 | 272 |
| 47545230-02 | 9/25/2014 | american showa | 9/18-9/25 | 48 | 208 |
| 47391636-002 | 9/29/2014 | worth place | 9/10-9/25 | 96 | 104 |
| 47970484-001 | 10/2/2014 | rick 717 | 9/16-10/13 | 160 | 320 |
| 49703725-001 | 12/31/2014 | compass | 12/15-1/11 | 160 | 320 |
| 49698546-002 | 12/31/2014 | roxanne | 12/15-1/11 | 160 | 320 |
| 49712519-001 | 1/3/2015 | roxane | 12/17-1/13 | 72 | 88 |
| 49712519-002 | 1/20/2015 | roxane | 1/14-1/20 | 40 | 200 |
| 49698546-003 | 1/21/2015 | roxane | 1/12 - 1/16/15 | 32 | 192 |
| 50121521-002 | 1/28/2015 | compass | 1/14-1/27 | 80 | 80 |
| | | | | 7584 | 7976 |

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 58907372-001 | 3/30/16 | etna | 3/15-3/29 | 80 | 80 |
| 58820098-001 | 3/31/16 | amazon | 3/14-4/10 | 160 | 160 |
| 58821102-001 | 3/31/16 | amazon | 3/14-4/10 | 160 | 160 |
| 59072463-001 | 4/1/16 | tanger outlet | 3/24-3/25 | 8 | 8 |
| 57388185-005 | 4/14/16 | brew dog | 3/28-4/13 | 104 | 104 |
| 59272627-001 | 4/18/16 | rogue | 4/1-4/28 | 160 | 160 |
| 58820098-003 | 4/25/16 | rogue | 4/11-4/22 | 80 | 80 |
| 59960000-001 | 5/5/16 | grandview yard | 5/2-5/5 | 32 | 32 |
| 58821102-002 | 5/7/16 | rogue | 4/11-5/8 | 160 | 160 |
| 60478256-001 | 5/24/16 | groveport 2 | 5/22-5/23 | 8 | 8 |
| 60458041-001 | 6/1/16 | groveport 2 | 5/20-6/16 | 160 | 160 |
| 60376997-001 | 6/2/16 | groveport 2 | 5/17-6/13 | 160 | 160 |
| 60413782-001 | 6/3/16 | groveport 2 | 5/18-6/14 | 160 | 160 |
| 58821102-003 | 6/4/16 | rogue | 5/9-6/5 | 160 | 160 |
| 60523490-001 | 6/9/16 | creekside 17 | 5/24-6/20 | 160 | 160 |
| 60829033-001 | 6/16/16 | tanger outlet | 6/6-7/3 | 160 | 160 |
| 58821102-004 | 7/2/16 | rogue | 6/6-7/3 | 160 | 160 |
| 60458041-002 | 7/14/16 | ikea | 6/17-7/14 | 160 | 160 |
| 61513429-001 | 7/21/16 | creekside 17 | 7/5-8/1 | 160 | 160 |
| 61571673-001 | 7/22/16 | rick 567 | 7/6-8/2 | 160 | 160 |
| 61584593-001 | 7/23/16 | rick 567 | 7/7-8/3 | 160 | 160 |
| 58821102-005 | 7/30/16 | rogue | 7/4-7/31 | 160 | 160 |

1158

SOFCO002374

**Rented Forklift per job / hours**

**Operator Forklift hours**

## CINCINNATI - Valndalia/United/Eqip Depot

| Invoice Number | Invoice Date | Job | dates | hrs |
|---|---|---|---|---|
| 8/1/2013 | | | | |
| 110975267-005 | 8/17/2013 | Forest Phar | 8/2 - 8/30/13 | 160 |
| 110975267-006 | 9/14/2013 | Forest Phar | 8/30 - 9/27/13 | 160 |
| 13941396-001 | 9/25/2013 | Accusport | 9/9 - 10/7/13 | 160 |
| 14645267-001 | 10/7/2013 | Mane | 10/4 -10/5/13 | 32 |
| 14374388-001 | 10/9/2013 | White Castle | 9/24 -10/22/13 | 160 |
| 14459258-001 | 10/9/2013 | Lyons Magnus | 9/27 - 10/4/13 | 40 |
| 110975267-007 | 10/12/2013 | Miami Univ | 9/27 - 10/25/13 | 160 |
| 13941396-003 | 10/23/2013 | Accusport | 10/7 - 11/4/13 | 160 |
| 14374388-002 | 10/28/2013 | White Castle | 10/22 - 10/25/13 | 40 |
| 110975267-008 | 11/9/2013 | Miami Univ | 10/25 - 11/22/13 | 160 |
| 15389297-001 | 11/19/2013 | Loreal | 11/4 - 12/2/13 | 160 |
| 15550895-001 | 11/26/2013 | Dearborn Jail | 11/11 - 12/9/13 | 160 |
| 110975267-009 | 12/7/2013 | Miami Univ | 11/22 - 12/20/13 | 160 |
| 15389297-002 | 12/11/2013 | Mazak | 12/2 - 12/9/13 | 40 |
| 16342467-001 | 12/19/2013 | Loreal | 12/16 - 12/18/13 | 24 |
| 15550895-002 | 12/19/2013 | Dearborn Jail | 12/9 - 12/18/13 | 80 |
| 15509065-002 | 12/20/2013 | Mazak | 12/23 - 1/20/14 | 160 |
| 16603079-001 | 1/15/2014 | Cengage | 12/31 - 1/28/14 | 160 |
| 15509065-003 | 1/31/2014 | WPAFB | 1/20 - 1/29/14 | 80 |
| 16603079-002 | 2/11/2014 | Cengage | 1/28 - 2/7/14 | 80 |
| 10765782 | 2/12/2014 | Crossroads | 1/29 - 2/26/14 | 160 |
| 7/31/2014 | | | | **2384** |

## COLUMBUS - Sunbelt Rental

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 49872221-004 | 2/3/2015 | bocchi | 1/26-1/29 | 32 | 32 |
| 50601643-001 | 2/16/2015 | compass | 2/11-2/12 | 8 | 8 |
| 51216623-001 | 3/26/2015 | innotrac | 3/19-3/26 | 40 | 40 |
| 51647067-001 | 4/17/2015 | innotrac | 10-Apr | 8 | 8 |
| 51617739-001 | 4/17/2015 | innotrac | 4/9-4/10 | 16 | 16 |
| 51517361-001 | 4/24/2015 | franklin intl | 4/7-5/4 | 136 | 136 |
| 51954651-001 | 5/12/2015 | hilliard data | 4/27-5/21 | 160 | 160 |
| 52408168-001 | 5/20/2015 | dublin data | 5/15-5/18 | 32 | 32 |
| 52168342-001 | 5/22/2015 | rick atc | 5/5-6/1 | 160 | 160 |
| 52280504-001 | 5/27/2015 | dublin data | 5/11-6/7 | 160 | 160 |
| 51954651-002 | 6/1/2015 | dublin data | 5/22-5/26 | 24 | 24 |
| 52786619-001 | 6/6/2015 | aep | 6/2-6/5 | 32 | 32 |
| 52168342-002 | 6/6/2015 | rick atc | 6/2-6/3 | 16 | 16 |
| 52280504-002 | 6/23/2015 | dublin data | 6/8-6/19 | 80 | 80 |
| 52883828-001 | 6/24/2015 | aep | 6/6-7/3 | 160 | 160 |
| 52745145-002 | 7/3/2015 | vantrust | 6/30-7/2 | 24 | 24 |
| 53263707-001 | 7/9/2015 | new albany data | 6/25-7/8 | 80 | 80 |
| 53341887-01 | 7/10/2015 | new albany data | 6/29-7/9 | 72 | 72 |
| 53617485-001 | 7/23/2015 | Reynoldsburg | 7/13 - 8/9/15 | 160 | 160 |
| 52883828-002 | 7/31/2015 | aep | 7/4-7/31 | 160 | 160 |
| | | | | **3376** | **5760** |

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 8/1/2013 | | | | | |
| 41656679-001 | 9/4/2013 | Honda | 8/27 - 9/13 | 40 | 160 |
| 41839719-002 | 9/24/2013 | Ascena | 9/6 - 10/3/13 | 160 | 200 |
| 42328225-001 | 10/21/2013 | Reynoldsburg 145 | 10/3 -10/30/13 | 160 | 320 |
| 41839719-003 | 10/22/2013 | healthy new alb | 10/4 - 10/31/13 | 160 | 192 |
| 42409717-001 | 10/31/2013 | Porject reds | 10/9 - 11/5/13 | 160 | 320 |
| 42565050-001 | 11/5/2013 | Nestle | 10/18 - 11/14/13 | 160 | 200 |
| 42907650-001 | 11/15/2013 | Grove City MOB | 11/7 - 11/13/13 | 40 | 200 |
| 42328225-003 | 11/18/2013 | Centerpoint | 10/31 - 11/27/13 | 160 | 200 |
| 42840056-001 | 11/18/2013 | Centerpoint | 11/4 - 11/16/13 | 80 | 240 |
| 41839719-004 | 11/19/2013 | healthy new alb | 11/1 - 11/28/13 | 160 | 320 |
| 43047021-001 | 11/20/2013 | stewart Elem | 11/18/2013 | 8 | 168 |
| 42409717-002 | 11/23/2013 | Creekside XI | 11/6 -12/3/13 | 160 | 320 |
| 42901416-001 | 11/25/2013 | Centerpoint | 11/7 - 12/4/13 | 160 | 200 |
| 42565000-003 | 12/23/2013 | Creekside XI | 12/13 -12/17/13 | 32 | 56 |
| 41839719-006 | 12/26/2013 | Ascena | 11/29 -12/26/13 | 160 | 240 |
| 41839719-007 | 1/6/2014 | Ascena | 12/27 -12/31/13 | 32 | 192 |
| 44035295-001 | 2/14/2014 | mem hospital | 1/29-2/25 | 160 | 320 |
| 44287951-001 | 3/5/2014 | easton | 2/17-3/16 | 160 | 240 |
| 44426330-001 | 3/10/2014 | healthy new alb | 2/28-3/7 | 40 | 120 |
| 44035295-002 | 3/20/2014 | mem hospital | 2/26-3/17 | 112 | |
| 7/31/2014 | | | | | **272** |

1452

SOFCO002375

Rented Forklift per job / hours

1478

877

## CINCINNATI - Valndalia/United/Eqip Depot

| Invoice | job | date | dates | hrs |
|---|---|---|---|---|
| 10776551 | Crossroads | 3/12/2014 | 2/26 - 3/26/14 | 160 |
| 119045155-001 | Dearborn Jail | 4/29/2014 | 4/22 - 4/28/14 | 40 |
| 119142313-001 | Montg Cty Trans | 5/10/2014 | 4/25 - 5/23/14 | 160 |
| 10801669 | 8008 Deer | 5/13/2014 | 5/8 - 5/10/14 | 24 |
| 119218692-001 | Rookwood | 5/14/2014 | 4/29 - 5/27/14 | 160 |
| 119142313-002 | Montg Cty Trans | 6/5/2014 | 5/23 - 6/3/14 | 80 |
| 120292149-001 | Rookwood | 6/18/2014 | 6/11 - 6/16/14 | 40 |
| 120621231-001 | Urology | 6/25/2014 | 6/24/2014 | 8 |
| 10831861 | KLW | 7/28/2014 | 7/14 - 8/11/14 | 168 |
| | | | | 3336 |

8/4/2012 - 7/31/2013

| Invoice Number | job | Invoice Date | dates | hrs |
|---|---|---|---|---|
| 110975267-002 | Forest Phar | 5/25/2013 | 5/10 - 6/7/13 | 160 |
| 111154748-001 | miami Sports | 6/1/2013 | 5/17 - 6/14/13 | 160 |
| 110975267-003 | Forest Phar | 6/22/2013 | 6/7 - 7/5/13 | 160 |
| 111154748-002 | miami Sports | 6/29/2013 | 6/14 - 7/12/13 | 160 |
| 110975267-004 | Forest Phar | 7/20/2013 | 7/5 - 8/2/13 | 160 |
| | | | | 800 |

## COLUMBUS - Sunbelt Rental

| Invoice number | job | date | dates | hrs | Total | Operator Forklift hours |
|---|---|---|---|---|---|---|
| 45545195-001 | sumitomo | 5/21/2014 | 5/5-5/6/1 | 160 | 320 | 160 |
| 45598764-001 | sumitomo | 5/22/2014 | 5/6-6/2 | 160 | 200 | 40 |
| 45691283-001 | fairfield med | 5/23/2014 | 5/12-5/22 | 72 | 232 | 160 |
| 46045702-001 | columbia gas | 6/4/2014 | 6/2-6/3 | 8 | 32 | 24 |
| 46205827-001 | creekside 9 | 6/26/2014 | 6/10-7/7 | 160 | 320 | 160 |
| 46206325-001 | creekside 9 | 6/27/2014 | 6/11-7/8 | 160 | 240 | 80 |
| 46522785-001 | creekside 9 | 7/12/2014 | 6/26-7/23 | 160 | 200 | 40 |
| 120828836-001 | dent Athlete Devt | 7/18/2014 | 7/2 - 7/30/14 | 160 | 168 | 8 |
| | | | | | 6512 | 3344 |

0

8/1/2012 - 7/31/2013

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 35830996-001 | 8/15/2012 | Goodale | 7/30 - 8/14/12 | 80 | 160 |
| 35787738-002 | 8/17/2012 | target | 7/26 - 8/22/12 | 64 | 240 |
| 35144261-001 | 9/6/2012 | Columbus school | 8/20 - 9/16/12 | 160 | 224 |
| 36400079-001 | 9/12/2012 | East side urology | 9/5 - 9/7/12 | 24 | 320 |
| 35787738-003 | 9/14/2012 | target | 8/23 - 9/19/12 | 160 | 184 |
| 36144261-002 | 9/24/2012 | Columbus school | 9/17 - 9/20/12 | 32 | 160 |
| 36411954-001 | 9/27/2012 | target | 9 5/-10/2/12 | 160 | 32 |
| 36798164-001 | 10/11/2012 | Proj Discover | 10/1 -10/10/12 | 80 | 160 |
| 35787738-004 | 10/13/2012 | target | 9/20 - 10/17/12 | 160 | 80 |
| 36411954-002 | 10/20/2012 | target | 10/3 - 10/30/12 | 160 | 160 |
| 36411954-003 | 11/17/2012 | Target | 10/31 - 11/27/12 | 160 | 160 |
| 37852233-001 | 12/13/2012 | Columbus school | 12/1/2012 | 8 | 160 |
| 36411954-004 | 12/15/2012 | target | 12/15/2012 | 160 | 8 |
| 38117406-001 | 1/14/2013 | roxanne | 1/4 - 1/1/13 | 64 | 64 |
| 38686952-001 | 2/28/2013 | Bare Essence | 2/19 - 2/26 | 40 | 40 |
| 39183508-001 | 3/28/2013 | Ascena | 3/26 - 3/28/13 | 16 | 16 |
| 39159454-002 | 4/11/2013 | Ascena | 3/25 - 4/5/13 | 80 | 80 |
| 39201299-001 | 4/15/2013 | Ascena | 3/28 - 4/5/13 | 56 | 56 |
| 39448981-001 | 4/16/2013 | Limited Dc | 4/12/2013 | 8 | 8 |
| 39687311-001 | 4/30/2013 | Ascena | 4/27 - 4/29/13 | 24 | 24 |
| 39658633-001 | 5/14/2013 | progegis 5 | 4/26 - 5/23/13 | 160 | 160 |
| 39705223-001 | 5/15/2013 | progegis 5 | 4/29 - 5/26/13 | 160 | 160 |
| 39726252-001 | 5/17/2013 | progegis 5 | 4/30 - 5/27/13 | 160 | 160 |
| 38993152-001 | 5/27/2013 | columbia gas | 5/9 - 6/5/13 | 160 | 160 |
| 40162918-002 | 6/6/2013 | Americas Floor | 5/30 - 6/5/13 | 40 | 40 |
| 40093569-001 | 6/7/2013 | Ascena | 5/22 - 6/18/13 | 160 | 160 |
| 40271968-001 | 6/19/2013 | Restoration Hdw | 6/3 - 6/30/13 | 160 | 160 |
| 40093569-002 | 6/28/2013 | Ascena | 6/19 - 6/27/13 | 48 | 48 |
| | | | | 2744 | 3544 |

SOFCO002376

Rented Forklift per job / hours

Operator Forklift hours

**CINCINNATI - Vandalia/United/Eqip Depot**

| Invoice Number | Invoice Date 7/31/2012 | job | dates | hrs |
|---|---|---|---|---|
| 8/1/2011 | | | | |
| 94891506-001 | 8/19/2011 | saylor Park | 8/10 - 8/17/11 | 40 |
| 100977369-001 | 1/19/2012 | Mariemont Elem | 1/17/2012 | 8 |
| 101051906-003 | 4/3/2012 | Mane | 3/19 - 4/16/12 | 160 |
| 101051906-002 | 3/6/2012 | Mane | 2/20 - 3/19/12 | 160 |
| 101051906-001 | 2/7/2012 | Mane | 1/23 - 2/20/12 | 160 |
| | | | | 528 |

**COLUMBUS - Sunbelt Rental**

| Invoice Number | Invoice Date 7/31/2012 | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 8/1/2011 | | | | | 40 |
| 94473662-001 | 7/27/2011 | Polaris Medical | 7/15 - 8/12/11 | 160 | 168 |
| 94486662-001 | 8/2/2011 | Honda ELP | 7/18 - 8/11/11 | 160 | 320 |
| 94473662-002 | 8/18/2011 | Honda ELP | 8/12 - 8/16/11 | 40 | 200 |
| 94486662-002 | 8/31/2011 | Honda ELP | 8/15 - 9/12/11 | 160 | 320 |
| 31114235-001 | 8/31/2011 | Hilton | 8.17 - 8/26/11 | 64 | 64 |
| 94486662-003 | 9/27/2011 | Honda ELP | 9/12 - 10/10/11 | 160 | 160 |
| 31469735-001 | 9/29/2011 | Pizzuti | 9/12 - 9/29/11 | 80 | 80 |
| 31471804-001 | 9/29/2011 | MBM | 9/13 - 10/10/11 | 160 | 160 |
| 31877113-001 | 10/27/2011 | Multi-Tenant | 10/10 - 11/6/11 | 160 | 160 |
| 32009728-001 | 11/5/2011 | Multi-Tenant | 10/19 - 11/15/11 | 160 | 160 |
| 32412731-001 | 12/14/2011 | Abercrombie | 11/16 - 12/13/11 | 160 | 160 |
| 32654021-001 | 12/14/2011 | Axium | 12/7 - 12/13/11 | 40 | 40 |
| 32918472-001 | 1/6/2012 | Abercrombie | 1/3 - 1/5/12 | 40 | 40 |
| 32412731-002 | 1/6/2012 | Abercrombie | 12/14 - 12/22/11 | 40 | 40 |
| 32918472-002 | 1/11/2012 | Abercrombie | 1/3 - 1/9/12 | 40 | 40 |
| 32997209-001 | 1/11/2012 | Reynoldsburg | 1/6/2012 | 8 | 8 |
| 32997895-001 | 1/20/2012 | Abercrombie | 1/4 - 1/31/12 | 80 | 80 |
| 336233343-001 | 2/1/2012 | MBM | 1/27 - 1/30/12 | 16 | 16 |
| 33091236-001 | 2/1/2012 | Multi-Tenant | 1/16 - 2/12/12 | 160 | 160 |
| 33427771-001 | 2/15/2012 | Multi-Tenant | 2/13 - 2/14/12 | 8 | 8 |
| 32918472-006 | 2/16/2012 | Abercrombie | 1/31 - 2/27/1 | 160 | 160 |
| 33316752-002 | 2/22/2012 | Abercrombie | 2/6 - 2/21/12 | 80 | 80 |
| 32918472-008 | 3/15/2012 | Abercrombie | 2/28 - 3/26/12 | 160 | 160 |
| 33397361-004 | 3/22/2012 | Abercrombie | 3/9 - 3/22/12 | 80 | 80 |
| 34037522-001 | 4/10/2012 | Hilton | 3/30 - 3/31/12 | 8 | 8 |
| 34370415-001 | 4/30/2012 | st anns | 4/23 - 4/27/12 | 40 | 40 |
| 34486095-001 | 5/8/2012 | hilton | 5/1 - 5/2/12 | 8 | 8 |
| 34628609-001 | 5/26/2012 | Convention Ctr | 5/9 - 5/18/12 | 40 | 40 |
| 34885480-001 | 5/30/2012 | Honda East Lib | 5/29 - 5/30/12 | 8 | 8 |
| 34976996-001 | 6/4/2012 | Franlin Cty Child | 6/1/2012 | 8 | 8 |
| 35055281-001 | 6/15/2012 | Honda East Lib | 6/7 - 6/12/12 | 40 | 40 |
| 35452094-001 | 7/6/2012 | Franlin Cty Chid | 7/2 - 7/5/12 | 40 | 40 |
| | | | | 2568 | 3096 |

**CINCINNATI (continued)**

| Invoice Number | Invoice Date 7/31/2011 | job | dates | hrs |
|---|---|---|---|---|
| 8/1/2010 | | | | |
| 92132292-002 | 2/23/2011 | Beavercreek | 2/21/2011 | 8 |
| 92206580-001 | 3/15/2011 | Beavercreek | 2/28 - 3/28/11 | 160 |
| 92206580-002 | 4/7/2011 | Beavercreek | 3/28 - 4/6/11 | 160 |

**COLUMBUS (continued)**

| Invoice Number | Invoice Date 7/31/2011 | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 8/1/2010 | | | | | 8 |
| 27122397-001 | 10/7/2010 | COTA | 10/7/2010 | 8 | 168 |
| 27237558-001 | 10/18/2010 | Grange | 10/15/2010 | 8 | 168 |
| 27200498-001 | 10/19/2010 | Whitehall | 10/13 - 10/19/10 | 40 | 40 |
| 27927729-001 | 12/24/2010 | Excell | 12/9 - 1/5/11 | 160 | 160 |
| 27927729-002 | 1/20/2011 | Excell | 1/6 - 1/14/11 | 56 | 56 |
| 28425654-001 | 2/2/2011 | Childrens | 1/28/2011 | 8 | 8 |

1111

SOFCO002377

Rented Forklift per job / hours

## CINCINNATI - Valndalia/United/Eqip Depot

| Invoice Number | Invoice Date | job | dates | hrs |
|---|---|---|---|---|
| 8/1/2009 | 7/31/2010 | | | |
| none | | | | |
| | | | | 328 |
| | | | | 0 |

## COLUMBUS - Sunbelt Rental

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 8/1/2009 | 7/31/2010 | | | | |
| 21761609-001 | 8/13/2009 | Cold Storage | 8/12/2009 | 8 | 8 |
| 22288761-001 | 9/25/2009 | Chesire Elem | 9/21 - 9/23/09 | 24 | 24 |
| 22433403-001 | 10/6/2009 | Scotts wellness | 9/30-10/1/09 | 16 | 16 |
| 22331516-001 | 10/9/2009 | Doctors West | 9/23 - 10/6/09 | 80 | 80 |
| 23032858-001 | 11/16/2009 | Cold Storage | 11/13/2009 | 8 | 8 |
| 23545359-001 | 1/4/2010 | Battelle Conv | 1/4/2010 | 8 | 8 |
| | | | | 144 | 144 |

| Invoice Number | Invoice Date | job | dates | hrs | Total |
|---|---|---|---|---|---|
| 28884869-001 | 3/26/2011 | Mars | 3/9 - 4/5/11 | 160 | 160 |
| 28945426-001 | 3/31/2011 | mars | 3/14 - 4/10/11 | 160 | 160 |
| 28945426-002 | 4/14/2011 | mars | 4/11 - 4/12/11 | 16 | 16 |
| 29506480-001 | 5/12/2011 | Rave | 4/25 - 5/22/11 | 160 | 160 |
| 29732017-001 | 5/19/2011 | Excell | 5/11 - 5/19/11 | 40 | 40 |
| 29506480-002 | 6/9/2011 | Rave | 5/23 - 6/19/11 | 160 | 160 |
| 30151580-001 | 6/21/2011 | Medical Office | 6/9 - 6/20/11 | 80 | 80 |
| 30175548-001 | 6/28/2011 | Excell | 6/10 - 6/11/11 | 16 | 16 |
| 29506480-003 | 6/28/2011 | Rave | 6/20 - 6/27/11 | 40 | 40 |
| 30221758-001 | 7/1/2011 | Noble | 6/14 - 7/11/11 | 160 | 160 |
| | | | | 1272 | 1600 |

## Operator Forklift hours

334

440

SOFCO002378

## AFFIDAVIT OF TIM GATES

STATE OF OHIO          )

                              ) SS:

COUNTY OF _Hamilton_    )

Tim Gates, being first duly sworn, deposes and says that:

1. I am Tim Gates. I am over the age of 18 and I am competent to testify to the matters set forth herein.

2. Two families owned Southern Ohio Fabricators, Inc., the Kling family and the Nickerson family. The Kling family was the majority shareholder. Neither Jim Ludwig, Dave Schmitt, John Hesford, nor Dan Powell owned any portion of Southern Ohio Fabricators, Inc. I have never owned a portion of Southern Ohio Fabricators, Inc.

      Further affiant sayeth naught.

_____
                           Tim Gates

Sworn and subscribed to before me this _6_ day of November, 2018.

Notary public: _Tracy A Wagner_

My commission expires: _6-15-2020_

                       TRACY A. WAGNER
              Notary Public, State of Ohio
           My Commission Expires 06-15-2020

4852-8674-4442, v. 1



## AFFIDAVIT OF TIM GATES

STATE OF OHIO              )

                                   ) SS:

COUNTY OF __Hamilton__     )

Tim Gates, being first duly sworn, deposes and says that:

1. I am Tim Gates. I am over the age of 18 and I am competent to testify to the matters set forth herein.

2. I was the President of Southern Ohio Fabricators, Inc. until July 2004.

3. Two families owned Southern Ohio Fabricators, Inc., the Kling family and the Nickerson family. The Kling family was the majority shareholder.

4. Southern Ohio Fabricators, Inc. had a wholly owned subsidiary named Sofco Erectors, Inc. that existed prior to April 2004 ("Old Sofco").

5. In March 2004 Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., a company owned by John Hesford, Jim Ludwig, and Dan Powell.

6. After Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., Old Sofco performed no work. Old Sofco was merely a shell corporation until it could be wound down. It had no equipment, employees, or any ability to perform work.

7. Similarly, after Old Sofco's assets were sold, Southern Ohio Fabricators, Inc. did not perform any erection work. It had no personnel or equipment to perform any such erection work after it sold Old Sofco's assets.

8. None of the owners of Southern Ohio Fabricators, Inc. or Old Sofco owned, operated, or had involvement in any company that performed erection services after the sale of Old Sofco's assets.

9. In July 2004, Southern Ohio Fabricators, Inc. sold its assets to Clermont Steel Fabricators.

10. After Southern Ohio Fabricators, Inc. sold its assets, I signed a consulting agreement and assisted in winding it up. After Southern Ohio Fabricators, Inc. sold its assets, it ceased to perform any work and like Old Sofco was merely a shell corporation.



SOFCO002148

Further affiant sayeth naught.

_____
Tim Gates

Sworn and subscribed to before me this _11_ day of September, 2018.

Notary public: _Tracy A Wagner_

My commission expires: _6-15-2020_

TRACY A. WAGNER
Notary Public, State of Ohio
My Commission Expires 06-15-2020

4851-6528-0113, v. 1



# OHIO OPERATING ENGINEERS
## FRINGE BENEFIT PROGRAMS

1180 Dublin Road
PO Box 12009
Columbus OH 43212-0009
614.488.0708

Carol A. Wilson
Administrator

August 31, 2017

**MAILED VIA REGULAR & CERTIFIED U.S. MAIL**

SOFCO ERECTORS INC
10360 WAYNE AVE
CINCINNATI OH 45215-1129

Re:     **Partial and Complete Withdrawal Liability
        Demand for Payment**

To Whom It May Concern:

        The Ohio Operating Engineers Pension Plan ("Plan") was recently informed that the collective bargaining agreement between the Ohio Operating Engineers Local 18 and Sofco Erectors, Inc. (hereinafter referred to as "Sofco") was terminated. After receiving this notice, the Plan performed a calculation of Sofco's complete withdrawal liability. This calculation was prepared by the Plan's actuary, and is based upon a complete withdrawal from the Pension Plan during the Plan year ending July 31, 2017. According to this calculation, Sofco's complete withdrawal liability is **$368,315. (Please see attached copy of the actuary's August 29, 2017 letter and calculation).**

        Additionally, the Actuary also noticed more than a 70% reduction in contribution hours reported by Sofco for the three year period of 2011-2013. This decline in hours constitutes a partial withdrawal by Sofco from the collective bargaining agreement during this period. As a result, the Plan's actuary also performed partial withdrawal liability calculations. **(Please see aforementioned letter and calculation).** Although there is no partial withdrawal liability for the Plan year ending July 31, 2013, these calculations revealed the following:

- For the Plan year ending July 31, 2011, partial withdrawal liability in the amount of $344,627;

- For the Plan year ending July 31, 2012, partial withdrawal liability in the amount of $111,358.

        Based on all calculations performed by the Plan's actuary, the Plan hereby requests and demands that Sofco pays the following amounts:

- Complete withdrawal liability for the Plan year ending July 31, 2017 in the amount of $368,315 which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721;



HEALTH AND WELFARE PLAN  •  PENSION FUND  •  APPRENTICESHIP FUND  •  EDUCATION AND SAFETY FUND

- Partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627 which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327;

- Partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358 which can be paid in six quarterly payments of $17,294 and a final payment of $10,652.

The Plan also requests and demands that Sofco remits its payments (with a separate check for each calculation) under these payment plans by no later than October 30, 2017. A quarterly or lump sum payment should be made payable to:  The Ohio Operating Engineering Pension Plan, Attn: Samantha Polsinelli, 1180 Dublin Rd., P.O. Box 12009, Columbus, Ohio 43212.

Sincerely,

Bryan C. Barch, Esq.
In-House Counsel

 **Segal Consulting**

101 North Wacker Drive  Suite 500  Chicago, IL 60606-1724
T 312.984.8619  www.segalco.com

Daniel V. Ciner, MAAA, EA
Senior Vice President and Actuary
dciner@segalco.com

August 29, 2017

*VIA E-MAIL*

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
1180 Dublin Road
Columbus, Ohio 43212

Re:    **Ohio Operating Engineers Pension Fund – Partial and Complete Withdrawal Liability
        Calculations for Sofco Erectors, Inc.**

Dear Ms. Polsinelli:

As requested, we have updated the withdrawal liability calculation for Sofco Erectors, Inc. assuming three
partial withdrawals in the Plan years ended July 31 of 2011, 2012, and 2013, respectively, and a complete
withdrawal in the Plan year ended July 31, 2017. As described below, we look to Fund Counsel regarding
interpretations as to assessment of withdrawal liability for construction industry employers.

➤ For the Plan year ended July 31, 2011, the calculated amount of partial withdrawal liability is
  $344,627, which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327.
➤ For the Plan year ended July 31, 2012, the calculated amount of partial withdrawal liability is
  $111,358 (after application of the credit for the prior partial withdrawal as of July 31, 2011), which
  can be paid in six quarterly payments of $17,294 and a final payment of $10,652.
➤ For the Plan year ended July 31, 2013, the calculated amount of partial withdrawal liability is $0
  (after application of the credit for the prior partial withdrawals as of July 31, 2011 and 2012).
➤ For the Plan year ended July 31, 2017, the calculated amount of complete withdrawal liability is
  $368,315 (after application of the credit for the prior partial withdrawals as of July 31, 2011, 2012,
  and 2013), which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721.

The above withdrawal liability calculations are based on the asset values and liabilities stated in the
July 31, 2008, 2009, 2010, and 2016 withdrawal liability reports, respectively. In addition, they are based
on the contribution information provided in your e-mails dated May 1, 2017 and May 9, 2017, including
maximum hourly contribution rates of $4.00, $4.50, and $6.00 for the 10-year periods ended July 31,
2009, 2010, and 2017, respectively.

Under Section 4205(b)(1) of ERISA, a partial withdrawal occurs when contribution hours in each of three
consecutive years (the "three-year testing period") are at least 70% less than the average of the two
highest years of contribution hours during the five years preceding the three-year testing period. Based on
the information you provided us, Sofco Erectors, Inc. incurred three consecutive 70% declines for the
three-year testing periods that ended in 2011, 2012, and 2013.

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
August 29, 2017
Page 2

Under Section 4208(d)(1) of ERISA, for construction industry employers in construction industry plans, partial withdrawal liability is assessable when work continues for an insubstantial portion of the employer's work in the jurisdiction of the collective bargaining agreement. The calculations included in this letter assume that this employer will be assessed partial withdrawal liability for each partial withdrawal. We defer to Fund Counsel's interpretation as to whether partial withdrawal liability is assessable to this employer.

Under Section 4206 of ERISA, partial withdrawal liability based on a 70% decline in contribution hours is calculated as a fraction of the amount that would be payable if there were a complete withdrawal by this employer on the last day of the first Plan year in the three-year testing period (i.e., in 2009, 2010, and 2011 for the 2011, 2012, and 2013 partial withdrawals, respectively). This fraction equals the ratio of the employer's contribution hours for the Plan year following the end of the three-year testing period to the average contribution hours during the five years preceding the first year of the three-year testing period.

Under Section 4206 of ERISA, any withdrawal liability (either complete or partial) for an employer is reduced by the amount of any partial withdrawal liability of the employer with respect to the Plan for a previous year. We have determined the amount of credit for the prior partial withdrawals, and have offset the partial withdrawal liability for the Plan years ended July 31, 2012 and July 31, 2013, as well as the complete withdrawal liability as of July 31, 2017, by the respective credit amounts.

We have enclosed exhibits showing the details of our calculations as follows:
For the July 31, 2011 partial withdrawal:
  Exhibit A – Determination of Partial Withdrawal
  Exhibit B – Calculation of the Allocable Amount of Unfunded Vested Benefits
  Exhibit C – Determination of Withdrawal Liability
  Exhibit D – Determination of Payment Schedule under ERISA Section 4219
  Exhibit E – Basis for Determining Withdrawal Liability

For the July 31, 2012 partial withdrawal:
  Exhibit F – Determination of Partial Withdrawal
  Exhibit G – Calculation of the Allocable Amount of Unfunded Vested Benefits
  Exhibit H – Development of Credit for Prior (July 31, 2011) Partial Withdrawal
  Exhibit I – Determination of Withdrawal Liability
  Exhibit J – Determination of Payment Schedule under ERISA Section 4219
  Exhibit K – Basis for Determining Withdrawal Liability

For the July 31, 2013 partial withdrawal:
  Exhibit L – Determination of Partial Withdrawal
  Exhibit M – Calculation of the Allocable Amount of Unfunded Vested Benefits
  Exhibit N – Development of Credit for Prior (July 31, 2011 and July 31, 2012) Partial Withdrawals
  Exhibit O – Determination of Withdrawal Liability
  Exhibit P – Basis for Determining Withdrawal Liability

✳ Segal Consulting

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
August 29, 2017
Page 3

For the July 31, 2017 complete withdrawal:

    Exhibit Q – Calculation of the Allocable Amount of Unfunded Vested Benefits

    Exhibit R – Development of Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals

    Exhibit S – Determination of Withdrawal Liability

    Exhibit T – Determination of Payment Schedule under ERISA Section 4219

    Exhibit U – Basis for Determining Withdrawal Liability

As with all withdrawals, the assessment of withdrawal liability is subject to Fund Counsel review.  Please let us know if you have any questions.

Sincerely,

Daniel V. Ciner

Enclosures

cc:   Ms. Carol Wilson (w/enclosures)
      Ms. Megan Kelly (w/enclosures)

*5685716v1/05517.008*

EXHIBIT A

## Ohio Operating Engineers Pension Fund

### DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2011

Employer Name:     **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                    07/31/2011

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | 12,253.50 | 13% |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |
| 2004 | 10,862.00 | | |

*A partial withdrawal has occurred as of July 31, 2011.*

�distinctive Segal Consulting

EXHIBIT B

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2009

Employer Name: Sofco Erectors, Inc.

| Year Ended[1] July 31 (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) |
|---|---|---|---|---|---|
| | Basic[2] (2) | Reallocated[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | (6) |
| 2003 | $195,618,368 | $0 | $178,834,875 | $291,244 | $318,577 |
| 2004 | (21,738,368) | 0 | 183,435,933 | 275,279 | (32,622) |
| 2005 | 103,632,017 | 0 | 184,525,945 | 211,259 | 118,646 |
| 2006 | (136,835,103) | 0 | 187,236,038 | 189,279 | (138,328) |
| 2007 | 31,859,110 | 0 | 192,258,544 | 180,029 | 29,833 |
| 2008 | 138,233,538 | 0 | 202,969,173 | 187,255 | 127,531 |
| Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6) | | | | | $423,637 |

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✶ Segal Consulting

EXHIBIT C

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

Employer Name: Sofco Erectors, Inc.

| | | | |
|---|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | | $423,637 |
| B. | De Minimis Reduction Under ERISA Section 4209 | | |
| | (1) | Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) | Reduction: $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | | $423,637 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2003 − 07/31/2008 | | 58,229.50 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | | 11,645.90 |
| F. | Contribution Hours 08/01/2011 - 07/31/2012 | | 2,172.00 |
| G. | Partial Withdrawal Liability Factor: 1 − [(F) ÷ (E)] | | 81.349660% |
| H. | Withdrawal Liability: (C) x (G) | | $344,627 |

✳ Segal Consulting

EXHIBIT D

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2011

Employer Name:                         Sofco Erectors, Inc.

(1)  Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 1999 | 18,877.50 | N/A |
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | 24,877.83 |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |

(2)  Average Base Units for highest 3 consecutive years
during 10 years ended July 31, 2008                            24,877.83

(3)  Highest contribution rate during 10 years ending          $4.00
July 31, 2009

(4)  Partial withdrawal liability fraction (see Exhibit C, Item G)    81.349660%

(5)  Annual payment = (2) x (3) x (4) [rounded up to the nearest $4]    $80,956

(6)  Quarterly payment = (5) / 4                               $20,239

(7)  Number of Full Years of Payment                           4

(8)  Remaining Balance After 4 Years                           $69,044

(9)  Number of Full Quarterly Payments in Year 5:              3

(10)  Amount of Remaining Payment = (8) - (6) x (9)            $8,327

✕ Segal Consulting

EXHIBIT E

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2008.

3. All assumptions per the July 31, 2008 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2008.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any application of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✳ Segal Consulting

EXHIBIT F

Ohio Operating Engineers Pension Fund

## DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2012

Employer Name:  **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                      07/31/2012

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |

*A partial withdrawal has occurred as of July 31, 2012.*

✳ Segal Consulting

EXHIBIT G

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2010

Employer Name: Sofco Erectors, Inc.

| Year Ended[1] July 31 (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) (6) |
|---|---|---|---|---|---|
| | Basic[2] (2) | Reallocated[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $182,577,144 | $0 | $178,834,875 | $291,244 | $297,339 |
| 2004 | (20,379,720) | 0 | 183,435,933 | 275,279 | (30,583) |
| 2005 | 97,536,016 | 0 | 184,525,945 | 211,259 | 111,666 |
| 2006 | (129,233,153) | 0 | 187,236,038 | 189,279 | (130,643) |
| 2007 | 30,182,315 | 0 | 192,258,544 | 180,029 | 28,262 |
| 2008 | 131,321,861 | 0 | 202,969,173 | 187,255 | 121,155 |
| 2009 | 357,008,602 | 0 | 210,884,752 | 161,099 | 272,726 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)      $669,922

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✳ Segal Consulting

EXHIBIT H

**Ohio Operating Engineers Pension Fund**
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWAL
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal......................... | $ | 397,196 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal........................ | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal............................... | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal................................................................................. | $ | 423,637 |
| E: | Credit for prior partial withdrawal [ A x B x C / (D x B )]............................................................. | $ | 323,117 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✶ Segal Consulting

EXHIBIT I

Ohio Operating Engineers Pension Fund

### DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $669,922 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $669,922 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2004 − 07/31/2009 | 48,975.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 9,795.00 |
| F. | Contribution Hours 08/1/2012 - 07/31/2013 | 3,442.50 |
| G. | Partial Withdrawal Liability Factor: 1 − [(F) ÷ (E)] | 64.854518% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | $434,475 |
| I. | Credit for Prior (July 31, 2011) Partial Withdrawal | $323,117 |
| J. | Withdrawal Liability: (H) − (I), but not less than zero | $111,358 |

✱ Segal Consulting

EXHIBIT J

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

Employer Name:        Sofco Erectors, Inc.

(1)  Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | N/A |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |
| 2009 | 1,607.50 | 8,213.00 |

(2)  Average Base Units for highest 3 consecutive years during 10 years ended July 31, 2009     23,702.50

(3)  Highest contribution rate during 10 years ending July 31, 2010     $4.50

(4)  Partial withdrawal liability fraction (see Exhibit I, Item G)     64.854518%

(5)  Annual payment = (2) x (3) x (4) [rounded up to the nearest $4]     $69,176

(6)  Quarterly payment = (5) / 4     $17,294

(7)  Number of Full Years of Payment     1

(8)  Remaining Balance After 1 Year     $45,240

(9)  Number of Full Quarterly Payments in Year 2:     2

(10)  Amount of Remaining Payment = (8) - (6) x (9)     $10,652

✳ Segal Consulting

EXHIBIT K

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2009.

3. All assumptions per the July 31, 2009 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2009.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

�×⭐ Segal Consulting

EXHIBIT L

Ohio Operating Engineers Pension Fund

## DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2013

Employer Name:   **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                    07/31/2013

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2013 | 3,442.50 | 12,253.50 | 28% |
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | | |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |

*A partial withdrawal has occurred as of July 31, 2013.*

✳ Segal Consulting

EXHIBIT M

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2011

Employer Name: Sofco Erectors, Inc.

| Year Ended[1] July 31 (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) (6) |
|---|---|---|---|---|---|
| | Basic[2] (2) | Reallocated[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $169,535,919 | $0 | $178,834,875 | $291,244 | $276,100 |
| 2004 | (19,021,072) | 0 | 183,435,933 | 275,279 | (28,545) |
| 2005 | 91,440,015 | 0 | 184,525,945 | 211,259 | 104,687 |
| 2006 | (121,631,202) | 0 | 187,236,038 | 189,279 | (122,958) |
| 2007 | 28,505,519 | 0 | 192,258,544 | 180,029 | 26,692 |
| 2008 | 124,410,184 | 0 | 202,969,173 | 187,255 | 114,778 |
| 2009 | 339,158,172 | 0 | 210,884,752 | 161,099 | 259,090 |
| 2010 | 42,238,100 | 0 | 218,622,244 | 127,590 | 24,651 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)  $654,495

[1] Years not shown have no withdrawal liability components.
[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.
[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.
[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.
[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✳ Segal Consulting

EXHIBIT N

**Ohio Operating Engineers Pension Fund**
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Partial Withdrawal in the Plan Year Ended July 31, 2013

Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal................. | $ | 370,754 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal................. | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal..................... | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal......................................................................... | $ | 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)]............... | $ | 301,607 |

Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012

| | | | |
|---|---|---|---|
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal................. | $ | 629,844 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal................. | | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal.................... | $ | 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal......................................................................... | $ | 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)]............... | $ | 104,696 |

| | | | |
|---|---|---|---|
| K: | Total credit for prior partial withdrawals [ E + J ] | $ | 406,303 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✴ Segal Consulting

EXHIBIT O

Ohio Operating Engineers Pension Fund

## DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2013

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $654,495 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1)  Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2)  Reduction:  $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $654,495 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2005 − 07/31/2010 | 37,608.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 7,521.60 |
| F. | Contribution Hours 08/1/2013 - 07/31/2014 | 3,834.00 |
| G. | Partial Withdrawal Liability Factor: 1 − [(F) ÷ (E)] | 49.026803% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | $320,878 |
| I. | Credit for Prior (July 31, 2011 and 2012) Partial Withdrawals | $406,303 |
| J. | Withdrawal Liability: (H) − (I), but not less than zero | $0 |

✶ Segal Consulting

EXHIBIT P

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2013

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2010.

3. All assumptions per the July 31, 2010 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2010.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✦ Segal Consulting

EXHIBIT Q

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer Name: Sofco Erectors, Inc.

| Year Ended[1] July 31 | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
| | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | (2) and (3) |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $91,288,572 | $0 | $178,834,875 | $291,244 | $148,669 |
| 2004 | (10,869,184) | 0 | 183,435,933 | 275,279 | (16,311) |
| 2005 | 54,864,009 | 0 | 184,525,945 | 211,259 | 62,812 |
| 2006 | (76,019,502) | 0 | 187,236,038 | 189,279 | (76,849) |
| 2007 | 18,444,748 | 0 | 192,258,544 | 180,029 | 17,271 |
| 2008 | 82,940,123 | 0 | 202,969,173 | 187,255 | 76,519 |
| 2009 | 232,055,591 | 0 | 210,884,752 | 161,099 | 177,272 |
| 2010 | 29,566,670 | 0 | 218,622,244 | 127,590 | 17,255 |
| 2011 | 127,603,629 | 0 | 230,778,340 | 95,158 | 52,615 |
| 2012 | 214,305,669 | 0 | 250,306,333 | 70,436 | 60,305 |
| 2013 | 7,764,623 | 0 | 269,018,918 | 46,278 | 1,336 |
| 2014 | (129,537,937) | 6,853 | 298,703,055 | 62,852 | (27,255) |
| 2015 | 261,224,360 | 0 | 331,169,312 | 94,102 | 74,227 |
| 2016 | 112,294,964 | 0 | 360,524,316 | 121,118 | 37,725 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)  $605,591

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✳ Segal Consulting

EXHIBIT R

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Withdrawal in the Plan Year Ended July 31, 2017

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011**

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal.............. | $ | 212,111 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............. | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal................ | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.................................................................. | $ | 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)]..... | $ | 172,551 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012**

| | | | |
|---|---|---|---|
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal.............. | $ | 389,383 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............. | | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal.................... | $ | 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal................................................ | $ | 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)]..... | $ | 64,725 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2013**

| | | | |
|---|---|---|---|
| K: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal.............. | $ | 406,638 |
| L: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............. | | 0.490268 |
| M: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal.................... | $ | - |
| N: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal................................................ | $ | 654,495 |
| O: | Credit for prior partial withdrawal in Plan year ended July 31, 2013 [ K x L x M / (N x L)]............. | $ | - |
| | | | |
| P: | Total credit for prior partial withdrawals [ E + J + O ] | $ | 237,276 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✳ Segal Consulting

EXHIBIT S

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

Employer Name: Sofco Erectors, Inc.

| | | | |
|---|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | | $605,591 |
| B. | De Minimis Reduction Under ERISA Section 4209 | | |
| | (1) | Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) | Reduction: $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Limitation in Accordance with ERISA Section 4225 (Sale of Assets) | | N/A* |
| D. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | | $605,591 |
| E. | Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals | | $237,276 |
| F. | Withdrawal Liability: (D) − (E), but not less than zero | | $368,315 |

\* We are unaware of any applicability of Section 4225 on this assessment and defer to the Fund
 Administrator and Legal Counsel to determine whether it applies

✶ Segal Consulting

EXHIBIT T

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer Name:                    Sofco Erectors, Inc.

(1)  Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2007 | 11,053.50 | N/A |
| 2008 | 11,978.00 | N/A |
| 2009 | 1,607.50 | 8,213.00 |
| 2010 | 440.00 | 4,675.17 |
| 2011 | 1,123.00 | 1,056.83 |
| 2012 | 2,172.00 | 1,245.00 |
| 2013 | 3,442.50 | 2,245.83 |
| 2014 | 3,834.00 | 3,149.50 |
| 2015 | 5,527.00 | 4,267.83 |
| 2016 | 5,477.00 | 4,946.00 |

(2)  Average Base Units for highest 3 consecutive years            8,213.00
     during 10 years ended July 31, 2016

(3)  Highest contribution rate during 10 years ended               $6.00
     July 31, 2017

(4)  Annual payment = (2) x (3) [rounded up to the nearest $4]      $49,280

(5)  Quarterly payment = (4) / 4                                   $12,320

(6)  Number of Full Years of Payment                               10

(7)  Remaining Balance After 10 Years                              $2,721

(8)  Number of Full Quarterly Payments in Year 11:                 0

(9)  Amount of Remaining Payment = (7) - (5) x (8)                 $2,721

✴ Segal Consulting

EXHIBIT U

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2016.

3. All assumptions per the July 31, 2016 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2016.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

✶ Segal Consulting

# The Libman Actuarial Group, Inc.

5755 Granger Road, Suite 501
Independence OH 44131-1442

www.libmanag.com
**216-398-3888**
Fax 216-398-5069

September 7, 2018

Gary L. Greenberg
Attorney at Law
Jackson Lewis P.C.
425 Walnut Street
Suite 2300
Cincinnati, OH 45202

RE:     Sofco Erectors, Inc. / Ohio Operating Engineers Pension Fund Withdrawal Liability

Dear Gary:

This report contains my expert opinion regarding the Sofco Erectors, Inc. Withdrawal Liability upon withdrawal from the Ohio Operating Engineers Pension Fund.

## Assignment

You have requested that I review the Withdrawal Liability Assessment for Sofco Erectors, Inc. by the Ohio Operating Engineers Pension Fund as of July 31, 2017. I was also requested to calculate the Withdrawal Liability under the assumption that:

1.  There were no Partial Withdrawal Assessments, and

2.  Contributions for Sofco Erectors, Inc. began on April 4, 2004 and that the contributions for any predecessor employer should not be considered in determining the Sofco Erectors, Inc. Withdrawal Liability.

The sources of the data used for the calculations made for this report are detailed in the Data Sources section of this report.

## Findings

Because funding for Sofco Erectors, Inc. began on April 1, 2004, the cumulative 5 year contributions for all years prior to the Plan Year Ending July 31, 2009 were reduced. This resulted in lower amounts of liability allocated to Sofco Erectors, Inc. for those years and a resulting Preliminary Allocable Amount of Unfunded Vested Benefits of $451,061 instead of the $605,591 (before any offsets for partial withdrawal liabilities) as calculated by Segal Consulting.

The calculations supporting these findings are detailed on the included Exhibit.

ALL-STATE LEGAL®

E

SOFCO002150

**Methods and Assumptions**

The actuarial methods used in these calculations are identical to those used by Segal Consulting with the exceptions noted above (i.e. no partial assessment and no contributions prior to April 1, 2004).

**Data Sources**

I was supplied with the following documents which were received, reviewed and relied upon in my calculations:

- August 29, 2017 letter from Segal Consulting re: Ohio Operating Engineers Pension Fund Withdrawal Liabilities for Sofco Erectors, Inc.,

- The Ohio Operating Engineers Pension Fund Withdrawal Liability Valuation Reports prepared by Segal Consulting for the Plan Years Ending July 31, 2009 through July 31, 2016, and

- The Ohio Operating Engineers Pension Fund supplied printout showing monthly remittance amounts from Sofco Erectors, Inc. from 1998 through and including the month of March, 2017.

**Summary**

Please note that all calculations from The Libman Actuarial Group can only be considered as unofficial since the laws and regulations require that official and final Withdrawal Liability calculations must be prepared by the Plan's actuary. Based on my expert opinion, I do not expect the Segal Consulting calculations to differ materially from those provided in my report.

The above fairly and accurately represent my findings as an expert witness in this matter. Any and all exhibits are an integral part of this report.

Please contact me if you have any questions or comments regarding these opinions

Cordially,

Michael L. Libman, MAAA, FCA, MSPA

Enclosures:
- Exhibit – Detailed Withdrawal Liability Calculations
- cv of Michael L. Libman

## Ohio Operating Engineers Pension Fund
### Withdrawal Liability Calculations
### Sofco Erectors, Inc.

### Total Withdrawal During the Plan Year Ending July 31, 2017

### Excluding Predecessor Contributions Prior to April 1, 2004
### Assuming No Partial Withdrawals

| Year Ended | Unamortized Balance of Withdrawal Liability Pools | | Contributions During the Prior 5 year Period | | Liability Allocated |
|---|---|---|---|---|---|
| | Basic | Reallocated | Total Plan | Sofco Erectors, Inc. | |
| 7/31/2003 | 91,288,582 | | $178,834,875 | $0 | $0 |
| 7/31/2004 | (10,869,184) | | 183,435,933 | 9,411 | (558) |
| 7/31/2005 | 54,864,009 | | 184,525,945 | 44,832 | 13,330 |
| 7/31/2006 | (76,019,502) | | 187,236,038 | 83,109 | (33,743) |
| 7/31/2007 | 18,444,748 | | 192,258,544 | 119,913 | 11,504 |
| 7/31/2008 | 82,940,123 | | 202,969,173 | 164,079 | 67,048 |
| 7/31/2009 | 232,055,591 | | 210,884,752 | 161,099 | 177,272 |
| 7/31/2010 | 29,566,670 | | 218,622,244 | 127,590 | 17,255 |
| 7/31/2011 | 127,603,629 | | 230,778,340 | 95,158 | 52,615 |
| 7/31/2012 | 214,305,669 | | 250,306,333 | 70,436 | 60,305 |
| 7/31/2013 | 7,764,623 | | 269,018,918 | 46,278 | 1,336 |
| 7/31/2014 | (129,537,937) | 6,853 | 298,703,055 | 62,852 | (27,255) |
| 7/31/2015 | 261,224,360 | | 331,169,312 | 94,102 | 74,227 |
| 7/31/2016 | 112,294,964 | | 360,524,316 | 121,118 | 37,725 |
| | | Preliminary Allocable Amount of Unfunded Vested Benefits | | | $451,061 |

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $451,061 |
| B. | De minimis Reduction (ERISA Sec.4209) | |
| | 1. Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | 2. Reduction of $100,000 + B1 - A, not > B1 or <0 | $0 |
| D. | Net Allocable Amount of Unfunded vested Benefits for Complete Withdrawal | $451,061 |
| E. | Credit for Prior Partial Withdrawal | $0 |
| F. | Withdrawal Liability D - E, not less than zero | $451,061 |

Ohio Operating Engineers Pension Fund
Withdrawal Liability Calculations
Sofco Erectors, Inc.

Total Withdrawal During the Plan Year Ending July 31, 2017

Excluding Predecessor Contributions Prior to April 1, 2004
Assuming No Partial Withdrawals

Determination of Payment Schedule Under ERISA Section 4219

| | PYE 7/31 | Hours | 3Yr-Average |
|---|---|---|---|
| 1 Employer Base Units History | 2007 | 11,053.50 | |
| | 2008 | 11,978.00 | |
| | 2009 | 1,607.50 | 8,213.00 |
| | 2010 | 440.00 | 4,675.17 |
| | 2011 | 1,123.00 | 1,056.83 |
| | 2012 | 2,172.00 | 1,245.00 |
| | 2013 | 3,442.50 | 2,245.83 |
| | 2014 | 3,834.00 | 3,149.50 |
| | 2015 | 5,527.00 | 4,267.83 |
| | 2016 | 5,477.00 | 4,946.00 |

| | |
|---|---|
| 2 Average Base Units for the High 3 Consecutive 10 years Ended 7/31/16 | 8,213.00 |
| 3 Highest Contribution Rate during 10 years ended 7/31/17 | $6.00 |
| 4 Annual Payment = 2 x 3 | $49,280.00 |
| 5 Quarterly Payment = 4 / 3 | $12,320.00 |
| 6 Number of Quarterly Payments | 57.00 |
| 7 Remaining Payment | $7,661.69 |
| Applicable Discount Rate | 7.25% |

SOFCO 002153

## Michael L. Libman

Associate, Society of Actuaries (1970)
Member, American Academy of Actuaries (1971)
Enrolled Actuary (1979)
Member, American Society of Pension Actuaries (1996)
Fellow, Conference of Consulting Actuaries (2000)

### Employment

**The Libman Actuarial Group, Inc. (and predecessor) Cleveland OH Effective 1/1/90**

Consulting Actuary- over 300 clients primarily in Ohio, including several law firms; responsible for creative consulting and research.

**Foster Higgins and predecessors Cleveland OH 1975-1989**

Consulting Actuary- over 250 plans from 1 to 6,000 participants. Senior actuary with responsibilities for managing the actuarial practice and business development.

**Mutual of New York New York NY 1963-1974**

Assistant Actuarial Director- financial projection, corporate modeling and many other actuarial assignments

### Professional Educational Activities

Society of Actuaries- Part 150 Exam Committee 1986-1991 (Life Contingencies)

Conference of Consulting Actuaries – 2009 Audiocast Panelist "Statutory Hybrid Plans – Recent Developments"

### Most Relevant Work Experience

Consulting Actuary to QDRO Group (formerly Pension Evaluators) of Medina, OH   1996 - Present

Litigation Support in divorce proceedings and other matters

### Depositions

Expert Witness for the Plaintiff- Rubber Associates, Inc. v. United Food and CWU-EP- Arbitration 5/29/13

Expert Witness for the Spouse – Moyer v. Moyer- Trial Testimony 10/1/12

Expert Witness for the Plaintiff – Khaliel and Taylor, et al v. Norton Healthcare, Inc. Retirement Plan- Deposed 9/14/12

Expert Witness for the Plaintiff – Cottillion, et al v. United Refining Co.- Deposed 3/8/12

Expert Witness for the Plaintiff – J. West  v. AK Steel

### Education

BS in mathematics, St. Lawrence University 1963

SOFCO002154

**The Libman Actuarial Group, Inc.**

5755 Granger Road, Suite 501
Independence OH 44131-1442

www.libmanag.com
**216-398-3888**
Fax 216-398-5069

September 7, 2018

Gary L. Greenberg
Attorney at Law
Jackson Lewis P.C.
425 Walnut Street
Suite 2300
Cincinnati, OH  45202

RE:    Sofco Erectors, Inc. / Ohio Operating Engineers Pension Fund Withdrawal Liability

Dear Gary:

This report contains my expert opinion regarding the Sofco Erectors, Inc. Withdrawal Liability upon withdrawal from the Ohio Operating Engineers Pension Fund.

**Assignment**

You have requested that I review the Withdrawal Liability Assessment for Sofco Erectors, Inc. by the Ohio Operating Engineers Pension Fund as of July 31, 2017. I was also requested to calculate the Withdrawal Liability under the assumption that:

1. There were no Partial Withdrawal Assessments, and

2. The interest rate used for the Withdrawal Liability Calculation was the same 7.25% per annum assumption that was used as the interest assumption for the actuarial funding valuations performed by Segal Consulting between 2008 and 2016 inclusive.

The sources of the data used for the calculations made for this report are detailed in the Data Sources section of this report.

**Findings**

Using the funding valuation interest rate of 7.25% I observed that as of July 31, 2014 the Plan Assets exceeded Withdrawal Liability.  Under the Withdrawal Liability method chosen by the Plan, all previous Withdrawal Liability bases are set to zero when this occurs.  Assets again exceeded Withdrawal Liability on July 31, 2015 so no new Withdrawal Liability base was established on that date.  As of July 31, 2016, a Withdrawal Liability base was established, but since the amount allocated to Sofco Erectors, Inc. was less than the Deminimus amount for this situation, the Withdrawal Liability is equal to zero.  The calculations supporting these findings are detailed on the included Exhibit.

F

**Methods and Assumptions**

The actuarial methods used in these calculations are identical to those used by Segal Consulting with the exceptions noted above (i.e. no partial assessment and the use of the 7.25% interest rate).

**Data Sources**

I was supplied with the following documents which were received, reviewed and relied upon in my calculations:

- August 29, 2017 letter from Segal Consulting re: Ohio Operating Engineers Pension Fund Withdrawal Liabilities for Sofco Erectors, Inc.,

- The Ohio Operating Engineers Pension Fund Withdrawal Liability Valuation Reports prepared by Segal Consulting for the Plan Years Ending July 31, 2009 through July 31, 2016, and

- The Ohio Operating Engineers Pension Fund supplied printout showing monthly remittance amounts from Sofco Erectors, Inc. from 1998 through and including the month of March, 2017.

**Summary**

Please note that all calculations from The Libman Actuarial Group can only be considered as unofficial since the laws and regulations require that official and final Withdrawal Liability calculations be prepared by the Plan's actuary. Based on my expert opinion, I do not expect the Segal Consulting calculations to differ materially from those provided in my report.

The above fairly and accurately represent my findings as an expert witness in this matter. Any and all exhibits are an integral part of this report.

Please contact me if you have any questions or comments regarding these opinions

Cordially,

Michael L. Libman, MAAA, FCA, MSPA

Enclosures:
- Exhibit – Detailed Withdrawal Liability Calculations
- cv of Michael L. Libman

Ohio Operating Engineers Pension Fund
Withdrawal Liability Calculations
Sofco Erectors, Inc.

Total Withdrawal During the Plan Year Ending July 31, 2017

Based on Funding Valuation Liability Assumptions
Assuming No Partial Withdrawals

| Year Ended | Unamortized Balance of Withdrawal Liability Pools | | Contributions During the Prior 5 year Period | | Liability Allocated |
| | Basic | Reallocated | Total Plan | Sofco Erectors, Inc. | |
|---|---|---|---|---|---|
| 7/31/2003 | 91,288,582 [1] | | $178,834,875 | $291,244 | 0 [2] |
| 7/31/2004 | (10,869,184) [1] | | 183,435,933 | 275,279 | 0 [2] |
| 7/31/2005 | 54,864,009 [1] | | 184,525,945 | 211,259 | 0 [2] |
| 7/31/2006 | (76,019,502) [1] | | 187,236,038 | 189,279 | 0 [2] |
| 7/31/2007 | 18,444,748 [1] | | 192,258,544 | 180,029 | 0 [2] |
| 7/31/2008 | (75,645,136) | | 202,969,173 | 187,255 | 0 [2] |
| 7/31/2009 | 197,513,237 | | 210,884,752 | 161,099 | 0 [2] |
| 7/31/2010 | (34,272,140) | | 218,622,244 | 127,590 | 0 [2] |
| 7/31/2011 | (4,423,614) | | 230,778,340 | 95,158 | 0 [2] |
| 7/31/2012 | 49,095,067 | | 250,306,333 | 70,436 | 0 [2] |
| 7/31/2013 | (152,237,427) | | 269,018,918 | 46,278 | 0 [2] |
| 7/31/2014 | (121,092,797) | 6,853 | 298,703,055 | 62,852 | 0 [2] |
| 7/31/2015 | (73,899,768) | | 331,169,312 | 94,102 | 0 [2] |
| 7/31/2016 | 19,479,420 | | 360,524,316 | 121,118 | 6,544 |
| | Preliminary Allocable Amount of Unfunded Vested Benefits | | | | $6,544 |

[1] Funding liability numbers prior to 2008 were not readily available. These liabilities are those provided by the Fund in their calculations and have no effect on the ultimate withdrawal liability amount on this basis as assets exceeded liabilities as of July 31, 2014.

[2] Unamortized Balance set to $0 as a result of plan being fully funded as of July 31, 2014 and 2015.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $6,544 |
| B. | De minimis Reduction (ERISA Sec.4209) | |
| | 1. Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | 2. Reduction of $100,000 + B1 - A, not > B1 or <0 | $143,456 |
| D. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | ($136,912) |
| E. | Credit for Prior Partial Withdrawal | $0 |
| F. | Withdrawal Liability D - E, not less than zero | $0 |

Payment Schedule does not apply since the Withdrawal Liability is $0.

Prepared by the Libman Actuarial Group

## Michael L. Libman

Associate, Society of Actuaries (1970)
Member, American Academy of Actuaries (1971)
Enrolled Actuary (1979)
Member, American Society of Pension Actuaries (1996)
Fellow, Conference of Consulting Actuaries (2000)

### Employment

**The Libman Actuarial Group, Inc. (and predecessor) Cleveland OH Effective 1/1/90**

Consulting Actuary- over 300 clients primarily in Ohio, including several law firms; responsible for creative consulting and research.

**Foster Higgins and predecessors Cleveland OH 1975-1989**

Consulting Actuary- over 250 plans from 1 to 6,000 participants. Senior actuary with responsibilities for managing the actuarial practice and business development.

**Mutual of New York New York NY 1963-1974**

Assistant Actuarial Director- financial projection, corporate modeling and many other actuarial assignments

### Professional Educational Activities

Society of Actuaries- Part 150 Exam Committee 1986-1991 (Life Contingencies)

Conference of Consulting Actuaries – 2009 Audiocast Panelist "Statutory Hybrid Plans – Recent Developments"

### Most Relevant Work Experience

Consulting Actuary to QDRO Group (formerly Pension Evaluators) of Medina, OH   1996 - Present

Litigation Support in divorce proceedings and other matters

### Depositions

Expert Witness for the Plaintiff- Rubber Associates, Inc. v. United Food and CWU-EP- Arbitration 5/29/13

Expert Witness for the Spouse – Moyer v. Moyer- Trial Testimony 10/1/12

Expert Witness for the Plaintiff – Khaliel and Taylor, et al v. Norton Healthcare, Inc. Retirement Plan- Deposed 9/14/12

Expert Witness for the Plaintiff – Cottillion, et al v. United Refining Co.- Deposed 3/8/12

Expert Witness for the Plaintiff – J. West v. AK Steel

### Education

BS in mathematics, St. Lawrence University 1963

# The Libman Actuarial Group, Inc.

5755 Granger Road, Suite 501
Independence OH 44131-1442

www.libmanag.com
216-398-3888
Fax 216-398-5069

December 18, 2018

Gary L. Greenberg
Attorney at Law
Jackson Lewis P.C.
425 Walnut Street
Suite 2300
Cincinnati, OH 45202

RE:     Sofco Erectors, Inc. / Ohio Operating Engineers Pension Fund Withdrawal Liability

Dear Gary:

This report contains my expert opinion regarding the Sofco Erectors, Inc. Withdrawal Liability upon withdrawal from the Ohio Operating Engineers Pension Fund.

**Assignment**

You have requested that I review the Withdrawal Liability Assessment for Sofco Erectors, Inc. by the Ohio Operating Engineers Pension Fund as of July 31, 2017. I was also requested to calculate the Withdrawal Liability under the assumption that:

1.  There were no Partial Withdrawal Assessments,

2.  The interest rate used for the Withdrawal Liability Calculation was the same 7.25% per annum assumption that was used as the interest assumption for the actuarial funding valuations performed by Segal Consulting between 2003 and 2016 inclusive, and

3.  Prior Pools were not eliminated when the Unfunded Liability became zero in 2014.

The sources of the data used for the calculations made for this report are detailed in the Data Sources section of this report.

**Findings**

Using the funding valuation interest rate of 7.25%, I observed that as of 7/31/2003, 7/31/2004, 7/31/2005, 7/31/2006 and 7/31/2007 the Plan Assets exceeded Withdrawal Liability. If the Prior Pools are not eliminated when the Unfunded Liability becomes zero, as of July 31, 2016 the Withdrawal Liability for Sofco Erectors, Inc. is $46,189 following the De Minimis reduction. The calculations supporting these findings are detailed on the included Exhibit.

G

**Methods and Assumptions**

The actuarial methods used in these calculations are identical to those used by Segal Consulting with the exceptions noted above (i.e. no partial assessment and the use of the 7.25% interest rate).

**Data Sources**

I was supplied with the following documents which were received, reviewed and relied upon in my calculations:

- August 29, 2017 letter from Segal Consulting re: Ohio Operating Engineers Pension Fund Withdrawal Liabilities for Sofco Erectors, Inc.,

- The Ohio Operating Engineers Pension Fund Withdrawal Liability Valuation Reports prepared by Segal Consulting for the Plan Years Ending July 31, 2003 through July 31, 2016, and

- The Ohio Operating Engineers Pension Fund supplied printout showing monthly remittance amounts from Sofco Erectors, Inc. from 1998 through and including the month of March, 2017.

**Summary**

Please note that all calculations from The Libman Actuarial Group can only be considered as unofficial since the laws and regulations require that official and final Withdrawal Liability calculations be prepared by the Plan's actuary. Based on my expert opinion, I do not expect the Segal Consulting calculations to differ materially from those provided in my report.

The above fairly and accurately represent my findings as an expert witness in this matter. Any and all exhibits are an integral part of this report.

Please contact me if you have any questions or comments regarding these opinions

Cordially,

Michael L. Libman, MAAA, FCA, MSPA

Enclosures:
- Exhibit – Detailed Withdrawal Liability Calculations
- cv of Michael L. Libman

## Ohio Operating Engineers Pension Fund
### Withdrawal Liability Calculations
### Sofco Erectors, Inc.

### Total Withdrawal During the Plan Year Ending July 31, 2017

### Based on Funding Valuation Liability Assumptions
### Assuming No Partial Withdrawals
### Assuming Prior Pools Not Eliminated When Unfunded Liability Becomes Zero

| Year Ended | Unamortized Balance of Withdrawal Liability Pools | | Contributions During the Prior 5 year Period | | Liability Allocated |
|---|---|---|---|---|---|
|  | Basic | Reallocated | Total Plan | Sofco Erectors, Inc. |  |
| 7/31/2003 | 0 [1] |  | $178,834,875 | $291,244 | 0 |
| 7/31/2004 | 0 [1] |  | 183,435,933 | 275,279 | 0 |
| 7/31/2005 | 0 [1] |  | 184,525,945 | 211,259 | 0 |
| 7/31/2006 | 0 [1] |  | 187,236,038 | 189,279 | 0 |
| 7/31/2007 | 0 [1] |  | 192,258,544 | 180,029 | 0 |
| 7/31/2008 | 27,876,479 |  | 202,969,173 | 187,255 | 25,718 |
| 7/31/2009 | 195,415,934 |  | 210,884,752 | 161,099 | 149,282 |
| 7/31/2010 | (36,643,706) |  | 218,622,244 | 127,590 | (21,386) |
| 7/31/2011 | (7,091,627) |  | 230,778,340 | 95,158 | (2,924) |
| 7/31/2012 | 46,106,894 |  | 250,306,333 | 70,436 | 12,974 |
| 7/31/2013 | (155,571,110) |  | 269,018,918 | 46,278 | (26,762) |
| 7/31/2014 | (124,799,066) | 6,853 | 298,703,055 | 62,852 | (26,258) |
| 7/31/2015 | (73,899,768) |  | 331,169,312 | 94,102 | (20,999) |
| 7/31/2016 | 19,479,420 |  | 360,524,316 | 121,118 | 6,544 |
|  |  | Preliminary Allocable Amount of Unfunded Vested Benefits |  |  | $96,189 |

[1] No Withdrawal Liability Pool established for this year

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $96,189 |
| B. | De minimis Reduction (ERISA Sec.4209) | |
|  | 1. Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
|  | 2. Reduction of $100,000 + B1 - A, not > B1 or <0 | $50,000 |
| D. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $46,189 |
| E. | Credit for Prior Partial Withdrawal | $0 |
| F. | Withdrawal Liability D - E, not less than zero | $46,189 |

Prepared by the Libman Actuarial Group

Ohio Operating Engineers Pension Fund
Withdrawal Liability Calculations
Sofco Erectors, Inc.

Total Withdrawal During the Plan Year Ending July 31, 2017

Based on Funding Valuation Liability Assumptions
Assuming No Partial Withdrawals
Assuming Prior Pools Not Eliminated When Unfunded Liability Becomes Zero

Determination of Payment Schedule Under ERISA Section 4219

| | | PYE 7/31 | Hours | 3Yr-Average |
|---|---|---|---|---|
| 1 | Employer Base Units History | 2007 | 11,053.50 | |
| | | 2008 | 11,978.00 | |
| | | 2009 | 1,607.50 | 8,213.00 |
| | | 2010 | 440.00 | 4,675.17 |
| | | 2011 | 1,123.00 | 1,056.83 |
| | | 2012 | 2,172.00 | 1,245.00 |
| | | 2013 | 3,442.50 | 2,245.83 |
| | | 2014 | 3,834.00 | 3,149.50 |
| | | 2015 | 5,527.00 | 4,267.83 |
| | | 2016 | 5,477.00 | 4,946.00 |
| 2 | Average Base Units High 3 Consecutive 10 Years Ended 7/31/16 | | | 8,213.00 |
| 3 | Highest Contribution Rate during 10 years ended 7/31/17 | | | $6.00 |
| 4 | Annual Payment = 2 x 3 | | | $49,280.00 |
| 5 | Quarterly Payment = 4 / 3 | | | $12,320.00 |
| 6 | Number of Quarterly Payments | | | 3.00 |
| 7 | Remaining Payment | | | $10,581.71 |
| | Applicable Discount Rate | | | 7.25% |

Prepared by the Libman Actuarial Group

# Michael L. Libman

Associate, Society of Actuaries (1970)
Member, American Academy of Actuaries (1971)
Enrolled Actuary (1979)
Member, American Society of Pension Actuaries (1996)
Fellow, Conference of Consulting Actuaries (2000)

## Employment

### The Libman Actuarial Group, Inc. (and predecessor) Cleveland OH Effective 1/1/90

Consulting Actuary- over 300.clients primarily in Ohio, including several law firms; responsible for creative consulting and research.

### Foster Higgins and predecessors Cleveland OH 1975-1989

Consulting Actuary- over 250 plans from 1 to 6,000 participants. Senior actuary with responsibilities for managing the actuarial practice and business development.

### Mutual of New York New York NY 1963-1974

Assistant Actuarial Director- financial projection, corporate modeling and many other actuarial assignments

## Professional Educational Activities

Society of Actuaries- Part 150 Exam Committee 1986-1991 (Life Contingencies)

Conference of Consulting Actuaries – 2009 Audiocast Panelist "Statutory Hybrid Plans – Recent Developments"

## Most Relevant Work Experience

Consulting Actuary to QDRO Group (formerly Pension Evaluators) of Medina, OH   1996 - Present

Litigation Support in divorce proceedings and other matters

## Depositions

Expert Witness for the Plaintiff- Rubber Associates, Inc. v. United Food and CWU-EP- Arbitration 5/29/13

Expert Witness for the Spouse – Moyer v. Moyer- Trial Testimony 10/1/12

Expert Witness for the Plaintiff – Khaliel and Taylor, et al v. Norton Healthcare, Inc. Retirement Plan- Deposed 9/14/12

Expert Witness for the Plaintiff – Cottillion, et al v. United Refining Co.- Deposed 3/8/12

Expert Witness for the Plaintiff – J. West  v. AK Steel

## Education

BS in mathematics, St. Lawrence University 1963

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| SOFCO ERECTORS, INC., | : | |
| Claimant, | : | AAA Case No. 01-18-0001-3790 |
| v. | : | Arbitrator John Sands |
| OHIO OPERATING ENGINEERS PENSION FUND, | : | |
| Respondent. | : | |

**RESPONDENT OHIO OPERATING ENGINEERS PENSION FUND'S
ANSWERS TO SOFCO ERECTORS, INC.'S
SECOND SET OF INTERROGATORIES**

Now comes Respondent Ohio Operating Engineers Pension Fund (the "Pension Fund"), pursuant to 29 C.F.R. §4221.5(a)(2), to answer to Claimant Sofco Erectors, Inc.'s ("Sofco's") Second Set of Interrogatories ("Interrogatories") with the following objections, responses and conditions.

**PRELIMINARY STATEMENT**

1.　　The Pension Fund's responses are subject to any and all objections regarding relevance, materiality, propriety, and admissibility. The Pension Fund reserves these objections and any other objections not stated herein that would require the exclusion of any evidence at any time during this action. The Pension Fund may interpose these objections at any time prior to and during the arbitration of this case.

2.　　The Pension Fund does not intend to make any incidental or implied admissions by these responses. Accordingly, Sofco shall not construe the Pension Fund's response or objection to any document request as its admission that it accepts or admits the existence of any facts assumed by the request, and Sofco shall not construe the Pension Fund's response or

objection as admissible evidence of any such assumed facts.

      3.      The Pension Fund provides these responses without prejudice to its right to produce later evidence of any subsequently discovered facts or interpretations thereof.

## GENERAL OBJECTIONS AND CONDITIONS

      Respondent Pension Fund makes the following general objections and conditions, which are hereby incorporated into each answer to Sofco's Interrogatories in addition to any specific objections that may be stated in the answers thereto.

      1.      The Pension Fund objects to any undefined terms in Sofco's Interrogatories that differ from how the Pension Fund uses such terms in the ordinary course of business or in the administration of the Pension Fund.  Any response or use of such terms in these responses does not constitute a waiver of any objections regarding the definition or scope of such terms. Without limitation, the Pension Fund objects to the use of vague and ambiguous terms.

      2.      In making its objections, the Pension Fund does not in any way waive or intend to waive, but rather intends to preserve and is preserving, should it become appropriate:

            a.      all objections as to the competency, relevancy, materiality, and admissibility of any information that may be produced or disclosed in response to these Interrogatories;

            b.      all rights to object on any ground to the use of any information that may be produced or disclosed in response to these Interrogatories, or the subject matter thereof, in any subsequent proceedings, including arbitration or trial of this or any other action; and

            c.      all rights to object on any ground to any requests for further responses to these Interrogatories and/or to further discovery relating to the subject matter of the responses herein.

3. The Pension Fund objects to the Interrogatories to the extent that they are overbroad or unduly burdensome and impose obligations in excess of those imposed by 29 C.F.R. §4221.5(a)(2) or the Federal Rules of Civil Procedure.

4. The Pension Fund objects to the Interrogatories to the extent that they request or seek information not in the Pension Fund's possession, custody, knowledge or control.

5. Only discoverable information shall be provided. Requested information will not be identified or produced if it exceeds the scope of discovery as set forth under 29 C.F.R. §4221(5)(a) or the Federal Rules of Civil Procedure.

6. The Pension Fund objects to any requests for the identification of any information protected by the attorney-client privilege or attorney work product doctrine. No attorney-client privilege or attorney work product documents or information shall be disclosed or produced. To the extent that any privileged information is provided, it is provided inadvertently and shall not constitute a waiver of the privilege as to that or any other information.

7. The Pension Fund reserves the right to revise, correct, add to, or clarify any of the responses herein.

<u>**RESPONSES TO INTERROGATORIES**</u>

**Interrogatory 1.** Describe in detail the formula the Fund is using to determine Sofco is

liable for partial withdrawal. In describing the formula, please explain how the Fund interprets the

term "insubstantial portion," in ERISA, 29 U.S.C. §1388(d)(1), and identify any documents that

include, reference and/or support the Fund's interpretation.

<u>**ANSWER:**</u>

The Fund objects to this Interrogatory because it is vague, ambiguous, calls for a legal
conclusion, and assumes facts not in evidence. Specifically, the Interrogatory assumes that a
"formula" was used to determine that Sofco was liable for partial withdrawal liability. As a
result of decline in Sofco's contributions to the Fund, contributions continued for no more than
an insubstantial portion of its work in the craft and area jurisdiction of the collective bargaining
agreement. Congress, in 29 U.S.C. § 1388(d), declined to establish a formula or "numerical
test" for calculating what constitutes an "insubstantial portion." Additionally, the PBGC
declined to reduce the term "insubstantial portion" to a formula or to a "given percentage of
work." <u>See</u> Opinion Ltr. 95-2 (Aug. 18, 1995). The determination of what constitutes an
"insubstantial portion" is left to the discretion and responsibility of the plan sponsor. <u>Id.</u> Here,
following the partial withdrawals, Sofco's contributions continued only on behalf of forklift
operators and one shop employee. This work, the work for which contributions continued, did
not constitute a substantial portion of Sofco's work. Further answering, see the Pension Fund's
Response to Sofco's Request for Review.

Respectfully submitted,

*Daniel J. Clark*
Daniel J. Clark (0075125)
Allen S. Kinzer (0040237)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone (614) 464-6436
Facsimile (614) 719-4650
djclark@vorys.com
askinzer@vorys.com

*Attorneys for the Ohio Operating Engineers*
*Pension Fund*

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and accurate copy of the foregoing, *Ohio Operating Engineers Pension Fund's Answers to Sofco Erector, Inc.'s Second Set of Interrogatories*, was served on this 13th day of November, 2018, upon the following:

***By U.S. mail and E-mail:***

Gary L. Greenberg
Mark B. Gerano
Jackson Lewis P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202
Gary.Greenberg@jacksonlewis.com
Mark.Gerano@jacksonlewis.com


                                                *Daniel J. Clark*
                                                Daniel J. Clark

11/13/2018 31602770

## AFFIDAVIT OF JIM LUDWIG

STATE OF TEXAS           )

                              ) SS:

COUNTY OF _Kendall_     )

Jim Ludwig, being first duly sworn, deposes and says that:

1. I am Jim Ludwig. I am over the age of 18 and I am competent to testify to the matters set forth herein.

2. Prior to April 1, 2004, I was employed by a company called Sofco Erectors, Inc. ("Old Sofco")

3. On April 1, 2004 I owned a portion of a company called Sofco Erectors Acquisition, Inc. that purchased the assets and name of Old Sofco. We then formed the company now known as Sofco Erectors, Inc. ("New Sofco")

4. I never owned any portion of Old Sofco or its parent company, Southern Ohio Fabricators, Inc.

      Further affiant sayeth naught.



                          Jim Ludwig

Sworn and subscribed to before me this 5th day of November, 2018.

Notary public:

My commission expires: 09-19-2022



RANDALL E. YOUNG
NOTARY PUBLIC - STATE OF TEXAS
ID# 4878511
COMM. EXP. 09-19-2022

4845-0070-5914, v. 1