AMERICAN ARBITRATION ASSOCIATION

- - -

In the Matter of )
Arbitration Between: )
)
Sofco Erectors, Inc. )
)
Employer, )
)
and )Case No.: 01-18-0001-3790
)
Ohio Operating Engineers )
Pension Fund, )
)
Fund.

- - -

Deposition of Thomas P. Byers, a witness herein, called by the Employer for cross-examination pursuant to the Ohio Rules of Civil Procedure, taken before Karen A. Toth, Notary Public in and for the State of Ohio, at the offices of Fadel & Beyer, LLC, Bridge Building, Suite 120, 18500 Lake Road, Rocky River, Ohio, on Wednesday, September 26, 2018, commencing at 10:10 a.m.

- - -

APPEARANCES:

On behalf of the Employer:
Gary L. Greenberg, Esq.
Jackson Lewis, P.C.
425 Walnut Street
Suite 2300
Cincinnati, Ohio 45202

On behalf of Ohio Operating Engineers Pension Fund:
Allen S. Kinzer, Esq.
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
PO Box 1008
Columbus, Ohio 43216

On behalf of International Union of Operating Engineers and the witness:
Timothy R. Fadel, Esq.
Fadel & Beyer, LLC
Bridge Building
Suite 120
18500 Lake Road
Rocky River, Ohio 44116

Also present:
John Hesford

\---

INDEX

| WITNESS: | CROSS |
|---|---|
| Thomas P. Byers | |
| by Mr. Greenberg | 5 |

\---

EXHIBITS

| Employer: | Marked |
|---|---|
| A through DD | premarked |

\---

THOMAS P. BYERS

Of lawful age, being first duly sworn, as hereinafter certified, was examined and testified as follows:

MR. GREENBERG: We're here today to take the deposition of Tom Byers, the president of International Union of Operating Engineers Local 18 in the matter of Sofco Erectors, Inc. and the Ohio Operating Engineers Pension Fund pending before Arbitrator John Sands. We're here pursuant to the rules of the American Arbitration Association for multi-employer pension plan withdrawal liability disputes, the parties' joint discovery plan and agreement of counsel for the parties and for Local 18.

My name is Gary Greenberg and I represent the Employer, Sofco Erectors, and I have with me today the president of Sofco Erectors, John Hesford.

I'll ask the other attorneys to state their appearances.

MR. KINZER: Allen Kinzer of the Vorys, Sater, Seymour & Pease law firm

representing the Ohio Operating Engineers Pension Fund.

MR. FADEL: Timothy Fadel, Fadel & Beyer, representing the International Union of Operating Engineers Local 18, and to the extent that Mr. Byers is being asked questions in his capacity as president or an employee of Local 18 I will be functioning as his counsel.

MR. KINZER: And for purposes of witness identification, the Ohio Operating Engineers Pension Fund has identified Mr. Byers as a witness in his capacity as president of Local 18 of the International Union of Operating Engineers.

MR. GREENBERG: Thank you. Can we stipulate to the court reporter's qualifications?

MR. KINZER: Yes.

MR. GREENBERG: Thank you.

CROSS-EXAMINATION

By Mr. Byers:

Q Mr. Byers, please state your full name and where are you employed?

A My name is Thomas P. Byers. I'm employed with

Page 6

the International Union of Operating Engineers Local 18. I work out of the Cleveland office.
Q Have you been deposed before?
A Yes.
Q So just as a reminder, I'm sure you know how this process works, but I want to ask you to let me finish my questions before you give your answers so the court reporter can get it all down. Will you do that?
A Uh-huh. Yes.
Q Also you need to say yes or no.
If at any time you don't understand one of my questions will you let me know?
A Yes.
Q Can you think of any reason why you would not be able to answer all my questions today accurately to the best of your knowledge, because of medication or lack of sleep or anything else that would be distracting you today?
A No.
Q And if at any time you need a break, will you let me know?
A Yes.

Page 7

Q Of course, I would want that to be after you have answered my question.
A Yes.
Q Thank you.
So how long have you been president of Local 18?
A I'm going to ballpark it. I don't know the exact date but it was sometime in 2014, 2015.
Q And did you hold any positions with Local 18 before that?
A Elected positions, I was an auditor for Local 18.
Q And for what period of time?
A I couldn't tell you the dates. I believe I finished as the auditor as I took over president. I believe those were concurrent. I could not tell you when I became auditor of Local 18.
I was hired as an organizer of Local 18 in 2006.
Q And do you work in Local 18's corporate headquarters?
A Yeah. I work in headquarters for Local 18, yes.

Page 8

Q And that's in Cleveland?
A Yes.
Q So what are your duties as president?
A Maintain the referral system, make sure everything is working smoothly, everything is accurately recorded, process the grievances that are brought to me by the district offices, and assist in negotiations when required, oversee the vehicle maintenance of all Local 18's vehicles, and other duties that might be assigned to me by the business manager.
Q And who is the business manager of Local 18?
A Richard Dalton, D-a-l-t-o-n.
Q Is he essentially the chief executive officer of Local 18, or is there somebody he reports to that's above him?
A He reports to an executive board, however he would be considered the CEO.
Q And are you on the executive board?
A Yes. All the officers of Local 18 are a member of the board.
Q That's you, Mr. Dalton and how many others?
A There are -- we have five districts in the

Page 9

state and there are three members from each district that are executive board members and the six line officers of Local 18 which would be part of the executive board.
Q Okay. And you also hold a position with the Ohio Operating Engineers Pension Fund?
A I'm a trustee on the Pension Fund.
Q And how long have you been a trustee?
A 2015-ish. Sometime in there. 2016.
Q And the Pension Fund has an equal number of union appointed and employer appointed trustees; is that correct?
A Yes, it's a Taft Hartley fund.
Q Who are the other union appointed trustees?
A Richard Dalton, Patrick Sink, Mark Totman, myself.
Q And all four of these, including yourself, were appointed by the Local 18 executive board; is that correct?
A I don't know that it came through the executive board. I'm not exactly sure of the appointee. It may be the chairman.
Q All four that you named are also officers of Local 18?

Page 10

A No.
Q No?
A No. Patrick Sink is not an officer of Local 18.
Q The other three are?
A Yes.
Q And what is Patrick Sink's position with Local 18?
A He is business manager emeritus. I guess he's retired from Local 18.
Q And who were the employer trustees?
A You have Mark Sterling, you have George Palco, you have Vic DiGeronimo, Jr., and I believe the newest one was just appointed prior to the last meeting. I believe his name is Scott Erick. I believe his last name is spelled E-r-i-c-k.
Q Who did he replace?
A Stan Roediger.
Q And how often do the Pension Fund trustees meet?
A Quarterly.
Q Are you familiar with Sofco Erectors?
A Yes.

Page 11

Q And how is it that you're familiar with Sofco?
A When I worked in our Columbus office they had work in the central part of the state and so I saw the dispatches come through for operators.
Q And when was that?
A That would have been in 2014; early 2014, late 2013.
Q Did you ever have any direct dealings with Sofco?
A I have met several times with several of their employees and management.
Q So I'm sure you've met several times with their managers?
A Some of the managers, yes.
Q Some of the managers. Do you remember any of the names?
A Mike Talbert, Dan Powell.
Q Anyone else?
A Various equipment operators throughout the years, but I don't know that I can rattle off their names to you.
Q I want to focus on the managers. So over the years you've had a handful of meetings with Sofco managers?

Page 12

A Maybe three times.
Q And do you recall the subject matter of those discussions?
A Most of them were concerning grievances.
Q And do you recall what the grievances were about?
A I think one had to do with a layoff, and several had to do with equipment manning issues.
Q And what were those equipment manning issues?
A In at least one case I believe an operator was laid off from running a forklift due to lack of work and it was still being operated by someone other than an operating engineer.
Q And it was being operated by a member of the Ironworkers Union?
A I couldn't tell you.
Q So you don't know one way or the other?
A No.
Q So tell me what you remember about that discussion.
A Well, I was notified by a district rep or I was notified by a business rep in the Columbus area and he had a meeting with the company.

Page 13

He was unsuccessful in reaching an agreement. I handled the issue.

And I think there is two similar issues like this that I had with different business reps that were involved and I think I met with Mike Talbert, and at least once with Mr. Powell about that at the office and it got resolved.
Q And do you recall how it was resolved?
A At least one case I know that a work order was placed and an operating engineer was placed to work for the company.
Q Do you recall anything else about these discussions concerning manning of forklifts?
A Could you clarify a little bit? I'm not sure if that's --
Q Yeah. You testified that one or two of your discussions with Sofco management concerned the manning of a piece of equipment and I think you said it was a forklift?
A Yes.
Q You said that an operating engineer had been laid off, that somebody else was operating a forklift, there was a complaint, you discussed

Page 14

it with management and it was resolved. Did I say all that correctly?
A Yes.
Q Do you remember anything else from the discussion with Sofco management about that issue?
A Nothing specific.
Q Do you have any recollection of what Sofco's explanation was for having somebody else drive the forklift?
A Nothing specific.
Q Anything general?
A Well, the same thing every craft or every company tells you when you have that issue, is that they can assign it as they see fit.
Q Do you recall any discussion about the work being assigned to members of the Ironworkers Union?
A Not in those discussions, no.
Q You don't recall one way or the other?
A I don't remember that being --
Q Okay. The Operating Engineers Local 18 over the years supplied crane operators to Sofco; is that correct?

Page 15

A Among other operators, yes.
Q I'd like you to take a look at Exhibit A in the exhibit book. So what you have in front of you is a booklet with a lot of documents, and we have premarked these documents as exhibits. There are also some tabs, and so the booklet is divided into the tabs. Some of the tabs there is only one exhibit and some of the tabs there is more than one exhibit.
So I'll refer to the tab number and the exhibit and we'll try to do this as efficiently as possible.
So we're looking at Tab 1 and that document is marked as Exhibit A. It appears to be a letter on Sofco Erectors, Inc. letterhead to a Mr. Richard Hobbs. It's signed John Hesford, president, CEO, and you'll see at the bottom there is a cc to Mr. Richard Dalton, Local 18, the Ohio Operating Engineers.
Have you seen the letter before today?
MR. FADEL: Object. Go ahead.
A I don't remember seeing one with Mr. Hobbs'

Page 16

name at the top. I think I saw one that was addressed to someone at Local 18. I could be mistaken but I don't remember seeing one that was addressed to Mr. Hobbs. I could have. I don't remember it.
Q So first of all, are you familiar with an organization called AGC of Ohio?
A Yes.
Q What is AGC of Ohio?
A It's an association of contractors that work in the building industry, employer association.
Q And your union, Local 18, has a statewide contract with AGC of Ohio; is that correct?
A Yes.
Q So do you recall that in February of 2017 that Sofco Erectors terminated its participation in the AGC of Ohio negotiating group with Local 18 and terminated its relationship with Local 18 effective April 30th of 2017?
MR. FADEL: Objection.
Q Do you recall that?
A This document says April 28th.
Q I'm sorry, April 28th.

Page 17

A Yes, I do remember that happening. As I said before, I don't remember the one addressed to Mr. Hobbs; however, the gist of what's in that document I remember.
Q So it's your understanding that as of the expiration of the 2014-'17 union contract with AGC, on April 30th of 2017, that after that Sofco had no further obligations to Local 18?
MR. FADEL: Objection.
MR. KINZER: Objection.
Q Is that your understanding?
A No. You said 2014. It's May of 2013. And I don't remember that it terminated any obligations to us. It just means that they terminated their participation in that collective bargaining agreement.
Q After April 30th of 2017 Local 18 no longer had either a union contract or a bargaining relationship with Sofco Erectors, correct?
MR. FADEL: Objection.
A That is correct.
Q To the best of your knowledge, did Sofco Erectors pay all of the wages and fringe benefits, provide all of the union dues

Page 18

required by its union contract with your organization?
MR. FADEL: Objection.
MR. KINZER: Objection.
Q To the best of your knowledge?
A I don't know that I can answer that.
Q Do you have any evidence or any knowledge of Sofco owing any back fringe benefit payments, union dues or -- let me rephrase that.
Do you have any knowledge of Sofco Erectors owing any back fringe benefit contributions, wages or union dues through April 30th of 2017?
MR. FADEL: Objection.
A I don't have knowledge one way or the other about that.
Q But the Union hasn't made any such claim up to this point, correct?
MR. FADEL: Objection.
A For fringe benefits the Union wouldn't make a claim. That's a fringe benefit issue. It's not the Union.
Q Okay. Are you aware that since terminating its relationship with Local 18 that Sofco has

Page 19

been using crane operators employed by crane leasing companies that are covered by Local 18 contracts?
MR. FADEL: Objection.
Q Are you aware of that?
A Generally.
Q So please turn to Tab 2, Exhibit B. So Exhibit B, you'll see that there are six pages in Exhibit B. The first page is headed "Sofco jobs in District 3, 2/2018."
So let's start with the first page of Exhibit B. Do you recognize this document?
A I do.
Q Did you prepare it?
A I provided it, I did not prepare.
Q And who did you provide it to?
A I believe I provided it to the fringe benefit office.
Q The Pension Fund fringe benefit office?
A Yes.
Q Who prepared it?
A Separate people have printed different parts of this. It's not all a single document.
Q Can you explain how this document came about?

Page 20

MR. KINZER: Objection in terms of are you talking about the six pages or the one page, Gary? I'm kind of lost on the exhibit.
MR. GREENBERG: Sure.
MR. KINZER: Are you talking about --
MR. GREENBERG: The six pages.
MR. KINZER: The whole six pages?
MR. GREENBERG: Yes.
Q These six pages seem to indicate that somebody was watching over Sofco to see what kind of work was being done. Can you explain to me how that happened? Who initiated the process of investigating the work that Sofco was doing?
A I requested business reps in the Columbus office and in the Cincinnati office or in the District 4-5 -- I'll call it District 4-5, it's in Franklin, Ohio. The Columbus office is District 3. I requested the reps in those two areas to provide me with information on ongoing jobs or any work in those two areas that Sofco was performing.
Q And why did you do that?

Page 21

A Several reasons. One, I wanted to make sure none of our operating engineers were working for them after they terminated the agreement.
Q Any other reason?
A Yeah, I was looking for a prime opportunity to pick at the project.
Q And at any point in time did you pick at any other projects?
A No.
Q Any other reason?
A Yes, I wanted to document that they were still doing the same work they were doing before they terminated the agreement with Local 18.
Q And what made you think that they would still be doing the same work?
A Well, in the particular case of Franklin County, I drove past the job every day.
Q Okay. So you probably noticed that there were cranes operating there?
A There were cranes on the project.
Q And did you check out whether there were union employees operating those cranes?
A I did not.
Q Why not?

A I have people that will do that for me.
Q Did you have somebody do that?
A I'm sure they did.
Q And what was reported to you?
A They didn't report anything out of the ordinary.
Q Meaning that you've learned that the leasing companies that were providing those cranes were also providing operators that were covered by the contract with Local 18, correct?
A I don't know in all cases, but generally there were some that there were no cranes on-site.
Q So let's turn to the second page. So can you tell me who prepared the second page?
A I believe it was a collaboration between the business reps in District 3 and myself. I don't know who prepared the document. That may have been something -- I don't know if I typed that or not. It looks like whoever typed this page also typed it. I can't tell you who that was.
Q And can you tell me what each of these individuals was doing on these projects as of

April 2017? In other words, were they operating cranes, were they doing something else?
A I couldn't be 100 percent sure about them. I would assume by just knowing the names, the first three were probably forklift operators, but I'd be speculating. And the last one on the list I know had various duties, worked out of the shop some.
Q I'd like you to turn to not the next page but the -- and not the one after that, so you can go past the two pictures. And there is an email?
MR. FADEL: Just to be clear, we're on 168?
MR. GREENBERG: Yes.
Q You'll see there is numbers stamped at the bottom. It says 168. That will help guide us through these documents. So there is an email from Greg Greenlee and it's to you dated February 19, 2018. And it says here that there is a picture attached but it also says that there is a list of jobs that Sofco is currently working on and done in 2017.

A Uh-huh.
Q And then it says here that the attached is the fringes for the members working from February of 2017 to March of 2017.
MR. GREENBERG: So I don't recall that we received that attachment and so I'm going to ask Mr. Kinzer to check on that.
MR. KINZER: They would not be the fringe records. Greg Greenlee is not an employee of the Pension Fund of our client.
MR. GREENBERG: No, all I'm saying is that this was provided to us in response to our document request and it refers to a list of jobs and employees and fringes and I don't believe we received that enclosure. So you'll see there is a Bates number 168 and then there is a picture attached that's 169. Then the next document after that is 170 and we start to see work orders.
So, Mr. Kinzer, what I'm suggesting to you is that the email refers to an attachment that was not included and so what I'm asking now is for you to check into that and see if you can find that document for us.

THE WITNESS: Do you want to talk for a minute?
MR. FADEL: Can we take a break?
MR. GREENBERG: Sure.
(Short recess.)
By Mr. Greenberg:
Q All right. So Mr. Byers, please look at Exhibit C-1. And there are 23 pages. So they run from 170. Again, we're looking at the number stamped in the bottom right corner. These were documents produced by the Pension Fund which I think we're going to find out they received from you or your office. And if you look at the numbers in the bottom they run from 170 through 192. So if you can just sort of take a look through those.
A You said through 92?
Q Through 192. So again, we're referring to the numbers that are stamped on the bottom right-hand corner. And I think that, as you know, in litigation when documents are produced the party that is producing those documents stamps numbers on each page as a record of what documents were produced and

Page 26

those are called Bates numbers. So you'll see in the bottom right corner OOE. That stands for Ohio Operating Engineers Pension Fund, 170 through 192.
A Okay.
Q All right. So tell me, do you recognize these documents?
A Yes, generally the group of them. I don't have them memorized, the orders or dates or anything. However, that appears to be documents provided to me by the District 4-5 office when I requested dispatch work orders for forklift operators that were referred to Sofco.
Q All right. So where are these documents kept?
A Those would be kept in the district offices. Some of these from back in 2001 would have been kept in either a Cincinnati or a Dayton office. At some point in there those offices merged together and so those closed and all the records were combined and kept in what we call District 4-5.
Q So this is what you call District 4-5?
A Yes, I'm pretty sure all these are from

Page 27

District 4-5. There may be one in there that is from another district. By looking at the counties I can tell.
Q Where is that office today?
A It is in Franklin, Ohio.
Q And that covers Cincinnati and Dayton?
A Yes, sir.
Q And so that's where the originals are kept, correct?
A Yes.
Q So how does this process work? I mean, how do those work orders get created?
A Typically there'll be a phone call from the employer to the dispatcher and they'll provide the information that's listed on the preprinted form, the contractor's name, the location of the job, when the member is supposed to report, date and time, piece of equipment that they'll be running; if it's provided, the type of work, the description of what the work is. Then there is a slot for operator, and that would be where we've -- where the dispatcher would fill in who she dispatched to that job, and then who gave them

Page 28

the order and the contract phone number for who provided the order or if there is a foreman they need to report to, that is information that is provided on there. And then the cards are typically time stamped at the top of the page when the order was created, and in either the middle bottom of the page when the work order was filled.
Q And this is how it's supposed to work in every case, in every situation where the employer contacts Local 18 to obtain an employee, one of your members, the dispatcher is supposed to fill out one of these work orders?
A In most cases. There could be a time when it's an employee that was laid off for a week or so that gets directly called by the employer. In that case the employee will call into the union hall and tell them hey, I got recalled back to ABC contracting or whatever. And in some cases there is not one of these work orders created, it's just posted in the member's work record.
Q If we look at the very first page of C-1, you'll see next to the word "operator" it says

Page 29

"recall, Don Richard"?
A Uh-huh.
Q You need to say yes.
A Yes. I'm sorry.
Q So would this be one of those situation where a laid off employee is recalled?
A It looks as if Don Richards was recalled but it looks like in this case Joanne called the office and told us that they were going to recall Don Richards. Down at the bottom it says who the order was given by, so it could have been the member. She would not have indicated someone from the office had called.
Q And then is Joanne somebody that worked for Local 18 or for Sofco?
A I assume Sofco.
Q I see. Okay. So where it says "order given by," that's the person who made the call from the employer?
A Correct.
Q And, again, you testified that in most cases this is how the Local 18 member would be obtained for the work in question?
A Yes.

Page 30

Q And it would be the rare case when an employer would be called directly by the employer to be recalled?
MR. FADEL: Objection. Go ahead and answer.
Q Let me rephrase that. I'll withdraw that question.
Do you have somewhere in one of the district offices or the district offices that covered the areas where Sofco did business, records of individuals who had been directly recalled by Sofco?
MR. FADEL: Objection. You can answer.
Q Do you know if those records exist?
A Generally, yes. Sometimes we wouldn't know if the employee didn't notify us that he was laid off. If he just did it on his own, was gone a couple weeks and didn't notify the hall to put his registration card in to seek other work. He may have just been going fishing in Florida and comes back. We wouldn't have known that he was laid off and recalled.
Q Did you ask your district offices to provide

Page 31

you with any of these records to show that individuals were recalled by Sofco directly and then called the Union to let the Union know?
A I didn't specifically ask that. I requested all the work orders that the district had provided. Sometimes you'll see where it may say -- some in there say direct recall.
Q Now, I'd like you to look at the package of materials that have been marked as Exhibit C-2. This is a document that was provided to me this morning by Mr. Kinzer. I'm guessing that's because you provided it to counsel this morning; is that correct?
MR. FADEL: Objection.
A Yes.
Q All right. So tell me about Exhibit C-2. How did that come about that you have these documents this morning?
A Yesterday I followed up with our District 3 office, informed them that when I reviewed the exhibits that were provided to you by Mr. Kinzer I noticed there weren't any work orders from District 3 in there. So I

Page 32

requested District 3 to send me the information that they had on forklift work orders.
Q District 3 is Columbus?
A Yes, sir.
Q All right. So my understanding is that Sofco operates in Local 18 Districts 3 and 4-5 for the most part; is that correct?
A They have offices in Indiana that I don't know anything about.
Q I'm talking about in Ohio. To the best of your knowledge?
A Yes.
Q Would it be accurate for us to say that between Exhibit C-1 and Exhibit C-2 we now have all of the forklift operator work orders for Sofco from Districts 3 and 4-5, to the best of your knowledge?
A I would say they sent me what they had. I don't know when 4-5 merged. It's hard to say what there was. They didn't go back 30 years or 20 years on it, they just went back in recent records of what they had. I didn't go back.

Page 33

Q How far back did you ask them to go?
A I told them not to go dig anything out of archives.
Q So what does that mean? How far back did they go?
A I can look at a document and tell you what they provided if you need me to. This one says '08 looks to be the first date on it, if we're talking about C-2. So I'm going to assume that's probably how far back they went through their records here.
Now in the 4-5 office I'd have to look at those documents and see.
Q Please, take a few minutes and do that. I do see that there is some that are dated 2001.
A Uh-huh.
Q You need to say yes.
A You didn't ask me a question.
Q Well, I wanted the record to reflect that you were agreeing with me.
A I don't know what you saw.
Q Oh, okay. Well, what did you see? How far back do these records go?
A I'm looking. There is at least some from

1999.
Q All right. So to the best of your knowledge, District 4-5 provided you with all the work orders that they have for forklift operators for Sofco going back to 1999?
MR. FADEL: Objection. You can answer.
A I'm assuming they did. I wasn't there and collected the records myself, but they gave me what they could find.
Q And with Exhibit C-2, the District 3 records go back to 2008, January of 2008, so with C-2 we have, to the best of your knowledge, all of the work orders for Sofco but forklift operators going back that far, correct?
MR. FADEL: Objection. You can answer.
A I assume so.
Q Thank you.
So I'd now like you to turn to Exhibit D. If you look at the bottom right corner we're looking for Bates number 193.
A Okay.
Q Can you identify that document for me?

A It's a summary of projects that I asked the District 4-5 staff to prepare of current or ongoing or recent work that Sofco was performing in the District 4-5 area.
Q And who prepared this document?
A It was sent to me. I'm not sure which of the reps prepared it or if it was the district rep.
Q So this isn't based on your personal observations, this is based on the observations of some folks who work for Local 18, to the best of your knowledge?
A Yes.
Q So I'm looking at the first line here. It says, "On March" -- I'm going to -- I'm sorry, it's "On 3-10-2017 took picture of Sofco Erectors Ironworkers running forklift on parking structure being renovated to a new hotel. This is a two month plus project."
So let me stop there. When you see on this document capital I Ironworkers, what does that mean to you?
A It means that there was an ironworker on the project, according to what the person that

prepared this document says.
Q So let me stop there. What is Sofco Erector's business? What do they do?
A They're a steel erection company.
Q So if you and I were walking onto a typical Sofco project what would we see in front of us? We'd see employees working on the site doing what? Erecting steel structures, right?
A Maybe.
Q Help me out here. You told me you've meet with them, you know Sofco, you know what they do, you know their business.
A What phase of the site are you talking about? Are you talking about when the footers are being poured or when the roof is being put on? I can't tell you what a typical site is. It could be three feet of mud all over the whole thing and people walking around in boots or it could be a completed building.
Q I'm not asking what they're wearing, I'm asking what they're doing. What are the on-site employees doing, what kind of work? What kind of building trades work are they doing?

A They are building a building.
Q All right. They are building the steel metal structure, correct?
A The building, whatever it would be.
Q You don't know. You don't want to tell me here that you know that it's ironworkers doing the work?
MR. FADEL: Objection.
A There is not just ironworkers on a construction site.
Q No, I know. But what about the people that work for Sofco?
A As far as I know right now they are all ironworkers.
Q What about going back to when you were in Columbus? You said you know you've driven by their sites, you met with them a couple of times. You must know something about the work that they do. So you do know that for many, many years Sofco has employed members of the Ironworkers Union to do erection work on building sites, correct?
MR. FADEL: Objection.
Q You know that to be true, right?

MR. FADEL: Objection.
A They build buildings. I mean what do you want me --
Q Okay. So you're not going to acknowledge that, fine.
A No, I told you what they did and you just don't like what I told you.
Q You're not going to acknowledge that they employ members of the Ironworkers Union; is that where we are?
A I already told you that they employ ironworkers.
Q Thank you.
So let's look at the second line here.
A Which page?
Q Same page.
A Which was?
Q 193.
A Okay.
Q All right. So it says here, "On 3-13-2017 observed Sofco Erectors foreman, Pete Leonard an Ironworker, running a RT forklift on Aero Parkway, Florence, Kentucky." So do you recognize the name Pete Leonard?

A I do not.
Q Let's look at the third line. It says that, "Sofco Erectors working on Crossroads Church on 4450 Eastgate South Drive, Cincinnati, Ohio. Local 18 member working for Maxim Crane Works witnessed Sofco Erectors' ironworker operating a forklift from approximately middle of March 2017 to middle of April 2017." So my question is, first of all, do you recognize the name of this company, Maxim Crane Works?
A Yes.
Q And Local 18 has a contract with Maxim Crane Works?
A Yes.
Q I want to ask you about these first three entries here. So these first three entries suggest that ironworkers were operating forklifts on Sofco Erectors projects, correct? Isn't that what's being reported here?
MR. FADEL: Objection. You can answer.
A I'm trying to puzzle through the first part of what you said. Can you repeat your question please?

Q Let me rephrase that.
These first three entries here concern work that was being performed in March and April of 2017, correct?
A Yes.
Q Local 18's contract with Sofco was still in effect during March and April of 2017, correct?
MR. FADEL: Objection. You can answer.
A Mind if I refer back to a document?
Q You want to see the contract?
A Yes.
Q Sure. Turn to Tab 3. So if you look at Tab 3 you'll see the cover of the AGC of Ohio Building Agreement effective May 8, 2013 through April 30, 2017. Does that refresh your recollection?
A Yes.
Q All right. Thank you.
Now, turning back to Exhibit D, and this is the one that is stamped 193 in the bottom right-hand corner. The first three entries on this page involve a report of

ironworkers operating forklifts on Sofco projects in March and April of 2017, correct?
MR. FADEL: Objection. You can answer.
A Yes.
Q And Local 18's contract with Sofco was still in effect during those two months, correct?
A Yes.
Q Can you tell me whether a grievance was filed over those three incidents that were reported here on this document?
A I cannot.
Q All right. Now, I'd like you to turn to Exhibit E. And these are the last three pages of Tab 2. And these are marked in the bottom right corner. This is sideways so you have to turn it sideways to see this, but they are marked 431, 432 and 433. We're still in Tab 2. It's the last three pages of Tab 2.
A Yes.
Q Are you there?
A Uh-huh.
Q We received these three pages from counsel for the Pension Fund just the other day. Can you

Page 42

identify these documents for me, tell me what they are?
A Yes. They're are differences between the three pages, what they are.
Q All right. Let's start with the first page. What's the first page?
A The first page is the result of a search through an electronic referral report that I did from the District 3 dispatches for 2016. And I might have picked up the last week of 2015 when I did it because it would have been posted in the prior year. So a little bit of 2015 and 2016 in there. I searched for the employer, I searched for Sofco in the employer column and these are the members that came up.
Q And these are the only ones that came up?
A For District 3 in that time period.
Q And you looked for the entire year 2016?
A I looked through what I had. I can't recall the date of when this search was done. I've got to assume that this document might have been the search for folks that were working there at the time that I did it. It may have been -- I'm not sure of the date when I

Page 43

performed it but my guess would be it was probably everything for '16, but I can't be sure.
Q And what's the next page?
A The next page is a page off of a referral report. This wasn't done as a search for Sofco, this was done as a -- just a report that was filed for the week ending February 11 of '17 and there was an operator that was dispatched to work with Sofco to operate a forklift. And that's highlighted in there who the operator was.
Q I see. And then the last page is part of that same report?
A No, this is the District 4-5.
Q I'm sorry. And what is the last page then?
A That looks like in '16 they were able to provide the names of two members that were dispatched to Sofco Erectors.
Q And that's all that came up for 2016 in District 4-5?
A As far as I know, yes, sir.
Q All right. Please turn to Exhibit F. So Exhibit F is a copy of the AGC of Ohio

Page 44

building agreement effective May 8, 2013 through April 30, 2017. So I want you to take a few minutes and tell me if you can identify this as what I just described?
A As I'm going through it I see there are two page 2 and 3 in there.
Q We do have duplicates. Everybody should tear out one of those duplicate pages, please. Looks like what we did when we copied this for production we duplicated those two pages.
MR. KINZER: You change the Bates stamp numbers if you take it out. Leave it in.
MR. GREENBERG: No problem. For the records we copied pages 2 and 3 of the Union contract twice.
MR. FADEL: We'll stipulate that there is not a duplication in the original.
MR. GREENBERG: Right. Okay. Yeah, we'll turn all the pages here and make sure we've got them all, and when we put these booklets together we ran through them several times to make sure we had everything right and we just missed that one. Of course, it's

Page 45

probably just as well that we left it in since it was produced that way.
Q So can we agree that apart from the duplication of pages 2 and 3, that this is a true and accurate copy of Local 18's 2013-2017 contract with AGC of Ohio building agreement?
A Yeah, there is notes on one of the pages in the wage scale and there is a couple sections that are highlighted in there that didn't come that way.
Q But otherwise?
A And then I think there is a signature page at the end that is missing, but I don't think it really has any effect on the intent of the agreement, the intent of the prior pages.
Q Well, let me ask you about that signature page. On Page 90 -- well, there is an acceptance of agreement page that shows that there is a line for the Employer to sign, for the Union rep to sign and this one is unsigned. So when you say signature page is missing do you mean a signed copy?
A No, I mean, another blank one that would be a Union copy and one that would be provided to

them.
Q I see. This is the contractor's copy?
A Another page or two.
Q But otherwise this is a true and accurate copy?
A Seems to be.
Q Roughly how many employers were parties to this agreement?
A I couldn't tell you.
Q More than ten, more than 20, more than 50?
A I'd say more than ten anyway. I don't know the number.
Q The work jurisdiction clause, so we find that in Sections 10-12 on pages 4 through 6. So please take a look at that. Is there anything in the work jurisdiction provision that refers to the operation of forklifts?
MR. FADEL: Objection. You can answer.
A All like equipment.
Q All right. So your view is that all like equipment refers to forklifts. Anything else?
A As it relates to the particular section; is that what you're asking?

Q Yes. I'm just asking if there is any wording in Sections 10 through 12 that refers to forklifts, and you've answered, you've said all like equipment refers to forklifts in your view?
A Sure.
Q Anything else?
A Not at a glance here.
Q To the best of your recollection is the work jurisdiction provision in the 2013-17 contract the same in the previous three contracts?
MR. FADEL: Objection.
A Yeah. I'd like to point out that in the second paragraph of Paragraph 10 it states, "It's further understood that all equipment for which classifications and wages have been established in this agreement, including that equipment for which classifications and wage rates may be hereafter established, they shall be manned when operated on the job site by a member of the International Union of Operating Engineers and paid the rate specified in the agreement."
Q So that's also -- again it's your testimony

that that also refers to forklifts?
A It refers to all equipment which has classifications and wages established in the agreement.
Q To the best of your knowledge and recollection, were the work jurisdiction provisions in the previous three agreements the same as the work jurisdiction provision in the 2013-17 agreement?
MR. FADEL: Objection. You can answer.
A I don't know. I would have to refer to the document.
Q Well, okay, we'll get to those.
So I want to understand something about this agreement. It applies to construction sites throughout the State of Ohio, correct?
A And Northern Kentucky.
Q Is Local 18 a party to any other union contracts or was Local 18 a party to any other union contracts between 2013 and 2017 other than this one?
A You mean with --

Q Anyone. Any groups of employers or any individual employers?
A Yes.
Q Let's start with multi-employer contracts. There is a heavy highway agreement; is that correct?
A Yes.
Q Now, Sofco is not a party to that agreement, correct?
A Not that I'm aware of.
Q Any other multi-employer contracts other than this one and the heavy highway agreement?
A Sure. The Cleveland Employers Association, the CEA agreement.
Q Any others?
A The National Maintenance Agreement.
Q Any others?
A The General President's Agreement. We're going to be going on for quite a while because there is probably 20 international agreements that Local 18 is a party to. And also satellite agreements with probably 150 employers. We also have what we call a short form agreement. That is not with a

Page 50

multi-employer association, however it's a blanket agreement that covers an area.
Q And this is where an employer would agree to adopt or live by one of the multi-employer agreements?
A Some of those, yes, satellite agreements would be specifically negotiated one-on-one, but those weren't multi-employer agreements we discussed.
Q Do some of these individual contracts with employers cover non-construction employees, shop employees, manufacturing employees?
A Most of those are not multi-employer.
Q That's what I mean. I'm asking about individual contracts.
A Sure, yes.
Q So if you have a bargaining relationship with an employer that manufactures or fabricates, those are usually individual contracts?
A Yes.
Q And this contract that we're looking at here doesn't cover manufacturing employees, correct?
A Not that I'm aware of.

Page 51

Q All right. I'd like us to look at Section 127.
MR. FADEL: Is that Paragraph 127?
MR. GREENBERG: Yeah, or Paragraph 127.
Q So we're looking at Page 48 of the 2013-2017 building agreement. Article 15, Paragraph 127, the heading is "Termination of jurisdictional disputes." So I want to ask you to explain to me the reference to the impartial -- this is in the first paragraph of Paragraph 127. It's the first sentence. It says, "Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement, creating an Impartial Jurisdictional Disputes Board." What is the Impartial Jurisdictional Disputes Board?
A My understanding of it is very general, that it is taken care of at our international level and if disputes are taken to them the board will hear the case and make a decision.
Q So now, when we look at the last paragraph of -- and I'm calling it Section 127 because

Page 52

it has more than one paragraph. I'm going to read it out loud.
"This article of the contract will go into effect when the National AGC reaffiliates with the Impartial Jurisdictional Disputes Board." I'm going to stop there. So was there ever a point in time that you can recall when the National AGC was affiliated with the Impartial Jurisdictional Disputes Board?
A By reading the language I'm going to assume just because of the word reaffiliates.
Q That at some point in time they were affiliated?
A I would assume, based upon the general meaning of the prefix re.
Q But you don't have any recollection of when that was?
A No.
Q All right. And I'm going to read the last sentence. "This article will not be applicable until such time as the International Union of Operating Engineers reaffiliates with the Building and Construction Trades Department of the

Page 53

AFL-CIO."
When did the Operating Engineers International leave the Building and Construction Trades Department of AFL-CIO?
A I don't know.
Q And was it three or five years ago, ten years ago, roughly speaking?
MR. FADEL: Objection.
Q Just to the best of your recollection.
A I don't know.
Q Has the Operating Engineers International reaffiliated with the Building and Construction Trades Department?
A I don't know.
Q To the best of your knowledge, in the time that you have been employed by Local 18 has any jurisdictional dispute involving an employee covered by this contract been submitted to the Impartial Jurisdictional Disputes Board?
MR. FADEL: Objection.
A I don't know.
Q So do you understand the term jurisdictional dispute?

A I do.
Q Explain what it means to you. What is a jurisdictional dispute?
MR. FADEL: Objection. You can answer.
A It means that there are multiple crafts that are claiming the operation or the jurisdiction of a piece of equipment or a particular job would fall under their agreement.
Q And when you say crafts you, of course, mean the building trades unions, correct?
A Yes.
Q And that would include the Laborers Union, correct?
A Uh-huh.
Q Yes?
A Yes.
Q The Ironworkers Union?
A Yes.
Q Carpenters Union?
A All of them.
Q All right. So in the time that you have been employed by Local 18 has Local 18 had any jurisdictional disputes with the Ironworkers

Union?
A I don't know that at the union level there has been any dispute between the two unions. Surely on a job site basis there are members of unions that perform work outside of their union's jurisdiction, and typically when that happens the unions will file a grievance over that matter or it gets worked out on-site. But as far as something between the leadership of the Operating Engineers and the Ironworkers I'm not aware.
Q Are you aware of any jurisdictional disputes between the Ironworkers and Local 18 on any job sites that were resolved at the job site?
A Sure.
Q Okay. So those disputes were over what piece of equipment?
A Those disputes -- let me see if I can rephrase my answer to the last question.
Q Sure.
A I don't recall any case where representatives from Local 18 and representatives of an ironworkers local engaged in a dispute on the job site. There have been occasions where

Local 18 has filed a grievance on behalf of a member over the manning of a piece of equipment with the Ironworkers.
Q Have any of those matters ended up being appealed to arbitration?
A None that I'm aware of. I'm sure before my time there could have been.
Q To the best of your knowledge, have any of those matters resulted in the filing of a National Labor Relations Board charge?
A Ironworkers, was that your question?
Q Yes, with the Ironworkers.
A None that I'm aware of. But again my history with Local 18 is fairly short.
Q And what about with the Laborers, have there been any jurisdictional disputes over equipment with the Laborers Union?
MR. FADEL: Objection. You can answer.
A Yes.
Q And that includes operation of forklifts?
A In certain geographical areas and certain types of work.
Q And have any of those disputes resulted in

cases before the National Labor Relations Board?
A Sure.
Q And what was the result of those matters?
A In certain geographical areas certain employers have been awarded the work of the operation of forklifts.
Q To the laborers, correct?
A Yes.
Q So now I'm going to ask you to just take a few minutes and look at Exhibits G, H and I. And all I want to know is whether we have true and accurate copies of the AGC building agreement effective 2010 to '13, 2007 to '10, and 2004 to 2007. And just take a few minutes and look through and tell me whether we have true and accurate copies of those.
MR. FADEL: I'm going to object. I'm going to point out at this time that it looks like I is an incomplete copy.
MR. GREENBERG: Which one?
MR. FADEL: I.
MR. GREENBERG: So what happened with I is there is a funny way in which the book

was laid out and we ended up -- see the pages on one side go forward and on the other side go backwards?

MR. FADEL: I'll tell you what, I'll see if I have actual copies that are -- I don't know how these were copies or why they are in the order that they are.

MR. GREENBERG: It is only I that is forward and backward and --

MR. FADEL: Somebody tore it apart and tried to feed it through the copy machine.

MR. GREENBERG: I don't why it happened that way but it did. The other three I think are copied fine.

A In G it appears that we're missing a couple classifications between 54 and 55 where it looks like it didn't make the fold. And maybe 56, 57. Looks like in the wage sections where there is some writing in between which may list equipment that is not -- it's right at the page break between the two pages.

Q I see there is a miscopy there that may have blocked one or two classifications. Okay.

A Same on 62, 63.

MR. KINZER: One thing we can do here, Gary, is would Sofco stipulate that forklifts are included in the classification at the end of these books?

MR. GREENBERG: Look, there is no argument about that. I mean, you can see that in each of these books that in the classification sections, yeah, there is a reference to forklifts.

MR. FADEL: In the weekly pay section, weekly hourly pay section as well?

MR. GREENBERG: That's what I meant.

MR. FADEL: In the middle of the back they are listed twice.

MR. GREENBERG: Oh, okay. Yeah. There is no question about that.

MR. FADEL: Multiple times really.

MR. GREENBERG: Yeah.

MR. FADEL: We'll look through them.

MR. KINZER: Okay. I was trying to short circuit.

MR. FADEL: I am too. I can get you copies. I think I can get you accurate copies in the book form. I may have them.

MR. GREENBERG: That will be great. You can do that on the break. This isn't going to be something that is going to be disputed. These contracts are what they are.

MR. FADEL: That's the one that we're going to have an issue with because you're now on Exhibit I. He's not going to be able to testify to I. Just to be clear, I think we've stipulated this is not a true and accurate copy that you've reproduced.

MR. GREENBERG: It's just that the pages are not in order.

MR. FADEL: So it's a true copy, it's not accurate?

MR. GREENBERG: It's accurate but not true. But anyway, look, we can skip over I. Let's me just ask about, G and H.

Q Except for a couple lines that were blocked in the wage sections do these look like true and accurate copies of the 2010-'13, 2007-'10 contracts? I'm sorry I meant G and H.

A G and H, yes, with the exception of what you said.

Q Yes. We'll skip over I. And let's turn to J, K, L and M. That's Tabs 7, 8, 9 and 10. These are copies of Sofco's contracts with the various ironworkers locals. And, of course, these are multi-employer contracts that Sofco joined and was party to. And they are for periods of time that overlap with the Local 18 building agreement 2013 to 2017.

So I want to ask if you've ever had the opportunity to review these Ironworkers contracts, any of them or all of them?

A None of them.

Q Not familiar with them?

A No.

Q All right. Just want to ask though a couple of questions about Exhibit M, and so that's Tab 10. You're going to have to turn to the page that is numbered 142 in the bottom right corner.

Now, what I want you to do is please turn to Page 158. I'm talking about the number that's stamped on the bottom right

corner. It's actually Page 17 of this contract and it's stamped 158 in the bottom right corner.
A Okay.
Q All right. So at the top you'll see that it's headed, "Ironworkers Local Union No. 44 Collective Bargaining Agreement, August 27, 2014 through May 31, 2018." And you'll see that it is headed "Appendix B, craft jurisdiction." Are you with me?
A Yes, I'm on the right page.
Q Good. Now turn to the next page, Page 18. You will see that there is a list of different kinds of equipment, and it's in alphabetical order, which is helpful. So go down a few lines to the Fs. You'll see that there is a line that begins with the word flues, f-l-u-e-s?
A Uh-huh.
Q You see it's nine lines down?
A I'm looking at it.
Q And look at the third and forth word or phrase on that line. You'll see it says flues, flumes, and then it says "forklift operation,

forklifts." Did I read that correctly?
A That's what the document says.
Q So you don't have any reason to dispute that the Ironworkers Local 44 contract lists forklift operation and forklifts as part of that union's jurisdiction?
MR. FADEL: Objection. You can answer.
Q You don't have any knowledge one way or the other, right?
A I'm looking at an exhibit you gave me marked N and you asked me to read the words that were on a certain page and I can see what the page says.
Q All right. So, of course we have a Local 18 contract that refers to the operation of forklifts in the contract, right?
MR. FADEL: Objection. You can answer.
Q We've talked about that before.
A You've provided exhibits that are Local 18 agreements that have forklift in there. Is that what you're asking?
Q Yes.

A Okay.
Q And certainly you can speak to that because you have personal knowledge of what's in the Local 18 contract, correct?
A Yeah. I looked at it and read it there as well.
Q All right. And as far as the reference to forklift operation and forklifts in this Ironworkers contract, you have no knowledge one way or the other as to what that means?
MR. FADEL: Objection.
Q Right?
A No. I'm looking at words on a page.
Q All right.
A You guys run nuclear reactors? Says it in here. MRI equipment? Wow. Laser beams. Is that like a gun to shoot somebody?
Q I hope not.
A Just curious.
Q We're going to talk about your knowledge of Sofco's operations. And you testified that there have been a few disputes over the years over the assignment of forklift work by Sofco to people other than members of Local 18,

correct?
A Yes.
Q And you have no knowledge as to whether all of those assignments involved ironworkers, members of the Ironworkers Union or someone else?
A Correct.
Q I'd like you to look at Exhibit O. Are you familiar with the company called Precision Environmental Company?
A Yes.
Q And are you familiar with the arbitration decision that's in front of us that has been marked as Exhibit O?
MR. FADEL: Objection. You can answer.
A Only very generally.
Q Did you testify at this hearing?
A I did not.
Q Did anybody else from Local 18 testify at this hearing?
MR. FADEL: Objection. You can answer.
A I don't know. I'd have to look through it and

see.
Q This case involved assignment of forklift work to laborers after the company terminated its relationship with Local 18, correct?
A If you want me to read through it and tell you I can.
Q What is your understanding of why the Pension Fund lost this case?
MR. FADEL: Objection.
MR. KINZER: Objection.
MR. FADEL: Answer if you're able.
A I couldn't tell you. I have no idea.
Q Can you tell me whether there is any difference between the facts of this case and the facts of Sofco's case that we're litigating here today?
MR. KINZER: Objection.
MR. FADEL: I'm going to object as well.
Q Other than it's the ironworkers driving forklifts in our case and laborers in this case, are there any other differences?
MR. KINZER: Objection.

A Going back to my statement earlier, I told you I was generally familiar with the agreement or with this award. I can read through it and tell you my opinion, if you want me to read this document, but I've never read this document before. I couldn't tell you if there is differences or similarities.
Q So at least as you sit here today you have no knowledge of the differences or the similarities between this case and Sofco's case?
MR. KINZER: Objection.
A You said it a little bit more eloquently than what I just did but I think you said the same thing.
Q All right. I'd like you to turn to Exhibit P. Exhibit P is a letter dated August 15, 2018 to me from Attorney Daniel J. Clark, and it's captioned "Ohio Operating Engineers Pension Fund's witness disclosure." And you'll see the witness number 3 is listed as Thomas Byers as president of Local 18 of the International Union of Operating Engineers?
A Uh-huh.

Q And that would be you, correct?
A Yes.
Q When did you find out that you would be a witness in this case?
MR. FADEL: Objection.
MR. KINZER: Objection. I'm going to object to that as attorney-client privilege. I'm not sure where you're going with this, Gary. So he would have met with the attorneys for the Fund, and to the extent you're getting into discussions between the attorney and the client we would object for attorney-client privilege.
MR. GREENBERG: Except that he's not your client for this purpose. You said that you're calling him in his capacity as president of Local 18, and Local 18 is not your client, that's Mr. Fadel's client. So our position is that your discussions with him to prepare him to be a witness in this case in his capacity as president of Local 18 are not privileged.
MR. FADEL: I'm going to go ahead and object to the extend that you are seeking

any information that Mr. Byers and I -- that I relayed to Mr. Byers or Mr. Byers relayed to me in any capacity whatsoever to the extent I have any relationship or any conversation with Mr. Byers that is necessarily in my capacity as attorney for the Union and his capacity as president for the Union.
MR. GREENBERG: I agree. And I don't want Mr. Byers to tell me about any conversations that he had with you, Mr. Fadel, because those were privileged. But his conversations with counsel for the Fund are not privileged.
MR. FADEL: Well, to the extent that he's a trustee of the fund I would venture to say that they are privileged.
MR. GREENBERG: But we've already established here that he's being called as a witness and he's here today because of his capacity as president of Local 18.
MR. FADEL: What we have to establish is that you called him as a witness in this matter, and the testimony being elicited from him is entirely due to the

questions that you are asking. To the extent you're asking him questions about his knowledge as president of Local 18, that's my relationship with him. To the extend that you're asking questions about his acknowledge in his capacity as an officer or a representative of the fund, that is Mr. Kinzer's bailiwick. There would be no other conversations other than those two, and either way those conversations go they are protected by attorney-client privilege.

MR. KINZER: We're going to instruct the witness not to answer. If you want to take that to the Arbitrator, we can have that dispute. I'm not sure what the point of that dispute would be other than it doesn't advance the ball of this arbitration, but if you want to do that, Gary, go ahead. But I'm instructing the witness not to answer that question.

MR. GREENBERG: Well, let's back up a second. Really the only question that's on the record at this point is when did he find out he was going to be a witness. And then

you said don't go into -- if you're going to go into conversations with counsel we would object to that. But I don't think --

MR. FADEL: Give me one minute. We might be able to work something out.

MR. GREENBERG: All right.

(Discussion off the record.)

MR. FADEL: I don't know if it will work, but we'll be willing to stipulate or I think the Funds will be willing to stipulate that Mr. Byers found out he was going to be a witness in this case when counsel told him he was going to be a witness in this case.

Now, if we're going to makes that stipulation in no way are we waiving any objection or any attorney-client privilege that we have, but it would just be a way to help you out with this deposition and move along.

MR. GREENBERG: I understand.

MR. FADEL: If that's not acceptable then --

MR. GREENBERG: That's fine.

MR. FADEL: So for the record, I guess we will stipulate that at this point in time when Mr. Byers knew he was going to be a witness was when he was told he would potentially be a witness by counsel for the Funds.

MR. GREENBERG: Well, again, I just wanted to know approximately when that was. I mean, I don't think that's privileged.

MR. FADEL: I wouldn't be able to know and I --

Let's get a minute here.

MR. KINZER: Yeah.

MR. GREENBERG: I didn't mean for this --

MR. FADEL: I know, but you understand the predicament here where we're trying to --

A I can make it real simple so you guys don't have to waste all your time arguing. I don't remember when it was. I get emails from these guys all the time about stuff, so I can't tell you when it was.

Q That's fine.

A Does that save you guys some time?

Q I didn't mean to cause that much of a ruckus.

A Sometime I assume between whenever this letter is. I don't know. I really don't know when it was.

Q All right. So in this letter counsel for the Fund describes the subjects about which you might testify in this case. So the first subject is Sofco's collective bargaining relationship with Local 18. Let me stop there. What do you know about Sofco's collective bargaining relationship with Local 18 other than the existence of these contracts that we looked at a little bit earlier in this deposition?

A The letter where they terminated their agreement.

Q Anything else?

A No. I think that's -- I would -- I would put it as a good relationship. Put lots of our crane operators and forklift operators to work.

Q All right. Then the next subject that's listed here that you might testify about is,

Page 74

quote, "The nature of the work performed by Sofco prior to and following the termination of the collective bargaining relationship."
So let's start about prior to. So what was the nature of the work performed by Sofco prior to termination of the relationship?
MR. FADEL: Objection. Answer if you can.
MR. GREENBERG: Well, just curious, the objection, this is exactly what --
MR. FADEL: I'm just objecting for the record. You're asking for the basis of my objection?
MR. GREENBERG: Yeah.
MR. FADEL: Just curious?
MR. GREENBERG: Just curious because I'm just asking about --
MR. FADEL: I believe the question has been asked and answered already.
MR. GREENBERG: All right. Understood. I don't think so.
MR. FADEL: Well, I can go back in my notes but we'll speed it along.
Q What was the nature of the work performed by

Page 75

Sofco, I assume that means by Local 18 members for Sofco, prior to termination of the collective bargaining relationship?
A So you're asking me -- make sure I understand the question -- the nature of work performed by Local 18 members for Sofco? You threw that in there. I'm just trying to make sure I answer the right question.
Q That's fair. I'm trying to understand what is meant by what the attorney wrote here. So let me back up. I'm just going to read it the way that it was written. It says, "The nature of the work performed by Sofco prior to." So what do you know, generally speaking, about the nature of the work performed by Sofco prior to termination of the relationship?
MR. FADEL: Objection. You can answer.
A My answer would be identical to when you and I sparred about the fact that I said they built buildings.
Q That's it. Anything else?
A No.
Q Well, they used crane operators, right? I

Page 76

mean, so you know something more about the nature of their work other than building buildings?
A Well, do you want to know the nature of the work or what the employees of Local 18 did? I'm not familiar with --
Q I thought that would be included in the nature of the work. I'm guessing that's what Fund counsel wants you to testify about.
MR. FADEL: Objection.
Q Okay. The nature of the work performed by Sofco prior to termination of the bargaining relationship.
A The nature of the work was that they built buildings.
Q All right. Using what tools and equipment?
A I can only testify to what operating engineers do.
Q All right. Tell me.
A I'm not an ironworker.
Q Give me the list?
A We operate heavy equipment.
Q What kind of heavy equipment did operating engineers operate for Sofco prior to

Page 77

termination of the relationship?
A They operated forklifts, they operated cranes, they worked in the shop. I'm sure they operated hand tools, drove a pickup truck. I'm sure they probably did some rigging, some signaling.
Q Anything else?
A I'm sure there is.
Q I'm just asking for your knowledge.
A I gave it to you. That's what I know.
Q It also says here that you're going to testify about the nature of the work performed by Sofco following the termination of the collective bargaining relationship. So what would that be?
A I believe it would be the same thing.
Q All the same?
A As far as I know. Except that it wouldn't be operating engineers doing the work.
Q Well, except for operation of the cranes, right, those are members of Local 18, correct?
A Not for Sofco.
Q Okay. It also says here that you're going to testify to the identity of current or former

Local 18 members employed by Sofco. So can you identify current or former Local 18 members employed by Sofco?
A Sure. Can I refer to some other exhibits here?
Q Sure. Let's limit that to current or former members of Local 18 employed by Sofco after termination of the agreement. I'm not going to ask you about those who were employed before that. Can you identify any current or former Local 18 member employed by Sofco after termination of its relationship with Local 18?
A Can I refer to prior exhibits?
Q Yes, of course.
A At least Jason Allen.
Q And is he a current Local 18 member or a former member?
A I'm not sure.
Q And what is your knowledge? What did he do for the company following termination of its relationship with Local 18?
A Following termination?
Q Yes.
A I know he was at least bringing parts to a job

once. I spoke with Dan Powell one time and he informed me that he was going to try to get Jason Allen as a laborer, so he may be performing laborer work as well. That's what I can tell you.
Q Okay. So I want to understand something about Jason Allen. My understanding is that his work was not on-site, it was in the shop and perhaps moving parts from the shop to job sites; is that correct?
A You're asking me what your understanding is?
Q No, your understanding. What's your understanding of Jason Allen's job duties?
A I've had reports that he's been out on job sites, and I've had reports that he worked in the shop.
Q Okay. I want to ask about shop work. To your knowledge how many individuals work for Sofco in its shop?
A I have no idea.
Q More than one?
A I have no idea.
Q Do you know whether Local 18 has ever filed a grievance against Sofco for assigning shop

work to individuals who were not members of Local 18?
A I don't know of any.
Q Let's look at Exhibit Q.
A I'm sorry. What tab would that be in?
Q Tab 13.
MR. GREENBERG: Let's take a restroom break and let's go off the record.
(Short recess.)
By Mr. Greenberg:
Q Mr. Byers, I'd like you to take a look at Tab 13. So if you look at the numbers in the bottom right corner you'll see that Tab 13 documents are numbered OOE154 through 00E163. So these are documents that were produced by the Pension Fund and they all apparently relate to grievances filed by Local 18 or by Local 18 members over the assignment of forklift work to people who are not members of Local 18. So I want to ask first if you know how the Pension Fund came to acquire these documents? Did they come from you or somebody on your staff?
A I asked the district reps in Columbus and in

District 4-5 Franklin to send me copies of grievances that they had on file relating to forklifts and Sofco. And I also researched what I had at headquarters office in Cleveland.
Q And this is what you came up with, these pages here, 154 to 163, you and your staff?
A I think there is -- at first glance I think that's it. I'm not sure if there were others provided. I see you got some stuff back in 14. I'm sure we'll get there.
Q We will. And Tab 14, I'll just tell you that Sofco produced its records, the grievances over assignment of forklifts to operators other than members of Local 18 and that's behind Tab 14. We'll get to that in a few minutes.
MR. FADEL: If I can just clarify. You indicated that it's 154 to 163 is Exhibit Q. Actually Exhibit Q only runs through --
MR. GREENBERG: That's right. It starts with Q but I've divided these up into the separate grievances, to the best of my

understanding.
Q So let's start with Q. And Q is Bates number 154 through 156, so it's three pages. And it appears to be a letter about a grievance settlement back in 2013. Begins with the letter to Mr. Dalton from a Stanley Brubaker. And then the next page is a copy of a grievance, and the page after that is a copy of a check. Do you have any personal knowledge of the matters referenced in Exhibit Q?
A No.
Q All right. Let's turn to R. You might know a bit more about this one since your name is on the letter. So Exhibit R, that's Bates stamp numbered 157 through 163. So let's start with the first page of R. It is a letter to Mr. Timothy R. Fadel at Wuliger, Fadel & Beyer dated November 7, 2016. It is signed by Thomas B. Byers. Can you identify that document?
A Yes. That's a document that I used. When we have a grievance settlement we started using Mr. Fadel as a clearing house to help assist

us in maintaining records about grievances.
Q So I'm going to assume that when you did research on the past history of grievances that you would have also asked Mr. Fadel to --
A (Nods head.)
Q You didn't ask him?
A I did not.
MR. GREENBERG: Well, as long as we're sitting here I'll ask Mr. Fadel to find any records that he has of grievances involving Sofco.
MR. FADEL: Your request is duly noted.
MR. GREENBERG: If we don't get anything we'll assume that there isn't anything there.
MR. FADEL: You should assume nothing. And I'll put that on the record. You should assume that my response or lack thereof is indicative of nothing.
MR. GREENBERG: Okay.
MR. FADEL: And if you want to subpoena information from me you're free to do that.

MR. GREENBERG: No, I think I'll leave it up to Pension Fund counsel to decide whether to pursue that further.
Q Okay. So the cover letter refers to the enclosed information, and then there is some pages after that that are numbered consecutively. So let's start with the next page. It's headed "Summary, Sofco Erectors, grievance dated 7-12-16." Mr. Byers, do you know who prepared this page?
A I do not. I can have my guess that it would be handwritten by one of the business reps in District 4-5 and submitted to my office. It may have been typed by his district rep or it may have been typed by him or the secretary, but most of that information comes from the district.
Q All right. So this is a document that's kept in, you know, sort of the normal course of your business?
A Yes.
Q I'd like you to look at the second entry for July 11, 2016. So I'm going to read this out loud. "Business Rep Jason Baker spoke with

John Hesford with Sofco Erectors. John stated that Sofco has assigned forklifts to Ironworkers." I'm going to stop there. Do you recall reading that in this summary at the time?
A Not specifically.
Q But you don't dispute the fact that as of the date that you received this summary, which would have been sometime on or before November 7, 2016, that you knew that Sofco was assigning forklift work to ironworkers?
A Based upon this I can tell you that I see right here that they have assigned forklifts to ironworkers because I'm reading it on this paper. I don't know that I've been notified that they're solely assigning it. It says they have assigned forklifts.
Q Okay. Let's turn to Tab 14. So as I explained a few minutes ago, Tab 14 includes all of the documents that Sofco produced to the Fund that relate to grievances in the company's records involving assignment of work to forklift operators. I'm going to start with Exhibit S. And Exhibit S is a grievance

form. There is a reference to a steward Justin Gabbard. So Justin Gabbard is an employee of Local 18, correct?
A You're saying -- yeah, he's a business rep, if you're talking about Exhibit S.
Q Yes, I'm talking about Exhibit S.
A Yes, he's the business representative.
Q In District 4-5?
A Yes.
Q So now I'm going to ask you to turn all the way back to Exhibit D.
A Do you have the tab number?
Q That is Tab 2. And it is the last few pages of Tab 2. Well, no, I'm sorry, it's not the last few pages.
MR. FADEL: It's 00193.
MR. GREENBERG: Thank you.
Q All right. So the second entry on Exhibit D, first page refers to an ironworker running a RT forklift on Aero Parkway, Florence, Kentucky. Did you see that it says that on 3-13-2017.
A Uh-huh.
Q And then you turn all the way back to Tab 14

and you see a grievance form that's dated 3-15-2017, and it appears to be a reference to the same matter. Do you agree with that?
A Yes.
Q Do you have any personal knowledge as to how this matter was handled and how it was resolved?
A Yes, I believe I do.
Q Okay. Tell me what you recall.
A Personal knowledge or based on what I see on the paper right here?
Q Well, both.
A Okay. Well, down at the bottom, about half of it is obscured at the bottom where it's handwritten, but if you look at the last sentence, which is kind of in the middle of the bottom line, it looks like it says "Company agreed to put a company operator on forklift until" something. And then it looks like that might be Mr. Hesford's signature next to that there.
Q All right. And again, in addition to what you just read or summarized, do you have any other recollection about how this matter was

handled?
A No.
Q All right. Now, I'd like you to look at Exhibit T. That's the next page. And Exhibit T is a letter dated February 9, 2017 to Mr. Richard Hobbs. It's a request for a Step 2A grievance hearing, and it appears to be signed by Thomas P. Byers. Do you have any recollection of what this matter was about?
A There is an agreement but the district didn't reach a resolution with the Employer and following the grievance procedure the next step if we can't agree at Step 2 is when the business rep, district rep and the Employer meet to try to come up with a resolution. There was no resolution forthcoming so the next step is 2A of the grievance procedure which is that I will meet with someone from the AGC, in this case Mr. Hobbs, and have some discussions about the grievance.
Q So let me step back a second and ask you about the Step 2 meeting. Did you attend that meeting?
A The Step 2 meeting?

Q The one that involves this matter?
A That's Step 2A.
Q I'm sorry. The one before Step 2A?
A The one before Step 2A I did not attend.
Q Do you know who did?
A We can go back and look on the form on the prior page and see if it tells me.
Q I think that's a different matter because the prior page, it's dated 3-15-2017.
A Okay. So we need to find the grievance form that was sent along with this letter, because I assume it was part of the document that was provided because the Bates number at the bottom of this one is different from the Bates number -- you know, there is two Bates numbers on the next one so it looks like we've got enclosed is a grievance. I would have enclosed the grievance with the letter.
Q Okay. I believe I might have separated documents that should have been combined into a single exhibit, but that's okay. So let's look at the next page which we've marked as Exhibit U. And then there are a couple of pages after that including the grievance form.

Page 90

So let's take a look at Sofco 1176. That's the grievance.

So when we look at the grievance form you'll see that it's dated 1-26-2017. I'm going to read the statement of facts out loud. "Sofco Erectors, Inc. has assigned someone other than an operating engineer on two forklifts beginning on January 24, 2017, at the hotel project on Hetzel Street, Cincinnati." And you'll see it's signed by Justin Gabbard. Do you recognize his signature?

A Yes.

Q And he was a business representative for Local 18 at that time?

A Yes.

Q And do you have any recollection of what this grievance was about and how it was handled?

A Well, it appears that it was about there was -- someone other than an operator was assigned to two forklifts on a project and Mr. Gabbard filed a grievance because someone other than an operator was assigned. That's what it's about.

Page 91

Q Let's look at the next page. Perhaps this will refresh your recollection.

And I do realize now that these were produced by both Sofco and the Fund so there are actually a few pages in Tab 18 that were produced by Local 18 and produced by the Fund and we produced them as well.

So looking at the document that is numbered 00E142 and Sofco 1177, you'll see at the top it says "from." And I'm not sure I can read that. It says, "Produced by Operator 718. And it's a summary, Sofco Erectors, Inc., 1-24-2017. Do you recognize this document?

A I recognize that there is writing on it that wasn't on there when it was provided.

MR. FADEL: I think that's your clients's writing.

MR. HESFORD: That's is my handwriting.

A The bottom is mine.

MR. HESFORD: It's just, yeah, we were trying to sort out --

A This was probably provided from Al, I would

Page 92

assume, to you guys. That's where this document comes from.

Q Yes.

A So you provided our document back to us.

Q Looks that way. So you can identify this as a document that came from your file, other than the handwritten notes at the very top, correct?

A I'm reading here. Give me just a few minutes if you would. Yes.

Q All right. So let's talk about what we have here. And I'll start with the reference to two forklifts being operated by someone other than an operating engineer. To your knowledge were these forklifts being operated by members of the Ironworkers Union or individuals who were not members of the Ironworker Union or do you know one way or the other?

A I do not know.

Q So when I read through this summary and I go all the way to the bottom, it appears that this matter was not resolved with the company, correct?

A That's correct.

Page 93

Q Okay. And when we turn back -- now, let's turn back to Exhibit T, which is your letter to Hobbs. Exhibit T refers to the grievance that is included and described in Exhibit U; correct?

A You're throwing me off on all the letters here.

Q I'm sorry.

A Are you talking Exhibit U now?

Q I want you to look at Exhibit T.

A Yes.

Q And you'll see the first sentence in your letter to Mr. Hobbs says, "Enclosed is a grievance filed by Middletown Business Representative Justine Gabbard," et cetera. Does that refer to the grievance that is included in Exhibit U? I'm going to refer to it as the Hetzel Street grievance.

A Yeah, you're throwing me off because of the differing numbers on it. That's all.

Q I understand.

A Yes, it looks like, based upon the February 8 letter in Exhibit U, Mr. Jeff Powell, district representative, sent that along with the

Page 94

grievance. It looks like you've just used the employer's provided grievance form. The one from Local 18 probably has more information on it somewhere. But yes, it looks like it's pertaining to the subject matter of the same grievance.
Q All right. Did Mr. Hobbs respond to this letter?
A Yes.
Q And what was his response?
A Let's meet.
Q And did you meet with Mr. Hobbs about this grievance?
A I did.
Q And when was that?
A Sometime after. If there was a copy of the Local 18's grievance form I'm pretty sure it would probably indicate the date I met with Mr. Hobbs.
Q Who else attended that meeting?
A I believe Dan Powell did.
Q And what happened at that meeting?
A At the end of the day nothing.
Q Not resolved?

Page 95

A It was not resolved.
Q And what's the next step after that?
A Well, it would have been arbitration.
Q And the Union chose not to appeal this matter at arbitration; is that correct?
A I think sometime while we were still discussing we left a meeting without a resolution, but I think Mr. Powell and I talked a couple more times and then while the discussions were going on we got a letter that said that they were going to terminate their agreement with Local 18.
Q I understand. But I just also want you to confirm that the Union chose not to appeal this matter at arbitration, correct?
A Yeah, I believe we kept the dialogue open until we got the letter.
Q And chose not to appeal this matter at arbitration, correct?
A We did not arbitrate it.
Q I'd like you to look at Tab 15. Tab 15 you'll see is also marked -- the document behind Tab 15 is marked as Exhibit Z. Are you with me?
A Yes.

Page 96

Q Have you seen this document before today?
A I don't think so.
Q Were you aware as a trustee of the Pension Fund that Sofco had been assessed for partial and complete withdrawal liability?
A Yes.
Q In fact, I assume you must have attended a meeting where the trustees voted to move forward with this assessment, correct?
A Have to be careful about assuming.
Q Okay.
A No.
Q There was no such meeting?
A There was no vote.
Q No vote. This was simply something that was handled by Bryan Barch, in-house counsel? He signed the letter.
A I'll agree he signed the letter.
Q Who authorized him to send this letter?
A I don't know.
Q Who is Bryan Barch?
A He was an attorney for the fringe office.
Q And who did he report to?
A His ultimate supervisor would be Carol Wilson.

Page 97

Q And she's the Fund administrator?
A Yes.
Q Did she have authority to approve these withdrawal liability assessment letters?
A If I'm here as a business rep from Local 18 talking about our documents I can tell you I don't know. Is that why I'm here?
Q Do you understand why Sofco was assessed for partial withdrawal liability?
MR. KINZER: Objection.
MR. FADEL: Objection.
Q Do you understand what partial withdrawal liability means?
A I do.
Q Has any other Local 18 union contract signatory ever -- and I'm talking about in the building trades. Ever been assessed for partial withdrawal liability, to your knowledge?
MR. FADEL: Objection.
A I don't know.
Q You don't know?
A Don't know.
Q Did you do any research or did you authorize

any research to determine how much of Sofco's forklift work has been performed by members of the Ironworkers Union?
A Other than the documents that were already provided where it named them, no, there was no specific directive to calculate hours other than in the processing of grievances.
Q I'd like you to turn to Tab 16. This is Exhibit AA. So Exhibit AA is an email -- well, it's a letter that was sent by email and U.S. Mail by me as attorney for Sofco on November 10, 2017. You'll see that it's addressed to trustees, Ohio Operating Engineers Pension Fund, care of Bryan Barch, in-house counsel.
Were you given a copy of this letter at any point in time, November of 2017 or thereafter?
A Mind if I take a glance as it?
Q Please.
A I don't remember the letter.
Q I'd like you to turn seven pages. And when you turn seven pages you're going to come to a two-page document that has the caption

"Affidavit of John Hesford" on it.
A Okay.
Q Do you see that affidavit?
A I do.
Q Please take your time and read through it and I'm going to ask you a couple of questions about it.
A Okay, I've read it.
Q Thank you. Do you have any reason to believe that any of the statements made by Mr. Hesford in this affidavit are incorrect?
A I don't know why he would lie in an affidavit.
Q Okay. So again, just sitting here today, you're not disputing any of his statements in this affidavit?
A I don't -- I don't know.
Q You don't have any knowledge of anything that would dispute any of these statements, correct?
A I guess I should have kept going because I didn't realize we were talking about Exhibit B and all the attachments going further in there. I guess I probably should read those first as referenced in number 7 in Exhibit A.

Q Sure.
A The letter from Maxim says they run cranes on all Sofco job sites within the jurisdiction of Local 18. And Tri-State Crane says that they run cranes. I have an issue of whether I believe the Maxim letter's words, but I didn't write it.
Q Maybe that was wishful thinking.
A I hope. Okay. I have no reason to doubt anything that Mr. Hesford said.
Q Thank you. Now please look at Tab 17. This is a document that is marked as Exhibit BB. This is another letter that I wrote to the Trustees of the Pension Fund care of Mr. Barch. Do you recall seeing or being given a copy of this letter?
A No, I don't recall.
Q Please take a look at the document behind Tab 18. This is the exhibit marked CC. And it's a letter dated June 22, 2018 to me from Fund Attorney Daniel J. Clark. Have you seen this letter before today?
A I don't think so.
Q Please take a look at Tab 19. This is a

document marked Exhibit DD. Are you familiar with an individual by the name of Tim Gates?
A No.
Q Are you aware that the company that is called Sofco Erectors, Inc. had different owners before 2004?
A I didn't know the date but I did see it in the prior document that you had me look at. But no, I was not aware.
Q I'd like you to take a few minutes and read through Exhibit DD and when you're done I'm going to ask you a couple of questions about it.
A Okay.
Q Do you have any reason to dispute any of the statements made by Mr. Gates in this affidavit?
A I don't think he would lie.
Q There is nothing that you know that is different than what's stated in this affidavit?
A When I met with Dan Powell he told me that he and John were 50/50 owners of the company. I see Jim Ludwig in there from March of '04. So

I just assumed that maybe is the way it was in '04 with Sofco Erectors Acquisition, Inc.
Q Right. Correct. And anything else you see in here that you question?
A No, I don't know why anybody would lie in an affidavit.
Q Thank you. This might be all I have and so let me talk to Mr. Hesford and then we will either close or ask another question or two.
(Short recess.)
Q So Mr. Byers, I appreciate your patience this morning and I want you to think back to my questions, your answers and as you sit here right now is there anything that you said that you feel you need to correct, anything you need to add to any of the answers you gave me previously in order to make sure that I have accurate information?
A Sure. I did think about the Precision Environmental case you asked me about, if there were any differences between the two.
Q All right.
A Between this case and that one. I'd say in this case we provided over 100 work orders

that show that Sofco employed operating engineers on cranes and forklifts or we've provided work orders for the forklifts. We can get you the cranes.
In the Precision Environmental case we just had the testimony of people that work there. We didn't have any documentation to prove it.
Q Anything else you can think of?
A No. Except you said to thank me for my patience. I wasn't very patient.
Q I thought you were fine.
So I'm going to ask the court reporter to prepare a transcript and I'm going to ask her to send it to you or your counsel. You know, we can send it to counsel to help you review it. And then there is going to be a correction sheet. So if you see anything in the transcript that needs to be corrected you'll put it on the correction sheet.
A Okay.
Q And then once you've approved it as being an accurate transcript we'll ask you to sign and return the signed signature page. Is that

okay?
A Okay.
MR. GREENBERG: Is that all right?
MR. FADEL: Yeah.
MR. GREENBERG: Thank you. Off the record.
(Deposition concluded at 1:01 p.m.)
(Signature not waived.)
\- - -

SIGNATURE PAGE

CASE NAME: Sofco Erectors, Inc. vs. Ohio Operating Engineers Pension Fund

Case Number: 01-18-0001-3790
Deponent: Thomas P. Byers
Date: Wednesday, September 26, 2018

To the Reporter:

I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me. I request that the following changes be entered upon the record for the reasons indicated.

I have signed my name to the Errata Sheet and the appropriate Certificate and authorize you to attach both to the original transcript.

________________________
Thomas P. Byers

Subscribed and sworn to before me this ______day of ____________, 2018.

________________________
Notary Public
My commission expires:________________________.

PLEASE USE THIS ERRATA SHEET TO MAKE ANY AND ALL CORRECTIONS, BY LISTING THE PAGE NUMBER, LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE ERROR. PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS ON THE TRANSCRIPT. IF NEEDED USE THE BACK OF THIS SHEET. UPON COMPLETION PLEASE SIGN AND DATE THIS SHEET AT THE BOTTOM. THANK YOU.

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

SIGNATURE:____________________DATE:_____________

State of Ohio, )
) SS: CERTIFICATE
County of Cuyahoga, )

I, Karen A. Toth, Notary Public in and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, Thomas P. Byers, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given by him was by me reduced to stenotypy/computer in the presence of said witness, afterward transcribed, and that the foregoing is a true and correct transcript of the testimony so given by him as aforesaid.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment

I do further certify that I am not a relative, counsel, or attorney of either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio on this 4th day of October, 2018.

______________________________

Karen A. Toth, Notary Public in and for the State of Ohio.

My Commission expires May 6, 2023.

PENGAD 800-631-6989 EXHIBIT A Employer

CINCINNATI
Phone: 513-771-1600
Fax: 513-771-5490

COLUMBUS
Phone: 614-761-2500
Fax: 614-761-2515

INDIANAPOLIS
Phone: 317-352-9680
Fax: 317-352-9688

**SOFCO ERECTORS, INC.**

***10360 WAYNE AVE. (WOODLAWN) CINCINNATI, OHIO 45215**
**7667 FISHEL DRIVE SOUTH DUBLIN, OHIO 43016**
**7037 BROOKVILLE ROAD INDIANAPOLIS, IN 46239**

February 7, 2017

Mr. Richard Hobbs
AGC of Ohio LRD
1755 Northwest Blvd
Columbus, Ohio 43212

Dear Mr. Richard Hobbs,

Effective April 28, 2017, Sofco Erectors is terminating our participation in the AGC of Ohio Building Agreement, effective May 8, 2013 through April 30, 2017, between The International Union of Operating Engineers Local 18 and its Branches (AFL-CIO) and the Labor Relations Division of the AGC of Ohio. Accordingly, if there is any successor agreement to which you believe we are bound, please be advised that we hereby terminate that agreement, and we do not intend to be bound by any future collective bargaining agreement with the AGC and Operating Engineers Local 18.

An Audit Review (attached) was recently performed by Local 18 for the period 6/1/12 to 1/1/17. Please contact Caroline Riley at the Cincinnati office when and if you wish to review our records for the period 1/1/17 to 4/28/17.

Sincerely,

John Hesford
President CEO

Enclosure
Cc: Mr. Richard Dalton, Local 18, the Ohio Operating Engineers



EXHIBIT
B
Employer
PENGAD 800-631-6989

Sofco jobs in District 3

2/2018

Licking County

- Warehouse in New Albany early-summer 2017 1 forklift

Delaware County

- Vocational school no forklift summer 2017
- Polaris IKEA 6 month job forklift on site ran by Gilbane employees.

Franklin County.

- Trabue rd. UPS no forklift on site 2 months June- July 2017
- 5 different Warehouses in Rickenbacker over summer thru present 2017 2 forklift running per job.
- Grove City Mt. Carmel Hospital. 1 forklift job was june-Dec 2017
- Short north on high street 9 story high rise no forklift. ongoing
- Children's hospital on Livingston 7 story building started 2/12/2017 no forklift at this time.
- Children's hospital 18th street office Aug- present forklift running with iron workers.
- Mt. Carmel Hilton corporation drive 1 story building started first of year forklift on site being used.

Pickaway County,

- Sofidel paper plant 3 forklifts all of 2017 operators laid off replaced by Ironworkers

**Members working for sofco when agreement abrogated April 2017**

- **Joey Bing- Sofidel**
- **Kathleen Hart-Sofidel**
- **Charles Owsley-Sofidel**
- **Donald Grimm-4/5 member**
- **Howard Reed-New Albany**
- **Jason Allen-parts runner stayed with company**

From: Greg Greenlee ggreenlee@iuoelocal18.org
Subject: FW: Sofco
Date: Feb 19, 2018 at 4:22:24 PM
To: Tom Byers tbyers@iuoelocal18.org


-----Original Message-----
From: Chad Creeks
Sent: Monday, February 19, 2018 4:12 PM
To: Greg Greenlee <ggreenlee@iuoelocal18.org>
Subject: Sofco

Sofco moved a forklift in at the Livingston Ave Children's job today.





Sent from my iPhone

OOE-000167

**Tom Byers**

**From:** Greg Greenlee
**Sent:** Monday, February 19, 2018 9:57 AM
**To:** Tom Byers
**Subject:** sofco Jobs
**Attachments:** Sofco.pdf; sofco 1.jpg; sofco 2.jpg

Here is the list of job's that Sofco is currently working on and done in 2017. I attached the fringes of members working from Feb 2017- March 2017 when they were laid off. The Sofco 1 picture is from the children's Hospital on 18th and Sofco 2 picture is the Mt. Carmel job on Hilton Corporate Dr.

Greg Greenlee
District Representative
IUOE Local 18 District #3
1188 Dublin Road
Columbus, Ohio 43215
614-486-5281
ggreenlee@iuoelocal18.org



SUNBEL
TRAK
SUNBE

OOE-000169

**ORDER**

Contractor Sofco

Location of Job Tylersville Rd.

Date: Report Mon 10·29·01 Time 7:30aM

Make of Machine Skytrack RT forklift

Type of Work

Operator Recall Don Richards

3 to 4 weeks. OCT 26 '01 PM12:01

Report to: Jim Irondorf.

513-615-5115

Order Given By Joann

Telephone No. 513-771-1600 ext 121

Date 10.26.01 Time 11:32 Per Jm

Form No. 21

OOE-000170

PENGAD 800-631-6989 EXHIBIT C-1 Employer

Butler County

JUL 13 '01 PM 4:23

## ORDER

Contractor: Sofco

Location of Job: Center Point

Date: Report 7·16·01 Time 7:00 AM

Make of Machine: Skytrack Operater

Type of Work: (RT. Forklift)

Operator: Experienced

John Ryan.

Report to Howard Achoe

JUL 13 '01 PM 4:06

Order Given By: Joanne

Telephone No.: 513·771·1600 Ext. 21

Date Time Per JB

Form No. 21

Butler County

## ORDER

Contractor: Sofco

Location of Job: Tylersville Rd-Butler County (Back)

Date: Report Mon. 10/29/01 Time 7:30 aM

Make of Machine: Skytrack Forklift W/ Hyd. arm

Type of Work: Must be experienced

Operator:

Report to Jim Frondorf

(513) 615-5115

Order Given By: JoAnn

Telephone No.: (513) 771-1600 Ext. 121

Date Time Per Tricia

Form No. 21

**ORDER** AUG28 03 3:55PM

Contractor Sofco Erectors

Location of Job Commerce Center Drive - behind Dayton Daily News

Date: Report 9-2-03 Time 7 A M

Make of Machine 8,000# R.T. F/L

Type of Work

Operator Harold Devers 10-4-02 4:33

Work 7-3:30

Approx 3 weeks AUG28 03 4:06PM

Order Given By Mike Howe

Telephone No. 513-615-5098

Date 8-28-03 Time 3:55 Per [illegible]

Form No. 21

**ORDER** AUG27 03 9:53AM

Contractor SOFCO ERECTORS

Location of Job COMMERCE PARKWAY

BUTLER CTY.

Date: Report TUES. 9-2-03 Time 7:00 M

Make of Machine SKYTRACK FORKLIFT

Type of Work

Operator REQUEST BY LETTER

PAM HARTMAN

11-5-02 3:45

AUG28 03 8:1

8-28-03 8:13am

WORKING 7:00 - 3:30 MON-FRI

Order Given By MIKE HOUSE

Telephone No. 513-615-5098

Date 8-27-03 Time 9:52 Per JENNY

Form No. 21

OOE-000172

## ORDER

SEP12 07 9:43AM

Contractor Sofco Erectors

Location of Job Brookville - Project Eagle

Montgomery County

Date: Report Thurs 9/13/07 Time 7:00a M

Make of Machine 10,000 lb RT forklift

Type of Work

Operator George O'Neill 2907 8:59

SEP12 07 9:59AM

certification required

approx. 1 month

Order Given By Mike House

Telephone No. 513-615-5098

Date 9/12/07 Time 9:42 Per Jenny

Form No. 21

## ORDER

SEP 7 07 10:08AM

Contractor Sofco Erectors

Location of Job Brookville - Project Eagle

Montgomery County

Date: Report Sat 9/8/07 Time 7:00 a M

Make of Machine 10,000 lb RT forklift

Type of Work

Operator Christine Robinson 12-21-06 2:25

SEP 7 07 10:42AM

certification required

approx. 1 month

Order Given By Mike House

Telephone No. 513-615-5098

Date 9/7/07 Time 10:08 Per Jenny

Form No. 21

## ORDER

OCT16 07 9:53AM

Contractor Sofco Erectors

Location of Job West Jefferson 6815 St. Rt. 29

Madison Cty

Date: Report Wed. 10/17/07 Time 7:30 M

Make of Machine RT forklift

Type of Work unloading trucks / moving mat.

Operator Jeff Cash 11-22-06 1:03

Report to: Wayne Corson 614-332-9356

certification required

3-4 weeks

Order Given By Bronson Tatterson

Telephone No. 614-761-2500

Date 10-16-07 Time 9:52 Per Jenny

Form No. 21

MONT. COUNTY

**ORDER**

AUG24 07 7:44AM

Contractor SOFCO ERECTORS

Location of Job BROOKVILLE- PROJECT EAGLE (SEE BACK)

Date: Report MON. 8/27/07 Time 7 A M

Make of Machine 10,000 LB. ALL-TERRAIN

Type of Work TELESCOPING BOOM FORKLIFT

Operator OFF-LOADING STEEL, PRE-ASSEMBLING BAR JOISTS Darrell mcKinley 92506 10:21

AUG24 07 9:03AM

COUPLE MONTHS OF WORK

WORKING 5/8'S

MIKE IS YOUR CONTACT PERSON

Order Given By MIKE HOUSE

Telephone No. 513-615-5098

Date 8/24/07 Time 7:40 Per DB

Form No. 21

**ORDER**

MAY11 07 5:04PM

Contractor SOFCO

Location of Job Windish Rd. 1 mile on Right

Date: Report 5-14-07 Time 7:00 AM

Make of Machine

Type of Work RT. Forklift

Operator Roger Bailey

MAY11 07 5:17PM

Report Kenny Olterman

Order Given By Jim Fondorf

Telephone No. 513-615-5115

Date Time Per

Form No. 21

OOE-000174

**ORDER**

FEB12 04 2:43PM

Contractor Sofco

Location of Job Target Store

625 & Wilmington Pike

Date: Report Mon 2.16.04 Time 7:30 M

Make of Machine 10,000 RT forklift

Type of Work

Operator Harold Dennis 10.4.02 433

FEB12 04 3:05PM

approx 3 weeks

Order Given By Mike House

Telephone No. 513-625-5098

Date 2.12.04 Time 2:41p Per Jm.

Form No. 21

**ORDER**

JUN 4 04 2:54PM

Contractor Sofco

Location of Job Trotwood H.S.

Union Rd.

Date: Report Mon 6.7.04 Time 7A M

Make of Machine lull forklift-RT

Type of Work 40T Grove hydro

Operator Wm Swope

9.22.03 3:16

JUN 4 04 3:11PM

2 days

Order Given By Mike Tryon

Telephone No. 513-200-3690

Date Time Per Jm.

Form No. 21

Sucker Cry

**ORDER** OCT 6 05 8:28AM

Contractor Sofco Erectors

Location of Job Off Union Center Blvd ; Building F

Date: Report Thurs. 10/6 Time ASAP M

~~or Fri 10/7 7:30 am~~

Make of Machine

Type of Work Rt forklift operator

Operator

3-4 days

working 5/8's

Sp. (Mike Smith) OCT 6 05 8:41AM

Ken Oaterman) 7.12.05 10:57

Order Given By Jim Frondorf

Telephone No. 513-615-5115

Date 10/6/05 Time 8:25 Per OB

Form No. 21

OOE-000176

OCT 11 '99 AM 12:22

**ORDER**

Contractor Sofco

Location of Job KM

Date: Report 10-12-99 Time 7A M

Make of Machine forklift

Type of Work

Operator

Request by Otr

Gerald Nickell

OCT 11 '99 PM 2:56

Order Given By

Telephone No.

Date Time Per

Form No. 21

Butler Co.

**ORDER**

AUG14 06 10:02AM

Contractor Sofco Erectors

Location of Job Port Union Rd. Bldg J.

Date: Report 8/15/06 Time 7:00a M

Make of Machine rt forklift (certified)

Type of Work initizing bar joists and moving them, unloading trucks

Operator

Christine Robinson 7.5.06 11:20

AUG14 06 10:53AM

working 5x8's

Order Given By Jim Frondorf

Telephone No. 513-615-5115

Date Time Per Jm

Form No. 21

OOE-000177

DEC 22 '99 AM 10:09

**ORDER**

Contractor Sofco

Location of Job GM

Monday

Date: Report 12/27/99 Time 4:30pM

Make of Machine

Type of Work FORKLift (w/cert)

Operator Carry deck

Report 12/23 (Thurs) 2:00 for

drug testing + paperwork (pays 4hrs)

2nd Shift 10 hrs / week)

Rept to Larry Hill @ Column F11

Order Given By Larry Hill →

Telephone No. 513-615-5098

Date Time Per

Form No. 21

Gary L. Hall

DEC 22 '99 AM 11:32

**ORDER**

Contractor Sofco

Location of Job GM Moraine

M.K. drug trailer

Date: Report 10-18-99 Time 7:30 AM

Make of Machine forklift /

Type of Work carry deck

Operator

Pam Hartman

OCT 15 '99 PM 3:47

couple months

Order Given By Joann

Telephone No.

Date Time Per

Form No. 21

NOV 29 '99 AM 9:19

**ORDER**

Contractor Sofco

Location of Job GM- Moraine

Report to MK Safety Trailor for Drug Test.

Date: Report 11/29 Time ASAP M

Make of Machine forklift 11/30/99 7 30/A

Type of Work

Operator

Daren Driggers

No show 9:30AM 11/30/99

NOV 29 '99 AM 9:48

approx 1 month

Order Given By Joanne

Telephone No. 513-771-1600 ext 21

Date Time Per

Form No. 21

Mike 513-615-5098

**ORDER**

Contractor Sofco

Location of Job GM - Moraine

Date: Report 11-30-99 Time ASAP M

Make of Machine forklift

Type of Work

Operator

Reg by Mike
Robert Donley

NOV 30 '99 AM 10:14

Order Given By Mike

Telephone No. 513 - 615 - 509[illegible]

Date Time Per

Form No. 21

**ORDER**

JUN 2 '99 PM 3:33

Contractor Sofco

Location of Job Haubelhauser Rd.

Date: Report 6/3/99 Time 7 AM

Make of Machine Sky Track Fork

Type of Work Truck Oper.

Operator

Contact Craig Smith
Jerry Micke

Order Given By John

Telephone No (513) 771 - 1600 x 24

Date 6/2/99 Time 10:08 Per [illegible]

Form No. 21

JUL 23 '99 AM 11:45

**ORDER**

Contractor: Sofco

Location of Job: Off Union Centre Blvd Tuesday Over→

Date: Report 7-27-99 Time 6:30 AM

Make of Machine: rough terrain

Type of Work: forklift

Operator:

must be certified

Phyllis Smith

JUL 26 '99 PM 2:43

see Foreman - Jim Frondorf

Order Given By:

Telephone No. 513-771-1600 X 21

Date | Time | Per

Form No. 21

JAN 25 '99 AM 8:43

**ORDER**

Contractor: Sofco

Location of Job: Cheney / Moraine GM trailer park

Date: Report 1-26-99 Time 7:00 AM

Make of Machine: forklift

Type of Work: 5 ton

Operator:

Gary West

Red truck in parking lot

GM training

Order Given By: Joann

Telephone No.

Date | Time | Per

Form No. 21

JAN 25 '99 AM 9:16

DEC 21 '99 PM 2:51

**ORDER**

Contractor: Sofco

Location of Job: GM

Date: Report 12/27/99 Monday Time 4:30 PM

Make of Machine:

Type of Work: Forklift (certified)

Operator: Larry Peck CCO

10 hrs - 1 week 2nd shift

2:00 Thurs. for drug testing

needed (pass 4 hrs) column

Kept to Larry Hill @ FW →

Order Given By: Larry Hill

Telephone No. 513-615-5698

Date: Cancelled Per: [illegible]

Form No. 21 12/22/99 10:06

heavy Blvd.

FEB 3'00 AM 8:52

**ORDER**

Contractor Sofco

Location of Job GM MK drug test trailer plant 1 Column line E8

Date: Report 2/3/00 Thur. Time ASAP M

Make of Machine Gull - RT forklift

Type of Work w/ extending

Operator boom

Clayton Oaks.
couple days replacement

Order Given By Mike House

Telephone No. 513-615-5098

Date Time Per FEB 3'00 AM 9:08

Form No. 21

---

57 lift oper. fork lift

**ORDER**

Contractor Sofco

Location of Job G.M. Enter at Gate

Meet at Tables Col E2

Date: Report Mon 6/19/00 Time 7 AM

Make of Machine Forklift

Type of Work

Operator Robert Deman

(approx. 2wk replacement)
GM drug-tested.

JUN 16 '00 PM 2:54

Order Given By Larry Hill

Telephone No. 513-615-5119

Date Time Per

Form No. 21

---

**ORDER**

MAR 14 '00 AM 7:49

Contractor SOFCO

Location of Job G.M.

Date: Report 3/14/00 Time ASAP M

Make of Machine Forklift (Two)

Type of Work Certified

Operator G.M.STP.

Replacement

John Moore

MAR 14 '00 AM 8:00

Order Given By

Telephone No.

Date 3/14/00 Time 7:50 Per [initials]

Form No. 21

JAN 25 '00 AM 10:01

**ORDER**

Contractor Sofco Steel Erectors

Location of Job GM - Moraine

Date: Report 1/26/00 Wed Time 7 A M

Make of Machine 7 1/2 ton forklift

Type of Work

Operator Jamie Kimbrough Board

if drug tested Report to Column F-11

if not report to Drug Trailor

JAN 25 '00 PM 3:21

approx 2 weeks

Order Given By Mike House

Telephone No. 513-614-5098

Date Time Per

Form No. 21 Report to Larry Hill

---

S.T. forklift

JAN 26 '00 PM 2:13

**ORDER**

Contractor Sofco

Location of Job GM - Moraine

Date: Report 1/27/00 Thur Time 7 A M

Make of Machine Lull (RT) & Industrial

Type of Work forklift

Operator tight close area

Marlene Jones

JAN 26 '00 PM 3:29

Order Given By Larry Hill

Telephone No.

Date Time Per Mike

Form No. 21

---

JUL 19 '00 PM 4:22

**ORDER**

Contractor Sofco

Location of Job Union Center

Date: Report Thur, July 20 Time 7 A M

Make of Machine SkyTRACK RT forklift

Type of Work

Operator temp. replacement

Paula Slonaker

JUL 19 '00 PM 4:42

Order Given By JEANN MILLER

Telephone No. 695 5095 (513)

Date Time Per

Form No. 21

Butler Warren County

**ORDER**

SEP 26 '00 AM 10:05

Contractor Sofco

Location of Job Kohls Distribution Center Monroe

Date: Report Wed 9.27.00 Time 7:30 M

Make of Machine Rt Forklift

Type of Work

Operator Harold Dewers, 6.27.00 1:46

SEP 26 '00 AM 11:00

2 months 10 hrs a day. Some overtime

Order Given By Mike House

Telephone No. 513-615-5098

Date Time Per

Form No. 21

---

Butler County

**ORDER**

JUL 17 '00 AM 9:20

Contractor Sofco

Location of Job Union Center Blvd

Date: Report 7/18/00 Tues. Time 7a M

Make of Machine 10,000 SkyTrac R.T forklift

Type of Work boom alongside col

Operator Steve Dunk

5 days 7-3:30

2-3 weeks

JUL 17 '00 AM 10:52

Order Given By Joann

Telephone No. 513-771-1600 ext21

Date Time Per

Form No. 21

---

Butler County

**ORDER**

SEP 19 '00 PM 1:34

Contractor Sofco

Location of Job Kohl's store Weston 12163 from I-75 turn right on Salzman Rd

Date: Report Weds 9/20 Time 7 am

Make of Machine R.T Forklift ~~extendable boom on side~~ Sky Track 10,000

Type of Work Building Kohl's

Operator 7am-3:30 M-F

No Sat/Sun.

6 weeks

Jerry Eberhart 6.23 4:05

SEP 19 '00 PM 2:23

Order Given By Joanne Miller

Telephone No. 513 771-1600 ex 21.

Date Time Per

Form No. 21

RT Cert

NOV 7'00 PM 3:15

**ORDER**

Contractor: Sofco

Location of Job: World Park bldg #9

Date: Report 11/8/00 Time 7am

Make of Machine: Cert. R.T forklift

Type of Work: High paced, setting steel

Operator: Kelli Price

NOV 7'00 PM 3:48

rest of week

Order Given By: Joanne

Telephone No.: 513-771-1600 ext 21

Date ___ Time ___ Per ___

Form No. 21

---

STP forklift

SEP 14'00 PM 2:31

**ORDER**

Contractor: Sofco

Location of Job: Columbia Rise E-4 G.M. Gate 5 - ask for Sofco.

Date: Report Mon 9/18 Time 7am

Make of Machine: ind forklift

Type of Work: Close, tight work.

Operator: Hyman King 7.17.00 2:140

1 week replacement

SEP 14'00 PM 4:51

Order Given By: Harry Hill

Telephone No.: 513-615-5119

Date ___ Time ___ Per ___

Form No. 21

---

Rt Fork Cert.

**ORDER**

NOV 1'00 PM 4:26

Contractor: Sofco

Location of Job: World Park off Union Center

Date: Report 11/2/00 Time 7:00AM 8:30AM

Make of Machine: Rt Forklift

Type of Work: Cert Set Truck

Operator: operator

NOV 1'00 PM 4:49

Edwin Stage 10.11.00 1:33

Order Given By: Joann

Telephone No.: 513-771-1600 x21

Date ___ Time ___ Per ___

Form No. 21

STP Rt fork

DEC 20 '00 AM 8:02

**ORDER**

Contractor Sofco

Location of Job drug trailor

Friday 9AM

Date: Report 12/26/00 Tues Time 7aM

Make of Machine lull RT forklift

Type of Work buss ducts/live electric in

Operator ceiling putting beams in

(experience)

Tony Francis

DEC 21 '00 PM 2:05

Order Given By Larry Hill

Telephone No. 513-615-5119

Date Time Per

Form No. 21

---

STP fork

DEC 20 '00 AM 11:03

**ORDER**

Contractor Sofco

Location of Job drug trailor

Friday 9AM

Date: Report 12/26 Tues Time 7a M

Make of Machine forklift Ord.

Type of Work

Operator Donald Richards

DEC 21 '00 PM 3:57

Order Given By Larry Hill

Telephone No. 513-615-5119

Date Time Per

Form No. 21

---

STP Rt fork

DEC 20 '00 AM 8:02

**ORDER**

Contractor Sofco

Location of Job drug trailor

Friday 9AM drug testing

Date: Report 12/26/00 Tues Time 7a M

Make of Machine lull Rt forklift

Type of Work buss ducts/live electric in

Operator ceiling putting beams in

(experience)

Kenneth Conatser)

DEC 21 '00 PM 2:17

Order Given By Larry Hill

Telephone No. 513-615-5119

Date Time Per

Form No. 21

Rt fork certification

OCT 31 '00 AM 10:47

**ORDER**

Contractor SofCo

Location of Job 4600 Port Union Rd.

Date: Report 11/1 Time 7:20 AM

Make of Machine Cert. Skytrack Operator

Type of Work

Operator James Gentile 10.3.00 2:37

OCT 31 '00 PM 2:49

Order Given By Joann

Telephone No. 513-771-1600 x 21

Date Time Per

Form No. 21

---

S/T Rt forklift

**ORDER**

Contractor Sofco

Location of Job GM Truck & Bus Column R-10 W. Side of Bldg.

Date: Report Thursday 12/21 Time 7 AM

Make of Machine Lull RT forklift

Type of Work Buss ducts/electric in ceiling putting beams in

Operator Richard Korber.

DEC 20 '00 PM 3:14

Order Given By Larry Hill

Telephone No. 513-615-5119

Date 12/20 Time 9:10 Per Jim

Form No. 21

over →

---

**ORDER**

OCT 4 '00 PM 2:05

Contractor Sofco

Location of Job Mason Montgomery Rd.

Date: Report Thurs 10/5 Time 7:00 AM

Make of Machine RT. forklift

Type of Work Building

Operator Start time is normally 7:30 am. 2nd yr. apprentice. Sean Rick

OCT 4 '00 PM 3:30

Order Given By Jim Ludwig

Telephone No.

Date Time Per

Form No. 21

OCT 25 '00 AM10:18

**ORDER**

Contractor Ferguson job for Sofco Erect.

Location of Job Butler Co. World Park Bldg. #9

Date: Report Thurs 26 Time 7:30 AM

Make of Machine Skytrack Forktruck

Type of Work Rough Terrain

Operator (someone w/ experience)

· 3 wks to a month 8hrs/day

· Report to ~~Larry Bills~~ Bud Bruce

· If lost call Budd Matthews, project manager ~~615-8091~~

OCT 25 '00 AM 11:07

Order Given By JoAnne Miller

Telephone No. (513) 771-1600 ex 21.

| Date | Time | Per |
|---|---|---|
| | 12:20 | per Joanne |

Form No. 21

OCT 24 '00 PM 1:20

**ORDER**

Contractor Ferguson job for Sofco Erectors

Location of Job Butler County, World Park Bldg. Building

Date: Report Wed 25 Time 7:30 AM

Make of Machine Skytrack Forktruck

Type of Work rough terrain

Operator (someone w/ experience)

· 3 wks to a month · 8 hrs/day

· Report to Larry Bills

· If lost call Budd Matthews, project manager 615-8091

OCT 24 '00 PM 2:06

Order Given By Jo Anne Miller

Telephone No. (513) 771-1600 ex 21

| Date | Time | Per |
|---|---|---|
| 6.27.00 | 3:05 | Fatima Sanders |

Form No. 21

Hart Co.

**ORDER**

Contractor Sofco Steel Erectors

Location of Job Kettering MCSI jobsite

Date: Report Fri 4.12.02 Time 7am

Make of Machine Rt forklift 6000lb.

Type of Work

Operator Randy Horwhuro

approx 1 week

Report to: Scott Robbkin

Order Given By Mike House

Telephone No. 513-615-5098

| Date | Time | Per |
|---|---|---|
| | | |

Form No. 21

Butler Hwy.

**ORDER**

NOV20 06 3:52PM

Contractor Sofco

Location of Job Rt 63 Monroe, Ohio

Date: Report Tues 11.21.06 Time 7:30 AM

Make of Machine Rt forklift

Type of Work

Operator Forrest Miles 4.5.06 12:17

NOV20 06 4:25PM

Order Given By Jeri Irondorf

Telephone No. 513-615-5115

Date Time Per Kim

Form No. 21

D-5

OOE-000188

BUTLER CTY.

**ORDER** AUG 3 06 1:33PM

Contractor SOFCO ERECTORS

Location of Job PORT UNION, BLDG. J (SEE BACK)

Date: Report MON. 8/7/06 Time 7 A M

Make of Machine R/T FORKLIFT (CERTIFIED OPER.) W/TELESCOPING BOOM

Type of Work

Operator UNITIZING BAR JOISTS AND MOVING THEM; UNLOADING TRUCKS. 4TH YR APPRENTICE (8/4/06) 3 WEEKS TO A MONTH OF WORK; 5/8'S

CONTACT PERSON IS RYAN BAUGH 513-383-2516

Alan McKibben AUG 4 06 12:24PM

Order Given By JIM FRONDORF

Telephone No. 513-615-5115

Date 8/3/06 Time 1:30 Per DB

Form No. 21

**ORDER**

AUG11 06 3:30PM

Contractor Sofco Erectors

Location of Job Port Union Bldg J

Date: Report Mon 8/14/06 Time 7:00a M

Make of Machine RT Forklift certified

Type of Work initizing bar joists and moving them, unloading trucks

Operator

Phyllis Smith

AUG11 06 4:14PM

working 5/8's

Order Given By Jim Frondorf

Telephone No. 513-615-5115

Date Time Per Jm.

Form No. 21

BUTLER CTY.

**ORDER** JUL26 06 4:17PM

Contractor SOFCO ERECTORS

Location of Job BLDG. J UNION CTR. BLVD. WEST CHESTER

Date: Report MON 7/24/06 Time 7:00 AM

Make of Machine RT FORKLIFT (CERTIFIED)

Type of Work

Operator

Phyllis Smith JUL25 06 10:06AM

3 WKS TO A MONTH

RYAN BAUGH 513-383-2516

Order Given By JIM FRONDORF

Telephone No. 513-615-5115

Date Time Per Jm

Form No. 21

MADISON CO.

**ORDER**

'13 SEP 24 PM 1:39

Contractor SOFCO ERECTORS

Location of Job 10 ENTERPRISE PARKWAY, WEST JEFFERSON, OH- DIRECTIONS ON BACK

Date: Report WED. 9/25/13 Time 7 A M

Make of Machine F/L WITH EXTENDABLE BOOM

Type of Work UNLOADING TRUCKS, LOADING/

Operator UNLOADING RACKS

JOURNEYMAN ROBERT CHILDS

5 X 8'S SEP24 13 4:24PM

CONTACT PERSON IS TOM MAUPIN 614-679-1275

~~Andrew Smith~~

Order Given By MIKE TALBERT ~~SEP24 13 3:43PM~~

Telephone No. 614-679-1266

Date 9/24/13 Time 1:39 Per DB

Form No. 21

MADISON CO.

**ORDER**

'13 SEP 24 PM 1:36

Contractor SOFCO ERECTORS

Location of Job 10 ENTERPRISE PARKWAY, WEST JEFFERSON, OH- DIRECTIONS ON BACK

Date: Report WED. 9/25/13 Time 7 A M

Make of Machine F/L WITH EXTENDABLE BOOM

Type of Work UNLOADING TRUCKS, LOADING/UNLOAD(

Operator RACKS

JOURNEYMAN

5 X 8'S Eileen Murphy SEP24 13 4:07PM

CONTACT PERSON IS TOM MAUPIN 614-679-1275

~~SEP24 13 2:41PM~~

Order Given By MIKE TALBERT

Telephone No. 614-679-1266

Date 9/24/13 Time 1:36 Per DB

Form No. 21

Butler Cty.

**ORDER**

OCT 9 13 12:36PM

Contractor Sofco Erectors

Location of Job Miami U. Oxford

Date: Report 10.10.13 Time 7:30 AM

Make of Machine extended forklift

Type of Work Loyd High lift work

Operator Carmelita Willis far reach certified 8.22.13 1:01 ~~OCT 9 13 3:24PM~~

Pete 513-383-2655

3 1/2 day M-F

Order Given By John

Telephone No. 513-615-5092

Date 10.9.13 Time 12:35 Per Jon

Form No. 21

'07 JUL 23 PM12:35 **ORDER**

Contractor Sofco

Location of Job Hebron, Ky

West PARK International

Date: Report 7/24/07 Time 6:30AM

Make of Machine

Type of Work Rt. Forklift (cert)

Operator

Stephen Myers

'07 JUL 23 PM 2:36

3:00 for directions

Order Given By Jim

Telephone No. 615-5115

Date 7/23/07 Time 1:35PM Per KR

Form No. 21

---

'07 JUL 31 AM 9:26

**ORDER**

Contractor Sofco

Location of Job Hebron, KY

Call for Directions

Date: Report 8/1/07 Time 6:30A M

Make of Machine Rt. Forklift-Cert.

Type of Work Temp. Replacement

Operator Candace Mayes

'07 JUL 31 PM 4:51

Order Given By Jim Frondorf

Telephone No. 615-5115

Date 7/31/07 Time 9:26am Per HR

Form No. 21

---

'07 JUL 17 AM 8:45

**ORDER**

Contractor Sofco

Location of Job Parkwest Blvd.

Date: Report 7/18/07 Time 6:30AM

Make of Machine Rt. Forklift-Cert.

Type of Work

Operator Robert Moran

'07 JUL 17 AM10:05

Order Given By Jim Frondorf

Telephone No. 615-5115

Date 7/17/07 Time 8:45am Per HR

Form No. 21

OOE-000191

'07 MAY 4 PM 3:21

**ORDER**

Contractor Sofco

Location of Job IND. Park Kajima (BOONE CTY)

see direction on back

Date: Report 5/7/07 Time 7:00a M

Make of Machine Rt. Forklift- Cert

Type of Work Apprentice

Operator Eileen Murphy

'07 MAY 4 PM 3:32

Order Given By Jim Frondorf

Telephone No. 615-5115

Date 5/4/07 Time 3:15PM Per HR

Form No. 21

'07 MAY 15 PM 1:30

**ORDER**

Contractor Sofco

Location of Job Richwood, KY

Date: Report 5/16/07 Time 7:00A M

Make of Machine Rt. Forklift-Cert.

Type of Work Temp. Replacement 3 days

Operator Charles Lipscomb

'07 MAY 15 PM 3:34

Order Given By Jim Frondorf

Telephone No. 615-5115

Date 5/15/07 Time 1:31pm Per HR

Form No. 21

Butler Cty

Contractor Sofco

Location of Job

Date: Report

Make of Machine

Type of Work

Operator

on the job

Mike House

Order Given By

Telephone No.

Date

Form No. 21

OOE-000192

**ORDER**

JAN24 08 9:44AM

Contractor SOFCO Erectors 761-2500

Location of Job Avon Distribution Center

Zanesville OH

Date: Report Tues 1-29-08 Time 7:30 AM

Make of Machine Forklift w/ extension

Type of Work Forklift certification

Operator STP

70E to Exit 157 (Rt93)
North 2.5 miles @ ABI Pam
Industrial (L) follow signs.
to Avon trailer

Order Given By Mike Talbott

Telephone No.

Date Time Per

Form No. 21

EXHIBIT
C-2
Employer
PENGAD 800-631-6989

**ORDER**

JAN24 08 9:44AM

Contractor SOFCO Erectors - Mike Talbot 761-2500

Location of Job Avon Distribution Center Zanesville OH

Date: Report Monday Time 7:30AM

Make of Machine Forklift w/extension

Type of Work Forklift cert

Operator STP

~~Gary Murray under recall~~

Larry Rogers accepted.

9-19-07

Order Given By Mike Talbott

Telephone No.

Date Time Per

Form No. 21

JAN25 08 10:31AM

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:32 #404 P.003/049

# ORDER

JAN25 08 1:56PM

Contractor SOFCO Erectors

Location of Job Cardinal Health - Dublin

Date: Report MONDAY 1-28-08 Time 7:3 AM

Make of Machine Forklift

Type of Work Alvin Raber

Operator 614-332-2134

Forklift Certifications

Kayo Parsley Accepted.

9-4-07 4:03

Order Given By John Branstool

Telephone No.

Date Time Per

Form No. 21

JAN25 08 2:39PM

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:32 #404 P.004/049

# ORDER

JAN28 08 10:42AM

Contractor Sofco

Location of Job Avon Disterbution

Date: Report TUES 1-29 Time 7:30A M

Make of Machine FORKLIFT - ~~[illegible]~~

Type of Work RACKS 7-10-07

Operator Daniel Dailey

70E to Exit 157 (Rt93) North 2.5 miles to East Point Industrial (L) follow signs to Avon (trailers)

Order Given By Mike Talbott

Telephone No.

~~JAN28 08 2:34PM~~

Date Time Per

Form No. 21

# ORDER

JAN30 08 8:06AM

Contractor Sofco

Location of Job Avon - Zanesville

Date: Report 1-30-08 Time ASAP M

Make of Machine forklift

Type of Work Racks

Operator Kelley Vineyard

12-506

replace Dan Bailey
no show

Order Given By Mike JAN30 08 8:27AM

Telephone No.

Date Time Per

Form No. 21

**ORDER** FEB15 08 1:37PM

Contractor Sofco

Location of Job Alum Creek + Speigel Dr.

Date: Report 2/18/08 Time 7:30 A.M

Make of Machine R/T Forklift

Type of Work

Operator Kathleen Hart

10-307 9:11am

Order Given By Mike

Telephone No. 761-2500

Date Time Per

Form No. 21

FEB15 08 4:01PM

# ORDER

FEB18 08 8:57AM

Contractor Sofco

Location of Job Alum Creek & Speigel Rd

Date: Report 2-19-08 Time 7:30 M

Make of Machine Rt forklift

Type of Work

Operator

4-Swells

8's Brad Brumage

8-31-07

Order Given By Mike

Telephone No. 761-3600

Date Time Per

Form No. 21

Feb 18 3:30p

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:33 #404 P.008/049

270-33 Dublin E 33

L on Post
1st Right
-Emerald Pkwy

**ORDER**

Contractor Sofco

Location of Job Cardinal Health

2-19-07

Date: Report 2/18/07 Time 7:00 A.M

Make of Machine R/T Forklift

Type of Work Post Bd

Operator Arwyn Hoptins

~~4th Year App~~ 10-11-07

5x8's 8 days 3:42p

614-332-2134

Alvin Rayburn

Order Given By John Branstool

Telephone No.

Date Time Per

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:34 #404 P.009/049

# ORDER

MAR18 08 1:27PM

Contractor: Sofco

Location of Job: Alum Creek & Spiegel

Date: Report 3-19-08 Time 7:30 AM

Make of Machine: forklift

Type of Work:

Operator:

Recall Gary Murray 12-3-07

Order Given By: Mike MAR18 08 3:49PM

Telephone No.

Date Time Per

Form No. 21

MAR25 08 8:11AM

# ORDER

Contractor SOFCO Erectors

Location of Job Rickenbacker
Speigel & Shook Road
Take Alum Creek to Speigel - deadends
into Shook

Date: Report TUES 03-26-08 Time 7 A M

Make of Machine RT Forklift

Type of Work Forklift Cert.

Operator 5 - 8's

Duration - ?

Report to : Wayne Corsick

Day Arwyn Hopkins
10-11-07 3:40pm

Order Given By John Branstool

Telephone No.

Date Time Per

Form No. 21 MAR25 08 3:52PM

# ORDER

MAR26 08 2:01PM

Contractor Sofco

Location of Job Rickenbacker

Spiegel & Shook Rd.

Date: Report MARCH 27 Time 7:30 AM

Make of Machine RT Forklift

Type of Work 5-8's

Operator

Report to: Wayne Corsick

Keith Galloway

10-12-07 9:59 Am

Hay

Order Given By John Brunstool

Telephone No.

Date Time Per

Form No. 21

MAR26 08 2:50PM

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:34 #404 P.012/049

**ORDER** MAR27 08 11:29AM

Contractor SOFCO ERECTORS

Location of Job Rickenbacker

Spiegel & Shook Roads

Date: Report March 28 Time 7A M

Make of Machine BT Forklift.

Type of Work 5-8's

Operator

Report to: Wayne Corsick

Derek Adams

4 days 10-1807

Order Given By Mike Talbert

Telephone No.

Date Time Per

Form No. 24 MAR27 08 12:58PM

**ORDER** APR15 08 1:53PM

Contractor SOFCO Erectors

Location of Job Alum Creek & Speigel

Date: Report 4/16/08 Time 7 A M

Make of Machine AT Forklift

Type of Work Moving Steel

Operator

REport to Tom Mopin, Superintendent
614-679-1275

Jody Dave Rogers
11-29-04 1:34pm

Order Given By John Branstool, BR

Telephone No.

Date Time Per

Form No. 21
APR15 08 3:12PM

# ORDER

Contractor: Sofco

Location of Job: New Albany

Date: Report 12-14-10 Time 7:30 AM

Make of Machine: forklift

Type of Work:

Operator: Request Kevin Carris 9-21-10

9 days 1:58pm

Order Given By: Mike   [illegible] 2:32PM

Telephone No. 761-2500

Date | Time | Per

Form No. 21

From:IUOE LOCAL 18 District 3   614 486 7258   09/25/2018 14:35   #404 P.015/049

# ORDER

09-10 18 2:21PM

Contractor Sofco

Location of Job New Albany

Date: Report 12-13-10 Time 7:30 M

Make of Machine Forklift

Type of Work

Operator

Request Joe Harlow

12-2-10

Order Given By Mike

Telephone No. Tel 2500

Date Time Per

Form No. 21

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:35 #404 P.016/049

# ORDER

FEB 8 11 2:05PM

Contractor Sofco

Location of Job Columbus

Date: Report 2-9-11 Time 7:A M

Make of Machine forklift

Type of Work

Operator

request Robert Hoover
12-27-10

Order Given By FEB 8 11 4:42PM

Telephone No.

Date Time Per

Form No. 21

# ORDER

MAR 6 2012 AM 11:04

Contractor Sofco

Location of Job Dublin

Date: Report 3-6-12 Time ASAP M

Make of Machine Forklift

Type of Work

Operator

Request Jon Allen

11-11-11

Order Given By Mike Talbott

Telephone No.

Date Time Per

Form No. 21

MAR 6 2012 PM 12:42

**ORDER** MAR 29 2013 PM3:19

Contractor Sofco

Location of Job Columbus
Pataskala

Date: Report 4-1-13 Time 7:30 M

Make of Machine forklift

Type of Work

Operator
Minority female

Katie Hart
Leclays 10-9-12 11:31 Am

Order Given By Mike Talbert

Telephone No. 761-2500

Date Time Per

Form No. 21 MAR 29 2013 PM6:52

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:36 #404 P.019/049

**ORDER** MAR 29 2013 PM3:20

Contractor: Sofco

Location of Job: Pataskala

Date: Report 4-1-13 Time 7:30 M

Make of Machine: forklift

Type of Work

Operator

request

Larry Rogers

1 day 2-4-13

1:20 pm

Order Given By: Mike Talbert

Telephone No. 761-2500

Date Time Per

Form No. 21

APR 1 2013 AM9:05

**ORDER**

APR 2 2013 PM2:05

Contractor Sofco

Location of Job Pataskala-Licking

310 to Rt 40 west to Arcena

Date: Report 4-3-13 Time 7:30 AM

Make of Machine AT Forklift

Type of Work Racks-steel

Operator

DL+ forklift cards

Setting racks-last pace

Robert Rentas

4 days 9-26-12 3:20pm

Order Given By Rob

Telephone No. 614-679-1272

Date Time Per APR 2 2013 PM2:20

Form No. 21

# ORDER

APR 30 2013 AM8:30

Contractor Sofco

Location of Job Heritage Drive in ~~Adena~~ Etna, Ohio - Etna

Date: Report 4-30-13 Time ASAP M

Make of Machine Cat forklift -RT

Type of Work Racks

Operator

70E to 310N left on Rt40 R into Etna Park left on Heritage

Order Given By Rob

Telephone No. 614-679-1272

Date Time Per

Form No. 21

APR 30 2013

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:37 #404 P.022/049

# ORDER

APR 30 2013 PM2:05

Contractor: Sofco

Location of Job: Etna OH

Date: Report: 5-1-13 Time: 7:00 AM

Make of Machine: RT Forklift

Type of Work: Racks

Operator: Scott Icenhower 12512

Order Given By: Rob

Telephone No.: 614-679-1292

Date Time Per

Form No. 21

APR 30 2013 PM3:51

From:IUOE LOCAL 18 District 3 614 486 7268 09/25/2018 14:37 #404 P.023/049

# ORDER

Contractor Sofco MAY 2 2013 AM 8:25

Location of Job Etna, OH

Date: Report 5-3-13 Time 7:00 AM

Make of Machine Forklift -

Type of Work

Operator

Charles Lantz

1-9-13 1:25p

11 days

Order Given By

Telephone No. 614-679-1272

Date Time Per

Form No. 21

MAY 2 2013

**ORDER** NOV 1 2013 AM10:47

Contractor SofCo

Location of Job Toy Rd Groveport

Date: Report 11-4-13 Time 7Am M

Make of Machine forklift-Rt

Type of Work certified

Operator

hauling rocks

Paul Osborne

10-17-13

Order Given By Mike Talbot

Telephone No. 761-2500

Date Time Per

orm No. 21

NOV 1 2013 PM1:07

**ORDER** NOV 1 2013 AM 11:09

Contractor Sofco

Location of Job Toy Rd

Date: Report 11-4-13 Time 730 A M

Make of Machine Rt forklift

Type of Work certified

Operator

Robert Hughes

10-1813

Order Given By Mike Talbott

Telephone No. 614-761-2500

Date Time Per

Form No. 21

NOV 1 2013 PM 4:27

Franklin County

**ORDER**

NOV 7 2013 AM 7:50

Contractor: SOFCO Erectors

Location of Job: Alum Creek near Rickenback

Date: Report: ASAP 11-7-13 Time 7:30A M

Make of Machine: Telescopic Forklift

Type of Work: Unloading trucks

Operator: 3 wks

Evan Cansler
10-18-13

Order Given By: Alvin

Telephone No.: 614-332-2134

Date | Time | Per

Form No. 21

NOV 7 2013 AM 11:02

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:38 #404 P.027/049

**ORDER**

NOV 12 2013 AM9:38

Contractor Sofco

Location of Job Alum Creek to Creekside

Date: Report 11-12-13 Time ASAP M

Make of Machine Rt forklift

Type of Work Certified

Operator

Donn Porch

10-21-13 11:41am

30 days

Order Given By Alvin

Telephone No. (614-332-2134

~~NOV 12 2013 AM11:34~~

Date Time Per

Form No. 21

NOV 12 2013 PM12:09

Franklin County **ORDER** JAN 3 2014 PM2:34

Contractor SOFCO Erectors

Location of Job Center Point

Grove Port OH off Alum Creek Drive

Date: Report Monday 1/6/14 Time 7:3A M

Make of Machine Open Cab IND Fortklift w/ extensions

Type of Work Cert in Forklift

Operator working 8's

approx 2 wks

4days Carla Robinette

Report to: Jeff Kilbow 8-30-13
740-739-7121

Order Given By Mike

Telephone No. 614-679-1266

Date Time Per

Form No. 21

JAN 3 2014 PM3:11

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:38 #404 P.029/049

# ORDER

MAY 2 2014 AM 10:37

Contractor: Sofco

Location of Job: 14800 Industrial Parkway

Date: Report Monday 5-5 Time 7A M

Make of Machine: forklift racks

Type of Work:

Operator:

1 week Carrie Robinette
recall 4-30-14

Order Given By: Mike Talbert

Telephone No.: 761-2500

Date: Time: Per MAY 2 2014 PM 4:10

Form No. 21

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:39 #404 P.030/049

# ORDER

MAY 2 2014 AM 10:38

Contractor: Sofco

Location of Job: 14800 Industrial Parkway

Date: Report: Monday 5-5 Time 7A M

Make of Machine: Forklift

Type of Work: Racks

Operator:
Lowells Corey Barrett
10-22-13

Order Given By: Mike Talbert

Telephone No.: 761-2500

Date | Time | Per

Form No. 21

MAY 2 2014 PM 3:23

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:39 #404 P.031/049

**ORDER** JUN 11 2014 AM 11:15

Contractor Sofco

Location of Job 2450 Creekside
Obetz

Date: Report 6-12-14 Time 7A M

Make of Machine forklift

Type of Work

Operator

Apprentice
Howard Reed
6-2-14

Order Given By Mike

Telephone No. 679-1266 JUN 11 2014 PM 3:21

Date Time Per

Form No. 21

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:39 #404 P.032/049

**ORDER** JUN 11 2014 AM 11:16

Contractor: Sofco

Location of Job: 2450 Creekside
Obetz

Date: Report 6-12-14 Time 7A M

Make of Machine: forklift

Type of Work

Operator
Apprentice
Kevin Skinner
12-2-13

Order Given By: Mike

Telephone No. 679-1266

Date | Time | Per

JUN 11 2014 PM 2:59

Form No. 21

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:39 #404 P.033/049

# ORDER

JUN 13 2014 PM1:57

Contractor SOFCO ERECTORS

Location of Job 2450 Creekside Obetz

Date: Report MONDAY 6/16/14 Time 7A M

Make of Machine Forklift Cert

Type of Work Apprentice

Operator

John Hobbs

6-12-14

Order Given By Mike

Telephone No. 614-679-1266

Date Time Per

Form No. 21

JUN 13 2014 PM2:17

# ORDER

Contractor Sofco

Location of Job Rohr Rd

Date: Report 8-11-14 Time 7A M

Make of Machine forklift - cert

Type of Work

Operator

Scott Stanfield

4-28-14

14 days

Order Given By Mike

Telephone No. 614-679-1216

Date Time Per

Form No. 21

AUG 8 2014 PM 4:57

# ORDER

AUG 8 2014 PM2:52

Contractor: Sofco

Location of Job: Groveport

Date: Report 8/1/14 Time 7A M

Make of Machine: forklift

Type of Work: certs

Operator: Nathan Seitz 3-2514

20 days

Order Given By: Weaver Mike

Telephone No.

Date Time Per AUG 8 2014 PM4:55

Form No. 21

**ORDER** AUG 12 2014 PM 1:18

Contractor Sofco

Location of Job Rohr Rd -3099

Date: Report 8/13/14 Time 7A M

Make of Machine Forklift

Type of Work Add certs

Operator

Charles Dusla

7-1-14

Order Given By Mike

Telephone No. 761-2500

Date Time Per AUG 12 2014 PM 3:34

Form No. 21

# ORDER

APR 24 2015 PM2:27

Contractor: Sofco

Location of Job: 5200 Blythe Pkwy Hilliard

Date: Report 4-27-15 Time 7A M

Make of Machine: Forklift

Type of Work:

Operator:

Neal Kevin Steiner
7-8-14

Order Given By: Mike

Telephone No. 609-1216 APR 24 2015 PM2:22

Date | Time | Per

Form No. 21

**ORDER** APR 24 2015 PM2:31

Contractor Sofco

Location of Job 5200 Britton Pkwy
Hilliard

Date: Report 4-28-15 Time 7A M

Make of Machine forklift

Type of Work

Operator
Howard Reed
Recall 12-24-14
18 days

Order Given By Mike

Telephone No. 609-1266

APR 24 2015 PM2:23

Date Time Per

Form No. 21

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:41 #404 P.039/049

**ORDER** AUG 19 2015 PM 1:34

Contractor Sofco

Location of Job 6666 Pontious Rd
Groveport

Date: Report 8-20-15 Time 7A M

Make of Machine Forkley

Type of Work

Operator

recall Howard Reed
Rob - 679-1272 7-14-15

Order Given By Mike

Telephone No. 679-1266

Date Time Per AUG 19 2015 PM 1:37

Form No. 21

# ORDER

AUG 19 2015 PM1:35

Contractor Sofco

Location of Job 6606 Pontious Rd

Groveport

Date: Report 8/20/15 Time 7A M

Make of Machine Forklift

Type of Work Stacks

Operator

Rob 679-1272

Christopher Bolen

20hrs 6-8-15

Order Given By Mike

Telephone No. 679-1266

Date Time Per AUG 18 2015 PM1:54 AUG 19 2015

Form No. 21

Franklin

**ORDER**

AUG 21 2015 AM9:31

Contractor Sofco

Location of Job 9224 Intermodal Rickenbacker - SE Corner

Date: Report 8-24-15 Time 7A M

Make of Machine Forklift

Type of Work Certified

Operator building racking systems warehouse - new build fast paced 6 Sured

Latonya Patton

2-16-15

Order Given By Mike

Telephone No. 761-2500

Date Time AUG 21 2015 PM2:27

Form No. 21

6/29. Paid

Franklin

**ORDER** AUG 21 2015 AM 11:46

Contractor Sofco

Location of Job 6606 Pontius Rd

Groveport, Ohio

Date: Report 8-24-15 Time 7A M

Make of Machine Certified forklift

Type of Work building racking

Operator systems - fast parcel

warehouse - new Build

6-8weeks Michael Sena

8-20-15 10:30A

(0) no certification

Order Given By Mike

Telephone No. 761-[illegible] 2600

Date Time Per

Form No. 21

AUG 21 2015 PM [illegible]

**ORDER**

AUG 21 2015 PM1:30

Contractor Sofco

Location of Job 6066 Potious Rd
Groveport

Date: Report 8-24-15 Time 7A M

Make of Machine Certified forklift

Type of Work building racks

Operator
6-8 weeks Ted Crabtree
8-20-15 11:15am

No certification

Order Given By Mike

Telephone No. 761-2500

Date Time AUG 21 2015 PM2:38

Form No. 21

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:42 #404 P.044/049

Franklin **ORDER** AUG 24 2015 AM8:27

Contractor Sofco

Location of Job Toledo Pontious Rd
Groveport Ohio

Date: Report 8-25-15 Time 7:30 AM

Make of Machine Certified forklift

Type of Work building racks for

Operator warehouse roof - fast paced
6-8 weeks
Apprentices ok just not brand
new ones Richard Quiroz
1 day 6-8-15 10:14am

Order Given By Mike

Telephone No. - 679-12666

Date Time Per AUG 24 2015 PM5:11

Form No. 21

Franklin

**ORDER**

AUG 24 2015 AM8:29

Contractor Sofco

Location of Job 6606 Pontius Rd

Groveport Ohio

Date: Report 8-25-15 Time ASAP M

Make of Machine Certified forklift

Type of Work building racks for

Operator warehouse need fast paced

6-8 weeks

Apprentices OK just not brand

new ones William Mathney

7271

Order Given By Mike

Telephone No. 679-1266

Date Time Per AUG 24 2015 PM4:37

Form No. 21

# ORDER

AUG 28 2015 PM2:43

Contractor Sofco

Location of Job 2501 Rohr Rd

buldng next to it

Date: Report 8-31-15 Time 7A M

Make of Machine forklift

Type of Work

Operator

15 days Tesha Patt

8-19-18

Order Given By Mike

Telephone No. 614-761-2500

Date Time Per

Form No. 21

AUG 28 2015 PM

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:43 #404 P.047/049

**ORDER** SEP 4 2015 AM11:39

Contractor Sofco

Location of Job 9565 Legistics Court

Date: Report Tues 9-8 Time 7A M

Make of Machine forklift

Type of Work

Operator

corner of 762 / Rickenbacker

Southside Dennis Jeffrey

714-[illegible]

Order Given By Mike

Telephone No. 679-1266

Date Time Per

Form No 21 SEP 4 2015 PM2:55

From:IUOE LOCAL 18 District 3 614 486 7258 09/25/2018 14:43 #404 P.048/049

**ORDER** SEP 4 2015 AM 11:40

Contractor Safco

Location of Job 9565 Logistics Court

Date: Report Tues 9-8 Time 7A M

Make of Machine forklift

Type of Work

Operator

corner of 7101 Rickenbacker

Michael McCoy

6-9-15

Order Given By Mike

Telephone No. 679-1266

Date Time Per

Form No. 21

SEP 4 2015 PM 3:40



On 3/10/2017, took picture of Sofco Erectors Ironworkers running forklift on parking structure being renovated to a new hotel. This is a 2 month plus project.

On 3/13/2017, observed Sofco Erectors foreman, Pete Leonard an Ironworker, running a RT forklift on Aero Parkway, Florence, Kentucky. It was a 2 to 3-week job for set up roof compartment, and taken them to the crane.

Sofco Erectors working on Crossroads Church on 4450 Eastgate South Drive, Cincinnati, Ohio. Local 18 member working for Maxim Crane Works witnessed Sofco Erectors Ironworker operating a forklift from approximately middle of March 2017 to middle of April of 2017.

On 6/29/2017 Sofco Erectors was working for n/s General Contractor Hemmer on Steward Road, in Fairfield, Ohio, setting the roof on a tip up building. Operating forklifts to set up roof cement, and to move components to the crane. This was about a 3-month long project.

Picture taken of a RT forklift on Sofco Erectors job on 8/23/2017, at Ewing Blvd, Florence, Kentucky, for moving, and setting a steel structure.

Picture of Sofco Erectors Ironworker running forklift on 8/30/2017 at Jacquemin Drive, West Chester, Ohio, for roof on a tilt up building.

On 10/26/2017, found Sofco Erectors foreman, Phil Longford an Ironworker, running a RT forklift on Summer Street, Cincinnati, for moving roof components to crane.

Sofco Erectors working for non-signatory Danis at 200 North Jefferson Street, Dayton, Ohio. Local 18 member working for Maxim Crane Works witnessed Sofco Erectors bring RT forklift on site on approximately 9/25/2017, and on a daily basis observed Ironworkers operating the forklift until the Local 18 member was laid off, on 12/20/2017, and was no longer able to observe Ironworkers operating RT forklift.

Sofco Erectors working at Mane Inc at 1093 Mane Way, Lebanon, Ohio. Local 18 member working with Maxim Crane Works has witnessed Sofco Erectors operating forklift, starting around 1st week of February 2018. Job is still on-going.

Sofco Ironworker operating
a forklift, on Aero Pkwy
in Florence, Kentucky.



Sofco Ironworker operating
a forklift, on Aero Pkwy
in Florence, Kentucky.



Sofco Ironworker operating a forklift on Hetzel St., in Cincinnati.

Sofco Ironworker operating a forklift on Hetzel St., in Cincinnati.

RT forklift on the Sofco Ewing Blvd. job in Florence, Kentucky.

Sofco Ironworker operating a forklift on Summer St., in Cincinnati.

Sofco Ironworker operating
a forklift, on Jacquemin Drive in
West Chester, Ohio.



| Members Name Date/Time Registered | Date/Time ordered | Date/Time dispatched | Start Date | Employer | Job Location | Type of Equipment | Recall | Request | Odd Days |
|---|---|---|---|---|---|---|---|---|---|
| Howard Reed | | | | | | | | | |
| 10/13/2015 3:08 PM | Direct | Recall | 1/6/2016 | Sofco | Groveport | Forklift | X | | |
| Andrew Sentiuany | 4/14/2016 | 4/14/2016 | 4/15/2016 | Sofco Erectors | Columbus | certified fork lift | | | |
| 10/29/2015 11:52 AM | 1:43 PM | 2:09 PM | | | | | | apprentice | |
| William Matheny II | 4/14/2016 | 4/14/2016 | 4/15/2016 | Sofco Erectors | Columbus | certified fork lift | | | |
| 10/23/2015 1:35 PM | 1:47 PM | 4:46 PM | | | | | | apprentice | |
| Don Ireland | 5/18/2016 | 5/18/2016 | 5/19/2016 | Sofco Erectors | Groveport | rt fork lift | | certified | |
| 2/1/2016 10:02 | 11:13 | 2:18 | | | | | | | |
| Robert Rentas | 5/18/2016 | 5/18/2016 | 5/19/2016 | Sofco Erectors | Groveport | rt fork lift | | certified | 2 |
| 4/21/2016 10:29 | 11:14 | 3:38 | | | | | | | |
| James Sorrell | 5/23/2016 | 5/23/2016 | 5/24/2016 | Sofco Erectors | Groveport | rt fork lift | | certified | |
| 3/29/2016 11:58 | 2:57 | 3:55 | | | | | | | |

| Members Name<br>Date/Time Registered | Date/Time ordered | Date/Time dispatched | Start Date | Employer | Job Location | Type of Equipment | Recall | Request | Odd Days | Minority |
|---|---|---|---|---|---|---|---|---|---|---|
| Jon Search<br>1/30/2017 10:16 AM | 2/2/2017<br>9:46 AM | 2/6/2017<br>10:27 AM | 2/7/2017 | Columbus Steel Erectors | Grove City | lattice boom crawler | | CCO | | x |
| Randy Hollobaugh<br>12/28/2016 11:26 AM | 2/3/2017<br>8:43 AM | 2/3/2017<br>8:59 AM | 2/6/2017 | Kenmore Construction | Columbus | trackhoe | | by letter | | |
| Robert Kussmaul<br>11/23/2016 2:39 PM | 2/6/2017<br>8:27 AM | 2/6/2017<br>9:19 AM | 2/6/2017 | Parks Drilling | Lockbourne | helper/oiler | | apprentice<br>OSHA 10 | 3 | |
| Jennifer Evans<br>11/7/2016 2:00 PM | 2/6/2017<br>8:28 AM | 2/6/2017<br>9:24 AM | 2/6/2017 | Parks Drilling | Lockbourne | rt forklift | | apprentice, certified<br>OSHA 10 | 3 | |
| Ryan Weinkauf<br>11/8/2016 2:42 PM | 2/7/2017<br>12:02 PM | 2/8/2017<br>10:37 AM | 2/9/2017 | Midwest Steel | Marysville | carrydeck<br>rt forklift | | apprentice, f/l certified<br>CCO | | |
| Christina Easton<br>12/20/2016 10:04 AM | 2/8/2017<br>3:39 PM | 2/8/2017<br>3:49 PM | 2/9/2017 | All Crane | Columbus | tower crane | | by letter | | |
| Jordan Cruz<br>11/7/2016 12:49 PM | 2/7/2017<br>3:36 PM | 2/9/2017<br>9:28 AM | 2/10/2017 | All Crane | Columbus | helper/oiler<br>(tower crane) | | apprentice | | x |
| Ronzal King Jr.<br>11/3/2016 2:05 PM | 2/7/2017<br>3:37 PM | 2/9/2017<br>10:17 AM | 2/10/2017 | All Crane | Columbus | helper/oiler<br>(tower crane) | | apprentice | | |
| Daniel Dillworth<br>9/9/2016 3:59 PM | direct | recall | 2/10/2017 | United Foundations | Columbus | skid steer | x | | | x |
| Michael Fink<br>1/6/2017 2:08 PM | direct | recall | 2/6/2017 | J Wood | Summerfield | skid steer | x | | | |
| Mike Evans<br>12/21/2016 1:28 PM | direct | recall | 1/30/2017 | Geo. Igel | Cincinnati | trackhoe | x | | | |
| Travis Daniels<br>1/5/2017 2:16 PM | direct | recall | 2/6/2017 | Beaver Excavating | Minford | trackhoe | x | | | |
| Carl Jenkins Jr.<br>11/28/2016 1:52 PM | direct | recall | 2/6/2017 | Beaver Excavating | Minford | crane | x | | | |
| Howard Reed<br>2/3/2017 2:01 PM | direct | recall | 2/6/2017 | Solco Erectors | New Albany | forklift | x | | | |
| Ardell Henneberg<br>12/27/2016 8:10 AM | direct | recall | 2/6/2017 | McDaniel's Construction | Columbus | trackhoe | x | | | |
| Angel Castaneda<br>1/4/2017 2:28 PM | direct | recall | 1/31/2017 | Kokosing | Columbus | crane | x | | | x |
| Andrew Crapyou<br>1/27/2017 11:49 AM | direct | recall | 2/6/2017 | Beaver Excavating | Minford | loader | x | | | |
| David Salzgaber<br>10/24/2016 2:16 PM | direct | recall | 2/2/2017 | J&H Erectors | Lucasville | trackhoe | x | | | |

D3
2017

Columbus District 3 Week Ending 2/11/17

2-13-17
GG

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Brittany Winkler 9/7/2016 11:18 | 9/9/2016 2:41 | 9/9/2016 3:41 | 9/12/2016 | Sofco Erectors | Lebanon | forklift | | 1st yr app | | |
| Kimberly Russell 10/12/16 2:30 | 10/21/2016 11:37 | 10/24/2016 9:23 | 10/26/2016 | Sofco | Florence | forklift | | 1st yr app | | X |

4/5

2016



AGC OF OHIO
BUILDING AGREEMENT
Effective
May 8, 2013 through April 30, 2017
Between
THE INTERNATIONAL UNION OF
OPERATING ENGINEERS
LOCAL 18 AND ITS BRANCHES, (AFL-CIO)
AND
LABOR RELATIONS DIVISION
OF THE
AGC OF OHIO
AGC
OF
OHIO

PENGAD 800-631-6989
EXHIBIT
F
EmployER

**EMPLOYERS**

**LABOR RELATIONS DIVISION**
**AGC OF OHIO**

**1755 Northwest Boulevard**
**Columbus, Ohio 43212**
**(614) 486-6446**
**FAX: (614) 486-6498**
**www.agcohio.com**

**Richard Hobbs**
**Executive Vice President**

## INDEX

| | Paragraph |
|---|---|
| Affirmative Action Program | Exhibit B |
| Apprentice/Helper (Oiler), Boiler Operators, Signalmen Provisions | 77-80 |
| Apprentices | 106-107 |
| Arbitration | 125-126 |
| Bonding | 47 |
| Construction Advancement Program | 108-113 |
| Credit Union | 115 |
| Crews and General Provisions | 77-100 |
| Date Signed and Signatures | 131 |
| Dewatering | 13 |
| Direct Deposit | 63H |
| Discharges | 19 or 25 |
| Divert Wage Increase | 43 |
| Drug Testing | 30 |
| Duration of Agreement | 105 |
| Effective Date of Agreement | 130-131 |
| Employees' Relief | 91 |
| Enforcement Measures | 117-123 |
| Equipment Rental | 99 |
| Escalator Clause and Complementing | 69 |
| Field Mechanic Trainee Wage | Schedule A |
| Four Ten Work Schedule | 63 A-G |
| Fringe Benefit Programs | 41-47 |
| Grievance Procedure | 125-126 |
| Harassment Policy | 31 |
| Hazardous Waste Projects | 15,29 |
| Heaters-Pumps-Boilers-24 hour, 7 day | 68 |
| Holidays | 67 |
| Hourly First-Day Pay | 84 |
| Hourly Pay | 53 or 56 |
| I-9 | 128 |
| Incentive Pay | |
| Underground, Height and Length Booms | 70-76 |
| Jurisdiction-Work | 10-12 |
| Jurisdictional Area | 1-2 |
| Jurisdictional Disputes | 127 |
| Lay-Off | 25,55,60,89 |
| Liabilities | 5 |
| Management Rights | 7 |
| Master Mechanic, Zones 1, 2 & 3 | 87-88 |
| New Unclassified Equipment | 50 |
| Nondiscrimination | 8-9 |

## INDEX (continued)

| | Paragraph |
|---|---|
| Overtime | 62-64 |
| Owner-Operator | 100 |
| PAC / PEP | 114B |
| Pay Checks | 90 |
| Pay Day | 89 |
| Picket Lines | 123 |
| Piggyback Operation | 86 |
| Pre-Job Conference | 15-16 |
| Provisions and Limitations | 6 |
| Recognition | 4 |
| Referral Policy (Hiring Procedures) | 32-40 |
| Registered Apprentice Wage Schedule | Exhibit A |
| Repairs | 93 |
| Reporting Pay | 59 |
| Safety Program | 26-29 |
| Savings and Separability | 129 |
| Scope of Agreement | 3 |
| Shifts | 81 |
| Site Clearance | 63 |
| Starting Time | 62 |
| Steward | 24-25 |
| Strikes | 124 |
| Sub-Contractors | 117 |
| Supervisory Employees | 97 |
| Termination Slips | 96 |
| Trainee Wage Schedule | Exhibit A |
| Transfer of Union Employees | 119 |
| Transfers on Job Equipment | 21-22 |
| Union Administrative Dues and Deductions | 114-116 |
| Union Shop | 17-18 |
| Wage Rates | Exhibit A |
| Weekly Pay | 52 or 54-55 |
| Work Week | 61 |

| | Page |
|---|---|
| Term of Agreement | 49 |
| Exhibit A, Wage Rates and Fringe Benefits | 51-87 |
| Exhibit B, Affirmative Action Program | 87-90 |
| Acceptance of Agreement | 91-99 |

## DIRECTORY

OFFICERS

Local 18 and its Branches
Headquarters Office
3515 Prospect Avenue
Cleveland, Ohio 44115
216-432-3138
FAX: 216-432-0370
www.iuoelocal18.org

Patrick L. Sink
Business Manager

Richard E. Dalton
President

Mark A. Totman
Vice President

Gary G. Siesel
Recording-Corresponding Secretary

Premo P. Panzarello
Financial Secretary

Joseph S. Lucas
Treasurer

## DISTRICT NO. 1

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashtabula | Erie | Huron | Lorain |
| Cuyahoga | Geauga | Lake | Medina |

District Staff
Donald Taggart
David Russell
Tom Perevosnik
Jack Klopman II

3515 Prospect Avenue, Cleveland, Ohio 44115
Office: 216-432-3131
Fax: 216-432-3135

## DISTRICT NO. 2

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Allen | Hardin | Paulding | Van Wert |
| Defiance | Henry | Putnam | Williams |
| Fulton | Lucas | Sandusky | Wood |
| Hancock | Ottawa | Seneca | |

District Staff
Gary Siesel
Douglas Leidy
Brett LaFaso
Kipton Siesel

2412 South Reynolds Road, Toledo, Ohio 43614
Office: 419-865-0221
Fax: 419-865-0601

SOFCO002311

## DISTRICT NO. 3

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Athens | Hocking | Meigs | Pike |
| Crawford | Jackson | Morgan | Ross |
| Delaware | Knox | Morrow | Scioto |
| Fairfield | Lawrence | Muskingum | Vinton |
| Franklin | Licking | Perry | Union |
| Gallia | Marion | Pickaway | Wyandot |

District Staff
Timothy Hammock

John Branstool
Chad Creeks
David Hurd
Matthew Woods
Mark Totman, Legislative Representative

1188 Dublin Road, Columbus, Ohio 43215
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 4/5

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Adams | Clermont | Highland | Preble |
| Auglaize | Clinton | Logan | Shelby |
| Brown | Darke | Madison | Warren |
| Butler | Fayette | Mercer | |
| Champaign | Greene | Miami | |
| Clark | Hamilton | Montgomery | |

Covering the following counties in Kentucky:

| | | | |
|---|---|---|---|
| Boone | Campbell | Kenton | Pendleton |

District Staff
Gary Marsh

Kenneth Waughtal
Stanley Brubaker
Joe Daniels
Jefferson Powell
Nathaniel Brice

8401 Claude Thomas Road, Suite 21-A, Franklin, Ohio 45005
Office: 937-806-0406
FAX: 937-806-0408

## DISTRICT NO. 6

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashland | Harrison | Nobel | Summit |
| Belmont | Holmes | Portage | Tuscarawas |
| Carroll | Jefferson | Richland | Washington |
| Coshocton | Monroe | Stark | Wayne |
| Guernsey | | | |

District Staff
Joseph Lucas

Darrin Morgan
Joe Casto
Doug Pallaye
Brad Marshall

1707 Triplett Boulevard, Akron, Ohio 44306
Office: 330-784-5461
FAX: 330-784-8827

## LOCAL 18S
## STATIONARY ENGINEERS

Staff
Scott Peters
Doug Pallaye
John Hardesty

3515 Prospect Avenue
Room 206
Cleveland, Ohio 44115
Office: 216-432-2668
FAX: 216-432-0796

**AGREEMENT**

**Between**

**The AGC OF OHIO**
**Labor Relations Division**

**which may be referred to hereinafter as the "Association"**

**and**

**THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 18 AND ITS BRANCHES, (AFL-CIO) referred to hereinafter as the "Union"**

This Agreement is negotiated by and between the Association and the Union within the geographical area as defined herein through their authorized agents, to wit:

That, whereas, the parties desire to stabilize employment and promote efficiency in the Construction Industry, agree upon wage rates, hours and conditions of employment, and to eliminate strikes, boycotts, lockouts and stoppages of work, and

Whereas, the Union and the Employer shall, through the issuance of working rules and regulations to the workmen, inform them of the terms of this Agreement and enforce compliance with the terms thereof, and

Whereas, the Employers agree to recognize and subscribe to the approved referral system as adopted by the International Union of Operating Engineers, Local 18.

Now, therefore, the undersigned Association and the Union agree as follows:

# ARTICLE I

## GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Geauga, Lake, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

## SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

# ARTICLE II

## RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**–The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**–This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

## ARTICLE I

### GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Geauga, Lake, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

### DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

### SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, all Wind Generation Devices and all supporting Infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## ARTICLE II

### RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**–The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**–This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

6. **Provisions and Limitations**–All members of the AGC of Ohio Labor Relations Division, and such other persons, firms or corporations who, as an Employer, become signatory to this Agreement, shall be bound by all of its terms and conditions, as well as any amendments which may be negotiated between the AGC of Ohio Labor Relations Division, and the Union. It is expressly understood that all Employers bound to the terms and conditions of this Agreement are required to pay the amounts as indicated in Article IV to the appropriate Fringe Benefit Programs.

7. **Management Rights**–The operation of the job and the direction of the working forces, including the right to hire, suspend and discharge for proper cause, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer.

8. **Nondiscrimination**–It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio and the Commonwealth of Kentucky and Lawful Orders thereof relative to nondiscrimination and fair employment practices. The Employer and the Union shall not knowingly discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or Apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

9. Further, the Employer and Union agree to adopt and embrace the Pact of 10 July 68 executed under provisions of the Executive Order 11246 and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations revised; an Affirmative Action Program to implement all provisions of applicable federal regulations to assure nondiscrimination in employment, upgrade, demotion or transfer, and recruitment advertising, layoff or termination, rates of pay and selection for all types of training as evidenced in Exhibit "B" attached hereto as if they had originally negotiated the same.

10. **Jurisdiction of Work**–In accordance with the terms of this Agreement, the Employer shall employ Operating Engineers for the erection, operation, assembly and disassembly, and maintenance and repair (fueling and greasing) of the following construction equipment regardless of motive power: Air Compressors, Batch Plants, Boilers, Cableways, Derricks, Finishing Machines, Pumps, Trucks, Crawlers, Locomotive and Tower Cranes; Concrete Mixers and Concrete Mixing Plants, Hoes, Shovels, Pile Drivers, Tractors, Scrapers, Endloaders, Hoists and all like equipment, including the use of Geodimeter or any other device that electronically measures (shoots) distance shall be the work of the Operating Engineers (only applies to in-house crew) within the jurisdiction as assigned to the Union by the American Federation of Labor. It is further understood that all equipment for which classifications and wages have been established in this Agreement, and including that equipment for which classifications and wage rates may hereafter be established, shall be manned, when operated on the job site, by a member of the International Union of Operating Engineers, and paid the rates as specified in this Agreement.

11. Operating Engineers shall be employed to do all pipe fitting and all burning and welding necessary for the preparation and maintaining of equipment operated by members of the Union.

12. Operating Engineers shall be assigned to all work performed in connection with the installation, fueling, starting and stopping, repair, maintenance and operation of the below listed small equipment: Compressors of 185 CFM or less (not discharging into a common header)

Heaters
Welding machines of 300 amp or less
Gas or diesel driven pumps 4" and under (or one 6" pump)
Generators of 15 KW or less
Conveyors 18" belt or less

A combination up to five (5) pieces of the above equipment shall, when in use, be serviced as an additional duty by an Operating Engineer who is employed by an Employer on a project. When six (6) pieces of the above equipment are in use on an Employer's project, a Utility Operator will be employed at the Class "C" rate. The Utility Operator shall also perform other work on the project.

In the event there are no Operating Engineers employed by the Employer on the project, the Employer shall employ an Operating Engineer at the Class "E" rate to service any small equipment in use, until the Class "C" rate becomes in effect.

An Operating Engineer shall be assigned to all work performed in connection with the installation, maintenance, repair and starting and stopping of electric submersible pumps. Neces-

SOFCO002316

sary work on electric submersible pumps shall be assigned to an Operating Engineer working on the project as an additional duty; no full-time Operator is required.

Work in the servicing and maintaining of self-contained, mobile light plants shall be assigned to an Operating Engineer as an additional duty to his/her regular job. Such work shall normally be assigned to a Mechanic, Grease Crew or Apprentice/Helper (Oiler). Equipment operator employees shall be required to carry sufficient tools to make minor adjustments on the equipment they operate.

When an Apprentice/Helper (Oiler) is assigned as the primary operator to a fuel/grease combo vehicle which requires specialized CDL endorsement, he/she will receive a $3.00 per hour premium over the Class "E" rate.

**13. Dewatering Systems**–A "Dewatering System" is defined as a combination of one or more pumps of any type, size or motive power with combined discharge capacity of over 4", including but not limited to, well-point pumps, submersible well pumps, ejector or educator pumps in combination with wells, well-points, sumps, piping and/or other appurtenances irrespective of motive power to control water on any and all types of construction work. The complete installation, operation and necessary maintenance work, including all piping, shall be performed by Operating Engineers. A Dewatering System shall be operated by Pump Operators at all times the Dewatering System is in operation unless otherwise agreed at the Pre-Job Conference or with the Union.

**14.** The Union will at all times, when requested by the Employer, use its best efforts to furnish the Employer with competent employees to operate, maintain and repair equipment in accordance with the terms and conditions of this Agreement.

**15. Pre-Job**–It is agreed that upon the request of either party a Pre-Job Conference shall be held prior to commencing work. In case of a necessary emergency start of the construction job, the Pre-Job Conference shall be held as soon as possible after the start of work. It is further agreed that upon the awarding of any building contract of $500,000.00 and over, the successful contractor will immediately notify the Union when it has been awarded the contract. It is further agreed the Union may request, receive and hold a Pre-Job Conference with the Employer on an individual basis.

Before the start of any project containing known hazardous waste materials, there will be a Pre-Job held. The Employer must notify the Union five (5) days prior to starting work on the project. Failure to do so, the Union has the right to withhold its services until such time a Pre-Job is held.

**16.** Following are the items which will be discussed at the Pre-Job Conference:

A. The Employer will advise the Union Representative of the Employer's requirements of necessary employees in the classification of work under this Agreement, and the Union will determine and advise the Employer of the ability of the Union to fulfill such requirements when requested.

B. Work schedules.

C. Questions of jurisdiction and assignment of work.

D. The Employer agrees that whenever possible at such Pre-Job Conference they will notify the Union of any subcontracts let by the Employer, the names of the subcontractors, and the nature of the work to be performed by the subcontractors. The Union may request a subcontractor to meet with the Union and the subcontractor will meet with the Union prior to commencing work on a project if the subcontractor did not attend the original Pre-Job Conference for the project. It is understood and agreed that no agreement may be made at the Pre-Job Conference which will in effect change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

**17.** Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Local Unions above stated on the effective date of this sub-section shall remain members of the Local Unions in good standing as a condition of employment.

**18.** All present employees who are not members of the Local Unions and all employees who are hired hereafter shall become and remain members in good standing of any one of said Locals as a condition of employment on and after the eighth (8th) day following the effective date of this sub-section or following the beginning of their employment, whichever is later.

**19.** The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory or who fails to observe

SOFCO002317

the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of any employee under the terms of this Agreement. Any grievance arising through application of this clause shall be adjusted in accordance with the procedures outlined in Article XIV, Paragraphs 124, 125 and 126 of this Agreement. Intoxication and/or assault committed on the job site shall be cause for immediate discharge.

**20.** The Union shall place no limitation upon the amount of work which an employee shall perform during the working day and there shall be no restriction imposed against the use of any type of machinery, tools or labor-saving devices. The Employer agrees that the work jurisdiction of the Operating Engineers, as assigned by the AFL-CIO, will be respected and all Operating Engineer work will be performed by an Operating Engineer, and it is the intent of both parties that Operating Engineers will be assigned work on the basis that will make each job as productive and efficient as possible. It is agreed that a fair day's work shall be given for a fair day's pay.

**21.** The Employer may shift during a work day an Operating Engineer from one piece of hourly rate of pay equipment to another hourly rate of pay piece of equipment without limitation from same job site providing the shifting does not interfere with another Operating Engineer's work day. This condition also pertains to weekly-pay equipment. However, there shall not be any intermixing with weekly-pay equipment to hourly-pay equipment. The Operating Engineer will be paid the highest rate for the day.

The District agent in each district, in order to maintain our jurisdiction, will make jobs as efficient and productive as possible.

**22.** If an Employer violates Paragraph 20, the Employer's penalty shall be to pay the first qualified registered applicant the applicable wage and fringe benefits from the first day of violation.

**23.** The authorized representative of the Union shall have access to the job during working hours for the purpose of visiting individual members, adjusting grievances or disputes and such other duties as he may have to perform. The representative will report to the job supervisor before visiting the project.

### STEWARD

**24.** The Union may, when it believes it necessary, appoint a Steward whenever possible from Operating Engineers working on the Employer's job and the Union District Representative will, when making such an appointment, notify the Employer. The Steward shall perform full-time work for the Employer and he/she shall be subject to the same rules, rights and working conditions as other employees. Under no circumstances shall the Steward have any authority to call a strike, slowdown of work or perform any other action which would be in violation of this Agreement.

**25.** The Employer agrees that each new employee shall report to the job Steward before starting work if a Steward has been appointed for that particular Employer's job. The Steward shall be allowed sufficient time during working hours to perform all normal duties required of a Steward. No Steward shall have job priority but will be laid off in the same manner as any other Operating Engineer upon completion of his/her particular job assignment; twenty-four (24) hour notice to the Union prior to his/her lay off is required to give the Union time to select another qualified Steward to replace the laid-off Steward, but this twenty-four (24) hour notice is not required when a Steward is discharged for cause by the Employer.

### SAFETY

**26.** The Union and the Employer will cooperate in the establishment of a safety program. At the Pre-Job Conference by mutual agreement, the wearing of safety hats may be made a condition of employment. All safety equipment required by the project owner or manager will be at no cost to the employee, except work shoes of any type. Both the Employer and employees shall comply with the applicable state safety codes and any other applicable government or civil regulations pertaining to safety. It is expressly understood that if the employees' immediate health and safety are involved, the Union through its representative may order discontinuation of operations until satisfactory results are obtained.

### TRAINING

**27.** The Safety Training Passport (STP)16-hour program will be made available to all union members by the Union at no cost to the Employer. The program will consist of:

SOFCO002318

Safety Awareness as required by
OSHA 29CFR 1926.21

Fall Protection as required by
OSHA 29CFR 1926.503

Hazard Communication as required by
OSHA 29CFR 1926.59

Operating Engineers dispatched to a project to perform trench excavation work will be required to have successfully completed eight (8) hours of trench safety training. This program became effective May 1, 2007.

It is agreed that both the Employer and the Union will encourage and assist in the promotion of this training.

Effective May 1, 2011 and thereafter, all Operating Engineers dispatched to and/or employed on a project are required to have successfully completed the 16-hour Safety Training Passport (STP) Program or an OSHA-approved 10-hour construction safety training program. Comparable safety training shall be renewed and updated every five (5) years or the Operating Engineer shall be considered unqualified. Verification of valid, updated training must be presented to the Employer upon dispatch, hire or request. Employers who provide such safety training shall not be required to pay employees to attend the training.

**28.** Within forty-eight (48) hours after an industrial accident occurs, the company shall have all necessary State Workers' Compensation forms available and completed on the Employer's part. A copy of the completed forms shall be sent to the Union's office in the district where the accident occurred.

**29.** All **toxic/hazardous** projects will be subject to any and all safety regulations and insurance provisions that may be required by the appropriate governmental agencies. When dangerous atmospheres are present so that an Operator is required to don a special protective suit and/or self-contained breathing apparatus at a private, state, federal or other designated toxic/hazardous waste site, the Employer will notify the Union district office. Reasonable dress-up time and clean-up time will be allowed. The first qualified bargaining unit employee on the job will be designated the steward-safety person, who shall have access to company monitoring records and be kept informed of amounts of contaminants on the job site. A sheltered "safe zone" area shall be provided. There shall be wash-up facilities on all

toxic/hazardous waste sites. When hazmat training credentials are required, the Operator will receive a $.50 per hour premium added to his/her base rate.

On such projects, it is expressly understood that if the employees' immediate health and safety are in danger, the employee may discontinue operations, without penalty, until satisfactory results are obtained, or until such time as a recognized safety agent shall declare the equipment or operation to be safe. All Operating Engineers employees shall be advised by the Employer prior to employment as to the nature of the known hazardous waste and possible resultant physical injuries as may be required by applicable law.

**30. DRUG TESTING:** The Employer and the Union are committed to a policy that promotes safety in the work place, employee health, and well being. In consideration of this policy, the Union and Employer agree that any employee found to be under the influence of, in possession of, or engaged in the distribution of drugs or alcohol on the job site shall be subject to disciplinary action, up to and including immediate discharge.

Within two (2) weeks of reporting to the job site, each new Operator may be scheduled for a drug test. Employees using a prescription drug which may impair mental or motor function shall inform their supervisor in writing of such drug use.

Employee involvement with drugs and alcohol can adversely affect job performance and employee morale. In the Construction Industry the consequences of drug or alcohol use or influence while on the job site can be disastrous. The Employer and Union, therefore, agree to the following policy to insure all employees of a safe and efficient job site free from the effects of drug and alcohol use or influence.

All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of illegal drug or alcohol use impairment while on the job site, may be required as a condition of continued employment to submit to a test for alcohol and/or illegal drug use which impairs the employee's ability to safely perform his/her duties on the job site. Such tests involve a sampling of the employee's blood, urine, or breath unless a specific type of test is required by the project owner, in which case such mandated test shall be ob-

served. Any employee who is asked to submit to such a test will be required to sign a consent form. If an employee who is asked to submit to a test refuses to do so, or refuses to sign the necessary consent form, that employee will be subject to disciplinary action up to and including discharge. Refusal to take a test or the submission of an adulterated sample shall be determined the same as a positive test result. The employee/member shall follow all requirements outlined in this section.

All testing will be done by a reliable, established laboratory. If this initial test screen result indicates positive findings, further testing of the same sample must be done to confirm the original findings before the laboratory can report a positive finding. The confirmation test will be conducted by an independent accredited National Institute of Drug Abuse or College of American Pathology Laboratory and/or currently qualified under the Substance Abuse & Mental Health Services Administration (SAMSHA) under the U.S. Dept. of Health & Human Services, and will utilize the more scientific Gas Chromatography/Mass Spectrometry examination (GC/MS). The results of all tests will be kept confidential between the employee, the Employer and the Union. The employee shall be paid his/her regular hourly wage and fringes for time required for drug testing provided results are negative.

If the GC/MS test results are positive, the employee may be granted a leave of absence for the purposes of drug and alcohol rehabilitation. If the employee is eligible such rehabilitation programs are covered under the Ohio Operating Engineers Health and Welfare Program providing the employee confines him/her self to a twenty-four (24) hour licensed rehabilitation medical facility.

Until the employee presents certification of successful completion of the rehabilitation program to the Local 18 Medical Review Officer (MRO), the employee shall be removed from the Employer's job site, shall be prohibited from registering under Article III of the referral of this agreement and shall not be dispatched to work. Upon presentation of certification of the employee's successful completion of the drug/alcohol rehabilitation program to the Local 18 MRO, the employee may be restored to his/her original job with the Employer. If the employee is not restored to their original job, the employee will be allowed to register for work in the referral by registering a new work referral card.

The employee shall, under either circumstance, for the next succeeding twelve (12) month period, present to the Local 18 MRO monthly certification of negative drug/alcohol test results. Failure to do so will result in denying the employee the right to maintain his/her referral card in the register and utilize the referral or if working, to be removed from work.

Any positive drug and/or alcohol test result after the second rehabilitation procedure shall result in the applicant being permanently barred from registering on the Local 18 referral.

**31. HARASSMENT POLICY:** The parties to this Agreement mutually agree that harassment of any nature is not to be tolerated. Every person working under this Agreement shall immediately notify the Employer when a possibility of a problem happens or exists.

## ARTICLE III

### REFERRAL SYSTEM

**32.** Local 18 and its Branches shall maintain registers of all applicants for referral. Applicants shall not be permitted to be registered in more than one office of the Union at any one time. All applicants will be registered in order of application, provided no person shall be deemed to be an applicant who is otherwise gainfully employed as an Operating Engineer or not immediately available for work. Registrations and re-registrations will be accepted during customary business hours. Applicants shall be classified in priority groups in accordance with the following criteria:

**GROUP A:** All applicants who have worked as Operating Engineers at least 360 days, 90 days or more per year during the last four (4) years, and have been employed for at least 360 days, 90 days or more per year during the last four (4) years on work as defined in Article I of this Agreement within the geographical jurisdiction of Local 18, and who have lived in the State of Ohio, or in any county contiguous thereto, for at least one (1) year prior to application.

**GROUP A PREFERRED:** Must have Group A eligibility. Group A registrants may voluntarily register in the Group A Preferred; however, registrants in this Preferred A status shall have at least fifteen (15) years employment or availability for employment in any one or more of the classifications contained

SOFCO002320

in this Agreement and in the type or kind of craft work covered by this Agreement in the geographic area as defined by this Agreement. Referral in this group is limited to the following described equipment and will be given priority of referral from the Group A Preferred deck. Preferred A status employees will not be eligible for letter of request by the Employer: Welding Machines, Elevator, Conveyor, Pumps, Compressors, Generators, One Drum Hoist, Mono-Rail Hoist and Portable Heaters.

It is further understood and agreed that when the Employer employs Operating Engineers not currently in their employ for any machines listed in this section, the Employer shall call the referral office servicing his/her job or project and request that an employee qualifying under the Preferred A status be dispatched to service and operate said machine. Any Operating Engineer currently employed by an Employer can be used to operate any of the above listed machines. Apprentices shall not operate this equipment more than fifteen (15) days.

Workmen registering in this Preferred A Group shall be ineligible to register in any other group and shall not work in any classification other than those specified in this section and only have recall rights for equipment specified in this section.

**GROUP A RETIREES:** Must have Group A eligibility. The pension was set up to enhance the lives of retirees in their golden years. Retiring from the trades is by voluntary choice.

A retiree is an equipment operator or mechanic who has applied for and is receiving a pension from any construction industry source.

Upon retirement the retiree can only register in this group. The Group A retirees will be referred to jobs only after the Group A classification and the Preferred A classification have been exhausted.

The Group A retirees will not be eligible for letter of request by the Employer.

**GROUP B:** Same as Group A, except that the employment shall have been at least 270 days, three (3) years of 90 days each. All fourth year Apprentices and Trainees shall be registered in this group.

**GROUP C:** All applicants who have worked as Operating Engineers at least ninety (90) days per year during each of the last two (2) years, and who have lived in the State of Ohio or any county contiguous thereto for at least one (1) year prior to application. All third year Apprentices and Trainees shall be registered in this group.

**GROUP D:** All applicants who have worked as Operating Engineers at least ninety (90) days during the twelve (12) months prior to application. All second year Apprentices and Trainees shall be registered in this group.

**GROUP E:** All other applicants and all first year Apprentices and Trainees shall be registered in this group.

**GROUP F:** All applicants who are "temporary employees".

All applicants who have attained eligibility in any of the foregoing groups shall not lose eligibility as a result of their failure to obtain the required days of employment during the applicable periods of time. All graduating Apprentices shall upon journeymen certification become eligible for Group A. When an applicant fails to register in his/her eligibility group due to reasons other than illness, as hereinafter defined, and does not notify the Union Hall, the resultant failure to obtain the required days of employment during the applicable periods of time shall cause the applicant to lose eligibility in that group.

Any registrant requesting that their work registration card be placed on hold due to sickness, ill health or physical condition, must present to the Union a doctor's certificate or statement certifying that the registrant will be under a doctor's care for a minimum of thirty (30) days, and that such illness or physical condition prevents the registered applicant from working as an Operating Engineer. A work registrant's card will only be placed on hold for a minimum period of thirty (30) days, and a maximum period of one hundred twenty (120) days. No registration cards will be placed in the hold position for illness or physical condition for less than a thirty (30) day duration. Any refusals of dispatches due to illness or physical condition for a period of less than thirty (30) days shall be counted as a refusal under the terms and conditions of the referral procedure.

**33.** In referring applicants, the following procedure shall be followed:

A. Applicants in Group A shall first be referred, and then Group A Preferred, then Group A Retirees, then applicants in the succeeding groups, in order, through Group E. In each group, the Union shall refer applicants in order of their places on the referral list.

B. Registered Apprentices or Trainees shall be referred in order of their position on the referral list.

C. Employers shall have the right to reject any applicant referred for employment and shall immediately notify the Union in writing of such rejection. In the event a registrant is discharged by the Employer because of lack of sufficient ability, and he/she does not exercise his/her rights under the Referral Board of Review and Arbitration under Paragraph 37, the classification or equipment from which he/she is discharged shall be stricken from his/her referral record and he/she shall not be dispatched to a job in that classification or on that equipment until he/she has:

1. Taken training at his/her training site and has been certified, or

2. Has presented to his/her dispatch office a letter from a previous Employer, in signed agreement with Local 18 working within Local 18's jurisdiction, stating that in the Employer's opinion the discharged registrant has successfully completed a job assignment in that classification or on that piece of equipment in his employment.

D. When an applicant is actually employed, he/she shall notify the Union office at which he/she is registered within twenty-four (24) hours. Failure to do so is an imposition upon those registered and not employed and, therefore, such applicant will be barred from re-registering, unless and until he/she has made application to the Board of Review and Arbitration provided for in Paragraph 37 of this Agreement, and shows good cause for his/her failure to give such notice.

E. When an applicant becomes employed, his/her name shall be removed from the register as soon as he/she shall have worked for a total of thirty-one (31) accumulative working days (one (1) day jobs shall not count). An Operator who relieves another Operator will not be charged for the first fifteen (15) days (only one (1) fifteen (15) day relief per registration application card). All days after that will be counted toward his/her time.

If an applicant is employed for less than thirty-one (31) accumulative working days, he/she shall be restored to his/her previous position on the register when such employment terminates. Any applicant who quits employment or fails to show up for work assignment at starting time after being dispatched (provided he/she was dispatched the previous day), for whatever reason, except accident verified by police report, shall be placed at the bottom of the applicable registration group regardless of the number of days worked and shall not be eligible for request until he/she puts in a new registration card. When reason for employment termination is questioned, applicant must present a written termination slip evidencing reasons other than a voluntary quit before he/she is restored to his/her previous position on the register.

An applicant for employment may not refuse referral to employment for any reason except that the applicant may inform the District Office in writing, before any referral, that he/she will not accept employment referrals in certain named counties within the District. If an applicant refuses a job referral for the second consecutive time, he/she shall lose his/her position on the register and go to the bottom of the list for his/her group[1]. If the dispatcher is unable to contact an applicant, the failure to contact shall not be deemed to be a refusal.

F. Applicants must notify the Union office in which they are registered by telephone, or letter, or telegram, or in person of their continued availability for employment within thirty (30) days after the date of last registration or re-registration in order to maintain their places on the register.

In order to equally distribute and defray the cost of services rendered by the use of this referral system, all individuals who make use of this referral system shall be required to pay an initial registration fee of $20.00* and another $20.00* for each re-registration thereafter, provided that such fee shall not exceed $20.00* in any consecutive thirty (30) day period and provided that such fee shall not apply to the following:

1. Members in good standing of Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their regular dues; and

[1]Does not apply to the former Ohio or Kentucky Building & Light Commercial Agreements Referral.

*Effective October 1, 2013 $20.00. In the event that the General Executive Board exercises its authority under Article XI, Section 1 of the Constitution to increase the per capita tax payable to the International Union, effective July 1, 2014, July 1, 2015, July 1, 2016 and/or July 1, 2017, the registration fee of Local 18 shall increase in conjunction with such per capita tax increases(s) pursant to Article XXIV, Subdivision 7, Section (1) of the Constitution of the International Union of Operating Engineers.

2. Applicants for membership to Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their fees; and

3. Members in good standing of the International Union of Operating Engineers who are paying travel dues whose proportionate share of the cost of this referral system is met by the payment of their fees.

G. The Union shall use its best efforts to notify all registered applicants when work is available for them, but the Union assumes no responsibility or obligation for failure to locate an applicant.

H. All applicants must submit a written resume of their experience and qualifications at the time of original registrations, and may be tested on the equipment they operate at the nearest available training site prior to being assigned a position on the referral list.

I. Subject to this referral system Employers may hire through this Referral policy, by name, former employees who have resided for at least twenty-four (24) months in the State of Ohio or in any county contiguous thereto, and have been employed by the Employer making the request during the past twenty-four (24) months within the jurisdiction of this Agreement. The Employer must make the request to the appropriate Union District Office and the employee requested must be registered on the District referral list (Groups A through E).

Employers may hire through this referral policy by name individuals in Group A for a production machine, or for a mechanic, or mechanic/welder, who has been registered on the out-of-work list for at least ten (10) days in the District in which the work is to be performed. Individuals shall have only one (1) request per four (4) month period from the last request. The request by name must be confirmed later in writing on the letterhead of the Employer and signed by either the Employer or the superintendent of the project.

Nothing in the referral procedure shall interfere with the transfer of an Employer's employees on his payroll from one project to another project within the geographical area covered by Local 18. When transferring employees, the Employer will notify the Union District Office from which the employee is to be transferred.

The Union agrees the transfer will be processed in an expedient manner.

J. The purpose of the referral system is to provide nondiscriminatory employment opportunities. Individuals who register therein deserve a preference over those who do not. Therefore, it is agreed that in the event the referral list is exhausted and the Union is temporarily unable to furnish qualified applicants within twenty-four (24) hours after receiving the Employer's request (Saturdays, Sundays and holidays excepted), the Employer may temporarily employ others until the Union notifies the Employer that it has qualified registrants available for employment.

Applicants hired by the Employer under this procedure shall be known as "temporary employees", and will be subject to replacements. The Employer will notify the Union District Representative of the name, union affiliation (if any), date of employment and social security number of such temporary employee. The Union will maintain a register of all such "temporary employees" and such register shall be known as the temporary register. Such "temporary employees" may also be referred by the Union (when the referral list is exhausted) from Group F.

Such "temporary employee" shall be subject to replacement by a qualified registered applicant under the procedure listed herein:

1. The Union shall give a five (5) working day written notice to the Employer with whom the "temporary employee" is working and such "temporary employee" will thereupon be replaced at the end of the five (5) working day period provided the Union furnishes a qualified registered applicant.

2. The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the temporary register.

K. When an Employer states requirements for special skills or abilities in his/her request for employee applicants, the Union shall refer the first applicant on the register possessing such skills or abilities, regardless of the place or classification of such applicant on the register. If a contractor requests or requires that the operator be a Certified Operator, verification of the operator's certification is the responsibility of the Employer. If the Employer notifies the Union in writing, within thirty (30) days of the employee's discharge, of an Operator who had been

SOFCO002323

in his employment and who had not performed satisfactorily, and the Employer does not wish this Operator to be referred to the Employer for future employment, the Union shall honor this written request.

L. Any employee who quits a contractor without proper notice and is subsequently hired by an Employer with whom Local 18 has a contractual relationship without a proper referral by Local 18 shall be discharged by the Employer when it is called to his attention.

**34.** Employers shall give first opportunity to persons registered for employment, as provided herein, by calling or notifying the Union at any of its offices in the territory where the work is to be performed.

**35.** Registration of applicants and selections of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership, policies, or requirements. It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio, the Commonwealth of Kentucky, and lawful orders thereof in nondiscrimination and fair employment practices.

The Employer and the Union shall not discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

The Union agrees to furnish an Employer, at his request, any statement or data required under any regulations referred to herein.

**36.** In addition to the above Registration Groups there shall be established a Short Term Job Group. The sole purpose of this Short Term Job Group is to enable registrants to acquire time to be eligible for unemployment benefits. Registration in this group is limited to applicants eligible for Group A of this referral and all fourth year Apprentices showing proof of need for additional time to qualify for unemployment benefits.

Applicants' referral out of the Short Term Job Group will be limited to jobs of two (2) days or less duration in a calendar week or eight (8) days or less duration in a calendar month on equipment listed on their registration cards. Any refusals of jobs will cause the registrant's card to be removed from the Short Term Job Group deck. Dispatches for short term jobs as defined above will first be made from the Short Term Job Group. If the dispatcher is unable to fill the short term job order from the Short Term Job Group he/she will proceed to fill the order from Groups A through F in accordance with the referral rules. Dispatcher should notify Employers when dispatching from the Short Term Job Group. The Employer reserves the right to request dispatch from Group A.

Since this Short Term Job Group is intended to provide limited employment for those needing credit for unemployment compensation, the Union shall, through its business agents, remove from employment any Operating Engineer who has accumulated more than two (2) days per calendar week or over eight (8) days in a calendar month – as a result of the Short Term Job Group.

Registrants in the Short Term Job Group will not be eligible for any recall or request provisions of the referral as herein described. Employment received as a result of the Short Term Job Group referral will not provide eligibility for Employer recall when the registrant is registered in Group A, Preferred A, or Group A Retirees deck. Apprentices or Trainees will not be permitted to register in the Short Term Job Group except as noted above. Registrants may not register in the Short Term Job Group or Group A or Preferred A or Group A Retirees deck at the same time. The Employer shall not be permitted to transfer employees dispatched from the Short Term Job Group from one project to another project.

The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the Short Term Job Group.

All the remaining rules with regard to the operation of the referral shall be applicable to the operation of the Group A, Preferred A and Group A Retirees except as modified above.

**37.** Any registrant or any Employer who may feel aggrieved by the operation of this referral system shall have the right to and must file his/her grievance, in writing, within ten (10) days after the occurrence of the event concerning which he/she complains with a Board of Review and Arbitration consisting of one (1) representative of the Union, one (1) representative of

SOFCO002324

the Employer, and an impartial third member to be selected by agreement of the Union and the Employer, and the decision of this Board shall be final and binding on all parties.

38. This statement as to referrals shall be posted in all places where notices to Employers and applicants for employment are customarily posted, including all offices of the Union; all offices of the Employer.

39. A Labor Relations Division Representative of the AGC of Ohio may inspect the referral register at the Union District Office at any time during normal office hours.

40. All officers and business representatives of the Union who have had previous work experience in any one or more of the job classifications contained in this Agreement shall be deemed to be employed at the trade and it is the intent of this section to provide that upon return to the employment in the trade, he/she shall do so with the same preference as if he/she had continually worked at the trade and shall be eligible upon registration for Group A.

## ARTICLE IV

### FRINGE BENEFIT PROGRAMS

41. The fringe benefit provisions contained herein shall apply to all Employer members of the AGC of Ohio Labor Relations Division, and Employers who become signatory or bound by this Agreement, as well as any other Employer or Employer groups who become a party to an Agreement covering the fringe benefit programs set forth herein.

42. All Employers bound hereby agree to be bound by the Agreement and Declarations of Trust, as amended, establishing the Pension Fund, Health and Welfare Plan and Apprenticeship Fund, copies of which all parties agree have been furnished to and read by all Employers bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declarations of Trust and any rules, regulations, or plans adopted by the Trustees pursuant thereto, shall become a part of this Agreement as though fully written herein. All Employers bound hereby irrevocably designate the Employer Trustees of said Funds and Plan and their successors as their representatives for the purpose set forth in said Agreements and Declarations of Trust.

43. Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

PENSION FUND: Effective May 8, 2013 is $6.00 per hour

HEALTH & WELFARE PLAN: Effective May 8, 2013 is $6.91 per hour; May 1, 2014 is $7.16 per hour; May 1, 2015 is $7.41 per hour

APPRENTICESHIP FUND: Effective May 8, 2013 is $.60 per hour; May 1, 2014 is $.67 per hour; May 1, 2015 is $.75 per hour

SAFETY TRAINING AND EDUCATIONAL TRUST FUND: Effective May 8, 2014 is $.07 per hour; May 1, 2015 is $.09 per hour

The Union shall have the option of diverting all or any part of the increase scheduled for improvement of or payment of costs of any fund benefits provided under this Agreement; provided that the Union gives the Employer written notice of its election to do so by registered letter sent to the office of the AGC of Ohio at least 60 days before the effective date of the scheduled change specifying in said notice the amount of change to be applied for this purpose in the fund benefit for which the money is to be used.

44. It is further understood and agreed by and between the parties that duly authorized representatives of any of said Trust Funds or Plan shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all employees upon whom the Employer is obligated to make contributions and with respect to the payment of monies to the AGC of Ohio's Construction Industry Advancement Program under paragraphs 109, et.seq. and with respect to the Administrative Dues deduction under paragraph 114. Notwithstanding the foregoing authority allowing audits with respect to the AGC of Ohio's Construction Industry Advancement Program and the Administrative Dues deduction, the audits shall only be conducted in conjunction with the Fringe Benefit Funds or Plans referred to herein and shall not be conducted independently. The twenty-four (24) hour notice referred to in paragraph 45(A) shall only be given for delinquencies to the employees Fringe Benefit Funds or Plan referred to therein.

SOFCO002325

45. Reports of employees who have worked the number of hours that they have been paid, and such other data and information as may be required, and all contributions payable to the Funds or Plan shall be transmitted to the offices of the Funds or Plan no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed. In the event said audit is refused, reports not furnished, or said contributions are not paid, as aforesaid, the following remedies, in whole or part, and in addition to all other remedies, either in law, in equity, by contract or authorized by the aforementioned Agreements and Declarations of Trust, shall be available.

A. After the Trustees or the Agent of any Funds or Plan have given the delinquent Employer twenty-four (24) hours written notice at the address shown in the records of the Funds, Plan or Union, the Union shall have the right to take such legal and lawful action as it may deem necessary until such delinquent payments are made or said audit is permitted, such action including but not limited to the right to withhold its services from such Employer for as long as the failure to make such contributions or audit continues, Article XIV notwithstanding.

B. In the event either the Union or the Trustees of any Funds or Plan may decide to utilize the grievance and arbitration procedure in this paragraph to collect delinquent contributions and liquidated damages to enforce any audit, or to obtain any report, the following procedure shall apply:

Unless the issue is resolved between the Employer and the party giving notice, within five (5) calendar days after deposit of written notice of delinquency and/or demand for audit and/or report in the United States mail, to the Employer at the address shown in the records of the Funds, Plan or Union, such party may refer the matter to an arbitrator to be named by the AGC of Ohio Labor Relations Division and by Local 18 of the International Union of Operating Engineers whose decision in writing shall be final and binding on all parties. In the event such parties are unable to choose an arbitrator within ten (10) days after written request therefore, the Union or the Trustees of any Funds or Plan may request an arbitrator according to the rules and regulations of the American Arbitration Association whose decision in writing shall be final and binding on all parties. The parties to the arbitration shall each bear one-half (1/2) of the total costs.

46. In no event shall the foregoing provisions relating to Fringe Benefits be subject to or suitable for grievance and arbitration under Article XIV of this Agreement.

47. The Employer must obtain an Insurance Payment Bond (IPB), from a company that is "best" rated A, financial category 7 or better, payable to the Ohio Operating Engineers Fringe Benefit Program as a guarantee that the fringe benefits referred to herein are paid by the insurance carrier in the event that the Employer becomes delinquent in its payments and defaults thereon. In lieu of a surety bond, an Employer may substitute an equivalent cash bond, which will be escrowed to guarantee payment of fringes. If the Employer fails to provide the necessary bond within thirty (30) days of request by the Union, the Union shall withhold services until receipt of such bond, or the Employer makes fringe contributions on a weekly basis.

The Employer shall obtain said Insurance Payment Bond or cash bond in amounts set forth below:

| | | |
|---|---|---|
| 1-10 | Operating Engineers | $ 50,000.00 |
| 11-20 | Operating Engineers | 75,000.00 |
| 21-50 | Operating Engineers | 100,000.00 |
| Over 50 | Operating Engineers | 125,000.00 |

## ARTICLE V

### WAGE RATES

48. The purpose of this Agreement is to establish wage rates and conditions to apply for all work as defined herein and for operation of all equipment which comes within the jurisdiction of the International Union of Operating Engineers, and as negotiated by and between Local 18 and its Branches of the International Union of Operating Engineers and the AGC of Ohio Labor Relations Division.

49. Exhibit "A" covering wage rates and classifications attached hereto is made a part of this Agreement.

50. It is agreed if equipment within the jurisdiction of the International Union of Operating Engineers is used by an Employer and if there is no appropriate classification listed under the wage schedules therein, then the Union and the Association negotiating committees will negotiate a new classification and rate of pay for such equipment within five (5) days.

SOFCO002326

51. The geographical jurisdiction of this Agreement will be zoned for wages only. Conditions of employment will be the same for all employees covered by this Agreement.

Zone I: Covering Portage and Summit counties only.

Zone IA: Covering Erie, Huron, Lorain and Medina counties.

Zone II: Covering the counties of Lucas and Wood only.

Zone III: Covering the counties of Adams, Allen, Ashland, Athens, Auglaize, Belmont, Brown, Butler, Carroll, Champaign, Clark, Clermont, Clinton, Coshocton, Crawford, Darke, Defiance, Delaware, Fairfield, Fayette, Franklin, Fulton, Gallia, Greene, Guernsey, Hamilton, Hancock, Hardin, Harrison, Henry, Highland, Hocking, Holmes, Jackson, Jefferson, Knox, Lawrence, Licking, Logan, Madison, Marion, Mercer, Meigs, Miami, Montgomery, Monroe, Morgan, Morrow, Muskingum, Noble, Paulding, Perry, Pickaway, Pike, Preble, Putnam, Richland, Ross, Sandusky, Scioto, Seneca, Shelby, Tuscarawas, Union, Van Wert, Vinton, Warren, Washington, Wayne, Williams, and Wyandot. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

## ARTICLE VI

### WEEKLY PAY AND HOURLY PAY CLASSIFICATIONS AND REPORTING PAY PROVISIONS

52. In all counties covered by this Agreement, the following classifications shall be employed on a WEEKLY PAY basis:

Asphalt Plants
  Boiler Operators, Apprentice/Helper (Oiler), Registered Apprentices and Signalmen, when members of crew
  Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Cherry Pickers
Cranes (all types)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Floating Equipment
Gradalls
Hoes (except when attached to farm or industrial type tractor or CAT 320 backhoes or equivalent and below)
Hoists, with two or more drums in use

Horizontal Directional Drill (over 500,000 ft. lbs. thrust)
Maintenance Engineers (Mechanic and/or Welder)
Master Mechanics
Panelboard Operators (all types on site)
Pile Drivers
Power Shovels
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Tug Boats

53. In all counties covered by ZONES I, II and III, the following classifications shall be employed on an HOURLY PAY basis (two (2), four (4), or eight (8) hours):

A-Frames
Air Compressors, pressurizing shaft or tunnels
Allen Screed Paver (concrete)
Apprentice/Helpers (Oilers), Helpers, Boiler Operators, when not members of a crew
Asphalt Pavers
Backfillers
Backfillers with Tampers
Ballast Re-Locator
Bar and Joint Installing Machines
Barrier Moving Machine
Batch Plant Operators
Bobcat Type and/or Skid Steer Loader
Boilers (15 lbs. pressure and over)
Boom Trucks (all types)
Bulldozers
Bull Floats
Burlap and Curing Machines
Cableways
Clefplanes
CMI-type equipment
Combination Concrete Mixers and Towers
Compressors, on building construction
Concrete Grinder/Planer
Concrete Mixers
Concrete Pumps
Concrete Saw, Vermeer type
Concrete Spreaders
Conveyors, used for handling building materials
Crushers

Deckhands
Directional Drill "Locator"
Drum Firemen in asphalt plants
Elevating Graders or Euclid Loaders
Endloaders
Farm-type Tractors, pulling attachments
Finishing Machines
Fork Lifts (all types)
Forklift (rough terrain with winch/hoist)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (sonic pile driving)
Gunite Machines
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes, when attached to farm or industrial type tractors
Hoists (building construction)
Horizontal Directional Drill (less than 500,000 ft. lbs. thrust)
House Elevators (except those automatic call button controlled)
Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate of pay will be "Class E")
Hydraulic Gantry (lift system)
Hydro-seeders
Inboard, Outboard Motor Boat Launches
Kolman-type Loaders (dirt loading)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Lead Greasemen
Light Plant Operators
Locomotives (all types)
Man Lifts
Mixers, one bag capacity with side loaders
Mixers, Paving (multiple drums)
Mobile Concrete Pumps, with booms (including oiler, etc.)
Mucking Machines
Mudjacks
Pavement Breakers (hydraulic or cable)
Pettibone - Rail Equipment
Plant Mixers (on site)
Post Drivers
Post Hole Diggers
Power Driven Heaters (oil fired)

Power Graders
Power Scoops
Power Sweepers
Power Scrubbers
Prentice Loader
Pressure Grouting
Pressure Pumps (over 1/2" discharge)
Pump Operators, installing or operating well-points or other types of dewatering systems
Pumps (4" and over discharge)
Pumps (under 4" discharge)
Rail Tamper (with automatic lifting and aligning device)
Switch & Tie Tampers (without lifting and aligning device)
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Utility Operators
VAC/ALLS
Vibratory Compactors, with integral power
Welders (except electric machines)

**54.** In all the counties covered by ZONES I, IA, II and III, employees covered by this Agreement employed on a WEEKLY PAY basis reporting for work on Saturday, Sunday or holidays shall be paid as follows: Employees who have not started to work will receive two (2) hours at premium pay for reporting to work (only need to stay on job for one (1) hour). Employees who start to work will receive four (4) hours pay at premium rate; more than four (4) hours will receive eight (8) hours pay at the premium rate. For inclement weather only it will be 2-4-6-8 hours of pay at the premium rate of pay.

They must report to work at starting time and remain on the job until release.

**55.** When a machine having a forty (40) hour guarantee is laid up on a project site and the workmen are laid off and paid off, that machine cannot be started back to productive work on that project site unless it is laid up for one week (seven days) without calling back the workmen who had manned the machine and they shall be paid for the time they have been off, unless mutual agreement is reached between the Employer and the Union District Representative to permit employees to work on the weekly guarantee equipment during the seven (7) day "lay-up" period without penalty.

**56.** In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis, unless notified by the Employer not to report to work, shall receive two (2) hours' pay for reporting to work; if such operator does not start to work, he/she shall receive his/her two (2) hours reporting time. An employee may be required to stay at the work project for one (1) hour to be eligible for two (2) hours reporting pay unless the Employer releases the employee prior to the end of the first hour. If the employee starts to work, he/she shall receive four (4) hours' pay; if the employee works over four (4) hours, he/she shall receive eight (8) hours' pay; for inclement weather only it will be 2-4-6-8 hours.

In all counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis reporting to work on Saturday, Sunday or holidays, all conditions in this paragraph will apply and both reporting time and time worked will be paid for at the rate provided in accordance with Article VII. They must report to work at starting time to be entitled to reporting pay. Where less than four (4) hours or less than eight (8) hours are worked, the employees must remain on the work for the full four (4) hours or the full eight (8) hours, as the case may be, to be entitled to pay for the four (4) or eight (8) hours, as stipulated in this Agreement. Employee call off notification must be made not less than 60 minutes prior to the established starting time or show pay applies.

A. When an employee working on equipment with a weekly-pay guarantee and work with his/her equipment is completed on a project, the employee is guaranteed only Monday through Wednesday pay if the equipment finishes the work on the project the first three days of the week. The Employer will notify the Union District Representative prior to application of this provision.

**57.** Crews will be eligible for straight time weekly pay when their equipment is transferred out of their District up to the day the equipment is shutdown; otherwise, Paragraph 56, Section A prevails.

**58.** On jobs where there is only one (1) day's work for a piece of equipment, employee or crew may be employed on a day-pay basis. Upon the Contractor's request to the Union Business Representative for a second day for special occasions, the Union gives the Representative authority to authorize a second day for the period of this contract.

**59.** All reporting pay time paid to an employee shall count as working hours with respect to any work guarantees or overtime pay provisions.

**60.** Employees who are working for an Employer in other than their local residence area thereby necessitating them to pay room and board shall, upon request, be granted their release if the Employer is unable to supply enough work to justify their staying. Employees released under this provision will be considered as laid-off because of lack of work.

## ARTICLE VII

### PROVISIONS FOR PREMIUM RATE OF PAY

**61.** The week shall begin on Monday A.M. and shall end on Sunday P.M.

**62.** The regular starting time must be established for not less than one (1) week. Any time worked prior to the established starting time will be paid for at the applicable premium rate unless otherwise arranged through Union notification.

**63.** The normal work day shall consist of eight (8) hours and the normal work week of forty (40) hours. One and one-half (1-1/2) times the regular rate shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, and including Saturday. When an Employer performs clearance and excavation for site preparation for industrial or building sites, the Employer will pay the wage rates listed herein, all overtime will be performed at one and one-half (1-1/2) times the regular rate. Subject to Paragraph 121, all other conditions and provisions shall be as provided herein.

A. An Employer may, however, have the option of working a four-ten hour schedule at straight time rates. No Operating Engineer with a weekly guarantee will lose a paid holiday he/she would otherwise receive by working a four-ten week. Instead, such employees will receive, in addition to wages and fringes for hours worked in a four-ten week, an additional eight (8) hours and fringes at straight time rates for the holiday. If the Employer elects, upon notification to work a four-ten hour schedule, he shall pay overtime in such cases on all hours over ten (10) hours per day or over forty (40) per week, whichever is greater. A four-ten work schedule must be by the week.

SOFCO002329

In addition to the above: It is agreed that when time is lost by the crew during the regular work week, Monday through Thursday, due to inclement weather, holiday, equipment breakdown or directions of the project owner, this time may be made up by the entire crew on Friday at the regular rate of wages. All Friday work must be scheduled on a minimum of eight (8) hours basis. All hours worked in excess of the forty (40) hours in the work week or ten (10) hours each day, shall be paid at the appropriate overtime rate of pay.

B. Any employee hired on any day of the week, Monday through Thursday, and who does not lose any time from the day of his/her initial hire until Thursday shall receive the overtime rate of wages for Friday, providing the crew is eligible for the premium rate for Friday.

C. Should any other trade on the project in the contractor's employ, working in conjunction with the Operating Engineers, receive premium pay on a Friday, the Operating Engineers would also receive premium pay for the Friday.

D. If the other basic crafts employed by your contractor on the project receive the overtime rate for the ninth (9th) and tenth (10th) hours, the Operating Engineers will also receive the overtime rate.

E. When an Employer works three (3) days or less in a week, premium time will be paid after eight (8) hours for each of the days, except for holidays, inclement weather or completion of the job.

F. Pay day will be on Thursday.

G. Weekly pay employees, in order to be eligible for eight hours' pay that day, must be available to perform work for the Employer.

H. Direct deposit will be at the discretion of the employer. There will be no cost or fees to the employee.

64. Double time will continue to be paid to any Operator who is complementing another trade that is receiving double time. All work performed by an employee on Sunday or holidays shall be paid at two times the regular rate established in this Agreement or any escalated rate that may be in effect.

65. No Weekly Pay employee covered by this Agreement shall lose time because of the observed holidays. If not requested to work, he/she shall be paid eight (8) hours straight

time pay at the rate established in this Agreement or eight (8) hours at any escalated rate that may be in effect. Holidays shall be of twenty-four (24) hours duration. When required to work on holidays, the employee shall be paid two times the regular rate established in this Agreement or any escalated rate in effect.

66. There shall be no work required on Labor Day except in special cases of emergency.

67. The observed holidays are Christmas, New Year's Day, Labor Day, Memorial Day (last Monday in month of May), Independence Day and Thanksgiving Day. When any of the aforementioned holidays fall on Sunday, they will be observed on Monday. All weekly pay Employees covered by this Agreement to be eligible for holiday pay must be available for work the first regularly scheduled work day prior to the holiday and be available for work the first regularly scheduled work day after the holiday.

68. Where steam boilers, power driven heaters or pumps are used on a continuous seven (7) day twenty-four (24) hours per day operation, overtime may be avoided by using four (4) shifts of Operating Engineers, each shift to work six (6) hours on a seven (7) day basis. Each Operating Engineer so employed shall be paid forty (40) hours at the applicable straight time rate and two (2) hours at double the applicable straight time rate. The aforementioned condition, where overtime may be avoided, can only be used upon the Employer's guarantee of a minimum thirty (30) days of operation. In the event the Employer cannot furnish thirty (30) days of employment after starting work under Paragraph 68, it is agreed that upon lay-off of employees the Employer will pay retroactive overtime to such laid-off employees from the start of this particular operation in accordance with Article VII, Paragraphs 63 and 64 of this Agreement.

69. Job Master Mechanics and Operators of derricks, cranes, derrick cars on steel erection and on building construction and all winch trucks used in hoisting construction material and any type of hoist, shall command and receive the highest rate of pay and the same applicable premium pay and conditions of overtime where the rates or conditions for the Ironworkers, Boiler Makers, Pile Drivers and Pipefitters are higher than the rates specified in this Agreement for the foregoing classifications. To be eligible for the benefits of complementing the above mentioned trades, an Operator must be required to perform a specific operation which is directly related to the work which the other trades are performing.

70. Operating Engineers employed on any equipment within the jurisdiction of the International Union of Operating Engineers working in shafts, tunnels or storage caverns where natural earth or rock is undisturbed overhead, shall be paid fifty cents ($.50) per hour above the rates in this Agreement or in addition to any escalated rate that may be in effect. This does not apply to open cut work.

71. Booms, including jib 150 feet through 180 feet in length, fifty cents($.50) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

72. Booms, including jib over 180 feet through 249 feet in length, one dollar($1.00) per hour in addition to the established crane rate or any escalated rate that may be in effect.

73. Booms, including jib of 250 feet and over in length, one dollar twenty-five cents ($1.25) per hour in addition to the established crane rate or any escalated rate that may be in effect.

74. Conventional cranes whether crawler or truck when used as a tower crane, the effective length of the mast and the boom combined, will be used to determine when these extra rates will be applied.

75. Tower Cranes, the height of the boom point from the first floor level of the project, will be used to determine when these extra rates will apply.

76. On jobs where crane-type or derrick-type machines are operated on floors above the first floor level of the building, twenty-five cents ($.25) per hour shall be paid in addition to the established crane rate or any escalated rate that may be in effect.

## ARTICLE VIII

### CREWS AND GENERAL PROVISIONS

77. In all the counties within the jurisdiction of this Agreement, crews shall be employed on all truck cranes, power shovels, cranes, rotary drills on caisson work, cableways, draglines, tower derricks, tower cranes, multiple drum pavers, pile driving machines and hoes, standard gauge locomotives, bucket trench machines (over 24" wide) and horizontal directional drills (over 500,000 ft.lbs.thrust). Crews shall consist of an Operating Engineer and an Apprentice/Helper (Oiler) or Signalman on machines, regardless of motive of power, or an Operating Engineer and Fireman on steam machines.

78A. Apprentice/Helpers (Oilers) are required on hoes, excavators, and front hydraulic shovels having a base operating weight in excess of 105,000 pounds, single cab hydraulic cranes on rubber with a total weight of 125,000 pounds and Apprentice/Helpers (Oilers) shall be required on cable crawler cranes over 80 ton structural capacity, defined as: the factory specified total maximum counter weight with a PCSA rating not to exceed 36,400 pounds, based on 50' of boom at 40' radius, with the single line pull not exceeding 17,000 pounds. Anything outside any of the aforementioned limits determines the crane as requiring an Apprentice/Helper (Oiler). All factory certifications and the computer system will be available for inspection at any time by the Union or their designee. On remote control gradalls, Apprentice/Helpers (Oilers) shall be at the discretion of the Employer. Truck cranes, lattice boom, thirty (30) ton capacity and under; hydraulic truck cranes and all terrain cranes fifty (50) ton capacity or less, an Apprentice/Helper (Oiler) is not required. However, if someone other than an Operating Engineer is assigned to this work, this paragraph will be revoked on the project, and an Apprentice/Helper (Oiler) will be required for the remainder of the project. An Apprentice/Helper (Oiler) is required on self-erecting cranes (as defined by the manufacturer) while being erected and dismantled.

78B. Apprentice/Helper (Oiler) on jobs of thirty (30) days or more will be given a minimum of 30 minutes per day operating the machine they are assigned to (or a similar machine on the same project). If the Apprentice/Helper (Oiler) cannot be trained to operate the machine to the satisfaction of the Employer then he/she shall be replaced.

79A. Work of the Boiler Operator, Apprentice/Helper (Oiler), Registered Apprentice, and Signalman shall include getting up steam and greasing up, filling gas tanks and making the machine and equipment ready for operating at the starting time. If, at the discretion of the Employer, an Apprentice/Helper (Oiler), Registered Apprentice, or Signalman is required to make gas or diesel machines ready to operate before the regular starting time, such Apprentice/Helper (Oiler), Registered Apprentice, or Signalman shall be paid one-half (1/2) hour's pay at one and one-half (1-1/2) times the regular rate. If, at the discretion of the Employer, a Boiler Operator or Registered Apprentice is required to get up steam and grease steam machines and make them ready to operate before regular starting time, then

SOFCO002331

such Boiler Operator or Registered Apprentice shall be paid one (1) hour's pay at one and one-half (1-1/2) times the regular rate.

79B. Apprentice/Helpers (Oilers), while assigned to track hoes, cranes and other equipment, will perform the following work on the project as additional duty:

- Cover small equipment (i.e. pumps, generators, compressors, etc.)
- Act as signal person
- Safety/fire watch
- Practice operating in a learning environment in the vicinity
- Help with survey duties on project
- Help mechanic, lube trucks, fuel
- Practice operating rough terrain forklift, front loader, rubber tire hoe, loader in vicinity of primary duty
- Replace other operators who may be absent on project
- Run parts or materials as necessary
- Safety enforcement
- Productive activity on job site to facilitate job completion when it does not interfere with progress of primary machine, providing this does not interfere with another Operating Engineer's workday

80. Apprentice/Helper (Oiler), Registered Apprentices, Signalmen, Grease Truck Operators, when requested to work the regular one-half (1/2) hour lunch period, will eat their lunch prior to or after the regular one-half (1/2) hour lunch period in order to be able to oil, grease and repair machines during the regular one-half (1/2) hour lunch period at no extra pay.

81. More than one (1) shift may be worked in any twenty-four (24) hour period and the starting time of the shifts shall be left to the discretion of the Employer. This starting time must be maintained five (5) days, Monday through Friday. However, more than six (6) hours shall not be worked without allowing thirty (30) minutes for a lunch period. Where two (2) shifts are employed, eight (8) hours shall constitute a day's work for the first shift and eight (8) hours shall constitute a day's work for the second shift. When three (3) shifts are employed, eight (8) hours shall constitute a day's work for the first shift, seven and one-half (7-1/2)

hours work with eight (8) hours pay shall constitute the second shift, and seven (7) hours work with eight (8) hours pay shall constitute the third shift. For the purpose of overtime pay for multiple shift operations, a work day shall be determined by the starting time of the shift. In addition, the second shift will receive twenty-five cents ($.25) per hour, third shift fifty cents ($.50) per hour premium above the established rate of pay.

When warranted by a particular job's conditions, shift work may be instituted for less than five (5) consecutive days.

82. Where project owners establish specifications, requirements, or for safety reasons that limit the days or hours in which work may be performed, the Employer, after advance notice to the Union, may start the work week after 6:00 p.m. on Sunday at straight time rates. In applying this schedule, Sunday p.m. will be considered Monday, the following Friday will be considered Saturday (paid at time and one-half) and Saturday will be considered Sunday (paid at double time). All premium pay provisions will apply for the sixth and seventh days as to Saturday and Sunday, respectively.

83. When it is necessary for equipment to be operated, the Operating Engineer who regularly operates the particular piece of equipment shall be given first chance to perform the work. If an Apprentice/Helper (Oiler) is required, the Apprentice/Helper (Oiler) who is regularly assigned to the particular piece of equipment shall be given first choice to perform the Apprentice/Helper's (Oiler's) duties. In an emergency, any employee may be assigned to any equipment. It is understood that the Master Mechanic or Steward will be notified, when possible, of such emergency requirements.

84. Employees who are requested, referred and employed by Employers on the same day under hourly classifications in this Agreement shall be paid a minimum of eight (8) hours pay on the day they report to the job. Any overtime worked after the normal quitting time shall be paid at the proper overtime rate in addition to the eight (8) hours minimum first day pay guarantee. The furnishing of a truck by a Mechanic shall not be a condition of employment. If an Employer is requesting a Mechanic from the Union, the Employer may require the new Mechanic to furnish a truck. If a Mechanic is required to furnish a truck, compensation will be negotiated between the Mechanic and the Employer.

**85.** Equipment Operator employees shall be required to carry sufficient tools to make minor repairs and adjustments in order to meet manufacturers daily maintenance requirements on the equipment they operate. This excludes diagnostic and electronic equipment.

**86.** If compressors, generators, boilers, hydraulic pumps or power pacs or any other type of power equipment is mounted piggyback on crane-type equipment requiring a crew, two (2) Operating Engineers will be employed at the Class "A" rate or any escalated rate in effect and under the weekly guarantee. If the crane does not ordinarily require a crew, see Paragraph 78A, the employment of a second operator shall be at the discretion of the Employer. The jurisdiction of the Operating Engineers must be preserved, however, and if someone other than an Operating Engineer is used to operate the piggyback equipment, the contractor must immediately employ a second Operating Engineer at the Class "A" rate.

Where compressors up to 600 CFM or hydraulic pump, power pacs, etc. are operated and exclusively used to power attachments, such as hoe ram and other similar pieces of equipment, the equipment will be considered and manned as a piggyback operation. If a second person (Operating Engineer) is required, even though the equipment is located adjacent to the machine or crane and not mounted directly on the machine, the second person (Operating Engineer) operating the equipment is paid the Class A rate of pay for the day.

Where a second person is an apprentice, refer to the Registered Apprenticeship Wage Schedule on page 86.

If the crane does not require a crew, the auxiliary piece of equipment will be manned by an Operating Engineer and paid the appropriate rate of pay.

**87.** ZONES I, IA, II, and III - As listed in Exhibit A.

When a contractor has eight (8) or more major Operating Engineers (major Operating Engineers A, B and C classifications) employed in the District, he/she shall employ a Master Mechanic. In addition to the Master Mechanic required above, if a contractor has eight (8) or more Operating Engineers (major Operating Engineers A, B and C classifications) employed by him/her on any one job, he/she shall employ a Master Mechanic on that job. The Master Mechanic so employed shall be answerable to the Employer and must be a member of the International Union of

Operating Engineers, Local 18. The Master Mechanic duties will be assigned by the Employer. Job Master Mechanics so employed shall be paid at the rate specified herein or paid fifty cents ($.50) per hour above the highest rate of any Operating Engineer working under his/her direction, whichever of these rates is higher.

On jobs where maintenance operators are to be employed, the first one (1) employed shall be Class A; the second one, if required, may be a Mechanic Trainee. Any further hire of maintenance operators shall be one Class "A," then a Mechanic Trainee may be hired. This ratio of one Class "A" to Mechanic Trainee shall be continued in the hire of all maintenance operators as required by the project requirements. Mechanics in training, working under these provisions, will be compensated according to the schedule provided under the "Field Mechanics Trainee Schedule."

**88.** Operators of equipment serviced by a Master Mechanic on a job site shall not be counted in the number of Operators within the District to determine when a Master Mechanic will be required for the District.

**89.** Employees shall be paid once each week, with not more than five (5) days withheld on the designated payday on the job prior to their normal quitting time. Failure to comply with this provision will require the Employer to pay these employees involved the double time rate if required to wait on the job. If required to return the next day to receive their pay, they shall be paid a minimum of four (4) hours at the hourly rate applicable for that day. These same conditions will apply to employees who are terminated after completion of their job assignment. In the event of the discharge of an employee, he/she shall be paid immediately or his/her time will continue until he/she is paid off properly. If not paid off by normal quitting time, the aforementioned requirements will be applied if he/she is required to return the next day for his/her pay. Any employee discharged for just cause will receive their paycheck by the end of the next pay period.

**90.** Paychecks will show the following information:

(1) Total hours worked
(2) Overtime hours (premium hours)
(3) Gross pay
(4) All deductions listed
(5) All fringe contributions (to be shown as a total contribution)

SOFCO002333

**91.** Employees requiring relief, for sickness or other causes, must notify his/her immediate supervisor before leaving the job. Such relief shall be arranged through the Union District Office.

**92.** Employer agrees to carry Workers' Compensation or other equivalent liability insurance for the protection of all employees covered by this Agreement.

**93.** At the direction of the Employer's representative on the job, Operating Engineers shall be allowed proper time for necessary repairs and upkeep. During periods of major repairs there must be suitable shelter around equipment and heated from November through March.

**94.** On projects where at least eight (8) Operators are employed, the Employer, during the months of November 1 through April 30, will furnish a heated shelter where employees may change clothes.

**95.** Sanitary drinking water and toilet facilities will be available on the project in compliance with the provisions of the applicable state code.

**96.** The Employer agrees, upon the termination of any employee covered by this Agreement, to furnish such employee so released with a termination slip at the time of release, showing reason for said release. (Union will provide uniform numbered slips in duplicate; original for employee, duplicate for the Employer's file).

**97.** No supervisory employee shall perform productive work or operate equipment which would deny an Operating Engineer employee employment.

**98.** In the reduction of forces on any project, it is agreed that non-area residents will be the first to be laid off except for a limited number of key men as mutually agreed by the Union and the Employer at the Pre-Job Conference. Non-area residents are herein defined as those who have not resided in the State of Ohio or in counties contiguous thereto, nor in Boone, Campbell, Kenton and Pendleton counties in Kentucky, or in counties contiguous thereto, for a period of one (1) year.

**99.** When an Employer rents or leases equipment manned from an Employer in signed relations with this Union, the Engineer or Crew may be transferred to the payroll of the lessee, providing the referral office servicing the job or project shall be notified prior to such transfer and provided further that such employee's

employment by the lessee shall terminate upon the termination of the lease or rental of the equipment or any replacement thereof whichever is later.

**100.** When an Employer hires an Owner Operator with one (1) machine and the Owner Operator himself operates such single machine, the Owner Operator will be placed on the Employer's payroll. In the event that the above mentioned machine requires two (2) employees, such employees shall be placed on the Employer's payroll. However, when the Owner Operator has two (2) or more machines operating on the same job, he/she shall then be considered a sub-contractor and therefore come under the sub-contractors clause.

## ARTICLE IX

### TERM OF AGREEMENT

**101.** The Union will notify the Association which is signatory to this Agreement of the name and address of any contractor who becomes signatory to or bound by this Agreement during the term of this Agreement. The notice shall be given in writing within seven (7) days of the time any such contractor becomes signatory or bound hereto. The notice shall include a copy of the signature page of the contract or the assent card and, if not noted thereon, a statement of the date the contract or assent card was signed or the date the contractor became bound.

**102.** Within seven (7) days of the receipt of a notice from the Union of its intent to terminate or modify this Agreement, the Association will notify all such contractors of whom the Association has been notified by the Union. Each such contractor shall have thirty (30) days from the date the Association received the notice of intent to terminate or modify to advise the Union in writing of its intent to negotiate separately for a renewal agreement.

**103.** In the event any such contractor fails to advise the Union of its intent to negotiate separately within the time period set forth above, such contractor shall be deemed and presumed to agree to the terms and Agreement arrived at in negotiations between the Union and the Association and to be bound by the collective bargaining agreement resulting therefrom.

**104.** The provisions of this section shall operate for successive collective bargaining agreements until such time as the

SOFCO002334

Contractor or Union gives timely notice that said party desires to negotiate separately. Said notice shall be given within the time periods provided in the termination clause of this Agreement or any successive collective bargaining agreement.

**105.** The provisions of this Agreement shall continue in full force and effect through April 30, 2017 and thereafter from year-to-year, including new terms, conditions and compensation, until termination at the option of either party, in writing, 60 days prior to expiration of Agreement.

## ARTICLE X

### APPRENTICES

**106.** In order to maintain sufficient skilled mechanics for the industry and, in order to present proper learning opportunities for youth and, in order to effectuate the principles and desires of the negotiating parties created by the foregoing, the negotiators hereby fully subscribe to the Ohio Operating Engineers Apprenticeship Fund Agreement and Declaration of Trust dated 20 October 65 as if they had originally negotiated the same. The only limitation upon the program is the Affirmative Action Program here attached (Exhibit "B"), in addition to the proper rules, regulations, processes, and procedures enunciated by the Joint Apprenticeship and Training Committee established by the Trust of 20 October 65.

**107.** It is understood by the negotiating parties that a Registered Apprentice Engineer works under the direction of the Operating Engineer and the Joint Apprenticeship and Training Committee, and that the Operating Engineer shall see that he/she stays on the job, properly caring for his/her machine. The Employer shall give sufficient opportunity for the Registered Apprentice to operate under the supervision of the Operating Engineer when time and opportunity avails itself. The Area Coordinator of Apprentices shall be appraised periodically and by his request of performance to further the Registered Apprentices' learning situation. Registered Apprentices shall receive the scale enunciated by the Joint Apprenticeship and Training Committee in the time justified category that the Registered Apprentice has accomplished. For every three (3) Operating Engineer Journeymen employed by the company, there may be employed one (1) Registered Apprentice or Trainee Engineer through the referral when they are available. An apprentice, while employed as part of a crew per Article VIII paragraph 77, will not be subject to the apprenticeship ratios in this collective bargaining agreement.

## ARTICLE XI

### CONSTRUCTION INDUSTRY ADVANCEMENT PROGRAM

**108.** The Employer and the Union agree to and approve the establishment of a Construction Industry Advancement Program to promote the common good of the Construction Industry by providing financial support for activities which may include but not necessarily be restricted to: (a) promotion of safety; (b) market development; (c) protection of legitimate markets; (d) public relations; (e) personnel practices and labor relations; (f) education; (g) industry relations; (h) apprenticeship training; (i) participation in Funds and Plans provided for in collective bargaining agreement, such as Health and Welfare Plans; and (j) collection and distribution of information from and to all segments of the Construction Industry and related groups or authorities.

**109.** Each Employer bound by this Agreement shall pay twenty cents ($.20) per hour worked effective May 1, 2010 to the AGC of Ohio Construction Industry Advancement Fund. Such funds shall be transmitted along with the Health and Welfare payments to the Ohio Operating Engineers Health and Welfare Office located at 1180 Dublin Road, Columbus, Ohio 43215, no later than the fifteenth (15th) day of the month immediately following the calendar month.

A. Administrative Fee. In addition to the CIAP payment each Contractor bound by the Agreement who is not an AGC of Ohio member shall pay an administrative fee of fifteen cents ($0.15) per hour for each hour worked by employees of the Contractor who are working within the bargaining unit herein. Such payments shall be transmitted with the fringe payments provided herein or transmitted directly to the AGC of Ohio no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed.

B. The Union shall have no participation or control of any kind or degree whatsoever nor shall the Union be connected in any way whatsoever with the Construction Industry Advancement Fund.

SOFCO002335

C. The Employer will hold the Union harmless from any liabilities arising out of the terms of Paragraph 108 through and inclusive of Paragraph 109D.

**110.** AGC of Ohio shall be the exclusive Administrator of the State Fund. Payments to the program shall be in accordance with instructions on forms furnished by the Association.

**111.** The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the fifteenth (15th) day of each month covering amounts due for the preceding month. If an Employer shall fail to make their payment when the same shall be due and payable, he shall be subject to an additional charge of one and one half percent (1-1/2%) per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses and impairment of reserves. In addition to the additional charges referred to herein, an Employer who fails to make timely payments shall be liable for legal fees and court costs incurred by the Association in collecting late payments.

**112.** Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and Fund of the Construction Industry Advancement Program shall not be distributed among any Employers, or the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

**113.** There is specifically excluded from the purposes of the Construction Industry Advancement Program the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during periods of work stoppages or strikes.

## ARTICLE XII

### UNION ADMINISTRATIVE DUES AND DEDUCTIONS

**114A.** Upon notification by the Union that a uniform administrative dues deduction has been authorized by all employees of the Employer, the Employer shall deduct said uniform administrative dues. The Union shall be responsible for obtaining all individually signed authorizations.

**114B.** The employer will deduct ten cents ($0.10) for each hour that the employee receives wages under the terms of the Agreement on the basis of individually signed voluntary authorized deduction forms. It is agreed that these authorized deductions are for remittance to Local 18's Political Education Patterns known as P.E.P., and are not a condition of membership in the International Union of Operating Engineers, Local 18 or of employment with the Employer, and that P.E.P. will use such monies in making political contributions in connection with federal, state and local elections. Payments for P.E.P. reflecting employee hours worked shall be made on the monthly fringe benefit reporting forms and shall be remitted at the same time and in the same manner as the Employer submits the fringe benefit payments under Article V of this Agreement.

The costs of administering this payroll deduction for P.E.P. are incorporated into the economic package provided under the terms of this Agreement so that the I.U.O.E. has, through its negotiation and its execution of this Agreement, reimbursed the Employer for the costs of such administration.

**115.** Credit Union savings will be agreed to only if deductions are the same for all employees and the Union is responsible for obtaining the voluntary authorization.

**116.** The Union agrees to indemnify and save the Employer harmless against any and all claims, suits or other forms of liability arising out of said deductions.

## ARTICLE XIII

### ENFORCEMENT MEASURES

**117.** It is agreed that all subcontractors shall be subject to the terms and provisions of this Agreement as it relates to the Operating Engineers.

**118.** The Union shall require that no Union person shall leave a job by quitting unless he/she has been properly relieved after giving ample notice of his/her intention to quit to the Employer.

**119.** The Union shall not transfer a Union person from one Employer to another without the consent of the Employer and the Union person involved. Neither shall the Employer transfer a Union person from his/her employ to another Employer's payroll without the consent of the Union person involved and the Union.

**120.** All employees of the Employer shall be allowed time to vote on Election Day as required by law on employees own time.

**121.** If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to the Employer.

**122.** There are areas within the scope of this Agreement for which the wages and conditions contained herein may not be appropriate due to competition or other reasons. In such cases, adjustments will be made in accordance with principles agreed to by the parties during negotiations.

**123.** No employee covered hereby may be discharged by an individual Employer for refusing to cross a legal primary picket line established by an International Union affiliated with the Building and Construction Trades Department of the AFL-CIO or a Local Union thereof or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Local Union thereof, which picket line has been authorized and sanctioned by proper authorities. No jurisdictional or illegal informational picket line shall be recognized.

## ARTICLE XIV

### NO STRIKE-NO LOCKOUT-ARBITRATION AND DISPUTES

**124.** The Employer shall not cause, permit or engage in any lockout of its employees during the term of this Agreement.

The Union shall not authorize, cause, engage in or sanction, nor will any employee take part in any illegal slowdown, work stoppage, strike, picketing or other concerted interference against the Employer, or occurring at or around the Employer's office or work locations during the term of this Agreement.

**125.** Should a dispute arise between any of the parties (Employee, Employer, Association and/or Union) to this Agreement as to its meaning, intent or the application of its terms, this dispute will be settled in accordance with the following grievance procedure:

**STEP 1:** The aggrieved employee shall first take up his/her grievance orally with the Employer's Supervisor or Representative. The employee may, if he/she so desires, have his/her

Steward appear with him/her. The grievance shall be orally brought to the Employer's attention within three (3) working days of the occurrence or discovery of the grievance, but in no event will the grievance be honored by management later than fifteen (15) days past the incident giving rise to the complaint. A grievance not submitted within the time limit shall be deemed untimely and is waived.

**STEP 2:** In the event the grievance is not settled, the employee then shall put his/her grievance in writing within three (3) working days after STEP 1 meeting, dated and signed along with the contract Article effected and submit the grievance to the District Business Representative and he/she and the Business Representative shall meet with the Employer's Representative and attempt to settle the matter. If no settlement can be reached within ten (10) working days from the date of the written grievance, then

**STEP 2a:** The grievance may be considered by a designated representative of the Union and the Labor Relations Director of the Associated General Contractors of Ohio, who shall have the authority to mutually agree upon a final and binding settlement of the grievance. If Step 2a. is not utilized, or if no settlement can be reached in Step 2a. within five (5) days from the date the grievance is referred, then:

**STEP 3:** The grievance may be referred to the State Joint Committee consisting of six (6) members, three (3) to be appointed by the Labor Relations Division of the AGC of Ohio and three (3) to be appointed by Local 18 of the International Union of Operating Engineers. Where the State Joint Committee, by majority vote (5 members or more), resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this agreement. In case of failure of either party to appear at the hearing of a grievance properly filed for hearing, the parties in attendance shall offer evidence in support of their position and the Committee shall dispose of the case on the basis of such evidence. If no settlement is reached at this STEP within fifteen (15) working days from the date the grievance is referred, then

**STEP 4:** The grievance shall then be referred to an Arbitrator selected by the Committee referred to in STEP 3. If the parties cannot agree on an Arbitrator within forty-eight (48) hours after the parties agree to submit the matter to arbitration, the parties shall jointly request the Federal Mediation and Concilia-

SOFCO002337

tion Service to furnish a list of Arbitrators from which the Arbitrator shall be selected by the alternate striking of names.

126. The expenses and fees of the Arbitrator shall be shared equally by the parties. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms and provisions of this Agreement. The Arbitrator's decision shall be final and binding upon the parties hereto.

## ARTICLE XV

### DETERMINATION OF JURISDICTIONAL DISPUTES

127. Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement creating the Impartial Jurisdictional Disputes Board. In particular, both parties agree to be bound by the provision of the Agreement which states: Any decision or interpretation of the Impartial Jurisdictional Disputes Board shall immediately be accepted and complied with by all parties signatory to this Agreement.

The parties hereto agree that in the event of a jurisdictional dispute with any other Union or Unions, the dispute shall be submitted to the Impartial Jurisdictional Disputes Board for settlement in accord with the Plan adopted by the Building Trades Department, AFL-CIO.

The parties hereto further agree that they will be bound by any decision or award of the Disputes Board. There shall be no stoppage of work or slowdown arising out of any such dispute. No jurisdictional work stoppages, and no jurisdictional picket lines shall be recognized.

This article of the contract will go into effect when the National A.G.C. reaffiliates with the Impartial Jurisdictional Disputes Board. This article will not be applicable until such time as the International Union of Operating Engineers reaffiliates with the Building and Construction Trades Department of the AFL-CIO.

## ARTICLE XVI

### I-9

128. The Union and the Employers during the term of this Agreement agree to use their best efforts to establish a master file of I-9 employment eligibility verification forms on all members. This file will be maintained at the Union office and be available for the Employers' use.

## ARTICLE XVII

### SAVINGS AND SEPARABILITY

129. It is mutually agreed that if any clause, terms or provisions of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other board or agency having jurisdiction in the matter, such clause, terms or provisions shall be or become inoperative of any effect without disturbing the other clauses, terms or provisions of this Agreement and the remaining part of this Agreement shall remain in full force and effect. In the event that any clause, terms or provisions of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other board or agency having jurisdiction in the matter, said clause, terms or provisions shall be re-negotiated to the mutual satisfaction of the parties, but during such re-negotiation work shall not be interrupted or stopped by lockout, strikes, boycotts or other labor troubles.

## ARTICLE XVIII

### EFFECTIVE

130. This Agreement shall be effective May 8, 2013 and shall remain in force and in accordance with the terms of Article IX hereof. Wage rates and fringe payments shall be effective as designated by this Agreement.

131. IN WITNESS WHEREOF, WE, the undersigned duly authorized Employer Representatives and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO) executed this Agreement on the 8th day of May, 2013.

**I.U.O.E. LOCAL 18 AND ITS BRANCHES**

S/PATRICK L. SINK
Business Manager

S/RICHARD E. DALTON
President

S/MARK A. TOTMAN
Vice President

S/GARY G. SIESEL
Recording-Corresponding Secretary

S/PREMO P. PANZARELLO
Financial Secretary

S/JOSEPH S. LUCAS
Treasurer

Trustees

S/TIMOTHY D. HAMMOCK
S/SCOTT R. STEVENSON
S/DONALD G. TAGGART

**AGC OF OHIO LABOR RELATIONS DIVISION**

S/RICHARD HOBBS
Executive Vice President

S/MIKE DYER
Goettle Construction Co.
Vice President, Operations

S/THOMAS G. MURASKI, P.E.
Kokosing Construction Company Inc.
Vice President

## EXHIBIT A, Zone 1

**WAGE RATES AND FRINGE CONTRIBUTIONS**

**ZONE I** covering Summit and Portage counties:

Classification: **MASTER MECHANIC**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $33.18* | $33.98* | $34.78* | $35.83* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

SOFCO002339

Classification: **GROUP A**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $32.93* | $33.73* | $34.53* | $35.58* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
All Concrete pumps with booms
Cranes (all types)***
Cranes – Compact; track or rubber over 4,000 pounds capacity
Cranes – Self-erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam, suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

| | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' - 180' | $33.43* | $34.23* | $35.03* | $36.08* |
| 180' - 249' | 33.93* | 34.73* | 35.53* | 36.58* |
| 250' and over | 34.18* | 34.98* | 35.78* | 36.83* |

*If additional funds are required for fringe benefits, they may be diverted from wages.

SOFCO0002340

Classification: **GROUP B**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $32.83* | $33.63* | $34.43* | $35.48* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saw, vermeer-type
Endloaders
Hydro Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: **GROUP C**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.79* | $32.59* | $33.39* | $34.44* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
** Voluntary

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate of pay will be "Class E")
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating Well Points or other types of Dewatering Systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

SOFCO002341

Classification: **GROUP D**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $30.57* | $31.37* | $32.17* | $33.22* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Backfillers & Tampers
Ballast Relocator
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps (without boom with 4" or smaller system)
Concrete Spreaders
Conveyors, used for handling materials
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers, except asphalt rollers
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot post roller or grader
VAC/ALLS
Vibratory compactors, with integral power
Welders

Classification: **GROUP E**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $25.28* | $26.08* | $26.88* | $27.93* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helper (Oiler)
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber (under 4,000 pounds)
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

SOFCO002342

## EXHIBIT A, Zone 1A

**ZONE 1A** covering Erie, Huron, Lorain, Medina

Certified Crane Operator Pay
Operating Engineers employed on any piece of equipment requiring a Certified Crane Operator (CCO) certification shall be paid a premium of fifty cents ($0.50) per hour in addition to the crane rate or any escalated rate that may be in effect.

Day Pay
In all counties covered by ZONE 1A of this Agreement, the following classifications shall be employed on a DAY PAY basis:

Asphalt Pavers
Backfillers and Tampers
Backfillers
Bar and Joint Installing Machines
Batch Plant Operators
Boom Trucks
Bulldozers
Bull Floats
Burlap and Curing Machines
CMI-type Equipment
Cableways
Concrete Pumps
Concrete Spreaders
Crushers
Drum Firemen in Asphalt Plants
Elevating Graders or Euclid Loaders
End Loaders
Finishing Machines
Floating Equipment (anything on Great Lakes or its tributaries is under the River & Lake Agreement)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (Sonic Pile Driving)

Grinders (all)
Hoes (when attached to farm or industrial-type tractors or CAT 320 backhoes or equivalent and below)
Horizontal Directional Drill Operator and Horizontal Directional Drill Locator
Hydro Excavator (all types C rate) (F rate if a second person is needed) Helper rate
Inboard, Outboard Motor Boat Launches
Laser Screeds and like equipment
Lead Greasemen
Locomotives (all)
Mobile Concrete Pumps, with Boom
Mucking Machines
Pavement Breakers, Hydro, or Cable
Planers (all types)
Plant Mixers (on site)
Portable Hydraulic Gantry (lift system C Rate) (F Rate if a second person is needed)
Power Graders
Power Scoops
Pump Operators, installing or operating well-points or other types of dewatering systems
Push Cats
Road Widening Trenchers
Rollers (all types)
Rotomills
Rough Terrain Forklifts (with winch/hoist)
Saw, concrete vermeer–type
Self-propelled Power Spreaders
Self-propelled Power Sub-graders
Slip Form Pavers
Straddle Carriers
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Vibratory Compactors, with integral power

SOFCO002343

## EXHIBIT A, Zone 1A
### WAGE RATES AND FRINGE CONTRIBUTIONS

**MASTER MECHANIC/EQUIPMENT FOREMAN**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $35.28* | $36.21* | $37.01* | $38.06* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

**GROUP A**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $34.78* | $35.71* | $36.51* | $37.56* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

A-Frames
Boiler Operators, Compressor Operators,
  Hydraulic Pumps & Power Pacs when
  mounted on a crane or regardless of where
  said equipment is mounted (piggy-back
  operation)
Boom Trucks (all types)
Cableways
Cherry Pickers

Combination Concrete Mixers & Towers
Concrete Pumps
Cranes (all types)***
Cranes – compact; track or rubber over 4000
  lbs. capacity
Cranes – self erecting; stationary, track, or truck
  (all configurations)
Derricks (all types)

*(Continued on next page)*

SOFCO002344

Draglines
Dredges (dipper, clam, or suction), 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (two or more drums)
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic or Welder)
Mixers, Paving (multiple drum)
Mobile Concrete Pumps with Booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Robotics Equipment Operator/Mechanic
Rotary Drills, (all), used on caisson work, wells (all types), Geothermal work, and substructure work
Rough Terrain Forklifts with Winch/Hoist (when used as a crane)
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

| | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| Over 200' | $35.53* | $36.46* | $37.26* | $38.31* |
| Over 300' | 35.78* | 36.71* | 37.51* | 38.56* |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.

**GROUP B**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $34.63* | $35.56* | $36.36* | $37.41* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

Asphalt Pavers
Bulldozers
CMI-Type Equipment
Endloaders
Horizontal Directional Drill Locator
Horizontal Directional Drill Operator
Instrument Man
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills
Saw (concrete vermeer–type)

SOFCO002345

**GROUP C**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $33.18* | $34.11* | $34.91* | $35.96* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

Air Compressors, pressurizing shafts, or tunnels
Asphalt Rollers (all)
Forklifts
Hoists, one drum
House Elevators (except automatic call button controlled)
Hydro Excavator (all types C rate) (F rate if a second person is needed) Helper rate
Laser Screeds and like equipment
Man Lifts
Modular Moving and Placement machine (C rate) (F rate if a second person is needed)
Mud Jacks
Portable Hydraulic Gantry (lift system C Rate) (F Rate if a second person is needed)
Power Boilers (over 15 lbs. pressure)
Pump Operators, installing or operating well points or other type of dewatering system
Pressure Groutings
Trenchers (24" and under)
Utility Operators

**GROUP D**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $32.40* | $33.33* | $34.13* | $35.18* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

Compressors, on building construction
Conveyors, building material
Generators
Gunite Machines
Mixers, capacity more than one bag
Mixers, one bag capacity (side loader)
Post Drivers
Post Hole Diggers
Pavement Breakers, hydraulic or cable
Road Widening Trenchers
Rollers
Welder Operators

SOFCO002346

GROUP E

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $32.08* | $33.01* | $33.81* | $34.86* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

Backfillers and Tampers
Batch Plants
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Cleaning Machine Operator (decontamination included)
Clefplanes
Concrete Spreading Machines
Crushers
Deckhands
Drum Firemen (asphalt)
Farm-type Tractor, pulling attachments
Finishing Machines
Forklifts (masonry work only)
Form Trenchers
High Pressure Pumps (over ½" discharge)
Hydro Seeders
Pumps (4" and over discharge), provided it is not part of a dewatering system discharged into a common header
Self-Propelled Power Spreaders
Self-Propelled Sub-Graders
Submersible Pumps (4" and over discharge), provided it is not part of a dewatering system discharged into a common header
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Vibratory Compactors, with integral power

GROUP F

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $25.00* | $25.93* | $26.73* | $27.78* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

SOFCO002347

Operators of:

Apprentice/Helpers, Helpers, Oiler, Signalmen
Barrier Moving Machines (additional duty, paid same rate)
Bobcat-type and/or Skid Steer Loader
Bobcat–type and/or Skid Steer Loader with any and all attachment
Cranes – compact; track or rubber under 4000 lbs. capacity
Geodimeter
Grade Checker
Grinders (all)
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Planers (all types)
Power Boilers (less than 15 lbs. pressure)
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Rod Man
Rotomills
Saw (concrete vermeer-type)
Submersible Pumps (under 4" discharge)
Vac/Alls

## EXHIBIT A, Zone II

### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE II** covering Lucas and Wood counties.

Classification: **MASTER MECHANIC**

| | 5/6/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $32.44* | $33.24* | $34.04* | $35.09* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

SOFCO0002348

Classification: **GROUP A**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $32.19* | $32.99* | $33.79* | $34.84* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***
Cranes – Compact; track or rubber over 4000 pounds capacity
Cranes – Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)

Gradalls
Helicopter Operators/winch, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders
Rail Tampers (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

| | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' - 180' | $32.69* | $33.49* | $34.29* | $35.34* |
| 180' - 249' | 33.19* | 33.99* | 34.79* | 35.84* |
| 250' and over | 33.44* | 34.24* | 35.04* | 36.09* |

*If additional funds are required for fringe benefits, they may be diverted from wages.

SOFCO002349

Classification: **GROUP B**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $32.07* | $32.87* | $33.67* | $34.72* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders
Hydro Milling Machines
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: **GROUP C**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.03* | $31.83* | $32.63* | $33.68* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms and with 5" system)
Fork Lifts (except masonry)
Highway Drills - all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate will be "Class E")
Man Lifts
Material hoist/elevators

*(Continued on next page)*

SOFCO002350

Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover)
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $29.85* | $30.65* | $31.45* | $32.50* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Ballast Relocators
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreaders
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder

SOFCO002351

Classification: **GROUP E**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $24.39* | $25.19* | $25.99* | $27.04* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helpers (Oilers)
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber under 4,000 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signal Person
Submersible Pumps (under 4" discharge)

## EXHIBIT A, Zone III

### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE III** covering Akron and counties, Columbus and counties, Franklin and counties, and Toledo and counties:

For AKRON and the following counties: Ashland, Belmont, Carroll, Coshocton, Guernsey, Harrison, Holmes, Jefferson, Monroe, Noble, Richland, Stark, Tuscarawas, Washington and Wayne.

For COLUMBUS and the following counties: Crawford, Delaware, Fairfield, Franklin, Hocking, Knox, Licking, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Union and Wyandot.

For FRANKLIN and the following counties: Adams, Athens, Auglaize, Brown, Butler, Champaign, Clark, Clermont, Clinton, Darke, Fayette, Gallia, Greene, Hamilton, Highland, Jackson, Lawrence, Logan, Madison, Meigs, Mercer, Miami, Montgomery, Morgan, Preble, Ross, Scioto, Shelby, Vinton and Warren. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

For TOLEDO and the following counties: Allen, Defiance, Fulton, Hancock, Hardin, Henry, Ottowa, Paulding, Putnam, Sandusky, Seneca, Van Wert and Williams.

SOFCO0002352

Classification: **MASTER MECHANIC**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.69* | $32.49* | $33.29* | $34.34* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Classification: **GROUP A**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.44* | $32.24* | $33.04* | $34.09* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***
Cranes – Compact; track or rubber over 4000 pounds capacity
Cranes – Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders
Rail Tampers (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure

*(Continued on next page)*

SOFCO0002353

Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

| | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' - 180' | $31.94* | $32.74* | $33.54* | $34.59* |
| 180' - 249' | 32.44* | 33.24* | 34.04* | 35.09* |
| 250' and over | 32.69* | 33.49* | 34.29* | 35.34* |

*If additional funds are required for fringe benefits, they may be diverted from wages.

Classification: **GROUP B**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.32* | $32.12* | $32.92* | $33.97* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders
Hydro Milling Machines
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: **GROUP C**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $30.28* | $31.08* | $31.88* | $32.93* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

SOFCO0002354

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps without booms and with 5" system
Fork Lifts (except masonry)
Highway Drills - all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate of pay will be "Class E")
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie (Inserter/Remover)
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $29.10* | $29.90* | $30.70* | $31.75* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Ballast Relocators
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreading Machines
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen in asphalt plants
Farm-type Tractors, pulling attachments

*(Continued on next page)*

SOFCO002355

Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder Operators

Classification: **GROUP E**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $23.64* | $24.44* | $25.24* | $26.29* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:
Allen Screed Pavers (concrete)
Apprentice/Helpers (Oilers) and Signalmen
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber under 4,000 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Submersible Pumps (under 4" discharge)

SOFCO0002356

## REGISTERED APPRENTICESHIP WAGE SCHEDULE

### ZONE I, ZONE 1A, ZONE II, ZONE III

| | |
|---|---|
| First Year Apprentice<br>50% of Class A | Third Year Apprentice<br>70% of Class A |
| Second Year Apprentice<br>60% of Class A | Fourth Year Apprentice<br>80% of Class A |

A new classification of Trainee is hereby established and the rates of pay are as follows:

| | |
|---|---|
| First Year Trainee<br>60% of Bulldozer Rate | Third Year Trainee<br>75% of Bulldozer Rate |
| Second Year Trainee<br>60% of Bulldozer Rate | Fourth Year Trainee<br>90% of Bulldozer Rate |

There will be a 10% increase for the apprentices on top of the percentages listed above provided they are operating mobile equipment.

The rates paid to the Apprentice or Trainee shall not exceed the classification rate the Apprentice or Trainee is working. For every five (5) Operating Engineer Journeymen employed, there may be employed one (1) Registered Apprentice Engineer or Trainee. Through the referral, Employers may employ Registered Apprentices or Trainees within this limitation when they are available. Any increase in the Apprenticeship contributions, agreed by the parties, will be shared equally by the Union and Employer.

## FIELD MECHANIC TRAINEE SCHEDULE

| | |
|---|---|
| First Year | 50% of Class "A" rate |
| Second Year | 60% of Class "A" rate |
| Third Year | 70% of Class "A" rate |
| Fourth Year | 80% of Class "A" rate |

Only those individuals who have obtained a two (2) year Associates Degree, from an accredited school, will be accepted into this program. If the Mechanic Trainee is required to have a CDL license, he/she will be paid a 10% incentive above the percentages listed above. After successful completion of the fourth year, the Mechanic will be paid at Class "A" rate.

## SPECIAL RATES

Any work under A, B and C as described in Article I of this Agreement awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## EXHIBIT B

### AFFIRMATIVE ACTION PROGRAM

1. Under the provisions of Executive Order 11246, issued by the President of the United States, and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations as revised, and relative court orders, a specific affirmative program must be developed to assure that the employment of workers and the treatment of employees during employment is completely nondiscriminatory in regard to race, creed, color, sex, age, religion or national origin.

2. The parties to this Agreement are mutually desirous of developing an affirmative action agreement to implement the provisions of applicable federal regulations in order to assure nondiscrimination in employment; upgrading; demotion or transfer; recruitment and recruitment advertising; lay-off or termination; rate of pay and selection for all types of training.

3. In order to assure nondiscrimination now and in the future and in an effort to attract a maximum number of potential apprentices from minority and female groups, the parties to this Agreement have formulated the following Affirmative Action Program:

### A. APPRENTICESHIP

The parties agree to establish a positive program of apprenticeship selection and to use the following program to attract minority and female groups to the Operating Engineers' Apprenticeship Program:

1. Develop a "fact sheet" for distribution to all secondary school counselors, youth opportunity centers, social action agencies and state employment offices.

2. Make available speakers to inform and advise high school students and others of opportunities in apprenticeship for Operating Engineers.

3. Notify all interested agencies and parties thirty (30) days prior to the period for taking applications; and making such interested agency or parties aware of the nature of all tests in order to facilitate a proper pre-test educational effort.

4. Provide application forms for apprenticeship and adequate instruction for properly preparing same, upon request, during recruitment periods at all training sites of the Operating Engineers Apprenticeship Program at certain union halls of Local 18. Develop an outreach program for the recruiting and pre-apprentice training of individuals from minority and female groups to enable them to enter the apprenticeship program.

5. To use a standardized, uniform battery of tests to determine applicant proficiency and aptitudes in reading, computation and mechanical skills suitable for the craft of Operating Engineer.

6. May have the test administered by an agency other than the Ohio Operating Engineers Apprenticeship Program and uniformly and numerically graded.

7. Interview sufficient applicants personally by teams consisting of one (1) representative of Management and one (1) of the Union who shall independently grade each applicant individually and then average the scores.

8. When an applicant fails to achieve acceptance, the Joint Apprenticeship and Training Committee shall make every effort to inform the applicant and the referring or cooperating agency of the area of insufficiency.

9. In order for the applicant, after acceptance as an Operating Engineer Apprentice, to become immediately employable by a Participating Employer, the Joint Apprenticeship and Training Committee shall provide training sites with equipment of the nature for which the apprentice will be employed, in order to acquaint the apprentice with safety measures as well as the operation and maintenance of the same and teach him/her the use of the machine as a tool of the trade and to generate good work habits. After the training, he/she shall be employed as an "apprentice-in-training" as such openings occur.

10. The parties to this Agreement agree to jointly assist a minority group employee to be integrated into the work force and the Union by:

A. Having management supervision on the job make every effort to assist and encourage minority group apprentices and to welcome such individuals to the job;

B. Have each apprentice and pre-apprentice trainee assigned to a Journeyperson Operating Engineer for help and assistance, and

C. Have Union officers inform the membership of the importance of making welcome all minority groups into the Union, and

D. The education, training requirements and disciplines of Registered apprentices shall be governed by the Joint Apprenticeship and Training Committee and its standards.

**B. JOURNEY PERSONS**

1. The parties will undertake a joint training program to assure equal opportunity to all journey persons who desire to acquire the skills required to work on a variety of equipment within the jurisdiction of the Operating Engineers.

2. Local Union officials will notify minority and female members of this program. They will offer to minority and female members an opportunity for training on any highway equipment. If the parties determine that a minority or female group member lacks adequate pre-training qualifications, the reasons for such determination shall be noted in writing and shall be available for inspection during a review of this program by appropriate federal contracting or administering agency officials. An attempt shall be made to have availability of training according to the demands for craftsmen to operate the specific type of equipment involved.

3. Each member of the Local will be advised of this Agreement and the appropriate avenues for redress if any of its terms are breached by either party.

The parties undertake this Affirmative Action Program in accordance with Executive Order 11246 and applicable court orders. It is their understanding that participation in the program

by any contractor shall be accepted in lieu of that portion of a required affirmative action plan which would otherwise be directed to jobs manned by members of the Operating Engineers Union.

The parties shall from the date of this Agreement, when required, report to the appropriate federal contracting or administering agency. The report will specifically indicate the total number of minority group individuals or females in the Union. In evaluating these reports, the appropriate federal contracting or administering agency officials will have complete access to relevant records of the parties and will be expected to discuss the progress of the program freely with the parties and Union members.

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City State Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature) Date

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

Union Representative (Signature)

**CONTRACTORS COPY** (ORIGINAL SIGNATURE)



AGC OF OHIO
BUILDING AGREEMENT
Effective
May 1, 2010 through April 30, 2013
Between
THE INTERNATIONAL UNION OF
OPERATING ENGINEERS
LOCAL 18 AND ITS BRANCHES, (AFL-CIO)
AND
LABOR RELATIONS DIVISION
OF THE
AGC OF OHIO
AGC
OF
OHIO

EXHIBIT
G
Employer
PENGAD 800-631-6989

**EMPLOYERS**

**LABOR RELATIONS DIVISION**
**AGC OF OHIO**

**1755 Northwest Boulevard**
**Columbus, Ohio 43212**
**(614) 486-6446**
**FAX: (614) 486-6498**
**www.agcohio.com**

**Richard Hobbs**
**Executive Vice President**

## INDEX

| | Paragraph |
|---|---|
| Affirmative Action Program | Exhibit B |
| Apprentice/Helper (Oiler), Boiler Operators, Signalmen Provisions | 77-80 |
| Apprentices | 106-107 |
| Arbitration | 125-126 |
| Bonding | 47 |
| Construction Advancement Program | 108-113 |
| Credit Union | 115 |
| Crews and General Provisions | 77-100 |
| Date Signed and Signatures | 131 |
| Dewatering | 13 |
| Direct Deposit | 63H |
| Discharges | 19 or 25 |
| Divert Wage Increase | 43 |
| Drug Testing | 30 |
| Duration of Agreement | 105 |
| Effective Date of Agreement | 130-131 |
| Employees' Relief | 91 |
| Enforcement Measures | 117-123 |
| Equipment Rental | 99 |
| Escalator Clause and Complementing | 69 |
| Field Mechanic Trainee Wage | Schedule A |
| Four Ten Work Schedule | 63 A-G |
| Fringe Benefit Programs | 41-47 |
| Grievance Procedure | 125-126 |
| Harassment Policy | 31 |
| Hazardous Waste Projects | 15,29 |
| Heaters-Pumps-Boilers-24 hour, 7 day | 68 |
| Holidays | 67 |
| Hourly First-Day Pay | 84 |
| Hourly Pay | 53 or 56 |
| I-9 | 128 |
| Incentive Pay Underground, Height and Length Booms | 70-76 |
| Jurisdiction-Work | 10-12 |
| Jurisdictional Area | 1-2 |
| Jurisdictional Disputes | 127 |
| Lay-Off | 25,55,60,89 |
| Liabilities | 5 |
| Management Rights | 7 |
| Master Mechanic, Zones 1, 2 & 3 | 87-88 |
| New Unclassified Equipment | 50 |

## INDEX (continued)

| | Paragraph |
|---|---|
| Nondiscrimination | 8-9 |
| Overtime | 62-64 |
| Owner-Operator | 100 |
| PAC / PEP | 114B |
| Pay Checks | 90 |
| Pay Day | 89 |
| Picket Lines | 123 |
| Piggyback Operation | 86 |
| Pre-Job Conference | 15-16 |
| Provisions and Limitations | 6 |
| Recognition | 4 |
| Referral Policy (Hiring Procedures) | 32-40 |
| Registered Apprentice Wage Schedule | Exhibit A |
| Repairs | 93 |
| Reporting Pay | 59 |
| Safety Program | 26-29 |
| Savings and Separability | 129 |
| Scope of Agreement | 3 |
| Shifts | 81 |
| Site Clearance | 63 |
| Starting Time | 62 |
| Steward | 24-25 |
| Strikes | 124 |
| Sub-Contractors | 117 |
| Supervisory Employees | 97 |
| Termination Slips | 96 |
| Trainee Wage Schedule | Exhibit A |
| Transfer of Union Employees | 119 |
| Transfers on Job Equipment | 21-22 |
| Union Administrative Dues and Deductions | 114-116 |
| Union Shop | 17-18 |
| Wage Rates | Exhibit A |
| Weekly Pay | 52 or 54-55 |
| Work Week | 61 |

| | Page |
|---|---|
| Term of Agreement | 50 |
| Exhibit A, Wage Rates and Fringe Benefits | 51-75 |
| Exhibit B, Affirmative Action Program | 75-78 |
| Acceptance of Agreement | 79-87 |

## DIRECTORY

OFFICERS

Local 18 and its Branches
Headquarters Office
3515 Prospect Avenue
Cleveland, Ohio 44115
216-432-3138
FAX: 216-432-0370
www.iuoelocal18.org

Patrick L. Sink
Business Manager

Richard E. Dalton
President

Steve D.DeLong
Vice President

Mark A. Totman
Recording-Corresponding Secretary

Premo P. Panzarello
Financial Secretary

Joseph S. Lucas
Treasurer

## DISTRICT NO. 1

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashtabula | Erie | Huron | Lorain |
| Cuyahoga | Geauga | Lake | Medina |

District Staff
Steve DeLong

Donald Taggart — Steven Mayor
David Russell — Ken McGlashan

3515 Prospect Avenue, Cleveland, Ohio 44115
Office: 216-432-3131
Fax: 216-432-3135

## DISTRICT NO. 2

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Allen | Hardin | Paulding | Van Wert |
| Defiance | Henry | Putnam | Williams |
| Fulton | Lucas | Sandusky | Wood |
| Hancock | Ottawa | Seneca | |

District Staff
Steve Heckler

Gary Siesel — Andrew Myers
Douglas Leidy — Joy Facey

2412 South Reynolds Road, Toledo, Ohio 43614
Office: 419-865-0221
Fax: 419-865-0601

## DISTRICT NO. 3

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Crawford | Hocking | Marion | Perry |
| Delaware | Knox | Morrow | Pickaway |
| Fairfield | Licking | Muskingum | Union |
| Franklin | Wyandot | | |

District Staff
Timothy Hammock
John Branstool
Chad Creeks
David Hurd
Mark Totman, Legislative Representative

1188 Dublin Road, Columbus, Ohio 43215
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 4

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Auglaize | Clinton | Logan | Montgomery |
| Butler | Darke | Madison | Preble |
| Champaign | Fayette | Mercer | Shelby |
| Clark | Greene | Miami | Warren |

District Staff
Stanley Brubaker
Joe Daniels
Kenneth Waughtal

6051 N. Dixie Drive, Dayton, Ohio 45414
Office: 937-890-5914
FAX: 937-890-5180

## DISTRICT NO. 5

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Adams | Gallia* | Lawrence* | Ross* |
| Athens* | Hamilton | Meigs* | Scioto* |
| Brown | Highland | Morgan* | Vinton* |
| Clermont | Jackson* | Pike* | |

Covering the following counties in Kentucky:

| | | | |
|---|---|---|---|
| Boone | Campbell | Kenton | Pendleton |

District Staff
Gary Marsh
Nathaniel Brice
Jefferson Powell

9730 Reading Road (Cincinnati) Evendale, Ohio 45215
Office: 513-733-5575
FAX: 513-733-4672

*Counties served through District No. 3, Columbus office
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 6

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashland | Harrison | Nobel | Summit |
| Belmont | Holmes | Portage | Tuscarawas |
| Carroll | Jefferson | Richland | Washington |
| Coshocton | Monroe | Stark | Wayne |
| Guernsey | | | |

District Staff
Joseph Lucas
Terry Phillips
William Larrick
Tom James

1707 Triplett Boulevard, Akron, Ohio 44306
Office: 330-784-5461
FAX: 330-784-8827

**LOCAL 18S**
**STATIONARY ENGINEERS**

Staff
Scott Peters
James Kumse
Thomas Ridenbaugh

3515 Prospect Avenue
Room 206
Cleveland, Ohio 44115
Office: 216-432-2668
FAX: 216-432-0796

# AGREEMENT

**Between**

**The AGC OF OHIO**
**Labor Relations Division**

**which may be referred to hereinafter as the "Association"**

**and**

**THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 18 AND ITS BRANCHES, (AFL-CIO) referred to hereinafter as the "Union"**

This Agreement is negotiated by and between the Association and the Union within the geographical area as defined herein through their authorized agents, to wit:

That, whereas, the parties desire to stabilize employment and promote efficiency in the Construction Industry, agree upon wage rates, hours and conditions of employment, and to eliminate strikes, boycotts, lockouts and stoppages of work, and

Whereas, the Union and the Employer shall, through the issuance of working rules and regulations to the workmen, inform them of the terms of this Agreement and enforce compliance with the terms thereof, and

Whereas, the Employers agree to recognize and subscribe to the approved referral system as adopted by the International Union of Operating Engineers, Local 18.

Now, therefore, the undersigned Association and the Union agree as follows:

# ARTICLE I

## GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Erie, Geauga, Huron, Lake, Medina, Lorain, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

## SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

# ARTICLE II

## RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**–The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**–This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement

the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

**6. Provisions and Limitations**–All members of the AGC of Ohio Labor Relations Division, and such other persons, firms or corporations who, as an Employer, become signatory to this Agreement, shall be bound by all of its terms and conditions, as well as any amendments which may be negotiated between the AGC of Ohio Labor Relations Division, and the Union. It is expressly understood that all Employers bound to the terms and conditions of this Agreement are required to pay the amounts as indicated in Article IV to the appropriate Fringe Benefit Programs.

**7. Management Rights**–The operation of the job and the direction of the working forces, including the right to hire, suspend and discharge for proper cause, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer.

**8. Nondiscrimination**–It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio and the Commonwealth of Kentucky and Lawful Orders thereof relative to nondiscrimination and fair employment practices. The Employer and the Union shall not knowingly discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or Apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

**9.** Further, the Employer and Union agree to adopt and embrace the Pact of 10 July 68 executed under provisions of the Executive Order 11246 and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations revised; an Affirmative Action Program to implement all provisions of applicable federal regulations to assure nondiscrimination in employment, upgrade, demotion or transfer, and recruitment advertising, layoff or termination, rates of pay and selection for all types of training as evidenced in Exhibit "B" attached hereto as if they had originally negotiated the same.

**10. Jurisdiction of Work**–In accordance with the terms of this Agreement, the Employer shall employ Operating Engineers for the erection, operation, assembly and disassembly, and maintenance and repair (fueling and greasing) of the following construction equipment regardless of motive power: Air Compressors, Batch Plants, Boilers, Cableways, Derricks, Finishing Machines, Pumps, Trucks, Crawlers, Locomotive and Tower Cranes; Concrete Mixers and Concrete Mixing Plants, Hoes, Shovels, Pile Drivers, Tractors, Scrapers, Endloaders, Hoists and all like equipment, including the use of Geodimeter or any other device that electronically measures (shoots) distance shall be the work of the Operating Engineers (only applies to in-house crew) within the jurisdiction as assigned to the Union by the American Federation of Labor. It is further understood that all equipment for which classifications and wages have been established in this Agreement, and including that equipment for which classifications and wage rates may hereafter be established, shall be manned, when operated on the job site, by a member of the International Union of Operating Engineers, and paid the rates as specified in this Agreement.

**11.** Operating Engineers shall be employed to do all pipe fitting and all burning and welding necessary for the preparation and maintaining of equipment operated by members of the Union.

**12.** Operating Engineers shall be assigned to all work performed in connection with the installation, fueling, starting and stopping, repair, maintenance and operation of the below listed small equipment: Compressors of 185 CFM or less (not discharging into a common header)

Heaters
Welding machines of 300 amp or less
Gas or diesel driven pumps 4" and under (or one 6" pump)
Generators of 15 KW or less
Conveyors 18" belt or less

A combination up to five (5) pieces of the above equipment shall, when in use, be serviced as an additional duty by an Operating Engineer who is employed by an Employer on a project. When six (6) pieces of the above equipment are in use on an Employer's project, a Utility Operator will be employed at the Class "C" rate. The Utility Operator shall also perform other work on the project.

In the event there are no Operating Engineers employed by the Employer on the project, the Employer shall employ an Operating Engineer at the Class "E" rate to service any small equipment in use, until the Class "C" rate becomes in effect.

An Operating Engineer shall be assigned to all work performed in connection with the installation, maintenance, repair and starting and stopping of electric submersible pumps. Necessary work on electric submersible pumps shall be assigned to an Operating Engineer working on the project as an additional duty; no full-time Operator is required.

Work in the servicing and maintaining of self-contained, mobile light plants shall be assigned to an Operating Engineer as an additional duty to his/her regular job. Such work shall normally be assigned to a Mechanic, Grease Crew or Apprentice/Helper (Oiler). Equipment operator employees shall be required to carry sufficient tools to make minor adjustments on the equipment they operate.

When an Apprentice/Helper (Oiler) is assigned as the primary operator to a fuel/grease combo vehicle which requires specialized CDL endorsement, he/she will receive a $3.00 per hour premium over the Class "E" rate.

**13. Dewatering Systems**--A "Dewatering System" is defined as a combination of one or more pumps of any type, size or motive power with combined discharge capacity of over 4", including but not limited to, well-point pumps, submersible well pumps, ejector or educator pumps in combination with wells, well-points, sumps, piping and/or other appurtenances irrespective of motive power to control water on any and all types of construction work. The complete installation, operation and necessary maintenance work, including all piping, shall be performed by Operating Engineers. A Dewatering System shall be operated by Pump Operators at all times the Dewatering System is in operation unless otherwise agreed at the Pre-Job Conference or with the Union.

**14.** The Union will at all times, when requested by the Employer, use its best efforts to furnish the Employer with competent employees to operate, maintain and repair equipment in accordance with the terms and conditions of this Agreement.

**15. Pre-Job**--It is agreed that upon the request of either party a Pre-Job Conference shall be held prior to commencing

work. In case of a necessary emergency start of the construction job, the Pre-Job Conference shall be held as soon as possible after the start of work. It is further agreed that upon the awarding of any building contract of $500,000.00 and over, the successful contractor will immediately notify the Union when it has been awarded the contract. It is further agreed the Union may request, receive and hold a Pre-Job Conference with the Employer on an individual basis.

Before the start of any project containing known hazardous waste materials, there will be a Pre-Job held. The Employer must notify the Union five (5) days prior to starting work on the project. Failure to do so, the Union has the right to withhold its services until such time a Pre-Job is held.

**16.** Following are the items which will be discussed at the Pre-Job Conference:

A. The Employer will advise the Union Representative of the Employer's requirements of necessary employees in the classification of work under this Agreement, and the Union will determine and advise the Employer of the ability of the Union to fulfill such requirements when requested.

B. Work schedules.

C. Questions of jurisdiction and assignment of work.

D. The Employer agrees that whenever possible at such Pre-Job Conference they will notify the Union of any subcontracts let by the Employer, the names of the subcontractors, and the nature of the work to be performed by the subcontractors. The Union may request a subcontractor to meet with the Union and the subcontractor will meet with the Union prior to commencing work on a project if the subcontractor did not attend the original Pre-Job Conference for the project. It is understood and agreed that no agreement may be made at the Pre-Job Conference which will in effect change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

**17.** Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Local Unions above stated on the effective date of this sub-section shall remain members of the Local Unions in good standing as a condition of employment.

**18.** All present employees who are not members of the Local Unions and all employees who are hired hereafter shall become and remain members in good standing of any one of said Locals as a condition of employment on and after the eighth (8th) day following the effective date of this sub-section or following the beginning of their employment, whichever is later.

**19.** The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory or who fails to observe the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of any employee under the terms of this Agreement. Any grievance arising through application of this clause shall be adjusted in accordance with the procedures outlined in Article XIV, Paragraphs 124, 125 and 126 of this Agreement. Intoxication and/or assault committed on the job site shall be cause for immediate discharge.

**20.** The Union shall place no limitation upon the amount of work which an employee shall perform during the working day and there shall be no restriction imposed against the use of any type of machinery, tools or labor-saving devices. The Employer agrees that the work jurisdiction of the Operating Engineers, as assigned by the AFL-CIO, will be respected and all Operating Engineer work will be performed by an Operating Engineer, and it is the intent of both parties that Operating Engineers will be assigned work on the basis that will make each job as productive and efficient as possible. It is agreed that a fair day's work shall be given for a fair day's pay.

**21.** The Employer may shift during a work day an Operating Engineer from one piece of hourly rate of pay equipment to another hourly rate of pay piece of equipment without limitation from same job site providing the shifting does not interfere with another Operating Engineer's work day. This condition also pertains to weekly-pay equipment. However, there shall not be any intermixing with weekly-pay equipment to hourly-pay equipment. The Operating Engineer will be paid the highest rate for the day.

The District agent in each district, in order to maintain our jurisdiction, will make jobs as efficient and productive as possible.

**22.** If an Employer violates Paragraph 21, the Employer's penalty shall be to pay the first qualified registered applicant the applicable wage and fringe benefits from the first day of violation.

**23.** The authorized representative of the Union shall have access to the job during working hours for the purpose of visiting individual members, adjusting grievances or disputes and such other duties as he may have to perform. The representative will report to the job supervisor before visiting the project.

### STEWARD

**24.** The Union may, when it believes it necessary, appoint a Steward whenever possible from Operating Engineers working on the Employer's job and the Union District Representative will, when making such an appointment, notify the Employer. The Steward shall perform full-time work for the Employer and he/she shall be subject to the same rules, rights and working conditions as other employees. Under no circumstances shall the Steward have any authority to call a strike, slowdown of work or perform any other action which would be in violation of this Agreement.

**25.** The Employer agrees that each new employee shall report to the job Steward before starting work if a Steward has been appointed for that particular Employer's job. The Steward shall be allowed sufficient time during working hours to perform all normal duties required of a Steward. No Steward shall have job priority but will be laid off in the same manner as any other Operating Engineer upon completion of his/her particular job assignment; twenty-four (24) hour notice to the Union prior to his/her lay off is required to give the Union time to select another qualified Steward to replace the laid-off Steward, but this twenty-four (24) hour notice is not required when a Steward is discharged for cause by the Employer.

### SAFETY

**26.** The Union and the Employer will cooperate in the establishment of a safety program. At the Pre-Job Conference by mutual agreement, the wearing of safety hats may be made a condition of employment. All safety equipment required by the project owner or manager will be at no cost to the employee, except work shoes of any type. Both the Employer and employees shall comply with the applicable state safety codes

SOFCO002267

and any other applicable government or civil regulations pertaining to safety. It is expressly understood that if the employees' immediate health and safety are involved, the Union through its representative may order discontinuation of operations until satisfactory results are obtained.

### TRAINING

**27.** The Safety Training Passport 16-hour program will be made available to all union members by the Union at no cost to the Employer. The program will consist of:

Safety Awareness as required by OSHA 29CFR 1926.21

Fall Protection as required by OSHA 29CFR 1926.503

Hazard Communication as required by OSHA 29CFR 1926.59

Operating Engineers dispatched to a project to perform trench excavation work will be required to have successfully completed eight (8) hours of trench safety training. This program became effective May 1, 2007.

It is agreed that both the Employer and the Union will encourage and assist in the promotion of this training.

Effective May 1, 2011 and thereafter, all Operating Engineers dispatched to and/or employed on a project are required to have successfully completed the 16-hour Safety Training Passport (STP) Program or an OSHA-approved 10-hour construction safety training program. Comparable safety training shall be renewed and updated every five (5) years or the Operating Engineer shall be considered unqualified. Verification of valid, updated training must be presented to the Employer upon dispatch, hire or request. Employers who provide such safety training shall not be required to pay employees to attend the training.

**28.** Within forty-eight (48) hours after an industrial accident occurs, the company shall have all necessary State Workers' Compensation forms available and completed on the Employer's part. A copy of the completed forms shall be sent to the Union's office in the district where the accident occurred.

**29.** All **toxic/hazardous** projects will be subject to any and all safety regulations and insurance provisions that may be

required by the appropriate governmental agencies. When dangerous atmospheres are present so that an Operator is required to don a special protective suit and/or self-contained breathing apparatus at a private, state, federal or other designated toxic/hazardous waste site, the Employer will notify the Union district office. Reasonable dress-up time and clean-up time will be allowed. The first qualified bargaining unit employee on the job will be designated the steward-safety person, who shall have access to company monitoring records and be kept informed of amounts of contaminants on the job site. A sheltered "safe zone" area shall be provided. There shall be wash-up facilities on all toxic/hazardous waste sites. When hazmat training credentials are required, the Operator will receive a $.50 per hour premium added to his/her base rate.

On such projects, it is expressly understood that if the employees' immediate health and safety are in danger, the employee may discontinue operations, without penalty, until satisfactory results are obtained, or until such time as a recognized safety agent shall declare the equipment or operation to be safe. All Operating Engineers employees shall be advised by the Employer prior to employment as to the nature of the known hazardous waste and possible resultant physical injuries as may be required by applicable law.

**30. DRUG TESTING:** The Employer and the Union are committed to a policy that promotes safety in the work place, employee health, and well being. In consideration of this policy, the Union and Employer agree that any employee found to be under the influence of, in possession of, or engaged in the distribution of drugs or alcohol on the job site shall be subject to disciplinary action, up to and including immediate discharge.

Within two (2) weeks of reporting to the job site, each new Operator may be scheduled for a drug test. Employees using a prescription drug which may impair mental or motor function shall inform their supervisor in writing of such drug use.

Employee involvement with drugs and alcohol can adversely affect job performance and employee morale. In the Construction Industry the consequences of drug or alcohol use or influence while on the job site can be disastrous. The Employer and Union, therefore, agree to the following policy to insure all employees of a safe and efficient job site free from the effects of drug and alcohol use or influence.

SOFCO002268

All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of illegal drug or alcohol use impairment while on the job site, may be required as a condition of continued employment to submit to a test for alcohol and/or illegal drug use which impairs the employee's ability to safely perform his/her duties on the job site. Such tests usually involve a sampling of the employee's blood, urine, or breath. Any employee who is asked to submit to such a test will be required to sign a consent form. If an employee who is asked to submit to a test refuses to do so, or refuses to sign the necessary consent form, that employee will be subject to disciplinary action up to and including discharge. Refusal to take a test or the submission of an adulterated sample shall be determined the same as a positive test result. The employee/member shall follow all requirements outlined in this section.

All testing will be done by a reliable, established laboratory. If this initial test screen result indicates positive findings, further testing of the same sample must be done to confirm the original findings before the laboratory can report a positive finding. The confirmation test will be conducted by an independent accredited National Institute of Drug Abuse or College of American Pathology Laboratory and/or currently qualified under the Substance Abuse & Mental Health Services Administration (SAMSHA) under the U.S. Dept. of Health & Human Services, and will utilize the more scientific Gas Chromatography/Mass Spectrometry examination (GC/MS). The results of all tests will be kept confidential between the employee, the Employer and the Union. The employee shall be paid his/her regular hourly wage and fringes for time required for drug testing provided results are negative.

If the GC/MS test results are positive, the employee may be granted a leave of absence for the purposes of drug and alcohol rehabilitation. If the employee is eligible such rehabilitation programs are covered under the Ohio Operating Engineers Health and Welfare Program providing the employee confines him/her self to a twenty-four (24) hour licensed rehabilitation medical facility.

Until the employee presents certification of successful completion of the rehabilitation program to the Local 18 Medical Review Officer (MRO), the employee shall be removed from the Employer's job site; shall be prohibited from registering under Article III of the referral of this contract and shall not be dispatched to work. Upon presentation of certification of the employee's successful completion of the drug/alcohol rehabilitation program to the Local 18 MRO, the employee may be restored to his/her original job with the Employer. If the employee is not restored to their original job, the employee will be allowed to register for work in the referral by registering a new work referral card. The employee shall, under either circumstance, for the next succeeding twelve (12) month period, present to the Local 18 MRO monthly certification of negative drug/alcohol test results. Failure to do so will result in denying the employee the right to maintain his/her referral card in the register and utilize the referral or if working, to be removed from work.

Any positive drug and/or alcohol test result after the second rehabilitation procedure shall result in the applicant being permanently barred from registering on the Local 18 referral.

**31. HARASSMENT POLICY:** The parties to this Agreement mutually agree that harassment of any nature is not to be tolerated. Every person working under this Agreement shall immediately notify the Employer when a possibility of a problem happens or exists.

## ARTICLE III

### REFERRAL SYSTEM

**32.** Local 18 and its Branches shall maintain registers of all applicants for referral. Applicants shall not be permitted to be registered in more than one office of the Union at any one time. All applicants will be registered in order of application, provided no person shall be deemed to be an applicant who is otherwise gainfully employed as an Operating Engineer or not immediately available for work. Registrations and re-registrations will be accepted during customary business hours. Applicants shall be classified in priority groups in accordance with the following criteria:

**GROUP A:** All applicants who have worked as Operating Engineers at least 360 days, 90 days or more per year during

the last four (4) years, and have been employed for at least 360 days, 90 days or more per year during the last four (4) years on work as defined in Article I of this Agreement within the geographical jurisdiction of Local 18, and who have lived in the State of Ohio, or in any county contiguous thereto, for at least one (1) year prior to application.

**GROUP A PREFERRED:** Must have Group A eligibility. Group A registrants may voluntarily register in the Group A Preferred, however, registrants in this Preferred A status shall have at least fifteen (15) years employment or availability for employment in any one or more of the classifications contained in this Agreement and in the type or kind of craft work covered by this Agreement in the geographic area as defined by this Agreement. Referral in this group is limited to the following described equipment and will be given priority of referral from the Group A Preferred deck. Preferred A status employees will not be eligible for letter of request by the Employer: Welding Machines, Elevator, Conveyor, Pumps, Compressors, Generators, One Drum Hoist, Mono-Rail Hoist and Portable Heaters.

It is further understood and agreed that when the Employer employs Operating Engineers not currently in their employ for any machines listed in this section, the Employer shall call the referral office servicing his/her job or project and request that an employee qualifying under the Preferred A status be dispatched to service and operate said machine. Any Operating Engineer currently employed by an Employer can be used to operate any of the above listed machines. Apprentices shall not operate this equipment more than fifteen (15) days.

Workmen registering in this Preferred A Group shall be ineligible to register in any other group and shall not work in any classification other than those specified in this section and only have recall rights for equipment specified in this section.

**GROUP A RETIREES:** Must have Group A eligibility. The pension was set up to enhance the lives of retirees in their golden years. Retiring from the trades is by voluntary choice.

A retiree is an equipment operator or mechanic who has applied for and is receiving a pension from any construction industry source.

Upon retirement the retiree can only register in this group. The Group A retirees will be referred to jobs only after the Group A classification and the Preferred A classification have been exhausted.

The Group A retirees will not be eligible for letter of request by the Employer.

**GROUP B:** Same as Group A, except that the employment shall have been at least 270 days, three (3) years of 90 days each. All fourth year Apprentices and Trainees shall be registered in this group.

**GROUP C:** All applicants who have worked as Operating Engineers at least ninety (90) days per year during each of the last two (2) years, and who have lived in the State of Ohio or any county contiguous thereto for at least one (1) year prior to application. All third year Apprentices and Trainees shall be registered in this group.

**GROUP D:** All applicants who have worked as Operating Engineers at least ninety (90) days during the twelve (12) months prior to application. All second year Apprentices and Trainees shall be registered in this group.

**GROUP E:** All other applicants and all first year Apprentices and Trainees shall be registered in this group.

**GROUP F:** All applicants who are "temporary employees".

All applicants who have attained eligibility in any of the foregoing groups shall not lose eligibility as a result of their failure to obtain the required days of employment during the applicable periods of time. All graduating Apprentices shall upon journeymen certification become eligible for Group A. When an applicant fails to register in his/her eligibility group due to reasons other than illness, as hereinafter defined, and does not notify the Union Hall, the resultant failure to obtain the required days of employment during the applicable periods of time shall cause the applicant to lose eligibility in that group.

Any registrant requesting that their work registration card be placed on hold due to sickness, ill health or physical condition, must present to the Union a doctor's certificate or statement certifying that the registrant will be under a doctor's care for a minimum of thirty (30) days, and that such illness or physical condition prevents the registered applicant from working as an Operating Engineer. A work registrant's card will only

be placed on hold for a minimum period of thirty (30) days, and a maximum period of one hundred twenty (120) days. No registration cards will be placed in the hold position for illness or physical condition for less than a thirty (30) day duration. Any refusals of dispatches due to illness or physical condition for a period of less than thirty (30) days shall be counted as a refusal under the terms and conditions of the referral procedure.

**33.** In referring applicants, the following procedure shall be followed:

A. Applicants in Group A shall first be referred, and then Group A Preferred, then Group A Retirees, then applicants in the succeeding groups, in order, through Group E. In each group, the Union shall refer applicants in order of their places on the referral list.

B. Registered Apprentices or Trainees shall be referred in order of their position on the referral list.

C. Employers shall have the right to reject any applicant referred for employment and shall immediately notify the Union in writing of such rejection. In the event a registrant is discharged by the Employer because of lack of sufficient ability, and he/she does not exercise his/her rights under the Referral Board of Review and Arbitration under Paragraph 37, the classification or equipment from which he/she is discharged shall be stricken from his/her referral record and he/she shall not be dispatched to a job in that classification or on that equipment until he/she has:

1. Taken training at his/her training site and has been certified, or

2. Has presented to his/her dispatch office a letter from a previous Employer, in signed agreement with Local 18 working within Local 18's jurisdiction, stating that in the Employer's opinion the discharged registrant has successfully completed a job assignment in that classification or on that piece of equipment in his employment.

D. When an applicant is actually employed, he/she shall notify the Union office at which he/she is registered within twenty-four (24) hours. Failure to do so is an imposition upon those registered and not employed and, therefore, such applicant will be barred from re-registering, unless and until he/she has made application to the Board of Review and Arbitration provided for in Paragraph 37 of this Agreement, and shows

good cause for his/her failure to give such notice.

E. When an applicant becomes employed, his/her name shall be removed from the register as soon as he/she shall have worked for a total of thirty-one (31) accumulative working days (one (1) day jobs shall not count). An Operator who relieves another Operator will not be charged for the first fifteen (15) days (only one (1) fifteen (15) day relief per registration application card). All days after that will be counted toward his/her time.

If an applicant is employed for less than thirty-one (31) accumulative working days, he/she shall be restored to his/her previous position on the register when such employment terminates. Any applicant who quits employment or fails to show up for work assignment at starting time after being dispatched (provided he/she was dispatched the previous day), for whatever reason, except accident verified by police report, shall be placed at the bottom of the applicable registration group regardless of the number of days worked and shall not be eligible for request until he/she puts in a new registration card. When reason for employment termination is questioned, applicant must present a written termination slip evidencing reasons other than a voluntary quit before he/she is restored to his/her previous position on the register.

An applicant for employment may not refuse referral to employment for any reason except that the applicant may inform the District Office in writing, before any referral, that he/she will not accept employment referrals in certain named counties within the District. If an applicant refuses a job referral for the second consecutive time, he/she shall lose his/her position on the register and go to the bottom of the list for his/her group[1]. If the dispatcher is unable to contact an applicant, the failure to contact shall not be deemed to be a refusal.

F. Applicants must notify the Union office in which they are registered by telephone, or letter, or telegram, or in person of their continued availability for employment within thirty (30) days after the date of last registration or re-registration in order to maintain their places on the register.

In order to equally distribute and defray the cost of services rendered by the use of this referral system, all individuals

[1]Does not apply to the former Ohio or Kentucky Building & Light Commercial Agreements Referral.

who make use of this referral system shall be required to pay an initial registration fee of $18.75* and another $18.75* for each re-registration thereafter, provided that such fee shall not exceed $18.75* in any consecutive thirty (30) day period and provided that such fee shall not apply to the following:

1. Members in good standing of Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their regular dues; and

2. Applicants for membership to Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their fees; and

3. Members in good standing of the International Union of Operating Engineers who are paying travel dues whose proportionate share of the cost of this referral system is met by the payment of their fees.

G. The Union shall use its best efforts to notify all registered applicants when work is available for them, but the Union assumes no responsibility or obligation for failure to locate an applicant.

H. All applicants must submit a written resume of their experience and qualifications at the time of original registrations, and may be tested on the equipment they operate at the nearest available training site prior to being assigned a position on the referral list.

I. Subject to this referral system Employers may hire through this Referral policy, by name, former employees who have resided for at least twenty-four (24) months in the State of Ohio or in any county contiguous thereto, and have been employed by the Employer making the request during the past twenty-four (24) months within the jurisdiction of this Agreement. The Employer must make the request to the appropriate Union District Office and the employee requested must be registered on the District referral list (Groups A through E).

Employers may hire through this referral policy by name individuals in Group A for a production machine, or for a mechanic, or mechanic/welder, who has been registered on the out-of-work list for at least ten (10) days in the District in which the work is to be performed. Individuals shall have only one (1) request per four (4) month period from the last request. The request by name must be confirmed later in writing on the letterhead of the Employer and signed by either the Employer or the superintendent of the project.

Nothing in the referral procedure shall interfere with the transfer of an Employer's employees on his payroll from one project to another project within the geographical area covered by Local 18. When transferring employees, the Employer will notify the Union District Office from which the employee is to be transferred.

The Union agrees the transfer will be processed in an expedient manner.

J. The purpose of the referral system is to provide nondiscriminatory employment opportunities. Individuals who register therein deserve a preference over those who do not. Therefore, it is agreed that in the event the referral list is exhausted and the Union is temporarily unable to furnish qualified applicants within twenty-four (24) hours after receiving the Employer's request (Saturdays, Sundays and holidays excepted), the Employer may temporarily employ others until the Union notifies the Employer that it has qualified registrants available for employment.

Applicants hired by the Employer under this procedure shall be known as "temporary employees", and will be subject to replacements. The Employer will notify the Union District Representative of the name, union affiliation (if any), date of employment and social security number of such temporary employee. The Union will maintain a register of all such "temporary employees" and such register shall be known as the temporary register. Such "temporary employees" may also be referred by the Union (when the referral list is exhausted) from Group F.

Such "temporary employee" shall be subject to replacement by a qualified registered applicant under the procedure listed herein:

1. The Union shall give a five (5) working day written notice to the Employer with whom the "temporary employee" is working and such "temporary employee" will thereupon be replaced at the end of the five (5) working day period provided the Union furnishes a qualified registered applicant.

*Effective July 1, 2011 $19.25; July 1, 2012 $19.75

2. The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the temporary register.

K. When an Employer states requirements for special skills or abilities in his/her request for employee applicants, the Union shall refer the first applicant on the register possessing such skills or abilities, regardless of the place or classification of such applicant on the register. If a contractor requests or requires that the operator be a Certified Operator, verification of the operator's certification is the responsibility of the Employer. If the Employer notifies the Union in writing, within thirty (30) days of the employee's discharge, of an Operator who had been in his employment and who had not performed satisfactorily, and the Employer does not wish this Operator to be referred to the Employer for future employment, the Union shall honor this written request.

L. Any employee who quits a contractor without proper notice and is subsequently hired by an Employer with whom Local 18 has a contractual relationship without a proper referral by Local 18 shall be discharged by the Employer when it is called to his attention.

**34.** Employers shall give first opportunity to persons registered for employment, as provided herein, by calling or notifying the Union at any of its offices in the territory where the work is to be performed.

**35.** Registration of applicants and selections of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, by-laws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership, policies, or requirements. It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio, the Commonwealth of Kentucky, and lawful orders thereof in nondiscrimination and fair employment practices.

The Employer and the Union shall not discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

The Union agrees to furnish an Employer, at his request, any statement or data required under any regulations referred to herein.

**36.** In addition to the above Registration Groups there shall be established a Short Term Job Group. The sole purpose of this Short Term Job Group is to enable registrants to acquire time to be eligible for unemployment benefits. Registration in this group is limited to applicants eligible for Group A of this referral and all fourth year Apprentices showing proof of need for additional time to qualify for unemployment benefits.

Applicants' referral out of the Short Term Job Group will be limited to jobs of two (2) days or less duration in a calendar week or eight (8) days or less duration in a calendar month on equipment listed on their registration cards. Any refusals of jobs will cause the registrant's card to be removed from the Short Term Job Group deck. Dispatches for short term jobs as defined above will first be made from the Short Term Job Group. If the dispatcher is unable to fill the short term job order from the Short Term Job Group he/she will proceed to fill the order from Groups A through F in accordance with the referral rules. Dispatcher should notify Employers when dispatching from the Short Term Job Group. The Employer reserves the right to request dispatch from Group A.

Since this Short Term Job Group is intended to provide limited employment for those needing credit for unemployment compensation, the Union shall, through its business agents, remove from employment any Operating Engineer who has accumulated more than two (2) days per calendar week or over eight (8) days in a calendar month – as a result of the Short Term Job Group.

Registrants in the Short Term Job Group will not be eligible for any recall or request provisions of the referral as herein described. Employment received as a result of the Short Term Job Group referral will not provide eligibility for Employer recall when the registrant is registered in Group A, Preferred A, or Group A Retirees deck. Apprentices or Trainees will not be permitted to register in the Short Term Job Group except as noted above. Registrants may not register in the Short Term Job Group or Group A or Preferred A or Group A Retirees deck at the same time. The Employer shall not be permitted to transfer employees dispatched from the Short Term Job Group from one project to another project.

The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the Short Term Job Group.

All the remaining rules with regard to the operation of the referral shall be applicable to the operation of the Group A, Preferred A and Group A Retirees except as modified above.

**37.** Any registrant or any Employer who may feel aggrieved by the operation of this referral system shall have the right to and must file his/her grievance, in writing, within ten (10) days after the occurrence of the event concerning which he/she complains with a Board of Review and Arbitration consisting of one (1) representative of the Union, one (1) representative of the Employer, and an impartial third member to be selected by agreement of the Union and the Employer, and the decision of this Board shall be final and binding on all parties.

**38.** This statement as to referrals shall be posted in all places where notices to Employers and applicants for employment are customarily posted, including all offices of the Union; all offices of the Employer.

**39.** A Labor Relations Division Representative of the AGC of Ohio may inspect the referral register at the Union District Office at any time during normal office hours.

**40.** All officers and business representatives of the Union who have had previous work experience in any one or more of the job classifications contained in this Agreement shall be deemed to be employed at the trade and it is the intent of this section to provide that upon return to the employment in the trade, he/she shall do so with the same preference as if he/she had continually worked at the trade and shall be eligible upon registration for Group A.

## ARTICLE IV

### FRINGE BENEFIT PROGRAMS

**41.** The fringe benefit provisions contained herein shall apply to all Employer members of the AGC of Ohio Labor Relations Division, and Employers who become signatory or bound by this Agreement, as well as any other Employer or Employer groups who become a party to an Agreement covering the fringe benefit programs set forth herein.

**42.** All Employers bound hereby agree to be bound by the

Agreement and Declarations of Trust, as amended, establishing the Pension Fund, Health and Welfare Plan and Apprenticeship Fund, copies of which all parties agree have been furnished to and read by all Employers bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declarations of Trust and any rules, regulations, or plans adopted by the Trustees pursuant thereto, shall become a part of this Agreement as though fully written herein. All Employers bound hereby irrevocably designate the Employer Trustees of said Funds and Plan and their successors as their representatives for the purpose set forth in said Agreements and Declarations of Trust.

**43.** Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

PENSION FUND: Effective May 1, 2010 is $5.00 per hour

HEALTH & WELFARE PLAN: Effective May 1, 2010 is $6.66 per hour

APPRENTICESHIP FUND: Effective May 1, 2010 is $.55 per hour

SAFETY TRAINING AND EDUCATIONAL TRUST FUND: Effective May 1, 1992 is $.04 per hour

The Union shall have the option of diverting all or any part of the increase scheduled for improvement of or payment of costs of any fund benefits provided under this Agreement; provided that the Union gives the Employer written notice of its election to do so by registered letter sent to the office of the AGC of Ohio at least 60 days before the effective date of the scheduled change specifying in said notice the amount of change to be applied for this purpose in the fund benefit for which the money is to be used.

**44.** It is further understood and agreed by and between the parties that duly authorized representatives of any of said Trust Funds or Plan shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all employees upon whom the Employer is obligated to make contributions and with respect

to the payment of monies to the AGC of Ohio's Construction Industry Advancement Program under paragraphs 109, et.seq. and with respect to the Administrative Dues deduction under paragraph 114. Notwithstanding the foregoing authority allowing audits with respect to the AGC of Ohio's Construction Industry Advancement Program and the Administrative Dues deduction, the audits shall only be conducted in conjunction with the Fringe Benefit Funds or Plans referred to herein and shall not be conducted independently. The twenty-four (24) hour notice referred to in paragraph 45(A) shall only be given for delinquencies to the employees Fringe Benefit Funds or Plan referred to therein.

**45.** Reports of employees who have worked the number of hours that they have been paid, and such other data and information as may be required, and all contributions payable to the Funds or Plan shall be transmitted to the offices of the Funds or Plan no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed. In the event said audit is refused, reports not furnished, or said contributions are not paid, as aforesaid, the following remedies, in whole or part, and in addition to all other remedies, either in law, in equity, by contract or authorized by the aforementioned Agreements and Declarations of Trust, shall be available.

A. After the Trustees or the Agent of any Funds or Plan have given the delinquent Employer twenty-four (24) hours written notice at the address shown in the records of the Funds, Plan or Union, the Union shall have the right to take such legal and lawful action as it may deem necessary until such delinquent payments are made or said audit is permitted, such action including but not limited to the right to withhold its services from such Employer for as long as the failure to make such contributions or audit continues, Article XIV notwithstanding.

B. In the event either the Union or the Trustees of any Funds or Plan may decide to utilize the grievance and arbitration procedure in this paragraph to collect delinquent contributions and liquidated damages to enforce any audit, or to obtain any report, the following procedure shall apply:

Unless the issue is resolved between the Employer and the party giving notice, within five (5) calendar days after deposit of written notice of delinquency and/or demand for

audit and/or report in the United States mail, to the Employer at the address shown in the records of the Funds, Plan or Union, such party may refer the matter to an arbitrator to be named by the AGC of Ohio Labor Relations Division and by Local 18 of the International Union of Operating Engineers whose decision in writing shall be final and binding on all parties. In the event such parties are unable to choose an arbitrator within ten (10) days after written request therefore, the Union or the Trustees of any Funds or Plan may request an arbitrator according to the rules and regulations of the American Arbitration Association whose decision in writing shall be final and binding on all parties. The parties to the arbitration shall each bear one-half (1/2) of the total costs.

**46.** In no event shall the foregoing provisions relating to Fringe Benefits be subject to or suitable for grievance and arbitration under Article XIV of this Agreement.

**47.** The Employer must obtain an Insurance Payment Bond (IPB), from a company that is "best" rated A, financial category 7 or better, payable to the Ohio Operating Engineers Fringe Benefit Program as a guarantee that the fringe benefits referred to herein are paid by the insurance carrier in the event that the Employer becomes delinquent in its payments and defaults thereon. In lieu of a surety bond, an Employer may substitute an equivalent cash bond, which will be escrowed to guarantee payment of fringes. If the Employer fails to provide the necessary bond within thirty (30) days of request by the Union, the Union shall withhold services until receipt of such bond, or the Employer makes fringe contributions on a weekly basis.

The Employer shall obtain said Insurance Payment Bond or cash bond in amounts set forth below:

| | | |
|---|---|---|
| 1-10 | Operating Engineers | $ 50,000.00 |
| 11-20 | Operating Engineers | 75,000.00 |
| 21-50 | Operating Engineers | 100,000.00 |
| Over 50 | Operating Engineers | 125,000.00 |

## ARTICLE V

### WAGE RATES

**48.** The purpose of this Agreement is to establish wage rates and conditions to apply for all work as defined herein and for operation of all equipment which comes within the jurisdic-

tion of the International Union of Operating Engineers, and as negotiated by and between Local 18 and its Branches of the International Union of Operating Engineers and the AGC of Ohio Labor Relations Division.

**49.** Exhibit "A" covering wage rates and classifications attached hereto is made a part of this Agreement.

**50.** It is agreed if equipment within the jurisdiction of the International Union of Operating Engineers is used by an Employer and if there is no appropriate classification listed under the wage schedules therein, then the Union and the Association negotiating committees will negotiate a new classification and rate of pay for such equipment within five (5) days.

**51.** The geographical jurisdiction of this Agreement will be zoned for wages only. Conditions of employment will be the same for all employees covered by this Agreement.

Zone I: Covering Portage and Summit counties only.

Zone II: Covering the counties of Lucas and Wood only.

Zone III: Covering the counties of Adams, Allen, Ashland, Athens, Auglaize, Belmont, Brown, Butler, Carroll, Champaign, Clark, Clermont, Clinton, Coshocton, Crawford, Darke, Defiance, Delaware, Fairfield, Fayette, Franklin, Fulton, Gallia, Greene, Guernsey, Hamilton, Hancock, Hardin, Harrison, Henry, Highland, Hocking, Holmes, Jackson, Jefferson, Knox, Lawrence, Licking, Logan, Madison, Marion, Mercer, Meigs, Miami, Montgomery, Monroe, Morgan, Morrow, Muskingum, Noble, Paulding, Perry, Pickaway, Pike, Preble, Putnam, Richland, Ross, Sandusky, Scioto, Seneca, Shelby, Tuscarawas, Union, Van Wert, Vinton, Warren, Washington, Wayne, Williams, and Wyandot. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

## ARTICLE VI

### WEEKLY PAY AND HOURLY PAY CLASSIFICATIONS AND REPORTING PAY PROVISIONS

**52.** In all counties covered by this Agreement, the following classifications shall be employed on a WEEKLY PAY basis:

Asphalt Plants
Boiler Operators, Apprentice/Helper (Oiler), Registered Apprentices and Signalmen, when members of crew
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Cherry Pickers
Cranes (all types)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Floating Equipment
Gradalls
Hoes (except when attached to farm or industrial type tractor or CAT 320 backhoes or equivalent and below)
Hoists, with two or more drums in use
Horizontal Directional Drill (over 500,000 ft. lbs. thrust)
Maintenance Engineers (Mechanic and/or Welder)
Master Mechanics
Panelboard Operators (all types on site)
Pile Drivers
Power Shovels
Rotary Drills (all), used on caissons for foundations and substructure work
Side Booms
Tug Boats

**53.** In all counties covered by ZONES I, II and III, the following classifications shall be employed on an HOURLY PAY basis (two (2), four (4), or eight (8) hours):

A-Frames
Air Compressors, pressurizing shaft or tunnels
Allen Screed Paver (concrete)
Apprentice/Helpers (Oilers), Helpers, Boiler Operators, when not members of a crew
Asphalt Pavers
Backfillers
Backfillers with Tampers
Ballast Re-Locator
Bar and Joint Installing Machines
Barrier Moving Machine
Batch Plant Operators
Bobcat Type and/or Skid Steer Loader
Boilers (15 lbs. pressure and over)
Boom Trucks (all types)
Bulldozers
Bull Floats

SOFCO002276

Burlap and Curing Machines
Cableways
Clefplanes
CMI-type equipment
Combination Concrete Mixers and Towers
Compressors, on building construction
Concrete Grinder/Planer
Concrete Mixers
Concrete Pumps
Concrete Saw, Vermeer type
Concrete Spreaders
Conveyors, used for handling building materials
Crushers
Deckhands
Directional Drill "Locator"
Drum Firemen in asphalt plants
Elevating Graders or Euclid Loaders
Endloaders
Farm-type Tractors, pulling attachments
Finishing Machines
Fork Lifts (all types)
Forklift (rough terrain with winch/hoist)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (sonic pile driving)
Gunite Machines
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes, when attached to farm or industrial type tractors
Hoists (building construction)
Horizontal Directional Drill (less than 500,000 ft. lbs. thrust)
House Elevators (except those automatic call button controlled)
Hydraulic Gantry (lift system)
Hydro-seeders
Inboard, Outboard Motor Boat Launches
Kolman-type Loaders (dirt loading)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Lead Greasemen
Light Plant Operators
Locomotives (all types)
Man Lifts

Mixers, one bag capacity with side loaders
Mixers, Paving (multiple drums)
Mobile Concrete Pumps, with booms (including oiler, etc.)
Mucking Machines
Mudjacks
Pavement Breakers (hydraulic or cable)
Pettibone - Rail Equipment
Plant Mixers (on site)
Post Drivers
Post Hole Diggers
Power Driven Heaters (oil fired)
Power Graders
Power Scoops
Power Sweepers
Power Scrubbers
Prentice Loader
Pressure Grouting
Pressure Pumps (over 1/2" discharge)
Pump Operators, installing or operating well-points or other types of dewatering systems
Pumps (4" and over discharge)
Pumps (under 4" discharge)
Rail Tamper (with automatic lifting and aligning device)
Switch & Tie Tampers (without lifting and aligning device)
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Utility Operators
VAC/ALLS
Vibratory Compactors, with integral power
Welders (except electric machines)

**54.** In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on a WEEKLY PAY basis reporting for work on Saturday, Sunday or holidays shall be paid as follows: Employees who have not started to work will receive two (2) hours at premium pay for reporting to work (only need to stay on job for one (1) hour). Employees who start to work will receive four (4) hours pay at premium rate; more than four (4) hours will receive eight (8) hours pay at the premium rate. For inclement weather only it will be 2-4-6-8 hours of pay at the premium rate of pay.

They must report to work at starting time and remain on the job until release.

**55.** When a machine having a forty (40) hour guarantee is laid up on a project site and the workmen are laid off and paid off, that machine cannot be started back to productive work on that project site unless it is laid up for one week (seven days) without calling back the workmen who had manned the machine and they shall be paid for the time they have been off, unless mutual agreement is reached between the Employer and the Union District Representative to permit employees to work on the weekly guarantee equipment during the seven (7) day "lay-up" period without penalty.

**56.** In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis, unless notified by the Employer not to report to work, shall receive two (2) hours' pay for reporting to work; if such operator does not start to work, he/she shall receive his/her two (2) hours' reporting time. An employee may be required to stay at the work project for one (1) hour to be eligible for two (2) hours reporting pay unless the Employer releases the employee prior to the end of the first hour. If the employee starts to work, he/she shall receive four (4) hours' pay; if the employee works over four (4) hours, he/she shall receive eight (8) hours' pay; for inclement weather only it will be 2-4-6-8 hours.

In all counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis reporting to work on Saturday, Sunday or holidays, all conditions in this paragraph will apply and both reporting time and time worked will be paid for at the rate provided in accordance with Article VII. They must report to work at starting time to be entitled to reporting pay. Where less than four (4) hours or less than eight (8) hours are worked, the employees must remain on the work for the full four (4) hours or the full eight (8) hours, as the case may be, to be entitled to pay for the four (4) or eight (8) hours, as stipulated in this Agreement.

A. When an employee working on equipment with a weekly-pay guarantee and work with his/her equipment is completed on a project, the employee is guaranteed only Monday through Wednesday pay if the equipment finishes the work on the project the first three days of the week. The Employer will notify the Union District Representative prior to application of this provision.

**57.** Crews will be eligible for straight time weekly pay when their equipment is transferred out of their District up to the day the equipment is shutdown, otherwise, Paragraph 56, Section A prevails.

**58.** On jobs where there is only one (1) day's work for a piece of equipment, employee or crew may be employed on a day-pay basis. Upon the Contractor's request to the Union Business Representative for a second day for special occasions, the Union gives the Representative authority to authorize a second day for the period of this contract.

**59.** All reporting pay time paid to an employee shall count as working hours with respect to any work guarantees or overtime pay provisions.

**60.** Employees who are working for an Employer in other than their local residence area thereby necessitating them to pay room and board shall, upon request, be granted their release if the Employer is unable to supply enough work to justify their staying. Employees released under this provision will be considered as laid-off because of lack-of-work.

## ARTICLE VII

### PROVISIONS FOR PREMIUM RATE OF PAY

**61.** The week shall begin on Monday A.M. and shall end on Sunday P.M.

**62.** The regular starting time must be established for not less than one (1) week. Any time worked prior to the established starting time will be paid for at the applicable premium rate unless otherwise arranged through Union notification.

**63.** The normal work day shall consist of eight (8) hours and the normal work week of forty (40) hours. One and one-half (1-1/2) times the regular rate shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, and including Saturday. When an Employer performs clearance and excavation for site preparation for industrial or building sites, the Employer will pay the wage rates listed herein, all overtime will be performed at one and one-half (1-1/2) times the regular rate. Subject to Paragraph 121, all other conditions and provisions shall be as provided herein.

A. An Employer may, however, have the option of working a four-ten hour schedule at straight time rates. No Operat-

SOFCO002278

ing Engineer with a weekly guarantee will lose a paid holiday he/she would otherwise receive by working a four-ten week. Instead, such employees will receive, in addition to wages and fringes for hours worked in a four-ten week, an additional eight (8) hours and fringes at straight time rates for the holiday. If the Employer elects, upon notification to work a four-ten hour schedule, he shall pay overtime in such cases on all hours over ten (10) hours per day or over forty (40) per week, whichever is greater. A four-ten work schedule must be by the week.

In addition to the above: It is agreed that when time is lost by the crew during the regular work week, Monday through Thursday, due to inclement weather, holiday, equipment breakdown or directions of the project owner, this time may be made up by the entire crew on Friday at the regular rate of wages. All Friday work must be scheduled on a minimum of eight (8) hours basis. All hours worked in excess of the forty (40) hours in the work week or ten (10) hours each day, shall be paid at the appropriate overtime rate of pay.

B. Any employee hired on any day of the week, Monday through Thursday, and who does not lose any time from the day of his/her initial hire until Thursday shall receive the overtime rate of wages for Friday, providing the crew is eligible for the premium rate for Friday.

C. Should any other trade on the project in the contractor's employ, working in conjunction with the Operating Engineers, receive premium pay on a Friday, the Operating Engineers would also receive premium pay for the Friday.

D. If the other basic crafts employed by your contractor on the project receive the overtime rate for the ninth (9th) and tenth (10th) hours, the Operating Engineers will also receive the overtime rate.

E. When an Employer works three (3) days or less in a week, premium time will be paid after eight (8) hours for each of the days, except for holidays, inclement weather or completion of the job.

F. Pay day will be on Thursday.

G. Weekly pay employees, in order to be eligible for eight hours' pay that day, must be available to perform work for the Employer.

H. If direct deposit is available, the member can participate voluntarily.

**64.** Double time will continue to be paid to any Operator who is complementing another trade that is receiving double time. All work performed by an employee on Sunday or holidays shall be paid at two times the regular rate established in this Agreement or any escalated rate that may be in effect.

**65.** No Weekly Pay employee covered by this Agreement shall lose time because of the observed holidays. If not requested to work, he/she shall be paid eight (8) hours straight time pay at the rate established in this Agreement or eight (8) hours at any escalated rate that may be in effect. Holidays shall be of twenty-four (24) hours duration. When required to work on holidays, the employee shall be paid two times the regular rate established in this Agreement or any escalated rate in effect.

**66.** There shall be no work required on Labor Day except in special cases of emergency.

**67.** The observed holidays are Christmas, New Year's Day, Labor Day, Memorial Day (last Monday in month of May), Independence Day and Thanksgiving Day. When any of the aforementioned holidays fall on Sunday, they will be observed on Monday. All weekly pay Employees covered by this Agreement to be eligible for holiday pay must be available for work the first regularly scheduled work day prior to the holiday and be available for work the first regularly scheduled work day after the holiday.

**68.** Where steam boilers, power driven heaters or pumps are used on a continuous seven (7) day twenty-four (24) hours per day operation, overtime may be avoided by using four (4) shifts of Operating Engineers, each shift to work six (6) hours on a seven (7) day basis. Each Operating Engineer so employed shall be paid forty (40) hours at the applicable straight time rate and two (2) hours at double the applicable straight time rate. The aforementioned condition, where overtime may be avoided, can only be used upon the Employer's guarantee of a minimum thirty (30) days of operation. In the event the Employer cannot furnish thirty (30) days of employment after starting work under Paragraph 68, it is agreed that upon lay-off of employees the Employer will pay retroactive overtime to such laid-off employees from the start of this particular operation in accordance with Article VII, Paragraphs 63 and 64 of this Agreement.

**69.** Job Master Mechanics and Operators of derricks, cranes, derrick cars on steel erection and on building construction and all winch trucks used in hoisting construction material and any type of hoist, shall command and receive the highest rate of pay and the same applicable premium pay and conditions of overtime where the rates or conditions for the Ironworkers, Boiler Makers, Pile Drivers and Pipefitters are higher than the rates specified in this Agreement for the foregoing classifications. To be eligible for the benefits of complementing the above mentioned trades, an Operator must be required to perform a specific operation which is directly related to the work which the other trades are performing.

**70.** Operating Engineers employed on any equipment within the jurisdiction of the International Union of Operating Engineers working in shafts, tunnels or storage caverns where natural earth or rock is undisturbed overhead, shall be paid fifty cents ($.50) per hour above the rates in this Agreement or in addition to any escalated rate that may be in effect. This does not apply to open cut work.

**71.** Booms, including jib 150 feet through 180 feet in length, fifty cents($.50) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

**72.** Booms, including jib over 180 feet through 249 feet in length, one dollar($1.00) per hour in addition to the established crane rate or any escalated rate that may be in effect.

**73.** Booms, including jib of 250 feet and over in length, one dollar twenty-five cents ($1.25) per hour in addition to the established crane rate or any escalated rate that may be in effect.

**74.** Conventional cranes whether crawler or truck when used as a tower crane, the effective length of the mast and the boom combined, will be used to determine when these extra rates will be applied.

**75.** Tower Cranes, the height of the boom point from the first floor level of the project, will be used to determine when these extra rates will apply.

**76.** On jobs where crane-type or derrick-type machines are operated on floors above the first floor level of the building, twenty-five cents ($.25) per hour shall be paid in addition to the established crane rate or any escalated rate that may be in effect.

## ARTICLE VIII

### CREWS AND GENERAL PROVISIONS

**77.** In all the counties within the jurisdiction of this Agreement, crews shall be employed on all truck cranes, power shovels, cranes, rotary drills on caisson work, cableways, draglines, tower derricks, tower cranes, multiple drum pavers, pile driving machines and hoes, standard gauge locomotives, bucket trench machines (over 24" wide) and horizontal directional drills (over 500,000 ft.lbs.thrust). Crews shall consist of an Operating Engineer and an Apprentice/Helper (Oiler) or Signalman on machines, regardless of motive of power, or an Operating Engineer and Fireman on steam machines.

**78A.** Apprentice/Helpers (Oilers) are required on hoes, excavators, and front hydraulic shovels having a base operating weight in excess of 105,000 pounds, single cab hydraulic cranes on rubber with a total weight of 125,000 pounds and Apprentice/Helpers (Oilers) shall be required on cable crawler cranes over 80 ton structural capacity, defined as: the factory specified total maximum counter weight with a PCSA rating not to exceed 36,400 pounds, based on 50' of boom at 40' radius, with the single line pull not exceeding 17,000 pounds. Anything outside any of the aforementioned limits determines the crane as requiring an Apprentice/Helper (Oiler). All factory certifications and the computer system will be available for inspection at any time by the Union or their designee. On remote control gradalls, Apprentice/Helpers (Oilers) shall be at the discretion of the Employer. Truck cranes, lattice boom, thirty (30) ton capacity and under; hydraulic truck cranes and all terrain cranes fifty (50) ton capacity or less, an Apprentice/Helper (Oiler) is not required. However, if someone other than an Operating Engineer is assigned to this work, this paragraph will be revoked on the project, and an Apprentice/Helper (Oiler) will be required for the remainder of the project. An Apprentice/Helper (Oiler) is required on self-erecting cranes (as defined by the manufacturer) while being erected and dismantled.

**78B.** Apprentice/Helper (Oiler) on jobs of thirty (30) days or more will be given a minimum of 30 minutes per day operating the machine they are assigned to (or a similar machine on the same project). If the Apprentice/Helper (Oiler) cannot be trained to operate the machine to the satisfaction of the Employer then he/she shall be replaced.

SOFCO002280

**79A.** Work of the Boiler Operator, Apprentice/Helper (Oiler), Registered Apprentice, and Signalman shall include getting up steam and greasing up, filling gas tanks and making the machine and equipment ready for operating at the starting time. If, at the discretion of the Employer, an Apprentice/Helper (Oiler), Registered Apprentice, or Signalman is required to make gas or diesel machines ready to operate before the regular starting time, such Apprentice/Helper (Oiler), Registered Apprentice, or Signalman shall be paid one-half (1/2) hour's pay at one and one-half (1-1/2) times the regular rate. If, at the discretion of the Employer, a Boiler Operator or Registered Apprentice is required to get up steam and grease steam machines and make them ready to operate before regular starting time, then such Boiler Operator or Registered Apprentice shall be paid one (1) hour's pay at one and one-half (1-1/2) times the regular rate.

**79B.** Apprentice/Helpers, (Oilers) while assigned to track hoes, cranes and other equipment, will perform the following work on the project as additional duty:

- Cover small equipment (i.e. pumps, generators, compressors, etc.)
- Act as signal person
- Safety/fire watch
- Practice operating in a learning environment in the vicinity
- Help with survey duties on project
- Help mechanic, lube trucks, fuel
- Practice operating rough terrain forklift, front loader, rubber tire hoe, loader in vicinity of primary duty
- Replace other operators who may be absent on project
- Run parts or materials as necessary
- Safety enforcement
- Productive activity on job site to facilitate job completion when it does not interfere with progress of primary machine, providing this does not interfere with another Operating Engineer's workday

**80.** Apprentice/Helper (Oiler), Registered Apprentices, Signalmen, Grease Truck Operators, when requested to work the regular one-half (1/2) hour lunch period, will eat their lunch prior to or after the regular one-half (1/2) hour lunch period in order to be able to oil, grease and repair machines during the regular one-half (1/2) hour lunch period at no extra pay.

**81.** More than one (1) shift may be worked in any twenty-four (24) hour period and the starting time of the shifts shall be left to the discretion of the Employer. This starting time must be maintained five (5) days, Monday through Friday. However, more than six (6) hours shall not be worked without allowing thirty (30) minutes for a lunch period. Where two (2) shifts are employed, eight (8) hours shall constitute a day's work for the first shift and eight (8) hours shall constitute a day's work for the second shift. When three (3) shifts are employed, eight (8) hours shall constitute a day's work for the first shift, seven and one-half (7-1/2) hours work with eight (8) hours pay shall constitute the second shift, and seven (7) hours work with eight (8) hours pay shall constitute the third shift. For the purpose of overtime pay for multiple shift operations, a work day shall be determined by the starting time of the shift. In addition, the second shift will receive twenty-five cents ($.25) per hour, third shift fifty cents ($.50) per hour premium above the established rate of pay.

When warranted by a particular job's conditions, shift work may be instituted for less than five (5) consecutive days.

**82.** Where project owners establish specifications, requirements, or for safety reasons that limit the days or hours in which work may be performed, the Employer, after advance notice to the Union, may start the work week after 6:00 p.m. on Sunday at straight time rates. In applying this schedule, Sunday p.m. will be considered Monday, the following Friday will be considered Saturday (paid at time and one-half) and Saturday will be considered Sunday (paid at double time). All premium pay provisions will apply for the sixth and seventh days as to Saturday and Sunday, respectively.

**83.** When it is necessary for equipment to be operated, the Operating Engineer who regularly operates the particular piece of equipment shall be given first chance to perform the work. If an Apprentice/Helper (Oiler) is required, the Apprentice/Helper (Oiler) who is regularly assigned to the particular piece of equipment shall be given first choice to perform the Apprentice/Helper's (Oiler's) duties. In an emergency, any employee may be assigned to any equipment. It is understood that the Master Mechanic or Steward will be notified, when possible, of such emergency requirements.

SOFCO002281

**84.** Employees who are requested, referred and employed by Employers on the same day under hourly classifications in this Agreement shall be paid a minimum of eight (8) hours pay on the day they report to the job. Any overtime worked after the normal quitting time shall be paid at the proper overtime rate in addition to the eight (8) hours minimum first day pay guarantee. The furnishing of a truck by a Mechanic shall not be a condition of employment. If an Employer is requesting a Mechanic from the Union, the Employer may require the new Mechanic to furnish a truck. If a Mechanic is required to furnish a truck, compensation will be negotiated between the Mechanic and the Employer.

**85.** Equipment Operator employees shall be required to carry sufficient tools to make minor repairs and adjustments in order to meet manufacturers daily maintenance requirements on the equipment they operate. This excludes diagnostic and electronic equipment.

**86.** If compressors, generators, boilers, hydraulic pumps or power pacs or any other type of power equipment is mounted piggyback on crane-type equipment requiring a crew, two (2) Operating Engineers will be employed at the Class "A" rate or any escalated rate in effect and under the weekly guarantee. If the crane does not ordinarily require a crew, see Paragraph 78A, the employment of a second operator shall be at the discretion of the Employer. The jurisdiction of the Operating Engineers must be preserved, however, and if someone other than an Operating Engineer is used to operate the piggyback equipment, the contractor must immediately employ a second Operating Engineer at the Class "A" rate.

Where compressors up to 600 CFM or hydraulic pump, power pacs, etc. are operated and exclusively used to power attachments, such as hoe ram and other similar pieces of equipment, the equipment will be considered and manned as a piggyback operation. If a second person (Operating Engineer) is required, even though the equipment is located adjacent to the machine or crane and not mounted directly on the machine, the second person (Operating Engineer) operating the equipment is paid the Class A rate of pay for the day.

Where a second person is an apprentice, refer to the Registered Apprenticeship Wage Schedule on page 74.

If the crane does not require a crew, the auxiliary piece of

equipment will be manned by an Operating Engineer and paid the appropriate rate of pay.

**87.** ZONES I, II, and III - Toledo and counties, Dayton and counties, Cincinnati and counties, Columbus and counties, Akron and counties, including Summit and Portage:

When a contractor has eight (8) or more major Operating Engineers (major Operating Engineers A, B and C classifications) employed in the District, he/she shall employ a Master Mechanic. In addition to the Master Mechanic required above, if a contractor has eight (8) or more Operating Engineers (major Operating Engineers A, B and C classifications) employed by him/her on any one job, he/she shall employ a Master Mechanic on that job. The Master Mechanic so employed shall be answerable to the Employer and must be a member of the International Union of Operating Engineers, Local 18. Job Master Mechanics so employed shall be paid at the rate specified herein or paid fifty cents ($.50) per hour above the highest rate of any Operating Engineer working under his/her direction, whichever of these rates is higher.

On jobs where maintenance operators are to be employed, the first one (1) employed shall be Class A; the second one, if required, may be a Mechanic Trainee. Any further hire of maintenance operators shall be one Class "A," then a Mechanic Trainee may be hired. This ratio of one Class "A" to Mechanic Trainee shall be continued in the hire of all maintenance operators as required by the project requirements. Mechanics in training, working under these provisions, will be compensated according to the schedule provided under the "Field Mechanics Trainee Schedule."

**88.** Operators of equipment serviced by a Master Mechanic on a job site shall not be counted in the number of Operators within the District to determine when a Master Mechanic will be required for the District.

**89.** Employees shall be paid once each week, with not more than five (5) days withheld on the designated payday on the job prior to their normal quitting time. Failure to comply with this provision will require the Employer to pay these employees involved the double time rate if required to wait on the job. If required to return the next day to receive their pay, they shall be paid a minimum of four (4) hours at the hourly rate applicable for that day. These same conditions will apply to employees

SOFCO002282

who are terminated after completion of their job assignment. In the event of the discharge of an employee, he/she shall be paid immediately or his/her time will continue until he/she is paid off properly. If not paid off by normal quitting time, the aforementioned requirements will be applied if he/she is required to return the next day for his/her pay. Any employee discharged for just cause will receive their paycheck by the end of the next pay period.

**90.** Paychecks will show the following information:

(1) Total hours worked
(2) Overtime hours (premium hours)
(3) Gross pay
(4) All deductions listed
(5) All fringe contributions (to be shown as a total contribution)

**91.** Employees requiring relief, for sickness or other causes, must notify his/her immediate supervisor before leaving the job. Such relief shall be arranged through the Union District Office.

**92.** Employer agrees to carry Workers' Compensation or other equivalent liability insurance for the protection of all employees covered by this Agreement.

**93.** At the direction of the Employer's representative on the job, Operating Engineers shall be allowed proper time for necessary repairs and upkeep. During periods of major repairs there must be suitable shelter around equipment and heated from November through March.

**94.** On projects where at least eight (8) Operators are employed, the Employer, during the months of November 1 through April 30, will furnish a heated shelter where employees may change clothes.

**95.** Sanitary drinking water and toilet facilities will be available on the project in compliance with the provisions of the applicable state code.

**96.** The Employer agrees, upon the termination of any employee covered by this Agreement, to furnish such employee so released with a termination slip at the time of release, showing reason for said release. (Union will provide uniform numbered slips in duplicate; original for employee, duplicate for the Employer's file).

**97.** No supervisory employee shall perform productive work or operate equipment which would deny an Operating Engineer employee employment.

**98.** In the reduction of forces on any project, it is agreed that non-area residents will be the first to be laid off except for a limited number of key men as mutually agreed by the Union and the Employer at the Pre-Job Conference. Non-area residents are herein defined as those who have not resided in the State of Ohio or in counties contiguous thereto, nor in Boone, Campbell, Kenton and Pendleton counties in Kentucky, or in counties contiguous thereto, for a period of one (1) year.

**99.** When an Employer rents or leases equipment manned from an Employer in signed relations with this Union, the Engineer or Crew may be transferred to the payroll of the lessee, providing the referral office servicing the job or project shall be notified prior to such transfer and provided further that such employee's employment by the lessee shall terminate upon the termination of the lease or rental of the equipment or any replacement thereof whichever is later.

**100.** When an Employer hires an Owner Operator with one (1) machine and the Owner Operator himself operates such single machine, the Owner Operator will be placed on the Employer's payroll. In the event that the above mentioned machine requires two (2) employees, such employees shall be placed on the Employer's payroll. However, when the Owner Operator has two (2) or more machines operating on the same job, he/she shall then be considered a sub-contractor and therefore come under the sub-contractors clause.

## ARTICLE IX

### TERM OF AGREEMENT

**101.** The Union will notify the Association which is signatory to this Agreement of the name and address of any contractor who becomes signatory to or bound by this Agreement during the term of this Agreement. The notice shall be given in writing within seven (7) days of the time any such contractor becomes signatory or bound hereto. The notice shall include a copy of the signature page of the contract or the assent card and, if not noted thereon, a statement of the date the contract or assent card was signed or the date the contractor became bound.

**102.** Within seven (7) days of the receipt of a notice from the Union of its intent to terminate or modify this Agreement, the Association will notify all such contractors of whom the Association has been notified by the Union. Each such contractor shall have thirty (30) days from the date the Association received the notice of intent to terminate or modify to advise the Union in writing of its intent to negotiate separately for a renewal agreement.

**103.** In the event any such contractor fails to advise the Union of its intent to negotiate separately within the time period set forth above, such contractor shall be deemed and presumed to agree to the terms and Agreement arrived at in negotiations between the Union and the Association and to be bound by the collective bargaining agreement resulting therefrom.

**104.** The provisions of this section shall operate for successive collective bargaining agreements until such time as the Contractor or Union gives timely notice that said party desires to negotiate separately. Said notice shall be given within the time periods provided in the termination clause of this Agreement or any successive collective bargaining agreement.

**105.** The provisions of this Agreement shall continue in force and effect through April 30, 2013 and thereafter from year-to-year until termination at the option of either party, after sixty (60) days notice in writing to the other party.

## ARTICLE X

### APPRENTICES

**106.** In order to maintain sufficient skilled mechanics for the industry and, in order to present proper learning opportunities for youth and, in order to effectuate the principles and desires of the negotiating parties created by the foregoing, the negotiators hereby fully subscribe to the Ohio Operating Engineers Apprenticeship Fund Agreement and Declaration of Trust dated 20 October 65 as if they had originalty negotiated the same. The only limitation upon the program is the Affirmative Action Program here attached (Exhibit "B"), in addition to the proper rules, regulations, processes, and procedures enunciated by the Joint Apprenticeship and Training Committee established by the Trust of 20 October 65.

**107.** It is understood by the negotiating parties that a Registered Apprentice Engineer works under the direction of the Operating Engineer and the Joint Apprenticeship and Training Committee, and that the Operating Engineer shall see that he/she stays on the job, properly caring for his/her machine. The Employer shall give sufficient opportunity for the Registered Apprentice to operate under the supervision of the Operating Engineer when time and opportunity avails itself. The Area Coordinator of Apprentices shall be appraised periodically and by his request of performance to further the Registered Apprentices' learning situation. Registered Apprentices shall receive the scale enunciated by the Joint Apprenticeship and Training Committee in the time justified category that the Registered Apprentice has accomplished. For every five (5) Operating Engineer Journeymen employed by the company, there may be employed one (1) Registered Apprentice or Trainee Engineer through the referral when they are available. An apprentice, while employed as part of a crew per Article VIII paragraph 77, will not be subject to the apprenticeship ratios in this collective bargaining agreement.

## ARTICLE XI

### CONSTRUCTION INDUSTRY ADVANCEMENT PROGRAM

**108.** The Employer and the Union agree to and approve the establishment of a Construction Industry Advancement Program to promote the common good of the Construction Industry by providing financial support for activities which may include but not necessarily be restricted to: (a) promotion of safety; (b) market development; (c) protection of legitimate markets; (d) public relations; (e) personnel practices and labor relations; (f) education; (g) industry relations; (h) apprenticeship training; (i) participation in Funds and Plans provided for in collective bargaining agreement, such as Health and Welfare Plans; and (j) collection and distribution of information from and to all segments of the Construction Industry and related groups or authorities.

**109.** Each Employer bound by this Agreement shall pay twenty cents ($.20) per hour worked effective May 1, 2010 to the AGC of Ohio Construction Industry Advancement Fund. Such funds shall be transmitted along with the Health and Welfare payments to the Ohio Operating Engineers Health and

Welfare Office located at 1180 Dublin Road, Columbus, Ohio 43215, no later than the fifteenth (15th) day of the month immediately following the calendar month.

A. Administrative Fee. In addition to the CIAP payment each Contractor bound by the Agreement who is not an AGC of Ohio member shall pay an administrative fee of ten cents ($0.10) per hour for each hour worked by employees of the Contractor who are working within the bargaining unit herein. Such payments shall be transmitted with the fringe payments provided herein or transmitted directly to the AGC of Ohio no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed.

B. The Union shall have no participation or control of any kind or degree whatsoever nor shall the Union be connected in any way whatsoever with the Construction Industry Advancement Fund.

C. The Employer will hold the Union harmless from any liabilities arising out of the terms of Paragraph 108 through and inclusive of Paragraph 109D.

**110.** AGC of Ohio shall be the exclusive Administrator of the State Fund. Payments to the program shall be in accordance with instructions on forms furnished by the Association.

**111.** The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the fifteenth (15th) day of each month covering amounts due for the preceding month. If an Employer shall fail to make their payment when the same shall be due and payable, he shall be subject to an additional charge of one and one half percent (1-1/2%) per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses and impairment of reserves. In addition to the additional charges referred to herein, an Employer who fails to make timely payments shall be liable for legal fees and court costs incurred by the Association in collecting late payments.

**112.** Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and Fund of the Construction Industry Advancement Program shall not be distributed among any Employers, or the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

**113.** There is specifically excluded from the purposes of the Construction Industry Advancement Program the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during periods of work stoppages or strikes.

## ARTICLE XII

### UNION ADMINISTRATIVE DUES AND DEDUCTIONS

**114A.** Upon notification by the Union that a uniform administrative dues deduction has been authorized by all employees of the Employer, the Employer shall deduct said uniform administrative dues. The Union shall be responsible for obtaining all individually signed authorizations.

**114B.** The employer will deduct five cents ($0.05) for each hour that the employee receives wages under the terms of the Agreement on the basis of individually signed voluntary authorized deduction forms. It is agreed that these authorized deductions are for remittance to Local 18's Political Education Patterns known as P.E.P., and are not a condition of membership in the International Union of Operating Engineers, Local 18 or of employment with the Employer, and that P.E.P. will use such monies in making political contributions in connection with federal, state and local elections. Payments for P.E.P. reflecting employee hours worked shall be made on the monthly fringe benefit reporting forms and shall be remitted at the same time and in the same manner as the Employer submits the fringe benefit payments under Article V of this Agreement.

The costs of administering this payroll deduction for P.E.P. are incorporated into the economic package provided under the terms of this Agreement so that the I.U.O.E. has, through its negotiation and its execution of this Agreement, reimbursed the Employer for the costs of such administration.

**115.** Credit Union savings will be agreed to only if deductions are the same for all employees and the Union is responsible for obtaining the voluntary authorization.

**116.** The Union agrees to indemnify and save the Employer harmless against any and all claims, suits or other forms of liability arising out of said deductions.

## ARTICLE XIII

### ENFORCEMENT MEASURES

**117.** It is agreed that all subcontractors shall be subject to the terms and provisions of this Agreement as it relates to the Operating Engineers.

**118.** The Union shall require that no Union person shall leave a job by quitting unless he/she has been properly relieved after giving ample notice of his/her intention to quit to the Employer.

**119.** The Union shall not transfer a Union person from one Employer to another without the consent of the Employer and the Union person involved. Neither shall the Employer transfer a Union person from his/her employ to another Employer's payroll without the consent of the Union person involved and the Union.

**120.** All employees of the Employer shall be allowed time to vote on Election Day as required by law on employees own time.

**121.** If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to the Employer.

**122.** There are areas within the scope of this Agreement for which the wages and conditions contained herein may not be appropriate due to competition or other reasons. In such cases, adjustments will be made in accordance with principles agreed to by the parties during negotiations.

**123.** No employee covered hereby may be discharged by an individual Employer for refusing to cross a legal primary picket line established by an International Union affiliated with the Building and Construction Trades Department of the AFL-CIO or a Local Union thereof or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Local Union thereof, which picket line has been

authorized and sanctioned by proper authorities. No jurisdictional or illegal informational picket line shall be recognized.

## ARTICLE XIV

### NO STRIKE-NO LOCKOUT-ARBITRATION AND DISPUTES

**124.** The Employer shall not cause, permit or engage in any lockout of its employees during the term of this Agreement.

The Union shall not authorize, cause, engage in or sanction, nor will any employee take part in any illegal slowdown, work stoppage, strike, picketing or other concerted interference against the Employer, or occurring at or around the Employer's office or work locations during the term of this Agreement.

**125.** Should a dispute arise between any of the parties, (Employee, Employer, Association and/or Union) to this Agreement as to its meaning, intent or the application of its terms, this dispute will be settled in accordance with the following grievance procedure:

**STEP 1:** The aggrieved employee shall first take up his/her grievance orally with the Employer's Supervisor or Representative. The employee may, if he/she so desires, have his/her Steward appear with him/her. The grievance shall be orally brought to the Employer's attention within three (3) working days of the occurrence or discovery of the grievance, but in no event will the grievance be honored by management later than fifteen (15) days past the incident giving rise to the complaint. A grievance not submitted within the time limit shall be deemed untimely and is waived.

**STEP 2:** In the event the grievance is not settled, the employee then shall put his/her grievance in writing within three (3) working days after STEP 1 meeting, dated and signed along with the contract Article effected and submit the grievance to the District Business Representative and he/she and the Business Representative shall meet with the Employer's Representative and attempt to settle the matter. If no settlement can be reached within ten (10) working days from the date of the written grievance, then

**STEP 2a:** The grievance may be considered by a designated representative of the Union and the Labor Relations Director of the Associated General Contractors of Ohio, who

SOFCO002286

shall have the authority to mutually agree upon a final and binding settlement of the grievance. If Step 2a. is not utilized, or if no settlement can be reached in Step 2a. within five (5) days from the date the grievance is referred, then:

**STEP 3:** The grievance may be referred to the State Joint Committee consisting of six (6) members, three (3) to be appointed by the Labor Relations Division of the AGC of Ohio and three (3) to be appointed by Local 18 of the International Union of Operating Engineers. Where the State Joint Committee, by majority vote (5 members or more), resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this agreement. In case of failure of either party to appear at the hearing of a grievance properly filed for hearing, the parties in attendance shall offer evidence in support of their position and the Committee shall dispose of the case on the basis of such evidence. If no settlement is reached at this STEP within fifteen (15) working days from the date the grievance is referred, then

**STEP 4:** The grievance shall then be referred to an Arbitrator selected by the Committee referred to in STEP 3. If the parties cannot agree on an Arbitrator within forty-eight (48) hours after the parties agree to submit the matter to arbitration, the parties shall jointly request the Federal Mediation and Conciliation Service to furnish a list of Arbitrators from which the Arbitrator shall be selected by the alternate striking of names.

**126.** The expenses and fees of the Arbitrator shall be shared equally by the parties. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms and provisions of this Agreement. The Arbitrator's decision shall be final and binding upon the parties hereto.

## ARTICLE XV

### DETERMINATION OF JURISDICTIONAL DISPUTES

**127.** Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement creating the Impartial Jurisdictional Disputes Board. In particular, both parties agree to be bound by the provision of the Agreement which states: Any decision or interpretation of the Impartial Jurisdictional Disputes Board shall immediately be accepted and complied with by all parties signatory to this Agreement.

The parties hereto agree that in the event of a jurisdictional dispute with any other Union or Unions, the dispute shall be submitted to the Impartial Jurisdictional Disputes Board for settlement in accord with the Plan adopted by the Building Trades Department, AFL-CIO.

The parties hereto further agree that they will be bound by any decision or award of the Disputes Board. There shall be no stoppage of work or slowdown arising out of any such dispute. No jurisdictional work stoppages, and no jurisdictional picket lines shall be recognized.

This article of the contract will go into effect when the National A.G.C. reaffiliates with the Impartial Jurisdictional Disputes Board.

## ARTICLE XVI

### I-9

**128.** The Union and the Employers during the term of this Agreement agree to use their best efforts to establish a master file of I-9 employment eligibility verification forms on all members. This file will be maintained at the Union office and be available for the Employers' use.

## ARTICLE XVII

### SAVINGS AND SEPARABILITY

**129.** It is mutually agreed that if any clause, terms or provisions of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other board or agency having jurisdiction in the matter, such clause, terms or provisions shall be or become inoperative of any effect without disturbing the other clauses, terms or provisions of this Agreement and the remaining part of this Agreement shall remain in full force and effect. In the event that any clause, terms or provisions of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other board or agency having jurisdiction in the matter, said clause, terms or provisions shall be re-negotiated to the mutual satisfaction of the parties, but during such re-negotiation work shall not be interrupted or stopped by lockout, strikes, boycotts or other labor troubles.

SOFCO002287

## ARTICLE XVIII

### EFFECTIVE

**130.** This Agreement shall be effective May 1, 2010 and shall remain in force and in accordance with the terms of Article IX hereof. Wage rates and fringe payments shall be effective as designated by this Agreement.

**131.** IN WITNESS WHEREOF, WE, the undersigned duly authorized Employer Representatives and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO) executed this Agreement on the 1st day of May, 2010.

**I.U.O.E. LOCAL 18 AND ITS BRANCHES**

S/PATRICK L. SINK
Business Manager

S/RICHARD E. DALTON
President

S/STEVE D. DELONG
Vice President

S/MARK A. TOTMAN
Recording-Corresponding Secretary

S/PREMO P. PANZARELLO
Financial Secretary

S/JOSEPH S. LUCAS
Treasurer

Trustees

S/TIMOTHY D. HAMMOCK
S/GARY G. SIESEL
S/SCOTT R. STEVENSON

**AGC OF OHIO LABOR RELATIONS DIVISION**

S/RICHARD HOBBS
Executive Vice President

S/BILL BRENNAN
President, Construction Contractors Council, Toledo (AGC)

S/MIKE DYER
Goettle Construction Co.
Vice President, Operations

## EXHIBIT "A"

### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE I** covering Summit and Portage counties:

Classification: **MASTER MECHANIC**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $31.23* | $31.73* | $32.78* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

SOFCO002288

Classification: **GROUP A**

|  | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
|  | $30.98* | $31.48* | $32.53* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers

All Concrete pumps with booms
Cranes (all types)***
Cranes – Compact; track or rubber over 4,000 pounds capacity
Cranes – Self-erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines

Dredges (dipper, clam, suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms

Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib 150'-180' add $0.50 to Zone I Group A rate
***Boom & Jib over 180' through 249' add $1.00 to Zone I Group A rate
***Boom & Jib 250' and over add $1.25 to Zone I Group A rate

SOFCO002289

Classification: **GROUP B**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $30.88* | $31.38* | $32.43* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saw, vermeer-type
Endloaders
Hydro-Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: **GROUP C**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $29.84* | $30.34* | $31.39* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
** Voluntary

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating Well Points or other types of Dewatering Systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $28.62* | $29.12* | $30.17* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Backfillers & Tampers
Ballast Relocator
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps (without boom with 4" or smaller system)
Concrete Spreaders
[illegible] handling materials
Rollers, except asphalt rollers
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen

Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Tractors, pulling sheepfoot post roller or grader
VAC/ALLS
Vibratory compactors, with integral power
Welders

Classification: **GROUP E**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $23.33* | $23.83* | $24.88* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helper (Oiler)
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber (under 4,000 pounds)
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches

Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

SOFCO002291

# EXHIBIT "A"
## WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE II** covering Lucas and Wood counties:

Classification: **MASTER MECHANIC**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $30.49* | $30.99* | $32.04* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Classification: **GROUP A**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $30.24* | $30.74* | $31.79* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***
Cranes – Compact; track or rubber over 4000 pounds capacity
Cranes – Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines

(Continued on next page)

SOFCO002292

Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib 150'-180' add $0.50 to Zone II Group A rate
***Boom & Jib over 180'-249' add $1.00 to Zone II Group A rate
***Boom & Jib 250' and over add $1.25 to Zone II Group A rate

Classification: **GROUP B**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $30.12* | $30.62* | $31.67* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saw Vermeer-type
Endloaders
Hydro Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push cats
Rotomills (all), grinders and planers of all types

SOFCO002293

Classification: **GROUP C**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $29.08* | $29.58* | $30.63* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $27.90* | $28.40* | $29.45* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Ballast Relocator
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" system or smaller
Concrete Spreaders
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers

*(Continued on next page)*

SOFCO002294

Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt rollers)
Self-propelled Power Spreaders
Self-propelled Sub-Graders
Shotcrete machines
Tire Repairmen
Tractors, pulling sheepfoot roller or grader
VAC/ALLS
Vibratory Compactors, with integral power
Welder

Classification: **GROUP E**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $22.44* | $22.94* | $23.99* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helper (Oiler)
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber over 4,000 pounds capacity
Directional Drill "Locator"
Fueling & greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

## EXHIBIT A
### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE III** covering Akron and counties, Cincinnati and counties, Columbus and counties, Dayton and counties, and Toledo and counties:

For AKRON and the following counties: Ashland, Belmont, Carroll, Coshocton, Guernsey, Harrison, Holmes, Jefferson, Monroe, Noble, Richland, Stark, Tuscarawas, Washington and Wayne.

For CINCINNATI and the following counties: Adams, Athens, Brown, Clermont, Gallia, Hamilton, Highland, Jackson, Lawrence, Meigs, Morgan, Ross, Scioto and Vinton. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

For COLUMBUS and the following counties: Crawford, Delaware, Fairfield, Franklin, Hocking, Knox, Licking, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Union and Wyandot.

For DAYTON and the following counties: Auglaize, Butler, Champaign, Clark, Clinton, Darke, Fayette, Greene, Logan, Madison, Mercer, Miami, Montgomery, Preble, Shelby and Warren.

For TOLEDO and the following counties: Allen, Defiance, Fulton, Hancock, Hardin, Henry, Ottowa, Paulding, Putnam, Sandusky, Seneca, Van Wert and Williams.

SOFCO002295

Classification: **MASTER MECHANIC**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $29.74* | $30.24* | $31.29* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Classification: **GROUP A**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $29.49* | $29.99* | $31.04* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***
Cranes – Compact; track or rubber over 4000 pounds capacity
Cranes – Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines

*(Continued on next page)*

SOFCO002296

Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders
Rail Tampers (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib 150'-180' add $0.50 to Zone III Group A rate
***Boom & Jib over 180' - 249' add $1.00 to Zone III Group A rate
***Boom & Jib 250' and over add $1.25 to Zone III Group A rate

Classification: **GROUP B**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $29.37* | $29.87* | $30.92* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders
Hydro Milling Machines
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

SOFCO002297

Classification: **GROUP C**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $28.33* | $28.83* | $29.88* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps without booms and with 5" system
Fork Lifts (except masonry)
Highway Drills - all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover)
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $27.15* | $27.65* | $28.70* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Ballast Relocators
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats

*(Continued on next page)*

SOFCO002298

Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreading Machines
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen in asphalt plants
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder Operators

Classification: **GROUP E**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $21.69* | $22.19* | $23.24* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Pavers (concrete)
Apprentice/Helpers (Oilers) and Signalmen
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber under 4,000 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Submersible Pumps (under 4" discharge)

SOFCO002299

## REGISTERED APPRENTICESHIP WAGE SCHEDULE

### ZONE I, ZONE II, ZONE III

First Year Apprentice
50% of Class A

Second Year Apprentice
60% of Class A

Third Year Apprentice
70% of Class A

Fourth Year Apprentice
80% of Class A

A new classification of Trainee is hereby established and the rates of pay are as follows:

First Year Trainee
60% of Bulldozer Rate

Second Year Trainee
60% of Bulldozer Rate

Third Year Trainee
75% of Bulldozer Rate

Fourth Year Trainee
90% of Bulldozer Rate

There will be a 10% increase for the apprentices on top of the percentages listed above provided they are operating mobile equipment.

The rates paid to the Apprentice or Trainee shall not exceed the classification rate the Apprentice or Trainee is working. For every five (5) Operating Engineer Journeymen employed, there may be employed one (1) Registered Apprentice Engineer or Trainee. Through the referral, Employers may employ Registered Apprentices or Trainees within this limitation when they are available. Any increase in the Apprenticeship contributions, agreed by the parties, will be shared equally by the Union and Employer.

## FIELD MECHANIC TRAINEE SCHEDULE

| | |
|---|---|
| First Year | 50% of Class "A" rate |
| Second Year | 60% of Class "A" rate |
| Third Year | 70% of Class "A" rate |
| Fourth Year | 80% of Class "A" rate |

Only those individuals who have obtained a two (2) year Associates Degree, from an accredited school, will be accepted into this program. If the Mechanic Trainee is required to have a CDL license, he/she will be paid a 10% incentive above the percentages listed above. After successful completion of the fourth year, the Mechanic will be paid at Class "A" rate.

## SPECIAL RATES

Any work under A, B and C as described in Article I of this Agreement awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## EXHIBIT "B"

### AFFIRMATIVE ACTION PROGRAM

1. Under the provisions of Executive Order 11246, issued by the President of the United States, and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations as revised, and relative court orders, a specific affirmative program must be developed to assure that the employment of workers and the treatment of employees during employment is completely nondiscriminatory in regard to race, creed, color, sex, age, religion or national origin.

2. The parties to this Agreement are mutually desirous of developing an affirmative action agreement to implement the provisions of applicable federal regulations in order to assure nondiscrimination in employment; upgrading; demotion or transfer; recruitment and recruitment advertising; lay-off or termination; rate of pay and selection for all types of training.

3. In order to assure nondiscrimination now and in the future and in an effort to attract a maximum number of potential apprentices from minority and female groups, the parties to this Agreement have formulated the following Affirmative Action Program:

#### A. APPRENTICESHIP

The parties agree to establish a positive program of apprenticeship selection and to use the following program to attract minority and female groups to the Operating Engineers' Apprenticeship Program:

1. Develop a "fact sheet" for distribution to all secondary school counselors, youth opportunity centers, social action agencies and state employment offices.

SOFCO002300

2. Make available speakers to inform and advise high school students and others of opportunities in apprenticeship for Operating Engineers.

3. Notify all interested agencies and parties thirty (30) days prior to the period for taking applications; and making such interested agency or parties aware of the nature of all tests in order to facilitate a proper pre-test educational effort.

4. Provide application forms for apprenticeship and adequate instruction for properly preparing same, upon request, during recruitment periods at all training sites of the Operating Engineers Apprenticeship Program at certain union halls of Local 18. Develop an outreach program for the recruiting and pre-apprentice training of individuals from minority and female groups to enable them to enter the apprenticeship program.

5. To use a standardized, uniform battery of tests to determine applicant proficiency and aptitudes in reading, computation and mechanical skills suitable for the craft of Operating Engineer.

6. May have the test administered by an agency other than the Ohio Operating Engineers Apprenticeship Program and uniformly and numerically graded.

7. Interview sufficient applicants personally by teams consisting of one (1) representative of Management and one (1) of the Union who shall independently grade each applicant individually and then average the scores.

8. When an applicant fails to achieve acceptance, the Joint Apprenticeship and Training Committee shall make every effort to inform the applicant and the referring or cooperating agency of the area of insufficiency.

9. In order for the applicant, after acceptance as an Operating Engineer Apprentice, to become immediately employable by a Participating Employer, the Joint Apprenticeship and Training Committee shall provide training sites with equipment of the nature for which the apprentice will be employed, in order to acquaint the apprentice with safety measures as well as the operation and maintenance of the same and teach him/her the use of the machine as a tool of the trade and to generate good work habits. After the training, he/she shall be employed as an "apprentice-in-training" as such openings occur.

10. The parties to this Agreement agree to jointly assist a minority group employee to be integrated into the work force and the Union by:

A. Having management supervision on the job make every effort to assist and encourage minority group apprentices and to welcome such individuals to the job;

B. Have each apprentice and pre-apprentice trainee assigned to a Journeyperson Operating Engineer for help and assistance, and

C. Have Union officers inform the membership of the importance of making welcome all minority groups into the Union, and

D. The education, training requirements and disciplines of Registered apprentices shall be governed by the Joint Apprenticeship and Training Committee and its standards.

**B. JOURNEY PERSONS**

1. The parties will undertake a joint training program to assure equal opportunity to all journey persons who desire to acquire the skills required to work on a variety of equipment within the jurisdiction of the Operating Engineers.

2. Local Union officials will notify minority and female members of this program. They will offer to minority and female members an opportunity for training on any highway equipment. If the parties determine that a minority or female group member lacks adequate pre-training qualifications, the reasons for such determination shall be noted in writing and shall be available for inspection during a review of this program by appropriate federal contracting or administering agency officials. An attempt shall be made to have availability of training according to the demands for craftsmen to operate the specific type of equipment involved.

3. Each member of the Local will be advised of this Agreement and the appropriate avenues for redress if any of its terms are breached by either party.

The parties undertake this Affirmative Action Program in accordance with Executive Order 11246 and applicable court orders. It is their understanding that participation in the program by any contractor shall be accepted in lieu of that portion

of a required affirmative action plan which would otherwise be directed to jobs manned by members of the Operating Engineers Union.

The parties shall from the date of this Agreement, when required, report to the appropriate federal contracting or administering agency. The report will specifically indicate the total number of minority group individuals or females in the Union. In evaluating these reports, the appropriate federal contracting or administering agency officials will have complete access to relevant records of the parties and will be expected to discuss the progress of the program freely with the parties and Union members.

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City State Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature) Date

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

Union Representative (Signature)

**CONTRACTORS COPY** (ORIGINAL SIGNATURE)

SOFCO002302

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City State Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature) (Date)

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES (AFL-CIO)

Union Representative (Signature)

**HEADQUARTERS COPY** (ORIGINAL SIGNATURE)

*For Headquarters Use Only* CODE ______________

SOFCO002303

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

________________________________________
Name of Employer (Printed)

________________________________________
Employer Address

________________________________________
City State Zip Code

________________________________________
Area Code & Telephone

________________________________________
Authorized Employer Representative (Signature) (Date)

________________________________________
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES (AFL-CIO)

________________________________________
Union Representative (Signature)

**UNION DISTRICT COPY** (ORIGINAL SIGNATURE)

*For Headquarters Use Only* CODE __________

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City State Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature) (Date)

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES (AFL-CIO)

Union Representative (Signature)

**FRINGE OFFICE COPY** (ORIGINAL SIGNATURE)

*For Headquarters Use Only* CODE ____________

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and Its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

____________________________________
Name of Employer (Printed)

____________________________________
Employer Address

____________________________________
City State Zip Code

____________________________________
Area Code & Telephone

____________________________________
Authorized Employer Representative (Signature) Date

____________________________________
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

____________________________________
Union Representative (Signature)

**ASSOCIATION COPY** (ORIGINAL SIGNATURE)



SAFETY
IS OUR TARGET
INTERNATIONAL UNION OF OPERATING ENGINEERS
ORGANIZED DEC. 7, 1896
LABOR OMNIA VINCIT

SOFCO002307

# AGC OF OHIO BUILDING AGREEMENT

Effective
May 1, 2007 through April 30, 2010

Between

THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

AND

LABOR RELATIONS DIVISION OF THE AGC OF OHIO

SOFCO002208

**EMPLOYERS**

**LABOR RELATIONS DIVISION**
**AGC OF OHIO**

**1755 Northwest Boulevard**
**Columbus, Ohio 43212**
**(614) 486-6446**
**FAX: (614) 486-6498**

**Richard Hobbs**
**Executive Vice President**

## INDEX

| | Paragraph |
|---|---|
| Affirmative Action Program | Exhibit B |
| Apprentices | 106–107 |
| Arbitration | 125–126 |
| Bonding | 47 |
| Construction Advancement Program | 108–113 |
| Crews and General Provisions | 77–100 |
| Date Signed and Signatures | 131 |
| Dewatering | 13 |
| Discharges | 19 or 25 |
| Divert Wage Increase | 43 |
| Drug Testing | 30 |
| Duration of Agreement | 105 |
| Effective Date of Agreement | 130–131 |
| Employees' Relief | 91 |
| Enforcement Measures | 117–123 |
| Equipment Rental | 99 |
| Escalator Clause and Complementing | 69 |
| Field Mechanic Trainee Wage Schedule | Exhibit A |
| Four Ten Work Schedule | 63A–G |
| Fringe Benefit Programs | 41–47 |
| Grievance Procedure | 125–126 |
| Harassment Policy | 31 |
| Hazardous Waste Projects | 15, 29 |
| Heaters-Pumps-Boilers–24 hour, 7 day | 68 |
| Holidays | 67 |
| Hourly First-Day Pay | 84 |
| Hourly Pay | 53 or 56 |
| I–9 | 128 |
| Incentive Pay | |
| Underground, Height and Length Booms | 70–76 |
| Jurisdiction-Work | 10–12 |
| Jurisdictional Area | 1–2 |
| Jurisdictional Disputes | 127 |
| Lay-Off | 25, 55, 60, 89 |
| Liabilities | 5 |
| Management Rights | 7 |
| Master Mechanic, Zones 1, 2 & 3 | 87–88 |
| New Unclassified Equipment | 50 |
| Nondiscrimination | 8–9 |

## INDEX (continued)

| | Paragraph |
|---|---|
| Oilers, Boiler Operators, Helpers Signalmen Provisions | 77–80 |
| Overtime | 62–64 |
| Owner-Operator | 100 |
| Pay Checks | 90 |
| Pay Day | 89 |
| Picket Lines | 123 |
| Piggyback Operation | 86 |
| Pre-Job Conference | 15–16 |
| Provisions and Limitations | 6 |
| Recognition | 4 |
| Referral Policy (Hiring Procedures) | 32–40 |
| Registered Apprentice Wage Schedule | Exhibit A |
| Repairs | 93 |
| Reporting Pay | 59 |
| Safety Program | 26–29 |
| Savings and Separability | 129 |
| Scope of Agreement | 3 |
| Shifts | 81 |
| Site Clearance | 63 |
| Starting Time | 62 |
| Steward | 24–25 |
| Strikes | 124 |
| Sub-Contractors | 117 |
| Supervisory Employees | 97 |
| Termination Slips | 96 |
| Trainee Wage Schedule | Exhibit A |
| Transfer of Union Employees | 119 |
| Transfers on Job Equipment | 21–22 |
| Union Administrative Dues and Deductions | 114–116 |
| Union Shop | 17–18 |
| Wage Rates | Exhibit A |
| Weekly Pay | 52 or 54–55 |
| Work Week | 61 |

| | Page |
|---|---|
| Text of Agreement | 1–50 |
| Exhibit A, Wage Rates & Fringe Benefits | 51–75 |
| Exhibit B, Affirmative Action Program | 75–78 |
| Acceptance of Agreement | 79–88 |

## DIRECTORY

OFFICERS

Local 18 and Its Branches
Headquarters Office
3515 Prospect Avenue
Cleveland, Ohio 44115
216-432-3138
FAX: 216-432-0370

Patrick L. Sink
Business Manager

Kenneth M. Triplett
President

Floyd S. Jeffries
Vice President

Charles W. Scherer
Recording-Corresponding Secretary

Steve D. DeLong
Financial Secretary

Premo P. Panzarello
Treasurer

## DISTRICT NO. 1

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashtabula | Erie | Huron | Lorain |
| Cuyahoga | Geauga | Lake | Medina |

District Representatives
Steve DeLong

Jeffrey Milum
Donald Taggart
Steven Mayor
Ken McGlashan

3515 Prospect Avenue, Cleveland, Ohio 44115
Office: 216-432-3131
FAX: 216-432-3135

## DISTRICT NO. 2

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Allen | Hardin | Paulding | Van Wert |
| Defiance | Henry | Putnam | Williams |
| Fulton | Lucas | Sandusky | Wood |
| Hancock | Ottawa | Seneca | |

District Representatives
Steve Heckler

Gary Siesel
Douglas Leidy
Andrew Myers
Joy Facey

2412 South Reynolds Road, Toledo, Ohio 43614
Office: 419-865-0221
FAX: 419-865-0601

## DISTRICT NO. 3

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Crawford | Hocking | Marion | Perry |
| Delaware | Knox | Morrow | Pickaway |
| Fairfield | Licking | Muskingum | Union |
| Franklin | | | Wyandot |

District Representatives
Gregory Kingsbury

Tommy Thompson — Timothy Hammock
John Branstool — David Hurd

Mark Totman, Legislative Representative

1188 Dublin Road, Columbus, Ohio 43215
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 4

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Auglaize | Clinton | Logan | Montgomery |
| Butler | Darke | Madison | Preble |
| Champaign | Fayette | Mercer | Shelby |
| Clark | Greene | Miami | Warren |

District Representatives
Richard Dalton

Louis Monnin — Stanley Brubaker

6051 N. Dixie Drive, Dayton, Ohio 45414
Office: 937-890-5914
FAX: 937-890-5180

## DISTRICT NO. 5

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Adams | Gallia* | Lawrence* | Ross* |
| Athens* | Hamilton | Meigs* | Scioto* |
| Brown | Highland | Morgan* | Vinton* |
| Clermont | Jackson* | Pike* | |

Covering the following counties in Kentucky:

| | | | |
|---|---|---|---|
| Boone | Campbell | Kenton | Pendleton |

District Representatives
Gary Marsh

James Gentile — Jefferson Powell

9730 Reading Road (Cincinnati) Evendale, Ohio 45215
Office: 513-733-5575
FAX: 513-733-4672

*Counties served through District No. 3, Columbus Office
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 6

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashland | Harrison | Noble | Summit |
| Belmont | Holmes | Portage | Tuscarawas |
| Carroll | Jefferson | Richland | Washington |
| Coshocton | Monroe | Stark | Wayne |
| Guernsey | | | |

District Representatives
Steve DiLoreto

Floyd Jeffries — Thomas James
Joseph Lucas — William Larrick

1707 Triplett Boulevard, Akron, Ohio 44306
Office: 330-784-5461
FAX: 330-784-8827

**LOCAL 18S**
**STATIONARY ENGINEERS**

Representatives

Scott Peters
Charles Scherer James Kumse Thomas Ridenbaugh

3515 Prospect Avenue
Room 206
Cleveland, Ohio 44115
Office: 216-432-2668
FAX: 216-432-0796

# AGREEMENT

## Between

## The AGC OF OHIO Labor Relations Division

**which may be referred to hereinafter as the "Association"**

**and**

**THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 18 AND ITS BRANCHES, (AFL-CIO) referred to hereinafter as the "Union"**

This Agreement is negotiated by and between the Association and the Union within the geographical area as defined herein through their authorized agents, to wit:

That, whereas, the parties desire to stabilize employment and promote efficiency in the Construction Industry, agree upon wage rates, hours and conditions of employment, and to eliminate strikes, boycotts, lockouts and stoppages of work, and

Whereas, the Union and the Employer shall, through the issuance of working rules and regulations to the workmen, inform them of the terms of this Agreement and enforce compliance with the terms thereof, and

Whereas, the Employers agree to recognize and subscribe to the approved referral system as adopted by the International Union of Operating Engineers, Local 18.

Now, therefore, the undersigned Association and the Union agree as follows:

SOFCO002213

## ARTICLE I

### GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Erie, Geauga, Huron, Lake, Medina, Lorain, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

### DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

### SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## ARTICLE II

### RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**–The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**–This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting

SOFCO002214

without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

6. **Provisions and Limitations**–All members of the AGC of Ohio Labor Relations Division, and such other persons, firms or corporations who, as an Employer, become signatory to this Agreement, shall be bound by all of its terms and conditions, as well as any amendments which may be negotiated between the AGC of Ohio Labor Relations Division, and the Union. It is expressly understood that all Employers bound to the terms and conditions of this Agreement are required to pay the amounts as indicated in Article IV to the appropriate Fringe Benefit Programs.

7. **Management Rights**–The operation of the job and the direction of the working forces, including the right to hire, suspend and discharge for proper cause, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer.

8. **Nondiscrimination**–It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio and the Commonwealth of Kentucky and Lawful Orders thereof relative to nondiscrimination and fair employment practices. The Employer and the Union shall not knowingly discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or Apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

9. Further, the Employer and Union agree to adopt and embrace the Pact of 10 July 68 executed under provisions of the Executive Order 11246 and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations revised; an Affirmative Action Program to implement all provisions of applicable federal regulations to assure nondiscrimination in employment, upgrade, demotion or transfer, and recruitment advertising, layoff or termination, rates of pay and selection for all types of training as evidenced in Exhibit "B" attached hereto as if they had originally negotiated the same.

10. **Jurisdiction of Work**–In accordance with the terms of this Agreement, the Employer shall employ Operating Engineers for the erection, operation, assembly and disassembly and maintenance and repair of the following construction equipment regardless of motive power: Air Compressors, Batch Plants, Boilers, Cableways, Derricks, Finishing Machines, Pumps, Trucks, Crawlers, Locomotive and Tower Cranes; Concrete Mixers and Concrete Mixing Plants, Hoes, Shovels, Pile Drivers, Tractors, Scrapers, Endloaders, Hoists and all like equipment, including the use of Geodimeter or any other device that electronically measures (shoots) distance shall be the work of the Operating Engineers (only applies to in-house crew) within the jurisdiction as assigned to the Union by the American Federation of Labor. It is further understood that all equipment for which classifications and wages have been established in this Agreement, and including that equipment for which classifications and wage rates may hereafter be established, shall be manned, when operated on the job site, by a member of the International Union of Operating Engineers, and paid the rates as specified in this Agreement.

11. Operating Engineers shall be employed to do all pipe fitting and all burning and welding necessary for the preparation and maintaining of equipment operated by members of the Union.

12. Operating Engineers shall be assigned to all work performed in connection with the installation, fueling, starting and stopping, repair, maintenance and operation of the below listed small equipment:

Compressors of 185 CFM or less (not discharging into a common header)
Heaters
Welding machines of 300 amp or less
Gas or diesel driven pumps 4" and under (or one 6" pump)
Generators of 15 KW or less
Conveyors 18" belt or less

A combination up to five (5) pieces of the above equipment shall, when in use, be serviced as an additional duty by an Operating Engineer who is employed by an Employer on a project. When six (6) pieces of the above equipment are in use on an Employer's project, a Utility Operator will be employed at the Class "C" rate. The Utility Operator shall also perform other work on the project.

In the event there are no Operating Engineers employed by the Employer on the project, the Employer shall employ an Operating Engineer at the Class "E" rate to service any small equipment in use, until the Class "C" rate becomes in effect.

An Operating Engineer shall be assigned to all work performed in connection with the installation, maintenance, repair and starting and stopping of electric submersible pumps. Necessary work on electric submersible pumps shall be assigned to an Operating Engineer working on the project as an additional duty; no full-time Operator is required.

Work in the servicing and maintaining of self-contained, mobile light plants shall be assigned to an Operating Engineer as an additional duty to his/her regular job. Such work shall normally be assigned to a Mechanic, Grease Crew or Oiler. Equipment operator employees shall be required to carry sufficient tools to make minor adjustments on the equipment they operate.

When an Oiler/Helper is assigned as the primary operator to a fuel/grease combo vehicle which requires specialized CDL endorsement, he/she will receive a $3.00 per hour premium over the Class "E" rate.

13. **Dewatering Systems**–A "Dewatering System" is defined as a combination of one or more pumps of any type, size or motive power with combined discharge capacity of over 4", including but not limited to, well-point pumps, submersible well pumps, ejector or educator pumps in combination with wells, well-points, sumps, piping and/or other appurtenances irrespective of motive power to control water on any and all types of construction work. The complete installation, operation and necessary maintenance work, including all piping, shall be performed by Operating Engineers. A Dewatering System shall be operated by Pump Operators at all times the Dewatering System is in operation unless otherwise agreed at the Pre-Job Conference or with the Union.

14. The Union will at all times, when requested by the Employer, use its best efforts to furnish the Employer with competent employees to operate, maintain and repair equipment in accordance with the terms and conditions of this Agreement.

15. **Pre-Job**–It is agreed that upon the request of either party a Pre-Job Conference shall be held prior to commencing work. In case of a necessary emergency start of the construc-

tion job, the Pre-Job Conference shall be held as soon as possible after the start of work. It is further agreed that upon the awarding of any building contract of $500,000.00 and over, the successful contractor will immediately notify the Union when it has been awarded the contract. It is further agreed the Union may request, receive and hold a Pre-Job Conference with the Employer on an individual basis.

Before the start of any project containing known hazardous waste materials, there will be a pre-job held. The Employer must notify the Union five (5) days prior to starting work on the project. Failure to do so, the Union has the right to withhold its services until such time a pre-job is held.

16. Following are the items which will be discussed at the Pre-Job Conference:

A. The Employer will advise the Union Representative of the Employer's requirements of necessary employees in the classification of work under this Agreement, and the Union will determine and advise the Employer of the ability of the Union to fulfill such requirements when requested.

B. Work schedules.

C. Questions of jurisdiction and assignment of work.

D. The Employer agrees that whenever possible at such Pre-Job Conference they will notify the Union of any subcontracts let by the Employer, the names of the subcontractors, and the nature of the work to be performed by the subcontractors. The Union may request a subcontractor to meet with the Union and the subcontractor will meet with the Union prior to commencing work on a project if the subcontractor did not attend the original Pre-Job Conference for the project. It is understood and agreed that no agreement may be made at the Pre-Job Conference which will in effect change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

17. Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Local Unions above stated on the effective date of this sub-section shall remain members of the Local Unions in good standing as a condition of employment.

SOFCO002216

**18.** All present employees who are not members of the Local Unions and all employees who are hired hereafter shall become and remain members in good standing of any one of said Locals as a condition of employment on and after the eighth (8th) day following the effective date of this sub-section or following the beginning of their employment, whichever is later.

**19.** The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory or who fails to observe the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of any employee under the terms of this Agreement. Any grievance arising through application of this clause shall be adjusted in accordance with the procedures outlined in Article XIV, Paragraphs 124, 125 and 126 of this Agreement. Intoxication and/or assault committed on the job site shall be cause for immediate discharge.

**20.** The Union shall place no limitation upon the amount of work which an employee shall perform during the working day and there shall be no restriction imposed against the use of any type of machinery, tools or labor-saving devices. The Employer agrees that the work jurisdiction of the Operating Engineers, as assigned by the AFL-CIO, will be respected and all Operating Engineer work will be performed by an Operating Engineer, and it is the intent of both parties that Operating Engineers will be assigned work on the basis that will make each job as productive and efficient as possible. It is agreed that a fair day's work shall be given for a fair day's pay.

**21.** The Employer may shift during a work day an Operating Engineer from one piece of hourly rate of pay equipment to another hourly rate of pay piece of equipment without limitation from same job site providing the shifting does not interfere with another Operating Engineer's work day. This condition also pertains to weekly-pay equipment. However, there shall not be any intermixing with weekly-pay equipment to hourly-pay equipment. The Operating Engineer will be paid the highest rate for the day.

The District agent in each district, in order to maintain our jurisdiction, will make jobs as efficient and productive as possible.

**22.** If an Employer violates Paragraph 21, the Employer's

penalty shall be to pay the first qualified registered applicant the applicable wage and fringe benefits from the first day of violation.

**23.** The authorized representative of the Union shall have access to the job during working hours for the purpose of visiting individual members, adjusting grievances or disputes and such other duties as he may have to perform. The representative will report to the job supervisor before visiting the project.

## STEWARD

**24.** The Union may, when it believes it necessary, appoint a Steward whenever possible from Operating Engineers working on the Employer's job and the Union District Representative will, when making such an appointment, notify the Employer. The Steward shall perform full-time work for the Employer and he/she shall be subject to the same rules, rights and working conditions as other employees. Under no circumstances shall the Steward have any authority to call a strike, slowdown of work or perform any other action which would be in violation of this Agreement.

**25.** The Employer agrees that each new employee shall report to the job Steward before starting work if a Steward has been appointed for that particular Employer's job. The Steward shall be allowed sufficient time during working hours to perform all normal duties required of a Steward. No Steward shall have job priority but will be laid off in the same manner as any other Operating Engineer upon completion of his/her particular job assignment; twenty-four (24) hour notice to the Union prior to his/her lay off is required to give the Union time to select another qualified Steward to replace the laid-off Steward, but this twenty-four (24) hour notice is not required when a Steward is discharged for cause by the Employer.

## SAFETY

**26.** The Union and the Employer will cooperate in the establishment of a safety program. At the Pre-Job Conference by mutual agreement, the wearing of safety hats may be made a condition of employment. All safety equipment required by the project owner or manager will be at no cost to the employee, except work shoes of any type. Both the Employer and employees shall comply with the applicable state safety codes

and any other applicable government or civil regulations pertaining to safety. It is expressly understood that if the employees' immediate health and safety are involved, the Union through its representative may order discontinuation of operations until satisfactory results are obtained.

### TRAINING

**27.** The Safety Training Passport 16-hour program will be made available to all union members by the Union at no cost to the Employer. The program will consist of:

Safety Awareness as required by OSHA 29CFR 1926.21

Fall Protection as required by OSHA 29CFR 1926.503

Hazard Communication as required by OSHA 29CFR 1926.59

Operating Engineers dispatched to a project to perform trench excavation work will be required to have successfully completed eight (8) hours of trench safety training. This program will become effective May 1, 2007.

It is agreed that both the Employer and the Union will encourage and assist in the promotion of this training.

**28.** Within forty-eight (48) hours after an industrial accident occurs, the company shall have all necessary State Workers' Compensation forms available and completed on the Employer's part. A copy of the completed forms shall be sent to the Union's office in the district where the accident occurred.

**29.** All **toxic/hazardous** projects will be subject to any and all safety regulations and insurance provisions that may be required by the appropriate governmental agencies. When dangerous atmospheres are present so that an Operator is required to don a special protective suit and/or self-contained breathing apparatus at a private, state, federal or other designated toxic/hazardous waste site, the Employer will notify the Union district office. Reasonable dress-up time and clean-up time will be allowed. The first qualified bargaining unit employee on the job will be designated the steward-safety person, who shall have access to company monitoring records and be kept informed of amounts of contaminants on the job site. A

sheltered "safe zone" area shall be provided. There shall be wash-up facilities on all toxic/hazardous waste sites. When hazmat training credentials are required, the Operator will receive a $.50 per hour premium added to his/her base rate.

On such projects, it is expressly understood that if the employees' immediate health and safety are in danger, the employee may discontinue operations, without penalty, until satisfactory results are obtained, or until such time as a recognized safety agent shall declare the equipment or operation to be safe. All Operating Engineers employees shall be advised by the Employer prior to employment as to the nature of the known hazardous waste and possible resultant physical injuries as may be required by applicable law.

**30. DRUG TESTING:** The Employer and the Union are committed to a policy that promotes safety in the work place, employee health, and well being. In consideration of this policy, the Union and Employer agree that any employee found to be under the influence of, in possession of, or engaged in the distribution of drugs or alcohol on the job site shall be subject to disciplinary action, up to and including immediate discharge.

Within two (2) weeks of reporting to the job site, each new Operator may be scheduled for a drug test. Employees using a prescription drug which may impair mental or motor function shall inform their supervisor in writing of such drug use.

Employee involvement with drugs and alcohol can adversely affect job performance and employee morale. In the Construction Industry the consequences of drug or alcohol use or influence while on the job site can be disastrous. The Employer and Union, therefore, agree to the following policy to insure all employees of a safe and efficient job site free from the effects of drug and alcohol use or influence.

All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of illegal drug or alcohol use impairment while on the job site, may be required as a condition of continued employment to submit to a test for alcohol and/or illegal drug use which impairs the employee's ability to safely perform his/her duties on the job site. Such tests usually involve a sampling of the employee's blood, urine, or breath. Any em-

ployee who is asked to submit to such a test will be required to sign a consent form. If an employee who is asked to submit to a test refuses to do so, or refuses to sign the necessary consent form, that employee will be subject to disciplinary action up to and including discharge. Refusal to take a test or the submission of an adulterated sample shall be determined the same as a positive test result. The employee/member shall follow all requirements outlined in this section.

All testing will be done by a reliable, established laboratory. If this initial test screen result indicates positive findings, further testing of the same sample must be done to confirm the original findings before the laboratory can report a positive finding. The confirmation test will be conducted by an independent accredited National Institute of Drug Abuse or College of American Pathology Laboratory and will utilize the more scientific Gas Chromatography/Mass Spectrometry examination (GC/MS). The results of all tests will be kept confidential between the employee, the Employer and the Union. The employee shall be paid his/her regular hourly wage and fringes for time required for drug testing provided results are negative.

If the GC/MS test results are positive, the employee may be granted a leave of absence for the purposes of drug and alcohol rehabilitation. If the employee is eligible such rehabilitation programs are covered under the Ohio Operating Engineers Health and Welfare Program providing the employee confines his/her self to a twenty-four (24) hour licensed rehabilitation medical facility.

Until the employee presents certification of successful completion of the rehabilitation program, he/she shall be removed from the Employer's job site; shall be prohibited from registering under Article III of the referral of this contract and shall not be dispatched to work. Upon presentation of certification of the employee's successful completion of the drug/alcohol rehabilitation program, the employee may be restored to his/her original job with the Employer. If the employee is not restored to their original job, the employee will be allowed to register for work in the referral by registering a new work referral card. The employee shall, under either circumstance, for the next succeeding twelve (12) month period, present to the District Representative monthly certification of negative drug/alcohol test results. Failure to do so will result in denying the employee the right

to maintain his/her referral card in the register and utilize the referral or if working, to be removed from work.

**31. Harassment Policy:** The parties to this Agreement mutually agree that harassment of any nature is not to be tolerated. Every person working under this Agreement shall immediately notify the Employer when a possibility of a problem happens or exists.

## ARTICLE III

### REFERRAL SYSTEM

**32.** Local 18 and its Branches, shall maintain registers of all applicants for referral. Applicants shall not be permitted to be registered in more than one office of the Union at any one time. All applicants will be registered in order of application, provided no person shall be deemed to be an applicant who is otherwise gainfully employed as an Operating Engineer or not immediately available for work. Registrations and re-registrations will be accepted during customary business hours. Applicants shall be classified in priority groups in accordance with the following criteria:

**GROUP A:** All applicants who have worked as Operating Engineers at least 360 days, 90 days or more per year during the last four (4) years, and have been employed for at least 360 days, 90 days or more per year during the last four (4) years on work as defined in Article I of this Agreement within the geographical jurisdiction of Local 18, and who have lived in the State of Ohio, or in any county contiguous thereto, for at least one (1) year prior to application.

**GROUP A PREFERRED:** Must have Group A eligibility. Group A registrants may voluntarily register in the Group A Preferred, however, registrants in this Preferred A status shall have at least fifteen (15) years employment or availability for employment in any one or more of the classifications contained in this Agreement and in the type or kind of craft work covered by this Agreement in the geographic area as defined by this Agreement. Referral in this group is limited to the following described equipment and will be given priority of referral from the Group A Preferred deck. Preferred A status employees will not be eligible for letter of request by the Employer: Welding Machines, Elevator, Conveyor, Pumps, Compressors, Gen-

SOFCO002219

erators, One Drum Hoist, Mono-Rail Hoist and Portable Heaters.

It is further understood and agreed that when the Employer employs Operating Engineers not currently in their employ for any machines listed in this section, the Employer shall call the referral office servicing his/her job or project and request that an employee qualifying under the Preferred A status be dispatched to service and operate said machine. Any Operating Engineer currently employed by an Employer can be used to operate any of the above listed machines. Apprentices shall not operate this equipment more than fifteen (15) days.

Workmen registering in this Preferred A Group shall be ineligible to register in any other group and shall not work in any classification other than those specified in this section and only have recall rights for equipment specified in this section.

**GROUP A RETIREES:** Must have Group A eligibility. The pension was set up to enhance the lives of retirees in their golden years. Retiring from the trades is by voluntary choice.

A retiree is an equipment operator or mechanic who has applied for and is receiving a pension from any construction industry source.

Upon retirement the retiree can only register in this group. The Group A retirees will be referred to jobs only after the Group A classification and the Preferred A classification have been exhausted.

The Group A retirees will not be eligible for letter of request by the Employer.

**GROUP B:** Same as Group A, except that the employment shall have been at least 270 days, three (3) years of 90 days each. All fourth year Apprentices and Trainees shall be registered in this group.

**GROUP C:** All applicants who have worked as Operating Engineers at least ninety (90) days per year during each of the last two (2) years, and who have lived in the State of Ohio or any county contiguous thereto for at least one (1) year prior to application. All third year Apprentices and Trainees shall be registered in this group.

**GROUP D:** All applicants who have worked as Operating Engineers at least ninety (90) days during the twelve (12) months prior to application. All second year Apprentices and Trainees shall be registered in this group.

**GROUP E:** All other applicants and all first year Apprentices and Trainees shall be registered in this group.

**GROUP F:** All applicants who are "temporary employees."

All applicants who have attained eligibility in any of the foregoing groups shall not lose eligibility as a result of their failure to obtain the required days of employment during the applicable periods of time. All graduating Apprentices shall upon journeymen certification become eligible for Group A. When an applicant fails to register in his/her eligibility group due to reasons other than illness, as hereinafter defined, and does not notify the Union Hall, the resultant failure to obtain the required days of employment during the applicable periods of time shall cause the applicant to lose eligibility in that group.

Any registrant requesting that their work registration card be placed on hold due to sickness or ill health must present to the Union a doctor's certificate or statement certifying that the registrant will be under a doctor's care for a minimum of thirty (30) days, and that such illness prevents the registered applicant from working as an Operating Engineer. A work registrant's card will only be placed on hold for a minimum period of thirty (30) days, and a maximum period of one hundred twenty (120) days. No registration cards will be placed in the hold position for illness less than a thirty (30) day duration. Any refusals of dispatches due to illness for a period of less than thirty (30) days shall be counted as a refusal under the terms and conditions of the referral procedure.

**33.** In referring applicants, the following procedure shall be followed:

A. Applicants in Group A shall first be referred, and then Group A Preferred, then Group A Retirees, then applicants in the succeeding groups, in order, through Group E. In each group, the Union shall refer applicants in order of their places on the referral list.

B. Registered Apprentices or Trainees shall be referred in order of their position on the referral list.

C. Employers shall have the right to reject any applicant referred for employment and shall immediately notify the Union in writing of such rejection. In the event a registrant is discharged by the Employer because of lack of sufficient ability,

and he/she does not exercise his/her rights under the Referral Board of Review and Arbitration under Paragraph 37, the classification or equipment from which he/she is discharged shall be stricken from his/her referral record and he/she shall not be dispatched to a job in that classification or on that equipment until he/she has:

1. Taken training at his/her training site and has been certified, or

2. Has presented to his/her dispatch office a letter from a previous Employer, in signed agreement with Local 18 working within Local 18's jurisdiction, stating that in the Employer's opinion the discharged registrant has successfully completed a job assignment in that classification or on that piece of equipment in his employment.

D. When an applicant is actually employed, he/she shall notify the Union office at which he/she is registered within twenty-four (24) hours. Failure to do so is an imposition upon those registered and not employed and, therefore, such applicant will be barred from re-registering, unless and until he/she has made application to the Board of Review and Arbitration provided for in Paragraph 37 of this Agreement, and shows good cause for his/her failure to give such notice.

E. When an applicant becomes employed, his/her name shall be removed from the register as soon as he/she shall have worked for a total of thirty-one (31) accumulative working days (one (1) day jobs shall not count). An Operator who relieves another Operator will not be charged for the first fifteen (15) days (only one (1) fifteen (15) day relief per registration application card). All days after that will be counted toward his/her time.

If an applicant is employed for less than thirty-one (31) accumulative working days, he/she shall be restored to his/her previous position on the register when such employment terminates. Any applicant who quits employment or fails to show up for work assignment at starting time after being dispatched (provided he/she was dispatched the previous day), for whatever reason, except accident verified by police report, shall be placed at the bottom of the applicable registration group regardless of the number of days worked and shall not be eligible

for request until he/she puts in a new registration card. When reason for employment termination is questioned, applicant must present a written termination slip evidencing reasons other than a voluntary quit before he/she is restored to his/her previous position on the register.

An applicant for employment may not refuse referral to employment for any reason except that the applicant may inform the District Office in writing, before any referral, that he/she will not accept employment referrals in certain named counties within the District. If an applicant refuses a job referral for the second consecutive time, he/she shall lose his/her position on the register and go to the bottom of the list for his/her group.* If the dispatcher is unable to contact an applicant, the failure to contact shall not be deemed to be a refusal.

F. Applicants must notify the Union office in which they are registered by telephone, or letter, or telegram, or in person of their continued availability for employment within thirty (30) days after the date of last registration or re-registration in order to maintain their places on the register.

In order to equally distribute and defray the cost of services rendered by the use of this referral system, all individuals who make use of this referral system shall be required to pay an initial registration fee of $17.25 and another $17.25 for each re-registration thereafter, provided that such fee shall not exceed $17.25 in any consecutive thirty (30) day period and provided that such fee shall not apply to the following:

1. Members in good standing of Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their regular dues; and

2. Applicants for membership to Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their fees; and

3. Members in good standing of the International Union of Operating Engineers who are paying travel dues whose proportionate share of the cost of this referral system is met by the payment of their fees.

G. The Union shall use its best efforts to notify all registered

*Does not apply to the former Ohio or Kentucky Building & Light Commercial Agreements Referral.

applicants when work is available for them, but the Union assumes no responsibility or obligation for failure to locate an applicant.

H. All applicants must submit a written resume of their experience and qualifications at the time of original registrations, and may be tested on the equipment they operate at the nearest available training site prior to being assigned a position on the referral list.

I. Subject to this referral system Employers may hire through this referral policy, by name, former employees who have resided for at least twenty-four (24) months in the State of Ohio or in any county contiguous thereto, and have been employed by the Employer making the request during the past twenty-four (24) months within the jurisdiction of this Agreement. The Employer must make the request to the appropriate Union District Office and the employee requested must be registered on the District referral list (Groups A through E).

Employers may hire through this referral policy by name individuals in Group A for a production machine, or for a mechanic, or mechanic/welder, who has been registered on the out-of-work list for at least ten (10) days in the District in which the work is to be performed. Individuals shall have only one (1) request per four (4) month period from the last request. The request by name must be confirmed later in writing on the letterhead of the Employer and signed by either the Employer or the superintendent of the project.

Nothing in the referral procedure shall interfere with the transfer of an Employer's employees on his payroll from one project to another project within the geographical area covered by Local 18. When transferring employees, the Employer will notify the Union District Office from which the employee is to be transferred.

The Union agrees the transfer will be processed in an expedient manner.

J. The purpose of the referral system is to provide nondiscriminatory employment opportunities. Individuals who register therein deserve a preference over those who do not. Therefore, it is agreed that in the event that the referral list is exhausted and the Union is temporarily unable to furnish qualified applicants within twenty-four (24) hours after receiving the Employer's request (Saturdays, Sundays and holidays excepted), the Employer may

temporarily employ others until the Union notifies the Employer that it has qualified registrants available for employment.

Applicants hired by the Employer under this procedure shall be known as "temporary employees," and will be subject to replacements. The Employer will notify the Union District Representative of the name, union affiliation (if any), date of employment and social security number of such "temporary employee." The Union will maintain a register of all such "temporary employees" and such register shall be known as the temporary register. Such "temporary employees" may also be referred by the Union (when the referral list is exhausted) from Group F.

Such "temporary employee" shall be subject to replacement by a qualified registered applicant under the procedure listed herein:

1. The Union shall give a five (5) working day written notice to the Employer with whom the "temporary employee" is working and such "temporary employee" will thereupon be replaced at the end of the five (5) working day period provided the Union furnishes a qualified registered applicant.

2. The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the temporary register.

K. When an Employer states requirements for special skills or abilities in his/her request for employee applicants, the Union shall refer the first applicant on the register possessing such skills or abilities, regardless of the place or classification of such applicant on the register. If a contractor requests or requires that the operator be a Certified Operator, verification of the operator's certification is the responsibility of the Employer. If the Employer notifies the Union in writing, within thirty (30) days of the employee's discharge, of an Operator who had been in his employment and who had not performed satisfactorily, and the Employer does not wish this Operator to be referred to the Employer for future employment, the Union shall honor this written request.

L. Any employee who quits a contractor without proper notice and is subsequently hired by an Employer with whom Local 18 has a contractual relationship without a proper referral by Local 18 shall be discharged by the Employer when it is called to his attention.

SOFCO002222

**34.** Employers shall give first opportunity to persons registered for employment, as provided herein, by calling or notifying the Union at any of its offices in the territory where the work is to be performed.

**35.** Registration of applicants and selections of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, by-laws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership, policies, or requirements. It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio, the Commonwealth of Kentucky, and lawful orders thereof in nondiscrimination and fair employment practices.

The Employer and the Union shall not discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

The Union agrees to furnish an Employer, at his request, any statement or data required under any regulations referred to herein.

**36.** In addition to the above Registration Groups there shall be established a Short Term Job Group. The sole purpose of this Short Term Job Group is to enable registrants to acquire time to be eligible for unemployment benefits. Registration in this group is limited to applicants eligible for Group A of this referral and all fourth year Apprentices showing proof of need for additional time to qualify for unemployment benefits.

Applicants' referral out of the Short Term Job Group will be limited to jobs of two (2) days or less duration in a calendar week or eight (8) days or less duration in a calendar month on equipment listed on their registration cards. Any refusals of jobs will cause the registrant's card to be removed from the Short Term Job Group deck. Dispatches for short term jobs as defined above will first be made from the Short Term Job Group. If the dispatcher is unable to fill the short term job order from the Short Term Job Group he/she will proceed to fill the order from Groups A through F in accordance with the referral rules. Dispatcher should notify Employers when dispatching from the Short Term Job Group. The Employer reserves the right to request dispatch from Group A.

Since this Short Term Job Group is intended to provide limited employment for those needing credit for unemployment compensation, the Union shall, through its business agents, remove from employment any Operating Engineer who has accumulated more than two (2) days per calendar week or over eight (8) days in a calendar month—as a result of the Short Term Job Referral Group.

Registrants in the Short Term Job Group will not be eligible for any recall or request provisions of the referral as herein described. Employment received as a result of the Short Term Job Group referral will not provide eligibility for Employer recall when the registrant is registered in Group A, Preferred A, or Group A Retirees deck. Apprentices or Trainees will not be permitted to register in the Short Term Job Group except as noted above. Registrants may not register in the Short Term Job Group or Group A or Preferred A or Group A Retirees deck at the same time. The Employer shall not be permitted to transfer employees dispatched from the Short Term Job Group from one project to another project.

The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the Short Term Job Group.

All the remaining rules with regard to the operation of the referral shall be applicable to the operation of the Group A, Preferred A and Group A Retirees except as modified above.

**37.** Any registrant or any Employer who may feel aggrieved by the operation of this referral system shall have the right to and must file his/her grievance, in writing, within ten (10) days after the occurrence of the event concerning which he/she complains with a Board of Review and Arbitration consisting of one (1) representative of the Union, one (1) representative of the Employer, and an impartial third member to be selected by agreement of the Union and the Employer, and the decision of this Board shall be final and binding on all parties.

**38.** This statement as to referrals shall be posted in all places where notices to Employers and applicants for employment are customarily posted, including all offices of the Union; all offices of the Employer.

**39.** A Labor Relations Division Representative of the AGC of Ohio may inspect the referral register at the Union District Office at any time during normal office hours.

**40.** All officers and business representatives of the Union who have had previous work experience in any one or more of the job classifications contained in this Agreement shall be deemed to be employed at the trade and it is the intent of this section to provide that upon return to the employment in the trade, he/she shall do so with the same preference as if he/she had continually worked at the trade and shall be eligible upon registration for Group A.

## ARTICLE IV

### FRINGE BENEFIT PROGRAMS

**41.** The fringe benefit provisions contained herein shall apply to all Employer members of the AGC of Ohio Labor Relations Division, and Employers who become signatory or bound by this Agreement, as well as any other Employer or Employer groups who become a party to an Agreement covering the fringe benefit programs set forth herein.

**42.** All Employers bound hereby agree to be bound by the Agreement and Declarations of Trust, as amended, establishing the Pension Fund, Health and Welfare Plan and Apprenticeship Fund, copies of which all parties agree have been furnished to and read by all Employers bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declarations of Trust and any rules, regulations, or plans adopted by the Trustees pursuant thereto, shall become a part of this Agreement as though fully written herein. All Employers bound hereby irrevocably designate the Employer Trustees of said Funds and Plan and their successors as their representatives for the purpose set forth in said Agreements and Declarations of Trust.

**43.** Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

PENSION FUND: Effective May 1, 2007 is $3.65 per hour

HEALTH & WELFARE PLAN: Effective May 1, 2007 is $5.91 per hour

APPRENTICESHIP FUND: Effective May 1, 2006 is $.50 per hour

SAFETY TRAINING AND EDUCATIONAL TRUST FUND: Effective May 1, 1992 is $.04 per hour

The Union shall have the option of diverting all or any part of the increase scheduled for improvement of or payment of costs of any fund benefits provided under this Agreement; provided that the Union gives the Employer written notice of its election to do so by registered letter sent to the office of the AGC of Ohio at least 60 days before the effective date of the scheduled change specifying in said notice the amount of change to be applied for this purpose in the fund benefit for which the money is to be used.

**44.** It is further understood and agreed by and between the parties that duly authorized representatives of any of said Trust Funds or Plan shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all employees upon whom the Employer is obligated to make contributions and with respect to the payment of monies to the AGC of Ohio's Construction Industry Advancement Program under paragraphs 109, et. seq. and with respect to the Administrative Dues deduction under paragraph 114. Notwithstanding the foregoing authority allowing audits with respect to the AGC of Ohio's Construction Industry Advancement Program and the Administrative Dues deduction, the audits shall only be conducted in conjunction with the Fringe Benefit Funds or Plans referred to herein and shall not be conducted independently. The twenty-four (24) hour notice referred to in paragraph 45 (A) shall only be given for delinquencies to the employees Fringe Benefit Funds or Plan referred to therein.

**45.** Reports of employees who have worked the number of hours that they have been paid, and such other data and information as may be required, and all contributions payable to the Funds or Plan shall be transmitted to the offices of the Funds or Plan no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed. In the event said audit is refused, reports not

SOFCO002224

furnished, or said contributions are not paid, as aforesaid, the following remedies, in whole or part, and in addition to all other remedies, either in law, in equity, by contract or authorized by the aforementioned Agreements and Declarations of Trust, shall be available.

A. After the Trustees or the Agent of any Funds or Plan have given the delinquent Employer twenty-four (24) hours written notice at the address shown in the records of the Funds, Plan or Union, the Union shall have the right to take such legal and lawful action as it may deem necessary until such delinquent payments are made or said audit is permitted, such action including but not limited to the right to withhold its services from such Employer for as long as the failure to make such contributions or audit continues, Article XIV notwithstanding.

B. In the event either the Union or the Trustees of any Funds or Plan may decide to utilize the grievance and arbitration procedure in this paragraph to collect delinquent contributions and liquidated damages to enforce any audit, or to obtain any report, the following procedure shall apply:

Unless the issue is resolved between the Employer and the party giving notice, within five (5) calendar days after deposit of written notice of delinquency and/or demand for audit and/or report in the United States mail, to the Employer at the address shown in the records of the Funds, Plan or Union, such party may refer the matter to an arbitrator to be named by the AGC of Ohio Labor Relations Division and by Local 18 of the International Union of Operating Engineers whose decision in writing shall be final and binding on all parties. In the event such parties are unable to choose an arbitrator within ten (10) days after written request therefor, the Union or the Trustees of any Funds or Plan may request an arbitrator according to the rules and regulations of the American Arbitration Association whose decision in writing shall be final and binding on all parties. The parties to the arbitration shall each bear one-half (1/2) of the total costs.

**46.** In no event shall the foregoing provisions relating to Fringe Benefits be subject to or suitable for grievance and arbitration under Article XIV of this Agreement.

**47.** The Employer must obtain an Insurance Payment Bond (IPB), from a company that is "best" rated A, financial category 7 or better, payable to the Ohio Operating Engineers Fringe Benefit Program as a guarantee that the fringe benefits referred to herein are paid by the insurance carrier in the event that the Employer becomes delinquent in its payments and defaults thereon. In lieu of a surety bond, an Employer may substitute an equivalent cash bond, which will be escrowed to guarantee payment of fringes. If the Employer fails to provide the necessary bond within thirty (30) days of request by the Union, the Union shall withhold services until receipt of such bond, or the Employer makes fringe contributions on a weekly basis.

The Employer shall obtain said Insurance Payment Bond or cash bond in amounts set forth below:

| | | |
|---|---|---|
| 1–10 | Operating Engineers | $50,000.00 |
| 11–20 | Operating Engineers | $75,000.00 |
| 21–50 | Operating Engineers | $100,000.00 |
| Over 50 | Operating Engineers | $125,000.00 |

## ARTICLE V

### WAGE RATES

**48.** The purpose of this Agreement is to establish wage rates and conditions to apply for all work as defined herein and for operation of all equipment which comes within the jurisdiction of the International Union of Operating Engineers, and as negotiated by and between Local 18 and its Branches of the International Union of Operating Engineers and the AGC of Ohio Labor Relations Division.

**49.** Exhibit "A" covering wage rates and classifications attached hereto is made a part of this Agreement.

**50.** It is agreed if equipment within the jurisdiction of the International Union of Operating Engineers is used by an Employer and if there is no appropriate classification listed under the wage schedules therein, then the Union and the Association negotiating committees will negotiate a new classification and rate of pay for such equipment within five (5) days.

**51.** The geographical jurisdiction of this Agreement will be zoned for wages only. Conditions of employment will be the same for all employees covered by this Agreement.

Zone I: Covering Portage and Summit counties only.

Zone II: Covering the counties of Lucas and Wood only.

Zone III: Covering the counties of Adams, Allen, Ashland, Athens, Auglaize, Belmont, Brown, Butler, Carroll, Champaign, Clark, Clermont, Clinton, Coshocton, Crawford, Darke, Defiance, Delaware, Fairfield, Fayette, Franklin, Fulton, Gallia, Greene, Guernsey, Hamilton, Hancock, Hardin, Harrison, Henry, Highland, Hocking, Holmes, Jackson, Jefferson, Knox, Lawrence, Licking, Logan, Madison, Marion, Mercer, Meigs, Miami, Montgomery, Monroe, Morgan, Morrow, Muskingum, Noble, Paulding, Perry, Pickaway, Pike, Preble, Putnam, Richland, Ross, Sandusky, Scioto, Seneca, Shelby, Tuscarawas, Union, Van Wert, Vinton, Warren, Washington, Wayne, Williams, and Wyandot. In Kentucky, the Counties of Boone, Campbell, Kenton and Pendleton.

## ARTICLE VI

### WEEKLY PAY AND HOURLY PAY CLASSIFICATIONS AND REPORTING PAY PROVISIONS

52. In all counties covered by this Agreement, the following classifications shall be employed on a WEEKLY PAY basis:

Asphalt Plants
Boiler Operators, Oiler/Helper, Registered Apprentices and Signalmen, when members of crew
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Cherry Pickers
Cranes (all types)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Floating Equipment
Gradalls
Hoes (except when attached to farm or industrial type tractor or CAT 320 backhoes or equivalent and below)
Hoists, with two or more drums in use
Horizontal Directional Drill (over 500,000 ft. lbs. thrust)
Maintenance Engineers (Mechanic and/or Welder)
Master Mechanics

Panelboard Operators (all types on site)
Pile Drivers
Power Shovels
Rotary Drills (all), used on caissons for foundations and substructure work
Side Booms
Tug Boats

53. In all counties covered by ZONES I, II and III, the following classifications shall be employed on an HOURLY PAY basis (two (2), four (4), or eight (8) hours):

A-Frames
Air Compressors, pressurizing shaft or tunnels
Allen Screed Paver (concrete)
Asphalt Pavers
Backfillers
Backfillers with Tampers
Ballast Re-Locator
Bar and Joint Installing Machines
Barrier Moving Machine
Batch Plant Operators
Bobcat Type and/or Skid Steer Loader
Boilers (15 lbs. pressure and over)
Boom Trucks (all types)
Bulldozers
Bull Floats
Burlap and Curing Machines
Cableways
Clefplanes
CMI-type equipment
Combination Concrete Mixers and Towers
Compressors, on building construction
Concrete Grinder/Planer
Concrete Mixers
Concrete Pumps
Concrete Spreaders
Concrete Saw, vermeer type
Conveyors, used for handling building materials
Crushers
Deckhands
Directional Drill "Locator"
Drum Firemen in asphalt plants
Elevating Graders or Euclid Loaders

Endloaders
Farm-type Tractors, pulling attachments
Finishing Machines
Fork Lifts (all types)
Forklift (rough terrain with winch/hoist)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (sonic pile driving)
Gunite Machines
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes, when attached to farm or industrial type tractors
Hoists (building construction)
Horizontal Directional Drill (less than 500,000 ft. lbs. thrust)
House Elevators (except those automatic call button controlled)
Hydraulic Gantry (lift system)
Hydro-seeders
Inboard, Outboard Motor Boat Launches
Kolman-type Loaders (dirt loading)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Lead Greasemen
Light Plant Operators
Locomotives (all types)
Man Lifts
Mixers, One Bag Capacity, with side loaders
Mixers, Paving (multiple drum)
Mobile Concrete Pumps, with booms (including oiler, etc.)
Mucking Machines
Mudjacks
Oilers, Helpers and Boiler Operators, when not members of a crew
Pavement Breakers (hydraulic or cable)
Pettibone-Rail Equipment
Plant Mixers (on site)
Post Drivers
Post Hole Diggers
Power Driven Heaters (oil fired)
Power Graders
Power Scoops

Power Sweepers
Power Scrubbers
Prentice Loader
Pressure Grouting
Pressure Pumps (over 1/2" discharge)
Pump Operators, installing or operating well-points or other types of dewatering systems
Pumps (4" and over discharge)
Pumps (under 4" discharge)
Rail Tamper (with automatic lifting and aligning device)
Switch & Tie Tampers (without lifting and aligning device)
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Utility Operators
VAC/ALLS
Vibratory Compactors, with integral power
Welders (except electric machines)

**54.** In all the counties covered by ZONES I, II, and III, employees covered by this Agreement employed on a WEEKLY PAY basis reporting for work on Saturday, Sunday or holidays shall receive eight (8) hours straight time for reporting if no work is performed and they are not required to remain on the job; if they start to work, they shall receive eight (8) hours at premium time in accordance with Article VII.

They must report for work at starting time and, except as noted above, remain on the work for the full eight (8) hours to be entitled to receive the eight (8) hours pay stipulated in this Agreement.

**55.** When a machine having a forty (40) hour guarantee is laid up on a project site and the workmen are laid off and paid off, that machine cannot be started back to productive work on that project site unless it is laid up for one week (seven days) without calling back the workmen who had manned the machine and they shall be paid for the time they have been off, unless mutual agreement is reached between the Employer and the Union District Representative to permit employees to work on the weekly guarantee equipment during the seven (7) day "lay-up" period without penalty.

**56.** In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on an

SOFCO002227

HOURLY PAY basis, unless notified by the Employer not to report to work, shall receive two (2) hours' pay for reporting to work; if such operator does not start to work, he/she shall receive his/her two (2) hours' reporting time. An employee may be required to stay at the work project for one (1) hour to be eligible for two (2) hours reporting pay unless the Employer releases the employee prior to the end of the first hour. If the employee starts to work, he/she shall receive four (4) hours' pay; if the employee works over four (4) hours, he/she shall receive eight (8) hours' pay; for inclement weather only it will be 2-4-6-8 hours.

In all counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis reporting to work on Saturday, Sunday or holidays, all conditions in this paragraph will apply and both reporting time and time worked will be paid for at the rate provided in accordance with Article VII. They must report to work at starting time to be entitled to reporting pay. Where less than four (4) hours or less than eight (8) hours are worked, the employees must remain on the work for the full four (4) hours or the full eight (8) hours, as the case may be, to be entitled to pay for the four (4) or eight (8) hours, as stipulated in this Agreement.

A. When an employee working on equipment with a weekly-pay guarantee and work with his/her equipment is completed on a project, the employee is guaranteed only Monday through Wednesday pay if the equipment finishes the work on the project the first three days of the week. The Employer will notify the Union District Representative prior to application of this provision.

**57.** Crews will be eligible for straight time weekly pay when their equipment is transferred out of their District up to the day the equipment is shutdown, otherwise, Paragraph 56, Section A prevails.

**58.** On jobs where there is only one (1) day's work for a piece of equipment, employee or crew may be employed on a day-pay basis. Upon the Contractor's request to the Union Business Representative for a second day for special occasions, the Union gives the Representative authority to authorize a second day for the period of this contract.

**59.** All reporting pay time paid to an employee shall

count as working hours with respect to any work guarantees or overtime pay provisions.

**60.** Employees who are working for an Employer in other than their local residence area thereby necessitating them to pay room and board shall, upon request, be granted their release if the Employer is unable to supply enough work to justify their staying. Employees released under this provision will be considered as laid-off because of lack-of-work.

## ARTICLE VII

### PROVISIONS FOR PREMIUM RATE OF PAY

**61.** The week shall begin on Monday A.M. and shall end on Sunday P.M.

**62.** The regular starting time must be established for not less than one (1) week. Any time worked prior to the established starting time will be paid for at the applicable premium rate unless otherwise arranged through Union notification.

**63.** The normal work day shall consist of eight (8) hours and the normal work week of forty (40) hours. One and one-half (1-1/2) times the regular rate shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, and including Saturday.

When an Employer performs clearance and excavation for site preparation for industrial or building sites, the Employer will pay the wage rates listed herein, all overtime will be performed at one and one-half (1-1/2) times the regular rate. Subject to Paragraph 121, all other conditions and provisions shall be as provided herein.

A. An Employer may, however, have the option of working a four-ten hour schedule at straight time rates. No Operating Engineer with a weekly guarantee will lose a paid holiday he/she would otherwise receive by working a four-ten week. Instead, such employees will receive, in addition to wages and fringes for hours worked in a four-ten week, an additional eight (8) hours and fringes at straight time rates for the holiday. If the Employer elects, upon notification to work a four-ten hour schedule, he shall pay overtime in such cases on all hours over ten (10) hours per day or over forty (40) per week, whichever is greater. A four-ten work schedule must be by the week.

SOFCO002228

In addition to the above: It is agreed that when time is lost by the crew during the regular work week, Monday through Thursday, due to inclement weather, holiday, equipment breakdown or directions of the project owner, this time may be made up by the entire crew on Friday at the regular rate of wages. All Friday work must be scheduled on a minimum of eight (8) hours basis. All hours worked in excess of the forty (40) hours in the work week or ten (10) hours each day, shall be paid at the appropriate overtime rate of pay.

B. Any employee hired on any day of the week, Monday through Thursday, and who does not lose any time from the day of his/her initial hire until Thursday shall receive the overtime rate of wages for Friday, providing the crew is eligible for the premium rate for Friday.

C. Should any other trade on the project in the contractor's employ, working in conjunction with the Operating Engineers, receive premium pay on a Friday, the Operating Engineers would also receive premium pay for the Friday.

D. If the other basic crafts employed by your contractor on the project receive the overtime rate for the ninth (9th) and tenth (10th) hours, the Operating Engineers will also receive the overtime rate.

E. When an Employer works three (3) days or less in a week, premium time will be paid after eight (8) hours for each of the days, except for holidays, inclement weather or completion of the job.

F. Pay day will be on Thursday.

G. Weekly pay employees, in order to be eligible for eight hours' pay that day, must be available to perform work for the Employer.

**64.** Double time will continue to be paid to any Operator who is complementing another trade that is receiving double time. All work performed by an employee on Sunday or holidays shall be paid at two times the regular rate established in this Agreement or any escalated rate that may be in effect.

**65.** No weekly pay employee covered by this Agreement shall lose time because of the observed holidays. If not requested to work, he/she shall be paid eight (8) hours straight time pay at the rate established in this Agreement or eight (8) hours at any escalated rate that may be in effect. Holidays

shall be of twenty-four (24) hours duration. When required to work on holidays, the employee shall be paid two times the regular rate established in this Agreement or any escalated rate in effect.

**66.** There shall be no work required on Labor Day except in special cases of emergency.

**67.** The observed holidays are Christmas, New Year's Day, Labor Day, Memorial Day (last Monday in the month of May), Independence Day and Thanksgiving Day. When any of the aforementioned holidays fall on Sunday, they will be observed on Monday. All weekly pay employees covered by this Agreement to be eligible for holiday pay must be available for work the first regularly scheduled work day prior to the holiday and be available for work the first regularly scheduled work day after the holiday.

**68.** Where steam boilers, power driven heaters or pumps are used on a continuous seven (7) day twenty-four (24) hours per day operation, overtime may be avoided by using four (4) shifts of Operating Engineers, each shift to work six (6) hours on a seven (7) day basis. Each Operating Engineer so employed shall be paid forty (40) hours at the applicable straight time rate and two (2) hours at double the applicable straight time rate. The aforementioned condition, where overtime may be avoided, can only be used upon the Employer's guarantee of a minimum thirty (30) days of operation. In the event the Employer cannot furnish thirty (30) days of employment after starting work under Paragraph 68, it is agreed that upon lay-off of employees the Employer will pay retroactive overtime to such laid-off employees from the start of this particular operation in accordance with Article VII, Paragraphs 63 and 64 of this Agreement.

**69.** Job Master Mechanics and Operators of derricks, cranes, derrick cars on steel erection and on building construction and all winch trucks used in hoisting construction material and any type of hoist, shall command and receive the highest rate of pay and the same applicable premium pay and conditions for overtime where the rates or conditions for the Ironworkers, Boiler Makers, Pile Drivers and Pipefitters are higher than the rates specified in this Agreement for the foregoing classifications. To be eligible for the benefits of complementing the above mentioned trades, an Operator must be required to

perform a specific operation which is directly related to the work which the other trades are performing.

70. Operating Engineers employed on any equipment within the jurisdiction of the International Union of Operating Engineers working in shafts, tunnels or storage caverns where natural earth or rock is undisturbed overhead, shall be paid fifty cents ($.50) per hour above the rates in this Agreement or in addition to any escalated rate that may be in effect. This does not apply to open cut work.

71. Booms, including jib 150 feet through 180 feet in length, fifty cents ($.50) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

72. Booms, including jib over 180 feet in length through 249 feet in length, one dollar ($1.00) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

73. Booms, including jib of 250 feet and over in length, one dollar twenty-five cents ($1.25) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

74. Conventional cranes whether crawler or truck when used as a tower crane, the effective length of the mast and the boom combined, will be used to determine when these extra rates will be applied.

75. Tower Cranes, the height of the boom point from the first floor level of the project, will be used to determine when these extra rates will apply.

76. On jobs where crane-type or derrick-type machines are operated on floors above the first floor level of the building, twenty-five cents ($.25) per hour shall be paid in addition to the established crane rate or any escalated rate that may be in effect.

## ARTICLE VIII

### CREWS AND GENERAL PROVISIONS

77. In all of the counties within the jurisdiction of this Agreement, crews shall be employed on all truck cranes, power shovels, cranes, rotary drills on caisson work, cableways, draglines, tower derricks, tower cranes, multiple drum

pavers, pile driving machines and hoes, standard gauge locomotives, bucket trench machines (over 24" wide) and horizontal directional drills (over 500,000 ft. lbs. thrust). Crews shall consist of an Operating Engineer and an Apprentice/Helper or Signalman on machines, regardless of motive of power, or an Operating Engineer and Fireman on steam machines.

**78A.** Apprentice/Helpers are required on hoes, excavators, and front hydraulic shovels having a base operating weight in excess of 105,000 pounds, all terrain cranes with a total weight of 125,000 pounds and Apprentice/Helpers shall be required on cable crawler cranes over 80 ton structural capacity, defined as: the factory specified total maximum counter weight with a PCSA rating not to exceed 36,400 pounds, based on 50' of boom at 40' radius, with the single line pull not exceeding 17,000 pounds. Anything outside any of the aforementioned limits determines the crane as requiring an Apprentice/Helper. All factory certifications and the computer system will be available for inspection at any time by the Union or their designee. On remote control gradalls, Apprentice/Helpers shall be at the discretion of the Employer. Truck cranes, lattice boom, thirty (30) ton capacity and under; hydraulic truck cranes and all terrain cranes fifty (50) tons or less, an Oiler is not required. However, if someone other than an Operating Engineer is assigned to this work, this paragraph will be revoked on the project, and an Apprentice/Helper will be required for the remainder of the project. An Apprentice/Helper is required on self-erecting cranes (as defined by the manufacturer) while being erected and dismantled.

**78B.** Oilers on jobs of thirty (30) days or more will be given a minimum of 30 minutes per day operating the machine they are assigned to (or a similar machine on the same project). If the Oiler cannot be trained to operate the machine to the satisfaction of the Employer then he/she shall be replaced.

**79A.** Work of the Boiler Operator, Oiler/Helper, Registered Apprentice, and Signalman shall include getting up steam and greasing up, filling gas tanks and making the machine and equipment ready for operating at the starting time. If, at the discretion of the Employer, an Oiler/Helper, Registered Apprentice, or Signalman is required to make gas or diesel machines ready to operate before the regular starting time, such

SOFCO002230

Oiler/Helper, Registered Apprentice, or Signalman shall be paid one-half (1/2) hour's pay at one and one-half (1-1/2) times the regular rate. If, at the discretion of the Employer, a Boiler Operator or Registered Apprentice is required to get up steam and grease steam machines and make them ready to operate before regular starting time, then such Boiler Operator or Registered Apprentice shall be paid one (1) hour's pay at one and one-half (1-1/2) times the regular rate.

**79B.** Apprentice/Helpers, while assigned to track hoes, cranes and other equipment, will perform the following work on the project as additional duty:

- Cover small equipment (i.e. pumps, generators, compressors, etc.)
- Act as signal person
- Safety/fire watch
- Practice operating in a learning environment in the vicinity
- Help with survey duties on project
- Help mechanic, lube trucks, fuel
- Practice operating rough terrain forklift, front loader, rubber tire hoe, loader in vicinity of primary duty
- Replace other operators who may be absent on project
- Run parts or materials as necessary
- Safety enforcement
- Productive activity on job site to facilitate job completion when it does not interfere with progress of primary machine, providing this does not interfere with another Operating Engineer's workday

**80.** Oiler/Helpers, Registered Apprentices, Signalmen, Grease Truck Operators, when requested to work the regular one-half (1/2) hour lunch period, will eat their lunch prior to or after the regular one-half (1/2) hour lunch period in order to be able to oil, grease and repair machines during the regular one-half (1/2) hour lunch period at no extra pay.

**81.** More than one (1) shift may be worked in any twenty-four (24) hour period and the starting time of the shifts shall be left to the discretion of the Employer. This starting time must be maintained five (5) days, Monday through Friday. However,

more than six (6) hours shall not be worked without allowing thirty (30) minutes for a lunch period. Where two (2) shifts are employed, eight (8) hours shall constitute a day's work for the first shift and eight (8) hours shall constitute a day's work for the second shift. When three (3) shifts are employed, eight (8) hours shall constitute a day's work for the first shift, seven and one-half (7-1/2) hours work with eight (8) hours pay shall constitute the second shift, and seven (7) hours work with eight (8) hours pay shall constitute the third shift. For the purpose of overtime pay for multiple shift operations, a work day shall be determined by the starting time of the shift. In addition, the second shift will receive twenty-five cents ($.25) per hour, third shift fifty cents ($.50) per hour premium above the established rate of pay.

When warranted by a particular job's conditions, shift work may be instituted for less than five (5) consecutive days.

**82.** Where project owners establish specifications, requirements, or for safety reasons that limit the days or hours in which work may be performed, the Employer, after advance notice to the Union, may start the work week after 6:00 p.m. on Sunday at straight time rates. In applying this schedule, Sunday p.m. will be considered Monday, the following Friday will be considered Saturday (paid at time and one-half) and Saturday will be considered Sunday (paid at double time). All premium pay provisions will apply for the sixth and seventh days as to Saturday and Sunday, respectively.

**83.** When it is necessary for equipment to be operated, the Operating Engineer who regularly operates the particular piece of equipment shall be given first chance to perform the work. If an Apprentice/Helper is required, the Apprentice/Helper who is regularly assigned to the particular piece of equipment shall be given first choice to perform the Apprentice/Helper's duties. In an emergency, any employee may be assigned to any equipment. It is understood that the Master Mechanic or Steward will be notified, when possible, of such emergency requirements.

**84.** Employees who are requested, referred and employed by Employers on the same day under hourly classifications in this Agreement shall be paid a minimum of eight (8) hours pay on the day they report to the job. Any overtime

SOFCO002231

worked after the normal quitting time shall be paid at the proper overtime rate in addition to the eight (8) hours minimum first day pay guarantee. The furnishing of a truck by a Mechanic shall not be a condition of employment. If an Employer is requesting a Mechanic from the Union, the Employer may require the new Mechanic to furnish a truck. If a Mechanic is required to furnish a truck, compensation will be negotiated between the Mechanic and the Employer.

**85.** Equipment Operator employees shall be required to carry sufficient tools to make minor repairs and adjustments in order to meet manufacturers daily maintenance requirements on the equipment they operate. This excludes diagnositc and electronic equipment.

**86.** If compressors, generators, boilers, hydraulic pumps or power pacs or any other type of power equipment is mounted piggyback on crane-type equipment requiring a crew, two (2) Operating Engineers will be employed at the Class "A" rate or any escalated rate in effect and under the weekly guarantee.

If the crane does not ordinarily require a crew, see Paragraph 78A, the employment of a second operator shall be at the discretion of the Employer. The jurisdiction of the Operating Engineers must be preserved, however, and if someone other than an Operating Engineer is used to operate the piggyback equipment, the contractor must immediately employ a second Operating Engineer at the Class "A" rate.

Where compressors up to 600 CFM or hydraulic pump, power pacs, etc. are operated and exclusively used to power attachments, such as hoe ram and other similar pieces of equipment, the equipment will be considered and manned as a piggyback operation. If a second person (Operating Engineer) is required, even though the equipment is located adjacent to the machine or crane and not mounted directly on the machine, the second person (Operating Engineer) operating the equipment is paid the Class "A" rate of pay for the day.

Where a second person is an apprentice, refer to the Registered Apprenticeship Wage Schedule on page 74.

If the crane does not require a crew, the auxiliary piece of equipment will be manned by an Operating Engineer and paid the appropriate rate of pay.

**87.** ZONES I, II and III - Toledo, and counties, Dayton

and counties, Cincinnati and counties, Columbus and counties, Akron and counties, including Summit and Portage:

When a contractor has eight (8) or more major Operating Engineers (major Operating Engineers A, B and C classifications) employed in the District, he/she shall employ a Master Mechanic. In addition to the Master Mechanic required above, if a contractor has eight (8) or more Operating Engineers (major Operating Engineers A, B and C classifications) employed by him/her on any one job, he/she shall employ a Master Mechanic on that job. The Master Mechanic so employed shall be answerable to the Employer and must be a member of the International Union of Operating Engineers, Local 18. Job Master Mechanics so employed shall be paid at the rate specified herein or paid fifty cents ($.50) per hour above the highest rate of any Operating Engineer working under his/her direction, whichever of these rates is higher.

On jobs where maintenance operators are to be employed, the first one (1) employed shall be Class A; the second one, if required, may be a Mechanic Trainee. Any further hire of maintenance operators shall be one (1) Class "A," then a Mechanic Trainee may be hired. This ratio of one (1) Class "A" to Mechanic Trainee shall be continued in the hire of all maintenance operators as required by the project requirements. Mechanics in training, working under these provisions, will be compensated according to the schedule provided under the "Field Mechanics Trainee Schedule."

**88.** Operators of equipment serviced by a Master Mechanic on a job site shall not be counted in the number of Operators within the District to determine when a Master Mechanic will be required for the District.

**89.** Employees shall be paid once each week, with not more than five (5) days withheld on the designated payday on the job prior to their normal quitting time. Failure to comply with this provision will require the Employer to pay these employees involved the double time rate if required to wait on the job. If required to return the next day to receive their pay, they shall be paid a minimum of four (4) hours at the hourly rate applicable for that day. These same conditions will apply to employees who are terminated after completion of their job assignment. In the event of the discharge of an employee, he/she

SOFCO002232

shall be paid immediately or his/her time will continue until he/she is paid off properly. If not paid off by normal quitting time, the aforementioned requirements will be applied if he/she is required to return the next day for his/her pay. Any employee discharged for just cause will receive their paycheck by the end of the next pay period.

**90.** Paychecks will show the following information:
(1) Total hours worked
(2) Overtime hours (premium hours)
(3) Gross pay
(4) All deductions listed
(5) All fringe contributions (to be shown as a total contribution)

**91.** Employees requiring relief, for sickness or other causes, must notify his/her immediate supervisor before leaving the job. Such relief shall be arranged through the Union District Office.

**92.** Employer agrees to carry Workers' Compensation or other equivalent liability insurance for the protection of all employees covered by this Agreement.

**93.** At the direction of the Employer's representative on the job, Operating Engineers shall be allowed proper time for necessary repairs and upkeep. During periods of major repairs there must be suitable shelter around equipment and heated from November through March.

**94.** On projects where at least eight (8) Operators are employed, the Employer, during the months of November 1 through April 30, will furnish a heated shelter where employees may change clothes.

**95.** Sanitary drinking water and toilet facilities will be available on the project in compliance with the provisions of the applicable state code.

**96.** The Employer agrees, upon the termination of any employee covered by this Agreement, to furnish such employee so released with a termination slip at the time of release, showing reason for said release. (Union will provide uniform numbered slips in duplicate; original for employee, duplicate for the Employer's file.)

**97.** No supervisory employee shall perform productive work or operate equipment which would deny an Operating Engineer employee employment.

**98.** In the reduction of forces on any project, it is agreed that non-area residents will be the first to be laid off except for a limited number of key men as mutually agreed by the Union and the Employer at the Pre-Job Conference. Non-area residents are herein defined as those who have not resided in the State of Ohio or in counties contiguous thereto, nor in Boone, Campbell, Kenton and Pendleton counties in Kentucky, or in counties contiguous thereto, for a period of one (1) year.

**99.** When an Employer rents or leases equipment manned from an Employer in signed relations with this Union, the Engineer or Crew may be transferred to the payroll of the lessee, providing the referral office servicing the job or project shall be notified prior to such transfer and provided further that such employee's employment by the lessee shall terminate upon the termination of the lease or rental of the equipment or any replacement thereof whichever is later.

**100.** When an Employer hires an Owner Operator with one (1) machine and the Owner Operator himself operates such single machine, the Owner Operator will be placed on the Employer's payroll. In the event that the above mentioned machine requires two (2) employees, such employees shall be placed on the Employer's payroll. However, when the Owner Operator has two (2) or more machines operating on the same job, he/she shall then be considered a sub-contractor and therefore come under the sub-contractors clause.

## ARTICLE IX

### TERM OF AGREEMENT

**101.** The Union will notify the Association which is signatory to this Agreement of the name and address of any contractor who becomes signatory to or bound by this Agreement during the term of this Agreement. The notice shall be given in writing within seven (7) days of the time any such contractor becomes signatory or bound hereto. The notice shall include a copy of the signature page of the contract or the assent card and, if not noted thereon, a statement of the date

the contract or assent card was signed or the date the contractor became bound.

**102.** Within seven (7) days of the receipt of a notice from the Union of its intent to terminate or modify this Agreement, the Association will notify all such contractors of whom the Association has been notified by the Union. Each such contractor shall have thirty (30) days from the date the Association received the notice of intent to terminate or modify to advise the Union in writing of its intent to negotiate separately for a renewal agreement.

**103.** In the event any such contractor fails to advise the Union of its intent to negotiate separately within the time period set forth above, such contractor shall be deemed and presumed to agree to the terms and Agreement arrived at in negotiations between the Union and the Association and to be bound by the collective bargaining agreement resulting therefrom.

**104.** The provisions of this section shall operate for successive collective bargaining agreements until such time as the Contractor or Union gives timely notice that said party desires to negotiate separately. Said notice shall be given within the time periods provided in the termination clause of this Agreement or any successive collective bargaining agreement.

**105.** The provisions of this Agreement shall continue in force and effect through April 30, 2010 and thereafter from year-to-year until termination at the option of either party, after sixty (60) days notice in writing to the other party.

## ARTICLE X

### APPRENTICES

**106.** In order to maintain sufficient skilled mechanics for the industry and, in order to present proper learning opportunities for youth and, in order to effectuate the principles and desires of the negotiating parties created by the foregoing, the negotiators hereby fully subscribe to the Ohio Operating Engineers Apprenticeship Fund Agreement and Declaration of Trust dated 20 October 65 as if they had originally negotiated the same. The only limitation upon the program is the Affirmative Action Program here attached (Exhibit "B"), in addition to

the proper rules, regulations, processes, and procedures enunciated by the Joint Apprenticeship and Training Committee established by the Trust of 20 October 65.

**107.** It is understood by the negotiating parties that a Registered Apprentice Engineer works under the direction of the Operating Engineer and the Joint Apprenticeship and Training Committee, and that the Operating Engineer shall see that he/she stays on the job, properly caring for his/her machine. The Employer shall give sufficient opportunity for the Registered Apprentice to operate under the supervision of the Operating Engineer when time and opportunity avails itself. The Area Coordinator of Apprentices shall be appraised periodically and by his request of performance to further the Registered Apprentices' learning situation. Registered Apprentices shall receive the scale enunciated by the Joint Apprenticeship and Training Committee in the time justified category that the Registered Apprentice has accomplished. For every five (5) Operating Engineer Journeymen employed by the company, there may be employed one (1) Registered Apprentice or Trainee Engineer through the referral when they are available.

## ARTICLE XI

### CONSTRUCTION INDUSTRY ADVANCEMENT PROGRAM

**108.** The Employer and the Union agree to and approve the establishment of a Construction Industry Advancement Program to promote the common good of the Construction Industry by providing financial support for activities which may include but not necessarily be restricted to: (a) promotion of safety; (b) market development; (c) protection of legitimate markets; (d) public relations; (e) personnel practices and labor relations; (f) education; (g) industry relations; (h) apprenticeship training; (i) participation in Funds and Plans provided for in collective bargaining agreement, such as Health and Welfare Plans; and (j) collection and distribution of information from and to all segments of the Construction Industry and related groups or authorities.

**109.** Each Employer bound by this Agreement shall pay fourteen cents ($.14) per hour worked effective May 1, 1998 to the AGC of Ohio Construction Industry Advancement Fund. Upon subsequent approval by the Health and Welfare Trust-

SOFCO002234

ees, such checks shall be transmitted along with the Health and Welfare payments to the Ohio Operating Engineers Health & Welfare Office located at 1180 Dublin Road, Columbus, Ohio 43215, no later than the fifteenth (15th) day of the month immediately following the calendar month.

A. Each Employer covered by this Agreement shall pay to the Construction Industry Advancement Program for each hour worked by each employee within the bargaining unit:

**EFFECTIVE MAY 1, 1998**

| | Div. | State | Total |
|---|---|---|---|
| Toledo | .10 | .14 | .24 |
| Akron | .08 | .14 | .22 |
| Dayton | .08 | .14 | .22 |
| Columbus | .05 | .14 | .19 |
| Cincinnati | .035 | .14 | .175 |

B. By the fifteenth (15th) day of the month following the close of the reporting period, in addition to making the payment required by Article IV of this Agreement, each Employer, if working in that geographical area, shall reproduce and send a copy of their remittance report to the appropriate division office along with their check for the number of hours worked by covered employees, multiplied by the division rate per hour.

Payments required under this Article shall be addressed as follows: Toledo Construction Industry Advancement Program, 1845 Collingwood Blvd., Toledo, Ohio 43264; Akron Construction Industry Advancement Program, 453 High Street, Suite 101, Akron, Ohio 44311; Dayton Construction Industry Advancement Program, 115 Linwood Street, Dayton, Ohio 45405; Columbus Industry Advancement Program, 1755 Northwest Blvd., Columbus, Ohio 43212; Cincinnati Construction Industry Advancement Program, 3 Kovach Drive, Cincinnati, Ohio 45215.

C. The Union shall have no participation or control of any kind or degree whatsoever nor shall the Union be connected in any way whatsoever with the Construction Industry Advancement Fund.

D. The Employer will hold the Union harmless from any liabilities arising out of the terms of Paragraph 108 through and inclusive of Paragraph 109D.

**110.** AGC of Ohio shall be the exclusive Administrator of the State Fund. Payments to the program shall be in accordance with instructions on forms furnished by the Association.

**111.** The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the fifteenth (15th) day of each month covering amounts due for the preceding month. If an Employer shall fail to make their payment when the same shall be due and payable, he shall be subject to an additional charge of one and one half percent (1-1/2%) per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses and impairment of reserves. In addition to the additional charges referred to herein, an Employer who fails to make timely payments shall be liable for legal fees and court costs incurred by the Association in collecting late payments.

**112.** Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and Fund of the Construction Industry Advancement Program shall not be distributed among any Employers, or the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

**113.** There is specifically excluded from the purposes of the Construction Industry Advancement Program the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during periods of work stoppages or strikes.

## ARTICLE XII

### UNION ADMINISTRATIVE DUES AND DEDUCTIONS

**114.** Upon notification by the Union that a uniform administrative dues deduction has been authorized by all employees of the Employer, the Employer shall deduct said uniform administrative dues. The Union shall be responsible for obtaining all individually signed authorizations.

**115.** Credit Union savings will be agreed to only if de-

SOFCO002235

ductions are the same for all employees and the Union is responsible for obtaining the voluntary authorization.

**116.** The Union agrees to indemnify and save the Employer harmless against any and all claims, suits or other forms of liability arising out of said deductions.

## ARTICLE XIII

### ENFORCEMENT MEASURES

**117.** It is agreed that all subcontractors shall be subject to the terms and provisions of this Agreement as it relates to the Operating Engineers.

**118.** The Union shall require that no Union person shall leave a job by quitting unless he/she has been properly relieved after giving ample notice of his/her intention to quit to the Employer.

**119.** The Union shall not transfer a Union person from one Employer to another without the consent of the Employer and the Union person involved. Neither shall the Employer transfer a Union person from his/her employ to another Employer's payroll without the consent of the Union person involved and the Union.

**120.** All employees of the Employer shall be allowed time to vote on Election Day as required by law on employees own time.

**121.** If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to the Employer.

**122.** There are areas within the scope of this Agreement for which the wages and conditions contained herein may not be appropriate due to competition or other reasons. In such cases, adjustments will be made in accordance with principles agreed to by the parties during negotiations.

**123.** No employee covered hereby may be discharged by an Individual Employer for refusing to cross a legal primary

picket line established by an International Union affiliated with the Building and Construction Trades Department of the AFL-CIO or a Local Union thereof or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Local Union thereof, which picket line has been authorized and sanctioned by proper authorities. No jurisdictional or illegal informational picket line shall be recognized.

## ARTICLE XIV

### NO STRIKE—NO LOCKOUT—ARBITRATION AND DISPUTES

**124.** The Company shall not cause, permit or engage in any lockout of its employees during the term of this Agreement.

The Union shall not authorize, cause, engage in or sanction, nor will any employee take part in any illegal slowdown, work stoppage, strike, picketing or other concerted interference against the Employer, or occurring at or around the Company's office or work locations during the term of this Agreement.

**125.** Should a dispute arise between any of the parties, (Employee, Company, Association and/or Union) to this Agreement as to its meaning, intent or the application of its terms, this dispute will be settled in accordance with the following grievance procedure:

**STEP 1:** The aggrieved employee shall first take up his/her grievance orally with the Employer's Supervisor or Representative. The employee may, if he/she so desires, have his/her Steward appear with him/her. The grievance shall be orally brought to the Employer's attention within three (3) working days of the occurrence or discovery of the grievance, but in no event will the grievance be honored by management later than fifteen (15) days past the incident giving rise to the complaint. A grievance not submitted within the time limit shall be deemed untimely and is waived.

**STEP 2:** In the event the grievance is not settled, the employee then shall put his/her grievance in writing within three (3) working days after STEP 1 meeting, dated and signed along with the contract Article effected and submit the grievance to the District Business Representative and he/she and the Business Representative shall meet with the Employer's Representative and attempt to settle the matter. If no settlement can be reached within ten (10) working days from the date

SOFCO002236

of the written grievance, then

**STEP 3:** The grievance may be referred to the State Joint Committee consisting of six (6) members, three (3) to be appointed by the Labor Relations Division of the AGC of Ohio and three (3) to be appointed by Local 18 of the International Union of Operating Engineers. Where the State Joint Committee, by majority vote (5 members or more), resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this agreement. In case of failure of either party to appear at the hearing of a grievance properly filed for hearing, the parties in attendance shall offer evidence in support of their position and the Committee shall dispose of the case on the basis of such evidence. If no settlement is reached at this STEP within fifteen (15) working days from the date the grievance is referred, then

**STEP 4:** The grievance shall then be referred to an Arbitrator selected by the Committee referred to in STEP 3. If the parties cannot agree on an Arbitrator within forty-eight (48) hours after the parties agree to submit the matter to arbitration, the parties shall jointly request the Federal Mediation and Conciliation Service to furnish a list of Arbitrators from which the Arbitrator shall be selected by the alternate striking of names.

**126.** The expenses and fees of the Arbitrator shall be shared equally by the parties. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms and provisions of this Agreement. The Arbitrator's decision shall be final and binding upon the parties hereto.

## ARTICLE XV

### DETERMINATION OF JURISDICTIONAL DISPUTES

**127.** Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement creating the Impartial Disputes Board. In particular, both parties agree to be bound by the provision of the Agreement which states: Any decision or interpretation of the Impartial Disputes Board shall immediately be accepted and complied with by all parties signatory to this Agreement.

The parties hereto agree that in the event of a jurisdictional dispute with any other Union or Unions, the dispute shall be submitted to the Impartial Jurisdictional Disputes Board for

settlement in accord with the Plan adopted by the Building Trades Department, AFL-CIO.

The parties hereto further agree that they will be bound by any decision or award of the Disputes Board. There shall be no stoppage of work or slowdown arising out of any such dispute. No jurisdictional work stoppages, and no jurisdictional picket lines shall be recognized.

This article of the contract will go into effect when the National A.G.C. reaffiliates with the Impartial Disputes Board.

## ARTICLE XVI

### I – 9

**128.** The Union and the Employers during the term of this Agreement agree to use their best efforts to establish a master file of I – 9 employment eligibility verification forms on all members. This file will be maintained at the Union office and be available for the Employer's use.

## ARTICLE XVII

### SAVINGS AND SEPARABILITY

**129.** It is mutually agreed that if any clause, terms or provisions of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other board or agency having jurisdiction in the matter, such clause, terms or provisions shall be or become inoperative of any effect without disturbing the other clauses, terms or provisions of this Agreement and the remaining part of this Agreement shall remain in full force and effect. In the event that any clause, terms or provisions of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other board or agency having jurisdiction in the matter, said clause, terms or provisions shall be re-negotiated to the mutual satisfaction of the parties, but during such re-negotiation work shall not be interrupted or stopped by lockout, strikes, boycotts or other labor troubles.

SOFCO002237

# ARTICLE XVIII

## EFFECTIVE

130. This Agreement shall be effective May 1, 2007 and shall remain in force and in accordance with the terms of Article IX hereof. Wage rates and fringe payments shall be effective as designated by this Agreement.

131. IN WITNESS WHEREOF, WE, the undersigned duly authorized Employer Representatives and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO) executed this Agreement on the 1st day of May, 2007.

**I.U.O.E. LOCAL 18 AND ITS BRANCHES**

S/PATRICK L. SINK
Business Manager

S/KENNETH M. TRIPLETT
President

S/FLOYD S. JEFFRIES
Vice President

S/CHARLES W. SCHERER
Recording-Corresponding Secretary

S/STEVE D. DELONG
Financial Secretary

S/PREMO P. PANZARELLO
Treasurer

S/RICHARD E. DALTON

S/LOUIS E. MONNIN

S/STEVEN R. HECKLER

**AGC OF OHIO LABOR RELATIONS DIVISION**

S/RICHARD HOBBS
Executive Vice President

S/BILL BRENNAN
President, Construction Contractors Council, Toledo (AGC)

S/MIKE DYER
Goettle Construction Co.
Vice President, Operations

# EXHIBIT "A"

## WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE I** covering Summit and Portage counties:

Classification: **MASTER MECHANIC**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $29.68 | $30.28* | $31.23* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

SOFCO002238

Classification: **GROUP A**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $29.43 | $30.03* | $30.98* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination—Concrete Mixers & Towers
All Concrete Pumps with booms
Cranes (all types)
(Boom & Jib 150'-180'—$29.93 effective 5/1/2007)
(Boom & Jib over 180' through 249'—$30.43 effective 5/1/2007)
(Boom & Jib 250' and over—$30.68 effective 5/1/2007)
(Boom & Jib 150'-180'—$30.53* effective 5/1/2008)
(Boom & Jib over 180' through 249'—$31.03* effective 5/1/2008)
(Boom & Jib 250' and over—$31.28* effective 5/1/2008)

(Boom & Jib 150'-180'—$31.48* effective 5/1/2009)
(Boom & Jib over 180' through 249'—$31.98* effective 5/1/2009)
(Boom & Jib 250' and over—$32.23* effective 5/1/2009)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Cranes—Self Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

SOFCO002239

Classification: **GROUP B**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $29.33 | $29.93* | $30.88* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saw, vermeer type
Endloaders
Hydro Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: **GROUP C**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $28.29 | $28.89* | $29.84* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating Well Points or other types of Dewatering Systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

SOFCO002240

Classification: **GROUP D**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $27.07 | $27.67* | $28.62* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Backfillers & Tampers
Ballast Relocator
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps (without boom with 4" or smaller system)
Concrete Spreaders
Conveyors, used for handling materials
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers, except asphalt rollers
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot post roller or grader
VAC/ALLS
Vibratory Compactors, with integral power
Welders

Classification: **GROUP E**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $21.78 | $22.38* | $23.33* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Allen Screed Paver (concrete)
Boilers (less than 15 lbs. pressure)
Cranes—Compact; track or rubber under 4,000 pounds)
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Oilers/Helpers
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

SOFCO002241

## EXHIBIT "A"

### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE II** covering Lucas and Wood counties:

Classification: **MASTER MECHANIC**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $28.94 | $29.54* | $30.49* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Classification: **GROUP A**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $28.69 | $29.29* | $30.24* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination—Concrete Mixers & Towers
All Concrete Pumps with booms
Cranes (all types)
(Boom & Jib 150'-180'—$29.19 effective 5/1/07)
(Boom & Jib over 180' through 249'—$29.69 effective 5/1/07)
(Boom & Jib 250' and over—$29.94 effective 5/1/07)
(Boom & Jib 150'-180'—$29.79* effective 5/1/08)
(Boom & Jib over 180' through 249'—$30.29* effective 5/1/08)
(Boom & Jib 250' and over—$30.54* effective 5/1/08)
(Boom & Jib 150'-180'—$30.74* effective 5/1/09)
(Boom & Jib over 180' through 249'—$31.24* effective 5/1/09)
(Boom & Jib 250' and over—$31.49* effective 5/1/09)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Cranes—Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls

(Continued on next page)

SOFCO002242

Helicopter Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

Classification: **GROUP B**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $28.57 | $29.17* | $30.12* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saw, vermeer type
Endloaders
Hydro Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

SOFCO0002243

Classification: **GROUP C**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $27.53 | $28.13* | $29.08* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $26.35 | $26.95* | $27.90* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Ballast Relocator
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms and with 4" system or smaller
Concrete Spreaders
Conveyors, used for handling building material
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines

*(Continued on next page)*

SOFCO002244

Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt rollers)
Self-Propelled Power Spreaders
Self-Propelled Sub-Graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot roller or grader
VAC/ALLS
Vibratory Compactors, with integral power
Welder

Classification: **GROUP E**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $20.89 | $21.49* | $22.44* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Allen Screed Paver (concrete)
Boilers (less than 15 lbs. pressure)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Directional Drill "Locator"
Fueling & greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators

Masonry Fork Lifts
Oilers/Helpers
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

## EXHIBIT "A"
### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE III** covering Akron and counties, Cincinnati and counties, Columbus and counties, Dayton and counties, and Toledo and counties:

For AKRON and the following counties: Ashland, Belmont, Carroll, Coshocton, Guernsey, Harrison, Holmes, Jefferson, Monroe, Noble, Richland, Stark, Tuscarawas, Washington and Wayne.

For CINCINNATI and the following counties: Adams, Athens, Brown, Clermont, Gallia, Hamilton, Highland, Jackson, Lawrence, Meigs, Morgan, Ross, Scioto and Vinton. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

For COLUMBUS and the following counties: Crawford, Delaware, Fairfield, Franklin, Hocking, Knox, Licking, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Union and Wyandot.

For DAYTON and the following counties: Auglaize, Butler, Champaign, Clark, Clinton, Darke, Fayette, Greene, Logan, Madison, Mercer, Miami, Montgomery, Preble, Shelby and Warren.

For TOLEDO and the following counties: Allen, Defiance, Fulton, Hancock, Hardin, Henry, Ottowa, Paulding, Putnam, Sandusky, Seneca, Van Wert and Williams.

SOFCO002245

Classification: **MASTER MECHANIC**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $28.19 | $28.79* | $29.74* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Classification: **GROUP A**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $27.94 | $28.54* | $29.49* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination—Concrete Mixers & Towers
All Concrete Pumps with booms
Cranes (all types)
(Boom & Jib 150'-180'—$28.44 effective 5/1/07)
(Boom & Jib over 180' through 249'—$28.94 effective 5/1/07)
(Boom & Jib 250' and over—$29.19 effective 5/1/07)
(Boom & Jib 150'-180'—$29.04* effective 5/1/08)

*(Continued on next page)*

SOFCO002246

(Boom & Jib over 180' through 249'—$29.54* effective 5/1/08)
(Boom & Jib 250' and over—$29.79* effective 5/1/08)
(Boom & Jib 150'-180'—$29.99* effective 5/1/09)
(Boom & Jib over 180' through 249'—$30.49* effective 5/1/09)
(Boom & Jib 250' and over—$30.74* effective 5/1/09)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Cranes—Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (Multiple Drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders
Rail Tampers (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

Classification: **GROUP B**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $27.82 | $28.42* | $29.37* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders
Hydro Milling Machines
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

SOFCO002247

Classification: **GROUP C**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $26.78 | $27.38* | $28.33* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps without booms and with 5" system
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)

Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $25.60 | $26. 20* | $27.15* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Ballast Relocators
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats

*(Continued on next page)*

SOFCO002248

Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreading Machines
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen in asphalt plants
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder Operators

Classification: **GROUP E**

| | 5/1/2007 | 5/1/2008 | 5/1/2009 |
|---|---|---|---|
| | $20.14 | $20.74* | $21.69* |
| Health & Welfare | 5.91 | 6.31 | 6.66 |
| Pension | 3.65 | 4.00 | 4.00 |
| Apprenticeship | .50 | .50 | .50 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Allen Screed Pavers (concrete)
Boilers (less than 15 lbs. pressure)
Cranes—Compact; track or rubber under 4,000 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Oilers/Helpers and Signalmen
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Submersible Pumps (under 4" discharge)

SOFCO002249

## REGISTERED APPRENTICESHIP WAGE SCHEDULE

### ZONE I, ZONE II, ZONE III

| | |
|---|---|
| First Year Apprentice<br>50% of Class "A" | Third Year Apprentice<br>70% of Class "A" |
| Second Year Apprentice<br>60% of Class "A" | Fourth Year Apprentice<br>80% of Class "A" |

A new classification of Trainee is hereby established and the rates of pay are as follows:

| | |
|---|---|
| First Year Trainee<br>60% of Bulldozer Rate | Third Year Trainee<br>75% of Bulldozer Rate |
| Second Year Trainee<br>60% of Bulldozer Rate | Fourth Year Trainee<br>90% of Bulldozer Rate |

There will be a 10% increase for the apprentices on top of the percentages listed above provided they are operating mobile equipment.

The rates paid to the Apprentice or Trainee shall not exceed the classification rate the Apprentice or Trainee is working. For every five (5) Operating Engineer Journeymen employed, there may be employed one (1) Registered Apprentice Engineer or Trainee. Through the referral, Employers may employ Registered Apprentices or Trainees within this limitation when they are available. Any increase in the Apprenticeship contributions, agreed by the parties, will be shared equally by the Union and Employer.

## FIELD MECHANIC TRAINEE SCHEDULE

| | |
|---|---|
| First Year | 50% of Class "A" rate |
| Second Year | 60% of Class "A" rate |
| Third Year | 70% of Class "A" rate |
| FourthYear | 80% of Class "A" rate |

Only those individuals who have obtained a two (2) year Associates Degree, from an accredited school, will be accepted into this program. If the Mechanic Trainee is required to have a CDL license, he/she will be paid a 10% incentive above the percentages listed above. After successful completion of the fourth year, the Mechanic will be paid at Class "A" rate.

## SPECIAL RATES

Any work under A, B and C as described in Article I of this Agreement awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## EXHIBIT "B"

### AFFIRMATIVE ACTION PROGRAM

1. Under the provisions of Executive Order 11246, issued by the President of the United States, and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations as revised, and relative court orders, a specific affirmative program must be developed to assure that the employment of workers and the treatment of employees during employment is completely nondiscriminatory in regard to race, creed, color, sex, age, religion or national origin.

2. The parties to this Agreement are mutually desirous of developing an affirmative action agreement to implement the provisions of applicable federal regulations in order to assure nondiscrimination in employment; upgrading; demotion or transfer; recruitment and recruitment advertising; lay-off or termination; rate of pay and selection for all types of training.

3. In order to assure nondiscrimination now and in the future and in an effort to attract a maximum number of potential apprentices from minority and female groups, the parties to this Agreement have formulated the following Affirmative Action Program:

#### A. APPRENTICESHIP

The parties agree to establish a positive program of apprenticeship selection and to use the following program to attract minority and female groups to the Operating Engineers Apprenticeship Program:

1. Develop a "fact sheet" for distribution to all secondary school counselors, youth opportunity centers, social action agencies and state employment offices.

SOFCO002250

2. Make available speakers to inform and advise high school students and others of opportunities in apprenticeship for Operating Engineers.

3. Notify all interested agencies and parties thirty (30) days prior to the period for taking applications; and making such interested agency or parties aware of the nature of all tests in order to facilitate a proper pre-test educational effort.

4. Provide application forms for apprenticeship and adequate instruction for properly preparing same upon request, during recruitment period at all training sites of the Operating Engineers Apprenticeship Program at certain union halls of Local 18. Develop an outreach program for the recruiting and pre-apprentice training of individuals from minority and female groups to enable them to enter the apprenticeship program.

5. To use a standardized, uniform battery of tests to determine applicant proficiency and aptitudes in reading, computation and mechanical skills suitable for the craft of Operating Engineer.

6. May have the test administered by an agency other than the Operating Engineers Apprenticeship Program and uniformly and numerically graded.

7. Interview sufficient applicants personally by teams consisting of one representative of Management and one of the Union who shall independently grade each applicant individually and then average the scores.

8. When an applicant fails to achieve acceptance, the Joint Apprenticeship and Training Committee shall make every effort to inform the applicant and the referring or cooperating agency of the area of insufficiency.

9. In order for the applicant, after acceptance as an Operating Engineer Apprentice, to become immediately employable by a Participating Employer, the Joint Apprenticeship and Training Committee shall provide training sites with equipment of the nature for which the apprentice will be employed, in order to acquaint the apprentice with safety measures as well as the operation and maintenance of the same and teach him/her the use of the machine as a tool of the trade and to generate good work habits. After the training, he/she shall be employed as an "apprentice-in-training" as such openings occur.

10. The parties to this Agreement agree to jointly assist a minority group employee to be integrated into the work force and the Union by:

A. Having management supervision on the job make every effort to assist and encourage minority group apprentices and to welcome such individuals to the job;

B. Have each apprentice and pre-apprentice trainee assigned to a Journeyperson Operating Engineer for help and assistance, and

C. Have Union officers inform the membership of the importance of making welcome all minority groups into the Union, and

D. The education, training requirements and disciplines of registered apprentices shall be governed by the Apprenticeship Joint Apprenticeship and Training Committee and Standards.

**B. JOURNEYPERSONS**

1. The parties will undertake a joint training program to assure equal opportunity to all journeypersons who desire to acquire the skills required to work on a variety of equipment within the jurisdiction of the Operating Engineers.

2. Local Union officials will notify minority and female members of this program. They will offer to minority and female members an opportunity for training on any highway equipment. If the parties determine that a minority or female group member lacks adequate pre-training qualifications, the reasons for such determination shall be noted in writing and shall be available for inspection during a review of this program by appropriate federal contracting or administering agency officials. An attempt shall be made to have availability of training according to the demands for craftsmen to operate the specific type of equipment involved.

3. Each member of the Local will be advised of this Agreement and the appropriate avenues for redress if any of its terms are breached by either party.

The parties undertake this Affirmative Action Program in accordance with Executive Order 11246 and applicable court orders. It is their understanding that participation in the pro-

gram by any Contractor shall be accepted in lieu of that portion of a required affirmative action plan which would otherwise be directed to jobs manned by members of the Operating Engineers Union.

The parties shall from the date of this Agreement, when required, report to the appropriate federal contracting or administering agency. The report will specifically indicate the total number of minority group individuals or females in the Union. In evaluating these reports, the appropriate federal contracting or administering agency officials will have complete access to relevant records of the parties and will be expected to discuss the progress of the program freely with the parties and Union members.

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

________________________________________
Name of Employer (Printed)

________________________________________
Employer Address

________________________________________
City State Zip Code

________________________________________
Area Code & Telephone

________________________________________
Authorized Employer Representative (Signature) Date

________________________________________
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

________________________________________
District Representative (Signature)

CONTRACTORS COPY (ORIGINAL SIGNATURE)

SOFCO002252

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City State Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature) Date

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

District Representative (Signature)

HEADQUARTERS COPY (ORIGINAL SIGNATURE)

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City State Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature) Date

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

District Representative (Signature)

UNION DISTRICT COPY (ORIGINAL SIGNATURE)

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City State Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature) Date

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

District Representative (Signature)

FRINGE OFFICE COPY (ORIGINAL SIGNATURE)

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City State Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature) Date

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

District Representative (Signature)

ASSOCIATION COPY (ORIGINAL SIGNATURE)



SAFETY
IS OUR TARGET

SOFCO002257

SAFETY IS OUR TARGET

# AGC OF OHIO BUILDING AGREEMENT

**Effective**
**May 1, 2004 through April 30, 2007**

**Between**

**THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 18 AND ITS BRANCHES, (AFL-CIO)**

**AND**

**LABOR RELATIONS DIVISION OF THE AGC OF OHIO**

SOFCO002159

**EMPLOYERS**

**LABOR RELATIONS DIVISION**
**AGC OF OHIO**

**1755 N.W. Boulevard**
**Columbus, Ohio 43212**
**(614) 486-6446**
**FAX: (614) 486-6498**
**TOLL FREE: (800) 557-6446**

**Richard Hobbs**
**Executive Director**

## INDEX

| | Paragraph |
|---|---|
| Affirmative Action Program | Exhibit B |
| Apprentices | 106–107 |
| Arbitration | 125–126 |
| Bonding | 47 |
| Construction Advancement Program | 108–113 |
| Crews and General Provisions | 77–100 |
| Date Signed and Signatures | 131 |
| Dewatering | 13 |
| Discharges | 19 or 25 |
| Divert Wage Increase | 43 |
| Drug Testing | 30 |
| Duration of Agreement | 105 |
| Effective Date of Agreement | 130–131 |
| Employees' Relief | 91 |
| Enforcement Measures | 117–123 |
| Equipment Rental | 99 |
| Escalator Clause and Complementing | 69 |
| Field Mechanic Trainee Wage Schedule | Exhibit A |
| Four Ten Work Schedule | 63A–G |
| Fringe Benefit Programs | 41–47 |
| Grievance Procedure | 125–126 |
| Harassment Policy | 31 |
| Hazardous Waste Projects | 15, 29 |
| Heaters-Pumps-Boilers–24 hour, 7 day | 68 |
| Holidays | 67 |
| Hourly First-Day Pay | 84 |
| Hourly Pay | 53 or 56 |
| I–9 | 128 |
| Incentive Pay | |
| Underground, Height and Length Booms | 70–76 |
| Jurisdiction-Work | 10–12 |
| Jurisdictional Area | 1–2 |
| Jurisdictional Disputes | 127 |
| Lay-Off | 25, 55, 60, 89 |
| Liabilities | 5 |
| Management Rights | 7 |
| Master Mechanic, Zones 1, 2 & 3 | 87–88 |
| New Unclassified Equipment | 50 |
| Nondiscrimination | 8–9 |

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

______________________________
Name of Employer (Printed)

______________________________
Employer Address

______________________________
City State Zip Code

______________________________
Area Code & Telephone

______________________________
Authorized Employer Representative (Signature) Date

______________________________
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

______________________________
District Representative (Signature)

ASSOCIATION COPY (USE NO CARBON)

## INDEX (continued)

| | Paragraph |
|---|---|
| Oilers, Boiler Operators, Helpers Signalmen Provisions | 77–80 |
| Overtime | 62–64 |
| Owner-Operator | 100 |
| Pay Checks | 90 |
| Pay Day | 89 |
| Picket Lines | 123 |
| Piggyback Operation | 86 |
| Pre-Job Conference | 15–16 |
| Provisions and Limitations | 6 |
| Recognition | 4 |
| Referral Policy (Hiring Procedures) | 32–40 |
| Registered Apprentice Wage Schedule | Exhibit A |
| Repairs | 93 |
| Reporting Pay | 59 |
| Safety Program | 26–29 |
| Savings and Separability | 129 |
| Scope of Agreement | 3 |
| Shifts | 81 |
| Site Clearance | 63 |
| Starting Time | 62 |
| Steward | 24–25 |
| Strikes | 124 |
| Sub-Contractors | 117 |
| Supervisory Employees | 97 |
| Termination Slips | 96 |
| Trainee Wage Schedule | Exhibit A |
| Transfer of Union Employees | 119 |
| Transfers on Job Equipment | 21–22 |
| Union Administrative Dues and Deductions | 114–116 |
| Union Shop | 17–18 |
| Wage Rates | Exhibit A |
| Weekly Pay | 52 or 54–55 |
| Work Week | 61 |
| | **Page** |
| Text of Agreement | 1–50 |
| Exhibit A, Wage Rates & Fringe Benefits | 51–75 |
| Exhibit B, Affirmative Action Program | 75–78 |
| Acceptance of Agreement | 79–88 |

## DIRECTORY

OFFICERS

Local 18 and its Branches
Headquarters Office
3515 Prospect Avenue
Cleveland, Ohio 44115
216-432-3138
FAX: 216-432-0370

Patrick L. Sink
Business Manager

Kenneth M. Triplett
President

Floyd S. Jeffries
Vice President

Charles W. Scherer
Recording-Corresponding Secretary

Larry G. Reynolds
Financial Secretary

Premo P. Panzarello
Treasurer

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

______________________________
Name of Employer (Printed)

______________________________
Employer Address

______________________________
City State Zip Code

______________________________
Area Code & Telephone

______________________________
Authorized Employer Representative (Signature) Date

______________________________
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

______________________________
District Representative (Signature)

FRINGE OFFICE COPY (USE NO CARBON)

## DISTRICT NO. 1

Covering the following counties in Ohio:

Ashtabula
Cuyahoga
Erie
Geauga
Huron
Lake
Lorain
Medina

District Representatives

Steve DeLong
Jeff Milum
Donald Taggart
Steven Mayor
Premo Panzarello
Scott Ranftl
John Liscoe, Jr.

3515 Prospect Avenue, Cleveland, Ohio 44115
Office: 216-432-3131
FAX: 216-432-3135

## DISTRICT NO. 2

Covering the following counties in Ohio:

Allen
Defiance
Fulton
Hancock
Hardin
Henry
Lucas
Ottawa
Paulding
Putnam
Sandusky
Seneca
Van Wert
Williams
Wood

District Representatives

Charles Lafaso, Jr.
Gary Slesel
Steve Heckler
Andrew Myers

2412 South Reynolds Road, Toledo, Ohio 43614
Office: 419-865-0221
FAX: 419-865-0601

## DISTRICT NO. 3

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Crawford | Hocking | Marion | Pickaway |
| Delaware | Knox | Morrow | Union |
| Fairfield | Licking | Muskingham | Wyandot |
| Franklin | | Perry | |

District Representatives
Greg Kingsbury

Tommy Thompson — Rolland Llewellyn
Larry Bodner — Tim Hammock
Mark Totman, Legislative Representative

1188 Dublin Road, Columbus, Ohio 43215
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 4

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Auglaize | Clinton | Logan | Montgomery |
| Butler | Darke | Madison | Preble |
| Champaign | Fayette | Mercer | Shelby |
| Clark | Greene | Miami | Warren |

District Representatives
Richard Dalton

Louis Monnin — Scott Clark

6051 N. Dixie Drive, Dayton, Ohio 45414
Office: 937-890-5914
FAX: 937-890-5180

MAILING ADDRESS: P.O. Box 13462, Northridge Branch
Dayton, Ohio 45413

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

______________________________
Name of Employer (Printed)

______________________________
Employer Address

______________________________
City State Zip Code

______________________________
Area Code & Telephone

______________________________
Authorized Employer Representative (Signature) Date

______________________________
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

______________________________
District Representative (Signature)

UNION DISTRICT COPY (USE NO CARBON)

## DISTRICT NO. 5

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Adams | Gallia* | Lawrence* | Ross* |
| Athens* | Hamilton | Meigs* | Scioto* |
| Brown | Highland | Morgan* | Vinton* |
| Clermont | Jackson* | Pike* | |

Covering the following counties in Kentucky:
Boone, Campbell, Kenton, Pendleton

District Representatives
Larry G. Reynolds
Gerald Hall
Bill Burdett

9730 Reading Road (Cincinnati) Evendale, Ohio 45215
Office: 513-733-5575
FAX: 513-733-4672

*Counties served through District No. 3, Columbus office
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 6

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashland | Harrison | Noble | Summit |
| Belmont | Holmes | Portage | Tuscarawas |
| Carroll | Jefferson | Richland | Washington |
| Coshocton | Monroe | Stark | Wayne |
| Guernsey | | | |

District Representatives
Steve DiLoreto
Floyd Jeffries
Joe Lucas
Tom James
Bill Larrick

1707 Triplett Boulevard, Akron, Ohio 44306
Office: 330-784-5461
FAX: 330-784-8827

## LOCAL 18S
## STATIONARY ENGINEERS

Representatives

Charles W. Scherer — Scott Peters
James Kumse — Thomas Ridenbaugh

3515 Prospect Avenue
Room 206
Cleveland, Ohio 44115
Office: 216-432-2668
FAX: 216-432-0796

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

________________________________________
Name of Employer (Printed)

________________________________________
Employer Address

________________________________________
City State Zip Code

________________________________________
Area Code & Telephone

________________________________________
Authorized Employer Representative (Signature) Date

________________________________________
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

________________________________________
District Representative (Signature)

HEADQUARTERS COPY (USE NO CARBON)

# AGREEMENT

**Between**

**The AGC OF OHIO**
**Labor Relations Division**

**which may be referred to hereinafter as the "Association"**

**and**

**THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 18 AND ITS BRANCHES, (AFL-CIO)**
**referred to hereinafter as the "Union"**

This Agreement is negotiated by and between the Association and the Union within the geographical area as defined herein through their authorized agents, to wit:

That, whereas, the parties desire to stabilize employment and promote efficiency in the Construction Industry, agree upon wage rates, hours and conditions of employment, and to eliminate strikes, boycotts, lockouts and stoppages of work, and

Whereas, the Union and the Employer shall, through the issuance of working rules and regulations to the workmen, inform them of the terms of this Agreement and enforce compliance with the terms thereof, and

Whereas, the Employers agree to recognize and subscribe to the approved referral system as adopted by the International Union of Operating Engineers, Local 18.

Now, therefore, the undersigned Association and the Union agree as follows:

## ARTICLE I

### GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Erie, Geauga, Huron, Lake, Medina, Lorain, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

### DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

### SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

______________________________
Name of Employer (Printed)

______________________________
Employer Address

______________________________
City State Zip Code

______________________________
Area Code & Telephone

______________________________
Authorized Employer Representative (Signature) Date

______________________________
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

______________________________
District Representative (Signature)

CONTRACTORS COPY (USE NO CARBON)

gram by any Contractor shall be accepted in lieu of that portion of a required affirmative action plan which would otherwise be directed to jobs manned by members of the Operating Engineers Union.

The parties shall from the date of this Agreement, when required, report to the appropriate federal contracting or administering agency. The report will specifically indicate the total number of minority group individuals or females in the Union. In evaluating these reports, the appropriate federal contracting or administering agency officials will have complete access to relevant records of the parties and will be expected to discuss the progress of the program freely with the parties and Union members.

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## ARTICLE II

### RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**–The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**–This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting

SOFCO002170

without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

6. **Provisions and Limitations**–All members of the AGC of Ohio Labor Relations Division, and such other persons, firms or corporations who, as an Employer, become signatory to this Agreement, shall be bound by all of its terms and conditions, as well as any amendments which may be negotiated between the AGC of Ohio Labor Relations Division, and the Union. It is expressly understood that all Employers bound to the terms and conditions of this Agreement are required to pay the amounts as indicated in Article IV to the appropriate Fringe Benefit Programs.

7. **Management Rights**–The operation of the job and the direction of the working forces, including the right to hire, suspend and discharge for proper cause, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer.

8. **Nondiscrimination**–It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio and the Commonwealth of Kentucky and Lawful Orders thereof relative to nondiscrimination and fair employment practices. The Employer and the Union shall not knowingly discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or Apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

9. Further, the Employer and Union agree to adopt and embrace the Pact of 10 July 68 executed under provisions of the Executive Order 11246 and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations revised; an Affirmative Action Program to implement all provisions of applicable federal regulations to assure nondiscrimination in employment, upgrade, demotion or transfer, and recruitment advertising, layoff or termination, rates of pay and selection for all types of training as evidenced in Exhibit "B" attached hereto as if they had originally negotiated the same.

10. **Jurisdiction of Work**–In accordance with the terms of this Agreement, the Employer shall employ Operating Engi-

10. The parties to this Agreement agree to jointly assist a minority group employee to be integrated into the work force and the Union by:

A. Having management supervision on the job make every effort to assist and encourage minority group apprentices and to welcome such individuals to the job;

B. Have each apprentice and pre-apprentice trainee assigned to a Journeyperson Operating Engineer for help and assistance, and

C. Have Union officers inform the membership of the importance of making welcome all minority groups into the Union, and

D. The education, training requirements and disciplines of registered apprentices shall be governed by the Apprenticeship Joint Apprenticeship and Training Committee and Standards.

**B. JOURNEYPERSONS**

1. The parties will undertake a joint training program to assure equal opportunity to all journeypersons who desire to acquire the skills required to work on a variety of equipment within the jurisdiction of the Operating Engineers.

2. Local Union officials will notify minority and female members of this program. They will offer to minority and female members an opportunity for training on any highway equipment. If the parties determine that a minority or female group member lacks adequate pre-training qualifications, the reasons for such determination shall be noted in writing and shall be available for inspection during a review of this program by appropriate federal contracting or administering agency officials. An attempt shall be made to have availability of training according to the demands for craftsmen to operate the specific type of equipment involved.

3. Each member of the Local will be advised of this Agreement and the appropriate avenues for redress if any of its terms are breached by either party.

The parties undertake this Affirmative Action Program in accordance with Executive Order 11246 and applicable court orders. It is their understanding that participation in the pro-

2. Make available speakers to inform and advise high school students and others of opportunities in apprenticeship for Operating Engineers.

3. Notify all interested agencies and parties thirty (30) days prior to the period for taking applications; and making such interested agency or parties aware of the nature of all tests in order to facilitate a proper pre-test educational effort.

4. Provide application forms for apprenticeship and adequate instruction for properly preparing same upon request, during recruitment period at all training sites of the Operating Engineers Apprenticeship Program at certain union halls of Local 18. Develop an outreach program for the recruiting and pre-apprentice training of individuals from minority and female groups to enable them to enter the apprenticeship program.

5. To use a standardized, uniform battery of tests to determine applicant proficiency and aptitudes in reading, computation and mechanical skills suitable for the craft of Operating Engineer.

6. May have the test administered by an agency other than the Operating Engineers Apprenticeship Program and uniformly and numerically graded.

7. Interview sufficient applicants personally by teams consisting of one representative of Management and one of the Union who shall independently grade each applicant individually and then average the scores.

8. When an applicant fails to achieve acceptance, the Joint Apprenticeship and Training Committee shall make every effort to inform the applicant and the referring or cooperating agency of the area of insufficiency.

9. In order for the applicant, after acceptance as an Operating Engineer Apprentice, to become immediately employable by a Participating Employer, the Joint Apprenticeship and Training Committee shall provide training sites with equipment of the nature for which the apprentice will be employed, in order to acquaint the apprentice with safety measures as well as the operation and maintenance of the same and teach him/her the use of the machine as a tool of the trade and to generate good work habits. After the training, he/she shall be employed as an "apprentice-in-training" as such openings occur.

neers for the erection, operation, assembly and disassembly and maintenance and repair of the following construction equipment regardless of motive power: Air Compressors, Batch Plants, Boilers, Cableways, Derricks, Finishing Machines, Pumps, Trucks, Crawlers, Locomotive and Tower Cranes; Concrete Mixers and Concrete Mixing Plants, Hoes, Shovels, Pile Drivers, Tractors, Scrapers, Endloaders, Hoists and all like equipment, including the use of Geodimeter or any other device that electronically measures (shoots) distance shall be the work of the Operating Engineers (only applies to in-house crew) within the jurisdiction as assigned to the Union by the American Federation of Labor. It is further understood that all equipment for which classifications and wages have been established in this Agreement, and including that equipment for which classifications and wage rates may hereafter be established, shall be manned, when operated on the job site, by a member of the International Union of Operating Engineers, and paid the rates as specified in this Agreement.

11. Operating Engineers shall be employed to do all pipe fitting and all burning and welding necessary for the preparation and maintaining of equipment operated by members of the Union.

12. Operating Engineers shall be assigned to all work performed in connection with the installation, fueling, starting and stopping, repair, maintenance and operation of the below listed small equipment:

Compressors of 185 CFM or less (not discharging into a common header)
Heaters
Welding machines of 300 amp or less
Gas or diesel driven pumps 4" and under (or one 6" pump)
Generators of 15 KW or less
Conveyors 18" belt or less

A combination up to five (5) pieces of the above equipment shall, when in use, be serviced as an additional duty by an Operating Engineer who is employed by an Employer on a project. When six (6) pieces of the above equipment are in use on an Employer's project, a Utility Operator will be employed at the Class "C" rate. The Utility Operator shall also perform other work on the project.

In the event there are no Operating Engineers employed by the Employer on the project, the Employer shall employ an Operating Engineer at the Class "E" rate to service any small equipment in use, until the Class "C" rate becomes in effect.

An Operating Engineer shall be assigned to all work performed in connection with the installation, maintenance, repair and starting and stopping of electric submersible pumps. Necessary work on electric submersible pumps shall be assigned to an Operating Engineer working on the project as an additional duty; no full-time Operator is required.

Work in the servicing and maintaining of self-contained, mobile light plants shall be assigned to an Operating Engineer as an additional duty to his/her regular job. Such work shall normally be assigned to a Mechanic, Grease Crew or Oiler. Equipment operator employees shall be required to carry sufficient tools to make minor adjustments on the equipment they operate.

When an Oiler/Helper is assigned as the primary operator to a fuel/grease combo vehicle which requires specialized CDL endorsement, he/she will receive a $3.00 per hour premium over the Class "E" rate.

**13. Dewatering Systems**–A "Dewatering System" is defined as a combination of one or more pumps of any type, size or motive power with combined discharge capacity of over 4", including but not limited to, well-point pumps, submersible well pumps, ejector or educator pumps in combination with wells, well-points, sumps, piping and/or other appurtenances irrespective of motive power to control water on any and all types of construction work. The complete installation, operation and necessary maintenance work, including all piping, shall be performed by Operating Engineers. A Dewatering System shall be operated by Pump Operators at all times the Dewatering System is in operation unless otherwise agreed at the Pre-Job Conference or with the Union.

**14.** The Union will at all times, when requested by the Employer, use its best efforts to furnish the Employer with competent employees to operate, maintain and repair equipment in accordance with the terms and conditions of this Agreement.

**15. Pre-Job**–It is agreed that upon the request of either party a Pre-Job Conference shall be held prior to commencing work. In case of a necessary emergency start of the construc-

## SPECIAL RATES

Any work under A, B and C as described in Article I of this Agreement awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## EXHIBIT "B"

### AFFIRMATIVE ACTION PROGRAM

1. Under the provisions of Executive Order 11246, issued by the President of the United States, and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations as revised, and relative court orders, a specific affirmative program must be developed to assure that the employment of workers and the treatment of employees during employment is completely nondiscriminatory in regard to race, creed, color, sex, age, religion or national origin.

2. The parties to this Agreement are mutually desirous of developing an affirmative action agreement to implement the provisions of applicable federal regulations in order to assure nondiscrimination in employment; upgrading; demotion or transfer; recruitment and recruitment advertising; lay-off or termination; rate of pay and selection for all types of training.

3. In order to assure nondiscrimination now and in the future and in an effort to attract a maximum number of potential apprentices from minority and female groups, the parties to this Agreement have formulated the following Affirmative Action Program:

### A. APPRENTICESHIP

The parties agree to establish a positive program of apprenticeship selection and to use the following program to attract minority and female groups to the Operating Engineers Apprenticeship Program:

1. Develop a "fact sheet" for distribution to all secondary school counselors, youth opportunity centers, social action agencies and state employment offices.

SOFCO002173

## REGISTERED APPRENTICESHIP WAGE SCHEDULE

### ZONE I, ZONE II, ZONE III

| | |
|---|---|
| First Year Apprentice 50% of Class "A" | Third Year Apprentice 70% of Class "A" |
| Second Year Apprentice 60% of Class "A" | Fourth Year Apprentice 80% of Class "A" |

A new classification of Trainee is hereby established and the rates of pay are as follows:

| | |
|---|---|
| First Year Trainee 60% of Bulldozer Rate | Third Year Trainee 75% of Bulldozer Rate |
| Second Year Trainee 60% of Bulldozer Rate | Fourth Year Trainee 90% of Bulldozer Rate |

There will be a 10% increase for the apprentices on top of the percentages listed above provided they are operating mobile equipment.

The rates paid to the Apprentice or Trainee shall not exceed the classification rate the Apprentice or Trainee is working. For every five (5) Operating Engineer Journeymen employed, there may be employed one (1) Registered Apprentice Engineer or Trainee. Through the referral, Employers may employ Registered Apprentices or Trainees within this limitation when they are available. Any increase in the Apprenticeship contributions, agreed by the parties, will be shared equally by the Union and Employer.

## FIELD MECHANIC TRAINEE SCHEDULE

| | |
|---|---|
| First Year | 50% of Class "A" rate |
| Second Year | 60% of Class "A" rate |
| Third Year | 70% of Class "A" rate |
| FourthYear | 80% of Class "A" rate |

Only those individuals who have obtained a two (2) year Associates Degree, from an accredited school, will be accepted into this program. If the Mechanic Trainee is required to have a CDL license, he/she will be paid a 10% incentive above the percentages listed above. After successful completion of the fourth year, the Mechanic will be paid at Class "A" rate.

tion job, the Pre-Job Conference shall be held as soon as possible after the start of work. It is further agreed that upon the awarding of any building contract of $500,000.00 and over, the successful contractor will immediately notify the Union when it has been awarded the contract. It is further agreed the Union may request, receive and hold a Pre-Job Conference with the Employer on an individual basis.

Before the start of any project containing known hazardous waste materials, there will be a pre-job held. The Employer must notify the Union five (5) days prior to starting work on the project. Failure to do so, the Union has the right to withhold its services until such time a pre-job is held.

**16.** Following are the items which will be discussed at the Pre-Job Conference:

A. The Employer will advise the Union Representative of the Employer's requirements of necessary employees in the classification of work under this Agreement, and the Union will determine and advise the Employer of the ability of the Union to fulfill such requirements when requested.

B. Work schedules.

C. Questions of jurisdiction and assignment of work.

D. The Employer agrees that whenever possible at such Pre-Job Conference they will notify the Union of any subcontracts let by the Employer, the names of the subcontractors, and the nature of the work to be performed by the subcontractors. The Union may request a subcontractor to meet with the Union and the subcontractor will meet with the Union prior to commencing work on a project if the subcontractor did not attend the original Pre-Job Conference for the project. It is understood and agreed that no agreement may be made at the Pre-Job Conference which will in effect change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

**17.** Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Local Unions above stated on the effective date of this sub-section shall remain members of the Local Unions in good standing as a condition of employment.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-3 Filed: 01/14/20 Page: 283 of 549 PAGEID #: 449

**18.** All present employees who are not members of the Local Unions and all employees who are hired hereafter shall become and remain members in good standing of any one of said Locals as a condition of employment on and after the eighth (8th) day following the effective date of this sub-section or following the beginning of their employment, whichever is later.

**19.** The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory or who fails to observe the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of any employee under the terms of this Agreement. Any grievance arising through application of this clause shall be adjusted in accordance with the procedures outlined in Article XIV, Paragraphs 124, 125 and 126 of this Agreement. Intoxication and/or assault committed on the job site shall be cause for immediate discharge.

**20.** The Union shall place no limitation upon the amount of work which an employee shall perform during the working day and there shall be no restriction imposed against the use of any type of machinery, tools or labor-saving devices. The Employer agrees that the work jurisdiction of the Operating Engineers, as assigned by the AFL-CIO, will be respected and all Operating Engineer work will be performed by an Operating Engineer, and it is the intent of both parties that Operating Engineers will be assigned work on the basis that will make each job as productive and efficient as possible. It is agreed that a fair day's work shall be given for a fair day's pay.

**21.** The Employer may shift during a work day an Operating Engineer from one piece of hourly rate of pay equipment to another hourly rate of pay piece of equipment without limitation from same job site providing the shifting does not interfere with another Operating Engineer's work day. This condition also pertains to weekly-pay equipment. However, there shall not be any intermixing with weekly-pay equipment to hourly-pay equipment. The Operating Engineer will be paid the highest rate for the day.

The District agent in each district, in order to maintain our jurisdiction, will make jobs as efficient and productive as possible.

**22.** If an Employer violates Paragraph 21, the Employer's

Classification: **GROUP E**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $18.09 | $19.19* | $20.29* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Allen Screed Paver (concrete)
Boilers (less than 15 lbs. pressure)
Cranes—Compact; track or rubber under 4,000 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Oilers/Helpers and Signalmen
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Submersible Pumps (under 4" discharge)

SOFCO002175

Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreading Machines
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen in asphalt plants
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder Operators

penalty shall be to pay the first qualified registered applicant the applicable wage and fringe benefits from the first day of violation.

**23.** The authorized representative of the Union shall have access to the job during working hours for the purpose of visiting individual members, adjusting grievances or disputes and such other duties as he may have to perform. The representative will report to the job supervisor before visiting the project.

## STEWARD

**24.** The Union may, when it believes it necessary, appoint a Steward whenever possible from Operating Engineers working on the Employer's job and the Union District Representative will, when making such an appointment, notify the Employer. The Steward shall perform full-time work for the Employer and he/she shall be subject to the same rules, rights and working conditions as other employees. Under no circumstances shall the Steward have any authority to call a strike, slowdown of work or perform any other action which would be in violation of this Agreement.

**25.** The Employer agrees that each new employee shall report to the job Steward before starting work if a Steward has been appointed for that particular Employer's job. The Steward shall be allowed sufficient time during working hours to perform all normal duties required of a Steward. No Steward shall have job priority but will be laid off in the same manner as any other Operating Engineer upon completion of his/her particular job assignment; twenty-four (24) hour notice to the Union prior to his/her lay off is required to give the Union time to select another qualified Steward to replace the laid-off Steward, but this twenty-four (24) hour notice is not required when a Steward is discharged for cause by the Employer.

## SAFETY

**26.** The Union and the Employer will cooperate in the establishment of a safety program. At the Pre-Job Conference by mutual agreement, the wearing of safety hats may be made a condition of employment. All safety equipment required by the project owner or manager will be at no cost to the employee, except work shoes of any type. Both the Employer and employees shall comply with the applicable state safety codes

SOFCO002176

and any other applicable government or civil regulations pertaining to safety. It is expressly understood that if the employees' immediate health and safety are involved, the Union through its representative may order discontinuation of operations until satisfactory results are obtained.

**TRAINING**

**27.** The Safety Training Passport 16-hour program will be made available to all union members by the Union at no cost to the Employer. The program will consist of:

Safety Awareness as required by OSHA 29CFR 1926.21

Fall Protection as required by OSHA 29CFR 1926.503

Hazard Communication as required by OSHA 29CFR 1926.59

Operating Engineers dispatched to a project to perform trench excavation work will be required to have successfully completed eight (8) hours of trench safety training. This program will become effective May 1, 2007.

It is agreed that both the Employer and the Union will encourage and assist in the promotion of this training.

**28.** Within forty-eight (48) hours after an industrial accident occurs, the company shall have all necessary State Workers' Compensation forms available and completed on the Employer's part. A copy of the completed forms shall be sent to the Union's office in the district where the accident occurred.

**29.** All **toxic/hazardous** projects will be subject to any and all safety regulations and insurance provisions that may be required by the appropriate governmental agencies. When dangerous atmospheres are present so that an Operator is required to don a special protective suit and/or self-contained breathing apparatus at a private, state, federal or other designated toxic/hazardous waste site, the Employer will notify the Union district office. Reasonable dress-up time and clean-up time will be allowed. The first qualified bargaining unit employee on the job will be designated the steward-safety person, who shall have access to company monitoring records and be kept informed of amounts of contaminants on the job site. A

Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $23.55 | $24.65* | $25.75* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Ballast Relocator
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats

*(Continued on next page)*

Classification: **GROUP C**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $24.73 | $25.83* | $26.93* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps without booms and with 5" system
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)

sheltered "safe zone" area shall be provided. There shall be wash-up facilities on all toxic/hazardous waste sites. When hazmat training credentials are required, the Operator will receive a $.50 per hour premium added to his/her base rate.

On such projects, it is expressly understood that if the employees' immediate health and safety are in danger, the employee may discontinue operations, without penalty, until satisfactory results are obtained, or until such time as a recognized safety agent shall declare the equipment or operation to be safe. All Operating Engineers employees shall be advised by the Employer prior to employment as to the nature of the known hazardous waste and possible resultant physical injuries as may be required by applicable law.

**30. DRUG TESTING:** The Employer and the Union are committed to a policy that promotes safety in the work place, employee health, and well being. In consideration of this policy, the Union and Employer agree that any employee found to be under the influence of, in possession of, or engaged in the distribution of drugs or alcohol on the job site shall be subject to disciplinary action, up to and including immediate discharge.

Within two (2) weeks of reporting to the job site, each new Operator may be scheduled for a drug test. Employees using a prescription drug which may impair mental or motor function shall inform their supervisor in writing of such drug use.

Employee involvement with drugs and alcohol can adversely affect job performance and employee morale. In the Construction Industry the consequences of drug or alcohol use or influence while on the job site can be disastrous. The Employer and Union, therefore, agree to the following policy to insure all employees of a safe and efficient job site free from the effects of drug and alcohol use or influence.

All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of illegal drug or alcohol use impairment while on the job site, may be required as a condition of continued employment to submit to a test for alcohol and/or illegal drug use which impairs the employee's ability to safely perform his/her duties on the job site. Such tests usually involve a sampling of the employee's blood, urine, or breath. Any em-

ployee who is asked to submit to such a test will be required to sign a consent form. If an employee who is asked to submit to a test refuses to do so, or refuses to sign the necessary consent form, that employee will be subject to disciplinary action up to and including discharge. Refusal to take a test or the submission of an adulterated sample shall be determined the same as a positive test result. The employee/member shall follow all requirements outlined in this section.

All testing will be done by a reliable, established laboratory. If this initial test screen result indicates positive findings, further testing of the same sample must be done to confirm the original findings before the laboratory can report a positive finding. The confirmation test will be conducted by an independent accredited National Institute of Drug Abuse or College of American Pathology Laboratory and will utilize the more scientific Gas Chromatography/Mass Spectrometry examination (GC/MS). The results of all tests will be kept confidential between the employee, the Employer and the Union. The employee shall be paid his/her regular hourly wage and fringes for time required for drug testing provided results are negative.

If the GC/MS test results are positive, the employee may be granted a leave of absence for the purposes of drug and alcohol rehabilitation. If the employee is eligible such rehabilitation programs are covered under the Ohio Operating Engineers Health and Welfare Program providing the employee confines his/her self to a twenty-four (24) hour licensed rehabilitation medical facility.

Until the employee presents certification of successful completion of the rehabilitation program, he/she shall be removed from the Employer's job site; shall be prohibited from registering under Article III of the referral of this contract and shall not be dispatched to work. Upon presentation of certification of the employee's successful completion of the drug/alcohol rehabilitation program, the employee may be restored to his/her original job with the Employer. If the employee is not restored to their original job, the employee will be allowed to register for work in the referral by registering a new work referral card. The employee shall, under either circumstance, for the next succeeding twelve (12) month period, present to the District Representative monthly certification of negative drug/alcohol test results. Failure to do so will result in denying the employee the right

Classification: **GROUP B**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $25.77 | $26.87* | $27.97* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Endloaders
Hydro Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types
Vermeer-type Concrete Saw

SOFCO002179

Forklift (rough terrain with winch/hoist)
Gradalls
(Boom & Jib 150'-180'—$26.39 effective 5/1/04)
(Boom & Jib over 180' through 249'—$26.89 effective 5/1/04)
(Boom & Jib 250' and over—$27.14 effective 5/1/04)
(Boom & Jib 150'-180'—$27.49* effective 5/1/05)
(Boom & Jib over 180' through 249'—$27.99* effective 5/1/05)
(Boom & Jib 250' and over—$28.24* effective 5/1/05)
(Boom & Jib 150'-180'—$28.59* effective 5/1/06)
(Boom & Jib over 180' through 249'—$29.09* effective 5/1/06)
(Boom & Jib 250' and over—$29.34* effective 5/1/06)
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (Multiple Drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

to maintain his/her referral card in the register and utilize the referral or if working, to be removed from work.

**31. Harassment Policy:** The parties to this Agreement mutually agree that harassment of any nature is not to be tolerated. Every person working under this Agreement shall immediately notify the Employer when a possibility of a problem happens or exists.

## ARTICLE III

### REFERRAL SYSTEM

**32.** Local 18 and its Branches, shall maintain registers of all applicants for referral. Applicants shall not be permitted to be registered in more than one office of the Union at any one time. All applicants will be registered in order of application, provided no person shall be deemed to be an applicant who is otherwise gainfully employed as an Operating Engineer or not immediately available for work. Registrations and re-registrations will be accepted during customary business hours. Applicants shall be classified in priority groups in accordance with the following criteria:

**GROUP A:** All applicants who have worked as Operating Engineers at least 360 days, 90 days or more per year during the last four (4) years, and have been employed for at least 360 days, 90 days or more per year during the last four (4) years on work as defined in Article I of this Agreement within the geographical jurisdiction of Local 18, and who have lived in the State of Ohio, or in any county contiguous thereto, for at least one (1) year prior to application.

**GROUP A PREFERRED:** Must have Group A eligibility. Group A registrants may voluntarily register in the Group A Preferred, however, registrants in this Preferred A status shall have at least fifteen (15) years employment or availability for employment in any one or more of the classifications contained in this Agreement and in the type or kind of craft work covered by this Agreement in the geographic area as defined by this Agreement. Referral in this group is limited to the following described equipment and will be given priority of referral from the Group A Preferred deck. Preferred A status employees will not be eligible for letter of request by the Employer: Welding Machines, Elevator, Conveyor, Pumps, Compressors, Gen-

erators, One Drum Hoist, Mono-Rail Hoist and Portable Heaters.

It is further understood and agreed that when the Employer employs Operating Engineers not currently in their employ for any machines listed in this section, the Employer shall call the referral office servicing his/her job or project and request that an employee qualifying under the Preferred A status be dispatched to service and operate said machine. Any Operating Engineer currently employed by an Employer can be used to operate any of the above listed machines. Apprentices shall not operate this equipment more than fifteen (15) days.

Workmen registering in this Preferred A Group shall be ineligible to register in any other group and shall not work in any classification other than those specified in this section and only have recall rights for equipment specified in this section.

**GROUP A RETIREES:** Must have Group A eligibility. The pension was set up to enhance the lives of retirees in their golden years. Retiring from the trades is by voluntary choice.

A retiree is an equipment operator or mechanic who has applied for and is receiving a pension from any construction industry source.

Upon retirement the retiree can only register in this group. The Group A retirees will be referred to jobs only after the Group A classification and the Preferred A classification have been exhausted.

The Group A retirees will not be eligible for letter of request by the Employer.

**GROUP B:** Same as Group A, except that the employment shall have been at least 270 days, three (3) years of 90 days each. All fourth year Apprentices and Trainees shall be registered in this group.

**GROUP C:** All applicants who have worked as Operating Engineers at least ninety (90) days per year during each of the last two (2) years, and who have lived in the State of Ohio or any county contiguous thereto for at least one (1) year prior to application. All third year Apprentices and Trainees shall be registered in this group.

**GROUP D:** All applicants who have worked as Operating Engineers at least ninety (90) days during the twelve (12) months prior to application. All second year Apprentices and Trainees shall be registered in this group.

Classification: **GROUP A**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $25.89 | $26.99* | $28.09* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Barrier Moving Machine
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination—Concrete Mixers & Towers
All Concrete Pumps with booms
Cranes (all types)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Cranes—Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment

(Continued on next page)

Classification: **MASTER MECHANIC**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $26.14 | $27.24* | $28.34* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

**GROUP E**: All other applicants and all first year Apprentices and Trainees shall be registered in this group.

**GROUP F**: All applicants who are "temporary employees."

All applicants who have attained eligibility in any of the foregoing groups shall not lose eligibility as a result of their failure to obtain the required days of employment during the applicable periods of time. All graduating Apprentices shall upon journeymen certification become eligible for Group A. When an applicant fails to register in his/her eligibility group due to reasons other than illness, as hereinafter defined, and does not notify the Union Hall, the resultant failure to obtain the required days of employment during the applicable periods of time shall cause the applicant to lose eligibility in that group.

Any registrant requesting that their work registration card be placed on hold due to sickness or ill health must present to the Union a doctor's certificate or statement certifying that the registrant will be under a doctor's care for a minimum of thirty (30) days, and that such illness prevents the registered applicant from working as an Operating Engineer. A work registrant's card will only be placed on hold for a minimum period of thirty (30) days, and a maximum period of one hundred twenty (120) days. No registration cards will be placed in the hold position for illness less than a thirty (30) day duration. Any refusals of dispatches due to illness for a period of less than thirty (30) days shall be counted as a refusal under the terms and conditions of the referral procedure.

**33.** In referring applicants, the following procedure shall be followed:

A. Applicants in Group A shall first be referred, and then Group A Preferred, then Group A Retirees, then applicants in the succeeding groups, in order, through Group E. In each group, the Union shall refer applicants in order of their places on the referral list.

B. Registered Apprentices or Trainees shall be referred in order of their position on the referral list.

C. Employers shall have the right to reject any applicant referred for employment and shall immediately notify the Union in writing of such rejection. In the event a registrant is discharged by the Employer because of lack of sufficient ability,

and he/she does not exercise his/her rights under the Referral Board of Review and Arbitration under Paragraph 37, the classification or equipment from which he/she is discharged shall be stricken from his/her referral record and he/she shall not be dispatched to a job in that classification or on that equipment until he/she has:

1. Taken training at his/her training site and has been certified, or

2. Has presented to his/her dispatch office a letter from a previous Employer, in signed agreement with Local 18 working within Local 18's jurisdiction, stating that in the Employer's opinion the discharged registrant has successfully completed a job assignment in that classification or on that piece of equipment in his employment.

D. When an applicant is actually employed, he/she shall notify the Union office at which he/she is registered within twenty-four (24) hours. Failure to do so is an imposition upon those registered and not employed and, therefore, such applicant will be barred from re-registering, unless and until he/she has made application to the Board of Review and Arbitration provided for in Paragraph 37 of this Agreement, and shows good cause for his/her failure to give such notice.

E. When an applicant becomes employed, his/her name shall be removed from the register as soon as he/she shall have worked for a total of thirty-one (31) accumulative working days (one (1) day jobs shall not count). An Operator who relieves another Operator will not be charged for the first fifteen (15) days (only one (1) fifteen (15) day relief per registration application card). All days after that will be counted toward his/her time.

If an applicant is employed for less than thirty-one (31) accumulative working days, he/she shall be restored to his/her previous position on the register when such employment terminates. Any applicant who quits employment or fails to show up for work assignment at starting time after being dispatched (provided he/she was dispatched the previous day), for whatever reason, except accident verified by police report, shall be placed at the bottom of the applicable registration group regardless of the number of days worked and shall not be eligible

Masonry Fork Lifts
Oilers/Helpers
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

## EXHIBIT "A"
### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE III** covering Akron and counties, Cincinnati and counties, Columbus and counties, Dayton and counties, and Toledo and counties:

For AKRON and the following counties: Ashland, Belmont, Carroll, Coshocton, Guernsey, Harrison, Holmes, Jefferson, Monroe, Noble, Richland, Stark, Tuscarawas, Washington and Wayne.

For CINCINNATI and the following counties: Adams, Athens, Brown, Clermont, Gallia, Hamilton, Highland, Jackson, Lawrence, Meigs, Morgan, Ross, Scioto and Vinton. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

For COLUMBUS and the following counties: Crawford, Delaware, Fairfield, Franklin, Hocking, Knox, Licking, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Union and Wyandot.

For DAYTON and the following counties: Auglaize, Butler, Champaign, Clark, Clinton, Darke, Fayette, Greene, Logan, Madison, Mercer, Miami, Montgomery, Preble, Shelby and Warren.

For TOLEDO and the following counties: Allen, Defiance, Fulton, Hancock, Hardin, Henry, Ottowa, Paulding, Putnam, Sandusky, Seneca, Van Wert and Williams.

Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt rollers)
Self-Propelled Power Spreaders
Self-Propelled Sub-Graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot roller or grader
VAC/ALLS
Vibratory Compactors, with integral power
Welder

Classification: **GROUP E**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $18.84 | $19.94* | $21.04* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Allen Screed Paver (concrete)
Boilers (less than 15 lbs. pressure)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Directional Drill "Locator"
Fueling & greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators

for request until he/she puts in a new registration card. When reason for employment termination is questioned, applicant must present a written termination slip evidencing reasons other than a voluntary quit before he/she is restored to his/her previous position on the register.

An applicant for employment may not refuse referral to employment for any reason except that the applicant may inform the District Office in writing, before any referral, that he/she will not accept employment referrals in certain named counties within the District. If an applicant refuses a job referral for the second consecutive time, he/she shall lose his/her position on the register and go to the bottom of the list for his/her group.* If the dispatcher is unable to contact an applicant, the failure to contact shall not be deemed to be a refusal.

F. Applicants must notify the Union office in which they are registered by telephone, or letter, or telegram, or in person of their continued availability for employment within thirty (30) days after the date of last registration or re-registration in order to maintain their places on the register.

In order to equally distribute and defray the cost of services rendered by the use of this referral system, all individuals who make use of this referral system shall be required to pay an initial registration fee of $16.75 and another $16.75 for each re-registration thereafter, provided that such fee shall not exceed $16.75 in any consecutive thirty (30) day period (the aforestated $16.75 will increase to $17.25 effective July 1, 2005) and provided that such fee shall not apply to the following:

1. Members in good standing of Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their regular dues; and

2. Applicants for membership to Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their fees; and

3. Members in good standing of the International Union of Operating Engineers who are paying travel dues whose proportionate share of the cost of this referral system is met by the payment of their fees.

*Does not apply to the Ohio or Kentucky Building & Light Commercial Agreements Referral.

SOFCO002184

G. The Union shall use its best efforts to notify all registered applicants when work is available for them, but the Union assumes no responsibility or obligation for failure to locate an applicant.

H. All applicants must submit a written resume of their experience and qualifications at the time of original registrations, and may be tested on the equipment they operate at the nearest available training site prior to being assigned a position on the referral list.

I. Subject to this referral system Employers may hire through this referral policy, by name, former employees who have resided for at least twenty-four (24) months in the State of Ohio or in any county contiguous thereto, and have been employed by the Employer making the request during the past twenty-four (24) months within the jurisdiction of this Agreement. The Employer must make the request to the appropriate Union District Office and the employee requested must be registered on the District referral list (Groups A through E).

Employers may hire through this referral policy by name individuals in Group A for a production machine, or for a mechanic, or mechanic/welder, who has been registered on the out-of-work list for at least ten (10) days in the District in which the work is to be performed. Individuals shall have only one (1) request per four (4) month period from the last request. The request by name must be confirmed later in writing on the letterhead of the Employer and signed by either the Employer or the superintendent of the project.

Nothing in the referral procedure shall interfere with the transfer of an Employer's employees on his payroll from one project to another project within the geographical area covered by Local 18. When transferring employees, the Employer will notify the Union District Office from which the employee is to be transferred.

The Union agrees the transfer will be processed in an expedient manner.

J. The purpose of the referral system is to provide nondiscriminatory employment opportunities. Individuals who register therein deserve a preference over those who do not. Therefore, it is agreed that in the event that the referral list is exhausted and the Union is temporarily unable to furnish qualified applicants within twenty-four (24) hours after receiving the Employer's request

Classification: **GROUP D**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $24.30 | $25.40* | $26.50* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Ballast Relocator
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms and with 4" system or smaller
Concrete Spreaders
Conveyors, used for handling building material
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines

*(Continued on next page)*

Classification: **GROUP C**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $25.48 | $26.58* | $27.68* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

(Saturdays, Sundays and holidays excepted), the Employer may temporarily employ others until the Union notifies the Employer that it has qualified registrants available for employment.

Applicants hired by the Employer under this procedure shall be known as "temporary employees," and will be subject to replacements. The Employer will notify the Union District Representative of the name, union affiliation (if any), date of employment and social security number of such "temporary employee." The Union will maintain a register of all such "temporary employees" and such register shall be known as the temporary register. Such "temporary employees" may also be referred by the Union (when the referral list is exhausted) from Group F.

Such "temporary employee" shall be subject to replacement by a qualified registered applicant under the procedure listed herein:

1. The Union shall give a five (5) working day written notice to the Employer with whom the "temporary employee" is working and such "temporary employee" will thereupon be replaced at the end of the five (5) working day period provided the Union furnishes a qualified registered applicant.

2. The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the temporary register.

K. When an Employer states requirements for special skills or abilities in his/her request for employee applicants, the Union shall refer the first applicant on the register possessing such skills or abilities, regardless of the place or classification of such applicant on the register. If a contractor requests or requires that the operator be a Certified Operator, verification of the operator's certification is the responsibility of the Employer. If the Employer notifies the Union in writing, within thirty (30) days of the employee's discharge, of an Operator who had been in his employment and who had not performed satisfactorily, and the Employer does not wish this Operator to be referred to the Employer for future employment, the Union shall honor this written request.

L. Any employee who quits a contractor without proper notice and is subsequently hired by an Employer with whom Local 18 has a contractual relationship without a proper referral by Local 18 shall be discharged by the Employer when it is called to his attention.

**34.** Employers shall give first opportunity to persons registered for employment, as provided herein, by calling or notifying the Union at any of its offices in the territory where the work is to be performed.

**35.** Registration of applicants and selections of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, by-laws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership, policies, or requirements. It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio, the Commonwealth of Kentucky, and lawful orders thereof in nondiscrimination and fair employment practices.

The Employer and the Union shall not discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

The Union agrees to furnish an Employer, at his request, any statement or data required under any regulations referred to herein.

**36.** In addition to the above Registration Groups there shall be established a Short Term Job Group. The sole purpose of this Short Term Job Group is to enable registrants to acquire time to be eligible for unemployment benefits. Registration in this group is limited to applicants eligible for Group A of this referral and all fourth year Apprentices showing proof of need for additional time to qualify for unemployment benefits.

Applicants' referral out of the Short Term Job Group will be limited to jobs of two (2) days or less duration in a calendar week or eight (8) days or less duration in a calendar month on equipment listed on their registration cards. Any refusals of jobs will cause the registrant's card to be removed from the Short Term Job Group deck. Dispatches for short term jobs as defined above will first be made from the Short Term Job Group. If the dispatcher is unable to fill the short term job order from the Short Term Job Group he/she will proceed to fill the order from Groups A through F in accordance with the referral rules. Dispatcher should notify Employers when dispatching from the Short Term Job Group. The Employer reserves the right to request dispatch from Group A.

Classification: **GROUP B**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $26.52 | $27.62* | $28.72* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Endloaders
Hydro Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types
Vermeer-type Concrete Saw

(Boom & Jib 250' and over—$27.89 effective 5/1/04)
(Boom & Jib 150'-180'—$28.24* effective 5/1/05)
(Boom & Jib over 180' through 249'—$28.74* effective 5/1/05)
(Boom & Jib 250' and over—$28.99* effective 5/1/05)
(Boom & Jib 150'-180'—$29.34* effective 5/1/06)
(Boom & Jib over 180' through 249'—$29.84* effective 5/1/06)
(Boom & Jib 250' and over—$30.09* effective 5/1/06)

Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

Since this Short Term Job Group is intended to provide limited employment for those needing credit for unemployment compensation, the Union shall, through its business agents, remove from employment any Operating Engineer who has accumulated more than two (2) days per calendar week or over eight (8) days in a calendar month—as a result of the Short Term Job Referral Group.

Registrants in the Short Term Job Group will not be eligible for any recall or request provisions of the referral as herein described. Employment received as a result of the Short Term Job Group referral will not provide eligibility for Employer recall when the registrant is registered in Group A, Preferred A, or Group A Retirees deck. Apprentices or Trainees will not be permitted to register in the Short Term Job Group except as noted above. Registrants may not register in the Short Term Job Group or Group A or Preferred A or Group A Retirees deck at the same time. The Employer shall not be permitted to transfer employees dispatched from the Short Term Job Group from one project to another project.

The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the Short Term Job Group.

All the remaining rules with regard to the operation of the referral shall be applicable to the operation of the Group A, Preferred A and Group A Retirees except as modified above.

**37.** Any registrant or any Employer who may feel aggrieved by the operation of this referral system shall have the right to and must file his/her grievance, in writing, within ten (10) days after the occurrence of the event concerning which he/she complains with a Board of Review and Arbitration consisting of one (1) representative of the Union, one (1) representative of the Employer, and an impartial third member to be selected by agreement of the Union and the Employer, and the decision of this Board shall be final and binding on all parties.

**38.** This statement as to referrals shall be posted in all places where notices to Employers and applicants for employment are customarily posted, including all offices of the Union; all offices of the Employer.

**39.** A Labor Relations Division Representative of the AGC of Ohio may inspect the referral register at the Union District Office at any time during normal office hours.

SOFCO002188

**40.** All officers and business representatives of the Union who have had previous work experience in any one or more of the job classifications contained in this Agreement shall be deemed to be employed at the trade and it is the intent of this section to provide that upon return to the employment in the trade, he shall do so with the same preference as if he had continually worked at the trade and shall be eligible upon registration for Group A.

## ARTICLE IV

### FRINGE BENEFIT PROGRAMS

**41.** The fringe benefit provisions contained herein shall apply to all Employer members of the AGC of Ohio Labor Relations Division, and Employers who become signatory or bound by this Agreement, as well as any other Employer or Employer groups who become a party to an Agreement covering the fringe benefit programs set forth herein.

**42.** All Employers bound hereby agree to be bound by the Agreement and Declarations of Trust, as amended, establishing the Pension Fund, Health and Welfare Plan and Apprenticeship Fund, copies of which all parties agree have been furnished to and read by all Employers bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declarations of Trust and any rules, regulations, or plans adopted by the Trustees pursuant thereto, shall become a part of this Agreement as though fully written herein. All Employers bound hereby irrevocably designate the Employer Trustees of said Funds and Plan and their successors as their representatives for the purpose set forth in said Agreements and Declarations of Trust.

**43.** Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

PENSION FUND: Effective May 1, 2000 is $3.00 per hour

HEALTH & WELFARE PLAN: Effective May 1, 2004 is $5.11 per hour

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination—Concrete Mixers & Towers
All Concrete Pumps with booms
Cranes (all types)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Cranes—Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
(Boom & Jib 150'-180'—$27.14 effective 5/1/04)
(Boom & Jib over 180' through 249'—$27.64 effective 5/1/04)

*(Continued on next page)*

SOFCO002189

## EXHIBIT "A"

### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE II** covering Lucas and Wood counties:

Classification: **MASTER MECHANIC**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $26.89 | $27.99* | $29.09* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Classification: **GROUP A**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $26.64 | $27.74* | $28.84* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

APPRENTICESHIP FUND: Effective May 1, 2000 is $.45 per hour

SAFETY TRAINING AND EDUCATIONAL TRUST FUND: Effective May 4, 1992 is $.04 per hour

The Union shall have the option of diverting all or any part of the increase scheduled for improvement of or payment of costs of any fund benefits provided under this Agreement; provided that the Union gives the Employer written notice of its election to do so by registered letter sent to the office of the AGC of Ohio at least 60 days before the effective date of the scheduled change specifying in said notice the amount of change to be applied for this purpose in the fund benefit for which the money is to be used.

**44.** It is further understood and agreed by and between the parties that duly authorized representatives of any of said Trust Funds or Plan shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all employees upon whom the Employer is obligated to make contributions and with respect to the payment of monies to the AGC of Ohio's Construction Industry Advancement Program under paragraphs 109, et. seq. and with respect to the Administrative Dues deduction under paragraph 114. Notwithstanding the foregoing authority allowing audits with respect to the AGC of Ohio's Construction Industry Advancement Program and the Administrative Dues deduction, the audits shall only be conducted in conjunction with the Fringe Benefit Funds or Plans referred to herein and shall not be conducted independently. The twenty-four (24) hour notice referred to in paragraph 45 (A) shall only be given for delinquencies to the employees Fringe Benefit Funds or Plan referred to therein.

**45.** Reports of employees who have worked the number of hours that they have been paid, and such other data and information as may be required, and all contributions payable to the Funds or Plan shall be transmitted to the offices of the Funds or Plan no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed. In the event said audit is refused, reports not

SOFCO002190

furnished, or said contributions are not paid, as aforesaid, the following remedies, in whole or part, and in addition to all other remedies, either in law, in equity, by contract or authorized by the aforementioned Agreements and Declarations of Trust, shall be available.

A. After the Trustees or the Agent of any Funds or Plan have given the delinquent Employer twenty-four (24) hours written notice at the address shown in the records of the Funds, Plan or Union, the Union shall have the right to take such legal and lawful action as it may deem necessary until such delinquent payments are made or said audit is permitted, such action including but not limited to the right to withhold its services from such Employer for as long as the failure to make such contributions or audit continues, Article XIV notwithstanding.

B. In the event either the Union or the Trustees of any Funds or Plan may decide to utilize the grievance and arbitration procedure in this paragraph to collect delinquent contributions and liquidated damages to enforce any audit, or to obtain any report, the following procedure shall apply:

Unless the issue is resolved between the Employer and the party giving notice, within five (5) calendar days after deposit of written notice of delinquency and/or demand for audit and/or report in the United States mail, to the Employer at the address shown in the records of the Funds, Plan or Union, such party may refer the matter to an arbitrator to be named by the AGC of Ohio Labor Relations Division and by Local 18 of the International Union of Operating Engineers whose decision in writing shall be final and binding on all parties. In the event such parties are unable to choose an arbitrator within ten (10) days after written request therefor, the Union or the Trustees of any Funds or Plan may request an arbitrator according to the rules and regulations of the American Arbitration Association whose decision in writing shall be final and binding on all parties. The parties to the arbitration shall each bear one-half (1/2) of the total costs.

46. In no event shall the foregoing provisions relating to Fringe Benefits be subject to or suitable for grievance and arbitration under Article XIV of this Agreement.

Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers, except asphalt rollers
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot post roller or grader
VAC/ALLS
Vibratory Compactors, with integral power
Welders

Classification: **GROUP E**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $19.73 | $20.83* | $21.93* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Allen Screed Paver (concrete)
Boilers (less than 15 lbs. pressure)
Cranes—Compact; track or rubber under 4,000 pounds)
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Oilers/Helpers
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

SOFCO002191

Classification: **GROUP D**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $25.02 | $26.12* | $27.22* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Backfillers & Tampers
Ballast Relocator
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps (without boom with 4" or smaller system)
Concrete Spreaders
Conveyors, used for handling materials
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers

**47.** The Employer must obtain an Insurance Payment Bond (IPB), from a company that is "best" rated A, financial category 7 or better, payable to the Ohio Operating Engineers Fringe Benefit Program as a guarantee that the fringe benefits referred to herein are paid by the insurance carrier in the event that the Employer becomes delinquent in its payments and defaults thereon. In lieu of a surety bond, an Employer may substitute an equivalent cash bond, which will be escrowed to guarantee payment of fringes. If the Employer fails to provide the necessary bond within thirty (30) days of request by the Union, the Union shall withhold services until receipt of such bond, or the Employer makes fringe contributions on a weekly basis.

The Employer shall obtain said Insurance Payment Bond or cash bond in amounts set forth below:

| | | |
|---|---|---|
| 1–10 | Operating Engineers | $50,000.00 |
| 11–20 | Operating Engineers | $75,000.00 |
| 21–50 | Operating Engineers | $100,000.00 |
| Over 50 | Operating Engineers | $125,000.00 |

## ARTICLE V

### WAGE RATES

**48.** The purpose of this Agreement is to establish wage rates and conditions to apply for all work as defined herein and for operation of all equipment which comes within the jurisdiction of the International Union of Operating Engineers, and as negotiated by and between Local 18 and its Branches of the International Union of Operating Engineers and the AGC of Ohio Labor Relations Division.

**49.** Exhibit "A" covering wage rates and classifications attached hereto is made a part of this Agreement.

**50.** It is agreed if equipment within the jurisdiction of the International Union of Operating Engineers is used by an Employer and if there is no appropriate classification listed under the wage schedules therein, then the Union and the Association negotiating committees will negotiate a new classification and rate of pay for such equipment within five (5) days.

**51.** The geographical jurisdiction of this Agreement will be zoned for wages only. Conditions of employment will be the same for all employees covered by this Agreement.

SOFCO002192

Zone I: Covering Portage and Summit counties only.

Zone II: Covering the counties of Lucas and Wood only.

Zone III: Covering the counties of Adams, Allen, Ashland, Athens, Auglaize, Belmont, Brown, Butler, Carroll, Champaign, Clark, Clermont, Clinton, Coshocton, Crawford, Darke, Defiance, Delaware, Fairfield, Fayette, Franklin, Fulton, Gallia, Greene, Guernsey, Hamilton, Hancock, Hardin, Harrison, Henry, Highland, Hocking, Holmes, Jackson, Jefferson, Knox, Lawrence, Licking, Logan, Madison, Marion, Mercer, Meigs, Miami, Montgomery, Monroe, Morgan, Morrow, Muskingum, Noble, Paulding, Perry, Pickaway, Pike, Preble, Putnam, Richland, Ross, Sandusky, Scioto, Seneca, Shelby, Tuscarawas, Union, Van Wert, Vinton, Warren, Washington, Wayne, Williams, and Wyandot. In Kentucky, the Counties of Boone, Campbell, Kenton and Pendleton.

## ARTICLE VI

### WEEKLY PAY AND HOURLY PAY CLASSIFICATIONS AND REPORTING PAY PROVISIONS

**52.** In all counties covered by this Agreement, the following classifications shall be employed on a WEEKLY PAY basis:

Asphalt Plants
Boiler Operators, Oiler/Helper, Registered Apprentices and Signalmen, when members of crew
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Cherry Pickers
Cranes (all types)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Floating Equipment
Gradalls
Hoes (except when attached to farm or industrial type tractor or CAT 320 backhoes or equivalent and below)
Hoists, with two or more drums in use
Horizontal Directional Drill (over 500,000 ft. lbs. thrust)
Maintenance Engineers (Mechanic and/or Welder)
Master Mechanics

Classification: **GROUP C**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $26.24 | $27.34* | $28.44* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating Well Points or other types of Dewatering Systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP B**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $27.28 | $28.38* | $29.48* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Endloaders
Hydro Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types
Vermeer-type Concrete Saw

Panelboard Operators (all types on site)
Pile Drivers
Power Shovels
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Tug Boats

**53.** In all counties covered by ZONES I, II and III, the following classifications shall be employed on an HOURLY PAY basis (two (2), four (4), or eight (8) hours):
A-Frames
Air Compressors, pressurizing shaft or tunnels
Allen Screed Paver (concrete)
Asphalt Pavers
Backfillers and Tampers
Backfillers
Ballast Re-Locator
Bar and Joint Installing Machines
Barrier Moving Machine
Batch Plant Operators
Bobcat Type and/or Skid Steer Loader
Boilers (15 lbs. pressure and over)
Boom Trucks (all types)
Bulldozers
Bull Floats
Burlap and Curing Machines
Cableways
Clefplanes
CMI-type equipment
Combination Concrete Mixers and Towers
Compressors, on building construction
Concrete Grinder/Planer
Concrete Mixers
Concrete Pumps
Concrete Spreaders
Conveyors, used for handling building materials
Crushers
Deckhands
Directional Drill "Locator"
Drum Firemen in asphalt plants
Elevating Graders or Euclid Loaders
Endloaders

SOFCO002194

Farm-type Tractors, pulling attachments
Finishing Machines
Fork Lifts (all types)
Forklift (rough terrain with winch/hoist)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (sonic pile driving)
Gunite Machines
Helicoptor Operators, hoisting building materials
Helicoptor Winch Operators, hoisting building materials
Hoes, when attached to farm or industrial type tractors
Hoists (building construction)
Horizontal Directional Drill (less than 500,000 ft. lbs. thrust)
House Elevators (except those automatic call button controlled)
Hydraulic Gantry (lift system)
Hydro-seeders
Inboard, Outboard Motor Boat Launches
Kolman-type Loaders (dirt loading)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Lead Greasemen
Light Plant Operators
Locomotives (all types)
Man Lifts
Mixers, Paving (multiple drum)
Mobile Concrete Pumps, with booms (including oiler, etc.)
Mucking Machines
Mudjacks
Oilers, Helpers and Boiler Operators, when not members of a crew
One Bag Capacity Mixers, with side loaders
Pavement Breakers (hydraulic or cable)
Pettibone-Rail Equipment
Plant Mixers (on site)
Post Drivers
Post Hole Diggers
Power Driven Heaters (oil fired)
Power Graders
Power Scoops
Power Sweepers

(Boom & Jib over 180' through 249'—$28.38 effective 5/1/2004)
(Boom & Jib 250' and over—$28.63 effective 5/1/2004)
(Boom & Jib 150'-180'—$28.98* effective 5/1/2005)
(Boom & Jib over 180' through 249'—$29.48* effective 5/1/2005)
(Boom & Jib 250' and over—$29.73* effective 5/1/2005)
(Boom & Jib 150'-180'—$30.08* effective 5/1/2006)
(Boom & Jib over 180' through 249'—$30.58* effective 5/1/2006)
(Boom & Jib 250' and over—$30.83* effective 5/1/2006)
Forklift (rough terrain with winch/hoist)
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

Classification: **GROUP A**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $27.38 | $28.48* | $29.58* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination—Concrete Mixers & Towers
All Concrete Pumps with booms
Cranes (all types)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Cranes—Self Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Gradalls
(Boom & Jib 150'-180'—$27.88 effective 5/1/2004)

Power Scrubbers
Prentice Loader
Pressure Grouting
Pressure Pumps (over 1/2" discharge)
Pump Operators, installing or operating well-points or other types of dewatering systems
Pumps (4" and over discharge)
Pumps (under 4" discharge)
Rail Tamper (with automatic lifting and aligning device)
Switch & Tie Tampers (without lifting and aligning device)
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Utility Operators
VAC/ALLS
Vermeer-type Concrete Saw
Vibratory Compactors, with integral power
Welders (except electric machines)

**54.** In all the counties covered by ZONES I, II, and III, employees covered by this Agreement employed on a WEEKLY PAY basis reporting for work on Saturday, Sunday or holidays shall receive eight (8) hours straight time for reporting if no work is performed and they are not required to remain on the job; if they start to work, they shall receive eight (8) hours at premium time in accordance with Article VII.

They must report for work at starting time and, except as noted above, remain on the work for the full eight (8) hours to be entitled to receive the eight (8) hours pay stipulated in this Agreement.

**55.** When a machine having a forty (40) hour guarantee is laid up on a project site and the workmen are laid off and paid off, that machine cannot be started back to productive work on that project site unless it is laid up for one week (seven days) without calling back the workmen who had manned the machine and they shall be paid for the time they have been off, unless mutual agreement is reached between the Employer and the Union District Representative to permit employees to work on the weekly guarantee equipment during the seven (7) day "lay-up" period without penalty.

**56.** In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on an

SOFCO002196

HOURLY PAY basis, unless notified by the Employer not to report to work, shall receive two (2) hours' pay for reporting to work; if such operator does not start to work, he/she shall receive his/her two (2) hours' reporting time. An employee may be required to stay at the work project for one (1) hour to be eligible for two (2) hours reporting pay unless the Employer releases the employee prior to the end of the first hour. If the employee starts to work, he/she shall receive four (4) hours' pay; if the employee works over four (4) hours, he/she shall receive eight (8) hours' pay; for inclement weather only it will be 2-4-6-8 hours.

In all counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis reporting to work on Saturday, Sunday or holidays, all conditions in this paragraph will apply and both reporting time and time worked will be paid for at the rate provided in accordance with Article VII. They must report to work at starting time to be entitled to reporting pay. Where less than four (4) hours or less than eight (8) hours are worked, the employees must remain on the work for the full four (4) hours or the full eight (8) hours, as the case may be, to be entitled to pay for the four (4) or eight (8) hours, as stipulated in this Agreement.

A. When an employee working on equipment with a weekly-pay guarantee and work with his/her equipment is completed on a project, the employee is guaranteed only Monday through Wednesday pay if the equipment finishes the work on the project the first three days of the week. The Employer will notify the Union District Representative prior to application of this provision.

**57.** Crews will be eligible for straight time weekly pay when their equipment is transferred out of their District up to the day the equipment is shutdown, otherwise, Paragraph 56, Section A prevails.

**58.** On jobs where there is only one (1) day's work for a piece of equipment, employee or crew may be employed on a day-pay basis. Upon the Contractor's request to the Union Business Representative for a second day for special occasions, the Union gives the Representative authority to authorize a second day for the period of this contract.

**59.** All reporting pay time paid to an employee shall

## EXHIBIT "A"

### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE I** covering Summit and Portage counties:

Classification: **MASTER MECHANIC**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $27.63 | $28.73* | $29.83* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

## ARTICLE XVIII

### EFFECTIVE

130. This Agreement shall be effective May 1, 2004 and shall remain in force and in accordance with the terms of Article IX hereof. Wage rates and fringe payments shall be effective as designated by this Agreement.

131. IN WITNESS WHEREOF, WE, the undersigned duly authorized Employer Representatives and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO) executed this Agreement on the 1st day of May, 2004.

**I.U.O.E. LOCAL 18 AND ITS BRANCHES**

S/PATRICK L. SINK
Business Manager

S/KENNETH M. TRIPLETT
President

S/FLOYD S. JEFFRIES
Vice President

S/CHARLES W. SCHERER
Recording-Corresponding Secretary

S/LARRY G. REYNOLDS
Financial Secretary

S/PREMO P. PANZARELLO
Treasurer

S/CHARLES LAFASO, JR.

S/RICHARD E. DALTON

S/GERALD W. HALL

**AGC OF OHIO LABOR RELATIONS DIVISION**

S/RICHARD HOBBS
Executive Director

count as working hours with respect to any work guarantees or overtime pay provisions.

60. Employees who are working for an Employer in other than their local residence area thereby necessitating them to pay room and board shall, upon request, be granted their release if the Employer is unable to supply enough work to justify their staying. Employees released under this provision will be considered as laid-off because of lack-of-work.

## ARTICLE VII

### PROVISIONS FOR PREMIUM RATE OF PAY

61. The week shall begin on Monday A.M. and shall end on Sunday P.M.

62. The regular starting time must be established for not less than one (1) week. Any time worked prior to the established starting time will be paid for at the applicable premium rate unless otherwise arranged through Union notification.

63. The normal work day shall consist of eight (8) hours and the normal work week of forty (40) hours. One and one-half (1-1/2) times the regular rate shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, and including Saturday.

When an Employer performs clearance and excavation for site preparation for industrial or building sites, the Employer will pay the wage rates listed herein, all overtime will be performed at one and one-half (1-1/2) times the regular rate. Subject to Paragraph 121, all other conditions and provisions shall be as provided herein.

A. An Employer may, however, have the option of working a four-ten hour schedule at straight time rates. No Operating Engineer with a weekly guarantee will lose a paid holiday he/she would otherwise receive by working a four-ten week. Instead, such employees will receive, in addition to wages and fringes for hours worked in a four-ten week, an additional eight (8) hours and fringes at straight time rates for the holiday. If the Employer elects, upon notification to work a four-ten hour schedule, he shall pay overtime in such cases on all hours over ten (10) hours per day or over forty (40) per week, whichever is greater. A four-ten work schedule must be by the week.

In addition to the above: It is agreed that when time is lost by the crew during the regular work week, Monday through Thursday, due to inclement weather, holiday, equipment breakdown or directions of the project owner, this time may be made up by the entire crew on Friday at the regular rate of wages. All Friday work must be scheduled on a minimum of eight (8) hours basis. All hours worked in excess of the forty (40) hours in the work week or ten (10) hours each day, shall be paid at the appropriate overtime rate of pay.

B. Any employee hired on any day of the week, Monday through Thursday, and who does not lose any time from the day of his/her initial hire until Thursday shall receive the overtime rate of wages for Friday, providing the crew is eligible for the premium rate for Friday.

C. Should any other trade on the project in the contractor's employ, working in conjunction with the Operating Engineers, receive premium pay on a Friday, the Operating Engineers would also receive premium pay for the Friday.

D. If the other basic crafts employed by your contractor on the project receives the overtime rate for the ninth (9th) and tenth (10th) hours, the Operating Engineers will also receive the overtime rate.

E. When an Employer works three (3) days or less in a week, premium time will be paid after eight (8) hours for each of the days, except for holidays, inclement weather or completion of the job.

F. Pay day will be on Thursday.

G. Weekly pay employees, in order to be eligible for eight hours' pay that day, must be available to perform work for the Employer.

**64.** Double time will continue to be paid to any Operator who is complementing another trade that is receiving double time. All work performed by an employee on Sunday or holidays shall be paid at two times the regular rate established in this Agreement or any escalated rate that may be in effect.

**65.** No weekly pay employee covered by this Agreement shall lose time because of the observed holidays. If not requested to work, he/she shall be paid eight (8) hours straight time pay at the rate established in this Agreement or eight (8) hours at any escalated rate that may be in effect. Holidays

be submitted to the Impartial Jurisdictional Disputes Board for settlement in accord with the Plan adopted by the Building Trades Department, AFL-CIO.

The parties hereto further agree that they will be bound by any decision or award of the Disputes Board. There shall be no stoppage of work or slowdown arising out of any such dispute. No jurisdictional work stoppages, and no jurisdictional picket lines shall be recognized.

This article of the contract will go into effect when the National A.G.C. reaffiliates with the Impartial Disputes Board.

## ARTICLE XVI

### I – 9

**128.** The Union and the Employers during the term of this Agreement agree to use their best efforts to establish a master file of I – 9 employment eligibility verification forms on all members. This file will be maintained at the Union office and be available for the Employer's use.

## ARTICLE XVII

### SAVINGS AND SEPARABILITY

**129.** It is mutually agreed that if any clause, terms or provisions of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other board or agency having jurisdiction in the matter, such clause, terms or provisions shall be or become inoperative of any effect without disturbing the other clauses, terms or provisions of this Agreement and the remaining part of this Agreement shall remain in full force and effect. In the event that any clause, terms or provisions of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other board or agency having jurisdiction in the matter, said clause, terms or provisions shall be re-negotiated to the mutual satisfaction of the parties, but during such re-negotiation work shall not be interrupted or stopped by lockout, strikes, boycotts or other labor troubles.

SOFCO002199

ment can be reached within ten (10) working days from the date of the written grievance, then

**STEP 3:** The grievance may be referred to the State Joint Committee consisting of six (6) members, three (3) to be appointed by the Labor Relations Division of the AGC of Ohio and three (3) to be appointed by Local 18 of the International Union of Operating Engineers. Where the State Joint Committee, by majority vote (5 members or more), resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this agreement. In case of failure of either party to appear at the hearing of a grievance properly filed for hearing, the parties in attendance shall offer evidence in support of its position and the Committee shall dispose of the case on the basis of such evidence. If no settlement is reached at this STEP within fifteen (15) working days from the date the grievance is referred, then

**STEP 4:** The grievance shall then be referred to an Arbitrator selected by the Committee referred to in STEP 3. If the parties cannot agree on an Arbitrator within forty-eight (48) hours after the parties agree to submit the matter to arbitration, the parties shall jointly request the Federal Mediation and Conciliation Service to furnish a list of Arbitrators from which the Arbitrator shall be selected by the alternate striking of names.

**126.** The expenses and fees of the Arbitrator shall be shared equally by the parties. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms and provisions of this Agreement. The Arbitrator's decision shall be final and binding upon the parties hereto.

## ARTICLE XV

### DETERMINATION OF JURISDICTIONAL DISPUTES

**127.** Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement creating the Impartial Disputes Board. In particular, both parties agree to be bound by the provision of the Agreement which states: Any decision or interpretation of the Impartial Disputes Board shall immediately be accepted and complied with by all parties signatory to this Agreement.

The parties hereto agree that in the event of a jurisdictional dispute with any other Union or Unions, the dispute shall

shall be of twenty-four (24) hours duration. When required to work on holidays, the employee shall be paid two times the regular rate established in this Agreement or any escalated rate in effect.

**66.** There shall be no work required on Labor Day except in special cases of emergency.

**67.** The observed holidays are Christmas, New Year's Day, Labor Day, Memorial Day (last Monday in the month of May), Independence Day and Thanksgiving Day. When any of the aforementioned holidays fall on Sunday, they will be observed on Monday. All weekly pay employees covered by this Agreement to be eligible for holiday pay must be available for work the first regularly scheduled work day prior to the holiday and be available for work the first regularly scheduled work day after the holiday.

**68.** Where steam boilers, power driven heaters or pumps are used on a continuous seven (7) day twenty-four (24) hours per day operation, overtime may be avoided by using four (4) shifts of Operating Engineers, each shift to work six (6) hours on a seven (7) day basis. Each Operating Engineer so employed shall be paid forty (40) hours at the applicable straight time rate and two (2) hours at double the applicable straight time rate. The aforementioned condition, where overtime may be avoided, can only be used upon the Employer's guarantee of a minimum thirty (30) days of operation. In the event the Employer cannot furnish thirty (30) days of employment after starting work under Paragraph 68, it is agreed that upon lay-off of employees the Employer will pay retroactive overtime to such laid-off employees from the start of this particular operation in accordance with Article VII, Paragraph 64 of this Agreement.

**69.** Job Master Mechanics and Operators of derricks, cranes, derrick cars on steel erection and on building construction and all winch trucks used in hoisting construction material and any type of hoist, shall command and receive the highest rate of pay and the same applicable premium pay and conditions for overtime where the rates or conditions for the Ironworkers, Boiler Makers, Pile Drivers and Pipefitters are higher than the rates specified in this Agreement for the foregoing classifications. To be eligible for the benefits of complementing the above mentioned trades, an Operator must be required to

perform a specific operation which is directly related to the work which the other trades are performing.

**70.** Operating Engineers employed on any equipment within the jurisdiction of the International Union of Operating Engineers working in shafts, tunnels or storage caverns where natural earth or rock is undisturbed overhead, shall be paid fifty cents ($.50) per hour above the rates in this Agreement or in addition to any escalated rate that may be in effect. This does not apply to open cut work.

**71.** Booms, including jib 150 feet through 180 feet in length, fifty cents ($.50) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

**72.** Booms, including jib over 180 feet in length through 249 feet in length, one dollar ($1.00) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

**73.** Booms, including jib of 250 feet and over in length, one dollar twenty-five cents ($1.25) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

**74.** Conventional cranes whether crawler or truck when used as a tower crane, the effective length of the mast and the boom combined, will be used to determine when these extra rates will be applied.

**75.** Tower Cranes, the height of the boom point from the first floor level of the project, will be used to determine when these extra rates will apply.

**76.** On jobs where crane-type or derrick-type machines are operated on floors above the first floor level of the building, twenty-five cents ($.25) per hour shall be paid in addition to the established crane rate or any escalated rate that may be in effect.

## ARTICLE VIII

### CREWS AND GENERAL PROVISIONS

**77.** In all of the counties within the jurisdiction of this Agreement, crews shall be employed on all truck cranes, power shovels, cranes, rotary drills on caisson work, cable-ways, draglines, tower derricks, tower cranes, multiple drum

by an individual Employer for refusing to cross a legal primary picket line established by an International Union affiliated with the Building and Construction Trades Department of the AFL-CIO or a Local Union thereof or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Local Union thereof, which picket line has been authorized and sanctioned by proper authorities. No jurisdictional or illegal informational picket line shall be recognized.

## ARTICLE XIV

### NO STRIKE—NO LOCKOUT—ARBITRATION AND DISPUTES

**124.** The Company shall not cause, permit or engage in any lockout of its employees during the term of this Agreement.

The Union shall not authorize, cause, engage in or sanction, nor will any employee take part in any illegal slowdown, work stoppage, strike, picketing or other concerted interference against the Employer, or occurring at or around the Company's office or work locations during the term of this Agreement.

**125.** Should a dispute arise between any of the parties, (Employee, Company, Association and/or Union) to this Agreement as to its meaning, intent or the application of its terms, this dispute will be settled in accordance with the following grievance procedure:

**STEP 1:** The aggrieved employee shall first take up his/her grievance orally with the Employer's Supervisor or Representative. The employee may, if he/she so desires, have his/her Steward appear with him/her. The grievance shall be orally brought to the Employer's attention within three (3) working days of the occurrence or discovery of the grievance, but in no event will the grievance be honored by management later than fifteen (15) days past the incident giving rise to the complaint. A grievance not submitted within the time limit shall be deemed untimely and is waived.

**STEP 2:** In the event the grievance is not settled, the employee then shall put his/her grievance in writing within three (3) working days after STEP 1 meeting, dated and signed along with the contract Article effected and submit the grievance to the District Business Representative and he/she and the Business Representative shall meet with the Employer's Representative and attempt to settle the matter. If no settle-

SOFCO002201

responsible for obtaining the voluntary authorization.

**116.** The Union agrees to indemnify and save the Employer harmless against any and all claims, suits or other forms of liability arising out of said deductions.

## ARTICLE XIII

### ENFORCEMENT MEASURES

**117.** It is agreed that all subcontractors shall be subject to the terms and provisions of this Agreement as it relates to the Operating Engineers.

**118.** The Union shall require that no Union person shall leave a job by quitting unless he/she has been properly relieved after giving ample notice of his/her intention to quit to the Employer.

**119.** The Union shall not transfer a Union person from one Employer to another without the consent of the Employer and the Union person involved. Neither shall the Employer transfer a Union person from his/her employ to another Employer's payroll without the consent of the Union person involved and the Union.

**120.** All employees of the Employer shall be allowed time to vote on Election Day as required by law on employees own time.

**121.** If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to the Employer.

**122.** There are areas within the scope of this Agreement for which the wages and conditions contained herein may not be appropriate due to competition or other reasons. In such cases, adjustments will be made in accordance with principles agreed to by the parties during negotiations. Either party may request a meeting with the other party to be held within fifteen (15) days of notification to the other party.

**123.** No employee covered hereby may be discharged

pavers, pile driving machines and hoes, standard gauge locomotives, bucket trench machines (over 24" wide) and horizontal directional drills (over 500,000 ft. lbs. thrust). Crews shall consist of an Operating Engineer and an Apprentice/Helper or Signalman on machines, regardless of motive of power, or an Operating Engineer and Fireman on steam machines.

**78A.** Apprentice/Helpers are required on hoes, excavators, and front hudraulic shovels having a base operating weight in excess of 105,000 pounds, all terrain cranes with a total weight of 125,000 pounds and Apprentice/Helpers shall be required on cable crawler cranes over 80 ton structural capacity, defined as: the factory specified total maximum counter weight with a PCSA rating not to exceed 36,400 pounds, based on 50' of boom at 40' radius, with the single line pull not exceeding 17,000 pounds. Anything outside any of the aforementioned limits determines the crane as requiring an Apprentice/Helper. All factory certifications and the computer system will be available for inspection at any time by the Union or their designee. On remote control gradalls, Apprentice/Helpers shall be at the discretion of the Employer. Truck cranes, lattice boom, thirty (30) ton capacity and under; hydraulic truck cranes and all terrain cranes fifty (50) tons or less, an Oiler is not required. However, if someone other than an Operating Engineer is assigned to this work, this paragraph will be revoked on the project, and an Apprentice/Helper will be required for the remainder of the project. An Apprentice/Helper is required on self-erecting cranes (as defined by the manufacturer) while being erected and dismantled.

**78B.** Oilers on jobs of thirty (30) days or more will be given a minimum of 30 minutes per day operating the machine they are assigned to (or a similar machine on the same project). If the Oiler cannot be trained to operate the machine to the satisfaction of the Employer then he/she shall be replaced.

**79A.** Work of the Boiler Operator, Oiler/Helper, Registered Apprentice, and Signalman shall include getting up steam and greasing up, filling gas tanks and making the machine and equipment ready for operating at the starting time. If, at the discretion of the Employer, an Oiler/Helper, Registered Apprentice, or Signalman is required to make gas or diesel machines ready to operate before the regular starting time, such

SOFCO002202

Oiler/Helper, Registered Apprentice, or Signalman shall be paid one-half (1/2) hour's pay at one and one-half (1-1/2) times the regular rate. If, at the discretion of the Employer, a Boiler Operator or Registered Apprentice is required to get up steam and grease steam machines and make them ready to operate before regular starting time, then such Boiler Operator or Registered Apprentice shall be paid one (1) hour's pay at one and one-half (1-1/2) times the regular rate.

**79B.** Apprentice/Helpers, while assigned to track hoes, cranes and other equipment, will perform the following work on the project as additional duty:

- Cover small equipment (i.e. pumps, generators, compressors, etc.)
- Act as signal person
- Safety/fire watch
- Practice operating in a learning environment in the vicinity
- Help with survey duties on project
- Help mechanic, lube trucks, fuel
- Practice operating rough terrain forklift, front loader, rubber tire hoe, loader in vicinity of primary duty
- Replace other operators who may be absent on project
- Run parts or materials as necessary
- Safety enforcement
- Productive activity on job site to facilitate job completion when it does not interfere with progress of primary machine, providing this does not interfere with another Operating Engineer's workday

**80.** Oiler/Helpers, Registered Apprentices, Signalmen, Grease Truck Operators, when requested to work the regular one-half (1/2) hour lunch period, will eat their lunch prior to or after the regular one-half (1/2) hour lunch period in order to be able to oil, grease and repair machines during the regular one-half (1/2) hour lunch period at no extra pay.

**81.** More than one (1) shift may be worked in any twenty-four (24) hour period and the starting time of the shifts shall be left to the discretion of the Employer. This starting time must be maintained five (5) days, Monday through Friday. However,

of the State Fund. Payments to the program shall be in accordance with instructions on forms furnished by the Association.

**111.** The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the fifteenth (15th) day of each month covering amounts due for the preceding month. If an Employer shall fail to make their payment when the same shall be due and payable, he shall be subject to an additional charge of one and one half percent (1-1/2%) per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses and impairment of reserves. In addition to the additional charges referred to herein, an Employer who fails to make timely payments shall be liable for legal fees and court costs incurred by the Association in collecting late payments.

**112.** Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and Fund of the Construction Industry Advancement Program shall not be distributed among any Employers, or the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

**113.** There is specifically excluded from the purposes of the Construction Industry Advancement Program the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during periods of work stoppages or strikes.

## ARTICLE XII

### UNION ADMINISTRATIVE DUES AND DEDUCTIONS

**114.** Upon notification by the Union that a uniform administrative dues deduction has been authorized by all employees of the Employer, the Employer shall deduct said uniform administrative dues. The Union shall be responsible for obtaining all individually signed authorizations.

**115.** Credit Union savings will be agreed to only if deductions are the same for all employees and the Union is

ees, such checks shall be transmitted along with the Health and Welfare payments to the Ohio Operating Engineers Health & Welfare Office located at 1180 Dublin Road, Columbus, Ohio 43215, no later than the fifteenth (15th) day of the month immediately following the calendar month.

A. Each Employer covered by this Agreement shall pay to the Construction Industry Advancement Program for each hour worked by each employee within the bargaining unit:

**EFFECTIVE MAY 1, 1998**

| | Div. | State | Total |
|---|---|---|---|
| Toledo | .10 | .14 | .24 |
| Akron | .08 | .14 | .22 |
| Dayton | .08 | .14 | .22 |
| Columbus | .05 | .14 | .19 |
| Cincinnati | .035 | .14 | .175 |

B. By the fifteenth (15th) day of the month following the close of the reporting period, in addition to making the payment required by Article IV of this Agreement, each Employer, if working in that geographical area, shall reproduce and send a copy of their remittance report to the appropriate division office along with their check for the number of hours worked by covered employees, multiplied by the division rate per hour.

Payments required under this Article shall be addressed as follows: Toledo Construction Industry Advancement Program, 136 North Summit, Toledo, Ohio 43604; Akron Construction Industry Advancement Program, 495 Wolf Ledges, Akron, Ohio 44311; Dayton Construction Industry Advancement Program, 115 Linwood Street, Dayton, Ohio 45405; Columbus Industry Advancement Program, P.O. Box 16061, Columbus, Ohio 43216; Cincinnati Construction Industry Advancement Program, 1010 Yale Avenue, Cincinnati, Ohio 45206.

C. The Union shall have no participation or control of any kind or degree whatsoever nor shall the Union be connected in any way whatsoever with the Construction Industry Advancement Fund.

D. The Employer will hold the Union harmless from any liabilities arising out of the terms of Paragraph 108 through and inclusive of Paragraph 109D.

**110.** AGC of Ohio shall be the exclusive Administrator

more than six (6) hours shall not be worked without allowing thirty (30) minutes for a lunch period. Where two (2) shifts are employed, eight (8) hours shall constitute a day's work for the first shift and eight (8) hours shall constitute a day's work for the second shift. When three (3) shifts are employed, eight (8) hours shall constitute a day's work for the first shift, seven and one-half (7-1/2) hours work with eight (8) hours pay shall constitute the second shift, and seven (7) hours work with eight (8) hours pay shall constitute the third shift. For the purpose of overtime pay for multiple shift operations, a work day shall be determined by the starting time of the shift. In addition, the second shift will receive twenty-five cents ($.25) per hour, third shift fifty cents ($.50) per hour premium above the established rate of pay.

When warranted by a particular job's conditions, shift work may be instituted for less than five (5) consecutive days.

**82.** Where project owners establish specifications, requirements, or for safety reasons that limit the days or hours in which work may be performed, the Employer, after advance notice to the Union, may start the work week after 6:00 p.m. on Sunday at straight time rates. In applying this schedule, Sunday p.m. will be considered Monday, the following Friday will be considered Saturday (paid at time and one-half) and Saturday will be considered Sunday (paid at double time). All premium pay provisions will apply for the sixth and seventh days as to Saturday and Sunday, respectively.

**83.** When it is necessary for equipment to be operated, the Operating Engineer who regularly operates the particular piece of equipment shall be given first chance to perform the work. If an Apprentice/Helper is required, the Apprentice/Helper who is regularly assigned to the particular piece of equipment shall be given first choice to perform the Apprentice/Helper's duties. In an emergency, any employee may be assigned to any equipment. It is understood that the Master Mechanic or Steward will be notified, when possible, of such emergency requirements.

**84.** Employees who are requested, referred and employed by Employers on the same day under hourly classifications in this Agreement shall be paid a minimum of eight (8) hours pay on the day they report to the job. Any overtime

worked after the normal quitting time shall be paid at the proper overtime rate in addition to the eight (8) hours minimum first day pay guarantee. The furnishing of a truck by a Mechanic shall not be a condition of employment. If an Employer is requesting a Mechanic from the Union, the Employer may require the new Mechanic to furnish a truck. If a Mechanic is required to furnish a truck, compensation will be negotiated between the Mechanic and the Employer.

**85.** Equipment Operator employees shall be required to carry sufficient tools to make minor repairs and adjustments in order to meet manufacturers daily maintenance requirements on the equipment they operate. This excludes diagnositc and electronic equipment.

**86.** If compressors, generators, boilers, hydraulic pumps or power pacs or any other type of power equipment is mounted piggyback on crane-type equipment requiring a crew, two (2) Operating Engineers will be employed at the Class "A" rate or any escalated rate in effect and under the weekly guarantee.

If the crane does not ordinarily require a crew, see Paragraph 78A, the employment of a second operator shall be at the discretion of the Employer. The jurisdiction of the Operating Engineers must be preserved, however, and if someone other than an Operating Engineer is used to operate the piggyback equipment, the contractor must immediately employ a second Operating Engineer at the Class "A" rate.

Where compressors up to 600 CFM or hydraulic pump, power pacs, etc. are operated and exclusively used to power attachments, such as hoe ram and other similar pieces of equipment, the equipment will be considered and manned as a piggyback operation. If a second person (Operating Engineer) is required, even though the equipment is located adjacent to the machine or crane and not mounted directly on the machine, the second person (Operating Engineer) operating the equipment is paid the Class "A" rate of pay for the day.

Where a second person is an apprentice, refer to the Registered Apprenticeship Wage Schedule on page 74.

If the crane does not require a crew, the auxiliary piece of equipment will be manned by an Operating Engineer and paid the appropriate rate of pay.

**87.** ZONES I, II and III - Toledo, and counties, Dayton

the proper rules, regulations, processes, and procedures enunciated by the Joint Apprenticeship and Training Committee established by the Trust of 20 October 65.

**107.** It is understood by the negotiating parties that a Registered Apprentice Engineer works under the direction of the Operating Engineer and the Joint Apprenticeship and Training Committee, and that the Operating Engineer shall see that he/she stays on the job, properly caring for his/her machine. The Employer shall give sufficient opportunity for the Registered Apprentice to operate under the supervision of the Operating Engineer when time and opportunity avails itself. The Area Coordinator of Apprentices shall be appraised periodically and by his request of performance to further the Registered Apprentices' learning situation. Registered Apprentices shall receive the scale enunciated by the Joint Apprenticeship and Training Committee in the time justified category that the Registered Apprentice has accomplished. For every five (5) Operating Engineer Journeymen employed by the company, there may be employed one (1) Registered Apprentice or Trainee Engineer through the referral when they are available.

## ARTICLE XI

### CONSTRUCTION INDUSTRY ADVANCEMENT PROGRAM

**108.** The Employer and the Union agree to and approve the establishment of a Construction Industry Advancement Program to promote the common good of the Construction Industry by providing financial support for activities which may include but not necessarily be restricted to: (a) promotion of safety; (b) market development; (c) protection of legitimate markets; (d) public relations; (e) personnel practices and labor relations; (f) education; (g) industry relations; (h) apprenticeship training; (i) participation in Funds and Plans provided for in collective bargaining agreement, such as Health and Welfare Plans; and (j) collection and distribution of information from and to all segments of the Construction Industry and related groups or authorities.

**109.** Each Employer bound by this Agreement shall pay fourteen cents ($.14) per hour worked effective May 1, 1998 to the AGC of Ohio Construction Industry Advancement Fund. Upon subsequent approval by the Health and Welfare Trust-

the contract or assent card was signed or the date the contractor became bound.

**102.** Within seven (7) days of the receipt of a notice from the Union of its intent to terminate or modify this Agreement, the Association will notify all such contractors of whom the Association has been notified by the Union. Each such contractor shall have thirty (30) days from the date the Association received the notice of intent to terminate or modify to advise the Union in writing of its intent to negotiate separately for a renewal agreement.

**103.** In the event any such contractor fails to advise the Union of its intent to negotiate separately within the time period set forth above, such contractor shall be deemed and presumed to agree to the terms and Agreement arrived at in negotiations between the Union and the Association and to be bound by the collective bargaining agreement resulting therefrom.

**104.** The provisions of this section shall operate for successive collective bargaining agreements until such time as the Contractor or Union gives timely notice that said party desires to negotiate separately. Said notice shall be given within the time periods provided in the termination clause of this Agreement or any successive collective bargaining agreement.

**105.** The provisions of this Agreement shall continue in force and effect through April 30, 2007 and thereafter from year-to-year until termination at the option of either party, after sixty (60) days notice in writing to the other party.

## ARTICLE X

### APPRENTICES

**106.** In order to maintain sufficient skilled mechanics for the industry and, in order to present proper learning opportunities for youth and, in order to effectuate the principles and desires of the negotiating parties created by the foregoing, the negotiators hereby fully subscribe to the Ohio Operating Engineers Apprenticeship Fund Agreement and Declaration of Trust dated 20 October 65 as if they had originally negotiated the same. The only limitation upon the program is the Affirmative Action Program here attached (Exhibit "B"), in addition to

and counties, Cincinnati and counties, Columbus and counties, Akron and counties, including Summit and Portage:

When a contractor has eight (8) or more major Operating Engineers (major Operating Engineers A, B and C classifications) employed in the District, he/she shall employ a Master Mechanic. In addition to the Master Mechanic required above, if a contractor has eight (8) or more Operating Engineers (major Operating Engineers A, B and C classifications) employed by him/her on any one job, he/she shall employ a Master Mechanic on that job. The Master Mechanic so employed shall be answerable to the Employer and must be a member of the International Union of Operating Engineers, Local 18. Job Master Mechanics so employed shall be paid at the rate specified herein or paid fifty cents ($.50) per hour above the highest rate of any Operating Engineer working under his/her direction, whichever of these rates is higher.

On jobs where maintenance operators are to be employed, the first one (1) employed shall be Class A; the second one, if required, may be a Mechanic Trainee. Any further hire of maintenance operators shall be one (1) Class "A," then a Mechanic Trainee may be hired. This ratio of one (1) Class "A" to Mechanic Trainee shall be continued in the hire of all maintenance operators as required by the project requirements. Mechanics in training, working under these provisions, will be compensated according to the schedule provided under the "Field Mechanics Trainee Schedule."

**88.** Operators of equipment serviced by a Master Mechanic on a job site shall not be counted in the number of Operators within the District to determine when a Master Mechanic will be required for the District.

**89.** Employees shall be paid once each week, with not more than five (5) days withheld on the designated payday on the job prior to their normal quitting time. Failure to comply with this provision will require the Employer to pay these employees involved the double time rate if required to wait on the job. If required to return the next day to receive their pay, they shall be paid a minimum of four (4) hours at the hourly rate applicable for that day. These same conditions will apply to employees who are terminated after completion of their job assignment. In the event of the discharge of an employee, he/she

SOFCO002206

shall be paid immediately or his/her time will continue until he/she is paid off properly. If not paid off by normal quitting time, the aforementioned requirements will be applied if he/she is required to return the next day for his/her pay. Any employee discharged for just cause will receive their paycheck by the end of the next pay period.

**90.** Paychecks will show the following information:
(1) Total hours worked
(2) Overtime hours (premium hours)
(3) Gross pay
(4) All deductions listed
(5) All fringe contributions (to be shown as a total contribution)

**91.** Employees requiring relief, for sickness or other causes, must notify his/her immediate supervisor before leaving the job. Such relief shall be arranged through the Union District Office.

**92.** Employer agrees to carry Workers' Compensation or other equivalent liability insurance for the protection of all employees covered by this Agreement.

**93.** At the direction of the Employer's representative on the job, Operating Engineers shall be allowed proper time for necessary repairs and upkeep. During periods of major repairs there must be suitable shelter around equipment and heated from November through March.

**94.** On projects where at least eight (8) Operators are employed, the Employer, during the months of November 1 through April 30, will furnish a heated shelter where employees may change clothes.

**95.** Sanitary drinking water and toilet facilities will be available on the project in compliance with the provisions of the applicable state code.

**96.** The Employer agrees, upon the termination of any employee covered by this Agreement, to furnish such employee so released with a termination slip at the time of release, showing reason for said release. (Union will provide uniform numbered slips in duplicate; original for employee, duplicate for the Employer's file.)

**97.** No supervisory employee shall perform productive work or operate equipment which would deny an Operating Engineer employee employment.

**98.** In the reduction of forces on any project, it is agreed that non-area residents will be the first to be laid off except for a limited number of key men as mutually agreed by the Union and the Employer at the Pre-Job Conference. Non-area residents are herein defined as those who have not resided in the State of Ohio or in counties contiguous thereto, nor in Boone, Campbell, Kenton and Pendleton counties in Kentucky, or in counties contiguous thereto, for a period of one (1) year.

**99.** When an Employer rents or leases equipment manned from an Employer in signed relations with this Union, the Engineer or Crew may be transferred to the payroll of the lessee, providing the referral office servicing the job or project shall be notified prior to such transfer and provided further that such employee's employment by the lessee shall terminate upon the termination of the lease or rental of the equipment or any replacement thereof whichever is later.

**100.** When an Employer hires an Owner Operator with one (1) machine and the Owner Operator himself operates such single machine, the Owner Operator will be placed on the Employer's payroll. In the event that the above mentioned machine requires two (2) employees, such employees shall be placed on the Employer's payroll. However, when the Owner Operator has two (2) or more machines operating on the same job, he/she shall then be considered a sub-contractor and therefore come under the sub-contractors clause.

## ARTICLE IX

### TERM OF AGREEMENT

**101.** The Union will notify the Association which is signatory to this Agreement of the name and address of any contractor who becomes signatory to or bound by this Agreement during the term of this Agreement. The notice shall be given in writing within seven (7) days of the time any such contractor becomes signatory or bound hereto. The notice shall include a copy of the signature page of the contract or the assent card and, if not noted thereon, a statement of the date

EXHIBIT J Employer

#372

# REINFORCED CONCRETE IRON WORKERS AGREEMENT

### FORM OF AGREEMENT

This Agreement, by and between the Reinforced Concrete Contractors Association (RCCA) of Greater Cincinnati, as negotiating agent only, for each Employer who hereinafter signs this Agreement or a true copy hereof, hereinafter referred to as the Employer and Local Union No. 372, International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, hereinafter, referred to as the Union.

### PREAMBLE

This Agreement is entered into by collective bargaining to prevent strikes and lockouts and to facilitate peaceful adjustment of grievances and disputes between Employer and Union in this trade and to prevent waste, unnecessary and avoidable delays, and expense, and, so far as possible, to provide for Labor's continuous employment, such employment to be in accordance with the conditions herein set forth and at wages herein agreed upon; also, that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions, and, further, the establishment of the necessary procedures by which these ends may be accomplished.

### ARTICLE 1

**Craft Jurisdiction:** Par. 1. It is agreed that the jurisdiction of work covered by this Agreement is that provided for in the charter grant issued by the American Federation of Labor to the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, it being understood that the claims are subject to trade agreements and final decisions of the AFL-CIO as well as the decisions rendered by the Impartial Jurisdictional Disputes Board.

Par. 2. The parties hereto agree to be bound within the territorial jurisdiction of this Agreement by the terms and provisions of the Agreement dated June 1, 1984 establishing the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry. In particular, the parties agree to be bound by those provisions of the Agreement requiring compliance with the decisions and awards of the Board, or Hearings Panels. Decisions rendered under the Plan shall be final, binding and conclusive on the parties.

Par. 3. Local Union No. 372 claims the following work:

(A) Work in connection with field fabrication, handling, racking, sorting, cutting, bending, hoisting, placing, burning, welding and tying of all materials used to reinforce concrete construction, except loading and unloading by hand and carrying to a centralized point adjacent to or upon the site of the project on which such materials are to be used.

(B) Realigning of reinforcing iron, wire mesh placing, bricking, pulling and similar reinforcing materials, placing steel dowels, as well as refastening and resetting same while concrete is being poured.

(C) Reinforcing steel and wire mesh in roadways and sidewalks in connection with building construction, also erection and fabrication of preconnection with building construction, also erection and fabrication of prestressed and precast joist, beams, columns and slabs, walls, roofs, tanks, manholes, trenches and covers.

(D) The handling and placing of "J" or Jack bars on slip form construction; the placing of all clips, bolts and steel rods and wire fabric or mesh pertaining to gunite construction; the placing of steel-tex or paper-back mesh used primarily for reinforcing and placing wire mesh to reinforce gypsum roof construction.

(E) Metal decking similar to "corruform" when used for floor forms over metal or concrete supports whether welded or clipped.

(F) Post Tension. All loading and unloading, hoisting, placing and tying of all post tensioning cables. Also wrecking of cones, wedging of the tendons, stressing, cutting and repairing.

### ARTICLE 2

**Union Security:** All Employees who are members of the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers on the effective date of this Agreement shall be required to remain members of the Association in good standing as a condition of employment during the term of this Agreement. All Employees may be required to become and remain members of the Association in good standing as a condition of employment from and after the eighth (8th) day following the date of their employment, or the effective date of this Agreement, whichever is later. (This clause shall be effective only in those states permitting Union Security.)

### ARTICLE 3

**Territory:** The territory covered by this Agreement shall be the territorial jurisdiction of Local Union No. 372, which covers the Counties of Hamilton, Clermont, Brown and parts of the Counties of Butler, Warren, Clinton, Highland and Adams in the State of Ohio; Boone, Kenton, Campbell, Gallatin, Grant, Pendleton, Bracken, Robertson, Harrison, Nicholas, Bourbon and parts of the counties of Carroll, Owen, Scott, Fayette, Clark, Montgomery, Fleming and Mason in the State of Kentucky; Dearborn, Ohio, Switzerland, Ripley, Franklin, and parts of the Counties of Fayette, Decatur, Jennings and Jefferson, in the State of Indiana.

### ARTICLE 4

Eight (8) hours shall constitute a day's work from 7:30 A.M. to 4:30 P.M. from Monday through Friday inclusive, except in territories where a shorter work day prevails among a majority of the building trades unions on building work. The Employer will allow a Ten (10) minute break between starting time and 12:00 Noon. The normal lunch time shall be a thirty (30) minute period between 12:00 Noon and 1:00 P.M. Any change in the normal work week or lunch period shall be by mutual agreement between the Business Agent and the Employer or his representative.

Employees are to be allowed one-half (1/2) hour for supper with pay at contractual overtime rate if they work two (2) hours overtime after the end of their regular work day, and if they are to continue to work after the supper period. In the event of additional overtime, Employees will be allowed one half (1/2) hour mealtime with pay provided above after each additional four (4) hours of overtime beyond the previous overtime plus meal time, if they are to continue to work after this supper period.

The Employer has the option of working either five (5) eight-hour days or four (4) ten-hour days to constitute a normal forty (40) hour work week, provided that it does not conflict with Federal, State or Local regulations or laws. The Employer can change from one such schedule to the other, subject to the limitations that it will give the Union at least seven (7) calendar days notice of such change and maintain such shift for a minimum of one (1) work week.

When the four (4) ten-hour work week is in effect, the standard work day shall be an established consecutive ten (10) hour period between the hours of 6:30 A.M. and 6:30 P.M. exclusive of the thirty (30) minute lunch period. Forty (40) hours per week shall constitute a week's work Monday through Thursday, inclusive. In the event more than ten (10) hours are worked Monday through Saturday double time will apply towards overtime. If work is performed on Friday and Saturday, time and one-half will apply. Work in excess of ten (10) hours will be at double time rate including Sundays and holidays.

SOFCO001753


**Saturday Make-Up Day:** On projects where contractually required or when mutually agreed upon by the Employee, Business Agent and Employer to procure work and employment for members of Local Union No. 372, a make-up day may be installed on Saturday when four (4) or more hours are lost in a work day due to inclement weather only. The make-up day will be treated as a regular work day. Work will be voluntary and there will be no recriminations against any Employee for refusing to work said make-up day. Employees on the job throughout the week are to be asked first to work Saturday.

A grievance board consisting of six (6) members, three (3) Union Representatives and three (3) Management Representatives, will be set up to maintain the make-up day. Any Employer or Employer Representative who violates these conditions shall be referred to the Joint Grievance Committee for settlement and its decision will be final.

## ARTICLE 5

**Shift Work:** When two or three shifts are worked, Employees on the first shift shall be paid at the rate of eight (8) hours work for eight (8) hours pay; Employees on the second shift shall be paid at the rate of seven and one-half (7-1/2) hours of work for eight (8) hours pay and Employees on the third shift shall be paid at the rate of seven (7) hours of work for eight (8) hours pay.

The rate for shift time work performed on Saturdays, Sundays or Holidays shall start with the first or "morning shift."

Employer contribution to fringe funds and withholdings provided by this Agreement for Employees on a second shift shall be at the rate of eight (8) hours of payment for seven and one-half (7-1/2) hours of work and for Employees on a third shift shall be at the rate of eight (8) hours of payment for seven (7) hours of work.

No Employee shall be required to work more than eight (8) hours in any twenty-four (24) hour period on shift work.

## ARTICLE 6

**Overtime and Holidays:** Par. 1. One and one half (1-1/2) times the regular wage rates shall be paid for all work performed for the ninth (9th) and tenth (10th) hours worked Monday through Friday and ten (10) hours on Saturday. Double times the regular wage rate shall be paid for all hours worked in excess of one and one-half (1-1/2) rates established above. No work shall be performed on Labor Day except to save life or property.

Par. 2. The following holidays shall be observed on the days recognized nationally: New Year's Day, Memorial Day, July Fourth, Labor Day, Thanksgiving Day and Christmas Day.

Par. 3. Any Holidays which occur on a Sunday shall be observed the following Monday.

Par. 4. When overtime work is to be performed on a particular job site, or on a portion of the job, Employees on the job site shall be given the opportunity to share in the overtime work on an equal basis, so far as is practical.

Par. 5. Any Employee reporting for work after the scheduled starting time must complete eight (8) hours of regular time before receiving overtime pay, unless employee has been dispatched from the Union Hall on the day of starting employment.

## ARTICLE 7

**Wage Rates:** The hourly wage rates shall be paid in accordance with the following:

| | 6/1/14 | Wage Rate |
|---|---|---|
| Journeyman | | $ 26.25 |
| Foreman | | $ 29.00 |
| General Foreman | | $ 29.50 |

Residential Work shall be performed at $ 0.10 under the regular journeyman rate.

Any work performed under Iron Workers International Maintenance Agreements shall be performed at ninety percent (90%) of the Employee's wage rate.

At the option of the Union and upon prior sixty (60) days notice to the Association, the Union shall have the right to take all or any part of the scheduled wage increases as an additional Employer contribution to the Welfare Fund or Pension Fund or Annuity Fund.

**Prevailing Wage Rates:** When the prevailing rates established for a job or project by a public agency are less than those established by this Agreement, the Employers and the Union agree to meet and discuss a project agreement for the work to be performed on the job project.

**Apprentice Wage Rates:**

0–1200ours worked........................................60%
1201–2400 hours worked.................................75%
2401–3600 hours worked.................................85%
3600–over hours worked.................................100%

Full fringe contributions will be paid on all apprentice hours. The apprentice to journeyman ratio and/or wage scale or percentages may be different from the ratio and/or wage scale or percentages specified herein to the extent provided, permitted or required by the applicable International or project agreement. The ratios and/or wage scale or percentages provided in such Agreement shall be applicable in accordance with such Agreement when certified by either the International Union or the applicable local Union.

## ARTICLE 8

**Transportation Expense:** There shall be no travel expense allowed on the jobs within the first thirty (30) mile radius of the Hamilton County Court House, Cincinnati, Ohio. This will be known as Zone I. Work in excess of thirty (30) miles radius of the Hamilton County Court House will be known as Zone II with an hourly increase on wages of twenty-five cents ($.25) per hour travel expense. This twenty-five cents ($.25) is paid over and above the hourly pay rate. This amount is paid over and above the regular hourly pay rate.

## ARTICLE 9

**Piece Work:** It is further agreed that the Employees will not contract, subcontract, work piece work, or work for less than the scale of wages established by the Agreement. The Employers agree not to offer and/or to pay, and the Employees will not accept a bonus based on specific performance on any individual job.

## ARTICLE 10

**Work Limitation:** There shall be no limitation placed on the amount of work to be performed by any workman during working hours.

## ARTICLE 11

**Concrete Pours:** The realigning or reinforcing steel, wire mesh and similar reinforcing materials during concrete pouring will be performed by a Reinforced Concrete Iron Worker. Violation of this Article shall be the basis of reference to the Joint Grievance Committee, further should the Committee judge that such work was willfully performed by other than a Reinforced Concrete Iron Worker; it may impose a fine of not less than one (1) days pay, payable to the Apprenticeship Fund.

## ARTICLE 12

**Pay Day:** Par. 1. The regular pay day shall be once a week on such day as agreed upon between the Employer and the local Union, and

SOFCO001754

wages shall be paid before quitting time, and wages are to be paid in cash or other legal tender. On pay days when the job does not start working the Employer shall have the Employees' pay on the job site between 7:30 and 9:30 A.M.

Par. 2. Employers may withhold where necessary, but not to exceed three (3) days wages to enable them to prepare the payroll.

Par. 3. When Employees are laid off, or discharged, they shall be paid in full in cash or other legal tender, on the job immediately, and if required to go to some other point or to the office of the Employer, the Employees shall be paid for the time required to go to such places. When Employees quit of their own accord, they shall wait until the regular pay day for wages due them.

Par. 4. Any undue delay or loss of time caused the Employees through no fault of their own shall be paid for by the Employer causing such delay, at the regular straight time wages.

Par. 5. Accompanying each payment of wages shall be a separate statement identifying the Employee, showing the total earnings, the amount of each deduction, the purpose thereof, and the net earnings.

Par. 6. When Employees are not paid in one (1) weeks time on starting job, there shall be a draw of one (1) days pay, if requested.

Par. 7. When a pay check issued to an Employee is returned for insufficient funds, the Employer shall pay to the Employee a sum equal to ten percent (10%) of the gross wages affected, as a penalty. If the returned check is not redeemed with sufficient funds plus the penalty within seven (7) days this shall be cause for removal of all Employees covered under this Agreement from this Employer.

### ARTICLE 13

**Welfare Plan:** Par. 1. All Employers agree to contribute the amount indicated below per hour for which the Employee is paid without regard to whether the Employee was working on straight time hours or overtime hours, for all Employees covered by this Agreement to the Welfare Fund.

The contributions of the Employers shall be used, exclusively, to provide group life insurance, surgical expense insurance and temporary disability benefits to eligible Employees and their families in such form and amount as the Trustees of the Welfare Fund may determine, and the organization and administration expenses of the Welfare Fund.

Par. 2. The said Welfare Fund shall be administered pursuant to an Agreement and Declaration of Trust administered jointly by an equal number of representatives of the Employers and the Union, which Agreement and Declaration of Trust shall conform to all requirements of law. A copy of the said Agreement and Declaration of Trust, together with any amendments thereto shall be considered as part of this Agreement as though set forth here at length.

Par. 3. These contributions shall be paid into the Iron Workers District Council (of Southern Ohio and Vicinity) Benefit Plan, P. O. Box 398, Dayton, Ohio 45401, unless otherwise provided for, not later than the 15th day of the following month.

July 1, 2014 ............................ $ 6.35 per hour

### ARTICLE 14

**Pension Fund:** All Employers agree to contribute the amount indicated below per hour for which the Employee is paid without regard to whether the Employee was working on straight time hours or overtime hours, for all Employees covered by this Agreement to the Pension Fund. The contribution of the Employers shall be used exclusively to provide benefits in conjunction with the Pension Fund set up by the District Council Fund Officers, Pension Fund, Dayton, Ohio.

The said Pension Fund shall be administered pursuant to an Agreement and Declaration of Trust administered jointly by an equal number of representatives of the Employers and the Union, which Agreement and Declaration of Trust, shall conform to all requirements of law. A copy of the said Agreement and Declaration of Trust, together with any amendments thereto, shall be considered as part of this Agreement as though set forth here at length.

These contributions shall be paid into the Iron Workers District Council (Southern Ohio and Vicinity) Pension Fund, P. O. Box 398, Dayton, Ohio 45401, unless otherwise provided for not later than the 15th of the following month.

July 1, 2014 ............................ $ 8.90 per hour

### ARTICLE 15

**Annuity Plan:** Each Employer who is subject to the provisions hereof shall be bound by the terms and provisions of this Agreement and Declaration of Trust dated April 27, 1971, as amended and as the same may hereafter be amended from time to time which establishes and governs the operations of the Iron Workers of Southern Ohio & Vicinity Annuity Trust. That document shall be deemed to be a part of this Agreement as though set forth here at length.

Each such Employer agrees to contribute to said Annuity Plan the following amounts. Effective June 1, 2003 for each overtime hour worked, the Annuity shall be paid at the overtime rate, i.e. time and one half or double time.

July 1, 2014 ............................ $2.80 per hour

These contributions shall be paid into the Iron Workers District Council (Southern Ohio and Vicinity) Annuity Plan, P. O. Box 398, Dayton, Ohio 45401, unless otherwise provided for not later than the 15th of the following month.

### ARTICLE 16

**Check Off and Working Assessments:** Commencing June 1, 1992 and continuing thereafter during the terms of this Agreement, and in accordance with the terms of an individual and voluntary authorization for check-off of membership dues and Working Assessments in the form agreed upon by the parties hereto, and permitted by the provisions of Section 302(C) of the Labor Management Relations Act, as amended, the Employer agrees to deduct once each week from the wages of each Employee covered by this Agreement who signs such authorization, six cents (6¢) per hour for the Dues Check-Off and four percent (4%) of the Employee's hourly wage rate as Working Assessment for all Employees for each hour for which the Employee is paid. Apprentice rates are six cents (6¢) per hour for Dues Check Off and three percent (3%) of the hourly rate for Working Assessments. The amount deducted shall be remitted to the Union by the 15th day of the following month together with a statement setting forth the name and hours paid of each Employee from whose wages the deduction is made with separate check to be issued to Iron Workers Local 372. A ten percent (10%) per month (with a $10.00 minimum) penalty will be assessed on each late report.

### ARTICLE 17

**Construction Advancement Program:** It is understood that Allied Construction Industries of Cincinnati ("Allied Construction Industries"), an Ohio corporation not for profit, has established, effective January 1, 1968, by a Declaration of Trust, a fund (herein called the "Fund") putting into effect the Construction Advancement Program of Greater Cincinnati, the purposes of such program to be to generally promote and improve the construction industry in the Greater Cincinnati area, including without limiting the generality of the foregoing development of markets, improvement of relations with others (including the public, architects, suppliers and labor), educational programs, the preparation and distribution of collective

bargaining agreements (including pension, health & welfare plans), providing services in connection with the administration of pension, health and welfare plans, and other matters of general benefit to the industry; provided that the activities shall not include the influencing of legislation, the providing of financial aid to Employers or Employees during work stoppages, or making any payments, except for services actually rendered, in connection with the program to any members or officers of Allied Construction Industries or of any other Employer contributing to the Fund. It is understood that upon request and that, subject to the foregoing limitations such Declaration of Trust may be amended from time to time by Allied Construction Industries.

During the continuation of the Agreement, commencing June 1, 2010 each Employer a party hereto shall pay to the Fund ten cents ($0.10)for each hour paid to each of the Employees who are in the collective bargaining unit covered by this Agreement.

Each Employer shall pay the contribution to the Fund monthly on or before the 15th day of each month on account of hours for which it compensated such Employees during the preceding calendar month, and with each such payment shall deliver to the Board of Trustees of the Fund a schedule relating thereto in such form as the Board of Trustees requires.

June 1, 2010 ............................ $0.10

### ARTICLE 18

**Apprenticeship Training, Drug & Safety Fund:** (A) Effective June 1, 2005 all Employers agree to pay the amount indicated below along with the amount outlined in Article 39 of this Agreement per contract schedule for each hour for which the Employee is paid. for all Employees covered by this Agreement to the Reinforced Concrete Iron Workers Joint Apprenticeship Committee Fund. Payments to this fund shall be monthly and shall be due no later than the 15th day of the month following. This shall be administered by the Reinforced Concrete Iron Workers Joint Apprenticeship Committee in accordance with an Agreement and Declaration of Trust approved by Reinforced Concrete Iron Workers Local Union 372 and the Cincinnati Division, Associated General Contractors of Ohio, Inc.

Employers party to this agreement employing journeymen covered by this agreement, agree to accept apprentices at a ratio of Three (3) journeymen to one (1) apprentice. (3:1 ratio)

June 1, 2014 ............................ $0.40 (plus $0.15 Safety)

### ARTICLE 18 – B

**IMPACT Fund:** the Ironworker Management Progressive Action Cooperative Trust, a jointly trusteed Cooperative Trust with federal tax exempt status under section 501 (c) (5) of the Internal Revenue Code. Tax exempt status determination was rendered under the initial name of the Trust, which was the Employers Responsive Educational Cooperation Trust of North America. The general purposes of the Trust include the improvement and development of the Ironworker Industry through Education, Training, Communication, Cooperation and governmental lobbying and legislative initiatives.

The reporting, payment, frequency of payment and administration of such contributions shall be governed by the terms of the IMPACT Trust Agreement; policies and resolutions.

The contributions shall be in lieu of any and all contractual requirements for contributions to the National Ironworkers and Employers Apprenticeship Training and Journeyman Upgrading Fund. This deduction is funded equally by the Employer and employee based on three quarters (3/4%) of a percent of the gross wages. The contribution will be submitted to the Benefit Office on the Pension, Welfare, and Annuity Remittance Forms as a line item for Impact and Organizing Fund.

### ARTICLE 18-C

**Organizing Fund:** there will be an established International Organizing Fund based on one quarter (1/4%) of a percent on the Journeymen hourly rate for each hour worked per member per month. This will also be paid on the Benefit Fringe Pension form as a line item (Organizing Fund). The fund office will then forward the payment to the National Organizing Fund.

### ARTICLE 19

**Bond:** The Union may require Employers who have never employed Iron Workers within the territory of this District Council or any Employer that is over thirty (30) days in arrears on contributions and/or liquidated damages to procure, pay the premium for and deliver to that Local Union a surety bond written by a responsible surety company in the penal sum of not less than $50,000 guaranteeing the payment of all such contributions and moneys or payments to Employees such as wages, dues deductions, Apprentice Training Funds, Vacation Plan Funds, Industry Funds and liquidated damages which may become due to the Iron Workers District Council of Southern Ohio & Vicinity Welfare Trust, to the Iron Workers District Council of Southern Ohio & Vicinity Annuity Trust, or to any of them.

### ARTICLE 20

**Trust & Agreement:** Unless he/it has already done so, each Employer who is subject to the provision hereof shall enter into a written Participation Agreement with the Iron Workers District Council of Southern Ohio & Vicinity Benefit Plan, the Iron Workers District Council of Southern Ohio and Vicinity Pension Trust, and the Iron Workers District Council of Southern Ohio & Vicinity Annuity Trust, pertaining to a participation in these Trusts, in the form prescribed by those Trusts.

### ARTICLE 21

**Reporting Time:** When an Employee is ordered by the Employer or his representative to report for work and then is not put to work because weather conditions do not permit work, the Employer shall pay the Employee for one (1) hour's time, provided the Employee reports at starting time and remains on the job during said one (1) hour and reports with the tools, his/her own and those furnished by the Employer, as set forth in Article 22. This one (1) hour reporting time shall not apply if the Employer or his representative notified the Employee prior to the end of the work shift on the previous work day not to report the next work day if weather conditions are adverse, or if the Employer or his representative notifies the Employee, or the steward for the job or the Business Agent of the Union by 6:30 A.M. on the morning the Employee is scheduled to report for work, that the Employee is not to report.

When an Employee is ordered by the Employer or his representative to report for work and then through no fault of the Employee is not put to work (other than for weather conditions that do not permit work when the paragraph above applies) or employed for less than two (2) hours, weather permitting work, the Employer shall pay him/her for two (2) hours time, provided the Employee remains on the job during the said two (2) hours and reports with the tools, his/her own and those furnished by the Employer as set forth in Article 22. On jobs of more than two (2) hours duration all Employees shall be paid for actual hours worked.

## ARTICLE 22

**Tools:** Each Employee shall be required to furnish the following tools:

| Tools for Rod Work | Tools for Precast Work |
|---|---|
| Two (2) pairs of Pliers (One for spare) | One (1) 3/4" Spud Wrench |
| One (1) Rod Reel | One (1) 7/8" Spud Wrench |
| One (1) 6' Rule | One (1) 12" Crescent Wrench |
| One (1) 25' Tape Measure | One (1) 50' Tape Measure |
| One pair of steel toe boots | One (1) 40 lb Hammer |
| | One (1) Belt and Bolt Bag |
| | One (1) Ratchet Wrench |
| | One (1) Socket Set |

Of which is suitable for use in reinforced concrete iron work and have these tools with him/her on the job each day of employment along with a hard hat. Steel toe boots required on many projects shall be the responsibility of the Iron Worker to have and maintain.

The Employer will furnish and Employee will wear all safety equipment, including a hard hat, safety glasses and safety harness as required by the Ohio State Safety Code, IC-3. The Employer will furnish a sanitary liner with the initial issue of the hard hat. The Employer shall have the right to require Employees to sign a receipt when issued the safety equipment and the Employees shall return them to the Employer at the time of their separation from employment. If an Employee fails to return these items at the time of separation, the Employer may deduct the cost of these items from the Employee's pay. Employer agrees to replace any broken tools while in his employment.

## ARTICLE 23

**Subcontracting:** The Employer agrees not to subcontract or sublet any work covered by this Agreement to any person, firm or corporation, which does not pay at least the minimum rates of pay as set forth in this Agreement together with fringes established herein, and who does not abide by the working conditions covered by this Agreement.

## ARTICLE 24

**Foremen:** When two (2) or more Employees are employed, one (1) shall be selected by the Employer to act as Foreman and receive a Foreman's' wages, and the Foreman is the only representative of the Employer who shall issue instructions to the workers.

**General Foreman:** When two (2) or more Crews are employed (a crew consisting of four or more workers and a foreman), one (1) shall be employed as a General Foreman. No General Foreman will be allowed to take the place of a Journeyman Iron Worker on any overtime work. All General Foremen shall be members of this International Association while acting in the capacity of General Foreman over members of the craft.

There shall be no restriction as to the employment of foremen or pushers. The Employer may employ on one piece of work as many foremen or pushers as in his judgment is necessary for the safe, expeditious and economical handling of the same.

## ARTICLE 25

**Welders Helpers:** When welding on steel skeletons or when scaffolding is used, welders shall be provided with a helper as follows: When 2 or 3 journeymen welders are used, 1 helper shall be employed. When 4 or 5 journeymen welders are used, 2 helpers shall be employed.

## ARTICLE 26

**Safety:** Par. 1. Planking Floors. Working floors upon which derricks set must be covered tight with suitable planking over entire floor except where openings are left for ladders. No more than two (2) floors, or a maximum of twenty five (25) feet, beneath each riveting scaffold shall remain open or uncovered, and all such floors shall be planked and within a minimum radius of ten (10) feet.

Par. 2. Stiffening and Supporting Working Load Points. Where iron is landed on the floor or any point of a structure under construction, all connections shall be fully fitted up and tightened and substantial supports provided to safely sustain such added weight.

Par. 3. Riding the Load or Load Falls. No Employee shall be permitted to ride the load or load fall except in case of inspection, and erection and dismantling of derricks.

Par. 4. Slings. Steel cable will be used instead of chains or hemp slings.

Par. 5. Protection of Signal Devices. Proper practical safe housing, casing or tube shall be provided for any and every means, method, appliance or equipment employed to transmit or give signals, directing work or operation of any and various devices in connection with work being done by Employees.

Par. 6. Elevator Shaft Protection. No Employee will be permitted to work in an elevator shaft while car is in operation. The first floor beneath and the first floor above Employees working shall be planked safe in all elevator shafts.

Par. 7. Power Operated Equipment. (A) When power operated equipment is used to hoist reinforcing materials above or below the ground level, or above or below any floor level, no less than four (4) Employees and foreman (one of which shall be a signal man), shall be employed, except where by mutual agreement between the Employer Representative and the Business Agent, a fewer number of Employees may be used to perform the work in a safe and expeditious manner. If the Business Agent cannot be reached, such mutual agreement shall be between the Employer's representative and the duly appointed steward on the job.

(B) When power operated equipment is used to hoist reinforcing materials on the same level it shall require two (2) rod workers. The building of steel cages for reinforcing of drilled piers, caissons, or columns will be performed by the rod workers; setting of steel cages for reinforcing of drilled piers, caissons, or columns can be performed with one (1) rod worker, providing it meets with safety standards.

Iron Workers will set pre-tied steel cages for reinforcing of drilled piers, caissons, or columns if they are working on the project. If Local Union No.372 Iron Workers are not working on the project, the business agent and Employer will meet to determine an alternative solution.

Par. 8 (A). When handling or placing by hand, reinforcing sheet mesh of a size exceeding two hundred (200) square feet and/or one hundred (100) pounds, expanded metal or other similar materials, no less than four (4) workers shall be employed.

(B). No less than two (2) workers shall be employed on handling or placing by hand steeltex, or roll mesh forty-two (42) pounds per hundred (100) square feet or heavier, unless five (5) rolls or less of this mesh is to be used on the job; however it is agreed that one (1) Employee may place not more than two (2) rolls in any one day on a specific item of work that will not be repeated.

(C). No Employee shall be permitted to weld, burn, grind or chip, unless equipped with the proper safety devices to perform such work, and such Employees shall be required to use such safety equipment.

Par. 9. In ditches or open excavations, the safety provisions of Bulletin 202 of the Ohio State Safety code shall apply.

Par. 10. Effective date for enforcement of this provision is June 1, 1998: When safety belts are used to perform work covered by this

Agreement, the belt furnished by the Employer shall conform to the applicable OSHA Standards or to the American National Standards Institute (ANSI) Standards A 10.14-75. The suspension belt shall consist of 2 "D" rings with one center hook. The Employer agrees to require Employees using safety belts to conform to the requirements of these provisions. The belts must be in safe operating condition when issued and maintained in a safe operating condition at all times. An Employee shall have the right to refuse to work from a safety belt which does not meet the requirements of this provision.

ARTICLE 27

**Shipping Employees:** Employees shipped to jobs or work out of the jurisdiction of the Local shall receive transportation, traveling time and expenses, providing they remain on the job thirty (30) days or until the job is completed if it requires less than thirty (30) days. Employees shipped to a job and not put to work, weather permitting, or the job is not ready for them to go to work, shall be paid the regular rates for such time, or such Employees shall be shipped back to the shipping point with time and transportation paid by the Employer.

**Busing:** If required that an Employee must be bused to a work location, it is understood that the Employee goes in on his/her time and out on the contractor's time.

ARTICLE 28

**Drinking Water-Clothes Room:** The Employer shall furnish suitable drinking water and paper drinking cups at all times. On smaller jobs that do not justify a shed for each trade, the rodworker shall be entitled to use the facilities that are available. The Employer shall provide suitable and sanitary toilets on all jobs regardless of size or duration. The Employer shall be responsible for the loss of Employees' tools and clothing due to fire or burglary. Proof of loss must be furnished.

ARTICLE 29

**Compensation Insurance:** The Employer must at all times provide Worker's Compensation Insurance.

ARTICLE 30

**Business Representative:** The Business Representative of the Union shall be permitted to visit all jobs, but will in no way interfere with the progress of the work.

ARTICLE 31

**Steward:** There shall be a steward on each job who shall be appointed by the Business Representative from among the Employees on the job. The steward shall keep a record of the workers laid off and discharged; and take up all grievances on the job and try to have the same adjusted, and in the event the steward cannot adjust them, he/she must promptly report that fact to the Business Representative, who shall report same to the proper officer of the Union so that efforts can be made to adjust any matter without a stoppage of work. The steward shall see that the provisions of this Agreement are complied with and report to the Union the true conditions and facts. The Steward shall promptly take care of injured workers and accompany them to their homes or to a hospital as the case may require, without any loss of time and report the injury to the proper officers of the Union. The Employer agrees that the job steward will not be discharged until after proper notification has been given to the Union. When Employees are laid off, the job steward, provided he/she is capable of performing the work, shall be the last Employee laid off except the foreman.

ARTICLE 32

**Protection of Union Principles:** The removal of journeymen Iron Workers and Apprentices from a job in order to render legal assistance to other Local Unions to protect Union principles shall not constitute a violation of this Agreement, provided such removal is first approved by the General Executive Board and notice thereof is first given to the Employer involved.

ARTICLE 33

**Letters:** The Employer agrees to furnish, with reasonable promptness upon request, a statement on company letterhead, setting forth the wage rates paid to Employees covered by this Agreement on jobs within the territorial jurisdiction of this Agreement, for the purpose of establishing prevailing wage rates for any area of the jurisdiction in question.

ARTICLE 34

**Apprenticeship:** The parties signatory hereto agree to establish a Joint Apprenticeship Committee in accordance with the provisions of the "Iron Workers Apprenticeship and Training Standards," as contained in Section 1, Article XXIII of the International Constitution. Said Committee shall formulate and operate an Apprenticeship Program in the local area in conformity with said standards.

ARTICLE 35

**Settlement of Disputes:** Par. 1. In the event a dispute occurs due to an alleged violation of this Agreement, or any section thereof, the matter shall be referred to a Joint Grievance Committee for settlement and its decision shall be final.

Par. 2. The Joint Grievance Committee shall be composed of four (4) members: two (2) from the Employers and two (2) from the Union. Following appointment said Grievance Committee shall meet, elect a Chairman and a Secretary, adopt rules of procedure which shall bind the parties concerned and proceed to consider any matters properly before it. The Joint Grievance Committee shall have the power only to adjust disputes which may arise due to an alleged violation of the Agreement, or any section thereof. No committee member shall be directly involved in the dispute by said committee.

Par. 3. All complaints, based on an alleged violation of this Agreement or any section thereof, shall be referred to the Joint Grievance Committee in writing. Said committee shall meet within two (2) working days of receipt of said complaint to consider the same. If the Committee, within three (3) working days of such a meeting, is unable to decide a matter before it, the members of the Committee shall petition the American Arbitration Association for a fifth (5th) member. The decision of said Committee shall be determined by a majority of its members and shall be rendered within seven (7) days after such submission. Said decision shall be final and binding upon the parties. Any expense involved in the operation of the Committee shall be borne equally by the parties involved in the dispute. The Committee shall make its decision within the scope and terms of this Agreement and shall not have the power to add to, subtract from, or modify the provisions of this Agreement in any way.

Par. 4. No proceedings hereunder, based on any dispute, complaint or grievance herein provided for, shall be recognized unless called to the attention of the Employer and the Union in writing within seven (7) days after the alleged violation was committed.

Par. 5. Pending final decision on any matter by the Joint Grievance Committee, no action will be taken by either party which will halt or interrupt the orderly conduct of the Employer's business.

ARTICLE 36

**Strikes and Lockouts:** Par. 1. It is mutually agreed that there shall be no strikes authorized by the Union or no lockouts authorized by the Employer, except for the refusal of either party to submit to

arbitration, in accordance with Article 35, or failure on the part of either party to carry out the award of the board of arbitration.

Par. 2. Every facility of each of the parties hereto is hereby pledged to immediately overcome any such situation; provided, however, it shall not be a violation of any provision of this Agreement for any person covered by this Agreement to refuse to cross or work behind the picket line of any affiliated Union which has been authorized by the International of that Union, the Central Labor Council or Building and Construction Trades Council.

## ARTICLE 37

**Equal Employment Opportunity Clause:** The Employers and Union agree they will not discriminate against any Employee or applicant for employment because of race, creed, color, sex,. national origin or age. The parties further agree to abide by Executive Order 11246 and any other federal, state, county or city regulations establishing and extending equal employment opportunity. The Union agrees to furnish the Employer, upon request, any statement or data required to be filed under such regulations.

The parties to this Agreement agree to be bound by the terms and conditions of the Journeyman Employment Training Agreement and the Female Employment and Training Agreement for the Greater Cincinnati Area Construction Industry endorsed by Building Trades Council of Cincinnati and Allied Construction Industries and to the implementation of these Agreements in accordance with their terms.

## ARTICLE 38

**Scope of Agreement:** This Agreement contains all of the provisions agreed upon by the Employers and the Union. Neither the Employers nor the Union will be bound by rules, regulations, or agreements not herein contained except interpretations or decisions of the Board of Arbitration.

## ARTICLE 39

**Safety Training and Drug Testing Program:** The parties to this Agreement seek to provide a safe drug and alcohol free environment for all Iron Workers. The purpose of the Safety Training, Drug Testing and Alcohol Policy is to encourage Union contractors and Union members to work safely and prevent accidents. The program, governed by three (3) Union and three (3) Employer representatives, will increase awareness and better train and educate all participants in safety and first aid courses. It will also help eliminate the use of illegal drugs and maintain a workplace free from alcohol during work hours and strive for an accident free workplace. This program will reward us with fewer lost time hours and equip the Iron Worker to better handle emergencies at work and at home as well. In support of this goal, both Union and Employer pledge their mutual cooperation as follows:

**Safety Program** – All Iron Workers employed in the jurisdiction of Local Union No. 372 shall complete one (1) safety or continuing education course, as selected by the Labor/Management Committee, during each contract year (June 1 through May 31). Attendees shall be paid for attending such courses beginning the second contract year.

For the purpose of this Article, it is understood and agreed the Training Wage shall be the applicable Journeymen hourly wage rate set forth in Article 7 of this Agreement. There shall be a maximum of ten (10) hours allowed for the Drug and Safety training pay, no overtime pay or fringe benefits contributions will be made on hours paid for Training. Courses will be developed and conducted by the Safety Training Labor/Management Committee.

**Drug Program** – Pursuant to Rule 4123-17-58 or 4123-17-58.1 of the Ohio Administrative Code, Local Union No. 372 is willing to meet at minimum the requirements of the Level 3 of the State of Ohio Drug Free Program., including the 25% testing of all members. The Committee for the Safety and Drug Program shall establish and monitor the programs and select the testing facility and establish the levels of testing within the guidelines of the State Plan. All Employers agree to contribute the amount indicated below per hour for which the Employee is paid without regard to whether the Employee was working on straight time hours or overtime hours, for all Employees covered by this Agreement to this Drug Program Fund.

June 1, 2005 .................................. $ 0.15 per hour

## ARTICLE 40

: The Agreement, with any amendments thereof made as provided for therein, shall remain in full force and effect until midnight of May 31, 2015and, unless written notice be given by either party to the other at least sixty (60) days prior to such date of a desire for change therein or to terminate the same, it shall continue in effect for an additional year thereafter. In the same manner, this Agreement, with any amendments thereof, shall remain in effect from year to year thereafter, subject to termination at the expiration of any such contract year upon notice in writing given by either party to the other at least sixty (60) days prior to the expiration of such contract year. Any such notice as herein above provided for in this Article, whether specifying a desire to terminate or to change at the end of the current contract year shall have the effect of terminating this Agreement at such time.

Each outside Local Union shall, after receiving the approval of the General Executive Board, notify, in writing, their fair employers and contractors in their jurisdiction not less than sixty (60) days in advance of any proposed new agreement and working rules and when requesting the aforementioned approval of the General Executive board, the Local union shall submit two (2) copies of its proposal, which shall not be submitted to their employers until same has been approved by the General Executive Board.

**RECAP OF WAGE SCHEDULE**
**7/1/2014 – 5/31/2017**

| | 6/30/14 | 6/1/15 | 6/1/16 |
|---|---|---|---|
| Wage Rate | $ 26.25 | | |
| Health & Welfare | $ 6.35 | | |
| Pension | $ 8.90 | | |
| Annuity | $ 2.80 | | |
| IMPACT | 1/2% (0.5) | | |
| Organizing Fund | 1/2% (0.5) | | |
| Const. Advance. | $0.10 | | |
| Apprentice | $0.40 | | |
| Safety & Drug | $0.15 | | |
| Total Package | 45.08 | | |
| | | | |
| Foreman | $29.00 | | |
| General Foreman | $29.50 | | |

The Apprentice rate is based on hours worked. For the correct rate on any Apprentice, contact Rodworkers Apprenticeship office at 513-475-5733

**The Following scheduled increases will be allocated as needed:**

**June 1, 2015** **Wage Opener**

**June 1, 2016** **Wage Opener**

**"We certify that this is a true copy of the FORM OF AGREEMENT"**

IN WITNESS WHEREOF, we, the undersigned, have executed this AGREEMENT on the _____ day of ____________________ 20________.

UNION REPRESENTATIVE

Robert Barker, Business Agent
International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers
Local Union No. 372
4958 Winton Ridge Lane
Cincinnati, Ohio 45232
(513) 761-3720

Terry Phillips Executive Director
Reinforced Concrete Contractors Association
3 Kovach Dr.
Cincinnati, Ohio 45215
(513) 475-5730

CONTRACTOR REPRESENTATIVE

______________________________
Name and Title

______________________________
Company Name

______________________________
Address

______________________________
City State Zip Code

______________________________
Phone/Fax



JUNE 1, 2013 - MAY 31, 2018

# AGREEMENT

BETWEEN

IRONWORKERS STEEL ERECTORS SECTION
LABOR RELATIONS DIVISION
OHIO BUILDING CHAPTER, INC.
WEST CENTRAL OHIO DIVISION
ASSOCIATED GENERAL CONTRACTORS

7250 POE AVENUE, DAYTON, OHIO 45414

AND

IRONWORKERS LOCAL UNION #290
INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, AFL-CIO

606 HILLROSE AVENUE
DAYTON, OHIO
(937) 222-1622

**2013 - 2018**

# INDEX

Articlel-Preamble........................................ Page 1
Article II - Scope of Agreement........................ Page 2
Article III - Territory...................................... Page 2
Article IV - Protection of Union Principles........... Page 2
Article V - Contractual Relationship.................. Page 4
Article VI – Union Security................................ Page 4
Article VII – Strikes and Lockouts..................... Page 5
Article VIII – Letters....................................... Page 5
Article IX – Saving Clause................................ Page 5
Article X – Safety Provisions............................ Page 6
Article XI – Safety Training............................... Page 9
Article XII – IMPACT/Drug Testing................... Page 9
Article XIII – Referral Clause........................... Page 10
Article XIV – Compensation Insurance............. Page 14
Article XV – Craft Jurisdiction.......................... Page 14
Article XVI – Wages........................................ Page 21
Article XVII – Work Day.................................. Page 26
Article XVIII – Working Conditions.................... Page 29
Article XIX – Welding Conditions...................... Page 31
Article XX – Tools.......................................... Page 31
Article XXI – Foremen..................................... Page 33
Article XXII – Business Agents........................ Page 34
Article XXIII – Job Steward.............................. Page 35
Article XXIV – Welfare Plan............................. Page 36
Article XXV – Pension Plan.............................. Page 37
Article XXVI – Annuity.................................... Page 38
Article XXVII – Vacation Savings Plan.............. Page 40
Article XXVIII – Bond...................................... Page 40
Article XXIX – Participation Agreement............. Page 41
Article XXX – Dues Check-off.......................... Page 41
Article XXXI – Building Trades Dues Check-off... Page 42
Article XXXII – Const. Ind. Advancement Fund... Page 43
Article XXXIII – Settlement of Disputes............ Page 44
Article XXXIV – Duration and Termination......... Page 45
Appendix "A" – Participation Agreement............ Page 47
Signature Pages.................................... Pages 49-51

SOFCO001668

## AGREEMENT

This Agreement is made and entered into this 1st day of June, 2013 by and between the Ironworkers Steel Erectors Section, Labor Relations Division, West Central Ohio Division, Ohio Building Chapter, Inc., Associated General Contractors of America, Inc., Hereinafter referred to as "Association", and Local Union # 290 of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, AFL-CIO, hereinafter referred to as "Union".

It is understood that the Association is not liable for the performance of the obligations of any Employer under this Agreement, as the Association is acting only as the negotiating representative for certain of its members, other Employers who have authorized it to do so, and other Employers who agree to be bound by the provisions of this Agreement, hereafter collectively, or individually, referred to as Employers or Employer. The Association certifies that it is authorized to negotiate this Agreement on behalf of all Employers listed on the list furnished to the Union at the commencement of negotiations. The Association will certify to the Union any Employer who authorizes the Association to represent it in negotiations with the Union after the date of this Agreement and such Employer shall also be covered by and bound by the terms of this Agreement.

## ARTICLE I
## PREAMBLE

This Agreement is entered into by collective bargaining to prevent strikes and lockouts and to facilitate peaceful adjustment of grievances and disputes between Employer and Union in this trade and to prevent waste, unnecessary and avoidable delays and expense, and, so far as possible, to provide for labor continuous employment, such employment to be in accordance with the conditions herein set forth and at wages herein agreed upon; also, that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions, and further, to establish the necessary procedures by which these ends may be accomplished.

## ARTICLE II
## SCOPE OF AGREEMENT

This Agreement contains all of the provisions agreed upon by the Employers and the Union. Neither the Employers nor the Union will be bound by rules, regulations, or Agreements not herein contained, except interpretations or decisions resulting from arbitration.

## ARTICLE III
## TERRITORY

The territory covered by this Agreement shall be the territorial jurisdiction of Local Union #290 which extends halfway to the nearest outside Local Union of the International Association of Bridge, Structural Ornamental and Reinforcing Ironworkers. This Agreement will apply to the following counties: Allen, Auglaize, Mercer, Logan, Shelby, Champaign, Darke, Miami, Clark, Greene, Montgomery, Preble, Clinton, Highland, and the north half of Butler and Warren, as well as parts of Fayette, Hardin, Mercer and Van Wert in Ohio; Randolph, Wayne, Union and Fayette, in Indiana, by agreement of the Ironworkers District Council of Southern Ohio and vicinity.

## ARTICLE IV
## PROTECTION OF UNION PRINCIPLES

The removal of a Journeyman Ironworker and Apprentices from a job in order to render legal assistance to other Local Unions to protect Union principles shall not constitute a violation of this Agreement, provided such removal is first approved by the General Executive Board and notice thereof is first given to the Employer involved.

There shall be no restriction of the use of any raw material except prison made.

Employees shall not be prevented from securing employment as a result of physical examination.

Slowdowns, forcing of overtime, spread work tactics, standby crews and featherbedding practices have been and are unauthorized.

In accordance with the terms of this Agreement, the use of Apprentices shall not be prohibited.

An obligation imposed upon and in so far as possible, accepted by the Union as being properly its own, is the availability at all times in so far as possible during the life of the Agreement of sufficiently skilled workmen, capable of performing the work of this trade and to constantly endeavor to improve the ability of such workmen and further to have in the making, through Apprenticeship Training, workmen who can enter this trade properly equipped to perform the work. The employment of as many Apprentices as is reasonable and practical shall be encouraged.

An obligation imposed upon and accepted by the Employer is the compliance with the Ohio State Workmen's Compensation Insurance Law, Ohio Administrative Code, Chapter 4121:1-3, specific safety requirements of the Industrial Commission of Ohio relating to construction, Federal Security Agency, Social Security Board, and the Bureau of Unemployment Compensation.

There shall be no limit on production of workmen or restriction of the full use of proper tools or equipment and there shall not be any task or piecework.

It is agreed that the Employees will not contract sub-contract, work piecework, or work for less than the scale of wages established by the Agreement. The Employers agree not to offer and/or to pay, and the Employees will not accept a bonus based on specific performance on any individual job.

## ARTICLE V
## CONTRACTUAL RELATIONSHIP

The Employer agrees not to subcontract or sublet any work covered by this Agreement to any person, firm or corporation which is not in contractual relationship with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, or any of its affiliated Local Unions.

The Union agrees that it will not furnish Employees to any Contractors not signatory to this Agreement with the Union.

## ARTICLE VI
## UNION SECURITY

The employers agree to recognize the Union as the exclusive bargaining agent on all matters pertaining to wages, hours and other conditions of employment.

All Employees who are members of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers on the effective date of this Agreement shall be required to remain members of the Union in good standing as a condition of employment during the term of this Agreement. All Employees may be required to become and remain members of the Union in good standing as a condition of employment from and after the eighth day following the dates of their employment or the effective date of this Agreement, whichever is later. "Good standing" for the purpose herein shall mean the tender of periodic dues and initiation fees uniformly required by the Union as a condition of acquiring or retaining membership in the Union.

The Company will, immediately after it has been definitely established by written notification from the Union that an Employee is not in good standing, discharge such Employee as required in the aforementioned paragraph.

This clause shall be effective only in those states permitting Union security.

## ARTICLE VII
## STRIKES AND LOCKOUTS

It is mutually agreed that there shall be no strikes authorized by the Union or no lockouts authorized by the Employer, except for the refusal of either party to submit to arbitration, in accordance with the provisions of this Agreement, or failure on the part of either party to carry out the award of the Arbitrator.

Every facility of each of the parties hereto is hereby pledged to immediately overcome any such situation; provided, however, it shall not be a violation of any provision of this Agreement for any person covered by this Agreement to refuse to cross or work behind the legal picket line of any affiliated Union which has been authorized by the International of that Union, the Central Labor Council or Building and Construction Trades Council.

## ARTICLE VIII
## LETTERS

It is agreed that all Employers who are parties to this Agreement, and employ Ironworkers in the jurisdiction of Local Union #290, will furnish Local Union #290 with a signed letter on the letterhead of the Employer, stating that they have employed Ironworkers and paid the negotiated scale of wages and fringe benefits on any and all jobs which the Employer has performed with Ironworkers with reasonable promptness upon receipt of written request from the Local Union. Upon written request from the Union, the Employer shall furnish signed letters stating the name of job, county and state, and the type of erection, material, length of job and the number of Ironworkers employed or any other information the Union may request so that prevailing wage rates or jurisdictional matters may be substantiated.

## ARTICLE IX
## SAVINGS CLAUSE

Should any part of or any provision herein contained be

rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any decree of a court of competent jurisdiction, invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation the parties signatory hereto agree to immediately meet and renegotiate such parts or provisions affected.

## ARTICLE X
## SAFETY PROVISIONS

When the vision of the Employee is impaired during the course of erection or hoisting of materials and an adequate audio signal device is not available an Ironworker shall be assigned to act as signalman.

The Employer agrees to maintain all equipment in a safe working condition. The Employer agrees to make all reasonable provisions for the health and safety of his Employees at all times during the hours of employment and all Employees shall use safety equipment provided by the Employer. If special training is required to monitor safety on the job, the Contractor will provide such training.

No Employee shall be obliged by the terms of this Agreement to use any equipment or vehicle not in safe operating condition and not equipped with all safety appliances required by law.

No Employee shall be required to work nor shall any Employee be discriminated against for refusing to work with equipment that is unsafe, or under conditions that are determined unsafe, or fail to comply with all state safety laws and all rules and regulations of the Ohio Department of Labor and Industry relating to safety.

Under no circumstances shall an Employer request an Ironworker Employee to work around any type rig where the boom of such rig will at any time in the work operation come nearer or within ten (10) feet to any high voltage power line, until the proper safety precautionary measures have been

taken to cover said power lines in manner to avoid contact of the boom to the power line.

Employers shall furnish for welders all protective equipment and safety equipment such as welders gloves welding hoods, leather sleeves and jackets.

Where iron is landed on the floor or any point of a structure under construction, all connections shall be fully fitted up and tightened and substantial support provided to safely sustain such added weight.

The use of floats when bolting up should be enforced when safety factor is being abused by the Employee.

No Employee shall be permitted to ride the load or load fall except in the case of inspection, and erection, and dismantling of derricks.

Steel cable will be used instead of chains or hemp slings.

Proper practical safe housing, casing or tube, shall be provided for any and every means, method, appliance or equipment employed to transmit or give signals, direction work or operating of any and various devices in connection with work being done by Employees.

No Employee will be permitted to work in an elevator shaft while car is in operation. The first floor beneath and the first floor above men working shall be planked safe in all elevator shafts.

In accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the sole responsibility of the Employer to insure the safety and health of its employees. Nothing in the Collective Bargaining Agreement will make the Union liable to any employees or to any other persons in the event that injury or accident occurs.

The safety and health standards and rules contained herein

are minimum standards and are not intended to imply that the Union objects to the establishment and imposition by the Employer of additional or more stringent rules to protect the health and safety of the employees. It shall be the sole responsibility of the Employer to insure companies with safety and health standards and rules.

On jobs which employ in excess of forty men, the safetyman will be given a job which gives him an opportunity to circulate about the job in the course of his assigned duties. This is not to imply that there will be any limitations on the amount of work to be performed by the safetyman on behalf of the Contractor.

On all bridge jobs being constructed over rivers the Employer shall designate a structural Ironworker with able swimming ability as safetyman. If the Contractor has two or more Ironworkers working in the river bed in the work area he will not be required to employ an Ironworker for the purpose of safety man only but this man may be assigned to other work provided it does not require him to leave the area while Ironworkers are working overhead. The Contractor will furnish the safetyman with a boat suitable for patrolling the water area beneath the workmen.

No Employee shall be permitted to weld, burn, grind or chip, unless equipped with the proper safety devices to perform such work.

In ditches or open excavations, the safety provisions of Ohio Administrative Code, Chapter 4121:1-3 shall apply.

On composite construction type work Employees will not be required to erect steel with metal studs on the walking surface when they present a safety hazard.

## ARTICLE XI
## SAFETY TRAINING

SAFETY TRAINING: The Local Union will train twenty-five percent (25%) per year of the membership in safety and related journeyman upgrading, with a goal of one hundred percent (100%) by the expiration of the contract.

QUARTERLY TRAINING AS FOLLOWS: Quarterly Foreman training classes will be held. Quarterly Journeyman retraining classes will be held. A contribution rate from the membership of five cents ($.05) will be used to pay attendees for the upgrade classes.

## ARTICLE XII
## IMPACT/Drug testing

In addition to the per hour wage rate, the Employer shall contribute an additional one-half (1/2) of one per cent (1%) of the existing wage rate to Ironworker Management Progressive Action Cooperative Trust (IMPACT), a jointly trusted Cooperative Trust with federal tax exempt status under Section 501 (a) of the Internal Revenue Code as an exempt organization under Section 501(c) (5) of the Internal Revenue Code. The general purposes of the Trust include the improvement and development of the Ironworker Industry through Education, Training, Communication, Cooperation and governmental lobbying and legislative initiatives.

The reporting, payment, frequency of payment and administration of such contributions shall be governed by the terms of the IMPACT Trust agreement, policies and resolutions.

The one per cent (1%) contribution shall be in lieu of any and all contractual requirements for contributions to the National Ironworkers and Employers Apprenticeship Training and Journeyman Upgrading Fund and the Institute of the Ironworking Industry. In addition, the Union and Employer agree that by making contributions to IMPACT each of them

shall become bound to IMPACT's Drug and Alcohol Screening Policy and Procedure or equivalent and any amendments or modifications thereto.

## ARTICLE XIII
## REFERRAL CLAUSE

In order to maintain an efficient system of production in the industry, to provide for an orderly procedure of referral of applicants for employment and to preserve the legitimate interests of the Employees in their employment, the Employer and Union agree to the following plan of referral of applicants to employment:

1. The Employer shall have the right to employ directly a minimum number of key Employees who may consist of a Superintendent, General Foreman and Foreman. The Employer shall have the right to hire any Ironworker on the "A" list, providing all Ironworkers, including supervision, notify the Business Manager or Business Agent before reporting to work for any Contractor.

2. All other Employees required by the Employer shall be furnished and referred to the Employer by the Union.

3. The Employer shall have the right to reject any applicant referred by the Local Union.

4. The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non- membership in the Union. Such selection and referral shall not be affected in any way by rules, regulations, by laws, constitutional provisions or any other aspect of obligation of Union membership policies or requirements. The selection and referral of applicants shall be operated in accordance with the following plan.

5. The Union shall register all applicants for employment on the basis of the groups listed below. Each applicant shall be registered in the highest priority

group for which he qualifies.

6. Registration of applicants and selection of applicants for referral to jobs shall be on a non-discriminatory basis and shall not be based on or in any way affected by Union membership, by- laws, rules, regulations, constitutional provisions, or any other aspects or obligations of Union membership, policies or requirements. The Union and the Employer shall fully comply with all the requirements contained in Executive Order # 11246 dated September 24, 1965 and will comply with all rulings promulgated by the office of federal contract compliance of the department of labor established thereunder. Both Employer and Union agree that they will not discriminate against an Employee or applicant for employment because of race, creed, color, age, sex, or national origin whether this applicant or Employee is a journeyman, apprentice, or trainee.

**Group "A"**
All applicants for employment who have worked at the trade as a mechanic or apprentice for the past five (5) years have previously passed a journeyman's examination conducted by a duly constituted Local Union affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers qualifying them to work as a mechanic at the trade; have been employed for a period of at least four (4) years during the last five (5) years by Employers (parties to collective bargaining Agreements with the Union), and who have actually resided for the past year within the geographical area constituting the normal construction labor market.

**Group "B"**
All applicants for employment who have worked at the trade as a mechanic or apprentice for the past five (5) years and have previously passed a journeyman's examination conducted by a duly constituted Local Union affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers qualifying them to work as a mechanic at the trade.

**Group "C"**
All applicants for employment who have worked at the trade as a mechanic or apprentice for the past three (3) years or more and who have for the past year actually resided within the geographical area constituting the normal construction labor market.

**Group "D"**
All applicants for employment who have worked at the trade for more than one (1) year:

7. The Union shall maintain each of the separate group lists set forth above, which shall list the applicants within each group in the order of the dates they registered as available for employment.

8. Employers shall advise the Union of the number of applicants needed. The Union shall refer applicants to the Employer by first referring applicants in group "A" in the order of their places on said list and then referring applicants in the same manner successively from the lists in group "B" then group "C" and then group "D". Any applicant who is rejected by the Employer shall be returned to his appropriate place within his group and shall be referred to another Employer in accordance with the position of his group and his place within the group.

Upon a registrant being referred for employment and actually employed on a job more than five (5) days, such registrant's name shall be removed from the list until such a time as his employment has been terminated, at which time he shall be registered at the bottom of the appropriate list under which he is entitled to be registered. If a registrant, upon being referred in regular order, refuses to accept the referral, such registrant's name shall be placed at the bottom of the appropriate list under which he is entitled to be registered.

9. The order of referral set forth above shall be followed except in cases where Employers require and call for Employees possessing special skills and ability in

which case the Union shall refer the first applicant on the register possessing such special skills and abilities.

10. Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between the Employer and the Union.

11. In the event that the referral facilities maintained by the Local Union are unable to fill the requisition of an Employer for Employees within a forty-eight (48) hour period after such requisition is made by the Employer (Saturdays, Sundays and Holidays excepted), the Employer may employ applicants directly at the job site. In such event, the Employer will notify the Local Union of the name and dates of such hiring.

If the Union is unable to provide apprentices at the ratios established in the apprenticeship Agreement (3:1) within 48 hours of the Contractors request, the Contractor shall be able to refer workers as apprentices and the apprenticeship program shall consider indenturing the new workers as apprentices. The JAC will make any apprenticeship program changes as will be required to implement this position. This provision is applicable only to projects of four (4) weeks or longer duration.

On Ornamental work, which is normally performed by two (2) Ironworkers, one (1) may be an Apprentice.

12. The Local Union, through its examining board, shall examine all job applicants who have not previously passed an examination conducted by a duly constituted Local Union affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers in order to determine whether they are qualified to perform the work of the craft as a mechanic and be eligible for referral. Such examinations shall be held at least once every month.

13. In the event that any job applicant is dissatisfied

with his group classification or his order of referral, in that such applicant claims that he was not placed in the proper group set forth above or was not referred in the regular order as provided above, or if a job applicant has failed in his examination to qualify as an eligible referent, such aggrieved job applicant may appeal in writing within ten (10) days from the day on which his complaint arose, or failure to pass his examination, to an appellate tribunal consisting of an Employer representative, a Union representative and an impartial umpire appointed jointly by the Employer and the Union, and the decision of the appellate tribunal shall be final and binding.

14. The Employer and the Local Union shall post in appropriate places all provisions relating to the hiring arrangement set forth in this Agreement.

## ARTICLE XIV
## COMPENSATION INSURANCE

Workman's Compensation and unemployment insurance must at all times cover Ironworker Employees on all jobs. In states where private insurance is carried for this purpose the Employer must supply the Local Union with the name and address of the insurance company which handles the coverage on Employees covered by this Agreement.

## ARTICLE XV
## CRAFT JURISDICTION

It is agreed that the jurisdiction of work covered by this Agreement is that provided for in the charter grant issued by the American Federation of Labor to the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers,

Claims are subject to trade Agreements and final decisions of the AFL-CIO.

Jurisdictional disputes shall be settled in accordance with the

procedure established by the Building Trades Department of the AFL-CIO or in special cases as agreed and established by two or more International Unions without interruption of work or delay to the job.

Ironworkers perform all work in connection with field fabrication and/or erection, erection, installation, removal, wrecking and dismantling of structural, architectural and reinforcing iron and steel, ornamental lead, bronze, brass, copper and aluminum, and plastics or other material when used in place thereof.

### Jurisdiction Language

IW Local #290 claims for its members all work including but not limited to: the field, fabrication, production and/or erection and construction of all structural iron, steel; ornamental lead, bronze, brass, copper, aluminum, steel, glass, all Ferro stand nonferrous metals and plastics; precast, prestressed and poststressed concrete structures, agitators; air ducts, anchors, application of all sealants such as Thiokol, Neoprene and similar types used to seal metal to metal surfaces; access door and frames; air conditioner cans; amusement equipment; anchors; Geodesic and other domes, decking, diagrams and other roofing systems; agents and ticket booths, aprons, aqueducts, atriums, bells, bank fixtures, bar joist, blast furnaces, book stacks, building, boilers and stokers (sectional water tube, and tubular) boxes, bracing brackets, bridges and bridge rail, bridge viaducts, bucks, bulkheads, bumper and bumper posts, bunkers cableways, cable slots and cable wells, cages, caissons, canopies and unistrut canopies, car-dox and carports and enclosures, cart lift fronts, caps, cast tiling, cat walks, chutes of all types, circuit breakers, clips, clocks, collars, column casings, column cladding, column covers, concentrators, counter supports, conservatories, conveyors, coolers, coping, corbels, corrugated sheets when attached to steel frames, including insulation; cranes (the erection, installation, handling operating and maintenance on all forms of construction work), all types of cranes including jib-cranes; crushers, cupolas, curb guards, theater curtain and backstage lifts, curtains, curtain wall, window wall and substitute systems, stone curtain-wall, dams (cofferdams)

decking (metal); roof decking (such as but not limited to "Cofar" and similar type materials, as well as "Trusdeck", Mahon "M" deck and other dual purpose type roof deck), decorations and displays dismantling and loading out conveyors, aggregate plants, batch plants, refrigeration plants, derricks including jumping and servicing of hoisting equipment and personnel hoist, directory boards, room dividers, docks and dock leveler, doors, metal or metal clad doors and frames; glass doors, hangar doors patio doors; rolling doors; rolling fire and iron doors; sliding doors; maintenance on doors; fire doors; rolling shutter doors; door plates, draft curtains; drapery track; domes, dredges, drums, duct and trench frames and plates, duct supports, dumb waiter enclosures and fronts, dumpers, duo rails, drywall, metal trim; electrical supports, elevators, elevator cars, elevator fronts and closures, elevator dust covers and fascia; enamel tanks, enamel vats, ceramic laminated spandrelite, entrances, erection of steel towers, erection and dismantling of Monigan walking dragline, launch hammer bucket wheel excavator and other trenching equipment; signaling on high lines whirley cranes and derricks, buck hoist, man hoists, forklifts, material towers and scanning antennae; assembling and erection of offshore drilling platforms or similar installations; escalators, escalator trim, approaches and sub framing of all false work, fans and hot rooms, fencing of all types, fiberglass or substituted materials, fire equipment, breaks, stops and fire escapes, fins, flag poles, floor construction and flooring, floor plates, flumes, frames, frames in support of boilers, erection, rigging or dismantling of all framework, sheet metal on fence frame6work, highway metal plate guardrail; highway delineators and reflectors (metal or synthetic); guard cable; highway safety devices; fronts, fur and storage rooms, gates and collapsible gates, generators, grating, grilling and foundation work, grills, grill work, guards, guides, greenhouses guardhouses, gymnasium equipment, handrails, (aluminum, glass, metal and plastic); hanging ceilings; hardware and screens, hoppers, hospital room TV supports and gas supports, hot rooms, inclines, iron doors, jail and cell work, jail cell beds, benches, bunks, chairs, tables, mirrors; jail cell access doors; joists (precast, prestressed and

poststressed), all types of cranes including job-cranes; kalsomined doors, kilns, laminated wood structures, laser beams, lintels, lockers, locks and locksmithing, louvers, machinery (moving, hoisting, lowering and placing on foundations), making and installation of all articles made of wire and fibrous rope; marquees, material altered in field such as; framing, cutting, bending, drilling, burning and welding by acetylene gas and electrical machines; erection of all curtain wall, window wall glass, metal floor decking, metal furniture, metal strips or tight lacing for decorative or protective purposed, metal windows and enclosures, mixers, modular buildings, monorails, multi-plate, name plates and nosings, nuclear reactors, electromagnetic shielding plates and atomic vessels including all components parts, the plumbing, aligning and leveling of all material and equipment through the use of optical instruments, operating devices, operating and dental room light equipment; oxygen and gas pipe supports, ovens, pans, panic devices and locks, panels (insulated and non insulated, factory and field assembled),Q-panel; any type panel pertaining to curtain wall whether it be stone aggregate or precast; partitions, toilet partitions and supports; pen stocks, pile drivers, pipe railing, pipe supports, plaques, plastic and synthetic fences; platforms; playground equipment pit liners, porcelain enameled panels, prefabricated metal building, preglazed windows, storefront, and window walls; pulverizers, reinforcing steel, racks, railings (including pipe) railroad bridgework and maintenance, radiator enclosures, reservoirs, revolving doors, rigging (including shipyards, navy yards, vessels and government departments), rigging in connection with displays shows, all metal roof systems including standing seam mansard roofs, space roof systems, rolling grills, and shutters, rotors, safe deposit boxes, night depositories and drive-up equipment, safety devices, safes, sash, preglazed sash, steel and aluminum sash scaffolding scenery equipment, sculptures and art objects; scrum plates; sills and sill plates; seats; seating and plank seating, security doors; security door frames; shafting, sheet piling, shelving, shoring, sidewalk and vault lights, signs, signaling, rigging and hoisting involved with the use of helicopters; skate wheels; skip hoists, skylights, slope wall; smoke conveyors,

smoke plates, space frames, solar energy panels spandrels (metal and precast concrete ), spillways, stacks, stacker cranes, stage equipment and counterweight system and rigging for asbestos curtain, stairways, including pre-engineered stairs; all types of stairs, staining and steel supports, steel and fire proof curtains; storefronts and entrances; stators, stokers, storage racks used as an intrinsic part of a building, storage rooms, stoves, subways, sun shades, support brick wall and steel granite; swimming pool equipment; switch gear, tables, towers, tanks, target ranges; target range baffles, booths, and conveyors; temporary fencing; thimbles; thresholds; tracks and guides, track frames; tramways, transformers; travelers, traveling sheaves, trellises; trim on vaults; turnstiles trusses (steel, Howe and combination trusses), tunnels; turbines, all translucent and plastic material on steel frame construction, vats, vaults,, doors, vaults, ventilators, vertical hydraulic elevators, pressure vessels and vessels of all types, wire mesh, wire work; wall, stub, stud, wall tires; wainscoting; waste compactors; weather stripping; weather vanes, weirs and weir plates, welding machines, wheel guards, winches, windows window cleaning equipment, window washing hooks window and door screens and brackets, window stools, wickets, window washer track, x-ray equipment, x-ray support. Aligning, leveling and surveying n conjunction with steel or machinery erection. The unloading, distributing, stockpiling and handling of all materials coming under the jurisdictional claims of the Union. All layout work for the above regardless of equipment needed to perform operations; all work in connection with starting, stopping, operating, maintaining all equipment used in the performance of the above listed work; and all labor involved in water and wind testing of windows and curtain wall. Ornamental lead shall consist of the distributing, erection, installation, removal, uncrating and recrating, unloading and reloading, relocation, repair, maintenance, layout, removal replacement, handing, cutting, bending, rigging, jobsite fabrication, framing drilling, fitting, burning, incidental building of scaffolding, welding by combination of various gases and electricity. All reinforcing work in connection with field fabrication, handling, racking, sorting, cutting, bending, hoisting, placing, burning, welding,

sorting, cutting, bending, hoisting, placing, burning, welding and tying of all material used to reinforce concrete construction shall be done by Iron Workers. Erection of steel towers and handling and fastening of cables and guys for same; unloading, racking, sorting, cutting, bending, hoisting, placing and typing, burning and welding including stud welding of all iron, steel and metal in reinforced concrete construction including mesh for floor arches and the making of hoops and stirrups, metal forms and metal supports thereof; jacking of slip forms, G.F.R.C. Dryvit System, including the securing of bolting and/or welding and the installation of steeltex and wire mesh of an type when used for reinforced concrete construction, tool room attendant, alteration, wrecking, dismantling and repair of all of the above and all house smith work and submarine diving in connection with or about the same. The above claims are subject to trade agreements and decisions of the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry of the Building and Construction Trades Department. The demolition of all of the above work be done by Iron Workers.

Local Union # 290 claims the following work on reinforcing:

(a) Work in connection with the field, fabrication, handling, racking, sorting, cutting, bending, hoisting, placing, burning, welding and tying of all materials used to reinforce concrete construction, except loading and unloading by hand and carrying to a Centralized point adjacent to or upon the site of the project on which materials are to be used. When shop fabricating reinforcing iron, including handling, racking, sorting, cutting and bending, one apprentice Ironworker may be employed for every journeyman Ironworker engaged in such work.

(b) Realigning of reinforcing iron, wire mesh and similar reinforcing materials, placing steel dowels, as well as refastening and resetting same while concrete is being poured.

(c) Reinforcing steel and wire mesh in roadways and sidewalks in connection with building construction, also erection and fabrication of pre-stressed and pre-cast joist,

beams, columns and slabs, walls, roofs, tanks, manholes, trenches and covers.

(d) The handling and placing "j" or jack bars on slip form construction; the placing of all clips, bolts and steel rods and wire fabric or mesh pertaining to Gannett construction; the placing of steel-Tex or paper-back mesh used primarily for reinforcing.

The welding torch is a tool of the trade having jurisdiction over the work being welded. Craftsmen using the welding torch shall perform any of the work of their trade, and shall work under the supervision of the craft Foreman.

Gas and electric driven welding machines and air compressors are considered tools of the trade having jurisdiction of the work being done and as such the Ironworker when using the equipment shall operate the equipment and perform job site servicing.

Jacks, rollers, chain falls, sling chokers, fork lifts, air tuggers and other types of power equipment are considered tools of the trade having jurisdiction of the work being done and as such the Ironworker when performing work utilizing such equipment shall operate the equipment and perform job site servicing.

Ironworkers will perform all work pertaining to erecting guy or stiff leg derricks, skip hoists, tower cranes, tram ways, cable ways, gin poles, chicago booms, a-frames, gallows frames, mobile and jib cranes, overhead cranes, or other lifting equipment when used by the Ironworker as a tool of the trade in performing work claimed by the Ironworker.

Ironworkers will perform the work in the changing of all booms and jibs on mobile and stationary cranes, reeving of cables, placing and removing counterweights, building of cribs, shoring and placing of mats and other similar work required on the equipment outlined in the first paragraph of this section when being used by the Ironworker as a tool of the trade.

***Section 1 - Wage Rates***
***Effective June 1, 2013:***

| | Base | H&W | Pension | Appr. | Industry | Training | Annuity | Club | Total |
|---|---|---|---|---|---|---|---|---|---|
| Journeyman | $26.23 | $6.20 | $8.60 | $.45 | $.25 | $.05 | $3.43 | $.22 | $45.43 |
| Structural | $26.23 | $6.20 | $8.60 | $.45 | $.25 | $.05 | $3.43 | $.22 | $45.43 |
| Reinforcing | $26.23 | $6.20 | $8.60 | $.45 | $.25 | $.05 | $3.43 | $.22 | $45.43 |
| Machinery mover | $26.23 | $6.20 | $8.60 | $.45 | $.25 | $.05 | $3.43 | $.22 | $45.43 |
| Rigger & erector | $26.23 | $6.20 | $8.60 | $.45 | $.25 | $.05 | $3.43 | $.22 | $45.43 |
| Welder | $26.23 | $6.20 | $8.60 | $.45 | $.25 | $.05 | $3.43 | $.22 | $45.43 |
| Metal Bldg. Erector | $26.23 | $6.20 | $8.60 | $.45 | $.25 | $.05 | $3.43 | $.22 | $45.43 |
| Sheeter | $26.23 | $6.20 | $8.60 | $.45 | $.25 | $.05 | $3.43 | $.22 | $45.43 |

Foreman rate: Add seven percent (7%) of base wage plus full fringes.

General Foreman rate: Add nine percent (9%) of base wage plus full fringes.

**Future increases are as follows:**
Effective June 1, 2014 add $.80 to total package.
Effective June 1, 2015 add $1.00 to total package.
Effective June 1, 2016 add $1.00 to total package.
Effective June 1, 2017 add $1.00 to total package.

* With forty-five (45) days written notice to the Association, Ironworkers Local #290 may distribute money from the base wage to existing fringe benefit funds.

**Section 2 - Reporting Time**
Time allowed for the territory of Local Union #290 will be allowed as follows:

Area #1 - one hour's time or pay for the first day reporting for work. However, when an Employee reports for work of one day's duration or less, he shall be paid one hour's time or pay for the time it takes to reach the site of employment.

Area #2 - actual time not to exceed two hour's time or pay for the first day reporting for work. However, when an Employee reports to an Employer and such employment is one day's duration or less, he shall be paid actual time not to exceed two hour's time or pay for the time it takes to reach the site of employment.

Ironworkers shall be notified of lay-off one hour before said lay-off. Sufficient time will be given Ironworkers to gather tools.

**Section 3 - Payday**
The regular pay day shall be once a week on such day as agreed upon between the Employer and the Local Union and wages shall be paid before quitting time and wages are to be

paid in cash or other legal tender.
When Employees quit on their own accord, they shall wait until the next regular pay day for the wages due to them.

Employers shall withhold only four days' wages from an Employee for Local #290's jurisdiction.

When Employees are laid off, or discharged, they shall be paid in full in cash or other legal tender on the job immediately, and if required to go to some other point or wait until the following day, the Employees shall be paid an "additional" 2 hours pay in one of the following 3 fashions at the Employees option:

1. The Ironworker can pick up his check at the Employer's office anytime between 9:00 a.m. and 12:00 noon the first normal workday following layoff.*
2. A check will be made available at the Union hall no later than noon the first normal working day following the layoff.*
3. A check will be postmarked and mailed the next day following the layoff to the address of the Employee's choice.*

*An additional 2 hours pay for each 24-hour period.

Employers who have had an established office within the jurisdiction of this Agreement for over two years and have a history of prompt and accurate payments to the fringe funds, when laying off Employees on Saturdays, Sundays and Holidays, the Employer may pay off the next regular work day in one of the following three fashions at the Employee's option:

1. The Ironworker can pick up his check at the Employer's office anytime between 9:00 a.m. and 12:00 noon the first normal workday following layoff.*
2. A check will be made available at the Union hall no later than noon the first normal working day following the layoff.*
3. A check will be mailed to the Ironworker's home

address no later than the first normal working day following the layoff.*

* An additional 2 hours pay for each 24-hour period.

Accompanying each payment of wages shall be a separate statement identifying the Employer, showing the total earnings, the amount of each deduction, the purpose thereof and net earnings.

Any undue delay or loss of time caused the Employees through no fault of their own shall be paid for by the Employer causing such delay, at the regular straight time wages. Accompanying each payment of wages shall be a separate statement identifying the Employer, showing the total earnings, the amount of each deduction, the purpose thereof and net earnings.

Any company paying in check or other legal tender shall give the address of the Employer Company and the parent company or corporation.

In the event that the bank upon which an Employer draws his payroll check refuses to honor it, the Employer shall within twenty-four (24) hours thereafter issue to the Employee in question payment in cash, money order, or certified check, in the gross amount of said dishonored payroll check, plus twenty percent (20%) of the gross amount. The penalty does not apply if the Employee does not attempt to cash his check within thirty (30) days from receipt.

**Section 4 - Apprenticeship Wages**

The parties signatory hereto agrees to the establishment of a Joint Apprenticeship Committee in accordance with the provisions of the "Ironworkers Apprenticeship and Training Standards" as contained in article XXIII of the International Constitution. Said committee shall formulate and operate an apprenticeship program in the Local area in conformity with said standards. During each of the period's set forth below, apprentices shall be paid as follows:

JIW Program:

| | |
|---|---|
| 1st year apprentice | 60% of journeyman's rate |
| 2nd year apprentice | 70% of journeyman's rate |
| 3rd year apprentice | 80% of journeyman's rate |
| 4th year apprentice | 90% of journeyman's rate |

Rod Program:

| | |
|---|---|
| 1st year apprentice | 65% of journeyman's rate |
| 2nd year apprentice | 80% of journeymen's rate |

**Section 5 - Apprenticeship and Membership Retraining and Education Fund**

The Employer agrees to pay forty-five cents ($.45) per hour for each hour for which the Employee is paid, for all Employees covered by this Agreement, to Ironworkers Local Union # 290 apprentice and membership retraining fund, pursuant to the joint trust agreement establishing the fund, and shall be paid monthly up to and including the last payroll date in each and every calendar month on or before the 15th day of the following month. The payments into this fund shall be used for the purpose set forth in the trust agreement executed by the parties hereto.

Union and management agree that if the reserves of this fund are reduced to a minimum level, as determined by the JAC, this contract will be re-opened to address that issue.

Whereas, of the above-mentioned forty-five cents ($.45) per hour, seven cents ($.07) is to be considered a wage contribution to the fund that has been agreed to be taken in lieu of wages. The other thirty-eight cents ($.38) is to be considered strictly an Employer contribution. Since seven cents ($.07) will be paid by the Employer to this fund in lieu of paying said seven cents ($.07) per hour in wages, the following procedure shall be followed:

When in a proper procedure, action taken by the Local Union's membership, to discontinue the contribution to this fund, the

seven cents ($.07) per hour will be added to the existing wage scale at that time, and the Employer shall be notified of this action as outlined in the duration and termination section of this Agreement, and the other thirty-eight cents ($.38) Employer contribution will be terminated.

The failure of an Employer to pay the contribution required hereunder promptly when due shall be a violation of the Collective Bargaining Agreement between the said Employer and Local Union # 290 as well as a violation of the Employer's obligations, hereunder. Nonpayment by an Employer of any monies due shall not relieve any other Employer from his obligation to make payments.

**Section 6 - Trainee Classification**
It is agreed between the parties that at such time as a provision is negotiated on a national basis with the International Union to provide for a trainee or similar classification at a scale less than that for a journeyman, the terms of the provision will be incorporated in this Agreement and become effective on the same date as the provision is accepted by the International Union.

## ARTICLE XVII
## WORK DAY

**Section 1 - Working Hours**
Employees shall be at their posts prepared to start work at the regular starting time provided the shed or room for the workers to change their clothes is adjacent to or within a reasonable distance from their work.

Eight (8) hours shall constitute a day's work from 7:00 a.m. to 5:00 p.m. from Monday to Friday, inclusive, except in territories where a shorter workday prevails among a majority of the building trade Unions on building work. Noon hours may be curtailed by Agreement with the men on the job and the Contractor or his representative. Once starting time is established, refer to the next paragraph.

Upon the mutual agreement of the Contractor and Business Agent four ten-hour days shall be permitted if 40 hours duration and started at the beginning of the "workweek" (Monday). The 11th and 12th hours daily shall be paid at time and one-half. Friday may be a straight-time make-up day if the job is weathered out. A minimum of eight (8) hours shall be scheduled on Friday make-up day, weather permitting. Hours worked within the scheduled work hours, (not to exceed forty (40) hours in a "workweek") shall be paid at the straight time rate. Hours in excess of forty hours shall be at the applicable overtime rate. If Fridays are scheduled to work the job will return to the normal five (5) eight hours a day schedule.

The make-up is voluntary for each individual employee and the employee shall not be discriminated against with regard to lay off for refusing to work.

When a legal Holiday falls on a scheduled workday, the Employer may use the four/ten (4/10) hour day "workweek" schedule for the remainder of the "workweek". As such a make-up day is not applicable and Friday is an overtime day.

Saturday may be considered a voluntary straight time make-up date if the job is weathered out. Employees choosing to work this day at straight time shall be guaranteed an eight hour shift, but shall only be paid for actual hours worked. Any hours worked over forty (40) for the week are to be paid at the premium rate.

**Section 2 - Show-up Time**

Employees shall be paid one (1) hour Show-up Time regardless of weather, however in the first six hours of the day; the one-hour shall float. Example: rain starts at 9:30 a.m.; work resumes at 10:05 a.m., Employees shall be paid for hours worked, including weather delay.

Employees shall be paid two (2) hours if work is ordered to start on a job within the first hour and then must be stopped for any reason within the first two (2) hours. Safety considerations will be a prime factor in determining whether

work can be performed.

In inclement weather, work may be suspended by mutual agreement between the Employee and the Employer representative. Employee must remain on the job for the full time paid if requested to do so by the Employer.

**Section 3 - Shift Work**

When two (2) shifts are employed, the first shift shall work eight (8) hours for eight (8) hours' pay. The second shift shall work seven and one-half (7 ½) hours for eight (8) hours' pay. When three (3) shifts are employed, the first shift shall work eight (8) hours for eight (8) hours pay, the second shift shall work seven and one- half (7 ½) hours for eight (8) hours pay and the third shift shall work seven (7) hours for eight (8) hours pay. When multiple shifts are worked on Saturday, it shall be at time and one-half. When multiple shifts are worked on Sunday or recognized Holidays, the pay shall be at the double time rate. On all shift work performed on Saturdays, Sundays, or Holidays, the overtime rate shall start with the beginning of the first or "morning" shift; not more than one (1) shift shall be allowed on a job of less than five (5) days duration, except in case of an emergency, which shall be decided, upon approval of the Business Agent and/or the General Executive Board. In localities where the workday is less than eight (8) hours per day, the hours on shift work shall be shortened proportionately.

Any additional men required to work any shift will receive the same rate of pay as the men already at work, on that shift, provided they have not worked eight hours on any other job or for any other Employer on that date.

**Section 4 - Overtime and Holidays**

Time and one-half shall be paid for the 9th through the 12th hour worked Monday through Friday. Time and one-half shall be paid for the first 12 hours worked on Saturday. Double time shall be paid Sundays, Holidays and over 12 hours Monday through Saturday.

No work shall be performed on Labor Day except to save life or property. The following Holidays shall be observed:

| | |
|---|---|
| New Year's Day | Labor Day |
| Memorial Day | Christmas Day |
| Fourth of July | Thanksgiving Day |

A holiday which occurs on a Sunday shall be observed the following Monday.

Employees called in or sent in on emergency work any time outside of regular daylight work hours shall receive a minimum of four hours at time and one-half rate.

No Employee shall be required after having worked sixteen (16) hours (lunch periods included) to return to work for the straight time rate of wages without having had eight (8) hours off the jobs. Supervision and Stewards are excluded for a maximum of two (2) hours to stay over and coordinate the job, in which case a minimum of six (6) hours off the job would be required.

**Section 5 - Shipping Employees**
Employees shipped to jobs or work out of the jurisdiction of the Local Union shall receive transportation, traveling time and expenses, providing they remain on the job thirty (30) days, or until the job is completed if it requires less than thirty days.

Employees shipped to a job and not put to work, weather permitting, or the job is not ready for them to go to work shall be paid the regular wage rate for such time, or such Employees shall be shipped back to the shipping point with time and transportation paid by the Employer.

## ARTICLE XVIII
## WORKING CONDITIONS

Section 1 - Drinking Water - The Employer shall furnish suitable drinking water and paper cups on the job site no later

than one hour after starting time. Ice water shall be furnished from May 1 to October 1.

Section 2 - Change Room - Each job of sufficient duration and size to justify same shall be provided with a shed or room for the Employees to change their clothes and keep their tools.

Section 3 - Sanitary Facilities - Sanitary Port-o-lets, Kem-Johns or equivalent facilities shall be provided by the Employer on jobs of sufficient duration and size to justify them.

Section 4 - Personal Equipment - No Ironworker shall be permitted to furnish, supply or rent to his Employer any equipment used in connection with Ironworker's work, such as welding machines, cutting torches, impact wrenches, power grinders, power drills, pick-up trucks, hoisting equipment or similar equipment in a category recognizably larger than convention hand-tools. Also, he shall not be allowed to use a personally owned automobile or truck for moving, transporting, or delivering material, merchandise or equipment for the Employer.

Section 5 - Meal and Coffee Break- There shall be a coffee break between starting time and lunchtime; however, there will be no general shutdown of the job or work done by the Employees. In cases when shifts are required for employees to be continuously at work for more than ten (10) hours, the employer shall schedule a second (2nd) * paid thirty (30) minute meal break effective upon the commencement for the ** third (3rd) overtime hour. Subsequent * meal break shall be scheduled each four (4) hours thereafter.***

Section 6 - Jury Duty - Any Ironworker called for jury duty shall be paid eight (8) hour's wages for the first day only that he serves on same.

Section 7 - Paid Parking - Employer shall provide parking or pay for same when pay parking is necessary.

Section 8 - Time Clocks - Members of the Local Union shall

not be required to punch time clocks.

Section 9 - Amount of Work - There shall be no limitation placed on the amount of work to be performed by any workman during working hours.

Section 10 - Crew Sizes - On all work operations coming under the jurisdiction of this Agreement, a sufficient number of men will be employed in order that the work involved can be performed in a safe and expeditious manner. No less than two men shall be employed on handling or placing roll mesh by hand.

## ARTICLE XIX
## WELDING CONDITIONS

When a Contractor has welding on projects that require state certified welding tests, Contractors will stand expenses for certifying welder Employees.

For Ironworkers that have papers showing certification or have proof of qualifications, it is agreed that the Employer may retain the certification papers until job completion or until the welding work for the Contractor is completed. All papers will then be sent to Local # 290.

When welding on steel skeletons or when scaffolding or ladders are used and when unusually hazardous conditions are apparent, each welder shall be provided Ironworker assistance, as the job safety performance requires.

## ARTICLE XX
## TOOLS

All journeymen Ironworkers and apprentice employed on ornamental, structural or rod work shall furnish their own tools. The following list shall be construed as minimum requirements:

1-12" hacksaw
1-12" square
1-plumb bob and line
1-50' tape
1-6' rule
1-scriber
1-divider
1-ball peen hammer
Or #2 hammer
1-ratchet and socket wrenches (1/2 drive)
1-8" pliers
1-set open end wrenches
1-10" crescent wrench
1-7/8" spud wrench
1-12" crescent wrench
1-pair pliers
1-center punch
1-drift pin
1-tap wrench
1-24" level
1-6" screw driver
1-8" screw driver
1-12" screw driver
1-offset screw driver
1-cold chisel
1-3/4" spud wrench
1-bull pin
1-tie wire reel with belt
1-pair of side cutting pliers
1-belt and bag

All tools broken by Ironworkers in the performance of their duties shall be replaced with top quality tools by the Employer.

When tools are stolen from tool shed or Contractor's toolbox, Contractor or Employer shall be responsible when Employee gives Contractor or Employer list of tools prior to date tools were stolen.

In case of a fire on the job at any time, the Contractor or Employer shall be held responsible for the loss of mechanics' tools and clothing in such fire when Employee gives Contractor or Employer list of tools and clothing prior to the fire.

When tools are to be checked out and in, it shall be done during working hours.

An Employer may terminate an Employee who, through negligence, causes significant loss of tools to his/her Employer. Each Ironworker has a responsibility and duty to take care of and return Employer tools issued to the Ironworker.

On jobs requiring the need of tool room or supply attendants for tools or supplies used exclusively by Ironworkers, these

attendants shall be journeyman Ironworkers.

All Employees shall be given ample time to gather and stow all tools before the regular quitting time.

Employers shall furnish certain personal safety items; welding hoods, welding jackets, safety harness and lanyards, safety reels, hard hats.

If required by the project, the cost of steel toed boots, not to exceed one hundred fifty dollars ($150.00), will be paid for by the Employer if the Employee has been employed for six (6) months or five hundred (500) hours, This will be monitored by the Union Hall and Contractors. The Contractors will notify the Union which Employees have received the shoe allowance. Employees shall give a signed authorization to deduct the cost of any personal safety items from his/her pay prior to receiving the items (except boots). The cost of the items will be deducted if not returned. When items are returned to the Employer, the authorization shall be returned to the Employee.

## ARTICLE XXI
## FOREMEN

The selection of craft Foremen or craft General Foremen, over workmen of their respective crafts, shall be entirely the responsibility of the Employer.

When two (2) or more Employees are employed, one shall be selected by the Employer to act as Foreman and receive a Foreman's wages, and the Foreman is the only representative of the Employer who shall issue instructions to the workmen.

There shall be no restrictions as to the employment of Foreman or pushers. The Employer may employ on one piece of work as many Foremen or pushers as in his judgment are necessary for the safe, expeditious and economical handling of same.

If the first Foreman is not a member of Local Union # 290, the second Foreman shall be a member of Local Union # 290, provided he meets the standards set forth by the Employer.

When three or more Foreman are employed one (1) shall be employed as a General Foreman.

No Foreman will be allowed to take the place of a journeyman Ironworker on any overtime work.

All General Foremen shall be members of this International Association while acting in a capacity of General Foreman over members of the craft.

All General Foremen in the jurisdiction of the Local #290 will be guaranteed a forty (40) hour week by any Employer or Contractor when the employment is of forty hours or more duration.

An Employee working as the General Foreman the day before and the day after a holiday will receive pay for the holiday regardless of the duration of the job provided the holiday falls within the work week (Monday through Friday) and the job is not worked on said holiday, provided all other conditions are satisfied.

When only one Ironworker is employed on the job and is required to assume responsibility, read and interpret plans, he shall be paid Foreman's wages.

The Foreman rate of pay shall be seven percent (7%) of the journeyman base wage.

The General Foreman rate of pay shall be nine percent (9%) of the journeyman base wage.

## ARTICLE XXII
## BUSINESS AGENTS

The Contractor agrees that the Business Agent can visit the

job site at any time if the owner's regulations permit; however, the Business Agent, when arriving at the job, will notify the Ironworker Foreman and Union Steward of his/her arrival and will in no way interfere with the progress of the work.

No person except those representing the Employee shall have the right to interfere with workmen during working hours.

## ARTICLE XXIII
## JOB STEWARD

There shall be a Steward on each job who shall be appointed by the Business Representative. He shall keep a record of the workers laid off and discharged, and take up all grievances on the job and try to have the same adjusted. In the event he cannot adjust them he must promptly report that fact to the Business Representative, who shall report same to the proper officer of the Union so that efforts can be made to adjust any matter without a stoppage of work.

He shall see that the provisions of this Agreement are complied with and report to the Union the true conditions and facts.

The Steward shall promptly take care of injured workers and accompany them to their home or to a hospital, as the case may be, or require, without any loss of time and report the injury to the proper officers of the Union.

The Employer agrees that the job Steward will not be discharged until after proper notification has been given to the Union, and further, when Employees are laid off, the job Steward will be the last man laid off, providing he is capable of performing the work in question.

When two (2) or more Ironworkers are employed by the Employer, no Ironworker shall serve in the capacity of Steward and Foreman, or Steward and General Foreman or Steward and Superintendent at the same time.

Stewards shall be qualified workmen performing work of their craft. There shall be no non- working Stewards.

## ARTICLE XXIV
## WELFARE PLAN

Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and declaration of trust dated August 1, 1952, as amended and as the same may hereafter be amended from time to time, which established and which governs the operations of the Ironworker District Council of Southern Ohio and vicinity welfare trust. That document shall be deemed to be a part of this Collective Bargaining Agreement as though set forth herein at length. Each such Employer agrees to pay to say welfare trust the sum specified in article XV for each hour required to be paid for hereunder to any Ironworker employed by him. Reports shall be rendered monthly for a four-week or five-week period, as appropriate; in each report a fraction of less than one-half (1/2) hour in connection with a man shall not be paid for, and one-half (1/2) hour or more shall be paid for in one-half (1/2) hour increments. In computing the payments to be made by each Employer into that welfare trust, there shall be included the payments required to be made for shift differential, paid reporting time, paid holidays, paid vacations, and all other items for which payment is provided hereunder. Employers' reports and contributions for any month are due in the office of the welfare trust on or before the fifteenth day of the following month. For the late filing of reports and for the late payment of contributions, liquidated damages shall be assessed in conformity with the then current policies of the United States Internal Revenue Service with respect to late filings and payments to it; under the foregoing the following charges presently (1982) prevail: (a) liquidated damages: (1) for the late filing of reports: 5% of the amount of the contribution covered by the report, per month or fraction thereof, not to exceed 25%, and (2) for late payment of contributions: 1.5% per month or fraction thereof, not to exceed 50 months, except that for the first five months of concurrent late reporting and also late payment this 1.5%

shall be deemed to be included in the 5% in (1) above: (b) interest: for late payment of contributions, interest at the rate of 0.5% per month through January 31, 1980, at the rate of 1.0% per month effective February 1, 1980, and at the rate of 18% per annum effective July 1, 1981 on all delinquent payments, liquidated damages, and accumulated interest until paid. Interest shall be calculated on a daily basis and shall be payable monthly.

## ARTICLE XXV
## PENSION PLAN

Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and declaration of trust dated October 30, 1962, as amended and as the same may hereafter be amended from time to time, which established and which governs the operations of the Ironworker District Council of Southern Ohio and Vicinity Pension Trust. That document shall be deemed to be a part of this Collective Bargaining Agreement as though set forth herein at length. Each such Employer agrees to continue to pay to say pension trust the sum specified in article XV for each hour required to be paid for hereunder to any Ironworker employed by him. Reports shall be rendered monthly for a four-week or five-week period, as appropriate; in each report a fraction of less than one-half (1/2) hour in connection with a man shall not be paid, one-half (1/2) hour or more shall be paid in one-half (1/2) hour increments. In computing the payments to be made by each Employer into that Pension Trust there shall be included the payments required to be made for shift differential, paid reporting time, paid holidays, paid vacations, and all other items for which payment is provided hereunder. Employers' reports and contributions for any month are due in the office of the pension trust on or before the fifteenth day of the following month. For the late filing of reports and for the late payment of contributions, liquidated damages shall be assessed in conformity with the then current policies of the United States Internal Revenue Service with respect to late filings and payments to it; under the foregoing the following charges presently (1982) prevail:

(a) liquidated damages: (1) for the late filing of reports: 5% of the amount of the contribution covered by the report, per month or fraction thereof, not to exceed 25% and (2) for late payment of contributions: 1.5% per month or fraction thereof, not to exceed 50 months, except that for the first five months of concurrent late reporting and also late payment this 1.5% shall be deemed to be included in the 5% in (1) above: (b) interest: for late payment of contributions, interest at the rate of 0.5% per month through January 31, 1980, at the rate of 1.0% per month effective February 1, 1980, and at the rate of 18% per annum effective July 1, 1981 on all delinquent payments, liquidated damages, and accumulated interest until paid. Interest shall be calculated on a daily basis and shall be payable monthly.

**Excess Benefit Plan**

Excess Benefit Plan: The parties hereto recognizes that certain participants in the Ironworkers District Council of Southern Ohio & Vicinity Pension Trust may not receive their total pension benefit because of the benefit payment limitations imposed under Internal Revenue Code Section 415. In order to enable such participants to receive the full benefit that otherwise would have been payable by the Ironworkers District Council of Southern Ohio & Vicinity Pension Trust, an Excess Pension Benefit Plan and Trust will be established. The arties hereto agree that a portion of the negotiated contributions for the Ironworkers District Council of Southern Ohio & Vicinity Pension Trust instead may be directed into the Excess Pension Benefit Plan. The amount of contributions to be delivered shall be based on determinations made periodically by the Board of Trustees of the Ironworkers District Council of Southern Ohio & Vicinity Pension Trust or its duly authorized designee.

## ARTICLE XXVI
## ANNUITY

Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and declaration of trust dated April 27th, 1971, as amended

and as the same may hereafter be amended from time to time, which established and which governs the operations of the Ironworker District Council of Southern Ohio and Vicinity Annuity Trust. That document shall be deemed to be a part of this Collective Bargaining Agreement as though set forth herein at length. Each such Employer agrees to pay to said Annuity Trust, effective with the first payroll period commencing on or after June 1, 1994 the negotiated rate per straight time hours worked and one and one half times the negotiated rate for each time and one half and two time the negotiated rate for each double time worked for hereunder to any Ironworker employed by the Contractor, or rate so stated in Article XV. Reports shall be rendered monthly for a four-week or five-week period, as appropriate; in each report a fraction of less than one-half (1/2) hour in connection with a man shall not be paid for, and one-half (1/2) hour or more shall be paid for in one-half (1/2) hour increments. In computing the payments to be made by each Employer into that annuity trust, there shall be included the payments required to be made for shift differential, paid reporting time, paid holidays, paid vacations, and all other items for which payment is provided hereunder. Employers' reports and contributions for any month are due in the office of the welfare trust on or before the fifteenth day of the following month. For the late filing of reports and for the late payment of contributions, liquidated damages shall be assessed in conformity with the then current policies of the United States Internal Revenue Service with respect to late filings and payments to it; under the foregoing the following charges presently (1982) prevail: (a) liquidated damages: (1) for the late filing of reports: 5% of the amount of the contribution covered by the report, per month or fraction thereof, not to exceed 25%, and (2) for late payment of contributions: 1.5% per month or fraction thereof, not to exceed 50 months, except that for the first five months of concurrent late reporting and also late payment this 1.5% shall be deemed to be included in the 5% in (1) above: (b) interest: for late payment of contributions, interest at the rate of 0.5% per month through January 31, 1980, at the rate of 1.0% per month effective February 1, 1980, and at the rate of 18% per annum effective July 1, 1981 on all delinquent

payments, liquidated damages, and accumulated interest until paid. Interest shall be calculated on a daily basis and shall be payable monthly.

## ARTICLE XXVII
## VACATION SAVINGS PLAN

Upon 45 days notice, Employers will deduct an amount per hour as may be designated by the Union from the weekly pay of Ironworker Employees and remit the same to a fund or plan, it being understood that such a fund or plan shall not require the establishment of a joint board of trustees, or the mutual adoption of a Trust Agreement, such as to entail involved administrative procedures, or reporting procedures to any governmental agency and, further that such fund or plan shall be set up in such a manner as not to violate any Local, State or Federal laws.

## ARTICLE XXVIII
## BOND

Section 1 - the Union may require those Employers who are bound to the provisions of this Agreement who have not maintained an office in the geographic area covered by this Agreement for over five (5) years to procure, pay the premium for, and deliver to the Union a bond underwritten by a surety company authorized to do business in Ohio in the amount of twenty-five thousand dollars, which bond shall guarantee the Employer's obligations to pay all wages due Employees under this Agreement and further guarantee all payments, penalties and other costs due to (1) the Ironworkers District Council of Southern Ohio & Vicinity Pension Trust, (2) the Ironworkers District Council of Southern Ohio & Vicinity Welfare Trust and (3) Ironworkers Local Union # 290, Apprentice and Membership Retaining Fund and, (4) any vacation savings plan implemented pursuant to article XXVI of this Agreement and (5) dues check-off and, (6) Building Trades/III/IPEF Check-Off.

Section 2 - the Union may require any Employer, other than Employer obligated under section 1 of this article, to procure, pay the premium for, and deliver to the Union a bond underwritten by a surety company authorized to do business in Ohio in the amount of twenty-five thousand dollars, which bond shall guarantee the Employer's obligations to pay all wages due Employees under this Agreement and further guarantee all payments, penalties and other costs due to (1) the Ironworkers District Council of Southern Ohio & Vicinity Pension Trust, (2) the Ironworkers District Council of Southern Ohio & Vicinity Welfare Trust and, (3) Ironworkers Local Union # 290, Apprentice and Membership Retraining Fund and, (4) any vacation savings plan implemented pursuant to article XXVI of this Agreement and (5) dues check-off and, (6) Building Trades/III/IPEF Check-Off.

## ARTICLE XXIX
## PARTICIPATION AGREEMENT

All Employers must sign Fringe Benefit Participation Agreements as requested by welfare pension funds. The participation agreements are available from Ironworkers Health and Welfare Fund office, 1470 Worldwide Place, Vandalia, Ohio 45377.

Each Employer who is subject to the provisions hereof shall enter into a written participation Agreement with the Ironworkers District Council of Southern Ohio & Vicinity Welfare Trust, the Ironworkers District Council of Southern Ohio & Vicinity Pension Trust, pertaining to participation in those trusts; in the form prescribed by those trusts. The Participation Agreement is included in the Collective Bargaining Agreement as appendix "A".

## ARTICLE XXX
## DUES CHECK-OFF

Commencing October 1, 1975, and continuing thereafter during the term of this Agreement, and in accordance with the

terms of an individual and voluntary written authorization for check-off of Union dues in the form agreed upon by the parties hereto and permitted by the provisions of section 302(c) of the Labor Management Relations Act, as amended, the Employer agrees to deduct once each week from the wages of each Employee covered by this Agreement, who signs such an authorization six (6) percent of said Employees gross wages. The amount deducted shall be remitted to Ironworkers Local #290 indicated on reporting forms by the 15th day of the following month together with a statement setting forth the name and hours paid of each Employee from whose wages the deduction was made.

Employers making late deposits (after the 15th of the month) to the Depository of the withholdings from Employee's wages for Dues Check-Off and Working Dues, shall be assessed interest at the rate of five percent (5%) per month on the amount past due, such interest to be added to the amount due to the Union. Not to exceed twenty percent (20%) annually.

## ARTICLE XXXI
## BUILDING TRADES DUES CHECK-OFF

Each Employer is required to deduct or withhold the sum of ten cents ($.10) per payroll hour from the net pay of each of his Employees for a building trades dues check-off. It is clearly understood that the five cents ($.05) per payroll hour deduction is in addition to the member's regular dues and assessments.

The monies so deducted shall be remitted to the Union by the fifteenth (15th) day of the following month together with a statement setting forth the name and hours worked of each Employee from whose wages the deduction is made. Said monies shall be mailed to Ironworkers Local Union # 290, 606 Hillrose Avenue, Dayton, Ohio 45404.

Employers making late deposits (after the 15th of the month) to the Depository of the withholdings from Employee's wages for Dues Check-Off and Working Dues, shall be assessed

interest at the rate of five percent (5%) per month on th amount past due, such interest to be added to the amount du to the Union. Not to exceed twenty percent (20%) annually.

## ARTICLE XXXII
## CONSTRUCTION INDUSTRY ADVANCEMENT FUND

The Employer and the Union agree to and approve th establishment of a Construction Industry Advanceme Program to promote the common good of the constructio industry by providing financial support for activities whic may include promotion of safety, market development, publ relations, labor relations and education.

Each Employer covered by this Agreement shall pay to th Construction Industry Advancement Program the amour of twenty-five cents ($.25) for each hour worked by eac Employee within the bargaining unit.

Payments to the program shall be in accordance with instructions on forms furnished by the Association who is the exclusive administrator of this fund.

The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the 15th day of each month covering amounts due for the preceding month. If an Employer shall fail to make his payment when the same shall be due and payable, he shall be subject to an additional charge of 10% per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses, impairment of reserves, and costs of collection arising from late payment.

Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and fund of the construction industry advancement program shall not be distributed among any Employers, or

the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

There is specifically excluded from the purposes of the Construction Industry Advancement Program, the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize Contractors during periods of work stoppages or strikes.

This program is subject to all applicable federal and state laws.

In the event a majority of Local Ironworker Employers form a Steel Erectors Association in this jurisdiction, that Association and the West Central Ohio Division, Ohio Building Chapter, Inc., will mutually agree on the administration of the Construction Industry Advancement Program. If Agreement cannot be reached, members of such newly formed Association may make their Construction Industry Advancement Program payments to such newly formed organization.

## ARTICLE XXXIII
## SETTLEMENT OF DISPUTES

Section 1. Grievances – Should differences arise between the Employer and the Union as to the meaning and application of the provisions of this agreement or should differences arise about matters not specifically mentioned in this agreement, there shall be no suspending of work or lockout of such differences. An earnest effort shall be made to settle such differences immediately and in the following manner:

There shall be an Arbitration Committee of three (3) members of the Contractor Association and three (3) members representing Ironworkers Local #290 selected by their respective organizations. The duties of the Joint Arbitration Committee shall be mutual consideration and settlement of all disputes that may arise. The joint Committee will appoint a

Chairman and a Secretary. The Secretary shall keep minutes of the meeting.

The Committee shall meet at the call of the Chairman or Secretary with-in seventy-two (72) hours exclusive of Saturdays, Sundays and Holidays.

In the event no agreement has been reached and the Joint Committee is deadlocked, the question at issue shall be referred to a disinterested Arbitration Board. The Board shall be selected as follows: One (1) member chosen by the Employer, One (1) selected by the union and the two (2) selected shall choose the third (3) members.

Pending consideration of any question referred to the Joint Arbitration Committee or pending a decision of the Joint Arbitration Board provided in this Article, it is expressly understood that there shall be no strikes or lockouts or stoppages of work of any kind ordered or permitted against any member of the parties hereto.

Section 2. The Joint Arbitration Committee or the Joint Arbitration Board shall have jurisdiction over all questions involving the interpretation and application of any section of this agreement. They shall not, however, be empowered to handle negotiations for the new agreement, changes in the wage scale, or jurisdiction disputes.

Section 3. Each party shall individually pay the expenses of the Arbitrator it appoints and the two parties shall jointly share the expense of the third Arbitrator.

There shall be no strikes, work stoppages, or lockouts during the processing of any grievances or disputes in accordance with the manner prescribed in the local or national Agreement.

## ARTICLE XXXIV
## DURATION AND TERMINATION

The Agreement, with any amendments thereof made as

provided for therein shall remain in full force and effect until midnight May 31, 2018 and, unless written notice be given by either party to the other at least sixty (60) days prior to such date of a desire for change therein or to terminate the same, it shall continue in effect for an additional year thereafter. In the event the Employer decides to terminate the Agreement, the Employer is mandated to send a certified mail notice to all parties as notification of terminating the Agreement. In the same manner, this Agreement with any amendments thereof shall remain in effect from year to year thereafter, subject to termination at the expiration of any such contract year upon notice in writing given by either party to the other at least sixty (60) days prior to the expiration of such contract year.

Each outside Local Union shall, after receiving the approval of the General Executive Board, notify, in writing, the employers and contractors in their jurisdiction not less than sixty - (60) days in advance of any proposed new agreement and working rules and when requesting the aforementioned approval of the General Executive Board, the Local Union shall submit two (2) copies of its proposal, which shall not be submitted to their employers until same has been approved by the General Executive Board. The final draft of all new agreements and working rules and/or the final draft of all changes in existing agreements and working rules shall be submitted to and be approved by the General Executive Board before they are signed by the officers of the Local Union, and any such agreement or working rules or amendments thereto which have not been approved by the General Executive Board shall have no binding force or validity. Outside Local Unions, which fail or refuse to comply with the provisions of this Section or Section 28d or that violate an agreement after approval of same by the General Executive Board will be subject to the forfeiture of their charter, and the officers or members of outside Local Union violating the provisions contained in this Section or Section 28d shall be subject to charges and, after trial, such penalty as the General Executive Board may deem proper.

Any such notice as hereinabove provided for in the preceding

paragraph, whether specifying a desire to terminate or to change at the end of the current contract year, shall have the effect of terminating this Agreement at such time.

Article XXXI will be governed by the memorandum of Agreement titled 281 signed as a part of this Agreement.

## Appendix "A"
## Participation Agreement

The undersigned Employer employing Ironworkers, for and in consideration of the provision by the above welfare trust (hereinafter called simply "welfare trust") of health, welfare, and death benefits, by the above pension trust (hereinafter called simply "pension trust") of pension, retirement, and death benefits, and by the above annuity trust (hereinafter called simply "annuity trust") of annuity benefits, to eligible Ironworkers Employees of said Employer, hereby agrees to accept, to be bound by, and to comply with the terms and provisions of (1) the Agreement and declaration of trust dated August 1, 1952 and establishing the welfare trust, as amended, and as hereafter amended, and (2) the Agreement and declaration of trust dated October 30, 1962 and establishing the pension trust, as amended, and as hereafter amended, and (3) the Agreement and declaration of trust dated April 27, 1971 and establishing the annuity trust, as amended, and as hereafter amended. Receipt of a copy of those documents as amended to date is acknowledged. It is intended that this participation Agreement be the written Agreement required by the labor-management act of 1947 to permit the welfare trust, the pension trust, and the annuity trust to receive contributions from the Employer on behalf of his/its Employees. This Employer hereby ratifies the selection of, and accepts as his/its representatives, the present Employer trustees of the welfare trust, pension trust, and the annuity trust, and their successors in office from time to time. Contributions to the welfare trust, to the pension trust, and to the annuity trust will be made by this Employer as required by said Agreements and declaration of trust; as amended and as hereafter amended from time to time, at the rates and in

the manner prescribed either (a) therein or (b) in a collective Bargaining Agreement entered into by this Employer or entered into by an Association of which he/it is a member or the terms of which he/it observes, with any Local Union of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, AFL-CIO, or with the District Council of Southern Ohio and vicinity of said International Association, or with said International Association, itself, as any or all of such Agreements are or may be amended, supplemented, modified, extended, renewed, or superseded from time to time. Such contributions shall commence forthwith, if they have not already commenced, and shall continue for a period provided in such Agreements, including all amendments, supplements, modifications, extensions, renewals, or successor Agreements thereto, and shall continue thereafter until the first day of the month following the month in which the board of trustees of the welfare trust, the board of trustees of the pension trust, and the board of trustees of the annuity trust shall each have received from this Employer written notice of termination of this participation Agreement. Effective date of this Agreement is the earliest of (1) the date of the first employment for which contributions may have been paid to any of the above trusts, or (2) the date of the commencement of all work involving employment of Ironworkers which was in progress on the date this Agreement is signed, or (3) the date on which this Agreement is signed.

**Participation Agreement**

Date signed: ______________________________,20__________

______________________________________________________
(Name of Employer)

By:___________________________________________________
(Corporate officer)
(Required if Employer is incorporated; otherwise, partner or owner)

______________________________________________________
(Title of person signing)

Check whether:

Corporation__________________________
Partnership__________________________
IndividualOwnership__________________

Employer's name and complete mailing address

______________________________________________________
(Employer's Name)

______________________________________________________
(Address)

______________________________________________________
(City) (State) (ZipCode)

Send two completed copies to the welfare trust/pension trust/ annuity trust office. One fully executed copy will be returned to the Employer.

Accepted on ______________________________,20__________
Ironworkers District Council of Southern Ohio & Vicinity Welfare Trust, Ironworkers District Council of Southern Ohio & Vicinity Pension Trust, and Ironworkers District Council of Southern Ohio & Vicinity Annuity Trust

By:___________________________________________________

Authorized Union/Employee Trustee

And by:_______________________________________________
(Authorized Employer Trustee)

In witness whereof, we, the undersigned, have executed this Agreement on the 1st day of June, 2013, on behalf of our principals as indicated.

For Local Union # 290

Joseph L. Pittaluga, s/ ____________________
President

Rob Ratermann, s/ ____________________
Business Manager/Financial Secretary

Jeff Bush, s/ ____________________
Business Agent

For the Ironworkers Steel Erectors Section, Labor Relations Division, Ohio Building Chapter, Inc., West Central Ohio Division, Associated General Contractors of America

Randall L. Fox, s/ ____________________
Secretary Negotiating Committee

John Hesford, s/ ____________________
Negotiating Committee

Terry Estes, s/ ____________________
Negotiating Committee

Shawn Runyon, s/ ____________________
Negotiating Committee

The undersigned, desiring to become additional parties to the Collective Bargaining Agreement between the Ironworkers Steel Erectors Section, Labor Relations Division, Ohio Building Chapter, Inc., West Central Ohio Division, Associated General Contractors of America, and Ironworkers Local Union #290, which is dated June 1, 2013, hereby certify that they have read the said Agreement and agree to accept and be bound by all the terms and provisions thereof as additional parties thereto.

______________________________
(Name of Employer)

______________________________
(Address) (Phone)

By: ______________________________
(Authorized Representative)

**Ironworkers Local Union #290**

By: ______________________________

Date: ________________



SCFCO001720



EXHIBIT
PENGAD 800-631-6989
L
Employer

SOFCO001409

# AGREEMENT BETWEEN CENTRAL OHIO AGC AND CENTRAL OHIO STEEL ERECTORS AND IRONWORKERS LOCAL UNION NO. 172

| | | |
|---|---|---|
| | PREAMBLE | 3 |
| | SAFETY | 3 |
| | DRUG-FREE WORKPLACE | 3 |
| | NON-DISCRIMINATION | 4 |
| 1 | CRAFT JURISDICTION | 4 |
| 2 | RECOGNITION AND SECURITY | 7 |
| 3 | REFERRAL CLAUSE | 8 |
| 4 | TERRITORY | 10 |
| 5 | WORK HOURS PER DAY | 10 |
| 6 | SHIFT WORK | 12 |
| 7 | OVERTIME & HOLIDAYS | 13 |
| 8 | DUES CHECK-OFF | 13 |
| 9 | WAGE RATES | 14 |
| 10 | PIECEWORK | 15 |
| 11 | WORK LIMITATION | 15 |
| 12 | PAYDAY | 15 |
| 13 | BENEFIT TRUST | 16 |
| 14 | PENSION PLAN | 17 |
| 15 | ANNUITY TRUST | 17 |
| 16 | BOND PROVISION | 18 |
| 17 | APPRENTICE TRAINING CONTRIBUTIONS | 19 |
| 18 | REPORTING TIME | 20 |
| 19 | REPORTING TIME (SHOW-UP TIME) | 20 |
| 20 | FOREMAN | 20 |
| 21 | PHYSICAL REQUIREMENTS | 22 |

| | | |
|---|---|---|
| 22 | STRUCTURAL STEEL ERECTION & POWER OPERATED EQUIPMENT CREW | 22 |
| 23 | HELICOPTER AGREEMENT | 23 |
| 24 | STACKS | 23 |
| 25 | STONE SETTING | 23 |
| 26 | POURING CONCRETE | 24 |
| 27 | WELDER'S HELPER | 25 |
| 28 | SAFETY PROVISIONS | 25 |
| 29 | FINISHER'S TOOLS | 28 |
| 30 | SHIPPING EMPLOYEES | 30 |
| 31 | BUSINESS REPRESENTATIVE | 30 |
| 32 | JOB STEWARD | 30 |
| 33 | PROTECTION OF UNION PRINCIPLES | 31 |
| 34 | SUBCONTRACTING | 31 |
| 35 | WORKING CONDITIONS | 32 |
| 36 | DECLARATION OF PRINCIPLES | 33 |
| 37 | CONTRACTORS | 33 |
| 38 | SETTLEMENT OF DISPUTES | 34 |
| 39 | STRIKES AND LOCKOUTS | 34 |
| 40 | SCOPE OF AGREEMENT | 35 |
| 41 | LETTERS | 35 |
| 42 | CONSTRUCTION ADVANCEMENT (CAP/IAP) | 35 |
| 43 | IMPACT FUND | 36 |
| 44 | INT'L IRONWORKERS ORGANIZING FUND | 37 |
| 45 | SAVINGS CLAUSE | 37 |
| 46 | DURATION AND TERMINATION | 37 |
| | WAGE AND FRINGE FUND RATES | 40 |
| | CIRCULAR LETTER NO. 742 | 42 |

# PREAMBLE

THIS AGREEMENT is made and entered into this 1st day of June, 2013 by and between the CENTRAL OHIO DIVISION, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC. hereinafter referred to as the "Employer" and the IRONWORKERS LOCAL UNION NO. 172, hereinafter referred to as the "Union".

This Agreement is entered into by collective bargaining to prevent strikes and lockouts and to facilitate peaceful adjustment of grievances and disputes between Employer and Union in this trade and to prevent waste, unnecessary and avoidable delays, and expense, and, so far as possible to provide for labor's continuous employment, such employment to be in accordance with the conditions herein set forth and at wages herein agreed upon, also, that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions, and further, the establishment of the necessary procedures by which these ends may be accomplished.

# SAFETY

The employees covered by the terms of this Agreement shall at all times while in the employ of the Employer be bound by the safety rules and regulations as established by the Employer in accordance with the Construction Safety Act and OSHA. These rules and regulations will be published and posted at conspicuous places throughout the project.

In accordance with the requirements of OSHA, it shall be the exclusive responsibility of each Employer on a job site to which this Agreement applies to assure safe working conditions for its employees and compliance by them with any safety rules contained herein or established by the Employer. Nothing in this Agreement will make the Union liable to any employees or to other persons in the event that injury or accident occurs.

# DRUG-FREE WORKPLACE

The Union and the Employer mutually agree to the policy of maintaining a drug free workplace in compliance with Federal Regulations and the Impact Drug and Alcohol Screening Policy and Procedure, which by reference is made part of this agreement. Labor and Management are committed to maintaining a workplace free of illegal drugs. Both parties recognize that illegal drug use poses health and safety hazards to the employee and to the construction industry at large. Management and labor prohibit the possession or use of illegal drugs and/or alcohol on all construction projects.

Employees manufacturing, distributing, dispensing, possessing or using illegal drugs and/or alcohol on construction projects are subject to immediate dismissal.

The parties recognize the Employer's right to formulate and propose a drug and alcohol policy, subject to all applicable laws and regulations, procedural safeguards, scientific principles, and legitimate interests of privacy and confidentiality. As such, nothing in this agreement, or in the Impact Drug and Alcohol Screening Policy and Procedure, shall prohibit the employer from conducting drug and alcohol screenings

in addition to that required by this agreement provided such tests meet or exceed accepted industry standards.

If the employer conducts drug and alcohol screenings in addition to that required by this agreement, individual employees may be required to sign consent forms or documentation involved in the actual screening process. Any refusal to comply with these requests or any attempt to switch, adulterate, or alter any sample or specimen shall be deemed a violation of this agreement. Any on-site testing shall be conducted by trained personnel and positive screenings shall be confirmed by certified laboratory analysis.

Employees may be temporarily suspended pending the results of laboratory analysis or confirmation of any post-accident or reasonable suspicion screening but shall be reimbursed for all wage and benefit loss incurred (not to exceed 32 hours) during this suspension. All false positives resulting from on-site screening shall also require reimbursement for wage and benefit loss (not to exceed 32 hours) by the employer.

Employees using prescription or over-the-counter drugs that may impair their ability to safely perform their assigned jobs shall inform their employer of such usage. They shall also indicate any such usage during any drug or alcohol screening. It shall not be a violation of this agreement or any confidentiality implied by this agreement for the third party administrator of a signatory contractor to report positive test results to the third party Administrator of Impact and such results shall be acted upon in accordance with the accepted procedures of this agreement.

Any violation of the Impact Drug and Alcohol Screening Policy and Procedures (or any addenda contained in this agreement) shall be subject to the provisions of Article 38 of this agreement.

## NON-DISCRIMINATION

The Employer and the Union agree that they will not discriminate against any employee or applicant for employment because of Race, Color, Creed, Age, Sex or National Origin. The parties further agree to abide by Executive Order 11246 and other succeeding Federal, State, County, and City regulations, establishing or extending equal employment opportunities.

## ARTICLE I
## CRAFT JURISDICTION

SECTION 1. This Agreement covers all field erection and construction work traditionally performed by and coming under the jurisdiction of the Association. The Employer recognizes that the claimed scope of work covered under this Agreement by the Association is that provided for, but not limited to, the jurisdictional claims contained within the charter grant issued by the AFL-CIO to the Association and contained in Article 4 of the Association's Constitution.

SECTION 2. Agreements, National in Scope between Ironworkers International Association and other International Unions, covering work jurisdiction and allocation and division of work among employees represented for the purpose of collective bargaining by such labor organizations, shall be respected

and applied by the Employer.

SECTION 3. It is understood and agreed that Employers signatory to this Agreement shall not sign a stipulation to be bound by the terms of the Agreement establishing the Impartial Jurisdictional Disputes Board nor be bound by its decisions. Any such stipulation that previously may have been entered into or on behalf of the Employer is rescinded by execution of this contract. It is further understood that the parties to this Agreement shall not submit any dispute to the Impartial Jurisdiction Disputes Board.

SECTION 4. The foregoing Section 3 shall remain in full force and effective until such time as all other Employers in the construction industry having agreements with the Ironworkers Union, and all other Unions affiliated with the Building and Construction Trades Department, have signed a stipulation to be bound by the terms of the Agreement and decisions of the Impartial Jurisdictional Disputes Board.

SECTION 5. In the event of any dispute as to Jurisdiction of work covered by the terms of this Agreement being claimed by Unions other than those affiliated with the Building and Construction Trades Department, AFL-CIO, then such dispute shall be referred to the International Unions involved for determination by whatever procedures they may adopt and the work shall proceed as assigned by the individual Employer until such determination by the International Unions in any given jurisdictional determination shall be implemented immediately by the individual Employer involved.

SECTION 6. There shall be no strikes, work stoppages, or other interferences with the work by reason of jurisdictional disputes.

SECTION 7. This Local Union claims for its members the fabrication, production, erection and construction of all iron, steel, ornamental lead, bronze, brass, copper, aluminum, all ferrous and nonferrous metals; precast, pre-stressed and post-stressed concrete structures, agitators, air ducts, anchors, application of all sealants such as Thiokol, Neoprene and similar types used to seal metal to metal surfaces; apron, aqueducts, awnings, bar joist, blast furnaces, book stacks, boilers (sectional water tube, and tubular), boxes, brackets, bridges, bucks, bulkheads, bunkers, cableways, caissons, canopies, caps, cast tiling, chutes, clips, cofferdams, concentrators, conveyors, coolers, coping, corbels, corrugated sheets when attached to steel frames; cranes (the erection, installation, handling, operating and maintenance on all forms of construction work), crushers, cupolas, curtains, dams, decking (metal), roof decking (such as "coffer" and similar type materials, as well as "Trusdeck", Mahan "M" deck and other dual purpose type roof deck), derricks, docks, domes, dredges, drums, duct and trench frames and plates, dumb waiter enclosures, dumpers, elevators, elevator cars, elevator enclosures, enamel tanks, enamel vats, escalators, expanded metals, fascias, false work, fans, fencing, fire escapes, fins, flag poles, floor construction and flooring, flumes, frames, frames in support of boilers, fronts, fur rooms, gates, grating, grillage and foundation work, grill work, guards, hangers, hanging ceilings, hoppers, hot rooms, inclines, iron doors, jail and cell work, joist (precast, prestressed and post-stressed), kalomeined doors, kilns, lintels, lockers, locks, louvers, machinery (moving, hoisting, lowering and placing on foundations),

making and installation of all articles made of wire and fibrous rope; marquees, material altered in field, such as: framing, cutting, bending, drilling, burning and welding by acetylene gas and electric machines, metal curtain wall, metal floor decking, metal forms and false work pertaining to concrete construction, metal windows, metal furniture and enclosures, mixers, monorails, multi-plate, operating devices, ovens, pans, panels (insulated and non-insulated, factory and field assembled) pen stocks, pile drivers, plates, porcelain enameled panels, prefabricated metal buildings, pulverizers, racks railing (including pipe), railroad bridgework and maintenance, reservoirs, rigging (including shipyards, navy yards, vessels and government departments), roofs, rolling shutters, safe deposit boxes, safes, sash, scaffolding, seats, shafting, sheet piling, shelving, shoring, sidewalk and vault lights signs, skip hoists, skylights, smoke conveyors, spandrels (metal and precast concrete), spillways, stacks, stairways, stokers, storage rooms, stoves, subways, sun shades, tables, towers, tanks, tracks, tramway, travelers, traveling sheaves, trusses (steel Howe, and combination), tunnels, vats, vault doors, vaults, ventilators, vertical hydraulic elevators, vessel, viaducts, window wall, wire work; wrecking and dismantling of all of the above and all house-smith work and submarine diving in connection with or about the same.

1. The assembly and erection of all metal shapes, sheets, pieces, studs, girts, purlins or other members for metal framing systems which are load bearing in function, no matter how limited the contribution to the load bearing resistance path or diaphragm function, which are utilized in the construction of structures; including all siding, sheeting, metal roofing, bar grating, flooring and any related accessories.

2. The mixing, manufacture and erection of all products or applications of fiber reinforced plastics and all related accessories.

3. The lay out and erection of all exterior wall systems including the anchors, framing, supporting members, sealing caulking, all vision lites, entrances, wall infill panels or spandrel panels whether weather protective, decorative, solar energy collecting, reflecting or sound attenuating in function including radio frequency (RF) shielding and all related accessories for the wall system.

4. All infill panels on stair rails, stair platform rails, barrier rails or other rail systems including all related accessories.

5. The fabrication, maintenance, repair, rigging and setting of all metal intermodal transportation containers and all related accessories when used on railway cars, ships, trucks or in stationary locations.

6. The unloading, handling, hoisting, distribution, placing and tying of all metal reinforcing bars, fibers, mesh and all related accessories for reinforcing cast in place concrete.

7. The unloading and erection of all power operated walkways, speedwalks and conveyors including all supporting framing, railings, wainscots, belting, all related accessories and operating mechanisms for transporting either materials or personnel whether horizontal, inclined or vertical.

8. All metal and metal products and all related accessories designed to be decorative, cosmetic or ornamental and commonly called "architectural metal" or miscellaneous iron.

9. The unloading, distribution and erection of all metallic door frames, including doors, hardware and all related accessories which are designed or intended to absorb or repel seismic, atmospheric, meteorological, or explosive forces, repel intruders, provide privacy or security and detention door systems whether the doors are operated manually or by power operators and whether the doors swing, slide, coil, stack or utilize other forces to control entry, egress or passage through the door opening.

The above claims are subject to trade agreements and decision of the National Joint Board for the Settlement of Jurisdictional Disputes.

SECTION 8. DEFINITION OF WORK COVERED.

"Contractor" where used in this Agreement means any Contractor engaged in either (1) building construction, (2) heavy construction, (3) highway construction, or (4) railroad construction or (5) building or plant maintenance including emergency repairs or planned scheduled maintenance.

## ARTICLE 2
## RECOGNITION AND SECURITY

SECTION 1. All employees who are members of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers on the effective date of this Agreement shall be required to remain members of the Association in good standing as a condition of employment during the term of this Agreement. All employees may be required to become and remain members of the Association in good standing as a condition of employment from and after the eighth (8th) day following the dates of employment, or the effective date of this Agreement, whichever is later. (This clause shall be effective only in those states permitting Union Security.)

SECTION 2. If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to this Employer.

SECTION 3. It is understood that the negotiation committee for the aforementioned Employer and the negotiating committee for the Union are acting only as agents in the negotiation of this contract and that the negotiating committee for the Employer is the agent only for those individuals, partnerships, and corporations who have authorized them so to act, and the negotiating committee for the Union is agent only for the Union and its members, and in no event shall either of the said negotiating committees be bound or held liable in any manner for any breach of this contract of the contractors, employees, or members of the Union.

## ARTICLE 3
## REFERRAL CLAUSE

In order to maintain an efficient system of production in the industry, to provide for an orderly procedure of referral of applicants for employment and to preserve the legitimate interest of employees in the employment, the Employer and the Union agree to the following plan of referral of applicants to employment.

SECTION 1. The Employer shall have the right to employ directly a minimum number of key employees who may consist of a superintendent, general foreman and foremen. In addition, the Employer shall have the right to employ directly, on any Job in the locality in which the Employer maintains his principal place of business, employees required on such Job or Jobs provided such employees are regular employees of the Employer who have been employed by the Employer fifty percent (50%) of the time during the previous twelve (12) months; and on jobs of the Employer located outside of the locality in which the Employer maintains his principal place of business, forty percent (40%) of such employees.

SECTION 2. All other employees required by the Employer shall be furnished and referred to the Employer by the Union.

SECTION 3. The Employer shall have the right to reject any applicant referred by the local Union.

SECTION 4. The Union shall select and refer applicants for employment without discrimination against such applicants by reason of Race, Creed, Sex, Color, National Origin, Membership or Non-Membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements. The selection and referral of applicants shall be operated in accordance with the following plan.

SECTION 5. The Union shall register any applicants for employment on the basis of the Groups listed below. Each applicant shall be registered in the highest priority group for which he qualifies.

GROUP "A" All applicants for employment who have worked at the trade as a mechanic or apprentice for the past four (4) years; have previously passed a Journeyman's examination conducted by a duly constituted Local Union affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, qualifying them to work as a mechanic at the trade; have been employed for a period of at least one (1) year during the past four (4) years by Employers (parties to collective bargaining agreements with the Union), and who have actually resided for the past year within the geographical area constituting the normal construction labor market.

Upon graduation from the Apprenticeship School of Ironworkers Local Union No. 172, in conjunction with the Central Ohio Division, Associated General Contractors of America, Inc., and approved by the Federal Bureau of Apprenticeship, the Ironworkers will be immediately placed in Group "A".

GROUP "B" All applicants for employment who have worked at the trade as a mechanic or apprentice for the past four (4) years; and have previously

passed a journeyman's examination conducted by a duly constituted local Union affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers qualifying them to work as a mechanic at the trade.

GROUP "C" All applicants for employment who have worked at the trade as a mechanic or apprentice for the past two (2) years or more and have for the past year actually resided within the geographical area constituting the normal construction labor market.

GROUP "D" All applicants for employment who have worked at the trade for more than one (1) year.

SECTION 6. The Union shall maintain each of the separate group lists set forth above which shall list the applicants within each group in the order of the dates they registered as available for employment.

SECTION 7. Employers shall advise the Union of the number of applicants needed. The Union shall refer applicants to the Employer by first referring applicants in Group "A" in the order of their places on said list and then referring applicants in the same manner successively from the lists in Group "B", then Group "C", and then Group "D". Any applicant who is rejected by the Employer shall be returned to his appropriate place within his group and shall be referred to another Employer in accordance with the position of his group and his place within the group. Upon a registrant being referred for employment and actually employed on a job more than three (3) days, such registrant's name shall be removed from the list until such time as his employment has been terminated at which time he shall be registered at the bottom of the appropriate list under which he is entitled to be registered.

If a registrant, upon being referred in regular order, refuses to accept the referral, such registrant's name shall be placed at the bottom of the appropriate list under which he is entitled to be registered.

SECTION 8. The order of referral set forth above shall be followed except in cases where Employers require and call for employees possessing special skills and abilities in which case the Union shall refer the first applicant on the register possessing such special skills and abilities.

SECTION 9. Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between the Employer and Union.

SECTION 10. In the event that the referral facilities maintained by the local Union are unable to fill the requisition of an Employer for employees within a forty-eight (48) hour period after such requisition is made by the Employer (Saturdays, Sundays and Holidays excepted), the Employer may employ applicants directly at the job site.

In such event, the Employer will notify the local Union of the names and dates of such hiring.

SECTION 11. The local Union, through its Examining Board, shall examine job applicants who have not previously passed an examination conducted by a duly constituted local Union affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers in order to determine whether

they are qualified to perform the work of the craft as a mechanic and be eligible for referral. Such examinations shall be held at least every month.

SECTION 12. In the event that any job applicant is dissatisfied with his Group Classification or his order of referral in that such applicant claims that he was not placed in the proper group set forth above or was not referred in the regular order as provided above or if a job applicant has failed in his examination to qualify as an eligible referent, such aggrieved job applicant may appeal in writing within ten (10) days from the day on which his complaint arose, or failure to pass his examination, to an Appellate Tribunal consisting of an Employer representative, a Union representative and an Impartial Umpire appointed jointly by the Employer and the Union, and the decision of the Appellate Tribunal shall be final and binding.

SECTION 13. The Employer and the local Union shall post in appropriate places all provisions relating to the hiring arrangement set forth in this Agreement.

## ARTICLE 4
## TERRITORY

SECTION 1. The territory covered by this Agreement shall be the territorial jurisdiction of Local Union No. 172 which includes all or part of the following Ohio Counties: Champaign, Clark, Crawford, Delaware, Fairfield, Fayette, Franklin, Hardin, Highland, Hocking, Jackson, Knox, Licking, Logan, Madison, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Ross, Union, Vinton, and Wyandot.

SECTION 2. The boundaries of Local Union No. 172 were established by mutual agreement at the District Council of Southern Ohio and Vicinity meeting held e 20, 1956, at Dayton, Ohio, and approved by the General Executive Board of this International on June 26, 1956.

## ARTICLE 5
## WORK HOURS PER DAY

SECTION 1. Eight (8) hours shall constitute a day's work, which shall be performed between the hours of 7:00 a.m. and 4:30 p.m. Except if contractually required (subject to verification) or by mutual agreement between the Business Agent and the Employer, work performed before the standard starting time or after the standard quitting time, shall be paid at the applicable overtime rate. On jobs where it becomes necessary to have a one (1) hour lunch period the quitting time shall be set back one-half (½) hour. Normal lunch hour shall be a one-half (½) hour period, which begins no sooner than three and one-half (3½)) hours nor later than four and one-half (4 ½) hours from the starting time. When work men are required to work through the normal lunch hour, such work shall be regarded as overtime. NOTE: On jobs using the standard four/ten (4/10) work schedule, lunch shall be a one-half (½) hour period which begins no sooner than four and one-half (4 ½) hours nor later than five and one-half (5½) hours from the starting time. When a legal holiday falls on a scheduled workday, the Employer may use the four/ten (4/10) hour day workweek. (Excludes

Thanksgiving, Christmas and New Year)

SECTION 2. Changes in the work hours per day in special cases, not however to exceed an eight (8) hour day, may be made to meet special conditions upon application to and approval of the General Executive Board.

SECTION 3. If an Employee is required to work unscheduled overtime more than ten (10) hours at the option of the majority they may take a one-half (½) hour lunch break without pay at the end of the tenth (10th) hour of work and an additional one-half (½) hour lunch break without pay after each additional four (4) hours of work. (This clause does not apply to scheduled shift work).

SECTION 4. Employees called in or sent in on emergency work anytime outside regular daylight work hours shall receive a minimum of four (4) hours at time and one half rate.

SECTION 5. Four/Ten Work Week. By mutual agreement between the Employer and the Union, a job may be worked on a four (4) day ten (10) hour basis and worked at the regular straight time rate, this shall constitute a forty (40) hour week. However, at no time shall an agreement to work four/tens (4/10) on one job be construed to mean another job may be worked under the same conditions without the same mutual agreement. All four/tens (4/10) jobs will be scheduled at the beginning of the Monday starting time mutually agreed upon. When the four (4) day ten (10) hour option is exercised, it must remain in effect for the full work-week or until job completion, whichever occurs first (provided that the job runs a minimum of one week). All employees of the Employer covered by this agreement on a particular job must come under this provision. Ten consecutive hours, exclusive of one half (½) hour lunch period between the hours of 7:00 a.m. and 6:00 p.m. shall constitute a workday from Monday through Thursday. Work performed before and after the regular 4/10 work hours Monday through Friday, Saturday and Sunday will be at the applicable overtime rate. One coffee break is required at midmorning and a second coffee break is required after the lunch hour.

SHIFTS: When a four (4) day week is being utilized and two (2) shifts are scheduled, the first or day shift will consist of ten (10) hours worked for ten (10) hours pay; the second shift shall consist of ten (10) hours worked for ten (10) hours pay. In the event an employee elects to work less than a full shift he will be paid for the hours actually worked.

FRIDAY MAKE-UP DAY: Due to inclement weather or other conditions beyond the Employer's control, a Friday make up day may be scheduled with the following provisions:

A) The makeup-day is voluntary for each individual employee and the employee shall not be discriminated against with regard to lay off for refusing to work.

B) The make up day shall be scheduled for at least eight (8) hours work, weather permitting work.

C) Hours worked within the scheduled work hours, (not to exceed forty (40) hours in a work week) shall be paid at the straight time rate. Hours in excess of

forty hours shall be paid at the applicable overtime rate.

D) When a legal Holiday falls on a scheduled workday, the Employer may use the four/ten (4/10) hour day workweek schedule for the remainder of the workweek. Foremen and general foremen will still receive the guaranteed forty-hour pay plus any overtime that may be worked.

An employee who is referred for employment whose work is scheduled for less than forty (40) hours (from date of hire to termination) shall receive the appropriate rate of overtime pay for all hours worked in excess of eight (8) hours per day.

SECTION 6. Due to inclement weather or other conditions beyond the employers control and upon prior mutual agreement or if contractually required (subject to verification) between the employer and the union, a Saturday make up day may be utilized on designated projects.

The makeup day is voluntary for each individual employee and shall be scheduled for at least 8 hours, weather permitting.

Work performed before and after the regular eight-hour day Monday through Saturday will be at the applicable overtime rate. All foreman and general foreman wage and hour guarantees shall remain in effect.

Employees on other similarly affected sites may voluntarily transfer to a designated site to perform work as needed on the make up day, but their employment shall not supercede that of designated site employees seeking to work the make up day.

Any agreement to utilize this section on a specific site does not automatically grant an extension of these terms and conditions to other sites without prior agreement of such extension.

When a legal holiday occurs or is observed during the standard workweek, Monday through Friday, a make up day on the following Saturday is not applicable and in this instance is an overtime day.

## ARTICLE 6
## SHIFT WORK

When two (2) shifts are employed, the first shift shall work eight (8) hours and receive eight (8) hours pay. The second shift shall work eight (8) hours and receive eight (8) hours pay plus a ten (10) percent shift differential.

When three (3) shifts are employed, the first shift shall work eight (8) hours and receive eight (8) hours pay. The second shift shall work seven and one half (7½) hours and receive seven and one half (7½) hours pay plus a ten (10) percent shift differential. The third shift shall work seven (7) hours and receive seven (7) hours pay plus a fifteen (15) percent shift differential.

When multiple shifts are employed on Saturday, Sunday, and recognized holidays or where each shift is longer than eight (8) hours, the rate of pay shall be calculated at the appropriate overtime rate (REFER TO ARTICLE 7 - OVERTIME AND HOLIDAYS) plus the appropriate shift differential. The overtime rate shall

start with the first or morning shift. A thirty (30) minute lunch break shall be observed on each shift and shall not be considered as time worked.

When an individual is required to work overtime beyond his usual shift he shall remain on such appropriate overtime rate of pay until he receives a break of not less than eight (8) hours.

Upon prior agreement between the local union and the Employer, where job conditions dictate a second or third shift may be worked absent a first or second shift providing the appropriate shift differential work hours and rates of pay are observed. (UNDER THE TERMS OF THIS PARTICULAR PARAGRAPH EACH SHIFT SHALL BE A FULL EIGHT (8) HOUR SHIFT). The appropriate shift designation shall be based on starting time.

Except in cases of emergency as decided by the General Executive Board, not more than one shift shall be allowed on a job of less than five (5) days duration.

## ARTICLE 7
## OVERTIME AND HOLIDAYS

SECTION 1. All work in excess of eight (8) hours Monday through Friday shall be paid at the rate of one and one half (1 ½) the hourly rate for the 9th 10th, and 11th hours. Employees must work eight (8) hours before overtime shall be paid. All work performed after the 12th hour shall be paid at the double time rate. The first twelve (12) hours worked on Saturday shall be paid one and one half (1 ½) times the hourly rate. All work performed after twelve (12) ten hours will be paid at the double time rate. All work performed on Sunday and Holidays shall be paid at the double time rate. No work shall be performed on Labor Day except to save life or property.

SECTION 2. The following holidays shall be observed: New Year's Day, Labor Day, Memorial Day, Thanksgiving Day, July 4, Christmas Day

SECTION 3. Any of the above holidays in Section 2 which occur on a Sunday shall be observed on the following Monday. No Employee shall accept time off as compensation for overtime.

## ARTICLE 8
## DUES CHECK OFF

Commencing June 1, 1974 and continuing thereafter during the term of this Agreement, and in accordance with the terms of an individual and voluntary written authorization for check off of Union dues in the form agreed upon by the parties hereto and permitted by the provisions of Section 302 (c) of the Labor Management Relations Act as amended, the Employer agrees to deduct once each week from the wages of each employee covered by this Agreement who signs such authorization, five (5%) percent of said employees gross wages. The amount deducted shall be remitted to Ironworkers Local Union No. 172 indicated on reporting forms by the 15th day of the following month together with a statement setting forth the name and hours paid of each employee from whose wages the deduction is made.

## ARTICLE 9
## WAGE RATES

The different classifications of an "Ironworker" are as follows: Structural, Welder, Ornamental, Machinery Mover, Reinforcing, Fence Erector, Rigger, Sheeter. All in the above classifications are paid the same hourly rate as that listed for a Journeyman Ironworker.

SECTION 1. The following minimum hourly wages shall apply to the classifications indicated.

June 1, 2013 - $ 27.67
June 1, 2014 - to be determined
June 1, 2015 - to be determined

The above rates become effective with the first day of the first full pay week in the month of the effective date of the increase.

SECTION 2. Foreman. Not less than one dollar and seventy-five cents ($1.75) above the journeyman rate as of June 1, 2013. Not less than two dollars ($2.00) above the journeyman rate as of June 1, 2014.

General Foreman. Not less than two dollars and twenty-five cents ($2.25) above the journeyman rate as of June 1, 2013. Not less than two dollars and fifty cents ($2.50) above the journeyman rate as of June 1, 2014.

SECTION 3. Apprentices and trainees shall be paid not less than the following minimum percentages of the journeyman rate:

| | | | |
|---|---|---|---|
| First one thousand hours | - 60% | Fifth one thousand hours | - 80% |
| Second one thousand | - 65% | Sixth one thousand hours | - 85% |
| Third one thousand hours | - 70% | Seventh one thousand | - 90% |
| Fourth one thousand hours | - 75% | Eighth one thousand hours | - 95% |

SECTION 4. HOT PAY. Hot pay shall be at the rate of one dollar ($1.00) per hour added to the classification rate shown in Article 9, Section 1. "Hot" work is defined as a work area in which the temperature is in excess of one hundred fifty (150) degrees F° due to the presence of a furnace, smelter, incinerator, or other equipment that emits extreme heat.

## EFFECTIVE JUNE 1, 2013

| | |
|---|---|
| Journeyman Ironworker | $ 27.67 per hour |
| Foreman | 29.42 per hour |
| General Foreman | 29.92 per hour |
| Pension | 8.60 per hour |
| Health and Welfare | 6.20 per hour |
| Annuity | 2.55 per hour paid |
| Apprentice Fund | 1% of existing wage rate |

| | |
|---|---|
| Safety Training Fund | .06 per hour |
| Construction Advancement Fund | .04 per hour |
| I.P.A.L. | $ .02 per hour |
| IMPACT FUND | 1% of existing wage rate |

**DEDUCTED:** Dues Check Off 5% of Gross Wages

**Wages & Benefits will be determined from increase**

| | |
|---|---|
| EFFECTIVE June 1, 2014 | $ 1.00 increase |
| EFFECTIVE June 1, 2015 | $ .90 increase |
| EFFECTIVE June 1, 2016 | $ .90 increase |
| EFFECTIVE June 1, 2017 | $ .90 increase |

## ARTICLE 10
## PIECEWORK

It is further agreed that the Employees will not contract, subcontract, work piecework, or work for less that the scale of wages established by the Agreement. The Employers agree not to offer and/or to pay, and the Employees will not accept, a bonus based on specific performance while on any individual job.

## ARTICLE 11
## WORK LIMITATION

There shall be no limitation placed on the amount of work to be performed by any workman during working hours.

## ARTICLE 12
## PAYDAY

SECTION 1. The regular payday shall be on Friday or once a week on such day as agreed upon between the Employer and the local Union and wages shall be paid before quitting time and wages are to be paid in cash or other legal tender.

SECTION 2. Employers may withhold only four (4) days wages from an Employee from Local Union No. 172 jurisdiction.

SECTION 3. When employees are laid off, or discharged, they shall be paid in full, in cash or other legal tender, on the job immediately, and if required to go to some other point or to the office of the Employer, the employees shall be paid for the time required to go to such places. When employees quit of their own accord, they shall wait until the regular payday for the wages due them.

SECTION 4. Any undue delay or loss of time caused employees through no fault of their own shall be paid for by the Employer causing such delay, at the regular straight time wages.

SECTION 5. Accompanying each payment of wages shall be a separate statement identifying the Employer, showing the total earnings, the amount of each deduction, the purpose thereof and net earning. Any Company paying in check or other legal tender shall give the address of the Employer Company and the Parent Company or corporation.

SECTION 6. In the event that the bank upon which an Employer draws his payroll check refuses to honor it for insufficient funds, the Employer shall within twentyfour (24) hours thereafter issue to the employee in question payment in cash, money order, or certified check, in the net amount of said dishonored payroll check plus ten (10%) percent of the net amount. The penalty does not apply if the employee does not attempt to cash his check within thirty (30) days.

SECTION 7. In the event of a layoff of Ironworkers working after the regular working hours of the Employer's office, the pay due those Ironworkers may be mailed directly to their homes or to the Union office, no later than the following regular working day.

## ARTICLE 13
## BENEFIT TRUST

Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated August 1, 1952, as amended and as the same way hereafter be amended from time to time, which established and which governs the operations of the Ironworkers District Council of Southern Ohio & Vicinity Benefit Trust. That document shall be deemed to be part of this Collective Bargaining Agreement as though set forth herein at length. Unless the Employer has already done so, each Employer who is subject to the provisions hereof shall enter into a signed Participation Agreement with the Trustees of the Trust in a form prescribed by the Trustees. Each Employer agrees to continue to pay to said Benefit Trust not less than (six dollars and twenty cents ($6.20)) effective June 1, 2013 through May 31, 2018 for each hour worked under this agreement for any Ironworker employed by the Employer. Reports shall be rendered monthly for a fourweek or fiveweek period, as appropriate.

In computing the payments to be made by each Employer into the Trust there shall be included the payments made for shift differential, paid reporting time, paid holidays and all other items for which payment is provided excluding paid vacation. Employers' reports and contributions based upon hours worked in any month shall be paid and are due in the office of the Benefit Trust on or before the fifteenth day of the following month. For the late filing of all reports and for the late payment of contributions, liquidated damages shall be assessed in conformity with the then current policies of the United States Internal Revenue Service with respect to late filings and payments to it; under the foregoing the following charges presently prevail in 2007:

(a) For late filing of reports, five (5%) percent of the amount of the contribution covered by the report, per month, not to exceed twenty-five (25%) percent;

(b) for late payment of contributions, (1) One and one-half (1½%) percent

per month not to exceed fifty (50) months, except that for the first five (5) months of concurrent late reporting and also late payment this one and one-half (1½%) percent shall be included in the five (5%) percent in (a) above, plus (2) interest at the rate of one (1%) percent per month on all delinquent payments until paid.

## ARTICLE 14
## PENSION TRUST

Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated October 30, 1962, as amended and as the same may hereafter be amended from time to time, which established and which governs the operations of the Ironworkers District Council of Southern Ohio & Vicinity Pension Trust. That document shall be deemed to be part of this Collective Bargaining Agreement as though set forth herein at length. Unless the Employer has already done so, each Employer who is subject to the provisions hereof shall enter into a signed Participation Agreement with the Trustees of the Trust in a form prescribed by the Trustees.

Each Employer agrees to pay to said Pension Trust not less than eight dollars and sixty cents ($8.60) an hour from June 1, 2013 through May 31, 2018 for each hour worked under this Agreement for any Ironworker employed by the Employer. Reports shall be rendered monthly for a four-week or five-week period, as appropriate. In computing the payments to be made by each Employer into the trust there shall be included the payments made for shift differential, paid reporting time, paid holidays and all other items for which payment is provided excluding paid vacation. Employers' reports and contributions based upon hours worked in any month shall be paid and are due in the office of the Pension Trust on or before the fifteenth (15th) day of the following month. For the late filing of reports and for the late payment of contributions, liquidated damages shall be assessed in conformity with the then current policies of the United States Internal Revenue Service with respect to late filings and payments to it; under the foregoing the following charges presently prevail in 2013: (a) for late filing of reports, five (5%) percent of the amount of the contribution covered by the report, per month, not to exceed twenty-five (25%) percent; (b) for late payment of contributions, (1) One and one-half (1½%) percent per month, not to exceed 50 months, except that for the first five (5) months of concurrent late reporting and also late payment this one and one-half (1½%) percent shall be included in the five (5%) percent in (a) above, plus (2) interest at the rate of one (1%) percent per month on all delinquent payments until paid.

## ARTICLE 15
## ANNUITY TRUST

Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated April 27, 1971, as amended and as the same may hereafter be amended from time to time, which established and which governs the operation of the

Ironworkers District Council of Southern Ohio and Vicinity Annuity Trust. That document shall be deemed to be a part of the Collective Bargaining Agreement as though set forth herein at length. Unless the Employer has already done so, each Employer who is subject to the provisions hereof shall enter into a signed Participation Agreement with the Trustees of the Trust in a form prescribed by the Trustees.

Each Employer agrees to continue to pay said Annuity Trust not less than two dollars and fifty-five cents ($2.55) an hour for each hour **paid** under this Agreement for any Ironworker employed by the Employer. Reports shall be rendered monthly for a four-week or five-week period, as appropriate.

In computing the payments to be made by each Employer into the Trust there shall be included the payments made for shift differential, paid reporting time, paid holidays and all other items for which payment is provided excluding paid vacation. Employers' reports and contributions based upon hours paid in any month shall be paid and are due in the office of the Annuity Trust on or before the fifteenth (15th) day of the following month. For the late filing of reports and for the late payment of contributions, liquidated damages shall be assessed in conformity with the then current policies of the United States Internal Revenue Service with respect to late filings and payments to it under the foregoing the following charges presently prevail in 2007; (a) for late filing of reports, five (5%) percent of the amount of the contribution covered by the report per month not to exceed twenty-five (25%) percent; (b) for late payment of contributions, (1) one and one/half (1½%) percent per month, not to exceed fifty (50) months, except that for the first five (5) months of concurrent late reporting and also late payment this one and one-half (1½%) percent shall be included in the five (5%) percent in (a) above, plus (2) interest at the rate of one (1%) percent per month on all delinquent payments until paid.

## ARTICLE 16
## BOND PROVISION

The Union shall require those Employers who have not established and maintained an office in the Jurisdiction of Ironworkers Local Union No. 172 for two (2) years or more, or who are not previously a party to an agreement with Ironworkers Local Union No. 172 or who are delinquent or who become delinquent in payments to Benefits and Deductions programs provided by this agreement to procure, pay the premium for, and deliver to the Union, a Bond written by a responsible Surety Company of the State of Ohio in the sum of fifty thousand dollars ($50,000.00) plus any existing delinquencies due said Benefits and Deductions programs, guaranteeing fringe benefits due employees under this agreement and all payments and penalties due as provided in this Agreement.

Employers desiring to start work before furnishing such Bond shall make five thousand dollars ($5,000.00) cash deposit with Ironworkers Local #172. His job may then proceed for a period of seven (7) days. Thereafter, the fifty thousand dollars ($50,000.00) Bond must be posted before work may continue.

Any such deposit shall be refunded to the Employer upon presentation of the Bond. The above Bond and cash deposit are for the purpose of securing the payment by their Employer of any deductions programs and shall be refunded to the Employer within ten (10) days upon completion of the work, providing that all obligations with respect to the programs have been paid.

Payments are due on the fifteenth (15th) day of the month following the month reported and are considered delinquent on the thirtieth (30th) day of the month following the month reported. Damages shall be assessed according to the Health & Welfare, Pension Plan and Annuity Fund Trust Document.

The Union shall refuse to refer men and shall withdraw men from any individual Employer who has not complied with the provisions of this Section and such refusal and/or withdrawal will not constitute a violation of this Agreement.

## ARTICLE 17
## APPRENTICESHIP TRAINING CONTRIBUTIONS

SECTION 1. Each Employer shall contribute one percent (1%) of the Base Wage Rate per hour worked by employees covered under this collective bargaining agreement into a fund to defray training costs and the expense of administration of a (Employer/Union) apprenticeship training program.

SECTION 2. Each employer shall contribute an additional six cents ($.06) per hour worked by employees covered under this collective bargaining agreement into the Safety fund to provide funding and employee compensation for safety training as outlined in Article 28, Section 23, and to provide safety training classes as part of this apprenticeship training program. These funds shall be accounted separately under the supervision of the Joint Apprenticeship Committee of Local No. 172. The parties to this collective bargaining agreement expressly recognize that monies already in this separate fund on the effective date of this collective bargaining agreement may be used for any of the purposes specified in this section.

SECTION 3. Forms will be furnished and may be used as the fourth and fifth copies of the Benefit & Pension Report. Payments are to be made by the fifteenth (15th) of the month following the month in which the time is worked. If payments are not made by the thirtieth (30th) of the month following the month in which the time is worked, the Union shall remove their members until such payments are made. Checks should be made payable to the Ironworkers Local Union No. 172 Apprenticeship Training Fund and mailed to 2867 S. High Street, Columbus Ohio 43207.

SECTION 4. The said Apprenticeship Training Fund shall be administered pursuant to an Agreement and Declaration of Trust administered jointly by an equal number of representatives from the Employers and the Union, which Agreement and Declaration of Trust shall conform to all requirements of law. A copy of the said Agreement and Declaration of Trust, together with any amendments thereto shall be considered as part of this Agreement as though set forth here at length.

SECTION 5. Apprentices shall be hired and transferred in accordance with

the apprentice provisions between the Employer and the Union. On structural work, one (1) apprentice may be employed to every four (4) journeymen; on rod work, one apprentice may be employed for every three (3) journeymen. On all finishing, steel sash, stairway and ornamental work, one (1) apprentice may be allowed for every one (1) journeyman. One (1) apprentice may be employed for every sheeting gang.

## ARTICLE 18
## REPORTING TIME

SECTION 1. When an employee is ordered by the Employer or his representative to report for work and then through no fault of the employee is not put to work or employed for less than two (2) hours, the Employer shall pay him for two (2) hours time, weather permitting work, provided the employees remain on the job during the said two (2) hours. On jobs of more than two (2) hours duration, all employees shall be paid for the actual hours worked.

## ARTICLE 19
## REPORTING TIME (SHOW-UP TIME)

SECTION 1. On all jobs outside of Franklin County and contiguous counties, two (2) hours shall be paid for reporting time regardless of the weather conditions at the stipulated rate, provided, however, the men remain on the job two (2) hours or are sent home by their foreman or the Contractor.

SECTION 2. On all jobs in Franklin County and contiguous counties, one (1) hour shall be paid for reporting time regardless of weather conditions at the stipulated rate, provided however; the men remain on the job one (1) hour or are sent home by their foreman or the Contractor.

SECTION 3. On all work being performed on Sunday or holidays, show up time shall be paid at the double time rate. On all work being performed on Saturday, show up time shall be paid at the time and one-half rate.

SECTION 4. On request by the Contractor to hire an ironworker for one day, the Ironworker will be paid on a two (2) hour, four (4) hour, and eight (8) hour basis.

SECTION 5. When the Contractor or the Employer's representative or steward on the job calls the Ironworkers Union Hall for additional men, the man's pay shall start at the regular starting time the first day; providing the Ironworker arrives on the job in a reasonable length of time: ( time to be agreed upon by the Contractor and Business Agent.) The second day and days thereafter, the man shall be required to be on the job at starting time or be paid from the time he begins work.

## ARTICLE 20
## FOREMAN

SECTION 1. When two (2) or more journeymen are employed, one shall be selected by the Employer to act as craft foreman and receive the appropriate rate of pay as specified in this article. When only one journeyman or apprentice Ironworker is employed and is required to assume responsibility for the work

performed, or read and interpret detailed drawings or plans, he shall also receive the appropriate foreman rate of pay. When a journeyman or apprentice Ironworker, on a job of any size, as a condition of employment is required to read detailed working drawings or plans and assume responsibility for the work performed or is required to direct or lead the work of other journeymen or apprentice Ironworkers, he shall be considered a foreman and be paid the appropriate rate of pay and receive all other guarantees as specified in this article.

SECTION 2. When an out of town Contractor brings in a foreman and the job requires another foreman, the second foreman will be a member of Local Union No. 172, providing he can perform the work. Thereafter every other foreman will be a local member.

SECTION 3. There shall be no restriction as to the employment of foremen or pushers. The Employer may employ on one piece of work as many foremen or pushers as in his judgment is necessary for the safe, expeditious and economical handling of the same.

SECTION 4. All foremen shall receive not less than one dollar and seventy-five cents ($1.75) per hour over the journeyman rate as of June 1, 2013 and two dollars over journeyman rate as of June 1, 2014 per hour over the journeyman rate and shall be guaranteed forty (40) hours per week plus overtime on jobs where five (5) or more men are employed and where the job is five (5) or more days duration. The week is meant the Employers regular pay week and shall apply only to the first and succeeding full pay weeks. The foreman shall be available to the Employer during the full time for which he is paid even though the job is not in progress.

Note: On jobs using the standard four/ten (4/10) work schedule, the work week is Monday through Thursday. All foreman/general foremen shall receive the same guarantees as outlined in this section.

SECTION 5. Where fifteen (15) or more Ironworkers are employed, a general foreman shall be employed. He shall receive not less than two dollars and twenty-five cents ($2.25) per hour over the journeyman rate as of June 1, 2013 and two dollars and fifty cents as of June 1, 2014 and be guaranteed forty (40) hours per week plus overtime.

SECTION 6. No foreman will be allowed to take the place of any journeyman Ironworkers on any overtime work providing the journeyman is qualified to perform the work.

SECTION 7. Unless mutually agreed upon between the local union and the Employer prior to such designation, an apprentice Ironworker shall not be designated a foreman, nor shall an apprentice Ironworker issue instructions to journeymen Ironworkers. Upon such agreed upon designation, said apprentice shall receive the appropriate journeyman's rate of pay plus the appropriate foreman's differential and all other guarantees due a foreman as specified in this article.

SECTION 8. The foreman is the only representative of the Employer who shall issue instructions to the workmen.

## ARTICLE 21
## PHYSICAL REQUIREMENTS

SECTION 1. Employees shall not be prevented from securing employment as a result of physical examination.

SECTION 2. Upon request, the Union will provide to an Employer information, if known, regarding physical disabilities that prevent an employee from safely performing work duties. Employers and Union agree that no employee shall suffer discrimination on account of Race, Color, Creed, Age, Sex or National Origin and that no otherwise qualified employee shall suffer discrimination on account of a handicap.

## ARTICLE 22
## STRUCTURAL STEEL ERECTION & POWER OPERATED EQUIPMENT CREW SIZE

SECTION 1. On any substantial structural steel erection project (two (2) floors or more) the crew shall consist of four (4) men and a foreman.

The erection of wall bearing bar joists or other wall bearing structural steel may be performed by a crew consisting of three (3) men and a foreman.

Pre-assembled roof or floor sections consisting of multiple bar joists or other structural shapes assembled and hoisted as a single unit shall be erected by a crew consisting of three (3) men and a foreman.

Structural steel erection requiring four (4) hours or less may be performed by a crew sufficient in size to safely perform such work provided such work is not performed piece meal in an effort to create such a condition.

No less than six (6) men and a foreman shall be employed around any guy or stiff leg derrick used in the erection of structural steel.

SECTION 2. When power operated equipment is used to hoist building materials or when it becomes necessary in the operation of power operated booms or cableways to use a signal man, Ironworkers shall be employed, as provided for in the GREEN BOOK (Plan for Settling Jurisdictional Disputes for the Building Trades Department).

SECTION 3. Power Operated Equipment When power operated equipment is used to unload or hoist one truck load or less of reinforcing materials above or below the ground level or at ground level, or above or below any floor level, no less than two (2) men shall be employed.

SECTION 4. No less than three (3) men and a foreman shall be employed on ForkLifts except where by mutual agreement between the Employer representative and the Business Agent, a fewer number of men may be used to perform the work in a safe and expeditious manner.

*The Above Described Provisions Shall Be Enforced Consistent With The Intent Of Circular Letter No. 742 Dated April 13, 1972 As Printed Herein And Any Deviations Shall Be By Mutual Agreement Between The Union And The Employer.*

*However, At No Time Shall An Agreement On One Project Be Construed As To Mean The Same Agreement And Conditions Shall Exist Or Be Extended To Another Without Further Negotiation.*

## ARTICLE 23
## HELICOPTER AGREEMENT

There shall be a five (5) man crew when erecting or raising steel, heavy equipment, ventilators, roof frames, roof deck, etc. with a helicopter. The crew will include one foreman who shall be situated at the most advantageous point relative to safety and efficiency. When both points (supply and erection) are not clearly visible to each other, there shall be an additional radio signal man, whose sole duty will be to signal the copter for erection purposes. The rest of the men will be distributed to make up the crew for hooking on and erecting or landing. Face protectors and safety glasses shall be furnished by the Contractor. There shall be a minimum of one hundred and twenty-five (125) feet of cable on the helicopter winch for erection purposes. It shall be the Ironworker foreman's privilege at his discretion to have the winch, cable and all lifting harnesses checked for safety and replaced at his suggestion.

## ARTICLE 24
## STACKS

This Agreement is made and entered into this 6th day of September, 1968. The Unions and the Company hereby agree that the Company may use a composite crew for the construction of reinforced concrete chimneys based on the following:

1. The Unions agree that their men will work in a composite crew using sectional or jump forms, and that in so far as possible equal numbers of each of the three (3) crews will be used in the crew and in no case will the deferential in the number of men from each crew be more than one.

2. The composite crew will be used only on the construction of the concrete chimney shaft. Other work on the job, such as foundations, ladders, lightning rods, linings, and all of the other things that go into a chimney, but which are not the concrete shaft itself, will be built or installed along craft lines.

3. All men on the job will be paid strictly according to the rules and regulations of the agreements covering local Unions involved in the particular job.

## ARTICLE 25
## STONE SETTING

SECTION 1. The placing and operating of all derricks and rigging in connection with cut stone, precast stone or concrete, mosaic and rubble, or any substitute for the foregoing, on all buildings, structures, bridges and viaducts in the course of construction, alteration, addition or repair; also on all demolition jobs where the stone is hoisted on or off the wall with a derrick or crane.

SECTION 2. The rigging erecting of all swinging and temporary scaffolds

for settling, cleaning and pointing of cutstone, precast stone or concrete, mosaic or rubble or any substitute for the foregoing shall be the work of the Ironworker, and any re-hanging of the same shall be the work of the Ironworker.

SECTION 3. The handling and rolling of all cutstone, precast stone or concrete, mosaic or rubble or any substitute for the same at the job site shall be the work of the Ironworker. Also the loading or unloading of the same shall be the work of the Ironworker.

SECTION 4. All burning, welding and bolting in connection with the erection of precast concrete and similar material shall be the work of the ironworker.

SECTION 5. There shall be an Ironworker Signalman employed on setting stone or other similar material when power equipment is used.

SECTION 6. The above Article 25 is subject to trade agreements to which International Association is a party as well as declarations rendered by the National Impartial Disputes Board for the Settlement of Jurisdictional disputes.

## ARTICLE 26
## POURING CONCRETE

Where precast, pre-stressed, reinforced concrete structural members (columns, beams, girders, slabs, etc,) are used in the construction of buildings, bridges and other structures and power equipment such as derricks, cranes, jacks and/or digging is used, work of loading, unloading, moving and placing to complete erection shall be performed by Ironworkers.

An ironworker will be used to straighten, tie or adjust steel rods when concrete is being poured but will not be required as a standby man.

An Ironworker will be used on reinforcing steel and wire mesh in roadways and sidewalks in connection with building construction.

Ironworkers will be used to lay wire mesh and paperback Steele and all other material when used to reinforce concrete on all types of building and other construction work. The pulling or raising of wire where necessary shall be the work of the Ironworker.

The Employer agrees not to assign or subcontract any work of the Union in regards to the reinforcing of poured concrete, to be performed at the job site of construction, on work covered by the collective bargaining agreement with Local Union No. 172, to any Contractor not in agreement with Local Union No. 172 or to any other labor organization. If the Union determines that the Employer is in violation of the above article, it may, take the following action.

1. The Union may terminate Agreement immediately.

2. The Union may need an injunction in any court of competent jurisdiction to restrain further violation of this Article 26 by the Contractor or his agents. This remedy shall be in addition to any other remedy, in law or equity.

3. If the Employer should violate this assignment or subcontract article, the nature of damage suffered by the Union, difficult to ascertain. The Employer will pay to the Union two hundred dollars ($200.00) per day, each working day

the Employer is in violation of this Article. That nothing herein shall preclude the Union being able to affect any other remedy at law or equity including the obtaining of attorney fees and other cost of suit.

When an authorized Company representative request men for the work described above, and the Union is unable to furnish men, the above Paragraph does not apply.

## ARTICLE 27
## WELDER'S HELPER

SECTION 1. The Employer will assign Ironworker Helpers to assist welders as needed to safely and efficiently perform the work assigned. Apprentices may be utilized as Welder's Helpers within the established ratios of Article 17, Section 5. The Welder's Helper may also be utilized as a Fire Watch as required by job conditions.

SECTION 2. A helper shall not be required when welding floor deck, precast concrete or ornamental iron.

## ARTICLE 28
## SAFETY PROVISIONS

SECTION 1. When the use of hand signals during steel erection, rigging or the hoisting of materials becomes unsafe, impractical or when direct visual contact with the crane or hoist operator is impaired, an Ironworker will be utilized as a separate signalman to either relay hand signals or operate hand held radio or telephone signaling devices.

SECTION 2. The Employer agrees to maintain all equipment in a safe working condition. The Employer agrees to make all reasonable provisions for the health and safety of his employees at all times during the hours of employment and all employees shall use safety equipment provided by the Employer, failure to comply will subject employees to immediate dismissal without recourse.

SECTION 3. No employee shall be obligated by the terms of this agreement to use any equipment or vehicle not in safe operating condition and not equipped with all safety appliances required by law.

SECTION 4. No employee shall be required to work nor shall any employee be discriminated against for refusing to work with equipment that is unsafe, or under conditions that are determined unsafe by the majority of employees on the job, or failure to comply with all State and Federal safety laws.

SECTION 5. Under no circumstances shall an Employer request Ironworker employees to work around any type rig where the boom of such rig will at any time in the work operation come nearer or within ten (10) feet to any high voltage power line, until the proper safety precautionary measures have been taken to cover said power lines in manner to avoid contact of the boom with the power line.

SECTION 6. Working floors upon which derricks are set must be covered tight with suitable planking or netting over entire floor except where openings are left for ladders. No more than two (2) floors or a maximum of twentyfive (25) feet

shall remain open or uncovered and all such floors shall be planked or netted and within a minimum radius of ten (10) feet.

SECTION 7. Where iron is landed on the floor or any point of a structure under construction, all connections shall be fully fitted up and tightened and substantial support provided to safely sustain such added weight.

SECTION 8. No employee shall be permitted to ride the load or load fall, except in the case of inspection, and erection, and dismantling of derricks.

SECTION 9. Proper practical safe housing, casing or tube, shall be provided for any and every means, method, appliance or equipment employed to transmit or give signals, direction work or operating of any and various devices in connection with work being done by employees.

SECTION 10. Steel cable will be used instead of chains or hemp slings.

SECTION 11. No employee will be permitted to work in an elevator shaft while car is in operation. The first floor beneath and the first floor above men working shall be planked safe in all elevator shafts.

SECTION 12. The steward, when observing or being informed of a potential hazard on the project, shall inform the foreman of said hazard. If the reported hazard is not remedied to comply with state and federal codes, the steward shall promptly report the hazard to the Union. Unless qualified and designated by the employer, the Steward shall not act as the employer's safety person.

SECTION 13. Any Employer employing forty (40) men or more on any one job the steward will be assigned a job which gives him an opportunity to circulate about his Employers operation and will not be restricted to one crew or gang. This is not to imply that there will be any limitations on the amount of work to be performed by the steward on behalf of the Contractor.

SECTION 14. On all bridge jobs being constructed over rivers the Employer shall designate a structural ironworker with able swimming ability as safety man. If the Contractor has two or more Ironworkers working in the river bed in the work area he will not be required to employ an Ironworker for the purpose of safety man only but this man may be assigned to other work provided it does not require him to leave the area while Ironworkers are working overhead. The Contractor will furnish the safety man with a boat suitable for patrolling the water area beneath the workmen.

SECTION 15. No employee shall be permitted to weld, burn, grind or chip, unless equipped with the proper safety devices to perform such work.

SECTION 16. In ditches or open excavations, the safety provisions of the Ohio State Safety Code and the Federal Safety Code shall apply.

SECTION 17. An obligation imposed upon and accepted by the Employer is the compliance, with the Ohio State Worker's Compensation Insurance Law, Specific Safety Requirements of the Industrial Commission of Ohio Relating to Construction, Federal Security Agency, Social Security Board and the Bureau of Employment Services.

SECTION 18. Structural steel with Nelson Studs or other types of concrete anchors welded or fastened to the walking surfaces of the beams will not be erected in the jurisdiction of Ironworkers Local Union No. 172. Nelson Studs or other types of anchors on the walking surfaces of the beams must be installed by Ironworkers after the beams are erected.

SECTION 19. When hand signals for cranes, derricks, hoists and cableways used on work under the jurisdiction of Local Union No. 172 are needed such signaling is to be done by an Ironworker.

SECTION 20. When an Ironworker is directing the movements of a crane or other rigs via hand signals, he must have an unobstructed view of the Operator, as well as, all boom, swing and load movements. In the event that a clear and complete view is not available, a second Ironworker signalman shall be utilized.

SECTION 21. When working on crane runways, under operating conditions, rail stops, lights or flags should be placed between workmen and operating crane. If conditions do not permit such safety precautions, one or more Ironworkers will be provided to protect the workmen.

SECTION 22. The Employer shall provide or pay for the following safety equipment: HARD HATS, WELDING GLOVES, WELDING JACKET or SLEEVES, WELDING HOOD WITH APPROPRIATE LENSES, BURNING GOGGLES, SAFETY GLASSES, GRINDING SHIELDS, and such SAFETY BELTS or HARNESSES as required for the employee's safety and protection. All safety equipment shall comply with applicable OSHA standards. Such equipment shall remain the property of the Employer. The Employer reserves the right to require the employee to sign an agreement to return all Employer supplied safety equipment in good condition (absent normal wear and tear). If the equipment is not returned as required, the Employer may deduct the replacement cost from the employee's paycheck. When as a condition of employment, SAFETY (STEEL-TOED) BOOTS are required, the Employer shall reimburse each employee (not to exceed $100.00 annually) for the cost of such safety boots.

SECTION 23. Recognizing the moral obligation of the union and the legal duty of the employer to provide a safe work place, both parties agree to implement safety training as the need arises. Individuals receiving such training shall receive compensation for their time. This compensation and any other costs associated with the implementation of such training shall be borne by a safety training fund as outlined in Section 2, Article 17 of this agreement.

As part of its obligation to provide trained applicants the union agrees to continue its efforts to encourage safety education. All members of Local Union No. 172, being referred to work under this collective bargaining agreement will complete training in the following areas:

## OSHA TEN-HOUR COURSE
## CPR - FIRST AID
## OSHA REGULATIONS

It shall be understood that as part of its obligation to provide a safe work place the Employer will actively encourage participation in all applicable safety training by all employees covered by this collective bargaining agreement and shall thru its representatives on the Apprenticeship Committee require all current and future apprentice members of Local Union No. 172 to receive such training as part of the regular classroom course work associated with their apprenticeship.

Employee education that is compliant with the Ohio Bureau of Workers' Compensation Drug Free Workplace Program as created by Executive Order 92-65V shall be conducted and funded under the terms and conditions of this section.

All other individuals regardless of local union affiliation being referred for employment under this agreement shall be eligible to enroll in any safety training program conducted under the terms of this section.

## ARTICLE 29
## FINISHER'S TOOLS

SECTION 1. Employees employed on ornamental work shall furnish for their own use all necessary hand tools to enable them to effectively install such work. Expendable tools broken on the job shall be replaced by the Employer. The employee will be responsible for his nonexpendable tools. No employee shall be held responsible for the loss of the Employer's tools or equipment in his charge:

All ornamental Ironworkers will have the following tools in their possession:

**EXPENDABLE**

Hacksaw Blades
Hammer Handle
Plumb Bob & Line
Drill bits up to ⅜"
Taps
6-ft. Rule

**NON-EXPENDABLE**

Ratchet & Socket up to ½ Inch Open End Wrenches up to ¾ Inch
12 Inch Combination Square
12 Inch Crescent Wrench
Rubber or Rawhide Mallet
1½ Lb. Ball Peen Hammer
12 Inch Hacksaw
50 Foot Tape
8 Inch Pliers
Divider
Drift Pin
6 Inch Screw Driver
8 Inch Screw Driver
12 Inch Screw Driver

Cold Chisel
24 Inch Level
Scriber
Offset Screw Driver
Tap Wrench
Center Punch

***All structural Ironworkers will have in their possessions the following tools:***

**STRUCTURAL WORK AND MACHINERY MOVING**

1 4 or 6 lb. sledge hammer
1 12 Inch Crescent Wrench
1 Belt and Bolt Bag
1 ¾ Spud Wrench
1 50 Foot Tape
1 ⅞ Spud Wrench
1 6 Foot Rule
1 Bull Pin

**SHEETING WORK**

1 12 Inch Hacksaw
1 24 Inch Level
1 6 Foot Rule
1 50 Foot Tape
1 Scriber
1 Divider
1 Cold Chisel
1 Ball Peen Hammer
1 12 Inch Combination Square
1 Ratchet & Socket Wrenches (½ Inch Drive)
1 Pr. R H Metal Masters
1 Pr. L H Metal Masters
1 Pr. #5 Bulldog Shears
1 10 Inch Crescent Wrench
1 8 Inch Pliers
1 6 Inch Screw Driver
1 8 Inch Screw Driver
1 12 Inch Screw Driver
1 Offset Screw Driver
1 Plumb Bob & Line
1 Center Punch

**Rod Work:** 1 25-foot tape measure • 1 Reel & Belt • 1 Pair Pliers

SECTION 2. At the Contractor's option, he may require any workman to sign out for personal tools such as hard hats, safety belts, which the employee will retain while in the company's employ. The workmen shall return such items upon the termination of his employment and upon failure to do so the Contractor may deduct the actual cost of such items from the workman's paycheck. It is further understood that a safe place will be provided where workmen may leave hard hats, safetybelts, and personal belongings overnight or during other nonwork hours.

SECTION 3. Portable electric hoists, which are used four (4) hours or less per day, are tools of the trade.

## ARTICLE 30
## SHIPPING EMPLOYEES

SECTION 1. Employees shipped to jobs or work out of the jurisdiction of the local Union shall receive transportation, traveling time and expenses, providing they remain on the job, thirty (30) days or until the job is completed, if it requires less than thirty (30) days. Employees shipped to a job and not put to work, weather permitting, or the job is not ready for them to go to work, shall be paid the regular wage rate for such time, or such employees shall be shipped back to the shipping point with time and transportation paid by the Employer.

SECTION 2. Each individual journeyman or apprentice Ironworker referred from the local union to a job site within the jurisdiction of Ironworkers Local No. 172 and then transferred to a job site beyond the boundaries of those counties listed in Article 4, Section 1, shall receive a minimum of thirty (30) dollars per diem, payable as a separate expense allowance to cover the added cost associated with working beyond the jurisdiction of the local union.

SECTION 3. Any exceptions to Section 2 shall be subject to negotiation and agreement between Local 172 and the Employer.

## ARTICLE 31
## BUSINESS REPRESENTATIVE

SECTION 1. The Business Representative of the Union shall be permitted to visit all jobs, but will in no way interfere with the progress of the work.

## ARTICLE 32
## JOB STEWARD

SECTION 1. There shall be a steward on each job who shall be appointed by the Business Agent. He shall keep a record of workers laid off and discharged and take up all grievances of the job and try to have same adjusted, and in the event he cannot adjust them he must promptly report that fact to the Business Agent who shall report same to the proper officer of the Union so that efforts can be made to adjust any matter without a stoppage of work. He shall see that the provisions of these working rules are complied with and report to the Union the true condition and facts. All accidents and injuries shall be promptly reported to the steward. The steward shall, with the knowledge of the employer's representative, accompany or transport the injured ironworker as the case may require to the nearest medical facility and if necessary thereafter to their home without any loss of time. The steward shall report the accident or injury to the Union and the Employer. The steward shall not have authority to cause a work stoppage on any job of fair Employer. A steward failing to fulfill his duties shall be subject to censure by his Union and also subject to a penalty upon conviction on charges provided for in the International Constitution.

SECTION 2. All reasonable effort shall be made by the Employer or his Representative to employ the Steward during all times that work covered by this Collective Bargaining Agreement is progressing. This section shall also

entitle the Steward to be included in all overtime that does not require the replacement of another worker. The Employer agrees that the job steward will not be discharged until after proper notification has been given to the Union and, further, when employees are laid off the job, the steward will be the last man laid off providing he is capable of performing the work in question.

SECTION 3. When forty (40) men or more are employed on an individual job by an individual Employer, the steward shall be guaranteed forty (40) hours per week. The steward shall be available to that Employer during the full time for which he is paid even though the job is not in progress. In the event the steward leaves the job for any reason, he shall appoint a temporary steward to act in his capacity until he returns.

SECTION 4. Each Employer primarily engaged in machinery moving and employing five (5) or more Ironworkers shall have a company steward who shall assume the responsibility outlined in Section 1, 2, 3 of the above.

SECTION 5. The job steward's duties shall not include the hiring, referral or termination of employees. The job steward shall not be employed in a position that would under the terms of this agreement, describe a foreman or general foreman.

## ARTICLE 33
## PROTECTION OF UNION PRINCIPLES

SECTION 1. The removal of journeymen Ironworkers and apprentices from a job in order to render legal assistance to other local unions to protect union principles shall not constitute a violation of this Agreement, provided such removal is first approved by the General Executive Board and notice thereof is first given to Employer involved.

## ARTICLE 34
## SUBCONTRACTING

SECTION 1. The territorial and occupational jurisdiction of the Union, as stated in this agreement, shall be recognized to the end that the Employer shall not subcontract or contract out such work nor utilize on the job site the services of any other person, company, or concern to perform such work that does not observe the same wages, fringe benefits, hours and conditions of employment as enjoyed by the employees covered by this agreement.

SECTION 2. The Union agrees that it will not furnish employees to any one not signatory to any agreement with the Union.

SECTION 3. The Union, recognizing the burden that inflexibility can place on contractors in the construction industry, shall consider amendments or adjustments to this article to address extenuating circumstance that may preclude a signatory contractor's ability to contract and perform work in compliance with this Article. Any amendments or adjustments shall apply only to such project(s) as agreed upon and shall not grant a waiver of this Article without prior negotiation to any other project(s). Although a contractual relationship defining terms and conditions of employment may not be established by such an

amendment, a craft jurisdictional claim is maintained and the payment of such prevailing wages shall be observed.

## ARTICLE 35
## WORKING CONDITIONS

SECTION 1. Each job of sufficient duration and size to justify same shall be provided with a shed or room for the employees to change their clothes and keep their tools. Such shed or room shall be heated between October 1 and May 1.

SECTION 2. Sanitary Port-O-Lets, KemJohns or equivalent facilities shall be provided by the Employer on Jobs of sufficient duration and size to justify them. They shall be maintained in a useable sanitary condition and when such portable toilets are provided by the general contractor or another subcontractor as part of the general trade's contract on a particular project, their sanitary maintenance shall be addressed by the Employer to the appropriate provider.

SECTION 3. No ironworker shall be permitted to furnish or rent to his Employer any equipment used in connection with Ironworkers work, such as welding machines, cutting torches, impact wrenches, power grinders, power tools, pickup trucks, hoisting equipment or similar equipment in a category recognizably larger than conventional handtools. Also, he shall not be required to use a personally owned automobile or truck for moving, transporting, or delivering material, merchandise or equipment for the Employer.

SECTION 4. There shall be no limitation placed on time amount or work to be performed by any workman during working hours.

SECTION 5. When tools or clothing are stolen or destroyed while in the Employer's tool sheds or tool box, the Employer shall be responsible when employee gives the Employer a list of tools and clothing prior to date tools or clothing are stolen or destroyed. After such a loss a notarized statement verifying loss of those tools or clothing may be required.

SECTION 6. When tools are to be checked out and in, it shall be done during working hours.

SECTION 7. The Employer shall furnish suitable drinking water and paper cups on the Job site no later than one hour after starting time. Ice water shall be furnished from May 1 to October 1.

SECTION 8. There shall be a ten-minute (10) coffee break taken at mid-morning of the working hours. There shall be no afternoon coffee break when working on regular shift work. Only one Employee shall be permitted to leave the Job site to procure coffee or other nonalcoholic beverages during working hours, traveling not more than 500 yards. In the event a catering truck visits the job site, one man will be designated to go to said truck for all employees. At no time shall entire crews leave their work stations. If above conditions cannot be met, employees must furnish their own coffee or other nonalcoholic beverages.

SECTION 9. All scheduled shifts in EXCESS of eight (8) hours shall require a second coffee break. It shall be scheduled at mid-afternoon and conducted under the same provisions as Section 8.

It shall be a violation of this agreement for individuals to negotiate with the Employer a "trade" of this coffee break for an "early quit".

## ARTICLE 36
## DECLARATION OF PRINCIPLES

The selection of craft foreman or craft general foremen, over workmen of the respective crews, shall be entirely the responsibility of the Employer.

The welding torch is a tool of the trade having Jurisdiction over the work being welded. Craftsmen using the welding torch shall perform any of the work of their trade, and shall work under the supervision of the craft foreman.

There shall be no limit on production of workmen or restriction of the full use of proper tools or equipment and there shall not be any task or piece work.

Jurisdictional disputes shall be settled in accordance with the procedure established by the Building Trades Department of the AFL-CIO or in special cases as agreed and established by two or more International Unions without interruption of work or delay to the job.

Slowdowns, forcing of overtime, spread work tactics, standby crews and featherbedding practices have been and are condemned.

Stewards shall be qualified workmen performing work of their craft. There shall be no non-working stewards.

There shall be no strikes, work stoppages, or lockouts during the processing of any grievances or disputes in accordance with the manner prescribed in the local or national agreement.

There shall be no restriction of the use of any raw material, except prison made.

No person except those representing the Employer shall have the right to interfere with workmen during working hours.

In accordance with the terms of this agreement the use of apprentices shall not be prohibited.

An obligation imposed upon and in so far as possible, accepted by the Union as being properly its own, is the availability at all times in so far as possible during the life of the Agreement of sufficiently skilled workmen, capable of performing the work of this trade and to constantly endeavor to improve the ability of such workmen and further to have in the making, through apprenticeship training, workmen who can enter this trade properly equipped to perform the work. The employment of as many apprentices as is reasonable and practical shall be encouraged.

## ARTICLE 37
## CONTRACTORS

SECTION 1. At the request of Local Union No. 172, the Associations that are a part of this Agreement shall furnish a list of contractors who have given Power of Attorney to said Associations to bargain on their behalf.

## ARTICLE 38
## SETTLEMENT OF DISPUTES

SECTION 1. Grievances. Should differences arise between the Employer and the Union as to the meaning and application of the provisions of this Agreement or should differences arise about matters not specifically mentioned in this Agreement, there shall be no suspending of work or lockout on account of such differences. An earnest effort shall be made to settle such differences immediately and in the following manner.

There shall be an Arbitration Committee of three (3) members of the Contractor Association and three (3) members representing Ironworker Local Union 172 selected by their respective organizations. The duties of the Joint Arbitration Committee shall be mutual consideration and settlement of all disputes that may arise. The Joint Committee will appoint a Chairman and a Secretary. The Secretary shall keep minutes of each meeting.

The Committee shall meet at the call of the Chairman or Secretary within seventy-two (72) hours exclusive of Saturdays, Sundays and holidays.

In the event no agreement has been reached and the Joint Committee is deadlocked, the question at issue shall be referred to a disinterested arbitration board. The board shall be selected as follows: One (1) member chosen by the Employer, One (1) selected by the Union and the two (2) selected shall choose the third (3) member.

Pending consideration of any question referred to the Joint Arbitration Committee or pending a decision of the Joint Arbitration Board provided in this Article, it is expressly understood that there shall be no strikes or lockouts or stoppages of work of any kind ordered or permitted against any member of the parties hereto.

SECTION 2. The Joint Arbitration Committee or the Joint Arbitration Board shall have jurisdiction over all questions involving the interpretation and application of any section of this agreement. They shall not, however, be empowered to handle negotiations for the new agreement, changes in the wage scale, or jurisdictional disputes.

SECTION 3. Each party shall individually pay the expenses of the arbitrator it appoints and the two parties shall jointly share the expense of the third arbitrator.

## ARTICLE 39
## STRIKES AND LOCKOUTS

SECTION 1. It is mutually agreed that there shall be no strikes or lockouts except for the refusal of either party to submit to arbitration as herein provided or failure on the part of either party to carry out the award of the Board of Arbitration, or failure on the part of the Employer to render the required reports and make the required payments to (a) Ironworkers District Council of Southern Ohio and Vicinity Benefit Trust or (b) Ironworkers District Council of Southern Ohio and Vicinity Pension Trust or Ironworkers District Council of Southern Ohio and Vicinity Annuity Trust.

SECTION 2. Every facility of each of the parties hereto is hereby pledged to immediately overcome any such situation; provided, however, it shall not be a violation of any provision of this agreement for any person covered by this agreement to refuse to cross or work behind the legal picket line of any affiliated Union which has been authorized by the International for that Union, the Central Labor Council or Building and Construction Trades Council.

## ARTICLE 40
## SCOPE OF AGREEMENT

SECTION 1. This Agreement contains all of the provisions agreed upon by the Employers and the Union. Neither the Employers nor the Union will be bound by rules, regulations or agreements not herein contained except interpretations or decisions of the Board of Arbitration.

## ARTICLE 41
## LETTERS

It is agreed that all Contractors who are parties to this Agreement and employ Ironworkers in the jurisdiction of Local Union No. 172 will furnish Local Union No. 172 with signed letters on letterhead of the Employer, stating that they have employed Ironworkers and paid the negotiated scale of wages on any and all jobs which the Employer has performed with Ironworkers, with reasonable promptness upon receipt of request.

For purposes of jurisdictional assignment, Employers signatory to this agreement shall at the request of the Union provide a signed letter describing in detail the work performed by members of this Union in their employ and shall provide any other material such as drawings or photographs not subject to any trade secret agreements that would be useful or necessary to establish or maintain jurisdictional claims of this Union.

## ARTICLE 42
## CONSTRUCTION ADVANCEMENT PROGRAM

Construction Advancement Program of Central Ohio (Industry Advancement Fund). Employers subject to the terms of this Agreement who employ Ironworkers and apprentices within the jurisdiction of Local Union No. 172 shall abide by all terms and conditions of the Construction Advancement Program (Industry Advancement Fund), which is as follows:

(A) The Employers have established a program to promote the common good of the construction industry which may include but not necessarily restricted to the study of and service of: (1) Safety and Accident Preventions, (2) Continuing Education, (3) Market Development, (4) Public Relations and Services, (5) Labor Relations and Personnel Practice, (6) Protection of Legitimate Markets, and (7) Industry Relations and Public Education.

(B) The Employers have established the Construction Advancement Program by a Declaration of Trust dated November 14, 1968, a copy of which

is available for inspection by the parties at the office of the Trustees thereof at 1775 Northwest Boulevard, Columbus, Ohio and which is included herein by reference and made a part thereof. Each Employer covered by this Agreement shall pay four cents ($.04) for each hour worked by each journeyman, apprentice, or other employee within the bargaining unit to the Construction Advancement Program of Central Ohio (Industry Advancement Fund). For all overtime hours the Construction Advancement Program of Central Ohio (Industry Advancement Fund) shall be paid at the overtime rate (hours paid).

(C) The consideration of this Agreement is as follows:

1. Recognition by the parties of the need for providing the means whereby the Employer can facilitate and supplement the financing of its Collective Bargaining, contract maintenance and other activities.

2. Obligations assumed by the Employer to withhold, collect and forward monies from the pay of its employees for the benefit of its employees in Welfare Funds, Pension Funds, etc.

3. Obligations assumed by the Employer to pay, collect and forward monies for the Apprenticeship Training Fund.

Payments to this Program shall be in accordance with instructions on forms furnished by the Ironworkers Local #172. The Program is to be administered for the purpose set forth in Section (a) of Article 42 and in accordance with the terms of said Declaration of Trust.

The monthly contribution period and report shall end and include the last full weekly pay period of the month. Payment and reports for contribution period shall be mailed or delivered to the Program Office or authorized collection point, on or before the 15th day of the following month. Payments postmarked or delivered after the 15th day of the following month shall be subject to an additional charge of not more than ten percent (10%) per month until paid, to reimburse the Construction Advancement Program of Central Ohio (Industry Advancement Fund) for damages due to additional administrative expense, impairment of reserves and costs of collection arising from late payment.

There is specifically excluded from the purpose of the Construction Advancement Program of Central Ohio (Industry Advancement Fund), the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize Contractors during a period or periods of work stoppages or strikes. The administration of the Construction Advancement Program of Central Ohio (Industry Advancement Fund) shall comply with all present and future Federal Laws governing same.

## ARTICLE 43
## IMPACT FUND

SECTION 1. In addition to the per hour wage rate, the Employer shall contribute an additional three quarter of one percent (¾%) of the existing wage rate to Ironworker Management Progressive Action Cooperative Trust (IMPACT), a jointly trusted Cooperative Trust with federal tax exempt status under Section 501 (a) of the Internal Revenue Code as an exempt organization under Section

501 (c) (5) of the Internal Revenue Code. The general purposes of the Trust include the improvement and development of the Ironworker Industry through Education, Training, Communication, Cooperation and governmental lobbying and legislative initiatives.

The reporting, payment, frequency of payment and administration of such contributions shall be governed by the terms of the IMPACT Trust agreement, policies and resolutions.

The three quarter of one percent (¾ of 1%) contribution shall be in lieu of any and all contractual requirements for contributions to the National Ironworkers and Employers Apprenticeship Training and Journeyman Upgrading Fund and the Institute of the Ironworking Industry. In addition, the Union and Employer agree that by making contributions to IMPACT each of them shall become bound to IMPACT's Drug and Alcohol Screening Policy and Procedure or equivalent program and any amendments or modifications thereto.

## ARTICLE 44
## INTERNATIONAL IRONWORKERS ORGANIZING FUND

In accordance with action taken by the delegates at the 42nd International Convention, Article XVI, Sources of Revenue of the International Constitution was amended to read: "Sec. 2d. Each Outside and Regional Local Union shall pay an International Supplemental Per Capita Tax of one-quarter of one percent (¼ of 1%) of the applicable hourly journeyman wage rate for each hour worked per member per month to the International Ironworkers Organizing Fund. The disbursements from this Fund shall be approved by the General President, disbursed through the General Treasurer's Office, and shall be used solely for the purpose of meeting the financial requirements of organizing the unorganized and for no other purpose."

## ARTICLE 45
## SAVINGS CLAUSE

SECTION 1. Should any part of or any provision herein contained be rendered or declared invalid by reason any existing or subsequently exceed legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation the parties signatory hereto agree to immediately meet to renegotiate such parts or provisions affected.

SECTION 2. The remaining parts or provisions shall remain in full force and effect.

## ARTICLE 46
## DURATION AND TERMINATION

This agreement, with any amendments thereof made as provided for therein, shall remain in full force and effect until midnight of May 31, 2018 except as noted herein for an individual Employer, and unless written notice be given by either party to the other at least four (4) months prior to such a

date of a desire for change therein or to terminate the same, it shall continue in effect for an additional year thereafter. In the same manner, this agreement with any amendments thereof shall remain in effect from year to year thereafter, subject to termination at the expiration of such contract year upon notice in writing given by either party to the other at least four (4) months prior to the expiration of such contract year. Any such notice as here in above provided for in this article, whether specifying a desire to terminate or to change at the end of the current contract year, shall have the effect of terminating this agreement at such time.

An individual Employer may terminate this agreement by notifying the other party, in writing, four (4) months prior to May 31, 2014 or the anniversary date of this contract (May 31, 2017) of his intent to modify and/or terminate this agreement following which this agreement shall terminate as of May 31, 2014 or the anniversary date of this contract (May 31, 2017) for that Employer only.

If a state or federal law is passed that affects this Agreement, the signatory parties, by mutual agreement, may meet to discuss such affected provisions of this agreement.

IN WITNESS WHEREOF, this agreement has been executed by the parties hereto as of the date and year first above written, in the city of Columbus, State of Ohio.

**FOR LOCAL UNION NO. 172**

Of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers

James V. Bosworth
John Burns, II
Stephen A. Seymour
Timothy L. Breitfeller

**FOR THE EMPLOYER:**
**CENTRAL OHIO AGC**

Richard J. Hobbs
Craig Wanner
Ken Gonya
Daniel Powell



WYANDOT
MARION
MORROW
HARDIN
LOGAN
UNION
DELAWARE
KNOX
LICKING
CLARK
MADISON
FAIRFIELD
PICKAWAY
FAYETTE
ROSS
VINTON
HIGHLAND
PIKE
JACKSON
MEIGS

## WAGE AND FRINGE FUND RATES
## EFFECTIVE JUNE 1, 2013

| | |
|---|---|
| Journeyman Ironworker | $ 27.67 per hour |
| Foreman | 29.42 per hour |
| General Foreman | 29.92 per hour |
| Pension | 8.60 per hour |
| Health and Welfare | 6.20 per hour |
| Annuity | 2.55 per hour paid |
| Apprentice Fund | 1% of existing wage rate |
| Safety Training Fund | .06 per hour |
| Industry Advancement Fund (AGC) | .04 per hour |
| I.P.A.L. | $ .02 per hour |
| IMPACT FUND | 1% of existing wage rate |

**DEDUCTED:** Dues Check Off 5% of Gross Wages

**Wages & Benefits will be determined from increase**

| | |
|---|---|
| EFFECTIVE June 1, 2014 | $1.00 increase |
| EFFECTIVE June 1, 2015 | $ .90 increase |
| EFFECTIVE June 1, 2016 | $ .90 increase |
| EFFECTIVE June 1, 2017 | $ .90 increase |



INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL AND REINFORCING IRON WORKERS

SOFCO001450

# CIRCULAR LETTER NO. 742

April 13, 1972

FROM: International Association of Bridge, Structural & Ornamental Ironworkers

TO: ALL AFFILIATED OUTSIDE ERECTION LOCAL UNIONS

CIRCULAR LETTER NO. 742

Dear Sirs and Brothers:

Due to the many inquiries received from our affiliated outside erection local Unions relative to classification of Paragraph A, Section 14 of the General Working Rules of the International Association of Bridge, Structural and Ornamental Ironworkers captioned "Ironworkers Required on Guy and Stiff Leg Derricks' it has been decided that this letter of clarification be directed to all outside erection local Unions in order to eliminate any future misunderstandings.

*Paragraph A, Section 14 states as follows:*

"No less than six (6) men and a foreman shall be employed around any guy or stiff leg derrick used on steel erection and, on all mobile or power operated rigs of any description no less than four (4) men and a foreman shall be employed."

The clarification requested deals with the portion of the above quoted section, which states as follows:

"On all mobile or power operated rigs of any description no less than four (4) men and a foreman shall be employed."

The above quoted section provides for the number of men to be used on a guy or stiff leg derrick and on all mobile or power operated rigs when such equipment is used on steel erection. On all other work operations coming under the jurisdiction of this International Association on where members of this Association and employed a sufficient number of men will be employed in order that the work involved can be performed in a safe and expeditious manner. This means the Employer will not be required to use four (4) men and a foreman on work operations not requiring this number of men. It also means that on rigging

or unloading operations where more than four (4) men and foreman required, such additional members will be employed.

Acknowledging the technological changes in methods of installation and new materials that have occurred in recent years and in order to protect the work opportunities of our members on all work coming within the jurisdiction of the Ironworker trade, it is absolutely mandatory that we utilize the greatest weapons available. These weapons are the skills of our membership, production, uniform conditions, etc.

It is of the utmost importance that the officers and members of this International Association exercise good judgment in determining the proper number of members to be used on certain work operations where mobile or power operated rigs are used. The safety of the members employed must be considered as well as the possible over manning of a specific work operation, which, in many instances, has resulted in such work operations being assigned to other crafts and subsequently resulted in jurisdictional disputes.

This letter should be read to the membership of your local Union at the next regular meeting and all job stewards must be acquainted with the subject matter contained herein.

Fraternally yours,

Signed John H. Lyons

John H. Lyons

**GENERAL PRESIDENT**

Signed Joel D. Drake

Joel D. Drake

**GENERAL SECRETARY**



# Collective Bargaining Agreement

Between the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers Local 44

and the

Steel Erectors, Fabricators and Riggers Association

Labor Relations Division

Cincinnati Division

February 1st, 2012 thru May 31st 2014



# IRONWORKERS' LOCAL UNION #44
## Collective Bargaining Agreement
2/1/2012 thru 5/31/2013

PREAMBLE ........ Page 2
NEGOTIATING AGENT ........ Page 2
CRAFT JURISDICTION ........ Article 1
TERRITORY ........ Article 2
UNION SECURITY ........ Article 3
PROTECTION OF UNION PRINCIPLES ........ Article 4
SETTLEMENT OF DISPUTES ........ Article 5
BOND ........ Article 6
LETTERS ........ Article 7
STRIKES AND LOCKOUTS ........ Article 8
NONDISCRIMINATION ........ Article 9
COMPENSATION INSURANCE ........ Article 10
WAGE RATES ........ Article 11
TRANSPORTATION EXPENSE ........ Article 12
BENEFIT PLAN ........ Article 13
PENSION PLAN ........ Article 14
ANNUITY PLAN ........ Article 15
APPRENTICESHIP TRAINING FUND ........ Article 16
IMPACT FUND ........ Article 17
Ironworker Organizing and Marketing Plan ........ Article 18
CONSTRUCTION ADVANCEMENT PROGRAM ........ Article 19
CHECK-OFF ........ Article 20
VACATION NOTIFICATION ........ Article 21
WORK HOURS PER DAY ........ Article 22
REPORTING TIME ........ Article 23
SHIFT WORK ........ Article 24
HOLIDAYS ........ Article 25
PAY DAY ........ Article 26
FOREMEN ........ Article 27
APPRENTICESHIP ........ Article 28
JOBSITE ACCESS ........ Article 29
WELDERS ........ Article 30
WORKING CONDITIONS ........ Article 31
SAFETY PROVISIONS ........ Article 32
TOOLS ........ Article 33
JOB STEWARD ........ Article 34
SCOPE OF WORK ........ Article 35
SAVINGS CLAUSE ........ Article 36
LISTS ........ Article 37
DURATION AND TERMINATION ........ Article 38

*This Agreement is made and entered into this 1st day of February, 2012, by and between the Steel Erectors, Fabricators and Riggers Association, Labor Relations Division, 3 Kovach Drive, Lockland, Ohio 45215, hereinafter referred to as the "Association" and/or "Employer" and Local Union #44 of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers (affiliated with the AFL-CIO) hereinafter referred to as the "Union", and/or "Employees".*

### PREAMBLE

This Agreement is entered into by collective bargaining to prevent strikes and lockouts and to facilitate peaceful adjustment of grievances and disputes between the Union and the Employer in this trade and to prevent waste, unnecessary and avoidable delays, and expense, and, so far as possible, to provide for labor's continuous employment, such employment to be in accordance with the conditions herein set forth and at wages agreed upon; also, that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions and further the establishment of the necessary procedures by which these ends may be accomplished.

### NEGOTIATING AGENT

It is understood and agreed that the Steel Erectors, Fabricators and Riggers Association, Labor Relations Division, is the sole bargaining agent in the negotiation of this "Form of Agreement" for any and all signatory Employers of Ironworkers within the jurisdiction of Ironworkers Local #44, and by signing said Agreement, the Employer hereby assigns bargaining rights to the Association. And further, the Employer recognizes Ironworkers Local #44 as the sole bargaining agent in the negotiation of the "Form of Agreement" for its members and hereby acknowledges that the Union is representative of a majority of its Ironworker Employees, and agrees to be bound by the terms and conditions of this Collective Bargaining Agreement, including all renewals, extensions and renegotiated provisions thereof.

In no event shall the Association be bound as principal or be held liable in any manner for any breach of this Agreement by any of the Employers or Employees of such Employers, or the Union. It is further agreed that any breach of this "Form of Agreement," duly signed by any Employer, shall be several, not joint.

### ARTICLE 1

**Craft Jurisdiction:** It is agreed that the jurisdiction of work covered by this Agreement is that provided for in the charter grant issued by the American Federation of Labor to the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, and the jurisdictional claims of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers are subject to trade Agreements and final decisions of the AFL-CIO.

The jurisdiction of work referred to in this Article is the jurisdiction of work claimed by the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, and nothing contained herein shall make it mandatory for the Employer to accept the claims of jurisdiction as being binding upon him. The Employer does not waive any of his rights be permitting the inclusion of the jurisdiction of work in this Agreement.

### ARTICLE 2

**Territory:** The territory covered by this Agreement shall be the territorial jurisdiction of Local Union #44, which covers the Counties of Brown, Clermont and Hamilton, and parts of the Counties of Adams, Butler, Clinton, Highland and Warren in the State of Ohio; Boone, Bourbon, Bracken, Campbell, Gallatin, Grant, Harrison, Kenton, Nicholas, Pendleton, Robertson, and parts of the Counties of Carroll, Fleming, Mason, Montgomery, Owen and Scott in the State of Kentucky; Dearborn, Franklin, Ohio, Ripley, Switzerland, and parts of the Counties of Decatur, Fayette, Jefferson, Jennings, and Union County in the State of Indiana.

### ARTILCE 3

**Union Security:** The Employers agree to recognize the Union as the exclusive bargaining agent on all matters pertaining to wages, hours and other conditions of employment. As a condition of employment, all Employees covered by this Agreement shall, on the eighth (8th) day after date of hiring or eight (8) days after signing of this Agreement, whichever may occur later, become members of the Union and remain members in good standing in

the Union during the term of this Agreement. "Good Standing" for the purpose herein shall mean the tender of periodic dues and initiation fees uniformly required by the Union as a condition of acquiring or retaining membership in the Union.

The Employer will, immediately after it has been definitely established by written notification from the Union that an Employee is not in good standing, discharge such Employees as required in the aforementioned paragraph.

This clause shall be effective only in those states permitting Union security.

**ARTICLE 4**

**Protection of Union Principles:** The removal of journeymen Ironworkers and apprentices from a job in order to render legal assistance to other local Unions to protect Union principles shall not constitute a violation of this Agreement, provided such removal is first approved by the General Executive Board of the International Union and notice thereof is first given to the Employer involved.

**ARTICLE 5**

**Settlement of Disputes:** Any dispute as to the proper interpretation of this Agreement shall be handled as follows:

**Step 1.** Resolved between the Union and the Employer; if they fail to reach a settlement within five (5) working days proceed to Step 2 with written notice to the Union and the Steel Erectors, Fabricators and Riggers Association that the dispute has not been resolved at Step 1.

**Step 2.** The dispute is referred to the Joint Conference Committee (JCC) consisting of three (3) representatives from the Union and three (3) representatives from the Steel Erectors, Fabricators and Riggers Association who shall here and act upon the matter within ten (10) working days after receipt of the dispute. Unanimous decision of the JCC shall be final and binding on all parties. Matters not resolved by the JCC shall be referred to Step 3 within five (5) working days.

**Step 3.** The dispute is referred in writing to a Board of Arbitration composed of one(1) person appointed by each party, the two (2) so appointed to select a third member. In the event that the two (2) so appointed arbitrators are unable within two (2) days to agree upon the third arbitrator, they shall jointly request the presiding judge of the Hamilton County Court of Common Pleas to furnish a panel of five (5) judges of the Hamilton County Court of Common Pleas from which the third member shall be selected. The decision of the Board of Arbitration shall be handed down within two (2) days after the selection of the third member and the decision of the Board of Arbitration shall be final and binding upon both parties.

The Board of Arbitration shall have jurisdiction over all questions involving the interpretation and application of any section of this Agreement. It shall not, however, be empowered to handle negotiations for a new Agreement, changes in the wage scale, or jurisdictional disputes.

Each party shall individually pay the expenses of the arbitrator it appoints and the two parties shall jointly share the expense of the third arbitrator.

**ARTICLE 6**

**Bond:** The Union shall require Employers who have never employed Ironworkers within the territory of the Union, and any Employer that is over thirty (30) days in arrears in payment of contributions, interest, and/or liquidated damages, to procure, pay the premium for, and deliver to the Union a surety bond written by a responsible surety company in the penal sum of not less than $50,000.00, guaranteeing the payment of all contributions, interests, and liquidated damages which may become due to the Ironworkers District Council of Southern Ohio & Vicinity Welfare Trust, the Ironworkers district Council of Southern Ohio & Vicinity Pension Trust, and the Ironworkers District Council of Southern Ohio & Vicinity Annuity Trust, or any of them. Such bond shall also guarantee the payment of all wages, vacation fund deductions, dues check – offs, and other contractual obligations to those persons and entities to receive the same.

When an Employer is more than fifteen (15) days delinquent in making payments to the various funds, the Union may withhold its services upon a five (5) day notice to the Employer by certified mail.

**ARTICLE 7**

**Letters:** It is agreed that all Employers who are parties to this Agreement will furnish, upon request and with reasonable promptness, signed letters on company letterhead stating that they have performed specific items of work and paid the negotiated scale of wages on any and all jobs on which the Employer has utilized members of the Ironworkers International Union.

**ARTICLE 8**

**Strikes and Lockouts:** It is mutually agreed that there shall be not strikes authorized by the Union or no lockouts authorized by the Employer, except for the refusal of either party to submit to arbitration, in accordance with Article 5, or failure on the part of either party to carry out the award of the board of arbitration. Every facility of each of the parties hereto is hereby pledged to immediately overcome any such situation; provided, however it shall not be a violation of any provision of this Agreement for any person covered by this Agreement to refuse to cross or work behind the picket line of any affiliated Union which has been authorized by the International of that Union, the Central Labor Council or Building and Construction Trades Council.

**ARTICLE 9**

**Nondiscrimination:** The Employers and the Union agree they will not discriminate against any Employee or applicant for employment because of race, creed, color, sex, national origin or age. The parties further agree to abide by Executive Order 11246 and any other federal, state, county or city laws or ordinances establishing and extending equal employment opportunity. The Union agrees to furnish the Employer, upon request, any statement or data required to be filed under such laws or ordinances.

**ARTICLE 10**

**Compensation Insurance:** Worker's Compensation and Unemployment Insurance must at all times cover Ironworker Employees on all jobs. In states where private insurance is carried for this purpose the Employer must supply the Local Union with the name and address of the insurance company which handles the coverage on Employees covered by this Agreement.

**ARTICLE 11**

**Wage Rates:** Effective February 1st, 2012 through May 31st, 2014, the following minimum wage rates per hour shall apply to the following journeymen classifications: (Those persons who carry current welder Certifications and maintain continuity with the International Ironworkers Welder Certification program shall receive the appropriate pay listed below regardless of job being performed in the field. This list shall be supplied monthly by the local union with classification and any increase due from certifications. (Failure on the Unions part to forward this information may cause the increase from taking effect.)

This information is provided online as well by going to welderscertification.org and entering username: **readonly** and password: **readonly**.
The welder certification shall be for unlimited thickness material and all positions.

| **Craft Jurisdiction** | **2/1/12** | **6/1/12** | **6/1/13** |
|---|---|---|---|
| Structural | $25.10 | $24.80 | *25.00 |
| Ornamental | $25.10 | $24.80 | *25.00 |
| Machinery Movers, Rigger or Machinery Erectors | $25.10 | $24.80 | *25.00 |
| Journeyman Welder SMAW/ Current weld Certs required | $25.35 | $25.05 | *25.25 |
| Journeyman Welder FCAW/ Current weld Certs required | $25.35 | $25.05 | *25.25 |
| Journeyman Welder FCAW & SMAW/ Current weld Certs required (Highest Journeyman rate) | $25.60 | $25.30 | *25.50 |
| Sheeter | $25.10 | $24.80 | *25.00 |
| Conveyor Mechanic | $25.10 | $24.80 | *25.00 |
| Heavy/ Highway Maintenance Mechanic | $25.10 | $24.80 | *25.00 |
| Fence Erector | $22.80 | $22.50 | *22.70 |
| Residential Ironworker | $25.10 | $24.80 | *25.00 |

* If 650,000 or more hours are worked within the local during the previous fiscal year, as reported to the trust fund, an additional increase of $.25 cents will be added automatically. The hours worked shall be determined based off of fund office records for prior fiscal year ending January 31st.

The Union has the option to apply money from wages to fringe benefit plans with 30 days written notice.

**Foreman Wage Rates:** Foreman rates are based on the applicable craft rate. (Foreman who maintain the prescribed Journeyman welder rate shall have their Foreman rate based from that wage.)

Foreman 2 to 6 Employees ........... +$ 1.00
Foreman 7 or more Employees ...... +$ 1.50
General Foreman......................... +$ 2.00

**Apprentice Wage Rates:**
Starting Rate................................ 50% of Journeyman rate

Apprentice wage rates shall increase at a rate of 5% as the Apprentice completes the required curriculum and on the job training as per the Ironworkers Local 44 Joint Apprenticeship and Training Fund Standards. Those standards are to be determined by the Joint Management and Labor Trustees appointed by both parties represented here in.

**Overtime:** Overtime, unless otherwise provided for, shall be paid for any and all hours worked before and after the hours established in Article 22 of this Agreement. When an Employee begins overtime he/she shall remain on overtime until receiving a shift break of at least seven (7) hours prior to commencing work on the Employee's normally established shift. Overtime rates are to be calculated as follows:

**Premium Time:** The hours of work *immediately* following the scheduled quitting time each day, Monday through Friday, and the first ten (10) consecutive hours of work *immediately* following the scheduled starting time on Saturday shall be paid for at the rate of one and one half (1-1/2) time the regular hourly wage rates as enumerated above. When an Employee is provided one days notice to work Overtime, during the regular work week Monday thru Friday, the Employee must work the entire 8 hours (10 hours on a four ten hour job) before receiving the proper overtime wage rate.

**Double Time:** All hours paid in excess of the first two (2) hours *immediately* following the scheduled quitting time each day, Monday through Friday, and in excess of ten (10) consecutive hours *immediately* following the scheduled starting time on Saturday and all work performed on Sundays and Holidays shall be paid for at the rate of (2) times the regular hourly wage rates as enumerated in the first paragraph of this section. (Except where previously provided

**Prevailing Wage Rates:** When the prevailing rates established for a job or project by a public agency are less than those established by this Agreement, the Employers and the Union agree to meet and discuss a project Agreement for the work to be performed on the job or project.

## ARTICLE 12

**Transportation Expense:** There shall be no transportation expense allowed on the jobs within the thirty-one (31) mile radius of the Hamilton County Court House, Cincinnati, Ohio. When Employers are moved from shop to job or job to job during working hours, the Employees shall be paid the regular rate of wages and fringe benefits for the time spent traveling. Transportation expense beyond the thirty-one (31) mile radius shall be as follows:

Over 31 miles ............................................... $6.00 per day

Over 31 miles ............................................... $8.00 per day
**effective 6/1/13**

***Transportation expense is not subject to withholding taxes.***

## ARTICLE 13

**Benefit Plan:** Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated August 1, 1952 as amended and as the same may hereafter be amended from time to time, which established and which governs the operation of the Ironworkers District Council of Southern Ohio & Vicinity Benefit Plan. That document shall be deemed to be a part of this Collective Bargaining Agreement as though set forth herein at length, unless provided for in another agreement.
Each such Employer agrees to contribute to said Benefit Plan for each hour actually worked at the trade by each Employee who is covered by this Agreement, and for each hour for which wages are paid under other provisions of this Agreement, the following amount:
For each hour worked effective 2/1/2012 ........... $ 6.20

*For the duration of this contract any new or additional monies shall be removed from the wages set forth here-in.*

## ARTICLE 14

**Pension Plan:** Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated October 30, 1962, as amended and as the same may hereafter be amended from time to time, which established and which governs the operations of the Ironworkers District Council of Southern Ohio& Vicinity Pension Trust. That document shall be deemed to be a part of this collective Bargaining Agreement as though set forth herein at length, unless provided for in another Agreement.

Each such Employer agrees to contribute to said Pension trust for each hour actually worked at the trade by each Employee who is covered by this Agreement, and for each hour for which wages are paid under other provisions of this Agreement the following amounts:

For each hour worked effective 2/1/2012 .................. $ 8.00
For each hour worked effective 6/1/2012 .................. $ 8.30
For each hour worked effective 6/1/2013 .................. $ 8.60

*For the duration of this contract any new or additional monies shall be removed from the wages set forth here-in.*

## ARTICLE 15

**Annuity Plan:** Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated April 27, 1971, as amended and as the same may hereafter be amended from time to time which established and governs the operations of the Ironworkers District Council of Southern Ohio & Vicinity Annuity Trust. That document shall be deemed to be a part of this collective bargaining Agreement as though set forth herein at length, unless provided for in another agreement.

Each such Employer agrees to contribute to said Annuity Plan for each hour actually worked at the trade by each Employee who is covered by this Agreement, and for each hour for which ***wages are paid*** under other provisions of this Agreement, the following amounts:

Straight time hour .................................................. $3.00
Premium Time Hour.................................................. $4.50
Double Time Hour .................................................. $6.00

**Effective 2/1/2012 Apprentices who have signed an Apprenticeship Agreement with Ironworkers Local 44 after the effective date shall have Annuity Contributions set at:**

$.25 for the first year of training*
$.25 for the second year of training*
$.50 for the third year of training*
$1.00 during the fourth year of training*

***Premium & Double Time Hours are defined in Article 11, Overtime.**

*For all intents and purposes this Annuity Plan contribution is calculated as hours for which an Employee is paid including Apprentices.*

## ARTICLE 16

**Joint Apprentice & Training Committee Fund:** Each Employer who is subject to the provisions hereof shall be bound by all terms and provisions of the Agreement and Declaration of Trust dated March 23, 1960 as amended, and as same may hereafter be amended from time to time, which established and governs the operations of the Ironworkers Local # 44 Joint Apprentice & Training Committee Fund ("Fund"). That document shall be deemed to be a part of this Collective Bargaining Agreement as though set forth herein at length. Contributions to this Fund shall be paid into the Ironworkers Local # 44 Joint Apprentice & Training Committee Fund no later than the 15th day of the following month at the rate set Agreement may be reopened for the purpose of negotiating such a change.

The parties to this Agreement also seek to provide a safe, drug and alcohol free environment for Ironworkers. In seeking to provide a safe, drug and alcohol free workplace for all Ironworkers, the Union and the Employer will encourage Union contractors and Union members to work safely and prevent accidents. In support of this goal, both Union and Employer pledge their mutual cooperation as follows:

**Safety Program:** All Ironworkers employed in the jurisdiction of Local #44 shall complete one: (1) safety or continuing education course, as selected by the Ironworkers Local #44 Joint Apprentice & Training Committee ("JATC"), during each contract year (June 1 through May 31). Attendees may, at the discretion of the JATC
trustees, receive a stipend, in an amount to be determined by the JATC trustees, for attending courses available through the Ironworkers Local # 44 Joint Apprentice & Training Committee. There shall be no overtime pay or fringe benefit contributions made on hours paid for training. Courses will be developed and conducted by Ironworkers Local # 44 Joint Apprentice & Training Committee.

The Safety Program will increase awareness and better train and educate all participants in safety and first aid courses. It will also help eliminate the use of illegal drugs, maintain a workplace free from alcohol during working hours, and strive for an accident-free workplace by making available to journeyman and apprentices certain specified alcohol and / or drug treatment opportunities which are not otherwise provided for through the drug testing and alcohol policy set forth below in the Drug Testing & Alcohol Policy. This program will reward us with fewer lost time hours and equip the Ironworker to better handle emergencies at work and home as well.

**Drug Testing & Alcohol Policy:** The parties agree to a drug testing and alcohol policy that will help eliminate the use of illegal drugs, maintain a workplace free from alcohol during working hours, and strive for an accident-free workplace. This program will be administered solely by IMPACT National Substance Abuse Program. The parties identified above agree to cooperate in every reasonable manner with IMPACT to achieve a Drug and Alcohol Free Workplace. This testing program and its policies shall be the exclusive and only testing program recognized by the parties. This Program and its policies are intended to meet the requirements of Section 501(c)(3) of the Internal Revenue as amended by the Employee Retirement Income Security Act.

Any Ironworker not in compliance with the Drug and Alcohol Policy is not eligible for employment. And furthermore, it is understood and agreed that the Local Union shall not dispatch, nor an Employer hire, any Ironworker that has not met the requirements of this Article in an agreed upon time frame.

Each such Employer agrees to contribute to the Ironworkers Local # 44 Joint Apprentice & Training Committee Fund for each hour actually worked at the trade by each Employee who is covered by this Agreement, and for each hour for which wages are paid under other provisions of this Agreement, the following amount:

For each hour worked effective:
December 1st, 2010 ................................................ $0.60

## ARTICLE 17

**Ironworker Management Progressive Action Cooperative Trust (IMPACT fund):** In order to improve the economic competitiveness of the Ironworking industry, to establish innovative marketing program, to develop educational programs to advance safety and health, to assist in the establishment and maintenance of quality training and apprenticeship programs, to address issues of insurance and bonding affecting the industry,

to establish mechanisms to monitor and help enforce compliance with governmental laws, regulations and standards affecting the industry, to establish local and regional labor-management committee, to sponsor meetings, seminars and programs concerning issues affecting the industry. To facility the exchange of information between employers and Iron Workers and to establish alliances and mergers of existing trust, Employers will establish and fund IMPACT.

**Effective:2/1/ 2012**

Employers shall contribute ¼% of each employee gross while the Iron worker shall contribute ½% of their gross pay.

**Ironworkers International Organizing Fund:** Thru IMPACT each Ironworkers shall contribute ¼% of their gross pay to the Ironworkers International Organizing Fund. These monies will be remitted along with the additional ¾% to IMPACT thru the Southern Ohio District Council Fund Office.

***1% of gross pay shall be remitted for IMPACT:***
***¼% Employer contribution***
***¾% Employee contribution.***

**ARTICLE 18**

**Ironworkers Organizing and Marketing Plan:** In order to promote, communicate and market the Ironworking industry, it's Signatory Contractors, the Unionized Ironworker and the benefits of Organized labor as a local and viable presence in the Construction market, each employer agrees to deduct the amount following from each employee and remit same on or before the fifteenth of the month following the work performed for each actual hour worked at the trade for each employee covered under this agreement.

February 1st, 2012 ................................................ $0.52

**Article 19**

**Construction Advancement Program of Greater Cincinnati:** It is understood that Allied Construction Industries of Cincinnati ("Allied Construction Industries"), an Ohio corporation not for profit, has established, by a Declaration of Trust, a fund (herein called the "Fund") putting into effect the Construction Advancement Program of Greater Cincinnati, the purposes of such program to be to generally promote and improve the construction industry in the Greater Cincinnati area, including, without limiting the generality of the foregoing, development of relations with others (including the public, architects, suppliers and labor), educational programs, the preparation and distribution of collective bargaining Agreements (including pension, health and welfare plans), providing services in connection with the administration of pension, health and welfare plans, and other matters of general benefit to the industry; provided that the activities shall not include the influencing of legislation, the providing of financial aid to Employers or Employees during work stoppages, or making any payments, except for services actually rendered in connection with the program to any members or officers of Allied Construction Industries or of any other Employer contributing to the Fund. It is understood that each Employer will be furnished with a copy of the Declaration of Trust upon request and that, subject to the foregoing limitations such Declaration of Trust may be amended from time to time by Allied Construction Industries.

The contributions to this Fund shall be paid monthly, on or before the 15th day of the following month in which the work is performed.

Each such Employer agrees to contribute to said Construction Advancement Program for each hour actually worked at the trade by each Employee who is covered by this Agreement, **the following amount:**

For each hour worked effective December 1st 2010........... $0.10

**Article 20**

**Check-Off/Working Dues:** Effective June 1, 2001 and continuing thereafter during the term of this Agreement, and in accordance with the terms of an individual and voluntary authorization for check-off of Membership Dues and Working Dues in the form agreed upon by the parties hereto, and permitted by the provisions of Section 302(c) of the Labor Management Relations Act, as amended, the Employer agrees to deduct once each week from the wages of each Employee covered by this Agreement who signs such authorization the following amounts:

For each hour worked effective February 1st, 2012:
Dues Check-Off ..................................$0.03 per hour worked
Working Dues......................................4.5% of gross wages
Effective 6/1/2012 Working Dues-...........4 % of gross wages
IPAL...................................................$.08 per hour worked

The amount deducted shall be remitted to the Union by the 15th day of the following month together with a statement setting forth the name and hours paid of each Employee from whose wages the deduction is made.

Employers making late deposits (after the 15th of the month) to the Depository of the withholdings from Employees' wages for Dues Check-Off and Working Dues, shall be assessed interest at the rate of one and one half percent (1-1/2%) per month on the amount past due, such interest to be added to the amount due the Union.

**Article 21**

**Vacation:** Any Employee desiring to take time off from work for a vacation must make arrangements with his Employer at least two weeks prior to the start of the vacation period. No more than 20% of the Employees from any one job or from any one Employer shall take time off for vacation at the same time, unless otherwise agreed by the Employer.

**Article 22**

**Work Hours Per Day:** Eight (8) consecutive hours, exclusive of a one half (1/2) hour scheduled lunch period between the hours of 6:30 A.M. and 4:30 P.M. shall constitute a work day, and from Monday through Friday the work week.

Changes in the work hours per day in special cases, not however, to exceed an eight (8) hour day, may be made to meet special conditions upon notification to the Union. Changes in the work hours per day for a period longer than two (2) days must be mutually agreed upon by the Union and the Employer. The Employer and the Union agree that it is the intent and goal of this section to have at least eight (8) hours of employment provided unless other provisions of this agreement preclude such employment.

**Beverage:** Employees will be permitted to take a non-alcoholic beverage to their place of work for consumption as time and the work schedule allow.

**Supper Break:** An Employee required to work more than ten (10) hours in any one (1) day shall receive a thirty (30) minute **paid** supper break effective upon the commencement of the eleventh (11th) hour. If the Employee agrees to work through the supper break, one-half (1/2) hour at the double-time (2x)

rate shall be added to the actual hours paid for at the completion of that shift.

**Pick-up/Clean-up:** Employees shall be allowed no less than fifteen (15) minutes prior to the end of the work shift for clean-up, picking up of the Employer's and Employee's tools, and securing of the Employer's equipment. However, this should not be construed to mean that the Employee may leave the job or project prior to the regularly scheduled quitting time without permission from the Employer.

**Standard Four/Ten Hour Jobs:** By mutual agreement between the Union and the Employer or when bid documents require, a job may be worked on a four (4) day ten (10) hour basis and worked at the regular straight time rate and this shall constitute a forty (40) hour week. However, at no time shall an Agreement to work four/tens on one job be construed to mean another job may be worked under the same conditions without the same mutual agreement.

All 4/10 jobs will be scheduled beginning on Monday at the starting time mutually agreed upon between the Union and the Employer. When the four (4) day ten (10) hour option is exercised, it must remain in effect for the full work week or until job completion, whichever occurs first, provided that the job runs a minimum of one work week. All Employees of the Employer covered by this Agreement on a particular job must come under this provision.

**Work Hours/Work Week:** Ten (10) consecutive hours, exclusive of a one half (1/2) hour scheduled lunch period between the hours of 6:00 A.M. and 6:00 P.M. shall constitute a work day and from Monday through Thursday the work week.

Work performed before and after the regular 4/10 work hours Monday through Thursday, Friday if applicable, Sunday and Holidays will be paid for at the double time rate. Up to ten (10) hours of work performed on Friday, other than on a make-up day, shall be paid for at the premium time (1-1/2x) rate.

The provisions covering beverages, supper break and pick-up/clean-up time also apply to 4/10 jobs.

**Shifts:** When a four (4) day week is being utilized and two (2) shifts are scheduled, the first or day shift shall consist of ten (10) hours work for ten (10) hours pay and the second shift shall consist of nine and one half (9 1/2) hours worked for ten (10) hours pay. In the event an Employee elects to work less than a full shift he will be paid for the hours actually worked.

Employer contributions to fringe funds and withholdings provided by this Agreement for Employees on a second shift shall be at the rate of ten (10) hours of pay for nine and one half (9 1/2) hours of work.

**Friday Make-up Day:** Due to inclement weather or other conditions beyond the Employer's control, a Friday make-up day may be scheduled with the following provisions:

**A)** The make-up day is voluntary for each individual Employee and the Employee shall not be discriminated against with regard to lay-off for refusing to work.

**B)** The make-up day shall be scheduled for ten (10) hours work, weather permitting work.

**C)** Hours worked within the scheduled work hours, (not to exceed forty (40) hours in a work week) shall be paid at the straight time rate. Hours in excess of forty (40) hours shall be paid at the applicable overtime rate.

**D)** The make-up day may not be used to make-up a recognized holiday.

## Article 23

**Reporting Time:** When an Employee is requested and dispatched from the Union hall, on the first (1st) day of employment the Employee shall be paid the hourly wage rate commencing at job starting time until work is completed that day or job quitting time, whichever occurs first; provided, however, said Employee arrives at the jobsite within a reasonable amount of time. The Employee will be given a dispatch slip signed by the Business Manager or Business Agent showing the time the Employee was dispatched from the Union hall.

Reporting time as described herein is not a travel expense and should not be confused with Article 12, "Transportation Expense".

When an Employee is ordered by the Employer or his representative to report for work and then, through no fault of the Employee is not put to work; (except for weather conditions that do not permit work) the Employee shall receive two (2) hours pay.

When an Employee starts to work, the Employee shall receive a minimum of two (2) hours pay. When an Employee works more than two (2) hours, the Employee shall be paid for the actual hours worked.

In all instances where reporting time is applicable the Employee must remain on the job or project for the hours paid for unless released earlier by the foreman or person in charge.

Employers shall not be liable for reporting time for Employees who report for work without proper tools as set forth in Article 34.

On Saturdays, Sundays and Holidays reporting time shall be paid at the applicable overtime rate.

## Article 24

**Shift Work:** When two (2) or three (3) shifts are worked, Employees on the first shift shall be paid at the rate of eight (8) hours pay for eight (8) hours work, Employees on the second shift shall be paid at the rate of eight (8) hours pay for seven and one half (7 1/2) hours work and Employees on the third shift shall be paid at the rate of eight (8) hours pay for seven (7) hours work.

The rate for shift time work performed on Saturdays, Sundays or Holidays shall start with the first or "morning shift".

Employer contributions to fringe funds and withholdings provided by this Agreement for Employees on a second shift shall be at the rate of eight (8) hours of contributions for seven and one half (7 1/2) hours of work and for Employees on a third shift shall be at the rate of eight (8) hours of contributions for seven (7) hours of work.

**On New Construction Work:** Not more than one (1) shift shall be allowed on a job of less than five (5) days duration except in case of an emergency, which shall be decided by the General Executive Board.

Notwithstanding the contents of the above paragraph, the General Executive Board, in special instances and cases, may determine that the contents of the above paragraph shall not apply and in such cases may specially provide for shift work and payment for such shift work.

**On Renovation, Alteration and Repair Work:** Shift work shall be performed by standard uniform rules established by the General Executive Board.

## Article 25

**Holidays:** The following holidays shall be observed on those days as recognized nationally: New Year's Day, Federal Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. No work shall be performed on Labor Day except to save life or property.

Any holiday which occurs on a Sunday shall be observed the following Monday.

**Article 26**

**Payday:** Unless mutually agreed upon between the Union and the Employer, the regular payday shall be once a week on Friday
(except four (4) ten (10) hour jobs in which case the payday shall be Thursday) and the Employer may withhold where necessary a reasonable amount of wages due, not to exceed three (3) days, to enable them to prepare the payroll.

Wages shall be paid **before** the established quitting time either in cash or by payroll check. Employees not receiving their pay by quitting time on the regular payday shall be entitled to receive four (4) hours of compensation at the regular straight time wage for each twenty-four (24) hour waiting period or any portion thereof.

Accompanying each payment of wages shall be a separate statement identifying the Employee, showing the total earnings, deductions and net earnings. The Employee must be able to easily identify the hours which were actually worked and the hours for which the Employee was paid from said statement. If an employer so desires and an employee agrees, paychecks, including layoff checks, may be direct deposited into the employees account on the normal payday, or on the day of layoff. Late deposits due to holidays will not incur the penalties here-in described.

**Layoff:** When Employees are laid off, or discharged, they shall be paid in full in cash or payroll check on the job immediately, and allowed fifteen (15) to thirty (30) minutes to pick up tools as job conditions warrant. **Layoff is payoff.** If required to go to some other point or to the office of the Employer, the Employees shall be paid for the time required to go to such places.

If special circumstances exist relative to overtime hours, weekend work and remuneration for Employees during hours when the Employer's payroll department may be closed, Employee checks shall be prepared and furnished promptly upon resumption of the first normal business day. If circumstances occur that would cause an employer to be unable to provide a paycheck on the following business day, the paycheck shall be next day shipped to the address provided to them by the employee.

Accompanying the layoff check there shall be a termination slip showing the reason for the termination. When Employees quit of their own accord, they shall wait until the regular payday for the wages due them.

When jobs are closed or shut down for one (1) or two (2) days, due to events or conditions over which the employer has no control, the Employee may request his/her check in which case the Employer will have the check sent to the job if time permits. If circumstances preclude this, the Employee may pick up the check at the Employer's office on the Employee's time.

If any undue delay, or loss of time causes the Employees, through no fault of their own, and where the previous paragraph is not applicable, shall be paid for by the Employer causing such delay or loss of time, at the regular straight time wages unless previously agreed to with consent of the union.

**Article 27**

**Foremen:** When two (2) or more Employees are employed, one shall be selected by the Employer to act as foreman and receive foreman's wages. The designated foreman is the only representative of the Employer who shall issue instructions to the workers. The Employer may employ on one piece of work as many foremen as in his judgment is necessary for the safe, expeditious and economical handling of the same.

Unless mutually agreed upon between the Union and the Employer, an apprentice Ironworker shall not be designated as a foreman, nor shall an apprentice Ironworker issue instructions to a journeyman member.

If the first foreman is not a member of Local Union #44, the second foreman shall be a member of Local Union #44 and 50-50 thereafter, provided they meet the standards set forth by the Employer.

If the general foreman is not a member of Local Union #44, then he shall be counted as the first foreman and the second foreman shall be a member of Local Union #44 and 50-50 thereafter, provided they meet the standards set forth by the Employer. If not, the Employer shall replace him with another member of Local #44. When there are eighteen (18) or more Ironworkers employed by an Employer on a job, there shall be three (3) foremen included, one of whom shall be designated by the Employer as general foreman.

No foreman shall have more than ten (10) Ironworkers under his supervision at any one time.

**Article 28**

**Apprenticeship:** The parties signatory hereto agree to establish a Joint Apprenticeship Committee in accordance with the provisions of the "Ironworkers Apprenticeship and Training Standards", as contained in Section 1, Article 23 of the International Constitution. Said Committee shall formulate and operate an Apprenticeship Program in the local area in conformity with said standards.

**Structural Ironwork**: an Apprentice Ratio of the first two workers hired to be journeymen Ironworkers, the second two would be Apprentices if available. The following two hired would again be Journeymen and the next two Apprentices if available. The next 6 would be all Journeyman and this ratio shall repeat.

**Miscellaneous Steel, Ornamental Ironwork, Glasswork, Fence Erection, Sheeting and Metal Building Construction projects**: A ratio of 1:1 One (1) Journeyman to One (1) Apprentice. (On projects that require 6 men or more the ratio shall change to 2:1 Two (2) Journeymen to One (1) Apprentice beginning with the 7th man.) Apprentices shall be dispatched as available.

**Industrial Maintenance:** projects that do not fall under the guidelines of an National Maintenance Agreement qualification if available the Apprentice ratio of 2 Journeyman followed by 2 Apprentices. 2:2 shall apply.

**Article 29**

**Jobsite Access:** The Business Representatives of the Union shall be permitted to visit all jobs, but will in no way interfere with the progress of the work. Prior to visiting the jobsite, the Business Representatives should first report to the project supervisor or job foreman.

**Article 30**

**Welding Conditions**

**Welders' Helpers:** When welding on steel skeletons or when scaffolding is used, welders shall be provided with Ironworker assistance for the safety of the welders at the discretion of the Employer. However, no welder shall be required to work alone out of the view of another worker.

**Certification of Welders:** When certified welding is a job requirement, the Union shall furnish, if available, such personnel. If a certified welder is not available through Ironworkers Local #44, the Employer agrees to pay the cost of certification, including the applicable hourly wage, for Ironworkers who have papers showing certification within the past three years, or have proof of previous qualification.

In the event the Employee fails to certify the first test and the

Employer wishes to have the Employee take a second test, the Employer agrees to pay the cost of certification. However, it is agreed that the applicable hourly wage will be paid only if the second test is successful.

**When the cost of testing an employee on site is paid for by the employer,** it is agreed that the Employer may retain the certification papers until the job completion or until the welding work for the contractor is completed. All papers will then be turned over to the Employee or sent to Local #44.

## ARTICLE 31

**Working Conditions**

**Shipping Employees:** Employees shipped to jobs or work out of the jurisdiction of the local Union shall receive transportation, traveling time and expenses provided they do not leave the job of their own accord prior to thirty (30) days or prior to the job completion if the job requires less than thirty (30) days. Employees shipped to a job and not put to work, weather permitting, or the job is not ready for them to go to work, shall be paid the regular wage for such time, or such Employees shall be shipped back to the shipping point with time and transportation paid by the Employer.

**Piecework:** It is further agreed that the Employees will not contract, subcontract, work piecework, or work for less than the scale of wages established by this Agreement. The Employer agrees not to offer and/or pay, and the Employees will not accept, a bonus based on specific performance on any individual job.

**Work Limitation:** There shall be no limitation placed on the amount of work to be performed by any Employee during working hours.

**Ironworkers Required on Structural Steel Erection:** No less than six (6) Ironworkers and a foreman shall be employed around any Guy or Stiff Leg Derrick used on steel erection. On all power operated rigs of any description used on steel erection, no less than four (4) Ironworkers and a foreman shall be employed, except as follows: In cases due to Market Conditions, less than 5 men may be used provided that the Contractor and the Union Agree. The work will be done in a safe manner.

On projects where the significant amount of the work to be performed is the installation of lightweight structural members or open web steel joist the amount of men required in the raising gang shall be determined by the Contractor based upon the work being completed in a safe manner.

**Shelter:** Each job of sufficient size and length to justify same, shall be provided with a trailer, shed or room for the Employees to change their clothes and keep their tools. The Trailer shall be provided with adequate heating facilities and be of adequate size to accommodate all employees of the employer.

**Drinking Water:** The Employer shall furnish suitable drinking water and paper drinking cups at all times. Ice water shall be furnished during the months of April through October, or as weather and/or job site permits.

## Article 32

**Safety Provisions**

**Safety:** The job steward shall refer to the Employer any and all hazards on the job. Such hazards shall be remedied to comply with all applicable safety codes.

**Planking Floors:** On working floors, upon which derricks are set, the floors must be covered tight with suitable planking over the entire floor (except where openings are left for ladders). No more than two (2) floors, or a maximum of twenty-five (25) feet, beneath each work scaffold shall remain open or uncovered, and all such floors shall be planked and within a minimum radius of ten (10) feet.

**Stiffening and Supporting Working Load Points:** Where iron is landed on the floor or any point of a structure under construction, all connections shall be fully fitted up and tightened and substantial supports provided to safely sustain such added weight.

**Riding the Load or Load Falls:** No Employee shall be permitted to ride the load or load fall (except in case of inspection, and erection and dismantling of derricks).

**Slings:** Undamaged steel cable will be used instead of chains or hemp slings.

**Protection of Signal Devices:** Proper practical safe housing, casing or tube shall be provided for any and every means, method, appliance or equipment employed to transmit or give signals, directing work or operation of any and various devices in connection with work being done by Employees.

**Elevator Shaft Protection:** No Employee will be permitted to work in an elevator shaft while car is in operation. The first floor beneath and the first floor above Employees working shall be planked safe in all elevator shafts.

**Bridge Jobs Over Water:** On all bridge jobs being constructed over the Ohio River, the Employer shall employ one or more Ironworkers, other than the steward, with able swimming ability, and furnish him with a safety boat or boats which shall not be less than 16 feet long and 54 inches in beam with built-in floatation, propelled by not less than a 25 horsepower motor to enable him to patrol the water area beneath the workers during all working hours while Ironworkers are working on such jobs. Boat or boats are to be used for the safety of Employees only. No Ironworker shall be above or on water unless the safety boat is in position. On all other bridge jobs over water of five (5) feet or more in depth, the same rules shall apply except the boat is to be of adequate size to perform the service.

**Floats for Working Scaffold:** Floats or needle beams must be hung for the safe working conditions of Ironworkers while working on steel.

**Power Line Protection:** Will comply with the applicable safety code.

**Fire Watcher:** If an Employer employs a fire watcher, he shall be an Ironworker.

**Protective Clothes:** Welder's sleeves, gloves, hoods, burning goggles and strikers will be made available on the job for Employees' use when at the discretion of the foreman they are necessary for the Employees' safety and protection. Such equipment shall remain the property of the Employer. When hard hats, metatarsal protective shields, face shields, prescription safety glasses, ear plugs, full body harness with lanyard and other safety items are a condition of employment, they shall be furnished or Employee reimbursed once annually per approved purchases. The Employer may require the Employee to sign a receipt when equipment is issued and if not returned upon separation of employment, the Employer may deduct the cost of same from the Employee's pay. All conditions shall comply with the applicable OSHA standard.

**Injured Employees:** When an Employee is injured and must be taken to a physician or hospital for treatment, he shall be paid for the hours scheduled for that day at the applicable rate if not permitted to return to the job on the day of injury. The injured Employee's ability to work or not work shall be determined by a qualified physician.

**Shear Connectors:** Employees will not be required to erect steel with shear connectors or any other similar fixtures on the walking surface of beams.

**Article 33**

**Tools:** Employees employed on work claimed by Ironworkers Local #44 shall furnish the necessary hand tools to perform such work. The following list shall be construed as the minimum tool requirement.

**STRUCTURAL WORK Tools**

1-belt & bolt bag 1-6' rule or 25' tape
1-3/4" spud wrench 1-50' tape
1-7/8" spud wrench 1-hammer, 4 lb. or heavier
1-bull pin 1-pocket knife 1-12" crescent wrench

**ORNAMENTAL/CONVEYOR/MAINTENANCE WORK**

| | |
|---|---|
| 1-12" hack saw | 1-pliers - channel locks |
| 1-12" combination square | 1-pliers - slip joint |
| 1-plumb bob and line | 1-pliers - Kleins |
| 1-chalk line | 1-center punch |
| 1-6' rule | 1-24" level |
| 1-50' tape | 2-aligning pins |
| 1-divider | 1-pocket knife |
| 1-scriber | 2-C clamps |
| 1-tap wrench | 2-vise grips |
| 1-set allen wrenches | 1-ball peen hammer |
| 1-set open end wrenches | 1-set of chisels |
| 3-crescent wrenches, 8", 10", 12" | |
| 1-1/2" ratchet & socket wrenches | |
| 3-Phillips screwdrivers, #1, #2, #3 | |
| 3-slot screwdrivers, 6", 8", 12" | |

All other tools required shall be furnished by the Employer. Employees shall be held responsible for tools, equipment and accessories furnished by the Employer while being used by the Employees or in their possession. Employees shall use proper judgment in the use and care of these items while they are in their possession. Normal breakage and unavoidable loss of Employer's tools or Employees' tools shall be assumed by the Employer upon presentation by Employee of satisfactory evidence of breakage, loss or theft.

**Article 34**

**Job Steward:** There shall be a job steward on each job who shall be appointed by the Business Manager or Business Agent. He shall keep a record of the workers laid off and discharged and take up all grievances on the job and try to have the same adjusted. In the event he cannot adjust them he must promptly report that fact to the Business Manager or Business Agent, who shall report same to the proper officer of the Union so that efforts can be made to adjust any matter without a stoppage of work.

The job steward shall see that the provisions of this Agreement are complied with and report to the Union the true conditions and facts. He shall promptly take care of injured workers and accompany them to their homes or for treatment as the case may require, without any loss of time and report the injury to the proper officers of the Union.

If a job is temporarily shut down for any reason, the job steward shall remain on the job so long as any other Employee of the Employer covered by this Agreement remains on the job and performs manual work covered by this Agreement. The Employer agrees that the job steward will not be discharged until after proper notification has been given to the Union, and further, when Employees are laid off, the job steward will be the last of the working force laid off, providing he is capable of performing the work in question.

It is further understood that a job steward's duties shall not include the hiring, referral or termination of Employees.

**Article 35**

**Scope of Agreement:** This Agreement contains all of the provisions agreed upon by the Employers and the Union. Neither the Employers nor the Union will be bound by rules, regulations or Agreements not herein contained except interpretations or decisions of the Board of Arbitration.

**Article 36**

**Savings Clause:** Should any part of or any provision herein contained be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portions of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation the parties signatory hereto agree to immediately meet to renegotiate such parts or provisions affected.

The remaining parts or provisions will remain in full force and effect.

**Article 37**

**Lists:** The Steel Erectors, Fabricators and Riggers Association shall furnish the Union with a list of its membership and the Union will furnish the Association with a list of contractors who sign this Agreement within 30 days following the effective date of such membership or becoming signatory to the contract.

**Article 38**

**Duration and Termination:** This Agreement shall become effective on the 1st day of February, 2012, and remain in full force and effect except as otherwise provided herein, until the 31st day of May 2014, and shall automatically renew itself from year to year thereafter unless written notice to terminate or amend the Agreement is given by either party not less than one hundred twenty (120) days prior to the expiration date or any subsequent renewal thereof. For the purposes of this Article 38, written notice shall be by Certified Mail, addressed to the Labor Relations Division of the Steel Erectors, Fabricators and Riggers Association or Ironworkers Local #44, and notification shall be considered effective on the date of mailing.

If, during the initial or any subsequent term of this Agreement, any Federal law or legislation is enacted, whether involving or arising out of Federal statute or statutory amendment or regulations thereto, that would otherwise alter or expand the Employees, positions, job classifications, bargaining units, projects, geographic area or business enterprises or entities, to which or to whom this Agreement relates, the parties hereto agree to meet and discuss any provision in this Agreement that may be affected by such legislation. Such discussions shall be considered a re-opener of negotiations on only such affected provisions, and the remaining articles in the Agreement shall remain in full force and effect.

If notice of termination shall be given, negotiations for a new Agreement shall take place during the one hundred twenty (120) days prior to its expiration.

If notice to amend shall be given, such notice shall set forth the proposed amendments and the parties shall promptly meet to negotiate with respect to the proposed amendments. In the event that negotiations for a new Agreement shall continue beyond the expiration of the term of this Agreement, this Agreement shall continue in full force and effect, provided, however, that either party may then terminate this Agreement upon ten (10) days written notice to the other party.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date and year first written, in the City of Cincinnati, State of Ohio

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL AND REINFORCING IRONWORKERS
LOCAL UNION #44
1125 Victory Place Hebron KY 41048
859-586-2100 fax:859-586-0862

By Title

Signature Date

**FOR THE EMPLOYER**
Please Print or Type

Employer

Address

City State Zip

Phone Fax

Company Officer

Title

Signature Date

**We certify that this is a true copy of the "FORM OF AGREEMENT"**

John Baugh, President
International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers Local Union #44

Tina Lainhart, Executive Director
Steel Erectors, Fabricators and Riggers Association
3 Kovach Drive, Lockland, Ohio 45215
Phone 513-475-5730 Fax: 513-475-5731

12

**Territorial Jurisdiction of Ironworkers Local 44**

Rush
Union
Butler
Warren
Clinton
Franklin
Decatur
Hamilton
Dearborn
Ripley
Highland
Clermont
Brown
Boone
Ohio
Kenton
Campbell
Adams
Switzerland
Jefferson
Gallatin
Bracken
Grant
Trimble
Mason
Lewis
Owen
Henry
Harrison
Robertson
Oldham
Fleming
Nicholas
Scott
Bourbon
Shelby
Rowan

SOFCO000131



# Collective Bargaining Agreement

Between the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers Local 44

and the

Steel Erectors, Fabricators and Riggers Association

Labor Relations Division

Cincinnati Division

August 27, 2014 through May 31, 2018

## INDEX

PREAMBLE .......... Page 2
NEGOTIATING AGENT .......... Page 2
CRAFT JURISDICTION .......... Article 1
TERRITORY .......... Article 2
UNION SECURITY .......... Article 3
PROTECTION OF UNION PRINCIPLES .. Article 4
SETTLEMENT OF DISPUTES .......... Article 5
BOND .......... Article 6
LETTERS .......... Article 7
STRIKES AND LOCKOUTS .......... Article 8
NONDISCRIMINATION .......... Article 9
COMPENSATION INSURANCE .......... Article 10
WAGE RATES .......... Article 11
TRANSPORTATION EXPENSE .......... Article 12
BENEFIT PLAN .......... Article 13
PENSION PLAN .......... Article 14
ANNUITY PLAN .......... Article 15
APPRENTICESHIP TRAINING FUND ...... Article 16
IMPACT FUND .......... Article 17
Ironworker Organizing and Marketing Plan Article 18
Construction Advancement Program ........ Article 19
CHECK-OFF .......... Article 20
VACATION NOTIFICATION .......... Article 21
WORK HOURS PER DAY .......... Article 22
REPORTING TIME .......... Article 23
SHIFT WORK .......... Article 24
HOLIDAYS .......... Article 25
PAY DAY .......... Article 26
FOREMEN .......... Article 27
APPRENTICESHIP .......... Article 28
JOBSITE ACCESS .......... Article 29
WELDERS .......... Article 30
WORKING CONDITIONS .......... Article 31
SAFETY PROVISIONS .......... Article 32
TOOLS .......... Article 33
JOB STEWARD .......... Article 34
SCOPE OF WORK .......... Article 35
SAVINGS CLAUSE .......... Article 36
LISTS .......... Article 37
DURATION AND TERMINATION .......... Article 38

*This Agreement is made and entered into this 27th day of August, 2014, by and between the Steel Erectors, Fabricators and Riggers Association, Labor Relations Division, 3 Kovach Drive, Lockland, Ohio 45215, hereinafter referred to as the "Association" and/or "Employer" and Local Union #44 of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers (affiliated with the AFL-CIO) hereinafter referred to as the "Union", and/or "Employees".*

## PREAMBLE

This Agreement is entered into by collective bargaining to prevent strikes and lockouts and to facilitate peaceful adjustment of grievances and disputes between the Union and the Employer in this trade and to prevent waste, unnecessary and avoidable delays, and expense, and, so far as possible, to provide for labor's continuous employment, such employment to be in accordance with the conditions herein set forth and at wages agreed upon; also, that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions and further the establishment of the necessary procedures by which these ends may be accomplished.

## NEGOTIATING AGENT

It is understood and agreed that the Steel Erectors, Fabricators and Riggers Association, Labor Relations Division, is the sole bargaining agent in the negotiation of this "Form of Agreement" for any and all signatory Employers of Ironworkers within the jurisdiction of Ironworkers Local #44, and by signing said Agreement, the Employer hereby assigns bargaining rights to the Association. And further, the Employer recognizes Ironworkers Local #44 as the sole bargaining agent in the negotiation of the "Form of Agreement" for its members and hereby acknowledges that the Union is representative of a majority of its Ironworker Employees, and agrees to be bound by the terms and conditions of this Collective Bargaining Agreement, including all renewals, extensions and renegotiated provisions thereof.

In no event shall the Association be bound as principal or be held liable in any manner for any breach of this Agreement by any of the Employers or Employees of such Employers, or the Union. It is further agreed that any breach of this "Form of Agreement," duly signed by any Employer, shall be several, not joint.

## ARTICLE 1

**Craft Jurisdiction:** It is agreed that the jurisdiction of work covered by this Agreement is that provided for in the charter grant issued by the American Federation of Labor to the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, and the jurisdictional claims of the International Association of Bridge, Structural, Ornamental and

Reinforcing Ironworkers are subject to trade Agreements and final decisions of the AFL-CIO.

The jurisdiction of work referred to in this Article is the jurisdiction of work claimed by the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, and nothing contained herein shall make it mandatory for the Employer to accept the claims of jurisdiction as being binding upon him. The Employer does not waive any of his rights be permitting the inclusion of the jurisdiction of work in this Agreement.

**See Appendix B**

## ARTICLE 2

**Territory:** The territory covered by this Agreement shall be the territorial jurisdiction of Local Union #44, which covers the Counties of Brown, Clermont and Hamilton, and parts of the Counties of Adams, Butler, Clinton, Highland and Warren in the State of Ohio; Boone, Bourbon, Bracken, Campbell, Gallatin, Grant, Harrison, Kenton, Nicholas, Pendleton, Robertson, and parts of the Counties of Carroll, Fleming, Mason, Montgomery, Owen and Scott in the State of Kentucky; Dearborn, Franklin, Ohio, Ripley, Switzerland, and parts of the Counties of Decatur, Fayette, Jefferson, Jennings, and Union County in the State of Indiana.

## ARTILCE 3

**Union Security:** The Employers agree to recognize the Union as the exclusive bargaining agent on all matters pertaining to wages, hours and other conditions of employment. As a condition of employment, all Employees covered by this Agreement shall, on the eighth (8th) day after date of hiring or eight (8) days after signing of this Agreement, whichever may occur later, become members of the Union and remain members in good standing in the Union during the term of this Agreement. "Good Standing" for the purpose herein shall mean the tender of periodic dues and initiation fees uniformly required by the Union as a condition of acquiring or retaining membership in the Union.

The Employer will, immediately after it has been definitely established by written notification from the Union that an Employee is not in good standing, discharge such Employees as required in the aforementioned paragraph.

This clause shall be effective only in those states permitting Union security.

## ARTICLE 4

**Protection of Union Principles:** The removal of journeymen Ironworkers and apprentices from a job in order to render legal assistance to other local Unions to protect Union principles shall not constitute a violation of this Agreement, provided such removal is first approved by the General Executive Board of the International Union and notice thereof is first given to the Employer involved.

## ARTICLE 5

**Settlement of Disputes:** Any dispute as to the proper interpretation of this Agreement shall be handled as follows:

**Step 1.** Resolved between the Union and the Employer; if they fail to reach a settlement within five (5) working days proceed to Step 2 with written notice to the Union and the Steel Erectors, Fabricators and Riggers Association that the dispute has not been resolved at Step 1.

**Step 2.** The dispute is referred to the Joint Conference Committee (JCC) consisting of three (3) representatives from the Union and three (3) representatives from the Steel Erectors, Fabricators and Riggers Association who shall here and act upon the matter within ten (10) working days after receipt of the dispute. Unanimous decision of the JCC shall be final and binding on all parties. Matters not resolved by the JCC shall be referred to Step 3 within five (5) working days.

**Step 3.** The dispute is referred in writing to a Board of Arbitration composed of one(1) person appointed by each party, the two (2) so appointed to select a third member. In the event that the two (2) so appointed arbitrators are unable within two (2) days to agree upon the third arbitrator, they shall jointly request the presiding judge of the Hamilton County Court of Common Pleas to furnish a panel of five (5) judges of the Hamilton County Court of Common Pleas from which the third member shall be selected. The decision of the Board of Arbitration shall be handed down within two (2) days after the selection of the third member and the decision of the Board of Arbitration shall be final and binding upon both parties.

The Board of Arbitration shall have jurisdiction over all questions involving the interpretation and application of any section of this Agreement. It shall not, however, be empowered to handle negotiations for a new Agreement, changes in the wage scale, or jurisdictional disputes.

Each party shall individually pay the expenses of the arbitrator it appoints and the two parties shall jointly share the expense of the third arbitrator.

### ARTICLE 6

**Bond:** The Union shall require Employers who have never employed Ironworkers within the territory of the Union, and any Employer that is over thirty (30) days in arrears in payment of contributions, interest, and/or liquidated damages, to procure, pay the premium for, and deliver to the Union a surety bond written by a responsible surety company in the penal sum of not less than $50,000.00, guaranteeing the payment of all contributions, interests, and liquidated damages which may become due to the Ironworkers District Council of Southern Ohio & Vicinity Welfare Trust, the Ironworkers district Council of Southern Ohio & Vicinity Pension Trust, and the Ironworkers District Council of Southern Ohio & Vicinity Annuity Trust, or any of them. Such bond shall also guarantee the payment of all wages, vacation fund deductions, dues check – offs, and other contractual obligations to those persons and entities to receive the same.

When an Employer is more than fifteen (15) days delinquent in making payments to the various funds, the Union may withhold its services upon a five (5) day notice to the Employer by certified mail.

### ARTICLE 7

**Letters:** It is agreed that all Employers who are parties to this Agreement will furnish, upon request and with reasonable promptness, signed letters on company letterhead stating that they have performed specific items of work and paid the negotiated scale of wages on any and all jobs on which the Employer has utilized members of the Ironworkers International Union.

### ARTICLE 8

**Strikes and Lockouts:** It is mutually agreed that there shall be not strikes authorized by the Union or no lockouts authorized by the Employer, except for the refusal of either party to submit to arbitration, in accordance with Article 5, or failure on the part of either party to carry out the award of the board of arbitration. Every facility of each of the parties hereto is hereby pledged to immediately overcome any such situation; provided, however it shall not be a violation of any provision of this Agreement for any person covered by this Agreement to refuse to cross or work behind the picket line of any affiliated Union which has been authorized by the International of that Union, the Central Labor Council or Building and Construction Trades Council.

### ARTICLE 9

**Nondiscrimination:** The Employers and the Union agree they will not discriminate against any Employee or applicant for employment because of race, creed, color, sex, national origin, age. The parties further agree to abide by Executive Order 11246 and any other federal, state, county or city laws or ordinances establishing and extending equal employment opportunity. The Union agrees to furnish the Employer, upon request, any statement or data required to be filed under such laws or ordinances.

### ARTICLE 10

**Compensation Insurance:** Worker's Compensation and Unemployment Insurance must at all times cover Ironworker Employees on all jobs. In states where private insurance is carried for this purpose the Employer must supply the Local Union with the name and address of the insurance company which handles the coverage on Employees covered by this Agreement.

### ARTICLE 11

**Wage Rates:** Effective August 27, 2014 through May 31st, 2018, the following minimum wage rates per hour shall apply to the following journeymen classifications: (Those persons who carry current welder Certifications and maintain continuity with the International Ironworkers Welder Certification program shall receive the appropriate pay listed below regardless of job being performed in the field. This list shall be supplied monthly by the local union with classification and any increase due from certifications. (Failure on the Unions part to forward this information may cause the increase from taking effect.)

This information is provided online as well by going to welderscertification.org and entering username: **readonly** and password: **readonly**.

The welder certification shall be for unlimited thickness material and all positions.

**See page 16 for wage schedules**

The Union has the option to apply money from wages to fringe benefit plans with 30 days written notice.

**Foreman Wage Rates:** Foreman rates are based on the applicable craft rate. (Foreman who maintain the

prescribed Journeyman welder rate shall have their Foreman rate based from that wage.)

Foreman 2 to 6 Employees .......................... $1.25
Foreman 7 or more Employees .................. $1.75
General Foreman ...................................... $2.25

No Foreman will be allowed to take the place of a Journeyman, unless the Journeyman is unable, unwilling or unqualified to work.

**Apprentice Wage Rates:**
Starting Rate ......................55% of Journeyman rate

Apprentice wage rates shall increase at a rate of 5% as the Apprentice completes the required curriculum and on the job training as per the Ironworkers Local 44 Joint Apprenticeship and Training Fund Standards. Those standards are to be determined by the Joint Management and Labor Trustees appointed by both parties represented here in.

**Overtime:** Overtime, unless otherwise provided for, shall be paid for any and all hours worked before and after the hours established in Article 22 of this Agreement. When an Employee begins overtime he/she shall remain on overtime until receiving a shift break of at least seven (7) hours prior to commencing work on the Employee's normally established shift. Overtime rates are to be calculated as follows:

**Premium Time:** The hours of work *immediately* following the scheduled quitting time each day, Monday through Friday, and the first ten (10) consecutive hours of work *immediately* following the scheduled starting time on Saturday shall be paid for at the rate of one and one half (1-1/2) time the regular hourly wage rates as enumerated above. When an Employee is provided one days notice to work Overtime, during the regular
work week Monday thru Friday, the Employee must work the entire 8 hours (10 hours on a four ten hour job) before receiving the proper overtime wage rate.

**Double Time:** All hours paid in excess of the first two (2) hours *immediately* following the scheduled quitting time each day, Monday through Friday, and in excess of ten (10) consecutive hours *immediately* following the scheduled starting time on Saturday and all work performed on Sundays and Holidays shall be paid for at the rate of (2) times the regular hourly wage rates as enumerated in the first paragraph of this section. (Except where previously provided

**Prevailing Wage Rates:** When the prevailing rates established for a job or project by a public agency are less than those established by this Agreement, the Employers and the Union agree to meet and discuss a project Agreement for the work to be performed on the job or project.

## ARTICLE 12

**Transportation Expense:** There shall be no transportation expense allowed on the jobs within the thirty-one (31) mile radius of the Hamilton County Court House, Cincinnati, Ohio. When Employers are moved from shop to job or job to job during working hours, the Employees shall be paid the regular rate of wages and fringe benefits for the time spent traveling. Transportation expense beyond the thirty-one (31) mile radius shall be as follows:

Over 31 miles ..................................$8.00 per day

***Transportation expense is not subject to withholding taxes.***

## ARTICLE 13

**Benefit Plan:** Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated August 1, 1952 as amended and as the same may hereafter be amended from time to time, which established and which governs the operation of the Ironworkers District Council of Southern Ohio & Vicinity Benefit Plan. That document shall be deemed to be a part of this Collective Bargaining Agreement as though set forth herein at length, unless provided for in another agreement.

Each such Employer agrees to contribute to said Benefit Plan for each hour actually worked at the trade by each Employee who is covered by this Agreement, and for each hour for which wages are paid under other provisions of this Agreement, the following amount:

For each hour worked effective 8/27/14 .............. $6.35
*For the duration of this contract any new or additional monies shall be removed from the wages set forth here-in.*

## ARTICLE 14

**Pension Plan:** Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated October 30, 1962, as amended and as the same may hereafter be amended from time to time, which established and which governs the operations of the Ironworkers District Council of Southern Ohio&

Vicinity Pension Trust. That document shall be deemed to be a part of this collective Bargaining Agreement as though set forth herein at length, unless provided for in another Agreement.

Each such Employer agrees to contribute to said Pension trust for each hour actually worked at the trade by each Employee who is covered by this Agreement, and for each hour for which wages are paid under other provisions of this Agreement the following amounts:

For each hour worked effective 6/1/14......... $ 8.90
For each hour worked effective 6/1/15......... $ 9.20
For each hour worked effective 6/1/16......... $ 9.50
For each hour worked effective 6/1/17......... $ 9.50

*For the duration of this contract any new or additional monies shall be removed from the wages set forth here-in.*

**ARTICLE 15**

**Annuity Plan:** Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated April 27, 1971, as amended and as the same may hereafter be amended from time to time which established and governs the operations of the Ironworkers District Council of Southern Ohio & Vicinity Annuity Trust. That document shall be deemed to be a part of this collective bargaining Agreement as though set forth herein at length, unless provided for in another agreement.

Each such Employer agrees to contribute to said Annuity Plan for each hour actually worked at the trade by each Employee who is covered by this Agreement, and for each hour for which ***wages are paid*** under other provisions of this Agreement, the following amounts:

Straight time hour ....................................... $3.00
Premium Time Hour .................................. $4.50
Double Time Hour ..................................... $6.00

**Effective 2/1/2012 Apprentices who have signed an Apprenticeship Agreement with Ironworkers Local 44 after the effective date shall have Annuity Contributions set at:**

$.25 for the first year of training*
$.25 for the second year of training*
$.50 for the third year of training*
$1.00 during the fourth year of training*

***Premium & Double Time Hours are defined in Article 11, Overtime.**

*For all intents and purposes this Annuity Plan contribution is calculated as hours for which an Employee is paid including Apprentices.*

**ARTICLE 16**

**Joint Apprentice & Training Committee Fund:** Each Employer who is subject to the provisions hereof shall be bound by all terms and provisions of the Agreement and Declaration of Trust dated March 23, 1960 as amended, and as same may hereafter be amended from time to time, which established and governs the operations of the Ironworkers Local # 44 Joint Apprentice & Training Committee Fund ("Fund"). That document shall be deemed to be a part of this Collective Bargaining Agreement as though set forth herein at length. Contributions to this Fund shall be paid into the Ironworkers Local # 44 Joint Apprentice & Training Committee Fund no later than the 15th day of the following month at the rate set Agreement may be reopened for the purpose of negotiating such a change.

The parties to this Agreement also seek to provide a safe, drug and alcohol free environment for Ironworkers. In seeking to provide a safe, drug and alcohol free workplace for all Ironworkers, the Union and the Employer will encourage Union contractors and Union members to work safely and prevent accidents. In support of this goal, both Union and Employer pledge their mutual cooperation as follows:

**Safety Program:** All Ironworkers employed in the jurisdiction of Local #44 shall complete one: (1) safety or continuing education course, as selected by the Ironworkers Local #44 Joint Apprentice & Training Committee ("JATC"), during each contract year (June 1 through May 31). Attendees may, at the discretion of the JATC trustees, receive a stipend, in an amount to be determined by the JATC trustees, for attending courses available through the Ironworkers Local # 44 Joint Apprentice & Training Committee. There shall be no overtime pay or fringe benefit contributions made on hours paid for training. Courses will be developed and conducted by Ironworkers Local # 44 Joint Apprentice & Training Committee.

The Safety Program will increase awareness and better train and educate all participants in safety and first aid courses. It will also help eliminate the use of illegal drugs, maintain a workplace free from alcohol during working hours, and strive for an accident-free workplace by making available to journeyman and apprentices certain specified alcohol and / or drug

treatment opportunities which are not otherwise provided for through the drug testing and alcohol policy set forth below in the Drug Testing & Alcohol Policy. This program will reward us with fewer lost time hours and equip the Ironworker to better handle emergencies at work and home as well.

**Drug Testing & Alcohol Policy**: The parties agree to a drug testing and alcohol policy that will help eliminate the use of illegal drugs, maintain a workplace free from alcohol during working hours, and strive for an accident-free workplace. This program will be administered solely by IMPACT National Substance Abuse Program. The parties identified above agree to cooperate in every reasonable manner with IMPACT to achieve a Drug and Alcohol Free Workplace. This testing program and its policies shall be the exclusive and only testing program recognized by the parties. This Program and its policies are intended to meet the requirements of Section 501(c)(3) of the Internal Revenue as amended by the Employee Retirement Income Security Act.

Any Ironworker not in compliance with the Drug and Alcohol Policy is not eligible for employment. And furthermore, it is understood and agreed that the Local Union shall not dispatch, nor an Employer hire, any Ironworker that has not met the requirements of this Article in an agreed upon time frame.

Each such Employer agrees to contribute to the Ironworkers Local # 44 Joint Apprentice & Training Committee Fund for each hour actually worked at the trade by each Employee who is covered by this Agreement, and for each hour for which wages are paid under other provisions of this Agreement, the following amount:

For each hour worked effective:
December 1st, 2010 .................................. $0.60

## ARTICLE 17

**Ironworker Management Progressive Action Cooperative Trust (IMPACT fund):** In order to improve the economic competitiveness of the Ironworking industry, to establish innovative marketing program, to develop educational programs to advance safety and health, to assist in the establishment and maintenance of quality training and apprenticeship programs, to address issues of insurance and bonding affecting the industry, to establish mechanisms to monitor and help enforce compliance with governmental laws, regulations and standards affecting the industry, to establish local and regional labor-management committee, to sponsor meetings, seminars and programs concerning issues affecting the industry. To facility the exchange of information between employers and Iron Workers and to establish alliances and mergers of existing trust, Employers will establish and fund IMPACT.

**Effective: 8/27/14**

Employers shall contribute 3/8% (0.375) of each employees hourly pay while the Iron Worker shall contribute 5/8% (0.625) of their hourly pay

**Ironworkers International Organizing Fund:** Thru IMPACT each Ironworkers shall contribute 3/8% of their Hourly pay to the Ironworkers International Organizing Fund. These monies will be remitted along with the additional 5/8% to IMPACT thru the Southern Ohio District Council Fund Office.

***1% of hourly pay shall be remitted for IMPACT:***
***3/8 % Employer contribution***
***5/8% Employee contribution.***

## ARTICLE 18

**Ironworkers Organizing and Marketing Plan:** In order to promote, communicate and market the Ironworking industry, it's Signatory Contractors, the Unionized Ironworker and the benefits of Organized labor as a local and viable presence in the Construction market, each employer agrees to deduct the amount following from each employee and remit same on or before the fifteenth of the month following the work performed for each actual hour worked at the trade for each employee covered under this agreement.

February 1st, 2012 .................................... $0.52

## Article 19

**Construction Advancement Program of Greater Cincinnati:** It is understood that Allied Construction Industries of Cincinnati ("Allied Construction Industries"), an Ohio corporation not for profit, has established, by a Declaration of Trust, a fund (herein called the "Fund") putting into effect the Construction Advancement Program of Greater Cincinnati, the purposes of such program to be to generally promote and improve the construction industry in the Greater Cincinnati area, including, without limiting the generality of the foregoing, development of relations with others (including the public, architects, suppliers and labor), educational programs, the preparation and distribution of collective bargaining Agreements (including pension, health and welfare plans), providing services in connection with the administration of pension, health and welfare plans, and other matters of general benefit to the industry;

provided that the activities shall not include the influencing of legislation, the providing of financial aid to Employers or Employees during work stoppages, or making any payments, except for services actually rendered in connection with the program to any members or officers of Allied Construction Industries or of any other Employer contributing to the Fund. It is understood that each Employer will be furnished with a copy of the Declaration of Trust upon request and that, subject to the foregoing limitations such Declaration of Trust may be amended from time to time by Allied Construction Industries.

The contributions to this Fund shall be paid monthly, on or before the 15th day of the following month in which the work is performed.

Each such Employer agrees to contribute to said Construction Advancement Program for each hour actually worked at the trade by each Employee who is covered by this Agreement**, the following amount:**

For each hour worked effective 12/1/10............ $0.10

### Article 20

**Check-Off/Working Dues:** Effective June 1, 2001 and continuing thereafter during the term of this Agreement, and in accordance with the terms of an individual and voluntary authorization for check-off of Membership Dues and Working Dues in the form agreed upon by the parties hereto, and permitted by the provisions of Section 302(c) of the Labor Management Relations Act, as amended, the Employer agrees to deduct once each week from the wages of each Employee covered by this Agreement who signs such authorization the following amounts:.
For each hour worked effective February 1st, 2012:
Dues Check-Off ..................... $0.03 per hour worked
Effective 6/1/2014 Working Dues- 6% of gross wages
IPAL ...................................... $.08 per hour worked

The amount deducted shall be remitted to the Union by the 15th day of the following month together with a statement setting forth the name and hours paid of each Employee from whose wages the deduction is made.

Employers making late deposits (after the 15th of the month) to the Depository of the withholdings from Employees' wages for Dues Check-Off and Working Dues, shall be assessed interest at the rate of one and one half percent (1-1/2%) per month on the amount past due, such interest to be added to the amount due the Union.

### Article 21

**Vacation:** Any Employee desiring to take time off from work for a vacation must make arrangements with his Employer at least two weeks prior to the start of the vacation period. No more than 20% of the Employees from any one job or from any one Employer shall take time off for vacation at the same time, unless otherwise agreed by the Employer.

### Article 22

**Work Hours Per Day:** Eight (8) consecutive hours, exclusive of a one-half (1/2) hour scheduled lunch between the third (3rd) and sixth (6th) hours (unless mutually agreed upon by the Employer and the Business Manager), shall constitute a work day. At no time can a lunch period not be taken. An eight hour (8) hour shift, between the hours of 6:30 am and 4:30 pm, shall constitute a work day and from Monday to Friday a work week. Changes in the work hours per day in special cases, not however, to exceed an eight (8) hour day, may be made to meet special conditions upon notification to the Union. Changes in the work hours per day for a period longer than two (2) days must be mutually agreed upon by the Union and the Employer. The Employer and the Union agree that it is the intent and goal of this section to have at least eight (8) hours of employment provided unless other provisions of this agreement preclude such employment.

**Saturday Make-up Day:** On projects when contractually required, Saturday may be considered a voluntary make-up day if the job is weathered out. Employees choosing to work this day at straight time will be scheduled for an eight hour shift and shall be paid for actual hours worked. Any hours worked beyond 40 hours for the week shall be at the overtime rate.

The make-up is voluntary for each individual employee and the employee shall not be discriminated against with regards to lay-off, recall, or promotion for refusing to work on Saturday.

**Break:** There shall be a break between starting time and lunch time; however, there will be no general shutdown of the job or work.

**Supper Break:** An Employee required to work more than ten (10) hours in any one (1) day shall receive a thirty (30) minute **paid** supper break effective upon the commencement of the eleventh (11th) hour. If the Employee agrees to work through the supper break, one-half (1/2) hour at the double-time (2x) rate shall be added to the actual hours paid for at the completion of that shift.

**Pick-up/Clean-up:** Employees shall be allowed no less than fifteen (15) minutes prior to the end of the work shift for clean-up, picking up of the Employer's and Employee's tools, and securing of the Employer's equipment. However, this should not be construed to mean that the Employee may leave the job or project prior to the regularly scheduled quitting time without permission from the Employer.

**Standard Four/Ten Hour Jobs:** By mutual agreement between the Union and the Employer or when bid documents require, a job may be worked on a four (4) day ten (10) hour basis and worked at the regular straight time rate and this shall constitute a forty (40) hour week. However, at no time shall an Agreement to work four/tens on one job be construed to mean another job may be worked under the same conditions without the same mutual agreement.

All 4/10 jobs will be scheduled beginning on Monday at the starting time mutually agreed upon between the Union and the Employer. When the four (4) day ten (10) hour option is exercised, it must remain in effect for the full work week or until job completion, whichever occurs first, provided that the job runs a minimum of one work week. All Employees of the Employer covered by this Agreement on a particular job must come under this provision.

**Work Hours/Work Week:** Ten (10) consecutive hours, exclusive of a one half (1/2) hour scheduled lunch period between the third (3rd) and sixth (6th) hours unless mutually agreed upon by the Employer and the Business Manager), shall constitute a work day. At no time can a lunch period not be taken. A ten (10) hour shift between the hours of 6:00 am and 6:00 pm shall constitute a work day and from Monday through Thursday the work week.

Work performed before and after the regular 4/10 work hours Monday through Thursday, Friday if applicable, Sunday and Holidays will be paid for at the double time rate. Up to ten (10) hours of work performed on Friday, other than on a make-up day, shall be paid for at the premium time (1-1/2x) rate.

The provisions covering beverages, supper break and pick- up/clean-up time also apply to 4/10 jobs.

**Shifts:** When a four (4) day week is being utilized and two (2) shifts are scheduled, the first or day shift shall consist of ten (10) hours work for ten (10) hours pay and the second shift shall consist of nine and one half (9 1/2) hours worked for ten (10) hours pay. In the event an Employee elects to work less than a full shift he will be paid for the hours actually worked.

Employer contributions to fringe funds and withholdings provided by this Agreement for Employees on a second shift shall be at the rate of ten (10) hours of pay for nine and one half (9 1/2) hours of work.

**Friday Make-up Day:** Due to inclement weather or other conditions beyond the Employer's control, a Friday make-up day may be scheduled with the following provisions:

**A)** The make-up day is voluntary for each individual Employee and the Employee shall not be discriminated against with regard to lay-off for refusing to work.

**B)** The make-up day shall be scheduled for ten (10) hours work, weather permitting work.

**C)** Hours worked within the scheduled work hours, (not to exceed forty (40) hours in a work week) shall be paid at the straight time rate. Hours in excess of forty (40) hours shall be paid at the applicable overtime rate.

**D)** The make-up day may not be used to make-up a recognized holiday.

## Article 23

**Reporting Time:** When an Employee is requested and dispatched from the Union hall, on the first (1st) day of employment the Employee shall be paid the hourly wage rate commencing at job starting time until work is completed that day or job quitting time, whichever occurs first; provided, however, said Employee arrives at the jobsite within a reasonable amount of time. The Employee will be given a dispatch slip signed by the Business Manager or Business Agent showing the time the Employee was dispatched from the Union hall.

Reporting time as described herein is not a travel expense and should not be confused with Article 12, "Transportation Expense".

When an Employee is ordered by the Employer or his representative to report for work and then, through no fault of the Employee is not put to work; (except for weather conditions that do not permit work) the Employee shall receive two (2) hours pay.

When an Employee starts to work, the Employee shall receive a minimum of two (2) hours pay. When an Employee works more than two (2) hours, the Employee shall be paid for the actual hours worked.

In all instances where reporting time is applicable the Employee must remain on the job or project for the hours paid for unless released earlier by the foreman or person in charge.

Employers shall not be liable for reporting time for Employees who report for work without proper tools as set forth in Article 34.

On Saturdays, Sundays and Holidays reporting time shall be paid at the applicable overtime rate.

### Article 24

**Shift Work:** When two (2) or three (3) shifts are worked, Employees on the first shift shall be paid at the rate of eight (8) hours pay for eight (8) hours work, Employees on the second shift shall be paid at the rate of eight (8) hours pay for seven and one half (7 1/2) hours work and Employees on the third shift shall be paid at the rate of eight (8) hours pay for seven (7) hours work.

The rate for shift time work performed on Saturdays, Sundays or Holidays shall start with the first or "morning shift".

Employer contributions to fringe funds and withholdings provided by this Agreement for Employees on a second shift shall be at the rate of eight (8) hours of contributions for seven and one half (7 1/2) hours of work and for Employees on a third shift shall be at the rate of eight (8) hours of contributions for seven (7) hours of work.

**On New Construction Work:** Not more than one (1) shift shall be allowed on a job of less than five (5) days duration except in case of an emergency, which shall be decided by the General Executive Board.

Notwithstanding the contents of the above paragraph, the General Executive Board, in special instances and cases, may determine that the contents of the above paragraph shall not apply and in such cases may specially provide for shift work and payment for such shift work.

**On Renovation, Alteration and Repair Work:** Shift work shall be performed by standard uniform rules established by the General Executive Board.

### Article 25

**Holidays:** The following holidays shall be observed on those days as recognized nationally: New Year's Day, Federal Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. No work shall be performed on Labor Day except to save life or property.

Any holiday which occurs on a Sunday shall be observed the following Monday.

### Article 26

**Payday:** Unless mutually agreed upon between the Union and the Employer, the regular payday shall be once a week on Friday (except four (4) ten (10) hour jobs in which case the payday shall be Thursday) and the Employer may withhold where necessary a reasonable amount of wages due, not to exceed three (3) days, to enable them to prepare the payroll.

Wages shall be paid **before** the established quitting time either in cash or by payroll check. Employees not receiving their pay by quitting time on the regular payday shall be entitled to receive four (4) hours of compensation at the regular straight time wage for each twenty-four (24) hour waiting period or any portion thereof.

Accompanying each payment of wages shall be a separate statement identifying the Employee, showing the total earnings, deductions and net earnings. The Employee must be able to easily identify the hours which were actually worked and the hours for which the Employee was paid from said statement. If an employer so desires and an employee agrees, paychecks, including layoff checks, may be direct deposited into the employees account on the normal payday, or on the day of layoff. Late deposits due to holidays will not incur the penalties here-in described.

**Layoff:** When Employees are laid off, or discharged, they shall be paid in full in cash or payroll check on the job immediately, and allowed fifteen (15) to thirty (30) minutes to pick up tools as job conditions warrant. **Layoff is payoff.** If required to go to some other point or to the office of the Employer, the Employees shall be paid for the time required to go to such places.

If special circumstances exist relative to overtime hours, weekend work and remuneration for Employees during hours when the Employer's payroll department may be closed, Employee checks shall be prepared and furnished promptly upon resumption of the first normal business day. If circumstances occur that would cause an employer to be unable to provide a paycheck on the following business day, the paycheck shall be next day shipped to the address provided to them by the employee.

Accompanying the layoff check there shall be a termination slip showing the reason for the termination. When Employees quit of their own accord, they shall wait until the regular payday for the wages due them.

When jobs are closed or shut down for one (1) or two (2) days, due to events or conditions over which the employer has no control, the Employee may request his/her check in which case the Employer will have the check sent to the job if time permits. If circumstances preclude this, the Employee may pick up the check at the Employer's office on the Employee's time.

If any undue delay, or loss of time causes the Employees, through no fault of their own, and where

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-3 Filed: 01/14/20 Page: 444 of 549 PAGEID #: 610

the previous paragraph is not applicable, shall be paid for by the Employer causing such delay or loss of time, at the regular straight time wages unless previously agreed to with consent of the union.

### Article 27

**Foremen:** When two (2) or more Employees are employed, one shall be selected by the Employer to act as foreman and receive foreman's wages. The designated foreman is the only representative of the Employer who shall issue instructions to the workers. The Employer may employ on one piece of work as many foremen as in his judgment is necessary for the safe, expeditious and economical handling of the same.

Unless mutually agreed upon between the Union and the Employer, an apprentice Ironworker shall not be designated as a foreman, nor shall an apprentice Ironworker issue instructions to a journeyman member.

If the first foreman is not a member of Local Union #44, the second foreman shall be a member of Local Union #44 and 50-50 thereafter, provided they meet the standards set forth by the Employer.

If the general foreman is not a member of Local Union #44, then he shall be counted as the first foreman and the second foreman shall be a member of Local Union #44 and 50-50 thereafter, provided they meet the standards set forth by the Employer. If not, the Employer shall replace him with another member of Local #44. When there are eighteen (18) or more Ironworkers employed by an Employer on a job, there shall be three (3) foremen included, one of whom shall be designated by the Employer as general foreman.

No foreman shall have more than ten (10) Ironworkers under his supervision at any one time.

### Article 28

**Apprenticeship:** The parties signatory hereto agree to establish a Joint Apprenticeship Committee in accordance with the provisions of the "Ironworkers Apprenticeship and Training Standards", as contained in Section 1, Article 23 of the International Constitution. Said Committee shall formulate and operate an Apprenticeship Program in the local area in conformity with said standards.

**Structural Ironwork**: an Apprentice Ratio of the first two workers hired to be journeymen Ironworkers, the second two would be Apprentices if available. The following two hired would again be Journeymen and the next two Apprentices if available. The next 6 would be all Journeyman and this ratio shall repeat.

**Miscellaneous Steel, Ornamental Ironwork, Glasswork, Fence Erection, Sheeting and Metal Building Construction projects**: A ratio of 1:1 One (1) Journeyman to One (1) Apprentice. (On projects that require 6 men or more the ratio shall change to 2:1 Two (2) Journeymen to One (1) Apprentice beginning with the 7th man.) Apprentices shall be dispatched as available.

**Industrial Maintenance:** projects that do not fall under the guidelines of an National Maintenance Agreement qualification if available the Apprentice ratio of 2 Journeyman followed by 2 Apprentices. 2:2 shall apply.

### Article 29

**Jobsite Access:** The Business Representatives of the Union shall be permitted to visit all jobs, but will in no way interfere with the progress of the work. Prior to visiting the jobsite, the Business Representatives should first report to the project supervisor or job foreman.

### Article 30

**Welding Conditions**

**Welders' Helpers:** When welding on steel skeletons or when scaffolding is used, welders shall be provided with Ironworker assistance for the safety of the welders at the discretion of the Employer. However, no welder shall be required to work alone out of the view of another worker.

**Certification of Welders:** When certified welding is a job requirement, the Union shall furnish, if available, such personnel. If a certified welder is not available through Ironworkers Local #44, the Employer agrees to pay the cost of certification, including the applicable hourly wage, for Ironworkers who have papers showing certification within the past three years, or have proof of previous qualification.

In the event the Employee fails to certify the first test and the Employer wishes to have the Employee take a second test, the Employer agrees to pay the cost of certification. However, it is agreed that the applicable hourly wage will be paid only if the second test is successful.

**When the cost of testing an employee on site is paid for by the employer,** it is agreed that the Employer may retain the certification papers until the job completion or until the welding work for the contractor is completed. All papers will then be turned over to the Employee or sent to Local #44.

## ARTICLE 31

**Working Conditions**

**Shipping Employees:** Employees shipped to jobs or work out of the jurisdiction of the local Union shall receive transportation, traveling time and expenses provided they do not leave the job of their own accord prior to thirty (30) days or prior to the job completion if the job requires less than thirty (30) days. Employees shipped to a job and not put to work, weather permitting, or the job is not ready for them to go to work, shall be paid the regular wage for such time, or such Employees shall be shipped back to the shipping point with time and transportation paid by the Employer.

**Piecework:** It is further agreed that the Employees will not contract, subcontract, work piecework, or work for less than the scale of wages established by this Agreement. The Employer agrees not to offer and/or pay, and the Employees will not accept, a bonus based on specific performance on any individual job.

**Work Limitation:** There shall be no limitation placed on the amount of work to be performed by any Employee during working hours.

**Ironworkers Required on Structural Steel Erection:** No less than six (6) Ironworkers and a foreman shall be employed around any Guy or Stiff Leg Derrick used on steel erection. On all power operated rigs of any description used on steel erection, no less than four (4) Ironworkers and a foreman shall be employed, except as follows: In cases due to Market Conditions, less than 5 men may be used provided that the Contractor and the Union Agree. The work will be done in a safe manner.

On projects where the significant amount of the work to be performed is the installation of lightweight structural members or open web steel joist the amount of men required in the raising gang shall be determined by the Contractor based upon the work being completed in a safe manner.

**Shelter:** Each job of sufficient size and length to justify same, shall be provided with a trailer, shed or room for the Employees to change their clothes and keep their tools. The Trailer shall be provided with adequate heating facilities and be of adequate size to accommodate all employees of the employer.

**Drinking Water:** The Employer shall within one hour of starting time furnish suitable drinking water and paper drinking cups at all times, unless provided by the owner. Ice water shall be furnished during the months of April through October, or as weather and/or job site permits.

## Article 32

**Safety Provisions**

**Safety:** The job steward shall refer to the Employer any and all hazards on the job. Such hazards shall be remedied to comply with all applicable safety codes.

**Planking Floors:** On working floors, upon which derricks are set, the floors must be covered tight with suitable planking over the entire floor (except where openings are left for ladders). No more than two (2) floors, or a maximum of twenty-five (25) feet, beneath each work scaffold shall remain open or uncovered, and all such floors shall be planked and within a minimum radius of ten (10) feet.

**Stiffening and Supporting Working Load Points:** Where iron is landed on the floor or any point of a structure under construction, all connections shall be fully fitted up and tightened and substantial supports provided to safely sustain such added weight.

**Riding the Load or Load Falls:** No Employee shall be permitted to ride the load or load fall (except in case of inspection, and erection and dismantling of derricks).

**Slings:** Undamaged steel cable will be used instead of chains or hemp slings.

**Protection of Signal Devices:** Proper practical safe housing, casing or tube shall be provided for any and every means, method, appliance or equipment employed to transmit or give signals, directing work or operation of any and various devices in connection with work being done by Employees.

**Elevator Shaft Protection:** No Employee will be permitted to work in an elevator shaft while car is in operation. The first floor beneath and the first floor above Employees working shall be planked safe in all elevator shafts.

**Bridge Jobs Over Water:** On all bridge jobs being constructed over the Ohio River, the Employer shall employ one or more Ironworkers, other than the steward, with able swimming ability, and furnish him with a safety boat or boats which shall not be less than 16 feet long and 54 inches in beam with built-in floatation, propelled by not less than a 25 horsepower motor to enable him to patrol the water area beneath the workers during all working hours while Ironworkers are working on such jobs. Boat or boats are to be used for the safety of Employees only. No Ironworker shall be above or on water unless the safety boat is in position. On all other bridge jobs over water of five (5) feet or more in depth, the same rules shall apply except the boat is to be of adequate size to perform the service.

**Floats for Working Scaffold:** Floats or needle beams must be hung for the safe working conditions of Ironworkers while working on steel.

**Power Line Protection:** Will comply with the applicable safety code.

**Fire Watcher:** If an Employer employs a fire watcher, he shall be an Ironworker.

**Protective Clothes:** Welder's sleeves, gloves, hoods, burning goggles and strikers will be made available on the job for Employees' use when at the discretion of the foreman they are necessary for the Employees' safety and protection. Such equipment shall remain the property of the Employer. When hard hats, metatarsal protective shields, face shields, prescription safety glasses, ear plugs, full body harness with lanyard and other safety items are a condition of employment, they shall be furnished or Employee reimbursed once annually per approved purchases. The Employer may require the Employee to sign a receipt when equipment is issued and if not returned upon separation of employment, the Employer may deduct the cost of same from the Employee's pay. All conditions shall comply with the applicable OSHA standard.

**Injured Employees:** When an Employee is injured and must be taken to a physician or hospital for treatment, he shall be paid for the hours scheduled for that day at the applicable rate if not permitted to return to the job on the day of injury. The injured Employee's ability to work or not work shall be determined by a qualified physician.

**Shear Connectors:** Employees will not be required to erect steel with shear connectors or any other similar fixtures on the walking surface of beams.

## Article 33

**Tools:** Employees employed on work claimed by Ironworkers Local #44 shall furnish the necessary hand tools to perform such work. The following list shall be construed as the minimum
tool requirement.

**STRUCTURAL WORK Tools**

1-belt & bolt bag 1-6' rule or 25' tape
1-3/4" spud wrench 1-50' tape
1-7/8" spud wrench 1-hammer, 4 lb. or heavier
1-bull pin 1-pocket knife 1-12" crescent wrench

**ORNAMENTAL/CONVEYOR/MAINTENANCE WORK**

| | |
|---|---|
| 1-12" hack saw | 1-pliers - channel locks |
| 1-12" combination square | 1-pliers - slip joint |
| 1-plumb bob and line | 1-pliers - Kleins |
| 1-chalk line | 1-center punch |
| 1-6' rule | 1-24" level |
| 1-50' tape | 2-aligning pins |
| 1-divider | 1-pocket knife |
| 1-scriber | 2-C clamps |
| 1-tap wrench | 2-vise grips |
| 1-set allen wrenches | 1-ball peen hammer |
| 1-set open end wrenches | 1-set of chisels |

3-crescent wrenches, 8", 10", 12"
1-1/2" ratchet & socket wrenches
3-Phillips screwdrivers, #1, #2, #3
3-slot screwdrivers, 6", 8", 12"

All other tools required shall be furnished by the Employer. Employees shall be held responsible for tools, equipment and accessories furnished by the Employer while being used by the Employees or in their possession. Employees shall use proper judgment in the use and care of these items while they are in their possession. Normal breakage and unavoidable loss of Employer's tools or Employees' tools shall be assumed by the Employer upon presentation by Employee of satisfactory evidence of breakage, loss or theft.

## Article 34

**Job Steward:** There shall be a job steward on each job who shall be appointed by the Business Manager or Business Agent. He shall keep a record of the workers laid off and discharged and take up all grievances on the job and try to have the same adjusted. In the event he cannot adjust them he must promptly report that fact to the Business Manager or Business Agent, who shall report same to the proper officer of the Union so that efforts can be made to adjust any matter without a stoppage of work.

The job steward shall see that the provisions of this Agreement are complied with and report to the Union the true conditions and facts. He shall promptly take care of injured workers and accompany them to their homes or for treatment as the case may require, without any loss of time and report the injury to the proper officers of the Union.

If a job is temporarily shut down for any reason, the job steward shall remain on the job so long as any other Employee of the Employer covered by this Agreement remains on the job and performs manual work covered by this Agreement. The Employer agrees that the job steward will not be discharged until after proper notification has been given to the Union, and further, when Employees are laid off, the job

steward will be the last of the working force laid off, providing he is capable of performing the work in question.

It is further understood that a job steward's duties shall not include the hiring, referral or termination of Employees.

### Article 35

**Scope of Agreement:** This Agreement contains all of the provisions agreed upon by the Employers and the Union. Neither the Employers nor the Union will be bound by rules, regulations or Agreements not herein contained except interpretations or decisions of the Board of Arbitration.

### Article 36

**Savings Clause**: Should any part of or any provision herein contained be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portions of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation the parties signatory hereto agree to immediately meet to renegotiate such parts or provisions affected.

The remaining parts or provisions will remain in full force and effect.

### Article 37

**Lists:** The Steel Erectors, Fabricators and Riggers Association shall furnish the Union with a list of its membership and the Union will furnish the Association with a list of contractors who sign this Agreement within 30 days following the effective date of such membership or becoming signatory to the contract.

### Article 38

**Duration and Termination:** This Agreement shall become effective on the 27th day of August 2014, and remain in full force and effect except as otherwise provided herein, until the 31st day of May 2018, and shall automatically renew itself from year to year thereafter unless written notice to terminate or amend the Agreement is given by either party not less than one hundred twenty (120) days prior to the expiration date or any subsequent renewal thereof. For the purposes of this Article 38, written notice shall be by Certified Mail, addressed to the Labor Relations Division of the Steel Erectors, Fabricators and Riggers Association or Ironworkers Local #44, and notification shall be considered effective on the date of mailing.

If, during the initial or any subsequent term of this Agreement, any Federal law or legislation is enacted, whether involving or arising out of Federal statute or statutory amendment or regulations thereto, that would otherwise alter or expand the Employees, positions, job classifications, bargaining units, projects, geographic area or business enterprises or entities, to which or to whom this Agreement relates, the parties hereto agree to meet and discuss any provision in this Agreement that may be affected by such legislation. Such discussions shall be considered a re-opener of negotiations on only such affected provisions, and the remaining articles in the Agreement shall remain in full force and effect.

If notice of termination shall be given, negotiations for a new Agreement shall take place during the one hundred twenty (120) days prior to its expiration.

If notice to amend shall be given, such notice shall set forth the proposed amendments and the parties shall promptly meet to negotiate with respect to the proposed amendments. In the event that negotiations for a new Agreement shall continue beyond the expiration of the term of this Agreement, this Agreement shall continue in full force and effect, provided, however, that either party may then terminate this Agreement upon ten (10) days written notice to the other party.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date and year first written, in the City of Cincinnati, State of Ohio

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL AND REINFORCING IRONWORKERS
LOCAL UNION #44
1125 Victory Place Hebron KY 41048
859-586-2100 fax:859-586-0862

LAWRENCE E. OBERDING BM-FS/T
By (please print) Title

8-27-14
Signature Date

**FOR THE EMPLOYER**
Please Print or Type

Employer

Address

City State Zip

Phone Fax

Company Officer

Title

Signature Date

**We certify that this is a true copy of the "FORM OF AGREEMENT"**

William Woodward, District Council President
International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers Local Union #44

Terry Phillips, Executive Director
Steel Erectors, Fabricators and Riggers Association
3 Kovach Drive, Lockland, Ohio 45215
Phone 513-221.8020 Fax: 513-221-8023

# WAGE RATES AND FRINGE SCHEDULE

**Effective: August 27, 2014 – May 31, 2018**

Bridge, Structural, Ornamental Iron Workers, Machinery Movers an Riggers

**IRON WORKERS LOCAL 44**

1125 Victory Place, Hebron KY 41048 – Phone: (859) 586-2100 – Fax: (859) 586-0862

| Article 11 – Wage Rates | 8/27/2014 | 6/1/2015 | 6/1/2016 | 6/1/2017 |
|---|---|---|---|---|
| Structural | $25.65 | $26.40 | $27.10 | $28.10 |
| Ornamental | $25.65 | $26.40 | $27.10 | $28.10 |
| Machinery Movers, Rigger | $25.65 | $26.40 | $27.10 | $28.10 |
| Journeyman Welder 1" SMAW Certification | $25.90 | $26.65 | $27.35 | $28.35 |
| Journeyman Welder 1" FCAW Certification | $25.90 | $26.65 | $27.35 | $28.35 |
| Journeyman Welder 1" SMAW/FCAW Certification | | | | |
| **(Highest Journeyman Rate) | $26.15 | $26.90 | $27.60 | $28.60 |
| **Ironworkers with the Weld Certification receive the appropriate Higher wage regardless if they weld not the project or not | | | | |
| Sheeter | $25.65 | $26.40 | $27.10 | $28.10 |
| Conveyor Mechanic | $25.65 | $26.40 | $27.10 | $28.10 |
| Heavy/ Highway Maintenance | $25.65 | $26.40 | $27.10 | $28.10 |
| Fence Erector | $23.09 | $23.76 | $24.39 | $25.29 |
| Residential Ironworker | $26.60 | $26.35 | $27.05 | $28.05 |
| **Foreman** | | | | |
| 2 to 6 Employees | $1.25 | $1.25 | $1.25 | $1.25 |
| 7 or more Employees | $1.75 | $17.5 | $1.75 | $1.75 |
| General Foreman | $2.25 | $2.25 | $2.25 | $2.25 |

**Apprenticeship**

Apprentice Rates are based on the completion of the Apprenticeship criteria. First Year Apprentices begin at 55% of Journeyman Structural Ironworker base rate. Pay increases at 5% increments. Change notifications will be provided through the Apprenticeships Coordinator at 859-586-2100 ext. 13

**Articles 12, 13, 14, 16, 17, 18, 19 and 20 are paid on hours worked.** **Article 15 is paid on hours PAID.**

| | 8/27/2014 | 6/1/2015 | 6/1/2016 | 6/1/2017 |
|---|---|---|---|---|
| **Article 12** Transportation Expense – (over 31 mile) Non Taxable per day | $8.00 | $8.00 | $8.00 | $8.00 |
| **Article 13** Benefit Plan | $6.35 | $6.35 | $6.35 | $6.35 |
| **Article 14** Pension Plan | $8.90 | $9.20 | $9.50 | $9.50 |
| **Article 15** Journeyman Straight Time Annuity Plan | $3.00 | $3.00 | $3.00 | $3.00 |
| Journeyman Premium Hr. (1 ½ X) | $4.50 | $4.50 | $4.50 | $4.50 |
| Journeyman Double Time (2x) | $6.00 | $6.00 | $6.00 | $6.00 |
| **Apprentice Annuity Plan** | | | | |
| *First Year Apprentice | $0.25 | $0.25 | $0.25 | $0.25 |
| *Second Year Apprentice | $0.25 | $0.25 | $0.25 | $0.25 |
| *Third Year Apprentice | $0.50 | $0.50 | $0.50 | $0.50 |
| *Fourth Year Apprentice | $1.00 | $1.00 | $1.00 | $1.00 |
| ***As stated in Article 15 this amount shall be paid on hours paid as above For Journeyman*** | | | | |
| **Article 15** Apprenticeship, Safety and Drug Testing Fund | $0.60 | $0.60 | $0.60 | $0.60 |
| **Article 17** IMPACT Fund | | | | |
| **Employee Contribution** Ironworker hourly rate time hours worked | 5/8% | 5/8% | 5/8% | 5/8% |
| **Employer Contribution (International Organizing Fund)** Ironworker hourly times hours worked | 3/8% | 3/8% | 3/8% | 3/8% |
| **Article 18** Organizing/Marketing Fund ***(Employee Deduction)*** | $0.52 | $0.52 | $0.52 | $0.52 |
| **Article 19** Construction Advancement Program | $0.10 | $0.10 | $0.10 | $0.10 |
| **Article 20** Dues Check-off /Working Dues ***(Employee Deduction)*** | $0.03 | $0.03 | $0.03 | $0.03 |
| **Article 20** Working Dues ***(Employee Deduction)*** Ironworker gross | 6% | 6% | 6% | 6% |
| **Article 20 IPAL *(Employee Deduction)*** | $0.08 | $0.08 | $0.08 | $0.08 |

**APPENDIX B**

**Craft Jurisdiction:**

This International Association claims for its members all work (any new technology, processes, materials and type of substitute materials) including but not limited to all: Bending, Bolting, Burning, Caulking, Crating, Cutting, Dismantling, Distributing, Drilling, Erection, Fabricating, Fitting, Glazing of all ferrous and non-ferrous materials, Hoisting, Installation, Layout, Lowering, Maintenance, Metals, Miscellaneous Steel, Placing, Precasting, Raising, Recrating, Reinforcing, Removing, Repair, Replacing, Rigging, Setting, Signaling, Sorting, Storing, Structural Steel, Torqueing, Tying, Uncrating, Unloading and Welding, all processes and materials.

Access Doors and Frames; Accordion Grills; Acoustical Elements; Aggregate Plants; Agitators; Air Conditioner Cans; Air Ducts; Aluminum; Amusement Rides and Equipment; Anchors; Antennae, all (cellular, coax, microwave, radio, wave guide, etc.); Aprons; Aqueducts; Artwork; Asbestos Curtains; Atomic Vessels, all component parts (aligning, leveling and plumbing); Atriums; Attenuator Systems; Automated Teller Machines (ATM) [rigging, setting, etc.]; Awnings; Baffles, all; Bag Houses; Ball/Bowl Mills; Balloons; Bank Fixtures; Banking Equipment; Bar Mats; Barges, all (Casino, etc.); Barjoist; Barricades for Security; Barrier Cables; Batch Plants (both permanent and temporary); Bells; Billboard Supports and Signs; Blast Deflectors; Blast Furnaces; Bleacher Support Steel; Bleacher Systems; Bleachers, all materials; Boiler Support Steel; Boilers and Stokers (sectional, tubular and water tube); Bollards, all; Book Stacks; Booths, all (Agent, guard, ticket, toll, etc.); Bore Cast Piles; Bowl/Ball Mills; Boxes; Bracing; Brackets; Brass; Brick Supports; Bridge Rail; Bridge Viaducts; Bridges, all (including bailey, concrete segmented, expansion, mabey, pipe, pontoon, poured in place, precast, prefabricated, steel, structural, suspension, temporary, etc.); Bronze; Buck Hoists; Bucks; Building Envelope Systems; Buildings, Bulkheads, Bumper and Bumper Posts; Bunkers, Burial Containers; Cable Guardrail Systems; Cable Slots and Cable Wells; Cableways; Cages; Caissons; Canopies and Unistrut Canopies; Caps; Car Lift Fronts; Car Lifts and Related Steel Members; Car-dox; Carports and Enclosures; Cast Tiling; Cat Walks; Ceramic Laminated Spandrelite; Checker Plate; Chutes, all types; Circuit Breakers; Clips; Clocks; Cobiax Balls and all similar type Space Saving Supports; Cofferdams; Collapsible Gates; Collars; Column Casings; Column Cladding; Column Covers; Composite Materials; Concentrators; Concrete Barriers; Concrete Construction (reinforced); Concrete Joists (post stressed, precast, and prestressed); Conservatories; Conveyors, all types; Coolers; Coping; Copper; Corbels; Corrugated Sheets, all (including insulation); Counter Supports; Counter Top Support Steel; Counter Top Supports, all types and materials; Cranes, all types (dismantling, erections [including crawlers, mobile, tower, etc.], handling, installation, maintenance and operation on all forms of construction work); Crash Barriers (cabling, mesh partitioning, safety fencing, etc.); Crushers; CSL Tubes (ultra sound operation in caissons, etc.); CT Scan Equipment and Support Steel; Cupolas; Curb Guards; Curtainwall, all (aluminum, glass, marble, steel, stone, terra cotta, etc.); Curtains; Curtain Wall Testing (water and wind); Cushion Crash Walls; Cyclones; Dams; Decking, all types (floor and roof); Decorations; Degassers; Dental Room Light Equipment; Derricks; Diamond Plate; Digesters; Directory Board; Displays; Dock Levelers; Docks; Domes, all structures; Door Frames, all types; Door Plates; Doors, all types and materials (access, accordion, coiling, detention, electric, fire, glass, hangar, iron, metal or metal clad, patio, pneumatic, rapid roll, revolving, rolling, rolling shutter, security, sliding, swing, wood, etc.); Doors, retrofitting; Draft Curtains; Dragline (erection and dismantling); Drapery Track; Dredges; Drilling Platforms; Drive-Up Equipment; Drums; Drycask Storage Systems; Dryvit Systems; Drywall; Duct Frame; Duct Support, Dumbwaiter, including enclosures and fronts; Dumpers; Duorail; Dust Collectors; Dwydag Bars; Electrical Supports; Electromagnetic Frequency Shielding Plates; Elevator Cars; Elevator Dust Covers and Fascia; Elevator Fronts and Enclosures; Elevators; Embedded Metals (angles, pads and plates);Enamel

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-3 Filed: 01/14/20 Page: 451 of 549 PAGEID #: 617

Tanks; Enamel Vats; Entrances; Escalator Approaches; Escalator Subframing; Escalator Trim; Escalators; Expanded Metals; Expansion Joints; Fabric Canopy Structures; Fall Protection Systems; False Work; Fans; Fascia; Fascia Entrances; Fascia Soffits; Fencing, all types (chain link, fiberglass, ornamental, plastic, synthetic, temporary, wood, etc.); Ferrous Metals; Fiber Carbon Material; Fiberglass Shapes; Fins; Fire Breaks, Fire Code and Grills; Fire Equipment; Fire Escapes; Fire Extinguisher Cabinets; Fire Stops; Fire Watch (on all Ironworker related work); Fireproof Curtain; Firewall Systems; Fish Enhancement Facilities; Flag Poles; Flagging, all (aerial lifts, cranes, trucks, etc.); Flare Stacks; Floor Construction; Floor Cranes and Similar Devices; Floor Plates, all (checker plate, diamond plate, non-skid, etc.); Flooring, all (computer metal, etc.); Flues; Flumes; Forklift Operation; Forklifts; Forms, all; Foundation Work; Frames, all types(access, security door, trench, etc.); Framework; Fronts; FRP; Fur Storage Rooms; G.F.R.C. Systems; Gami-Knife Equipment and Support Steel; Gates; Generators; Geodesic Domes; Gielinger Type Columns; Glass; Glide Rail; Granite and Precast Paver Stones (handling and setting); Granite Supports; Grating; Green Screens; Greenhouses; Grill Work; Grillage; Grills; Grouting (base plates, precast, etc.); Guard Cable; Guardhouses; Guardrail, all types; Guards; Guides; Gymnasium Equipment;; Handicapped Lifts; Handrail; all types (aluminum, fiberglass, glass, metal, plastic, wood, etc.); Hangars; Hangers and Carriers; Hanging Ceilings; Hardware and Screens; Heliostat Systems; Highlines; Highway Delineators: Highway Reflectors; Highway Safety Devices; Highway Sign Supports; Hoisting Equipment; Hoppers; Hospital Room Television Supports; Hot Rooms; Hydraulic Jacking Lifts and Gantries; Inclines; Inspection (fall arrest, installation, rigging, scaffolding, welding, etc.); Jet Ways; Jib-Cranes; Joists; Kalomeined Doors; Kilns: Kiosks; Lagging; Laminated Wood Structures: Laser Beams; Lath (beads, hung ceilings, metal, plaster methodologies, purlins, wire, etc.); Launch Hammer Bucket Wheel Excavator; Lifts (uses of all types); Light Gauge Metal Roof Trusses: Light Gauge Metal Studs: lights 9highway, signs, scoreboard, sidewalk, stadium, vault, etc.); Lintels; Locker Room Fixtures; Lockers; Locking Devices, all types (for security cells, etc.); Locks and Locksmithing; Louvers; Machine Faced Gate Guides; Machinery, all (distributing, handling, hoisting, lowering, moving, placing on foundations, stockpiling, tec.); Man Hoists; Marquees; Masonry support Steel; Material Altered in Field (bending, burning, cutting, drilling, framing, welding by acetylene gas and electric machines, etc.); Material Towers; Medical Equipment; Melters; Metal Buildings (gutters, prefabricated, pre-engineered, purlins, rake, siding, trim, etc.); Metal Enclosures; Metal Furniture; Metal Strips; Metal Trim; Metal Windows; Micropiles; Mixers; Modular Buildings and Vaults; Modules rigging and assembly for multi-craft; Monorails; MRI Equipment; Multiplate: Nameplate; Might Depositories; Mon-Ferrous Metals; Nosings; Nuclear Drycask Storage Systems; Nuclear Facilities (decommissioning and dismantling); Nuclear Reactors; Operating Room Devices; Operating Room Light Equipment; Ornamental Lead/ Ovens/ Pan Deck Forms; Panels, all types (Alcopolic, Alucobond, architectural, composite, concrete, curtain wall, enamel, factory fabricated, fiberglass, field assembled, G.F.R.C., insulated, metal, non-insulated, phenolic, photo-voltaic, porcelain, prefabricated, pre-glazed, Q-Type, Reynobond, solar, stone, terra cotta, translucent, Trespa, etc.); Panic Devices; Panic Locks; Pans; Parabolic Systems; Partitions; Pasteurizers; Peaking Units, Pedimats; Pen Stocks; Personnel Hoists; Pile Drivers; Pin Piles; Pipe Railing; Pipe Supports, all (Gas, Oxygen, etc.); Pit Liners; Plaques; Plastics; Plates; Platforms mechanical, multi-craft, etc.; Playground Equipment; Pole Barns; Poles; Polycarbonate and Poly Carbon Materials; Polymer; Porch Supports; Post Tensioning (accessories, grouting, jacking , prestressed, sleeves, stressing and distressing of tendons, tendons, etc.); Poster Frames; Poststressed Concrete; Post-stressed concrete Structures; Power Rigging, all; Precast; Pre-glazed all (Curtainwall, Doors, Panels, Sash, Windows, etc.); Presses; Pressure Vessels; Prestressed Concrete; Prestressed Concrete Structures Pultedid Shapes; Pulverizers; Rack Systems; Racks; Radar (alignment, dish, equipment, pads, supports, etc.); Radiator Enclosures; Radome (both steel or non-ferrous framed and/or pulverized); Railings; Railroad Bridge Work; Railroad Maintenance; Rain Screens; Reactor Heads; Rebar, all (accessories, bars, bar splices [threaded or bolted], beams, cages, caissons,

SOFCO000159

columns, composite, couplers, fiber mesh, fiberglass, mats, mesh, panels, piles, walls, etc.); Refrigeration Plants; Reinforcing Steel; Reinforcing Tie Guns (operation); Reservoirs; Revolving Doors; Rigging, all (display shelves, display shows, government departments, Master Rigger, navy yards, power rigging, shipyards, vessels, etc.); Roller Plates; Rolling Grills; Rolling Shutters; Roofing Systems, all: Roofs, all (checker plate, mansard, metal, space systems, standing seam, etc.); Room Dividers; Rotors; Safe Deposit Boxes; Safes; Safety Devices; Safety Support (for all Ironworker related work); Sash (aluminum, fiberglass, pre-glazed, steel window, etc.); Scaffolding; Scenery Equipment; Screen Wall; Screens (door and window); Sculptures; Scum Plates; Sealants (related to work installed by Ironworkers); Seating, all types (plank, stadium, theater, etc.); Seats, all types; Security Barriers; Security Screens; Security Systems (cable, composite, concrete, steel, wire, etc.); Security Windows Screens; Shafting; Sheet Metal; Sheet Piling; Shelving; Shielding, all materials; Shoring; Sidewalk Supports; and Steel; Sign Trestles; Signaling of all Hoisting Operations; Signs (airport, highway support, etc.); Sill Beams; Sill Plates; Sills; SIP Deck (Stay in Place); Skate Wheels; Skip Hoists; Skylights; Slope Walls; Slot Machines and Bases; Smoke Baffles; Smoke Conveyors; Smoke Curtains; Smoke Plates; Smoke Screens; Solar Panels; Solar Shades; Solar System Support Steel; Solar Systems; Soldier Piles; Sound Barriers; Space Frames, all types; Spandrels (composite, metal and precast); Spillways; Spray Booths; Stacker Cranes; Stacks; Stage Counterweight System; Stage Equipment; Stage Lifts; Stage Rigging; Stair Lifts; Stairway, all types (concrete, knocked down, prefabricated, steel, tower, etc.); Stators; Steel; Steel Curtains; Steel Supports; Steel Towers; (erection of); Stokers; Stone, all types; Stone Curtainwall; Storage Racks (freestanding and/or part of building structure); Storage Rooms; Storefronts; Stoves; Strand Jacks; Structural Iron; Structural Steel; Subways; Sun Shades; Sunscreens; Support Steel, all types single bridged, etc.; Suspended Work Platforms; Swimming Pool Equipment; Switch Gear; Tables; Tanks; Target Ranges, all (baffles, booths, government, indoor, military, municipal, outdoor, etc.); Temporary Shoring (false work and steel supports); Tent Structures (including fabric skin); Theater Curtains; Thimbles; Thresholds; Tight Lacing (for decorative or protective purposes); Toilet Partition Support Steel; Toilet Partitions; Tool Room; (attendant, operation, etc.); Tack Frames; Tracks and Guides; Tramways; Transformers; Translucent and Plastic materials; Traveling Sheaves; Travelers; Trellises; Trench Frame; Trenching Equipment; Troughs; Trusses, all types; Tunnels; Turbines; Turnstiles; Vats; Vault Doors; Vault Trim; Vaults; Ventilators; Vertical Hydraulic Elevators; Vessels, all types; Wainscoting; Wall Ties (Masonry); Walls (Stub and Stud); Waste Compactors; Weather Stripping; Weather Vanes; Weir Plates; Weirs; Welding (all process and materials); Wheel Guards; Whirly Cranes; Wickets; Winches; Wind Generators (installation and maintenance); Wind Turbines, including offshore (anchor bolt cage, blades, foundation, nacelle tower, rotor, tensioning, torqueing, etc.); Wind Walls; Window Cleaning Equipment; Window Stools; Window Walls; Window Washer Track (horizontal and vertical); Window Washing Hooks; Windows (pre-glazed); Wire and Fibrous Rope (making and installation of all articles made of); Wire Lath Assemblies; Wire Mesh, all; Wire Mesh Grills; Wire Mesh Panels; Wire Mesh Partitions; Wire Partitions; Wire Work; X-Ray Equipment; X-Ray Equipment Support Steel.

The above claims are subject to trade agreements and decisions of the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry of the Building and Construction Trades Department.

Ironworkers Local Union #44 Collective Bargaining Agreement August 27, 2014 through May 31, 2018

Territorial Jurisdiction of Ironworkers Local 44

Connersville
Liberty
Fayette
Union
Rushville
Xenia
Brookville
Franklin
Butler
Hamilton
Lebanon
Warren
Wilmington
Clinton
Hamilton
Dearborn
Lawrenceburg
Cincinnati
Batavia
Clermont
Ripley
Versailles
Burlington
Alexandria
Rising Sun
Boone
Ohio
31-mile marker
Independence
Kenton
Campbell
Brown
Georgetown
Switzerland
Warsaw
Vevay
Madison
Carrollton
Carroll
Bracken
Brooksville
Grant
Williamstown
Falmouth
Maysville
Trimble
Bedford
Mason
Owenton
Owen
Mount Olivet
Robertson
Henry
Harrison
Flemingsburg
Highland

20

SOFCO000161

**AMERICAN ARBITRATION ASSOCIATION**

In the matter of arbitration between: AAA No. 01-16-000-39530

PRECISION ENVIRONMENTAL COMPANY,
Claimant,

-v-

OHIO OPERATING ENGINEERS PENSION FUND,
Respondent.

Mitchell B. Goldberg, Arbitrator

Date of Award:
February 5, 2018

**OPINION AND AWARD**

Appearances:

For the Claimant:
Frank W. Buck, Neal B. Wainblat and Jeffrey J. Moyle, Littler Mendelson, PC

For the Respondent:
Daniel J. Clark and Elizabeth B. Howard, Vorys, Sater, Seymour & Pease LLP

I. Introduction and Background.

This is an arbitration proceeding conducted under the American Arbitration Association's Multi-employer Pension Plan Arbitration rules for Withdrawal Liability Disputes. Claimant ("Employer") is one of the employer participants in the Ohio Operating Engineers Pension Fund ("Fund"). Claimant is an employer as defined in the Multi-employer Pension Plan, and in the Multi-employer Pension Plan Amendments Act ("MPPAA"). Claimant filed a pension plan claim request for arbitration with AAA on September 14, 2016 after disputing the Respondent's demand for withdrawal liability dated December 23, 2015 in the amount of $188,044.00, and the amount of quarterly installments payments of $4,692.00 (and one final payment of $3,081.00) for the reasons discussed below. Claimant was a signatory to a collective bargaining

agreement ("CBA") under which it was obligated to make pension contributions to the Fund on behalf of the employees described in the CBA bargaining unit.

The Fund alleges that withdrawal liability was assessed against the Employer in accordance with 29 U.S.C. Section 1381(a). The Employer completely withdrew from the Fund when it or a trade or business under which it had a common control permanently ceased to have an obligation to contribute to the Fund. Alternatively, it alleges that under 29 U.S.C. Section 1383(b)(2),the Employer completely withdrew from the Fund when it ceased to have an obligation to contribute to the Fund and the Employer or a trade or business under which it shared common control continued performing work in the jurisdiction of the CBA for which contributions were previously required. Respondent contends that its withdrawal liability assessment against the Employer was properly and legally assessed under the MPPAA and that the amounts assessed are due under the Fund's schedule of payments.

The parties agreed, after conducting discovery with respect to their claims and defenses, to waive a formal hearing on the issues. They instead agreed to submit joint opposing motions for summary judgment on the disputed issues. Each party filed their respective briefs, responses and replies to the dispositive motions.

A multi-employer pension plan is a plan to which more than one employer contributes and which is maintained pursuant to one or more CBAs between the employers and the union. The plans are jointly trusteed and administered under Section 302 of the LMRA, 29 U.S.C. Section 186. Half of the trustees are appointed by the union and the other half by employers or employer associations. The applicable CBA in this dispute is between the Construction Employers Association, of which Precision was a member, and the International Union of Operating Engineers, Local 18. That CBA expired on April 30, 2015. Precision withdrew its recognition of the Operating Engineers and no longer remained as a party to any subsequent

CBA between the Construction Employers Association and the Operating Engineers. Claimant, at all relevant times, was engaged in the business of demolition and asbestos removal within the building and construction industry.

In 1980, Congress enacted MPPAA, amending ERISA and the Internal Revenue Code to further regulate the conduct of multiemployer plans and to protect the PBGC in its role as the guarantor of plan benefits. The MPPAA required plan trustees to collect withdrawal liability from employers whose operations terminated, or whose obligations to contribute terminated. In general, the amount of withdrawal liability is the employer's proportionate share of the plan's unfunded vested liabilities, as determined under a statutory formula. The plan's liability is the actuarial present value of the benefit obligations which have vested. A plan's unfunded vested liability is the difference between the vested liability and the value of the plan's assets at the point in time when the withdrawal liability is triggered.

Congress sought to cure the problems arising when an employer ceased making payments to a plan fund, leaving the plan with vested pension obligations which were only partially funded. A vested benefit is one that is guaranteed to the worker after a number of years of service. An employer who partially or completely withdraws from paying its contributions into a plan causes withdrawal liability to be calculated and paid in order to protect the other employers in the multiemployer plan from having to pay for those benefits. Congress believed that the added burdens upon employers who remained as plan participants might induce more of them to remove themselves from multiemployer plans. This would discourage the entry of new plan participants and precipitate the financial failure of less stable pans.[1]

The MPPAA established special industry rules, some of which apply to the building and construction industry. The building and construction industry rules, which apply in this dispute,

---

[1] *Laborers Pension Fund v. W.R. Weis Co.*, 180 F. Supp. 3d 540, 548-549 (2016) (Citing other Circuit cases and a Supreme Court decision).

generally provide that an industry employer is deemed to have withdrawn only if it ceases to have an obligation to contribute while continuing to perform the same type of work previously covered by the plan in the jurisdiction of the union as set forth in the applicable CBA.

Withdrawal liability has been found to occur in cases where the employer goes out of business, sells a business, downsizes, goes non-union by hiring subcontractors to perform the work, or when the subject union under a CBA is decertified. In such cases, courts have found that employers were legally obligated to pay contributions to the funds as required by the CBA, notwithstanding that the union was decertified prior to the end of the contract term. Under the MPPAA, the funds had an independent right to sue for delinquent contributions owed under the terms of the CBA, irrespective of whether a union could legally enforce the terms of the CBA.[2] Accordingly, the MPPAA authorizes multiemployer plans to sue for delinquent contributions owed under the terms of the plan and under the terms of a CBA.[3] Both parties agree that the Employer's obligation to make contributions to the Fund in this case ceased when the subject CBA expired by its terms on April 30, 2015. The relevance of the above cases regarding decertification to the case at hand is that in the above cases it is clear that withdrawal liability was triggered because the employers no longer had the obligation to make contributions after the expiration of those CBAs, and it was clear that the employers continued to perform the work in those jurisdictions of the type for which contributions were previously required.

II. <u>The Statutory Provisions</u>.

Section 4203 of ERISA, 29 U.S.C. Section 1383(b)(2) states:

A withdrawal occurs under this paragraph if -

(A) an employer ceases to have an obligation to contribute under the plan, and

[2] *Midwest Operating Engineers Welfare Fund v. Cleveland Quarry*, 844 F.3d 627 (7th Cir. 2016).
[3] *Central States, Southeast & Southwest Areas Pension Fund v. Schilli Corp*, 420 F.3d 663, 669-670 (7th Cir. 2005).

(B) the employer -
(i) continues to perform the work in the jurisdiction of the [CBA] of the type for which contributions were previously required.

An "obligation to contribute" is defined as an obligation to contribute arising: (1) under one or more collective bargaining agreements; or (2) as a result of a duty under applicable labor-management relations law. 29 U.S.C. Section 1392(a). Under 29 U.S.C. Section 1401(a)(3)(A), the Fund's assessment of withdrawal liability is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

III. The Jurisdictional Dispute.

A jurisdictional dispute arose between the Operating Engineers union and the Laborers' union over the right to exclusively perform the work described as forklift and skid steer work. Both Unions had CBAs with the Employer that covered that particular type of work. The dispute was ultimately resolved through an NLRB proceeding (Section 10(k) of the NLRA) and subsequent litigation over that jurisdictional issue. The jurisdictional issue was resolved in favor of the Laborers Union of North America. The Sixth Circuit in *Orrand v. Hunt* decided that the Employer's obligation to continue its contributions to the Fund ceased after the resolution of the jurisdictional issue.[4] The issue remained as to whether the cessesson of forklift and skid steer work by the Operating Engineers employees that was performed before their CBA termination, coupled with the expiration of their CBA (April 30, 2015) triggered a withdrawal liability assessment under the MPPAA. There is no question that the obligation for the Employer to make contributions to the Fund ceased, and that the Employer continued to perform the type of work that the Operating Engineers performed previously before the resolution of the jurisdictional issue. This was forklift and skid steer work as set forth in its CBA with the

[4] 852 F.3d 592 (6th Cir. 2017).

Employer Association. The Employer's assigned work to the Laborers Union was also within the geographic jurisdiction of the Operating Engineers' previous CBA. It was the type of work for which contributions were required from the Employer to the Fund, until the jurisdictional issue was resolved and the CBA expired.. Thereafter, that same type of work was performed by the Laborers, another union within the same jurisdiction (type of work and geographic location) set forth in the expired CBA. That Union (Laborers) was a party to a different CBA with the Employer, that required contributions to be paid to a different pension fund.

A fixed computed withdrawal liability that attempts to recover an amount of money that would be owed by the Employer to compensate the Plan for the Employer's proportionate share of the Plan's unfunded vested liabilities secures the Plan's ultimate ability to pay the defined benefits due to the Union's employees when the defined benefit retirement benefits are due to be paid. This unfunded amount is determined on the date of exit from the plan.[5] If the Fund cannot collect its withdrawal liability payments, the other employers within the multiemployer fund will under certain circumstances be required to make up the deficiency caused by the Fund's inability to collect the balance due of payments that consist of its unfunded vested benefits necessary to pay the defined pension benefits promised to the employees in the bargaining unit who have already earned their defined retirement benefits as expressed in the CBA and in the incorporated pension fund plan. The withdrawing employer is paying its proportional share of the unfunded contribution amounts for work done prior to the employer's withdrawal, rather than for work done after its withdrawal.[6] However, the Fund, under other circumstances, may receive substitute contributions from other employers within the multiemployer plan or from other plans if those employers hire Operating Engineers' employees for the subject work on other projects within the geographical jurisdiction under CBAs that

[5] 29 U.S.C., Section 1391.
[6] 29 U.S.C., Section 1391(b)(1)(A).

provide those employees with work that was lost to the Operating Engineers under this work jurisdiction dispute.

Notwithstanding the fact that forklift and skid steer work was in the described work jurisdiction of both the Laborers' CBA and the Operation Engineers' CBA, the work had for many years been assigned by the Employer to the Laborers, and not the Operating Engineers. However, in the Fall of 2011 the Employer, at the request of the Operating Engineers, assigned forklift and skid steer work on a demolition job at a Hospital in Cleveland. The Employer denied the request because it never in the past made contributions to the Fund for forklift and skid steer work that was performed by members of the Laborers' Union.[7] It had, however, assigned some of that work to Operating Engineers employees in the past and paid contributions to the Fund when it hired Operating Engineers to perform work under its CBA. The calculation of withdrawal liability to the Employer by the Fund is based upon some forklift and skid steer work or other CBA work that was in fact performed by its members before the withdrawal. Those were for hours of work for which contributions were made by the Employer, but not enough contributions to make up for the vested, but unfunded benefits that remained outstanding at the time of the withdrawal.

IV. Analysis and Findings.

*The Stevens Cases*

The U.S. Court, for the Northern District of Ohio decided the case of *Stevens Engineers & Constructors, Inc. v Iron Workers Loc. 17 Pension Fd.*[8] Plaintiff is a contractor who is one of the employers in a multiemployer pension plan with the Defendant pension fund. The Plaintiff sought to enforce an arbitration award that prohibited the Defendant fund from collecting withdrawal liability. The Fund attempted to assess withdrawal liability under the above

[7] Tony Digeronimo Affidavit, Exhibit A to Employer's Motion for Summary Judgment.
[8] 2016 U.S. Dist. LEXIS 114028; L.R.R.M 3388 (2016).

construction industry withdrawal liability provisions of ERISA. Stevens, between 1985 and 2013 was a party to a series of CBAs with the Ironworkers Fund. It made contributions to the Fund when the Ironworkers performed work covered by the CBAs. As in the instant case, Stevens, the employer, did not renew the Ironworkers' CBA after it expired on April 20, 2013. Its obligation to contribute to the Fund ceased at that point. Also like this case, after the CBA expired and after another union of millrights obtained the right to exclusively perform certain work that was in the stated jurisdictional provisions of both CBAs, the Ironworkers Fund sought withdrawal liability for the work performed by Ironworkers before the CBA expired and work for which Stevens had made pension fund contributions during the life of the CBA. The Fund determined that Stevens had assigned ironworker work of the type for which Stevens had been required to contribute to the Fund. Stevens demanded arbitration of the dispute.

The subject CBA recognized that jurisdictional disputes would arise due to the fact that various craft unions in their respective CBAs would claim the same work for its members. In this case, both the Ironworkers CBA and the Laborers-Millrights unions both claimed the same jurisdictional work as described in each of their CBAs. However, unlike the CBA in this case, the parties to the CBAs were also parties to a National Maintenance Agreement ("NMA") that recognized that various crafts may claim work assignments that are part of their respective CBAs. Accordingly, as part of its responsibility under the NMA, Stevens agreed to conduct a pre-job conference to cover all craft work assignments for each project. Stevens conducted the pre-job conference for a certain project after the above CBA with the Ironworkers expired. It assigned certain work to the Millrights instead of the Ironworkers. The losing union, in this case, the Ironworkers, could challenge Stevens' assignment by first having the issue referred to the International Unions to resolve the dispute. If the assignment dispute was not resolved at that level, either Stevens as the Employer or the Union could refer the issue to final and binding

arbitration. This contractual internal dispute resolution process would provide a speedier process for the resolution of the dispute, and the unions agreed not to strike while this resolution process was untaken. Stevens and the Ironworkers Union engaged in the NMA process to a certain point, but it did not go to arbitration. The contested work went to the Millrights when the Ironworkers Union decided not to go further with the NMA process.

The Ironworkers Union thereafter pursued a claim for withdrawal liability against Stevens. Its claim was that Stevens stated that prior to the expiration of the Ironworkers' CBA, Stevens used Ironworkers to perform certain Ironworkers work "on several occasions over the years." Stevens also performed the same type of work in the same jurisdiction covering the pension fund obligations in the CBA within 5 years after May 1, 2013, but because that work was assigned to the Millrights and not the Ironworkers, Stevens would not have an obligation to make pension contributions under the Ironworkers CBA to the Ironworkers pension fund, thereby causing withdrawal liability to be triggered.

The Arbitrator in the withdrawal liability dispute conducted a hearing and issued his findings and conclusions of law. He determined that the Ironworkers abandoned its claim of contractual jurisdiction over the work that Stevens assigned to the Millrights. He further stated that the disputed work Stevens assigned to the Mfillrights was not in the Ironworkers' craft jurisdiction defined in its expired CBA and thus, Stevens did not assume such work within 5 years after April 30, 2013, the date on which it ceased to have an obligation to contribute to the Fund. The Arbitrator stated:

> [Section] 1383 also requires such work to be work "of the type for which contributions were previously required," and concluded that because the work at issue was performed by millrights under Stevens' unchallenged assignment, that work is not work for which contributions had ever been required to the Iron Workers Local 17 Pension Fund. As such, he determined that the [Fund] Trustees determination to the

contrary was clearly erroneous.[9]

The Fund disagreed with the Arbitrator's findings and conclusions of law and sought to vacate the award before the District Court. The Fund relied upon a decertification decision in the 7th Circuit that held that the decertification of the union did not terminate the employer's obligation to contribute for withdrawal liability purposes, by operation of law (Section 1145).[10] The Court, however, distinguished the decertification case by stating that the controlling issue is not when Stevens' obligation to contribute to the Fund ceased; instead, the question is whether "the special status enjoyed by multiemployer pension funds under [Section] 1145 applies to the assessment of withdrawal liability arising from an inter-union craft jurisdictional dispute." It went further to discuss cases that make it clear that a Fund is not permitted under ERISA to collect employer contributions for work properly assigned to another union in a jurisdictional dispute, notwithstanding that the Fund's CBA also covers that work. An employer is not required to contribute to a plaintiff Fund unless it is contractually obligated to do so. In other words, notwithstanding that two CBAs cover the same work, the work that was properly assigned to the winning union requires pension contributions to that fund for those workers, and not also for the losing union's fund, notwithstanding that both union CBAs cover the same work.

The Ironworkers Fund argued, as the Fund here argues, that prohibiting it to collect withdrawal liability for work previously performed under its CBA, and for work in which Stevens previously made contributions, would reduce its contribution base. Even if the Union went through the NMA procedure and lost, instead of abandoning its claim, the Fund would still be entitled to collect withdrawal liability for the vested but unfunded contributions that needed to be

---

[9] The Arbitrator further stated that the Trustees' use of the withdrawal liability process to determine a work jurisdiction dispute between two NMA-party unions was unreasonable in the sense that Local 17 used the Fund as a "cat's paw in its turf war with the Millrights over craft jurisdiction and to punish Stevens for having
terminated its Iron Workers [CBA]."

[10] *Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663 (7th Cir. 2005).

added to the contributions it had already received for past Ironworkers work when previous contributions were made to the Fund by Stevens. However, the Court found that the work assigned to the Millrights was not work for which contributions "had ever been required to the Fund." In other words, notwithstanding that work in the past was assigned and performed by the Ironworkers, and that work produced contributions to the Fund and was so required under the Ironworkers CBA, the Court is not requiring any further recovery of withdrawal liability contributions (payments) for that same work that would otherwise by due if the obligation to contribute ceased due to a decertification or loss of union work. The Court stated:

> The Court recognizes the circularity of this argument. There is no dispute that Stevens has assigned . . .work to ironworkers instead of the millrights in the past. Thus, "craft jurisdiction" changes from job to job. The Court could find no case in which a pension fund sought to impose withdrawal liability based upon an employer's assignment of assignable work to another craft union.
> * * *
> Finally, while the Fund would have received additional [make-up] contributions if all the . . . work on the . . . project had been assigned to the Ironworkers, its contribution base was not reduced because it received contributions for all work within the Ironworkers' craft jurisdiction from Stevens' contractors who employed them. No non-union labor was used on the project.
>
> Again, the level of any pension fund contributions will naturally change marginally from job to job based upon the assignment of assignable work.

The Sixth Circuit affirmed the District Court's decision finding that no withdrawal liability is due to the Fund for the past Ironworker work that was performed during its CBA, and for which contributions were made by Stevens.[11] The Court expanded further upon the difference between a situation where an employer "goes non-union," stays in the industry, but ceases making payments to the plan, and a situation where the employer withdraws from work within the jurisdiction of its CBA. The Court states that the first situation *does* decrease the

[11] *Stevens Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund*, No. 16-4098/4099 (December 13, 2017).

contribution base of the plan because the employer is withdrawing from the plan when it goes non-union and stops making contributions. The MPPAA provides that an employer must pay a proportional share of the unfunded amount to the Fund, determined based on the employer's share of contributions for work prior to the withdrawal, rather than after the withdrawal. However, under the second situation, the withdrawal of jurisdictional work does not pose an undue threat to a fund as long as contributions are made for whatever union work is done in the area. This is because the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry. Employees are often dispatched to another contributing contractor who will make contributions to the same plan or another union pension fund plan.

The Court expanded its rationale that was explained by the Arbitrator and the District Court. It acknowledged that the MPPAA expresses a general policy in favor of making employers who withdraw from an underfunded fund pay into it. However, the MPPAA expressly limits the situations in which contributions are required, the specific provisions of the text control over the looser general principles that are also embodied in the MPPAA. The particular rationale for the construction industry exception provides an incentive for employers to gain the benefit of work without the detriment of pension liability when an employer takes on a job that requires pension benefits. The Court states:

> Before its withdrawal from the CBA, Stevens would not have owed contribution liability to Local 17 for work properly assigned to another union through the NMA. It therefore causes no imbalance for Stevens to owe no liability for such work properly assigned after withdrawal either.

*The Weis Decision*

The Employer also relies upon the decision of the District Court for the Eastern Division of Illinois to support its position that no withdrawal liability was triggered in this case when the

*Weis* jurisdictional issue was resolved in favor of the Laborers Union as opposed to the Briicklayers Union (BAC) for the disputed work.[12] Weis stopped employing Laborers and stopped contributing to the Fund in October 2009 under the Laborers CBA. It ended its CBA relationship with the Laborers in 2012. The matter went to arbitration on the issue of whether the Fund could assess withdrawal liability. The Arbitrator found in favor of the Employer. The Fund went to Court to vacate the award and to have withdrawal liability assessed in accordance with its calculation of withdrawal liability for payment of the unfunded vested benefits caused by the withdrawal. The Court affirmed the arbitration award.

Weis employed its last laborer in October 2009 after the CBA expired. The Arbitrator sustained the Fund's claim that after 2009, the Employer may have performed some tasks within the general jurisdiction of the Laborer's CBA, notwithstanding that the work overlapped with work under the BAC and ICE CBAs. Weis contributed to the BAC pension fund for these hours. The Laborers Fund claimed withdrawal liability. Weis contested the claim, arguing that it was entitled to an exception for the construction industry, in which an employer is deemed not to have withdrawn, and thus is not subject to withdrawal liability. The Laborers Union revised its demand letter and adjusted the withdrawal date back to October 2009 when its CBA expired. Like the Stevens case, the disputed work was performed after that date by another union's employees and contributions were made to that union's fund.

The Arbitrator, as in the Stevens decisions, ruled in *Weis'* favor, holding that it was not liable for withdrawal payments because it did not continue to perform work in the jurisdiction of the Laborer's CBA of the type for which contributions were previously required under 1383(b)(2)(B)(i). The Arbitrator stated:

> In other words, even though Weis continued employing non-laborers to do some work covered by the laborers' CBA, Weis never had an obligation to contribute to the [Laborer's Fund] for non-laborers' work,

[12] *Laborer's Pension Fund v. W.R. Weis Co.*, 180 F.Supp.3d 540 (E.D. Illinois 2016).

> when it had already contributed to the other workers' [BAC and ICE] pension funds.[13]

The Court found, as did the Arbitrator, that in *Weis'* case, the history and custom showed that the Laborers' CBA did not require contributions for work done by the other unions for its work, when the employer had made pension contributions to a different union. The Fund argued, as in Stevens, that the legislative purpose of the MPPAA was not accomplished when the Laborer's funding base was compromised due to *Weis* being excused from absorbing the additional cost increases for unpaid unfunded vested benefits that were due over and above the previous contributions that were made to the Laborer's fund for work done under its CBA before the CBA expired in October 2009. The Court applied the same reasoning as above, stating that the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry. Employees are often dispatched to another contributing contractor (with the same union plan, or a different union plan). The construction work is generally done on a project-by-project basis. An employer's covered employment may fluctuate drastically, and when a project ends an employer's workers will normally remain in the labor pool available for employment by other contributing union employers. The Court concluded by stating that the fluctuations are normal events that do not pose an undue threat to a plan as long as contributions are made for whatever union work is done in the geographic area.

The Fund argued that it would be damaged in the sense that its contribution base would be reduced if *Weis* could continue doing the same type of work, but change its workforce to a different trade union, in this case from laborers to non-laborers. The Court, however, held that the legislative history did not support this view because the Fund's base did not encompass work performed by other union members when Weis contributed to other pension funds for that

---

[13] The Arbitrator also held that Weis could assert an affirmative defense of equitable estoppel because Weis reasonably relied to its detriment on the Fund previous assurances that it owed no additional contributions to the Laborer's Fund.

subject work. Weis was not escaping from its contribution obligations because it never had an obligation in the first place to contribute to the Fund for the other union's work. As stated in the Stevens' rationale, this is not a situation where *Weis* stays in the industry but goes non-union and ceases making payments to the plan. Instead, *Weis* continued making contributions to the BAC pension plan and it sustained that funding base. Accordingly, the Court found that the Arbitrator's award did not undermine the legislative purpose of the statute.

*Findings*

The above judicial findings of a controlling legislative purpose that looks upon the effect of an employer withdrawal on industry-wide union employment in the geographic area instead of the specific effect of a withdrawal upon a single employer when that employer ceases to have an obligation to contribute to the plan due to the termination of its participation in the multiemployer collective bargaining agreement is not apparent from the plain reading of the statutory language. Applying that statutory language in this case would seem to trigger withdrawal liability under a plain reading because Precision's obligation to contribute to the Operating Engineers' Fund ceased upon the termination of the CBA. The Employer continued to perform the skid-steer and forklift work that was previously performed under the Union's work jurisdiction, under which contributions to the Fund were previously required. Moreover, the contribution base was decreased by its inability to recover additional unpaid contributions for its unfunded vested benefits that related to the Employer contributions it made to the Fund for work performed by the Union in the past up to the point when the Employer's obligations ceased.

The damage to a single pension fund contribution base becomes evident when one considers the different financial conditions of various union pension funds. If withdrawal liability is not triggered under the above facts for an employer that was obligated to contribute to a fund that was in poor financial condition, the loss of funding for its unfunded vested benefits could be

meaningful. The effects of its poor condition and the loss of funding for those unfunded vested benefits could result in the inability to meet its defined pension payments to its beneficiaries in the future for the retired union workers. Those workers who accumulated benefits through the contributions that were made to the financially stressed fund could be at risk to the point of a PBGC bailout that would produce a substantial reduction of pension benefits. The fact that some other pension fund gained contributions through a jurisdictional decision on some industry wide basis would not be of solace to the employees who performed the subject work and received less than the full contributions necessary to fund both for funding the vested benefits and the unfunded vested benefits that were provided under the terms of the CBA and the Fund.

The Respondent Fund highlights the losses to the single fund when a CBA is terminated without compensating a pension fund for the unfunded liability arising out of its participation. It makes no difference to the particular fund when a portion of the covered work is lost to non-union employees or union employees. When no compensation is provided to the Fund for the loss of payments or contributions for its vested, but unfunded benefits, the Fund has nevertheless lost a portion of its contribution base regardless of whether the lost work is performed by a union or non-union worker. This would necessarily place a burden upon the remaining employers in the multiemployer plan who are left with unfunded liabilities that must be met. It is foreseeable that in some instances the remaining employers in the multiemployer plans could be competitors of the employer who was relieved of the burden to pay withdrawal liability for those unfunded contributions.

Nevertheless, the above Courts have spoken on this precise issue. They have determined that for the construction industry there is some compelling congressional intent, as expressed through its legislative history, to treat employer withdrawals from CBAs and ceased contribution obligations differently for triggering withdrawal liability. Arbitrators must follow these

decisions that state the law on this issue, or risk having their decisions vacated, based upon a judicial finding that they have exceeded their power by manifestly disregarding the law.[14]

V. Award.

The Claimant's motion for summary judgment is granted, and the Respondent's motion for summary judgment is denied for the above reasons. No withdrawal liability is to be assessed against the Employer under Section 4203 of ERISA, 29 U.S.C. Section 1383(b)(2)(A) and (B). Respondent shall refund to Claimant all assessed withdrawal liability payments received from Respondent.

Date of Award: February 5, 2018

/s/ *Mitchell B. Goldberg, Arbitrator*
Mitchell B. Goldberg, Arbitrator

[14] 9 U.S.C. Section 10(4) of the Federal Arbitration Act. A manifest disregard of the law occurs when when an arbitrator understands and correctly states the law but proceeds to ignore it. *See, e.g. Wilko v. Swan*, 346 U.S.427, 436 (1953); *San Martine Co. de Navegacion, S.A. v. Saguenay Terminals*, 293 F.2d 796,801 (9th Cir. 1961).

18



Vorys, Sater, Seymour and Pease LLP
Legal Counsel

52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

614.464.6400 | www.vorys.com

Founded 1909

Daniel J. Clark
Direct Dial (614) 464-6436
Direct Fax (614) 719-4650
Email djclark@vorys.com

August 15, 2018

**VIA E-MAIL**

Gary L. Greenberg
Jackson Lewis P.C.
425 Walnut Street
Suite 2300
Cincinnati, OH 45202

Re: Ohio Operating Engineers Pension Fund's Witness Disclosure

Dear Gary:

Pursuant to our agreement and the Arbitrator's order the Ohio Operating Engineers Pension Fund identifies the below individuals as potential witnesses in the hearing regarding the withdrawal liability assessments issued by the Fund to Sofco Erectors, Inc.

1. Dan Ciner, Segal Consulting. Mr. Ciner may testify regarding the withdrawal liability calculations prepared by Segal on behalf of the Funds, which for the basis for the withdrawal lability sought by the Fund from Sofco.

2. Carol A. Wilson, Administrator. Ms. Wilson may testify as to Sofco Erectors, Inc.'s participation as a contributing employer in the Fund, including the contributions history, contribution reports submitted by Sofco to the Fund and as a custodian of records maintained by the Fund.

3. Thomas Byers, President Local 18 of the International Union of Operating Engineers. Mr. Byers may testify as to Sofco's collective bargaining relationship with Local 18, the nature of the work performed by Sofco prior to and following the termination of the collective bargaining relationship and the identity of current or former Local 18 members employed by Sofco.

4. Dan Powell and John Hesford. Mssrs. Powell and Hesford may testify to the collective bargaining relationship between Sofco and Local 18, the individuals



employed by Sofco pursuant to collective bargaining agreements with Local 18, Sofco's history of participation in the Fund prior to the termination of the agreements, the nature of Sofco's operations since the termination of its agreements with Local 18, the alleged 2004 asset purchase acquiring assets of Southern Ohio Fabricators, Inc., and the individuals employed by Sofco.

5. Records custodians of record produced or utilized by either party.

6. Witnesses identified or called by Sofco.

Sincerely,

Daniel J. Clark

DJC/djc

cc: Allen S. Kinzer
Mark Gerano



International Union of Operating Engineers

LOCAL 18 AND ITS BRANCHES • SERVING THE FORMER DISTRICT 4 AND 5 OFFICES

8401 CLAUDE THOMAS ROAD STE. 21A • FRANKLIN, OH 45005-1476

(937) 806-0406 FAX: (937) 806-0408

Office of
District No. 4/5

October 23, 2013

Mr. Richard Dalton, President
I.U.O.E. Local 18 Headquarters
3515 Prospect Avenue
Cleveland OH 44115-2619

RE: Grievance Dated 6/25/13

Dear Sir and Brother,

The grievance dated 6/25/13 with Sofco Erectors Inc. over not abiding by the terms and conditions of the AGC of Ohio Building Agreement, May 8, 2013 through April 30, 2017, Article II, para. 22, as it relates to fork lifts. The company agreed to pay twenty (20) hours wages and fringes to the first qualified registered applicant.

We consider the grievance closed.

If you have any questions, please feel free to call.

Fraternally yours,

Stanley E. Brubaker
Business Representative

/db

EXHIBIT
D
Employer
PENGAD 800-631-6989

# GRIEVANCE FORM

2-90

Fax from : 10-10-13 08:12a Pg: 1

NAME OF STEWARD OR BUSINESS REPRESENTATIVE: STANLEY BRUBAKER

DATE: 6/25/13

CONTRACTOR: SOFCO ERECTORS INC.

LOCATION OF JOB: MIAMI UNIVERISTY

MEMBER'S NAME: 

MEMBER'S HOME PHONE INCLUDING AREA CODE: 

MEMBER'S ADDRESS: 

AGENT COVERING JOB: STANLEY BRUBAKER

DISTRICT NO. 4

**STATEMENT OF FACTS** BREACH OF CONTRACT, SOFCO ERECTORS INC. IS NOT ABIDING BY THE TERMS AND CONDITIONS OF THE AGC OF OHIO BUILDING AGREEMENT, MAY 8, 2013 THROUGH APRIL 30, 2017, ARTICLE II PARA. 22 AS IT RELATES TO FORKLIFTS.

RESOLUTION: COMPANY TO PLACE WORK ORDER AND PAY THE FIRST QUALIFIED REGISTERED APPLICANT FROM THE REFERRAL ALL APPLICABLE WAGES AND FRINGE BENEFITS FROM THE FIRST DAY OF VIOLATION.

WHICH AGREEMENT HERE AFFECTED AGC OHIO BUILDING AGREEMENT
(Highway, Sewer, Building, Pipeline, etc.)

WHICH ARTICLE OF AGREEMENT AFFECTED ARTICLE II, PARA. 22

[signature]
Signature of Steward or Business Representative

Signature of Member

**DISPOSITION AND DATE STEP 1:** ON 6/24/13 B.A. STAN BRUBAKER SPOKE WITH FOREMAN PETE LEONARD; NO RESOLUTION.

**DISPOSITION AND DATE STEP 2:** ON 6/25/13 WROTE UP GRIEVANCE AND FAX TO COMPANY.

10-11-13 Company agrees to place work order and pay first qualified operator from the referral 20 hours wages and fringes to settle grievance.

AGREED TO BY [signature] [signature]

Form No. 2

OOE-000155

SOFCO ERECTORS, INC.
WOODLAWN, OHIO 45215

413442

| HOURS REGULAR | HOURS OVERTIME | RATE | EARNINGS REGULAR | EARNINGS OVERTIME | OTHER PAY BASIS | OTHER PAY RATE | OTHER PAY AMOUNT | DESCRIPTION | PAY PERIOD |
|---|---|---|---|---|---|---|---|---|---|
| 20.00 | | 31.44 | 628.80 | | 2.00 | | | SAFETY | 10/14/13 to 10/20/13 |

No. 413442

TOTAL PAY 628.80

DEDUCTIONS THIS PERIOD

| | | | | | | | | | | TOTAL DEDUCTIONS |
|---|---|---|---|---|---|---|---|---|---|---|
| FWH | 56.89 | MED | 9.12 | SOC | 38.99 | OHSWH | 14.33 | DUES % | 18.86 | 138.19 |

| EMPLOYEE INFORMATION | | YEAR-TO-DATE TOTALS | | | | | | NET PAY |
|---|---|---|---|---|---|---|---|---|
| RANDY A. HURSELL | | GROSS | 628.80 | FICA | 48.11 | KY | .00 | |
| XXX-XX-2260 | HURSR | FWH | 56.89 | OHIO | 14.33 | IN | .00 | 490.61 |

PLEASE DETACH THIS PORTION AND RETAIN FOR YOUR RECORDS.

THIS CHECK IS VOID IF MICRO PRINT SIGNATURE LINE IS UNREADABLE UNDER MAGNIFICATION.

**SOFCO ERECTORS, INC.**
10360 WAYNE AVENUE
CINCINNATI, OHIO 45215
TELEPHONE (513) 771-1600

NORTH SIDE BANK AND TRUST 13-55/420

413442

PAYROLL CHECK

Pay: ***************************Four hundred ninety dollars and 61 cents

| DATE | CHECK NO. | AMOUNT |
|---|---|---|
| 10/23/2013 | 413442 | $*****490.61** |

PAY TO THE ORDER OF

RANDY A. HURSELL
5006 DENISON DR
FAIRFIELD, OH 45014

VOID IF NOT CASHED WITHIN 90 DAYS

[signature]
SOFCO ERECTORS, INC.

THE FACE OF THIS CHECK HAS A SECURITY VOID BACKGROUND PATTERN - DO NOT CASH IF THE WORD VOID IS VISIBLE.

⑈413442⑈ ⑆042000550⑆ 20014506⑈

Randy Hursell
10-23-13



International Union of Operating Engineers

LOCAL 18 AND ITS BRANCHES • SERVING OHIO

THIRTY-FIVE FIFTEEN PROSPECT AVENUE • CLEVELAND, OHIO 44115-2648

(216) 432-3138 FAX: (216) 432-0370

Thomas P. Byers
President

November 7, 2016

Mr. Timothy R. Fadel
Wuliger, Fadel & Beyer
The Brownell Building
1340 Sumner Court
Cleveland, Ohio 44115-2851

**IN RE: SOFCO ERECTORS GRIEVANCE SETTLEMENT**

Dear Mr. Fadel:

The enclosed information, in regards to the above captioned matter, is for your files and information.

Sincerely yours,

Thomas P. Byers
President

TPB/pjn
Enclosure(s)

Summary
Sofco Erectors
Grievance Dated 7/12/16

July 11, 2016
Business Rep. Jason Baker made a job site visit to Sofco Erectors on Byers Rd., in Miamisburg, Ohio. Observed someone other than an operator performing forklift work on the project. Business Rep. Jason Baker spoke with foreman Scott Robkin. No resolution at this time.

July 11, 2016
Business Rep. Jason Baker spoke with John Hesford with Sofco Erectors. John Stated that Sofco has assigned forklifts to Ironworkers. He also stated that not just anybody could run a forklift and not tear it up.

July 12, 2016
Faxed grievance to company.

July 22, 2016
Step 2 meeting with District Representative Gary Marsh, Business Representative Jason Baker, and John Hesford with Sofco Erectors. No resolution at this time.

August 10, 2016
District Representative Gary Marsh met with John Hesford. Company agrees to place work order and hire first two (2) qualified 1st year apprentices from the District 4/5 referral and pay each a minimum of 24 hours to settle grievance.

September 9, 2016
Mike House with Sofco Erectors placed 1 work order for 1 apprentice.

September 15, 2016
Brittany Winkler received her pay check at her residence.

October 21, 2016
John Hesford with Sofco Erectors placed one (1) work order for 1st year apprentice.

October 28, 2016
Kimberly Russell signed for her check at District 4/5 office.

# GRIEVANCE FORM

NAME OF STEWARD OR BUSINESS REPRESENTATIVE: Jason Baker

DATE: 7/12/2016

CONTRACTOR: Sofco Erectors

LOCATION OF JOB: Byers Road, Miamisburg, OH

MEMBER'S NAME:

MEMBERS HOME PHONE INCLUDING AREA CODE:

MEMBER'S ADDRESS:

AGENT COVERING JOB: Jason Baker

DISTRICT NO. 4/5

STATEMENT OF FACTS: Sofco Erectors has assigned someone other than an operating engineer on forklifts beginning on 7-11-16 at Byers Road, in Miamisburg, Ohio.

RESOLUTION SOUGHT: The employer's penalty shall be to pay the first two qualified registered applicants in the District 4/5 referral the applicable wages and fringe benefits from the first day of violation until project completion.

WHICH AGREEMENT HERE AFFECTED (Highway, Sewer, Building, Pipeline, Etc.): 2013 - 2017 AGC of Ohio Building Agreement

WHICH ARTICLE OF AGREEMENT AFFECTED: Article II, Para. 22; Exhibit A Zone III Group C

Signature of Steward or Business Representative

Signature of Member

DISPOSITION & DATE STEP 1: Business Rep. Jason Baker met with foreman Scott Robkin on 7-11-16. No resolution.
Business Rep. Jason Baker spoke with John Hesford. No resolution.

DISPOSITION & DATE STEP 2: On July 22, 2016 District Representative Gary Marsh and Business Representative Jason Baker met with John Hesford with no resolution. On August 10, 2016 District Representative Gary Marsh met with John Hesford. Company agrees to place work order and hire the first two qualified 1st year apprentices from the referral and pay each a minimum of 24 hours to settle grievance.

Form No 2

Agreed: ____________ By Union

Agreed: ____________ By Company

Fax from : 513 771 5498 08-02-16 01:29p Pg: 2/2

10/31/2016 10:42 #132 P.003/007

OOE-000159

From: 10/31/2016 10:43 #132 P.004/007

WARREN CTY

# ORDER

SEP 9 16 2:41PM

Contractor SOFCO ERECTORS

Location of Job MAIN ST. LEBANON, OHIO

Date: Report MON 9/12/16 Time 7:30A M

Make of Machine FORKLIFT

Type of Work

Operator 1ST YR APPRENTICE

FORK CERT

SEP 9 16 3:43PM

Brittany Winkler 9-7-16 11:18

ATLEAST 24 HOURS

GRIEVANCE SETTLEMENT

Order Given By MIKE HOUSE

Telephone No. 513-383-7796

Date 9-9-16 Time 2:41 Per G MARSH

Form No. 21

EMPLOYEE WINKB BRITTANY K. WINKLER ***-**-5660 Check 309591 09/15/16
Dates: 09/12/16-09/18/16

| Hrs/Earnings | Current | YTD | Deduction | Current | Ytd | Deduction | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Reg Hrs | 24.00 | 24.00 | FIT | 45.99 | 45.99 | FRINGES | | |
| | | | FICA | 37.27 | 37.27 | AGC FEE | 3.60 | 3.60 |
| REG | 487.20 | 487.20 | OH | 9.84 | 9.84 | APPR & TRN | 18.00 | 18.00 |
| | | | LEBANON | 4.87 | 4.87 | EDUC & SAF | 2.16 | 2.16 |
| | Hours | Pay Rate | PEP Local | 2.40 | 2.40 | H&W | 183.84 | 183.84 |
| REG | 24.00 | 20.30 | UNION DUES | 14.62 | 14.62 | IAP/AGC | 4.80 | 4.80 |
| | | | | | | PENSION | 144.00 | 144.00 |

| | Current | YTD |
|---|---|---|
| GROSS $ | 487.20 | 487.20 |
| CURRENT PAY | 487.20 | |

| | Current | YTD |
|---|---|---|
| TOT DED | 114.99 | 114.99 |
| NET PAY | 372.21 | 372.21 |

309591

Copy of Check - VOID VOID

09/15/16 V O I D

BRITTANY K. WINKLER
601 PINTA AVE
MIDDLETOWN, OH 45044

WINKB - BRITTANY K. WINKLER

| | Regular Hours | Regular Rate | Regular Earnings | Overtime Hours | Overtime Rate | Overtime Earnings |
|---|---|---|---|---|---|---|
| Hourly Wage | 24.00 | 20.30 | 487.20 | 0.00 | 30.45 | |

From: 10/31/2016 10:44 #132 P.007/007

SOFCO ERECTORS, INC. 43305

EMPLOYEE RUSSK KIMBERLY S. RUSSEL ***-**-9741 Check 43305 10/27/16

Dates: 10/24/16-10/30/16

| Hrs/Earnings | Current | YTD | Deduction | Current | Ytd | Deduction | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Reg Hrs | 24.00 | 24.00 | FIT | 34.31 | 34.31 | FRINGES | | |
| | | | FICA | 37.27 | 37.27 | AGC FEE | 3.60 | 3.60 |
| REG | 487.20 | 487.20 | OH | 9.43 | 9.43 | APPR & TRN | 18.00 | 18.00 |
| | | | FLORENCE | 9.74 | 9.74 | EDUC & SAF | 2.16 | 2.16 |
| | Hours | Pay Rate | PEP Local | 2.40 | 2.40 | H&W | 183.84 | 183.84 |
| REG | 24.00 | 20.30 | UNION DUES | 14.62 | 14.62 | IAP/AGC | 4.80 | 4.80 |
| | | | | | | PENSION | 144.00 | 144.00 |

| | Current | YTD | | Current | YTD |
|---|---|---|---|---|---|
| GROSS $ | 487.20 | 487.20 | TOT DED | 107.77 | 107.77 |
| CURRENT PAY | 487.20 | | NET PAY | 379.43 | 379.43 |

THE REVERSE SIDE OF THIS DOCUMENT INCLUDES MICROPRINTED ENDORSEMENT LINES AND ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

SOFCO

**SOFCO ERECTORS, INC.**
10350 WAYNE AVENUE
CINCINNATI, OH 45215
513-771-1600

NORTH SIDE BANK & TRUST
4125 HAMILTON AVENUE
CINCINNATI, OH 45223
13-55/420

43305

CHECK NO.

43305

DATE AMOUNT

****THREE HUNDRED SEVENTY NINE DOLLARS AND 43 CENTS*****

10/27/16 **********379.43

PAY TO THE ORDER OF

KIMBERLY S. RUSSEL
737 GRAY OAK DR
TROTWOOD, OH 45426

SOFCO ERECTORS, INC.
VOID AFTER 90 DAYS

Caroline Riley

AUTHORIZED SIGNATURE

⑈043305⑈ ⑆042000550⑆ 2005181７⑈

SOFCO ERECTORS, INC. 43305

RUSSK - KIMBERLY S. RUSSEL

| | <------ Regular | -------> | | <----- Overtime | -------> | |
|---|---|---|---|---|---|---|
| | Hours | Rate | Earnings | Hours | Rate | Earnings |
| Hourly Wage | 24.00 | 20.30 | 487.20 | 0.00 | 30.45 | |

COPY

Kimberly Russell 10-28-16

SIGNATURE: DATE:

Boone Cty

**ORDER**

OCT21 16 11:37

Contractor SOFCO ERECTORS

Location of Job 7 HILLS CHURCH

6800 HAZEL CT. FLORENCE KY

Date: Report WED 10/26/16 Time 7:00A M

Make of Machine FORKLIFT

Type of Work

Operator 1ST YR APPRENTICE

Kimberly Russell 10.12.16 2:30

DARRELL SALEE 513-200-3690

GRIEVANCE SETTLEMENT

OCT24 16 9:25

Order Given By JOHN

Telephone No. 513-615-5092

Date 10-21-16 Time 11:37 Per

Form No. 21

2-90

# GRIEVANCE FORM

**NAME OF STEWARD OR BUSINESS REPRESENTATIVE** Justin Gabbard

**DATE** 3/15/2017

**CONTRACTOR** Sofco Erectors, Inc.

**LOCATION OF JOB** Aero Parkway, Florence KY

**MEMBER'S NAME**

**MEMBERS HOME PHONE INCLUDING AREA CODE** 937-806-0406

**MEMBER'S ADDRESS**

**AGENT COVERING JOB** Justin Gabbard

**DISTRICT NO.** 4/5

**STATEMENT OF FACTS:** Sofco Erectors, Inc has assigned someone other than an Operating Engineer on a Rough Terrain Forklift. Beginning on 03/13/2017 at the Aero Parkway in Florence, KY.

**RESOLUTION SOUGHT:** To pay the first qualified registered applicant in the District 4/5 referral the applicable wages, and fringe benefits from the first day of violation, until project completion.

PENGAD 800-631-6989
EXHIBIT
Employer S

**WHICH AGREEMENT HERE AFFECTED** (Highway, Sewer, Building, Pipeline, Etc.) 2013-2017 AGC of Ohio Building Agreement

Justin Gabbard Justin Gabbard
Signature of Steward or Business Representative

**WHICH ARTICLE OF AGREEMENT AFFECTED** ARTICLE II, PARA. 22 SCHEDULE II, CLASS C

Signature of Member

**DISPOSITION & DATE STEP 1:** Business Representative Justin Gabbard met with foreman Pete Leonard on 3/13/17. No resolution.

Business Representative Justin Gabbard spoke with company representative John Hesford on 3/14/17. No resolution.

SOFCO001173

Step 2: On 3-16-17 Business Representative Justin Gabbard spoke with company representative John Hesford at 6:30am and stated he would Return to office to meet at 3:30pm. Business Representative Justin Gabbard and District Representative Jeff Powell arrived at company office to meet John Hesford. Did not Return to office. Business Representative Justin Gabbard and District Representative Jeff Powell called and left messages, no return calls. Fax Grievance to company. No resolution.

[illegible] Jeff Powell met with company [illegible] John Hesford. company agreed to put company operator on Fork Lift until [illegible]

Form No 2



International Union of Operating Engineers
LOCAL 18 AND ITS BRANCHES • SERVING OHIO
THIRTY-FIVE FIFTEEN PROSPECT AVENUE • CLEVELAND, OHIO 44115-2648
(216) 432-3138 FAX: (216) 432-0370

Thomas P. Byers
President

February 9, 2017

via email rjh@agcohio.com and U. S. Mail

Mr. Richard Hobbs
Executive Vice President
Labor Relations Division
AGC of Ohio
1755 Northwest Boulevard
Columbus, Ohio 43212

**RE: REQUEST FOR STEP 2A GRIEVANCE HEARING**

Dear Mr. Hobbs:

Enclosed is a grievance filed by Middletown Business Representative Justin Gabbard against ***Sofco Erectors, Inc. ("Sofco")*** who is in violation of Article II, paragraph 22, Schedule III, Group C of the 2013 – 2017 AGC of Ohio Building Agreement.

I am requesting that you contact me within five days from the date of this letter to schedule Step 2A of the grievance procedure to address the issue that Sofco assigned someone other than an operating engineer to operate two forklifts at the hotel project on Hetzel Street in Cincinnati, Ohio.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Thomas P. Byers
President

TPB/pjn
Enclosure(s)
C: Mr. Richard E. Dalton, Business Manager
Mr. Jefferson Powell, District Representative
Mr. Justin Gabbard, Business Representative

EXHIBIT
1
Employer



 International Union of Operating Engineers
LOCAL 18 AND ITS BRANCHES • SERVING THE FORMER DISTRICT 4 AND 5 OFFICES
3860 TOWNE BLVD. • FRANKLIN, OH 45005-5593
(937) 806-0406 FAX: (937) 806-0408

Office of
District No. 4/5

February 8, 2017

Mr. Thomas Byers, President
I.U.O.E. Local 18 Headquarters
3515 Prospect Avenue
Cleveland OH 44115-2619

RE: Sofco Erectors

Dear Sir and Brother,

We have not been able to reach a resolution regarding the Sofco Erectors grievance dated 01/24/2017 therefore I am recommending the grievance be referred to Step 2a.

Thank you for your consideration. If you need further information, please do not hesitate to call.

Fraternally,

Jeff Powell
District Representative

/mm

TB

OOE-000141

SOFCO001175

2-90

# GRIEVANCE FORM

NAME OF STEWARD OR BUSINESS REPRESENTATIVE: Justin Gabbard

DATE: 1/26/2017

CONTRACTOR: Sofco Erectors, Inc.

LOCATION OF JOB: Hetzel St., Cincinnati

MEMBER'S NAME:

MEMBERS HOME PHONE INCLUDING AREA CODE: 937-806-0406

MEMBER'S ADDRESS: 3860 Town Blvd., Franklin OH 45005

AGENT COVERING JOB: Justin Gabbard

DISTRICT NO. 4/5

**STATEMENT OF FACTS:**

SOFCO ERECTORS, INC HAS ASSIGNED SOMEONE OTHER THAN AN OPERATING ENGINEER ON TWO (2) FORKLIFTS BEGINNING ON JANUARY 24, 2017 AT THE HOTEL PROJECT ON HETZEL ST., CINCINNATI.

**RESOLUTION SOUGHT:** THE EMPLOYER'S PENALTY SHALL BE TO PAY THE FIRST QUALIFIED REGISTERED APPLICANTS IN THE DISTRICT 4/5 REFERRAL THE APPLICABLE WAGES AND FRINGE BENEFITS FROM THE FIRST DAY OF VIOLATION UNTIL PROJECT COMPLETION.

WHICH AGREEMENT HERE AFFECTED (Highway, Sewer, Building, Pipeline, Etc.): AGC of Ohio Building Agreement May 8, 2013 through April 30, 2017

Justin Gabbard Justin Gabbard
Signature of Steward or Business Representative

WHICH ARTICLE OF AGREEMENT AFFECTED: ARTICLE II, PARA. 22 SCHDEDULE III, GROUP C

Signature of Member

DISPOSITION & DATE STEP 1: BUSINESS REPRESENTATIVE JUSTIN GABBARD MET WITH FOREMAN HERB McFARLAND ON 1/24/2017. ~~NO RESOLUTION.~~ Business Representative Justin Gabbard and District Representative Jeff Powell met with Foreman on 1-27-17

DISPOSITION & DATE STEP 2: no resolution at job site. Gave Grievance to job site foreman HERB McFarland

Form No 2

SOFCO001176

From Jackson L
Produced By
Operators
7/18

Summary
Sofco Erectors, Inc
1/24/2017

January 24, 2017

On a routine job site visit, Sofco Erectors is working at Hetzel St., in Cincinnati. I found two (2) forklifts being operated by someone other than an Operating Engineer. I spoke with the foreman, Herb McFarland, and he told me that he had to get with the company to see what they were going to do. No resolution.

January 26, 2017

I returned to the job site, and found that someone other than an Operating Engineer was still running the forklifts.

January 27, 2017

Step 2. Business Representative Justin Gabbard, and District Representative Jeff Powell met with foreman Herb McFarland, on the job site, to present grievance. No resolution. Both forklifts were still in operation with someone other than an Operating Engineer.

January 31, 2017

Called Jim Fondorf, and left a message.

February 1, 2017

Called Jim Fondorf, and left a message.

February 2, 2017

Called Jim Fondorf. Spoke with Fondorf but said to speak with John Hesford.

February 2, 2017

Called, and spoke with John Hesford regarding grievance. Hesford said he would get back with me.

February 7, 2017

Called John Hesford. Left a message.

John Hesford returned my call, and set up meeting.

Business Representative Justin Gabbard, and District Representative Jeff Powell met company representative John Hesford, with no resolution. Hesford stated that Sofco is done with the forklifts on this project.

Resolution desired: to pay the first two (2) qualified registered applicants, from the District 4/5 referral, each 80 hours wages, and fringes.

Recommend proceed to Step 2a meeting.

Justin reported Jt still running

1 IND
1 RT

OOE-000142

SOFCO001177





International Union of Operating Engineers
Local 18
3860 Towne Blvd.
Franklin OH 45005
(937) 806-0406 (800) 452-1528 Fax: (937) 806-0408

# FAX

From

To

| | | | |
|---|---|---|---|
| **To:** | Sofco Erectors | | |
| **Attn:** | John Hesford | **From:** | Gary Marsh, District Representative |
| **Fax:** | 513-771-5490 | **Pages:** | 2 Total |
| **Re:** | Grievance | **Date:** | August 26, 2016 |

John,

Please sign at the bottom, and fax back to 937-806-0408.

Thank you,

Gary Marsh

**If this fax is not transmitted completely, please call.**

# GRIEVANCE FORM

2-90

NAME OF STEWARD OR BUSINESS REPRESENTATIVE Jason Baker

DATE 7/12/2016

CONTRACTOR Sofco Erectors

LOCATION OF JOB Byers Road, Miamisburg, OH

MEMBER'S NAME

MEMBERS HOME PHONE INCLUDING AREA CODE

MEMBER'S ADDRESS

AGENT COVERING JOB Jason Baker

DISTRICT NO. 4/5

STATEMENT OF FACTS: Sofco Erectors has assigned someone other than an operating engineer on forklifts beginning on 7-11-16 at Byers Road, in Miamisburg, Ohio.

RESOLUTION SOUGHT: The employer's penalty shall be to pay the first two qualified registered applicants in the District 4/5 referral the applicable wages and fringe benefits from the fist day of violation until project completion.

WHICH AGREEMENT HERE AFFECTED (Highway, Sewer, Building, Pipeline, Etc.) 2013 - 2017 AGC of Ohio Building Agreement

Signature of Steward or Business Representative

WHICH ARTICLE OF AGREEMENT AFFECTED Article II, Para. 22 Exhibit A Zone III Group C

Signature of Member

DISPOSITION & DATE STEP 1: Business Rep. Jason Baker met with foreman Scott Robkin on 7-11-16. No resolution.
Business Rep. Jason Baker spoke with John Hesford. No resolution.

DISPOSITION & DATE STEP 2: On July 22, 2016 District Representative Gary Marsh and Business Representative Jason Baker met with John Hesford with no resolution. On August 10, 2016 District Representative Gary Marsh met with John Hesford. Company agrees to place work order and hire the first two qualified 1st year apprentices from the referral and pay each a minimum of 24 hours to settle grievance.

Form No 2

Agreed: ______ By Union

Agreed: ______ By Company

SOFCO001179



International Union of Operating Engineers
Local 18 - District 4/5
3860 Towne Blvd
Franklin, OH 45005
(937) 806-0406 (800) 452-1528 Fax: (937) 806-0408

# FAX

| To: | Sofco Erectors Inc. | | |
|---|---|---|---|
| Attn: | John Hesford | From: | Jason Baker, Business Representative |
| Fax: | 513-771-5490 | Pages: | 2 Total |
| Re: | Grievance | Date: | July 12, 2016 |

Please contact me regarding the attached grievance at 937-510-1086.

Thank you,

Jason Baker, Business Representative

**If this fax is not transmitted completely, please call.**

MEET w/ Gary

2-90

# GRIEVANCE FORM

NAME OF STEWARD OR BUSINESS REPRESENTATIVE: Jason Baker

DATE: 7/12/2016

CONTRACTOR: Sofco Erectors

LOCATION OF JOB: Byers Road, Miamisburg, OH

MEMBER'S NAME:

MEMBERS HOME PHONE INCLUDING AREA CODE:

MEMBER'S ADDRESS:

AGENT COVERING JOB: Jason Baker

DISTRICT NO. 4/5

STATEMENT OF FACTS: Sofco Erectors has assigned someone other than an operating engineer on forklifts beginning on 7-11-16 at Byers Road, in Miamisburg, Ohio.

RESOLUTION SOUGHT: The employer's penalty shall be to pay the first two qualified registered applicants in the District 4/5 referral the applicable wages and fringe benefits from the fist day of violation until project completion.

WHICH AGREEMENT HERE AFFECTED (Highway, Sewer, Building, Pipeline, Etc.): 2013 - 2017 AGC of Ohio Building Agreement

WHICH ARTICLE OF AGREEMENT AFFECTED: Article II, Para. 22
Exhibit A Zone III Group C

[signature] Jason Baker
Signature of Steward or Business Representative

Signature of Member

DISPOSITION & DATE STEP 1: Business Rep. Jason Baker met with foreman Scott Robkin on 7-11-16. No resolution.
Business Rep. Jason Baker spoke with John Hesford. No resolution.

DISPOSITION & DATE STEP 2:

Form No 2

EXHIBIT
X
Employer
PENGAD 800-631-6989

FROM LOCAL 18, DISTRICT 3
1188 DUBLIN RD.
COLUMBUS, OH 43215
(614) 486-5281
FAX: (614) 486-7258

TO: Mike Talbert, Field Operations Manager
SOFCO ERECTORS INC

FROM: Chad Creeks, Business Representative

SUBJECT: Grievance

DATE: March 11, 2014

PAGES: 3 including cover

Please review.

# GRIEVANCE FORM

NAME OF STEWARD OR BUSINESS REPRESENTATIVE: Chad C. Creeks

DATE: March 11, 2014

CONTRACTOR: SOFCO Erectors

LOCATION OF JOB: Delaware County, Powell, Ohio

MEMBER'S NAME: Chad C. Creeks

MEMBER'S HOME PHONE INCLUDING AREA CODE
AREA CODE: 614-486-5281

MEMBER'S ADDRESS: 1188 Dublin Road, Columbus OH 43215

AGENT COVERING JOB: Chad C. Creeks

DISTRICT NO: 3

STATEMENT OF FACTS: During a routine job site visit on March 6, 2014 I discovered SOFCO Erectors, Inc. has breached the AGC Building Agreement by assigning someone other than an Operating Engineer on a forklift at the Target Store construction project in Powell, Ohio on Sawmill Road.

RESOLUTION SOUGHT: As a result the employer has agreed to pay the first qualified registered applicant from the IUOE District 3 Referral the applicable wages and fringes from the first day of the violation.

WHICH AGREEMENT HERE AFFECTED (Highway, Sewer, Building, Pipeline, etc.): AGC Building Agreement

WHICH ARTICLE OF AGREEMENT AFFECTED: Article II, Paragraph 20 & 22

[signature]
Signature of Steward or Business Representative

[signature]
Signature of Member

DISPOSITION AND DATE STEP 1:
3/6/2014 Spoke to foreman Alvin Raber. No resolution.
3/7/2014 Left voice mail for Mike Talbert, Field Operations Manager. No resolution.

DISPOSITION AND DATE STEP 2:
3/11/14 CHAD CREEK CAME TO SOFCO OFFICE - DISCUSSION " "
3/13/14 CHAD CREEK AND THOMAS BYERS CAME TO SOFCO OFFICE - WANTING PAYMENT IN FULL LABOR & FRINGE SINCE 3/6/14 WAS ONLY RESOLUTION. NO RESOLUTION
NO MENTION OF ACTUALLY PUTTING SOMEONE TO WORK.

SOFCO001187



International Union of Operating Engineers

LOCAL 18 AND ITS BRANCHES • SERVING OHIO

ELEVEN EIGHTY-EIGHT DUBLIN ROAD • COLUMBUS, OHIO 43215-7005

(614) 486-5281 FAX: (614) 486-7258

Office of District No. 3

March 24, 2014

Settlement Letter

Sofco Erectors and the International Union of Operating Engineers, Local 18 agree to the following settlement for the grievance dated March 11, 2014.

Sofco Erectors agrees to hire an apprentice from the I.U.O.E. Local 18, District 3 referral for operation of forklifts. It is also agreed that the apprentice will perform other duties as prescribed in the AGC of Ohio Building Agreement, paragraph 79B.

Chad C. Creeks
Business Representative, IUOE Local 18

Dan Powell
Sofco Erectors, President/COO

# GRIEVANCE FORM

2-90

NAME OF STEWARD OR BUSINESS REPRESENTATIVE STANLEY BRUBAKER

DATE 6/25/13

CONTRACTOR SOFCO ERECTORS INC.

LOCATION OF JOB MIAMI UNIVERISTY

MEMBER'S NAME

MEMBER'S HOME PHONE INCLUDING AREA CODE

MEMBER'S ADDRESS

AGENT COVERING JOB STANLEY BRUBAKER

DISTRICT NO. 4

**STATEMENT OF FACTS** BREACH OF CONTRACT, SOFCO ERECTORS INC. IS NOT ABIDING BY THE TERMS AND CONDITIONS OF THE AGC OF OHIO BUILDING AGREEMENT, MAY 8, 2013 THROUGH APRIL 30, 2017, ARTICLE II PARA. 22 AS IT RELATES TO FORKLIFTS.

RESOLUTION: COMPANY TO PLACE WORK ORDER AND PAY THE FIRST QUALIFIED REGISTERED APPLICANT FROM THE REFERRAL ALL APPLICABLE WAGES AND FRINGE BENEFITS FROM THE FIRST DAY OF VIOLATION.

WHICH AGREEMENT HERE AFFECTED AGC OHIO BUILDING AGREEMENT
(Highway, Sewer, Building, Pipeline, etc.)

WHICH ARTICLE OF AGREEMENT AFFECTED ARTICLE II, PARA. 22

Stanley E. Brubaker
Signature of Steward or Business Representative

Signature of Member

PENGAD 800-631-6989 EXHIBIT Employer

**DISPOSITION AND DATE STEP 1:** ON 6/24/13 B.A. STAN BRUBAKER SPOKE WITH FOREMAN PETE LEONARD; NO RESOLUTION.

SOFCO001190

**DISPOSITION AND DATE STEP 2:** ON 6/25/13 WROTE UP GRIEVANCE AND FAX TO COMPANY.

10-11-13 Company agree to place work order and pay first qualified operator from the referral 20 hours wages and fringes to settle grievance.

ACREED TO BY

Form No. 2



# OHIO OPERATING ENGINEERS
## FRINGE BENEFIT PROGRAMS

1180 Dublin Road
PO Box 12009
Columbus OH 43212-0009
614.488.0708

Carol A. Wilson
Administrator

August 31, 2017

**MAILED VIA REGULAR & CERTIFIED U.S. MAIL**

SOFCO ERECTORS INC
10360 WAYNE AVE
CINCINNATI OH 45215-1129

**Re: Partial and Complete Withdrawal Liability Demand for Payment**

To Whom It May Concern:

The Ohio Operating Engineers Pension Plan ('Plan") was recently informed that the collective bargaining agreement between the Ohio Operating Engineers Local 18 and Sofco Erectors, Inc. (hereinafter referred to as "Sofco") was terminated. After receiving this notice, the Plan performed a calculation of Sofco's complete withdrawal liability. This calculation was prepared by the Plan's actuary, and is based upon a complete withdrawal from the Pension Plan during the Plan year ending July 31, 2017. According to this calculation, Sofco's complete withdrawal liability is **$368,315. (Please see attached copy of the actuary's August 29, 2017 letter and calculation).**

Additionally, the Actuary also noticed more than a 70% reduction in contribution hours reported by Sofco for the three year period of 2011-2013. This decline in hours constitutes a partial withdrawal by Sofco from the collective bargaining agreement during this period. As a result, the Plan's actuary also performed partial withdrawal liability calculations. **(Please see aforementioned letter and calculation).** Although there is no partial withdrawal liability for the Plan year ending July 31, 2013, these calculations revealed the following:

- For the Plan year ending July 31, 2011, partial withdrawal liability in the amount of $344,627;
- For the Plan year ending July 31, 2012, partial withdrawal liability in the amount of $111,358.

Based on all calculations performed by the Plan's actuary, the Plan hereby requests and demands that Sofco pays the following amounts:

- Complete withdrawal liability for the Plan year ending July 31, 2017 in the amount of $368,315 which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721;

- Partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627 which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327;

- Partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358 which can be paid in six quarterly payments of $17,294 and a final payment of $10,652.

**The Plan also requests and demands that Sofco remits its payments (with a separate check for each calculation) under these payment plans by no later than October 30, 2017.** A quarterly or lump sum payment should be made payable to: The Ohio Operating Engineering Pension Plan, Attn: Samantha Polsinelli, 1180 Dublin Rd., P.O. Box 12009, Columbus, Ohio 43212.

Sincerely,

Bryan C. Barch, Esq.
In-House Counsel

 101 North Wacker Drive Suite 500 Chicago, IL 60606-1724
T 312.984.8619 www.segalco.com

Daniel V. Ciner, MAAA, EA
Senior Vice President and Actuary
dciner@segalco.com

August 29, 2017

*VIA E-MAIL*

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
1180 Dublin Road
Columbus, Ohio 43212

Re: **Ohio Operating Engineers Pension Fund – Partial and Complete Withdrawal Liability Calculations for Sofco Erectors, Inc.**

Dear Ms. Polsinelli:

As requested, we have updated the withdrawal liability calculation for Sofco Erectors, Inc. assuming three partial withdrawals in the Plan years ended July 31 of 2011, 2012, and 2013, respectively, and a complete withdrawal in the Plan year ended July 31, 2017. As described below, we look to Fund Counsel regarding interpretations as to assessment of withdrawal liability for construction industry employers.

- For the Plan year ended July 31, 2011, the calculated amount of partial withdrawal liability is $344,627, which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327.
- For the Plan year ended July 31, 2012, the calculated amount of partial withdrawal liability is $111,358 (after application of the credit for the prior partial withdrawal as of July 31, 2011), which can be paid in six quarterly payments of $17,294 and a final payment of $10,652.
- For the Plan year ended July 31, 2013, the calculated amount of partial withdrawal liability is $0 (after application of the credit for the prior partial withdrawals as of July 31, 2011 and 2012).
- For the Plan year ended July 31, 2017, the calculated amount of complete withdrawal liability is $368,315 (after application of the credit for the prior partial withdrawals as of July 31, 2011, 2012, and 2013), which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721.

The above withdrawal liability calculations are based on the asset values and liabilities stated in the July 31, 2008, 2009, 2010, and 2016 withdrawal liability reports, respectively. In addition, they are based on the contribution information provided in your e-mails dated May 1, 2017 and May 9, 2017, including maximum hourly contribution rates of $4.00, $4.50, and $6.00 for the 10-year periods ended July 31, 2009, 2010, and 2017, respectively.

Under Section 4205(b)(1) of ERISA, a partial withdrawal occurs when contribution hours in each of three consecutive years (the "three-year testing period") are at least 70% less than the average of the two highest years of contribution hours during the five years preceding the three-year testing period. Based on the information you provided us, Sofco Erectors, Inc. incurred three consecutive 70% declines for the three-year testing periods that ended in 2011, 2012, and 2013.

Under Section 4208(d)(1) of ERISA, for construction industry employers in construction industry plans, partial withdrawal liability is assessable when work continues for an insubstantial portion of the employer's work in the jurisdiction of the collective bargaining agreement. The calculations included in this letter assume that this employer will be assessed partial withdrawal liability for each partial withdrawal. We defer to Fund Counsel's interpretation as to whether partial withdrawal liability is assessable to this employer.

Under Section 4206 of ERISA, partial withdrawal liability based on a 70% decline in contribution hours is calculated as a fraction of the amount that would be payable if there were a complete withdrawal by this employer on the last day of the first Plan year in the three-year testing period (i.e., in 2009, 2010, and 2011 for the 2011, 2012, and 2013 partial withdrawals, respectively). This fraction equals the ratio of the employer's contribution hours for the Plan year following the end of the three-year testing period to the average contribution hours during the five years preceding the first year of the three-year testing period.

Under Section 4206 of ERISA, any withdrawal liability (either complete or partial) for an employer is reduced by the amount of any partial withdrawal liability of the employer with respect to the Plan for a previous year. We have determined the amount of credit for the prior partial withdrawals, and have offset the partial withdrawal liability for the Plan years ended July 31, 2012 and July 31, 2013, as well as the complete withdrawal liability as of July 31, 2017, by the respective credit amounts.

We have enclosed exhibits showing the details of our calculations as follows:

<u>For the July 31, 2011 partial withdrawal:</u>

Exhibit A – Determination of Partial Withdrawal
Exhibit B – Calculation of the Allocable Amount of Unfunded Vested Benefits
Exhibit C – Determination of Withdrawal Liability
Exhibit D – Determination of Payment Schedule under ERISA Section 4219
Exhibit E – Basis for Determining Withdrawal Liability

<u>For the July 31, 2012 partial withdrawal:</u>

Exhibit F – Determination of Partial Withdrawal
Exhibit G – Calculation of the Allocable Amount of Unfunded Vested Benefits
Exhibit H – Development of Credit for Prior (July 31, 2011) Partial Withdrawal
Exhibit I – Determination of Withdrawal Liability
Exhibit J – Determination of Payment Schedule under ERISA Section 4219
Exhibit K – Basis for Determining Withdrawal Liability

<u>For the July 31, 2013 partial withdrawal:</u>

Exhibit L – Determination of Partial Withdrawal
Exhibit M – Calculation of the Allocable Amount of Unfunded Vested Benefits
Exhibit N – Development of Credit for Prior (July 31, 2011 and July 31, 2012) Partial Withdrawals
Exhibit O – Determination of Withdrawal Liability
Exhibit P – Basis for Determining Withdrawal Liability

For the July 31, 2017 complete withdrawal:

Exhibit Q – Calculation of the Allocable Amount of Unfunded Vested Benefits
Exhibit R – Development of Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals
Exhibit S – Determination of Withdrawal Liability
Exhibit T – Determination of Payment Schedule under ERISA Section 4219
Exhibit U – Basis for Determining Withdrawal Liability

As with all withdrawals, the assessment of withdrawal liability is subject to Fund Counsel review. Please let us know if you have any questions.

Sincerely,

Daniel V. Ciner
Enclosures

cc: Ms. Carol Wilson (w/enclosures)
Ms. Megan Kelly (w/enclosures)

5685716v1/05517.008

EXHIBIT A

Ohio Operating Engineers Pension Fund

DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2011

Employer Name: **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle: 07/31/2011

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | 12,253.50 | 13% |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |
| 2004 | 10,862.00 | | |

*A partial withdrawal has occurred as of July 31, 2011.*

EXHIBIT B

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2009

Employer Name: Sofco Erectors, Inc.

| Year Ended[1] July 31 | Unamortized Balance of Withdrawal Liability Pools: Basic[2] | Reallocated[3] | Contributions During 5-Year Period Ended Prior to Date Pool Established: Total Plan Contributions[4] | Obligated Employer Contributions[5] | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) |
|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $195,618,368 | $0 | $178,834,875 | $291,244 | $318,577 |
| 2004 | (21,738,368) | 0 | 183,435,933 | 275,279 | (32,622) |
| 2005 | 103,632,017 | 0 | 184,525,945 | 211,259 | 118,646 |
| 2006 | (136,835,103) | 0 | 187,236,038 | 189,279 | (138,328) |
| 2007 | 31,859,110 | 0 | 192,258,544 | 180,029 | 29,833 |
| 2008 | 138,233,538 | 0 | 202,969,173 | 187,255 | 127,531 |
| Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6) | | | | | $423,637 |

[1] *Years not shown have no withdrawal liability components.*

[2] *Original value of the changes in the unfunded vested benefits, written down 5% per year.*

[3] *Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*

[4] *Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*

[5] *Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

EXHIBIT C

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $423,637 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) – (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $423,637 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2003 – 07/31/2008 | 58,229.50 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 11,645.90 |
| F. | Contribution Hours 08/01/2011 - 07/31/2012 | 2,172.00 |
| G. | Partial Withdrawal Liability Factor: 1 – [(F) ÷ (E)] | 81.349660% |
| H. | Withdrawal Liability: (C) x (G) | $344,627 |

EXHIBIT D

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2011

Employer Name: Sofco Erectors, Inc.

(1) Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 1999 | 18,877.50 | N/A |
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | 24,877.83 |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |

| | | |
|---|---|---|
| (2) | Average Base Units for highest 3 consecutive years during 10 years ended July 31, 2008 | 24,877.83 |
| (3) | Highest contribution rate during 10 years ending July 31, 2009 | $4.00 |
| (4) | Partial withdrawal liability fraction (see Exhibit C, Item G) | 81.349660% |
| (5) | Annual payment = (2) x (3) x (4) [rounded up to the nearest $4] | $80,956 |
| (6) | Quarterly payment = (5) / 4 | $20,239 |
| (7) | Number of Full Years of Payment | 4 |
| (8) | Remaining Balance After 4 Years | $69,044 |
| (9) | Number of Full Quarterly Payments in Year 5: | 3 |
| (10) | Amount of Remaining Payment = (8) - (6) x (9) | $8,327 |

EXHIBIT E

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2008.

3. All assumptions per the July 31, 2008 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2008.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any application of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

EXHIBIT F

Ohio Operating Engineers Pension Fund

DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2012

Employer Name: Sofco Erectors, Inc.

End of Three-Year Testing Cycle: 07/31/2012

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |

*A partial withdrawal has occurred as of July 31, 2012.*

EXHIBIT G

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2010

Employer Name: Sofco Erectors, Inc.

| | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
|---|---|---|---|---|---|
| Year Ended[1] July 31 | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | (2) and (3) |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $182,577,144 | $0 | $178,834,875 | $291,244 | $297,339 |
| 2004 | (20,379,720) | 0 | 183,435,933 | 275,279 | (30,583) |
| 2005 | 97,536,016 | 0 | 184,525,945 | 211,259 | 111,666 |
| 2006 | (129,233,153) | 0 | 187,236,038 | 189,279 | (130,643) |
| 2007 | 30,182,315 | 0 | 192,258,544 | 180,029 | 28,262 |
| 2008 | 131,321,861 | 0 | 202,969,173 | 187,255 | 121,155 |
| 2009 | 357,008,602 | 0 | 210,884,752 | 161,099 | 272,726 |
| Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6) | | | | | $669,922 |

[1] *Years not shown have no withdrawal liability components.*

[2] *Original value of the changes in the unfunded vested benefits, written down 5% per year.*

[3] *Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*

[4] *Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*

[5] *Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

EXHIBIT H

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWAL
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal | $ | 397,196 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal | $ | 423,637 |
| E: | Credit for prior partial withdrawal [ A x B x C / (D x B )] | $ | 323,117 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

EXHIBIT I

Ohio Operating Engineers Pension Fund

## DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $669,922 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) – (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $669,922 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2004 – 07/31/2009 | 48,975.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 9,795.00 |
| F. | Contribution Hours 08/1/2012 - 07/31/2013 | 3,442.50 |
| G. | Partial Withdrawal Liability Factor: 1 – [(F) ÷ (E)] | 64.854518% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | $ 434,475 |
| I. | Credit for Prior (July 31, 2011) Partial Withdrawal | $323,117 |
| J. | Withdrawal Liability: (H) – (I), but not less than zero | $111,358 |

EXHIBIT J

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

Employer Name: Sofco Erectors, Inc.

(1) Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | N/A |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |
| 2009 | 1,607.50 | 8,213.00 |

| | | |
|---|---|---|
| (2) | Average Base Units for highest 3 consecutive years during 10 years ended July 31, 2009 | 23,702.50 |
| (3) | Highest contribution rate during 10 years ending July 31, 2010 | $4.50 |
| (4) | Partial withdrawal liability fraction (see Exhibit I, Item G) | 64.854518% |
| (5) | Annual payment = (2) x (3) x (4) [rounded up to the nearest $4] | $69,176 |
| (6) | Quarterly payment = (5) / 4 | $17,294 |
| (7) | Number of Full Years of Payment | 1 |
| (8) | Remaining Balance After 1 Year | $45,240 |
| (9) | Number of Full Quarterly Payments in Year 2: | 2 |
| (10) | Amount of Remaining Payment = (8) - (6) x (9) | $10,652 |

Segal Consulting

EXHIBIT K

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).
2. Census data collected as of July 31, 2009.
3. All assumptions per the July 31, 2009 withdrawal liability report.
4. Market value of assets based on audited financial statements as of July 31, 2009.
5. Total plan contributions are as reported in the audited financial statements.
6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.
7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.
8. We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

EXHIBIT L

Ohio Operating Engineers Pension Fund

## DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2013

Employer Name: **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle: 07/31/2013

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2013 | 3,442.50 | 12,253.50 | 28% |
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | | |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |

*A partial withdrawal has occurred as of July 31, 2013.*

EXHIBIT M

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2011

Employer Name: Sofco Erectors, Inc.

| | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
|---|---|---|---|---|---|
| Year Ended[1] July 31 | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | (2) and (3) |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $169,535,919 | $0 | $178,834,875 | $291,244 | $276,100 |
| 2004 | (19,021,072) | 0 | 183,435,933 | 275,279 | (28,545) |
| 2005 | 91,440,015 | 0 | 184,525,945 | 211,259 | 104,687 |
| 2006 | (121,631,202) | 0 | 187,236,038 | 189,279 | (122,958) |
| 2007 | 28,505,519 | 0 | 192,258,544 | 180,029 | 26,692 |
| 2008 | 124,410,184 | 0 | 202,969,173 | 187,255 | 114,778 |
| 2009 | 339,158,172 | 0 | 210,884,752 | 161,099 | 259,090 |
| 2010 | 42,238,100 | 0 | 218,622,244 | 127,590 | 24,651 |
| Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6) | | | | | $654,495 |

[1] *Years not shown have no withdrawal liability components.*

[2] *Original value of the changes in the unfunded vested benefits, written down 5% per year.*

[3] *Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*

[4] *Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*

[5] *Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

EXHIBIT N

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Partial Withdrawal in the Plan Year Ended July 31, 2013

| | Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011 | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal | $ | 370,754 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal | $ | 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)] | $ | 301,607 |
| | **Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012** | | |
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal | $ | 629,844 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal | | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal | $ | 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal | $ | 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)] | $ | 104,696 |
| K. | Total credit for prior partial withdrawals [ E + J] | $ | 406,303 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

EXHIBIT O

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2013

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $654,495 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) – (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $654,495 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2005 – 07/31/2010 | 37,608.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 7,521.60 |
| F. | Contribution Hours 08/1/2013 - 07/31/2014 | 3,834.00 |
| G. | Partial Withdrawal Liability Factor: 1 – [(F) ÷ (E)] | 49.026803% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | $320,878 |
| I. | Credit for Prior (July 31, 2011 and 2012) Partial Withdrawals | $406,303 |
| J. | Withdrawal Liability: (H) – (I), but not less than zero | $0 |

EXHIBIT P

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2013

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).
2. Census data collected as of July 31, 2010.
3. All assumptions per the July 31, 2010 withdrawal liability report.
4. Market value of assets based on audited financial statements as of July 31, 2010.
5. Total plan contributions are as reported in the audited financial statements.
6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.
7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.
8. We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

EXHIBIT Q

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer Name: Sofco Erectors, Inc.

| | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
|---|---|---|---|---|---|
| Year Ended[1] July 31 | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | (2) and (3) |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $91,288,572 | $0 | $178,834,875 | $291,244 | $148,669 |
| 2004 | (10,869,184) | 0 | 183,435,933 | 275,279 | (16,311) |
| 2005 | 54,864,009 | 0 | 184,525,945 | 211,259 | 62,812 |
| 2006 | (76,019,502) | 0 | 187,236,038 | 189,279 | (76,849) |
| 2007 | 18,444,748 | 0 | 192,258,544 | 180,029 | 17,271 |
| 2008 | 82,940,123 | 0 | 202,969,173 | 187,255 | 76,519 |
| 2009 | 232,055,591 | 0 | 210,884,752 | 161,099 | 177,272 |
| 2010 | 29,566,670 | 0 | 218,622,244 | 127,590 | 17,255 |
| 2011 | 127,603,629 | 0 | 230,778,340 | 95,158 | 52,615 |
| 2012 | 214,305,669 | 0 | 250,306,333 | 70,436 | 60,305 |
| 2013 | 7,764,623 | 0 | 269,018,918 | 46,278 | 1,336 |
| 2014 | (129,537,937) | 6,853 | 298,703,055 | 62,852 | (27,255) |
| 2015 | 261,224,360 | 0 | 331,169,312 | 94,102 | 74,227 |
| 2016 | 112,294,964 | 0 | 360,524,316 | 121,118 | 37,725 |
| Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6) | | | | | $605,591 |

*[1] Years not shown have no withdrawal liability components.*

*[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.*

*[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*

*[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*

*[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

EXHIBIT R

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Withdrawal in the Plan Year Ended July 31, 2017

| | Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011 | |
|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal................. | $ 212,111 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal.............. | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal................ | $ 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.......................................................... | $ 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)]..... | $ 172,551 |
| | **Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012** | |
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal............. | $ 389,383 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal.............. | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal..................... | $ 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.......................................................... | $ 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)]..... | $ 64,725 |
| | **Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2013** | |
| K: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal............. | $ 406,638 |
| L: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal.............. | 0.490268 |
| M: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal..................... | $ - |
| N: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.......................................................... | $ 654,495 |
| O: | Credit for prior partial withdrawal in Plan year ended July 31, 2013 [ K x L x M / (N x L)]............ | $ - |
| P. | Total credit for prior partial withdrawals [ E + J + O] | $ 237,276 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

EXHIBIT S

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $605,591 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) – (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Limitation in Accordance with ERISA Section 4225 (Sale of Assets) | N/A* |
| D. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $605,591 |
| E. | Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals | $237,276 |
| F. | Withdrawal Liability: (D) – (E), but not less than zero | $368,315 |

* We are unaware of any applicability of Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies

EXHIBIT T

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer Name: Sofco Erectors, Inc.

(1) Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2007 | 11,053.50 | N/A |
| 2008 | 11,978.00 | N/A |
| 2009 | 1,607.50 | 8,213.00 |
| 2010 | 440.00 | 4,675.17 |
| 2011 | 1,123.00 | 1,056.83 |
| 2012 | 2,172.00 | 1,245.00 |
| 2013 | 3,442.50 | 2,245.83 |
| 2014 | 3,834.00 | 3,149.50 |
| 2015 | 5,527.00 | 4,267.83 |
| 2016 | 5,477.00 | 4,946.00 |

| | | |
|---|---|---|
| (2) | Average Base Units for highest 3 consecutive years during 10 years ended July 31, 2016 | 8,213.00 |
| (3) | Highest contribution rate during 10 years ended July 31, 2017 | $6.00 |
| (4) | Annual payment = (2) x (3) [rounded up to the nearest $4] | $49,280 |
| (5) | Quarterly payment = (4) / 4 | $12,320 |
| (6) | Number of Full Years of Payment | 10 |
| (7) | Remaining Balance After 10 Years | $2,721 |
| (8) | Number of Full Quarterly Payments in Year 11: | 0 |
| (9) | Amount of Remaining Payment = (7) - (5) x (8) | $2,721 |

Segal Consulting

EXHIBIT U

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).
2. Census data collected as of July 31, 2016.
3. All assumptions per the July 31, 2016 withdrawal liability report.
4. Market value of assets based on audited financial statements as of July 31, 2016.
5. Total plan contributions are as reported in the audited financial statements.
6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.
7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

Representing Management Exclusively in Workplace Law and Related Litigation

jackson|lewis.

425 Walnut Street
Suite 2300
Cincinnati, Ohio 45202
Tel 513 621-3440
Fax 513 621-4449
www.jacksonlewis.com

ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC | ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD | ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA | AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA | BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT | BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA | BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA | CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR | CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA | CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO | DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL | DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION | DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY | DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | GRAND RAPIDS, MI | MINNEAPOLIS, MN

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: 513-873-2103
MY EMAIL ADDRESS IS: GARY.GREENBERG@JACKSONLEWIS.COM

November 10, 2017

**VIA E-MAIL & U.S. MAIL**

Trustees, Ohio Operating Engineers Pension Fund
c/o Brian C. Barch, In-house Counsel
1180 Dublin Road
PO Box 12009
Columbus, OH 43212-0009

RE: Sofco Erectors, Inc. - Request for Review of Withdrawal Liability Assessment dated August 31, 2017

To the Trustees:

This is the Request for Review by Sofco Erectors, Inc. ("Company") of the Ohio Operating Engineers Pension Fund ("Fund") assessment of withdrawal liability issued to the Company on August 31, 2017, pursuant to 29 U.S.C. § 1399(b)(2)(A).

## I. INTRODUCTION

The Company disputes the assessments in their entirety, for these reasons:

1. The Fund's assessment of complete withdrawal liability is contrary to 29 U.S.C. § 1383(b)(1), the special exception for construction industry employers and plans.[1] Because the Company has not continued or resumed performing work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously (as of April 30, 2017) required, there has been no complete withdrawal for which liability may be assessed.

2. The Fund's assessments of partial withdrawal liability are contrary to 29 U.S.C. § 1388(d)(1). During the years in question, the Company's obligation to contribute to the Plan were for "more than an insubstantial portion of its work in the craft and area jurisdiction of the collective bargaining agreement of the type of which contribution [were] required." Accordingly, there were no partial withdrawals for which liability may be assessed.

[1] The Company understands that there is no dispute that it is a construction industry employer, and the Fund's Plan is a construction industry plan, for purposes of 29 U.S.C. § 1383(b)(1), the construction industry exception.


## II. BACKGROUND

These background facts are taken from the Affidavit of John Hesford (attached as Exhibit 1) and the Fund's Withdrawal Liability Assessment dated August 31, 2017.

The Company began operations on April 1, 2004, when it purchased the assets of its predecessor. The Company was a party to a series of collective bargaining agreements with the International Union of Operating Engineers, Local 18 ("Local 18") the last of which was effective from May 8, 2013 through April 30, 2017 ("CBA"). In accordance with these collective bargaining agreements, the Company made the required contributions for hours worked by employees within the craft and geographic jurisdiction of these agreements through April 30, 2017.

The Company terminated the CBA and its relationship with Local 18 effective April 30, 2017. Since then, all of the Company's on-site construction work has been performed by the following, and no others: (a) Company employees covered by its collective bargaining agreements with Iron Workers Local Nos. 44, 172 and 180; (b) crane operators covered by the CBA and its successors, and employed by crane leasing companies that have contracted with the Company to provide cranes and crane operators for these projects; and (c) licensed surveyors to establish building lines for precast installations (nothing more). All of the crane leasing companies that contract with the Company for work in Local 18's jurisdiction make the required payments to the Fund for the crane operators assigned to these projects.

In a letter dated August 31, 2017, the Fund assessed the Company for withdrawal liability as follows:

- Complete withdrawal liability for the Plan year ending July 31, 2017, in the amount of $368,315 ($605,591 less credit for partial withdrawals).

- Partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627, based on finding that the ratio of hours to maximum average contribution base units ("CBUs") during a 3 year testing cycle were as follows:

    * 2011 – 9%
    * 2010 – 4%
    * 2009 – 13%

- Partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358, based on finding that the ratio of hours to maximum average CBUs during a 3 year testing cycle were as follows:



jackson lewis
Attorneys at Law

* 2012 – 18%
* 2011 – 9%
* 2010 – 4%

- Partial withdrawal liability for the Plan year ending July 31, 2013 in the amount of $0 (after application of prior partial withdrawals), based on finding the ratio of hours to maximum average CBUs during a 3 year testing period were as follows:

  * 2013 – 28%
  * 2012 – 18%
  * 2011 – 9%

The Fund's assessment letter does not explain why it used the statutory "70% decline" formula, which does not apply to construction industry employers/plans, to find partial withdrawal, nor why it did not apply the "insubstantial portion" provision in 29 U.S.C. § 1388(d)(1), which does apply. Moreover, the Fund's letter does not explain why the construction industry exception to complete withdrawal liability does not apply here, given that Company employees have not continued or resumed work within Local 18's jurisdiction since April 30, 2017.

In an email to Fund in-house counsel, Bryan Barch, dated October 23, 2017, Company counsel asked for "documentation in the Fund's possession that confirms, supports or explains the Fund's application of the [70% decline] formula to the Company. . . ." In the same email, Company counsel asked for "documents in the Fund's possession that confirms, supports or explains [the Fund's] findings and conclusion [that the Company continued or resumed work within the craft and geographic jurisdiction of Local 18]." The only response received to date was on November 1, 2017, from the Fund's outside counsel stating that he would have to review the file in more depth before responding on these issues. A copy of this email exchange is attached as Exhibit 2.

## III. THERE HAS BEEN NO COMPLETE WITHDRAWAL

A. The CBA did not obligate the Company to make pension contributions for subcontractors; therefore, use of subcontractors for work formerly performed by the Company's Local 18 employees is not grounds for imposing withdrawal liability.

"[T]here is no withdrawal [as a result of subcontracting] unless the [construction] employer would have been obligated to make contributions for work performed by subcontractors under the terminated agreement. If contributions would not have been required, there would be no withdrawal, because the employer would not be continuing to perform work of the type for which contributions were previously required." PBGC Opinion Letter 85-5.



jackson lewis
Attorneys at Law

While the CBA, in Art. XIII, Sect. 117,, states that "all subcontractors shall be subject to the terms and provisions of this Agreement as it relates Operating Engineers", neither this nor any other provision of the CBA expressly imposes liability on the Company if the subcontractor fails to make the required payments. Accordingly, the construction industry exception applies, as the Company is not "continuing to perform work of the type for which contributions were previously required".

B. All of the subcontracted crane operators are covered by the CBA and its successor, and their employers make the required payments to the Fund; therefore, use of these subcontractors is not grounds for imposing withdrawal liability.

In enacting the Multi-Employer Pension Plan Act in 1980, Congress recognized that the withdrawal of a single construction employer from a construction industry plan does not reduce the contribution base if "other signatory employers take up the slack." *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for Northern California*, 859 F. 2d 808, 812 (1988).

Here, other signatory employers have taken up the slack. This is the opposite of what occurred in *Oregon-Washington Carpenters-Employers Pension Trust Fund v. BQC Construction Inc. Hardware Service*, 485 F. Supp. 2d 1206 (2007), where the court imposed withdrawal because the construction employer subcontracted to **non-union** carpenters:

> "Boden could have avoided withdrawal liability by subcontracting to a union employer who would make contributions to the Plan, thereby taking up the slack created by Boden. Because Boden did not subcontract to a union employer, the problem of unfunded vested benefits belongs to Boden, and Boden is liable."

*Id* at p. 1216.

Because the Company subcontracts only to Local 18 employers, it is **not** liable for withdrawal.

## IV. THERE WAS NO PARTIAL WITHDRAWAL BECAUSE THE WORK CONTINUED DURING THE YEARS IN QUESTION FOR MORE THAN AN INSUBSTANTIAL PORTION OF THE COMPANY'S WORK IN THE UNION'S JURISDICTION

29 U.S.C. § 1388(d)(1) states: "An employer to whom section 1383(b) of this title (relating to the building and construction industry) applies is liable for a partial withdrawal **only** if the employer's obligation to contribute under the plan is continued for no more than an **insubstantial portion** of its work in the craft and area jurisdiction of the collective bargaining agreement of the type for which contributions are required." (Emphasis added.)



jackson lewis
Attorneys at Law

"Insubstantial portion" is not defined in the statute, nor has it been defined by the PBGC. In fact, the PBGC punted on the issue. PBGC Opinion Letter 95-2. Nor does there appear to be any case law defining the term for purposes of this provision.

However, "insubstantial portion" must mean a decline in contributions greater than the "70% decline" formula set forth in the provision applicable outside the construction industry; why else have a separate provision? And it must mean a portion that is close to zero. See Definition of "Insubstantial" in Merriam Webster dictionary: "not substantial: such as a: lacking substance or material nature b: lacking firmness or solidity: FLIMSY."

The IRS definition of "insubstantial" for purposes of charitable contribution reporting is instructive:

> "Token Exception – Insubstantial goods or services a charitable organization provides in exchange for a contribution do not have to be described in the acknowledgment [to the donor]. Goods and services are considered to be insubstantial if . . . 1. the fair market value of the benefits received does not exceed the lesser of 2 percent of the payment or $106,* or 2. the payment is at least $53,* the only items provided bear the organization's name or logo . . . and the cost of these items is within the limit for 'low-cost articles', which is $10.60.*
>
> *The dollar amounts are for 2016. Guideline amounts are adjusted for inflation."

IRS Publication 1771, "Charitable Contributions, Substantiation and Disclosure Requirements."

The IRS defines "insubstantial" to mean 2% or less, which is consistent with the dictionary definition. The Company's contribution ratios during the years in question were 13%, 4%, 9%, 18% and 28%, all above, and all but one well above, 2%. This was "more than insubstantial" during all of the 3 year measurement periods. Accordingly, there were no partial withdrawals for which liability may be assessed.

## V. CONCLUSION

For the reasons stated above, the Company requests that the Fund overturn and cancel the assessments of withdrawal liability in their entirety and return to the Company the payments already made.[2]

---

[2] The Company may supplement this Request for Review before the 90-day limitation period expires if the actuarial consultant retained by the Company advises that the Fund's actuary over-stated what is owed due to erroneous calculations. Of course, such supplement would be moot if the assessments are overturned in their entirely.

Trustees, Ohio Operating
Engineers Pension Fund

November 10, 2017
Page 6

jackson lewis
Attorneys at Law

Respectfully submitted,

Gary L. Greenberg

Gary L. Greenberg
Attorney for Sofco Erectors, Inc.

GLG/dlc
Enclosures

Cc: (Via email and U.S. Mail)
Daniel J. Clark
Alan Kinzer
Vorys, Sater, Seymour and Pease LLP
Outside Counsel for the Fund

4840-5678-4468, v. 1

**IN THE MATTER OF:**

OHIO OPERATING ENGINEERS
PENSION FUND

And

SOFCO ERECTORS, INC.

AFFIDAVIT OF JOHN HESFORD

---

STATE OF OHIO )
) ss.
COUNTY OF HAMILTON )

1. My name is John Hesford. I am President of Sofco Erectors, Inc. (the "Company"), 10360 Wayne Ave, Cincinnati, Ohio 45215. The Company began operations on April 1, 2004, when it purchased the assets of its predecessor.

2. The Company was a party to a series of collective bargaining agreements with the International Union of Operating Engineers, Local 18 ("Local 18"), the last of which was effective from May 8, 2013 through April 30, 2017 ("CBA").

3. The Company terminated the CBA and its relationship with Local 18 effective April 30, 2017; Local 18 has not disputed this.

4. At all times since termination of the CBA, all construction and related work performed on customers' premises by the Company ("on-site work") within the geographic jurisdiction of the CBA has been limited to a) employees of the Company who are covered by the Company's collective bargaining agreements with Iron Workers Local Nos. 44, 172 and 290, b)



crane operators covered by the CBA and its successor, and employed by crane leasing companies that have contracted with the Company to provide cranes and crane operators for these projects, and c) licensed surveyors to establish building lines for precast installations (nothing more).

5. At all times since termination of the CBA, the Company has employed no non-union employees or subcontractors to perform on-site work within the geographic jurisdiction of the CBA, other than the licensed surveyors referenced in paragraph 4 above.

6. Attached as Exhibit A is a complete list of all of the crane leasing companies that the Company has contracted with since termination of the CBA for performance of on-site work within the geographic jurisdiction of the CBA.

7. Attached as Exhibit B – E are letters from the companies listed on Exhibit A that confirm each a) exclusively employs Local 18 operators to run cranes in Local 18's jurisdiction and b) pays into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement for each hour worked.

I swear and affirm that this Affidavit is true and accurate to the best of my knowledge, and is based on my personal knowledge.

Further Affiant sayeth not.

November 10, 2017

[signature]
John Hesford

Subscribed and sworn to before me
this 10 day of November, 2017.

[signature: Caroline Riley]

Hamilton County, Ohio
My Commission Expires: 11/1/2020
Acting in Hamilton County, Ohio
4844-1580-5779, v. 1

NOTARIAL SEAL
STATE OF OHIO

CAROLINE JEAN RILEY
NOTARY PUBLIC
IN AND FOR THE
STATE OF OHIO
MY COMMISSION EXPIRES
NOVEMBER 1, 2020

**EXHIBIT A**

Following are all of the crane leasing companies contracted by Sofco Erectors, Inc. ("Company") since April 30, 2017, to provide cranes and crane operators for on-site work within the jurisdiction of the Company's 2013-2017 collective bargaining agreement with IUOE Local 18.

Tri-State Crane & Rigging Service
4838 Spring Grove Ave
Cincinnati, OH 45232

Capital City Crane
2299 Performance Way
Columbus, OH 43207

Gould & Smith Crane Rental
8205 Farwick Court
Cincinnati, OH 45249

Maxim Crane Works
840 Licking Pike
Wilder, KY 41076



P.O. Box 308
Newport, KY 41072
phone: 859.441.7400
fax: 859.442.6201
www.maximcrane.com

November 1, 2017

To Whom It May Concern,

Maxim Crane Works, L.P. employs Operating Engineers Local 18 operators to run cranes on all Sofco Erectors Inc. jobsites within the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

Boyd K. Vogt, Jr
Regional Credit Manager
Maxim Crane Works, L.P.

EXHIBIT B

Whatever it takes.



**Tri-State Crane**
**& Rigging Service**
4838 Spring Grove Avenue
Cincinnati, OH 45232
Office: (513)-541-9992
Fax: (513)-541-3395

November 2, 2017

To Whom It May Concern,

Tri-State Crane Rental exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

EXHIBIT
C



October 18, 2017

To Whom it May Concern,

Capital City Crane Company exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

Brian Gibson

President & CEO

2299 Performance Way · Columbus, Ohio 43207 · 614.278.2120 · Fax 614.278.2184
www.ccgroup-inc.com





CRANE RENTAL INC.

8205 FARWICK COURT ▪ CINCINNATI, OHIO 45249 ▪ 513-489-2050 ▪ FAX 513-489-1873

24 HOURS SERVICE

November 1, 2017

To Whom It May Concern,

Gould & Smith Crane Rental exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

James Smith, President
Gould & Smith Crane Rental, Inc.

EXHIBIT
E

**Greenberg, Gary L. (Cincinnati)**

**From:** Clark, Daniel J. <djclark@vorys.com>
**Sent:** Wednesday, November 01, 2017 5:27 PM
**To:** Greenberg, Gary L. (Cincinnati); Kinzer, Allen S.
**Cc:** Baron, Peggy M.
**Subject:** RE: Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017

Gary-

Yes, this file has been transferred to us. We are just getting our hands around it, so I do not have all the answers for you, but I did not want to ignore you either. I will address your points from your October 23, 2017 email to Bryan Barch in turn.

1. I believe that the August 29 correspondence included all of the information from the Fund's actuaries necessary for Libman Actuarial to review. Are there specific questions the Libman has or pieces of information that they need?

2. The Pension Fund has not adopted its own procedures for withdrawal liability matters. They operate according to the statute and applicable regulations.

3 and 4. I am going to have to review the file in more depth before responding to you on these issues.

Dan

**Daniel J. Clark**
Partner

Vorys, Sater, Seymour and Pease LLP
52 East Gay Street | Columbus, Ohio 43215

Direct: 614.464.6436
Fax: 614.719.4650
Email: djclark@vorys.com
*www.vorys.com*

---

**From:** Greenberg, Gary L. (Cincinnati) [mailto:Gary.Greenberg@Jacksonlewis.com]
**Sent:** Tuesday, October 31, 2017 1:26 PM
**To:** Clark, Daniel J.; Kinzer, Allen S.
**Subject:** FW: Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017

Gentlemen-

Ohio Operating Engineers Pension Fund in-house counsel Bryan Barch informed me yesterday that you now represent the Fund in this matter. On October 23, 2017, I sent the e-mail below to Mr. Barch. I have yet to receive a response.

EXHIBIT
2

Please let me know right away whether our actuarial consultant may communicate directly with the Fund's actuaries at Segal Consulting about their calculations and assumptions.

Also, let me know as soon as possible when I will receive a response to my substantive questions and information requests.

Gary Greenberg
Attorney for Sofco Erectors, Inc.

**Gary L. Greenberg**
Attorney at Law
**Jackson Lewis P.C.**
425 Walnut Street
Suite 2300
Cincinnati, OH 45202
Direct: (513) 873-2103 | Main: (513) 621-3440
Gary.Greenberg@Jacksonlewis.com | www.jacksonlewis.com
***Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative***

**From:** Greenberg, Gary L. (Cincinnati)
**Sent:** Monday, October 23, 2017 11:14 AM
**To:** Bryan Barch <BryanBarch@ooefbp.com>
**Subject:** Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017

Mr. Barch-

Thank you for sending me the Acceptance of Agreement by Sofco Erectors, Inc. ("Company') dated 10-3-11, the 2010-13 and 2013-17 collective bargaining agreements, the Pension Trust Agreement and Pension Plan. I have these follow-up questions:

-We have retained the Libman Actuarial Group of Cleveland, Ohio to consult with us on the calculations and assumptions. May our consultant communicate directly with the Fund's actuaries at Segal Consulting for this purpose?

-I note that Section 16 of the Pension Plan, which governs withdrawal liability, does not include any dispute resolution requirements. Accordingly, we assume that the Fund has no requirements for resolution of disputes over withdrawal liability assessments, aside from what is required by the applicable provisions of ERISA. If this assumption is incorrect, please let me know immediately and provide the Fund's requirements.

-The actuary's calculation letter dated August 29, 2017 correctly cites Section 4208(d)1) as the provision that governs assessment of partial withdrawal liability in the construction industry; such liability may be assessed only when work continues for an "insubstantial portion" of the employer's work in the jurisdiction of the collective bargaining agreement. But the calculations of partial withdrawal liability are based entirely on application of the 70% decline provision in Section 4205(b)(1), which does not apply to the construction industry. Please provide any documentation in the Fund's possession that confirms, supports or explains the Fund's application of the 4205(b)(1) formula to the Company, including without limitation policies, resolutions and precedents.

As you know, in accordance with ERISA's construction industry exemption, complete withdrawal liability may only be assessed against the Company if it continued to perform or resumed the same work performed by bargaining unit employees within the craft and geographic jurisdiction of the collective bargaining agreement. Since expiration of the 2017 agreement, no Company employee has performed any such work, based on our understanding of the craft and geographic jurisdiction of the expired agreement. We assume that the Fund found and concluded that the Company continued or resumed such work following expiration. Please provide the specifics upon which this finding and conclusion was based, including what work the Fund believes has been performed by the Company within the jurisdiction of the agreement since expiration, and by whom. Also, please provide any documentation in the Fund's possession that confirms, supports or explains this finding and conclusion, including without limitation policies, resolutions and precedents.

The Company is making the installment payments in accordance with the Demand for Payment. In doing so, the Company is not admitting that the assessments are valid.

Thank you for your attention to this.

Gary Greenberg
Attorney for Sofco Erectors, Inc.

**Gary L. Greenberg**
Attorney at Law
**Jackson Lewis P.C.**
425 Walnut Street
Suite 2300
Cincinnati, OH 45202
Direct: (513) 873-2103 | Main: (513) 621-3440
Gary.Greenberg@Jacksonlewis.com | www.jacksonlewis.com

***Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative***

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

From the law offices of Vorys, Sater, Seymour and Pease LLP.

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

Representing Management Exclusively in Workplace Law and Related Litigation

jackson lewis.

425 Walnut Street
Suite 2300
Cincinnati, Ohio 45202
Tel 513 621-3440
Fax 513 621-4449
www.jacksonlewis.com

ALBANY, NY
ALBUQUERQUE, NM
ATLANTA, GA
AUSTIN, TX
BALTIMORE, MD
BIRMINGHAM, AL
BOSTON, MA
CHICAGO, IL
CINCINNATI, OH
CLEVELAND, OH
DALLAS, TX
DAYTON, OH
DENVER, CO
DETROIT, MI
GRAND RAPIDS, MI
GREENVILLE, SC
HARTFORD, CT
HONOLULU, HI*
HOUSTON, TX
INDIANAPOLIS, IN
JACKSONVILLE, FL
KANSAS CITY REGION
LAS VEGAS, NV
LONG ISLAND, NY
LOS ANGELES, CA
MADISON, WI
MEMPHIS, TN
MIAMI, FL
MILWAUKEE, WI
MINNEAPOLIS, MN
MONMOUTH COUNTY, NJ
MORRISTOWN, NJ
NEW ORLEANS, LA
NEW YORK, NY
NORFOLK, VA
OMAHA, NE
ORANGE COUNTY, CA
ORLANDO, FL
PHILADELPHIA, PA
PHOENIX, AZ
PITTSBURGH, PA
PORTLAND, OR
PORTSMOUTH, NH
PROVIDENCE, RI
RALEIGH, NC
RAPID CITY, SD
RICHMOND, VA
SACRAMENTO, CA
SALT LAKE CITY, UT
SAN DIEGO, CA
SAN FRANCISCO, CA
SAN JUAN, PR
SEATTLE, WA
ST. LOUIS, MO
TAMPA, FL
WASHINGTON, DC REGION
WHITE PLAINS, NY

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: 513-873-2103
MY EMAIL ADDRESS IS: GARY.GREENBERG@JACKSONLEWIS.COM

November 29, 2017

**VIA E-MAIL & U.S. MAIL**

Trustees, Ohio Operating Engineers Pension Fund
c/o Brian C. Barch, In-house Counsel
1180 Dublin Road
PO Box 12009
Columbus, OH 43212-0009

RE: Sofco Erectors, Inc. – Supplemental Request for Review of Withdrawal Liability Assessment dated August 31, 2017

To the Trustees:

This is a Supplement to the Request for Review submitted by Sofco Erectors, Inc. ("Company") on November 10, 2017. In its Request for Review dated November 10, 2017, the Company disputed the Fund's assessments in their entirety, based on 29 U.S.C. § 1383(b)(1) and 29 U.S.C. § 1388(d)(1). In this Supplement, the Company submits grounds for reducing the assessments if they are not overturned in their entirety.

## I. THE FUND'S ACTUARY ERRONEOUSLY INCLUDED AMOUNTS FROM BEFORE APRIL 1, 2004 IN CALCULATING THE ASSESSMENT

The Company began operations on April 1, 2004, when it purchased the assets of its predecessor. Affidavit of John Hesford, attached as Exhibit 1 to Company's Request for Review dated November 10, 2017. This was an arms-length transaction. Neither of the Company's owners, John Hesford and Dan Powell, had any ownership in the predecessor Company or familial relationship with its owners. The previous owner of these assets was Southern Ohio Fabricators, Inc.; a list of its owners at time of purchase is attached as Exhibit 1.

Southern Ohio Fabricators, Inc. and its owners ceased operations entirely, and therefore had no withdrawal liability. 29 U.S.C. § 1383(b)(1). Accordingly, the Company began operations on April 1, 2004 with a clean slate as to the Fund.

jackson|lewis.

Despite the Company not operating before April 1, 2004 and the predecessor's exemption from withdrawal liability, the Fund's actuary included amounts from before that date in calculating the assessments. See Exhibits B, C, D, G, J, M, and Q, attached to the Segal Consulting letter dated August 29, 2017. When the liability allocation for Plan Year ending July 31, 2003 is excluded, and assuming withdrawal liability (which the Company disputes), the assessments would be as follows:

| | Assessed | Revised |
|---|---|---|
| Partial – YE 7-31-11 | $344,627 | $ 48,907 |
| Partial – YE 7-31-12 | $111,358 | $160,404 |
| Partial – YE 7-31-13 | $0 | $0 |
| Complete – YE 7-31-17 | $368,315 | $301,681 |
| Total: | $824,300 | $510,992 |

See summary prepared by Company's actuarial consultant, attached as Exhibit 2.

The removal of contributions preceding April 1, 2004 would likely further reduce the liability, but the Company's actuarial consultant did not have sufficient data to calculate the additional reduction. The Company requests that the Fund recalculate the Company's withdrawal liability by excluding pre-April 1, 2004 contributions made by Southern Ohio Fabricators, Inc., in addition to excluding (as above) the liability allocation for the Plan Year ending July 31, 2003.

## II. THE FUND HAS NOT PROVIDED REQUESTED INFORMATION THAT MIGHT ALSO AFFECT THE CALCULATIONS

On November 15, 2017, counsel for the Company e-mailed the following requests for information to counsel for the Fund (attached as Exhibit 3):

- The withdrawal liability reports for7/31/2008, 7/31/2009, and 7/31/2016, as referred to in the Exhibits E, K, and U attached to the Segal Consulting letter dated 8/29/2017.
- Why were the partial withdrawal calculations based on the withdrawal liability reports for 3 years before the partial withdrawal assessment?
- What interest rate was used to calculate the quarterly installments in each of the three assessments, and what is the basis for those rates?
- What is the payment start date for each of the three assessments?

None of the requested information has been provided. Accordingly, the Company reserves the right to raise issues related to the requested information in arbitration.

jackson|lewis.

## III. CONCLUSION

For the reasons set forth in the Company's Request for Review dated November 10, 2017, the partial and complete withdrawal liability assessments should be overturned in their entirety. If the assessments are not overturned, then they should be recalculated and reduced by excluding the liability allocation for the Plan Year ending July 31, 2003 and all contributions made before April 1, 2004, as the Company did not operate before that date and is not a successor to the liability allocations and contributions of Southern Ohio Fabricators, Inc., which ceased operations on that date.

Respectfully submitted,

Gary L. Greenberg
Gary L. Greenberg
Attorney for Sofco Erectors, Inc.

GLG/dlc
Enclosures

Cc: (Via email and U.S. Mail)
Daniel J. Clark
Alan Kinzer
Vorys, Sater, Seymour and Pease LLP
Outside Counsel for the Fund

4831-0309-6919, v. 1

**LIST OF SHAREHOLDERS OF SOUTHERN OHIO FABRICATORS, INC.**

**Names of Shareholders**

Patricia Kling Ballman

Elizabeth Kling Mayotte

Christina Perry (Daughter of John Emerson Kling)

Josephine Kling Trippe

Susan Kling Worthington

Elizabeth Kling Mayotte, Susan Kling Worthington and Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable Trust FBO Christina Perry With Life Estate for Margaret S. Kling

Elizabeth Kling Mayotte, Susan Kling Worthington and Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable Trust FBO Josephine Kling Trippe, Patricia Kling Ballman, Elizabeth Kling Mayotte and Susan Kling Worthington With Life Estate for Margaret S. Kling

Jerry T. Nickerson

Jerry T. Nickerson, Trustee, FBO Laurie A. Nickerson

Laurie A. Nickerson

Jennifer L. Nickerson

Anne Nickerson

Timothy J. Gates

Stephen R. Sundin

James W. Ludwig

EXHIBIT 1

Ohio Operating Engineers Pension Fund
Withdrawal Liablity Calculations
Sofco Erectors, Inc.

DEMANDED WITHDRAWAL LIABILITY AMOUNTS

| | | Partial Withdrawal Liability 7/31/2011 | Partial Withdrawal Liability 7/31/2012 | Partial Withdrawal Liability 7/31/2013 | Total Withdrawal Liability 7/31/2017 | Totals |
|---|---|---|---|---|---|---|
| Original Calculation | 1 | $344,627 | $111,358 | $0 | $368,315 | $824,300 |
| Revised Calculation | 2 | $48,907 | $160,404 | $0 | $301,681 | $510,992 |
| Change | | ($295,720) | $49,046 | $0 | ($66,634) | ($313,308) |

1 Calculations per Ohio Operating Engineers Fringe Benefit Programs Demand for Payment dated August 31, 2017.

2 Revised Calculations reflect removal of Plan Year Ended July 31, 2003 from Liability. The removal of contributions preceding April 1, 2004 would also change the results, but we lack sufficient data to calculate the amount of such reduction.

EXHIBIT
2

**Greenberg, Gary L. (Cincinnati)**

| | |
|---|---|
| **From:** | Crawford, Denice L (Cincinnati) on behalf of Mills, James A. (Cincinnati) |
| **Sent:** | Wednesday, November 15, 2017 1:54 PM |
| **To:** | djclark@vorys.com; askinzer@vorys.com |
| **Cc:** | Greenberg, Gary L (Cincinnati); Rosenthal, Daniel G. (Cincinnati) |
| **Subject:** | Sofco Erectors, Inc. |

Dear Mr. Clark and Mr. Kinzer,

My colleague, Gary Greenberg, is currently unavailable but asked to me to forward this request from the Company's actuarial consultant for a response from the Fund's actuary. The Company requests the following information:

- The withdrawal liability reports for 7/31/2008, 7/31/2009, and 7/31/2016, as referred to in the Exhibits E, K and U attached to the Segal Consulting letter dated 8/29/2017.
- Why were the partial withdrawal calculations based on the withdrawal liability reports for 3 years before the partial withdrawal assessment?
- What interest rate was used to calculate the quarterly installments in each of the three assessments, and what is the basis for those rates?
- What is the payment start date for each of the three assessments?

Jim Mills

**James A. Mills**
Attorney at Law
**Jackson Lewis P.C.**
425 Walnut Street
Suite 2300
Cincinnati, OH 45202
Direct: (513) 873-2113 | Main: (513) 621-3440
James.Mills@Jacksonlewis.com | www.jacksonlewis.com
***Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative***

EXHIBIT
3



Vorys, Sater, Seymour and Pease LLP
Legal Counsel

52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

614.464.6400 | www.vorys.com

Founded 1909

Daniel J. Clark
Direct Dial (614) 464-6436
Direct Fax (614) 719-4650
Email djclark@vorys.com

June 22, 2018

**VIA U.S. MAIL**

Gary L. Greenberg
Jackson Lewis P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202

Re: Sofco Erectors, Inc.

Dear Gary:

As you know we represent the Ohio Operating Engineers Pension Fund with respect to its assessment of withdrawal liability against Sofco Erectors, Inc. (the "Company"). This correspondence constitutes the Fund's response to the Company's request for review dated November 10, 2017. For the reasons set forth below, the Fund confirms that withdrawal liability was properly assessed against the Company.

**A. The Company Does Not Qualify for the Construction Industry Exception**

The Company disputed the withdrawal liability assessment by contending that following the termination of it collective bargaining agreement with Local 18 of the International Union of Operating Engineers (the "Union") it had "not continued or resumed performing work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." 29 U.S.C. § 1383(d)(1). The Fund acknowledges that it and the Company are in the construction industry such that the construction industry exception could apply.

The Fund disputes the Company's contention that it has not continued to perform work in the jurisdiction of the collective bargaining agreement following the termination of the CBA with the Union. Specifically, since April 2017, the Company has continued to employ forklift operators. Prior to April 2017, the Company routinely assigned members of the Union to operate forklifts, which are within the jurisdiction of the CBA, and made contributions to the Fund on behalf of this work.

Moreover, the Company had employed members of the Union to perform shop work, repairing and maintaining equipment. Contributions were paid pursuant to the CBA based upon this work. This work continued to be performed following April 2017. Indeed, the Fund understands



that a Union operator was retained by the Company following the termination of the CBA, for the purpose of performing the same work as was previously performed on a contributory basis.

Given the above, it is evident that the Company has continued to perform work within the jurisdiction of the CBA. Accordingly, the construction industry exception is not applicable. Complete withdrawal liability was properly assessed on account of the Company's withdrawal from the plan.

**B. Partial Withdrawal Liability Was Properly Assessed.**

Next, the Fund has considered the Company's position with respect to the assessments of withdrawal liability based upon a partial withdrawal in 2011 and 2012. The Company's Request for Review notes that an employer under Section 1383(b) is liable for a partial withdrawal if the employers obligation to contribute under the plan continued for "no more than an insubstantial portion of its work" 29 U.S.C. § 1388(d).

The Fund acknowledges the applicability of this exception. However, the Company's obligation to contribute to the Fund continued for more than "an insubstantial portion" of its work. While the Fund acknowledges that the terms "insubstantial portion" is not clearly defined in the statute, the Fund rejects the Company's suggestion that the terms should be interprets to mean 2% or less.

Such an interpretation of the statute would effectively eliminate the assessment of withdrawal liability in the construction industry. Had that been the intent of Congress, it could have done as much. In fact, we noted in the legislative history, construction industry employers advocated for the adoption of a 5% or less definition to be incorporated into the statute. This suggestion was not adopted. Accordingly, it seems evident that the term "insubstantial portion" must mean something less than 30% but greater than 5%. Given the above, the Fund sees no reason to alter it assessments of partial withdrawal liability.

**C. The Company's Contribution History Precedes April 2004.**

In Company's supplemented request for review, it contends that its contribution history should be calculated starting with April 2004 and that the Fund's withdrawal liability calculation should be revised to exclude contribution history from 2002 and 2003. The Company contends it started contributing to the Fund following an April 2004 asset purchase.

In response to the Company's request for review, the Fund examined the contribution history of the Company. Contrary to the Company's assertion, the Fund has a long history of contributions on behalf of Sofco Erectors, Inc. The Company has been signatory to CBAs with the Union dating back to at least the 1980s. Moreover, contributions were paid by Sofco Erectors, Inc. both before and after April 2004. Contributions were made on behalf of many of the same employees before and after April 2004.



Accordingly, the Company's contention that withdrawal liability should only be based upon a contribution history commencing in April 2004 is unsupported by the Company's actual contribution history and contribution reports to the Fund.

For the reasons described above, the Company's Request for Review was considered but did not result in any modification in the amount of the withdrawal liability assessed.

Sincerely,

Daniel J. Clark

Daniel J. Clark

DJC/lm

cc: Allen S. Kinzer *(via email)*
Elizabeth Weinewuth *(via email)*
Arbitrator John Sands (*via email* via AAA JaniceHoldinski@adr.org)



# AFFIDAVIT OF TIM GATES

STATE OF OHIO )
) SS:
COUNTY OF Hamilton )

Tim Gates, being first duly sworn, deposes and says that:

1. I am Tim Gates. I am over the age of 18 and I am competent to testify to the matters set forth herein.

2. I was the President of Southern Ohio Fabricators, Inc. until July 2004.

3. Two families owned Southern Ohio Fabricators, Inc., the Kling family and the Nickerson family. The Kling family was the majority shareholder.

4. Southern Ohio Fabricators, Inc. had a wholly owned subsidiary named Sofco Erectors, Inc. that existed prior to April 2004 ("Old Sofco").

5. In March 2004 Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., a company owned by John Hesford, Jim Ludwig, and Dan Powell.

6. After Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., Old Sofco performed no work. Old Sofco was merely a shell corporation until it could be wound down. It had no equipment, employees, or any ability to perform work.

7. Similarly, after Old Sofco's assets were sold, Southern Ohio Fabricators, Inc. did not perform any erection work. It had no personnel or equipment to perform any such erection work after it sold Old Sofco's assets.

8. None of the owners of Southern Ohio Fabricators, Inc. or Old Sofco owned, operated, or had involvement in any company that performed erection services after the sale of Old Sofco's assets.

9. In July 2004, Southern Ohio Fabricators, Inc. sold its assets to Clermont Steel Fabricators.

10. After Southern Ohio Fabricators, Inc. sold its assets, I signed a consulting agreement and assisted in winding it up. After Southern Ohio Fabricators, Inc. sold its assets, it ceased to perform any work and like Old Sofco was merely a shell corporation.

Further affiant sayeth naught.

Tim Gates

Sworn and subscribed to before me this 11 day of September, 2018.

Notary public: Tracy A Wagner

My commission expires: 6-15-2020

TRACY A. WAGNER
Notary Public, State of Ohio
My Commission Expires 06-15-2020

4851-6528-0113, v. 1