Page 124

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

--|--

Case No. 01-18-0001-3790

--|--

Sofco Erectors, Inc.,

                              Employer,
                    and

Ohio Operating Engineers Pension Fund,

                              Fund.

--|--

Deposition of:    THOMAS P. BYERS
                  Volume II

Date and Time:    Friday, November 2, 2018
                  1:10 p.m.

Place:            Vorys, Sater, Seymour &
                    Pease, LLP
                  52 East Gay Street
                  Columbus, Ohio

Reporter:         Maria DiPaolo Jones, RDR, CRR
                  Notary Public - State of Ohio

                  --|--

---

**Page 125**

```
1    APPEARANCES:
2    On behalf of Sofco Erectors, Inc.:
3        MR. GARY L. GREENBERG
         Jackson Lewis, PC
4        425 Walnut Street, Suite 2300
         Cincinnati, Ohio 45202
5        513.621.3440
6    On behalf of Ohio Operating Engineers Pension Fund:
7        MR. ALLEN S. KINZER
         Vorys, Sater, Seymour & Pease, LLP
8        52 East Gay Street
         Columbus, Ohio 43216-1008
9        614.464.6400
10   On behalf of Thomas P. Byers:
11       MR. TIMOTHY R. FADEL
         Fadel & Beyer, LLC
12       Bridge Building, Suite 120
         18500 Lake Road
13       Rocky River, Ohio 44116
         440.333.2050
14
     ALSO PRESENT:
15
         Mr. Dan Powell
16
             --|--
17
18
19
20
21
22
23
24
```

---

**Page 126**

```
1                  INDEX
2                  --|--
3    THOMAS P. BYERS              PAGE
     Examination (continued) by Mr. Greenberg   127
4
                   --|--
5
             EMPLOYER EXHIBITS
6
     LETTER DESCRIPTION           IDENTIFIED
7
     EE  Construction Site Jurisdictional   129
8        Amendment Between International
         Union of Operating Engineers and
9        International Association of
         Bridge, Structural and Ornamental
10       Iron Workers
11   FF  7/6/1990 letter from Hanley   130
12   GG  7/3/1990 letter from Worley   130
13   HH  4/9/1992 NLRB decision       141
14                 --|--
15
16
17
18
19
20
21
22
23
24
```

---

**Page 127**

```
1              Friday Afternoon Session
2              November 2, 2018.
3              --|--
4         (Witness sworn.)
5         MR. GREENBERG: So we are here today to
 continue the deposition of Tom Byers, president of
 International Union of Operating Engineers Local 18,
 In the Matter of Sofco Erectors, Inc. and the Ohio
 Operating Engineers Pension Fund pending before
 Arbitrator John Sands. We're here pursuant to the
 rules of the American Arbitration Association for
 multiemployer pension plan withdrawal liability
 disputes and the parties' joint discovery plan and
 notice and agreement of counsel.
15        My name is Gary Greenberg and I represent
 Sofco Erectors, Inc., and I have with me here today
 one of Sofco's co-owners, Dan Powell.
18        And I'll ask the other attorneys in the
 room to state their appearances.
20        MR. KINZER: Allen Kinzer on behalf of the
 Ohio Operating Engineers Pension Fund.
22        MR. FADEL: Timothy Fadel on behalf of the
 deponent.
24             --|--
```

---

**Page 128**

```
1             THOMAS P. BYERS,
2    being first duly sworn, as prescribed by law, was
3    examined and testified as follows:
4             EXAMINATION (continued)
5    BY MR. GREENBERG:
6    Q.    Mr. Byers, you are still employed as
7    president of IUOE Local 18, correct?
8    A.    Yes.
9    Q.    And is there any reason that you would not
10   be able to answer my questions accurately today?
11   Lack of sleep or medication or anything like that?
12   A.    No. I will add I may stand up at some
13   point during our meeting today because I've got a
14   tailbone that's killing me, and if you see me
15   slouching or standing up, it's not anything other
16   than relieving a little pain.
17   Q.    If you need a break at any time, will you
18   let me know?
19   A.    Sure.
20   Q.    And, of course, answer the question first,
21   but then you can take a break.
22   A.    Yes.
23   Q.    Okay. That's fine.
24        MR. GREENBERG: Let's go off the record
```

CIN-TEL CORPORATION

PH:  513-621-7723                                    FX:  513-263-9023

---

Page 129

1    and mark this as Employer Exhibit EE.
2         (EMPLOYER EXHIBIT EE MARKED.)
3         Q.    Mr. Byers, I'm showing you a document that
4    has been marked as Employer Exhibit EE.  You'll be
5    in the bottom right-hand corner there are some
6    letters and numbers.  The letters are "OOE," and then
7    the numbers run from 562 through 567, and you might
8    remember from the last time we were together that
9    these are control numbers and OOE means that this is
10   a document that was produced by the Ohio Operating
11   Engineers Pension Fund.
12        So this is a document that I received
13   shortly after the last time we were together and, of
14   course, that's why we had to get back together here
15   today, so I could ask you a few questions about this
16   document.
17        And so let me start by asking you whether
18   this is a document that you provided to your Local 18
19   counsel or to Fund counsel or to both.
20        A.    This is part of a document that I gave to
21   Fund counsel.
22        Q.    And what was the rest of the document?
23        A.    It was a cover letter from the
24   International Union of Operating Engineers.

---

Page 130

1         Q.    All right.  Well, let's go ahead and mark
2    that.
3         (EMPLOYER EXHIBITS FF AND GG MARKED.)
4         Q.    Mr. Byers, you made reference to a cover
5    letter and so now I'm showing you a document that we
6    have marked as Employer's Exhibit FF, it's a letter
7    dated July 6, 1990, To:  All IUOE H&P Business
8    Managers, and then some other recipients are listed.
9    At the bottom right corner there is a control number
10   that's covered up, I believe it's 558, and then the
11   next page you'll see is 559.  So are you looking at
12   that document?
13        A.    Yes.
14        Q.    So when you testified a few minutes ago
15   that you provided Exhibit EE along with a cover
16   letter, is that the cover letter that we've marked as
17   Exhibit FF?
18        A.    Yes.
19        Q.    And now I'd like you to look at the
20   document that we have marked as Exhibit GG, and
21   Exhibit GG looks like a letter dated July 3, 1990, on
22   the letterhead of the International Association of
23   Bridge, Structural and Ornamental Iron Workers, and
24   there are two control -- there are control numbers in

---

Page 131

1    the bottom right corner, two pages, OOE-560 and
2    OOE-561.
3         So when you provided Exhibits EE and FF to
4    your attorney and the Fund attorney, did you also
5    provide Exhibit GG?
6         A.    Yes.
7         Q.    And when you provided these three
8    documents, did you include any other pages or
9    documents that were related to these three documents?
10   Any other cover letters or any other documents that
11   refer or relate to a jurisdictional agreement between
12   the Operating Engineers and the Ironworkers Union?
13        A.    I believe those were the only three
14   documents.
15        Q.    So how did you come into possession of
16   these three documents?
17        A.    They were documents that were in a file in
18   the president's office when I took over as president
19   of Local 18.
20        Q.    And where was this file kept in the
21   president's office?  Was it in a drawer?  In a file
22   cabinet?
23        A.    It was in the lower right-hand drawer of
24   my desk.

---

Page 132

1         Q.    Was it in a file folder?
2         By the way, I am using the word "it."
3    When I say "it," I mean all three of these documents.
4    Were they kept together?
5         A.    Yes.
6         Q.    And were they in a file folder?
7         A.    I really couldn't tell you if they were in
8    a folder.
9         Q.    So I want to ask you to think back to the
10   last time we were together, which was on September 26
11   and that was up in Cleveland at Mr. Fadel's
12   office.  Do you remember that?
13        A.    Yes.
14        Q.    And as of that date had you already
15   provided these documents to your counsel and to Fund
16   counsel?
17        A.    No.
18        Q.    So this is something you thought to look
19   for after that day?
20        A.    Yes.
21        Q.    And you went back to your office and you
22   opened your drawer and you found these documents?
23        A.    I went to a drawer that had jurisdictional
24   documents and I knew that had a file of

---

3 (Pages 129 to 132)

Page 133

1  jurisdictional documents and had things related to
2  the joint board of jurisdictional disputes that you
3  had questioned me about at deposition and looked in
4  there.
5      Q.    And what else was in that drawer that
6  relates to jurisdiction?  What other papers were in
7  there?
8      A.    Well, there was probably another hundred
9  documents in there.
10     Q.    And can you give me just a general idea of
11  the subject matters covered by these hundred pages of
12  documents?
13     A.    Similar letters to these from and to other
14  trade unions.
15     Q.    Was there anything else in that drawer
16  relating to jurisdictional agreements or
17  jurisdictional disputes between Operating Engineers
18  and Ironworkers other than Exhibits EE, FF, and GG?
19  Anything else?
20     A.    Not that I'm aware of.
21     Q.    All right.  Let's take a closer look at
22  Exhibit EE.  So first just a very basic question.  I
23  see that Exhibit EE purports to be an agreement
24  between an entity called International Union of

Page 134

1  Operating Engineers and another entity called
2  International Association of Bridge, Structural and
3  Ornamental Iron Workers.  What is the relationship
4  between your organization, I'm going to call it
5  "Local 18," and the entity that is referenced here,
6  International Union of Operating Engineers?
7      A.    Local 18 is an affiliate local of the
8  International Union of Operating Engineers.
9      Q.    So can you explain a little bit more about
10  what it means to be an affiliate?  What is the legal
11  relationship between Local 18 and the International
12  Union of Operating Engineers?  Do you have bosses at
13  the International Union of Operating Engineers?  I
14  mean, is there somebody there that you report to, or
15  is it more like a relationship of equals?  Or explain
16  to me, what's the reporting relationship between
17  Local 18 and the international?
18         MR. KINZER:  I'm going to object to the
19  extent that your question, can he provide a legal
20  opinion, you asked for the legal relationship.
21         MR. GREENBERG:  Well, yes.
22     Q.    But your understanding of the
23  relationship.
24     A.    On a day-to-day basis I don't have to

Page 135

1  report any of my actions to the international.
2      Q.    So let's take, for example, your Local 18
3  contract with the Associated General Contractors of
4  Ohio, and so when Local 18 enters into negotiations
5  with the AGC of Ohio, are you -- is your organization
6  in control of those negotiations from the union side,
7  or do you have to submit to the wishes of the
8  international in terms of those negotiations?  Who's
9  making the decisions at the bargaining table, Local
10  18 or the international?
11     A.    I would say that it is Local 18.  I think
12  if we got too far sideways from our charter, our
13  international would want to have an explanation of
14  it.
15     Q.    But as far as who's sitting at the
16  bargaining table with the AGC of Ohio, it's Local 18,
17  not the international, correct?
18     A.    That's correct.
19     Q.    Do you hold any officer position with the
20  international?
21     A.    No.
22     Q.    Have you ever?
23     A.    I served on a committee at our
24  international convention last year.

Page 136

1      Q.    And what was that committee?
2      A.    It was a -- I'm trying to give you the
3  proper name of it -- a officers' reports committee.
4      Q.    Is that the only role you've played with
5  the international?
6      A.    Yes.
7      Q.    What position at the international is the
8  chief executive?  Is it the general president, or is
9  there a different position that actually is the
10  highest level officer at the international?
11     A.    I think the general president would be
12  considered like a CEO, but there is a general
13  executive board that guides.
14     Q.    That's like the board of directors?
15     A.    Sure.
16     Q.    And the general president is the chief
17  executive officer?
18     A.    Yes.
19     Q.    And, as far as you know, that's always
20  been true?
21     A.    As far as I know.
22     Q.    So this document that's been marked as
23  Exhibit EE, if we look at the last page, we'll see
24  that there's a date on there, August 19, 1970.  And

CIN-TEL CORPORATION

PH: 513-621-7723                    FX: 513-263-9023

---

Page 137

1    of course you were not involved with Local 18 at that
2    point in time, correct?
3        A.    I wasn't born by August 19th of 1970.
4        Q.    I'm feeling old.
5        Again, looking at this last page, 567,
6    that's the control number in the bottom right-hand
7    corner, I notice that under the heading for the
8    signature lines International Union of Operating
9    Engineers, I see the name Hunter P. Wharton, General
10   President. As far as you know, he was the general
11   president of the International Union of Operating
12   Engineers in August of 1970? To the best of your
13   knowledge.
14       A.    My knowledge consists of what's on this
15   piece of paper in front of me about whether
16   Mr. Wharton was the general president, and I have to
17   assume by the fact that his name is on the bottom of
18   the documents he was.
19       Q.    Do you have any other copies of this
20   document that would actually have his signature on
21   it?
22       A.    I do not.
23       Q.    So do you have any knowledge as to whether
24   this document actually could have been effected

---

Page 138

1    without the general president's signature?
2        MR. FADEL: I'm going to object. Go ahead
3    and answer.
4        Q.    Do you know one way or the other?
5        A.    I'm going to assume that a document like
6    this was probably circulated amongst all the parties
7    and I have a document that wasn't signed by the two
8    folks that probably resided in Washington, DC.
9        Q.    But you have no personal knowledge one way
10   or the other as to whether it was ever signed by
11   Mr. Wharton, correct?
12       A.    I do not.
13       Q.    To your knowledge, was this document, and
14   again we're looking at Exhibit EE, to your knowledge,
15   was this document ever provided to Sofco?
16       A.    Not to my knowledge.
17       Q.    To your knowledge, was this document ever
18   provided to the Associated General Contractors of
19   Ohio?
20       A.    Not that I'm aware of.
21       Q.    I'd like you to turn to page 2 of this
22   document, and this is the one that has the control
23   number 563 in the bottom right-hand corner, and I'm
24   going to ask you to look at the first two sentences

---

Page 139

1    at the top, and there's a heading above these
2    sentences that reads Roman numeral I - Forklifts. So
3    I'm going to read those two sentences out loud. "The
4    operation of forklifts shall be the work of Operating
5    Engineers. Rigging in connection with the forklifts
6    shall be the work of the Iron Workers."
7        So based on your knowledge of what goes on
8    on construction sites what's your interpretation of
9    that second sentence? What is meant -- let me
10   rephrase that.
11       What's your understanding of the phrase
12   "Rigging in connection with the forklifts"?
13       A.    That would be taking rigging materials and
14   putting them around whatever the load would be or
15   attaching them to the load and then attaching them to
16   a lift point on the forklift.
17       Q.    Anything else?
18       A.    No, I think that would encompass my
19   understanding of it.
20       Q.    All right. Let's take a look at Exhibit
21   FF. So this is a letter dated July 6, 1990, and on
22   the second page it looks like there's a signature by
23   a Frank Hanley, General President. Are you familiar
24   with Mr. Hanley?

---

Page 140

1        A.    Vaguely.
2        Q.    Do you have any knowledge or recollection
3    as to when his term as general president ended?
4        A.    I do not.
5        Q.    And I'm going to assume, based on an
6    earlier answer about your date of birth, that as of
7    July 6, 1990, you were not employed by the Operating
8    Engineers Local 18 at that time.
9        A.    No.
10       Q.    Am I correct about that?
11       A.    You are correct.
12       Q.    So other than the fact that you found
13   Exhibits EE and FF in a drawer in your office do you
14   have any evidence that Exhibit EE is a true and
15   correct -- a true and accurate copy of a
16   jurisdictional agreement between the International
17   Union of Operating Engineers and the International
18   Association of Bridge, Structural and Ornamental Iron
19   Workers?
20       MR. FADEL: Objection. You can answer.
21       A.    I'm not a document expert. I couldn't
22   tell you one way or the other if that's a true and
23   accurate copy of it.
24       Q.    Looking at Exhibit FF, I'm going to read

---

WWW.CINTELCORPORATION.COM          E-Mail    CINTELCO@GMAIL.COM

Page 141

1   the last sentence on the first page out loud and then
2   I'm going to ask you a couple of questions about it.
3   "If local union agreements are already in place, I am
4   sure it would be in the best interest to continue
5   these types of understandings, but if not, the 1970
6   Understanding should be used."
7       So my question is this: Are you aware of
8   any agreements between your organization, Local 18,
9   and any of the ironworkers' locals in the State of
10   Ohio regarding jurisdiction?
11     A.   No.
12     Q.   Is it your understanding, based on this
13   sentence, that if there were a local agreement in
14   place between Local 18 and an ironworkers' local in
15   Ohio that was different than Exhibit EE, that the
16   local agreements would control?
17       MR. FADEL: Objection. You can answer.
18     A.   I'm not sure I know how to answer that.
19   I'm not sure that that sentence applies to whether
20   it's an agreement between the local unions or if
21   that's an agreement between a local union and a
22   contractor association.
23       MR. GREENBERG: If you'll mark that as HH.
24       (EMPLOYER EXHIBIT HH MARKED.)

Page 142

1     Q.   Mr. Byers, I'm showing you what we have
2   marked as Employer's Exhibit HH, and it's a copy of a
3   National Labor Relations Board decision dated April
4   9, 1992, and you'll see in the caption that there's a
5   reference to the parties including International
6   Union of Operating Engineers, Local 825, and
7   International Association of Bridge, Structural and
8   Ornamental Iron Workers, Local 480.
9       And I want to ask you first if you're
10   familiar with International Union of Operating
11   Engineers Local 825.
12       MR. FADEL: I'm going to object,
13   Mr. Greenberg. My understanding is that this
14   deposition will be limited to questions based upon
15   the documents that the local union produced, which
16   would include the referral work orders and the
17   jurisdictional agreements that you've marked as
18   Exhibits EE, FF, and GG. I'm not too sure if this
19   falls within the parameters of what we've agreed upon
20   here today.
21       MR. GREENBERG: It does.
22       MR. KINZER: I would raise the same
23   objection.
24       MR. FADEL: Well, I'm not too sure how it

Page 143

1   does.
2       MR. KINZER: Not sure how it does either.
3   I'm going to raise the same objection and at this
4   point instruct the witness not to answer based on the
5   agreement between Mr. Greenberg and me, and if he
6   wants to take it to the arbitrator, we can do so.
7       MR. GREENBERG: All right. So I'm going
8   to state for the record why I'm asking the witness
9   this question, and then you can either stick with
10   your position or let me ask my questions.
11       So the purpose in putting this decision in
12   front of the witness is to ask him about the
13   reference on the first page under Section Roman
14   numeral II, Subsection B, which is headed "Work in
15   Dispute," and I'm going to read what it says here.
16   "The disputed work involves the starting, stopping,
17   and maintenance of welding machine engines."
18       And my plan is to ask the witness to
19   either confirm or dispute that that is a type of work
20   that is addressed by the purported jurisdictional
21   agreement between the ironworkers and the
22   International Union of Operating Engineers so that if
23   we put these two documents side by side, we would see
24   on page 3 of Exhibit EE that the jurisdictional

Page 144

1   agreement purports to award the operations,
2   servicing, and maintenance of pumps, compressors,
3   generators, and welding machines to the Operating
4   Engineers in 1970, allegedly confirmed in a letter
5   sent out in 1990 but, nonetheless, we see in 1991 and
6   1992 we have two locals affiliated with these two
7   international unions disputing work involving the
8   starting, stopping, and maintenance of welding
9   machine engines. So --
10       MR. KINZER: My objection would be -- he's
11   raised a legal argument so I would add to my
12   objection.
13       And I also note that you can raise that
14   legal argument, Mr. Greenberg, with the arbitrator,
15   but you asking questions about an NLRB 10(k) decision
16   is beyond the scope of what we agreed to do here.
17       MR. GREENBERG: All right. I've stated my
18   position, and with that I have no further questions.
19       I'm going to ask this witness after the
20   transcript is prepared to review the transcript, make
21   any corrections if you find any mistakes, and sign it
22   after you've done that. And with that, I have
23   nothing else.
24       MR. KINZER: Okay.

CIN-TEL CORPORATION
PH:  513-621-7723                                    FX:  513-263-9023

---

Page 145

```
 1              MR. FADEL:  Thank you.
 2              MR. KINZER:  Thank you.
 3              MR. GREENBERG:  Thank you.
 4              (Whereupon, at 1:39 p.m., the deposition
 5         was concluded and signature was not waived.)
 6                        --|--
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 147

```
 1              AFFIDAVIT
 2    State of Ohio        )
                           ) SS:
 3    County of _____ )
 4         I, THOMAS P. BYERS, do hereby certify that I
      have read the foregoing transcript of my deposition
 5    given on Friday, November 2, 2018; that together with
      the correction page attached hereto noting changes in
 6    form or substance, if any, it is true and correct.
 7
 8    _____
 9              THOMAS P. BYERS
10         I do hereby certify that the foregoing
      transcript of the deposition of THOMAS P. BYERS was
11    submitted to the witness for reading and signing;
      that after he had stated to the undersigned Notary
12    Public that he had read and examined his deposition,
      he signed the same in my presence on the _____ day
13    of _____, 2018.
14
15              Notary Public
16
17    My commission expires _____, _____.
18                        --|--
19
20
21
22
23
24
```

---

Page 146

```
 1              CERTIFICATE
 2    State of Ohio        )
                           ) SS:
 3    County of Franklin   )
 4         I, Maria DiPaolo Jones, RDR and CRR, the
      undersigned, a duly qualified and commissioned notary
 5    public within and for the State of Ohio, do certify
      that, before giving his deposition, THOMAS P. BYERS
 6    was by me first duly sworn to testify to the truth,
      the whole truth, and nothing but the truth; that the
 7    foregoing is the deposition given at said time and
      place by THOMAS P. BYERS; that I am neither a
 8    relative of nor employee of any of the parties or
      their counsel and have no interest whatever in the
 9    result of the action.
10         IN WITNESS WHEREOF, I hereunto set my hand and
      official seal of office on this 9th day of November,
11    2018.
12
      _____
13         Maria DiPaolo Jones, RDR, CRR,
           and Notary Public in and for the
14         State of Ohio.
15    My commission expires June 19, 2021.
16                        --|--
17
18
19
20
21
22
23
24
```

---

Page 148

```
 1         PLEASE USE THIS ERRATA SHEET TO MAKE ANY
      AND ALL CORRECTIONS, BY LISTING THE PAGE NUMBER,
 2    LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE
      ERROR.  PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS
 3    ON THE TRANSCRIPT.  IF NEEDED USE THE BACK OF THIS
      SHEET.  UPON COMPLETION PLEASE SIGN AND DATE THIS
 4    SHEET AT THE BOTTOM.  THANK YOU.
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    SIGNATURE:_____DATE:_____
```

WWW.CINTELCORPORATION.COM     E-Mail   CINTELCO@GMAIL.COM

Employer
EXHIBIT
EE
Date: 11.2.2018

CONSTRUCTION SITE JURISDICTIONAL AGREEMENT BETWEEN
INTERNATIONAL UNION OF OPERATING ENGINEERS
and
INTERNATIONAL ASSOCIATION OF BRIDGE,
STRUCTURAL AND ORNAMENTAL IRON WORKERS

The undersigned Committees of the International Union of Operating Engineers and the International Association of Bridge, Structural and Ornamental Iron Workers have held numerous meetings and have consummated the following agreement to settle jurisdictional disputes between the two organizations on construction sites.

It is the purpose of this agreement to further improve the relationship between our respective trades, to settle jurisdictional disputes directly, to protect each other's proper jurisdiction from encroachment by others, and to mutually assist each other in organizing the unorganized.

This agreement shall not relate to nor have any bearing upon jurisdictional disputes that may now exist, or in the future arise, between either of these organizations with any other national or international union or subordinate body.

The respective Committees shall be continued and shall meet at least twice a year at a place and date determined by mutual agreement of the respective General Presidents.

If a jurisdictional dispute cannot be settled locally, or a question of interpretation arises as to the meaning or intent of this agreement, it shall be referred immediately to the respective General Presidents or their designees for an answer. There shall be no work stoppages pending settlement. It is agreed that all decisions and agreements between the two International Unions shall be considered operative and effective by each International Union except as clarified in this Memorandum of Agreement.

2.

## I - FORKLIFTS

The operation of forklifts shall be the work of Operating Engineers. Rigging in connection with the forklifts shall be the work of the Iron Workers.

## II - SIGNALLING - HIGHLINES, CRANES AND DERRICKS

Such duties required to initiate and/or relay signals by mechanical, electronic or electrical means, including hand signals, or paddles, directly to the Operator of the above referred to construction equipment is the work of the Iron Workers. The servicing and inspection of highlines is the work of the Iron Workers. The foregoing does not apply to excavation work.

## III - BRIDGE CRANES, DERRRICKS AND DERRICK BARGES

a) <u>Bridge Cranes</u> - The operation of bridge cranes in fabrication shops established at construction sites is the work of the Operating Engineers.

b) <u>Derricks</u> - The operation of power equipment including agitated swing adapters on derricks shall be the work of Operating Engineers. Other types of swinging operations shall be performed by the Iron Workers. The erection thereof shall be the work of the Iron Workers.

c) <u>Derrick Barges</u> - The operation of deck engines on derrick barges shall be the work of the Operating Engineers.

## IV - ROCK, SAND AND GRAVEL PLANTS
### (Construction Jobsites)

Fabrication of structural steel framework, the assembly, setting and erection thereon of bins, hoppers, rigging of crusher components, shaker screens, pre-assembled conveyor sections and steel ladders will be performed by a composite crew. This is with the exception that erection of structural steel framework and all

OOE-000563

3.

rigging work shall be the work of the Iron Workers, and all mechanical work shall be the work of the Operating Engineers.

## V – DISMANTLING AND LOADING OUT OF CONVEYORS AGGREGATE PLANTS, BATCH PLANTS, CABLE WAYS, REFRIGERATION PLANTS, ETC.

a) Handling of steel which includes burning off nuts and knocking out bolts shall be done by Iron Workers.

1) The Engineers will remove all rollers, disconnecting and dismantling mechanical equipment such as compressors, refrigeration units and power equipment connected thereon, and all rigging in connection with the above shall be the work of the Iron Workers.

b) The operation and servicing of the power equipment is recognized as the work of the Operating Engineers.

## VI – PUMPS, COMPRESSORS, GENERATORS AND WELDING MACHINES

The operation, servicing and maintenance of pumps, compressors, generators, and welding machines (gasoline or diesel driven) shall be the work of the Operating Engineers.

## VII – HIGHWAY TYPE (PORTABLE) BATCH PLANT, HOT PLANT AND ROCK PLANTS

The assembly and disassembly of the above type plants shall be the work of the Operating Engineers.

## VIII – ERECTION AND DISMANTLING MONIGAN WALKING DRAGLINE, LAUNCHHAMMER BUCKET WHEEL EXCAVATOR AND SIMILAR TYPE EQUIPMENT, EXCLUDING TRENCHING MACHINES

It is understood and agreed that the erection and dismantling of Monigan Walking Dragline, Launchhammer Bucket Wheel Excavator, and similar type equipment, excluding trenching machines, shall be performed by a composite crew, fifty-fifty of Iron Workers and Operating Engineers.

OOB-000564

4.

## IX – HIGHWAY AND EARTHMOVING PROJECTS

The unloading, loading out, assembly, disassembly and all other modifications, including boom changes and modifications on equipment coming within the jurisdiction of the International Union of Operating Engineers, shall be performed by members of the Operating Engineers.

## X – CRANES USED ON STRUCTURAL STEEL ERECTION

Cranes used on structural steel erection where Iron Workers are to be working with power equipment in the erection of structural steel – the unloading, attaching, lengthening, shortening and dismantling or changing of booms and counterweights, the reeving of cables in topping lift, boom or jib for cranes used in connection with such work shall be performed by the Iron Workers plus the Operating Engineers who have been assigned to the crane.

It is understood if a crane is shipped and arrives on the project partially or completely disassembled, the Iron Workers will unload and rig the components into their proper position.

All mechanical adjustments of the parts of this operation such as take-ups, leveling and aligning of motor base, or bed plate, proper adjustment to the cats will be performed by the Operating Engineers who have been assigned to the crane and at least one heavy duty mechanic.

Unloading or loading out of such power equipment will be performed by the same crew.

OOE-000565

## XI – WORK ON ALL BUILDING, PRE-CAST CONCRETE AND INDUSTRIAL CONSTRUCTION, EXCLUDING STEEL ERECTION

On all building, pre-cast concrete and industrial construction, such as chemical plants, power houses, steel mills, refineries, etc., other than steel erection operations, on all multi-purpose cranes on which an Iron Workers' crew will be assigned to it for their rigging operations by the contractor, the work shall be performed in the following manner and does not pertain to shop or mechanical yards on major construction projects where the Operating Engineers have established shops or mechanical yards.

1.  Unloading of multi-purpose cranes shall be performed in the following manner:

> Iron Workers shall perform necessary rigging and Operating Engineers shall perform all assembly, except as outlined below.

2.  Loading out of multi-purpose cranes shall be performed in the opposite manner to the unloading operation:

> i.e., power rigging by Iron Workers and disassembly shall be performed by Operating Engineers. The loading and unloading operation will be under the supervision of the Master Mechanic.

3.  Boom modifications will be performed in the following manner:

> a)  When rig is working with Iron Workers all modifications will be performed by a composite crew of Iron Workers and Operating Engineers. What is meant by a composite crew of Operating Engineers

is an Engineer and Oiler who have been assigned to said rig. What is meant by a composite crew of Iron Workers is the number required to perform said modifications in a safe and expeditious manner.

b) It is assumed that when another craft is assigned a rig or crane that the Operating Engineers will perform all boom modifications.

It is understood that if additional help is needed, Iron Workers will be called upon to assist.

It is agreed that all work in connection with booms will be performed as outlined above.

XII - TOWER CRANES AND SURVEY WORK

With respect to erection of tower cranes and survey work, these matters were thoroughly discussed. The respective Committees decided to defer action pending further studies.

INTERNATIONAL UNION OF
OPERATING ENGINEERS

INTERNATIONAL ASSOCIATION OF BRIDGE,
STRUCTURAL AND ORNAMENTAL IRON WORKERS

HUNTER P. WHARTON
GENERAL PRESIDENT

JOHN H. LYONS, GENERAL PRESIDENT

Russell T. Conlon, Chairman

John L. McCarthy, Chairman

Howard R. Dalton

Dale Ray

Frank Hanley

Leonard P. Mahoney

August 19, 1970

OOE-000567

Employers
EXHIBIT
FF
Date: 11.2.2018

*International Union of Operating Engineers*

1125 SEVENTEENTH STREET NORTHWEST ★ WASHINGTON, D. C. 20036

AFFILIATED WITH THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS

OFFICE OF GENERAL PRESIDENT ● (202) 429-9100

July 6, 1990

TO:  ALL IUOE H & P BUSINESS MANAGERS
     ALL IUOE RECIONAL DIRECTORS
     ALL IUOE INTERNATIONAL REPRESENTATIVES

Dear Sirs and Brothers:

At recent meetings held between this International Union and the International Association of Bridge, Structural and Ornamental Iron Workers, discussions were held relative to developing a stronger and more viable working relationship between our two (2) International Unions.  As you are well aware, both trades have had serious setbacks and problems relative to the inroads created by nonunion contractors throughout the United States and Canada.

As such, our two (2) Committees feel it is incumbent upon ourselves to work even more closely than we have in the past.  Lengthy discussions were held relative to the 1970 Jurisdictional Understanding between our two (2) trades.  After these discussions, it was felt to be in our best interest to continue to use this guideline in an effort to resolve disputes that may arise from time to time between our two (2) International Unions.

Therefore, you are instructed to use this 1970 Understanding between our two (2) trades as a guideline to resolve these disputes and take the opportunity to hold discussions with our Regional Directors throughout the United States and Canada relative to this matter.  These discussions should be held at the Regional level and ensure that our International Representatives and Business Managers at these meetings understand the necessity that we work even closer together than we have in the past.  If local union agreements are already in place, I am sure it would be in the best interest to continue these types of understandings but if not, the 1970 Understanding should be used.

REC'D JUL 12 1990

- 2 -

Enclosed you will find a copy of the 1970 Understanding for your information and use.

If you have any questions relative to this matter, please contact my office.

Best wishes and kindest personal regards.

Fraternally yours,

Frank Hanley
General President

FH/bu
Enclosure

OOB-000559

Employer
EXHIBIT GG
11.2.2018

International Association of

# Bridge, Structural and Ornamental Iron Workers

**JAKE WEST**
GENERAL PRESIDENT

**JUEL D. DRAKE**
GENERAL PRESIDENT EMERITUS

**LeROY E. WORLEY**
GENERAL SECRETARY

**JAMES E. COLE**
GENERAL TREASURER



Affiliated with AFL-CIO

SUITE 400
1750 NEW YORK AVE. N.W.
WASHINGTON, D.C. 20006
202 383-4800

July 3, 1990

TO:        PRESIDENT OF ALL DISTRICT COUNCILS
AND INTERNATIONAL REPRESENTATIVES
SERVICING OUTSIDE LOCAL UNIONS

Dear Sir and Brother:

At recent meetings held between this International Association
and the International Union of Operating Engineers, discussions
were held relative to developing a stronger and more viable
working relationship between our two (2) International Unions.
As you are well aware, both trades have had serious setbacks and
problems relative to the inroads created by non-union contractors
throughout the United States and Canada.

As such, our two (2) Committees feel it is incumbent upon
ourselves to work even more closely then we have in the past.
Lengthy discussions were held relative to the 1970 Jurisdictional
Understanding between our two (2) trades. After these
discussions, it was felt to be in our best interest to continue
to use this guideline in an effort to resolve disputes that may
arise from time to time between our two (2) International Unions.

Therefore you are instructed to use this 1970 Understanding
between our two (2) trades as a guideline to resolve these
disputes and take the opportunity to hold discussions with our
business agents throughout the United States and Canada relative
to this matter. These discussions should be held at a District
Council level and ensure that our business representatives and
delegates at these meetings understand the necessity that we work
even closer together than we have in the past. If local union
agreements are already in place, I am sure it would be in the
best interest to continue these types of understanding but if
not, the 1970 Understanding should be used.

## International Association of Bridge, Structural and Ornamental Iron Workers

**- 2 -**

Enclosed you will find a copy of the 1970 Understanding for your information and use.

If you have any questions relative to this matter, please contact my office.

With best wishes, I am

Fraternally yours,

*Leroy E. Worley*

General Secretary

LEW:dlt
Enclosure

OOB-000561



**International Union of Operating Engineers, Local 825, ABCDR & RH, a/w AFL–CIO and Bay Steel Deck Erectors, Inc. and International Association of Bridge, Structural and Ornamental Iron Workers, Local 480.** Case 22–CD–584

April 9, 1992

DECISION AND DETERMINATION OF DISPUTE

BY CHAIRMAN STEPHENS AND MEMBERS OVIATT AND RAUDABAUGH

The charge in this Section 10(k) proceeding was filed on May 16, 1991, by the Employer, Bay Steel Deck Erectors (Bay Steel) alleging that the Respondent, International Union of Operating Engineers, Local 825, ABCDR & RH (Operating Engineers) violated Section 8(b)(4)(D) of the National Labor Relations Act by engaging in proscribed activity with an object of forcing the Employer to assign certain work to employees it represents rather than to employees represented by the International Association of Bridge, Structural and Ornamental Iron Workers, Local 480, AFL–CIO (Iron Workers). The hearing was held on September 11, 1991, before Hearing Officer Norma B. C. Sharp. Thereafter, the Employer and the Operating Engineers filed briefs in support of their positions.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board affirms the hearing officer's rulings, finding them free from prejudicial error. On the entire record, the Board makes the following findings.

I. JURISDICTION

The Company is a New Jersey corporation engaged in the installation of floor decking, with its principal place of business in Brick, New Jersey, where it annually receives goods and materials valued in excess of $50,000 directly from suppliers located outside the State of New Jersey. The parties stipulate, and we find, that the Employer is engaged in commerce within the meaning of Section 2(6) and (7) of the Act and that the Operating Engineers and Iron Workers are labor organizations within the meaning of Section 2(5) of the Act.

II. THE DISPUTE

A. *Background and Facts of Dispute*

Bay Steel separately subcontracted Rabinowitz Ironworks, Inc. and Damon G. Douglas Company to install sheet metal floor decking at jobsites in Springfield and Hackensack, New Jersey, respectively. Bay Steel's employees are represented by the Iron Workers. Sometime in May or June 1991 the business agent for the Operating Engineers contacted Charles O'Neil, the vice

president of Bay Steel. The agent told O'Neil that Bay Steel did not have an agreement with the Operating Engineers for the work at the Springfield site and would have to have a man to "cover," i.e., turn on and off and maintain, the welding machine, or the Operating Engineers would picket the jobsite. O'Neil refused to comply and picketing began 2 days later. The picket signs stated: "Local 825 versus Bay Steel No Signed Agreement." Bay Steel employees crossed the picket line, but the crane operators, who were members of the Operating Engineers, honored the picket line and work ceased. The site owner, Rabinowitz Ironworks, told Bay Steel to leave until the crane work was completed. Bay Steel left and returned to complete its job after the crane work was done.

According to Bay Steel Vice President O'Neil, picketing began at the Hackensack construction site after O'Neil advised Operating Engineers' Business Agent Craig Wask that Bay Steel did not need someone to "cover" the welding machines. O'Neil testified that Bay Steel was forced off the job by Damon Douglas, Inc. in order to end the picketing. Bay Steel subsequently filed a petition for a representation election and unfair labor practice charges alleging violations of Sections 8(b)(7)(C), 8(b)(4)(ii)(B), and 8(b)(4)(i) and (ii)(D). The Regional Director obtained a voluntary cessation of picketing at the Springfield site and an agreement not to picket the Hackensack site so that Bay Steel could return to the sites and perform its work.

B. *Work in Dispute*

The disputed work involves the starting, stopping, and maintenance of welding machine engines. The welding machine engine is mounted on the back of a pickup truck, which is driven by a foreman who is represented by the Iron Workers. The welding machine is started by flipping a switch on the engine.

C. *Contentions of the Parties*

Bay Steel contends that reasonable cause exists to believe that the Operating Engineers violated Section 8(b)(4)(D). It argues that the task of "covering" the welding machine engine should be assigned to its employees who are represented by the Iron Workers with whom it has a collective-bargaining agreement. Bay Steel asserts that the collective-bargaining agreement, employer preference, practice, economy and efficiency favor assignment of the disputed work to employees represented by the Iron Workers. Additionally, the Employer seeks a broad determination contending that there is a likelihood that similar disputes will recur in the geographical area.

The Operating Engineers argues that it seeks to represent those employees assigned to "cover" the welding machine engines and does not claim that the dis-

puted work has to be assigned to employees it represents. It further maintains that its picketing was lawful within the limits of Section 8(b)(7)(C) of the Act because its purpose was to obtain an 8(f) prehire agreement. It also argues that the dispute is moot because the picketing has stopped and the work is completed.[1]

The Operating Engineers also argues that a broad determination is unnecessary because a similar dispute is not likely to occur because it has agreed not to picket or threaten to picket for an 8(f) agreement covering persons operating welding machines.

Iron Workers, Local 480, did not appear or take part in the proceeding.

### D. *Applicability of the Statute*

Before the Board may proceed with a determination of the dispute pursuant to Section 10(k) of the Act, it must be satisfied that there is reasonable cause to believe that a violation of Section 8(b)(4)(D) has occurred and that there exists no agreed-upon method for the voluntary adjustment of the dispute.

Bay Steel Vice President O'Neil testified that agents of the Operating Engineers claimed the work in dispute and then picketed the Springfield and Hackensack worksites.

Operating Engineers argues that it did not violate Section 8(b)(4)(D) because its picketing was recognitional. Although its contention that it was seeking to represent the employee performing the disputed work and a contract with the Employer might support a finding that it had a recognitional objective, the issue in a 10(k) proceeding is whether reasonable cause exists to believe that the respondent had as one objective forcing or requiring the employer to assign the disputed work to individuals represented by it. *Electrical Workers IBEW Local 701 (University of Chicago)*, 255 NLRB 1157, 1161 (1981).

We find reasonable cause to believe that a violation of Section 8(b)(4)(D) has occurred and, in the absence of any claim or evidence to the contrary, that there exists no agreed-upon method for the voluntary adjustment of the dispute within the meaning of Section 10(k). Accordingly, we find that the dispute is properly before the Board for determination.

### E. *Merits of the Dispute*

Section 10(k) requires the Board to make an affirmative award of disputed work after considering various factors. *NLRB v. Electrical Workers IBEW Local 1212 (Columbia Broadcasting)*, 364 U.S. 573 (1961). The Board has held that its determination in a jurisdictional dispute is an act of judgment based on common sense and experience, reached by balancing the factors in-

---
[1] We find without merit the Operating Engineers' argument that the jurisdictional dispute is moot.

volved in a particular case. *Machinists Lodge 1743 (J. A. Jones Construction)*, 135 NLRB 1402 (1962).

The following factors are relevant in making the determination of the dispute.

#### 1. Collective-bargaining agreements

Vice President O'Neil testified that Bay Steel has had collective-bargaining agreements since 1983 with the Iron Workers which represents the employees assigned the responsibilities of welding metal decking to flooring. He also testified that the agreement does not specifically mention the work in dispute. The mere existence of a collective-bargaining agreement is not a factor favoring a work assignment. Thus, this factor favors neither group of employees.

#### 2. Employer preference and past practice

The Employer prefers to award the work in dispute to employees represented by the Iron Workers. Bay Steel has had a collective-bargaining agreement with the Iron workers since 1983. It has never hired an engineer to start, stop, or service the welding machine engine. Generally, the foreman at the jobsite turns the welding machine engine switch on or off. Employees represented by the Iron Workers also start the machine when doing welding.

Thus, the factor of employer preference and past practice favors the assignment of the work in dispute to the Employer's employees represented by the Iron Workers.

#### 3. Area and industry practice

The work in dispute has been assigned to members of the Iron Workers as well as to members of the Operating Engineers in the area. Witnesses from PSM Steel Construction and McManus Steel Deck Erectors, Inc. testified as to area practice.

Richard Paluzzi, vice president of PSM Steel, testified that PSM had employed, for approximately 3 years, a member of the Operating Engineers whose sole purpose was to start, stop, and service welding machines. Paluzzi testified that PSM had signed a contract with the Operating Engineers in October 1984 when PSM was required, allegedly as a result of threats made to its steel deck supplier, to hire an engineer even though it did not need or want one. He also testified that employees represented by the Iron Workers would also start and stop the machines and that, since 1989, the task of "covering" and maintaining the machines has been assigned to employees represented by the Iron Workers.

Michael McManus, secretary of McManus Steel, testified that McManus Steel, which also uses welding machines in installing metal floors, uses employees represented by the Operating Engineers as well as employees represented by the Iron Workers. According to

24          DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

McManus, the assignment depends on whether the Operating Engineers insists that a member of the Operating Engineers "covers" the welding machine. We find that the factor of area practice is inconclusive.

#### 4. Relative skills

All of the witnesses testified that no skill is required to perform the work in dispute of turning the engine on and off, and changing the oil and air filters. Thus, the factor of relative skills favors neither group of employees.

#### 5. Economy and efficiency of operations

Currently the work in dispute is performed by employees represented by the Iron Workers, with whom the Employer has a collective-bargaining agreement. After starting the welding engine these employees perform other functions, including welding. In contrast, the Employer employs no employees represented by the Operating Engineers and if the Employer did employ an operating engineer merely to "cover" the welding machine engine that employee would be idle for most of the work day. For example, Vice President Paluzzi of PSM Steel testified that when that company employed an operating engineer to perform the work in dispute he had nothing to do during the work day because the iron workers, who arrived at the jobsite first, turned on the welding machine. The operating engineer would service the machine when it was not being used, a task that took approximately 2 hours, was necessary only every few months, and could have been performed by employees represented by the Iron Workers.

We find the factor of economy and efficiency of operations favors assignment of the work in dispute to employees represented by the Iron Workers.

#### Conclusions

After considering all the relevant factors, we conclude that employees represented by Iron Workers

Local 480 are entitled to perform the work in the dispute. We reach this conclusion relying on the factors of employer preference and past practice, and economy and efficiency of operations.

In making this determination, we are awarding the work to employees represented by Iron Workers Local 480, not to that Union or its members. The determination is limited to the controversy that gave rise to this proceeding.[2]

#### DETERMINATION OF DISPUTE

The National Labor Relations Board makes the following Determination of Dispute.

1. Employees of Bay Steel Deck Erectors, Inc. represented by the Iron Workers Local 480 are entitled to perform the disputed work of starting, stopping, and maintaining welding machine engines at the Springfield and Hackensack, New Jersey jobsites of Bay Steel Deck Erectors, Inc.

2. International Union of Operating Engineers, Local 825 ABCDR & RH, AFL–CIO, is not entitled by means proscribed by Section 8(b)(4)(D) of the Act to force Bay Steel Deck Erectors, Inc. to assign the disputed work to employees represented by it.

3. Within 10 days from this date, Operating Engineers, Local 825, ABCDR & RH, a/w AFL–CIO, shall notify the Regional Director for Region 22 in writing whether it will refrain from forcing the Employer, by means proscribed by Section 8(b)(4)(D), to assign the disputed work in a manner inconsistent with this determination.

---

[2] The Employer's request for a broad determination is denied. A broad determination may be justified where there is evidence of similar and widespread practices with the same unlawful objective. See *Teamsters Local 5 (Mid South Fire Protection)*, 224 NLRB 1605 (1976). The subjective testimony of witnesses Paluzzi and McManus that their companies would not have entered into collective-bargaining agreements with Operating Engineers without some pressure is not sufficient to establish that a broad determination is warranted here.