CIN-TEL CORPORATION

PH:  513-621-7723                                    FX:  513-263-9023

Page 1

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

--|--

Case No. 01-18-0001-3790

--|--

Sofco Erectors, Inc.,

Employer,
and

Ohio Operating Engineers Pension Fund,

Fund.

--|--

Deposition of:   DANIEL V. CINER

Date and Time:   Monday, October 8, 2018
                 9:27 a.m.

Place:           Vorys, Sater, Seymour &
                   Pease, LLP
                 52 East Gay Street
                 Columbus, Ohio

Reporter:        Maria DiPaolo Jones, RDR, CRR
                 Notary Public - State of Ohio

--|--

CIN-TEL CORPORATION

PH: 513-621-7723          FX: 513-263-9023

---

## Page 2

```
 1   APPEARANCES:
 2   On behalf of Sofco Erectors, Inc.:
 3       MR. GARY L. GREENBERG
         Jackson Lewis, PC
 4       425 Walnut Street, Suite 2300
         Cincinnati, Ohio  45202
 5       513.621.3440
 6   On behalf of Ohio Operating Engineers Pension Fund
     and Daniel V. Ciner:
 7
         MR. DANIEL J. CLARK
 8       Vorys, Sater, Seymour & Pease, LLP
         52 East Gay Street
 9       Columbus, Ohio  43216-1008
         614.464.6400
10
     ALSO PRESENT:
11
         Mr. Dan Powell
12
                --|--
13
14
15
16
17
18
19
20
21
22
23
24
```

---

## Page 4

```
 1       Erectors, Inc. - Request for Review
         of Withdrawal Liability Assessment
 2   LETTER DESCRIPTION          IDENTIFIED
 3   M   11/29/2017 letter Re:  Sofco      39
         Erectors, Inc. - Supplemental
 4       Request for Review of Withdrawal
         Liability Assessment dated
 5       August 31, 2017
 6   N   6/22/2018 letter Re:  Sofco       39
         Erectors, Inc.
 7
     O   Affidavit of Tim Gates            40
 8
 9   P   Precision Environmental Company   41
         Arbitration Opinion and Award
10   Q   The New York Times Company U.S.   41
         District Court Opinion and Order
11
12   R   9/7/2018 letter Re:  Sofco Erectors,   43
         Inc./Ohio Operating Engineers
         Pension Fund Withdrawal Liability
13
                --|--
14
15
16
17
18
19
20
21
22
23
24
```

---

## Page 3

```
 1               INDEX
 2              --|--
 3   DANIEL V. CINER        PAGE
     Examination by Mr. Greenberg     6
 4
               --|--
 5
          CINER EXHIBITS
 6
     LETTER DESCRIPTION          IDENTIFIED
 7
     A   OOEP Fund's Witness Disclosure   10
 8
     B   OOEP Fund Withdrawal Liability   12
 9       Valuation as of July 31, 2009
10   C   OOEP Fund Withdrawal Liability   15
         Valuation as of July 31, 2010
11
     D   OOEP Fund Withdrawal Liability   15
12       Valuation as of July 31, 2011
13   E   OOEP Fund Withdrawal Liability   15
         Valuation as of July 31, 2012
14
     F   OOEP Fund Withdrawal Liability   15
15       Valuation as of July 31, 2013
16   G   OOEP Fund Withdrawal Liability   15
         Valuation as of July 31, 2014
17
     H   OOEP Fund Withdrawal Liability   15
18       Valuation as of July 31, 2015
19   I   OOEP Fund Withdrawal Liability   15
         Valuation as of July 31, 2016
20
     J   May 8, 2013 through April 30, 2017   29
21       Collective Bargaining Agreement
22   K   8/31/2017 letter Re:  Partial and   29
         Complete Withdrawal Liability
23       Demand for Payment
24   L   11/10/2017 letter Re:  Sofco        38
```

---

## Page 5

```
 1           Monday Morning Session
 2             October 8, 2018.
 3                --|--
 4       (CINER EXHIBITS A - R MARKED.)
 5       MR. GREENBERG:  We're here today to take
 6   the deposition of Daniel V. Ciner In the Matter of
 7   Sofco Erectors, Inc. and the Ohio Operating Engineers
 8   Pension Fund which from this point forward I will
 9   refer to as "the Fund," and that matter is pending
10   before the American Arbitration Association and
11   Arbitrator John Sands, and we're here today pursuant
12   to the rules of the American Arbitration Association
13   for multiemployer pension plan withdrawal liability
14   disputes, the parties' joint discovery plan notice
15   and agreement of counsel.
16       And with me today representing Sofco
17   Erectors is one of the company's officers, Dan
18   Powell.
19       So let me ask Mr. Clark to appear for the
20   record.
21       MR. CLARK:  Dan Clark, counsel for the
22   Pension Fund.
23       MR. GREENBERG:  Mr. Clark, are you also
24   counsel for Mr. Ciner here today?
```

---

2 (Pages 2 to 5)

CIN-TEL CORPORATION

PH: 513-621-7723 FX: 513-263-9023

## Page 6

1     MR. CLARK: I am.
2     MR. GREENBERG: Can we stipulate to the
3  qualifications of the court reporter?
4     MR. CLARK: Yes.
5     MR. GREENBERG: Okay.
6        --|--
7     DANIEL V. CINER,
8  being by me first duly sworn, as hereinafter
9  certified, deposes and says as follows:
10        EXAMINATION
11  BY MR. GREENBERG:
12    Q.    So, Mr. Ciner, please state your full
13  name.
14    A.    Daniel V. Ciner, enrolled actuary for the
15  pension plan.
16    Q.    And where are you employed?
17    A.    Segal Consulting.
18    Q.    In what location?
19    A.    Chicago.
20    Q.    And what position do you have with Segal
21  Consulting?
22    A.    I'm a senior vice president and actuary.
23    Q.    How long have you held that position?
24    A.    I don't recall. Probably about seven

## Page 7

1  years at this particular position.
2     Q.    And how long have you worked for Segal
3  Consulting as an actuary?
4     A.    Thirty years.
5     Q.    Let's just briefly go over your education
6  and your professional certifications. Where did you
7  go to college?
8     A.    Bradley University in Peoria, Illinois.
9     Q.    And what was your major?
10    A.    Mathematics.
11    Q.    When did you graduate?
12    A.    In 1988.
13    Q.    And did you have -- oh, I'm sorry, what
14  was your degree?
15    A.    I'm sorry, 1987.
16    Q.    1987. And what was your degree?
17    A.    My degree was in mathematics, minors in
18  business and economics.
19    Q.    And did you have any graduate school
20  education?
21    A.    No.
22    Q.    And do you have any professional
23  certifications?
24    A.    Yes. I am an enrolled actuary and member

## Page 8

1  of the American Academy of Actuaries.
2     Q.    Have you ever authored any papers that
3  were published in peer-reviewed journals?
4     A.    No.
5     Q.    So you mentioned, I think in answer to my
6  first question, that you perform actuarial services
7  for the Fund; is that correct?
8     A.    Correct.
9     Q.    And how long have you been doing that?
10    A.    Approximately 15 years.
11    Q.    So I'm going to ask you a series of
12  questions here today about services that you've
13  performed for the Fund. And I'm going to assume
14  you've been deposed before. Correct?
15    A.    I have.
16    Q.    So you know that you should wait till I
17  finish a question before you answer. Correct?
18    A.    (Witness nods head.)
19    Q.    You should say "yes."
20    A.    Yes.
21    Q.    And if at any time you don't understand
22  one of my questions, will you let me know?
23    A.    Yes.
24    Q.    Also, if at any time you need a break,

## Page 9

1  please let me know but wait until you've answered the
2  question.
3     A.    Okay.
4     Q.    Yes? All right. Thank you.
5     A.    Yes.
6     Q.    What did you do to prepare for today's
7  deposition?
8     A.    I reviewed the calculations and the letter
9  that we prepared for this employer's withdrawal
10  liability assessment as well as applicable law.
11    Q.    Anything else?
12    A.    I met with Mr. Clark.
13    Q.    All right. I'm going to ask you questions
14  about some documents that we have marked as exhibits.
15    A.    Okay.
16    Q.    And you'll find in front of you a booklet,
17  and I'm going to do my best to go through these in
18  order so that we'll be efficient. And so if you turn
19  to Tab 1, please, you'll find Exhibit A. Exhibit A
20  is a letter dated August 15, 2018, addressed to me,
21  Gary L. Greenberg, and if you'll look at the second
22  page, it was signed by Fund counsel Daniel J. Clark,
23  the caption is "Ohio Operating Engineers Pension
24  Fund's Witness Disclosure," and you'll see that the

WWW.CINTELCORPORATION.COM     E-Mail    CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723                    FX: 513-263-9023

---

Page 10

1    first witness that's listed there is you, Dan Ciner.
2         Have you seen this letter before today?
3         A.    No.
4         Q.    And when did you first learn that you were
5    going to be a witness in this case?
6         A.    I don't recall exactly.
7         Q.    All right. I'm going to read what it says
8    here in this letter out loud and then I'll have a
9    question about it.
10        A.    Okay.
11        Q.    "Mr. Ciner may testify regarding the
12   withdrawal liability calculations prepared by Segal
13   on behalf of the Funds which for" -- and I assume
14   "for" really means "form" -- "which for the basis for
15   the withdrawal liabilities sought by the Fund from
16   Sofco."
17        Are you going to be able to testify here
18   this morning about that subject from personal
19   knowledge?
20        A.    Can you restate that, the question?
21        Q.    Sure. So I read to you a description of
22   your testimony that was provided by counsel. I just
23   read it out loud.
24        A.    Okay.

---

Page 11

1         Q.    What I'm asking you is whether you're
2    going to be able to testify here this morning about
3    that subject matter that's described here from
4    personal knowledge.
5         A.    Yes.
6         Q.    And that personal knowledge is based on
7    what? How did you gain that personal knowledge?
8         A.    Based on having overseen the work to
9    prepare the calculations described here.
10        Q.    All right. Thank you.
11        Please turn to Tab 2. And now we're going
12   to look at Exhibit B, so you're going to notice that
13   in the, if you turn it sideways, in the bottom right
14   corner you'll see that there is a number stamped,
15   well, there are three letters, OOE-000059, so you
16   probably know from other cases that this is what we
17   call a Bates stamp which is a way of keeping track of
18   documents that are produced by one party to another.
19        And so "OOE," of course, stands for Ohio
20   Operating Engineers, these are documents that were
21   produced by the Pension Fund and so as we go through
22   many of these documents I'm going to refer to these
23   numbers in the corner to help us figure out what
24   we're looking at. Is that okay?

---

Page 12

1         A.    Yes, it is.
2         Q.    All right. Good. I also want to point
3    out that Tabs 2 through 9 are a series of documents
4    that appear to be reports provided by Segal to the
5    Fund each year from 2009 or perhaps 2010 through
6    2017. And I'm going to ask you a few questions about
7    each of these and then when we get to the last one,
8    I'm going to get into it in more detail.
9         So we'll start with this first one, I'll
10   just ask you to identify the document. We're looking
11   at Exhibit B which is at Tab 2.
12        A.    Okay. This is an annual evaluation report
13   for withdrawal liability purposes for the plan year
14   ended July 31st, 2009, for the Ohio Operating
15   Engineers Pension Fund.
16        Q.    And when we turn to the next page, which
17   is Bates stamped OOE-60, you'll see that there is a
18   cover letter to the board of trustees of Ohio
19   Operating Engineers Pension Fund and in the second
20   paragraph it says, "The actuarial calculations were
21   completed under the supervision of Daniel V. Ciner."
22   And that's you, correct?
23        A.    Yes.
24        Q.    So, again, let's -- I want to be efficient

---

Page 13

1    here. So it's my understanding that you supervised
2    the creation of this document and all the subsequent
3    annual reports through 2017; is that correct?
4         A.    Yes.
5         Q.    And at the bottom you'll see that the
6    letter, this cover letter is actually from somebody
7    named John P. Bragan, B-r-a-g-a-n, Vice President.
8    And who is Mr. Bragan?
9         A.    Mr. Bragan was the -- what at Segal we
10   call a client relationship manager who's the lead
11   consultant/client contact with the client.
12        Q.    I see. Between the two of you who played
13   the larger role in creating this document?
14        A.    I did.
15        Q.    And that would be true between you and the
16   client relations person signing the letter, that
17   would also be true for the subsequent years?
18        A.    Yes.
19        Q.    All right. And in each case, I mean, to
20   the best of your knowledge and recollection, you
21   would say that each of these was accurate.
22        A.    Yes.
23        Q.    As far as you know or can recall none of
24   these were redone after the fact. I have the final

---

4 (Pages 10 to 13)

CIN-TEL CORPORATION

PH: 513-621-7723                    FX: 513-263-9023

Page 14

1   version here, and I guess we can take a little time
2   and kind of skim through these.
3       A.   Okay.
4       Q.   Which we'll do now.  In fact, why don't we
5   just take a break here for a few minutes, or go off
6   the record for a few minutes and give you a chance to
7   skim through these documents then I'll just ask you
8   to confirm that these are true and accurate copies of
9   the reports --
10      A.   Okay.
11      Q.   -- that you authored and provided each
12  year.
13      A.   Okay.
14          (Off the record.)
15      A.   Okay.
16      Q.   And so now that you've had a chance to
17  look through Exhibits B through I, are these -- do
18  these appear to be true and accurate copies of the
19  withdrawal liability valuations provided by Segal to
20  the Fund for July 31, 2009, through July 31st,
21  2016?
22      A.   Yes.
23      Q.   Thank you.
24          So my understanding is that over the last

Page 15

1   ten years or so you have spent a substantial amount
2   of your time performing services for this fund; is
3   that correct?
4       A.   A substantial amount of my total time
5   or --
6       Q.   Substantial part of your total time.  A
7   small part?  Substantial?  Significant?
8       A.   Small part of my total time at Segal.
9       Q.   Are there any other construction industry
10  pension funds for which you perform services now or
11  in the past?
12      A.   Yes.
13      Q.   How many others, roughly?
14      A.   Approximately 15.
15      Q.   So is that a specialty for you within
16  Segal?  Do you predominantly handle construction
17  industry funds, or do you handle both construction
18  and nonconstruction funds?
19      A.   I handle construction and nonconstruction.
20      Q.   Can you give me a rough idea of
21  percentages?  Is it 50 percent construction?
22  Twenty percent?
23      A.   Of the cases I work on, this is a rough
24  approximation, approximately three-quarters

Page 16

1   construction.
2       Q.   So now I'd like you to turn to Exhibit I,
3   that's Tab 9, and I'm going to ask you some more
4   detailed questions about the valuation as of July 31,
5   2016.  So let's start with Bates No. 106.  And I see
6   that now at this point Megan Kelly is the
7   relationship person at Segal?
8       A.   Yes.
9       Q.   And I see that there's a CC on Allen
10  Kinzer, he of course is Fund counsel, outside
11  counsel, correct?
12      A.   Yes.
13      Q.   And Miss Carol Wilson, she is Fund
14  administrator; is that correct?
15      A.   Yes.
16      Q.   And who is Charles M. Ciuni, C-i-u-n-i,
17  CPA?
18      A.   Fund auditor.
19      Q.   Firm auditor.
20      A.   Fund.
21      Q.   Oh, I'm sorry.  Fund auditor.
22      A.   Auditor for the Fund.
23      Q.   Fund auditor.  Very good.
24          And is he in house or is he with an

Page 17

1   outside firm, if you know?
2       A.   He's with an outside firm.
3       Q.   Do you know what firm he's with?
4       A.   I know Ciuni is in the name.  I don't
5   recall the full name of the CPA firm.
6       Q.   Please turn to 109, Bates No. 109.  I want
7   to ask you about the third bullet, I'm going to read
8   that out loud.  "Actuarial results in this report are
9   not rounded, but that does not imply precision."  Can
10  you explain that to me?  Why is that sentence in
11  there, and what does it mean?
12      A.   It's because actuarial calculations
13  measure values of future benefit payments based on a
14  set of assumptions so that they're events that are
15  not known yet, but it's a way actuaries calculate the
16  values today of future benefits paid to all plan
17  participants.
18      Q.   Please turn to the next page.  This is
19  Bates No. 110.  I'm going to ask you about the second
20  bullet.  I'm going to read that out loud.  "The
21  increase in the unfunded vested liability since last
22  year was primarily caused by the lower than expected
23  return on the market value of Plan assets and
24  assumption changes."

WWW.CINTELCORPORATION.COM          E-Mail    CINTELCO@GMAIL.COM

Page 18

1    What were the assumption changes between
2    the previous year and this year's report?
3        A.    I'll reference the report, the back of the
4    report that describes the actuarial assumptions.
5        Q.    And that would be Exhibit 4?
6        A.    That would be Section 4 -- is it Exhibit
7    4?  Correct, Exhibit 4 of Section 4.
8        Page, this page 131, the changes were to
9    the mortality assumptions, and the prior assumptions
10   are listed here.
11       Q.    Anything else?  Any assumption changes are
12   listed here, correct?
13       A.    Yes.
14       Q.    All right.  Please look at the page with
15   Bates No. 111.  So this is a page headed "Summary of
16   Key Results."  I'm going to ask you a few questions
17   about the interest assumptions.  So under Interest
18   Assumptions we see that there's something called
19   "Valuation (funding) interest rate," and then you
20   look down toward the end of that row and you'll see
21   that in 2015 that Valuation (funding) interest rate
22   was 7-and-a-quarter percent and in 2016 it was
23   7-and-a-quarter percent.  Did I read that correctly?
24       A.    Yes.

Page 19

1        Q.    So please explain what is meant by
2    "valuation (funding) interest rate."
3        A.    Those are the interest rates used for the
4    ERISA funding valuations for each of the respective
5    plan years beginning the day after this date.
6        Q.    And how does the Fund use that interest
7    rate?
8        A.    It's used to calculate the value of
9    liabilities for purposes of meeting ERISA minimum
10   funding requirements and other legal requirements.
11       Q.    And who selected this interest rate for
12   the Fund?  Was it your firm?
13       A.    That's me as the actuary.
14       Q.    That's you.  And so what was the basis for
15   advising the Fund that it should use 7.25 percent for
16   purposes of valuation funding?
17       A.    A review of past experience and future
18   expectations taking into account the plan's asset
19   allocation and expected returns.
20       Q.    So just to put this in simple laymen's
21   terms, layperson's terms, you're looking at the
22   Fund's investments as a whole, a whole package, and
23   as an expert in this field you're advising the Fund
24   that you can reasonably expect to be earning

Page 20

1    7.25 percent on these investments in coming years; is
2    that correct?
3        A.    Yes.
4        Q.    And that's a long-term projection,
5    correct?
6        A.    That is.
7        Q.    Okay.  So underneath that there's a
8    reference to something called PBGC interest rates.
9    What are the PBGC interest rates?
10       A.    "PBGC" stands for the Pension Benefit
11   Guaranty Corporation, and these particular interest
12   rates are interest rates that they publish for --
13   that are used for terminating plans, used for
14   calculations for terminating or mass withdrawn plans,
15   and they are -- approximate annuity purchase interest
16   rates.
17       Q.    And are these rates published for the
18   termination and mass withdrawal of multiemployer
19   pension plans like this fund?
20       A.    Yes.
21       Q.    And these rates, what we're going to call
22   now the PBGC interest rates just as you did in this
23   document, these rates are published for the purpose
24   of administering multiemployer plans that essentially

Page 21

1    go out of business, correct?
2        A.    Yes.
3        Q.    So explain to me the mechanics of that in
4    terms of where these PBGC interest rates come in.  So
5    let's say that we've got, let's talk about a mass
6    withdrawal.  You have a pension fund that's been set
7    up by a multiemployer group and a union and in the
8    course of negotiations they just agree it's going to
9    go out of business.  There's going to be a mass
10   withdrawal when this contract expires, something else
11   is going to take its place.  So, of course, you have
12   all of these promised benefits, vested benefits.
13       So what does the PBGC say the trustees,
14   the employers, the union, what are they supposed to
15   do from that point forward, and how do they use these
16   interest rates?
17       A.    So what you're describing, my
18   understanding, is a mass withdrawal, and these
19   interest rates are used to calculate -- mass
20   withdrawal involves a number of calculations and
21   assessing liabilities to employers that are
22   withdrawing the plan, and it could also include some
23   who withdrew within three years of the mass
24   withdrawal, and these interest rates are used to

CIN-TEL CORPORATION

PH: 513-621-7723                          FX: 513-263-9023

---

Page 22

1    calculate what could be additional liability such
2    that all of the liabilities of a plan are allocated
3    to employers, withdrawing employers.
4        Q.    So, in other words, these -- when there's
5    a mass withdrawal, these interest rates are
6    mandatory?
7        A.    Yes.
8        Q.    But only for mass withdrawals and plan
9    terminations.
10       A.    They may have other uses.
11       Q.    But they are not mandatory for
12   single-employer withdrawals, correct?
13       A.    Correct.
14       Q.    So my understanding is that for purposes
15   of calculating unfunded vested benefits, Segal uses a
16   blend between the valuation funding interest rate and
17   the PBGC interest rates, correct?
18       A.    Yes.
19       Q.    How long has Segal been doing that?
20       A.    Can I --
21       Q.    I'm sorry?
22       A.    Well, I feel the need to elaborate on
23   that.
24       Q.    Sure.

---

Page 23

1        A.    It's not all actuaries at Segal. It's
2    some actuaries. It's not a firm-wide basis, but it's
3    my -- as an actuary it's my best estimate calculation
4    basis.
5        Q.    In the world of withdrawal liability this
6    is often referred to as the "Segal Blend," correct?
7        A.    That's right.
8        Q.    All right. So what is your rationale for
9    using PBGC interest rates to help calculate the
10   unfunded vested benefits?
11       A.    The rationale is that an employer leaving
12   the plan is essentially making a final settlement and
13   the way you settle a multiemployer pension plan is by
14   using those -- is by doing an annuity purchase on
15   behalf of all of the participants, and the interest
16   rates published by PBGC approximate annuity purchase
17   interest rates.
18            And then to the effect that the plan
19   doesn't have enough assets to pay for the annuitized
20   liabilities, the excess is considered funded over the
21   long term, so a long-term interest rate is used and
22   that's why there's a blend. So to the effect that
23   there's assets used, the liability's based on PBGC
24   rates and, if it's not funded, you use the funding

---

Page 24

1    interest rates.
2        Q.    I want to circle back to the mass
3    withdrawal and plan termination situation where these
4    interest rates are mandated. When a multiemployer
5    pension plan -- let me step back.
6            Have you ever been involved in a -- have
7    you done or performed actuarial services in a mass
8    withdrawal or plan termination?
9        A.    Yes.
10       Q.    And when the plan is terminated, what
11   happens to all of the funds, the existing funds? Do
12   they remain in place and continue to be invested or
13   are annuities purchased?
14       A.    In my experiences --
15       Q.    Yeah.
16       A.    -- they were invested.
17       Q.    Okay. But, of course, when a plan is
18   terminated or there's a mass withdrawal, there are no
19   more contributions being made from that point
20   forward, correct?
21       A.    Only in terms of withdrawal liability
22   payments but no ongoing employer contributions.
23       Q.    Right. So, essentially, over time the
24   plan is wound down.

---

Page 25

1        A.    Yes.
2        Q.    Looking again at the Summary of Key
3    Results, let's look at the heading of "Unfunded
4    Vested Liability" and you'll see there's a line
5    "Market value of assets," and you'll see there's
6    something like 2.188 billion dollars. Now, I want
7    you to look above that under Present Value of Vested
8    Benefits. Present Value of Vested Benefits at
9    funding interest rate are about 2.2 billion, correct?
10       A.    Yes.
11       Q.    So if I'm reading this summary correctly,
12   if the funding interest rate was used and that was
13   the only interest rate used to calculate unfunded
14   vested liability, it would end up being a little bit
15   under $20 million; is that correct?
16       A.    Yes.
17       Q.    And there would have been virtually no
18   withdrawal liability assessed for Sofco or anybody
19   else withdrawing during this plan year; would you
20   agree with that?
21       A.    Well, because there's historical amounts
22   still maintained depending on an employer's
23   contribution history, there still could be some
24   withdrawal liability.

WWW.CINTELCORPORATION.COM          E-Mail    CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH:  513-621-7723                                    FX:  513-263-9023

---

Page 26

1       Q.    So there is the pool that's created from a
2   previous year, correct?
3       A.    Yes.
4       Q.    Now, the -- well, let's turn to another
5   page.  Let's look at 115, please.  So 115 is headed
6   "Basic Pools" and then there's a chart or a
7   spreadsheet headed "Basic Pools as of July 31, 2016."
8   Can you explain this chart?  What's a basic pool, and
9   what does this tell us?
10      A.    Okay.  The calculations here are as
11  prescribed in the law in ERISA for multiemployer
12  pension plans that are in the construction industry,
13  and the unfunded vested liability each year is the
14  calculation as we just reviewed for the current year
15  as done for each year over the last 20 years.
16            And each year what's called a chargeable
17  change is what we also call a pool, and that
18  represents the total unfunded vested liability in a
19  given year minus outstanding balances of prior pools,
20  and every time a pool is established, it's reduced
21  5 percent per year till it's gone after 20 years.
22  That's why there only, at most, would be 20 years of
23  pools.
24      Q.    So, let's see, you testified that you've

---

Page 27

1   been working for Segal for 30 years and providing
2   services for this fund for about 10 years; is that
3   correct?
4       A.    Fifteen.
5       Q.    Oh, 15 years?
6       A.    Yes.
7       Q.    So can you explain why the unfunded vested
8   liability jumped from zero in 2002 to 260,824,000 and
9   change in 2003?
10      A.    I don't know.
11      Q.    Let's see.  What year did you begin
12  providing services to this fund?
13      A.    I believe it was 2003.
14      Q.    And I'm just going to ask you to think
15  about what the potential explanation is.  One
16  explanation that jumps to my mind is that perhaps
17  between 2002 and 2003 that's when the Fund started
18  using the Segal Blend rather than the funding
19  interest rate to calculate its withdrawal liability.
20  Does that refresh your recollection?
21      A.    I don't know if that's true.
22      Q.    Has the Fund been using the Segal Blend to
23  calculate its unfunded vested liability since you
24  began to perform services?

---

Page 28

1       A.    Yes.
2       Q.    You don't know what interest rate
3   assumptions the Fund was using before then?
4       A.    No.
5       Q.    Please turn to Tab 10, Exhibit J.  Are you
6   familiar with the labor agreement between the AGC of
7   Ohio and the International Union of Operating
8   Engineers Local 18 that was effective 2013 to 2017?
9       A.    No.
10      Q.    So you would not be able to answer any
11  questions about the work jurisdiction provisions of
12  this contract?
13      A.    No.
14      Q.    Please turn to Tab 11, Exhibit K.  So
15  Exhibit K is a letter dated August 31, 2017, to Sofco
16  Erectors, Re: Partial and Complete Liability Demand
17  for Payment.  So the first two pages is or appears to
18  be a cover letter signed by Bryan C. Barch, In-House
19  Counsel, and then after that you'll see another
20  letter dated August 29, 2017, from Segal Consulting.
21  So I want to start with the first two pages and
22  that's, I'm going to call that the cover letter to
23  the report signed by Mr. Barch.
24            Did you help to draft this cover letter?

---

Page 29

1       A.    No.
2       Q.    Did you review it before it went out?
3       A.    I've never seen it before now.
4       Q.    All right.  So I'm only going to ask you
5   questions about the pages that are headed "Segal
6   Consulting."  Well, the first page is headed "Segal
7   Consulting" and then the subsequent pages show that
8   it's all part of the same letter dated August 29,
9   2017, and then there's some attachments.  Can you
10  identify that part of the document?
11      A.    Yes.
12      Q.    What is it?
13      A.    This is a letter that we prepared for the
14  Fund in response to a request that we do these
15  calculations for the Fund.
16      Q.    And who is Miss Samantha Polsinelli?
17      A.    She represents the Fund as I believe.  I
18  don't know her exact role or title.
19      Q.    Who from the Fund directed you or
20  requested that you do these calculations?
21      A.    I don't recall.
22      Q.    And did that request come with a phone
23  call or an email, if you recall?
24      A.    I don't know.

---

8 (Pages 26 to 29)

CIN-TEL CORPORATION

Page 30

1    Q.   I'm going to direct your attention to the
2  second-to-last paragraph.
3    A.   Okay.
4    Q.   And I am going to read the first sentence
5  out loud. "The above withdrawal liability
6  calculations are based on the asset values and
7  liabilities stated in the July 31, 2008, 2009, 2010,
8  and 2016 withdrawal liability reports, respectively."
9        So I want to ask you to match that
10 sentence up to the exhibits that we've looked at.
11 The 2016 withdrawal liability report is the one that
12 we had marked Exhibit I, that's at Tab 9; is that
13 correct?
14   A.   Yes.
15   Q.   And the 2010 report is the one that we
16 marked Exhibit C; is that correct? That's the one at
17 Tab 3?
18   A.   Yes.
19   Q.   And the 2009 report is the one that we
20 marked as Exhibit B, correct?
21   A.   Yes.
22       MR. GREENBERG:  And I don't think we
23 received the July 31, 2008, report from the Fund, and
24 I'm going to look through my records again to see

Page 31

1  whether or not we have it, but I'm going to ask
2  Mr. Clark to send it to us if -- I'll check and let
3  you know later, but as I sit here right now I don't
4  think we received it. So I'll ask you to check your
5  records to see if you have a record of having sent
6  it.
7    Q.   All right. Now I'm going to read the next
8  sentence out loud. "In addition, they are based on
9  the contribution information provided in your e-mails
10 dated May 1, 2017 and May 9, 2017," and then there's
11 some more to the sentence.
12       Does that refresh your recollection about
13 having been requested to do this calculation by
14 email?
15   A.   It certainly suggests that there was --
16 some part of the request was via email.
17   Q.   Do you recall receiving emails with
18 contribution information? I mean, you would need
19 that information to do the calculation, correct?
20   A.   Yes.
21   Q.   And did you review that information in
22 preparing for today?
23   A.   I did not.
24       MR. GREENBERG:  Dan Clark, I don't recall

Page 32

1  that we received copies of those emails in response
2  to our document requests so I'll ask you to check
3  that as well and request that you send those if you
4  haven't already. And if you find that you did, let
5  us know, but I don't recall -- I don't recall seeing
6  those.
7    Q.   So now I want to ask you about the next
8  paragraph. So the next paragraph begins as follows:
9  "Under Section 4205(b)(1) of ERISA, a partial
10 withdrawal occurs when contribution hours in each of
11 the three consecutive years (the 'three-year testing
12 period') are at least 70 percent less than the
13 average of the two highest years of contribution
14 hours during the five years preceding the three-year
15 testing period."
16       So that text I just read is taken directly
17 from that statute that you cite there, correct?
18   A.   Yes.
19   Q.   And that statute, that particular
20 provision, does not apply to construction industry
21 employers, does it? By its own terms.
22   A.   I'm not aware of anything in that section
23 that says it does not apply to construction
24 employers.

Page 33

1    Q.   Well, let's turn to the next page. So now
2  you cite in your letter to Section 4208(d)(1). Let
3  me read that sentence out loud. "Under Section
4  4208(d)(1) of ERISA, for construction industry
5  employers in construction industry plans" -- let me
6  stop you there. You would agree that Sofco Erectors
7  is a construction industry employer and a
8  construction industry plan, correct?
9    A.   I don't have firsthand knowledge of Sofco
10 Erectors or that they're a construction industry
11 employer.
12   Q.   Would you agree that this fund is a
13 construction industry plan?
14   A.   Yes.
15   Q.   All right. So let me read the rest of
16 that sentence. ". . . partial withdrawal liability
17 is assessable when work continues for an
18 insubstantial portion of the employer's work in the
19 jurisdiction of the collective bargaining agreement."
20       So you would agree that there is a
21 separate provision in ERISA defining partial
22 withdrawal for construction industry employers in
23 construction industry plans, correct?
24   A.   I don't think that's defining partial

9 (Pages 30 to 33)

CIN-TEL CORPORATION

PH:  513-621-7723                               FX:  513-263-9023

---

Page 34

1    withdrawal. It's saying conditions under which their
2    partial withdrawal isn't assessed. It's not saying
3    how you would calculate it.
4        Q.  Fair enough.
5        A.  That 4205 --
6        Q.  So this is interesting. All right. So
7    let's read the rest of that paragraph. "The
8    calculations included in this letter assume that this
9    employer will be assessed partial withdrawal
10   liability for each partial withdrawal. We defer to
11   Fund Counsel's interpretation as to whether partial
12   withdrawal liability is assessable to this employer."
13       Why is that last sentence included in that
14   paragraph?
15       A.  Because it's a legal interpretation of
16   what it means for insubstantial portion of employer's
17   work. It's not a -- it's not a calculation, it's not
18   anything that we would know about how that's
19   interpreted since we're not --
20       Q.  But what you did, in effect, here was to
21   presume that "insubstantial" means the same thing as
22   the 70/30 formula, correct?
23       A.  No.
24       Q.  Well then why did you use the 70/30

---

Page 35

1    formula to calculate partial withdrawal?
2        A.  Because that's how ERISA -- that's part of
3    ERISA to do those calculations.
4        Q.  I think that, and I don't want to make
5    this argumentative, but I want to back up here a
6    second and make sure that you understand what you're
7    saying. Are you giving me a legal opinion here that
8    "insubstantial" means the same thing as the 70/30
9    formula?
10       A.  No.
11       Q.  All right. So did someone from the Fund
12   instruct you to use the 70/30 formula or is that just
13   something you do as a matter of course with
14   construction industry funds?
15       A.  We use it when we're being asked to
16   calculate withdrawal liability.
17       Q.  Always? With construction -- I'm asking
18   about construction industry funds.
19       A.  Yes.
20       Q.  So with a construction industry fund
21   you've never used a different formula; it's always
22   been 70/30.
23       A.  I don't know.
24       Q.  What about with this fund?

---

Page 36

1        A.  I don't know.
2        Q.  Have you ever done a partial withdrawal
3    calculation for this fund before this one?
4        A.  I don't recall.
5        Q.  Were you specifically asked to do one for
6    this company; Sofco?
7        A.  Yes.
8        Q.  By who?
9        A.  By someone from the Fund, potentially
10   Miss Polsinelli or someone else.
11       Q.  So she asked you to do both a complete and
12   a partial calculation; is that correct?
13       A.  That's my recollection.
14       Q.  Has this fund ever asked you to do both a
15   complete and partial withdrawal calculation for any
16   other company?
17       A.  I don't recall.
18       Q.  How many other withdrawal liability
19   calculations have you done for this fund?
20       A.  I don't know.
21       Q.  Three? Four? Six? Eight? Ten?
22       A.  Working for the Fund for 15 years I don't
23   really -- I can't recall going back all those years.
24       Q.  And you don't recall ever doing a partial

---

Page 37

1    withdrawal calculation for any other company other
2    than this one.
3        A.  I may have. I don't know.
4        Q.  I'd like you to turn to Tab 12 which is
5    Exhibit L. I'd like you to look at the affidavit of
6    John Hesford that's attached to Exhibit L. By the
7    way, have you seen Exhibit L before today?
8        A.  I may have if it was attached to -- I
9    believe I did.
10       Q.  Did you help the Fund prepare the response
11   to the company's request for review?
12       A.  My recollection is we were asked to look
13   at some of the questions, but I did not help prepare
14   any letters or anything from the Fund.
15       Q.  And do you recall, again looking at L,
16   which questions you were asked to help with?
17       A.  I don't recall which ones.
18       Q.  Okay. So let's turn back to the affidavit
19   of John Hesford, and I'm going to read Paragraph 1
20   out loud. "My name is John Hesford. I am President
21   of Sofco Erectors, Inc. (the 'Company'), 10360 Wayne
22   Avenue, Cincinnati, Ohio 45215. The Company began
23   operations on April 1, 2004, when it purchased the
24   assets of its predecessor."

---

WWW.CINTELCORPORATION.COM       E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723                          FX: 513-263-9023

---

Page 38

1    Do you have any personal knowledge that
2  would dispute that assertion?
3    A.   No.
4    Q.   If this assertion is true, would that
5  change your withdrawal liability calculation given
6  the fact that you included contributions before 2004
7  in your calculations?
8    A.   Yes.
9    Q.   And if this assertion is true, it would
10 significantly reduce the withdrawal liability; is
11 that correct?
12   A.   It would reduce the withdrawal liability.
13 I can't say what "significant" means.
14   Q.   All right.  Thank you.
15        Please look at Tab 13, that's Exhibit M.
16 So this is a supplemental request to review that we
17 submitted to the Pension Fund.  Have you seen this
18 document before today?
19   A.   Yes.
20   Q.   And did you provide some responses to
21 questions about this document?
22   A.   I don't recall if we helped with any
23 particular responses, but I do remember seeing it.
24   Q.   Please turn to Tab 14, that's Exhibit N.

---

Page 39

1  Exhibit N is a letter dated June 22, 2018, it's a
2  letter to me, Gary Greenberg, it says, "Re: Sofco
3  Erectors, Inc."  If you turn to the third page,
4  you'll see that it's signed by Daniel J. Clark,
5  attorney for the Fund.
6        I'm going to read the -- you'll see in the
7  first paragraph the second sentence, I'm going to
8  read that out loud.  "This correspondence constitutes
9  the Fund's response to the Company's request for
10 review dated November 10, 2017."
11       Have you seen this document before today?
12   A.   Not that I recall.
13   Q.   Do you know whether you provided any
14 information or advice to assist in drafting this
15 document?
16   A.   I don't recall.
17   Q.   Please look at Tab 15, this is Exhibit O.
18 This is an affidavit from an individual by the name
19 of Tim Gates who says that he was president of a
20 company, Southern Ohio Fabricators, Inc., until July
21 2004, that's in Paragraph 2; and that that company
22 had a wholly-owned subsidiary named Sofco Erectors,
23 Inc., that's in Paragraph 4; and then there's some
24 more information about the current company's

---

Page 40

1  predecessor company.
2        Do you have any personal knowledge that
3  would dispute anything in this affidavit?
4    A.   No.
5    Q.   Please turn to Tab 16, this is Exhibit P.
6  So Exhibit P is an arbitration decision involving
7  this fund and a company called Precision
8  Environmental Company.  Did you perform the
9  withdrawal liability calculations for Precision
10 Environmental Company?
11   A.   I don't recall, but as actuary for the
12 Fund I would guess yes.
13   Q.   Do you recall testifying at a deposition
14 or at the hearing in this matter?
15   A.   No.
16 States District Court, Southern District of Ohio,
17 the -- Southern District of New York, sorry,
18   Q.   Please turn to Tab 17, Exhibit Q.  Exhibit
19 Q is a copy of a court decision from the United
20 States District Court, Southern District of Ohio,
21 the -- Southern District of New York, The New York
22 Times Company, Plaintiff, against Newspaper and Mail
23 Deliverers' Publishers' Pension Fund.  This is a
24 court decision that is dated May 26 of 2018

---

Page 41

1  [verbatim].  Very recent.  Are you familiar with this
2  court decision?
3    A.   I am.
4    Q.   And I'm sure it was topic of discussion at
5  Segal, correct?
6    A.   Yes.
7    Q.   And you're aware of the fact that in this
8  decision the judge, this federal judge, rejected the
9  use of the Segal Blend to calculate unfunded vested
10 liability, correct?
11   A.   Yes.
12   Q.   Have you reviewed this decision?
13   A.   I'll say yes.
14   Q.   Can you -- I'm going to guess that you
15 disagree with it.  Is that true?
16   A.   Yes.
17   Q.   And tell me why you disagree with it.
18   A.   Because up until this decision all
19 challenges to the use of Segal Blend to assess
20 withdrawal liability since it started being used in
21 1980 have come out in favor of supporting Segal
22 Blend, and there's also a subsequent ruling in
23 New Jersey that -- after this that also supported
24 Segal Blend as being reasonable for calculating

---

11 (Pages 38 to 41)

CIN-TEL CORPORATION

PH: 513-621-7723                                      FX: 513-263-9023

---

Page 42

1 unfunded vested liabilities.
2    Q.   Has the Segal company filed any friend of
3 the court briefs regarding the use of the Segal
4 Blend?
5    A.   My understanding is that we intend to do
6 so. I don't know if it's already been done.
7    Q.   That would be probably on appeal, when
8 this case goes to the Court of Appeals?
9    A.   Yes.
10    Q.   Has Segal published any papers or written
11 commentary, you know, an email blog, anything that
12 comments on this decision and explains from Segal's
13 point of view why it's wrong?
14    A.   Yes. We have a publication that we send
15 out to all of our clients probably on our website
16 addressing this and then addressing the subsequent
17 New Jersey circuit court ruling.
18    Q.   And I could find this on your website?
19    A.   They should -- yes, they should be there.
20    Q.   Please turn to Tab 18, this is Exhibit R.
21 So Sofco has retained a consulting actuary to assist
22 us in this case, it's called the Libman Actuarial
23 Group, Inc., and the owner/named partner is an
24 actuary by the name of Michael Libman. Are you

---

Page 43

1 familiar with Mr. Libman?
2    A.   No.
3    Q.   Have you seen this document before today?
4    A.   No.
5    Q.   I'm going to take a break here and I'd
6 like you to take your time and read through this
7 report. It's not lengthy, and then we can get back
8 together in 10 or 15 minutes and I'll ask you a few
9 questions about it. If you need more time to read
10 through it, you can let me know.
11    A.   Okay.
12         MR. CLARK: It looks like there's two here
13 with a --
14         MR. GREENBERG: Huh?
15         MR. CLARK: You said the document has --
16 it's two letters from Mr. Libman with a CV? Do you
17 want him to review the entire exhibit?
18         MR. GREENBERG: There's two different
19 reports on two different issues and, yes, so there
20 are two letters, correct.
21         This exhibit has two letters attached to
22 it, so I'll ask you to read through both.
23         THE WITNESS: Okay.
24         (Recess taken.)

---

Page 44

1         MR. GREENBERG: All right. Back on the
2 record.
3    Q.   (By Mr. Greenberg) Mr. Ciner, we just took
4 a break to give you a chance to look through Exhibit
5 R, and Exhibit R consists of two letters from the
6 company's consulting actuary, so let's start with the
7 one that is marked Sofco-2150 through 2153 -- I'm
8 sorry. Let me start over.
9         Let's just start with the first two pages,
10 2150, 2151, and then there are a couple of charts
11 attached to that. This letter purports to calculate
12 what a complete withdrawal liability would look like
13 if contributions before April of 2004 were not taken
14 into account, correct?
15    A.   Yes.
16    Q.   And, again, I know that you've only had a
17 little bit of time to review this, but do you see any
18 flaws in our consultant's calculations, again,
19 assuming the premise? Assuming that contributions
20 before April 1, 2004, are eliminated.
21    A.   Yeah, we would have to do the calculations
22 ourselves to see if we agree, but they don't -- they
23 look reasonable relative to what it describes as the
24 calculation.

---

Page 45

1    Q.   Understood. Thank you.
2         So now we're going to look at the other
3 letter, that is the one that begins 2155, 2156, 2157.
4 So the premise of this letter is that the interest
5 rate used for withdrawal liability calculation would
6 be the same 7.25 percent used for funding, and I know
7 you disagree with that premise, but assuming that
8 premise were true and accurate do these calculations
9 look reasonable to you?
10    A.   The calculations look reasonable but the
11 one item I would point out that's -- I don't know
12 that is clearly enough described here is when the
13 unfunded liability for a plan becomes zero, the prior
14 pools are not automatically eliminated; it's an
15 option. So if this were to say the trustees would
16 have elected to eliminate them --
17    Q.   Understood. Thank you.
18    A.   -- it would look reasonable.
19    Q.   Thinking back over your testimony here
20 this morning is there anything that you can think of
21 that you would like to say differently or add to your
22 prior testimony?
23    A.   No.
24    Q.   I'm going to ask the court reporter to

---

12 (Pages 42 to 45)

CIN-TEL CORPORATION
PH:  513-621-7723                                        FX:  513-263-9023

---

Page 46

```
 1        prepare a transcript and I'll ask you to review it
 2        and if you find any errors in her transcription,
 3        there will be a sheet that you can fill out to make
 4        those corrections.  Will you do that?
 5        A.    Yes.
 6        Q.    And then we'll ask that you sign it once
 7   you've done that, and that's all I have.
 8             MR. GREENBERG:  Thank you very much for
 9   your patience.
10             (Whereupon, at 10:42 a.m., the deposition
11   was concluded and signature was not waived.)
12                       --|--
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 48

```
 1                       AFFIDAVIT
 2   State of _____ )
 3   County of _____ ) SS:
 4        I, DANIEL V. CINER, do hereby certify that I
     have read the foregoing transcript of my deposition
 5   given on Monday, October 8, 2018; that together with
     the correction page attached hereto noting changes in
 6   form or substance, if any, it is true and correct.
 7
 8                    DANIEL V. CINER
 9        I do hereby certify that the foregoing
     transcript of the deposition of DANIEL V. CINER was
10   submitted to the witness for reading and signing;
     that after he had stated to the undersigned Notary
11   Public that he had read and examined his deposition,
     he signed the same in my presence on the _____ day
12   of _____, 2018.
13
14   _____
                   Notary Public
15
16   My commission expires _____, _____.
17                       --|--
18
19
20
21
22
23
24
```

---

Page 47

```
 1                       CERTIFICATE
 2   State of Ohio        )
 3   County of Franklin   ) SS:
 4        I, Maria DiPaolo Jones, RDR and CRR, the
     undersigned, a duly qualified and commissioned notary
 5   public within and for the State of Ohio, do certify
     that, before giving his deposition, DANIEL V. CINER
 6   was by me first duly sworn to testify to the truth,
     the whole truth, and nothing but the truth; that the
 7   foregoing is the deposition given at said time and
     place by DANIEL V. CINER; that I am neither a
 8   relative of nor employee of any of the parties or
     their counsel and have no interest whatever in the
 9   result of the action.
10        IN WITNESS WHEREOF, I hereunto set my hand and
     official seal of office on this 15th day of October,
11   2018.
12
13   _____
                   Maria DiPaolo Jones, RDR, CRR,
14               and Notary Public in and for the
                   State of Ohio.
15   My commission expires June 19, 2021.
16
17                       --|--
18
19
20
21
22
23
24
```

---

Page 49

```
 1        PLEASE USE THIS ERRATA SHEET TO MAKE ANY
     AND ALL CORRECTIONS, BY LISTING THE PAGE NUMBER,
 2   LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE
     ERROR.  PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS
 3   ON THE TRANSCRIPT.  IF NEEDED USE THE BACK OF THIS
     SHEET.  UPON COMPLETION PLEASE SIGN AND DATE THIS
 4   SHEET AT THE BOTTOM.  THANK YOU.
                                    _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   SIGNATURE:_____DATE:_____
```

13 (Pages 46 to 49)



**Vorys, Sater, Seymour and Pease LLP**
Legal Counsel


Ciner
EXHIBIT A
Date 10.8.2018

52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

614.464.6400 | www.vorys.com

Founded 1909

Daniel J. Clark
Direct Dial (614) 464-6436
Direct Fax (614) 719-4650
Email djclark@vorys.com

August 15, 2018

**VIA E-MAIL**

Gary L. Greenberg
Jackson Lewis P.C.
425 Walnut Street
Suite 2300
Cincinnati, OH 45202

Re:    Ohio Operating Engineers Pension Fund's Witness Disclosure

Dear Gary:

Pursuant to our agreement and the Arbitrator's order the Ohio Operating
Engineers Pension Fund identifies the below individuals as potential witnesses in the hearing
regarding the withdrawal liability assessments issued by the Fund to Sofco Erectors, Inc.

1. Dan Ciner, Segal Consulting. Mr. Ciner may testify regarding the withdrawal
   liability calculations prepared by Segal on behalf of the Funds, which for the
   basis for the withdrawal lability sought by the Fund from Sofco.

2. Carol A. Wilson, Administrator. Ms. Wilson may testify as to Sofco Erectors,
   Inc.'s participation as a contributing employer in the Fund, including the
   contributions history, contribution reports submitted by Sofco to the Fund and
   as a custodian of records maintained by the Fund.

3. Thomas Byers, President Local 18 of the International Union of Operating
   Engineers. Mr. Byers may testify as to Sofco's collective bargaining
   relationship with Local 18, the nature of the work performed by Sofco prior to
   and following the termination of the collective bargaining relationship and the
   identity of current or former Local 18 members employed by Sofco.

4. Dan Powell and John Hesford. Mssrs. Powell and Hesford may testify to the
   collective bargaining relationship between Sofco and Local 18, the individuals



**Legal Counsel**

Gary L. Greenberg
August 15, 2018
Page 2

employed by Sofco pursuant to collective bargaining agreements with Local 18, Sofco's history of participation in the Fund prior to the termination of the agreements, the nature of Sofco's operations since the termination of its agreements with Local 18, the alleged 2004 asset purchase acquiring assets of Southern Ohio Fabricators, Inc., and the individuals employed by Sofco.

5.  Records custodians of record produced or utilized by either party.

6.  Witnesses identified or called by Sofco.

Sincerely,

Daniel J. Clark

DJC/djc

cc:    Allen S. Kinzer
       Mark Gerano

**Ohio Operating Engineers Pension Fund**

*Withdrawal Liability Valuation as of*
*July 31, 2009*

Copyright © 2010

THE SEGAL GROUP, INC.,
THE PARENT OF THE SEGAL COMPANY
ALL RIGHTS RESERVED



OOE-000059

 **SEGAL**

THE SEGAL COMPANY
1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 F 216.687.4490 www.segalco.com

*January 14, 2010*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2009 through July 31, 2010.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic employee and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2009. The benefit provisions included in the calculations are those that were in effect on July 31, 2009.*

*We look forward to reviewing this report with you at your next meeting and answering any questions you may have.*

*Sincerely,*

*THE SEGAL COMPANY*

*By:* _____

*John P. Bragan*
*Vice President*

OOE-000060

## SECTION 1

**VALUATION SUMMARY**

Significant Issues in Valuation
Year..........................................i

Summary of Key Results..............ii

## SECTION 2

**VALUATION RESULTS**

A. Determination of Withdrawal
Liability....................................1

B. Unfunded Vested Liability......3

C. Withdrawal Liability
Experience ..............................6

## SECTION 3

**SUPPLEMENTARY INFORMATION**

EXHIBIT A
Method for Allocating
Withdrawal Liability..................7

EXHIBIT B
Employer Withdrawal Liability
Worksheet For Withdrawals from
August 1, 2009 Through July 31,
2010..........................................10

## SECTION 4

**ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY**

EXHIBIT I
Calculation of Unfunded Vested
Liability ...................................12

EXHIBIT II
Withdrawal Liability Pools.......13

EXHIBIT III
Actuarial Assumptions and
Methods....................................14

EXHIBIT IV
Summary of Plan Provisions ....16

✷ SEGAL

OOE-000061

**SECTION 1:    Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Significant Issues in Valuation Year**

- The unfunded vested liability as of July 31, 2009 is $649.0 million, compared to $310.8 million as of July 31, 2008.  A new positive pool of $357.0 million was created.

- The interest rates used for funded portion of vested liability changed from 5.95% for the first 20 years and 5.02% thereafter to 5.31% for the first 20 years and 5.04% thereafter.

- The increase in the unfunded vested liability was primarily due to a significant investment loss.

✫SEGAL

i

**SECTION 1:    Valuation Summary for the Ohio Operating Engineers Pension Fund**

<u>Summary of Key Results</u>

|  | July 31 | |
|---|---|---|
|  | **2009** | **2008** |
| **Demographic Data:** | | |
| Number of active vested employees | 5,691 | 5,709 |
| Number of inactive vested participants | 1,147 | 1,088 |
| Number of pensioners and beneficiaries | 6,770 | 6,748 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 5.31% for 20 years, 5.04% thereafter | 5.95% for 20 years, 5.02% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $1,784,225,620 | $1,718,984,777 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,262,395,641 | 2,041,622,067 |
| Present value of vested benefits for withdrawal liability purposes | 2,088,461,029 | 1,983,293,541 |
| **Withdrawal Liability:** | | |
| Market value of assets | $1,439,447,964 | $1,672,523,979 |
| Unfunded vested liability for withdrawal liability purposes | 649,013,065 | 310,769,562 |
| Withdrawal liability pool established | 357,008,602 | 138,233,538 |

✷ SEGAL

ii

OOE-000063

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

## A. DETERMINATION OF WITHDRAWAL LIABILITY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan.  In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial.  Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service.  In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension).  The value of these benefits is

determined as of July 31, 2009 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions.  The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan."  It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary.  However, the PBGC has not yet promulgated any assumptions or methods.

Our "best estimate" of unfunded vested liability involves the same actuarial assumptions as are used in our valuations for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses.  Details are provided in Section 4, Exhibit III.

As of July 31, 2009, the actuarial present value of vested Plan benefits for withdrawal liability purposes is $2,088,461,029. Since the market value of assets as of the same date is $1,439,447,964, the unfunded vested liability for withdrawal liability purposes is $649,013,065.

✳ SEGAL

1

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

*De minimis*

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments, unless the plan has fixed some other schedule. The payment schedule is more fully detailed in Section 3, Exhibit A.

Payments in advance may be discounted though the Trustees have not set a rule as to discount terms. Interest discounting is applied at the valuation funding interest rate. Annual payments cease when the total liability and interest have been paid. The law imposes a 20-year maximum payment schedule.

⁎ SEGAL

2

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability this year is shown in Chart 1. The figures for the prior year are shown for comparison purposes.

**Changes Since Prior Year**
PBGC interest rates changed from 5.95% for 20 years and 5.02% thereafter to 5.31% for 20 years and 5.04% thereafter.

There were no plan changes reflected since the prior valuation.

Plan changes effective on or after August 1, 2009 are not included in this year's determination; any such changes will be included in the determination for the year ended July 31, 2010. Effective August 1, 2009, the benefit accrual rate was lowered from 3.3% to 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009.

*The chart summarizes the determination of the unfunded vested liability for the current plan year as well as the prior year.*

**CHART 1**

**Determination of Unfunded Vested Liability**

|  | July 31 | |
|---|---|---|
|  | **2009** | **2008** |
| Present value of vested benefits at funding interest rate | $1,784,225,620 | $1,718,984,777 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,262,395,641 | 2,041,622,067 |
| Market value of assets | 1,439,447,964 | 1,672,523,979 |
| Ratio funded at PBGC interest rates | 0.636249 | 0.819213 |
| Present value of vested benefits for withdrawal liability purposes | 2,088,461,029 | 1,983,293,541 |
| Unfunded vested liability | 649,013,065 | 310,769,562 |

✳ SEGAL

OOE-000066

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 years are detailed in Chart 2. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

Since we are not aware of any pools established prior to July 31, 2003, we consider there to be none prior to that date.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 2**

**Basic Pools as of July 31, 2009**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1990 | $0 | $0 | $0 |
| 1991 | 0 | 0 | 0 |
| 1992 | 0 | 0 | 0 |
| 1993 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 182,577,144 |
| 2004 | 220,610,306 | (27,172,960) | (20,379,720) |
| 2005 | 330,847,750 | 121,920,020 | 97,536,016 |
| 2006 | 161,030,169 | (152,039,003) | (129,233,153) |
| 2007 | 184,389,447 | 33,535,905 | 30,182,315 |
| 2008 | 310,769,562 | 138,233,538 | 131,321,861 |
| 2009 | 649,013,065 | 357,008,602 | 357,008,602 |
| Total | | | $649,013,065 |

✳ SEGAL

4

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**Reallocated Amounts**

In addition, withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated.  Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.  We are unaware of any such liabilities; therefore, there are no additional amounts to be allocated.

**SECTION 2:** **Valuation Results for the Ohio Operating Engineers Pension Fund**

## C. WITHDRAWAL LIABILITY EXPERIENCE

We have not been notified of any employers withdrawing from the fund during the year ended July 31, 2009, nor of any outstanding withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

It is advisable for the Fund to maintain a reserve against outstanding withdrawal liability assessments that are deemed uncollectible. Otherwise, the total of outstanding assessments may come to be viewed as Plan assets. The basis for setting such a reserve is, we believe, a matter for the Trustees, subject of course to any advice that legal counsel may offer and to a finding by the auditor that it is reasonable.

The Plan's Trustees, auditor, counsel, or administrator may have bases for a realistic appraisal. In any event, it may be a difficult judgment to make. We cannot offer more than an initial suggestion that the Trustees may want to consider, in case there is no specific basis for fixing the amount of that reserve. The Trustees may, for example, want to consider a reserve equal to some percentage of the outstanding total. That would not necessarily be a judgment as to the collectibility of any one assessment; it would be a discount from the total that had been assessed. The reserve figure for each successive year will be adjusted so as to reflect experience. And, of course, ultimately the facts and circumstances may provide a very concrete basis for setting the reserve.

✴ SEGAL

6

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT A**
**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these three sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

✶ SEGAL

7

**SECTION 3:** **Supplementary Information for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the de minimis rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible withdrawal consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years

ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)  The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)  the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate of 7.25%. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment

**SECTION 3:     Supplementary Information for the Ohio Operating Engineers Pension Fund**

should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

⭐SEGAL

OOE-000072

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT B**

**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2009 Through July 31, 2010**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) + (3)] (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $182,577,144 | $0 | $178,834,875 | _____ | _____ |
| 2004 | (20,379,720) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 97,536,016 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (129,233,153) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 30,182,315 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 131,321,861 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 357,008,602 | 0 | 210,884,752 | _____ | _____ |

A. Gross liability: (Sum of Column 6) ................................................................ _____

B. *De minimis* ............................................................................................................ 50,000

C. Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero ........................................... _____

D. Net Withdrawal Liability: (A) – (C), but not less than zero ................................................................. _____

---

[1] *Years not shown have no withdrawal liability components.*

[2] *Amortized value of the changes in the unfunded vested benefits, written down 5% per year.*

[3] *Amortized value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*

[4] *Sum of total fund contributions for the Plan year listed and the four preceding years.*

[5] *Sum of employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

⋆ SEGAL

10

**SECTION 4:     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**January 14, 2010**

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2009. The calculations were performed in accordance with generally accepted actuarial principles and practices.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Vice President and Actuary
Enrolled Actuary No. 08-05773

**SECTION 4:**   **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| The calculations include the following participants as of July 31, 2009 | |
|---|---|
| a. Active vested employees | 5,691 |
| b. Inactive employees with vested pension rights | 1,147 |
| c. Pensioners and beneficiaries | 6,770 |
| The actuarial factors are shown below as of July 31, 2009 | |
| 1. Present value of vested benefits at funding interest rate | $1,784,225,620 |
| 2. Present value of vested benefits at PBGC interest rates, including allowance for expenses | 2,262,395,641 |
| 3. Market value of assets | 1,439,447,964 |
| 4. Ratio funded at PBGC interest rates: (3) ÷ (2), not greater than 1.0 | 0.636249 |
| 5. Present value of vested benefits for withdrawal liability purposes: (4) × (2) + [1 − (4)] × (1) | $2,088,461,029 |
| 6. Unfunded vested liability: (5) − (3), not less than 0 | 649,013,065 |

✲SEGAL

OOE-000075

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2009* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1990 | $0 | $0 | $0 | $0 | $0 |
| 1991 | 0 | 0 | 0 | 0 | 0 |
| 1992 | 0 | 0 | 0 | 0 | 0 |
| 1993 | 0 | 0 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 182,577,144 | 0 | 182,577,144 |
| 2004 | (27,172,960) | 0 | (20,379,720) | 0 | (20,379,720) |
| 2005 | 121,920,020 | 0 | 97,536,016 | 0 | 97,536,016 |
| 2006 | (152,039,003) | 0 | (129,233,153) | 0 | (129,233,153) |
| 2007 | 33,535,905 | 0 | 30,182,315 | 0 | 30,182,315 |
| 2008 | 138,233,538 | 0 | 131,321,861 | 0 | 131,321,861 |
| 2009 | 357,008,602 | 0 | 357,008,602 | 0 | 357,008,602 |

* *Each pool is written down annually at the rate of 5% of the original amount*

⋆ SEGAL

OOE-000076

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT III**
**Actuarial Assumptions and Methods**

| | |
|---|---|
| **Investment return:** | To the extent the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date are used. |
| | PBGC Interest Rates as of July 31, 2009 |
| |     Select rate                5.31% |
| |     Ultimate rate after 20 years  5.04% |
| | To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding:  7.25%. |
| | The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits — at PBGC rates — with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits. |
| **Administration expenses:** | No separate expense charge except for that portion of the vested benefits that is matched by assets.  For that portion, an expense load equal to that prescribed in Appendix C to PBGC reg. Part 4044 (based on the PBGC Interest Rates) is used. |
| **Valuation of assets:** | At market value |

✶ SEGAL

14

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Mortality rates:** | RP-2000 Combined Healthy Blue Collar Mortality |
| **Disability mortality rates:** | RP-2000 Disabled Retiree Mortality Table |
| **Retirement rates:** | |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Unknown characteristics of employees:** | Same as those exhibited by employees with similar known characteristics.  If not specified, participants are assumed to be male. |
| **Allocation method:** | Presumptive |
| **Contribution period for prorating liabilities:** | 5 years |
| **De minimis deductible:** | $50,000, or ¾% of the unfunded vested liability, if smaller.  The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✴SEGAL

OOE-000078

**SECTION 4:**    **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT IV**
**Summary of Plan Provisions**

---

This exhibit summarizes the major provisions of the Plan included in the valuation.  It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

---

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf on and after May 1, 2006

⭑ SEGAL

16

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

---

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |

---

**Participation:** Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:** One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:**

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

✱ SEGAL

OOE-000080

**SECTION 4:** **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**Contribution Rate:**          $4.00 per hour effective May 1, 2008 ($1.00 per hour supplemental)

5057905v1/05517.001

✳ **SEGAL**

18

OOE-000081

# Ohio Operating Engineers
# Pension Fund
**Withdrawal Liability Valuation as of
July 31, 2010**

Copyright © 2011 by The Segal Group, Inc., parent of The Segal Company. All rights reserved.

EXHIBIT C

Date 10·8·2018





 **SEGAL**

THE SEGAL COMPANY
1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 F 216.687.4490 www.segalco.com

*January 21, 2011*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2010 through July 31, 2011.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic employee and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2010. The benefit provisions included in the calculations are those that were in effect on July 31, 2010.*

*We look forward to reviewing this report with you at your next meeting and answering any questions you may have.*

*Sincerely,*

*THE SEGAL COMPANY*

*By:* _____

*John P. Bragan*
*Vice President*

OOE-000083

## SECTION 1

### VALUATION SUMMARY

Significant Issues in Valuation Year........................................... i

Summary of Key Results ............. ii

## SECTION 2

### VALUATION RESULTS

A. Determination of Withdrawal Liability.................................... 1

B. Unfunded Vested Liability...... 3

C. Withdrawal Liability Experience .............................. 6

## SECTION 3

### SUPPLEMENTARY INFORMATION

EXHIBIT A
Method for Allocating Withdrawal Liability.................. 7

EXHIBIT B
Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2010 Through July 31, 2011 ......................................... 10

## SECTION 4

### ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

EXHIBIT I
Calculation of Unfunded Vested Liability ..................................... 12

EXHIBIT II
Withdrawal Liability Pools....... 13

EXHIBIT III
Actuarial Assumptions and Methods ..................................... 14

EXHIBIT IV
Summary of Plan Provisions .... 16

✷ SEGAL

**SECTION 1:      Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Significant Issues in Valuation Year**

- The unfunded vested liability as of July 31, 2010 is $654.6 million, compared to $649.0 million as of July 31, 2009.  A new positive pool of $42.2 million was created.

- The interest rates used for funded portion of vested liability changed from 5.31% for the first 20 years and 5.04% thereafter to 4.93% for the first 20 years and 4.66% thereafter.

- The increase in the unfunded vested liability was primarily due to the decrease in the PBGC interest rates, partially offset by a favorable investment return on the market value of assets.

- The benefit accrual rate was decreased from 3.3% to 1.75% of contributions (excluding supplemental contributions) effective for benefits earned on or after August 1, 2009.

⁎SEGAL

i

## SECTION 1:     Valuation Summary for the Ohio Operating Engineers Pension Fund

### Summary of Key Results

|  | July 31 | |
|---|---|---|
|  | **2010** | **2009** |
| **Demographic Data:** | | |
| Number of active vested employees | 5,531 | 5,691 |
| Number of inactive vested participants | 1,213 | 1,147 |
| Number of pensioners and beneficiaries | 6,908 | 6,770 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 4.93% for 20 years, 4.66% thereafter | 5.31% for 20 years, 5.04% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $1,813,132,148 | $1,784,225,620 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,407,173,256 | 2,262,395,641 |
| Present value of vested benefits for withdrawal liability purposes | 2,192,693,314 | 2,088,461,029 |
| **Withdrawal Liability:** | | |
| Market value of assets | $1,538,057,679 | $1,439,447,964 |
| Unfunded vested liability for withdrawal liability purposes | 654,635,635 | 649,013,065 |
| Withdrawal liability pool established | 42,238,100 | 357,008,602 |

✶ SEGAL

OOE-000086

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

## A. DETERMINATION OF WITHDRAWAL LIABILITY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension). The value of these benefits is determined as of July 31, 2010 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

Our "best estimate" of unfunded vested liability involves the same actuarial assumptions as are used in our valuations for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

As of July 31, 2010, the actuarial present value of vested Plan benefits for withdrawal liability purposes is $2,192,693,314. Since the market value of assets as of the same date is $1,538,057,679, the unfunded vested liability for withdrawal liability purposes is $654,635,635.

✶ SEGAL

1

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

**De minimis**

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments, unless the plan has fixed some other schedule. The payment schedule is more fully detailed in Section 3, Exhibit A.

Payments in advance may be discounted though the Trustees have not set a rule as to discount terms. Interest discounting is applied at the valuation funding interest rate. Annual payments cease when the total liability and interest have been paid. The law imposes a 20-year maximum payment schedule.

⋆ SEGAL

OOE-000088

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability this year is shown in Chart 1. The figures for the prior year are shown for comparison purposes.

**Changes Since Prior Year**

- PBGC interest rates changed from 5.31% for 20 years and 5.04% thereafter to 4.93% for 20 years and 4.66% thereafter.

- Effective August 1, 2009, the benefit accrual rate was lowered from 3.3% to 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009.

*The chart summarizes the determination of the unfunded vested liability for the current plan year as well as the prior year.*

**CHART 1**

**Determination of Unfunded Vested Liability**

|  | July 31 | |
|---|---|---|
|  | **2010** | **2009** |
| Present value of vested benefits at funding interest rate | $1,813,132,148 | $1,784,225,620 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,407,173,256 | 2,262,395,641 |
| Market value of assets | 1,538,057,679 | 1,439,447,964 |
| Ratio funded at PBGC interest rates | 0.638948 | 0.636249 |
| Present value of vested benefits for withdrawal liability purposes | $2,192,693,314 | $2,088,461,029 |
| Unfunded vested liability | 654,635,635 | 649,013,065 |

✶ SEGAL

3

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 years are detailed in Chart 2. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

Since we are not aware of any pools established prior to July 31, 2003, we consider there to be none prior to that date.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 2**

**Basic Pools as of July 31, 2010**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1991 | $0 | $0 | $0 |
| 1992 | 0 | 0 | 0 |
| 1993 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 169,535,919 |
| 2004 | 220,610,306 | (27,172,960) | (19,021,072) |
| 2005 | 330,847,750 | 121,920,020 | 91,440,015 |
| 2006 | 161,030,169 | (152,039,003) | (121,631,202) |
| 2007 | 184,389,447 | 33,535,905 | 28,505,519 |
| 2008 | 310,769,562 | 138,233,538 | 124,410,184 |
| 2009 | 649,013,065 | 357,008,602 | 339,158,172 |
| 2010 | 654,635,635 | 42,238,100 | 42,238,100 |
| Total | | | $654,635,635 |

✱ SEGAL

OOE-000090

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

In addition, withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal. We are unaware of any such liabilities; therefore, there are no additional amounts to be allocated.

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

## C. WITHDRAWAL LIABILITY EXPERIENCE

We have not been notified of any employers withdrawing from the fund during the year ended July 31, 2010, nor of any outstanding withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

It is advisable for the Fund to maintain a reserve against outstanding withdrawal liability assessments that are deemed uncollectible. Otherwise, the total of outstanding assessments may come to be viewed as Plan assets. The basis for setting such a reserve is, we believe, a matter for the Trustees, subject of course to any advice that legal counsel may offer and to a finding by the auditor that it is reasonable.

The Plan's Trustees, auditor, counsel, or administrator may have bases for a realistic appraisal. In any event, it may be a difficult judgment to make. We cannot offer more than an initial suggestion that the Trustees may want to consider, in case there is no specific basis for fixing the amount of that reserve. The Trustees may, for example, want to consider a reserve equal to some percentage of the outstanding total. That would not necessarily be a judgment as to the collectibility of any one assessment; it would be a discount from the total that had been assessed. The reserve figure for each successive year will be adjusted so as to reflect experience. And, of course, ultimately the facts and circumstances may provide a very concrete basis for setting the reserve.

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT A**

**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1)  the Plan's unfunded vested liability as of July 31, 1980;

(2)  the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3)  reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**

The "unamortized balance" of each of these three sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**

The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**

The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1)  by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2)  by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

⋆ **SEGAL**

7

OOE-000093

**SECTION 3: Supplementary Information for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the de minimis rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a) The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b) the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate of 7.25%. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment

✸ SEGAL

8

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

**Partial Withdrawal**
The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**
PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

⋆ SEGAL

OOE-000095

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT B**

**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2010 Through July 31, 2011**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: $[(5) \div (4)] \times [(2) + (3)]$ (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $169,535,919 | $0 | $178,834,875 | _____ | _____ |
| 2004 | (19,021,072) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 91,440,015 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (121,631,202) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 28,505,519 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 124,410,184 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 339,158,172 | 0 | 210,884,752 | _____ | _____ |
| 2010 | 42,238,100 | 0 | 218,622,244 | _____ | _____ |

A. Gross liability: (Sum of Column 6) .................................................................. _____

B. *De minimis* ....................................................................................................... 50,000

C. Deductible: $100,000 + (B) − (A), but not greater than (B) nor less than zero............................ _____

D. Net Withdrawal Liability: (A) − (C), but not less than zero .................................................. _____

[1] *Years not shown have no withdrawal liability components.*

[2] *Amortized value of the changes in the unfunded vested benefits, written down 5% per year.*

[3] *Amortized value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*

[4] *Sum of total fund contributions for the Plan year listed and the four preceding years.*

[5] *Sum of employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

⭐ **SEGAL**

10

**SECTION 4:**    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

---

**January 21, 2011**

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2010.  The calculations were performed in accordance with generally accepted actuarial principles and practices.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants.  We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Vice President and Actuary
Enrolled Actuary No. 08-05773

**SECTION 4:     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| | | |
|---|---|---:|
| The calculations include the following participants as of July 31, 2010 | | |
| a. | Active vested employees | 5,531 |
| b. | Inactive employees with vested pension rights | 1,213 |
| c. | Pensioners and beneficiaries | 6,908 |
| The actuarial factors are shown below as of July 31, 2010 | | |
| 1. | Present value of vested benefits at funding interest rate | $1,813,132,148 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 2,407,173,256 |
| 3. | Market value of assets | 1,538,057,679 |
| 4. | Ratio funded at PBGC interest rates: (3) ÷ (2), not greater than 1.0 | 0.638948 |
| 5. | Present value of vested benefits for withdrawal liability purposes: (4) × (2) + [1 – (4)] × (1) | $2,192,693,314 |
| 6. | Unfunded vested liability: (5) – (3), not less than 0 | 654,635,635 |

✷ SEGAL

12

**SECTION 4:** Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2010* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1991 | $0 | $0 | $0 | $0 | $0 |
| 1992 | 0 | 0 | 0 | 0 | 0 |
| 1993 | 0 | 0 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 169,535,919 | 0 | 169,535,919 |
| 2004 | (27,172,960) | 0 | (19,021,072) | 0 | (19,021,072) |
| 2005 | 121,920,020 | 0 | 91,440,015 | 0 | 91,440,015 |
| 2006 | (152,039,003) | 0 | (121,631,202) | 0 | (121,631,202) |
| 2007 | 33,535,905 | 0 | 28,505,519 | 0 | 28,505,519 |
| 2008 | 138,233,538 | 0 | 124,410,184 | 0 | 124,410,184 |
| 2009 | 357,008,602 | 0 | 339,158,172 | 0 | 339,158,172 |
| 2010 | 42,238,100 | 0 | 42,238,100 | 0 | 42,238,100 |

* Each pool is written down annually at the rate of 5% of the original amount

✱ SEGAL

OOE-000099

**SECTION 4:** **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT III**

**Actuarial Assumptions and Methods**

---

| | |
|---|---|
| **Investment return:** | To the extent the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date are used. |

PBGC Interest Rates as of July 31, 2010

Select rate             4.93%

Ultimate rate after 20 years   4.66%

To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%.

The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

---

| | |
|---|---|
| **Administration expenses:** | No separate expense charge except for that portion of the vested benefits that is matched by assets. For that portion, an expense load equal to that prescribed in Appendix C to PBGC reg. Part 4044 (based on the PBGC Interest Rates) is used. |

---

| | |
|---|---|
| **Valuation of assets:** | At market value |

---

☀ SEGAL

OOE-000100

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Mortality rates:** | RP-2000 Combined Healthy Blue Collar Mortality |
| **Disability mortality rates:** | RP-2000 Disabled Retiree Mortality Table |
| **Retirement rates:** | |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Unknown characteristics of employees:** | Same as those exhibited by employees with similar known characteristics.  If not specified, participants are assumed to be male. |
| **Allocation method:** | Presumptive |
| **Contribution period for prorating liabilities:** | 5 years |
| ***De minimis* deductible:** | $50,000, or ¼% of the unfunded vested liability, if smaller.  The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✳ SEGAL

15

**SECTION 4:**   **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation.  It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009

⭐ SEGAL

16

**SECTION 4:** Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |

**Participation:** Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:** One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:**

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

✶ SEGAL

17

**SECTION 4:     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**Contribution Rate:**                    $5.00 per hour, effective May 1, 2010 ($2.00 per hour supplemental) and
$5.50 per hour, effective May 1, 2011 ($2.50 per hour supplemental)

5137198v1/05517.001

# Ohio Operating Engineers
# Pension Fund
**Withdrawal Liability Valuation as of
July 31, 2011**

This report has been prepared at the request of the Board of Trustees for the purposes of establishing the basis for withdrawal liability assessments during the August 1, 2011 through July 31, 2012 period. This report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety. The measurements shown in this report may not be applicable for other purposes.
Copyright © 2012 by The Segal Group, Inc., parent of The Segal Company. All rights reserved.

EXHIBIT D
Cire
Date: 10·5·2015




✴ SEGAL

OOE-000302

 **SEGAL**

THE SEGAL COMPANY
1300 East Ninth Street, Suite 1900 Cleveland, OH  44114
T 216.687.4400 F 216.687.4490  www.segalco.com

*January 30, 2012*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability.  It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer.  It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2011 through July 31, 2012.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary.  The basic employee and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2011.  The benefit provisions and assumptions included in the calculations are those that were in effect on July 31, 2011.*

*We look forward to reviewing this report with you at your next meeting and answering any questions you may have.*

*Sincerely,*

*THE SEGAL COMPANY*

*By:* _____
*John P. Bragan*
   *Vice President*

OOE-000303

## SECTION 1

### VALUATION SUMMARY

Significant Issues in Valuation
    Year.......................................... i

Summary of Key Results............. ii

## SECTION 2

### VALUATION RESULTS

A. Determination of Withdrawal
    Liability.................................. 1

B. Unfunded Vested Liability...... 3

C. Withdrawal Liability
    Experience ............................. 6

## SECTION 3

### SUPPLEMENTARY INFORMATION

EXHIBIT A
    Method for Allocating
    Withdrawal Liability................. 7

EXHIBIT B
    Employer Withdrawal Liability
    Worksheet For Withdrawals from
    August 1, 2011 Through July 31,
    2012......................................... 10

## SECTION 4

### ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

EXHIBIT I
    Calculation of Unfunded Vested
    Liability .................................... 12

EXHIBIT II
    Withdrawal Liability Pools....... 13

EXHIBIT III
    Actuarial Assumptions and
    Methods .................................... 14

EXHIBIT IV
    Summary of Plan Provisions .... 16

⋆ SEGAL

OOE-000304

**SECTION 1:    Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Significant Issues in Valuation Year**

- The unfunded vested liability as of July 31, 2011 is $789.0 million, compared to $654.6 million as of July 31, 2010. A new positive pool of $173.1 million was created.

- The increase in the unfunded vested liability was primarily due to assumption changes, partially offset by an investment gain.

- The following assumption changes were made since the prior valuation:

  – The interest rates used for funded portion of vested liability changed from 4.93% for the first 20 years and 4.66% thereafter to 4.21% for the first 25 years and 4.34% thereafter.

  – The healthy mortality assumption changed from the RP-2000 Combined Healthy Blue Collar Mortality Table to the RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection.

  – The disabled mortality assumption changed from the RP-2000 Disabled Retiree Mortality Table to the RP-2000 Disabled Retiree Mortality Table Set Back Two Years.

- The contribution rate increased from $4.50 to $5.00 effective May 1, 2010, and from $5.00 to $5.50 effective May 1, 2011. These increases were supplemental and do not impact future benefit accruals.

�atk SEGAL

i

OOE-000305

**SECTION 1:** **Valuation Summary for the Ohio Operating Engineers Pension Fund**

## Summary of Key Results

| | July 31 | |
| --- | --- | --- |
| | **2011** | **2010** |
| **Demographic Data:** | | |
| Number of active vested employees | 5,482 | 5,531 |
| Number of inactive vested participants | 1,281 | 1,213 |
| Number of pensioners and beneficiaries | 7,000 | 6,908 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 4.21% for 25 years, 4.34% thereafter | 4.93% for 20 years, 4.66% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $1,951,770,432 | $1,813,132,148 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,855,127,896 | 2,407,173,256 |
| Present value of vested benefits for withdrawal liability purposes | 2,489,928,761 | 2,192,693,314 |
| **Withdrawal Liability:** | | |
| Market value of assets | $1,700,889,092 | $1,538,057,679 |
| Unfunded vested liability for withdrawal liability purposes | 789,039,669 | 654,635,635 |
| Withdrawal liability pool established | 173,131,468 | 42,238,100 |

✶ SEGAL

OOE-000306

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

## A.  DETERMINATION OF WITHDRAWAL LIABILITY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan.  In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial.  Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service.  In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension).  The value of these benefits is

determined as of July 31, 2011 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions.  The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan."  It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary.  However, the PBGC has not yet promulgated any assumptions or methods.

Our "best estimate" of unfunded vested liability involves the same actuarial assumptions as are used in our valuations for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses.  Details are provided in Section 4, Exhibit III.

As of July 31, 2011, the actuarial present value of vested Plan benefits for withdrawal liability purposes is $2,489,928,761. Since the market value of assets as of the same date is $1,700,889,092, the unfunded vested liability for withdrawal liability purposes is $789,039,669.

✶SEGAL

1

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

**De minimis**

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments, unless the plan has fixed some other schedule. The payment schedule is more fully detailed in Section 3, Exhibit A.

Payments in advance may be discounted though the Trustees have not set a rule as to discount terms. Annual payments cease when the total liability and interest have been paid. The law imposes a 20-year maximum payment schedule.

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability this year is shown in Chart 1.  The figures for the prior year are shown for comparison purposes.

**Changes Since Prior Year**

The following assumption changes were made since last year's determination:

> PBGC interest rates changed from 4.93% for 20 years and 4.66% thereafter to 4.21% for 25 years and 4.34% thereafter.

> The healthy mortality assumption changed from the RP-2000 Combined Healthy Blue Collar Mortality Table to the RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection.

> The disabled mortality assumption changed from the RP-2000 Disabled Retiree Mortality Table to the RP-2000 Disabled Retiree Mortality Table Set Back Two Years.

There were no plan changes since the prior valuation.

The contribution rate increased from $4.50 to $5.00 effective May 1, 2010, and from $5.00 to $5.50 effective May 1, 2011. These increases were supplemental and do not impact future benefit accruals.

---

*The chart summarizes the determination of the unfunded vested liability for the current plan year as well as the prior year.*

**CHART 1**

**Determination of Unfunded Vested Liability**

| | July 31 | |
|---|---|---|
| | **2011** | **2010** |
| Present value of vested benefits at funding interest rate | $1,951,770,432 | $1,813,132,148 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,855,127,896 | 2,407,173,256 |
| Market value of assets | 1,700,889,092 | 1,538,057,679 |
| Ratio funded at PBGC interest rates | 0.595731 | 0.638948 |
| Present value of vested benefits for withdrawal liability purposes | $2,489,928,761 | $2,192,693,314 |
| Unfunded vested liability | 789,039,669 | 654,635,635 |

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 years are detailed in Chart 2. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

Since we are not aware of any pools established prior to July 31, 2003, we consider there to be none prior to that date.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 2**

**Basic Pools as of July 31, 2011**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1992 | $0 | $0 | $0 |
| 1993 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 156,494,695 |
| 2004 | 220,610,306 | (27,172,960) | (17,662,424) |
| 2005 | 330,847,750 | 121,920,020 | 85,344,014 |
| 2006 | 161,030,169 | (152,039,003) | (114,029,252) |
| 2007 | 184,389,447 | 33,535,905 | 26,828,724 |
| 2008 | 310,769,562 | 138,233,538 | 117,498,507 |
| 2009 | 649,013,065 | 357,008,602 | 321,307,742 |
| 2010 | 654,635,635 | 42,238,100 | 40,126,195 |
| 2011 | 789,039,669 | 173,131,468 | 173,131,468 |
| Total | | 173,131,468 | $789,039,669 |

✻ SEGAL

OOE-000310

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

In addition, withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated.  Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.  We are unaware of any such liabilities; therefore, there are no additional amounts to be allocated.

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**C.  WITHDRAWAL LIABILITY EXPERIENCE**

We have not been notified of any employers withdrawing from the fund during the year ended July 31, 2011, nor of any outstanding withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

☆ SEGAL

OOE-000312

**SECTION 3:** **Supplementary Information for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT A**

**Method for Allocating Withdrawal Liability**

---

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**

The "unamortized balance" of each of these three sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**

The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**

The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount.  Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225).  Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings.  They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions.  The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years

ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments.  The quarterly installment is calculated as one-fourth of the product of:

(a)    The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)    the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate of 7.25%.  Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts.  It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history.  These procedures and records are necessary in order to be able to determine an assessment

⁂ SEGAL

8

**SECTION 3:** **Supplementary Information for the Ohio Operating Engineers Pension Fund**

should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

**SECTION 3:   Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT B**

**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2011 Through July 31, 2012**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷(4)] x [(2) + (3)] (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $156,494,695 | $0 | $178,834,875 | _____ | _____ |
| 2004 | (17,662,424) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 85,344,014 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (114,029,252) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 26,828,724 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 117,498,507 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 321,307,742 | 0 | 210,884,752 | _____ | _____ |
| 2010 | 40,126,195 | 0 | 218,622,244 | _____ | _____ |
| 2011 | 173,131,468 | 0 | 230,778,340 | _____ | _____ |

A.  Allocable Amount of Unfunded Vested Benefits.................................................................... _____

B.  *De minimis*....................................................................................................................... __50,000__

C.  Deductible: $100,000 + (B) − (A), but not greater than (B) nor less than zero........................... _____

D.  Allocable Unfunded Vested Liability: (A) − (C), but not less than zero and without regard to annual
      payment limitations ......................................................................................................... _____

[1]*Years not shown have no withdrawal liability components.*
[2]*Amortized value of the changes in the unfunded vested benefits, written down 5% per year.*
[3]*Amortized value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*
[4]*Sum of total fund contributions for the Plan year listed and the four preceding years.*
[5]*Sum of employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

⚹ **SEGAL**

OOE-000316

**SECTION 4:**     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

---

January 30, 2012

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2011. The calculations were performed in accordance with generally accepted actuarial principles and practices.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Vice President and Actuary
Enrolled Actuary No. 11-05773

OOE-000317

**SECTION 4:**    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| The calculations include the following participants as of July 31, 2011 | |
|---|---|
| a. | Active vested employees | 5,482 |
| b. | Inactive employees with vested pension rights | 1,281 |
| c. | Pensioners and beneficiaries | 7,000 |

| The actuarial factors are shown below as of July 31, 2011 | |
|---|---|
| 1. | Present value of vested benefits at funding interest rate | $1,951,770,432 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 2,855,127,896 |
| 3. | Market value of assets | 1,700,889,092 |
| 4. | Ratio funded at PBGC interest rates: (3) ÷ (2), not greater than 1.0 | 0.595731 |
| 5. | Present value of vested benefits for withdrawal liability purposes: (4) × (2) + [1 − (4)] × (1) | $2,489,928,761 |
| 6. | Unfunded vested liability: (5) − (3), not less than 0 | 789,039,669 |

✷ SEGAL

12

OOE-000318

SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**

**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2011* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1992 | $0 | $0 | $0 | $0 | $0 |
| 1993 | 0 | 0 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 156,494,695 | 0 | 156,494,695 |
| 2004 | (27,172,960) | 0 | (17,662,424) | 0 | (17,662,424) |
| 2005 | 121,920,020 | 0 | 85,344,014 | 0 | 85,344,014 |
| 2006 | (152,039,003) | 0 | (114,029,252) | 0 | (114,029,252) |
| 2007 | 33,535,905 | 0 | 26,828,724 | 0 | 26,828,724 |
| 2008 | 138,233,538 | 0 | 117,498,507 | 0 | 117,498,507 |
| 2009 | 357,008,602 | 0 | 321,307,742 | 0 | 321,307,742 |
| 2010 | 42,238,100 | 0 | 40,126,195 | 0 | 40,126,195 |
| 2011 | 173,131,468 | 0 | 173,131,468 | 0 | 173,131,468 |

*Each pool is written down annually at the rate of 5% of the original amount*

✱ SEGAL

OOE-000319

**SECTION 4:**    **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT III**

**Actuarial Assumptions and Methods**

| | |
|---|---|
| **Investment Return:** | To the extent the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date are used. |

PBGC Interest Rates as of July 31, 2011

    Select rate             4.21%

    Ultimate rate after 25 years  4.34%

To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding:  7.25%.

The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

| | |
|---|---|
| **Administration Expenses:** | No separate expense charge except for that portion of the vested benefits that is matched by assets.  For that portion, an expense load equal to that prescribed in Appendix C to PBGC reg. Part 4044 (based on the PBGC Interest Rates) is used. |
| **Valuation of Assets:** | At market value |

✱ SEGAL

OOE-000320

**SECTION 4:** **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Mortality Rates:** | RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection |
| **Disability Mortality Rates:** | RP-2000 Disabled Retiree Mortality Table Set Back Two Years |
| **Retirement Rates:** | |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Unknown Characteristics of Employees:** | Same as those exhibited by employees with similar known characteristics. If not specified, participants are assumed to be male. |
| **Allocation Method:** | Presumptive |
| **Contribution Period for Prorating Liabilities:** | 5 years |
| **De minimis Deductible:** | $50,000, or ¾% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✴ SEGAL

15

SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation.  It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009

✷ SEGAL

16

**SECTION 4:** **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

---

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

---

**Participation:** Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:** One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:**

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

| Contribution Rate: | $5.50 per hour, effective May 1, 2011 ($2.50 per hour supplemental) |
|---|---|

5244504v1/05517.001

OOE-000324

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**May 2, 2012**

## REVISED ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2011. The calculations were performed in accordance with generally accepted actuarial principles and practices. This actuarial certification was revised from the prior version due to the restatement of PBGC interest rates as of July 31, 2011.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Vice President and Actuary
Enrolled Actuary No. 11-05773

✶SEGAL

1

OOE-000325

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| | | |
|---|---|---|
| The calculations include the following participants as of July 31, 2011 | | |
| a. | Active vested employees | 5,482 |
| b. | Inactive employees with vested pension rights | 1,281 |
| c. | Pensioners and beneficiaries | 7,000 |
| The actuarial factors are shown below as of July 31, 2011 | | |
| 1. | Present value of vested benefits at funding interest rate | $1,951,770,432 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 2,847,796,623 |
| 3. | Market value of assets | 1,700,889,092 |
| 4. | Ratio funded at PBGC interest rates: (3) ÷ (2), not greater than 1.0 | 0.597265 |
| 5. | Present value of vested benefits for withdrawal liability purposes: (4) × (2) + [1 − (4)] × (1) | $2,486,935,465 |
| 6. | Unfunded vested liability: (5) − (3), not less than 0 | 786,046,373 |

✭SEGAL

2

OOE-000326

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT II**

**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2011* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1992 | $0 | $0 | $0 | $0 | $0 |
| 1993 | 0 | 0 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 156,494,695 | 0 | 156,494,695 |
| 2004 | (27,172,960) | 0 | (17,662,424) | 0 | (17,662,424) |
| 2005 | 121,920,020 | 0 | 85,344,014 | 0 | 85,344,014 |
| 2006 | (152,039,003) | 0 | (114,029,252) | 0 | (114,029,252) |
| 2007 | 33,535,905 | 0 | 26,828,724 | 0 | 26,828,724 |
| 2008 | 138,233,538 | 0 | 117,498,507 | 0 | 117,498,507 |
| 2009 | 357,008,602 | 0 | 321,307,742 | 0 | 321,307,742 |
| 2010 | 42,238,100 | 0 | 40,126,195 | 0 | 40,126,195 |
| 2011 | 170,138,172 | 0 | 170,138,172 | 0 | 170,138,172 |

* Each pool is written down annually at the rate of 5% of the original amount

✯ SEGAL

3

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT III**

**Actuarial Assumptions and Methods**

---

**Investment Return:**

To the extent the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date are used.

PBGC Interest Rates as of July 31, 2011

Select rate                4.22%

Ultimate rate after 20 years  4.34%

To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%.

The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

---

**Administration Expenses:**

No separate expense charge except for that portion of the vested benefits that is matched by assets. For that portion, an expense load equal to that prescribed in Appendix C to PBGC reg. Part 4044 (based on the PBGC Interest Rates) is used.

---

**Valuation of Assets:**

At market value

---

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Mortality Rates:** | RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection |
| **Disability Mortality Rates:** | RP-2000 Disabled Retiree Mortality Table Set Back Two Years |
| **Retirement Rates:** | |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Unknown Characteristics of Employees:** | Same as those exhibited by employees with similar known characteristics.  If not specified, participants are assumed to be male. |
| **Allocation Method:** | Presumptive |
| **Contribution Period for Prorating Liabilities:** | 5 years |
| ***De minimis* Deductible:** | $50,000, or ¾% of the unfunded vested liability, if smaller.  The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

★ SEGAL

5

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT IV**

**Summary of Plan Provisions**

---

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009

✶ SEGAL

6

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

**Participation:** Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:** One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:**

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

✶ SEGAL

7

OOE-000331

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Contribution Rate:** | $5.50 per hour, effective May 1, 2011 ($2.50 per hour supplemental) |

5258266v1/05517.001

⋆ SEGAL

# Ohio Operating Engineers
# Pension Fund

**Withdrawal Liability Valuation as of
July 31, 2012**



This report has been prepared at the request of the Board of Trustees for the purposes of establishing the
basis for withdrawal liability assessments during the August 1, 2012 through July 31, 2013 period. This report may
not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only
be provided to other parties in its entirety. The measurements shown in this report may not be applicable for
other purposes.
Copyright © 2013 by The Segal Group, Inc., parent of The Segal Company. All rights reserved.





 **SEGAL**

THE SEGAL COMPANY
1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 F 216.687.4490 www.segalco.com

*January 28, 2013*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2012 through July 31, 2013.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2012. The benefit provisions and assumptions included in the calculations are those that were in effect on July 31, 2012.*

*We look forward to reviewing this report with you at our next meeting and to answering any questions you may have.*

*Sincerely,*

*THE SEGAL COMPANY*

*By:* _____
      *John P. Bragan*
      *Vice President*

*cc:*    *Thomas M. Tarpy, Esq.*
       *Mr. Raymond Orrand*
       *Mr. Charles M. Ciuni, CPA*

OOE-000334

## SECTION 1

**VALUATION SUMMARY**

Significant Issues in Valuation
  Year.......................................1-1

Summary of Key Results...........1-2

## SECTION 2

**VALUATION RESULTS**

A. Determination of Withdrawal
   Liability.................................2-1

B. Unfunded Vested Liability...2-3

C. Withdrawal Liability
   Experience ...........................2-6

## SECTION 3

**SUPPLEMENTARY INFORMATION**

EXHIBIT A
  Method for Allocating
  Withdrawal Liability...............3-1

EXHIBIT B
  Employer Withdrawal Liability
  Worksheet For Withdrawals from
  August 1, 2012 Through July 31,
  2013 ......................................3-4

## SECTION 4

**ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY**

EXHIBIT I
  Calculation of Unfunded Vested
  Liability ..................................4-2

EXHIBIT II
  Withdrawal Liability Pools......4-3

EXHIBIT III
  Actuarial Assumptions and
  Methods..................................4-4

EXHIBIT IV
  Summary of Plan Provisions ...4-7

⋆ SEGAL

**SECTION 1:     Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Significant Issues in Valuation Year**

➢ Figures as of July 31, 2011 recognize the Pension Benefit Guaranty Corporation's (PBGC's) correction to the applicable interest rate, which occurred after release of the July 31, 2011 withdrawal liability report. The updated interest rate reduced the unfunded vested liability as of that date by $3.0 million.

➢ The unfunded vested liability as of July 31, 2012 is $1.01 billion, compared to $786 million as of July 31, 2011. A positive basic pool of $268 million was established.

➢ Interest rates used to determine the funded portion of the present value of vested benefits changed from 4.22% for 20 years and 4.34% thereafter to 2.95% for 20 years and 3.66% thereafter (PBGC interest rates).

➢ The increase in the unfunded vested liability since last year was primarily caused by the decrease in the PBGC interest rates.

➢ The plan amendment that changed the benefit accrual rate from 1.75% of contributions to 1.90% of contributions for contributions on and after August 1, 2012 is not yet recognized for withdrawal liability purposes.

➢ The contribution rate increased from $5.50 to $5.75 per hour effective May 1, 2012. This increase was supplemental and does not impact future benefit accruals.

✶ SEGAL

**SECTION 1:    Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Summary of Key Results**

| | July 31 | |
| --- | --- | --- |
| | **2012** | **2011**\*\* |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries\* | 7,012 | 7,000 |
| Number of inactive vested participants | 1,343 | 1,281 |
| Number of active vested employees | 5,490 | 5,482 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 2.95% for 20 years, 3.66% thereafter | 4.22% for 20 years, 4.34% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $1,995,466,511 | $1,951,770,432 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 3,433,267,738 | 2,847,796,623 |
| Present value of vested benefits for withdrawal liability purposes | 2,707,910,522 | 2,486,935,465 |
| **Unfunded Present Value of Vested Benefits:** | | |
| Market value of assets | $1,701,216,407 | $1,700,889,092 |
| Unfunded vested liability for withdrawal liability purposes | 1,006,694,115 | 786,046,373 |
| Withdrawal liability pools established | | |
| • Basic pool | 267,882,086 | 170,138,172 |
| • Reallocated pool | 0 | 0 |

\* *Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*
\*\**Figures based on PBGC interest rates updated from prior year report due to PBGC correction to rates after the report was issued.*

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

## A. DETERMINATION OF WITHDRAWAL LIABILITY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension). The value of these benefits is

determined as of July 31, 2012 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuary's "best estimate" of unfunded vested liability involves the same actuarial assumptions as are used in the valuation for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

***De minimis***

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in Section 3, Exhibit A.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in Section 4 of this report.

**Changes Since Prior Year**

The following assumption change was made since last year's determination:

> PBGC interest rates changed from 4.22% for 20 years and 4.34% thereafter to 2.95% for 20 years and 3.66% thereafter.

No plan changes are reflected this year.

Plan changes effective on or after August 1, 2012 are not included in this year's determination; any such changes will be included in the determination for the year ended July 31, 2013. These changes include:

> The benefit accrual rate changed from 1.75% of contributions to 1.90% of contributions for contributions on and after August 1, 2012.

The contribution rate increased from $5.50 to $5.75 per hour effective May 1, 2012. This increase was supplemental and did not impact benefit accruals.

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 plan years are detailed in Chart 1. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 1**

**Basic Pools as of July 31, 2012**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1993 | $0 | $0 | $0 |
| 1994 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 143,453,470 |
| 2004 | 220,610,306 | (27,172,960) | (16,303,776) |
| 2005 | 330,847,750 | 121,920,020 | 79,248,013 |
| 2006 | 161,030,169 | (152,039,003) | (106,427,302) |
| 2007 | 184,389,447 | 33,535,905 | 25,151,929 |
| 2008 | 310,769,562 | 138,233,538 | 110,586,830 |
| 2009 | 649,013,065 | 357,008,602 | 303,457,312 |
| 2010 | 654,635,635 | 42,238,100 | 38,014,290 |
| 2011 | 786,046,373 | 170,138,172 | 161,631,263 |
| 2012 | 1,006,694,115 | 267,882,086 | 267,882,086 |
| Total | | | $1,006,694,115 |

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.

We are unaware of any such liabilities; therefore, there are no additional amounts to be allocated.

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

### C.  WITHDRAWAL LIABILITY EXPERIENCE

We have not been notified of any employers withdrawing from the fund during the last plan year, nor of any outstanding withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund

**EXHIBIT A**
**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these three sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the de minimis rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)    The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)    the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

⭑ SEGAL

**SECTION 3:**    **Supplementary Information for the Ohio Operating Engineers Pension Fund**

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT B**
**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2012 Through July 31, 2013**

Employer Name: _____

| | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: |
| Year Ended July 31[1] (1) | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | [(5) ÷ (4)] x [(2) + (3)] (6) |
|---|---|---|---|---|---|
| 2003 | $143,453,470 | $0 | $178,834,875 | _____ | _____ |
| 2004 | (16,303,776) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 79,248,013 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (106,427,302) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 25,151,929 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 110,586,830 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 303,457,312 | 0 | 210,884,752 | _____ | _____ |
| 2010 | 38,014,290 | 0 | 218,622,244 | _____ | _____ |
| 2011 | 161,631,263 | 0 | 230,778,340 | _____ | _____ |
| 2012 | 267,882,086 | 0 | 250,306,333 | _____ | _____ |

A.  Gross liability: (Sum of Column 6)                                                        _____

B.  *De minimis*                                                                                          50,000

C.  Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero      _____

D.  Allocable Unfunded Vested Liability: (A) – (C), not less than zero and without regard to annual payment limitations      _____

---

[1] Years not shown have no withdrawal liability component
[2] Original value of changes in unfunded vested benefits, written down 5% per year.
[3] Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.
[4] Total Fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.
[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

**SECTION 4:** Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

January 28, 2013

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2012. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 11-05773

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT I**
**Calculation of Unfunded Vested Liability**

| | | |
|---|---|---:|
| The calculations include the following participants as of July 31, 2012 | | |
| a. | Pensioners and beneficiaries (including 1,782 beneficiaries)* | 7,012 |
| b. | Inactive participants with vested pension rights | 1,343 |
| c. | Active vested employees | 5,490 |

| | | |
|---|---|---:|
| The actuarial factors are shown below as of July 31, 2012 | | |
| 1. | Present value of vested benefits at funding interest rate | $1,995,466,511 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 3,433,267,738 |
| 3. | Market value of assets | 1,701,216,407 |
| 4. | Ratio funded at PBGC interest rates [(3) ÷ (2), not greater than 1.0] | 0.4955 |
| 5. | Present value of vested benefits for withdrawal liability purposes [(4) x (2) + (1.0 – (4)) x (1)] | $2,707,910,522 |
| 6. | Unfunded vested liability [(5) – (3), not less than zero] | 1,006,694,115 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

★ SEGAL

SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2012* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1993 | $0 | $0 | $0 | $0 | $0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 143,453,470 | 0 | 143,453,470 |
| 2004 | (27,172,960) | 0 | (16,303,776) | 0 | (16,303,776) |
| 2005 | 121,920,020 | 0 | 79,248,013 | 0 | 79,248,013 |
| 2006 | (152,039,003) | 0 | (106,427,302) | 0 | (106,427,302) |
| 2007 | 33,535,905 | 0 | 25,151,929 | 0 | 25,151,929 |
| 2008 | 138,233,538 | 0 | 110,586,830 | 0 | 110,586,830 |
| 2009 | 357,008,602 | 0 | 303,457,312 | 0 | 303,457,312 |
| 2010 | 42,238,100 | 0 | 38,014,290 | 0 | 38,014,290 |
| 2011 | 170,138,172 | 0 | 161,631,263 | 0 | 161,631,263 |
| 2012 | 267,882,086 | 0 | 267,882,086 | 0 | 267,882,086 |

* *Basic and reallocated pools are written down annually at the rate of 5% of the original amount.*

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT III**
**Actuarial Assumptions and Methods**

---

| | |
|---|---|
| **Investment Return:** | (a) To the extent vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used. |

PBGC Interest Rates as of July 31, 2012:

| | |
|---|---|
| First 20 years | 2.95% |
| After 20 years | 3.66% |

(b) To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

(c) The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

---

| | |
|---|---|
| **Healthy Mortality Rates:** | RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA |
| **Disability Mortality Rates:** | RP-2000 Disabled Retiree Mortality Table Set Back Two Years |
| | The RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA from 2000 reasonably reflects the projected mortality experience of the Plan as of the measurement date. The mortality table was then adjusted to future years using generational projection under Scale AA to reflect future mortality improvement. |

⋆ SEGAL

4-4
OOE-000351

SECTION 4:     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**Retirement Rates:**

Upon completion of service requirement, the following rates apply for active employees:

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

Inactive vested participants are assumed to retire at age 62 if eligible for early retirement, otherwise Normal Retirement Age.

**Unknown Characteristics of Participants:**

Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male.

**Administrative Expenses:**

$10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets.

**SECTION 4:**   **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Valuation of Assets:** | At market value |
| **Allocation method:** | Presumptive |
| **Contribution period for prorating liabilities:** | 5 years |
| *De minimis* **Deductible:** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✱ SEGAL

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009

⋆ SEGAL

**SECTION 4:**   **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

---

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

---

| | |
|---|---|
| **Participation:** | Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund |
| **Past Service Credit:** | One year of past service for each full year of continuous service prior to June 1, 1964 |
| **Future Service Credit:** | For the period between June 1, 1964 and July 31, 1976: |

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

**SECTION 4:      Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

**Contribution Rate:**          $5.75 per hour, effective May 1, 2012 ($2.75 per hour supplemental)

5316091v1/05517.001



✳ Segal Consulting

# Ohio Operating Engineers Pension Fund

Withdrawal Liability Valuation as of
July 31, 2013



This report has been prepared at the request of the Board of Trustees for the purposes of establishing the
basis for withdrawal liability assessments during the August 1, 2013 through July 31, 2014 period. This report may
not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only
be provided to other parties in its entirety. The measurements shown in this report may not be applicable for
other purposes.

Copyright © 2014 by The Segal Group, Inc. All rights reserved.

 Segal Consulting

1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 www.segalco.com

*February 3, 2014*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2013 through July 31, 2014.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2013. The benefit provisions included in the calculations are those that were in effect on July 31, 2013.*

*We look forward to reviewing this report with you at your next meeting and to answering any questions you may have.*

*Sincerely,*

*Segal Consulting, a Member of The Segal Group, Inc.*

*By:*  _____
*John P. Bragan*
*Vice President*

*cc:*     *Thomas M. Tarpy, Esq.*
        *Mr. Raymond Orrand*
        *Mr. Charles M. Ciuni, CPA*

OOE-000358

## SECTION 1

**ACTUARIAL VALUATION SUMMARY**

Significant Issues in Valuation
Year.......................................1-1

Summary of Key Results...........1-2

## SECTION 2

**ACTUARIAL VALUATION RESULTS**

A. Determination of Withdrawal
Liability.................................2-1

B. Unfunded Vested Liability...2-3

C. Withdrawal Liability
Experience ...........................2-6

## SECTION 3

**SUPPLEMENTARY INFORMATION**

EXHIBIT A
Method for Allocating
Withdrawal Liability...............3-1

EXHIBIT B
Employer Withdrawal Liability
Worksheet For Withdrawals from
August 1, 2013 Through
July 31, 2014 .........................3-4

## SECTION 4

**ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY**

EXHIBIT I
Calculation of Unfunded Vested
Liability ..................................4-2

EXHIBIT II
Withdrawal Liability Pools......4-3

EXHIBIT III
Actuarial Assumptions and
Methods ..................................4-4

EXHIBIT IV
Summary of Plan Provisions ...4-7

✶ Segal Consulting

**SECTION 1:    Actuarial Valuation Summary as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Significant Issues in Valuation Year**

1.  The unfunded vested liability as of July 31, 2013 is $955 million, compared to $1.01 billion as of July 31, 2012. A positive basic pool of $9 million was established.

2.  Interest rates used to determine the funded portion of the present value of vested benefits changed from 2.95% for 20 years and 3.66% thereafter to 2.60% for 20 years and 3.43% thereafter (PBGC interest rates).

3.  The decrease in the unfunded vested liability since last year was primarily caused by the better than expected return on the market value of plan assets, partially offset by the decrease in the PBGC interest rates.

4.  The plan amendment that changed the benefit accrual rate from 1.75% of contributions to 1.90% of contributions for contributions on and after August 1, 2012 is recognized for withdrawal liability purposes this year.

5.  The contribution rate increased from $5.75 to $6.00 per hour effective May 1, 2013. This increase was supplemental and does not impact future benefit accruals.

✷ Segal Consulting

**SECTION 1:    Actuarial Valuation Summary as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Summary of Key Results**

| | July 31 | |
|---|---|---|
| | **2013** | **2012** |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries* | 7,013 | 7,012 |
| Number of inactive vested participants | 1,377 | 1,343 |
| Number of active vested participants | 5,448 | 5,490 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 2.60% for 20 years, 3.43% thereafter | 2.95% for 20 years, 3.66% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $2,035,951,567 | $1,995,466,511 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 3,658,158,877 | 3,433,267,738 |
| Present value of vested benefits for withdrawal liability purposes | 2,897,073,351 | 2,707,910,522 |
| **Unfunded Present Value of Vested Benefits:** | | |
| Market value of assets | $1,941,872,830 | $1,701,216,407 |
| Unfunded vested liability for withdrawal liability purposes | 955,200,521 | 1,006,694,115 |
| Withdrawal liability pools established | | |
| • Basic pool | 9,134,851 | 267,882,086 |
| • Reallocated pool | 0 | 0 |

\* *Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

**SECTION 2:** **Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

## A. DETERMINATION OF WITHDRAWAL LIABILITY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension).

The value of these benefits is determined as of July 31, 2013 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuary's "best estimate" of unfunded vested liability for this Plan involves the same actuarial assumptions as are used for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

✳ Segal Consulting

**SECTION 2:     Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

**De minimis**

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in Section 3, Exhibit A.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.

**SECTION 2:    Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in Section 4 of this report.

**Changes Since Prior Year**

The following assumption changes were made since last year's determination:

➤   PBGC interest rates changed from 2.95% for 20 years and 3.66% thereafter to 2.60% for 20 years and 3.43% thereafter.

The following plan change is reflected for the first time this year:

➤   The benefit accrual rate changed from 1.75% of contributions to 1.90% of contributions for contributions on and after August 1, 2012.

The contribution rate increased from $5.75 to $6.00 per hour effective May 1, 2013. This increase was supplemental and does not impact future benefit accruals.

**SECTION 2:**     **Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 plan years are detailed in Chart 1. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 1**
**Basic Pools as of July 31, 2013**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1994 | $0 | $0 | $0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 130,412,246 |
| 2004 | 220,610,306 | (27,172,960) | (14,945,128) |
| 2005 | 330,847,750 | 121,920,020 | 73,152,012 |
| 2006 | 161,030,169 | (152,039,003) | (98,825,352) |
| 2007 | 184,389,447 | 33,535,905 | 23,475,134 |
| 2008 | 310,769,562 | 138,233,538 | 103,675,154 |
| 2009 | 649,013,065 | 357,008,602 | 285,606,882 |
| 2010 | 654,635,635 | 42,238,100 | 35,902,385 |
| 2011 | 786,046,373 | 170,138,172 | 153,124,355 |
| 2012 | 1,006,694,115 | 267,882,086 | 254,487,982 |
| 2013 | 955,200,521 | 9,134,851 | 9,134,851 |
| **Total** | | | $955,200,521 |

Segal Consulting

**SECTION 2:** Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund

**Reallocated Amounts**

Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.

We are unaware of any such liabilities as of July 31, 2013; therefore, there are no additional amounts to be allocated as of that date.

**SECTION 2:     Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

### C.  WITHDRAWAL LIABILITY EXPERIENCE

We have been notified of one employer withdrawing from the fund during the last plan year, and that this employer settled its remaining withdrawal liability in a lump sum after July 31, 2013.  We have not been notified of any outstanding withdrawal liability payments as of July 31, 2013.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

**SECTION 3:**    Supplementary Information as of July 31, 2013 for the Ohio Operating Engineers Pension Fund

**EXHIBIT A**
**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

**SECTION 3:     Supplementary Information as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the plan year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)   The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)   the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

✳ Segal Consulting

SECTION 3:     Supplementary Information as of July 31, 2013 for the Ohio Operating Engineers Pension Fund

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

**SECTION 3:**    Supplementary Information as of July 31, 2013 for the Ohio Operating Engineers Pension Fund

**EXHIBIT B**
**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2013 Through July 31, 2014**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) ÷ (3)] (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $130,412,246 | $0 | $ 178,834,875 | _____ | _____ |
| 2004 | (14,945,128) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 73,152,012 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (98,825,352) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 23,475,134 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 103,675,154 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 285,606,882 | 0 | 210,884,752 | _____ | _____ |
| 2010 | 35,902,385 | 0 | 218,622,244 | _____ | _____ |
| 2011 | 153,124,355 | 0 | 230,778,340 | _____ | _____ |
| 2012 | 254,487,982 | 0 | 250,306,333 | _____ | _____ |
| 2013 | 9,134,851 | 0 | 269,018,918 | _____ | _____ |

A.  Gross liability: (Sum of Column 6)
B.  *De minimis*                                                                                                     50,000
C.  Deductible: $100,000 ÷ (B) – (A), but not greater than (B) nor less than zero
D.  Allocable Unfunded Vested Liability: (A) – (C), not less than zero and without regard to annual payment limitations

[1] *Years not shown have no withdrawal liability component*
[2] *Original value of changes in unfunded vested benefits, written down 5% per year.*
[3] *Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.*
[4] *Total Fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*
[5] *Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

**✸ Segal Consulting**

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

February 3, 2014

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that Segal Consulting, a Member of The Segal Group, Inc., has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2013. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 11-05773

✶ Segal Consulting

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

## EXHIBIT I
## Calculation of Unfunded Vested Liability

The calculations include the following participants as of July 31, 2013

| | | |
|---|---|---:|
| a. | Pensioners and beneficiaries (including 1,801 beneficiaries)* | 7,013 |
| b. | Inactive participants with vested pension rights | 1,377 |
| c. | Active vested participants | 5,448 |

The actuarial factors are shown below as of July 31, 2013

| | | |
|---|---|---:|
| 1. | Present value of vested benefits at funding interest rate | $2,035,951,567 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 3,658,158,877 |
| 3. | Market value of assets | 1,941,872,830 |
| 4. | Ratio funded at PBGC interest rates [(3)÷(2), not greater than 1.0] | 0.530833 |
| 5. | Present value of vested benefits for withdrawal liability purposes [(4) x (2) + (1.0 − (4)) x (1)] | 2,897,073,351 |
| 6. | Unfunded vested liability [(5) − (3), not less than zero ] | 955,200,521 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.

✳ Segal Consulting

**SECTION 4:** Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2013* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1994 | $0 | $0 | $0 | $0 | $0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 130,412,246 | 0 | 130,412,246 |
| 2004 | (27,172,960) | 0 | (14,945,128) | 0 | (14,945,128) |
| 2005 | 121,920,020 | 0 | 73,152,012 | 0 | 73,152,012 |
| 2006 | (152,039,003) | 0 | (98,825,352) | 0 | (98,825,352) |
| 2007 | 33,535,905 | 0 | 23,475,134 | 0 | 23,475,134 |
| 2008 | 138,233,538 | 0 | 103,675,154 | 0 | 103,675,154 |
| 2009 | 357,008,602 | 0 | 285,606,882 | 0 | 285,606,882 |
| 2010 | 42,238,100 | 0 | 35,902,385 | 0 | 35,902,385 |
| 2011 | 170,138,172 | 0 | 153,124,355 | 0 | 153,124,355 |
| 2012 | 267,882,086 | 0 | 254,487,982 | 0 | 254,487,982 |
| 2013 | 9,134,851 | 0 | 9,134,851 | 0 | 9,134,851 |

*Basic and reallocated pools are written down annually at the rate of 5% of the original amount.*

✴ Segal Consulting

**SECTION 4:**   **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT III**
**Actuarial Assumptions and Methods**

| | |
|---|---|
| **Investment Return:** | (a) To the extent the vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used. |

PBGC Interest Rates as of July 31, 2013:

| | |
|---|---|
| First 20 years | 2.60% |
| After 20 years | 3.43% |

(b) To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

(c) The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

| | |
|---|---|
| **Mortality Rates:** | Healthy: RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA |

Disabled: RP-2000 Disabled Retiree Mortality Table Set Back Two Years

The RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA from 2000 reasonably reflects the projected mortality experience of the Plan as of the measurement date. The mortality table was then adjusted to future years using generational projection under Scale AA to reflect future mortality improvement.

**✷ Segal Consulting**

**SECTION 4:     Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

| Retirement Rates: | Upon completion of service requirement, the following rates apply for active employees: |
|---|---|

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

**Retirement Age for Inactive Vested Participants:**

62 if eligible for early retirement, otherwise Normal Retirement Age

**Unknown Characteristics of Participants:**

Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male.

**Administrative Expenses:**

$10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets.

**Valuation of Assets:**

At market value

Segal Consulting

4-5
OOE-000376

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Allocation method:** | Presumptive |
| **Contribution period for prorating liabilities:** | 5 years |
| *De minimis* **Deductible:** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✦ Segal Consulting

**SECTION 4:    Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Retirement:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf from August 1, 2009 through July 31, 2012, plus
- 1.9% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2012

✳ Segal Consulting

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

**Participation:** Members who are employed by Employers and who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:** One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:** For the period between June 1, 1964 and July 31, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|-------|-----------------|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

**Contribution Rate:**

$5.75 per hour, effective May 1, 2012 ($2.75 per hour supplemental and not subject to benefit accrual);

$6.00 per hour, effective May 1, 2013 ($3.00 per hour supplemental and not subject to benefit accrual).

5402259v2/05517.001



✕ Segal Consulting

# Ohio Operating Engineers Pension Fund

**Withdrawal Liability Valuation as of July 31, 2014**



EXHIBIT
G

This report has been prepared at the request of the Board of Trustees for the purposes of establishing the basis for withdrawal liability assessments during the August 1, 2014 through July 31, 2015 period. This report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety. The measurements shown in this report may not be applicable for other purposes.
Copyright © 2014 by The Segal Group, Inc. All rights reserved.



# ✱ Segal Consulting

1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 www.segalco.com

*January 6, 2015*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2014 through July 31, 2015.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2014. The benefit provisions included in the calculations are those that were in effect on July 31, 2014.*

*We look forward to reviewing this report with you at your next meeting and to answering any questions you may have.*

*Sincerely,*

*Segal Consulting, a Member of The Segal Group, Inc.*

*By:*    Megan R. Kelly

*Megan R. Kelly, CEBS*
*Vice President and Benefits Consultant*

*cc:*    *Thomas M. Tarpy, Esq.*
        *Ms. Carol Wilson*
        *Mr. Charles M. Ciuni, CPA*

OOE-000382

## SECTION 1

**ACTUARIAL VALUATION SUMMARY**

Significant Issues in Valuation Year .............................................. 4

Summary of Key Results ............. 5

## SECTION 2

**ACTUARIAL VALUATION RESULTS**

A. Determination of Withdrawal Liability .................................. 6

B. Unfunded Vested Liability ...... 8

C. Withdrawal Liability Experience ........................... 11

## SECTION 3

**SUPPLEMENTARY INFORMATION**

EXHIBIT A
Method for Allocating Withdrawal Liability ................ 12

EXHIBIT B
Employer Withdrawal Liability Worksheet for Withdrawals from August 1, 2014 through July 31, 2015 ........................... 15

## SECTION 4

**ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY**

EXHIBIT I
Calculation of Unfunded Vested Liability .................................... 17

EXHIBIT II
Withdrawal Liability Pools ....... 18

EXHIBIT III
Actuarial Assumptions and Methods .................................... 19

EXHIBIT IV
Summary of Plan Provisions .... 22


✳ Segal Consulting

OOE-000383

**SECTION 1:**     Actuarial Valuation Summary as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

**Significant Issues in Valuation Year**

1. The unfunded vested liability as of July 31, 2014 is $750 million, compared to $955 million as of July 31, 2013. A negative basic pool of $144 million was established.

2. A withdrawn employer settled their withdrawal liability obligation in a lump sum during the Plan Year ended July 31, 2014. As a result, a reallocated pool of $7,614 was established.

3. Interest rates used to determine the funded portion of the present value of vested benefits changed from 2.60% for 20 years and 3.43% thereafter to 3.43% for 20 years and 3.66% thereafter (PBGC interest rates).

4. The decrease in the unfunded vested liability since last year was primarily caused by the better than expected return on the market value of plan assets, and the increase in the PBGC interest rates.

**SECTION 1:    Actuarial Valuation Summary as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

### Summary of Key Results

| | July 31 | |
| --- | --- | --- |
| | **2014** | **2013** |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries* | 7,053 | 7,013 |
| Number of inactive vested participants | 1,419 | 1,377 |
| Number of active vested participants | 5,382 | 5,448 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 3.43% for 20 years, 3.66% thereafter | 2.60% for 20 years, 3.43% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $2,083,985,264 | $2,035,951,567 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 3,338,260,468 | 3,658,158,877 |
| Present value of vested benefits for withdrawal liability purposes | 2,886,751,734 | 2,897,073,351 |
| **Unfunded Present Value of Vested Benefits:** | | |
| Market value of assets | $2,136,567,447 | $1,941,872,830 |
| Unfunded vested liability for withdrawal liability purposes | 750,184,287 | 955,200,521 |
| Withdrawal liability pools established | | |
| • Basic pool | -143,931,041 | 9,134,851 |
| • Reallocated pool | 7,614 | 0 |

*\* Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

**SECTION 2:     Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

## A.  DETERMINATION OF WITHDRAWAL LIABILITY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

**Determination of Unfunded Vested Liability**

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension). The value of these benefits is

determined as of July 31, 2014 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuary's "best estimate" of unfunded vested liability for this Plan involves the same actuarial assumptions as are used for plan funding, with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

**SECTION 2:     Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method adopted by the Trustees.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

The PBGC has affirmed that a multiemployer plan may assess withdrawal liability to employers that withdraw even if the plan currently has no unfunded vested liability.

*De minimis*

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in Section 3, Exhibit A.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.

✕ Segal Consulting

**SECTION 2:**    **Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**B. UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in Section 4 of this report.

**Changes Since Prior Year**

PBGC interest rates changed from 2.60% for 20 years and 3.43% thereafter to 3.43% for 20 years and 3.66% thereafter.

✶ Segal Consulting

**SECTION 2:     Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**Basic Pools**
The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 Plan Years are detailed in Chart 1. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 1**
**Basic Pools as of July 31, 2014**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1995 | $0 | $0 | $0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 117,371,021 |
| 2004 | 220,610,306 | (27,172,960) | (13,586,480) |
| 2005 | 330,847,750 | 121,920,020 | 67,056,011 |
| 2006 | 161,030,169 | (152,039,003) | (91,223,402) |
| 2007 | 184,389,447 | 33,535,905 | 21,798,338 |
| 2008 | 310,769,562 | 138,233,538 | 96,763,477 |
| 2009 | 649,013,065 | 357,008,602 | 267,756,452 |
| 2010 | 654,635,635 | 42,238,100 | 33,790,480 |
| 2011 | 786,046,373 | 170,138,172 | 144,617,446 |
| 2012 | 1,006,694,115 | 267,882,086 | 241,093,877 |
| 2013 | 955,200,521 | 9,134,851 | 8,678,108 |
| 2014 | 750,184,287 | (143,931,041) | (143,931,041) |
| **Total** | | | $750,184,287 |

�containers **Segal Consulting**

SECTION 2: Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

**Reallocated Amounts**

Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the Plan Year preceding withdrawal.

During the last Plan Year, there was $7,614 that was deemed uncollectible as a result of the settlement amount paid by a withdrawn employer being lower than the allocated unfunded vested liability for the employer. As a result, a reallocated pool was established and is shown in Chart 2 below.

*This chart shows historical reallocated pools.*

**CHART 2**

**Reallocated Pool as of July 31, 2014***

| Plan Year Ended July 31 | Initial Value | Unamortized Balance |
|---|---|---|
| 2014 | $7,614 | $7,614 |
| Total | $7,614 | $7,614 |

* No reallocated pools were established prior to 2014.

✳ Segal Consulting

**SECTION 2:     Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

---

### C. WITHDRAWAL LIABILITY EXPERIENCE

We have been notified of four employers withdrawing from the fund during the last Plan Year. Currently, three withdrawn employers are making withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

✳ Segal Consulting

SECTION 3:    Supplementary Information as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

**EXHIBIT A**
**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan Year (to the end of the Plan Year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan Year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

✷ Segal Consulting

**SECTION 3:    Supplementary Information as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

---

**Reallocated Amounts**
The total amount, if any, of unfunded vested liability determined in any Plan Year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan Year preceding withdrawal.

**Proration to the Employer**
For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan Year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by an a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**
A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)   The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the Plan Year of withdrawal, and

(b)   the highest contribution rate in the 10-year period ending with the Plan Year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**
Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

✶ Segal Consulting

SECTION 3:    Supplementary Information as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the Plan Year and the preceding two Plan Years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two Plan Years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the Plan Year following the year of the partial withdrawal to the employer's average contributory hours in the five Plan Years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two Plan Years in which the hours were the highest within the five Plan Years preceding the Plan Year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

✳ **Segal Consulting**

**SECTION 3:**     Supplementary Information as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

**EXHIBIT B**
**Employer Withdrawal Liability Worksheet for Withdrawals from August 1, 2014 through July 31, 2015**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) + (3)] (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $117,371,021 | $0 | $178,834,875 | _____ | _____ |
| 2004 | (13,586,480) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 67,056,011 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (91,223,402) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 21,798,338 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 96,763,477 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 267,756,452 | 0 | 210,884,752 | _____ | _____ |
| 2010 | 33,790,480 | 0 | 218,622,244 | _____ | _____ |
| 2011 | 144,617,446 | 0 | 230,778,340 | _____ | _____ |
| 2012 | 241,093,877 | 0 | 250,306,333 | _____ | _____ |
| 2013 | 8,678,108 | 0 | 269,018,918 | _____ | _____ |
| 2014 | (143,931,041) | 7,614 | 298,703,055 | _____ | _____ |

A.   Gross liability: (Sum of Column 6)
B.   *De minimis*                                                        50,000
C.   Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero
D.   Allocable Unfunded Vested Liability: (A) – (C), not less than zero and without regard to annual payment limitations

[1] *Years not shown have no withdrawal liability component*
[2] *Original value of changes in unfunded vested benefits, written down 5% per year.*
[3] *Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.*
[4] *Total Fund contributions for the Plan Year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*
[5] *Obligated employer contributions for the Plan Year listed and the four preceding years, including contributions owed but not yet paid.*

**SECTION 4:**  **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

---

**January 6, 2015**

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that Segal Consulting, a Member of The Segal Group, Inc., has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2014. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 14-05773

✱ Segal Consulting

OOE-000396

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| The calculations include the following participants as of July 31, 2014 | |
|---|---|
| a. Pensioners and beneficiaries (including 1,846 beneficiaries)* | 7,053 |
| b. Inactive participants with vested pension rights | 1,419 |
| c. Active vested participants | 5,382 |

| The actuarial factors are shown below as of July 31, 2014 | |
|---|---|
| 1. Present value of vested benefits at funding interest rate | $2,083,985,264 |
| 2. Present value of vested benefits at PBGC interest rates, including allowance for expenses | 3,338,260,468 |
| 3. Market value of assets | 2,136,567,477 |
| 4. Ratio funded at PBGC interest rates [(3) ÷ (2), not greater than 1.0] | 0.640024 |
| 5. Present value of vested benefits for withdrawal liability purposes [(4) x (2) ÷ (1.0 – (4)) x (1)] | 2,886,751,734 |
| 6. Unfunded vested liability [(5) – (3), not less than zero] | 750,184,287 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

**SECTION 4:**    **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2014* | | |
|---|---|---|---|---|---|
| | **Basic Pool** | **Reallocated Pool** | **Basic Pool** | **Reallocated Pool** | **Total Pools** |
| 1995 | $0 | $0 | $0 | $0 | $0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 117,371,021 | 0 | 117,371,021 |
| 2004 | (27,172,960) | 0 | (13,586,480) | 0 | (13,586,480) |
| 2005 | 121,920,020 | 0 | 67,056,011 | 0 | 67,056,011 |
| 2006 | (152,039,003) | 0 | (91,223,402) | 0 | (91,223,402) |
| 2007 | 33,535,905 | 0 | 21,798,338 | 0 | 21,798,338 |
| 2008 | 138,233,538 | 0 | 96,763,477 | 0 | 96,763,477 |
| 2009 | 357,008,602 | 0 | 267,756,452 | 0 | 267,756,452 |
| 2010 | 42,238,100 | 0 | 33,790,480 | 0 | 33,790,480 |
| 2011 | 170,138,172 | 0 | 144,617,446 | 0 | 144,617,446 |
| 2012 | 267,882,086 | 0 | 241,093,877 | 0 | 241,093,877 |
| 2013 | 9,134,851 | 0 | 8,678,108 | 0 | 8,678,108 |
| 2014 | (143,931,041) | 7,614 | (143,931,041) | 7,614 | (143,923,427) |

* *Basic and reallocated pools are written down annually at the rate of 5% of the original amount.*

✳ Segal Consulting

**SECTION 4:**   **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT III**
**Actuarial Assumptions and Methods**

---

| | |
|---|---|
| **Investment Return:** | (a) To the extent the vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used. |

PBGC Interest Rates as of July 31, 2014:

| | |
|---|---|
| First 20 years | 3.43% |
| After 20 years | 3.66% |

(b) To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

(c) The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

---

**Mortality Rates:**

Healthy:  RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA

Disabled: RP-2000 Disabled Retiree Mortality Table Set Back Two Years

The RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA from 2000 reasonably reflects the projected mortality experience of the Plan as of the measurement date. The mortality table was then adjusted to future years using generational projection under Scale AA to anticipate future mortality improvement

✱ Segal Consulting

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Retirement Rates:** | Upon completion of service requirement, the following rates apply for active employees: |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Retirement Age for Inactive Vested Participants:** | 62 if eligible for early retirement, otherwise Normal Retirement Age |
| **Unknown Data for Participants:** | Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male. |
| **Percent Married:** | 85% of male participants and 50% of female participants |
| **Age and Sex of Spouse:** | Spouse of male participant is assumed to be three years younger than the participant and spouse of female participant is assumed to be three years older than the participant. If not specified, spouse is assumed to be the opposite sex of the participant. |

✳ Segal Consulting

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Benefit Election:** | Married participants are assumed to elect the more valuable of the 50% joint-and-survivor annuity with "pop-up" form of payment and the single life annuity with five years certain. Non-married participants are assumed to elect the single life annuity with five years certain. |
| **Administrative Expenses:** | $10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets. |
| **Valuation of Assets:** | At market value |
| **Allocation Method:** | Presumptive |
| **Contribution Period for Prorating Liabilities:** | 5 years |
| *De minimis* **Deductible:** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |
| **Plan Status:** | Ongoing Plan |

**Regular Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf from August 1, 2009 through July 31, 2012, plus
- 1.9% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2012

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

---

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

---

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

---

**Forms of Payment:**

The normal forms of payment are:

- Qualified Joint and Survivor Annuity, which under the Plan is a 50% joint-and-survivor annuity with a "pop-up" feature, for married participants
- Single Life Annuity with five years certain for single participants

The generally available optional forms of payment are:

- 66-2/3% Joint and Survivor Option (no longer available to new retirees)
- 75% Joint and Survivor Option
- 100% Joint and Survivor Option

**SECTION 4:**  **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Participation:** | Members who are employed by Employers and who are covered by a collective bargaining agreement with the Pension Fund |
| **Past Service Credit:** | One year of past service for each full year of continuous service prior to June 1, 1964 |
| **Future Service Credit:** | For the period between June 1, 1964 and July 31, 1976: |

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

| | |
|---|---|
| **Contribution Rate:** | $6.00 per hour, effective May 1, 2013 ($3.00 per hour supplemental and not subject to benefit accrual). |

5471760v1/05517.001

✳ Segal Consulting



✶ Segal Consulting

# Ohio Operating Engineers Pension Fund

**Withdrawal Liability Valuation
as of July 31, 2015**

This report has been prepared at the request of the Board of Trustees for the purposes of establishing the basis for withdrawal liability assessments during the August 1, 2015 through July 31, 2016 period. This report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety. The measurements shown in this report may not be applicable for other purposes.
Copyright © 2016 by The Segal Group, Inc. All rights reserved.

Date: 10.8.2018
EXHIBIT 4
Ciner

 **Segal Consulting**

1300 EAST NINTH STREET, SUITE 1900 CLEVELAND, OH 44114
T 216.687.4400 www.segalco.com

January 27, 2016

Board of Trustees
Ohio Operating Engineers Pension Fund
Columbus, Ohio

Dear Trustees:

This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2015 through July 31, 2016.

The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2015. The benefit provisions included in the calculations are those that were in effect on July 31, 2015.

We look forward to reviewing this report with you at your next meeting and to answering any questions you may have.

Sincerely,

Segal Consulting, a Member of The Segal Group, Inc.

By: _Megan R. Kelly_

Megan R. Kelly, CEBS
Vice President and Benefits Consultant

cc:     Thomas M. Tarpy, Esq.
        Ms. Carol Wilson
        Mr. Charles M. Ciuni, CPA

OOE-000406

**Table of Contents**

**Section 1: Actuarial Valuation Summary**

Significant Issues in Valuation Year ........................................................................................................................... 4

Summary of Key Results .............................................................................................................................................. 5

**Section 2: Actuarial Valuation Results**

A.   Determination of Withdrawal Liability ............................................................................................................. 6

B.   Unfunded Vested Liability ................................................................................................................................. 8

C.   Withdrawal Liability Experience ..................................................................................................................... 11

**Section 3: Supplementary Information**

EXHIBIT A
   Method for Allocating Withdrawal Liability ..................................................................................................... 12

EXHIBIT B
   Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2015 Through July 31, 2016 ............................................ 15

**Section 4: Actuarial Certification of Withdrawal Liability**

EXHIBIT I
   Calculation of Unfunded Vested Liability .......................................................................................................... 17

EXHIBIT II
   Withdrawal Liability Pools ................................................................................................................................. 18

EXHIBIT III
   Actuarial Assumptions and Methods ................................................................................................................. 19

EXHIBIT IV
   Summary of Plan Provisions ............................................................................................................................... 23


✕ Segal Consulting

**SECTION 1:**     Actuarial Valuation Summary as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

**Significant Issues in Valuation Year**

1. The Multiemployer Pension Reform Act of 2014 (MPRA) amended ERISA to expect PBGC's guarantee to cover qualified pre-retirement survivor annuities (QPSA). As a result, the value of this benefit is included in the present value of vested benefits used for determining withdrawal liability as of July 31, 2015.

2. The unfunded vested liability as of July 31, 2015 is $971 million, compared to $750 million as of July 31, 2014. A positive basic pool of $275 million was established.

3. Interest rates used to determine the funded portion of the present value of vested benefits changed from 3.43% for 20 years and 3.66% thereafter to 2.32% for 20 years and 2.37% thereafter (PBGC interest rates).

4. The increase in the unfunded vested liability since last year was primarily caused by the decrease in the PBGC interest rates.

**SECTION 1: Actuarial Valuation Summary as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

**Summary of Key Results**

| | July 31 | |
| --- | --- | --- |
| | **2014** | **2015** |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries* | 7,053 | 7,068 |
| Number of inactive vested participants | 1,419 | 1,428 |
| Number of active vested participants | 5,382 | 5,310 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 3.43% for 20 years, 3.66% thereafter | 2.32% for 20 years, 2.37% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $2,083,985,264 | $2,140,283,436 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 3,338,260,468 | 4,060,944,552 |
| Present value of vested benefits for withdrawal liability purposes | 2,886,751,734 | 3,189,341,325 |
| **Unfunded Present Value of Vested Benefits:** | | |
| Market value of assets | $2,136,567,447 | $2,218,072,665 |
| Unfunded vested liability for withdrawal liability purposes | 750,184,287 | 971,268,660 |
| Withdrawal liability pools established | | |
| • Basic pool | -143,931,041 | 274,973,011 |
| • Reallocated pool | 7,614 | 0 |

* *Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

**SECTION 2: Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund**

---

## A. DETERMINATION OF WITHDRAWAL LIABILITY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. MPRA amended ERISA to expand PBGC's guarantee to cover qualified pre-retirement survivor annuities. As a result, the value of this benefit is included in the present value of vested benefits used for determining withdrawal liability as of July 31, 2015. The value of these benefits is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuary's "best estimate" of unfunded vested liability for this Plan involves the same actuarial assumptions as are used for plan funding, with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

### Allocation

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method adopted by the Trustees.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

✳ Segal Consulting

6

**SECTION 2:** **Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund**

The PBGC has affirmed that a multiemployer plan may assess withdrawal liability to employers that withdraw even if the plan currently has no unfunded vested liability.

***De minimis***
Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**
The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in Section 3, Exhibit A.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.

✕ Segal Consulting

SECTION 2:    Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund

---

**B. UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in Section 4 of this report.

**Changes Since Prior Year**

The Multiemployer Pension Reform Act of 2014 (MPRA) amended ERISA to expect PBGC's guarantee to cover qualified pre-retirement survivor annuities (QPSA). As a result, the value of this benefit is included in the present value of vested benefits used for determining withdrawal liability as of July 31, 2015.

PBGC interest rates changed from 3.43% for 20 years and 3.66% thereafter to 2.32% for 20 years and 2.37% thereafter.

⁎ Segal Consulting

OOE-000412

**SECTION 2:      Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 plan years are detailed in Chart 1. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 1**

**Basic Pools as of July 31, 2015**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1996 | $0 | $0 | $0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 104,329,796 |
| 2004 | 220,610,306 | (27,172,960) | (12,227,832) |
| 2005 | 330,847,750 | 121,920,020 | 60,960,010 |
| 2006 | 161,030,169 | (152,039,003) | (83,621,452) |
| 2007 | 184,389,447 | 33,535,905 | 20,121,543 |
| 2008 | 310,769,562 | 138,233,538 | 89,851,800 |
| 2009 | 649,013,065 | 357,008,602 | 249,906,021 |
| 2010 | 654,635,635 | 42,238,100 | 31,678,575 |
| 2011 | 786,046,373 | 170,138,172 | 136,110,538 |
| 2012 | 1,006,694,115 | 267,882,086 | 227,699,773 |
| 2013 | 955,200,521 | 9,134,851 | 8,221,366 |
| 2014 | 750,184,287 | (143,931,041) | (136,734,489) |
| 2015 | 971,268,660 | 274,973,011 | 274,973,011 |
| **Total** | | | $971,268,660 |

**SECTION 2:**    **Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.

*This chart shows historical reallocated pools.*

**CHART 2**

**Reallocated Pool as of July 31, 2015\***

| Plan Year Ended July 31 | Initial Value | Unamortized Balance |
|---|---|---|
| 2014 | $7,614 | $7,233 |
| **Total** | $7,614 | $7,233 |

\* *No reallocated pools were established for years not shown.*

✳ Segal Consulting

**SECTION 2:    Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund**

### C.  WITHDRAWAL LIABILITY EXPERIENCE

We have been notified of two employers withdrawing from the fund during the last Plan Year.

For the last plan year, the Fund received $146,792 from withdrawal liability assessments. These serve to fund the Plan in the same manner as employer contributions. Currently, three withdrawn employers are making withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

SECTION 3:    Supplementary Information as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

**EXHIBIT A**
**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan Year (to the end of the Plan Year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

SECTION 3:    Supplementary Information as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

---

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)   The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the Plan Year of withdrawal, and

(b)   the highest contribution rate in the 10-year period ending with the Plan Year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

**SECTION 3:** Supplementary Information as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the Plan Year and the preceding two Plan Years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two Plan Years in which the base units were the highest within the five Plan Years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two Plan Years in which the hours were the highest within the five plan years preceding the Plan Year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

✳ Segal Consulting

**SECTION 3:    Supplementary Information as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT B**
**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2015 Through July 31, 2016**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) + (3)] |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | (6) |
| 2003 | $104,329,796 | $0 | $178,834,875 | _____ | _____ |
| 2004 | (12,227,832) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 60,960,010 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (83,621,452) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 20,121,543 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 89,851,800 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 249,906,021 | 0 | 210,884,752 | _____ | _____ |
| 2010 | 31,678,575 | 0 | 218,622,244 | _____ | _____ |
| 2011 | 136,110,538 | 0 | 230,778,340 | _____ | _____ |
| 2012 | 227,699,773 | 0 | 250,306,333 | _____ | _____ |
| 2013 | 8,221,366 | 0 | 269,018,918 | _____ | _____ |
| 2014 | (136,734,489) | 7,233 | 298,703,055 | _____ | _____ |
| 2015 | 274,973,011 | 0 | 331,169,312 | _____ | _____ |

A.  Gross liability: (Sum of Column 6)
B.  *De minimis*                                                                                                    50,000
C.  Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero
D.  Allocable Unfunded Vested Liability: (A) – (C), not less than zero and without regard to annual payment limitations

[1] *Years not shown have no withdrawal liability component.*
[2] *Original value of changes in unfunded vested benefits, written down 5% per year.*
[3] *Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.*
[4] *Total Fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*
[5] *Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

✳ Segal Consulting

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

---

**January 27, 2016**

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that Segal Consulting, a Member of The Segal Group, Inc., has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2015. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 14-05773

Segal Consulting

16
OOE-000420

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT I**
**Calculation of Unfunded Vested Liability**

The calculations include the following participants as of July 31, 2015

| | | |
|---|---|---|
| a. | Pensioners and beneficiaries (including 1,886 beneficiaries)* | 7,068 |
| b. | Inactive participants with vested pension rights | 1,428 |
| c. | Active vested participants | 5,310 |

The actuarial factors are shown below as of July 31, 2015.

| | | |
|---|---|---|
| 1. | Present value of vested benefits at funding interest rate | $2,140,283,436 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 4,060,944,552 |
| 3. | Market value of assets | 2,218,072,665 |
| 4. | Ratio funded at PBGC interest rates [(3) ÷ (2), not greater than 1.0] | 0.546196 |
| 5. | Present value of vested benefits for withdrawal liability purposes [(4) x (2) + (1.0 − (4)) x (1)] | $3,189,341,325 |
| 6. | Unfunded vested liability [(5) − (3), not less than zero] | 971,268,660 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

✳ Segal Consulting

**SECTION 4:** Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2015* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1996 | $0 | $0 | $0 | $0 | $0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 104,329,796 | 0 | 104,329,796 |
| 2004 | (27,172,960) | 0 | (12,227,832) | 0 | (12,227,832) |
| 2005 | 121,920,020 | 0 | 60,960,010 | 0 | 60,960,010 |
| 2006 | (152,039,003) | 0 | (83,621,452) | 0 | (83,621,452) |
| 2007 | 33,535,905 | 0 | 20,121,543 | 0 | 20,121,543 |
| 2008 | 138,233,538 | 0 | 89,851,800 | 0 | 89,851,800 |
| 2009 | 357,008,602 | 0 | 249,906,021 | 0 | 249,906,021 |
| 2010 | 42,238,100 | 0 | 31,678,575 | 0 | 31,678,575 |
| 2011 | 170,138,172 | 0 | 136,110,538 | 0 | 136,110,538 |
| 2012 | 267,882,086 | 0 | 227,699,773 | 0 | 227,699,773 |
| 2013 | 9,134,851 | 0 | 8,221,366 | 0 | 8,221,366 |
| 2014 | (143,931,041) | 7,614 | (136,734,489) | 7,233 | (136,727,256) |
| 2015 | 274,973,011 | 0 | 274,973,011 | 0 | 274,973,011 |

\* *Basic and reallocated pools are written down annually at the rate of 5% of the original amount.*

✳ Segal Consulting

18
OOE-000422

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT III**
**Actuarial Assumptions and Methods**

---

| | |
|---|---|
| **Investment Return:** | (a) To the extent the vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used. |

PBGC Interest Rates as of July 31, 2015:

| | |
|---|---|
| First 20 years | 2.32% |
| After 20 years | 2.37% |

(b) To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

(c) The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

---

**Mortality Rates:** Healthy: RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA

Disabled: RP-2000 Disabled Retiree Mortality Table Set Back Two Years

The RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA from 2000 reasonably reflects the projected mortality experience of the Plan as of the measurement date. The mortality table was then adjusted to future years using generational projection under Scale AA to anticipate future mortality improvement.

The mortality rates were based on historical and current demographic data and professional judgment. As part of the analysis, a comparison was made between the actual number of deaths by age and liability change due to deaths and the projected

✳ Segal Consulting

19

**SECTION 4:  Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

number and liability change based on the prior years' assumption over the most recent four years.

**Retirement Rates:**

Upon completion of service requirement, the following rates apply for active employees:

| Age | Annual Retirement Rates |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

The retirement rates were based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. As part of the analysis, a comparison was made between the actual number of retirements and liability change due to retirements and the projected number of retirements and liability change based on the prior years' assumption over the most recent five years.

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Retirement Age for Inactive Vested Participants:** | 62 if eligible for early retirement, otherwise Normal Retirement Age |
| | The retirement age for inactive vested participants was based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. |
| **Unknown Characteristics of Participants:** | Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male. |
| **Percent Married** | 85% of male participants and 50% of female participants |
| **Age and Sex of Spouse** | Spouses of male participants are assumed to be three years younger than the participants and spouses of female participants are assumed to be three years older than the participants. If not specified, spouses are assumed to be of the participants' opposite sex. |
| **Benefit Election** | Married participants are assumed to elect the more valuable of the 50% joint-and-survivor annuity with "pop-up" form of payment and the single life annuity with five years certain. Non-married participants are assumed to elect the single life annuity with five years certain. |
| | The benefit elections were based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. |
| **Administrative Expenses:** | $10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets. |
| **Valuation of Assets:** | At market value |
| **Allocation method:** | Presumptive |

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Contribution period for prorating liabilities:** | 5 years |
| *De minimis* **Deductible:** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

SECTION 4: **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |
| **Plan Status:** | Ongoing Plan |

**Regular Pension:**

| | |
|---|---|
| *Age Requirement:* | 65 |
| *Service Requirement:* | None |
| *Amount:* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf from August 1, 2009 through July 31, 2012, plus
- 1.9% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2012

✳ Segal Consulting

**SECTION 4:**  **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

**Early Retirement:**

| | |
|---|---|
| *Age Requirement:* | 57 |
| *Service Requirement:* | Ten years of credited service |
| *Amount:* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| *Or* | |
| *Service Requirement:* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount:* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement:* | None |
| *Service Requirement:* | Five years of credited service |
| *Amount:* | Normal or early pension accrued based on plan in effect when last active |
| *Normal Retirement Age:* | 65 |

**Qualified Pre-Retirement Survivor Benefit:**

| | |
|---|---|
| *Age Requirement:* | None |
| *Service Requirement:* | Five years of credited service |
| *Amount:* | 50% of the benefit participant would have received had he or she retired the day before he or she died and elected the joint and survivor option. If the participant died prior to eligibility for an early retirement pension, the spouse's benefit is deferred to the date participant would have been age 57 or, for participants with less than 10 years of credited service, age 62. |

✳ Segal Consulting

**SECTION 4:**    **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

---

**Forms of Payment:**

*The normal forms of payment are:*

- Qualified Joint and Survivor Annuity, which under the Plan is a 50% joint-and-survivor annuity with a "pop-up" feature, for married participants
- Single Life Annuity with five years certain for single participants

*The generally available optional forms of payment are:*

- 66-2/3% Joint and Survivor Option (no longer available to new retirees as of August 1, 2009)
- 75% Joint and Survivor Option (only available to married participants)
- 100% Joint and Survivor Option (only available to married participants)

**Participation**

Members who are employed by Employers and who are covered by a collective bargaining agreement with the Pension Fund

**Service Credit:**

*Past Service Credit*

One year of past service for each full year of continuous service prior to June 1, 1964

*Future Service Credit*

For the period between June 1, 1964 and July 31, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

✱ Segal Consulting

25
OOE-000429

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

**Contribution Rate:** $6.00 per hour, effective May 1, 2013 ($3.00 per hour supplemental and not subject to benefit accrual)

**Changes in Plan Provisions:**                There were no changes in plan provisions reflected in this actuarial valuation.

5552181v1/05517.001

✴ Segal Consulting

26
OOE-000430



✴ Segal Consulting

# Ohio Operating Engineers Pension Fund

**Withdrawal Liability Valuation**
as of July 31, 2016



This report has been prepared at the request of the Board of Trustees for the purposes of establishing the basis for withdrawal liability assessments during the August 1, 2016 through July 31, 2017 period. This report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety. The measurements shown in this report may not be applicable for other purposes.

Copyright © 2017 by The Segal Group, Inc. All rights reserved.



## Segal Consulting

1300 EAST NINTH STREET, SUITE 1900 CLEVELAND, OH 44114
T 216.687.4400 WWW.SEGALCO.COM

January 31, 2017

Board of Trustees
Ohio Operating Engineers Pension Fund
Columbus, Ohio

Dear Trustees:

This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2016 through July 31, 2017.

The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2016. The benefit provisions included in the calculations are those that were in effect on July 31, 2016.

We look forward to reviewing this report with you at your next meeting and to answering any questions you may have.

Sincerely,

Segal Consulting, a Member of The Segal Group, Inc.

By: _Megan K. Kelly_

Megan K. Kelly, CEBS
Vice President and Benefits Consultant

cc:    Allen S. Kinzer, Esq.
       Ms. Carol Wilson
       Charles M. Ciuni, CPA

OOE-000106

# Table of Contents

**Ohio Operating Engineers Pension Fund Withdrawal Liability Valuation as of July 31, 2016**

## Section 1: Actuarial Valuation Summary
Important Information about Withdrawal Liability Valuations .................................................................................................................. 4
Significant Issues in Valuation Year ................................................................................................................................................... 6
Summary of Key Results ..................................................................................................................................................................... 7

## Section 2: Actuarial Valuation Results
A. Determination of Withdrawal Liability ............................................................................................................................................ 8
B. Unfunded Vested Liability ............................................................................................................................................................ 10
C. Withdrawal Liability Experience .................................................................................................................................................. 13

## Section 3: Supplementary Information
Exhibit A - Method for Allocating Withdrawal Liability ..................................................................................................................... 14
Exhibit B - Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2016 Through July 31, 2017 ................... 18

## Section 4: Actuarial Certification
Exhibit 1 - Calculation of Unfunded Vested Liability ....................................................................................................................... 20
Exhibit 2 - Withdrawal Liability Pools .............................................................................................................................................. 21
Exhibit 3 - Summary of Plan Provisions .......................................................................................................................................... 22
Exhibit 4 - Actuarial Assumptions and Methods ............................................................................................................................. 25

OOE-000107

# Section 1: Actuarial Valuation Summary

## Important Information about Withdrawal Liability Valuations

A withdrawal liability valuation is prepared to assist in the determination and assessment of withdrawal liability. It is a forecast of future uncertain obligations of a pension plan. As such, the forecast will never precisely match the actual stream of benefits and expenses to be paid. In order to prepare withdrawal liability valuations, Segal Consulting ("Segal") relies on a number of input items. These include:

> **Plan Provisions** Plan provisions define the rules that will be used to determine benefit payments, and those rules, or the interpretation of them, may change over time. It is important for the Trustees to keep Segal informed with respect to plan provisions and administrative procedures, and to review the plan summary included in our report to confirm that Segal has correctly interpreted the plan of benefits. For an employer withdrawing in a particular plan year, the relevant plan provisions are those in effect at the end of the prior plan year.

> **Participant Information** The present value of vested benefits, upon which withdrawal liability for an employer is determined, is based on data provided to the actuary by the plan. Segal does not audit such data for completeness or accuracy, other than reviewing it for obvious inconsistencies compared to prior data and other information that appears unreasonable. It is not necessary to have perfect data for a valuation: the valuation is an estimated forecast, not a prediction. Notwithstanding the above, it is important for Segal to receive the best possible data and to be informed about any known incomplete or inaccurate data.

> **Financial Information** The withdrawal liability valuation is based on the asset values as of the valuation date, typically reported by the auditor. The allocation of the unfunded present value of vested benefits to an employer is based on its detailed obligated contribution information as well as that for other participating employers, as provided by the plan.

> **Actuarial Assumptions** In measuring the present value of vested benefits for withdrawal liability purposes, Segal starts by developing a forecast of the vested benefits to be paid to existing plan participants for the rest of their lives and the lives of their beneficiaries. This requires actuarial assumptions as to the probability of death and retirement. The forecasted benefits are then discounted to a present value. The actuarial model used to develop the present value of vested benefits for withdrawal liability purposes may use approximations and estimates that will have an immaterial impact on our results. In addition, the actuarial assumptions may change over time, and while this can have a significant impact on the reported results, it does not mean that the previous assumptions or results were unreasonable or wrong.

OOE-000108

Given the above, the user of Segal's withdrawal liability valuation report (or other actuarial calculations) needs to keep the following in mind:

> The withdrawal liability valuation report is prepared for use by the Trustees. It includes information relative to the provisions of ERISA pertaining to withdrawal liability. Segal is not responsible for the use or misuse of its report, particularly by any other party.

> A withdrawal liability valuation is a measurement as of a specific date — it is not a prediction of a plan's future financial condition. Accordingly, Segal did not perform an analysis of other potential financial measurements.

> Actuarial results in this report are not rounded, but that does not imply precision.

> Segal does not provide investment, legal, accounting, or tax advice. This withdrawal liability valuation report is based on Segal's understanding of applicable guidance in these areas and of the plan's provisions. The Trustees should look to their other advisors for expertise in these areas.

> While Segal maintains extensive quality assurance procedures, a withdrawal liability valuation involves complex computer models and numerous inputs. In the event that an inaccuracy is discovered after presentation of Segal's results, Segal may revise that valuation report or make an appropriate adjustment in the next valuation.

> Segal's withdrawal liability report shall be deemed to be final and accepted by the Trustees upon delivery and review. Trustees should notify Segal immediately of any questions or concerns about the final content.

As Segal Consulting has no discretionary authority with respect to the management or assets of the Plan, it is not a fiduciary in its capacity as actuaries and consultants with respect to the Plan.



OOE-000109

## Significant Issues in Valuation Year

> The unfunded vested liability for withdrawal liability purposes as of July 31, 2016 is $1.02 billion, as compared to $971.3 million as of the prior year. A positive basic pool of $112.3 million was established.

> The increase in the unfunded vested liability since last year was primarily caused by the lower than expected return on the market value of Plan assets and assumption changes.

> Interest rates used to determine the funded portion of the present value of vested benefits changed from 2.32% for 20 years and 2.37% thereafter to 2.50% for 20 years and 2.85% thereafter (PBGC interest rates).

> The healthy and disabled mortality rates were updated to the RP-2014 Blue Collar Mortality Tables (Healthy Annuitant tables for nondisabled pensioners, Employee tables for non-pensioners, and Disabled Retiree tables for disabled participants) with rates increased by 10%, projected on a generational basis using scale MP-2016.

OOE-000110

## Summary of Key Results

| | July 31 | |
| --- | --- | --- |
| | 2015 | 2016 |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries* | 7,068 | 7,063 |
| Number of inactive vested participants | 1,428 | 1,424 |
| Number of active vested participants | 5,310 | 5,281 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 2.32% for 20 years, 2.37% thereafter | 2.50% for 20 years, 2.85% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $2,140,283,436 | $2,208,027,458 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 4,060,944,552 | 4,053,661,277 |
| Present value of vested benefits for withdrawal liability purposes | 3,189,341,325 | 3,204,474,373 |
| **Unfunded Vested Liability:** | | |
| Market value of assets | $2,218,072,665 | $2,188,548,038 |
| Unfunded vested liability for withdrawal liability purposes | 971,268,660 | 1,015,926,335 |
| **Withdrawal Liability Pools Established:** | | |
| Basic pool | $274,973,011 | $112,294,964 |
| Reallocated pool | 0 | 0 |

\* *Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

OOE-000111

# Section 2: Actuarial Valuation Results

## A. Determination of Withdrawal Liability

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. The value of these benefits is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuarial assumptions and methods are reasonable (taking into account the experience of the Plan and reasonable expectations) and, in combination, represent the actuary's best estimate of anticipated experience under the Plan to determine the unfunded vested benefits for withdrawal liability purposes.

The interest rate is based on a blend, which includes rates selected based on estimated annuity purchase rates for benefits being settled, because withdrawal liability is a final settlement of an employer's obligations to the Plan. For benefits that could be settled immediately, because assets on hand are sufficient, the annuity purchase rates are those promulgated by PBGC under ERISA Sec. 4044 for multiemployer plans terminating by mass withdrawal on the measurement date. For benefits that cannot be settled immediately because they are not currently funded, the calculation uses rates equal to the interest rate used for plan funding calculations.



OOE-000112

## Allocation

The Plan's method of allocation is fully described in *Section 3, Exhibit A*. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method adopted by the Trustees.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

The PBGC has affirmed that a multiemployer plan may assess withdrawal liability to employers that withdraw even if the plan currently has no unfunded vested liability.

## De minimis

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

## Payment of Withdrawal Liability

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in *Section 3, Exhibit A*.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.



OOE-000113

## B. Unfunded Vested Liability

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in *Section 4* of this report.

### Changes Since Prior Year

The following assumption changes were made since last year's determination:

> PBGC interest rates changed from 2.32% for 20 years and 2.37% thereafter to 2.50% for 20 years and 2.85% thereafter.

> The healthy and disabled mortality rates were updated to the RP-2014 Blue Collar Mortality Tables (Healthy Annuitant tables for nondisabled pensioners, Employee tables for non-pensioners, and Disabled Retiree tables for disabled participants) with rates increased by 10%, projected on a generational basis using scale MP-2016.

The mortality assumption changes were effective August 1, 2016 for funding purposes and July 31, 2016 for withdrawal liability purposes.

OOE-000114

## Basic Pools

The Plan's unfunded vested liability for withdrawal liability purposes for each of the past 20 plan years is detailed below.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

### BASIC POOLS AS OF JULY 31, 2016

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1997 | $0 | $0 | $0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 91,288,572 |
| 2004 | 220,610,306 | (27,172,960) | (10,869,184) |
| 2005 | 330,847,750 | 121,920,020 | 54,864,009 |
| 2006 | 161,030,169 | (152,039,003) | (76,019,502) |
| 2007 | 184,389,447 | 33,535,905 | 18,444,748 |
| 2008 | 310,769,562 | 138,233,538 | 82,940,123 |
| 2009 | 649,013,065 | 357,008,602 | 232,055,591 |
| 2010 | 654,635,635 | 42,238,100 | 29,566,670 |
| 2011 | 786,046,373 | 170,138,172 | 127,603,629 |
| 2012 | 1,006,694,115 | 267,882,086 | 214,305,669 |
| 2013 | 955,200,521 | 9,134,851 | 7,764,623 |
| 2014 | 750,184,287 | (143,931,041) | (129,537,937) |
| 2015 | 971,268,660 | 274,973,011 | 261,224,360 |
| 2016 | 1,015,926,335 | 112,294,964 | 112,294,964 |
| Total | | | $1,015,926,335 |

OOE-000115

## Reallocated Amounts

Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in *Section 3, Exhibit A.*

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.

We are unaware that any new reallocated liabilities arose since the prior year. The reallocated pools are shown in the chart below.

### REALLOCATED POOLS AS OF JULY 31, 2016*

| Plan Year Ended July 31 | Initial Value | Unamortized Balance |
|---|---|---|
| 2014 | $7,614 | $6,853 |
| **Total** | $7,614 | $6,853 |

* *No reallocated pools were established for years not shown.*

OOE-000116

# C. Withdrawal Liability Experience

We have been notified of two employers withdrawing from the fund during the last Plan year. A settlement payment was received after the end of the current Plan year for a previously withdrawn employer, and the adjustment in the settlement amount will be recognized in a reallocated pool in the next valuation.

For the last Plan year, the Fund received $127,902 from withdrawal liability assessments. These serve to fund the Plan in the same manner as employer contributions. Currently, four withdrawn employers are making withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

OOE-000117

# Section 3: Supplementary Information

## EXHIBIT A - METHOD FOR ALLOCATING WITHDRAWAL LIABILITY

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

> the Plan's unfunded vested liability as of July 31, 1980;

> the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

> reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

### Unamortized Balances

The "unamortized balance" of each of these sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

### Initial Amount

The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

 Segal Consulting   14

OOE-000118

## Annual Changes

The change in the Plan's unfunded vested liability as of the end of any Plan year is generally determined as follows:

> by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

> by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

## Reallocated Amounts

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.



OOE-000119

## Proration to the Employer

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the five years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the plan year in which the change or reallocation arose. The total is also reduced by any employer surcharges paid to a plan that resulted from the plan being in critical status under PPA '06. MPRA provides that contribution increases that go into effect after July 31, 2015 pursuant to a Funding Improvement or a Rehabilitation Plan are also disregarded.

## Payment of Withdrawal Liability

A withdrawn employer's withdrawal liability assessment is payable in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

> The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

> the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

Per MPRA, any contribution surcharges accruing on or after December 31, 2014 or any increases in the contribution rate required under a Funding Improvement or a Rehabilitation Plan that go into effect after July 31, 2015 are excluded from the determination of the highest rate in the 10-year period described above.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.



OOE-000120

## Maintenance of Allocations

Even if no employer withdrawal had occurred, an annual determination of the Plan's unfunded vested liability, and of any reallocable uncollectible withdrawal liability amounts, is required. The Plan must be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond to an inquiry from a participating employer as to the amount of its potential liability.

## Partial Withdrawal

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

## Plan Reentry

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceeds 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.



OOE-000121

# EXHIBIT B - EMPLOYER WITHDRAWAL LIABILITY WORKSHEET FOR WITHDRAWALS FROM AUGUST 1, 2016 THROUGH JULY 31, 2017

**Employer Name:**

| Year Ended July 31[1] | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) + (3)] |
| | Basic Pools[2] | Reallocated Pools[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $91,288,572 | $0 | $178,834,875 | | |
| 2004 | (10,869,184) | 0 | 183,435,933 | | |
| 2005 | 54,864,009 | 0 | 184,525,945 | | |
| 2006 | (76,019,502) | 0 | 187,236,038 | | |
| 2007 | 18,444,748 | 0 | 192,258,544 | | |
| 2008 | 82,940,123 | 0 | 202,969,173 | | |
| 2009 | 232,055,591 | 0 | 210,884,752 | | |
| 2010 | 29,566,670 | 0 | 218,622,244 | | |
| 2011 | 127,603,629 | 0 | 230,778,340 | | |
| 2012 | 214,305,669 | 0 | 250,306,333 | | |
| 2013 | 7,764,623 | 0 | 269,018,918 | | |
| 2014 | (129,537,937) | 6,853 | 298,703,055 | | |
| 2015 | 261,224,360 | 0 | 331,169,312 | | |
| 2016 | 112,294,964 | 0 | 360,524,316 | | |

A. Gross liability: (Sum of Column 6)

B. *De minimis*                                                                                     50,000

C. Deductible: $100,000 + (B) − (A), but not greater than (B) nor less than zero

D. Allocable Unfunded Vested Liability: (A) − (C), not less than zero and without regard to annual payment limitations[6]

---

1  Years not shown have no withdrawal liability component.
2  Original value of changes in unfunded vested liability, written down 5% per year.
3  Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.
4  Total Fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.
5  Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.
6  Prior to reflecting impact of partial withdrawal or sale of assets, if applicable.

# Section 4: Actuarial Certification

January 31, 2017

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that Segal Consulting, a Member of The Segal Group, Inc., has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2016. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 14-05773

OOE-000123

## EXHIBIT 1 - CALCULATION OF UNFUNDED VESTED LIABILITY

The valuation was made with respect to the following data supplied to us by the Plan Administrator:

| | |
|---|---|
| Pensioners as of the valuation date (including 1,888 beneficiaries)* | 7,063 |
| Participants inactive with vested rights | 1,424 |
| Participants active with vested rights | 5,281 |
| Total participants | **13,768** |

The actuarial factors as of the valuation date are as follows:

| | |
|---|---|
| Present value of vested benefits at funding interest rate | $2,208,027,458 |
| Present value of vested benefits at PBGC interest rates, including allowance for expenses | 4,053,661,277 |
| Market value of assets | 2,188,548,038 |
| Ratio funded at PBGC interest rates | 0.539894 |
| Present value of vested benefits for withdrawal liability purposes | 3,204,474,373 |
| Unfunded vested liability | 1,015,926,335 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.

OOE-000124

## EXHIBIT 2 - WITHDRAWAL LIABILITY POOLS

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2016[1] | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1997 | $0 | $0 | $0 | $0 | $0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 91,288,572 | 0 | 91,288,572 |
| 2004 | (27,172,960) | 0 | (10,869,184) | 0 | (10,869,184) |
| 2005 | 121,920,020 | 0 | 54,864,009 | 0 | 54,864,009 |
| 2006 | (152,039,003) | 0 | (76,019,502) | 0 | (76,019,502) |
| 2007 | 33,535,905 | 0 | 18,444,748 | 0 | 18,444,748 |
| 2008 | 138,233,538 | 0 | 82,940,123 | 0 | 82,940,123 |
| 2009 | 357,008,602 | 0 | 232,055,591 | 0 | 232,055,591 |
| 2010 | 42,238,100 | 0 | 29,566,670 | 0 | 29,566,670 |
| 2011 | 170,138,172 | 0 | 127,603,629 | 0 | 127,603,629 |
| 2012 | 267,882,086 | 0 | 214,305,669 | 0 | 214,305,669 |
| 2013 | 9,134,851 | 0 | 7,764,623 | 0 | 7,764,623 |
| 2014 | (143,931,041) | 7,614 | (129,537,937) | 6,853 | (129,531,084) |
| 2015 | 274,973,011 | 0 | 261,224,360 | 0 | 261,224,360 |
| 2016 | 112,294,964 | 0 | 112,294,964 | 0 | 112,294,964 |

---

[1] *Basic and reallocated pools are written down annually at the rate of 5% of the original amount.*

OOE-000125

# EXHIBIT 3 - SUMMARY OF PLAN PROVISIONS

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| Plan Year | August 1 through July 31 |
|---|---|
| Pension Credit Year | June 1 through May 31 |
| Plan Status | Ongoing plan |
| Normal Pension | • *Age Requirement:* 65 |
| | • *Service Requirement:* None |
| | • *Amount:* Sum of the following: |
| |   • $20.00 for each year of past service, plus |
| |   • 3.8% of contributions paid on employee's behalf through April 30, 2006, plus |
| |   • 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus |
| |   • 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf from August 1, 2009 through July 31, 2012, plus |
| |   • 1.9% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2012. |
| Early Retirement | • *Age Requirement:* 57 |
| | • *Service Requirement:* Ten years of credited service |
| | • *Amount:* Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| |   *Or* |
| | • *Service Requirement:* 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| | • *Amount:* Normal pension accrued reduced by 0.625% for each month of age less than 61 |
| Vesting | • *Age Requirement:* None |
| | • *Service Requirement:* Five years of credited service. |
| | • *Amount:* Normal or early pension accrued based on plan in effect when last active |
| | • *Normal Retirement Age:* 65 |

OOE-000126

| | |
|---|---|
| **Qualified Pre-Retirement Survivor Benefit:** | • *Age Requirement:* None |
| | • *Service Requirement:* Five years of credited service |
| | • *Amount:* 50% of the benefit participant would have received had he or she retired the day before he or she died and elected the joint and survivor option. If the participant died prior to eligibility for an early retirement pension, the spouse's benefit is deferred to the date participant would have been age 57 or, for participants with less than 10 years of credited service, age 62. |
| **Forms of Benefits** | • *The normal forms of payment are:* |
| | • Qualified Joint and Survivor Annuity, which under the Plan is a 50% joint-and-survivor annuity with a "pop-up" feature, for married participants |
| | • Single Life Annuity with five years certain for single participants |
| | • *The generally available optional forms of payment are:* |
| | • 66-2/3% Joint and Survivor Option (no longer available to new retirees as of August 1, 2009) |
| | • 75% Joint and Survivor Option (only available to married participants) |
| | • 100% Joint and Survivor Option (only available to married participants) |
| **Participation** | • Members who are employed by Employers and who are covered by a collective bargaining agreement with the Pension Fund |
| **Service Credit** | • *Past Service Credit:* One year of past service for each full year of continuous service prior to June 1, 1964 |
| | • *Future Service Credit:* |
| | For the period between June 1, 1964 and July 31, 1976: |

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

OOE-000127

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

| | |
|---|---|
| **Contribution Rate** | $6.00 per hour, effective May 1, 2013 ($3.00 per hour supplemental and not subject to benefit accrual) |
| **Changes in Plan Provisions** | There were no changes in plan provisions reflected in this actuarial valuation |

OOE-000128

## EXHIBIT 4 - ACTUARIAL ASSUMPTIONS AND METHODS

| | |
|---|---|
| **Investment Return** | To the extent the vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used. |

PBGC Interest Rates as of July 31, 2016:

First 20 years        2.50%

After 20 years        2.85%

To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

The discount rate is based on a blend, which includes rates selected based on estimated annuity purchase rates for benefits being settled, because withdrawal liability is a final settlement of an employer's obligations to the Plan. For benefits that could be settled immediately, because assets on hand are sufficient, the annuity purchase rates are those promulgated by PBGC under ERISA Sec. 4044 for multiemployer plans terminating by mass withdrawal on the measurement date. For benefits that cannot be settled immediately because they are not currently funded, the calculation uses rates equal to the discount rate used for plan funding calculations.

**Mortality Rates**

Healthy Non-Annuitants: RP-2014 Blue Collar Employee Mortality Tables (sex distinct) with rates increased by 10%, projected on a generational basis using scale MP-2016.

Healthy Annuitants: RP-2014 Blue Collar Healthy Annuitant Mortality Tables (sex distinct) with rates increased by 10%, projected on a generational basis using scale MP-2016.

Disabled Participants: RP-2014 Disabled Retiree Tables (sex distinct) with rates increased by 10%, projected on a generational basis using scale MP-2016.

The underlying tables with the generational projection to the ages of participants as of the measurement date reasonably reflect the mortality experience of the Plan as of the measurement date.

The healthy and disabled mortality tables were then adjusted to future years using the generational projection under Scale MP-2016 to anticipate future mortality improvement.

The mortality rates were based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. As part of the analysis, a comparison was made between the actual number of deaths and liability change due to deaths and the projected number and liability change based on the prior years' assumption over the most recent five years, taking into consideration the results of Segal's industry mortality study.

OOE-000129

**Retirement Rates**

| Age | Annual Retirement Rates |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

The retirement rates were based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. As part of the analysis, a comparison was made between the actual number of retirements and liability change due to retirements and the projected number and liability change based on the prior years' assumption over the most recent five years.

**Retirement Age for Inactive Vested Participants**

62, if eligible for early retirement, otherwise Normal Retirement Age

The assumed retirement age for inactive vested participants was based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment.  As part of the analysis, a comparison was made between the actual number of retirements and the projected number based on the prior year's assumption over the most recent five years.

**Unknown Data for Participants**

Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male.

**Percent Married**

85% of male participants and 50% of female participants.

**Age and Sex of Spouse**

Spouses of male participants are assumed to be three years younger than the participants and spouses of female participants are assumed to be three years older than the participants. If not specified, spouses are assumed to be of the participants' opposite sex.

OOE-000130

| **Benefit Election** | Married participants are assumed to elect the more valuable of the 50% joint-and-survivor annuity with "pop-up" form of payment and the single life annuity with five years certain. Non-married participants are assumed to elect the single life annuity with five years certain. |
|---|---|
| | The assumed benefit elections were based on historical and current demographic data, adjusted to reflect the plan design, estimated future experience and professional judgment. As part of the analysis, a comparison was made between the assumed and the actual option election patterns over the most recent five years. |
| **Delayed Retirement Factors** | Active participants assumed to work enough hours each month to not qualify for delayed retirement adjustment. Inactive vested participants who are assumed to commence receipt of benefits after attaining normal retirement age qualify for delayed retirement increases. |
| **Annual Administrative Expenses** | $10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets. |
| **Valuation of Assets** | At market value |
| **Allocation Method** | Presumptive |
| **Contribution Period for Prorating Liabilities** | 5 years |
| *De minimis* **Deductible** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000 |
| **Justification for Change in Actuarial Assumptions** | Based on past experience and future expectations, the following actuarial assumptions were changed as of August 1, 2016 for funding purposes and July 31, 2016 for withdrawal liability purposes:<br><br>Mortality for healthy lives, previously RP-2000 Combined Healthy Blue Collar Mortality Table, projected generationally with Scale AA.<br><br>Mortality for disabled lives, previously RP-2000 Disabled Retiree Mortality Table, with ages set back two years. |

5640814v2/05517.001

OOE-000131

Ciner

EXHIBIT J

Date: 10.8.2018



# AGC OF OHIO
# BUILDING AGREEMENT

Effective
May 8, 2013 through April 30, 2017

Between

THE INTERNATIONAL UNION OF
OPERATING ENGINEERS
LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

AND

LABOR RELATIONS DIVISION
OF THE
AGC OF OHIO

AGC
OF
OHIO

**EMPLOYERS**

**LABOR RELATIONS DIVISION**
**AGC OF OHIO**

**1755 Northwest Boulevard**
**Columbus, Ohio 43212**
**(614) 486-6446**
**FAX: (614) 486-6498**
**www.agcohio.com**

**Richard Hobbs**
**Executive Vice President**

SOFCO002309

## INDEX

| | Paragraph |
|---|---|
| Affirmative Action Program | Exhibit B |
| Apprentice/Helper (Oiler), Boiler Operators, | |
| Signalmen Provisions | 77-80 |
| Apprentices | 106-107 |
| Arbitration | 125-126 |
| Bonding | 47 |
| Construction Advancement Program | 108-113 |
| Credit Union | 115 |
| Crews and General Provisions | 77-100 |
| Date Signed and Signatures | 131 |
| Dewatering | 13 |
| Direct Deposit | 63H |
| Discharges | 19 or 25 |
| Divert Wage Increase | 43 |
| Drug Testing | 30 |
| Duration of Agreement | 105 |
| Effective Date of Agreement | 130-131 |
| Employees' Relief | 91 |
| Enforcement Measures | 117-123 |
| Equipment Rental | 99 |
| Escalator Clause and Complementing | 69 |
| Field Mechanic Trainee Wage | Schedule A |
| Four Ten Work Schedule | 63 A-G |
| Fringe Benefit Programs | 41-47 |
| Grievance Procedure | 125-126 |
| Harassment Policy | 31 |
| Hazardous Waste Projects | 15,29 |
| Heaters-Pumps-Boilers-24 hour, 7 day | 68 |
| Holidays | 67 |
| Hourly First-Day Pay | 84 |
| Hourly Pay | 53 or 56 |
| I-9 | 128 |
| Incentive Pay | |
| Underground, Height and Length Booms | 70-76 |
| Jurisdiction-Work | 10-12 |
| Jurisdictional Area | 1-2 |
| Jurisdictional Disputes | 127 |
| Lay-Off | 25,55,60,89 |
| Liabilities | 5 |
| Management Rights | 7 |
| Master Mechanic, Zones 1, 2 & 3 | 87-88 |
| New Unclassified Equipment | 50 |
| Nondiscrimination | 8-9 |

I

## INDEX (continued)

| | Paragraph |
|---|---|
| Overtime | 62-64 |
| Owner-Operator | 100 |
| PAC / PEP | 114B |
| Pay Checks | 90 |
| Pay Day | 89 |
| Picket Lines | 123 |
| Piggyback Operation | 86 |
| Pre-Job Conference | 15-16 |
| Provisions and Limitations | 6 |
| Recognition | 4 |
| Referral Policy | |
| (Hiring Procedures) | 32-40 |
| Registered Apprentice Wage Schedule | Exhibit A |
| Repairs | 93 |
| Reporting Pay | 59 |
| Safety Program | 26-29 |
| Savings and Separability | 129 |
| Scope of Agreement | 3 |
| Shifts | 81 |
| Site Clearance | 63 |
| Starting Time | 62 |
| Steward | 24-25 |
| Strikes | 124 |
| Sub-Contractors | 117 |
| Supervisory Employees | 97 |
| Termination Slips | 96 |
| Trainee Wage Schedule | Exhibit A |
| Transfer of Union Employees | 119 |
| Transfers on Job Equipment | 21-22 |
| Union Administrative Dues and Deductions | 114-116 |
| Union Shop | 17-18 |
| Wage Rates | Exhibit A |
| Weekly Pay | 52 or 54-55 |
| Work Week | 61 |

| | Page |
|---|---|
| Term of Agreement | 49 |
| Exhibit A, Wage Rates and Fringe Benefits | 51-87 |
| Exhibit B, Affirmative Action Program | 87-90 |
| Acceptance of Agreement | 91-99 |

II

SOFCO002310

## DIRECTORY

OFFICERS

Local 18 and its Branches
Headquarters Office
3515 Prospect Avenue
Cleveland, Ohio 44115
216-432-3138
FAX: 216-432-0370
www.iuoelocal18.org

Patrick L. Sink
Business Manager

Richard E. Dalton
President

Mark A. Totman
Vice President

Gary G. Siesel
Recording-Corresponding Secretary

Premo P. Panzarello
Financial Secretary

Joseph S. Lucas
Treasurer

III

### DISTRICT NO. 1

Covering the following counties in Ohio:

| Ashtabula | Erie | Huron | Lorain |
|---|---|---|---|
| Cuyahoga | Geauga | Lake | Medina |

District Staff
Donald Taggart

David Russell                                    Jack Klopman II
Tom Perevosnik

3515 Prospect Avenue, Cleveland, Ohio 44115
Office: 216-432-3131
Fax: 216-432-3135

### DISTRICT NO. 2

Covering the following counties in Ohio:

| Allen | Hardin | Paulding | Van Wert |
|---|---|---|---|
| Defiance | Henry | Putnam | Williams |
| Fulton | Lucas | Sandusky | Wood |
| Hancock | Ottawa | Seneca | |

District Staff
Gary Siesel

Douglas Leidy                                    Kipton Siesel
Brett LaFaso

2412 South Reynolds Road, Toledo, Ohio 43614
Office: 419-865-0221
Fax: 419-865-0601

IV

## DISTRICT NO. 3

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Athens | Hocking | Meigs | Pike |
| Crawford | Jackson | Morgan | Ross |
| Delaware | Knox | Morrow | Scioto |
| Fairfield | Lawrence | Muskingum | Vinton |
| Franklin | Licking | Perry | Union |
| Gallia | Marion | Pickaway | Wyandot |

District Staff
Timothy Hammock

John Branstool
Chad Creeks

David Hurd
Matthew Woods

Mark Totman, Legislative Representative

1188 Dublin Road, Columbus, Ohio 43215
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 4/5

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Adams | Clermont | Highland | Preble |
| Auglaize | Clinton | Logan | Shelby |
| Brown | Darke | Madison | Warren |
| Butler | Fayette | Mercer | |
| Champaign | Greene | Miami | |
| Clark | Hamilton | Montgomery | |

Covering the following counties in Kentucky:

| | | | |
|---|---|---|---|
| Boone | Campbell | Kenton | Pendleton |

District Staff
Gary Marsh

Kenneth Waughtal
Stanley Brubaker
Joe Daniels

Jefferson Powell
Nathaniel Brice

8401 Claude Thomas Road, Suite 21-A, Franklin, Ohio 45005
Office: 937-806-0406
FAX: 937-806-0408

v

## DISTRICT NO. 6

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashland | Harrison | Nobel | Summit |
| Belmont | Holmes | Portage | Tuscarawas |
| Carroll | Jefferson | Richland | Washington |
| Coshocton | Monroe | Stark | Wayne |
| Guernsey | | | |

District Staff
Joseph Lucas

Darrin Morgan
Joe Casto

Doug Pallaye
Brad Marshall

1707 Triplett Boulevard, Akron, Ohio 44306
Office: 330-784-5461
FAX: 330-784-8827

## LOCAL 18S
## STATIONARY ENGINEERS

Staff
Scott Peters
Doug Pallaye
John Hardesty

3515 Prospect Avenue
Room 206
Cleveland, Ohio 44115
Office: 216-432-2668
FAX: 216-432-0796

VI

SOFCO002312

# AGREEMENT

## Between

### The AGC OF OHIO
### Labor Relations Division

**which may be referred to hereinafter as the "Association"**

and

### THE INTERNATIONAL UNION
### OF OPERATING ENGINEERS
### LOCAL 18 AND ITS BRANCHES, (AFL-CIO)
### referred to hereinafter as the "Union"

This Agreement is negotiated by and between the Association and the Union within the geographical area as defined herein through their authorized agents, to wit:

That, whereas, the parties desire to stabilize employment and promote efficiency in the Construction Industry, agree upon wage rates, hours and conditions of employment, and to eliminate strikes, boycotts, lockouts and stoppages of work, and

Whereas, the Union and the Employer shall, through the issuance of working rules and regulations to the workmen, inform them of the terms of this Agreement and enforce compliance with the terms thereof, and

Whereas, the Employers agree to recognize and subscribe to the approved referral system as adopted by the International Union of Operating Engineers, Local 18.

Now, therefore, the undersigned Association and the Union agree as follows:

VII

1

# ARTICLE I

## GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Geauga, Lake, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

## SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

2

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

# ARTICLE II

## RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**—The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**—This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

3

# ARTICLE I

## GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Geauga, Lake, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

## SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to, the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

2

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

# ARTICLE II

## RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**—The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**—This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

3

**6. Provisions and Limitations**–All members of the AGC of Ohio Labor Relations Division, and such other persons, firms or corporations who, as an Employer, become signatory to this Agreement, shall be bound by all of its terms and conditions, as well as any amendments which may be negotiated between the AGC of Ohio Labor Relations Division, and the Union. It is expressly understood that all Employers bound to the terms and conditions of this Agreement are required to pay the amounts as indicated in Article IV to the appropriate Fringe Benefit Programs.

**7. Management Rights**–The operation of the job and the direction of the working forces, including the right to hire, suspend and discharge for proper cause, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer.

**8. Nondiscrimination**–It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio and the Commonwealth of Kentucky and Lawful Orders thereof relative to nondiscrimination and fair employment practices. The Employer and the Union shall not knowingly discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or Apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

**9.** Further, the Employer and Union agree to adopt and embrace the Pact of 10 July 68 executed under provisions of the Executive Order 11246 and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations revised; an Affirmative Action Program to implement all provisions of applicable federal regulations to assure nondiscrimination in employment, upgrade, demotion or transfer, and recruitment advertising, layoff or termination, rates of pay and selection for all types of training as evidenced in Exhibit "B" attached hereto as if they had originally negotiated the same.

**10. Jurisdiction of Work**–In accordance with the terms of this Agreement, the Employer shall employ Operating Engineers for the erection, operation, assembly and disassembly, and maintenance and repair (fueling and greasing) of the following construction equipment regardless of motive power: Air Compressors, Batch Plants, Boilers, Cableways, Derricks, Finishing Machines, Pumps, Trucks, Crawlers, Locomotive and Tower Cranes; Concrete Mixers and Concrete Mixing Plants, Hoes, Shovels, Pile Drivers, Tractors, Scrapers, Endloaders, Hoists and all like equipment, including the use of Geodimeter or any other device that electronically measures (shoots) distance shall be the work of the Operating Engineers (only applies to in-house crew) within the jurisdiction as assigned to the Union by the American Federation of Labor. It is further understood that all equipment for which classifications and wages have been established in this Agreement, and including that equipment for which classifications and wage rates may hereafter be established, shall be manned, when operated on the job site, by a member of the International Union of Operating Engineers, and paid the rates as specified in this Agreement.

**11.** Operating Engineers shall be employed to do all pipe fitting and all burning and welding necessary for the preparation and maintaining of equipment operated by members of the Union.

**12.** Operating Engineers shall be assigned to all work performed in connection with the installation, fueling, starting and stopping, repair, maintenance and operation of the below listed small equipment: Compressors of 185 CFM or less (not discharging into a common header)

Heaters

Welding machines of 300 amp or less

Gas or diesel driven pumps 4" and under (or one 6" pump)

Generators of 15 KW or less

Conveyors 18" belt or less

A combination up to five (5) pieces of the above equipment shall, when in use, be serviced as an additional duty by an Operating Engineer who is employed by an Employer on a project. When six (6) pieces of the above equipment are in use on an Employer's project, a Utility Operator will be employed at the Class "C" rate. The Utility Operator shall also perform other work on the project.

In the event there are no Operating Engineers employed by the Employer on the project, the Employer shall employ an Operating Engineer at the Class "E" rate to service any small equipment in use, until the Class "C" rate becomes in effect.

An Operating Engineer shall be assigned to all work performed in connection with the installation, maintenance, repair and starting and stopping of electric submersible pumps. Neces-

4

5

sary work on electric submersible pumps shall be assigned to an Operating Engineer working on the project as an additional duty; no full-time Operator is required.

Work in the servicing and maintaining of self-contained, mobile light plants shall be assigned to an Operating Engineer as an additional duty to his/her regular job. Such work shall normally be assigned to a Mechanic, Grease Crew or Apprentice/Helper (Oiler). Equipment operator employees shall be required to carry sufficient tools to make minor adjustments on the equipment they operate.

When an Apprentice/Helper (Oiler) is assigned as the primary operator to a fuel/grease combo vehicle which requires specialized CDL endorsement, he/she will receive a $3.00 per hour premium over the Class "E" rate.

**13. Dewatering Systems**–A "Dewatering System" is defined as a combination of one or more pumps of any type, size or motive power with combined discharge capacity of over 4″, including but not limited to, well-point pumps, submersible well pumps, ejector or educator pumps in combination with wells, well-points, sumps, piping and/or other appurtenances irrespective of motive power to control water on any and all types of construction work. The complete installation, operation and necessary maintenance work, including all piping, shall be performed by Operating Engineers. A Dewatering System shall be operated by Pump Operators at all times the Dewatering System is in operation unless otherwise agreed at the Pre-Job Conference or with the Union.

**14.** The Union will at all times, when requested by the Employer, use its best efforts to furnish the Employer with competent employees to operate, maintain and repair equipment in accordance with the terms and conditions of this Agreement.

**15. Pre-Job**–It is agreed that upon the request of either party a Pre-Job Conference shall be held prior to commencing work. In case of a necessary emergency start of the construction job, the Pre-Job Conference shall be held as soon as possible after the start of work. It is further agreed that upon the awarding of any building contract of $500,000.00 and over, the successful contractor will immediately notify the Union when it has been awarded the contract. It is further agreed the Union may request, receive and hold a Pre-Job Conference with the Employer on an individual basis.

6

Before the start of any project containing known hazardous waste materials, there will be a Pre-Job held. The Employer must notify the Union five (5) days prior to starting work on the project. Failure to do so, the Union has the right to withhold its services until such time a Pre-Job is held.

**16.** Following are the items which will be discussed at the Pre-Job Conference:

A. The Employer will advise the Union Representative of the Employer's requirements of necessary employees in the classification of work under this Agreement, and the Union will determine and advise the Employer of the ability of the Union to fulfill such requirements when requested.

B. Work schedules.

C. Questions of jurisdiction and assignment of work.

D. The Employer agrees that whenever possible at such Pre-Job Conference they will notify the Union of any subcontracts let by the Employer, the names of the subcontractors, and the nature of the work to be performed by the subcontractors. The Union may request a subcontractor to meet with the Union and the subcontractor will meet with the Union prior to commencing work on a project if the subcontractor did not attend the original Pre-Job Conference for the project. It is understood and agreed that no agreement may be made at the Pre-Job Conference which will in effect change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

**17.** Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Local Unions above stated on the effective date of this sub-section shall remain members of the Local Unions in good standing as a condition of employment.

**18.** All present employees who are not members of the Local Unions and all employees who are hired hereafter shall become and remain members in good standing of any one of said Locals as a condition of employment on and after the eighth (8th) day following the effective date of this sub-section or following the beginning of their employment, whichever is later.

**19.** The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory or who fails to observe

7

the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of any employee under the terms of this Agreement. Any grievance arising through application of this clause shall be adjusted in accordance with the procedures outlined in Article XIV, Paragraphs 124, 125 and 126 of this Agreement. Intoxication and/or assault committed on the job site shall be cause for immediate discharge.

20. The Union shall place no limitation upon the amount of work which an employee shall perform during the working day and there shall be no restriction imposed against the use of any type of machinery, tools or labor-saving devices. The Employer agrees that the work jurisdiction of the Operating Engineers, as assigned by the AFL-CIO, will be respected and all Operating Engineer work will be performed by an Operating Engineer, and it is the intent of both parties that Operating Engineers will be assigned work on the basis that will make each job as productive and efficient as possible. It is agreed that a fair day's work shall be given for a fair day's pay.

21. The Employer may shift during a work day an Operating Engineer from one piece of hourly rate of pay equipment to another hourly rate of pay piece of equipment without limitation from same job site providing the shifting does not interfere with another Operating Engineer's work day. This condition also pertains to weekly-pay equipment. However, there shall not be any intermixing with weekly-pay equipment to hourly-pay equipment. The Operating Engineer will be paid the highest rate for the day.

The District agent in each district, in order to maintain our jurisdiction, will make jobs as efficient and productive as possible.

22. If an Employer violates Paragraph 20, the Employer's penalty shall be to pay the first qualified registered applicant the applicable wage and fringe benefits from the first day of violation.

23. The authorized representative of the Union shall have access to the job during working hours for the purpose of visiting individual members, adjusting grievances or disputes and such other duties as he may have to perform. The representative will report to the job supervisor before visiting the project.

8

## STEWARD

24. The Union may, when it believes it necessary, appoint a Steward whenever possible from Operating Engineers working on the Employer's job and the Union District Representative will, when making such an appointment, notify the Employer. The Steward shall perform full-time work for the Employer and he/she shall be subject to the same rules, rights and working conditions as other employees. Under no circumstances shall the Steward have any authority to call a strike, slowdown of work or perform any other action which would be in violation of this Agreement.

25. The Employer agrees that each new employee shall report to the job Steward before starting work if a Steward has been appointed for that particular Employer's job. The Steward shall be allowed sufficient time during working hours to perform all normal duties required of a Steward. No Steward shall have job priority but will be laid off in the same manner as any other Operating Engineer upon completion of his/her particular job assignment; twenty-four (24) hour notice to the Union prior to his/her lay off is required to give the Union time to select another qualified Steward to replace the laid-off Steward, but this twenty-four (24) hour notice is not required when a Steward is discharged for cause by the Employer.

## SAFETY

26. The Union and the Employer will cooperate in the establishment of a safety program. At the Pre-Job Conference by mutual agreement, the wearing of safety hats may be made a condition of employment. All safety equipment required by the project owner or manager will be at no cost to the employee, except work shoes of any type. Both the Employer and employees shall comply with the applicable state safety codes and any other applicable government or civil regulations pertaining to safety. It is expressly understood that if the employees' immediate health and safety are involved, the Union through its representative may order discontinuation of operations until satisfactory results are obtained.

## TRAINING

27. The Safety Training Passport (STP)16-hour program will be made available to all union members by the Union at no cost to the Employer. The program will consist of:

9

Safety Awareness as required by
OSHA 29CFR 1926.21

Fall Protection as required by
OSHA 29CFR 1926.503

Hazard Communication as required by
OSHA 29CFR 1926.59

Operating Engineers dispatched to a project to perform trench excavation work will be required to have successfully completed eight (8) hours of trench safety training. This program became effective May 1, 2007.

It is agreed that both the Employer and the Union will encourage and assist in the promotion of this training.

Effective May 1, 2011 and thereafter, all Operating Engineers dispatched to and/or employed on a project are required to have successfully completed the 16-hour Safety Training Passport (STP) Program or an OSHA-approved 10-hour construction safety training program. Comparable safety training shall be renewed and updated every five (5) years or the Operating Engineer shall be considered unqualified. Verification of valid, updated training must be presented to the Employer upon dispatch, hire or request. Employers who provide such safety training shall not be required to pay employees to attend the training.

**28.** Within forty-eight (48) hours after an industrial accident occurs, the company shall have all necessary State Workers' Compensation forms available and completed on the Employer's part. A copy of the completed forms shall be sent to the Union's office in the district where the accident occurred.

**29.** All toxic/hazardous projects will be subject to any and all safety regulations and insurance provisions that may be required by the appropriate governmental agencies. When dangerous atmospheres are present so that an Operator is required to don a special protective suit and/or self-contained breathing apparatus at a private, state, federal or other designated toxic/hazardous waste site, the Employer will notify the Union district office. Reasonable dress-up time and clean-up time will be allowed. The first qualified bargaining unit employee on the job will be designated the steward-safety person, who shall have access to company monitoring records and be kept informed of amounts of contaminants on the job site. A sheltered "safe zone" area shall be provided. There shall be wash-up facilities on all

10

toxic/hazardous waste sites. When hazmat training credentials are required, the Operator will receive a $.50 per hour premium added to his/her base rate.

On such projects, it is expressly understood that if the employees' immediate health and safety are in danger, the employee may discontinue operations, without penalty, until satisfactory results are obtained, or until such time as a recognized safety agent shall declare the equipment or operation to be safe. All Operating Engineers employees shall be advised by the Employer prior to employment as to the nature of the known hazardous waste and possible resultant physical injuries as may be required by applicable law.

**30. DRUG TESTING:** The Employer and the Union are committed to a policy that promotes safety in the work place, employee health, and well being. In consideration of this policy, the Union and Employer agree that any employee found to be under the influence of, in possession of, or engaged in the distribution of drugs or alcohol on the job site shall be subject to disciplinary action, up to and including immediate discharge.

Within two (2) weeks of reporting to the job site, each new Operator may be scheduled for a drug test. Employees using a prescription drug which may impair mental or motor function shall inform their supervisor in writing of such drug use.

Employee involvement with drugs and alcohol can adversely affect job performance and employee morale. In the Construction Industry the consequences of drug or alcohol use or influence while on the job site can be disastrous. The Employer and Union, therefore, agree to the following policy to insure all employees of a safe and efficient job site free from the effects of drug and alcohol use or influence.

All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of illegal drug or alcohol use impairment while on the job site, may be required as a condition of continued employment to submit to a test for alcohol and/or illegal drug use which impairs the employee's ability to safely perform his/her duties on the job site. Such tests involve a sampling of the employee's blood, urine, or breath unless a specific type of test is required by the project owner, in which case such mandated test shall be ob-

11

SOFCO002319

served. Any employee who is asked to submit to such a test will be required to sign a consent form. If an employee who is asked to submit to a test refuses to do so, or refuses to sign the necessary consent form, that employee will be subject to disciplinary action up to and including discharge. Refusal to take a test or the submission of an adulterated sample shall be determined the same as a positive test result. The employee/member shall follow all requirements outlined in this section.

All testing will be done by a reliable, established laboratory. If this initial test screen result indicates positive findings, further testing of the same sample must be done to confirm the original findings before the laboratory can report a positive finding. The confirmation test will be conducted by an independent accredited National Institute of Drug Abuse or College of American Pathology Laboratory and/or currently qualified under the Substance Abuse & Mental Health Services Administration (SAMSHA) under the U.S. Dept. of Health & Human Services, and will utilize the more scientific Gas Chromatography/Mass Spectrometry examination (GC/MS). The results of all tests will be kept confidential between the employee, the Employer and the Union. The employee shall be paid his/her regular hourly wage and fringes for time required for drug testing provided results are negative.

If the GC/MS test results are positive, the employee may be granted a leave of absence for the purposes of drug and alcohol rehabilitation. If the employee is eligible such rehabilitation programs are covered under the Ohio Operating Engineers Health and Welfare Program providing the employee confines him/her self to a twenty-four (24) hour licensed rehabilitation medical facility.

Until the employee presents certification of successful completion of the rehabilitation program to the Local 18 Medical Review Officer (MRO), the employee shall be removed from the Employer's job site, shall be prohibited from registering under Article III of the referral of this agreement and shall not be dispatched to work. Upon presentation of certification of the employee's successful completion of the drug/alcohol rehabilitation program to the Local 18 MRO, the employee may be restored to his/her original job with the Employer. If the employee is not restored to their original job, the employee will be allowed to register for work in the referral by registering a new work referral card.

12

The employee shall, under either circumstance, for the next succeeding twelve (12) month period, present to the Local 18 MRO monthly certification of negative drug/alcohol test results. Failure to do so will result in denying the employee the right to maintain his/her referral card in the register and utilize the referral or if working, to be removed from work.

Any positive drug and/or alcohol test result after the second rehabilitation procedure shall result in the applicant being permanently barred from registering on the Local 18 referral.

**31. HARASSMENT POLICY:** The parties to this Agreement mutually agree that harassment of any nature is not to be tolerated. Every person working under this Agreement shall immediately notify the Employer when a possibility of a problem happens or exists.

## ARTICLE III

### REFERRAL SYSTEM

**32.** Local 18 and its Branches shall maintain registers of all applicants for referral. Applicants shall not be permitted to be registered in more than one office of the Union at any one time. All applicants will be registered in order of application, provided no person shall be deemed to be an applicant who is otherwise gainfully employed as an Operating Engineer or not immediately available for work. Registrations and re-registrations will be accepted during customary business hours. Applicants shall be classified in priority groups in accordance with the following criteria:

**GROUP A:** All applicants who have worked as Operating Engineers at least 360 days, 90 days or more per year during the last four (4) years, and have been employed for at least 360 days, 90 days or more per year during the last four (4) years on work as defined in Article I of this Agreement within the geographical jurisdiction of Local 18, and who have lived in the State of Ohio, or in any county contiguous thereto, for at least one (1) year prior to application.

**GROUP A PREFERRED:** Must have Group A eligibility. Group A registrants may voluntarily register in the Group A Preferred; however, registrants in this Preferred A status shall have at least fifteen (15) years employment or availability for employment in any one or more of the classifications contained

13

In this Agreement and in the type or kind of craft work covered by this Agreement in the geographic area as defined by this Agreement. Referral in this group is limited to the following described equipment and will be given priority of referral from the Group A Preferred deck. Preferred A status employees will not be eligible for letter of request by the Employer: Welding Machines, Elevator, Conveyor, Pumps, Compressors, Generators, One Drum Hoist, Mono-Rail Hoist and Portable Heaters.

It is further understood and agreed that when the Employer employs Operating Engineers not currently in their employ for any machines listed in this section, the Employer shall call the referral office servicing his/her job or project and request that an employee qualifying under the Preferred A status be dispatched to service and operate said machine. Any Operating Engineer currently employed by an Employer can be used to operate any of the above listed machines. Apprentices shall not operate this equipment more than fifteen (15) days.

Workmen registering in this Preferred A Group shall be ineligible to register in any other group and shall not work in any classification other than those specified in this section and only have recall rights for equipment specified in this section.

**GROUP A RETIREES:** Must have Group A eligibility. The pension was set up to enhance the lives of retirees in their golden years. Retiring from the trades is by voluntary choice.

A retiree is an equipment operator or mechanic who has applied for and is receiving a pension from any construction industry source.

Upon retirement the retiree can only register in this group. The Group A retirees will be referred to jobs only after the Group A classification and the Preferred A classification have been exhausted.

The Group A retirees will not be eligible for letter of request by the Employer.

**GROUP B:** Same as Group A, except that the employment shall have been at least 270 days, three (3) years of 90 days each. All fourth year Apprentices and Trainees shall be registered in this group.

**GROUP C:** All applicants who have worked as Operating Engineers at least ninety (90) days per year during each of the last two (2) years, and who have lived in the State of Ohio or any

14

county contiguous thereto for at least one (1) year prior to application. All third year Apprentices and Trainees shall be registered in this group.

**GROUP D:** All applicants who have worked as Operating Engineers at least ninety (90) days during the twelve (12) months prior to application. All second year Apprentices and Trainees shall be registered in this group.

**GROUP E:** All other applicants and all first year Apprentices and Trainees shall be registered in this group.

**GROUP F:** All applicants who are "temporary employees".

All applicants who have attained eligibility in any of the foregoing groups shall not lose eligibility as a result of their failure to obtain the required days of employment during the applicable periods of time. All graduating Apprentices shall upon journeymen certification become eligible for Group A. When an applicant fails to register in his/her eligibility group due to reasons other than illness, as hereinafter defined, and does not notify the Union Hall, the resultant failure to obtain the required days of employment during the applicable periods of time shall cause the applicant to lose eligibility in that group.

Any registrant requesting that their work registration card be placed on hold due to sickness, ill health or physical condition, must present to the Union a doctor's certificate or statement certifying that the registrant will be under a doctor's care for a minimum of thirty (30) days, and that such illness or physical condition prevents the registered applicant from working as an Operating Engineer. A work registrant's card will only be placed on hold for a minimum period of thirty (30) days, and a maximum period of one hundred twenty (120) days. No registration cards will be placed in the hold position for illness or physical condition for less than a thirty (30) day duration. Any refusals of dispatches due to illness or physical condition for a period of less than thirty (30) days shall be counted as a refusal under the terms and conditions of the referral procedure.

**33.** In referring applicants, the following procedure shall be followed:

A. Applicants in Group A shall first be referred, and then Group A Preferred, then Group A Retirees, then applicants in the succeeding groups, in order, through Group E. In each group, the Union shall refer applicants in order of their places on the referral list.

15

B. Registered Apprentices or Trainees shall be referred in order of their position on the referral list.

C. Employers shall have the right to reject any applicant referred for employment and shall immediately notify the Union in writing of such rejection. In the event a registrant is discharged by the Employer because of lack of sufficient ability, and he/she does not exercise his/her rights under the Referral Board of Review and Arbitration under Paragraph 37, the classification or equipment from which he/she is discharged shall be stricken from his/her referral record and he/she shall not be dispatched to a job in that classification or on that equipment until he/she has:

1. Taken training at his/her training site and has been certified, or

2. Has presented to his/her dispatch office a letter from a previous Employer, in signed agreement with Local 18 working within Local 18's jurisdiction, stating that in the Employer's opinion the discharged registrant has successfully completed a job assignment in that classification or on that piece of equipment in his employment.

D. When an applicant is actually employed, he/she shall notify the Union office at which he/she is registered within twenty-four (24) hours. Failure to do so is an imposition upon those registered and not employed and, therefore, such applicant will be barred from re-registering, unless and until he/she has made application to the Board of Review and Arbitration provided for in Paragraph 37 of this Agreement, and shows good cause for his/her failure to give such notice.

E. When an applicant becomes employed, his/her name shall be removed from the register as soon as he/she shall have worked for a total of thirty-one (31) accumulative working days (one (1) day jobs shall not count). An Operator who relieves another Operator will not be charged for the first fifteen (15) days (only one (1) fifteen (15) day relief per registration application card). All days after that will be counted toward his/her time.

If an applicant is employed for less than thirty-one (31) accumulative working days, he/she shall be restored to his/her previous position on the register when such employment terminates. Any applicant who quits employment or fails to show up for work assignment at starting time after being dispatched (provided he/she was dispatched the previous day), for what-

ever reason, except accident verified by police report, shall be placed at the bottom of the applicable registration group regardless of the number of days worked and shall not be eligible for request until he/she puts in a new registration card. When reason for employment termination is questioned, applicant must present a written termination slip evidencing reasons other than a voluntary quit before he/she is restored to his/her previous position on the register.

An applicant for employment may not refuse referral to employment for any reason except that the applicant may inform the District Office in writing, before any referral, that he/she will not accept employment referrals in certain named counties within the District. If an applicant refuses a job referral for the second consecutive time, he/she shall lose his/her position on the register and go to the bottom of the list for his/her group[1]. If the dispatcher is unable to contact an applicant, the failure to contact shall not be deemed to be a refusal.

F. Applicants must notify the Union office in which they are registered by telephone, or letter, or telegram, or in person of their continued availability for employment within thirty (30) days after the date of last registration or re-registration in order to maintain their places on the register.

In order to equally distribute and defray the cost of services rendered by the use of this referral system, all individuals who make use of this referral system shall be required to pay an initial registration fee of $20.00* and another $20.00* for each re-registration thereafter, provided that such fee shall not exceed $20.00* in any consecutive thirty (30) day period and provided that such fee shall not apply to the following:

1. Members in good standing of Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their regular dues; and

---

[1]Does not apply to the former Ohio or Kentucky Building & Light Commercial Agreements Referral.

*Effective October 1, 2013 $20.00. In the event that the General Executive Board exercises its authority under Article XI, Section 1 of the Constitution to increase the per capita tax payable to the International Union, effective July 1, 2014, July 1, 2015, July 1, 2016 and/or July 1, 2017, the registration fee of Local 18 shall increase in conjunction with such per capita tax increase(s) pursuant to Article XXIV, Subdivision 7, Section (1) of the Constitution of the International Union of Operating Engineers.

16

17

2.  Applicants for membership to Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their fees; and

3.  Members in good standing of the International Union of Operating Engineers who are paying travel dues whose proportionate share of the cost of this referral system is met by the payment of their fees.

G.  The Union shall use its best efforts to notify all registered applicants when work is available for them, but the Union assumes no responsibility or obligation for failure to locate an applicant.

H.  All applicants must submit a written resume of their experience and qualifications at the time of original registrations, and may be tested on the equipment they operate at the nearest available training site prior to being assigned a position on the referral list.

I.  Subject to this referral system Employers may hire through this Referral policy, by name, former employees who have resided for at least twenty-four (24) months in the State of Ohio or in any county contiguous thereto, and have been employed by the Employer making the request during the past twenty-four (24) months within the jurisdiction of this Agreement. The Employer must make the request to the appropriate Union District Office and the employee requested must be registered on the District referral list (Groups A through E).

Employers may hire through this referral policy by name individuals in Group A for a production machine, or for a mechanic, or mechanic/welder, who has been registered on the out-of-work list for at least ten (10) days in the District in which the work is to be performed. Individuals shall have only one (1) request per four (4) month period from the last request. The request by name must be confirmed later in writing on the letterhead of the Employer and signed by either the Employer or the superintendent of the project.

Nothing in the referral procedure shall interfere with the transfer of an Employer's employees on one job from one project to another project within the geographical area covered by Local 18. When transferring employees, the Employer will notify the Union District Office from which the employee is to be transferred.

18

The Union agrees the transfer will be processed in an expedient manner.

J.  The purpose of the referral system is to provide non-discriminatory employment opportunities. Individuals who register therein deserve a preference over those who do not. Therefore, it is agreed that in the event the referral list is exhausted and the Union is temporarily unable to furnish qualified applicants within twenty-four (24) hours after receiving the Employer's request (Saturdays, Sundays and holidays excepted), the Employer may temporarily employ others until the Union notifies the Employer that it has qualified registrants available for employment.

Applicants hired by the Employer under this procedure shall be known as "temporary employees", and will be subject to replacements. The Employer will notify the Union District Representative of the name, union affiliation (if any), date of employment and social security number of such temporary employee. The Union will maintain a register of all such "temporary employees" and such register shall be known as the temporary register. Such "temporary employees" may also be referred by the Union (when the referral list is exhausted) from Group F.

Such "temporary employee" shall be subject to replacement by a qualified registered applicant under the procedure listed herein:

1.  The Union shall give a five (5) working day written notice to the Employer with whom the "temporary employee" is working and such "temporary employee" will thereupon be replaced at the end of the five (5) working day period provided the Union furnishes a qualified registered applicant.

2.  The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the temporary register.

K.  When an Employer states requirements for special skills or abilities in his/her request for employee applicants, the Union shall refer the first applicant on the register possessing such skills or abilities, regardless of the place or classification of such applicant on the register. If a contractor requests or requires that the operator be a Certified Operator, verification of the operator's certification is the responsibility of the Employer. If the Employer notifies the Union in writing, within thirty (30) days of the employee's discharge, of an Operator who had been

19

in his employment and who had not performed satisfactorily, and the Employer does not wish this Operator to be referred to the Employer for future employment, the Union shall honor this written request.

L. Any employee who quits a contractor without proper notice and is subsequently hired by an Employer with whom Local 18 has a contractual relationship without a proper referral by Local 18 shall be discharged by the Employer when it is called to his attention.

34. Employers shall give first opportunity to persons registered for employment, as provided herein, by calling or notifying the Union at any of its offices in the territory where the work is to be performed.

35. Registration of applicants and selections of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership, policies, or requirements. It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio, the Commonwealth of Kentucky, and lawful orders thereof in nondiscrimination and fair employment practices.

The Employer and the Union shall not discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

The Union agrees to furnish an Employer, at his request, any statement or data required under any regulations referred to herein.

36. In addition to the above Registration Groups there shall be established a Short Term Job Group. The sole purpose of this Short Term Job Group is to enable registrants to acquire time to be eligible for unemployment benefits. Registration in this group is limited to applicants eligible for Group A of this referral and all fourth year Apprentices showing proof of need for additional time to qualify for unemployment benefits.

Applicants' referral out of the Short Term Job Group will be limited to jobs of two (2) days or less duration in a calendar week or eight (8) days or less duration in a calendar month on equip-

20

ment listed on their registration cards. Any refusals of jobs will cause the registrant's card to be removed from the Short Term Job Group deck. Dispatches for short term jobs as defined above will first be made from the Short Term Job Group. If the dispatcher is unable to fill the short term job order from the Short Term Job Group he/she will proceed to fill the order from Groups A through F in accordance with the referral rules. Dispatcher should notify Employers when dispatching from the Short Term Job Group. The Employer reserves the right to request dispatch from Group A.

Since this Short Term Job Group is intended to provide limited employment for those needing credit for unemployment compensation, the Union shall, through its business agents, remove from employment any Operating Engineer who has accumulated more than two (2) days per calendar week or over eight (8) days in a calendar month – as a result of the Short Term Job Group.

Registrants in the Short Term Job Group will not be eligible for any recall or request provisions of the referral as herein described. Employment received as a result of the Short Term Job Group referral will not provide eligibility for Employer recall when the registrant is registered in Group A, Preferred A, or Group A Retirees deck. Apprentices or Trainees will not be permitted to register in the Short Term Job Group except as noted above. Registrants may not register in the Short Term Job Group or Group A or Preferred A or Group A Retirees deck at the same time. The Employer shall not be permitted to transfer employees dispatched from the Short Term Job Group from one project to another project.

The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the Short Term Job Group.

All the remaining rules with regard to the operation of the referral shall be applicable to the operation of the Group A, Preferred A and Group A Retirees except as modified above.

37. Any registrant or any Employer who may feel aggrieved by the operation of this referral system shall have the right to and must file his/her grievance, in writing, within ten (10) days after the occurrence of the event concerning which he/she complains with a Board of Review and Arbitration consisting of one (1) representative of the Union, one (1) representative of

21

the Employer, and an impartial third member to be selected by agreement of the Union and the Employer, and the decision of this Board shall be final and binding on all parties.

**38.** This statement as to referrals shall be posted in all places where notices to Employers and applicants for employment are customarily posted, including all offices of the Union; all offices of the Employer.

**39.** A Labor Relations Division Representative of the AGC of Ohio may inspect the referral register at the Union District Office at any time during normal office hours.

**40.** All officers and business representatives of the Union who have had previous work experience in any one or more of the job classifications contained in this Agreement shall be deemed to be employed at the trade and it is the intent of this section to provide that upon return to the employment in the trade, he/she shall do so with the same preference as if he/she had continually worked at the trade and shall be eligible upon registration for Group A.

## ARTICLE IV

### FRINGE BENEFIT PROGRAMS

**41.** The fringe benefit provisions contained herein shall apply to all Employer members of the AGC of Ohio Labor Relations Division, and Employers who become signatory or bound by this Agreement, as well as any other Employer or Employer groups who become a party to an Agreement covering the fringe benefit programs set forth herein.

**42.** All Employers bound hereby agree to be bound by the Agreement and Declarations of Trust, as amended, establishing the Pension Fund, Health and Welfare Plan and Apprenticeship Fund, copies of which all parties agree have been furnished to and read by all Employers bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declarations of Trust and any rules, regulations, or plans adopted by the Trustees pursuant thereto, shall become a part of this Agreement as though fully written herein. All Employers bound hereby irrevocably designate the Employer Trustees of said Funds and Plan and their successors as their representatives for the purpose set forth in said Agreements and Declarations of Trust.

22

**43.** Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

PENSION FUND: Effective May 8, 2013 is $6.00 per hour

HEALTH & WELFARE PLAN: Effective May 8, 2013 is $6.91 per hour; May 1, 2014 is $7.16 per hour; May 1, 2015 is $7.41 per hour

APPRENTICESHIP FUND: Effective May 8, 2013 is $.60 per hour; May 1, 2014 is $.67 per hour; May 1, 2015 is $.75 per hour

SAFETY TRAINING AND EDUCATIONAL TRUST FUND: Effective May 8, 2014 is $.07 per hour; May 1, 2015 is $.09 per hour

The Union shall have the option of diverting all or any part of the increase scheduled for improvement of or payment of costs of any fund benefits provided under this Agreement; provided that the Union gives the Employer written notice of its election to do so by registered letter sent to the office of the AGC of Ohio at least 60 days before the effective date of the scheduled change specifying in said notice the amount of change to be applied for this purpose in the fund benefit for which the money is to be used.

**44.** It is further understood and agreed by and between the parties that duly authorized representatives of any of said Trust Funds or Plan shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all employees upon whom the Employer is obligated to make contributions and with respect to the payment of monies to the AGC of Ohio's Construction Industry Advancement Program under paragraphs 109, et.seq. and with respect to the Administrative Dues deduction under paragraph 114. Notwithstanding the foregoing authority allowing audits with respect to the AGC of Ohio's Construction Industry Advancement Program and the Administrative Dues deduction, the audits shall only be conducted in conjunction with the Fringe Benefit Funds or Plans referred to herein and shall not be conducted independently. The twenty-four (24) hour notice referred to in paragraph 45(A) shall only be given for delinquencies to the employees Fringe Benefit Funds or Plan referred to therein.

23

SOFCO002325

**45.** Reports of employees who have worked the number of hours that they have been paid, and such other data and information as may be required, and all contributions payable to the Funds or Plan shall be transmitted to the offices of the Funds or Plan no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed. In the event said audit is refused, reports not furnished, or said contributions are not paid, as aforesaid, the following remedies, in whole or part, and in addition to all other remedies, either in law, in equity, by contract or authorized by the aforementioned Agreements and Declarations of Trust, shall be available.

**A.** After the Trustees or the Agent of any Funds or Plan have given the delinquent Employer twenty-four (24) hours written notice at the address shown in the records of the Funds, Plan or Union, the Union shall have the right to take such legal and lawful action as it may deem necessary until such delinquent payments are made or said audit is permitted, such action including but not limited to the right to withhold its services from such Employer for as long as the failure to make such contributions or audit continues, Article XIV notwithstanding.

**B.** In the event either the Union or the Trustees of any Funds or Plan may decide to utilize the grievance and arbitration procedure in this paragraph to collect delinquent contributions and liquidated damages to enforce any audit, or to obtain any report, the following procedure shall apply:

Unless the issue is resolved between the Employer and the party giving notice, within five (5) calendar days after deposit of written notice of delinquency and/or demand for audit and/or report in the United States mail, to the Employer at the address shown in the records of the Funds, Plan or Union, such party may refer the matter to an arbitrator to be named by the AGC of Ohio Labor Relations Division and by Local 18 of the International Union of Operating Engineers whose decision in writing shall be final and binding on all parties. In the event such parties are unable to choose an arbitrator within ten (10) days after written request therefore, the Union or the Trustees of any Funds or Plan may request an arbitrator according to the rules and regulations of the American Arbitration Association whose decision in writing shall be final and binding on all parties. The parties to the arbitration shall each bear one-half (1/2) of the total costs.

**46.** In no event shall the foregoing provisions relating to Fringe Benefits be subject to or suitable for grievance and arbitration under Article XIV of this Agreement.

**47.** The Employer must obtain an Insurance Payment Bond (IPB), from a company that is "best" rated A, financial category 7 or better, payable to the Ohio Operating Engineers Fringe Benefit Program as a guarantee that the fringe benefits referred to herein are paid by the insurance carrier in the event that the Employer becomes delinquent in its payments and defaults thereon. In lieu of a surety bond, an Employer may substitute an equivalent cash bond, which will be escrowed to guarantee payment of fringes. If the Employer fails to provide the necessary bond within thirty (30) days of request by the Union, the Union shall withhold services until receipt of such bond, or the Employer makes fringe contributions on a weekly basis.

The Employer shall obtain said Insurance Payment Bond or cash bond in amounts set forth below:

| 1-10 | Operating Engineers | $ 50,000.00 |
|---|---|---|
| 11-20 | Operating Engineers | 75,000.00 |
| 21-50 | Operating Engineers | 100,000.00 |
| Over 50 | Operating Engineers | 125,000.00 |

## ARTICLE V

### WAGE RATES

**48.** The purpose of this Agreement is to establish wage rates and conditions to apply for all work as defined herein and for operation of all equipment which comes within the jurisdiction of the International Union of Operating Engineers, and as negotiated by and between Local 18 and its Branches of the International Union of Operating Engineers and the AGC of Ohio Labor Relations Division.

**49.** Exhibit "A" covering wage rates and classifications attached hereto is made a part of this Agreement.

**50.** It is agreed if equipment within the jurisdiction of the International Union of Operating Engineers is used by an Employer and if there is no appropriate classification listed under the wage schedules therein, then the Union and the Association negotiating committees will negotiate a new classification and rate of pay for such equipment within five (5) days.

24

25

SOFCO002326

**51.** The geographical jurisdiction of this Agreement will be zoned for wages only. Conditions of employment will be the same for all employees covered by this Agreement.

Zone I: Covering Portage and Summit counties only.

Zone IA: Covering Erie, Huron, Lorain and Medina counties.

Zone II: Covering the counties of Lucas and Wood only.

Zone III: Covering the counties of Adams, Allen, Ashland, Athens, Auglaize, Belmont, Brown, Butler, Carroll, Champaign, Clark, Clermont, Clinton, Coshocton, Crawford, Darke, Defiance, Delaware, Fairfield, Fayette, Franklin, Fulton, Gallia, Greene, Guernsey, Hamilton, Hancock, Hardin, Harrison, Henry, Highland, Hocking, Holmes, Jackson, Jefferson, Knox, Lawrence, Licking, Logan, Madison, Marion, Mercer, Meigs, Miami, Montgomery, Monroe, Morgan, Morrow, Muskingum, Noble, Paulding, Perry, Pickaway, Pike, Preble, Putnam, Richland, Ross, Sandusky, Scioto, Seneca, Shelby, Tuscarawas, Union, Van Wert, Vinton, Warren, Washington, Wayne, Williams, and Wyandot. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

## ARTICLE VI

### WEEKLY PAY AND HOURLY PAY CLASSIFICATIONS AND REPORTING PAY PROVISIONS

**52.** In all counties covered by this Agreement, the following classifications shall be employed on a WEEKLY PAY basis:
Asphalt Plants
  Boiler Operators, Apprentice/Helper (Oiler), Registered Apprentices and Signalmen, when members of crew
    Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Cherry Pickers
Cranes (all types)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Floating Equipment
Gradalls
Hoes (except when attached to farm or industrial type tractor or CAT 320 backhoes or equivalent and below)
Hoists, with two or more drums in use

26

Horizontal Directional Drill (over 500,000 ft. lbs. thrust)
Maintenance Engineers (Mechanic and/or Welder)
Master Mechanics
Panelboard Operators (all types on site)
Pile Drivers
Power Shovels
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Tug Boats

**53.** In all counties covered by ZONES I, II and III, the following classifications shall be employed on an HOURLY PAY basis (two (2), four (4), or eight (8) hours):
A-Frames
Air Compressors, pressurizing shaft or tunnels
Allen Screed Paver (concrete)
Apprentice/Helpers (Oilers), Helpers, Boiler Operators, when not members of a crew
Asphalt Pavers
Backfillers
Backfillers with Tampers
Ballast Re-Locator
Bar and Joint Installing Machines
Barrier Moving Machine
Batch Plant Operators
Bobcat Type and/or Skid Steer Loader
Boilers (15 lbs. pressure and over)
Boom Trucks (all types)
Bulldozers
Bull Floats
Burlap and Curing Machines
Cableways
Cletplanes
CMI-type equipment
Combination Concrete Mixers and Towers
Compressors, on building construction
Concrete Grinder/Planer
Concrete Mixers
Concrete Pumps
Concrete Saw, Vermeer type
Concrete Spreaders
Conveyors, used for handling building materials
Crushers

27

SOFCO002327

Deckhands
Directional Drill "Locator"
Drum Firemen in asphalt plants
Elevating Graders or Euclid Loaders
Endloaders
Farm-type Tractors, pulling attachments
Finishing Machines
Fork Lifts (all types)
Forklift (rough terrain with winch/hoist)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (sonic pile driving)
Gunite Machines
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes, when attached to farm or industrial type tractors
Hoists (building construction)
Horizontal Directional Drill (less than 500,000 ft. lbs. thrust)
House Elevators (except those automatic call button controlled)
    Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the
    rate of pay will be "Class E")
Hydraulic Gantry (lift system)
Hydro-seeders
Inboard, Outboard Motor Boat Launches
Kolman-type Loaders (dirt loading)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Lead Greasemen
Light Plant Operators
Locomotives (all types)
Man Lifts
Mixers, one bag capacity with side loaders
Mixers, Paving (multiple drums)
Mobile Concrete Pumps, with booms (including oiler, etc.)
Mucking Machines
Mudjacks
Pavement Breakers (hydraulic or cable)
Pettibone - Rail Equipment
Plant Mixers (on site)
Post Drivers
Post Hole Diggers
Power Driven Heaters (oil fired)

Power Graders
Power Scoops
Power Sweepers
Power Scrubbers
Prentice Loader
Pressure Grouting
Pressure Pumps (over 1/2" discharge)
Pump Operators, installing or operating well-points or other
    types of dewatering systems
Pumps (4" and over discharge)
Pumps (under 4" discharge)
Rail Tamper (with automatic lifting and aligning device)
Switch & Tie Tampers (without lifting and aligning device)
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Utility Operators
VAC/ALLS
Vibratory Compactors, with integral power
Welders (except electric machines)

54. In all the counties covered by ZONES I, IA, II and III, employees covered by this Agreement employed on a WEEKLY PAY basis reporting for work on Saturday, Sunday or holidays shall be paid as follows: Employees who have not started to work will receive two (2) hours at premium pay for reporting to work (only need to stay on job for one (1) hour). Employees who start to work will receive four (4) hours pay at premium rate; more than four (4) hours will receive eight (8) hours pay at the premium rate. For inclement weather only it will be 2-4-6-8 hours of pay at the premium rate of pay.

They must report to work at starting time and remain on the job until release.

55. When a machine having a forty (40) hour guarantee is laid up on a project site and the workmen are laid off and paid off, that machine cannot be started back to productive work on that project site unless it is laid up for one week (seven days) without calling back the workmen who had manned the machine and they shall be paid for the time they have been off, unless mutual agreement is reached between the Employer and the Union District Representative to permit employees to work on the weekly guarantee equipment during the seven (7) day "lay-up" period without penalty.

28

29

SOFCO002328

56. In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis, unless notified by the Employer not to report to work, shall receive two (2) hours pay for reporting to work. If such operator does not start to work, he/she shall receive his/her two (2) hours reporting time. An employee may be required to stay at the work project for one (1) hour to be eligible for two (2) hours reporting pay unless the Employer releases the employee prior to the end of the first hour. If the employee starts to work, he/she shall receive four (4) hours pay. If the employee works over four (4) hours, he she shall receive eight (8) hours' pay; for inclement weather only it will be 2-4-6-8 hours.

In all counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis reporting to work on Saturday, Sunday or holidays, all conditions in this paragraph will apply, and both reporting time and time worked will be paid for at the rate provided in accordance with Article VII. They must report to work at starting time to be entitled to reporting pay. Where less than four (4) hours or less than eight (8) hours are worked, the employees must remain on the work for the full four (4) hours or the full eight (8) hours, as the case may be, to be entitled to pay for the four (4) or eight (8) hours, as stipulated in this Agreement. Employee call off notification must be made not less than 60 minutes prior to the established starting time or show pay applies.

A. When an employee working on equipment with a weekly-pay guarantee and work with his/her equipment is completed on a project, the employee is guaranteed only Monday through Wednesday pay if the equipment finishes the work on the project the first three days of the week. The Employer will notify the Union District Representative prior to application of this provision.

57. Crews will be eligible for straight time weekly pay when their equipment is transferred out of their District up to the day the equipment is shutdown; otherwise, Paragraph 56, Section A prevails.

58. On jobs where there is only one (1) day's work for a piece of equipment, employee or crew may be employed on a day-pay basis. Upon the Contractor's request to the Union Business Representative for a second day for special occasions, the Union gives the Representative authority to authorize a second day for the period of this contract.

30

59. All reporting time paid to an employee shall count as working hours with respect to any work guarantees or overtime pay provisions.

60. Employees who are working for an Employer in other than their local residence area thereby necessitating them to pay room and board shall, upon request, be granted their release if the Employer is unable to supply enough work to justify their staying. Employees released under this provision will be considered as laid-off because of lack of work.

## ARTICLE VII

### PROVISIONS FOR PREMIUM RATE OF PAY

61. The week shall begin on Monday A.M. and shall end on Sunday P.M.

62. The regular starting time must be established for not less than one (1) week. Any time worked prior to the established starting time will be paid for at the applicable premium rate unless otherwise arranged through Union notification.

63. The normal work day shall consist of eight (8) hours and the normal work week of forty (40) hours. One and one-half (1-1/2) times the regular rate shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, and including Saturday. When an Employer performs clearance and excavation for site preparation for industrial or building sites, the Employer will pay the wage rates listed herein, all overtime will be performed at one and one-half (1-1/2) times the regular rate. Subject to Paragraph 121, all other conditions and provisions shall be as provided herein.

A. An Employer may, however, have the option of working a four-ten hour schedule at straight time rates. No Operating Engineer with a weekly guarantee will lose a paid holiday he/she would otherwise receive by working a four-ten week. Instead, such employees will receive, in addition to wages and fringes for hours worked in a four-ten week, an additional eight (8) hours and fringes at straight time rates for the holiday. If the Employer elects, upon notification to work a four-ten hour schedule, he shall pay overtime in such cases on all hours over ten (10) hours per day or over forty (40) per week, whichever is greater. A four-ten work schedule must be by the week.

31

SOFCO002329

In addition to the above: It is agreed that when time is lost by the crew during the regular work week, Monday through Thursday, due to inclement weather, holiday, equipment breakdown or directions of the project owner, this time may be made up by the entire crew on Friday at the regular rate of wages. All Friday work must be scheduled on a minimum of eight (8) hours basis. All hours worked in excess of the forty (40) hours in the work week or ten (10) hours each day, shall be paid at the appropriate overtime rate of pay.

B. Any employee hired on any day of the week, Monday through Thursday, and who does not lose any time from the day of his/her initial hire until Thursday shall receive the overtime rate of wages for Friday, providing the crew is eligible for the premium rate for Friday.

C. Should any other trade on the project in the contractor's employ, working in conjunction with the Operating Engineers, receive premium pay on a Friday, the Operating Engineers would also receive premium pay for the Friday.

D. If the other basic crafts employed by your contractor on the project receive the overtime rate for the ninth (9th) and tenth (10th) hours, the Operating Engineers will also receive the overtime rate.

E. When an Employer works three (3) days or less in a week, premium time will be paid after eight (8) hours for each of the days, except for holidays, inclement weather or completion of the job.

F. Pay day will be on Thursday.

G. Weekly pay employees, in order to be eligible for eight hours' pay that day, must be available to perform work for the Employer.

H. Direct deposit will be at the discretion of the employer. There will be no cost or fees to the employee.

64. Double time will continue to be paid to any Operator who is complementing another trade that is receiving double time. All work performed by an employee on Sunday or holidays shall be paid at two times the regular rate established in this Agreement or any escalated rate that may be in effect.

65. No Weekly Pay employee covered by this Agreement shall lose time because of the observed holidays. If not requested to work, he/she shall be paid eight (8) hours straight

32

time pay at the rate established in this Agreement or eight (8) hours at any escalated rate that may be in effect. Holidays shall be of twenty-four (24) hours duration. When required to work on holidays, the employee shall be paid two times the regular rate established in this Agreement or any escalated rate in effect.

66. There shall be no work required on Labor Day except in special cases of emergency.

67. The observed holidays are Christmas, New Year's Day, Labor Day, Memorial Day (last Monday in month of May), Independence Day and Thanksgiving Day. When any of the aforementioned holidays fall on Sunday, they will be observed on Monday. All weekly pay Employees covered by this Agreement to be eligible for holiday pay must be available for work the first regularly scheduled work day prior to the holiday and be available for work the first regularly scheduled work day after the holiday.

68. Where steam boilers, power driven heaters or pumps are used on a continuous seven (7) day twenty-four (24) hours per day operation, overtime may be avoided by using four (4) shifts of Operating Engineers, each shift to work six (6) hours on a seven (7) day basis. Each Operating Engineer so employed shall be paid forty (40) hours at the applicable straight time rate and two (2) hours at double the applicable straight time rate. The aforementioned condition, where overtime may be avoided, can only be used upon the Employer's guarantee of a minimum thirty (30) days of operation. In the event the Employer cannot furnish thirty (30) days of employment after starting work under Paragraph 68, it is agreed that upon lay-off of employees the Employer will pay retroactive overtime to such laid-off employees from the start of this particular operation in accordance with Article VII, Paragraphs 63 and 64 of this Agreement.

69. Job Master Mechanics and Operators of derricks, cranes, derrick cars on steel erection and on building construction and all winch trucks used in hoisting construction material and any type of hoist, shall command and receive the highest rate of pay and the same applicable premium pay and conditions of overtime where the rates or conditions for the Ironworkers, Boiler Makers, Pile Drivers and Pipefitters are higher than the rates specified in this Agreement for the foregoing classifications. To be eligible for the benefits of complementing the above mentioned trades, an Operator must be required to perform a specific operation which is directly related to the work which the other trades are performing.

33

70. Operating Engineers employed on any equipment within the jurisdiction of the International Union of Operating Engineers working in shafts, tunnels or storage caverns where natural earth or rock is undisturbed overhead, shall be paid fifty cents ($.50) per hour above the rates in this Agreement or in addition to any escalated rate that may be in effect. This does not apply to open cut work.

71. Booms, including jib 150 feet through 180 feet in length, fifty cents($.50) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

72. Booms, including jib over 180 feet through 249 feet in length, one dollar($1.00) per hour in addition to the established crane rate or any escalated rate that may be in effect.

73. Booms, including jib of 250 feet and over in length, one dollar twenty-five cents ($1.25) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

74. Conventional cranes whether crawler or truck when used as a tower crane, the effective length of the mast and the boom combined, will be used to determine when these extra rates will be applied.

75. Tower Cranes, the height of the boom point from the first floor level of the project, will be used to determine when these extra rates will apply.

76. On jobs where crane-type or derrick-type machines are operated on floors above the first floor level of the building, twenty-five cents ($.25) per hour shall be paid in addition to the established crane rate or any escalated rate that may be in effect.

## ARTICLE VIII

### CREWS AND GENERAL PROVISIONS

77. In all the counties within the jurisdiction of this Agreement, crews shall be employed on all truck cranes, power shovels, cranes, rotary drills on caisson work, cableways, draglines, tower derricks, tower cranes, multiple drum pavers, pile driving machines and hoes, standard gauge locomotives, bucket trench machines (over 24" wide) and horizontal directional drills (over 500,000 ft.lbs.thrust). Crews shall consist of an Operating Engineer and an Apprentice/Helper (Oiler) or Signalman on machines, regardless of motive of power, or an Operating Engineer and Fireman on steam machines.

34

78A. Apprentice/Helpers (Oilers) are required on hoes, excavators, and front hydraulic shovels having a base operating weight in excess of 105,000 pounds, single cab hydraulic cranes on rubber with a total weight of 125,000 pounds and Apprentice/Helpers (Oilers) are required on cable crawler cranes over 80 ton structural capacity, defined as: the factory specified total maximum counter weight with a PCSA rating not to exceed 36,400 pounds, based on 50' of boom at 40' radius, with the single line pull not exceeding 17,000 pounds. Anything outside any of the aforementioned limits determines the crane as requiring an Apprentice/Helper (Oiler). All factory certifications and the computer system will be available for inspection at any time by the Union or their designee. On remote control gradalls, Apprentice/Helpers (Oilers) shall be at the discretion of the Employer. Truck cranes, lattice boom, thirty (30) ton capacity and under; hydraulic truck cranes and all terrain cranes fifty (50) ton capacity or less, an Apprentice/Helper (Oiler) is not required. However, if someone other than an Operating Engineer is assigned to this work, this paragraph will be revoked on the project, and an Apprentice/Helper (Oiler) will be required for the remainder of the project. An Apprentice/Helper (Oiler) is required on self-erecting cranes (as defined by the manufacturer) while being erected and dismantled.

78B. Apprentice/Helper (Oiler) on jobs of thirty (30) days or more will be given a minimum of 30 minutes per day operating the machine they are assigned to (or a similar machine on the same project). If the Apprentice/Helper (Oiler) cannot be trained to operate the machine to the satisfaction of the Employer then he/she shall be replaced.

79A. Work of the Boiler Operator, Apprentice/Helper (Oiler), Registered Apprentice, and Signalman shall include getting up steam and greasing up, filling gas tanks and making the machine and equipment ready for operating at the starting time. If, at the discretion of the Employer, an Apprentice/Helper (Oiler), Registered Apprentice, or Signalman is required to make gas or diesel machines ready to operate before the regular starting time, such Apprentice/Helper (Oiler), Registered Apprentice, or Signalman shall be paid one-half (1/2) hour's pay at one and one-half (1-1/2) times the regular rate. If, at the discretion of the Employer, a Boiler Operator or Registered Apprentice is required to get up steam and grease steam machines and make them ready to operate before regular starting time, then

35

such Boiler Operator or Registered Apprentice shall be paid one (1) hour's pay at one and one-half (1-1/2) times the regular rate.

79B. Apprentice/Helpers (Oilers), while assigned to track hoes, cranes and other equipment, will perform the following work on the project as additional duty:

- Cover small equipment (i.e. pumps, generators, compressors, etc.)
- Act as signal person
- Safety/fire watch
- Practice operating in a learning environment in the vicinity
- Help with survey duties on project
- Help mechanic, lube trucks, fuel
- Practice operating rough terrain forklift, front loader, rubber tire hoe, loader in vicinity of primary duty
- Replace other operators who may be absent on project
- Run parts or materials as necessary
- Safety enforcement
- Productive activity on job site to facilitate job completion when it does not interfere with progress of primary machine, providing this does not interfere with another Operating Engineer's workday

80. Apprentice/Helper (Oiler), Registered Apprentices, Signalmen, Grease Truck Operators, when requested to work the regular one-half (1/2) hour lunch period, will eat their lunch prior to or after the regular one-half (1/2) hour lunch period in order to be able to oil, grease and repair machines during the regular one-half (1/2) hour lunch period at no extra pay.

81. More than one (1) shift may be worked in any twenty-four (24) hour period and the starting time of the shifts shall be left to the discretion of the Employer. This starting time must be maintained five (5) days, Monday through Friday. However, more than six (6) hours shall not be worked without allowing thirty (30) minutes for a lunch period. Where two (2) shifts are employed, eight (8) hours shall constitute a day's work for the first shift and eight (8) hours shall constitute a day's work for the second shift. When three (3) shifts are employed, eight (8) hours shall constitute a day's work for the first shift, seven and one-half (7-1/2)

hours work with eight (8) hours pay shall constitute the second shift, and seven (7) hours work with eight (8) hours pay shall constitute the third shift. For the purpose of overtime pay for multiple shift operations, a work day shall be determined by the starting time of the shift. In addition, the second shift will receive twenty-five cents ($.25) per hour, third shift fifty cents ($.50) per hour premium above the established rate of pay.

When warranted by a particular job's conditions, shift work may be instituted for less than five (5) consecutive days.

82. Where project owners establish specifications, requirements, or for safety reasons that limit the days or hours in which work may be performed, the Employer, after advance notice to the Union, may start the work week after 6:00 p.m. on Sunday at straight time rates. In applying this schedule, Sunday p.m. will be considered Monday, the following Friday will be considered Saturday (paid at time and one-half) and Saturday will be considered Sunday (paid at double time). All premium pay provisions will apply for the sixth and seventh days as to Saturday and Sunday, respectively.

83. When it is necessary for equipment to be operated, the Operating Engineer who regularly operates the particular piece of equipment shall be given first chance to perform the work. If an Apprentice/Helper (Oiler) is required, the Apprentice/Helper (Oiler) who is regularly assigned to the particular piece of equipment shall be given first choice to perform the Apprentice/Helper's (Oiler's) duties. In an emergency, any employee may be assigned to any equipment. It is understood that the Master Mechanic or Steward will be notified, when possible, of such emergency requirements.

84. Employees who are requested, referred and employed by Employers on the same day under hourly classifications in this Agreement shall be paid a minimum of eight (8) hours pay on the day they report to the job. Any overtime worked after the normal quitting time shall be paid at the proper overtime rate in addition to the eight (8) hours minimum first day pay guarantee. The furnishing of a truck by a Mechanic shall not be a condition of employment. If an Employer is requesting a Mechanic from the Union, the Employer may require the new Mechanic to furnish a truck. If a Mechanic is required to furnish a truck, compensation will be negotiated between the Mechanic and the Employer.

36

37

**85.** Equipment Operator employees shall be required to carry sufficient tools to make minor repairs and adjustments in order to meet manufacturers daily maintenance requirements on the equipment they operate. This excludes diagnostic and electronic equipment.

**86.** If compressors, generators, boilers, hydraulic pumps or power pacs or any other type of power equipment is mounted piggyback on crane-type equipment requiring a crew, two (2) Operating Engineers will be employed at the Class "A" rate or any escalated rate in effect and under the weekly guarantee. If the crane does not ordinarily require a crew, see Paragraph 78A, the employment of a second operator shall be at the discretion of the Employer. The jurisdiction of the Operating Engineers must be preserved, however, and if someone other than an Operating Engineer is used to operate the piggyback equipment, the contractor must immediately employ a second Operating Engineer at the Class "A" rate.

Where compressors up to 600 CFM or hydraulic pump, power pacs, etc. are operated and exclusively used to power attachments, such as hoe ram and other similar pieces of equipment, the equipment will be considered and manned as a piggyback operation. If a second person (Operating Engineer) is required, even though the equipment is located adjacent to the machine or crane and not mounted directly on the machine, the second person (Operating Engineer) operating the equipment is paid the Class A rate of pay for the day.

Where a second person is an apprentice, refer to the Registered Apprenticeship Wage Schedule on page 86.

If the crane does not require a crew, the auxiliary piece of equipment will be manned by an Operating Engineer and paid the appropriate rate of pay.

**87.** ZONES I, IA, II, and III - As listed in Exhibit A.

When a contractor has eight (8) or more major Operating Engineers (major Operating Engineers A, B and C classifications) employed in the District, he/she shall employ a Master Mechanic. In addition to the Master Mechanic required above, if a contractor has eight (8) or more Operating Engineers (major Operating Engineers A, B and C classifications) employed by him/her on any one job, he/she shall employ a Master Mechanic on that job. The Master Mechanic so employed shall be answerable to the Employer and must be a member of the International Union of Operating Engineers, Local 18. The Master Mechanic duties will be assigned by the Employer. Job Master Mechanics so employed shall be paid at the rate specified herein or paid fifty cents ($.50) per hour above the highest rate of any Operating Engineer working under his/her direction, whichever of these rates is higher.

On jobs where maintenance operators are to be employed, the first one (1) employed shall be Class A; the second one, if required, may be a Mechanic Trainee. Any further hire of maintenance operators shall be one Class "A," then a Mechanic Trainee may be hired. This ratio of one Class "A" to Mechanic Trainee shall be continued in the hire of all maintenance operators as required by the project requirements. Mechanics in training, working under these provisions, will be compensated according to the schedule provided under the "Field Mechanics Trainee Schedule."

**88.** Operators of equipment serviced by a Master Mechanic on a job site shall not be counted in the number of Operators within the District to determine when a Master Mechanic will be required for the District.

**89.** Employees shall be paid once each week, with not more than five (5) days withheld on the designated payday on the job prior to their normal quitting time. Failure to comply with this provision will require the Employer to pay these employees involved the double time rate if required to wait on the job. If required to return the next day to receive their pay, they shall be paid a minimum of four (4) hours at the hourly rate applicable for that day. These same conditions will apply to employees who are terminated after completion of their job assignment. In the event of the discharge of an employee, he/she shall be paid immediately or his/her time will continue until he/she is paid off properly. If not paid off by normal quitting time, the aforementioned requirements will be applied if he/she is required to return the next day for his/her pay. Any employee discharged for just cause will receive their paycheck by the end of the next pay period.

**90.** Paychecks will show the following information:
    (1) Total hours worked
    (2) Overtime hours (premium hours)
    (3) Gross pay
    (4) All deductions listed
    (5) All fringe contributions (to be shown as a total contribution)

SOFCO002333

**91.** Employees requiring relief, for sickness or other causes, must notify his/her immediate supervisor before leaving the job. Such relief shall be arranged through the Union District Office.

**92.** Employer agrees to carry Workers' Compensation or other equivalent liability insurance for the protection of all employees covered by this Agreement.

**93.** At the direction of the Employer's representative on the job, Operating Engineers shall be allowed proper time for necessary repairs and upkeep. During periods of major repairs there must be suitable shelter around equipment and heated from November through March.

**94.** On projects where at least eight (8) Operators are employed, the Employer, during the months of November 1 through April 30, will furnish a heated shelter where employees may change clothes.

**95.** Sanitary drinking water and toilet facilities will be available on the project in compliance with the provisions of the applicable state code.

**96.** The Employer agrees, upon the termination of any employee covered by this Agreement, to furnish such employee so released with a termination slip at the time of release, showing reason for said release. (Union will provide uniform numbered slips in duplicate; original for employee, duplicate for the Employer's file).

**97.** No supervisory employee shall perform productive work or operate equipment which would deny an Operating Engineer employee employment.

**98.** In the reduction of forces on any project, it is agreed that non-area residents will be the first to be laid off except for a limited number of key men as mutually agreed by the Union and the Employer at the Pre-Job Conference. Non-area residents are herein defined as those who have not resided in the State of Ohio or in counties contiguous thereto, nor in Boone, Campbell, Kenton and Pendleton counties in Kentucky, or in counties contiguous thereto, for a period of one (1) year.

**99.** When an Employer rents or leases equipment manned from an Employer in signed relations with this Union, the Engineer or Crew may be transferred to the payroll of the lessee, providing the referral office servicing the job or project shall be notified prior to such transfer and provided further that such employee's

40

employment by the lessee shall terminate upon the termination of the lease or rental of the equipment or any replacement thereof whichever is later.

**100.** When an Employer hires an Owner Operator with one (1) machine and the Owner Operator himself operates such single machine, the Owner Operator will be placed on the Employer's payroll. In the event that the above mentioned machine requires two (2) employees, such employees shall be placed on the Employer's payroll. However, when the Owner Operator has two (2) or more machines operating on the same job, he/she shall then be considered a sub-contractor and therefore come under the sub-contractors clause.

## ARTICLE IX

### TERM OF AGREEMENT

**101.** The Union will notify the Association which is signatory to this Agreement of the name and address of any contractor who becomes signatory to or bound by this Agreement during the term of this Agreement. The notice shall be given in writing within seven (7) days of the time any such contractor becomes signatory or bound hereto. The notice shall include a copy of the signature page of the contract or the assent card and, if not noted thereon, a statement of the date the contract or assent card was signed or the date the contractor became bound.

**102.** Within seven (7) days of the receipt of a notice from the Union of its intent to terminate or modify this Agreement, the Association will notify all such contractors of whom the Association has been notified by the Union. Each such contractor shall have thirty (30) days from the date the Association received the notice of intent to terminate or modify to advise the Union in writing of its intent to negotiate separately for a renewal agreement.

**103.** In the event any such contractor fails to advise the Union of its intent to negotiate separately within the time period set forth above, such contractor shall be deemed and presumed to agree to the terms and Agreement arrived at in negotiations between the Union and the Association and to be bound by the collective bargaining agreement resulting therefrom.

**104.** The provisions of this section shall operate for successive collective bargaining agreements until such time as the

41

Contractor or Union gives timely notice that said party desires to negotiate separately. Said notice shall be given within the time periods provided in the termination clause of this Agreement or any successive collective bargaining agreement.

**105.** The provisions of this Agreement shall continue in full force and effect through April 30, 2017 and thereafter from year-to-year, including new terms, conditions and compensation, until termination at the option of either party, in writing, 60 days prior to expiration of Agreement.

## ARTICLE X

### APPRENTICES

**106.** In order to maintain sufficient skilled mechanics for the industry and, in order to present proper learning opportunities for youth and, in order to effectuate the principles and desires of the negotiating parties created by the foregoing, the negotiators hereby fully subscribe to the Ohio Operating Engineers Apprenticeship Fund Agreement and Declaration of Trust dated 20 October 65 as if they had originally negotiated the same. The only limitation upon the program is the Affirmative Action Program here attached (Exhibit "B"), in addition to the proper rules, regulations, processes, and procedures enunciated by the Joint Apprenticeship and Training Committee established by the Trust of 20 October 65.

**107.** It is understood by the negotiating parties that a Registered Apprentice Engineer works under the direction of the Operating Engineer and the Joint Apprenticeship and Training Committee, and that the Operating Engineer shall see that he/she stays on the job, properly caring for his/her machine. The Employer shall give sufficient opportunity for the Registered Apprentice to operate under the supervision of the Operating Engineer when time and opportunity avails itself. The Area Coordinator of Apprentices shall be appraised periodically and by his request of performance to further the Registered Apprentices' learning situation. Registered Apprentices shall receive the scale enunciated by the Joint Apprenticeship and Training Committee in the time justified category that the Registered Apprentice has accomplished. For every three (3) Operating Engineer Journeymen employed by the company, there may be employed one (1) Registered Apprentice or Trainee Engineer through the referral when they are available. An ap-

42

prentice, while employed as part of a crew per Article VIII paragraph 77, will not be subject to the apprenticeship ratios in this collective bargaining agreement.

## ARTICLE XI

### CONSTRUCTION INDUSTRY ADVANCEMENT PROGRAM

**108.** The Employer and the Union agree to and approve the establishment of a Construction Industry Advancement Program to promote the common good of the Construction Industry by providing financial support for activities which may include but not necessarily be restricted to: (a) promotion of safety; (b) market development; (c) protection of legitimate markets; (d) public relations; (e) personnel practices and labor relations; (f) education; (g) industry relations; (h) apprenticeship training; (i) participation in Funds and Plans provided for in collective bargaining agreement, such as Health and Welfare Plans; and (j) collection and distribution of information from and to all segments of the Construction Industry and related groups or authorities.

**109.** Each Employer bound by this Agreement shall pay twenty cents ($.20) per hour worked effective May 1, 2010 to the AGC of Ohio Construction Industry Advancement Fund. Such funds shall be transmitted along with the Health and Welfare payments to the Ohio Operating Engineers Health and Welfare Office located at 1180 Dublin Road, Columbus, Ohio 43215, no later than the fifteenth (15th) day of the month immediately following the calendar month.

A. Administrative Fee. In addition to the CIAP payment each Contractor bound by the Agreement who is not an AGC of Ohio member shall pay an administrative fee of fifteen cents ($0.15) per hour for each hour worked by employees of the Contractor who are working within the bargaining unit herein. Such payments shall be transmitted with the fringe payments provided herein or transmitted directly to the AGC of Ohio no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed.

B. The Union shall have no participation or control of any kind or degree whatsoever nor shall the Union be connected in any way whatsoever with the Construction Industry Advancement Fund.

43

SOFCO002335

C. The Employer will hold the Union harmless from any liabilities arising out of the terms of Paragraph 108 through and inclusive of Paragraph 109D.

**110.** AGC of Ohio shall be the exclusive Administrator of the State Fund. Payments to the program shall be in accordance with instructions on forms furnished by the Association.

**111.** The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the fifteenth (15th) day of each month covering amounts due for the preceding month. If an Employer shall fail to make their payment when the same shall be due and payable, he shall be subject to an additional charge of one and one half percent (1-1/2%) per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses and impairment of reserves. In addition to the additional charges referred to herein, an Employer who fails to make timely payments shall be liable for legal fees and court costs incurred by the Association in collecting late payments.

**112.** Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and Fund of the Construction Industry Advancement Program shall not be distributed among any Employers, or the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

**113.** There is specifically excluded from the purposes of the Construction Industry Advancement Program the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during periods of work stoppages or strikes.

## ARTICLE XII

### UNION ADMINISTRATIVE DUES AND DEDUCTIONS

**114A.** Upon notification by the Union that a uniform administrative dues deduction has been authorized by all employees of the Employer, the Employer shall deduct said uniform administrative dues. The Union shall be responsible for obtaining all individually signed authorizations.

44

**114B.** The employer will deduct ten cents ($0.10) for each hour that the employee receives wages under the terms of the Agreement on the basis of individually signed voluntary authorized deduction forms. It is agreed that these authorized deductions are for remittance to Local 18's Political Education Patterns known as P.E.P., and are not a condition of membership in the International Union of Operating Engineers, Local 18 or of employment with the Employer, and that P.E.P. will use such monies in making political contributions in connection with federal, state and local elections. Payments for P.E.P. reflecting employee hours worked shall be made on the monthly fringe benefit reporting forms and shall be remitted at the same time and in the same manner as the Employer submits the fringe benefit payments under Article V of this Agreement.

The costs of administering this payroll deduction for P.E.P. are incorporated into the economic package provided under the terms of this Agreement so that the I.U.O.E. has, through its negotiation and its execution of this Agreement, reimbursed the Employer for the costs of such administration.

**115.** Credit Union savings will be agreed to only if deductions are the same for all employees and the Union is responsible for obtaining the voluntary authorization.

**116.** The Union agrees to indemnify and save the Employer harmless against any and all claims, suits or other forms of liability arising out of said deductions.

## ARTICLE XIII

### ENFORCEMENT MEASURES

**117.** It is agreed that all subcontractors shall be subject to the terms and provisions of this Agreement as it relates to the Operating Engineers.

**118.** The Union shall require that no Union person shall leave a job by quitting unless he/she has been properly relieved after giving ample notice of his/her intention to quit to the Employer.

**119.** The Union shall not transfer a Union person from one Employer to another without the consent of the Employer and the Union person involved. Neither shall the Employer transfer a Union person from his/her employ to another Employer's payroll without the consent of the Union person involved and the Union.

45

**120.** All employees of the Employer shall be allowed time to vote on Election Day as required by law on employees own time.

**121.** If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to the Employer.

**122.** There are areas within the scope of this Agreement for which the wages and conditions contained herein may not be appropriate due to competition or other reasons. In such cases, adjustments will be made in accordance with principles agreed to by the parties during negotiations.

**123.** No employee covered hereby may be discharged by an individual Employer for refusing to cross a legal primary picket line established by an International Union affiliated with the Building and Construction Trades Department of the AFL-CIO or a Local Union thereof or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Local Union thereof, which picket line has been authorized and sanctioned by proper authorities. No jurisdictional or illegal informational picket line shall be recognized.

## ARTICLE XIV

### NO STRIKE-NO LOCKOUT-ARBITRATION AND DISPUTES

**124.** The Employer shall not cause, permit or engage in any lockout of its employees during the term of this Agreement.

The Union shall not authorize, cause, engage in or sanction, nor will any employee take part in any illegal slowdown, work stoppage, strike, picketing or other concerted interference against the Employer, or occurring at or around the Employer's office or work locations during the term of this Agreement.

**125.** Should a dispute arise between any of the parties (Employee, Employer, Association and/or Union) to this Agreement as to its meaning, intent or the application of its terms, this dispute will be settled in accordance with the following grievance procedure:

**STEP 1:** The aggrieved employee shall first take up his/her grievance orally with the Employer's Supervisor or Representative. The employee may, if he/she so desires, have his/her

Steward appear with him/her. The grievance shall be orally brought to the Employer's attention within three (3) working days of the occurrence or discovery of the grievance, but in no event will the grievance be honored by management later than fifteen (15) days past the incident giving rise to the complaint. A grievance not submitted within the time limit shall be deemed untimely and is waived.

**STEP 2:** In the event the grievance is not settled, the employee then shall put his/her grievance in writing within three (3) working days after STEP 1 meeting, dated and signed along with the contract Article effected and submit the grievance to the District Business Representative and he/she and the Business Representative shall meet with the Employer's Representative and attempt to settle the matter. If no settlement can be reached within ten (10) working days from the date of the written grievance, then

**STEP 2a:** The grievance may be considered by a designated representative of the Union and the Labor Relations Director of the Associated General Contractors of Ohio, who shall have the authority to mutually agree upon a final and binding settlement of the grievance. If Step 2a. is not utilized, or if no settlement can be reached in Step 2a. within five (5) days from the date the grievance is referred, then:

**STEP 3:** The grievance may be referred to the State Joint Committee consisting of six (6) members, three (3) to be appointed by the Labor Relations Division of the AGC of Ohio and three (3) to be appointed by Local 18 of the International Union of Operating Engineers. Where the State Joint Committee, by majority vote (5 members or more), resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this agreement. In case of failure of either party to appear at the hearing of a grievance properly filed for hearing, the parties in attendance shall offer evidence in support of their position and the Committee shall dispose of the case on the basis of such evidence. If no settlement is reached at this STEP within fifteen (15) working days from the date the grievance is referred, then

**STEP 4:** The grievance shall then be referred to an Arbitrator selected by the Committee referred to in STEP 3. If the parties cannot agree on an Arbitrator within forty-eight (48) hours after the parties agree to submit the matter to arbitration, the parties shall jointly request the Federal Mediation and Concilia-

46

47

tion Service to furnish a list of Arbitrators from which the Arbitrator shall be selected by the alternate striking of names.

**126.** The expenses and fees of the Arbitrator shall be shared equally by the parties. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms and provisions of this Agreement. The Arbitrator's decision shall be final and binding upon the parties hereto.

## ARTICLE XV

### DETERMINATION OF JURISDICTIONAL DISPUTES

**127.** Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement creating the Impartial Jurisdictional Disputes Board. In particular, both parties agree to be bound by the provision of the Agreement which states: Any decision or interpretation of the Impartial Jurisdictional Disputes Board shall immediately be accepted and complied with by all parties signatory to this Agreement.

The parties hereto agree that in the event of a jurisdictional dispute with any other Union or Unions, the dispute shall be submitted to the Impartial Jurisdictional Disputes Board for settlement in accord with the Plan adopted by the Building Trades Department, AFL-CIO.

The parties hereto further agree that they will be bound by any decision or award of the Disputes Board. There shall be no stoppage of work or slowdown arising out of any such dispute. No jurisdictional work stoppages, and no jurisdictional picket lines shall be recognized.

This article of the contract will go into effect when the National A.G.C. reaffiliates with the Impartial Jurisdictional Disputes Board. This article will not be applicable until such time as the International Union of Operating Engineers reaffiliates with the Building and Construction Trades Department of the AFL-CIO.

## ARTICLE XVI

### I-9

**128.** The Union and the Employers during the term of this Agreement agree to use their best efforts to establish a master file of I-9 employment eligibility verification forms on all members. This file will be maintained at the Union office and be available for the Employers' use.

48

## ARTICLE XVII

### SAVINGS AND SEPARABILITY

**129.** It is mutually agreed that if any clause, terms or provisions of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other board or agency having jurisdiction in the matter, such clause, terms or provisions shall be or become inoperative of any effect without disturbing the other clauses, terms or provisions of this Agreement and the remaining part of this Agreement shall remain in full force and effect. In the event that any clause, terms or provisions of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other board or agency having jurisdiction in the matter, said clause, terms or provisions shall be re-negotiated to the mutual satisfaction of the parties, but during such re-negotiation work shall not be interrupted or stopped by lockout, strikes, boycotts or other labor troubles.

## ARTICLE XVIII

### EFFECTIVE

**130.** This Agreement shall be effective May 8, 2013 and shall remain in force and in accordance with the terms of Article IX hereof. Wage rates and fringe payments shall be effective as designated by this Agreement.

**131.** IN WITNESS WHEREOF, WE, the undersigned duly authorized Employer Representatives and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO) executed this Agreement on the 8th day of May, 2013.

49

SOFCO002338

**I.U.O.E. LOCAL 18 AND ITS BRANCHES**

S/PATRICK L. SINK
Business Manager

S/RICHARD E. DALTON
President

S/MARK A. TOTMAN
Vice President

S/GARY G. SIESEL
Recording-Corresponding Secretary

S/PREMO P. PANZARELLO
Financial Secretary

S/JOSEPH S. LUCAS
Treasurer

Trustees

S/TIMOTHY D. HAMMOCK
S/SCOTT R. STEVENSON
S/DONALD G. TAGGART

**AGC OF OHIO LABOR RELATIONS DIVISION**

S/RICHARD HOBBS
Executive Vice President

S/MIKE DYER
Goettle Construction Co.
Vice President, Operations

S/THOMAS G. MURASKI, P.E.
Kokosing Construction Company Inc.
Vice President

50

---

**EXHIBIT A, Zone 1**
**WAGE RATES AND FRINGE CONTRIBUTIONS**

ZONE I covering Summit and Portage counties:

Classification: **MASTER MECHANIC**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $33.18* | $33.98* | $34.78* | $35.83* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

51

SOFCO002339

Classification: **GROUP A**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $32.93* | $33.73* | $34.53* | $35.58* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10*† | .10** | .10** | .10*† |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

52

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators,
  when compressor or boiler is mounted on
  crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
All Concrete pumps with booms

Cranes (all types)***
Cranes – Compact; track or rubber over 4,000
  pounds capacity
Cranes – Self-erecting; stationary, track or truck
  (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam, suction) 3-man crew
Elevating Graders or Euclid Loaders

Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building
  materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers

53

Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning
  device)
Rotary Drills (all), used on caissons for
  foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

| | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' - 180' | $33.43* | $34.23* | $35.03* | $36.08* |
| 180' - 249' | 33.93* | 34.73* | 35.53* | 36.58* |
| 250' and over | 34.18* | 34.98* | 35.78* | 36.83* |

*If additional funds are required for fringe benefits, they may be
diverted from wages.

SOFCO002340

Classification: **GROUP B**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $32.83* | $33.63* | $34.43* | $35.48* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

54

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saw, vermeer-type
Endloaders
Hydro Milling Machine

Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: **GROUP C**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.79* | $32.59* | $33.39* | $34.44* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

55

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate of pay will be "Class E")

Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating Well Points or other types of Dewatering Systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

SOFCO002341

Classification: **GROUP D**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $30.57* | $31.37* | $32.17* | $33.22* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Backfillers & Tampers
Ballast Relocator
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps (without boom with 4" or
   smaller system)
Concrete Spreaders
Conveyors, used for handling materials

Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers

Rollers, except asphalt rollers
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen

Tractors, pulling sheepfoot post roller or grader
VAC/ALLS
Vibratory compactors, with integral power
Welders

Classification: **GROUP E**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $25.28* | $26.08* | $26.88* | $27.93* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helper (Oiler)
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber (under 4,000
   pounds)
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches

Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

SOFCO0002342

## EXHIBIT A, Zone 1A

ZONE 1A covering Erie, Huron, Lorain, Medina

**Certified Crane Operator Pay**

Operating Engineers employed on any piece of equipment requiring a Certified Crane Operator (CCO) certification shall be paid a premium of fifty cents ($0.50) per hour in addition to the crane rate or any escalated rate that may be in effect.

**Day Pay**

In all counties covered by ZONE 1A of this Agreement, the following classifications shall be employed on a DAY PAY basis:

Asphalt Pavers
Backfillers and Tampers
Backfillers
Bar and Joint Installing Machines
Batch Plant Operators
Boom Trucks
Bulldozers
Bull Floats
Burlap and Curing Machines
CMI-type Equipment
Cableways
Concrete Pumps

Concrete Spreaders
Crushers
Drum Firemen in Asphalt Plants
Elevating Graders or Euclid Loaders
End Loaders
Finishing Machines
Floating Equipment (anything on Great Lakes or its tributaries is under the River & Lake Agreement)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (Sonic Pile Driving)

Grinders (all)
Hoes (when attached to farm or industrial-type tractors or CAT 320 backhoes or equivalent and below)
Horizontal Directional Drill Operator and Horizontal Directional Drill Locator
Hydro Excavator (all types C rate) (F rate if a second person is needed) Helper rate
Inboard, Outboard Motor Boat Launches
Laser Screeds and like equipment
Lead Greasemen
Locomotives (all)
Mobile Concrete Pumps, with Boom
Mucking Machines
Pavement Breakers, Hydro, or Cable
Planers (all types)
Plant Mixers (on site)
Portable Hydraulic Gantry (lift system C Rate) (F Rate if a second person is needed)

Power Graders
Power Scoops
Pump Operators, installing or operating well-points or other types of dewatering systems
Push Cats
Road Widening Trenchers
Rollers (all types)
Rotomills
Rough Terrain Forklifts (with winch/hoist)
Saw, concrete vermeer–type
Self-propelled Power Spreaders
Self-propelled Power Sub-graders
Slip Form Pavers
Straddle Carriers
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Vibratory Compactors, with integral power

SOFCO002343

58

59

## EXHIBIT A, Zone 1A
### WAGE RATES AND FRINGE CONTRIBUTIONS

MASTER MECHANIC/EQUIPMENT FOREMAN

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $35.28* | $36.21* | $37.01* | $38.06* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

60

GROUP A

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $34.78* | $35.71* | $36.51* | $37.56* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

61

Operators of:

A-Frames
Boiler Operators, Compressor Operators,
  Hydraulic Pumps & Power Pacs when
  mounted on a crane or regardless of where
  said equipment is mounted (piggy-back
  operation)
Boom Trucks (all types)
Cableways
Cherry Pickers

Combination Concrete Mixers & Towers
Concrete Pumps
Cranes (all types)***
Cranes – compact, track or rubber over 4000
  lbs. capacity
Cranes – self erecting; stationary, track, or truck
  (all configurations)
Derricks (all types)

(Continued on next page)

SOFCO0002344

Draglines
Dredges (dipper, clam, or suction), 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building
 materials
Hoes (all types)
Hoists (two or more drums)
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic or Welder)
Mixers, Paving (multiple drum)
Mobile Concrete Pumps with Booms
Panelboards (all types on site)
Pile Drivers
Power Shovels

Robotics Equipment Operator/Mechanic
Rotary Drills, (all), used on caisson work, wells
 (all types), Geothermal work, and
 substructure work
Rough Terrain Forklifts with Winch/Hoist (when
used as a crane)
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

|  | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| Over 200' | $35.53* | $36.46* | $37.26* | $38.31* |
| Over 300' | 35.78* | 36.71* | 37.51* | 38.56* |

*In the event that additional funds are needed for fringe benefits, they
will be diverted from wages.

**GROUP B**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $34.63* | $35.56* | $36.36* | $37.41* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

Asphalt Pavers
Bulldozers
CMI-Type Equipment
Endloaders
Horizontal Directional Drill Locator
Horizontal Directional Drill Operator
Instrument Man
Kolman-type Loaders (dirt loading)

Lead Greasemen
Mucking Machines
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills
Saw (concrete vermeer–type)

62

63

SOFCO002345

**GROUP C**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $33.18* | $34.11* | $34.91* | $35.96* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

64

Operators of:

Air Compressors, pressurizing shafts, or tunnels
Asphalt Rollers (all)
Forklifts
Hoists, one drum
House Elevators (except automatic call button controlled)
Hydro Excavator (all types C rate) (F rate if a second person is needed) Helper rate
Laser Screeds and like equipment
Man Lifts
Modular Moving and Placement machine (C rate) (F rate if a second person is needed)
Mud Jacks
Portable Hydraulic Gantry (lift system C Rate) (F Rate if a second person is needed)
Power Boilers (over 15 lbs. pressure)
Pump Operators, installing or operating well points or other type of dewatering system
Pressure Groutings
Trenchers (24" and under)
Utility Operators

**GROUP D**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $32.40* | $33.33* | $34.13* | $35.18* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

65

Operators of:

Compressors, on building construction
Conveyors, building material
Generators
Gunite Machines
Mixers, capacity more than one bag
Mixers, one bag capacity (side loader)
Post Drivers
Post Hole Diggers
Pavement Breakers, hydraulic or cable
Road Widening Trenchers
Rollers
Welder Operators

SOFCO0002346

## GROUP E

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $32.08* | $33.01* | $33.81* | $34.86* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

Backfillers and Tampers
Batch Plants
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Cleaning Machine Operator (decontamination included)
Clefplanes
Concrete Spreading Machines
Crushers
Deckhands

Drum Firemen (asphalt)
Farm-type Tractor, pulling attachments
Finishing Machines
Forklifts (masonry work only)
Form Trenchers
High Pressure Pumps (over ½" discharge)
Hydro Seeders
Pumps (4" and over discharge), provided it is not part of a dewatering system discharged into a common header
Self-Propelled Power Spreaders

Self-Propelled Sub-Graders
Submersible Pumps (4" and over discharge), provided it is not part of a dewatering system discharged into a common header
Tire Repairmen

Tractors, pulling sheepsfoot rollers or graders
Vibratory Compactors, with integral power

## GROUP F

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $25.00* | $25.93* | $26.73* | $27.78* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

SOFCO002347

Operators of:

Apprentice/Helpers, Helpers, Oiler, Signalmen
Barrier Moving Machines (additional duty, paid
  same rate)
Bobcat-type and/or Skid Steer Loader
Bobcat-type and/or Skid Steer Loader with any
  and all attachment
Cranes – compact; track or rubber under 4000
  lbs. capacity
Geodimeter
Grade Checker
Grinders (all)
Inboard, Outboard Motor Boat Launches

Light Plant Operators
Planers (all types)
Power Boilers (less than 15 lbs. pressure)
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Rod Man
Rotomills
Saw (concrete vermeer-type)
Submersible Pumps (under 4" discharge)
Vac/Alls

68

## EXHIBIT A, Zone II
### WAGE RATES AND FRINGE CONTRIBUTIONS

ZONE II covering Lucas and Wood counties.

Classification: **MASTER MECHANIC**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $32.44* | $33.24* | $34.04* | $35.09* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

69

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

SOFCO002348

Classification: **GROUP A**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $32.19* | $32.99* | $33.79* | $34.84* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators,
   when compressor or boiler is mounted on
   crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***

Cranes – Compact; track or rubber over 4000
   pounds capacity
Cranes – Self-Erecting; stationary, track or truck
   (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)

Gradalls
Helicopter Operators/winch, hoisting building
   materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders

Rail Tampers (with automatic lifting and aligning
   device)
Rotary Drills (all), used on caissons for
   foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

|  | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' – 180' | $32.69* | $33.49* | $34.29* | $35.34* |
| 180' – 249' | 33.19* | 33.99* | 34.79* | 35.84* |
| 250' and over | 33.44* | 34.24* | 35.04* | 36.09* |

*If additional funds are required for fringe benefits, they may be
diverted from wages.

70

71

SOFCO002349

Classification: **GROUP B**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Health & Welfare | $32.07* | $32.87* | $33.67* | $34.72* |
| Pension | 6.91 | 7.16 | 7.41 | 7.41 |
| Apprenticeship | 6.00 | 6.00 | 6.00 | 6.00 |
| E & S | .60 | .67 | .75 | .75 |
| CIAP | .04 | .07 | .09 | .09 |
| CIAP Admin. | .20 | .20 | .20 | .20 |
| PAC | .15 | .15 | .15 | .15 |
| | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

72

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders
Hydro Milling Machines

Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: **GROUP C**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.03* | $31.83* | $32.63* | $33.68* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

73

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms and with 5" system)
Fork Lifts (except masonry)

Highway Drills - all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate will be "Class E")
Man Lifts
Material hoist/elevators

*(Continued on next page)*

SOFCO0002350

Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well
  points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover

Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and
  aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $29.85* | $30.65* | $31.45* | $32.50* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Ballast Relocators
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines

Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction

Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side
  loaders)
All Concrete Pumps without booms with 4" or
  smaller system
Concrete Spreaders
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines

Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder

SOFCO002351

Classification: **GROUP E**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $24.39* | $25.19* | $25.99* | $27.04* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

| | |
|---|---|
| Allen Screed Paver (concrete) | Light Plant Operators |
| Apprentice/Helpers (Oilers) | Masonry Fork Lifts |
| Boilers (less than 15 lbs. pressure) | Power Driven Heaters (oil fired) |
| Cranes-Compact; track or rubber under 4,000 pounds | Power Scrubbers |
| | Power Sweepers |
| Directional Drill "Locator" | Pumps (under 4" discharge) |
| Fueling and greasing +$3.00 | Signal Person |
| Inboard, Outboard Motor Boat Launches | Submersible Pumps (under 4" discharge) |

76

---

## EXHIBIT A, Zone III
### WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE III** covering Akron and counties, Columbus and counties, Franklin and counties, and Toledo and counties:

For AKRON and the following counties: Ashland. Belmont, Carroll, Coshocton, Guernsey, Harrison, Holmes. Jefferson, Monroe, Noble, Richland, Stark, Tuscarawas, Washington and Wayne.

For COLUMBUS and the following counties: Crawford, Delaware, Fairfield, Franklin, Hocking, Knox, Licking. Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Union and Wyandot.

For FRANKLIN and the following counties: Adams, Athens, Auglaize, Brown, Butler, Champaign, Clark, Clermont. Clinton, Darke, Fayette, Gallia, Greene, Hamilton, Highland, Jackson, Lawrence, Logan, Madison, Meigs, Mercer, Miami, Montgomery, Morgan, Preble, Ross, Scioto, Shelby, Vinton and Warren. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

For TOLEDO and the following counties: Allen, Defiance. Fulton, Hancock. Hardin, Henry, Ottawa, Paulding. Putnam, Sandusky, Seneca, Van Wert and Williams.

77

SOFCO0002352

Classification: **MASTER MECHANIC**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $31.69* | $32.49* | $33.29* | $34.34* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Classification: **GROUP A**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $31.44* | $32.24* | $33.04* | $34.09* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

78

Operators of:
Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***
Cranes – Compact; track or rubber over 4000 pounds capacity
Cranes – Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials

Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders
Rail Tampers (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure

79

*(Continued on next page)*

SOFCO002353

Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

|  | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' - 180' | $31.94" | $32.74" | $33.54' | $34.59" |
| 180' - 249' | 32.44' | 33.24' | 34.04' | 35.09" |
| 250' and over | 32.69' | 33.49' | 34.29' | 35.34" |

*If additional funds are required for fringe benefits, they may be diverted from wages.

Classification: GROUP B

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $31.32' | $32.12' | $32.92' | $33.97' |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:
Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders
Hydro Milling Machines

Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: GROUP C

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $30.28' | $31.08' | $31.88' | $32.93' |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

SOFCO0002354

80

81

82

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps without booms and with 5" system
Fork Lifts (except masonry)
Highway Drills - all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate of pay will be "Class E")

Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie (Inserter/Remover)
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

83

Classification: **GROUP D**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $29.10* | $29.90* | $30.70* | $31.75* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Ballast Relocators
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Cleiplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag

Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreading Machines
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen in asphalt plants
Farm-type Tractors, pulling attachments

*(Continued on next page)*

SOFCO0002355

Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers

Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder Operators

Classification: **GROUP E**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $23.64* | $24.44* | $25.24* | $26.29* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:
Allen Screed Pavers (concrete)
Apprentice/Helpers (Oilers) and Signalmen
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber under 4,000
 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00

Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Submersible Pumps (under 4" discharge)

84

85

SOFCO0002356

## REGISTERED APPRENTICESHIP WAGE SCHEDULE
### ZONE I, ZONE 1A, ZONE II, ZONE III

| | |
|---|---|
| First Year Apprentice | Third Year Apprentice |
| 50% of Class A | 70% of Class A |
| Second Year Apprentice | Fourth Year Apprentice |
| 60% of Class A | 80% of Class A |

A new classification of Trainee is hereby established and the rates of pay are as follows:

| | |
|---|---|
| First Year Trainee | Third Year Trainee |
| 60% of Bulldozer Rate | 75% of Bulldozer Rate |
| Second Year Trainee | Fourth Year Trainee |
| 60% of Bulldozer Rate | 90% of Bulldozer Rate |

There will be a 10% increase for the apprentices on top of the percentages listed above provided they are operating mobile equipment.

The rates paid to the Apprentice or Trainee shall not exceed the classification rate the Apprentice or Trainee is working. For every five (5) Operating Engineer Journeymen employed, there may be employed one (1) Registered Apprentice Engineer or Trainee. Through the referral, Employers may employ Registered Apprentices or Trainees within this limitation when they are available. Any increase in the Apprenticeship contributions, agreed by the parties, will be shared equally by the Union and Employer.

## FIELD MECHANIC TRAINEE SCHEDULE

| | |
|---|---|
| First Year | 50% of Class "A" rate |
| Second Year | 60% of Class "A" rate |
| Third Year | 70% of Class "A" rate |
| Fourth Year | 80% of Class "A" rate |

Only those individuals who have obtained a two (2) year Associates Degree, from an accredited school, will be accepted into this program. If the Mechanic Trainee is required to have a CDL license, he/she will be paid a 10% incentive above the percentages listed above. After successful completion of the fourth year, the Mechanic will be paid at Class "A" rate.

86

## SPECIAL RATES

Any work under A, B and C as described in Article I of this Agreement awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## EXHIBIT B
### AFFIRMATIVE ACTION PROGRAM

1. Under the provisions of Executive Order 11246, issued by the President of the United States, and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations as revised, and relative court orders, a specific affirmative program must be developed to assure that the employment of workers and the treatment of employees during employment is completely nondiscriminatory in regard to race, creed, color, sex, age, religion or national origin.

2. The parties to this Agreement are mutually desirous of developing an affirmative action agreement to implement the provisions of applicable federal regulations in order to assure nondiscrimination in employment; upgrading; demotion or transfer; recruitment and recruitment advertising; lay-off or termination; rate of pay and selection for all types of training.

3. In order to assure nondiscrimination now and in the future and in an effort to attract a maximum number of potential apprentices from minority and female groups, the parties to this Agreement have formulated the following Affirmative Action Program:

### A. APPRENTICESHIP

The parties agree to establish a positive program of apprenticeship selection and to use the following program to attract minority and female groups to the Operating Engineers' Apprenticeship Program:

1. Develop a "fact sheet" for distribution to all secondary school counselors, youth opportunity centers, social action agencies and state employment offices.

87

SOFCO002357

2. Make available speakers to inform and advise high school students and others of opportunities in apprenticeship for Operating Engineers.

3. Notify all interested agencies and parties thirty (30) days prior to the period for taking applications; and making such interested agency or parties aware of the nature of all tests in order to facilitate a proper pre-test educational effort.

4. Provide application forms for apprenticeship and adequate instruction for properly preparing same, upon request, during recruitment periods at all training sites of the Operating Engineers Apprenticeship Program at certain union halls of Local 18. Develop an outreach program for the recruiting and pre-apprentice training of individuals from minority and female groups to enable them to enter the apprenticeship program.

5. To use a standardized, uniform battery of tests to determine applicant proficiency and aptitudes in reading, computation and mechanical skills suitable for the craft of Operating Engineer.

6. May have the test administered by an agency other than the Ohio Operating Engineers Apprenticeship Program and uniformly and numerically graded.

7. Interview sufficient applicants personally by teams consisting of one (1) representative of Management and one (1) of the Union who shall independently grade each applicant individually and then average the scores.

8. When an applicant fails to achieve acceptance, the Joint Apprenticeship and Training Committee shall make every effort to inform the applicant and the referring or cooperating agency of the area of insufficiency.

9. In order for the applicant, after acceptance as an Operating Engineer Apprentice, to become immediately employable by a Participating Employer, the Joint Apprenticeship and Training Committee shall provide training sites with equipment of the nature for which the apprentice will be employed, in order to acquaint the apprentice with safety measures as well as the operation and maintenance of the same and teach him/her the use of the machine as a tool of the trade and to generate good work habits. After the training, he/she shall be employed as an "apprentice-in-training" as such openings occur.

88

10. The parties to this Agreement agree to jointly assist a minority group employee to be integrated into the work force and the Union by:

A. Having management supervision on the job make every effort to assist and encourage minority group apprentices and to welcome such individuals to the job;

B. Have each apprentice and pre-apprentice trainee assigned to a Journeyperson Operating Engineer for help and assistance, and

C. Have Union officers inform the membership of the importance of making welcome all minority groups into the Union, and

D. The education, training requirements and disciplines of Registered apprentices shall be governed by the Joint Apprenticeship and Training Committee and its standards.

## B. JOURNEY PERSONS

1. The parties will undertake a joint training program to assure equal opportunity to all journey persons who desire to acquire the skills required to work on a variety of equipment within the jurisdiction of the Operating Engineers.

2. Local Union officials will notify minority and female members of this program. They will offer to minority and female members an opportunity for training on any highway equipment. If the parties determine that a minority or female group member lacks adequate pre-training qualifications, the reasons for such determination shall be noted in writing and shall be available for inspection during a review of this program by appropriate federal contracting or administering agency officials. An attempt shall be made to have availability of training according to the demands for craftsmen to operate the specific type of equipment involved.

3. Each member of the Local will be advised of this Agreement and the appropriate avenues for redress if any of its terms are breached by either party.

The parties undertake this Affirmative Action Program in accordance with Executive Order 11246 and applicable court orders. It is their understanding that participation in the program

89

SOFCO002358

by any contractor shall be accepted in lieu of that portion of a required affirmative action plan which would otherwise be directed to jobs manned by members of the Operating Engineers Union.

The parties shall from the date of this Agreement, when required, report to the appropriate federal contracting or administering agency. The report will specifically indicate the total number of minority group individuals or females in the Union. In evaluating these reports, the appropriate federal contracting or administering agency officials will have complete access to relevant records of the parties and will be expected to discuss the progress of the program freely with the parties and Union members.

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____

Name of Employer (Printed)

_____

Employer Address

_____

City                         State                         Zip Code

_____

Area Code & Telephone

_____

Authorized Employer Representative (Signature) Date

_____

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____

Union Representative (Signature)

**CONTRACTORS COPY**          (ORIGINAL SIGNATURE)

90



EXHIBIT K

Date: 10-8-2018



# OHIO OPERATING ENGINEERS
## FRINGE BENEFIT PROGRAMS

1180 Dublin Road
PO Box 12009
Columbus OH 43212-0009
614.488.0708

Carol A. Wilson
Administrator

August 31, 2017

**MAILED VIA REGULAR & CERTIFIED U.S. MAIL**

SOFCO ERECTORS INC
10360 WAYNE AVE
CINCINNATI OH 45215-1129

Re:    Partial and Complete Withdrawal Liability
       Demand for Payment

To Whom It May Concern:

The Ohio Operating Engineers Pension Plan ('Plan") was recently informed that the collective bargaining agreement between the Ohio Operating Engineers Local 18 and Sofco Erectors, Inc. (hereinafter referred to as "Sofco") was terminated. After receiving this notice, the Plan performed a calculation of Sofco's complete withdrawal liability. This calculation was prepared by the Plan's actuary, and is based upon a complete withdrawal from the Pension Plan during the Plan year ending July 31, 2017. According to this calculation, Sofco's complete withdrawal liability is $368,315. (Please see attached copy of the actuary's August 29, 2017 letter and calculation).

Additionally, the Actuary also noticed more than a 70% reduction in contribution hours reported by Sofco for the three year period of 2011-2013. This decline in hours constitutes a partial withdrawal by Sofco from the collective bargaining agreement during this period. As a result, the Plan's actuary also performed partial withdrawal liability calculations. (Please see aforementioned letter and calculation). Although there is no partial withdrawal liability for the Plan year ending July 31, 2013, these calculations revealed the following:

- For the Plan year ending July 31, 2011, partial withdrawal liability in the amount of $344,627;

- For the Plan year ending July 31, 2012, partial withdrawal liability in the amount of $111,358.

Based on all calculations performed by the Plan's actuary, the Plan hereby requests and demands that Sofco pays the following amounts:

- Complete withdrawal liability for the Plan year ending July 31, 2017 in the amount of $368,315 which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721;

HEALTH AND WELFARE PLAN • PENSION FUND • APPRENTICESHIP FUND • EDUCATION AND SAFETY FUND

- Partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627 which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327;

- Partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358 which can be paid in six quarterly payments of $17,294 and a final payment of $10,652.

   **The Plan also requests and demands that Sofco remits its payments (with a separate check for each calculation) under these payment plans by no later than October 30, 2017.** A quarterly or lump sum payment should be made payable to: The Ohio Operating Engineering Pension Plan, Attn: Samantha Polsinelli, 1180 Dublin Rd., P.O. Box 12009, Columbus, Ohio 43212.

Sincerely,

Bryan C. Barch, Esq.
In-House Counsel

 **Segal Consulting**

101 North Wacker Drive Suite 500 Chicago, IL 60606-1724
T 312.984.8619 www.segalco.com

Daniel V. Ciner, MAAA, EA
Senior Vice President and Actuary
dciner@segalco.com

August 29, 2017

*VIA E-MAIL*

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
1180 Dublin Road
Columbus, Ohio 43212

Re:  **Ohio Operating Engineers Pension Fund – Partial and Complete Withdrawal Liability Calculations for Sofco Erectors, Inc.**

Dear Ms. Polsinelli:

As requested, we have updated the withdrawal liability calculation for Sofco Erectors, Inc. assuming three partial withdrawals in the Plan years ended July 31 of 2011, 2012, and 2013, respectively, and a complete withdrawal in the Plan year ended July 31, 2017. As described below, we look to Fund Counsel regarding interpretations as to assessment of withdrawal liability for construction industry employers.

> For the Plan year ended July 31, 2011, the calculated amount of partial withdrawal liability is $344,627, which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327.
> For the Plan year ended July 31, 2012, the calculated amount of partial withdrawal liability is $111,358 (after application of the credit for the prior partial withdrawal as of July 31, 2011), which can be paid in six quarterly payments of $17,294 and a final payment of $10,652.
> For the Plan year ended July 31, 2013, the calculated amount of partial withdrawal liability is $0 (after application of the credit for the prior partial withdrawals as of July 31, 2011 and 2012).
> For the Plan year ended July 31, 2017, the calculated amount of complete withdrawal liability is $368,315 (after application of the credit for the prior partial withdrawals as of July 31, 2011, 2012, and 2013), which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721.

The above withdrawal liability calculations are based on the asset values and liabilities stated in the July 31, 2008, 2009, 2010, and 2016 withdrawal liability reports, respectively. In addition, they are based on the contribution information provided in your e-mails dated May 1, 2017 and May 9, 2017, including maximum hourly contribution rates of $4.00, $4.50, and $6.00 for the 10-year periods ended July 31, 2009, 2010, and 2017, respectively.

Under Section 4205(b)(1) of ERISA, a partial withdrawal occurs when contribution hours in each of three consecutive years (the "three-year testing period") are at least 70% less than the average of the two highest years of contribution hours during the five years preceding the three-year testing period. Based on the information you provided us, Sofco Erectors, Inc. incurred three consecutive 70% declines for the three-year testing periods that ended in 2011, 2012, and 2013.

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
August 29, 2017
Page 2

Under Section 4208(d)(1) of ERISA, for construction industry employers in construction industry plans, partial withdrawal liability is assessable when work continues for an insubstantial portion of the employer's work in the jurisdiction of the collective bargaining agreement. The calculations included in this letter assume that this employer will be assessed partial withdrawal liability for each partial withdrawal. We defer to Fund Counsel's interpretation as to whether partial withdrawal liability is assessable to this employer.

Under Section 4206 of ERISA, partial withdrawal liability based on a 70% decline in contribution hours is calculated as a fraction of the amount that would be payable if there were a complete withdrawal by this employer on the last day of the first Plan year in the three-year testing period (i.e., in 2009, 2010, and 2011 for the 2011, 2012, and 2013 partial withdrawals, respectively). This fraction equals the ratio of the employer's contribution hours for the Plan year following the end of the three-year testing period to the average contribution hours during the five years preceding the first year of the three-year testing period.

Under Section 4206 of ERISA, any withdrawal liability (either complete or partial) for an employer is reduced by the amount of any partial withdrawal liability of the employer with respect to the Plan for a previous year. We have determined the amount of credit for the prior partial withdrawals, and have offset the partial withdrawal liability for the Plan years ended July 31, 2012 and July 31, 2013, as well as the complete withdrawal liability as of July 31, 2017, by the respective credit amounts.

We have enclosed exhibits showing the details of our calculations as follows:

For the July 31, 2011 partial withdrawal:

    Exhibit A – Determination of Partial Withdrawal

    Exhibit B – Calculation of the Allocable Amount of Unfunded Vested Benefits

    Exhibit C – Determination of Withdrawal Liability

    Exhibit D – Determination of Payment Schedule under ERISA Section 4219

    Exhibit E – Basis for Determining Withdrawal Liability

For the July 31, 2012 partial withdrawal:

    Exhibit F – Determination of Partial Withdrawal

    Exhibit G – Calculation of the Allocable Amount of Unfunded Vested Benefits

    Exhibit H – Development of Credit for Prior (July 31, 2011) Partial Withdrawal

    Exhibit I – Determination of Withdrawal Liability

    Exhibit J – Determination of Payment Schedule under ERISA Section 4219

    Exhibit K – Basis for Determining Withdrawal Liability

For the July 31, 2013 partial withdrawal:

    Exhibit L – Determination of Partial Withdrawal

    Exhibit M – Calculation of the Allocable Amount of Unfunded Vested Benefits

    Exhibit N – Development of Credit for Prior (July 31, 2011 and July 31, 2012) Partial Withdrawals

    Exhibit O – Determination of Withdrawal Liability

    Exhibit P – Basis for Determining Withdrawal Liability

✴ Segal Consulting

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
August 29, 2017
Page 3

For the July 31, 2017 complete withdrawal:

    Exhibit Q – Calculation of the Allocable Amount of Unfunded Vested Benefits

    Exhibit R – Development of Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals

    Exhibit S – Determination of Withdrawal Liability

    Exhibit T – Determination of Payment Schedule under ERISA Section 4219

    Exhibit U – Basis for Determining Withdrawal Liability

As with all withdrawals, the assessment of withdrawal liability is subject to Fund Counsel review. Please let us know if you have any questions.

Sincerely,

Daniel V. Ciner

Enclosures

cc:    Ms. Carol Wilson (w/enclosures)
       Ms. Megan Kelly (w/enclosures)

5685716v1/05517.008

EXHIBIT A

## Ohio Operating Engineers Pension Fund

## DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2011

Employer Name:  **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                          07/31/2011

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | 12,253.50 | 13% |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |
| 2004 | 10,862.00 | | |

*A partial withdrawal has occurred as of July 31, 2011.*

✶ Segal Consulting

EXHIBIT B

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2009

Employer Name:                    Sofco Erectors, Inc.

| Year Ended[1] July 31 | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
|---|---|---|---|---|---|
| | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | (2) and (3) |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $195,618,368 | $0 | $178,834,875 | $291,244 | $318,577 |
| 2004 | (21,738,368) | 0 | 183,435,933 | 275,279 | (32,622) |
| 2005 | 103,632,017 | 0 | 184,525,945 | 211,259 | 118,646 |
| 2006 | (136,835,103) | 0 | 187,236,038 | 189,279 | (138,328) |
| 2007 | 31,859,110 | 0 | 192,258,544 | 180,029 | 29,833 |
| 2008 | 138,233,538 | 0 | 202,969,173 | 187,255 | 127,531 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)          $423,637

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✳ Segal Consulting

EXHIBIT C

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $423,637 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) – (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $423,637 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2003 – 07/31/2008 | 58,229.50 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 11,645.90 |
| F. | Contribution Hours 08/01/2011 - 07/31/2012 | 2,172.00 |
| G. | Partial Withdrawal Liability Factor: 1 – [(F) ÷ (E)] | 81.349660% |
| H. | Withdrawal Liability: (C) x (G) | $344,627 |

✶ Segal Consulting

EXHIBIT D

**Ohio Operating Engineers Pension Fund**
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2011

Employer Name:                    Sofco Erectors, Inc.

(1)  Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 1999 | 18,877.50 | N/A |
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | 24,877.83 |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |

(2)  Average Base Units for highest 3 consecutive years
during 10 years ended July 31, 2008                          24,877.83

(3)  Highest contribution rate during 10 years ending
July 31, 2009                                                 $4.00

(4)  Partial withdrawal liability fraction (see Exhibit C, Item G)    81.349660%

(5)  Annual payment = (2) x (3) x (4) [rounded up to the nearest $4]    $80,956

(6)  Quarterly payment = (5) / 4                                 $20,239

(7)  Number of Full Years of Payment                             4

(8)  Remaining Balance After 4 Years                             $69,044

(9)  Number of Full Quarterly Payments in Year 5:                3

(10)  Amount of Remaining Payment = (8) - (6) x (9)              $8,327

✳ Segal Consulting

EXHIBIT E

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

1.  Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2.  Census data collected as of July 31, 2008.

3.  All assumptions per the July 31, 2008 withdrawal liability report.

4.  Market value of assets based on audited financial statements as of July 31, 2008.

5.  Total plan contributions are as reported in the audited financial statements.

6.  Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7.  We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8.  We are unaware of any application of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✶ Segal Consulting

EXHIBIT F

Ohio Operating Engineers Pension Fund

## DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2012

Employer Name:  **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                    07/31/2012

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |

*A partial withdrawal has occurred as of July 31, 2012.*

✶ Segal Consulting

EXHIBIT G

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2010

Employer Name: Sofco Erectors, Inc.

| Year Ended[1] | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
| | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | |
| July 31 | | | | | |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $182,577,144 | $0 | $178,834,875 | $291,244 | $297,339 |
| 2004 | (20,379,720) | 0 | 183,435,933 | 275,279 | (30,583) |
| 2005 | 97,536,016 | 0 | 184,525,945 | 211,259 | 111,666 |
| 2006 | (129,233,153) | 0 | 187,236,038 | 189,279 | (130,643) |
| 2007 | 30,182,315 | 0 | 192,258,544 | 180,029 | 28,262 |
| 2008 | 131,321,861 | 0 | 202,969,173 | 187,255 | 121,155 |
| 2009 | 357,008,602 | 0 | 210,884,752 | 161,099 | 272,726 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)     $669,922

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✴ Segal Consulting

EXHIBIT H

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWAL
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal...................... | $ | 397,196 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal....................... | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal........................... | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal................................................................................................................... | $ | 423,637 |
| E: | Credit for prior partial withdrawal [ A x B x C / (D x B )]........................................................................ | $ | 323,117 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

⭑ Segal Consulting

EXHIBIT I

Ohio Operating Engineers Pension Fund

## DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $669,922 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) – (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $669,922 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2004 – 07/31/2009 | 48,975.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 9,795.00 |
| F. | Contribution Hours 08/1/2012 - 07/31/2013 | 3,442.50 |
| G. | Partial Withdrawal Liability Factor: 1 – [(F) ÷ (E)] | 64.854518% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | $ 434,475 |
| I. | Credit for Prior (July 31, 2011) Partial Withdrawal | $323,117 |
| J. | Withdrawal Liability: (H) – (I), but not less than zero | $111,358 |

✕ Segal Consulting

EXHIBIT J

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

Employer Name:        Sofco Erectors, Inc.

(1) Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | N/A |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |
| 2009 | 1,607.50 | 8,213.00 |

(2) Average Base Units for highest 3 consecutive years during 10 years ended July 31, 2009       23,702.50

(3) Highest contribution rate during 10 years ending July 31, 2010       $4.50

(4) Partial withdrawal liability fraction (see Exhibit I, Item G)       64.854518%

(5) Annual payment = (2) x (3) x (4) [rounded up to the nearest $4]       $69,176

(6) Quarterly payment = (5) / 4       $17,294

(7) Number of Full Years of Payment       1

(8) Remaining Balance After 1 Year       $45,240

(9) Number of Full Quarterly Payments in Year 2:       2

(10) Amount of Remaining Payment = (8) - (6) x (9)       $10,652

✳ Segal Consulting

EXHIBIT K

Ohio Operating Engineers Pension Fund

## BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

1.  Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2.  Census data collected as of July 31, 2009.

3.  All assumptions per the July 31, 2009 withdrawal liability report.

4.  Market value of assets based on audited financial statements as of July 31, 2009.

5.  Total plan contributions are as reported in the audited financial statements.

6.  Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7.  We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8.  We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✳ Segal Consulting

EXHIBIT L

Ohio Operating Engineers Pension Fund

## DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2013

Employer Name:  **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                    07/31/2013

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2013 | 3,442.50 | 12,253.50 | 28% |
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | | |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |

*A partial withdrawal has occurred as of July 31, 2013.*

✳ Segal Consulting

EXHIBIT M

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2011

Employer Name: Sofco Erectors, Inc.

| Year Ended[1] July 31 (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
|---|---|---|---|---|---|
| | Basic[2] (2) | Reallocated[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | (2) and (3) (6) |
| 2003 | $169,535,919 | $0 | $178,834,875 | $291,244 | $276,100 |
| 2004 | (19,021,072) | 0 | 183,435,933 | 275,279 | (28,545) |
| 2005 | 91,440,015 | 0 | 184,525,945 | 211,259 | 104,687 |
| 2006 | (121,631,202) | 0 | 187,236,038 | 189,279 | (122,958) |
| 2007 | 28,505,519 | 0 | 192,258,544 | 180,029 | 26,692 |
| 2008 | 124,410,184 | 0 | 202,969,173 | 187,255 | 114,778 |
| 2009 | 339,158,172 | 0 | 210,884,752 | 161,099 | 259,090 |
| 2010 | 42,238,100 | 0 | 218,622,244 | 127,590 | 24,651 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)   $654,495

[1] Years not shown have no withdrawal liability components.

[2] Original value of the charges in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✕ Segal Consulting

EXHIBIT N

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Partial Withdrawal in the Plan Year Ended July 31, 2013

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011**

| | | | |
|---|---|---|---:|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal............... | $ | 370,754 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............... | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal................... | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal................................................................................ | $ | 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)]............... | $ | 301,607 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012**

| | | | |
|---|---|---|---:|
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal............... | $ | 629,844 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............... | | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal................... | $ | 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal............................................................................... | $ | 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)]............... | $ | 104,696 |
| K: | Total credit for prior partial withdrawals [ E + J ] | $ | 406,303 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✳ Segal Consulting

EXHIBIT O

Ohio Operating Engineers Pension Fund

## DETERMINATION OF WITHDRAWAL LIABILITY

### For a Partial Withdrawal in the Plan Year Ending July 31, 2013

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $654,495 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $654,495 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2005 − 07/31/2010 | 37,608.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 7,521.60 |
| F. | Contribution Hours 08/1/2013 - 07/31/2014 | 3,834.00 |
| G. | Partial Withdrawal Liability Factor: 1 − [(F) ÷ (E)] | 49.026803% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | $320,878 |
| I. | Credit for Prior (July 31, 2011 and 2012) Partial Withdrawals | $406,303 |
| J. | Withdrawal Liability: (H) − (I), but not less than zero | $0 |

✳ Segal Consulting

EXHIBIT P

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2013

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2010.

3. All assumptions per the July 31, 2010 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2010.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✳ Segal Consulting

EXHIBIT Q

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer Name:      Sofco Erectors, Inc.

| Year Ended[1] July 31 (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) (6) |
|---|---|---|---|---|---|
| | Basic[2] (2) | Reallocated[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $91,288,572 | $0 | $178,834,875 | $291,244 | $148,669 |
| 2004 | (10,869,184) | 0 | 183,435,933 | 275,279 | (16,311) |
| 2005 | 54,864,009 | 0 | 184,525,945 | 211,259 | 62,812 |
| 2006 | (76,019,502) | 0 | 187,236,038 | 189,279 | (76,849) |
| 2007 | 18,444,748 | 0 | 192,258,544 | 180,029 | 17,271 |
| 2008 | 82,940,123 | 0 | 202,969,173 | 187,255 | 76,519 |
| 2009 | 232,055,591 | 0 | 210,884,752 | 161,099 | 177,272 |
| 2010 | 29,566,670 | 0 | 218,622,244 | 127,590 | 17,255 |
| 2011 | 127,603,629 | 0 | 230,778,340 | 95,158 | 52,615 |
| 2012 | 214,305,669 | 0 | 250,306,333 | 70,436 | 60,305 |
| 2013 | 7,764,623 | 0 | 269,018,918 | 46,278 | 1,336 |
| 2014 | (129,537,937) | 6,853 | 298,703,055 | 62,852 | (27,255) |
| 2015 | 261,224,360 | 0 | 331,169,312 | 94,102 | 74,227 |
| 2016 | 112,294,964 | 0 | 360,524,316 | 121,118 | 37,725 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)      $605,591

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✳ Segal Consulting

EXHIBIT R

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Withdrawal in the Plan Year Ended July 31, 2017

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011**

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal............... | $ | 212,111 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal.............. | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal................ | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.................................................................. | $ | 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)]..... | $ | 172,551 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012**

| | | | |
|---|---|---|---|
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal.............. | $ | 389,383 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal.............. | | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal.................. | $ | 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal...................................................... | $ | 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)]..... | $ | 64,725 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2013**

| | | | |
|---|---|---|---|
| K: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal.............. | $ | 406,638 |
| L: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............. | | 0.490268 |
| M: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal.................. | $ | - |
| N: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal........................................................ | $ | 654,495 |
| O: | Credit for prior partial withdrawal in Plan year ended July 31, 2013 [ K x L x M / (N x L)]............. | $ | - |

| | | | |
|---|---|---|---|
| P: | Total credit for prior partial withdrawals [ E + J + O] | $ | 237,276 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✳ Segal Consulting

EXHIBIT S

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $605,591 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Limitation in Accordance with ERISA Section 4225 (Sale of Assets) | N/A* |
| D. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $605,591 |
| E. | Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals | $237,276 |
| F. | Withdrawal Liability: (D) − (E), but not less than zero | $368,315 |

* We are unaware of any applicability of Section 4225 on this assessment and defer to the Fund
  Administrator and Legal Counsel to determine whether it applies

✷ Segal Consulting

EXHIBIT T

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer Name:          Sofco Erectors, Inc.

(1)  Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2007 | 11,053.50 | N/A |
| 2008 | 11,978.00 | N/A |
| 2009 | 1,607.50 | 8,213.00 |
| 2010 | 440.00 | 4,675.17 |
| 2011 | 1,123.00 | 1,056.83 |
| 2012 | 2,172.00 | 1,245.00 |
| 2013 | 3,442.50 | 2,245.83 |
| 2014 | 3,834.00 | 3,149.50 |
| 2015 | 5,527.00 | 4,267.83 |
| 2016 | 5,477.00 | 4,946.00 |

(2)  Average Base Units for highest 3 consecutive years         8,213.00
     during 10 years ended July 31, 2016

(3)  Highest contribution rate during 10 years ended            $6.00
     July 31, 2017

(4)  Annual payment = (2) x (3) [rounded up to the nearest $4]   $49,280

(5)  Quarterly payment = (4) / 4                                 $12,320

(6)  Number of Full Years of Payment                             10

(7)  Remaining Balance After 10 Years                            $2,721

(8)  Number of Full Quarterly Payments in Year 11:               0

(9)  Amount of Remaining Payment = (7) - (5) x (8)               $2,721

✳ Segal Consulting

EXHIBIT U

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2016.

3. All assumptions per the July 31, 2016 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2016.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

✗ Segal Consulting

**jackson lewis.**

Representing Management Exclusively in Workplace Law and Related Litigation

425 Walnut Street
Suite 2300
Cincinnati, Ohio 45202
Tel 513 621-3440
Fax 513 621-4449
www.jacksonlewis.com

MY DIRECT DIAL IS: 513-873-2103
MY EMAIL ADDRESS IS: GARY.GREENBERG@JACKSONLEWIS.COM

| | | | |
|---|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

November 10, 2017



Ciner
EXHIBIT
L
10·8·2018

## VIA E-MAIL & U.S. MAIL

Trustees, Ohio Operating Engineers Pension Fund
c/o Brian C. Barch, In-house Counsel
1180 Dublin Road
PO Box 12009
Columbus, OH 43212-0009

      RE:    Sofco Erectors, Inc. - Request for Review of Withdrawal Liability Assessment
             dated August 31, 2017

To the Trustees:

This is the Request for Review by Sofco Erectors, Inc. ("Company") of the Ohio Operating Engineers Pension Fund ("Fund") assessment of withdrawal liability issued to the Company on August 31, 2017, pursuant to 29 U.S.C. § 1399(b)(2)(A).

## I.    INTRODUCTION

The Company disputes the assessments in their entirety, for these reasons:

1. The Fund's assessment of complete withdrawal liability is contrary to 29 U.S.C. § 1383(b)(1), the special exception for construction industry employers and plans.[1] Because the Company has not continued or resumed performing work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously (as of April 30, 2017) required, there has been no complete withdrawal for which liability may be assessed.

2. The Fund's assessments of partial withdrawal liability are contrary to 29 U.S.C. § 1388(d)(1). During the years in question, the Company's obligation to contribute to the Plan were for "more than an insubstantial portion of its work in the craft and area jurisdiction of the collective bargaining agreement of the type of which contribution [were] required." Accordingly, there were no partial withdrawals for which liability may be assessed.

---

[1] The Company understands that there is no dispute that it is a construction industry employer, and the Fund's Plan is a construction industry plan, for purposes of 29 U.S.C. § 1383(b)(1), the construction industry exception.


**jackson lewis**
Attorneys at Law

Trustees, Ohio Operating
Engineers Pension Fund

November 10, 2017
Page 2

## II.    BACKGROUND

These background facts are taken from the Affidavit of John Hesford (attached as Exhibit 1) and the Fund's Withdrawal Liability Assessment dated August 31, 2017.

The Company began operations on April 1, 2004, when it purchased the assets of its predecessor. The Company was a party to a series of collective bargaining agreements with the International Union of Operating Engineers, Local 18 ("Local 18") the last of which was effective from May 8, 2013 through April 30, 2017 ("CBA"). In accordance with these collective bargaining agreements, the Company made the required contributions for hours worked by employees within the craft and geographic jurisdiction of these agreements through April 30, 2017.

The Company terminated the CBA and its relationship with Local 18 effective April 30, 2017. Since then, all of the Company's on-site construction work has been performed by the following, and no others: (a) Company employees covered by its collective bargaining agreements with Iron Workers Local Nos. 44, 172 and 180; (b) crane operators covered by the CBA and its successors, and employed by crane leasing companies that have contracted with the Company to provide cranes and crane operators for these projects; and (c) licensed surveyors to establish building lines for precast installations (nothing more). All of the crane leasing companies that contract with the Company for work in Local 18's jurisdiction make the required payments to the Fund for the crane operators assigned to these projects.

In a letter dated August 31, 2017, the Fund assessed the Company for withdrawal liability as follows:

- Complete withdrawal liability for the Plan year ending July 31, 2017, in the amount of $368,315 ($605,591 less credit for partial withdrawals).

- Partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627, based on finding that the ratio of hours to maximum average contribution base units ("CBUs") during a 3 year testing cycle were as follows:

  * 2011 – 9%
  * 2010 – 4%
  * 2009 – 13%

- Partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358, based on finding that the ratio of hours to maximum average CBUs during a 3 year testing cycle were as follows:



  * 2012 – 18%
  * 2011 – 9%
  * 2010 – 4%

- Partial withdrawal liability for the Plan year ending July 31, 2013 in the amount of $0 (after application of prior partial withdrawals), based on finding the ratio of hours to maximum average CBUs during a 3 year testing period were as follows:

  * 2013 – 28%
  * 2012 – 18%
  * 2011 – 9%

The Fund's assessment letter does not explain why it used the statutory "70% decline" formula, which does not apply to construction industry employers/plans, to find partial withdrawal, nor why it did not apply the "insubstantial portion" provision in 29 U.S.C. § 1388(d)(1), which does apply. Moreover, the Fund's letter does not explain why the construction industry exception to complete withdrawal liability does not apply here, given that Company employees have not continued or resumed work within Local 18's jurisdiction since April 30, 2017.

In an email to Fund in-house counsel, Bryan Barch, dated October 23, 2017, Company counsel asked for "documentation in the Fund's possession that confirms, supports or explains the Fund's application of the [70% decline] formula to the Company. . . ." In the same email, Company counsel asked for "documents in the Fund's possession that confirms, supports or explains [the Fund's] findings and conclusion [that the Company continued or resumed work within the craft and geographic jurisdiction of Local 18]." The only response received to date was on November 1, 2017, from the Fund's outside counsel stating that he would have to review the file in more depth before responding on these issues. A copy of this email exchange is attached as Exhibit 2.

## III.  THERE HAS BEEN NO COMPLETE WITHDRAWAL

A. The CBA did not obligate the Company to make pension contributions for subcontractors; therefore, use of subcontractors for work formerly performed by the Company's Local 18 employees is not grounds for imposing withdrawal liability.

"[T]here is no withdrawal [as a result of subcontracting] unless the [construction] employer would have been obligated to make contributions for work performed by subcontractors under the terminated agreement. If contributions would not have been required, there would be no withdrawal, because the employer would not be continuing to perform work of the type for which contributions were previously required." PBGC Opinion Letter 85-5.



Attorneys at Law

While the CBA, in Art. XIII, Sect. 117,, states that "all subcontractors shall be subject to the terms and provisions of this Agreement as it relates Operating Engineers", neither this nor any other provision of the CBA expressly imposes liability on the Company if the subcontractor fails to make the required payments. Accordingly, the construction industry exception applies, as the Company is not "continuing to perform work of the type for which contributions were previously required".

B. All of the subcontracted crane operators are covered by the CBA and its successor, and their employers make the required payments to the Fund; therefore, use of these subcontractors is not grounds for imposing withdrawal liability.

In enacting the Multi-Employer Pension Plan Act in 1980, Congress recognized that the withdrawal of a single construction employer from a construction industry plan does not reduce the contribution base if "other signatory employers take up the slack." *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for Northern California*, 859 F. 2d 808, 812 (1988).

Here, other signatory employers have taken up the slack. This is the opposite of what occurred in *Oregon-Washington Carpenters-Employers Pension Trust Fund v. BQC Construction Inc. Hardware Service*, 485 F. Supp. 2d 1206 (2007), where the court imposed withdrawal because the construction employer subcontracted to **non-union** carpenters:

> "Boden could have avoided withdrawal liability by subcontracting to a union employer who would make contributions to the Plan, thereby taking up the slack created by Boden. Because Boden did not subcontract to a union employer, the problem of unfunded vested benefits belongs to Boden, and Boden is liable."

*Id* at p. 1216.

Because the Company subcontracts only to Local 18 employers, it is **not** liable for withdrawal.

## IV. THERE WAS NO PARTIAL WITHDRAWAL BECAUSE THE WORK CONTINUED DURING THE YEARS IN QUESTION FOR MORE THAN AN INSUBSTANTIAL PORTION OF THE COMPANY'S WORK IN THE UNION'S JURISDICTION

29 U.S.C. § 1388(d)(1) states: "An employer to whom section 1383(b) of this title (relating to the building and construction industry) applies is liable for a partial withdrawal **only** if the employer's obligation to contribute under the plan is continued for no more than an **insubstantial portion** of its work in the craft and area jurisdiction of the collective bargaining agreement of the type for which contributions are required." (Emphasis added.)



**jackson|lewis**

Attorneys at Law

"Insubstantial portion" is not defined in the statute, nor has it been defined by the PBGC. In fact, the PBGC punted on the issue. PBGC Opinion Letter 95-2. Nor does there appear to be any case law defining the term for purposes of this provision.

However, "insubstantial portion" must mean a decline in contributions greater than the "70% decline" formula set forth in the provision applicable outside the construction industry; why else have a separate provision? And it must mean a portion that is close to zero. See Definition of "Insubstantial" in Merriam Webster dictionary: "not substantial: such as a: lacking substance or material nature b: lacking firmness or solidity: FLIMSY."

The IRS definition of "insubstantial" for purposes of charitable contribution reporting is instructive:

> "Token Exception – Insubstantial goods or services a charitable
> organization provides in exchange for a contribution do not have to
> be described in the acknowledgment [to the donor]. Goods and
> services are considered to be insubstantial if . . . 1. the fair market
> value of the benefits received does not exceed the lesser of 2
> percent of the payment or \$106,* or 2. the payment is at least \$53,*
> the only items provided bear the organization's name or logo . . .
> and the cost of these items is within the limit for 'low-cost
> articles', which is \$10.60.*
>
> *The dollar amounts are for 2016.  Guideline amounts are adjusted
> for inflation."

IRS Publication 1771, "Charitable Contributions, Substantiation and Disclosure Requirements."

The IRS defines "insubstantial" to mean 2% or less, which is consistent with the dictionary definition. The Company's contribution ratios during the years in question were 13%, 4%, 9%, 18% and 28%, all above, and all but one well above, 2%. This was "more than insubstantial" during all of the 3 year measurement periods. Accordingly, there were no partial withdrawals for which liability may be assessed.

## V.    CONCLUSION

For the reasons stated above, the Company requests that the Fund overturn and cancel the assessments of withdrawal liability in their entirety and return to the Company the payments already made.[2]

---

[2] The Company may supplement this Request for Review before the 90-day limitation period expires if the actuarial consultant retained by the Company advises that the Fund's actuary over-stated what is owed due to erroneous calculations.  Of course, such supplement would be moot if the assessments are overturned in their entirety.

Trustees, Ohio Operating
Engineers Pension Fund

November 10, 2017
Page 6



Attorneys at Law

Respectfully submitted,

*Gary L. Greenberg*

Gary L. Greenberg
Attorney for Sofco Erectors, Inc.

GLG/dlc
Enclosures

Cc:     (Via email and U.S. Mail)
        Daniel J. Clark
        Alan Kinzer
        Vorys, Sater, Seymour and Pease LLP
        Outside Counsel for the Fund

4840-5678-4468, v. 1

IN THE MATTER OF:

OHIO OPERATING ENGINEERS
PENSION FUND

And                                          AFFIDAVIT OF JOHN HESFORD

SOFCO ERECTORS, INC.

---

STATE OF OHIO          )
                       ) ss.
COUNTY OF HAMILTON     )

     1.     My name is John Hesford. I am President of Sofco Erectors, Inc. (the "Company"),
10360 Wayne Ave, Cincinnati, Ohio 45215. The Company began operations on April 1, 2004,
when it purchased the assets of its predecessor.

     2.     The Company was a party to a series of collective bargaining agreements with the
International Union of Operating Engineers, Local 18 ("Local 18"), the last of which was effective
from May 8, 2013 through April 30, 2017 ("CBA").

     3.     The Company terminated the CBA and its relationship with Local 18 effective
April 30, 2017; Local 18 has not disputed this.

     4.     At all times since termination of the CBA, all construction and related work
performed on customers' premises by the Company ("on-site work") within the geographic
jurisdiction of the CBA has been limited to a) employees of the Company who are covered by the
Company's collective bargaining agreements with Iron Workers Local Nos. 44, 172 and 290, b)



EXHIBIT
1

crane operators covered by the CBA and its successor, and employed by crane leasing companies that have contracted with the Company to provide cranes and crane operators for these projects, and c) licensed surveyors to establish building lines for precast installations (nothing more).

5.     At all times since termination of the CBA, the Company has employed no non-union employees or subcontractors to perform on-site work within the geographic jurisdiction of the CBA, other than the licensed surveyors referenced in paragraph 4 above.

6.     Attached as Exhibit A is a complete list of all of the crane leasing companies that the Company has contracted with since termination of the CBA for performance of on-site work within the geographic jurisdiction of the CBA.

7.     Attached as Exhibit B – E are letters from the companies listed on Exhibit A that confirm each a) exclusively employs Local 18 operators to run cranes in Local 18's jurisdiction and b) pays into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement for each hour worked.

I swear and affirm that this Affidavit is true and accurate to the best of my knowledge, and is based on my personal knowledge.

Further Affiant sayeth not.

November 10, 2017

_John Hesford_

Subscribed and sworn to before me
this _10_ day of November, 2017.

_Caroline Riley_

Hamilton County, Ohio
My Commission Expires: _11/1/2020_
Acting in Hamilton County, Ohio
4844-1580-5779, v. 1

CAROLINE JEAN RILEY
NOTARY PUBLIC
IN AND FOR THE
STATE OF OHIO
MY COMMISSION EXPIRES
NOVEMBER 1, 2020

2

**EXHIBIT A**

Following are all of the crane leasing companies contracted by Sofco Erectors, Inc.

("Company") since April 30, 2017, to provide cranes and crane operators for on-site work within

the jurisdiction of the Company's 2013-2017 collective bargaining agreement with IUOE Local

18.


Tri-State Crane & Rigging Service
4838 Spring Grove Ave
Cincinnati, OH 45232

Capital City Crane
2299 Performance Way
Columbus, OH 43207

Gould & Smith Crane Rental
8205 Farwick Court
Cincinnati, OH 45249

Maxim Crane Works
840 Licking Pike
Wilder, KY 41076


4844-1580-5779, v. 1



P.O. Box 308
Newport, KY 41072
phone: 859.441.7400
fax: 859.442.6201
www.maximcrane.com

November 1, 2017

To Whom It May Concern,

Maxim Crane Works, L.P. employs Operating Engineers Local 18 operators to run cranes on all Sofco Erectors Inc. jobsites within the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

Boyd K. Vogt, Jr
Regional Credit Manager
Maxim Crane Works, L.P.

EXHIBIT
B

Whatever it takes.



# Tri-State Crane
# & Rigging Service

**4838 Spring Grove Avenue**
**Cincinnati, OH 45232**
**Office: (513)-541-9992**
**Fax: (513)-541-3395**

November 2, 2017

To Whom It May Concern,

Tri-State Crane Rental exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

**EXHIBIT**
**C**



October 18, 2017

To Whom it May Concern,

Capital City Crane Company exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

Brian Gibson

President & CEO





## CRANE RENTAL INC.

8205 FARWICK COURT ■ CINCINNATI, OHIO 45249 ■ 513-489-2050 ■ FAX 513-489-1873

### 24 HOURS SERVICE

November 1, 2017

To Whom It May Concern,

Gould & Smith Crane Rental exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

James Smith, President
Gould & Smith Crane Rental, Inc.

EXHIBIT

E

CRANE RENTAL ■ TRUCKING ■ STORAGE

## Greenberg, Gary L. (Cincinnati)

| | |
|---|---|
| **From:** | Clark, Daniel J. <djclark@vorys.com> |
| **Sent:** | Wednesday, November 01, 2017 5:27 PM |
| **To:** | Greenberg, Gary L. (Cincinnati); Kinzer, Allen S. |
| **Cc:** | Baron, Peggy M. |
| **Subject:** | RE: Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017 |

Gary-

Yes, this file has been transferred to us. We are just getting our hands around it, so I do not have all the answers for you, but I did not want to ignore you either. I will address your points from your October 23, 2017 email to Bryan Barch in turn.

1.  I believe that the August 29 correspondence included all of the information from the Fund's actuaries necessary for Libman Actuarial to review. Are there specific questions the Libman has or pieces of information that they need?

2.  The Pension Fund has not adopted its own procedures for withdrawal liability matters. They operate according to the statute and applicable regulations.

3 and 4. I am going to have to review the file in more depth before responding to you on these issues.

Dan



**Daniel J. Clark**
Partner

Vorys, Sater, Seymour and Pease LLP
52 East Gay Street | Columbus, Ohio
43215

Direct: 614.464.6436
Fax: 614.719.4650
Email: djclark@vorys.com
*www.vorys.com*

---

**From:** Greenberg, Gary L. (Cincinnati) [mailto:Gary.Greenberg@Jacksonlewis.com]
**Sent:** Tuesday, October 31, 2017 1:26 PM
**To:** Clark, Daniel J.; Kinzer, Allen S.
**Subject:** FW: Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017

Gentlemen-

Ohio Operating Engineers Pension Fund in-house counsel Bryan Barch informed me yesterday that you now represent the Fund in this matter. On October 23, 2017, I sent the e-mail below to Mr. Barch. I have yet to receive a response.

1



EXHIBIT
2

Please let me know right away whether our actuarial consultant may communicate directly with the Fund's actuaries at Segal Consulting about their calculations and assumptions.

Also, let me know as soon as possible when I will receive a response to my substantive questions and information requests.

Gary Greenberg
Attorney for Sofco Erectors, Inc.


**Gary L. Greenberg**

Attorney at Law

**Jackson Lewis P.C.**

425 Walnut Street
Suite 2300

Cincinnati, OH 45202

Direct: (513) 873-2103 | Main: (513) 621-3440

Gary.Greenberg@Jacksonlewis.com | www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*


**From:** Greenberg, Gary L. (Cincinnati)
**Sent:** Monday, October 23, 2017 11:14 AM
**To:** Bryan Barch <BryanBarch@ooefbp.com>
**Subject:** Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017

Mr. Barch-

Thank you for sending me the Acceptance of Agreement by Sofco Erectors, Inc. ("Company") dated 10-3-11, the 2010-13 and 2013-17 collective bargaining agreements, the Pension Trust Agreement and Pension Plan. I have these follow-up questions:

-We have retained the Libman Actuarial Group of Cleveland, Ohio to consult with us on the calculations and assumptions. May our consultant communicate directly with the Fund's actuaries at Segal Consulting for this purpose?

-I note that Section 16 of the Pension Plan, which governs withdrawal liability, does not include any dispute resolution requirements. Accordingly, we assume that the Fund has no requirements for resolution of disputes over withdrawal liability assessments, aside from what is required by the applicable provisions of ERISA. If this assumption is incorrect, please let me know immediately and provide the Fund's requirements.

-The actuary's calculation letter dated August 29, 2017 correctly cites Section 4208(d)1 as the provision that governs assessment of partial withdrawal liability in the construction industry; such liability may be assessed only when work continues for an "insubstantial portion" of the employer's work in the jurisdiction of the collective bargaining agreement. But the calculations of partial withdrawal liability are based entirely on application of the 70% decline provision in Section 4205(b)(1), which does not apply to the construction industry. Please provide any documentation in the Fund's possession that confirms, supports or explains the Fund's application of the 4205(b)(1) formula to the Company, including without limitation policies, resolutions and precedents.

2

As you know, in accordance with ERISA's construction industry exemption, complete withdrawal liability may only be assessed against the Company if it continued to perform or resumed the same work performed by bargaining unit employees within the craft and geographic jurisdiction of the collective bargaining agreement. Since expiration of the 2017 agreement, no Company employee has performed any such work, based on our understanding of the craft and geographic jurisdiction of the expired agreement. We assume that the Fund found and concluded that the Company continued or resumed such work following expiration. Please provide the specifics upon which this finding and conclusion was based, including what work the Fund believes has been performed by the Company within the jurisdiction of the agreement since expiration, and by whom. Also, please provide any documentation in the Fund's possession that confirms, supports or explains this finding and conclusion, including without limitation policies, resolutions and precedents.

The Company is making the installment payments in accordance with the Demand for Payment. In doing so, the Company is not admitting that the assessments are valid.

Thank you for your attention to this.

Gary Greenberg
Attorney for Sofco Erectors, Inc.

**Gary L. Greenberg**

Attorney at Law

**Jackson Lewis P.C.**

425 Walnut Street
Suite 2300

Cincinnati, OH 45202

Direct: (513) 873-2103 | Main: (513) 621-3440

Gary.Greenberg@Jacksonlewis.com  |  www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.
From the law offices of Vorys, Sater, Seymour and Pease LLP.

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

3

Representing Management Exclusive... a Workplace Law and Related Litigation

**jackson lewis.**

425 Walnut Street
Suite 2300
Cincinnati, Ohio 45202
Tel 513 621-3440
Fax 513 621-4449
www.jacksonlewis.com

| | | | |
|---|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

MY DIRECT DIAL IS: 513-873-2103
MY EMAIL ADDRESS IS: GARY.GREENBERG@JACKSONLEWIS.COM

*through an affiliation with Jackson Lewis P.C., a Law Corporation

November 29, 2017



**VIA E-MAIL & U.S. MAIL**

Trustees, Ohio Operating Engineers Pension Fund
c/o Brian C. Barch, In-house Counsel
1180 Dublin Road
PO Box 12009
Columbus, OH 43212-0009

      RE:   Sofco Erectors, Inc. – Supplemental Request for Review of Withdrawal Liability
            Assessment dated August 31, 2017

To the Trustees:

      This is a Supplement to the Request for Review submitted by Sofco Erectors, Inc. ("Company") on November 10, 2017. In its Request for Review dated November 10, 2017, the Company disputed the Fund's assessments in their entirety, based on 29 U.S.C. § 1383(b)(1) and 29 U.S.C. § 1388(d)(1). In this Supplement, the Company submits grounds for reducing the assessments if they are not overturned in their entirety.

**I.    THE FUND'S ACTUARY ERRONEOUSLY INCLUDED AMOUNTS FROM BEFORE APRIL 1, 2004 IN CALCULATING THE ASSESSMENT**

      The Company began operations on April 1, 2004, when it purchased the assets of its predecessor. Affidavit of John Hesford, attached as Exhibit 1 to Company's Request for Review dated November 10, 2017. This was an arms-length transaction. Neither of the Company's owners, John Hesford and Dan Powell, had any ownership in the predecessor Company or familial relationship with its owners. The previous owner of these assets was Southern Ohio Fabricators, Inc.; a list of its owners at time of purchase is attached as Exhibit 1.

      Southern Ohio Fabricators, Inc. and its owners ceased operations entirely, and therefore had no withdrawal liability. 29 U.S.C. § 1383(b)(1). Accordingly, the Company began operations on April 1, 2004 with a clean slate as to the Fund.

Trustees, Ohio Operating
Engineers Pension Fund

# jackson|lewis.

November 29, 2017
Page 2

Despite the Company not operating before April 1, 2004 and the predecessor's exemption from withdrawal liability, the Fund's actuary included amounts from before that date in calculating the assessments. See Exhibits B, C, D, G, J, M, and Q, attached to the Segal Consulting letter dated August 29, 2017. When the liability allocation for Plan Year ending July 31, 2003 is excluded, and assuming withdrawal liability (which the Company disputes), the assessments would be as follows:

|  | Assessed | Revised |
|---|---|---|
| Partial – YE 7-31-11 | $344,627 | $ 48,907 |
| Partial – YE 7-31-12 | $111,358 | $160,404 |
| Partial – YE 7-31-13 | $0 | $0 |
| Complete – YE 7-31-17 | $368,315 | $301,681 |
| Total: | $824,300 | $510,992 |

See summary prepared by Company's actuarial consultant, attached as Exhibit 2.

The removal of contributions preceding April 1, 2004 would likely further reduce the liability, but the Company's actuarial consultant did not have sufficient data to calculate the additional reduction. The Company requests that the Fund recalculate the Company's withdrawal liability by excluding pre-April 1, 2004 contributions made by Southern Ohio Fabricators, Inc., in addition to excluding (as above) the liability allocation for the Plan Year ending July 31, 2003.

## II.    THE FUND HAS NOT PROVIDED REQUESTED INFORMATION THAT MIGHT ALSO AFFECT THE CALCULATIONS

On November 15, 2017, counsel for the Company e-mailed the following requests for information to counsel for the Fund (attached as Exhibit 3):

- The withdrawal liability reports for 7/31/2008, 7/31/2009, and 7/31/2016, as referred to in the Exhibits E, K, and U attached to the Segal Consulting letter dated 8/29/2017.

- Why were the partial withdrawal calculations based on the withdrawal liability reports for 3 years before the partial withdrawal assessment?

- What interest rate was used to calculate the quarterly installments in each of the three assessments, and what is the basis for those rates?

- What is the payment start date for each of the three assessments?

None of the requested information has been provided. Accordingly, the Company reserves the right to raise issues related to the requested information in arbitration.

# jackson|lewis.

### III.     CONCLUSION

For the reasons set forth in the Company's Request for Review dated November 10, 2017, the partial and complete withdrawal liability assessments should be overturned in their entirety.  If the assessments are not overturned, then they should be recalculated and reduced by excluding the liability allocation for the Plan Year ending July 31, 2003 and all contributions made before April 1, 2004, as the Company did not operate before that date and is not a successor to the liability allocations and contributions of Southern Ohio Fabricators, Inc., which ceased operations on that date.

Respectfully submitted,

Gary L. Greenberg
Attorney for Sofco Erectors, Inc.

GLG/dlc
Enclosures

Cc:     (Via email and U.S. Mail)
        Daniel J. Clark
        Alan Kinzer
        Vorys, Sater, Seymour and Pease LLP
        Outside Counsel for the Fund

4831-0309-6919, v. 1

## LIST OF SHAREHOLDERS OF
## SOUTHERN OHIO FABRICATORS, INC.

### Names of Shareholders

Patricia Kling Ballman

Elizabeth Kling Mayotte

Christina Perry (Daughter of John Emerson Kling)

Josephine Kling Trippe

Susan Kling Worthington

Elizabeth Kling Mayotte, Susan Kling Worthington and
Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable
Trust FBO Christina Perry
With Life Estate for Margaret S. Kling

Elizabeth Kling Mayotte, Susan Kling Worthington and
Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable
Trust FBO Josephine Kling Trippe, Patricia Kling Ballman,
Elizabeth Kling Mayotte and Susan Kling Worthington
With Life Estate for Margaret S. Kling

Jerry T. Nickerson

Jerry T. Nickerson, Trustee, FBO Laurie A. Nickerson

Laurie A. Nickerson

Jennifer L. Nickerson

Anne Nickerson

Timothy J. Gates

Stephen R. Sundin

James W. Ludwig

1185459.1

EXHIBIT
1

Ohio Operating Engineers Pension Fund
Withdrawal Liablity Calculations
Sofco Erectors, Inc.

DEMANDED WITHDRAWAL LIABILITY AMOUNTS

|  | | Partial Withdrawal Liability 7/31/2011 | Partial Withdrawal Liability 7/31/2012 | Partial Withdrawal Liability 7/31/2013 | Total Withdrawal Liability 7/31/2017 | Totals |
|---|---|---|---|---|---|---|
| Original Calculation | 1 | $344,627 | $111,358 | $0 | $368,315 | $824,300 |
| Revised Calculation | 2 | $48,907 | $160,404 | $0 | $301,681 | $510,992 |
| Change | | ($295,720) | $49,046 | $0 | ($66,634) | ($313,308) |

1  Calculations per Ohio Operating Engineers Fringe Benefit Programs Demand for Payment
   dated August 31, 2017.

2  Revised Calculations reflect removal of Plan Year Ended July 31, 2003 from Liability.
   The removal of contributions preceding April 1, 2004 would also change the results,
   but we lack sufficient data to calculate the amount of such reduction.

EXHIBIT
2

**Greenberg, Gary L. (Cincinnati)**

| | |
|---|---|
| From: | Crawford, Denice L. (Cincinnati) on behalf of Mills, James A. (Cincinnati) |
| Sent: | Wednesday, November 15, 2017 1:54 PM |
| To: | djclark@vorys.com; askinzer@vorys.com |
| Cc: | Greenberg, Gary L. (Cincinnati); Rosenthal, Daniel G. (Cincinnati) |
| Subject: | Sofco Erectors, Inc. |

Dear Mr. Clark and Mr. Kinzer,

My colleague, Gary Greenberg, is currently unavailable but asked to me to forward this request from the Company's actuarial consultant for a response from the Fund's actuary. The Company requests the following information:

- The withdrawal liability reports for 7/31/2008, 7/31/2009, and 7/31/2016, as referred to in the Exhibits E, K and U attached to the Segal Consulting letter dated 8/29/2017.

- Why were the partial withdrawal calculations based on the withdrawal liability reports for 3 years before the partial withdrawal assessment?

- What interest rate was used to calculate the quarterly installments in each of the three assessments, and what is the basis for those rates?

- What is the payment start date for each of the three assessments?

Jim Mills

**James A. Mills**
Attorney at Law
**Jackson Lewis P.C.**
425 Walnut Street
Suite 2300
Cincinnati, OH 45202
Direct: (513) 873-2113 | Main: (513) 621-3440
James.Mills@Jacksonlewis.com | www.jacksonlewis.com
*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*







Ciner
EXHIBIT N
Date: 10-8-2018

**Vorys, Sater, Seymour and Pease LLP**
Legal Counsel

52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

614.464.6400 | www.vorys.com

Founded 1909

Daniel J. Clark
Direct Dial    (614) 464-6436
Direct Fax    (614) 719-4650
Email djclark@vorys.com

June 22, 2018

## VIA U.S. MAIL

Gary L. Greenberg
Jackson Lewis P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202

                Re:    Sofco Erectors, Inc.

Dear Gary:

As you know we represent the Ohio Operating Engineers Pension Fund with respect to its assessment of withdrawal liability against Sofco Erectors, Inc. (the "Company"). This correspondence constitutes the Fund's response to the Company's request for review dated November 10, 2017. For the reasons set forth below, the Fund confirms that withdrawal liability was properly assessed against the Company.

### A. The Company Does Not Qualify for the Construction Industry Exception

The Company disputed the withdrawal liability assessment by contending that following the termination of it collective bargaining agreement with Local 18 of the International Union of Operating Engineers (the "Union") it had "not continued or resumed performing work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." 29 U.S.C. § 1383(d)(1). The Fund acknowledges that it and the Company are in the construction industry such that the construction industry exception could apply.

The Fund disputes the Company's contention that it has not continued to perform work in the jurisdiction of the collective bargaining agreement following the termination of the CBA with the Union. Specifically, since April 2017, the Company has continued to employ forklift operators. Prior to April 2017, the Company routinely assigned members of the Union to operate forklifts, which are within the jurisdiction of the CBA, and made contributions to the Fund on behalf of this work.

Moreover, the Company had employed members of the Union to perform shop work, repairing and maintaining equipment. Contributions were paid pursuant to the CBA based upon this work. This work continued to be performed following April 2017. Indeed, the Fund understands


**VORYS**
Legal Counsel

Gary L. Greenberg
June 22, 2018
Page 2

that a Union operator was retained by the Company following the termination of the CBA, for the purpose of performing the same work as was previously performed on a contributory basis.

Given the above, it is evident that the Company has continued to perform work within the jurisdiction of the CBA. Accordingly, the construction industry exception is not applicable. Complete withdrawal liability was properly assessed on account of the Company's withdrawal from the plan.

### B. Partial Withdrawal Liability Was Properly Assessed.

Next, the Fund has considered the Company's position with respect to the assessments of withdrawal liability based upon a partial withdrawal in 2011 and 2012. The Company's Request for Review notes that an employer under Section 1383(b) is liable for a partial withdrawal if the employers obligation to contribute under the plan continued for "no more than an insubstantial portion of its work" 29 U.S.C. § 1388(d).

The Fund acknowledges the applicability of this exception. However, the Company's obligation to contribute to the Fund continued for more than "an insubstantial portion" of its work. While the Fund acknowledges that the terms "insubstantial portion" is not clearly defined in the statute, the Fund rejects the Company's suggestion that the terms should be interprets to mean 2% or less.

Such an interpretation of the statute would effectively eliminate the assessment of withdrawal liability in the construction industry. Had that been the intent of Congress, it could have done as much. In fact, we noted in the legislative history, construction industry employers advocated for the adoption of a 5% or less definition to be incorporated into the statute. This suggestion was not adopted. Accordingly, it seems evident that the term "insubstantial portion" must mean something less than 30% but greater than 5%. Given the above, the Fund sees no reason to alter it assessments of partial withdrawal liability.

### C. The Company's Contribution History Precedes April 2004.

In Company's supplemented request for review, it contends that its contribution history should be calculated starting with April 2004 and that the Fund's withdrawal liability calculation should be revised to exclude contribution history from 2002 and 2003. The Company contends it started contributing to the Fund following an April 2004 asset purchase.

In response to the Company's request for review, the Fund examined the contribution history of the Company. Contrary to the Company's assertion, the Fund has a long history of contributions on behalf of Sofco Erectors, Inc. The Company has been signatory to CBAs with the Union dating back to at least the 1980s. Moreover, contributions were paid by Sofco Erectors, Inc. both before and after April 2004. Contributions were made on behalf of many of the same employees before and after April 2004.


Legal Counsel

Gary L. Greenberg
June 22, 2018
Page 3

       Accordingly, the Company's contention that withdrawal liability should only be based upon a contribution history commencing in April 2004 is unsupported by the Company's actual contribution history and contribution reports to the Fund.

       For the reasons described above, the Company's Request for Review was considered but did not result in any modification in the amount of the withdrawal liability assessed.

                      Sincerely,

                      Daniel J. Clark

DJC/lm

cc:    Allen S. Kinzer *(via email)*
       Elizabeth Weinewuth *(via email)*
       Arbitrator John Sands *(via email* via AAA JaniceHoldinski@adr.org)

Ciner
EXHIBIT ◯
Date: 10.8.2018

## AFFIDAVIT OF TIM GATES

STATE OF OHIO                    )
                                 ) SS:
COUNTY OF  HAMILTON              )

Tim Gates, being first duly sworn, deposes and says that:

1. I am Tim Gates. I am over the age of 18 and I am competent to testify to the matters set forth herein.

2. I was the President of Southern Ohio Fabricators, Inc. until July 2004.

3. Two families owned Southern Ohio Fabricators, Inc., the Kling family and the Nickerson family. The Kling family was the majority shareholder.

4. Southern Ohio Fabricators, Inc. had a wholly owned subsidiary named Sofco Erectors, Inc. that existed prior to April 2004 ("Old Sofco").

5. In March 2004 Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., a company owned by John Hesford, Jim Ludwig, and Dan Powell.

6. After Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., Old Sofco performed no work. Old Sofco was merely a shell corporation until it could be wound down. It had no equipment, employees, or any ability to perform work.

7. Similarly, after Old Sofco's assets were sold, Southern Ohio Fabricators, Inc. did not perform any erection work. It had no personnel or equipment to perform any such erection work after it sold Old Sofco's assets.

8. None of the owners of Southern Ohio Fabricators, Inc. or Old Sofco owned, operated, or had involvement in any company that performed erection services after the sale of Old Sofco's assets.

9. In July 2004, Southern Ohio Fabricators, Inc. sold its assets to Clermont Steel Fabricators.

10. After Southern Ohio Fabricators, Inc. sold its assets, I signed a consulting agreement and assisted in winding it up. After Southern Ohio Fabricators, Inc. sold its assets, it ceased to perform any work and like Old Sofco was merely a shell corporation.

Further affiant sayeth naught.

_Tim Gates_

Tim Gates

Sworn and subscribed to before me this _11_ day of September, 2018.

Notary public: _Tracy A Wagner_

My commission expires: _6-15-2020_

TRACY A. WAGNER
Notary Public, State of Ohio
My Commission Expires 06-15-2020

4851-6528-0113, v. 1

Case: 2:18-cv-00180-GCS-EPD Doc #: 1-1 Filed: 03/01/18 Page: 1 of 18 PAGEID #: 10

Ciner
EXHIBIT  P
Date: 10.8.2018

**AMERICAN ARBITRATION ASSOCIATION**

In the matter of arbitration between:                    AAA No. 01-16-000-39530

PRECISION ENVIRONMENTAL COMPANY,                         Mitchell B. Goldberg, Arbitrator
                  Claimant,

                                                         Date of Award:
          -v-                                            February 5, 2018

OHIO OPERATING ENGINEERS PENSION
FUND,
                  Respondent.

**OPINION AND AWARD**

Appearances:

For the Claimant:
Frank W. Buck, Neal B. Wainblat and Jeffrey J. Moyle, Littler Mendelson, PC

For the Respondent:
Daniel J. Clark and Elizabeth B. Howard, Vorys, Sater, Seymour & Pease LLP

I.        Introduction and Background.

          This is an arbitration proceeding conducted under the American Arbitration Association's

Multi-employer Pension Plan Arbitration rules for Withdrawal Liability Disputes. Claimant

("Employer") is one of the employer participants in the Ohio Operating Engineers Pension Fund

("Fund"). Claimant is an employer as defined in the Multi-employer Pension Plan, and in the

Multi-employer Pension Plan Amendments Act ("MPPAA"). Claimant filed a pension plan claim

request for arbitration with AAA on September 14, 2016 after disputing the Respondent's

demand for withdrawal liability dated December 23, 2015 in the amount of $188,044.00, and the

amount of quarterly installments payments of $4,692.00 (and one final payment of $3,081.00)

for the reasons discussed below. Claimant was a signatory to a collective bargaining

1

agreement ("CBA") under which it was obligated to make pension contributions to the Fund on behalf of the employees described in the CBA bargaining unit.

The Fund alleges that withdrawal liability was assessed against the Employer in accordance with 29 U.S.C. Section 1381(a). The Employer completely withdrew from the Fund when it or a trade or business under which it had a common control permanently ceased to have an obligation to contribute to the Fund. Alternatively, it alleges that under 29 U.S.C. Section 1383(b)(2),the Employer completely withdrew from the Fund when it ceased to have an obligation to contribute to the Fund and the Employer or a trade or business under which it shared common control continued performing work in the jurisdiction of the CBA for which contributions were previously required. Respondent contends that its withdrawal liability assessment against the Employer was properly and legally assessed under the MPPAA and that the amounts assessed are due under the Fund's schedule of payments.

The parties agreed, after conducting discovery with respect to their claims and defenses, to waive a formal hearing on the issues. They instead agreed to submit joint opposing motions for summary judgment on the disputed issues. Each party filed their respective briefs, responses and replies to the dispositive motions.

A multi-employer pension plan is a plan to which more than one employer contributes and which is maintained pursuant to one or more CBAs between the employers and the union. The plans are jointly trusteed and administered under Section 302 of the LMRA, 29 U.S.C. Section 186. Half of the trustees are appointed by the union and the other half by employers or employer associations. The applicable CBA in this dispute is between the Construction Employers Association, of which Precision was a member, and the International Union of Operating Engineers, Local 18. That CBA expired on April 30, 2015. Precision withdrew its recognition of the Operating Engineers and no longer remained as a party to any subsequent

2

CBA between the Construction Employers Association and the Operating Engineers. Claimant, at all relevant times, was engaged in the business of demolition and asbestos removal within the building and construction industry.

In 1980, Congress enacted MPPAA, amending ERISA and the Internal Revenue Code to further regulate the conduct of multiemployer plans and to protect the PBGC in its role as the guarantor of plan benefits. The MPPAA required plan trustees to collect withdrawal liability from employers whose operations terminated, or whose obligations to contribute terminated. In general, the amount of withdrawal liability is the employer's proportionate share of the plan's unfunded vested liabilities, as determined under a statutory formula. The plan's liability is the actuarial present value of the benefit obligations which have vested. A plan's unfunded vested liability is the difference between the vested liability and the value of the plan's assets at the point in time when the withdrawal liability is triggered.

Congress sought to cure the problems arising when an employer ceased making payments to a plan fund, leaving the plan with vested pension obligations which were only partially funded. A vested benefit is one that is guaranteed to the worker after a number of years of service. An employer who partially or completely withdraws from paying its contributions into a plan causes withdrawal liability to be calculated and paid in order to protect the other employers in the multiemployer plan from having to pay for those benefits. Congress believed that the added burdens upon employers who remained as plan participants might induce more of them to remove themselves from multiemployer plans. This would discourage the entry of new plan participants and precipitate the financial failure of less stable pans.[1]

The MPPAA established special industry rules, some of which apply to the building and construction industry. The building and construction industry rules, which apply in this dispute,

---

[1] *Laborers Pension Fund v. W.R. Weis Co.*, 180 F. Supp. 3d 540, 548-549 (2016) (Citing other Circuit cases and a Supreme Court decision).

generally provide that an industry employer is deemed to have withdrawn only if it ceases to have an obligation to contribute while continuing to perform the same type of work previously covered by the plan in the jurisdiction of the union as set forth in the applicable CBA.

Withdrawal liability has been found to occur in cases where the employer goes out of business, sells a business, downsizes, goes non-union by hiring subcontractors to perform the work, or when the subject union under a CBA is decertified. In such cases, courts have found that employers were legally obligated to pay contributions to the funds as required by the CBA, notwithstanding that the union was decertified prior to the end of the contract term. Under the MPPAA, the funds had an independent right to sue for delinquent contributions owed under the terms of the CBA, irrespective of whether a union could legally enforce the terms of the CBA.[2] Accordingly, the MPPAA authorizes multiemployer plans to sue for delinquent contributions owed under the terms of the plan and under the terms of a CBA.[3] Both parties agree that the Employer's obligation to make contributions to the Fund in this case ceased when the subject CBA expired by its terms on April 30, 2015. The relevance of the above cases regarding decertification to the case at hand is that in the above cases it is clear that withdrawal liability was triggered because the employers no longer had the obligation to make contributions after the expiration of those CBAs, and it was clear that the employers continued to perform the work in those jurisdictions of the type for which contributions were previously required.

II.     The Statutory Provisions.

Section 4203 of ERISA, 29 U.S.C. Section 1383(b)(2) states:

A withdrawal occurs under this paragraph if -

(A)     an employer ceases to have an obligation to contribute under the plan, and

---

[2] *Midwest Operating Engineers Welfare Fund v. Cleveland Quarry*, 844 F.3d 627 (7th Cir. 2016).
[3] *Central States, Southeast & Southwest Areas Pension Fund v. Schilli Corp*, 420 F.3d 663, 669-670 (7th Cir. 2005).

4

     (B)    the employer -

          (i) continues to perform the work in the jurisdiction of the [CBA] of the type
             for which contributions were previously required.

An "obligation to contribute" is defined as an obligation to contribute arising: (1) under

one or more collective bargaining agreements; or (2) as a result of a duty under applicable

labor-management relations law. 29 U.S.C. Section 1392(a). Under 29 U.S.C. Section

1401(a)(3)(A), the Fund's assessment of withdrawal liability is presumed correct unless the

party contesting the determination shows by a preponderance of the evidence that the

determination was unreasonable or clearly erroneous.

III.    The Jurisdictional Dispute.

A jurisdictional dispute arose between the Operating Engineers union and the Laborers'

union over the right to exclusively perform the work described as forklift and skid steer work.

Both Unions had CBAs with the Employer that covered that particular type of work. The dispute

was ultimately resolved through an NLRB proceeding (Section 10(k) of the NLRA) and

subsequent litigation over that jurisdictional issue. The jurisdictional issue was resolved in favor

of the Laborers Union of North America. The Sixth Circuit in *Orrand v. Hunt* decided that the

Employer's obligation to continue its contributions to the Fund ceased after the resolution of the

jurisdictional issue.[4] The issue remained as to whether the cessesson of forklift and skid steer

work by the Operating Engineers employees that was performed before their CBA termination,

coupled with the expiration of their CBA (April 30, 2015) triggered a withdrawal liability

assessment under the MPPAA. There is no question that the obligation for the Employer to

make contributions to the Fund ceased, and that the Employer continued to perform the type of

work that the Operating Engineers performed previously before the resolution of the

jurisdictional issue. This was forklift and skid steer work as set forth in its CBA with the

---

[4] 852 F.3d 592 (6th Cir. 2017).

Employer Association. The Employer's assigned work to the Laborers Union was also within the geographic jurisdiction of the Operating Engineers' previous CBA. It was the type of work for which contributions were required from the Employer to the Fund, until the jurisdictional issue was resolved and the CBA expired.. Thereafter, that same type of work was performed by the Laborers, another union within the same jurisdiction (type of work and geographic location) set forth in the expired CBA. That Union (Laborers) was a party to a different CBA with the Employer, that required contributions to be paid to a different pension fund.

A fixed computed withdrawal liability that attempts to recover an amount of money that would be owed by the Employer to compensate the Plan for the Employer's proportionate share of the Plan's unfunded vested liabilities secures the Plan's ultimate ability to pay the defined benefits due to the Union's employees when the defined benefit retirement benefits are due to be paid. This unfunded amount is determined on the date of exit from the plan.[5] If the Fund cannot collect its withdrawal liability payments, the other employers within the multiemployer fund will under certain circumstances be required to make up the deficiency caused by the Fund's inability to collect the balance due of payments that consist of its unfunded vested benefits necessary to pay the defined pension benefits promised to the employees in the bargaining unit who have already earned their defined retirement benefits as expressed in the CBA and in the incorporated pension fund plan. The withdrawing employer is paying its proportional share of the unfunded contribution amounts for work done prior to the employer's withdrawal, rather than for work done after its withdrawal.[6] However, the Fund, under other circumstances, may receive substitute contributions from other employers within the multiemployer plan or from other plans if those employers hire Operating Engineers' employees for the subject work on other projects within the geographical jurisdiction under CBAs that

---

[5] 29 U.S.C., Section 1391.
[6] 29 U.S.C., Section 1391(b)(1)(A).

provide those employees with work that was lost to the Operating Engineers under this work jurisdiction dispute.

Notwithstanding the fact that forklift and skid steer work was in the described work jurisdiction of both the Laborers' CBA and the Operation Engineers' CBA, the work had for many years been assigned by the Employer to the Laborers, and not the Operating Engineers. However, in the Fall of 2011 the Employer, at the request of the Operating Engineers, assigned forklift and skid steer work on a demolition job at a Hospital in Cleveland. The Employer denied the request because it never in the past made contributions to the Fund for forklift and skid steer work that was performed by members of the Laborers' Union.[7] It had, however, assigned some of that work to Operating Engineers employees in the past and paid contributions to the Fund when it hired Operating Engineers to perform work under its CBA. The calculation of withdrawal liability to the Employer by the Fund is based upon some forklift and skid steer work or other CBA work that was in fact performed by its members before the withdrawal. Those were for hours of work for which contributions were made by the Employer, but not enough contributions to make up for the vested, but unfunded benefits that remained outstanding at the time of the withdrawal.

IV.    Analysis and Findings.

*The Stevens Cases*

The U.S. Court, for the Northern District of Ohio decided the case of *Stevens Engineers & Constructors, Inc. v Iron Workers Loc. 17 Pension Fd.*[8] Plaintiff is a contractor who is one of the employers in a multiemployer pension plan with the Defendant pension fund. The Plaintiff sought to enforce an arbitration award that prohibited the Defendant fund from collecting withdrawal liability. The Fund attempted to assess withdrawal liability under the above

---

[7] Tony Digeronimo Affidavit, Exhibit A to Employer's Motion for Summary Judgment.
[8] 2016 U.S. Dist. LEXIS 114028; L.R.R.M 3388 (2016).

7

construction industry withdrawal liability provisions of ERISA. Stevens, between 1985 and 2013

was a party to a series of CBAs with the Ironworkers Fund. It made contributions to the Fund

when the Ironworkers performed work covered by the CBAs. As in the instant case, Stevens,

the employer, did not renew the Ironworkers' CBA after it expired on April 20, 2013. Its

obligation to contribute to the Fund ceased at that point. Also like this case, after the CBA

expired and after another union of millrights obtained the right to exclusively perform certain

work that was in the stated jurisdictional provisions of both CBAs, the Ironworkers Fund sought

withdrawal liability for the work performed by Ironworkers before the CBA expired and work for

which Stevens had made pension fund contributions during the life of the CBA. The Fund

determined that Stevens had assigned ironworker work of the type for which Stevens had been

required to contribute to the Fund. Stevens demanded arbitration of the dispute.

The subject CBA recognized that jurisdictional disputes would arise due to the fact that

various craft unions in their respective CBAs would claim the same work for its members. In this

case, both the Ironworkers CBA and the Laborers-Millrights unions both claimed the same

jurisdictional work as described in each of their CBAs. However, unlike the CBA in this case,

the parties to the CBAs were also parties to a National Maintenance Agreement ("NMA") that

recognized that various crafts may claim work assignments that are part of their respective

CBAs. Accordingly, as part of its responsibility under the NMA, Stevens agreed to conduct a

pre-job conference to cover all craft work assignments for each project. Stevens conducted the

pre-job conference for a certain project after the above CBA with the Ironworkers expired. It

assigned certain work to the Millrights instead of the Ironworkers. The losing union, in this case,

the Ironworkers, could challenge Stevens' assignment by first having the issue referred to the

International Unions to resolve the dispute. If the assignment dispute was not resolved at that

level, either Stevens as the Employer or the Union could refer the issue to final and binding

8

arbitration. This contractual internal dispute resolution process would provide a speedier process for the resolution of the dispute, and the unions agreed not to strike while this resolution process was untaken. Stevens and the Ironworkers Union engaged in the NMA process to a certain point, but it did not go to arbitration. The contested work went to the Millrights when the Ironworkers Union decided not to go further with the NMA process.

The Ironworkers Union thereafter pursued a claim for withdrawal liability against Stevens. Its claim was that Stevens stated that prior to the expiration of the Ironworkers' CBA, Stevens used Ironworkers to perform certain Ironworkers work "on several occasions over the years." Stevens also performed the same type of work in the same jurisdiction covering the pension fund obligations in the CBA within 5 years after May 1, 2013, but because that work was assigned to the Millrights and not the Ironworkers, Stevens would not have an obligation to make pension contributions under the Ironworkers CBA to the Ironworkers pension fund, thereby causing withdrawal liability to be triggered.

The Arbitrator in the withdrawal liability dispute conducted a hearing and issued his findings and conclusions of law. He determined that the Ironworkers abandoned its claim of contractual jurisdiction over the work that Stevens assigned to the Millrights. He further stated that the disputed work Stevens assigned to the Mfillrights was not in the Ironworkers' craft jurisdiction defined in its expired CBA and thus, Stevens did not assume such work within 5 years after April 30, 2013, the date on which it ceased to have an obligation to contribute to the Fund. The Arbitrator stated:

> [Section] 1383 also requires such work to be work "of the type for which contributions were previously required," and concluded that because the work at issue was performed by millrights under Stevens' unchallenged assignment, that work is not work for which contributions had ever been required to the Iron Workers Local 17 Pension Fund. As such, he determined that the [Fund] Trustees determination to the

contrary was clearly erroneous.[9]

The Fund disagreed with the Arbitrator's findings and conclusions of law and sought to vacate the award before the District Court. The Fund relied upon a decertification decision in the 7th Circuit that held that the decertification of the union did not terminate the employer's obligation to contribute for withdrawal liability purposes, by operation of law (Section 1145).[10] The Court, however, distinguished the decertification case by stating that the controlling issue is not when Stevens' obligation to contribute to the Fund ceased; instead, the question is whether "the special status enjoyed by multiemployer pension funds under [Section] 1145 applies to the assessment of withdrawal liability arising from an inter-union craft jurisdictional dispute." It went further to discuss cases that make it clear that a Fund is not permitted under ERISA to collect employer contributions for work properly assigned to another union in a jurisdictional dispute, notwithstanding that the Fund's CBA also covers that work. An employer is not required to contribute to a plaintiff Fund unless it is contractually obligated to do so. In other words, notwithstanding that two CBAs cover the same work, the work that was properly assigned to the winning union requires pension contributions to that fund for those workers, and not also for the losing union's fund, notwithstanding that both union CBAs cover the same work.

The Ironworkers Fund argued, as the Fund here argues, that prohibiting it to collect withdrawal liability for work previously performed under its CBA, and for work in which Stevens previously made contributions, would reduce its contribution base. Even if the Union went through the NMA procedure and lost, instead of abandoning its claim, the Fund would still be entitled to collect withdrawal liability for the vested but unfunded contributions that needed to be

---

[9] The Arbitrator further stated that the Trustees' use of the withdrawal liability process to determine a work jurisdiction dispute between two NMA-party unions was unreasonable in the sense that Local 17 used the Fund as a "cat's paw in its turf war with the Millrights over craft jurisdiction and to punish Stevens for having terminated its Iron Workers [CBA]."

[10] *Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663 (7th Cir. 2005).

added to the contributions it had already received for past Ironworkers work when previous

contributions were made to the Fund by Stevens. However, the Court found that the work

assigned to the Millrights was not work for which contributions "had ever been required to the

Fund." In other words, notwithstanding that work in the past was assigned and performed by the

Ironworkers, and that work produced contributions to the Fund and was so required under the

Ironworkers CBA, the Court is not requiring any further recovery of withdrawal liability

contributions (payments) for that same work that would otherwise by due if the obligation to

contribute ceased due to a decertification or loss of union work. The Court stated:

> The Court recognizes the circularity of this argument. There is no
> dispute that Stevens has assigned . . .work to ironworkers instead
> of the millrights in the past. Thus, "craft jurisdiction" changes from
> job to job. The Court could find no case in which a pension fund
> sought to impose withdrawal liability based upon an employer's
> assignment of assignable work to another craft union.
> * * *
> Finally, while the Fund would have received additional [make-up]
> contributions if all the . . . work on the . . . project had been assigned
> to the Ironworkers, its contribution base was not reduced because it
> received contributions for all work within the Ironworkers' craft
> jurisdiction from Stevens' contractors who employed them. No
> non-union labor was used on the project.
>
> Again, the level of any pension fund contributions will naturally change
> marginally from job to job based upon the assignment of assignable
> work.

The Sixth Circuit affirmed the District Court's decision finding that no withdrawal liability

is due to the Fund for the past Ironworker work that was performed during its CBA, and for

which contributions were made by Stevens.[11] The Court expanded further upon the difference

between a situation where an employer "goes non-union," stays in the industry, but ceases

making payments to the plan, and a situation where the employer withdraws from work within

the jurisdiction of its CBA. The Court states that the first situation *does* decrease the

---

[11] *Stevens Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund*, No. 16-4098/4099
(December 13, 2017).

11

contribution base of the plan because the employer is withdrawing from the plan when it goes non-union and stops making contributions. The MPPAA provides that an employer must pay a proportional share of the unfunded amount to the Fund, determined based on the employer's share of contributions for work prior to the withdrawal, rather than after the withdrawal. However, under the second situation, the withdrawal of jurisdictional work does not pose an undue threat to a fund as long as contributions are made for whatever union work is done in the area. This is because the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry. Employees are often dispatched to another contributing contractor who will make contributions to the same plan or another union pension fund plan.

The Court expanded its rationale that was explained by the Arbitrator and the District Court. It acknowledged that the MPPAA expresses a general policy in favor of making employers who withdraw from an underfunded fund pay into it. However, the MPPAA expressly limits the situations in which contributions are required, the specific provisions of the text control over the looser general principles that are also embodied in the MPPAA. The particular rationale for the construction industry exception provides an incentive for employers to gain the benefit of work without the detriment of pension liability when an employer takes on a job that requires pension benefits. The Court states:

> Before its withdrawal from the CBA, Stevens would not have owed contribution liability to Local 17 for work properly assigned to another union through the NMA. It therefore causes no imbalance for Stevens to owe no liability for such work properly assigned after withdrawal either.

### The Weis Decision

The Employer also relies upon the decision of the District Court for the Eastern Division of Illinois to support its position that no withdrawal liability was triggered in this case when the

*Weis* jurisdictional issue was resolved in favor of the Laborers Union as opposed to the Bricklayers Union (BAC) for the disputed work.[12] Weis stopped employing Laborers and stopped contributing to the Fund in October 2009 under the Laborers CBA. It ended its CBA relationship with the Laborers in 2012. The matter went to arbitration on the issue of whether the Fund could assess withdrawal liability. The Arbitrator found in favor of the Employer. The Fund went to Court to vacate the award and to have withdrawal liability assessed in accordance with its calculation of withdrawal liability for payment of the unfunded vested benefits caused by the withdrawal. The Court affirmed the arbitration award.

Weis employed its last laborer in October 2009 after the CBA expired. The Arbitrator sustained the Fund's claim that after 2009, the Employer may have performed some tasks within the general jurisdiction of the Laborer's CBA, notwithstanding that the work overlapped with work under the BAC and ICE CBAs. Weis contributed to the BAC pension fund for these hours. The Laborers Fund claimed withdrawal liability. Weis contested the claim, arguing that it was entitled to an exception for the construction industry, in which an employer is deemed not to have withdrawn, and thus is not subject to withdrawal liability. The Laborers Union revised its demand letter and adjusted the withdrawal date back to October 2009 when its CBA expired. Like the Stevens case, the disputed work was performed after that date by another union's employees and contributions were made to that union's fund.

The Arbitrator, as in the Stevens decisions, ruled in *Weis'* favor, holding that it was not liable for withdrawal payments because it did not continue to perform work in the jurisdiction of the Laborer's CBA of the type for which contributions were previously required under 1383(b)(2)(B)(i). The Arbitrator stated:

> In other words, even though Weis continued employing non-laborers
> to do some work covered by the laborers' CBA, Weis never had an
> obligation to contribute to the [Laborer's Fund] for non-laborers' work,

---

[12] *Laborer's Pension Fund v. W.R. Weis Co.*, 180 F.Supp.3d 540 (E.D. Illinois 2016).

13

when it had already contributed to the other workers' [BAC and ICE] pension funds.[13]

The Court found, as did the Arbitrator, that in *Weis'* case, the history and custom showed that the Laborers' CBA did not require contributions for work done by the other unions for its work, when the employer had made pension contributions to a different union. The Fund argued, as in Stevens, that the legislative purpose of the MPPAA was not accomplished when the Laborer's funding base was compromised due to *Weis* being excused from absorbing the additional cost increases for unpaid unfunded vested benefits that were due over and above the previous contributions that were made to the Laborer's fund for work done under its CBA before the CBA expired in October 2009. The Court applied the same reasoning as above, stating that the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry. Employees are often dispatched to another contributing contractor (with the same union plan, or a different union plan). The construction work is generally done on a project-by-project basis. An employer's covered employment may fluctuate drastically, and when a project ends an employer's workers will normally remain in the labor pool available for employment by other contributing union employers. The Court concluded by stating that the fluctuations are normal events that do not pose an undue threat to a plan as long as contributions are made for whatever union work is done in the geographic area.

The Fund argued that it would be damaged in the sense that its contribution base would be reduced if *Weis* could continue doing the same type of work, but change its workforce to a different trade union, in this case from laborers to non-laborers. The Court, however, held that the legislative history did not support this view because the Fund's base did not encompass work performed by other union members when Weis contributed to other pension funds for that

---

[13] The Arbitrator also held that Weis could assert an affirmative defense of equitable estoppel because Weis reasonably relied to its detriment on the Fund previous assurances that it owed no additional contributions to the Laborer's Fund.

subject work. Weis was not escaping from its contribution obligations because it never had an obligation in the first place to contribute to the Fund for the other union's work. As stated in the Stevens' rationale, this is not a situation where *Weis* stays in the industry but goes non-union and ceases making payments to the plan. Instead, *Weis* continued making contributions to the BAC pension plan and it sustained that funding base. Accordingly, the Court found that the Arbitrator's award did not undermine the legislative purpose of the statute.

*Findings*

The above judicial findings of a controlling legislative purpose that looks upon the effect of an employer withdrawal on industry-wide union employment in the geographic area instead of the specific effect of a withdrawal upon a single employer when that employer ceases to have an obligation to contribute to the plan due to the termination of its participation in the multiemployer collective bargaining agreement is not apparent from the plain reading of the statutory language. Applying that statutory language in this case would seem to trigger withdrawal liability under a plain reading because Precision's obligation to contribute to the Operating Engineers' Fund ceased upon the termination of the CBA. The Employer continued to perform the skid-steer and forklift work that was previously performed under the Union's work jurisdiction, under which contributions to the Fund were previously required. Moreover, the contribution base was decreased by its inability to recover additional unpaid contributions for its unfunded vested benefits that related to the Employer contributions it made to the Fund for work performed by the Union in the past up to the point when the Employer's obligations ceased.

The damage to a single pension fund contribution base becomes evident when one considers the different financial conditions of various union pension funds. If withdrawal liability is not triggered under the above facts for an employer that was obligated to contribute to a fund that was in poor financial condition, the loss of funding for its unfunded vested benefits could be

meaningful. The effects of its poor condition and the loss of funding for those unfunded vested benefits could result in the inability to meet its defined pension payments to its beneficiaries in the future for the retired union workers. Those workers who accumulated benefits through the contributions that were made to the financially stressed fund could be at risk to the point of a PBGC bailout that would produce a substantial reduction of pension benefits. The fact that some other pension fund gained contributions through a jurisdictional decision on some industry wide basis would not be of solace to the employees who performed the subject work and received less than the full contributions necessary to fund both for funding the vested benefits and the unfunded vested benefits that were provided under the terms of the CBA and the Fund.

The Respondent Fund highlights the losses to the single fund when a CBA is terminated without compensating a pension fund for the unfunded liability arising out of its participation. It makes no difference to the particular fund when a portion of the covered work is lost to non-union employees or union employees. When no compensation is provided to the Fund for the loss of payments or contributions for its vested, but unfunded benefits, the Fund has nevertheless lost a portion of its contribution base regardless of whether the lost work is performed by a union or non-union worker. This would necessarily place a burden upon the remaining employers in the multiemployer plan who are left with unfunded liabilities that must be met. It is foreseeable that in some instances the remaining employers in the multiemployer plans could be competitors of the employer who was relieved of the burden to pay withdrawal liability for those unfunded contributions.

Nevertheless, the above Courts have spoken on this precise issue. They have determined that for the construction industry there is some compelling congressional intent, as expressed through its legislative history, to treat employer withdrawals from CBAs and ceased contribution obligations differently for triggering withdrawal liability. Arbitrators must follow these

16

decisions that state the law on this issue, or risk having their decisions vacated, based upon a judicial finding that they have exceeded their power by manifestly disregarding the law.[14]

V.      Award.

The Claimant's motion for summary judgment is granted, and the Respondent's motion for summary judgment is denied for the above reasons. No withdrawal liability is to be assessed against the Employer under Section 4203 of ERISA, 29 U.S.C. Section 1383(b)(2)(A) and (B). Respondent shall refund to Claimant all assessed withdrawal liability payments received from Respondent.

Date of Award: February 5, 2018                    /s/ *Mitchell B. Goldberg, Arbitrator*
                                                   Mitchell B. Goldberg, Arbitrator

---

[14] 9 U.S.C. Section 10(4) of the Federal Arbitration Act. A manifest disregard of the law occurs when when an arbitrator understands and correctly states the law but proceeds to ignore it. *See, e.g. Wilko v. Swan*, 346 U.S.427, 436 (1953); *San Martine Co. de Navegacion, S.A. v. Saguenay Terminals*, 293 F.2d 796,801 (9th Cir. 1961).

17



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
THE NEW YORK TIMES COMPANY,

                        Plaintiff,

        -against-

NEWSPAPER AND MAIL DELIVERERS'-PUBLISHERS'
PENSION FUND,

                        Defendant.
-----------------------------------------X
NEWSPAPER AND MAIL DELIVERERS'-PUBLISHERS'
PENSION FUND AND THE BOARD OF TRUSTEES OF
THE NEWSPAPER AND MAIL DELIVERERS'-
PUBLISHERS' PENSION FUND,

                        Plaintiffs,

        -against-

THE NEW YORK TIMES COMPANY,

                        Defendant.
-----------------------------------------X

A P P E A R A N C E S:

        Attorneys for The New York Times Company

        JONES DAY
        51 Louisiana Avenue, N.W
        Washington, D.C. 20001
        By:  Evan Miller, Esq.
             Yaakov M. Roth, Esq.
             Mark C. Savignac, Esq.



17 Civ. 6178

17 Civ. 6290

OPINION and
ORDER

Attorneys for Newspaper and Mail Deliverers'-
Publishers' Pension Fund and its Board of Trustees

SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
By:   Ronald E. Richman, Esq.
      Max Garfield, Esq.
      Adam B. Gartner, Esq.

**Sweet, D.J.**

In these consolidated actions, The New York Times Company
(the "Times") and the Newspaper and Mail Deliverers'-Publishers'
Pension Fund and Board of Trustees of the Newspaper and Mail
Deliverers'-Publishers' Pension Fund (together, the "Fund") have
cross-moved for summary judgment under Federal Rule of Civil
Procedure 56 on their respective requests to modify or vacate
the arbitration award (the "Award") issued by assigned
arbitrator Mark L. Irvings (the "Arbitrator") in American
Arbitration Association ("AAA") Case No. 01-14-1433 on July 19,
2017, pursuant to the Employee Retirement Income Security Act of
1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, as amended by the
Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), 29
U.S.C. § 1381, *et seq.*

The dispute arises out of a carefully-negotiated
multiemployer collective bargaining agreement ("CBA") that
governs certain aspects of the Newspaper and Mail Deliverers'-
Publishers' Pension Fund applicable to many newspapers in New
York City. The instant motions present a veritable Augean
Stables of issues to be resolved, a cavalcade of sharp disputes
that have been distilled down by the parties and their skilled

3

counsel to four principal issues. Put simply, these issues are:
(1) whether the Times incurred liability by partially
withdrawing from the Fund for plan years ending May 31, 2012,
and May 31, 2013; (2) whether the discount rate used by the Fund
when assessing the Times' withdrawal liability was appropriate;
(3) whether the Fund applied the proper statutory procedure to
calculate liability for the second partial withdrawal; and (4)
whether and to what extent the Times is entitled to interest on
the repayment of overpaid withdrawal liability.

Based on the conclusions set forth below, the motions are
determined as follows. First, the Times incurred withdrawal
liability, and the Arbitrator's finding that the CBA's
contribution base unit under 29 U.S.C. § 1301(a)(11) ("CBU") was
shifts has not been rebutted. Second, the Fund's use of the
Segal Blend rate when assessing the Times' withdrawal liability
was, in this instance, improper, and the Arbitrator's finding to
the contrary is reversed. Third, the Fund's calculation of the
Times' second partial liability was improper. Lastly, the
Arbitrator correctly determined that the Times was entitled to
interest on overpaid withdrawal liability, and his conclusion as
to the applicable interest rate has not been rebutted.

4

I. **Statutory Background and Facts**

a. Statutory Background

Before delving into the facts, a brief overview of ERISA's statutory framework is appropriate.

"ERISA is a comprehensive statutory scheme regulating employee retirement plans." Trs. of Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc., 692 F.3d 127, 128 (2d Cir. 2012) (citing 29 U.S.C. § 1001, et seq.). Part of ERISA's purpose is "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 214 (1986) (internal quotation marks omitted). CBAs create employer retirement plans and employer obligations to contribute to such plans. See 29 U.S.C. §§ 1002(37)(A), 1392(a). In addition, Congress created the Pension Benefit Guaranty Corporation ("PBGC"), "a wholly owned Government corporation, to administer an insurance program for participants in both single-employer and multiemployer pension plans." Id. (citation omitted); see 29 U.S.C. § 1306.

5

Multiemployer pension plans, like the one at issue here, are where "multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." Trs. of Local 138 Pension Tr. Fund, 692 F.3d at 129. Such plans are useful in "certain unionized industries" where companies often go "into and out of business, and . . . employees transfer[ ] among employers." Id. Looking to such plans, Congress passed the MPPAA to amend ERISA and "adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 722 (1984).

The MPPAA implemented "new rules under which a withdrawing employer would be required to pay whatever share of the plan's unfunded vested liabilities was attributable to that employer's participation." Pension Benefit Guar. Corp., 467 U.S. at 723 (citation omitted). "This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." Id. at 725

6

(quoting 29 U.S.C. §§ 1381, 1391). "[C]omplete withdrawal from a plan occurs when an employer (1) permanently ceases to have an obligation to contribute to a plan arising (a) under one or more collective bargaining or related agreements or (b) as a result of a duty under applicable labor-management relations law; or (2) permanently ceases all covered operations under a plan. Withdrawal liability may also be imposed for partial withdrawals." ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, 846 F.2d 879, 881 (2d Cir. 1988) (citing 29 U.S.C. §§ 1381, 1383, 1385, 1392). The MPPAA defines a "partial withdrawal" if, in any plan year, there is a "70 percent contribution decline." 29 U.S.C. § 1385(a)(1).[1] Employers pay withdrawal liability in

---

[1]     ERISA Section 4205 defines a partial withdrawal, more fully, as follows:

> (a)   Except as otherwise provided in this section, there is a partial withdrawal by an employer from a plan on the last day of a plan year if for such plan year –
>
>      (1)  there is a 70-percent contribution decline, or .
>      . .
>
> (b)   For purposes of subsection (a) of this section –
>
>      (1)(A) There is a 70-percent contribution decline for any plan year if during each plan year in the 3-year testing period the employer's contribution base units do not exceed 30 percent of the employer's contribution base units for the high base year.

29 U.S.C. § 1385. A "3-year testing period" is "the period consisting of the plan year and the immediately preceding 2 plan years." Id. § 1385(b)(1)(B)(i). An employer's "contribution base units for the high base year is the average number of such units for the 2 plan years for which the employer's contribution base

annual installments, calculated based on an employer's
historical contribution amount. See 29 U.S.C. §§ 1391(c),
1399(c).

Congress later authorized the PBGC to promulgate
regulations to "provide for proper adjustments . . . so that the
liability for any complete or partial withdrawal in any
subsequent year . . . properly reflects the employer's share of
liability with respect to the plan." 29 U.S.C. § 1386(b)(2). The
PBGC obliged, creating a credit applicable to subsequent
withdrawal liability based on payments already made, such that
the "credit phases out over time, thereby roughly capturing the
change in the composition of the liability pool and allocating
withdrawal liability accordingly." Cent. States, Se. & Sw. Areas
Pension Fund v. Safeway, Inc., 229 F.3d 605, 612 (7th Cir. 2000)
(citing 29 C.F.R. § 4206.1, et seq.); see also 26 C.F.R.
§ 4206.1(a) ("The purpose of the [statutory] credit is to
protect a withdrawing employer from being charged twice for the
same unfunded vested benefits.").

---

units were the highest within the 5 plan years immediately
preceding the beginning of the 3-year testing period." Id.
§ 1385(b)(1)(B)(ii). A "contribution base unit" as "a unit with
respect to which an employer has an obligation to contribute
under a multiemployer plan." Id. § 1301(a)(11).

After an employer withdraws from a plan, the plan sponsor
is vested with the authority to determine the amount of
withdrawal liability. See 29 U.S.C. §§ 1382, 1391. The plan
sponsor then informs the withdrawing employer of the liability,
sets a payment schedule, and demands payment. Id. §§ 1382(2),
1399(b)(1). Within 90 days of receiving the notice, the employer
may request a review of the sponsor's determination of liability
or the payment schedule. Id. § 1399(b)(2)(A). Either side may
thereafter initiate arbitration proceedings within 60 days of
the earlier of: (1) the date on which the employer was notified
of the sponsor's withdrawal liability determination and demand
for payment, or (2) 120 days after the date of the employer's
request for review. Id. § 1401(a)(1). If the employer fails to
request arbitration within the statutory time periods, the
amount of withdrawal liability assessed by the plan sponsor in
the notice becomes "due and owing." Id. § 1401(b). Regardless of
whether an employer requests review or initiates an arbitration,
the employer needs to pay the assessed withdrawal liability
payments in accordance with the payment schedule set forth in
the notice. Id. § 1399(c)(2).

Arbitral decisions over ERISA disputes are subject to
judicial review by federal courts. 29 U.S.C. § 1401(b)(2).

9

b. The CBA and its Provisions

The following facts are drawn from the parties'
declarations, attached exhibits, and Rule 56.1 Statements
submitted in connection with the instant cross-motions for
summary judgment. See Fund's 56.1 Statement ("Fund's 56.1"), No.
17 Civ. 6178, Dkt. No. 26; the Times' 56.1 Statement ("Times'
56.1"), Dkt. No. 20; the Fund's Rule 56.1 Response ("Fund's 56.1
Response"), Dkt. No. 27; the Times' Rule 56.1 Response ("Times'
56.1 Response"), Dkt. No. 29; the Times' Rule 56.1 Reply
("Times' 56.1 Reply"), Dkt. No. 29; Declaration of Jacob M. Roth
dated September 15, 2017 ("Roth Decl."), Dkt. No. 19;
Declaration of Max Garfield dated October 20, 2017 ("Garfield
Decl."), Dkt. No. 28. Unless otherwise noted, the facts are
undisputed.

In 1981, the Newspaper and Mail Deliverers' Union of New
York and Vicinity (the "NMDU") and the Times entered into a CBA.
See Garfield Decl. Ex. 4 (the CBA). Of relevance here, the CBA
contained provisions that required the Times to make
contributions to the Fund, a multiemployer pension plan. While
amended over the years, the CBA's provisions concerning pension

10

contributions have remained the same and operative from then to the instant dispute.[2]

Section 13-I of the CBA, which describes the Times' contribution requirements to Fund, provides, in relevant part:

> The [Times] agrees it shall contribute 8% of each employee's pay rate per shift for each shift worked by each employee in the bargaining unit to the [Fund], but not in excess of five (5) shifts in any payroll week in any one office for any one employee. In addition contributions shall be made when an employee becomes eligible for worker's compensation benefits. Such payments shall be retroactive to the first day of absence.

CBA § 13-I.1. In addition to shifts worked, Section 13-K.3 required that the Times make contributions for "days of paid leave":

> Days of paid leave taken or not taken but paid for during the year or leave accumulated when taken or paid for under this Section shall be included in the schedule of days worked for which vacations and days of paid leave are allowed and for which welfare and pension contributions are made.

CBA § 13-K.3. Section 13-K.5 further provided that: "Time spent on duty with the National Guard or on Reserve Duty, shall be included in the days worked for which paid leave is allowed, to a maximum of two (2) weeks." CBA § 13-K.5.

---

[2]    For example, over the years, the NMDU and the Times have agreed to adjust the amounts that employees are paid. Fund's 56.1 ¶ 12. These changes are not relevant to the issues presented here.

11

Section 5 of the CBA details "Shifts and Regular Working
Time." Under the CBA, a "day shift" is "[a] regular day's work"
that consists of "7 hours and 54 minutes or less consecutively
between the period of 7:00 a.m. to 8:00 p.m." and a "night
shift" as either "a result night's work" consistent of "seven
(7) or fewer consecutive hours of work on short nights and eight
(8) or fewer consecutive hours of work on one long night between
the period of 6:00 p.m. and 10:00 a.m." or "seven and one-half
(7 1/2) or fewer consecutive hours of work when the period shall
begin at 4:00 p.m." on Saturday. CBA §§ 5-A, 5-B. Each type of
shift had a different applicable wage rate, depending on whether
the shift was "hourly," "daily," weekly," or "overtime." CBA
§ 13-A.

Under the CBA, employees working in particular positions
are entitled to extra pay. For example, participating employees
who drive a tractor-trailer receive an extra $2.25 for every
shift, CBA § 2-E.2(j), and who operate a forklift receive an
extra $0.25 per shift, CBA § 3-Q.

The CBA also included provisions that required the Times to contribute to the Publishers'-Newspaper and Mail Deliverers' Welfare Fund (the "Welfare Fund").[3] Section 13-H.1 required that:

> The [Times] agrees that it shall contribute 6 1/2% of each employee's rate per shift for each shift worked by each employee in the bargaining unit to the [Welfare Fund], but not in excess of five (5) shifts in any payroll week in any one office for any one employee. In addition to the above percentage contribution, for each shift worked by each employee who is not a regular situation holder . . . there shall be an additional contribution to the [Welfare Fund] of $6.00 per shift, but not in excess of five (5) shifts in any one payroll week in any one office for any one employee, in the first year of this Agreement. In the second year such additional contribution shall be increased to $7.00; in the third year, to $8.00. In addition contributions shall be made when an employee becomes eligible for worker's compensation benefits. Such payments shall be retroactive to the first day of absence. . . .

CBA § 13-H.1. In subsequent years, the Welfare Fund was amended. For example, in 1987, the parties agreed that "an additional $3.76 per shift from wages and after taxes (maximum of five shifts) shall be contributed to the Welfare Fund." Garfield Decl. Ex. 6 § 2(a). In 1992, the parties agreed to a provision that allowed reapportionment between the two funds:

> With respect to wage increases effect March 31, 1993 and thereafter, the Union may elect to reapportion the contributions due on those increases between its pension plan and its health and welfare plan the total

---

[3]    ERISA defines an "obligation to contribute" as on arising "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a).

13

   (8%) and health and welfare (7.68%) plan contributions
   made by the Times, provided that: (i) the total
   contribution made by The Times to all plans does not
   exceed 15.68%; (ii) the Union notifies The Times at
   least ninety (90) days in advance of its intent to
   reapportion the contributions; and (iii) the
   reapportionment shall not, in any event, result in a
   contribution to the pension fund of less then [*sic*]
   the amount necessary to meet any minimum contribution
   requirements established by law.

Garfield Decl. Ex. 7 § 8(D).


### c. The Assessed Partial Withdrawals


   In 2008, the Times closed its wholly-owned distribution

business, City and Suburban Delivery Systems ("C&S"). Times'

56.1 ¶ 8; Fund's 56.1 ¶ 93. Under a separate CBA with nearly

identical language to the Fund's CBA, the Times also contributed

to the Fund for C&S employees. Fund's 56.1 ¶¶ 94-96. While

initially planning to lay off C&S employees and pay the

anticipated withdrawal liability, after negotiating with the

NMDU, the Times decided to retain approximately 65 C&S

employees. Times' 56.1 ¶ 10; Fund ¶ 98. The hired C&S employees

were paid at the Times' wage rate, which was higher than the

previously paid C&S rate of pay. Fund's 56.1 ¶ 104.


   On September 13, 2013, however, the Fund informed the Times

that the Fund had assessed the Times as having partially

withdrawn from the Fund during the plan years ending May 31,
2012, and May 31, 2013, incurring $25.7 million in withdrawal
liability. Times' 56.1 ¶ 11. The Fund made its assessment by
calculating a 70% decline in CBUs, with shifts worked by
employees as the applicable CBU. Fund's 56.1 ¶ 35. The Times had
viewed the applicable CBU under the CBA as wages. Fund's 56.1
¶ 36. During the Fund plan years at issue, neither the dollar
amounts of non-overtime pay the Times paid to covered employees
nor total contributions to the Fund declined to the level that
would constitute a partial withdrawal under ERISA. Times' 56.1
¶ 12. It is undisputed that, if the opposing side's claims as to
the applicable CBU is correct, that side's mathematical
assessment with regard to whether the Times incurred partial
liability withdrawal is also correct.

The Fund's actuary, Rosana Egan ("Egan") of The Segal
Company ("Segal") assessed the Times' withdrawal liability for
both plan years ending May 31, 2012, and May 31, 2013, and used
shifts as the applicable CBU. Fund's 56.1 ¶¶ 37, 43-44. In
calculating the Times' withdrawal liability, Egan used the
"Segal Blend," which combined lower market interest rates
published by the PBGC and the plan's generally used minimum
funding investment return interest rate, 7.5%, to calculate the

Fund's unfunded vested benefits. For all other purposes other
than withdrawal liability, Egan used a minimum funding
investment return assumption of 7.5%. Fund's 56.1 ¶ 39. Fund's
56.1 ¶ 38; Times' 56.1 ¶ 18. Using the Segal Blend, Egan
calculated the Times' partial withdrawal liability for the plan
year ending May 31, 2012, to be $25,706,371 (the "First
Assessment"), and for the plan year ending May 31, 2013, to be
$7,849,772 (the "Second Assessment").[4] Fund's 56.1 ¶¶ 37, 43;
Times' 56.1 ¶ 11.

   The Second Assessment, which covered the Times' partial
withdrawal liability for the plan ending May 31, 2013, was
calculated using the following procedure: first, Egan subtracted
the statutory credit provided by 29 U.S.C. § 1386(b) from the
Times' allocable share of the Fund's unfunded vested benefits
("UVBs") calculated under 29 U.S.C. § 1386(a)(1) and, second,
multiplied that difference by the partial withdrawal fraction
described by 29 U.S.C. § 1386(a)(2). Times' 56.1 ¶ 26; see
Garfield Decl. Ex. 19, at 27.

---

[4]    The Fund initially calculated the 2013 partial withdrawal
liability as $0, but revised its calculations in December 2014
following receipt of final figures. See Interim Op. 27.

16

d. The Arbitrator's Interim Opinion

In April 2014, the Times initiated arbitration proceedings pursuant to 29 U.S.C. § 1401(a)(1). Before the Arbitrator, the Times disputed the Fund's determination that a partial withdrawal had occurred, the Fund's computation of the liability, and the Fund's calculation of the Second Assessment. See Roth Decl. Ex. A ("Interim Op."), at 1-2.

The Arbitrator conducted six days of hearing between February 10, 2015 and October 7, 2015, which included admitted exhibits and testimony. The Arbitrator heard testimony from: Egan, who served as the Fund's enrolled actuary from the mid-1990s until 2015; John Urbank ("Urbank"), the Fund's benefits consultant and client relationship manager from around 1995 through 2015; Mitchell Lewis ("Lewis"), the Fund's auditor at WeiserMazars LLP from 1997 through 2013; Morris Claffee ("Claffee"), the Times' senior payroll manager responsible for submitting contributions for Times employees covered by the NMDU's CBA to the Fund; Terry Hayes ("Hayes"), the Times' Director of Labor Relations and a Fund Trustee; Neal Schelberg ("Schelberg"), a Proskauer Rose partner in employee benefits who served as co-counsel for the Fund; Darren French ("French"), the

17

Times' actuarial expert; and Ethan Emanuel Kra ("Kra"), the
Fund's actuarial expert. See generally Garfield Decl. Ex. 3
("Arbitration Transcript"). The parties submitted post-hearing
briefing by February 20, 2016. Interim Op. 1.

On June 14, 2016, the Arbitrator issued an Interim Opinion
that summarized the evidence received and made certain factual
findings. Interim Op. 1. First, the Arbitrator found that
"shifts" were the applicable CBU for the Times' contribution to
the Fund "when viewed as a contextual whole," which included
reviewing different provisions' language in the CBA and the
longtime understanding and actions of the parties involved with
the Fund. See id. at 63. As such, the Arbitrator concluded that
the Times had incurred the assessed partial withdrawal
liability. See id. The Arbitrator also upheld the Fund's use of
the Segal Blend, noting that it was "settled law" that "the
Segal Blend is consistent with the requirements of § 4312(a)."
See id. at 54-59. With regard to the Second Assessment, however,
the Arbitrator found that the Fund had improperly calculated the
amount of credit to which the Times was owed, terming the Fund's
assessment of partial withdrawal liability for the May 2013 plan
"convoluted" and, accordingly, reduced the partial withdrawal
liability for the plan year ending May 31, 2013, from $7,849,772

to $375,100. See id. at 59—63. Lastly, the Arbitrator ordered
that the Fund repay the Times the amount the Times overpaid the
Fund, including "appropriate interest." Id. at 63.

### e. The Arbitrator's Opinions on Interest

Following the Interim Opinion, the Times and the Fund
disagreed as to the appropriate interest rate to be applied to
the Fund's overpayment repayments. Back before the Arbitrator,
the Times argued that an 18% interest rate was applicable
because that was the rate the Times had been asked by the Fund
to apply when the Times once made a late contribution payment.
See Roth Decl. Ex. H ("Interim Interest Op."), at 5—8. The Fund
argued that the 18% rate had not been formally adopted for
withdrawal liability and, therefore, the interest rate set by
the PBGC was applicable. See id. at 8—9.

On December 24, 2016, the Arbitrator issued an interim
ruling and found that, while the Fund had not formally
established an applicable rate, discovery was necessary to
determine if the Fund had a "policy and practice regarding the
imposition of interest for delinquent withdrawal liability

19

payments, and the inclusion of interest on refunds of
overpayments of withdrawal liability." Id. at 12-13.

On July 12, 2017, following discovery and the submission of
briefing, the Arbitrator issued a Final Ruling on Interest. See
Roth Decl. Ex. J ("Final Interest Op."). There, the Arbitrator
rejected the Times' request for 18% interest, noting that there
was only a single instance when the Fund imposed an 18% rate on
a late withdrawal liability payment, which did not "establish
that the Board [of the Fund] even adopted a uniform policy" of
charging such an interest or that it was "charged on a
consistent basis over a reasonable period of time." Id. at 18-
21. Accordingly, the Arbitrator affirmed the Fund's use of the
then-applicable PBGC interest rate, which was 3.25%. Id. at 21.

### f. The Arbitrator's Final Award

On July 19, 2017, the Arbitrator issued the Award and
stated that all issues involved in the arbitration were fully
resolved. See Roth Decl. Ex. J. Following the Arbitrator's
rulings, the Fund refunded the Times the overpayment of
principal along with interest calculated pursuant to 29 C.F.R.
§ 4219.32(c). Fund's 56.1 ¶ 114.

20

## II. **Prior Proceedings**

On August 15, 2017, the Times filed an action to vacate the Award in part. No. 17 Civ. 6178 (RWS), Dkt. No. 1. On August 18, 2017, the Fund also filed an action to vacate the Award in part. No. 17 Civ. 6290 (RWS), Dkt. No. 1. On September 11, 2017, the two actions were consolidated. No. 17 Civ. 6178 (RWS), Dkt. No. 17; No. 17 Civ. 6290 (RWS), Dkt. No. 17.

On September 15, 2017, the Times moved for summary judgment, and the Fund cross-moved for the same on October 20, 2017. No. 17 Civ. 6178 (RWS), Dkt. Nos. 18, 24; No. 17 Civ. 6290 (RWS), Dkt. No. 23. The motions were heard and marked fully submitted on December 6, 2017.

## III. **Applicable Standards**

### a. Summary Judgment

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

21

56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. Westinghouse Elec. Corp. v. N.Y.C. Transit Auth., 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson, 477 U.S. at 249). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

### b. Standards of Review of ERISA Arbitration Decisions

Under ERISA, courts reviewing decisions of an arbitrator apply different standards to questions of law and to questions of fact. When reviewing an arbitrator's legal conclusions apply courts apply a *de novo* standard of review. 666 Drug, Inc. v. Tr.

of 1199 SEIU Health Care Emps. Pension Fund, 571 F. App'x 51, 52
(2d Cir. 2014); HOP Energy, L.L.C. v. Local 553 Pension Fund,
678 F.3d 158, 160 (2d Cir. 2012). When reviewing an arbitrator's
factual findings, "there shall be a presumption, rebuttable only
by a clear preponderance of the evidence, that the findings of
fact made by the arbitrator were correct." Nat'l Ret. Fund v.
Metz Culinary Mgmt., Inc., No. 16 Civ. 2408 (VEC), 2017 WL
1157156, at *5 (S.D.N.Y. Mar. 27, 2017) (quoting 29 U.S.C.
§ 1401(c)). For mixed questions of law and fact, in the absence
of controlling Second Circuit precedent, courts generally adopt
a clear error standard of review. See 666 Drug, Inc. v. Tr. of
1199 SEIU Health Care Emps. Pension Fund, No. 12 Civ. 1251
(PAE), 2013 WL 4042614, at *5 (S.D.N.Y. Aug. 8, 2013)
(collecting cases), aff'd, 571 F. App'x 51 (2d Cir. 2014).

## IV. The Parties' Motions for Summary Judgment are Granted in Part and Denied in Part

### a. The Arbitrator's Decision that the Times Partially Withdrew from the Fund is Affirmed

The first issue presented is what constitutes the CBUs
under the CBA. That answer—whether it is "shifts," the Fund's
answer, or "wages," the Times' answer—is the fulcrum around
which whether the Times partially withdrew from the Fund turns.

23

As described above, the Arbitrator concluded that the answer was "shifts." Interim Op. 33.

The Times argues that the Arbitrator's conclusion was "legally flawed." Times' Mem. in Supp. of Mot. for Summ. J. ("Times' Mem.") 18, No. 17 Civ. 6178, Dkt. No. 20. To the Times, the question presented is one purely of law: how to apply ERISA's definition of a "contribution base unit," the "unit with respect to which an employer has an obligation to contribute," to the obligations created by the CBA. 29 U.S.C. § 1301(a)(11); see Times' Mem. 18. Principally, the Times points to parts of the CBA that require the Times to contribute for instances when employees do not actually work, such as various leaves of absence, and evidence presented to the Arbitrator that certain categories of employees, like foremen, received compensation not based on shifts to demonstrate that the "substance and reality" of the Times' pension obligations to the Fund. Times Mem. 18-19. Finally, the Times avers that, as a purely legal question, it is improper to consider the subjective understanding of and actions based on the CBU by those at the Fund and at the Times. Times Mem. 20.

24

In response, the Fund presents two arguments. First, the
Fund contends that the CBA's language alone is what determines
the Times' contribution obligations, and the CBA's terms
unambiguously required that contributions be made "per shift for
each shift worked" by covered employees. Fund's Mem. of Law in
Supp. of Cross-Mot. for Summ. J. ("Fund's Mem.") 18 (quoting CBA
§ 13-I.1), No. 17 Civ. 6178, Dkt. No. 25. The Fund supports this
reading by pointing to other CBA provisions that define "day"
and "night" shifts, as well as others which cap the Times'
contributions to the Fund at five shifts in any given payroll
week. See Fund's Mem. 19. As a secondary argument, the Fund
contends that, given the Administrator considered extrinsic
evidence in making his determination, his interpretation of the
CBA is a factual finding entitled to a higher degree of
deference. See Fund's Mem. 22-24.

Initially, it needs to be determined which standard of
review is appropriate when reviewing the Arbitrator's finding of
shifts as the CBU. The Interim Opinion does not afford a cut-
and-dry answer.

The Arbitrator examined the language of the CBA and found
that adopting the Times' reading would render the provision

25

"'for each shift worked' wholly superfluous," Interim Op. 33,
which is the kind of language courts generally employ when
construing a contract's "plain meaning." LaSalle Bank Nat'l
Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir.
2005) (citations omitted) ("[A]n interpretation of a contract
that has 'the effect of rendering at least one clause
superfluous or meaningless . . . is not preferred and will be
avoided if possible."). Were this the exclusive, or even primary
basis upon which the Arbitrator's decision rested, *de novo*
review of this legal determination would be appropriate.

However, the Arbitrator's opening observation was that the
CBA was "not without some ambiguity," Interim Op. 33, a comment
repeated several other times, see id. at 33-34. Following a
brief discussion of surplusage—itself a canon of construction
used to resolve ambiguity—the Arbitrator dedicated the majority
of his analysis to resolving "[w]hatever ambiguity in the
provision exists [that] derives from the phrase 'shift worked.'"
Interim Op. 33. In doing so, the Arbitrator considered other
provisions of the CBA, see id. 33-36, and witness testimony,
relying especially on evidence from the Fund's enrolled actuary
and auditor, which the Arbitrator found truthful, see id. 36-38.
Taken in its entirety, the CBU decision in the Interim Opinion

is properly read as finding the CBA ambiguous and then resolving
that unspecified amount of ambiguity in the CBA through
consideration of intrinsic and extrinsic evidence.

"When courts interpret CBAs, traditional rules of contract
interpretation apply as long as they are consistent with federal
labor policies." Aeronautical Indus. Dist. Lodge 91 of Int'l
Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United
Techs. Corp., Pratt & Whitney, 230 F.3d 569, 576 (2d Cir. 2000).
Whether or not a contract is ambiguous is a threshold question
of law to be reviewed de novo. See, e.g., Broder v. Cablevision
Sys. Corp., 418 F.3d 187, 197 (2d Cir. 2005); Walk-In Med. Ctrs.,
Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987)
("The determination of whether a contract term is ambiguous is a
threshold question of law for the court."). A contract is
unambiguous when it has "'a definite and precise meaning,
unattended by danger of misconception in the purport of the
contract itself, and concerning which there is no reasonable
basis for a difference of opinion.'" Olin Corp. v. Am. Home
Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012) (citation omitted);
see Walk-In Med. Ctrs., 818 F.2d at 263 (stating that language
is ambiguous if it is "capable of more than one meaning when
viewed objectively by a reasonably intelligent person who has

examined the context of the entire integrated agreement and who
is cognizant of the customs, practices, usages and terminology
as generally understood in the particular trade or business").

The Arbitrator's conclusion that the CBA was "not without
some ambiguity" was proper. Reasonable bases exist to believe,
from the language of the CBA's provision alone, that the CBU
could be either shifts or wages. The Fund's argument that
"shifts" avoids surplusage because Section 13-I.1 has language
requiring payment "per shift for each shift" has merit. Also, in
the same section, the CBA caps the number of payroll week shifts
at five shifts. See CBA § 13-I.1. It is valid to wonder why that
language be there if the CBA meant anything other than "shifts."
However, the Times' arguments are not without their own weight.
Paying "8% of each employee's pay rate per shift for each shift
worked" could be reasonably read to mean monetary contribution
rate of 8% of earnings or, in other words, the total payments
over the total shifts. Moreover, as the Times identifies, the
CBA requires 8% contributions to the Fund for paid leave, which
amounts to employees' unworked time that is quantified in days—
to implement a "shifts worked" approach requires a leap of

interpretative logic that even the Arbitrator recognized.[5] See
CBA § 13-K.3; Interim Op. 34 (emphasis added) ("Once one
incorporates the notion that all time compensated . . . is
treated as a 'shift worked,' any ambiguity in §13-I.1 is
resolved."). Accordingly, the Arbitrator's consideration of

---

[5]    In its submissions, the Times repeatedly cites to extrinsic
evidence, such as testimony given during the Arbitration
regarding contribution practices, even while arguing that *de
novo* review is appropriate. The Times contends that such
evidence is appropriate even while simultaneously stating that
this is a question of law because "applicable labor-management
relations law" obligations can arise from under ERISA law from
"past practices." See Times Mem. 14 (quoting, in part, 29 U.S.C.
§ 1392(a)(2)). This argument fails. To be sure, in addition to
CBAs, employer obligations to contribute to plans can arise from
"a duty under applicable labor-management relations law." 29
U.S.C. § 1392(a). However, the Supreme Court has clarified that
that avenue of obligation refers to "any obligation imposed by
the [National Labor Relations Act of 1935]." Laborers Health &
Welfare Tr. Fund For N. California v. Advanced Lightweight
Concrete Co., 484 U.S. 539, 546 & n.11 (1988) (citing 29 U.S.C.
§ 1392(a)). No such obligation has been put forth as relevant to
the instant dispute. The Times' citation to Bozetarnik v.
Mahland, 195 F.3d 77, 82 (2d Cir. 1999), does not persuade that
past practices amount to an ERISA-imposed duty. In Bozetarnik,
the court rejected that certain alleged past practices could
amount to implied terms of a CBA, particularly because that CBA
contained an integration clause; nowhere did the court discuss
past practices as creating duties arising under labor law. See
id. at 82-83. Accordingly, any determination of the CBA's
ambiguity requires looking only to the language of the CBA. See
Aeronautical Indus., 230 F.3d at 576 (citing United Mine Workers
v. LTV Steel Co. (In re Chateaugay Corp.), 891 F.2d 1034, 1038
(2d Cir. 1989)) ("Only when provisions are ambiguous may courts
look to extrinsic factors—such as bargaining history, past
practices, and other provisions in the CBA—to interpret the
language in question.")

extrinsic evidence to resolve what is an ambiguous contract was proper. See Aeronautical Indus., 230 F.3d at 576-77 ("[W]e believe that extrinsic factors are relevant to determining the precise nature of the Company's duties . . . because the contested contractual language is not unambiguous on its face.").

The Arbitrator's factual finding that that CBA's CBU are shifts is presumptively correct except by a rebuttal showing of the clear preponderance of the evidence. See 29 U.S.C. § 1401(c). Under such a standard, the Arbitrator's finding must remain undisturbed.

As the Interim Opinion demonstrates, the Arbitrator considered a wide range of presented extrinsic evidence. He considered the Fund's Pension Plan, which detailed the Fund's operations and described employee compensation from contributing employers in terms of "credited service shifts." Interim Op. 34. After hearing days of witnesses, detailed above, the Arbitrator highlighted the testimony of Egan and Lewis, both of whom testified that "they always understood the CBU to be shifts," as credible. Interim Op. 36; see id. 37 ("[T]heir actions over the years demonstrated the truthfulness of their assertions."). The

30

Arbitrator noted that the Welfare Fund's contribution language,
which had "virtually identical language" to the Fund's CBA and
treated the contribution rate as shifts, supported the
conclusion that shifts was the CBU. Interim Op. 36.

In reaching his conclusion, the Arbitrator considered the
evidence put forward by the Times, and which are similar to the
arguments raised by it on the instant motion. See Times' Mem.
18-20. Such facts included: that the Times' payroll software was
set up to combine different shift-based pays into a single
amount, entitled "Base MTD [Month to Date]," which was then
multiplied by 8% to get the pension contributions; the fact that
the Times made pension contributions for the differentials paid
for shifts of employees entitled to higher pay, like forklift
operators; and that the Times consistently reported to the Segal
actuaries that the Times was using wages as its contribution
rate. See Interim Op. 34-35, 37.

The Times' position is not meritless, and evidence adduced
supports the contention that many employees at the Times who
interacted with the Fund believed that the CBUs were wages.
Assuredly, there was confusion between the parties. However, a
contract can only mean one thing, and the "determination as to

which of competing inferences to draw" between compelling
evidence "lies within the province of the trier of fact." In
Time Prods., Ltd. v. Toy Biz, Inc., 38 F.3d 660, 665 (2d Cir.
1994) (citations omitted). By statute, that trier was the
Arbitrator. Particularly in the face of the weight given by the
Arbitrator to the testimonies of Egan and Lewis, the Times'
evidentiary showing today has not established by a clear
preponderance of the evidence that the Arbitrator was incorrect
in concluding that the terms of the CBA set the applicable CBUs
as wages. See, e.g., Faiveley Transp. Malmo AB v. Wabtec Corp.,
559 F.3d 110, 118 (2d Cir. 2009) ("Assessments of the
credibility of witnesses are peculiarly within the province of
the trier of fact and are entitled to considerable deference.").

Accordingly, the Arbitrator's factual finding is afforded
deference, and his conclusion that the CBA's CBU is shifts is
upheld. See Sigmund Cohn Corp. v. Dist. No. 15 Machinists
Pension Fund by its Bd. of Trs., 804 F. Supp. 490, 493 (E.D.N.Y.
1992) (citing Chi. Truck Drivers Pension Fund v. Louis Zahn Drug
Co., 890 F.2d 1405, 1406 (7th Cir. 1989)) ("Courts reviewing
arbitration awards have consistently upheld the arbitrator's

factual findings under [ERISA] section 4221(c)'s [29 U.S.C.
§ 1401(c)] 'presumption of correctness.'").[6]

## b. The Arbitrator's Approval of the Segal Blend is Reversed

The second issue presented is whether the Fund's actuary,
Egan, after concluding that the Times had partially withdrawn
from the Fund, used the appropriate discount rate in calculating
the Times' withdrawal liability. Specifically, Egan used a
discount rate of 6.5%, known in the industry as the Segal Blend,
which was calculated by blending the Fund's investment-return
rate of 7.5% with lower, risk-free rates published by the PBGC.
Interim Op. 25. This rate was different than what the Fund used
when calculating the Times' minimum funding requirements. As
such, the parties dispute whether the asymmetrical application
of the Segal Blend was legally permissible.

The Times contends that the Fund's actuary's use of the
Segal Blend violated both ERISA and Supreme Court precedent.
First, the Times argues that the rate the Fund used for

---

[6]    As the Arbitrator's decision that the CBUs were shifts is
upheld, the Fund's argument that, even were the CBUs to be found
as wages, that the Times still incurred liability because it
attempted to "evade or avoid" withdrawal liability pursuant to
29 U.S.C. § 1392(c), need not be reached. See Fund's Mem. 24-27.

calculating minimum funding requirements, 7.5%, needed to be the same that was used for any withdrawal liability calculations. In support, the Times identifies identical language in ERISA between the minimum funding rules and withdrawal liability calculations, both of which require an actuary to use rates that are "reasonable (taking into account the experience of the plan and reasonable expectations)" and which, "in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1084(c)(3)(A)-(B) (detailing permissible actuarial assumptions for minimum funding for multiemployer plans); 29 U.S.C. § 1393(a)(1) (detailing permissible actuarial assumptions for withdrawal liability); see Times Mem. 24-25.[7]

---

[7]    Section 1084(c)(3), which addresses actuarial assumption requirements for minimum funding as to ERISA plans, requires:

> For purposes of this section, all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods—(A) each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and (B) which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

29 U.S.C. § 1084(c)(3).

Section 1393(a), which addresses actuarial assumption requirements for withdrawal liability as to ERISA plans, requires:

> The corporation may prescribe by regulation actuarial assumptions which may be used by a plan actuary in determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part. Withdrawal liability under

34

Congress' use of identical language, the Times contends, meant
that the same assumptions—and, therefore, the same rates—were to
be used in both cases. In addition, the Times points to the
Supreme Court's decision in Concrete Pipe & Prods. of Cal., Inc.
v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602
(1993), which discussed "the necessity" of a Fund actuary to
apply "the same assumptions and methods in more than one
context," particularly highlighting a fund's interest rate
assumption. Id. at 632; see id. at 633 ("[T]he calculation of
withdrawal liability is . . . arguably the most important
assumption" and "is the critical interest rate assumption that
must be used for other purposes as well."); Times Mem. 25-27.
Based on those statements, the Times avers that Egan's use of
the Segal Blend solely for the purpose of calculating withdrawal
liability was wrong. Lastly, the Times argues that the Segal
Blend's estimation were not the best estimate of the anticipated
experience of the Fund, because a blend of risk-free rates does

---

this part shall be determined by each plan on the
basis of—(1) actuarial assumptions and methods which,
in the aggregate, are reasonable (taking into account
the experience of the plan and reasonable
expectations) and which, in combination, offer the
actuary's best estimate of anticipated experience
under the plan, or (2) actuarial assumptions and
methods set forth in the corporation's regulations for
purposes of determining an employer's withdrawal
liability.

29 U.S.C. § 1393(a).

35

not represent the Fund's actual investment portfolio. See Times
Mem. 28-30.

The Fund counters that Egan's use of the Segal Blend was
proper. In response to the Times' statutory arguments, the Fund
notes that while ERISA language identified by the Times is the
same between the two provisions, the minimum funding provision
requires actuarial assumptions only to be "reasonable," 19
U.S.C. § 1084(c)(3), while withdrawal liability provisions
require the assumptions be reasonable "in the aggregate," 29
U.S.C. § 1393(a)(1); see Fund's Mem. 28. Moreover, the minimum
funding and withdrawal liability sections each require an
actuary to take into account "reasonable expectations" and
"anticipated expectations." Compare 29 U.S.C. § 1393(a)(1), with
id. § 1084(c)(3). If Congress had intended the same assumptions
to be used for contributions as with withdrawals, posits the
Fund, Congress could and would have included a cross-reference,
like in other sections. See Fund's Mem. 29. To the Fund, ERISA's
expectation language demonstrates that, as withdrawal liability
calculations are made after an employer has withdrawn from a
fund and face no further risk connected to that fund's
performance, it is reasonable and proper for an actuary to set a

lower return rate based on a finding of lower risk.[8] See Fund's Mem. 27-30. Second, the Fund avers that Concrete Pipe does not foreclose this reading, noting that the Court only went so far as to state that "[u]sing different assumptions [for different purposes] could very well be attacked as presumptively unreasonable both in arbitration and on judicial review," which is not the same as explicitly forbidding different rates. Concrete Pipe, 508 U.S. at 633 (second alteration in original) (citation omitted).

In his Interim Opinion, as noted above, the Arbitrator sided with the Fund in concluding that Egan's use of the Segal Blend was legally acceptable. See Interim Op. 54-59. The Arbitrator acknowledged that the Times' reading of Concrete Pipe was not "implausible," but that the Supreme Court's language was also "not a definitive rejection . . . of using different assumptions for different purposes." Interim Op. 55. Rather, the Concrete Pipe Court "was leaving open the possibility an actuary

_____

[8]    Should a fund fail to meet it investment return assumption—for example, in the case of the Fund, a return of 7.5%—contributing employers are required to make up the shortfall. See Reply Mem. of Law in Further Supp. of the Fund's Mot. for Summ. J. ("Fund's Reply") 13, No. 17 Civ. 6178, Dkt. No. 29; Combined Reply Mem. in Supp. of the Times' Mot. for Summ. J. and Opp. to Cross-Mot. for Summ. J. ("Times' Opp.") 11, No. 17 Civ. 6178, Dkt. No. 30.

37

could convincingly explain why it was appropriate and reasonable
to use different interest rate assumptions for different
purposes." Id. As to the Times' ERISA statutory language
arguments, the Arbitrator found that they were "not new" and had
not been accepted by other arbitrators or federal courts;
rather, the Arbitrator observed that "arbitration awards have
expressly held that the Segal Blend . . . if found by the
actuary to be the appropriate actuarial assumption, is
appropriate under § 4312(a)." Id. at 56-57. As such, the
Arbitrator upheld the use of the Segal Blend by the Fund,
concluding that "[i]f the dominant case law is going to be
reversed based on the Times' arguments, that action will not
come in an arbitration decision, but rather through court
review." Id. at 58.

Before reviewing the Arbitrator's opinion, a more fulsome
review of Concrete Pipe is merited—or, as the opinion covers a
wider range of topics, at least as to the part of the opinion
implicated by the parties' dispute. Broadly-speaking, in
Concrete Pipe, an arbitrator determined that Concrete Pipe and
Products of California had incurred withdrawal liability because
it did not pay enough into a CBA-created employee pension plan
covered by ERISA. See Concrete Pipe, 508 U.S. at 614-15. On

38

appeal, the Court affirmed the plan's assessment, concluding that the statutory regime created by the MPPAA under which employers made payments into pension funds did not create procedural due process or takings violations under the Fifth Amendment. See id. at 647.

Part of the Court's opinion addressing procedural due process is relevant to the present issue. One of Concrete Pipe's arguments was that the MPPAA created opportunities for trustee bias to influence the amount employers had to pay in withdrawal liability: because the MPPAA allowed determinations of a plan's trustees to be made without a hearing, and because those conclusions were then insulated by the MPPAA's presumptions of correctness on appeal before an arbitrator, the statute deprived employers the opportunity for a fair adjudication. See id. at 620. After concluding that the MPPAA needed to be read to permit employers to challenge factual determinations before an arbitrator by a preponderance of the evidence, the Court applied its determined presumption to factual issues raised by Concrete Pipe in its challenge. See id. at 630-32. One such issue was the amount of withdrawal liability assessed by the plan.

The Court concluded that a fund's calculation of withdrawal
liability differed from other facts found by a fund. In part,
the Court found this because withdrawal liability is calculated
by an actuary, who is "not . . . vulnerable to suggestions of
bias or its appearance" because "actuaries are trained
professionals subject to regulatory standards." Id. at 632. In
addition to external professional standards, the Court
highlighted common language in ERISA regarding actuarial
assumptions between two different contexts: withdrawal liability
and minimum funding. Similar language itself created checks on
the ability of a plan to be biased because:

> The use of the same language to describe the actuarial
> assumptions and methods to be used in these different
> contexts . . . check[s] the actuary's discretion in
> each of them. Using different assumptions [for
> different purposes] could very well be attacked as
> presumptively unreasonable both in arbitration and on
> judicial review. . . . For example, the use of
> assumptions (such as low interest rates) that would
> tend to increase the fund's unfunded vested liability
> for withdrawal liability purposes would also make it
> more difficult for the plan to meet the minimum
> funding requirements.

Id. at 632-33 (alteration in original) (internal quotation marks
and citation omitted). Moreover, the Court did not find "any
method or assumption unique to the calculation of withdrawal
liability . . . so manipulable as to create a significant
opportunity for bias to operate, and arguably the most important
assumption . . . is the critical interest rate assumption that

must be used for other purposes as well." Id. at 633. Before an arbitrator, an employer would need to rebut an actuary's conclusions by a preponderance that "the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary." Id. at 635. That presumption, however, did not support a procedural due process objection. Id.

Insofar as the Times wishes to argue that use of different interest rates in different contexts is always impermissible as a matter of law, that argument fails. Both the ERISA provisions and the language of Concrete Pipe discussed above indicate otherwise.

The ERISA provisions addressing actuarial assumptions as to minimum funding versus withdrawal liability, while similar, are meaningfully different. Specifically, the inclusion of the clause "in the aggregate" is an addition that cannot be ignored. 29 U.S.C. § 1393(a)(1). That clause's distinct inclusion in the withdrawal liability section, suggests that Congress envisioned the possibility that calculating withdrawal liability could combine many different assumptions and methods to result in something different than that found for the contribution

41

requirements. See Bates v. United States, 522 U.S. 23, 29-30
(1997) (citation omitted, alteration in original) ("'[W]here
Congress includes particular language in one section of a
statute but omits it in another section of the same Act, it is
generally presumed that Congress acts intentionally and
purposely in the disparate inclusion or exclusion."). That said,
the overall similarity of language should not be ignored, and
suggests that Congress expected that the rates used in the
different situations would be, at minimum, similar, if not the
same. See Smith v. City of Jackson, Miss., 544 U.S. 228, 233
(2005) (plurality opinion) ("[W]hen Congress uses the same
language in two statutes having similar purposes, particularly
when one is enacted shortly after the other, it is appropriate
to presume that Congress intended that text to have the same
meaning in both statutes.").

The conclusion reached from Concrete Pipe is the following.
Actuarial bias against withdrawing employers was guarded against
because there is no "significant opportunity for bias to
operate" when "the most important assumption . . . is the
critical interest rate assumption that must be used for other
purposes as well." Concrete Pipe, 508 U.S. at 632-33. In the
same breath, however, the Court stated that the "assumptions

42

used by [a] Plan in its other calculations may be supplemented
by several actuarial assumptions unique to withdrawal
liability." Id. at 633 (emphasis added, internal quotation marks
omitted). The expectation is that a standard, uniform interest
rate is applied in all contexts, and any deviation "could very
well be attacked as presumptively unreasonable both in
arbitration and on judicial review." Id. at 633 (citation
omitted). That does not mean, however, that deviation is, at all
times, impermissible by law—were that the case, the Court would
not have included the open-ended "could very well be" language
rather than something more definitive. While few courts have
delved into the murky mists of these particular ERISA
provisions, this Court is not the first to read Concrete Pipe in
this way. See Chi. Truck Drivers, Helpers & Warehouse Workers
Union (Indep.) Pension Fund v. CPC Logistics, Inc., 698 F.3d
346, 355 (7th Cir. 2012) (Posner, J.) (discussing Concrete Pipe
and observing that "the Court [in Concrete Pipe] had indicated
that 'supplemental' assumptions that might cause the rates to
diverge were permissible").

However, simply because the use of the Segal Blend uniquely
in the context of calculating an employer's withdrawal liability
is not prohibited as a matter of law does not mean that its

43

application in the present context was proper. Rather, to the extent that the Times contends that the use of the Segal Blend in this instance violated ERISA law, that claim is merited.

The Arbitrator's decision that the Segal Blend's use was reasonable in the aggregate is a mixed question of fact and law and is reviewed for clear error. See 666 Drug, Inc., 2013 WL 4042614, at *5 (collecting cases); accord Plan Bd. of Sunkist Ret. Plan v. Harding & Leggett, Inc., 463 F. App'x 702, 703 (9th Cir. 2011) (reviewing district court's review of withdrawal liability interest rate assumption for clear error).

As detailed above, ERISA requires that when determining an employer's withdrawal liability, "actuarial assumptions and methods" must, "in the aggregate, [be] reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1) (emphasis added). Egan's testimony before the Arbitrator was that a 7.5% percent assumption was her "best estimate of how the Pension Fund's assets . . . will on average perform over the long term." Arb. Tr. 568:3-8; see Arb. Tr. 600:3-15 (observing that the Segal Blend was "lower" than Egan's best estimate of

44

anticipated plan experience in the long term). If 7.5% was the Fund actuary's "best estimate," it strains reason to see how the Segal Blend, a 6.5% rate derived by blending that 7.5% "best estimate" assumption with lower, no-risk PBGC bond rates, can be accepted as the anticipated plan experience. This is especially when the blend includes interest rates for assets not included in the Fund's portfolio. The Segal Blend's applicability is further undermined by Egan's acknowledgment that she had used the Segal Blend as her "best estimate" when calculating withdraw liability "regardless of the particular pension plan's actual portfolio of assets." Arb. Tr. 585:10-586:5.

In defense of the Segal Blend, the Fund argues that there is less risk facing employers like the Times who withdraw because the liability of those employers becomes fixed; if the Fund underperforms, the withdrawer is not required to pay more, unlike an employer still part of the Fund's plan. See Fund Mem. 28-29. Because of this background, the Fund notes, not only did Egan, but also the Fund's actuarial expert, Kra, testified that the Segal Blend was, in the aggregate, reasonable. See Fund Mem. 33-34 (citing Arb. Tr. 695:12-16). On the other hand, the Times's rejoinder that a withdrawing employer also does not share in any over-performance by the Fund, which would reduce

45

future contribution obligations, effectively nullifies the
Fund's argument. See Times' Opp. 11. Accordingly, the inquiry
returns to what the statute states it requires for an applicable
return rate: what is the best estimate of the "anticipated
experience" under the plan." 29 U.S.C. § 1393(a)(1).

The Arbitrator's Interim Opinion did not actively engage
with the issue of whether the Segal Blend's rate was a
reasonable best estimate. Rather, after concluding that the
Segal Blend was not foreclosed as a matter of law, he found that
there was "no evidence to suggest that the decision to use the
Segal Blend was part of a scheme to take advantage of the Times"
and accepted that, because Egan had been using the "Segal Blend
when calculating withdrawal liability the entire time," the
Times could not claim the Segal Blend's caused it to be
"unfairly penalized." Interim Op. 58-59.[9] That reasoning does not
support a finding that the Segal Blend's rate was the "best
estimate" of the plan's "anticipated experience." A lack of
duplicity does not, by itself, equate with a correct answer.

---

[9]     Earlier in the Interim Opinion, the Arbitrator did outline
Egan, Kra, and French's testimony as to the Segal Blend, though
without opining on the merits of the rate. See Interim Op. 31-
33.

46

In sum, the actuary's testimony, combined with the untethered composition of the Segal Blend and paucity of analysis by the Arbitrator, create "a definite and firm conviction that a mistake has been made" in accepting the Segal Blend; as such, this Court will "set the findings aside even though there is evidence supporting them that, by itself, would be considered substantial." Wu Lin v. Lynch, 813 F.3d 122, 128 (2d Cir. 2016) (quoting 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2585 (3d ed. 2007)). Accordingly, the Arbitrator's decision that the Segal Blend was the appropriate rate to calculate the Times' partial withdrawal is reversed. In the absence of additional evidence sufficient to support a different rate, the Times' liability should be recalculated using the 7.5% assumption testified to as the "best estimate."

## c. The Arbitrator's Reversal of the Fund's Calculations of the 2013 Partial Withdrawal is Affirmed

The third issue presented is which method for calculating successive partial liability withdrawal is appropriate. As found above, the Times incurred withdrawal liability for both plan years ending May 31, 2012 and May 31, 2013. Under ERISA, to "protect a withdrawing employer from being charged twice for the

same unfunded vested benefits" when charged over multiple years,
29 C.F.R. § 4206.1(a), a credit mechanism computation was
statutorily created to reduce a withdrawing employer's
withdrawal liability by any liability incurred the previous
year. See 29 U.S.C. § 1386; see generally 29 C.F.R. § 4206.1, *et
seq*. The parties do not dispute that Section 1386 is the
relevant statute, but rather how to read and apply its
computational directives to calculate the Times' 2013 partial
withdrawal liability—or, in other words, an order of operations
problem in the form of statutory interpretation.


    29 U.S.C. § 1386, or ERISA Section 4206, is the portion
relevant here, and describes with ERISA's typical simplicity how
to calculate partial withdrawal liability. Because of its
significance to the instant issue, the relevant portion of
Section 1386 is presented here:

> (a) The amount of an employer's liability for a
> partial withdrawal, before the application of sections
> 1399(c)(1) and 1405 of this title, is equal to the
> product of—
>
> > (1) the amount determined under section 1391 of
> > this title, and adjusted under section 1389 of
> > this title if appropriate, determined as if the
> > employer had withdrawn from the plan in a
> > complete withdrawal—
> >
> > > (A) on the date of the partial withdrawal,
> > > or

48

(B) in the case of a partial withdrawal described in section 1385(a)(1) of this title (relating to 70-percent contribution decline), on the last day of the first plan year in the 3-year testing period, multiplied by

(2) a fraction which is 1 minus a fraction—

(A) the numerator of which is the employer's contribution base units for the plan year following the plan year in which the partial withdrawal occurs, and

(B) the denominator of which is the average of the employer's contribution base units for—

(i) except as provided in clause (ii), the 5 plan years immediately preceding the plan year in which the partial withdrawal occurs, or

(ii) in the case of a partial withdrawal described in section 1385(a)(1) of this title (relating to 70-percent contribution decline), the 5 plan years immediately preceding the beginning of the 3-year testing period.

(b)

(1) In the case of an employer that has withdrawal liability for a partial withdrawal from a plan, any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction of such liability) of the employer with respect to the plan for a previous plan year.

29 U.S.C. § 1386(a)-(b)(1).

49

The Fund contends that the proper computational procedure
was the way it initially calculated the Times' 2013 liability,
which is as follows. First, the Fund calculated the Times'
allocable share of the UVBs under 29 U.S.C. § 1386(a)(1), then
subtracted from that number the statutory credit of the amount
of the Times' partial withdrawal liability the previous year
under 29 U.S.C. § 1386(b), and then multiplied that difference
by a fraction which represents the decline of the partial
withdrawal, described in 29 U.S.C. § 1386(a)(2). See Fund's Mem.
35-36; Second Assessment at 27. The Fund argues that the
statute's language is unambiguous. Under Section 1386, the first
element of the equation is "the amount determined under section
1391 of this title [ERISA Section 4211], and adjusted under
section 1389 of this title [ERISA Section 4209] if appropriate,
determined as if the employer had withdrawn from the plan in a
complete withdrawal." 29 U.S.C. § 1386(a)(1). As Sections 1391
and 1389 apply whether there is a full or partial withdrawal,
the Fund argues, the only way not to render the "determined as
if the employer had withdrawn from the plan in a complete
withdrawal" directive superfluous requires applying Section
1386(b)(1) as part of Section 1386(a)(1), which requires that
any employer "for a partial or complete withdrawal from that
plan in a subsequent plan year . . . be reduced by the amount of

any partial withdrawal liability." Id. § 1386(b)(1); see Fund's
Mem. 36. Because the ERISA provision is unambiguous, the Fund
states, any extrinsic evidence, such as PBGC documents put
forward by the Times and described below, are irrelevant. See
Fund's Mem. 36-38.

By contrast, the Times argues that the partial withdrawal
calculation should go as follows. First, the employer's
allocable share of the plan's UVBs is calculated as if it had
been a complete withdrawal, pursuant to 29 U.S.C. § 1386(a)(1).
That figure is then multiplied by the aforementioned partial
withdrawal fraction laid out in 29 U.S.C. § 1386(a)(2). Then,
that product is reduced by any partial liability from the
previous plan year, pursuant to 29 U.S.C. § 1386(b)(1). See
Times' Mem. 31. The Times supports this computational
interpretation in three ways. Similarly pointing to the statute,
the Times observes that Section 1386(a) first states how to
calculate "an employer's liability for a partial withdrawal,"
and then, logically, Section 1386(b) states that an employer's
"withdrawal liability for a partial withdrawal" is reduced by
credit for the prior partial withdrawal. See Times' Mem. 32.
Second, the Times identifies an Opinion Letter by the PBGC which
states that the "plain language [of] Section 4206(a) precludes

51

the prior use of Section 4206(b)(1) in this adjustment process"
in the manner set-out by the Fund and that calculations as
argued by the Fund are "clearly erroneous." PBGC Op. Letter 85-4
(Jan. 30, 1985); see Times' Mem. 33. Lastly, the Times contends
that the Fund's mathematical proscription causes the Times to
incur additional liability on subsequent partial withdrawals,
even if nothing changes between the initial and successive
partial withdrawals, which defeats the purpose of Congress
granting the credit at all. See Times' Mem. 33.


        The Arbitrator concluded, as a matter of law, that the
Times' partial withdrawal liability adjustment calculations were
correct. See Interim Op. 59-60. Without opining on what legal
weight to apply to the PBGC Opinion Letter, the Arbitrator found
the Opinion Letter to present a "more faithful reading and
application of § 4206." Id. Calling the Fund's statutory reading
"convoluted," the Arbitrator concluded there was:

> [N]o cogent reason to believe Congress intended that a
> fund is supposed to start the calculation following
> § 4206(a)(1), then skip the step set forth in
> § 4206(a)(2) and go to the subtraction of prior
> partial withdrawal liability called for in
> § 4206(b)(1), and only then revert back to the
> multiplier of the partial withdrawal fraction
> described in § 4206(a)(2).

Id.

Reviewing the Arbitrator's statutory interpretations *de novo*, his conclusion is affirmed. This "review necessarily begins with the statutory text to determine whether the language, viewed in context, unambiguously reveals Congress's intent." United States v. Colasuonno, 697 F.3d 164, 173 (2d Cir. 2012) (citing Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)).

Looking to the text of the statute itself, Section 1386 is laid out in a two-part fashion. In subsection (a), the "amount" of an employer's partial withdrawal liability is determined in Section 1386(a), which requires multiplying the UVBs in Section 1386(a)(1) by the contribution-base decline fraction of Section 1386(a)(2). Next, in subsection (b), the liability determined in Section 1386(a) is reduced by the amount of any partial withdrawal liability from the previous plan year. Viewed this way—in other words, in the order the statute was written—the statutory calculations proceed in a logical, linear, and unambiguous fashion. "To be sure, Congress might have expressed itself more clearly, but . . . this is the most natural reading of the statute." Shepherd v. Goord, 662 F.3d 603, 607 (2d Cir. 2011).

The Fund's contention that any other reading but theirs
makes the "as if the employer had withdrawn from the plan in a
complete withdrawal" language superfluous is unavailing.[10]
Rather, this clause clarifies that, even though the overall
section deals with partial withdrawal, the starting calculation
at Section 1386(a)(1) is arrived at no differently than in a
complete withdrawal. While perhaps overly cautious of ERISA's
drafters, this reading does not necessarily render the clause
superfluous. At minimum, the clause's inclusion does not warrant
the statutory hop-scotch the Fund would otherwise have actuaries
perform. See Krause v. Titleserv, Inc., 402 F.3d 119, 127-28 (2d
Cir. 2005) (quoting Hohn v. United States, 524 U.S. 236, 249
(1998) and Lamie v. United States Tr., 540 U.S. 526, 536 (2004))
(second alteration in original) ("[W]e are reluctant to endorse
an awkward reading of its words for no better reason than to
satisfy the canon of construction . . . '[g]eneral principles of

---

[10]    Curiously, the Fund argues in its briefing that the statute
is "unambiguous, as it is here because it has only one reading
that gives effect to all of the words." Fund's Mem. 37. However,
the preference of avoiding surplusage is itself a canon of
construction. See, e.g., Marx v. Gen. Revenue Corp., 568 U.S.
371, 386 (2013) (discussing the "canon against surplusage").
Courts are instructed to use canons of statutory construction to
help resolve any statutory ambiguity. Colasuonno, 697 F.3d at
173. By invoking an argument against surplusage, the Fund itself
acknowledges the possibility of ambiguity. In any event, as
described above, both the statutory text and extrinsic guidance
point in the same direction: the Times' position.

54

statutory construction are notoriously unreliable' and 'should
not take precedence over more convincing reasons'" because the
"'preference for avoiding surplusage constructions is not
absolute.'").

Lastly, to whatever extent there were ambiguity as to
Section 1386, it is squarely resolved by the 1985 PBGC Opinion
Letter. The PBGC wrote the 1985 Opinion Letter after being
presented with the same question here. There, the PBGC concluded
the Times' reading "correct" and the Fund's reading "clearly
erroneous." PBGC Op. Letter 85-4 (Jan. 30, 1985). The PBGC's
opinion is instructive and a useful cross-check. See Beck v.
PACE Int'l Union, 551 U.S. 96, 104 (2007) (alteration in
original) (quoting Mead Corp. v. Tilley, 490 U.S. 714, 722, 725-
26 (1989)) ("We have traditionally deferred to the PBGC when
interpreting ERISA, for 'to attempt to answer these questions
without the views of the agencies responsible for enforcing
ERISA, would be to embar[k] upon a voyage without a compass.'");
Trs. of Local 138 Pension Tr. Fund, 692 F.3d at 134-35 ("The
PBGC, the agency charged with administering the withdrawal-
liability provisions under ERISA, is traditionally afforded
substantial deference in its reasonable interpretations of the
statute."); Marcella v. Capital Dist. Physicians' Health Plan,
Inc., 293 F.3d 42, 48 (2d Cir. 2002) (citing Opinion Letters

from the Department of Labor and observing that "[w]hatever
ambiguity there might be in ERISA on this point . . . we are
supported in our conclusion by the . . . agency charged with
interpretation and enforcement of the statute").

Accordingly, the Arbitrator's conclusion that the Second
Assessment was incorrectly calculated and order that the Fund's
calculations be redone was correct and is affirmed.

### d. The Arbitrator's Approval of the Interest Rate the Fund Applied to the Times' Overpayment is Affirmed

The fourth and last issue presented pertains to the amount
that the Fund needs to refund the Times for overpayments of
partial withdrawal liability payments. As found above, the Times
incurred partial withdrawal liability for plans ending May 31,
2012, and May 31, 2013, but the Fund incorrectly computed that
liability as to the Second Assessment, resulting in the Times
overpaying. As such, the Fund needed to repay the Times.
Vanquishing the question of repayments, however, created, like
the Lernaean Hydra, two new questions to resolve.

The first question is whether interest needs to be included
when repaying overpaid withdrawal liability. Imperfect overlap

56

between the directives of ERISA's statutory language and PBGC

regulations creates this problem. 29 U.S.C. § 1103(c)(1), ERISA

Section 403(c)(1), requires that "the assets of a plan shall

never inure to the benefit of any employer and shall be held for

the exclusive purpose of providing benefits to participants in

the plan and their beneficiaries and defraying reasonable

expenses in administering the plan." 29 U.S.C. § 1103(c)(1).

ERISA's anti-inurement provision has certain exceptions,

however, including: "In the case of a withdrawal liability

payment which has been determined to be an overpayment, [the

anti-inurement rule] shall not prohibit the return of such

payment to the employer within 6 months after the date of such

determination." Id. § 1103(c)(3). "The purpose of the anti-

inurement provision, in common with ERISA's other fiduciary

responsibility provisions, is to apply the law of trusts to

discourage abuses such as self-dealing, imprudent investment,

and misappropriation of plan assets, by employers and others."

Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541

U.S. 1, 23 (2004). At the same time, PBGC regulation provides

that: "If the plan sponsor or an arbitrator determines that

payments made in accordance with the schedule of payments

established by the plan sponsor have resulted in an overpayment

of withdrawal liability, the plan sponsor shall refund the

overpayment, with interest, in a lump sum." 29 C.F.R
§ 4219.31(d). The simultaneous existence of these provisions—one
expressly referencing the payment of interest and the other
conspicuously not—muddies the water.

If interest is owed, the second question is what should be
the applicable rate. PBGC regulation proscribes that a fund must
"credit interest on the overpayment . . . at the same rate as
the rate for overdue withdrawal liability payments, as
established under [29 C.F.R.] § 4219.32 or by the plan pursuant
to [29 C.F.R.] § 4219.33." 29 C.F.R. § 4219.31(d). The question
here, therefore, is whether the Fund authorized an interest rate
at a particular level or if the PBGC default interest rate under
Section 4219.32 is to apply.

The Times avers that payment of interest is necessary
because of the PBGC's promulgations, which have been regularly
followed by federal courts and prevent a potentially
unconstitutional "interest-free loan" from an employer to a fund
by an biased fund trustees prior to any arbitral review. Times'
Mem. 35 (alteration in original) (quoting Huber v. Casablanca
Indus., Inc., 916 F.2d 85, 103 (3d Cir. 1990), abrogated on
other grounds by Milwaukee Brewery Workers' Pension Plan v.

58

Joseph Schlitz Brewing Co., 513 U.S. 414, 431 (1995) (holding
that the "MPPAA calculates its installment schedule on the
assumption that interest begins accruing on the first day of the
year following withdrawal")). In addition, the Times contends
that the PBGC regulation is not contrary to ERISA because the
overpaid sums are not plan assets and therefore not covered by
the anti-inurement provision. See id.

As to the applicable rate, the Times argues for 18%,
pointing to the Section 9.5(b) of the Fund's Trust Agreement,
which includes a provision entitled "Default in Payment" and
provides: "A delinquent Employer shall be liable for any
expenses incurred in effectuating such payment (including . . .
interest at a rate of 18 percent per annum or such other
interest rate that the Trustees deem appropriate given the
circumstances)." Times' Mem. 36 (quoting Times' 56.1 ¶ 28); see
also Garfield Decl. Ex. 64 ("Trust Agreement") art. IX. Outside
of the Trust Agreement, the Times points to evidence it argues
demonstrates a practice by the Fund of using 18%, including
several instances when the Fund either informed the Times that
payment delinquency incurred 18% per annum interest or sought
that rate in litigation with other employers. See Times' Mem.
36; Times' Opp. 19-20.

59

In response, the Fund argues that it should not have to pay any interest. Pointing to ERISA's language and relying on Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), the Fund contends that ERISA's language unambiguously and "directly" speaks on the issue of interest on overpayment returns, foreclosing the application of interest on such returns and making the PBGC's regulation an impermissible construction of ERISA entitled to no deference. Id. at 842; see Fund's Mem. 38-39. The Fud also rejects the argument that the overpayments are not an asset of the plan, stating that clear ERISA provisions expressly carving out an exception for such repayments foreclose that reading. See Fund's Reply 15-16.

If it owes interest, the Fund argues the Arbitrator's factual findings and determination of 3.5% as the rate should be affirmed. The Fund notes that nothing in the Fund's Trust Agreement that expressly deals with withdrawal liability proscribes an interest rate, observing that Trust Agreement Section 9.10, which deals with withdrawal liability, does not mention interest rates, but that Section 9.4(a), which deals with "the failure of any Employer to make Employer contributions to the Trust Fund," expressly mentions Section 9.5(b), the

provision relied upon by the Times. Trust Agreement art. XI; see
Fund's Reply 18. Furthermore, the Fund avers, the evidence
adduced in the arbitration demonstrated that, rather than a
regular practice of requiring 18%, the Fund has used a variety
of rates over the years; to the extent an 18% rate was used, it
was either in error, such as with the Times, or as a matter of
ERISA statutory requirement necessitating 18% for delinquent
contributions. See Fund's Mem. 40; Fund's Reply 19-20.


The Arbitrator first determined that the PGBC regulation
did not violate ERISA's anti-inurement rule and, therefore, the
Fund needed to pay interest on any repayment to the Times for
overpaid withdrawal liability at the same rate a charged for
late payment of withdrawal liability. Interim Interest Op. 10;
Final Interest Op. 17. The Arbitrator's decision was "assumed"
and principally based on the Third Circuit's decision in Huber,
which upheld the PGBC rule regarding interest and whose
conclusions regarding the interplay between Section 4129.31(d)
and the anti-inurement rule has never been overturned or
questioned by any other court. Final Interest Op. 17; see
Interim Interest Op. 10. Before deciding the applicable rate,
however, the Arbitrator permitted additional discovery on Fund
to see if the Fund had established a withdrawal liability

61

interest rate either by policy or practice. See Interim Interest Op. 12-13.

Following discovery, the Arbitrator ultimately concluded that, in the absence of an established rate by the Fund, the set PBGC rate of 3.25% applied. Final Interest Op. 20-21. The Arbitrator did not find that the Fund trustees had unanimously adopted an express interest rate for late withdrawal fees, as the Arbitrator found required under the Fund's Trust Agreement Section 6.4(a), based in part on an affidavit submitted by a co-counsel to the Fund, even while noting that Fund Board meeting minutes had indicated past discussion about, but no actual vote on, such a policy.[11] See Interim Interest Op. 10; Final Interest Op. 10, 18. The Arbitrator also rejected the Times' argument that Section 9.5 was relevant to withdrawal liability payments, finding that that provision was part of the Trust Agreement to address employer contributions and, significantly, neither made a specific reference to withdrawal liability nor included a general statement as to "any payment" of an employer when discussing interest rates. Interim Interest Op. 10-11. As to any

---

[11]    Fund Trust Agreement Section 6.4(a) provides: "All action of the Board shall be taken by unanimous vote of the Trustees, as hereinafter provided. When voting, the Employer Trustees, as a unit, shall each have one vote. All action by the Board shall be by unanimous vote of the two units." Trust Agreemen art. XI.

established practice or policy, the Arbitrator reviewed different instances of the Fund seeking interest on late withdrawal liability and found that the Fund had, on differing occasions, used a 0% rate, 3.25% rate, 5% rate, and 18% rate. Final Interest Op. 6-9, 19-20. After reviewing the marshalled evidence, the Arbitrator found that "the Fund has had a practice of assessing interest on late payments of withdrawal liability and contributions at a rate substantially below 18% and very close to the prevailing PBGC rate if payments were made for the Fund to initiate litigation." Final Interest Op. 20.

The first issue—whether interest is to be applied at all— requires resolution of a purely legal question. Namely, what is to be made of the PBGC's promulgated regulation interpreting ERISA in the context of ERISA's anti-inurement provision? While not binding, the Third Circuit's opinion in Huber is informative, as the court there faced the same issue as presented here. In Huber, the court determined that Congress had intended to consider overpayment funds part of a plan's assets, and that the absence of discussing interest in Section 1103(c)(1), when Congress had included interest in other ERISA provisions, indicated the statute itself barred interest. See Huber, 916 F.2d at 101-02. However, as ERISA also required

employers to pay assessed withdrawal liability upfront and only later dispute the payments before a neutral arbitrator to potentially recoup its monies—a "draconian interim payment procedure"—not applying the PBGC regulation would permit, "in effect[,] an interest free loan" to a fund. Id. at 102. Striking down the application of the anti-inurement clause with regard to interest on overpayments of withdrawal liability was, to that court, "the least intrusive means of adjusting the statute to preserve its constitutionality." Id.

The analysis in Huber and its outcome is adopted. While philosophically brow-raising to construe an employer's overpayments as part of the plan's assets, the language of Section 1103(c) indicates that Congress intended overpayments to be treated as such.[12] Had Congress not envisioned overpayments on withdrawal liability to be part of the plan's assets, there would have been no reason to have expressly included a carve-out

---

[12]   Put another way, if monies were assessed and charged to an employer by a fund, but later found to be collected improperly, it is curious to view those contested sum, under the law, as already subsumed by monies in the fund whose "exclusive purpose[ ]" is to benefit participants in the plan, as opposed to still the property of the employer, or perhaps, even, nobodies. 29 U.S.C. § 1103(c)(1). Of course, possession is nine-tenths of the law. Regardless, the statute is clear on this point and, naturally, controls, philosophical disagreements be they as they may.

for such sums. See 29 U.S.C. § 1103(c)(3). The anti-inurement
provision is therefore appropriately applied here.

Unlike the Huber court's reading, however, it is not clear
that the absence of an explicit provision to provide interest in
the withdrawal liability section is so "telling" as to itself
bar such interest payments. Huber, 916 F.2d at 101 (citation
omitted). As the Times notes, the Supreme Court has "since 1933
. . . consistently acknowledged that a monetary award does not
fully compensate for an injury unless it includes an interest
component." Kansas v. Colorado, 533 U.S. 1, 10 (2001)
(collecting cases). This principle is as judicially established
as it intuitively proper. Given this backdrop, ERISA's statutory
language is best read as "silent" on the specific issue of
interest, at which point the "question for the court is whether
the agency's answer is based on a permissible construction of
the statute." Chevron, 467 U.S. at 843. The PBGC regulation,
which unobtrusively fills this statutory silence, is certainly
such a reasonable construction.

Whether ERISA is ambiguous, and the PBGC regulation is
applied, or is clear, and normally would not, in the present
instance, however, is a distinction without a difference. The

65

PBGC regulation must be applied because, were ERISA's statute to
be all there is, "the employer may deprived of (and the trustees
allowed) the use of a considerable sum for a substantial period
of time." Huber, 916 F.3d at 102. Such an arrangement only
avoids constitutional due process concerns "so long as an
employer has not been forced to overpay." Id.

The Fund is wrong to claim that the concerns raised by the
Huber court—concerns regarding ensuring procedural safeguards
against self-interested fund trustees—were resolved by the
Supreme Court's decision in Concrete Pipe. As discussed above,
the Concrete Pipe Court discussed at length the ways in which
review by a neutral arbitrator would alleviate due process
concerns created by various statutory presumptions favoring a
fund's trustees. See supra at 39-41. However, sidestepping
constitutional concerns with regard to presumptions of
correctness does not address, and does not resolve, the risk of
statutorily permitting interest-free loans to funds at the
expense of employers. Review by a neutral arbitrator is not a
panacea: while certainly a check on the risk of potentially
abusive trustees, it nevertheless remains true that the "harm
caused by the biased decisionmaker is alleviated" only when an
improperly assessed payment is returned in a form that does not

66

amount to an "interest-free loan." Huber, 916 F.2d at 103. This
is acutely true in a regime known amongst the courts as a "pay
now-fight later" system. See, e.g., Amalgamated Lithographers of
Am. v. Unz & Co. Inc., 670 F. Supp. 2d 214, 222 (S.D.N.Y. 2009).
Procedural due process and fair adjudication require a balance
to exist where there is no incentive to manipulate ERISA's rules
and the system does not deprive a party of property without the
opportunity for complete compensation down the line. See id. at
102 (citing First English Evangelical Lutheran Church v. Cnty.
of L.A., 482 U.S. 304, 318-19 (1987)) ("[T]he difference between
permanent and temporary loss of the use of property is a matter
of degree, not of kind.").


This Court is not the first to reach this conclusion, even
in the wake of Concrete Pipe—including, notably, the Third
Circuit. See Bd. of Trs. of Trucking Emps. of N. Jersey Welfare
Fund, Inc.-Pension Fund v. Kero Leasing Corp., 377 F.3d 288, 304
& n.18 (3d Cir. 2004) ("We are not persuaded that our conclusion
in Huber regarding payment of interest was dealt a fatal blow by
the Supreme Court's decision in Concrete Pipe."); accord Mary
Helen Coal Corp. v. Hudson, 235 F.3d 207, 214 (4th Cir. 2000)
(addressing Coal Act payment obligation claims, which the court
held were treated like "an obligation to pay withdrawal

liability under [Title IV of ERISA]," citing Huber approvingly, and holding that "[g]iven the pay first, dispute later framework, adopting the Trustees' interpretation of the anti-inurement clause would expose 'serious constitutional defects' in the application of the provision"). Thirty years after Huber, applying 29 C.F.R § 4219.31(d) as a patch that remains the "least intrusive" way to resolve this ERISA issue. Huber, 916 F.2d at 102. Accordingly, the Fund owes the Times interest on repayments of overpaid withdrawal liability.

Given that the Times is owed interest on such overpayments, the rate of interest needs to be determined. The Arbitrator answered by concluding the applicable PBGC rate applied because the Fund had not adopted a set policy, either by statute or practice. See Final Interest Op. 18, 20; see also 29 C.F.R. § 4219.31(d). That conclusion is upheld.

First, the Arbitrator was correct when he construed that the 18% per annum interest rate established by Section 9.5 of the Trust Agreement, the section entitled "Default in Payment," applies only to late contributions by employers. See Interim Interest Op. 8. The Arbitrator's conclusions with regard to the Trust Agreement's provisions looked solely at the contract and,

68

therefore, should be reviewed as a question of law. See Interim
Interest Op. 10-11.


Trust Agreement Article Nine may be entitled "Payments to
the Fund," but that does not mean that every subsection
provision must necessarily bleed into the others. Trust
Agreement art. IX. Looking at the agreement, Subsection 9.5(b)
is nestled between provisions that discuss what happens when an
employer fails to make a contribution to the Fund, see id.
§ 9.4, and permitted enforcement actions by the Fund when an
employer fails to make required contributions, see id. § 9.6;
directly above Section 9.5(b) is Section 9.5(a), which discusses
the Fund's Board's authority to take action to pursue collection
of employer contributions, see id. § 9.5(a). Discussion of
withdrawal liability is at the very end of the section and
focuses on the process for arbitrating disputes over withdrawal
liability. See id. § 9.10. Section 9.10 does not discuss
interest rates or details about payments of any sort. See id.
Grafting the interest rate written in the context of and meant
to be applied to delinquent payments by employers onto a section
that discusses which offices of the AAA should hear cases and
under which state's laws those cases should be heard is not the

.       ⸱

most "natural reading" of the Trust Agreement. Shepherd, 662

F.3d at 607; see generally Trust Agreement art. IX.


        The Arbitrator's factual finding that the Fund had no

policy or practice applying 18% to overdue withdrawal liability

payments is similarly upheld. Final Interest Op. 20-21. The

Times points to instances, both as to itself and in prior

litigations involving the Fund, where the Fund used 18% as the

applicable interest rate for withdrawal liability.[13] As described

above, the arbitration's discovery also revealed, and the Fund

presented to the Arbitrator, other instances when the Fund

applied interest rates to delinquent withdrawal liability

payment sat rates not 18%, and which ranged from 0% to 5%.

Evidence from the Fund's Board meetings pulled in both

directions: the Fund trustees indicated at one meeting that

withdrawal liability interest rates should be the same as for

---

[13]     The Times also contends that because the Fund argued in
briefings for prior legal proceedings for an 18% rate, the Fund
is bound by that position under the doctrine of judicial
estoppel. See Times' Mem. 38 (citing Bates v. Long Island R.
Co., 997 F.2d 1028, 1037 (2d Cir. 1993)). The Fund's
explanation—that those prior lawsuits required an 18% interest
rate pursuant to ERISA Section 4301(b), which provides that
withdrawal liability be treated like delinquent contributions—
sufficiently supports the position that the Fund's posture in
those instances was different than here, where an interest rate
needed to have been established by the Fund to be applicable but
was not. See Fund's Reply 20.

delinquent contributions, but also that the trustees chose not
to adopt a rule that explicitly relates to withdrawal liability.
Final Interest Op. 10-11.

It is sufficient to observe that it has not been
established by a preponderance of the evidence that the
Arbitrator's finding was wrong.[14] For a plan to establish an
applicable withdrawal liability rate, it needed to be pursuant
to 29 C.F.R. § 4219.33. See 29 C.F.R. § 4219.31(d). To accord
with that provision, any rule adopted by the Fund needed
generally to "operate and be applied uniformly with respect to
each employer." Id. § 4219.33. The Arbitrator did not find a
"consistently applied" rate, and the facts adduced at the
arbitration could reasonably support that finding. Final
Interest Op. 20. While some evidence pulled in the opposite
direction, the possibility of a difference of opinion is not
enough to rebut the Arbitrator's conclusion. See Sigmund Cohn
Corp., 804 F. Supp. at 493; Mangan v. Owens Truckmen, Inc., 715

---

[14]    In other words, the Court need not determine whether it was
appropriate for the Arbitrator, after determining that there was
no formal adoption by the Fund of an interest rate for
withdrawal liability, to then proceed to look for a "de facto
policy" by the Fund. Final Interest Op. 19; see Interim Interest
Op. 11 (appearing to require the Fund to use the same rate
established at its practice for assessing interest on delinquent
withdrawal liability payments as for refunding overpayments as a
matter of equity).

71

F. Supp. 436, 439 (E.D.N.Y. 1989) (citation omitted) ("Title 29
U.S.C. § 1401(c) 'represents a considered decision by Congress
that district courts not be authorized to second-guess
arbitrators' decisions.'"). Accordingly, the Arbitrator's
decision to apply the applicable PBGC rate of 3.25% interest on
the refunded overpayments is affirmed.

**Conclusion**

For the foregoing reasons, the Times and Fund's cross-
motions for summary judgment are granted in part and denied in
part.

Submit judgment on notice.

It is so ordered.

**New York, NY**
**March 26, 2018**

ROBERT W. SWEET
U.S.D.J.

# The Libman Actuarial Group, Inc.

*Ciner*
EXHIBIT R
Date: 10.8.2018

5755 Granger Road, Suite 501
Independence OH 44131-1442

www.libmanag.com
**216-398-3888**
Fax 216-398-5069

September 7, 2018

Gary L. Greenberg
Attorney at Law
Jackson Lewis P.C.
425 Walnut Street
Suite 2300
Cincinnati, OH 45202

RE: Sofco Erectors, Inc. / Ohio Operating Engineers Pension Fund Withdrawal Liability

Dear Gary:

This report contains my expert opinion regarding the Sofco Erectors, Inc. Withdrawal Liability upon withdrawal from the Ohio Operating Engineers Pension Fund.

## Assignment

You have requested that I review the Withdrawal Liability Assessment for Sofco Erectors, Inc. by the Ohio Operating Engineers Pension Fund as of July 31, 2017. I was also requested to calculate the Withdrawal Liability under the assumption that:

1. There were no Partial Withdrawal Assessments, and

2. Contributions for Sofco Erectors, Inc. began on April 4, 2004 and that the contributions for any predecessor employer should not be considered in determining the Sofco Erectors, Inc. Withdrawal Liability.

The sources of the data used for the calculations made for this report are detailed in the Data Sources section of this report.

## Findings

Because funding for Sofco Erectors, Inc. began on April 1, 2004, the cumulative 5 year contributions for all years prior to the Plan Year Ending July 31, 2009 were reduced. This resulted in lower amounts of liability allocated to Sofco Erectors, Inc. for those years and a resulting Preliminary Allocable Amount of Unfunded Vested Benefits of $451,061 instead of the $605,591 (before any offsets for partial withdrawal liabilities) as calculated by Segal Consulting.

The calculations supporting these findings are detailed on the included Exhibit.

SOFCO002150

**Methods and Assumptions**

The actuarial methods used in these calculations are identical to those used by Segal Consulting with the exceptions noted above (i.e. no partial assessment and no contributions prior to April 1, 2004).

**Data Sources**

I was supplied with the following documents which were received, reviewed and relied upon in my calculations:

- August 29, 2017 letter from Segal Consulting re: Ohio Operating Engineers Pension Fund Withdrawal Liabilities for Sofco Erectors, Inc.,

- The Ohio Operating Engineers Pension Fund Withdrawal Liability Valuation Reports prepared by Segal Consulting for the Plan Years Ending July 31, 2009 through July 31, 2016, and

- The Ohio Operating Engineers Pension Fund supplied printout showing monthly remittance amounts from Sofco Erectors, Inc. from 1998 through and including the month of March, 2017.

**Summary**

Please note that all calculations from The Libman Actuarial Group can only be considered as unofficial since the laws and regulations require that official and final Withdrawal Liability calculations must be prepared by the Plan's actuary. Based on my expert opinion, I do not expect the Segal Consulting calculations to differ materially from those provided in my report.

The above fairly and accurately represent my findings as an expert witness in this matter. Any and all exhibits are an integral part of this report.

Please contact me if you have any questions or comments regarding these opinions

Cordially,

Michael L. Libman, MAAA, FCA, MSPA

Enclosures:
- Exhibit – Detailed Withdrawal Liability Calculations
- cv of Michael L. Libman

Ohio Operating Engineers Pension Fund
Withdrawal Liability Calculations
Sofco Erectors, Inc.

Total Withdrawal During the Plan Year Ending July 31, 2017

Excluding Predecessor Contributions Prior to April 1, 2004
Assuming No Partial Withdrawals

| | Unamortized Balance of Withdrawal Liability Pools | | Contributions During the Prior 5 year Period | | |
|---|---|---|---|---|---|
| Year Ended | Basic | Reallocated | Total Plan | Sofco Erectors, Inc. | Liability Allocated |
| 7/31/2003 | 91,288,582 | | $178,834,875 | $0 | $0 |
| 7/31/2004 | (10,869,184) | | 183,435,933 | 9,411 | (558) |
| 7/31/2005 | 54,864,009 | | 184,525,945 | 44,832 | 13,330 |
| 7/31/2006 | (76,019,502) | | 187,236,038 | 83,109 | (33,743) |
| 7/31/2007 | 18,444,748 | | 192,258,544 | 119,913 | 11,504 |
| 7/31/2008 | 82,940,123 | | 202,969,173 | 164,079 | 67,048 |
| 7/31/2009 | 232,055,591 | | 210,884,752 | 161,099 | 177,272 |
| 7/31/2010 | 29,566,670 | | 218,622,244 | 127,590 | 17,255 |
| 7/31/2011 | 127,603,629 | | 230,778,340 | 95,158 | 52,615 |
| 7/31/2012 | 214,305,669 | | 250,306,333 | 70,436 | 60,305 |
| 7/31/2013 | 7,764,623 | | 269,018,918 | 46,278 | 1,336 |
| 7/31/2014 | (129,537,937) | 6,853 | 298,703,055 | 62,852 | (27,255) |
| 7/31/2015 | 261,224,360 | | 331,169,312 | 94,102 | 74,227 |
| 7/31/2016 | 112,294,964 | | 360,524,316 | 121,118 | 37,725 |
| | | | Preliminary Allocable Amount of Unfunded Vested Benefits | | $451,061 |

A. Preliminary Allocable Amount of Unfunded Vested Benefits — $451,061
B. De minimis Reduction (ERISA Sec.4209)
    1. Lesser of 0.75% of Unfunded Vested Benefits or $50,000 — $50,000
    2. Reduction of $100,000 + B1 - A, not > B1 or <0 — $0
D. Net Allocable Amount of Unfunded vested Benefits for Complete Withdrawal — $451,061
E. Credit for Prior Partial Withdrawal — $0
F. Withdrawal Liability D - E, not less than zero — $451,061

Ohio Operating Engineers Pension Fund
Withdrawal Liability Calculations
Sofco Erectors, Inc.

Total Withdrawal During the Plan Year Ending July 31, 2017

Excluding Predecessor Contributions Prior to April 1, 2004
Assuming No Partial Withdrawals

Determination of Payment Schedule Under ERISA Section 4219

| 1 Employer Base Units History | PYE 7/31 | Hours | 3Yr-Average |
|---|---|---|---|
| | 2007 | 11,053.50 | |
| | 2008 | 11,978.00 | |
| | 2009 | 1,607.50 | 8,213.00 |
| | 2010 | 440.00 | 4,675.17 |
| | 2011 | 1,123.00 | 1,056.83 |
| | 2012 | 2,172.00 | 1,245.00 |
| | 2013 | 3,442.50 | 2,245.83 |
| | 2014 | 3,834.00 | 3,149.50 |
| | 2015 | 5,527.00 | 4,267.83 |
| | 2016 | 5,477.00 | 4,946.00 |

| | |
|---|---|
| 2 Average Base Units for the High 3 Consecutive 10 years Ended 7/31/16 | 8,213.00 |
| 3 Highest Contribution Rate during 10 years ended 7/31/17 | $6.00 |
| 4 Annual Payment = 2 x 3 | $49,280.00 |
| 5 Quarterly Payment = 4 / 3 | $12,320.00 |
| 6 Number of Quarterly Payments | 57.00 |
| 7 Remaining Payment | $7,661.69 |
| Applicable Discount Rate | 7.25% |

SOFCO000153

# Michael L. Libman

Associate, Society of Actuaries (1970)
Member, American Academy of Actuaries (1971)
Enrolled Actuary (1979)
Member, American Society of Pension Actuaries (1996)
Fellow, Conference of Consulting Actuaries (2000)

## Employment

### The Libman Actuarial Group, Inc. (and predecessor) Cleveland OH Effective 1/1/90

Consulting Actuary- over 300 clients primarily in Ohio, including several law firms; responsible for creative consulting and research.

### Foster Higgins and predecessors Cleveland OH 1975-1989

Consulting Actuary- over 250 plans from 1 to 6,000 participants. Senior actuary with responsibilities for managing the actuarial practice and business development.

### Mutual of New York New York NY 1963-1974

Assistant Actuarial Director- financial projection, corporate modeling and many other actuarial assignments

## Professional Educational Activities

Society of Actuaries- Part 150 Exam Committee 1986-1991 (Life Contingencies)

Conference of Consulting Actuaries – 2009 Audiocast Panelist "Statutory Hybrid Plans – Recent Developments"

## Most Relevant Work Experience

Consulting Actuary to QDRO Group (formerly Pension Evaluators) of Medina, OH   1996 - Present

Litigation Support in divorce proceedings and other matters

## Depositions

Expert Witness for the Plaintiff- Rubber Associates, Inc. v. United Food and CWU-EP- Arbitration 5/29/13

Expert Witness for the Spouse – Moyer v. Moyer- Trial Testimony 10/1/12

Expert Witness for the Plaintiff – Khaliel and Taylor, et al v. Norton Healthcare, Inc. Retirement Plan- Deposed 9/14/12

Expert Witness for the Plaintiff – Cottillion, et al v. United Refining Co.- Deposed 3/8/12

Expert Witness for the Plaintiff – J. West  v. AK Steel

## Education

BS in mathematics, St. Lawrence University 1963

# The Libman Actuarial Group, Inc.

5755 Granger Road, Suite 501
Independence OH 44131-1442

www.libmanag.com
**216-398-3888**
Fax 216-398-5069

September 7, 2018

Gary L. Greenberg
Attorney at Law
Jackson Lewis P.C.
425 Walnut Street
Suite 2300
Cincinnati, OH 45202

RE:    Sofco Erectors, Inc. / Ohio Operating Engineers Pension Fund Withdrawal Liability

Dear Gary:

This report contains my expert opinion regarding the Sofco Erectors, Inc. Withdrawal Liability upon withdrawal from the Ohio Operating Engineers Pension Fund.

## Assignment

You have requested that I review the Withdrawal Liability Assessment for Sofco Erectors, Inc. by the Ohio Operating Engineers Pension Fund as of July 31, 2017. I was also requested to calculate the Withdrawal Liability under the assumption that:

1. There were no Partial Withdrawal Assessments, and

2. The interest rate used for the Withdrawal Liability Calculation was the same 7.25% per annum assumption that was used as the interest assumption for the actuarial funding valuations performed by Segal Consulting between 2008 and 2016 inclusive.

The sources of the data used for the calculations made for this report are detailed in the Data Sources section of this report.

## Findings

Using the funding valuation interest rate of 7.25% I observed that as of July 31, 2014 the Plan Assets exceeded Withdrawal Liability. Under the Withdrawal Liability method chosen by the Plan, all previous Withdrawal Liability bases are set to zero when this occurs. Assets again exceeded Withdrawal Liability on July 31, 2015 so no new Withdrawal Liability base was established on that date. As of July 31, 2016, a Withdrawal Liability base was established, but since the amount allocated to Sofco Erectors, Inc. was less than the Deminimus amount for this situation, the Withdrawal Liability is equal to zero. The calculations supporting these findings are detailed on the included Exhibit.

SOFCO002155

**Methods and Assumptions**

The actuarial methods used in these calculations are identical to those used by Segal Consulting with the exceptions noted above (i.e. no partial assessment and the use of the 7.25% interest rate).

**Data Sources**

I was supplied with the following documents which were received, reviewed and relied upon in my calculations:

- August 29, 2017 letter from Segal Consulting re: Ohio Operating Engineers Pension Fund Withdrawal Liabilities for Sofco Erectors, Inc.,

- The Ohio Operating Engineers Pension Fund Withdrawal Liability Valuation Reports prepared by Segal Consulting for the Plan Years Ending July 31, 2009 through July 31, 2016, and

- The Ohio Operating Engineers Pension Fund supplied printout showing monthly remittance amounts from Sofco Erectors, Inc. from 1998 through and including the month of March, 2017.

**Summary**

Please note that all calculations from The Libman Actuarial Group can only be considered as unofficial since the laws and regulations require that official and final Withdrawal Liability calculations be prepared by the Plan's actuary. Based on my expert opinion, I do not expect the Segal Consulting calculations to differ materially from those provided in my report.

The above fairly and accurately represent my findings as an expert witness in this matter. Any and all exhibits are an integral part of this report.

Please contact me if you have any questions or comments regarding these opinions

Cordially,

Michael L. Libman, MAAA, FCA, MSPA

Enclosures:
- Exhibit – Detailed Withdrawal Liability Calculations
- cv of Michael L. Libman

SOFCO002156

Ohio Operating Engineers Pension Fund
Withdrawal Liability Calculations
Sofco Erectors, Inc.

Total Withdrawal During the Plan Year Ending July 31, 2017

Based on Funding Valuation Liability Assumptions
Assuming No Partial Withdrawals

| Year Ended | Unamortized Balance of Withdrawal Liability Pools | | Contributions During the Prior 5 year Period | | Liability Allocated |
| | Basic | Reallocated | Total Plan | Sofco Erectors, Inc. | |
|---|---|---|---|---|---|
| 7/31/2003 | 91,288,582 [1] | | $178,834,875 | $291,244 | 0 [2] |
| 7/31/2004 | (10,869,184) [1] | | 183,435,933 | 275,279 | 0 [2] |
| 7/31/2005 | 54,864,009 [1] | | 184,525,945 | 211,259 | 0 [2] |
| 7/31/2006 | (76,019,502) [1] | | 187,236,038 | 189,279 | 0 [2] |
| 7/31/2007 | 18,444,748 [1] | | 192,258,544 | 180,029 | 0 [2] |
| 7/31/2008 | (75,645,136) | | 202,969,173 | 187,255 | 0 [2] |
| 7/31/2009 | 197,513,237 | | 210,884,752 | 161,099 | 0 [2] |
| 7/31/2010 | (34,272,140) | | 218,622,244 | 127,590 | 0 [2] |
| 7/31/2011 | (4,423,614) | | 230,778,340 | 95,158 | 0 [2] |
| 7/31/2012 | 49,095,067 | | 250,306,333 | 70,436 | 0 [2] |
| 7/31/2013 | (152,237,427) | | 269,018,918 | 46,278 | 0 [2] |
| 7/31/2014 | (121,092,797) | 6,853 | 298,703,055 | 62,852 | 0 [2] |
| 7/31/2015 | (73,899,768) | | 331,169,312 | 94,102 | 0 [2] |
| 7/31/2016 | 19,479,420 | | 360,524,316 | 121,118 | 6,544 |
| | | | Preliminary Allocable Amount of Unfunded Vested Benefits | | $6,544 |

[1] Funding liability numbers prior to 2008 were not readily available. These liabilities are
those provided by the Fund in their calculations and have no effect on the ultimate
withdrawal liability amount on this basis as assets exceeded liabilities as of July 31, 2014.

[2] Unamortized Balance set to $0 as a result of plan being fully funded as of July 31, 2014 and 2015.

| | |
|---|---|
| A. Preliminary Allocable Amount of Unfunded Vested Benefits | $6,544 |
| B. De minimis Reduction (ERISA Sec.4209) | |
| 1. Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| 2. Reduction of $100,000 + B1 - A, not > B1 or <0 | $143,456 |
| D. Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | ($136,912) |
| E. Credit for Prior Partial Withdrawal | $0 |
| F. Withdrawal Liability D - E, not less than zero | $0 |

Payment Schedule does not apply since the Withdrawal Liability is $0.

# Michael L. Libman

Associate, Society of Actuaries (1970)
Member, American Academy of Actuaries (1971)
Enrolled Actuary (1979)
Member, American Society of Pension Actuaries (1996)
Fellow, Conference of Consulting Actuaries (2000)

## Employment

### The Libman Actuarial Group, Inc. (and predecessor) Cleveland OH Effective 1/1/90

Consulting Actuary- over 300 clients primarily in Ohio, including several law firms; responsible for creative consulting and research.

### Foster Higgins and predecessors Cleveland OH 1975-1989

Consulting Actuary- over 250 plans from 1 to 6,000 participants. Senior actuary with responsibilities for managing the actuarial practice and business development.

### Mutual of New York New York NY 1963-1974

Assistant Actuarial Director- financial projection, corporate modeling and many other actuarial assignments

## Professional Educational Activities

Society of Actuaries- Part 150 Exam Committee 1986-1991 (Life Contingencies)

Conference of Consulting Actuaries – 2009 Audiocast Panelist "Statutory Hybrid Plans – Recent Developments"

## Most Relevant Work Experience

Consulting Actuary to QDRO Group (formerly Pension Evaluators) of Medina, OH   1996 - Present

Litigation Support in divorce proceedings and other matters

## Depositions

Expert Witness for the Plaintiff- Rubber Associates, Inc. v. United Food and CWU-EP- Arbitration 5/29/13

Expert Witness for the Spouse – Moyer v. Moyer- Trial Testimony 10/1/12

Expert Witness for the Plaintiff – Khaliel and Taylor, et al v. Norton Healthcare, Inc. Retirement Plan- Deposed 9/14/12

Expert Witness for the Plaintiff – Cottillion, et al v. United Refining Co.- Deposed 3/8/12

Expert Witness for the Plaintiff – J. West  v. AK Steel

## Education

BS in mathematics, St. Lawrence University 1963