CIN-TEL CORPORATION

PH:   513-621-7723                                    FX:   513-263-9023

Page 1

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

--|--

Case No. 01-18-0001-3790

--|--

Sofco Erectors, Inc.,

Employer,
and

Ohio Operating Engineers Pension Fund,

Fund.

--|--

Rule 30(B)(6)
Deposition of:    JUSTIN SHAWN HELMICK

Date and Time:    Friday, October 26, 2018
                  1:36 p.m.

Place:            Vorys, Sater, Seymour &
                    Pease, LLP
                  52 East Gay Street
                  Columbus, Ohio

Reporter:         Maria DiPaolo Jones, RDR, CRR
                  Notary Public - State of Ohio

--|--

CIN-TEL CORPORATION

PH:  513-621-7723                                            FX:  513-263-9023

---

Page 2

```
1    APPEARANCES:
2    On behalf of Sofco Erectors, Inc.:
3        MR. GARY L. GREENBERG
         Jackson Lewis, PC
4        425 Walnut Street, Suite 2300
         Cincinnati, Ohio 45202
5        513.621.3440
6    On behalf of Ohio Operating Engineers Pension Fund
     and Justin Shawn Helmick:
7
         MR. DANIEL J. CLARK
8        Vorys, Sater, Seymour & Pease, LLP
         52 East Gay Street
9        Columbus, Ohio 43216-1008
         614.464.6400
10
     ALSO PRESENT:
11
         Mr. Dan Powell
12
               --|--
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 3

```
1              INDEX
2               --|--
3    JUSTIN SHAWN HELMICK            PAGE
     Examination by Mr. Greenberg       6
4
               --|--
5
         FUND EXHIBITS
6
     LETTER DESCRIPTION            IDENTIFIED
7
8    A   Employer's Third Revised Notice of    8
         Organization Deposition Under
9        Fed R. Civ P. 30(B)(6) to Fund

10   B   May 1, 2010 through April 30, 2013   11
         Collective Bargaining Agreement
11   C   May 8, 2013 through April 30, 2017   15
         Collective Bargaining Agreement
12
     D   2/1/2016 OOEP Fund Amended Agreement  16
13       and Declaration of Trust
14   E   OOEP Plan Revised 3/1/2017           21
15   F   10/3/2011 Executed Acceptance of     28
         Agreement
16
     G   OOEP Fund Withdrawal Liability       29
17       Valuation as of July 31, 2009
18   H   OOEP Fund Withdrawal Liability       32
         Valuation as of July 31, 2010
19
     I   OOEP Fund Withdrawal Liability       33
20       Valuation as of July 31, 2011
21   J   OOEP Fund Withdrawal Liability       33
         Valuation as of July 31, 2012
22
     K   OOEP Fund Withdrawal Liability       33
23       Valuation as of July 31, 2013
24   L   OOEP Fund Withdrawal Liability       33
```

---

Page 4

```
1    LETTER DESCRIPTION            IDENTIFIED
2    M   OOEP Fund Withdrawal Liability       33
         Valuation as of July 31, 2015
3
     N   OOEP Fund Withdrawal Liability       33
4        Valuation as of July 31, 2016
5    O   8/31/2017 letter Re: Partial and     33
         Complete Withdrawal Liability
6        Demand for Payment; 8/29/2017
         letter Re: Ohio Operating
7        Engineers Pension Fund - Partial
         and Complete Withdrawal Liability
8        Calculations for Sofco Erectors, Inc.
9    P   11/10/2017 letter Re: Sofco          41
         Erectors, Inc. - Request for Review
10       of Withdrawal Liability Assessment
         dated August 31, 2017
11
     Q   11/29/2017 letter Re: Sofco          42
12       Erectors, Inc. - Supplemental
         Request for Review of Withdrawal
13       Liability Assessment dated
         August 31, 2017
14
     R   6/22/2018 letter Re: Sofco           42
15       Erectors, Inc.
16   S   Affidavit of Tim Gates              43
17   T   Precision Environmental Company      43
         Arbitration Opinion and Award
18
     U   Members' work records               44
19
               --|--
20
21
22
23
24
```

---

Page 5

```
1              Friday Afternoon Session
2              October 26, 2018.
3              --|--
4              (FUND EXHIBITS A THROUGH U MARKED.)
5              (Witness sworn.)
6              MR. GREENBERG:  We're here today to take
7    the deposition of the Ohio Operating Engineers
8    Pension Fund In the Matter of Sofco Erectors,
9    Inc. and the Ohio Operating Engineers Pension Fund
10   pending before the American Arbitration Association
11   and Arbitrator John Sands pursuant to the rules of
12   the American Arbitration Association for
13   multiemployer pension plan withdrawal liability
14   disputes, the parties' joint discovery plan notice of
15   deposition and agreement of the parties.
16             With me today representing Sofco Erectors
17   is one of the co-owners, Dan Powell.
18             And I'll ask counsel for the Fund to make
19   his appearance.
20             MR. CLARK:  Dan Clark representing the
21   Fund and the witness today.
22             MR. GREENBERG:  And, Mr. Clark, can we
23   stipulate to the qualifications of the court
24   reporter?
```

---

WWW.CINTELCORPORATION.COM        E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723                                    FX: 513-263-9023

Page 6

1       MR. CLARK: Yes.
2            JUSTIN SHAWN HELMICK,
3  being by me first duly sworn, as hereinafter
4  certified, deposes and says as follows:
5            DIRECT EXAMINATION
6  BY MR. GREENBERG:
7       Q.   All right. Speaking now to the witness,
8  please state your full name.
9       A.   Justin Shawn Helmick.
10      Q.   And where are you employed?
11      A.   At the Ohio Operating Engineers Fringe
12  Benefit Program.
13      Q.   And what is your position?
14      A.   I am the assistant administrator.
15      Q.   How long have you held that position?
16      A.   Just under three months.
17      Q.   And where were you employed before you
18  held this current position?
19      A.   With the Ohio Operating Engineers Fringe
20  Benefit Program as a field representative.
21      Q.   And how long did you hold that position?
22      A.   Four years.
23      Q.   What were your duties as field
24  representative?

Page 7

1       A.   The collection of audits, picking up
2  payment from contractors, assisting contractors with
3  their contribution forms.
4       Q.   And what are your duties as assistant
5  administrator?
6       A.   Oversee the day-to-day operations of the
7  office with the main focus on the audit department.
8       Q.   Who were you employed with before you were
9  a field representative with the Fund?
10      A.   U.S. Casting Company.
11      Q.   What was your position there?
12      A.   I was a foreman in the molding department.
13      Q.   As assistant administrator of the Fund who
14  do you report to?
15      A.   The administrator, Carol Wilson.
16      Q.   So from this point forward, well, from the
17  beginning when I use the word "Fund," you'll
18  understand that that refers to the Ohio Operating
19  Engineers Pension Fund, your employer, correct?
20      A.   Correct.
21      Q.   You'll agree with that?
22      A.   Yes.
23      Q.   All right. Thank you.
24           Have you been deposed before?

Page 8

1       A.   Yes.
2       Q.   So you understand that I'm going to ask
3  you a series of questions and you'll wait till I'm
4  done with the question and you'll respond to the best
5  of your ability. Correct?
6       A.   Correct.
7       Q.   And if at any time you don't understand my
8  question, will you let me know?
9       A.   I will.
10      Q.   And if at any time you need a break, will
11  you let me know?
12      A.   I will.
13      Q.   Thank you.
14           Of course, I do want you to wait until
15  you've answered the question before you take a break.
16      A.   Sure.
17      Q.   All right. So I'm going to show you a
18  document that we will mark as Employer's Exhibit A,
19  and I believe it's in front of you, and this is a
20  document with a heading "American Arbitration
21  Association" and a little bit underneath you'll see
22  in big bold print "EMPLOYERS THIRD REVISED NOTICE OF
23  ORGANIZATION DEPOSITION UNDER FED R. CIV P. 30(B)(6)
24  TO FUND."

Page 9

1            Do you recognize this document? Have you
2  seen it before today?
3       A.   No, I have not.
4       Q.   Are you aware that you are being deposed
5  here today as a representative of the Fund?
6       A.   Yes.
7       Q.   Turn to the third page of this document
8  and you'll see that there's a page headed "Exhibit
9  A."
10      A.   Yes.
11      Q.   Have you seen that before?
12      A.   Yes.
13      Q.   Okay. So you understand that the purpose
14  of this deposition here today is for me, on behalf of
15  my client, to ask you questions about the subject
16  matters listed under Exhibit A?
17      A.   Yes.
18      Q.   What did you do to prepare for today's
19  deposition?
20      A.   I reviewed documents, spoke to Carol, the
21  administrator.
22      Q.   Anything else?
23      A.   No.
24      Q.   Give me a rough idea of the documents you

3 (Pages 6 to 9)

CIN-TEL CORPORATION

PH: 513-621-7723                                    FX: 513-263-9023

---

Page 10

1    reviewed.
2        A.    The documents that Dan provided you when
3    we started.
4        Q.    So that would be a report from Segal
5    Consulting --
6        A.    Correct.
7        Q.    -- and some records of contributions and
8    the pension plan?
9        A.    Yeah. Yes.
10       Q.    Are you familiar with Sofco Erectors,
11   Inc.?
12       A.    Not outside of this case, no.
13       Q.    But as part of this case you're aware that
14   there's a dispute between a former contributing
15   employer called Sofco Erectors, Inc. and the Fund
16   over withdrawal liability, correct?
17       A.    Correct.
18       Q.    And you are aware that Sofco was a
19   contributing employer to the Fund for a number of
20   years through April 30th, 2017, correct?
21       A.    Yes.
22       Q.    All right. So what we're going to do now
23   is we're going to take a look at some more exhibits,
24   and I provided you with an exhibit booklet. The

---

Page 11

1    exhibit booklet is divided into tabs and we're going
2    to start with the document that's behind Tab No. 1
3    which has been marked as Exhibit B. So do you have
4    that in front of you?
5        A.    Uh-huh. Yes.
6        Q.    You need to say "yes" or "no."
7        A.    Yes.
8        Q.    So Exhibit B, if you'll look at the first
9    page, it appears to be the front of a union contract
10   between AGC of Ohio and Operating Engineers Local 18.
11   So first I want to ask if you're familiar with AGC of
12   Ohio. Are you familiar with that?
13       A.    Yes.
14       Q.    And what is AGC of Ohio?
15       A.    It is the Associated General Contractors.
16       Q.    And it is a multiemployer bargaining
17   group, correct?
18       A.    Yes.
19       Q.    And AGC of Ohio enters into union
20   contracts on behalf of its members with various
21   unions including Operating Engineers Local 18,
22   correct?
23       A.    Yes.
24       Q.    So, looking at Exhibit B, are you familiar

---

Page 12

1    with this union contract?
2        A.    Yes.
3        Q.    And would you agree with me that this is a
4    true and accurate copy of the union contract in
5    effect between AGC of Ohio and Operating Engineers
6    Local 18 from May 1, 2010, through April 30, 2013?
7        A.    It's the cover page. I mean, I don't see
8    the rest of the agreement, but yes.
9        Q.    Well, it's behind the -- turn some pages.
10       A.    Okay.
11       Q.    So take a little time.
12       A.    Sure.
13       Q.    Look through it. So I'm just going to ask
14   you if it appears to you to be a true and accurate
15   copy of that union contract.
16       A.    Yes, it does appear to be a true and
17   accurate copy.
18       Q.    All right. I'm just going to ask you just
19   a few questions about this document, and I want you
20   to turn to Article IV which begins at page 22. Tell
21   me when you're there.
22       A.    Okay. I'm there.
23       Q.    So Article IV has a heading "Fringe
24   Benefit Programs" and then there are some section

---

Page 13

1    numbers underneath that begin with Section 41, it
2    goes on for several pages through Section 47
3    concluding page 25. Do you see that?
4        A.    Yes, I do.
5        Q.    And would you agree with me that Article
6    IV, Sections 41 through 47, govern the relationship
7    between Sofco as a contributing employer under this
8    union contract and the Fund during the period of time
9    that this contract was in effect?
10       A.    Yes.
11       Q.    So now I want to take a look at Section
12   42. We're still in Article IV, and now we're at the
13   bottom of page 22/top of page 23, so I'm going to
14   read this first sentence out loud. "All Employers
15   bound hereby agree to be bound by the Agreement and
16   Declarations of Trust, as amended, establishing the
17   Pension Fund," and then there's some more words after
18   that.
19            So a few minutes ago counsel for the Fund
20   handed me a document that we're going to look at in
21   more detail in a few minutes called the Ohio
22   Operating Engineers Pension Fund Amended Agreement
23   and Declaration of Trust Effective February 1, 2016.
24            The contract that we're looking at was

---

4 (Pages 10 to 13)

CIN-TEL CORPORATION

PH: 513-621-7723                                    FX: 513-263-9023

Page 14

1    effective 2010 through 2013, so I'm going to assume
2    that there was an agreement and declaration of trust
3    that was a predecessor of the document that you just
4    handed me.  Is that correct?
5        A.    I wouldn't want to assume.  I can only go
6    off the documents that are in front of me.  I'm not
7    familiar with anything before that.
8        Q.    All right.  But, to the best of your
9    knowledge, prior to the date of the document you
10   handed me there was an agreement and declaration of
11   trust in effect.
12       A.    Yes.
13       Q.    And that would be the document referenced
14   by Section 42 of the contract that we're looking at,
15   correct?
16       A.    Yes.
17       Q.    And so, based on this contract, Sofco as a
18   party to this contract was also bound by that
19   agreement and declaration of trust, correct?
20       A.    Yes.
21       Q.    Other than -- and now we're going to talk
22   about the period from 2010 through 2013, the period
23   in which this contract was in effect.
24       A.    Uh-huh.

Page 15

1        Q.    Other than this contract and the agreement
2    and declaration of trust referenced in this contract
3    were there any other documents during this period
4    that governed the relationship between Sofco and the
5    Fund?  Other than those two.
6        A.    No.
7        Q.    All right.  Let's turn now to Tab 2 which
8    would be Exhibit C and, essentially, I'm going to ask
9    you the same questions.  So now we're looking at a
10   union contract between AGC of Ohio Building Agreement
11   effective May 8, 2013, through April 30, 2017, and
12   Operating Engineers Local 18.  Are you familiar with
13   this document?
14       A.    Yes.
15       Q.    And this is the union contract that was in
16   effect between AGC of Ohio and Operating Engineers
17   Local 18 between this stated period of time, correct?
18       A.    Yes.
19       Q.    And Sofco was a party to this agreement,
20   correct?
21       A.    Yes.
22       Q.    And, looking at Article IV on page 22, so
23   we're looking at Article IV and Article IV begins on
24   page 22, it begins with Section 41 and it runs to

Page 16

1    page 25 through Section 47.  Do you see that?
2        A.    Yes.
3        Q.    And would you agree that Article IV,
4    Sections 41 through 47, governed the relationship
5    between the Fund and Sofco during the period of time
6    that this union contract was in effect?
7        A.    Yes.
8        Q.    And then, as with the previous contract,
9    we're going to look at Section 42, and you'll see in
10   Section 42 again there's a reference to "the
11   Agreement and Declarations of Trust, as amended,
12   establishing the Pension Fund," and then there's some
13   more words.
14           MR. GREENBERG:  Let's go ahead and mark
15   the document behind Tab 3 as Exhibit D.
16           MR. CLARK:  This one?
17           MR. GREENBERG:  Yes, thank you.
18       Q.    So please look at Exhibit D, and put that
19   side by side with Exhibit C, Section 42.  So as of
20   February 1, 2016, the document referred to in Section
21   42 as the agreement and declaration of trust
22   establishing the pension fund is the same document
23   that we have marked as Exhibit D.  Would you agree
24   with that?

Page 17

1        A.    Yes.
2        Q.    And before February 1, 2016, there was a
3    similar document in effect that would have been
4    referenced by Section 42, correct?
5        A.    Yes.
6        Q.    And the only two documents governing the
7    relationship between the Fund and Sofco during the
8    period of time this contract was in effect would have
9    been this union contract that we've marked as Exhibit
10   C and the amended agreement and declaration of trust
11   we have marked as Exhibit D.  Correct?
12       A.    Yes.
13       Q.    All right.  Now I have a few questions, a
14   few more questions about Exhibit D.  I'd like you to
15   turn to the last page, and the last page, this is
16   page 25, shows some signatures and there's a heading
17   "Employer Trustees," there's a heading "Union
18   Trustees," and these were the eight trustees who were
19   in office as of February 1, 2016; is that correct?
20       A.    Yes.
21       Q.    Since then have any of these trustees been
22   replaced?
23       A.    Yes.
24       Q.    Which ones?

WWW.CINTELCORPORATION.COM          E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH:  513-621-7723                                        FX:  513-263-9023

---

Page 18

```
 1      A.   Stanley Roediger, one of the employer
 2   trustees.
 3      Q.   And who replaced him and when?
 4      A.   I do not know the answer to that.
 5      Q.   You don't know who replaced him?
 6      A.   No.
 7      Q.   Anybody else?
 8      A.   Gary Siesel on the union trustees is no
 9   longer.
10      Q.   And he was replaced by Tom Byers?
11      A.   Yes.
12      Q.   And do you recall when that happened?
13      A.   No, I do not.
14      Q.   I notice that there are no amendments
15   attached to Exhibit D.  Have there been any
16   amendments to this agreement and declaration of trust
17   enacted since February 1, 2016?
18      A.   I do not know.
19      Q.   I'd like you to look at Section 4.1, this
20   is Article IV, Section 4.1 on page 9.
21      A.   Okay.
22      Q.   The provision that we're looking at is
23   called "Conduct of Trust Business"; is that correct?
24      A.   Yes.
```

Page 19

```
 1      Q.   And the last sentence of 4.1 reads as
 2   follows, let me read that out loud, "The Trustees or
 3   any person duly authorized by the Trustees may, in
 4   the course of conducting the business of the Trust
 5   Fund, execute any instrument in the name of the Trust
 6   Fund."  Did I read that correctly?
 7      A.   Yes.
 8      Q.   And can you explain that provision?  How
 9   does that work in the day-to-day operations of the
10   Fund?
11      A.   Just what it says, that they can
12   authorize -- trustees can authorize anyone in the
13   course of conducting business for the Fund.
14      Q.   And who has the trustees -- have the
15   trustees authorized others to execute notices of
16   withdrawal liability?
17      A.   I don't understand the question.
18      Q.   Okay.  I'll come back to that later.
19      A.   Okay.
20      Q.   Please turn to page 14.  So you'll see
21   that there's a Section 4.11 that is headed
22   "Additional Authority"?
23      A.   Yes.
24      Q.   Can you tell me whether any part of
```

Page 20

```
 1   Section 4.11 refers in any way, either expressly or
 2   by implication, to the authority to determine
 3   withdrawal liability?
 4      A.   Could you repeat the question?
 5      Q.   Sure.  What is it -- is there any
 6   provision, any part of 4.11 that empowers the
 7   trustees to determine whether participating employers
 8   have withdrawn from the Fund and, if so, whether
 9   withdrawal liability should be assessed?
10      A.   I would say in Section (e) it's stated "to
11   do all acts, whether or not expressly authorized
12   herein, which the Trustees deem necessary or proper
13   for the protection of the property held hereunder"
14   would cover withdrawal liability.
15      Q.   Okay.  Fair enough.  And (e) refers back
16   to the introductory sentence that says "The Trustees
17   are hereby empowered."  Do you see that?
18      A.   Yes, all right.
19      Q.   All right.  Is there anything in 4.11 that
20   authorizes the trustees to delegate that power to
21   anybody else?
22      A.   In Section 4.11?
23      Q.   Yes.
24      A.   No.
```

Page 21

```
 1      Q.   Is there anything elsewhere in this
 2   document that authorizes the trustees to delegate
 3   that authority to anyone else?
 4      A.   Yes.  Back to Section 4.1, "The Trustees
 5   or any person duly authorized by the Trustees."
 6      Q.   All right.  Let's talk about that.  Who
 7   has been duly authorized by the trustees to determine
 8   whether a contributing employer has withdrawn from
 9   the Fund and, if so, should be assessed withdrawal
10   liability?
11      A.   The administrator.
12      Q.   And is there something in writing that
13   tells us that?  Any document anywhere?
14      A.   Our fiduciary responsibility to be members
15   of the Fund.
16      Q.   So that really wasn't an answer to my
17   question.  What I'm asking is whether there's a
18   document in existence anywhere in Fund files,
19   anywhere in Fund records where the trustees have
20   authorized the administrator in writing to make
21   determinations of withdrawal liability.
22      A.   Not that I am aware of.
23      Q.   Okay.  All right.  Please turn to Tab 4,
24   which is Exhibit E.  Exhibit E is a document with a
```

WWW.CINTELCORPORATION.COM        E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723                                      FX: 513-263-9023

---

Page 22

1    cover page where you can see in big bold print the
2    following words: "THE OHIO OPERATING ENGINEERS
3    PENSION PLAN, REVISED March 21, '17." This is a
4    document I received some months ago from former
5    in-house counsel for the Fund Bryan Barch, so I'd
6    like you to take a few minutes and look at this
7    document and all of its pages and tell me if you can
8    identify it.
9        A.   Yes. I would identify it as the cover
10   page, the Ohio Operating Engineers Pension Plan
11   Revised.
12       Q.   I'm actually asking you about the whole
13   document.
14       A.   All right. Yes.
15       Q.   What is the whole document?
16       A.   It's the pension plan.
17       Q.   Is this a pension plan that covered
18   Sofco's employees at the time that Sofco terminated
19   its relationship with Local 18 on April 30, 2017?
20       A.   Yes.
21       Q.   Do you know whether this pension plan has
22   been amended since then?
23       A.   I do not know.
24           MR. CLARK: That's the one he brought.

---

Page 23

1            MR. GREENBERG: Oh. Let's go off the
2    record.
3            (Discussion off the record.)
4        Q.   All right. Please take a look at page 7,
5    Section 1.33, and you'll see that Section 1.33
6    provides a definition of "withdrawal liability,"
7    correct?
8        A.   Correct.
9        Q.   And it also refers to Article 16, correct?
10       A.   Correct.
11       Q.   And then please turn to Article 16, pages
12   35 and 36, and you will see that there are three
13   sections in Article 16 dealing with withdrawal
14   liability, correct?
15       A.   Correct.
16       Q.   Other than Section 1.33 and Article 16 are
17   there any other provisions in this pension plan that
18   address withdrawal liability?
19       A.   No.
20       Q.   Okay. Please turn to Section 9.03,
21   second sentence, I'm going to read that out loud.
22   9.03, second sentence, "All rules and decisions of
23   the Trustees or the Fund Administrator shall be
24   uniformly and consistently applied to all

---

Page 24

1    Participants in similar circumstances." Did I read
2    that out loud?
3        A.   Yes.
4        Q.   And, to the best of your knowledge, has
5    the Fund done that, in your experience?
6        A.   Yes.
7        Q.   Is there any provision in this document or
8    in any other internal Fund document that defines
9    "partial withdrawal" for purposes of the Fund?
10       A.   Not that I'm aware of.
11       Q.   You're aware that Sofco was assessed for
12   partial withdrawal, correct?
13       A.   Correct.
14       Q.   To your knowledge, has any other
15   participating employer who ended its relationship
16   with the Operating Engineers been assessed for
17   partial withdrawal liability?
18       A.   Not to my knowledge.
19       Q.   To your knowledge, has any other employer
20   ever been audited to determine whether they owed
21   partial withdrawal liability to the Fund?
22       A.   Not to my knowledge.
23       Q.   And do you know why this employer, Sofco,
24   was audited for partial withdrawal when other

---

Page 25

1    employers have not?
2        A.   No.
3        Q.   And given those facts can you explain
4    whether that's consistent with the provision that I
5    just read, 9.2, evenhanded treatment -- I'm sorry,
6    9.02, second sentence.
7            MR. CLARK: Object to the question as to
8    the provision referring to participants.
9        Q.   Do you have an answer?
10       A.   Repeat that again.
11       Q.   Yeah. Do you think that auditing Sofco
12   for partial withdrawal and not auditing any other
13   employer for partial withdrawal is consistent with
14   the second sentence of 9.03?
15       A.   Yes, I do.
16       Q.   And why do you believe it's consistent?
17   How is auditing Sofco for partial withdrawal and not
18   auditing any other employers for partial withdrawal
19   equal treatment?
20       A.   I don't know that it applied to anyone
21   else.
22       Q.   You just don't know one way or the other.
23       A.   Right. Correct.
24       Q.   And you wouldn't know unless you did an

---

WWW.CINTELCORPORATION.COM          E-Mail   CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH:  513-621-7723                          FX:  513-263-9023

---

Page 26

1   audit for that purpose, right?
2       A.   Correct.
3       Q.   All right.  Please turn to 1.13, Section
4   1.13, page 2, and it runs over to page 3.  So here we
5   have the definition of "employee" for purposes of
6   this pension plan, correct?
7       A.   Correct.
8       Q.   I'd like you to look at the definition,
9   and take a few minutes to read through it, and then
10  I'm going to ask you to explain to me the difference
11  between Subsection (a) and Subsection (c).
12          All right.  Have you had a chance to look
13  that over?
14      A.   Yeah.  Yes.
15      Q.   Okay.  So Subsection (a), I'm going to
16  read that out loud, "'Employee' means . . . an
17  employee of an Employer covered by a collective
18  bargaining agreement between the Employer and the
19  Union and as to whom contributions are made by the
20  Employer."
21          So if we turn back to Exhibit C, which is
22  the union contract that was in effect between Sofco
23  and Local 18, 2013 through 2017, (a) would refer to
24  all the employees covered by that union contract,

---

Page 27

1   correct?
2       A.   Correct.
3       Q.   All right.  Now let's talk about (c).  I'm
4   going to read (c) out loud, "'Employee' means . . .
5   an employee of an Employer, whether or not a member
6   of the Union, as to whom the Trustees shall have
7   entered into an agreement for inclusion in the Plan
8   and as to whom contributions are made by the
9   Employer."
10          So what's the difference between the
11  employee who is defined by (c) and the employee who
12  is defined by (a)?
13      A.   Employee as to Section (c), it could refer
14  to an employee who -- it's all work in the
15  jurisdiction, so they don't necessarily have to be a
16  union member.
17      Q.   Okay.  Union member --
18      A.   If they're performing the work of the
19  operating engineers, fringe benefits are due.
20      Q.   And if they're performing work -- if
21  they're performing operating engineers work, they're
22  covered by the collective bargaining agreement,
23  right?
24      A.   Yes.

---

Page 28

1       Q.   So they would be covered by (a).  Correct?
2       A.   Yes.
3       Q.   Okay.  So let's talk about (c).  (c)
4   refers to employees who are not covered by (a),
5   right?
6       A.   Yes.
7       Q.   So you could have, let's say Sofco has a
8   clerical employee who works in the office and Sofco
9   says to the union and the Fund "We'd like to put this
10  clerical employee into the pension fund," or a truck
11  driver, "We'd like to put this truck driver in the
12  pension fund," and the union and the Fund agree.
13  That person would be covered by (c), correct?
14      A.   Yes.
15      Q.   Okay.  Thank you.
16          All right.  Let's take a look at Tab 5,
17  this would be Exhibit F.
18          All right.  So Exhibit F appears to be a
19  document headed "Acceptance of Agreement" and there
20  is a reference to the AGC of Ohio Labor Relations
21  Division, and there's some references here to the
22  trust funds.  You'll see that above "Name of
23  Employer" it says "Sofco Erectors, Inc."  You'll see
24  that it's signed by an authorized employer

---

Page 29

1   representative by the name of John Hesford.  It's
2   signed by somebody on behalf of Local 18.  And it
3   looks like there's something under Fringe Office Copy
4   and there's some initials there.  And you'll also see
5   that it is dated October 3, 2011.
6          Can you identify this document?
7       A.   Yes.
8       Q.   What is it?
9       A.   It's a page out of the agreement.  The AGC
10  agreement.
11      Q.   Yes, so this is the last page of the AGC
12  agreement and this happens to be a copy that's
13  actually executed by the various parties, correct?
14      A.   Yes.
15      Q.   Do you know whether the Fund has any
16  copies of this acceptance of agreement in its file
17  since 2011?
18      A.   No, I do not.
19      Q.   Under Fringe Office Copy, next to the word
20  "Code" there's some initials, can you explain that?
21  Can you tell me what that is?
22      A.   I can't even read it.  I don't even know
23  what it says.  No, I can't tell you what that is.
24      Q.   This document also refers to "any Trust

---

CIN-TEL CORPORATION

PH: 513-621-7723                          FX: 513-263-9023

---

Page 30

1    Agreement hereafter entered into between these
2    parties," and that would be the same trust agreement
3    that we looked at earlier and that's been marked as
4    Exhibit D, correct?
5        A.    Yes.
6        Q.    All right.  Please turn to Tab 6.  So Tab
7    6, Exhibit F [verbatim] is a copy of the Segal
8    withdrawal liability valuation report as of July 31,
9    2009.  And then we have several more of those that
10   we're going to just take a few minutes to look at,
11   and don't worry, I only have a few questions about
12   these documents, we're not going to get too deeply
13   into them, I've already done that with your actuary.
14       So I'm going to ask you this same question
15   about each of these, and you might or might not know
16   the answer, but let's start with this Exhibit F, this
17   withdrawal liability valuation as of July 31, 2009.
18   Do you recognize this document?  Have you looked at
19   it?
20       A.    Yeah, I've reviewed it.
21       Q.    All right.  So let's look at the second
22   page.  There's a cover page and then the second page
23   appears to be a cover letter dated January 14, 2010,
24   to the Board of Trustees, Ohio Operating Engineers

---

Page 31

1    Pension Fund.  It's from The Segal Company, and, of
2    course, you know that The Segal Company is the
3    actuarial firm that the Fund has used for many years
4    to determine withdrawal liability, correct?
5        A.    Correct.
6        Q.    So the Fund -- so let's look at the
7    letter, first paragraph, second sentence.  So this of
8    course is referring to the report that's attached and
9    here's what the sentence says:  "It also establishes
10   the basis for assessments of withdrawal liability for
11   withdrawal during the period August 1, 2009 through
12   July 31, 2010."
13       To the best of your knowledge, did the
14   Fund trustees use any other information to determine
15   unfunded vested liability during that period of time
16   other than this report?
17       A.    I do not know.
18       Q.    I'd like you to look at page 4 of this
19   report.  So on page 4 you'll see that it's headed
20   "Section 2:  Valuation Results for the Ohio Operating
21   Engineers Pension Fund," and you're going to see in
22   Chart 2 under the column headed "Plan Year Ending
23   July 31" there's a series of years, of dates, 1990
24   through 2009.

---

Page 32

1        Next to that there's a column headed
2    "Unfunded Vested Liability," and you will see that
3    under that for each year the unfunded vested
4    liability for the Fund was zero dollars, every single
5    year, '90, '91, '92, et cetera, all the way down to
6    2003.
7        So let's make sure we're clear on this.
8    In 2002 the unfunded vested liability was zero.  In
9    2003 it jumped to $260,824,491.  Can you explain why
10   the unfunded vested liability increased by over
11   260 million -- I'm sorry, I may have read that
12   incorrectly.  $260,824,491.  Can you explain why the
13   unfunded vested liability increased by over
14   $260 million between 2002 and 2003?
15       A.    No.  I'm not the actuary.
16       Q.    To your knowledge, was that the year that
17   the Fund trustees adopted the Segal Blend as the
18   interest rate for determining withdrawal liability?
19       A.    Before my employment.  I do not know the
20   answer.
21       Q.    So now I've got the same -- well, if we go
22   back a couple of questions when I was asking you
23   about what the Fund relied on, I'm going to ask you
24   the same questions about Exhibit H, which is behind

---

Page 33

1    Tab 7; I, which is behind Tab 8, J, which is behind
2    Tab 9; K, which is behind Tab 10; L, which is behind
3    Tab 11; M, which is behind Tab 12; N, which is
4    behind Tab 13, and my question for each of these,
5    after you've taken a few minutes to look through
6    them, involves what the Fund relied on -- the Fund
7    trustees -- to determine the unfunded vested
8    liability in each of these years.
9        And what you're going to see is that each
10   of these exhibits is for the year ending 2010, 2011,
11   et cetera, all the way through your period of
12   employment, up to your period of employment and
13   through your period of employment.  You'll see that
14   the last of these, Exhibit N, is Withdrawal Liability
15   Valuation as of July 31, 2016.
16       So my question is this:  In each of these
17   years, to your knowledge, did the trustees rely on
18   any other information in determining the amount of
19   unfunded vested liability that the Fund was suffering
20   with at that time other than these Segal reports?
21       A.    To the best of my knowledge, no.
22       Q.    Thank you.
23       Now please turn to Tab 14 and we will mark
24   that as Exhibit O.  So let's start with the first two

---

WWW.CINTELCORPORATION.COM        E-Mail    CINTELCO@GMAIL.COM

CIN-TEL CORPORATION

PH: 513-621-7723                                    FX: 513-263-9023

Page 34

1    pages of Exhibit O, and you'll see that it's a letter
2    dated August 31, 2017, and it is addressed to Sofco
3    Erectors, Inc., and on the second page you'll see
4    that there's a signature that reads "Bryan C. Barch,
5    Esq." -- E-s-q. -- "In-House Counsel." Who is Bryan
6    C. Barch?
7        A.    The former attorney for the Ohio Operating
8    Engineers Fringe Benefit Program.
9        Q.    When did his -- let me back up. Strike
10   that.
11           When you say "former attorney," he was an
12   in-house attorney, correct?
13       A.    Correct.
14       Q.    Meaning he was directly employed, he was
15   on the payroll, of the Fund, correct?
16       A.    Correct.
17       Q.    And when did his employment end?
18       A.    I'd be guessing, but I believe it was
19   earlier -- beginning of 2018.
20       Q.    So when he wrote this letter, he was still
21   an employee of the Fund, correct?
22       A.    Correct.
23       Q.    When did his employment with the Fund
24   begin?

Page 35

1        A.    I do not know.
2        Q.    Was he employed by the Fund when you began
3    working there?
4        A.    Yes.
5        Q.    So can you identify the first two pages of
6    Exhibit O?
7        A.    Yes.
8        Q.    What is it?
9        A.    It's a letter that Bryan Barch prepared
10   and sent to Sofco Erectors.
11       Q.    And this is a letter that demands payment
12   from Sofco for partial and complete withdrawal
13   liability, correct?
14       A.    Yes.
15       Q.    Who authorized Mr. Barch to send this
16   letter on behalf of the Fund?
17       A.    The administrator.
18       Q.    How do you know that? I mean, is there a
19   letter, is there a memo, is there an email where the
20   administrator --
21       A.    She would review the letter before it was
22   mailed.
23       Q.    So let's back up, and I want to understand
24   the steps that were taken that resulted in this

Page 36

1    letter going out. And I'm not going to ask you about
2    the legal issues, you know, or I'm not going to get
3    into how the withdrawal liability was calculated, I
4    just want to understand the internal process that led
5    to Sofco terminating its relationship with Local 18
6    up to this letter going out.
7            So my assumption is that Local 18 notified
8    the Fund that the relationship had ended, right?
9        A.    Correct.
10       Q.    And what steps were taken after that?
11       A.    Someone at the fringe benefit office
12   contacted Segal to have them do the report that we
13   have previously looked at, and then after their
14   determination Brian prepared this letter and sent it
15   to Sofco.
16       Q.    All right. So when we -- when you refer
17   to "Segal Report," that would be the rest of Exhibit
18   O, correct? Let's turn to the third page of Exhibit
19   O and you'll see there's a letter dated August 29,
20   2017, via email to Ms. Samantha Polsinelli.
21       A.    Yes.
22       Q.    So this is the Segal report that Segal
23   provided to the Fund which the Fund then sent to
24   Sofco as an attachment to the demand for payment.

Page 37

1    Correct?
2        A.    Correct.
3        Q.    Who is Samantha Polsinelli?
4        A.    The former assistant administrator.
5        Q.    All right. So, if I understand correctly,
6    Ms. Polsinelli receives this letter and the letter
7    goes to the administrator and Mr. Barch, Mr. Barch
8    prepares the first two pages, the administrator
9    approves it, and the letter goes out; is that
10   correct?
11       A.    Correct.
12       Q.    And none of this was reviewed by the
13   trustees before this letter went out. Correct?
14       A.    To the best of my knowledge, correct.
15       Q.    So I'm going to circle back to the general
16   question that I asked you earlier and now I'm going
17   to ask you a more specific question relating to this
18   letter. Where is the authority granted to the
19   administrator to send this letter out without seeking
20   the formal approval of the trustees? Where does that
21   authority come from?
22       A.    Well, if I had to cite -- if you go to Tab
23   4 --
24       Q.    All right. Thank you.

10 (Pages 34 to 37)

Page 38

1    A.    -- Section 9.02, if I have you in the
2  right tab.
3    Q.    Tab 4.  This would be the pension plan?
4    A.    Yeah.  Page 26 I believe it is.
5    Q.    Page 26.  All right.
6    A.    Top of the page, "Powers and Duties of the
7  Trustees and the Fund Administrator."
8    Q.    All right.  Very good.  And so your
9  testimony is that 9.02 authorizes the Fund
10 administrator, if so directed by the trustees, to
11 send out demands for payment of withdrawal liability,
12 correct?
13   A.    Yes.
14   Q.    All right.  So is there anything in
15 writing anywhere in the files, in the internal
16 documents back at the Fund, at the Fund offices, that
17 show us that the trustees directed the Fund
18 administrator to send this letter?
19   A.    No.
20   Q.    All right.  Looking again at Exhibit O,
21 third page, so you'll see that at the bottom of the
22 third page there's a cite to a provision in ERISA.
23 And you're aware that ERISA is the law that governs
24 pension plans, correct?

Page 39

1    A.    Correct.
2    Q.    Okay.  You'll see that there is a
3  reference to a provision in ERISA regarding partial
4  withdrawals, correct?
5    A.    Correct.
6    Q.    And you'll see that there's a reference to
7  something that, I'm going to call it the 70 percent
8  formula.  Do you see that?
9    A.    Yes.
10   Q.    Now look at the top of the next page.  I'm
11 going to read the first paragraph on the next page
12 out loud.  "Under Section 428(d)(1) of ERISA, for
13 construction industry employers in construction
14 industry plans, partial withdrawal liability is
15 assessable when work continues for an insubstantial
16 portion of the employer's work in the jurisdiction of
17 the collective bargaining agreement."  That's the
18 first sentence.  I'm going to stop there.
19         So would you agree that the pension plan
20 that we're talking about here that we've marked as
21 Exhibit D -- I'm sorry, Exhibit C, is in fact a
22 construction industry plan?
23   A.    Yes.
24   Q.    And would you agree that Sofco is a

Page 40

1  construction industry employer?
2    A.    Yes.
3    Q.    So, continuing on with that paragraph,
4  second sentence, "The calculations included in this
5  letter assume that this employer will be assessed
6  partial withdrawal liability for each partial
7  withdrawal."
8          I'm going to read the third sentence.  "We
9  defer to Fund Counsel's interpretation as to whether
10 partial withdrawal liability is assessable to this
11 employer."
12         You understand from the two sentences that
13 I just read that the actuary isn't deciding whether
14 as a legal matter Sofco owed any partial withdrawal,
15 correct?
16   A.    Correct.
17   Q.    And you'll see here that there's a
18 reference to "Fund Counsel."  Would that have been
19 Mr. Barch?
20   A.    Yes.
21   Q.    So was it Mr. Barch who decided that
22 partial withdrawal liability should be assessed to
23 this employer?
24   A.    I do not know.

Page 41

1    Q.    All right.  Please turn to Tab 15, it's
2  Exhibit P.  Exhibit P is a letter to the trustees of
3  the Fund care of Bryan Barch.  It's a letter from me
4  to Mr. Barch dated November 10, 2017, and you'll see
5  in the Re: line it says "Sofco Erectors, Inc. -
6  Request for Review of Withdrawal Liability Assessment
7  dated August 31, 2017."  Have you seen this document
8  before today?
9    A.    No, I have not.
10   Q.    Were you aware that Sofco filed a request
11 for review?
12   A.    No, I was not.
13   Q.    Well, you know that Sofco disputed the
14 withdrawal liability, correct?
15   A.    Correct.
16   Q.    And aren't you aware that the first step
17 for disputing withdrawal liability is to file what's
18 called a request for review?
19   A.    Yes.
20   Q.    What steps were taken to have this request
21 to review reviewed by the trustees?
22   A.    I do not know.
23   Q.    So, to the best of your knowledge, this
24 was not shared with the trustees?

CIN-TEL CORPORATION

PH: 513-621-7723                                FX: 513-263-9023

---

Page 42

1     A.   I do not know.
2     Q.   Turn to Tab 16, this is Exhibit Q.  This
3  is a letter from me to Mr. Barch dated November 29,
4  2017.  You'll see in the Re: line "Sofco Erectors,
5  Inc. - Supplemental Request for Review of Withdrawal
6  Liability Assessment dated August 31, 2017."  So do
7  you have any knowledge as to whether this letter was
8  reviewed by the trustees?
9     A.   I do not.
10    Q.   Is there any sort of internal guideline or
11 protocol for how requests for reviews are handled by
12 the Fund?
13    A.   Not to my knowledge.
14    Q.   All right.  Now I'd like you to turn to
15 Tab 17, which is Exhibit R.  Exhibit R is a letter
16 dated June 22, 2018, it's to me, you'll see the Re:
17 line "Sofco Erectors, Inc.," and you'll see on the
18 third page it's signed by Daniel J. Clark who, of
19 course, is outside attorney for the Fund.  Correct?
20    A.   Correct.
21    Q.   Can you tell me who at the Fund reviewed
22 this before it was mailed by counsel?
23    A.   The administrator, Carol Wilson.
24    Q.   And do you know whether it was submitted

---

Page 43

1  to the trustees for review before it was sent?
2     A.   I do not.
3     Q.   Please turn to Tab 18.  You'll see that at
4  Tab 18 there's a document we are marking as Exhibit
5  S, and it is an affidavit from a Mr. Tim Gates; it's
6  two pages.  Please take a few minutes to read through
7  it and then I'm going to ask you just one or two
8  questions about it.
9          All right?
10    A.   Uh-huh.
11    Q.   Have you seen this document before today?
12    A.   I have not.
13    Q.   Now that you've had a chance to read
14 through it do you have any facts or evidence that
15 would dispute any of the allegations in this
16 affidavit?
17    A.   No.
18    Q.   Please turn to Tab 19.  So at Tab 19 we
19 have a document that's been marked as Exhibit T, it
20 is an American Arbitration Association Opinion and
21 Award, the parties are Precision Environmental
22 Company and Ohio Operating Engineers Pension Fund.
23          Are you familiar with Precision
24 Environmental Company?

---

Page 44

1     A.   I am, yes.
2     Q.   You are.  Did you testify at this hearing?
3     A.   I did not.
4     Q.   And can you confirm that this is a true
5  and accurate copy of the opinion and award that was
6  issued by Arbitrator Goldberg in the withdrawal
7  liability dispute between Precision Environmental
8  Company and the Ohio Operating Engineers Pension
9  Fund?
10    A.   Yes, it looks to be.
11    Q.   All right.  Please turn to Tab 20.  So Tab
12 20 is a series of pages that were produced by the
13 Fund to us and I have a few questions about these
14 pages.  Let's take a break for a few minutes to give
15 you a chance to skim through, I'll ask you my few
16 questions about these pages, and then we'll be ready
17 to wrap it up.  All right?
18         MR. GREENBERG:  Let's take ten minutes.
19         (Recess taken.)
20         MR. GREENBERG:  Back on the record.
21    Q.   (By Mr. Greenberg) So have you had a
22 chance to review the document that we have marked as
23 Exhibit U?
24    A.   Yes.

---

Page 45

1     Q.   So you're going to see in the bottom
2  right-hand corner there are some letters and numbers,
3  OOE-000571, that's on the first page, the second page
4  is OOE-572, et cetera, et cetera.  So when I ask you
5  about these pages, I'm going to refer to those
6  numbers in the bottom right-hand corner.  Okay?
7     A.   Okay.
8     Q.   And perhaps you already know this, but
9  these are control numbers or what we call Bates
10 numbers that help us keep track of documents that are
11 produced by one party to the other, and "OOE"
12 signifies that these are documents that were produced
13 by Fund counsel to me.  Understood?
14    A.   Yes.
15    Q.   So we're going to start with the first
16 page which is 571.  Can you identify this document
17 and explain it to me?
18    A.   Yes.  This is a member's work card with
19 the union, his employment history.
20    Q.   So what does it tell us?
21    A.   Where he was working, what contractor he
22 was working for, and what time -- at what date he was
23 dispatched to that particular contractor for
24 employment.

---

12 (Pages 42 to 45)

CIN-TEL CORPORATION

PH: 513-621-7723                                    FX: 513-263-9023

---

Page 46

1    Q.    All right. And this refers to a member of
2  Local 18 by the name of Jason Allen; is that correct?
3    A.    Correct.
4    Q.    And what does 571 tell us about the
5  relationship between Mr. Allen and Sofco Erectors?
6    A.    He was employed with Sofco Erectors on
7  June 15 of 2015.
8    Q.    And before that he was employed by a
9  company called Miller Pipeline?
10   A.    Correct.
11   Q.    Can you tell me what this tells us about
12  what he did for Miller Pipeline?
13   A.    It looks that he ran an HDD machine.
14   Q.    What is an HDD machine?
15   A.    I am not familiar with it.
16   Q.    Okay. Does this document tell us what he
17  did for Sofco Erectors?
18   A.    No, it does not.
19   Q.    Let's look at the next page, this is 572,
20  and it continues on to 573. So can you identify 572
21  and 573?
22   A.    Yes.
23   Q.    What is it?
24   A.    It's a contribution history, work history.

---

Page 47

1    Q.    Okay. And what does this tell us about
2  the relationship between, would it again be Jason
3  Allen and Sofco?
4    A.    Yes. The hours that were reported on his
5  behalf by Sofco.
6    Q.    And does it also show hours reported by
7  Miller Pipeline?
8    A.    Yes, it does.
9    Q.    Is there anything about these two pages
10  that tell us what kind of work Mr. Allen performed
11  for Sofco?
12   A.    No.
13   Q.    A little bit more clarity. I want you to
14  help me out a little bit more on this because you
15  mentioned hours, I want you to look at the column
16  that's headed "Work Period."
17   A.    Okay.
18   Q.    Can you explain what "Work Period" means?
19  So you'll see the very first entry under Work Period
20  includes the following numbers: "201705." What does
21  that mean?
22   A.    That is the year and the month that the
23  hours were reported.
24   Q.    And so what does that tell us?

---

Page 48

1    A.    The month that he worked and contributions
2  were sent on his behalf from Sofco for that -- for
3  the first one.
4    Q.    And that would be 40 hours?
5    A.    Yes.
6    Q.    In May of 2017?
7    A.    Yes.
8    Q.    And all of the other entries were prior to
9  2017; is that correct?
10   A.    Correct.
11   Q.    Please look at the document that is
12  numbered 574, 575, or the pages I should say, and
13  576, 577, 578, 579. It looks to me like all of those
14  pages are similar or part of the same report, so tell
15  me about 574 through 579. What is it?
16   A.    It's a member detail report which has the
17  member's name, the employer name, the month that the
18  hours were reported, and a breakdown of the funds and
19  the administrative dues. The 2-1/2 percent are the
20  administrative dues.
21   Q.    I'm sorry. What do you mean by
22  "administrative dues"?
23   A.    That is a payroll deduction from the
24  member. They pay their union dues.

---

Page 49

1    Q.    Oh, union dues.
2    A.    Yeah.
3    Q.    I see. Very good.
4    A.    The letters represent each fund, so "E" is
5  the education and safety, "A" is apprenticeship, "P"
6  is pension, and "W" is health and welfare.
7          The administrative dues are actually a
8  gross wage, that is actually not hours.
9    Q.    All right.
10   A.    It's 3 percent of their gross.
11   Q.    I see. So explain to me what this tells
12  us about Mr. Grimm. Let's start with Donald R. Grimm
13  so I can understand this document.
14   A.    Sure.
15   Q.    So we see Donald Grimm's name and then we
16  look over at something called "Refno," that column
17  all has the same number even though there are
18  different names. So what does "N60676" mean?
19   A.    I'm not familiar with that column.
20   Q.    So that's not really telling us anything
21  about these particular employees, right?
22   A.    Correct.
23   Q.    Okay. So let's look at Work Period, and
24  what we see here next to Mr. Grimm's name is "Work

---

CIN-TEL CORPORATION

PH: 513-621-7723                    FX: 513-263-9023

---

Page 50

1   Period - 201703." That would be March of 2017?
2       A.   Correct.
3       Q.   So what does this tell us about how many
4   hours he worked for purposes of the pension
5   contribution in March of 2017?
6       A.   Seventy-two hours.
7       Q.   And then Ms. Hart worked 73 hours for
8   purposes of pension contributions in March of 2017;
9   is that correct?
10      A.   Correct.
11      Q.   Mr. Moore worked 72 hours in March of
12  2017; is that correct?
13      A.   Correct.
14      Q.   And Mr. Reed worked 94-1/2 hours; is that
15  correct?
16      A.   Correct.
17      Q.   Looking at the next page, and now we're
18  looking at how many hours various individuals worked
19  for purposes of pension contributions in February of
20  2017; is that correct?
21      A.   Correct.
22      Q.   Mr. Allen, it would have been 160 hours.
23  Correct?
24      A.   Correct.

---

Page 51

1       Q.   Mr. Grimm, 160 hours.
2       A.   Correct.
3       Q.   Ms. Hart, 85 hours, correct?
4       A.   Correct.
5       Q.   And Mr. Reed, 108 hours?
6       A.   Correct.
7       Q.   The next page, now we're looking at 576,
8   so now we're looking at Mr. Allen working in May of
9   2017 and the Fund receiving contributions for 40
10  hours for work in May of 2017; is that correct?
11      A.   Correct.
12      Q.   And then there's a Mr. Bing, 40 hours were
13  contributed for him in May of 2017?
14      A.   Correct.
15      Q.   Ms. Hart, 40 hours?
16      A.   Correct.
17      Q.   And Mr. Owsley, 40 hours?
18      A.   Correct.
19      Q.   And I want to understand something about
20  the reference to the month. In terms of payroll, the
21  employees who worked for Sofco would have been
22  paid -- do you know if they would have been paid
23  weekly or biweekly? Do you know?
24      A.   I do not know. Generally, they're a

---

Page 52

1   weekly pay if they do not have a fringe bond, but
2   some contractors do report their contributions on a
3   monthly basis.
4       Q.   But in terms of the employee receiving
5   their hourly pay and having fringe contributions
6   deducted from that -- or fringe contributions made on
7   top of that hourly pay and dues deducted, the payroll
8   would usually be at least a week behind, correct?
9       A.   Correct.
10      Q.   So for work through the end of April, the
11  last week of April, that payment would be made at the
12  end of the first week in May, correct?
13      A.   Yes. Correct.
14      Q.   So when we see payments for 40 hours made
15  201705 for Mr. Allen, Mr. Bing, et cetera, those
16  could have been for the last week of April; is that
17  correct?
18      A.   No. It would be for the actual month that
19  the hours were worked, not when they're reported
20  necessarily. It would go to the month that the hours
21  were worked.
22      Q.   I see. All right.
23           So now let's look at 577, this shows
24  Mr. Allen working 80 hours in April of 2017 for

---

Page 53

1   pension purposes, correct?
2       A.   Correct.
3       Q.   And then we've got a Mr. Jon Allen, a
4   Mr. Joey Bing, Miss Kathleen Hart, and Mr. Charles
5   Owsley at 578 working the stated hours in April of
6   2017 for pension purposes; is that correct?
7       A.   That is correct.
8       Q.   And 579 is basically a total for Mr. Allen
9   showing a dues contribution; is that right? Based
10  on --
11      A.   Yes.
12      Q.   -- his pay?
13      A.   Yes.
14           MR. GREENBERG: All right. It's possible
15  that I'm done. Let me just step outside with my
16  client here for a minute.
17           MR. CLARK: Okay.
18           (Recess taken.)
19           MR. GREENBERG: So we're going to have
20  this typed up as a transcript and the court reporter
21  will send it to your attorney and it will be provided
22  to you, and we're going to ask that you review it,
23  that you make any corrections on the correction page
24  if you find any errors in the transcript, and once

---

14 (Pages 50 to 53)

CIN-TEL CORPORATION

PH: 513-621-7723                                              FX: 513-263-9023

---

Page 54

```
 1    you're done with that, that you sign it.  Will you do
 2    that?
 3            THE WITNESS:  Yes.
 4            MR. GREENBERG:  Thank you for your
 5    patience.  That's all I have today.
 6            THE WITNESS:  Thank you.
 7            MR. CLARK:  Thanks.
 8            (Whereupon, at 3:13 p.m., the deposition
 9    was concluded and signature was not waived.)
10                        --|--
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 55

```
 1                      AFFIDAVIT
 2    State of Ohio          )
                             ) SS:
 3    County of _____ )
 4        I, JUSTIN SHAWN HELMICK, do hereby certify
 5    that I have read the foregoing transcript of my
      deposition given on Friday, October 26, 2018; that
 6    together with the correction page attached hereto
      noting changes in form or substance, if any, it is
 7    true and correct.
 8        _____
          JUSTIN SHAWN HELMICK
 9
10        I do hereby certify that the foregoing
11    transcript of the deposition of JUSTIN SHAWN HELMICK
      was submitted to the witness for reading and signing;
      that after he had stated to the undersigned Notary
12    Public that he had read and examined his deposition,
      he signed the same in my presence on the _____ day
13    of _____, 2018.
14
15        _____
                 Notary Public
16
17    My commission expires _____, _____.
18                        --|--
19
20
21
22
23
24
```

Page 56

```
 1                      CERTIFICATE
 2    State of Ohio          )
                             ) SS:
 3    County of Franklin     )
 4        I, Maria DiPaolo Jones, RDR and CRR, the
      undersigned, a duly qualified and commissioned notary
 5    public within and for the State of Ohio, do certify
      that, before giving his deposition, JUSTIN SHAWN
 6    HELMICK was by me first duly sworn to testify to the
      truth, the whole truth, and nothing but the truth;
 7    that the foregoing is the deposition given at said
      time and place by JUSTIN SHAWN HELMICK; that I am
 8    neither a relative of nor employee of any of the
      parties or their counsel and have no interest
 9    whatever in the result of the action.
10        IN WITNESS WHEREOF, I hereunto set my hand and
      official seal of office on this 5th day of November,
11    2018.
12
13        _____
          Maria DiPaolo Jones, RDR, CRR,
          and Notary Public in and for the
14        State of Ohio.
15    My commission expires June 19, 2021.
16    (2572-MDJ)
17                        --|--
18
19
20
21
22
23
24
```

Page 57

```
 1        PLEASE USE THIS ERRATA SHEET TO MAKE ANY
      AND ALL CORRECTIONS, BY LISTING THE PAGE NUMBER,
 2    LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE
      ERROR.  PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS
 3    ON THE TRANSCRIPT.  IF NEEDED USE THE BACK OF THIS
      SHEET.  UPON COMPLETION PLEASE SIGN AND DATE THIS
 4    SHEET AT THE BOTTOM.  THANK YOU.
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    SIGNATURE:_____DATE:_____
```

15 (Pages 54 to 57)

WWW.CINTELCORPORATION.COM        E-Mail   CINTELCO@GMAIL.COM

*Fund*
EXHIBIT *A*
Date: 10-26-2018

### AMERICAN ARBITRATION ASSOCIATION

SOFCO ERECTORS, INC.                    : Case No: 01-18-0001-3790
                                         :
     "Employer"                      :
                                         :
     And                             :
                                         :  **EMPLOYER'S THIRD REVISED**
                                         :  **NOTICE OF ORGANIZATION**
OHIO OPERATING ENGINEERS                 :  **DEPOSITION UNDER FED. R. CIV. P.**
PENSION FUND                             :  **30(B)(6) TO FUND**
                                         :
     "Fund"                          :
                                         :


**TO:**    Ohio Operating Engineers Pension Fund
        c/o Daniel J. Clark
        Allen S. Kinzer
        Vorys, Sater, Seymour and Pease LLP
        52 East Gay Street
        P.O. Box 1008
        Columbus, Ohio 43216-1008
        djclark@vorys.com
        askinzer@vorys.com

Please take notice that pursuant to Rule 16 of the American Arbitration Association's Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes, Rule 30(b)(6) of the Federal Rules of Civil Procedure, and other applicable federal and state laws, including Section 4219 of the Employee Retirement Income Security Act ("ERISA"), Sofco Erectors, Inc. (the "Employer" or "Softco") intends to take the deposition(s) of one or more of the Ohio Operating Engineers Pension Fund's (the "Fund") officers, directors, managing agents, or other persons to testify on its behalf regarding the matters identified in Exhibit A which are known or reasonably available to the Fund.

This individual(s) shall appear at the following address at 1:30 p.m. on October 26, 2018 and testify to such matters:

**ADDRESS:**   **Vorys, Sater, Seymour and Pease LLP**
              **52 E. Gay Street**
              **Columbus, Ohio 43215**


Dated: October 9, 2018

Requested By:

Gary L. Greenberg
Mark B. Gerano
JACKSON LEWIS, P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202
Phone: (513) 873-2103
Email: Gary.Greenberg@jacksonlewis.com
       Mark.Gerano@jacksonlewis.com

Attorneys for Employer, Sofco Erectors, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of October, 2018, a true and accurate copy of the

foregoing was served upon the following via email and regular U.S. Mail:

Daniel J. Clark
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
djclark@vorys.com

and

Allen S. Kinzer
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
askinzer@vorys.com

Attorneys for the Ohio Operating Engineers Pension Fund

Gary L. Greenberg

2

## EXHIBIT A

1) Sofco's participation as a contributing employer in the Fund, including the contribution history, contribution reports submitted by Sofco to the Fund, records and facts relied on by the Fund in issuing the Partial and Complete Withdrawal Liability Demand for Payment to Sofco, and records and facts relied on by the Fund in its response to Sofco's Request for Review and Supplemental Request for Review.

2) The internal process followed by the Fund in issuing the Partial and Complete Withdrawal Liability Demand for Payment to Sofco.

3) Facts relating to the following documents:

   a) AGC of Ohio 2010-13 and 2013-17 Building Agreements with IUOE Local 18;

   b) Ohio Operating Engineers Pension Fund Amended Agreement and Declaration of Trust;

   c) Ohio Operating Engineers Pension Plan;

   d) Segal Group reports 2010-2016 (OOE 59-131, 302-430);

   e) Precision Environmental Company Arbitration Decision; and

   f) Records regarding Sofco employees produced by Fund (OOE 571-579).

4845-2671-3975, v. 1

1



# AGC OF OHIO
# BUILDING AGREEMENT

**Effective
May 1, 2010 through April 30, 2013**

**Between**

**THE INTERNATIONAL UNION OF
OPERATING ENGINEERS
LOCAL 18 AND ITS BRANCHES, (AFL-CIO)**

**AND**

**LABOR RELATIONS DIVISION
OF THE
AGC OF OHIO**



Fund
EXHIBIT B
Date: 10.26.2018

**EMPLOYERS**

**LABOR RELATIONS DIVISION**
**AGC OF OHIO**

**1755 Northwest Boulevard**
**Columbus, Ohio 43212**
**(614) 486-6446**
**FAX: (614) 486-6498**
**www.agcohio.com**

**Richard Hobbs**
**Executive Vice President**

## INDEX

| | Paragraph |
|---|---|
| Affirmative Action Program | Exhibit B |
| Apprentice/Helper (Oiler), Boiler Operators, Signalmen Provisions | 77-80 |
| Apprentices | 106-107 |
| Arbitration | 125-126 |
| Bonding | 47 |
| Construction Advancement Program | 108-113 |
| Credit Union | 115 |
| Crews and General Provisions | 77-100 |
| Date Signed and Signatures | 131 |
| Dewatering | 13 |
| Direct Deposit | 63H |
| Discharges | 19 or 25 |
| Divert Wage Increase | 43 |
| Drug Testing | 30 |
| Duration of Agreement | 105 |
| Effective Date of Agreement | 130-131 |
| Employees' Relief | 91 |
| Enforcement Measures | 117-123 |
| Equipment Rental | 99 |
| Escalator Clause and Complementing | 69 |
| Field Mechanic Trainee Wage | Schedule A |
| Four Ten Work Schedule | 63 A-G |
| Fringe Benefit Programs | 41-47 |
| Grievance Procedure | 125-126 |
| Harassment Policy | 31 |
| Hazardous Waste Projects | 15,29 |
| Heaters-Pumps-Boilers-24 hour, 7 day | 68 |
| Holidays | 67 |
| Hourly First-Day Pay | 84 |
| Hourly Pay | 53 or 56 |
| I-9 | 128 |
| Incentive Pay | |
| Underground, Height and Length Booms | 70-76 |
| Jurisdiction-Work | 10-12 |
| Jurisdictional Area | 1-2 |
| Jurisdictional Disputes | 127 |
| Lay-Off | 25,55,60,89 |
| Liabilities | 5 |
| Management Rights | 7 |
| Master Mechanic, Zones 1, 2 & 3 | 87-88 |
| New Unclassified Equipment | 50 |

I

## INDEX (continued)

| | Paragraph |
|---|---|
| Nondiscrimination | 8-9 |
| Overtime | 62-64 |
| Owner-Operator | 100 |
| PAC / PEP | 114B |
| Pay Checks | 90 |
| Pay Day | 89 |
| Picket Lines | 123 |
| Piggyback Operation | 86 |
| Pre-Job Conference | 15-16 |
| Provisions and Limitations | 6 |
| Recognition | 4 |
| Referral Policy | |
| (Hiring Procedures) | 32-40 |
| Registered Apprentice Wage Schedule | Exhibit A |
| Repairs | 93 |
| Reporting Pay | 59 |
| Safety Program | 26-29 |
| Savings and Separability | 129 |
| Scope of Agreement | 3 |
| Shifts | 81 |
| Site Clearance | 63 |
| Starting Time | 62 |
| Steward | 24-25 |
| Strikes | 124 |
| Sub-Contractors | 117 |
| Supervisory Employees | 97 |
| Termination Slips | 96 |
| Trainee Wage Schedule | Exhibit A |
| Transfer of Union Employees | 119 |
| Transfers on Job Equipment | 21-22 |
| Union Administrative Dues and Deductions | 114-116 |
| Union Shop | 17-18 |
| Wage Rates | Exhibit A |
| Weekly Pay | 52 or 54-55 |
| Work Week | 61 |

| | Page |
|---|---|
| Term of Agreement | 50 |
| Exhibit A, Wage Rates and Fringe Benefits | 51-75 |
| Exhibit B, Affirmative Action Program | 75-78 |
| Acceptance of Agreement | 79-87 |

II

## DIRECTORY

### OFFICERS

Local 18 and Its Branches
Headquarters Office
3515 Prospect Avenue
Cleveland, Ohio 44115
216-432-3138
FAX: 216-432-0370
www.iuoelocal18.org

Patrick L. Sink
Business Manager

Richard E. Dalton
President

Steve D.DeLong
Vice President

Mark A. Totman
Recording-Corresponding Secretary

Premo P. Panzarello
Financial Secretary

Joseph S. Lucas
Treasurer

## DISTRICT NO. 1

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashtabula | Erie | Huron | Lorain |
| Cuyahoga | Geauga | Lake | Medina |

District Staff
Steve DeLong

| | |
|---|---|
| Donald Taggart | Steven Mayor |
| David Russell | Ken McGlashan |

3515 Prospect Avenue, Cleveland, Ohio 44115
Office: 216-432-3131
Fax: 216-432-3135

## DISTRICT NO. 2

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Allen | Hardin | Paulding | Van Wert |
| Defiance | Henry | Putnam | Williams |
| Fulton | Lucas | Sandusky | Wood |
| Hancock | Ottawa | Seneca | |

District Staff
Steve Heckler

| | |
|---|---|
| Gary Siesel | Andrew Myers |
| Douglas Leidy | Joy Facey |

2412 South Reynolds Road, Toledo, Ohio 43614
Office: 419-865-0221
Fax: 419-865-0601

III

IV

SOFCO002261

## DISTRICT NO. 3

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Crawford | Hocking | Marion | Perry |
| Delaware | Knox | Morrow | Pickaway |
| Fairfield | Licking | Muskingum | Union |
| Franklin | Wyandot | | |

District Staff
Timothy Hammock

John Branstool                                          David Hurd
Chad Creeks

Mark Totman, Legislative Representative

1188 Dublin Road, Columbus, Ohio 43215
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 4

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Auglaize | Clinton | Logan | Montgomery |
| Butler | Darke | Madison | Preble |
| Champaign | Fayette | Mercer | Shelby |
| Clark | Greene | Miami | Warren |

District Staff
Stanley Brubaker

Joe Daniels                                          Kenneth Waughtal

6051 N. Dixie Drive, Dayton, Ohio 45414
Office: 937-890-5914
FAX: 937-890-5180

V

## DISTRICT NO. 5

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Adams | Gallia* | Lawrence* | Ross* |
| Athens* | Hamilton | Meigs* | Scioto* |
| Brown | Highland | Morgan* | Vinton* |
| Clermont | Jackson* | Pike* | |

Covering the following counties in Kentucky:

| | | | |
|---|---|---|---|
| Boone | Campbell | Kenton | Pendleton |

District Staff
Gary Marsh

Nathaniel Brice                                          Jefferson Powell

9730 Reading Road (Cincinnati) Evendale, Ohio 45215
Office: 513-733-5575
FAX: 513-733-4672

*Counties served through District No. 3, Columbus office
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 6

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashland | Harrison | Nobel | Summit |
| Belmont | Holmes | Portage | Tuscarawas |
| Carroll | Jefferson | Richland | Washington |
| Coshocton | Monroe | Stark | Wayne |
| Guernsey | | | |

District Staff
Joseph Lucas

Terry Phillips                                          Tom James
William Larrick

1707 Triplett Boulevard, Akron, Ohio 44306
Office: 330-784-5461
FAX: 330-784-8827

VI

SOFCO002262

**LOCAL 18S**
**STATIONARY ENGINEERS**

Staff
Scott Peters
James Kumse
Thomas Ridenbaugh

3515 Prospect Avenue
Room 206
Cleveland, Ohio 44115
Office: 216-432-2668
FAX: 216-432-0796

VII

# AGREEMENT

## Between

### The AGC OF OHIO
### Labor Relations Division

which may be referred to hereinafter
as the "Association"

and

### THE INTERNATIONAL UNION
### OF OPERATING ENGINEERS
### LOCAL 18 AND ITS BRANCHES, (AFL-CIO)
### referred to hereinafter as the "Union"

• This Agreement is negotiated by and between the Association and the Union within the geographical area as defined herein through their authorized agents, to wit:

That, whereas, the parties desire to stabilize employment and promote efficiency in the Construction Industry, agree upon wage rates, hours and conditions of employment, and to eliminate strikes, boycotts, lockouts and stoppages of work, and

Whereas, the Union and the Employer shall, through the issuance of working rules and regulations to the workmen, inform them of the terms of this Agreement and enforce compliance with the terms thereof, and

Whereas, the Employers agree to recognize and subscribe to the approved referral system as adopted by the International Union of Operating Engineers, Local 18.

Now, therefore, the undersigned Association and the Union agree as follows:

1

SOFCO002263

# ARTICLE I

## GEOGRAPHICAL JURISDICTIONAL AREA

1.    The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2.    All counties in the State of Ohio except Ashtabula, Cuyahoga, Erie, Geauga, Huron, Lake, Medina, Lorain, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3.    "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

## SCOPE

A.    "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B.    "Power Plant, all Wind Generation Devices and all supporting Infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas. lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C.    "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

D.    Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

# ARTICLE II

## RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4.    Recognition--The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5.    Liabilities--This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement

2

3

the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

**6.    Provisions and Limitations**–All members of the AGC of Ohio Labor Relations Division, and such other persons, firms or corporations who, as an Employer, become signatory to this Agreement, shall be bound by all of its terms and conditions, as well as any amendments which may be negotiated between the AGC of Ohio Labor Relations Division, and the Union. It is expressly understood that all Employers bound to the terms and conditions of this Agreement are required to pay the amounts as indicated in Article IV to the appropriate Fringe Benefit Programs.

**7.    Management Rights**–The operation of the job and the direction of the working forces, including the right to hire, suspend and discharge for proper cause, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer.

**8.    Nondiscrimination**–It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio and the Commonwealth of Kentucky and Lawful Orders thereof relative to nondiscrimination and fair employment practices. The Employer and the Union shall not knowingly discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or Apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

**9.    Further**, the Employer and Union agree to adopt and embrace the Pact of 10 July 68 executed under provisions of the Executive Order 11246 and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations revised; an Affirmative Action Program to implement all provisions of applicable federal regulations to assure nondiscrimination in employment, upgrade, demotion or transfer, and recruitment advertising, layoff or termination, rates of pay and selection for all types of training as evidenced in Exhibit "B" attached hereto as if they had originally negotiated the same.

4

**10.    Jurisdiction of Work**–In accordance with the terms of this Agreement, the Employer shall employ Operating Engineers for the erection, operation, assembly and disassembly, and maintenance and repair (fueling and greasing) of the following construction equipment regardless of motive power: Air Compressors, Batch Plants, Boilers, Cableways, Derricks, Finishing Machines, Pumps, Trucks, Crawlers, Locomotive and Tower Cranes; Concrete Mixers and Concrete Mixing Plants, Hoes, Shovels, Pile Drivers, Tractors, Scrapers, Endloaders, Hoists and all like equipment, including the use of Geodimeter or any other device that electronically measures (shoots) distance shall be the work of the Operating Engineers (only applies to in-house crew) within the jurisdiction as assigned to the Union by the American Federation of Labor. It is further understood that all equipment for which classifications and wages have been established in this Agreement, and including that equipment for which classifications and wage rates may hereafter be established, shall be manned, when operated on the job site, by a member of the International Union of Operating Engineers, and paid the rates as specified in this Agreement.

**11.    Operating Engineers shall be employed to do all pipe fitting and all burning and welding necessary for the preparation and maintaining of equipment operated by members of the Union.**

**12.    Operating Engineers shall be assigned to all work performed in connection with the installation, fueling, starting and stopping, repair, maintenance and operation of the below listed small equipment: Compressors of 185 CFM or less (not discharging into a common header)**
  Heaters
  Welding machines of 300 amp or less
  Gas or diesel driven pumps 4″ and under (or one 6″ pump)
  Generators of 15 KW or less
  Conveyors 18″ belt or less

A combination up to five (5) pieces of the above equipment shall, when in use, be serviced as an additional duty by an Operating Engineer who is employed by an Employer on a project. When six (6) pieces of the above equipment are in use on an Employer's project, a Utility Operator will be employed at the Class "C" rate. The Utility Operator shall also perform other work on the project.

5

SOFCO002265

In the event there are no Operating Engineers employed by the Employer on the project, the Employer shall employ an Operating Engineer at the Class "E" rate to service any small equipment in use, until the Class "C" rate becomes in effect.

An Operating Engineer shall be assigned to all work performed in connection with the installation, maintenance, repair and starting and stopping of electric submersible pumps. Necessary work on electric submersible pumps shall be assigned to an Operating Engineer working on the project as an additional duty; no full-time Operator is required.

Work in the servicing and maintaining of self-contained, mobile light plants shall be assigned to an Operating Engineer as an additional duty to his/her regular job. Such work shall normally be assigned to a Mechanic, Grease Crew or Apprentice/Helper (Oiler). Equipment operator employees shall be required to carry sufficient tools to make minor adjustments on the equipment they operate.

When an Apprentice/Helper (Oiler) is assigned as the primary operator to a fuel/grease combo vehicle which requires specialized CDL endorsement, he/she will receive a $3.00 per hour premium over the Class "E" rate.

13. **Dewatering Systems**—A "Dewatering System" is defined as a combination of one or more pumps of any type, size or motive power with combined discharge capacity of over 4", including but not limited to, well-point pumps, submersible well pumps, ejector or educator pumps in combination with wells, well-points, sumps, piping and/or other appurtenances irrespective of motive power to control water on any and all types of construction work. The complete installation, operation and necessary maintenance work, including all piping, shall be performed by Operating Engineers. A Dewatering System shall be operated by Pump Operators at all times the Dewatering System is in operation unless otherwise agreed at the Pre-Job Conference or with the Union.

14. The Union will at all times, when requested by the Employer, use its best efforts to furnish the Employer with competent employees to operate, maintain and repair equipment in accordance with the terms and conditions of this Agreement.

15. **Pre-Job**—It is agreed that upon the request of either party a Pre-Job Conference shall be held prior to commencing

6

work. In case of a necessary emergency start of the construction job, the Pre-Job Conference shall be held as soon as possible after the start of work. It is further agreed that upon the awarding of any building contract of $500,000.00 and over, the successful contractor will immediately notify the Union when it has been awarded the contract. It is further agreed the Union may request, receive and hold a Pre-Job Conference with the Employer on an individual basis.

Before the start of any project containing known hazardous waste materials, there will be a Pre-Job held. The Employer must notify the Union five (5) days prior to starting work on the project. Failure to do so, the Union has the right to withhold its services until such time a Pre-Job is held.

16. Following are the items which will be discussed at the Pre-Job Conference:

A. The Employer will advise the Union Representative of the Employer's requirements of necessary employees in the classification of work under this Agreement, and the Union will determine and advise the Employer of the ability of the Union to fulfill such requirements when requested.

B. Work schedules.

C. Questions of jurisdiction and assignment of work.

D. The Employer agrees that whenever possible at such Pre-Job Conference they will notify the Union of any subcontracts let by the Employer, the names of the subcontractors, and the nature of the work to be performed by the subcontractors. The Union may request a subcontractor to meet with the Union and the subcontractor will meet with the Union prior to commencing work on a project if the subcontractor did not attend the original Pre-Job Conference for the project. It is understood and agreed that no agreement may be made at the Pre-Job Conference which will in effect change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

17. Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Local Unions above stated on the effective date of this sub-section shall remain members of the Local Unions in good standing as a condition of employment.

7

**18.** All present employees who are not members of the Local Unions and all employees who are hired hereafter shall become and remain members in good standing of any one of said Locals as a condition of employment on and after the eighth (8th) day following the effective date of this sub-section or following the beginning of their employment, whichever is later.

**19.** The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory or who fails to observe the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of any employee under the terms of this Agreement. Any grievance arising through application of this clause shall be adjusted in accordance with the procedures outlined in Article XIV, Paragraphs 124, 125 and 126 of this Agreement. Intoxication and/or assault committed on the job site shall be cause for immediate discharge.

**20.** The Union shall place no limitation upon the amount of work which an employee shall perform during the working day and there shall be no restriction imposed against the use of any type of machinery, tools or labor-saving devices. The Employer agrees that the work jurisdiction of the Operating Engineers, as assigned by the AFL-CIO, will be respected and all Operating Engineer work will be performed by an Operating Engineer, and it is the intent of both parties that Operating Engineers will be assigned work on the basis that will make each job as productive and efficient as possible. It is agreed that a fair day's work shall be given for a fair day's pay.

**21.** The Employer may shift during a work day an Operating Engineer from one piece of hourly rate of pay equipment to another hourly rate of pay piece of equipment without limitation from same job site providing the shifting does not interfere with another Operating Engineer's work day. This condition also pertains to weekly-pay equipment. However, there shall not be any intermixing with weekly-pay equipment to hourly-pay equipment. The Operating Engineer will be paid the highest rate for the day.

The District agent in each district, in order to maintain our jurisdiction, will make jobs as efficient and productive as possible.

8

**22.** If an Employer violates Paragraph 21, the Employer's penalty shall be to pay the first qualified registered applicant the applicable wage and fringe benefits from the first day of violation.

**23.** The authorized representative of the Union shall have access to the job during working hours for the purpose of visiting individual members, adjusting grievances or disputes and such other duties as he may have to perform. The representative will report to the job supervisor before visiting the project.

**STEWARD**

**24.** The Union may, when it believes it necessary, appoint a Steward whenever possible from Operating Engineers working on the Employer's job and the Union District Representative will, when making such an appointment, notify the Employer. The Steward shall perform full-time work for the Employer and he/she shall be subject to the same rules, rights and working conditions as other employees. Under no circumstances shall the Steward have any authority to call a strike, slowdown of work or perform any other action which would be in violation of this Agreement.

**25.** The Employer agrees that each new employee shall report to the job Steward before starting work if a Steward has been appointed for that particular Employer's job. The Steward shall be allowed sufficient time during working hours to perform all normal duties required of a Steward. No Steward shall have job priority but will be laid off in the same manner as any other Operating Engineer upon completion of his/her particular job assignment; twenty-four (24) hour notice to the Union prior to his/her lay off is required to give the Union time to select another qualified Steward to replace the laid-off Steward, but this twenty-four (24) hour notice is not required when a Steward is discharged for cause by the Employer.

**SAFETY**

**26.** The Union and the Employer will cooperate in the establishment of a safety program. At the Pre-Job Conference by mutual agreement, the wearing of safety hats may be made a condition of employment. All safety equipment required by the project owner or manager will be at no cost to the employee, except work shoes of any type. Both the Employer and employees shall comply with the applicable state safety codes

9

SOFCO002267

and any other applicable government or civil regulations pertaining to safety. It is expressly understood that if the employees' immediate health and safety are involved, the Union through its representative may order discontinuation of operations until satisfactory results are obtained.

### TRAINING

27. The Safety Training Passport 16-hour program will be made available to all union members by the Union at no cost to the Employer. The program will consist of:

Safety Awareness as required by
OSHA 29CFR 1926.21

Fall Protection as required by
OSHA 29CFR 1926.503

Hazard Communication as required by
OSHA 29CFR 1926.59

Operating Engineers dispatched to a project to perform trench excavation work will be required to have successfully completed eight (8) hours of trench safety training. This program became effective May 1, 2007.

It is agreed that both the Employer and the Union will encourage and assist in the promotion of this training.

Effective May 1, 2011 and thereafter, all Operating Engineers dispatched to and/or employed on a project are required to have successfully completed the 16-hour Safety Training Passport (STP) Program or an OSHA-approved 10-hour construction safety training program. Comparable safety training shall be renewed and updated every five (5) years or the Operating Engineer shall be considered unqualified. Verification of valid, updated training must be presented to the Employer upon dispatch, hire or request. Employers who provide such safety training shall not be required to pay employees to attend the training.

28. Within forty-eight (48) hours after an industrial accident occurs, the company shall have all necessary State Workers' Compensation forms available and completed on the Employer's part. A copy of the completed forms shall be sent to the Union's office in the district where the accident occurred.

29. All toxic/hazardous projects will be subject to any and all safety regulations and insurance provisions that may be

10

required by the appropriate governmental agencies. When dangerous atmospheres are present so that an Operator is required to don a special protective suit and/or self-contained breathing apparatus at a private, state, federal or other designated toxic/hazardous waste site, the Employer will notify the Union district office. Reasonable dress-up time and clean-up time will be allowed. The first qualified bargaining unit employee on the job will be designated the steward-safety person, who shall have access to company monitoring records and be kept informed of amounts of contaminants on the job site. A sheltered "safe zone" area shall be provided. There shall be wash-up facilities on all toxic/hazardous waste sites. When hazmat training credentials are required, the Operator will receive a $.50 per hour premium added to his/her base rate.

On such projects, it is expressly understood that if the employees' immediate health and safety are in danger, the employee may discontinue operations, without penalty, until satisfactory results are obtained, or until such time as a recognized safety agent shall declare the equipment or operation to be safe. All Operating Engineers employees shall be advised by the Employer prior to employment as to the nature of the known hazardous waste and possible resultant physical injuries as may be required by applicable law.

30. **DRUG TESTING:** The Employer and the Union are committed to a policy that promotes safety in the work place, employee health, and well being. In consideration of this policy, the Union and Employer agree that any employee found to be under the influence of, in possession of, or engaged in the distribution of drugs or alcohol on the job site shall be subject to disciplinary action, up to and including immediate discharge.

Within two (2) weeks of reporting to the job site, each new Operator may be scheduled for a drug test. Employees using a prescription drug which may impair mental or motor function shall inform their supervisor in writing of such drug use.

Employee involvement with drugs and alcohol can adversely affect job performance and employee morale. In the Construction Industry the consequences of drug or alcohol use or influence while on the job site can be disastrous. The Employer and Union, therefore, agree to the following policy to insure all employees of a safe and efficient job site free from the effects of drug and alcohol use or influence.

11

SOFCO002268

All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of illegal drug or alcohol use impairment while on the job site, may be required as a condition of continued employment to submit to a test for alcohol and/or illegal drug use which impairs the employee's ability to safely perform his/her duties on the job site. Such tests usually involve a sampling of the employee's blood, urine, or breath. Any employee who is asked to submit to such a test will be required to sign a consent form. If an employee who is asked to submit to a test refuses to do so, or refuses to sign the necessary consent form, that employee will be subject to disciplinary action up to and including discharge. Refusal to take a test or the submission of an adulterated sample shall be determined the same as a positive test result. The employee/member shall follow all requirements outlined in this section.

All testing will be done by a reliable, established laboratory. If this initial test screen result indicates positive findings, further testing of the same sample must be done to confirm the original findings before the laboratory can report a positive finding. The confirmation test will be conducted by an independent accredited National Institute of Drug Abuse or College of American Pathology Laboratory and/or currently qualified under the Substance Abuse & Mental Health Services Administration (SAMSHA) under the U.S. Dept. of Health & Human Services, and will utilize the more scientific Gas Chromatography/Mass Spectrometry examination (GC/MS). The results of all tests will be kept confidential between the employee, the Employer and the Union. The employee shall be paid his/her regular hourly wage and fringes for time required for drug testing provided results are negative.

If the GC/MS test results are positive, the employee may be granted a leave of absence for the purposes of drug and alcohol rehabilitation. If the employee is eligible such rehabilitation programs are covered under the Ohio Operating Engineers Health and Welfare Program providing the employee confines him/her self to a twenty-four (24) hour licensed rehabilitation medical facility.

Until the employee presents certification of successful completion of the rehabilitation program to the Local 18 Medical Review Officer (MRO), the employee shall be removed from the Employer's job site; shall be prohibited from registering under Article III of the referral of this contract and shall not be dispatched to work. Upon presentation of certification of the employee's successful completion of the drug/alcohol rehabilitation program to the Local 18 MRO, the employee may be restored to his/her original job with the Employer. If the employee is not restored to their original job, the employee will be allowed to register for work in the referral by registering a new work referral card. The employee shall, under either circumstance, for the next succeeding twelve (12) month period, present to the Local 18 MRO monthly certification of negative drug/alcohol test results. Failure to do so will result in denying the employee the right to maintain his/her referral card in the register and utilize the referral or if working, to be removed from work.

Any positive drug and/or alcohol test result after the second rehabilitation procedure shall result in the applicant being permanently barred from registering on the Local 18 referral.

**31. HARASSMENT POLICY:** The parties to this Agreement mutually agree that harassment of any nature is not to be tolerated. Every person working under this Agreement shall immediately notify the Employer when a possibility of a problem happens or exists.

## ARTICLE III

### REFERRAL SYSTEM

**32.** Local 18 and its Branches shall maintain registers of all applicants for referral. Applicants shall not be permitted to be registered in more than one office of the Union at any one time. All applicants will be registered in order of application, provided no person shall be deemed to be an applicant who is otherwise gainfully employed as an Operating Engineer or not immediately available for work. Registrations and re-registrations will be accepted during customary business hours. Applicants shall be classified in priority groups in accordance with the following criteria:

**GROUP A:** All applicants who have worked as Operating Engineers at least 360 days, 90 days or more per year during

12

13

the last four (4) years, and have been employed for at least 360 days, 90 days or more per year during the last four (4) years on work as defined in Article I of this Agreement within the geographical jurisdiction of Local 18, and who have lived in the State of Ohio, or in any county contiguous thereto, for at least one (1) year prior to application.

**GROUP A PREFERRED:** Must have Group A eligibility. Group A registrants may voluntarily register in the Group A Preferred, however, registrants in this Preferred A status shall have at least fifteen (15) years employment or availability for employment in any one or more of the classifications contained in this Agreement and in the type or kind of craft work covered by this Agreement in the geographic area as defined by this Agreement. Referral in this group is limited to the following described equipment and will be given priority of referral from the Group A Preferred deck. Preferred A status employees will not be eligible for letter of request by the Employer: Welding Machines, Elevator, Conveyor, Pumps, Compressors, Generators, One Drum Hoist, Mono-Rail Hoist and Portable Heaters.

It is further understood and agreed that when the Employer employs Operating Engineers not currently in their employ for any machines listed in this section, the Employer shall call the referral office servicing his/her job or project and request that an employee qualifying under the Preferred A status be dispatched to service and operate said machine. Any Operating Engineer currently employed by an Employer can be used to operate any of the above listed machines. Apprentices shall not operate this equipment more than fifteen (15) days.

Workmen registering in this Preferred A Group shall be ineligible to register in any other group and shall not work in any classification other than those specified in this section and only have recall rights for equipment specified in this section.

**GROUP A RETIREES:** Must have Group A eligibility. The pension was set up to enhance the lives of retirees in their golden years. Retiring from the trades is by voluntary choice.

A retiree is an equipment operator or mechanic who has applied for and is receiving a pension from any construction industry source.

14

Upon retirement the retiree can only register in this group. The Group A retirees will be referred to jobs only after the Group A classification and the Preferred A classification have been exhausted.

The Group A retirees will not be eligible for letter of request by the Employer.

**GROUP B:** Same as Group A, except that the employment shall have been at least 270 days, three (3) years of 90 days each. All fourth year Apprentices and Trainees shall be registered in this group.

**GROUP C:** All applicants who have worked as Operating Engineers at least ninety (90) days per year during each of the last two (2) years, and who have lived in the State of Ohio or any county contiguous thereto for at least one (1) year prior to application. All third year Apprentices and Trainees shall be registered in this group.

**GROUP D:** All applicants who have worked as Operating Engineers at least ninety (90) days during the twelve (12) months prior to application. All second year Apprentices and Trainees shall be registered in this group.

**GROUP E:** All other applicants and all first year Apprentices and Trainees shall be registered in this group.

**GROUP F:** All applicants who are "temporary employees".

All applicants who have attained eligibility in any of the foregoing groups shall not lose eligibility as a result of their failure to obtain the required days of employment during the applicable periods of time. All graduating Apprentices shall upon journeymen certification become eligible for Group A. When an applicant fails to register in his/her eligibility group due to reasons other than illness, as hereinafter defined, and does not notify the Union Hall, the resultant failure to obtain the required days of employment during the applicable periods of time shall cause the applicant to lose eligibility in that group.

Any registrant requesting that their work registration card be placed on hold due to sickness, ill health or physical condition, must present to the Union a doctor's certificate or statement certifying that the registrant will be under a doctor's care for a minimum of thirty (30) days, and that such illness or physical condition prevents the registered applicant from working as an Operating Engineer. A work registrant's card will only

15

SOFCO002270

be placed on hold for a minimum period of thirty (30) days, and a maximum period of one hundred twenty (120) days. No registration cards will be placed in the hold position for illness or physical condition for less than a thirty (30) day duration. Any refusals of dispatches due to illness or physical condition for a period of less than thirty (30) days shall be counted as a refusal under the terms and conditions of the referral procedure.

33. In referring applicants, the following procedure shall be followed:

A. Applicants in Group A shall first be referred, and then Group A Preferred, then Group A Retirees, then applicants in the succeeding groups, in order, through Group E. In each group, the Union shall refer applicants in order of their places on the referral list.

⌣ B. Registered Apprentices or Trainees shall be referred in order of their position on the referral list.

C. Employers shall have the right to reject any applicant referred for employment and shall immediately notify the Union in writing of such rejection. In the event a registrant is discharged by the Employer because of lack of sufficient ability, and he/she does not exercise his/her rights under the Referral Board of Review and Arbitration under Paragraph 37, the classification or equipment from which he/she is discharged shall be stricken from his/her referral record and he/she shall not be dispatched to a job in that classification or on that equipment until he/she has:

1. Taken training at his/her training site and has been certified, or

2. Has presented to his/her dispatch office a letter from a previous Employer, in signed agreement with Local 18 working within Local 18's jurisdiction, stating that in the Employer's opinion the discharged registrant has successfully completed a job assignment* in that classification or on that piece of equipment in his employment.

D. When an applicant is actually employed, he/she shall notify the Union office at which he/she is registered within twenty-four (24) hours. Failure to do so is an imposition upon those registered and not employed and, therefore, such applicant will be barred from re-registering, unless and until he/she has made application to the Board of Review and Arbitration provided for in Paragraph 37 of this Agreement, and shows

16

good cause for his/her failure to give such notice.

E. When an applicant becomes employed, his/her name shall be removed from the register as soon as he/she shall have worked for a total of thirty-one (31) accumulative working days (one (1) day jobs shall not count). An Operator who relieves another Operator will not be charged for the first fifteen (15) days (only one (1) fifteen (15) day relief per registration application card). All days after that will be counted toward his/her time.

If an applicant is employed for less than thirty-one (31) accumulative working days, he/she shall be restored to his/her previous position on the register when such employment terminates. Any applicant who quits employment or fails to show up for work assignment at starting time after being dispatched (provided he/she was dispatched the previous day), for whatever reason, except accident verified by police report, shall be placed at the bottom of the applicable registration group regardless of the number of days worked and shall not be eligible for request until he/she puts in a new registration card. When reason for employment termination is questioned, applicant must present a written termination slip evidencing reasons other than a voluntary quit before he/she is restored to his/her previous position on the register.

An applicant for employment may not refuse referral to employment for any reason except that the applicant may inform the District Office in writing, before any referral, that he/she will not accept employment referrals in certain named counties within the District. If an applicant refuses a job referral for the second consecutive time, he/she shall lose his/her position on the register and go to the bottom of the list for his/her group*. If the dispatcher is unable to contact an applicant, the failure to contact shall not be deemed to be a refusal.

F. Applicants must notify the Union office in which they are registered by telephone, or letter, or telegram, or in person of their continued availability for employment within thirty (30) days after the date of last registration or re-registration in order to maintain their places on the register.

In order to equally distribute and defray the cost of services rendered by the use of this referral system, all individuals

---

*Does not apply to the former Ohio or Kentucky Building & Light Commercial Agreements Referral.

17

who make use of this referral system shall be required to pay an initial registration fee of $18.75* and another $18.75* for each re-registration thereafter, provided that such fee shall not exceed $18.75* in any consecutive thirty (30) day period and provided that such fee shall not apply to the following:

1. Members in good standing of Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their regular dues; and

2. Applicants for membership to Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their fees; and

3. Members in good standing of the International Union of Operating Engineers who are paying travel dues whose proportionate share of the cost of this referral system is met by the payment of their fees.

G. The Union shall use its best efforts to notify all registered applicants when work is available for them, but the Union assumes no responsibility or obligation for failure to locate an applicant.

H. All applicants must submit a written resume of their experience and qualifications at the time of original registrations, and may be tested on the equipment they operate at the nearest available training site prior to being assigned a position on the referral list.

I. Subject to this referral system Employers may hire through this Referral policy, by name, former employees who have resided for at least twenty-four (24) months in the State of Ohio or in any county contiguous thereto, and have been employed by the Employer making the request during the past twenty-four (24) months within the jurisdiction of this Agreement. The Employer must make the request to the appropriate Union District Office and the employee requested must be registered on the District referral list (Groups A through E).

Employers may hire through this referral policy by name individuals in Group A for a production machine, or for a mechanic, or mechanic/welder, who has been registered on the out-of-work list for at least ten (10) days in the District in

*Effective July 1, 2011 $19.25; July 1, 2012 $19.75

18

which the work is to be performed. Individuals shall have only one (1) request per four (4) month period from the last request. The request by name be confirmed later in writing on the letterhead of the Employer and signed by either the Employer or the superintendent of the project.

Nothing in the referral procedure shall interfere with the transfer of an Employer's employees on his payroll from one project to another project within the geographical area covered by Local 18. When transferring employees, the Employer will notify the Union District Office from which the employee is to be transferred.

The Union agrees the transfer will be processed in an expedient manner.

J. The purpose of the referral system is to provide nondiscriminatory employment opportunities. Individuals who register therein deserve a preference over those who do not. Therefore, it is agreed that in the event the referral list is exhausted and the Union is temporarily unable to furnish qualified applicants within twenty-four (24) hours after receiving the Employer's request (Saturdays, Sundays and holidays excepted), the Employer may temporarily employ others until the Union notifies the Employer that it has qualified registrants available for employment.

Applicants hired by the Employer under this procedure shall be known as "temporary employees", and will be subject to replacements. The Employer will notify the Union District Representative of the name, union affiliation (if any), date of employment and social security number of such temporary employee. The Union will maintain a register of all such "temporary employees" and such register shall be known as the temporary register. Such "temporary employees" may also be referred by the Union (when the referral list is exhausted) from Group F.

Such "temporary employee" shall be subject to replacement by a qualified registered applicant under the procedure listed herein:

1. The Union shall give a five (5) working day written notice to the Employer with whom the "temporary employee" is working and such "temporary employee" will thereupon be replaced at the end of the five (5) working day period provided the Union furnishes a qualified registered applicant.

19

SOFCO002272

2. The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the temporary register.

K. When an Employer states requirements for special skills or abilities in his/her request for employee applicants, the Union shall refer the first applicant on the register possessing such skills or abilities, regardless of the place or classification of such applicant on the register. If a contractor requests or requires that the operator be a Certified Operator, verification of the operator's certification is the responsibility of the Employer. If the Employer notifies the Union in writing, within thirty (30) days of the employee's discharge, of an Operator who had been in his employment and who had not performed satisfactorily, and the Employer does not wish this Operator to be referred to the Employer for future employment, the Union shall honor this written request.

L. Any employee who quits a contractor without proper notice and is subsequently hired by an Employer with whom Local 18 has a contractual relationship without a proper referral by Local 18 shall be discharged by the Employer when it is called to his attention.

34. Employers shall give first opportunity to persons registered for employment, as provided herein, by calling or notifying the Union at any of its offices in the territory where the work is to be performed.

35. Registration of applicants and selections of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, by-laws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership, policies, or requirements. It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio, the Commonwealth of Kentucky, and lawful orders thereof in nondiscrimination and fair employment practices.

The Employer and the Union shall not discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

The Union agrees to furnish an Employer, at his request,

20

any statement or data required under any regulations referred to herein.

36. In addition to the above Registration Groups there shall be established a Short Term Job Group. The sole purpose of this Short Term Job Group is to enable registrants to acquire time to be eligible for unemployment benefits. Registration in this group is limited to applicants eligible for Group A of this referral and all fourth year Apprentices showing proof of need for additional time to qualify for unemployment benefits.

Applicants' referral out of the Short Term Job Group will be limited to jobs of two (2) days or less duration in a calendar week or eight (8) days or less duration in a calendar month on equipment listed on their registration cards. Any refusals of jobs will cause the registrant's card to be removed from the Short Term Job Group deck. Dispatches for short term jobs as defined above will first be made from the Short Term Job Group. If the dispatcher is unable to fill the short term job order from the Short Term Job Group he/she will proceed to fill the order from Groups A through F in accordance with the referral rules. Dispatcher must notify Employers when dispatching from the Short Term Job Group. The Employer reserves the right to request dispatch from Group A.

Since this Short Term Job Group is intended to provide limited employment for those needing credit for unemployment compensation, the Union shall, through its business agents, remove from employment any Operating Engineer who has accumulated more than two (2) days per calendar week or over eight (8) days in a calendar month — as a result of the Short Term Job Group.

Registrants in the Short Term Job Group will not be eligible for any recall or request provisions of the referral as herein described. Employment received as a result of the Short Term Job Group referral will not provide eligibility for Employer recall when the registrant is registered in Group A, Preferred A, or Group A Retirees deck. Apprentices or Trainees will not be permitted to register in the Short Term Job Group except as noted above. Registrants may not register in the Short Term Job Group or Group A or Preferred A or Group A Retirees deck at the same time. The Employer shall not be permitted to transfer employees dispatched from the Short Term Job Group from one project to another project.

21

SOFCO002273

The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the Short Term Job Group.

All the remaining rules with regard to the operation of the referral shall be applicable to the operation of the Group A, Preferred A and Group A Retirees except as modified above.

**37.** Any registrant or any Employer who may feel aggrieved by the operation of this referral system shall have the right to and must file his/her grievance, in writing, within ten (10) days after the occurrence of the event concerning which he/she complains with a Board of Review and Arbitration consisting of one (1) representative of the Employer, and an impartial third member to be selected by agreement of the Union and the Employer, and the decision of this Board shall be final and binding on all parties.

**38.** This statement as to referrals shall be posted in all places where notices to Employers and applicants for employment are customarily posted, including all offices of the Union; all offices of the Employer.

**39.** A Labor Relations Division Representative of the AGC of Ohio may inspect the referral register at the Union District Office at any time during normal office hours.

**40.** All officers and business representatives of the Union who have had previous work experience in any one or more of the job classifications contained in this Agreement shall be deemed to be employed at the trade and it is the intent of this section to provide that upon return to the employment in the trade, he/she shall do so with the same preference as if he/she had continually worked at the trade and shall be eligible upon registration for Group A.

## ARTICLE IV

### FRINGE BENEFIT PROGRAMS

**41.** The fringe benefit provisions contained herein shall apply to all Employer members of the AGC of Ohio Labor Relations Division, and Employers who become signatory or bound by this Agreement, as well as any other Employer or Employer groups who become a party to an Agreement covering the fringe benefit programs set forth herein.

**42.** All Employers bound hereby agree to be bound by the

Agreement and Declarations of Trust, as amended, establishing the Pension Fund, Health and Welfare Plan and Apprenticeship Fund, copies of which all parties agree have been furnished to and read by all Employers bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declarations of Trust and any rules, regulations, or plans adopted by the Trustees pursuant thereto, shall become a part of this Agreement as though fully written herein. All Employers bound hereby irrevocably designate the Employer Trustees of said Funds and Plan and their successors as their representatives for the purpose set forth in said Agreements and Declarations of Trust.

**43.** Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

PENSION FUND: Effective May 1, 2010 is $5.00 per hour

HEALTH & WELFARE PLAN: Effective May 1, 2010 is $6.66 per hour

APPRENTICESHIP FUND: Effective May 1, 2010 is $.55 per hour

SAFETY TRAINING AND EDUCATIONAL TRUST FUND: Effective May 1, 1992 is $.04 per hour

The Union shall have the option of diverting all or any part of the increase scheduled for improvement of or payment of costs of any fund benefits provided under this Agreement; provided that the Union gives the Employer written notice of its election to do so by registered letter sent to the office of the AGC of Ohio at least 60 days before the effective date of the scheduled change specifying in said notice the amount of change to be applied for this purpose in the fund benefit for which the money is to be used.

**44.** It is further understood and agreed by and between the parties that duly authorized representatives of any of said Trust Funds or Plan shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all employees upon whom the Employer is obligated to make contributions and with respect

22

23

to the payment of monies to the AGC of Ohio's Construction Industry Advancement Program under paragraphs 109, et.seq. and with respect to the Administrative Dues deduction under paragraph 114. Notwithstanding the foregoing authority allowing audits with respect to the AGC of Ohio's Construction Industry Advancement Program and the Administrative Dues deduction, the audits shall only be conducted in conjunction with the Fringe Benefit Funds or Plans referred to herein and shall not be conducted independently. The twenty-four (24) hour notice referred to in paragraph 45(A) shall only be given for delinquencies to the employees Fringe Benefit Funds or Plan referred to therein.

45. Reports of employees who have worked the number of hours that they have been paid, and such other data and information as may be required, and all contributions payable to the Funds or Plan shall be transmitted to the offices of the Funds or Plan no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed. In the event said audit is refused, reports not furnished, or said contributions are not paid, as aforesaid, the following remedies, in whole or part, and in addition to all other remedies, either in law, in equity, by contract or authorized by the aforementioned Agreements and Declarations of Trust, shall be available.

A. After the Trustees or the Agent of any Funds or Plan have given the delinquent Employer twenty-four (24) hours written notice at the address shown in the records of the Funds, Plan or Union, the Union shall have the right to take such legal and lawful action as it may deem necessary until such delinquent payments are made or said audit is permitted, such action including but not limited to the right to withhold its services from such Employer for as long as the failure to make such contributions or audit continues, Article XIV notwithstanding.

B. In the event either the Union or the Trustees of any Funds or Plan may decide to utilize the grievance and arbitration procedure in this paragraph to collect delinquent contributions and liquidated damages to enforce any audit, or to obtain any report, the following procedure shall apply:

Unless the issue is resolved between the Employer and the party giving notice, within five (5) calendar days after deposit of written notice of delinquency and/or demand for

24

audit and/or report in the United States mail, to the Employer at the address shown in the records of the Funds, Plan or Union, such party may refer the matter to an arbitrator to be named by the AGC of Ohio Labor Relations Division and by Local 18 of the International Union of Operating Engineers whose decision in writing shall be final and binding on all parties. In the event such parties are unable to choose an arbitrator within ten (10) days after written request therefore, the Union or the Trustees of any Funds or Plan may request an arbitrator according to the rules and regulations of the American Arbitration Association whose decision in writing shall be final and binding on all parties. The parties to the arbitration shall each bear one-half (1/2) of the total costs.

46. In no event shall the foregoing provisions relating to Fringe Benefits be subject to or suitable for grievance and arbitration under Article XIV of this Agreement.

47. The Employer must obtain an Insurance Payment Bond (IPB), from a company that is "best" rated A, financial category 7 or better, payable to the Ohio Operating Engineers Fringe Benefit Program as a guarantee that the fringe benefits referred to herein are paid by the insurance carrier in the event that the Employer becomes delinquent in its payments and defaults thereon. In lieu of a surety bond, an Employer may substitute an equivalent cash bond, which will be escrowed to guarantee payment of fringes. If the Employer fails to provide the necessary bond within thirty (30) days of request by the Union, the Union shall withhold services until receipt of such bond, or the Employer makes fringe contributions on a weekly basis.

The Employer shall obtain said Insurance Payment Bond or cash bond in amounts set forth below:

| 1-10 | Operating Engineers | $ 50,000.00 |
| 11-20 | Operating Engineers | 75,000.00 |
| 21-50 | Operating Engineers | 100,000.00 |
| Over 50 | Operating Engineers | 125,000.00 |

## ARTICLE V

### WAGE RATES

48. The purpose of this Agreement is to establish wage rates and conditions to apply for all work as defined herein and for operation of all equipment which comes within the jurisdic-

25

tion of the International Union of Operating Engineers, and as negotiated by and between Local 18 and its Branches of the International Union of Operating Engineers and the AGC of Ohio Labor Relations Division.

**49.** Exhibit "A" covering wage rates and classifications attached hereto is made a part of this Agreement.

**50.** It is agreed if equipment within the jurisdiction of the International Union of Operating Engineers is used by an Employer and if there is no appropriate classification listed under the wage schedules therein, then the Union and the Association negotiating committees will negotiate a new classification and rate of pay for such equipment within five (5) days.

**51.** The geographical jurisdiction of this Agreement will be zoned for wages only. Conditions of employment will be the same for all employees covered by this Agreement.

Zone I: Covering Portage and Summit counties only.

Zone II: Covering the counties of Lucas and Wood only.

Zone III: Covering the counties of Adams, Allen, Ashland, Athens, Auglaize, Belmont, Brown, Butler, Carroll, Champaign, Clark, Clermont, Clinton, Coshocton, Crawford, Darke, Defiance, Delaware, Fairfield, Fayette, Franklin, Fulton, Gallia, Greene, Guernsey, Hamilton, Hancock, Hardin, Harrison, Henry, Highland, Hocking, Holmes, Jackson, Jefferson, Knox, Lawrence, Licking, Logan, Madison, Marion, Mercer, Meigs, Miami, Montgomery, Monroe, Morgan, Morrow, Muskingum, Noble, Paulding, Perry, Pickaway, Pike, Preble, Putnam, Richland, Ross, Sandusky, Scioto, Seneca, Shelby, Tuscarawas, Union, Van Wert, Vinton, Warren, Washington, Wayne, Williams, and Wyandot. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

## ARTICLE VI

### WEEKLY PAY AND HOURLY PAY CLASSIFICATIONS AND REPORTING PAY PROVISIONS

**52.** In all counties covered by this Agreement, the following classifications shall be employed on a WEEKLY PAY basis.
Asphalt Plants
Boiler Operators, Apprentice/Helper (Oiler), Registered

26

Apprentices and Signalmen, when members of crew
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Cherry Pickers
Cranes (all types)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Floating Equipment
Gradalls
Hoes (except when attached to farm or industrial type tractor or CAT 320 backhoes or equivalent and below)
Hoists, with two or more drums in use
Horizontal Directional Drill (over 500,000 ft. lbs. thrust)
Maintenance Engineers (Mechanic and/or Welder)
Master Mechanics
Panelboard Operators (all types on site)
Pile Drivers
Power Shovels
Rotary Drills (all), used on caissons for foundations and substructure work
Side Booms
Tug Boats

**53.** In all counties covered by ZONES I, II and III, the following classifications shall be employed on an HOURLY PAY basis (two (2), four (4), or eight (8) hours):
A-Frames
Air Compressors, pressurizing shaft or tunnels
Allen Screed Paver (concrete)
Apprentice/Helpers (Oilers), Helpers, Boiler Operators, when not members of a crew
Asphalt Pavers
Backfillers
Backfillers with Tampers
Ballast Re-Locator
Bar and Joint Installing Machines
Barrier Moving Machine
Batch Plant Operators
Bobcat Type and/or Skid Steer Loader
Boilers (15 lbs. pressure and over)
Boom Trucks (all types)
Bulldozers
Bull Floats

27

Burlap and Curing Machines
Cableways
Clefplanes
CMI-type equipment
Combination Concrete Mixers and Towers
Compressors, on building construction
Concrete Grinder/Planer
Concrete Mixers
Concrete Pumps
Concrete Saw, Vermeer type
Concrete Spreaders
Conveyors, used for handling building materials
Crushers
Deckhands
Directional Drill "Locator"
Drum Firemen in asphalt plants
Elevating Graders or Euclid Loaders
Endloaders
Farm-type Tractors, pulling attachments
Finishing Machines
Fork Lifts (all types)
Forklift (rough terrain with winch/hoist)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (sonic pile driving)
Gunite Machines
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes, when attached to farm or industrial type tractors
Hoists (building construction)
Horizontal Directional Drill (less than 500,000 ft. lbs. thrust)
House Elevators (except those automatic call button controlled)
Hydraulic Gantry (lift system)
Hydro-seeders
Inboard, Outboard Motor Boat Launches
Kolman-type Loaders (dirt loading)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Lead Greasemen
Light Plant Operators
Locomotives (all types)
Man Lifts

28

Mixers, one bag capacity with side loaders
Mixers, Paving (multiple drums)
Mobile Concrete Pumps, with booms (including oiler, etc.)
Mucking Machines
Mudjacks
Pavement Breakers (hydraulic or cable)
Pettibone - Rail Equipment
Plant Mixers (on site)
Post Drivers
Post Hole Diggers
Power Driven Heaters (oil fired)
Power Graders
Power Scoops
Power Sweepers
Power Scrubbers
Prentice Loader
Pressure Grouting
Pressure Pumps (over 1/2" discharge)
Pump Operators, installing or operating well-points or other types of dewatering systems
Pumps (4" and over discharge)
Pumps (under 4" discharge)
Rail Tamper (with automatic lifting and aligning device)
Switch & Tie Tampers (without lifting and aligning device)
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Utility Operators
VAC/ALLS
Vibratory Compactors, with integral power
Welders (except electric machines)

**54.** In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on a WEEKLY PAY basis reporting for work on Saturday, Sunday or holidays shall be paid as follows: Employees who have not started to work will receive two (2) hours at premium pay for reporting to work (only need to stay on job for one (1) hour). Employees who start to work will receive four (4) hours pay at premium rate; more than four (4) hours will receive eight (8) hours pay at the premium rate. For inclement weather only it will be 2-4-6-8 hours of pay at the premium rate of pay.

They must report to work at starting time and remain on the job until release.

29

**55.** When a machine having a forty (40) hour guarantee is laid up on a project site and the workmen are laid off and paid off, that machine cannot be started back to productive work on that project site unless it is laid up for one week (seven days) without calling back the workmen who had manned the machine and they shall be paid for the time they have been off, unless mutual agreement is reached between the Employer and the Union District Representative to permit employees to work on the weekly guarantee equipment during the seven (7) day "lay-up" period without penalty.

**56.** In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis, unless notified by the Employer not to report to work, shall receive two (2) hours' pay for reporting to work; if such operator does not start to work, he/she shall receive his/her two (2) hours' reporting time. An employee may be required to stay at the work project for one (1) hour to be eligible for two (2) hours reporting pay unless the Employer releases the employee prior to the end of the first hour. If the employee starts to work, he/she shall receive four (4) hours' pay; if the employee works over four (4) hours, he/she shall receive eight (8) hours' pay; for inclement weather only it will be 2-4-6-8 hours.

In all counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis reporting to work on Saturday, Sunday or holidays, all conditions in this paragraph will apply and both reporting time and time worked will be paid for at the rate provided in accordance with Article VII. They must report to work at starting time to be entitled to reporting pay. Where less than four (4) hours or less than eight (8) hours are worked, the employees must remain on the work for the full four (4) hours or the full eight (8) hours, as the case may be, to be entitled to pay for the four (4) or eight (8) hours, as stipulated in this Agreement.

**A.** When an employee working on equipment with a weekly-pay guarantee and work with his/her equipment is completed on a project, the employee is guaranteed only Monday through Wednesday pay if the equipment finishes the work on the project the first three days of the week. The Employer will notify the Union District Representative prior to application of this provision.

30

**57.** Crews will be eligible for straight time weekly pay when their equipment is transferred out of their District up to the day the equipment is shutdown, otherwise, Paragraph 56, Section A prevails.

**58.** On jobs where there is only one (1) day's work for a piece of equipment, employee or crew may be employed on a day-pay basis. Upon the Contractor's request to the Union Business Representative for a second day for special occasions, the Union gives the Representative authority to authorize a second day for the period of this contract.

**59.** All reporting pay time paid to an employee shall count as working hours with respect to any work guarantees or overtime pay provisions.

**60.** Employees who are working for an Employer in other than their local residence area thereby necessitating them to pay room and board shall, upon request, be granted their release if the Employer is unable to supply enough work to justify their staying. Employees released under this provision will be considered as laid-off because of lack-of-work.

## ARTICLE VII

### PROVISIONS FOR PREMIUM RATE OF PAY

**61.** The week shall begin on Monday A.M. and shall end on Sunday P.M.

**62.** The regular starting time must be established for not less than one (1) week. Any time worked prior to the established starting time will be paid for at the applicable premium rate unless otherwise arranged through Union notification.

**63.** The normal work day shall consist of eight (8) hours and the normal work week of forty (40) hours. One and one-half (1-1/2) times the regular rate shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, and including Saturday. When an Employer performs clearance and excavation for site preparation for industrial or building sites, the Employer will pay the wage rates listed herein, all overtime will be performed at one and one-half (1-1/2) times the regular rate. Subject to Paragraph 121, all other conditions and provisions shall be as provided herein.

**A.** An Employer may, however, have the option of working a four-ten hour schedule at straight time rates. No Operat-

31

ing Engineer with a weekly guarantee will lose a paid holiday he/she would otherwise receive by working a four-ten week. Instead, such employees will receive, in addition to wages and fringes for hours worked in a four-ten week, an additional eight (8) hours and fringes at straight time rates for the holiday. If the Employer elects, upon notification to work a four-ten hour schedule, he shall pay overtime in such cases on all hours over ten (10) hours per day or over forty (40) per week, whichever is greater. A four-ten work schedule must be by the week.

In addition to the above: It is agreed that when time is lost by the crew during the regular work week, Monday through Thursday, due to inclement weather, holiday, equipment breakdown or directions of the project owner, this time may be made up by the entire crew on Friday at the regular rate of wages. All Friday work must be scheduled on a minimum of eight (8) hours basis. All hours worked in excess of the forty (40) hours in the work week or ten (10) hours each day, shall be paid at the appropriate overtime rate of pay.

B. Any employee hired on any day of the week, Monday through Thursday, and who does not lose any time from the day of his/her initial hire until Thursday shall receive the overtime rate of wages for Friday, providing the crew is eligible for the premium rate for Friday.

C. Should any other trade on the project in the contractor's employ, working in conjunction with the Operating Engineers, receive premium pay on a Friday, the Operating Engineers would also receive premium pay for the Friday.

D. If the other basic crafts employed by your contractor on the project receive the overtime rate for the ninth (9th) and tenth (10th) hours, the Operating Engineers will also receive the overtime rate.

E. When an Employer works three (3) days or less in a week, premium time will be paid after eight (8) hours for each of the days, except for holidays, inclement weather or completion of the job.

F. Pay day will be on Thursday.

G. Weekly pay employees, in order to be eligible for eight hours' pay that day, must be available to perform work for the Employer.

H. If direct deposit is available, the member can participate voluntarily.

64. Double time will continue to be paid to any Operator who is complementing another trade that is receiving double time. All work performed by an employee on Sunday or holidays shall be paid at two times the regular rate established in this Agreement or any escalated rate that may be in effect.

65. No Weekly Pay employee covered by this Agreement shall lose time because of the observed holidays. If not requested to work, he/she shall be paid eight (8) hours straight time pay at the rate established in this Agreement or eight (8) hours at any escalated rate that may be in effect. Holidays shall be of twenty-four (24) hours duration. When required to work on holidays, the employee shall be paid two times the regular rate established in this Agreement or any escalated rate in effect.

66. There shall be no work required on Labor Day except in special cases of emergency.

67. The observed holidays are Christmas, New Year's Day, Labor Day, Memorial Day (last Monday in month of May), Independence Day and Thanksgiving Day. When any of the aforementioned holidays fall on Sunday, they will be observed on Monday. All weekly pay Employees covered by this Agreement to be eligible for holiday pay must be available for work the first regularly scheduled work day prior to the holiday and be available for work the first regularly scheduled work day after the holiday.

68. Where steam boilers, power driven heaters or pumps are used on a continuous seven (7) day twenty-four (24) hours per day operation, overtime may be avoided by using four (4) shifts of Operating Engineers, each shift to work six (6) hours on a seven (7) day basis. Each Operating Engineer so employed shall be paid forty (40) hours at the applicable straight time rate and two (2) hours at double the applicable straight time rate. The aforementioned condition, where overtime may be avoided, can only be used upon the Employer's guarantee of a minimum thirty (30) days of operation. In the event the Employer cannot furnish thirty (30) days of employment after starting work under Paragraph 68, it is agreed that upon lay-off of employees the Employer will pay retroactive overtime to such laid-off employees from the start of this particular operation in accordance with Article VII, Paragraphs 63 and 64 of this Agreement.

32

33

69. Job Master Mechanics and Operators of derricks, cranes, derrick cars on steel erection and on building construction and all winch trucks used in hoisting construction material and any type of hoist, shall command and receive the highest rate of pay and the same applicable premium pay and conditions of overtime where the rates or conditions for the Ironworkers, Boiler Makers, Pile Drivers and Pipefitters are higher than the rates specified in this Agreement for the foregoing classifications. To be eligible for the benefits of complementing the above mentioned trades, an Operator must be required to perform a specific operation which is directly related to the work which the other trades are performing.

70. Operating Engineers employed on any equipment within the jurisdiction of the International Union of Operating Engineers working in shafts, tunnels or storage caverns where natural earth or rock is undisturbed overhead, shall be paid fifty cents ($.50) per hour above the rates in this Agreement or in addition to any escalated rate that may be in effect. This does not apply to open cut work.

71. Booms, including jib 150 feet through 180 feet in length, fifty cents ($.50) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

72. Booms, including jib over 180 feet through 249 feet in length, one dollar($1.00) per hour in addition to the established crane rate or any escalated rate that may be in effect.

73. Booms, including jib of 250 feet and over in length, one dollar twenty-five cents ($1.25) per hour in addition to the established crane rate or any escalated rate that may be in effect.

74. Conventional cranes whether crawler or truck when used as a tower crane, the effective length of the mast and the boom combined, will be used to determine when these extra rates will be applied.

75. Tower Cranes, the height of the boom point from the first floor level of the project, will be used to determine when these extra rates will apply.

76. On jobs where crane-type or derrick-type machines are operated on floors above the first floor level of the building, twenty-five cents ($.25) per hour shall be paid in addition to the established crane rate or any escalated rate that may be in effect.

34

## ARTICLE VIII
### CREWS AND GENERAL PROVISIONS

77. In all the counties within the jurisdiction of this Agreement, crews shall be employed on all truck cranes, power shovels, cranes, rotary drills on caisson work, cableways, draglines, tower derricks, tower cranes, multiple drum pavers, pile driving machines and hoes, standard gauge locomotives, bucket trench machines (over 24" wide) and horizontal directional drills (over 500,000 ft.lbs.thrust). Crews shall consist of an Operating Engineer and an Apprentice/Helper (Oiler) or Signalman on machines, regardless of motive of power, or an Operating Engineer and Fireman on steam machines.

78A. Apprentice/Helpers (Oilers) are required on hoes, excavators, and front hydraulic shovels having a base operating weight in excess of 105,000 pounds, single cab hydraulic cranes on rubber with a total weight of 125,000 pounds and Apprentice/Helpers (Oilers) shall be required on cable crawler cranes over 80 ton structural capacity, defined as: the factory specified total maximum counter weight with a PCSA rating not to exceed 36,400 pounds, based on 50' of boom at 40' radius, with the single line pull not exceeding 17,000 pounds. Anything outside any of the aforementioned limits determines the crane as requiring an Apprentice/Helper (Oiler). All factory certifications and the computer system will be available for inspection at any time by the Union or their designee. On remote control gradalls, Apprentice/Helpers (Oilers) shall be at the discretion of the Employer. Truck cranes, lattice boom, thirty (30) ton capacity and under; hydraulic truck cranes and all terrain cranes fifty (50) ton capacity or less, an Apprentice/Helper (Oiler) is not required. However, if someone other than an Operating Engineer is assigned to this work, this paragraph will be revoked on the project, and an Apprentice/Helper (Oiler) will be required for the remainder of the project. An Apprentice/Helper (Oiler) is required on self-erecting cranes (as defined by the manufacturer) while being erected and dismantled.

78B. Apprentice/Helper (Oiler) on jobs of thirty (30) days or more will be given a minimum of 30 minutes per day operating the machine they are assigned to (or a similar machine on the same project). If the Apprentice/Helper (Oiler) cannot be trained to operate the machine to the satisfaction of the Employer then he/she shall be replaced.

35

SOFCO002280

**79A.** Work of the Boiler Operator, Apprentice/Helper (Oiler), Registered Apprentice, and Signalman shall include getting up steam and greasing up, filling gas tanks and making the machine and equipment ready for operating at the starting time. If, at the discretion of the Employer, an Apprentice/Helper (Oiler), Registered Apprentice, or Signalman is required to make gas or diesel machines ready to operate before the regular starting time, such Apprentice/Helper (Oiler), Registered Apprentice, or Signalman shall be paid one-half (1/2) hour's pay at one and one-half (1-1/2) times the regular rate. If, at the discretion of the Employer, a Boiler Operator or Registered Apprentice is required to get up steam and grease steam machines and make them ready to operate before regular starting time, then such Boiler Operator or Registered Apprentice shall be paid one (1) hour's pay at one and one-half (1-1/2) times the regular rate.

**79B.** Apprentice/Helpers, (Oilers) while assigned to track hoes, cranes and other equipment, will perform the following work on the project as additional duty:

• Cover small equipment (i.e. pumps, generators, compressors, etc.)
• Act as signal person
• Safety/fire watch
• Practice operating in a learning environment in the vicinity
• Help with survey duties on project
• Help mechanic, lube trucks, fuel
• Practice operating rough terrain forklift, front loader, rubber tire hoe, loader in vicinity of primary duty
• Replace other operators who may be absent on project
• Run parts or materials as necessary
• Safety enforcement
• Productive activity on job site to facilitate job completion when it does not interfere with progress of primary machine, providing this does not interfere with another Operating Engineer's workday

**80.** Apprentice/Helper (Oiler), Registered Apprentices, Signalmen, Grease Truck Operators, when requested to work the regular one-half (1/2) hour lunch period, will eat their lunch prior to or after the regular one-half (1/2) hour lunch period in order to be able to oil, grease and repair machines during the

36

regular one-half (1/2) hour lunch period at no extra pay.

**81.** More than one (1) shift may be worked in any twenty-four (24) hour period and the starting time of the shifts shall be left to the discretion of the Employer. This starting time must be maintained five (5) days, Monday through Friday. However, more than six (6) hours shall not be worked without allowing thirty (30) minutes for a lunch period. Where two (2) shifts are employed, eight (8) hours shall constitute a day's work for the first shift and eight (8) hours shall constitute a day's work for the second shift. When three (3) shifts are employed, eight (8) hours shall constitute a day's work for the first shift, seven and one-half (7-1/2) hours work with eight (8) hours pay shall constitute the second shift, and seven (7) hours work with eight (8) hours pay shall constitute the third shift. For the purpose of overtime pay for multiple shift operations, a work day shall be determined by the starting time of the shift. In addition, the second shift will receive twenty-five cents ($.25) per hour, third shift fifty cents ($.50) per hour premium above the established rate of pay.

When warranted by a particular job's conditions, shift work may be instituted for less than five (5) consecutive days.

**82.** Where project owners establish specifications, requirements, or for safety reasons that limit the days or hours in which work may be performed, the Employer, after advance notice to the Union, may start the work week after 6:00 p.m. on Sunday at straight time rates. In applying this schedule, Sunday p.m. will be considered Monday, the following Friday will be considered Saturday (paid at time and one-half) and Saturday will be considered Sunday (paid at double time). All premium pay provisions will apply for the sixth and seventh days as to Saturday and Sunday, respectively.

**83.** When it is necessary for equipment to be operated, the Operating Engineer who regularly operates the particular piece of equipment shall be given first chance to perform the work. If an Apprentice/Helper (Oiler) is required, the Apprentice/Helper (Oiler) who is regularly assigned to the particular piece of equipment shall be given first choice to perform the Apprentice/Helper's (Oiler's) duties. In an emergency, any employee may be assigned to any equipment. It is understood that the Master Mechanic or Steward will be notified, when possible, of such emergency requirements.

37

SOFCO002281

84. Employees who are requested, referred and employed by Employers on the same day under hourly classifications in this Agreement shall be paid a minimum of eight (8) hours pay on the day they report to the job. Any overtime worked after the normal quitting time shall be paid at the proper overtime rate in addition to the eight (8) hours minimum first day pay guarantee. The furnishing of a truck by a Mechanic shall not be a condition of employment. If an Employer is requesting a Mechanic from the Union, the Employer may require the new Mechanic to furnish a truck. If a Mechanic is required to furnish a truck, compensation will be negotiated between the Mechanic and the Employer.

85. Equipment Operator employees shall be required to carry sufficient tools to make minor repairs and adjustments in order to meet manufacturers daily maintenance requirements on the equipment they operate. This excludes diagnostic and electronic equipment.

86. If compressors, generators, boilers, hydraulic pumps or power pacs or any other type of power equipment is mounted piggyback on crane-type equipment requiring a crew, two (2) Operating Engineers will be employed at the Class "A" rate or any escalated rate in effect and under the weekly guarantee. If the crane does not ordinarily require a crew, see Paragraph 78A, the employment of a second operator shall be at the discretion of the Employer. The jurisdiction of the Operating Engineers must be preserved, however, and if someone other than an Operating Engineer is used to operate the piggyback equipment, the contractor must immediately employ a second Operating Engineer at the Class "A" rate.

Where compressors up to 600 CFM or hydraulic pump, power pacs, etc. are operated and exclusively used to power attachments, such as hoe ram and other similar pieces of equipment, the equipment will be considered and manned as a piggyback operation. If a second person (Operating Engineer) is required, even though the equipment is located adjacent to the machine or crane and not mounted directly on the machine, the second person (Operating Engineer) operating the equipment is paid the Class A rate of pay for the day.

Where a second person is an apprentice, refer to the Registered Apprenticeship Wage Schedule on page 74.

If the crane does not require a crew, the auxiliary piece of

38

equipment will be manned by an Operating Engineer and paid the appropriate rate of pay.

87. ZONES I, II, and III - Toledo and counties, Dayton and counties, Cincinnati and counties, Columbus and counties, Akron and counties, including Summit and Portage:

When a contractor has eight (8) or more major Operating Engineers (major Operating Engineers A, B and C classifications) employed in the District, he/she shall employ a Master Mechanic. In addition to the Master Mechanic required above, if a contractor has eight (8) or more Operating Engineers (major Operating Engineers A, B and C classifications) employed by him/her on any one job, he/she shall employ a Master Mechanic on that job. The Master Mechanic so employed shall be answerable to the Employer and must be a member of the International Union of Operating Engineers, Local 18. Job Master Mechanics so employed shall be paid at the rate specified herein or paid fifty cents ($.50) per hour above the highest rate of any Operating Engineer working under his/her direction, whichever of these rates is higher.

On jobs where maintenance operators are to be employed, the first one (1) employed shall be Class A; the second one, if required, may be a Mechanic Trainee. Any further hire of maintenance operators shall be one Class "A," then a Mechanic Trainee may be hired. This ratio of one Class "A" to Mechanic Trainee shall be continued in the hire of all maintenance operators as required by the project requirements. Mechanics in training, working under these provisions, will be compensated according to the schedule provided under the "Field Mechanics Trainee Schedule."

88. Operators of equipment serviced by a Master Mechanic on a job site shall not be counted in the number of Operators within the District to determine when a Master Mechanic will be required for the District.

89. Employees shall be paid once each week, with not more than five (5) days withheld on the designated payday on the job prior to their normal quitting time. Failure to comply with this provision will require the Employer to pay these employees involved the double time rate if required to wait on the job. If required to return the next day to receive their pay, they shall be paid a minimum of four (4) hours at the hourly rate applicable for that day. These same conditions will apply to employees

39

SOFCO002282

who are terminated after completion of their job assignment. In the event of the discharge of an employee, he/she shall be paid immediately or his/her time will continue until he/she is paid off properly. If not paid off by normal quitting time, the aforementioned requirements will be applied if he/she is required to return the next day for his/her pay. Any employee discharged for just cause will receive their paycheck by the end of the next pay period.

90. Paychecks will show the following information:
    (1) Total hours worked
    (2) Overtime hours (premium hours)
    (3) Gross pay
    (4) All deductions listed
    (5) All fringe contributions (to be shown as a total contribution)

91. Employees requiring relief, for sickness or other causes, must notify his/her immediate supervisor before leaving the job. Such relief shall be arranged through the Union District Office.

92. Employer agrees to carry Workers' Compensation or other equivalent liability insurance for the protection of all employees covered by this Agreement.

93. At the direction of the Employer's representative on the job, Operating Engineers shall be allowed proper time for necessary repairs and upkeep. During periods of major repairs there must be suitable shelter around equipment and heated from November through March.

94. On projects where at least eight (8) Operators are employed, the Employer, during the months of November 1 through April 30, will furnish a heated shelter where employees may change clothes.

95. Sanitary drinking water and toilet facilities will be available on the project in compliance with the provisions of the applicable state code.

96. The Employer agrees, upon the termination of any employee covered by this Agreement, to furnish such employee so released with a termination slip at the time of release, showing reason for said release. (Union will provide uniform numbered slips in duplicate; original for employee, duplicate for the Employer's file).

40

97. No supervisory employee shall perform productive work or operate equipment which would deny an Operating Engineer employee employment.

98. In the reduction of forces on any project, it is agreed that non-area residents will be the first to be laid off except for a limited number of key men as mutually agreed by the Union and the Employer at the Pre-Job Conference. Non-area residents are herein defined as those who have not resided in the State of Ohio or in counties contiguous thereto, nor in Boone, Campbell, Kenton and Pendleton counties in Kentucky, or in counties contiguous thereto, for a period of one (1) year.

99. When an Employer rents or leases equipment manned from an Employer in signed relations with this Union, the Engineer or Crew may be transferred to the payroll of the lessee, providing the referral office servicing the job or project shall be notified prior to such transfer and provided further that such employee's employment by the lessee shall terminate upon the termination of the lease or rental of the equipment or any replacement thereof whichever is later.

100. When an Employer hires an Owner Operator with one (1) machine and the Owner Operator himself operates such single machine, the Owner Operator will be placed on the Employer's payroll. In the event that the above mentioned machine requires two (2) employees, such employees shall be placed on the Employer's payroll. However, when the Owner Operator has two (2) or more machines operating on the same job, he/she shall then be considered a sub-contractor and therefore come under the sub-contractors clause.

## ARTICLE IX

### TERM OF AGREEMENT

101. The Union will notify the Association which is signatory to this Agreement of the name and address of any contractor who becomes signatory to or bound by this Agreement during the term of this Agreement. The notice shall be given in writing within seven (7) days of the time any such contractor becomes signatory or bound hereto. The notice shall include a copy of the signature page of the contract or the assent card and, if not noted thereon, a statement of the date the contract or assent card was signed or the date the contractor became bound.

41

SOFCO002283

**102.** Within seven (7) days of the receipt of a notice from the Union of its intent to terminate or modify this Agreement, the Association will notify all such contractors of whom the Association has been notified by the Union. Each such contractor shall have thirty (30) days from the date the Association received the notice of intent to terminate or modify to advise the Union in writing of its intent to negotiate separately for a renewal agreement.

**103.** In the event any such contractor fails to advise the Union of its intent to negotiate separately within the time period set forth above, such contractor shall be deemed and presumed to agree to the terms and Agreement arrived at in negotiations between the Union and the Association and to be bound by the collective bargaining agreement resulting therefrom.

**104.** The provisions of this section shall operate for successive collective bargaining agreements until such time as the Contractor or Union gives timely notice that said party desires to negotiate separately. Said notice shall be given within the time periods provided in the termination clause of this Agreement or any successive collective bargaining agreement.

**105.** The provisions of this Agreement shall continue in force and effect through April 30, 2013 and thereafter from year-to-year until termination at the option of either party, after sixty (60) days notice in writing to the other party.

## ARTICLE X

### APPRENTICES

**106.** In order to maintain sufficient skilled mechanics for the industry and, in order to present proper learning opportunities for youth and, in order to effectuate the principles and desires of the negotiating parties created by the foregoing, the negotiators hereby fully subscribe to the Ohio Operating Engineers Apprenticeship Fund Agreement and Declaration of Trust dated 20 October 65 as if they had originally negotiated the same. The only limitation upon the program is the Affirmative Action Program here attached (Exhibit "B"), in addition to the proper rules, regulations, processes, and procedures enunciated by the Joint Apprenticeship and Training Committee established by the Trust of 20 October 65.

42

**107.** It is understood by the negotiating parties that a Registered Apprentice Engineer works under the direction of the Operating Engineer and the Joint Apprenticeship and Training Committee, and that the Operating Engineer shall see that he/she stays on the job, properly caring for his/her machine. The Employer shall give sufficient opportunity for the Registered Apprentice to operate under the supervision of the Operating Engineer when time and opportunity avails itself. The Area Coordinator of Apprentices shall be appraised periodically and by his request of performance to further the Registered Apprentices' learning situation. Registered Apprentices shall receive the scale enunciated by the Joint Apprenticeship and Training Committee in the time justified category that the Registered Apprentice has accomplished. For every five (5) Operating Engineer Journeymen employed by the company, there may be employed one (1) Registered Apprentice or Trainee Engineer through the referral when they are available. An apprentice, while employed as part of a crew per Article VIII paragraph 77, will not be subject to the apprenticeship ratios in this collective bargaining agreement.

## ARTICLE XI

### CONSTRUCTION INDUSTRY ADVANCEMENT PROGRAM

**108.** The Employer and the Union agree to and approve the establishment of a Construction Industry Advancement Program to promote the common good of the Construction Industry by providing financial support for activities which may include but not necessarily be restricted to: (a) promotion of safety; (b) market development; (c) protection of legitimate markets; (d) public relations; (e) personnel practices and labor relations; (f) education; (g) industry relations; (h) apprenticeship training; (i) participation in Funds and Plans provided for in collective bargaining agreement, such as Health and Welfare Plans; and (j) collection and distribution of information from and to all segments of the Construction Industry and related groups or authorities.

**109.** Each Employer bound by this Agreement shall pay twenty cents ($.20) per hour worked effective May 1, 2010 to the AGC of Ohio Construction Industry Advancement Fund. Such funds shall be transmitted along with the Health and Welfare payments to the Ohio Operating Engineers Health and

43

SOFCO002284

Welfare Office located at 1180 Dublin Road, Columbus, Ohio 43215, no later than the fifteenth (15th) day of the month immediately following the calendar month.

A. Administrative Fee. In addition to the CIAP payment each Contractor bound by the Agreement who is not an AGC of Ohio member shall pay an administrative fee of ten cents ($0.10) per hour for each hour worked by employees of the Contractor who are working within the bargaining unit herein. Such payments shall be transmitted with the fringe payments provided herein or transmitted directly to the AGC of Ohio no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed.

B. The Union shall have no participation or control of any kind or degree whatsoever nor shall the Union be connected in any way whatsoever with the Construction Industry Advancement Fund.

C. The Employer will hold the Union harmless from any liabilities arising out of the terms of Paragraph 108 through and inclusive of Paragraph 109D.

110. AGC of Ohio shall be the exclusive Administrator of the State Fund. Payments to the program shall be in accordance with instructions on forms furnished by the Association.

111. The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the fifteenth (15th) day of each month covering amounts due for the preceding month. If an Employer shall fail to make their payment when the same shall be due and payable, he shall be subject to an additional charge of one and one half percent (1-1/2%) per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses and impairment of reserves. In addition to the additional charges referred to herein, an Employer who fails to make timely payments shall be liable for legal fees and court costs incurred by the Association in collecting late payments.

112. Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and Fund of the Construction Industry

44

Advancement Program shall not be distributed among any Employers, or the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

113. There is specifically excluded from the purposes of the Construction Industry Advancement Program the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during periods of work stoppages or strikes.

## ARTICLE XII

### UNION ADMINISTRATIVE DUES AND DEDUCTIONS

114A. Upon notification by the Union that a uniform administrative dues deduction has been authorized by all employees of the Employer, the Employer shall deduct said uniform administrative dues. The Union shall be responsible for obtaining all individually signed authorizations.

114B. The employer will deduct five cents ($0.05) for each hour that the employee receives wages under the terms of the Agreement on the basis of individually signed voluntary authorized deduction forms. It is agreed that these authorized deductions are for remittance to Local 18's Political Education Patterns known as P.E.P., and are not a condition of membership in the International Union of Operating Engineers, Local 18 or of employment with the Employer, and that P.E.P. will use such monies in making political contributions in connection with federal, state and local elections. Payments for P.E.P. reflecting employee hours worked shall be made on the monthly fringe benefit reporting forms and shall be remitted at the same time and in the same manner as the Employer submits the fringe benefit payments under Article V of this Agreement.

The costs of administering this payroll deduction for P.E.P. are incorporated into the economic package provided under the terms of this Agreement so that the I.U.O.E. has, through its negotiation and its execution of this Agreement, reimbursed the Employer for the costs of such administration.

115. Credit Union savings will be agreed to only if deductions are the same for all employees and the Union is responsible for obtaining the voluntary authorization.

45

**116.** The Union agrees to indemnify and save the Employer harmless against any and all claims, suits or other forms of liability arising out of said deductions.

## ARTICLE XIII

### ENFORCEMENT MEASURES

**117.** It is agreed that all subcontractors shall be subject to the terms and provisions of this Agreement as it relates to the Operating Engineers.

**118.** The Union shall require that no Union person shall leave a job by quitting unless he/she has been properly relieved after giving ample notice of his/her intention to quit to the Employer.

**119.** The Union shall not transfer a Union person from one Employer to another without the consent of the Employer and the Union person involved. Neither shall the Employer transfer a Union person from his/her employ to another Employer's payroll without the consent of the Union person involved and the Union.

**120.** All employees of the Employer shall be allowed time to vote on Election Day as required by law on employees own time.

**121.** If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to the Employer.

**122.** There are areas within the scope of this Agreement for which the wages and conditions contained herein may not be appropriate due to competition or other reasons. In such cases, adjustments will be made in accordance with principles agreed to by the parties during negotiations.

**123.** No employee covered hereby may be discharged by an Individual Employer for refusing to cross a legal primary picket line established by an International Union affiliated with the Building and Construction Trades Department of the AFL-CIO or a Local Union thereof or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Local Union thereof, which picket line has been

46

authorized and sanctioned by proper authorities. No jurisdictional or illegal informational picket line shall be recognized.

## ARTICLE XIV

### NO STRIKE-NO LOCKOUT-ARBITRATION AND DISPUTES

**124.** The Employer shall not cause, permit or engage in any lockout of its employees during the term of this Agreement.

The Union shall not authorize, cause, engage in or sanction, nor will any employee take part in any illegal slowdown, work stoppage, strike, picketing or other concerted interference against the Employer, or occurring at or around the Employer's office or work locations during the term of this Agreement.

**125.** Should a dispute arise between any of the parties, (Employee, Employer, Association and/or Union) to this Agreement as to its meaning, intent or the application of its terms, this dispute will be settled in accordance with the following grievance procedure:

**STEP 1:** The aggrieved employee shall first take up his/her grievance orally with the Employer's Supervisor or Representative. The employee may, if he/she so desires, have his/her Steward appear with him/her. The grievance shall be orally brought to the Employer's attention within three (3) working days of the occurrence or discovery of the grievance, but in no event will the grievance be honored by management later than fifteen (15) days past the incident giving rise to the complaint. A grievance not submitted within the time limit shall be deemed untimely and is waived.

**STEP 2:** In the event the grievance is not settled, the employee then shall put his/her grievance in writing within three (3) working days after STEP 1 meeting, dated and signed along with the contract Article effected and submit the grievance to the District Business Representative and he/she and the Business Representative shall meet with the Employer's Representative and attempt to settle the matter. If no settlement can be reached within ten (10) working days from the date of the written grievance, then

**STEP 2a:** The grievance may be considered by a designated representative of the Union and the Labor Relations Director of the Associated General Contractors of Ohio, who

47

shall have the authority to mutually agree upon a final and binding settlement of the grievance. If Step 2a. is not utilized, or if no settlement can be reached in Step 2a. within five (5) days from the date the grievance is referred, then:

**STEP 3:** The grievance may be referred to the State Joint Committee consisting of six (6) members, three (3) to be appointed by the Labor Relations Division of the AGC of Ohio and three (3) to be appointed by Local 18 of the International Union of Operating Engineers, by majority vote (5 members or more), resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this agreement. In case of failure of either party to appear at the hearing of a grievance properly filed for hearing, the parties in attendance shall offer evidence in support of their position and the Committee shall dispose of the case on the basis of such evidence. If no settlement is reached at this STEP within fifteen (15) working days from the date the grievance is referred, then

**STEP 4:** The grievance shall then be referred to an Arbitrator selected by the Committee referred to in STEP 3. If the parties cannot agree on an Arbitrator within forty-eight (48) hours after the parties agree to submit the matter to arbitration, the parties shall jointly request the Federal Mediation and Conciliation Service to furnish a list of Arbitrators from which the Arbitrator shall be selected by the alternate striking of names.

**126.** The expenses and fees of the Arbitrator shall be shared equally by the parties. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms and provisions of this Agreement. The Arbitrator's decision shall be final and binding upon the parties hereto.

## ARTICLE XV

### DETERMINATION OF JURISDICTIONAL DISPUTES

**127.** Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement creating the Impartial Jurisdictional Disputes Board. In particular, both parties agree to be bound by the provision of the Agreement which states: Any decision or interpretation of the Impartial Jurisdictional Disputes Board shall immediately be accepted and complied with by all parties signatory to this Agreement.

The parties hereto agree that in the event of a jurisdictional dispute with any other Union or Unions, the dispute shall be submitted to the Impartial Jurisdictional Disputes Board for settlement in accord with the Plan adopted by the Building Trades Department, AFL-CIO.

The parties hereto further agree that they will be bound by any decision or award of the Disputes Board. There shall be no stoppage of work or slowdown arising out of any such dispute. No jurisdictional work stoppages, and no jurisdictional picket lines shall be recognized.

This article of the contract will go into effect when the National A.G.C. reaffiliates with the Impartial Jurisdictional Disputes Board.

## ARTICLE XVI

### I-9

**128.** The Union and the Employers during the term of this Agreement agree to use their best efforts to establish a master file of I-9 employment eligibility verification forms on all members. This file will be maintained at the Union office and be available for the Employers' use.

## ARTICLE XVII

### SAVINGS AND SEPARABILITY

**129.** It is mutually agreed that if any clause, terms or provisions of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other board or agency having jurisdiction in the matter, such clause, terms or provisions shall be or become inoperative of any effect without disturbing the other clauses, terms or provisions of this Agreement and the remaining part of this Agreement shall remain in full force and effect. In the event that any clause, terms or provisions of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other board or agency having jurisdiction in the matter, said clause, terms or provisions shall be re-negotiated to the mutual satisfaction of the parties, but during such re-negotiation work shall not be interrupted or stopped by lockout, strikes, boycotts or other labor troubles.

SOFCO002287

# ARTICLE XVIII

## EFFECTIVE

130. This Agreement shall be effective May 1, 2010 and shall remain in force and in accordance with the terms of Article IX hereof. Wage rates and fringe payments shall be effective as designated by this Agreement.

131. IN WITNESS WHEREOF, WE, the undersigned duly authorized Employer Representatives and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO) executed this Agreement on the 1st day of May, 2010.

### I.U.O.E. LOCAL 18 AND ITS BRANCHES

S/PATRICK L. SINK
Business Manager

S/PREMO P. PANZARELLO
Financial Secretary

S/RICHARD E. DALTON
President

S/JOSEPH S. LUCAS
Treasurer

S/STEVE D. DELONG
Vice President

Trustees

S/MARK A. TOTMAN
Recording-Corresponding
Secretary

S/TIMOTHY D. HAMMOCK
S/GARY G. SIESEL
S/SCOTT R. STEVENSON

### AGC OF OHIO LABOR RELATIONS DIVISION

S/RICHARD HOBBS
Executive Vice President

S/BILL BRENNAN
President, Construction Contractors Council, Toledo (AGC)

S/MIKE DYER
Goettle Construction Co.
Vice President, Operations

50

## EXHIBIT "A"
### WAGE RATES AND FRINGE CONTRIBUTIONS
ZONE I covering Summit and Portage counties:

Classification: MASTER MECHANIC

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $31.23* | $31.73* | $32.78* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

51

Classification: **GROUP A**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $30.98* | $31.48* | $32.53* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

52

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers

All Concrete pumps with booms
Cranes (all types)***
Cranes – Compact; track or rubber over 4,000 pounds capacity
Cranes – Self-erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines

Dredges (dipper, clam, suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms

53

Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib 150'-180' add $0.50 to Zone I Group A rate
***Boom & Jib over 180' through 249' add $1.00 to Zone I Group A rate
***Boom & Jib 250' and over add $1.25 to Zone I Group A rate

SOFCO002289

Classification: **GROUP B**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $30.88* | $31.38* | $32.43* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

54

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:
Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saw, vermeer-type
Endloaders
Horton Milling Machine

Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: **GROUP C**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $29.84* | $30.34* | $31.39* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

55

*If additional funds are required for fringe benefits, they may be diverted from wages.
** Voluntary

Operators of:
A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)

Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating Well Points or other types of Dewatering Systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

SOFCO002290

Classification: **GROUP D**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $28.62* | $29.12* | $30.17* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Backfillers & Tampers
Ballast Relocator
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps (without boom with 4" or
    smaller system)
Concrete Spreaders
Rollers, except asphalt rollers
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen

Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Tractors, pulling sheepfoot post roller or grader
VAC/ALLS
Vibratory compactors, with integral power
Welders

Classification: **GROUP E**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $23.33* | $23.83* | $24.88* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helper (Oiler)
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber (under 4,000
    pounds)
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches

Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

SOFCO002291

# EXHIBIT "A"
## WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE II** covering Lucas and Wood counties:

Classification: **MASTER MECHANIC**

|  | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
|  | $30.49* | $30.99* | $32.04* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Classification: **GROUP A**

|  | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
|  | $30.24* | $30.74* | $31.79* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators,
  when compressor or boiler is mounted on
  crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***
Cranes – Compact; track or rubber over 4000
  pounds capacity
Cranes – Self-Erecting; stationary, track or
  truck (all configurations)

Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building
  materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines

(Continued on next page)

SOFCO002292

Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)

Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib 150'-180' add $0.50 to Zone II Group A rate
***Boom & Jib over 180'-249' add $1.00 to Zone II Group A rate
***Boom & Jib 250' and over add $1.25 to Zone II Group A rate

Classification: **GROUP B**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $30.12* | $30.62* | $31.67* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saw Vermeer-type
Endloaders
Hydro Milling Machine

Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push cats
Rotomills (all), grinders and planers of all types

SOFCO002293

SOFCO0002294

Classification: **GROUP C**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $29.08* | $29.58* | $30.63* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

62

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or
    without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5"
    system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call
    button controlled)

Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well
    points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and
    aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: **GROUP D**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $27.90* | $28.40* | $29.45* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

63

Operators of:

Ballast Relocator
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side
    loaders)
All Concrete Pumps without booms with 4"
    system or smaller

Concrete Spreaders
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers

(Continued on next page)

SOFCO0002295

Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt rollers)
Self-propelled Power Spreaders
Self-propelled Sub-Graders

Shotcrete machines
Tire Repairmen
Tractors, pulling sheepfoot roller or grader
VAC/ALLS
Vibratory Compactors, with integral power
Welder

Classification: **GROUP E**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $22.44* | $22.94* | $23.99* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helper (Oiler)
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber over 4,000
   pounds capacity

Directional Drill "Locator"
Fueling & greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators

Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers

Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

# EXHIBIT A
## WAGE RATES AND FRINGE CONTRIBUTIONS

**ZONE III** covering Akron and counties, Cincinnati and counties, Columbus and counties, Dayton and counties, and Toledo and counties:

For AKRON and the following counties: Ashland, Belmont, Carroll, Coshocton, Guernsey, Harrison, Holmes, Jefferson, Monroe, Noble, Richland, Stark, Tuscarawas, Washington and Wayne.

For CINCINNATI and the following counties: Adams, Athens, Brown, Clermont, Gallia, Hamilton, Highland, Jackson, Lawrence, Meigs, Morgan, Ross, Scioto and Vinton. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

For COLUMBUS and the following counties: Crawford, Delaware, Fairfield, Franklin, Hocking, Knox, Licking, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Union and Wyandot.

For DAYTON and the following counties: Auglaize, Butler, Champaign, Clark, Clinton, Darke, Fayette, Greene, Logan, Madison, Mercer, Miami, Montgomery, Preble, Shelby and Warren.

For TOLEDO and the following counties: Allen, Defiance, Fulton, Hancock, Hardin, Henry, Ottawa, Paulding, Putnam, Sandusky, Seneca, Van Wert and Williams.

Classification: **MASTER MECHANIC**

|  | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
|  | $29.74* | $30.24* | $31.29* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

99

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Classification: **GROUP A**

|  | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
|  | $29.49* | $29.99* | $31.04* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

67

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers

Concrete Pumps with booms (all)
Cranes (all types)***
Cranes – Compact; track or rubber over 4000 pounds capacity
Cranes – Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines

*(Continued on next page)*

SOFCO002296

Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building
   materials
Helicopter Winch Operators, hoisting building
   materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or
   Welder)
Mixers, paving (multiple drum)

Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders
Rail Tampers (with automatic lifting and
   aligning device)
Rotary Drills (all), used on caissons for
   foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib 150'-180' add $0.50 to Zone III
   Group A rate
***Boom & Jib over 180' - 249' add $1.00 to
   Zone III Group A rate
***Boom & Jib 250' and over add $1.25 to Zone
   III Group A rate

Classification: **GROUP B**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $29.37* | $29.87* | $30.92* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour
   from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with
   hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders

Hydro Milling Machines
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

SOFCO002297

**Classification: GROUP C**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $28.33* | $28.83* | $29.88* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

70

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps without booms and with 5" system
Fork Lifts (except masonry)

Highway Drills - all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)

Pumps (4" and over discharge)
Railroad Tie Inserter/Remover)
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)

Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

**Classification: GROUP D**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| | $27.15* | $27.65* | $28.70* |
| Health & Welfare | 6.66 | 6.66 | 6.66 |
| Pension | 5.00 | 5.50 | 5.50 |
| Apprenticeship | .55 | .60 | .60 |
| E & S | .04 | .04 | .04 |
| AGC Contractor Dues | .20 | .20 | .20 |
| OCIA | .05 | .05 | .05 |
| Non-AGC Contractor Dues | .10 | .10 | .10 |
| PAC | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

71

Operators of:

Ballast Relocators
Backfillers and Tampers

Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats

(Continued on next page)

SOFCO002298

72

Burlap and Curing Machines
Cleiplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreading Machines
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen in asphalt plants
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers

Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder Operators

---

Classification: **GROUP E**

| | 5/1/2010 | 5/1/2011 | 5/1/2012 |
|---|---|---|---|
| Health & Welfare | $21.69* | $22.19* | $23.24* |
| Pension | 6.66 | 6.66 | 6.66 |
| Apprenticeship | 5.00 | 5.50 | 5.50 |
| E & S | .55 | .60 | .60 |
| AGC Contractor Dues | .04 | .04 | .04 |
| OCIA | .20 | .20 | .20 |
| Non-AGC Contractor Dues | .05 | .05 | .05 |
| PAC | .10 | .10 | .10 |
| | .05** | .05** | .05** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

73

Operators of:

Allen Screed Pavers (concrete)
Apprentice/Helpers (Oilers) and Signalmen
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber under 4,000 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches

Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Submersible Pumps (under 4" discharge)

SOFCO002299

## REGISTERED APPRENTICESHIP WAGE SCHEDULE
### ZONE I, ZONE II, ZONE III

| | |
|---|---|
| First Year Apprentice<br>50% of Class A | Third Year Apprentice<br>70% of Class A |
| Second Year Apprentice<br>60% of Class A | Fourth Year Apprentice<br>80% of Class A |

A new classification of Trainee is hereby established and the rates of pay are as follows:

| | |
|---|---|
| First Year Trainee<br>60% of Bulldozer Rate | Third Year Trainee<br>75% of Bulldozer Rate |
| Second Year Trainee<br>60% of Bulldozer Rate | Fourth Year Trainee<br>90% of Bulldozer Rate |

There will be a 10% increase for the apprentices on top of the percentages listed above provided they are operating mobile equipment.

The rates paid to the Apprentice or Trainee shall not exceed the classification rate the Apprentice or Trainee is working. For every five (5) Operating Engineer Journeymen employed, there may be employed one (1) Registered Apprentice Engineer or Trainee. Through the referral, Employers may employ Registered Apprentices or Trainees within this limitation when they are available. Any increase in the Apprenticeship contributions, agreed by the parties, will be shared equally by the Union and Employer.

## FIELD MECHANIC TRAINEE SCHEDULE

| | |
|---|---|
| First Year | 50% of Class "A" rate |
| Second Year | 60% of Class "A" rate |
| Third Year | 70% of Class "A" rate |
| Fourth Year | 80% of Class "A" rate |

Only those individuals who have obtained a two (2) year Associates Degree, from an accredited school, will be accepted into this program. If the Mechanic Trainee is required to have a CDL license, he/she will be paid a 10% incentive above the percentages listed above. After successful completion of the fourth year, the Mechanic will be paid at Class "A" rate.

74

## SPECIAL RATES

Any work under A, B and C as described in Article I of this Agreement awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## EXHIBIT "B"
### AFFIRMATIVE ACTION PROGRAM

1. Under the provisions of Executive Order 11246, issued by the President of the United States, and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations as revised, and relative court orders, a specific affirmative program must be developed to assure that the employment of workers and the treatment of employees during employment is completely nondiscriminatory in regard to race, creed, color, sex, age, religion or national origin.

2. The parties to this Agreement are mutually desirous of developing an affirmative action agreement to implement the provisions of applicable federal regulations in order to assure nondiscrimination in employment; upgrading; demotion or transfer; recruitment and recruitment advertising; lay-off or termination; rate of pay and selection for all types of training.

3. In order to assure nondiscrimination now and in the future and in an effort to attract a maximum number of potential apprentices from minority and female groups, the parties to this Agreement have formulated the following Affirmative Action Program:

### A. APPRENTICESHIP

The parties agree to establish a positive program of apprenticeship selection and to use the following program to attract minority and female groups to the Operating Engineers' Apprenticeship Program:

1. Develop a "fact sheet" for distribution to all secondary school counselors, youth opportunity centers, social action agencies and state employment offices.

75

SOFCO002300

2. Make available speakers to inform and advise high school students and others of opportunities in apprenticeship for Operating Engineers.

3. Notify all interested agencies and parties thirty (30) days prior to the period for taking applications; and making such interested agency or parties aware of the nature of all tests in order to facilitate a proper pre-test educational effort.

4. Provide application forms for apprenticeship and adequate instruction for properly preparing same, upon request, during recruitment periods at all training sites of the Operating Engineers Apprenticeship Program at certain union halls of Local 18. Develop an outreach program for the recruiting and pre-apprentice training of individuals from minority and female groups to enable them to enter the apprenticeship program.

5. To use a standardized, uniform battery of tests to determine applicant proficiency and aptitudes in reading, computation and mechanical skills suitable for the craft of Operating Engineer.

6. May have the test administered by an agency other than the Ohio Operating Engineers Apprenticeship Program and uniformly and numerically graded.

7. Interview sufficient applicants personally by teams consisting of one (1) representative of Management and one (1) of the Union who shall independently grade each applicant individually and then average the scores.

8. When an applicant fails to achieve acceptance, the Joint Apprenticeship and Training Committee shall make every effort to inform the applicant and the referring or cooperating agency of the area of insufficiency.

9. In order for the applicant, after acceptance as an Operating Engineer Apprentice, to become immediately employable by a Participating Employer, the Joint Apprenticeship and Training Committee shall provide training sites with equipment of the nature for which the apprentice will be employed, in order to acquaint the apprentice with safety measures as well as the operation and maintenance of the same and teach him/her the use of the machine as a tool of the trade and to generate good work habits. After the training, he/she shall be employed as an "apprentice-in-training" as such openings occur.

10. The parties to this Agreement agree to jointly assist a minority group employee to be integrated into the work force and the Union by:

A. Having management supervision on the job make every effort to assist and encourage minority group apprentices and to welcome such individuals to the job;

B. Have each apprentice and pre-apprentice trainee assigned to a Journeyperson Operating Engineer for help and assistance, and

C. Have Union officers inform the membership of the importance of making welcome all minority groups into the Union, and

D. The education, training requirements and disciplines of Registered apprentices shall be governed by the Joint Apprenticeship and Training Committee and its standards.

### B. JOURNEY PERSONS

1. The parties will undertake a joint training program to assure equal opportunity to all journey persons who desire to acquire the skills required to work on a variety of equipment within the jurisdiction of the Operating Engineers.

2. Local Union officials will notify minority and female members of this program. They will offer to minority and female members an opportunity for training on any highway equipment. If the parties determine that a minority or female group member lacks adequate pre-training qualifications, the reasons for such determination shall be noted in writing and shall be available for inspection during a review of this program by appropriate federal contracting or administering agency officials. An attempt shall be made to have availability of training according to the demands for craftsmen to operate the specific type of equipment involved.

3. Each member of the Local will be advised of this Agreement and the appropriate avenues for redress if any of its terms are breached by either party.

The parties undertake this Affirmative Action Program in accordance with Executive Order 11246 and applicable court orders. It is their understanding that participation in the program by any contractor shall be accepted in lieu of that portion

76

77

SOFCO002301

of a required affirmative action plan which would otherwise be directed to jobs manned by members of the Operating Engineers Union.

The parties shall from the date of this Agreement, when required, report to the appropriate federal contracting or administering agency. The report will specifically indicate the total number of minority group individuals or females in the Union. In evaluating these reports, the appropriate federal contracting or administering agency officials will have complete access to relevant records of the parties and will be expected to discuss the progress of the program freely with the parties and Union members.

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____

Name of Employer (Printed)

_____

Employer Address

_____

City                 State              Zip Code

_____

Area Code & Telephone

_____

Authorized Employer Representative (Signature) Date

_____

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____

Union Representative (Signature)

**CONTRACTORS COPY**          (ORIGINAL SIGNATURE)

78

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City                State              Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature)    (Date)

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES (AFL-CIO)

Union Representative (Signature)

**HEADQUARTERS COPY**    (ORIGINAL SIGNATURE)

*For Headquarters Use Only*    CODE _____

SOFCO002303

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

| City | State | Zip Code |

Area Code & Telephone

Authorized Employer Representative (Signature)      (Date)

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES (AFL-CIO)

Union Representative (Signature)

**UNION DISTRICT COPY**      (ORIGINAL SIGNATURE)

*For Headquarters Use Only*      CODE _____

SOFCO002304

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

Name of Employer (Printed)

Employer Address

City      State      Zip Code

Area Code & Telephone

Authorized Employer Representative (Signature)    (Date)

Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES (AFL-CIO)

Union Representative (Signature)

**FRINGE OFFICE COPY**    (ORIGINAL SIGNATURE)

*For Headquarters Use Only*    CODE _____

SOFCO002305

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____
Name of Employer (Printed)

_____
Employer Address

_____
City                    State                    Zip Code

_____
Area Code & Telephone

_____
Authorized Employer Representative (Signature) Date

_____
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____
Union Representative (Signature)

**ASSOCIATION COPY**          (ORIGINAL SIGNATURE)

SOFCO002306



SOFCO002307



# AGC OF OHIO BUILDING AGREEMENT

Effective
May 8, 2013 through April 30, 2017

Between

THE INTERNATIONAL UNION OF
OPERATING ENGINEERS
LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

AND

LABOR RELATIONS DIVISION
OF THE
AGC OF OHIO



Fund
EXHIBIT C
Date: 10.26.2018

**EMPLOYERS**

**LABOR RELATIONS DIVISION
AGC OF OHIO**

1755 Northwest Boulevard
Columbus, Ohio 43212
(614) 486-6446
FAX: (614) 486-6498
www.agcohio.com

**Richard Hobbs
Executive Vice President**

SOFCO002309

# INDEX

| | Paragraph |
|---|---|
| Affirmative Action Program | Exhibit B |
| Apprentice/Helper (Oiler), Boiler Operators, Signalmen Provisions | 77-80 |
| Apprentices | 106-107 |
| Arbitration | 125-126 |
| Bonding | 47 |
| Construction Advancement Program | 108-113 |
| Credit Union | 115 |
| Crews and General Provisions | 77-100 |
| Date Signed and Signatures | 131 |
| Dewatering | 13 |
| Direct Deposit | 63H |
| Discharges | 19 or 25 |
| Divert Wage Increase | 43 |
| Drug Testing | 30 |
| Duration of Agreement | 105 |
| Effective Date of Agreement | 130-131 |
| Employees' Relief | 91 |
| Enforcement Measures | 117-123 |
| Equipment Rental | 99 |
| Escalator Clause and Complementing | 69 |
| Field Mechanic Trainee Wage | Schedule A |
| Four Ten Work Schedule | 63 A-G |
| Fringe Benefit Programs | 41-47 |
| Grievance Procedure | 125-126 |
| Harassment Policy | 31 |
| Hazardous Waste Projects | 15,29 |
| Heaters-Pumps-Boilers-24 hour, 7 day | 68 |
| Holidays | 67 |
| Hourly First-Day Pay | 84 |
| Hourly Pay | 53 or 56 |
| I-9 | 128 |
| Incentive Pay | |
| Underground, Height and Length Booms | 70-76 |
| Jurisdiction-Work | 10-12 |
| Jurisdictional Area | 1-2 |
| Jurisdictional Disputes | 127 |
| Lay-Off | 25,55,60,89 |
| Liabilities | 5 |
| Management Rights | 7 |
| Master Mechanic, Zones 1, 2 & 3 | 87-88 |
| New Unclassified Equipment | 50 |
| Nondiscrimination | 8-9 |

I

# INDEX (continued)

| | Paragraph |
|---|---|
| Overtime | 62-64 |
| Owner-Operator | 100 |
| PAC / PEP | 114B |
| Pay Checks | 90 |
| Pay Day | 89 |
| Picket Lines | 123 |
| Piggyback Operation | 86 |
| Pre-Job Conference | 15-16 |
| Provisions and Limitations | 6 |
| Recognition | 4 |
| Referral Policy | |
| (Hiring Procedures) | 32-40 |
| Registered Apprentice Wage Schedule | Exhibit A |
| Repairs | 93 |
| Reporting Pay | 59 |
| Safety Program | 26-29 |
| Savings and Separability | 129 |
| Scope of Agreement | 3 |
| Shifts | 81 |
| Site Clearance | 63 |
| Starting Time | 62 |
| Steward | 24-25 |
| Strikes | 124 |
| Sub-Contractors | 117 |
| Supervisory Employees | 97 |
| Termination Slips | 96 |
| Trainee Wage Schedule | Exhibit A |
| Transfer of Union Employees | 119 |
| Transfers on Job Equipment | 21-22 |
| Union Administrative Dues and Deductions | 114-116 |
| Union Shop | 17-18 |
| Wage Rates | Exhibit A |
| Weekly Pay | 52 or 54-55 |
| Work Week | 61 |

| | Page |
|---|---|
| Term of Agreement | 49 |
| Exhibit A, Wage Rates and Fringe Benefits | 51-87 |
| Exhibit B, Affirmative Action Program | 87-90 |
| Acceptance of Agreement | 91-99 |

II

## DIRECTORY

### OFFICERS

Local 18 and its Branches
Headquarters Office
3515 Prospect Avenue
Cleveland, Ohio 44115
216-432-3138
FAX: 216-432-0370
www.iuoelocal18.org

Patrick L. Sink
Business Manager

Richard E. Dalton
President

Mark A. Totman
Vice President

Gary G. Siesel
Recording-Corresponding Secretary

Premo P. Panzarello
Financial Secretary

Joseph S. Lucas
Treasurer

III

## DISTRICT NO. 1

Covering the following counties in Ohio:

| Ashtabula | Erie | Huron | Lorain |
|-----------|--------|-------|--------|
| Cuyahoga | Geauga | Lake | Medina |

District Staff
Donald Taggart

David Russell           Jack Klopman II
Tom Perevcsnik

3515 Prospect Avenue, Cleveland, Ohio 44115
Office: 216-432-3131
Fax: 216-432-3135

## DISTRICT NO. 2

Covering the following counties in Ohio:

| Allen | Hardin | Paulding | Van Wert |
|----------|--------|----------|----------|
| Defiance | Henry | Putnam | Williams |
| Fulton | Lucas | Sandusky | Wood |
| Hancock | Ottawa | Seneca | |

District Staff
Gary Siesel

Douglas Leidy          Kipton Siesel
Brett LaFaso

2412 South Reynolds Road, Toledo, Ohio 43614
Office: 419-865-0221
Fax: 419-865-0601

IV

## DISTRICT NO. 3

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Athens | Hocking | Meigs | Pike |
| Crawford | Jackson | Morgan | Ross |
| Delaware | Knox | Morrow | Scioto |
| Fairfield | Lawrence | Muskingum | Vinton |
| Franklin | Licking | Perry | Union |
| Gallia | Marion | Pickaway | Wyandot |

District Staff
Timothy Hammock

John Branstool                                     David Hurd
Chad Creeks                                        Matthew Woods
Mark Totman; Legislative Representative

1188 Dublin Road, Columbus, Ohio 43215
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 4/5

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Adams | Clermont | Highland | Preble |
| Auglaize | Clinton | Logan | Shelby |
| Brown | Darke | Madison | Warren |
| Butler | Fayette | Mercer | |
| Champaign | Greene | Miami | |
| Clark | Hamilton | Montgomery | |

Covering the following counties in Kentucky:

| | | | |
|---|---|---|---|
| Boone | Campbell | Kenton | Pendleton |

District Staff
Gary Marsh

Kenneth Waughtal                              Jefferson Powell
Stanley Brubaker                               Nathaniel Brice
Joe Daniels

8401 Claude Thomas Road, Suite 21-A, Franklin, Ohio 45005
Office: 937-806-0406
FAX: 937-806-0408

V

## DISTRICT NO. 6

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashland | Harrison | Nobel | Summit |
| Belmont | Holmes | Portage | Tuscarawas |
| Carroll | Jefferson | Richland | Washington |
| Coshocton | Monroe | Stark | Wayne |
| Guernsey | | | |

District Staff
Joseph Lucas

Darrin Morgan                                    Doug Pallaye
Joe Casto                                          Brad Marshall

1707 Triplett Boulevard, Akron, Ohio 44306
Office: 330-784-5461
FAX: 330-784-8827

## LOCAL 18S
## STATIONARY ENGINEERS

Staff
Scott Peters
Doug Pallaye
John Hardesty

3515 Prospect Avenue
Room 206
Cleveland, Ohio 44115
Office: 216-432-2668
FAX: 216-432-0796

VI

SOFCO002312

## AGREEMENT

### Between

### The AGC OF OHIO
### Labor Relations Division

### which may be referred to hereinafter
### as the "Association"

### and

### THE INTERNATIONAL UNION
### OF OPERATING ENGINEERS
### LOCAL 18 AND ITS BRANCHES, (AFL-CIO)
### referred to hereinafter as the "Union"

This Agreement is negotiated by and between the Association and the Union within the geographical area as defined herein through their authorized agents, to wit:

That, whereas, the parties desire to stabilize employment and promote efficiency in the Construction Industry, agree upon wage rates, hours and conditions of employment, and to eliminate strikes, boycotts, lockouts and stoppages of work, and

Whereas, the Union and the Employer shall, through the issuance of working rules and regulations to the workmen, inform them of the terms of this Agreement and enforce compliance with the terms thereof, and

Whereas, the Employers agree to recognize and subscribe to the approved referral system as adopted by the International Union of Operating Engineers, Local 18.

Now, therefore, the undersigned Association and the Union agree as follows:

VII

1

# ARTICLE I

## GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Geauga, Lake, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

## SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

2

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

# ARTICLE II

## RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**—The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**—This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

3

SOFCO002314

# ARTICLE I

## GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Geauga, Lake, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

## SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to, the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

2

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

# ARTICLE II

## RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**—The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**—This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

3

**6. Provisions and Limitations**–All members of the AGC of Ohio Labor Relations Division, and such other persons, firms or corporations who, as an Employer, become signatory to this Agreement, shall be bound by all of its terms and conditions, as well as any amendments which may be negotiated between the AGC of Ohio Labor Relations Division, and the Union. It is expressly understood that all Employers bound to the terms and conditions of this Agreement are required to pay the amounts as indicated in Article IV to the appropriate Fringe Benefit Programs.

**7. Management Rights**–The operation of the job and the direction of the working forces, including the right to hire, suspend and discharge for proper cause, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer.

**8. Nondiscrimination**–It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio and the Commonwealth of Kentucky and Lawful Orders thereof relative to nondiscrimination and fair employment practices. The Employer and the Union shall not knowingly discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or Apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

**9.** Further, the Employer and Union agree to adopt and embrace the Pact of 10 July 68 executed under provisions of the Executive Order 11246 and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations revised; an Affirmative Action Program to implement all provisions of applicable federal regulations to assure nondiscrimination in employment, upgrade, demotion or transfer, and recruitment advertising, layoff or termination, rates of pay and selection for all types of training as evidenced in Exhibit "B" attached hereto as if they had originally negotiated the same.

**10. Jurisdiction of Work**–In accordance with the terms of this Agreement, the Employer shall employ Operating Engineers for the erection, operation, assembly and disassembly, and maintenance and repair (fueling and greasing) of the following construction equipment regardless of motive power: Air Compressors, Batch Plants, Boilers, Cableways, Derricks,

Finishing Machines, Pumps, Trucks, Crawlers, Locomotive and Tower Cranes; Concrete Mixers and Concrete Mixing Plants, Hoes, Shovels, Pile Drivers, Tractors, Scrapers, Endloaders, Hoists and all like equipment, including the use of Geodimeter or any other device that electronically measures (shoots) distance shall be the work of the Operating Engineers (only applies to in-house crew) within the jurisdiction as assigned to the Union by the American Federation of Labor. It is further understood that all equipment for which classifications and wages have been established in this Agreement, and including that equipment for which classifications and wage rates may hereafter be established, shall be manned, when operated on the job site, by a member of the International Union of Operating Engineers, and paid the rates as specified in this Agreement.

**11.** Operating Engineers shall be employed to do all pipe fitting and all burning and welding necessary for the preparation and maintaining of equipment operated by members of the Union.

**12.** Operating Engineers shall be assigned to all work performed in connection with the installation, fueling, starting and stopping, repair, maintenance and operation of the below listed small equipment: Compressors of 185 CFM or less (not discharging into a common header)

    Heaters
    Welding machines of 300 amp or less
    Gas or diesel driven pumps 4" and under (or one 6" pump)
    Generators of 15 KW or less
    Conveyors 18" belt or less

A combination up to five (5) pieces of the above equipment shall, when in use, be serviced as an additional duty by an Operating Engineer who is employed by an Employer on a project. When six (6) pieces of the above equipment are in use on an Employer's project, a Utility Operator will be employed at the Class "C" rate. The Utility Operator shall also perform other work on the project.

In the event there are no Operating Engineers employed by the Employer on the project, the Employer shall employ an Operating Engineer at the Class "E" rate to service any small equipment in use, until the Class "C" rate becomes in effect.

An Operating Engineer shall be assigned to all work performed in connection with the installation, maintenance, repair and starting and stopping of electric submersible pumps. Neces-

4

5

sary work on electric submersible pumps shall be assigned to an Operating Engineer working on the project as an additional duty; no full-time Operator is required.

Work in the servicing and maintaining of self-contained, mobile light plants shall be assigned to an Operating Engineer as an additional duty to his/her regular job. Such work shall normally be assigned to a Mechanic, Grease Crew or Apprentice/Helper (Oiler). Equipment operator employees shall be required to carry sufficient tools to make minor adjustments on the equipment they operate.

When an Apprentice/Helper (Oiler) is assigned as the primary operator to a fuel/grease combo vehicle which requires specialized CDL endorsement, he/she will receive a $3.00 per hour premium over the Class "E" rate.

**13. Dewatering Systems**–A "Dewatering System" is defined as a combination of one or more pumps of any type, size or motive power with combined discharge capacity of over 4", including but not limited to, well-point pumps, submersible well pumps, ejector or educator pumps in combination with wells, well-points, sumps, piping and/or other appurtenances irrespective of motive power to control water on any and all types of construction work. The complete installation, operation and necessary maintenance work, including all piping, shall be performed by Operating Engineers. A Dewatering System shall be operated by Pump Operators at all times the Dewatering System is in operation unless otherwise agreed at the Pre-Job Conference or with the Union.

**14.** The Union will at all times, when requested by the Employer, use its best efforts to furnish the Employer with competent employees to operate, maintain and repair equipment in accordance with the terms and conditions of this Agreement.

**15. Pre-Job**–It is agreed that upon the request of either party a Pre-Job Conference shall be held prior to commencing work. In case of a necessary emergency start of the construction job, the Pre-Job Conference shall be held as soon as possible after the start of work. It is further agreed that upon the awarding of any building contract of $500,000.00 and over, the successful contractor will immediately notify the Union when it has been awarded the contract. It is further agreed the Union may request, receive and hold a Pre-Job Conference with the Employer on an individual basis.

6

Before the start of any project containing known hazardous waste materials, there will be a Pre-Job held. The Employer must notify the Union five (5) days prior to starting work on the project. Failure to do so, the Union has the right to withhold its services until such time a Pre-Job is held.

**16.** Following are the items which will be discussed at the Pre-Job Conference:

A. The Employer will advise the Union Representative of the Employer's requirements of necessary employees in the classification of work under this Agreement, and the Union will determine and advise the Employer of the ability of the Union to fulfill such requirements when requested.

B. Work schedules.

C. Questions of jurisdiction and assignment of work.

D. The Employer agrees that whenever possible at such Pre-Job Conference they will notify the Union of any subcontracts let by the Employer, the names of the subcontractors, and the nature of the work to be performed by the subcontractors. The Union may request a subcontractor to meet with the Union and the subcontractor will meet with the Union prior to commencing work on a project if the subcontractor did not attend the original Pre-Job Conference for the project. It is understood and agreed that no agreement may be made at the Pre-Job Conference which will in effect change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

**17.** Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Local Unions above stated on the effective date of this sub-section shall remain members of the Local Unions in good standing as a condition of employment.

**18.** All present employees who are not members of the Local Unions and all employees who are hired hereafter shall become and remain members in good standing of any one of said Locals as a condition of employment on and after the eighth (8th) day following the effective date of this sub-section or following the beginning of their employment, whichever is later.

**19.** The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory or who fails to observe

7

SOFCO002317

the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of any employee under the terms of this Agreement. Any grievance arising through application of this clause shall be adjusted in accordance with the procedures outlined in Article XIV, Paragraphs 124, 125 and 126 of this Agreement. Intoxication and/or assault committed on the job site shall be cause for immediate discharge.

**20.** The Union shall place no limitation upon the amount of work which an employee shall perform during the working day and there shall be no restriction imposed against the use of any type of machinery, tools or labor-saving devices. The Employer agrees that the work jurisdiction of the Operating Engineers, as assigned by the AFL-CIO, will be respected and all Operating Engineer work will be performed by an Operating Engineer, and it is the intent of both parties that Operating Engineers will be assigned work on the basis that will make each job as productive and efficient as possible. It is agreed that a fair day's work shall be given for a fair day's pay.

**21.** The Employer may shift during a work day an Operating Engineer from one piece of hourly rate of pay equipment to another hourly rate of pay piece of equipment without limitation from same job site providing the shifting does not interfere with another Operating Engineer's work day. This condition also pertains to weekly-pay equipment. However, there shall not be any intermixing with weekly-pay equipment to hourly-pay equipment. The Operating Engineer will be paid the highest rate for the day.

The District agent in each district, in order to maintain our jurisdiction, will make jobs as efficient and productive as possible.

**22.** If an Employer violates Paragraph 20, the Employer's penalty shall be to pay the first qualified registered applicant the applicable wage and fringe benefits from the first day of violation.

**23.** The authorized representative of the Union shall have access to the job during working hours for the purpose of visiting individual members, adjusting grievances or disputes and such other duties as he may have to perform. The representative will report to the job supervisor before visiting the project.

8

## STEWARD

**24.** The Union may, when it believes it necessary, appoint a Steward whenever possible from Operating Engineers working on the Employer's job and the Union District Representative will, when making such an appointment, notify the Employer. The Steward shall perform full-time work for the Employer and he/she shall be subject to the same rules, rights and working conditions as other employees. Under no circumstances shall the Steward have any authority to call a strike, slowdown of work or perform any other action which would be in violation of this Agreement.

**25.** The Employer agrees that each new employee shall report to the job Steward before starting work if a Steward has been appointed for that particular Employer's job. The Steward shall be allowed sufficient time during working hours to perform all normal duties required of a Steward. No Steward shall have job priority but will be laid off in the same manner as any other Operating Engineer upon completion of his/her particular job assignment; twenty-four (24) hour notice to the Union prior to his/her lay off is required to give the Union time to select another qualified Steward to replace the laid-off Steward, but this twenty-four (24) hour notice is not required when a Steward is discharged for cause by the Employer.

## SAFETY

**26.** The Union and the Employer will cooperate in the establishment of a safety program. At the Pre-Job Conference by mutual agreement, the wearing of safety hats may be made a condition of employment. All safety equipment required by the project owner or manager will be at no cost to the employee, except work shoes of any type. Both the Employer and employees shall comply with the applicable state safety codes and any other applicable government or civil regulations pertaining to safety. It is expressly understood that if the employees' immediate health and safety are involved, the Union through its representative may order discontinuation of operations until satisfactory results are obtained.

## TRAINING

**27.** The Safety Training Passport (STP) 16-hour program will be made available to all union members by the Union at no cost to the Employer. The program will consist of:

9

SOFCO002318

Safety Awareness as required by
OSHA 29CFR 1926.21

Fall Protection as required by
OSHA 29CFR 1926.503

Hazard Communication as required by
OSHA 29CFR 1926.59

Operating Engineers dispatched to a project to perform trench excavation work will be required to have successfully completed eight (8) hours of trench safety training. This program became effective May 1, 2007.

It is agreed that both the Employer and the Union will encourage and assist in the promotion of this training.

Effective May 1, 2011 and thereafter, all Operating Engineers dispatched to and/or employed on a project are required to have successfully completed the 16-hour Safety Training Passport (STP) Program or an OSHA-approved 10-hour construction safety training program. Comparable safety training shall be renewed and updated every five (5) years or the Operating Engineer shall be considered unqualified. Verification of valid, updated training must be presented to the Employer upon dispatch, hire or request. Employers who provide such safety training shall not be required to pay employees to attend the training.

28. Within forty-eight (48) hours after an industrial accident occurs, the company shall have all necessary State Workers' Compensation forms available and completed on the Employer's part. A copy of the completed forms shall be sent to the Union's office in the district where the accident occurred.

29. All toxic/hazardous projects will be subject to any and all safety regulations and insurance provisions that may be required by the appropriate governmental agencies. When dangerous atmospheres are present so that an Operator is required to don a special protective suit and/or self-contained breathing apparatus at a private, state, federal or other designated toxic/hazardous waste site, the Employer will notify the Union district office. Reasonable dress-up time and clean-up time will be allowed. The first qualified bargaining unit employee on the job will be designated the steward-safety person, who shall have access to company monitoring records and be kept informed of amounts of contaminants on the job site. A sheltered "safe zone" area shall be provided. There shall be wash-up facilities on all

10

toxic/hazardous waste sites. When hazmat training credentials are required, the Operator will receive a $.50 per hour premium added to his/her base rate.

On such projects, it is expressly understood that if the employees' immediate health and safety are in danger, the employee may discontinue operations, without penalty, until satisfactory results are obtained, or until such time as a recognized safety agent shall declare the equipment or operation to be safe. All Operating Engineers employees shall be advised by the Employer prior to employment as to the nature of the known hazardous waste and possible resultant physical injuries as may be required by applicable law.

30. DRUG TESTING: The Employer and the Union are committed to a policy that promotes safety in the work place, employee health, and well being. In consideration of this policy, the Union and Employer agree that any employee found to be under the influence of, in possession of, or engaged in the distribution of drugs or alcohol on the job site shall be subject to disciplinary action, up to and including immediate discharge.

Within two (2) weeks of reporting to the job site, each new Operator may be scheduled for a drug test. Employees using a prescription drug which may impair mental or motor function shall inform their supervisor in writing of such drug use.

Employee involvement with drugs and alcohol can adversely affect job performance and employee morale. In the Construction Industry the consequences of drug or alcohol use or influence while on the job site can be disastrous. The Employer and Union, therefore, agree to the following policy to insure all employees of a safe and efficient job site free from the effects of drug and alcohol use or influence.

All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of illegal drug or alcohol use impairment while on the job site, may be required as a condition of continued employment to submit to a test for alcohol and/or illegal drug use which impairs the employee's ability to safely perform his/her duties on the job site. Such tests shall involve a sampling of the employee's blood, urine, or breath unless a specific type of test is required by the project owner, in which case such mandated test shall be ob-

11

SOFCO002319

served. Any employee who is asked to submit to such a test will be required to sign a consent form. If an employee who is asked to submit to a test refuses to do so, or refuses to sign the necessary consent form, that employee will be subject to disciplinary action up to and including discharge. Refusal to take a test or the submission of an adulterated sample shall be determined the same as a positive test result. The employee/member shall follow all requirements outlined in this section.

All testing will be done by a reliable, established laboratory. If this initial test screen result indicates positive findings, further testing of the same sample must be done to confirm the original findings before the laboratory can report a positive finding. The confirmation test will be conducted by an independent accredited National Institute of Drug Abuse or College of American Pathology Laboratory and/or currently qualified under the Substance Abuse & Mental Health Services Administration (SAMSHA) under the U.S. Dept. of Health & Human Services, and will utilize the more scientific Gas Chromatography/Mass Spectrometry examination (GC/MS). The results of all tests will be kept confidential between the employee, the Employer and the Union. The employee shall be paid his/her regular hourly wage and fringes for time required for drug testing provided results are negative.

If the GC/MS test results are positive, the employee may be granted a leave of absence for the purposes of drug and alcohol rehabilitation. If the employee is eligible such rehabilitation programs are covered under the Ohio Operating Engineers Health and Welfare Program providing the employee confines him/her self to a twenty-four (24) hour licensed rehabilitation medical facility.

Until the employee presents certification of successful completion of the rehabilitation program to the Local 18 Medical Review Officer (MRO), the employee shall be removed from the Employer's job site, shall be prohibited from registering under Article III of the referral of this agreement and shall not be dispatched to work. Upon presentation of certification of the employee's successful completion of the drug/alcohol rehabilitation program to the Local 18 MRO, the employee may be restored to his/her original job with the Employer. If the employee is not restored to their original job, the employee will be allowed to register for work in the referral by registering a new work referral card.

12

The employee shall, under either circumstance, for the next succeeding twelve (12) month period, present to the Local 18 MRO monthly certification of negative drug/alcohol test results. Failure to do so will result in denying the employee the right to maintain his/her referral card in the register and utilize the referral or if working, to be removed from work.

Any positive drug and/or alcohol test result after the second rehabilitation procedure shall result in the applicant being permanently barred from registering on the Local 18 referral.

**31. HARASSMENT POLICY:** The parties to this Agreement mutually agree that harassment of any nature is not to be tolerated. Every person working under this Agreement shall immediately notify the Employer when a possibility of a problem happens or exists.

# ARTICLE III

## REFERRAL SYSTEM

**32.** Local 18 and its Branches shall maintain registers of all applicants for referral. Applicants shall not be permitted to be registered in more than one office of the Union at any one time. All applicants will be registered in order of application, provided no person shall be deemed to be an applicant who is otherwise gainfully employed as an Operating Engineer or not immediately available for work. Registrations and re-registrations will be accepted during customary business hours. Applicants shall be classified in priority groups in accordance with the following criteria:

**GROUP A:** All applicants who have worked as Operating Engineers at least 360 days, 90 days or more per year during the last four (4) years, and have been employed for at least 360 days, 90 days or more per year during the last four (4) years on work as defined in Article I of this Agreement within the geographical jurisdiction of Local 18, and who have lived in the State of Ohio, or in any county contiguous thereto, for at least one (1) year prior to application.

**GROUP A PREFERRED:** Must have Group A eligibility. Group A registrants may voluntarily register in the Group A Preferred; however, registrants in this Preferred A status shall have at least fifteen (15) years employment or availability for employment in any one or more of the classifications contained

13

in this Agreement and in the type or kind of craft work covered by this Agreement in the geographic area as defined by this Agreement. Referral in this group is limited to the following described equipment and will be given priority of referral from the Group A Preferred deck. Preferred A status employees will not be eligible for letter of request by the Employer: Welding Machines, Elevator, Conveyor, Pumps, Compressors, Generators, One Drum Hoist, Mono-Rail Hoist and Portable Heaters.

It is further understood and agreed that when the Employer employs Operating Engineers not currently in their employ for any machines listed in this section, the Employer shall call the referral office servicing his/her job or project and request that an employee qualifying under the Preferred A status be dispatched to service and operate said machine. Any Operating Engineer currently employed by an Employer can be used to operate any of the above listed machines. Apprentices shall not operate this equipment more than fifteen (15) days.

Workmen registering in this Preferred A Group shall be ineligible to register in any other group and shall not work in any classification other than those specified in this section and only have recall rights for equipment specified in this section.

**GROUP A RETIREES:** Must have Group A eligibility. The pension was set up to enhance the lives of retirees in their golden years. Retiring from the trades is by voluntary choice.

A retiree is an equipment operator or mechanic who has applied for and is receiving a pension from any construction industry source.

Upon retirement the retiree can only register in this group. The Group A retirees will be referred to jobs only after the Group A classification and the Preferred A classification have been exhausted.

The Group A retirees will not be eligible for letter of request by the Employer.

**GROUP B:** Same as Group A, except that the employment shall have been at least 270 days, three (3) years of 90 days each. All fourth year Apprentices and Trainees shall be registered in this group.

**GROUP C:** All applicants who have worked as Operating Engineers at least ninety (90) days per year during each of the last two (2) years, and who have lived in the State of Ohio or any

14

county contiguous thereto for at least one (1) year prior to application. All third year Apprentices and Trainees shall be registered in this group.

**GROUP D:** All applicants who have worked as Operating Engineers at least ninety (90) days during the twelve (12) months prior to application. All second year Apprentices and Trainees shall be registered in this group.

**GROUP E:** All other applicants and all first year Apprentices and Trainees shall be registered in this group.

**GROUP F:** All applicants who are "temporary employees".

All applicants who have attained eligibility in any of the foregoing groups shall not lose eligibility as a result of their failure to obtain the required days of employment during the applicable periods of time. All graduating Apprentices shall upon journeymen certification become eligible for Group A. When an applicant fails to register in his/her eligibility group due to reasons other than illness, as hereinafter defined, and does not notify the Union Hall, the resultant failure to obtain the required days of employment during the applicable periods of time shall cause the applicant to lose eligibility in that group.

Any registrant requesting that their work registration card be placed on hold due to sickness, ill health or physical condition, must present to the Union a doctor's certificate or statement certifying that the registrant will be under a doctor's care for a minimum of thirty (30) days, and that such illness or physical condition prevents the registered applicant from working as an Operating Engineer. A work registrant's card will only be placed on hold for a minimum period of thirty (30) days, and a maximum period of one hundred twenty (120) days. No registration cards will be placed in the hold position for illness or physical condition for less than a thirty (30) day duration. Any refusals of dispatches due to illness or physical condition for a period of less than thirty (30) days shall be counted as a refusal under the terms and conditions of the referral procedure.

33. In referring applicants, the following procedure shall be followed:

A. Applicants in Group A shall first be referred, and then Group A Preferred, then Group A Retirees, then applicants in the succeeding groups, in order, through Group E. In each group, the Union shall refer applicants in order of their places on the referral list.

15

B.   Registered Apprentices or Trainees shall be referred in order of their position on the referral list.

C.   Employers shall have the right to reject any applicant referred for employment and shall immediately notify the Union in writing of such rejection. In the event a registrant is discharged by the Employer because of lack of sufficient ability, and he/she does not exercise his/her rights under the Referral Board of Review and Arbitration under Paragraph 37, the classification or equipment from which he/she is discharged shall be stricken from his/her referral record and he/she shall not be dispatched to a job in that classification or on that equipment until he/she has:

1.   Taken training at his/her training site and has been certified, or

2.   Has presented to his/her dispatch office a letter from a previous Employer, in signed agreement with Local 18 working within Local 18's jurisdiction, stating that in the Employer's opinion the discharged registrant has successfully completed a job assignment in that classification or on that piece of equipment in his employment.

D.   When an applicant is actually employed, he/she shall notify the Union office at which he/she is registered within twenty-four (24) hours. Failure to do so is an imposition upon those registered and not employed and, therefore, such applicant will be barred from re-registering, unless and until he/she has made application to the Board of Review and Arbitration provided for in Paragraph 37 of this Agreement, and shows good cause for his/her failure to give such notice.

E.   When an applicant becomes employed, his/her name shall be removed from the register as soon as he/she shall have worked for a total of thirty-one (31) accumulative working days (one (1) day jobs shall not count). An Operator who relieves another Operator will not be charged for the first fifteen (15) days (only one (1) fifteen (15) day relief per registration application card). All days after that will be counted toward his/her time.

If an applicant is employed for less than thirty-one (31) accumulative working days, he/she shall be restored to his/her previous position on the register when such employment terminates. Any applicant who quits employment or fails to show up for work assignment at starting time after being dispatched (provided he/she was dispatched the previous day), for what-

16

ever reason, except accident verified by police report, shall be placed at the bottom of the applicable registration group regardless of the number of days worked and shall not be eligible for request until he/she puts in a new registration card. When reason for employment termination is questioned, applicant must present a written termination slip evidencing reasons other than a voluntary quit before he/she is restored to his/her previous position on the register.

An applicant for employment may not refuse referral to employment for any reason except that the applicant may inform the District Office in writing, before any referral, that he/she will not accept employment referrals in certain named counties within the District. If an applicant refuses a job referral for the second consecutive time, he/she shall lose his/her position on the register and go to the bottom of the list for his/her group[1]. If the dispatcher is unable to contact an applicant, the failure to contact shall not be deemed to be a refusal.

F.   Applicants must notify the Union office in which they are registered by telephone, or letter, or telegram, or in person of their continued availability for employment within thirty (30) days after the date of last registration or re-registration in order to maintain their places on the register.

In order to equally distribute and defray the cost of services rendered by the use of this referral system, all individuals who make use of this referral system shall be required to pay an initial registration fee of $20.00[*] and another $20.00[*] for each re-registration thereafter, provided that such fee shall not exceed $20.00[*] in any consecutive thirty (30) day period and provided that such fee shall not apply to be following:

1.   Members in good standing of Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their regular dues; and

[1]Does not apply to the former Ohio or Kentucky Building & Light Commercial Agreements Referral.

[*]Effective October 1, 2013 $20.00. In the event that the General Executive Board exercises its authority under Article XI, Section 1 of the Constitution to increase the per capita tax payable to the International Union, effective July 1, 2014, July 1, 2015, July 1, 2016 and/or July 1, 2017, the registration fee of Local 18 shall increase in conjunction with such per capita tax increases(s) pursuant to Article XXIV, Subdivision 7, Section (1) of the Constitution of the International Union of Operating Engineers.

17

2. Applicants for membership to Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their fees; and

3. Members in good standing of the International Union of Operating Engineers who are paying travel dues whose proportionate share of the cost of this referral system is met by the payment of their fees.

G. The Union shall use its best efforts to notify all registered applicants when work is available for them, but the Union assumes no responsibility or obligation for failure to locate an applicant.

H. All applicants must submit a written resume of their experience and qualifications at the time of original registrations, and may be tested on the equipment they operate at the nearest available training site prior to being assigned a position on the referral list.

I. Subject to this referral system Employers may hire through this Referral policy, by name, former employees who have resided for at least twenty-four (24) months in the State of Ohio or in any county contiguous thereto, and have been employed by the Employer making the request during the past twenty-four (24) months within the jurisdiction of this Agreement. The Employer must make the request to the appropriate Union District Office and the employee requested must be registered on the District referral list (Groups A through E).

Employers may hire through this referral policy by name individuals in Group A for a production machine, or for a mechanic, or mechanic/welder, who has been registered on the out-of-work list for at least ten (10) days in the District in which the work is to be performed. Individuals shall have only one (1) request per four (4) month period from the last request. The request by name must be confirmed later in writing on the letterhead of the Employer and signed by either the Employer or the superintendent of the project.

Nothing in the referral procedure shall interfere with the transfer of an Employer's employees on his payroll from one project to another project within the geographical area covered by Local 18. When transferring employees, the Employer will notify the Union District Office from which the employee is to be transferred.

18

The Union agrees the transfer will be processed in an expedient manner.

J. The purpose of the referral system is to provide non-discriminatory employment opportunities. Individuals who register therein deserve a preference over those who do not. Therefore, it is agreed that in the event the referral list is exhausted and the Union is temporarily unable to furnish qualified applicants within twenty-four (24) hours after receiving the Employer's request (Saturdays, Sundays and holidays excepted), the Employer may temporarily employ others until the Union notifies the Employer that it has qualified registrants available for employment.

Applicants hired by the Employer under this procedure shall be known as "temporary employees", and will be subject to replacements. The Employer will notify the Union District Representative of the name, union affiliation (if any), date of employment and social security number of such temporary employee. The Union will maintain a register of all such "temporary employees" and such register shall be known as the temporary register. Such "temporary employees" may also be referred by the Union (when the referral list is exhausted) from Group F.

Such "temporary employee" shall be subject to replacement by a qualified registered applicant under the procedure listed herein:

1. The Union shall give a five (5) working day written notice to the Employer with whom the "temporary employee" is working and such "temporary employee" will thereupon be replaced at the end of the five (5) working day period provided the Union furnishes a qualified registered applicant.

2. The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the temporary register.

K. When an Employer states requirements for special skills or abilities in his/her request for employee applicants, the Union shall refer the first applicant on the register possessing such skills or abilities, regardless of the place or classification of such applicant on the register. If a contractor requests or requires that the operator be a Certified Operator, verification of the operator's certification is the responsibility of the Employer. If the Employer notifies the Union in writing, within thirty (30) days of the employee's discharge, of an Operator who had been

19

in his employment and who had not performed satisfactorily, and the Employer does not wish this Operator to be referred to the Employer for future employment, the Union shall honor this written request.

L. Any employee who quits a contractor without proper notice and is subsequently hired by an Employer with whom Local 18 has a contractual relationship without a proper referral by Local 18 shall be discharged by the Employer when it is called to his attention.

34. Employers shall give first opportunity to persons registered for employment, as provided herein, by calling or notifying the Union at any of its offices in the territory where the work is to be performed.

35. Registration of applicants and selections of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership, policies, or requirements. It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio, the Commonwealth of Kentucky, and lawful orders thereof in nondiscrimination and fair employment practices.

The Employer and the Union shall not discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

The Union agrees to furnish an Employer, at his request, any statement or data required under any regulations referred to herein.

36. In addition to the above Registration Groups there shall be established a Short Term Job Group. The sole purpose of this Short Term Job Group is to enable registrants to acquire time to be eligible for unemployment benefits. Registration in this group is limited to applicants eligible for Group A of this referral and all fourth year Apprentices showing proof of need for additional time to qualify for unemployment benefits.

Applicants' referral out of the Short Term Job Group will be limited to jobs of two (2) days or less duration in a calendar week or eight (8) days or less duration in a calendar month on equip-

20

ment listed on their registration cards. Any refusals of jobs will cause the registrant's card to be removed from the Short Term Job Group deck. Dispatches for short term jobs as defined above will first be made from the Short Term Job Group. If the dispatcher is unable to fill the short term job order from the Short Term Job Group he/she will proceed to fill the order from Groups A through F in accordance with the referral rules. Dispatcher should notify Employers when dispatching from the Short Term Job Group. The Employer reserves the right to request dispatch from Group A.

Since this Short Term Job Group is intended to provide limited employment for those needing credit for unemployment compensation, the Union shall, through its business agents, remove from employment any Operating Engineer who has accumulated more than two (2) days per calendar week or over eight (8) days in a calendar month – as a result of the Short Term Job Group.

Registrants in the Short Term Job Group will not be eligible for any recall or request provisions of the referral as herein described. Employment received as a result of the Short Term Job Group referral will not provide eligibility for Employer recall when the registrant is registered in Group A, Preferred A, or Group A Retirees deck. Apprentices or Trainees will not be permitted to register in the Short Term Job Group except as noted above. Registrants may not register in the Short Term Job Group or Group A or Preferred A or Group A Retirees deck at the same time. The Employer shall not be permitted to transfer employees dispatched from the Short Term Job Group from one project to another project.

The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the Short Term Job Group.

All the remaining rules with regard to the operation of the referral shall be applicable to the operation of the Group A, Preferred A and Group A Retirees except as modified above.

37. Any registrant or any Employer who may feel aggrieved by the operation of this referral system shall have the right to and must file his/her grievance, in writing, within ten (10) days after the occurrence of the event concerning which he/she complains with a Board of Review and Arbitration consisting of one (1) representative of the Union, one (1) representative of

21

the Employer, and an impartial third member to be selected by agreement of the Union and the Employer, and the decision of this Board shall be final and binding on all parties.

38. This statement as to referrals shall be posted in all places where notices to Employers and applicants for employment are customarily posted, including all offices of the Union; all offices of the Employer.

39. A Labor Relations Division Representative of the AGC of Ohio may inspect the referral register at the Union District Office at any time during normal office hours.

40. All officers and business representatives of the Union who have had previous work experience in any one or more of the job classifications contained in this Agreement shall be deemed to be employed at the trade and it is the intent of this section to provide that upon return to the employment in the trade, he/she shall do so with the same preference as if he/she had continually worked at the trade and shall be eligible upon registration for Group A.

## ARTICLE IV

### FRINGE BENEFIT PROGRAMS

41. The fringe benefit provisions contained herein shall apply to all Employer members of the AGC of Ohio Labor Relations Division, and Employers who become signatory or bound by this Agreement, as well as any other Employer or Employer groups who become a party to an Agreement covering the fringe benefit programs set forth herein.

42. All Employers bound hereby agree to be bound by the Agreement and Declarations of Trust, as amended, establishing the Pension Fund, Health and Welfare Plan and Apprenticeship Fund, copies of which all parties agree have been furnished to and read by all Employers bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declarations of Trust and any rules, regulations, or plans adopted by the Trustees pursuant thereto, shall become a part of this Agreement as though fully written herein. All Employers bound hereby irrevocably designate the Employer Trustees of said Funds and Plan and their successors as their representatives for the purpose set forth in said Agreements and Declarations of Trust.

22

43. Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

PENSION FUND: Effective May 8, 2013 is $6.00 per hour

HEALTH & WELFARE PLAN: Effective May 8, 2013 is $6.91 per hour; May 1, 2014 is $7.16 per hour; May 1, 2015 is $7.41 per hour

APPRENTICESHIP FUND: Effective May 8, 2013 is $.60 per hour; May 1, 2014 is $.67 per hour; May 1, 2015 is $.75 per hour

SAFETY TRAINING AND EDUCATIONAL TRUST FUND: Effective May 8, 2014 is $.07 per hour; May 1, 2015 is $.09 per hour

The Union shall have the option of diverting all or any part of the increase scheduled for improvement of or payment of costs of any fund benefits provided under this Agreement; provided that the Union gives the Employer written notice of its election to do so by registered letter sent to the office of the AGC of Ohio at least 60 days before the effective date of the scheduled change specifying in said notice the amount of change to be applied for this purpose in the fund benefit for which the money is to be used.

44. It is further understood and agreed by and between the parties that duly authorized representatives of any of said Trust Funds or Plan shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all employees upon whom the Employer is obligated to make contributions and with respect to the payment of monies to the AGC of Ohio's Construction Industry Advancement Program under paragraphs 109, et.seq. and with respect to the Administrative Dues deduction under paragraph 114. Notwithstanding the foregoing authority allowing audits with respect to the AGC of Ohio's Construction Industry Advancement Program and the Administrative Dues deduction, the audits shall only be conducted in conjunction with the Fringe Benefit Funds or Plans referred to herein and shall not be conducted independently. The twenty-four (24) hour notice referred to in paragraph 45(A) shall only be given for delinquencies to the employees Fringe Benefit Funds or Plan referred to therein.

23

SOFCO002325

**45.** Reports of employees who have worked the number of hours that they have been paid, and such other data and information as may be required, and all contributions payable to the Funds or Plan shall be transmitted to the offices of the Funds or Plan no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed. In the event said audit is refused, reports not furnished, or said contributions are not paid, as aforesaid, the following remedies, in whole or part, and in addition to all other remedies, either in law, in equity, by contract or authorized by the aforementioned Agreements and Declarations of Trust, shall be available.

A. After the Trustees or the Agent of any Funds or Plan have given the delinquent Employer twenty-four (24) hours written notice at the address shown in the records of the Funds, Plan or Union, the Union shall have the right to take such legal and lawful action as it may deem necessary until such delinquent payments are made or said audit is permitted, such action including but not limited to the right to withhold its services from such Employer for as long as the failure to make such contributions or audit continues, Article XIV notwithstanding.

B. In the event either the Union or the Trustees of any Funds or Plan may decide to utilize the grievance and arbitration procedure in this paragraph to collect delinquent contributions and liquidated damages to enforce any audit, or to obtain any report, the following procedure shall apply:

Unless the issue is resolved between the Employer and the party giving notice, within five (5) calendar days after deposit of written notice of delinquency and/or demand for audit and/or report in the United States mail, to the Employer at the address shown in the records of the Funds, Plan or Union, such party may refer the matter to an arbitrator to be named by the AGC of Ohio Labor Relations Division and by Local 18 of the International Union of Operating Engineers whose decision in writing shall be final and binding on all parties. In the event such parties are unable to choose an arbitrator within ten (10) days after written request therefore, the Union or the Trustees of any Funds or Plan may request an arbitrator according to the rules and regulations of the American Arbitration Association whose decision in writing shall be final and binding on all parties. The parties to the arbitration shall each bear one-half (1/2) of the total costs.

24

**46.** In no event shall the foregoing provisions relating to Fringe Benefits be subject to or suitable for grievance and arbitration under Article XIV of this Agreement.

**47.** The Employer must obtain an Insurance Payment Bond (IPB), from a company that is "best" rated A, financial category 7 or better, payable to the Ohio Operating Engineers Fringe Benefit Program as a guarantee that the fringe benefits referred to herein are paid by the insurance carrier in the event that the Employer becomes delinquent in its payments and defaults thereon. In lieu of a surety bond, an Employer may substitute an equivalent cash bond, which will be escrowed to guarantee payment of fringes. If the Employer fails to provide the necessary bond within thirty (30) days of request by the Union, the Union shall withhold services until receipt of such bond, or the Employer makes fringe contributions on a weekly basis.

The Employer shall obtain said Insurance Payment Bond or cash bond in amounts set forth below:

| | | |
|---|---|---|
| 1-10 | Operating Engineers | $ 50,000.00 |
| 11-20 | Operating Engineers | 75,000.00 |
| 21-50 | Operating Engineers | 100,000.00 |
| Over 50 | Operating Engineers | 125,000.00 |

## ARTICLE V

### WAGE RATES

**48.** The purpose of this Agreement is to establish wage rates and conditions to apply for all work as defined herein and for operation of all equipment which comes within the jurisdiction of the International Union of Operating Engineers, and as negotiated by and between Local 18 and its Branches of the International Union of Operating Engineers and the AGC of Ohio Labor Relations Division.

**49.** Exhibit "A" covering wage rates and classifications attached hereto is made a part of this Agreement.

**50.** It is agreed if equipment within the jurisdiction of the International Union of Operating Engineers is used by an Employer and if there is no appropriate classification listed under the wage schedules therein, then the Union and the Association negotiating committees will negotiate a new classification and rate of pay for such equipment within five (5) days.

25

**51.** The geographical jurisdiction of this Agreement will be zoned for wages only. Conditions of employment will be the same for all employees covered by this Agreement.

Zone I: Covering Portage and Summit counties only.

Zone IA: Covering Erie, Huron, Lorain and Medina counties.

Zone II: Covering the counties of Lucas and Wood only.

Zone III: Covering the counties of Adams, Allen, Ashland, Athens, Auglaize, Belmont, Brown, Butler, Carroll, Champaign, Clark, Clermont, Clinton, Coshocton, Crawford, Darke, Defiance, Delaware, Fairfield, Fayette, Franklin, Fulton, Gallia, Greene, Guernsey, Hamilton, Hancock, Hardin, Harrison, Henry, Highland, Hocking, Holmes, Jackson, Jefferson, Knox, Lawrence, Licking, Logan, Madison, Marion, Mercer, Meigs, Miami, Montgomery, Monroe, Morgan, Morrow, Muskingum, Noble, Paulding, Perry, Pickaway, Pike, Preble, Putnam, Richland, Ross, Sandusky, Scioto, Seneca, Shelby, Tuscarawas, Union, Van Wert, Vinton, Warren, Washington, Wayne, Williams, and Wyandot. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

## ARTICLE VI

### WEEKLY PAY AND HOURLY PAY CLASSIFICATIONS AND REPORTING PAY PROVISIONS

**52.** In all counties covered by this Agreement, the following classifications shall be employed on a WEEKLY PAY basis:

Asphalt Plants

    Boiler Operators, Apprentice/Helper (Oiler), Registered Apprentices and Signalmen, when members of crew

        Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)

Cherry Pickers

Cranes (all types)

Derricks (all types)

Draglines

Dredges (dipper, clam or suction) 3-man crew

Floating Equipment

Gradalls

Hoes (except when attached to farm or industrial type tractor or CAT 320 backhoes or equivalent and below)

Hoists, with two or more drums in use

26

Horizontal Directional Drill (over 500,000 ft. lbs. thrust)

Maintenance Engineers (Mechanic and/or Welder)

Master Mechanics

Panelboard Operators (all types on site)

Pile Drivers

Power Shovels

Rotary Drills (all), used on caissons for foundations and sub-structure work

Side Booms

Tug Boats

**53.** In all counties covered by ZONES I, II and III, the following classifications shall be employed on an HOURLY PAY basis (two (2), four (4), or eight (8) hours):

A-Frames

Air Compressors, pressurizing shaft or tunnels

Allen Screed Paver (concrete)

Apprentice/Helpers (Oilers), Helpers, Boiler Operators, when not members of a crew

Asphalt Pavers

Backfillers

Backfillers with Tampers

Ballast Re-Locator

Bar and Joint Installing Machines

Barrier Moving Machine

Batch Plant Operators

Bobcat Type and/or Skid Steer Loader

Boilers (15 lbs. pressure and over)

Boom Trucks (all types)

Bulldozers

Bull Floats

Burlap and Curing Machines

Cableways

Clefplanes

CMI-type equipment

Combination Concrete Mixers and Towers

Compressors, on building construction

Concrete Grinder/Planer

Concrete Mixers

Concrete Pumps

Concrete Saw, Vermeer type

Concrete Spreaders

Conveyors, used for handling building materials

Crushers

27

SOFCO002327

Deckhands
Directional Drill "Locator"
Drum Firemen in asphalt plants
Elevating Graders or Euclid Loaders
Endloaders
Farm-type Tractors, pulling attachments
Finishing Machines
Fork Lifts (all types)
Forklift (rough terrain with winch/hoist)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (sonic pile driving)
Gunite Machines
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes, when attached to farm or industrial type tractors
Hoists (building construction)
Horizontal Directional Drill (less than 500,000 ft. lbs. thrust)
House Elevators (except those automatic call button controlled)
    Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the
    rate of pay will be "Class E")
Hydraulic Gantry (lift system)
Hydro-seeders
Inboard, Outboard Motor Boat Launches
Kolman-type Loaders (dirt loading)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Lead Greasemen
Light Plant Operators
Locomotives (all types)
Man Lifts
Mixers, one bag capacity with side loaders
Mixers, Paving (multiple drums)
Mobile Concrete Pumps, with booms (including oiler, etc.)
Mucking Machines
Mudjacks
Pavement Breakers (hydraulic or cable)
Pettibone - Rail Equipment
Plant Mixers (on site)
Post Drivers
Post Hole Diggers
Power Driven Heaters (oil fired)

Power Graders
Power Scoops
Power Sweepers
Power Scrubbers
Prentice Loader
Pressure Grouting
Pressure Pumps (over 1/2" discharge)
Pump Operators, installing or operating well-points or other
    types of dewatering systems
Pumps (4" and over discharge)
Pumps (under 4" discharge)
Rail Tamper (with automatic lifting and aligning device)
Switch & Tie Tampers (without lifting and aligning device)
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Utility Operators
VAC/ALLS
Vibratory Compactors, with integral power
Welders (except electric machines)

54. In all the counties covered by ZONES I, IA, II and III, employees covered by this Agreement employed on a WEEKLY PAY basis reporting for work on Saturday, Sunday or holidays shall be paid as follows: Employees who have not started to work will receive two (2) hours at premium pay for reporting to work (only need to stay on job for one (1) hour). Employees who start to work will receive four (4) hours pay at premium rate; more than four (4) hours will receive eight (8) hours pay at the premium rate. For inclement weather only it will be 2-4-6-8 hours of pay at the premium rate of pay.

They must report to work at starting time and remain on the job until release.

55. When a machine having a forty (40) hour guarantee is laid up on a project site and the workmen are laid off and paid off, that machine cannot be started back to productive work on that project site unless it is laid up for one week (seven days) without calling back the workmen who had manned the machine and they shall be paid for the time they have been off, unless mutual agreement is reached between the Employer and the Union District Representative to permit employees to work on the weekly guarantee equipment during the seven (7) day "lay-up" period without penalty.

28

29

SOFCO002328

56. In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis unless notified by the Employer not to report to work, shall receive two (2) hours' pay for reporting to work; if such operator does not start to work, he/she shall receive his/her two (2) hours reporting time. An employee may be required to stay at the work project for one (1) hour to be eligible for two (2) hours reporting pay unless the Employer releases the employee prior to the end of the first hour. If the employee starts to work, he/she shall receive four (4) hours' pay; if the employee works over four (4) hours, he/she shall receive eight (8) hours' pay, for inclement weather only it will be 2-4-6-8 hours.

In all counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis reporting to work on Saturday, Sunday or holidays, all conditions in this paragraph will apply and both reporting time and time worked will be paid for at the rate provided in accordance with Article VII. They must report to work at starting time to be entitled to reporting pay. Where less than four (4) hours or less than eight (8) hours are worked, the employees must remain on the work for the full four (4) hours or the full eight (8) hours, as the case may be, to be entitled to pay for the four (4) or eight (8) hours, as stipulated in this Agreement. Employee call off notification must be made not less than 60 minutes prior to the established starting time or show pay applies.

A. When an employee working on equipment with a weekly-pay guarantee and work with his/her equipment is completed on a project, the employee is guaranteed only Monday through Wednesday pay if the equipment finishes the work on the project the first three days of the week. The Employer will notify the Union District Representative prior to application of this provision.

57. Crews will be eligible for straight time weekly pay when their equipment is transferred out of their District up to the day the equipment is shutdown; otherwise, Paragraph 56, Section A prevails.

58. On jobs where there is only one (1) day's work for a piece of equipment, employee or crew may be employed on a day-pay basis. Upon the Contractor's request to the Union Business Representative for a second day for special occasions, the Union gives the Representative authority to authorize a second day for the period of this contract.

30

59. All reporting pay time paid to an employee shall count as working hours with respect to any work guarantees or overtime pay provisions.

60. Employees who are working for an Employer in other than their local residence area hereby necessitating them to pay room and board shall, upon request, be granted their release if the Employer is unable to supply enough work to justify their staying. Employees released under this provision will be considered as laid-off because of lack of work.

## ARTICLE VII

### PROVISIONS FOR PREMIUM RATE OF PAY

61. The week shall begin on Monday A.M. and shall end on Sunday P.M.

62. The regular starting time must be established for not less than one (1) week. Any time worked prior to the established starting time will be paid for at the applicable premium rate unless otherwise arranged through Union notification.

63. The normal work day shall consist of eight (8) hours and the normal work week of forty (40) hours. One and one-half (1-1/2) times the regular rate shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, and including Saturday. When an Employer performs clearance and excavation for site preparation for industrial or building sites, the Employer will pay the wage rates listed herein, all overtime will be performed at one and one-half (1-1/2) times the regular rate. Subject to Paragraph 121, all other conditions and provisions shall be as provided herein.

A. An Employer may, however, have the option of working a four-ten hour schedule at straight time rates. No Operating Engineer with a weekly guarantee will lose a paid holiday he/she would otherwise receive by working a four-ten week. Instead, such employees will receive, in addition to wages and fringes for hours worked in a four-ten week, an additional eight (8) hours and fringes at straight time rates for the holiday. If the Employer elects, upon notification to work a four-ten hour schedule, he shall pay overtime in such cases on all hours over ten (10) hours per day or over forty (40) per week, whichever is greater. A four-ten work schedule must be by the week.

31

In addition to the above: It is agreed that when time is lost by the crew during the regular work week, Monday through Thursday, due to inclement weather, holiday, equipment breakdown or directions of the project owner, this time may be made up by the entire crew on Friday at the regular rate of wages. All Friday work must be scheduled on a minimum of eight (8) hours basis. All hours worked in excess of the forty (40) hours in the work week or ten (10) hours each day, shall be paid at the appropriate overtime rate of pay.

B. Any employee hired on any day of the week, Monday through Thursday, and who does not lose any time from the day of his/her initial hire until Thursday shall receive the overtime rate of wages for Friday, providing the crew is eligible for the premium rate for Friday.

C. Should any other trade on the project in the contractor's employ, working in conjunction with the Operating Engineers, receive premium pay on a Friday, the Operating Engineers would also receive premium pay for the Friday.

D. If the other basic crafts employed by your contractor on the project receive the overtime rate for the ninth (9th) and tenth (10th) hours, the Operating Engineers will also receive the overtime rate.

E. When an Employer works three (3) days or less in a week, premium time will be paid after eight (8) hours for each of the days, except for holidays, inclement weather or completion of the job.

F. Pay day will be on Thursday.

G. Weekly pay employees, in order to be eligible for eight hours' pay that day, must be available to perform work for the Employer.

H. Direct deposit will be at the discretion of the employer. There will be no cost or fees to the employee.

64. Double time will continue to be paid to any Operator who is complementing another trade that is receiving double time. All work performed by an employee on Sunday or holidays shall be paid at two times the regular rate established in this Agreement or any escalated rate that may be in effect.

65. No Weekly Pay employee covered by this Agreement shall lose time because of the observed holidays. If not requested to work, he/she shall be paid eight (8) hours straight time pay at the rate established in this Agreement or eight (8) hours at any escalated rate that may be in effect. Holidays shall be of twenty-four (24) hours duration. When required to work on holidays, the employee shall be paid two times the regular rate established in this Agreement or any escalated rate in effect.

66. There shall be no work required on Labor Day except in special cases of emergency.

67. The observed holidays are Christmas, New Year's Day, Labor Day, Memorial Day (last Monday in month of May), Independence Day and Thanksgiving Day. When any of the aforementioned holidays fall on Sunday, they will be observed on Monday. All weekly pay Employees covered by this Agreement to be eligible for holiday pay must be available for work the first regularly scheduled work day prior to the holiday and be available for work the first regularly scheduled work day after the holiday.

68. Where steam boilers, power driven heaters or pumps are used on a continuous seven (7) day twenty-four (24) hours per day operation, overtime may be avoided by using four (4) shifts of Operating Engineers, each shift to work six (6) hours on a seven (7) day basis. Each Operating Engineer so employed shall be paid forty (40) hours at the applicable straight time rate and two (2) hours at double the applicable straight time rate. The aforementioned condition, where overtime may be avoided, can only be used upon the Employer's guarantee of a minimum thirty (30) days of operation. In the event the Employer cannot furnish thirty (30) days of employment after starting work under Paragraph 68, it is agreed that upon lay-off of employees the Employer will pay retroactive overtime to such laid-off employees from the start of this particular operation in accordance with Article VII, Paragraphs 63 and 64 of this Agreement.

69. Job Master Mechanics and Operators of derricks, cranes, derrick cars on steel erection and on building construction and all winch trucks used in hoisting construction material and any type of hoist, shall command and receive the highest rate of pay and the same applicable premium pay and conditions of overtime where the rates or conditions for the Ironworkers, Boiler Makers, Pile Drivers and Pipefitters are higher than the rates specified in this Agreement for the foregoing classifications. To be eligible for the benefits of complementing the above mentioned trades, an Operator must be required to perform a specific operation which is directly related to the work which the other trades are performing.

32

33

70. Operating Engineers employed on any equipment within the jurisdiction of the International Union of Operating Engineers working in shafts, tunnels or storage caverns where natural earth or rock is undisturbed overhead, shall be paid fifty cents ($.50) per hour above the rates in this Agreement or in addition to any escalated rate that may be in effect. This does not apply to open cut work.

71. Booms, including jib 150 feet through 180 feet in length, fifty cents($.50) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

72. Booms, including jib over 180 feet through 249 feet in length, one dollar($1.00) per hour in addition to the established crane rate or any escalated rate that may be in effect.

73. Booms, including jib of 250 feet and over in length, one dollar twenty-five cents ($1.25) per hour in addition to the established crane rate or any escalated rate that may be in effect.

74. Conventional cranes whether crawler or truck when used as a tower crane, the effective length of the mast and the boom combined, will be used to determine when these extra rates will be applied.

75. Tower Cranes, the height of the boom point from the first floor level of the project, will be used to determine when these extra rates will apply.

76. On jobs where crane-type or derrick-type machines are operated on floors above the first floor level of the building, twenty-five cents ($.25) per hour shall be paid in addition to the established crane rate or any escalated rate that may be in effect.

## ARTICLE VIII

### CREWS AND GENERAL PROVISIONS

77. In all the counties within the jurisdiction of this Agreement, crews shall be employed on all truck cranes, power shovels, cranes, rotary drills on caisson work, cableways, draglines, tower derricks, tower cranes, multiple drum pavers, pile driving machines and hoes, standard gauge locomotives, bucket trench machines (over 24" wide) and horizontal directional drills (over 500,000 ft.lbs.thrust). Crews shall consist of an Operating Engineer and an Apprentice/Helper (Oiler) or Signalman on machines, regardless of motive of power, or an Operating Engineer and Fireman on steam machines.

34

78A. Apprentice/Helpers (Oilers) are required on hoes, excavators, and front hydraulic shovels having a base operating weight in excess of 105,000 pounds, single cab hydraulic cranes on rubber with a total weight of 125,000 pounds and Apprentice/Helpers (Oilers) shall be required on cable crawler cranes over 80 ton structural capacity, defined as: the factory specified total maximum counter weight with a PCSA rating not to exceed 36,400 pounds, based on 50' of boom at 40' radius, with the single line pull not exceeding 17,000 pounds. Anything outside any of the aforementioned limits determines the crane as requiring an Apprentice/Helper (Oiler). All factory certifications and the computer system will be available for inspection at any time by the Union or their designee. On remote control gradalls, Apprentice/Helpers (Oilers) shall be at the discretion of the Employer. Truck cranes, lattice boom, thirty (30) ton capacity and under; hydraulic truck cranes and all terrain cranes fifty (50) ton capacity or less, an Apprentice/Helper (Oiler) is not required. However, if someone other than an Operating Engineer is assigned to this work, this paragraph will be revoked on the project, and an Apprentice/Helper (Oiler) will be required for the remainder of the project. An Apprentice/Helper (Oiler) is required on self-erecting cranes (as defined by the manufacturer) while being erected and dismantled.

78B. Apprentice/Helper (Oiler) on jobs of thirty (30) days or more will be given a minimum of 30 minutes per day operating the machine they are assigned to (or a similar machine on the same project). If the Apprentice/Helper (Oiler) cannot be trained to operate the machine to the satisfaction of the Employer then he/she shall be replaced.

79A. Work of the Boiler Operator, Apprentice/Helper (Oiler), Registered Apprentice, and Signalman shall include getting up steam and greasing up, filling gas tanks and making the machine and equipment ready for operating at the starting time. If, at the discretion of the Employer, an Apprentice/Helper (Oiler), Registered Apprentice, or Signalman is required to make gas or diesel machines ready to operate before the regular starting time, such Apprentice/Helper (Oiler), Registered Apprentice, or Signalman shall be paid one-half (1/2) hour's pay at one and one-half (1-1/2) times the regular rate. If, at the discretion of the Employer, a Boiler Operator or Registered Apprentice is required to get up steam and grease steam machines and make them ready to operate before regular starting time, then

35

such Boiler Operator or Registered Apprentice shall be paid one (1) hour's pay at one and one-half (1-1/2) times the regular rate.

**79B.** Apprentice/Helpers (Oilers), while assigned to track hoes, cranes and other equipment, will perform the following work on the project as additional duty:

- Cover small equipment (i.e. pumps, generators, compressors, etc.)
- Act as signal person
- Safety/fire watch
- Practice operating in a learning environment in the vicinity
- Help with survey duties on project
- Help mechanic, lube trucks, fuel
- Practice operating rough terrain forklift, front loader, rubber tire hoe, loader in vicinity of primary duty
- Replace other operators who may be absent on project
- Run parts or materials as necessary
- Safety enforcement
- Productive activity on job site to facilitate job completion when it does not interfere with progress of primary machine, providing this does not interfere with another Operating Engineer's workday

**80.** Apprentice/Helper (Oiler), Registered Apprentices, Signalmen, Grease Truck Operators, when requested to work the regular one-half (1/2) hour lunch period, will eat their lunch prior to or after the regular one-half (1/2) hour lunch period in order to be able to oil, grease and repair machines during the regular one-half (1/2) hour lunch period at no extra pay.

**81.** More than one (1) shift may be worked in any twenty-four (24) hour period and the starting time of the shifts shall be left to the discretion of the Employer. This starting time must be maintained five (5) days, Monday through Friday. However, more than six (6) hours shall not be worked without allowing thirty (30) minutes for a lunch period. Where two (2) shifts are employed, eight (8) hours shall constitute a day's work for the first shift and eight (8) hours shall constitute a day's work for the second shift. When three (3) shifts are employed, eight (8) hours shall constitute a day's work for the first shift, seven and one-half (7-1/2)

hours work with eight (8) hours pay shall constitute the second shift, and seven (7) hours work with eight (8) hours pay shall constitute the third shift. For the purpose of overtime pay for multiple shift operations, a work day shall be determined by the starting time of the shift. In addition, the second shift will receive twenty-five cents ($.25) per hour, third shift fifty cents ($.50) per hour premium above the established rate of pay.

When warranted by a particular job's conditions, shift work may be instituted for less than five (5) consecutive days.

**82.** Where project owners establish specifications, requirements, or for safety reasons that limit the days or hours in which work may be performed, the Employer, after advance notice to the Union, may start the work week after 6:00 p.m. on Sunday at straight time rates. In applying this schedule, Sunday p.m. will be considered Monday, the following Friday will be considered Saturday (paid at time and one-half) and Saturday will be considered Sunday (paid at double time). All premium pay provisions will apply for the sixth and seventh days as to Saturday and Sunday, respectively.

**83.** When it is necessary for equipment to be operated, the Operating Engineer who regularly operates the particular piece of equipment shall be given first chance to perform the work. If an Apprentice/Helper (Oiler) is required, the Apprentice/Helper (Oiler) who is regularly assigned to the particular piece of equipment shall be given first choice to perform the Apprentice/Helper's (Oiler's) duties. In an emergency, any employee may be assigned to any equipment. It is understood that the Master Mechanic or Steward will be notified, when possible, of such emergency requirements.

**84.** Employees who are requested, referred and employed by Employers on the same day under hourly classifications in this Agreement shall be paid a minimum of eight (8) hours pay on the day they report to the job. Any overtime worked after the normal quitting time shall be paid at the proper overtime rate in addition to the eight (8) hours minimum first day pay guarantee. The furnishing of a truck by a Mechanic shall not be a condition of employment. If an Employer is requesting a Mechanic from the Union, the Employer may require the new Mechanic to furnish a truck. If a Mechanic is required to furnish a truck, compensation will be negotiated between the Mechanic and the Employer.

36

37

**85.** Equipment Operator employees shall be required to carry sufficient tools to make minor repairs and adjustments in order to meet manufacturers daily maintenance requirements on the equipment they operate. This excludes diagnostic and electronic equipment.

**86.** If compressors, generators, boilers, hydraulic pumps or power pacs or any other type of power equipment is mounted piggyback on crane-type equipment requiring a crew, two (2) Operating Engineers will be employed at the Class "A" rate or any escalated rate in effect and under the weekly guarantee. If the crane does not ordinarily require a crew, see Paragraph 78A, the employment of a second operator shall be at the discretion of the Employer. The jurisdiction of the Operating Engineers must be preserved, however, and if someone other than an Operating Engineer is used to operate the piggyback equipment, the contractor must immediately employ a second Operating Engineer at the Class "A" rate.

Where compressors up to 600 CFM or hydraulic pump, power pacs, etc, are operated and exclusively used to power attachments, such as hoe ram and other similar pieces of equipment, the equipment will be considered and manned as a piggyback operation. If a second person (Operating Engineer) is required, even though the equipment is located adjacent to the machine or crane and not mounted directly on the machine, the second person (Operating Engineer) operating the equipment is paid the Class A rate of pay for the day.

Where a second person is an apprentice, refer to the Registered Apprenticeship Wage Schedule on page 86.

If the crane does not require a crew, the auxiliary piece of equipment will be manned by an Operating Engineer and paid the appropriate rate of pay.

**87.** ZONES I, IA, II, and III - As listed in Exhibit A.

When a contractor has eight (8) or more major Operating Engineers (major Operating Engineers A, B and C classifications) employed in the District, he/she shall employ a Master Mechanic. In addition to the Master Mechanic required above, if a contractor has eight (8) or more Operating Engineers (major Operating Engineers A, B and C classifications) employed by him/her on any one job, he/she shall employ a Master Mechanic on that job. The Master Mechanic so employed shall be answerable to the Employer and must be a member of the International Union of

38

Operating Engineers, Local 18. The Master Mechanic duties will be assigned by the Employer. Job Master Mechanics so employed shall be paid at the rate specified herein or paid fifty cents ($.50) per hour above the highest rate of any Operating Engineer working under his/her direction, whichever of these rates is higher.

On jobs where maintenance operators are to be employed, the first one (1) employed shall be Class A; the second one, if required, may be a Mechanic Trainee. Any further hire of maintenance operators shall be one Class "A," then a Mechanic Trainee may be hired. This ratio of one Class "A" to Mechanic Trainee shall be continued in the hire of all maintenance operators as required by the project requirements. Mechanics in training, working under these provisions, will be compensated according to the schedule provided under the "Field Mechanics Trainee Schedule."

**88.** Operators of equipment serviced by a Master Mechanic on a job site shall not be counted in the number of Operators within the District to determine when a Master Mechanic will be required for the District.

**89.** Employees shall be paid once each week, with not more than five (5) days withheld on the designated payday on the job prior to their normal quitting time. Failure to comply with this provision will require the Employer to pay these employees involved the double time rate if required to wait on the job. If required to return the next day to receive their pay, they shall be paid a minimum of four (4) hours at the hourly rate applicable for that day. These same conditions will apply to employees who are terminated after completion of their job assignment. In the event of the discharge of an employee, he/she shall be paid immediately or his/her time will continue until he/she is paid off properly. If not paid off by normal quitting time, the aforementioned requirements will be applied if he/she is required to return the next day for his/her pay. Any employee discharged for just cause will receive their paycheck by the end of the next pay period.

**90.** Paychecks will show the following information:
(1) Total hours worked
(2) Overtime hours (premium hours)
(3) Gross pay
(4) All deductions listed
(5) All fringe contributions (to be shown as a total contribution)

39

SOFCO002333

**91.** Employees requiring relief, for sickness or other causes, must notify his/her immediate supervisor before leaving the job. Such relief shall be arranged through the Union District Office.

**92.** Employer agrees to carry Workers' Compensation or other equivalent liability insurance for the protection of all employees covered by this Agreement.

**93.** At the direction of the Employer's representative on the job, Operating Engineers shall be allowed proper time for necessary repairs and upkeep. During periods of major repairs there must be suitable shelter around equipment and heated from November through March.

**94.** On projects where at least eight (8) Operators are employed, the Employer, during the months of November 1 through April 30, will furnish a heated shelter where employees may change clothes.

**95.** Sanitary drinking water and toilet facilities will be available on the project in compliance with the provisions of the applicable state code.

**96.** The Employer agrees, upon the termination of any employee covered by this Agreement, to furnish such employee so released with a termination slip at the time of release, showing reason for said release. (Union will provide uniform numbered slips in duplicate; original for employee, duplicate for the Employer's file).

**97.** No supervisory employee shall perform productive work or operate equipment which would deny an Operating Engineer employee employment.

**98.** In the reduction of forces on any project, it is agreed that non-area residents will be the first to be laid off except for a limited number of key men as mutually agreed by the Union and the Employer at the Pre-Job Conference. Non-area residents are herein defined as those who have not resided in the State of Ohio or in counties contiguous thereto, nor in Boone, Campbell, Kenton and Pendleton counties in Kentucky, or in counties contiguous thereto, for a period of one (1) year.

**99.** When an Employer rents or leases equipment manned from an Employer in signed relations with this Union, the Engineer or Crew may be transferred to the payroll of the lessee, providing the referral office servicing the job or project shall be notified prior to such transfer and provided further that such employee's

40

employment by the lessee shall terminate upon the termination of the lease or rental of the equipment or any replacement thereof whichever is later.

**100.** When an Employer hires an Owner Operator with one (1) machine and the Owner Operator himself operates such single machine, the Owner Operator will be placed on the Employer's payroll. In the event that the above mentioned machine requires two (2) employees, such employees shall be placed on the Employer's payroll. However, when the Owner Operator has two (2) or more machines operating on the same job, he/she shall then be considered a sub-contractor and therefore come under the sub-contractors clause.

## ARTICLE IX

### TERM OF AGREEMENT

**101.** The Union will notify the Association which is signatory to this Agreement of the name and address of any contractor who becomes signatory or bound by this Agreement during the term of this Agreement. The notice shall be given in writing within seven (7) days of the time any such contractor becomes signatory or bound hereto. The notice shall include a copy of the signature page of the contract or the assent card and, if not noted thereon, a statement of the date the contract or assent card was signed or the date the contractor became bound.

**102.** Within seven (7) days of the receipt of a notice from the Union of its intent to terminate or modify this Agreement, the Association will notify all such contractors of whom the Association has been notified by the Union. Each such contractor shall have thirty (30) days from the date the Association received the notice of intent to terminate or modify to advise the Union in writing of its intent to negotiate separately for a renewal agreement.

**103.** In the event any such contractor fails to advise the Union of its intent to negotiate separately within the time period set forth above, such contractor shall be deemed and presumed to agree to the Union and the Association and to be bound by the collective bargaining agreement resulting therefrom.

**104.** The provisions of this section shall operate for successive collective bargaining agreements until such time as the

41

SOFCO002334

Contractor or Union gives timely notice that said party desires to negotiate separately. Said notice shall be given within the time periods provided in the termination clause of this Agreement or any successive collective bargaining agreement.

**105.** The provisions of this Agreement shall continue in full force and effect through April 30, 2017 and thereafter from year-to-year, including new terms, conditions and compensation, until termination at the option of either party, in writing, 60 days prior to expiration of Agreement.

## ARTICLE X

### APPRENTICES

**106.** In order to maintain sufficient skilled mechanics for the industry and, in order to present proper learning opportunities for youth and, in order to effectuate the principles and desires of the negotiating parties created by the foregoing, the negotiators hereby fully subscribe to the Ohio Operating Engineers Apprenticeship Fund Agreement and Declaration of Trust dated 20 October 65 as if they had originally negotiated the same. The only limitation upon the program is the Affirmative Action Program here attached (Exhibit "B"), in addition to the proper rules, regulations, processes, and procedures enunciated by the Joint Apprenticeship and Training Committee established by the Trust of 20 October 65.

**107.** It is understood by the negotiating parties that a Registered Apprentice Engineer works under the direction of the Operating Engineer and the Joint Apprenticeship and Training Committee, and that the Operating Engineer shall see that he/she stays on the job, properly caring for his/her machine. The Employer shall give sufficient opportunity for the Registered Apprentice to operate under the supervision of the Operating Engineer when time and opportunity avails itself. The Area Coordinator of Apprentices shall be appraised periodically and by his request of performance to further the Registered Apprentices' learning situation. Registered Apprentices shall receive the scale enunciated by the Joint Apprenticeship and Training Committee in the time justified category that the Registered Apprentice has accomplished. For every three (3) Operating Engineer Journeymen employed by the company, there may be employed one (1) Registered Apprentice or Trainee Engineer through the referral when they are available. An ap-

42

prentice, while employed as part of a crew per Article VIII paragraph 77, will not be subject to the apprenticeship ratios in this collective bargaining agreement.

## ARTICLE XI

### CONSTRUCTION INDUSTRY ADVANCEMENT PROGRAM

**108.** The Employer and the Union agree to and approve the establishment of a Construction Industry Advancement Program to promote the common good of the Construction Industry by providing financial support for activities which may include but not necessarily be restricted to: (a) promotion of safety; (b) market development; (c) protection of legitimate markets; (d) public relations; (e) personnel practices and labor relations; (f) education; (g) industry relations; (h) apprenticeship training; (i) participation in Funds and Plans provided for in collective bargaining agreement, such as Health and Welfare Plans; and (j) collection and distribution of information from and to all segments of the Construction Industry and related groups or authorities.

**109.** Each Employer bound by this Agreement shall pay twenty cents ($.20) per hour worked effective May 1, 2010 to the AGC of Ohio Construction Industry Advancement Fund. Such funds shall be transmitted along with the Health and Welfare payments to the Ohio Operating Engineers Health and Welfare Office located at 1180 Dublin Road, Columbus, Ohio 43215, no later than the fifteenth (15th) day of the month immediately following the calendar month.

A. Administrative Fee. In addition to the CIAP payment each Contractor bound by the Agreement who is not an AGC of Ohio member shall pay an administrative fee of fifteen cents ($0.15) per hour for each hour worked by employees of the Contractor who are working within the bargaining unit herein. Such payments shall be transmitted with the fringe payments provided herein or transmitted directly to the AGC of Ohio no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed.

B. The Union shall have no participation or control of any kind or degree whatsoever nor shall the Union be connected in any way whatsoever with the Construction Industry Advancement Fund.

43

C. The Employer will hold the Union harmless from any liabilities arising out of the terms of Paragraph 108 through and inclusive of Paragraph 109D.

**110.** AGC of Ohio shall be the exclusive Administrator of the State Fund. Payments to the program shall be in accordance with instructions on forms furnished by the Association.

**111.** The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the fifteenth (15th) day of each month covering amounts due for the preceding month. If an Employer shall fail to make their payment when the same shall be due and payable, he shall be subject to an additional charge of one and one half percent (1-1/2%) per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses and impairment of reserves. In addition to the additional charges referred to herein, an Employer who fails to make timely payments shall be liable for legal fees and court costs incurred by the Association in collecting late payments.

**112.** Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and Fund of the Construction Industry Advancement Program shall not be distributed among any Employers, or the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

**113.** There is specifically excluded from the purposes of the Construction Industry Advancement Program the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during periods of work stoppages or strikes. .

## ARTICLE XII

### UNION ADMINISTRATIVE DUES AND DEDUCTIONS

**114A.** Upon notification by the Union that a uniform administrative dues deduction has been authorized by all employees of the Employer, the Employer shall deduct said uniform administrative dues. The Union shall be responsible for obtaining all individually signed authorizations.

44

**114B.** The employer will deduct ten cents ($0.10) for each hour that the employee receives wages under the terms of the Agreement on the basis of individually signed voluntary authorized deduction forms. It is agreed that these authorized deductions are for remittance to Local 18's Political Education Patterns known as P.E.P., and are not a condition of membership in the International Union of Operating Engineers, Local 18 or of employment with the Employer, and that P.E.P. will use such monies in making political contributions in connection with federal, state and local elections. Payments for P.E.P. reflecting employee hours worked shall be made on the monthly fringe benefit reporting forms and shall be remitted at the same time and in the same manner as the Employer submits the fringe benefit payments under Article V of this Agreement.

The costs of administering this payroll deduction for P.E.P. are incorporated into the economic package provided under the terms of this Agreement so that the I.U.O.E. has, through its negotiation and its execution of this Agreement, reimbursed the Employer for the costs of such administration.

**115.** Credit Union savings will be agreed to only if deductions are the same for all employees and the Union is responsible for obtaining the voluntary authorization.

**116.** The Union agrees to indemnify and save the Employer harmless against any and all claims, suits or other forms of liability arising out of said deductions.

## ARTICLE XIII

### ENFORCEMENT MEASURES

**117.** It is agreed that all subcontractors shall be subject to the terms and provisions of this Agreement as it relates to the Operating Engineers.

**118.** The Union shall require that no Union person shall leave a job by quitting unless he/she has been properly relieved after giving ample notice of his/her intention to quit to the Employer.

**119.** The Union shall not transfer a Union person from one Employer to another without the consent of the Employer and the Union person involved. Neither shall the Employer transfer a Union person from his/her employ to another Employer's payroll without the consent of the Union person involved and the Union.

45

SOFCO002336

**120.** All employees of the Employer shall be allowed time to vote on Election Day as required by law on employees own time.

**121.** If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to the Employer.

**122.** There are areas within the scope of this Agreement for which the wages and conditions contained herein may not be appropriate due to competition or other reasons. In such cases, adjustments will be made in accordance with principles agreed to by the parties during negotiations.

**123.** No employee covered hereby may be discharged by an individual Employer for refusing to cross a legal primary picket line established by an International Union affiliated with the Building and Construction Trades Department of the AFL-CIO or a Local Union thereof or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Local Union thereof, which picket line has been authorized and sanctioned by proper authorities. No jurisdictional or illegal informational picket line shall be recognized.

## ARTICLE XIV

### NO STRIKE-NO LOCKOUT-ARBITRATION AND DISPUTES

**124.** The Employer shall not cause, permit or engage in any lockout of its employees during the term of this Agreement.

The Union shall not authorize, cause, engage in or sanction, nor will any employee take part in any illegal slowdown, work stoppage, strike, picketing or other concerted interference against the Employer, or occurring at or around the Employer's office or work locations during the term of this Agreement.

**125.** Should a dispute arise between any of the parties (Employee, Employer, Association and/or Union) to this Agreement as to its meaning, intent or the application of its terms, this dispute will be settled in accordance with the following grievance procedure:

**STEP 1:** The aggrieved employee shall first take up his/her grievance orally with the Employer's Supervisor or Representative. The employee may, if he/she so desires, have his/her

Steward appear with him/her. The grievance shall be orally brought to the Employer's attention within three (3) working days of the occurrence or discovery of the grievance, but in no event will the grievance be honored by management later than fifteen (15) days past the incident giving rise to the complaint. A grievance not submitted within the time limit shall be deemed untimely and is waived.

**STEP 2:** In the event the grievance is not settled, the employee then shall put his/her grievance in writing within three (3) working days after STEP 1 meeting, dated and signed along with the contract Article effected and submit the grievance to the District Business Representative and he/she and the Business Representative shall meet with the Employer's Representative and attempt to settle the matter. If no settlement can be reached within ten (10) working days from the date of the written grievance, then

**STEP 2a:** The grievance may be considered by a designated representative of the Union and the Labor Relations Director of the Associated General Contractors of Ohio, who shall have the authority to mutually agree upon a final and binding settlement of the grievance. If Step 2a. is not utilized, or if no settlement can be reached in Step 2a. within five (5) days from the date the grievance is referred, then:

**STEP 3:** The grievance may be referred to the State Joint Committee consisting of six (6) members, three (3) to be appointed by the Labor Relations Division of the AGC of Ohio and three (3) to be appointed by Local 18 of the International Union of Operating Engineers. Where the State Joint Committee, by majority vote (5 members or more), resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this agreement. In case of failure of either party to appear at the hearing of a grievance properly filed for hearing, the parties in attendance shall offer evidence in support of their position and the Committee shall dispose of the case on the basis of such evidence. If no settlement is reached at this STEP within fifteen (15) working days from the date the grievance is referred, then

**STEP 4:** The grievance shall then be referred to an Arbitrator selected by the Committee referred to in STEP 3. If the parties cannot agree on an Arbitrator within forty-eight (48) hours after the parties agree to submit the matter to arbitration, the parties shall jointly request the Federal Mediation and Concilia-

46

47

tion Service to furnish a list of Arbitrators from which the Arbitrator shall be selected by the alternate striking of names.

**126.** The expenses and fees of the Arbitrator shall be shared equally by the parties. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms and provisions of this Agreement. The Arbitrator's decision shall be final and binding upon the parties hereto.

## ARTICLE XV

### DETERMINATION OF JURISDICTIONAL DISPUTES

**127.** Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement creating the Impartial Jurisdictional Disputes Board. In particular, both parties agree to be bound by the provision of the Agreement which states: Any decision or interpretation of the Impartial Jurisdictional Disputes Board shall immediately be accepted and complied with by all parties signatory to this Agreement.

The parties hereto agree that in the event of a jurisdictional dispute with any other Union or Unions, the dispute shall be submitted to the Impartial Jurisdictional Disputes Board for settlement in accord with the Plan adopted by the Building Trades Department, AFL-CIO.

The parties hereto further agree that they will be bound by any decision or award of the Disputes Board. There shall be no stoppage of work or slowdown arising out of any such dispute. No jurisdictional work stoppages, and no jurisdictional picket lines shall be recognized.

This article of the contract will go into effect when the National A.G.C. reaffiliates with the Impartial Jurisdictional Disputes Board. This article will not be applicable until such time as the International Union of Operating Engineers reaffiliates with the Building and Construction Trades Department of the AFL-CIO.

## ARTICLE XVI

### I-9

**128.** The Union and the Employers during the term of this Agreement agree to use their best efforts to establish a master file of I-9 employment eligibility verification forms on all members. This file will be maintained at the Union office and be available for the Employers' use.

48

## ARTICLE XVII

### SAVINGS AND SEPARABILITY

**129.** It is mutually agreed that if any clause, terms or provisions of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other board or agency having jurisdiction in the matter, such clause, terms or provisions shall be or become inoperative of any effect without disturbing the other clauses, terms or provisions of this Agreement and the remaining part of this Agreement shall remain in full force and effect. In the event that any clause, terms or provisions of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other board or agency having jurisdiction in the matter, said clause, terms or provisions shall be re-negotiated to the mutual satisfaction of the parties, but during such re-negotiation work shall not be interrupted or stopped by lockout, strikes, boycotts or other labor troubles.

## ARTICLE XVIII

### EFFECTIVE

**130.** This Agreement shall be effective May 8, 2013 and shall remain in force and in accordance with the terms of Article IX hereof. Wage rates and fringe payments shall be effective as designated by this Agreement.

**131.** IN WITNESS WHEREOF, WE, the undersigned duly authorized Employer Representatives and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO) executed this Agreement on the 8th day of May, 2013.

49

## I.U.O.E. LOCAL 18 AND ITS BRANCHES

S/PATRICK L. SINK
Business Manager

S/RICHARD E. DALTON
President

S/MARK A. TOTMAN
Vice President

S/GARY G. SIESEL
Recording-Corresponding Secretary

S/PREMO P. PANZARELLO
Financial Secretary

S/JOSEPH S. LUCAS
Treasurer

Trustees

S/TIMOTHY D. HAMMOCK
S/SCOTT R. STEVENSON
S/DONALD G. TAGGART

## AGC OF OHIO LABOR RELATIONS DIVISION

S/RICHARD HOBBS
Executive Vice President

S/MIKE DYER
Goettle Construction Co.
Vice President, Operations

S/THOMAS G. MURASKI, P.E.
Kokosing Construction Company Inc.
Vice President

50

**EXHIBIT A, Zone 1**
**WAGE RATES AND FRINGE CONTRIBUTIONS**

ZONE I covering Summit and Portage counties:

Classification: MASTER MECHANIC

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $33.18* | $33.98* | $34.78* | $35.83 |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

51

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

SOFCO002339

Classification: **GROUP A**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Health & Welfare | $32.93* | $33.73* | $34.53* | $35.58* |
| Pension | 6.91 | 7.16 | 7.41 | 7.41 |
| Apprenticeship | 6.00 | 6.00 | 6.00 | 6.00 |
| E & S | .60 | .67 | .75 | .75 |
| CIAP | .04 | .07 | .09 | .09 |
| CIAP Admin. | .20 | .20 | .20 | .20 |
| PAC | .15 | .15 | .15 | .15 |
| | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

52

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators,
  when compressor or boiler is mounted on
  crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
All Concrete pumps with booms

Cranes (all types)***
Cranes – Compact; track or rubber over 4,000
  pounds capacity
Cranes – Self-erecting; stationary, track or truck
  (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam, suction) 3-man crew
Elevating Graders or Euclid Loaders

Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building
  materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers

Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning
  device)
Rotary Drills (all), used on caissons for
  foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

| | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' – 180' | $33.43* | $34.23* | $35.03* | $36.08* |
| 180' – 249' | 33.93* | 34.73* | 35.53* | 36.58* |
| 250' and over | 34.18* | 34.98* | 35.78* | 36.83* |

*If additional funds are required for fringe benefits, they may be
diverted from wages.

53

SOFCO002340

# EXHIBIT A, Zone 1A

**ZONE 1A** covering Erie, Huron, Lorain, Medina

Certified Crane Operator Pay
Operating Engineers employed on any piece of equipment requiring a Certified Crane Operator (CCO) certification shall be paid a premium of fifty cents ($0.50) per hour in addition to the crane rate or any escalated rate that may be in effect.

Day Pay
In all counties covered by ZONE 1A of this Agreement, the following classifications shall be employed on a DAY PAY basis:

Asphalt Pavers
Backfillers and Tampers
Backfillers
Bar and Joint Installing Machines
Batch Plant Operators
Boom Trucks
Bulldozers
Bull Floats
Burlap and Curing Machines
CMI-type Equipment
Cableways
Concrete Pumps

Concrete Spreaders
Crushers
Drum Firemen in Asphalt Plants
Elevating Graders or Euclid Loaders
End Loaders
Finishing Machines
Floating Equipment (anything on Great Lakes or its tributaries is under the River & Lake Agreement)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (Sonic Pile Driving)

Grinders (all)
Hoes (when attached to farm or industrial-type tractors or CAT 320 backhoes or equivalent and below)
Horizontal Directional Drill Operator and Horizontal Directional Drill Locator
Hydro Excavator (all types C rate) (F rate if a second person is needed) Helper rate
Inboard, Outboard Motor Boat Launches
Laser Screeds and like equipment
Lead Greasemen
Locomotives (all)
Mobile Concrete Pumps, with Boom
Mucking Machines
Pavement Breakers, Hydro, or Cable
Planers (all types)
Plant Mixers (on site)
Portable Hydraulic Gantry (lift system C Rate) (F Rate if a second person is needed)

Power Graders
Power Scoops
Pump Operators, installing or operating well-points or other types of dewatering systems
Push Cats
Road Widening Trenchers
Rollers (all types)
Rotomills
Rough Terrain Forklifts (with winch/hoist)
Saw, concrete vermeer–type
Self-propelled Power Spreaders
Self-propelled Power Sub-graders
Slip Form Pavers
Straddle Carriers
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Vibratory Compactors, with integral power

58

59

SOFCO002343

**GROUP C**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $33.18* | $34.11* | $34.91* | $35.96* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

64

Operators of:

Air Compressors, pressurizing shafts, or tunnels
Asphalt Rollers (all)
Forklifts
Hoists, one drum
House Elevators (except automatic call button controlled)
Hydro Excavator (all types C rate) (F rate if a second person is needed) Helper rate
Laser Screeds and like equipment
Man Lifts

Modular Moving and Placement machine (C rate) (F rate if a second person is needed)
Mud Jacks
Portable Hydraulic Gantry (lift system C Rate) (F Rate if a second person is needed)
Power Boilers (over 15 lbs. pressure)
Pump Operators, installing or operating well points or other type of dewatering system
Pressure Groutings
Trenchers (24" and under)
Utility Operators

---

**GROUP D**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $32.40* | $33.33* | $34.13* | $35.18* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

65

Operators of:

Compressors, on building construction
Conveyors, building material
Generators
Gunite Machines
Mixers, capacity more than one bag
Mixers, one bag capacity (side loader)

Post Drivers
Post Hole Diggers
Pavement Breakers, hydraulic or cable
Road Widening Trenchers
Rollers
Welder Operators

SOFCO002346

Classification: **GROUP E**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $24.39* | $25.19* | $25.99* | $27.04* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

76

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helpers (Oilers)
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber under 4,000 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches

Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signal Person
Submersible Pumps (under 4" discharge)

## EXHIBIT A, Zone III
### WAGE RATES AND FRINGE CONTRIBUTIONS

ZONE III covering Akron and counties, Columbus and counties, Franklin and counties, and Toledo and counties:

For AKRON and the following counties: Ashland, Belmont, Carroll, Coshocton, Guernsey, Harrison, Holmes, Jefferson, Monroe, Noble, Richland, Stark, Tuscarawas, Washington and Wayne.

For COLUMBUS and the following counties: Crawford, Delaware, Fairfield, Franklin, Hocking, Knox, Licking, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Union and Wyandot.

For FRANKLIN and the following counties: Adams, Athens, Auglaize, Brown, Butler, Champaign, Clark, Clermont, Clinton, Darke, Fayette, Gallia, Greene, Hamilton, Highland, Jackson, Lawrence, Logan, Madison, Meigs, Mercer, Miami, Montgomery, Morgan, Preble, Ross, Scioto, Shelby, Vinton and Warren. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

77

For TOLEDO and the following counties: Allen, Defiance, Fulton, Hancock, Hardin, Henry, Ottawa, Paulding, Putnam, Sandusky, Seneca, Van Wert and Williams.

SOFCO002352

Classification: **MASTER MECHANIC**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $31.69* | $32.49* | $33.29* | $34.34* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Classification: **GROUP A**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $31.44* | $32.24* | $33.04* | $34.09* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

78

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***
Cranes – Compact; track or rubber over 4000 pounds capacity
Cranes – Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials

Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders
Rail Tampers (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure

79

(Continued on next page)

SOFCO002353

Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

| | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' - 180' | $31.94* | $32.74* | $33.54* | $34.59* |
| 180' - 249' | 32.44* | 33.24* | 34.04* | 35.09* |
| 250' and over | 32.69* | 33.49* | 34.29* | 35.34* |

*If additional funds are required for fringe benefits, they may be diverted from wages.

Classification: **GROUP B**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.32* | $32.12* | $32.92* | $33.97* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour
   from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with hoe
   attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders
Hydro Milling Machines

Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

Classification: **GROUP C**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $30.28* | $31.08* | $31.88* | $32.93* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

SOFCO002354

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps without booms and with 5" system
Fork Lifts (except masonry)
Highway Drills - all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate of pay will be "Class E")

Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie (Inserter/Remover)
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

82

Classification: **GROUP D**

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $29.10* | $29.90* | $30.70* | $31.75* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

83

Operators of:

Ballast Relocators
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag

Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreading Machines
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen in asphalt plants
Farm-type Tractors, pulling attachments

*(Continued on next page)*

SOFCO002355

| Finishing Machines | Rollers (except asphalt) |
|---|---|
| Form Trenchers | Self-propelled Power Spreaders |
| Generators | Self-propelled Sub-graders |
| Gunite Machines | Shotcrete Machines |
| Hydro-seeders | Tire Repairmen |
| Pavement Breakers (hydraulic or cable) | Tractors, pulling sheepfoot rollers or graders |
| Post Drivers | VAC/ALLS |
| Post Hole Diggers | Vibratory Compactors, with integral power |
| Pressure Pumps (over 1/2" discharge) | Welder Operators |
| Road Widening Trenchers | |

84

Classification: **GROUP E**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $23.64* | $24.44* | $25.24* | $26.29* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

| Allen Screed Pavers (concrete) | Inboard, Outboard Motor Boat Launches |
|---|---|
| Apprentice/Helpers (Oilers) and Signalmen | Light Plant Operators |
| Boilers (less than 15 lbs. pressure) | Masonry Fork Lifts |
| Cranes-Compact; track or rubber under 4,000 | Power Driven Heaters (oil fired) |
| pounds | Power Scrubbers |
| Directional Drill "Locator" | Power Sweepers |
| Fueling and greasing +$3.00 | Pumps (under 4" discharge) |
|  | Submersible Pumps (under 4" discharge) |

85

SOFCO002356

## REGISTERED APPRENTICESHIP WAGE SCHEDULE
### ZONE I, ZONE 1A, ZONE II, ZONE III

| | |
|---|---|
| First Year Apprentice | Third Year Apprentice |
| 50% of Class A | 70% of Class A |
| Second Year Apprentice | Fourth Year Apprentice |
| 60% of Class A | 80% of Class A |

A new classification of Trainee is hereby established and the rates of pay are as follows:

| | |
|---|---|
| First Year Trainee | Third Year Trainee |
| 60% of Bulldozer Rate | 75% of Bulldozer Rate |
| Second Year Trainee | Fourth Year Trainee |
| 60% of Bulldozer Rate | 90% of Bulldozer Rate |

There will be a 10% increase for the apprentices on top of the percentages listed above provided they are operating mobile equipment.

The rates paid to the Apprentice or Trainee shall not exceed the classification rate the Apprentice or Trainee is working. For every five (5) Operating Engineer Journeymen employed, there may be employed one (1) Registered Apprentice Engineer or Trainee. Through the referral, Employers may employ Registered Apprentices or Trainees within this limitation when they are available. Any increase in the Apprenticeship contributions, agreed by the parties, will be shared equally by the Union and Employer.

## FIELD MECHANIC TRAINEE SCHEDULE

| | |
|---|---|
| First Year | 50% of Class "A" rate |
| Second Year | 60% of Class "A" rate |
| Third Year | 70% of Class "A" rate |
| Fourth Year | 80% of Class "A" rate |

Only those individuals who have obtained a two (2) year Associates Degree, from an accredited school, will be accepted into this program. If the Mechanic Trainee is required to have a CDL license, he/she will be paid a 10% incentive above the percentages listed above. After successful completion of the fourth year, the Mechanic will be paid at Class "A" rate.

86

## SPECIAL RATES

Any work under A, B and C as described in Article I of this Agreement awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## EXHIBIT B
### AFFIRMATIVE ACTION PROGRAM

1. Under the provisions of Executive Order 11246, issued by the President of the United States, and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations as revised, and relative court orders, a specific affirmative program must be developed to assure that the employment of workers and the treatment of employees during employment is completely nondiscriminatory in regard to race, creed, color, sex, age, religion or national origin.

2. The parties to this Agreement are mutually desirous of developing an affirmative action agreement to implement the provisions of applicable federal regulations in order to assure nondiscrimination in employment; upgrading; demotion or transfer; recruitment and recruitment advertising; lay-off or termination; rate of pay and selection for all types of training.

3. In order to assure nondiscrimination now and in the future and in an effort to attract a maximum number of potential apprentices from minority and female groups, the parties to this Agreement have formulated the following Affirmative Action Program:

### A. APPRENTICESHIP

The parties agree to establish a positive program of apprenticeship selection and to use the following program to attract minority and female groups to the Operating Engineers' Apprenticeship Program:

1. Develop a "fact sheet" for distribution to all secondary school counselors, youth opportunity centers, social action agencies and state employment offices.

87

2. Make available speakers to inform and advise high school students and others of opportunities in apprenticeship for Operating Engineers.

3. Notify all interested agencies and parties thirty (30) days prior to the period for taking applications; and making such interested agency or parties aware of the nature of all tests in order to facilitate a proper pre-test educational effort.

4. Provide application forms for apprenticeship and adequate instruction for properly preparing same, upon request, during recruitment periods at all training sites of the Operating Engineers Apprenticeship Program at certain union halls of Local 18. Develop an outreach program for the recruiting and pre-apprentice training of individuals from minority and female groups to enable them to enter the apprenticeship program.

5. To use a standardized, uniform battery of tests to determine applicant proficiency and aptitudes in reading, computation and mechanical skills suitable for the craft of Operating Engineer.

6. May have the test administered by an agency other than the Ohio Operating Engineers Apprenticeship Program and uniformly and numerically graded.

7. Interview sufficient applicants personally by teams consisting of one (1) representative of Management and one (1) of the Union who shall independently grade each applicant individually and then average the scores.

8. When an applicant fails to achieve acceptance, the Joint Apprenticeship and Training Committee shall make every effort to inform the applicant and the referring or cooperating agency of the area of insufficiency.

9. In order for the applicant, after acceptance as an Operating Engineer Apprentice, to become immediately employable by a Participating Employer, the Joint Apprenticeship and Training Committee shall provide training sites with equipment of the nature for which the apprentice will be employed, in order to acquaint the apprentice with safety measures as well as the operation and maintenance of the same and teach him/her the use of the machine as a tool of the trade and to generate good work habits. After the training, he/she shall be employed as an "apprentice-in-training" as such openings occur.

88

10. The parties to this Agreement agree to jointly assist a minority group employee to be integrated into the work force and the Union by:

A. Having management supervision on the job make every effort to assist and encourage minority group apprentices and to welcome such individuals to the job;

B. Have each apprentice and pre-apprentice trainee assigned to a Journeyperson Operating Engineer for help and assistance, and

C. Have Union officers inform the membership of the importance of making welcome all minority groups into the Union, and

D. The education, training requirements and disciplines of Registered apprentices shall be governed by the Joint Apprenticeship and Training Committee and its standards.

## B. JOURNEY PERSONS

1. The parties will undertake a joint training program to assure equal opportunity to all journey persons who desire to acquire the skills required to work on a variety of equipment within the jurisdiction of the Operating Engineers.

2. Local Union officials will notify minority and female members of this program. They will offer to minority and female members an opportunity for training on any highway equipment. If the parties determine that a minority or female group member lacks adequate pre-training qualifications, the reasons for such determination shall be noted in writing and shall be available for inspection during a review of this program by appropriate federal contracting or administering agency officials. An attempt shall be made to have availability of training according to the demands for craftsmen to operate the specific type of equipment involved.

3. Each member of the Local will be advised of this Agreement and the appropriate avenues for redress if any of its terms are breached by either party.

The parties undertake this Affirmative Action Program in accordance with Executive Order 11246 and applicable court orders. It is their understanding that participation in the program

89

SOFCO002358

by any contractor shall be accepted in lieu of that portion of a required affirmative action plan which would otherwise be directed to jobs manned by members of the Operating Engineers Union.

The parties shall from the date of this Agreement, when required, report to the appropriate federal contracting or administering agency. The report will specifically indicate the total number of minority group individuals or females in the Union. In evaluating these reports, the appropriate federal contracting or administering agency officials will have complete access to relevant records of the parties and will be expected to discuss the progress of the program freely with the parties and Union members.

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____
Name of Employer (Printed)

_____
Employer Address

_____
City            State            Zip Code

_____
Area Code & Telephone

_____
Authorized Employer Representative  (Signature)  Date

_____
Authorized Employer Representative  (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____
Union Representative (Signature)

**CONTRACTORS COPY**          (ORIGINAL SIGNATURE)

90

SOFCO002359

Fund
EXHIBIT D
10.26.2018

# OHIO OPERATING ENGINEERS PENSION FUND

## AMENDED AGREEMENT AND DECLARATION OF TRUST

**Effective February 1, 2016**

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARTICLE I – DEFINITIONS ......................................................................................... 2

    1.1    Act ...................................................................................................... 2
    1.2    Administrator ..................................................................................... 2
    1.3    Beneficiary ........................................................................................ 2
    1.4    Code .................................................................................................. 2
    1.5    Employee .......................................................................................... 2
    1.6    Employer ........................................................................................... 2
    1.7    Fund or Trust Fund ........................................................................... 2
    1.8    Fund Administrator ........................................................................... 3
    1.9    Name of Plan .................................................................................... 3
    1.10   Participant ......................................................................................... 3
    1.11   Trust Agreement or Trust ................................................................. 3
    1.12   Trustees ............................................................................................. 3
    1.13   Union ................................................................................................. 3

ARTICLE II – PURPOSE OF THE TRUST AND USE OF THE FUND ...................... 4

    2.1    Purpose .............................................................................................. 4
    2.2    Exclusive Benefit ............................................................................. 4

ARTICLE III – TRUSTEES OF THE FUND ................................................................ 4

    3.1    Number, Appointment ...................................................................... 4
    3.2    Term of Office .................................................................................. 5
    3.3    Officers ............................................................................................. 5
    3.4    Union Trustees ................................................................................. 5
    3.5    Employer Trustees ........................................................................... 5
    3.6    Acceptance of Appointment ............................................................. 5
    3.7    Resignation ....................................................................................... 6
    3.8    Removal ............................................................................................ 6
    3.9    Successor Trustees – Appointment ................................................... 6
    3.10   Successor Trustees -- Powers and Duties ......................................... 6
    3.11   Vacancies ......................................................................................... 6
    3.12   Quorum ............................................................................................. 7
    3.13   Meetings ........................................................................................... 7
    3.14   Attendance at Meetings .................................................................... 7
    3.15   Action Without Meeting ................................................................... 8
    3.16   Resolution of Impasse ...................................................................... 8
    3.17   Voting ............................................................................................... 8
    3.18   Participation at Meetings; Minutes .................................................. 8
    3.19   Office of the Fund ............................................................................ 9

i

ARTICLE IV – POWERS AND DUTIES OF TRUSTEES ..........................................9

4.1     Conduct of Trust Business.................................................................. 9
4.2     Use of Fund for Expenses................................................................. 9
4.3     Use of Fund to Provide Benefits....................................................... 10
4.4     Investments ..................................................................................... 10
4.5     Deposits and Disbursements ............................................................ 12
4.6     Allocation and Delegation of Fiduciary Responsibilities ................... 12
4.7     Committees of the Board of Trustees ................................................ 12
4.8     Administrative Manager .................................................................... 13
4.9     Collection of Employer Contributions................................................ 13
4.10    Bylaws, Rules and Regulations......................................................... 13
4.11    Additional Authority ........................................................................ 14
4.12    Bonds ............................................................................................. 15
4.13    Insurance ........................................................................................ 15
4.14    Information to Participants and Beneficiaries...................................... 16
4.15    Accountants and Actuaries ............................................................... 16
4.16    Trustees to Act Without Compensation............................................. 16
4.17    Reports .......................................................................................... 16
4.18    Records of Trustee Transactions....................................................... 16
4.19    Construction and Determinations by Trustees.................................... 17
4.20    Liability.......................................................................................... 17
4.21    Reliance on Written Instruments ...................................................... 17
4.22    Reliance by Others.......................................................................... 18
4.23    Discharge of Liability ...................................................................... 18
4.24    Merger............................................................................................ 18
4.25    Settling Disputes ............................................................................. 18
4.26    Reciprocity Agreements.................................................................... 18
4.27    Written Plan for Benefits ................................................................. 19
4.28    Internal Revenue Service and Labor Department Approval.................. 19

ARTICLE V – CONTRIBUTIONS AND COLLECTIONS..........................................19

5.1     Employer Contributions.................................................................... 19
5.2     Responsibility for Contributions........................................................ 20
5.3     Work Outside Jurisdiction ............................................................... 20
5.4     Collection and Enforcement of Payments........................................... 20
5.5     Cost of Collection ........................................................................... 20
5.6     Production of Records...................................................................... 21
5.7     Non-Payment of Contributions.......................................................... 21
5.8     Delinquent Contributions as Plan Assets........................................... 22
5.9     Refund of Contributions .................................................................. 22
5.10    Varying Rates of Contribution.......................................................... 22

ARTICLE VI – BENEFICIAL RIGHTS..................................................................23

6.1     No Right, Title or Interest of Employers and Union ........................... 23
6.2     Limitations upon Beneficial Rights of Employees ............................... 23

ii

ARTICLE VII – AMENDMENT AND TERMINATION OF TRUST AGREEMENT AND
TRUST FUND .................................................................................................................23
    7.1    Amendment ....................................................................................................... 23
    7.2    Termination ....................................................................................................... 24

ARTICLE VIII – MISCELLANEOUS PROVISIONS ...........................................................24
    8.1    Law Applicable ................................................................................................ 24
    8.2    Savings Clause ................................................................................................. 24
    8.3    Withholding Payment ....................................................................................... 24
    8.4    Beneficiaries under Disability .......................................................................... 24
    8.5    Gender .............................................................................................................. 25

## INTRODUCTION

WHEREAS, an Agreement and Declaration of Trust was made and entered into as of the 1st day of June 1964, pursuant to which the Ohio Operating Engineers Pension Fund was created and administered; and

WHEREAS, the Agreement and Declaration of Trust made and entered into as of the 1st day of June, 1964, was amended, redrafted and replaced with a new and separate instrument on November 29, 1977;

WHEREAS, the November 29, 1977 Agreement and Declaration of Trust ("Trust Agreement") has been properly amended from time to time, pursuant to its applicable provisions;

WHEREAS, the signatories hereto are currently the duly appointed and acting trustees (the "Trustees") under the Trust Agreement; and

WHEREAS, Article VII of the Trust Agreement empowers the Trustees to amend the Trust Agreement by a majority vote; and

WHEREAS, the Trust Agreement requires updating and further amendments which the Trustees believe are best made through an amendment and restatement of the Trust Agreement;

NOW, THEREFORE, pursuant to the powers vested in them as Trustees, the undersigned hereby amend the Trust Agreement by deleting in their entirety the terms of said Trust Agreement and substituting therefor the following terms effective on and after February 1, 2016.

1

ARTICLE I

DEFINITIONS

1.1 Act. The term "Act" as used herein shall mean the Employee Retirement Income Security Act of 1974 as the same may be amended and modified from time to time, together with any rules and regulations promulgated pursuant to the provisions of said Act.

1.2 Administrator. The term "Administrator" shall mean the current Trustees.

1.3 Beneficiary. The term "Beneficiary" as used herein shall mean either a person designated by an Employee to receive benefits which may be payable under the provisions of the Plan, or a person other than an Employee who, by the terms of the Plan, is or may become entitled to benefits thereunder.

1.4 Code. The term "Code" shall mean the Internal Revenue Code of 1986, as amended.

1.5 Employee. The term "Employee" as used herein shall mean any person in the employ of an Employer on whose behalf the Employer is obligated by written agreement to make contributions to the Fund.

1.6 Employer. The term "Employer" as used herein shall mean any person, corporation, partnership, unincorporated association, labor organization or other legal entity obligated by written agreement to make contributions to the Fund established herein. By making contributions to this Fund, all such Employers shall be deemed to have accepted and to be bound by the terms of this Trust Agreement as the same may be amended from time to time.

1.7 Fund or Trust Fund. The terms "Fund" and "Trust Fund" as used herein shall mean the trust estate of the pension trust herein established as it may, from time to time, be constituted, including, but not limited to, policies of insurance, investments and the income

2

therefrom, Employers' contributions paid or due and owing the Fund, and all other assets or money held by the Trustees for the uses and purposes of this Trust.

    1.8    <u>Fund Administrator</u>. The term "Fund Administrator" shall mean the person appointed in accordance with Section 4.8 of the Trust Agreement.

    1.9    <u>Name of Plan</u>. The pension plan established pursuant to Section 4.27 of the provisions of this Trust Agreement.

    1.10    <u>Participant</u>. The term "Participant" as used herein shall mean any Employee or former Employee who is or who may become eligible to receive a benefit of any type from this Fund, or whose Beneficiary may be or may become eligible to receive any such benefit.

    1.11    <u>Trust Agreement or Trust</u>. The terms "Trust Agreement" and "Trust" as used herein shall mean this instrument as the same may be amended and modified from time to time.

    1.12    <u>Trustees</u>. The term "Trustees" as used herein shall mean the current Trustees, together with their successors designated and appointed in accordance with the terms of this Trust Agreement. The Trustees, collectively, shall be the "Administrator" of this Fund as that term is used in the Act.

    1.13    <u>Union</u>. The term "Union" as used herein shall mean, collectively and separately, the International Union of Operating Engineers Local 18 and its branches (AFL-CIO).

3

ARTICLE II

PURPOSE OF THE TRUST AND USE OF THE FUND

2.1     Purpose.  The Fund shall be established and maintained to provide:

(a) pension, retirement, disability and death benefits for Participants and Beneficiaries pursuant

to the provisions of the Plan, and (b) the means for financing the expenses of the Trustees in

administering the Plan and Trust Agreement.  It is intended that the Plan and Trust be a

"multiemployer plan" as that term is defined in Section 3(37) of the Act.  In accordance with

Section 302(c) of the Labor Management Relations Act, as amended (also known as the Taft-

Hartley Act), the Fund shall constitute a trust established for the exclusive purpose of providing

the Plan's Participants and Beneficiaries the retirement and related benefits provided under the

provisions of the Plan.

2.2     Exclusive Benefit.  No part of the Fund or of the income therefrom may be

used for purposes other than for the exclusive benefit of Employees and their Beneficiaries and

to defray reasonable expenses relating to the administration of the Plan.

ARTICLE III

TRUSTEES OF THE FUND

3.1     Number, Appointment.  The Fund shall be administered by eight Trustees,

who shall together be the named fiduciary, four of whom shall be Employer Trustees, and four of

whom shall be Union Trustees.  The Labor Relations Division of the Ohio Contractors

Association, The Associated General Contractors of America, Inc. (hereinafter, the

"LRD/OCA"), shall designate three individuals to serve as Employer Trustees, and the

Associated Contractors of Ohio, Inc., The Associated General Contractors of America, Inc.

(hereinafter the "ACO"), shall designate one individual to serve as an Employer Trustee, and the

4

Union shall designate four individuals to serve as Union Trustees. No person disqualified by law to serve as a Trustee shall either be appointed or permitted to serve as a Trustee.

    3.2    Term of Office. Upon appointment, all Trustees shall serve as such until death, proper resignation or until removal as provided herein.

    3.3    Officers. The Trustees shall elect from their members a Chairman, a Vice Chairman, a Secretary, and an Assistant Secretary. The Chairman and Assistant Secretary shall be elected from the Union Trustees and the Vice Chairman and the Secretary shall be elected from the Employer Trustees.

    3.4    Union Trustees. Each Union Trustee shall be appointed in accordance with internal Union procedure and shall be designated to the Trustees in writing by the Union.

    3.5    Employer Trustees.

    (a)    Each Employer Trustee must be either an Employer or an Employee of an Employer.

    (b)    An Employer Trustee who, while in office, retires, sells his Employer business, or otherwise changes his relationship with the Employer, may continue to serve as an Employer Trustee provided the same body which appointed the Trustee approves and redesignates him to continue as an Employer Trustee after his change in status.

    (c)    When either the LRD/OCA or the ACO designates Trustees to succeed Trustees who have died, resigned or been removed, those organizations shall certify to the Trustees, in writing, the name or names of the newly designated Trustees.

    3.6    Acceptance of Appointment. Upon appointment, each Trustee shall execute a written acceptance whereby he agrees to accept and be bound by all terms and requirements of this Agreement, as the same may from time to time be amended.

5

3.7     Resignation. A Trustee may resign and become and remain fully discharged from all further duty and responsibility hereunder upon giving thirty days' notice, in writing, to the remaining Trustees. The remaining Trustees, however, may accept shorter notice as sufficient. In such notice there shall be stated a date upon which such resignation shall take effect. Such resignation shall take effect upon the date specified in the notice unless a successor Trustee shall have been designated at an earlier date, in which event such resignation shall take effect immediately upon the designation of such successor Trustee.

3.8     Removal. Any Trustee may be removed from office at any time by the body which appointed him by delivering to the remaining Trustees a copy of written notice of removal.

3.9     Successor Trustees – Appointment. In the event that any Trustee shall die, become incapable of acting hereunder, resign or be removed, a successor Trustee shall be immediately appointed by the body which appointed the original Trustee. Any Trustee may be declared incapable of acting within the meaning of this paragraph only by the action of all other Trustees then in office.

3.10     Successor Trustees -- Powers and Duties. Any Trustee upon his designation as a successor Trustee, upon his acceptance of his trusteeship in writing, and upon becoming properly bonded, shall become vested with all the property, rights, powers and duties of a Trustee hereunder, with like effect as if originally designated as a Trustee.

3.11     Vacancies. It is the intention hereof that the Fund shall at all times be administered by an equal number of Employer Trustees and Union Trustees, but until the designation of a Successor Trustee or Trustees as hereinbefore provided, a quorum of the remaining Trustees shall have full power to act.

3.12   <u>Quorum</u>.  At least two Union Trustees and two Employer Trustees shall be present at any meeting of the Trustees in order for any action to be taken, which number shall constitute a quorum for the transaction of any business.  Except as otherwise expressly provided herein, any action taken by the Trustees pursuant to this paragraph shall be by majority vote of the Trustees then present.  Any and all actions so taken shall have the same force and effect as if taken by all the Trustees.

3.13   <u>Meetings</u>.  An annual meeting of the Board of Trustees shall be held during the month of May at a date fixed by the Trustees, but the Trustees may, by unanimous consent, hold such meeting in some other month.  The Chairman or the Secretary of the Trustees may call a meeting of the Trustees at any time by giving at least ten days' written notice of the time and place thereof to the remaining Trustees.  Any five of the Trustees may call a meeting of the Trustees at any time by giving at least ten days' written notice of the time and place thereof to the remaining Trustees.  Meetings of the Trustees may also be held at any time without notice if all the Trustees are present and consent thereto.  In addition to the annual meeting required herein, the Trustees shall meet as often as may be required for the proper administration of the Fund.

3.14   <u>Attendance at Meetings</u>.  In the event any Trustee fails or refuses to attend two consecutive properly called meetings of the Trustees, a majority of the Trustees attending the second of such meetings may notify in writing the organization which designated the non-attending Trustee of the fact of such non-attendance.  Said organization shall take appropriate action to insure the attendance of the non-attending Trustee, and if said non-attending Trustee fails to resume attendance at the next regularly called meeting, then said organization shall, upon written notice from the Trustees, appoint a successor to the non-attending Trustee.

3.15    Action Without Meeting.  Action may be taken by the Trustees without a meeting, provided, however, that in such cases there shall be unanimous written concurrence by all of the Trustees then in office.

3.16    Resolution of Impasse.  In the event a deadlock shall arise over the administration of the Fund or the interpretation of this Trust Agreement, the Trustees representing the Employers and the Trustees representing the Union shall attempt to select an individual to act as an impartial umpire of the deadlocked issue.  If no agreement can be reached for the selection of an impartial umpire within the ten calendar days following the date upon which such deadlock arose, then the Chairman of the Board of Trustees shall apply to the American Arbitration Association for the designation of an impartial umpire selected by the two-panel method to resolve the deadlock in accordance with its rules and regulations.  The decision of any umpire so selected or appointed shall be binding upon all persons and parties concerned. The expenses of arbitration shall be paid from the Fund.

3.17    Voting.  Each Trustee shall have one vote upon all matters, provided, however, that if at any meeting there is present an unequal number of Union Trustees and Employer Trustees, then the group of Trustees having the fewer number present shall be entitled to cast that number of votes which is equal to the total number of votes cast by the group of Trustees having the larger number present, such vote being cast as follows:  Each Trustee in the smaller group may cast one vote; each additional vote to which such group of Trustees is entitled shall be cast by majority vote of such group Trustees.

3.18    Participation at Meetings; Minutes.  All official meetings of the Trustees shall be attended by the Trustees only and shall not be open to the public, except that there may attend such other persons as may be invited by the Trustees.  Written minutes, a copy of which

8

shall be furnished with reasonable promptness to each Trustee, shall be kept of all business transacted and of all matters upon which voting shall have occurred.

      3.19   Office of the Fund. The principal office of the Trust Fund shall, so long as such location is feasible, be located and maintained in Columbus, Ohio. The location of the principal office shall be made known to the parties interested in the Trust Fund. At such office, and at such other places as may be required by law, there shall be maintained the books and records pertaining to the Trust Fund and its administration.

ARTICLE IV

POWERS AND DUTIES OF TRUSTEES

      4.1   Conduct of Trust Business. The Trustees shall have general supervision of the operation of the Fund and shall conduct the business and activities of the Fund in accordance with this Trust Agreement and applicable law. The Trustees shall hold, manage and protect the Trust Fund and collect the income therefrom and contributions thereto. The Trustees or any person duly authorized by the Trustees may, in the course of conducting the business of the Trust Fund, execute any instrument in the name of the Trust Fund.

      4.2   Use of Fund for Expenses. Subject to their obligation not to violate the terms of the Act or any other federal, state or local law, the Trustees shall have the power and authority to use and apply the Trust Fund to pay or provide for the payment of all reasonable and necessary expenses (a) of collecting the Employer contributions and payments and other moneys and property to which they may be entitled, and (b) of administering the affairs of this Trust, including the employment of such administrative, legal, expert and clerical assistance, and (c) the purchase or lease of such premises, materials, supplies and equipment, and (d) the performance of such other acts, as the Trustees, in their sole discretion, find necessary or appropriate in the

9

performance of their duties; and (e) the reimbursement of the Trustees for expenses in the administration of the Trust Fund.

4.3     Use of Fund to Provide Benefits.  The Trustees shall also have the power and authority to use the Trust Fund to pay or provide for the payment of retirement, death and disability benefits to eligible Participants and Beneficiaries in accordance with the terms, provisions and conditions of the Plan to be maintained and administered hereunder by the Trustees.

4.4     Investments.

(a)     The Trustees shall have the power and authority to invest and reinvest such assets of the Fund as are not necessary for current expenditures or for liquid reserves in such investments as are permissible under the Act and as are consistent with the Trustees' fiduciary responsibility.  The Trustees may sell, exchange or otherwise dispose of such investments at any time.  The Trustees shall also have power and authority (in addition to, and not in limitation of, common law and statutory authority) to invest in any investments which may include, but are not limited to, stocks, bonds, mutual funds, exchange traded funds, options, real or personal property, common trust funds and other collective investment funds, pooled accounts and equity interests in real estate.  The Trustees shall have the authority, in respect to such investments, to exercise all such rights, power and privileges as might be lawfully exercised by any person owning similar investments.  The Trustees shall establish investment policies or guidelines relating to the investment of the assets of the Fund consistent with the objectives of the Fund and applicable law.

10

(b)     Delegation and Allocation of Investment Functions.

(1)     The Trustees are authorized, in their discretion, to allocate to a committee duly constituted under Section 4.7 such duties and responsibilities to invest and reinvest such Fund assets as shall be specified in such allocation.

(2)     The Trustees shall have the power and authority to appoint one or more investment managers (as defined in Section 3(38) of the Act) and to delegate to such manager or managers responsibility and authority for the management, acquisition, disposition, investment and reinvestment of such of the assets of the Trust Fund as the Trustees shall specify. Any such appointment is subject to termination by the Trustees. The fees and expenses of such investment manager, to the extent permitted by law, shall be paid out of the Fund.

(3)     In connection with any allocation or delegation of investment functions under paragraphs (1) and (2) of this subsection (b), the Trustees shall, from time to time, adopt appropriate investment policies or guidelines.

(c)     Notwithstanding any other provisions of this Trust Agreement, the Fund may be invested in any collective investment fund or funds, including common and group trust funds presently in existence or hereafter established which are maintained by a bank or trust company supervised by a state or federal agency, notwithstanding that the bank or trust company is the Trustee, Investment Manager, or is otherwise a party-in-interest of the Plan. The assets so invested shall be subject to all the provisions of the instruments establishing such funds as they may be amended from time to time. Such instruments of group trusts as they may be amended from time to time are hereby incorporated and made a part of this Trust as if fully set forth

11

herein. The combining of money and other assets of the Fund with money and other assets of other trusts and accounts in such fund or funds is specifically authorized.

(d) The Trustees may enter into a group annuity contract or contracts with an insurance company for the purpose of investing all or a portion of the Fund, or for the purpose of providing benefits to Participants or Beneficiaries under the Fund.

4.5 <u>Deposits and Disbursements</u>. All Trust Funds not invested shall be deposited by the Trustees in such depository or depositories as the Trustees shall from time to time select, and any such deposit or deposits, or disbursements therefrom, shall be made in the name of the Fund in the manner designated by the Trustees and upon the signature(s) of persons designated and authorized by the Trustees or by the Investment Manager appointed in accordance with Section 4.4(b)(2) of this Article.

4.6 <u>Allocation and Delegation of Fiduciary Responsibilities</u>. The Trustees may, by resolution or bylaw, or by duly appointed amendment to this Trust Agreement, allocate fiduciary responsibilities and various administrative duties to committees or subcommittees of the Board of Trustees, and they may delegate such responsibilities and duties to other individuals as they may deem appropriate or necessary and as may be consistent with applicable law.

4.7 <u>Committees of the Board of Trustees</u>. The Trustees, by bylaw or by resolution, may create such committee or committees as they deem necessary for the effective and efficient administration of the Fund. The membership of such committees shall consist of members of the Board of Trustees selected by the Chairman. Each committee shall consist of an equal number of Employer and Union Trustees, and a quorum of a committee shall be as provided in the by-law or resolution creating the committee.

12

4.8     Administrative Manager.  The Trustees may contract for the services of an individual, firm or corporation as an administrative manager (to be known by the title; "Fund Administrator"), who shall, under the direction of the Trustees or under the direction of any duly appointed committee thereof, perform the routine duties of administration of the office or offices of the Trust Fund and of the Trustees, and who may coordinate and administer the accounting, bookkeeping and clerical services, provide for the coordination of actuarial services furnished by the consulting actuary, prepare (in cooperation where appropriate with the consulting actuary and independent auditor) all reports and other documents to be prepared, filed or disseminated by or on behalf of the Trust in accordance with law, assist in the collection of contributions required to be paid to the Trust Fund by Employers, and otherwise perform such other duties and furnish such other services as may be assigned, delegated or directed or as may be contracted by or on behalf of the Trustees.  The administrative manager may serve as the custodian on behalf of the Trustees of all documents and other records of the Trustees and of the Trust Fund.

4.9     Collection of Employer Contributions.  The Trustees and any Fund Administrator appointed by the Trustees shall have the power to demand, collect and receive Employer contributions from Employers as more fully set forth in Article V hereto, and to hold such monies as part of the Fund for the purposes herein specified.

4.10    Bylaws, Rules and Regulations.

(a)     The Trustees are hereby empowered and authorized to adopt such bylaws and to promulgate such rules and regulations as are deemed necessary or desirable to facilitate the proper administration of the Trust Fund, provided that the same are not inconsistent with the terms of this Trust Agreement.  All bylaws, rules and regulations adopted by action of the

Trustees shall be binding upon all parties hereto, all parties dealing with the Trust Fund, and all persons claiming any benefits hereunder.

(b)     No bylaw, regulation, rule, action or determination made or adopted by the Trustees, nor any decision or determination made by any impartial umpire appointed pursuant to Section 3.16 of this Agreement, shall in any manner conflict with this Trust Agreement or with any applicable federal, state or local law, and shall, insofar as practicable, be consistent with the provisions of any current collective bargaining agreement between any Employer and the Union.

4.11     Additional Authority.  The Trustees are hereby empowered, in addition to such other powers as are set forth herein or are conferred by law:

(a)     to enter into any and all contracts and agreements for carrying out the terms of this Trust Agreement and for the administration of the Fund, and to do all acts as they, in their discretion, deem necessary or advisable, such contracts and agreements and acts to be binding and conclusive on the parties hereto and on the Participants or Beneficiaries involved;

(b)     to keep property and securities registered in the names of the Trustees or of the Fund or in the name of any other individual or entity duly designated by the Trustees;

(c)     to establish and accumulate as part of the Fund such reasonable reserve funds as the Trustees, in their sole discretion, deem necessary or desirable to carry out the purposes of such Fund;

(d)     to pay out of the Trust Fund all real and personal property taxes, income taxes, and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund, or any money, property, or securities forming a part thereof;

(e)     to do all acts, whether or not expressly authorized herein, which the Trustees deem necessary or proper for the protection of the property held hereunder;

14

   (f)  to sell, exchange, lease, convey, mortgage or dispose of any property forming a part of the Fund, whether real or personal, upon such terms as they may deem proper, and to execute and deliver any and all instruments of conveyance, leases, mortgages and transfers in connection therewith;

   (g)  to retain experts, such as accountants, lawyers, and investment advisors to assist the Fund in the performance of its duties; and

   (h)  to vote in person or by proxy, with or without power of substitution, on any stocks, bonds or other securities held by it;

   4.12  <u>Bonds</u>. The Trustees, and any employees who are empowered and authorized to sign checks and handle monies of the Fund, shall be bonded by a duly authorized surety company qualified to write such bonds in such amounts as may be determined from time to time by the Trustees (but not less than the amounts required by law). The Trustees may also bond such other employees of the Fund as they deem necessary. The cost of the premiums for such bonds shall be paid out of the Fund.

   4.13  <u>Insurance</u>. The Trustees may in their discretion obtain and maintain policies of insurance, to the extent permitted by law, to insure themselves, the Fund as such, as well as Employees or agents of the Trustees and of the Fund while engaged in business and related activities for and on behalf of the Trust Fund (1) with respect to liability to others as a result of acts, errors or omissions of such Trustee or Trustees, Employees or agents, respectively, provided such insurance policy shall provide recourse by the insurer against Trustees as may be required by law, and (2) with respect to injuries received or property damage suffered by them. The cost of the premiums for such policies of insurance shall be paid out of the Fund.

4.14 <u>Information to Participants and Beneficiaries</u>. The Trustees shall provide Participants and Beneficiaries such information as may be required by law.

4.15 <u>Accountants and Actuaries</u>. The Trustees shall engage one or more independent qualified public accountants and one or more enrolled actuaries to perform all services as may be required by applicable law and such other services as the Trustees may deem necessary.

4.16 <u>Trustees to Act Without Compensation</u>. The Trustees shall act in such capacity without compensation, but they shall be entitled to reimbursement for the expenses properly and actually incurred in the performance of their duties with the Trust Fund, including, without limitation, attendance at meetings and other functions of the Board of Trustees or its committees while on business of the Board of Trustees, and attendance at institutes, seminars, conferences or workshops for or on behalf of the Trust Fund.

4.17 <u>Reports</u>. All reports required by law to be signed by one or more Trustees shall be signed by all of the Trustees, provided that all of the Trustees may appoint in writing, or by resolution adopted and recorded in the minutes, one or more of their members to sign such report on behalf of the Trustees.

4.18 <u>Records of Trustee Transactions</u>. The Trustees shall keep true and accurate books of account and a record of all of their transactions and meetings (including actions taken at such meetings and by informal action of the Trustees), which records and books shall be audited at least annually by a certified public accountant. A copy of each audit report shall be furnished to all Trustees and shall be available for inspection by interested persons at the principal office of the Trustees.

16

4.19   <u>Construction and Determinations by Trustees</u>.  Subject to the stated

purposes of the Fund and the provisions of this Trust Agreement, the Trustees shall have full and

exclusive authority to determine all questions of coverage and eligibility, methods of providing

or arranging for benefits and all other matters related to the administration or operation of the

Plan and Fund.  They shall have full power to construe the provisions of this Trust Agreement,

the terms used herein and the bylaws and regulations issued thereunder.  Any such determination

and any such construction adopted by the Trustees in good faith shall be binding upon all of the

parties hereto and the Beneficiaries hereof.  Neither the foregoing, any difference arising

thereunder, nor any matter involving or arising under this Trust Agreement shall be subject to

any grievance or arbitration procedure established in any collective bargaining agreement

between an Employer and the Union; provided, however, that this clause shall not be construed

as affecting either the rights and liabilities of any of the parties under any such collective

bargaining agreement or the right of the Union to enforce the payment of Employer contributions

through the use of an established grievance and arbitration procedure.

4.20   <u>Liability</u>.  The Trustees, to the extent permitted by applicable law, shall

incur no liability in acting upon any instrument, application, notice, request, signed letter,

telegram or other paper or document believed by them to be genuine and to contain a true

statement of facts.

4.21   <u>Reliance on Written Instruments</u>.  Any Trustee, to the extent permitted by

applicable law, may rely upon any instrument in writing purporting to have been signed by a

majority of the Trustees or authorized Trustees as conclusive evidence of the fact that a majority

of the Trustees or authorized Trustees have taken the action stated to have been taken in such

instrument.

17

4.22 <u>Reliance by Others</u>. No party dealing with the Trustees shall be obligated (a) to see that any funds or property of the Trust Fund are applied to stated Trust purposes, or (b) to see that the terms of this Trust Agreement have been complied with, or (c) to inquire into the necessity or expediency of any act of the Trustees. Every instrument executed by the Trustees shall be conclusive evidence in favor of every person relying thereon (a) that at the time of the execution of said instrument the Trust was in full force and effect, (b) that the instrument was executed in accordance with the terms and conditions of this Trust Agreement, and (c) that the Trustees were duly authorized and empowered to execute the instrument.

4.23 <u>Discharge of Liability</u>. The receipt by the Trustees of any money or property or checks (after such checks are honored at the bank and paid to the Trust Fund) shall discharge the person or persons paying or transferring the same.

4.24 <u>Merger</u>. Subject to their fiduciary duties and to applicable law and/or regulations, the Trustees shall have the power to merge with any other fund established for similar purposes as this Fund.

4.25 <u>Settling Disputes</u>. The Trustees shall have discretion to compromise or settle any claim or controversy in such manner as, in their best judgment, is in the best interests of the Fund. Any majority decision made by the Trustees in compromise or settlement of a claim or controversy, or any compromise or settlement agreement entered into by the Trustees, shall be conclusive and binding on all parties interested in this Trust.

4.26 <u>Reciprocity Agreements</u>. The Trustees may, in their sole discretion, enter into such reciprocity agreement or agreements with other pension funds as they may determine to be in the best interests of the Fund, provided that any such reciprocity agreement or agreements

18

shall not be inconsistent with the terms of this Trust Agreement or the written agreements under which this Trust Agreement is maintained.

4.27    Written Plan for Benefits. The Trustees shall establish and maintain a written plan under which benefits effectuating the provisions of Article II shall be paid. Such plan shall be known as the Ohio Operating Engineers Pension Plan (referred to in this Trust Agreement as the "Plan"). The Trustees shall have the power to, from time to time, amend the Plan, provided that any amendment shall not be inconsistent with the provisions of this instrument.

4.28    Internal Revenue Service and Labor Department Approval. The Trust Fund and the Plan are intended to qualify for approval by the Director of Rulings and Agreement of the Internal Revenue Service, United States Treasury Department, under Sections 401(a) and 501(a) of the Code. The Trustees are authorized to make whatever applications are necessary with the Internal Revenue Service to receive and maintain the approval of the Trust and Plan.

## ARTICLE V

## CONTRIBUTIONS AND COLLECTIONS

5.1    Employer Contributions. Each Employer shall make prompt contributions or payments to the Fund in such amount and under such terms as from time to time may be set forth in the then current collective bargaining agreement or other written agreement requiring contributions to the Fund. Such contributions shall constitute an absolute obligation to the Fund and shall not be subject to set off because of any claim which an Employer may have against the Union or an Employee. Contributions shall be paid to the Trustees, or to such depository as the Trustees may designate, by check, bank draft, money order, wire transfer, or other agreed upon method of transmitting money or its equivalent, made payable as the Trustees shall direct. The

payment of contributions shall be made periodically at such intervals as shall be directed by the Trustees, or as may be specified in any written agreement requiring the payment of contributions.

   5.2 <u>Responsibility for Contributions</u>. Except as may be otherwise provided by law, each Employer shall be responsible only for the contributions payable by it on behalf of its own Employees. No Employer or any employer association or group shall be responsible for the contributions, payments or other obligations of any other Employer.

   5.3 <u>Work Outside Jurisdiction</u>. To the extent permitted by the collective bargaining agreement and the Plan, in the event an Employee employed by an Employer performs work outside of the geographical jurisdiction of the Union, the Employer may continue to make payments to the Fund.

   5.4 <u>Collection and Enforcement of Payments</u>. The Trustees (or such committee of the Trustees as the Board of Trustees shall appoint), or the Fund Administrator (if one has been appointed and when directed by such committee or by the Board of Trustees), shall have the power to demand, collect and receive Employer payments and all other money and property to which the Trustees may be entitled, and shall hold the same until applied to the purposes provided in this Trust Agreement. They shall take such steps, including the institution and prosecution of, or the intervention in, such legal or administrative proceedings as is determined to be in the best interest of the Fund for the purpose of collecting such payments, money and property.

   5.5 <u>Cost of Collection</u>. The Trustees shall have the power to impose reasonable cost of collection assessments as provided in the Act against those Employers who become delinquent in paying Employee contributions. In cases where the Trustees or the Fund Administrator find it necessary to take legal action to recover amounts due the Fund from

delinquent Employers, the Trustees or said Fund Administrator shall also be entitled to recover reasonable attorney's fees as fixed by the court together with court costs. Assessments of statutory damages and interest shall be fixed by rules and regulations promulgated by the Trustees, shall be based upon a reasonable estimate as to the actual loss to the Fund because of delinquent contributions, and shall not be discriminatory in nature. Since late payments to the Fund may cause loss of protection to Participants and may result in considerable additional administrative expense and since many other elements of damage may result from late contributions to the Fund, it is impossible to determine accurately in advance the full extent of the damage and expense which can result from delinquent payments. Therefore, the Trustees may, if they deem it advisable, base the amount of any statutory damages or interest upon uniform percentage of delinquent amounts due.

      5.6    <u>Production of Records</u>. Each Employer shall promptly furnish to the Trustees or their representative, on demand, the names of his Employees; their Social Security numbers, the hours worked by each Employee, and such other information as the Trustees may reasonably require in connection with the administration of the Fund. The Trustees or their representative may examine pertinent employment and payroll records of each Employer at the Employer's place of business whenever such examination is necessary or advisable in connection with the proper administration of the Fund. The Union shall, upon request, promptly furnish information regarding an Employee's employment status.

      5.7    <u>Non-Payment of Contributions</u>. Non-payment by any Employer of any contribution or other monies owed to the Fund shall not relieve any other Employer from its obligation to make required payments to the Fund.

21

5.8     Delinquent Contributions as Plan Assets. As of the date any unpaid Employer contributions are required to be paid to the Fund, the contributions shall become plan assets for purposes of subtitle A and parts 1 and 4 of subtitle B of title I of ERISA, and Code Section 4975. To the extent any individual officers, directors or other representatives of the Employer exercise sufficient control or authority over the unpaid contributions as to constitute a fiduciary under ERISA Section 3(21), they shall serve in such a fiduciary capacity on behalf of the Fund and Trust with respect to the unpaid contributions.

5.9     Refund of Contributions. Except as provided in this section below, no Employer, directly or indirectly, shall receive any refund of contributions paid to the Trust or participate in the disposition of any assets of the Fund or receive any benefits from the Fund. Notwithstanding the foregoing or any other provisions of this Trust Agreement, if an Employer contribution or payment of withdrawal liability is based upon a mistake of fact or law, such excess contribution may be returned to the Employer within six months after the Administrator determines that the contribution was made by such a mistake. The contribution or payment is considered as returned within the required period if the Employer establishes a right to a refund of the amount mistakenly contributed or paid by filing a claim with the Administrator within six months after the date on which the Administrator determines that a mistake did occur. In general, interest or earnings on the amount of the overpayment shall not be credited to the amount of the overpayment. However, in the case of the return of an overpayment of withdrawal liability, interest determined in accordance with Pension Benefit Guaranty Corporation regulations on the amount of overpayments may also be returned.

5.10    Varying Rates of Contribution. So long as contributions are made to the Fund pursuant to a proper written agreement, the Trustees may, but are not required to, accept

22

contributions which are not at a uniform rate among all Employers. In formulating a plan for the payment of benefits in such cases, the Trustees may, but need not, provide for a non-discriminatory method of crediting hours worked in relation to rate of contributions.

## ARTICLE VI

## BENEFICIAL RIGHTS

6.1 <u>No Right, Title or Interest of Employers and Union</u>. Neither the Union, the Employer, any Participant or any person claiming by or through such Participant by reason of having been named a Beneficiary in a certificate or otherwise, nor any other person, shall have any right, title or interest in or to the Fund or any part thereof. Except as may be required by law, there shall be no pro-rata or other distribution of any of the assets of the Fund as a result of any Union, Employer, group or association of Employees or Employers or Participants ceasing participation in the Fund.

6.2 <u>Limitations upon Beneficial Rights of Employees</u>. All benefits which may become payable from the Fund shall be free from the interference and control of any creditor of any party. In accordance with Section 401(a)(13)(A)of the Code, unless otherwise permitted by Sections 401(a)(13)(B) and (C) of the Code, neither the assets of the Fund nor any benefits payable to any person hereunder shall be subject to assignment or other anticipation, to seizure, or to sale under any legal, equitable or other process.

## ARTICLE VII

## AMENDMENT AND TERMINATION OF
## TRUST AGREEMENT AND TRUST FUND

7.1 <u>Amendment</u>. The Trustees may, by majority action, amend and/or supplement any of the provisions of this Trust Agreement, provided, however, that no

23

amendment affecting the level of benefits payable shall be made except upon the advice of counsel and of a qualified actuary or actuarial firm. Any amendment to this Trust Agreement may be made so as to take effect retroactively to the extent permitted by law.

      7.2    Termination. To the extent permitted by law (including any applicable administrative regulations), the Trustees shall have the power to cease operation of and to terminate the Fund and its implementing plan under such circumstances as, in the judgment of the Trustees, would be in the best interest of all Participants. The termination of the Plan and distribution of the assets of the Trust shall comply with Section 4041A of the Act and applicable regulations thereunder.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

      8.1    Law Applicable. This Trust is created in the State of Ohio and, except to matters of federal law, all questions pertaining to the construction, and administration of this Trust Agreement shall be determined in accordance with the laws of the State of Ohio.

      8.2    Savings Clause. Should any provision of this Trust Agreement be held to be unlawful or unenforceable, the remaining provisions contained herein shall nevertheless continue in full force and effect.

      8.3    Withholding Payment. In the event that a question or dispute shall arise as to the proper person or persons to whom benefits hereunder should be paid, the Trustees may withhold payment of such benefits pending resolution, to the satisfaction of the Trustees, of such question or dispute.

      8.4    Beneficiaries under Disability. In the event any benefits become payable hereunder due to legal disability, or to a person who under the considered judgment of the

24

Trustees, is unable to properly administer such benefits by reason of mental or physical disability, then such benefits may be paid for the benefit of such person either to the legally appointed guardian or conservator of such person or to any relative of such person who has assumed responsibility for the care of such person.

      8.5   <u>Gender</u>. Whenever any words are used in this Trust Agreement in the masculine gender, they shall also be construed to include the feminine and/or neuter gender in all situations where such construction would so apply. Whenever any words herein are used in the singular number, they shall also be construed to include the plural number in all situations where such construction would apply. Whenever any words herein are used in the plural number, they shall also be construed to include the singular number in all situations where such construction would apply.

      IN WITNESS WHEREOF, the undersigned, being the current Trustees hereunder, do hereby adopt this amended and restated Trust Agreement this 1st day of February, 2016.

Employer Trustees:

_____
Stanley I. Roediger, Jr., Vice Chairman

_____
Mark Sterling

_____
Victor DiGeronimo, Secretary

_____
George Palko

Union Trustees:

_____
Richard E. Dalton, Chairman

_____
Patrick L. Sink

_____
Gary G. Siesel, Assistant Secretary

_____
Mark Totman

1/14/2016 21256282 V.4



**THE OHIO OPERATING ENGINEERS**

**PENSION PLAN**

**REVISED March 1, 2017**

# THE OHIO OPERATING ENGINEERS
# PENSION PLAN

## TABLE OF CONTENTS

| ARTICLE | PAGE |
|---|---|
| 1    DEFINITIONS | 1 |
| 1.01.  Accrued Monthly Benefit | 1 |
| 1.02.  Act | 1 |
| 1.03.  Actuarial Equivalent | 1 |
| 1.04.  Annuity Starting Date | 1 |
| 1.05.  Beneficiary | 2 |
| 1.06.  Break in Service | 2 |
| 1.07.  Code | 2 |
| 1.08.  Contingent Annuitant | 2 |
| 1.09.  Credited Service | 2 |
| 1.10.  Deferred Vested Participant | 2 |
| 1.11.  Early Retirement Age | 2 |
| 1.12.  Effective Date | 2 |
| 1.13.  Employee | 2 |
| 1.14.  Employer | 3 |
| 1.15.  Fund Administrator | 3 |
| 1.16.  Future Service Credit Years | 3 |
| 1.17.  Hour of Service | 4 |
| 1.18.  Normal Form | 5 |
| 1.19.  Normal Retirement Age | 5 |

ARTICLE                                                             PAGE

1.20.    Participant ..................................................................................... 5

1.21.    Past Service Credit Year ................................................................ 5

1.22.    Plan ............................................................................................... 6

1.23.    Plan Year ...................................................................................... 6

1.24.    Qualified Election ......................................................................... 6

1.25.    Qualified Joint and Survivor Annuity ........................................... 6

1.26.    Qualified Preretirement Survivor Annuity .................................... 6

1.27.    Service Credit Year ....................................................................... 7

1.28.    Spouse or Surviving Spouse .......................................................... 7

1.29.    Trustees ......................................................................................... 7

1.30.    Union ............................................................................................. 7

1.31.    Unfunded Vested Benefits ............................................................. 7

1.32.    Unreduced Early Retirement ......................................................... 7

1.33.    Withdrawal Liability ..................................................................... 7

2       PARTICIPATION ....................................................................... 8

2.01.    Initial Eligibility ........................................................................... 8

2.02.    Eligibility Under Reciprocal Agreement ....................................... 8

3       CREDITED SERVICE ................................................................ 8

3.01.    Continuous Employment ............................................................... 8

3.02.    Break in Service ............................................................................ 9

4       ELIGIBILITY FOR RETIREMENT BENEFITS ......................... 10

4.01.    Normal Retirement ........................................................................ 10

4.02.    Early Retirement ........................................................................... 10

4.03.    Disability Retirement .................................................................... 11

ARTICLE                                                                                  PAGE

4.04.   Deferred Vested Benefit ............................................................................... 11

5       AMOUNT OF RETIREMENT BENEFITS ............................................... 12

5.01.   Normal Retirement.......................................................................................... 12

5.02.   Unreduced Early Retirement Benefit.............................................................. 13

5.03.   Regular Early Retirement Benefit................................................................... 13

5.04.   Disability Retirement Benefit ........................................................................ 14

5.05.   Deferred Vested Benefit ................................................................................. 15

5.07.   Benefit After Break in Service....................................................................... 15

5.08.   August 1, 1999 Increase in Certain Benefits ................................................ 16

6       PAYMENT OF BENEFITS ............................................................................ 16

6.01.   Method of Payment........................................................................................ 16

6.02.   Designation of Beneficiary or Contingent Annuitant .................................... 17

6.03.   Additional Distribution Requirements............................................................ 18

6.04.   Timing of Payments....................................................................................... 18

6.05.   Return to Work Outside Union Jurisdiction After Benefits Have Commenced................ 18

6.06.   Suspension of Benefits................................................................................... 18

6.07.   Small Lump Sum Cashouts............................................................................ 20

6.08.   Actuarial Equivalent for Lump Sum Payments ............................................. 20

7       DEATH BENEFITS ........................................................................................ 21

7.01.   General........................................................................................................... 21

7.02.   Death After Benefit Commencement Date ..................................................... 21

7.03.   Death After Application for Benefits.............................................................. 21

7.04.   Death Before Retirement - Married Participant............................................... 22

7.05.   Death Before Retirement - Unmarried Participant .......................................... 23

| ARTICLE | PAGE |
|---|---|

7.06.   Payment Upon Death of Participant ............................................................. 23

7.07.   Distribution Requirements Applicable to Death Benefits ............................... 24

7.08.   Heroes Act Death Benefit Provision............................................................... 24

7.09.   Eligible Rollover Distributions ...................................................................... 24

8      TRUSTEES..................................................................................................... 25

8.01.   Board of Trustees............................................................................................ 25

9      PLAN ADMINISTRATION ........................................................................... 25

9.01.   Plan Administration ........................................................................................ 25

9.02.   Powers and Duties of the Trustees and the Fund Administrator ...................... 26

9.03.   Rules and Decisions........................................................................................ 26

9.04.   Applications and Forms .................................................................................. 26

9.05.   Facility of Payment ........................................................................................ 27

10     CONTRIBUTIONS; FUNDING REQUIREMENTS ........................................ 27

10.01.   Contributions and Additional Funding Requirements .................................... 27

11     AMENDMENTS ............................................................................................. 28

11.01.   Trustees' Right to Amend Plan....................................................................... 28

11.02.   Amendment of Vesting Rights........................................................................ 29

12     TERMINATION; DISTRIBUTION OF ASSETS ............................................ 29

12.01.   Plan Termination............................................................................................ 29

12.02.   Distribution of Benefits.................................................................................. 29

13     CREDITORS OF PARTICIPANTS ................................................................. 29

13.01.   Non-Assignability .......................................................................................... 29

13.02.   Qualified Domestic Relations Orders ............................................................. 29

| ARTICLE | | PAGE |
|---|---|---|
| 14 | CLAIMS PROCEDURE | 30 |
| 14.01. | Filing a Claim for Benefits | 30 |
| 14.02. | Denial of Claim | 31 |
| 14.03. | Review Procedure | 32 |
| 15 | MISCELLANEOUS | 33 |
| 15.01. | Employer's Right to Terminate Employees | 33 |
| 15.02. | Gender | 33 |
| 15.03. | Service Credit Period | 33 |
| 15.04. | Maximum Benefit Limitation | 33 |
| 15.05. | Named Fiduciaries | 34 |
| 15.06. | Plan Merger | 35 |
| 15.07. | Notice Requirements | 35 |
| 15.08. | Right of Recovery | 35 |
| 15.09. | Limitation on Reversion of Contributions | 35 |
| 15.10. | Specific Effective Dates | 35 |
| 16 | WITHDRAWAL LIABILITY | 35 |
| 16.01. | General Liability | 35 |
| 16.02. | Amount of Withdrawal Liability | 36 |
| 16.03. | De Minimis Rule | 36 |
| | APPENDIX A | 38 |

## THE OHIO OPERATING ENGINEERS
## PENSION PLAN

The Board of Trustees of The Ohio Operating Engineers Pension Fund hereby adopts the following amended and restated multi-employer pension plan for the exclusive benefit of the eligible Employees of all contributing Employers and, where applicable, the Beneficiaries of such Employees. It is intended that this Plan shall comply with the applicable provisions of the Internal Revenue Code of 1986, as amended, and the Employee Retirement Income Security Act of 1974, as amended.

The Plan is being amended and restated effective March 1, 2017 to incorporate necessary or appropriate changes to the Plan.

## ARTICLE 1
## DEFINITIONS

**1.01. Accrued Monthly Benefit**
"Accrued Monthly Benefit" means a Participant's normal retirement benefit, calculated as of the determination date, to which he would be entitled at his Normal Retirement Age.

**1.02. Act**
"Act" means the Employee Retirement Income Security Act of 1974, as may be amended from time to time.

**1.03. Actuarial Equivalent**
"Actuarial Equivalent" means equality in value of the aggregate amounts expected to be received under different forms of payment. Such equality in value shall be based on assumptions as to the occurrence of future events. The future events to be taken into account are mortality for Participants, mortality for Beneficiaries and an interest discount for the time value of money. For purposes of the Plan, these actuarial assumptions shall be the mortality and interest assumptions contained in Appendix A attached hereto and made a part hereof.

**1.04. Annuity Starting Date**
"Annuity Starting Date" means the first day of the first period for which an amount is paid as an annuity or in any other form.

**1.05. Beneficiary**

"Beneficiary" means, subject to the provisions of Article 6, the individual designated by a Participant as being entitled to receive any death benefit payable under the Plan.

**1.06. Break in Service**

"Break in Service" means, with respect to Future Service Credit Years, a five-year period (before June 1, 1998, a three-year period), each year of which ends May 31, during which a Participant is credited with less than 300 Hours of Service during each of those years. With respect to Past Service Credit Years, a Participant will incur a Break in Service in accordance with the rules described in Section 1.21.

**1.07. Code**

"Code" means the Internal Revenue Code of 1986, as may be amended from time to time.

**1.08. Contingent Annuitant**

"Contingent Annuitant" means the Spouse, son or daughter designated by a Participant at the time of his retirement to receive any benefits under this Plan after the Participant's death.

**1.09. Credited Service**

"Credited Service" means the sum of a Participant's Past Service Credit Years and his Future Service Credit Years. Credited Service shall be determined on the basis of the 12-consecutive-month period ending each May 31.

**1.10. Deferred Vested Participant**

"Deferred Vested Participant" means an individual who is eligible for a benefit under the Plan pursuant to Section 4.04.

**1.11. Early Retirement Age**

"Early Retirement Age" means the date a Participant with ten or more years of Credited Service has attained age 57.

**1.12. Effective Date**

"Effective Date" means, generally for this amended and restated Plan, March 1, 2017. However, to the extent that another effective date is set forth in the Plan, or a Plan provision is required by Section 15.10 to be effective at another date, the Effective Date shall mean, with respect to such Plan provision, such other date.

**1.13. Employee**

"Employee" means (a) an employee of an Employer covered by a collective bargaining agreement between the Employer and the Union and as to whom contributions are made by the Employer; (b) an employee who worked for an Employer who was bound by a collective bargaining agreement with the Union on June 1, 1964, or who otherwise was engaged in work covered by a collective bargaining agreement to which the Union was a party between June 1, 1954 and May 31, 1964, within the jurisdiction of the Union, in the building, heavy construction, airport construction, railroad construction or utility construction branches of the construction industry; (c) an employee of an Employer, whether or not a member of the Union, as to whom

2

the Trustees shall have entered into an agreement for inclusion in the Plan and as to whom contributions are made by the Employer; and (d) a person in a salaried capacity employed by the Union upon being proposed by the Union and after acceptance by the Trustees.

**1.14. Employer**

"Employer" means any association, corporate or otherwise, or any individual or corporate employer who is signatory to a contract with the Union covering wages, hours and working conditions and any employer not presently a party to such a contract, provided that any Employer shall satisfy the requirements for participation in the Plan as established by the Trustees and shall agree in writing to be bound by this Plan and the Agreement and Declaration of Trust. The Union and the Board of Trustees of this Plan shall not be considered as Employers except for the sole purpose of making contributions to the Fund for their Employees.

**1.15. Fund Administrator**

"Fund Administrator" or "Administrator" means the individual or group of individuals to whom the Trustees of The Ohio Operating Engineers Pension Fund delegate certain administrative functions under the Plan.

**1.16. Future Service Credit Years**

"Future Service Credit Years" or "Future Service Credit" means:

(a)    for the period between June 1, 1964 and July 31, 1976:

| If the Total Number of Hours of Service in a Service Credit Year for Which Employer Contributions Are Made for an Employee are: | The Amount of Future Service Credit Year Shall Be: |
|---|---|
| Less than 300 hours | None |
| 300 hours but less than 600 hours | 1/4 year |
| 600 hours but less than 900 hours | 1/2 year |
| 900 hours but less than 1,200 hours | 3/4 year |
| 1,200 hours and over | 1 year |

(b)    for the period beginning on and after August 1, 1976:

| If the Total Number of Hours of Service in a Service Credit Year for Which Employer Contributions Are Made for an Employee are: | The Amount of Future Service Credit Year Shall Be: |
|---|---|
| Less than 300 hours | None |
| 300 hours but less than 500 hours | 1/4 year |
| 500 hours but less than 750 hours | 1/2 year |
| 750 hours but less than 1,000 hours | 3/4 year |
| 1,000 hours and over | 1 year |

**1.17.  Hour of Service**

"Hour of Service" means:

(a)      each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the Employer for which the Employer is required to make appropriate contributions for such hours to the Fund.  These hours shall be credited to the Employee for the computation period or periods in which the duties are performed; and

(b)      each hour for which an Employee is paid, or entitled to payment, by the Employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence, provided the Employer makes appropriate contributions for such hours to the Fund.  Except for disability, no more than 301 Hours of Service shall be credited under this paragraph for any single continuous period (whether or not such period occurs in a single computation period).  Hours under this paragraph shall be calculated and credited pursuant to Section 2530.200b-2 of the Employee Benefits Security Administration Regulations which are incorporated herein by this reference; and

(c)      each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer, provided the Employer makes appropriate contributions for such hours to the Fund.  The same Hours of Service shall not be credited under paragraph (a) or paragraph (b), as the case may be, and under this paragraph (c).  These hours shall be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made; and

(d)      in the case of a Participant who is absent from work for maternity or paternity reasons, such Participant shall have credited, solely for purposes of determining whether a Break in Service has occurred for eligibility and vesting, in the year in which the absence begins if necessary to prevent a Break in Service for such year or, in the following year, the number of hours that would normally have been credited but for such absence or, in any case in which such hours cannot be determined, 8 Hours of Service per day of such absence.  The total number of hours treated as Hours of Service under this paragraph shall not exceed 301 Hours of Service.  For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence (i) by reason of pregnancy of the Participant; (ii) by reason of the birth of a child of the Participant; (iii) by reason of the placement of a child with the Participant in connection with the adoption of such child by such Participant; or (iv) for purposes of caring for such child for a period beginning immediately following such birth or placement; and

(e)      in the case of a Participant (not in pay status as of January 1, 2000) whose continuous employment ended when the Participant became employed by (i) The Ohio Operating Engineers Pension Plan; or (ii) The Ohio Operating Engineers Health and Welfare Plan, the following rule will apply:  Solely for the purpose of avoiding a Break in Service, the Participant shall be credited with 301 Hours of Service for any 12-month period ending May 31 during which he both (A) remains so employed through May 31; and (B) does not elect to commence benefits under this Plan (waived for a Participant who has attained age 70-½).  Such 301 Hours

of Service shall not be taken into account in determining Credited Service, Service Credit Years or Hours of Service in a Service Credit Year.

(f) Hours of Service shall be credited for a Participant's noncovered service for which no Employer contributions are made but for which the Participant is credited with Hours of Service for purposes of vesting and qualifying for an early retirement benefit, in accordance with Employee Benefits Security Administration Regulation Section 2530.210(c).

**1.18. Normal Form**
"Normal Form" means an immediate five years certain and life annuity, payable in monthly installments on the first day of each calendar month for 60 months certain and thereafter on the first day of each calendar month in which the Participant has lived the entire preceding month. In the event of the Participant's death during the 60-month certain period, monthly payments, in the same amount as those made during the Participant's life, shall continue to the Participant's Beneficiary for the balance of such period certain.

**1.19. Normal Retirement Age**
"Normal Retirement Age" means the day on which a Participant attains age 65.

**1.20. Participant**
"Participant" means either (a) an Employee who is actively participating in the Plan in accordance with Section 2.01; or (b) a Deferred Vested Participant.

**1.21. Past Service Credit Year**
"Past Service Credit Year" or "Past Service Credit" means service credits for service prior to June 1, 1964. Each Participant in the Plan as of June 1, 1964 shall be credited with a Past Service Credit Year (or fractions thereof to the nearest 1/4th) for each year of continuous service (or fractions thereof to the nearest 1/4th) as an operating engineer for an Employer or Employers within the jurisdiction of the Union or any of its branches or predecessors, provided that an Employee shall be deemed to have been in continuous service from the date the Employee first performed work for an Employer or Employers within the jurisdiction of the Union until June 1, 1964, unless a break in continuous service occurred prior to June 1, 1964. For this purpose, failure to work for an Employer or Employers within the jurisdiction of the Union for a period of six or more consecutive months shall constitute a break in continuous service, except that it shall be presumed that a Participant who was a member in good standing in the Union on June 1, 1964 was engaged in continuous service through the period of his continuous active membership in the Union. For the purpose of establishing whether a break in continuous service occurred, a withdrawal, suspension or other loss of Union membership for a period of six consecutive months or longer shall be presumed to be a break in continuous service unless the break in continuous service was a direct result of (a) time spent in the Armed Forces of the United States; provided that, except in time of war, Past Service Credit shall not be allowed for longer than four Past Service Credit Years; or (b) time during which the Employee was absent from work for which he received workers' compensation or sickness and accident benefits from The Ohio Operating Engineers Health and Welfare Plan. Notwithstanding the foregoing provisions of this Section 1.21, any Employee who was a Participant in the Plan on June 1, 1975 who had not incurred a Break in Service between June 1, 1964 and June 1, 1975

5

prior to accumulating ten years of Credited Service shall not suffer a loss of Past Service Credit Years for such years of Credited Service accrued prior to any break in his continuous service before June 1, 1964, provided that Employer contributions for at least 50 hours were made on his behalf for work performed prior to June 1, 1969.

**1.22. Plan**

"Plan" means The Ohio Operating Engineers Pension Plan, as evidenced by this document and any amendments made hereto. The Plan may also be referred to herein as "Fund."

**1.23. Plan Year**

"Plan Year" means the fiscal year of the Plan ending each July 31st.

**1.24. Qualified Election**

"Qualified Election" means a waiver of a Qualified Joint and Survivor Annuity. Any waiver of a Qualified Joint and Survivor Annuity shall not be effective unless (a) the Participant's Spouse consents in writing to the election; (b) the Spouse's consent acknowledges the effect of the election; (c) the Spouse's consent is witnessed by a Plan representative or notary public; and (d) the election designates a form of benefit payment which may not be changed without spousal consent (or the Spouse expressly permits designations by the Participant without any further spousal consent). If it is established to the satisfaction of a Plan representative that there is no Spouse, the Spouse cannot be located, the Participant and Spouse are legally separated, or spousal consent is not otherwise required by federal regulations, a waiver will be deemed a Qualified Election. Any consent by a Spouse obtained under this provision (or establishment that the consent of a Spouse may not be obtained) shall be effective only with respect to such Spouse. A consent that permits designations by the Participant without any requirement of further consent by such Spouse must acknowledge that the Spouse has the right to limit consent to a specific form of benefit, where applicable, and that the Spouse voluntarily elects to relinquish such right. A revocation of a prior waiver may be made by a Participant without the consent of the Spouse at any time before the commencement of benefits. The number of revocations shall not be limited. No consent obtained under this provision shall be valid unless the Participant has received notice as provided in Section 15.07.

**1.25. Qualified Joint and Survivor Annuity**

"Qualified Joint and Survivor Annuity" means an immediate annuity for the life of the Participant with a survivor annuity for the life of the Spouse which is equal to 50% of the amount of the annuity which is payable during the joint lives of the Participant and the Spouse and which is determined by the amount of benefit which can be purchased with the Participant's vested Accrued Monthly Benefit.

**1.26. Qualified Preretirement Survivor Annuity**

"Qualified Preretirement Survivor Annuity" means the death benefit payable to the Surviving Spouse of a vested married Participant. If the Participant dies after attaining age 57 with at least 10 years of Credited Service, the "Qualified Preretirement Survivor Annuity" payable to his Surviving Spouse will be the same benefit that would be payable if the Participant had retired with an immediate Qualified Joint and Survivor Annuity on the day before the Participant's date of death. If the Participant dies before attaining age 57 but with at least 10

years of Credited Service, the "Qualified Preretirement Survivor Annuity" payable to his Surviving Spouse will be the same benefit that would be payable if the Participant had (a) separated from service on the date of death (or date of separation from service, if earlier); (b) survived to age 57; (c) retired with an immediate Qualified Joint and Survivor Annuity at age 57; and (d) died on the day after attaining age 57. The Qualified Preretirement Survivor Annuity payable to the Surviving Spouse of a Participant who dies after being credited with at least 5 years of Credited Service but less than 10 years of Credited Service shall be payable on the date the Participant would have attained age 62, or the Participant's date of death, if later.

**1.27. Service Credit Year**

"Service Credit Year" means a 12-month period commencing each June 1 and ending May 31 of the following year.

**1.28. Spouse or Surviving Spouse**

"Spouse" or "Surviving Spouse" means, for purposes of payment of either a Qualified Joint and Survivor Annuity or a Qualified Preretirement Survivor Annuity, the person to whom a Participant is currently married. Effective on and after September 16, 2013, a "Spouse" or "Surviving Spouse" shall include an individual married to a Participant in a same-sex marriage that was validly entered into in a jurisdiction whose laws authorized the marriage, even if the Participant resides in a jurisdiction that does not recognize the validity of the same-sex marriage. For purposes of payment of either a Qualified Joint and Survivor Annuity or a Qualified Preretirement Survivor Annuity, a former Spouse will also be treated as a "Spouse" or "Surviving Spouse" to the extent provided under a qualified domestic relations order, as described in Section 13.02.

**1.29. Trustees**

"Trustees" means the initial Trustees designated in the Agreement and Declaration of Trust together with their successors designated or appointed in accordance with the terms of said Agreement and Declaration of Trust.

**1.30. Union**

"Union" means Local Union No. 18 of the International Union of Operating Engineers and its branches.

**1.31. Unfunded Vested Benefits**

"Unfunded Vested Benefits" means the amount equal to the value of nonforfeitable benefits under the Plan as set forth in the most recent actuarial valuation, less the market value of the assets of the Plan as shown in the most recent actuarial valuation.

**1.32. Unreduced Early Retirement**

"Unreduced Early Retirement" means retirement by a Participant on or after the date on which he attains age 62 but prior to the date on which he attains age 65.

**1.33. Withdrawal Liability**

"Withdrawal Liability" means the amount of the Unfunded Vested Benefits allocable, under Article 16, to an Employer that withdraws from the Plan.

7

## ARTICLE 2
## PARTICIPATION

**2.01. Initial Eligibility**

An Employee shall become a Participant in the Plan as of the later of (a) the first day on which an Employer becomes obligated to make contributions to the Plan on his behalf; and (b) the date on which such contributions are actually received by the Plan.

**2.02. Eligibility Under Reciprocal Agreement**

If an Employee becomes a Participant in the Plan by virtue of transferring from another pension plan with which the Trustees have entered into a reciprocal agreement requiring such person's participation, the Employee, for purposes of this Plan, shall become a Participant in the Plan on the date on which contributions were first made for him to such other pension plan, provided the Trustees of this Plan have recognized the right of such earlier participation in said reciprocal agreement.

## ARTICLE 3
## CREDITED SERVICE

**3.01. Continuous Employment**

A Participant shall continue to earn Credited Service under the Plan during his continuous employment with an Employer until (a) he dies before retirement; (b) he retires; or (c) he incurs a Break in Service in accordance with Sections 1.06, or 1.21, as appropriate. For purposes of this Plan, the following events shall not be considered as interruptions in continuous employment of a Participant:

(i)     absence of not more than 48 months (no limit in time of war) due to service in the Armed Forces of the United States. Effective for Participants returning to employment with an Employer after December 12, 1994, absences for qualified military service not exceeding 60 months (when added with all previous absences for qualified military service) shall be treated as Credited Service and the Employer which last employed the Participant before the period of qualified military service shall be liable for contributions for a period of qualified military service, in accordance with Code Section 414(u);

(ii)     the Participant received no Credited Service by reason of working under a collective bargaining agreement requiring contributions to another pension plan to which any local of the International Union of Operating Engineers is a party and with which the Trustees have a reciprocal agreement;

(iii)     contiguous noncovered service for which no Employer contributions are made but for which the Participant is credited with Hours of Service for purposes of vesting and qualifying for an early retirement benefit, in accordance with Employee Benefits Security Administration Regulation Section 2530.210(c);

8

(iv)   in accordance with procedures established by the Fund Administrator, periods of time during which the Participant was totally unable to work due to sickness or injury as evidenced by proof of "Disability" (as defined in Section 4.03) satisfactory to the Trustees; and

(v)   unpaid absence from work for up to 12 weeks that qualify under the Family and Medical Leave Act.

## 3.02.   Break in Service

(a)   If a Participant or former Participant, who was under age 62 and who had not yet accumulated ten years of Credited Service, incurred a Break in Service before August 1, 1976, all previously accumulated Credited Service, Accrued Monthly Benefits and death benefits were forfeited. If a Participant had acquired at least ten years of Credited Service or was age 62 at the time he incurred a Break in Service, only preretirement death benefits were forfeited.

(b)   If a Participant had no nonforfeitable rights to benefits as of a Break in Service between August 1, 1976 and December 31, 1998, his Credited Service before such Break in Service shall be taken into account if, but only if, he has completed one year of Credited Service as a Participant in the Plan within the 12-consecutive-month period after his return to employment or if he completes 1,000 Hours of Service or more during a Service Credit Year.

(c)   Effective August 1, 1976 to May 31, 1980, years of Credited Service prior to a Break in Service of a Participant who had no nonforfeitable rights to benefits based on Credited Service prior to such Break in Service shall not be taken into account if the Break in Service years plus the number of consecutive years thereafter of less than one year of Credited Service equals or exceeds the number of his years of Credited Service prior to the Break in Service. Effective June 1, 1980 to May 31, 1998, the preceding sentence will apply except that a Participant shall not forfeit such Credited Service unless he fails to complete one year of Credited Service, as herein prescribed, within a minimum of five years, including the three years which result in the Break in Service.

(d)   Effective June 1, 1998, if a Participant had no nonforfeitable rights to benefits as of a Break in Service, the Participant's years of Credited Service before the Break in Service will be disregarded.

(e)   Notwithstanding any provision contained herein, a Deferred Vested Participant who is reemployed by an Employer prior to the time that his monthly benefits commence under this Plan shall have his Credited Service restored as of the date of his termination of employment, provided that such restoration of Credited Service shall not result in the duplication of benefits to such Participant.

9

## ARTICLE 4
## ELIGIBILITY FOR RETIREMENT BENEFITS

**4.01. Normal Retirement**

A Participant shall be eligible for a normal retirement benefit, determined in accordance with the provisions of Section 5.01, upon his attainment of age 65. Payment of such benefit may commence, in accordance with the provisions of Article 6, on the first day of any month following the month in which a Participant's application for his normal retirement benefit is received and approved by the Fund Administrator. The Fund Administrator may permit benefits to commence with a retroactive Annuity Starting Date if a terminated Participant fails to apply for retirement benefits on his Normal Retirement Age due to the fact that such person could not be located, for other equitable reasons as permitted by the Fund Administrator. Notwithstanding any provision contained in the Plan, a Participant's Accrued Monthly Benefit shall be fully vested and nonforfeitable upon attainment of his Normal Retirement Age except to the extent such Accrued Monthly Benefit was forfeited pursuant to Section 3.02.

**4.02. Early Retirement**

(a)    Unreduced Early Retirement. A Participant shall be eligible for an Unreduced Early Retirement benefit, determined in accordance with the provisions of Section 5.02, if his employment with an Employer is terminated on or after his 62nd birthday but prior to his Normal Retirement Age. Payment of such benefit may commence, in accordance with the provisions of Article 6, on the first day of any month following the month in which a Participant's application for an Unreduced Early Retirement benefit is received and approved by the Fund Administrator.

(b)    Unreduced Early Retirement with 30 Service Credit Years. A Participant shall be eligible for an Unreduced Early Retirement benefit, determined in accordance with the provisions of Section 5.02, if his employment with an Employer is terminated on or after the later of his 61st birthday or April 1, 1997, with Employer contributions for at least 300 Hours of Service in each of 30 Service Credit Years. Payment of such benefit may commence, in accordance with the provisions of Article 6, on the first day of any month following the month in which a Participant's application for an Unreduced Early Retirement benefit is received and approved by the Fund Administrator.

(c)    Regular Early Retirement. A Participant shall be eligible for an early retirement benefit, determined in accordance with the provisions of Section 5.03, if his employment with an Employer is terminated on or after his 57th birthday and after he has completed ten or more years of Credited Service. If a Participant's employment with an Employer is terminated before he has attained age 57 but after he has completed ten years of Credited Service, the Participant will be eligible for an early retirement benefit upon his attainment of age 57. Payment of an early retirement benefit under this paragraph (c) shall commence as of the Participant's Normal Retirement Age, unless a Participant elects to commence payments prior to such date. If a Participant requests the Fund Administrator to authorize the commencement of his early retirement benefit as of the first day of any month coincident with or following his Early Retirement Age but before he attains age 62, his benefit shall commence as of the first day of the month following the month in which the Participant's application for his early retirement benefit

10

is received and approved by the Fund Administrator, but the amount thereof shall be reduced as provided in Section 5.03.

**4.03. Disability Retirement**

A Participant who has not yet attained age 62, who has at least ten years (five years, if an active Participant on or after May 1, 1988) of Credited Service and who suffers a Disability while he is an active Participant shall be eligible for a disability retirement benefit in accordance with the provisions of Section 5.04. A Deferred Vested Participant who becomes disabled shall not be eligible for a disability retirement benefit under the Plan. For purposes of this Plan, the term "Disability" shall mean any injury or illness incurred by a Participant while he is an active Participant in the Plan which results in the Participant becoming wholly disabled and unable to perform as an operating engineer or in any occupation or work which will generate as much annual gross income as he realized as an operating engineer at the time of his Disability. Notwithstanding the previous provisions of this paragraph, a Participant shall not be qualified for a disability retirement benefit under this Plan if his Disability is incurred as the result of his addiction to narcotics or was incurred while he was engaged in a felonious enterprise or resulted from an intentionally self-inflicted injury.

For purposes of the Plan, a Participant shall be deemed to have suffered a Disability if the Fund Administrator is satisfied that the requirements of this Section, regarding the nature of the Participant's injury or illness, have been met. A Participant's Disability may be demonstrated to the Fund Administrator by either of the following means:

(a)     a certification by a physician selected by the Participant that the Participant's injury or illness satisfies the requirements of this Section, plus a determination by the Social Security Administration that, due to the Participant's injury or illness, he qualifies for Social Security disability benefits; or

(b)     a certification by a physician selected by the Participant and a certification by a physician selected by the Trustees that the Participant's injury or illness satisfies the requirements of this Section.

In order for a Participant to be considered to have suffered a Disability, his application for a disability retirement benefit, along with the proper physician certifications and Social Security Administration determinations, if applicable, as required by this section, must be filed with the Fund Administrator within a two-year period beginning on the date on which he suffers his injury or illness. In the event that a Participant's application is not filed within the time period designated herein, such application may nevertheless be approved by the Fund Administrator, provided all physician certifications state that the Participant's injury or illness satisfied the requirements of this Section as of the date on which the Participant incurred such injury or illness.

**4.04. Deferred Vested Benefit**

A Participant shall be eligible for a deferred vested benefit in accordance with the provision of Section 5.05 if his employment with an Employer is terminated before death or before his eligibility for any benefit pursuant to either Section 4.01 (Retirement), 4.02 (Early

Retirement) or 4.03 (Disability), provided he has completed at least ten years of Credited Service. Notwithstanding the previous sentence, each Employee who is an active Participant in the Plan on or after May 1, 1988 shall be fully vested in his Accrued Monthly Benefit and eligible for a deferred vested benefit in the event of the termination of his employment in accordance with this Section after he has completed at least five years of Credited Service.

## ARTICLE 5
## AMOUNT OF RETIREMENT BENEFITS

**5.01. Normal Retirement**

A Participant who retires on or after the date on which he attains his Normal Retirement Age will be entitled to a monthly benefit, determined in the Normal Form, in an amount equal to the sum of his monthly past service benefit (if any) plus his monthly future service benefit. A Participant's monthly past service benefit shall be determined by multiplying his Past Service Credit Years by an amount determined in accordance with the following table:

| Date of Retirement | | |
|---|---|---|
| **On or After** | **But Before** | **Amount** |
| 6/1/64 | 7/1/74 | $ 2.75 |
| 7/1/74 | 3/1/81 | $ 3.00 |
| 3/1/81 | 3/1/84 | $ 6.00 |
| 3/1/84 | 5/1/87 | $10.00 |
| 5/1/87 | 5/1/90 | $15.00 |
| 5/1/90 | ---- | $20.00 |

A Participant's monthly future service benefit shall be determined by multiplying Employer contributions (excluding supplemental contributions) credited to the Participant at the time of determination by a percentage determined in accordance with the following table:

| Date of Retirement | | |
|---|---|---|
| **On or After** | **But Before** | **Percentage** |
| 6/1/64 | 1/1/67 | 1.28 |
| 1/1/67 | 5/1/69 | 1.40 |
| 5/1/69 | 5/1/71 | 2.06 |
| 5/1/71 | 7/1/74 | 2.15 |
| 7/1/74 | 5/1/76 | 2.20 |
| 5/1/76 | 3/1/81 | 2.25 |
| 3/1/81 | 3/1/84 | 2.65 |
| 3/1/84 | 5/1/87 | 3.00 |
| 5/1/87 | 5/1/88 | 3.25 |
| 5/1/88 | 5/1/90 | 3.40 |
| 5/1/90 | 2/1/94 | 3.50 |
| 2/1/94 | 5/1/98 | 3.60 |

| | | |
|---|---|---|
| 5/1/98 | 8/1/99 | 3.70 |
| 8/1/99 | 5/1/06 | 3.80 |
| 5/1/06 | 8/1/09 | 3.30* |
| 8/1/09 | 8/1/12 | 1.75** |
| 8/1/12 | *** | 1.90*** |

\*       for Employer contributions attributable to months commencing on and after May 1, 2006 and prior to August 1, 2009.

\*\*      for Employer contributions attributable to months commencing on and after August 1, 2009.

\*\*\*     for Employer contributions attributable to months commencing on and After August 1, 2012.

See Section 5.07 for calculation of the benefit of a Participant who receives Future Service Credit after a Break in Service.

**5.02. Unreduced Early Retirement Benefit**

(a)      A Participant who retires on or after the date on which he attains age 62 but prior to the date on which he attains his Normal Retirement Age will be entitled to a monthly Unreduced Early Retirement benefit, determined in the Normal Form. The amount of a Participant's Unreduced Early Retirement benefit shall be determined in accordance with the provisions of Section 5.01 by calculating his monthly past service benefit (if any) and his monthly future service benefit as of the date of his Unreduced Early Retirement.

(b)      A Participant who retires on or after the date on which he attains age 61, with Employer contributions for at least 300 Hours of Service in each of 30 Service Credit Years, will be entitled to a monthly Unreduced Early Retirement benefit, determined in the Normal Form. The amount of a Participant's Unreduced Early Retirement benefit shall be determined in accordance with the provisions of Section 5.01 by calculating his monthly past service benefit (if any) and his monthly future service benefit as of the date of his Unreduced Early Retirement.

**5.03. Regular Early Retirement Benefit**
A Participant who retires on or after his Early Retirement Age will be entitled to a monthly benefit, determined in the Normal Form. The amount of a Participant's early retirement benefit shall be determined in accordance with the provisions of Section 5.01 by calculating his monthly past service benefit (if any) and his monthly future service benefit as of the date of his early retirement, but such benefit shall be reduced by:

(a)      in the case of a Participant with ten or more years of Credited Service but not 300 Hours of Service in each of 30 Service Credit Years, .5% (.005) of the amount so determined for each month that the Participant's early retirement benefit commencement date precedes the first day of the month following the month in which the Participant would attain age 62; or

13

(b)    in the case of a Participant with Employer contributions for at least 300 Hours of Service in each of 30 Service Credit Years retiring on or after April 1, 1997, .625% (.00625) of the amount so determined for each month that the Participant's early retirement benefit commencement date precedes the first day of the month following the month in which the Participant would attain age 61.

### 5.04.  Disability Retirement Benefit

A Participant who satisfies the requirements of Section 4.03 will be entitled to a monthly benefit, determined in the Normal Form.  Effective for Participants who incur a Disability on or after May 1, 2006, the amount of a Participant's disability retirement benefit shall be determined in accordance with the provisions of Section 5.01 by calculating his monthly past service benefit (if any) and his monthly future service benefit as of the date of his Disability, but such benefit shall be reduced by .5% (.005) of the amount so determined for each month that the Participant's disability retirement benefit commencement date precedes the first day of the month following the month in which the Participant would attain age 62, but in no event shall any reductions exceed 30% (.30).  Payment of a Participant's disability retirement benefit shall commence, in accordance with the provisions of Article 6, on the first day of the month following the initial five-consecutive-month period during which the Participant has been determined to have suffered a Disability, as described in Section 4.03, provided such five-consecutive-month period shall not commence or coincide with any period of time during which a Participant is receiving unemployment benefits.

A Participant's disability retirement benefits that first commence on and after June 1, 2012, shall cease if, prior to the date such Participant qualifies for Normal Retirement or Early Retirement, he:

(a)    ceases to be eligible for Social Security disability benefits (but only to the extent that the initial Disability finding was based on the Participant's receipt of Social Security disability benefits), or

(b)    is determined by the Trustees to have sufficiently recovered and no longer meets the requirements of Disability; or

(c)    engages in an occupation or employment (except for rehabilitation) that is inconsistent with the finding of Disability; or

(d)    refuses to undergo a medical examination or to furnish other additional proof of continue disability requested by the Trustees; provided, however, that the disabled Participant may not be required to undergo a medical examination more often than twice a year.

A disability retirement benefit that ceases to be paid to a Participant in accordance with this Section shall again commence to be paid to the Participant in the form previously elected by the Participant commencing on and after the first day of the month following the month in which the Participant meets the requirements for Normal Retirement in accordance with Section 4.01 or Early Retirement in accordance with Section 4.02.  The amount of any additional retirement benefits earned by the Participant under the Plan after the date his disability retirement benefits

14

ceased being calculated in accordance with this Section shall be determined as if the Participant first retired on the date of his subsequent retirement.

In no event will disability retirement benefits be paid to a Participant in accordance with this Section during a period in which the Participant's retirement benefits are required to be suspended in accordance with Section 6.06.

**5.05. Deferred Vested Benefit**
A Participant who is eligible for a deferred vested benefit pursuant to the provisions of Section 4.04 will be entitled to a monthly benefit, commencing on the first day of the month following the month in which (a) the Participant attains age 57 if he has at least ten years of Credited Service or he attains his Normal Retirement Age if he has less than ten years of Credited Service; and (b) the Participant's application for his deferred vested benefit is received and approved by the Fund Administrator. The amount of a Participant's deferred vested benefit shall be determined, in the Normal Form, in accordance with the provisions of Section 5.01 by calculating his monthly past service benefit (if any) and his monthly future service benefit using: (i) the percentage in effect under the table in Section 5.01 as of the date of the last Employer contribution in the last Service Credit Year during which the Participant was credited with at least 300 Hours of Service before a Break in Service; and (ii) Employer contributions credited to the Participant; but such benefit shall be reduced by .5% (.005) of the amount so determined for each month that the Participant's deferred vested benefit commencement date precedes the first day of the month following the month in which the Participant would attain age 62. Payment of a Participant's deferred vested benefit shall be made in accordance with the provisions of Article 6.

**5.06. Increased Benefits for Certain Former Participants and Spouses**
At the discretion of the Trustees, all former Participants and certain Spouses of former Participants who are receiving benefits under the Plan may have the amount of their benefits increased. Such benefit increases may be made, in the sole discretion of the Trustees, to either the monthly benefits payable under the Plan to such former Participants and Spouses or in the form of a single lump sum additional payment made to such former Participants and Spouses. Benefit increases under this Section 5.06 shall be made by resolution at any regularly scheduled meeting of the Trustees.

**5.07. Benefit After Break in Service**
This Section shall apply to a Participant who resumes service after January 1, 1999 following a Break in Service. If a Participant's Credited Service is interrupted by a Break in Service, the amount of the Participant's future service benefit shall be determined in the Normal Form by:

(a) multiplying the percentage in effect under the table in Section 5.01 as of the date of the last Employer contribution in the last Service Credit Year during which the Participant was credited with at least 300 Hours of Service before the initial Break in Service by Employer contributions credited to the Participant: (i) before the Break in Service and (ii) after the Break in Service but before a Service Credit Year in which the Participant has 1,000 Hours of Service; plus

(b)      multiplying the percentage in effect under the table in Section 5.01 as of the date of the last Employer contribution in the last Service Credit Year during which the Participant was credited with at least 300 Hours of Service before a later Break in Service, by Employer contributions credited to the Participant for and after the Service Credit Year in which the Participant has 1,000 Hours of Service.

The calculation of a Participant's benefit attributable to Future Service Credit under this Section shall be subject to the Break in Service rules of Section 3.02.

**5.08.   August 1, 1999 Increase in Certain Benefits**
(a)      A person shall receive the pension increase described in paragraph (b) if he was receiving monthly pension payments as of July 31, 1999, and he is:

> (i)      a Participant who retired on or after Normal Retirement Age under Section 4.01, a Participant who retired on or after Early Retirement Age under Section 4.02, or a Participant who retired due to Disability with a pension under Section 4.03;

> (ii)      the Surviving Spouse of a Participant described in paragraph (a)(i); or

> (iii)      the Surviving Spouse of a Participant who died in active service.

This does not include period certain payments where the Participant died within five years of retiring with a pension payable in the Normal Form or a Contingent Annuitant who is not the Surviving Spouse. A person who commences receiving the increased benefit described in paragraph (b) below, is rehired by an Employer and subsequently retires from the Plan with an increased monthly pension shall receive the greater of his or her retirement benefit increased in accordance with this Section 5.08 prior to his rehire or his increased monthly pension determined after his subsequent retirement.

(b)      Effective August 1, 1999, the monthly pension of a person described in paragraph (a) shall be increased by $50. Notwithstanding the foregoing, if after the $50 increase the person's monthly payment is less than $500, the person's monthly payment shall be increased to $500.

**ARTICLE 6**
**PAYMENT OF BENEFITS**

**6.01.   Method of Payment**

(a)      General Requirements. At the time a Participant becomes entitled to receive any benefit described in Article 5, the Fund Administrator shall either make payment from the Plan to such Participant (i) in the automatic form of payment described in paragraph (b) which is applicable to the Participant; or (ii) in one of the optional methods of payment elected by such Participant pursuant to paragraph (c).

(b)     Automatic Forms.  Unless an optional form of payment is elected by the Participant under paragraph (c) pursuant to a Qualified Election within the 180-day period ending on the Annuity Starting Date, the benefit of a married Participant shall be paid in the form of a Qualified Joint and Survivor Annuity.  Unless an optional form of payment is elected by the Participant under paragraph (c) within the 180-day period ending on the Annuity Starting Date, the benefit of an unmarried Participant shall be paid in the Normal Form.

(c)     Optional Forms.  This subparagraph (c) shall be effective for distributions commencing on or after August 1, 2009.  A Participant may elect, subject to the provisions of paragraph (b), on forms provided by the Fund Administrator, to receive his benefit under the Plan in a contingent annuity which shall be the Actuarial Equivalent of the benefit computed for the Participant under the Normal Form.  A contingent annuity is an annuity benefit, reduced in accordance with the provisions of Appendix A, payable in monthly installments during the Participant's lifetime on the first day of each calendar month in which the Participant has lived the entire preceding month, with monthly payments equal to 50% (or 75% or 100% if the Contingent Annuitant is the Participant's Spouse) of the monthly payments made during the Participant's lifetime continuing to the Participant's Contingent Annuitant, if surviving, after the Participant's death, with the last payment to be made as of the first day of the month in which the death of the Contingent Annuitant occurs.  In addition to the contingent annuity, the Normal Form of payment is available as an optional form of payment for a married Participant.

Subject to the provisions of paragraph (b), a Participant may elect to change his election with respect to the form of payment of his benefit under the Plan, provided such change in election is filed with the Fund Administrator within 180 days of the date of his initial election and prior to his Annuity Starting Date.  In the event that a Participant is receiving his benefit under the Plan in the form of a Qualified Joint and Survivor Annuity (or a joint and 75% or 100% survivor annuity where the Contingent Annuitant is the Participant's Spouse) and his Spouse predeceases him, upon notification of the Fund Administrator of such Spouse's death, beginning with the first payment following the death of the Participant's Spouse and continuing for all future payments required under the Plan, the Participant's monthly benefit shall automatically be paid to him in the Normal Form, calculated as of the time of the Participant's initial receipt of benefits under the Plan.

The Fund Administrator shall provide the Participant with a general description of the material features, and an explanation of the relative values of, the optional forms of benefits available under the Plan in a manner that will satisfy the notice requirements of Code Section 417(a)(3) and Treasury Regulation Section 1.417(a)(3)-1.

**6.02.  Designation of Beneficiary or Contingent Annuitant**
For purposes of this Article 6, unless a Qualified Election is in effect at the time his benefit commences, a Participant's Surviving Spouse shall be deemed his Beneficiary or Contingent Annuitant without the filing of any designation form with the Fund Administrator. No other designation by the Participant, except to designate a contingent Beneficiary or Beneficiaries to receive benefits if the Participant dies unmarried, shall be effective without such a Qualified Election.

**6.03. Additional Distribution Requirements**

Notwithstanding any other provision of this Plan to the contrary, the distributions to a Participant required by this Section 6.03 shall commence not later than by the date set forth in Section 6.04(b), and shall be made over a period not greater than the life of the Participant or over the life expectancy of the life expectancy of the Participant and his designated beneficiary in accordance with the required minimum distribution provisions of Section 401(a)(9) of the Code [including the incidental distribution requirements of Code Section 401(a)(9)(G)] and the applicable Treasury Regulations under Section 401(a)(9) of the Code, including Treasury Regulation 1.401(a)(9)-6, which shall be incorporated by reference. The provisions of this Section 6.03 shall override any distribution options in the Plan inconsistent with this Section 6.03, including the provisions set forth in Section 7.07.

**6.04. Timing of Payments**

(a)     Unless the Participant elects otherwise, the payment of benefits shall begin no later than 60 days after the latest of the close of the Plan Year in which (i) the Participant attains his Normal Retirement Age; (ii) occurs the 10th anniversary of the year in which the Participant commenced participation in the Plan; or (iii) the Participant terminates service with an Employer. Notwithstanding the foregoing, the failure of a Participant to consent to a distribution while a benefit is immediately distributable shall be deemed to be an election to defer commencement of the payment of any benefit sufficient to satisfy this Section 6.04. A Participant who is eligible for a distribution from the Plan prior to his normal retirement date shall be informed of his right to defer a distribution from the Plan and the consequences of the failure to do so including a description of how much larger benefits will be if the commencement of distributions is deferred.

(b)     Effective for Plan Years beginning on and after August 1, 1989, in no event will the entire interest of a Participant be distributed, or commence to be distributed, later than the April 1st following the year in which the Participant attains age 70-½.

**6.05. Return to Work Outside Union Jurisdiction After Benefits Have Commenced**

If a Participant engages in service outside the jurisdiction of the Union and would otherwise be entitled to a transfer of credit from another plan to this Plan pursuant to a reciprocal agreement referred to in Section 2.02 and if at that time the Participant is entitled to or is receiving normal retirement benefits under this Plan or is then receiving early retirement benefits or Unreduced Early Retirement benefits under this Plan, then, notwithstanding any provision in this Plan to the contrary, the Trustees shall refuse to accept any contributions from said other plan; and the Participant shall not be entitled to any benefits under this Plan with respect to such service. Benefits payable from the Plan at the time the Participant engaged in such service shall not be suspended unless otherwise permitted by Section 6.06 below.

**6.06. Suspension of Benefits**

(a)     The portion of any monthly benefit attributable to benefits which accrued on or after June, 2002 and otherwise payable under this Plan shall be permanently forfeited for any month in which a Participant is credited with 41 or more hours of service in that month in a

18

business activity of the type engaged by any Employer in the geographic jurisdiction of the Union in a trade or craft in which such person was employed at any time while a Participant in the Plan. However, the suspension shall not continue past the April 1 of the calendar year following the year in which the Participant attains age 70-½.

If, on or after June, 2002, Participant who was eligible to commence receiving retirement benefits in accordance with Section 5 of the Plan applied for retirement benefits and such retirement benefits were either: (i) approved by the Plan but suspended before payments commenced, or (ii) commenced but were suspended after the Participant commenced employment performing supervisory activities relating to operating engineers, then the Plan shall provide each affected Participant with a lump sum payment not later than by January 1, 2006 (or such later date as permitted by the Internal Revenue Service) equal to the amount of benefit payments that were suspended on and after June 7, 2004, plus interest.

(b) Benefits shall be payable again after the Participant notifies the Fund Administrator in writing as to the first calendar month in which such person did not engage in 41 or more hours of service. The initial payment, upon recommencement, shall be made before the first day of the third calendar month after such written notice was received. That payment shall be for all benefits payable for months following the last month for which the Participant was engaged in 41 or more hours of service.

(c) Upon recommencement, benefits shall be paid to the Participant in the same form (i.e., five years certain and life annuity or contingent annuity) as benefits were paid to such former Participant prior to suspension of such benefits pursuant to this Section and shall be calculated in the manner as set forth in paragraph (d) below.

(d) Upon recommencement, a Participant's monthly future service benefit shall be determined by multiplying:

(i) (A) Employer contributions credited to the Participant at the time of his initial retirement; and (B) Employer contribution credited to the Participant on and after the date of his rehire but prior to the Service Credit Year in which the Participant is credited with at least 1,000 Hours of Service, by the percentage in effect under the table set forth in Section 5.01 which was applicable to the Participant's initial retirement; and

(ii) Employer contributions credited to the Participant on and after the Service Credit Year in which the Participant is credited with at least 1,000 Hours of Service by the percentage in effect under the table set forth in Section 5.01 which is applicable to the Participant's subsequent retirement.

Any early retirement reduction set forth in Section 5.03 shall apply to the Participant's entire retirement benefit, and shall be based upon his age on the date of his subsequent retirement.

(e) The initial payment upon recommencement of benefits shall be offset by any benefit payment actually made to the Participant for months in which the Participant works for 41 or more hours of service for an employer within the jurisdiction of the Union. To the extent

such overpayment is not completely offset against the initial payment, it shall be offset against future payments limited to 25% of each such future payment until it has been completely offset.

(f)     Participants receiving benefits must notify the Fund Administrator of certain details of any employment after such benefits have commenced. Such details shall include the name and address of the employer, work site location, date employment commenced, nature of employment, actual hours worked by month and expected monthly hours. If the Participant does not provide such notice, the Fund Administrator shall suspend pension benefits pursuant to this section upon learning of subsequent potential monthly service of 41 or more hours of service for an employer within the jurisdiction of the Union unless it is unreasonable under the circumstances for the Fund Administrator to presume that the Participant was engaged in such service.

(g)     For the purpose of this Section 6.06, "hours of service" shall have the meaning as set forth in 29 CFR 2530.200b-2(a)(1) and (2)) and "Participant" shall also include a former Participant who is receiving or entitled to receive a benefit from the Plan.

**6.07.   Small Lump Sum Cashouts**
Effective as of January 15, 2010, in the event the Actuarial Equivalent present value of the Participant's vested retirement benefit calculated pursuant to Sections 5.01, 5.02, 5.03, 5.04 or 5.05 (as applicable), or a Beneficiary's death benefit calculated pursuant to Article 7, does not exceed $5,000 at the time of such person's termination of employment or death, the Trustees shall make a lump sum payment to the Participant or Beneficiary, which is equal to the Actuarial Equivalent present value of such retirement or death benefit provided that the Participant's written consent shall be required if the Actuarial Equivalent present value exceeds $1,000.

**6.08.   Actuarial Equivalent for Lump Sum Payments**
With respect to any lump sum payment or benefit subject to Section 417(e) of the Code, the following rules apply effective for distributions on or after August 1, 2008:

(a)     The Applicable Interest Rate for a Plan Year shall be the adjusted first, second and third segment rates applied under the rules similar to the rules of Section 430(h)(2)(C) of the Code for the second full calendar month preceding the Plan Year which contains the date of distribution or such other time as the Secretary of Treasury may by Regulations prescribe. For this purpose, the first, second, and third segment rates are the first, second and third segment rates that would be determined under Section 430(h)(2)(C) of the Code if:

(b)     Section 430(h)(2)(D) of the Code were applied by substituting the average yields for the second full calendar month preceding the Plan Year which contains the date of distribution or such other time as the Secretary of Treasury may by regulations prescribe for the average yields for the 24-month period described in such Section, and

(c)     Section 430(h)(2)(G)(i)(II) of the Code were applied by substituting "Section 417(e)(3)(A)(ii)(II)" for "Section 412(b)(5)(B)(ii)(II)", and

(d)     The applicable percentage under Section 430(h)(2)(G) of the Code is treated as being 20% in 2008, 40% in 2009, 60% in 2010, and 80% in 2011.

The Applicable Mortality Table for all purposes under the Plan shall be the mortality table prescribed in regulations under Section 417(e) of the Code for use in the Plan Year that contains the date of distribution.

**ARTICLE 7**
**DEATH BENEFITS**

**7.01.  General**
Except as provided in this Section, no death benefits shall be payable under the Plan.  The provisions of this Article 7 shall exclusively govern the payment of death benefits under the Plan, even to the exclusion of any laws governing a decedent's estate to the extent that such laws are preempted by the Act.  Notwithstanding any provision contained herein, death benefits provided under this Plan shall be incidental, within the meaning of Section 1.401-1(b)(1) of the Regulations issued by the Secretary of the Treasury and the rulings issued thereunder.

**7.02.  Death After Benefit Commencement Date**
If a former Participant who is receiving a benefit under the Plan dies, death benefits shall be provided hereunder pursuant to the form of payment in effect under Article 6 at the time of such former Participant's death.  A former Participant who has a form of payment of benefits in effect at the time of his death which provides for no payments to his Spouse, Contingent Annuitant or Beneficiary after his lifetime shall have no death benefit coverage hereunder.

If a Participant retires having elected a pension for life with no survivor annuity provisions (with spousal consent in the case of a married Participant) and begins receiving either a retirement benefit, disability retirement benefit or deferred vested benefit and dies before having 60 monthly payments of such benefit, payments shall be made to the Participant's Beneficiary either (a) monthly until the remainder of the 60 monthly payments have been made; or (b) in a single lump sum amount calculated using a 5% interest reduction factor.  If payments continue to be made monthly to the Participant's Beneficiary and said Beneficiary dies before such 60 monthly payments have been made, the remaining payments shall be made as prescribed in Section 7.06.  If, upon the death of the Beneficiary, the payment is to be made to the Beneficiary's estate or to more than one individual, such payment will be made in a single lump sum amount calculated using a 5% interest reduction factor.

**7.03.  Death After Application for Benefits**
Upon the death of a Participant who has satisfied all requirements for a benefit to commence under the Plan, including the completion of an application with the Fund Administrator in which a payment form is elected, prior to the actual commencement of benefits to such Participant, his Beneficiary shall have the option to receive benefits either (a) in

accordance with the provisions applicable to the form of benefit elected by the Participant prior to his death; or (b) under the remaining provisions of this Article 7 as if the Participant had died prior to retirement. If the Participant dies without satisfying all of the requirements for the payment of benefits under the Plan, payment of any death benefits under the Plan shall be made in accordance with the remaining provisions of this Article 7 as if the Participant had died prior to retirement, unless the Trustees determine, in a nondiscriminatory manner, to allow the Participant's Beneficiary to receive benefits in some other form.

### 7.04. Death Before Retirement - Married Participant

(a)     Vested Married Participant. If a married Participant who is fully vested in his Accrued Monthly Benefit (including a Deferred Vested Participant) dies before actual retirement, his Surviving Spouse shall receive a death benefit in the form of a Qualified Preretirement Survivor Annuity. Alternatively, the Surviving Spouse may elect the death benefit provided in either paragraph (c) or (d) of this Section 7.04 instead of such Qualified Preretirement Survivor Annuity. A Surviving Spouse shall not be required to begin receiving payment of such benefit prior to the time that the Participant would have attained his Normal Retirement Age.

(b)     Non-Vested Married Participant. If a married Participant who is not fully vested in his Accrued Monthly Benefit dies before actual retirement, his Surviving Spouse may elect the death benefit provided in either paragraph (c) or (d) of this Section 7.04.

(c)     Return of Employer Contribution. A Surviving Spouse who elects to receive the death benefit provided under this paragraph shall be entitled to receive a death benefit equal to the amount of Employer contributions credited under the Plan to the Participant at the time of his death.

(d)     Alternative Monthly Benefit.  If a married Participant dies before actual retirement at a time when Employer contributions for at least 1,000 Hours of Service are then credited under the Plan to the Participant, his Spouse (if she is entitled to this election pursuant to other provisions of this Section) may elect to receive $75 per month payable until the earlier of (i) the date on which said Spouse remarries; or (ii) the date on which said Spouse attains age 65. If the Spouse elects payment under this paragraph (d) but dies before receiving at least the benefit to which she would have been entitled had she elected payment under paragraph (c), the difference between the amounts will be divided equally among the surviving children of the deceased Participant. If there are no surviving children at the time of the Spouse's death, no further benefit will be paid under this paragraph (d). If a Surviving Spouse elects to receive the monthly benefit described in this paragraph (d), subject to the provisions of Article 6, each of the deceased Participant's unmarried children under age 18 shall also receive $75 per month until the earliest of (A) the date on which said child attains age 18; (B) the date on which said child marries; (C) the date on which the Spouse remarries; or (D) the date on which the Spouse attains age 65.

(e)     Death of Surviving Spouse Prior to Commencement of Preretirement Survivor Annuity. If a Participant's Surviving Spouse should die prior to commencement of payment of the Qualified Preretirement Survivor Annuity required in paragraph (a), the death benefit

provided in paragraph (c) shall be paid as prescribed in Section 7.06 as if the Participant had been unmarried at the time of his death.

(f) <u>Benefits Upon Termination of Marriage</u>. When a Participant's marriage is terminated before retirement, in the absence of a qualified domestic relations order or other written evidence to the contrary, the former Spouse shall have no rights to any benefits under the Plan.

(g) <u>Pre-January 1, 2000 Waiver</u>. Notwithstanding the preceding paragraphs of this Section, if: (i) a Participant and his Spouse made a Qualified Election to waive the Qualified Preretirement Survivor Annuity before January 1, 2000 under the Plan as in effect before January 1, 2000; and (ii) such Qualified Election is not revoked, then the Participant's Beneficiary shall receive the death benefit provided in paragraph (c) and no other benefit will be paid under this Section.

**7.05. Death Before Retirement - Unmarried Participant**
If an unmarried Participant, including a Deferred Vested Participant or alternate payee, dies before actual retirement, his Beneficiary shall be entitled to receive a death benefit equal to the amount of Employer contributions credited under the Plan to the Participant at the time of his death.

**7.06. Payment Upon Death of Participant**
Upon the death of a married Participant who is eligible for a death benefit, the Trustees, upon proper notice and such verification as they shall require, shall pay the death benefit specified in Section 7.04.

Upon the death of an unmarried Participant who is eligible for a death benefit, the Trustees, upon proper notice and such verification as they shall require, shall pay the death benefit to such Beneficiary as said Participant shall have designated; provided, however, that in default of such designation or if the last designated Beneficiary shall not survive the Participant, the death benefit shall be paid in a single sum to the first surviving class of the following classes of successive preference Beneficiaries: (a) child or children, (b) parents and (c) brothers and sisters. For purposes of this Section, the words "child" and "children" shall include the legally adopted child or children of the Participant. In the event that a Participant's Beneficiary is a minor child and the amount payable to such child under this Article 7 is equal to or greater than $1,000, such amount shall be paid by the Fund Administrator to the court appointed guardian of such child.

Notwithstanding any provision contained in this Article 7, if a designated Beneficiary or a Surviving Spouse of a Participant causes the death of the Participant through such Beneficiary's or Spouse's willful act, the designated Beneficiary or Surviving Spouse who causes the Participant's death shall have no right to receive any benefit under the Plan. In the event that a Participant has more than one Beneficiary, the interest of the Beneficiary who causes the Participant's death shall be divided equally among the remaining Beneficiaries.

**7.07. Distribution Requirements Applicable to Death Benefits**

If the distribution of the Participant's interest under the Plan has begun and he dies before his entire interest has been distributed to him, the remaining portion of such interest will be distributed at least as rapidly as under the method of distribution being used prior to the Participant's death.

Subject to the succeeding paragraph, if the Participant dies before his distribution has begun, his entire interest shall be distributed within five years of his death unless (a) a portion of his interest is payable to or on behalf of a designated Beneficiary; (b) such portion will be distributed over the life of such designated Beneficiary or over a period not extending beyond the life expectancy of such designated Beneficiary; and (c) such distribution begins not later than one year after the date of the Participant's death (or such date as prescribed by the Secretary of Treasury).

Notwithstanding the preceding paragraph, if the designated Beneficiary is the Participant's Surviving Spouse, the date by which distribution must commence under (c) in the preceding paragraph shall be the date the Participant would have attained age 70-½. If the Surviving Spouse dies before distribution to said Spouse begins, this Section shall apply as if the Surviving Spouse were the Participant. In addition, any amount paid to a child of the Participant will be treated as if it had been paid to the Surviving Spouse if the amount becomes payable to the Surviving Spouse when the child reaches the age of majority.

**7.08. Heroes Act Death Benefit Provision**

Effective for death occurring on or after December 31, 2007, if a Participant dies while performing "qualified military service" (as defined in Code Section 414(u)), the survivors of the Participant are entitled to any additional benefits and vesting service (other than benefit accruals relating to the period of qualified military service) provided under the Plan as if the Participant had resumed employment and then died.

**7.09. Eligible Rollover Distributions**

(a)    Eligible Rollover Distribution:  Any distribution of all or any portion of the balance to the Distributee, except that an Eligible Rollover Distribution does not include (A) any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated beneficiary, or for a specified period of ten years or more; (B) any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; (C) the portion of any distribution that is not includable in gross income; and (D) at the election of the Administrator, any other distribution, provided that all distributions in the year are reasonably expected to total less than $200.00.

(b)    Eligible Retirement Plan:  An individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b), an annuity plan described in Code Section 403(a) or a qualified trust described in Code Section 401(a) that accepts the Distributee's Eligible Rollover Distribution. An Eligible Retirement Plan shall also mean an annuity contract described in Code Section 403(b) and an eligible plan under Code

24

Section 457(b) which is maintained by a state, political subdivision of a state or any agency or instrumentality of a state or political subdivision of a state which agrees to separately account for amounts transferred into such plan from this Plan. The definition of Eligible Retirement Plan shall also apply in the case of a distribution to a Surviving Spouse or to a Spouse or former Spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Section 414(p). In the case of an Eligible Rollover Distribution to a beneficiary other than a Surviving Spouse who is also a "designate beneficiary" [as defined by Section 401(a)(9)(E) of the Code], an Eligible Retirement Plan shall include an inherited individual retirement account. An eligible retirement plan shall also mean a Roth IRA provided the Distributee could have otherwise rolled over a traditional IRA to the Roth IRA during the year.

(c)    Distributee:    A Distributee includes an Employee or former Employee.    In addition, the Spouse or Surviving Spouse of an Employee or former Employee, or an alternate payee, is a Distributee with regard to the interest of such person.    A Beneficiary other than a Surviving Spouse who is also a "designated beneficiary" [as defined by Section 401(a)(9)(E) of the Code] shall be a Distributee with regard to the interest of such person.

(d)    Direct Rollover:    A payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

This Section 7.09 shall permit a Direct Rollover by a Distributee of an Eligible Rollover Distribution to and Eligible Retirement Plan.

## ARTICLE 8
## TRUSTEES

**8.01.   Board of Trustees**
A Board of Trustees consisting of eight persons, of whom half shall be Union Trustees and half shall be Employer Trustees, shall cause to have continued the Agreement and Declaration of Trust establishing The Ohio Operating Engineers Pension Fund and providing for the administration of the Trust by said Trustees. On and after the date it has been entered into, the Trust Agreement shall be deemed to form a part of this Plan and any and all rights or benefits which may accrue to any person under this Plan shall be subject to all the terms and provisions of said Trust Agreement.

## ARTICLE 9
## PLAN ADMINISTRATION

**9.01.   Plan Administration**
The Plan shall be administered by the Fund Administrator appointed by the Trustees. The Fund Administrator shall supervise the routine administration of the Plan and assume such other responsibilities as the Trustees may assign to him.

**9.02. Powers and Duties of the Trustees and the Fund Administrator**

The Trustees or the Fund Administrator, if so directed by the Trustees, shall have such powers as may be necessary to discharge their duties to administer the Plan in their sole and absolute discretion. These powers shall include, but not be limited to, the following:

(a)     to construe and interpret the Plan, decide all questions of eligibility and determine the amounts, manner and time of payment of any benefits hereunder;

(b)     to prescribe procedures to be followed by Participants or Beneficiaries filing applications for benefits;

(c)     to prepare and distribute, in such manner as the Trustees or the Fund Administrator determines to be appropriate, information explaining the Plan;

(d)     to receive from any Employer and from Participants or Beneficiaries such information as shall be necessary for the proper administration of the Plan;

(e)     to furnish an Employer, upon request, such annual reports with respect to the administration of the Plan as are reasonable and appropriate;

(f)     to receive and review the periodic valuation of the Plan made by the Plan's actuary;

(g)     to receive, review and keep on file (as it deems convenient or proper) financial reports;

(h)     to appoint or employ individuals, including an investment advisor, to assist in the administration of the Plan and any other agents it deems advisable, including legal and actuarial counsel.

**9.03. Rules and Decisions**

The Trustees and the Fund Administrator, if so directed by the Trustees, may adopt such rules and actuarial tables as they deem necessary, desirable or appropriate. All rules and decisions of the Trustees or the Fund Administrator shall be uniformly and consistently applied to all Participants in similar circumstances. When making a determination or calculation, the Trustees and the Fund Administrator shall be entitled to rely upon information furnished by a Participant or Beneficiary, an Employer, the legal counsel of an Employer or the Plan's actuary.

**9.04. Applications and Forms**

The Fund Administrator shall require a Participant to complete and file with the Fund Administrator an application for benefits and all other forms approved by the Trustees and the Fund Administrator and to furnish all pertinent information requested by the Fund Administrator. The Fund Administrator may rely upon all such information so furnished him, including the Participant's current mailing address.

**9.05. Facility of Payment**

Whenever, in the Fund Administrator's opinion, a person entitled to receive any payment of a benefit or installment thereof hereunder is under a legal disability or is incapacitated in any way so as to be unable to manage his financial affairs, the Fund Administrator may make payments to such person or to his legal representative or to a relative of such person for his benefit; or the Fund Administrator may apply the payment for the benefit of such person in such manner as the Fund Administrator considers advisable. Any payment of a benefit or installment thereof in accordance with the provisions of this Section shall be a complete discharge of any liability for the making of such payment under the provisions of the Plan.

# ARTICLE 10
## CONTRIBUTIONS; FUNDING REQUIREMENTS

**10.01. Contributions and Additional Funding Requirements**

(a)     Contributions.     The Employers shall make such contributions as required by applicable collective bargaining or other legally permissible written agreement. Participants shall not be required or allowed to contribute to the Plan.

(b)     Additional Funding Requirements. Effective with regard to Plan Years beginning after July 31, 2008, the Plan shall comply with certain additional funding rules for multiemployer plans in either endangered or critical status. The determination of whether the Plan is in endangered or critical status shall be determined in accordance with Code Section 432(b), and applicable regulations or other guidance thereunder. All terms used in this Subsection (b) shall have the meaning as set forth in Code Section 432, and applicable regulations or other guidance thereunder.

(i)     If the Plan is in endangered status, the Trustees shall adopt and implement a funding improvement plan in accordance with the requirements of Code Section 432(c).

(ii)     If the Plan is in critical status, the Trustees shall adopt and implement a rehabilitation plan in accordance with the requirements of Code Section 432(e); and the requirements of Code Section 432(f) shall apply during the rehabilitation plan adoption period and the rehabilitation period. The rehabilitation plan may include reductions in plan expenditures, reductions in future benefit accruals or adjustable benefits (to the extent that the notice provisions of Code Section 432(e)(8)(C) are complied with), or increases in contributions, if agreed to by the bargaining parties, or other such actions permitted under Code Section 432(e).

The Plan may not be amended after the date of the adoption of a rehabilitation plan so as to be inconsistent with the rehabilitation plan. The Plan also may not be amended after the date of the adoption of a rehabilitation plan to increase benefits, including future benefit accruals, unless the Plan's actuary certifies that such increase is paid for out of additional contributions not contemplated by the rehabilitation plan, and, after taking into account the benefit increase, the multiemployer plan still is reasonably expected to emerge from critical status by the end of the rehabilitation period on the schedule contemplated in the rehabilitation plan. Effective on and after the date the

notice of certification of the Plan's critical status for the initial critical year under Code Section 432(b)(3)(D) is sent, the Plan shall not (A) pay any payment in excess of monthly amounts paid under a single life annuity; (B) make any payment for the purchase of an irrevocable commitment from an insurer to pay benefits; or (C) make other payments specified by the Secretary of the Treasury, unless such payments are a make-up payments in the case of a retroactive Annuity Starting Date, or other similar payments of benefits owed with respect to a prior period.

(iii)    In accordance with Section 204 of the Worker, Retiree and Employee Recovery Act of 2008, (WRERA), the Trustees may make an election to temporarily freeze the Plan's funded status for the August 1, 2009 Plan Year to be the same as the Plan Year immediately prior to the election year. In accordance with Section 205 of WRERA, the Trustees may elect to extend the funding improvement or rehabilitation period by three years. To the extent that a future law, regulation, or guidance permits similar relief with regard to future Plan Years, such law, regulation or guidance shall be incorporated by reference.

(iv)    To the extent necessary, the Plan shall be further amended to comply with the requirements of this section.

(v)    To the extent not specifically described above, Section 432 of the Code, and applicable regulations and other guidance thereunder, shall be incorporated by reference.

## ARTICLE 11
## AMENDMENTS

### 11.01. Trustees' Right to Amend Plan

The Trustees shall have the right at any time, by an instrument in writing, to modify, alter or amend this Plan in whole or in part; provided, however, that no amendment to the Plan (including a change in the actuarial basis for determining optional or early retirement benefits) shall be effective to the extent that it has the effect of decreasing a Participant's Accrued Monthly Benefit. Notwithstanding the preceding sentence, a Participant's Accrued Monthly Benefit may be reduced to the extent permitted under Section 412(c)(8) of the Code. For purposes of this Section, a Plan amendment which has the effect of (a) eliminating or reducing an early retirement benefit or a retirement-type subsidy; or (b) eliminating an optional form of benefit with respect to benefits attributable to service before the amendment shall be treated as reducing Accrued Monthly Benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a Participant who satisfies (either before or after the amendment) the pre-amendment conditions for the subsidy. The rules of this paragraph shall also apply to a Plan amendment relating to accruals that otherwise places greater restrictions or conditions on a Participant's rights to Section 411(d)(6) protected benefits already accrued, even if the amendment merely adds a restriction or condition that is permitted under the vesting rules in Section 411(a)(3) through (11).

**11.02. Amendment of Vesting Rights**

This Section shall only apply to amendments adopted on or prior to August 9, 2006. If any amendment to the Plan made pursuant to this Article 11 changes the nonforfeitable rights with respect to Accrued Monthly Benefits, each Participant having not less than three years of Credited Service may elect, during the period beginning when the amendment is adopted and ending no earlier than the latest of (a) 60 days after the amendment's adoption; (b) 60 days after the amendment's effective date; or (c) 60 days after the Participant is issued a written notice of the amendment, to have his nonforfeitable rights computed without regard to such amendment.

## ARTICLE 12
## TERMINATION; DISTRIBUTION OF ASSETS

**12.01. Plan Termination**

The Trustees may at any time terminate the Plan. In the event of the termination or partial termination of the Plan or the complete discontinuance of contributions by the Employers to the Plan, the rights of all affected Participants to benefits accrued to the date thereof, to the extent then funded, shall be nonforfeitable; and all assets thereof shall be allocated in the following manner: The Plan shall terminate and there shall be credited to each Participant his share of the assets of the Plan as determined in accordance with Sections 4041A and 4281 of the Act.

**12.02. Distribution of Benefits**

Subject to the provisions of Article 6, any distribution after termination of the Plan may be in the form of retirement income payments from the Trust, annuity contracts or cash as determined by the Trustees; provided, however, that any funds remaining after the satisfaction of all liabilities to Participants, retired Participants and other Beneficiaries under the Plan and due to variations between actuarial assumptions and actual experience shall be returned to the Participants.

## ARTICLE 13
## CREDITORS OF PARTICIPANTS

**13.01. Non-Assignability**

To the extent permitted by law, and except as provided below, assignment, pledge or encumbrance of any character of the benefits under this Plan are not permitted or recognized under any circumstances; and such benefits shall not be subject to claims of creditors, execution, attachment, garnishment or any other legal process. A Participant may make a voluntary and revocable assignment of not more than 10% of any benefit payment received hereunder, provided assignment is not made for the purpose of defraying the Plan's administrative expenses.

**13.02. Qualified Domestic Relations Orders**

Section 13.01 shall also apply to the creation, assignment or recognition of a right to any benefit payable with respect to a Participant pursuant to a domestic relations order, unless such order is determined to be a qualified domestic relations order. For purposes of this Section, a "qualified domestic relations order" is any judgment, decree or order (including approval of a property settlement agreement) which relates to the provision of child support, alimony

29

payments or marital property rights of a spouse, former spouse, child or other dependent of a Participant and is made pursuant to a state domestic relations law which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a Participant, provided such order clearly specifies:

      (a)    the name and last known mailing address (if any) of the Participant and the name and mailing address of each alternate payee covered by the order;

      (b)    the amount or percentage of the Participant's benefits to be made by the Plan to each such alternate payee or the manner in which such amount or percentage is to be determined;

      (c)    the number of payments or period to which such order applies; and

      (d)    that order applies to the Plan.

In addition to the requirements contained in the previous paragraph, a domestic relations order will be a qualified domestic relations order only if such order:

      (a)    does not require the Plan to provide any type or form of benefit or any option not otherwise provided under the Plan;

      (b)    does not require the Plan to provide increased benefits; and

      (c)    does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

## ARTICLE 14
## CLAIMS PROCEDURE

### 14.01. Filing a Claim for Benefits
Sections 14.01, 14.02 and 14.03 shall apply to claims filed on or after January 1, 2002.

A Participant or Beneficiary, or such person's authorized representative, shall notify the Fund Administrator of a claim for benefits under the Plan. Such request shall be made in writing to the Fund Administrator and shall set forth the basis of such claim and shall authorize the Fund Administrator to conduct such examinations as may be necessary for the Fund Administrator to determine, in his discretion, the validity of the claim and to take such steps as may be necessary to facilitate the payment of benefits to which the claimant may be entitled under the terms of the Plan.

A decision by the Fund Administrator on a claim for benefits, except disability retirement pursuant to Section 4.03 of the Plan, shall be made promptly and not later than 90 days after the Fund Administrator's receipt of the claim, unless special circumstances require an extension of the time for deciding the claim; in which case, a decision shall be rendered as soon as possible

but not later than 180 days after the initial receipt of the claim for benefits. Written notice of any extension of time shall be furnished to the claimant prior to the expiration of the initial 90-day period. Such notice to the claimant shall indicate the special circumstances requiring the extension and the date by which the Fund Administrator expects to render a decision.

A decision by the Fund Administrator on a claim for disability retirement pursuant to Section 4.03 of the Plan shall be made promptly and not later than 45 days after the Fund Administrator's receipt of the claim, unless the Fund Administrator determines that an extension of time of 30 days is necessary due to matters beyond the control of the Plan, and notifies the claimant prior to the expiration of the 45-day period of the circumstances requiring the extension of time and the date a decision will be made. If, prior to the end of the first 30-day extension period, the Fund Administrator determines that, due to matters beyond the control of the Plan, a decision cannot be rendered within the first 30-day extension period and notifies the claimant of the circumstances requiring the need for an additional extension, the determination may be extended for an additional 30 days after the expiration of the first 30-day extension. The notice to the claimant of the first or second 30-day extension shall explain the standards on which entitlement of a benefit is based, the unresolved issues that prevent a decision on the claim, and the additional information needed to resolve such issues. To the extent that the Fund Administrator requests an extension due to the failure of the claimant to submit information necessary to decide a claim, the period of making the benefit determination described in this paragraph shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information. The claimant shall be afforded at least 45 days within which to provide the specified information.

**14.02. Denial of Claim**
Whenever a claim for benefits by any Participant or Beneficiary has been denied by the Fund Administrator, a written or electronic notice prepared in a manner calculated to be understood by the Participant or Beneficiary shall be provided setting forth:

      (a)    the specific reasons for the denial;

      (b)    the specific reference to the pertinent Plan provisions on which the denial is based;

      (c)    a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

      (d)    an explanation of the Plan's claim review procedure and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of the Act following an adverse determination upon review.

In the case of an adverse determination of a claim for disability retirement in accordance with Section 4.03, the information provided to the claimant shall also include, to the extent necessary, the information set forth in Employee Benefits Security Administration Regulation Section 2560.503-1(g)(1)(v).

31

**14.03. Review Procedure**

If a claim for benefits is denied, the claimant may request a review of the claim by the Trustees within 60 days after notice of the denial (180 days in the case of a claim for disability benefits pursuant to Section 4.03 of the Plan). When requesting a review, the claimant must indicate the reason(s) for requesting the review and be prepared to submit any additional evidence to support the claim. Plan documents and other materials pertaining to the claim will be available for the claimant's review.

The Trustees meet quarterly. The review shall be conducted at the Trustees' next scheduled quarterly meeting except that if a request for review is received less than 30 days before the date of a scheduled Trustees' meeting, the review may be conducted at the next Trustees' meeting following the meeting that is to be held in less than 30 days. If special circumstances warrant, a decision on the request for review can be made at the third Trustees' meeting following the receipt of the appeal, provided that (a) the claimant is notified of the extension before the prior deadline; and (b) such extension notice specifies the circumstances requiring the delay and the date the Plan expects to decide the appeal. To the extent that the Trustees request an extension due to the failure of the claimant to submit information necessary to decide a claim, the period of making the benefit determination described in this paragraph shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information.

The Trustees will make a determination, in their sole discretion, based upon the applicable provisions of the Plan, whether to approve or deny such appeal. The Trustees will consider all information submitted by the claimant, regardless of whether the information was part of the original claim. With regard to a disability claim under Section 4.03 of the Plan (a) for issues involving medical judgment, the Trustees must consult with an independent health care professional; and (b) the Trustees must give no deference to the initial claim denial.

After their decision has been made, the Trustees will notify the claimant, in writing or through electronic means, as to such decision not later than 5 days after the date the decision was made. Such notice will include:

(a)     the reasons for the decision;

(b)     references to the specific Plan provisions on which the decision is based;

(c)     a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits;

(d)     a statement of the claimant's right to bring an action under Section 502(a) of the Act and;

(e)     in the case of a claim for disability retirement pursuant to Section 4.03, if an internal rule, guideline, protocol or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a

32

statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided free of charge to the claimant upon request.

No action at law or equity shall be brought against the Trustees to recover under the Plan unless the claimant has complied with the claims and review procedures and exhausted his administrative remedies, nor shall any such action be brought at all unless commenced within three years after a decision on the claimant's request for review. Effective as of the date this amended and restated plan is adopted by the Trustees, any such action shall only be brought in the United States District Court in Columbus, Ohio.

## ARTICLE 15
## MISCELLANEOUS

### 15.01. Employer's Right to Terminate Employees
The right of any Employer to terminate the employment of any of its Employees shall not in any way be affected by its Employees' participation in this Plan.

### 15.02. Gender
Wherever used in this Plan, the masculine pronoun refers to both men and women, unless clearly indicated to the contrary.

### 15.03. Service Credit Period
Accrual of benefits for Past Service Credit shall be calculated on the basis of the Credited Service for that portion of each year in which an Employee was a Participant. Accrual of benefits for Future Service Credit shall be calculated on the basis of nonforfeitable contributions received on behalf of an Employee.

### 15.04. Maximum Benefit Limitation
The Plan shall not provide annual benefits which exceed the limitations set forth in Code Section 415(b) and applicable regulations thereunder. This limitation shall be referred to hereinafter as the "Maximum Annual Benefit." The Maximum Annual Benefit shall be increased by cost-of-living increases published in regulations issued by the Secretary of the Treasury. Any such cost-of-living increases shall not be effective for purposes of this Plan prior to the first day of the calendar year for which the increase is effective as prescribed by the regulations. The Plan shall incorporate by reference the provisions of Code Section 415 and final Treasury Regulations thereunder to the extent not set forth in this Section 15.04.

For the purpose of this Section, a Participant's retirement benefits are benefits that are accrued by the Participant under the Plan from all participating Employers, but shall not include retirement benefits earned by the Participant under any other multiemployer plan.

Effective for Limitation Years commencing on and after July 1, 2008, if a Participant is also a participant in another defined benefit plan maintained by an Employer which is not a multiemployer plan ("other plan"), only the Participant's benefits under this Plan that are attributable to such Employer's contributions will be aggregated with the benefits under the

33

Employer's other plan for the purpose of determining whether the aggregated plans satisfy the dollar limitations under Section 415(b) of the Code. Notwithstanding the preceding sentence, this Plan shall not be aggregated with any other non-multiemployer plan for the purpose of applying the 100 percent of compensation limit under Code Section 415(b)(1)(B) to the non-multiemployer plan; nor will the 100 percent of compensation limit apply to the Plan.

In the case of a Participant who has had a severance from employment with the Employer, the limitations contained in Code Section 415(b) applicable to the Participant in any Limitation Year beginning after the date of severance shall be automatically adjusted under Code Section 415(d).

Effective for distributions for Plan Years commencing after December 31, 2005, for purposes of adjusting any benefit under subparagraph (B) of Code Section 415(b)(2) for any form of benefit subject to Code Section 417(e)(3), the interest rate assumption shall not be less than the greater of:

    (a)    five and a half percent (5.5%);

    (b)    the rate that provides a benefit of not more than one-hundred-five percent (105%) of the benefit that would be provided if the applicable interest rate [as defined in Code Section 417(e)(3)] were the interest rate assumption; or

    (c)    the rate specified in the Plan.

The applicable interest rate is the annual rate of interest on 30-year Treasury securities for the first day of the second month preceding the month in which the Participant's Annuity Starting Date occurs, as further defined by reference to Code Section 417(e) and applicable Treasury regulations thereunder, except that for Annuity Starting Dates commencing in 2004 and 2005, the interest rate used is the greater of 5.5% or the interest rate set forth in the Plan.

For purposes of this Section 15.04, the following definitions shall apply:

    (a)    "415 Compensation" For purposes of this Section 15.04, the term "compensation", for purposes of this Section 7.15 and of Section 415 of the Code, includes those items specified in Treasury Regulation Section 1.415-2(d)(2)(i) and excludes those items specified in Treasury Regulation Section 1.415-2(d)(3), if applicable. For Limitation Years beginning on and after January 1, 1998, and for purposes of applying the compensation limit of this Section 15.04 and of Code Section 415, compensation paid or made available during such Limitation Years shall include any elective deferral as defined in Code Section 402(g)(3)) as well as any elective amount which is not includible in the gross income of the Employee by reason of Code Sections 125, 132(f)(4) or 457.

    (b)    "Limitation Year" means the Plan Year.

**15.05. Named Fiduciaries**
The named fiduciaries of the Plan shall be the Trustees.

**15.06. Plan Merger**

In case of any merger or consolidation with, or transfer of assets or liabilities to, any other plan, each Participant in the Plan will (if the Plan then terminates) receive a benefit immediately after the merger, consolidation or transfer which is equal to, or greater than, the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer (if this Plan had then terminated).

**15.07. Notice Requirements**

In the case of a Qualified Joint and Survivor Annuity, the Fund Administrator shall, no less than 30 days and no more than 180 days prior to the Annuity Starting Date, provide each Participant a written explanation of (a) the terms and conditions of a Qualified Joint and Survivor Annuity; (b) the Participant's right to make and the effect of an election to waive the Qualified Joint and Survivor Annuity form of benefit; (c) the rights of a Participant's Spouse; and (d) the right to make and the effect of a revocation of a previous election to waive the Qualified Joint and Survivor Annuity. A Participant may elect (with spousal consent) to waive the requirement that the written explanation be provided at least 30 days before the Annuity Starting Date if the distribution commences more than seven days after the explanation is provided.

**15.08. Right of Recovery**

Whenever the Plan, as a result of oversight, lack of information or misrepresentation has paid benefits in excess of amounts that should have been paid, the Fund Administrator shall have the right to recover such overpayment(s) from the beneficiary of such overpayment, including the right to offset such overpayment(s) from subsequent payments.

**15.09. Limitation on Reversion of Contributions**

Employer contributions made under the Plan shall be held for the exclusive benefit of Participants and their Beneficiaries and may not revert to an Employer except that, in the case of a contribution made by an Employer based upon a mistake of fact or law, such contribution may be returned to the Employer within six months after the Fund Administrator determines that the contribution was made by such a mistake.

**15.10. Specific Effective Dates**

Notwithstanding anything contained in this Plan to the contrary, any Plan provision which is required to be included due to a change in an applicable provision of the Code shall be effective as of the date specified in the Code for such provision to be effective.

**ARTICLE 16**
**WITHDRAWAL LIABILITY**

**16.01. General Liability**

This Plan primarily covers employees in the building and construction industry. Therefore, subsection (b) of Section 4203 of the Act, shall apply to all Employers for whom the building and construction industry exemption set forth in subsection (b) applies.

**16.02. Amount of Withdrawal Liability**

When an Employer completely or partially withdraws from the Plan, as described in the Act, that Employer shall be obligated to pay withdrawal liability equal to the amount of Unfunded Vested Benefits allocable to that Employer. The amount of Unfunded Vested Benefits allocable to an Employer which completely withdraws from the Plan shall be calculated in accordance with the "basic" or "presumptive rule" of Section 4211(b) of the Act.

**16.03. De Minimis Rule**

The amount of the Unfunded Vested Benefits allocable to an Employer who withdraws completely from the Plan, calculated in accordance with Section 16.02 above, shall be reduced by the smaller of (a) 3/4ths of 1% of the Plan's Unfunded Vested Benefits (determined as of the end of the Plan Year ending before the date of withdrawal); or (b) $50,000, reduced by the amount, if any, by which the Unfunded Vested Benefits allocable to the Employer, determined without regard to this subsection, exceeds $100,000.00. This de minimis rule does not apply to an Employer who withdraws in a Plan Year in which substantially all Employers withdraw from the Plan; or, in any case in which substantially all Employers withdraw from the Plan during a period of one or more Plan Years pursuant to an agreement or arrangement to withdraw, to any Employer who withdraws pursuant to such agreement or arrangement.

REMAINDER OF PAGE REMAINS BLANK

IN WITNESS WHEREOF, the undersigned have caused this Plan as amended, to be executed as of February 6, 2017, unless otherwise stated herein.

THE OHIO OPERATING ENGINEERS PENSION FUND

EMPLOYER TRUSTEES                    UNION TRUSTEES

_____     _____
Victor DiGeronimo, Jr.               Thomas P. Byers

_____     _____
George J. Palko                      Richard E. Dalton

_____     _____
Stanley I. Roediger, Jr.             Patrick L. Sink

_____     _____
W. Mark Sterling                     Mark Totman

# THE OHIO OPERATING ENGINEERS
## PENSION PLAN
## APPENDIX A

This table is to be used in calculating the amount of benefits payable under the 50%, 75% or 100% joint-and-survivor options.

| JOINT AND SURVIVOR OPTION | PERCENTAGE OF MONTHLY CALCULATED BENEFIT PAYABLE TO PARTICIPANT IF ONE OF THE FOLLOWING JOINT AND SURVIVOR OPTIONS IS SELECTED | | |
|---|---|---|---|
| | **50%** | **75%** | **100%** |
| Age of Spouse is: | | | |
| 16 or more years younger | 85.0% | 77.5% | 70.0% |
| 11-15 years younger | 86.5 | 79.75 | 73.0 |
| 6-10 years younger | 88.0 | 82.0 | 76.0 |
| 2-5 years younger | 89.5 | 84.25 | 79.0 |
| Within 2 years | 91.0 | 86.5 | 82.0 |
| 2-5 years older | 92.5 | 88.75 | 85.0 |
| 6-10 years older | 94.0 | 91.0 | 88.0 |
| 11-15 years older | 95.5 | 93.25 | 91.0 |
| 16 or more years older | 97.0 | 95.5 | 94.0 |

38

CODE NO. CCO67Y00
NEW_____OLD_____
ASSIGNED BY TH

Fund
EXHIBIT F
10·26·2018

6794

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division, does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) Including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

SOFCO ERECTORS, INC
Name of Employer (Printed)

10360 WAYNE AVE
Employer Address

CINCINNATI          OH          45215
City                State       Zip Code

573-771-1600
Area Code & Telephone

_____    10-3-11
Authorized Employer Representative (Signature)    (Date)

JOHN HESFORD
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL 18 AND ITS BRANCHES (AFL-CIO)

_____
Union Representative (Signature)

**FRINGE OFFICE COPY**          (ORIGINAL SIGNATURE)

*For Headquarters Use Only*          CODE_____

**Ohio Operating Engineers Pension Fund**

*Withdrawal Liability Valuation as of
July 31, 2009*

Copyright © 2010

THE SEGAL GROUP, INC.,
THE PARENT OF THE SEGAL COMPANY
ALL RIGHTS RESERVED



OOE-000059

 **SEGAL**

THE SEGAL COMPANY
1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 F 216.687.4490 www.segalco.com

*January 14, 2010*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2009 through July 31, 2010.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic employee and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2009. The benefit provisions included in the calculations are those that were in effect on July 31, 2009.*

*We look forward to reviewing this report with you at your next meeting and answering any questions you may have.*

*Sincerely,*

*THE SEGAL COMPANY*

*By:*

*John P. Bragan*
*Vice President*

## SECTION 1

### VALUATION SUMMARY

Significant Issues in Valuation
  Year...........................................i

Summary of Key Results..............ii

## SECTION 2

### VALUATION RESULTS

A. Determination of Withdrawal
   Liability....................................1

B. Unfunded Vested Liability......3

C. Withdrawal Liability
   Experience ..............................6

## SECTION 3

### SUPPLEMENTARY INFORMATION

EXHIBIT A
Method for Allocating
Withdrawal Liability..................7

EXHIBIT B
Employer Withdrawal Liability
Worksheet For Withdrawals from
August 1, 2009 Through July 31,
2010.........................................10

## SECTION 4

### ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

EXHIBIT I
Calculation of Unfunded Vested
Liability ...................................12

EXHIBIT II
Withdrawal Liability Pools.......13

EXHIBIT III
Actuarial Assumptions and
Methods...................................14

EXHIBIT IV
Summary of Plan Provisions ....16

✴ SEGAL

OOE-000061

**SECTION 1:    Valuation Summary for the Ohio Operating Engineers Pension Fund**

---

**Significant Issues in Valuation Year**

- The unfunded vested liability as of July 31, 2009 is $649.0 million, compared to $310.8 million as of July 31, 2008.  A new positive pool of $357.0 million was created.

- The interest rates used for funded portion of vested liability changed from 5.95% for the first 20 years and 5.02% thereafter to 5.31% for the first 20 years and 5.04% thereafter.

- The increase in the unfunded vested liability was primarily due to a significant investment loss.

✶SEGAL

i

OOE-000062

**SECTION 1:    Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Summary of Key Results**

| | July 31 | |
| --- | --- | --- |
| | **2009** | **2008** |
| **Demographic Data:** | | |
| Number of active vested employees | 5,691 | 5,709 |
| Number of inactive vested participants | 1,147 | 1,088 |
| Number of pensioners and beneficiaries | 6,770 | 6,748 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 5.31% for 20 years, 5.04% thereafter | 5.95% for 20 years, 5.02% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $1,784,225,620 | $1,718,984,777 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,262,395,641 | 2,041,622,067 |
| Present value of vested benefits for withdrawal liability purposes | 2,088,461,029 | 1,983,293,541 |
| **Withdrawal Liability:** | | |
| Market value of assets | $1,439,447,964 | $1,672,523,979 |
| Unfunded vested liability for withdrawal liability purposes | 649,013,065 | 310,769,562 |
| Withdrawal liability pool established | 357,008,602 | 138,233,538 |

✱ SEGAL

ii

**SECTION 2: Valuation Results for the Ohio Operating Engineers Pension Fund**

---

## A. DETERMINATION OF WITHDRAWAL LIABILITY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension). The value of these benefits is determined as of July 31, 2009 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

Our "best estimate" of unfunded vested liability involves the same actuarial assumptions as are used in our valuations for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

As of July 31, 2009, the actuarial present value of vested Plan benefits for withdrawal liability purposes is $2,088,461,029. Since the market value of assets as of the same date is $1,439,447,964, the unfunded vested liability for withdrawal liability purposes is $649,013,065.

✳ SEGAL

1

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

*De minimis*

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments, unless the plan has fixed some other schedule. The payment schedule is more fully detailed in Section 3, Exhibit A.

Payments in advance may be discounted though the Trustees have not set a rule as to discount terms. Interest discounting is applied at the valuation funding interest rate. Annual payments cease when the total liability and interest have been paid. The law imposes a 20-year maximum payment schedule.

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability this year is shown in Chart 1.  The figures for the prior year are shown for comparison purposes.

**Changes Since Prior Year**

PBGC interest rates changed from 5.95% for 20 years and 5.02% thereafter to 5.31% for 20 years and 5.04% thereafter.

There were no plan changes reflected since the prior valuation.

Plan changes effective on or after August 1, 2009 are not included in this year's determination; any such changes will be included in the determination for the year ended July 31, 2010. Effective August 1, 2009, the benefit accrual rate was lowered from 3.3% to 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009.

---

*The chart summarizes the determination of the unfunded vested liability for the current plan year as well as the prior year.*

**CHART 1**

**Determination of Unfunded Vested Liability**

| | July 31 | |
|---|---|---|
| | **2009** | **2008** |
| Present value of vested benefits at funding interest rate | $1,784,225,620 | $1,718,984,777 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,262,395,641 | 2,041,622,067 |
| Market value of assets | 1,439,447,964 | 1,672,523,979 |
| Ratio funded at PBGC interest rates | 0.636249 | 0.819213 |
| Present value of vested benefits for withdrawal liability purposes | 2,088,461,029 | 1,983,293,541 |
| Unfunded vested liability | 649,013,065 | 310,769,562 |

✳ **SEGAL**

3

OOE-000066

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 years are detailed in Chart 2. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

Since we are not aware of any pools established prior to July 31, 2003, we consider there to be none prior to that date.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 2**

**Basic Pools as of July 31, 2009**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1990 | $0 | $0 | $0 |
| 1991 | 0 | 0 | 0 |
| 1992 | 0 | 0 | 0 |
| 1993 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 182,577,144 |
| 2004 | 220,610,306 | (27,172,960) | (20,379,720) |
| 2005 | 330,847,750 | 121,920,020 | 97,536,016 |
| 2006 | 161,030,169 | (152,039,003) | (129,233,153) |
| 2007 | 184,389,447 | 33,535,905 | 30,182,315 |
| 2008 | 310,769,562 | 138,233,538 | 131,321,861 |
| 2009 | 649,013,065 | 357,008,602 | 357,008,602 |
| Total | | 357,008,602 | $649,013,065 |

⋆ SEGAL

4

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

In addition, withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal. We are unaware of any such liabilities; therefore, there are no additional amounts to be allocated.

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

## C.  WITHDRAWAL LIABILITY EXPERIENCE

We have not been notified of any employers withdrawing from the fund during the year ended July 31, 2009, nor of any outstanding withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

It is advisable for the Fund to maintain a reserve against outstanding withdrawal liability assessments that are deemed uncollectible. Otherwise, the total of outstanding assessments may come to be viewed as Plan assets. The basis for setting such a reserve is, we believe, a matter for the Trustees, subject of course to any advice that legal counsel may offer and to a finding by the auditor that it is reasonable.

The Plan's Trustees, auditor, counsel, or administrator may have bases for a realistic appraisal.  In any event, it may be a difficult judgment to make.  We cannot offer more than an initial suggestion that the Trustees may want to consider, in case there is no specific basis for fixing the amount of that reserve.  The Trustees may, for example, want to consider a reserve equal to some percentage of the outstanding total. That would not necessarily be a judgment as to the collectibility of any one assessment; it would be a discount from the total that had been assessed.  The reserve figure for each successive year will be adjusted so as to reflect experience.  And, of course, ultimately the facts and circumstances may provide a very concrete basis for setting the reserve.

✶ SEGAL

6

**SECTION 3:** Supplementary Information for the Ohio Operating Engineers Pension Fund

**EXHIBIT A**

**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**

The "unamortized balance" of each of these three sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**

The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**

The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

★ SEGAL

7

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the de minimis rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)  The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)  the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate of 7.25%. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment

✳ SEGAL

8

**SECTION 3:     Supplementary Information for the Ohio Operating Engineers Pension Fund**

should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a

fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

✶ SEGAL

OOE-000072

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT B**

**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2009 Through July 31, 2010**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷(4)] x [(2) + (3)] (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $182,577,144 | $0 | $178,834,875 | _____ | _____ |
| 2004 | (20,379,720) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 97,536,016 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (129,233,153) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 30,182,315 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 131,321,861 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 357,008,602 | 0 | 210,884,752 | _____ | _____ |

A. Gross liability: (Sum of Column 6) ................................................................................ _____

B. *De minimis* ...................................................................................................................... 50,000

C. Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero .............. _____

D. Net Withdrawal Liability: (A) – (C), but not less than zero ........................................... _____

---

[1] *Years not shown have no withdrawal liability components.*

[2] *Amortized value of the changes in the unfunded vested benefits, written down 5% per year.*

[3] *Amortized value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*

[4] *Sum of total fund contributions for the Plan year listed and the four preceding years.*

[5] *Sum of employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

✱ SEGAL

10

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

### January 14, 2010

### ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2009.  The calculations were performed in accordance with generally accepted actuarial principles and practices.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants.  We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Vice President and Actuary
Enrolled Actuary No. 08-05773

✴SEGAL

11

OOE-000074

**SECTION 4:** Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| | | |
|---|---|---:|
| The calculations include the following participants as of July 31, 2009 | | |
| a. | Active vested employees | 5,691 |
| b. | Inactive employees with vested pension rights | 1,147 |
| c. | Pensioners and beneficiaries | 6,770 |
| The actuarial factors are shown below as of July 31, 2009 | | |
| 1. | Present value of vested benefits at funding interest rate | $1,784,225,620 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 2,262,395,641 |
| 3. | Market value of assets | 1,439,447,964 |
| 4. | Ratio funded at PBGC interest rates: (3) ÷ (2), not greater than 1.0 | 0.636249 |
| 5. | Present value of vested benefits for withdrawal liability purposes: (4) × (2) + [1 − (4)] × (1) | $2,088,461,029 |
| 6. | Unfunded vested liability: (5) − (3), not less than 0 | 649,013,065 |

⋆ SEGAL

12

OOE-000075

**SECTION 4:**   **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT II**

**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2009* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1990 | $0 | $0 | $0 | $0 | $0 |
| 1991 | 0 | 0 | 0 | 0 | 0 |
| 1992 | 0 | 0 | 0 | 0 | 0 |
| 1993 | 0 | 0 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 182,577,144 | 0 | 182,577,144 |
| 2004 | (27,172,960) | 0 | (20,379,720) | 0 | (20,379,720) |
| 2005 | 121,920,020 | 0 | 97,536,016 | 0 | 97,536,016 |
| 2006 | (152,039,003) | 0 | (129,233,153) | 0 | (129,233,153) |
| 2007 | 33,535,905 | 0 | 30,182,315 | 0 | 30,182,315 |
| 2008 | 138,233,538 | 0 | 131,321,861 | 0 | 131,321,861 |
| 2009 | 357,008,602 | 0 | 357,008,602 | 0 | 357,008,602 |

* Each pool is written down annually at the rate of 5% of the original amount

★SEGAL

SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**EXHIBIT III**
**Actuarial Assumptions and Methods**

| | |
|---|---|
| **Investment return:** | To the extent the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date are used. |
| | PBGC Interest Rates as of July 31, 2009 |
| | Select rate                5.31% |
| | Ultimate rate after 20 years  5.04% |
| | To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding:  7.25%. |
| | The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits — at PBGC rates — with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits. |
| **Administration expenses:** | No separate expense charge except for that portion of the vested benefits that is matched by assets.  For that portion, an expense load equal to that prescribed in Appendix C to PBGC reg. Part 4044 (based on the PBGC Interest Rates) is used. |
| **Valuation of assets:** | At market value |

✳ SEGAL

14

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Mortality rates:** | RP-2000 Combined Healthy Blue Collar Mortality |
| **Disability mortality rates:** | RP-2000 Disabled Retiree Mortality Table |
| **Retirement rates:** | |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Unknown characteristics of employees:** | Same as those exhibited by employees with similar known characteristics.  If not specified, participants are assumed to be male. |
| **Allocation method:** | Presumptive |
| **Contribution period for prorating liabilities:** | 5 years |
| ***De minimis* deductible:** | $50,000, or ¾% of the unfunded vested liability, if smaller.  The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✱ SEGAL

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT IV**
**Summary of Plan Provisions**

---

This exhibit summarizes the major provisions of the Plan included in the valuation.  It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

---

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf on and after May 1, 2006

✶ SEGAL

OOE-000079

**SECTION 4:**   **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |

| | |
|---|---|
| **Participation:** | Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund |
| **Past Service Credit:** | One year of past service for each full year of continuous service prior to June 1, 1964 |
| **Future Service Credit:** | |

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

✱ **SEGAL**

17

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**Contribution Rate:**                  $4.00 per hour effective May 1, 2008 ($1.00 per hour supplemental)

5057905v1/05517.001

✳ SEGAL

18

OOE-000081

# Ohio Operating Engineers
# Pension Fund
**Withdrawal Liability Valuation as of
July 31, 2010**

Copyright © 2011 by The Segal Group, Inc., parent of The Segal Company. All rights reserved.



✭ SEGAL

Fund
EXHIBIT 4
10-26-218

OOE-000082

 **SEGAL**

THE SEGAL COMPANY
1300 East Ninth Street, Suite 1900 Cleveland, OH  44114
T 216.687.4400 F 216.687.4490  www.segalco.com

*January 21, 2011*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability.  It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer.  It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2010 through July 31, 2011.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary.  The basic employee and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2010.  The benefit provisions included in the calculations are those that were in effect on July 31, 2010.*

*We look forward to reviewing this report with you at your next meeting and answering any questions you may have.*

*Sincerely,*

*THE SEGAL COMPANY*

*By:*    John P. Bragan

*John P. Bragan*
*Vice President*

OOE-000083

## SECTION 1

### VALUATION SUMMARY

Significant Issues in Valuation
Year........................................... i

Summary of Key Results.............. ii

## SECTION 2

### VALUATION RESULTS

A. Determination of Withdrawal
Liability..................................... 1

B. Unfunded Vested Liability...... 3

C. Withdrawal Liability
Experience ............................... 6

## SECTION 3

### SUPPLEMENTARY INFORMATION

EXHIBIT A
Method for Allocating
Withdrawal Liability.................. 7

EXHIBIT B
Employer Withdrawal Liability
Worksheet For Withdrawals from
August 1, 2010 Through July 31,
2011 .......................................... 10

## SECTION 4

### ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

EXHIBIT I
Calculation of Unfunded Vested
Liability .................................... 12

EXHIBIT II
Withdrawal Liability Pools....... 13

EXHIBIT III
Actuarial Assumptions and
Methods..................................... 14

EXHIBIT IV
Summary of Plan Provisions .... 16

✴ SEGAL

OOE-000084

**SECTION 1:**     **Valuation Summary for the Ohio Operating Engineers Pension Fund**

---

**Significant Issues in Valuation Year**

- The unfunded vested liability as of July 31, 2010 is $654.6 million, compared to $649.0 million as of July 31, 2009. A new positive pool of $42.2 million was created.

- The interest rates used for funded portion of vested liability changed from 5.31% for the first 20 years and 5.04% thereafter to 4.93% for the first 20 years and 4.66% thereafter.

- The increase in the unfunded vested liability was primarily due to the decrease in the PBGC interest rates, partially offset by a favorable investment return on the market value of assets.

- The benefit accrual rate was decreased from 3.3% to 1.75% of contributions (excluding supplemental contributions) effective for benefits earned on or after August 1, 2009.

✶ SEGAL

i

OOE-000085

**SECTION 1:    Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Summary of Key Results**

| | July 31 | |
| --- | --- | --- |
| | **2010** | **2009** |
| **Demographic Data:** | | |
| Number of active vested employees | 5,531 | 5,691 |
| Number of inactive vested participants | 1,213 | 1,147 |
| Number of pensioners and beneficiaries | 6,908 | 6,770 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 4.93% for 20 years, 4.66% thereafter | 5.31% for 20 years, 5.04% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $1,813,132,148 | $1,784,225,620 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,407,173,256 | 2,262,395,641 |
| Present value of vested benefits for withdrawal liability purposes | 2,192,693,314 | 2,088,461,029 |
| **Withdrawal Liability:** | | |
| Market value of assets | $1,538,057,679 | $1,439,447,964 |
| Unfunded vested liability for withdrawal liability purposes | 654,635,635 | 649,013,065 |
| Withdrawal liability pool established | 42,238,100 | 357,008,602 |

✶SEGAL

OOE-000086

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

---

## A.  DETERMINATION OF WITHDRAWAL LIABILITY

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan.  In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial.  Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service.  In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension).  The value of these benefits is

determined as of July 31, 2010 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions.  The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan."  It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary.  However, the PBGC has not yet promulgated any assumptions or methods.

Our "best estimate" of unfunded vested liability involves the same actuarial assumptions as are used in our valuations for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses.  Details are provided in Section 4, Exhibit III.

As of July 31, 2010, the actuarial present value of vested Plan benefits for withdrawal liability purposes is $2,192,693,314. Since the market value of assets as of the same date is $1,538,057,679, the unfunded vested liability for withdrawal liability purposes is $654,635,635.

✳ SEGAL

1

**SECTION 2: Valuation Results for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

*De minimis*

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments, unless the plan has fixed some other schedule. The payment schedule is more fully detailed in Section 3, Exhibit A.

Payments in advance may be discounted though the Trustees have not set a rule as to discount terms. Interest discounting is applied at the valuation funding interest rate. Annual payments cease when the total liability and interest have been paid. The law imposes a 20-year maximum payment schedule.

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**B. UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability this year is shown in Chart 1. The figures for the prior year are shown for comparison purposes.

**Changes Since Prior Year**

- PBGC interest rates changed from 5.31% for 20 years and 5.04% thereafter to 4.93% for 20 years and 4.66% thereafter.

- Effective August 1, 2009, the benefit accrual rate was lowered from 3.3% to 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009.

---

*The chart summarizes the determination of the unfunded vested liability for the current plan year as well as the prior year.*

**CHART 1**

**Determination of Unfunded Vested Liability**

|  | July 31 | |
|---|---|---|
|  | **2010** | **2009** |
| Present value of vested benefits at funding interest rate | $1,813,132,148 | $1,784,225,620 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,407,173,256 | 2,262,395,641 |
| Market value of assets | 1,538,057,679 | 1,439,447,964 |
| Ratio funded at PBGC interest rates | 0.638948 | 0.636249 |
| Present value of vested benefits for withdrawal liability purposes | $2,192,693,314 | $2,088,461,029 |
| Unfunded vested liability | 654,635,635 | 649,013,065 |

**✳ SEGAL**

3

OOE-000089

**SECTION 2:** **Valuation Results for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 years are detailed in Chart 2. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

Since we are not aware of any pools established prior to July 31, 2003, we consider there to be none prior to that date.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 2**

**Basic Pools as of July 31, 2010**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1991 | $0 | $0 | $0 |
| 1992 | 0 | 0 | 0 |
| 1993 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 169,535,919 |
| 2004 | 220,610,306 | (27,172,960) | (19,021,072) |
| 2005 | 330,847,750 | 121,920,020 | 91,440,015 |
| 2006 | 161,030,169 | (152,039,003) | (121,631,202) |
| 2007 | 184,389,447 | 33,535,905 | 28,505,519 |
| 2008 | 310,769,562 | 138,233,538 | 124,410,184 |
| 2009 | 649,013,065 | 357,008,602 | 339,158,172 |
| 2010 | 654,635,635 | 42,238,100 | 42,238,100 |
| Total | | | $654,635,635 |

✱ **SEGAL**

OOE-000090

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

In addition, withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated.  Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.  We are unaware of any such liabilities; therefore, there are no additional amounts to be allocated.

✴SEGAL

5

OOE-000091

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**C.  WITHDRAWAL LIABILITY EXPERIENCE**

We have not been notified of any employers withdrawing from the fund during the year ended July 31, 2010, nor of any outstanding withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

It is advisable for the Fund to maintain a reserve against outstanding withdrawal liability assessments that are deemed uncollectible. Otherwise, the total of outstanding assessments may come to be viewed as Plan assets. The basis for setting such a reserve is, we believe, a matter for the Trustees, subject of course to any advice that legal counsel may offer and to a finding by the auditor that it is reasonable.

The Plan's Trustees, auditor, counsel, or administrator may have bases for a realistic appraisal. In any event, it may be a difficult judgment to make. We cannot offer more than an initial suggestion that the Trustees may want to consider, in case there is no specific basis for fixing the amount of that reserve. The Trustees may, for example, want to consider a reserve equal to some percentage of the outstanding total. That would not necessarily be a judgment as to the collectibility of any one assessment; it would be a discount from the total that had been assessed. The reserve figure for each successive year will be adjusted so as to reflect experience. And, of course, ultimately the facts and circumstances may provide a very concrete basis for setting the reserve.

**SECTION 3:** Supplementary Information for the Ohio Operating Engineers Pension Fund

**EXHIBIT A**

**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these three sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

✴ **SEGAL**

7

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the de minimis rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years

ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)    The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)    the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate of 7.25%. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment

**✱ SEGAL**

8

OOE-000094

**SECTION 3:     Supplementary Information for the Ohio Operating Engineers Pension Fund**

should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

**Partial Withdrawal**
The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**
PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT B**
**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2010 Through July 31, 2011**

Employer Name:_____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5)÷(4)] x [(2) + (3)] (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $169,535,919 | $0 | $178,834,875 | _____ | _____ |
| 2004 | (19,021,072) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 91,440,015 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (121,631,202) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 28,505,519 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 124,410,184 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 339,158,172 | 0 | 210,884,752 | _____ | _____ |
| 2010 | 42,238,100 | 0 | 218,622,244 | _____ | _____ |

A.  Gross liability: (Sum of Column 6) ...................................................................   _____

B.  *De minimis* ...............................................................................................   50,000

C.  Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero............................   _____

D.  Net Withdrawal Liability: (A) – (C), but not less than zero ...............................................   _____

[1] *Years not shown have no withdrawal liability components.*

[2] *Amortized value of the changes in the unfunded vested benefits, written down 5% per year.*

[3] *Amortized value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*

[4] *Sum of total fund contributions for the Plan year listed and the four preceding years.*

[5] *Sum of employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

✳ **SEGAL**

10

**SECTION 4:**     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

---

**January 21, 2011**

**ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY**

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2010. The calculations were performed in accordance with generally accepted actuarial principles and practices.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Vice President and Actuary
Enrolled Actuary No. 08-05773

✴ SEGAL

11

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| | The calculations include the following participants as of July 31, 2010 | |
|---|---|---|
| a. | Active vested employees | 5,531 |
| b. | Inactive employees with vested pension rights | 1,213 |
| c. | Pensioners and beneficiaries | 6,908 |
| | The actuarial factors are shown below as of July 31, 2010 | |
| 1. | Present value of vested benefits at funding interest rate | $1,813,132,148 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 2,407,173,256 |
| 3. | Market value of assets | 1,538,057,679 |
| 4. | Ratio funded at PBGC interest rates: (3) ÷ (2), not greater than 1.0 | 0.638948 |
| 5. | Present value of vested benefits for withdrawal liability purposes: (4) × (2) + [1 − (4)] × (1) | $2,192,693,314 |
| 6. | Unfunded vested liability: (5) − (3), not less than 0 | 654,635,635 |


**SEGAL**

12

SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2010* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1991 | $0 | $0 | $0 | $0 | $0 |
| 1992 | 0 | 0 | 0 | 0 | 0 |
| 1993 | 0 | 0 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 169,535,919 | 0 | 169,535,919 |
| 2004 | (27,172,960) | 0 | (19,021,072) | 0 | (19,021,072) |
| 2005 | 121,920,020 | 0 | 91,440,015 | 0 | 91,440,015 |
| 2006 | (152,039,003) | 0 | (121,631,202) | 0 | (121,631,202) |
| 2007 | 33,535,905 | 0 | 28,505,519 | 0 | 28,505,519 |
| 2008 | 138,233,538 | 0 | 124,410,184 | 0 | 124,410,184 |
| 2009 | 357,008,602 | 0 | 339,158,172 | 0 | 339,158,172 |
| 2010 | 42,238,100 | 0 | 42,238,100 | 0 | 42,238,100 |

* Each pool is written down annually at the rate of 5% of the original amount

**SECTION 4:     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT III**
**Actuarial Assumptions and Methods**

| | |
|---|---|
| **Investment return:** | To the extent the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date are used. |
| | PBGC Interest Rates as of July 31, 2010 |
| | Select rate                              4.93% |
| | Ultimate rate after 20 years  4.66% |
| | To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%. |
| | The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits. |
| **Administration expenses:** | No separate expense charge except for that portion of the vested benefits that is matched by assets. For that portion, an expense load equal to that prescribed in Appendix C to PBGC reg. Part 4044 (based on the PBGC Interest Rates) is used. |
| **Valuation of assets:** | At market value |

✱ SEGAL

14

**SECTION 4:     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Mortality rates:** | RP-2000 Combined Healthy Blue Collar Mortality |
| **Disability mortality rates:** | RP-2000 Disabled Retiree Mortality Table |
| **Retirement rates:** | |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Unknown characteristics of employees:** | Same as those exhibited by employees with similar known characteristics.  If not specified, participants are assumed to be male. |
| **Allocation method:** | Presumptive |
| **Contribution period for prorating liabilities:** | 5 years |
| *De minimis* **deductible:** | $50,000, or ¾% of the unfunded vested liability, if smaller.  The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✶ SEGAL

15

OOE-000101

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009

 **SEGAL**

16

OOE-000102

**SECTION 4:     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |

**Participation:**       Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:**       One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:**

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

✶SEGAL

OOE-000103

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

| **Contribution Rate:** | $5.00 per hour, effective May 1, 2010 ($2.00 per hour supplemental) and $5.50 per hour, effective May 1, 2011 ($2.50 per hour supplemental) |
|---|---|

5137198v1/05517.001

# Ohio Operating Engineers
# Pension Fund
### Withdrawal Liability Valuation as of
### July 31, 2011

This report has been prepared at the request of the Board of Trustees for the purposes of establishing the basis for withdrawal liability assessments during the August 1, 2011 through July 31, 2012 period. This report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety. The measurements shown in this report may not be applicable for other purposes.
Copyright © 2012 by The Segal Group, Inc., parent of The Segal Company. All rights reserved.



✶ SEGAL

OOE-000302

 **SEGAL**

THE SEGAL COMPANY
1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 F 216.687.4490 www.segalco.com

*January 30, 2012*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2011 through July 31, 2012.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic employee and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2011. The benefit provisions and assumptions included in the calculations are those that were in effect on July 31, 2011.*

*We look forward to reviewing this report with you at your next meeting and answering any questions you may have.*

*Sincerely,*

*THE SEGAL COMPANY*

*By:* _____
      John P. Bragan
      *Vice President*

OOE-000303

## SECTION 1

### VALUATION SUMMARY

Significant Issues in Valuation
 Year........................................... i

Summary of Key Results.............. ii

## SECTION 2

### VALUATION RESULTS

A. Determination of Withdrawal
 Liability.................................... 1

B. Unfunded Vested Liability...... 3

C. Withdrawal Liability
 Experience .............................. 6

## SECTION 3

### SUPPLEMENTARY INFORMATION

EXHIBIT A
 Method for Allocating
 Withdrawal Liability.................. 7

EXHIBIT B
 Employer Withdrawal Liability
 Worksheet For Withdrawals from
 August 1, 2011 Through July 31,
 2012......................................... 10

## SECTION 4

### ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

EXHIBIT I
 Calculation of Unfunded Vested
 Liability ................................... 12

EXHIBIT II
 Withdrawal Liability Pools....... 13

EXHIBIT III
 Actuarial Assumptions and
 Methods................................... 14

EXHIBIT IV
 Summary of Plan Provisions .... 16

⋆ SEGAL

OOE-000304

**SECTION 1:    Valuation Summary for the Ohio Operating Engineers Pension Fund**

---

**Significant Issues in Valuation Year**

- The unfunded vested liability as of July 31, 2011 is $789.0 million, compared to $654.6 million as of July 31, 2010.  A new positive pool of $173.1 million was created.

- The increase in the unfunded vested liability was primarily due to assumption changes, partially offset by an investment gain.

- The following assumption changes were made since the prior valuation:

    – The interest rates used for funded portion of vested liability changed from 4.93% for the first 20 years and 4.66% thereafter to 4.21% for the first 25 years and 4.34% thereafter.

    – The healthy mortality assumption changed from the RP-2000 Combined Healthy Blue Collar Mortality Table to the RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection.

    – The disabled mortality assumption changed from the RP-2000 Disabled Retiree Mortality Table to the RP-2000 Disabled Retiree Mortality Table Set Back Two Years.

- The contribution rate increased from $4.50 to $5.00 effective May 1, 2010, and from $5.00 to $5.50 effective May 1, 2011. These increases were supplemental and do not impact future benefit accruals.

✶SEGAL

i

**SECTION 1:    Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Summary of Key Results**

| | July 31 | |
| | **2011** | **2010** |
|---|---|---|
| **Demographic Data:** | | |
| Number of active vested employees | 5,482 | 5,531 |
| Number of inactive vested participants | 1,281 | 1,213 |
| Number of pensioners and beneficiaries | 7,000 | 6,908 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 4.21% for 25 years, 4.34% thereafter | 4.93% for 20 years, 4.66% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $1,951,770,432 | $1,813,132,148 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,855,127,896 | 2,407,173,256 |
| Present value of vested benefits for withdrawal liability purposes | 2,489,928,761 | 2,192,693,314 |
| **Withdrawal Liability:** | | |
| Market value of assets | $1,700,889,092 | $1,538,057,679 |
| Unfunded vested liability for withdrawal liability purposes | 789,039,669 | 654,635,635 |
| Withdrawal liability pool established | 173,131,468 | 42,238,100 |

✷SEGAL

ii

OOE-000306

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**A.  DETERMINATION OF WITHDRAWAL LIABILITY**

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

**Determination of Unfunded Vested Liability**

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension). The value of these benefits is determined as of July 31, 2011 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

Our "best estimate" of unfunded vested liability involves the same actuarial assumptions as are used in our valuations for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

As of July 31, 2011, the actuarial present value of vested Plan benefits for withdrawal liability purposes is $2,489,928,761. Since the market value of assets as of the same date is $1,700,889,092, the unfunded vested liability for withdrawal liability purposes is $789,039,669.

⋆ **SEGAL**

1

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

**De minimis**

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments, unless the plan has fixed some other schedule. The payment schedule is more fully detailed in Section 3, Exhibit A.

Payments in advance may be discounted though the Trustees have not set a rule as to discount terms. Annual payments cease when the total liability and interest have been paid. The law imposes a 20-year maximum payment schedule.

⋆ SEGAL

2

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability this year is shown in Chart 1.  The figures for the prior year are shown for comparison purposes.

**Changes Since Prior Year**

The following assumption changes were made since last year's determination:

➢ PBGC interest rates changed from 4.93% for 20 years and 4.66% thereafter to 4.21% for 25 years and 4.34% thereafter.

➢ The healthy mortality assumption changed from the RP-2000 Combined Healthy Blue Collar Mortality Table to the RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection.

➢ The disabled mortality assumption changed from the RP-2000 Disabled Retiree Mortality Table to the RP-2000 Disabled Retiree Mortality Table Set Back Two Years.

There were no plan changes since the prior valuation.

The contribution rate increased from $4.50 to $5.00 effective May 1, 2010, and from $5.00 to $5.50 effective May 1, 2011. These increases were supplemental and do not impact future benefit accruals.

---

*The chart summarizes the determination of the unfunded vested liability for the current plan year as well as the prior year.*

**CHART 1**

**Determination of Unfunded Vested Liability**

|  | July 31 | |
| --- | --- | --- |
|  | **2011** | **2010** |
| Present value of vested benefits at funding interest rate | $1,951,770,432 | $1,813,132,148 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 2,855,127,896 | 2,407,173,256 |
| Market value of assets | 1,700,889,092 | 1,538,057,679 |
| Ratio funded at PBGC interest rates | 0.595731 | 0.638948 |
| Present value of vested benefits for withdrawal liability purposes | $2,489,928,761 | $2,192,693,314 |
| Unfunded vested liability | 789,039,669 | 654,635,635 |

✯ SEGAL

3

OOE-000309

SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 years are detailed in Chart 2. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

Since we are not aware of any pools established prior to July 31, 2003, we consider there to be none prior to that date.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 2**

**Basic Pools as of July 31, 2011**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1992 | $0 | $0 | $0 |
| 1993 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 156,494,695 |
| 2004 | 220,610,306 | (27,172,960) | (17,662,424) |
| 2005 | 330,847,750 | 121,920,020 | 85,344,014 |
| 2006 | 161,030,169 | (152,039,003) | (114,029,252) |
| 2007 | 184,389,447 | 33,535,905 | 26,828,724 |
| 2008 | 310,769,562 | 138,233,538 | 117,498,507 |
| 2009 | 649,013,065 | 357,008,602 | 321,307,742 |
| 2010 | 654,635,635 | 42,238,100 | 40,126,195 |
| 2011 | 789,039,669 | 173,131,468 | 173,131,468 |
| Total | | | $789,039,669 |

4

OOE-000310

**SECTION 2:**   **Valuation Results for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

In addition, withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal. We are unaware of any such liabilities; therefore, there are no additional amounts to be allocated.

5

OOE-000311

**SECTION 2:**     **Valuation Results for the Ohio Operating Engineers Pension Fund**

**C. WITHDRAWAL LIABILITY EXPERIENCE**

We have not been notified of any employers withdrawing from the fund during the year ended July 31, 2011, nor of any outstanding withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

**SECTION 3:     Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT A**

**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**

The "unamortized balance" of each of these three sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**

The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**

The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

**☆ SEGAL**

7

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

---

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years

ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)  The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)  the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate of 7.25%. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment

⊀ SEGAL

8

**SECTION 3: Supplementary Information for the Ohio Operating Engineers Pension Fund**

should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

✴SEGAL

OOE-000315

**SECTION 3:**     Supplementary Information for the Ohio Operating Engineers Pension Fund

**EXHIBIT B**

**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2011 Through July 31, 2012**

Employer Name:_____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5)÷(4)] x [(2)+(3)] (6) |
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
|---|---|---|---|---|---|
| 2003 | $156,494,695 | $0 | $178,834,875 | | |
| 2004 | (17,662,424) | 0 | 183,435,933 | | |
| 2005 | 85,344,014 | 0 | 184,525,945 | | |
| 2006 | (114,029,252) | 0 | 187,236,038 | | |
| 2007 | 26,828,724 | 0 | 192,258,544 | | |
| 2008 | 117,498,507 | 0 | 202,969,173 | | |
| 2009 | 321,307,742 | 0 | 210,884,752 | | |
| 2010 | 40,126,195 | 0 | 218,622,244 | | |
| 2011 | 173,131,468 | 0 | 230,778,340 | | |

A. Allocable Amount of Unfunded Vested Benefits............................................................................

B. *De minimis*..................................................................................................................  50,000

C. Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero............................

D. Allocable Unfunded Vested Liability: (A) – (C), but not less than zero and without regard to annual payment limitations...............................................................................................

[1]*Years not shown have no withdrawal liability components.*
[2]*Amortized value of the changes in the unfunded vested benefits, written down 5% per year.*
[3]*Amortized value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*
[4]*Sum of total fund contributions for the Plan year listed and the four preceding years.*
[5]*Sum of employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

✶**SEGAL**

OOE-000316

**SECTION 4:** Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

January 30, 2012

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2011. The calculations were performed in accordance with generally accepted actuarial principles and practices.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Vice President and Actuary
Enrolled Actuary No. 11-05773

**SECTION 4:** **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| The calculations include the following participants as of July 31, 2011 | |
|---|---|
| a. Active vested employees | 5,482 |
| b. Inactive employees with vested pension rights | 1,281 |
| c. Pensioners and beneficiaries | 7,000 |
| The actuarial factors are shown below as of July 31, 2011 | |
| 1. Present value of vested benefits at funding interest rate | $1,951,770,432 |
| 2. Present value of vested benefits at PBGC interest rates, including allowance for expenses | 2,855,127,896 |
| 3. Market value of assets | 1,700,889,092 |
| 4. Ratio funded at PBGC interest rates: (3) ÷ (2), not greater than 1.0 | 0.595731 |
| 5. Present value of vested benefits for withdrawal liability purposes: (4) × (2) + [1 − (4)] × (1) | $2,489,928,761 |
| 6. Unfunded vested liability: (5) − (3), not less than 0 | 789,039,669 |

✷**SEGAL**

12

SECTION 4:     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**

**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2011* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1992 | $0 | $0 | $0 | $0 | $0 |
| 1993 | 0 | 0 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 156,494,695 | 0 | 156,494,695 |
| 2004 | (27,172,960) | 0 | (17,662,424) | 0 | (17,662,424) |
| 2005 | 121,920,020 | 0 | 85,344,014 | 0 | 85,344,014 |
| 2006 | (152,039,003) | 0 | (114,029,252) | 0 | (114,029,252) |
| 2007 | 33,535,905 | 0 | 26,828,724 | 0 | 26,828,724 |
| 2008 | 138,233,538 | 0 | 117,498,507 | 0 | 117,498,507 |
| 2009 | 357,008,602 | 0 | 321,307,742 | 0 | 321,307,742 |
| 2010 | 42,238,100 | 0 | 40,126,195 | 0 | 40,126,195 |
| 2011 | 173,131,468 | 0 | 173,131,468 | 0 | 173,131,468 |

* Each pool is written down annually at the rate of 5% of the original amount

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT III**

**Actuarial Assumptions and Methods**

---

| | |
|---|---|
| **Investment Return:** | To the extent the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date are used. |

PBGC Interest Rates as of July 31, 2011

    Select rate                 4.21%

    Ultimate rate after 25 years  4.34%

To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%.

The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

---

| | |
|---|---|
| **Administration Expenses:** | No separate expense charge except for that portion of the vested benefits that is matched by assets.  For that portion, an expense load equal to that prescribed in Appendix C to PBGC reg. Part 4044 (based on the PBGC Interest Rates) is used. |

---

| | |
|---|---|
| **Valuation of Assets:** | At market value |

---

✴SEGAL

OOE-000320

**SECTION 4:** **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Mortality Rates:** | RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection |
| **Disability Mortality Rates:** | RP-2000 Disabled Retiree Mortality Table Set Back Two Years |
| **Retirement Rates:** | |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Unknown Characteristics of Employees:** | Same as those exhibited by employees with similar known characteristics.  If not specified, participants are assumed to be male. |
| **Allocation Method:** | Presumptive |
| **Contribution Period for Prorating Liabilities:** | 5 years |
| *De minimis* **Deductible:** | $50,000, or ¾% of the unfunded vested liability, if smaller.  The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✷ SEGAL

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009

 **SEGAL**

16

**SECTION 4:**    **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

**Participation:**    Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:**    One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:**

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

✶SEGAL

17

OOE-000323

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**Contribution Rate:**                    $5.50 per hour, effective May 1, 2011 ($2.50 per hour supplemental)

5244504v1/05517.001

✷ SEGAL

18

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

## May 2, 2012

## REVISED ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2011. The calculations were performed in accordance with generally accepted actuarial principles and practices. This actuarial certification was revised from the prior version due to the restatement of PBGC interest rates as of July 31, 2011.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Vice President and Actuary
Enrolled Actuary No. 11-05773

⋆ SEGAL

1

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| | The calculations include the following participants as of July 31, 2011 | |
|---|---|---|
| a. | Active vested employees | 5,482 |
| b. | Inactive employees with vested pension rights | 1,281 |
| c. | Pensioners and beneficiaries | 7,000 |
| | The actuarial factors are shown below as of July 31, 2011 | |
| 1. | Present value of vested benefits at funding interest rate | $1,951,770,432 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 2,847,796,623 |
| 3. | Market value of assets | 1,700,889,092 |
| 4. | Ratio funded at PBGC interest rates: (3) ÷ (2), not greater than 1.0 | 0.597265 |
| 5. | Present value of vested benefits for withdrawal liability purposes: (4) × (2) + [1 − (4)] × (1) | $2,486,935,465 |
| 6. | Unfunded vested liability: (5) − (3), not less than 0 | 786,046,373 |

✱ SEGAL

2

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT II**

**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2011* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1992 | $0 | $0 | $0 | $0 | $0 |
| 1993 | 0 | 0 | 0 | 0 | 0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 156,494,695 | 0 | 156,494,695 |
| 2004 | (27,172,960) | 0 | (17,662,424) | 0 | (17,662,424) |
| 2005 | 121,920,020 | 0 | 85,344,014 | 0 | 85,344,014 |
| 2006 | (152,039,003) | 0 | (114,029,252) | 0 | (114,029,252) |
| 2007 | 33,535,905 | 0 | 26,828,724 | 0 | 26,828,724 |
| 2008 | 138,233,538 | 0 | 117,498,507 | 0 | 117,498,507 |
| 2009 | 357,008,602 | 0 | 321,307,742 | 0 | 321,307,742 |
| 2010 | 42,238,100 | 0 | 40,126,195 | 0 | 40,126,195 |
| 2011 | 170,138,172 | 0 | 170,138,172 | 0 | 170,138,172 |

* Each pool is written down annually at the rate of 5% of the original amount

✱ SEGAL

3

OOE-000327

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT III**

**Actuarial Assumptions and Methods**

| | |
|---|---|
| **Investment Return:** | To the extent the present value of vested benefits is matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date are used. |
| | PBGC Interest Rates as of July 31, 2011 |
| | Select rate                4.22% |
| | Ultimate rate after 20 years  4.34% |
| | To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%. |
| | The portion of the vested benefits that is matched by readily available assets is determined by comparing – at PBGC present value of vested benefits – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits. |
| **Administration Expenses:** | No separate expense charge except for that portion of the vested benefits that is matched by assets. For that portion, an expense load equal to that prescribed in Appendix C to PBGC reg. Part 4044 (based on the PBGC Interest Rates) is used. |
| **Valuation of Assets:** | At market value |

✳ **SEGAL**

4

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Mortality Rates:** | RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection |
| **Disability Mortality Rates:** | RP-2000 Disabled Retiree Mortality Table Set Back Two Years |
| **Retirement Rates:** | |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Unknown Characteristics of Employees:** | Same as those exhibited by employees with similar known characteristics.  If not specified, participants are assumed to be male. |
| **Allocation Method:** | Presumptive |
| **Contribution Period for Prorating Liabilities:** | 5 years |
| **De minimis Deductible:** | $50,000, or ¾% of the unfunded vested liability, if smaller.  The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✳ **SEGAL**

5

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation.  It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009

*SEGAL

6

OOE-000330

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

**Participation:** Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:** One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:**

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

✳ **SEGAL**

OOE-000331

**Revised Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**Contribution Rate:**            $5.50 per hour, effective May 1, 2011 ($2.50 per hour supplemental)

5258266v1/05517.001

✷ SEGAL

8

OOE-000332

# Ohio Operating Engineers
# Pension Fund

**Withdrawal Liability Valuation as of
July 31, 2012**

This report has been prepared at the request of the Board of Trustees for the purposes of establishing the
basis for withdrawal liability assessments during the August 1, 2012 through July 31, 2013 period. This report may
not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only
be provided to other parties in its entirety. The measurements shown in this report may not be applicable for
other purposes.
Copyright © 2013 by The Segal Group, Inc., parent of The Segal Company. All rights reserved.







EXHIBIT 4
Fund
Date 10-24-2018



**SEGAL**

THE SEGAL COMPANY
1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 F 216.687.4490 www.segalco.com

*January 28, 2013*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2012 through July 31, 2013.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2012. The benefit provisions and assumptions included in the calculations are those that were in effect on July 31, 2012.*

*We look forward to reviewing this report with you at our next meeting and to answering any questions you may have.*

*Sincerely,*

*THE SEGAL COMPANY*

*By:*

*John P. Bragan*
*Vice President*

*cc:*    *Thomas M. Tarpy, Esq.*
       *Mr. Raymond Orrand*
       *Mr. Charles M. Ciuni, CPA*

OOE-000334

## SECTION 1

**VALUATION SUMMARY**

Significant Issues in Valuation Year.......................................1-1

Summary of Key Results...........1-2

## SECTION 2

**VALUATION RESULTS**

A. Determination of Withdrawal Liability.................................2-1

B. Unfunded Vested Liability...2-3

C. Withdrawal Liability Experience ...........................2-6

## SECTION 3

**SUPPLEMENTARY INFORMATION**

EXHIBIT A
Method for Allocating Withdrawal Liability...............3-1

EXHIBIT B
Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2012 Through July 31, 2013 ........................................3-4

## SECTION 4

**ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY**

EXHIBIT I
Calculation of Unfunded Vested Liability ...................................4-2

EXHIBIT II
Withdrawal Liability Pools......4-3

EXHIBIT III
Actuarial Assumptions and Methods...................................4-4

EXHIBIT IV
Summary of Plan Provisions ...4-7

 SEGAL

OOE-000335

**SECTION 1:     Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Significant Issues in Valuation Year**

➤ Figures as of July 31, 2011 recognize the Pension Benefit Guaranty Corporation's (PBGC's) correction to the applicable interest rate, which occurred after release of the July 31, 2011 withdrawal liability report. The updated interest rate reduced the unfunded vested liability as of that date by $3.0 million.

➤ The unfunded vested liability as of July 31, 2012 is $1.01 billion, compared to $786 million as of July 31, 2011. A positive basic pool of $268 million was established.

➤ Interest rates used to determine the funded portion of the present value of vested benefits changed from 4.22% for 20 years and 4.34% thereafter to 2.95% for 20 years and 3.66% thereafter (PBGC interest rates).

➤ The increase in the unfunded vested liability since last year was primarily caused by the decrease in the PBGC interest rates.

➤ The plan amendment that changed the benefit accrual rate from 1.75% of contributions to 1.90% of contributions for contributions on and after August 1, 2012 is not yet recognized for withdrawal liability purposes.

➤ The contribution rate increased from $5.50 to $5.75 per hour effective May 1, 2012. This increase was supplemental and does not impact future benefit accruals.

✶ SEGAL

**SECTION 1:     Valuation Summary for the Ohio Operating Engineers Pension Fund**

**Summary of Key Results**

| | July 31 | |
| --- | --- | --- |
| | **2012** | **2011\*\*** |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries\* | 7,012 | 7,000 |
| Number of inactive vested participants | 1,343 | 1,281 |
| Number of active vested employees | 5,490 | 5,482 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 2.95% for 20 years, 3.66% thereafter | 4.22% for 20 years, 4.34% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $1,995,466,511 | $1,951,770,432 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 3,433,267,738 | 2,847,796,623 |
| Present value of vested benefits for withdrawal liability purposes | 2,707,910,522 | 2,486,935,465 |
| **Unfunded Present Value of Vested Benefits:** | | |
| Market value of assets | $1,701,216,407 | $1,700,889,092 |
| Unfunded vested liability for withdrawal liability purposes | 1,006,694,115 | 786,046,373 |
| Withdrawal liability pools established | | |
| • Basic pool | 267,882,086 | 170,138,172 |
| • Reallocated pool | 0 | 0 |

\* *Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*
\*\**Figures based on PBGC interest rates updated from prior year report due to PBGC correction to rates after the report was issued.*

*✱SEGAL

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**A.  DETERMINATION OF WITHDRAWAL LIABILITY**

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

**Determination of Unfunded Vested Liability**

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension). The value of these benefits is determined as of July 31, 2012 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuary's "best estimate" of unfunded vested liability involves the same actuarial assumptions as are used in the valuation for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

⋆SEGAL

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

**De minimis**

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a de minimis deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in Section 3, Exhibit A.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

---

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in Section 4 of this report.

**Changes Since Prior Year**

The following assumption change was made since last year's determination:

➤   PBGC interest rates changed from 4.22% for 20 years and 4.34% thereafter to 2.95% for 20 years and 3.66% thereafter.

No plan changes are reflected this year.

Plan changes effective on or after August 1, 2012 are not included this year's determination; any such changes will be included in the determination for the year ended July 31, 2013. These changes include:

➤   The benefit accrual rate changed from 1.75% of contributions to 1.90% of contributions for contributions on and after August 1, 2012.

The contribution rate increased from $5.50 to $5.75 per hour effective May 1, 2012. This increase was supplemental and did not impact benefit accruals.

**SECTION 2:    Valuation Results for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 plan years are detailed in Chart 1. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 1**
**Basic Pools as of July 31, 2012**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1993 | $0 | $0 | $0 |
| 1994 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 143,453,470 |
| 2004 | 220,610,306 | (27,172,960) | (16,303,776) |
| 2005 | 330,847,750 | 121,920,020 | 79,248,013 |
| 2006 | 161,030,169 | (152,039,003) | (106,427,302) |
| 2007 | 184,389,447 | 33,535,905 | 25,151,929 |
| 2008 | 310,769,562 | 138,233,538 | 110,586,830 |
| 2009 | 649,013,065 | 357,008,602 | 303,457,312 |
| 2010 | 654,635,635 | 42,238,100 | 38,014,290 |
| 2011 | 786,046,373 | 170,138,172 | 161,631,263 |
| 2012 | 1,006,694,115 | 267,882,086 | 267,882,086 |
| Total | | | $1,006,694,115 |

✳ SEGAL

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.

We are unaware of any such liabilities; therefore, there are no additional amounts to be allocated.

**SECTION 2:     Valuation Results for the Ohio Operating Engineers Pension Fund**

**C.  WITHDRAWAL LIABILITY EXPERIENCE**

We have not been notified of any employers withdrawing from the fund during the last plan year, nor of any outstanding withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT A**
**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these three sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the de minimis rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)    The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)    the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

✻ SEGAL

OOE-000345

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

**SECTION 3:    Supplementary Information for the Ohio Operating Engineers Pension Fund**

**EXHIBIT B**
**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2012 Through July 31, 2013**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) + (3)] (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $143,453,470 | $0 | $178,834,875 | | |
| 2004 | (16,303,776) | 0 | 183,435,933 | | |
| 2005 | 79,248,013 | 0 | 184,525,945 | | |
| 2006 | (106,427,302) | 0 | 187,236,038 | | |
| 2007 | 25,151,929 | 0 | 192,258,544 | | |
| 2008 | 110,586,830 | 0 | 202,969,173 | | |
| 2009 | 303,457,312 | 0 | 210,884,752 | | |
| 2010 | 38,014,290 | 0 | 218,622,244 | | |
| 2011 | 161,631,263 | 0 | 230,778,340 | | |
| 2012 | 267,882,086 | 0 | 250,306,333 | | |

A.  Gross liability: (Sum of Column 6)

B.  *De minimis*                                                                                                 50,000

C.  Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero

D.  Allocable Unfunded Vested Liability: (A) – (C), not less than zero and without regard to annual payment limitations

---
[1] *Years not shown have no withdrawal liability component*
[2] *Original value of changes in unfunded vested benefits, written down 5% per year.*
[3] *Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.*
[4] *Total Fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*
[5] *Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

**SECTION 4:** Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund

January 28, 2013

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that The Segal Company has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2012. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 11-05773



**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT I**
**Calculation of Unfunded Vested Liability**

| | | |
|---|---|---:|
| The calculations include the following participants as of July 31, 2012 | | |
| a. | Pensioners and beneficiaries (including 1,782 beneficiaries)* | 7,012 |
| b. | Inactive participants with vested pension rights | 1,343 |
| c. | Active vested employees | 5,490 |

| | | |
|---|---|---:|
| The actuarial factors are shown below as of July 31, 2012 | | |
| 1. | Present value of vested benefits at funding interest rate | $1,995,466,511 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 3,433,267,738 |
| 3. | Market value of assets | 1,701,216,407 |
| 4. | Ratio funded at PBGC interest rates [(3) ÷ (2), not greater than 1.0] | 0.4955 |
| 5. | Present value of vested benefits for withdrawal liability purposes [(4) x (2) + (1.0 – (4)) x (1)] | $2,707,910,522 |
| 6. | Unfunded vested liability [(5) – (3), not less than zero] | 1,006,694,115 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2012* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1993 | $0 | $0 | $0 | $0 | $0 |
| 1994 | 0 | 0 | 0 | 0 | 0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 143,453,470 | 0 | 143,453,470 |
| 2004 | (27,172,960) | 0 | (16,303,776) | 0 | (16,303,776) |
| 2005 | 121,920,020 | 0 | 79,248,013 | 0 | 79,248,013 |
| 2006 | (152,039,003) | 0 | (106,427,302) | 0 | (106,427,302) |
| 2007 | 33,535,905 | 0 | 25,151,929 | 0 | 25,151,929 |
| 2008 | 138,233,538 | 0 | 110,586,830 | 0 | 110,586,830 |
| 2009 | 357,008,602 | 0 | 303,457,312 | 0 | 303,457,312 |
| 2010 | 42,238,100 | 0 | 38,014,290 | 0 | 38,014,290 |
| 2011 | 170,138,172 | 0 | 161,631,263 | 0 | 161,631,263 |
| 2012 | 267,882,086 | 0 | 267,882,086 | 0 | 267,882,086 |

*  *Basic and reallocated pools are written down annually at the rate of 5% of the original amount.*

**SECTION 4: Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT III**
**Actuarial Assumptions and Methods**

**Investment Return:**

(a) To the extent vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used.

PBGC Interest Rates as of July 31, 2012:

| | |
|---|---|
| First 20 years | 2.95% |
| After 20 years | 3.66% |

(b) To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

(c) The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

**Healthy Mortality Rates:** RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA

**Disability Mortality Rates:** RP-2000 Disabled Retiree Mortality Table Set Back Two Years

The RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA from 2000 reasonably reflects the projected mortality experience of the Plan as of the measurement date. The mortality table was then adjusted to future years using generational projection under Scale AA to reflect future mortality improvement.

✱SEGAL

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Retirement Rates:** | Upon completion of service requirement, the following rates apply for active employees: |

| Age | Rate |
|-----|------|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

Inactive vested participants are assumed to retire at age 62 if eligible for early retirement, otherwise Normal Retirement Age.

**Unknown Characteristics of Participants:** Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male.

**Administrative Expenses:** $10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets.

✱ SEGAL

**SECTION 4:**    **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Valuation of Assets:** | At market value |
| **Allocation method:** | Presumptive |
| **Contribution period for prorating liabilities:** | 5 years |
| *De minimis* **Deductible:** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

★ SEGAL

**SECTION 4:     Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2009

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

---

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

---

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

---

**Participation:** Members who are employed by Employers who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:** One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:** For the period between June 1, 1964 and July 31, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

✱ SEGAL

**SECTION 4:    Actuarial Certification of Withdrawal Liability for the Ohio Operating Engineers Pension Fund**

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

**Contribution Rate:**            $5.75 per hour, effective May 1, 2012 ($2.75 per hour supplemental)

5316091v1/05517.001

✴ SEGAL



✳ Segal Consulting

# Ohio Operating Engineers Pension Fund

**Withdrawal Liability Valuation as of
July 31, 2013**



This report has been prepared at the request of the Board of Trustees for the purposes of establishing the
basis for withdrawal liability assessments during the August 1, 2013 through July 31, 2014 period. This report may
not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only
be provided to other parties in its entirety. The measurements shown in this report may not be applicable for
other purposes.
Copyright © 2014 by The Segal Group, Inc. All rights reserved.

 Segal Consulting

1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 www.segalco.com

*February 3, 2014*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2013 through July 31, 2014.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2013. The benefit provisions included in the calculations are those that were in effect on July 31, 2013.*

*We look forward to reviewing this report with you at your next meeting and to answering any questions you may have.*

*Sincerely,*

*Segal Consulting, a Member of The Segal Group, Inc.*

*By:*

*John P. Bragan*
*Vice President*

*cc:     Thomas M. Tarpy, Esq.*
*Mr. Raymond Orrand*
*Mr. Charles M. Ciuni, CPA*

OOE-000358

## SECTION 1

### ACTUARIAL VALUATION SUMMARY

Significant Issues in Valuation
Year.......................................1-1

Summary of Key Results...........1-2

## SECTION 2

### ACTUARIAL VALUATION RESULTS

A. Determination of Withdrawal
Liability.................................2-1

B. Unfunded Vested Liability...2-3

C. Withdrawal Liability
Experience ...........................2-6

## SECTION 3

### SUPPLEMENTARY INFORMATION

EXHIBIT A
Method for Allocating
Withdrawal Liability................3-1

EXHIBIT B
Employer Withdrawal Liability
Worksheet For Withdrawals from
August 1, 2013 Through
July 31, 2014 ...........................3-4

## SECTION 4

### ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

EXHIBIT I
Calculation of Unfunded Vested
Liability ...................................4-2

EXHIBIT II
Withdrawal Liability Pools......4-3

EXHIBIT III
Actuarial Assumptions and
Methods ...................................4-4

EXHIBIT IV
Summary of Plan Provisions ...4-7


Segal Consulting

OOE-000359

**SECTION 1:** **Actuarial Valuation Summary as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Significant Issues in Valuation Year**

1. The unfunded vested liability as of July 31, 2013 is $955 million, compared to $1.01 billion as of July 31, 2012. A positive basic pool of $9 million was established.

2. Interest rates used to determine the funded portion of the present value of vested benefits changed from 2.95% for 20 years and 3.66% thereafter to 2.60% for 20 years and 3.43% thereafter (PBGC interest rates).

3. The decrease in the unfunded vested liability since last year was primarily caused by the better than expected return on the market value of plan assets, partially offset by the decrease in the PBGC interest rates.

4. The plan amendment that changed the benefit accrual rate from 1.75% of contributions to 1.90% of contributions for contributions on and after August 1, 2012 is recognized for withdrawal liability purposes this year.

5. The contribution rate increased from $5.75 to $6.00 per hour effective May 1, 2013. This increase was supplemental and does not impact future benefit accruals.

✴ Segal Consulting

**SECTION 1:** **Actuarial Valuation Summary as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

### Summary of Key Results

| | July 31 | |
|---|---|---|
| | **2013** | **2012** |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries* | 7,013 | 7,012 |
| Number of inactive vested participants | 1,377 | 1,343 |
| Number of active vested participants | 5,448 | 5,490 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 2.60% for 20 years, 3.43% thereafter | 2.95% for 20 years, 3.66% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $2,035,951,567 | $1,995,466,511 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 3,658,158,877 | 3,433,267,738 |
| Present value of vested benefits for withdrawal liability purposes | 2,897,073,351 | 2,707,910,522 |
| **Unfunded Present Value of Vested Benefits:** | | |
| Market value of assets | $1,941,872,830 | $1,701,216,407 |
| Unfunded vested liability for withdrawal liability purposes | 955,200,521 | 1,006,694,115 |
| Withdrawal liability pools established | | |
| • Basic pool | 9,134,851 | 267,882,086 |
| • Reallocated pool | 0 | 0 |

\* *Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

✴ Segal Consulting

OOE-000361

**SECTION 2:     Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

**A.  DETERMINATION OF WITHDRAWAL LIABILITY**

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

**Determination of Unfunded Vested Liability**

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension).

The value of these benefits is determined as of July 31, 2013 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuary's "best estimate" of unfunded vested liability for this Plan involves the same actuarial assumptions as are used for plan funding with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

**✱ Segal Consulting**

**SECTION 2:    Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method prescribed in the law.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

*De minimis*

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in Section 3, Exhibit A.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.

✳ Segal Consulting

**SECTION 2:     Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in Section 4 of this report.

**Changes Since Prior Year**

The following assumption changes were made since last year's determination:

➢    PBGC interest rates changed from 2.95% for 20 years and 3.66% thereafter to 2.60% for 20 years and 3.43% thereafter.

The following plan change is reflected for the first time this year:

➢    The benefit accrual rate changed from 1.75% of contributions to 1.90% of contributions for contributions on and after August 1, 2012.

The contribution rate increased from $5.75 to $6.00 per hour effective May 1, 2013. This increase was supplemental and does not impact future benefit accruals.

**✕ Segal Consulting**

**SECTION 2:     Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 plan years are detailed in Chart 1. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 1**
**Basic Pools as of July 31, 2013**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1994 | $0 | $0 | $0 |
| 1995 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 130,412,246 |
| 2004 | 220,610,306 | (27,172,960) | (14,945,128) |
| 2005 | 330,847,750 | 121,920,020 | 73,152,012 |
| 2006 | 161,030,169 | (152,039,003) | (98,825,352) |
| 2007 | 184,389,447 | 33,535,905 | 23,475,134 |
| 2008 | 310,769,562 | 138,233,538 | 103,675,154 |
| 2009 | 649,013,065 | 357,008,602 | 285,606,882 |
| 2010 | 654,635,635 | 42,238,100 | 35,902,385 |
| 2011 | 786,046,373 | 170,138,172 | 153,124,355 |
| 2012 | 1,006,694,115 | 267,882,086 | 254,487,982 |
| 2013 | 955,200,521 | 9,134,851 | 9,134,851 |
| **Total** | | | $955,200,521 |

✳ Segal Consulting

**SECTION 2:     Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**
Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.

We are unaware of any such liabilities as of July 31, 2013; therefore, there are no additional amounts to be allocated as of that date.

**SECTION 2:    Actuarial Valuation Results as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

**C. WITHDRAWAL LIABILITY EXPERIENCE**

We have been notified of one employer withdrawing from the fund during the last plan year, and that this employer settled its remaining withdrawal liability in a lump sum after July 31, 2013. We have not been notified of any outstanding withdrawal liability payments as of July 31, 2013.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

**SECTION 3:     Supplementary Information as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT A**
**Method for Allocating Withdrawal Liability**

---

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

✦ Segal Consulting

OOE-000368

**SECTION 3:      Supplementary Information as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the plan year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)   The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

(b)   the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

**SECTION 3:     Supplementary Information as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

SECTION 3:     Supplementary Information as of July 31, 2013 for the Ohio Operating Engineers Pension Fund

**EXHIBIT B**
**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2013 Through July 31, 2014**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) + (3)] (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $130,412,246 | $0 | $ 178,834,875 | | |
| 2004 | (14,945,128) | 0 | 183,435,933 | | |
| 2005 | 73,152,012 | 0 | 184,525,945 | | |
| 2006 | (98,825,352) | 0 | 187,236,038 | | |
| 2007 | 23,475,134 | 0 | 192,258,544 | | |
| 2008 | 103,675,154 | 0 | 202,969,173 | | |
| 2009 | 285,606,882 | 0 | 210,884,752 | | |
| 2010 | 35,902,385 | 0 | 218,622,244 | | |
| 2011 | 153,124,355 | 0 | 230,778,340 | | |
| 2012 | 254,487,982 | 0 | 250,306,333 | | |
| 2013 | 9,134,851 | 0 | 269,018,918 | | |

A. Gross liability: (Sum of Column 6)
B. *De minimis*                                                                                                          50,000
C. Deductible: $100,000 + (B) − (A), but not greater than (B) nor less than zero
D. Allocable Unfunded Vested Liability: (A) − (C), not less than zero and without regard to annual payment limitations

[1] *Years not shown have no withdrawal liability component*
[2] *Original value of changes in unfunded vested benefits, written down 5% per year.*
[3] *Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.*
[4] *Total Fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*
[5] *Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

February 3, 2014

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that Segal Consulting, a Member of The Segal Group, Inc., has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2013. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

### Certificate Contents

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 11-05773



**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| | The calculations include the following participants as of July 31, 2013 | |
|---|---|---|
| a. | Pensioners and beneficiaries (including 1,801 beneficiaries)* | 7,013 |
| b. | Inactive participants with vested pension rights | 1,377 |
| c. | Active vested participants | 5,448 |

| | The actuarial factors are shown below as of July 31, 2013 | |
|---|---|---|
| 1. | Present value of vested benefits at funding interest rate | $2,035,951,567 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 3,658,158,877 |
| 3. | Market value of assets | 1,941,872,830 |
| 4. | Ratio funded at PBGC interest rates [(3)÷(2), not greater than 1.0] | 0.530833 |
| 5. | Present value of vested benefits for withdrawal liability purposes [(4) x (2) + (1.0 − (4)) x (1)] | 2,897,073,351 |
| 6. | Unfunded vested liability [(5) − (3), not less than zero ] | 955,200,521 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

**SECTION 4:** Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2013* | | |
| --- | --- | --- | --- | --- | --- |
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1994 | $0 | $0 | $0 | $0 | $0 |
| 1995 | 0 | 0 | 0 | 0 | 0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 130,412,246 | 0 | 130,412,246 |
| 2004 | (27,172,960) | 0 | (14,945,128) | 0 | (14,945,128) |
| 2005 | 121,920,020 | 0 | 73,152,012 | 0 | 73,152,012 |
| 2006 | (152,039,003) | 0 | (98,825,352) | 0 | (98,825,352) |
| 2007 | 33,535,905 | 0 | 23,475,134 | 0 | 23,475,134 |
| 2008 | 138,233,538 | 0 | 103,675,154 | 0 | 103,675,154 |
| 2009 | 357,008,602 | 0 | 285,606,882 | 0 | 285,606,882 |
| 2010 | 42,238,100 | 0 | 35,902,385 | 0 | 35,902,385 |
| 2011 | 170,138,172 | 0 | 153,124,355 | 0 | 153,124,355 |
| 2012 | 267,882,086 | 0 | 254,487,982 | 0 | 254,487,982 |
| 2013 | 9,134,851 | 0 | 9,134,851 | 0 | 9,134,851 |

*  *Basic and reallocated pools are written down annually at the rate of 5% of the original amount.*

**✱ Segal Consulting**

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT III**
**Actuarial Assumptions and Methods**

---

| | |
|---|---|
| **Investment Return:** | (a) To the extent the vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used. |

PBGC Interest Rates as of July 31, 2013:

| | |
|---|---|
| First 20 years | 2.60% |
| After 20 years | 3.43% |

(b) To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

(c) The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses -- at PBGC rates -- with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

---

| | |
|---|---|
| **Mortality Rates:** | Healthy: RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA |

Disabled: RP-2000 Disabled Retiree Mortality Table Set Back Two Years

The RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA from 2000 reasonably reflects the projected mortality experience of the Plan as of the measurement date. The mortality table was then adjusted to future years using generational projection under Scale AA to reflect future mortality improvement.

✱ Segal Consulting

**SECTION 4:** Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund

---

| **Retirement Rates:** | Upon completion of service requirement, the following rates apply for active employees: |

| Age | Rate |
| --- | --- |
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

**Retirement Age for Inactive Vested Participants:** 62 if eligible for early retirement, otherwise Normal Retirement Age

---

**Unknown Characteristics of Participants:** Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male.

---

**Administrative Expenses:** $10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets.

---

**Valuation of Assets:** At market value

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Allocation method:** | Presumptive |
| **Contribution period for prorating liabilities:** | 5 years |
| **De minimis Deductible:** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

**SECTION 4:**  **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT IV**
**Summary of Plan Provisions**

---

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |

**Normal Retirement:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf from August 1, 2009 through July 31, 2012, plus
- 1.9% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2012

✴ Segal Consulting

4-7
OOE-000378

**SECTION 4:**  **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

**Participation:** Members who are employed by Employers and who are covered by a collective bargaining agreement with the Pension Fund

**Past Service Credit:** One year of past service for each full year of continuous service prior to June 1, 1964

**Future Service Credit:** For the period between June 1, 1964 and July 31, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

✴ Segal Consulting

**SECTION 4:**   **Actuarial Certification of Withdrawal Liability as of July 31, 2013 for the Ohio Operating Engineers Pension Fund**

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

**Contribution Rate:**   $5.75 per hour, effective May 1, 2012 ($2.75 per hour supplemental and not subject to benefit accrual);

$6.00 per hour, effective May 1, 2013 ($3.00 per hour supplemental and not subject to benefit accrual).

5402259v2/05517.001

✳ Segal Consulting



✳ Segal Consulting

# Ohio Operating Engineers Pension Fund

**Withdrawal Liability Valuation as of July 31, 2014**

This report has been prepared at the request of the Board of Trustees for the purposes of establishing the basis for withdrawal liability assessments during the August 1, 2014 through July 31, 2015 period. This report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety. The measurements shown in this report may not be applicable for other purposes.
Copyright © 2014 by The Segal Group, Inc. All rights reserved.





OOE-000381

# ✳ Segal Consulting

1300 East Ninth Street, Suite 1900 Cleveland, OH 44114
T 216.687.4400 www.segalco.com

*January 6, 2015*

*Board of Trustees*
*Ohio Operating Engineers Pension Fund*
*Columbus, Ohio*

*Dear Trustees:*

*This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2014 through July 31, 2015.*

*The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2014. The benefit provisions included in the calculations are those that were in effect on July 31, 2014.*

*We look forward to reviewing this report with you at your next meeting and to answering any questions you may have.*

*Sincerely,*

*Segal Consulting, a Member of The Segal Group, Inc.*

*By:*    *Megan R. Kelly, CEBS*
*Vice President and Benefits Consultant*

*cc:*    *Thomas M. Tarpy, Esq.*
*Ms. Carol Wilson*
*Mr. Charles M. Ciuni, CPA*

OOE-000382

## SECTION 1

### ACTUARIAL VALUATION SUMMARY

Significant Issues in Valuation Year .............................................. 4

Summary of Key Results ............. 5

## SECTION 2

### ACTUARIAL VALUATION RESULTS

A. Determination of Withdrawal Liability .................................. 6

B. Unfunded Vested Liability...... 8

C. Withdrawal Liability Experience ........................... 11

## SECTION 3

### SUPPLEMENTARY INFORMATION

EXHIBIT A
Method for Allocating Withdrawal Liability................ 12

EXHIBIT B
Employer Withdrawal Liability Worksheet for Withdrawals from August 1, 2014 through July 31, 2015 ........................... 15

## SECTION 4

### ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

EXHIBIT I
Calculation of Unfunded Vested Liability ................................... 17

EXHIBIT II
Withdrawal Liability Pools....... 18

EXHIBIT III
Actuarial Assumptions and Methods.................................... 19

EXHIBIT IV
Summary of Plan Provisions .... 22


Segal Consulting

OOE-000383

**SECTION 1:** **Actuarial Valuation Summary as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**Significant Issues in Valuation Year**

1. The unfunded vested liability as of July 31, 2014 is $750 million, compared to $955 million as of July 31, 2013. A negative basic pool of $144 million was established.

2. A withdrawn employer settled their withdrawal liability obligation in a lump sum during the Plan Year ended July 31, 2014. As a result, a reallocated pool of $7,614 was established.

3. Interest rates used to determine the funded portion of the present value of vested benefits changed from 2.60% for 20 years and 3.43% thereafter to 3.43% for 20 years and 3.66% thereafter (PBGC interest rates).

4. The decrease in the unfunded vested liability since last year was primarily caused by the better than expected return on the market value of plan assets, and the increase in the PBGC interest rates.

✶ Segal Consulting

**SECTION 1:    Actuarial Valuation Summary as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

### Summary of Key Results

| | July 31 | |
| --- | --- | --- |
| | **2014** | **2013** |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries* | 7,053 | 7,013 |
| Number of inactive vested participants | 1,419 | 1,377 |
| Number of active vested participants | 5,382 | 5,448 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 3.43% for 20 years, 3.66% thereafter | 2.60% for 20 years, 3.43% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $2,083,985,264 | $2,035,951,567 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 3,338,260,468 | 3,658,158,877 |
| Present value of vested benefits for withdrawal liability purposes | 2,886,751,734 | 2,897,073,351 |
| **Unfunded Present Value of Vested Benefits:** | | |
| Market value of assets | $2,136,567,447 | $1,941,872,830 |
| Unfunded vested liability for withdrawal liability purposes | 750,184,287 | 955,200,521 |
| Withdrawal liability pools established | | |
| • Basic pool | -143,931,041 | 9,134,851 |
| • Reallocated pool | 7,614 | 0 |

\* *Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

**SECTION 2:    Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

---

**A.  DETERMINATION OF WITHDRAWAL LIABILITY**

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

**Determination of Unfunded Vested Liability**

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. In accordance with Opinion Letter 86-24 from the Pension Benefit Guaranty Corporation (PBGC), no death benefits are considered vested, except for payments connected with the normal or optional form of benefit (such as benefits due a beneficiary under a Joint and Survivor pension). The value of these benefits is

determined as of July 31, 2014 and is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuary's "best estimate" of unfunded vested liability for this Plan involves the same actuarial assumptions as are used for plan funding, with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

✳ **Segal Consulting**

6

**SECTION 2:** Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method adopted by the Trustees.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

The PBGC has affirmed that a multiemployer plan may assess withdrawal liability to employers that withdraw even if the plan currently has no unfunded vested liability.

*De minimis*

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in Section 3, Exhibit A.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.

✳ Segal Consulting

**SECTION 2:** Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

---

**B. UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in Section 4 of this report.

**Changes Since Prior Year**

PBGC interest rates changed from 2.60% for 20 years and 3.43% thereafter to 3.43% for 20 years and 3.66% thereafter.

✳ Segal Consulting

**SECTION 2:    Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 Plan Years are detailed in Chart 1. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 1**

**Basic Pools as of July 31, 2014**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1995 | $0 | $0 | $0 |
| 1996 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 117,371,021 |
| 2004 | 220,610,306 | (27,172,960) | (13,586,480) |
| 2005 | 330,847,750 | 121,920,020 | 67,056,011 |
| 2006 | 161,030,169 | (152,039,003) | (91,223,402) |
| 2007 | 184,389,447 | 33,535,905 | 21,798,338 |
| 2008 | 310,769,562 | 138,233,538 | 96,763,477 |
| 2009 | 649,013,065 | 357,008,602 | 267,756,452 |
| 2010 | 654,635,635 | 42,238,100 | 33,790,480 |
| 2011 | 786,046,373 | 170,138,172 | 144,617,446 |
| 2012 | 1,006,694,115 | 267,882,086 | 241,093,877 |
| 2013 | 955,200,521 | 9,134,851 | 8,678,108 |
| 2014 | 750,184,287 | (143,931,041) | (143,931,041) |
| Total | | | $750,184,287 |

**✳ Segal Consulting**

9

**SECTION 2:    Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the Plan Year preceding withdrawal.

During the last Plan Year, there was $7,614 that was deemed uncollectible as a result of the settlement amount paid by a withdrawn employer being lower than the allocated unfunded vested liability for the employer. As a result, a reallocated pool was established and is shown in Chart 2 below.

*This chart shows historical reallocated pools.*

**CHART 2**

**Reallocated Pool as of July 31, 2014\***

| Plan Year Ended July 31 | Initial Value | Unamortized Balance |
|---|---|---|
| 2014 | $7,614 | $7,614 |
| **Total** | $7,614 | $7,614 |

\* *No reallocated pools were established prior to 2014.*

**✳ Segal Consulting**

10

**SECTION 2:**     Actuarial Valuation Results as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

---

### C.  WITHDRAWAL LIABILITY EXPERIENCE

We have been notified of four employers withdrawing from the fund during the last Plan Year. Currently, three withdrawn employers are making withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

✦ Segal Consulting

**SECTION 3:**  **Supplementary Information as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT A**
**Method for Allocating Withdrawal Liability**

---

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1)  the Plan's unfunded vested liability as of July 31, 1980;

(2)  the change in the Plan's unfunded vested liability as of the end of each subsequent Plan Year (to the end of the Plan Year preceding withdrawal); and

(3)  reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1)  by establishing the Plan's unfunded vested liability as of the end of that Plan Year, and

(2)  by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

**SECTION 3:     Supplementary Information as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan Year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan Year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan Year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by an a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a)   The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the Plan Year of withdrawal, and

(b)   the highest contribution rate in the 10-year period ending with the Plan Year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

✶ **Segal Consulting**

**SECTION 3:    Supplementary Information as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the Plan Year and the preceding two Plan Years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two Plan Years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the Plan Year following the year of the partial withdrawal to the employer's average contributory hours in the five Plan Years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two Plan Years in which the hours were the highest within the five Plan Years preceding the Plan Year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

**✳ Segal Consulting**

SECTION 3:    Supplementary Information as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

**EXHIBIT B**
**Employer Withdrawal Liability Worksheet for Withdrawals from August 1, 2014 through July 31, 2015**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) + (3)] (6) |
|---|---|---|---|---|---|
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $117,371,021 | $0 | $178,834,875 | _____ | _____ |
| 2004 | (13,586,480) | 0 | 183,435,933 | _____ | _____ |
| 2005 | 67,056,011 | 0 | 184,525,945 | _____ | _____ |
| 2006 | (91,223,402) | 0 | 187,236,038 | _____ | _____ |
| 2007 | 21,798,338 | 0 | 192,258,544 | _____ | _____ |
| 2008 | 96,763,477 | 0 | 202,969,173 | _____ | _____ |
| 2009 | 267,756,452 | 0 | 210,884,752 | _____ | _____ |
| 2010 | 33,790,480 | 0 | 218,622,244 | _____ | _____ |
| 2011 | 144,617,446 | 0 | 230,778,340 | _____ | _____ |
| 2012 | 241,093,877 | 0 | 250,306,333 | _____ | _____ |
| 2013 | 8,678,108 | 0 | 269,018,918 | _____ | _____ |
| 2014 | (143,931,041) | 7,614 | 298,703,055 | _____ | _____ |

A. Gross liability: (Sum of Column 6)
B. *De minimis*                                                                                                                    50,000
C. Deductible: $100,000 + (B) − (A), but not greater than (B) nor less than zero
D. Allocable Unfunded Vested Liability: (A) − (C), not less than zero and without regard to annual payment limitations

[1] Years not shown have no withdrawal liability component
[2] Original value of changes in unfunded vested benefits, written down 5% per year.
[3] Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.
[4] Total Fund contributions for the Plan Year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.
[5] Obligated employer contributions for the Plan Year listed and the four preceding years, including contributions owed but not yet paid.

**SECTION 4:** Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

**January 6, 2015**

**ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY**

This is to certify that Segal Consulting, a Member of The Segal Group, Inc., has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2014. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 14-05773

 Segal Consulting

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT I**

**Calculation of Unfunded Vested Liability**

| | | |
|---|---|---:|
| The calculations include the following participants as of July 31, 2014 | | |
| a. | Pensioners and beneficiaries (including 1,846 beneficiaries)* | 7,053 |
| b. | Inactive participants with vested pension rights | 1,419 |
| c. | Active vested participants | 5,382 |

| | | |
|---|---|---:|
| The actuarial factors are shown below as of July 31, 2014 | | |
| 1. | Present value of vested benefits at funding interest rate | $2,083,985,264 |
| 2. | Present value of vested benefits at PBGC interest rates, including allowance for expenses | 3,338,260,468 |
| 3. | Market value of assets | 2,136,567,477 |
| 4. | Ratio funded at PBGC interest rates [(3) ÷ (2), not greater than 1.0] | 0.640024 |
| 5. | Present value of vested benefits for withdrawal liability purposes [(4) x (2) + (1.0 − (4)) x (1)] | 2,886,751,734 |
| 6. | Unfunded vested liability [(5) − (3), not less than zero] | 750,184,287 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

SECTION 4:   Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2014* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1995 | $0 | $0 | $0 | $0 | $0 |
| 1996 | 0 | 0 | 0 | 0 | 0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 117,371,021 | 0 | 117,371,021 |
| 2004 | (27,172,960) | 0 | (13,586,480) | 0 | (13,586,480) |
| 2005 | 121,920,020 | 0 | 67,056,011 | 0 | 67,056,011 |
| 2006 | (152,039,003) | 0 | (91,223,402) | 0 | (91,223,402) |
| 2007 | 33,535,905 | 0 | 21,798,338 | 0 | 21,798,338 |
| 2008 | 138,233,538 | 0 | 96,763,477 | 0 | 96,763,477 |
| 2009 | 357,008,602 | 0 | 267,756,452 | 0 | 267,756,452 |
| 2010 | 42,238,100 | 0 | 33,790,480 | 0 | 33,790,480 |
| 2011 | 170,138,172 | 0 | 144,617,446 | 0 | 144,617,446 |
| 2012 | 267,882,086 | 0 | 241,093,877 | 0 | 241,093,877 |
| 2013 | 9,134,851 | 0 | 8,678,108 | 0 | 8,678,108 |
| 2014 | (143,931,041) | 7,614 | (143,931,041) | 7,614 | (143,923,427) |

*  *Basic and reallocated pools are written down annually at the rate of 5% of the original amount.*

SECTION 4:    Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers
              Pension Fund

**EXHIBIT III**
**Actuarial Assumptions and Methods**

| | |
|---|---|
| **Investment Return:** | (a) To the extent the vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used. |

PBGC Interest Rates as of July 31, 2014:

| | |
|---|---|
| First 20 years | 3.43% |
| After 20 years | 3.66% |

(b) To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

(c) The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

| | |
|---|---|
| **Mortality Rates:** | Healthy:  RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA |

Disabled: RP-2000 Disabled Retiree Mortality Table Set Back Two Years

The RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA from 2000 reasonably reflects the projected mortality experience of the Plan as of the measurement date. The mortality table was then adjusted to future years using generational projection under Scale AA to anticipate future mortality improvement

✸ Segal Consulting

**SECTION 4:    Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Retirement Rates:** | Upon completion of service requirement, the following rates apply for active employees: |

| Age | Rate |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

| | |
|---|---|
| **Retirement Age for Inactive Vested Participants:** | 62 if eligible for early retirement, otherwise Normal Retirement Age |
| **Unknown Data for Participants:** | Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male. |
| **Percent Married:** | 85% of male participants and 50% of female participants |
| **Age and Sex of Spouse:** | Spouse of male participant is assumed to be three years younger than the participant and spouse of female participant is assumed to be three years older than the participant. If not specified, spouse is assumed to be the opposite sex of the participant. |

✳ Segal Consulting

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Benefit Election:** | Married participants are assumed to elect the more valuable of the 50% joint-and-survivor annuity with "pop-up" form of payment and the single life annuity with five years certain. Non-married participants are assumed to elect the single life annuity with five years certain. |
| **Administrative Expenses:** | $10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets. |
| **Valuation of Assets:** | At market value |
| **Allocation Method:** | Presumptive |
| **Contribution Period for Prorating Liabilities:** | 5 years |
| **De minimis Deductible:** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

✶ **Segal Consulting**

21
OOE-000401

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |
| **Plan Status:** | Ongoing Plan |

**Regular Pension:**

| | |
|---|---|
| *Age Requirement* | 65 |
| *Service Requirement* | None |
| *Amount* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf from August 1, 2009 through July 31, 2012, plus
- 1.9% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2012

✱ Segal Consulting

**SECTION 4:**    **Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

---

**Early Retirement:**

| | |
|---|---|
| *Age Requirement* | 57 |
| *Service Requirement* | 10 years of credited service |
| *Amount* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| or | |
| *Service Requirement* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

**Vesting:**

| | |
|---|---|
| *Age Requirement* | None |
| *Service Requirement* | 5 years of credited service |
| *Amount* | Normal or early pension accrued |
| *Normal Retirement Age* | 65 |

**Forms of Payment:**

The normal forms of payment are:

- Qualified Joint and Survivor Annuity, which under the Plan is a 50% joint-and-survivor annuity with a "pop-up" feature, for married participants
- Single Life Annuity with five years certain for single participants

The generally available optional forms of payment are:

- 66-2/3% Joint and Survivor Option (no longer available to new retirees)
- 75% Joint and Survivor Option
- 100% Joint and Survivor Option

**SECTION 4:     Actuarial Certification of Withdrawal Liability as of July 31, 2014 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Participation:** | Members who are employed by Employers and who are covered by a collective bargaining agreement with the Pension Fund |
| **Past Service Credit:** | One year of past service for each full year of continuous service prior to June 1, 1964 |
| **Future Service Credit:** | For the period between June 1, 1964 and July 31, 1976: |

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

| | |
|---|---|
| **Contribution Rate:** | $6.00 per hour, effective May 1, 2013 ($3.00 per hour supplemental and not subject to benefit accrual). |

5471760v1/05517.001



✶ Segal Consulting

# Ohio Operating Engineers Pension Fund

**Withdrawal Liability Valuation
as of July 31, 2015**

This report has been prepared at the request of the Board of Trustees for the purposes of establishing the basis for withdrawal liability assessments during the August 1, 2015 through July 31, 2016 period. This report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety. The measurements shown in this report may not be applicable for other purposes.
Copyright © 2016 by The Segal Group, Inc. All rights reserved.



OOE-000405

 **Segal Consulting**

1300 EAST NINTH STREET, SUITE 1900 CLEVELAND, OH 44114
T 216.687.4400 www.segalco.com

January 27, 2016

Board of Trustees
Ohio Operating Engineers Pension Fund
Columbus, Ohio

Dear Trustees:

This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2015 through July 31, 2016.

The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2015. The benefit provisions included in the calculations are those that were in effect on July 31, 2015.

We look forward to reviewing this report with you at your next meeting and to answering any questions you may have.

Sincerely,

Segal Consulting, a Member of The Segal Group, Inc.

By:     Megan B. Kelly

Megan B. Kelly, CEBS
Vice President and Benefits Consultant

cc:     Thomas M. Tarpy, Esq.
        Ms. Carol Wilson
        Mr. Charles M. Ciuni, CPA

OOE-000406

**Table of Contents**

## Section 1: Actuarial Valuation Summary

Significant Issues in Valuation Year ........................................................................................................................................... 4

Summary of Key Results........................................................................................................................................................... 5

## Section 2: Actuarial Valuation Results

A.   Determination of Withdrawal Liability ............................................................................................................................. 6

B.   Unfunded Vested Liability ................................................................................................................................................ 8

C.   Withdrawal Liability Experience ...................................................................................................................................... 11

## Section 3: Supplementary Information

EXHIBIT A
  Method for Allocating Withdrawal Liability ....................................................................................................................... 12

EXHIBIT B
  Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2015 Through July 31, 2016 ................................. 15

## Section 4: Actuarial Certification of Withdrawal Liability

EXHIBIT I
  Calculation of Unfunded Vested Liability ............................................................................................................................ 17

EXHIBIT II
  Withdrawal Liability Pools ............................................................................................................................................... 18

EXHIBIT III
  Actuarial Assumptions and Methods ................................................................................................................................. 19

EXHIBIT IV
  Summary of Plan Provisions ............................................................................................................................................. 23

 Segal Consulting

**SECTION 1:**     **Actuarial Valuation Summary as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

---

**Significant Issues in Valuation Year**

1. The Multiemployer Pension Reform Act of 2014 (MPRA) amended ERISA to expect PBGC's guarantee to cover qualified pre-retirement survivor annuities (QPSA). As a result, the value of this benefit is included in the present value of vested benefits used for determining withdrawal liability as of July 31, 2015.

2. The unfunded vested liability as of July 31, 2015 is $971 million, compared to $750 million as of July 31, 2014. A positive basic pool of $275 million was established.

3. Interest rates used to determine the funded portion of the present value of vested benefits changed from 3.43% for 20 years and 3.66% thereafter to 2.32% for 20 years and 2.37% thereafter (PBGC interest rates).

4. The increase in the unfunded vested liability since last year was primarily caused by the decrease in the PBGC interest rates.

✴ Segal Consulting

**SECTION 1:** **Actuarial Valuation Summary as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

## Summary of Key Results

|  | July 31 | |
|---|---|---|
|  | **2014** | **2015** |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries* | 7,053 | 7,068 |
| Number of inactive vested participants | 1,419 | 1,428 |
| Number of active vested participants | 5,382 | 5,310 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 3.43% for 20 years, 3.66% thereafter | 2.32% for 20 years, 2.37% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $2,083,985,264 | $2,140,283,436 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 3,338,260,468 | 4,060,944,552 |
| Present value of vested benefits for withdrawal liability purposes | 2,886,751,734 | 3,189,341,325 |
| **Unfunded Present Value of Vested Benefits:** | | |
| Market value of assets | $2,136,567,447 | $2,218,072,665 |
| Unfunded vested liability for withdrawal liability purposes | 750,184,287 | 971,268,660 |
| Withdrawal liability pools established | | |
| • Basic pool | -143,931,041 | 274,973,011 |
| • Reallocated pool | 7,614 | 0 |

\* *Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

**SECTION 2: Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund**

---

**A. DETERMINATION OF WITHDRAWAL LIABILITY**

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), signed into law on September 26, 1980 and amended by the Deficit Reduction Act of 1984 (DEFRA), requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

A withdrawal also may be partial. Partial withdrawals are described in more detail in Section 3, Exhibit A.

If an employer reenters the Plan after incurring withdrawal liability, the withdrawal liability may be abated. This is also described in more detail in Section 3, Exhibit A.

**Determination of Unfunded Vested Liability**

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. MPRA amended ERISA to expand PBGC's guarantee to cover qualified pre-retirement survivor annuities. As a result, the value of this benefit is included in the present value of vested benefits used for determining withdrawal liability as of July 31, 2015. The value of these benefits is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuary's "best estimate" of unfunded vested liability for this Plan involves the same actuarial assumptions as are used for plan funding, with the exception of the assumed rate of investment return (i.e., a blend of interest assumptions prescribed by the PBGC and plan funding assumptions), the value ascribed to Plan assets (i.e., market value), and administrative expenses. Details are provided in Section 4, Exhibit III.

**Allocation**

The Plan's method of allocation is fully described in Section 3, Exhibit A. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method adopted by the Trustees.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

✴ Segal Consulting

6

**SECTION 2:** Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund

The PBGC has affirmed that a multiemployer plan may assess withdrawal liability to employers that withdraw even if the plan currently has no unfunded vested liability.

*De minimis*
Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

**Payment of Withdrawal Liability**
The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in Section 3, Exhibit A.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.

✶ Segal Consulting

**SECTION 2:    Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund**

---

**B.  UNFUNDED VESTED LIABILITY**

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in Section 4 of this report.

**Changes Since Prior Year**

The Multiemployer Pension Reform Act of 2014 (MPRA) amended ERISA to expect PBGC's guarantee to cover qualified pre-retirement survivor annuities (QPSA). As a result, the value of this benefit is included in the present value of vested benefits used for determining withdrawal liability as of July 31, 2015.

PBGC interest rates changed from 3.43% for 20 years and 3.66% thereafter to 2.32% for 20 years and 2.37% thereafter.

✦ Segal Consulting

OOE-000412

**SECTION 2:    Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund**

**Basic Pools**

The Plan's unfunded vested liabilities, as calculated for withdrawal liability purposes, for each of the past 20 plan years are detailed in Chart 1. The chargeable change for each year and the remaining unamortized balance as of the valuation date are also shown.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

*The chargeable changes for the last 20 years are summarized in this chart.*

**CHART 1**
**Basic Pools as of July 31, 2015**

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1996 | $0 | $0 | $0 |
| 1997 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 104,329,796 |
| 2004 | 220,610,306 | (27,172,960) | (12,227,832) |
| 2005 | 330,847,750 | 121,920,020 | 60,960,010 |
| 2006 | 161,030,169 | (152,039,003) | (83,621,452) |
| 2007 | 184,389,447 | 33,535,905 | 20,121,543 |
| 2008 | 310,769,562 | 138,233,538 | 89,851,800 |
| 2009 | 649,013,065 | 357,008,602 | 249,906,021 |
| 2010 | 654,635,635 | 42,238,100 | 31,678,575 |
| 2011 | 786,046,373 | 170,138,172 | 136,110,538 |
| 2012 | 1,006,694,115 | 267,882,086 | 227,699,773 |
| 2013 | 955,200,521 | 9,134,851 | 8,221,366 |
| 2014 | 750,184,287 | (143,931,041) | (136,734,489) |
| 2015 | 971,268,660 | 274,973,011 | 274,973,011 |
| Total | | | $971,268,660 |

✦ Segal Consulting

9

**SECTION 2:**    Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund

**Reallocated Amounts**

Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in Section 3, Exhibit A.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.

*This chart shows historical reallocated pools.*

**CHART 2**

**Reallocated Pool as of July 31, 2015***

| Plan Year Ended July 31 | Initial Value | Unamortized Balance |
|---|---|---|
| 2014 | $7,614 | $7,233 |
| **Total** | $7,614 | $7,233 |

* *No reallocated pools were established for years not shown.*

✶ Segal Consulting

**SECTION 2:    Actuarial Valuation Results as of July 31, 2015 for the for Ohio Operating Engineers Pension Fund**

**C. WITHDRAWAL LIABILITY EXPERIENCE**

We have been notified of two employers withdrawing from the fund during the last Plan Year.

For the last plan year, the Fund received $146,792 from withdrawal liability assessments. These serve to fund the Plan in the same manner as employer contributions. Currently, three withdrawn employers are making withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

✕ Segal Consulting

SECTION 3:    Supplementary Information as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

**EXHIBIT A**
**Method for Allocating Withdrawal Liability**

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

(1) the Plan's unfunded vested liability as of July 31, 1980;

(2) the change in the Plan's unfunded vested liability as of the end of each subsequent Plan Year (to the end of the Plan Year preceding withdrawal); and

(3) reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

**Unamortized Balances**
The "unamortized balance" of each of these sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

**Initial Amount**
The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

**Annual Changes**
The change in the Plan's unfunded vested liability as of the end of any Plan year is determined as follows:

(1) by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

(2) by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

If the Plan had no unfunded vested liability as of the end of a year, it is entered as zero.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is therefore an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is therefore a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

✦ Segal Consulting

**SECTION 3:** Supplementary Information as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

**Reallocated Amounts**

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

**Proration to the Employer**

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability, each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the 5 years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the Plan Year in which the change or reallocation arose.

**Payment of Withdrawal Liability**

A withdrawn employer's withdrawal liability assessment is paid in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

(a) The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the Plan Year of withdrawal, and

(b) the highest contribution rate in the 10-year period ending with the Plan Year of withdrawal.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and crediting interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.

**Maintenance of Allocations**

Even if no employer withdrawal had occurred, the method requires determination annually of the value of the Plan's unfunded vested liability and of any reallocable uncollectible withdrawal liability amounts. It is also necessary for the Plan to be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond, as required by law, to an inquiry from a participating employer as to the amount of its potential liability.

✶ Segal Consulting

13

OOE-000417

**SECTION 3:    Supplementary Information as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

**Partial Withdrawal**

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the Plan Year and the preceding two Plan Years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two Plan Years in which the base units were the highest within the five Plan Years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

**Plan Reentry**

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceed 30% of the average of the contributory hours in the two Plan Years in which the hours were the highest within the five plan years preceding the Plan Year of withdrawal.

Withdrawal liability payments due after plan reentry are abated, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

✴ Segal Consulting

**SECTION 3:** Supplementary Information as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

**EXHIBIT B**
**Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2015 Through July 31, 2016**

Employer Name: _____

| Year Ended July 31[1] (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) + (3)] |
| | Basic Pools[2] (2) | Reallocated Pools[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | (6) |
|---|---|---|---|---|---|
| 2003 | $104,329,796 | $0 | $178,834,875 | | |
| 2004 | (12,227,832) | 0 | 183,435,933 | | |
| 2005 | 60,960,010 | 0 | 184,525,945 | | |
| 2006 | (83,621,452) | 0 | 187,236,038 | | |
| 2007 | 20,121,543 | 0 | 192,258,544 | | |
| 2008 | 89,851,800 | 0 | 202,969,173 | | |
| 2009 | 249,906,021 | 0 | 210,884,752 | | |
| 2010 | 31,678,575 | 0 | 218,622,244 | | |
| 2011 | 136,110,538 | 0 | 230,778,340 | | |
| 2012 | 227,699,773 | 0 | 250,306,333 | | |
| 2013 | 8,221,366 | 0 | 269,018,918 | | |
| 2014 | (136,734,489) | 7,233 | 298,703,055 | | |
| 2015 | 274,973,011 | 0 | 331,169,312 | | |

A. Gross liability: (Sum of Column 6)
B. *De minimis*                                                                 50,000
C. Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero
D. Allocable Unfunded Vested Liability: (A) – (C), not less than zero and without regard to annual payment limitations

[1] *Years not shown have no withdrawal liability component.*
[2] *Original value of changes in unfunded vested benefits, written down 5% per year.*
[3] *Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.*
[4] *Total Fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*
[5] *Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

✴ Segal Consulting

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

---

**January 27, 2016**

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that Segal Consulting, a Member of The Segal Group, Inc., has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2015. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

**Certificate Contents**

| | |
|---|---|
| **EXHIBIT I** | Calculation of Unfunded Vested Liability |
| **EXHIBIT II** | Withdrawal Liability Pools |
| **EXHIBIT III** | Actuarial Assumptions and Methods |
| **EXHIBIT IV** | Summary of Plan Provisions |

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.

Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 14-05773



**SECTION 4:** Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

**EXHIBIT I**
**Calculation of Unfunded Vested Liability**

| The calculations include the following participants as of July 31, 2015 | |
|---|---|
| a. Pensioners and beneficiaries (including 1,886 beneficiaries)* | 7,068 |
| b. Inactive participants with vested pension rights | 1,428 |
| c. Active vested participants | 5,310 |

| The actuarial factors are shown below as of July 31, 2015. | |
|---|---|
| 1. Present value of vested benefits at funding interest rate | $2,140,283,436 |
| 2. Present value of vested benefits at PBGC interest rates, including allowance for expenses | 4,060,944,552 |
| 3. Market value of assets | 2,218,072,665 |
| 4. Ratio funded at PBGC interest rates [(3) ÷ (2), not greater than 1.0] | 0.546196 |
| 5. Present value of vested benefits for withdrawal liability purposes [(4) x (2) + (1.0 – (4)) x (1)] | $3,189,341,325 |
| 6. Unfunded vested liability [(5) – (3), not less than zero] | 971,268,660 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

**SECTION 4:** Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

**EXHIBIT II**
**Withdrawal Liability Pools**

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2015* | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1996 | $0 | $0 | $0 | $0 | $0 |
| 1997 | 0 | 0 | 0 | 0 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 104,329,796 | 0 | 104,329,796 |
| 2004 | (27,172,960) | 0 | (12,227,832) | 0 | (12,227,832) |
| 2005 | 121,920,020 | 0 | 60,960,010 | 0 | 60,960,010 |
| 2006 | (152,039,003) | 0 | (83,621,452) | 0 | (83,621,452) |
| 2007 | 33,535,905 | 0 | 20,121,543 | 0 | 20,121,543 |
| 2008 | 138,233,538 | 0 | 89,851,800 | 0 | 89,851,800 |
| 2009 | 357,008,602 | 0 | 249,906,021 | 0 | 249,906,021 |
| 2010 | 42,238,100 | 0 | 31,678,575 | 0 | 31,678,575 |
| 2011 | 170,138,172 | 0 | 136,110,538 | 0 | 136,110,538 |
| 2012 | 267,882,086 | 0 | 227,699,773 | 0 | 227,699,773 |
| 2013 | 9,134,851 | 0 | 8,221,366 | 0 | 8,221,366 |
| 2014 | (143,931,041) | 7,614 | (136,734,489) | 7,233 | (136,727,256) |
| 2015 | 274,973,011 | 0 | 274,973,011 | 0 | 274,973,011 |

* Basic and reallocated pools are written down annually at the rate of 5% of the original amount.

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

---

**EXHIBIT III**
**Actuarial Assumptions and Methods**

---

**Investment Return:**

(a)      To the extent the vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used.

PBGC Interest Rates as of July 31, 2015:

| | |
|---|---|
| First 20 years | 2.32% |
| After 20 years | 2.37% |

(b)      To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

(c)      The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

---

**Mortality Rates:**

Healthy: RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA

Disabled: RP-2000 Disabled Retiree Mortality Table Set Back Two Years

The RP-2000 Combined Healthy Blue Collar Mortality Table with generational projection using Scale AA from 2000 reasonably reflects the projected mortality experience of the Plan as of the measurement date. The mortality table was then adjusted to future years using generational projection under Scale AA to anticipate future mortality improvement.

The mortality rates were based on historical and current demographic data and professional judgment. As part of the analysis, a comparison was made between the actual number of deaths by age and liability change due to deaths and the projected

**Segal Consulting**

19
OOE-000423

SECTION 4: **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

number and liability change based on the prior years' assumption over the most recent four years.

**Retirement Rates:**

Upon completion of service requirement, the following rates apply for active employees:

| Age | Annual Retirement Rates |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

The retirement rates were based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. As part of the analysis, a comparison was made between the actual number of retirements and liability change due to retirements and the projected number of retirements and liability change based on the prior years' assumption over the most recent five years.

✳ Segal Consulting

**SECTION 4:**  Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund

| | |
|---|---|
| **Retirement Age for Inactive Vested Participants:** | 62 if eligible for early retirement, otherwise Normal Retirement Age |
| | The retirement age for inactive vested participants was based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. |
| **Unknown Characteristics of Participants:** | Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male. |
| **Percent Married** | 85% of male participants and 50% of female participants |
| **Age and Sex of Spouse** | Spouses of male participants are assumed to be three years younger than the participants and spouses of female participants are assumed to be three years older than the participants. If not specified, spouses are assumed to be of the participants' opposite sex. |
| **Benefit Election** | Married participants are assumed to elect the more valuable of the 50% joint-and-survivor annuity with "pop-up" form of payment and the single life annuity with five years certain. Non-married participants are assumed to elect the single life annuity with five years certain. |
| | The benefit elections were based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. |
| **Administrative Expenses:** | $10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets. |
| **Valuation of Assets:** | At market value |
| **Allocation method:** | Presumptive |

✳ Segal Consulting

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

| | |
|---|---|
| **Contribution period for prorating liabilities:** | 5 years |
| *De minimis* **Deductible:** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000. |

SECTION 4:    **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

**EXHIBIT IV**
**Summary of Plan Provisions**

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| | |
|---|---|
| **Plan Year:** | August 1 through July 31 |
| **Pension Credit Year:** | June 1 through May 31 |
| **Plan Status:** | Ongoing Plan |

**Regular Pension:**

| | |
|---|---|
| *Age Requirement:* | 65 |
| *Service Requirement:* | None |
| *Amount:* | Sum of the following: |

- $20.00 for each year of past service, plus
- 3.8% of contributions paid on employee's behalf through April 30, 2006, plus
- 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus
- 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf from August 1, 2009 through July 31, 2012, plus
- 1.9% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2012

**SECTION 4:** **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

---

**Early Retirement:**

| | |
|---|---|
| *Age Requirement:* | 57 |
| *Service Requirement:* | Ten years of credited service |
| *Amount:* | Normal pension accrued reduced by 0.5% for each month of age less than 62 |
| *Or* | |
| *Service Requirement:* | 30 years of credited service, including at least 300 hours of service in each of the 30 years |
| *Amount:* | Normal pension accrued reduced by 0.625% for each month of age less than 61 |

---

**Vesting:**

| | |
|---|---|
| *Age Requirement:* | None |
| *Service Requirement:* | Five years of credited service |
| *Amount:* | Normal or early pension accrued based on plan in effect when last active |
| *Normal Retirement Age:* | 65 |

---

**Qualified Pre-Retirement Survivor Benefit:**

| | |
|---|---|
| *Age Requirement:* | None |
| *Service Requirement:* | Five years of credited service |
| *Amount:* | 50% of the benefit participant would have received had he or she retired the day before he or she died and elected the joint and survivor option. If the participant died prior to eligibility for an early retirement pension, the spouse's benefit is deferred to the date participant would have been age 57 or, for participants with less than 10 years of credited service, age 62. |

✕ Segal Consulting

**SECTION 4:**     **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

**Forms of Payment:**

*The normal forms of payment are:*
- Qualified Joint and Survivor Annuity, which under the Plan is a 50% joint-and-survivor annuity with a "pop-up" feature, for married participants
- Single Life Annuity with five years certain for single participants

*The generally available optional forms of payment are:*
- 66-2/3% Joint and Survivor Option (no longer available to new retirees as of August 1, 2009)
- 75% Joint and Survivor Option (only available to married participants)
- 100% Joint and Survivor Option (only available to married participants)

**Participation**

Members who are employed by Employers and who are covered by a collective bargaining agreement with the Pension Fund

**Service Credit:**

*Past Service Credit*     One year of past service for each full year of continuous service prior to June 1, 1964

*Future Service Credit*     For the period between June 1, 1964 and July 31, 1976:

| Hours | Years of Credit |
|-------|-----------------|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

✴ Segal Consulting

**SECTION 4:**    **Actuarial Certification of Withdrawal Liability as of July 31, 2015 for the Ohio Operating Engineers Pension Fund**

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|-------|-----------------|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

**Contribution Rate**: $6.00 per hour, effective May 1, 2013 ($3.00 per hour supplemental and not subject to benefit accrual)

**Changes in Plan Provisions:**         There were no changes in plan provisions reflected in this actuarial valuation.

5552181v1/05517.001

✯ Segal Consulting



✗ Segal Consulting

# Ohio Operating Engineers Pension Fund

**Withdrawal Liability Valuation**
as of July 31, 2016

This report has been prepared at the request of the Board of Trustees for the purposes of establishing the basis for withdrawal liability assessments during the August 1, 2016 through July 31, 2017 period. This report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety. The measurements shown in this report may not be applicable for other purposes.

Copyright © 2017 by The Segal Group, Inc. All rights reserved.



Date: 10-26-2018 EXHIBIT N Fund


**Segal Consulting**

1300 EAST NINTH STREET, SUITE 1900 CLEVELAND, OH 44114
T 216.687.4400 WWW.SEGALCO.COM

January 31, 2017

Board of Trustees
Ohio Operating Engineers Pension Fund
Columbus, Ohio

Dear Trustees:

This report summarizes and reviews the Plan's status and experience with respect to employer withdrawal liability. It outlines the withdrawal liability method adopted and explains the calculation of the amount of liability of a withdrawn employer. It also establishes the basis for assessments of withdrawal liability for withdrawal during the period August 1, 2016 through July 31, 2017.

The actuarial calculations were completed under the supervision of Daniel V. Ciner, MAAA, Enrolled Actuary. The basic participant and financial data used in this report are the same as those used in the actuarial valuation as of August 1, 2016. The benefit provisions included in the calculations are those that were in effect on July 31, 2016.

We look forward to reviewing this report with you at your next meeting and to answering any questions you may have.

Sincerely,

Segal Consulting, a Member of The Segal Group, Inc.

By:    Megan K. Kelly

Megan K Kelly, CEBS
Vice President and Benefits Consultant

cc:    Allen S. Kinzer, Esq.
       Ms. Carol Wilson
       Charles M. Ciuni, CPA

OOE-000106

# Table of Contents

**Ohio Operating Engineers Pension Fund Withdrawal Liability Valuation as of July 31, 2016**

## Section 1: Actuarial Valuation Summary
Important Information about Withdrawal Liability Valuations ....................................................................................................................4
Significant Issues in Valuation Year..........................................................................................................................................................6
Summary of Key Results ...........................................................................................................................................................................7
## Section 2: Actuarial Valuation Results
A. Determination of Withdrawal Liability ....................................................................................................................................................8
B. Unfunded Vested Liability......................................................................................................................................................................10
C. Withdrawal Liability Experience.............................................................................................................................................................13
## Section 3: Supplementary Information
Exhibit A - Method for Allocating Withdrawal Liability..............................................................................................................................14
Exhibit B - Employer Withdrawal Liability Worksheet For Withdrawals from August 1, 2016 Through July 31, 2017 ............................18
## Section 4: Actuarial Certification
Exhibit 1 - Calculation of Unfunded Vested Liability ................................................................................................................................20
Exhibit 2 - Withdrawal Liability Pools ......................................................................................................................................................21
Exhibit 3 - Summary of Plan Provisions...................................................................................................................................................22
Exhibit 4 - Actuarial Assumptions and Methods ......................................................................................................................................25

OOE-000107

## Section 1: Actuarial Valuation Summary

### Important Information about Withdrawal Liability Valuations

A withdrawal liability valuation is prepared to assist in the determination and assessment of withdrawal liability. It is a forecast of future uncertain obligations of a pension plan. As such, the forecast will never precisely match the actual stream of benefits and expenses to be paid. In order to prepare withdrawal liability valuations, Segal Consulting ("Segal") relies on a number of input items. These include:

➤ **Plan Provisions** Plan provisions define the rules that will be used to determine benefit payments, and those rules, or the interpretation of them, may change over time. It is important for the Trustees to keep Segal informed with respect to plan provisions and administrative procedures, and to review the plan summary included in our report to confirm that Segal has correctly interpreted the plan of benefits. For an employer withdrawing in a particular plan year, the relevant plan provisions are those in effect at the end of the prior plan year.

➤ **Participant Information** The present value of vested benefits, upon which withdrawal liability for an employer is determined, is based on data provided to the actuary by the plan. Segal does not audit such data for completeness or accuracy, other than reviewing it for obvious inconsistencies compared to prior data and other information that appears unreasonable. It is not necessary to have perfect data for a valuation: the valuation is an estimated forecast, not a prediction. Notwithstanding the above, it is important for Segal to receive the best possible data and to be informed about any known incomplete or inaccurate data.

➤ **Financial Information** The withdrawal liability valuation is based on the asset values as of the valuation date, typically reported by the auditor. The allocation of the unfunded present value of vested benefits to an employer is based on its detailed obligated contribution information as well as that for other participating employers, as provided by the plan.

➤ **Actuarial Assumptions** In measuring the present value of vested benefits for withdrawal liability purposes, Segal starts by developing a forecast of the vested benefits to be paid to existing plan participants for the rest of their lives and the lives of their beneficiaries. This requires actuarial assumptions as to the probability of death and retirement. The forecasted benefits are then discounted to a present value. The actuarial model used to develop the present value of vested benefits for withdrawal liability purposes may use approximations and estimates that will have an immaterial impact on our results. In addition, the actuarial assumptions may change over time, and while this can have a significant impact on the reported results, it does not mean that the previous assumptions or results were unreasonable or wrong.

OOE-000108

Given the above, the user of Segal's withdrawal liability valuation report (or other actuarial calculations) needs to keep the following in mind:

> The withdrawal liability valuation report is prepared for use by the Trustees. It includes information relative to the provisions of ERISA pertaining to withdrawal liability. Segal is not responsible for the use or misuse of its report, particularly by any other party.

> A withdrawal liability valuation is a measurement as of a specific date — it is not a prediction of a plan's future financial condition. Accordingly, Segal did not perform an analysis of other potential financial measurements.

> Actuarial results in this report are not rounded, but that does not imply precision.

> Segal does not provide investment, legal, accounting, or tax advice. This withdrawal liability valuation report is based on Segal's understanding of applicable guidance in these areas and of the plan's provisions. The Trustees should look to their other advisors for expertise in these areas.

> While Segal maintains extensive quality assurance procedures, a withdrawal liability valuation involves complex computer models and numerous inputs. In the event that an inaccuracy is discovered after presentation of Segal's results, Segal may revise that valuation report or make an appropriate adjustment in the next valuation.

> Segal's withdrawal liability report shall be deemed to be final and accepted by the Trustees upon delivery and review. Trustees should notify Segal immediately of any questions or concerns about the final content.

As Segal Consulting has no discretionary authority with respect to the management or assets of the Plan, it is not a fiduciary in its capacity as actuaries and consultants with respect to the Plan.

OOE-000109

## Significant Issues in Valuation Year

> The unfunded vested liability for withdrawal liability purposes as of July 31, 2016 is $1.02 billion, as compared to $971.3 million as of the prior year. A positive basic pool of $112.3 million was established.

> The increase in the unfunded vested liability since last year was primarily caused by the lower than expected return on the market value of Plan assets and assumption changes.

> Interest rates used to determine the funded portion of the present value of vested benefits changed from 2.32% for 20 years and 2.37% thereafter to 2.50% for 20 years and 2.85% thereafter (PBGC interest rates).

> The healthy and disabled mortality rates were updated to the RP-2014 Blue Collar Mortality Tables (Healthy Annuitant tables for nondisabled pensioners, Employee tables for non-pensioners, and Disabled Retiree tables for disabled participants) with rates increased by 10%, projected on a generational basis using scale MP-2016.

OOE-000110

## Summary of Key Results

| | July 31 | |
|---|---|---|
| | 2015 | 2016 |
| **Demographic Data:** | | |
| Number of pensioners and beneficiaries* | 7,068 | 7,063 |
| Number of inactive vested participants | 1,428 | 1,424 |
| Number of active vested participants | 5,310 | 5,281 |
| **Interest Assumptions:** | | |
| Valuation (funding) interest rate | 7.25% | 7.25% |
| PBGC interest rates | 2.32% for 20 years, 2.37% thereafter | 2.50% for 20 years, 2.85% thereafter |
| **Present Value of Vested Benefits:** | | |
| Present value of vested benefits at funding interest rate | $2,140,283,436 | $2,208,027,458 |
| Present value of vested benefits at PBGC rates, including allowance for expenses | 4,060,944,552 | 4,053,661,277 |
| Present value of vested benefits for withdrawal liability purposes | 3,189,341,325 | 3,204,474,373 |
| **Unfunded Vested Liability:** | | |
| Market value of assets | $2,218,072,665 | $2,188,548,038 |
| Unfunded vested liability for withdrawal liability purposes | 971,268,660 | 1,015,926,335 |
| **Withdrawal Liability Pools Established:** | | |
| Basic pool | $274,973,011 | $112,294,964 |
| Reallocated pool | 0 | 0 |

\* *Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

OOE-000111

## Section 2: Actuarial Valuation Results

### A. Determination of Withdrawal Liability

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) requires assessment of withdrawal liability on an employer that withdraws from the Plan. In general, "withdrawal" means the employer has permanently ceased operations under the Plan or has permanently ceased to have an obligation to contribute to the Plan.

An employer in the construction industry is considered to have withdrawn from the Plan only if it continues (or within five years resumes) the same type of work in the jurisdiction of the labor contract.

#### Determination of Unfunded Vested Liability

The amount of withdrawal liability is based on the Plan's unfunded vested liability at the time of withdrawal. The "unfunded vested liability" refers to the value of vested benefits not covered by assets.

For withdrawal liability purposes, "vested benefits" are the benefits that are considered non-forfeitable if the participant incurs a permanent break in service. The value of these benefits is based on the Plan provisions as of the same date.

Determinations of the value of the liability for vested benefits are based on a set of actuarial assumptions. The law prescribes that the assumptions and methods used must be reasonable in the aggregate and "offer the actuary's best estimate of anticipated experience under the plan." It also authorizes the PBGC to promulgate assumptions and methods for use by the Plan's actuary. However, the PBGC has not yet promulgated any assumptions or methods.

The actuarial assumptions and methods are reasonable (taking into account the experience of the Plan and reasonable expectations) and, in combination, represent the actuary's best estimate of anticipated experience under the Plan to determine the unfunded vested benefits for withdrawal liability purposes.

The interest rate is based on a blend, which includes rates selected based on estimated annuity purchase rates for benefits being settled, because withdrawal liability is a final settlement of an employer's obligations to the Plan. For benefits that could be settled immediately, because assets on hand are sufficient, the annuity purchase rates are those promulgated by PBGC under ERISA Sec. 4044 for multiemployer plans terminating by mass withdrawal on the measurement date. For benefits that cannot be settled immediately because they are not currently funded, the calculation uses rates equal to the interest rate used for plan funding calculations.



OOE-000112

## Allocation

The Plan's method of allocation is fully described in *Section 3, Exhibit A*. Briefly, the method involves prorating the unfunded vested liability as of July 31, 1980 plus (or minus) a proration of changes in that figure in each subsequent year before withdrawal. The original unfunded vested liability and each year's change are subject to 5% annual write-downs. This method is known as the "presumptive method" and is the method adopted by the Trustees.

Another amount is added to the total amount to be allocated for possible withdrawal liability, namely, the amounts not collected because of bankruptcy, deductibles subtracted from amounts actually assessed, or other limitations on withdrawal assessments specified by law. These uncollected or nonassessable amounts are reallocated among the employer accounts and are also subject to 5% annual write-downs.

The PBGC has affirmed that a multiemployer plan may assess withdrawal liability to employers that withdraw even if the plan currently has no unfunded vested liability.

## De minimis

Each withdrawal liability assessment is the total of the unamortized balances of the allocation amounts, as defined above, less a *de minimis* deductible. The deductible is $50,000 but not more than ¾% of the Plan's unfunded vested liability. This deductible amount is reduced, dollar for dollar, by the amount by which the total of charges prorated to the employer exceeds $100,000.

## Payment of Withdrawal Liability

The total amount of an employer's withdrawal liability is not ordinarily payable in a lump sum. The law sets forth a basis for calculating annual amounts, to be paid in quarterly installments unless the plan has fixed some other schedule, and there is a 20-year payment maximum. The payment schedule is more fully detailed in *Section 3, Exhibit A*.

Under certain circumstances, as allowed by ERISA, the Trustees may require immediate payment of withdrawal liability assessments.



OOE-000113

## B. Unfunded Vested Liability

The determination of the unfunded vested liability is based on the actuarial assumptions and methods and plan of benefits described in *Section 4* of this report.

### Changes Since Prior Year

The following assumption changes were made since last year's determination:

> PBGC interest rates changed from 2.32% for 20 years and 2.37% thereafter to 2.50% for 20 years and 2.85% thereafter.

> The healthy and disabled mortality rates were updated to the RP-2014 Blue Collar Mortality Tables (Healthy Annuitant tables for nondisabled pensioners, Employee tables for non-pensioners, and Disabled Retiree tables for disabled participants) with rates increased by 10%, projected on a generational basis using scale MP-2016.

   The mortality assumption changes were effective August 1, 2016 for funding purposes and July 31, 2016 for withdrawal liability purposes.

OOE-000114

## Basic Pools

The Plan's unfunded vested liability for withdrawal liability purposes for each of the past 20 plan years is detailed below.

The chargeable change amount is determined as the unfunded vested liability for a given year less the greater of the sum of the previous unamortized balances or zero. The unamortized balance of each chargeable change is equal to the initial amount with a 5% write-down each year since the establishment of said amount.

### BASIC POOLS AS OF JULY 31, 2016

| Plan Year Ended July 31 | Unfunded Vested Liability | Chargeable Change | Unamortized Balance of Chargeable Change |
|---|---|---|---|
| 1997 | $0 | $0 | $0 |
| 1998 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 260,824,491 | 91,288,572 |
| 2004 | 220,610,306 | (27,172,960) | (10,869,184) |
| 2005 | 330,847,750 | 121,920,020 | 54,864,009 |
| 2006 | 161,030,169 | (152,039,003) | (76,019,502) |
| 2007 | 184,389,447 | 33,535,905 | 18,444,748 |
| 2008 | 310,769,562 | 138,233,538 | 82,940,123 |
| 2009 | 649,013,065 | 357,008,602 | 232,055,591 |
| 2010 | 654,635,635 | 42,238,100 | 29,566,670 |
| 2011 | 786,046,373 | 170,138,172 | 127,603,629 |
| 2012 | 1,006,694,115 | 267,882,086 | 214,305,669 |
| 2013 | 955,200,521 | 9,134,851 | 7,764,623 |
| 2014 | 750,184,287 | (143,931,041) | (129,537,937) |
| 2015 | 971,268,660 | 274,973,011 | 261,224,360 |
| 2016 | 1,015,926,335 | 112,294,964 | 112,294,964 |
| **Total** | | | $1,015,926,335 |

OOE-000115

## Reallocated Amounts

Withdrawing employers are charged with prorated shares of the "nonassessable" or "uncollectible" liabilities that are reallocated. Reallocation is more fully described in *Section 3, Exhibit A*.

Each annual reallocated amount is written down by 5% of the original amount for each full year from the date that it was originally determined to the end of the plan year preceding withdrawal.

We are unaware that any new reallocated liabilities arose since the prior year. The reallocated pools are shown in the chart below.

### REALLOCATED POOLS AS OF JULY 31, 2016*

| Plan Year Ended July 31 | Initial Value | Unamortized Balance |
|---|---|---|
| 2014 | $7,614 | $6,853 |
| Total | $7,614 | $6,853 |

\* *No reallocated pools were established for years not shown.*

OOE-000116

## C. Withdrawal Liability Experience

We have been notified of two employers withdrawing from the fund during the last Plan year. A settlement payment was received after the end of the current Plan year for a previously withdrawn employer, and the adjustment in the settlement amount will be recognized in a reallocated pool in the next valuation.

For the last Plan year, the Fund received $127,902 from withdrawal liability assessments. These serve to fund the Plan in the same manner as employer contributions. Currently, four withdrawn employers are making withdrawal liability payments.

An employer is entitled to be advised, upon its request, of the amount of its potential withdrawal liability.

OOE-000117

# Section 3: Supplementary Information

## EXHIBIT A - METHOD FOR ALLOCATING WITHDRAWAL LIABILITY

The Plan determines the liability of an employer that has completely withdrawn on the basis of the statutory presumptive method defined in Section 4211(b) of ERISA.

The liability of an employer for complete withdrawal from the Plan is determined as the sum of the unamortized balances, as of the end of the Plan Year preceding withdrawal, of the employer's prorated shares of each of the following:

> the Plan's unfunded vested liability as of July 31, 1980;

> the change in the Plan's unfunded vested liability as of the end of each subsequent Plan year (to the end of the Plan year preceding withdrawal); and

> reallocated amounts that would have been payable to the Plan as withdrawal liability payments for withdrawals in preceding years, except that they were nonassessable under certain statutory provisions or not collectible.

### Unamortized Balances

The "unamortized balance" of each of these sources of liability assessment is determined by reducing each figure by 5% of its original amount for each full year from the end of the Plan Year as of which the charge was originally determined to the end of the Plan Year immediately preceding withdrawal.

### Initial Amount

The Plan's unfunded vested liability as of July 31, 1980 was determined by subtracting the market value of Plan assets from the value of vested benefits under the Plan.

OOE-000118

## Annual Changes

The change in the Plan's unfunded vested liability as of the end of any Plan year is generally determined as follows:

> by establishing the Plan's unfunded vested liability as of the end of that Plan year, and

> by subtracting the total, not less than zero, of (a) the unamortized balance of the unfunded vested liability as of July 31, 1980 and (b) the unamortized balances of each previous annual change after July 31, 1980.

A "positive" change represents an unfunded vested liability greater than the total of the unamortized balances and is an addition to potential liability assessments for future withdrawals. A "negative" change represents an unfunded vested liability lower than the total of unamortized balances and is a credit against amounts that would otherwise determine potential liability assessments for future withdrawals.

## Reallocated Amounts

The total amount, if any, of unfunded vested liability determined in any Plan year after July 31, 1980 to be nonassessable or uncollectible with respect to employers that withdrew is established as an amount to be prorated among each of the participating employers as an additional withdrawal liability amount. Nonassessable amounts consist of amounts deducted under the *de minimis* rule (ERISA Section 4209), amounts not payable because of the 20-year limit (ERISA Section 4219(c)(1)), and amounts not payable because of the limitations in the event of sale of all of the employer's assets (ERISA Section 4225). Uncollectible amounts consist of amounts that the Trustees have determined are uncollectible for reasons arising out of cases under federal bankruptcy law or similar proceedings. They also include any other amount of assessed liability determined by the Plan's Trustees to be uncollectible.

Each annual amount of reallocable nonassessables and uncollectibles is written down by 5% of the original amount for each full year from the date as of which it was originally determined to the end of the Plan year preceding withdrawal.

 Segal Consulting  15

OOE-000119

## Proration to the Employer

For determining the amount of its liability in the event of its complete withdrawal, the initial amount of unfunded vested liability, each annual change in the unfunded vested liability and each annual reallocable amount of nonassessable and uncollectible amounts is prorated to an employer on the basis of a ratio of contributions. The ratio is the employer's obligated contributions to the Plan to total employer contributions made to the Plan during an "apportionment base period," consisting of the five years ending with the end of the Plan year as of which each of the amounts was determined.

The total of employer contributions with respect to an apportionment base period is reduced by any contributions otherwise included in the total that were made by a significant employer that withdrew from the Plan in or before the plan year in which the change or reallocation arose. The total is also reduced by any employer surcharges paid to a plan that resulted from the plan being in critical status under PPA '06. MPRA provides that contribution increases that go into effect after July 31, 2015 pursuant to a Funding Improvement or a Rehabilitation Plan are also disregarded.

## Payment of Withdrawal Liability

A withdrawn employer's withdrawal liability assessment is payable in quarterly installments. The quarterly installment is calculated as one-fourth of the product of:

> The average base units in the three consecutive years that produce the highest average within the 10-year period ending before the plan year of withdrawal, and

> the highest contribution rate in the 10-year period ending with the plan year of withdrawal.

Per MPRA, any contribution surcharges accruing on or after December 31, 2014 or any increases in the contribution rate required under a Funding Improvement or a Rehabilitation Plan that go into effect after July 31, 2015 are excluded from the determination of the highest rate in the 10-year period described above.

The number of quarterly installments is calculated on the basis of the amount of withdrawal liability and interest at the actuarial valuation rate used for funding purposes. Payments are limited to a maximum of 20 years.

 Segal Consulting  16

OOE-000120

## Maintenance of Allocations

Even if no employer withdrawal had occurred, an annual determination of the Plan's unfunded vested liability, and of any reallocable uncollectible withdrawal liability amounts, is required. The Plan must be in a position to allocate liability to any particular employer based on its contribution history. These procedures and records are necessary in order to be able to determine an assessment should withdrawal occur and also to respond to an inquiry from a participating employer as to the amount of its potential liability.

## Partial Withdrawal

The withdrawal may also be partial. A "partial withdrawal" occurs if there is a 70% decline in the number of contribution base units or there is a partial cessation of the employer's obligation to contribute. A 70% decline occurs if the contribution base units in the plan year and the preceding two plan years (the testing period) are less than 30% of contribution base units for the high base year. The "high base year" is the average of the base units in the two plan years in which the base units were the highest within the five plan years preceding the testing period. A partial withdrawal may also occur if an employer ceases to have an obligation to contribute under one or more, but not all of its collective bargaining agreements, and continues work in the jurisdiction, or if the employer permanently ceases to be obligated to contribute for work performed at one or more, but not all, of the facilities covered but continues the work at that facility.

For a construction-industry plan, a partial withdrawal occurs only if the employer is obligated to contribute to the plan for only an insubstantial portion of its continuing work of the type covered by the plan within the jurisdiction of the labor agreement.

Under a partial withdrawal, the amount of liability is equal to the amount of withdrawal liability for a complete withdrawal (net of any deductible), multiplied by a fraction, which is one minus a ratio. The ratio is that of the employer's contributory hours in the plan year following the year of the partial withdrawal to the employer's average contributory hours in the five plan years preceding the year of the partial withdrawal.

## Plan Reentry

PBGC has issued regulations describing the procedure to be followed in the event an employer reenters the Plan after incurring withdrawal liability. Withdrawal liability will be abated if the post-reentry level of contributory hours exceeds 30% of the average of the contributory hours in the two plan years in which the hours were the highest within the five plan years preceding the plan year of withdrawal, provided the employer posts a bond or escrow account equal to 70% of the withdrawal liability payments otherwise due. In the event of a withdrawal following reentry, the withdrawal liability is adjusted to reflect prior withdrawal liability payments.

Section 3: Supplementary Information as of July 31, 2016 for the Ohio Operating Engineers Pension Fund

 Segal Consulting   17

OOE-000121

## EXHIBIT B - EMPLOYER WITHDRAWAL LIABILITY WORKSHEET FOR WITHDRAWALS FROM AUGUST 1, 2016 THROUGH JULY 31, 2017

**Employer Name:**

| Year Ended July 31[1] | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ending With Date Pool Established | | Liability Allocated: [(5) ÷ (4)] x [(2) + (3)] |
|---|---|---|---|---|---|
| | Basic Pools[2] | Reallocated Pools[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $91,288,572 | $0 | $178,834,875 | | |
| 2004 | (10,869,184) | 0 | 183,435,933 | | |
| 2005 | 54,864,009 | 0 | 184,525,945 | | |
| 2006 | (76,019,502) | 0 | 187,236,038 | | |
| 2007 | 18,444,748 | 0 | 192,258,544 | | |
| 2008 | 82,940,123 | 0 | 202,969,173 | | |
| 2009 | 232,055,591 | 0 | 210,884,752 | | |
| 2010 | 29,566,670 | 0 | 218,622,244 | | |
| 2011 | 127,603,629 | 0 | 230,778,340 | | |
| 2012 | 214,305,669 | 0 | 250,306,333 | | |
| 2013 | 7,764,623 | 0 | 269,018,918 | | |
| 2014 | (129,537,937) | 6,853 | 298,703,055 | | |
| 2015 | 261,224,360 | 0 | 331,169,312 | | |
| 2016 | 112,294,964 | 0 | 360,524,316 | | |

A. Gross liability: (Sum of Column 6)

B. *De minimis* — 50,000

C. Deductible: $100,000 + (B) – (A), but not greater than (B) nor less than zero

D. Allocable Unfunded Vested Liability: (A) – (C), not less than zero and without regard to annual payment limitations[6]

1   Years not shown have no withdrawal liability component.
2   Original value of changes in unfunded vested liability, written down 5% per year.
3   Original value of nonassessable and uncollectible withdrawal liability, written down 5% per year.
4   Total Fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.
5   Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.
6   Prior to reflecting impact of partial withdrawal or sale of assets, if applicable.

OOE-000122

# Section 4: Actuarial Certification

January 31, 2017

## ACTUARIAL CERTIFICATION OF WITHDRAWAL LIABILITY

This is to certify that Segal Consulting, a Member of The Segal Group, Inc., has prepared an Actuarial Valuation to calculate the pools used to assess withdrawal liability to employers who withdraw during the year beginning August 1, 2016. The calculations were performed in accordance with generally accepted actuarial principles and practices. This valuation report may not otherwise be copied or reproduced in any form without the consent of the Board of Trustees and may only be provided to other parties in its entirety.

The valuation was based on information supplied by the auditor with respect to contributions and assets and by the Plan Administrator with respect to the data required on participants. We have not verified and customarily would not verify such information, but we have no reason to doubt its substantial accuracy.

I am a member of the American Academy of Actuaries and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion herein. To the best of my knowledge, the information supplied in this Actuarial Valuation is complete and accurate, and in my opinion the assumptions used, in the aggregate, (a) are reasonable (taking into account the experience of the Plan and reasonable expectations) and (b) represent my best estimate of anticipated experience under the Plan.


Daniel V. Ciner, MAAA
Senior Vice President and Actuary
Enrolled Actuary No. 14-05773

OOE-000123

## EXHIBIT 1 - CALCULATION OF UNFUNDED VESTED LIABILITY

The valuation was made with respect to the following data supplied to us by the Plan Administrator:

| | |
|---|---|
| Pensioners as of the valuation date (including 1,888 beneficiaries)* | 7,063 |
| Participants inactive with vested rights | 1,424 |
| Participants active with vested rights | 5,281 |
| Total participants | 13,768 |

The actuarial factors as of the valuation date are as follows:

| | |
|---|---|
| Present value of vested benefits at funding interest rate | $2,208,027,458 |
| Present value of vested benefits at PBGC interest rates, including allowance for expenses | 4,053,661,277 |
| Market value of assets | 2,188,548,038 |
| Ratio funded at PBGC interest rates | 0.539894 |
| Present value of vested benefits for withdrawal liability purposes | 3,204,474,373 |
| Unfunded vested liability | 1,015,926,335 |

*Excluding alternate payees entitled to benefits under a Qualified Domestic Relations Order.*

OOE-000124

## EXHIBIT 2 - WITHDRAWAL LIABILITY POOLS

| Pool Established July 31 | Original Amount | | Pool Balance on July 31, 2016[1] | | |
|---|---|---|---|---|---|
| | Basic Pool | Reallocated Pool | Basic Pool | Reallocated Pool | Total Pools |
| 1997 | $0 | $0 | $0 | $0 | $0 |
| 1998 | 0 | 0 | 0 | 0 | 0 |
| 1999 | 0 | 0 | 0 | 0 | 0 |
| 2000 | 0 | 0 | 0 | 0 | 0 |
| 2001 | 0 | 0 | 0 | 0 | 0 |
| 2002 | 0 | 0 | 0 | 0 | 0 |
| 2003 | 260,824,491 | 0 | 91,288,572 | 0 | 91,288,572 |
| 2004 | (27,172,960) | 0 | (10,869,184) | 0 | (10,869,184) |
| 2005 | 121,920,020 | 0 | 54,864,009 | 0 | 54,864,009 |
| 2006 | (152,039,003) | 0 | (76,019,502) | 0 | (76,019,502) |
| 2007 | 33,535,905 | 0 | 18,444,748 | 0 | 18,444,748 |
| 2008 | 138,233,538 | 0 | 82,940,123 | 0 | 82,940,123 |
| 2009 | 357,008,602 | 0 | 232,055,591 | 0 | 232,055,591 |
| 2010 | 42,238,100 | 0 | 29,566,670 | 0 | 29,566,670 |
| 2011 | 170,138,172 | 0 | 127,603,629 | 0 | 127,603,629 |
| 2012 | 267,882,086 | 0 | 214,305,669 | 0 | 214,305,669 |
| 2013 | 9,134,851 | 0 | 7,764,623 | 0 | 7,764,623 |
| 2014 | (143,931,041) | 7,614 | (129,537,937) | 6,853 | (129,531,084) |
| 2015 | 274,973,011 | 0 | 261,224,360 | 0 | 261,224,360 |
| 2016 | 112,294,964 | 0 | 112,294,964 | 0 | 112,294,964 |

[1] Basic and reallocated pools are written down annually at the rate of 5% of the original amount.

OOE-000125

## EXHIBIT 3 - SUMMARY OF PLAN PROVISIONS

This exhibit summarizes the major provisions of the Plan included in the valuation. It is not intended to be, nor should it be interpreted as, a complete statement of all plan provisions.

| Plan Year | August 1 through July 31 |
|---|---|
| Pension Credit Year | June 1 through May 31 |
| Plan Status | Ongoing plan |
| Normal Pension | • *Age Requirement:* 65<br>• *Service Requirement:* None<br>• *Amount:* Sum of the following:<br>  • $20.00 for each year of past service, plus<br>  • 3.8% of contributions paid on employee's behalf through April 30, 2006, plus<br>  • 3.3% of contributions (excluding supplemental contributions) paid on employee's behalf from May 1, 2006 through July 31, 2009, plus<br>  • 1.75% of contributions (excluding supplemental contributions) paid on employee's behalf from August 1, 2009 through July 31, 2012, plus<br>  • 1.9% of contributions (excluding supplemental contributions) paid on employee's behalf on and after August 1, 2012. |
| Early Retirement | • *Age Requirement:* 57<br>• *Service Requirement:* Ten years of credited service<br>• *Amount:* Normal pension accrued reduced by 0.5% for each month of age less than 62<br>Or<br>• *Service Requirement:* 30 years of credited service, including at least 300 hours of service in each of the 30 years<br>• *Amount:* Normal pension accrued reduced by 0.625% for each month of age less than 61 |
| Vesting | • *Age Requirement:* None<br>• *Service Requirement:* Five years of credited service.<br>• *Amount:* Normal or early pension accrued based on plan in effect when last active<br>• *Normal Retirement Age:* 65 |

OOE-000126

| | |
|---|---|
| **Qualified Pre-Retirement Survivor Benefit:** | • *Age Requirement:* None<br>• *Service Requirement:* Five years of credited service<br>• *Amount:* 50% of the benefit participant would have received had he or she retired the day before he or she died and elected the joint and survivor option. If the participant died prior to eligibility for an early retirement pension, the spouse's benefit is deferred to the date participant would have been age 57 or, for participants with less than 10 years of credited service, age 62. |
| **Forms of Benefits** | • *The normal forms of payment are:*<br>  • Qualified Joint and Survivor Annuity, which under the Plan is a 50% joint-and-survivor annuity with a "pop-up" feature, for married participants<br>  • Single Life Annuity with five years certain for single participants<br>• *The generally available optional forms of payment are:*<br>  • 66-2/3% Joint and Survivor Option (no longer available to new retirees as of August 1, 2009)<br>  • 75% Joint and Survivor Option (only available to married participants)<br>  • 100% Joint and Survivor Option (only available to married participants) |
| **Participation** | • Members who are employed by Employers and who are covered by a collective bargaining agreement with the Pension Fund |
| **Service Credit** | • *Past Service Credit:* One year of past service for each full year of continuous service prior to June 1, 1964<br>• *Future Service Credit:*<br>For the period between June 1, 1964 and July 31, 1976: |

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 599 | ¼ |
| 600 - 899 | ½ |
| 900 - 1,199 | ¾ |
| 1,200 and over | 1 |

OOE-000127

For the period on and after August 1, 1976:

| Hours | Years of Credit |
|---|---|
| Under 300 | 0 |
| 300 - 499 | ¼ |
| 500 - 749 | ½ |
| 750 - 999 | ¾ |
| 1,000 and over | 1 |

| | |
|---|---|
| **Contribution Rate** | $6.00 per hour, effective May 1, 2013 ($3.00 per hour supplemental and not subject to benefit accrual) |
| **Changes in Plan Provisions** | There were no changes in plan provisions reflected in this actuarial valuation |

OOE-000128

## EXHIBIT 4 - ACTUARIAL ASSUMPTIONS AND METHODS

**Investment Return**

To the extent the vested benefits are matched by the market value of plan assets on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R. Ch. XL, Part 4044, which are in effect for the applicable withdrawal liability valuation date, are used.

PBGC Interest Rates as of July 31, 2016:

| | |
|---|---|
| First 20 years | 2.50% |
| After 20 years | 2.85% |

To the extent the vested benefits are not matched by plan assets (at market), the interest assumption is the same as used for plan funding: 7.25%

The portion of the vested benefits that is matched by readily available assets is determined by comparing the total present value of vested benefits plus expenses – at PBGC rates – with the total market value of assets; each vested benefit is treated as covered by assets to the same extent as all other vested benefits.

The discount rate is based on a blend, which includes rates selected based on estimated annuity purchase rates for benefits being settled, because withdrawal liability is a final settlement of an employer's obligations to the Plan. For benefits that could be settled immediately, because assets on hand are sufficient, the annuity purchase rates are those promulgated by PBGC under ERISA Sec. 4044 for multiemployer plans terminating by mass withdrawal on the measurement date. For benefits that cannot be settled immediately because they are not currently funded, the calculation uses rates equal to the discount rate used for plan funding calculations.

**Mortality Rates**

Healthy Non-Annuitants: RP-2014 Blue Collar Employee Mortality Tables (sex distinct) with rates increased by 10%, projected on a generational basis using scale MP-2016.

Healthy Annuitants: RP-2014 Blue Collar Healthy Annuitant Mortality Tables (sex distinct) with rates increased by 10%, projected on a generational basis using scale MP-2016.

Disabled Participants: RP-2014 Disabled Retiree Tables (sex distinct) with rates increased by 10%, projected on a generational basis using scale MP-2016.

The underlying tables with the generational projection to the ages of participants as of the measurement date reasonably reflect the mortality experience of the Plan as of the measurement date.

The healthy and disabled mortality tables were then adjusted to future years using the generational projection under Scale MP-2016 to anticipate future mortality improvement.

The mortality rates were based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. As part of the analysis, a comparison was made between the actual number of deaths and liability change due to deaths and the projected number and liability change based on the prior years' assumption over the most recent five years, taking into consideration the results of Segal's industry mortality study.

OOE-000129

**Retirement Rates**

| Age | Annual Retirement Rates |
|---|---|
| 57 | 10% |
| 58 | 9% |
| 59 | 7% |
| 60 - 61 | 10% |
| 62 | 60% |
| 63 | 40% |
| 64 | 30% |
| 65 | 60% |
| 66 | 40% |
| 67 | 100% |

In addition, upon reaching age 61 and earning 30 years of credited service, the assumed retirement rate at each age is the greater of 60% or the applicable rate from the above schedule.

The retirement rates were based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment. As part of the analysis, a comparison was made between the actual number of retirements and liability change due to retirements and the projected number and liability change based on the prior years' assumption over the most recent five years.

**Retirement Age for Inactive Vested Participants**

62, if eligible for early retirement, otherwise Normal Retirement Age

The assumed retirement age for inactive vested participants was based on historical and current demographic data, adjusted to reflect estimated future experience and professional judgment.  As part of the analysis, a comparison was made between the actual number of retirements and the projected number based on the prior year's assumption over the most recent five years.

**Unknown Data for Participants**

Same as those exhibited by participants with similar known characteristics. If not specified, participants are assumed to be male.

**Percent Married**

85% of male participants and 50% of female participants.

**Age and Sex of Spouse**

Spouses of male participants are assumed to be three years younger than the participants and spouses of female participants are assumed to be three years older than the participants. If not specified, spouses are assumed to be of the participants' opposite sex.

OOE-000130

| | |
|---|---|
| **Benefit Election** | Married participants are assumed to elect the more valuable of the 50% joint-and-survivor annuity with "pop-up" form of payment and the single life annuity with five years certain. Non-married participants are assumed to elect the single life annuity with five years certain. |
| | The assumed benefit elections were based on historical and current demographic data, adjusted to reflect the plan design, estimated future experience and professional judgment. As part of the analysis, a comparison was made between the assumed and the actual option election patterns over the most recent five years. |
| **Delayed Retirement Factors** | Active participants assumed to work enough hours each month to not qualify for delayed retirement adjustment. Inactive vested participants who are assumed to commence receipt of benefits after attaining normal retirement age qualify for delayed retirement increases. |
| **Annual Administrative Expenses** | $10,000, plus $200 per vested participant, plus a percentage (defined by statute) of the excess of the value of plan benefits over $200,000, and is applicable to the portion of benefits that is matched by assets. |
| **Valuation of Assets** | At market value |
| **Allocation Method** | Presumptive |
| **Contribution Period for Prorating Liabilities** | 5 years |
| **De minimis Deductible** | $50,000, or 3/4 of 1% of the unfunded vested liability, if smaller. The deductible is reduced, dollar for dollar, if the gross assessment is in excess of $100,000 |
| **Justification for Change in Actuarial Assumptions** | Based on past experience and future expectations, the following actuarial assumptions were changed as of August 1, 2016 for funding purposes and July 31, 2016 for withdrawal liability purposes: |
| | Mortality for healthy lives, previously RP-2000 Combined Healthy Blue Collar Mortality Table, projected generationally with Scale AA. |
| | Mortality for disabled lives, previously RP-2000 Disabled Retiree Mortality Table, with ages set back two years. |

5640814v2/05517.001

OOE-000131




EXHIBIT
Date 10·26·2018



# OHIO OPERATING ENGINEERS
## FRINGE BENEFIT PROGRAMS

1180 Dublin Road
PO Box 12009
Columbus OH 43212-0009
614.488.0708

Carol A. Wilson
Administrator

August 31, 2017

**MAILED VIA REGULAR & CERTIFIED U.S. MAIL**

SOFCO ERECTORS INC
10360 WAYNE AVE
CINCINNATI OH 45215-1129

Re:   Partial and Complete Withdrawal Liability
      Demand for Payment

To Whom It May Concern:

The Ohio Operating Engineers Pension Plan ('Plan') was recently informed that the collective bargaining agreement between the Ohio Operating Engineers Local 18 and Sofco Erectors, Inc. (hereinafter referred to as "Sofco") was terminated. After receiving this notice, the Plan performed a calculation of Sofco's complete withdrawal liability. This calculation was prepared by the Plan's actuary, and is based upon a complete withdrawal from the Pension Plan during the Plan year ending July 31, 2017. According to this calculation, Sofco's complete withdrawal liability is **$368,315. (Please see attached copy of the actuary's August 29, 2017 letter and calculation).**

Additionally, the Actuary also noticed more than a 70% reduction in contribution hours reported by Sofco for the three year period of 2011-2013. This decline in hours constitutes a partial withdrawal by Sofco from the collective bargaining agreement during this period. As a result, the Plan's actuary also performed partial withdrawal liability calculations. **(Please see aforementioned letter and calculation).** Although there is no partial withdrawal liability for the Plan year ending July 31, 2013, these calculations revealed the following:

- For the Plan year ending July 31, 2011, partial withdrawal liability in the amount of $344,627;

- For the Plan year ending July 31, 2012, partial withdrawal liability in the amount of $111,358.

Based on all calculations performed by the Plan's actuary, the Plan hereby requests and demands that Sofco pays the following amounts:

- Complete withdrawal liability for the Plan year ending July 31, 2017 in the amount of $368,315 which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721;

HEALTH AND WELFARE PLAN  •  PENSION FUND  •  APPRENTICESHIP FUND  •  EDUCATION AND SAFETY FUND

- Partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627 which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327;

- Partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358 which can be paid in six quarterly payments of $17,294 and a final payment of $10,652.

The Plan also requests and demands that Sofco remits its payments (with a separate check for each calculation) under these payment plans by no later than October 30, 2017. A quarterly or lump sum payment should be made payable to:  The Ohio Operating Engineering Pension Plan, Attn: Samantha Polsinelli, 1180 Dublin Rd., P.O. Box 12009, Columbus, Ohio 43212.

Sincerely,

Bryan C. Barch, Esq.
In-House Counsel


**Segal Consulting**
101 North Wacker Drive Suite 500 Chicago, IL 60606-1724
T 312.984.8619 www.segalco.com

Daniel V. Ciner, MAAA, EA
Senior Vice President and Actuary
dciner@segalco.com

August 29, 2017

*VIA E-MAIL*

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
1180 Dublin Road
Columbus, Ohio 43212

Re:   **Ohio Operating Engineers Pension Fund – Partial and Complete Withdrawal Liability
      Calculations for Sofco Erectors, Inc.**

Dear Ms. Polsinelli:

As requested, we have updated the withdrawal liability calculation for Sofco Erectors, Inc. assuming three
partial withdrawals in the Plan years ended July 31 of 2011, 2012, and 2013, respectively, and a complete
withdrawal in the Plan year ended July 31, 2017. As described below, we look to Fund Counsel regarding
interpretations as to assessment of withdrawal liability for construction industry employers.

> ➤ For the Plan year ended July 31, 2011, the calculated amount of partial withdrawal liability is
>   $344,627, which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327.
> ➤ For the Plan year ended July 31, 2012, the calculated amount of partial withdrawal liability is
>   $111,358 (after application of the credit for the prior partial withdrawal as of July 31, 2011), which
>   can be paid in six quarterly payments of $17,294 and a final payment of $10,652.
> ➤ For the Plan year ended July 31, 2013, the calculated amount of partial withdrawal liability is $0
>   (after application of the credit for the prior partial withdrawals as of July 31, 2011 and 2012).
> ➤ For the Plan year ended July 31, 2017, the calculated amount of complete withdrawal liability is
>   $368,315 (after application of the credit for the prior partial withdrawals as of July 31, 2011, 2012,
>   and 2013), which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721.

The above withdrawal liability calculations are based on the asset values and liabilities stated in the
July 31, 2008, 2009, 2010, and 2016 withdrawal liability reports, respectively. In addition, they are based
on the contribution information provided in your e-mails dated May 1, 2017 and May 9, 2017, including
maximum hourly contribution rates of $4.00, $4.50, and $6.00 for the 10-year periods ended July 31,
2009, 2010, and 2017, respectively.

Under Section 4205(b)(1) of ERISA, a partial withdrawal occurs when contribution hours in each of three
consecutive years (the "three-year testing period") are at least 70% less than the average of the two
highest years of contribution hours during the five years preceding the three-year testing period. Based on
the information you provided us, Sofco Erectors, Inc. incurred three consecutive 70% declines for the
three-year testing periods that ended in 2011, 2012, and 2013.

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
August 29, 2017
Page 2

Under Section 4208(d)(1) of ERISA, for construction industry employers in construction industry plans, partial withdrawal liability is assessable when work continues for an insubstantial portion of the employer's work in the jurisdiction of the collective bargaining agreement. The calculations included in this letter assume that this employer will be assessed partial withdrawal liability for each partial withdrawal. We defer to Fund Counsel's interpretation as to whether partial withdrawal liability is assessable to this employer.

Under Section 4206 of ERISA, partial withdrawal liability based on a 70% decline in contribution hours is calculated as a fraction of the amount that would be payable if there were a complete withdrawal by this employer on the last day of the first Plan year in the three-year testing period (i.e., in 2009, 2010, and 2011 for the 2011, 2012, and 2013 partial withdrawals, respectively). This fraction equals the ratio of the employer's contribution hours for the Plan year following the end of the three-year testing period to the average contribution hours during the five years preceding the first year of the three-year testing period.

Under Section 4206 of ERISA, any withdrawal liability (either complete or partial) for an employer is reduced by the amount of any partial withdrawal liability of the employer with respect to the Plan for a previous year. We have determined the amount of credit for the prior partial withdrawals, and have offset the partial withdrawal liability for the Plan years ended July 31, 2012 and July 31, 2013, as well as the complete withdrawal liability as of July 31, 2017, by the respective credit amounts.

We have enclosed exhibits showing the details of our calculations as follows:
For the July 31, 2011 partial withdrawal:

Exhibit A – Determination of Partial Withdrawal

Exhibit B – Calculation of the Allocable Amount of Unfunded Vested Benefits

Exhibit C – Determination of Withdrawal Liability

Exhibit D – Determination of Payment Schedule under ERISA Section 4219

Exhibit E – Basis for Determining Withdrawal Liability

For the July 31, 2012 partial withdrawal:

Exhibit F – Determination of Partial Withdrawal

Exhibit G – Calculation of the Allocable Amount of Unfunded Vested Benefits

Exhibit H – Development of Credit for Prior (July 31, 2011) Partial Withdrawal

Exhibit I – Determination of Withdrawal Liability

Exhibit J – Determination of Payment Schedule under ERISA Section 4219

Exhibit K – Basis for Determining Withdrawal Liability

For the July 31, 2013 partial withdrawal:

Exhibit L – Determination of Partial Withdrawal

Exhibit M – Calculation of the Allocable Amount of Unfunded Vested Benefits

Exhibit N – Development of Credit for Prior (July 31, 2011 and July 31, 2012) Partial Withdrawals

Exhibit O – Determination of Withdrawal Liability

Exhibit P – Basis for Determining Withdrawal Liability

✲ Segal Consulting

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
August 29, 2017
Page 3

For the July 31, 2017 complete withdrawal:

Exhibit Q – Calculation of the Allocable Amount of Unfunded Vested Benefits

Exhibit R – Development of Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals

Exhibit S – Determination of Withdrawal Liability

Exhibit T – Determination of Payment Schedule under ERISA Section 4219

Exhibit U – Basis for Determining Withdrawal Liability

As with all withdrawals, the assessment of withdrawal liability is subject to Fund Counsel review. Please let us know if you have any questions.

Sincerely,

Daniel V. Ciner
Enclosures

cc:  Ms. Carol Wilson (w/enclosures)
     Ms. Megan Kelly (w/enclosures)

5685716v1/05517.008

EXHIBIT A

## Ohio Operating Engineers Pension Fund

## DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2011

Employer Name:  **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                          07/31/2011

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | 12,253.50 | 13% |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |
| 2004 | 10,862.00 | | |

*A partial withdrawal has occurred as of July 31, 2011.*

✶ Segal Consulting

EXHIBIT B

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2009

Employer
Name:                     Sofco Erectors, Inc.

| Year Ended[1] July 31 | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) |
| | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $195,618,368 | $0 | $178,834,875 | $291,244 | $318,577 |
| 2004 | (21,738,368) | 0 | 183,435,933 | 275,279 | (32,622) |
| 2005 | 103,632,017 | 0 | 184,525,945 | 211,259 | 118,646 |
| 2006 | (136,835,103) | 0 | 187,236,038 | 189,279 | (138,328) |
| 2007 | 31,859,110 | 0 | 192,258,544 | 180,029 | 29,833 |
| 2008 | 138,233,538 | 0 | 202,969,173 | 187,255 | 127,531 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)                     $423,637

[1] *Years not shown have no withdrawal liability components.*

[2] *Original value of the changes in the unfunded vested benefits, written down 5% per year.*

[3] *Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.*

[4] *Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.*

[5] *Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.*

✶ Segal Consulting

EXHIBIT C

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $423,637 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) -- (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $423,637 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2003 – 07/31/2008 | 58,229.50 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 11,645.90 |
| F. | Contribution Hours 08/01/2011 - 07/31/2012 | 2,172.00 |
| G. | Partial Withdrawal Liability Factor: 1 – [(F) ÷ (E)] | 81.349660% |
| H. | Withdrawal Liability: (C) x (G) | $344,627 |

Segal Consulting

EXHIBIT D

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2011

Employer Name:                    Sofco Erectors, Inc.

(1)  Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 1999 | 18,877.50 | N/A |
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | 24,877.83 |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |

(2)  Average Base Units for highest 3 consecutive years during 10 years ended July 31, 2008        24,877.83

(3)  Highest contribution rate during 10 years ending July 31, 2009        $4.00

(4)  Partial withdrawal liability fraction (see Exhibit C, Item G)        81.349660%

(5)  Annual payment = (2) x (3) x (4) [rounded up to the nearest $4]        $80,956

(6)  Quarterly payment = (5) / 4        $20,239

(7)  Number of Full Years of Payment        4

(8)  Remaining Balance After 4 Years        $69,044

(9)  Number of Full Quarterly Payments in Year 5:        3

(10)  Amount of Remaining Payment = (8) - (6) x (9)        $8,327

✦ Segal Consulting

EXHIBIT E

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2008.

3. All assumptions per the July 31, 2008 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2008.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any application of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✳ Segal Consulting

EXHIBIT F

Ohio Operating Engineers Pension Fund

DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2012

Employer Name:     **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                    07/31/2012

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |

*A partial withdrawal has occurred as of July 31, 2012.*

✶ Segal Consulting

EXHIBIT G

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2010

Employer Name:        Sofco Erectors, Inc.

| Year Ended[1] July 31 | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) |
| | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $182,577,144 | $0 | $178,834,875 | $291,244 | $297,339 |
| 2004 | (20,379,720) | 0 | 183,435,933 | 275,279 | (30,583) |
| 2005 | 97,536,016 | 0 | 184,525,945 | 211,259 | 111,666 |
| 2006 | (129,233,153) | 0 | 187,236,038 | 189,279 | (130,643) |
| 2007 | 30,182,315 | 0 | 192,258,544 | 180,029 | 28,262 |
| 2008 | 131,321,861 | 0 | 202,969,173 | 187,255 | 121,155 |
| 2009 | 357,008,602 | 0 | 210,884,752 | 161,099 | 272,726 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)          $669,922

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✳ Segal Consulting

EXHIBIT H

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWAL
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal.......................... | $ | 397,196 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal....................... | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal............................. | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal....................................................................................... | $ | 423,637 |
| E: | Credit for prior partial withdrawal [ A x B x C / (D x B )]................................................... | $ | 323,117 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✴ Segal Consulting

EXHIBIT I

Ohio Operating Engineers Pension Fund

## DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $669,922 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1)   Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2)   Reduction: $100,000 + (B)(1) – (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $669,922 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2004 – 07/31/2009 | 48,975.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 9,795.00 |
| F. | Contribution Hours 08/1/2012 - 07/31/2013 | 3,442.50 |
| G. | Partial Withdrawal Liability Factor: 1 – [(F) ÷ (E)] | 64.854518% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | $ 434,475 |
| I. | Credit for Prior (July 31, 2011) Partial Withdrawal | $323,117 |
| J. | Withdrawal Liability: (H) – (I), but not less than zero | $111,358 |

✕ Segal Consulting

EXHIBIT J

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

Employer Name:                    Sofco Erectors, Inc.

(1)  Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | N/A |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |
| 2009 | 1,607.50 | 8,213.00 |

(2)  Average Base Units for highest 3 consecutive years             23,702.50
     during 10 years ended July 31, 2009

(3)  Highest contribution rate during 10 years ending               $4.50
     July 31, 2010

(4)  Partial withdrawal liability fraction (see Exhibit I, Item G)   64.854518%

(5)  Annual payment = (2) x (3) x (4) [rounded up to the nearest $4]   $69,176

(6)  Quarterly payment = (5) / 4                                    $17,294

(7)  Number of Full Years of Payment                                1

(8)  Remaining Balance After 1 Year                                 $45,240

(9)  Number of Full Quarterly Payments in Year 2:                   2

(10) Amount of Remaining Payment = (8) - (6) x (9)                  $10,652

✱ Segal Consulting

EXHIBIT K

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2009.

3. All assumptions per the July 31, 2009 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2009.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✳ Segal Consulting

EXHIBIT L

Ohio Operating Engineers Pension Fund

## DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2013

Employer Name:  **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                    07/31/2013

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2013 | 3,442.50 | 12,253.50 | 28% |
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | | |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |

*A partial withdrawal has occurred as of July 31, 2013.*

✴ Segal Consulting

EXHIBIT M

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2011

Employer Name:                           Sofco Erectors, Inc.

| Year Ended[1] July 31 | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
| | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | (2) and (3) |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $169,535,919 | $0 | $178,834,875 | $291,244 | $276,100 |
| 2004 | (19,021,072) | 0 | 183,435,933 | 275,279 | (28,545) |
| 2005 | 91,440,015 | 0 | 184,525,945 | 211,259 | 104,687 |
| 2006 | (121,631,202) | 0 | 187,236,038 | 189,279 | (122,958) |
| 2007 | 28,505,519 | 0 | 192,258,544 | 180,029 | 26,692 |
| 2008 | 124,410,184 | 0 | 202,969,173 | 187,255 | 114,778 |
| 2009 | 339,158,172 | 0 | 210,884,752 | 161,099 | 259,090 |
| 2010 | 42,238,100 | 0 | 218,622,244 | 127,590 | 24,651 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)          $654,495

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✶ Segal Consulting

EXHIBIT N

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Partial Withdrawal in the Plan Year Ended July 31, 2013

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011**

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal................ | $ | 370,754 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal................ | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal..................... | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.......................................................................... | $ | 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)]............... | $ | 301,607 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012**

| | | | |
|---|---|---|---|
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal................ | $ | 629,844 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal................ | | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal.................... | $ | 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.......................................................................... | $ | 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)].............. | $ | 104,696 |

| | | | |
|---|---|---|---|
| K: | Total credit for prior partial withdrawals [ E + J ] | $ | 406,303 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✳ Segal Consulting

EXHIBIT O

Ohio Operating Engineers Pension Fund

## DETERMINATION OF WITHDRAWAL LIABILITY

### For a Partial Withdrawal in the Plan Year Ending July 31, 2013

Employer Name: Sofco Erectors, Inc.

| | | | |
|---|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | | $654,495 |
| B. | De Minimis Reduction Under ERISA Section 4209 | | |
| | (1) | Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) | Reduction: $100,000 + (B)(1) – (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | | $654,495 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2005 – 07/31/2010 | | 37,608.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | | 7,521.60 |
| F. | Contribution Hours 08/1/2013 – 07/31/2014 | | 3,834.00 |
| G. | Partial Withdrawal Liability Factor: 1 – [(F) ÷ (E)] | | 49.026803% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | | $320,878 |
| I. | Credit for Prior (July 31, 2011 and 2012) Partial Withdrawals | | $406,303 |
| J. | Withdrawal Liability: (H) – (I), but not less than zero | | $0 |

⊀ Segal Consulting

EXHIBIT P

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2013

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2010.

3. All assumptions per the July 31, 2010 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2010.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✕ Segal Consulting

EXHIBIT Q

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer Name:                                       Sofco Erectors, Inc.

| Year Ended[1] July 31 | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
|---|---|---|---|---|---|
| | Basic[2] | Reallocated[3] | Total Plan Contributions[4] | Obligated Employer Contributions[5] | (2) and (3) |
| (1) | (2) | (3) | (4) | (5) | (6) |
| 2003 | $91,288,572 | $0 | $178,834,875 | $291,244 | $148,669 |
| 2004 | (10,869,184) | 0 | 183,435,933 | 275,279 | (16,311) |
| 2005 | 54,864,009 | 0 | 184,525,945 | 211,259 | 62,812 |
| 2006 | (76,019,502) | 0 | 187,236,038 | 189,279 | (76,849) |
| 2007 | 18,444,748 | 0 | 192,258,544 | 180,029 | 17,271 |
| 2008 | 82,940,123 | 0 | 202,969,173 | 187,255 | 76,519 |
| 2009 | 232,055,591 | 0 | 210,884,752 | 161,099 | 177,272 |
| 2010 | 29,566,670 | 0 | 218,622,244 | 127,590 | 17,255 |
| 2011 | 127,603,629 | 0 | 230,778,340 | 95,158 | 52,615 |
| 2012 | 214,305,669 | 0 | 250,306,333 | 70,436 | 60,305 |
| 2013 | 7,764,623 | 0 | 269,018,918 | 46,278 | 1,336 |
| 2014 | (129,537,937) | 6,853 | 298,703,055 | 62,852 | (27,255) |
| 2015 | 261,224,360 | 0 | 331,169,312 | 94,102 | 74,227 |
| 2016 | 112,294,964 | 0 | 360,524,316 | 121,118 | 37,725 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)                    $605,591

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✱ Segal Consulting

EXHIBIT R

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Withdrawal in the Plan Year Ended July 31, 2017

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011**

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal................. | $ | 212,111 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal.............. | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal................ | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.................................................................... | $ | 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)]..... | $ | 172,551 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012**

| | | | |
|---|---|---|---|
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal.............. | $ | 389,383 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal.............. | | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal..................... | $ | 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal................................................... | $ | 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)]..... | $ | 64,725 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2013**

| | | | |
|---|---|---|---|
| K: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal.............. | $ | 406,638 |
| L: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal.............. | | 0.490268 |
| M: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal..................... | $ | - |
| N: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.................................................... | $ | 654,495 |
| O: | Credit for prior partial withdrawal in Plan year ended July 31, 2013 [ K x L x M / (N x L)].............. | $ | - |
| P. | Total credit for prior partial withdrawals [ E + J + O] | $ | 237,276 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✶ Segal Consulting

EXHIBIT S

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

Employer Name: Sofco Erectors, Inc.

| | | | |
|---|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | | $605,591 |
| B. | De Minimis Reduction Under ERISA Section 4209 | | |
| | (1) | Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) | Reduction:  $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Limitation in Accordance with ERISA Section 4225 (Sale of Assets) | | N/A* |
| D. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | | $605,591 |
| E. | Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals | | $237,276 |
| F. | Withdrawal Liability: (D) − (E), but not less than zero | | $368,315 |

* We are unaware of any applicability of Section 4225 on this assessment and defer to the Fund
  Administrator and Legal Counsel to determine whether it applies

✳ Segal Consulting

EXHIBIT T

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer Name:　　　　　Sofco Erectors, Inc.

(1)　Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2007 | 11,053.50 | N/A |
| 2008 | 11,978.00 | N/A |
| 2009 | 1,607.50 | 8,213.00 |
| 2010 | 440.00 | 4,675.17 |
| 2011 | 1,123.00 | 1,056.83 |
| 2012 | 2,172.00 | 1,245.00 |
| 2013 | 3,442.50 | 2,245.83 |
| 2014 | 3,834.00 | 3,149.50 |
| 2015 | 5,527.00 | 4,267.83 |
| 2016 | 5,477.00 | 4,946.00 |

(2)　Average Base Units for highest 3 consecutive years during 10 years ended July 31, 2016　　　　8,213.00

(3)　Highest contribution rate during 10 years ended July 31, 2017　　　　$6.00

(4)　Annual payment = (2) x (3) [rounded up to the nearest $4]　　　　$49,280

(5)　Quarterly payment = (4) / 4　　　　$12,320

(6)　Number of Full Years of Payment　　　　10

(7)　Remaining Balance After 10 Years　　　　$2,721

(8)　Number of Full Quarterly Payments in Year 11:　　　　0

(9)　Amount of Remaining Payment = (7) - (5) x (8)　　　　$2,721

✴ Segal Consulting

EXHIBIT U

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

1.  Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2.  Census data collected as of July 31, 2016.

3.  All assumptions per the July 31, 2016 withdrawal liability report.

4.  Market value of assets based on audited financial statements as of July 31, 2016.

5.  Total plan contributions are as reported in the audited financial statements.

6.  Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7.  We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

✱ Segal Consulting

Representing Management Exclusively in Workplace Law and Related Litigation

**jackson lewis.**

425 Walnut Street
Suite 2300
Cincinnati, Ohio 45202
Tel 513 621-3440
Fax 513 621-4449
www.jacksonlewis.com

MY DIRECT DIAL IS: 513-873-2103
MY EMAIL ADDRESS IS: GARY.GREENBERG@JACKSONLEWIS.COM

| | | | |
|---|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation



November 10, 2017

**VIA E-MAIL & U.S. MAIL**

Trustees, Ohio Operating Engineers Pension Fund
c/o Brian C. Barch, In-house Counsel
1180 Dublin Road
PO Box 12009
Columbus, OH 43212-0009

      RE:    Sofco Erectors, Inc. - Request for Review of Withdrawal Liability Assessment
             dated August 31, 2017

To the Trustees:

      This is the Request for Review by Sofco Erectors, Inc. ("Company") of the Ohio
Operating Engineers Pension Fund ("Fund") assessment of withdrawal liability issued to the
Company on August 31, 2017, pursuant to 29 U.S.C. § 1399(b)(2)(A).

## I.    INTRODUCTION

      The Company disputes the assessments in their entirety, for these reasons:

1.    The Fund's assessment of complete withdrawal liability is contrary to 29 U.S.C. §
1383(b)(1), the special exception for construction industry employers and plans.[1]
Because the Company has not continued or resumed performing work in the jurisdiction
of the collective bargaining agreement of the type for which contributions were
previously (as of April 30, 2017) required, there has been no complete withdrawal for
which liability may be assessed. ·

2.    The Fund's assessments of partial withdrawal liability are contrary to 29 U.S.C. §
1388(d)(1). During the years in question, the Company's obligation to contribute to the
Plan were for "more than an insubstantial portion of its work in the craft and area
jurisdiction of the collective bargaining agreement of the type of which contribution
[were] required." Accordingly, there were no partial withdrawals for which liability may
be assessed.

---

[1] The Company understands that there is no dispute that it is a construction industry employer, and the Fund's Plan
is a construction industry plan, for purposes of 29 U.S.C. § 1383(b)(1), the construction industry exception.



Attorneys at Law

## II.    BACKGROUND

These background facts are taken from the Affidavit of John Hesford (attached as Exhibit 1) and the Fund's Withdrawal Liability Assessment dated August 31, 2017.

The Company began operations on April 1, 2004, when it purchased the assets of its predecessor. The Company was a party to a series of collective bargaining agreements with the International Union of Operating Engineers, Local 18 ("Local 18") the last of which was effective from May 8, 2013 through April 30, 2017 ("CBA"). In accordance with these collective bargaining agreements, the Company made the required contributions for hours worked by employees within the craft and geographic jurisdiction of these agreements through April 30, 2017.

The Company terminated the CBA and its relationship with Local 18 effective April 30, 2017. Since then, all of the Company's on-site construction work has been performed by the following, and no others: (a) Company employees covered by its collective bargaining agreements with Iron Workers Local Nos. 44, 172 and 180; (b) crane operators covered by the CBA and its successors, and employed by crane leasing companies that have contracted with the Company to provide cranes and crane operators for these projects; and (c) licensed surveyors to establish building lines for precast installations (nothing more). All of the crane leasing companies that contract with the Company for work in Local 18's jurisdiction make the required payments to the Fund for the crane operators assigned to these projects.

In a letter dated August 31, 2017, the Fund assessed the Company for withdrawal liability as follows:

- Complete withdrawal liability for the Plan year ending July 31, 2017, in the amount of $368,315 ($605,591 less credit for partial withdrawals).

- Partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627, based on finding that the ratio of hours to maximum average contribution base units ("CBUs") during a 3 year testing cycle were as follows:

    * 2011 – 9%
    * 2010 – 4%
    * 2009 – 13%

- Partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358, based on finding that the ratio of hours to maximum average CBUs during a 3 year testing cycle were as follows:


Attorneys at Law

* 2012 – 18%
* 2011 – 9%
* 2010 – 4%

- Partial withdrawal liability for the Plan year ending July 31, 2013 in the amount of $0 (after application of prior partial withdrawals), based on finding the ratio of hours to maximum average CBUs during a 3 year testing period were as follows:

    * 2013 – 28%
    * 2012 – 18%
    * 2011 – 9%

The Fund's assessment letter does not explain why it used the statutory "70% decline" formula, which does not apply to construction industry employers/plans, to find partial withdrawal, nor why it did not apply the "insubstantial portion" provision in 29 U.S.C. § 1388(d)(1), which does apply. Moreover, the Fund's letter does not explain why the construction industry exception to complete withdrawal liability does not apply here, given that Company employees have not continued or resumed work within Local 18's jurisdiction since April 30, 2017.

In an email to Fund in-house counsel, Bryan Barch, dated October 23, 2017, Company counsel asked for "documentation in the Fund's possession that confirms, supports or explains the Fund's application of the [70% decline] formula to the Company. . . ." In the same email, Company counsel asked for "documents in the Fund's possession that confirms, supports or explains [the Fund's] findings and conclusion [that the Company continued or resumed work within the craft and geographic jurisdiction of Local 18]." The only response received to date was on November 1, 2017, from the Fund's outside counsel stating that he would have to review the file in more depth before responding on these issues. A copy of this email exchange is attached as Exhibit 2.

## III.  THERE HAS BEEN NO COMPLETE WITHDRAWAL

A. The CBA did not obligate the Company to make pension contributions for subcontractors; therefore, use of subcontractors for work formerly performed by the Company's Local 18 employees is not grounds for imposing withdrawal liability.

"[T]here is no withdrawal [as a result of subcontracting] unless the [construction] employer would have been obligated to make contributions for work performed by subcontractors under the terminated agreement. If contributions would not have been required, there would be no withdrawal, because the employer would not be continuing to perform work of the type for which contributions were previously required." PBGC Opinion Letter 85-5.



**jackson|lewis**

Attorneys at Law

While the CBA, in Art. XIII, Sect. 117,, states that "all subcontractors shall be subject to the terms and provisions of this Agreement as it relates Operating Engineers", neither this nor any other provision of the CBA expressly imposes liability on the Company if the subcontractor fails to make the required payments. Accordingly, the construction industry exception applies, as the Company is not "continuing to perform work of the type for which contributions were previously required".

B. All of the subcontracted crane operators are covered by the CBA and its successor, and their employers make the required payments to the Fund; therefore, use of these subcontractors is not grounds for imposing withdrawal liability.

In enacting the Multi-Employer Pension Plan Act in 1980, Congress recognized that the withdrawal of a single construction employer from a construction industry plan does not reduce the contribution base if "other signatory employers take up the slack." *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for Northern California*, 859 F. 2d 808, 812 (1988).

Here, other signatory employers have taken up the slack. This is the opposite of what occurred in *Oregon-Washington Carpenters-Employers Pension Trust Fund v. BQC Construction Inc. Hardware Service*, 485 F. Supp. 2d 1206 (2007), where the court imposed withdrawal because the construction employer subcontracted to **non-union** carpenters:

> "Boden could have avoided withdrawal liability by subcontracting to a union employer who would make contributions to the Plan, thereby taking up the slack created by Boden. Because Boden did not subcontract to a union employer, the problem of unfunded vested benefits belongs to Boden, and Boden is liable."

*Id* at p. 1216.

Because the Company subcontracts only to Local 18 employers, it is **not** liable for withdrawal.

**IV. THERE WAS NO PARTIAL WITHDRAWAL BECAUSE THE WORK CONTINUED DURING THE YEARS IN QUESTION FOR MORE THAN AN INSUBSTANTIAL PORTION OF THE COMPANY'S WORK IN THE UNION'S JURISDICTION**

29 U.S.C. § 1388(d)(1) states: "An employer to whom section 1383(b) of this title (relating to the building and construction industry) applies is liable for a partial withdrawal **only** if the employer's obligation to contribute under the plan is continued for no more than an **insubstantial portion** of its work in the craft and area jurisdiction of the collective bargaining agreement of the type for which contributions are required." (Emphasis added.)


Attorneys at Law

"Insubstantial portion" is not defined in the statute, nor has it been defined by the PBGC. In fact, the PBGC punted on the issue. PBGC Opinion Letter 95-2. Nor does there appear to be any case law defining the term for purposes of this provision.

However, "insubstantial portion" must mean a decline in contributions greater than the "70% decline" formula set forth in the provision applicable outside the construction industry; why else have a separate provision? And it must mean a portion that is close to zero. See Definition of "Insubstantial" in Merriam Webster dictionary: "not substantial: such as a: lacking substance or material nature b: lacking firmness or solidity: FLIMSY."

The IRS definition of "insubstantial" for purposes of charitable contribution reporting is instructive:

> "Token Exception – Insubstantial goods or services a charitable organization provides in exchange for a contribution do not have to be described in the acknowledgment [to the donor]. Goods and services are considered to be insubstantial if . . . 1. the fair market value of the benefits received does not exceed the lesser of 2 percent of the payment or $106, or 2. the payment is at least $53, the only items provided bear the organization's name or logo . . . and the cost of these items is within the limit for 'low-cost articles', which is $10.60.
>
> *The dollar amounts are for 2016. Guideline amounts are adjusted for inflation."

IRS Publication 1771, "Charitable Contributions, Substantiation and Disclosure Requirements."

The IRS defines "insubstantial" to mean 2% or less, which is consistent with the dictionary definition. The Company's contribution ratios during the years in question were 13%, 4%, 9%, 18% and 28%, all above, and all but one well above, 2%. This was "more than insubstantial" during all of the 3 year measurement periods. Accordingly, there were no partial withdrawals for which liability may be assessed.

## V.   CONCLUSION

For the reasons stated above, the Company requests that the Fund overturn and cancel the assessments of withdrawal liability in their entirety and return to the Company the payments already made.[2]

---

[2] The Company may supplement this Request for Review before the 90-day limitation period expires if the actuarial consultant retained by the Company advises that the Fund's actuary over-stated what is owed due to erroneous calculations. Of course, such supplement would be moot if the assessments are overturned in their entirety.

Trustees, Ohio Operating
Engineers Pension Fund

November 10, 2017
Page 6



Attorneys at Law

Respectfully submitted,

*Gary L. Greenberg*

Gary L. Greenberg
Attorney for Sofco Erectors, Inc.

GLG/dlc
Enclosures

Cc:    (Via email and U.S. Mail)
Daniel J. Clark
Alan Kinzer
Vorys, Sater, Seymour and Pease LLP
Outside Counsel for the Fund

4840-5678-4468, v. 1

IN THE MATTER OF:

OHIO OPERATING ENGINEERS
PENSION FUND

And                                     AFFIDAVIT OF JOHN HESFORD

SOFCO ERECTORS, INC.

STATE OF OHIO         )
                        ) ss.
COUNTY OF HAMILTON  )

1.      My name is John Hesford. I am President of Sofco Erectors, Inc. (the "Company"), 10360 Wayne Ave, Cincinnati, Ohio 45215. The Company began operations on April 1, 2004, when it purchased the assets of its predecessor.

2.      The Company was a party to a series of collective bargaining agreements with the International Union of Operating Engineers, Local 18 ("Local 18"), the last of which was effective from May 8, 2013 through April 30, 2017 ("CBA").

3.      The Company terminated the CBA and its relationship with Local 18 effective April 30, 2017; Local 18 has not disputed this.

4.      At all times since termination of the CBA, all construction and related work performed on customers' premises by the Company ("on-site work") within the geographic jurisdiction of the CBA has been limited to a) employees of the Company who are covered by the Company's collective bargaining agreements with Iron Workers Local Nos. 44, 172 and 290, b)



crane operators covered by the CBA and its successor, and employed by crane leasing companies that have contracted with the Company to provide cranes and crane operators for these projects, and c) licensed surveyors to establish building lines for precast installations (nothing more).

5.      At all times since termination of the CBA, the Company has employed no non-union employees or subcontractors to perform on-site work within the geographic jurisdiction of the CBA, other than the licensed surveyors referenced in paragraph 4 above.

6.      Attached as Exhibit A is a complete list of all of the crane leasing companies that the Company has contracted with since termination of the CBA for performance of on-site work within the geographic jurisdiction of the CBA.

7.      Attached as Exhibit B – E are letters from the companies listed on Exhibit A that confirm each a) exclusively employs Local 18 operators to run cranes in Local 18's jurisdiction and b) pays into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement for each hour worked.

I swear and affirm that this Affidavit is true and accurate to the best of my knowledge, and is based on my personal knowledge.

Further Affiant sayeth not.

November 10, 2017

John Hesford

Subscribed and sworn to before me this 10 day of November, 2017.

Caroline Riley

Hamilton County, Ohio
My Commission Expires: 11/1/2020
Acting in Hamilton County, Ohio
4844-1580-5779, v. 1

CAROLINE JEAN RILEY
NOTARY PUBLIC
IN AND FOR THE
STATE OF OHIO
MY COMMISSION EXPIRES
NOVEMBER 1, 2020

2

**EXHIBIT A**

Following are all of the crane leasing companies contracted by Sofco Erectors, Inc. ("Company") since April 30, 2017, to provide cranes and crane operators for on-site work within the jurisdiction of the Company's 2013-2017 collective bargaining agreement with IUOE Local 18.

Tri-State Crane & Rigging Service
4838 Spring Grove Ave
Cincinnati, OH 45232

Capital City Crane
2299 Performance Way
Columbus, OH 43207

Gould & Smith Crane Rental
8205 Farwick Court
Cincinnati, OH 45249

Maxim Crane Works
840 Licking Pike
Wilder, KY 41076

4844-1580-5779, v. 1



P.O. Box 306
Newport, KY 41072
phone: 859.441.7400
fax: 859.442.6201
www.maximcrane.com

November 1, 2017

To Whom It May Concern,

Maxim Crane Works, L.P. employs Operating Engineers Local 18 operators to run cranes on all
Sofco Erectors Inc. jobsites within the jurisdiction of Local 18. For each hour worked, we pay
into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining
Agreement.

Boyd K. Vogt, Jr
Regional Credit Manager
Maxim Crane Works, L.P.

EXHIBIT
B

*Whatever it takes.*



# Tri-State Crane
# & Rigging Service
**4838 Spring Grove Avenue**
**Cincinnati, OH 45232**
**Office: (513)-541-9992**
**Fax: (513)-541-3395**

November 2, 2017

To Whom It May Concern,

Tri-State Crane Rental exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

**EXHIBIT**

**C**



October 18, 2017

To Whom it May Concern,

Capital City Crane Company exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

Brian Gibson

President & CEO



EXHIBIT

D



# CRANE RENTAL INC.

8205 FARWICK COURT ■ CINCINNATI, OHIO 45249 ■ 513-489-2050 ■ FAX 513-489-1873

## 24 HOURS SERVICE

November 1, 2017

To Whom It May Concern,

Gould & Smith Crane Rental exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

James Smith, President
Gould & Smith Crane Rental, Inc.

EXHIBIT
E

CRANE RENTAL ■ TRUCKING ■ STORAGE

**Greenberg, Gary L. (Cincinnati)**

| | |
|---|---|
| **From:** | Clark, Daniel J. <djclark@vorys.com> |
| **Sent:** | Wednesday, November 01, 2017 5:27 PM |
| **To:** | Greenberg, Gary L. (Cincinnati); Kinzer, Allen S. |
| **Cc:** | Baron, Peggy M. |
| **Subject:** | RE: Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017 |

Gary-

Yes, this file has been transferred to us. We are just getting our hands around it, so I do not have all the answers for you, but I did not want to ignore you either. I will address your points from your October 23, 2017 email to Bryan Barch in turn.

1. I believe that the August 29 correspondence included all of the information from the Fund's actuaries necessary for Libman Actuarial to review. Are there specific questions the Libman has or pieces of information that they need?

2. The Pension Fund has not adopted its own procedures for withdrawal liability matters. They operate according to the statute and applicable regulations.

3 and 4. I am going to have to review the file in more depth before responding to you on these issues.

an



**Daniel J. Clark**
Partner

Vorys, Sater, Seymour and Pease LLP
52 East Gay Street | Columbus, Ohio
43215

Direct: 614.464.6436
Fax: 614.719.4650
Email: djclark@vorys.com
www.vorys.com

---

**From:** Greenberg, Gary L. (Cincinnati) [mailto:Gary.Greenberg@Jacksonlewis.com]
**Sent:** Tuesday, October 31, 2017 1:26 PM
**To:** Clark, Daniel J.; Kinzer, Allen S.
**Subject:** FW: Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017

Gentlemen-

Ohio Operating Engineers Pension Fund in-house counsel Bryan Barch informed me yesterday that you now represent the Fund in this matter. On October 23, 2017, I sent the e-mail below to Mr. Barch. I have yet to receive a response.

1



Please let me know right away whether our actuarial consultant may communicate directly with the Fund's actuaries at Segal Consulting about their calculations and assumptions.

Also, let me know as soon as possible when I will receive a response to my substantive questions and information requests.

Gary Greenberg
Attorney for Sofco Erectors, Inc.

**Gary L. Greenberg**

Attorney at Law

Jackson Lewis P.C.

425 Walnut Street

Suite 2300

Cincinnati, OH 45202

Direct: (513) 873-2103 | Main: (513) 621-3440

Gary.Greenberg@Jacksonlewis.com | www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*

From: Greenberg, Gary L. (Cincinnati)
Sent: Monday, October 23, 2017 11:14 AM
To: Bryan Barch <BryanBarch@ooefbp.com>
Subject: Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017

Mr. Barch-

Thank you for sending me the Acceptance of Agreement by Sofco Erectors, Inc. ("Company') dated 10-3-11, the 2010-13 and 2013-17 collective bargaining agreements, the Pension Trust Agreement and Pension Plan. I have these follow-up questions:

-We have retained the Libman Actuarial Group of Cleveland, Ohio to consult with us on the calculations and assumptions. May our consultant communicate directly with the Fund's actuaries at Segal Consulting for this purpose?

-I note that Section 16 of the Pension Plan, which governs withdrawal liability, does not include any dispute resolution requirements. Accordingly, we assume that the Fund has no requirements for resolution of disputes over withdrawal liability assessments, aside from what is required by the applicable provisions of ERISA. If this assumption is incorrect, please let me know immediately and provide the Fund's requirements.

-The actuary's calculation letter dated August 29, 2017 correctly cites Section 4208(d)1) as the provision that governs assessment of partial withdrawal liability in the construction industry; such liability may be assessed only when work continues for an "insubstantial portion" of the employer's work in the jurisdiction of the collective bargaining agreement. But the calculations of partial withdrawal liability are based entirely on application of the 70% decline provision in Section 4205(b)(1), which does not apply to the construction industry. Please provide any documentation in the Fund's possession that confirms, supports or explains the Fund's application of the 4205(b)(1) formula to the Company, including without limitation policies, resolutions and precedents.

2

As you know, in accordance with ERISA's construction industry exemption, complete withdrawal liability may only be assessed against the Company if it continued to perform or resumed the same work performed by bargaining unit employees within the craft and geographic jurisdiction of the collective bargaining agreement. Since expiration of the 2017 agreement, no Company employee has performed any such work, based on our understanding of the craft and geographic jurisdiction of the expired agreement. We assume that the Fund found and concluded that the Company continued or resumed such work following expiration. Please provide the specifics upon which this finding and conclusion was based, including what work the Fund believes has been performed by the Company within the jurisdiction of the agreement since expiration, and by whom. Also, please provide any documentation in the Fund's possession that confirms, supports or explains this finding and conclusion, including without limitation policies, resolutions and precedents.

The Company is making the installment payments in accordance with the Demand for Payment. In doing so, the Company is not admitting that the assessments are valid.

Thank you for your attention to this.

Gary Greenberg
Attorney for Sofco Erectors, Inc.

**Gary L. Greenberg**

Attorney at Law

**Jackson Lewis P.C.**

425 Walnut Street
Suite 2300

Cincinnati, OH 45202

Direct: (513) 873-2103 | Main: (513) 621-3440

Gary.Greenberg@Jacksonlewis.com | www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

From the law offices of Vorys, Sater, Seymour and Pease LLP.

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

**jackson lewis.**

Representing Management Exclusive\_\_ n Workplace Law and Related Litigation

425 Walnut Street
Suite 2300
Cincinnati, Ohio 45202
Tel 513 621-3440
Fax 513 621-4449
www.jacksonlewis.com

| | | | |
|---|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

My Direct Dial Is: 513-873-2103
My Email Address Is: GARY.GREENBERG@JACKSONLEWIS.COM

*through an affiliation with Jackson Lewis P.C., a Law Corporation

November 29, 2017

Fund
EXHIBIT Q
10.26.2018

## VIA E-MAIL & U.S. MAIL

Trustees, Ohio Operating Engineers Pension Fund
c/o Brian C. Barch, In-house Counsel
1180 Dublin Road
PO Box 12009
Columbus, OH 43212-0009

RE:  Sofco Erectors, Inc. – Supplemental Request for Review of Withdrawal Liability
Assessment dated August 31, 2017

To the Trustees:

This is a Supplement to the Request for Review submitted by Sofco Erectors, Inc. ("Company") on November 10, 2017. In its Request for Review dated November 10, 2017, the Company disputed the Fund's assessments in their entirety, based on 29 U.S.C. § 1383(b)(1) and 29 U.S.C. § 1388(d)(1). In this Supplement, the Company submits grounds for reducing the assessments if they are not overturned in their entirety.

## I.  THE FUND'S ACTUARY ERRONEOUSLY INCLUDED AMOUNTS FROM BEFORE APRIL 1, 2004 IN CALCULATING THE ASSESSMENT

The Company began operations on April 1, 2004, when it purchased the assets of its predecessor. Affidavit of John Hesford, attached as Exhibit 1 to Company's Request for Review dated November 10, 2017. This was an arms-length transaction. Neither of the Company's owners, John Hesford and Dan Powell, had any ownership in the predecessor Company or familial relationship with its owners. The previous owner of these assets was Southern Ohio Fabricators, Inc.; a list of its owners at time of purchase is attached as Exhibit 1.

Southern Ohio Fabricators, Inc. and its owners ceased operations entirely, and therefore had no withdrawal liability. 29 U.S.C. § 1383(b)(1). Accordingly, the Company began operations on April 1, 2004 with a clean slate as to the Fund.

Trustees, Ohio Operating
Engineers Pension Fund

**jackson|lewis.**

November 29, 2017
Page 2

Despite the Company not operating before April 1, 2004 and the predecessor's exemption from withdrawal liability, the Fund's actuary included amounts from before that date in calculating the assessments. See Exhibits B, C, D, G, J, M, and Q, attached to the Segal Consulting letter dated August 29, 2017. When the liability allocation for Plan Year ending July 31, 2003 is excluded, and assuming withdrawal liability (which the Company disputes), the assessments would be as follows:

|  | Assessed | Revised |
|---|---|---|
| Partial – YE 7-31-11 | $344,627 | $ 48,907 |
| Partial – YE 7-31-12 | $111,358 | $160,404 |
| Partial – YE 7-31-13 | $0 | $0 |
| Complete – YE 7-31-17 | $368,315 | $301,681 |
| Total: | $824,300 | $510,992 |

See summary prepared by Company's actuarial consultant, attached as Exhibit 2.

The removal of contributions preceding April 1, 2004 would likely further reduce the liability, but the Company's actuarial consultant did not have sufficient data to calculate the additional reduction. The Company requests that the Fund recalculate the Company's withdrawal liability by excluding pre-April 1, 2004 contributions made by Southern Ohio Fabricators, Inc., in addition to excluding (as above) the liability allocation for the Plan Year ending July 31, 2003.

## II.    THE FUND HAS NOT PROVIDED REQUESTED INFORMATION THAT MIGHT ALSO AFFECT THE CALCULATIONS

On November 15, 2017, counsel for the Company e-mailed the following requests for information to counsel for the Fund (attached as Exhibit 3):

- The withdrawal liability reports for 7/31/2008, 7/31/2009, and 7/31/2016, as referred to in the Exhibits E, K, and U attached to the Segal Consulting letter dated 8/29/2017.

- Why were the partial withdrawal calculations based on the withdrawal liability reports for 3 years before the partial withdrawal assessment?

- What interest rate was used to calculate the quarterly installments in each of the three assessments, and what is the basis for those rates?

- What is the payment start date for each of the three assessments?

None of the requested information has been provided. Accordingly, the Company reserves the right to raise issues related to the requested information in arbitration.

**jackson|lewis.**

### III.        CONCLUSION

For the reasons set forth in the Company's Request for Review dated November 10, 2017, the partial and complete withdrawal liability assessments should be overturned in their entirety. If the assessments are not overturned, then they should be recalculated and reduced by excluding the liability allocation for the Plan Year ending July 31, 2003 and all contributions made before April 1, 2004, as the Company did not operate before that date and is not a successor to the liability allocations and contributions of Southern Ohio Fabricators, Inc., which ceased operations on that date.

Respectfully submitted,

Gary L. Greenberg
Attorney for Sofco Erectors, Inc.

GLG/dlc
Enclosures

Cc:      (Via email and U.S. Mail)
         Daniel J. Clark
         Alan Kinzer
         Vorys, Sater, Seymour and Pease LLP
         Outside Counsel for the Fund

4831-0309-6919, v. 1

## LIST OF SHAREHOLDERS OF
## SOUTHERN OHIO FABRICATORS, INC.

**Names of Shareholders**

Patricia Kling Ballman

Elizabeth Kling Mayotte

Christina Perry (Daughter of John Emerson Kling)

Josephine Kling Trippe

Susan Kling Worthington

Elizabeth Kling Mayotte, Susan Kling Worthington and
Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable
Trust FBO Christina Perry
With Life Estate for Margaret S. Kling

Elizabeth Kling Mayotte, Susan Kling Worthington and
Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable
Trust FBO Josephine Kling Trippe, Patricia Kling Ballman,
Elizabeth Kling Mayotte and Susan Kling Worthington
With Life Estate for Margaret S. Kling

Jerry T. Nickerson

Jerry T. Nickerson, Trustee, FBO Laurie A. Nickerson

Laurie A. Nickerson

Jennifer L. Nickerson

Anne Nickerson

Timothy J. Gates

Stephen R. Sundin

James W. Ludwig

1185459.1

EXHIBIT
1
tabbies

**Ohio Operating Engineers Pension Fund**
**Withdrawal Liablity Calculations**
**Sofco Erectors, Inc.**

DEMANDED WITHDRAWAL LIABILITY AMOUNTS

|  |  | Partial Withdrawal Liability 7/31/2011 | Partial Withdrawal Liability 7/31/2012 | Partial Withdrawal Liability 7/31/2013 | Total Withdrawal Liability 7/31/2017 | Totals |
|---|---|---|---|---|---|---|
| Original Calculation | 1 | $344,627 | $111,358 | $0 | $368,315 | $824,300 |
| Revised Calculation | 2 | $48,907 | $160,404 | $0 | $301,681 | $510,992 |
| Change |  | ($295,720) | $49,046 | $0 | ($66,634) | ($313,308) |

1 Calculations per Ohio Operating Engineers Fringe Benefit Programs Demand for Payment dated August 31, 2017.

2 Revised Calculations reflect removal of Plan Year Ended July 31, 2003 from Liability. The removal of contributions preceding April 1, 2004 would also change the results, but we lack sufficient data to calculate the amount of such reduction.



EXHIBIT
2

**Greenberg, Gary L. (Cincinnati)**

| | |
|---|---|
| From: | Crawford, Denice L. (Cincinnati) on behalf of Mills, James A. (Cincinnati) |
| Sent: | Wednesday, November 15, 2017 1:54 PM |
| To: | djclark@vorys.com; askinzer@vorys.com |
| Cc: | Greenberg, Gary L. (Cincinnati); Rosenthal, Daniel G. (Cincinnati) |
| Subject: | Sofco Erectors, Inc. |

Dear Mr. Clark and Mr. Kinzer,

My colleague, Gary Greenberg, is currently unavailable but asked to me to forward this request from the Company's actuarial consultant for a response from the Fund's actuary. The Company requests the following information:

- The withdrawal liability reports for 7/31/2008, 7/31/2009, and 7/31/2016, as referred to in the Exhibits E, K and U attached to the Segal Consulting letter dated 8/29/2017.

- Why were the partial withdrawal calculations based on the withdrawal liability reports for 3 years before the partial withdrawal assessment?

- What interest rate was used to calculate the quarterly installments in each of the three assessments, and what is the basis for those rates?

- What is the payment start date for each of the three assessments?

Jim Mills

**James A. Mills**
**Attorney at Law**
**Jackson Lewis P.C.**
425 Walnut Street
Suite 2300
Cincinnati, OH 45202
Direct: (513) 873-2113 | Main: (513) 621-3440
James.Mills@Jacksonlewis.com | www.jacksonlewis.com
*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*



1

# VORYS

**Vorys, Sater, Seymour and Pease LLP**
Legal Counsel

52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

614.464.6400 | www.vorys.com

Founded 1909

Fund
EXHIBIT R
Date 10·26·2018

Daniel J. Clark
Direct Dial  (614) 464-6436
Direct Fax  (614) 719-4650
Email djclark@vorys.com

June 22, 2018

**VIA U.S. MAIL**

Gary L. Greenberg
Jackson Lewis P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202

Re:  Sofco Erectors, Inc.

Dear Gary:

As you know we represent the Ohio Operating Engineers Pension Fund with respect to its assessment of withdrawal liability against Sofco Erectors, Inc. (the "Company"). This correspondence constitutes the Fund's response to the Company's request for review dated November 10, 2017. For the reasons set forth below, the Fund confirms that withdrawal liability was properly assessed against the Company.

### A.  The Company Does Not Qualify for the Construction Industry Exception

The Company disputed the withdrawal liability assessment by contending that following the termination of it collective bargaining agreement with Local 18 of the International Union of Operating Engineers (the "Union") it had "not continued or resumed performing work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." 29 U.S.C. § 1383(d)(1). The Fund acknowledges that it and the Company are in the construction industry such that the construction industry exception could apply.

The Fund disputes the Company's contention that it has not continued to perform work in the jurisdiction of the collective bargaining agreement following the termination of the CBA with the Union. Specifically, since April 2017, the Company has continued to employ forklift operators. Prior to April 2017, the Company routinely assigned members of the Union to operate forklifts, which are within the jurisdiction of the CBA, and made contributions to the Fund on behalf of this work.

Moreover, the Company had employed members of the Union to perform shop work, repairing and maintaining equipment. Contributions were paid pursuant to the CBA based upon this work. This work continued to be performed following April 2017. Indeed, the Fund understands



**VORYS**
Legal Counsel

Gary L. Greenberg
June 22, 2018
Page 2

that a Union operator was retained by the Company following the termination of the CBA, for the purpose of performing the same work as was previously performed on a contributory basis.

Given the above, it is evident that the Company has continued to perform work within the jurisdiction of the CBA. Accordingly, the construction industry exception is not applicable. Complete withdrawal liability was properly assessed on account of the Company's withdrawal from the plan.

### B. Partial Withdrawal Liability Was Properly Assessed.

Next, the Fund has considered the Company's position with respect to the assessments of withdrawal liability based upon a partial withdrawal in 2011 and 2012. The Company's Request for Review notes that an employer under Section 1383(b) is liable for a partial withdrawal if the employers obligation to contribute under the plan continued for "no more than an insubstantial portion of its work" 29 U.S.C. § 1388(d).

The Fund acknowledges the applicability of this exception. However, the Company's obligation to contribute to the Fund continued for more than "an insubstantial portion" of its work. While the Fund acknowledges that the terms "insubstantial portion" is not clearly defined in the statute, the Fund rejects the Company's suggestion that the terms should be interprets to mean 2% or less.

Such an interpretation of the statute would effectively eliminate the assessment of withdrawal liability in the construction industry. Had that been the intent of Congress, it could have done as much. In fact, we noted in the legislative history, construction industry employers advocated for the adoption of a 5% or less definition to be incorporated into the statute. This suggestion was not adopted. Accordingly, it seems evident that the term "insubstantial portion" must mean something less than 30% but greater than 5%. Given the above, the Fund sees no reason to alter it assessments of partial withdrawal liability.

### C. The Company's Contribution History Precedes April 2004.

In Company's supplemented request for review, it contends that its contribution history should be calculated starting with April 2004 and that the Fund's withdrawal liability calculation should be revised to exclude contribution history from 2002 and 2003. The Company contends it started contributing to the Fund following an April 2004 asset purchase.

In response to the Company's request for review, the Fund examined the contribution history of the Company. Contrary to the Company's assertion, the Fund has a long history of contributions on behalf of Sofco Erectors, Inc. The Company has been signatory to CBAs with the Union dating back to at least the 1980s. Moreover, contributions were paid by Sofco Erectors, Inc. both before and after April 2004. Contributions were made on behalf of many of the same employees before and after April 2004.



**VORYS**
Legal Counsel

Gary L. Greenberg
June 22, 2018
Page 3

Accordingly, the Company's contention that withdrawal liability should only be based upon a contribution history commencing in April 2004 is unsupported by the Company's actual contribution history and contribution reports to the Fund.

For the reasons described above, the Company's Request for Review was considered but did not result in any modification in the amount of the withdrawal liability assessed.

Sincerely,

Daniel J. Clark

Daniel J. Clark

DJC/lm

cc:   Allen S. Kinzer *(via email)*
      Elizabeth Weinewuth *(via email)*
      Arbitrator John Sands *(via email* via AAA JaniceHoldinski@adr.org)



Fund
EXHIBIT 5
10·26·2018

## AFFIDAVIT OF TIM GATES

STATE OF OHIO )

) SS:

COUNTY OF Hamilton )

Tim Gates, being first duly sworn, deposes and says that:

1. I am Tim Gates. I am over the age of 18 and I am competent to testify to the matters set forth herein.

2. I was the President of Southern Ohio Fabricators, Inc. until July 2004.

3. Two families owned Southern Ohio Fabricators, Inc., the Kling family and the Nickerson family. The Kling family was the majority shareholder.

4. Southern Ohio Fabricators, Inc. had a wholly owned subsidiary named Sofco Erectors, Inc. that existed prior to April 2004 ("Old Sofco").

5. In March 2004 Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., a company owned by John Hesford, Jim Ludwig, and Dan Powell.

6. After Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., Old Sofco performed no work. Old Sofco was merely a shell corporation until it could be wound down. It had no equipment, employees, or any ability to perform work.

7. Similarly, after Old Sofco's assets were sold, Southern Ohio Fabricators, Inc. did not perform any erection work. It had no personnel or equipment to perform any such erection work after it sold Old Sofco's assets.

8. None of the owners of Southern Ohio Fabricators, Inc. or Old Sofco owned, operated, or had involvement in any company that performed erection services after the sale of Old Sofco's assets.

9. In July 2004, Southern Ohio Fabricators, Inc. sold its assets to Clermont Steel Fabricators.

10. After Southern Ohio Fabricators, Inc. sold its assets, I signed a consulting agreement and assisted in winding it up. After Southern Ohio Fabricators, Inc. sold its assets, it ceased to perform any work and like Old Sofco was merely a shell corporation.

Further affiant sayeth naught.

_____
                Tim Gates

Sworn and subscribed to before me this __I I__ day of September, 2018.

Notary public: _Tracy A Wagner_

My commission expires: _6-15-2020_

TRACY A. WAGNER
Notary Public, State of Ohio
My Commission Expires 06-15-2020

4851-6528-0113, v. 1

fund
EXHIBIT T
10.26.2018

**AMERICAN ARBITRATION ASSOCIATION**

In the matter of arbitration between:                    AAA No. 01-16-000-39530

PRECISION ENVIRONMENTAL COMPANY,                         Mitchell B. Goldberg, Arbitrator
                    Claimant,

                                                         Date of Award:
        -v-                                              February 5, 2018

OHIO OPERATING ENGINEERS PENSION
FUND,

                    Respondent.

**OPINION AND AWARD**

Appearances:

For the Claimant:
Frank W. Buck, Neal B. Wainblat and Jeffrey J. Moyle,  Littler Mendelson, PC

For the Respondent:
Daniel J. Clark and Elizabeth B. Howard, Vorys, Sater, Seymour & Pease LLP

I.      Introduction and Background.

        This is an arbitration proceeding conducted under the American Arbitration Association's

Multi-employer Pension Plan Arbitration rules for Withdrawal Liability Disputes. Claimant

("Employer") is one of the employer participants in the Ohio Operating Engineers Pension Fund

("Fund"). Claimant is an employer as defined in the Multi-employer Pension Plan, and in the

Multi-employer Pension Plan Amendments Act ("MPPAA"). Claimant filed a pension plan claim

request for arbitration with AAA on September 14, 2016 after disputing the Respondent's

demand for withdrawal liability dated December 23, 2015 in the amount of $188,044.00, and the

amount of quarterly installments payments of $4,692.00 (and one final payment of $3,081.00)

for the reasons discussed below. Claimant was a signatory to a collective bargaining

1

agreement ("CBA") under which it was obligated to make pension contributions to the Fund on behalf of the employees described in the CBA bargaining unit.

The Fund alleges that withdrawal liability was assessed against the Employer in accordance with 29 U.S.C. Section 1381(a). The Employer completely withdrew from the Fund when it or a trade or business under which it had a common control permanently ceased to have an obligation to contribute to the Fund. Alternatively, it alleges that under 29 U.S.C. Section 1383(b)(2),the Employer completely withdrew from the Fund when it ceased to have an obligation to contribute to the Fund and the Employer or a trade or business under which it shared common control continued performing work in the jurisdiction of the CBA for which contributions were previously required. Respondent contends that its withdrawal liability assessment against the Employer was properly and legally assessed under the MPPAA and that the amounts assessed are due under the Fund's schedule of payments.

The parties agreed, after conducting discovery with respect to their claims and defenses, to waive a formal hearing on the issues. They instead agreed to submit joint opposing motions for summary judgment on the disputed issues. Each party filed their respective briefs, responses and replies to the dispositive motions.

A multi-employer pension plan is a plan to which more than one employer contributes and which is maintained pursuant to one or more CBAs between the employers and the union. The plans are jointly trusteed and administered under Section 302 of the LMRA, 29 U.S.C. Section 186. Half of the trustees are appointed by the union and the other half by employers or employer associations. The applicable CBA in this dispute is between the Construction Employers Association, of which Precision was a member, and the International Union of Operating Engineers, Local 18. That CBA expired on April 30, 2015. Precision withdrew its recognition of the Operating Engineers and no longer remained as a party to any subsequent

2

CBA between the Construction Employers Association and the Operating Engineers. Claimant, at all relevant times, was engaged in the business of demolition and asbestos removal within the building and construction industry.

In 1980, Congress enacted MPPAA, amending ERISA and the Internal Revenue Code to further regulate the conduct of multiemployer plans and to protect the PBGC in its role as the guarantor of plan benefits. The MPPAA required plan trustees to collect withdrawal liability from employers whose operations terminated, or whose obligations to contribute terminated. In general, the amount of withdrawal liability is the employer's proportionate share of the plan's unfunded vested liabilities, as determined under a statutory formula. The plan's liability is the actuarial present value of the benefit obligations which have vested. A plan's unfunded vested liability is the difference between the vested liability and the value of the plan's assets at the point in time when the withdrawal liability is triggered.

Congress sought to cure the problems arising when an employer ceased making payments to a plan fund, leaving the plan with vested pension obligations which were only partially funded. A vested benefit is one that is guaranteed to the worker after a number of years of service. An employer who partially or completely withdraws from paying its contributions into a plan causes withdrawal liability to be calculated and paid in order to protect the other employers in the multiemployer plan from having to pay for those benefits. Congress believed that the added burdens upon employers who remained as plan participants might induce more of them to remove themselves from multiemployer plans. This would discourage the entry of new plan participants and precipitate the financial failure of less stable pans.[1]

The MPPAA established special industry rules, some of which apply to the building and construction industry. The building and construction industry rules, which apply in this dispute,

---

[1] *Laborers Pension Fund v. W.R. Weis Co.*, 180 F. Supp. 3d 540, 548-549 (2016) (Citing other Circuit cases and a Supreme Court decision).

3

generally provide that an industry employer is deemed to have withdrawn only if it ceases to have an obligation to contribute while continuing to perform the same type of work previously covered by the plan in the jurisdiction of the union as set forth in the applicable CBA.

Withdrawal liability has been found to occur in cases where the employer goes out of business, sells a business, downsizes, goes non-union by hiring subcontractors to perform the work, or when the subject union under a CBA is decertified. In such cases, courts have found that employers were legally obligated to pay contributions to the funds as required by the CBA, notwithstanding that the union was decertified prior to the end of the contract term. Under the MPPAA, the funds had an independent right to sue for delinquent contributions owed under the terms of the CBA, irrespective of whether a union could legally enforce the terms of the CBA.[2] Accordingly, the MPPAA authorizes multiemployer plans to sue for delinquent contributions owed under the terms of the plan and under the terms of a CBA.[3] Both parties agree that the Employer's obligation to make contributions to the Fund in this case ceased when the subject CBA expired by its terms on April 30, 2015. The relevance of the above cases regarding decertification to the case at hand is that in the above cases it is clear that withdrawal liability was triggered because the employers no longer had the obligation to make contributions after the expiration of those CBAs, and it was clear that the employers continued to perform the work in those jurisdictions of the type for which contributions were previously required.

II.     The Statutory Provisions.

Section 4203 of ERISA, 29 U.S.C. Section 1383(b)(2) states:

A withdrawal occurs under this paragraph if -

    (A)     an employer ceases to have an obligation to contribute under the plan, and

---

[2] *Midwest Operating Engineers Welfare Fund v. Cleveland Quarry*, 844 F.3d 627 (7th Cir. 2016).
[3] *Central States, Southeast & Southwest Areas Pension Fund v. Schilli Corp*, 420 F.3d 663, 669-670 (7th Cir. 2005).

4

      (B)     the employer -
                (i) continues to perform the work in the jurisdiction of the [CBA] of the type
                     for which contributions were previously required.

An "obligation to contribute" is defined as an obligation to contribute arising: (1) under one or more collective bargaining agreements; or (2) as a result of a duty under applicable labor-management relations law. 29 U.S.C. Section 1392(a). Under 29 U.S.C. Section 1401(a)(3)(A), the Fund's assessment of withdrawal liability is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

III.    The Jurisdictional Dispute.

A jurisdictional dispute arose between the Operating Engineers union and the Laborers' union over the right to exclusively perform the work described as forklift and skid steer work. Both Unions had CBAs with the Employer that covered that particular type of work. The dispute was ultimately resolved through an NLRB proceeding (Section 10(k) of the NLRA) and subsequent litigation over that jurisdictional issue. The jurisdictional issue was resolved in favor of the Laborers Union of North America. The Sixth Circuit in *Orrand v. Hunt* decided that the Employer's obligation to continue its contributions to the Fund ceased after the resolution of the jurisdictional issue.[4] The issue remained as to whether the cessesson of forklift and skid steer work by the Operating Engineers employees that was performed before their CBA termination, coupled with the expiration of their CBA (April 30, 2015) triggered a withdrawal liability assessment under the MPPAA. There is no question that the obligation for the Employer to make contributions to the Fund ceased, and that the Employer continued to perform the type of work that the Operating Engineers performed previously before the resolution of the jurisdictional issue. This was forklift and skid steer work as set forth in its CBA with the

---

[4] 852 F.3d 592 (6th Cir. 2017).

Employer Association. The Employer's assigned work to the Laborers Union was also within the geographic jurisdiction of the Operating Engineers' previous CBA. It was the type of work for which contributions were required from the Employer to the Fund, until the jurisdictional issue was resolved and the CBA expired.. Thereafter, that same type of work was performed by the Laborers, another union within the same jurisdiction (type of work and geographic location) set forth in the expired CBA. That Union (Laborers) was a party to a different CBA with the Employer, that required contributions to be paid to a different pension fund.

A fixed computed withdrawal liability that attempts to recover an amount of money that would be owed by the Employer to compensate the Plan for the Employer's proportionate share of the Plan's unfunded vested liabilities secures the Plan's ultimate ability to pay the defined benefits due to the Union's employees when the defined benefit retirement benefits are due to be paid. This unfunded amount is determined on the date of exit from the plan.[5] If the Fund cannot collect its withdrawal liability payments, the other employers within the multiemployer fund will under certain circumstances be required to make up the deficiency caused by the Fund's inability to collect the balance due of payments that consist of its unfunded vested benefits necessary to pay the defined pension benefits promised to the employees in the bargaining unit who have already earned their defined retirement benefits as expressed in the CBA and in the incorporated pension fund plan. The withdrawing employer is paying its proportional share of the unfunded contribution amounts for work done prior to the employer's withdrawal, rather than for work done after its withdrawal.[6] However, the Fund, under other circumstances, may receive substitute contributions from other employers within the multiemployer plan or from other plans if those employers hire Operating Engineers' employees for the subject work on other projects within the geographical jurisdiction under CBAs that

---

[5] 29 U.S.C., Section 1391.
[6] 29 U.S.C., Section 1391(b)(1)(A).

6

provide those employees with work that was lost to the Operating Engineers under this work jurisdiction dispute.

Notwithstanding the fact that forklift and skid steer work was in the described work jurisdiction of both the Laborers' CBA and the Operation Engineers' CBA, the work had for many years been assigned by the Employer to the Laborers, and not the Operating Engineers. However, in the Fall of 2011 the Employer, at the request of the Operating Engineers, assigned forklift and skid steer work on a demolition job at a Hospital in Cleveland. The Employer denied the request because it never in the past made contributions to the Fund for forklift and skid steer work that was performed by members of the Laborers' Union.[7] It had, however, assigned some of that work to Operating Engineers employees in the past and paid contributions to the Fund when it hired Operating Engineers to perform work under its CBA. The calculation of withdrawal liability to the Employer by the Fund is based upon some forklift and skid steer work or other CBA work that was in fact performed by its members before the withdrawal. Those were for hours of work for which contributions were made by the Employer, but not enough contributions to make up for the vested, but unfunded benefits that remained outstanding at the time of the withdrawal.

IV.    Analysis and Findings.

The Stevens Cases

The U.S. Court, for the Northern District of Ohio decided the case of *Stevens Engineers & Constructors, Inc. v Iron Workers Loc. 17 Pension Fd.*[8] Plaintiff is a contractor who is one of the employers in a multiemployer pension plan with the Defendant pension fund. The Plaintiff sought to enforce an arbitration award that prohibited the Defendant fund from collecting withdrawal liability. The Fund attempted to assess withdrawal liability under the above

---

[7] Tony Digeronimo Affidavit, Exhibit A to Employer's Motion for Summary Judgment.
[8] 2016 U.S. Dist. LEXIS 114028; L.R.R.M 3388 (2016).

construction industry withdrawal liability provisions of ERISA. Stevens, between 1985 and 2013 was a party to a series of CBAs with the Ironworkers Fund. It made contributions to the Fund when the Ironworkers performed work covered by the CBAs. As in the instant case, Stevens, the employer, did not renew the Ironworkers' CBA after it expired on April 20, 2013. Its obligation to contribute to the Fund ceased at that point. Also like this case, after the CBA expired and after another union of millrights obtained the right to exclusively perform certain work that was in the stated jurisdictional provisions of both CBAs, the Ironworkers Fund sought withdrawal liability for the work performed by Ironworkers before the CBA expired and work for which Stevens had made pension fund contributions during the life of the CBA. The Fund determined that Stevens had assigned ironworker work of the type for which Stevens had been required to contribute to the Fund. Stevens demanded arbitration of the dispute.

The subject CBA recognized that jurisdictional disputes would arise due to the fact that various craft unions in their respective CBAs would claim the same work for its members. In this case, both the Ironworkers CBA and the Laborers-Millrights unions both claimed the same jurisdictional work as described in each of their CBAs. However, unlike the CBA in this case, the parties to the CBAs were also parties to a National Maintenance Agreement ("NMA") that recognized that various crafts may claim work assignments that are part of their respective CBAs. Accordingly, as part of its responsibility under the NMA, Stevens agreed to conduct a pre-job conference to cover all craft work assignments for each project. Stevens conducted the pre-job conference for a certain project after the above CBA with the Ironworkers expired. It assigned certain work to the Millrights instead of the Ironworkers. The losing union, in this case, the Ironworkers, could challenge Stevens' assignment by first having the issue referred to the International Unions to resolve the dispute. If the assignment dispute was not resolved at that level, either Stevens as the Employer or the Union could refer the issue to final and binding

8

arbitration. This contractual internal dispute resolution process would provide a speedier process for the resolution of the dispute, and the unions agreed not to strike while this resolution process was untaken. Stevens and the Ironworkers Union engaged in the NMA process to a certain point, but it did not go to arbitration. The contested work went to the Millrights when the Ironworkers Union decided not to go further with the NMA process.

The Ironworkers Union thereafter pursued a claim for withdrawal liability against Stevens. Its claim was that Stevens stated that prior to the expiration of the Ironworkers' CBA, Stevens used Ironworkers to perform certain Ironworkers work "on several occasions over the years." Stevens also performed the same type of work in the same jurisdiction covering the pension fund obligations in the CBA within 5 years after May 1, 2013, but because that work was assigned to the Millrights and not the Ironworkers, Stevens would not have an obligation to make pension contributions under the Ironworkers CBA to the Ironworkers pension fund, thereby causing withdrawal liability to be triggered.

The Arbitrator in the withdrawal liability dispute conducted a hearing and issued his findings and conclusions of law. He determined that the Ironworkers abandoned its claim of contractual jurisdiction over the work that Stevens assigned to the Millrights. He further stated that the disputed work Stevens assigned to the Mfillrights was not in the Ironworkers' craft jurisdiction defined in its expired CBA and thus, Stevens did not assume such work within 5 years after April 30, 2013, the date on which it ceased to have an obligation to contribute to the Fund. The Arbitrator stated:

> [Section] 1383 also requires such work to be work "of the type for
> which contributions were previously required," and concluded that
> because the work at issue was performed by millrights under Stevens'
> unchallenged assignment, that work is not work for which contributions
> had ever been required to the Iron Workers Local 17 Pension Fund. As
> such, he determined that the [Fund] Trustees determination to the

contrary was clearly erroneous.[9]

The Fund disagreed with the Arbitrator's findings and conclusions of law and sought to vacate the award before the District Court. The Fund relied upon a decertification decision in the 7th Circuit that held that the decertification of the union did not terminate the employer's obligation to contribute for withdrawal liability purposes, by operation of law (Section 1145).[10] The Court, however, distinguished the decertification case by stating that the controlling issue is not when Stevens' obligation to contribute to the Fund ceased; instead, the question is whether "the special status enjoyed by multiemployer pension funds under [Section] 1145 applies to the assessment of withdrawal liability arising from an inter-union craft jurisdictional dispute." It went further to discuss cases that make it clear that a Fund is not permitted under ERISA to collect employer contributions for work properly assigned to another union in a jurisdictional dispute, notwithstanding that the Fund's CBA also covers that work. An employer is not required to contribute to a plaintiff Fund unless it is contractually obligated to do so. In other words, notwithstanding that two CBAs cover the same work, the work that was properly assigned to the winning union requires pension contributions to that fund for those workers, and not also for the losing union's fund, notwithstanding that both union CBAs cover the same work.

The Ironworkers Fund argued, as the Fund here argues, that prohibiting it to collect withdrawal liability for work previously performed under its CBA, and for work in which Stevens previously made contributions, would reduce its contribution base. Even if the Union went through the NMA procedure and lost, instead of abandoning its claim, the Fund would still be entitled to collect withdrawal liability for the vested but unfunded contributions that needed to be

---

[9] The Arbitrator further stated that the Trustees' use of the withdrawal liability process to determine a work jurisdiction dispute between two NMA-party unions was unreasonable in the sense that Local 17 used the Fund as a "cat's paw in its turf war with the Millrights over craft jurisdiction and to punish Stevens for having terminated its Iron Workers [CBA]."

[10] *Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663 (7th Cir. 2005).

10

added to the contributions it had already received for past Ironworkers work when previous

contributions were made to the Fund by Stevens. However, the Court found that the work

assigned to the Millrights was not work for which contributions "had ever been required to the

Fund." In other words, notwithstanding that work in the past was assigned and performed by the

Ironworkers, and that work produced contributions to the Fund and was so required under the

Ironworkers CBA, the Court is not requiring any further recovery of withdrawal liability

contributions (payments) for that same work that would otherwise by due if the obligation to

contribute ceased due to a decertification or loss of union work. The Court stated:

> The Court recognizes the circularity of this argument. There is no
> dispute that Stevens has assigned . . .work to ironworkers instead
> of the millrights in the past. Thus, "craft jurisdiction" changes from
> job to job. The Court could find no case in which a pension fund
> sought to impose withdrawal liability based upon an employer's
> assignment of assignable work to another craft union.
> * * *
> Finally, while the Fund would have received additional [make-up]
> contributions if all the . . . work on the . . . project had been assigned
> to the Ironworkers, its contribution base was not reduced because it
> received contributions for all work within the Ironworkers' craft
> jurisdiction from Stevens' contractors who employed them. No
> non-union labor was used on the project.
>
> Again, the level of any pension fund contributions will naturally change
> marginally from job to job based upon the assignment of assignable
> work.

The Sixth Circuit affirmed the District Court's decision finding that no withdrawal liability

is due to the Fund for the past Ironworker work that was performed during its CBA, and for

which contributions were made by Stevens.[11] The Court expanded further upon the difference

between a situation where an employer "goes non-union," stays in the industry, but ceases

making payments to the plan, and a situation where the employer withdraws from work within

the jurisdiction of its CBA. The Court states that the first situation *does* decrease the

---

[11] *Stevens Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund*, No. 16-4098/4099
(December 13, 2017).

contribution base of the plan because the employer is withdrawing from the plan when it goes non-union and stops making contributions. The MPPAA provides that an employer must pay a proportional share of the unfunded amount to the Fund, determined based on the employer's share of contributions for work prior to the withdrawal, rather than after the withdrawal. However, under the second situation, the withdrawal of jurisdictional work does not pose an undue threat to a fund as long as contributions are made for whatever union work is done in the area. This is because the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry. Employees are often dispatched to another contributing contractor who will make contributions to the same plan or another union pension fund plan.

The Court expanded its rationale that was explained by the Arbitrator and the District Court. It acknowledged that the MPPAA expresses a general policy in favor of making employers who withdraw from an underfunded fund pay into it. However, the MPPAA expressly limits the situations in which contributions are required, the specific provisions of the text control over the looser general principles that are also embodied in the MPPAA. The particular rationale for the construction industry exception provides an incentive for employers to gain the benefit of work without the detriment of pension liability when an employer takes on a job that requires pension benefits. The Court states:

> Before its withdrawal from the CBA, Stevens would not have owed
> contribution liability to Local 17 for work properly assigned to another
> union through the NMA. It therefore causes no imbalance for Stevens
> to owe no liability for such work properly assigned after withdrawal
> either.

### The Weis Decision

The Employer also relies upon the decision of the District Court for the Eastern Division of Illinois to support its position that no withdrawal liability was triggered in this case when the

12

*Weis* jurisdictional issue was resolved in favor of the Laborers Union as opposed to the

Bricklayers Union (BAC) for the disputed work.[12] Weis stopped employing Laborers and

stopped contributing to the Fund in October 2009 under the Laborers CBA. It ended its CBA

relationship with the Laborers in 2012. The matter went to arbitration on the issue of whether

the Fund could assess withdrawal liability. The Arbitrator found in favor of the Employer. The

Fund went to Court to vacate the award and to have withdrawal liability assessed in accordance

with its calculation of withdrawal liability for payment of the unfunded vested benefits caused by

the withdrawal. The Court affirmed the arbitration award.

Weis employed its last laborer in October 2009 after the CBA expired. The Arbitrator

sustained the Fund's claim that after 2009, the Employer may have performed some tasks

within the general jurisdiction of the Laborer's CBA, notwithstanding that the work overlapped

with work under the BAC and ICE CBAs. Weis contributed to the BAC pension fund for these

hours. The Laborers Fund claimed withdrawal liability. Weis contested the claim, arguing that it

was entitled to an exception for the construction industry, in which an employer is deemed not to

have withdrawn, and thus is not subject to withdrawal liability. The Laborers Union revised its

demand letter and adjusted the withdrawal date back to October 2009 when its CBA expired.

Like the Stevens case, the disputed work was performed after that date by another union's

employees and contributions were made to that union's fund.

The Arbitrator, as in the Stevens decisions, ruled in *Weis'* favor, holding that it was not

liable for withdrawal payments because it did not continue to perform work in the jurisdiction of

the Laborer's CBA of the type for which contributions were previously required under

1383(b)(2)(B)(i). The Arbitrator stated:

> In other words, even though Weis continued employing non-laborers
> to do some work covered by the laborers' CBA, Weis never had an
> obligation to contribute to the [Laborer's Fund] for non-laborers' work,

---

[12] *Laborer's Pension Fund v. W.R. Weis Co.*, 180 F.Supp.3d 540 (E.D. Illinois 2016).

when it had already contributed to the other workers' [BAC and ICE] pension funds.[13]

The Court found, as did the Arbitrator, that in *Weis'* case, the history and custom showed that the Laborers' CBA did not require contributions for work done by the other unions for its work, when the employer had made pension contributions to a different union. The Fund argued, as in Stevens, that the legislative purpose of the MPPAA was not accomplished when the Laborer's funding base was compromised due to *Weis* being excused from absorbing the additional cost increases for unpaid unfunded vested benefits that were due over and above the previous contributions that were made to the Laborer's fund for work done under its CBA before the CBA expired in October 2009. The Court applied the same reasoning as above, stating that the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry. Employees are often dispatched to another contributing contractor (with the same union plan, or a different union plan). The construction work is generally done on a project-by-project basis. An employer's covered employment may fluctuate drastically, and when a project ends an employer's workers will normally remain in the labor pool available for employment by other contributing union employers. The Court concluded by stating that the fluctuations are normal events that do not pose an undue threat to a plan as long as contributions are made for whatever union work is done in the geographic area.

The Fund argued that it would be damaged in the sense that its contribution base would be reduced if *Weis* could continue doing the same type of work, but change its workforce to a different trade union, in this case from laborers to non-laborers. The Court, however, held that the legislative history did not support this view because the Fund's base did not encompass work performed by other union members when Weis contributed to other pension funds for that

---

[13] The Arbitrator also held that Weis could assert an affirmative defense of equitable estoppel because Weis reasonably relied to its detriment on the Fund previous assurances that it owed no additional contributions to the Laborer's Fund.

subject work. Weis was not escaping from its contribution obligations because it never had an obligation in the first place to contribute to the Fund for the other union's work. As stated in the Stevens' rationale, this is not a situation where *Weis* stays in the industry but goes non-union and ceases making payments to the plan. Instead, *Weis* continued making contributions to the BAC pension plan and it sustained that funding base. Accordingly, the Court found that the Arbitrator's award did not undermine the legislative purpose of the statute.

*Findings*

The above judicial findings of a controlling legislative purpose that looks upon the effect of an employer withdrawal on industry-wide union employment in the geographic area instead of the specific effect of a withdrawal upon a single employer when that employer ceases to have an obligation to contribute to the plan due to the termination of its participation in the multiemployer collective bargaining agreement is not apparent from the plain reading of the statutory language. Applying that statutory language in this case would seem to trigger withdrawal liability under a plain reading because Precision's obligation to contribute to the Operating Engineers' Fund ceased upon the termination of the CBA. The Employer continued to perform the skid-steer and forklift work that was previously performed under the Union's work jurisdiction, under which contributions to the Fund were previously required. Moreover, the contribution base was decreased by its inability to recover additional unpaid contributions for its unfunded vested benefits that related to the Employer contributions it made to the Fund for work performed by the Union in the past up to the point when the Employer's obligations ceased.

The damage to a single pension fund contribution base becomes evident when one considers the different financial conditions of various union pension funds. If withdrawal liability is not triggered under the above facts for an employer that was obligated to contribute to a fund that was in poor financial condition, the loss of funding for its unfunded vested benefits could be

15

meaningful. The effects of its poor condition and the loss of funding for those unfunded vested benefits could result in the inability to meet its defined pension payments to its beneficiaries in the future for the retired union workers. Those workers who accumulated benefits through the contributions that were made to the financially stressed fund could be at risk to the point of a PBGC bailout that would produce a substantial reduction of pension benefits. The fact that some other pension fund gained contributions through a jurisdictional decision on some industry wide basis would not be of solace to the employees who performed the subject work and received less than the full contributions necessary to fund both for funding the vested benefits and the unfunded vested benefits that were provided under the terms of the CBA and the Fund.

The Respondent Fund highlights the losses to the single fund when a CBA is terminated without compensating a pension fund for the unfunded liability arising out of its participation. It makes no difference to the particular fund when a portion of the covered work is lost to non-union employees or union employees. When no compensation is provided to the Fund for the loss of payments or contributions for its vested, but unfunded benefits, the Fund has nevertheless lost a portion of its contribution base regardless of whether the lost work is performed by a union or non-union worker. This would necessarily place a burden upon the remaining employers in the multiemployer plan who are left with unfunded liabilities that must be met. It is foreseeable that in some instances the remaining employers in the multiemployer plans could be competitors of the employer who was relieved of the burden to pay withdrawal liability for those unfunded contributions.

Nevertheless, the above Courts have spoken on this precise issue. They have determined that for the construction industry there is some compelling congressional intent, as expressed through its legislative history, to treat employer withdrawals from CBAs and ceased contribution obligations differently for triggering withdrawal liability. Arbitrators must follow these

16

decisions that state the law on this issue, or risk having their decisions vacated, based upon a judicial finding that they have exceeded their power by manifestly disregarding the law.[14]

V.      Award.

        The Claimant's motion for summary judgment is granted, and the Respondent's motion for summary judgment is denied for the above reasons. No withdrawal liability is to be assessed against the Employer under Section 4203 of ERISA, 29 U.S.C. Section 1383(b)(2)(A) and (B). Respondent shall refund to Claimant all assessed withdrawal liability payments received from Respondent.

Date of Award: February 5, 2018                    /s/ *Mitchell B. Goldberg, Arbitrator*
                                                   Mitchell B. Goldberg, Arbitrator

---

[14] 9 U.S.C. Section 10(4) of the Federal Arbitration Act. A manifest disregard of the law occurs when when an arbitrator understands and correctly states the law but proceeds to ignore it. *See, e.g. Wilko v. Swan*, 346 U.S.427, 436 (1953); *San Martine Co. de Navegacion, S.A. v. Saguenay Terminals*, 293 F.2d 796,801 (9th Cir. 1961).

18

| NAME | Allen, Jason | | | | REGISTER NO. | 4083627 |
| ADDRESS | 9747 E. Athens Road | | | | DISTRICT NO. | 3 |
| | Roseville OH 43777 | | INIT'D BY | DATE | | |
| PHONE N | 740-605-2359 | | LOCAL NO. 18 INIT'D | 7/1/2013 | | |
| REMARKS | | | BIRTH DATE 12/26/1984 | | CURRENT I.O. NO. | |
| | | | SOC. SEC. NO REDACT | | | |

| CAN OPERATE THE FOLLOWING EQUIPMENT: | DATED REPORTED TO WORK | CONTRACTOR | LOCATION OF JOB | TYPE OF MACHINE | DATE FINISHED |
|---|---|---|---|---|---|
| PD $554.25 6/17/13 | 5/24/12 | Miller Pipeline | Hilliard | HDD | 12-12-14 |
| | 4-15-15 | Miller Pipeline recall from 2-15 fringes | | | |
| SEE PERMIT RECORD | 6-15-15 | Sofco Erectors | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Fund
EXHIBIT U
Date: 10.26.2018

OOE-000571

Jason Allen REDACT

| Employer | Employer Name | Work Period | Fund | Quantity |
|---|---|---|---|---|
| 000679400 | SOFCO ERECTORS INC | 201705 | W | 40.00 |
| 000940000 | ACCIDENT & SICKNESS | 201704 | W | 27.00 |
| 000940000 | ACCIDENT & SICKNESS | 201704 | W | -27.00 |
| 000679400 | SOFCO ERECTORS INC | 201704 | W | 80.00 |
| 000679400 | SOFCO ERECTORS INC | 201703 | W | 200.00 |
| 000679400 | SOFCO ERECTORS INC | 201702 | W | 160.00 |
| 000679400 | SOFCO ERECTORS INC | 201701 | W | 144.00 |
| 000679400 | SOFCO ERECTORS INC | 201612 | W | 160.00 |
| 000679400 | SOFCO ERECTORS INC | 201611 | W | 192.00 |
| 000679400 | SOFCO ERECTORS INC | 201610 | W | 160.00 |
| 000679400 | SOFCO ERECTORS INC | 201609 | W | 152.00 |
| 000679400 | SOFCO ERECTORS INC | 201608 | W | 200.00 |
| 000679400 | SOFCO ERECTORS INC | 201607 | W | 112.00 |
| 000679400 | SOFCO ERECTORS INC | 201606 | W | 192.00 |
| 000679400 | SOFCO ERECTORS INC | 201605 | W | 160.00 |
| 000679400 | SOFCO ERECTORS INC | 201604 | W | 160.00 |
| 000679400 | SOFCO ERECTORS INC | 201603 | W | 200.00 |
| 000679400 | SOFCO ERECTORS INC | 201602 | W | 160.00 |
| 000679400 | SOFCO ERECTORS INC | 201601 | W | 152.00 |
| 000679400 | SOFCO ERECTORS INC | 201512 | W | 180.50 |
| 000679400 | SOFCO ERECTORS INC | 201511 | W | 160.00 |
| 000679400 | SOFCO ERECTORS INC | 201510 | W | 160.00 |
| 000679400 | SOFCO ERECTORS INC | 201509 | W | 160.00 |
| 000679400 | SOFCO ERECTORS INC | 201508 | W | 200.00 |
| 000679400 | SOFCO ERECTORS INC | 201507 | W | 160.00 |
| 000503200 | MILLER PIPELINE CORP | 201506 | W | 55.50 |
| 000679400 | SOFCO ERECTORS INC | 201506 | W | 80.00 |
| 000503200 | MILLER PIPELINE CORP | 201505 | W | 217.00 |
| 000503200 | MILLER PIPELINE CORP | 201504 | W | 147.50 |
| 000503200 | MILLER PIPELINE CORP | 201503 | W | 151.50 |
| 000503200 | MILLER PIPELINE CORP | 201502 | W | 107.50 |
| 000503200 | MILLER PIPELINE CORP | 201501 | W | 155.50 |
| 000503200 | MILLER PIPELINE CORP | 201412 | W | 71.50 |
| 000503200 | MILLER PIPELINE CORP | 201411 | W | 180.50 |
| 000503200 | MILLER PIPELINE CORP | 201410 | W | 247.00 |
| 000503200 | MILLER PIPELINE CORP | 201409 | W | 181.50 |
| 000503200 | MILLER PIPELINE CORP | 201408 | W | 261.00 |
| 000503200 | MILLER PIPELINE CORP | 201407 | W | 174.50 |
| 000503200 | MILLER PIPELINE CORP | 201406 | W | 192.50 |
| 000503200 | MILLER PIPELINE CORP | 201405 | W | 191.00 |
| 000503200 | MILLER PIPELINE CORP | 201404 | W | 157.50 |
| 000503200 | MILLER PIPELINE CORP | 201403 | W | 150.50 |
| 000503200 | MILLER PIPELINE CORP | 201402 | W | 158.50 |
| 000503200 | MILLER PIPELINE CORP | 201401 | W | 122.00 |
| 000503200 | MILLER PIPELINE CORP | 201312 | W | 126.00 |
| 000503200 | MILLER PIPELINE CORP | 201311 | W | 206.50 |
| 000503200 | MILLER PIPELINE CORP | 201310 | W | 154.00 |
| 000503200 | MILLER PIPELINE CORP | 201309 | W | 140.50 |
| 000503200 | MILLER PIPELINE CORP | 201308 | W | 260.50 |

OOE-000572

| 000503200 | MILLER PIPELINE CORP | 201307 | W | 144.00 |
| 000503200 | MILLER PIPELINE CORP | 201306 | W | 166.00 |
| 000503200 | MILLER PIPELINE CORP | 201305 | W | 206.00 |
| 000503200 | MILLER PIPELINE CORP | 201305 | W | -206.00 |
| 000503200 | MILLER PIPELINE CORP | 201305 | W | 206.00 |
| 000503200 | MILLER PIPELINE CORP | 201304 | W | 176.00 |
| 000503200 | MILLER PIPELINE CORP | 201303 | W | 188.00 |
| 000503200 | MILLER PIPELINE CORP | 201302 | W | 191.50 |
| 000503200 | MILLER PIPELINE CORP | 201301 | W | 122.50 |
| 000503200 | MILLER PIPELINE CORP | 201212 | W | 127.00 |
| 000503200 | MILLER PIPELINE CORP | 201211 | W | 201.50 |
| 000503200 | MILLER PIPELINE CORP | 201210 | W | 162.00 |
| 000503200 | MILLER PIPELINE CORP | 201209 | W | 152.00 |
| 000503200 | MILLER PIPELINE CORP | 201208 | W | 243.50 |
| 000503200 | MILLER PIPELINE CORP | 201207 | W | 156.00 |
| 000503200 | MILLER PIPELINE CORP | 201206 | W | 238.50 |
| 000503200 | MILLER PIPELINE CORP | 201205 | W | 18.50 |
| | | | | 10,027.50 |

OOE-000573

```
17:54:27 May 04 2017              M E M B E R   D E T A I L   R E P O R T                Page 688

CONTRACTORS REPORTING HOURS FOR A SPECIFIC CONTRACT

Deposit Date Range  : 04/01/2017 - 04/30/2017

Employer Type : D5 - DISTRICT 5

Employer Name              Mbr SSN Member Name          Refno  Work Period PstFund        Hours
-----------------------    ------- --------------------  -----  ----------- -------  -----------------
                                                         N60676  201703 2.5%        6160.00
                                                         N60676  201703 E            200.00
                                                         N60676  201703 A            200.00
                                                         N60676  201703 P            200.00
                                                         N60676  201703 W            200.00
SOFCO ERECTORS INC         REDACT  DONALD R GRIMM        N60676  201703 0.5%        2436.48
                                                         N60676  201703 2.5%        2436.48
                                                         N60676  201703 E             72.00
                                                         N60676  201703 A             72.00
                                                         N60676  201703 P             72.00
                                                         N60676  201703 W             72.00
SOFCO ERECTORS INC         REDACT  KATHLEEN S HART       N60676  201703 0.5%        2487.24
                                                         N60676  201703 2.5%        2487.24
                                                         N60676  201703 E             73.00
                                                         N60676  201703 A             73.00
                                                         N60676  201703 P             73.00
                                                         N60676  201703 W             73.00
SOFCO ERECTORS INC         REDACT  KEITH A MOORE         N60676  201703 0.5%        2427.84
                                                         N60676  201703 2.5%        2427.84
                                                         N60676  201703 E             72.00
                                                         N60676  201703 A             72.00
                                                         N60676  201703 P             72.00
                                                         N60676  201703 W             72.00
SOFCO ERECTORS INC         REDACT  HOWARD J REED         N60676  201703 0.5%        3206.34
                                                         N60676  201703 2.5%        3206.34
                                                         N60676  201703 E             94.50
                                                         N60676  201703 A             94.50
                                                         N60676  201703 P             94.50
                                                         N60676  201703 W             94.50
```

OOE-000574

| | | | | |
|---|---|---|---|---|
| SOFCO ERECTORS INC | REDACT | JASON R ALLEN | N53633 | 201702 0.5% | 4928.00 |

| | | | |
|---|---|---|---|
| SOFCO ERECTORS INC | REDACT | JASON R ALLEN | |

N53633   201702 0.5%      4928.00
N53633   201702 2.5%      4928.00
N53633   201702 E          160.00
N53633   201702 A          160.00
N53633   201702 P          160.00
N53633   201702 W          160.00

SOFCO ERECTORS INC   REDACT   DONALD R GRIMM

N53633   201702 0.5%      5414.40
N53633   201702 2.5%      5414.40
N53633   201702 E          160.00
N53633   201702 A          160.00
N53633   201702 P          160.00
N53633   201702 W          160.00

SOFCO ERECTORS INC   REDACT   KATHLEEN S HART

N53633   201702 0.5%      2961.00
N53633   201702 2.5%      2961.00
N53633   201702 E           85.00
N53633   201702 A           85.00
N53633   201702 P           85.00
N53633   201702 W           85.00

SOFCO ERECTORS INC   REDACT   HOWARD J REED

N53633   201702 0.5%      4128.48
N53633   201702 2.5%      4128.48
N53633   201702 E          108.00
N53633   201702 A          108.00
N53633   201702 P          108.00
N53633   201702 W          108.00

OOE-000575

| | | | | |
|---|---|---|---|---|
| SOFCO ERECTORS INC | REDACT | JASON R ALLEN | P11550 | 201705 0.5% | 1232.00 |
| | | | P11550 | 201705 2.5% | 1232.00 |
| | | | P11550 | 201705 E | 40.00 |
| | | | P11550 | 201705 A | 40.00 |
| | | | P11550 | 201705 P | 40.00 |
| | | | P11550 | 201705 W | 40.00 |
| SOFCO ERECTORS INC | REDACT | JOEY L BING | P11550 | 201705 0.5% | 1353.60 |
| | | | P11550 | 201705 2.5% | 1353.60 |
| | | | P11550 | 201705 E | 40.00 |
| | | | P11550 | 201705 A | 40.00 |
| | | | P11550 | 201705 P | 40.00 |
| | | | P11550 | 201705 W | 40.00 |
| SOFCO ERECTORS INC | REDACT | KATHLEEN S HART | P11550 | 201705 0.5% | 1353.60 |
| | | | P11550 | 201705 2.5% | 1353.60 |
| | | | P11550 | 201705 E | 40.00 |
| | | | P11550 | 201705 A | 40.00 |
| | | | P11550 | 201705 P | 40.00 |
| | | | P11550 | 201705 W | 40.00 |
| SOFCO ERECTORS INC | REDACT | CHARLES L OWSLEY | P11550 | 201705 0.5% | 1353.60 |
| | | | P11550 | 201705 2.5% | 1353.60 |
| | | | P11550 | 201705 E | 40.00 |
| | | | P11550 | 201705 A | 40.00 |
| | | | P11550 | 201705 P | 40.00 |
| | | | P11550 | 201705 W | 40.00 |

OOE-000576

SOFCO ERECTORS INC  JASON R ALLEN

| | | | | |
|---|---|---|---|---|
| N67583 | 201704 | 0.5% | | 2464.00 |
| N67583 | 201704 | 2.5% | | 2464.00 |
| N67583 | 201704 | E | | 80.00 |
| N67583 | 201704 | A | | 80.00 |
| N67583 | 201704 | P | | 80.00 |

OOE-000577

```
15:17:52 Jun 09 2017          M E M B E R   D E T A I L   R E P O R T                    Page 988

CONTRACTORS REPORTING HOURS FOR A SPECIFIC CONTRACT

Deposit Date Range  : 05/01/2017 - 05/31/2017

Employer Type : D5 - DISTRICT 5
```

| Employer Name | Mbr SSN | Member Name | Refno | Work Period | PstFund | Hours |
|---|---|---|---|---|---|---|
| SOFCO ERECTORS INC | REDACT | JON E ALLEN | N67583 | 201704 | W | 80.00 |
| | | | N67583 | 201704 | 0.5% | 1307.20 |
| | | | N67583 | 201704 | 2.5% | 1307.20 |
| | | | N67583 | 201704 | E | 40.00 |
| | | | N67583 | 201704 | A | 40.00 |
| | | | N67583 | 201704 | P | 40.00 |
| SOFCO ERECTORS INC | REDACT | JOEY L BING | N67583 | 201704 | W | 40.00 |
| | | | N67583 | 201704 | 0.5% | 2707.20 |
| | | | N67583 | 201704 | 2.5% | 2707.20 |
| | | | N67583 | 201704 | E | 80.00 |
| | | | N67583 | 201704 | A | 80.00 |
| | | | N67583 | 201704 | P | 80.00 |
| SOFCO ERECTORS INC | REDACT | KATHLEEN S HART | N67583 | 201704 | W | 80.00 |
| | | | N67583 | 201704 | 0.5% | 5820.48 |
| | | | N67583 | 201704 | 2.5% | 5820.48 |
| | | | N67583 | 201704 | E | 168.00 |
| | | | N67583 | 201704 | A | 168.00 |
| | | | N67583 | 201704 | P | 168.00 |
| SOFCO ERECTORS INC | REDACT | CHARLES L OWSLEY | N67583 | 201704 | W | 168.00 |
| | | | N67583 | 201704 | 0.5% | 5549.76 |
| | | | N67583 | 201704 | 2.5% | 5549.76 |
| | | | N67583 | 201704 | E | 160.00 |
| | | | N67583 | 201704 | A | 160.00 |
| | | | N67583 | 201704 | P | 160.00 |
| | | | N67583 | 201704 | W | 160.00 |

OOE-000578

SOFCO ERECTORS INC     [REDACTED] JASON R ALLEN          N60676     201703 0.5%          6160.00

OOE-000579