```
 1      BEFORE THE AMERICAN ARBITRATION ASSOCIATION

 2   SOFCO ERECTORS, INC.,        )
                                  )
 3        Claimant,               )
                                  )
 4        vs.                     )   Case No.
                                  )   01-18-0001-3790
 5   OHIO OPERATING               )
     ENGINEERS PENSION FUND,      )
 6                                )
          Respondent.             )
 7

 8

 9

10                 DEPOSITION OF

11                 DANIEL POWELL

12

13            Taken at the offices of
          VORYS SATER SEYMOUR AND PEASE LLP
14             52 East Gay Street
             Columbus, Ohio 43215
15
          on October 9, 2018, at 10:01 a.m.
16

17      Reported by: Julia Lamb, RPR, CRR

18

19                  -=0=-

20

21

22

23

24
```

Daniel Powell
October 09, 2018

Page 2

```
 1   APPEARANCES:
 2        Mark B. Gerano
          JACKSON LEWIS P.C.
 3        425 Walnut Street, Suite 2300
          Cincinnati, Ohio 45202
 4        513.898.0050
          Mark.Gerano@jacksonlewis.com
 5
              on behalf of the Claimant.
 6
 7        Daniel J. Clark
          Andrew T. Jordan
 8        VORYS SATER SEYMOUR AND PEASE LLP
          52 East Gay Street
 9        Columbus, Ohio 43215
          614.464.6400
10        djclark@vorys.com
          atjordan@vorys.com
11
              on behalf of the Respondent.
12
13
14
15   ALSO PRESENT:
16        John Hesford
17
18
19                  -=0=-
20
21
22
23
24
```

Page 3

```
 1               STIPULATIONS
 2        It is stipulated by and among counsel
 3   for the respective parties that the deposition
 4   of DANIEL POWELL, a Witness herein, called by
 5   the Respondent under the applicable Rules of
 6   Civil Procedure may be taken at this time by the
 7   notary pursuant to notice; that said deposition
 8   may be reduced to writing in stenotypy by the
 9   notary, whose notes thereafter may be
10   transcribed out of the presence of the witness,
11   and that the proof of the official character and
12   qualification of the notary is waived.
13                  -=0=-
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              INDEX OF EXAMINATION
 2                                          PAGE
 3   BY MR. CLARK:                            6
 4
 5
 6              INDEX OF EXHIBITS
 7   EXHIBIT        DESCRIPTION            PAGE
 8     1      Letter, 2-7-17               19
 9     2      Settlement Letter/ Grievance 27
              Form
10
       3      AGC of Ohio Building         37
11            Agreement
12     4      Letter, 7-24-18, with        45
              attachments
13
       5      AGC of Ohio Building         53
14            Agreement
15     6      Acceptance of Agreement      53
16     7      Acceptance of Agreement      57
17     8      Agreement                    59
18     9      Acceptance of Agreement -    60
              Continued
19
      10      Notice of Initiation of      61
20            Arbitration
21    11      Affidavit of Tim Gates       73
22    12      Union Summary Report         77
23    13      Ironworkers Local Union No.  80
              44 C - Active Certifications
24
```

Page 5

```
 1    14      Invoices                     81
 2    15      Agreement Between Central    83
              Ohio AGC and Ironworkers
 3            Local Union No. 172
 4    16      Jurisdictional Agreement     87
 5    17      Rented Forklift per job/hours 88
 6    18      SOFCO 1-31                   91
 7    19      Claimant Sofco Erectors,     93
              Inc.'s Responses to Ohio
 8            Operating Engineers Pension
              Fund's First Set of
 9            Interrogatories
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 6

1        DANIEL POWELL
2  being first duly sworn, as hereinafter certified,
3  deposes and says as follows:
4          CROSS-EXAMINATION
5  BY MR. CLARK:
6      Q.  Good morning.
7      **A.  Good morning.**
8      Q.  Could you state your name for the
9  record, please.
10     **A.  Daniel Powell.**
11     Q.  And could you spell Powell.
12     **A.  P-O-W-E-L-L.**
13     Q.  Okay.  Where do you reside, Mr. Powell?
14     **A.  In Grove City, Ohio.**
15     Q.  We met yesterday in a deposition of Dan
16  Ciner.  I am Dan Clark, one of the attorneys
17  representing the Ohio Operating Engineers
18  Pension Fund in a withdrawal liability matter.
19  Do you know that?
20     **A.  I do.**
21     Q.  We're here this morning to take your
22  deposition.  Have you ever had a deposition
23  taken before?
24     **A.  Yes.**

Page 7

1      Q.  In what context were you deposed?
2      **A.  It was a shareholder dispute.**
3      Q.  Do you recall what year that deposition
4  took place?
5      **A.  No.  10 or 12 years ago.**
6      Q.  What was the nature of the shareholder
7  dispute?
8      **A.  I'd say contractual language.**
9      Q.  Who were -- were you a party to that
10  case?
11     **A.  We were.**
12     Q.  Who were the other parties to the case?
13     **A.  Dave Schmitt and John Hesford.**
14     Q.  Were you a Plaintiff or a Defendant in
15  that action?
16     **A.  I think Defendant.**
17     Q.  And where was that action pending, or
18  jurisdiction?
19     **A.  In Hamilton County.**
20     Q.  Hamilton County, Ohio?
21     **A.  Right.**
22     Q.  And was Mr. Hesford a Plaintiff or
23  Defendant in that action?
24     **A.  Defendant as well.**

Page 8

1      Q.  And was Mr. Schmitt a Plaintiff or
2  Defendant in that action?
3      **A.  I believe the Plaintiff.**
4      Q.  How do you spell Schmitt?
5      **A.  S-C-H-M-I-T-T, I believe.**
6      Q.  Okay.  And what was his first name
7  again?
8      **A.  Dave.**
9      Q.  How was that action resolved?
10     **A.  Went to trial.**
11     Q.  Was it a jury trial?
12     **A.  No.**
13     Q.  And was there a decision issued by the
14  Court in that matter?
15     **A.  There was.**
16     Q.  And whose -- in whose favor was that
17  decision?
18     **A.  In our favor.**
19     Q.  Other than the deposition you gave in
20  the shareholder dispute litigation in Hamilton
21  County 10 or 12 years ago have you ever been
22  deposed?
23     **A.  I believe so.  Over a payment dispute in**
24  **probably early '90s.**

Page 9

1      Q.  And were you a party to that action?
2      **A.  No.**
3      Q.  Do you know who the parties in that case
4  were?
5      **A.  It would have been Carter Steel and**
6  **Southern Ohio Fabricators or Sofco.**
7      Q.  You said that was early '90s?
8      **A.  Right.**
9      Q.  And on whose behalf were you testifying
10  in that action?
11     **A.  We were -- Sofco.**
12     Q.  What was your role with Sofco in the
13  early '90s?
14     **A.  I'm not positive.**
15     Q.  Were you an employee of Sofco in the
16  early '90s?
17     **A.  The old Sofco, we'll call it, yes.**
18     Q.  Do you recall what your job title was
19  for the old Sofco?
20     **A.  It'd be manager of central Ohio**
21  **operations.**
22     Q.  How long did you hold the manager of
23  central Ohio operations for the old Sofco?
24     **A.  I don't recall.**

Daniel Powell
October 09, 2018

Page 10

1    Q. When did you first become employed by
2  Sofco?
3    **A. Well, I took a co-op job with Southern**
4  **Ohio Fabricating Company -- which is an acronym.**
5  **Sofco is an acronym.**
6    Q. Okay.
7    **A. -- in probably '84 or '85.**
8    Q. And how long after '84 or '85 did you
9  remain employed by the old Sofco?
10   **A. Well, I worked with Southern Ohio**
11 **Fabricating as well as the erectors side off and**
12 **on.**
13   Q. Until when did you work off and on?
14   **A. I think -- well, probably in mid to late**
15 **'80s I was on the erection side.**
16   Q. What happened in the mid to late '80s?
17   **A. I was working strictly for the erection**
18 **side.**
19   Q. And how long did you work strictly for
20 the erection side after the mid to late '80s?
21   **A. Until they closed around 2004.**
22   Q. When did you first assume title of
23 manager of central Ohio operations for Southern
24 Ohio Fabricators?

Page 11

1    **A. That would have been for the erectors in**
2  **1990.**
3    Q. Are you currently employed?
4    **A. Yes.**
5    Q. Where?
6    **A. Sofco Erectors.**
7    Q. And what's your current job title?
8    **A. President/COO.**
9    Q. How long have you held the president/COO
10 title?
11   **A. In the range of 10 to 12 years.**
12   Q. Was there a president of Sofco Erectors
13 prior to you -- who preceded you?
14   **A. Yes.**
15   Q. Who was that?
16   **A. Jim Ludwig.**
17   Q. Jim also go by James?
18   **A. Yes.**
19   Q. How long was James Ludwig the president
20 of Sofco Erectors?
21   **A. Well, of this company, which started in**
22 **2004, until he retired, it was a year or two.**
23   Q. So he was president from 2004 for a year
24 or two --

Page 12

1    **A. Correct.**
2    Q. -- before retirement.
3      Since 2004, has Sofco Erectors had any
4  other presidents other than you and Mr. Ludwig?
5    **A. John Hesford was president/CEO.**
6    Q. And how long did Mr. Hesford hold the
7  president/CEO title?
8    **A. Same time frame, 10 or 12 years.**
9    Q. Did Mr. Ludwig precede Mr. Hesford as
10 president and CEO of Sofco Erectors?
11   **A. Prior to that Mr. Ludwig was the sole**
12 **president.**
13   Q. So for -- from 2004 for one or two years
14 until his retirement Mr. Ludwig was the sole
15 president, and thereafter you've been working as
16 president/COO, and Mr. Hesford has been -- held
17 the title president/CEO. Is that correct?
18   **A. I thought you said CEO twice, but I've**
19 **been the COO. John has been CEO.**
20   Q. What are your job responsibilities as
21 president/COO of Sofco Erectors?
22   **A. I run our Columbus operation and oversee**
23 **our Indianapolis operation.**
24   Q. How long has Sofco Erectors had an

Page 13

1  Indianapolis operation?
2    **A. Since 2004.**
3    Q. Did you work in Indianapolis for the old
4  Sofco prior to 2004?
5    **A. No. Excuse me. Me personally?**
6    Q. Yes.
7    **A. No.**
8    Q. Okay. Did old Sofco have presence in
9  Indianapolis?
10   **A. When?**
11   Q. Prior to 2004.
12   **A. Yes.**
13   Q. And just so we're clear, when you're
14 using the term old Sofco -- because you
15 introduced that -- you're referring to Sofco
16 Erectors, Inc. prior to 2004. Is that correct?
17   **A. Right.**
18   Q. Who are the current owners of Sofco
19 Erectors, Inc.?
20   **A. Myself and John Hesford.**
21   Q. What type of corporate entity is Sofco
22 Erectors, Inc.? Is it a corporation?
23   **A. S corp.**
24   Q. Do you and Mr. Hesford share ownership

Daniel Powell
October 09, 2018

Page 14

1  equally?
2  **A. We do.**
3  Q. It's a 50/50 split then?
4  **A. Correct.**
5  Q. No other shareholder.
6  In 2004 who were the owners of Sofco
7  Erectors, Inc.?
8  **A. The new company or the old company?**
9  Q. The new company.
10 **A. A group consisting of James Ludwig, Dave**
11 **Schmitt, myself, and John Hesford purchased**
12 **certain assets from a receiver brought in by**
13 **Southern Ohio's bank.**
14 Q. At the time of that purchase did you,
15 Mr. Hesford, Mr. Schmitt, and Mr. Ludwig own
16 equal shares of the new Sofco entity?
17 **A. No. Mr. Ludwig had 19 percent. The**
18 **other three had 27 percent each.**
19 Q. Other than you and Mr. Hesford does
20 Sofco Erectors, Inc. have any other officers
21 currently?
22 **A. I'm not sure I know.**
23 Q. Is there a corporate secretary?
24 **A. Not that I know of.**

Page 15

1  Q. Is there a corporate treasurer?
2  **A. I'm not sure.**
3  Q. Does Sofco Erectors, Inc. have a chief
4  financial officer?
5  **A. I believe we do.**
6  Q. And who is that?
7  **A. Caroline Riley. And my hesitation is**
8  **just over titles. We're not too big on titles.**
9  Q. What's the -- what type of business is
10 Sofco Erectors, Inc. currently?
11 **A. It's an erection company. Erect mostly**
12 **steel and precast.**
13 Q. Building erection?
14 **A. Yes, sir.**
15 Q. And in what geographic area does Sofco
16 Erectors operate?
17 **A. Usually in central Ohio, southern and**
18 **southwestern Ohio, northern Kentucky, parts of**
19 **Indiana.**
20 Q. Indiana, is that primarily Indianapolis
21 area?
22 **A. Right.**
23 Q. How many employees does Sofco Erectors
24 currently have?

Page 16

1  **A. It varies on a daily basis.**
2  Q. Okay. Approximately?
3  **A. 150.**
4  Q. And your focus currently is on the
5  central Ohio market and the Indianapolis market.
6  Is that correct?
7  **A. Right.**
8  Q. How many employees work for Sofco in the
9  central Ohio market?
10 **A. Same answer. Changes daily, but today**
11 **probably in the range of 40.**
12 Q. Of the 40 employees in the central Ohio
13 market how many of them are actually doing
14 erection work?
15 **A. Well, I guess that depends on**
16 **definition.**
17 Q. That's fair. Let me ask it a different
18 way. What are the different job classifications
19 that you have in the central Ohio market?
20 **A. I mean, we have project managers,**
21 **estimators, myself, connectors.**
22 Q. Did you say project manager? Was that
23 the first one?
24 **A. Yes.**

Page 17

1  Q. What does a project manager do?
2  **A. Manages the projects.**
3  Q. Are they supervisory employees?
4  **A. Yes.**
5  Q. What do the estimators do?
6  **A. Estimate projects.**
7  Q. And we talked about you. What do the
8  connectors do?
9  **A. They connect pieces of steel in the air.**
10 Q. So other than the project managers,
11 estimators, connectors and yourself are there
12 any other job classifications that you have in
13 the central Ohio market for Sofco Erectors,
14 Inc.?
15 **A. I mean, I guess I'm hung up a little bit**
16 **on the classifications word. We don't classify**
17 **them as -- I mean, as an example, I do project**
18 **management and estimating and whatever else is**
19 **needed.**
20 Q. Okay. Let me ask it this way: If I
21 were to go to a job site where Sofco Erectors
22 has been hired to erect a structure, I assume
23 there would be a project manager on the site,
24 correct?

Daniel Powell
October 09, 2018

Page 18

1    A.  No.  Probably general foreman.

2    Q.  Okay.  And what are the foreman's

3  duties?

4    A.  Oversees the project.

5    Q.  And who are the people that he oversees?

6    A.  The ironworkers and operators.

7    Q.  What do the ironworkers do at the site

8  for Sofco Erectors?

9    A.  Everything involved in getting the

10  building erected.

11    Q.  What do the operators do for Sofco at

12  the site?

13    A.  Run all the cranes, erecting.

14    Q.  So when you used the term the connectors

15  earlier, is that describing work of the

16  ironworkers of connecting the steel?

17    A.  Yes.

18    Q.  And then the operators use the cranes to

19  lift the steel into place for the connectors to

20  work on it.  Is that fair?

21    A.  Correct.

22    Q.  So you use the term connectors.  Is that

23  another way to describe the work that the

24  ironworkers do on a Sofco Erectors site,

Page 19

1  connecting the --

2    A.  It's a very specific part of the

3  ironwork.

4    Q.  And when you use the term operators, are

5  you referring to crane operators?

6    A.  Yes.

7    Q.  How many crane operators does Sofco

8  Erectors, Inc. currently employ in the central

9  Ohio market?

10    A.  Well, we hire Capital City Crane in

11  Columbus who uses Local 18 operators.  Today

12  there's probably three or four.

13    Q.  Are you aware that previously Sofco

14  Erectors, Inc. had employed Local 18 operators

15  directly to operate cranes in the central Ohio

16  market?

17    A.  No.  I would guess not this Sofco, not

18  since 2004, I don't know that to be the case.

19    Q.  Are you aware that between 2004 and 2017

20  Sofco Erectors, Inc. was a party to a Collective

21  Bargaining Agreement with Local 18?

22    A.  I guess I don't know that for positive.

23    -=0=-

24    (Deposition Exhibit 1 marked.)

Page 20

1    -=0=-

2  BY MR. CLARK:

3    Q.  Mr. Powell, you've just been handed a

4  document marked as Exhibit 1 for your deposition

5  today.  This is a letter dated February 7, 2017

6  to Richard Dalton, Business Manager, Local 18

7  Operating Engineers.  Have you seen this

8  document before?

9    A.  I believe so.

10    Q.  At the top of the letter the letterhead

11  says it's coming from Sofco Erectors, Inc.  The

12  second address is a 7667 Fishel Drive South,

13  Dublin, Ohio address.  You see that?

14    A.  I do.

15    Q.  Is that the Sofco Erectors location that

16  you work out of?

17    A.  It is.

18    Q.  And was that Fishel Drive location your

19  office location in February of 2017?

20    A.  Yes.

21    Q.  The body of the letter states that

22  effective April 28th, 2017 Sofco is terminating

23  our participation in the AGC of Ohio Building

24  Agreement effective May 8, 2013 through

Page 21

1  April 30, 2017.  You see that?

2    A.  I do.

3    Q.  Are you familiar with the term AGC of

4  Ohio?

5    A.  Yes.

6    Q.  What is the AGC?

7    A.  I believe Associated General

8  Contractors.

9    Q.  And do you know why Sofco Erectors

10  terminated its participation in the AGC building

11  agreement effective April 30, 2017?

12    A.  I would say it was a combination of

13  reasons.

14    Q.  What were those reasons?

15    A.  I mean, in Columbus the operators

16  appeared to be ramping up their efforts to get a

17  bigger percentage of our use of forklifts, and

18  they started to be more aggressive, just costing

19  us a lot of time.  It became more clear that

20  they were not working in our best interests.

21    Q.  What other reasons were there for Sofco

22  Erectors to terminate the AGC building agreement

23  in 2017?

24    A.  I mean, those were kind of my reasons.

Daniel Powell
October 09, 2018

Page 22

1  **That was a decision that John Hesford and I made**
2  **together.**
3  Q.  Other than Local 18's efforts to get the
4  forklift operation work from Sofco, are there
5  any other reasons for the decision to terminate?
6  **A.  I guess I can't remember.**
7  Q.  So you just remember that one reason?
8  **A.  I do remember that one reason.**
9  Q.  What did Local 18 do that indicated to
10  you that it was intending to pursue the forklift
11  work?
12  **A.  They started spending more time showing**
13  **up on jobs which causes our guys to stop**
14  **working.**
15  Q.  Who showed up on jobs?
16  **A.  Union representatives.**
17  Q.  Do you know any of their names?
18  **A.  Chad Creeks I think might be one of**
19  **them.**
20  Q.  When did the union -- you said they
21  ramped up their efforts.  When did that ramp-up
22  start in your mind?
23  **A.  I don't have a specific time.**
24  Q.  This letter was sent in February of

Page 23

1  2017.  Was it in 2017 that those efforts got
2  ramped up or was it before 2017?
3  **A.  I would say it was before then.**
4  Q.  Was it in 2016?
5  **A.  I don't know when it was.**
6  Q.  If you look back at Exhibit 1, it refers
7  to the building agreement that was effective
8  May 8, 2013 through April 30, 2017.  You see
9  that line?
10  **A.  I do.**
11  Q.  Are you aware of efforts prior to May 8
12  of 2013 by Local 18 to see to it that Sofco
13  Erectors assigned operators to forklifts?
14  **A.  Yes.**
15  Q.  How are you aware of that?
16  **A.  It's what I just said.  They started**
17  **showing up more, demanding more of our time.**
18  Q.  But prior to May 8, 2013 had Local 18
19  shown up and pushed Sofco Erectors to hire
20  operators to operate forklifts?
21  **A.  I would say yes.**
22  Q.  Were there instances where
23  representatives of Local 18 would show up at a
24  job site and find that a -- that someone other

Page 24

1  than a Local 18 member was operating a forklift
2  for Sofco Erectors?
3  **A.  Yes.**
4  Q.  And did Local 18 file grievances over
5  those incidents?
6  **A.  I'd say I know they have, I'd say, more**
7  **often than not.**
8  Q.  Was one of your responsibilities on
9  behalf of Sofco to negotiate resolutions to
10  those grievances with Local 18?
11  **A.  Sometimes.**
12  Q.  Do you recall who you dealt with on
13  behalf of Local 18 on grievances concerning
14  forklift operation?
15  **A.  It would be various people, including**
16  **the -- I'll call them agents who came to the**
17  **site.**
18  Q.  Do you know who Tom Byers is?
19  **A.  I do.**
20  Q.  Who's Mr. Byers?
21  **A.  He's an officer at the operators Local**
22  **18.**
23  Q.  And did you have conversations with
24  Mr. Byers about Local 18's grievances concerning

Page 25

1  the assignment of forklift work?
2  **A.  I would say generally.**
3  Q.  Did you have more than one conversation
4  with Mr. Byers about Sofco Erectors assignment
5  of forklift work?
6  **A.  Yes.**
7  Q.  And in those conversations with
8  Mr. Byers did you agree that Sofco Erectors
9  would assign Local 18 operators to operate
10  forklifts?
11  **A.  I don't believe so.**
12  Q.  Did you agree in those conversations
13  with Mr. Byers to pay Local 18 members who were
14  denied the opportunity to operate forklifts at
15  Sofco Erectors?
16  **A.  I don't believe so.**
17  Q.  You don't believe you ever agreed to
18  that?
19  **A.  Not that I can recall.**
20  Q.  When Local 18 representatives arrived at
21  a job site and saw someone else was operating a
22  forklift other than a Local 18 member, do you
23  recall who in those instances had been assigned
24  to work the forklift?

Daniel Powell
October 09, 2018

Page 26

1    A. Ironworkers.
2    Q. And were there other instances where
3  Local 18 representatives visited a Sofco job
4  site and Local 18 members were operating
5  forklifts for Sofco Erectors?
6    A. Yes.
7    Q. Who -- on a specific job site who would
8  make the determination for Sofco Erectors as to
9  whether an operator or an ironworker would run a
10  forklift?
11    A. Generally ironworkers would run the
12  forklifts. The field would call into the office
13  if they thought an operator would be a good
14  idea.
15    Q. When you say the field, who is that
16  referring to?
17    A. Sofco employees in the field. General
18  foreman.
19    Q. And what factors might impact a decision
20  as to whether an ironworker or operator would be
21  the right choice to run a forklift?
22    A. Productivity, availability.
23    Q. Do you know who Chad creeks is?
24    A. Yes, I believe I mentioned him.

Page 27

1    Q. Is he the business representative for
2  Local 18?
3    A. One of them.
4    Q. And do you recall Mr. Creeks submitting
5  a grievance to you regarding Sofco's failure to
6  hire a Local 18 member to operate a forklift?
7    A. Not specifically.
8    Q. Do you recall agreeing to resolve a
9  grievance with Mr. Creeks by agreeing that Sofco
10  Erectors would hire an apprentice from Local 18
11  to operate forklifts?
12    A. Again, not specifically.
13            -=0=-
14        (Deposition Exhibit 2 marked.)
15            -=0=-
16  BY MR. CLARK:
17    Q. Mr. Powell, if you could take a look at
18  the document we've marked as Exhibit 2. This is
19  a settlement letter dated March 24, 2014.
20  There's a signature block on the lower
21  right-hand page 1 of Exhibit 2. It says your
22  name under it. Is that your signature?
23    A. Yes.
24    Q. And did you sign this settlement letter

Page 28

1  in your capacity as president and COO of Sofco
2  Erectors?
3    A. It would appear so.
4    Q. And does this settlement letter refresh
5  your recollection that you agreed to resolve a
6  grievance with Local 18 by agreeing to hire an
7  apprentice from the union for the operation of
8  forklifts?
9    A. It would appear.
10    Q. Did Sofco Erectors comply with this
11  settlement agreement?
12    A. I don't know.
13    Q. Why don't you know?
14    A. It's four years ago. I just don't
15  remember the specific job.
16    Q. Do you ever recall agreeing to settle a
17  grievance with Local 18 and then not following
18  through on the aspect of the agreement that you
19  signed off on?
20    A. No.
21    Q. You mentioned a few moments ago that
22  Sofco Erectors, Inc. subcontracted crane
23  operation work to other entities. Do you recall
24  that?

Page 29

1    A. Yes.
2    Q. I think you mentioned that in at least
3  the central Ohio market Capital City Crane is
4  the entity that you utilized. Is that correct?
5    A. Correct.
6    Q. When did Sofco Erectors, Inc. begin to
7  subcontract for crane operation in the central
8  Ohio market?
9    A. I don't remember.
10    Q. More than five years ago?
11    A. Yes.
12    Q. More than 10 years ago?
13    A. I'm not sure.
14    Q. Before Sofco Erectors, Inc. -- let me
15  take a step back.
16        Why did Sofco Erectors, Inc. begin to
17  subcontract for crane operation work?
18    A. That's the way the crane company did it
19  that we used.
20    Q. And what crane company was that?
21    A. Capital City Crane.
22    Q. You say that's the way they did it.
23  What did they do?
24    A. They supplied cranes operated.

Daniel Powell
October 09, 2018

Page 30

1  Q. And at some point was that a change in
2  their operation? Had they previously just
3  supplied the crane and you provided the
4  operator?
5  **A. No.**
6  Q. Do you recall when the last time Sofco
7  Erectors, Inc. directly employed a crane
8  operator in the central Ohio market?
9  **A. No.**
10  Q. Was it more than five years ago?
11  **A. I believe so.**
12  Q. When -- was it more than 10 years ago?
13  **A. Again, I'm not sure.**
14  Q. Whenever it was that Sofco Erectors,
15  Inc. last directly employed a crane operator as
16  opposed to having an operator supplied by the
17  crane company were those crane operators members
18  of Local 18?
19  **A. Yes.**
20  Q. Prior to 2004 when you were in your
21  position as manager of central Ohio operations
22  for the old Sofco entity did that business
23  utilize Local 18 members as crane operators?
24  **A. Yes.**

Page 31

1  Q. And did that practice of utilizing Local
2  18 members -- of employing Local 18 members as
3  crane operators continue from old Sofco to new
4  Sofco in 2004?
5  **A. Yeah. I don't remember the time frame.**
6  **What triggered it was the crane company. We**
7  **used a different crane company.**
8  Q. Okay. So under old Sofco the crane
9  operators were employed by Sofco Erectors and
10  were Local 18 members, correct?
11  **A. Some of them.**
12  Q. Okay. And then in 2004 you're now at
13  your new Sofco entity and that practice
14  continued until sometime where you changed crane
15  suppliers, and the crane operators came with the
16  crane from the subcontractor. Is that correct?
17  **A. So my point is I don't know when we**
18  **started using Capital City. All Crane is the**
19  **company that you could, they call it, bare rent**
20  **a crane, and the operator would be on Sofco's**
21  **payroll. And my point is I don't know if that**
22  **was after 2004.**
23  Q. You don't know when that was. Okay.
24  Looking back at Exhibit 1, if you could,

Page 32

1  in February of 2017 by this point Sofco
2  Erectors, Inc. was not employing any crane
3  operators. Is that correct?
4  **A. In Columbus I believe that's true.**
5  Q. Were there employees of Sofco Erectors
6  outside of Columbus that were crane operators?
7  **A. I don't know that.**
8  Q. Who would know that?
9  **A. Perhaps John Hesford and our**
10  **Indianapolis manager.**
11  Q. Who is the Indianapolis manager?
12  **A. Ken Deladurante.**
13  Q. Can you spell Ken's last name for us?
14  **A. I doubt it. D-E-L -- no.**
15  Q. We won't tell him that.
16  **A. A-D-U-R-A-N-T-E.**
17  Q. So just focused on the Columbus market
18  that you're most familiar with and focusing on
19  February of 2017 who were the Local 18 operators
20  employed by Sofco in your market?
21  **A. In February of 2017. Is that the**
22  **question?**
23  Q. Yes.
24  **A. I don't know for sure. I know we have**

Page 33

1  **or had, I expect, a shop guy at that time named**
2  **Jason Allen that was a member of Local 18 at**
3  **that time. I don't know if we had others or**
4  **not.**
5  Q. If you did have others in the central
6  Ohio market in early 2017, what type of work
7  would they be doing?
8  **A. They would be running forklifts. I'm**
9  **sorry. Was your previous question February of**
10  **2017?**
11  Q. Yes.
12  **A. Okay. Thank you.**
13  Q. Is Jason Allen still employed with Sofco
14  Erectors, Inc.?
15  **A. He is.**
16  Q. What does he do?
17  **A. As I said, we kind of call him the shop**
18  **guy. He does whatever is needed.**
19  Q. How long has Mr. Allen been employed as
20  the shop guy?
21  **A. I'm not sure.**
22  Q. More than five years?
23  **A. I doubt it.**
24  Q. Do you know if Mr. Allen's still a

Daniel Powell
October 09, 2018

Page 34

1  member of Local 18?
2  **A. I believe he is not.**
3  Q. And why do you believe that?
4  **A. Because he wanted to be. I asked**
5  **Mr. Byers if he could, and Mr. Byers said that**
6  **was something he could do, but just that he**
7  **would not do. So he is now in the laborers**
8  **union because he wanted to stay union, and he**
9  **withdrew from Local 18.**
10  Q. Other than Mr. Allen, you said in early
11  2017 other Local 18 members of Sofco would be
12  running forklifts. Do you recall the names of
13  any Local 18 members that operated forklifts for
14  Sofco in 2017?
15  **A. No.**
16  Q. Did any of those forklift operators
17  remain employed with Sofco following the
18  termination of its Collective Bargaining
19  Agreement with Local 18 in April of 2017?
20  **A. No, other than Mr. Allen.**
21  Q. Prior to Mr. Allen, your testimony was
22  that you thought that Mr. Allen had been doing
23  the shop work less than five years. Who did
24  that work prior to Jason Allen?

Page 35

1  **A. I believe his father Jon Allen.**
2  Q. And was Jon Allen a member of Local 18?
3  **A. I believe he was.**
4  Q. Do you recall when Mr. Allen's
5  employment with Sofco ended?
6  **A. I do not.**
7  Q. Did Mr. Allen retire from Sofco?
8  **A. He retired.**
9  Q. On a Sofco Erectors job site is forklift
10  operation a full-time position on the site?
11  **A. It varies.**
12  Q. Are there some projects where you
13  require full-time forklift operator?
14  **A. At times.**
15  Q. You say -- is it more often that
16  forklift operation is not a full-time position
17  on a job site, it's just something done
18  occasionally?
19  **A. I would say so.**
20  Q. Jumping back. Mr. Allen, you described
21  him as shop guy. Where is the shop that he
22  worked out of?
23  **A. That Fishel Drive in Dublin.**
24  Q. He would do maintenance work there?

Page 36

1  **A. Just varies. Make handrail posts, fix**
2  **welding leads, clean tools, run checks, errands.**
3  Q. How many current projects is Sofco
4  Erectors working on in the central Ohio market?
5  **A. In the range of six.**
6  Q. Do any of those six job sites have a
7  full-time forklift operator assigned to them?
8  **A. I don't believe so.**
9  Q. Do all six of those job sites have some
10  forklift work being performed on the site?
11  **A. I don't know.**
12  Q. Do some of them have forklift work being
13  performed?
14  **A. Yes. I was thinking no to your first**
15  **question. They do not all have forklift work.**
16  Q. And currently to the extent that the
17  forklift work is being done at any of those six
18  sites presently in the Columbus, Ohio market
19  that work is being done by members of the
20  ironworkers union?
21  **A. Correct.**
22  Q. When you were with old Sofco and
23  managing the central Ohio market for -- I think
24  you mentioned earlier that at that point Sofco

Page 37

1  Erectors was a party to a Collective Bargaining
2  Agreement with Local 18, correct?
3  **A. Again, I can't swear to that.**
4  Q. Did you employ members of Local 18 at
5  old Sofco in the central Ohio market?
6  **A. At times.**
7  Q. And those were the crane operators
8  primarily?
9  **A. Yes.**
10  -=0=-
11  (Deposition Exhibit 3 marked.)
12  -=0=-
13  BY MR. CLARK:
14  Q. Mr. Powell, you've just been handed a
15  document that we've marked as Exhibit 3. If I
16  could have you look at Exhibit 3 in conjunction
17  with Exhibit 1 that I showed you earlier.
18  Exhibit 1 is the letter to Mr. Daulton of Local
19  18 terminating participation in the AGC of Ohio
20  Building Agreement from May 8th, 2013 through
21  April 30 of 2017. Is Exhibit 3 the Collective
22  Bargaining Agreement that Exhibit 1 is
23  terminating?
24  **A. It appears to be.**

Page 38

1  Q. This document was provided to us by your
2  counsel in this case. That's what the numbers
3  down at the bottom right are indicating. I
4  should say it came from you and we use those to
5  identify page numbers. So if I could ask you to
6  turn to the last page which is marked Sofco
7  2359.
8  A. Got it.
9  Q. This page has a signature line for the
10  employer to sign this agreement. As you can
11  see, this version is unsigned. Do you believe
12  that a representative of Sofco Erectors at some
13  point signed this AGC of Ohio Building
14  Agreement?
15  A. I don't know that.
16  Q. Other than Exhibit 1 that I showed you
17  earlier are you aware of any other notices of
18  termination sent on behalf of Sofco to Local 18
19  terminating any Collective Bargaining Agreement?
20  A. No.
21  (Recess taken.)
22  BY MR. CLARK:
23  Q. Mr. Powell, we just took a brief break.
24  We're back on the record. And if I could ask

Page 39

1  you to take another look at Exhibit 3, the AGC
2  of Ohio Building Agreement that we marked
3  earlier. Do you agree that this agreement makes
4  forklift operation part of the work jurisdiction
5  of Local 18?
6  A. No.
7  Q. Why not?
8  A. I believe it's ironworkers work. I was
9  looking for the jurisdiction section.
10  Q. Why don't you turn to page -- actually
11  on the Sofco -- it's Sofco 2316. I think
12  section 10 is jurisdiction of work. Why don't
13  you just read that section to yourself. I've
14  got a couple questions, but I want to give you
15  an opportunity to look at it.
16  A. Okay.
17  Q. And if you could direct your attention
18  to the last sentence of section 10 of the
19  jurisdiction of work portion of the Collective
20  Bargaining Agreement. It states that it is
21  further understood that all equipment for which
22  classifications and wages have been established
23  in this agreement, including that equipment for
24  which classification and wage rates may

Page 40

1  hereafter be established, shall be manned when
2  operated on the job site by a member of the
3  International Union of Operating Engineers and
4  paid the rates as specified in this agreement.
5  You see that sentence?
6  A. I do.
7  Q. And does that indicate that when this
8  agreement establishes a wage rate for a job that
9  that work is to be performed by an operating
10  engineer?
11  A. I don't know if that's what it means.
12  Q. Have you ever read this work
13  jurisdiction section of the AGC building
14  agreement before this morning?
15  A. I'm sure I have.
16  Q. In what context did you read it before?
17  A. I don't recall.
18  Q. If you could turn back in the agreement
19  to Sofco 2340. And these are copied sideways,
20  but if you turn and look at what is page 53 of
21  the agreement, do you see forklift work
22  listed -- or forklift listed on page 53?
23  A. Rough terrain with winch/hoist. I do.
24  Q. Turning further back in the agreement to

Page 41

1  Sofco 2349.
2  A. Okay.
3  Q. I'm sorry, one more page, 2350, and on
4  what is page 73 of the agreement there's a
5  classification called group C, established. Do
6  you see forklifts identified as a piece of
7  equipment under group C?
8  A. Yes, except masonry.
9  Q. Does Sofco Erectors do any masonry work?
10  A. No.
11  Q. Turn back one page 2349. On page 70 of
12  the agreement there's a classification described
13  as group A. Do you see again forklift listed
14  under group A as a classification?
15  A. I see forklift, rough terrain with
16  winch/hoist.
17  Q. Do you know what a winch/hoist is?
18  A. I do not.
19  Q. Turn further to Sofco 2353. On page 78
20  and going onto 79 of the agreement there's a
21  classification group A. Do you see again
22  forklift, rough terrain with winch/hoist listed?
23  A. Yes.
24  Q. And then turning further to Sofco

Daniel Powell
October 09, 2018

Page 42

1  2355 -- actually starts on 2354 there's a
2  classification group C, and on 2355, which is
3  page 82 of the agreement, do you again see
4  forklifts except masonry listed?
5      A.  Yes.
6      Q.  And then turning then further to Sofco
7  2356 there's a group E classification.  Do you
8  see under group E masonry forklift is listed?
9      A.  Yes.
10     Q.  So we've looked at six instances in
11  which the AGC of Ohio Building Agreement
12  identifies forklift work as work to be assigned
13  to the operating engineers.  You had stated
14  earlier that you believe forklift work was
15  ironworkers work.  What is your basis for that
16  conclusion?
17     A.  What you just ran through is what the
18  operators claim to be their work.  I believe
19  these agreements to be bits and pieces of years
20  and years of modifying these agreements.
21     Q.  Are you aware of any written
22  modifications of the AGC building agreement with
23  respect to forklift work?
24     A.  Exhibit 3?  Is that your question?

Page 43

1      Q.  Yes.
2      A.  I am not.
3      Q.  So why do you believe that forklift work
4  is ironworkers work?
5      A.  I believe it's a jurisdictional dispute.
6  We've used ironworkers on forklifts for years
7  and years and years with minimal issues out of
8  the operators.
9      Q.  And you have also at times used
10 operating engineers on forklifts, correct?
11     A.  Yes.
12     Q.  Have the ironworkers ever filed a
13 grievance over your assignment of an operating
14 engineer to operate a forklift?
15     A.  I don't know.
16     Q.  Have the ironworkers ever threatened to
17 strike Sofco Erectors because of a decision that
18 you made to assign forklift work to an operating
19 engineer?
20     A.  Not that I recall.
21     Q.  Has a representative of the ironworkers
22 union ever caused a disruption on a Sofco work
23 site because forklift work was being performed
24 by an operating engineer?

Page 44

1      A.  Possibly.
2      Q.  Do you recall when that happened?
3      A.  I don't.
4      Q.  Do you know that that happened?
5      A.  I can recall Local 18 members operating
6  forklifts when damage occurred.  I'm not
7  positive the union representatives were there
8  other than Sofco employees.  They may have been.
9      Q.  Have the ironworkers ever filed unfair
10 labor practice charge against Sofco because it
11 assigned forklift work to operating engineers?
12     A.  Not that I'm aware.
13     Q.  Has Sofco Erectors ever been a party to
14 a 10-K proceeding before the National Labor
15 Relations Board regarding the assignment of
16 forklift work?
17     A.  Not that I'm aware.
18     Q.  You used the term a few minutes ago it's
19 a jurisdictional dispute.  What's your
20 understanding of the term jurisdictional
21 dispute?
22     A.  Several or multiple different building
23 trades, unions claiming same work.
24     Q.  And when there are multiple claims for

Page 45

1  the same work, the dispute is among the various
2  unions that want to perform the work?
3      A.  I would say.
4      Q.  Is James Ludwig still -- you mentioned
5  he's retired.  Does he still have any ownership
6  interest in Sofco Erectors?
7      A.  He does not.
8      Q.  Did Mr. Ludwig cease to become an owner
9  at the time of his retirement?
10     A.  Yes.
11     Q.  When he retired, was he bought out as an
12 owner?
13     A.  He was.
14     Q.  When did Mr. Schmitt cease to be an
15 owner of Sofco Erectors?
16     A.  I don't know the exact timing.  My guess
17 is 10 or 12 years ago.
18     Q.  Did that come about through the
19 litigation that you described earlier in
20 Hamilton County?
21     A.  He sought to get out shortly thereafter.
22          -=0=-
23        (Deposition Exhibit 4 marked.)
24          -=0=-

Daniel Powell
October 09, 2018

Page 46

1  BY MR. CLARK:
2      Q.  You had mentioned earlier this morning
3  that your title with the old Sofco entity was
4  manager for the central Ohio market.  Did
5  Mr. Hesford have a title or role with old Sofco?
6      A.  Yes.
7      Q.  Do you recall what that title was?
8      A.  I do not.
9      Q.  Do you recall what Mr. Hesford's role
10  with the old Sofco was?
11      A.  Not exactly.
12      Q.  Mr. Hesford a manager in the old Sofco
13  entity?
14      A.  Again, 2004 I was in Columbus.
15      Q.  So your testimony you don't have any
16  idea what Mr. Hesford was doing for the old
17  Sofco?
18      A.  That wasn't my testimony.  I'd say he
19  was taking off jobs, perhaps managing jobs.
20      Q.  What was Mr. Ludwig's role with the old
21  Sofco?
22      A.  He was president as well.
23      Q.  Do you know where Mr. Ludwig was
24  physically based when he served as president of

Page 47

1  the old Sofco?
2      A.  In Cincinnati.
3      Q.  Do you know how long prior to -- I'm
4  sorry.  Let me back up a step.
5          Prior to the -- in 2004 Mr. Ludwig
6  became president of the new Sofco entity.  Prior
7  to that was he serving as president of the old
8  Sofco entity?
9      A.  I believe so.
10      Q.  And do you know for how long prior to
11  2004 Mr. Ludwig had served as president of the
12  old Sofco entity?
13      A.  I do not.
14      Q.  It was a period of years?
15      A.  Yes.
16      Q.  Was Mr. Ludwig your supervisor when you
17  were manager for the central Ohio market for the
18  old Sofco?
19      A.  Yes.
20      Q.  Was that a direct reporting relationship
21  that you had to Mr. Ludwig?
22      A.  Yes.
23      Q.  Did Mr. Schmitt have any role in the old
24  Sofco entity?

Page 48

1      A.  No.
2      Q.  If you could turn in exhibit -- take a
3  step back.  Exhibit 4 is a letter addressed to
4  me from your counsel -- or from Sofco Erectors
5  counsel, Mr. Greenberg, dated July 24, 2018.
6  Have you seen this correspondence before this
7  morning?
8      A.  I'm not sure.
9      Q.  If you could turn to Exhibit A which is
10  attached to Exhibit 4.  Exhibit A is a document
11  titled Asset Purchase Agreement.  Have you seen
12  this document before this morning?
13      A.  Probably.
14      Q.  What is it?
15      A.  Looks like an Asset Purchase Agreement.
16      Q.  Turn to page 21 of the Asset Purchase
17  agreement.  There's an entity identified at the
18  top, Armor Metal Group, Inc.  Mr. Schmitt is
19  listed as associated with that as president.
20  You see that?
21      A.  I do.
22      Q.  What is Armor Metal Group, Inc.?
23      A.  That is one of Dave Schmitt's
24  corporations, I believe.

Page 49

1      Q.  Turn to page 22, next page of the Asset
2  Purchase Agreement.  There's a signature at the
3  bottom on behalf of Sofco Erectors Acquisition,
4  Inc.  Do you recognize that as Mr. Schmitt's
5  signature?
6      A.  Not necessarily, but...
7      Q.  You had described in 2004 that you,
8  Mr. Hesford, Mr. Schmitt, Mr. Ludwig formed a
9  new Sofco entity.  Was that entity called Sofco
10  Erectors Acquisition, Inc.?
11      A.  I believe so.
12      Q.  The Asset Purchase Agreement is signed
13  on behalf of Sofco Erectors, Inc.  Appears to be
14  signed by an individual named Leonard Eppel,
15  E-P-P-E-L.  Do you see that?
16      A.  I do.
17      Q.  Do you know who Mr. Eppel is?
18      A.  I believe he was the receiver brought by
19  Southern Ohio's bank I mentioned.
20      Q.  What bank was Southern Ohio
21  Fabricators -- what was the bank?
22      A.  I don't remember.
23      Q.  Mr. Eppel was the receiver hired by that
24  bank?

Daniel Powell
October 09, 2018

Page 50

1    A. I believe.
2    Q. Did you have any role in negotiating
3 this Asset Purchase Agreement?
4    **A. Very little I'd say.**
5    Q. Were you represented by counsel in
6 negotiating this Asset Purchase Agreement?
7    **A. I don't believe I was personally.**
8    Q. Do you know if Sofco Erectors
9 Acquisition, Inc. was represented by counsel in
10 negotiation of this Asset Purchase Agreement?
11    **A. I know there was involvement with**
12 **Finney, Stagnaro, Saba on page 21.**
13    Q. Did you ever have any communications
14 with Mr. Stagnaro regarding this Asset Purchase
15 Agreement?
16    **A. Yes. Well, let me back up. I guess I**
17 **can't recall specifically to the Asset Purchase**
18 **Agreement.**
19    Q. If you could turn now to Exhibit B
20 that's attached to Exhibit 4, and this is a
21 certificate from the Ohio Secretary of State's
22 Office that was provided to us by your counsel,
23 and specifically if you could look at page 2 of
24 Exhibit B. And in the middle of the page

Page 51

1 there's a line that asks for name and title of
2 officer and identifies James W. Ludwig as
3 president. You see that?
4    **A. I do.**
5    Q. And I think we talked earlier Mr. Ludwig
6 was president of Sofco Erectors Acquisition,
7 Inc. in 2004, correct?
8    **A. That, I'm not positive. This was the**
9 **old Sofco before Sofco Erectors Acquisition I**
10 **stated James was president.**
11    Q. Sofco Erectors Acquisition is the new
12 Sofco, correct?
13    **A. It was -- it is what it is. It's now**
14 **Sofco Erectors, Inc.**
15    Q. When was the asset transfer concluded?
16    **A. I mean, I don't know the exact date**
17 **unless it's on this. I don't have the exact**
18 **date, I don't think.**
19    Q. Turn to the first page of Exhibit 4.
20 The last paragraph on first page states, old
21 Sofco, also named Sofco Erectors, Inc. operated
22 prior to April 1, 2004. On April 1, 2004 Sofco
23 Erectors Acquisition, Inc. acquired all of old
24 Sofco's assets. Do you see that?

Page 52

1    **A. I do.**
2    Q. Does that refresh your recollection as
3 to the date that Sofco Erectors Acquisition,
4 Inc. acquired old Sofco's assets?
5    **A. I won't dispute it.**
6    Q. Now, turn back to the last page of
7 Exhibit B. There's a signature -- I'm sorry,
8 second-to-last page, page 3 of Exhibit B. Do
9 you recognize that as Mr. Ludwig's signature?
10    **A. I believe so.**
11    Q. And the signature's dated June 10 of
12 2004, correct?
13    **A. Yes.**
14    Q. As of June 10, 2004 was Mr. Ludwig
15 serving as president of the new Sofco entity?
16    **A. I would say.**
17    Q. Do you recognize the 3280 Hageman Street
18 address?
19    **A. No.**
20    Q. Turning back to the Asset Purchase
21 Agreement we looked at earlier, Exhibit A that's
22 attached to Exhibit 4, specifically page 22.
23 You saw this was signed by Mr. Schmitt on behalf
24 of Sofco Erectors, Inc. Was Mr. Schmitt

Page 53

1 authorized to sign that agreement on behalf of
2 Sofco Erectors Acquisition, Inc.?
3    **A. I'm assuming.**
4    Q. Why do you assume that?
5    **A. Because he did sign it.**
6               -=0=-
7        (Deposition Exhibits 5-6 marked.)
8               -=0=-
9 BY MR. CLARK:
10    Q. Mr. Powell, placed in front of you a
11 document we've marked as Exhibit 5. This was a
12 document produced by your counsel to us in this
13 matter. On page 1 it's entitled the AGC of Ohio
14 Building Agreement, May 1 of 2004 through
15 April 30th, 2007. Do you recognize this
16 agreement?
17    **A. Sure.**
18    Q. What is it?
19    **A. It's the AGC Operating Engineers Local**
20 **18 agreement for that specific time frame.**
21    Q. And was Sofco Erectors, Inc. a party to
22 this agreement?
23    **A. I don't know.**
24    Q. If you could turn to Exhibit 6, the

Daniel Powell
October 09, 2018

Page 54

1 other document that we handed you.

2 **A. Yes.**

3 Q. This is the acceptance of agreement
4 page. Do you recognize Mr. Ludwig's signature
5 on Exhibit 6?

6 **A. I do.**

7 Q. The signature's dated 9-17-2004. Is
8 that correct?

9 **A. Yes.**

10 Q. And that was after the Asset Purchase
11 Agreement that we saw earlier, correct?

12 **A. Yes.**

13 Q. And as of September of 2004 Mr. Ludwig
14 was acting as president of the new Sofco
15 Erectors, Inc. Is that correct?

16 **A. I believe so.**

17 Q. Would Mr. Ludwig have been authorized as
18 president of the company to execute a Collective
19 Bargaining Agreement on its behalf?

20 **A. I would think. I'm a little confused,**
21 **though, because this is -- shows page 85 and**
22 **this agreement stops at page 41. I don't see a**
23 **signature page in this agreement.**

24 Q. If you turn to Sofco 2163.

Page 55

1 **A. Not in order.**

2 Q. I did not do the copying so I can't
3 explain it.

4 **A. Okay. I see.**

5 Q. You see the signature page on 2163?

6 **A. Yes.**

7 Q. For the period of 2004 through 2007
8 Sofco Erectors, Inc. continued to employ members
9 of Local 18. Is that correct?

10 **A. I don't know.**

11 Q. You aware that Sofco Erectors, Inc. made
12 contributions to the pension plan -- the Ohio
13 Operating Engineers Pension Plan during the
14 period of May 2004 through April of 2007?

15 **A. Not specifically, no.**

16 Q. If the pension fund's records reflect
17 monthly contributions from Sofco for the period
18 of 2004 through 2017, do you have any reason to
19 question that?

20 **A. No.**

21 Q. Were you aware that prior to April of
22 2004 Sofco Erectors, Inc. made contributions to
23 the Ohio Operating Engineers Pension Plan?

24 **A. Again, I wouldn't dispute it.**

Page 56

1 Q. Do you know who Ann McClain is?

2 **A. Yes. She was an employee I believe with**
3 **Southern Ohio.**

4 Q. Was her title senior accounting clerk?

5 **A. It's possible.**

6 Q. Do you know what Ms. McClain's job
7 duties for the old Sofco were?

8 **A. No.**

9 Q. Do you know what locations McClain
10 worked out of?

11 **A. I believe somewhere in Cincinnati.**

12 Q. Do you know who Eddy Adkins is?

13 **A. I don't believe so.**

14 Q. Do you know who Dennis Dinsmoor,
15 D-I-N-S-M-O-O-R, is?

16 **A. I don't believe so.**

17 Q. How about Richard Hedke, H-E-D-K-E?

18 **A. I don't believe so.**

19 Q. Thomas Kennedy?

20 **A. I know a Thomas Kennedy.**

21 Q. Do you know a Thomas Kennedy that worked
22 for Sofco Erectors, Inc. in 2003?

23 **A. I know a Thomas Kennedy that worked at**
24 **Sofco. So I can't confirm the date is what I'm**

Page 57

1 trying to say.

2 Q. Was Mr. Kennedy a member of Local 18?

3 **A. I believe so.**

4 Q. How about Robert Maricle, M-A-R-I-C-L-E,
5 do you know Mr. Maricle?

6 **A. Not that I'm aware.**

7 Q. Paul Nokes, N-O-K-E-S, do you know
8 Mr. Nokes?

9 **A. No, sir.**

10 Q. How about Diane Smallwood, do you know
11 Diane Smallwood?

12 **A. I believe that was a Cincinnati**
13 **employee.**

14 Q. Of what company?

15 **A. I would say the old Sofco. I don't know**
16 **about the new Sofco or Acquisition.**

17 -=0=-

18 (Deposition Exhibit 7 marked.)

19 -=0=-

20 BY MR. CLARK:

21 Q. Mr. Powell, the court reporter just
22 handed you another exhibit marked as Exhibit 7.
23 This is an additional acceptance of agreement
24 page. To the right is a date written March 12,

Daniel Powell
October 09, 2018

Page 58

1 1984. Do you see that?

2 **A. I do.**

3 Q. The name of the company on this form is

4 Sofco Erectors, Inc. Do you see that?

5 **A. Yes.**

6 Q. The address appears to be 10333 Wayne in

7 Cincinnati.

8 **A. Okay.**

9 Q. Do you recognize that address?

10 **A. I do.**

11 Q. What is that address?

12 **A. That's the address of the building in**

13 **Cincinnati that Southern Ohio and Sofco used to**

14 **be at.**

15 Q. And did Sofco Erectors Acquisition, Inc.

16 acquire that property in 2004?

17 **A. No.**

18 Q. Do you recognize the company

19 representative's signature as Mr. Ludwig's

20 signature?

21 **A. I do not.**

22 Q. Do you know what Mr. Ludwig's role with

23 Sofco Erectors, Inc. was in 1984?

24 **A. No.**

Page 59

1 Q. Did you have any role with Sofco

2 Erectors, Inc. in 1984?

3 **A. Probably not. Again, I can't remember**

4 **when I started co-oping at Southern Ohio. It**

5 **was in that time frame.**

6 Q. To the best of your knowledge, was Sofco

7 Erectors a party to a Collective Bargaining

8 Agreement with Local 18 at the time you started

9 co-oping?

10 **A. I would have no idea.**

11 Q. Do you have any reason to dispute that?

12 **A. No.**

13 -=0=-

14 (Deposition Exhibit 8 marked.)

15 -=0=-

16 BY MR. CLARK:

17 Q. The next exhibit that we've placed in

18 front of you is an agreement dated August 10,

19 1987 between Local 18 and Sofco Erectors, Inc.

20 Have you seen Exhibit 8 before?

21 **A. Not that I'm aware.**

22 Q. Look down at the bottom left corner of

23 Exhibit 8. There's a signature and then typed

24 James W. Ludwig, Vice President/General

Page 60

1 Superintendent. You see that?

2 **A. I do.**

3 Q. Was Mr. Ludwig vice president and

4 general superintendent of Sofco Erectors, Inc.

5 in 1987?

6 **A. I have no idea.**

7 Q. Were you employed with Sofco Erectors,

8 Inc. in 1987?

9 **A. I'm not sure.**

10 Q. You ever been a member of a labor union

11 yourself?

12 **A. No.**

13 Q. The address listed for Sofco Erectors,

14 Inc. is a P.O. Box 15546. Do you recognize that

15 address?

16 **A. I do not.**

17 -=0=-

18 (Deposition Exhibit 9 marked.)

19 -=0=-

20 BY MR. CLARK:

21 Q. The next exhibit's been marked as

22 Exhibit 9. This is another acceptance of

23 agreement form. Have you seen Exhibit 9 before?

24 **A. I don't believe so.**

Page 61

1 Q. The name of the company on this form is

2 Sofco Erectors, Inc., correct?

3 **A. Yes.**

4 Q. And the address is the same Wayne Avenue

5 address we saw on the prior form. Is that

6 correct?

7 **A. Yes.**

8 Q. And do you recognize the signature on

9 this form as Mr. Ludwig's signature on behalf of

10 the company?

11 **A. I do not.**

12 Q. Do you recognize that signature as

13 someone else's signature?

14 **A. I do not.**

15 Q. Do you know who signed this agreement on

16 behalf of Sofco Erectors, Inc.?

17 **A. No. My eyes aren't very good.**

18 -=0=-

19 (Deposition Exhibit 10 marked.)

20 -=0=-

21 BY MR. CLARK:

22 Q. Mr. Powell, the next exhibit we've

23 marked it as Exhibit 10 is a lengthy document

24 with several exhibits attached to it. I promise

Daniel Powell
October 09, 2018

Page 62

1  I'm not going to make you read the whole thing,
2  but the first document that makes up Exhibit 10
3  is entitled Notice of Initiation of Arbitration.
4  Have you seen the Notice of Initiation of
5  Arbitration before?
6  **A.  Is that the first several pages?**
7  Q.  Yeah.  Feel free to look at it before
8  you answer.
9  **A.  I'm not sure.**
10  Q.  You're not sure if you've seen it
11  before?
12  **A.  Right.**
13  Q.  You understand that the Ohio Operating
14  Engineers Pension Fund has assessed withdrawal
15  liability against Sofco Erectors, Inc.?
16  **A.  I believe that's true.**
17  Q.  Do you have an understanding of what
18  withdrawal liability is?
19  **A.  I'll say some.**
20  Q.  What do you understand withdrawal
21  liability to be?
22  **A.  That a pension fund is underfunded**
23  **according to some calculations and a withdrawing**
24  **employer may be assessed a portion of that**

Page 63

1  **unfunded amount.**
2  Q.  Page 1 of Exhibit 10 states that Sofco
3  Erectors, Inc. disputes the Fund's alleged
4  determinations of partial and complete
5  withdrawal and demand for payment to the
6  employer dated August 31st, 2017.
7  Do you have an understanding of what
8  partial withdrawal liability is?
9  **A.  I would say not fully.**
10  Q.  What is your understanding of partial
11  withdrawal liability?
12  **A.  Just that it's, I believe, terms used in**
13  **this type of thing, this PBGC regulations.**
14  Q.  Do you have an understanding of what the
15  term complete withdrawal means?
16  **A.  Same answer.**
17  Q.  Have you reviewed any PBGC regulations
18  regarding partial or complete withdrawal
19  liability?
20  **A.  I believe so.**
21  Q.  Which regulations do you recall
22  reviewing?
23  **A.  I have no idea.**
24  Q.  Do you recall what any of those

Page 64

1  regulations said?
2  **A.  Not specifically.**
3  Q.  Why did you review the PBGC regulations
4  regarding withdrawal liability?
5  **A.  Because we got a notice that said we**
6  **owed a bunch of money to somebody.**
7  Q.  If you could turn to Exhibit A that's
8  attached to Exhibit 10.  And my question is
9  simply do you recognize this Exhibit A as the
10  notice you got assessing the withdrawal
11  liability?
12  **A.  I believe so.**
13  Q.  Looking at the first page of Exhibit A,
14  you're notified the Ohio Operating
15  Engineers Pension Fund was assessing withdrawal
16  liability -- partial withdrawal liability in the
17  amount of $344,627 for the plan year ending
18  July 31st of 2011?
19  **A.  I don't see where you're at the**
20  **moment.**
21  Q.  First bullet point on page 1.
22  **A.  Okay.  I see it.**
23  Q.  Do you understand that partial
24  withdrawal liability is assessed when an

Page 65

1  employer has a decline in their contributions to
2  a pension plan?
3  **A.  I don't understand all of the meanings**
4  **of partial withdrawal.**
5  Q.  Do you understand that an employer
6  incurs complete withdrawal liability when it
7  terminates its participation in a pension plan?
8  **A.  Again, I don't have a firm grasp of all**
9  **those regulations.**
10  Q.  If you could continue turning in Exhibit
11  **A.  These were not marked so I don't have**
12  **numbers at the bottom of each page to direct you**
13  **to.  Turn to the sixth page of Exhibit A.  Looks**
14  **like this.  Does it say Exhibit A at the upper**
15  **right?**
16  **A.  It does.**
17  Q.  This is a document that was sent to
18  Sofco Erectors, Inc. by the Ohio Operating
19  Engineers Pension Plan with the withdrawal
20  liability assessment, and Exhibit A shows the
21  contributions that Sofco Erectors, Inc. has made
22  to the pension plan in each year.  You see the
23  column on this page that is listed as -- titled
24  Contribution Based Units (Hours)?

Daniel Powell
October 09, 2018

Page 66

1    A. Yes.

2    Q. And according to this document the

3    contribution hours declined from 2008, a level

4    of 11,978 hours, to 2009, 1,607 and a half

5    hours. You see that?

6    A. Yes.

7    Q. Can you think of anything that happened

8    with Sofco Erectors business between 2008 and

9    2009 that would have led to a decline in Sofco's

10   contributions to the pension fund?

11   A. I believe the financial meltdown was in

12   2008. I'd say all of construction was

13   significantly down to every pension fund.

14   Q. Is 2008 the year that Sofco Erectors,

15   Inc. began to utilize subcontractors to perform

16   crane operation work?

17   A. Again, I said I don't know what that

18   time frame was.

19   Q. Do you know what Sofco Erectors gross

20   revenue was in 2008?

21   A. No.

22   Q. Do you know what it was in 2009?

23   A. No.

24   Q. Do you know if it went up or down from

Page 67

1    2008 to 2009?

2    A. No.

3    Q. Since 2004, has Sofco Erectors ever had

4    a year where its revenues declined by more than

5    80 percent from year to year?

6    A. I don't know.

7    Q. You don't know if your revenue declined

8    by more than 80 percent?

9    A. Revenue, not profit was the question. I

10   don't know that.

11   Q. Has, since 2004, Sofco Erectors, Inc.

12   ever had a year where its revenue declined by

13   more than 90 percent from one year to the next?

14   A. I don't know that.

15   Q. Do you have any personal knowledge as to

16   why the contributions from Sofco Erectors

17   declined from 2008 to 2009?

18   A. I do not other than again as I stated

19   the economy I know in that time frame went

20   significantly down.

21   Q. Do you believe that's the explanation or

22   you're just --

23   A. I know for sure the economy went down in

24   that time frame.

Page 68

1    Q. And when the economy went down, how did

2    that impact Sofco's contributions to the pension

3    plan?

4    A. Well, typically we work less hours which

5    means less contributions.

6    Q. Did the contributions from Sofco to the

7    ironworkers pension plan decline from 2008 to

8    2009?

9    A. I don't know.

10   Q. Would you expect that they would have if

11   the economy was declining at that time?

12   A. Yes.

13   Q. If you could turn in Exhibit 10 now to a

14   document that was marked as Exhibit C. This is

15   again a letter from your counsel, Mr. Greenberg,

16   dated November 29, 2017. Have you seen this

17   correspondence before this morning?

18   A. I don't know.

19   Q. Looking at the first page of the

20   November 29, the second full paragraph concludes

21   with the sentence: The previous owner of these

22   assets was Southern Ohio Fabricators, Inc. A

23   list of its owners at the time of purchase is

24   attached as Exhibit 1. You see that statement?

Page 69

1    A. I do.

2    Q. If you could turn to Exhibit 1 which is

3    titled List of Shareholders of Southern Ohio

4    Fabricators, Inc. Do you have any knowledge of

5    any shareholders of Southern Ohio Fabricators,

6    Inc. that are not listed on Exhibit 1?

7    A. No.

8    Q. Do you believe Exhibit 1 constitutes a

9    complete list of all the shareholders of

10   Southern Ohio Fabricators, Inc.?

11   A. I never knew who the shareholders were.

12   Q. Do you know who Patricia Kling Ballman

13   is?

14   A. No.

15   Q. Do you know who Elizabeth Kling Mayotte,

16   M-A-Y-O-T-T-E, is?

17   A. No.

18   Q. Do you know who Christina Perry is?

19   A. No.

20   Q. Do you know any members of the Kling

21   family? K-L-I-N-G.

22   A. I mean, I know Jack. I believe I met

23   Susan Kling Worthington. I may have met

24   Elizabeth Kling Mayotte. I believe I did.

Daniel Powell
October 09, 2018

Page 70

1    Q.  There's a number of individuals with the
2  last name Nickerson on this list.  Do you know
3  any members of the Nickerson family?
4    A.  I believe Jerry Nickerson was the only
5  one and maybe Anne Nickerson.
6    Q.  Did any of the Klings or Nickersons have
7  any active roles in the day-to-day operation of
8  the old Sofco entity?
9    A.  I would say I don't believe so.
10    Q.  Last name on this list on Exhibit 1 is
11  James Ludwig, again.  You previously indicated
12  that he was the president of Southern Ohio
13  Fabricators, Inc.  Do you know what his
14  ownership interest in old Sofco was?
15    A.  I do not.
16    Q.  When Sofco Erectors Acquisition, Inc.
17  purchased the assets of old Sofco, did
18  Mr. Ludwig receive any proceeds from that sale?
19    A.  I don't know.
20    Q.  In the first quarter of 2004 you
21  mentioned that there was a receiver involved
22  with old Sofco's bank.  Was Sofco Erectors, Inc.
23  still operating in the first quarter of 2004?
24    A.  Old Sofco I believe was.

Page 71

1    Q.  And for January through April 1st of
2  2004 did you continue to be paid in your
3  capacity as a manager for the old Sofco entity?
4    A.  I don't recall.
5    Q.  You don't recall if there was a period
6  where you went without pay for three months?
7    A.  I don't believe I went without pay for
8  three months.
9    Q.  Did you have any ownership interest in
10  the old Sofco entity?
11    A.  No.
12    Q.  Did Mr. Schmitt have any ownership
13  interest in the old Sofco entity?
14    A.  No.
15    Q.  How do you know that?
16    A.  I thought you just told me these were
17  all the owners.  I don't believe he did.  How's
18  that?
19    Q.  Okay.  I'm not telling you -- I'm
20  showing this is the list that I received from
21  your counsel, so I'm --
22    A.  I understand.
23    Q.  I'm asking if you know -- if this list
24  is accurate as far as you know or if there's

Page 72

1  others that I'm not aware of?
2    A.  I don't know of others.  And as far as I
3  know Dave Schmitt did not own any of Southern
4  Ohio.
5    Q.  So do you have any reason to doubt the
6  accuracy of this list that I have as Exhibit 1?
7    A.  No.
8    Q.  Who is Timothy Gates?
9    A.  Tim Gates was president, I believe, of
10  Southern Ohio Fabricators at some point.
11    Q.  Did Mr. Ludwig in his capacity as
12  president of Sofco Erectors, Inc. report to
13  Mr. Gates?
14    A.  I believe so.
15    Q.  When's the last time you spoke to
16  Mr. Gates?
17    A.  I don't remember.
18    Q.  In the last year?
19    A.  No.
20    Q.  Do you know what Mr. Gates is doing
21  currently?
22    A.  No.  I think he helps out at the church.
23    Q.  Which church?
24    A.  I have no idea.

Page 73

1    Q.  His church?
2    A.  I don't know.
3    Q.  How do you know that he helps out at the
4  church?
5    A.  I think someone told me that that knew
6  him.
7                -=0=-
8        (Deposition Exhibit 11 marked.)
9                -=0=-
10  BY MR. CLARK:
11    Q.  Next exhibit that we marked as
12  Exhibit 11 is a two-page document that is titled
13  Affidavit of Tim Gates.  Have you seen this
14  document before?
15    A.  Yes.
16    Q.  When have you seen it?
17    A.  I believe it was an exhibit in one of
18  these depositions.
19    Q.  The deposition of Mr. Byers?
20    A.  I would say.
21    Q.  Did you attend Mr. Byers' deposition?
22    A.  Did not.
23    Q.  What deposition did you see Exhibit 11
24  before?

Daniel Powell
October 09, 2018

Page 74

1    A. I don't recall for sure. I attended
2 Mr. Ciner's deposition.
3    Q. Have you read the Affidavit of Tim Gates
4 before this morning?
5    **A. Skimmed it.**
6    Q. Could you look at -- this is a sworn
7 statement of Mr. Gates as provided and it was
8 produced to us in this matter. Could you take a
9 look at paragraph five of Mr. Gates' affidavit.
10 You see that?
11    **A. Yes.**
12    Q. He states, in March 2004 old Sofco sold
13 its assets to Sofco Erectors Acquisition, Inc.,
14 a company owned by John Hesford, Jim Ludwig, and
15 Dan Powell. Do you see that?
16    **A. I do.**
17    Q. Would you agree with me that that
18 statement is not accurate?
19    **A. I don't know why Dave Schmitt isn't on**
20 **that list.**
21    Q. Would Mr. Gates have been aware
22 Mr. Schmitt was involved in the Asset Purchase
23 Agreement in 2004?
24    **A. I don't know what he would have known.**

Page 75

1    Q. So you would agree that paragraph five
2 is not accurate?
3    **A. I don't know everything about Sofco**
4 **Erectors Acquisition. Again, I was in Columbus**
5 **most of the time.**
6    Q. You did own 27 percent of Sofco Erectors
7 Acquisition, Inc., correct?
8    **A. I believe so.**
9    Q. And you currently own 50 percent of
10 that -- the entity that was Sofco Erectors
11 Acquisition, Inc.?
12    **A. I believe so.**
13    Q. Paragraph eight in Mr. Gates' affidavit
14 states that none of the owners of Southern Ohio
15 Fabricators, Inc. or old Sofco owned or operated
16 or had any involvement in any company that
17 performed erection services after the sale of
18 old Sofco's assets. Do you see that?
19    **A. I do.**
20    Q. Would you agree with me that that
21 statement is not accurate?
22    **A. I don't know that that's not accurate.**
23    Q. You saw earlier that Mr. Ludwig was on a
24 list of owners of Southern Ohio Fabricators,

Page 76

1 Inc., correct?
2    **A. Yes.**
3    Q. And I think we've established that
4 Mr. Ludwig both owned a percentage of and served
5 for a time as president of the new Sofco entity
6 which performed erection services after the
7 asset sale, correct?
8    **A. Yes.**
9    Q. Do you know why Mr. Gates excluded
10 reference to Mr. Ludwig's continuation with the
11 new Sofco entity in this affidavit?
12    **A. No.**
13    Q. Turning back to Exhibit 10 and that list
14 we saw of the shareholders of Southern Ohio
15 Fabricators, Inc.
16    **A. Okay.**
17    Q. So we talked about Mr. Ludwig. Other
18 than Mr. Ludwig did any of the other individuals
19 on this list have any ownership interest in
20 Sofco Erectors Acquisition, Inc.?
21    **A. I don't believe so.**
22    Q. Do you know that for sure or you just
23 don't know?
24    **A. Again, I'll say I don't believe so,**

Page 77

1 **because I don't know the acquisition company. I**
2 **don't recall exactly how that worked.**
3    Q. Do you know who Stephen Sudin,
4 S-U-D-I-N, is?
5    **A. He, I believe, ran the fabrication**
6 **operation for Southern Ohio.**
7    Q. And did he have any role with the new
8 Sofco entity after April 2004?
9    **A. No.**
10    MR. CLARK: Why don't we take a break.
11    (Recess taken.)
12    MR. CLARK: Back on the record.
13 BY MR. CLARK:
14    Q. Mr. Powell, we had, earlier this
15 morning, talked about forklift operation at
16 Sofco Erectors and who does it. Would you
17 describe -- just focusing on the forklift work,
18 is that a substantial portion of the work that
19 is done by Sofco Erectors?
20    **A. No.**
21    Q. There are some documents that we've been
22 provided I want to show you.
23         -=0=-
24    (Deposition Exhibit 12 marked.)

Daniel Powell
October 09, 2018

Page 78

1          -=0=-
2   BY MR. CLARK:
3       Q.  Mr. Powell, the document we marked as
4   Exhibit 12 has a Bates label of Sofco 2361
5   through 2369.  In this case we had asked Sofco
6   to identify operating engineers who have
7   performed forklift work for Sofco Erectors, Inc.
8   Do you recognize Exhibit 12 as records
9   reflecting operating engineers performing
10  forklift work for Sofco Erectors?
11      **A.  Not necessarily, because Jon Allen is**
12  **the first name I see.  It's not what he does.**
13      Q.  Mr. Allen is the shop employee you
14  identified earlier?
15      **A.  Yes.**
16      Q.  Under each of the names on the first
17  four pages of Exhibit 12 there's indication of
18  group C-18, forklifts.  You see that?
19      **A.  I do.**
20      Q.  Do you know what that's in reference to?
21      **A.  Not for sure.  I believe that is -- it**
22  **could be classification created by the**
23  **operators.**
24      Q.  Created by the operators under the

Page 79

1   building agreement that we looked at earlier?
2       **A.  Right.**
3       Q.  If we could turn to the page in Exhibit
4   12 marked Sofco 2365 towards the back.  And
5   there's a class listed under -- says Local 18
6   class fork truck driver and there are a number
7   of employees listed.  Mr. Allen you mentioned
8   already.  Do you recognize any of the other
9   names listed under fork truck operator on this
10  page?
11      **A.  I may have met Robert Hughes.**
12      Q.  Do you know what Mr. Hughes does or did
13  for Sofco Erectors?
14      **A.  I think he may be a union agent now.  I**
15  **think he may also have run a forklift for us in**
16  **Columbus.**
17      Q.  Sticking to that page 2365, are there
18  any other names other than Mr. Allen and
19  Mr. Hughes that you recognize?
20      **A.  I don't believe so.**
21      Q.  Turn to the next page marked Sofco 2366.
22  We again see Jon Allen identified.  Other than
23  Mr. Allen, do you recognize any of these
24  individuals listed on this page?

Page 80

1       **A.  I don't believe so.**
2       Q.  And turning to Sofco 2367, again same
3   question.  Other than Mr. Allen, do you
4   recognize any of the individuals listed on this
5   page?
6       **A.  I'm not sure about Robert Hoover.  I**
7   **believe we had a Robert Hoover in the shop**
8   **person position.  I don't know if it's the same.**
9       Q.  Do you know if the Robert Hoover that
10  you're recalling in the shop position was a
11  member of Local 18?
12      **A.  I do not.**
13      Q.  All right.  Turn to the last page, Sofco
14  2369, and there are five names listed on this
15  page.  Do you recognize any of those
16  individuals?
17      **A.  I don't believe so.**
18          -=0=-
19          (Deposition Exhibit 13 marked.)
20          -=0=-
21  BY MR. CLARK:
22      Q.  Mr. Powell, I've handed you a three-page
23  exhibit marked as Exhibit 13.  Pages are Sofco
24  548 through 550.  We received this document from

Page 81

1   your counsel in this case in response to a
2   request to identify the ironworkers who were
3   performing forklift work for Sofco Erectors,
4   Inc.  Do you recognize Exhibit 13 as ironworkers
5   who are assigned forklift work for Sofco
6   Erectors?
7       **A.  No.  This is Local 44 which is**
8   **ironworkers local in Cincinnati.**
9       Q.  What's the ironworkers local in central
10  Ohio area?
11      **A.  Local 172.**
12      Q.  To the extent that forklift work is
13  being performed by Sofco Erectors in the central
14  Ohio market, is it being assigned to ironworkers
15  Local 172 members?
16      **A.  Yes.**
17          -=0=-
18          (Deposition Exhibit 14 marked.)
19          -=0=-
20  BY MR. CLARK:
21      Q.  So the next exhibit that I've marked as
22  Exhibit 14 is Bates labeled Sofco 186 through
23  194, and then in the middle of exhibit it picks
24  up Sofco 310 to 418.  Let's focus first on just

Daniel Powell
October 09, 2018

Page 82

1 the first half 186 through 194. These appear to
2 be invoices from Sunbelt Rentals.
3 **A. Yes.**
4 Q. And the notation on the first page of
5 the exhibit, COLS with a date range, I'm
6 assuming that was a reference to Columbus. Do
7 you know what the Sunbelt Rental invoices are?
8 **A. They appear to be invoices for us having**
9 **Sunbelt Rental move forklifts around the city in**
10 **Columbus in that time period.**
11 Q. Time period being August of '17 through
12 July 31st of '18?
13 **A. Yes. And I hesitate because the invoice**
14 **doesn't always line up exactly with when the**
15 **work was performed.**
16 Q. Now, turning to the second half of the
17 exhibit that starts on Sofco 310 and runs
18 through 418, do these Sunbelt Rental invoices
19 reflect moving or maintenance of forklifts for a
20 period of August 2012 through July of 2013?
21 **A. It appears so. Actually I'd say if you**
22 **went clear to the end there's an August of '10**
23 **through 7 of '11 section.**
24 -=0=-

Page 83

1 (Deposition Exhibit 15 marked.)
2 -=0=-
3 BY MR. CLARK:
4 Q. Mr. Powell, I want to now turn to Sofco
5 Erectors, Inc.'s relationship with the
6 ironworkers union. I believe you identified
7 Ironworkers Local 172 as the ironworkers union
8 that covers the central Ohio market that you
9 manage. Is that correct?
10 **A. Yes.**
11 Q. Exhibit 15, do you recognize this as the
12 Central Ohio AGC agreement with Ironworkers
13 Local 172?
14 **A. Appears to be.**
15 Q. Did you participate on behalf of the AGC
16 in negotiating this agreement?
17 **A. I believe so.**
18 Q. Page 38 of the agreement.
19 **A. Yes.**
20 Q. You're identified as participating on
21 behalf -- for the employer, Central Ohio AGC.
22 Who's Richard J. Hobbs?
23 **A. I believe he's president of the AGC here**
24 **in Columbus.**

Page 84

1 Q. And how about Craig Wanner, W-A-N-N-E-R?
2 **A. He's another steel contractor,**
3 **owner/operator.**
4 Q. Do you know what his business is that he
5 owns?
6 **A. Wanner Metal Works.**
7 Q. How about Ken Gonya, G-O-N-Y-A, who is
8 Ken?
9 **A. Ken is an employee of Kokosing. They're**
10 **also a contractor.**
11 Q. What was your role in negotiating this
12 AGC agreement with Local 172?
13 **A. I was one of the contractors that**
14 **negotiated with the union.**
15 Q. If you could turn to page 4 of the
16 contract marked Sofco 1413. Article one
17 entitled Craft Jurisdiction. Are you aware of
18 anywhere in article one describes forklift work
19 as ironworker work?
20 **A. I haven't read it recently.**
21 Q. You can read it.
22 **A. Section one says this agreement covers**
23 **all field erection, construction work**
24 **traditionally performed by and coming under the**

Page 85

1 jurisdiction of the association.
2 **Section 7, this local claims its members**
3 **fabrication, production, erection, and**
4 **construction of all iron, steel, ornamental**
5 **lead, bronze, brass and so on, awnings, all of**
6 **that involves forklift use.**
7 **Making and installation of -- page 6,**
8 **making and installation of all articles made of**
9 **wire and fibrous rope, marquees, material**
10 **altered in field, such as framing, cutting,**
11 **bending, drilling.**
12 **Item one, the assembly and erection of**
13 **all metal shapes, sheets, pieces, studs, girts,**
14 **purlins.**
15 **The fabrication, maintenance, repair,**
16 **rigging and setting of all metal, intermodal**
17 **transportation containers and all related**
18 **accessories.**
19 **Unloading, handling, hoisting,**
20 **distribution, placing and tying of reinforcing**
21 **bar.**
22 **Unloading and erection of all of these**
23 **involve forklifts.**
24 Q. Still on page 5, article one, you,

Daniel Powell
October 09, 2018

Page 86

1  earlier today, used the term jurisdictional
2  dispute in referencing a dispute between two
3  unions regarding who's going to do what work,
4  correct?
5      **A. Yes.**
6      Q. And section five speaks to what action
7  an employer should take in the event of a
8  jurisdictional dispute. Is that correct?
9      **A. I don't know if I read that that's the**
10  **employer's to do. In the event of any dispute**
11  **as to jurisdiction of work covered such dispute**
12  **shall be referred to international unions.**
13     Q. Do you understand section five of the
14  AGC agreement for Local 172 to refer
15  jurisdictional disputes to the international
16  unions and then to require an employer to abide
17  by whatever determination those unions make?
18     **A. It would appear so.**
19     Q. Are you aware that the ironworkers union
20  and the operating engineers union have resolved
21  a jurisdictional dispute and agreed that
22  forklift work should be assigned to operating
23  engineers?
24     **A. No.**

Page 87

1          **-=0=-**
2      (Deposition Exhibit 16 marked.)
3          -=0=-
4  BY MR. CLARK:
5      Q. Mr. Powell, I've handed you a document
6  that we've marked as Exhibit 16. I assume you
7  haven't seen Exhibit 16 before today. Is that
8  correct?
9      **A. I believe that's correct.**
10     Q. This is a document that is marked OOE
11  562 through 567, and this is an agreement
12  between International Union of Operating
13  Engineers and the Ironworkers International
14  Union. If you could turn to page 2. At the top
15  you see the section one, forklifts? First
16  sentence: The operation of forklifts shall be
17  the work of operating engineers. Did I read
18  that correctly?
19     **A. Yes.**
20     Q. So were you unaware of the existence of
21  this agreement between the international unions
22  regarding the assignment of forklift work?
23     **A. Correct. I was unaware.**
24     Q. And you would agree that article one,

Page 88

1  section five of the agreement with -- Sofco
2  Erectors' agreement with Local 172 would require
3  Sofco as an employer to implement any resolution
4  of a jurisdictional dispute reached by the
5  international unions, correct?
6      **A. I mean, at first glance perhaps. This**
7  **is dated August 19th of 1970 so I don't know**
8  **what has happened between then and now.**
9      Q. Does Sofco Erectors, Inc. employ any
10  maintenance employees?
11     **A. Not specifically called that.**
12     Q. The shop individual that we identified,
13  both Allens, do either of them perform
14  maintenance work on equipment for Sofco
15  Erectors?
16     **A. At times.**
17     Q. What type of maintenance work do they
18  perform?
19     **A. I know they change oil in the welders**
20  **and the office trucks. They repair welding**
21  **lead, take care of tools.**
22          **-=0=-**
23      (Deposition Exhibit 17 marked.)
24          -=0=-

Page 89

1  BY MR. CLARK:
2      Q. Mr. Powell, the next exhibit has been
3  marked as Exhibit 17 and this was a document
4  produced by Sofco to us in this case. Title is
5  Rented Forklift per job/hours. Do you recognize
6  this report?
7      **A. Yes.**
8      Q. What is it?
9      **A. It appears to be a summary of forklift**
10  **rental in Cincinnati and Columbus with looks**
11  **like rental hours for the forklift, and on the**
12  **right there's an operator forklift hours.**
13     Q. What are the -- what does the operator
14  forklift hours indicate?
15     **A. I believe that's through payroll, the**
16  **operators that may have been paid under that**
17  **classification.**
18     Q. Those operators would have been members
19  of Local 18. Am I correct?
20     **A. I believe so.**
21     Q. And we see in 2017 -- or from two
22  thousand -- from 8-1-15 to 7-31-16 there are a
23  total of 1158 operator hours, correct?
24     **A. Right.**

Daniel Powell
October 09, 2018

Page 90

1    Q.  And that drops from '16 -- in row two
2   from 8-1-16 to July 31 of '17 to only 88 hours.
3   Is that correct?
4       **A.  That's what it looks like it says.**
5       Q.  Does that reflect the fact that Sofco
6   Erectors, Inc. terminated its Collective
7   Bargaining Agreement with Local 18 in early
8   2017?
9       **A.  That would certainly impact it.**
10      Q.  Just focusing on the Columbus Sunbelt
11  Rental hours in August 1, '17 through July 31st
12  of '18, it's 7,664 hours.  What does that
13  represent?
14      **A.  I believe that is the sum of the hours**
15  **that we paid rental for forklifts which means we**
16  **had -- we have in Columbus two rough terrain**
17  **forklifts owned by Sofco.  After that with**
18  **additional forklift work required, we rent**
19  **typically from Sunbelt.**
20      Q.  And does Sunbelt provide an operator to
21  run the forklift when you rent?
22      **A.  No.**
23      Q.  So the 7,664 hours is not necessarily
24  the number of hours that the forklift was in

Page 91

1   operation at a Sofco site.  That's the number of
2   hours that you paid to rent it from Sunbelt?
3       **A.  Yes.**
4       Q.  Okay.  So had Sofco Erectors continued
5   to be -- continued in its collective bargaining
6   relationship with Local 18 and had assigned
7   Local 18 members to operate the forklift, you
8   would expect that the operator hours for the
9   August '17 through July of '18 period would be
10  something less than 7,664 hours, correct?
11      **A.  Right.**
12      Q.  Because there's some period of time
13  where the forklift is being rented but not being
14  utilized?
15      **A.  Hopefully not, but possibly.**
16              -=0=-
17      (Deposition Exhibit 18 marked.)
18              -=0=-
19  BY MR. CLARK:
20      Q.  The next document that you've been
21  handed, sir, has been marked as Exhibit 18,
22  Bates stamped Sofco 1 through 31.  Do you
23  recognize this exhibit?
24      **A.  I believe it is from a book in our**

Page 92

1   Cincinnati office probably called something like
2   job book.
3       Q.  Do you know what the purpose of a job
4   book is?
5       **A.  So we assign a job number to each job,**
6   **and this is a chronological listing of those in**
7   **some time frame.**
8       Q.  Okay.  Each job appears -- column 10
9   appears to be dated.  Is that correct?
10      **A.  There's a date there.**
11      Q.  Do you know what that date indicates?
12      **A.  I do not.**
13      Q.  And the dates on Exhibit 18 appear to
14  run from December of 2003 through July of 2018.
15  Do you see that?
16      **A.  Yeah, from page 1 to page 31.**
17      Q.  Does this job book log each job
18  performed by Sofco Erectors from a period of
19  December 2003 through July 2018?
20      **A.  Again, I don't know that they're related**
21  **to when the job was performed.**
22      Q.  Column 8 on Exhibit 18 appears to be
23  titled Certified.  You see that?
24      **A.  I do.**

Page 93

1       Q.  Do you know what that means or
2   indicates?
3       **A.  I believe that's whether the girls in**
4   **accounting generate a certified payroll**
5   **report --**
6       Q.  And what's the purpose --
7       **A.  -- required on public work typically.**
8       Q.  Looking at still page 1, column -- I
9   don't know.  I guess it's next to the certified
10  column.  Appears to be titled Project Manager.
11      **A.  Yes.**
12      Q.  And then the column 9, I guess it's
13  Initial.  Do you know what Initial indicates?
14      **A.  I do not.**
15      Q.  On page 1 under Initial there appears to
16  be a Tom.  Do you know who that Tom is in
17  reference to?
18      **A.  I do not.**
19              -=0=-
20      (Deposition Exhibit 19 marked.)
21              -=0=-
22  BY MR. CLARK:
23      Q.  Mr. Powell, the next exhibit that you've
24  been handed has been marked as Exhibit 19, is

Daniel Powell
October 09, 2018

Page 94

1  Sofco Erectors' responses to Ohio Operating
2  Engineers Pension Fund's first set of requests
3  for interrogatories.  If you could turn to
4  page 2 of Exhibit 19.  And these were written
5  questions that we served on behalf of the
6  pension plan on Sofco Erectors.  And if you see
7  in response to interrogatory number one you are
8  identified as one of the individuals that
9  assisted in providing information that made up
10 the responses.  Do you see that?
11     **A.  I do.**
12     Q.  Have you seen Exhibit 19 before today?
13     **A.  I'm not sure.**
14     Q.  Do you recall assisting in the
15 preparation of responses to interrogatories in
16 this case?
17     **A.  I believe so.**
18     Q.  Turn on page 4 of the exhibit, looking
19 at interrogatory number eight.  Interrogatory
20 requested the identity of each person who's an
21 owner, officer or director of Sofco Erectors,
22 Inc. from January 1st, 1980 through the present.
23 You see that?
24     **A.  I do.**

Page 95

1     Q.  And the response -- the response
2  indicates that subject to and without waiving
3  objections John Hesford and Dan Powell are
4  Sofco's owners, and Jim Ludwig also initially
5  owned a portion of Sofco.  You see that?
6     **A.  Yes.**
7     Q.  In addition to Mr. Hesford, yourself,
8  Mr. Ludwig, I believe Mr. Schmitt was also an
9  owner of Sofco Erectors, correct?
10    **A.  Right.**
11    Q.  And similarly in response to
12 interrogatory number nine, which asks for the
13 identity of each owner, officer, director of
14 Sofco Erectors Acquisition, Inc., Mr. Ludwig,
15 Mr. Hesford, and yourself are listed, but
16 Mr. Schmitt is not.  Do you see that?
17    **A.  I do.**
18    Q.  Do you know why Mr. Schmitt was not
19 listed in response to interrogatory number nine?
20    **A.  I do not.**
21    Q.  In response to interrogatory number 10
22 you were asked to identify the owner, officer,
23 or director of Southern Ohio Fabricators, Inc.,
24 January 1st, 1980 through the present.  You see

Page 96

1  that question?
2     **A.  I do.**
3     Q.  And in response Sofco has stated, moving
4  onto page 6, that the Kling and Nickerson family
5  owned Southern Ohio Fabricators, Inc., and that
6  Tim Gates was the president of Southern Ohio
7  Fabricators, Inc.  Is that correct?
8     **A.  That's what it says.**
9     Q.  I think we just saw earlier that
10 Mr. Ludwig was also an owner of Southern Ohio
11 Fabricators, Inc.  Is that correct?
12    **A.  That's what that paper said.**
13    Q.  Do you know why Mr. Ludwig is not listed
14 in response to interrogatory number 10?
15    **A.  I do not.**
16    Q.  The Asset Purchase Agreement that we saw
17 earlier and the letter from your counsel
18 indicated the asset purchase was concluded on
19 April 1st of 2004.  Do you recall that?
20    **A.  Okay.**
21    Q.  And looking on page 4 of Exhibit 19 in
22 response to interrogatory number 6, we asked
23 Sofco to identify the commencement date which
24 was the date that it first had an obligation to

Page 97

1  contribute to the Ohio Operating Engineers
2  Pension Fund, and the response we received was
3  April 1st, 2004.  You see that?
4     **A.  I do.**
5     Q.  Do you know what happened on April 1st,
6  2004 that commenced an obligation on behalf of
7  Sofco Erectors Acquisition, Inc. to contribute
8  to the pension fund of the Ohio Operating
9  Engineers?
10    **A.  I believe that's when the company was
11 started.**
12    Q.  When the company was started, did you
13 notify Local 18 that there had been an asset
14 transfer and change in company?
15    **A.  I personally did not.**
16    Q.  Do you know if anyone did on behalf of
17 Sofco Erectors?
18    **A.  I do not.**
19    Q.  Do you know if anyone on behalf of Sofco
20 Erectors notified the Ohio Operating Engineers
21 Pension Plan that an asset purchase had happened
22 and that there was a new entity that was formed
23 as of April 1st, 2004?
24    **A.  I do not.**

Daniel Powell
October 09, 2018

Page 98

1    Q.  You recall earlier today we looked at
2  the signature page executed by Mr. Ludwig in
3  September of 2004 signing under the AGC building
4  agreement?  Do you recall that?
5    **A.  I believe.**
6    Q.  Are you aware of any other Collective
7  Bargaining Agreement entered into by Sofco
8  Erectors between April 1st of 2004 and September
9  of 2004 when Mr. Ludwig executed that signature
10  page?
11    **A.  I believe we were signatory with the**
12  **ironworkers.**
13    Q.  Did you -- did Sofco Erectors sign a new
14  contract with the ironworkers when it concluded
15  the asset purchase in April 2004?
16    **A.  I'm not sure.**
17    Q.  Did Sofco Erectors continue to operate
18  under the old Sofco's agreement?
19    **A.  No, I don't think that.**
20    Q.  Why don't you think that?
21    **A.  Because it was a different company, a**
22  **different tax ID number.**
23       MR. CLARK:  Let's take a quick break.
24          (Recess taken.)

Page 99

1  BY MR. CLARK:
2    Q.  Mr. Powell, I just wanted to -- before
3  we conclude this afternoon, I want to go back.
4  We had talked about your belief earlier in the
5  day you testified to that the forklift operation
6  work is work that should be assigned to the
7  ironworkers as opposed to the operating
8  engineers.  Have we talked about all the reasons
9  you believe that to be the case, or do you have
10  other reasons you believe that the ironworkers
11  are the --
12    **A.  I mean, what were the reasons I gave?**
13    Q.  You said that was your belief, that it
14  was ironworkers work.
15    **A.  Right.**
16    Q.  What is your reason for that belief, or
17  reasons?
18    **A.  Well, I think it's certainly common**
19  **practice.  It's more productive because**
20  **ironworkers can get off the forklift and go do**
21  **ironwork; operators do not.  So it's a big**
22  **productivity issue.  It has been going on as**
23  **long as I'm aware with us and other trades -- or**
24  **other contractors, I'm sorry.**

Page 100

1    Q.  And you acknowledge that Local 18 took
2  the position with Sofco Erectors that forklifts
3  should be operated by members -- by operating
4  engineers, correct?
5    **A.  On some, maybe even rare occasions, but**
6  **there's a lot of -- that one exhibit we looked**
7  **at there's a lot of forklift work that was not**
8  **disputed by the operators.**
9    Q.  In this case we have produced records
10  from Local 18 identifying forklift operators
11  dispatched from the hall to Sofco job sites.
12  Have you seen any of those records?
13    **A.  I believe I've seen -- it looks like**
14  **almost a call-in ticket maybe where Sofco had**
15  **called Local 18 to request an ironworker -- or**
16  **an operator, I'm sorry, for a forklift.  I'm not**
17  **sure that's exactly what you said, but maybe the**
18  **intent's there.**
19    Q.  Do you have knowledge of at least on
20  those occasions where Local 18 has a record of a
21  call from Sofco requesting a forklift operator
22  that Sofco utilized Local 18 operators for that
23  work?
24    **A.  No, not necessarily, because we don't**

Page 101

1  know if one was available, if one was qualified,
2  if one was sent.  I thought what I looked at was
3  a record that looked apparently like we had
4  called and requested one.
5    Q.  Have you also reviewed records of
6  grievances filed by Local 18 against Sofco for
7  failing to assign operators to forklift work?
8    **A.  I have seen some.**
9    Q.  Have you seen them in the context of
10  this case?
11    **A.  Yes.**
12    Q.  I know you testified earlier you don't
13  recall how many such grievances there were?
14    **A.  Correct.**
15    Q.  Do you doubt the authenticity of the
16  grievances that were provided by Local 18?
17    **A.  I mean, I didn't study them.  I'll say**
18  **no.**
19    Q.  You agree that Local 18 took the
20  position that forklift work should be assigned
21  to its members, correct?
22    **A.  Again, sometimes and maybe even rare**
23  **times, yes.**
24    Q.  And Local 18's continued insistence on

Daniel Powell
October 09, 2018

Page 102

1  its members performing forklift work was that
2  the reason that Sofco terminated its contract
3  with Local 18?
4      MR. GERANO:  Object to form.
5      You can answer.
6      **A.  I think what I stated were my reasons**
7  **and the discussion partly were because they**
8  **seemed to be ramping up those efforts to claim**
9  **more percentage of our Sofco work -- forklift**
10 **work, sorry.**
11     Q.  And who were these conversations with?
12     **A.  John Hesford.**
13     Q.  What were Mr. Hesford's reasons for
14 terminating the contract with Local 18?
15     **A.  I don't recall exactly.  Probably some**
16 **of the similar type of thing, but I don't recall**
17 **additional.**
18     MR. CLARK:  Those are all the questions
19 I have for you.  Thanks for your time.
20     **THE WITNESS:  You bet.**
21     (Signature not waived.)
22
23
24

Page 103

1              -=O=-
2      Thereupon, the testimony of October 9,
3  2018, was concluded at 1:21 p.m.
4              -=O=-
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 104

1                    CERTIFICATE
2  STATE OF OHIO      :
                        :  SS:
3  COUNTY OF FRANKLIN :
4          I, Julia Lamb, RPR, CRR, a Notary
   Public in and for the State of Ohio, duly
5  commissioned and qualified, do hereby certify
   that the within-named DANIEL POWELL was first
6  duly sworn to testify to the truth, the whole
   truth, and nothing but the truth in the cause
7  aforesaid; that the testimony then given was
   reduced to stenotypy in the presence of said
8  witness, afterwards transcribed; that the
   foregoing is a true and correct transcript of
9  the testimony; that this deposition was taken at
   the time and place in the foregoing caption
10 specified.
11         I do further certify that I am not a
   relative, employee or attorney of any of the
12 parties hereto; that I am not a relative or
   employee of any attorney or counsel employed by
13 the parties hereto; that I am not financially
   interested in the action; and further, I am not,
14 nor is the court reporting firm with which I am
   affiliated, under contract as defined in Civil
15 Rule 28(D).
16         In witness whereof, I have hereunto
   set my hand and affixed my seal of office at
17 Columbus, Ohio, on this 17th day of October,
   2018.
18
19
20     *Julia Lamb*
21
       Julia Lamb, RPR, CRR
22     Notary Public, State of Ohio.
23 My commission expires:  10-10-22
24

| CINCINNATI | COLUMBUS | INDIANAPOLIS |
|---|---|---|
| Phone: 513-771-1600 | Phone: 614-761-2500 | Phone: 317-352-9680 |
| Fax: 513-771-5490 | Fax: 614-761-2515 | Fax: 317-352-9688 |

# SOFCO ERECTORS, INC.

### *10360 WAYNE AVE. (WOODLAWN) CINCINNATI, OHIO 45215
### 7667 FISHEL DRIVE SOUTH DUBLIN, OHIO 43016
### 7037 BROOKVILLE ROAD INDIANAPOLIS, IN 46239

February 7, 2017

Mr. Richard Dalton, Business Manager
Local 18, the Operating Engineers
3515 Prospect Ave
Cleveland, Ohio 44115

Dear Mr. Richard Dalton,

Effective April 28, 2017, Sofco Erectors is terminating our participation in the AGC of Ohio Building Agreement, effective May 8, 2013 through April 30, 2017, between The International Union of Operating Engineers Local 18 and its Branches (AFL-CIO) and the Labor Relations Division of the AGC of Ohio. Accordingly, if there is any successor agreement to which you believe we are bound, please be advised that we hereby terminate that agreement, and we do not intend to be bound by any future collective bargaining agreement with the AGC and Operating Engineers Local 18.

An Audit Review (attached) was recently performed by Local 18 for the period 6/1/12 to 1/1/17. Please contact Caroline Riley at the Cincinnati office when and if you wish to review our records for the period 1/1/17 to 4/28/17.

Sincerely,

John Hesford
President CEO

Enclosure
Cc: Mr. Richard Hobbs, AGC of Ohio LRD

**EXHIBIT**
1
10-9-18
PENGAD 800-631-6989

SOFCO000046



# *International Union of Operating Engineers*

LOCAL 18 AND ITS BRANCHES · SERVING OHIO

THIRTY-FIVE FIFTEEN PROSPECT AVENUE · CLEVELAND, OHIO 44115-2648

(216) 432-3138          FAX: (216) 432-0370

Richard E. Dalton
Business Manager

February 16, 2017

Mr. John Hesford
President and CEO
SOFCO Erectors, Inc.
10360 Wayne Avenue
Cincinnati, Ohio 45215

Dear Mr. Hesford:

We are in receipt of your letter dated February 7, 2017 in which you have indicated that you will be terminating your collective bargaining agreement(s) with the International Union of Operating Engineers, Local 18 and *SOFCO Erectors, Inc.*

We must advise you that your company will be bound to the terms and conditions of the AGC of Ohio Building Agreement and/or of the Ohio Highway Heavy Agreement until the expiration of same on April 30, 2017.

We hope that you will reconsider, find the newly negotiated agreements favorable and sign at that time.

Sincerely,

Richard E. Dalton
Business Manager

RED/pjn
C: Mr. Thomas P. Byers, President
   Mr. Jefferson Powell, District Representative

SOFCO000048



# International Union of Operating Engineers

LOCAL 18 AND ITS BRANCHES • SERVING OHIO

ELEVEN EIGHTY-EIGHT DUBLIN ROAD. • COLUMBUS, OHIO 43215-7005

(614) 486-5281          FAX: (614) 486-7258

Office of
District No. 3

April 28, 2017

Via Certified Mail #:  7016 2070 0000 4243 2626

Sofco Erectors
7667 Fishel Drive South
Dublin, OH  43016

**RE:  Sofco Erectors**

To Whom It May Concern:

Sofco Erectors has indicated that they intend to terminate their agreement with IUOE Local 18 on April 30, 2017 and stated that ALL Operating Engineers will be laid off on April 28, 2017.

As a result of this action, be advised that effective May 1, 2017 there will be NO FUTURE FRINGE BENEFIT (Health and Welfare, Pension, Education and Safety, Apprenticeship) contributions accepted on your behalf.

You should register at your district office listed below for referral to work.  If you continue to work at Sofco Erectors, be advised that working for a non-signatory contractor is a violation of Local 18 Bylaws.

Please contact your Local 18 District office if you have any questions.

Sincerely,

Greg Greenlee
District Representative

I.U.O.E. Local 18, District 3
1188 Dublin Rd.
Columbus, OH  43215
614-486-5281

SOFCO000052



★
★
★
# *International Union of Operating Engineers*
★
LOCAL 18 AND ITS BRANCHES • SERVING OHIO
★
ELEVEN EIGHTY-EIGHT DUBLIN ROAD • COLUMBUS, OHIO 43215-7005
★
(614) 486-5281          FAX: (614) 486-7258
★

Office of
District No. 3
★
★

March 24, 2014

## Settlement Letter

Sofco Erectors and the International Union of Operating Engineers, Local 18 agree to the following settlement for the grievance dated March 11, 2014.

Sofco Erectors agrees to hire an apprentice from the I.U.O.E. Local 18, District 3 referral for operation of forklifts. It is also agreed that the apprentice will perform other duties as prescribed in the AGC of Ohio Building Agreement, paragraph 79B.

_____
Chad C. Creeks
Business Representative, IUOE Local 18

_____
Dan Powell
Sofco Erectors, President/*COO*

EXHIBIT
2
10-9-18

SOFCO001188

# GRIEVANCE FORM

NAME OF STEWARD OR
BUSINESS REPRESENTATIVE ___ Chad C. Creeks

DATE ___ March 11, 2014

CONTRACTOR ___ SOFCO Erectors

LOCATION OF JOB ___ Delaware County
Powell, Ohio

MEMBER'S NAME ___ Chad C. Creeks

MEMBER'S HOME PHONE INCLUDING AREA CODE
AREA CODE ___ 614-486-5281

MEMBER'S ADDRESS ___ 1188 Dublin Road
Columbus OH 43215

AGENT COVERING JOB ___ Chad C. Creeks

DISTRICT NO ___ 3

STATEMENT OF FACTS ___ During a routine job site visit on March 6, 2014 I discovered SOFCO Erectors, Inc. has breached the AGC Building

Agreement by assigning someone other than an Operating Engineer on a forklift at the Target Store construction

project in Powell, Ohio on Sawmill Road.

RESOLUTION SOUGHT: ___ As a result the employer has agreed to pay the first qualified registered applicant from the IUOE District 3 Referral

the applicable wages and fringes from the first day of the violation.

WHICH AGREEMENT HERE AFFECTED ___ AGC Building Agreement
(Highway, Sewer, Building, Pipeline, etc.)

WHICH ARTICLE OF AGREEMENT AFFECTED ___ Article II, Paragraph 20 & 22

Signature of Steward or Business Representative

Signature of Member

DISPOSITION AND DATE STEP 1: ___ 3/6/2014 ___ Spoke to foreman Alvin Raber.

DISPOSITION AND DATE STEP 2: ___ 3/7/2014 ___ Left voice mail for Mike Talbert, Field Operations Manager. No resolution.

3/11/14 ___ CHAD CREEK CAME TO SOFCO OFFICE - RESOLUTION ___ No resolution.

3/12/14 ___ CHAD CREEK AND THOMAS BYERS CAME TO SOFCO ___ " " ___ SOFCO001187

OFFICE - WANTING PAYMENT IN FULL WAGE & FRINGE

SINCE 3/6/14 WAS END RESOLUTION NO RESOLUTION

NO MENTION OF ACTUALLY PUTTING SOMEONE TO WORK.



# AGC OF OHIO
# BUILDING AGREEMENT

**Effective**
**May 8, 2013 through April 30, 2017**

**Between**

THE INTERNATIONAL UNION OF
OPERATING ENGINEERS
LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

**AND**

**LABOR RELATIONS DIVISION**
**OF THE**
**AGC OF OHIO**



EXHIBIT
3
10-9-18

PENGAD 800-631-6989

SOFCO002308

EMPLOYERS

LABOR RELATIONS DIVISION
AGC OF OHIO

1755 Northwest Boulevard
Columbus, Ohio 43212
(614) 486-6446
FAX: (614) 486-6498
www.agcohio.com

Richard Hobbs
Executive Vice President

SOFCO002309

## INDEX

| | Paragraph |
|---|---|
| Affirmative Action Program | Exhibit B |
| Apprentice/Helper (Oiler), Boiler Operators, | |
| Signalmen Provisions | 77-80 |
| Apprentices | 106-107 |
| Arbitration | 125-126 |
| Bonding | 47 |
| Construction Advancement Program | 108-113 |
| Credit Union | 115 |
| Crews and General Provisions | 77-100 |
| Date Signed and Signatures | 131 |
| Dewatering | 13 |
| Direct Deposit | 63H |
| Discharges | 19 or 25 |
| Divert Wage Increase | 43 |
| Drug Testing | 30 |
| Duration of Agreement | 105 |
| Effective Date of Agreement | 130-131 |
| Employees' Relief | 91 |
| Enforcement Measures | 117-123 |
| Equipment Rental | 99 |
| Escalator Clause and Complementing | 69 |
| Field Mechanic Trainee Wage | Schedule A |
| Four Ten Work Schedule | 63 A-G |
| Fringe Benefit Programs | 41-47 |
| Grievance Procedure | 125-126 |
| Harassment Policy | 31 |
| Hazardous Waste Projects | 15.29 |
| Heaters-Pumps-Boilers-24 hour, 7 day | 68 |
| Holidays | 67 |
| Hourly First-Day Pay | 84 |
| Hourly Pay | 53 or 56 |
| I-9 | 128 |
| Incentive Pay | |
| Underground, Height and Length Booms | 70-76 |
| Jurisdiction-Work | 10-12 |
| Jurisdictional Area | 1-2 |
| Jurisdictional Disputes | 127 |
| Lay-Off | 25,55,60,89 |
| Liabilities | 5 |
| Management Rights | 7 |
| Master Mechanic, Zones 1, 2 & 3 | 87-88 |
| New Unclassified Equipment | 50 |
| Nondiscrimination | 8-9 |

## INDEX (continued)

| | Paragraph |
|---|---|
| Overtime | 62-64 |
| Owner-Operator | 100 |
| PAC / PEP | 114B |
| Pay Checks | 90 |
| Pay Day | 89 |
| Picket Lines | 123 |
| Piggyback Operation | 86 |
| Pre-Job Conference | 15-16 |
| Provisions and Limitations | 6 |
| Recognition | 4 |
| Referral Policy | |
| (Hiring Procedures) | 32-40 |
| Registered Apprentice Wage Schedule | Exhibit A |
| Repairs | 93 |
| Reporting Pay | 59 |
| Safety Program | 26-29 |
| Savings and Separability | 129 |
| Scope of Agreement | 3 |
| Shifts | 81 |
| Site Clearance | 63 |
| Starting Time | 62 |
| Steward | 24-25 |
| Strikes | 124 |
| Sub-Contractors | 117 |
| Supervisory Employees | 97 |
| Termination Slips | 96 |
| Trainee Wage Schedule | Exhibit A |
| Transfer of Union Employees | 119 |
| Transfers on Job Equipment | 21-22 |
| Union Administrative Dues and Deductions | 114-116 |
| Union Shop | 17-18 |
| Wage Rates | Exhibit A |
| Weekly Pay | 52 or 54-55 |
| Work Week | 61 |

| | Page |
|---|---|
| Term of Agreement | 49 |
| Exhibit A, Wage Rates and Fringe Benefits | 51-87 |
| Exhibit B, Affirmative Action Program | 87-90 |
| Acceptance of Agreement | 91-99 |

I

II

## DIRECTORY

### OFFICERS

Local 18 and its Branches
Headquarters Office
3515 Prospect Avenue
Cleveland, Ohio 44115
216-432-3138
FAX: 216-432-0370
www.iuoelocal18.org

Patrick L. Sink
Business Manager

Richard E. Dalton
President

Mark A. Totman
Vice President

Gary G. Siesel
Recording-Corresponding Secretary

Premo P. Panzarello
Financial Secretary

Joseph S. Lucas
Treasurer

## DISTRICT NO. 1

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashtabula | Erie | Huron | Lorain |
| Cuyahoga | Geauga | Lake | Medina |

District Staff
Donald Taggart

David Russell                                    Jack Klopman II
Tom Perevosnik

3515 Prospect Avenue, Cleveland, Ohio 44115
Office: 216-432-3131
Fax: 216-432-3135

## DISTRICT NO. 2

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Allen | Hardin | Paulding | Van Wert |
| Defiance | Henry | Putnam | Williams |
| Fulton | Lucas | Sandusky | Wood |
| Hancock | Ottawa | Seneca | |

District Staff
Gary Siesel

Douglas Leidy                                    Kipton Siesel
Brett LaFaso

2412 South Reynolds Road, Toledo, Ohio 43614
Office: 419-865-0221
Fax: 419-865-0601

III                                              IV

SOFCO002311

## DISTRICT NO. 3

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Athens | Hocking | Meigs | Pike |
| Crawford | Jackson | Morgan | Ross |
| Delaware | Knox | Morrow | Scioto |
| Fairfield | Lawrence | Muskingum | Vinton |
| Franklin | Licking | Perry | Union |
| Gallia | Marion | Pickaway | Wyandot |

District Staff
Timothy Hammock

John Branstool                                       David Hurd
Chad Creeks                                           Matthew Woods
Mark Totman, Legislative Representative

1188 Dublin Road, Columbus, Ohio 43215
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 4/5

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Adams | Clermont | Highland | Preble |
| Auglaize | Clinton | Logan | Shelby |
| Brown | Darke | Madison | Warren |
| Butler | Fayette | Mercer | |
| Champaign | Greene | Miami | |
| Clark | Hamilton | Montgomery | |

Covering the following counties in Kentucky:

| | | | |
|---|---|---|---|
| Boone | Campbell | Kenton | Pendleton |

District Staff
Gary Marsh

Kenneth Waughtai                              Jefferson Powell
Stanley Brubaker                                 Nathaniel Brice
Joe Daniels

8401 Claude Thomas Road, Suite 21-A, Franklin, Ohio 45005
Office: 937-806-0406
FAX: 937-806-0408

v

## DISTRICT NO. 6

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashland | Harrison | Nobel | Summit |
| Belmont | Holmes | Portage | Tuscarawas |
| Carroll | Jefferson | Richland | Washington |
| Coshocton | Monroe | Stark | Wayne |
| Guernsey | | | |

District Staff
Joseph Lucas

Darrin Morgan                                     Doug Pallaye
Joe Casto                                            Brad Marshall

1707 Triplett Boulevard, Akron, Ohio 44306
Office: 330-784-5461
FAX: 330-784-8827

## LOCAL 18S
## STATIONARY ENGINEERS

Staff
Scott Peters
Doug Pallaye
John Hardesty

3515 Prospect Avenue
Room 206
Cleveland, Ohio 44115
Office: 216-432-2668
FAX: 216-432-0796

vi

SOFCO002312

# AGREEMENT

### Between

## The AGC OF OHIO
### Labor Relations Division

### which may be referred to hereinafter
### as the "Association"

### and

## THE INTERNATIONAL UNION
## OF OPERATING ENGINEERS
### LOCAL 18 AND ITS BRANCHES, (AFL-CIO)
### referred to hereinafter as the "Union"

This Agreement is negotiated by and between the Association and the Union within the geographical area as defined herein through their authorized agents, to wit:

That, whereas, the parties desire to stabilize employment and promote efficiency in the Construction Industry, agree upon wage rates, hours and conditions of employment, and to eliminate strikes, boycotts, lockouts and stoppages of work, and

Whereas, the Union and the Employer shall, through the issuance of working rules and regulations to the workmen, inform them of the terms of this Agreement and enforce compliance with the terms thereof, and

Whereas, the Employers agree to recognize and subscribe to the approved referral system as adopted by the International Union of Operating Engineers, Local 18.

Now, therefore, the undersigned Association and the Union agree as follows:

VII

1

SOFCO002313

# ARTICLE I

## GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Geauga, Lake, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

## SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

2

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

# ARTICLE II

## RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**–The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**–This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

3

SOFCO002314

# ARTICLE I

## GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employ-ment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Geauga, Lake, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

## DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

## SCOPE

A. "Industrial and Building Site" work is defined as includ-ing work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, all Wind Generation Devices and all supporting infrastructure (underground and roadway), Solar Farm, Geo Thermal Site, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drain-age lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incin-erator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

2

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

# ARTICLE II

## RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**–The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the ex-clusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are re-ferred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-em-ployer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designa-tion shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**–This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating repre-sentative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

3

SOFCO002315

6. **Provisions and Limitations**--All members of the AGC of Ohio Labor Relations Division, and such other persons, firms or corporations who, as an Employer, become signatory to this Agreement, shall be bound by all of its terms and conditions, as well as any amendments which may be negotiated between the AGC of Ohio Labor Relations Division, and the Union. It is expressly understood that all Employers bound to the terms and conditions of this Agreement are required to pay the amounts as indicated in Article IV to the appropriate Fringe Benefit Programs.

7. **Management Rights**--The operation of the job and the direction of the working forces, including the right to hire, suspend and discharge for proper cause, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer.

8. **Nondiscrimination**--It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio and the Commonwealth of Kentucky and Lawful Orders thereof relative to nondiscrimination and fair employment practices. The Employer and the Union shall not knowingly discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or Apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

9. Further, the Employer and Union agree to adopt and embrace the Pact of 10 July 68 executed under provisions of the Executive Order 11246 and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations revised; an Affirmative Action Program to implement all provisions of applicable federal regulations to assure nondiscrimination in employment, upgrade, demotion or transfer, and recruitment advertising, layoff or termination, rates of pay and selection for all types of training as evidenced in Exhibit "B" attached hereto as if they had originally negotiated the same.

10. **Jurisdiction of Work**--In accordance with the terms of this Agreement, the Employer shall employ Operating Engineers for the erection, operation, assembly and disassembly, and maintenance and repair (fueling and greasing) of the following construction equipment regardless of motive power: Air Compressors, Batch Plants, Boilers, Cableways, Derricks,

4

Finishing Machines, Pumps, Trucks, Crawlers, Locomotive and Tower Cranes; Concrete Mixers and Concrete Mixing Plants, Hoes, Shovels, Pile Drivers, Tractors, Scrapers, Endloaders, Hoists and all like equipment, including the use of Geodimeter or any other device that electronically measures (shoots) distance shall be the work of the Operating Engineers (only applies to in-house crew) within the jurisdiction as assigned to the Union by the American Federation of Labor. It is further understood that all equipment for which classifications and wages have been established in this Agreement, and including that equipment for which classifications and wage rates may hereafter be established, shall be manned, when operated on the job site, by a member of the International Union of Operating Engineers, and paid the rates as specified in this Agreement.

11. Operating Engineers shall be employed to do all pipe fitting and all burning and welding necessary for the preparation and maintaining of equipment operated by members of the Union.

12. Operating Engineers shall be assigned to all work performed in connection with the installation, fueling, starting and stopping, repair, maintenance and operation of the below listed small equipment: Compressors of 185 CFM or less (not discharging into a common header)

   Heaters
   Welding machines of 300 amp or less
   Gas or diesel driven pumps 4″ and under (or one 6″ pump)
   Generators of 15 KW or less
   Conveyors 18″ belt or less

A combination up to five (5) pieces of the above equipment shall, when in use, be serviced as an additional duty by an Operating Engineer who is employed by an Employer on a project. When six (6) pieces of the above equipment are in use on an Employer's project, a Utility Operator will be employed at the Class "C" rate. The Utility Operator shall also perform other work on the project.

In the event there are no Operating Engineers employed by the Employer on the project, the Employer shall employ an Operating Engineer at the Class "E" rate to service any small equipment in use, until the Class "C" rate becomes in effect.

An Operating Engineer shall be assigned to all work performed in connection with the installation, maintenance, repair and starting and stopping of electric submersible pumps. Neces-

5

SOFCO002316

sary work on electric submersible pumps shall be assigned to an Operating Engineer working on the project as an additional duty; no full-time Operator is required.

Work in the servicing and maintaining of self-contained, mobile light plants shall be assigned to an Operating Engineer as an additional duty to his/her regular job. Such work shall normally be assigned to a Mechanic, Grease Crew or Apprentice/Helper (Oiler). Equipment operator employees shall be required to carry sufficient tools to make minor adjustments on the equipment they operate.

When an Apprentice/Helper (Oiler) is assigned as the primary operator to a fuel/grease combo vehicle which requires specialized CDL endorsement, he/she will receive a $3.00 per hour premium over the Class "E" rate.

**13. Dewatering Systems**–A "Dewatering System" is defined as a combination of one or more pumps of any type, size or motive power with combined discharge capacity of over 4″, including but not limited to, well-point pumps, submersible well pumps, ejector or educator pumps in combination with wells, well-points, sumps, piping and/or other appurtenances irrespective of motive power to control water on any and all types of construction work. The complete installation, operation and necessary maintenance work, including all piping, shall be performed by Operating Engineers. A Dewatering System shall be operated by Pump Operators at all times the Dewatering System is in operation unless otherwise agreed at the Pre-Job Conference or with the Union.

**14.** The Union will at all times, when requested by the Employer, use its best efforts to furnish the Employer with competent employees to operate, maintain and repair equipment in accordance with the terms and conditions of this Agreement.

**15. Pre-Job**–It is agreed that upon the request of either party a Pre-Job Conference shall be held prior to commencing the construction job. In case of a necessary emergency start of the construction job, the Pre-Job Conference shall be held as soon as possible after the start of work. It is further agreed that upon the awarding of any building contract of $500,000.00 and over, the successful contractor will immediately notify the Union when it has been awarded the contract. It is further agreed the Union may request, receive and hold a Pre-Job Conference with the Employer on an individual basis.

6

Before the start of any project containing known hazardous waste materials, there will be a Pre-Job held. The Employer must notify the Union five (5) days prior to starting work on the project. Failure to do so, the Union has the right to withhold its services until such time a Pre-Job is held.

**16.** Following are the items which will be discussed at the Pre-Job Conference:

A. The Employer will advise the Union Representative of the Employer's requirements of necessary employees in the classification of work under this Agreement, and the Union will determine and advise the Employer of the ability of the Union to fulfill such requirements when requested.

B. Work schedules.

C. Questions of jurisdiction and assignment of work.

D. The Employer agrees that whenever possible at such Pre-Job Conference they will notify the Union of any subcontracts let by the Employer, the names of the subcontractors, and the nature of the work to be performed by the subcontractors. The Union may request a subcontractor to meet with the Union and the subcontractor will meet with the Union prior to commencing work on a project if the subcontractor did not attend the original Pre-Job Conference for the project. It is understood and agreed that no agreement may be made at the Pre-Job Conference which will in effect change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

**17.** Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Local Unions above stated on the effective date of this sub-section shall remain members of the Local Unions in good standing as a condition of employment.

**18.** All present employees who are not members of the Local Unions and all employees who are hired hereafter shall become and remain members in good standing of any one of said Locals as a condition of employment on and after the eighth (8th) day following the effective date of this sub-section or following the beginning of their employment, whichever is later.

**19.** The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory or who fails to observe

7

the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of any employee under the terms of this Agreement. Any grievance arising through application of this clause shall be adjusted in accordance with the procedures outlined in Article XIV, Paragraphs 124, 125 and 126 of this Agreement. Intoxication and/or assault committed on the job site shall be cause for immediate discharge.

20. The Union shall place no limitation upon the amount of work which an employee shall perform during the working day and there shall be no restriction imposed against the use of any type of machinery, tools or labor-saving devices. The Employer agrees that the work jurisdiction of the Operating Engineers, as assigned by the AFL-CIO, will be respected and all Operating Engineer work will be performed by an Operating Engineer, and it is the intent of both parties that Operating Engineers will be assigned work on the basis that will make each job as productive and efficient as possible. It is agreed that a fair day's work shall be given for a fair day's pay.

21. The Employer may shift during a work day an Operating Engineer from one piece of hourly rate of pay equipment to another hourly rate of pay piece of equipment without limitation from same job site providing the shifting does not interfere with another Operating Engineer's work day. This condition also pertains to weekly-pay equipment. However, there shall not be any intermixing with weekly-pay equipment to hourly-pay equipment. The Operating Engineer will be paid the highest rate for the day.

The District agent in each district, in order to maintain our jurisdiction, will make jobs as efficient and productive as possible.

22. If an Employer violates Paragraph 20, the Employer's penalty shall be to pay the first qualified registered applicant the applicable wage and fringe benefits from the first day of violation.

23. The authorized representative of the Union shall have access to the job during working hours for the purpose of visiting individual members, adjusting grievances or disputes and such other duties as he may have to perform. The representative will report to the job supervisor before visiting the project.

8

STEWARD

24. The Union may, when it believes it necessary, appoint a Steward whenever possible from Operating Engineers working on the Employer's job and the Union District Representative will, when making such an appointment, notify the Employer. The Steward shall perform full-time work for the Employer and he/she shall be subject to the same rules, rights and working conditions as other employees. Under no circumstances shall the Steward have any authority to call a strike, slowdown of work or perform any other action which would be in violation of this Agreement.

25. The Employer agrees that each new employee shall report to the job Steward before starting work if a Steward has been appointed for that particular Employer's job. The Steward shall be allowed sufficient time during working hours to perform all normal duties required of a Steward. No Steward shall have job priority but will be laid off in the same manner as any other Operating Engineer upon completion of his/her particular job assignment; twenty-four (24) hour notice to the Union prior to his/her lay off is required to give the Union time to select another qualified Steward to replace the laid-off Steward, but this twenty-four (24) hour notice is not required when a Steward is discharged for cause by the Employer.

SAFETY

26. The Union and the Employer will cooperate in the establishment of a safety program. At the Pre-Job Conference by mutual agreement, the wearing of safety hats may be made a condition of employment. All safety equipment required by the project owner or manager will be at no cost to the employee, except work shoes of any type. Both the Employer and employees shall comply with the applicable state safety codes and any other applicable government or civil regulations pertaining to safety. It is expressly understood that if the employees' immediate health and safety are involved, the Union through its representative may order discontinuation of operations until satisfactory results are obtained.

TRAINING

27. The Safety Training Passport (STP)16-hour program will be made available to all union members by the Union at no cost to the Employer. The program will consist of:

9

SOFCO002318

Safety Awareness as required by
OSHA 29CFR 1926.21

Fall Protection as required by
OSHA 29CFR 1926.503

Hazard Communication as required by
OSHA 29CFR 1926.59

Operating Engineers dispatched to a project to perform trench excavation work will be required to have successfully completed eight (8) hours of trench safety training. This program became effective May 1, 2007.

It is agreed that both the Employer and the Union will encourage and assist in the promotion of this training.

Effective May 1, 2011 and thereafter, all Operating Engineers dispatched to and/or employed on a project are required to have successfully completed the 16-hour Safety Training Passport (STP) Program or an OSHA-approved 10-hour construction safety training program. Comparable safety training shall be renewed and updated every five (5) years or the Operating Engineer shall be considered unqualified. Verification of valid, updated training must be presented to the Employer upon dispatch, hire or request. Employers who provide such safety training shall not be required to pay employees to attend the training.

28. Within forty-eight (48) hours after an industrial accident occurs, the company shall have all necessary State Workers' Compensation forms available and completed on the Employer's part. A copy of the completed forms shall be sent to the Union's office in the district where the accident occurred.

29. All toxic/hazardous projects will be subject to any and all safety regulations and insurance provisions that may be required by the appropriate governmental agencies. When dangerous atmospheres are present so that an Operator is required to don a special protective suit and/or self-contained breathing apparatus at a private, state, federal or other designated toxic/hazardous waste site, the Employer will notify the Union district office. Reasonable dress-up time and clean-up time will be allowed. The first qualified bargaining unit employee on the job will be designated the steward-safety person, who shall have access to company monitoring records and be kept informed of amounts of contaminants on the job site. A sheltered "safe zone" area shall be provided. There shall be wash-up facilities on all

10

toxic/hazardous waste sites. When hazmat training credentials are required, the Operator will receive a $.50 per hour premium added to his/her base rate.

On such projects, it is expressly understood that if the employees' immediate health and safety are in danger, the employee may discontinue operations, without penalty, until satisfactory results are obtained, or until such time as a recognized safety agent shall declare the equipment or operation to be safe. All Operating Engineers employees shall be advised by the Employer prior to employment as to the nature of the known hazardous waste and possible resultant physical injuries as may be required by applicable law.

30. DRUG TESTING: The Employer and the Union are committed to a policy that promotes safety in the work place, employee health, and well being. In consideration of this policy, the Union and Employer agree that any employee found to be under the influence of, in possession of, or engaged in the distribution of drugs or alcohol on the job site shall be subject to disciplinary action, up to and including immediate discharge.

Within two (2) weeks of reporting to the job site, each new Operator may be scheduled for a drug test. Employees using a prescription drug which may impair mental or motor function shall inform their supervisor in writing of such drug use.

Employee involvement with drugs and alcohol can adversely affect job performance and employee morale. In the Construction Industry the consequences of drug or alcohol use or influence while on the job site can be disastrous. The Employer and Union, therefore, agree to the following policy to insure all employees of a safe and efficient job site free from the effects of drug and alcohol use or influence.

All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of illegal drug or alcohol use impairment while on the job site, may be required as a condition of continued employment to submit to a test for alcohol and/or illegal drug use which impairs the employee's ability to safely perform his/her duties on the job site. Such tests involve a sampling of the employee's blood, urine, or breath unless a specific type of test is required by the project owner, in which case such mandated test shall be ob-

11

served. Any employee who is asked to submit to such a test will be required to sign a consent form. If an employee who is asked to submit to a test refuses to do so, or refuses to sign the necessary consent form, that employee will be subject to disciplinary action up to and including discharge. Refusal to take a test or the submission of an adulterated sample shall be determined the same as a positive test result. The employee/member shall follow all requirements outlined in this section.

All testing will be done by a reliable, established laboratory. If this initial test screen result indicates positive findings, further testing of the same sample must be done to confirm the original findings before the laboratory can report a positive finding. The confirmation test will be conducted by an independent accredited National Institute of Drug Abuse or College of American Pathology Laboratory and/or currently qualified under the Substance Abuse & Mental Health Services Administration (SAMSHA) under the U.S. Dept. of Health & Human Services, and will utilize the more scientific Gas Chromatography/Mass Spectrometry examination (GC/MS). The results of all tests will be kept confidential between the employee, the Employer and the Union. The employee shall be paid his/her regular hourly wage and fringes for time required for drug testing provided results are negative.

If the GC/MS test results are positive, the employee may be granted a leave of absence for the purposes of drug and alcohol rehabilitation. If the employee is eligible such rehabilitation programs are covered under the Ohio Operating Engineers Health and Welfare Program providing the employee confines him/her self to a twenty-four (24) hour licensed rehabilitation medical facility.

Until the employee presents certification of successful completion of the rehabilitation program to the Local 18 Medical Review Officer (MRO), the employee shall be removed from the Employer's job site, shall be prohibited from registering under Article III of the referral of this agreement and shall not be dispatched to work. Upon presentation of certification of the employee's successful completion of the drug/alcohol rehabilitation program to the Local 18 MRO, the employee may be restored to his/her original job with the Employer. If the employee is not restored to their original job, the employee will be allowed to register for work in the referral by registering a new work referral card.

12

The employee shall, under either circumstance, for the next succeeding twelve (12) month period, present to the Local 18 MRO monthly certification of negative drug/alcohol test results. Failure to do so will result in denying the employee the right to maintain his/her referral card in the register and utilize the referral or if working, to be removed from work.

Any positive drug and/or alcohol test result after the second rehabilitation procedure shall result in the applicant being permanently barred from registering on the Local 18 referral.

31. HARASSMENT POLICY: The parties to this Agreement mutually agree that harassment of any nature is not to be tolerated. Every person working under this Agreement shall immediately notify the Employer when a possibility of a problem happens or exists.

## ARTICLE III

### REFERRAL SYSTEM

32. Local 18 and its Branches shall maintain registers of all applicants for referral. Applicants shall not be permitted to be registered in more than one office of the Union at any one time. All applicants will be registered in order of application, provided no person shall be deemed to be an applicant who is otherwise gainfully employed as an Operating Engineer or not immediately available for work. Registrations and re-registrations will be accepted during customary business hours. Applicants shall be classified in priority groups in accordance with the following criteria:

GROUP A: All applicants who have worked as Operating Engineers at least 360 days, 90 days or more per year during the last four (4) years, and have been employed for at least 360 days, 90 days or more per year during the last four (4) years on work as defined in Article I of this Agreement within the geographical jurisdiction of Local 18, and who have lived in the State of Ohio, or in any county contiguous thereto, for at least one (1) year prior to application.

GROUP A PREFERRED: Must have Group A eligibility. Group A registrants may voluntarily register in the Group A Preferred; however, registrants in this Preferred A status shall have at least fifteen (15) years employment or availability for employment in any one or more of the classifications contained

13

SOFCO002320

in this Agreement and in the type or kind of craft work covered by this Agreement in the geographic area as defined by this Agreement. Referral in this group is limited to the following described equipment and will be given priority of referral from the Group A Preferred deck. Preferred A status employees will not be eligible for letter of request by the Employer: Welding Machines, Elevator, Conveyor, Pumps, Compressors, Generators, One Drum Hoist, Mono-Rail Hoist and Portable Heaters.

It is further understood and agreed that when the Employer employs Operating Engineers not currently in their employ for any machines listed in this section, the Employer shall call the referral office servicing his/her job or project and request that an employee qualifying under the Preferred A status be dispatched to service and operate said machine. Any Operating Engineer currently employed by an Employer can be used to operate any of the above listed machines. Apprentices shall not operate this equipment more than fifteen (15) days.

Workmen registering in this Preferred A Group shall be ineligible to register in any other group and shall not work in any classification other than those specified in this section and only have recall rights for equipment specified in this section.

**GROUP A RETIREES:** Must have Group A eligibility. The pension was set up to enhance the lives of retirees in their golden years. Retiring from the trades is by voluntary choice.

A retiree is an equipment operator or mechanic who has applied for and is receiving a pension from any construction industry source.

Upon retirement the retiree can only register in this group. The Group A retirees will be referred to jobs only after the Group A classification and the Preferred A classification have been exhausted.

The Group A retirees will not be eligible for letter of request by the Employer.

**GROUP B:** Same as Group A, except that the employment shall have been at least 270 days, three (3) years of 90 days each. All fourth year Apprentices and Trainees shall be registered in this group.

**GROUP C:** All applicants who have worked as Operating Engineers at least ninety (90) days per year during each of the last two (2) years, and who have lived in the State of Ohio or any county contiguous thereto for at least one (1) year prior to application. All third year Apprentices and Trainees shall be registered in this group.

**GROUP D:** All applicants who have worked as Operating Engineers at least ninety (90) days during the twelve (12) months prior to application. All second year Apprentices and Trainees shall be registered in this group.

**GROUP E:** All other applicants and all first year Apprentices and Trainees shall be registered in this group.

**GROUP F:** All applicants who are "temporary employees".

All applicants who have attained eligibility in any of the foregoing groups shall not lose eligibility as a result of their failure to obtain the required days of employment during the applicable periods of time. All graduating Apprentices shall upon journeymen certification become eligible for Group A. When an applicant fails to register in his/her eligibility group due to reasons other than illness, as hereinafter defined, and does not notify the Union Hall, the resultant failure to obtain the required days of employment during the applicable periods of time shall cause the applicant to lose eligibility in that group.

Any registrant requesting that their work registration card be placed on hold due to sickness, ill health or physical condition, must present to the Union a doctor's certificate or statement certifying that the registrant will be under a doctor's care for a minimum of thirty (30) days, and that such illness or physical condition prevents the registered applicant from working as an Operating Engineer. A work registrant's card will only be placed on hold for a minimum period of thirty (30) days, and a maximum period of one hundred twenty (120) days. No registration cards will be placed in the hold position for illness or physical condition for less than a thirty (30) day duration. Any refusals of dispatches due to illness or physical condition for a period of less than thirty (30) days shall be counted as a refusal under the terms and conditions of the referral procedure.

**33.** In referring applicants, the following procedure shall be followed:

A. Applicants in Group A shall first be referred, and then Group A Preferred, then Group A Retirees, then applicants in the succeeding groups, in order, through Group E. In each group, the Union shall refer applicants in order of their places on the referral list.

14

15

B.   Registered Apprentices or Trainees shall be referred in order of their position on the referral list.

C.   Employers shall have the right to reject any applicant referred for employment and shall immediately notify the Union in writing of such rejection. In the event a registrant is discharged by the Employer because of lack of sufficient ability, and he/she does not exercise his/her rights under the Referral Board of Review and Arbitration under Paragraph 37, the classification or equipment from which he/she is discharged shall be stricken from his/her referral record and he/she shall not be dispatched to a job in that classification or on that equipment until he/she has:

1.   Taken training at his/her training site and has been certified, or

2.   Has presented to his/her dispatch office a letter from a previous Employer, in signed agreement with Local 18 working within Local 18's jurisdiction, stating that in the Employer's opinion the discharged registrant has successfully completed a job assignment in that classification or on that piece of equipment in his employment.

D.   When an applicant is actually employed, he/she shall notify the Union office at which he/she is registered within twenty-four (24) hours. Failure to do so is an imposition upon those registered and not employed and, therefore, such applicant will be barred from re-registering, unless and until he/she has made application to the Board of Review and Arbitration provided for in Paragraph 37 of this Agreement, and shows good cause for his/her failure to give such notice.

E.   When an applicant becomes employed, his/her name shall be removed from the register as soon as he/she shall have worked for a total of thirty-one (31) accumulative working days (one (1) day jobs shall not count). An Operator who relieves another Operator will not be charged for the first fifteen (15) days (only one (1) fifteen (15) day relief per registration application card). All days after that will be counted toward his/her time.

If an applicant is employed for less than thirty-one (31) accumulative working days, he/she shall be restored to his/her previous position on the register when such employment terminates. Any applicant who quits employment or fails to show up for work assignment at starting time after being dispatched (provided he/she was dispatched the previous day), for what-

ever reason, except accident verified by police report, shall be placed at the bottom of the applicable registration group regardless of the number of days worked and shall not be eligible for request until he/she puts in a new registration card. When reason for employment termination is questioned, applicant must present a written termination slip evidencing reasons other than a voluntary quit before he/she is restored to his/her previous position on the register.

An applicant for employment may not refuse referral to employment for any reason except that the applicant may inform the District Office in writing, before any referral, that he/she will not accept employment referrals in certain named counties within the District. If an applicant refuses a job referral for the second consecutive time, he/she shall lose his/her position on the register and go to the bottom of the list for his/her group[1]. If the dispatcher is unable to contact an applicant, the failure to contact shall not be deemed to be a refusal.

F.   Applicants must notify the Union office in which they are registered by telephone, or letter, or telegram, or in person of their continued availability for employment within thirty (30) days after the date of last registration or re-registration in order to maintain their places on the register.

In order to equally distribute and defray the cost of services rendered by the use of this referral system, all individuals who make use of this referral system shall be required to pay an initial registration fee of $20.00* and another $20.00* for each re-registration thereafter, provided that such fee shall not exceed $20.00* in any consecutive thirty (30) day period and provided that such fee shall not apply to the following:

1.   Members in good standing of Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their regular dues; and

---

[1] Does not apply to the former Ohio or Kentucky Building & Light Commercial Agreements Referral.

*Effective October 1, 2013 $20.00. In the event that the General Executive Board exercises its authority under Article XI, Section 1 of the Constitution to increase the per capita tax payable to the International Union, effective July 1, 2014, July 1, 2015, July 1, 2016 and/or July 1, 2017, the registration fee of Local 18 shall increase in conjunction with such per capita tax increases(s) pursuant to Article XXIV, Subdivision 7, Section (1) of the Constitution of the International Union of Operating Engineers.

16

17

SOFCO002322

2. Applicants for membership to Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their fees; and

3. Members in good standing of the International Union of Operating Engineers who are paying travel dues whose proportionate share of the cost of this referral system is met by the payment of their fees.

G. The Union shall use its best efforts to notify all registered applicants when work is available for them, but the Union assumes no responsibility or obligation for failure to locate an applicant.

H. All applicants must submit a written resume of their experience and qualifications at the time of original registrations, and may be tested on the equipment they operate at the nearest available training site prior to being assigned a position on the referral list.

I. Subject to this referral system Employers may hire through this Referral policy, by name, former employees who have resided for at least twenty-four (24) months in the State of Ohio or in any county contiguous thereto, and have been employed by the Employer making the request during the past twenty-four (24) months within the jurisdiction of this Agreement. The Employer must make the request to the appropriate Union District Office and the employee requested must be registered on the District referral list (Groups A through E).

Employers may hire through this referral policy by name individuals in Group A for a production machine, or for a mechanic, or mechanic/welder, who has been registered on the out-of-work list for at least ten (10) days in the District in which the work is to be performed. Individuals shall have only one (1) request per four (4) month period from the last request. The request by name must be confirmed later in writing on the letterhead of the Employer and signed by either the Employer or the superintendent of the project.

Nothing in the referral procedure shall interfere with the transfer of an Employer's employees on his payroll from one project to another project within the geographical area covered by Local 18. When transferring employees, the Employer will notify the Union District Office from which the employee is to be transferred.

18

The Union agrees the transfer will be processed in an expedient manner.

J. The purpose of the referral system is to provide non-discriminatory employment opportunities. Individuals who register therein deserve a preference over those who do not. Therefore, it is agreed that in the event the referral list is exhausted and the Union is temporarily unable to furnish qualified applicants within twenty-four (24) hours after receiving the Employer's request (Saturdays, Sundays and holidays excepted), the Employer may temporarily employ others until the Union notifies the Employer that it has qualified registrants available for employment.

Applicants hired by the Employer under this procedure shall be known as "temporary employees", and will be subject to replacements. The Employer will notify the Union District Representative of the name, union affiliation (if any), date of employment and social security number of such temporary employee. The Union will maintain a register of all such "temporary employees" and such register shall be known as the temporary register. Such "temporary employees" may also be referred by the Union (when the referral list is exhausted) from Group F.

Such "temporary employee" shall be subject to replacement by a qualified registered applicant under the procedure listed herein:

1. The Union shall give a five (5) working day written notice to the Employer with whom the "temporary employee" is working and such "temporary employee" will thereupon be replaced at the end of the five (5) working day period provided the Union furnishes a qualified registered applicant.

2. The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the temporary register.

K. When an Employer states requirements for special skills or abilities in his/her request for employee applicants, the Union shall refer the first applicant on the register possessing such skills or abilities, regardless of the place or classification of such applicant on the register. If a contractor requests or requires that the operator be a Certified Operator, verification of the operator's certification is the responsibility of the Employer. If the Employer notifies the Union in writing, within thirty (30) days of the employee's discharge, of an Operator who had been

19

SOFCO002323

in his employment and who had not performed satisfactorily, and the Employer does not wish this Operator to be referred to the Employer for future employment, the Union shall honor this written request.

L. Any employee who quits a contractor without proper notice and is subsequently hired by an Employer with whom Local 18 has a contractual relationship without a proper referral by Local 18 shall be discharged by the Employer when it is called to his attention.

**34.** Employers shall give first opportunity to persons registered for employment, as provided herein, by calling or notifying the Union at any of its offices in the territory where the work is to be performed.

**35.** Registration of applicants and selections of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership, policies, or requirements. It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio, the Commonwealth of Kentucky, and lawful orders thereof in nondiscrimination and fair employment practices.

The Employer and the Union shall not discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

The Union agrees to furnish an Employer, at his request, any statement or data required under any regulations referred to herein.

**36.** In addition to the above Registration Groups there shall be established a Short Term Job Group. The sole purpose of this Short Term Job Group is to enable registrants to acquire time to be eligible for unemployment benefits. Registration in this group is limited to applicants eligible for Group A of this referral and all fourth year Apprentices showing proof of need for additional time to qualify for unemployment benefits.

Applicants' referral out of the Short Term Job Group will be limited to jobs of two (2) days or less duration in a calendar week or eight (8) days or less duration in a calendar month on equip-

20

ment listed on their registration cards. Any refusals of jobs will cause the registrant's card to be removed from the Short Term Job Group deck. Dispatches for short term jobs as defined above will first be made from the Short Term Job Group. If the dispatcher is unable to fill the short term job order from the Short Term Job Group he/she will proceed to fill the order from Groups A through F in accordance with the referral rules. Dispatcher should notify Employers when dispatching from the Short Term Job Group. The Employer reserves the right to request dispatch from Group A.

Since this Short Term Job Group is intended to provide limited employment for those needing credit for unemployment compensation, the Union shall, through its business agents, remove from employment any Operating Engineer who has accumulated more than two (2) days per calendar week or over eight (8) days in a calendar month—as a result of the Short Term Job Group.

Registrants in the Short Term Job Group will not be eligible for any recall or request provisions of the referral as herein described. Employment received as a result of the Short Term Job Group referral will not provide eligibility for Employer recall when the registrant is registered in Group A, Preferred A, or Group A Retirees deck. Apprentices or Trainees will not be permitted to register in the Short Term Job Group except as noted above. Registrants may not register in the Short Term Job Group or Group A or Preferred A or Group A Retirees deck at the same time. The Employer shall not be permitted to transfer employees dispatched from the Short Term Job Group from one project to another project.

The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the Short Term Job Group.

All the remaining rules with regard to the operation of the referral shall be applicable to the operation of the Group A, Preferred A and Group A Retirees except as modified above.

**37.** Any registrant or any Employer who may feel aggrieved by the operation of this referral system shall have the right to and must file his/her grievance. in writing, within ten (10) days after the occurrence of the event concerning which he/she complains with a Board of Review and Arbitration consisting of one (1) representative of the Union, one (1) representative of

21

SOFCO002324

the Employer, and an impartial third member to be selected by agreement of the Union and the Employer, and the decision of this Board shall be final and binding on all parties.

38. This statement as to referrals shall be posted in all places where notices to Employers and applicants for employment are customarily posted, including all offices of the Union; all offices of the Employer.

39. A Labor Relations Division Representative of the AGC of Ohio may inspect the referral register at the Union District Office at any time during normal office hours.

40. All officers and business representatives of the Union who have had previous work experience in any one or more of the job classifications contained in this Agreement shall be deemed to be employed at the trade and it is the intent of this section to provide that upon return to the employment in the trade, he/she shall do so with the same preference as if he/she had continually worked at the trade and shall be eligible upon registration for Group A.

## ARTICLE IV

### FRINGE BENEFIT PROGRAMS

41. The fringe benefit provisions contained herein shall apply to all Employer members of the AGC of Ohio Labor Relations Division, and Employers who become signatory or bound by this Agreement, as well as any other Employer or Employer groups who become a party to an Agreement covering the fringe benefit programs set forth herein.

42. All Employers bound hereby agree to be bound by the Agreement and Declarations of Trust, as amended, establishing the Pension Fund, Health and Welfare Plan and Apprenticeship Fund, copies of which all parties agree have been furnished to and read by all Employers bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declarations of Trust and any rules, regulations, or plans adopted by the Trustees pursuant thereto, shall become a part of this Agreement as though fully written herein. All Employers bound hereby irrevocably designate the Employer Trustees of said Funds and Plan and their successors as their representatives for the purpose set forth in said Agreements and Declarations of Trust.

22

43. Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

PENSION FUND: Effective May 8, 2013 is $6.00 per hour

HEALTH & WELFARE PLAN: Effective May 8, 2013 is $6.91 per hour; May 1, 2014 is $7.16 per hour; May 1, 2015 is $7.41 per hour

APPRENTICESHIP FUND: Effective May 8, 2013 is $.60 per hour; May 1, 2014 is $.67 per hour; May 1, 2015 is $.75 per hour

SAFETY TRAINING AND EDUCATIONAL TRUST FUND: Effective May 8, 2014 is $.07 per hour; May 1, 2015 is $.09 per hour

The Union shall have the option of diverting all or any part of the increase scheduled for improvement of or payment of costs of any fund benefits provided under this Agreement; provided that the Union gives the Employer written notice of its election to do so by registered letter sent to the office of the AGC of Ohio at least 60 days before the effective date of the scheduled change specifying in said notice the amount of change to be applied for this purpose in the fund benefit for which the money is to be used.

44. It is further understood and agreed by and between the parties that duly authorized representatives of any of said Trust Funds or Plan shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all employees upon whom the Employer is obligated to make contributions and with respect to the payment of monies to the AGC of Ohio's Construction Industry Advancement Program under paragraphs 109, et.seq. and with respect to the Administrative Dues deduction under paragraph 114. Notwithstanding the foregoing authority allowing audits with respect to the AGC of Ohio's Construction Industry Advancement Program and the Administrative Dues deduction, the audits shall only be conducted in conjunction with the Fringe Benefit Funds or Plans referred to herein and shall not be conducted independently. The twenty-four (24) hour notice referred to in paragraph 45(A) shall only be given for delinquencies to the employees Fringe Benefit Funds or Plan referred to therein.

23

SOFCO002325

45. Reports of employees who have worked the number of hours that they have been paid, and such other data and information as may be required, and all contributions payable to the Funds or Plan shall be transmitted to the offices of the Funds or Plan no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed. In the event said audit is refused, reports not furnished, or said contributions are not paid, as aforesaid, the following remedies, in whole or part, and in addition to all other remedies, either in law, in equity, by contract or authorized by the aforementioned Agreements and Declarations of Trust, shall be available.

A. After the Trustees or the Agent of any Funds or Plan have given the delinquent Employer twenty-four (24) hours written notice at the address shown in the records of the Funds, Plan or Union, shall have the right to take such legal and lawful action as it may deem necessary until such delinquent payments are made or said audit is permitted, such action including but not limited to the right to withhold its services from such Employer for as long as the failure to make such contributions or audit continues, Article XIV notwithstanding.

B. In the event either the Union or the Trustees of any Funds or Plan may decide to utilize the grievance and arbitration procedure in this paragraph to collect delinquent contributions and liquidated damages to enforce any audit, or to obtain any report, the following procedure shall apply:

Unless the issue is resolved between the Employer and the party giving notice, within five (5) calendar days after deposit of written notice of delinquency and/or demand for audit and/or report in the United States mail, to the Employer at the address shown in the records of the Funds, Plan or Union, such party may refer the matter to an arbitrator to be named by the AGC of Ohio Labor Relations Division and by Local 18 of the International Union of Operating Engineers whose decision in writing shall be final and binding on all parties. In the event such parties are unable to choose an arbitrator within ten (10) days after written request therefore, the Union or the Trustees of any Funds or Plan may request an arbitrator according to the rules and regulations of the American Arbitration Association whose decision in writing shall be final and binding on all parties. The parties to the arbitration shall each bear one-half (1/2) of the total costs.

24

46. In no event shall the foregoing provisions relating to Fringe Benefits be subject to or suitable for grievance and arbitration under Article XIV of this Agreement.

47. The Employer must obtain an Insurance Payment Bond (IPB), from a company that is "best" rated A. financial category 7 or better, payable to the Ohio Operating Engineers Fringe Benefit Program as a guarantee that the fringe benefits referred to herein are paid by the insurance carrier in the event that the Employer becomes delinquent in its payments and defaults thereon. In lieu of a surety bond, an Employer may substitute an equivalent cash bond, which will be escrowed to guarantee payment of fringes. If the Employer fails to provide the necessary bond within thirty (30) days of request by the Union, the Union shall withhold services until receipt of such bond, or the Employer makes fringe contributions on a weekly basis.

The Employer shall obtain said Insurance Payment Bond or cash bond in amounts set forth below:

| 1-10 | Operating Engineers | $ 50,000.00 |
| 11-20 | Operating Engineers | 75,000.00 |
| 21-50 | Operating Engineers | 100,000.00 |
| Over 50 | Operating Engineers | 125,000.00 |

## ARTICLE V

### WAGE RATES

48. The purpose of this Agreement is to establish wage rates and conditions to apply for all work as defined herein and for operation on all equipment which comes within the jurisdiction of the International Union of Operating Engineers, and as negotiated by and between Local 18 and its Branches of the International Union of Operating Engineers and the AGC of Ohio Labor Relations Division.

49. Exhibit "A" covering wage rates and classifications attached hereto is made a part of this Agreement.

50. It is agreed if equipment within the jurisdiction of the International Union of Operating Engineers is used by an Employer and if there is no appropriate classification listed under the wage schedules therein, then the Union and the Association negotiating committees will negotiate a new classification and rate of pay for such equipment within five (5) days.

25

SOFCO002326

51. The geographical jurisdiction of this Agreement will be zoned for wages only. Conditions of employment will be the same for all employees covered by this Agreement.

Zone I: Covering Portage and Summit counties only.

Zone IA: Covering Erie, Huron, Lorain and Medina counties.

Zone II: Covering the counties of Lucas and Wood only.

Zone III: Covering the counties of Adams, Allen, Ashland, Athens, Auglaize, Belmont, Brown, Butler, Carroll, Champaign, Clark, Clermont, Clinton, Coshocton, Crawford, Darke, Defiance, Delaware, Fairfield, Fayette, Franklin, Fulton, Gallia, Greene, Guernsey, Hamilton, Hancock, Hardin, Harrison, Henry, Highland, Hocking, Holmes, Jackson, Jefferson, Knox, Lawrence, Licking, Logan, Madison, Marion, Mercer, Meigs, Miami, Montgomery, Monroe, Morgan, Morrow, Muskingum, Noble, Paulding, Perry, Pickaway, Pike, Preble, Putnam, Richland, Ross, Sandusky, Scioto, Seneca, Shelby, Tuscarawas, Union, Van Wert, Vinton, Warren, Washington, Wayne, Williams, and Wyandot. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

## ARTICLE VI

### WEEKLY PAY AND HOURLY PAY CLASSIFICATIONS AND REPORTING PAY PROVISIONS

52. In all counties covered by this Agreement, the following classifications shall be employed on a WEEKLY PAY basis:
Asphalt Plants
  Boiler Operators, Apprentice/Helper (Oiler), Registered Apprentices and Signalmen, when members of crew
  Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Cherry Pickers
Cranes (all types)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Floating Equipment
Gradalls
Hoes (except when attached to farm or industrial type tractor or CAT 320 backhoes or equivalent and below)
Hoists, with two or more drums in use

26

Horizontal Directional Drill (over 500,000 ft. lbs. thrust)
Maintenance Engineers (Mechanic and/or Welder)
Master Mechanics
Panelboard Operators (all types on site)
Pile Drivers
Power Shovels
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Tug Boats

53. In all counties covered by ZONES I, II and III, the following classifications shall be employed on an HOURLY PAY basis (two (2), four (4), or eight (8) hours):
A-Frames
Air Compressors, pressurizing shaft or tunnels
Allen Screed Paver (concrete)
Apprentice/Helpers (Oilers), Helpers, Boiler Operators, when not members of a crew
Asphalt Pavers
Backfillers
Backfillers with Tampers
Ballast Re-Locator
Bar and Joint Installing Machines
Barrier Moving Machine
Batch Plant Operators
Bobcat Type and/or Skid Steer Loader
Boilers (15 lbs. pressure and over)
Boom Trucks (all types)
Bulldozers
Bull Floats
Burlap and Curing Machines
Cableways
Clefplanes
CMI-type equipment
Combination Concrete Mixers and Towers
Compressors, on building construction
Concrete Grinder/Planer
Concrete Mixers
Concrete Pumps
Concrete Saw, Vermeer type
Concrete Spreaders
Conveyors, used for handling building materials
Crushers

27

SOFCO002327

Deckhands
Directional Drill "Locator"
Drum Firemen in asphalt plants
Elevating Graders or Euclid Loaders
Endloaders
Farm-type Tractors, pulling attachments
Finishing Machines
Fork Lifts (all types)
Forklift (rough terrain with winch/hoist)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (sonic pile driving)
Gunite Machines
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes, when attached to farm or industrial type tractors
Hoists (building construction)
Horizontal Directional Drill (less than 500,000 ft. lbs. thrust)
House Elevators (except those automatic call button controlled)
    Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the
    rate of pay will be "Class E")
Hydraulic Gantry (lift system)
Hydro-seeders
Inboard, Outboard Motor Boat Launches
Kolman-type Loaders (dirt loading)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Lead Greasemen
Light Plant Operators
Locomotives (all types)
Man Lifts
Mixers, one bag capacity with side loaders
Mixers, Paving (multiple drums)
Mobile Concrete Pumps, with booms (including oiler, etc.)
Mucking Machines
Mudjacks
Pavement Breakers (hydraulic or cable)
Pettibone - Rail Equipment
Plant Mixers (on site)
Post Drivers
Post Hole Diggers
Power Driven Heaters (oil fired)

28

Power Graders
Power Scoops
Power Sweepers
Power Scrubbers
Prentice Loader
Pressure Grouting
Pressure Pumps (over 1/2" discharge)
Pump Operators, installing or operating well-points or other
    types of dewatering systems
Pumps (4" and over discharge)
Pumps (under 4" discharge)
Rail Tamper (with automatic lifting and aligning device)
Switch & Tie Tampers (without lifting and aligning device)
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24')
Utility Operators
VAC/ALLS
Vibratory Compactors, with integral power
Welders (except electric machines)

54. In all the counties covered by ZONES I, IA, II and III, employees covered by this Agreement employed on a WEEKLY PAY basis reporting for work on Saturday, Sunday or holidays shall be paid as follows: Employees who have not started to work will receive two (2) hours at premium pay for reporting to work (only need to stay on job for one (1) hour). Employees who start to work will receive four (4) hours pay at premium rate; more than four (4) hours will receive eight (8) hours pay at the premium rate. For inclement weather only it will be 2-4-6-8 hours of pay at the premium rate of pay.

They must report to work at starting time and remain on the job until release.

55. When a machine having a forty (40) hour guarantee is laid up on a project site and the workmen are laid off and paid off, that machine cannot be started back to productive work on that project site unless it is laid up for one week (seven days) without calling back the workmen who had manned the machine and they shall be paid for the time they have been off, unless mutual agreement is reached between the Employer and the Union District Representative to permit employees to work on the weekly guarantee equipment during the seven (7) day "lay-up" period without penalty.

29

SOFCO002328

56. In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis, unless notified by the Employer not to report to work, shall receive two (2) hours' pay for reporting to work; if such operator does not start to work, he/she shall receive his/her two (2) hours' reporting time. An employee may be required to stay at the work project for one (1) hour to be eligible for two (2) hours reporting pay unless the Employer releases the employee prior to the end of the first hour. If the employee starts to work, he/she shall receive four (4) hours' pay; if the employee works over four (4) hours, he/she shall receive eight (8) hours' pay; for inclement weather only it will be 2-4-6-8 hours.

In all counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis reporting to work on Saturday, Sunday or holidays, all conditions in this paragraph will apply and both reporting time and time worked will be paid for at the rate provided in accordance with Article VII. They must report to work at starting time to be entitled to reporting pay. Where less than four (4) hours or less than eight (8) hours are worked, the employees must remain on the work for the full four (4) hours or the full eight (8) hours, as the case may be, to be entitled to pay for the four (4) or eight (8) hours, as stipulated in this Agreement. Employee call off notification must be made not less than 60 minutes prior to the established starting time or show pay applies.

A. When an employee working on equipment with a weekly-pay guarantee and work with his/her equipment is completed on a project, the employee is guaranteed only Monday through Wednesday pay if the equipment finishes the work on the project the first three days of the week. The Employer will notify the Union District Representative prior to application of this provision.

57. Crews will be eligible for straight time weekly pay when their equipment is transferred out of their District up to the day the equipment is shutdown; otherwise, Paragraph 56, Section A prevails.

58. On jobs where there is only one (1) day's work for a piece of equipment, employee or crew may be employed on a day-pay basis. Upon the Contractor's request to the Union Business Representative for a second day for special occasions, the Union gives the Representative authority to authorize a second day for the period of this contract.

30

59. All reporting pay time paid to an employee shall count as working hours with respect to any work guarantees or overtime pay provisions.

60. Employees who are working for an Employer in other than their local residence area thereby necessitating them to pay room and board shall, upon request, be granted their release if the Employer is unable to supply enough work to justify their staying. Employees released under this provision will be considered as laid-off because of lack of work.

## ARTICLE VII

### PROVISIONS FOR PREMIUM RATE OF PAY

61. The week shall begin on Monday A.M. and shall end on Sunday P.M.

62. The regular starting time must be established for not less than one (1) week. Any time worked prior to the established starting time will be paid for at the applicable premium rate unless otherwise arranged through Union notification.

63. The normal work day shall consist of eight (8) hours and the normal work week of forty (40) hours. One and one-half (1-1/2) times the regular rate shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, and including Saturday. When an Employer performs clearance and excavation for site preparation for industrial or building sites, the Employer will pay the wage rates listed herein, all overtime will be performed at one and one-half (1-1/2) times the regular rate. Subject to Paragraph 121, all other conditions and provisions shall be as provided herein.

A. An Employer may, however, have the option of working a four-ten hour schedule at straight time rates. No Operating Engineer with a weekly guarantee will lose a paid holiday he/she would otherwise receive by working a four-ten week. Instead, such employees will receive, in addition to wages and fringes for hours worked in a four-ten week, an additional eight (8) hours and fringes at straight time rates for the holiday. If the Employer elects, upon notification to work a four-ten hour schedule, he shall pay overtime in such cases on all hours over ten (10) hours per day or over forty (40) per week, whichever is greater. A four-ten work schedule must be by the week.

31

SOFCO002329

In addition to the above: It is agreed that when time is lost by the crew during the regular work week, Monday through Thursday, due to inclement weather, holiday, equipment breakdown or directions of the project owner, this time may be made up by the entire crew on Friday at the regular rate of wages. All Friday work must be scheduled on a minimum of eight (8) hours basis. All hours worked in excess of the forty (40) hours in the work week or ten (10) hours each day, shall be paid at the appropriate overtime rate of pay.

B. Any employee hired on any day of the week, Monday through Thursday, and who does not lose any time from the day of his/her initial hire until Thursday shall receive the overtime rate of wages for Friday, providing the crew is eligible for the premium rate for Friday.

C. Should any other trade on the project in the contractor's employ, working in conjunction with the Operating Engineers, receive premium pay on a Friday, the Operating Engineers would also receive premium pay for the Friday.

D. If the other basic crafts employed by your contractor on the project receive the overtime rate for the ninth (9th) and tenth (10th) hours, the Operating Engineers will also receive the overtime rate.

E. When an Employer works three (3) days or less in a week, premium time will be paid after eight (8) hours for each of the days, except for holidays, inclement weather or completion of the job.

F. Pay day will be on Thursday.

G. Weekly pay employees, in order to be eligible for eight hours' pay that day, must be available to perform work for the Employer.

H. Direct deposit will be at the discretion of the employer. There will be no cost or fees to the employee.

64. Double time will continue to be paid to any Operator who is complementing another trade that is receiving double time. All work performed by an employee on Sunday or holidays shall be paid at two times the regular rate established in this Agreement or any escalated rate that may be in effect.

65. No Weekly Pay employee covered by this Agreement shall lose time because of the observed holidays. If not requested to work, he/she shall be paid eight (8) hours straight

32

time pay at the rate established in this Agreement or eight (8) hours at any escalated rate that may be in effect. Holidays shall be of twenty-four (24) hours duration. When required to work on holidays, the employee shall be paid two times the regular rate established in this Agreement or any escalated rate in effect.

66. There shall be no work required on Labor Day except in special cases of emergency.

67. The observed holidays are Christmas, New Year's Day, Labor Day, Memorial Day (last Monday in month of May), Independence Day and Thanksgiving Day. When any of the aforementioned holidays fall on Sunday, they will be observed on Monday. All weekly pay Employees covered by this Agreement to be eligible for holiday pay must be available for work the first regularly scheduled work day prior to the holiday and be available for work the first regularly scheduled work day after the holiday.

68. Where steam boilers, power driven heaters or pumps are used on a continuous seven (7) day twenty-four (24) hours per day operation, overtime may be avoided by using four (4) shifts of Operating Engineers, each shift to work six (6) hours on a seven (7) day basis. Each Operating Engineer so employed shall be paid forty (40) hours at the applicable straight time rate and two (2) hours at double the applicable straight time rate. The aforementioned condition, where overtime may be avoided, can only be used upon the Employer's guarantee of a minimum thirty (30) days of operation. In the event the Employer cannot furnish thirty (30) days of employment after starting work under Paragraph 68, it is agreed that upon lay-off of employees the Employer will pay retroactive overtime to such laid-off employees from the start of this particular operation in accordance with Article VII, Paragraphs 63 and 64 of this Agreement.

69. Job Master Mechanics and Operators of derricks, cranes, derrick cars on steel erection and on building construction and all winch trucks used in hoisting construction material and any type of hoist, shall command and receive the highest rate of pay and the same applicable premium pay and conditions of overtime where the rates or conditions for the Ironworkers, Boiler Makers, Pile Drivers and Pipefitters are higher than the rates specified in this Agreement for the foregoing classifications. To be eligible for the benefits of complementing the above mentioned trades, an Operator must be required to perform a specific operation which is directly related to the work which the other trades are performing.

33

70. Operating Engineers employed on any equipment within the jurisdiction of the International Union of Operating Engineers working in shafts, tunnels or storage caverns where natural earth or rock is undisturbed overhead, shall be paid fifty cents ($.50) per hour above the rates in this Agreement or in addition to any escalated rate that may be in effect. This does not apply to open cut work.

71. Booms, including jib 150 feet through 180 feet in length, fifty cents($.50) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

72. Booms, including jib over 180 feet through 249 feet in length, one dollar($1.00) per hour in addition to the established crane rate or any escalated rate that may be in effect.

73. Booms, including jib of 250 feet and over in length, one dollar twenty-five cents ($1.25) per hour in addition to the established crane rate or any escalated rate that may be in effect.

74. Conventional cranes whether crawler or truck when used as a tower crane, the effective length of the mast and the boom combined, will be used to determine when these extra rates will be applied.

75. Tower Cranes, the height of the boom point from the first floor level of the project, will be used to determine when these extra rates will apply.

76. On jobs where crane-type or derrick-type machines are operated on floors above the first floor level of the building, twenty-five cents ($.25) per hour shall be paid in addition to the established crane rate or any escalated rate that may be in effect.

## ARTICLE VIII

### CREWS AND GENERAL PROVISIONS

77. In all the counties within the jurisdiction of this Agreement, crews shall be employed on all truck cranes, power shovels, cranes, rotary drills on caisson work, cableways, draglines, tower derricks, tower cranes, multiple drum pavers, pile driving machines and hoes, standard gauge locomotives, bucket trench machines (over 24" wide) and horizontal directional drills (over 500,000 ft.lbs.thrust). Crews shall consist of an Operating Engineer and an Apprentice/Helper (Oiler) or Signalman on machines, regardless of motive of power, or an Operating Engineer and Fireman on steam machines.

34

78A. Apprentice/Helpers (Oilers) are required on hoes, excavators, and front hydraulic shovels having a base operating weight in excess of 105,000 pounds, single cab hydraulic cranes on rubber with a total weight of 125,000 pounds and Apprentice/Helpers (Oilers) shall be required on cable crawler cranes over 80 ton structural capacity, defined as: the factory specified total maximum counter weight with a PCSA rating not to exceed 36,400 pounds, based on 50' of boom at 40' radius, with the single line pull not exceeding 17,000 pounds. Anything outside any of the aforementioned limits determines the crane as requiring an Apprentice/Helper (Oiler). All factory certifications and the computer system will be available for inspection at any time by the Union or their designee. On remote control gradalls, Apprentice/Helpers (Oilers) shall be at the discretion of the Employer. Truck cranes, lattice boom, thirty (30) ton capacity and under; hydraulic truck cranes and all terrain cranes fifty (50) ton capacity or less, an Apprentice/Helper (Oiler) is not required. However, if someone other than an Operating Engineer is assigned to this work, this paragraph will be revoked on the project, and an Apprentice/Helper (Oiler) will be required for the remainder of the project. An Apprentice/Helper (Oiler) is required on self-erecting cranes (as defined by the manufacturer) while being erected and dismantled.

78B. Apprentice/Helper (Oiler) on jobs of thirty (30) days or more will be given a minimum of 30 minutes per day operating the machine they are assigned to (or a similar machine on the same project). If the Apprentice/Helper (Oiler) cannot be trained to operate the machine to the satisfaction of the Employer then he/she shall be replaced.

79A. Work of the Boiler Operator, Apprentice/Helper (Oiler), Registered Apprentice, and Signalman shall include getting up steam and greasing up, filling gas tanks and making the machine and equipment ready for operating at the starting time. If, at the discretion of the Employer, an Apprentice/Helper (Oiler), Registered Apprentice, or Signalman is required to make gas or diesel machines ready to operate before the regular starting time, such Apprentice/Helper (Oiler), Registered Apprentice, or Signalman shall be paid one-half (1/2) hour's pay at one and one-half (1-1/2) times the regular rate. If, at the discretion of the Employer, a Boiler Operator or Registered Apprentice is required to get up steam and grease steam machines and make them ready to operate before regular starting time, then

35

SOFCO002331

such Boiler Operator or Registered Apprentice shall be paid one (1) hour's pay at one and one-half (1-1/2) times the regular rate.

79B. Apprentice/Helpers (Oilers), while assigned to track hoes, cranes and other equipment, will perform the following work on the project as additional duty:

- Cover small equipment (i.e. pumps, generators, compressors, etc.)
- Act as signal person
- Safety/fire watch
- Practice operating in a learning environment in the vicinity
- Help with survey duties on project
- Help mechanic, lube trucks, fuel
- Practice operating rough terrain forklift, front loader, rubber tire hoe, loader in vicinity of primary duty
- Replace other operators who may be absent on project
- Run parts or materials as necessary
- Safety enforcement
- Productive activity on job site to facilitate job completion when it does not interfere with progress of primary machine, providing this does not interfere with another Operating Engineer's workday

80. Apprentice/Helper (Oiler), Registered Apprentices, Signalmen, Grease Truck Operators, when requested to work the regular one-half (1/2) hour lunch period, will eat their lunch prior to or after the regular one-half (1/2) hour lunch period in order to be able to oil, grease and repair machines during the regular one-half (1/2) hour lunch period at no extra pay.

81. More than one (1) shift may be worked in any twenty-four (24) hour period and the starting time of the shifts shall be left to the discretion of the Employer. This starting time must be maintained five (5) days, Monday through Friday. However, more than six (6) hours shall not be worked without allowing thirty (30) minutes for a lunch period. Where two (2) shifts are employed, eight (8) hours shall constitute a day's work for the first shift and eight (8) hours shall constitute a day's work for the second shift. When three (3) shifts are employed, eight (8) hours shall constitute a day's work for the first shift, seven and one-half (7-1/2)

36

hours work with eight (8) hours pay shall constitute the second shift, and seven (7) hours work with eight (8) hours pay shall constitute the third shift. For the purpose of overtime pay for multiple shift operations, a work day shall be determined by the starting time of the shift. In addition, the second shift will receive twenty-five cents ($.25) per hour, third shift fifty cents ($.50) per hour premium above the established rate of pay.

When warranted by a particular job's conditions, shift work may be instituted for less than five (5) consecutive days.

82. Where project owners establish specifications, requirements, or for safety reasons that limit the days or hours in which work may be performed, the Employer, after advance notice to the Union, may start the work week after 6:00 p.m. on Sunday at straight time rates. In applying this schedule, Sunday p.m. will be considered Monday, the following Friday will be considered Saturday (paid at time and one-half) and Saturday will be considered Sunday (paid at double time). All premium pay provisions will apply for the sixth and seventh days as to Saturday and Sunday, respectively.

83. When it is necessary for equipment to be operated, the Operating Engineer who regularly operates the particular piece of equipment shall be given first chance to perform the work. If an Apprentice/Helper (Oiler) is required, the Apprentice/Helper (Oiler) who is regularly assigned to the particular piece of equipment shall be given first choice to perform the Apprentice/Helper's (Oiler's) duties. In an emergency, any employee may be assigned to any equipment. It is understood that the Master Mechanic or Steward will be notified, when possible, of such emergency requirements.

84. Employees who are requested, referred and employed by Employers on the same day under hourly classifications in this Agreement shall be paid a minimum of eight (8) hours pay on the day they report to the job. Any overtime worked after the normal quitting time shall be paid at the proper overtime rate in addition to the eight (8) hours minimum first day pay guarantee. The furnishing of a truck by a Mechanic shall not be a condition of employment. If an Employer is requesting a Mechanic from the Union, the Employer may require the new Mechanic to furnish a truck. If a Mechanic is required to furnish a truck, compensation will be negotiated between the Mechanic and the Employer.

37

SOFCO002332

85. Equipment Operator employees shall be required to carry sufficient tools to make minor repairs and adjustments in order to meet manufacturers daily maintenance requirements on the equipment they operate. This excludes diagnostic and electronic equipment.

86. If compressors, generators, boilers, hydraulic pumps or power pacs or any other type of power equipment is mounted piggyback on crane-type equipment requiring a crew, two (2) Operating Engineers will be employed at the Class "A" rate or any escalated rate in effect and under the weekly guarantee. If the crane does not ordinarily require a crew, see Paragraph 78A, the employment of a second operator shall be at the discretion of the Employer. The jurisdiction of the Operating Engineers must be preserved, however, and if someone other than an Operating Engineer is used to operate the piggyback equipment, the contractor must immediately employ a second Operating Engineer at the Class "A" rate.

Where compressors up to 600 CFM or hydraulic pump, power pacs, etc. are operated and exclusively used to power attachments, such as hoe ram and other similar pieces of equipment, the equipment will be considered and manned as a piggyback operation. If a second person (Operating Engineer) is required, even though the equipment is located adjacent to the machine or crane and not mounted directly on the machine, the second person (Operating Engineer) operating the equipment is paid the Class A rate of pay for the day.

Where a second person is an apprentice, refer to the Registered Apprenticeship Wage Schedule on page 86.

If the crane does not require a crew, the auxiliary piece of equipment will be manned by an Operating Engineer and paid the appropriate rate of pay.

87. ZONES I, IA, II, and III - As listed in Exhibit A.

When a contractor has eight (8) or more major Operating Engineers (major Operating Engineers A, B and C classifications) employed in the District, he/she shall employ a Master Mechanic. In addition to the Master Mechanic required above, if a contractor has eight (8) or more Operating Engineers (major Operating Engineers A, B and C classifications) employed by him/her on any one job, he/she shall employ a Master Mechanic on that job. The Master Mechanic so employed shall be answerable to the Employer and must be a member of the International Union of

38

Operating Engineers, Local 18. The Master Mechanic duties will be assigned by the Employer. Job Master Mechanics so employed shall be paid at the rate specified herein or paid fifty cents ($.50) per hour above the highest rate of any Operating Engineer working under his/her direction, whichever of these rates is higher.

On jobs where maintenance operators are to be employed, the first one (1) employed shall be Class A; the second one, if required, may be a Mechanic Trainee. Any further hire of maintenance operators shall be one Class "A," then a Mechanic Trainee may be hired. This ratio of one Class "A" to Mechanic Trainee shall be continued in the hire of all maintenance operators as required by the project requirements. Mechanics in training, working under these provisions, will be compensated according to the schedule provided under the "Field Mechanics Trainee Schedule."

88. Operators of equipment serviced by a Master Mechanic on a job site shall not be counted in the number of Operators within the District to determine when a Master Mechanic will be required for the District.

89. Employees shall be paid once each week, with not more than five (5) days withheld on the designated payday on the job prior to their normal quitting time. Failure to comply with this provision will require the Employer to pay these employees involved the double time rate if required to wait on the job. If required to return the next day to receive their pay, they shall be paid a minimum of four (4) hours at the hourly rate applicable for that day. These same conditions will apply to employees who are terminated after completion of their job assignment. In the event of the discharge of an employee, he/she shall be paid immediately or his/her time will continue until he/she is paid off properly. If not paid off by normal quitting time, the aforementioned requirements will be applied if he/she is required to return the next day for his/her pay. Any employee discharged for just cause will receive their paycheck by the end of the next pay period.

90. Paychecks will show the following information:
(1) Total hours worked
(2) Overtime hours (premium hours)
(3) Gross pay
(4) All deductions listed
(5) All fringe contributions (to be shown as a total contribution)

39

**91.** Employees requiring relief, for sickness or other causes, must notify his/her immediate supervisor before leaving the job. Such relief shall be arranged through the Union District Office.

**92.** Employer agrees to carry Workers' Compensation or other equivalent liability insurance for the protection of all employees covered by this Agreement.

**93.** At the direction of the Employer's representative on the job, Operating Engineers shall be allowed proper time for necessary repairs and upkeep. During periods of major repairs there must be suitable shelter around equipment and heated from November through March.

**94.** On projects where at least eight (8) Operators are employed, the Employer, during the months of November 1 through April 30, will furnish a heated shelter where employees may change clothes.

**95.** Sanitary drinking water and toilet facilities will be available on the project in compliance with the provisions of the applicable state code.

**96.** The Employer agrees, upon the termination of any employee covered by this Agreement, to furnish such employee so released with a termination slip at the time of release, showing reason for said release. (Union will provide uniform numbered slips in duplicate; original for employee, duplicate for the Employer's file).

**97.** No supervisory employee shall perform productive work or operate equipment which would deny an Operating Engineer employee employment.

**98.** In the reduction of forces on any project, it is agreed that non-area residents will be the first to be laid off except for a limited number of key men as mutually agreed by the Union and the Employer at the Pre-Job Conference. Non-area residents are herein defined as those who have not resided in the State of Ohio or in counties contiguous thereto, nor in Boone, Campbell, Kenton and Pendleton counties in Kentucky, or in counties contiguous thereto, for a period of one (1) year.

**99.** When an Employer rents or leases equipment manned from an Employer in signed relations with this Union, the Engineer or Crew may be transferred to the payroll of the lessee, providing the referral office servicing the job or project shall be notified prior to such transfer and provided further that such employee's

40

employment by the lessee shall terminate upon the termination of the lease or rental of the equipment or any replacement thereof whichever is later.

**100.** When an Employer hires an Owner Operator with one (1) machine and the Owner Operator himself operates such single machine, the Owner Operator will be placed on the Employer's payroll. In the event that the above mentioned machine requires two (2) machines, such employees shall be placed on the Employer's payroll. However, when the Owner Operator has two (2) or more machines operating on the same job, he/she shall then be considered a sub-contractor and therefore come under the sub-contractors clause.

## ARTICLE IX

### TERM OF AGREEMENT

**101.** The Union will notify the Association which is signatory to this Agreement of the name and address of any contractor who becomes signatory to or bound by this Agreement during the term of this Agreement. The notice shall be given in writing within seven (7) days of the time any such contractor becomes signatory or bound hereto. The notice shall include a copy of the signature page of the contract or the assent card and, if not noted thereon, a statement of the date the contract or assent card was signed or the date the contractor became bound.

**102.** Within seven (7) days of the receipt of a notice from the Union of its intent to terminate or modify this Agreement, the Association will notify all such contractors of whom the Association has been notified by the Union. Each such contractor shall have thirty (30) days from the date the Association received the notice of intent to terminate or modify to advise the Union in writing of its intent to negotiate separately for a renewal agreement.

**103.** In the event any such contractor fails to advise the Union of its intent to negotiate separately within the time period set forth above, such contractor shall be deemed and presumed to agree to the terms and Agreement arrived at in negotiations between the Union and the Association and to be bound by the collective bargaining agreement resulting therefrom.

**104.** The provisions of this section shall operate for successive collective bargaining agreements until such time as the

41

Contractor or Union gives timely notice that said party desires to negotiate separately. Said notice shall be given within the time periods provided in the termination clause of this Agreement or any successive collective bargaining agreement.

105. The provisions of this Agreement shall continue in full force and effect through April 30, 2017 and thereafter from year-to-year, including new terms, conditions and compensation, until termination at the option of either party, in writing, 60 days prior to expiration of Agreement.

## ARTICLE X

### APPRENTICES

106. In order to maintain sufficient skilled mechanics for the industry and, in order to present proper learning opportunities for youth and, in order to effectuate the principles and desires of the negotiating parties created by the foregoing, the negotiators hereby fully subscribe to the Ohio Operating Engineers Apprenticeship Fund Agreement and Declaration of Trust dated 20 October 65 as if they had originally negotiated the same. The only limitation upon the program is the Affirmative Action Program here attached (Exhibit "B"), in addition to the proper rules, regulations, processes, and procedures enunciated by the Joint Apprenticeship and Training Committee established by the Trust of 20 October 65.

107. It is understood by the negotiating parties that a Registered Apprentice Engineer works under the direction of the Operating Engineer and the Joint Apprenticeship and Training Committee, and that the Operating Engineer shall see that he/she stays on the job, properly caring for his/her machine. The Employer shall give sufficient opportunity for the Registered Apprentice to operate under the supervision of the Operating Engineer when time and opportunity avails itself. The Area Coordinator of Apprentices shall be appraised periodically and by his request of performance to further the Registered Apprentices' learning situation. Registered Apprentices shall receive the scale enunciated by the Joint Apprenticeship and Training Committee in the time justified category that the Registered Apprentice has accomplished. For every three (3) Operating Engineer Journeymen employed by the company, there may be employed one (1) Registered Apprentice or Trainee Engineer through the referral when they are available. An ap-

42

prentice, while employed as part of a crew per Article VIII paragraph 77, will not be subject to the apprenticeship ratios in this collective bargaining agreement.

## ARTICLE XI

### CONSTRUCTION INDUSTRY ADVANCEMENT PROGRAM

108. The Employer and the Union agree to and approve the establishment of a Construction Industry Advancement Program to promote the common good of the Construction Industry by providing financial support for activities which may include but not necessarily be restricted to: (a) promotion of safety; (b) market development; (c) protection of legitimate markets; (d) public relations; (e) personnel practices and labor relations; (f) education; (g) industry relations; (h) apprenticeship training; (i) participation in Funds and Plans provided for in collective bargaining agreement, such as Health and Welfare Plans; and (j) collection and distribution of information from and to all segments of the Construction Industry and related groups or authorities.

109. Each Employer bound by this Agreement shall pay twenty cents ($.20) per hour worked effective May 1, 2010 to the AGC of Ohio Construction Industry Advancement Fund. Such funds shall be transmitted along with the Health and Welfare payments to the Ohio Operating Engineers Health and Welfare Office located at 1180 Dublin Road, Columbus, Ohio 43215, no later than the fifteenth (15th) day of the month immediately following the calendar month.

A. Administrative Fee. In addition to the CIAP payment each Contractor bound by the Agreement who is not an AGC of Ohio member shall pay an administrative fee of fifteen cents ($0.15) per hour for each hour worked by employees of the Contractor who are working within the bargaining unit herein. Such payments shall be transmitted with the fringe payments provided herein or transmitted directly to the AGC of Ohio no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed.

B. The Union shall have no participation or control of any kind or degree whatsoever nor shall the Union be connected in any way whatsoever with the Construction Industry Advancement Fund.

43

SOFCO002335

C. The Employer will hold the Union harmless from any liabilities arising out of the terms of Paragraph 108 through and inclusive of Paragraph 109D.

110. AGC of Ohio shall be the exclusive Administrator of the State Fund. Payments to the program shall be in accordance with instructions on forms furnished by the Association.

111. The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the fifteenth (15th) day of each month covering amounts due for the preceding month. If an Employer shall fail to make their payment when the same shall be due and payable, he shall be subject to an additional charge of one and one half percent (1-1/2%) per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses and impairment of reserves. In addition to the additional charges referred to herein, an Employer who fails to make timely payments shall be liable for legal fees and court costs incurred by the Association in collecting late payments.

112. Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and Fund of the Construction Industry Advancement Program shall not be distributed among any Employers, or the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

113. There is specifically excluded from the purposes of the Construction Industry Advancement Program the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during periods of work stoppages or strikes.

## ARTICLE XII

### UNION ADMINISTRATIVE DUES AND DEDUCTIONS

114A. Upon notification by the Union that a uniform administrative dues deduction has been authorized by all employees of the Employer, the Employer shall deduct said uniform administrative dues. The Union shall be responsible for obtaining all individually signed authorizations.

44

114B. The employer will deduct ten cents ($0.10) for each hour that the employee receives wages under the terms of the Agreement on the basis of individually signed voluntary authorized deduction forms. It is agreed that these authorized deductions are for remittance to Local 18's Political Education Patterns known as P.E.P., and are not a condition of membership in the International Union of Operating Engineers, Local 18 or of employment with the Employer, and that P.E.P. will use such monies in making political contributions in connection with federal, state and local elections. Payments for P.E.P. reflecting employee hours worked shall be made on the monthly fringe benefit reporting forms and shall be remitted at the same time and in the same manner as the Employer submits the fringe benefit payments under Article V of this Agreement.

The costs of administering this payroll deduction for P.E.P. are incorporated into the economic package provided under the terms of this Agreement so that the I.U.O.E. has, through its negotiation and its execution of this Agreement, reimbursed the Employer for the costs of such administration.

115. Credit Union savings will be agreed to only if deductions are the same for all employees and the Union is responsible for obtaining the voluntary authorization.

116. The Union agrees to indemnify and save the Employer harmless against any and all claims, suits or other forms of liability arising out of said deductions.

## ARTICLE XIII

### ENFORCEMENT MEASURES

117. It is agreed that all subcontractors shall be subject to the terms and provisions of this Agreement as it relates to the Operating Engineers.

118. The Union shall require that no Union person shall leave a job by quitting unless he/she has been properly relieved after giving ample notice of his/her intention to quit to the Employer.

119. The Union shall not transfer a Union person from one Employer to another without the consent of the Employer and the Union person involved. Neither shall the Employer transfer a Union person from his/her employ to another Employer's payroll without the consent of the Union person involved and the Union.

45

SOFCO002336

120. All employees of the Employer shall be allowed time to vote on Election Day as required by law on employees own time.

121. If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to the Employer.

122. There are areas within the scope of this Agreement for which the wages and conditions contained herein may not be appropriate due to competition or other reasons. In such cases, adjustments will be made in accordance with principles agreed to by the parties during negotiations.

123. No employee covered hereby may be discharged by an individual Employer for refusing to cross a legal primary picket line established by an International Union affiliated with the Building and Construction Trades Department of the AFL-CIO or a Local Union thereof or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Local Union thereof, which picket line has been authorized and sanctioned by proper authorities. No jurisdictional or illegal informational picket line shall be recognized.

## ARTICLE XIV

### NO STRIKE-NO LOCKOUT-ARBITRATION AND DISPUTES

124. The Employer shall not cause, permit or engage in any lockout of its employees during the term of this Agreement.

The Union shall not authorize, cause, engage in or sanction, nor will any employee take part in any illegal slowdown, work stoppage, strike, picketing or other concerted interference against the Employer, or occurring at or around the Employer's office or work locations during the term of this Agreement.

125. Should a dispute arise between any of the parties (Employee, Employer, Association and/or Union) to this Agreement as to its meaning, intent or the application of its terms, this dispute will be settled in accordance with the following grievance procedure:

STEP 1: The aggrieved employee shall first take up his/her grievance orally with the Employer's Supervisor or Representative. The employee may, if he/she so desires, have his/her

46

Steward appear with him/her. The grievance shall be orally brought to the Employer's attention within three (3) working days of the occurrence or discovery of the grievance, but in no event will the grievance be honored by management later than fifteen (15) days past the incident giving rise to the complaint. A grievance not submitted within the time limit shall be deemed untimely and is waived.

STEP 2: In the event the grievance is not settled, the employee then shall put his/her grievance in writing within three (3) working days after STEP 1 meeting, dated and signed along with the contract Article effected and submit the grievance to the District Business Representative and he/she and the Business Representative shall meet with the Employer's Representative and attempt to settle the matter. If no settlement can be reached within ten (10) working days from the date of the written grievance, then

STEP 2a: The grievance may be considered by a designated representative of the Union and the Labor Relations Director of the Associated General Contractors of Ohio, who shall have the authority to mutually agree upon a final and binding settlement of the grievance. If Step 2a. is not utilized, or if no settlement can be reached in Step 2a. within five (5) days from the date the grievance is referred, then:

STEP 3: The grievance may be referred to the State Joint Committee consisting of six (6) members, three (3) to be appointed by the Labor Relations Division of the AGC of Ohio and three (3) to be appointed by Local 18 of the International Union of Operating Engineers. Where the State Joint Committee, by majority vote (5 members or more), resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this agreement. In case of failure of either party to appear at the hearing of a grievance properly filed for hearing, the parties in attendance shall offer evidence in support of their position and the Committee shall dispose of the case on the basis of such evidence. If no settlement is reached at this STEP within fifteen (15) working days from the date the grievance is referred, then

STEP 4: The grievance shall then be referred to an Arbitrator selected by the Committee referred to in STEP 3. If the parties cannot agree on an Arbitrator within forty-eight (48) hours after the parties agree to submit the matter to arbitration, the parties shall jointly request the Federal Mediation and Concilia-

47

tion Service to furnish a list of Arbitrators from which the Arbitrator shall be selected by the alternate striking of names.

126. The expenses and fees of the Arbitrator shall be shared equally by the parties. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms and provisions of this Agreement. The Arbitrator's decision shall be final and binding upon the parties hereto.

## ARTICLE XV

### DETERMINATION OF JURISDICTIONAL DISPUTES

127. Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement creating the Impartial Jurisdictional Disputes Board. In particular, both parties agree to be bound by the provision of the Agreement which states: Any decision or interpretation of the Impartial Jurisdictional Disputes Board shall immediately be accepted and complied with by all parties signatory to this Agreement.

The parties hereto agree that in the event of a jurisdictional dispute with any other Union or Unions, the dispute shall be submitted to the Impartial Jurisdictional Disputes Board for settlement in accord with the Plan adopted by the Building Trades Department, AFL-CIO.

The parties hereto further agree that they will be bound by any decision or award of the Disputes Board. There shall be no stoppage of work or slowdown arising out of any such dispute. No jurisdictional work stoppages, and no jurisdictional picket lines shall be recognized.

This article of the contract will go into effect when the National A.G.C. reaffiliates with the Impartial Jurisdictional Disputes Board. This article will not be applicable until such time as the International Union of Operating Engineers reaffiliates with the Building and Construction Trades Department of the AFL-CIO.

## ARTICLE XVI

### I-9

128. The Union and the Employers during the term of this Agreement agree to use their best efforts to establish a master file of I-9 employment eligibility verification forms on all members. This file will be maintained at the Union office and be available for the Employers' use.



## ARTICLE XVII

### SAVINGS AND SEPARABILITY

129. It is mutually agreed that if any clause, terms or provisions of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other board or agency having jurisdiction in the matter, such clause, terms or provisions shall be or become inoperative of any effect without disturbing the other clauses, terms or provisions of this Agreement and the remaining part of this Agreement shall remain in full force and effect. In the event that any clause, terms or provisions of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other board or agency having jurisdiction in the matter, said clause, terms or provisions shall be re-negotiated to the mutual satisfaction of the parties, but during such re-negotiation work shall not be interrupted or stopped by lockout, strikes, boycotts or other labor troubles.

## ARTICLE XVIII

### EFFECTIVE

130. This Agreement shall be effective May 8, 2013 and shall remain in force and in accordance with the terms of Article IX hereof. Wage rates and fringe payments shall be effective as designated by this Agreement.

131. IN WITNESS WHEREOF, WE, the undersigned duly authorized Employer Representatives and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO) executed this Agreement on the 8th day of May, 2013.

**I.U.O.E. LOCAL 18 AND ITS BRANCHES**

S/PATRICK L. SINK
Business Manager

S/RICHARD E. DALTON
President

S/MARK A. TOTMAN
Vice President

S/GARY G. SIESEL
Recording-Corresponding Secretary

S/PREMO P. PANZARELLO
Financial Secretary

S/JOSEPH S. LUCAS
Treasurer

Trustees

S/TIMOTHY D. HAMMOCK
S/SCOTT R. STEVENSON
S/DONALD G. TAGGART

**AGC OF OHIO LABOR RELATIONS DIVISION**

S/RICHARD HOBBS
Executive Vice President

S/MIKE DYER
Goettle Construction Co.
Vice President, Operations

S/THOMAS G. MURASKI, P.E.
Kokosing Construction Company Inc.
Vice President

50

## EXHIBIT A, Zone 1
### WAGE RATES AND FRINGE CONTRIBUTIONS

ZONE I covering Summit and Portage counties:

Classification: MASTER MECHANIC

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $33.18* | $33.98* | $34.78* | $35.83* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.

**Voluntary

51

SOFCO002339

## Classification: GROUP A

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Health & Welfare | $32.93* | $33.73* | $34.53* | $35.58* |
| Pension | 6.91 | 7.16 | 7.41 | 7.41 |
| Apprenticeship | 6.00 | 6.00 | 6.00 | 6.00 |
| E & S | .60 | .67 | .75 | .75 |
| CIAP | .04 | .07 | .09 | .09 |
| CIAP Admin. | .20 | .20 | .20 | .20 |
| PAC | .15 | .15 | .15 | .15 |
| | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

52

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
All Concrete pumps with booms

Cranes (all types)***
Cranes – Compact; track or rubber over 4,000 pounds capacity
Cranes – Self-erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam, suction) 3-man crew
Elevating Graders or Euclid Loaders

Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers

Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

| ***Boom & Jib Rates | | | | |
|---|---|---|---|---|
| | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
| 150' - 180' | $33.43* | $34.23* | $35.03* | $36.03* |
| 180' - 249' | 33.93* | 34.73* | 35.53* | 36.58* |
| 250' and over | 34.18* | 34.98* | 35.78* | 36.83* |

*If additional funds are required for fringe benefits, they may be diverted from wages.

53

SOFCO002340

## Classification: GROUP B

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $32.83* | $33.63* | $34.43* | $35.48* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saw, vermeer-type
Endloaders
Hydro Milling Machine

Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

54

## Classification: GROUP C

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.79* | $32.59* | $33.39* | $34.44* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 7.16 | 7.41 | 7.41 | 7.41 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate of pay will be "Class E")

Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (Installing or operating Well Points or other types of Dewatering Systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

55

SOFCO002341

## Classification: GROUP D

|  | 5/8/2013 | 5/1/2014 / | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Health & Welfare | $30.57* | $31.37* | $32.17* | $33.22* |
| Pension | 6.91 | 7.16 | 7.41 | 7.41 |
| Apprenticeship | 6.00 | 6.00 | 6.00 | 6.00 |
| E & S | .60 | .67 | .75 | .75 |
| CIAP | .04 | .07 | .09 | .09 |
| CIAP Admin. | .20 | .20 | .20 | .20 |
| PAC | .15 | .15 | .15 | .15 |
|  | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Backfillers & Tampers
Ballast Relocator
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps (without boom with 4" or smaller system)
Concrete Spreaders
Conveyors, used for handling materials

Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers

Rollers, except asphalt rollers
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen

Tractors, pulling sheepfoot post roller or grader
VAC/ALLS
Vibratory compactors, with integral power
Welders

56

## Classification: GROUP E

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Health & Welfare | $25.28* | $26.03* | $26.88* | $27.93* |
| Pension | 6.91 | 7.16 | 7.41 | 7.41 |
| Apprenticeship | 6.00 | 6.00 | 6.00 | 6.00 |
| E & S | .60 | .67 | .75 | .75 |
| CIAP | .04 | .07 | .09 | .09 |
| CIAP Admin. | .20 | .20 | .20 | .20 |
| PAC | .15 | .15 | .15 | .15 |
|  | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helper (Oiler)
Boilers (less than 15 lbs. pressure)
Cranes-Compact, track or rubber (under 4,000 pounds)
Directional Drill "Locator"
Fueling and greasing -$3.00
Inboard, Outboard Motor Boat Launches

Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

57

SOFCO002342

# EXHIBIT A, Zone 1A

## ZONE 1A covering Erie, Huron, Lorain, Medina

### Certified Crane Operator Pay

Operating Engineers employed on any piece of equipment requiring a Certified Crane Operator (CCO) certification shall be paid a premium of fifty cents ($0.50) per hour in addition to the crane rate or any escalated rate that may be in effect.

### Day Pay

In all counties covered by ZONE 1A of this Agreement, the following classifications shall be employed on a DAY PAY basis:

Asphalt Pavers
Backfillers and Tampers
Backfillers
Bar and Joint Installing Machines
Batch Plant Operators
Boom Trucks
Bulldozers
Bull Floats
Burlap and Curing Machines
CMI-type Equipment
Cableways
Concrete Pumps

Concrete Spreaders
Crushers
Drum Firemen in Asphalt Plants
Elevating Graders or Euclid Loaders
End Loaders
Finishing Machines
Floating Equipment (anything on Great Lakes or its tributaries is under the River & Lake Agreement)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (Sonic Pile Driving)

58

Grinders (all)
Hoes (when attached to farm or industrial-type tractors or CAT 320 backhoes or equivalent and below)
Horizontal Directional Drill Operator and Horizontal Directional Drill Locator
Hydro Excavator (all types C rate) (F rate if a second person is needed) Helper rate
Inboard, Outboard Motor Boat Launches
Laser Screeds and like equipment
Lead Greasemen
Locomotives (all)
Mobile Concrete Pumps, with Boom
Mucking Machines
Pavement Breakers, Hydro, or Cable
Planers (all types)
Plant Mixers (on site)
Portable Hydraulic Gantry (lift system C Rate) (F Rate if a second person is needed)

Power Graders
Power Scoops
Pump Operators, installing or operating well-points or other types of dewatering systems
Push Cats
Road Widening Trenchers
Rollers (all types)
Rotomills
Rough Terrain Forklifts (with winch/hoist)
Saw, concrete vermeer-type
Self-propelled Power Spreaders
Self-propelled Power Sub-graders
Slip Form Pavers
Straddle Carriers
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Vibratory Compactors, with integral power

59

## EXHIBIT A, Zone 1A
### WAGE RATES AND FRINGE CONTRIBUTIONS

**MASTER MECHANIC/EQUIPMENT FOREMAN**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $35.28* | $36.21* | $37.01* | $38.06* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.

**Voluntary

60

**GROUP A**

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $34.78* | $35.71* | $36.51* | $37.56* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.

**Voluntary

Operators of:

A-Frames
Boiler Operators, Compressor Operators,
Hydraulic Pumps & Power Pacs when
mounted on a crane or regardless of where
said equipment is mounted (piggy-back
operation)
Boom Trucks (all types)
Cableways
Cherry Pickers

Combination Concrete Mixers & Towers
Concrete Pumps
Cranes (all types)***
Cranes – compact; track or rubber over 4000
lbs. capacity
Cranes – self erecting; stationary, track, or truck
(all configurations)
Derricks (all types)

61

*(Continued on next page)*

Draglines
Dredges (dipper, clam, or suction), 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (two or more drums)
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic or Welder)
Mixers, Paving (multiple drum)
Mobile Concrete Pumps with Booms
Panelboards (all types on site)
Pile Drivers
Power Shovels

Robotics Equipment Operator/Mechanic
Rotary Drills, (all), used on caisson work, wells (all types), Geothermal work, and substructure work
Rough Terrain Forklifts with Winch/Hoist (when used as a crane)
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

|  | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
| --- | --- | --- | --- | --- |
| Over 200' | $35.53* | $36.46* | $37.26* | $38.31* |
| Over 300' | 35.78* | 36.71* | 37.51* | 38.56* |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.

62

## GROUP B

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
| --- | --- | --- | --- | --- |
| Rate | $34.63* | $35.56* | $36.36* | $37.41* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:
Asphalt Pavers
Bulldozers
CMI-Type Equipment
Endloaders
Horizontal Directional Drill Locator
Horizontal Directional Drill Operator
Instrument Man
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills
Saw (concrete vermeer-type)

63

SOFCO002345

## GROUP C

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $33.18* | $34.11* | $34.91* | $35.98* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

Air Compressors, pressurizing shafts, or tunnels
Asphalt Rollers (all)
Forklifts
Hoists, one drum
House Elevators (except automatic call button controlled)
Hydro Excavator (all types C rate) (F rate if a second person is needed) Helper rate
Laser Screeds and like equipment
Man Lifts

Modular Moving and Placement machine (C rate) (F rate if a second person is needed)
Mud Jacks
Portable Hydraulic Gantry (lift system C Rate) (F Rate if a second person is needed)
Power Boilers (over 15 lbs. pressure)
Pump Operators, installing or operating well points or other type of dewatering system
Pressure Groutings
Trenchers (24" and under)
Utility Operators

64

## GROUP D

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $32.40* | $33.33* | $34.13* | $35.18* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

Compressors, on building construction
Conveyors, building material
Generators
Gunite Machines
Mixers, capacity more than one bag
Mixers, one bag capacity (side loader)

Post Drivers
Post Hole Diggers
Pavement Breakers, hydraulic or cable
Road Widening Trenchers
Rollers
Welder Operators

65

SOFCO002346

## GROUP E

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $32.08* | $33.01* | $33.81* | $34.86* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

Operators of:

Backfillers and Tampers
Batch Plants
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Cleaning Machine Operator (decontamination included)
Clefplanes
Concrete Spreading Machines
Crushers
Deckhands
Drum Firemen (asphalt)
Farm-type Tractor, pulling attachments
Finishing Machines
Forklifts (masonry work only)
Form Trenchers
High Pressure Pumps (over ½" discharge)
Hydro Seeders
Pumps (4" and over discharge), provided it is not part of a dewatering system discharged into a common header
Self-Propelled Power Spreaders

Self-Propelled Sub-Graders
Submersible Pumps (4" and over discharge), provided it is not part of a dewatering system discharged into a common header
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Vibratory Compactors, with integral power

66

## GROUP F

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Rate | $25.00* | $25.93* | $26.73* | $27.76* |
| H & W | 7.06 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .07 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PEP | .10** | .10** | .10** | .10** |

*In the event that additional funds are needed for fringe benefits, they will be diverted from wages.
**Voluntary

67

SOFCO002347

Operators of:

Apprentice/Helpers, Helpers, Oiler, Signalmen
Barrier Moving Machines (additional duty, paid same rate)
Bobcat-type and/or Skid Steer Loader
Bobcat-type and/or Skid Steer Loader with any and all attachment
Cranes -- compact; track or rubber under 4000 lbs. capacity
Geodimeter
Grade Checker
Grinders (all)
Inboard, Outboard Motor Boat Launches

Light Plant Operators
Planers (all types)
Power Boilers (less than 15 lbs. pressure)
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Rod Man
Rotomills
Saw (concrete vermeer-type)
Submersible Pumps (under 4" discharge)
Vac/Alls

68

## EXHIBIT A, Zone II
### WAGE RATES AND FRINGE CONTRIBUTIONS

ZONE II covering Lucas and Wood counties.

Classification: MASTER MECHANIC

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $32.44* | $33.24* | $34.04* | $35.09* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

69

SOFCO002348

## Classification: GROUP A

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| Health & Welfare | $32.19* | $32.99* | $33.79* | $34.84* |
| Pension | 6.91 | 6.00 | 6.00 | 7.41 |
| Apprenticeship | 6.00 | 6.00 | 6.00 | 6.00 |
| E & S | .60 | .67 | .75 | .75 |
| CIAP | .04 | .07 | .09 | .09 |
| CIAP Admin. | .20 | .20 | .20 | .20 |
| PAC | .15 | .15 | .15 | .15 |
| | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:
Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***

Cranes – Compact; track or rubber over 4000 pounds capacity
Cranes – Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)

70

Gradalls
Helicopter Operators/winch, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders

Rail Tampers (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24' wide)
Tug Boats

***Boom & Jib Rates

| | 5/9/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' - 180' | $32.69* | $33.49* | $34.29* | $35.34* |
| 180' - 249' | 33.19* | 33.99* | 34.79* | 35.84* |
| 250' and over | 33.44* | 34.24* | 35.04* | 36.09* |

*If additional funds are required for fringe benefits, they may be diverted from wages.

71

SOFCO002349

## Classification: GROUP B

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $32.07* | $32.87* | $33.87* | $34.72* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders
Hydro Milling Machines
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

72

## Classification: GROUP C

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.03* | $31.83* | $32.63* | $33.68* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms and with 5" system)
Fork Lifts (except masonry)
Highway Drills - all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate will be "Class E")
Man Lifts
Material hoist/elevators

73

(Continued on next page)

SOFCO002350

Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover

Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

Classification: GROUP D

|              | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|--------------|----------|----------|----------|----------|
|              | $29.85*  | $30.65*  | $31.45*  | $32.50*  |
| Health & Welfare | 6.91 | 7.16  | 7.41     | 7.41     |
| Pension      | 6.00     | 6.00     | 6.00     | 6.00     |
| Apprenticeship | .60    | .67      | .75      | .75      |
| E & S        | .04      | .07      | .09      | .09      |
| CIAP         | .20      | .20      | .20      | .20      |
| CIAP Admin.  | .15      | .15      | .15      | .15      |
| PAC          | .10**    | .10**    | .10**    | .10**    |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:
Ballast Relocators
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines

Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction

74

Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreaders
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines

Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder

75

SOFCO002351

Classification: GROUP E

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $24.39* | $25.19* | $25.99* | $27.04* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Allen Screed Paver (concrete)
Apprentice/Helpers (Oilers)
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber under 4,000 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches

Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signal Person
Submersible Pumps (under 4" discharge)

76

## EXHIBIT A, Zone III
## WAGE RATES AND FRINGE CONTRIBUTIONS

ZONE III covering Akron and counties, Columbus and counties, Franklin and counties, and Toledo and counties:

For AKRON and the following counties: Ashland, Belmont, Carroll, Coshocton, Guernsey, Harrison, Holmes, Jefferson, Monroe, Noble, Richland, Stark, Tuscarawas, Washington and Wayne.

For COLUMBUS and the following counties: Crawford, Delaware, Fairfield, Franklin, Hocking, Knox, Licking, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Union and Wyandot.

For FRANKLIN and the following counties: Adams, Athens, Auglaize, Brown, Butler, Champaign, Clark, Clermont, Clinton, Darke, Fayette, Gallia, Greene, Hamilton, Highland, Jackson, Lawrence, Logan, Madison, Meigs, Mercer, Miami, Montgomery, Morgan, Preble, Ross, Scioto, Shelby, Vinton and Warren. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

For TOLEDO and the following counties: Allen, Defiance, Fulton, Hancock, Hardin, Henry, Ottowa, Paulding, Putnam, Sandusky, Seneca, Van Wert and Williams.

77

SOFCO002352

## Classification: MASTER MECHANIC

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.69* | $32.49* | $33.29* | $34.34* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

78

## Classification: GROUP A

| | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
| | $31.44* | $32.24* | $33.04* | $34.09* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:
Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination – Concrete Mixers & Towers
Concrete Pumps with booms (all)
Cranes (all types)***
Cranes – Compact; track or rubber over 4000 pounds capacity
Cranes – Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Helicopter Winch Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loaders
Rail Tampers (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure

*(Continued on next page)*

79

SOFCO002353

Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

***Boom & Jib Rates

|  | 5/8/13 | 5/1/14 | 5/1/15 | 5/1/16 |
|---|---|---|---|---|
| 150' - 180' | $31.94* | $32.74* | $33.54* | $34.59* |
| 180' - 249' | 32.44* | 33.24* | 34.04* | 35.09* |
| 250' and over | 32.69 | 33.49* | 34.29* | 35.34* |

*If additional funds are required for fringe benefits, they may be diverted from wages.

### Classification: GROUP B

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $31.32* | $32.12* | $32.92* | $33.97* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

80

Operators of:
Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loaders with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Concrete Saws, vermeer type
Endloaders
Hydro Milling Machines
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types

### Classification: GROUP C

|  | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $30.28* | $31.08* | $31.88* | $32.93* |
| Health & Welfare | 6.91 | 7.16 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

81

SOFCO002354

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loaders with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps without booms and with 5" system
Fork Lifts (except masonry)
Highway Drills - all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled) Buck Hoists, Transport Platforms, Construction Elevators
Hydro Vac/Excavator (when a second person is needed, the rate of pay will be "Class E")

Man Lifts
Material Hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie (Inserter/Remover)
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

82

## Classification: GROUP D

|  | 5/6/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|---|---|---|---|---|
|  | $29.10* | $29.90* | $30.70* | $31.75* |
| Health & Welfare | 6.91 | 6.00 | 7.41 | 7.41 |
| Pension | 6.00 | 6.00 | 6.00 | 6.00 |
| Apprenticeship | .60 | .67 | .75 | .75 |
| E & S | .04 | .07 | .09 | .09 |
| CIAP | .20 | .20 | .20 | .20 |
| CIAP Admin. | .15 | .15 | .15 | .15 |
| PAC | .10** | .10** | .10** | .10** |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

Operators of:

Ballast Relocators
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Cleiplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag

Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4" or smaller system
Concrete Spreading Machines
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen in asphalt plants
Farm-type Tractors, pulling attachments

(Continued on next page)

83

SOFCO002355

Finishing Machines
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers

Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder Operators

## Classification: GROUP E

|                | 5/8/2013 | 5/1/2014 | 5/1/2015 | 5/1/2016 |
|----------------|----------|----------|----------|----------|
|                | $23.64*  | $24.44*  | $25.24*  | $26.29*  |
| Health & Welfare | 6.91   | 7.16     | 7.41     | 7.41     |
| Pension        | 6.00     | 6.00     | 6.00     | 6.00     |
| Apprenticeship | .60      | .67      | .75      | .75      |
| E & S          | .04      | .07      | .09      | .09      |
| CIAP           | .20      | .20      | .20      | .20      |
| CIAP Admin.    | .15      | .15      | .15      | .15      |
| PAC            | .10**    | .10**    | .10**    | .10**    |

*If additional funds are required for fringe benefits, they may be diverted from wages.
**Voluntary

84

Operators of:
Allen Screed Pavers (concrete)
Apprentice/Helpers (Oilers) and Signalmen
Boilers (less than 15 lbs. pressure)
Cranes-Compact; track or rubber under 4,000
   pounds
Directional Drill "Locator"
Fueling and greasing +$3.00

Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Submersible Pumps (under 4" discharge)

85

SOFCO002356

## REGISTERED APPRENTICESHIP WAGE SCHEDULE

### ZONE I, ZONE 1A, ZONE II, ZONE III

| | |
|---|---|
| First Year Apprentice | Third Year Apprentice |
| 50% of Class A | 70% of Class A |
| Second Year Apprentice | Fourth Year Apprentice |
| 60% of Class A | 80% of Class A |

A new classification of Trainee is hereby established and the rates of pay are as follows:

| | |
|---|---|
| First Year Trainee | Third Year Trainee |
| 60% of Bulldozer Rate | 75% of Bulldozer Rate |
| Second Year Trainee | Fourth Year Trainee |
| 60% of Bulldozer Rate | 90% of Bulldozer Rate |

There will be a 10% increase for the apprentices on top of the percentages listed above provided they are operating mobile equipment.

The rates paid to the Apprentice or Trainee shall not exceed the classification rate the Apprentice or Trainee is working. For every five (5) Operating Engineer Journeymen employed, there may be employed one (1) Registered Apprentice Engineer or Trainee. Through the referral, Employers may employ Registered Apprentices or Trainees within this limitation when they are available. Any increase in the Apprenticeship contributions, agreed by the parties, will be shared equally by the Union and Employer.

## FIELD MECHANIC TRAINEE SCHEDULE

| | |
|---|---|
| First Year | 50% of Class "A" rate |
| Second Year | 60% of Class "A" rate |
| Third Year | 70% of Class "A" rate |
| Fourth Year | 80% of Class "A" rate |

Only those individuals who have obtained a two (2) year Associates Degree, from an accredited school, will be accepted into this program. If the Mechanic Trainee is required to have a CDL license, he/she will be paid a 10% incentive above the percentages listed above. After successful completion of the fourth year, the Mechanic will be paid at Class "A" rate.

86

## SPECIAL RATES

Any work under A, B and C as described in Article I of this Agreement awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## EXHIBIT B
### AFFIRMATIVE ACTION PROGRAM

1. Under the provisions of Executive Order 11246, issued by the President of the United States, and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations as revised, and relative court orders, a specific affirmative program must be developed to assure that the employment of workers and the treatment of employees during employment is completely nondiscriminatory in regard to race, creed, color, sex, age, religion or national origin.

2. The parties to this Agreement are mutually desirous of developing an affirmative action agreement to implement the provisions of applicable federal regulations in order to assure nondiscrimination in employment; upgrading; demotion or transfer; recruitment and recruitment advertising; lay-off or termination; rate of pay and selection for all types of training.

3. In order to assure nondiscrimination now and in the future and in an effort to attract a maximum number of potential apprentices from minority and female groups, the parties to this Agreement have formulated the following Affirmative Action Program:

### A. APPRENTICESHIP

The parties agree to establish a positive program of apprenticeship selection and to use the following program to attract minority and female groups to the Operating Engineers' Apprenticeship Program:

1. Develop a "fact sheet" for distribution to all secondary school counselors, youth opportunity centers, social action agencies and state employment offices.

87

2. Make available speakers to inform and advise high school students and others of opportunities in apprenticeship for Operating Engineers.

3. Notify all interested agencies and parties thirty (30) days prior to the period for taking applications; and making such interested agency or parties aware of the nature of all tests in order to facilitate a proper pre-test educational effort.

4. Provide application forms for apprenticeship and adequate instruction for properly preparing same, upon request, during recruitment periods at all training sites of the Operating Engineers Apprenticeship Program at certain union halls of Local 18. Develop an outreach program for the recruiting and pre-apprentice training of individuals from minority and female groups to enable them to enter the apprenticeship program.

5. To use a standardized, uniform battery of tests to determine applicant proficiency and aptitudes in reading, computation and mechanical skills suitable for the craft of Operating Engineer.

6. May have the test administered by an agency other than the Ohio Operating Engineers Apprenticeship Program and uniformly and numerically graded.

7. Interview sufficient applicants personally by teams consisting of one (1) representative of Management and one (1) of the Union who shall independently grade each applicant individually and then average the scores.

8. When an applicant fails to achieve acceptance, the Joint Apprenticeship and Training Committee shall make every effort to inform the applicant and the referring or cooperating agency of the area of insufficiency.

9. In order for the applicant, after acceptance as an Operating Engineer Apprentice, to become immediately employable by a Participating Employer, the Joint Apprenticeship and Training Committee shall provide training sites with equipment of the nature for which the apprentice will be employed, in order to acquaint the apprentice with safety measures as well as the operation and maintenance of the same and teach him/her the use of the machine as a tool of the trade and to generate good work habits. After the training, he/she shall be employed as an "apprentice-in-training" as such openings occur.

88

10. The parties to this Agreement agree to jointly assist a minority group employee to be integrated into the work force and the Union by:

A. Having management supervision on the job make every effort to assist and encourage minority group apprentices and to welcome such individuals to the job;

B. Have each apprentice and pre-apprentice trainee assigned to a Journeyperson Operating Engineer for help and assistance, and

C. Have Union officers inform the membership of the importance of making welcome all minority groups into the Union, and

D. The education, training requirements and disciplines of Registered apprentices shall be governed by the Joint Apprenticeship and Training Committee and its standards.

## B. JOURNEY PERSONS

1. The parties will undertake a joint training program to assure equal opportunity to all journey persons who desire to acquire the skills required to work on a variety of equipment within the jurisdiction of the Operating Engineers.

2. Local Union officials will notify minority and female members of this program. They will offer to minority and female members an opportunity for training on any highway equipment. If the parties determine that a minority or female group member lacks adequate pre-training qualifications, the reasons for such determination shall be noted in writing and shall be available for inspection during a review of this program by appropriate federal contracting or administering agency officials. An attempt shall be made to have availability of training according to the demands for craftsmen to operate the specific type of equipment involved.

3. Each member of the Local will be advised of this Agreement and the appropriate avenues for redress if any of its terms are breached by either party.

The parties undertake this Affirmative Action Program in accordance with Executive Order 11246 and applicable court orders. It is their understanding that participation in the program

89

SOFCO002358

by any contractor shall be accepted in lieu of that portion of a required affirmative action plan which would otherwise be directed to jobs manned by members of the Operating Engineers Union.

The parties shall from the date of this Agreement, when required, report to the appropriate federal contracting or administering agency. The report will specifically indicate the total number of minority group individuals or females in the Union. In evaluating these reports, the appropriate federal contracting or administering agency officials will have complete access to relevant records of the parties and will be expected to discuss the progress of the program freely with the parties and Union members.

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agrees to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____
Name of Employer (Printed)

_____
Employer Address

_____
City                    State                    Zip Code

_____
Area Code & Telephone

_____
Authorized Employer Representative  (Signature)  Date

_____
Authorized Employer Representative  (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____
Union Representative (Signature)

**CONTRACTORS COPY**            (ORIGINAL SIGNATURE)

90

SOFCO002359

Representing Management Exclusively in Workplace Law and Related Litigation



| | |
|---|---|
| **Jackson Lewis P.C.** | ALBANY NY |
| **PNC Center** | ALBUQUERQUE NM |
| **201 E. Fifth Street** | ATLANTA GA |
| **26th Floor** | AUSTIN TX |
| **Cincinnati OH 45202** | BALTIMORE MD |
| **Tel 513 898-0050** | BIRMINGHAM AL |
| **Fax 513 898-0051** | BOSTON MA |
| **www.jacksonlewis.com** | CHICAGO IL |

ALBANY NY
ALBUQUERQUE NM
ATLANTA GA
AUSTIN TX
BALTIMORE MD
BIRMINGHAM AL
BOSTON MA
CHICAGO IL
CINCINNATI OH
CLEVELAND OH
DALLAS TX
DAYTON OH
DENVER CO
DETROIT MI
GRAND RAPIDS

GREENVILLE SC
HARTFORD CT
HONOLULU HI*
HOUSTON TX
INDIANAPOLIS IN
JACKSONVILLE FL
KANSAS CITY REGION
LAS VEGAS NV
LONG ISLAND NY
LOS ANGELES CA
MADISON, WI
MEMPHIS TN
MIAMI FL
MILWAUKEE WI
MINNEAPOLIS MN

MONMOUTH COUNTY NJ
MORRISTOWN NJ
NEW ORLEANS LA
NEW YORK NY
NORFOLK VA
OMAHA NE
ORANGE COUNTY CA
ORLANDO FL
PHILADELPHIA PA
PHOENIX AZ
PITTSBURGH PA
PORTLAND OR
PORTSMOUTH NH
PROVIDENCE RI

RALEIGH NC
RAPID CITY SD
RICHMOND VA
SACRAMENTO CA
SALT LAKE CITY UT
SAN DIEGO CA
SAN FRANCISCO CA
SAN JUAN PR
SEATTLE WA
ST. LOUIS MO
STAMFORD CT
TAMPA FL
WASHINGTON DC REGION
WHITE PLAINS NY

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: (513) 873-2103
MY EMAIL ADDRESS IS: GARY.GREENBERG@JACKSONLEWIS.COM

July 24, 2018

**VIA E-MAIL & U.S. MAIL**

Daniel J. Clark
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43216-1008
djclark@vorys.com

Allen S. Kinzer
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43216-1008
askinzer@vorys.com

Re:   Sofco Erectors, Inc./Ohio Operating Engineers Pension Fund
       AAA Case No. 01-18-0001-3790
       JS Case No. 4510

Dear Gentlemen:

I am writing to renew our request that the Fund exclude the contribution history of Sofco's predecessor and recalculate the assessments accordingly.

Sofco Erectors, Inc. ("Sofco") was formed in 2004 following an asset purchase. Sofco's predecessor, also called Sofco Erectors, Inc. ("Old Sofco") was a construction industry employer that, upon Sofco's purchase of its assets, ceased operations and has never performed any similar work since. Accordingly, relying on Old Sofco's contribution history in calculating Sofco's alleged withdrawal liability is inappropriate.

In response to Sofco's Supplemental Request for Review, you stated the Fund's belief that Sofco had a contribution history going back well before April 2004, based upon the fact that "Sofco Erectors, Inc." executed CBAs dating back into the 1980s. You also stated the Fund's position that, at the very least, Sofco would have successor liability. We disagree with both points.

Old Sofco, also named "Sofco Erectors, Inc.," operated prior to April 1, 2004. On April 1, 2004, Sofco Erectors Acquisitions, Inc. ("Sofco Acquisitions") acquired all of Old Sofco's assets. (*See* Asset Purchase Agreement, Exhibit A.) On June 10, 2004, Sofco Acquisitions amended its articles of incorporation and changed its name to "Sofco Erectors, Inc." (Exhibit B.) Sofco and Old Sofco are



EXHIBIT
4
10-9-18



Daniel J. Clark
Allen S. Kinzer

Vorys, Sater, Seymour & Pease LLP

July 24, 2018

Page 2

different entities; Sofco was formed by new owners, unrelated to Old Sofco. Accordingly, Old Sofco's prior contribution history should have no bearing on Sofco's alleged withdrawal liability.

Moreover, ERISA "clearly establishes that a purchaser of assets may not be held liable for the seller's contribution history, absent a special arrangement with the seller by which the purchaser voluntarily assumes that liability. No such arrangement was made here. Under the unambiguous provisions of the statute, there is really no room to argue Sofco is liable for Old Sofco's contribution history." *Richland Industries, Ltd. v. Robbins*, 617 F.Supp. 639, 644 (N.D. Ill. 1985).

Please let us know by July 31, 2018 whether the Fund will recalculate Sofco's alleged withdrawal liability using only Sofco's contribution history and excluding Old Sofco's contribution history.

Sincerely,
JACKSON LEWIS P.C.

Gary L. Greenberg
Attorney for Sofco Erectors, Inc.

GLG/dlc
Enclosures

cc: Mark Gerano (via e-mail)

4821-0567-2557, v. 1

ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is made this __11__ day of __March__, 2004, among SOFCO ERECTORS, INC., an Ohio corporation ("Seller") and SOFCO Erectors Acquisition, Inc., an Ohio corporation ("Buyer"). This Asset Purchase Agreement, including all exhibits to be attached hereto shall be referred to as the "Agreement."

RECITALS

A.      Seller is the owner of the land, building and business where Seller conducts business known as "Sofco Erectors"; and

B.      Subject to the terms in this Agreement, Seller wishes to sell, and Buyer wishes to buy, all of Seller's assets, business and operations conducted under the name Sofco Erectors (the "Business"), including the land and building where the Business operates.

AGREEMENT

NOW, THEREFORE, the parties agree as follows:

1.      PURCHASE AND SALE.

1.1     Purchase of Assets. At the Closing (as defined below), Seller will sell, transfer, and convey to Buyer, and Buyer will purchase from Seller, all of Seller's right, title and interest in and to (a) the Business as a going concern, (b) the name "Sofco Erectors" and all goodwill associated therewith, and (c) all of the assets and rights of Seller constituting the Business or used therein, of every kind and description, including the real estate and building where the Business operates, personal, tangible and intangible assets, wherever situated relating to the Business (collectively, the "Assets"), except the assets retained by Seller, identified in Exhibit 1.2 as the assets "Retained by Seller", which include Cash, Intercompany Receivables, Deferred Tax Assets, Prepaid Income Taxes and Deferred Federal Income Taxes (the "Excluded Assets").

1.2     Included Assets. The Assets shall include without limitation the following assets, properties and rights of Seller used directly or indirectly in the conduct of, or generated by or constituting, the Business, except the Excluded Assets identified in Exhibit 1.2:

        (a)      Receivables. All prepaid items, unbilled costs and fees, and accounts notes and other receivables;

        (b)      Personal Property. All tangible personal property, including all machinery, equipment, tools, vehicles, furniture, furnishings, office equipment, computers, leasehold improvements and other goods;

        (c)      Inventories. All supplies and inventories of the Business including work-in-progress, office supplies, and all such items shipped or to be shipped from vendors on or prior to the Closing Date but not yet received by Seller;



(d) <u>Intellectual Property</u>. All intellectual property used in and for the Business, defined to include without limitation, all of the following: (i) all rights under any United States and foreign patent, trademark, service mark, trade name, copyright or mask work right, whether registered or unregistered, and any applications therefor, (ii) all technologies, websites (including the content thereof), domain names, methods, formulations, data bases, trade secrets, know-how and inventions used by, in or owned by the Business, whether developed or under development, (iii) all computer software, including documentation and related object and source codes, developed by the Business or which the Business has the right to transfer, and (iv) any website, domain name and related technology and data, owned or maintained by Seller's parent, Southern Ohio Fabricator's Inc., which relates to the Business (collectively, the "Intellectual Property"). Notwithstanding the above, Seller is only aware of Intellectual Property consisting of its website and will take whatever action is required to transfer any portion of the website, domain name and related technology and data to Buyer, at Buyer's expense;

(e) <u>Contracts and Licenses</u>. To the extent permitted by applicable law, all rights under any written or oral contract, license or other instrument;

(f) <u>Government Permits and Licenses</u>. All government permits, authorizations and licenses, to the extent transferable;

(g) <u>Claims</u>. All rights and claims of Seller against any third parties, including without limitation, all rights under express or implied warranties relating to the Assets;

(h) <u>Books and Records</u>. All information, files, records, dates, plans, contracts and recorded information relating to the Business or the Assets; and

(i) <u>Real Estate</u>. The land located at 10360 Wayne Avenue, Cincinnati, Ohio 45215, together with all buildings, improvements, appurtenant rights and fixtures thereon (the "Real Estate"), as more particularly described on the attached Exhibit 1.2 (i).

<u>Corporate Documents</u>. With respect to corporate seals, certificates of incorporation, minute books, stock books, tax returns or other records having to do with the corporate organization of Seller ("Corporate Documents"), Buyer may review such Corporate Documents and make and retain copies of same. All such original Corporate Documents shall remain the property of Seller.

1.3 <u>Purchase Price</u>.

(a) The purchase price for the Assets (the "Purchase Price") shall equal an amount determined from the balance sheet of Seller as of the close of business on the date of the Closing using the following formula:

2

Purchase Price equals sixty nine percent (69%) of the Total Assets (except 100% of other assets which are cash deposits) purchased by Buyer less one hundred percent (100%) of the Total Current Liabilities assumed by Buyer.

By way of example only, the above formula, using the November 30, 2003, balance sheet of Seller, would produce a purchase price equal REDACTED as described on the attached Exhibit 1.2. As of the Closing Date, the Purchase Price will initially be calculated using the balance sheet of Seller as of the last day of the month immediately preceding the month of the Closing Date (the "Estimated Purchase Price"). Approximately one month after the Closing Date, the Estimated Purchase Price shall be recalculated based on Seller's balance sheet existing as of the close of business the day before the Closing Date (the "Final Purchase Price"). If the Final Purchase Price exceeds the Estimated Purchase Price, the excess of the Final Purchase Price over the Estimated Purchase Price shall be paid from Buyer to Seller within one (1) week of the determination of the Final Purchase Price. If the Final Purchase Price is less than the Estimated Purchase Price, the excess of the Estimated Purchase Price over the Final Purchase Price shall be paid from Seller to Buyer within one (1) week of the determination of the Final Purchase Price. In the event there is a dispute between Seller and Buyer as to the calculation or recalculation of either the Estimated Purchase Price or the Final Purchase Price, both parties agree to submit such dispute to binding arbitration pursuant to Section 8.6, below.

(b)    Simultaneous with the execution of this Agreement, Buyer shall pay earnest money in the amount REDACTED . (the "Deposit"), in the form of a cashier's check or by wire transfer check to a non interest bearing escrow account to be held by J. Neal Gardner, Esq., or his law firm's title company, as "Escrow Agent"; provided however Hyde Park Title Agency, LLC, shall perform all title work regarding the purchase of the Real Estate and shall handle the closing of the transaction contemplated hereby. The Deposit shall be retained by the Escrow Agent as earnest money to be used in the following ways: (a) applied at Closing as a credit toward the Purchase Price paid by the Buyer, or (b) if the sale shall fail to timely close by reason of a breach or default of this Agreement by Buyer, the Deposit shall be paid to Seller as liquidated damages and the parties shall be forever relieved of any obligations hereunder; or (c) if the sale shall fail to timely close by reason of a breach or default of the Agreement by Seller, the Deposit shall be refunded to the Buyer and Buyer shall have any other remedies available to it at law or in equity, or (d) the Deposit shall be paid to Buyer if this Agreement does not close for any of the reasons enumerated in Section 7.1, below.

(c)    The Purchase Price shall further be adjusted to reflect prorations for real estate taxes and assessments and personal property taxes (collectively "Taxes"). Seller shall be responsible for all Taxes accrued through the Closing Date and Buyer shall be responsible for all Taxes accruing after the Closing Date.

(d)    Payment of Purchase Price.    The Estimated Purchase Price shall be paid to Seller at the Closing by cashier's check or wire transfer, subject to the prorations described in Section 1.3(c), above, and subject to the Holdback and Real Estate Holdback described in Sections 1.3(e) and 1.3 (f) below.

3

(e)    <u>Holdback</u>.   Notwithstanding anything herein to the contrary, the sum of REDACTED shall be held back from the Estimated Purchase Price (the "Holdback") as security for Buyer in the event the Final Purchase Price is less than the Estimated Purchase Price. In the event the Final Purchase Price is less than the Estimated Purchase Price, the Holdback shall be paid to Seller less the dollar amount that the Final Purchase Price is less than the Estimated Purchase Price, which amount shall be retained by Buyer.

(f)    <u>Real Estate Closing</u>.   Notwithstanding anything herein to the contrary, the closing on the purchase and sale of the Real Estate shall not occur simultaneously with the Closing; rather, the closing on the purchase and sale of the Real Estate (the "Real Estate Closing") shall be delayed until such time as Seller has performed its obligations set forth in Section 3.16, below, regarding the clean up of the oil contamination on the Real Estate, to the satisfaction of Buyer. As a result, the Estimated Purchase Price shall be reduced by REDACTED REDACTED as security for Seller's performance of its obligations set forth in Section 3.16 (the "Real Estate Holdback"). Beginning with the Closing and continuing until the Real Estate Closing, Buyer shall lease from Seller the Real Estate and all improvements thereon, at the rental amount of REDACTED per month, which shall be prorated for any partial month. The lease shall be a "triple net" lease. If Seller has not performed its obligations set forth in Section 3.16, below, within six (6) months following the Closing, Buyer shall have the option to perform Seller's obligations set forth in Section 3.16. In such event, Buyer may use monies from the Real Estate Holdback to reimburse Buyer for any costs incurred by Buyer as a result of performing Seller's obligations. At the Real Estate Closing, the Real Estate Holdback, less and monies paid from the Real Estate Holdback to Buyer for costs incurred by Buyer in performing Seller's obligations, shall be paid to Seller.

1.4    <u>No Assumption of Liabilities</u>.

(a)    Except as provided in Section 1.4(b) and 1.4(c) hereof, Buyer does not assume, shall not be liable for, and does not acquire the Assets subject to, any liability or obligation of, or claim, action or cause of action against Seller or the Assets of any nature whatsoever and Seller shall indemnify and defend Buyer against and hold Buyer harmless from any and all claims, losses, damages, costs or expenses of any nature, brought against or incurred by Buyer with respect to any such liability or obligation of, or claim, action or cause of action against Seller or the Assets.

(b)    Without limiting the generality of Section 1.4 (a), Buyer shall not assume or otherwise become a sponsor of, maintain or continue any "Benefit Plan", as defined below, maintained by Seller or any "Related Party", as defined below, and no assets or liabilities of any of the Benefit Plans or any fiduciary, as defined in the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, with respect to such Benefit Plans, will be transferred to or assumed by Buyer. For purposes of this Section 1.4 (b), the term "Benefit Plan" means any pension plan, profit sharing plan, life insurance plan, severance pay plan, vacation pay plan, supplemental unemployment benefit plan, deferred compensation plan, fringe benefit plan, medical plan, disability plan, salary continuation plan, bonus plan, dependent care plan, incentive plan, or other

4

similar arrangement, whether or not such plans or programs are employee benefit plans within the meaning of Section 3 (3) of ERISA, whether funded or unfunded, and whether or not maintained pursuant to a collective bargaining agreement. For purposes of this Section 1.4 (b) the term "Related Party" means Seller and any trade or business (whether or not incorporated) which together with Seller would be considered a single employer under Titles I, II, III or IV of ERISA.

(c)     Notwithstanding anything herein to the contrary, Buyer shall assume the following liabilities of Seller as described on the attached Exhibit 1.2; to wit: Accounts Payable; Overbillings; and limited Accrued Expenses (officer bonus/accrual only). In addition, Buyer may assume certain operating leases of Seller as identified by Buyer in due diligence and approved by Seller and Buyer for assumption by Buyer (the "Assumed Leases"). Any Assumed Leases shall be attached hereto as Exhibit 1.4(c).

1.5     Allocation of Purchase Price.  The Purchase Price for the Assets as finally determined shall be allocated among the Assets as described on Exhibit 1.5, which will be prepared by Buyer's accountants and attached to this Agreement after Closing, subject to Seller's reasonable approval.  No party to this Agreement will take a position on any federal or state tax return, before any governmental agency charged with the collection of any income tax, or in any judicial proceeding that is in any way inconsistent with Exhibit 1.5.

2.     CLOSING

2.1     The Closing.  The Closing of the purchase of the Assets (the "Closing") shall be held at the offices of Finney, Stagnaro, Saba & Klusmeier Co., L.P.A., 2623 Erie Avenue Cincinnati, Ohio 45208, at such time as mutually agreed between the parties but no later than March 31, 2004, provided all conditions precedent to Closing have been waived or satisfied (the "Closing Date").

2.2     Items to be Delivered at Closing.

(a)     Transfer of Assets.  At the Closing or Real Estate Closing, whichever is applicable, Seller will take all actions reasonably necessary and appropriate to transfer, assign and convey the Assets to Buyer, including execution and delivery of a bill of sale, trademark assignments, contract assignments, general warranty deed and other appropriate documents in form and content reasonably satisfactory to Buyer and its counsel.  Seller also shall take all such steps as may be required to put Buyer in actual possession and operating control of the Assets.

(b)     Payment of Purchase Price.  At the Closing or the Real Estate Closing, whichever is applicable, Buyer shall deliver to Seller the Estimated Purchase Price via a cashier's check or wire transfer, subject to any prorations described in Section 1.3(c), above, the Holdback and the Real Estate Holdback.

(c)     Other Documents.  At the Closing, the parties also shall deliver to each other

5

the agreements, opinions, certificates and other documents referred to in Section 7 of this Agreement.

2.3     Third Party Consents.   To the extent that Seller's rights under any agreement, contract, commitment, lease, or other Asset to be assigned to Buyer hereunder may not be assigned without the consent of another person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and Seller, at its expense, shall use its best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by law and the Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer.

2.4     Further Assurances.  Following the Closing, each of the parties will cooperate with and execute and deliver to the other parties such other instruments and documents and take such actions as may be reasonably requested from time to time as necessary to carry out, evidence and confirm the intended purposes of this Agreement. In particular, at Buyer's request, Seller will execute, acknowledge and deliver to Buyer such other instruments of conveyance and transfer, certificate and other documents, and will take such other actions, as Buyer may reasonably require in order to vest more effectively in Buyer, or to put Buyer more fully in possession of, any of the Assets, to obtain permits and licenses required by any governmental agency.

3.     REPRESENTATIONS AND WARRANTIES OF SELLER.

Seller represents and warrants to Buyer as follows:

3.1     Authority, Approval and Enforceability.

(a)     Corporate Existence.  Seller is a corporation duly organized, validly existing and in good standing under the laws of Ohio. Seller is licensed to transact business in the State of Ohio. Seller has all requisite corporate power and authority to own, lease and operate its properties and to carry on the Business as conducted before the Closing. Seller has delivered to Buyer true and complete copies of its Articles and Bylaws.

(b)     Power to Execute Agreement.  Seller has all required corporate power and authority to sell the Assets and prior to the Closing Date, will have, full power and authority to execute, deliver and perform its obligations under this Agreement.

(c)     Absence of Conflicts.  The execution and delivery by Seller of this Agreement does not, and the completion of the transactions contemplated by this Agreement will

6

not, result in any conflict with, breach of, or termination or forfeiture under (or upon the failure to give notice or the lapse of time, or both, result in any conflict with, breach of, or termination or forfeiture under) any terms or provisions of the charter documents, as amended, of Seller or any statute, rule, regulation, judicial or governmental decree, order, judgment, agreement, lease, loan agreement, debenture, indenture, mortgage or other instrument to which Seller is a party or to which any of the Assets are subject.

        (d)    <u>Enforceability</u>. Upon the due execution and delivery by the parties, this Agreement will be a binding obligation of Seller enforceable against Seller in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

    3.2    <u>No Third Party Options</u>. There are no existing agreements, options, commitments or rights with, of or to any person to acquire any of the Assets or rights included in the Assets or any interest therein.

    3.3    <u>Required Consents and Approvals</u>. Exhibit 3.3 lists all governmental and other third party consents or approvals required to consummate the transactions contemplated herein.

    3.4    <u>Financial Statements</u>. Seller has delivered to Buyer copies of its audited financial statements for the years ended December 31, 2000, through December 31, 2002, and its unaudited financial statements for the period January 1, 2003, through November 30, 2003, (collectively the "Financial Statements"). All such Financial Statements (i) are in accordance with the books and records of Seller, (ii) have been prepared in accordance with consistently applied accounting principles, (iii) are accurate in all material respects, and (iv) present fairly the financial position of the Business as of the dates indicated and the results of operations and changes in financial position for the period indicated. There has been no material adverse change in the Business or the Assets since January 1, 2004, through the Closing.

    3.5    <u>Taxes</u>. Seller has timely filed within the time period for filing or any extension granted with respect thereto any and all federal, foreign, state, local and other returns, reports and estimates ("Returns") which Seller is required to file with respect to any and all taxes or other governmental charges, obligations or fees, including but not limited to any income, business, occupation, franchise, sales or use, withholding and secondary or transferee liability for taxes and any related interest or penalties thereon ("Tax" or "Taxes") attributable to or connected with the Business or the Assets. All such Tax Returns are true and correct and have been completed in accordance with applicable law. Seller has paid all Taxes shown to be due and payable on such Returns and has withheld all amounts it is required to withhold with respect to its employees. There are no pending or, to the best of Seller's knowledge, threatened audits, examinations, assessments, asserted deficiencies or claims for additional Taxes. There are (and as of immediately following the Closing there will be) no liens or similar encumbrances on the Assets, except for liens for current real or personal property taxes not yet due and payable. Seller has no knowledge of any basis for the assertion of any claim with respect to Taxes which would result in a lien or similar

7

encumbrance on the Assets or otherwise adversely affect the Buyer.

3.6     Title to Assets.  Seller has and will transfer to Buyer good and marketable title to the Assets.  The Assets are free and clear of restrictions on or conditions to transfer or assignment.  The Assets will be transferred to Buyer free and clear of mortgages, liens, encumbrances, claims and restrictions, except as listed in Exhibit 3.6 and liens for current real or personal property taxes not yet due and payable.  The Assets are not held under any leases, security agreements, conditional sales contracts, or other title retention arrangements.  The Assets include all equipment, intellectual property, inventory and other tangible and intangible assets now used in the Business and necessary for the conduct of the Business in the manner and to the extent presently conducted and operated.

3.7     Tangible Assets.  All material items or tangible property included in the Assets are in good operating condition and repair, subject to normal wear and maintenance, and are usable in the ordinary course of business.

3.8     Accounts and Notes Receivable.  Exhibit 3.8 contains a complete list of all outstanding accounts and notes receivable with aging (the "Accounts"), such list to be updated at Closing.  All Accounts reflected on the Financial Statements and/or listed on Exhibit 3.8 are (i) valid, genuine and subsisting, (ii) subject to no defenses, setoffs, or counterclaims, and (iii) expected to be paid in full.  No person has any lien on such Accounts or any part thereof, no agreement for deduction, free goods, discount or other deferred price for quantity adjustment has been made with respect to any of such Accounts; and no customer with an account receivable balance is known to Seller to be involved in voluntary or involuntary bankruptcy proceedings, is otherwise insolvent, or has notified Seller orally or in writing that such customer will not pay its Account.

3.9     Trade Names and Trademarks.  Seller owns or holds licenses or other rights to use all trademarks, service marks and trade names necessary for the conduct of the Business.  To the best of Seller's knowledge, Seller has not infringed, and is not now infringing, on any trade name, trademark or service mark belonging to any other person, firm or corporation.  Seller is not a party to any license, agreement, or arrangement, whether as licensor, licensee, or otherwise, with respect to any trademarks, service marks, trade names associated with the Business or applications for them.

3.10    Agreements.  Exhibit 3.10 sets forth a complete and accurate list of all agreements, written and oral, to which Seller is a party, or of which Seller is aware, included within the following categories (the "Agreements"):

(i)      purchase agreement, warranty, maintenance agreement, or equipment lease pertaining to any of the tangible Assets;

(ii)     agreement settling or compromising any claims or rights held or asserted by Seller with respect to the Assets;

8

(iii)     promissory note, loan agreement, guarantee or other agreement or commitment for the borrowing of money which is secured in part or in whole by any of the Assets, or which requires the other party to consent to the proposed sale of Assets;

(iv)     license, franchise, purchase or other agreement which relates to the ownership, scope or use of the Intellectual Property;

(v)     agreement or commitment for persons other than Seller's employees to perform continuing or future services for the Business;

(vi)     noncompetition or similar agreement which restricts the Business or, to the best of Seller's knowledge, any of Seller's employees from engaging in any activity, including any noncompetition agreement.

(vii)     joint venture or partnership agreements involving Seller;

(viii)     any other agreement involving commitments of $500.00 or more by Seller, or otherwise material to the Business.

Seller has provided Buyer complete and accurate copies of all written Agreements and summaries of all oral Agreements. Seller has in all material respects performed all the obligations required to be performed by it to date under the Agreements. Neither Seller nor, to Seller's knowledge, any of the other parties to the Agreements is in, or alleged to be in, material default under any of the Agreements, commitments, instruments or obligations, and there exists no event, condition or occurrence which, after notice or lapse of time, would constitute such a material default by Seller of any Agreements.

3.12  Intellectual Property Rights.

(a)     The Intellectual Property is sufficient in all material respects to conduct the Business as presently conducted. Seller in the conduct of the Business did not and does not utilize any patent, copyright, software, trade secret, know-how or mask work of others right except for those listed in Exhibit 3.12.

(b)     Except in each case as set forth in Exhibit 3.12:

(i)     Seller owns, or by the Closing Date will own, all right, title and interest in and to all of the Intellectual Property;

(ii)     Seller has the exclusive right to use, sell, license and dispose of, the exclusive right to bring actions for the infringement of, and otherwise exercise, all of the rights pertaining to the Intellectual Property;

9

(iii) The execution, delivery and performance of this Agreement will not breach or conflict with any instrument or agreement governing any of the Intellectual Property, or impair the right of Buyer to use, sell, license or dispose of the Intellectual Property, or to bring any action for the infringement of the Intellectual Property;

(iv) The manufacture, marketing, license, sale or use of Seller's software does not violate any license or agreement with any third party or infringe the intellectual property rights of any third party;

(v) To the best knowledge of Seller, no third party is infringing any of the Intellectual Property; and

(vi) Seller has taken all reasonable steps necessary or appropriate to safeguard and maintain the secrecy and confidentiality of, and establish Seller's proprietary rights in, all of the Intellectual Property.

(c) Seller has in all material respects performed, or is now performing, the obligations of Seller in all material respects pursuant to each and every license or agreement concerning the Intellectual Property. All such licenses and agreements are in full force and effect and are a valid and enforceable obligation against the other party or parties thereto in accordance with their terms (subject to the enforcement of remedies). To the best knowledge of Seller, no other party to such licenses and agreements is in default in any material respect.

3.13 Compliance with Applicable Laws. Seller has duly complied with all applicable laws, rules, regulations, ordinances, and all judgments, orders, rulings, and decrees of all federal, state and local governmental authorities (collectively, "Laws"), subject to such exceptions as shall have no material adverse affect on the Assets or the Business. Seller has not received notification of any asserted present or past failure to so comply with any Laws. Seller is not aware of any proposed laws, ordinances or regulations, or any pending or threatened legal or administrative proceedings or investigations, which if determined adversely to Seller, would result in any material adverse change to the Business or to any of the Assets or would materially affect the ability of Seller to perform its obligations hereunder.

3.14 Licenses and Other Rights. Exhibit 3.14 lists all permits and licenses from governmental authorities held by Seller. To the best of Seller's knowledge, no other permits or licenses are necessary for the conduct of the Business as presently conducted. Seller is not in default under any of such permits or licenses.

3.15 Litigation. There is no suit, action (equitable, legal, administrative or otherwise), proceeding or investigation of any kind pending or, to the best of Seller's knowledge, threatened against Seller, nor does Seller know of any reasonably likely basis for any such suit, action, proceeding or investigation except as shown in Exhibit 3.15.

10

3.16 <u>Absence of Environmental Liabilities</u>. Except as otherwise stated on Exhibit 3.16 and to the best of Seller's knowledge, Seller's business and the use of the Assets are now, and at all times in the past have been, conducted in full compliance with all applicable federal, state or local statutes, laws, regulations, rules, ordinances or codes (collectively, the "Environmental Laws") which prohibit, regulate or otherwise relate to the use, treatment, storage, handling, transport, disposal or discharge of chemicals, chemical solvents, gases, pollutants or "hazardous substances" (as that term is hereinafter defined) or otherwise relate to industrial hygiene or to the protection of the environment. The term "Hazardous Substances" shall mean any substance or material which has been determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety or property.

To the best of Seller's knowledge, the Real Estate owned by Seller is not, or as of the Closing will not be in violation of any Environmental Laws and no current use of the Real Estate constitutes a public or private nuisance. Seller has not used, stored, transported, discharged or disposed of any Hazardous Substances, except as listed on the Disclosure Schedule. No chemicals, chemical solvents or Hazardous Substances have been emitted by Seller in violation of Environmental Laws, or have been released or discharged into any source whatsoever. Seller has received no notification of release of a hazardous substance on the Real Estate. No wastes generated by Seller in operating the Business have ever been sent directly or indirectly to any site listed or formally proposed for listing on the National Priority List promulgated pursuant to CERCLA or to any site listed on any state list of hazardous substances sites requiring investigation or clean-up. Seller has not received from any governmental authority or third party any requests for information, notices of claim, demand letters or other notification that they are or may be potentially responsible with respect to any investigation or cleanup of hazardous substances.

Notwithstanding anything herein to the contrary, pursuant to the recommendation contained in the Preliminary Determination of Potential Environmental Concerns prepared by Civil & Environmental Consultants, Inc., dated February 2, 2004, Seller agrees, at Seller's cost, to identify the source producing the oil that was discovered on the creek that runs along the east side of the Real Estate, eliminate the oil contamination, perform the steps necessary to prevent the reoccurrence of the oil contamination and obtain a groundwater sample using a Geoprobe to evaluate whether groundwater coming onto the Real Estate is contaminated. In the event it is determined the groundwater on or about the Real Estate is contaminated, Seller shall pay all costs necessary to remediate such contamination.

3.17 <u>Employee Benefit Plans</u>. Exhibit 3.17 lists each employee benefit plan sponsored or maintained by Seller, whether formal or informal, whether or not set forth in writing, and whether covering one person or more than one person. As used here, the term "employee benefit plan" includes all plans, funds, programs, policies, arrangements, practices, customs and understandings providing benefits of economic value to any employee, former employee, or present or former beneficiary, dependent or assignee of any such employee or former employee other than regular salary, wages or commissions paid substantially concurrently with the performance of the services for which paid. "Employee benefit plan" includes all employee welfare benefit plans within the

11

meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and all employee pension benefit plans within the meaning of Section 3(2) of ERISA.

3.18 Labor Relations. There are no strikes, work stoppages, material grievance proceedings or other material controversies pending or threatened between Seller and any of its employees or any union or other collective bargaining unit representing such employees.

3.19 Brokers. Seller has not dealt with any investment bankers, finders or brokers in connection with this transaction except FMI Corporation.

3.20 Disclosure. No representation or warranty by Seller contained in this Agreement and no statement contained in any certificate, schedule or exhibit or list furnished to Buyer in connection with this Agreement or the transactions contemplated hereby contains or at the Closing Date will contain any untrue statement of fact or omits to state a material fact necessary to make the statements or information therein not misleading.

4.   REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

4.1   Approval, Authorization and Enforceability.

(a)   Power to Execute Agreement. Buyer has full power and authority to execute, deliver and perform its obligations under this Agreement. All actions of Buyer necessary for such execution, delivery and performance have been, or, as of the Closing Date, will have been duly taken.

(b)   Absence of Conflicts. The execution and delivery by Buyer of this Agreement does not, and the performance and consummation of the transactions contemplated by this Agreement will not, result in any conflict with, breach or violation of or default, termination or forfeiture under (or upon the failure to give notice or the lapse of time, or both, result in any conflict with, breach or violation of, or default, termination or forfeiture under) any statute, rule, regulation, judicial or governmental decree, order, judgment, agreement, lease, loan agreement, debenture, indenture, mortgage or other instrument binding upon Buyer or to which Buyer is a party.

(c)   Enforceability. Upon the due execution and delivery by the parties, this Agreement will be a binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

4.2   Litigation. There is no suit, action (equitable, legal, administrative or otherwise), proceeding or investigation of any kind pending or threatened against Buyer, and there is no factual basis for any such suit, action, proceeding or investigation of which Buyer is aware which could materially affect the ability of Buyer to carry out the transactions contemplated hereunder in

12

accordance with the terms hereof.

4.3   <u>Required Consents and Approvals</u>. All governmental and other third part consents or approvals required to be obtained by Buyer to consummate the transactions contemplated hereby have been obtained or will be obtained by the Closing Date.

5.   <u>ADDITIONAL AGREEMENTS RELATING TO THE PURCHASE OF ASSETS</u>.

5.1   <u>Cooperation by All Parties</u>. Each party will take all reasonable actions necessary to obtain (and will cooperate with the other parties in obtaining) any consent, approval, order or authorization of, or any registration, declaration or filing with, any governmental entity or other person required to be obtained or made by Seller or by Buyer in connection with the taking of any action contemplated by this Agreement. No party will take any action that would or might result in any of its representations and warranties set forth in this Agreement becoming untrue or in any of the conditions of the Closing not being satisfied.

5.2   <u>Conduct of Business</u>. Until the Closing Date Seller will carry on its Business in substantially the same manner as it has been conducted. Seller will use all reasonable efforts consistent with past practice and policies to preserve intact its present business organization, to preserve its relationships with officers, key employees, customers, suppliers and others having business dealings with it, to maintain and preserve the Assets, and to comply with all laws and regulations applicable to the Business, to the end that the Assets and Business shall be unimpaired at the Closing Date. Seller will not enter into any commitments to shareholders, creditors, employees, suppliers or others which are out of the ordinary or which would interfere with the proposed transaction. Prior to the Closing, Seller will make no distributions, payments or commitments to the Shareholders other than base salary and reimbursement of business expenses in accordance with standard practices.

5.3   <u>Notice to Buyer; Updates to Exhibits</u>. Seller will promptly advise Buyer of any event that may have a material adverse effect on the Business or the Assets, or that would impair Seller's ability to perform its obligations under this Agreement. Seller shall promptly disclose to Buyer any information contained in its representations, warranties or Seller's Exhibits which, because of any event occurring after the date of this Agreement, is incomplete or is no longer correct; provided, however, that none of such disclosures shall be deemed to modify, amend, or supplement Seller's representations, warranties or Exhibits for the purposes of Section 7 hereof unless Buyer shall have consented thereto in writing.

5.4   <u>Exclusivity</u>. Seller shall not, directly or indirectly, sell or encumber any part or all of the Assets, other than in the ordinary course of business consistent with past practice, or initiate or participate in any discussions or negotiations or enter into any agreement for any sale of assets or any other transaction inconsistent with the transaction set forth in this Agreement.

5.5   <u>Access</u>. Seller shall give Buyer and Buyer's representatives full access to and the

13

right to inspect, during normal business hours, all of the premises, properties, assets, records, contracts and other documents relating to the Business or the Assets and shall permit them to consult with Seller's officers, employees, accountants and other agents for the purposes of making such investigation of the Business and Assets as Buyer may reasonably wish to make, provided that such investigations hall not unreasonably interfere with Seller's business operations.

5.6     Press Releases.  Except as required by applicable law, no party to this Agreement shall give notice to third parties or otherwise make any public statement or press release concerning this Agreement or the transactions contemplated by this Agreement except with the prior written approval of the other, which approval shall not be unreasonably withheld.

5.7     Confidentiality.  Seller will hold in confidence and use reasonable efforts to have all its employees, consultants, agents and representatives hold in confidence all confidential information related to the Business or the Assets, and not disclose, or use such information or permit others to do so.

6.     COVENANTS RELATING TO POST-CLOSING MATTERS.

6.1     Use of Business Name.  After the Closing Date, Seller shall not use the name "Sofco Erectors" or any variation or combination thereof or any name confusingly similar thereto.

6.2     Non-Solicitation.  As of the Closing Date and/or immediately thereafter, Buyer may offer employment to, and Seller shall use its best efforts to assist Buyer in employing as new employees of Buyer, all persons presently engaged in the Business whom Buyer desires to rehire. Seller shall terminate effective as of the Closing Date all employment agreements it has with any of the employees and shall take all steps necessary to comply with all local, state and federal laws, statutes and regulations governing the termination of such employees.  Until the third anniversary of the Closing Date, Seller will not directly or indirectly solicit or offer employment to any Employee (i) who did not become an employee of Buyer, (ii) who is then an employee of Buyer, or (iii) who has terminated such employment without the consent of Buyer within 180 days of such solicitation or offer. Buyer agrees to use its best efforts to negotiate with any former employees of Seller hired by Buyer to have such former employees of Seller waive any rights for accrued vacation.

6.3     Maintenance of Books and Records.  Each of Seller and Buyer shall preserve until the fifth anniversary of the Closing Date all records possessed or to be possessed by such party relating to any of the assets, liabilities or business of the Business prior to the Closing Date.  After the Closing Date, where there is a legitimate purpose, such party shall provide the other parties with access, upon prior reasonable written request specifying the need therefor, during regular business hours, to (i) the officers and employees of such party and (ii) the books of account and records of such party, but, in each case, only to the extent relating to the assets, liabilities or business of the Business prior to the Closing Date, and the other parties and their representatives shall have the right to make copies of such books and records; provided, however, that the foregoing right of

14

access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of such party; and further, provided, that, as to so much of such information as constitutes trade secrets or confidential business information of such party, the requesting party and its officers, directors and representatives will use due care to not disclose such information except (i) as required by law, (ii) with the prior written consent of such party, which consent shall not be unreasonably withheld, or (iii) where such information becomes available to the public generally, or becomes generally known to competitors of such party, through sources other than the requesting party, its affiliates or its officers, directors or representatives. Such records may nevertheless be destroyed by a party if such party sends to the other parties written notice of its intent to destroy records, specifying with particularity the contents of the records to be destroyed. Such records may then be destroyed after the 30th day after such notice is given unless the other party objects to the destruction in which case the party seeking to destroy the records shall deliver such records to the objecting party.

6.4    Covenant Not to Compete. Seller agrees that for a period of five years after the Closing Date, neither it nor any of its affiliates will, directly or indirectly, own, manage, operate, join, control or participate in the ownership, management, operation or control of, any business whether in corporate, proprietorship or partnership form or otherwise where such business is competitive with the Business. This Agreement shall apply in each state and county in the United States. The parties hereto specifically acknowledge and agree that the remedy at law for any breach of the foregoing will be inadequate and that the Buyer, in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damage. In the event that the provisions of this Section 6.4 should ever be deemed to exceed the limitation provided by applicable law, then the parties agree that such provisions shall be reformed to set forth the maximum limitations permitted.

7.    CONDITIONS TO CLOSING.

7.1    Buyer's Conditions to Closing. The obligations of Buyer under this Agreement are subject to the satisfaction of the following conditions, unless waived by Buyer:

(a)    Representations and Warranties True as of the Closing Date. The representations and warranties of Seller set forth in this Agreement shall have been true and correct in all material respects on the date of this Agreement without regard to any Exhibit updates furnished by Seller after the date hereof and shall be true on the Closing Date in all material respects as though made as of such date.

(b)    Compliance with this Agreement. Seller shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)    Government Approvals. All consents, approvals, orders, authorizations, registrations, declarations and filings with any domestic or foreign governmental entity necessary

15

for the consummation of the transactions contemplated by this Agreement, if any, shall have been obtained or filed.

(d) <u>Third Party Consents</u>. Buyer shall have been furnished with satisfactory evidence of the consent, approval or notification of other parties whose consent, approval or notification shall be required in order to permit the sale, conveyance and assignment of the Assets.

(e) <u>No Threatened or Pending Litigation</u>. On the Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or pending before any court or governmental or regulatory authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with the Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened.

(f) <u>Financing.</u> Buyer shall have obtained financing to acquire the Assets upon terms acceptable to Buyer in Buyer's sole absolute discretion on or before 5:00 p.m., Friday, March 19, 2004.

(g) <u>Adverse Changes</u>. Between the date of this Agreement and the Closing Date there shall not have been any material adverse change in the Business, the Assets or the prospects of the Business.

(h) <u>UC Contract</u>. Buyer shall have negotiated with Seller, to Buyer's satisfaction, the terms and conditions under which Buyer shall be paid for services rendered on behalf of Southern Ohio Fabricators, Inc., with respect to any projects relating to the University of Cincinnati, for the period from April 1, 2004, through the completion of such projects.

7.2 <u>Seller's Conditions to Closing</u>. The obligations of Seller under this Agreement are subject to the satisfaction of the following conditions, unless waived by Seller:

(a) <u>Representations and Warranties True as of the Closing Date</u>. The representations and warranties of Buyer set forth in this Agreement shall have been true and correct in all material respects on the date of this Agreement without regard to any Exhibit updates furnished by Seller after the date hereof and shall be true on the Closing Date in all material respects as though made as of such date.

(b) <u>Compliance with this Agreement</u>. Buyer shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c) <u>No Threatened or Pending Litigation</u>. On the Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or pending

16

before any court or governmental or regulatory authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with the Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened.

(d) Approval of Counsel; Corporate Matters. All action, proceedings, resolutions, instruments and documents required to carry out this Agreement or incidental hereto and all other related legal matters shall have been approved on the Closing Date by counsel for Seller, in the exercise of their reasonable business judgment. Buyer shall have delivered to Seller such other documents, instruments, certifications and further assurances as such counsel may reasonably require.

8.  INDEMNIFICATION AND RELATED MATTERS.

8.1  Indemnification of Buyer. Seller will indemnify and hold harmless Buyer and any permitted assignee from and against any claims, actions, damage, expense, liability, loss or deficiency, including without limitation, reasonable attorneys' fees and other costs and expenses incident to any suit, action, claim or proceeding (collectively, the "Damages"), arising out of or resulting from:

(i) any inaccuracy in any representation or the breach of any warranty made by Seller in this Agreement;

(ii) any failure of Seller to perform or observe any term of this Agreement; and

(iii) any liabilities or obligations of Seller not purchased by Buyer.

8.2  Indemnification of Seller. Buyer will indemnify and hold harmless Seller and any permitted assignee from and against any claims, actions, damage, expense, liability, loss or deficiency, including without limitation, reasonable attorneys' fees and other costs and expenses incident to any suit, action, claim or proceeding (collectively, the "Damages"), arising out of or resulting from:

(i) any inaccuracy in any representation or the breach of any warranty made by Buyer in this Agreement;

(ii) any failure of Buyer to perform or observe any term of this Agreement; and

(iii) any liabilities or obligations of Seller specifically assumed by Buyer in writing pursuant to this Agreement.

17

8.3     Survival of Representations and Warranties.  The representations and warranties of the parties shall survive until two years after the Closing Date, except for representations and warranties concerning Taxes, which shall survive until the applicable statute of limitations has expired.

8.4     Third Party Actions.

(a)     All claims for indemnification under Sections 8.1 and 8.2 involving third party actions or demands shall be made in accordance with the procedure set forth in this Section 8.4.

(b)     Promptly after receipt by an indemnified party of notice of any third party action or demand which gives rise to Damages, such indemnified party shall notify the indemnifying party.  Failure so to notify the indemnifying party shall relieve it of any liability that it may have to any indemnified party to the extent that the defense of such action is materially prejudiced by such failure, provided the indemnifying party did not receive or otherwise have actual notice thereof.

(c)     The indemnifying party shall be entitled to participate in the defense of the third party action or demand and, at its option, to assume the defense thereof with counsel satisfactory to the indemnified party provided (i) that the indemnifying party confirm that the action or demand is covered by its indemnification obligation, and (ii) Buyer reserves the right to retain control of the defense of any action or demand which could reasonably be expected to materially affect Buyer's on-going operations or which could potentially exceed Twenty Five Thousand Dollars ($25,000.00) in Damages.  If the indemnifying party receives notice of any action or demand, it shall promptly notify the indemnified party as to whether it intends to control the defense thereof.

(d)     If an indemnifying party defends an action, (i) no compromise or settlement thereof may be effected by the indemnifying party without the indemnified party's consent (which shall not be unreasonably withheld) unless the sole relief provided is monetary damages that are paid in full by the indemnifying party and (ii) the indemnified party shall have no liability with respect to any compromise or settlement thereof effected without its consent.

(e)     If notice is given to an indemnifying party of the commencement of any action and it does not, within twenty (20) days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense thereof, the indemnified party shall be entitled to assume the defense thereof.  In such event, the indemnifying party shall not be bound by any compromise or settlement thereof effected by the indemnified party without its consent, which shall not be unreasonably withheld.

8.5     Method for Asserting Claims.  Any claim for Damages under this Section 8 shall be

18

made in writing and shall state in detail the basis on which the claim for Damages is made. Claims for Damages must be made on or before two years from the Closing Date, except claims for breaches of representations or warranties concerning taxes and claims arising out of intentional fraud. The indemnified party may not take legal action against the indemnifying party or offset Damages against payments due the indemnifying party unless such written claim has been given. Payment of any claim for Damages for which indemnification is due shall be made within thirty (30) days of the date of the claim. Disputes regarding liability for Damages under this Section 8 shall be resolved as set forth in Section 8.6.

    8.6   <u>Arbitration</u>.

      (a)   All disputes under this Section 8 shall be settled by arbitration in Hamilton County, Ohio before a single arbitrator pursuant to the rules of the American Arbitration Association. Arbitration may be commenced at any time by any party hereto giving written notice to the other party to a dispute that such dispute has been referred to arbitration under this Section 8.6. The arbitrator shall be selected by the joint agreement of Seller and Buyer, but if they do not so agree within twenty (20) days after the date of the notice referred to above, each party shall select one arbitrator. The two arbitrators selected by the parties shall select a third arbitrator and the three arbitrators shall serve as the arbitration panel. Any award rendered by the arbitrator, or arbitrators, whichever the case, shall be conclusive and binding upon the parties hereto; provided, however, that any such award shall be accompanied by a written opinion giving the reasons for the award. This provision for arbitration shall be specifically enforceable by the parties and the decision of the arbitrators in accordance herewith shall be final and binding and there shall be no right of appeal therefrom. Each party shall pay its own expenses of arbitration and the expenses of the arbitrators shall be equally shared; provided, however, that if in the opinion of the arbitrators any claim for indemnification or any defense or objection thereto was unreasonable, the arbitrators may assess, as part of the award, all or any part of the arbitration expenses of the other party (including reasonable attorneys' fees) and of the arbitrators against the party raising such unreasonable claim, defense or objection.

      (b)   To the extent that arbitration may not be legally permitted hereunder and the parties to any dispute hereunder may not at the time of such dispute mutually agree to submit such dispute to arbitration any party may commence a civil action in a court of appropriate jurisdiction to solve disputes hereunder. Nothing contained in this Section 8.6 shall prevent the parties from settling any dispute by mutual agreement at any time.

    8.7   <u>Compliance with Bulk Sales Laws</u>. Buyer and Seller hereby waive compliance by Buyer and Seller with the bulk sales law and any other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement. Seller shall indemnify Buyer from, and hold it harmless against, any liabilities, damages, costs and expenses resulting from or arising out of (i) the parties' failure to comply with any of such laws in respect of the transactions contemplated by this Agreement, or (ii) any action brought or levy made as a result thereof.

<div align="center">19</div>

8.8 <u>Other Rights and Remedies Not Affected</u>. The indemnification rights of the parties under this Section 8 are independent of and in addition to such rights and remedies as the parties may have at law or in equity or otherwise for any misrepresentation, breach of warranty or failure to fulfill any agreement or covenant hereunder on the part of any party hereto, including without limitation the right to seek specific performance, rescission or restitution, none of which rights or remedies shall be affected or diminished hereby.

9. <u>TERMINATION</u>    This Agreement may be terminated and abandoned only as follows:

(a)    at any time by the written agreement of Buyer and Seller;

(b)    by Buyer, (i) at any time if the representations and warranties of Seller contained in Section 3 hereof were incorrect in any material respect when made or at any time thereafter, or (ii) so long as Buyer is not then in default hereunder, if any of the conditions provided in Section 7.1 shall not have been satisfied or performed in any material respect on or before the date required to be satisfied or performed, and Buyer shall not have waived in writing such failure of satisfaction or nonperformance.

(c)    by Seller, (i) at any time if the representations and warranties of Buyer contained in Section 4 hereof were incorrect in any material respect when made or at any time thereafter, or (ii) so long as Seller is not then in default hereunder, if any of the conditions provided in Section 7.2 shall not have been satisfied or performed in any material respect on or before the date required to be satisfied or performed, and Seller shall not have waived in writing such failure of satisfaction or nonperformance.

In the event of any termination pursuant to this Section 9 (other than pursuant to Section (a)), written notice setting forth the reasons therefor shall forthwith be given by the terminating party.

10. <u>MISCELLANEOUS</u>.

10.1 <u>Sales and Use Taxes on the Assets</u>. Seller will pay the cost of any sales, use, transfer or similar taxes payable in connection with the sale, assignment, and transfer of the Assets.

10.2 <u>Expenses</u>. Except as otherwise provided in this Agreement, each party shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby, including legal, accounting and any investment banker or finder fees or commissions.

10.3 <u>Notices</u>. All notices and other communications hereunder shall be in writing. Notices shall be delivered personally, by registered or certified mail, or by commercial courier, return receipt requested. Notices shall be delivered to the addresses listed below or such new

20

address as an addressee may designate by notice to the other parties.  Notices shall be effective upon delivery when delivered in this manner.

If to Buyer, to:

> Armor Metal Group, Inc.
> 3280 Hageman Street
> Cincinnati, Ohio 45241
> Attn: David K. Schmitt, President

with a copy to:

> Finney, Stagnaro, Saba & Klusmeier Co., L.P.A.
> 2623 Erie Avenue
> Cincinnati, OH 45208
> Attn: Jeffrey G. Stagnaro, Esq.

If to Seller, to:

> Southern Ohio Fabricators, Inc.
> 
> _____
> Cincinnati, OH 45263
> Attn: _____

with a copy to:

> Keating, Muething & Klekamp, P.L.L.
> 1400 Provident Tower
> One East Fourth Street
> Cincinnati, Ohio 45202
> Attn: J. Neal Gardner, Esq.

10.4  <u>Entire Agreement; Amendment and Waiver</u>.  This Agreement, and the Exhibits attached hereto, constitute the entire agreement and supersede all prior and contemporaneous agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.  This Agreement may be amended by the parties only by an instrument in writing signed on behalf of each of the parties.  Terms of this Agreement may be waived only by the party entitled to the benefit thereof by a written instrument duly executed by such party.

10.5  <u>Assignment and Binding Effect</u>.  This Agreement may not be assigned prior to Closing by any party whether by operation of law or otherwise without the prior written consent of the other parties except that Buyer may assign its rights and obligations under this Agreement to an entity whereby Buyer guarantees the performance of the assigned. Subject to the foregoing, this

21

Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

10.6  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio applied without reference to choice of laws.

10.7  Severability of Provisions.  If any provision of this Agreement shall be held invalid or unenforceable, the remaining provisions of this Agreement shall not be affected thereby.

10.8  No Benefit to Others.  This Agreement is for the sole benefit of the parties hereto and their heirs, executors, legal representatives, successors and assigns, and shall not be construed to confer any rights on any other persons.

10.9  Buyer's Specific Performance.  The parties acknowledge that damages would be an inadequate remedy for any breach of the provisions of this Agreement by Seller and agree that the obligations of Seller hereunder shall be specifically enforceable.

10.10  Announcements.  Except as required by law, neither party will make any public disclosure of this Agreement without the prior consent of the other party.

10.11  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

10.12  Expiration of Offer.  This Agreement, as executed by Buyer, shall constitute an offer to purchase the Assets, which offer shall expire at 6:00 p.m. on Thursday, March 11, 2004 ("Expiration Time"), in the event this Agreement is not executed by Seller and delivered to Buyer prior to the Expiration Time.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

"SELLER"                          SOFCO ERECTORS, INC.

                                  By: _____
                                  Print: _LEONARD Z. EPPEL_
                                  Title: _AGREED PARTY_

"BUYER"                           SOFCO Erectors Acquisition, INC.

                                  By: _____
                                      David K. Schmitt
                                  Title:  Shareholder

22

Doc ID -->     200420102172

| DATE:<br>07/20/2004 | DOCUMENT ID<br>200420102172 | DESCRIPTION<br>DOMESTIC/AMENDMENT TO<br>ARTICLES (AMD) | FILING<br>50.00 | EXPED<br>.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |
|---|---|---|---|---|---|---|---|

**Receipt**
This is not a bill. Please do not remit payment.

FINNEY, STAGNARO, SABA & KLUSMEIER
MATTHEW C. STEELE
2623 ERIE AVENUE
CINCINNATI, OH 45208

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, J. Kenneth Blackwell

1450756

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**SOFCO ERECTORS, INC.**

and, that said business records show the filing and recording of:

Document(s)                                      Document No(s):
**DOMESTIC/AMENDMENT TO ARTICLES**         200420102172



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 19th day of July, A.D.
2004.

*J. Kenneth Blackwell*

Ohio Secretary of State

**EXHIBIT**
**B**

Doc ID -->        200420102172



Prescribed by **J. Kenneth Blackwell**
Ohio Secretary of State
Central Ohio: (614) 466-3910
Toll Free: 1-877-SOS-FILE (1-877-767-3453)

www.state.oh.us/sos
e-mail: busserv@sos.state.oh.us

| Expedite this Form: (Select One) | |
|---|---|
| Mail Form to one of the Following: | |
| ⦿ Yes | PO Box 1390 |
| | Columbus, OH 43216 |
| | *** Requires an additional fee of $100 *** |
| ○ No | PO Box 1028 |
| | Columbus, OH 43216 |

### Certificate of Amendment by Directors
### or Incorporators to Articles
*(Domestic)*
Filing Fee $50.00

*(CHECK ONLY ONE (1) BOX)*

| (1) ☑ Amendment by Directors | | (2) ☐ Amendment by Incorporators | |
|---|---|---|---|
| ☐ Amended by Directors | (123-AMDD) | ☐ Amended by Incorporators | (124-AMDI) |

**Complete the general information in this section for the box checked above.**

Name of Corporation    Sofco Erectors Acquisition, Inc.

Charter Number    1450756

☐  Please check if additional  provisions attached hereto are incorporated herein and made a part of these articles of organization.

---

**Complete the information in this section if box (1) is checked.**

Name and Title of Officer    James W. Ludwig                President
                             (name)                        (title)

*(CHECK ONLY ONE (1) BOX)*

☐  A meeting of the directors was duly called and held on _____
                                                              (Date)

☑  In a writing signed by all the Directors pursuant to section 1701.54 of the ORC

The following resolution was adopted pursuant to section 1701.70(B) ___-6___ of the ORC:
                                                        (Insert proper paragraph number)

   RESOLVED, that the articles of incorporation be amended to change the name of the corporation

   from Sofco Erectors Acquisition, Inc. to Sofco Erectors, Inc.; and

   RESOLVED FURTHER, that the Directors of the Corporation be and hereby are authorized to do

   all things necessary to effectuate such change in Corporation name, including without limitation filing a

   Certificate of Amendment by Directors with the Ohio Secretary of State.

---

**Complete the information in this section if box (2) is checked.**

540                          Page 1 of 2                     Last Revised: May 2002

Doc ID --> 200420102172

WE, the undersigned, being all of the incorporators of the above named corporation, do certify that the subscriptions to shares have not been received and the initial directors are not named in the articles. We hereby have elected to amend the articles as follows:

REQUIRED
Must be authenticated (signed)
by an authorized representative
(See Instructions)

_____
Authorized Representative

James W. Ludwig
(Print Name)
3280 Hageman Street

Cincinnati, OH 45241

6/10/04
Date

_____
Authorized Representative

(Print Name)

Date

_____
Authorized Representative

(Print Name)

Date

540                         Page 2 of 2                    Last Revised: May 2002

Page 3

Doc ID --> 200420102172



Prescribed by **J. Kenneth Blackwell**
Ohio Secretary of State
Central Ohio: (614) 466-3910
Toll Free: 1-877-SOS-FILE (1-877-767-3453)

www.state.oh.us/sos
e-mail: busserv@sos.state.oh.us

## CONSENT FOR USE OF SIMILAR NAME
*(For Domestic / Foreign, Profit or Non-Profit)*
Must Be Accompanied By Another Form

THE UNDERSIGNED DESIRING TO FILE A:

*(CHECK ONLY ONE (1) BOX)* This filing does not extend the registration period

| ☐ Where consenting entity is a corporation

(147-CSC) | Where consenting entity is a registrant of
☑ Trade Name
☐ Service Mark
☐ Trade Mark
(149-CSN) | Where consenting entity is a
☐ Limited Liability Company
☐ Limited Partnership
☐ Partnership Having Limited Liability
(148-CSL) |

☐ *Check here if additional provisions are attached*

Charter or Registration No.
of Entity Giving Consent        204357

Name of Entity
Giving Consent        Southern Ohio Fabricators, Inc.

Gives Its Consent To        Sofco Erectors Acquisition, Inc.

To Use The Name        Sofco Erectors

**REQUIRED**
Must be authenticated
(signed) by an authorized
representative        Authorized Representative        6/9/04        Date

Authorized Representative        Date

If the consenting party is a partnership, all general partners must sign. If only one partner is authorized to
sign, a copy of the resolution authorizing the signature must be included.

590        Page 1 of 1        Last Revised: May 2002



# AGC OF OHIO
# BUILDING AGREEMENT

**Effective**
**May 1, 2004 through April 30, 2007**

**Between**

**THE INTERNATIONAL UNION OF
OPERATING ENGINEERS
LOCAL 18 AND ITS BRANCHES, (AFL-CIO)**

**AND**

**LABOR RELATIONS DIVISION
OF THE
AGC OF OHIO**



EXHIBIT
5
10-9-18

SOFCO002159

**EMPLOYERS**


**LABOR RELATIONS DIVISION
AGC OF OHIO**

1755 N.W. Boulevard
Columbus, Ohio 43212
(614) 486-6446
FAX: (614) 486-6498
TOLL FREE: (800) 557-6446


**Richard Hobbs
Executive Director**

SOFCO002160

## INDEX

| | Paragraph |
|---|---|
| Affirmative Action Program | Exhibit B |
| Apprentices | 106–107 |
| Arbitration | 125–126 |
| Bonding | 47 |
| Construction Advancement Program | 108–113 |
| Crews and General Provisions | 77–100 |
| Date Signed and Signatures | 131 |
| Dewatering | 13 |
| Discharges | 19 or 25 |
| Divert Wage Increase | 43 |
| Drug Testing | 30 |
| Duration of Agreement | 105 |
| Effective Date of Agreement | 130–131 |
| Employees' Relief | 91 |
| Enforcement Measures | 117–123 |
| Equipment Rental | 99 |
| Escalator Clause and Complementing | 69 |
| Field Mechanic Trainee Wage Schedule | Exhibit A |
| Four Ten Work Schedule | 63A–G |
| Fringe Benefit Programs | 41–47 |
| Grievance Procedure | 125–126 |
| Harassment Policy | 31 |
| Hazardous Waste Projects | 15, 29 |
| Heaters-Pumps-Boilers–24 hour, 7 day | 68 |
| Holidays | 67 |
| Hourly First-Day Pay | 84 |
| Hourly Pay | 53 or 56 |
| I–9 | 128 |
| Incentive Pay | |
|    Underground, Height and Length Booms | 70–76 |
| Jurisdiction-Work | 10–12 |
| Jurisdictional Area | 1–2 |
| Jurisdictional Disputes | 127 |
| Lay-Off | 25, 55, 60, 89 |
| Liabilities | 5 |
| Management Rights | 7 |
| Master Mechanic, Zones 1, 2 & 3 | 87–88 |
| New Unclassified Equipment | 50 |
| Nondiscrimination | 8–9 |

i

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____

Name of Employer (Printed)

_____

Employer Address

_____

City                State             Zip Code

_____

Area Code & Telephone

_____

Authorized Employer Representative  (Signature)  Date

_____

Authorized Employer Representative  (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____

District Representative (Signature)

ASSOCIATION COPY      87     (USE NO CARBON)

## INDEX (continued)

|  | Paragraph |
|---|---|
| Oilers, Boiler Operators, Helpers Signalmen Provisions | 77–80 |
| Overtime | 62–64 |
| Owner-Operator | 100 |
| Pay Checks | 90 |
| Pay Day | 89 |
| Picket Lines | 123 |
| Piggyback Operation | 86 |
| Pre-Job Conference | 15–16 |
| Provisions and Limitations | 6 |
| Recognition | 4 |
| Referral Policy (Hiring Procedures) | 32–40 |
| Registered Apprentice Wage Schedule | Exhibit A |
| Repairs | 93 |
| Reporting Pay | 59 |
| Safety Program | 26–29 |
| Savings and Separability | 129 |
| Scope of Agreement | 3 |
| Shifts | 81 |
| Site Clearance | 63 |
| Starting Time | 62 |
| Steward | 24–25 |
| Strikes | 124 |
| Sub-Contractors | 117 |
| Supervisory Employees | 97 |
| Termination Slips | 96 |
| Trainee Wage Schedule | Exhibit A |
| Transfer of Union Employees | 119 |
| Transfers on Job Equipment | 21–22 |
| Union Administrative Dues and Deductions | 114–116 |
| Union Shop | 17–18 |
| Wage Rates | Exhibit A |
| Weekly Pay | 52 or 54–55 |
| Work Week | 61 |

|  | Page |
|---|---|
| Text of Agreement | 1–50 |
| Exhibit A, Wage Rates & Fringe Benefits | 51–75 |
| Exhibit B, Affirmative Action Program | 75–78 |
| Acceptance of Agreement | 79–88 |

II

SOFCO002162

## DIRECTORY

### OFFICERS

Local 18 and its Branches
Headquarters Office
3515 Prospect Avenue
Cleveland, Ohio 44115
216-432-3138
FAX: 216-432-0370

Patrick L. Sink
Business Manager

Kenneth M. Triplett
President

Floyd S. Jeffries
Vice President

Charles W. Scherer
Recording-Corresponding Secretary

Larry G. Reynolds
Financial Secretary

Premo P. Panzarello
Treasurer

III

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____
Name of Employer (Printed)

_____
Employer Address

_____
City                      State                      Zip Code

_____
Area Code & Telephone

_____
Authorized Employer Representative  (Signature)  Date

_____
Authorized Employer Representative  (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____
District Representative (Signature)

FRINGE OFFICE COPY          85          (USE NO CARBON)

SOFCO002163

## DISTRICT NO. 1

Covering the following counties in Ohio:

| | | |
|---|---|---|
| Ashtabula | Geauga | Lorain |
| Cuyahoga | Huron | Medina |
| Erie | Lake | |

District Representatives
Steve DeLong

| | | |
|---|---|---|
| Jeff Milum | Donald Taggart | Steven Mayor |
| Premo Panzarello | Scott Ranftl | John Liscoe, Jr. |

3515 Prospect Avenue, Cleveland, Ohio 44115
Office:  216-432-3131
FAX:  216-432-3135

## DISTRICT NO. 2

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Allen | Hardin | Paulding | Van Wert |
| Defiance | Henry | Putnam | Williams |
| Fulton | Lucas | Sandusky | Wood |
| Hancock | Ottawa | Seneca | |

District Representatives
Charles Lafaso, Jr.

Gary Siesel                        Steve Heckler

Andrew Myers

2412 South Reynolds Road, Toledo, Ohio 43614
Office:  419-865-0221
FAX:  419-865-0601

IV

SOFCO002164

## DISTRICT NO. 3

### Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Crawford | Hocking | Marion | Pickaway |
| Delaware | Knox | Morrow | Union |
| Fairfield | Licking | Muskingum | Wyandot |
| Franklin | | Perry | |

### District Representatives
Greg Kingsbury

Tommy Thompson      Rolland Llewellyn
Larry Bodner      Tim Hammock

Mark Totman, Legislative Representative

1188 Dublin Road, Columbus, Ohio 43215
Office: 614-486-5281
FAX: 614-486-7258

## DISTRICT NO. 4

### Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Auglaize | Clinton | Logan | Montgomery |
| Butler | Darke | Madison | Preble |
| Champaign | Fayette | Mercer | Shelby |
| Clark | Greene | Miami | Warren |

### District Representatives
Richard Dalton

Louis Monnin      Scott Clark

6051 N. Dixie Drive, Dayton, Ohio 45414
Office: 937-890-5914
FAX: 937-890-5180

MAILING ADDRESS: P.O. Box 13462, Northridge Branch
Dayton, Ohio 45413

v

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____
Name of Employer (Printed)

_____
Employer Address

_____
City      State      Zip Code

_____
Area Code & Telephone

_____
Authorized Employer Representative (Signature) Date

_____
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____
District Representative (Signature)

UNION DISTRICT COPY     83     (USE NO CARBON)

SOFCO002165

## DISTRICT NO. 5

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Adams | Gallia* | Lawrence* | Ross* |
| Athens* | Hamilton | Meigs* | Scioto* |
| Brown | Highland | Morgan* | Vinton* |
| Clermont | Jackson* | Pike* | |

Covering the following counties in Kentucky:
Boone, Campbell, Kenton, Pendleton

District Representatives
Larry G. Reynolds

Gerald Hall                                                    Bill Burdett

9730 Reading Road (Cincinnati) Evendale, Ohio 45215
Office:  513-733-5575
FAX:  513-733-4672

*Counties served through District No. 3, Columbus office
Office:  614-486-5281
FAX:  614-486-7258

## DISTRICT NO. 6

Covering the following counties in Ohio:

| | | | |
|---|---|---|---|
| Ashland | Harrison | Noble | Summit |
| Belmont | Holmes | Portage | Tuscarawas |
| Carroll | Jefferson | Richland | Washington |
| Coshocton | Monroe | Stark | Wayne |
| Guernsey | | | |

District Representatives
Steve DiLoreto

Floyd Jeffries                                                 Tom James
Joe Lucas                                                     Bill Larrick

1707 Triplett Boulevard, Akron, Ohio 44306
Office:  330-784-5461
FAX:  330-784-8827

VI

SOFCO002166

## LOCAL 18S
## STATIONARY ENGINEERS

Representatives

Charles W. Scherer                    Scott Peters
James Kumse                   Thomas Ridenbaugh

3515 Prospect Avenue
Room 206
Cleveland, Ohio 44115
Office:  216-432-2668
FAX:  216-432-0796

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____
Name of Employer (Printed)

_____
Employer Address

_____
City                        State                   Zip Code

_____
Area Code & Telephone

_____
Authorized Employer Representative  (Signature)  Date

_____
Authorized Employer Representative  (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____
District Representative (Signature)

HEADQUARTERS COPY        81        (USE NO CARBON)

VII

SOFCO002167

# AGREEMENT

## Between

## The AGC OF OHIO
## Labor Relations Division

### which may be referred to hereinafter as the "Association"

#### and

### THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 18 AND ITS BRANCHES, (AFL-CIO)
referred to hereinafter as the "Union"

This Agreement is negotiated by and between the Association and the Union within the geographical area as defined herein through their authorized agents, to wit:

That, whereas, the parties desire to stabilize employment and promote efficiency in the Construction Industry, agree upon wage rates, hours and conditions of employment, and to eliminate strikes, boycotts, lockouts and stoppages of work, and

Whereas, the Union and the Employer shall, through the issuance of working rules and regulations to the workmen, inform them of the terms of this Agreement and enforce compliance with the terms thereof, and

Whereas, the Employers agree to recognize and subscribe to the approved referral system as adopted by the International Union of Operating Engineers, Local 18.

Now, therefore, the undersigned Association and the Union agree as follows:

1

SOFCO002168

## ARTICLE I
### GEOGRAPHICAL JURISDICTIONAL AREA

1. The provisions of this Agreement shall govern employment of and conditions under which employees shall work and rates of pay they shall receive on work in Building Construction, in the following geographical area.

2. All counties in the State of Ohio except Ashtabula, Cuyahoga, Erie, Geauga, Huron, Lake, Medina, Lorain, Columbiana, Mahoning and Trumbull, and including Boone, Campbell, Kenton and Pendleton counties in Kentucky.

### DEFINITION OF BUILDING CONSTRUCTION

3. "Building Construction" work is defined as the erection and construction of building structures, including modifications thereof, or additions or repairs thereto intended for use for shelter, protection, comfort or convenience and demolition of same. Building Construction shall also include the excavation and foundations for Building Construction.

### SCOPE

A. "Industrial and Building Site" work is defined as including work inside the property line, but outside the actual building construction and shall include the grading and excavation of the site to bring it to grade level.

B. "Power Plant, Amusement Park, Athletic Stadium Site" work is defined as all work which is inside the property line, but outside the actual building construction. Such work shall include, but is not limited to the grading and excavation of the site, all work connected with the installation of sewer lines, drainage lines, gas lines, telephone and television conduit underground electrical lines and similar utility construction, parking lots, bridges, roads, streets, sidewalks, reservoirs, ash pits, storage tanks, ramps and other such construction work performed on the work site.

C. "Sewage Plant, Waste Plant and Water Treatment Facilities Construction" work is defined as all work in construction of pumping stations, waste and sewage disposal plants, incinerator plants, water treatment plants, filtration plants, solid waste disposal and similar pollution control processes.

2

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_____
Name of Employer (Printed)

_____
Employer Address

_____
City                    State                Zip Code

_____
Area Code & Telephone

_____
Authorized Employer Representative (Signature) Date

_____
Authorized Employer Representative (Printed)
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_____
District Representative (Signature)

CONTRACTORS COPY          79          (USE NO CARBON)

gram by any Contractor shall be accepted in lieu of that portion of a required affirmative action plan which would otherwise be directed to jobs manned by members of the Operating Engineers Union.

The parties shall from the date of this Agreement, when required, report to the appropriate federal contracting or administering agency. The report will specifically indicate the total number of minority group individuals or females in the Union. In evaluating these reports, the appropriate federal contracting or administering agency officials will have complete access to relevant records of the parties and will be expected to discuss the progress of the program freely with the parties and Union members.

D. Any work under A, B and C above awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## ARTICLE II

### RECOGNITION, SECURITY, PROVISIONS & LIMITATIONS

4. **Recognition**—The Association hereby recognizes the Union as exclusive collective bargaining agent for all Operating Engineers (within the geographical jurisdictional area stated in Article I), and the Union recognizes the Association as the exclusive collective bargaining agent for all Employers of the Operating Engineers (within the geographical jurisdictional area stated in Article I), and it is mutually acknowledged that each has acted as such agents continually for more than the past twenty years, and that now and over such period each has been so recognized by appropriate departments or agencies of both federal and state governments.

The persons, firms, corporations, joint ventures or other business entities bound by the terms of this Agreement are referred to in this Agreement as "Employer" or "Employers". The Employers and the Union by entering into this Agreement intend to and agree to establish a single multi-employer collective bargaining unit. Any Employer who becomes a party to this Agreement shall thereby become a member of the multi-employer collective bargaining unit established by this Agreement.

Employers covered by this Agreement shall be free to designate their own representatives for the purpose of collective bargaining and contract administration; however, such designation shall not affect the Employer's membership in the collective bargaining unit established by this Agreement.

5. **Liabilities**—This Agreement is negotiated by the AGC of Ohio Labor Relations Division, acting as negotiating representative for its members and for any breach of this Agreement the liability of an Employer shall be several, not joint, and the liability of the Association shall be only that of negotiating agent acting

78

3

SOFCO002170

without liability for the acts of its individual members or other Employers within the stated geographical jurisdictional area.

6. **Provisions and Limitations**–All members of the AGC of Ohio Labor Relations Division, and such other persons, firms or corporations who, as an Employer, become signatory to this Agreement, shall be bound by all of its terms and conditions, as well as any amendments which may be negotiated between the AGC of Ohio Labor Relations Division, and the Union. It is expressly understood that all Employers bound to the terms and conditions of this Agreement are required to pay the amounts as indicated in Article IV to the appropriate Fringe Benefit Programs.

7. **Management Rights**–The operation of the job and the direction of the working forces, including the right to hire, suspend and discharge for proper cause, and the right to relieve employees from duty because of lack of work, or for other legitimate reasons, is vested exclusively in the Employer.

8. **Nondiscrimination**–It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio and the Commonwealth of Kentucky and Lawful Orders thereof relative to nondiscrimination and fair employment practices. The Employer and the Union shall not knowingly discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or Apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

9. Further, the Employer and Union agree to adopt and embrace the Pact of 10 July 68 executed under provisions of the Executive Order 11246 and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations revised; an Affirmative Action Program to implement all provisions of applicable federal regulations to assure nondiscrimination in employment, upgrade, demotion or transfer, and recruitment advertising, layoff or termination, rates of pay and selection for all types of training as evidenced in Exhibit "B" attached hereto as if they had originally negotiated the same.

10. **Jurisdiction of Work**–In accordance with the terms of this Agreement, the Employer shall employ Operating Engi-

4

10. The parties to this Agreement agree to jointly assist a minority group employee to be integrated into the work force and the Union by:

A. Having management supervision on the job make every effort to assist and encourage minority group apprentices and to welcome such individuals to the job;

B. Have each apprentice and pre-apprentice trainee assigned to a Journeyperson Operating Engineer for help and assistance, and

C. Have Union officers inform the membership of the importance of making welcome all minority groups into the Union, and

D. The education, training requirements and disciplines of registered apprentices shall be governed by the Apprenticeship Joint Apprenticeship and Training Committee and Standards.

**B. JOURNEYPERSONS**

1. The parties will undertake a joint training program to assure equal opportunity to all journeypersons who desire to acquire the skills required to work on a variety of equipment within the jurisdiction of the Operating Engineers.

2. Local Union officials will notify minority and female members of this program. They will offer to minority and female members an opportunity for training on any highway equipment. If the parties determine that a minority or female group member lacks adequate pre-training qualifications, the reasons for such determination shall be noted in writing and shall be available for inspection during a review of this program by appropriate federal contracting or administering agency officials. An attempt shall be made to have availability of training according to the demands for craftsmen to operate the specific type of equipment involved.

3. Each member of the Local will be advised of this Agreement and the appropriate avenues for redress if any of its terms are breached by either party.

The parties undertake this Affirmative Action Program in accordance with Executive Order 11246 and applicable court orders. It is their understanding that participation in the pro-

77

2. Make available speakers to inform and advise high school students and others of opportunities in apprenticeship for Operating Engineers.

3. Notify all interested agencies and parties thirty (30) days prior to the period for taking applications; and making such interested agency or parties aware of the nature of all tests in order to facilitate a proper pre-test educational effort.

4. Provide application forms for apprenticeship and adequate instruction for properly preparing same upon request, during recruitment period at all training sites of the Operating Engineers Apprenticeship Program at certain union halls of Local 18. Develop an outreach program for the recruiting and pre-apprentice training of individuals from minority and female groups to enable them to enter the apprenticeship program.

5. To use a standardized, uniform battery of tests to determine applicant proficiency and aptitudes in reading, computation and mechanical skills suitable for the craft of Operating Engineer.

6. May have the test administered by an agency other than the Operating Engineers Apprenticeship Program and uniformly and numerically graded.

7. Interview sufficient applicants personally by teams consisting of one representative of Management and one of the Union who shall independently grade each applicant individually and then average the scores.

8. When an applicant fails to achieve acceptance, the Joint Apprenticeship and Training Committee shall make every effort to inform the applicant and the referring or cooperating agency of the area of insufficiency.

9. In order for the applicant, after acceptance as an Operating Engineer Apprentice, to become immediately employable by a Participating Employer, the Joint Apprenticeship and Training Committee shall provide training sites with equipment of the nature for which the apprentice will be employed, in order to acquaint the apprentice with safety measures as well as the operation and maintenance of the same and teach him/her the use of the machine as a tool of the trade and to generate good work habits. After the training, he/she shall be employed as an "apprentice-in-training" as such openings occur.

76

neers for the erection, operation, assembly and disassembly and maintenance and repair of the following construction equipment regardless of motive power: Air Compressors, Batch Plants, Boilers, Cableways, Derricks, Finishing Machines, Pumps, Trucks, Crawlers, Locomotive and Tower Cranes; Concrete Mixers and Concrete Mixing Plants, Hoes, Shovels, Pile Drivers, Tractors, Scrapers, Endloaders, Hoists and all like equipment, including the use of Geodimeter or any other device that electronically measures (shoots) distance shall be the work of the Operating Engineers (only applies to in-house crew) within the jurisdiction as assigned to the Union by the American Federation of Labor. It is further understood that all equipment for which classifications and wages have been established in this Agreement, and including that equipment for which classifications and wage rates may hereafter be established, shall be manned, when operated on the job site, by a member of the International Union of Operating Engineers, and paid the rates as specified in this Agreement.

11.   Operating Engineers shall be employed to do all pipe fitting and all burning and welding necessary for the preparation and maintaining of equipment operated by members of the Union.

12.   Operating Engineers shall be assigned to all work performed in connection with the installation, fueling, starting and stopping, repair, maintenance and operation of the below listed small equipment:

Compressors of 185 CFM or less (not discharging into a common header)
Heaters
Welding machines of 300 amp or less
Gas or diesel driven pumps 4" and under (or one 6" pump)
Generators of 15 KW or less
Conveyors 18" belt or less

A combination up to five (5) pieces of the above equipment shall, when in use, be serviced as an additional duty by an Operating Engineer who is employed by an Employer on a project. When six (6) pieces of the above equipment are in use on an Employer's project, a Utility Operator will be employed at the Class "C" rate. The Utility Operator shall also perform other work on the project.

5

In the event there are no Operating Engineers employed by the Employer on the project, the Employer shall employ an Operating Engineer at the Class "E" rate to service any small equipment in use, until the Class "C" rate becomes in effect.

An Operating Engineer shall be assigned to all work performed in connection with the installation, maintenance, repair and starting and stopping of electric submersible pumps. Necessary work on electric submersible pumps shall be assigned to an Operating Engineer working on the project as an additional duty; no full-time Operator is required.

Work in the servicing and maintaining of self-contained, mobile light plants shall be assigned to an Operating Engineer as an additional duty to his/her regular job. Such work shall normally be assigned to a Mechanic, Grease Crew or Oiler. Equipment operator employees shall be required to carry sufficient tools to make minor adjustments on the equipment they operate.

When an Oiler/Helper is assigned as the primary operator to a fuel/grease combo vehicle which requires specialized CDL endorsement, he/she will receive a $3.00 per hour premium over the Class "E" rate.

**13. Dewatering Systems**–A "Dewatering System" is defined as a combination of one or more pumps of any type, size or motive power with combined discharge capacity of over 4", including but not limited to, well-point pumps, submersible well pumps, ejector or educator pumps in combination with wells, well-points, sumps, piping and/or other appurtenances irrespective of motive power to control water on any and all types of construction work. The complete installation, operation and necessary maintenance work, including all piping, shall be performed by Operating Engineers. A Dewatering System shall be operated by Pump Operators at all times the Dewatering System is in operation unless otherwise agreed at the Pre-Job Conference or with the Union.

**14.** The Union will at all times, when requested by the Employer, use its best efforts to furnish the Employer with competent employees to operate, maintain and repair equipment in accordance with the terms and conditions of this Agreement.

**15. Pre-Job**–It is agreed that upon the request of either party a Pre-Job Conference shall be held prior to commencing work. In case of a necessary emergency start of the construc-

6

## SPECIAL RATES

Any work under A, B and C as described in Article I of this Agreement awarded subsequent from the effective date of this Agreement, then the Employer shall pay the rate of pay determined by adding the Operating Engineers Building Construction classification rate and the Operating Engineers Highway Heavy classification rate and divide by two (2).

## EXHIBIT "B"

### AFFIRMATIVE ACTION PROGRAM

1. Under the provisions of Executive Order 11246, issued by the President of the United States, and regulations issued under Chapter 60 of Title 41 of the Code of Federal Regulations as revised, and relative court orders, a specific affirmative program must be developed to assure that the employment of workers and the treatment of employees during employment is completely nondiscriminatory in regard to race, creed, color, sex, age, religion or national origin.

2. The parties to this Agreement are mutually desirous of developing an affirmative action agreement to implement the provisions of applicable federal regulations in order to assure nondiscrimination in employment; upgrading; demotion or transfer; recruitment and recruitment advertising; lay-off or termination; rate of pay and selection for all types of training.

3. In order to assure nondiscrimination now and in the future and in an effort to attract a maximum number of potential apprentices from minority and female groups, the parties to this Agreement have formulated the following Affirmative Action Program:

### A. APPRENTICESHIP

The parties agree to establish a positive program of apprenticeship selection and to use the following program to attract minority and female groups to the Operating Engineers Apprenticeship Program:

1. Develop a "fact sheet" for distribution to all secondary school counselors, youth opportunity centers, social action agencies and state employment offices.

75

SOFCO002173

## REGISTERED APPRENTICESHIP WAGE SCHEDULE

### ZONE I, ZONE II, ZONE III

| | |
|---|---|
| First Year Apprentice | Third Year Apprentice |
| 50% of Class "A" | 70% of Class "A" |
| Second Year Apprentice | Fourth Year Apprentice |
| 60% of Class "A" | 80% of Class "A" |

A new classification of Trainee is hereby established and the rates of pay are as follows:

| | |
|---|---|
| First Year Trainee | Third Year Trainee |
| 60% of Bulldozer Rate | 75% of Bulldozer Rate |
| Second Year Trainee | Fourth Year Trainee |
| 60% of Bulldozer Rate | 90% of Bulldozer Rate |

There will be a 10% increase for the apprentices on top of the percentages listed above provided they are operating mobile equipment.

The rates paid to the Apprentice or Trainee shall not exceed the classification rate the Apprentice or Trainee is working. For every five (5) Operating Engineer Journeymen employed, there may be employed one (1) Registered Apprentice Engineer or Trainee. Through the referral, Employers may employ Registered Apprentices or Trainees within this limitation when they are available. Any increase in the Apprenticeship contributions, agreed by the parties, will be shared equally by the Union and Employer.

## FIELD MECHANIC TRAINEE SCHEDULE

| | |
|---|---|
| First Year | 50% of Class "A" rate |
| Second Year | 60% of Class "A" rate |
| Third Year | 70% of Class "A" rate |
| FourthYear | 80% of Class "A" rate |

Only those individuals who have obtained a two (2) year Associates Degree, from an accredited school, will be accepted into this program. If the Mechanic Trainee is required to have a CDL license, he/she will be paid a 10% incentive above the percentages listed above. After successful completion of the fourth year, the Mechanic will be paid at Class "A" rate.

74

tion job, the Pre-Job Conference shall be held as soon as possible after the start of work. It is further agreed that upon the awarding of any building contract of $500,000.00 and over, the successful contractor will immediately notify the Union when it has been awarded the contract. It is further agreed the Union may request, receive and hold a Pre-Job Conference with the Employer on an individual basis.

Before the start of any project containing known hazardous waste materials, there will be a pre-job held. The Employer must notify the Union five (5) days prior to starting work on the project. Failure to do so, the Union has the right to withhold its services until such time a pre-job is held.

16. Following are the items which will be discussed at the Pre-Job Conference:

A. The Employer will advise the Union Representative of the Employer's requirements of necessary employees in the classification of work under this Agreement, and the Union will determine and advise the Employer of the ability of the Union to fulfill such requirements when requested.

B. Work schedules.

C. Questions of jurisdiction and assignment of work.

D. The Employer agrees that whenever possible at such Pre-Job Conference they will notify the Union of any subcontracts let by the Employer, the names of the subcontractors, and the nature of the work to be performed by the subcontractors. The Union may request a subcontractor to meet with the Union and the subcontractor will meet with the Union prior to commencing work on a project if the subcontractor did not attend the original Pre-Job Conference for the project. It is understood and agreed that no agreement may be made at the Pre-Job Conference which will in effect change, modify or abrogate the Labor Agreement in effect between the two parties hereto.

17. Subject to the provisions and limitations of the National Labor Relations Act, as amended, all present employees who are members of the Local Unions on the effective date of this sub-section shall remain members of the Local Unions in good standing as a condition of employment.

7

SOFCO002174

18. All present employees who are not members of the Local Unions and all employees who are hired hereafter shall become and remain members in good standing of any one of said Locals as a condition of employment on and after the eighth (8th) day following the effective date of this sub-section or following the beginning of their employment, whichever is later.

19. The Employer is to be the sole judge as to the satisfactory performance of work by an employee and may discharge any employee whose work is unsatisfactory or who fails to observe the safety precautions or other rules and regulations prescribed by the Employer for the health, safety and protection of his employees. However, no employee shall be discharged for defending the rights of any employee under the terms of this Agreement. Any grievance arising through application of this clause shall be adjusted in accordance with the procedures outlined in Article XIV, Paragraphs 124, 125 and 126 of this Agreement. Intoxication and/or assault committed on the job site shall be cause for immediate discharge.

20. The Union shall place no limitation upon the amount of work which an employee shall perform during the working day and there shall be no restriction imposed against the use of any type of machinery, tools or labor-saving devices. The Employer agrees that the work jurisdiction of the Operating Engineers, as assigned by the AFL-CIO, will be respected and all Operating Engineer work will be performed by an Operating Engineer, and it is the intent of both parties that Operating Engineers will be assigned work on the basis that will make each job as productive and efficient as possible. It is agreed that a fair day's work shall be given for a fair day's pay.

21. The Employer may shift during a work day an Operating Engineer from one piece of hourly rate of pay equipment to another hourly rate of pay piece of equipment without limitation from same job site providing the shifting does not interfere with another Operating Engineer's work day. This condition also pertains to weekly-pay equipment. However, there shall not be any intermixing with weekly-pay equipment to hourly-pay equipment. The Operating Engineer will be paid the highest rate for the day.

The District agent in each district, in order to maintain our jurisdiction, will make jobs as efficient and productive as possible.

22. If an Employer violates Paragraph 21, the Employer's

8

Classification: GROUP E

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $18.09 | $19.19* | $20.29* |
| Health & Welfare | | | |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Akron) | .14 | .14 | .14 |
| and (Cincinnati) | .08 | .08 | .08 |
| and (Columbus) | .035 | .035 | .035 |
| and (Dayton) | .05 | .05 | .05 |
| and (Toledo) | .08 | .08 | .08 |
| E & S | .10 | .10 | .10 |
| | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Allen Screed Paver (concrete)
Boilers (less than 15 lbs. pressure)
Cranes—Compact; track or rubber under 4,000 pounds
Directional Drill "Locator"
Fueling and greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Oilers/Helpers and Signalmen
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Submersible Pumps (under 4" discharge)

73

SOFCO002175

Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms with 4' or smaller system
Concrete Spreading Machines
Conveyors, used for handling building materials
Crushers
Deckhands
Drum Firemen in asphalt plants
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers

Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt)
Self-propelled Power Spreaders
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot rollers or graders
VAC/ALLS
Vibratory Compactors, with integral power
Welder Operators

72

penalty shall be to pay the first qualified registered applicant the applicable wage and fringe benefits from the first day of violation.

23. The authorized representative of the Union shall have access to the job during working hours for the purpose of visiting individual members, adjusting grievances or disputes and such other duties as he may have to perform. The representative will report to the job supervisor before visiting the project.

## STEWARD

24. The Union may, when it believes it necessary, appoint a Steward whenever possible from Operating Engineers working on the Employer's job and the Union District Representative will, when making such an appointment, notify the Employer. The Steward shall perform full-time work for the Employer and he/she shall be subject to the same rules, rights and working conditions as other employees. Under no circumstances shall the Steward have any authority to call a strike, slowdown of work or perform any other action which would be in violation of this Agreement.

25. The Employer agrees that each new employee shall report to the job Steward before starting work if a Steward has been appointed for that particular Employer's job. The Steward shall be allowed sufficient time during working hours to perform all normal duties required of a Steward. No Steward shall have job priority but will be laid off in the same manner as any other Operating Engineer upon completion of his/her particular job assignment; twenty-four (24) hour notice to the Union prior to his/her lay off is required to give the Union time to select another qualified Steward to replace the laid-off Steward, but this twenty-four (24) hour notice is not required when a Steward is discharged for cause by the Employer.

## SAFETY

26. The Union and the Employer will cooperate in the establishment of a safety program. At the Pre-Job Conference by mutual agreement, the wearing of safety hats may be made a condition of employment. All safety equipment required by the project owner or manager will be at no cost to the employee, except work shoes of any type. Both the Employer and employees shall comply with the applicable state safety codes

9

SOFCO002176

and any other applicable government or civil regulations pertaining to safety. It is expressly understood that if the employees' immediate health and safety are involved, the Union through its representative may order discontinuation of operations until satisfactory results are obtained.

## TRAINING

27.  The Safety Training Passport 16-hour program will be made available to all union members by the Union at no cost to the Employer. The program will consist of:

> Safety Awareness as required by
> OSHA 29CFR 1926.21
>
> Fall Protection as required by OSHA
> 29CFR 1926.503
>
> Hazard Communication as required by
> OSHA 29CFR 1926.59

Operating Engineers dispatched to a project to perform trench excavation work will be required to have successfully completed eight (8) hours of trench safety training. This program will become effective May 1, 2007.

It is agreed that both the Employer and the Union will encourage and assist in the promotion of this training.

28.  Within forty-eight (48) hours after an industrial accident occurs, the company shall have all necessary State Workers' Compensation forms available and completed on the Employer's part. A copy of the completed forms shall be sent to the Union's office in the district where the accident occurred.

29.  All **toxic/hazardous** projects will be subject to any and all safety regulations and insurance provisions that may be required by the appropriate governmental agencies. When dangerous atmospheres are present so that an Operator is required to don a special protective suit and/or self-contained breathing apparatus at a private, state, federal or other designated toxic/hazardous waste site, the Employer will notify the Union district office. Reasonable dress-up time and clean-up time will be allowed. The first qualified bargaining unit employee on the job will be designated the steward-safety person, who shall have access to company monitoring records and be kept informed of amounts of contaminants on the job site. A

10

Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

**Classification: GROUP D**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $23.55 | $24.65* | $25.75* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Ballast Relocator
Backfillers and Tampers

Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats

(Continued on next page)

71

Classification: GROUP C

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $24.73 | $25.83* | $26.93* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| and (Cincinnati) | .035 | .035 | .035 |
| and (Columbus) | .05 | .05 | .05 |
| and (Dayton) | .08 | .08 | .08 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps without booms and with 5" system
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)

70

sheltered "safe zone" area shall be provided. There shall be wash-up facilities on all toxic/hazardous waste sites. When hazmat training credentials are required, the Operator will receive a $.50 per hour premium added to his/her base rate.

On such projects, it is expressly understood that if the employees' immediate health and safety are in danger, the employee may discontinue operations, without penalty, until satisfactory results are obtained, or until such time as a recognized safety agent shall declare the equipment or operation to be safe. All Operating Engineers employees shall be advised by the Employer prior to employment as to the nature of the known hazardous waste and possible resultant physical injuries as may be required by applicable law.

30.   DRUG TESTING: The Employer and the Union are committed to a policy that promotes safety in the work place, employee health, and well being. In consideration of this policy, the Union and Employer agree that any employee found to be under the influence of, in possession of, or engaged in the distribution of drugs or alcohol on the job site shall be subject to disciplinary action, up to and including immediate discharge.

Within two (2) weeks of reporting to the job site, each new Operator may be scheduled for a drug test. Employees using a prescription drug which may impair mental or motor function shall inform their supervisor in writing of such drug use.

Employee involvement with drugs and alcohol can adversely affect job performance and employee morale. In the Construction Industry the consequences of drug or alcohol use or influence while on the job site can be disastrous. The Employer and Union, therefore, agree to the following policy to insure all employees of a safe and efficient job site free from the effects of drug and alcohol use or influence.

All job sites or work areas are subject to random or massive drug screening. Any employee who is involved in an on-the-job accident resulting in an injury to a person or property or whose observed behavior raises a reasonable suspicion of probable cause of illegal drug or alcohol use impairment while on the job site, may be required as a condition of continued employment to submit to a test for alcohol and/or illegal drug use which impairs the employee's ability to safely perform his/her duties on the job site. Such tests usually involve a sampling of the employee's blood, urine, or breath. Any em-

11

SOFCO002178

ployee who is asked to submit to such a test will be required to sign a consent form. If an employee who is asked to submit to a test refuses to do so, or refuses to sign the necessary consent form, that employee will be subject to disciplinary action up to and including discharge. Refusal to take a test or the submission of an adulterated sample shall be determined the same as a positive test result. The employee/member shall follow all requirements outlined in this section.

All testing will be done by a reliable, established laboratory. If this initial test screen result indicates positive findings, further testing of the same sample must be done to confirm the original findings before the laboratory can report a positive finding. The confirmation test will be conducted by an independent accredited National Institute of Drug Abuse or College of American Pathology Laboratory and will utilize the more scientific Gas Chromatography/Mass Spectrometry examination (GC/MS). The results of all tests will be kept confidential between the employee, the Employer and the Union. The employee shall be paid his/her regular hourly wage and fringes for time required for drug testing provided results are negative.

If the GC/MS test results are positive, the employee may be granted a leave of absence for the purposes of drug and alcohol rehabilitation. If the employee is eligible such rehabilitation programs are covered under the Ohio Operating Engineers Health and Welfare Program providing the employee confines his/her self to a twenty-four (24) hour licensed rehabilitation medical facility.

Until the employee presents certification of successful completion of the rehabilitation program, he/she shall be removed from the Employer's job site; shall be prohibited from registering under Article III of the referral of this contract and shall not be dispatched to work. Upon presentation of certification of the employee's successful completion of the drug/alcohol rehabilitation program, the employee may be restored to his/her original job with the Employer. If the employee is not restored to their original job, the employee will be allowed to register for work in the referral by registering a new work referral card. The employee shall, under either circumstance. for the next succeeding twelve (12) month period, present to the District Representative monthly certification of negative drug/alcohol test results. Failure to do so will result in denying the employee the right

12

## Classification: GROUP B

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| Health & Welfare | $25.77 | $26.87* | $27.97* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Akron) | .14 | .14 | .14 |
| and (Cincinnati) | .08 | .08 | .08 |
| and (Columbus) | .035 | .035 | .035 |
| and (Dayton) | .05 | .05 | .05 |
| and (Toledo) | .08 | .08 | .08 |
| | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Articulating/end dumps (minus $4.00 per hour
 from Class B)
Asphalt Pavers
Bobcat type and/or Skid Steer Loader with hoe
 attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Endloaders
Hydro Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types
Vermeer-type Concrete Saw

69

SOFCO002179

Forklift (rough terrain with winch/hoist)
Gradalls
(Boom & Jib 150'-180'—$26.39
effective 5/1/04)
(Boom & Jib over 180' through 249'—$26.89
effective 5/1/04)
(Boom & Jib 250' and over—$27.14
effective 5/1/04)
(Boom & Jib 150'-180'—$27.49*
effective 5/1/05)
(Boom & Jib over 180' through 249'—$27.99*
effective 5/1/05)
(Boom & Jib 250' and over—$28.24*
effective 5/1/05)
(Boom & Jib 150'-180'—$28.59*
effective 5/1/05)
(Boom & Jib over 180' through 249'—$29.09*
effective 5/1/06)
(Boom & Jib 250' and over—$29.34*
effective 5/1/06)
Helicopter Operators, hoisting building
materials
Helicopter Winch Operators, hoisting building
materials
Hoes (all types)

Hoists (with two or more drums)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or
Welder)
Mixers, paving (Multiple Drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning
device)
Rotary Drills (all), used on caissons for
foundations and sub-structure work
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24" wide)
Tug Boats

68

to maintain his/her referral card in the register and utilize the referral or if working, to be removed from work.

**31.** **Harassment Policy:** The parties to this Agreement mutually agree that harassment of any nature is not to be tolerated. Every person working under this Agreement shall immediately notify the Employer when a possibility of a problem happens or exists.

# ARTICLE III

## REFERRAL SYSTEM

**32.** Local 18 and its Branches, shall maintain registers of all applicants for referral. Applicants shall not be permitted to be registered in more than one office of the Union at any one time. All applicants will be registered in order of application, provided no person shall be deemed to be an applicant who is otherwise gainfully employed as an Operating Engineer or not immediately available for work. Registrations and re-registrations will be accepted during customary business hours. Applicants shall be classified in priority groups in accordance with the following criteria:

**GROUP A:** All applicants who have worked as Operating Engineers at least 360 days, 90 days or more per year during the last four (4) years, and have been employed for at least 360 days, 90 days or more per year during the last four (4) years on work as defined in Article I of this Agreement within the geographical jurisdiction of Local 18, and who have lived in the State of Ohio, or in any county contiguous thereto, for at least one (1) year prior to application.

**GROUP A PREFERRED:** Must have Group A eligibility. Group A registrants may voluntarily register in the Group A Preferred, however, registrants in this Preferred A status shall have at least fifteen (15) years employment or availability for employment in any one or more of the classifications contained in this Agreement and in the type or kind of craft work covered by this Agreement in the geographic area as defined by this Agreement. Referral in this group is limited to the following described equipment and will be given priority of referral from the Group A Preferred deck. Preferred A status employees will not be eligible for letter of request by the Employer: Welding Machines, Elevator, Conveyor. Pumps. Compressors, Gen-

13

SOFCO002180

erators, One Drum Hoist, Mono-Rail Hoist and Portable Heaters.

It is further understood and agreed that when the Employer employs Operating Engineers not currently in their employ for any machines listed in this section, the Employer shall call the referral office servicing his/her job or project and request that an employee qualifying under the Preferred A status be dispatched to service and operate said machine. Any Operating Engineer currently employed by an Employer can be used to operate any of the above listed machines. Apprentices shall not operate this equipment more than fifteen (15) days.

Workmen registering in this Preferred A Group shall be ineligible to register in any other group and shall not work in any classification other than those specified in this section and only have recall rights for equipment specified in this section.

**GROUP A RETIREES:** Must have Group A eligibility. The pension was set up to enhance the lives of retirees in their golden years. Retiring from the trades is by voluntary choice.

A retiree is an equipment operator or mechanic who has applied for and is receiving a pension from any construction industry source.

Upon retirement the retiree can only register in this group. The Group A retirees will be referred to jobs only after the Group A classification and the Preferred A classification have been exhausted.

The Group A retirees will not be eligible for letter of request by the Employer.

**GROUP B:** Same as Group A, except that the employment shall have been at least 270 days, three (3) years of 90 days each. All fourth year Apprentices and Trainees shall be registered in this group.

**GROUP C:** All applicants who have worked as Operating Engineers at least ninety (90) days per year during each of the last two (2) years, and who have lived in the State of Ohio or any county contiguous thereto for at least one (1) year prior to application. All third year Apprentices and Trainees shall be registered in this group.

**GROUP D:** All applicants who have worked as Operating Engineers at least ninety (90) days during the twelve (12) months prior to application. All second year Apprentices and Trainees shall be registered in this group.

14

## Classification: GROUP A

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| Health & Welfare | $5.89 | $26.99* | $28.09* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Akron) | .14 | .14 | .14 |
| and (Cincinnati) | .08 | .08 | .08 |
| and (Columbus) | .035 | .035 | .035 |
| and (Dayton) | .05 | .05 | .05 |
| and (Toledo) | .08 | .08 | .08 |
| E & S | .10 | .10 | .10 |
| | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Barrier Moving Machine
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination—Concrete Mixers & Towers
All Concrete Pumps with booms
Cranes (all types)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Cranes—Self-Erecting; stationary, track or truck (all configurations)
Derricks (all configurations)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment

(Continued on next page)

67

SOFCO002181

## Classification: MASTER MECHANIC

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| Health & Welfare | $26.14 | $27.24* | $28.34* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Akron) | .14 | .14 | .14 |
| and (Cincinnati) | .08 | .08 | .08 |
| and (Columbus) | .035 | .035 | .035 |
| and (Dayton) | .05 | .05 | .05 |
| and (Toledo) | .08 | .08 | .08 |
| E & S | .10 | .10 | .10 |
| | .04 | .04 | .04 |

* In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

66

**GROUP E:** All other applicants and all first year Apprentices and Trainees shall be registered in this group.

**GROUP F:** All applicants who are "temporary employees."

All applicants who have attained eligibility in any of the foregoing groups shall not lose eligibility as a result of their failure to obtain the required days of employment during the applicable periods of time. All graduating Apprentices shall upon journeymen certification become eligible for Group A. When an applicant fails to register in his/her eligibility group due to reasons other than illness, as hereinafter defined, and does not notify the Union Hall, the resultant failure to obtain the required days of employment during the applicable periods of time shall cause the applicant to lose eligibility in that group.

Any registrant requesting that their work registration card be placed on hold due to sickness or ill health must present to the Union a doctor's certificate or statement certifying that the registrant will be under a doctor's care for a minimum of thirty (30) days, and that such illness prevents the registered applicant from working as an Operating Engineer. A work registrant's card will only be placed on hold for a minimum period of thirty (30) days, and a maximum period of one hundred twenty (120) days. No registration cards will be placed in the hold position for illness less than a thirty (30) day duration. Any refusals of dispatches due to illness for a period of less than thirty (30) days shall be counted as a refusal under the terms and conditions of the referral procedure.

33. In referring applicants, the following procedure shall be followed:

A. Applicants in Group A shall first be referred, and then Group A Preferred, then Group A Retirees, then applicants in the succeeding groups, in order, through Group E. In each group, the Union shall refer applicants in order of their places on the referral list.

B. Registered Apprentices or Trainees shall be referred in order of their position on the referral list.

C. Employers shall have the right to reject any applicant referred for employment and shall immediately notify the Union in writing of such rejection. In the event a registrant is discharged by the Employer because of lack of sufficient ability,

15

and he/she does not exercise his/her rights under the Referral Board of Review and Arbitration under Paragraph 37, the classification or equipment from which he/she is discharged shall be stricken from his/her referral record and he/she shall not be dispatched to a job in that classification or on that equipment until he/she has:

1. Taken training at his/her training site and has been certified, or

2. Has presented to his/her dispatch office a letter from a previous Employer, in signed agreement with Local 18 working within Local 18's jurisdiction, stating that in the Employer's opinion the discharged registrant has successfully completed a job assignment in that classification or on that piece of equipment in his employment.

D. When an applicant is actually employed, he/she shall notify the Union office at which he/she is registered within twenty-four (24) hours. Failure to do so is an imposition upon those registered and not employed and, therefore, such applicant will be barred from re-registering, unless and until he/she has made application to the Board of Review and Arbitration provided for in Paragraph 37 of this Agreement, and shows good cause for his/her failure to give such notice.

E. When an applicant becomes employed, his/her name shall be removed from the register as soon as he/she shall have worked for a total of thirty-one (31) accumulative working days (one (1) day jobs shall not count). An Operator who relieves another Operator will not be charged for the first fifteen (15) days (only one (1) fifteen (15) day relief per registration application card). All days after that will be counted toward his/her time.

If an applicant is employed for less than thirty-one (31) accumulative working days, he/she shall be restored to his/her previous position on the register when such employment terminates. Any applicant who quits employment or fails to show up for work assignment at starting time after being dispatched (provided he/she was dispatched the previous day), for whatever reason, except accident verified by police report, shall be placed at the bottom of the applicable registration group regardless of the number of days worked and shall not be eligible

16

Masonry Fork Lifts
Oilers/Helpers
Power Driven Heaters (oil fired)
Power Scrubbers

Power Sweepers
Pumps (under 4" discharge)
Signalman
Submersible Pumps (under 4" discharge)

## EXHIBIT "A"
## WAGE RATES AND FRINGE CONTRIBUTIONS

ZONE III covering Akron and counties, Cincinnati and counties, Columbus and counties, Dayton and counties, and Toledo and counties:

For AKRON and the following counties: Ashland, Belmont, Carroll, Coshocton, Guernsey, Harrison, Holmes, Jefferson, Monroe, Noble, Richland, Stark, Tuscarawas, Washington and Wayne.

For CINCINNATI and the following counties: Adams, Athens, Brown, Clermont, Gallia, Hamilton, Highland, Jackson, Lawrence, Meigs, Morgan, Ross, Scioto and Vinton. In Kentucky, the counties of Boone, Campbell, Kenton and Pendleton.

For COLUMBUS and the following counties: Crawford, Delaware, Fairfield, Franklin, Hocking, Knox, Licking, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Union and Wyandot.

For DAYTON and the following counties: Auglaize, Butler, Champaign, Clark, Clinton, Darke, Fayette, Greene, Logan, Madison, Mercer, Miami, Montgomery, Preble, Shelby and Warren.

For TOLEDO and the following counties: Allen, Defiance, Fulton, Hancock, Hardin, Henry, Ottowa, Paulding, Putnam, Sandusky, Seneca, Van Wert and Williams.

65

Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers
Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers (except asphalt rollers)
Self-Propelled Power Spreaders

Self-Propelled Sub-Graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot roller or grader
VAC/ALLS
Vibratory Compactors, with integral power
Welder

**Classification: GROUP E**

|  | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| Health & Welfare | $18.84 | $19.94* | $21.04* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Toledo) | .14 | .14 | .14 |
|  | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Allen Screed Paver (concrete)
Boilers (less than 15 lbs. pressure)
Cranes—Compact; track or rubber over 4,000 pounds capacity

Directional Drill "Locator"
Fueling & greasing +$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators

64

for request until he/she puts in a new registration card. When reason for employment termination is questioned, applicant must present a written termination slip evidencing reasons other than a voluntary quit before he/she is restored to his/her previous position on the register.

An applicant for employment may not refuse referral to employment for any reason except that the applicant may inform the District Office in writing, before any referral, that he/she will not accept employment referrals in certain named counties within the District. If an applicant refuses a job referral for the second consecutive time, he/she shall lose his/her position on the register and go to the bottom of the list for his/her group.* If the dispatcher is unable to contact an applicant, the failure to contact shall not be deemed to be a refusal.

F. Applicants must notify the Union office in which they are registered by telephone, or letter, or telegram, or in person of their continued availability for employment within thirty (30) days after the date of last registration or re-registration in order to maintain their places on the register.

In order to equally distribute and defray the cost of services rendered by the use of this referral system, all individuals who make use of this referral system shall be required to pay an initial registration fee of $16.75 and another $16.75 for each re-registration thereafter, provided that such fee shall not exceed $16.75 in any consecutive thirty (30) day period (the aforestated $16.75 will increase to $17.25 effective July 1, 2005) and provided that such fee shall not apply to the following:

1. Members in good standing of Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their regular dues; and

2. Applicants for membership to Local 18 or its Branches, International Union of Operating Engineers, whose proportionate share of the cost of this referral system is met by their fees; and

3. Members in good standing of the International Union of Operating Engineers who are paying travel dues whose proportionate share of the cost of this referral system is met by the payment of their fees.

*Does not apply to the Ohio or Kentucky Building & Light Commercial Agreements Referral.

17

SOFCO002184

G. The Union shall use its best efforts to notify all registered applicants when work is available for them, but the Union assumes no responsibility or obligation for failure to locate an applicant.

H. All applicants must submit a written resume of their experience and qualifications at the time of original registrations, and may be tested on the equipment they operate at the nearest available training site prior to being assigned a position on the referral list.

I. Subject to this referral system Employers may hire through this referral policy, by name, former employees who have resided for at least twenty-four (24) months in the State of Ohio or in any county contiguous thereto, and have been employed by the Employer making the request during the past twenty-four (24) months within the jurisdiction of this Agreement. The Employer must make the request to the appropriate Union District Office and the employee requested must be registered on the District referral list (Groups A through E).

Employers may hire through this referral policy by name individuals in Group A for a production machine, or for a mechanic, or mechanic/welder, who has been registered on the out-of-work list for at least ten (10) days in the District in which the work is to be performed. Individuals shall have only one (1) request per four (4) month period from the last request. The request by name must be confirmed later in writing on the letterhead of the Employer and signed by either the Employer or the superintendent of the project.

Nothing in the referral procedure shall interfere with the transfer of an Employer's employees on his payroll from one project to another project within the geographical area covered by Local 18. When transferring employees, the Employer will notify the Union District Office from which the employee is to be transferred.

The Union agrees the transfer will be processed in an expedient manner.

J. The purpose of the referral system is to provide nondiscriminatory employment opportunities. Individuals who register therein deserve a preference over those who do not. Therefore, it is agreed that in the event that the referral list is exhausted and the Union is temporarily unable to furnish qualified applicants within twenty-four (24) hours after receiving the Employer's request

18

Classification: GROUP D

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $24.30 | $25.40* | $26.50* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Ballast Relocator
Backfillers and Tampers
Batch Plant Operators
Bar and Joint Installing Machines
Bull Floats
Burlap and Curing Machines
Clefplanes
Compressors, on building construction
Concrete Mixers, capacity more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps without booms and with 4" system or smaller
Concrete Spreaders
Conveyors, used for handling building material
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Form Trenchers
Generators
Gunite Machines

(Continued on next page)

63

SOFCO002185

## Classification: GROUP C

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| Health & Welfare | $25.48 | $26.58* | $27.68* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Toledo) | .14 | .14 | .14 |
| E & S | .10 | .10 | .10 |
| | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts
Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (installing or operating well points or other types of dewatering systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

62

(Saturdays, Sundays and holidays excepted), the Employer may temporarily employ others until the Union notifies the Employer that it has qualified registrants available for employment.

Applicants hired by the Employer under this procedure shall be known as "temporary employees," and will be subject to replacements. The Employer will notify the Union District Representative of the name, union affiliation (if any), date of employment and social security number of such "temporary employee." The Union will maintain a register of all such "temporary employees" and such register shall be known as the temporary register. Such "temporary employees" may also be referred by the Union (when the referral list is exhausted) from Group F.

Such "temporary employee" shall be subject to replacement by a qualified registered applicant under the procedure listed herein:

1. The Union shall give a five (5) working day written notice to the Employer with whom the "temporary employee" is working and such "temporary employee" will thereupon be replaced at the end of the five (5) working day period provided the Union furnishes a qualified registered applicant.

2. The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the temporary register.

K. When an Employer states requirements for special skills or abilities in his/her request for employee applicants, the Union shall refer the first applicant on the register possessing such skills or abilities, regardless of the place or classification of such applicant on the register. If a contractor requests or requires that the operator be a Certified Operator, verification of the operator's certification is the responsibility of the Employer. If the Employer notifies the Union in writing, within thirty (30) days of the employee's discharge, of an Operator who had been in his employment and who had not performed satisfactorily, and the Employer does not wish this Operator to be referred to the Employer for future employment, the Union shall honor this written request.

L. Any employee who quits a contractor without proper notice and is subsequently hired by an Employer with whom Local 18 has a contractual relationship without a proper referral by Local 18 shall be discharged by the Employer when it is called to his attention.

19

SOFCO002186

34. Employers shall give first opportunity to persons registered for employment, as provided herein, by calling or notifying the Union at any of its offices in the territory where the work is to be performed.

35. Registration of applicants and selections of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on or in any way affected by Union membership, by-laws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership, policies, or requirements. It is mutually agreed that the Employer and the Union shall abide by all of the laws of the United States, the State of Ohio, the Commonwealth of Kentucky, and lawful orders thereof in nondiscrimination and fair employment practices.

The Employer and the Union shall not discriminate against nor limit employment opportunities of any employee, applicant for employment or applicant for Union membership or apprenticeship training because of race, color, sex, age, religion, national origin or ancestry.

The Union agrees to furnish an Employer, at his request, any statement or data required under any regulations referred to herein.

36. In addition to the above Registration Groups there shall be established a Short Term Job Group. The sole purpose of this Short Term Job Group is to enable registrants to acquire time to be eligible for unemployment benefits. Registration in this group is limited to applicants eligible for Group A of this referral and all fourth year Apprentices showing proof of need for additional time to qualify for unemployment benefits.

Applicants' referral out of the Short Term Job Group will be limited to jobs of two (2) days or less duration in a calendar week or eight (8) days or less duration in a calendar month on equipment listed on their registration cards. Any refusals of jobs will cause the registrant's card to be removed from the Short Term Job Group deck. Dispatches for short term jobs as defined above will first be made from the Short Term Job Group. If the dispatcher is unable to fill the short term job order from the Short Term Job Group he/she will proceed to fill the order from Groups A through F in accordance with the referral rules. Dispatcher should notify Employers when dispatching from the Short Term Job Group. The Employer reserves the right to request dispatch from Group A.

20

## Classification: GROUP B

|                | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|----------------|----------|----------|----------|
| Health & Welfare | $26.52 | $27.62* | $28.72* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Toledo) | .14 | .14 | .14 |
|  | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

| | |
|---|---|
| Articulating/end dumps (minus $4.00 per hour from Class B) | Lead Greasemen |
| | Mucking Machines |
| Asphalt Pavers | Pettibone-Rail Equipment |
| Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs. | Power Graders |
| | Power Scoops |
| Bulldozers | Power Scrapers |
| C.M.I.-type equipment | Push Cats |
| Endloaders | Rotomills (all), grinders and planers of all types |
| Hydro Milling Machine | Vermeer-type Concrete Saw |
| Kolman-type Loaders (dirt loading) | |

61

SOFCO002187

Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning device)
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Slip Form Pavers
Straddle Carriers (building construction on site)
Trench Machines (over 24' wide)
Tug Boats

(Boom & Jib 250' and over—$27.89 effective 5/1/04)
(Boom & Jib 150'-180'—$28.24* effective 5/1/05)
(Boom & Jib over 180' through 249'—$28.74* effective 5/1/05)
(Boom & Jib 250' and over—$28.99* effective 5/1/05)
(Boom & Jib 150'-180'—$29.34* effective 5/1/05)
(Boom & Jib over 180' through 249'—$29.84* effective 5/1/06)
(Boom & Jib 250' and over—$30.09* effective 5/1/06)

60

Since this Short Term Job Group is intended to provide limited employment for those needing credit for unemployment compensation, the Union shall, through its business agents, remove from employment any Operating Engineer who has accumulated more than two (2) days per calendar week or over eight (8) days in a calendar month—as a result of the Short Term Job Referral Group.

Registrants in the Short Term Job Group will not be eligible for any recall or request provisions of the referral as herein described. Employment received as a result of the Short Term Job Group referral will not provide eligibility for Employer recall when the registrant is registered in Group A, Preferred A, or Group A Retirees deck. Apprentices or Trainees will not be permitted to register in the Short Term Job Group except as noted above. Registrants may not register in the Short Term Job Group or Group A or Preferred A or Group A Retirees deck at the same time. The Employer shall not be permitted to transfer employees dispatched from the Short Term Job Group from one project to another project.

The Union will save the Employer harmless for any liabilities occurring under the application of the provisions of the Short Term Job Group.

All the remaining rules with regard to the operation of the referral shall be applicable to the operation of the Group A, Preferred A and Group A Retirees except as modified above.

37. Any registrant or any Employer who may feel aggrieved by the operation of this referral system shall have the right to and must file his/her grievance, in writing, within ten (10) days after the occurrence of the event concerning which he/she complains with a Board of Review and Arbitration consisting of one (1) representative of the Union, one (1) representative of the Employer, and an impartial third member to be selected by agreement of the Union and the Employer, and the decision of this Board shall be final and binding on all parties.

38. This statement as to referrals shall be posted in all places where notices to Employers and applicants for employment are customarily posted, including all offices of the Union; all offices of the Employer.

39. A Labor Relations Division Representative of the AGC of Ohio may inspect the referral register at the Union District Office at any time during normal office hours.

21

SOFCO002188

40.  All officers and business representatives of the Union who have had previous work experience in any one or more of the job classifications contained in this Agreement shall be deemed to be employed at the trade and it is the intent of this section to provide that upon return to the employment in the trade, he shall do so with the same preference as if he had continually worked at the trade and shall be eligible upon registration for Group A.

## ARTICLE IV

### FRINGE BENEFIT PROGRAMS

41.  The fringe benefit provisions contained herein shall apply to all Employer members of the AGC of Ohio Labor Relations Division, and Employers who become signatory or bound by this Agreement, as well as any other Employer or Employer groups who become a party to an Agreement covering the fringe benefit programs set forth herein.

42.  All Employers bound hereby agree to be bound by the Agreement and Declarations of Trust, as amended, establishing the Pension Fund, Health and Welfare Plan and Apprenticeship Fund, copies of which all parties agree have been furnished to and read by all Employers bound hereby prior to the execution of this Agreement. It is mutually agreed that the provisions of said Agreements and Declarations of Trust and any rules, regulations, or plans adopted by the Trustees pursuant thereto, shall become a part of this Agreement as though fully written herein. All Employers bound hereby irrevocably designate the Employer Trustees of said Funds and Plan and their successors as their representatives for the purpose set forth in said Agreements and Declarations of Trust.

43.  Fringe benefit contributions shall be paid at the following rates for all hours paid to each employee by the Employer under this Agreement which shall in no way be considered or used in the determination of overtime pay. Hours paid shall include holidays and reporting hours which are paid.

PENSION FUND: Effective May 1, 2000 is $3.00 per hour

HEALTH & WELFARE PLAN: Effective May 1, 2004 is $5.11 per hour

22

Operators of:
Barrier Moving Machines
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination—Concrete Mixers & Towers
All Concrete Pumps with booms
Cranes (all types)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Cranes—Self-Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Forklift (rough terrain with winch/hoist)
Gradalls
Helicopter Operators, hoisting building materials
Hoes (all types)
Hoists (with two or more drums in use)
Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
(Boom & Jib 150'-180'—$27.14 effective 5/1/04)
(Boom & Jib over 180' through 249'—$27.64 effective 5/1/04)

(Continued on next page)

59

## EXHIBIT "A"
### WAGE RATES AND FRINGE CONTRIBUTIONS
ZONE II covering Lucas and Wood counties:

Classification: MASTER MECHANIC

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $26.89 | $27.99* | $29.09* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Classification: GROUP A

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| | $26.64 | $27.74* | $28.84* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Toledo) | .10 | .10 | .10 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

58

APPRENTICESHIP FUND: Effective May 1, 2000 is $.45 per hour

SAFETY TRAINING AND EDUCATIONAL TRUST FUND: Effective May 4, 1992 is $.04 per hour

The Union shall have the option of diverting all or any part of the increase scheduled for improvement of or payment of costs of any fund benefits provided under this Agreement; provided that the Union gives the Employer written notice of its election to do so by registered letter sent to the office of the AGC of Ohio at least 60 days before the effective date of the scheduled change specifying in said notice the amount of change to be applied for this purpose in the fund benefit for which the money is to be used.

44. It is further understood and agreed by and between the parties that duly authorized representatives of any of said Trust Funds or Plan shall have the right, on written notice, to audit the books and records of any party obligated under this Agreement to contribute thereto, with respect to the hours worked by and wages paid to all employees upon whom the Employer is obligated to make contributions and with respect to the payment of monies to the AGC of Ohio's Construction Industry Advancement Program under paragraphs 109, et. seq. and with respect to the Administrative Dues deduction under paragraph 114. Notwithstanding the foregoing authority allowing audits with respect to the AGC of Ohio's Construction Industry Advancement Program and the Administrative Dues deduction, the audits shall only be conducted in conjunction with the Fringe Benefit Funds or Plans referred to herein and shall not be conducted independently. The twenty-four (24) hour notice referred to in paragraph 45 (A) shall only be given for delinquencies to the employees Fringe Benefit Funds or Plan referred to therein.

45. Reports of employees who have worked the number of hours that they have been paid, and such other data and information as may be required, and all contributions payable to the Funds or Plan shall be transmitted to the offices of the Funds or Plan no later than the fifteenth (15th) day of the month immediately following the calendar month in which the work was performed. In the event said audit is refused, reports not

23

furnished, or said contributions are not paid, as aforesaid, the following remedies, in whole or part, and in addition to all other remedies, either in law, in equity, by contract or authorized by the aforementioned Agreements and Declarations of Trust, shall be available.

A. After the Trustees or the Agent of any Funds or Plan have given the delinquent Employer twenty-four (24) hours written notice at the address shown in the records of the Funds, Plan or Union, the Union shall have the right to take such legal and lawful action as it may deem necessary until such delinquent payments are made or said audit is permitted, such action including but not limited to the right to withhold its services from such Employer for as long as the failure to make such contributions or audit continues, Article XIV notwithstanding.

B. In the event either the Union or the Trustees of any Funds or Plan may decide to utilize the grievance and arbitration procedure in this paragraph to collect delinquent contributions and liquidated damages to enforce any audit, or to obtain any report, the following procedure shall apply:

Unless the issue is resolved between the Employer and the party giving notice, within five (5) calendar days after deposit of written notice of delinquency and/or demand for audit and/or report in the United States mail, to the Employer at the address shown in the records of the Funds, Plan or Union, such party may refer the matter to an arbitrator to be named by the AGC of Ohio Labor Relations Division and by Local 18 of the International Union of Operating Engineers whose decision in writing shall be final and binding on all parties. In the event such parties are unable to choose an arbitrator within ten (10) days after written request therefor, the Union or the Trustees of any Funds or Plan may request an arbitrator according to the rules and regulations of the American Arbitration Association whose decision in writing shall be final and binding on all parties. The parties to the arbitration shall each bear one-half (1/2) of the total costs.

19. In no event shall the foregoing provisions relating to Fringe Benefits be subject to or suitable for grievance and arbitration under Article XIV of this Agreement.

24

---

Pressure Pumps (over 1/2" discharge)
Road Widening Trenchers
Rollers, except asphalt rollers
Self-propelled Sub-graders
Shotcrete Machines
Tire Repairmen
Tractors, pulling sheepfoot post roller or grader
VAC/ALLS
Vibratory Compactors, with integral power
Welders

**Classification: GROUP E**

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| Health & Welfare | $19.73 | $20.83* | $21.93* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Akron) | .14 | .14 | .14 |
| E & S | .08 | .08 | .08 |
| | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Allen Screed Paver (concrete)
Boilers (less than 15 lbs. pressure)
Cranes—Compact; track or rubber under 4,000 pounds)
Directional Drill "Locator"
Fueling and greasing <$3.00
Inboard, Outboard Motor Boat Launches
Light Plant Operators
Masonry Fork Lifts
Oilers/Helpers
Power Driven Heaters (oil fired)
Power Scrubbers
Power Sweepers
Pumps (under 4" discharge)
Signalmen
Submersible Pumps (under 4" discharge)

57

---

SOFCO002192

## Classification: GROUP D

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| Health & Welfare | $25.02 | $26.12* | $27.22* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Akron) | .14 | .14 | .14 |
| E & S | .08 | .08 | .08 |
| | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Backfillers & Tampers
Ballast Relocator
Bar and Joint Installing Machines
Batch Plant Operators
Bull Floats
Burlap and Curing Machines
Clarifiers
Compressors, on building construction
Concrete Mixers, more than one bag
Concrete Mixers, one bag capacity (side loaders)
All Concrete Pumps (without boom with 4" or smaller system)
Concrete Spreaders
Conveyors, used for handling materials
Crushers
Deckhands
Drum Firemen (in asphalt plants)
Farm-type Tractors, pulling attachments
Finishing Machines
Firemen
Form Trenchers
Generators
Gunite Machines
Hydro-seeders
Pavement Breakers (hydraulic or cable)
Post Drivers
Post Hole Diggers

56

---

**ARTICLE V**
**WAGE RATES**

48. The purpose of this Agreement is to establish wage rates and conditions to apply for all work as defined herein and for operation of all equipment which comes within the jurisdiction of the International Union of Operating Engineers, and as negotiated by and between Local 18 and its Branches of the International Union of Operating Engineers and the AGC of Ohio Labor Relations Division.

49. Exhibit "A" covering wage rates and classifications attached hereto is made a part of this Agreement.

50. It is agreed if equipment within the jurisdiction of the International Union of Operating Engineers is used by an Employer and if there is no appropriate classification listed under the wage schedules herein, then the Union and the Association negotiating committees will negotiate a new classification and rate of pay for such equipment within five (5) days.

51. The geographical jurisdiction of this Agreement will be zoned for wages only. Conditions of employment will be the same for all employees covered by this Agreement.

25

47. The Employer must obtain an Insurance Payment Bond (IPB), from a company that is "best" rated A, financial category 7 or better, payable to the Ohio Operating Engineers Fringe Benefit Program as a guarantee that the fringe benefits referred to herein are paid by the insurance carrier in the event that the Employer becomes delinquent in its payments and defaults thereon. In lieu of a surety bond, an Employer may substitute an equivalent cash bond, which will be escrowed to guarantee payment of fringes. If the Employer fails to provide the necessary bond within thirty (30) days of request by the Union, the Union shall withhold services until receipt of such bond, or the Employer makes fringe contributions on a weekly basis.

The Employer shall obtain said Insurance Payment Bond or cash bond in amounts set forth below:

| | | |
|---|---|---|
| $$$ | Operating Engineers 1-10 | $50,000.00 |
| | Operating Engineers 11-20 | $75,000.00 |
| | Operating Engineers 21-50 | $100,000.00 |
| | Operating Engineers Over 50 | $125,000.00 |

SOFC0002193

Zone I: Covering Portage and Summit counties only.

Zone II: Covering the counties of Lucas and Wood only.

Zone III: Covering the counties of Adams, Allen, Ashland, Athens, Auglaize, Belmont, Brown, Butler, Carroll, Champaign, Clark, Clermont, Clinton, Coshocton, Crawford, Darke, Defiance, Delaware, Fairfield, Fayette, Franklin, Fulton, Gallia, Henry, Highland, Hocking, Holmes, Jackson, Jefferson, Knox, Lawrence, Licking, Logan, Madison, Marion, Mercer, Meigs, Miami, Montgomery, Monroe, Morgan, Morrow, Muskingum, Noble, Paulding, Perry, Pickaway, Pike, Preble, Putnam, Richland, Ross, Sandusky, Scioto, Seneca, Shelby, Tuscarawas, Union, Van Wert, Vinton, Warren, Washington, Wayne, Williams, and Wyandot. In Kentucky, the Counties of Boone, Campbell, Kenton and Pendelton.

ARTICLE VI
WEEKLY PAY AND HOURLY PAY
CLASSIFICATIONS AND REPORTING PAY
PROVISIONS

52. In all counties covered by this Agreement, the following classifications shall be employed on a WEEKLY PAY basis:

Asphalt Plants
Boiler Operators, Oiler/Helper, Registered Apprentices and Signalmen, when members of crew
Boiler Operators or Compressor Operators, when compressor or boiler is mounted on crane (Piggyback Operation)
Cherry Pickers
Cranes (all types)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Floating Equipment
Gradalls
Hoes (except when attached to farm or industrial type tractor or CAT 320 backhoes or equivalent and below)
Hoists, with two or more drums in use
Horizontal Directional Drill (over 500,000 ft. lbs. thrust)
Maintenance Engineers (Mechanic and/or Welder)
Master Mechanics

26

Classification: GROUP C

|  | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| Health & Welfare | $28.24 | $27.34* | $28.44* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Akron) | .14 | .14 | .14 |
| E & S | .08 | .08 | .08 |
|  | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
A-Frames
Air Compressors, pressurizing shafts or tunnels
Asphalt Rollers (all)
Bobcat-type and/or Skid Steer Loader with or without attachments
Boilers (15 lbs. pressure and over)
All Concrete Pumps (without booms with 5" system)
Fork Lifts (except masonry)
Highway Drills-all types (with integral power)
Hoists (with one drum)
House Elevators (except those automatic call button controlled)
Man Lifts

Material hoist/elevators
Mud Jacks
Pressure Grouting
Pump Operators (Installing or operating Well Points or other types of Dewatering Systems)
Pumps (4" and over discharge)
Railroad Tie Inserter/Remover
Rotovator (Lime-Soil Stabilizer)
Submersible Pumps (4" and over discharge)
Switch & Tie Tampers (without lifting and aligning device)
Trench Machines (24" and under)
Utility Operators

55

Classification: GROUP B

|  | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
|  | $27.28 | $28.38* | $29.48* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:
Articulating/end dumps (minus $4.00 per hour from Class B)
Asphalt Pavers
Bobcat-type and/or Skid Steer Loader with hoe attachment greater than 7,000 lbs.
Bulldozers
C.M.I.-type equipment
Endloaders
Hydro Milling Machine
Kolman-type Loaders (dirt loading)
Lead Greasemen
Mucking Machines
Pettibone-Rail Equipment
Power Graders
Power Scoops
Power Scrapers
Push Cats
Rotomills (all), grinders and planers of all types
Vermeer-type Concrete Saw

54

Panelboard Operators (all types on site)
Pile Drivers
Power Shovels
Rotary Drills (all), used on caissons for foundations and sub-structure work
Side Booms
Tug Boats

53. In all counties covered by ZONES I, II and III, the following classifications shall be employed on an HOURLY PAY basis (two (2), four (4), or eight (8) hours):
A-Frames
Air Compressors, pressurizing shaft or tunnels
Allen Screed Paver (concrete)
Asphalt Pavers
Backfillers and Tampers
Backfillers
Ballast Re-Locator
Bar and Joint Installing Machines
Barrier Moving Machine
Batch Plant Operators
Bobcat Type and/or Skid Steer Loader
Boilers (15 lbs. pressure and over)
Boom Trucks (all types)
Bulldozers
Bull Floats
Burlap and Curing Machines
Cableways
Clefplanes
CMI-type equipment
Combination Concrete Mixers and Towers
Compressors, on building construction
Concrete Grinder/Planer
Concrete Mixers
Concrete Pumps
Concrete Spreaders
Conveyors, used for handling building materials
Crushers
Deckhands
Directional Drill "Locator"
Drum Firemen in asphalt plants
Elevating Graders or Euclid Loaders
Endloaders

27

SOFCO002194

Farm-type Tractors, pulling attachments
Finishing Machines
Fork Lifts (all types)
Forklift (rough terrain with winch/hoist)
Form Trenchers
Generators (except when furnishing power for hand tools)
Generators (sonic pile driving)
Gunite Machines
Helicoptor Operators, hoisting building materials
Helicoptor Winch Operators, hoisting building materials
Hoes, when attached to farm or industrial type tractors
Hoists (building construction)
Horizontal Directional Drill (less than 500,000 ft. lbs. thrust)
House Elevators (except those automatic call button
    controlled)
Hydraulic Gantry (lift system)
Hydro-seeders
Inboard, Outboard Motor Boat Launches
Kolman-type Loaders (dirt loading)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Lead Greasemen
Light Plant Operators
Locomotives (all types)
Man Lifts
Mixers, Paving (multiple drum)
Mobile Concrete Pumps, with booms (including oiler, etc.)
Mucking Machines
Mudjacks
Oilers, Helpers and Boiler Operators, when not members
    of a crew
One Bag Capacity Mixers, with side loaders
Pavement Breakers (hydraulic or cable)
Pettibone-Rail Equipment
Plant Mixers (on site)
Post Drivers
Post Hole Diggers
Power Driven Heaters (oil fired)
Power Graders
Power Scoops
Power Sweepers

28

Horizontal Directional Drill
Hydraulic Gantry (lift system)
Laser Finishing Machines
Laser Screed and like equipment
Lift Slab or Panel Jack Operators
Locomotives (all types)
Maintenance Engineers (Mechanic and/or
    Welder)
Mixers, paving (multiple drum)
Mobile Concrete Pumps, with booms
Panelboards (all types on site)
Pile Drivers
Power Shovels
Prentice Loader
Rail Tamper (with automatic lifting and aligning
    device)
Rotary Drills (all), used on caissons for
    foundations and sub-structure work
Side Booms
Slip Form Pavers
Straddle Carriers (building construction
Trench Machines (over 24" wide)
Tug Boats

(Boom & Jib over 180' through 249'—$28.38
    effective 5/1/2004)
(Boom & Jib 250' and over—$28.63
    effective 5/1/2004)
(Boom & Jib 150'-180'—$28.98*
    effective 5/1/2005)
(Boom & Jib over 180' through 249'—$29.48*
    effective 5/1/2005)
(Boom & Jib 250' and over—$29.73*
    effective 5/1/2005)
(Boom & Jib 150'-180'—$30.08*
    effective 5/1/2006)
(Boom & Jib over 180' through 249'—$30.58*
    effective 5/1/2006)
(Boom & Jib 250' and over—$30.83*
    effective 5/1/2006)
Forklift (rough terrain with winch/hoist)
Helicoptor Operators, hoisting building
    materials
Helicoptor Winch Operators, hoisting building
    materials
Hoes (all types)
Hoists (with two or more drums in use)

53

## Classification: GROUP A

| | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
| Health & Welfare | $27.38 | $28.48* | $29.58* |
| Pension | 5.11 | 5.11 | 5.11 |
| Apprenticeship | 3.00 | 3.00 | 3.00 |
| IAP (State) | .45 | .45 | .45 |
| and (Akron) | .14 | .14 | .14 |
| E & S | .06 | .08 | .08 |
| | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

Operators of:

Barrier Moving Machines
Boiler Operators or Compressor Operators when compressor or boiler is mounted on crane (Piggyback Operation)
Boom Trucks (all types)
Cableways
Cherry Pickers
Combination—Concrete Mixers & Towers
All Concrete Pumps with booms
Cranes (all types)
Cranes—Compact; track or rubber over 4,000 pounds capacity
Cranes—Self Erecting; stationary, track or truck (all configurations)
Derricks (all types)
Draglines
Dredges (dipper, clam or suction) 3-man crew
Elevating Graders or Euclid Loaders
Floating Equipment
Gradalls
(Boom & Jib 150'-180'—$27.88 effective 5/1/2004)

52

Power Scrubbers
Prentice Loader
Pressure Grouting
Pressure Pumps (over 1/2" discharge)
Pump Operators, installing or operating well-points or other types of dewatering systems
Pumps (4" and over discharge)
Pumps (under 4" discharge)
Rail Tamper (with automatic lifting and aligning device)
Switch & Tie Tampers (without lifting and aligning device)
Tire Repairmen
Tractors, pulling sheepsfoot rollers or graders
Trench Machines (over 24")
Utility Operators
VAC/ALLS
Vermeer-type Concrete Saw
Vibratory Compactors, with integral power
Welders (except electric machines)

54. In all the counties covered by ZONES I, II, and III, employees covered by this Agreement employed on a WEEKLY PAY basis reporting for work on Saturday, Sunday or holidays shall receive eight (8) hours straight time for reporting if no work is performed and they are not required to remain on the job; if they start to work, they shall receive eight (8) hours at premium time in accordance with Article VII.

They must report for work at starting time and, except as noted above, remain on the work for the full eight (8) hours to be entitled to receive the eight (8) hours pay stipulated in this Agreement.

55. When a machine having a forty (40) hour guarantee is laid up on a project site and the workmen are laid off and paid off, that machine cannot be started back to productive work on that project site unless it is laid up for one week (seven days) without calling back the workmen who had manned the machine and they shall be paid for the time they have been off, unless mutual agreement is reached between the Employer and the Union District Representative to permit employees to work on the weekly guarantee equipment during the seven (7) day "lay-up" period without penalty.

56. In all the counties covered by ZONES I, II and III, employees covered by this Agreement employed on an

29

SOFCO002196

HOURLY PAY basis, unless notified by the Employer not to report to work, shall receive two (2) hours' pay for reporting to work; if such operator does not start to work, he/she shall receive his/her two (2) hours' reporting time. An employee may be required to stay at the work project for one (1) hour to be eligible for two (2) hours reporting pay unless the Employer releases the employee prior to the end of the first hour. If the employee starts to work, he/she shall receive four (4) hours' pay; if the employee works over four (4) hours, he/she shall receive eight (8) hours' pay; for inclement weather only it will be 2-4-6-8 hours.

In all counties covered by ZONES I, II and III, employees covered by this Agreement employed on an HOURLY PAY basis reporting to work on Saturday, Sunday or holidays, all conditions in this paragraph will apply and both reporting time and time worked will be paid for at the rate provided in accordance with Article VII. They must report to work at starting time to be entitled to reporting pay. Where less than four (4) hours or less than eight (8) hours are worked, the employees must remain on the work for the full four (4) hours or the full eight (8) hours, as the case may be, to be entitled to pay for the four (4) or eight (8) hours, as stipulated in this Agreement.

A.   When an employee working on equipment with a weekly-pay guarantee and work with his/her equipment is completed on a project, the employee is guaranteed only Monday through Wednesday pay if the equipment finishes the work on the project the first three days of the week. The Employer will notify the Union District Representative prior to application of this provision.

57.   Crews will be eligible for straight time weekly pay when their equipment is transferred out of their District up to the day the equipment is shutdown, otherwise, Paragraph 56, Section A prevails.

58.   On jobs where there is only one (1) day's work for a piece of equipment, employee or crew may be employed on a day-pay basis. Upon the Contractor's request to the Union Business Representative for a second day for special occasions, the Union gives the Representative authority to authorize a second day for the period of this contract.

59.   All reporting pay time paid to an employee shall

30

## EXHIBIT "A"
### WAGE RATES AND FRINGE CONTRIBUTIONS

ZONE I covering Summit and Portage counties:

Classification: MASTER MECHANIC

|  | 5/1/2004 | 5/1/2005 | 5/1/2006 |
|---|---|---|---|
|  | $27.63 | $28.73* | $29.83* |
| Health & Welfare | 5.11 | 5.11 | 5.11 |
| Pension | 3.00 | 3.00 | 3.00 |
| Apprenticeship | .45 | .45 | .45 |
| IAP (State) | .14 | .14 | .14 |
| and (Akron) | .08 | .08 | .08 |
| E & S | .04 | .04 | .04 |

*In the second and third years, monies may be diverted from the wage packages in Zones I, II & III to fringe benefits, if needed.

51

SOFCO002197

## ARTICLE XVIII

### EFFECTIVE

**130.** This Agreement shall be effective May 1, 2004 and shall remain in force and in accordance with the terms of Article IX hereof. Wage rates and fringe payments shall be effective as designated by this Agreement.

**131.** IN WITNESS WHEREOF, WE, the undersigned duly authorized Employer Representatives and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO) executed this Agreement on the 1st day of May, 2004.

**I.U.O.E. LOCAL 18 AND ITS BRANCHES**

S/PATRICK L. SINK
Business Manager

S/KENNETH M. TRIPLETT
President

S/FLOYD S. JEFFRIES
Vice President

S/CHARLES W. SCHERER
Recording-Corresponding
Secretary

S/LARRY G. REYNOLDS
Financial Secretary

S/PREMO P. PANZARELLO
Treasurer

S/CHARLES LAFASO, JR.

S/RICHARD E. DALTON

S/GERALD W. HALL

**AGC OF OHIO LABOR
RELATIONS DIVISION**

S/RICHARD HOBBS
Executive Director

50

count as working hours with respect to any work guarantees or overtime pay provisions.

**60.** Employees who are working for an Employer in other than their local residence area thereby necessitating them to pay room and board shall, upon request, be granted their release if the Employer is unable to supply enough work to justify their staying. Employees released under this provision will be considered as laid-off because of lack-of-work.

## ARTICLE VII

### PROVISIONS FOR PREMIUM RATE OF PAY

**61.** The week shall begin on Monday A.M. and shall end on Sunday P.M.

**62.** The regular starting time must be established for not less than one (1) week. Any time worked prior to the established starting time will be paid for at the applicable premium rate unless otherwise arranged through Union notification.

**63.** The normal work day shall consist of eight (8) hours and the normal work week of forty (40) hours. One and one-half (1-1/2) times the regular rate shall be paid for all work in excess of eight (8) hours per day or forty (40) hours per week, whichever is greater, and including Saturday.

When an Employer performs clearance and excavation for site preparation for industrial or building sites, the Employer will pay the wage rates listed herein, all overtime will be performed at one and one-half (1-1/2) times the regular rate. Subject to Paragraph 121, all other conditions and provisions shall be as provided herein.

**A.** An Employer may, however, have the option of working a four-ten hour schedule at straight time rates. No Operating Engineer with a weekly guarantee will lose a paid holiday he/she would otherwise receive by working a four-ten week. Instead, such employees will receive, in addition to wages and fringes for hours worked in a four-ten week, an additional eight (8) hours and fringes at straight time rates for the holiday. If the Employer elects, upon notification to work a four-ten hour schedule, he shall pay overtime in such cases on all hours over ten (10) hours per day or over forty (40) per week, whichever is greater. A four-ten work schedule must be by the week.

31

SOFCO002198

In addition to the above: It is agreed that when time is lost by the crew during the regular work week, Monday through Thursday, due to inclement weather, holiday, equipment breakdown or directions of the project owner, this time may be made up by the entire crew on Friday at the regular rate of wages. All Friday work must be scheduled on a minimum of eight (8) hours basis. All hours worked in excess of the forty (40) hours in the work week or ten (10) hours each day, shall be paid at the appropriate overtime rate of pay.

B.   Any employee hired on any day of the week, Monday through Thursday, and who does not lose any time from the day of his/her initial hire until Thursday shall receive the overtime rate of wages for Friday, providing the crew is eligible for the premium rate for Friday.

C.   Should any other trade on the project in the contractor's employ, working in conjunction with the Operating Engineers, receive premium pay on a Friday, the Operating Engineers would also receive premium pay for the Friday.

D.   If the other basic crafts employed by your contractor on the project receives the overtime rate for the ninth (9th) and tenth (10th) hours, the Operating Engineers will also receive the overtime rate.

E.   When an Employer works three (3) days or less in a week, premium time will be paid after eight (8) hours for each of the days, except for holidays, inclement weather or completion of the job.

F.   Pay day will be on Thursday.

G.   Weekly pay employees, in order to be eligible for eight hours' pay that day, must be available to perform work for the Employer.

**64.**   Double time will continue to be paid to any Operator who is complementing another trade that is receiving double time. All work performed by an employee on Sunday or holidays shall be paid at two times the regular rate established in this Agreement or any escalated rate that may be in effect.

**65.**   No weekly pay employee covered by this Agreement shall lose time because of the observed holidays. If not requested to work, he/she shall be paid eight (8) hours straight time pay at the rate established in this Agreement or eight (8) hours at any escalated rate that may be in effect. Holidays

32

be submitted to the Impartial Jurisdictional Disputes Board for settlement in accord with the Plan adopted by the Building Trades Department, AFL-CIO.

The parties hereto further agree that they will be bound by any decision or award of the Disputes Board. There shall be no stoppage of work or slowdown arising out of any such dispute. No jurisdictional work stoppages, and no jurisdictional picket lines shall be recognized.

This article of the contract will go into effect when the National A.G.C. reaffiliates with the Impartial Disputes Board.

## ARTICLE XVI
### I – 9

**128.**   The Union and the Employers during the term of this Agreement agree to use their best efforts to establish a master file of I – 9 employment eligibility verification forms on all members. This file will be maintained at the Union office and be available for the Employer's use.

## ARTICLE XVII
### SAVINGS AND SEPARABILITY

**129.**   It is mutually agreed that if any clause, terms or provisions of this Agreement is or is hereafter found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling, or ruling of any other board or agency having jurisdiction in the matter, such clause, terms or provisions shall be or become inoperative of any effect without disturbing the other clauses, terms or provisions of this Agreement and the remaining part of this Agreement shall remain in full force and effect. In the event that any clause, terms or provisions of this Agreement is found to be illegal or in contravention of any court ruling, National Labor Relations Board ruling or ruling of any other board or agency having jurisdiction in the matter, said clause, terms or provisions shall be re-negotiated to the mutual satisfaction of the parties, but during such re-negotiation work shall not be interrupted or stopped by lockout, strikes, boycotts or other labor troubles.

49

ment can be reached within ten (10) working days from the date of the written grievance, then

**STEP 3:** The grievance may be referred to the State Joint Committee consisting of six (6) members, three (3) to be appointed by the Labor Relations Division of the AGC of Ohio and three (3) to be appointed by Local 18 of the International Union of Operating Engineers. Where the State Joint Committee, by majority vote (5 members or more), resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this agreement. In case of failure of either party to appear at the hearing of a grievance properly filed for hearing, the parties in attendance shall offer evidence in support of its position and the Committee shall dispose of the case on the basis of such evidence. If no settlement is reached at this STEP within fifteen (15) working days from the date the grievance is referred, then

**STEP 4:** The grievance shall then be referred to an Arbitrator selected by the Committee referred to in STEP 3. If the parties cannot agree on an Arbitrator within forty-eight (48) hours after the parties agree to submit the matter to arbitration, the parties shall jointly request the Federal Mediation and Conciliation Service to furnish a list of Arbitrators from which the Arbitrator shall be selected by the alternate striking of names.

**126.** The expenses and fees of the Arbitrator shall be shared equally by the parties. The Arbitrator shall have no power to add to, subtract from, or modify any of the terms and provisions of this Agreement. The Arbitrator's decision shall be final and binding upon the parties hereto.

## ARTICLE XV

### DETERMINATION OF JURISDICTIONAL DISPUTES

**127.** Both parties to this Agreement agree to be bound by the terms and provisions of the Agreement creating the Impartial Disputes Board. In particular, both parties agree to be bound by the provision of the Agreement which states: Any decision or interpretation of the Impartial Disputes Board shall immediately be accepted and complied with by all parties signatory to this Agreement.

The parties hereto agree that in the event of a jurisdictional dispute with any other Union or Unions, the dispute shall

48

shall be of twenty-four (24) hours duration. When required to work on holidays, the employee shall be paid two times the regular rate established in this Agreement or any escalated rate in effect.

**66.** There shall be no work required on Labor Day except in special cases of emergency.

**67.** The observed holidays are Christmas, New Year's Day, Labor Day, Memorial Day (last Monday in the month of May), Independence Day and Thanksgiving Day. When any of the aforementioned holidays fall on Sunday, they will be observed on Monday. All weekly pay employees covered by this Agreement to be eligible for holiday pay must be available for work the first regularly scheduled work day prior to the holiday and be available for work the first regularly scheduled work day after the holiday.

**68.** Where steam boilers, power driven heaters or pumps are used on a continuous seven (7) day twenty-four (24) hours per day operation, overtime may be avoided by using four (4) shifts of Operating Engineers, each shift to work six (6) hours on a seven (7) day basis. Each Operating Engineer so employed shall be paid forty (40) hours at the applicable straight time rate and two (2) hours at double the applicable straight time rate. The aforementioned condition, where overtime may be avoided, can only be used upon the Employer's guarantee of a minimum thirty (30) days of operation. In the event the Employer cannot furnish thirty (30) days of employment after starting work under Paragraph 68, it is agreed that upon lay-off of employees the Employer will pay retroactive overtime to such laid-off employees from the start of this particular operation in accordance with Article VII, Paragraph 64 of this Agreement.

**69.** Job Master Mechanics and Operators of derricks, cranes, derrick cars on steel erection and on building construction and all winch trucks used in hoisting construction material and any type of hoist, shall command and receive the highest rate of pay and the same applicable premium pay and conditions for overtime where the rates or conditions for the Ironworkers, Boiler Makers, Pile Drivers and Pipefitters are higher than the rates specified in this Agreement for the foregoing classifications. To be eligible for the benefits of complementing the above mentioned trades, an Operator must be required to

33

perform a specific operation which is directly related to the work which the other trades are performing.

70. Operating Engineers employed on any equipment within the jurisdiction of the International Union of Operating Engineers working in shafts, tunnels or storage caverns where natural earth or rock is undisturbed overhead, shall be paid fifty cents ($.50) per hour above the rates in this Agreement or in addition to any escalated rate that may be in effect. This does not apply to open cut work.

71. Booms, including jib 150 feet through 180 feet in length, fifty cents ($.50) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

72. Booms, including jib over 180 feet in length through 249 feet in length, one dollar ($1.00) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

73. Booms, including jib of 250 feet and over in length, one dollar twenty-five cents ($1.25) per hour in addition to the established crane rate or any escalated crane rate that may be in effect.

74. Conventional cranes whether crawler or truck when used as a tower crane, the effective length of the mast and the boom combined, will be used to determine when these extra rates will be applied.

75. Tower Cranes, the height of the boom point from the first floor level of the project, will be used to determine when these extra rates will apply.

76. On jobs where crane-type or derrick-type machines are operated on floors above the first floor level of the building, twenty-five cents ($.25) per hour shall be paid in addition to the established crane rate or any escalated rate that may be in effect.

## ARTICLE VIII
### CREWS AND GENERAL PROVISIONS

77. In all of the counties within the jurisdiction of this Agreement, crews shall be employed on all truck cranes, power shovels, cranes, rotary drills on caisson work, cableways, draglines, tower derricks, tower cranes, multiple drum

34

by an individual Employer for refusing to cross a legal primary picket line established by an International Union affiliated with the Building and Construction Trades Department of the AFL-CIO or a Local Union thereof or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, a Local Union thereof, which picket line has been authorized and sanctioned by proper authorities. No jurisdictional or illegal informational picket line shall be recognized.

## ARTICLE XIV
### NO STRIKE—NO LOCKOUT—ARBITRATION AND DISPUTES

124. The Company shall not cause, permit or engage in any lockout of its employees during the term of this Agreement.

The Union shall not authorize, cause, engage in or sanction, nor will any employee take part in any illegal slowdown, work stoppage, strike, picketing or other concerted interference against the Employer, or occurring at or around the Company's office or work locations during the term of this Agreement.

125. Should a dispute arise between any of the parties, (Employee, Company, Association and/or Union) to this Agreement as to its meaning, intent or the application of its terms, this dispute will be settled in accordance with the following grievance procedure:

STEP 1: The aggrieved employee shall first take up his/her grievance orally with the Employer's Supervisor or Representative. The employee may, if he/she so desires, have his/her Steward appear with him/her. The grievance shall be orally brought to the Employer's attention within three (3) working days of the occurrence or discovery of the grievance, but in no event will the grievance be honored by management later than fifteen (15) days past the incident giving rise to the complaint. A grievance not submitted within the time limit shall be deemed untimely and is waived.

STEP 2: In the event the grievance is not settled, the employee then shall put his/her grievance in writing within three (3) working days after STEP 1 meeting, dated and signed along with the contract Article effected and submit the grievance to the District Business Representative and he/she and the Business Representative shall meet with the Employer's Representative and attempt to settle the matter. If no settle-

47

SOFCO002201

responsible for obtaining the voluntary authorization.

116.   The Union agrees to indemnify and save the Employer harmless against any and all claims, suits or other forms of liability arising out of said deductions.

## ARTICLE XIII
### ENFORCEMENT MEASURES

117.   It is agreed that all subcontractors shall be subject to the terms and provisions of this Agreement as it relates to the Operating Engineers.

118.   The Union shall require that no Union person shall leave a job by quitting unless he/she has been properly relieved after giving ample notice of his/her intention to quit to the Employer.

119.   The Union shall not transfer a Union person from one Employer to another without the consent of the Employer and the Union person involved. Neither shall the Employer transfer a Union person from his/her employ to another Employer's payroll without the consent of the Union person involved and the Union.

120.   All employees of the Employer shall be allowed time to vote on Election Day as required by law on employees own time.

121.   If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to the Employer.

122.   There are areas within the scope of this Agreement for which the wages and conditions contained herein may not be appropriate due to competition or other reasons. In such cases, adjustments will be made in accordance with principles agreed to by the parties during negotiations. Either party may request a meeting with the other party to be held within fifteen (15) days of notification to the other party.

123.   No employee covered hereby may be discharged

46

pavers, pile driving machines and hoes, standard gauge locomotives, bucket trench machines (over 24" wide) and horizontal directional drills (over 500,000 ft. lbs. thrust). Crews shall consist of an Operating Engineer and an Apprentice/Helper or Signalman on machines, regardless of motive of power, or an Operating Engineer and Fireman on steam machines.

78A.   Apprentice/Helpers are required on hoes, excavators, and front hudraulic shovels having a base operating weight in excess of 105,000 pounds, all terrain cranes with a total weight of 125,000 pounds and Apprentice/Helpers shall be required on cable crawler cranes over 80 ton structural capacity, defined as: the factory specified total maximum counter weight with a PCSA rating not to exceed 36,400 pounds, based on 50' of boom at 40' radius, with the single line pull not exceeding 17,000 pounds. Anything outside any of the aforementioned limits determines the crane as requiring an Apprentice/Helper. All factory certifications and the computer system will be available for inspection at any time by the Union or their designee. On remote control gradalls, Apprentice/Helpers shall be at the discretion of the Employer. Truck cranes, lattice boom, thirty (30) ton capacity and under; hydraulic truck cranes and all terrain cranes fifty (50) tons or less, an Oiler is not required. However, if someone other than an Operating Engineer is assigned to this work, this paragraph will be revoked on the project, and an Apprentice/Helper will be required for the remainder of the project. An Apprentice/Helper is required on self-erecting cranes (as defined by the manufacturer) while being erected and dismantled.

78B.   Oilers on jobs of thirty (30) days or more will be given a minimum of 30 minutes per day operating the machine they are assigned to (or a similar machine on the same project). If the Oiler cannot be trained to operate the machine to the satisfaction of the Employer then he/she shall be replaced.

79A.   Work of the Boiler Operator, Oiler/Helper, Registered Apprentice, and Signalman shall include getting up steam and greasing up, filling gas tanks and making the machine and equipment ready for operating at the starting time. If, at the discretion of the Employer, an Oiler/Helper, Registered Apprentice, or Signalman is required to make gas or diesel machines ready to operate before the regular starting time, such

35

SOFCO002202

Oiler/Helper, Registered Apprentice, or Signalman shall be paid one-half (1/2) hour's pay at one and one-half (1-1/2) times the regular rate. If, at the discretion of the Employer, a Boiler Operator or Registered Apprentice is required to get up steam and grease steam machines and make them ready to operate before regular starting time, then such Boiler Operator or Registered Apprentice shall be paid one (1) hour's pay at one and one-half (1-1/2) times the regular rate.

79B.    Apprentice/Helpers, while assigned to track hoes, cranes and other equipment, will perform the following work on the project as additional duty:

- Cover small equipment (i.e. pumps, generators, compressors, etc.)
- Act as signal person
- Safety/fire watch
- Practice operating in a learning environment in the vicinity
- Help with survey duties on project
- Help mechanic, lube trucks, fuel
- Practice operating rough terrain forklift, front loader, rubber tire hoe, loader in vicinity of primary duty
- Replace other operators who may be absent on project
- Run parts or materials as necessary
- Safety enforcement
- Productive activity on job site to facilitate job completion when it does not interfere with progress of primary machine, providing this does not interfere with another Operating Engineer's workday

80.    Oiler/Helpers, Registered Apprentices, Signalmen, Grease Truck Operators, when requested to work the regular one-half (1/2) hour lunch period, will eat their lunch prior to or after the regular one-half (1/2) hour lunch period in order to be able to oil, grease and repair machines during the regular one-half (1/2) hour lunch period at no extra pay.

81.    More than one (1) shift may be worked in any twenty-four (24) hour period and the starting time of the shifts shall be left to the discretion of the Employer. This starting time must be maintained five (5) days, Monday through Friday. However,

of the State Fund. Payments to the program shall be in accordance with instructions on forms furnished by the Association.

111.    The monthly contribution period and report shall end with and include the last full weekly pay period of the month. Payments and reports for each monthly contribution period shall be due on or before the fifteenth (15th) day of each month covering amounts due for the preceding month. If an Employer shall fail to make their payment when the same shall be due and payable, he shall be subject to an additional charge of one and one half percent (1-1/2%) per month until paid, to reimburse the Construction Industry Advancement Program for damages due to additional administrative expenses and impairment of reserves. In addition to the additional charges referred to herein, an Employer who fails to make timely payments shall be liable for legal fees and court costs incurred by the Association in collecting late payments.

112.    Should there be any termination of payments allocable to the Construction Industry Advancement Program by reason of the expiration of this Agreement or for any other reason, the assets and Fund of the Construction Industry Advancement Program shall not be distributed among any Employers, or the Union, but shall be held by the Association, which shall continue to administer and expend such assets and funds for the purposes as set forth herein and subject to the conditions as also provided herein.

113.    There is specifically excluded from the purposes of the Construction Industry Advancement Program the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during periods of work stoppages or strikes.

## ARTICLE XII
### UNION ADMINISTRATIVE DUES AND DEDUCTIONS

114.    Upon notification by the Union that a uniform administrative dues deduction has been authorized by all employees of the Employer, the Employer shall deduct said uniform administrative dues. The Union shall be responsible for obtaining all individually signed authorizations.

115.    Credit Union savings will be agreed to only if deductions are the same for all employees and the Union is

SOFCO002203

ees, such checks shall be transmitted along with the Health and Welfare payments to the Ohio Operating Engineers Health & Welfare Office located at 1180 Dublin Road, Columbus, Ohio 43215, no later than the fifteenth (15th) day of the month immediately following the calendar month.

A. Each Employer covered by this Agreement shall pay to the Construction Industry Advancement Program for each hour worked by each employee within the bargaining unit:

**EFFECTIVE MAY 1, 1998**

|  | Div. | State | Total |
|---|---|---|---|
| Toledo | .10 | .14 | .24 |
| Akron | .08 | .14 | .22 |
| Dayton | .08 | .14 | .22 |
| Columbus | .05 | .14 | .19 |
| Cincinnati | .035 | .14 | .175 |

B. By the fifteenth (15th) day of the month following the close of the reporting period, in addition to making the payment required by Article IV of this Agreement, each Employer, if working in that geographical area, shall reproduce and send a copy of their remittance report to the appropriate division office along with their check for the number of hours worked by covered employees, multiplied by the division rate per hour.

Payments required under this Article shall be addressed as follows: Toledo Construction Industry Advancement Program, 136 North Summit, Toledo, Ohio 43604; Akron Construction Industry Advancement Program, 495 Wolf Ledges, Akron, Ohio 44311; Dayton Construction Industry Advancement Program, 115 Linwood Street, Dayton, Ohio 45405; Columbus Industry Advancement Program, P.O. Box 16061, Columbus, Ohio 43216; Cincinnati Construction Industry Advancement Program, 1010 Yale Avenue, Cincinnati, Ohio 45206.

C. The Union shall have no participation or control of any kind or degree whatsoever nor shall the Union be connected in any way whatsoever with the Construction Industry Advancement Fund.

D. The Employer will hold the Union harmless from any liabilities arising out of the terms of Paragraph 108 through and inclusive of Paragraph 109D.

**110.** AGC of Ohio shall be the exclusive Administrator

44

more than six (6) hours shall not be worked without allowing thirty (30) minutes for a lunch period. Where two (2) shifts are employed, eight (8) hours shall constitute a day's work for the first shift and eight (8) hours shall constitute a day's work for the second shift. When three (3) shifts are employed, eight (8) hours shall constitute a day's work for the first shift, seven and one-half (7-1/2) hours work with eight (8) hours pay shall constitute the second shift, and seven (7) hours work with eight (8) hours pay shall constitute the third shift. For the purpose of overtime pay for multiple shift operations, a work day shall be determined by the starting time of the shift. In addition, the second shift will receive twenty-five cents (\$.25) per hour, third shift fifty cents (\$.50) per hour premium above the established rate of pay.

When warranted by a particular job's conditions, shift work may be instituted for less than five (5) consecutive days.

82. Where project owners establish specifications, requirements, or for safety reasons that limit the days or hours in which work may be performed, the Employer, after advance notice to the Union, may start the work week after 6:00 p.m. on Sunday at straight time rates. In applying this schedule, Sunday p.m. will be considered Monday, the following Friday will be considered Saturday (paid at time and one-half) and Saturday will be considered Sunday (paid at double time). All premium pay provisions will apply for the sixth and seventh days as to Saturday and Sunday, respectively.

83. When it is necessary for equipment to be operated, the Operating Engineer who regularly operates the particular piece of equipment shall be given first chance to perform the work. If an Apprentice/Helper is required, the Apprentice/Helper who is regularly assigned to the particular piece of equipment shall be given first choice to perform the Apprentice/Helper's duties. In an emergency, any employee may be assigned to any equipment. It is understood that the Master Mechanic or Steward will be notified, when possible, of such emergency requirements.

84. Employees who are requested, referred and employed by Employers on the same day under hourly classifications in this Agreement shall be paid a minimum of eight (8) hours pay on the day they report to the job. Any overtime

37

worked after the normal quitting time shall be paid at the proper overtime rate in addition to the eight (8) hours minimum first day pay guarantee. The furnishing of a truck by a Mechanic shall not be a condition of employment. If an Employer is requesting a Mechanic from the Union, the Employer may require the new Mechanic to furnish a truck. If a Mechanic is required to furnish a truck, compensation will be negotiated between the Mechanic and the Employer.

85.  Equipment Operator employees shall be required to carry sufficient tools to make minor repairs and adjustments in order to meet manufacturers daily maintenance requirements on the equipment they operate. This excludes diagnositc and electronic equipment.

86.  If compressors, generators, boilers, hydraulic pumps or power pacs or any other type of power equipment is mounted piggyback on crane-type equipment requiring a crew, two (2) Operating Engineers will be employed at the Class "A" rate or any escalated rate in effect and under the weekly guarantee.

If the crane does not ordinarily require a crew, see Paragraph 78A, the employment of a second operator shall be at the discretion of the Employer. The jurisdiction of the Operating Engineers must be preserved, however, and if someone other than an Operating Engineer is used to operate the piggyback equipment, the contractor must immediately employ a second Operating Engineer at the Class "A" rate.

Where compressors up to 600 CFM or hydraulic pump, power pacs, etc. are operated and exclusively used to power attachments, such as hoe ram and other similar pieces of equipment, the equipment will be considered and manned as a piggyback operation. If a second person (Operating Engineer) is required, even though the equipment is located adjacent to the machine or crane and not mounted directly on the machine, the second person (Operating Engineer) operating the equipment is paid the Class "A" rate of pay for the day.

Where a second person is an apprentice, refer to the Registered Apprenticeship Wage Schedule on page 74.

If the crane does not require a crew, the auxiliary piece of equipment will be manned by an Operating Engineer and paid the appropriate rate of pay.

87.  ZONES I, II and III - Toledo, and counties, Dayton

38

the proper rules, regulations, processes, and procedures enunciated by the Joint Apprenticeship and Training Committee established by the Trust of 20 October 65.

107.  It is understood by the negotiating parties that a Registered Apprentice Engineer works under the direction of the Operating Engineer and the Joint Apprenticeship and Training Committee, and that the Operating Engineer shall see that he/she stays on the job, properly caring for his/her machine. The Employer shall give sufficient opportunity for the Registered Apprentice to operate under the supervision of the Operating Engineer when time and opportunity avails itself. The Area Coordinator of Apprentices shall be appraised periodically and by his request of performance to further the Registered Apprentices' learning situation. Registered Apprentices shall receive the scale enunciated by the Joint Apprenticeship and Training Committee in the time justified category that the Registered Apprentice has accomplished. For every five (5) Operating Engineer Journeymen employed by the company, there may be employed one (1) Registered Apprentice or Trainee Engineer through the referral when they are available.

## ARTICLE XI

### CONSTRUCTION INDUSTRY ADVANCEMENT PROGRAM

108.  The Employer and the Union agree to and approve the establishment of a Construction Industry Advancement Program to promote the common good of the Construction Industry by providing financial support for activities which may include but not necessarily be restricted to: (a) promotion of safety; (b) market development; (c) protection of legitimate markets; (d) public relations; (e) personnel practices and labor relations; (f) education; (g) industry relations; (h) apprenticeship training; (i) participation in Funds and Plans provided for in collective bargaining agreement, such as Health and Welfare Plans; and (j) collection and distribution of information from and to all segments of the Construction Industry and related groups or authorities.

109.  Each Employer bound by this Agreement shall pay fourteen cents ($.14) per hour worked effective May 1, 1998 to the AGC of Ohio Construction Industry Advancement Fund. Upon subsequent approval by the Health and Welfare Trust-

43

the contract or assent card was signed or the date the contractor became bound.

102. Within seven (7) days of the receipt of a notice from the Union of its intent to terminate or modify this Agreement, the Association will notify all such contractors of whom the Association has been notified by the Union. Each such contractor shall have thirty (30) days from the date the Association received the notice of intent to terminate or modify to advise the Union in writing of its intent to negotiate separately for a renewal agreement.

103. In the event any such contractor fails to advise the Union of its intent to negotiate separately within the time period set forth above, such contractor shall be deemed and presumed to agree to the terms and Agreement arrived at in negotiations between the Union and the Association and to be bound by the collective bargaining agreement resulting therefrom.

104. The provisions of this section shall operate for successive collective bargaining agreements until such time as the Contractor or Union gives timely notice that said party desires to negotiate separately. Said notice shall be given within the time periods provided in the termination clause of this Agreement or any successive collective bargaining agreement.

105. The provisions of this Agreement shall continue in force and effect through April 30, 2007 and thereafter from year-to-year until termination at the option of either party, after sixty (60) days notice in writing to the other party.

## ARTICLE X
### APPRENTICES

106. In order to maintain sufficient skilled mechanics for the industry and, in order to present proper learning opportunities for youth and, in order to effectuate the principles and desires of the negotiating parties created by the foregoing, the negotiators hereby fully subscribe to the Ohio Operating Engineers Apprenticeship Fund Agreement and Declaration of Trust dated 20 October 65 as if they had originally negotiated the same. The only limitation upon the program is the Affirmative Action Program here attached (Exhibit "B"), in addition to

42

and counties, Cincinnati and counties, Columbus and counties, Akron and counties, including Summit and Portage.

When a contractor has eight (8) or more major Operating Engineers (major Operating Engineers A, B and C classifications) employed in the District, he/she shall employ a Master Mechanic. In addition to the Master Mechanic required above, if a contractor has eight (8) or more Operating Engineers (major Operating Engineers A, B and C classifications) employed by him/her on any one job, he/she shall employ a Master Mechanic on that job. The Master Mechanic so employed shall be answerable to the Employer and must be a member of the International Union of Operating Engineers, Local 18. Job Master Mechanics so employed shall be paid at the rate specified herein or paid fifty cents ($.50) per hour above the highest rate of any Operating Engineer working under his/her direction, whichever of these rates is higher.

On jobs where maintenance operators are to be employed, the first one (1) employed shall be Class A; the second one, if required, may be a Mechanic Trainee. Any further hire of maintenance operators shall be one (1) Class "A," then a Mechanic Trainee may be hired. This ratio of one (1) Class "A" to Mechanic Trainee shall be continued in the hire of all maintenance operators as required by the project requirements. Mechanics in training, working under these provisions, will be compensated according to the schedule provided under the "Field Mechanics Trainee Schedule."

88. Operators of equipment serviced by a Master Mechanic on a job site shall not be counted in the number of Operators within the District to determine when a Master Mechanic will be required for the District.

89. Employees shall be paid once each week, with not more than five (5) days withheld on the designated payday on the job prior to their normal quitting time. Failure to comply with this provision will require the Employer to pay these employees involved the double time rate if required to wait on the job. If required to return the next day to receive their pay, they shall be paid a minimum of four (4) hours at the hourly rate applicable for that day. These same conditions will apply to employees who are terminated after completion of their job assignment. In the event the discharge of an employee, he/she

39

SOFCO002206

shall be paid immediately or his/her time will continue until he/she is paid off properly. If not paid off by normal quitting time, the aforementioned requirements will be applied if he/she is required to return the next day for his/her pay. Any employee discharged for just cause will receive their paycheck by the end of the next pay period.

90.   Paychecks will show the following information:
   (1) Total hours worked
   (2) Overtime hours (premium hours)
   (3) Gross pay
   (4) All deductions listed
   (5) All fringe contributions (to be shown as a total contribution)

91.   Employees requiring relief, for sickness or other causes, must notify his/her immediate supervisor before leaving the job. Such relief shall be arranged through the Union District Office.

92.   Employer agrees to carry Workers' Compensation or other equivalent liability insurance for the protection of all employees covered by this Agreement.

93.   At the direction of the Employer's representative on the job, Operating Engineers shall be allowed proper time for necessary repairs and upkeep. During periods of major repairs there must be suitable shelter around equipment and heated from November through March.

94.   On projects where at least eight (8) Operators are employed, the Employer, during the months of November 1 through April 30, will furnish a heated shelter where employees may change clothes.

95.   Sanitary drinking water and toilet facilities will be available on the project in compliance with the provisions of the applicable state code.

96.   The Employer agrees, upon the termination of any employee covered by this Agreement, to furnish such employee so released with a termination slip at the time of release, showing reason for said release. (Union will provide uniform numbered slips in duplicate; original for employee, duplicate for the Employer's file.)

40

97.   No supervisory employee shall perform productive work or operate equipment which would deny an Operating Engineer employee employment.

98.   In the reduction of forces on any project, it is agreed that non-area residents will be the first to be laid off except for a limited number of key men as mutually agreed by the Union and the Employer at the Pre-Job Conference. Non-area residents are herein defined as those who have not resided in the State of Ohio or in counties contiguous thereto, nor in Boone, Campbell, Kenton and Pendleton counties in Kentucky, or in counties contiguous thereto, for a period of one (1) year.

99.   When an Employer rents or leases equipment manned from an Employer in signed relations with this Union, the Engineer or Crew may be transferred to the payroll of the lessee, providing the referral office servicing the job or project shall be notified prior to such transfer and provided further that such employee's employment by the lessee shall terminate upon the termination of the lease or rental of the equipment or any replacement thereof whichever is later.

100.   When an Employer hires an Owner Operator with one (1) machine and the Owner Operator himself operates such single machine, the Owner Operator will be placed on the Employer's payroll. In the event that the above mentioned machine requires two (2) employees, such employees shall be placed on the Employer's payroll. However, when the Owner Operator has two (2) or more machines operating on the same job, he/she shall then be considered a sub-contractor and therefore come under the sub-contractors clause.

## ARTICLE IX

### TERM OF AGREEMENT

101.   The Union will notify the Association which is signatory to this Agreement of the name and address of any contractor who becomes signatory to or bound by this Agreement during the term of this Agreement. The notice shall be given in writing within seven (7) days of the time any such contractor becomes signatory or bound hereto. The notice shall include a copy of the signature page of the contract or the assent card and, if not noted thereon, a statement of the date

41

SOFCO002207

CODE No. _55*6294_
NEW_____ OLD ✓
CODE No. CHECKED
ASSIGNED BY _XH_

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors, although not a member of the AGC of Ohio Labor Relations Division does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the AGC of Ohio Labor Relations Division with the International Union of Operating Engineers, Local 18 and its Branches, (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training, or any other fringe benefits, and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees and the terms and conditions of the Trusts as if made by the undersigned.

_SOFCO ERECTORS, INC_
Name of Employer (Printed)

_10360 WAYNE AVE_
Employer Address

_CINCINNATI      OH      45215_
City                State              Zip Code

_513 771 1600_
Area Code & Telephone

_____  9/17/04_
Authorized Employer Representative (Signature) Date

_JAMES W LOUIS_
Authorized Employer Representative (Printed)

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 18 AND ITS BRANCHES, (AFL-CIO)

_Larry J Reynolds_
District Representative (Signature)

FRINGE OFFICE COPY      85      (USE NO CARBON)

EXHIBIT
_6_
_10-9-18_

PENGAD 800-631-6989

CODE No. *556794*
NEW _____ OLD ✓
CODE No. CHECKED
ASSIGNED BY *FCW*

*WPA*

*3/12/84*

## ACCEPTANCE OF AGREEMENT

In consideration of the benefits to be derived and other good and valuable consideration, the undersigned contractor or successors although not a member of the Ohio Building Chapter Labor Relations Division, A.G.C., does hereby join in, adopt, accept and become a party to the collective bargaining agreement heretofore made by the Ohio Building Chapter Labor Relations Division, A.G.C., with the International Union of Operating Engineers Local 18, 18A, 18B and 18RA (AFL-CIO) including all of the provisions therein, and those pertaining to contributions to Trust Funds providing for Health & Welfare, Pension, Apprenticeship Training; or any other fringe benefits and agree to be bound by any Trust Agreement hereafter entered into between these parties and agrees to make contributions as required and authorizes these parties to name the Trustees to administer said funds and ratifies and accepts such Trustees and the terms and conditions of the Trusts as if made by the undersigned.

*Oberto Electors Inc*
Name of Company

*10333 Wayne*
Company Address

*Cincinnati , O          45215*
City                    State         Zip Code

*513 - 771-1600*
Company Phone

_____
Authorized Company Representative

*2/1/85*
Date

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 18, 18A, 18B and 18RA
(AFL-CIO)

_____
District Representative

"UNION HEAD QUARTERS COPY. -    (Use no carbon)

| EXHIBIT |
|---------|
| 7 |
| 10-9-18 |

PENGAD 800-631-6989

CODE No. 556794
NEW_____ OLD ✓
CODE No. CHECKED
ASSIGNED BY FCW

WPA

# AGREEMENT 10/14/87
## Non-Ohio Building Construction/LRD Members

This Collective Bargaining Agreement is entered into this _____ 10th _____ day of __ August __, 1987,

by and between __ Sofco Erectors, Inc. _____, hereinafter called the "Employer," of

_____, and the International Union of Operating Engineers, Local 18, 18A, 18B, and 18RA,

hereinafter called the "Union."

The parties agree:

1) The Employer is not a member of any employer bargaining group who has a labor agreement with the Union.

2) The Employer recognizes the Union as the exclusive bargaining agent of all its employees engaged to work within the trade jurisdiction of the Operating Engineers, and who are engaged in Building Construction for the Employer.

3) The Employer is not represented by any employer bargaining unit nor has any employer bargaining unit authority to act as an agent for the Employer. However, the Employer agrees to adopt and accept all the terms, wage rates and conditions of the 1987–1989 Ohio Building Construction Agreement except as modified herein. The Employer further agrees to make contributions to the Health and Welfare Fund, Pension Fund and Apprenticeship Fund as outlined in said Ohio Building Construction Agreement.

4a) Both parties hereto recognize that by the execution of this Agreement the Employer does not become a member of any multi-employer bargaining unit nor does it assign its bargaining rights to any such unit. The Employer is not bound or obligated by the provisions of Article XI of the 1987–1989 Ohio Building Construction Agreement. Both parties agree all provisions of Article XI are deleted from the Agreement with respect to the Employer signatory hereto.

4b) With exception of Article IV, both parties agree that all reference to any employer bargaining unit shall be deleted from the 1987–1989 Ohio Building Construction Agreement.

4c) It is further agreed by and between the undersigned Employer and the Union that Article XIV, Paragraph 112 through and inclusive of Paragraph 114 are not applicable, and, therefore, are not binding on the parties.

5) A copy of the 1987–1989 Ohio Building Construction Agreement is attached hereto and made a part hereof as though fully rewritten herein except as modified above.

In witness whereof, we, the undersigned duly authorized employer representatives and the International Union of Operating Engineers, Local 18, 18A, 18B and 18RA (AFL-CIO) executed this Agreement on this _____ 10th _____ day

of _____ August _____, 1987.

FOR THE EMPLOYER                     FOR THE UNION

Sofco Erectors, Inc.                 _Frank J. Miller_
Name                                 Business Manager

P.O. BOX 15546                       _____
Address Cincinnati, OH 45215         President

513 771-1600                         _____
Telephone Number                     District Representative

_____
Authorized Representative

James W. Ludwig
Vice President/General Superintendent

EXHIBIT
8
10-9-18

CODE No. 556794

NEW_____ OLD_____

CODE No. CHECKED

ASSIGNED BY_____

*Accept Signed*

(Acceptance of Agreement - Continued)

INITIAL ONE, failure to initial either 1 or 2 binds
Employer to Apprenticeship payment under option
#2 below:

1. The undersigned Employer elects to pay the
Associated Contractors of Ohio, Inc.,
Construction Industry Advancement Fund
the total sum per hour for each hour worked
by my employees who are working within
the bargaining unit as per Article XI, Para.
100 and 100a.

2. The undersigned Employer does not elect to
pay the total sum to the Associated
Contractors of Ohio, Inc., Construction
Industry Fund but does elect to pay .02 (2¢)
per hour plus the total amount of the
Construction Industry Advancement Fund
to the Apprenticeship Fund as per Article
XI, Para. 100c.

*Sofco Erectors Inc.*
Name of Company

*10 333 Wayne Ave*
Company Address

*Cincinnati Ohio 45215*
City          State          Zip Code

*771-1000*
Company Phone

Authorized Company Representative

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCALS NOS. 18, 18A, 18B and 18RA

District Representative



EXHIBIT

9

10-9-18

AMERICAN ARBITRATION ASSOCIATION

SOFCO ERECTORS, INC.

    "Employer"

    And                                    NOTICE OF INITIATION OF
                                                  ARBITRATION

OHIO OPERATING ENGINEERS
PENSION FUND

    "Fund"

---

    Pursuant to ERISA, 29 U.S.C. §1401, and PBGC Regulations, Part 4221, and the

American Arbitration Association's Multiemployer Pension Plan Rules for Withdrawal Liability

Disputes, Sofco Erectors, Inc. (the "Employer") gives notice to the Ohio Operating Engineers

Pension Fund (the "Fund") that it disputes the Fund's alleged determinations of Partial and

Complete Withdrawal Liability and Demand for Payment to Employer dated August 31, 2017,

and that it is initiating arbitration of this dispute.

I.   <u>Background</u>

    The Employer terminated its collective bargaining agreement and relationship with the

International Union of Operating Engineers, Local 18 ("Local 18") effective April 30, 2017.  In a

letter dated August 31, 2017 (attached as Exhibit A), the Fund alleged that the Employer's

termination of its relationship with Local 18 resulted in liability for complete withdrawal, and

assessed complete withdrawal liability for the Plan year ending July 31, 2017, in the amount of

$368,315 ($605,591 less credit for partial withdrawal assessments).  In the same letter, the Fund

also alleged that fluctuations in the Employer's Local 18 bargaining unit hours in previous plan



years resulted in liability for partial withdrawals, and assessed partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627, partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358, and partial withdrawal liability for the Plan year ending July 31, 2013 in the amount of $0 (after crediting of prior year partial withdrawal assessments).

On November 10, 2017, the Employer submitted a Request for Review to the Fund of its assessments in their entirety (attached as Exhibit B). In its Request for Review, the Employer explained that the Fund's alleged determinations of liability for complete and partial withdrawal were all contrary to the construction industry exemption provisions of ERISA, 29 U.S.C. §1383(b)(1) and 29 U.S.C. §1388(d)(1).

On November 29, 2017, the Employer submitted a Supplemental Request for Review to the Fund (attached as Exhibit C). In its Supplemental Request for Review, the Employer submitted grounds for reducing the assessments if they are not overturned in their entirety.

The Fund has not responded to either the Employer's Request for Review or its Supplemental Request for Review.

The Employer has paid and will continue to pay the Fund's assessments in quarterly installments until it is awarded relief from these unlawful assessments.

II.  Issues for Arbitration

The issues for arbitration include all of those raised by the Employer in its Request for Review dated November 10, 2017, and Supplemental Request for Review dated November 29, 2017, and any other relevant issues that come to light during the pre-hearing discovery process.

III.  Demand for Relief

The Arbitrator should award the following relief to the Employer:

2

a. Overturn the Fund's alleged determinations of Partial and Complete Withdrawal Liability dated August 31, 2017 in their entirety;

b. Require the Fund to withdraw the Demand for Payment;

c. Require the Fund to refund all of the withdrawal liability assessment payments made by the Employer to the Fund, with interest; and

d. Award the Employer its costs and attorneys' fees, and any other relief to which it may be entitled.

Respectfully submitted,

Gary L. Greenberg
Mark B. Gerano
Jackson Lewis P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202
(513) 873-2103
Gary.Greenberg@jacksonlewis.com
Mark.Gerano@jacksonlewis.com

Attorneys for Sofco Erectors, Inc.

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of April, 2018, a true and accurate copy of the foregoing was emailed to Jan Holdinski at HoldinskiJ@adr.org and overnighted by UPS with check for $6,200 for Initial Filing Fee to the American Arbitration Association office at 39555 Orchard Hill Place, Suite 140, Novi, MI 48375, and a copy was served upon the following via email and regular U.S. Mail:

> Daniel J. Clark
> Vorys, Sater, Seymour and Pease LLP
> 52 East Gay Street
> P.O. Box 1008
> Columbus, OH 43216-1008
> djclark@vorys.com
>
> and
>
> Allen S. Kinzer
> Vorys, Sater, Seymour and Pease LLP
> 52 East Gay Street
> P.O. Box 1008
> Columbus, OH 43216-1008
> askinzer@vorys.com
>
> Attorneys for the Ohio Operating Engineers Pension Fund
>
> and
>
> Richard E. Dalton,
> Business Manager
> International Union of Operating Engineers, Local 18
> 3515 Prospect Avenue
> Cleveland, OH 44115
> cindy@iuoelocal18.org

Gary L. Greenberg

4839-5298-1600, v. 1

4



# OHIO OPERATING ENGINEERS
## FRINGE BENEFIT PROGRAMS

1180 Dublin Road
PO Box 12009
Columbus OH 43212-0009
614.488.0708

Carol A. Wilson
Administrator

August 31, 2017

**MAILED VIA REGULAR & CERTIFIED U.S. MAIL**

SOFCO ERECTORS INC
10360 WAYNE AVE
CINCINNATI OH 45215-1129

Re:     Partial and Complete Withdrawal Liability
        Demand for Payment

To Whom It May Concern:

The Ohio Operating Engineers Pension Plan ('Plan") was recently informed that the collective bargaining agreement between the Ohio Operating Engineers Local 18 and Sofco Erectors, Inc. (hereinafter referred to as "Sofco") was terminated. After receiving this notice, the Plan performed a calculation of Sofco's complete withdrawal liability. This calculation was prepared by the Plan's actuary, and is based upon a complete withdrawal from the Pension Plan during the Plan year ending July 31, 2017. According to this calculation, Sofco's complete withdrawal liability is **$368,315. (Please see attached copy of the actuary's August 29, 2017 letter and calculation).**

Additionally, the Actuary also noticed more than a 70% reduction in contribution hours reported by Sofco for the three year period of 2011-2013. This decline in hours constitutes a partial withdrawal by Sofco from the collective bargaining agreement during this period. As a result, the Plan's actuary also performed partial withdrawal liability calculations. **(Please see aforementioned letter and calculation).** Although there is no partial withdrawal liability for the Plan year ending July 31, 2013, these calculations revealed the following:

- For the Plan year ending July 31, 2011, partial withdrawal liability in the amount of $344,627;

- For the Plan year ending July 31, 2012, partial withdrawal liability in the amount of $111,358.

Based on all calculations performed by the Plan's actuary, the Plan hereby requests and demands that Sofco pays the following amounts:

- Complete withdrawal liability for the Plan year ending July 31, 2017 in the amount of $368,315 which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721;



EXHIBIT

A

HEALTH AND WELFARE PLAN  •  PENSION FUND  •  APPRENTICESHIP FUND  •  EDUCATION AND SAFETY FUND

- Partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627 which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327;

- Partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358 which can be paid in six quarterly payments of $17,294 and a final payment of $10,652.

**The Plan also requests and demands that Sofco remits its payments (with a separate check for each calculation) under these payment plans by no later than October 30, 2017.** A quarterly or lump sum payment should be made payable to: The Ohio Operating Engineering Pension Plan, Attn: Samantha Polsinelli, 1180 Dublin Rd., P.O. Box 12009, Columbus, Ohio 43212.

Sincerely,

Bryan C. Barch, Esq.
In-House Counsel

 **Segal Consulting**

101 North Wacker Drive  Suite 500  Chicago, IL 60606-1724
T 312.984.8619  www.segalco.com

Daniel V. Ciner, MAAA, EA
Senior Vice President and Actuary
dciner@segalco.com

August 29, 2017

*VIA E-MAIL*

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
1180 Dublin Road
Columbus, Ohio 43212

Re:     **Ohio Operating Engineers Pension Fund – Partial and Complete Withdrawal Liability
        Calculations for Sofco Erectors, Inc.**

Dear Ms. Polsinelli:

As requested, we have updated the withdrawal liability calculation for Sofco Erectors, Inc. assuming three
partial withdrawals in the Plan years ended July 31 of 2011, 2012, and 2013, respectively, and a complete
withdrawal in the Plan year ended July 31, 2017. As described below, we look to Fund Counsel regarding
interpretations as to assessment of withdrawal liability for construction industry employers.

> For the Plan year ended July 31, 2011, the calculated amount of partial withdrawal liability is
  $344,627, which can be paid in 19 quarterly payments of $20,239 and a final payment of $8,327.
> For the Plan year ended July 31, 2012, the calculated amount of partial withdrawal liability is
  $111,358 (after application of the credit for the prior partial withdrawal as of July 31, 2011), which
  can be paid in six quarterly payments of $17,294 and a final payment of $10,652.
> For the Plan year ended July 31, 2013, the calculated amount of partial withdrawal liability is $0
  (after application of the credit for the prior partial withdrawals as of July 31, 2011 and 2012).
> For the Plan year ended July 31, 2017, the calculated amount of complete withdrawal liability is
  $368,315 (after application of the credit for the prior partial withdrawals as of July 31, 2011, 2012,
  and 2013), which can be paid in 40 quarterly payments of $12,320 and a final payment of $2,721.

The above withdrawal liability calculations are based on the asset values and liabilities stated in the
July 31, 2008, 2009, 2010, and 2016 withdrawal liability reports, respectively. In addition, they are based
on the contribution information provided in your e-mails dated May 1, 2017 and May 9, 2017, including
maximum hourly contribution rates of $4.00, $4.50, and $6.00 for the 10-year periods ended July 31,
2009, 2010, and 2017, respectively.

Under Section 4205(b)(1) of ERISA, a partial withdrawal occurs when contribution hours in each of three
consecutive years (the "three-year testing period") are at least 70% less than the average of the two
highest years of contribution hours during the five years preceding the three-year testing period. Based on
the information you provided us, Sofco Erectors, Inc. incurred three consecutive 70% declines for the
three-year testing periods that ended in 2011, 2012, and 2013.

Benefits, Compensation and HR Consulting. Member of The Segal Group. Offices throughout the United States and Canada

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
August 29, 2017
Page 2

Under Section 4208(d)(1) of ERISA, for construction industry employers in construction industry plans, partial withdrawal liability is assessable when work continues for an insubstantial portion of the employer's work in the jurisdiction of the collective bargaining agreement. The calculations included in this letter assume that this employer will be assessed partial withdrawal liability for each partial withdrawal. We defer to Fund Counsel's interpretation as to whether partial withdrawal liability is assessable to this employer.

Under Section 4206 of ERISA, partial withdrawal liability based on a 70% decline in contribution hours is calculated as a fraction of the amount that would be payable if there were a complete withdrawal by this employer on the last day of the first Plan year in the three-year testing period (i.e., in 2009, 2010, and 2011 for the 2011, 2012, and 2013 partial withdrawals, respectively). This fraction equals the ratio of the employer's contribution hours for the Plan year following the end of the three-year testing period to the average contribution hours during the five years preceding the first year of the three-year testing period.

Under Section 4206 of ERISA, any withdrawal liability (either complete or partial) for an employer is reduced by the amount of any partial withdrawal liability of the employer with respect to the Plan for a previous year. We have determined the amount of credit for the prior partial withdrawals, and have offset the partial withdrawal liability for the Plan years ended July 31, 2012 and July 31, 2013, as well as the complete withdrawal liability as of July 31, 2017, by the respective credit amounts.

We have enclosed exhibits showing the details of our calculations as follows:
For the July 31, 2011 partial withdrawal:
    Exhibit A – Determination of Partial Withdrawal
    Exhibit B – Calculation of the Allocable Amount of Unfunded Vested Benefits
    Exhibit C – Determination of Withdrawal Liability
    Exhibit D – Determination of Payment Schedule under ERISA Section 4219
    Exhibit E – Basis for Determining Withdrawal Liability

For the July 31, 2012 partial withdrawal:
    Exhibit F – Determination of Partial Withdrawal
    Exhibit G – Calculation of the Allocable Amount of Unfunded Vested Benefits
    Exhibit H – Development of Credit for Prior (July 31, 2011) Partial Withdrawal
    Exhibit I – Determination of Withdrawal Liability
    Exhibit J – Determination of Payment Schedule under ERISA Section 4219
    Exhibit K – Basis for Determining Withdrawal Liability

For the July 31, 2013 partial withdrawal:
    Exhibit L – Determination of Partial Withdrawal
    Exhibit M – Calculation of the Allocable Amount of Unfunded Vested Benefits
    Exhibit N – Development of Credit for Prior (July 31, 2011 and July 31, 2012) Partial Withdrawals
    Exhibit O – Determination of Withdrawal Liability
    Exhibit P – Basis for Determining Withdrawal Liability

✴ Segal Consulting

Ms. Samantha Polsinelli
Ohio Operating Engineers Fringe Benefit Programs
August 29, 2017
Page 3

For the July 31, 2017 complete withdrawal:

Exhibit Q – Calculation of the Allocable Amount of Unfunded Vested Benefits

Exhibit R – Development of Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals

Exhibit S – Determination of Withdrawal Liability

Exhibit T – Determination of Payment Schedule under ERISA Section 4219

Exhibit U – Basis for Determining Withdrawal Liability

As with all withdrawals, the assessment of withdrawal liability is subject to Fund Counsel review. Please let us know if you have any questions.

Sincerely,

Daniel V. Ciner
Enclosures

cc:   Ms. Carol Wilson (w/enclosures)
      Ms. Megan Kelly (w/enclosures)

5685716v1/05517.008

EXHIBIT A

## Ohio Operating Engineers Pension Fund

### DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2011

Employer Name:   **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                07/31/2011

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | 12,253.50 | 13% |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |
| 2004 | 10,862.00 | | |

*A partial withdrawal has occurred as of July 31, 2011.*

✶ Segal Consulting

EXHIBIT B

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2009

Employer
Name:                    Sofco Erectors, Inc.

| Year Ended[1] July 31 (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) (6) |
|---|---|---|---|---|---|
| | Basic[2] (2) | Reallocated[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $195,618,368 | $0 | $178,834,875 | $291,244 | $318,577 |
| 2004 | (21,738,368) | 0 | 183,435,933 | 275,279 | (32,622) |
| 2005 | 103,632,017 | 0 | 184,525,945 | 211,259 | 118,646 |
| 2006 | (136,835,103) | 0 | 187,236,038 | 189,279 | (138,328) |
| 2007 | 31,859,110 | 0 | 192,258,544 | 180,029 | 29,833 |
| 2008 | 138,233,538 | 0 | 202,969,173 | 187,255 | 127,531 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)          $423,637

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✳ Segal Consulting

EXHIBIT C

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $423,637 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1)  Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2)  Reduction: $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $423,637 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2003 − 07/31/2008 | 58,229.50 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 11,645.90 |
| F. | Contribution Hours 08/01/2011 - 07/31/2012 | 2,172.00 |
| G. | Partial Withdrawal Liability Factor: 1 − [(F) ÷ (E)] | 81.349660% |
| H. | Withdrawal Liability: (C) x (G) | $344,627 |

✱ Segal Consulting

EXHIBIT D

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2011

Employer Name:                    Sofco Erectors, Inc.

(1)   Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 1999 | 18,877.50 | N/A |
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | 24,877.83 |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |

(2)   Average Base Units for highest 3 consecutive years        24,877.83
      during 10 years ended July 31, 2008

(3)   Highest contribution rate during 10 years ending          $4.00
      July 31, 2009

(4)   Partial withdrawal liability fraction (see Exhibit C, Item G)   81.349660%

(5)   Annual payment = (2) x (3) x (4) [rounded up to the nearest $4]   $80,956

(6)   Quarterly payment = (5) / 4                               $20,239

(7)   Number of Full Years of Payment                          4

(8)   Remaining Balance After 4 Years                          $69,044

(9)   Number of Full Quarterly Payments in Year 5:             3

(10)  Amount of Remaining Payment = (8) - (6) x (9)            $8,327

✳ Segal Consulting

EXHIBIT E

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2011

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2008.

3. All assumptions per the July 31, 2008 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2008.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any application of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✕ Segal Consulting

EXHIBIT F

## Ohio Operating Engineers Pension Fund

### DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2012

Employer Name:  **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                    07/31/2012

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | 12,253.50 | 4% |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |
| 2005 | 11,807.00 | | |

*A partial withdrawal has occurred as of July 31, 2012.*

✳ Segal Consulting

EXHIBIT G

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2010

Employer Name:                    Sofco Erectors, Inc.

| Year Ended[1] July 31 (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of |
|---|---|---|---|---|---|
| | Basic[2] (2) | Reallocated[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | (2) and (3) (6) |
| 2003 | $182,577,144 | $0 | $178,834,875 | $291,244 | $297,339 |
| 2004 | (20,379,720) | 0 | 183,435,933 | 275,279 | (30,583) |
| 2005 | 97,536,016 | 0 | 184,525,945 | 211,259 | 111,666 |
| 2006 | (129,233,153) | 0 | 187,236,038 | 189,279 | (130,643) |
| 2007 | 30,182,315 | 0 | 192,258,544 | 180,029 | 28,262 |
| 2008 | 131,321,861 | 0 | 202,969,173 | 187,255 | 121,155 |
| 2009 | 357,008,602 | 0 | 210,884,752 | 161,099 | 272,726 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)          $669,922

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✳ Segal Consulting

EXHIBIT H

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWAL
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal...................... | $ | 397,196 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal...................... | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal........................... | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal............................................................................................... | $ | 423,637 |
| E: | Credit for prior partial withdrawal [ A x B x C / (D x B )]................................................................ | $ | 323,117 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✳ Segal Consulting

EXHIBIT I

Ohio Operating Engineers Pension Fund

## DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

Employer Name:  Sofco Erectors, Inc.

| | | |
|---|---|---:|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $669,922 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1)  Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2)  Reduction:  $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $669,922 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2004 − 07/31/2009 | 48,975.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 9,795.00 |
| F. | Contribution Hours 08/1/2012 - 07/31/2013 | 3,442.50 |
| G. | Partial Withdrawal Liability Factor: 1 − [(F) ÷ (E)] | 64.854518% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | $ 434,475 |
| I. | Credit for Prior (July 31, 2011) Partial Withdrawal | $323,117 |
| J. | Withdrawal Liability: (H) − (I), but not less than zero | $111,358 |

✕ Segal Consulting

EXHIBIT J

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Partial Withdrawal in the Plan Year Ended July 31, 2012

Employer Name:          Sofco Erectors, Inc.

(1)   Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2000 | 35,670.50 | N/A |
| 2001 | 20,085.50 | N/A |
| 2002 | 15,351.50 | 23,702.50 |
| 2003 | 12,313.50 | 15,916.83 |
| 2004 | 10,862.00 | 12,842.33 |
| 2005 | 11,807.00 | 11,660.83 |
| 2006 | 12,529.00 | 11,732.67 |
| 2007 | 11,053.50 | 11,796.50 |
| 2008 | 11,978.00 | 11,853.50 |
| 2009 | 1,607.50 | 8,213.00 |

(2)   Average Base Units for highest 3 consecutive years during 10 years ended July 31, 2009      23,702.50

(3)   Highest contribution rate during 10 years ending July 31, 2010      $4.50

(4)   Partial withdrawal liability fraction (see Exhibit I, Item G)      64.854518%

(5)   Annual payment = (2) x (3) x (4) [rounded up to the nearest $4]      $69,176

(6)   Quarterly payment = (5) / 4      $17,294

(7)   Number of Full Years of Payment      1

(8)   Remaining Balance After 1 Year      $45,240

(9)   Number of Full Quarterly Payments in Year 2:      2

(10)   Amount of Remaining Payment = (8) - (6) x (9)      $10,652

✳ Segal Consulting

EXHIBIT K

Ohio Operating Engineers Pension Fund

## BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2012

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2009.

3. All assumptions per the July 31, 2009 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2009.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✳ Segal Consulting

EXHIBIT L

Ohio Operating Engineers Pension Fund

## DETERMINATION OF A PARTIAL WITHDRAWAL AS OF JULY 31, 2013

Employer Name:  **Sofco Erectors, Inc.**

End of Three-Year Testing Cycle:                    07/31/2013

| Plan Year Ended 7/31 | Contribution Base Units (Hours) | 2-Year Average of Highest CBUs | Ratio of Hours to Maximum Average CBU |
|---|---|---|---|
| 2013 | 3,442.50 | 12,253.50 | 28% |
| 2012 | 2,172.00 | 12,253.50 | 18% |
| 2011 | 1,123.00 | 12,253.50 | 9% |
| 2010 | 440.00 | | |
| 2009 | 1,607.50 | | |
| 2008 | 11,978.00 | | |
| 2007 | 11,053.50 | | |
| 2006 | 12,529.00 | | |

*A partial withdrawal has occurred as of July 31, 2013.*

�atk Segal Consulting

EXHIBIT M

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2011

Employer Name:                    Sofco Erectors, Inc.

| Year Ended[1] July 31 (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) (6) |
|---|---|---|---|---|---|
| | Basic[2] (2) | Reallocated[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | |
| 2003 | $169,535,919 | $0 | $178,834,875 | $291,244 | $276,100 |
| 2004 | (19,021,072) | 0 | 183,435,933 | 275,279 | (28,545) |
| 2005 | 91,440,015 | 0 | 184,525,945 | 211,259 | 104,687 |
| 2006 | (121,631,202) | 0 | 187,236,038 | 189,279 | (122,958) |
| 2007 | 28,505,519 | 0 | 192,258,544 | 180,029 | 26,692 |
| 2008 | 124,410,184 | 0 | 202,969,173 | 187,255 | 114,778 |
| 2009 | 339,158,172 | 0 | 210,884,752 | 161,099 | 259,090 |
| 2010 | 42,238,100 | 0 | 218,622,244 | 127,590 | 24,651 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)          $654,495

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✱ Segal Consulting

EXHIBIT N

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Partial Withdrawal in the Plan Year Ended July 31, 2013

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011**

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal............... | $ | 370,754 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............... | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal............... | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.............................................................. | $ | 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)].............. | $ | 301,607 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012**

| | | | |
|---|---|---|---|
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal............... | $ | 629,844 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............... | | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal.................... | $ | 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.............................................................. | $ | 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)].............. | $ | 104,696 |

| | | | |
|---|---|---|---|
| K. | Total credit for prior partial withdrawals [ E + J ] | $ | 406,303 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✳ Segal Consulting

EXHIBIT O

Ohio Operating Engineers Pension Fund

## DETERMINATION OF WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2013

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $654,495 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1) Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2) Reduction: $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $654,495 |
| D. | Total Contribution Hours in the Five-Year Period 08/01/2005 -- 07/31/2010 | 37,608.00 |
| E. | Average Contribution Hours in Five-Year Period [(D) ÷ 5] | 7,521.60 |
| F. | Contribution Hours 08/1/2013 - 07/31/2014 | 3,834.00 |
| G. | Partial Withdrawal Liability Factor: 1 − [(F) ÷ (E)] | 49.026803% |
| H. | Net Allocable Share of Unfunded Vested Benefits for Partial Withdrawal: (C) x (G) | $320,878 |
| I. | Credit for Prior (July 31, 2011 and 2012) Partial Withdrawals | $406,303 |
| J. | Withdrawal Liability: (H) − (I), but not less than zero | $0 |

✳ Segal Consulting

EXHIBIT P

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Partial Withdrawal in the Plan Year Ending July 31, 2013

1. Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2. Census data collected as of July 31, 2010.

3. All assumptions per the July 31, 2010 withdrawal liability report.

4. Market value of assets based on audited financial statements as of July 31, 2010.

5. Total plan contributions are as reported in the audited financial statements.

6. Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7. We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

8. We are unaware of any applicability of ERISA Section 4225 on this assessment and defer to the Fund Administrator and Legal Counsel to determine whether it applies.

✳ Segal Consulting

EXHIBIT Q

Ohio Operating Engineers Pension Fund
CALCULATION OF ALLOCABLE AMOUNT OF UNFUNDED VESTED BENEFITS
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer
Name: Sofco Erectors, Inc.

| Year Ended[1] July 31 (1) | Unamortized Balance of Withdrawal Liability Pools | | Contributions During 5-Year Period Ended Prior to Date Pool Established | | Liability Allocated: (5) divided by (4), times the sum of (2) and (3) |
|---|---|---|---|---|---|
| | Basic[2] (2) | Reallocated[3] (3) | Total Plan Contributions[4] (4) | Obligated Employer Contributions[5] (5) | (6) |
| 2003 | $91,288,572 | $0 | $178,834,875 | $291,244 | $148,669 |
| 2004 | (10,869,184) | 0 | 183,435,933 | 275,279 | (16,311) |
| 2005 | 54,864,009 | 0 | 184,525,945 | 211,259 | 62,812 |
| 2006 | (76,019,502) | 0 | 187,236,038 | 189,279 | (76,849) |
| 2007 | 18,444,748 | 0 | 192,258,544 | 180,029 | 17,271 |
| 2008 | 82,940,123 | 0 | 202,969,173 | 187,255 | 76,519 |
| 2009 | 232,055,591 | 0 | 210,884,752 | 161,099 | 177,272 |
| 2010 | 29,566,670 | 0 | 218,622,244 | 127,590 | 17,255 |
| 2011 | 127,603,629 | 0 | 230,778,340 | 95,158 | 52,615 |
| 2012 | 214,305,669 | 0 | 250,306,333 | 70,436 | 60,305 |
| 2013 | 7,764,623 | 0 | 269,018,918 | 46,278 | 1,336 |
| 2014 | (129,537,937) | 6,853 | 298,703,055 | 62,852 | (27,255) |
| 2015 | 261,224,360 | 0 | 331,169,312 | 94,102 | 74,227 |
| 2016 | 112,294,964 | 0 | 360,524,316 | 121,118 | 37,725 |

Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal (Sum of Column 6)        $605,591

[1] Years not shown have no withdrawal liability components.

[2] Original value of the changes in the unfunded vested benefits, written down 5% per year.

[3] Original value of non-assessable or non-collectible withdrawal liability, written down 5% per year.

[4] Total fund contributions for the Plan year listed and the four preceding years, excluding contributions from withdrawn significant employers who withdrew on or before the date the pool was established.

[5] Obligated employer contributions for the Plan year listed and the four preceding years, including contributions owed but not yet paid.

✳ Segal Consulting

EXHIBIT R

Ohio Operating Engineers Pension Fund
DEVELOPMENT OF CREDIT FOR PRIOR PARTIAL WITHDRAWALS
For a Withdrawal in the Plan Year Ended July 31, 2017

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2011**

| | | | |
|---|---|---|---|
| A: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal................ | $ | 212,111 |
| B: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............. | | 0.813497 |
| C: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal................ | $ | 344,627 |
| D: | Amount of unfunded vested liability allocable to employer as if it had completely  withdrawn as of the date of the prior withdrawal................................................................ | $ | 423,637 |
| E: | Credit for prior partial withdrawal in Plan year ended July 31, 2011 [ A x B x C / (D x B)]..... | $ | 172,551 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2012**

| | | | |
|---|---|---|---|
| F: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal............. | $ | 389,383 |
| G: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............. | | 0.648545 |
| H: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal.................... | $ | 111,358 |
| I: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.................................................. | $ | 669,922 |
| J: | Credit for prior partial withdrawal in Plan year ended July 31, 2012 [ F x G x H / (I x G)]..... | $ | 64,725 |

**Credit for Prior Partial Withdrawal in Plan Year Ended July 31, 2013**

| | | | |
|---|---|---|---|
| K: | Sum of Employer's Share of Unamortized Pools for years prior to the partial withdrawal............. | $ | 406,638 |
| L: | Fraction determined under Section 4206(a)(2) of ERISA for the prior partial withdrawal............. | | 0.490268 |
| M: | Amount of withdrawal liability assessed to employer for the prior partial withdrawal.................... | $ | - |
| N: | Amount of unfunded vested liability allocable to employer as if it had completely withdrawn as of the date of the prior partial withdrawal.................................................. | $ | 654,495 |
| O: | Credit for prior partial withdrawal in Plan year ended July 31, 2013 [ K x L x M / (N x L)]............. | $ | - |
| | | | |
| P. | Total credit for prior partial withdrawals [ E + J + O] | $ | 237,276 |

*Note: Per ERISA Section 4206.10, the plan year in which the partial withdrawal occurred for purposes of the above calculations is deemed to be the first year of the 3-year testing period.*

✳ Segal Consulting

EXHIBIT S

Ohio Operating Engineers Pension Fund

DETERMINATION OF WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

Employer Name: Sofco Erectors, Inc.

| | | |
|---|---|---|
| A. | Preliminary Allocable Amount of Unfunded Vested Benefits | $605,591 |
| B. | De Minimis Reduction Under ERISA Section 4209 | |
| | (1)  Lesser of 0.75% of Unfunded Vested Benefits or $50,000 | $50,000 |
| | (2)  Reduction:  $100,000 + (B)(1) − (A) but not greater than (B)(1) nor less than zero | $0 |
| C. | Limitation in Accordance with ERISA Section 4225 (Sale of Assets) | N/A* |
| D. | Net Allocable Amount of Unfunded Vested Benefits for Complete Withdrawal | $605,591 |
| E. | Credit for Prior (July 31, 2011, 2012, and 2013) Partial Withdrawals | $237,276 |
| F. | Withdrawal Liability: (D) − (E), but not less than zero | $368,315 |

* We are unaware of any applicability of Section 4225 on this assessment and defer to the Fund
  Administrator and Legal Counsel to determine whether it applies

⋇ Segal Consulting

EXHIBIT T

Ohio Operating Engineers Pension Fund
DETERMINATION OF PAYMENT SCHEDULE UNDER ERISA SECTION 4219
For a Withdrawal in the Plan Year Ended July 31, 2017

Employer Name:            Sofco Erectors, Inc.

(1)  Employer Base Units (hours) history:

| Year Ended July 31 | Hours | 3-Year Average Hours |
|---|---|---|
| 2007 | 11,053.50 | N/A |
| 2008 | 11,978.00 | N/A |
| 2009 | 1,607.50 | 8,213.00 |
| 2010 | 440.00 | 4,675.17 |
| 2011 | 1,123.00 | 1,056.83 |
| 2012 | 2,172.00 | 1,245.00 |
| 2013 | 3,442.50 | 2,245.83 |
| 2014 | 3,834.00 | 3,149.50 |
| 2015 | 5,527.00 | 4,267.83 |
| 2016 | 5,477.00 | 4,946.00 |

(2)  Average Base Units for highest 3 consecutive years          8,213.00
     during 10 years ended July 31, 2016

(3)  Highest contribution rate during 10 years ended             $6.00
     July 31, 2017

(4)  Annual payment = (2) x (3) [rounded up to the nearest $4]    $49,280

(5)  Quarterly payment = (4) / 4                                  $12,320

(6)  Number of Full Years of Payment                             10

(7)  Remaining Balance After 10 Years                            $2,721

(8)  Number of Full Quarterly Payments in Year 11:               0

(9)  Amount of Remaining Payment = (7) - (5) x (8)               $2,721

✕ Segal Consulting

EXHIBIT U

Ohio Operating Engineers Pension Fund

BASIS FOR DETERMINING WITHDRAWAL LIABILITY

For a Withdrawal in the Plan Year Ending July 31, 2017

1.  Withdrawal liability computed using the "Presumptive Method" as described in ERISA Section 4211(b).

2.  Census data collected as of July 31, 2016.

3.  All assumptions per the July 31, 2016 withdrawal liability report.

4.  Market value of assets based on audited financial statements as of July 31, 2016.

5.  Total plan contributions are as reported in the audited financial statements.

6.  Historical contributions of previously withdrawn employers and employer for which this calculation was performed are as reported by the Fund Office.

7.  We are aware of no other participating employers belonging to the same controlled group as the employer for which this calculation was completed.

✶ Segal Consulting

# jackson lewis.

Representing Management Exclusively in Workplace Law and Related Litigation

425 Walnut Street
Suite 2300
Cincinnati, Ohio 45202
Tel 513 621-3440
Fax 513 621-4449
www.jacksonlewis.com

| | | |
|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: 513-873-2103
MY EMAIL ADDRESS IS: GARY.GREENBERG@JACKSONLEWIS.COM

November 10, 2017

**EXHIBIT B**

**VIA E-MAIL & U.S. MAIL**

Trustees, Ohio Operating Engineers Pension Fund
c/o Brian C. Barch, In-house Counsel
1180 Dublin Road
PO Box 12009
Columbus, OH 43212-0009

     RE:    Sofco Erectors, Inc. - Request for Review of Withdrawal Liability Assessment
            dated August 31, 2017

To the Trustees:

    This is the Request for Review by Sofco Erectors, Inc. ("Company") of the Ohio Operating Engineers Pension Fund ("Fund") assessment of withdrawal liability issued to the Company on August 31, 2017, pursuant to 29 U.S.C. § 1399(b)(2)(A).

## I.    INTRODUCTION

    The Company disputes the assessments in their entirety, for these reasons:

1.    The Fund's assessment of complete withdrawal liability is contrary to 29 U.S.C. § 1383(b)(1), the special exception for construction industry employers and plans.[1] Because the Company has not continued or resumed performing work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously (as of April 30, 2017) required, there has been no complete withdrawal for which liability may be assessed.

2.    The Fund's assessments of partial withdrawal liability are contrary to 29 U.S.C. § 1388(d)(1). During the years in question, the Company's obligation to contribute to the Plan were for "more than an insubstantial portion of its work in the craft and area jurisdiction of the collective bargaining agreement of the type of which contribution [were] required." Accordingly, there were no partial withdrawals for which liability may be assessed.

---

[1] The Company understands that there is no dispute that it is a construction industry employer, and the Fund's Plan is a construction industry plan, for purposes of 29 U.S.C. § 1383(b)(1), the construction industry exception.



## II.    BACKGROUND

These background facts are taken from the Affidavit of John Hesford (attached as Exhibit 1) and the Fund's Withdrawal Liability Assessment dated August 31, 2017.

The Company began operations on April 1, 2004, when it purchased the assets of its predecessor. The Company was a party to a series of collective bargaining agreements with the International Union of Operating Engineers, Local 18 ("Local 18") the last of which was effective from May 8, 2013 through April 30, 2017 ("CBA"). In accordance with these collective bargaining agreements, the Company made the required contributions for hours worked by employees within the craft and geographic jurisdiction of these agreements through April 30, 2017.

The Company terminated the CBA and its relationship with Local 18 effective April 30, 2017. Since then, all of the Company's on-site construction work has been performed by the following, and no others: (a) Company employees covered by its collective bargaining agreements with Iron Workers Local Nos. 44, 172 and 180; (b) crane operators covered by the CBA and its successors, and employed by crane leasing companies that have contracted with the Company to provide cranes and crane operators for these projects; and (c) licensed surveyors to establish building lines for precast installations (nothing more). All of the crane leasing companies that contract with the Company for work in Local 18's jurisdiction make the required payments to the Fund for the crane operators assigned to these projects.

In a letter dated August 31, 2017, the Fund assessed the Company for withdrawal liability as follows:

- Complete withdrawal liability for the Plan year ending July 31, 2017, in the amount of $368,315 ($605,591 less credit for partial withdrawals).

- Partial withdrawal liability for the Plan year ending July 31, 2011 in the amount of $344,627, based on finding that the ratio of hours to maximum average contribution base units ("CBUs") during a 3 year testing cycle were as follows:

    * 2011 – 9%
    * 2010 – 4%
    * 2009 – 13%

- Partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,358, based on finding that the ratio of hours to maximum average CBUs during a 3 year testing cycle were as follows:



      * 2012 – 18%
      * 2011 – 9%
      * 2010 – 4%

- Partial withdrawal liability for the Plan year ending July 31, 2013 in the amount of $0 (after application of prior partial withdrawals), based on finding the ratio of hours to maximum average CBUs during a 3 year testing period were as follows:

      * 2013 – 28%
      * 2012 – 18%
      * 2011 – 9%

     The Fund's assessment letter does not explain why it used the statutory "70% decline" formula, which does not apply to construction industry employers/plans, to find partial withdrawal, nor why it did not apply the "insubstantial portion" provision in 29 U.S.C. § 1388(d)(1), which does apply. Moreover, the Fund's letter does not explain why the construction industry exception to complete withdrawal liability does not apply here, given that Company employees have not continued or resumed work within Local 18's jurisdiction since April 30, 2017.

     In an email to Fund in-house counsel, Bryan Barch, dated October 23, 2017, Company counsel asked for "documentation in the Fund's possession that confirms, supports or explains the Fund's application of the [70% decline] formula to the Company. . . ." In the same email, Company counsel asked for "documents in the Fund's possession that confirms, supports or explains [the Fund's] findings and conclusion [that the Company continued or resumed work within the craft and geographic jurisdiction of Local 18]." The only response received to date was on November 1, 2017, from the Fund's outside counsel stating that he would have to review the file in more depth before responding on these issues. A copy of this email exchange is attached as Exhibit 2.

## III.   THERE HAS BEEN NO COMPLETE WITHDRAWAL

A. The CBA did not obligate the Company to make pension contributions for subcontractors; therefore, use of subcontractors for work formerly performed by the Company's Local 18 employees is not grounds for imposing withdrawal liability.

     "[T]here is no withdrawal [as a result of subcontracting] unless the [construction] employer would have been obligated to make contributions for work performed by subcontractors under the terminated agreement. If contributions would not have been required, there would be no withdrawal, because the employer would not be continuing to perform work of the type for which contributions were previously required." PBGC Opinion Letter 85-5.

Trustees, Ohio Operating
Engineers Pension Fund



November 10, 2017
Page 4

While the CBA, in Art. XIII, Sect. 117,, states that "all subcontractors shall be subject to the terms and provisions of this Agreement as it relates Operating Engineers", neither this nor any other provision of the CBA expressly imposes liability on the Company if the subcontractor fails to make the required payments. Accordingly, the construction industry exception applies, as the Company is not "continuing to perform work of the type for which contributions were previously required".

B. All of the subcontracted crane operators are covered by the CBA and its successor, and their employers make the required payments to the Fund; therefore, use of these subcontractors is not grounds for imposing withdrawal liability.

In enacting the Multi-Employer Pension Plan Act in 1980, Congress recognized that the withdrawal of a single construction employer from a construction industry plan does not reduce the contribution base if "other signatory employers take up the slack." *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for Northern California*, 859 F. 2d 808, 812 (1988).

Here, other signatory employers have taken up the slack. This is the opposite of what occurred in *Oregon-Washington Carpenters-Employers Pension Trust Fund v. BQC Construction Inc. Hardware Service*, 485 F. Supp. 2d 1206 (2007), where the court imposed withdrawal because the construction employer subcontracted to **non-union** carpenters:

> "Boden could have avoided withdrawal liability by subcontracting to a union employer who would make contributions to the Plan, thereby taking up the slack created by Boden. Because Boden did not subcontract to a union employer, the problem of unfunded vested benefits belongs to Boden, and Boden is liable."

*Id* at p. 1216.

Because the Company subcontracts only to Local 18 employers, it is **not** liable for withdrawal.

IV. **THERE WAS NO PARTIAL WITHDRAWAL BECAUSE THE WORK CONTINUED DURING THE YEARS IN QUESTION FOR MORE THAN AN INSUBSTANTIAL PORTION OF THE COMPANY'S WORK IN THE UNION'S JURISDICTION**

29 U.S.C. § 1388(d)(1) states: "An employer to whom section 1383(b) of this title (relating to the building and construction industry) applies is liable for a partial withdrawal **only** if the employer's obligation to contribute under the plan is continued for no more than an **insubstantial portion** of its work in the craft and area jurisdiction of the collective bargaining agreement of the type for which contributions are required." (Emphasis added.)



Trustees, Ohio Operating
Engineers Pension Fund

November 10, 2017
Page 5

"Insubstantial portion" is not defined in the statute, nor has it been defined by the PBGC. In fact, the PBGC punted on the issue. PBGC Opinion Letter 95-2. Nor does there appear to be any case law defining the term for purposes of this provision.

However, "insubstantial portion" must mean a decline in contributions greater than the "70% decline" formula set forth in the provision applicable outside the construction industry; why else have a separate provision? And it must mean a portion that is close to zero. See Definition of "Insubstantial" in Merriam Webster dictionary: "not substantial: such as a: lacking substance or material nature b: lacking firmness or solidity: FLIMSY."

The IRS definition of "insubstantial" for purposes of charitable contribution reporting is instructive:

> "Token Exception – Insubstantial goods or services a charitable organization provides in exchange for a contribution do not have to be described in the acknowledgment [to the donor]. Goods and services are considered to be insubstantial if . . . 1. the fair market value of the benefits received does not exceed the lesser of 2 percent of the payment or $106,* or 2. the payment is at least $53,* the only items provided bear the organization's name or logo . . . and the cost of these items is within the limit for 'low-cost articles', which is $10.60.*
>
> *The dollar amounts are for 2016. Guideline amounts are adjusted for inflation."

IRS Publication 1771, "Charitable Contributions, Substantiation and Disclosure Requirements."

The IRS defines "insubstantial" to mean 2% or less, which is consistent with the dictionary definition. The Company's contribution ratios during the years in question were 13%, 4%, 9%, 18% and 28%, all above, and all but one well above, 2%. This was "more than insubstantial" during all of the 3 year measurement periods. Accordingly, there were no partial withdrawals for which liability may be assessed.

## V.   CONCLUSION

For the reasons stated above, the Company requests that the Fund overturn and cancel the assessments of withdrawal liability in their entirety and return to the Company the payments already made.[2]

---

[2] The Company may supplement this Request for Review before the 90-day limitation period expires if the actuarial consultant retained by the Company advises that the Fund's actuary over-stated what is owed due to erroneous calculations. Of course, such supplement would be moot if the assessments are overturned in their entirety.



Trustees, Ohio Operating
Engineers Pension Fund

November 10, 2017
Page 6

Respectfully submitted,

*Gary L. Greenberg*

Gary L. Greenberg
Attorney for Sofco Erectors, Inc.

GLG/dlc
Enclosures

Cc:    (Via email and U.S. Mail)
      Daniel J. Clark
      Alan Kinzer
      Vorys, Sater, Seymour and Pease LLP
      Outside Counsel for the Fund

4840-5678-4468, v. 1

IN THE MATTER OF:

OHIO OPERATING ENGINEERS
PENSION FUND

And                                                    AFFIDAVIT OF JOHN HESFORD

SOFCO ERECTORS, INC.

_____

STATE OF OHIO            )
                         ) ss.
COUNTY OF HAMILTON  )

      1.      My name is John Hesford. I am President of Sofco Erectors, Inc. (the "Company"),
10360 Wayne Ave, Cincinnati, Ohio 45215. The Company began operations on April 1, 2004,
when it purchased the assets of its predecessor.

      2.      The Company was a party to a series of collective bargaining agreements with the
International Union of Operating Engineers, Local 18 ("Local 18"), the last of which was effective
from May 8, 2013 through April 30, 2017 ("CBA").

      3.      The Company terminated the CBA and its relationship with Local 18 effective
April 30, 2017; Local 18 has not disputed this.

      4.      At all times since termination of the CBA, all construction and related work
performed on customers' premises by the Company ("on-site work") within the geographic
jurisdiction of the CBA has been limited to a) employees of the Company who are covered by the
Company's collective bargaining agreements with Iron Workers Local Nos. 44, 172 and 290, b)



crane operators covered by the CBA and its successor, and employed by crane leasing companies that have contracted with the Company to provide cranes and crane operators for these projects, and c) licensed surveyors to establish building lines for precast installations (nothing more).

5.      At all times since termination of the CBA, the Company has employed no non-union employees or subcontractors to perform on-site work within the geographic jurisdiction of the CBA, other than the licensed surveyors referenced in paragraph 4 above.

6.      Attached as Exhibit A is a complete list of all of the crane leasing companies that the Company has contracted with since termination of the CBA for performance of on-site work within the geographic jurisdiction of the CBA.

7.      Attached as Exhibit B – E are letters from the companies listed on Exhibit A that confirm each a) exclusively employs Local 18 operators to run cranes in Local 18's jurisdiction and b) pays into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement for each hour worked.

I swear and affirm that this Affidavit is true and accurate to the best of my knowledge, and is based on my personal knowledge.

Further Affiant sayeth not.

November 10, 2017

John Hesford

Subscribed and sworn to before me
this 10 day of November, 2017.

Caroline Riley

Hamilton County, Ohio
My Commission Expires: 11/1/2020
Acting in Hamilton County, Ohio
4844-1580-5779, v. 1

CAROLINE JEAN RILEY
NOTARY PUBLIC
IN AND FOR THE
STATE OF OHIO
MY COMMISSION EXPIRES
NOVEMBER 1, 2020

2

**EXHIBIT A**

Following are all of the crane leasing companies contracted by Sofco Erectors, Inc.

("Company") since April 30, 2017, to provide cranes and crane operators for on-site work within

the jurisdiction of the Company's 2013-2017 collective bargaining agreement with IUOE Local

18.

Tri-State Crane & Rigging Service
4838 Spring Grove Ave
Cincinnati, OH 45232

Capital City Crane
2299 Performance Way
Columbus, OH 43207

Gould & Smith Crane Rental
8205 Farwick Court
Cincinnati, OH 45249

Maxim Crane Works
840 Licking Pike
Wilder, KY 41076



P.O. Box 308
Newport, KY 41072
phone: 859.441.7400
fax: 859.442.6201
www.maximcrane.com

November 1, 2017

To Whom It May Concern,

Maxim Crane Works, L.P. employs Operating Engineers Local 18 operators to run cranes on all Sofco Erectors Inc. jobsites within the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

Boyd K. Vogt, Jr
Regional Credit Manager
Maxim Crane Works, L.P.

EXHIBIT
B

**Whatever it takes.**



**Tri-State Crane
& Rigging Service**

4838 Spring Grove Avenue
Cincinnati, OH 45232
Office: (513)-541-9992
Fax: (513)-541-3395

November 2, 2017

To Whom It May Concern,

Tri-State Crane Rental exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18.  For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

**EXHIBIT**

**C**



October 18, 2017

To Whom it May Concern,

Capital City Crane Company exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18. For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

Brian Gibson

President & CEO





# *GOULD SMITH*

## *CRANE RENTAL INC.*

8205 FARWICK COURT ▪ CINCINNATI, OHIO 45249 ▪ 513-489-2050 ▪ FAX 513-489-1873

### *24 HOURS SERVICE*

November 1, 2017

To Whom It May Concern,

Gould & Smith Crane Rental exclusively employs Operating Engineers Local 18 operators to run cranes in the jurisdiction of Local 18.  For each hour worked, we pay into the appropriate fringe benefit funds in accordance with the Local 18 Collective Bargaining Agreement.

James Smith, President
Gould & Smith Crane Rental, Inc.



CRANE RENTAL ▪ TRUCKING ▪ STORAGE

**Greenberg, Gary L. (Cincinnati)**

| | |
|---|---|
| **From:** | Clark, Daniel J. <djclark@vorys.com> |
| **Sent:** | Wednesday, November 01, 2017 5:27 PM |
| **To:** | Greenberg, Gary L. (Cincinnati); Kinzer, Allen S. |
| **Cc:** | Baron, Peggy M. |
| **Subject:** | RE: Sofco Erectors, Inc. – Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017 |

Gary-

Yes, this file has been transferred to us. We are just getting our hands around it, so I do not have all the answers for you, but I did not want to ignore you either. I will address your points from your October 23, 2017 email to Bryan Barch in turn.

1. I believe that the August 29 correspondence included all of the information from the Fund's actuaries necessary for Libman Actuarial to review. Are there specific questions the Libman has or pieces of information that they need?

2. The Pension Fund has not adopted its own procedures for withdrawal liability matters. They operate according to the statute and applicable regulations.

3 and 4. I am going to have to review the file in more depth before responding to you on these issues.

Dan



**Daniel J. Clark**
Partner

Vorys, Sater, Seymour and Pease LLP
52 East Gay Street | Columbus, Ohio
43215

Direct: 614.464.6436
Fax: 614.719.4650
Email: djclark@vorys.com
www.vorys.com

---

**From:** Greenberg, Gary L. (Cincinnati) [mailto:Gary.Greenberg@Jacksonlewis.com]
**Sent:** Tuesday, October 31, 2017 1:26 PM
**To:** Clark, Daniel J.; Kinzer, Allen S.
**Subject:** FW: Sofco Erectors, Inc. – Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017

Gentlemen-

Ohio Operating Engineers Pension Fund in-house counsel Bryan Barch informed me yesterday that you now represent the Fund in this matter. On October 23, 2017, I sent the e-mail below to Mr. Barch. I have yet to receive a response.

1



EXHIBIT
**2**

Please let me know right away whether our actuarial consultant may communicate directly with the Fund's actuaries at Segal Consulting about their calculations and assumptions.

Also, let me know as soon as possible when I will receive a response to my substantive questions and information requests.

Gary Greenberg
Attorney for Sofco Erectors, Inc.


**Gary L. Greenberg**

**Attorney at Law**

**Jackson Lewis P.C.**

425 Walnut Street
Suite 2300

Cincinnati, OH 45202

Direct: (513) 873-2103 | Main: (513) 621-3440

Gary.Greenberg@Jacksonlewis.com | www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*


**From:** Greenberg, Gary L. (Cincinnati)
**Sent:** Monday, October 23, 2017 11:14 AM
**To:** Bryan Barch <BryanBarch@ooefbp.com>
**Subject:** Sofco Erectors, Inc. - Ohio Operating Engineers Pension Fund Demand for Payment of Alleged Partial and Complete Withdrawal Liability dated August 31, 2017

Mr. Barch-

Thank you for sending me the Acceptance of Agreement by Sofco Erectors, Inc. ("Company') dated 10-3-11, the 2010-13 and 2013-17 collective bargaining agreements, the Pension Trust Agreement and Pension Plan. I have these follow-up questions:

-We have retained the Libman Actuarial Group of Cleveland, Ohio to consult with us on the calculations and assumptions. May our consultant communicate directly with the Fund's actuaries at Segal Consulting for this purpose?

-I note that Section 16 of the Pension Plan, which governs withdrawal liability, does not include any dispute resolution requirements. Accordingly, we assume that the Fund has no requirements for resolution of disputes over withdrawal liability assessments, aside from what is required by the applicable provisions of ERISA. If this assumption is incorrect, please let me know immediately and provide the Fund's requirements.

-The actuary's calculation letter dated August 29, 2017 correctly cites Section 4208(d)1 as the provision that governs assessment of partial withdrawal liability in the construction industry; such liability may be assessed only when work continues for an "insubstantial portion" of the employer's work in the jurisdiction of the collective bargaining agreement. But the calculations of partial withdrawal liability are based entirely on application of the 70% decline provision in Section 4205(b)(1), which does not apply to the construction industry. Please provide any documentation in the Fund's possession that confirms, supports or explains the Fund's application of the 4205(b)(1) formula to the Company, including without limitation policies, resolutions and precedents.

As you know, in accordance with ERISA's construction industry exemption, complete withdrawal liability may only be assessed against the Company if it continued to perform or resumed the same work performed by bargaining unit employees within the craft and geographic jurisdiction of the collective bargaining agreement. Since expiration of the 2017 agreement, no Company employee has performed any such work, based on our understanding of the craft and geographic jurisdiction of the expired agreement. We assume that the Fund found and concluded that the Company continued or resumed such work following expiration. Please provide the specifics upon which this finding and conclusion was based, including what work the Fund believes has been performed by the Company within the jurisdiction of the agreement since expiration, and by whom. Also, please provide any documentation in the Fund's possession that confirms, supports or explains this finding and conclusion, including without limitation policies, resolutions and precedents.

The Company is making the installment payments in accordance with the Demand for Payment. In doing so, the Company is not admitting that the assessments are valid.

Thank you for your attention to this.

Gary Greenberg
Attorney for Sofco Erectors, Inc.

**Gary L. Greenberg**

**Attorney at Law**

**Jackson Lewis P.C.**

425 Walnut Street
Suite 2300
Cincinnati, OH 45202
Direct: (513) 873-2103 | Main: (513) 621-3440
Gary.Greenberg@Jacksonlewis.com | www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

From the law offices of Vorys, Sater, Seymour and Pease LLP.

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient but do not wish to receive communications through this medium, please so advise the sender immediately.

# jackson|lewis.

Representing Management Exclusive... .n Workplace Law and Related Litigation

425 Walnut Street
Suite 2300
Cincinnati, Ohio 45202
Tel 513 621-3440
Fax 513 621-4449
www.jacksonlewis.com

| | | |
|---|---|---|
| ALBANY, NY | GREENVILLE, SC | MONMOUTH COUNTY, NJ | RALEIGH, NC |
| ALBUQUERQUE, NM | HARTFORD, CT | MORRISTOWN, NJ | RAPID CITY, SD |
| ATLANTA, GA | HONOLULU, HI* | NEW ORLEANS, LA | RICHMOND, VA |
| AUSTIN, TX | HOUSTON, TX | NEW YORK, NY | SACRAMENTO, CA |
| BALTIMORE, MD | INDIANAPOLIS, IN | NORFOLK, VA | SALT LAKE CITY, UT |
| BIRMINGHAM, AL | JACKSONVILLE, FL | OMAHA, NE | SAN DIEGO, CA |
| BOSTON, MA | KANSAS CITY REGION | ORANGE COUNTY, CA | SAN FRANCISCO, CA |
| CHICAGO, IL | LAS VEGAS, NV | ORLANDO, FL | SAN JUAN, PR |
| CINCINNATI, OH | LONG ISLAND, NY | PHILADELPHIA, PA | SEATTLE, WA |
| CLEVELAND, OH | LOS ANGELES, CA | PHOENIX, AZ | ST. LOUIS, MO |
| DALLAS, TX | MADISON, WI | PITTSBURGH, PA | TAMPA, FL |
| DAYTON, OH | MEMPHIS, TN | PORTLAND, OR | WASHINGTON, DC REGION |
| DENVER, CO | MIAMI, FL | PORTSMOUTH, NH | WHITE PLAINS, NY |
| DETROIT, MI | MILWAUKEE, WI | PROVIDENCE, RI | |
| GRAND RAPIDS, MI | MINNEAPOLIS, MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

MY DIRECT DIAL IS: 513-873-2103
MY EMAIL ADDRESS IS: GARY.GREENBERG@JACKSONLEWIS.COM

November 29, 2017

<u>VIA E-MAIL & U.S. MAIL</u>

Trustees, Ohio Operating Engineers Pension Fund
c/o Brian C. Barch, In-house Counsel
1180 Dublin Road
PO Box 12009
Columbus, OH 43212-0009

     RE:    Sofco Erectors, Inc. – Supplemental Request for Review of Withdrawal Liability
            Assessment dated August 31, 2017

To the Trustees:

      This is a Supplement to the Request for Review submitted by Sofco Erectors, Inc. ("Company") on November 10, 2017. In its Request for Review dated November 10, 2017, the Company disputed the Fund's assessments in their entirety, based on 29 U.S.C. § 1383(b)(1) and 29 U.S.C. § 1388(d)(1). In this Supplement, the Company submits grounds for reducing the assessments if they are not overturned in their entirety.

## I. THE FUND'S ACTUARY ERRONEOUSLY INCLUDED AMOUNTS FROM BEFORE APRIL 1, 2004 IN CALCULATING THE ASSESSMENT

      The Company began operations on April 1, 2004, when it purchased the assets of its predecessor. Affidavit of John Hesford, attached as Exhibit 1 to Company's Request for Review dated November 10, 2017. This was an arms-length transaction. Neither of the Company's owners, John Hesford and Dan Powell, had any ownership in the predecessor Company or familial relationship with its owners. The previous owner of these assets was Southern Ohio Fabricators, Inc.; a list of its owners at time of purchase is attached as Exhibit 1.

      Southern Ohio Fabricators, Inc. and its owners ceased operations entirely, and therefore had no withdrawal liability. 29 U.S.C. § 1383(b)(1). Accordingly, the Company began operations on April 1, 2004 with a clean slate as to the Fund.



EXHIBIT
C

**jackson⏐lewis.**

Despite the Company not operating before April 1, 2004 and the predecessor's exemption from withdrawal liability, the Fund's actuary included amounts from before that date in calculating the assessments. See Exhibits B, C, D, G, J, M, and Q, attached to the Segal Consulting letter dated August 29, 2017. When the liability allocation for Plan Year ending July 31, 2003 is excluded, and assuming withdrawal liability (which the Company disputes), the assessments would be as follows:

|  | Assessed | Revised |
|---|---|---|
| Partial – YE 7-31-11 | $344,627 | $ 48,907 |
| Partial – YE 7-31-12 | $111,358 | $160,404 |
| Partial – YE 7-31-13 | $0 | $0 |
| Complete – YE 7-31-17 | $368,315 | $301,681 |
| Total: | $824,300 | $510,992 |

See summary prepared by Company's actuarial consultant, attached as Exhibit 2.

The removal of contributions preceding April 1, 2004 would likely further reduce the liability, but the Company's actuarial consultant did not have sufficient data to calculate the additional reduction. The Company requests that the Fund recalculate the Company's withdrawal liability by excluding pre-April 1, 2004 contributions made by Southern Ohio Fabricators, Inc., in addition to excluding (as above) the liability allocation for the Plan Year ending July 31, 2003.

## II.  THE FUND HAS NOT PROVIDED REQUESTED INFORMATION THAT MIGHT ALSO AFFECT THE CALCULATIONS

On November 15, 2017, counsel for the Company e-mailed the following requests for information to counsel for the Fund (attached as Exhibit 3):

- The withdrawal liability reports for 7/31/2008, 7/31/2009, and 7/31/2016, as referred to in the Exhibits E, K, and U attached to the Segal Consulting letter dated 8/29/2017.

- Why were the partial withdrawal calculations based on the withdrawal liability reports for 3 years before the partial withdrawal assessment?

- What interest rate was used to calculate the quarterly installments in each of the three assessments, and what is the basis for those rates?

- What is the payment start date for each of the three assessments?

None of the requested information has been provided. Accordingly, the Company reserves the right to raise issues related to the requested information in arbitration.

**jackson|lewis.**

III.       **CONCLUSION**

For the reasons set forth in the Company's Request for Review dated November 10, 2017, the partial and complete withdrawal liability assessments should be overturned in their entirety. If the assessments are not overturned, then they should be recalculated and reduced by excluding the liability allocation for the Plan Year ending July 31, 2003 and all contributions made before April 1, 2004, as the Company did not operate before that date and is not a successor to the liability allocations and contributions of Southern Ohio Fabricators, Inc., which ceased operations on that date.

Respectfully submitted,

*Gary L. Greenberg*

Gary L. Greenberg
Attorney for Sofco Erectors, Inc.

GLG/dlc
Enclosures

Cc:      (Via email and U.S. Mail)
        Daniel J. Clark
        Alan Kinzer
        Vorys, Sater, Seymour and Pease LLP
        Outside Counsel for the Fund

4831-0309-6919, v. 1

## LIST OF SHAREHOLDERS OF
## SOUTHERN OHIO FABRICATORS, INC.

### Names of Shareholders

Patricia Kling Ballman

Elizabeth Kling Mayotte

Christina Perry (Daughter of John Emerson Kling)

Josephine Kling Trippe

Susan Kling Worthington

Elizabeth Kling Mayotte, Susan Kling Worthington and
Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable
Trust FBO Christina Perry
With Life Estate for Margaret S. Kling

Elizabeth Kling Mayotte, Susan Kling Worthington and
Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable
Trust FBO Josephine Kling Trippe, Patricia Kling Ballman,
Elizabeth Kling Mayotte and Susan Kling Worthington
With Life Estate for Margaret S. Kling

Jerry T. Nickerson

Jerry T. Nickerson, Trustee, FBO Laurie A. Nickerson

Laurie A. Nickerson

Jennifer L. Nickerson

Anne Nickerson

Timothy J. Gates

Stephen R. Sundin

James W. Ludwig

1185459.1



**Ohio Operating Engineers Pension Fund**
**Withdrawal Liablity Calculations**
**Sofco Erectors, Inc.**

DEMANDED WITHDRAWAL LIABILITY AMOUNTS

| | Partial Withdrawal Liability 7/31/2011 | Partial Withdrawal Liability 7/31/2012 | Partial Withdrawal Liability 7/31/2013 | Total Withdrawal Liability 7/31/2017 | Totals |
|---|---|---|---|---|---|
| Original Calculation [1] | $344,627 | $111,358 | $0 | $368,315 | $824,300 |
| Revised Calculation [2] | $48,907 | $160,404 | $0 | $301,681 | $510,992 |
| Change | ($295,720) | $49,046 | $0 | ($66,634) | ($313,308) |

[1] Calculations per Ohio Operating Engineers Fringe Benefit Programs Demand for Payment dated August 31, 2017.

[2] Revised Calculations reflect removal of Plan Year Ended July 31, 2003 from Liability. The removal of contributions preceding April 1, 2004 would also change the results, but we lack sufficient data to calculate the amount of such reduction.



EXHIBIT
2

**Greenberg, Gary L. (Cincinnati)**

| | |
|---|---|
| **From:** | Crawford, Denice L. (Cincinnati) on behalf of Mills, James A. (Cincinnati) |
| **Sent:** | Wednesday, November 15, 2017 1:54 PM |
| **To:** | djclark@vorys.com; askinzer@vorys.com |
| **Cc:** | Greenberg, Gary L. (Cincinnati); Rosenthal, Daniel G. (Cincinnati) |
| **Subject:** | Sofco Erectors, Inc. |

Dear Mr. Clark and Mr. Kinzer,

My colleague, Gary Greenberg, is currently unavailable but asked to me to forward this request from the Company's actuarial consultant for a response from the Fund's actuary. The Company requests the following information:

- The withdrawal liability reports for 7/31/2008, 7/31/2009, and 7/31/2016, as referred to in the Exhibits E, K and U attached to the Segal Consulting letter dated 8/29/2017.

- Why were the partial withdrawal calculations based on the withdrawal liability reports for 3 years before the partial withdrawal assessment?

- What interest rate was used to calculate the quarterly installments in each of the three assessments, and what is the basis for those rates?

- What is the payment start date for each of the three assessments?

Jim Mills


**James A. Mills**
Attorney at Law
**Jackson Lewis P.C.**
425 Walnut Street
Suite 2300
Cincinnati, OH 45202
Direct: (513) 873-2113 | Main: (513) 621-3440
James.Mills@Jacksonlewis.com | www.jacksonlewis.com
*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*


EXHIBIT
3

## AFFIDAVIT OF TIM GATES

STATE OF OHIO          )

                              ) SS:

COUNTY OF <u>HAMILTON</u>    )

Tim Gates, being first duly sworn, deposes and says that:

1. I am Tim Gates. I am over the age of 18 and I am competent to testify to the matters set forth herein.

2. I was the President of Southern Ohio Fabricators, Inc. until July 2004.

3. Two families owned Southern Ohio Fabricators, Inc., the Kling family and the Nickerson family. The Kling family was the majority shareholder.

4. Southern Ohio Fabricators, Inc. had a wholly owned subsidiary named Sofco Erectors, Inc. that existed prior to April 2004 ("Old Sofco").

5. In March 2004 Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., a company owned by John Hesford, Jim Ludwig, and Dan Powell.

6. After Old Sofco sold its assets to Sofco Erectors Acquisition, Inc., Old Sofco performed no work. Old Sofco was merely a shell corporation until it could be wound down. It had no equipment, employees, or any ability to perform work.

7. Similarly, after Old Sofco's assets were sold, Southern Ohio Fabricators, Inc. did not perform any erection work. It had no personnel or equipment to perform any such erection work after it sold Old Sofco's assets.

8. None of the owners of Southern Ohio Fabricators, Inc. or Old Sofco owned, operated, or had involvement in any company that performed erection services after the sale of Old Sofco's assets.

9. In July 2004, Southern Ohio Fabricators, Inc. sold its assets to Clermont Steel Fabricators.

10. After Southern Ohio Fabricators, Inc. sold its assets, I signed a consulting agreement and assisted in winding it up. After Southern Ohio Fabricators, Inc. sold its assets, it ceased to perform any work and like Old Sofco was merely a shell corporation.



SOFCO002148

Further affiant sayeth naught.

Tim Gates

Sworn and subscribed to before me this _11_ day of September, 2018.

Notary public: _Tracy A Wagner_

My commission expires: _6-15-2020_

TRACY A. WAGNER
Notary Public, State of Ohio
My Commission Expires 06-15-2020

4851-6528-0113, v. 1

08/22/2018 08:21:50 AM

Sofco Erectors Inc

Page 1 of 3

Union Summary Report

08/01/16 to 07/31/17

OPERATING ENGINEERS - 18 - GROUP C - 18 FORK LIFTS

**20-0928181**

| Employee Name Trade | Emp No ID No/SS No | Earn Type | Hours Worked | Hours Paid | Gross Wages | Deduction and Fringes | | |
|---|---|---|---|---|---|---|---|---|
| ALLEN , JON E | ALLEJO | REG | 40.00 | 40.00 | 1,307.20 | UNION DUES | 39.22 | AGC FEE | 6.00 |
| GROUP C - 18 FORK LIFTS | ***-**-7559 | Total: | 40.00 | 40.00 | 1,307.20 | APPR & TRN | 30.00 | EDUC & SAF | 3.60 |
| | | | | | | H&W | 306.40 | IAP/AGC | 8.00 |
| | | | | | | PENSION | 240.00 | | |
| OWSLEY , CHARLES L | OWSLC | REG | | | | UNION DUES | | AGC FEE | |
| GROUP C - 18 FORK LIFTS | ***-**-7994 | Total: | .00 | .00 | | APPR & TRN | | EDUC & SAF | |
| | | | | | | H&W | | IAP/AGC | |
| | | | | | | PENSION | | | |
| RUSSEL , KIMBERLY S | RUSSK | REG | 24.00 | 24.00 | 487.20 | UNION DUES | 14.62 | AGC FEE | 3.60 |
| GROUP C - 18 FORK LIFTS | ***-**-9741 | Total: | 24.00 | 24.00 | 487.20 | APPR & TRN | 18.00 | EDUC & SAF | 2.16 |
| | | | | | | H&W | 183.84 | IAP/AGC | 4.80 |
| | | | | | | PENSION | 144.00 | | |
| WINKLER , BRITTANY K | WINKB | REG | 24.00 | 24.00 | 487.20 | UNION DUES | 14.62 | AGC FEE | 3.60 |
| GROUP C - 18 FORK LIFTS | ***-**-5660 | Total: | 24.00 | 24.00 | 487.20 | APPR & TRN | 18.00 | EDUC & SAF | 2.16 |
| | | | | | | H&W | 183.84 | IAP/AGC | 4.80 |
| | | | | | | PENSION | 144.00 | | |
| | | | 88.00 | 88.00 | 2,281.60 | | | | |

*(handwritten: "Driver")*

EXHIBIT
12
10-9-18

PENGAD 800-631-6989

SOFCO002361

08/22/2018 10:49:11 AM

**Sofco Erectors Inc**

Page 1 of 3

Union Summary Report

08/01/15 to 07/31/16

OPERATING ENGINEERS - 18 - GROUP C - 18 FORK LIFTS

20-0928181

| Employee Name / Trade | Emp No ID No/SS No | Earn Type | Hours Worked | Hours Paid | Gross Wages | Deduction and Fringes | | | |
|---|---|---|---|---|---|---|---|---|---|
| ALLEN , JON E | ALLEJO | REG | | | -11.20 | UNION DUES | (.34) | AGC FEE | |
| GROUP C - 18 FORK LIFTS ***-**-7559 | | Total: | .00 | .00 | -11.20 | APPR & TRN | 3.20 | EDUC & SAF | .80 |
| *Driver* | | | | | | H&W | 20.00 | IAP/AGC | |
| | | | | | | PENSION | | | |
| HART , KATHLEEN S | HARTK | REG | 172.00 | 172.00 | 5,682.88 | UNION DUES | 221.04 | AGC FEE | 30.90 |
| GROUP C - 18 FORK LIFTS ***-**-1369 | | OT - 1.5 | 34.00 | 51.00 | 1,685.04 | APPR & TRN | 154.50 | EDUC & SAF | 18.54 |
| | | Total: | 206.00 | 223.00 | 7,367.92 | H&W | 1,526.46 | IAP/AGC | 41.20 |
| | | | | | | PENSION | 1,236.00 | | |
| IRELAND , DONALD A | IRELD | REG | 30.00 | 30.00 | 987.90 | UNION DUES | 29.64 | AGC FEE | 4.50 |
| GROUP C - 18 FORK LIFTS ***-**-8538 | | Total: | 30.00 | 30.00 | 987.90 | APPR & TRN | 22.50 | EDUC & SAF | 2.70 |
| | | | | | | H&W | 222.30 | IAP/AGC | 6.00 |
| | | | | | | PENSION | 180.00 | | |
| MATHENY II, WILLIAM | MATHW | REG | 288.00 | 288.00 | 6,661.44 | UNION DUES | 11.10 | AGC FEE | 43.20 |
| GROUP C - 18 FORK LIFTS ***-**-7127 | | Total: | 288.00 | 288.00 | 6,661.44 | APPR & TRN | 216.00 | EDUC & SAF | 25.92 |
| | | | | | | H&W | 2,134.08 | IAP/AGC | 57.60 |
| | | | | | | PENSION | 1,728.00 | | |
| PATTON , LATONNYA | PATTL | REG | 184.00 | 184.00 | 6,079.36 | UNION DUES | 249.29 | AGC FEE | 34.36 |
| GROUP C - 18 FORK LIFTS ***-**-1398 | | OT - 1.5 | 45.00 | 67.50 | 2,230.20 | APPR & TRN | 171.76 | EDUC & SAF | 20.62 |
| | | Total: | 229.00 | 251.50 | 8,309.56 | H&W | 1,696.90 | IAP/AGC | 45.80 |
| | | | | | | PENSION | 1,374.00 | | |
| REED , HOWARD J | REEDH | REG | 320.00 | 320.00 | 10,572.80 | AGC FEE | 48.00 | APPR & TRN | 240.00 |
| GROUP C - 18 FORK LIFTS ***-**-5856 | | Total: | 320.00 | 320.00 | 10,572.80 | EDUC & SAF | 28.80 | H&W | 2,371.20 |
| | | | | | | IAP/AGC | 64.00 | PENSION | 1,920.00 |
| RENTAS , ROBERT J | RENTR | REG | 13.00 | 13.00 | 424.84 | UNION DUES | 12.75 | AGC FEE | 1.95 |
| GROUP C - 18 FORK LIFTS ***-**-2912 | | Total: | 13.00 | 13.00 | 424.84 | APPR & TRN | 9.75 | EDUC & SAF | 1.17 |
| | | | | | | H&W | 96.33 | IAP/AGC | 2.60 |
| | | | | | | PENSION | 78.00 | | |
| SORRELL , JAMES W | SORRJ | REG | 72.00 | 72.00 | 2,352.96 | UNION DUES | 70.58 | AGC FEE | 10.80 |
| GROUP C - 18 FORK LIFTS ***-**-2594 | | Total: | 72.00 | 72.00 | 2,352.96 | APPR & TRN | 54.00 | EDUC & SAF | 6.48 |
| | | | | | | H&W | 541.52 | IAP/AGC | 14.40 |
| | | | | | | PENSION | 432.00 | | |

1,158.00          36,666.22

1,197.50

08/22/2018 08:20:23 AM

**Sofco Erectors Inc**

Page 1 of 3

**Union Summary Report**

08/01/14 to 07/31/15

**OPERATING ENGINEERS - 18 - GROUP C - 18 FORK LIFTS**

20-0928181

| Employee Name / Trade | Emp No / ID No/SS No | Earn Type | Hours Worked | Hours Paid | Gross Wages | Deduction and Fringes | | |
|---|---|---|---|---|---|---|---|---|
| ALLEN , JASON R | ALLEJA | REG | 40.00 | 40.00 | 1,200.00 | UNION DUES | 36.00 AGC FEE | 6.00 |
| GROUP C - 18 FORK LIFTS ***-**-3713 | | Total: | 40.00 | 40.00 | 1,200.00 | APPR & TRN | 30.00 EDUC & SAF | 3.60 |
| | | | | | | H&W | 296.40 IAP/AGC | 8.00 |
| | | | | | | PENSION | 240.00 | |
| ALLEN , JON E | ALLEJO | REG | 1,816.00 | 1,816.00 | 56,582.08 | UNION DUES | 1,697.64 AGC FEE | 272.40 |
| GROUP C - 18 FORK LIFTS ***-**-7559 | | Total: | 1,816.00 | 1,816.00 | 56,582.08 | APPR & TRN | 1,230.80 EDUC & SAF | 130.64 |
| | | | | | | H&W | 13,046.56 IAP/AGC | 363.20 |
| | | | | | | PENSION | 10,896.00 | |
| HOBBS II, JOHN P | HOBBJ | REG | 294.00 | 294.00 | 9,137.52 | UNION DUES | 274.15 AGC FEE | 44.10 |
| GROUP C - 18 FORK LIFTS ***-**-2079 | | Total: | 294.00 | 294.00 | 9,137.52 | APPR & TRN | 196.98 EDUC & SAF | 20.58 |
| | | | | | | H&W | 2,105.04 IAP/AGC | 58.80 |
| | | | | | | PENSION | 1,764.00 | |
| OWSLEY , CHARLES L | OWSLC | REG | 250.00 | 250.00 | 7,770.00 | UNION DUES | 233.12 AGC FEE | 37.50 |
| GROUP C - 18 FORK LIFTS ***-**-7994 | | Total: | 250.00 | 250.00 | 7,770.00 | APPR & TRN | 167.50 EDUC & SAF | 17.50 |
| | | | | | | H&W | 1,790.00 IAP/AGC | 50.00 |
| | | | | | | PENSION | 1,500.00 | |
| REED , HOWARD J | REEDH | REG | 400.00 | 400.00 | 12,696.71 | UNION DUES | 380.93 AGC FEE | 60.00 |
| GROUP C - 18 FORK LIFTS ***-**-5856 | | Total: | 400.00 | 400.00 | 12,696.71 | APPR & TRN | 275.52 EDUC & SAF | 29.88 |
| | | | | | | H&W | 2,887.50 IAP/AGC | 80.00 |
| | | | | | | PENSION | 2,400.00 | |
| SEITZ , NATHAN T | SEITN | REG | 118.00 | 118.00 | 3,667.44 | UNION DUES | 110.03 AGC FEE | 17.70 |
| GROUP C - 18 FORK LIFTS ***-**-3304 | | Total: | 118.00 | 118.00 | 3,667.44 | APPR & TRN | 79.06 EDUC & SAF | 8.26 |
| | | | | | | H&W | 844.88 IAP/AGC | 23.60 |
| | | | | | | PENSION | 708.00 | |
| SKINNER , KEVIN S | SKINK | REG | 280.00 | 280.00 | 8,860.16 | UNION DUES | 265.82 AGC FEE | 42.00 |
| GROUP C - 18 FORK LIFTS ***-**-0381 | | Total: | 280.00 | 280.00 | 8,860.16 | APPR & TRN | 187.60 EDUC & SAF | 19.60 |
| | | | | | | H&W | 2,004.80 IAP/AGC | 56.00 |
| | | | | | | PENSION | 1,680.00 | |
| STANFIELD , SCOTT A | STANS | REG | 110.00 | 110.00 | 3,418.80 | UNION DUES | 102.57 AGC FEE | 16.50 |
| GROUP C - 18 FORK LIFTS ***-**-3800 | | Total: | 110.00 | 110.00 | 3,418.80 | APPR & TRN | 73.70 EDUC & SAF | 7.70 |
| | | | | | | H&W | 787.60 IAP/AGC | 22.00 |
| | | | | | | PENSION | 660.00 | |

| | 3,308.00 | 103,332.71 |
|---|---|---|
| | 3,308.00 | |

SOFCO002363

08/22/2018 08:19:59 AM

Sofco Erectors Inc

*CK Dates*

Page 1 of 3

Union Summary Report

01/01/14 to 07/31/14

OPERATING ENGINEERS - 18 - GROUP C - 18 FORK LIFTS

20-0928181

| Employee Name Trade | Emp No ID No/SS No | Earn Type | Hours Worked | Hours Paid | Gross Wages | Deduction and Fringes | | | |
|---|---|---|---|---|---|---|---|---|---|
| ALLEN , JON E | ALLEJO | REG | 1,204.00 | 1,204.00 | 36,841.12 | UNION DUES | 1,105.35 | AGC FEE | 180.60 |
| GROUP C - 18 FORK LIFTS ***-**-7559 | | Total: | 1,204.00 | 1,204.00 | 36,841.12 | AGC/PAC | 89.20 | APPR & TRN | 760.48 |
| *Driver* | | | *+ 884 (Timberline System)* | | | EDUC & SAF | 64.48 | H&W | 8,455.64 |
| | | | | | | IAP/AGC | 240.80 | PENSION | 7,224.00 |
| BENNETT , COREY D | BENNCO | REG | 148.00 | 148.00 | 4,599.84 | UNION DUES | 138.00 | AGC FEE | 22.20 |
| GROUP C - 18 FORK LIFTS ***-**-5977 | | Total: | 148.00 | 148.00 | 4,599.84 | AGC/PAC | 14.80 | APPR & TRN | 99.16 |
| | | | | | | EDUC & SAF | 10.36 | H&W | 1,059.68 |
| | | | | | | IAP/AGC | 29.60 | PENSION | 888.00 |
| HART , KATHLEEN S | HARTK | REG | 28.00 | 28.00 | 847.84 | UNION DUES | 25.44 | AGC FEE | 4.20 |
| GROUP C - 18 FORK LIFTS ***-**-1369 | | Total: | 28.00 | 28.00 | 847.84 | AGC/PAC | 2.80 | APPR & TRN | 16.80 |
| | | | | | | EDUC & SAF | 1.12 | H&W | 193.48 |
| | | | | | | IAP/AGC | 5.60 | PENSION | 168.00 |
| HOBBS II, JOHN P | HOBBJ | REG | 186.00 | 186.00 | 5,780.88 | UNION DUES | 173.44 | AGC FEE | 27.90 |
| GROUP C - 18 FORK LIFTS ***-**-2079 | | Total: | 186.00 | 186.00 | 5,780.88 | AGC/PAC | | APPR & TRN | 124.62 |
| | | | | | | EDUC & SAF | 13.02 | H&W | 1,331.76 |
| | | | | | | IAP/AGC | 37.20 | PENSION | 1,116.00 |
| REED , HOWARD J | REEDH | REG | 128.00 | 128.00 | 3,978.24 | UNION DUES | 119.36 | AGC FEE | 19.20 |
| GROUP C - 18 FORK LIFTS ***-**-5856 | | Total: | 128.00 | 128.00 | 3,978.24 | AGC/PAC | | APPR & TRN | 85.76 |
| | | | | | | EDUC & SAF | 8.96 | H&W | 916.48 |
| | | | | | | IAP/AGC | 25.60 | PENSION | 768.00 |
| ROBINETTE , CARIA M | ROBICA | REG | 180.00 | 180.00 | 5,543.20 | UNION DUES | 166.30 | AGC FEE | 27.00 |
| GROUP C - 18 FORK LIFTS ***-**-8621 | | Total: | 180.00 | 180.00 | 5,543.20 | AGC/PAC | 18.00 | APPR & TRN | 116.12 |
| | | | | | | EDUC & SAF | 10.68 | H&W | 1,272.80 |
| | | | | | | IAP/AGC | 36.00 | PENSION | 1,080.00 |
| SKINNER , KEVIN S | SKINK | REG | 128.00 | 128.00 | 3,978.24 | UNION DUES | 119.36 | AGC FEE | 19.20 |
| GROUP C - 18 FORK LIFTS ***-**-0381 | | Total: | 128.00 | 128.00 | 3,978.24 | AGC/PAC | | APPR & TRN | 85.76 |
| | | | | | | EDUC & SAF | 8.96 | H&W | 916.48 |
| | | | | | | IAP/AGC | 25.60 | PENSION | 768.00 |

|  |  | 2,002.00 | | 61,569.36 | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2,002.00 | | | | | | |

## Union Summary Report

SOFCO ERECTORS

08/23/2018 Page 1
System Date: 08/23/2018
System Time: 11:43 am

Period End Dates 7/29/2013 through 12/25/2013

Union: OPERATORS

| Employee | Regular Hours | Overtime Hours | Total Hours | Total Pay | Dues Deduct | PAC Deduct | H&W Fringe | PEN Fringe |
|---|---|---|---|---|---|---|---|---|
| **Local: LOCAL 0018** | | | | | | | | |
| **Class: Fork Truck Operator** | | | | | | | | |
| JON E. ALLEN | 824.00 | 10.00 | 834.00 | 25,404.92 | | | 5,762.94 | |
| EVAN D. CANSLER | 48.00 | | 48.00 | 1,453.44 | | | 331.68 | |
| ROBERT B. CHILDS | 142.00 | | 142.00 | 4,299.76 | | | 981.23 | |
| ROBERT L. HUGHES | 164.00 | | 164.00 | 4,965.92 | | | 1,133.24 | |
| DONN R. LARCK | 24.00 | | 24.00 | 726.72 | | | 165.84 | |
| EILEEN M. MURPHY | 160.00 | 1.00 | 161.00 | 4,890.22 | | | 1,112.51 | |
| PAUL W. OSBORNE | 80.00 | | 80.00 | 2,422.40 | | | 552.80 | |
| CARMELITA M. WILLIS | 62.00 | | 62.00 | 1,877.36 | | | 428.42 | |
| Class Totals | 1,504.00 | 11.00 | 1,515.00 | 46,040.74 | .00 | .00 | 10,468.66 | .00 |
| **Class: JOURNEYMAN** | | | | | | | | |
| MATTHEW A. HENDERSON | 22.00 | | 22.00 | 691.68 | | | 152.03 | |
| RANDY A. HURSELL | 20.00 | | 20.00 | 628.80 | | | 138.20 | |
| Class Totals | 42.00 | .00 | 42.00 | 1,320.48 | .00 | .00 | 290.23 | .00 |
| Local Totals | 1,546.00 | 11.00 | 1,557.00 | 47,361.22 | .00 | .00 | 10,758.89 | .00 |
| Union Totals | 1,546.00 | 11.00 | 1,557.00 | 47,361.22 | .00 | .00 | 10,758.89 | .00 |

SOFCO002365

SOFCO ERECTORS

# Union Summary Report

Period End Dates 7/31/2012 through 7/28/2013

Union: OPERATORS

| Employee | Regular Hours | Overtime Hours | Total Hours | Total Pay | Dues Deduct | PAC Deduct | H&W Fringe | PEN Fringe |
|---|---|---|---|---|---|---|---|---|
| **Local: LOCAL 0018** | | | | | | | | |
| **Class:  Fork Truck Operator** | | | | | | | | |
| JON E. ALLEN ꝑ𝓇ꝇᶹꝇ𝓇 | 1,966.00 | | 1,966.00 | 58,580.18 | | | 13,151.56 | |
| KATHLEEN S. HART | 184.00 | | 184.00 | 5,540.32 | | | 1,225.44 | |
| SCOTT ICENHOWER | 120.00 | | 120.00 | 3,633.60 | | | 799.20 | |
| CHARLES G. LANTZ | 88.00 | | 88.00 | 2,664.64 | | | 586.08 | |
| ROBERT J. RENTAS | 42.00 | | 42.00 | 1,250.96 | | | 279.72 | |
| LARRY D. ROGERS, SR. | 3.00 | | 3.00 | 88.89 | | | 19.98 | |
| JOSEPH E. STANLEY | 440.00 | 21.00 | 461.00 | 13,970.54 | | | 3,070.26 | |
| Class Totals | 2,843.00 | 21.00 | 2,864.00 | 85,729.13 | .00 | .00 | 19,132.24 | .00 |
| | | | | | | | | |
| **Class:  JOURNEYMAN** | | | | | | | | |
| ROBERT B. CHILDS | 64.00 | | 64.00 | 1,970.56 | | | 426.24 | |
| DONALD R. GRIMM | 192.00 | .50 | 192.50 | 5,934.77 | | | 1,282.05 | |
| MATTHEW A. HENDERSON | 196.00 | | 196.00 | 6,112.84 | | | 1,335.36 | |
| RANDY A. HURSELL | 64.00 | | 64.00 | 1,970.56 | | | 426.24 | |
| Class Totals | 516.00 | .50 | 516.50 | 15,988.73 | .00 | .00 | 3,469.89 | .00 |
| Local Totals | 3,359.00 | 21.50 | 3,380.50 | 101,717.86 | .00 | .00 | 22,602.13 | .00 |
| Union Totals | 3,359.00 | 21.50 | 3,380.50 | 101,717.86 | .00 | .00 | 22,602.13 | .00 |

SOFCO002366

SOFCO ERECTORS

08/23/2018          Page 1
System Date: 08/23/2018
System Time: 1:34 pm

## Union Summary Report

Period End Dates 7/31/2011 through 7/30/2012

Union: OPERATORS

| Employee | Regular Hours | Overtime Hours | Total Hours | Total Pay | Dues Deduct | PAC Deduct | H&W Fringe | PEN Fringe |
|---|---|---|---|---|---|---|---|---|
| **Local: LOCAL 0018** | | | | | | | | |
| **Class: Fork Truck Operator** | | | | | | | | |
| JON E. ALLEN DRIVER | 630.00 | | 630.00 | 18,473.30 | | | 4,195.80 | |
| CHARLES M. GAMBILL | 50.00 | | 50.00 | 1,441.50 | | | 333.00 | |
| ROBERT S. HOOVER | 1,029.00 | | 1,029.00 | 29,666.07 | | | 6,853.14 | |
| JOSEPH E. STANLEY | 32.00 | | 32.00 | 948.16 | | | 213.12 | |
| Class Totals | 1,741.00 | .00 | 1,741.00 | 50,529.03 | .00 | .00 | 11,595.06 | .00 |
| | | | | | | | | |
| **Class: JOURNEYMAN** | | | | | | | | |
| VICTOR L. FULTON | 318.00 | 22.00 | 340.00 | 10,526.49 | | | 2,264.40 | |
| RANDY A. HURSELL | 144.00 | 1.00 | 145.00 | 4,479.95 | | | 965.70 | |
| MARTY E. KORN | | 8.00 | 8.00 | 359.88 | | | 53.28 | |
| Class Totals | 462.00 | 31.00 | 493.00 | 15,366.32 | .00 | .00 | 3,283.38 | .00 |
| Local Totals | 2,203.00 | 31.00 | 2,234.00 | 65,895.35 | .00 | .00 | 14,878.44 | .00 |
| Union Totals | 2,203.00 | 31.00 | 2,234.00 | 65,895.35 | .00 | .00 | 14,878.44 | .00 |

SOFCO002367

# Union Summary Report

SOFCO ERECTORS

08/23/2018          Page 1
System Date: 08/23/2018
System Time:  3:20 pm

Period End Dates 7/31/2010 through 7/30/2011

Union: OPERATORS

| Employee | Regular Hours | Overtime Hours | Total Hours | Total Pay | Dues Deduct | PAC Deduct | H&W Fringe | PEN Fringe |
|---|---|---|---|---|---|---|---|---|
| **Local: LOCAL 0018** | | | | | | | | |
| **Class:  Fork Truck Operator** | | | | | | | | |
| ROBERT S. HOOVER | 789.00 | | 789.00 | 22,562.37 | | | 5,254.74 | |
| **Class:  JOURNEYMAN** | | | | | | | | |
| RUSSEL K. GARRIS | 72.00 | | 72.00 | 2,123.28 | | | 479.52 | |
| JOE M. HARLOW | 262.00 | | 262.00 | 7,726.38 | | | 1,744.92 | |
| Class Totals | 334.00 | .00 | 334.00 | 9,849.66 | .00 | .00 | 2,224.44 | .00 |
| Local Totals | 1,123.00 | .00 | 1,123.00 | 32,412.03 | .00 | .00 | 7,479.18 | .00 |
| Union Totals | 1,123.00 | .00 | 1,123.00 | 32,412.03 | .00 | .00 | 7,479.18 | .00 |

SOFCO002368

SOFCO ERECTORS

08/23/2018          Page 1
System Date: 08/23/2018
System Time: 3:21 pm

# Union Summary Report

Period End Dates 7/31/2009 through 7/30/2010

Union: OPERATORS

**Local: LOCAL 0018**
**Class: JOURNEYMAN**

| Employee | Regular Hours | Overtime Hours | Total Hours | Total Pay | Dues Deduct | PAC Deduct | H&W Fringe | PEN Fringe |
|---|---|---|---|---|---|---|---|---|
| RANDALL D. W. BAUGH | 152.00 | | 152.00 | 4,406.48 | | | 1,012.32 | |
| JAMIE M. CARR | 32.00 | | 32.00 | 931.68 | | | 213.12 | |
| MICHAEL R. CRUM | 72.00 | | 72.00 | 2,087.28 | | | 479.52 | |
| CECIL HOWELL, JR. | 32.00 | | 32.00 | 927.68 | | | 213.12 | |
| STEVEN L. LANCASTER | 152.00 | | 152.00 | 4,482.48 | | | 1,012.32 | |
| Class Totals | 440.00 | .00 | 440.00 | 12,835.60 | .00 | .00 | 2,930.40 | .00 |
| Local Totals | 440.00 | .00 | 440.00 | 12,835.60 | .00 | .00 | 2,930.40 | .00 |
| Union Totals | 440.00 | .00 | 440.00 | 12,835.60 | .00 | .00 | 2,930.40 | .00 |

SOFCO002369

| Ironworkers Local Union No. 44 C | 1/8/2014 |
| --- | --- |

| Certification Roster For: | Forkl Industrial/Rough Terrain Forklift Training |

**Active Certifications**

| SSN | Book Nbr | Name | Home Phone | Start Date | Expire Date |
| --- | --- | --- | --- | --- | --- |
| ***-**-3730 | 1211269 | ABPLANALP, MICHAEL A | (513) 738-4256 | 11/23/2013 | |
| ***-**-3403 | 1271622 | ADSON, JOE | (859) 356-5429 | 11/9/2013 | 11/9/2016 |
| ***-**-4480 | 1266815 | ANDERSON, ANDRE C | (513) 354-0612 | 11/9/2013 | 11/9/2016 |
| ***-**-6292 | 1266075 | BAKER, JOHN D Jr. | (513) 451-0957 | 11/9/2013 | 11/9/2016 |
| ***-**-6913 | 1193016 | BARGER, SCOTT A | | 11/23/2013 | |
| ***-**-9368 | 1285506 | BAUGH, JOHN M | (859) 371-3539 | 11/9/2013 | |
| ***-**-6019 | 1373810 | BERKEMEIER, ANTHONY L | (859) 916-1383 | 11/9/2013 | |
| ***-**-7357 | 1241144 | BILDNER, DOUGLAS J | (812) 584-6743 | 11/9/2013 | 11/9/2016 |
| ***-**-2219 | 1145810 | BILLS, LARRY S | (513) 724-1311 | 11/16/2013 | 11/16/2016 |
| ***-**-1462 | 1138302 | BOOTH, JF O | (812) 655-0434 | 11/9/2013 | |
| ***-**-2775 | 1382860 | BOWMAN, RAYMOND R | (859) 640-6558 | 11/9/2013 | |
| ***-**-0464 | -90000001 | BRUNKE, TIM J | (513) 561-4763 | 11/9/2013 | 11/9/2016 |
| ***-**-8713 | 1271677 | BURTON, MICHAEL J | (937) 588-9843 | 11/16/2013 | 11/16/2016 |
| ***-**-2036 | 1359057 | CAMPBELL, NICOLE M | (513) 485-2792 | 11/16/2013 | 11/16/2016 |
| ***-**-5553 | 1460999 | CAMPBELL, STEPHEN | (000) 000-0000 | 11/23/2013 | |
| ***-**-6030 | 1410828 | CARPENTER, CHRISTOPHER | (740) 353-6824 | 11/9/2013 | |
| ***-**-1118 | 1203646 | CHALK, JAMES M | | 11/9/2013 | 11/9/2016 |
| ***-**-9726 | 1250952 | CLINES, CRAIG | (406) 698-5474 | 11/16/2013 | 11/16/2016 |
| ***-**-0746 | 1290634 | COLLINS, ANTHONY W | (812) 539-4693 | 11/16/2013 | 11/16/2016 |
| ***-**-0058 | 1146463 | CRAMER, STEVEN M | (513) 582-1192 | 11/16/2013 | 11/16/2016 |
| ***-**-9076 | 1250701 | DAWSON, JOHN W | (513) 680-4323 | 11/16/2013 | 11/16/2016 |
| ***-**-7070 | 971052 | DELORMIER, CLIFTON | (606) 784-3354 | 11/9/2013 | 11/9/2016 |
| ***-**-4078 | 1220474 | DOERFLEIN, THOMAS J | (513) 367-5595 | 11/16/2013 | 11/16/2016 |
| ***-**-6770 | 1265180 | DUFFY, SEAN F | (812) 926-6050 | 11/23/2013 | |
| ***-**-9546 | 1234855 | EDWARDS, DOUGLAS J | (937) 386-8038 | 11/23/2013 | |
| ***-**-1760 | 1200102 | FENTY, TROY H | (513) 522-3148 | 11/9/2013 | |
| ***-**-2982 | 1448148 | FITZGERALD, TIM A | (000) 000-0000 | 11/23/2013 | |
| ***-**-1095 | 1270044 | GREENE, ALONZO | (606) 375-2926 | 11/9/2013 | 11/9/2016 |
| ***-**-2217 | 1433837 | GRESSLER, JAMES J | (513) 824-0570 | 11/9/2013 | 11/9/2016 |
| ***-**-5989 | 1280657 | GRIFFITH, GLENN R | (937) 927-9006 | 11/16/2013 | 11/16/2016 |
| ***-**-1024 | 1265181 | GWIN, SARIA L | | 11/23/2013 | |
| ***-**-7691 | 1245350 | HOLT, TIMOTHY E | (859) 912-2016 | 11/23/2013 | |



EXHIBIT

13

10-9-18

PENGAD 800-631-6989

SOFCO000548

| | | | | | |
|---|---|---|---|---|---|
| ***-**-5086 | 1340127 | HOLTMAN, DAVID J | (513) 965-8826 | 11/9/2013 | 11/9/2016 |
| ***-**-9126 | 1262618 | HOLTZ, WILLIAM P | (606) 635-7325 | 11/16/2013 | 11/16/2016 |
| ***-**-6462 | 1201054 | HOUNSHELL, DAVID S | (606) 635-8246 | 11/16/2013 | 11/16/2016 |
| ***-**-9016 | 1268170 | INGLES, JARED A | (812) 584-3248 | 11/9/2013 | |
| ***-**-9910 | 1237488 | JEFFERS, TIMOTHY W | | 11/16/2013 | 11/16/2016 |
| ***-**-6592 | 1413222 | JONES, RYAN C | (513) 680-8808 | 11/9/2013 | 11/9/2016 |
| ***-**-6143 | -90000001 | KINCADE, TERRY R | | 11/16/2013 | 11/16/2016 |
| ***-**-0707 | 1405896 | KLEIMEYER, WILLIAM A | (513) 505-4110 | 11/9/2013 | 11/9/2016 |
| ***-**-4970 | 1219704 | KREBS, DANIEL | (859) 727-2767 | 11/9/2013 | 11/9/2016 |
| ***-**-4595 | 1446814 | KRUETZKAMP, KEVIN W | (859) 663-8321 | 11/23/2013 | |
| ***-**-1479 | 1381469 | LINDSEY, WILLIAM K | (513) 375-0485 | 11/9/2013 | |
| ***-**-3518 | 1240248 | LONG, PHILLIP J | (859) 824-0899 | 11/9/2013 | |
| ***-**-2444 | 1232553 | LOWE, ALBERT P | (812) 623-2041 | 11/9/2013 | 11/9/2016 |
| ***-**-0865 | 1429897 | METCALF, OLIVER S | (937) 544-3370 | 11/16/2013 | 11/16/2016 |
| ***-**-2338 | 1304607 | MILLAR, RICKIE L | (859) 609-9060 | 11/16/2013 | 11/16/2016 |
| ***-**-6054 | 1337860 | MILLER, RON N | (812) 623-5352 | 11/9/2013 | 11/9/2016 |
| ***-**-6371 | 1221992 | MULLINS, JASON B | (859) 426-1239 | 11/23/2013 | |
| ***-**-5940 | 1362031 | NASH, THOMAS T | (513) 505-7228 | 11/9/2013 | 11/9/2016 |
| ***-**-3489 | 1144564 | OSBORNE, STEVEN L | (513) 459-0795 | 11/16/2013 | 11/16/2016 |
| ***-**-0116 | 1388467 | PENNINGTON, THOMAS D | (937) 779-7177 | 11/23/2013 | |
| ***-**-8799 | 1293895 | PRUITT, CONNIE G | (513) 734-1562 | 11/23/2013 | |
| ***-**-8688 | 1445887 | PRUITT, KEVIN W | | 11/23/2013 | |
| ***-**-1319 | 1295055 | REAMS, FRED W | (513) 752-2742 | 11/9/2013 | |
| ***-**-7316 | 1306632 | RECORD, DANIEL W | (859) 468-2420 | 11/9/2013 | 11/9/2016 |
| ***-**-6628 | 1232081 | RICHARDS, JOEL G | (859) 643-0599 | 11/16/2013 | 11/16/2016 |
| ***-**-0728 | 1434778 | ROWEKAMP, BRYAN D | (812) 655-0927 | 11/9/2013 | 11/9/2016 |
| ***-**-4227 | 1327524 | RUSSELL, JEFFREY A | (502) 732-9940 | 11/9/2013 | |
| ***-**-0530 | 1337826 | SCUDDER, JASON T | (812) 534-3118 | 11/16/2013 | 11/16/2016 |
| ***-**-1224 | 1310038 | SHAW, JOSEPH T | (812) 577-7753 | 11/9/2013 | 11/9/2016 |
| ***-**-4943 | 1462961 | SHELTON, LUCAS | (000) 000-0000 | 11/23/2013 | |
| ***-**-3092 | 1359055 | SHERWOOD, ADAM R | (513) 251-3958 | 11/23/2013 | |
| ***-**-3835 | 1373807 | SHERWOOD, JARED A | (513) 753-7814 | 11/23/2013 | |
| ***-**-7614 | 1147214 | SHINKLE, KENNETH W | (859) 907-0762 | 11/9/2013 | |
| ***-**-6149 | 1326725 | SHOEMAKE, LOREN H | | 11/9/2013 | 11/9/2016 |
| ***-**-3514 | 1378258 | SMALLWOOD, DANIEL J | (513) 349-3997 | 11/16/2013 | 11/16/2016 |
| ***-**-9869 | 1238597 | STOREY, RYAN R | (812) 744-9950 | 11/23/2013 | |

SOFCO000549

| | | | | | |
|---|---|---|---|---|---|
| ***-**-0328 | 1086187 | STRATTON, BRANDON T | (513) 587-5293 | 11/9/2013 | |
| ***-**-5325 | 1287082 | STULZ, ANDREW J | (859) 609-0118 | 11/23/2013 | |
| ***-**-8417 | 1211905 | THOMPSON, DARYL M | (513) 661-3775 | 11/23/2013 | |
| ***-**-8899 | 1303852 | THOMPSON, RIELY I | (614) 940-3281 | 11/9/2013 | |
| ***-**-6012 | 1195541 | THOMS, PHILIP L II | (513) 575-3377 | 11/16/2013 | 11/16/2016 |
| ***-**-6012 | 1195541 | THOMS, PHILIP L II | (513) 575-3377 | 4/21/2007 | |
| ***-**-8457 | 1050510 | TIBBITS, RICHARD | (812) 744-9076 | 11/9/2013 | 11/9/2016 |
| ***-**-2789 | 1406694 | TIEMEIER, JARROD D | (859) 635-3887 | 11/23/2013 | |
| ***-**-5026 | 1270045 | TINGLE, JUSTIN A | (502) 643-2366 | 11/9/2013 | 11/9/2016 |
| ***-**-7428 | 1193127 | TINGLE, RONNIE E | (812) 987-9659 | 11/9/2013 | 11/9/2016 |
| ***-**-8722 | 1333424 | TURNER, JAMES C | (812) 584-3506 | 11/16/2013 | 11/16/2016 |
| ***-**-2149 | 1434092 | WARREN, CARL | (513) 446-2163 | 12/21/2013 | |
| ***-**-5697 | 1408176 | WEST, MARKUS T | (513) 668-0098 | 11/9/2013 | 11/9/2016 |
| ***-**-8791 | 1196269 | WESTON, CHRIS | (812) 744-2251 | 11/16/2013 | 11/16/2016 |
| ***-**-5222 | 1222646 | WHITE, BRYAN C | (859) 586-0068 | 11/16/2013 | 11/16/2016 |
| ***-**-3882 | 1042711 | WOLPERT, EUGENE F | (502) 484-8572 | 11/9/2013 | |
| ***-**-0669 | 1315011 | WOLPERT III, EUGENE F | (502) 484-8572 | 11/9/2013 | |
| ***-**-2352 | 1348611 | YOUNG, HENRY | (513) 271-9889 | 11/9/2013 | 11/9/2016 |

1/8/2014

SOFCO000550

Cols -
8/11/17
7/31/18

SOFCO000186



INVOICE

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211


**SUNBELT**
R E N T A L S

| INVOICE NO. | 80374182-0001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 7/07/18 |

PAGE 1 of 1

INVOICE TO

9x12-7178-9646
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
RICKENBACKER 758
6198 GREEN POINTE DR S
GROVEPORT, OH 43125

614-214-7098

| RECEIVED BY | CONTRACT NO. |
|---|---|
| TALBERT, MIKE | 80374182 |

PURCHASE ORDER NO.
TUBE MOVE 6/29

JOB NO.
1 - RICKENBACKER 758

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | MOVE FEE / TRANSPORTATION | EA | 395.000 | 395.00 |
| | NRI92027 | | | |

Move tubes from Sofco office Fishel Dr
to Rickenbacker 758 6198 Green Pointe Dr
S, Groveport 6/29/18
SHIP TO: RICKENBACKER 758
6198 GREEN POINTE DR S
GROVEPORT, OH 43125

20-4160
BrJ

quipment. Service. Guaranteed.

EMIT TO:

NBELT RENTALS, INC.
) BOX 409211
TLANTA, GA 30384-9211

NET DUE UPON RECEIPT
Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 395.00 |
|---|---|
| SALES TAX | 29.63 |
| INVOICE TOTAL | 424.63 |

SOFCO000187

SALES INVOICE

# INVOICE

**SEND ALL PAYMENTS TO:**
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211



| | |
|---|---|
| **INVOICE NO.** | 80228630-0001 |
| **ACCOUNT NO.** | 230485 |
| **INVOICE DATE** | 7/02/18 |
| PAGE | 1 of 1 |

**INVOICE TO**

1oz-4503-5372
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

**JOB ADDRESS**
RICKENBACKER 758
6198 GREEN POINTE DR S
GROVEPORT, OH 43125

614-214-7098

| | |
|---|---|
| **RECEIVED BY** TATTERSON, BRONSON | **CONTRACT NO.** 80228630 |
| **PURCHASE ORDER NO.** | FORKLIFT MOVE |
| **JOB NO.** | 1 - RICKENBACKER 758 |
| **BRANCH** | COLUMBUS PC201 1275 W MOUND ST COLUMBUS, OH 43223-2213 614-341-9770 |

| Qty | Item number | Unit | Price | Amount |
|-----|-------------|------|-------|--------|
| 2 | MOVE FEE / TRANSPORTATION | EA | 75.000 | 150.00 |
| | NRI92027 | | | |
| | Pickup forklift 445901 from AEP New | | | |
| | Albany and Deliver to Rickenbacker 758 | | | |
| | 6198 Green Pointe Dr S, Groveport 7/2 | | | |
| | SHIP TO: RICKENBACKER 758 | | | |
| | 6198 GREEN POINTE DR S | | | |
| | GROVEPORT, OH 43125 | | | |

20-4160
BW

## Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT
Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| **SUBTOTAL** | 150.00 |
| **SALES TAX** | 11.25 |
| **INVOICE TOTAL** | 161.25 |

SOFCO000188

SALES INVOICE

# INVOICE

**SEND ALL PAYMENTS TO:**
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211



**SUNBELT RENTALS**

| INVOICE NO. | 80059207-0001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 6/26/18 |
| | PAGE 1 of 1 |

**INVOICE TO**

1oz - 5009 - 6161
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

| RECEIVED BY | CONTRACT NO. |
|---|---|
| TATTERSON, BRONSON | 80059207 |

PURCHASE ORDER NO.
758

JOB NO.
1 - RICKENBACKER 758

**JOB ADDRESS**
RICKENBACKER 758
6198 GREEN POINTE DR S
GROVEPORT, OH 43125

614-214-7098

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114XXX000 | EA | 75.000 | 75.00 |

DELIVERY
Move Sofco's 10K from PC201 to
Rickenbacker 758 6/26/18
SHIP TO: RICKENBACKER 758
6198 GREEN POINTE DR S
GROVEPORT, OH 43125

20-4160
BWT

# Equipment. Service. Guaranteed.

**REMIT TO:**

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT
Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 75.00 |
|---|---|
| SALES TAX | 5.63 |
| INVOICE TOTAL | 80.63 |

SOFCO000189

SALES INVOICE

# INVOICE

**SEND ALL PAYMENTS TO:**
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211



| | |
|---|---|
| **INVOICE NO.** | 75722468-0001 |
| **ACCOUNT NO.** | 230485 |
| **INVOICE DATE** | 1/22/18 |
| PAGE | 1 of 1 |

**INVOICE TO**

1oz-4021-4878
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

**JOB ADDRESS**
ACADIA
4630 HILTON CORPORATE DR
COLUMBUS, OH 43232

614-354-3731

| RECEIVED BY | CONTRACT NO. |
|---|---|
| TATTERSON, BRONSON | 75722468 |

PURCHASE ORDER NO.

FORKLIFT MOVE

JOB NO.

1 - ACADIA

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 2 | MOVE FEE / TRANSPORTATION | EA | 75.000 | 150.00 |
| | NRI92027 | | | |

Move forklift from Meritex to Acadia
1/22/18
SHIP TO: ACADIA
4630 HILTON CORPORATE DR
COLUMBUS, OH 43232

20-4149

Bns

## Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT
Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| **SUBTOTAL** | 150.00 |
| **SALES TAX** | 11.25 |
| **INVOICE TOTAL** | 161.25 |

SOFCO000190

INVOICE

## SEND ALL PAYMENTS TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

**SUNBELT**
**R E N T A L S**

| INVOICE NO. | 74834735-0001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 12/11/17 |
| PAGE | 1 of 1 |

INVOICE TO

1oz-4231-5084
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
MERITEX INDUSTIAL
6401 ADELAIDE CT
LOCKBOURNE, OH 43137

614-496-2279

| RECEIVED BY | CONTRACT NO. |
| TATTERSON, BRONSON | 74834735 |

PURCHASE ORDER NO.
MOVE FORKLIFT

JOB NO.
1 - MERITEX INDUSTIA

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|-----|-------------|------|-------|--------|
| 2 | 2114XXX000 EQUIPMENT MOVEMENT FR | EA | 75.000 | 150.00 |
| | FREIGHT | | | |

Move Sofco's forklift from Mt Carmel, GC
to Meritex Ind, Lockbourne 12/11/17
SHIP TO: MERITEX INDUSTIAL
6401 ADELAIDE CT
LOCKBOURNE, OH 43137

Z0-4152
BWJ

## Equipment. Service. Guaranteed.

EMIT TO:

JNBELT RENTALS, INC.
O BOX 409211
TLANTA, GA 30384-9211

NET DUE UPON RECEIPT
Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 150.00 |
| SALES TAX | 11.25 |
| INVOICE TOTAL | 161.25 |

SOFCO000191

SALES INVOICE

INVOICE

SEND ALL PAYMENTS TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA  30384-9211


**SUNBELT RENTALS**

| INVOICE NO. | 74409609-0001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 11/27/17 |
| PAGE | 1 of 1 |

INVOICE TO

1oz - 4342 - 5219
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
CHILDRENS HOSP
420 LIVINGSTON AVE
COLUMBUS, OH  43215

614-332-2134

| RECEIVED BY | CONTRACT NO. |
| TATTERSON, BRONSON | 74409609 |

PURCHASE ORDER NO.

112717

JOB NO.

1 - CHILDRENS HOSP

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH  43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|-----|-------------|------|-------|--------|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT FR | EA | 250.000 | 250.00 |
| | FREIGHT | | | |
| | 11-13 MOVED CUST FORKLIFT | | | |
| | SHIP TO:  CHILDRENS HOSP | | | |
| | 420 LIVINGSTON AVE | | | |
| | COLUMBUS, OH  43215 | | | |

20-4141
BWJ

**Equipment. Service. Guaranteed.**

IT TO:

ELT RENTALS, INC.
OX 409211
NTA, GA  30384-9211

NET DUE UPON RECEIPT
Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 250.00 |
| SALES TAX | 18.75 |
| INVOICE TOTAL | 268.75 |

SOFCO000192

SALES INVOICE



**UNBELT**
RENTALS

**SEND ALL PAYMENTS TO:**

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 74012116-0001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 11/08/17 |
| PAGE | 1 of 1 |

INVOICE TO

2oz - 6198 - 7847
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
MT CARMEL WEST PHASE II
5300 N MEADOWS DR
GROVE CITY, OH 43123 2546

614-679-1272

| RECEIVED BY | CONTRACT NO. |
|---|---|
| MORGAN, ROB | 74012116 |

PURCHASE ORDER NO.
MOVE FORKLIFT

JOB NO.
1 - MT CARMEL WEST P

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114xxx000 EQUIPMENT MOVEMENT FR | EA | 150.000 | 150.00 |
| | FREIGHT | | | |

Move Sofco's forklift and jib pole from
Children's Hospital to Mt Carmel Grove
City 11/8/17
SHIP TO: MT CARMEL WEST PHASE II
5300 N MEADOWS DR
GROVE CITY, OH 43123 2546

20-4109
BNT

## Equipment. Service. Guaranteed.

.EMIT TO:

UNBELT RENTALS, INC.
'O BOX 409211
.TLANTA, GA 30384-9211

NET DUE UPON RECEIPT
Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 150.00 |
|---|---|
| SALES TAX | 11.25 |
| INVOICE TOTAL | 161.25 |

SOFCO000193

SALES INVOICE

INVOICE

SEND ALL PAYMENTS TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

**SUNBELT**
**R E N T A L S**

| INVOICE NO. | 72417606-0001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 9/15/17 |

PAGE 1 of 1

INVOICE TO

2oz - 9876 - 13041
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

| RECEIVED BY | CONTRACT NO. |
|---|---|
| TATTERSON, BRONSON | 72417606 |

PURCHASE ORDER NO.

BOOM/FORKLIFT MOVES

JOB NO.

1 - U.P.S.

JOB ADDRESS
U.P.S.
5101 TRABUE ROAD
COLUMBUS, OH 43228 9613

614-332-2134

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 8 | 2114XXX000 EQUIPMENT MOVEMENT FR | EA | 75.000 | 600.00 |

FREIGHT
4 pickups/4deliveries of equipment
9/13 and 9/14 From OSU to UPS
SHIP TO:   U.P.S.
           5101 TRABUE ROAD
           COLUMBUS, OH 43228 9613

20-4132
BWJ

**Equipment. Service. Guaranteed.**

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT
Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 600.00 |
|---|---|
| SALES TAX | 45.00 |
| INVOICE TOTAL | 645.00 |

SOFCO000194

SALES INVOICE

Cols
8/1/12
7/31/13

SOFCO000310

# INVOICE

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211



| INVOICE NO. | 36361011-001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 8/31/12    075007 |

PAGE 1 of 1

| | |
|---|---|
| RECEIVED BY | CONTRACT NO. 36361011 |
| PURCHASE ORDER NO. | |
| JOB NO. | |
| BRANCH | |

INVOICE TO

1oz - 4618 - 5911
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748
**004638

JOB ADDRESS
OUR SHOP

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| 430062 | GRADALL | 534C-9 | 0444126 | 6000LB 36' SHOOTING |

**WORK PERFORMED:**
SERVICE CALL TO TARGET WEST JEFF JOB FOR UNIT WONT IDLE. TECH REPLACED FUEL FILTERS AND ADJUSTED IDLE UP.

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 75.000 | 75.00 |
| 1 | BF988 | MICROLITE FUEL SPIN- | EA | 7.758 | 7.76 |
| 1 | BF836 | MICROLITE IN-LINE FU | EA | 4.509 | 4.51 |

**LABOR:**

| Mechanic | Hours | Work | Rate | Extended |
|---|---|---|---|---|
| 20128288 | 1.75 | LABOR FOR REPAIRS | 95.00 | |

| | | | | |
|---|---|---|---|---|
| 430062 | GRADALL | 534C-9 | 0444126 | 6000LB 36' |



| | |
|---|---|
| TOTAL PARTS & MATERIALS | 87.27 |
| TOTAL LABOR HOURS/RATE | 1.75 H / 95.00 |
| TOTAL LABOR | 166.25 |

## Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| SUBTOTAL | 253.52 |
| SALES TAX | 17.10 |
| INVOICE TOTAL | 270.62 |

SOFCO000311

**WORK ORDER INVOICE**

# INVOICE

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

**SUNBELT**
R E N T A L S

| | |
|---|---|
| INVOICE NO. | 36868455-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 10/03/12 |
| | PAGE 1 of 1 |

INVOICE TO

1oz - 3522 - 4335
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
OUR SHOP

| RECEIVED BY | CONTRACT NO. 36868455 |
|---|---|
| PURCHASE ORDER NO. | BRONSON |
| JOB NO. | |
| BRANCH | WVA/KY SERVICE CENTER PC110 1275 W MOUND STREET COLUMBUS, OH 43223-2213 |

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE6361 | SKYTRAC | 10042 | 903405636 1 | 10,000LB 45'-48' SHO |

**WORK PERFORMED:**

CUSTOMERS SKYTRAK 10042. NEW ALBANY DATA PROJECT. E-MAIL SENT TO J BROWN FROM BRONSON. RUNNING ROUGH. BRIAN MADE RD CALL AND REPLACED FUEL FIL
TERS  UNIT OK. == NOTE == THIS UNIT WAS PAST DUE FOR PM
SERVICE AND NEEDS SERP BELT. ===
Steps Performed:
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE

*075511*

*20-S991*
*BWS*

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 75.000 | 75.00 |
| 1 | 3002 | FUEL FIL | EA | 2.422 | |
| 1 | P553004 | FUEL FLTR | EA | 7.080 | |
| 1 | ENVIRONMEN | 2133XXX000 | EA | 12.000 | 12.00 |

**LABOR:**

| Mechanic | Hours | Work | | | Rate | Extended |
|---|---|---|---|---|---|---|
| | | | SE6361 SKYTRAC 10042 | 903405636 1 | | 10,000LB 45'-48' SHO |
| 20314507 | 1.75 | LABOR FOR REPAIRS | | | 95.00 | 166.25 |

| | |
|---|---|
| TOTAL PARTS & MATERIALS | 96.50 |
| TOTAL LABOR HOURS/RATE | 1.75 H / 95.00 |
| TOTAL LABOR | 166.25 |

# Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| SUBTOTAL | 262.75 |
| SALES TAX | 17.73 |
| INVOICE TOTAL | **280.48** |

SOFCO000312

**WORK ORDER INVOICE**

# INVOICE

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211



| | |
|---|---|
| INVOICE NO. | 36909984-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 10/05/12 |

PAGE    1 of 1

*M O T*
*20-5991*

INVOICE TO

1oz - 4066 - 5076
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

JOB ADDRESS
PROJ DISCOVER
7217 NEW ALBANY CONDUIT RD
NEW ALBANY, OH  43054

614-771-1600

| RECEIVED BY | CONTRACT NO. |
|---|---|
| PATTERSON, BRONSON | 36909984 |

PURCHASE ORDER NO.
PROJ DISCOVER

JOB NO.
1 - PROJ DISCOVER

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH  43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 525.00 | 525.00 |
| | Moves by Eitel's Towing from Short St to New Albany Condit Rd to Fisher Dr back to New Albany-Condit Rd. | | | |
| | SHIP TO:  PROJ DISCOVER | | | |
| |     7217 NEW ALBANY CONDUIT RD | | | |
| |     NEW ALBANY, OH  43054 | | | |

*075505*

# Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA  30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-1/2% per month charge.

**SALES INVOICE**

| | |
|---|---|
| SUBTOTAL | 525.00 |
| SALES TAX | 35.44 |
| INVOICE TOTAL | **560.44** |

SOFCO000313



**INVOICE**

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 38198748-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 1/10/13  076993 |

PAGE 1 of 1

INVOICE TO

1oz - 2978 - 3661
##002975
SOFCO ERECTORS
7667 EISHEL DR S
DUBLIN OH 43016-8748

| RECEIVED BY | CONTRACT NO. |
| TATTERSON, BRONSON | 38198748 |
| PURCHASE ORDER NO. | |
| BRONSON | MOVE | |
| JOB NO. | |
| 1 - PROJECT DISCOVER | |
| BRANCH | |

REYNOLDSBURG PC145
275 REYNOLDSBURG NEW ALBANY RD RD
614-861-3086

JOB ADDRESS
PROJECT DISCOVERY
7217 NEW ALBANY CONDIT RD.
NEW ALBANY, OH 43054 8523

614-771-1600

| Qty | Item number | Unit | Price | Amount |
|-----|-------------|------|-------|--------|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 336.00 | 336.00 |
|  | - SKYTRAC PICK UP @ PROJECT DISCOVER |  |  |  |
|  | - DELIVER TO NEW TRAFFIC CONTROL CENTER |  |  |  |
|  | SHIP TO:  PROJECT DISCOVERY |  |  |  |
|  | 7217 NEW ALBANY CONDIT RD. |  |  |  |
|  | NEW ALBANY, OH  43054 8523 |  |  |  |

*20-59996
BWT KU*

FEB 8 – 2013

**quipment. Service. Guaranteed.**

MIT TO:

IBELT RENTALS, INC.
BOX 409211
ANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

**SALES INVOICE**

| SUBTOTAL | 336.00 |
| SALES TAX | 22.68 |
| INVOICE TOTAL | 358.68 |

SOFCO000314



**SUNBELT**
R E N T A L S

# INVOICE

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 38343866-001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 1/23/13 **076998** |

PAGE 1 of 1

INVOICE TO

1oz - 3142 - 3974
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
TRAFFIC CONTROL CENTER
1881 EAST 25TH AVE
COLUMBUS, OH 43219 1016

614-679-1272

| RECEIVED BY | CONTRACT NO. |
|---|---|
| BRONSON, | 38343866 |

PURCHASE ORDER NO.
FORKLIFT MOVE

JOB NO.
8

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT Move forklift from Sofco's shop to job at 1881 E 25th ave 1/14 SHIP TO: TRAFFIC CONTROL CENTER 1881 EAST 25TH AVE COLUMBUS, OH 43219 1016 | EA | 250.00 | 250.00 |

20-5996
BWJ

FEB 8 - 2013

**Equipment. Service. Guaranteed.**

EMIT TO:

JNBELT RENTALS, INC.
) BOX 409211
TLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 250.00 |
|---|---|
| SALES TAX | 16.88 |
| INVOICE TOTAL | 266.88 |

SOFCO000315

**SALES INVOICE**



**INVOICE**

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA  30384-9211

| | |
|---|---|
| INVOICE NO. | 38343582-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE. | 1/23/13   076997 |

PAGE  1 of 1

INVOICE TO

1oz - 3142 - 3973
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

| RECEIVED BY | CONTRACT NO. |
|---|---|
| BRONSON, | 38343582 |

PURCHASE ORDER NO.

FORKLIFT MOVE

JOB NO.
8

JOB ADDRESS

TRAFFIC CONTROL CENTER
1881 EAST 25TH AVE
COLUMBUS, OH  43219 1016

614-679-1272

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH  43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 150.00 | 150.00 |
| | Move forklift from 1881 E 25th ave to Sofco's Shop. | | | |
| | SHIP TO:  TRAFFIC CONTROL CENTER | | | |
| | 1881 EAST 25TH AVE | | | |
| | COLUMBUS, OH  43219 1016 | | | |

Bns
Shop   /1CT

FEB 8 - 2013

**Equipment. Service. Guaranteed.**

T TO:

ELT RENTALS, INC.
OX 409211
NTA, GA  30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| SUBTOTAL | 150.00 |
| SALES TAX | 10.13 |
| INVOICE TOTAL | **160.13** |

SOFCO000316

**SALES INVOICE**

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

**SUNBELT RENTALS®**

| INVOICE NO. | 38648096-001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 2/14/13 **077156** |

PAGE 1 of 1

INVOICE TO:
fax : 3056 - 3764
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

RECEIVED BY
TATTERSON, BRONSON

CONTRACT NO.
38648096

PURCHASE ORDER NO.

MOVE II

JOB NO.
1 - SOFCO ERECTORES

JOB ADDRESS
SOFCO ERECTORES
7667 FISHEL DRIVE SOUTH
DUBLIN, OH 43016-8748

614-761-2500

BRANCH
REYNOLDSBURG PC145
275 REYNOLDSBURG NEW ALBANY RD
RD
614-861-3086

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 294.00 | 294.00 |
| | SKYTRAK FROM NEW ALBANY TO GROVE CITY | | | |
| | SHIP TO: SOFCO ERECTORES | | | |
| | 7667 FISHEL DRIVE SOUTH | | | |
| | DUBLIN, OH 43016-8748 | | | |

`20- 5017
BWJ

FEB 2 5 2013

**uipment. Service. Guaranteed.**

T TO:

ELT RENTALS, INC.
X 409211
NTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| SUBTOTAL | 294.00 |
| SALES TAX | 19.85 |
| INVOICE TOTAL | 313.85 |

SALES INVOICE

SOFCO000317



**INVOICE**

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 38857178-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 3/01/13 |

PAGE 1 of 1

**INVOICE TO**
1oz - 3460 - 4346
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

RECEIVED BY

CONTRACT NO. 38857178

PURCHASE ORDER NO.

**JOB ADDRESS**
TS TRIM
6380 CANAL ST
CANAL WINCHESTER, OH 43110 204

JOB NO. 1 - TS TRIM

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE4126 | GRADALL | 534C-9 | 0444126 | 5000LB 28' SHOOTING |

**WORK PERFORMED:**
STEVE MADE SERVICE CALL TO TS TRIM SHOP  FOUND 2 INJECTOR LINE WITH HOLES RUBBED
INTO THEM, AND EXHAUST PIPE BROKEN AT THE TURBO.
STEVE REMOVED THE LINES AND EXH PIPE. ORDERED THE LINES AND REPAIRED THE PIPE.
FUEL LINE HAD BEEN ON B/O. STEVE RETURNED WHEN THEY CAME IN AND REPIRED THE MA
CHINE.
Steps Performed:
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE

**PARTS:**

| Qty | Part # | Description | U/M | Price | Exte |
|---|---|---|---|---|---|
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 75.000 | |
| 1 | SHOP SUPPLIES | 2133XXX000 | EA | 15.000 | 15.00 |
| 1 | 3932388 | TBE,SUP | EA | 93.570 | 93.57 |
| 1 | 3932390 | TBE,SUP | EA | 101.950 | 101.95 |
| | SE4126 | GRADALL | 534C-9 | 0444126 | 5000LB 28' SHOOTING |

**LABOR:**

| Mechanic | Hours | Work | Rate | Extended |
|---|---|---|---|---|
| 28027 | 5.75 | LABOR FOR REPAIRS | 95.00 | 546.25 |

MAR 2 9 2013

| TOTAL PARTS & MATERIALS | 285.52 |
| TOTAL LABOR HOURS/RATE | 5.75 H / 95.00 |
| TOTAL LABOR | 546.25 |
| SUBTOTAL | 831.77 |
| SALES TAX | 56.14 |
| INVOICE TOTAL | 887.91 |

**uipment. Service. Guaranteed.**

T TO:
BELT RENTALS, INC.
OX 409211
NTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

SOFCO000318

**WORK ORDER INVOICE**



**INVOICE**

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 39301790-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 4/02/13 |

078154

PAGE 1 of 1

INVOICE TO

1oz - 3103 - 3834
SOFCO ERECTORS
766Z FISHEL DR S
DUBLIN OH 43016-8748

**003103**

JOB ADDRESS
ASCENA
200 HERITAGE DR.
PATASKALA, OH 43062 9674

614-679-1267

| RECEIVED BY | CONTRACT NO. |
| BRONSON, TATTERSON | 39301790 |

PURCHASE ORDER NO.
MOVE EQUIP

JOB NO.
1 - ASCENA

BRANCH
REYNOLDSBURG PC145
275 REYNOLDSBURG NEW ALBANY RD
RD
614-861-3086

| Qty | Item number | Unit | Price | Amount |
|-----|-------------|------|-------|--------|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 210.00 | 210.00 |
| | move Gradall with Jib from Canal Winchester to Etna Ind. Park | | | |
| | SHIP TO: ASCENA 200 HERITAGE DR. PATASKALA, OH 43062 9674 | | | |

**Equipment. Service. Guaranteed.**

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

**SALES INVOICE**

| SUBTOTAL | 210.00 |
| SALES TAX | 14.18 |
| INVOICE TOTAL | 224.18 |

SOFCO000319

# INVOICE

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA  30384-9211

| INVOICE NO. | 39572699-001 |
| --- | --- |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 4/19/13  078335 |

PAGE  1 of 1

| RECEIVED BY | CONTRACT NO. |
| --- | --- |
|  | 39572699 |

PURCHASE ORDER NO.

**BILL TO:**
4022 - 5032
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

JOB NO.

1 - GROVE CITY MEDIC

JOB ADDRESS
GROVE CITY MEDICAL CENTER
5335 Hoover Road
GROVE CITY, OH  43123

614-679-1267

BRANCH
REYNOLDSBURG PC145
275 REYNOLDSBURG NEW ALBANY RD
RD
614-861-3086

| Qty | Item number | Unit | Price | Amount |
| --- | --- | --- | --- | --- |
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 387.20 | 387.20 |
|  | MT.CARMEL GROVE CITY TO ETNA \| PATASKAL A | | | |
|  | SHIP TO:  GROVE CITY MEDICAL CENTER | | | |
|  | 5335 Hoover Road | | | |
|  | GROVE CITY, OH  43123 | | | |

205017
BWT

MAY 8 – 2013

**uipment. Service. Guaranteed.**

T TO:

BELT RENTALS, INC.
OX 409211
NTA, GA  30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 387.20 |
| --- | --- |
| SALES TAX | 26.14 |
| INVOICE TOTAL | 413.34 |

SOFCO000320

SALES INVOICE



**INVOICE**

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| | |
|---|---|
| INVOICE NO. | 39833554-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 5/08/13    078497 |

PAGE 1 of 1

INVOICE TO

1oz - 3549 - 4390
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
CARDINAL HEALTH
EMERALD PARKWAY
DUBLIN, OH 43017

| RECEIVED BY | CONTRACT NO. |
|---|---|
| | 39833554 |

PURCHASE ORDER NO.

JOB NO.
1 - CARDINAL HEALTH

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 42' - 45' SHO |

**WORK PERFORMED:**
SERVICE CALL TO 5541 BOLEN PLACE  TUTTLE MALL JOB SCOTT 634-0826.
BRIAN FOUND 2 AND 4 INJECTOR LINES LEAKING. ORDERED PARTS OVER NIGHT. RETURN AND
INSTALL WHEN IN. ENG B3.9-C  S/N 45598238  BRIAN RETURNED
NEXT DAY AND REPLACED THE FUEL LINES RAN AND CHECKED FOR LEAKS.
Steps Performed:
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE

**PARTS:**

| Qty | Part # | Description | | U/M | Price | Extended |
|---|---|---|---|---|---|---|
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | | EA | 75.000 | 75.00 |
| 1 | 3932389 | TBE,SUP | | EA | 102.750 | 102.75 |
| 1 | 3932391 | TBE,SUP | | EA | 102.750 | 102.75 |
| 2 | 3918188 | WSH,SNG | | EA | 5.640 | 11.28 |
| 1 | FREIGHT-INBOUND | 2112XXX060 PARTS INB | | EA | 42.000 | 42.00 |

*20-5016 BWS pm*

**LABOR:**

| Mechanic | Hours | Work | | | Rate | Extended |
|---|---|---|---|---|---|---|
| | SE534C | GRADALL | 534C-9 | NONE | | 9000LB 42' - 45' SHO |
| 20314507 | 1.00 | LABOR FOR REPAIRS | | | 95.00 | 95.00 |
| 20314507 | 1.75 | LABOR FOR REPAIRS | | | 95.00 | 166.25 |

MAY 28 2013

| | |
|---|---|
| TOTAL PARTS & MATERIALS | 333.78 |
| TOTAL LABOR HOURS/RATE | 2.75 H / 95.00 |
| TOTAL LABOR | 261.25 |

**Equipment. Service. Guaranteed.**

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| SUBTOTAL | 595.03 |
| SALES TAX | 40.17 |
| INVOICE TOTAL | 635.20 |

SOFCO000321

**WORK ORDER INVOICE**



# INVOICE

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 40124413-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 5/23/13 | 078774 |

PAGE 1 of 1

INVOICE TO

SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

1oz - 3540 - 4414

| RECEIVED BY | TATTERSON, BRONSON | CONTRACT NO. 40124413 |
| PURCHASE ORDER NO. | | BRONSON |
| JOB NO. | | 1 - PROLOGIS 5 |

JOB ADDRESS
PROLOGIS 5
167 HERITAGE DR
PATASKALA, OH 43062

614-679-1267

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 2 | MOVE FEE / TRANSPORTATION<br>NRI92027<br>Move Sofco's forklift and jib attachment<br>from Stratmore in Dublin to Prologis 5<br>in Pataskala 5/22/13 AM<br>SHIP TO:  PROLOGIS 5<br>167 HERITAGE DR<br>PATASKALA, OH 43062 | EA | 125.00 | 250.00 |

20-5030
Bvs

JUN 6 - 2013

## Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

**SALES INVOICE**

| SUBTOTAL | 250.00 |
| SALES TAX | 16.88 |
| INVOICE TOTAL | 266.88 |

SOFCO000322



## INVOICE

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 40215051-001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 5/30/13  079084 |
| PAGE | 1 of 1 |

INVOICE TO

1oz - 3702 - 4655

SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

| RECEIVED BY | CONTRACT NO. |
|---|---|
| | 40215051 |

PURCHASE ORDER NO.

JOB ADDRESS
ASCENA
200 HERITAGE DRIVE
PATASKALA, OH 43062

JOB NO.
ASCENA

BRANCH
REYNOLDSBURG PC145
275 REYNOLDSBURG NEW ALBANY RD
RD

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 42' - 45' SHO |

**WORK PERFORMED:**
Went to jobsite for coolant leak.found hoses leaking. replaced hoses and added 2 gallons of antifreeze. ck no leaks.

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 85.000 | 85.00 |

**LABOR:**

| Mechanic | Hours | Work | Rate | Extended |
|---|---|---|---|---|
| 28288 | 2.50 | LABOR FOR REPAIRS | 80.00 | 200.00 |

| | | | | |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 42' - 45' SHO |

20-5029
BNS RM

## Equipment. Service. Guaranteed.

| TOTAL PARTS & MATERIALS | 85.00 |
|---|---|
| TOTAL LABOR HOURS/RATE | 2.50 H / 80.00 |
| TOTAL LABOR | 200.00 |
| SUBTOTAL | 285.00 |
| SALES TAX | 19.24 |
| INVOICE TOTAL | 304.24 |

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

**WORK ORDER INVOICE**

SOFCO000323

INVOICE

ND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 40463888-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 6/13/13  079099 |

PAGE  1 of 1

**INVOICE TO**

1oz - 3709 - 4532
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

| RECEIVED BY | CONTRACT NO. |
| | 40463888 |

PURCHASE ORDER NO.

JOB NO.

1 - ASCENA

**JOB ADDRESS**
ASCENA
200 HERITAGE DR.
PATASKALA, OH 43062 9674

BRANCH

REYNOLDSBURG PC145
275 REYNOLDSBURG NEW ALBANY RD
RD

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 42' - 45' SHO |

**WORK PERFORMED:**
Customer called from heritage drive pataskala job site,gas pedal broke and would
not move,found bolt fell out of pedal an,replaced bolt. tested drove ok.
Steps Performed:
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE

**LABOR:**

| Mechanic | Hours | Work | Rate | Extended |
|---|---|---|---|---|
| 28288 | 2.00 | LABOR FOR REPAIRS | 80.00 | 160.00 |

20-50 29
Bw Pay

| TOTAL PARTS & MATERIALS | 0.00 |
| TOTAL LABOR HOURS/RATE | 2.00 H / 80.00 |
| TOTAL LABOR | 160.00 |
| SUBTOTAL | 160.00 |
| SALES TAX | 10.80 |
| INVOICE TOTAL | 170.80 |

quipment. Service. Guaranteed.

EMIT TO:

NET DUE UPON RECEIPT

NBELT RENTALS, INC.
BOX 409211
LANTA, GA 30384-9211

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

SOFCO000324

**WORK ORDER INVOICE**



INVOICE

SEND ALL PAYMENTS TO:
SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 40642543-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 6/25/13   079527 |
| PAGE | 1 of 1 |

INVOICE TO

1oz - 3804 - 4727

SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
AMERICAS FLOOR SOURCE
3442 MILLENNIUM CT
COLUMBUS, OH 43219 5551

614-679-1267

| RECEIVED BY | CONTRACT NO. 40642543 |
| PURCHASE ORDER NO. | BRONSON |
| JOB NO. | 10 |
| BRANCH | REYNOLDSBURG PC145 275 REYNOLDSBURG NEW ALBANY RD RD 614-861-3086 |

| Qty | Item number | Unit | Price | Amount |
|-----|-------------|------|-------|--------|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 150.00 | 150.00 |
|  | * Millenium Ct ; Sofco's Shop |  |  |  |
|  | - Sky Trac \| Jib |  |  |  |
|  | SHIP TO: AMERICAS FLOOR SOURCE |  |  |  |
|  |     3442 MILLENNIUM CT |  |  |  |
|  |     COLUMBUS, OH 43219 5551 |  |  |  |

*20-S033*
*Bns* *FRT*

## Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS, INC.
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

**SALES INVOICE**

| SUBTOTAL | 150.00 |
| SALES TAX | 10.13 |
| **INVOICE TOTAL** | **160.13** |

SOFCO000325

Cols

8/1/10

7/31/11

SOFCO000397

# INVOICE

**SEND ALL PAYMENTS TO:**
**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211



| | |
|---|---|
| INVOICE NO. | 26874686-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 9/20/10 |

066872

PAGE 1 of 1

**INVOICE TO**

1oz - 2460 - 2604
**SOFCO ERECTORS**
7667 FISHEL DR S
DUBLIN OH 43016-8748

| RECEIVED BY | CONTRACT NO. |
|---|---|
| MIKE, 679-1266 | 26874686 |

PURCHASE ORDER NO.

JOB NO.
1 - GRANGE

**JOB ADDRESS**
GRANGE
S FRONT STREET
COLUMBUS, OH 43215

513-771-1600

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | MOVE FEE / TRANSPORTATION NRI92027 Move sofcos forklift from our shop to grange insurance on south front street SHIP TO: GRANGE   S FRONT STREET   COLUMBUS, OH 43215 | EA | 85.00 | 85.00 |

MDT
20-5893
fRC

OCT 7 – 2010

## Equipment. Service. Guaranteed.

**EMIT TO:**

**UNBELT RENTALS**
O BOX 409211
TLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| SUBTOTAL | 85.00 |
| SALES TAX | 5.74 |
| INVOICE TOTAL | 90.74 |

SOFCO000398

# INVOICE

**SEND ALL PAYMENTS TO:**
**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211



| INVOICE NO. | 26987602-001 |
| --- | --- |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 9/28/10 |

066874

PAGE 1 of 1

**INVOICE TO**

1oz - 2494 - 2624
SOFCO ERECTORS
7687 FISHEL DR S
DUBLIN OH 43016-8748

| RECEIVED BY | CONTRACT NO. |
| --- | --- |
| RABER, ALVIN | 26987602 |

PURCHASE ORDER NO.

JOB NO.
1 - THE LATHROP COMP

**JOB ADDRESS**

THE LATHROP COMPANY
1100 NEAL ZICK RD
WILLARD, OH 44890

614-332-2134

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
| --- | --- | --- | --- | --- |
| 4 | MOVE FEE / TRANSPORTATION NRI92027 MOVE CUSTOMERS SKYTRACK 10054 FROM OUR SHOP TO THE LATHROP CO 1100 NEAL ZICK RD WILLARD OHIO AT RATE OF $100.00 PER HR PORT TO PORT SHIP TO: THE LATHROP COMPANY 1100 NEAL ZICK RD WILLARD, OH 44890 | EA | 100.00 | 400.00 |

20-5941
BWT

OCT 7 – 2010

## Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 400.00 |
| --- | --- |
| SALES TAX | 27.00 |
| INVOICE TOTAL | 427.00 |

SALES INVOICE

SOFCO000399



**INVOICE**

SEND ALL PAYMENTS TO:
**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 27308264-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 10/22/10 |

067252

PAGE 1 of 1

INVOICE TO

1oz - 2932 - 3022
**#002932**
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

MOT SHOP PU

| RECEIVED BY | CONTRACT NO. |
| | 27308264 |
| PURCHASE ORDER NO. | |
| JOB NO. | |

JOB ADDRESS
OUR SHOP

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |

**WORK PERFORMED:**
JASON BROWN CALLED IN FOR LARRY 679-8498 GRADALL IN DELAWARE HENKLES PROJECT.
RAN OUT OF FUEL AND THINKS THEY BURNT THE STARTER TRYING TO RESTART. BRIAN
MADE RD CALL TO DELAWARE FOUND STARTER BAD. REMOVED THE STARTER AND TOOK IT TO
OUR REBUILDER FOR AN EXCHANGE STARTER. RETURNED TO SITE INSTALED THE STARTER
AND REPLACED THE IN LINE FUEL FILTER. UNIT STARTS AND RUNS OK.
Steps Performed:
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 65.000 | 65.00 |
| 1 | 16990 | STARTER | EA | 220.794 | 220.79 |
| 1 | BF836 | MICROLITE IN-LINE FU | EA | 4.005 | 4.01 |

**LABOR:**

| Mechanic | Hours | Work | Rate | |
|---|---|---|---|---|
| | SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |
| 20314507 | 4.20 | LABOR FOR REPAIRS | 85.00 | 357.00 |

NOV 24 2010

| TOTAL PARTS & MATERIALS | 289.80 |
| TOTAL LABOR HOURS/RATE | 4.20 H / 85.00 |
| TOTAL LABOR | 357.00 |
| SUBTOTAL | 646.80 |
| SALES TAX | 43.66 |
| INVOICE TOTAL | 690.46 |

**Equipment. Service. Guaranteed.**

REMIT TO:

NET DUE UPON RECEIPT

UNBELT RENTALS
O BOX 409211
TLANTA, GA 30384-9211

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

SOFCO000400

**WORK ORDER INVOICE**

INVOICE

SEND ALL PAYMENTS TO:
**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA  30384-9211

**SUNBELT**
**RENTALS**

| | |
|---|---|
| INVOICE NO. | 27688410-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 067318 |
| PAGE | 1 of 1 |

INVOICE TO

1oz - 2571 - 2674
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

| RECEIVED BY | CONTRACT NO. |
|---|---|
| BROWN, JASON | 27688410 |

| PURCHASE ORDER NO. |
|---|
| 9K EXT BOOM MOVE |

| JOB NO. |
|---|
| TGX |

JOB ADDRESS
TGX
6595 NEW ALBANY RD E
NEW ALBANY, OH  43054

614-679-1266

| BRANCH |
|---|
| HILLIARD PC203 |
| 5274 CEMETERY RD |
| HILLIARD, OH  43026-1501 |
| 614-876-2605 |

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 2 | MOVE FEE / TRANSPORTATION | EA | 100.00 | 200.00 |
| | NRI92027 | | | |
| | Move fee $100 per hour min. 2hrs | | | |
| | DELIVERY CHARGE | | | |
| | SHIP TO:  TGX | | | |
| | 6595 NEW ALBANY RD E | | | |
| | NEW ALBANY, OH  43054 | | | |

20-5945
BWT

DEC 7 - 2010

**Equipment. Service. Guaranteed.**

REMIT TO:

**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA  30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| SUBTOTAL | 200.00 |
| SALES TAX | 13.50 |
| INVOICE TOTAL | 213.50 |

SOFCO000401

**SUNBELT RENTALS**

SEND ALL PAYMENTS TO:
**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA 30384-9211**

| INVOICE NO. | 27876985-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 067420 |
| PAGE | 1 of 1 |

INVOICE TO

1oz - 2542 - 2653
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

| RECEIVED BY | CONTRACT NO. 27876985 |
| PURCHASE ORDER NO. | |

JOB ADDRESS
OUR SHOP

JOB NO.

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE4126 | GRADALL | 534C-9 | 0444126 | 5000LB 28' SHOOTING |

**WORK PERFORMED:**

CUSTOMERS FORKLIFT 534C-9 GRADALL. RD CALL TO NEWALBANY TGX JOB. STEVE CHECKED
THE BATTERY. IT SHOWED 13.7 VOLTS BUT TESTED WEAK NEEDS REPLACED. REPLACED BATT
ERY AND CLEANED BATTERY ENDS.
Steps Performed:
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE
CHK BATT FLUID LEVEL, CABLE CONNECT, HOLD DW
CHK BATTERY CHARGING SYSTEM

20-5945 PM
BWS

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 1 | 31-MHD | BATTERY 12 VOLT | EA | 118.275 | 118.28 |
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 65.000 | 65.00 |
| 1 | SHOP SUPPLIES | 2133XXX000 | EA | 10.000 | 10.00 |

**LABOR:**

| Mechanic | Hours | Work | Rate | Extended |
|---|---|---|---|---|
| | SE4126 | GRADALL  534C-9  0444126  5000LB 28' SHOOTING | | |
| 20111053 | 2.20 | CHK BATTERY CHARGING SYSTEM | 85.00 | 187.00 |

RECEIVED
DEC 2 0 2010
SOFCO ERECTORS, INC.

| TOTAL PARTS & MATERIALS | 193.28 |
| TOTAL LABOR HOURS/RATE | 2.20 H / 85.00 |
| TOTAL LABOR | 187.00 |

**Equipment. Service. Guaranteed.**

REMIT TO:

SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 380.28 |
| SALES TAX | 25.67 |
| **INVOICE TOTAL** | **405.95** |

**WORK ORDER INVOICE**

SOFCO000402

# SUNBELT
## RENTALS

SEND ALL PAYMENTS TO:
**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

| | |
|---|---|
| INVOICE NO. | 28072306-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 12/22/10 |

**067624**

PAGE 1 of 1

INVOICE TO

1oz - 2694 - 2799
**SOFCO ERECTORS**
7667 FISHEL DR S
DUBLIN OH 43016-8748

| RECEIVED BY | CONTRACT NO. |
|---|---|
| ALVIN | 28072306 |

PURCHASE ORDER NO.

JOB NO.
1 - MERCY HOSPITAL

JOB ADDRESS
MERCY HOSPITAL
110 E HOWARD ST
WILLARD, OH 44890

BRANCH

MANSFIELD PC209
2145 WALKER LAKE RD
ONTARIO, OH 44903-6520

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE0567 | SKYTRAK | 10042 | 30567 | 10,000LB 55' SHOOTIN |

**WORK PERFORMED:**
SERVICE CALL- REPLACE BATTERY REMOVE STARTER, SEND TO REX GILBERT'S
TO BE REBUILT, REINSTALL STARTER, TEST RUN
Steps Performed:
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE

**PARTS:**

| Qty | Part # | Description | | U/M | Price | Extended |
|---|---|---|---|---|---|---|
| 1 | MTP-65 | BATTERY | | EA | 114.870 | 114.87 |
| | Outside Labor | OUTSIDE LABOR | 216.68 | | | |

**LABOR:**

| Mechanic | Hours | Work | Rate | Extended |
|---|---|---|---|---|
| 20935656 | 3.50 | LABOR FOR REPAIRS | 95.00 | 332.50 |

| | | | | |
|---|---|---|---|---|
| SE0567 | SKYTRAK | 10042 | 30567 | 10,000LB 55' SHOOTIN |

20-SHOP
BWT

RECEIVED
JAN 1 4 2010
INC.

| | |
|---|---|
| TOTAL PARTS & MATERIALS | 114.87 |
| TOTAL LABOR HOURS/RATE | 3.50 H / 95.00 |
| TOTAL LABOR | 549.18 |

## Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| SUBTOTAL | 664.05 |
| SALES TAX | 45.11 |
| INVOICE TOTAL | 709.16 |

**WORK ORDER INVOICE**

SOFCO000403

**SUNBELT RENTALS**

SEND ALL PAYMENTS TO:
**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 27951230-001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 12/01/10 |

067422

PAGE  1 of 1

| INVOICE TO | | RECEIVED BY | CONTRACT NO. |
|---|---|---|---|
| 1oz - 2719 - 2801 | | TALBERT, MIKE | 27951230 |

SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

PURCHASE ORDER NO.
MOVE,

JOB NO.
1 - SOFCO ERECTORES

JOB ADDRESS
SOFCO ERECTORES
7667 FISHEL DR S
DUBLIN, OH 43016-8748

BRANCH
HILLIARD PC203
5274 CEMETERY RD
HILLIARD, OH 43026-1501
614-876-2605

614-761-2500

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 100.00 | 100.00 |

/// $100.00 AN HOUR 2HR MIN ///
P/U @ TGX 6595 NEW ALBANY RD EAST
DROP @ 9000 SMITH MILL RD
CONTACT: MIKE @ 679-1266
/// 9K GRADALL ///
SHIP TO: SOFCO ERECTORES
7667 FISHEL DR S
DUBLIN, OH 43016-8748

20-5945
Bro
pml

RECEIVED
DEC 2 0 2010
SOFCO ERECTORS, INC.

**Equipment. Service. Guaranteed.**

REMIT TO:

SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 100.00 |
|---|---|
| SALES TAX | 6.75 |
| INVOICE TOTAL | 106.75 |

**SALES INVOICE**

SOFCO000404



# INVOICE

SEND ALL PAYMENTS TO:
**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 28139530-001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 12/30/10 |

067626

PAGE 1 of 1

| RECEIVED BY | CONTRACT NO. |
|---|---|
| | 28139530 |

**INVOICE TO**

1cz - 2221 - 2345
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

PURCHASE ORDER NO.

JOB NO.

**JOB ADDRESS**
OUR SHOP

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |

**WORK PERFORMED:**
RAN SERVICE CALL ON 12/15/10 TO 9000 SMITH MILL IN NEW ALBANY ON GRADALL 534C-9.
FOUND TILT SWITCH STICKING AND WORKING INTERMITATLY. FOUND COVER ON ROCKER TO
BE BAD. TOOK HANDLE APART AND CLEANED OUT, STRAIGHTENED PLATES ON ROCKER SWITC
H. RETURNED ON 12/16 AND INSTALLED NEW SWITCH COVER, TESTED AND IS WORKING OK.
Steps Performed:
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 1 | 7003790 | CAP ROCKER SWITCH GR | EA | 2.309 | 2.31 |
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 65.000 | 65.00 |

**LABOR:**

| Mechanic | Hours | Work | Rate | Extended |
|---|---|---|---|---|
| 20111053 | 2.50 | LABOR FOR REPAIRS | 85.00 | 212.50 |

| SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |
|---|---|---|---|---|

20-5948
Bvs

RECEIVED
JAN 1 4 2010
SOFCO ERECTORS, INC.

| TOTAL PARTS & MATERIALS | 67.31 |
|---|---|
| TOTAL LABOR HOURS/RATE | 2.50 H / 85.00 |
| TOTAL LABOR | 212.50 |
| SUBTOTAL | 279.81 |
| SALES TAX | 18.89 |
| INVOICE TOTAL | 298.70 |

# Equipment. Service. Guaranteed.

REMIT TO:

**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

OFCO000405

# INVOICE

**SEND ALL PAYMENTS TO:**
SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA 30384-9211


**SUNBELT**
**RENTALS**

| INVOICE NO. | 28159006-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 1/03/11 067631 |

PAGE 1 of 1

INVOICE TO

1oz - 2154 - 2241
#230485
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
OUR SHOP

| RECEIVED BY | CONTRACT NO. |
| | 28159006 |

PURCHASE ORDER NO.

JOB NO.

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
| --- | --- | --- | --- | --- |
| SE4126 | GRADALL | 534C-9 | 0444126 | 5000LB 28' SHOOTING |

**WORK PERFORMED:**
LARRY RAN SERVICE CALL ON 12/22/10 ON BEECH RD FOR HYD HOSE LEAKING ON BOOM OF
SOFCO'S GRADALL 534C-9. ARRIVED AT SITE AND FOUND HYD FITTING ON HOSE ON THE BO
OM TO BE BAD, REPLACED FITTING AND TOPPED OFF HYD FLUID, TESTED UNIT FUNCTIONS,
TESTED OK SERVICE CALL REQUESTED BY TOM ON 12/21/1
0 @ 15:28
Steps Performed:
PERFORM INSPECTION/ANY NECESSARY MAINTENANCE

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
| --- | --- | --- | --- | --- | --- |
| 1 | 81635 | 1/2 X 1/2 X 90 F JIC | EA | 21.920 | 21.92 |
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 65.000 | 65.00 |
| 1 | HYDRA-TRANZ | HYDRA-TRANZ HYDRAULI | GA | 7.630 | 7.63 |

**LABOR:**

| Mechanic | Hours | Work | | | | Rate | Extended |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | SE4126 | GRADALL | 534C-9 | 0444126 | 5000LB 28' SHOOTING | |
| 14521388 | 1.50 | LABOR FOR REPAIRS | | | | 85.00 | 127.50 |

RECEIVED
JAN 1 4 2010
SOFCO ERECTORS, INC.

20-5948
BWT

| TOTAL PARTS & MATERIALS | 94.55 |
| TOTAL LABOR HOURS/RATE | 1.50 H / 85.00 |
| TOTAL LABOR | 127.50 |
| SUBTOTAL | 222.05 |
| SALES TAX | 15.00 |
| INVOICE TOTAL | 237.05 |

## Equipment. Service. Guaranteed.

**REMIT TO:**

SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

SOFCO000406

# INVOICE

**SEND ALL PAYMENTS TO:**
**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA 30384-9211**

## SUNBELT
### RENTALS

| INVOICE NO. | 28222843-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 1/07/11 | 0 6 7 8 1 7 |

PAGE 1 of 1

**INVOICE TO**

1oz - 2457 - 2558
SORCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

| RECEIVED BY | CONTRACT NO. |
| | 28222843 |

| PURCHASE ORDER NO. |
| BRONSON TATTERSON |

**JOB ADDRESS**

TGX
6595 NEW ALBANY RD E
NEW ALBANY, OH 43054

614-679-1266

| JOB NO. |
| TGX |

| BRANCH |
| REYNOLDSBURG PC145 |
| 275 REYNOLDSBURG NEW ALBANY RD RD |
| 614-861-3086 |

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114XXX000(CUSTOMER OWNED) TRANSPORT DELIVERY CHARGE SHIP TO: TGX 6595 NEW ALBANY RD E NEW ALBANY, OH 43054 | EA | 200.00 | 200.00 |

20-5945
BNT

RECEIVED

FEB 1 1 2011

SOFCO

# Equipment. Service. Guaranteed.

REMIT TO:

SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 200.00 |
| SALES TAX | 13.50 |
| INVOICE TOTAL | 213.50 |

SOFCO000407

SALES INVOICE

# INVOICE

**SEND ALL PAYMENTS TO:**
**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA  30384-9211**

## SUNBELT RENTALS

| INVOICE NO. | 28271877-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 1/13/11 |

067820

PAGE   1 of 1

INVOICE TO

1oz - 2215 - 2295
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

| RECEIVED BY | CONTRACT NO. |
| TATTERSON, BRONSON | 28271877 |

PURCHASE ORDER NO.

BRONSON TATTERSON

JOB NO.

1 - HENKLES CO

BRANCH

REYNOLDSBURG PC145
275 REYNOLDSBURG NEW ALBANY RD RD
614-861-3086

JOB ADDRESS
HENKLES CO
421 LONDON RD
DELAWARE, OH  43015-2493

614-679-1266

| Qty | Item number | Unit | Price | Amount |
|-----|-------------|------|-------|--------|
| 1 | 2114XXX000(CUSTOMER OWNED) TRANSPORT DELIVERY CHARGE SHIP TO:  HENKLES CO    421 LONDON RD    DELAWARE, OH  43015-2493 | EA | 200.00 | 200.00 |

20-5942
Bwr

RECEIVED
FEB 11 2011
SOFCO ERECTORS, INC.

# Equipment. Service. Guaranteed.

EMIT TO:

UNBELT RENTALS
O BOX 409211
TLANTA, GA  30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 200.00 |
| SALES TAX | 13.50 |
| INVOICE TOTAL | 213.50 |

SOFCO000408

**INVOICE**

SEND ALL PAYMENTS TO:
**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA  30384-9211

## SUNBELT
### RENTALS

| INVOICE NO. | 28311741-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 1/17/11  067821 |
| | PAGE    1 of 1 |

INVOICE TO

1oz - 2218 - 2324

SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

| RECEIVER TATTERSON, BRONSON | CONTRACT NO. 28311741 |
| PURCHASE ORDER NO. | BRONSON TATTERSON |
| JOB NO. | TGX |
| BRANCH | REYNOLDSBURG PC145 275 REYNOLDSBURG NEW ALBANY RD RD 614-861-3086 |

JOB ADDRESS
TGX
6595 NEW ALBANY RD E
NEW ALBANY, OH  43054

614-679-1266

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114XXX000(CUSTOMER OWNED) TRANSPORT DELIVERY CHARGE SHIP TO:  TGX     6595 NEW ALBANY RD E     NEW ALBANY, OH  43054 | EA | 200.00 | 200.00 |

20-5945
BNT

FEB 11 2011
SOFCO ERECTORS, INC.

## Equipment. Service. Guaranteed.

REMIT TO:

**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA  30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

SALES INVOICE

| SUBTOTAL | 200.00 |
| SALES TAX | 13.50 |
| INVOICE TOTAL | 213.50 |

SOFCO000409

# INVOICE

**SEND ALL PAYMENTS TO:**
**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA  30384-9211**

# SUNBELT
## RENTALS

| | |
|---|---|
| **INVOICE NO.** | 28652696-001 |
| **ACCOUNT NO.** | 230485 |
| **INVOICE DATE** | 068038 |

PAGE 1 of 1

INVOICE TO

1oz - 2466 - 2581
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

RECEIVED BY
BRONSON, ALVIN

CONTRACT NO.
28652696

PURCHASE ORDER NO.
BRONSON

JOB NO.
1 - WILLIAM H HALL

JOB ADDRESS
WILLIAM H HALL
NEIL AVE
10TH AVE
COLUMBUS, OH  43110

614-679-1267

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH  43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 2 | MOVE FEE / TRANSPORTATION | EA | 125.00 | 250.00 |
| | NRI92027 | | | |
| | Move gradall ext forklift w/ jib pole | | | |
| | from accell job in new albany to | | | |
| | William H Hall job on neil ave @ rate of | | | |
| | $125.00 per hr minimum 2 hrs contact | | | |
| | alvin 332-2134 | | | |
| | SHIP TO:  WILLIAM H HALL | | | |
| | NEIL AVE | | | |
| | 10TH AVE | | | |
| | COLUMBUS, OH  43110 | | | |

20-5950
BW

RECEIVED
MAR 2 - 2011
SOFCO ERECTORS, INC.

# Equipment. Service. Guaranteed.

**REMIT TO:**

NET DUE UPON RECEIPT

**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA  30384-9211**

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| | |
|---|---|
| **SUBTOTAL** | 250.00 |
| **SALES TAX** | 16.88 |
| **INVOICE TOTAL** | 266.88 |

SOFCO000410

# INVOICE

**SEND ALL PAYMENTS TO:**
**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA 30384-9211**



| INVOICE NO. | 28874423-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 068239 |
| PAGE | 1 of 1 |

**INVOICE TO**

1oz - 2226 - 2335
SOFCO ERECTORS
7667 FISHEL DR S
**002226
DUBLIN OH 43016-8748

| RECEIVED BY | CONTRACT NO. |
| TALBERT, MIKE | 28874423 |

PURCHASE ORDER NO.

JOB NO.
1 - MARS PETCARE (DU

**JOB ADDRESS**
MARS PETCARE (DUKE JOB)
15 COMMERCE PARKWAY
WEST JEFFERSON, OH 43162

614-679-1266

BRANCH
COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|-----|-------------|------|-------|--------|
| 2 | MOVE FEE / TRANSPORTATION | EA | 125.00 | 250.00 |
|   | NRI92027 |  |  |  |
|   | Move skytrak 10054 from accel project to |  |  |  |
|   | Mars Project in west jefferson ohio |  |  |  |
|   | SHIP TO:  MARS PETCARE (DUKE JOB) |  |  |  |
|   |    15 COMMERCE PARKWAY |  |  |  |
|   |    WEST JEFFERSON, OH  43162 |  |  |  |

20-5954
BWI

RECEIVED
MAR 22 2011
SOFCO ERECTORS. INC.

## Equipment. Service. Guaranteed.

**REMIT TO:**

**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA 30384-9211**

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 250.00 |
| SALES TAX | 16.88 |
| INVOICE TOTAL | 266.88 |

SOFCO000411



**SUNBELT**
**RENTALS**®

SEND ALL PAYMENTS TO:
SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA  30384-9211

| INVOICE NO. | 29311833-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 06861 |

PAGE  1 of 1

INVOICE TO

1oz - 2071 - 2173
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

| RECEIVED BY | CONTRACT NO. |
| TALBERT, MIKE | 29311833 |

PURCHASE ORDER NO.

N/R

JOB NO.

1 - MOVE CUSTOMERS E

JOB ADDRESS
MOVE CUSTOMERS EXTENDABOOM
7667 FISHEL DRIVE
DUBLIN, OH  43016-8747

614-761-2500

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH  43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|-----|-------------|------|-------|--------|
| 4 | MOVE FEE / TRANSPORTATION | EA | 125.00 | 500.00 |
|   | NRI92027 |  |  |  |
|   | Move customers forklift from mars in |  |  |  |
|   | west jeff to william h hall and then |  |  |  |
|   | move forklift from william h hall to |  |  |  |
|   | childrens hospital |  |  |  |
|   | SHIP TO:  MOVE CUSTOMERS EXTENDABOOM |  |  |  |
|   |          7667 FISHEL DRIVE |  |  |  |
|   |          DUBLIN, OH  43016-8747 |  |  |  |

*20-5954*
*BWT*
*266.87*

*20-5950*
*BWT*
*266.88*

RECEIVED
APR 26 2011
SOFCO ERECTORS, INC.

**Equipment. Service. Guaranteed.**

REMIT TO:

SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA  30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

SALES INVOICE

| SUBTOTAL | 500.00 |
| SALES TAX | 33.75 |
| INVOICE TOTAL | 533.75 |

SOFCO000412

*533.7*

**SUNBELT**
**RENTALS**

SEND ALL PAYMENTS TO:
SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 30151733-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 6/09/11 |

**069250**

PAGE  1 of 1

| INVOICE TO | RECEIVED BY | CONTRACT NO. |
|---|---|---|
| 1oz - 2202 - 2281 | JASON, BROWN | 30151733 |

INVOICE TO

SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

| PURCHASE ORDER NO. | |
|---|---|
| JOB NO. | 1 - JAMES CANCER HOS |

JOB ADDRESS
JAMES CANCER HOSPITAL
300 W 10TH AVE
COLUMBUS, OH 43210-1280

614-761-2500

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213
614-341-9770

| Qty | Item number | Unit | Price | Amount |
|---|---|---|---|---|
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 325.00 | 325.00 |
| | Move skytrack on 6-7 from campus to va hospital | | | |
| | SHIP TO:  JAMES CANCER HOSPITAL | | | |
| | 300 W 10TH AVE | | | |
| | COLUMBUS, OH  43210-1280 | | | |

*205952*
*BWS*
*FRT*

RECEIVED
JUN 2 7 2011
SOFCO ERECTORS, INC.

**Equipment. Service. Guaranteed.**

REMIT TO:

SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA  30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

SALES INVOICE

| SUBTOTAL | 325.00 |
| SALES TAX | 21.94 |
| INVOICE TOTAL | 346.94 |

SOFCO000413



## INVOICE

SEND ALL PAYMENTS TO:

**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 30620014-001 |
| --- | --- |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 7/13/11 |

069746

PAGE 1 of 1

INVOICE TO

1oz - 2600 - 2719
**002400

SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

| RECEIVED BY | CONTRACT NO. |
| --- | --- |
| TATTERSON, BRONSON | 30620014 |

PURCHASE ORDER NO.

FORKLIFT

JOB NO.

1 - MEDICAL OFFFICE

BRANCH

REYNOLDSBURG PC145
275 REYNOLDSBURG NEW ALBANY RD
RD
614-861-3086

JOB ADDRESS

MEDICAL OFFFICE BUILDING
0000 AFRICA ROAD
WESTERVILLE, OH 43082

614-679-1267

| Qty | Item number | Unit | Price | Amount |
| --- | --- | --- | --- | --- |
| 1 | 2114XXX000 EQUIPMENT MOVEMENT F FREIGHT | EA | 150.00 | 150.00 |
| | Move forkilft from Africa to polaris MOB 1.5 Hrs | | | |
| | SHIP TO: MEDICAL OFFFICE BUILDING 0000 AFRICA ROAD WESTERVILLE, OH 43082 | | | |

20-5959
BWT

RECEIVED
AUG 3 – 2011
SOFCO ERECTORS, INC.

## Equipment. Service. Guaranteed.

REMIT TO:

**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

| SUBTOTAL | 150.00 |
| --- | --- |
| SALES TAX | 10.13 |
| INVOICE TOTAL | 160.13 |

SOFCO000414



**SEND ALL PAYMENTS TO:**
**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA 30384-9211**

| | |
|---|---|
| **INVOICE NO.** | 30606022-001 |
| **ACCOUNT NO.** | 230485 |
| **INVOICE DATE** | 7/13/11 |

069747

PAGE  1 of 1

INVOICE TO

1oz - 2601 - 2720
**SOFCO ERECTORS**
**7667 FISHEL DR S**
**DUBLIN OH 43016-8748**

| RECEIVED BY | CONTRACT NO. |
|---|---|
| | 30606022 |
| PURCHASE ORDER NO. | |
| | ROB |
| JOB NO. | |
| | 1 - HONDA EAST LIBER |
| BRANCH | |

JOB ADDRESS
HONDA EAST LIBERTY
11000 STATE ROUTE 347
EAST LIBERTY, OH 43319-9470

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |

**WORK PERFORMED:**
CUSTOMER UNIT GRADALL 534 ROB 614-679-1272  EAST LIBERTY CALLED IN SAID STARTER
WAS BAD AND NEEDS REPLACED. Removed bad starter, had hole punched in
casing, installed new starter, repaired signal wire, test unit - ok.

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 1 | 16990 | STARTER | EA | 220.794 | 220.79 |
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 75.000 | 75.00 |

**LABOR:**

| Mechanic | Hours | Work | Rate | Extended |
|---|---|---|---|---|
| 20110481 | 2.25 | LABOR FOR REPAIRS | 95.00 | 213.75 |

| | | | | |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |

20-5960
BWJ
RM

RECEIVED
AUG 3 - 2011
SOFCO ERECTORS, INC.

**Equipment. Service. Guaranteed.**

| | |
|---|---|
| TOTAL PARTS & MATERIALS | 295.79 |
| TOTAL LABOR HOURS/RATE | 2.25 H / 95.00 |
| TOTAL LABOR | 213.75 |
| SUBTOTAL | 509.54 |
| SALES TAX | 35.14 |
| INVOICE TOTAL | **544.68** |

REMIT TO:

SUNBELT RENTALS
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

**WORK ORDER INVOICE**

SOFCO000415

INVOICE

**SEND ALL PAYMENTS TO:**
**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA 30384-9211**



| | |
|---|---|
| INVOICE NO. | 30695314-001 |
| | 230485 |
| INVOICE DATE | 7/18/11  069749 |

PAGE
1 of 1

| RECEIVED BY | CONTRACT NO. |
|---|---|
| | 30695314 |

PURCHASE ORDER NO.

INVOICE TO

1oz - 2201 - 2311
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH  43016-8748

JOB NO.
1 - HONDA EAST LIBER

BRANCH

JOB ADDRESS
HONDA EAST LIBERTY
11000 STATE ROUTE 347
EAST LIBERTY, OH 43319-9470

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |

**WORK PERFORMED:**
Gene - Honda, East Liberty - Unit has a hydraulic leak:   Found charge hose leak
ing from hydraulic pump. Removed rear hood. Made a new hose and installed it. Te
sted unit - ok.

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 75.000 | 75.00 |
| 1 | 6G-6FJX90S | 3/8" FEML JIC SWIVL | EA | 9.800 | 9.80 |
| 1 | 6G-6FJX | 2 WIRE HYD FITTING | EA | 4.250 | 4.25 |
| 2 | 6G2 | 6C2AT HOSE BY THE FO | EA | 5.090 | 10.18 |
| 1 | ENVIRONMEN | 2133XXX000 | EA | 4.000 | 4.00 |
| 1 | OIL | 2133XXX000 | EA | 11.000 | 11.00 |
| | 1 gallon hydraulic oil | | | | |

20-5960
BWT
RM

**LABOR:**

| Mechanic | Hours | Work | | Rate | Extended |
|---|---|---|---|---|---|
| | | | | | |
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING | |
| 20110481 | 1.00 | LABOR FOR REPAIRS | | 95.00 | 95.00 |

RECEIVED
AUG 3 - 2011
SOFCO ERECTORS INC.

| | |
|---|---|
| TOTAL PARTS & MATERIALS | 114.23 |
| TOTAL LABOR HOURS/RATE | 1.00 H / 95.00 |
| TOTAL LABOR | 95.00 |
| SUBTOTAL | 209.23 |
| SALES TAX | 14.12 |
| INVOICE TOTAL | 223.35 |

**Equipment. Service. Guaranteed.**

REMIT TO:

**SUNBELT RENTALS**
**PO BOX 409211**
**ATLANTA, GA 30384-9211**

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

SOFCO000416



**INVOICE**

SEND ALL PAYMENTS TO:

**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

| | |
|---|---|
| INVOICE NO. | 30729578-001 |
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 7/22/11 |

069753

PAGE 1 of 1

**INVOICE TO**

1oz - 8031 - 6218
*ST00L-E01
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

**JOB ADDRESS**

HONDA EAST LIBERTY
11000 STATE ROUTE 347
EAST LIBERTY, OH 43319-9470

RECEIVED BY

CONTRACT NO. 30729578

PURCHASE ORDER NO.

JOB NO. 1 - HONDA EAST LIBER

BRANCH

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |

**WORK PERFORMED:**

RD CALL TO HONDA CUSTOMERS UNIT HYD LEAKGene: Found main hose to LH lift cyl had rubbed through on the other hose. Made two new hoses and installed. Reinstalled hood assy. Tested unit - ok.

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 2 | 10G2 | 10C2AT HOSE BY THE F | EA | 7.310 | 14.62 |
| 1 | 10G-10FJX | 2 WIRE HYD FITTING | EA | 9.350 | 9.35 |
| 1 | 10G-10FJX90S | COUPLER | EA | 20.610 | 20.61 |
| 2.5 | 6G2 | 6C2AT HOSE BY THE FO | EA | 5.090 | 12.73 |
| 1 | 6G-6FJX90S | 3/8" FEML JIC SWIVL | EA | 9.800 | 9.80 |
| 1 | 6G-6FJX | 2 WIRE HYD FITTING | EA | 4.250 | 4.25 |
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 75.000 | 75.00 |
| 1 | ENVIRONMEN | 2133XXX000 | EA | 8.250 | 8.25 |

**LABOR:**

| Mechanic | Hours | Work | Rate | Extended |
|---|---|---|---|---|
| | | | | |
| | SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |
| 20110481 | 2.00 | LABOR FOR REPAIRS | 95.00 | 190.00 |

RECEIVED
AUG 3 - 2011

2U-5960
BWJ RM

| | |
|---|---|
| TOTAL PARTS & MATERIALS | 154.61 |
| TOTAL LABOR HOURS/RATE | 2.00 H / 95.00 |
| TOTAL LABOR | 190.00 |
| SUBTOTAL | 344.61 |
| SALES TAX | 23.65 |
| **INVOICE TOTAL** | **368.26** |

## Equipment. Service. Guaranteed.

**REMIT TO:**

**SUNBELT RENTALS**
PO BOX 409211
ATLANTA. GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject to a 1-½% per month charge.

SOFCO000417



**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

| INVOICE NO. | 30713861-001 |
|---|---|
| ACCOUNT NO. | 230485 |
| INVOICE DATE | 7/25/11  069843 |
| PAGE | 1 of 1 |

INVOICE TO

1oz - 2405 - 2535
SOFCO ERECTORS
7667 FISHEL DR S
DUBLIN OH 43016-8748

JOB ADDRESS
OUR SHOP

| RECEIVED BY | CONTRACT NO. |
|---|---|
| | 30713861 |
| PURCHASE ORDER NO. | |
| JOB NO. | |
| BRANCH | |

COLUMBUS PC201
1275 W MOUND ST
COLUMBUS, OH 43223-2213

| Equipment # | Make | Model | Serial # | Description |
|---|---|---|---|---|
| SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |

**WORK PERFORMED:**
RD CALL TO HONDA  HYD LEAK ON CUSTOMERS UNIT POC TOM
Found main hose to LH lift cyl rubbing through on other hose, made two new hoses & installed, reinstalled hood assy, test unit-ok.

**PARTS:**

| Qty | Part # | Description | U/M | Price | Extended |
|---|---|---|---|---|---|
| 2 | 10G2 | 10C2AT HOSE BY THE F | EA | 7.310 | 14.62 |
| 1 | 10G-10FJX | 2 WIRE HYD FITTING | EA | 9.750 | 9.75 |
| 1 | 10G-10FJX90S | COUPLER | EA | 20.610 | 20.61 |
| 2.5 | 6G2 | 6C2AT HOSE BY THE FO | EA | 5.090 | 12.73 |
| 1 | 6G-6FJX90S | 3/8" FEML JIC SWIVL | EA | 9.800 | 9.80 |
| 1 | 6G-6FJX | 2 WIRE HYD FITTING | EA | 4.140 | 4.14 |
| 1 | SERVICE CALL | 2134XXX000 SERVICE C | EA | 75.000 | 75.00 |
| 1 | ENVIRONMEN | 2133XXX000 | EA | 3.100 | 3.10 |

20- 5960
Bw
PM

**LABOR:**

| Mechanic | Hours | | Work | | Rate | Extended |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | SE534C | GRADALL | 534C-9 | NONE | 9000LB 45' SHOOTING |
| 20110481 | 2.00 | | LABOR FOR REPAIRS | | 95.00 | 190.00 |

AUG 11 2011
SOFCO

| TOTAL PARTS & MATERIALS | 149.75 |
|---|---|
| TOTAL LABOR HOURS/RATE | 2.00 H / 95.00 |
| TOTAL LABOR | 190.00 |
| SUBTOTAL | 339.75 |
| SALES TAX | 22.94 |
| INVOICE TOTAL | 362.69 |

## Equipment. Service. Guaranteed.

REMIT TO:

**SUNBELT RENTALS**
PO BOX 409211
ATLANTA, GA 30384-9211

NET DUE UPON RECEIPT

Invoices not paid within 30 days may be subject
to a 1-½% per month charge.

**WORK ORDER INVOICE**

SOFCO000418



# AGREEMENT BETWEEN
# CENTRAL OHIO AGC
# AND
# IRONWORKERS
# LOCAL UNION NO. 172

JUNE 1, 2014 — MAY 31, 2017

EXHIBIT
15
10-9-18

PENGAD 800-631-6989

SOFCO001409

# AGREEMENT BETWEEN
# CENTRAL OHIO AGC AND
# CENTRAL OHIO STEEL ERECTORS AND
# IRONWORKERS LOCAL UNION NO. 172

| | | |
|---|---|---|
| | PREAMBLE | 3 |
| | SAFETY | 3 |
| | DRUG-FREE WORKPLACE | 3 |
| | NON-DISCRIMINATION | 4 |
| 1 | CRAFT JURISDICTION | 4 |
| 2 | RECOGNITION AND SECURITY | 7 |
| 3 | REFERRAL CLAUSE | 8 |
| 4 | TERRITORY | 10 |
| 5 | WORK HOURS PER DAY | 10 |
| 6 | SHIFT WORK | 12 |
| 7 | OVERTIME & HOLIDAYS | 13 |
| 8 | DUES CHECK-OFF | 13 |
| 9 | WAGE RATES | 14 |
| 10 | PIECEWORK | 15 |
| 11 | WORK LIMITATION | 15 |
| 12 | PAYDAY | 15 |
| 13 | BENEFIT TRUST | 16 |
| 14 | PENSION PLAN | 17 |
| 15 | ANNUITY TRUST | 17 |
| 16 | BOND PROVISION | 18 |
| 17 | APPRENTICE TRAINING CONTRIBUTIONS | 19 |
| 18 | REPORTING TIME | 20 |
| 19 | REPORTING TIME (SHOW-UP TIME) | 20 |
| 20 | FOREMAN | 20 |
| 21 | PHYSICAL REQUIREMENTS | 22 |

SOFCO001410

| 22 | STRUCTURAL STEEL ERECTION & POWER OPERATED EQUIPMENT CREW | 22 |
| 23 | HELICOPTER AGREEMENT | 23 |
| 24 | STACKS | 23 |
| 25 | STONE SETTING | 23 |
| 26 | POURING CONCRETE | 24 |
| 27 | WELDER'S HELPER | 25 |
| 28 | SAFETY PROVISIONS | 25 |
| 29 | FINISHER'S TOOLS | 28 |
| 30 | SHIPPING EMPLOYEES | 30 |
| 31 | BUSINESS REPRESENTATIVE | 30 |
| 32 | JOB STEWARD | 30 |
| 33 | PROTECTION OF UNION PRINCIPLES | 31 |
| 34 | SUBCONTRACTING | 31 |
| 35 | WORKING CONDITIONS | 32 |
| 36 | DECLARATION OF PRINCIPLES | 33 |
| 37 | CONTRACTORS | 33 |
| 38 | SETTLEMENT OF DISPUTES | 34 |
| 39 | STRIKES AND LOCKOUTS | 34 |
| 40 | SCOPE OF AGREEMENT | 35 |
| 41 | LETTERS | 35 |
| 42 | CONSTRUCTION ADVANCEMENT (CAP/IAP) | 35 |
| 43 | IMPACT FUND | 36 |
| 44 | INT'L IRONWORKERS ORGANIZING FUND | 37 |
| 45 | SAVINGS CLAUSE | 37 |
| 46 | DURATION AND TERMINATION | 37 |
| | WAGE AND FRINGE FUND RATES | 40 |
| | CIRCULAR LETTER NO. 742 | 42 |

SOFCO001411

# PREAMBLE

THIS AGREEMENT is made and entered into this 1st day of June, 2013 by and between the CENTRAL OHIO DIVISION, ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC. hereinafter referred to as the "Employer" and the IRONWORKERS LOCAL UNION NO. 172, hereinafter referred to as the "Union".

This Agreement is entered into by collective bargaining to prevent strikes and lockouts and to facilitate peaceful adjustment of grievances and disputes between Employer and Union in this trade and to prevent waste, unnecessary and avoidable delays, and expense, and, so far as possible to provide for labor's continuous employment, such employment to be in accordance with the conditions herein set forth and at wages herein agreed upon, also, that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions, and further, the establishment of the necessary procedures by which these ends may be accomplished.

# SAFETY

The employees covered by the terms of this Agreement shall at all times while in the employ of the Employer be bound by the safety rules and regulations as established by the Employer in accordance with the Construction Safety Act and OSHA. These rules and regulations will be published and posted at conspicuous places throughout the project.

In accordance with the requirements of OSHA, it shall be the exclusive responsibility of each Employer on a job site to which this Agreement applies to assure safe working conditions for its employees and compliance by them with any safety rules contained herein or established by the Employer. Nothing in this Agreement will make the Union liable to any employees or to other persons in the event that injury or accident occurs.

# DRUG-FREE WORKPLACE

The Union and the Employer mutually agree to the policy of maintaining a drug free workplace in compliance with Federal Regulations and the Impact Drug and Alcohol Screening Policy and Procedure, which by reference is made part of this agreement. Labor and Management are committed to maintaining a workplace free of illegal drugs. Both parties recognize that illegal drug use poses health and safety hazards to the employee and to the construction industry at large. Management and labor prohibit the possession or use of illegal drugs and/or alcohol on all construction projects.

Employees manufacturing, distributing, dispensing, possessing or using illegal drugs and/or alcohol on construction projects are subject to immediate dismissal.

The parties recognize the Employer's right to formulate and propose a drug and alcohol policy, subject to all applicable laws and regulations, procedural safeguards, scientific principles, and legitimate interests of privacy and confidentiality. As such, nothing in this agreement, or in the Impact Drug and Alcohol Screening Policy and Procedure, shall prohibit the employer from conducting drug and alcohol screenings

3

SOFCO001412

in addition to that required by this agreement provided such tests meet or exceed accepted industry standards.

If the employer conducts drug and alcohol screenings in addition to that required by this agreement, individual employees may be required to sign consent forms or documentation involved in the actual screening process. Any refusal to comply with these requests or any attempt to switch, adulterate, or alter any sample or specimen shall be deemed a violation of this agreement. Any on-site testing shall be conducted by trained personnel and positive screenings shall be confirmed by certified laboratory analysis.

Employees may be temporarily suspended pending the results of laboratory analysis or confirmation of any post-accident or reasonable suspicion screening but shall be reimbursed for all wage and benefit loss incurred (not to exceed 32 hours) during this suspension. All false positives resulting from on-site screening shall also require reimbursement for wage and benefit loss (not to exceed 32 hours) by the employer.

Employees using prescription or over-the-counter drugs that may impair their ability to safely perform their assigned jobs shall inform their employer of such usage. They shall also indicate any such usage during any drug or alcohol screening. It shall not be a violation of this agreement or any confidentiality implied by this agreement for the third party administrator of a signatory contractor to report positive test results to the third party Administrator of Impact and such results shall be acted upon in accordance with the accepted procedures of this agreement.

Any violation of the Impact Drug and Alcohol Screening Policy and Procedures (or any addenda contained in this agreement) shall be subject to the provisions of Article 38 of this agreement.

## NON-DISCRIMINATION

The Employer and the Union agree that they will not discriminate against any employee or applicant for employment because of Race, Color, Creed, Age, Sex or National Origin. The parties further agree to abide by Executive Order 11246 and other succeeding Federal, State, County, and City regulations, establishing or extending equal employment opportunities.

## ARTICLE I
## CRAFT JURISDICTION

SECTION 1. This Agreement covers all field erection and construction work traditionally performed by and coming under the jurisdiction of the Association. The Employer recognizes that the claimed scope of work covered under this Agreement by the Association is that provided for, but not limited to, the jurisdictional claims contained within the charter grant issued by the AFL-CIO to the Association and contained in Article 4 of the Association's Constitution.

SECTION 2. Agreements, National in Scope between Ironworkers International Association and other International Unions, covering work jurisdiction and allocation and division of work among employees represented for the purpose of collective bargaining by such labor organizations, shall be respected

4

SOFCO001413

and applied by the Employer.

SECTION 3. It is understood and agreed that Employers signatory to this Agreement shall not sign a stipulation to be bound by the terms of the Agreement establishing the Impartial Jurisdictional Disputes Board nor be bound by its decisions. Any such stipulation that previously may have been entered into or on behalf of the Employer is rescinded by execution of this contract. It is further understood that the parties to this Agreement shall not submit any dispute to the Impartial Jurisdiction Disputes Board.

SECTION 4. The foregoing Section 3 shall remain in full force and effective until such time as all other Employers in the construction industry having agreements with the Ironworkers Union, and all other Unions affiliated with the Building and Construction Trades Department, have signed a stipulation to be bound by the terms of the Agreement and decisions of the Impartial Jurisdictional Disputes Board.

SECTION 5. In the event of any dispute as to Jurisdiction of work covered by the terms of this Agreement being claimed by Unions other than those affiliated with the Building and Construction Trades Department, AFL-CIO, then such dispute shall be referred to the International Unions involved for determination by whatever procedures they may adopt and the work shall proceed as assigned by the individual Employer until such determination by the International Unions in any given jurisdictional determination shall be implemented immediately by the individual Employer involved.

SECTION 6. There shall be no strikes, work stoppages, or other interferences with the work by reason of jurisdictional disputes.

SECTION 7. This Local Union claims for its members the fabrication, production, erection and construction of all iron, steel, ornamental lead, bronze, brass, copper, aluminum, all ferrous and nonferrous metals; precast, pre-stressed and post-stressed concrete structures, agitators, air ducts, anchors, application of all sealants such as Thiokol, Neoprene and similar types used to seal metal to metal surfaces; apron, aqueducts, awnings, bar joist, blast furnaces, book stacks, boilers (sectional water tube, and tubular), boxes, brackets, bridges, bucks, bulkheads, bunkers, cableways, caissons, canopies, caps, cast tiling, chutes, clips, cofferdams, concentrators, conveyors, coolers, coping, corbels, corrugated sheets when attached to steel frames; cranes (the erection, installation, handling, operating and maintenance on all forms of construction work), crushers, cupolas, curtains, dams, decking (metal), roof decking (such as "coffer" and similar type materials, as well as "Trusdeck", Mahan "M" deck and other dual purpose type roof deck), derricks, docks, domes, dredges, drums, duct and trench frames and plates, dumb waiter enclosures, dumpers, elevators, elevator cars, elevator enclosures, enamel tanks, enamel vats, escalators, expanded metals, fascias, false work, fans, fencing, fire escapes, fins, flag poles, floor construction and flooring, flumes, frames, frames in support of boilers, fronts, fur rooms, gates, grating, grillage and foundation work, grill work, guards, hangers, hanging ceilings, hoppers, hot rooms, inclines, iron doors, jail and cell work, joist (precast, prestressed and post-stressed), kalomeined doors, kilns, lintels, lockers, locks, louvers, machinery (moving, hoisting, lowering and placing on foundations),

5

SOFCO001414

making and installation of all articles made of wire and fibrous rope; marquees, material altered in field, such as: framing, cutting, bending, drilling, burning and welding by acetylene gas and electric machines, metal curtain wall, metal floor decking, metal forms and false work pertaining to concrete construction, metal windows, metal furniture and enclosures, mixers, monorails, multi-plate, operating devices, ovens, pans, panels (insulated and non-insulated, factory and field assembled) pen stocks, pile drivers, plates, porcelain enameled panels, prefabricated metal buildings, pulverizers, racks railing (including pipe), railroad bridgework and maintenance, reservoirs, rigging (including shipyards, navy yards, vessels and government departments), roofs, rolling shutters, safe deposit boxes, safes, sash, scaffolding, seats, shafting, sheet piling, shelving, shoring, sidewalk and vault lights signs, skip hoists, skylights, smoke conveyors, spandrels (metal and precast concrete), spillways, stacks, stairways, stokers, storage rooms, stoves, subways, sun shades, tables, towers, tanks, tracks, tramway, travelers, traveling sheaves, trusses (steel Howe, and combination), tunnels, vats, vault doors, vaults, ventilators, vertical hydraulic elevators, vessel, viaducts, window wall, wire work; wrecking and dismantling of all of the above and all house-smith work and submarine diving in connection with or about the same.

1. The assembly and erection of all metal shapes, sheets, pieces, studs, girts, purlins or other members for metal framing systems which are load bearing in function, no matter how limited the contribution to the load bearing resistance path or diaphragm function, which are utilized in the construction of structures; including all siding, sheeting, metal roofing, bar grating, flooring and any related accessories.

2. The mixing, manufacture and erection of all products or applications of fiber reinforced plastics and all related accessories.

3. The lay out and erection of all exterior wall systems including the anchors, framing, supporting members, sealing caulking, all vision lites, entrances, wall infill panels or spandrel panels whether weather protective, decorative, solar energy collecting, reflecting or sound attenuating in function including radio frequency (RF) shielding and all related accessories for the wall system.

4. All infill panels on stair rails, stair platform rails, barrier rails or other rail systems including all related accessories.

5. The fabrication, maintenance, repair, rigging and setting of all metal intermodal transportation containers and all related accessories when used on railway cars, ships, trucks or in stationary locations.

6. The unloading, handling, hoisting, distribution, placing and tying of all metal reinforcing bars, fibers, mesh and all related accessories for reinforcing cast in place concrete.

7. The unloading and erection of all power operated walkways, speedwalks and conveyors including all supporting framing, railings, wainscots, belting, all related accessories and operating mechanisms for transporting either materials or personnel whether horizontal, inclined or vertical.

6

8. All metal and metal products and all related accessories designed to be decorative, cosmetic or ornamental and commonly called "architectural metal" or miscellaneous iron.

9. The unloading, distribution and erection of all metallic door frames, including doors, hardware and all related accessories which are designed or intended to absorb or repel seismic, atmospheric, meteorological, or explosive forces, repel intruders, provide privacy or security and detention door systems whether the doors are operated manually or by power operators and whether the doors swing, slide, coil, stack or utilize other forces to control entry, egress or passage through the door opening.

The above claims are subject to trade agreements and decision of the National Joint Board for the Settlement of Jurisdictional Disputes.

SECTION 8. DEFINITION OF WORK COVERED.

"Contractor" where used in this Agreement means any Contractor engaged in either (1) building construction, (2) heavy construction, (3) highway construction, or (4) railroad construction or (5) building or plant maintenance including emergency repairs or planned scheduled maintenance.

## ARTICLE 2
## RECOGNITION AND SECURITY

SECTION 1. All employees who are members of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers on the effective date of this Agreement shall be required to remain members of the Association in good standing as a condition of employment during the term of this Agreement. All employees may be required to become and remain members of the Association in good standing as a condition of employment from and after the eighth (8th) day following the dates of employment, or the effective date of this Agreement, whichever is later. (This clause shall be effective only in those states permitting Union Security.)

SECTION 2. If the Union shall furnish employees to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained herein, the Union agrees that such more favorable wage rates and conditions shall automatically be extended to this Employer.

SECTION 3. It is understood that the negotiation committee for the aforementioned Employer and the negotiating committee for the Union are acting only as agents in the negotiation of this contract and that the negotiating committee for the Employer is the agent only for those individuals, partnerships, and corporations who have authorized them so to act, and the negotiating committee for the Union is agent only for the Union and its members, and in no event shall either of the said negotiating committees be bound or held liable in any manner for any breach of this contract of the contractors, employees, or members of the Union.

7

SOFCO001416

## ARTICLE 3
## REFERRAL CLAUSE

In order to maintain an efficient system of production in the industry, to provide for an orderly procedure of referral of applicants for employment and to preserve the legitimate interest of employees in the employment, the Employer and the Union agree to the following plan of referral of applicants to employment.

SECTION 1. The Employer shall have the right to employ directly a minimum number of key employees who may consist of a superintendent, general foreman and foremen. In addition, the Employer shall have the right to employ directly, on any Job in the locality in which the Employer maintains his principal place of business, employees required on such Job or Jobs provided such employees are regular employees of the Employer who have been employed by the Employer fifty percent (50%) of the time during the previous twelve (12) months; and on jobs of the Employer located outside of the locality in which the Employer maintains his principal place of business, forty percent (40%) of such employees.

SECTION 2. All other employees required by the Employer shall be furnished and referred to the Employer by the Union.

SECTION 3. The Employer shall have the right to reject any applicant referred by the local Union.

SECTION 4. The Union shall select and refer applicants for employment without discrimination against such applicants by reason of Race, Creed, Sex, Color, National Origin, Membership or Non-Membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements. The selection and referral of applicants shall be operated in accordance with the following plan.

SECTION 5. The Union shall register any applicants for employment on the basis of the Groups listed below. Each applicant shall be registered in the highest priority group for which he qualifies.

GROUP "A" All applicants for employment who have worked at the trade as a mechanic or apprentice for the past four (4) years; have previously passed a Journeyman's examination conducted by a duly constituted Local Union affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers, qualifying them to work as a mechanic at the trade; have been employed for a period of at least one (1) year during the past four (4) years by Employers (parties to collective bargaining agreements with the Union), and who have actually resided for the past year within the geographical area constituting the normal construction labor market.

Upon graduation from the Apprenticeship School of Ironworkers Local Union No. 172, in conjunction with the Central Ohio Division, Associated General Contractors of America, Inc., and approved by the Federal Bureau of Apprenticeship, the Ironworkers will be immediately placed in Group "A".

GROUP "B" All applicants for employment who have worked at the trade as a mechanic or apprentice for the past four (4) years; and have previously

8

passed a journeyman's examination conducted by a duly constituted local Union affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers qualifying them to work as a mechanic at the trade.

GROUP "C"  All applicants for employment who have worked at the trade as a mechanic or apprentice for the past two (2) years or more and have for the past year actually resided within the geographical area constituting the normal construction labor market.

GROUP "D"  All applicants for employment who have worked at the trade for more than one (1) year.

SECTION 6.  The Union shall maintain each of the separate group lists set forth above which shall list the applicants within each group in the order of the dates they registered as available for employment.

SECTION 7.  Employers shall advise the Union of the number of applicants needed.  The Union shall refer applicants to the Employer by first referring applicants in Group "A" in the order of their places on said list and then referring applicants in the same manner successively from the lists in Group "B", then Group "C", and then Group "D". Any applicant who is rejected by the Employer shall be returned to his appropriate place within his group and shall be referred to another Employer in accordance with the position of his group and his place within the group.  Upon a registrant being referred for employment and actually employed on a job more than three (3) days, such registrant's name shall be removed from the list until such time as his employment has been terminated at which time he shall be registered at the bottom of the appropriate list under which he is entitled to be registered.

If a registrant, upon being referred in regular order, refuses to accept the referral, such registrant's name shall be placed at the bottom of the appropriate list under which he is entitled to be registered.

SECTION 8.  The order of referral set forth above shall be followed except in cases where Employers require and call for employees possessing special skills and abilities in which case the Union shall refer the first applicant on the register possessing such special skills and abilities.

SECTION 9.  Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between the Employer and Union.

SECTION 10.  In the event that the referral facilities maintained by the local Union are unable to fill the requisition of an Employer for employees within a forty-eight (48) hour period after such requisition is made by the Employer (Saturdays, Sundays and Holidays excepted), the Employer may employ applicants directly at the job site.

In such event, the Employer will notify the local Union of the names and dates of such hiring.

SECTION 11.  The local Union, through its Examining Board, shall examine job applicants who have not previously passed an examination conducted by a duly constituted local Union affiliated with the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers in order to determine whether

9

SOFCO001418

they are qualified to perform the work of the craft as a mechanic and be eligible for referral. Such examinations shall be held at least every month.

SECTION 12. In the event that any job applicant is dissatisfied with his Group Classification or his order of referral in that such applicant claims that he was not placed in the proper group set forth above or was not referred in the regular order as provided above or if a job applicant has failed in his examination to qualify as an eligible referent, such aggrieved job applicant may appeal in writing within ten (10) days from the day on which his complaint arose, or failure to pass his examination, to an Appellate Tribunal consisting of an Employer representative, a Union representative and an Impartial Umpire appointed jointly by the Employer and the Union, and the decision of the Appellate Tribunal shall be final and binding.

SECTION 13. The Employer and the local Union shall post in appropriate places all provisions relating to the hiring arrangement set forth in this Agreement.

## ARTICLE 4
## TERRITORY

SECTION 1. The territory covered by this Agreement shall be the territorial jurisdiction of Local Union No. 172 which includes all or part of the following Ohio Counties: Champaign, Clark, Crawford, Delaware, Fairfield, Fayette, Franklin, Hardin, Highland, Hocking, Jackson, Knox, Licking, Logan, Madison, Marion, Morrow, Muskingum, Perry, Pickaway, Pike, Ross, Union, Vinton, and Wyandot.

SECTION 2. The boundaries of Local Union No. 172 were established by mutual agreement at the District Council of Southern Ohio and Vicinity meeting held e 20, 1956, at Dayton, Ohio, and approved by the General Executive Board of this International on June 26, 1956.

## ARTICLE 5
## WORK HOURS PER DAY

SECTION 1. Eight (8) hours shall constitute a day's work, which shall be performed between the hours of 7:00 a.m. and 4:30 p.m. Except if contractually required (subject to verification) or by mutual agreement between the Business Agent and the Employer, work performed before the standard starting time or after the standard quitting time, shall be paid at the applicable overtime rate. On jobs where it becomes necessary to have a one (1) hour lunch period the quitting time shall be set back one-half (½) hour. Normal lunch hour shall be a one-half (½) hour period, which begins no sooner than three and one-half (3½)) hours nor later than four and one-half (4 ½) hours from the starting time. When work men are required to work through the normal lunch hour, such work shall be regarded as overtime. NOTE: On jobs using the standard four/ten (4/10) work schedule, lunch shall be a one-half (½) hour period which begins no sooner than four and one-half (4 ½) hours nor later than five and one-half (5½) hours from the starting time. When a legal holiday falls on a scheduled workday, the Employer may use the four/ten (4/10) hour day workweek. (Excludes

10

Thanksgiving, Christmas and New Year)

SECTION 2. Changes in the work hours per day in special cases, not however to exceed an eight (8) hour day, may be made to meet special conditions upon application to and approval of the General Executive Board.

SECTION 3. If an Employee is required to work unscheduled overtime more than ten (10) hours at the option of the majority they may take a one-half (½) hour lunch break without pay at the end of the tenth (10th) hour of work and an additional one-half (½) hour lunch break without pay after each additional four (4) hours of work. (This clause does not apply to scheduled shift work).

SECTION 4. Employees called in or sent in on emergency work anytime outside regular daylight work hours shall receive a minimum of four (4) hours at time and one half rate.

SECTION 5. Four/Ten Work Week. By mutual agreement between the Employer and the Union, a job may be worked on a four (4) day ten (10) hour basis and worked at the regular straight time rate, this shall constitute a forty (40) hour week. However, at no time shall an agreement to work four/tens (4/10) on one job be construed to mean another job may be worked under the same conditions without the same mutual agreement. All four/tens (4/10) jobs will be scheduled at the beginning of the Monday starting time mutually agreed upon. When the four (4) day ten (10) hour option is exercised, it must remain in effect for the full work-week or until job completion, whichever occurs first (provided that the job runs a minimum of one week). All employees of the Employer covered by this agreement on a particular job must come under this provision. Ten consecutive hours, exclusive of one half (½) hour lunch period between the hours of 7:00 a.m. and 6:00 p.m. shall constitute a workday from Monday through Thursday. Work performed before and after the regular 4/10 work hours Monday through Friday, Saturday and Sunday will be at the applicable overtime rate. One coffee break is required at midmorning and a second coffee break is required after the lunch hour.

SHIFTS: When a four (4) day week is being utilized and two (2) shifts are scheduled, the first or day shift will consist of ten (10) hours worked for ten (10) hours pay; the second shift shall consist of ten (10) hours worked for ten (10) hours pay. In the event an employee elects to work less than a full shift he will be paid for the hours actually worked.

FRIDAY MAKE-UP DAY: Due to inclement weather or other conditions beyond the Employer's control, a Friday make up day may be scheduled with the following provisions:

A) The makeup-day is voluntary for each individual employee and the employee shall not be discriminated against with regard to lay off for refusing to work.

B) The make up day shall be scheduled for at least eight (8) hours work, weather permitting work.

C) Hours worked within the scheduled work hours, (not to exceed forty (40) hours in a work week) shall be paid at the straight time rate. Hours in excess of

11

forty hours shall be paid at the applicable overtime rate.

D) When a legal Holiday falls on a scheduled workday, the Employer may use the four/ten (4/10) hour day workweek schedule for the remainder of the workweek. Foremen and general foremen will still receive the guaranteed forty-hour pay plus any overtime that may be worked.

An employee who is referred for employment whose work is scheduled for less than forty (40) hours (from date of hire to termination) shall receive the appropriate rate of overtime pay for all hours worked in excess of eight (8) hours per day.

SECTION 6. Due to inclement weather or other conditions beyond the employers control and upon prior mutual agreement or if contractually required (subject to verification) between the employer and the union, a Saturday make up day may be utilized on designated projects.

The makeup day is voluntary for each individual employee and shall be scheduled for at least 8 hours, weather permitting.

Work performed before and after the regular eight-hour day Monday through Saturday will be at the applicable overtime rate. All foreman and general foreman wage and hour guarantees shall remain in effect.

Employees on other similarly affected sites may voluntarily transfer to a designated site to perform work as needed on the make up day, but their employment shall not supercede that of designated site employees seeking to work the make up day.

Any agreement to utilize this section on a specific site does not automatically grant an extension of these terms and conditions to other sites without prior agreement of such extension.

When a legal holiday occurs or is observed during the standard workweek, Monday through Friday, a make up day on the following Saturday is not applicable and in this instance is an overtime day.

## ARTICLE 6
## SHIFT WORK

When two (2) shifts are employed, the first shift shall work eight (8) hours and receive eight (8) hours pay. The second shift shall work eight (8) hours and receive eight (8) hours pay plus a ten (10) percent shift differential.

When three (3) shifts are employed, the first shift shall work eight (8) hours and receive eight (8) hours pay. The second shift shall work seven and one half (7½) hours and receive seven and one half (7½) hours pay plus a ten (10) percent shift differential. The third shift shall work seven (7) hours and receive seven (7) hours pay plus a fifteen (15) percent shift differential.

When multiple shifts are employed on Saturday, Sunday, and recognized holidays or where each shift is longer than eight (8) hours, the rate of pay shall be calculated at the appropriate overtime rate (REFER TO ARTICLE 7 - OVERTIME AND HOLIDAYS) plus the appropriate shift differential. The overtime rate shall

12

SOFCO001421

start with the first or morning shift. A thirty (30) minute lunch break shall be observed on each shift and shall not be considered as time worked.

When an individual is required to work overtime beyond his usual shift he shall remain on such appropriate overtime rate of pay until he receives a break of not less than eight (8) hours.

Upon prior agreement between the local union and the Employer, where job conditions dictate a second or third shift may be worked absent a first or second shift providing the appropriate shift differential work hours and rates of pay are observed. (UNDER THE TERMS OF THIS PARTICULAR PARAGRAPH EACH SHIFT SHALL BE A FULL EIGHT (8) HOUR SHIFT). The appropriate shift designation shall be based on starting time.

Except in cases of emergency as decided by the General Executive Board, not more than one shift shall be allowed on a job of less than five (5) days duration.

## ARTICLE 7
## OVERTIME AND HOLIDAYS

SECTION 1. All work in excess of eight (8) hours Monday through Friday shall be paid at the rate of one and one half (1 ½) the hourly rate for the 9th 10th, and 11th hours. Employees must work eight (8) hours before overtime shall be paid. All work performed after the 12th hour shall be paid at the double time rate. The first twelve (12) hours worked on Saturday shall be paid one and one half (1 ½) times the hourly rate. All work performed after twelve (12) ten hours will be paid at the double time rate. All work performed on Sunday and Holidays shall be paid at the double time rate. No work shall be performed on Labor Day except to save life or property.

SECTION 2. The following holidays shall be observed: New Year's Day, Labor Day, Memorial Day, Thanksgiving Day, July 4, Christmas Day

SECTION 3. Any of the above holidays in Section 2 which occur on a Sunday shall be observed on the following Monday. No Employee shall accept time off as compensation for overtime.

## ARTICLE 8
## DUES CHECK OFF

Commencing June 1, 1974 and continuing thereafter during the term of this Agreement, and in accordance with the terms of an individual and voluntary written authorization for check off of Union dues in the form agreed upon by the parties hereto and permitted by the provisions of Section 302 (c) of the Labor Management Relations Act as amended, the Employer agrees to deduct once each week from the wages of each employee covered by this Agreement who signs such authorization, five (5%) percent of said employees gross wages. The amount deducted shall be remitted to Ironworkers Local Union No. 172 indicated on reporting forms by the 15th day of the following month together with a statement setting forth the name and hours paid of each employee from whose wages the deduction is made.

13

# ARTICLE 9
## WAGE RATES

The different classifications of an "Ironworker" are as follows: Structural, Welder, Ornamental, Machinery Mover, Reinforcing, Fence Erector, Rigger, Sheeter. All in the above classifications are paid the same hourly rate as that listed for a Journeyman Ironworker.

SECTION 1. The following minimum hourly wages shall apply to the classifications indicated.

June 1, 2013 - $ 27.67
June 1, 2014 -   to be determined
June 1, 2015 -   to be determined

The above rates become effective with the first day of the first full pay week in the month of the effective date of the increase.

SECTION 2. <u>Foreman.</u> Not less than one dollar and seventy-five cents ($1.75) above the journeyman rate as of June 1, 2013. Not less than two dollars ($2.00) above the journeyman rate as of June 1, 2014.

<u>General Foreman.</u> Not less than two dollars and twenty-five cents ($2.25) above the journeyman rate as of June 1, 2013. Not less than two dollars and fifty cents ($2.50) above the journeyman rate as of June 1, 2014.

SECTION 3. Apprentices and trainees shall be paid not less than the following minimum percentages of the journeyman rate:

| | | | |
|---|---|---|---|
| First one thousand hours | - 60% | Fifth one thousand hours | - 80% |
| Second one thousand | - 65% | Sixth one thousand hours | - 85% |
| Third one thousand hours | - 70% | Seventh one thousand | - 90% |
| Fourth one thousand hours | - 75% | Eighth one thousand hours | - 95% |

SECTION 4. <u>HOT PAY.</u> Hot pay shall be at the rate of one dollar ($1.00) per hour added to the classification rate shown in Article 9, Section 1. "Hot" work is defined as a work area in which the temperature is in excess of one hundred fifty (150) degrees F° due to the presence of a furnace, smelter, incinerator, or other equipment that emits extreme heat.

## EFFECTIVE JUNE 1, 2013

| | |
|---|---|
| Journeyman Ironworker | $ 27.67  per hour |
| Foreman | 29.42  per hour |
| General Foreman | 29.92  per hour |
| Pension | 8.60  per hour |
| Health and Welfare | 6.20  per hour |
| Annuity | 2.55  per hour paid |
| Apprentice Fund | 1% of existing wage rate |

14

SOFCO001423

| | |
|---|---|
| Safety Training Fund | .06  per hour |
| Construction Advancement Fund | .04  per hour |
| I.P.A.L. | $    .02  per hour |
| IMPACT FUND | 1% of existing wage rate |

**DEDUCTED:**  Dues Check Off  5% of Gross Wages

**Wages & Benefits will be determined from increase**

| | |
|---|---|
| EFFECTIVE June 1, 2014 | $  1.00 increase |
| EFFECTIVE June 1, 2015 | $   .90 increase |
| EFFECTIVE June 1, 2016 | $   .90 increase |
| EFFECTIVE June 1, 2017 | $   .90 increase |

## ARTICLE 10
## PIECEWORK

It is further agreed that the Employees will not contract, subcontract, work piecework, or work for less that the scale of wages established by the Agreement.  The Employers agree not to offer and/or to pay, and the Employees will not accept, a bonus based on specific performance while on any individual job.

## ARTICLE 11
## WORK LIMITATION

There shall be no limitation placed on the amount of work to be performed by any workman during working hours.

## ARTICLE 12
## PAYDAY

SECTION 1. The regular payday shall be on Friday or once a week on such day as agreed upon between the Employer and the local Union and wages shall be paid before quitting time and wages are to be paid in cash or other legal tender.

SECTION 2.  Employers may withhold only four (4) days wages from an Employee from Local Union No. 172 jurisdiction.

SECTION 3. When employees are laid off, or discharged, they shall be paid in full, in cash or other legal tender, on the job immediately, and if required to go to some other point or to the office of the Employer, the employees shall be paid for the time required to go to such places.  When employees quit of their own accord, they shall wait until the regular payday for the wages due them.

SECTION 4.  Any undue delay or loss of time caused employees through no fault of their own shall be paid for by the Employer causing such delay, at the regular straight time wages.

15

SOFCO001424

SECTION 5. Accompanying each payment of wages shall be a separate statement identifying the Employer, showing the total earnings, the amount of each deduction, the purpose thereof and net earning. Any Company paying in check or other legal tender shall give the address of the Employer Company and the Parent Company or corporation.

SECTION 6. In the event that the bank upon which an Employer draws his payroll check refuses to honor it for insufficient funds, the Employer shall within twentyfour (24) hours thereafter issue to the employee in question payment in cash, money order, or certified check, in the net amount of said dishonored payroll check plus ten (10%) percent of the net amount. The penalty does not apply if the employee does not attempt to cash his check within thirty (30) days.

SECTION 7. In the event of a layoff of Ironworkers working after the regular working hours of the Employer's office, the pay due those Ironworkers may be mailed directly to their homes or to the Union office, no later than the following regular working day.

## ARTICLE 13
## BENEFIT TRUST

Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated August 1, 1952, as amended and as the same way hereafter be amended from time to time, which established and which governs the operations of the Ironworkers District Council of Southern Ohio & Vicinity Benefit Trust. That document shall be deemed to be part of this Collective Bargaining Agreement as though set forth herein at length. Unless the Employer has already done so, each Employer who is subject to the provisions hereof shall enter into a signed Participation Agreement with the Trustees of the Trust in a form prescribed by the Trustees. Each Employer agrees to continue to pay to said Benefit Trust not less than (six dollars and twenty cents ($6.20)) effective June 1, 2013 through May 31, 2018 for each hour worked under this agreement for any Ironworker employed by the Employer. Reports shall be rendered monthly for a fourweek or fiveweek period, as appropriate.

In computing the payments to be made by each Employer into the Trust there shall be included the payments made for shift differential, paid reporting time, paid holidays and all other items for which payment is provided excluding paid vacation. Employers' reports and contributions based upon hours worked in any month shall be paid and are due in the office of the Benefit Trust on or before the fifteenth day of the following month. For the late filing of all reports and for the late payment of contributions, liquidated damages shall be assessed in conformity with the then current policies of the United States Internal Revenue Service with respect to late filings and payments to it; under the foregoing the following charges presently prevail in 2007:

(a) For late filing of reports, five (5%) percent of the amount of the contribution covered by the report, per month, not to exceed twenty-five (25%) percent;

(b) for late payment of contributions, (1) One and one-half (1½%) percent

16

per month not to exceed fifty (50) months, except that for the first five (5) months of concurrent late reporting and also late payment this one and one-half (1½%) percent shall be included in the five (5%) percent in (a) above, plus (2) interest at the rate of one (1%) percent per month on all delinquent payments until paid.

## ARTICLE 14
## PENSION TRUST

Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated October 30, 1962, as amended and as the same may hereafter be amended from time to time, which established and which governs the operations of the Ironworkers District Council of Southern Ohio & Vicinity Pension Trust. That document shall be deemed to be part of this Collective Bargaining Agreement as though set forth herein at length. Unless the Employer has already done so, each Employer who is subject to the provisions hereof shall enter into a signed Participation Agreement with the Trustees of the Trust in a form prescribed by the Trustees.

Each Employer agrees to pay to said Pension Trust not less than eight dollars and sixty cents ($8.60) an hour from June 1, 2013 through May 31, 2018 for each hour worked under this Agreement for any Ironworker employed by the Employer. Reports shall be rendered monthly for a four-week or five-week period, as appropriate. In computing the payments to be made by each Employer into the trust there shall be included the payments made for shift differential, paid reporting time, paid holidays and all other items for which payment is provided excluding paid vacation. Employers' reports and contributions based upon hours worked in any month shall be paid and are due in the office of the Pension Trust on or before the fifteenth (15th) day of the following month. For the late filing of reports and for the late payment of contributions, liquidated damages shall be assessed in conformity with the then current policies of the United States Internal Revenue Service with respect to late filings and payments to it; under the foregoing the following charges presently prevail in 2013: (a) for late filing of reports, five (5%) percent of the amount of the contribution covered by the report, per month, not to exceed twenty-five (25%) percent; (b) for late payment of contributions, (1) One and one-half (1½%) percent per month, not to exceed 50 months, except that for the first five (5) months of concurrent late reporting and also late payment this one and one-half (1½%) percent shall be included in the five (5%) percent in (a) above, plus (2) interest at the rate of one (1%) percent per month on all delinquent payments until paid.

## ARTICLE 15
## ANNUITY TRUST

Each Employer who is subject to the provisions hereof shall be bound by all the terms and provisions of the Agreement and Declaration of Trust dated April 27, 1971, as amended and as the same may hereafter be amended from time to time, which established and which governs the operation of the

17

SOFCO001426

Ironworkers District Council of Southern Ohio and Vicinity Annuity Trust. That document shall be deemed to be a part of the Collective Bargaining Agreement as though set forth herein at length.  Unless the Employer has already done so, each Employer who is subject to the provisions hereof shall enter into a signed Participation Agreement with the Trustees of the Trust in a form prescribed by the Trustees.

Each Employer agrees to continue to pay said Annuity Trust not less than two dollars and fifty-five cents ($2.55) an hour for each hour **paid** under this Agreement for any Ironworker employed by the Employer.  Reports shall be rendered monthly for a four-week or five-week period, as appropriate.

In computing the payments to be made by each Employer into the Trust there shall be included the payments made for shift differential, paid reporting time, paid holidays and all other items for which payment is provided excluding paid vacation.  Employers' reports and contributions based upon hours paid in any month shall be paid and are due in the office of the Annuity Trust on or before the fifteenth (15th) day of the following month.  For the late filing of reports and for the late payment of contributions, liquidated damages shall be assessed in conformity with the then current policies of the United States Internal Revenue Service with respect to late filings and payments to it under the foregoing the following charges presently prevail in 2007; (a) for late filing of reports, five (5%) percent of the amount of the contribution covered by the report per month not to exceed twenty-five (25%) percent; (b) for late payment of contributions, (1) one and one/half (1½%) percent per month, not to exceed fifty (50) months, except that for the first five (5) months of concurrent late reporting and also late payment this one and one-half (1½%) percent shall be included in the five (5%) percent in (a) above, plus (2) interest at the rate of one (1%) percent per month on all delinquent payments until paid.

## ARTICLE 16
## BOND PROVISION

The Union shall require those Employers who have not established and maintained an office in the Jurisdiction of Ironworkers Local Union No. 172 for two (2) years or more, or who are not previously a party to an agreement with Ironworkers Local Union No. 172 or who are delinquent or who become delinquent in payments to Benefits and Deductions programs provided by this agreement to procure, pay the premium for, and deliver to the Union, a Bond written by a responsible Surety Company of the State of Ohio in the sum of fifty thousand dollars ($50,000.00) plus any existing delinquencies due said Benefits and Deductions programs, guaranteeing fringe benefits due employees under this agreement and all payments and penalties due as provided in this Agreement.

Employers desiring to start work before furnishing such Bond shall make five thousand dollars ($5,000.00) cash deposit with Ironworkers Local #172. His job may then proceed for a period of seven (7) days.  Thereafter, the fifty thousand dollars ($50,000.00)  Bond must be posted before work may continue.

18

SOFCO001427

Any such deposit shall be refunded to the Employer upon presentation of the Bond. The above Bond and cash deposit are for the purpose of securing the payment by their Employer of any deductions programs and shall be refunded to the Employer within ten (10) days upon completion of the work, providing that all obligations with respect to the programs have been paid.

Payments are due on the fifteenth (15th) day of the month following the month reported and are considered delinquent on the thirtieth (30th) day of the month following the month reported. Damages shall be assessed according to the Health & Welfare, Pension Plan and Annuity Fund Trust Document.

The Union shall refuse to refer men and shall withdraw men from any individual Employer who has not complied with the provisions of this Section and such refusal and/or withdrawal will not constitute a violation of this Agreement.

## ARTICLE 17
## APPRENTICESHIP TRAINING CONTRIBUTIONS

SECTION 1. Each Employer shall contribute one percent (1%) of the Base Wage Rate per hour worked by employees covered under this collective bargaining agreement into a fund to defray training costs and the expense of administration of a (Employer/Union) apprenticeship training program.

SECTION 2. Each employer shall contribute an additional six cents ($.06) per hour worked by employees covered under this collective bargaining agreement into the Safety fund to provide funding and employee compensation for safety training as outlined in Article 28, Section 23, and to provide safety training classes as part of this apprenticeship training program. These funds shall be accounted separately under the supervision of the Joint Apprenticeship Committee of Local No. 172. The parties to this collective bargaining agreement expressly recognize that monies already in this separate fund on the effective date of this collective bargaining agreement may be used for any of the purposes specified in this section.

SECTION 3. Forms will be furnished and may be used as the fourth and fifth copies of the Benefit & Pension Report. Payments are to be made by the fifteenth (15th) of the month following the month in which the time is worked. If payments are not made by the thirtieth (30th) of the month following the month in which the time is worked, the Union shall remove their members until such payments are made. Checks should be made payable to the Ironworkers Local Union No. 172 Apprenticeship Training Fund and mailed to 2867 S. High Street, Columbus Ohio 43207.

SECTION 4. The said Apprenticeship Training Fund shall be administered pursuant to an Agreement and Declaration of Trust administered jointly by an equal number of representatives from the Employers and the Union, which Agreement and Declaration of Trust shall conform to all requirements of law. A copy of the said Agreement and Declaration of Trust, together with any amendments thereto shall be considered as part of this Agreement as though set forth here at length.

SECTION 5. Apprentices shall be hired and transferred in accordance with

19

SOFCO001428

the apprentice provisions between the Employer and the Union.  On structural work, one (1) apprentice may be employed to every four (4) journeymen; on rod work, one apprentice may be employed for every three (3) journeymen.  On all finishing, steel sash, stairway and ornamental work, one (1) apprentice may be allowed for every one (1) journeyman.  One (1) apprentice may be employed for every sheeting gang.

## ARTICLE 18
## REPORTING TIME

SECTION 1.  When an employee is ordered by the Employer or his representative to report for work and then through no fault of the employee is not put to work or employed for less than two (2) hours, the Employer shall pay him for two (2) hours time, weather permitting work, provided the employees remain on the job during the said two (2) hours.  On jobs of more than two (2) hours duration, all employees shall be paid for the actual hours worked.

## ARTICLE 19
## REPORTING TIME (SHOW-UP TIME)

SECTION 1.  On all jobs outside of Franklin County and contiguous counties, two (2) hours shall be paid for reporting time regardless of the weather conditions at the stipulated rate, provided, however, the men remain on the job two (2) hours or are sent home by their foreman or the Contractor.

SECTION 2.  On all jobs in Franklin County and contiguous counties, one (1) hour shall be paid for reporting time regardless of weather conditions at the stipulated rate, provided however; the men remain on the job one (1) hour or are sent home by their foreman or the Contractor.

SECTION 3.  On all work being performed on Sunday or holidays, show up time shall be paid at the double time rate.  On all work being performed on Saturday, show up time shall be paid at the time and one-half rate.

SECTION 4.  On request by the Contractor to hire an ironworker for one day, the Ironworker will be paid on a two (2) hour, four (4) hour, and eight (8) hour basis.

SECTION 5.  When the Contractor or the Employer's representative or steward on the job calls the Ironworkers Union Hall for additional men, the man's pay shall start at the regular starting time the first day; providing the Ironworker arrives on the job in a reasonable length of time: ( time to be agreed upon by the Contractor and Business Agent.)  The second day and days thereafter, the man shall be required to be on the job at starting time or be paid from the time he begins work.

## ARTICLE 20
## FOREMAN

SECTION 1.  When two (2) or more journeymen are employed, one shall be selected by the Employer to act as craft foreman and receive the appropriate rate of pay as specified in this article.  When only one journeyman or apprentice Ironworker is employed and is required to assume responsibility for the work

20

performed, or read and interpret detailed drawings or plans, he shall also receive the appropriate foreman rate of pay. When a journeyman or apprentice Ironworker, on a job of any size, as a condition of employment is required to read detailed working drawings or plans and assume responsibility for the work performed or is required to direct or lead the work of other journeymen or apprentice Ironworkers, he shall be considered a foreman and be paid the appropriate rate of pay and receive all other guarantees as specified in this article.

SECTION 2. When an out of town Contractor brings in a foreman and the job requires another foreman, the second foreman will be a member of Local Union No. 172, providing he can perform the work. Thereafter every other foreman will be a local member.

SECTION 3. There shall be no restriction as to the employment of foremen or pushers. The Employer may employ on one piece of work as many foremen or pushers as in his judgment is necessary for the safe, expeditious and economical handling of the same.

SECTION 4. All foremen shall receive not less than one dollar and seventy-five cents ($1.75) per hour over the journeyman rate as of June 1, 2013 and two dollars over journeyman rate as of June 1, 2014 per hour over the journeyman rate and shall be guaranteed forty (40) hours per week plus overtime on jobs where five (5) or more men are employed and where the job is five (5) or more days duration. The week is meant the Employers regular pay week and shall apply only to the first and succeeding full pay weeks. The foreman shall be available to the Employer during the full time for which he is paid even though the job is not in progress.

Note: On jobs using the standard four/ten (4/10) work schedule, the work week is Monday through Thursday. All foreman/general foremen shall receive the same guarantees as outlined in this section.

SECTION 5. Where fifteen (15) or more Ironworkers are employed, a general foreman shall be employed. He shall receive not less than two dollars and twenty-five cents ($2.25) per hour over the journeyman rate as of June 1, 2013 and two dollars and fifty cents as of June 1, 2014 and be guaranteed forty (40) hours per week plus overtime.

SECTION 6. No foreman will be allowed to take the place of any journeyman Ironworkers on any overtime work providing the journeyman is qualified to perform the work.

SECTION 7. Unless mutually agreed upon between the local union and the Employer prior to such designation, an apprentice Ironworker shall not be designated a foreman, nor shall an apprentice Ironworker issue instructions to journeymen Ironworkers. Upon such agreed upon designation, said apprentice shall receive the appropriate journeyman's rate of pay plus the appropriate foreman's differential and all other guarantees due a foreman as specified in this article.

SECTION 8. The foreman is the only representative of the Employer who shall issue instructions to the workmen.

21

## ARTICLE 21
## PHYSICAL REQUIREMENTS

SECTION 1. Employees shall not be prevented from securing employment as a result of physical examination.

SECTION 2. Upon request, the Union will provide to an Employer information, if known, regarding physical disabilities that prevent an employee from safely performing work duties. Employers and Union agree that no employee shall suffer discrimination on account of Race, Color, Creed, Age, Sex or National Origin and that no otherwise qualified employee shall suffer discrimination on account of a handicap.

## ARTICLE 22
## STRUCTURAL STEEL ERECTION
## & POWER OPERATED EQUIPMENT CREW SIZE

SECTION 1. On any substantial structural steel erection project (two (2) floors or more) the crew shall consist of four (4) men and a foreman.

The erection of wall bearing bar joists or other wall bearing structural steel may be performed by a crew consisting of three (3) men and a foreman.

Pre-assembled roof or floor sections consisting of multiple bar joists or other structural shapes assembled and hoisted as a single unit shall be erected by a crew consisting of three (3) men and a foreman.

Structural steel erection requiring four (4) hours or less may be performed by a crew sufficient in size to safely perform such work provided such work is not performed piece meal in an effort to create such a condition.

No less than six (6) men and a foreman shall be employed around any guy or stiff leg derrick used in the erection of structural steel.

SECTION 2. When power operated equipment is used to hoist building materials or when it becomes necessary in the operation of power operated booms or cableways to use a signal man, Ironworkers shall be employed, as provided for in the GREEN BOOK (Plan for Settling Jurisdictional Disputes for the Building Trades Department).

SECTION 3. Power Operated Equipment When power operated equipment is used to unload or hoist one truck load or less of reinforcing materials above or below the ground level or at ground level, or above or below any floor level, no less than two (2) men shall be employed.

SECTION 4. No less than three (3) men and a foreman shall be employed on ForkLifts except where by mutual agreement between the Employer representative and the Business Agent, a fewer number of men may be used to perform the work in a safe and expeditious manner.

*The Above Described Provisions Shall Be Enforced Consistent With The Intent Of Circular Letter No. 742 Dated April 13, 1972 As Printed Herein And Any Deviations Shall Be By Mutual Agreement Between The Union And The Employer.*

22

SOFCO001431

*However, At No Time Shall An Agreement On One Project Be Construed As To Mean The Same Agreement And Conditions Shall Exist Or Be Extended To Another Without Further Negotiation.*

## ARTICLE 23
## HELICOPTER AGREEMENT

There shall be a five (5) man crew when erecting or raising steel, heavy equipment, ventilators, roof frames, roof deck, etc. with a helicopter. The crew will include one foreman who shall be situated at the most advantageous point relative to safety and efficiency. When both points (supply and erection) are not clearly visible to each other, there shall be an additional radio signal man, whose sole duty will be to signal the copter for erection purposes. The rest of the men will be distributed to make up the crew for hooking on and erecting or landing. Face protectors and safety glasses shall be furnished by the Contractor. There shall be a minimum of one hundred and twenty-five (125) feet of cable on the helicopter winch for erection purposes. It shall be the Ironworker foreman's privilege at his discretion to have the winch, cable and all lifting harnesses checked for safety and replaced at his suggestion.

## ARTICLE 24
## STACKS

This Agreement is made and entered into this 6th day of September, 1968. The Unions and the Company hereby agree that the Company may use a composite crew for the construction of reinforced concrete chimneys based on the following:

1. The Unions agree that their men will work in a composite crew using sectional or jump forms, and that in so far as possible equal numbers of each of the three (3) crews will be used and in no case will the deferential in the number of men from each crew be more than one.

2. The composite crew will be used only on the construction of the concrete chimney shaft. Other work on the job, such as foundations, ladders, lightning rods, linings, and all of the other things that go into a chimney, but which are not the concrete shaft itself, will be built or installed along craft lines.

3. All men on the job will be paid strictly according to the rules and regulations of the agreements covering local Unions involved in the particular job.

## ARTICLE 25
## STONE SETTING

SECTION 1. The placing and operating of all derricks and rigging in connection with cut stone, precast stone or concrete, mosaic and rubble, or any substitute for the foregoing, on all buildings, structures, bridges and viaducts in the course of construction, alteration, addition or repair; also on all demolition jobs where the stone is hoisted on or off the wall with a derrick or crane.

SECTION 2. The rigging erecting of all swinging and temporary scaffolds

23

SOFCO001432

for settling, cleaning and pointing of cutstone, precast stone or concrete, mosaic or rubble or any substitute for the foregoing shall be the work of the Ironworker, and any re-hanging of the same shall be the work of the Ironworker.

SECTION 3. The handling and rolling of all cutstone, precast stone or concrete, mosaic or rubble or any substitute for the same at the job site shall be the work of the Ironworker. Also the loading or unloading of the same shall be the work of the Ironworker.

SECTION 4. All burning, welding and bolting in connection with the erection of precast concrete and similar material shall be the work of the ironworker.

SECTION 5. There shall be an Ironworker Signalman employed on setting stone or other similar material when power equipment is used.

SECTION 6. The above Article 25 is subject to trade agreements to which International Association is a party as well as declarations rendered by the National Impartial Disputes Board for the Settlement of Jurisdictional disputes.

## ARTICLE 26
## POURING CONCRETE

Where precast, pre-stressed, reinforced concrete structural members (columns, beams, girders, slabs, etc,) are used in the construction of buildings, bridges and other structures and power equipment such as derricks, cranes, jacks and/or digging is used, work of loading, unloading, moving and placing to complete erection shall be performed by Ironworkers.

An ironworker will be used to straighten, tie or adjust steel rods when concrete is being poured but will not be required as a standby man.

An Ironworker will be used on reinforcing steel and wire mesh in roadways and sidewalks in connection with building construction.

Ironworkers will be used to lay wire mesh and paperback Steele and all other material when used to reinforce concrete on all types of building and other construction work. The pulling or raising of wire where necessary shall be the work of the Ironworker.

The Employer agrees not to assign or subcontract any work of the Union in regards to the reinforcing of poured concrete, to be performed at the job site of construction, on work covered by the collective bargaining agreement with Local Union No. 172, to any Contractor not in agreement with Local Union No. 172 or to any other labor organization. If the Union determines that the Employer is in violation of the above article, it may, take the following action.

1. The Union may terminate Agreement immediately.

2. The Union may need an injunction in any court of competent jurisdiction to restrain further violation of this Article 26 by the Contractor or his agents. This remedy shall be in addition to any other remedy, in law or equity.

3. If the Employer should violate this assignment or subcontract article, the nature of damage suffered by the Union, difficult to ascertain. The Employer will pay to the Union two hundred dollars ($200.00) per day, each working day

24

the Employer is in violation of this Article. That nothing herein shall preclude the Union being able to affect any other remedy at law or equity including the obtaining of attorney fees and other cost of suit.

When an authorized Company representative request men for the work described above, and the Union is unable to furnish men, the above Paragraph does not apply.

## ARTICLE 27
## WELDER'S HELPER

SECTION 1. The Employer will assign Ironworker Helpers to assist welders as needed to safely and efficiently perform the work assigned. Apprentices may be utilized as Welder's Helpers within the established ratios of Article 17, Section 5. The Welder's Helper may also be utilized as a Fire Watch as required by job conditions.

SECTION 2. A helper shall not be required when welding floor deck, precast concrete or ornamental iron.

## ARTICLE 28
## SAFETY PROVISIONS

SECTION 1. When the use of hand signals during steel erection, rigging or the hoisting of materials becomes unsafe, impractical or when direct visual contact with the crane or hoist operator is impaired, an Ironworker will be utilized as a separate signalman to either relay hand signals or operate hand held radio or telephone signaling devices.

SECTION 2. The Employer agrees to maintain all equipment in a safe working condition. The Employer agrees to make all reasonable provisions for the health and safety of his employees at all times during the hours of employment and all employees shall use safety equipment provided by the Employer, failure to comply will subject employees to immediate dismissal without recourse.

SECTION 3. No employee shall be obligated by the terms of this agreement to use any equipment or vehicle not in safe operating condition and not equipped with all safety appliances required by law.

SECTION 4. No employee shall be required to work nor shall any employee be discriminated against for refusing to work with equipment that is unsafe, or under conditions that are determined unsafe by the majority of employees on the job, or failure to comply with all State and Federal safety laws.

SECTION 5. Under no circumstances shall an Employer request Ironworker employees to work around any type rig where the boom of such rig will at any time in the work operation come nearer or within ten (10) feet to any high voltage power line, until the proper safety precautionary measures have been taken to cover said power lines in manner to avoid contact of the boom with the power line.

SECTION 6. Working floors upon which derricks are set must be covered tight with suitable planking or netting over entire floor except where openings are left for ladders. No more than two (2) floors or a maximum of twentyfive (25) feet

25

SOFCO001434

shall remain open or uncovered and all such floors shall be planked or netted and within a minimum radius of ten (10) feet.

SECTION 7. Where iron is landed on the floor or any point of a structure under construction, all connections shall be fully fitted up and tightened and substantial support provided to safely sustain such added weight.

SECTION 8. No employee shall be permitted to ride the load or load fall, except in the case of inspection, and erection, and dismantling of derricks.

SECTION 9. Proper practical safe housing, casing or tube, shall be provided for any and every means, method, appliance or equipment employed to transmit or give signals, direction work or operating of any and various devices in connection with work being done by employees.

SECTION 10. Steel cable will be used instead of chains or hemp slings.

SECTION 11. No employee will be permitted to work in an elevator shaft while car is in operation. The first floor beneath and the first floor above men working shall be planked safe in all elevator shafts.

SECTION 12. The steward, when observing or being informed of a potential hazard on the project, shall inform the foreman of said hazard. If the reported hazard is not remedied to comply with state and federal codes, the steward shall promptly report the hazard to the Union. Unless qualified and designated by the employer, the Steward shall not act as the employer's safety person.

SECTION 13. Any Employer employing forty (40) men or more on any one job the steward will be assigned a job which gives him an opportunity to circulate about his Employers operation and will not be restricted to one crew or gang. This is not to imply that there will be any limitations on the amount of work to be performed by the steward on behalf of the Contractor.

SECTION 14. On all bridge jobs being constructed over rivers the Employer shall designate a structural ironworker with able swimming ability as safety man. If the Contractor has two or more Ironworkers working in the river bed in the work area he will not be required to employ an Ironworker for the purpose of safety man only but this man may be assigned to other work provided it does not require him to leave the area while Ironworkers are working overhead. The Contractor will furnish the safety man with a boat suitable for patrolling the water area beneath the workmen.

SECTION 15. No employee shall be permitted to weld, burn, grind or chip, unless equipped with the proper safety devices to perform such work.

SECTION 16. In ditches or open excavations, the safety provisions of the Ohio State Safety Code and the Federal Safety Code shall apply.

SECTION 17. An obligation imposed upon and accepted by the Employer is the compliance, with the Ohio State Worker's Compensation Insurance Law, Specific Safety Requirements of the Industrial Commission of Ohio Relating to Construction, Federal Security Agency, Social Security Board and the Bureau of Employment Services.

26

SECTION 18. Structural steel with Nelson Studs or other types of concrete anchors welded or fastened to the walking surfaces of the beams will not be erected in the jurisdiction of Ironworkers Local Union No. 172. Nelson Studs or other types of anchors on the walking surfaces of the beams must be installed by Ironworkers after the beams are erected.

SECTION 19. When hand signals for cranes, derricks, hoists and cableways used on work under the jurisdiction of Local Union No. 172 are needed such signaling is to be done by an Ironworker.

SECTION 20. When an Ironworker is directing the movements of a crane or other rigs via hand signals, he must have an unobstructed view of the Operator, as well as, all boom, swing and load movements. In the event that a clear and complete view is not available, a second Ironworker signalman shall be utilized.

SECTION 21. When working on crane runways, under operating conditions, rail stops, lights or flags should be placed between workmen and operating crane. If conditions do not permit such safety precautions, one or more ironworkers will be provided to protect the workmen.

SECTION 22. The Employer shall provide or pay for the following safety equipment: HARD HATS, WELDING GLOVES, WELDING JACKET or SLEEVES, WELDING HOOD WITH APPROPRIATE LENSES, BURNING GOGGLES, SAFETY GLASSES, GRINDING SHIELDS, and such SAFETY BELTS or HARNESSES as required for the employee's safety and protection. All safety equipment shall comply with applicable OSHA standards. Such equipment shall remain the property of the Employer. The Employer reserves the right to require the employee to sign an agreement to return all Employer supplied safety equipment in good condition (absent normal wear and tear). If the equipment is not returned as required, the Employer may deduct the replacement cost from the employee's paycheck. When as a condition of employment, SAFETY (STEEL-TOED) BOOTS are required, the Employer shall reimburse each employee (not to exceed $100.00 annually) for the cost of such safety boots.

SECTION 23. Recognizing the moral obligation of the union and the legal duty of the employer to provide a safe work place, both parties agree to implement safety training as the need arises. Individuals receiving such training shall receive compensation for their time. This compensation and any other costs associated with the implementation of such training shall be borne by a safety training fund as outlined in Section 2, Article 17 of this agreement.

As part of its obligation to provide trained applicants the union agrees to continue its efforts to encourage safety education. All members of Local Union No. 172, being referred to work under this collective bargaining agreement will complete training in the following areas:

SOFCO001436

## OSHA TEN-HOUR COURSE
## CPR – FIRST AID
## OSHA REGULATIONS

It shall be understood that as part of its obligation to provide a safe work place the Employer will actively encourage participation in all applicable safety training by all employees covered by this collective bargaining agreement and shall thru its representatives on the Apprenticeship Committee require all current and future apprentice members of Local Union No. 172 to receive such training as part of the regular classroom course work associated with their apprenticeship.

Employee education that is compliant with the Ohio Bureau of Workers' Compensation Drug Free Workplace Program as created by Executive Order 92-65V shall be conducted and funded under the terms and conditions of this section.

All other individuals regardless of local union affiliation being referred for employment under this agreement shall be eligible to enroll in any safety training program conducted under the terms of this section.

## ARTICLE 29
## FINISHER'S TOOLS

SECTION 1.  Employees employed on ornamental work shall furnish for their own use all necessary hand tools to enable them to effectively install such work.  Expendable tools broken on the job shall be replaced by the Employer.  The employee will be responsible for his nonexpendable tools.  No employee shall be held responsible for the loss of the Employer's tools or equipment in his charge:

All ornamental Ironworkers will have the following tools in their possession:

## EXPENDABLE

| | |
|---|---|
| Hacksaw Blades | Drill bits up to ⅜" |
| Hammer Handle | Taps |
| Plumb Bob & Line | 6-ft. Rule |

## NON-EXPENDABLE

| | |
|---|---|
| Ratchet & Socket up to ½ Inch Open End Wrenches up to ¾ Inch | 50 Foot Tape |
| 12 Inch Combination Square | 8 Inch Pliers |
| 12 Inch Crescent Wrench | Divider |
| Rubber or Rawhide Mallet | Drift Pin |
| 1½ Lb. Ball Peen Hammer | 6 Inch Screw Driver |
| 12 Inch Hacksaw | 8 Inch Screw Driver |
| | 12 Inch Screw Driver |

28

SOFCO001437

Cold Chisel
24 Inch Level
Scriber

Offset Screw Driver
Tap Wrench
Center Punch

*All structural Ironworkers will have in their possessions the following tools:*

## STRUCTURAL WORK AND MACHINERY MOVING

1  4 or 6 lb. sledge hammer
1  12 Inch Crescent Wrench
1  Belt and Bolt Bag
1  ¾ Spud Wrench

1  50 Foot Tape
1  ⅞ Spud Wrench
1  6 Foot Rule
1  Bull Pin

## SHEETING WORK

1  12 Inch Hacksaw
1  24 Inch Level
1  6 Foot Rule
1  50 Foot Tape
1  Scriber
1  Divider
1  Cold Chisel
1  Ball Peen Hammer
1  12 Inch Combination Square
1  Ratchet & Socket  Wrenches
   (½ Inch Drive)

1  Pr. R H Metal Masters
1  Pr. L H Metal Masters
1  Pr. #5 Bulldog Shears
1  10 Inch Crescent Wrench
1  8 Inch Pliers
1  6 Inch Screw Driver
1  8 Inch Screw Driver
1  12 Inch Screw Driver
1  Offset Screw Driver
1  Plumb Bob & Line
1  Center Punch

**Rod Work:** 1 25-foot tape measure • 1 Reel & Belt • 1 Pair Pliers

SECTION 2.  At the Contractor's option, he may require any workman to sign out for personal tools such as hard hats, safety belts, which the employee will retain while in the company's employ.  The workmen shall return such items upon the termination of his employment and upon failure to do so the Contractor may deduct the actual cost of such items from the workman's paycheck.  It is further understood that a safe place will be provided where workmen may leave hard hats, safetybelts, and personal belongings overnight or during other nonwork hours.

SECTION 3.  Portable electric hoists, which are used four (4) hours or less per day, are tools of the trade.

29

SOFCO001438

## ARTICLE 30
## SHIPPING EMPLOYEES

SECTION 1.  Employees shipped to jobs or work out of the jurisdiction of the local Union shall receive transportation, traveling time and expenses, providing they remain on the job, thirty (30) days or until the job is completed, if it requires less than thirty (30) days.  Employees shipped to a job and not put to work, weather permitting, or the job is not ready for them to go to work, shall be paid the regular wage rate for such time, or such employees shall be shipped back to the shipping point with time and transportation paid by the Employer.

SECTION 2.  Each individual journeyman or apprentice Ironworker referred from the local union to a job site within the jurisdiction of Ironworkers Local No. 172 and then transferred to a job site beyond the boundaries of those counties listed in Article 4, Section 1, shall receive a minimum of thirty (30) dollars per diem, payable as a separate expense allowance to cover the added cost associated with working beyond the jurisdiction of the local union.

SECTION 3.  Any exceptions to Section 2 shall be subject to negotiation and agreement between Local 172 and the Employer.

## ARTICLE 31
## BUSINESS REPRESENTATIVE

SECTION 1.  The Business Representative of the Union shall be permitted to visit all jobs, but will in no way interfere with the progress of the work.

## ARTICLE 32
## JOB STEWARD

SECTION 1.  There shall be a steward on each job who shall be appointed by the Business Agent.  He shall keep a record of workers laid off and discharged and take up all grievances of the job and try to have same adjusted, and in the event he cannot adjust them he must promptly report that fact to the Business Agent who shall report same to the proper officer of the Union so that efforts can be made to adjust any matter without a stoppage of work.  He shall see that the provisions of these working rules are complied with and report to the Union the true condition and facts.  All accidents and injuries shall be promptly reported to the steward.  The steward shall, with the knowledge of the employer's representative, accompany or transport the injured ironworker as the case may require to the nearest medical facility and if necessary thereafter to their home without any loss of time.  The steward shall report the accident or injury to the Union and the Employer.  The steward shall not have authority to cause a work stoppage on any job of fair Employer.  A steward failing to fulfill his duties shall be subject to censure by his Union and also subject to a penalty upon conviction on charges provided for in the International Constitution.

SECTION 2.  All reasonable effort shall be made by the Employer or his Representative to employ the Steward during all times that work covered by this Collective Bargaining Agreement is progressing.  This section shall also

30

entitle the Steward to be included in all overtime that does not require the replacement of another worker. The Employer agrees that the job steward will not be discharged until after proper notification has been given to the Union and, further, when employees are laid off the job, the steward will be the last man laid off providing he is capable of performing the work in question.

SECTION 3. When forty (40) men or more are employed on an individual job by an individual Employer, the steward shall be guaranteed forty (40) hours per week. The steward shall be available to that Employer during the full time for which he is paid even though the job is not in progress. In the event the steward leaves the job for any reason, he shall appoint a temporary steward to act in his capacity until he returns.

SECTION 4. Each Employer primarily engaged in machinery moving and employing five (5) or more Ironworkers shall have a company steward who shall assume the responsibility outlined in Section 1, 2, 3 of the above.

SECTION 5. The job steward's duties shall not include the hiring, referral or termination of employees. The job steward shall not be employed in a position that would under the terms of this agreement, describe a foreman or general foreman.

## ARTICLE 33
## PROTECTION OF UNION PRINCIPLES

SECTION 1. The removal of journeymen Ironworkers and apprentices from a job in order to render legal assistance to other local unions to protect union principles shall not constitute a violation of this Agreement, provided such removal is first approved by the General Executive Board and notice thereof is first given to Employer involved.

## ARTICLE 34
## SUBCONTRACTING

SECTION 1. The territorial and occupational jurisdiction of the Union, as stated in this agreement, shall be recognized to the end that the Employer shall not subcontract or contract out such work nor utilize on the job site the services of any other person, company, or concern to perform such work that does not observe the same wages, fringe benefits, hours and conditions of employment as enjoyed by the employees covered by this agreement.

SECTION 2. The Union agrees that it will not furnish employees to any one not signatory to any agreement with the Union.

SECTION 3. The Union, recognizing the burden that inflexibility can place on contractors in the construction industry, shall consider amendments or adjustments to this article to address extenuating circumstance that may preclude a signatory contractor's ability to contract and perform work in compliance with this Article. Any amendments or adjustments shall apply only to such project(s) as agreed upon and shall not grant a waiver of this Article without prior negotiation to any other project(s). Although a contractual relationship defining terms and conditions of employment may not be established by such an

31

SOFCO001440

amendment, a craft jurisdictional claim is maintained and the payment of such prevailing wages shall be observed.

## ARTICLE 35
## WORKING CONDITIONS

SECTION 1.  Each job of sufficient duration and size to justify same shall be provided with a shed or room for the employees to change their clothes and keep their tools.  Such shed or room shall be heated between October 1 and May 1.

SECTION 2.  Sanitary Port-O-Lets, KemJohns or equivalent facilities shall be provided by the Employer on Jobs of sufficient duration and size to justify them.  They shall be maintained in a useable sanitary condition and when such portable toilets are provided by the general contractor or another subcontractor as part of the general trade's contract on a particular project, their sanitary maintenance shall be addressed by the Employer to the appropriate provider.

SECTION 3.  No ironworker shall be permitted to furnish or rent to his Employer any equipment used in connection with Ironworkers work, such as welding machines, cutting torches, impact wrenches, power grinders, power tools, pickup trucks, hoisting equipment or similar equipment in a category recognizably larger than conventional handtools.  Also, he shall not be required to use a personally owned automobile or truck for moving, transporting, or delivering material, merchandise or equipment for the Employer.

SECTION 4.  There shall be no limitation placed on time amount or work to be performed by any workman during working hours.

SECTION 5.  When tools or clothing are stolen or destroyed while in the Employer's tool sheds or tool box, the Employer shall be responsible when employee gives the Employer a list of tools and clothing prior to date tools or clothing are stolen or destroyed.  After such a loss a notarized statement verifying loss of those tools or clothing may be required.

SECTION 6.  When tools are to be checked out and in, it shall be done during working hours.

SECTION 7.  The Employer shall furnish suitable drinking water and paper cups on the Job site no later than one hour after starting time.  Ice water shall be furnished from May 1 to October 1.

SECTION 8.  There shall be a ten-minute (10) coffee break taken at mid-morning of the working hours.  There shall be no afternoon coffee break when working on regular shift work.  Only one Employee shall be permitted to leave the Job site to procure coffee or other nonalcoholic beverages during working hours, traveling not more than 500 yards.  In the event a catering truck visits the job site, one man will be designated to go to said truck for all employees.  At no time shall entire crews leave their work stations.  If above conditions cannot be met, employees must furnish their own coffee or other nonalcoholic beverages.

SECTION 9. All scheduled shifts in EXCESS of eight (8) hours shall require a second coffee break.  It shall be scheduled at mid-afternoon and conducted under the same provisions as Section 8.

32

SOFCO001441

It shall be a violation of this agreement for individuals to negotiate with the Employer a "trade" of this coffee break for an "early quit".

## ARTICLE 36
## DECLARATION OF PRINCIPLES

The selection of craft foreman or craft general foremen, over workmen of the respective crews, shall be entirely the responsibility of the Employer.

The welding torch is a tool of the trade having Jurisdiction over the work being welded. Craftsmen using the welding torch shall perform any of the work of their trade, and shall work under the supervision of the craft foreman.

There shall be no limit on production of workmen or restriction of the full use of proper tools or equipment and there shall not be any task or piece work.

Jurisdictional disputes shall be settled in accordance with the procedure established by the Building Trades Department of the AFL-CIO or in special cases as agreed and established by two or more International Unions without interruption of work or delay to the job.

Slowdowns, forcing of overtime, spread work tactics, standby crews and featherbedding practices have been and are condemned.

Stewards shall be qualified workmen performing work of their craft. There shall be no non-working stewards.

There shall be no strikes, work stoppages, or lockouts during the processing of any grievances or disputes in accordance with the manner prescribed in the local or national agreement.

There shall be no restriction of the use of any raw material, except prison made.

No person except those representing the Employer shall have the right to interfere with workmen during working hours.

In accordance with the terms of this agreement the use of apprentices shall not be prohibited.

An obligation imposed upon and in so far as possible, accepted by the Union as being properly its own, is the availability at all times in so far as possible during the life of the Agreement of sufficiently skilled workmen, capable of performing the work of this trade and to constantly endeavor to improve the ability of such workmen and further to have in the making, through apprenticeship training, workmen who can enter this trade properly equipped to perform the work. The employment of as many apprentices as is reasonable and practical shall be encouraged.

## ARTICLE 37
## CONTRACTORS

SECTION 1. At the request of Local Union No. 172, the Associations that are a part of this Agreement shall furnish a list of contractors who have given Power of Attorney to said Associations to bargain on their behalf.

33

SOFCO001442

## ARTICLE 38
## SETTLEMENT OF DISPUTES

SECTION 1. Grievances. Should differences arise between the Employer and the Union as to the meaning and application of the provisions of this Agreement or should differences arise about matters not specifically mentioned in this Agreement, there shall be no suspending of work or lockout on account of such differences. An earnest effort shall be made to settle such differences immediately and in the following manner.

There shall be an Arbitration Committee of three (3) members of the Contractor Association and three (3) members representing Ironworker Local Union 172 selected by their respective organizations. The duties of the Joint Arbitration Committee shall be mutual consideration and settlement of all disputes that may arise. The Joint Committee will appoint a Chairman and a Secretary. The Secretary shall keep minutes of each meeting.

The Committee shall meet at the call of the Chairman or Secretary within seventy-two (72) hours exclusive of Saturdays, Sundays and holidays.

In the event no agreement has been reached and the Joint Committee is deadlocked, the question at issue shall be referred to a disinterested arbitration board. The board shall be selected as follows: One (1) member chosen by the Employer, One (1) selected by the Union and the two (2) selected shall choose the third (3) member.

Pending consideration of any question referred to the Joint Arbitration Committee or pending a decision of the Joint Arbitration Board provided in this Article, it is expressly understood that there shall be no strikes or lockouts or stoppages of work of any kind ordered or permitted against any member of the parties hereto.

SECTION 2. The Joint Arbitration Committee or the Joint Arbitration Board shall have jurisdiction over all questions involving the interpretation and application of any section of this agreement. They shall not, however, be empowered to handle negotiations for the new agreement, changes in the wage scale, or jurisdictional disputes.

SECTION 3. Each party shall individually pay the expenses of the arbitrator it appoints and the two parties shall jointly share the expense of the third arbitrator.

## ARTICLE 39
## STRIKES AND LOCKOUTS

SECTION 1. It is mutually agreed that there shall be no strikes or lockouts except for the refusal of either party to submit to arbitration as herein provided or failure on the part of either party to carry out the award of the Board of Arbitration, or failure on the part of the Employer to render the required reports and make the required payments to (a) Ironworkers District Council of Southern Ohio and Vicinity Benefit Trust or (b) Ironworkers District Council of Southern Ohio and Vicinity Pension Trust or Ironworkers District Council of Southern Ohio and Vicinity Annuity Trust.

34

SOFCO001443

SECTION 2.  Every facility of each of the parties hereto is hereby pledged to immediately overcome any such situation; provided, however, it shall not be a violation of any provision of this agreement for any person covered by this agreement to refuse to cross or work behind the legal picket line of any affiliated Union which has been authorized by the International for that Union, the Central Labor Council or Building and Construction Trades Council.

## ARTICLE 40
## SCOPE OF AGREEMENT

SECTION 1.  This Agreement contains all of the provisions agreed upon by the Employers and the Union.  Neither the Employers nor the Union will be bound by rules, regulations or agreements not herein contained except interpretations or decisions of the Board of Arbitration.

## ARTICLE 41
## LETTERS

It is agreed that all Contractors who are parties to this Agreement and employ Ironworkers in the jurisdiction of Local Union No. 172 will furnish Local Union No. 172 with signed letters on letterhead of the Employer, stating that they have employed Ironworkers and paid the negotiated scale of wages on any and all jobs which the Employer has performed with Ironworkers, with reasonable promptness upon receipt of request.

For purposes of jurisdictional assignment, Employers signatory to this agreement shall at the request of the Union provide a signed letter describing in detail the work performed by members of this Union in their employ and shall provide any other material such as drawings or photographs not subject to any trade secret agreements that would be useful or necessary to establish or maintain jurisdictional claims of this Union.

## ARTICLE 42
## CONSTRUCTION ADVANCEMENT PROGRAM

Construction Advancement Program of Central Ohio (Industry Advancement Fund). Employers subject to the terms of this Agreement who employ Ironworkers and apprentices within the jurisdiction of Local Union No. 172 shall abide by all terms and conditions of the Construction Advancement Program (Industry Advancement Fund), which is as follows:

(A)  The Employers have established a program to promote the common good of the construction industry which may include but not necessarily restricted to the study of and service of: (1) Safety and Accident Preventions, (2) Continuing Education, (3) Market Development, (4) Public Relations and Services, (5) Labor Relations and Personnel Practice, (6) Protection of Legitimate Markets, and (7) Industry Relations and Public Education.

(B) The Employers have established the Construction Advancement Program by a Declaration of Trust dated November 14, 1968, a copy of which

35

is available for inspection by the parties at the office of the Trustees thereof at 1775 Northwest Boulevard, Columbus, Ohio and which is included herein by reference and made a part thereof.  Each Employer covered by this Agreement shall pay four cents ($.04) for each hour worked by each journeyman, apprentice, or other employee within the bargaining unit to the Construction Advancement Program of Central Ohio (Industry Advancement Fund).  For all overtime hours the Construction Advancement Program of Central Ohio (Industry Advancement Fund) shall be paid at the overtime rate (hours paid).

(C)  The consideration of this Agreement is as follows:

1.  Recognition by the parties of the need for providing the means whereby the Employer can facilitate and supplement the financing of its Collective Bargaining, contract maintenance and other activities.

2.  Obligations assumed by the Employer to withhold, collect and forward monies from the pay of its employees for the benefit of its employees in Welfare Funds, Pension Funds, etc.

3.  Obligations assumed by the Employer to pay, collect and forward monies for the Apprenticeship Training Fund.

Payments to this Program shall be in accordance with instructions on forms furnished by the Ironworkers Local #172.  The Program is to be administered for the purpose set forth in Section (a) of Article 42 and in accordance with the terms of said Declaration of Trust.

The monthly contribution period and report shall end and include the last full weekly pay period of the month.  Payment and reports for contribution period shall be mailed or delivered to the Program Office or authorized collection point, on or before the 15th day of the following month.  Payments postmarked or delivered after the 15th day of the following month shall be subject to an additional charge of not more than ten percent (10%) per month until paid, to reimburse the Construction Advancement Program of Central Ohio (Industry Advancement Fund) for damages due to additional administrative expense, impairment of reserves and costs of collection arising from late payment.

There is specifically excluded from the purpose of the Construction Advancement Program of Central Ohio (Industry Advancement Fund), the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize Contractors during a period or periods of work stoppages or strikes.  The administration of the Construction Advancement Program of Central Ohio (Industry Advancement Fund) shall comply with all present and future Federal Laws governing same.

## ARTICLE 43
## IMPACT FUND

SECTION 1.  In addition to the per hour wage rate, the Employer shall contribute an additional three quarter of one percent (¾%) of the existing wage rate to Ironworker Management Progressive Action Cooperative Trust (IMPACT), a jointly trusted Cooperative Trust with federal tax exempt status under Section 501 (a) of the Internal Revenue Code as an exempt organization under Section

36

SOFCO001445

501 (c) (5) of the Internal Revenue Code. The general purposes of the Trust include the improvement and development of the Ironworker Industry through Education, Training, Communication, Cooperation and governmental lobbying and legislative initiatives.

The reporting, payment, frequency of payment and administration of such contributions shall be governed by the terms of the IMPACT Trust agreement, policies and resolutions.

The three quarter of one percent (¾ of 1%) contribution shall be in lieu of any and all contractual requirements for contributions to the National Ironworkers and Employers Apprenticeship Training and Journeyman Upgrading Fund and the Institute of the Ironworking Industry. In addition, the Union and Employer agree that by making contributions to IMPACT each of them shall become bound to IMPACT's Drug and Alcohol Screening Policy and Procedure or equivalent program and any amendments or modifications thereto.

## ARTICLE 44
## INTERNATIONAL IRONWORKERS ORGANIZING FUND

In accordance with action taken by the delegates at the 42nd International Convention, Article XVI, Sources of Revenue of the International Constitution was amended to read: "Sec. 2d. Each Outside and Regional Local Union shall pay an International Supplemental Per Capita Tax of one-quarter of one percent (¼ of 1%) of the applicable hourly journeyman wage rate for each hour worked per member per month to the International Ironworkers Organizing Fund. The disbursements from this Fund shall be approved by the General President, disbursed through the General Treasurer's Office, and shall be used solely for the purpose of meeting the financial requirements of organizing the unorganized and for no other purpose."

## ARTICLE 45
## SAVINGS CLAUSE

SECTION 1. Should any part of or any provision herein contained be rendered or declared invalid by reason any existing or subsequently exceed legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation the parties signatory hereto agree to immediately meet to renegotiate such parts or provisions affected.

SECTION 2. The remaining parts or provisions shall remain in full force and effect.

## ARTICLE 46
## DURATION AND TERMINATION

This agreement, with any amendments thereof made as provided for therein, shall remain in full force and effect until midnight of May 31, 2018 except as noted herein for an individual Employer, and unless written notice be given by either party to the other at least four (4) months prior to such a

37

SOFCO001446

date of a desire for change therein or to terminate the same, it shall continue in effect for an additional year thereafter. In the same manner, this agreement with any amendments thereof shall remain in effect from year to year thereafter, subject to termination at the expiration of such contract year upon notice in writing given by either party to the other at least four (4) months prior to the expiration of such contract year. Any such notice as here in above provided for in this article, whether specifying a desire to terminate or to change at the end of the current contract year, shall have the effect of terminating this agreement at such time.

An individual Employer may terminate this agreement by notifying the other party, in writing, four (4) months prior to May 31, 2014 or the anniversary date of this contract (May 31, 2017) of his intent to modify and/or terminate this agreement following which this agreement shall terminate as of May 31, 2014 or the anniversary date of this contract (May 31, 2017) for that Employer only.

If a state or federal law is passed that affects this Agreement, the signatory parties, by mutual agreement, may meet to discuss such affected provisions of this agreement.

IN WITNESS WHEREOF, this agreement has been executed by the parties hereto as of the date and year first above written, in the city of Columbus, State of Ohio.

## FOR LOCAL UNION NO. 172
Of the International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers

James V. Bosworth
John Burns, II
Stephen A. Seymour
Timothy L. Breitfeller



## FOR THE EMPLOYER:
## CENTRAL OHIO AGC

Richard J. Hobbs
Craig Wanner
Ken Gonya
Daniel Powell



38

SOFCO001447



SOFCO001448

## WAGE AND FRINGE FUND RATES
### EFFECTIVE JUNE 1, 2013

| | |
|---|---|
| Journeyman Ironworker | $ 27.67  per hour |
| Foreman | 29.42  per hour |
| General Foreman | 29.92  per hour |
| Pension | 8.60  per hour |
| Health and Welfare | 6.20  per hour |
| Annuity | 2.55  per hour paid |
| Apprentice Fund | 1% of existing wage rate |
| Safety Training Fund | .06  per hour |
| Industry Advancement Fund (AGC) | .04  per hour |
| I.P.A.L. | $ .02  per hour |
| IMPACT FUND | 1% of existing wage rate |

**DEDUCTED:** Dues Check Off  5% of Gross Wages

### Wages & Benefits will be determined from increase

| | |
|---|---|
| EFFECTIVE June 1, 2014 | $1.00 increase |
| EFFECTIVE June 1, 2015 | $ .90 increase |
| EFFECTIVE June 1, 2016 | $ .90 increase |
| EFFECTIVE June 1, 2017 | $ .90 increase |

40

SOFCO001449



SOFCO001450

# CIRCULAR LETTER NO. 742

April 13, 1972

FROM: International Association of Bridge,
Structural & Ornamental Ironworkers

TO: ALL AFFILIATED OUTSIDE ERECTION
LOCAL UNIONS

CIRCULAR LETTER NO. 742

Dear Sirs and Brothers:

Due to the many inquiries received from our affiliated outside erection local Unions relative to classification of Paragraph A, Section 14 of the General Working Rules of the International Association of Bridge, Structural and Ornamental Ironworkers captioned "Ironworkers Required on Guy and Stiff Leg Derricks' it has been decided that this letter of clarification be directed to all outside erection local Unions in order to eliminate any future misunderstandings.

*Paragraph A, Section 14 states as follows:*

"No less than six (6) men and a foreman shall be employed around any guy or stiff leg derrick used on steel erection and, on all mobile or power operated rigs of any description no less than four (4) men and a foreman shall be employed."

The clarification requested deals with the portion of the above quoted section, which states as follows:

"On all mobile or power operated rigs of any description no less than four (4) men and a foreman shall be employed."

The above quoted section provides for the number of men to be used on a guy or stiff leg derrick and on all mobile or power operated rigs when such equipment is used on steel erection. On all other work operations coming under the jurisdiction of this International Association on where members of this Association and employed a sufficient number of men will be employed in order that the work involved can be performed in a safe and expeditious manner. This means the Employer will not be required to use four (4) men and a foreman on work operations not requiring this number of men. It also means that on rigging

SOFCO001451

or unloading operations where more than four (4) men and foreman required, such additional members will be employed.

Acknowledging the technological changes in methods of installation and new materials that have occurred in recent years and in order to protect the work opportunities of our members on all work coming within the jurisdiction of the Ironworker trade, it is absolutely mandatory that we utilize the greatest weapons available. These weapons are the skills of our membership, production, uniform conditions, etc.

It is of the utmost importance that the officers and members of this International Association exercise good judgment in determining the proper number of members to be used on certain work operations where mobile or power operated rigs are used. The safety of the members employed must be considered as well as the possible over manning of a specific work operation, which, in many instances, has resulted in such work operations being assigned to other crafts and subsequently resulted in jurisdictional disputes.

This letter should be read to the membership of your local Union at the next regular meeting and all job stewards must be acquainted with the subject matter contained herein.

Fraternally yours,

Signed John H. Lyons                    Signed Joel D. Drake

*John H. Lyons*                          *Joel D. Drake*

**GENERAL PRESIDENT**                    **GENERAL SECRETARY**

SOFCO001452

CONSTRUCTION SITE JURISDICTIONAL AGREEMENT BETWEEN
INTERNATIONAL UNION OF OPERATING ENGINEERS
and
INTERNATIONAL ASSOCIATION OF BRIDGE,
STRUCTURAL AND ORNAMENTAL IRON WORKERS

The undersigned Committees of the International Union of Operating Engineers and the International Association of Bridge, Structural and Ornamental Iron Workers have held numerous meetings and have consummated the following agreement to settle jurisdictional disputes between the two organizations on construction sites.

It is the purpose of this agreement to further improve the relationship between our respective trades, to settle jurisdictional disputes directly, to protect each other's proper jurisdiction from encroachment by others, and to mutually assist each other in organizing the unorganized.

This agreement shall not relate to nor have any bearing upon jurisdictional disputes that may now exist, or in the future arise, between either of these organizations with any other national or international union or subordinate body.

The respective Committees shall be continued and shall meet at least twice a year at a place and date determined by mutual agreement of the respective General Presidents.

If a jurisdictional dispute cannot be settled locally, or a question of interpretation arises as to the meaning or intent of this agreement, it shall be referred immediately to the respective General Presidents or their designees for an answer. There shall be no work stoppages pending settlement. It is agreed that all decisions and agreements between the two International Unions shall be considered operative and effective by each International Union except as clarified in this Memorandum of Agreement.

EXHIBIT

16

10-9-18

OOE-000562

## I – FORKLIFTS

The operation of forklifts shall be the work of Operating Engineers. Rigging in connection with the forklifts shall be the work of the Iron Workers.

## II – SIGNALLING – HIGHLINES, CRANES AND DERRICKS

Such duties required to initiate and/or relay signals by mechanical, electronic or electrical means, including hand signals, or paddles, directly to the Operator of the above referred to construction equipment is the work of the Iron Workers. The servicing and inspection of highlines is the work of the Iron Workers. The foregoing does not apply to excavation work.

## III – BRIDGE CRANES, DERRRICKS AND DERRICK BARGES

a) Bridge Cranes – The operation of bridge cranes in fabrication shops established at construction sites is the work of the Operating Engineers.

b) Derricks – The operation of power equipment including agitated swing adapters on derricks shall be the work of Operating Engineers. Other types of swinging operations shall be performed by the Iron Workers. The erection thereof shall be the work of the Iron Workers.

c) Derrick Barges – The operation of deck engines on derrick barges shall be the work of the Operating Engineers.

## IV – ROCK, SAND AND GRAVEL PLANTS
### (Construction Jobsites)

Fabrication of structural steel framework, the assembly, setting and erection thereon of bins, hoppers, rigging of crusher components, shaker screens, pre-assembled conveyor sections and steel ladders will be performed by a composite crew. This is with the exception that erection of structural steel framework and all

OOE-000563

3.

rigging work shall be the work of the Iron Workers, and all mechanical work shall be the work of the Operating Engineers.

### V - DISMANTLING AND LOADING OUT OF CONVEYORS AGGREGATE PLANTS, BATCH PLANTS, CABLE WAYS, REFRIGERATION PLANTS, ETC.

a) Handling of steel which includes burning off nuts and knocking out bolts shall be done by Iron Workers.

   1) The Engineers will remove all rollers, disconnecting and dismantling mechanical equipment such as compressors, refrigeration units and power equipment connected thereon, and all rigging in connection with the above shall be the work of the Iron Workers.

b) The operation and servicing of the power equipment is recognized as the work of the Operating Engineers.

### VI - PUMPS, COMPRESSORS, GENERATORS AND WELDING MACHINES

The operation, servicing and maintenance of pumps, compressors, generators, and welding machines (gasoline or diesel driven) shall be the work of the Operating Engineers.

### VII - HIGHWAY TYPE (PORTABLE) BATCH PLANT, HOT PLANT AND ROCK PLANTS

The assembly and disassembly of the above type plants shall be the work of the Operating Engineers.

### VIII - ERECTION AND DISMANTLING MONIGAN WALKING DRAGLINE, LAUNCHHAMMER BUCKET WHEEL EXCAVATOR AND SIMILAR TYPE EQUIPMENT, EXCLUDING TRENCHING MACHINES

It is understood and agreed that the erection and dismantling of Monigan Walking Dragline, Launchhammer Bucket Wheel Excavator, and similar type equipment, excluding trenching machines, shall be performed by a composite crew, fifty-fifty of Iron Workers and Operating Engineers.

OOE-000564

4.

## IX - HIGHWAY AND EARTHMOVING PROJECTS

The unloading, loading out, assembly, disassembly and all other modifications, including boom changes and modifications on equipment coming within the jurisdiction of the International Union of Operating Engineers, shall be performed by members of the Operating Engineers.

## X - CRANES USED ON STRUCTURAL STEEL ERECTION

Cranes used on structural steel erection where Iron Workers are to be working with power equipment in the erection of structural steel – the unloading, attaching, lengthening, shortening and dismantling or changing of booms and counterweights, the reeving of cables in topping lift, boom or jib for cranes used in connection with such work shall be performed by the Iron Workers plus the Operating Engineers who have been assigned to the crane.

It is understood if a crane is shipped and arrives on the project partially or completely disassembled, the Iron Workers will unload and rig the components into their proper position:

All mechanical adjustments of the parts of this operation such as take-ups, leveling and aligning of motor base, or bed plate, proper adjustment to the cats will be performed by the Operating Engineers who have been assigned to the crane and at least one heavy duty mechanic.

Unloading or loading out of such power equipment will be performed by the same crew.

OOE-000565

## XI - WORK ON ALL BUILDING, PRE-CAST CONCRETE AND INDUSTRIAL CONSTRUCTION, EXCLUDING STEEL ERECTION

On all building, pre-cast concrete and industrial construction, such as chemical plants, power houses, steel mills, refineries, etc., other than steel erection operations, on all multi-purpose cranes on which an Iron Workers' crew will be assigned to it for their rigging operations by the contractor, the work shall be performed in the following manner and does not pertain to shop or mechanical yards on major construction projects where the Operating Engineers have established shops or mechanical yards.

1. Unloading of multi-purpose cranes shall be performed in the following manner:

Iron Workers shall perform necessary rigging and Operating Engineers shall perform all assembly, except as outlined below.

2. Loading out of multi-purpose cranes shall be performed in the opposite manner to the unloading operation;

i.e., power rigging by Iron Workers and disassembly shall be performed by Operating Engineers. The loading and unloading operation will be under the supervision of the Master Mechanic.

3. Boom modifications will be performed in the following manner:

a) When rig is working with Iron Workers all modifications will be performed by a composite crew of Iron Workers and Operating Engineers. What is meant by a composite crew of Operating Engineers

OOE-000566

is an Engineer and Oiler who have been assigned to said rig. What is meant by a composite crew of Iron Workers is the number required to perform said modifications in a safe and expeditious manner.

b) It is assumed that when another craft is assigned a rig or crane that the Operating Engineers will perform all boom modifications.

It is understood that if additional help is needed, Iron Workers will be called upon to assist.

It is agreed that all work in connection with booms will be performed as outlined above.

## XII - TOWER CRANES AND SURVEY WORK

With respect to erection of tower cranes and survey work, these matters were thoroughly discussed. The respective Committees decided to defer action pending further studies.

INTERNATIONAL UNION OF
OPERATING ENGINEERS

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS

HUNTER P. WHARTON
GENERAL PRESIDENT

JOHN H. LYONS, GENERAL PRESIDENT

_Russell T. Conlon_
Russell T. Conlon, Chairman

_John L. McCarthy_
John L. McCarthy, Chairman

_Howard R. Dalton_
Howard R. Dalton

_Dale Ray_
Dale Ray

_Frank Hanley_
Frank Hanley

_Leonard P. Mahoney_
Leonard P. Mahoney

August 19, 1970

Rented Forklift per job / hours

| | CINCINNATI - Valndalia/United/Eqip Depot | | | COLUMBUS - Sunbelt Rental | | | | Total | Operator Forklift hours |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 8/1/2017 | 7/31/2018 | Hrs | 4160 | 8/1/2017 | 7/31/2018 | Hrs | 7664 | 11824 | 0 |
| 2 | 8/1/2016 | 7/31/2017 | Hrs | 3912 | 8/1/2016 | 7/31/2017 | Hrs | 6736 | 10648 | 88 |
| 3 | 8/1/2015 | 7/31/2016 | Hrs | 392 | 8/1/2015 | 7/31/2016 | Hrs | 7584 | 7976 | 1158 |
| 4 | 8/1/2014 | 7/31/2015 | Hrs | 2384 | 8/1/2014 | 7/31/2015 | Hrs | 5232 | 7616 | 3308 |
| 5 | 8/1/2013 | 7/31/2014 | Hrs | 3336 | 8/1/2013 | 7/31/2014 | Hrs | 5372 | 8708 | 3506 |
| 6 | 8/1/2012 | 7/31/2013 | Hrs | 800 | 8/1/2012 | 7/31/2013 | Hrs | 4710 | 5510 | 2843 |
| 7 | 8/1/2011 | 7/31/2012 | Hrs | 528 | 8/1/2011 | 7/31/2012 | Hrs | 3198 | 3726 | 1741 |
| 8 | 8/1/2010 | 7/31/2011 | Hrs | 328 | 8/1/2010 | 7/31/2011 | Hrs | 2061 | 2389 | 1123 |
| 9 | 8/1/2009 | 7/31/2010 | Hrs | 0 | 8/1/2009 | 7/31/2010 | Hrs | 144 | 144 | 440 |



EXHIBIT

17

10-9-18

PENGAD 800-631-6989

SOFCO002360

PENGAD 800-631-6989

EXHIBIT

18

01-9-18

SOFCO0000001

SOFCO0000002

SOFCO000003

SOFC000004

SOFCO0000005

SOFCO0000006

SOFCO0000007

SOFCO000008

SOFCO000009

| Job # | Customer | Job Name | Description (Steel, Joist, Deck) | City | County | State | Status | Project Manager | Date | Bill Invoiced | Comment |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Job # | Customer | Job Name | Description | City | County | State | Project Manager | Date | Billed Method | Contract Amount | Initial |
|---|---|---|---|---|---|---|---|---|---|---|---|

SOFCO060001

SOFCO0000012

SOFCO000013

SOFCO000014

SOFCO000015

SOFCO000016

SOFCO000017

SOFCO000018

SOFCO000019

SOFCO0000020

SOFC0000021

SOFCO000022

SOFC0000023

SOFCO000024

SOFCO0000025

SOFCO0000026

SOFC0000027

SOFCO000028

| Job# | Customer | Job Name | Description | | Count | State | | Date | Contract Amount | Billed |
|------|----------|----------|-------------|--|-------|-------|--|------|-----------------|--------|

SOFC0000029

SOFCO000030

SOFCO000031

AMERICAN ARBITRATION ASSOCIATION

SOFCO ERECTORS, INC. : Case No: 01-18-0001-3790
:
    "Claimant" :
:
And :
: **CLAIMANT SOFCO ERECTORS INC.'S**
: **RESPONSES TO OHIO OPERATING**
OHIO OPERATING ENGINEERS : **ENGINEERS PENSION FUND'S FIRST**
PENSION FUND : **SET OF INTERROGATORIES**
:
    "Respondent" :
:
:

Pursuant to Fed. R. Civ. P. 33, the Employer Sofco Erectors, Inc. responds to the Fund's first set of interrogatories as follows:

## PRELIMINARY STATEMENT

In addition to the specific objections stated below, Sofco objects generally to producing any information or documents subject to the work-product or attorney-client privilege, or to producing any document prepared in anticipation of this litigation or subject to any privilege. By responding to the Fund's interrogatories, and by producing documents, Sofco does not waive any available objection or privilege including, but not limited to, the attorney-client or work-product privilege. Sofco does not waive any objection that it may have to the introduction into evidence of its answers, responses or documents at any stage of these proceedings.

## GENERAL OBJECTIONS

Sofco objects generally to the definitions and instructions to the extent they require it to do anything more than is required by the Federal Rules of Civil Procedure. Sofco's agreement to produce a category of documents does not necessarily mean that it has any documents in that category, nor does it mean that it agrees with any factual predicate in any Interrogatory.



EXHIBIT

19

10-9-18

## INTERROGATORIES

INTERROGATORY NO. 1:

Identify each person who assisted or participated in preparing and/or supplying any of the information given in the responses to these Interrogatories, and indicate the specific Interrogatories that each person provided information for and the specific information each person provided.

**RESPONSE:** John Hesford and Dan Powell, with the assistance of counsel.

INTERROGATORY NO. 2:

State the name, last known business and/or residential address and telephone number of all persons whom you believe or have reason to know possess information or knowledge relating to the allegations in your Complaint, or any other knowledge that could potentially reflect, refer or relate to your claims in this matter, and describe the substance of the information you know or believe that person possesses.

**RESPONSE:** See Sofco's witness disclosure.

INTERROGATORY NO. 3:

Identify each and every collective bargaining agreement entered into between you and the Union, and for each agreement identified, state the name of the agreement and the date it was executed and the name of the person executing the agreement on your behalf.

**RESPONSE:** Pursuant to Fed. R. Civ. P. 33(d), see documents produced.

INTERROGATORY NO. 4:

Please identify each person you expect to call as an expert witness at the arbitration of this matter, and for each state the subject on which the expert is expected to testify; state the substance of the facts and opinions to which the expert is expected to testify; state a summary of the grounds for each such opinion; and to the extent any expert has provided a written summary of his or her opinion(s), please provide a full copy.

**RESPONSE:**

Michael Libman
The Libman Actuarial Group, Inc.
5755 Granger Rd., Suite 501
Independence, Ohio 44131
(216) 398-3888

Mr. Libman may testify regarding the Fund's calculations of withdrawal liability, including alternative calculations that exclude Old Sofco's contribution history, and that use the funding rather than the Segal blend interest rate, and related matters. Sofco will produce a copy of Mr. Libman's report.

INTERROGATORY NO. 5:

Identify each and every document Sofco has in its possession and/or of which you have knowledge that relates or is relevant to the Fund's demand for withdrawal liability and your request for review of that assessment including, but not limited to, documents relating to the relationship between Sofco and the Union; contracts or agreements between Sofco and the Union; documents regarding Sofco's obligation to make contributions to the Pension Fund (e.g., contracts; invoices; or Communications to or from the Pension Fund) regarding this obligation.

**RESPONSE: Objection.** This Interrogatory is overbroad, unduly burdensome, and it seeks information protected under the attorney-client privilege and the attorney work product

3

doctrine.  Subject to and without waiving any of the foregoing objections, pursuant to Fed. R. Civ. P. 33(d), Sofco will produce documents in response to this Interrogatory.

INTERROGATORY NO. 6:

Identify the Commencement Date.

**RESPONSE:** April 1, 2004.

INTERROGATORY NO. 7

Identify the Termination Date.

**RESPONSE:**  April 30, 2017.

INTERROGATORY NO. 8

Identify each person or entity who was an owner, officer, or director of Sofco Erectors, Inc. from January 1, 1980 through the present. For each of these people and/or entities, state the time period when they held the relevant position or ownership interest. For people or entities with an ownership interest in Sofco, identify the extent of their ownership interest (number of shares, total percentage of ownership, etc.). If any of the people or entities listed in this Interrogatory also have an ownership interest in another entity, please list the entity and the extent of the ownership interest in that entity.

**RESPONSE:  Objection.**  This Interrogatory is overbroad and unduly burdensome in that it seeks confidential information regarding Sofco's ownership structure.  Subject to and without waiving any of the foregoing objections, John Hesford and Dan Powell are Sofco's owners.  Jim Ludwig also initially owned a portion of Sofco.  A prior entity named Sofco Erectors, Inc. had separate ownership than the entity at issue in this case.

4

## INTERROGATORY NO. 9

Identify each person or entity who was an owner, officer, or director of Sofco Erectors Acquisition, Inc. from the Commencement Date through the present. For each of these people and/or entities, state the time period when they held the relevant position or ownership interest. For people or entities with an ownership interest, identify the extent of their ownership interest (number of shares, total percentage of ownership, etc.). If any of the people or entities listed in this Interrogatory also have an ownership interest in another entity, please list the entity and the extent of the ownership interest in that entity.

**RESPONSE: Objection.**  This Interrogatory is overbroad and unduly burdensome in that it seeks confidential information regarding Sofco Acquisition's ownership structure.  Subject to and without waiving any of the foregoing objections, Jim Ludwig, John Hesford and Dan Powell.

## INTERROGATORY NO. 10

Identify each person or entity who was an owner, officer, or director of Southern Ohio Fabricators, Inc. from January 1, 1980 through the present. For each of these people and/or entities, state the time period when they held the relevant position or ownership interest. For people or entities with an ownership interest, identify the extent of their ownership interest (number of shares, total percentage of ownership, etc.). If any of the people or entities listed in this Interrogatory also have an ownership interest in another entity, please list the entity and the extent of the ownership interest in that entity.

**RESPONSE: Objection.**  This Interrogatory seeks information that is irrelevant to the claims at issue in this case.  Subject to and without waiving any of the foregoing objections, the

5

Kling family and the Nickerson family owned Southern Ohio Fabricators, Inc. Tim Gates was the President of Southern Ohio Fabricators, Inc.

INTERROGATORY NO 11:

Identify any person, partnership, corporation, affiliate, parent company, subsidiary, subcontractor, or any other entity that either exercised control over Sofco Erectors, Inc. or was subject to the control of Sofco from January 1, 1980 until the present. For each of these entities, list their relationship to Sofco and the dates during which this relationship existed. Identify any governing documents or contracts that govern the terms of this relationship.

**RESPONSE:** None.

INTERROGATORY NO. 12:

Describe in detail the operations of Sofco and any other entity described in Interrogatory No. 11 during the time period of the Commencement Date through the Termination Date within the geographic jurisdiction of the Union. This description should detail all products produced or services performed including, without limitation, any and all Work performed. This description should include the revenue generated annually for each type of operation; the equipment used to perform the work; and the job classifications of the persons who worked in each operation.

**RESPONSE: Objection.** This Interrogatory is vague in that the term "operations" is not defined. Subject to and without waiving any of the foregoing objections, pursuant to Fed. R. Civ. P. 33(d), see the attached project list.

6

INTERROGATORY NO. 13:

Identify all locations where the operations identified in Interrogatory No. 12 were performed. For each location, list the name of the site; its address; describe the type of Work performed at the site; list the equipment used at the site; and identify the persons who performed the operations at each site.

**RESPONSE: Objection**. This Interrogatory is overbroad in that it requests extensive information about ever project Sofco performed. Subject to and without waiving any of the foregoing objections, Sofco will produce the project list and equipment rental records for its projects.

INTERROGATORY NO. 14:

Identify all employees who performed Work for you from the Commencement Date through the Termination Date.

**RESPONSE:** Pursuant to Fed. R. Civ. P. 33(d), Sofco will produce documents responsive to this Interrogatory.

INTERROGATORY NO. 15

Identify all employees who performed Work for you after the Termination Date.

**RESPONSE:** Pursuant to Fed. R. Civ. P. 33(d), Sofco will produce documents responsive to this Interrogatory.

INTERROGATORY NO. 16

Identify all of your employees who operated a crane from May 1, 2017 through the present.

**RESPONSE:** None.

7

INTERROGATORY NO. 17

Identify all of your employees who operated a forklift from May 1, 2017 through the present.

**RESPONSE:** Pursuant to Fed. R. Civ. P. 33(d), Sofco will produce documents responsive to this Interrogatory.

INTERROGATORY NO. 18

Identify all of your employees who performed maintenance work from May 1, 2017 through the present. For each employee identified, identify the equipment that each employee maintained.

**RESPONSE:** **Objection.** This Interrogatory is vague in that the term "maintenance work" is not defined.

INTERROGATORY NO. 19:

Identify all of your hourly employees employed from April 1, 2004 to the present. For each individual, provide the following information: job title(s) or job classification; job duties; location(s) where the duties were performed; and equipment used to perform job duties.

**RESPONSE:** **Objection.** This Interrogatory is overbroad and unduly burdensome in that it seeks information about positions and employees not involved in this case. Subject to and without waiving any of the foregoing objections, pursuant to Fed. R. Civ. P. 33(d), Sofco will produce documents in response to this Interrogatory related to relevant employees.

Respectfully submitted,

*/s/ Gary L. Greenberg*
Gary L. Greenberg
Mark B. Gerano
Jackson Lewis P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202
(513) 873-2103
Gary.Greenberg@jacksonlewis.com
Mark.Gerano@jacksonlewis.com

*Attorneys for Sofco Erectors, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of September, 2018, a true and accurate copy of the foregoing was served upon the following via email and regular U.S. Mail:

Daniel J. Clark
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
djclark@vorys.com

and

Allen S. Kinzer
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
askinzer@vorys.com

Attorneys for the Ohio Operating Engineers Pension Fund

/s/ Gary L. Greenberg
Gary L. Greenberg

4837-2942-5007, v. 1