🅐 Neutral
As of: February 21, 2019 9:13 PM Z

# *Stevens Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund*

United States Court of Appeals for the Sixth Circuit

October 3, 2017, Argued; December 13, 2017, Decided; December 13, 2017, Filed

File Name: 17a0280p.06

Nos. 16-4098/4099

**Reporter**

877 F.3d 663 *; 2017 U.S. App. LEXIS 25134 **; 210 L.R.R.M. 3259; 63 Employee Benefits Cas. (BNA) 1723; 2017 FED App. 0280P (6th Cir.); 2017 WL 6347716

STEVENS ENGINEERS & CONSTRUCTORS, INC., Plaintiff-Appellee, v. LOCAL 17 IRON WORKERS PENSION FUND; LOCAL 17 IRON WORKERS PENSION FUND BOARD OF TRUSTEES, Defendants-Appellants.

**Prior History: [**1]** Appeal from the United States District Court for the Northern District of Ohio at Cleveland. Nos. 1:15-cv-01965; 1:15-cv-01967—Donald C. Nugent, District Judge.

*Stevens Eng'rs & Constructors, Inc. v. Iron Workers Local 17 Pension Fund, 2016 U.S. Dist. LEXIS 114028 (N.D. Ohio, Aug. 24, 2016)*

## Core Terms

withdrawal, assigned, contributions, ironworkers, rigging, collective bargaining agreement, craft, millwrights, arbitrator, pension fund, installation, pension, pre-job, construction industry, rebar, pension liability, district court, unloading, drilling, laborers, provides, sponsor, Iron, site, work assignment, multiemployer, geographic, covering, holes, tasks

## Case Summary

### Overview

HOLDINGS: [1]-The district court properly found that a construction industry employer did not owe pension liability to the pension fund under the *Multiemployer Pension Plan Amendments Act*, *29 U.S.C.S. § 1383(b)(2)(B)(i)*, because the work identified by the union did not fall within the jurisdiction of the relevant collective bargaining agreement and did not otherwise require contributions by the employer; [2]-The collective bargaining agreement instead allowed the employer to assign jobs like the ones at issue to other trade unions, and a job did not trigger pension liability to the fund if it was properly assigned to a different union.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

*HN1*[⤓] **Multiemployer Plans, Complete Withdrawals**

Under the *Multiemployer Pension Plan Amendments Act*, part of the *Employee Retirement Income Security Act*, a construction industry employer who withdraws from a multiemployer pension plan owes liability to that plan if the employer conducts work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required. *29 U.S.C.S. § 1383(b)(2)(B)(i)*.

Business & Corporate Compliance > ... > Multiemployer Plans > Pensions & Benefits Law > Multiemployer Plans

*HN2*[⤓] **Pensions & Benefits, Multiemployer Plans**

The *Multiemployer Pension Plan Amendments Act* (MPPAA) modified and extended the coverage of the

877 F.3d 663, *663; 2017 U.S. App. LEXIS 25134, **1

Employee Retirement Income Security Act (ERISA). *Pub. L. 96-364, 94 Stat. 1208 (1980)*. ERISA had allowed collective bargaining agreements for employers in large, fragmented industries like construction to collect employer contributions for a single centralized industrywide pension fund, rather than for individual plans for each employer. *29 U.S.C.S. § 1301(a)(3)*. To avoid incentives for employers to flee when a multiemployer plan became underfunded, the MPPAA imposed a provision for withdrawal liability, under which an employer leaving an industry or a plan would be responsible for paying additional contributions to that plan at the time of their exit. *29 U.S.C.S. § 1381*. An employer subject to withdrawal liability owes a proportionate share of the unfunded amount of the plan, determined on the date of exit from the plan. *29 U.S.C.S. § 1391*.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Collection of Liability

**HN3[⤓]** **Multiemployer Plans, Collection of Liability**

The *Multiemployer Pension Plan Amendments Act* (MPPAA) provides that a plan's sponsor, often an entity supported by the local union, is normally responsible for calculating withdrawal liability, pursuant to the collective bargaining agreement's terms. *29 U.S.C.S. § 1382*. Where an employer and a plan disagree about the existence or extent of such withdrawal liability, the MPPAA also imposes a scheme for resolution of disputes, primarily through arbitration. *29 U.S.C.S. § 1401*. The MPPAA states that, in civil actions to enforce an assessment of withdrawal liability, there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct. *§ 1401(c)*.

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

**HN4[⤓]** **Multiemployer Plans, Complete Withdrawals**

Although withdrawal liability attaches to most types of employers, a special withdrawal scheme covers the construction industry. *29 U.S.C.S. § 1383(b)*. Under this arrangement, construction industry employers are not subject to withdrawal liability if they completely withdraw

from work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required. *§ 1383(b)(2)(B)(i)*. This provision exists because the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry; employees are often dispatched to another contributing contractor. On these premises, the withdrawal of an employer from work within the jurisdiction of a collective bargaining agreement does not pose an undue threat to a plan as long as contributions are made for whatever work is done in the area. At the same time, the withdrawal of any employer from the plan does decrease the base, however, if the employer stays in the industry but goes non-union and ceases making payments to the plan. In those latter circumstances, the *Multiemployer Pension Plan Amendments Act* provides that an employer must pay a proportional share of the unfunded amount in the plan, determined based on the employer's share of contributions for work prior to withdrawal, rather than after withdrawal. *29 U.S.C.S. § 1391(b)(1)(A)*.

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

**HN5[⤓]** **Multiemployer Plans, Complete Withdrawals**

Under the *Multiemployer Pension Plan Amendments Act*, a construction industry employer owes withdrawal liability only when it either continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or resumes such work within five years. *29 U.S.C.S. § 1383(b)(2)*.

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

**HN6[⤓]** **Multiemployer Plans, Complete Withdrawals**

An employer who withdraws from the construction industry but continues to own a part of a joint venture of a construction project does not owe withdrawal liability under *29 U.S.C.S. § 1383(b)(2)* for that ownership when the employer's collective bargaining agreement when in force would not have required contributions for that ownership.

877 F.3d 663, *663; 2017 U.S. App. LEXIS 25134, **1

Business & Corporate
Compliance > ... > ERISA > Funding
Requirements > Pension Plan Funding

*HN7*[↓] **Funding Requirements, Pension Plan Funding**

Where no other legal duty exists, an employer's obligation to contribute to a pension fund is tied exclusively to the collective bargaining agreement.

Business & Corporate
Compliance > ... > Multiemployer Plans > Pensions & Benefits Law > Multiemployer Plans

*HN8*[↓] **Pensions & Benefits, Multiemployer Plans**

A work-assignment process can direct pension contributions to the union to whom the work was assigned.

Business & Corporate
Compliance > ... > Multiemployer Plans > Pensions & Benefits Law > Multiemployer Plans

*HN9*[↓] **Pensions & Benefits, Multiemployer Plans**

A jurisdictional provision, where work can be assigned to multiple unions, means that a pension fund of a non-assigned union is not entitled to contributions for work assigned to members of a competing union within the jurisdiction of that union.

Business & Corporate
Compliance > ... > Multiemployer Plans > Pensions & Benefits Law > Multiemployer Plans

*HN10*[↓] **Pensions & Benefits, Multiemployer Plans**

The *Multiemployer Pension Plan Amendments Act* should be constructed strictly according to its text rather than through definitions constructed in the dim light of common-law inference.

Pensions & Benefits Law > Multiemployer

Plans > Complete Withdrawals

*HN11*[↓] **Multiemployer Plans, Complete Withdrawals**

The *Multiemployer Pension Plan Amendments Act* provides that withdrawal liability only attaches to work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required. *29 U.S.C.S. § 1383(b)*.

Business & Corporate
Compliance > ... > Multiemployer Plans > Pensions & Benefits Law > Multiemployer Plans

*HN12*[↓] **Pensions & Benefits, Multiemployer Plans**

Where the *Multiemployer Pension Plan Amendments Act* (MPPAA) expressly limits the situations in which contributions are required, the specific provisions of the text control over the looser general principles also embodied in the MPPAA.

Pensions & Benefits Law > Multiemployer
Plans > Liability for Withdrawals

*HN13*[↓] **Multiemployer Plans, Liability for Withdrawals**

The *Multiemployer Pension Plan Amendments Act* imposes withdrawal liability to avert the scenario in which the employer stays in the industry but goes non-union and ceases making payments to the plan.

Pensions & Benefits Law > Multiemployer
Plans > Complete Withdrawals

Pensions & Benefits Law > Multiemployer
Plans > Liability for Withdrawals

*HN14*[↓] **Multiemployer Plans, Complete Withdrawals**

The *Multiemployer Pension Plan Amendments Act's* provisions for withdrawal liability mean exactly what they say: an employer owes withdrawal liability for work that would have mandated contributions pursuant to the *Employee Retirement Income Security Act* if the collective bargaining agreement were still in force. *29*

U.S.C.S. § 1383(b).

Governments > Legislation > Interpretation

**HN15**[⬇] **Legislation, Interpretation**

Resort to a statute's legislative history is unnecessary when the text is clear.

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

**HN16**[⬇] **Multiemployer Plans, Complete Withdrawals**

The limitation "of the type for which contributions were previously required" in *29 U.S.C.S. § 1383(b)* establishes that an employer does not owe withdrawal liability for actions previously covered by a collective bargaining agreement but not generative of pension liability.

Contracts Law > Contract Interpretation > Parol Evidence > Custom & Usage

**HN17**[⬇] **Parol Evidence, Custom & Usage**

Extrinsic evidence like area practice does not overcome clear contract language.

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

**HN18**[⬇] **Multiemployer Plans, Complete Withdrawals**

Under the *Multiemployer Pension Plan Amendments Act's* standards for withdrawal liability, a plan sponsor may only assess withdrawal liability on a construction employer who resumes or performs work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required. *29 U.S.C.S. § 1383(b)(2)(B)(i).*

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Collection of Liability

**HN19**[⬇] **Multiemployer Plans, Collection of Liability**

A union pension fund is not entitled to collect contributions from a project assigned to another union where the assignment of that project had placed it outside the bounds of the relevant union's collective bargaining agreement.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Collection of Liability

**HN20**[⬇] **Multiemployer Plans, Collection of Liability**

A pension fund should not be able to establish an entitlement to contributions for work assigned to another union claiming jurisdiction over the work without invoking procedures for resolving the jurisdictional work assignment issue.

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Delinquent Contributions

**HN21**[⬇] **Causes of Action, Delinquent Contributions**

Under the *Employee Retirement Income Security Act*, delinquent contributions mean that some liability has already accrued, and thus some entity has an entitlement to money, *29 U.S.C.S. § 1145*. By contrast, no entity has any right to withdrawal liability if no such liability actually exists.

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Delinquent Contributions

**HN22**[⬇] **Causes of Action, Delinquent Contributions**

A union's failure to comply with terms in a collective bargaining agreement cannot affect the pension funds'

right to collect contributions that are due and owing to the funds. However, this prohibition only applies to contributions that are due and owing to the funds.

> Business & Corporate Compliance > ... > Pensions & Benefits Law > ERISA > Plan Establishment

> Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement of Bargaining Agreements

*HN23*[↓] **Employee Retirement Income Security Act (ERISA), Plan Establishment**

Pension funds are entitled to rely on the written terms of an existing *Employee Retirement Income Security Act* plan document or collective bargaining agreement.

> Business & Corporate Compliance > ... > Multiemployer Plans > Pensions & Benefits Law > Multiemployer Plans

> Pensions & Benefits Law > ERISA > Arbitration

*HN24*[↓] **Pensions & Benefits, Multiemployer Plans**

The *Multiemployer Pension Plan Amendments Act* (MPPAA) creates a presumption that any determination made by a plan sponsor under the MPPAA is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous. *29 U.S.C.S. § 1401(b)(3)(A)*. This provision means that an arbitrator is not only obliged to enquire into the soundness of the sponsor's determinations when they are challenged, but may receive new evidence in the course of his review and adopt his own conclusions of fact.

> Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

*HN25*[↓] **Multiemployer Plans, Complete Withdrawals**

Prior practice does not suffice to form withdrawal liability unless the collective bargaining agreement required the work to be assigned to the ironworkers. *29 U.S.C.S. § 1383(b)*.

> Torts > Vicarious Liability > Employers > Scope of Employment

*HN26*[↓] **Employers, Scope of Employment**

Under Ohio law, an employer is not responsible for those acts outside the scope of employment, and work is only in the scope of a worker's employment if it is conduct of the kind which he is employed to perform.

**Counsel:** ARGUED: Richard L. Stoper, Jr., GOLDSTEIN GRAGEL LLC, Cleveland, Ohio, for Appellants.

Daniel A. Richards, WESTON HURD LLP, Cleveland, Ohio, for Appellee.

ON BRIEF: Richard L. Stoper, Jr., Susan L. Gragel, GOLDSTEIN GRAGEL LLC, Cleveland, Ohio, for Appellants.

Daniel A. Richards, Morris L. Hawk, WESTON HURD LLP, Cleveland, Ohio, Jeanne V. Gordon, Amy M. Wojnarwsky, CAVITCH, FAMILO & DURKIN CO., L.P.A., Cleveland, Ohio, for Appellee.

**Judges:** Before: CLAY, ROGERS, and SUTTON, Circuit Judges.

**Opinion by:** ROGERS

# Opinion

[*665] ROGERS, Circuit Judge. *HN1*[↑] Under the *Multiemployer Pension Plan Amendments Act*, part of ERISA, a construction industry employer who withdraws from a multiemployer pension plan owes liability to that plan if the employer conducts work "in the jurisdiction of the collective bargaining agreement of the [*666] type for which contributions were previously required." *29 U.S.C. § 1383(b)(2)(B)(i)*. In accordance with this provision, the Trustees of the Iron Workers Local 17 Pension Fund assessed pension liability against Stevens Engineers & Constructors, claiming that Stevens's activities on a certain construction project [**2] involved such work within the jurisdiction of their previous collective bargaining agreement. As an arbitrator and the district court below found, however, Stevens did not owe pension liability to the Local 17 Pension Fund, because the work identified by Local 17 did not fall within the jurisdiction of the relevant

collective bargaining agreement, and did not otherwise require contributions by Stevens. The collective bargaining agreement instead allowed Stevens to assign jobs like the ones at issue to other trade unions, and a job did not trigger pension liability to the Local 17 Pension Fund if, as here, it was properly assigned to a different union. Local 17 offers additional arguments as to why Stevens owed withdrawal liability, but these are also unavailing.

I.

In 1980, Congress passed *HN2*[↑] the *Multiemployer Pension Plan Amendments Act* (MPPAA), which modified and extended the coverage of ERISA. *Pub. L. 96-364, 94 Stat. 1208 (1980)*. *ERISA* had allowed collective bargaining agreements for employers in large, fragmented industries like construction to collect employer contributions for a single centralized industrywide pension fund, rather than for individual plans for each employer. *See 29 U.S.C. § 1301(a)(3)*. To avoid incentives for employers to flee when a multiemployer plan became **[**3]** underfunded, the MPPAA imposed a provision for withdrawal liability, under which an employer leaving an industry or a plan would be responsible for paying additional contributions to that plan at the time of their exit. *29 U.S.C. § 1381*. An employer subject to withdrawal liability owes a proportionate share of the unfunded amount of the plan, determined on the date of exit from the plan. *29 U.S.C. § 1391*.

*HN3*[↑]] The MPPAA also provides that a plan's sponsor, often an entity supported by the local union, is normally responsible for calculating withdrawal liability, pursuant to the collective bargaining agreement's terms. *29 U.S.C. § 1382*. Where an employer and a plan disagree about the existence or extent of such withdrawal liability, the MPPAA also imposes a scheme for resolution of disputes, primarily through arbitration. *29 U.S.C. § 1401*. The MPPAA states that, in civil actions to enforce an assessment of withdrawal liability, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." *Id. § 1401(c)*.[1]

*HN4*[↑]] Although withdrawal liability attaches to most types of employers, a special withdrawal scheme— the

one at issue in this case—covers the construction industry. *29 U.S.C. § 1383(b)*. Under this **[**4]** arrangement, construction industry employers are not subject to withdrawal liability if they completely withdraw from "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." *Id. § 1383(b)(2)(B)(i)*. The Ninth Circuit has explained that this provision exists because "the construction industry as a whole does not necessarily shrink **[*667]** when a contributing contractor leaves the industry; employees are often dispatched to another contributing contractor." *H.C. Elliott, Inc. v. Carpenters Pension Tr. Fund for N. California, 859 F.2d 808, 811 (9th Cir. 1988)*. On these premises, the withdrawal of an employer from work within the jurisdiction of a collective bargaining agreement "do[es] not pose an undue threat to a plan as long as contributions are made for whatever work is done in the area." *Id. at 812* (quoting H.R. Rep. No. 96-869, 96th Cong., 2d Sess, pt. 1, at 75). At the same time, "[t]he withdrawal of any employer from the plan does decrease the base, however, if the employer stays in the industry but goes non-union and ceases making payments to the plan." *Id.* In those latter circumstances, the MPPAA provides that an employer must pay a proportional share of the unfunded amount in the plan, determined based on the employer's share of contributions for work **[**5]** prior to withdrawal, rather than after withdrawal. *29 U.S.C. § 1391(b)(1)(A)*.

The Iron Workers Local 17 Pension Fund (Fund) is a multiemployer pension plan subject to the MPPAA. It provides pensions for members of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers Local Union No. 17 (Local 17). The Board of Trustees of the Iron Workers Local 17 Pension Fund oversees and administers the Fund. The Fund is severely underfunded, with a deficit of over $170 million. An employer that withdraws from the Fund and cannot avail itself of the construction industry exception thus faces significant liability.

Stevens Engineers & Constructors (Stevens) is a company in the building and construction industry. Stevens specializes in heavy industrial construction, and at any given time generally employs several hundred union workers in a variety of trades. Between 1985 and April 2013, Stevens was a party to a series of collective bargaining agreements (CBAs) with Local 17, pursuant to which Stevens paid into the Fund. Like all previous CBAs, the final CBA between Stevens and Local 17 contained a statement of the jurisdiction establishing where the CBA applied. Article I of the CBA

---

[1] The MPPAA does not contain any provision establishing the standard of review for conclusions of law.

877 F.3d 663, *667; 2017 U.S. App. LEXIS 25134, **5

defined [**6] "craft jurisdiction," the ironworker work covered by the CBA, as the "unloading, handling, fabrication, re-fabrication, erection, and dismantling of structural, ornamental, reinforcing steel, metals, plastic, [and] composite and engineered materials." Article II of the CBA defined the "territory" of the CBA as a geographic range covering various counties in Northern Ohio. Jobs within the craft jurisdiction and the geographic jurisdiction of the CBA required payment by Stevens into the Fund, and Stevens made payments when so required.

The CBA between Stevens and Local 17 contained an additional qualifier. The craft jurisdiction section stated that the jurisdiction of the CBA was "subject to . . . Agreements, national in scope between the International and other International Unions covering work jurisdiction and [the] allocation and division of work." The CBA included this section because the jurisdiction claimed by craft unions in the construction industry can often overlap, and so unions have enacted various agreements allowing work divisions among crafts. Where work is assigned to one union through an assignment agreement, it is not within the domain of another union, and thus not [**7] subject to employer pension liability to that other union.

One work assignment agreement incorporated into the CBA was the National Maintenance Agreement (NMA). The NMA is a longstanding arrangement covering various craft unions, including ironworkers and millwrights, in construction [*668] projects, and directing which unions receive which work. The NMA provides that, where multiple unions can claim the same work, employers must conduct a pre-job conference to assign work on a project. Once a job is assigned through a pre-job conference, it belongs to the assigned craft union. Where a dispute continues following a pre-job conference, the NMA provides for a neutral umpire to resolve the dispute. If not challenged under the NMA, a task stands as assigned, and does not fall within the purview of any other union.

In April 2013, Stevens terminated its collective bargaining agreement with Local 17 and announced its intention not to directly employ any ironworkers on any future projects. Instead, where a Stevens project required ironworkers, Stevens would hire subcontractors to complete that work. As a result, Stevens ceased making contributions to the Fund. Stevens has not directly hired ironworkers [**8] since the termination of the CBA.

In September 2013, Stevens won a contract to renovate and install new equipment at the U.S. Steel No. 4 Seamless plant in Lorain County, Ohio, an area within the geographic jurisdiction of the previous Local 17 CBA. In accordance with the NMA, Stevens held a pre-job conference, at which Stevens announced that millwrights and not ironworkers would perform demolition and power rigging tasks for the No. 4 Seamless project. Power rigging involves the movement, handling, and removal of certain mechanical devices on construction sites. In previous jobs, Stevens had often assigned power rigging tasks to ironworkers, but in others, Stevens had chosen millwrights to do that work. Other employers subject to the NMA also assign rigging work to craft unions other than ironworkers.

Three days after the pre-job conference, a representative of Local 17 contacted Stevens to object to the job assignments. Local 17 protested Stevens's assignments as inconsistent with another inter-union agreement, the 1971 Ironworker Millwright Rigging Agreement, stating that ironworkers would have priority in power rigging work. The 1971 rigging agreement had been abrogated by the millwrights [**9] in 2005 and was no longer in force, but some construction employers continued to make assignments consistent with that agreement's terms. Stevens responded that it would not change the assignments on the No. 4 seamless site. The next step in the NMA process required Local 17 to submit its claims for dispute resolution; however, the union did not pursue the dispute further. The Trustees of the Fund did not participate in this process.

During Stevens's work at No. 4 Seamless, two irregularities occurred. One night in November 2013, laborers working for Stevens installed a three- to four-square-foot area of rebar on the site. In the pre-job conference, Stevens had assigned rebar installation exclusively to ironworkers. The next morning, when a Stevens manager discovered that the laborers had installed this rebar, the Stevens manager stated that the laborers had not been authorized to complete the task, apologized to the ironworkers, and stated that only ironworkers were permitted to do that work. Similarly, in January 2014, a subcontractor informed Stevens that millwrights were installing iron grating and handrails, despite Stevens's assignment of that work to ironworkers. Stevens immediately [**10] ordered the millwrights to cease that work. The total amount of ironworker activities wrongly performed by other crafts amounted to twenty hours, or less than two-tenths of one percent of all ironworker work.

877 F.3d 663, *668; 2017 U.S. App. LEXIS 25134, **10

On November 13, 2013, about two weeks after the pre-job conference, the Fund **[*669]** Board of Trustees passed a resolution holding that Stevens was performing work for which Stevens had previously used ironworkers, namely the demolition and power rigging work. In consequence, the Trustees voted to impose withdrawal liability on Stevens. The Fund used the abrogated 1971 Rigging Agreement as the basis for its assessment that it was entitled to payment for the work done by Stevens. The Fund presented Stevens with a demand for $5,056,017, the amount of the withdrawal liability it calculated Stevens owed. Stevens requested that the Trustees review their own determination, pursuant to an ERISA provision allowing employers the right to such reviews. *See* 29 U.S.C. § 1399(b)(2)(A). After hearing evidence from Stevens, the Trustees reconfirmed their own jurisdiction over Stevens.

Stevens moved to submit the claims to arbitration, pursuant to ERISA's mandatory-arbitration clause. *See* 29 U.S.C. § 1401(a)(1). During the discovery phase of the arbitration, **[**11]** the Fund learned of two additional activities by Stevens that it counted as irregularities. Prior to the pre-job conference, millwrights employed by Stevens had moved machinery at the No. 4 Seamless site. Likewise, laborers employed by Stevens had drilled a few holes for rebar on the site. The Fund had not known about these activities when it imposed withdrawal liability on Stevens, and the activities did not serve as a basis for its determination that Stevens had performed work subjecting Stevens to withdrawal liability.

After hearing four days of testimony, the arbitrator found that Stevens was not subject to withdrawal liability. The arbitrator concluded that Stevens had not conducted "work in the jurisdiction of the collective bargaining agreement" because Stevens had assigned power rigging and demolition tasks to the millwrights through the NMA. Although recognizing that the Fund's assessment of liability enjoyed a presumption of correctness, the arbitrator found that this presumption did not require liability against Stevens here, because the Fund's conclusion was clearly erroneous. The arbitrator also found that Stevens was not liable for the rebar installation and the millwrights' **[**12]** installation of iron grating, but did not discuss the laborers' drilling holes for rebar and unloading equipment, although it had heard evidence on these latter issues.

Following the arbitrator's award, Stevens brought a civil action against the Fund and the Trustees to enforce the arbitrator's award, and that same day the Fund and Trustees brought an action against Stevens seeking to vacate the award. The district court consolidated both actions into the current case. After motions, the district court granted Stevens's request to enforce the arbitrator's award, concluding like the arbitrator that Stevens had assigned the challenged tasks through the NMA, and so they were not within the Fund's jurisdiction. The district court further rejected the Fund's argument that the Fund should not be bound by Local 17's failure to object to the NMA-provided assignment, and found that the Fund could not independently assess withdrawal liability on Stevens outside of the context of the CBA.

The Fund now appeals.

## II.

Stevens did not owe withdrawal liability to the Fund because the power rigging work it assigned to the millwrights through the NMA was not work within the jurisdiction of the Local 17 CBA, **[**13]** and did not otherwise require contributions by Stevens. *HN5*[⬆] Under the MPPAA, a construction industry employer owes withdrawal liability only when it either "continues to perform **[*670]** work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required" or "resumes such work within 5 years . . . ." 29 U.S.C. § 1383(b)(2). Here, however, the power rigging work was not work within the jurisdiction of the CBA because the CBA permitted Stevens to assign this work to another union. The previous CBA between Stevens and Local 17 incorporated "[a]greements, national in scope between the International and other International Unions covering work jurisdiction and allocation and division of work," and it is not contested that the NMA is one such incorporated agreement. The NMA, in turn, provided that where a job is assigned through a pre-job conference, it belongs exclusively to the union to which it is assigned. The Fund therefore could not use the power rigging work as a basis for assessing withdrawal liability here, because the job's assignment to the millwrights in the pre-job conference meant it was within the jurisdiction of the millwrights rather than the ironworkers. The work **[**14]** thus did not trigger the "perform[ance] . . . in the jurisdiction of the collective bargaining agreement" requirement for 29 U.S.C. § 1383(b)(2) to apply.

This court has never addressed the precise meaning of "jurisdiction" under 29 U.S.C. § 1383(b)(2). The

conclusion that withdrawal liability is defined by the jurisdictional provisions of the relevant collective bargaining agreement is, however, consistent with other courts' approaches to this issue. For example, the Ninth Circuit has held that *HN6*[↑] an employer who withdrew from the construction industry but continued to own a part of a joint venture of a construction project did not owe withdrawal liability under *Section 1383(b)(2)* for that ownership, because the employer's CBA when in force would not have required contributions for that ownership. *Carpenters Pension Tr. Fund for N. California v. Underground Constr. Co., 31 F.3d 776, 780 (9th Cir. 1994)*. Similarly, the Seventh Circuit has stated in a general analysis of pension liability that, *HN7*[↑] where no other legal duty exists, an employer's "obligation to contribute is tied exclusively to the . . . CBA." *Michels Corp. v. Cent. States, Se., & Sw. Areas Pension Fund, 800 F.3d 411, 418 (7th Cir. 2015)*. Other circuits have also confirmed that *HN8*[↑] a work-assignment process can direct pension contributions to the union to whom the work was assigned. For example, the Eighth Circuit held that *HN9*[↑] a jurisdictional provision like the one here, where work could be assigned to [**15] multiple unions, meant that a pension fund of a non-assigned union was "not entitled to contributions for work assigned to members of a competing union within the jurisdiction of that union." *Carpenters Fringe Benefit Funds of Ill. v. McKenzie Eng'g, 217 F.3d 578, 585 (8th Cir. 2000)*.

The conclusion that withdrawal liability does not accrue from a task outside the jurisdiction of a collective bargaining agreement is also consistent with this circuit's more general precedents on the MPPAA. We have stated that *HN10*[↑] the MPPAA should be constructed strictly according to its text rather than through definitions "constructed in the dim light of common-law inference." *Cent. States, Se. & Sw. Areas Pension Fund v. Int'l Comfort Prods., LLC, 585 F.3d 281, 286 (6th Cir. 2009)*. Applying that principle here means applying the construction industry exception to withdrawal liability as it exists in the MPPAA, and *HN11*[↑] the MPPAA provides that withdrawal liability only attaches to work "in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." *29 U.S.C. § 1383(b)*. The straightforward interpretation of that text offers no grounds on which the Fund can assess withdrawal liability, because the Fund [*671] does not show that the CBA required contributions for work within the jurisdiction of another union.

To be sure, we have also acknowledged that the MPPAA expresses a [**16] general policy in favor of making employers who withdraw from an underfunded fund pay into it. *See Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund, 726 F.3d 738, 743 (6th Cir. 2013)*. We did not say, however, that this policy extends to finding liability where it would not otherwise exist. *HN12*[↑] Where, as here, the MPPAA expressly limits the situations in which contributions are required, the specific provisions of the text control over the looser general principles also embodied in the MPPAA.

Indeed, interpreting the "jurisdiction" triggering withdrawal liability under *29 U.S.C. § 1383(b)(2)(B)(i)* to be the jurisdiction established by a collective bargaining agreement is more consistent with the specific policy behind withdrawal liability, and the particular rationale for the construction industry exception. As the Ninth Circuit has explained, *HN13*[↑] the MPPAA imposes withdrawal liability to avert the scenario in which "the employer stays in the industry but goes non-union and ceases making payments to the plan." *H.C. Elliott, Inc., 859 F.2d at 811*. That incentive to gain the benefit of work without the detriment of pension liability does not exist, however, where an employer takes on a job that would not have required pension payments. Before its withdrawal from the CBA, Stevens would not have owed contribution liability to Local 17 for [**17] work properly assigned to another union through the NMA. It therefore causes no imbalance for Stevens to owe no liability for such work properly assigned after withdrawal either.

The Fund raises a series of objections to reading *Section 1383(b)* as not permitting withdrawal liability where a previous CBA would not have imposed it, but the Fund's contentions all fail. First, the Fund proposes an alternative interpretation of *Section 1383(b)* in which "jurisdiction" means only "geographic jurisdiction," but this argument is meritless. An opinion of the Second Circuit confirms that the jurisdictional clause of a CBA like the one at issue here covers both "the Union's defined trade and geographical jurisdiction." *Cleveland Wrecking Co. v. Iron Workers Local 40, 136 F.3d 884, 886 (2d Cir. 1997)*. The Fund points out that another portion of the MPPAA uses the term "craft and area jurisdiction" as opposed to just "jurisdiction," *see 29 U.S.C. § 1388(d)(1)*, but the principle that the greater includes the lesser means that the broad term "jurisdiction" can and does include the narrower variation "craft and area jurisdiction."

The Fund likewise states that interpreting "jurisdiction" to mean craft rather than geographic jurisdiction

produces an apparently absurd result of imposing liability where an employer works in a different [**18] state. But nothing says "jurisdiction" must apply to only one of craft or geography, and the natural reading is that it applies to both. In other words, *HN14*[↑] the MPPAA's provisions for withdrawal liability mean exactly what they say: an employer owes withdrawal liability for work that would have mandated contributions pursuant to ERISA if the CBA were still in force. *29 U.S.C. § 1383(b)*. This clarity means that, notwithstanding the Fund's suggestion, *HN15*[↑] resort to the MPPAA's legislative history is unnecessary because the text is clear. *See Mohamad v. Palestinian Auth., 566 U.S. 449, 458, 132 S. Ct. 1702, 182 L. Ed. 2d 720 (2012)*.

The Fund also expresses concern that a reading of "in the jurisdiction of the collective bargaining agreement" as covering [*672] whatever area a CBA establishes as its own jurisdiction makes redundant the second part of *Section 1383(b)*'s requirement: "of the type for which contributions were previously required." In fact, these two parts work in conjunction. *HN16*[↑] The limitation "of the type for which contributions were previously required" establishes that an employer does not owe withdrawal liability for actions previously covered by a CBA but not generative of pension liability. *Cf. Carpenters Pension Tr. Fund, 31 F.3d at 780* (demonstrating such a scenario). Reading both parts in conjunction fulfills, rather than frustrates, the MPPAA's [**19] scheme. It ensures that employers will not owe liability for actions after withdrawal that would not have generated liability before.

The Fund also identifies the fact that Stevens, while subject to the CBA, had previously employed ironworkers to do rigging work, as purportedly showing that this rigging work was within the ironworkers' jurisdiction. This argument ignores the point that under the CBA and the NMA, Stevens had the right to assign a job to various unions, and only incurred pension liability to a craft union when a task was so assigned. Knowing that, in the past, Stevens had exercised an option it possessed does not rebut the point that Stevens was not prohibited from assigning jobs to other unions in the future. The Fund finally objects that, even after the abrogation of the rigging agreement, area practice favored the assignment of rigging work to ironworkers, and thus Stevens would have owed liability for rigging work when the CBA was in force. *HN17*[↑] Extrinsic evidence like area practice does not overcome clear contract language, however. *Tackett v. M & G Polymers USA, LLC, 811 F.3d 204, 208 (6th Cir. 2016)*. Because this CBA through the incorporated NMA expressly

provides flexibility for Stevens to make rigging assignments, a survey of area [**20] practice is unnecessary to determine that Stevens could exercise a right that it possessed by the terms of the contract.

## III.

Although only Local 17 and not the Fund was a party to the CBA and capable of challenging work assignments under the NMA, that assignment is binding on the Fund, because the Fund did not have an independent right to assess liability based on a task assigned to another union through the NMA.[2] The Fund points out that, in some ERISA areas, pension funds are not necessarily bound by the failures of relevant unions to assert a fund's claims, and argues that it should be permitted to pursue claims against Stevens. Here, however, Local 17's action through the NMA was a necessary prerequisite to create obligation to contribute to the Fund, and so the Fund could not assess liability based on work never falling within its jurisdiction. The Fund's arguments that there was no forfeiture of its independent powers to assess liability thus fail, because no such independent powers existed in this context.

*HN18*[↑] Under the MPPAA's standards for withdrawal liability, a plan sponsor may only assess withdrawal liability on a construction employer who resumes or "perform[s] work in the jurisdiction [**21] of the collective bargaining agreement of the type for which contributions were previously required." [*673] *29 U.S.C. § 1383(b)(2)(B)(i)*. As discussed above, the jurisdiction of the collective bargaining agreement in this case incorporated the NMA, under which a craft union lacks jurisdiction over jobs properly assigned to another union pursuant to that agreement. Here, as both the arbitrator and the district court found, Local 17 did not have jurisdiction over rigging work because Stevens assigned that work to millwrights rather than ironworkers. The NMA process was exclusive and final. As a result, both the arbitrator and district court correctly concluded that the Fund did not have the power to retroactively determine that Stevens's work was within

---

[2] To be clear: the Fund does not raise the issue of whether it did or should have possessed an independent standing, separate from that of Local 17, to challenge work assignment through the NMA process. Rather, the Fund argues that it has the independent authority to subsequently assess liability on Stevens, regardless of rights established via NMA assignment. We thus leave for another day the question of a pension fund's independent standing to intervene in a process like the NMA.

the jurisdiction of Local 17 based only on the Fund's own authority, because that decision was precluded by the NMA.

The Fund nevertheless seeks the right to decide what tasks belonged to Local 17, regardless of NMA assignment, but the Fund lacks any such power to overturn the NMA's outcomes. An inter-union dispute process like the NMA establishes the jurisdiction for pension contribution claims, and must be challenged through its own procedures. The Eighth Circuit has **[\*\*22]** held, for instance, that HN19[⬆] a union pension fund was not entitled to collect contributions from a project assigned to another union, since the assignment of that project had placed it outside the bounds of the relevant union's CBA. *McKenzie, 217 F.3d at 585*. On relatively similarly facts to those here, the *McKenzie* court held that, unless challenged through the inter-union dispute resolution process, "the Funds are not entitled to contributions for work assigned to members of a competing union within the jurisdiction of that union." *Id.* We have in turn cited *McKenzie* for the proposition that HN20[⬆] a pension fund "should not be able to establish an entitlement to contributions for work assigned to another union claiming jurisdiction over the work without invoking procedures for resolving the jurisdictional work assignment issue." *Trs. of B.A.C. Local 32 Ins. Fund v. Ohio Ceiling & Partition Co., 48 Fed. Appx. 188, 2002 WL 35018235, at \*9 (6th Cir. 2002)*. That conclusion is equally valid in this case.

The Fund tries to distinguish *McKenzie* on the basis that "*McKenzie* involved delinquent contributions, not withdrawal liability." If anything, this fact would appear to make *McKenzie* more rather than less persuasive in this case. HN21[⬆] Under ERISA, delinquent contributions mean that some liability has already accrued, and thus some entity has an entitlement **[\*\*23]** to money, *see 29 U.S.C. § 1145*. By contrast, no entity has any right to withdrawal liability if no such liability actually exists. *McKenzie* is thus applicable to the issues in this case.

In addition, the Fund cites precedents expressing the general point that a plan sponsor is usually not bound by union conduct, but these cases are not relevant to this dispute. These precedents show only that plan sponsors can exercise already-extant rights, but they do not demonstrate any independent power to assess liability by a fund. For example, the Fund points to the fact that the Supreme Court has held that a coal company could not withhold plan contributions because the beneficiary union had gone on strike. *Lewis v. Benedict Coal Corp., 361 U.S. 459, 466, 80 S. Ct. 489,*

*4 L. Ed. 2d 442 (1960)*. In that case, however, the coal company had pledged to pay the fund a specific royalty per ton of coal produced, and had produced that amount of coal. *Id. at 461-62, 466*. Here, by contrast, the Fund's claim did not involve an amount certainly accrued, but rather a liability that never existed in the first place. Likewise, the Fund's observation that ERISA requires payment from "[e]very employer who is obligated to make contributions to a multiemployer **[\*674]** plan under the terms of the plan" without reference to others' defenses, *see* **[\*\*24]** *29 U.S.C. §1145*, only begs the question of whether Stevens was so obliged to make those contributions here. If Stevens was not otherwise obliged to contribute, then Stevens did not violate this prohibition against not paying required contributions by not contributing sums that Stevens did not owe.

The Fund also identifies various precedents holding that plan sponsors are not subject to estoppel or waiver based on union action, but those cases' procedural rules do not answer the point that substantive liability does not exist here. The Fund contends that Stevens should not avoid withdrawal liability just because Local 17 did not challenge the assignment of work to millwrights through the NMA. It is true that we have held in a deficient-contribution case that HN22[⬆] a union's failure to comply with terms in a CBA "cannot affect the [pension] Funds' right to collect contributions that are due and owing to the Funds." *Operating Eng'rs Local 324 Health Care Plan v. G&W Constr. Co., 783 F.3d 1045, 1053 (6th Cir. 2015)*. As *G&W Construction* also states, however, this prohibition only applies to contributions that are "due and owing to the Funds." *Id.* The Fund identifies no precedent stating that a union's failure to challenge work assignments can allow a fund to collect contributions not otherwise owed to that **[\*\*25]** fund.

Indeed, our precedents strongly emphasize the primacy of parties' prior arrangements in assessing when liability accrues, since HN23[⬆] "[f]unds are entitled to rely on the written terms of an existing ERISA plan document or collective bargaining agreement." *Id.* (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148, 1153 (7th Cir. 1989)*). In this case, that prior arrangement stated that work assignments would stand as assigned through the job-assignment process, and pension liability follow accordingly, unless challenged at the time of assignment. Because the Fund did not accrue any rights to contribution from work assigned to another craft through the NMA, or otherwise enjoy a right to challenge those assignments, permitting re-assessment now

would prove inconsistent with that obligation.

## IV.

In addition to its main argument on power rigging, the Fund points to tasks—drilling holes for rebar and unloading machinery—completed by Stevens workers but not discovered by the Fund before it assessed withdrawal liability on Stevens, and the Fund argues that these tasks permit its assessment of withdrawal liability. The district court ruled questionably that the Fund could not use after-acquired information to justify its imposition of withdrawal liability,[3] but in any [**26] event this information does not subject Stevens to liability to the Fund.

The Fund first points to the fact that it discovered that laborers employed by Stevens [*675] drilled holes for rebar installation, but drilling holes in preparation for rebar installation was not within the mandatory jurisdiction of the Local 17 CBA. The craft jurisdiction section of that CBA claimed for the ironworkers the "unloading, handling, fabrication, re-fabrication, erection, and dismantling of structural, ornamental, reinforcing steel, metals, plastic, composite and engineered materials." This list does not include the preparation of a site for metal installation (as opposed to the installation itself), and there was evidence from the arbitration hearing that drilling holes for rebar installation did not fall within the mandatory jurisdiction of the ironworkers. The Fund objects that Stevens had assigned drilling work to ironworkers in the past; however, _HN25_[⬆] prior practice does not suffice to form withdrawal liability unless the CBA required the work to be assigned to the ironworkers, _see 29 U.S.C. § 1383(b)_. The Fund thus does not offer evidence that this drilling constituted work per se requiring contributions from Stevens, as [**27] opposed to only requiring contributions if assigned to

the ironworkers.

The Fund also identifies the fact that millwrights unloaded machinery from trucks as work conducted within Local 17's jurisdiction. The NMA, however, permitted assigning this work to non-ironworkers. Because the unloading was assignable work through the NMA, it did not fall within Local 17's jurisdiction unless granted to Local 17 through the NMA, which did not happen here. It is true that this occurred before formal assignments at the pre-job conference. Under the NMA, however, a craft union does not have any right to work assignable to another union until after the union is assigned the work through a pre-job conference. Here, the unloading was assignable, and the pre-job conference assigned this work to non-ironworkers. Because Local 17 thus never had an exclusive claim to this work, it does not constitute work imposing liability on Stevens, and the Fund could not use that work to justify withdrawal liability.

## V.

Finally, the various irregularities during the construction process do not lead to withdrawal liability because Stevens was not responsible for them. The Fund identified two instances in which Stevens [**28] employees or agents conducted work unquestionably within the duty of ironworkers. In the first case, some carpenters or laborers installed a small portion of rebar on the site. In the second, millwrights installed grating and handrails around a machine. In both instances, however, Stevens did not order this work, was not aware of this work, and ordered it terminated as soon as Stevens learned of it. _HN26_[⬆] Under Ohio law, the governing law here, an employer is not responsible for those acts outside the scope of employment, and work is only in the scope of a worker's employment if it is conduct of the kind which he is employed to perform. _Groob v. KeyBank, 108 Ohio St. 3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, 1177 (Ohio 2006)_. Here, Stevens assigned ironworker work exclusively to the ironworkers, and neither authorized nor condoned the non-ironworkers performing that work. The district court thus did not err in finding that Stevens was not responsible for work done outside Stevens's control.

## VI.

The judgment of the district court is affirmed.

---

[3] The relevant section of _HN24_[⬆] the MPPAA creates a presumption that "any determination made by a plan sponsor under [the MPPAA] is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." _29 U.S.C. § 1401(a)(3)(B)_. The Supreme Court has held that this provision means that an arbitrator "is not only obliged to enquire into the soundness of the sponsor's determinations when they are challenged, but may receive new evidence in the course of his review and adopt his own conclusions of fact." _Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 623, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993)_.

877 F.3d 663, *675; 2017 U.S. App. LEXIS 25134, **28

**End of Document**

◆ Positive
As of: February 21, 2019 9:18 PM Z

# *Stevens Eng'rs & Constructors, Inc. v. Iron Workers Local 17 Pension Fund*

United States District Court for the Northern District of Ohio, Eastern Division

August 24, 2016, Decided; August 25, 2016, Filed

CASE NO. 1:15 CV 1965; 1:15 CV 1967

**Reporter**
2016 U.S. Dist. LEXIS 114028 *; 207 L.R.R.M. 3388; 2016 WL 4479486

STEVENS ENGINEERS & CONSTRUCTORS, INC., Plaintiff, vs. IRON WORKERS LOCAL 17 PENSION FUND, et al., Defendants.

**Subsequent History:** Affirmed by *Stevens Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund, 2017 U.S. App. LEXIS 25134 (6th Cir. Ohio, Dec. 13, 2017)*

## Core Terms

Arbitrator, withdrawal, assigned, millwrights, ironworkers, Rigging, Iron, pension fund, contributions, craft, carpenters, collective bargaining agreement, installation, employees, Trustees', parties, clearly erroneous, Funds, work assignment, pre-job, Steel, jurisdictional dispute, Seamless, disputes, terminated, abrogated, international union, Engineers, arbitration award, jurisdictional

**Counsel:** **[*1]** For Stevens Engineers & Constructors, Inc., Plaintiff (1:15-cv-01965-DCN): Daniel A. Richards, LEAD ATTORNEY, Morris L. Hawk, Weston Hurd - Cleveland, Cleveland, OH; Jeanne V. Gordon, LEAD ATTORNEY, Amy M. Wojnarwsky, Cavitch Familo & Durkin, Cleveland, OH.

For Local 17 Iron Workers Pension Fund, Local 17 Iron Workers Pension Fund Board of Trustees, Defendants (1:15-cv-01965-DCN): Susan L. Gragel, Teresa R. Pofok, LEAD ATTORNEYS, Andrew A. Crampton, Goldstein Gragel, Cleveland, OH.

For Local 17 Iron Workers Pension Fund, Local 17 Iron Workers Pension Fund Board of Trustees, Plaintiffs (1:15-cv-01967-DCN): Teresa R. Pofok, LEAD ATTORNEYS, Susan L. Gragel, Andrew A. Crampton, Cleveland, OH.

For Stevens Engineers & Constructors, Inc., Defendant (1:15-cv-01967-DCN): Amy M. Wojnarwsky, Jeanne V. Gordon, Cavitch Familo & Durkin, Cleveland, OH;

Daniel A. Richards, Morris L. Hawk, Weston Hurd - Cleveland, Cleveland, OH.

**Judges:** DONALD C. NUGENT, UNITED STATES DISTRICT JUDGE.

**Opinion by:** DONALD C. NUGENT

# Opinion

MEMORANDUM OPINION

This matter is before the Court on the Complaint of Plaintiff Stevens Engineers & Constructors, Inc, ("Stevens") to enforce the Arbitration Award of Arbitrator John E. Sands in Case No. 1:15 CV 1965, **[*2]** and the corresponding Complaint of Defendants Iron Workers Local 17 Pension Fund (the "Pension Fund" or "Fund") and its Board of Trustees ("Trustees") in Case No. 1:15 CV 1967, to vacate or modify the Arbitrator's Award.[1]

**PROCEDURAL BACKGROUND**[2]

———————————————

[1] Also pending is Steven's Partial Motion to Dismiss the Fund's Second Claim for relief in Case No. 15 CV 1967. (ECF #6) The Fund's First Claim for relief requests that the Arbitrator's Award by vacated. The Second Claim for relief, which is derivative of the First Claim for relief, seeks the collection of quarterly withdrawal liability payments owed pursuant to the Fund's original withdrawal liability assessment. The Fund notes that it does not seek immediate payments of the original withdrawal liability assessment, recognizing that any future continuation of such payments would only be granted if the Court vacates the Arbitrator's Award.

[2] The facts cited by the Court are derived from the Courts thorough review of the extensive record submitted in this action, including without limitation, the Opinion and Award of Arbitrator Sands, the briefing of the parties and the exhibits thereto and the transcripts of the arbitration proceedings.

2016 U.S. Dist. LEXIS 114028, *2

Plaintiff Stevens [*3] filed its Complaint for Judgment to Enforce Arbitration Award against the Pension Fund and its Trustees on September 23, 2015. (15 CV 1965, Doc.1) Later that same day, the Pension Fund and its Trustees filed a Complaint against Stevens seeking to Vacate or Modify the Arbitration Award. (15 CV 1967, Doc. 1) The actions were consolidated and have proceeded under the lower case number.

This action arises from the assessment of withdrawal liability by the Trustees of the Pension Fund against Stevens under the construction industry withdrawal liability provisions of _ERISA § 4203(b)_, _29 U.S.C. § 1383(b)_, and the _Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA")_ The MPPAA requires a contributing employer that withdraws from a multiemployer pension plan to pay its proportional share of the plan's unfunded vested benefits calculated in accordance with MPPAA's terms as of the end of the plan year preceding the plan year of withdrawal. In the construction industry, a complete withdrawal occurs under _29 U.S.C. § 1383(b)_ when an employer that ceases to have an obligation to contribute under the plan and:

> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or

> (ii) resumes such work within 5 [*4] years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of resumption.

Stevens is a construction industry employer who, between approximately 1985 and 2013, was bound to a series of collective bargaining agreements ("CBA's") with the Iron Workers Union Local 17 and was thus obligated to make, and did make, contributions to the Pension Fund when performing iron work covered by Local 17 CBA's. Stevens did not renew the Local 17 CBA when it expired on April 20, 2013 and its obligation to contribute to the Pension Fund ceased.

In September 2013 Stevens received a contract to complete the demolition, removal, replacement, upgrade and installation of new equipment for the #4 Seamless Mill Expansion Project at the U.S. Steel Lorain Mill ("No. 4 Seamless"). Stevens held the pre-job conference for the No. 4 Seamless job with representatives from all the crafts involved on October 29, 2013. Three days later Timothy McCarthy, the business manager of Local 17 Iron Workers Union, sent a letter to Stevens objecting to the assignment of certain work he believed was

ironworker work to the millwrights and expressing the Union's intent [*5] to invoke the NMA dispute procedures. After Stevens replied to that letter with its explanation for the assignments, the Union took no further action to dispute the assignment.

Approximately one week after receiving Stevens' response to Local 17's complaint about the assignments, on November 13, 2013, the Trustees of the Pension Fund, led by Timothy McCarthy, now acting as the Chairman of the Fund's Board of Trustees, determined that Stevens had assigned ironworker work of the type for which Stevens had been required to contribute to the Pension Fund before the Local 17 CBA was terminated to others, including millwrights. The Trustees voted to assess withdrawal liability against Stevens in the amount of $5,065,017. Stevens requested that the Trustees review the assessment of withdrawal liability. The Trustees considered the request and declined to change their position. Thereafter, Stevens demanded arbitration of the dispute and the parties selected Arbitrator John Sands to hear the case.[3]

The case proceeded to arbitration which consisted of four days of testimony, where both sides had full opportunity to adduce evidence, cross examine each other's witnesses, and to make argument in support of their respective positions. Following the hearings, each side submitted a post-hearing brief and a reply brief. The issue as framed by Arbitrator Sands is "whether the Fund correctly assessed withdrawal liability arising out of a construction industry craft jurisdictional dispute."

Arbitrator Sands issued his Opinion and Award on August 25, 2015, finding that the Pension Fund's assessment of withdrawal liability against Stevens and its denial of Steven's request for review were unreasonable and clearly erroneous and ordering the Fund to refund Steven's interim withdrawal liability payments with interest from the dates paid.

_____

[3] In its principal brief, Stevens notes, and Defendants do not dispute, that Arbitrator Sands has arbitrated and mediated more than 4,000 disputes in the fields of labor, employee benefits, withdrawal [*6] liability, commercial and employment law. Arbitrator Sands has extensive knowledge of withdrawal liability disputes and chaired the International Foundation of Employee Benefit Plans' Committee that drafted the American Arbitration Associations's revised Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes.

## FACTS[4]

Arbitrator Sands made the following Findings of Fact:

### Parties

1. The Pension Fund is a defined benefit multiemployer pension plan within the meaning of ERISA. The Fund was jointly established by the Steel and Iron Contractors Association and Iron Workers Local Union No. 17 ("Local17") in 1965 under the *Taft-Hartley Act*. The Fund is 40% funded with a funding deficit of more than $170 million. It is classified as a "Red Zone" or critically underfunded pension plan according to the provisions of the 2008 Pension Protection Act. Because the Fund is critically underfunded, the potential withdrawal liability for its contributing employers has become substantial.

2. Stevens Engineers & Constructors Inc. f/k/a Stevens Painton Corporation ("Stevens") is an employer in the building and construction industry. Stevens was founded in 1970 by the merger of Stevens Corporation and Painton Corporation. Stevens is a heavy industrial construction outfit involved in power, steel, automotive, and chemical work and employs approximately 165 full-time employees. Stevens also employs anywhere from [*8] several hundred to nearly one thousand union employees at any given time due to the nature of construction work.

### Governing Agreements

3. Through a series of Assent of Participation Agreements, Stevens was successively bound to collective bargaining agreements with Local 17, the last of which expired midnight on April 30, 2013. Stevens did not renew the Local 17 contract.

4. Stevens is also bound to collective bargaining agreements with the Laborers, Carpenters/Millwrights, Operating Engineers, Boilermakers, Cement Finishers, and Teamsters unions in the geographic jurisdictions where Stevens operates. These various unions each claim craft jurisdiction that overlaps with the craft jurisdiction the Iron Workers claim for its members. Particularly at issue here is the overlapping jurisdiction of the Iron Workers and Millwrights.

---

[4] The facts have been copied [*7] directly from the Arbitrator's Opinion and Award and include any formatting issues, spacing anomalies, typos, etc.

5. These are the Iron Workers' relevant collective bargaining agreement provisions that establish its jurisdiction in both geographical *and* craft terms:

### ARTICLE I

### CRAFT JURISDICTION

(a) It is agreed that the jurisdiction of work covered by the Agreement is that provided for in the charter grant issued by the American Federation of Labor ("AFL") to the Bridge, Structural, [*9] Ornamental and Reinforcing Iron Workers . . . , it being understood that *the claims are subject to . . . Agreements, national in scope between the International and other International Unions covering work jurisdiction and allocation and division of work among employees* represented for the purpose of collective bargaining by such labor organizations. . . .

(b) This Agreement shall cover and include but is not limited to the unloading, handling, . . erection, and dismantling of structural, ornamental, reinforcing steel, composite and engineered material and it is understood and agreed that the International claims for its members the fabrication, production, erection and construction of all . . . conveyors, cranes (the erection, installation, handling, operating and maintenance on all forms of construction work), . . . decking (metal); grating, . . . guards, machinery (moving, hoisting and placing on foundations), making and installation of all . . . material altered in the field, such as; framing, cutting, bending, drilling, burning and welding by acetylene gas and electric machines; . . . monorails, railings (including pipe), . . . rebar tie guns, . . rigging ..., stairways, . ... [*10] wrecking and dismantling all of the above. . . .

* * *

(g) When unloading structural steel with power equipment, . . . .

* * *

(j) When unloading and handling materials, other than structural steel, . . . [Emphasis added.]

### ARTICLE II

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 17 of 212 PAGEID #: 2011

Page 4 of 19
2016 U.S. Dist. LEXIS 114028, *10

## TERRITORY

The territory covered by the Agreement shall be the territorial jurisdiction of the Union and shall include the following counties: Cuyahoga, Ashtabula, Erie, Geauga, Huron, Lake, Medina, Portage, Summit and Lorain. . . . .

6. That Agreement's Preamble provides, in relevant part:

This Agreement is entered into by collective bargaining . . . to prevent waste, unnecessary and avoidable delays, and expenses . . . that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions, and further, the establishment of the necessary procedures by which these ends may be accomplished.

7. Stevens is also party to the Northeast Ohio Carpenters' Agreement, which sets terms and conditions of employment for Millwrights. Its craft jurisdiction provision covering Millwrights overlaps many of the areas and functions claimed by Iron Workers. These are some relevant terms of that Agreement:

**1.10 [*11] Millwrights and Machine Erectors**. The term "Millwrights and Machine Erectors' jurisdiction shall mean the unloading, hoisting, rigging, skidding, moving, dismantling, aligning, erecting, assembling, repairing, maintenance and adjusting of all structures . . . required to process material, handle, manufacture, or service, be it powered or receiving power manually . . . and in industries such as and including . . . but not limited to . . . steel mills. . . . The installation of . . . conveyors of all types, sizes and their supports. . . and the installation of all types of equipment necessary and required to process material either in the manufacturing or servicing. The handling and installation of. . . guards, . . . forging machines. . . . The . . . fabrication and installation of protection equipment including machinery guards . . . .
* * *

**1.12** When a carpenter [defined as including millwright] is available, the carpenter shall be assigned to unload and distribute all materials under the Union's jurisdiction. . . . .

8. As noted above, the Iron Workers craft jurisdiction is expressly limited by "Agreements, national in scope between the International and other International Unions covering **[*12]** work jurisdiction and allocation and division of work among employees. . . ."

9. One such agreement to which Stevens, the Millwrights, and the Iron Workers are all party is the National Maintenance Agreement ("NMA"), which applies to industrial construction, maintenance, replacement, and renovation work such as the project at issue here. That Agreement's first paragraph cites its following purposes:

Safety in all phases of work;
No disruption of the owner's work; Performance on schedule;
Cost-effective and quality craftsmanship;
Productivity flexibility;
Trained, available workforce;
Attainable work opportunities;
Resolution process for job site issues; and
Consistent terms and conditions.

10. The NMA recognizes that various crafts may claim work assignments that are part of the "recognized and traditional jurisdiction" of other crafts. To address such issues, it provides the following procedures:

3. *The Employer is required to conduct a pre-job conference, including all craft work assignments, for each project. . . .* Written craft work assignments will be distributed to the appropriate Unions, not to exceed ten (10) working days after the pre-job conference.
* * *

5. During the existence of the **[*13]** Agreement, there shall be no strikes, lockouts, work stoppages, or picketing arising out of any jurisdictional dispute. *Work will continue as originally assigned, pending resolution of the dispute.*
* * *

6. . . . *[All parties] stipulate that they will abide by the following procedures for the resolution of jurisdictional disputes.* A party challenging an assignment shall notify all affected parties, i.e. Unions and Employer, by mail FAX, or e-mail. *All disputes involving craft work assignments shall be referred to the International Unions, with which the Local Unions are affiliated, providing the International Union and the Employer an opportunity to resolve the dispute.*

7. If the International Unions and the Employer fail to resolve the dispute after five (5) working days after the date they were notified of the dispute any

International Union or Employer directly involved in the dispute may refer the arbitration . . . for resolution under this procedure. . . . .
9. . . . The decision of the Umpire shall be final and binding on all parties to the dispute. . . .
[Emphasis added.]

11. Under the NMA, craft assignments are presumed proper as assigned. Such assignments can be challenged under **[*14]** the dispute resolution process. If a matter is not resolved between an employer and the local or international union, the unions may initiate a review by an Umpire. The Umpire's decision is final and binding. An Umpire may not award backpay but determines disputed assignments going forward. Until a final Umpire decision, original assignments stand as made. As a result, if a union does not pursue the dispute resolution process under the NMA, the work stands as it was originally assigned.

12. Another "Agreement, national in scope . . . covering work jurisdiction and allocation and division of work among employees" is the May 1, 1971 agreement between the Iron Workers and the Millwrights covering "rigging in connection with the installation of machinery and/or equipment on building and construction projects" ("1971 Rigging Agreement"), Articles 3 and 4 of which allocate handling, rigging, and removal of machinery and equipment in heavy industrial plants such as the one at issue here.

13. In a joint meeting of Iron Workers and Millwrights International Representatives within months following the 1971 Rigging Agreement's adoption, Robert McVay for the Iron Workers and Jimmy Jones for the **[*15]** Millwrights stipulated that the Agreement does not apply to maintenance projects, only new construction.

14. In any event, by letter dated April 25, 2005 to Iron Workers General President Joseph Hunt, Carpenters' General President Douglas J. McCarron abrogated the 1971 Rigging Agreement citing the same reasons as he had for abrogating similar agreements regarding conveyors: "Most everyone recognized that these agreements were antiquated and non-productive." McCarron concluded, "It is our belief that by abrogating these agreements our union contractors will be more competitive and the members of both our organizations will gain market share." The 1971 Rigging Agreement has not been effective since then. Notwithstanding that fact, construction industry parties unaware of the abrogation continued to make some job assignments consistently with its terms, which underlies the Funds

claim that its terms continue in effect as area practice.

**Stevens' Operations**

15. Stevens' senior management was aware that Stevens faced withdrawal liability of up to $8 million if the Pension Fund were terminated by mass withdrawal. Stevens accordingly decided to stop self-performing, self hiring, and direct-hiring **[*16]** Local 17 ironworkers. In 2010 Stevens began to subcontract ironworker work to other heavy industrial construction contractors that are signatories to the Local 17 collective bargaining agreement, primarily Bender Constructors, Standard Construction, Chemsteel, Ambassador Steel, and Akron Erectors.

16. While Stevens self-performed 64 ironworker hours on the US Steel Number 6 Quench and Temper Project ("6 Q&T") in 2010, a project for which it had assigned work in 2009, Stevens did not further self-perform any ironworker assignments within the jurisdiction of Local 17 after 2010. These hours on the 6 Q&T predate Stevens's decision to stop self-performing ironworker work.

17. Stevens' Cleveland General Manager, Chet Seroka, advised clients in 2010 that Stevens would no longer directly hire Local 17 ironworkers to perform ironworker assignments in Local 17's jurisdiction. He met with US Steel, ArcelorMittal, and others to explain that Stevens would no longer self perform Local 17 ironworker work and would accordingly not apply for projects that consisted predominantly of ironworker work. Stevens has continued this work model consistently since then and has relinquished the opportunity to **[*17]** bid on numerous jobs, even when clients have asked it to bid on a project.

18. On December 4, 2012, Stevens confirmed its termination decision by letter to Local 17 and did not renew that contract upon its April 30, 2013 expiration. Stevens has not made contributions to the Fund since then.

19. In support of its "area practice" argument, the Fund adduced evidence concerning Stevens' work assignments at four projects that predated termination of its Iron Workers collective bargaining agreement: (a) March1997 LTV Steel 84" Cold Mill Modernization Project ("1997 LTV Project"), (b) October 2004 Rapid Discharge Rail Unloader for FirstEnergy at its Eastlake Ohio plant ("2004 First Energy Project"), (c) June 2007 Seamless Rotary Furnace at the U.S. Steel #3 Mill in

Lorain ("U.S. Steel 2007 Project"), and (d) 2010 6 Q&T. All four involved assignments to ironworkers of work also within Millwrights' claimed jurisdiction and rigging assignments that tracked the 1971 Rigging Agreement. The first three, however, antedated abrogation of that agreement; and Stevens made the work assignments on No. 6 Q&T prior to its having learned of that abrogation.

20. In September, 2013, after Stevens had terminated **[*18]** its Local 17 collective bargaining agreement, Stevens received a $14.5 million contract to complete the demolition, removal, replacement, upgrade and installation of new equipment for the #4 Seamless Mill Expansion Project at the U.S. Steel Lorain Mill ("No. 4 Seamless"), which the parties stipulate was subject to the NMA.

21. In accordance with NMA's Section 3, Stevens conducted a pre-job conference on October 29, 2013 with representatives of all crafts involved in the No. 4 Seamless project. Stevens' pre-job outline listed the jurisdictional assignments for all aspects of the project with these relevant provisions for millwrights and ironworkers:

⊞ *Go to table1*

**Local 17's Jurisdictional Dispute**

22. Three days later, on November 1, 2013, Local 17 Business Manager Timothy McCarthy wrote to Stevens' Project Director Rob **[*19]** Dolacki invoking the NMA and officially protesting "The assignment of 'removal of existing equipment and platforms to millwrights remove, and the handle and install mechanical equipment from storage millwrights' based on Stevens' abandonment "of the well documented use of the 1971 Ironworker Millwright Rigging Agreement in the assignment of trade jurisdiction." McCarthy demanded "documentation to support Stevens' decision to abandon the use of the 1971 Rigging Agreement for the equitable distribution of work." He concluded with these important sentences: "Iron Workers' Local No. 17 will await written response by November 6, 2013. Please be advised that all remedies under the NMA will be pursued by this organization." [Emphasis added.] McCarthy testified that, at the time he wrote this letter, he was aware that - the 1971 Rigging Agreement had been abrogated.

23. As required, Dolacki, who did not then know of the 1971 Rigging Agreement's abrogation, responded on November 6th, stating that Agreement applied only to new construction and not maintenance projects like No. 4 Seamless and in any event does not require all rigging to be performed by ironworkers. Dolacki concluded with this paragraph: **[*20]**

> Stevens Engineers and Constructors has historically assigned removal/demolition to either the installing trade, or the laborers, or a combination there of *[sic]*, ensuring that the removal/demolition is performed safely, and without damage to the connected facility. Since many of the existing equipment platforms are connected to the process equipment, the current assignments associated with this removal/demolition maintain this. However, if the platform [is] freestanding, self-supporting we will have the Iron Workers remove and the Laborers scrap.

24. Having responded as required, Dolacki awaited the next step of the NMA's dispute resolution procedure, referral to the international unions involved. During that period, Dolacki received a call from Iron Workers Business Agent Scott Munnings, McCarthy's subordinate, who wanted to sit and discuss the assignments. Dolacki responded that, as McCarthy had written, the parties were to follow the NMA's dispute resolution procedure.

25. Neither Local 17 nor the Iron Workers International pursued the dispute further in accordance with NMA dispute resolution process. Based on the lack of response from Local 17 or the international unions to his November **[*21]** 6th submission, Dolacki properly inferred that the work assignments included in the original pre-job conference were correct and accepted by all of the crafts involved in the project.

26. On two occasions during the entire No. 4 Seamless project Stevens' employees in other unions did perform work that Stevens' pre-job conference report did assign to ironworkers:

> (A) On one night during the first outage in late November 2013, when Stevens' carpenters and laborers were preparing a foundation to be poured the next day, they discovered that some of the rebar that Bender ironworkers were supposed to have installed that day was missing. Without direction or authorization from any Stevens manager they installed a three-to four-square-foot area of rebar that night so that concrete could be poured the next morning. The next day Bender's Iron Workers foreman, Wayne Gibbons, discovered

the new rebar and complained to Stevens' Project Manager, Harry Mertz. Mertz investigated, confirmed what had happened, told Stevens' carpenters and laborers they were not authorized to perform such work, and apologized to Gibbons, assuring him that no other crafts than ironworkers should do that work. And Stevens' **[*22]** contractor's ironworkers in fact installed all other rebar on the project.

(B) On January 24, 2014, Chet Seroka, Stevens' General Manager in Cleveland, received an email from Russ Metzger of Standard Construction stating that millwrights were performing ironworker work. This was the first notice that Stevens received of millwrights doing work that Stevens had properly assigned to ironworkers. Seroka investigated and learned that millwrights had begun installing grating and handrails at the charge/discharge machine, work not authorized or assigned by Stevens to millwrights. Stevens immediately stopped the millwrights' performance of that ironworker work and called Bender, a Local 17 signatory, to do that work. Seroka told Metzger that Stevens's employees were not to do any ironworker work and that Seroka would ensure that Stevens' NMA assignments were being followed. Seroka did not receive any other formal or written complaints from Metzger or anyone else about millwrights doing work Stevens had assigned to ironworkers at No. 4 Seamless, nor did Mertz or Dolacki.

The total such work that Stevens had assigned to ironworkers but that other unionized crafts performed without authorization **[*23]** or direction by Stevens amounted to less than twenty hours. Stevens subcontracted 8,000-9,000 ironworker hours to Bender and more to other Local 17 signatory employers. That unauthorized work accordingly amounts to less than two tenths of one percent of the work subcontracted to ironworker employers. I find that *de minimis* work was beyond the scope of employment of the employees who did it without Stevens' direction or authorization and that it was accordingly not ironworker work that Stevens continued to perform after termination of its obligation to contribute to the Fund for such work.

27. As noted above, McCarthy never responded to Stevens' November 6, 2013 letter. McCarthy testified that he did call Bill Dean, the Iron Workers' District Council President, an International Officer, to complain about Stevens' work assignments on No. 4 Seamless, but McCarthy submitted nothing in writing. He certainly

did nothing to comply with NMA Section 7's mandate that "All disputes involving craft work assignments *shall be referred* to the International Unions, with which the Local Unions are affiliated, providing the International Union and the Employer an opportunity to resolve the dispute."

28. **[*24]** From this failure to pursue the NMA procedure and McCarthy's testimony that his only later involvement with the International was as Trustee to request that Dean send him Umpire decisions in preparation for this arbitration, I infer that McCarthy affirmatively decided as a union official not to submit this jurisdictional dispute to determination through the NMA dispute resolution procedure but instead to pursue relief against Stevens as a Fund Trustee through the withdrawal liability process.

The Fund's Assessment of Withdrawal Liability

29. McCarthy, who also served on and chaired the Fund's Board of Trustees, reported to Fund counsel that Stevens was assigning work to millwrights that ironworkers should be performing as they had in past such projects. At the Trustees' November 13, 2013 meeting—just one week following Stevens' response to Local 17's NMA complaint—McCarthy made this report to the Trustees:

. . . Chairman McCarthy explained that Stevens was starting a project at the U.S. Steel mill. He stated that prior to the withdrawal from the Collective Bargaining Agreement with Iron Workers Local 17, Stevens used ironworkers to perform the work at the same mill on several occasions **[*25]** over the years. However, in October, Stevens put together a bid to perform the same work using millwrights. [Fund Counsel] explained that under the building and construction industry exception to withdrawal liability, generally a construction employer that withdraws *[sic]* from the CBA will not be liable for withdrawal liability if they do not return to work in the same jurisdiction without making contributions to the Pension Fund. In this situation Stevens is performing the same exact work within 5 years after May 1, 2013 in the jurisdiction covering the Pension Fund but will not have an obligation to make contributions to this Pension Fund. This triggers withdrawal liability. [Fund Counsel] stated that Stevens should be assessed withdrawal liability.

On this motion by Trustee Fisher seconded by Trustee Cusick, the Board of Trustees voted to assess withdrawal liability against Stevens for the

reasons stated above:

MOTION, to assess withdrawal liability against Stevens as the returned to the jurisdiction of Local 17 and are performing the same work performed prior to withdrawing from the Collective Bargaining Agreement.

30. In presenting the issue to the Trustees, McCarthy at no time **[*26]** told them that unionized millwrights were doing the work the Iron Workers claimed.; that Stevens claimed the assignments had been properly made to union millwrights; that the Iron Workers had chosen not to pursue its jurisdictional beef through the NMA's dispute resolution procedure; that, under the NMA, Stevens' assignments to the millwrights stood as made; that Local 17 ironworkers were performing work for and the Fund was receiving contributions from Stevens' contractor, Bender, or that the 1971 Rigging Agreement on which rested the Iron Workers' claim of entitlement to the disputed work had been abrogated in 2005. Nor did he share Dolaki's November 6th letter responding to Local 17's jurisdictional claim. 31. I find that, on November 13th the Trustees voted to assess withdrawal liability because Stevens had assigned work to millwrights that McCarthy and Fund Counsel thought should have been assigned to ironworkers. Essentially the Trustees decided a craft jurisdictional dispute in the Iron Workers' favor that the Iron Workers' collective bargaining agreement vested sole authority to decide to the NMA Umpire.

32. Some time after that decision, McCarthy directed Local 17's shop steward **[*27]** at the No. 4 Seamless site, Richard Crow, to start recording and emailing reports of millwrights doing work that ironworkers had done on past Stevens projects at U.S. Steel's Lorain facility. Crow's first such email, sent January 21, 2014, after the January 16th Trustees meeting that approved the November 13th meeting's minutes describing their decision to assess withdrawal liability, contained retroactive reports of such work dating back to late November, after the assessment decision. I accordingly find that the Trustees based their assessment decision solely on Stevens' October 29th pre-job conference report.

33. On January 17, 2014 the Fund sent its Notice and Demand for Withdrawal Liability to Stevens in the amount of $5,065,017. That letter's opening paragraph states the Fund's basis for assessment:

The purpose of this Notice is to inform you that due to the fact that Stevens has returned to work in the

jurisdiction of the Bridge, Structural, Ornamental and Reinforcing Iron Workers Local Union No. 17 AFL-CIO within five (5) years of withdrawing from the Collective Bargaining Agreement and for which no contributions were paid into the Iron Workers Local 17 Pension Fund ("Pension **[*28]** Fund"), your Company is now liability *[sic]* under *ERISA Section 4203(a)*. The Board of Trustees determined that Stevens is performing the same work at the same facility that was previously performed by ironworkers; however, contributions are not being made to the Pension Fund.

34. On March 13, 2014 Stevens timely requested review of the assessment pursuant to *ERISA Section 4219(b)(2)(A)* disputing the Fund's determination that Stevens had returned to work in Local 17's jurisdiction. Stevens defended its work assignments by furnishing additional information and documentation concerning the collective bargaining agreement's limitation of Local 17's jurisdiction by the International's agreements with other unions, the limitation of the 1971 Rigging Agreement on which Local 17 relied to new construction, Local 17's invocation and then abandonment of the NMA's dispute resolution procedure to vindicate its jurisdictional claims, a failure that accepted Stevens' work assignments in the No. 4 Seamless maintenance project at issue, that bound the Fund, and that required reversal of its determination that Stevens had returned to performing covered work.

35. On May 14, 2014, the Trustees met and considered Stevens' request for review. Each Trustee **[*29]** received a folder of materials relating to the request for review. Along with a privileged memorandum from Fund counsel, the Trustees received Stevens' October 29, 2013 Pre-Job Conference Outline; the 1971 Power Rigging Agreement; Stevens' June 2007 Pre-Job Conference Outline for the U.S. Steel #3 Rotary Furnace Project; Stevens' October 19, 2004 Pre-Job Conference Outline for the First Energy Project; Stevens March 11, 1997 Pre-Job Conference Outline for the LTV Steel Cold Mill Modernization; and Crow's four emails describing his personal as well as second-hand observations of millwrights' performance of iron workers' work, all of which occurred *after* the Trustees' November 13th decision to assess withdrawal liability. The Trustees also received the letters between Stevens and Local 17 relating to the assignments of work at the No. 4 Seamless project. The Trustees were informed that Pension Fund contribution reports and Local 17 Steward Reports confirmed that Stevens had paid contributions based on work performed by iron workers at the 2007

#3 Seamless Rotary Project. Again, neither McCarthy nor Fund Counsel informed the Trustees that the 1971 Rigging Agreement had been abrogated **[*30]** in 2005 notwithstanding that they both knew that fact.

36. Essentially, the Trustees received all of the evidence that Stevens and Local 17 would have presented to the Umpire under the NMA's dispute resolution procedure that the Local 17 collective bargaining agreement incorporates by reference but that Local 17 and the Iron Workers International failed to use.

37. After review of the documents and discussion, the Trustees sustained Local 17's jurisdictional claim to the work Stevens had assigned to millwrights and unanimously denied Stevens' request for review. The Trustees, through counsel, notified Stevens of the decision on May 27, 2014.

38. Stevens timely demanded arbitration on July 24, 2014.

(Opinion and Award, ECF #1, Ex.4, 3-23)

## ARBITRATOR'S CONCLUSIONS OF LAW

Arbitrator Sands framed the issue that was presented to him as "whether the Fund correctly assessed withdrawal liability arising out of a construction industry craft jurisdictional dispute." He determined that the Fund based its decision to assess withdrawal liability solely on Steven's allocation of work at the October 29, 2013 pre-job conference. Local 17 initially challenged some of the assignments and notified Stevens **[*31]** of its intention to pursue the NMA dispute resolution procedure. In the meantime, under the terms of the NMA, work continued "as originally assigned pending resolution of the dispute."

However, Local 17 ultimately elected not to submit its jurisdictional challenge to the NMA's dispute resolution procedure, thus in accordance with the terms of the NMA, Steven's allocation and division of work between ironworkers and millwrights stood as originally assigned. As Local 17's collective bargaining agreements incorporate the NMA by reference in its Craft Jurisdiction definition, Arbitrator Sands determined that Local 17 abandoned its claim of contractual jurisdiction over the work that Stevens had assigned to millwrights. (Opinion and Award at 25)

Further, in order for there to be a complete withdrawal under _ERISA §1383(b)(2)(B)_ an employer who has

ceased to have an obligation to contribute under a plan must continue to perform "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or resume such work within 5 years..." (emphasis added) Arbitrator Sands determined that the disputed work Stevens assigned to the millwrights was not in the craft **[*32]** jurisdiction that Local 17's collective bargaining agreement defines and thus Stevens did not resume "such work" within 5 years after April 30, 2013, the date on which it ceased to have an obligation to contribute to the Fund. (Id.) Accordingly, Arbitrator Sands determined that the Trustees' determination to the contrary was clearly erroneous. (Id.)

Arbitrator Sands noted that _§ 1383_ also requires such work to be work "of the type for which contributions were previously required," and concluded that because the work at issue was performed by millwrights under Stevens's unchallenged assignment, that work is not work for which contributions had ever been required to the Iron Workers Local 17 Pension Fund. As such, he determined that the Trustees' determination to the contrary was clearly erroneous. (Id. at 25-26)

Finally, Arbitrator Sands noted that the Trustees' use of the withdrawal liability process to determine a work jurisdiction dispute between two NMA-party unions was unreasonable and opined that what really happened here was that Local 17 used the Fund as a cat's paw in its turf war with the Millwrights over craft jurisdiction and to punish Stevens for having terminated its Iron Workers collective **[*33]** bargaining agreement. (Id. at 26-27) The parties have submitted all of the evidence received by the Arbitrator during the arbitration proceedings. In addition, each side has filed opening briefs and reply briefs. Counsel for both sides participated in oral argument before the Court. Further, each side filed post argument briefs. This matter is now ready for decision.

## THE TRUSTEES' AND PENSION FUND'S ASSIGNMENTS OF ERROR[5]

The Trustees assert that the Arbitrator's finding that no withdrawal occurred under _29 U.S.C. § 1383(b)_ is clearly erroneous for a number of reasons:

First, the Trustees argue that Local 17's contractual

---

[5] When discussing the joint claims of the Trustees and the Pension Fund, the Court will refer to both entities as the "Trustees".

waiver due to its failure to challenge Stevens' assignations of rigging work for the project at issue is immaterial to the Trustees' determination of withdrawal liability.

Second, even if Steven's assignments of rigging work to the millwrights were deemed proper under the NMA, such a finding would be irrelevant and immaterial to the Trustees' determination of withdrawal liability because Steven's resumed the "same work in the same area" for which contributions to the Pension **[*34]** Fund were previously required, resulting in a reduction of the Pension Fund's contribution base.

Third, the Arbitrator's finding that no withdrawal occurred despite acknowledging that Steven's millwrights performed certain work that had been assigned by Stevens to the ironworkers because the quantity of work performed was *de minimis* and was beyond the scope of employment of the employees who did it without Stevens' direction or authorization is clearly erroneous. The Trustees assert that there is no "*de minimis*" exception in the determination of whether a withdrawal occurred under § 1383(b). Further, the Trustees argue that the Arbitrator applied the incorrect legal standard to determine that the resumed work was "beyond the scope of employment" of the Stevens employees who performed it.

Fourth, the Arbitrator erred by failing to consider all of the Local 17 CBA bargaining unit work resumed by Stevens at the project which would have been sufficient to trigger withdrawal liability.

## STANDARD OF REVIEW OF ARBITRATOR'S AWARD

The Sixth Circuit has recognized that the judicial review provided pursuant to the MPPAA is extremely narrow, because "[i]n any proceeding under subsection (b) ... there shall be a *presumption,* **[*35]** *rebuttable only by a clear preponderance of the evidence*, that the findings of fact made by the arbitrator were correct." 29 U.S.C. § 1401(c) (emphasis added). Moreover, reviewing courts must give great deference to an arbitrator's determination because of the MPPAA's strong policy favoring arbitration of withdrawal liability disputes. Mason & Dixon Tank Lines, Inc. v. Central States Pension Fund, 852 F.2d 156, 163-64 (6th Cir.1988) (stating that arbitration is the "preferred method" for resolving withdrawal liability disputes and that "under the MPPAA 'arbitration reigns supreme'"). Sherwin

Williams Co. v. New York State Teamsters Conference Pension, Ret. Fund, 158 F.3d 387, 392 (6th Cir. 1998). Thus, district courts review an arbitrator's findings of fact under the "clearly erroneous" standard. Sherwin-Williams Co. v. New York State Teamsters Conference Pension and Retirement Fund, 969 F.Supp. 465 (N.D.Ohio 1997). "Clearly erroneous" means that the reviewing court has a definite and firm conviction that a mistake has been committed. Concrete Pipe and Products v. Construction Laborers Pension Trust, 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); Santa Fe Pacific Corp. v. Central States Pension Fund, 22 F.3d 725, 727 (7th Cir.), cert denied, 513 U.S. 987, 115 S. Ct. 483, 130 L. Ed. 2d 396 (1994). ("A finding is clearly erroneous if the reviewing court, after duly acknowledging the superior proximity of the fact finder to the witnesses, is firmly convinced that the finding is erroneous.") Under the clearly erroneous standard, a "court may not reverse the fact—finder's decision, even if it might come to a different conclusion, if the fact—finder's account of the evidence is plausible in light of the record viewed in its entirety. The question for the reviewing court **[*36]** is not whether it concurs with the arbitrator's decision but instead whether, on the entire record, it is left with the definite and firm conviction that a mistake has been committed.. Sherwin-Williams, supra, 969 F. Supp. at 471-72 citing Anderson v. Bessemer, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985) and Zenith Radio Corp. v. Hazeltine Research, *472 Inc., 395 U.S. 100, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969).

Unlike an arbitrator's findings of fact, which are presumed to be correct, a court reviews the arbitrator's conclusions of law *de novo*. Sherwin-Williams, 969 F.Supp. at 472. Mixed questions of fact and law, are generally subject to the clearly erroneous standard. *Id.* The use of the more deferential standard of review is based upon the recognition that "the dominant theme in MPPAA's resolution process is deference to the person who hears the evidence, thus, an arbitrator's decision on mixed questions of fact and law may only be set aside for clear error. Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan, 3 F.3d 994 (7th Cir.1993), Aff'd, 513 U.S. 414, 115 S. Ct. 981, 130 L. Ed. 2d 932 (1995); Chicago Truck Drivers Pension Fund v. Louis Zahn Drug Co., 890 F.2d 1405, 1410-11 (7th Cir.1989)(recognizing that substantial deference ought to be given to the decision of an arbitrator with special expertise in the area of labor and pension law.) Usually, determinations of whether a withdrawal occurred present mixed questions of fact and law subject to the clearly erroneous standard of review. Sherwin-Williams,

*969 F. Supp. at 472*

An exception to the use of the clearly erroneous standard with respect **[*37]** to review of a mixed question of law and fact has been recognized where the material facts in the case are stipulated or are not disputed by the parties. See *Technical Metallurigical Services, Inc. v. Plumbers and Pipefitters Nat. Pension Fund, 213 Fed Appx. 268 (5th Cir. 2007)* (where parties stipulated the facts before the arbitrator, there remains only a question of law.) In that situation, courts have applied the de novo standard of review.

The parties here vehemently disagree on whether the facts in this case were in dispute. The parties did submit some stipulated facts to the arbitrator, however, the arbitrator took four days of testimony and the Trustees disagree with many of his factual findings. As such, this is not a case like *Concrete Pipe* or *Technical Metallurigical Services* where the material facts are stipulated or not in dispute. Accordingly, the Court will apply the clearly erroneous standard on the questions of fact and mixed questions of law and fact and de novo review for pure questions of law.

## DISCUSSION

Moving to the Trustees' first assignment of error, the Trustees assert that the Union's failure to challenge Stevens' assignment of the work at issue through the NMA process is irrelevant to the validity of the Trustees' determination of withdrawal liability because under *ERISA § 515*, *29 U.S.C. § 1145*, an employer **[*38]** cannot rely on contractual defenses such as waiver, estoppel or acquiescence based on a union's failure to exhaust grievance remedies to escape its obligation to contribute to a multiemployer pension fund. They argue that *ERISA § 1145*, which applies when multiemployer pension funds are seeking to collect delinquent contributions, should apply in the context of a multiemployer pension fund seeking withdrawal liability under *ERISA § 1383*.[6]

*ERISA § 515* provides that:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not

---

[6] This argument presents a question of law that the Court will review de novo.

inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or agreement.

This provision permits a plan to rely on the literal terms of written commitments between the plan, the union, and the employer and, as a result, "the actual intent or understanding of the contracting parties is immaterial when the meaning of the language is clear." *Orrand v. Scassa Asphalt, Inc., 794 F.3d 556, 562 (6th Cir. 2015)* citing *Baker & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio, 133 F.3d 955, 959 (6th Cir. 1998)*. Courts are agreed that the effect of this section is "to accord ERISA funds special status, akin to a holder in **[*39]** due course under commercial law, and entitle them to enforce the writing regardless of the defenses that might be available under the common law of contracts. *Trustees of B.A.C. Local 32 Ins. Fund v. Ohio Ceiling and Partition Co., 48 Fed. Appx. 188, 2002 WL 35018235 at *3 (6th Cir. 2002)* citing *N.W. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc., 270 F.3d 1018, 1025 (6th Cir. 2001)*, cert denied, 535 U.S. 1017, 122 S. Ct. 1605, 152 L. Ed. 2d 620, 535 U.S. 1017, 122 S. Ct. 1606, 152 L. Ed. 2d 620 (2002). Congress passed *§ 515* to address the concern that "simple collection actions brought by plan trustees [had] been converted into lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plan's entitlement to the contributions and steps [were required] to simplify delinquency collection." *Operating Engineers Local 324 Health Care Plan v. G & W Construction Co., 783 F.3d 1045, 1051-52 (6th Cir. 2015)* citing *Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 87, 102 S. Ct. 851, 70 L. Ed. 2d 833 (1982)*. The Sixth Circuit has noted that Congress added *Section 515* "to free [] pension and welfare funds from defenses that pertain to the unions' conduct, ... and therefore "[a] claim that the union has promised not to collect a payment called for by the agreement is not a good answer to the trustees' suit." *Orrand, supra, 794 F.3d at 563*, quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d, 454, 460 (6th Cir. 1989).

Arbitrator Sands rejected as inapposite the Trustees' argument that in accordance with *§ 515*, it was not bound by Local 17's waiver of its jurisdictional claim to the work at issue by having failed to pursue the NMA jurisdictional dispute procedure. He noted that all of the cases cited by the Fund involved fund claims for delinquent contributions in which the funds **[*40]** were "suing as fiduciaries under *ERISA Section*

502(a)(3)(B)(ii) to enforce their independent rights to collect contributions under the authority of *ERISA Section 515*. The Trustees here have no such independent right to enforce Local 17's claims to craft jurisdiction against NMA parties." (Opinion and Award, at 28)

The Trustees, relying on a Seventh Circuit case,[7] contend that *§ 515* should be applicable to withdrawal liability cases since at least one court has applied *§ 515* to define an employer's obligation to contribute to a pension fund and the limited defenses that may be applicable thereto, to determine when withdrawal liability was triggered as withdrawal liability attaches only when an employer ceases to have an obligation to contribute to a fund. In *Schilli*, the employer Schilli, the parent corporation of three wholly owned subsidiaries, participated in the Plaintiff Fund for a number of years pursuant to a series of collective bargaining agreements with the Teamsters Local 878 which obligated Schilli to contribute specified amounts to the Fund on behalf of all the employees in the bargaining unit. In addition to the CBAs, Schilli and Local 878 signed a separate document—the Participation Agreement—which obligated Schilli to contribute **[*41]** a set amount per week to the Fund. The Participation Agreement contained a clause that provided that the Agreement shall continue in effect until such time that the Employer notifies the Fund(s) by certified mail that the Employer is no longer under legal duty to make contributions to the Fund(s). In November 1997, the employees of one of Schilli's subsidiaries, Truck Transport, voted to decertify the union which the NLRB confirmed. The employer did not notify the Fund of the decertification and continued to operate as usual. Truck Transport submitted its monthly contributions to the Fund in December 1997 and January 1998. In January 1998 Schilli closed the Truck Transport terminal and ceased contributing to the Fund. The Fund determined that Truck Transport had partially withdrawn from the Fund in 1997 and completely withdrawn in 1998 and demanded payment accordingly. Schilli contested the assessment and the issue went to arbitration. The arbitrator, noting that an employer withdraws from a plan only when it ceases to have an obligation to contribute, found that the Participation Agreement bound Truck Transport to contribute to the fund until it complied with the Agreement's notice **[*42]** provision and that Truck Transport had not given the prescribed notice in 1997.

Thus, he found that Truck Transport had not withdrawn in 1997 and Schilli could not be assessed withdrawal liability for 1997. The Fund filed an action in the Northern District of Illinois to vacate the arbitrator's award but the district court affirmed the award. On appeal from that decision, the Seventh Circuit affirmed. The Seventh Circuit assumed, without deciding, that if Truck Transport would have been liable in a *§ 1145* action for contributions through 1998, it remained "obligated to contribute" for withdrawal purposes until then. The Court determined that the decertification of Local 878 did not terminate Truck Transport's obligation to contribute, for withdrawal liability purposes, by operation of law. Further, while decertification terminated Local 878's right to enforce the Participation Agreement, it did not terminate the Fund's ability to collect contributions in a *§ 1145* action. Finally, the Court could not infer on the basis of the record before it that the Fund had waived the notice requirements of the Participation Agreement in 1997, thereby relieving Truck Transport of its obligation to contribute **[*43]** and triggering withdrawal liability for that year.

*Schilli* does not really address the situation at issue here. The question of when an employer's obligation to contribute to a pension fund ceases is controlled by *§ 1145*. The question here is not when Stevens' obligation to contribute to the Fund ceased. The question here is whether the special status enjoyed by multiemployer pension funds under *§ 1145* applies to the assessment of withdrawal liability arising from an inter-union craft jurisdictional dispute. Neither the Court nor the parties have located any precedent directly on point.

Moreover, courts have disagreed with respect to whether a union's failure invoke the jurisdictional dispute procedure can bar a Fund's effort to seek contributions under *§1145* for work assigned to a different union. In *Carpenters Fringe Benefit Funds of Illinois v. McKenzie Engineering, 217 F.3d 578 (8th Cir. 2000)*, the employer McKenzie was subject to collective bargaining agreements with several craft unions, including the carpenters Local 410 (Iowa territory including Keokuk, IA), and while it had no CBA with carpenters Local 166 (Illinois territory including Rock Island, IL), McKenzie agreed that a Memorandum of Agreement incorporates by reference a CBA that covers Local 166's territory and contains the same **[*44]** relevant terms and conditions as the Local 410 CBA. In 1995, McKenzie had a contract to repair an icebreaker protecting a dam at Keokuk. McKenzie's crew included two operating engineers, one boilermaker, and four carpenters who were members of Local 410. When the project fell

---

[7] *Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp., 420 F.3d 663 (7th Cir. 2005)*

behind schedule McKenzie replaced the four carpenters with non-union workers and finished the job. In late 1996, McKenzie was awarded a project to repair the Crescent Bridge spanning the Mississippi between Rock Island and Davenport, IA. As work began, Carpenters Local 166 claimed the right to the carpenter work on the project. Instead of hiring Local 166 carpenters, McKenzie signed a CBA with the Operating Engineers Local 150 covering the Crescent Bridge project and assigned the work to Local 150, which issued Operating Engineers work permits to the members of McKenzie's crew who had successfully finished the Keokuk dam project. The Funds (Local 410 and later Local 166) filed suit in January 1997 asserting that McKenzie failed to make contractually required contributions for employees within the territorial and occupational jurisdiction of Local 410 and 166. The Funds' claim for unpaid contributions [*45] was based entirely on an audit of McKenzie's payroll records from April 1, 1994 to December 31, 1997. Noting that under *ERISA § 515*, the Funds may collect only those contributions that McKenzie was contractually obligated to pay, the Court determined on the record before it that the Audit report on which the Funds relied for its claim failed to establish a claim for contributions contractually owed by McKenzie under the collective bargaining agreements with the Carpenters and its local unions. With respect to the Crescent Bridge project, the Court found that the record did not support a finding that any of the Crescent Bridge work was covered by a CBA with the Carpenters, as opposed to the Operating Engineers.

> On this record, McKenzie was contractually free to assign the Crescent Bridge work to either union, or part of the work to each union. Any union aggrieved by that assignment could invoke the inter-union jurisdictional dispute procedure, which results in a final work assignment decision prospectively binding on McKenzie....Because Local 166 did not invoke that procedure, the Funds are not entitled to contributions for work assigned to members of a competing union within the jurisdiction of [*46] that union.

*McKenzie, 217 F.3d at 585*. The Sixth Circuit considered and relied on *McKenzie* in deciding *Trustees of B.A.C. Local 32 Ins. Fund v. Ohio Ceiling and Partition Company Inc., 48 Fed. Appx. 188, 2002 WL 35018235 (6th Cir. 2002)*. In *Ohio Ceiling*, the plaintiff Funds (associated with the Bricklayers Union) sought contributions from Ohio Ceiling to the Bricklayers funds for work it assigned to the Carpenters instead of Bricklayers. The Sixth Circuit framed the issue as

"whether plaintiffs could demonstrate a contractual obligation to make contributions to the bricklayers funds when the carpenters union agreements purported to cover the same work, the work was assigned to employees covered by the carpenters union agreements and contributions were made in full to the carpenters union funds." *48 Fed. Appx. 188, Id. at *9*. The Court specifically noted that *McKenzie* supports the view that the plaintiff Funds should not be able to establish an entitlement to contributions for work assigned to another union claiming jurisdiction over the work without invoking procedures for resolving the jurisdictional work assignment dispute. "Looking at the basis for the protections afforded to ERISA plans under *§ 515*, nothing suggests that it was intended to afford ERISA fiduciaries a weapon against employers in undeclared jurisdictional disputes with competing unions." *48 Fed. Appx. 188, Id. at *10*. The Court determined [*47] that the Bricklayer Funds failed to demonstrate that Ohio Ceiling had a contractual obligation to pay contributions for the hours of disputed work performed by the carpenters union. *Id.*

On the other side, a district court in Rhode Island expressly disagreed with the Eighth Circuit's decision in *McKenzie*, and its position that a union's failure to invoke inter-union jurisdictional dispute procedures acts as a bar to the Fund(s) associated with the union from later seeking contributions under ERISA. *Rhode Island Carpenters Annuity Fund v. Trevi Icos Corp., 474 F.Supp.2d 326, 333-334 (D. RI 2007)*. Noting the cases which reiterate the lack of permissible defenses to a Union's claim for contributions under *§ 515*, and the settled authority that a pension fund is a distinct legal entity from its constituent union, the Court determined that the union's failure to invoke the jurisdictional dispute clause will not operate to bar the fund's action for contributions under ERISA. *Id. at 334*. Nevertheless, the Court agreed that even if the Fund's action is permitted under ERISA, an employer is not required to contribute to the plaintiff Fund unless it is contractually obligated to do so.

The Trustees point to two recent Sixth Circuit cases as support for the *Trevi Icos* position, that a contractual defense, [*48] such as waiver, does not limit a pension funds' ability to enforce an employer's obligation to contribute under the express terms of a collective bargaining agreement. *See Operating Engineers Local 324 Healthcare Plan v. G&W Constr. Co., 783 F.3d 1045 (6th Cir. 2015)*; *Orrand v. Scassa Asphalt, Inc., 794 F.3d 556 (6th Cir. 2015)*. Both cases are delinquent contribution cases subject to *ERISA § 515*. Neither

involved jurisdictional disputes among competing unions. In both cases the Court reiterated the special status afforded to ERISA funds under *§ 515* which permits funds to enforce the written contracts without regard to the understandings or common-law contract defenses of the original parties. Further, both note that conduct of the union that is contrary to the written provisions of the agreements cannot affect a fund's right to collect contributions that are due and owing to the fund. Interestingly, in *G&W Construction*, the Court reviewed a district court's denial of the plaintiff Fund's motion to strike the employer's affirmative defenses of laches, equitable estoppel and waiver. The Court determined that the motion to strike the defenses of equitable estoppel and laches should have been granted and declined to consider " whether it is appropriate to bar the affirmative defense of waiver in this *ERISA § 515* collection action." *G&W Constr. Co., 783 F.3d at 1057*.

Even if the Court accepts the **[\*49]** *Trevi Icos* view that a pension fund's special status under *§ 515* can be used as a weapon in an inter-union jurisdictional contest in delinquent contribution actions; as Arbitrator Sands noted, there is no precedent permitting the application of *§515* in an action for the collection of withdrawal liability, especially in the context of the inter-union jurisdictional dispute at issue here. Accordingly, Arbitrator Sands did not err in declining to apply *§ 515* in this instance. In any event, the Trustees here have not been barred from assessing withdrawal liability as a result of Local 17's election not to dispute Steven's assignment of work through the NMA dispute process. Rather, the arbitrator determined that such assessment was unreasonable and clearly erroneous in these circumstances.

Next, the Trustees assert that Arbitrator Sands clearly erred in finding that no withdrawal occurred under *§ 1383(b)* because even if Steven's assignments of rigging work to millwrights were deemed proper under the NMA, such a finding would be irrelevant and immaterial to the Trustees' determination of withdrawal liability because Steven's resumed the "same work in the same area" for which contributions to the Pension Fund were **[\*50]** previously required, resulting in a reduction of the Pension Fund's contribution base. The Trustees note that if Stevens had assigned rigging work on the 2013 project at issue as it had in the past, to a composite iron workers-millwrights crew pursuant to the 1971 Rigging Agreement and current industry practice, then the subcontractor for the iron work, such as Bender, would be obligated to contribute to the Fund so the Fund would not have experienced a reduction of its

contribution base. However, the Trustees assert that Stevens broke from the 1971 Rigging Agreement and industry practice when it assigned work on this job by causing portions of rigging work that would have been assigned to ironworkers (with corresponding contribution obligations to the Fund) to be diverted to millwrights for whom there was no obligation to contribute to the Fund. As such, contrary to Arbitrator Sand's finding, this reduced the Fund's contribution base.[8]

The 1971 Rigging Agreement between the International Union of Ironworkers and the International Union of Carpenters was adopted to avoid jurisdictional disputes between the two unions related to "rigging in connection with the installation of machinery and/or equipment on building and construction projects." Within months of the signing of the 1971 Rigging Agreement, representatives of both International Unions stipulated that the Agreement does not apply to maintenance projects, only new construction. The General President of the Carpenters' International abrogated the 1971 Rigging Agreement on April 25, 2005 in a letter to the Iron Workers' General President, noting that "[m]ost everyone recognized that these agreements were antiquated and non-productive." Arbitrator Sands found that the Rigging Agreement has not been effective since April 25, 2005, although industry parties not aware of the abrogation continued to make some job assignments consistently with its terms. (Opinion & Award, at 9-19) Neither the Trustees nor Stevens disputes these factual findings of Arbitrator Sands[9]. The dispute arises in the Trustees' **[\*52]** claim that the provisions of the 1971 Rigging Agreement have become area practice which they contend must still be followed by all employers when making craft assignments, regardless of efficiency, requirements of the specific job or other concerns.[10] Despite the Trustees' assertion, it

---

[8] Arbitrator Sands took extensive testimony on the status of the 1971 Rigging Agreement and industry practice. As such, whether Stevens' job assignments comport with the Rigging Agreement and/or current industry practice, or what current industry practice **[\*51]** may be, is a factual issue subject to the clearly erroneous standard of review.

[9] The Defendants argued at various times before the Arbitrator and in some briefing that the 1971 Rigging Agreement was not abrogated. However, by the time of oral arguments before this Court, the Defendants' position had evolved into their position that the provisions of the 1971 Rigging Agreement had become area practice.

[10] The Trustees' position would prevent an employer like

appears that different employers who are all signatories of the Local 17 CBA, assign rigging differently. What is clear is that Arbitrator Sands evaluated documentary evidence as well as the testimony of several witnesses on this point. The Fund's witnesses testified that work assignments continued to be made, for the most part, in accordance with the Rigging Agreement after it was abrogated. Stevens' witnesses said that since the abrogation of the Agreement the area practice has been to assign rigging based on efficiency and the nature of the project. The Arbitrator made credibility evaluations of this testimony and made a factual finding that it is no longer area practice to assign work in accordance with the 1971 Rigging Agreement. This factual determination is supported by the evidence and the Court does not find it to be clearly erroneous. Thus, the Trustees argument that Stevens has assigned rigging [*53] work in accordance with the 1971 Rigging Agreement in the past is irrelevant. Moreover, because rigging is an assignable task, employers may assign rigging in accordance with the 1971 Agreement or not, depending on the circumstances of each job.

The Trustees' paraphrasing of § 1383 that withdrawal liability attaches if an employer "resumed the same work in the same area" is misleading. Section 1383(b)(2)(B) provides that an employer who has ceased to have an obligation to contribute under a plan must continue to perform "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or resume such work within 5 years..." As the evidence in this case has made abundantly clear, the craft jurisdictions of many craft unions overlap and employers assign tasks that fall within the craft jurisdictions of multiple unions in different manners. The Arbitrator's decision here makes clear that assignable work which is assigned by an employer at an NMA pre-job conference falls within the jurisdiction of the union that is assigned the work unless an Umpire

---

Stevens who ceases its obligation to contribute to a multiemployer pension plan, from altering or adapting its practice of assigning work to the union associated with the pension fund in the future, despite any changes in technology, building or industry practices or the requirements of a future job. Thus, Arbitrator Sands stated that Fund Trustees do not have authority to determine inter-union work disputes because "the Fund's claim here of authority for the Trustees to resolve such disputes means that, even if Local 17 had followed the NMA procedure and lost, the Trustees [*54] could still have assessed withdrawal liability notwithstanding an Umpire's decision that the subject work fell outside the jurisdiction of Local 17's collective bargaining agreement. That proposition's absurdity compels its rejection." (Opinion & Award, at 26-27)

finds differently after going through the NMA jurisdictional dispute process. Thus, assignable [*55] work that is not assigned to a union is not within the jurisdiction of that union for that job. As Local 17 was not assigned the disputed rigging work on the No. 4 seamless project at issue, that rigging work was not in its jurisdiction and should not form the basis of a withdrawal liability claim. Further, since the work at issue was assigned to the Millwrights, it is not work for which contributions could have ever been required to the Fund. It follows that the Fund may not assess withdrawal liability based upon work which is not within its jurisdiction and for which contribution to the Fund had never been required.[11]

Finally, while the Fund would have received additional contributions if all of the rigging work on the No. 4 Seamless project had been assigned to Ironworkers, its contribution base was not reduced because it received contributions for all work within the Ironworkers' craft jurisdiction from Stevens' contractors who employed them. No non-union labor was used on the project.[12]

The Trustees also argue that the Arbitrator's finding that no withdrawal occurred despite acknowledging that Steven's millwrights performed certain work that had been assigned by Stevens to the ironworkers because the quantity of work performed was de minimis and was beyond the scope of employment of the employees who did it without Stevens' direction or authorization is clearly erroneous. The Trustees assert that there is no "de minimis" exception in the determination of whether a withdrawal occurred under § 1383(b). Further, the Trustees argue that the Arbitrator applied the incorrect legal standard to determine [*57] that the disputed work was "beyond the scope of employment" of the Stevens employees who performed it.

---

[11] The Court recognizes the circularity of this argument. There is no dispute that Stevens' has assigned rigging work to ironworkers instead of the millwrights in the past. Thus, "craft jurisdiction" changes from job to job. The Court could find no case in which a pension fund sought to impose withdrawal liability based upon an employer's assignment of assignable work to another craft union. As Arbitrator Sands noted, the MPPAA was not enacted to provide a club for multiemployer pension funds to use in turf wars with other unions (and thus other funds) over craft jurisdiction or [*56] to punish an employer for terminating a collective bargaining agreement.

[12] Again, the level of any pension fund contributions will naturally change marginally from job to job based upon the assignment of assignable work.

In his factual findings Arbitrator Sands noted two occasions during the No. 4 Seamless project that Stevens' employees in other unions performed work which had been assigned to ironworkers in the pre-job conference. The first occasion occurred one night in late November 2013, when Stevens' carpenters and laborers were preparing a foundation to be poured the next day and discovered a missing section of rebar that should have been installed during the day. Arbitrator Sands determined that Stevens' workers, without direction or authorization from any Stevens manager, installed a 3-4 foot area of rebar. The next day Bender's Iron Workers foreman, discovered the new rebar and complained to Stevens' Project Manager, Harry Mertz. After investigation, Mr. Mertz confirmed what happened and instructed Stevens' carpenters and laborers that they were not authorized to perform such work. Stevens' contractor's ironworkers installed all other rebar on the project. (Opinion & Award, at 15-16)

The second occasion occurred on January 24, 2014, when Stevens' General Manager Chet Seroka received an email **[*58]** from Mr. Metzger of Standard Construction stating that millwrights were performing ironworker work. Mr. Seroka investigated and learned that millwrights had begun installing grating and handrails to the charge/discharge machine, which is work that was assigned to the ironworkers not the millwrights in the pre-job conference. Stevens stopped the millwrights and called Bender to do that work. Mr. Seroka told Mr. Metzger that Stevens' employees were not to do any ironworker work and told him that he would ensure that Stevens' NMA assignments were being followed. Stevens did not receive any other formal or written complaints from Mr. Metzger or anyone else about millwrights doing work that Stevens had assigned to ironworkers. (Id.)

Ultimately, Arbitrator Sands determined that the work Stevens had assigned to ironworkers that was performed by other unionized crafts without authorization or direction by Stevens amounted to less than 20 hours. To put that in perspective, the Arbitrator noted that Stevens subcontracted 8,000-9,000 ironworker hours to Bender and more to other Local 17 signatory employers, making the unauthorized work less than two tenths on one percent of the work subcontracted **[*59]** to ironworker employers. (Id. at 16-17) As such he determined that this *de minimis* work was "beyond the scope of employment of the employees who did it without Stevens' direction or authorization and that it was accordingly not ironworker work that Stevens continued to perform after termination

of its obligation to contribute to the Fund for such work."(Id. at 17) Thus, the Arbitrator did not state that there is a *de minimis* exception to whether a withdrawal occurred under § 1383. The amount of work done outside the scope of the pre-job work assignments was not the focus. Rather, he found that the small amount of work done by Stevens' employees outside of the pre-job work assignments, was performed without Stevens' knowledge and authorization, and thus, such work was beyond the scope of employment of those employees. As such, the Arbitrator did not assign that work to Stevens, determining that it did not constitute ironworker work that Stevens continued to perform after termination of its obligation to contribute to the Fund for such work.

The Trustees assert that the Arbitrator applied an incorrect legal analysis to determine that the rebar and grating work that was performed by Stevens' employees was beyond **[*60]** the scope of their employment. The Trustees contend that the Arbitrator should have used the test set forth in *Figueroa v. U.S. Postal Service, 422 F.Supp.2d 866 (N.D. Ohio 2006)*. Under Ohio law as set out in *Figueroa*, an employee acts within his scope of employment if his conduct: (1) is the kind which he is employed to perform: (2) occurs substantially within the authorized limits of time and space; and (3) is motivated, at least in part, by a purpose to serve the employer. *Id. at 874*.[13] Under this standard it is clear that the first element has not been met. The Arbitrator found, and the parties do not dispute, that the rebar and grating work performed by Stevens' millwright and laborer employees was assigned to the ironworkers in the pre-job conference and was never work which Stevens' millwright and/or laborer employees were employed to perform. As such, the Arbitrator's conclusion that those millwrights and laborers were not acting within the scope of their employment with Stevens when they did the disputed work was correct. Accordingly, the Court finds that it was not improper for the Arbitrator to refuse to attribute that work to Stevens for the purpose of assessing withdrawal liability.

The Trustees' final argument is that the Arbitrator erred by failing to consider all of the Local 17 CBA bargaining unit work allegedly resumed by Stevens at the project which they assert would have been sufficient to trigger

---

[13] Whether an employee was acting within the scope of employment is **[*61]** a question of law governed by the law of the state in which the conduct occurred. *Figueroa, 422 F.Supp.2d at 874*. As such, the Court will review this issue under the *de novo* standard.

withdrawal liability. Arbitrator Sands evaluated everything that the Trustees' reviewed or used when making their decision to impose withdrawal liability on Stevens. This comports with his statutory mandate which was to determine whether the Fund's determination of withdrawal liability was unreasonable or clearly erroneous. *29 U.S.C. § 1401(a)(3)(A)*. In this assignment of error the Trustees assert that the Arbitrator was wrong in not considering events that the Fund never considered in its determination of withdrawal liability. The Trustees do not dispute that they did not consider this work when making the withdrawal liability decision. Moreover, Stevens responds that even if the additional items were considered, the Fund's assessment remains unreasonable and clearly erroneous because Stevens did not resume work within Local 17's jurisdiction. **[*62]** The Court makes no finding with respect to whether the additional items are credible or constitute the resumption of work by Stevens in Local 17's jurisdiction. Rather, based upon the evidence produced by the parties, the Court finds that the Arbitrator correctly defined the question he was engaged to resolve; carefully reviewed the all of the documentary and testimonial evidence relevant to that question and did not err in declining to review events that had no relevance to that question —specifically— whether the Trustees' decision to assess withdrawal liability in this instance was unreasonable or clearly erroneous. Based on this record and all of the arguments made to this Court, the Arbitrator's Opinion and Award is affirmed and will be enforced.

In addition to the refund of its interim withdrawal liability payments with interest, Stevens also seeks an award of attorney's fees in connection with this action to enforce. Pursuant to *29 U.S.C. § 1451(e)* "[i]n any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party." An award of fees under this section is discretionary. **[*63]** *See Central States, Southeast and Southwest Areas Pension Fund v. 888 Corp., 813 F.2d 760, 767 (6th Cir. 1987)*. Because the attorneys fees provisions of *29 U.S.C. § 1451(e)* are similar to the comparable ERISA attorney fees provision, *29 U.S.C. §1132(g)*, a district court should use the same guidelines utilized by courts under *§ 1132(g)*. Id. These factors are the degree of bad faith or culpability of the losing party; the ability of such party to satisfy an award of fees; whether such award would deter others from acting under similar circumstances; whether the party requesting fees sought to benefit all participants and

beneficiaries of a multiemployer plan or to resolve a significant legal question; and the relative merits of the parties' positions. *Id.*

Review of these factors weighs in favor of denying an award of fees. While the Arbitrator and Stevens contend that the Trustees actions in assessing withdrawal liability may have violated their ethical responsibilities, the Court makes no such determination. Rather, it is clear that the imposition of fees on a struggling fund would harm the fund and its participants. Moreover, as was evident throughout the proceedings here, this case involves unusual circumstances that have not been addressed by courts. While this Court found more merit in the position of the Arbitrator and the employer, **[*64]** the Trustees' position was not frivolous or insignificant. Overall, the unsettled and unique questions presented here militate against the imposition of attorney fees.

## CONCLUSION

For the reasons set forth above, Plaintiff Stevens' request to enforce the Arbitrator's Award is granted and Defendants' request to vacate or modify the Arbitrator's Award is denied. Defendants shall refund Stevens' interim withdrawal liability payments with interest from the date paid. Steven's Partial Motion to Dismiss Count 2 of the Trustees' Complaint in Case No. 15 CV 1967 is denied as moot. The Trustees' Complaint in Case No. 15 CV 1967 is dismissed. These actions are terminated. IT IS SO ORDERED.

*/s/ Donald C. Nugent*

DONALD C. NUGENT

UNITED STATES DISTRICT JUDGE

DATE: August 24, ***2016***

## JUDGMENT

Pursuant to a Memorandum Opinion of this Court, the relief sought by Plaintiff Stevens Engineers & Constructors, Inc. in its Complaint to Enforce the Arbitration Opinion and Award of Arbitrator John E. Sands in Case No. 1:15 CV 1965 is granted in part and denied in part and the relief sought by Iron Workers Local 17 Pension Fund and its Trustees in their Complaint to vacate or modify the Arbitration Opinion and Award in **[*65]** 1:15 CV 1967 is denied. The Arbitration Opinion and Award is hereby AFFIRMED.

2016 U.S. Dist. LEXIS 114028, *65

The Fund is ORDERED to refund Stevens' interim withdrawal liability payments from the dates paid, with interest. Stevens' request for attorneys fees incurred in connection with this action is denied. Stevens' Motion to Dismiss (ECF # 6) in Case No. 1:15 CV 1967 is denied as moot. THESE CASES ARE TERMINATED.

IT IS SO ORDERED.

/s/ *Donald C. Nugent*

DONALD C. NUGENT

UNITED STATES DISTRICT JUDGE

DATED:        August        24,        ***2016***

2016 U.S. Dist. LEXIS 114028, *65

**Table1 (**_Return to related document text_**)**

| | |
|---|---|
| <u>Demolition:</u> | |
| Existing Equipment and latforms Scrap-out | Millwrights Remove / Laborers |
| <u>Concrete Foundation Installation:</u> | |
| Rebar Installation | Iron Workers |
| Trench Covers | Iron Workers |
| <u>Process Equipment</u>: | |
| Unload Platforms and Equipment to Storage | Iron Workers |
| Building Structural Modifications | Iron Workers |
| Handle and Install Platforms from Storage | Iron Workers |
| Handle and Install Mechanical Equipment from Storage | Millwrights |

**Table1 (**_Return to related document text_**)**

---

**End of Document**

⚠️ Caution
As of: February 21, 2019 9:19 PM Z

## *Trs. of the B.A.C. Local 32 Ins. Fund. v. Ohio Ceiling & Partition Co.*

United States Court of Appeals for the Sixth Circuit

October 4, 2002, Filed

No. 01-1396

**Reporter**
48 Fed. Appx. 188 *; 2002 U.S. App. LEXIS 21095 **; 29 Employee Benefits Cas. (BNA) 1948; 2002 WL 35018235

THE TRUSTEES OF THE B.A.C. LOCAL 32 INSURANCE FUND; MARBLE AND TERRAZZO INDUSTRY PENSION FUND; TILE, MARBLE AND TERRAZZO INDUSTRY JOINT INDUSTRY TRAINING FUND; GREAT LAKES CERAMIC TILE COUNCIL FUND; TILE, MARBLE AND TERRAZZO INDUSTRY SUPPLEMENTAL UNEMPLOYMENT BENEFIT PLAN; TILE, MARBLE AND TERRAZZO INDUSTRY VACATION AND HOLIDAY FUND; BRICKLAYERS INTERNATIONAL PENSION FUND; B.A.C. LOCAL 32, Plaintiffs-Appellants, v. OHIO CEILING AND PARTITION COMPANY, INCORPORATED, Defendant-Appellee.

**Notice:** [**1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**Prior History:** On Appeal from the United States District Court for the Eastern District of Michigan. 00-70263. Friedman. 03-02-01.

**Disposition:** Affirmed.

## Core Terms

carpenters, contributions, contractor, traveling, funds, employees, benefits, affiliate, arbitration, bricklayers, collective bargaining agreement, district court, territorial jurisdiction, jurisdictional dispute, Tile, conditions, Pension, first sentence, perform work, unambiguously, territory, clauses, Marble, bind, sheet metal, jurisdictional, Terrazzo, contractual obligation, grievance, covering

## Case Summary

### Procedural Posture

Plaintiffs, trustees of union employee welfare benefit funds, sued defendant company in which they sought to collect employee benefits under § 515 of the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1145*. The United States District Court for the Eastern District of Michigan entered judgment in favor of the company. The trustees appealed.

### Overview

The trustees claimed that contributions were due under a collective bargaining agreement between the Bricklayers and Allied Craftworkers unions, and certain independent contractors (Michigan BAC Agreement). Although the company was not a signatory to the Michigan BAC Agreement, the trustees claimed the company was bound to the Michigan BAC Agreement by virtue of the traveling contractor clause in a different collective bargaining agreement between a union of Northern Ohio and the Ohio Contractors Association (Ohio BAC Agreement)--an agreement to which the company had admittedly assented. The court of appeals found that the first sentence the BAC Agreement was susceptible to more than one interpretation, therefore, the trustees could not rely on the travelling contractor clause in the Ohio BAC Agreement to bind the company to the Michigan BAC Agreement. Section 515 of ERISA was not intended to afford ERISA fiduciaries a weapon against employers in undeclared jurisdictional disputes with competing unions.

### Outcome
The judgment was affirmed.

## LexisNexis® Headnotes

48 Fed. Appx. 188, *188; 2002 U.S. App. LEXIS 21095, **1

Civil Procedure > Trials > Bench Trials

Pensions & Benefits Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Appeals > Standards of Review > De Novo Review

**HN1**[⤓] **Trials, Bench Trials**

A district court's conclusions of law following a bench trial are reviewed de novo, while its findings of fact are reviewed for clear error.

Business & Corporate Compliance > ... > ERISA > Funding Requirements > Pension Plan Funding

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Delinquent Contributions

Pensions & Benefits Law > Multiemployer Plans > General Overview

**HN2**[⤓] **Funding Requirements, Pension Plan Funding**

See *29 U.S.C.S. § 1145*.

Business & Corporate Compliance > ... > Types of Parties > Holders in Due Course > Rights

Contracts Law > Contract Conditions & Provisions > General Overview

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Delinquent Contributions

Contracts Law > ... > Types of Parties > Holders in Due Course > General Overview

Pensions & Benefits Law > ERISA > General Overview

Business & Corporate Compliance > ... > ERISA > Funding Requirements > Pension Plan Funding

Pensions & Benefits Law > Multiemployer Plans > General Overview

**HN3**[⤓] **Holders in Due Course, Rights**

*29 U.S.C.S. § 1145* entitles multiemployer plans to rely on the literal terms of written commitments between the plan, the union, and the employer and, as a result, the actual intent or understanding of the contracting parties is immaterial when the meaning of that language is clear. The effect of this provision is to accord Employee Retirement Income Security Act (ERISA) funds special status, akin to a holder in due course under commercial law, and entitle them to enforce the writing regardless of the defenses that might be available under the common law of contracts. Even so, ERISA funds are not entitled to enforce a nonexistent contractual obligation.

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

**HN4**[⤓] **Contract Interpretation, Ambiguities & Contra Proferentem**

Whether a contractual provision is ambiguous is a question of law for a court to determine.

Business & Corporate Compliance > ... > ERISA > Funding Requirements > Pension Plan Funding

Contracts Law > Defenses > Fraud & Misrepresentation > General Overview

Pensions & Benefits Law > ... > Civil Litigation > Causes of Action > Delinquent Contributions

**HN5**[⤓] **Funding Requirements, Pension Plan Funding**

Under *29 U.S.C.S. § 1145*, employers may not assert

48 Fed. Appx. 188, *188; 2002 U.S. App. LEXIS 21095, **1

traditional contract defenses such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law to avoid the clear terms of their agreements.

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

Contracts Law > Defenses > Ambiguities & Mistakes > General Overview

*HN6*[⤓]  **Contract Interpretation, Ambiguities & Contra Proferentem**

When a contractual provision is susceptible to more than one reasonable interpretation it is ambiguous and the intent of the parties to the contract may be considered.

Business & Corporate Compliance > ... > ERISA > Funding Requirements > Pension Plan Funding

Pensions & Benefits Law > ERISA > General Overview

*HN7*[⤓]  **Funding Requirements, Pension Plan Funding**

Employee Retirement Income Security Act (ERISA), funds seeking contributions under § 515 of ERISA are not subject to traditional contract defenses. Consistent with this proposition, courts hold that the mere fact that an award of benefits could cause an employer to "pay double" will not be sufficient to relieve the employer of its contractual obligation to make contributions to the ERISA funds.

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

*HN8*[⤓]  **Labor Arbitration, Judicial Review**

The United States Court of Appeals for the Third Circuit has rejected a claim for damages for breach of contract by one union when the National Labor Relations Board resolved the jurisdictional dispute in favor of another

union.

**Counsel:** For B.A.C. LOCAL 32 INSURANCE FUND, TILE, MARBLE AND TERRAZZO INDUSTRY PENSION FUND, TILE, MARBLE AND TERRAZZO INDUSTRY JOINT INDUSTRY TRAINING FUND, GREAT LAKES CERAMIC TILE COUNCIL FUND, TILE, MARBLE AND TERRAZZO INDUSTRY SUPPLEMENTAL UNEMPLOYMENT BENEFIT PLAN, TILE, MARBLE AND TERRAZZO INDUSTRY VACATION AND HOLIDAY FUND, BRICKLAYERS INTERNATIONAL PENSION FUND, B.A.C. LOCAL 32, Plaintiffs - Appellants: Seymour M. Waldman, Vladeck, Waldman, Elias & Engelhard, New York, NY. Christopher M. Seikaly, Southfield, MI.

For OHIO CEILING AND PARTITION COMPANY, INCORPORATED, Defendant - Appellee: Robert A. Koenig, James H. O'Doherty, Shumaker, Loop & Kendrick, Toledo, OH.

**Judges:** Before: GUY and BATCHELDER, Circuit Judges; QUIST, District **[\*\*2]** Judge. * Gordon J. Quist, District Judge, concurring.

**Opinion by:** RALPH B. GUY, JR.

# Opinion

 **[\*189]** **Before: GUY and BATCHELDER, Circuit Judges; QUIST, District Judge.** *

**RALPH B. GUY, JR., Circuit Judge.** Plaintiffs appeal from the entry of judgment in favor of the defendant, Ohio Ceiling and Partition Company, Inc. (OCP), in this action seeking to collect employee benefit contributions under § 515 of the Employee Retirement Income Security Act (ERISA), *29 U.S.C. § 1145*. Trustees of seven employee welfare benefit funds claim that contributions are due under a collective bargaining agreement between the Bricklayers and Allied Craftworkers (BAC), Local 32 of Michigan, and certain Independent Contractors (Michigan BAC Agreement). Although **[\*\*3]** OCP was not a signatory to the BAC Local 32 Agreement, **[\*190]** plaintiffs claim OCP was bound to that agreement by virtue of the Traveling

---

* The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

* The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

Contractor clause in a collective bargaining agreement between BAC Local 46 of Northern Ohio and the Ohio Contractors Association (Ohio BAC Agreement)--an agreement to which OCP had admittedly assented.

After a bench trial, the district court found that the Traveling Contractor clause did not bind OCP to the Michigan BAC Agreement. The district court also concluded that since OCP had paid contributions to other plans on behalf of the carpenters union employees that performed the work in Michigan, OCP should not be required to pay benefits to the bricklayers funds over what was essentially a jurisdictional dispute between the unions over covered work. After review of the record and the arguments presented on appeal, we affirm the judgment. [1]

 **[**4] I.**

Defendant OCP is an interior systems contractor located in Holland, Ohio. Started as a lathe and plastering contractor in 1968, OCP gradually expanded its services and now can perform complete flooring projects; including carpet, sheet vinyl, and hard tile. OCP did not begin doing tile, marble and terrazzo work (T-M-T work) until the late 1990s. Plaintiffs seek contributions for hours worked by the carpenters union employees who performed T-M-T work on two projects that OCP completed in Michigan. Matthew Townsend, OCP's president, testified that he hired union carpenters from Ohio for the Michigan jobs because the carpenters had a variety of skills needed for interior contracting work and because using the same carpenters from job to job made it possible to know what quality of work to expect. Plaintiffs have conceded that OCP made benefit contributions for the work in question to the carpenters union funds in accordance with the collective bargaining agreements between OCP and the local and national carpenters unions.

The parties stipulated that OCP was bound by: (1) a national collective bargaining agreement with the United Brotherhood of Carpenters and Joiners of America **[**5]**

(National Carpenters CBA); (2) a local collective bargaining agreement with the Northwest Ohio Regional Council of Carpenters, Carpenters, Lathers and Floorlayers Local Union No. 248 (Ohio Floorlayers CBA); and (3) a local collective bargaining agreement with the Northwest Ohio Regional Council of Carpenters Local Union Nos. 248, 372, 1138, 1581 and 2239 (Ohio Carpenters CBA). The National Carpenters and Ohio Floorlayers CBAs expressly included T-M-T work as covered work and required that employers make fringe benefit contributions to the specified carpenters employee benefit funds.

As mentioned earlier, OCP was not a signatory to either the Michigan BAC Agreement, under which plaintiffs claim contributions are due, or the bricklayers national agreement. Instead, plaintiffs claim that OCP was bound to the Michigan BAC Agreement as a result of the Traveling Contractors clause found in the local Ohio BAC Agreement. In 1995, before OCP had begun to perform any T-M-T **[*191]** work, OCP signed an Assent to the Ohio BAC Agreement in order to be able to do plaster work within the territorial area covered by that agreement; namely, the counties and townships in northern Ohio that are specified in **[**6]** paragraph 8 of that agreement. The critical clause, set forth in paragraph 44, provided as follows:

> **TRAVELING CONTRACTORS** - When the Employer has any work specified in this agreement to be performed outside of the area covered by this agreement and within the area covered by an agreement with another affiliate of the International Union of Bricklayers and Allied Craftsman, the Employer agrees to abide by the full terms and conditions of the agreement in effect in the jobsite area. Employees covered by the agreement who are sent to projects outside of the area covered by this agreement shall be paid at least the established minimum wage scale specified in Appendix A of this agreement but in no case less than the established minimum wage scale of the local agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local agreement. The employer shall in all other matters be governed by the provisions established in the jobsite local agreement. If employees are sent to work on a project in an area where there is no agreement covering the work, the full terms and conditions of this agreement shall apply.

The district **[**7]** court emphasized the explicit territorial

---

[1] The named plaintiffs included the union, BAC Local 32 of Michigan, and the Trustees of the BAC Local 32 Insurance Fund; Tile, Terrazzo and Marble Industry Pension Fund; Tile, Marble & Terrazzo Industry Joint Industrial Training Fund; Great Lakes Ceramic Tile Council Fund; Tile Terrazzo and Marble Industry Supplemental Unemployment Benefit Fund; Tile, Terrazzo and Marble Industry Vacation and Holiday Fund; and Bricklayers International Pension Fund.

jurisdiction of the Ohio BAC Agreement and concluded that the Traveling Contractors clause clearly and unambiguously applied only to BAC Local 46 employees, that is "employees covered by this agreement," who were "sent" to work on projects outside the area covered by the agreement. In addition, the district court concluded that BAC Local 32 was not intended as a third-party beneficiary of the Ohio BAC Agreement. Plaintiffs argue that this interpretation erroneously limits the extra-territorial effect of this provision by ignoring the scope of the first sentence.

Testimony from Robert Wilson, business manager for BAC Local 32 of Michigan, made clear that Local 32 believed it had a right to the T-M-T work performed by the carpenters from Ohio under the Jurisdictional Agreement and Disclaimer executed on July 16, 1997, between the national bricklayers and carpenters unions. On the other hand, Robert Bernius, the top official of the Northwest Regional Council of Carpenters, testified that the carpenters had retained jurisdiction over T-M-T work as long as the employer did not perform T-M-T work exclusively. Bernius denied that his local was alone **[**8]** in this interpretation and confirmed that there were procedures for resolving such jurisdictional disputes between the unions. Wilson conceded that although BAC Local 32 was aware that OCP was doing the work in question, Local 32 made no jurisdictional claim to the work.

In January 2000, after the work was completed, plaintiffs filed this action seeking unpaid contributions for the T-M-T work. The district court denied plaintiffs' motion for summary judgment in October 2000. At the conclusion of the bench trial, the district court rendered its decision in favor of defendant OCP. Judgment was entered in favor of OCP on March 1, 2001, with costs and attorney fees to be taxed according to law. This appeal followed.

**II.**

*HN1*[↑] The district court's conclusions of law following a bench trial are reviewed *de novo*, while its findings of fact are reviewed for clear error. *Kline v. TVA, 128 F.3d 337, 341 (6th Cir.* **[*192]** *1997)*. We begin with § 515 of ERISA, which provides that:

> *HN2*[↑] Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent **[**9]** not inconsistent with law, make such contributions in

accordance with the terms and conditions of such plan or such agreement.

*29 U.S.C. § 1145.* *HN3*[↑] This provision entitles multiemployer plans to rely on the literal terms of written commitments between the plan, the union, and the employer and, as a result, the actual intent or understanding of the contracting parties is immaterial when the meaning of that language is clear. *See Bakery & Confectionery Union and Indus. Int'l Health Benefits and Pension Funds v. New Bakery Co., 133 F.3d 955, 959 (6th Cir. 1998)*; *Bakery & Confectionery Union and Indus. Int'l Pension Fund v. Ralph's Grocery Co., 118 F.3d 1018, 1021 (4th Cir. 1997)*. The effect of this provision is to accord ERISA funds special status, akin to a holder in due course under commercial law, and entitle them to enforce the writing regardless of the defenses that might be available under the common law of contracts. *N.W. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc., 270 F.3d 1018, 1025 (6th Cir. 2001)*, cert. denied, *535 U.S. 1017, 152 L. Ed. 2d 620, 122 S. Ct. 1605, 1606, (2002)*; *New Bakery Co., 133 F.3d at 959.* **[**10]** [2] Even so, ERISA funds are not entitled to enforce a nonexistent contractual obligation. *DeVito v. Hempstead China Shop, Inc., 38 F.3d 651, 654 (2d Cir. 1994)*. *HN4*[↑] Whether a contractual provision is ambiguous is a question of law for the court to determine. *Walcher & Fox, 270 F.3d at 1025*.

**A. Traveling *Contractor Clause***

The first hurdle to plaintiffs' recovery is the district court's determination that the Traveling Contractor clause clearly and unambiguously applied only to employees sent from BAC Local 46 in Ohio to perform work outside the **[**11]** area covered by the Ohio BAC Agreement. Taking issue with this interpretation, plaintiffs argue that the first sentence of the clause broadly obligates a traveling employer doing covered work to abide by any agreement between another BAC affiliate and other employers that includes the jobsite within its territorial jurisdiction. Plaintiffs maintain that the district court ignored the first sentence and erroneously viewed the second sentence, which adds a

---

[2] Thus, *HN5*[↑] employers may not assert traditional contract defenses "such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law" to avoid the clear terms of their agreements. *Cent. States, S.E. and S.W. Areas Pension Funds v. Gerber Truck Serv., Inc., 870 F.2d 1148, 1153 (7th Cir. 1989)* (en banc).

qualification regarding the wage rates to be paid to "employees covered by [this] agreement" who are "sent" to work on a project, as establishing the scope of the entire Traveling Contractor clause.

Plaintiffs rely on several cases from other jurisdictions that enforced similar traveling contractor clauses. On close examination, however, these cases are of limited assistance in interpreting the Traveling Contractor clause at issue in this case. The two principle cases, cited for the proposition that traveling contractor clauses are valid, involved somewhat different clauses and arose in the context of an action by the local union to enforce an arbitration award against a nonsignatory employer. *See McKinstry Co. v. Sheet Metal Workers' Int'l Local 16, 859 F.2d 1382 (9th Cir. 1988)*; **[**12]** *Local Union No. 36, Sheet Metal Workers' Int'l v. Atlas Air [*193] Conditioning Co., 926 F.2d 770 (8th Cir. 1991)*.

In *McKinstry,* the employer had a CBA with Local 99 of the Sheet Metal Workers' International (SMWI) that contained traveling contractor provisions. McKinstry became the successful bidder on a job in an area within the jurisdiction of SMWI Local 16, with which McKinstry did not have a CBA. Local 16 brought a grievance claiming that McKinstry had violated the subcontracting clause in the CBA it had signed with *Local 99*, by hiring a nonunion subcontractor to do the sheet metal work. The grievance was arbitrated, McKinstry was found to have violated its agreement with Local 99, and damages were awarded to Local 16. McKinstry brought an action to vacate the arbitration award, and the issue on appeal was whether the agreement between Local 99 and McKinstry conferred enforceable benefits on Local 16, including the right to arbitration of grievances.

The court explained that when arbitration is sought by a nonsignatory to the agreement, that party must show that the signatories intended it to derive benefits from the agreement and that the nonsignatory party **[**13]** has the right to enforce those benefits. *859 F.2d at 1384-85*. While the court rejected the employer's contention that the clauses applied only to workers from the Local 99 area who were sent to a job site in another area, the court agreed that the "language is indeed ambiguous." *Id. at 1386*. Finding that the clauses were meant to benefit sheet metal workers from locals in other areas, the court concluded that McKinstry and Local 99 intended for nonsignatory SMWI locals to derive benefits from the agreement and, therefore, that Local 16 was entitled to arbitrate grievances against McKinstry.

In *Atlas Air Conditioning*, the Eighth Circuit relied on *McKinstry* to enforce an arbitration award that found the traveling contractor clauses required Atlas to comply with the CBA of an affiliated SMWI local covering the territory where Atlas was working. Although Atlas argued that the local adjustment board for the job site area did not have jurisdiction to hear the grievance, the court found the jurisdictional objection was both untimely and without merit. In rejecting that claim on the merits, the court concluded that the following clause obviously meant **[**14]** that Atlas was required to comply with the job site agreement.

> Except as provided in Section 2 & 6 of this Article, the Employer agrees that journeymen sheet metal workers hired outside of the territorial jurisdiction of this Agreement shall receive the wage scale and working conditions of the Local Agreement covering the territory in which such work is performed or supervised.

*926 F.2d at 772*. This conclusion was reached without discussion, and the actual language differs enough from the clause at issue in this case that it is of limited assistance to our inquiry.

One case on which plaintiffs place heavy reliance involved both the same BAC traveling contractor clause and an action under ERISA to recover benefits. *See Trustees of the Colo. Tile, Marble & Terrazzo Workers Pension Fund v. Wilkinson & Co.,134 F.3d. 383, 1998 WL 43172* (10th Cir. Feb. 3, 1998) (unpublished decision). In that case, however, the employer did not challenge the meaning of the traveling contractor clause.

Wilkinson had a CBA with BAC Local 77 in New Jersey that contained the traveling contractor clause. Wilkinson traveled to Colorado and hired a nonunion subcontractor **[**15]** to perform certain interior marble work at the Denver International Airport. BAC Local 6 in Colorado, with **[*194]** which Wilkinson did not have a CBA, claimed the work was covered by its CBA with other employers. Pension fund trustees sued under § 515 of ERISA to recover contributions for all hours of covered work performed within its territorial jurisdiction. Wilkinson argued that the CBA was ambiguous regarding the type of work covered, but conceded that the traveling contractor clause would bind it to the Colorado BAC Agreement. As an aside, the court noted that traveling contractor clauses were found to be valid in *McKinstry* and *Atlas*. The court explained:

> In the ordinary § 515 case, the plans seeking the

contributions are the ones named in the collective bargaining agreement or otherwise have a more direct relationship with the employer. Here, the trustees' § 515 claim arises through operation of the traveling contractors clause. The type of work Wilkinson performed in Colorado triggered the clause, thus requiring Wilkinson to comply with the terms of the Colorado CBA, which in turn required the payment of contributions to the trustees. Had Wilkinson performed the same **[**16]** work in Local 77's home territory, it could have been subject to a § 515 claim. Wilkinson does not challenge the enforceability of the traveling contractors clause per se, nor does it argue that the trustees here should be distinguished for any reason from the typical § 515 plaintiff. Under these circumstances, we see no reason why the clause should not be enforced to support the trustees' § 515 claim.

*134 F.3d 383, 1998 WL 43172,* at *6 (footnotes omitted). [3] Although the Tenth Circuit's decision supports the proposition that the clause can be understood to bind an employer to a job site agreement to which it was not a signatory, the court was not asked to determine whether that meaning is clear and unambiguous.

**[**17]** Although not cited by the parties, this court has found one case in which the meaning of a nearly identical traveling contractor clause was directly addressed in an action to collect contributions under § 515. *See Trustees of the BAC, Local 5 New York Retirement, Welfare Apprenticeship Training and Journeyman Upgrading and Labor-Management Coalition Funds v. Charles T. Driscoll Masonry Restoration Co., Inc., 165 F. Supp.2d 502 (S.D. N.Y. 2001).* In that case, Driscoll Masonry, a nonunion employer, signed a collective bargaining agreement with BAC Local 5 in order to do work on one job within Local 5's territorial jurisdiction. Driscoll performed a number of jobs in areas covered by agreements between certain BAC affiliates and other employers, but continued to refuse to sign agreements with those other BAC locals.

---

[3] Plaintiffs also cite *Merritt-Meridian Construction Corp. v. Local 64, BAC International Union, 1991 U.S. Dist. LEXIS 1396, No. 90-1228, 1991 WL 15527* (N.D. N.Y. Feb. 5, 1991)(unpublished decision), in which the court denied a motion to remand because an arbitration agreement existed by virtue of the BAC traveling contractor clause. The court cited *McKinstry* and found the employer was bound by the arbitration provision in the affiliate BAC local's CBA. There is no indication, however, that the employer disputed the meaning of the traveling contractor clause.

Local 5 and the trustees of its employee benefit funds demanded fringe benefit contributions for covered work performed by Driscoll's employees in New York but outside the territorial jurisdiction of the Local 5 agreement. When Driscoll refused, the funds sued under § 515 of ERISA.

The district court explained that to prevail, the funds must show that **[**18]** the agreement created an unambiguous contractual obligation for the defendants to make contributions. *165 F. Supp.2d at 510.* The **[*195]** Local 5 funds relied on the first sentence of the clause, which stated that:

When the employer has any work specified in ARTICLE IV of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an Agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area.

*165 F. Supp. 2d at 506* (quotation marks and emphasis omitted). As is apparent, this language is nearly identical to the first sentence of the clause that plaintiffs rely on in this case. The court in *Driscoll* concluded that this sentence clearly and unambiguously applied only if the employer had entered into a collective bargaining agreement with the BAC affiliate that covered the area in which the work was to be performed. In other words, "if Driscoll (the employer) does work as specified in Article IV (masonry) in an area of the state outside Local 5's jurisdiction **[**19]** where Driscoll has an agreement with another BAC local (the other local), then Driscoll pays benefits in accordance with its agreement with the other local." *165 F. Supp. 2d at 511.* [4]

Local 5 had also argued that the fourth sentence bound Driscoll to pay benefits for covered work performed anywhere in New York where Driscoll did not have a CBA with another BAC affiliate. As in this case, sentence four provided that: "'If employees are sent to work in an area where there is no local Agreement covering the work specified in ARTICLE IV of this Agreement, the full terms and conditions of this Agreement shall apply.'" *165 F. Supp. 2d at 506*

---

[4] The court also noted that this interpretation was supported by the deposition testimony of the president of BAC Local 5. Because the case was decided on cross motions for summary judgment, the court disregarded the contrary statements made in a subsequent affidavit by the president of Local 5.

(emphasis omitted). Disagreeing with Local 5, the court found that it applied **[**20]** only when employees performing masonry work within Local 5's territorial jurisdiction were subsequently sent to work on a project outside Local 5's territorial jurisdiction. *Id.* Summary judgment was granted to Driscoll.

We find that the first sentence of the BAC Traveling Contractor clause is susceptible to more than one interpretation. The phrase "within the area covered by an agreement with another affiliate of the International [BAC]" could refer to an agreement between OCP and the BAC affiliate, or it could refer to an agreement between any employer and the BAC affiliate. The *Driscoll* court found it unambiguously means the former, while plaintiffs argue that it unambiguously means the latter. Or, the reference in the first sentence to "any work specified in this agreement" could refer to work to be performed by employees covered by the Ohio BAC Agreement. Certainly, the second, third, and fourth sentences specifically refer to employees covered by the agreement who are sent to work in an area outside the territorial jurisdiction of the Ohio BAC Agreement. This is consistent with the district court's reading of the clause as a whole and in the context of the express territorial **[**21]** limits of the Ohio BAC Agreement.

*HN6*[↑] When a contractual provision is susceptible to more than one reasonable interpretation it is ambiguous and the intent of the parties to the contract may be considered. Although Wilson, the business manager for BAC Local 32 of Michigan, testified to his understanding of the clause, the only evidence of the parties' intent when entering into the Ohio BAC Agreement was the testimony of OCP's president. Townsend testified that when he signed the agreement **[*196]** he understood its territorial limits to be the *specified* counties and townships in northern Ohio. He also did not understand or intend that the Ohio BAC Agreement would bind OCP to what was essentially a national agreement with every BAC affiliate outside the northern Ohio area that had a CBA with any employer. This testimony is bolstered by the fact that although OCP was a union employer and had signed the National Carpenters CBA, it had not signed a national agreement with the International Bricklayers and Allied Craftworkers Union.

Accordingly, we affirm the district court's finding that the plaintiffs cannot rely on the Traveling Contractor clause in the Ohio BAC Agreement to bind OCP to the Michigan **[**22]** BAC Agreement. Even if we were to conclude otherwise, we also find that plaintiffs cannot overcome the second hurdle necessary to recover

contributions--that they were entitled to contributions under the Michigan BAC Agreement.

**B. Obligation to Pay Contributions**

After determining that the Traveling Contractor clause did not bind OCP to the Michigan BAC Agreement, the district court also concluded that

> since the defendant paid all of the ERISA benefits for all of its employees in Michigan under contract terms that they had with the carpenters' union, it [] certainly would be a windfall should Local 32 receive any benefits because they would not be in a position, number one, to pay any kind of benefit later on because the carpenters' union is going to do it. And certainly neither the company should be -- the defendant company in this particular matter, should be put in a position where they have to pay twice, and the only benefit would be a windfall to the pension plan of Local 32 and their trustees. Also, there would be no benefit to the employees.

> The whole scheme of ERISA and the reason for ERISA was to ensure that . . . employers will pay the benefits and that **[**23]** the employees can take advantage of it. In this case it would be a useless kind of exercise because they've already been paid. The carpenters who did the work . . . are going to get their benefit contribution added to it.
> The Court has some major concerns in this particular case. The Court believes essentially [that] the fund and its trustees used this case as a jurisdictional dispute. And I think to some extent they have to reexamine their fiduciary duties. That the union and its obligations to its members is much different than the fund and its trustees to exercise discretion. These kinds of cases cannot be used for jurisdictional disputes or anything of that nature.

Plaintiffs maintain that OCP's payment of contributions to the carpenters union funds cannot excuse OCP's breach of the agreement to contribute to the bricklayers funds for all hours of covered work. While we agree that several of plaintiffs' criticisms of the court's comments have merit, we are persuaded that this situation presents a more difficult question than is suggested by plaintiffs' arguments. As we see it, it is not the possible double payment or the concern over a windfall that is the heart of the **[**24]** issue, but rather that the work was performed under a CBA with another union claiming jurisdiction over the work and under which contributions were made to the associated employee

benefit funds.

Plaintiffs rely principally on the general proposition that, as indicated earlier, HN7[↑] ERISA funds seeking contributions under § 515 are not subject to traditional contract defenses. Consistent with this proposition, courts have held that the mere fact that an award of benefits could cause an employer to "pay double" would not be **[*197]** sufficient to relieve the employer of its contractual obligation to make contributions to the ERISA funds. *See Brogan v. Swanson Painting Co., 682 F.2d 807, 809-10 (9th Cir. 1982)* (cash payments to nonunion employees in an amount equal to the contributions did not itself excuse the obligation to contribute to the trust funds); *O'Hare v. Gen. Marine Transp. Corp., 740 F.2d 160, 170 (2d Cir. 1984)* (purchase of equivalent health care insurance for employees did not excuse failure to contribute to funds). We are not convinced that this case is similar to either *Brogan* or *O'Hare*, or that the protection of § 515 should be extended **[**25]** to this situation, even though one unreported district court decision relied on by plaintiffs concluded otherwise. *See Trustees of the BAC, Local 5 New York Retirement, Welfare, Apprenticeship Training and Journeymen Upgrading and Labor-Management Coalition Funds and BAC Local 5 v. Plaster Master, Inc.,* No. 99-5194 (S.D. N.Y. filed Jan. 9, 2001) (unreported decision) (citing *Brogan* and rejecting defense that contributions were made to a competing union).

In further support of their position, plaintiffs rely on *Hutter Construction Co. v. International Union of Operating Engineers, 862 F.2d 641 (7th Cir. 1988)*, as representing an analogous conflict between the competing jurisdictional claims of two unions. In *Hutter*, the court was asked to affirm an arbitrator's decision awarding damages to the operators union for breach of the subcontracting provisions in its CBA with Hutter despite the fact that the NLRB had awarded the work to the laborers union. The Seventh Circuit concluded that the arbitrator's award and the NLRB decision did not conflict because there was a distinction between seeking the work and seeking payment for the work. In a footnote, the court **[**26]** stated: "We recognize that Hutter will now pay two unions for work that was performed by one. This unfortunate result, however, is solely attributable to Hutter's decision to enter into conflicting collective bargaining agreements." *Id. at 645 n.16*. Plaintiffs argue that OCP's predicament likewise results from its decision to enter into conflicting agreements. In *Hutter*, however, the conflict was between a determination on the merits that the employer breached the CBA with one union and a

finding by the NLRB that the other union had a superior right to the work. Here, neither has actually been determined.

More importantly, to the extent that the rationale in *Hutter* may apply here, there is a split among the circuits that have addressed the dilemma presented in *Hutter*. While the Seventh and Ninth Circuits adhere to the distinction between seeking the work and seeking payment for the work, the First and Third Circuits have rejected such a distinction as "ephemeral" and held that an employer is not liable in damages to the disappointed union when it acts in accordance with an NLRB ruling resolving the jurisdictional dispute. *See T. Equip. Corp. v. Mass. Laborers' Dist. Council, 166 F.3d 11 (1st Cir. 1999)*; **[**27]** Local 30, *United Slate, Tile and Composition Roofers, Damp and Waterproof Workers Ass'n v. NLRB, 1 F.3d 1419 (3d Cir. 1993)*. This court has not specifically addressed the distinction drawn in *Hutter*, but HN8[↑] has rejected a claim for damages for breach of contract by one union when the NLRB resolved the jurisdictional dispute in favor of another union. *See Int'l Union, United Auto., Aerospace and Agric. Implement Workers (UAW) and its Local 1519 v. Rockwell Int'l Corp., 619 F.2d 580, 584-85 (6th Cir. 1980)* (interpreting *Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 11 L. Ed. 2d 320, 84 S. Ct. 401 (1964))*. *Rockwell* suggests that this circuit would not adopt the distinction made by the court in *Hutter*.

Finally, we are sympathetic to the district court's concern about the use of **[*198]** ERISA to press a jurisdictional dispute over the assignment of T-M-T work. It is undisputed that both the carpenters and bricklayers CBAs expressly include T-M-T work as covered work. Emphasizing their role as fiduciaries for the funds, plaintiffs distance themselves from any claim by Local 32 that it had a right to the work. Even so, the real question **[**28]** is whether plaintiffs could demonstrate a contractual obligation to make contributions to the bricklayers funds when the carpenters union agreements purported to cover the same work, the work was assigned to employees covered by the carpenters union agreements and contributions were made in full to the carpenters union funds.

The Eighth Circuit's decision in a similar case supports the view that plaintiffs should not be able to establish an entitlement to contributions for work assigned to another union claiming jurisdiction over the work without invoking procedures for resolving the jurisdictional work assignment issue. *See Carpenters Fringe Benefit*

*Funds v. McKenzie Eng'g, 217 F.3d 578 (8th Cir. 2000)*. Reversing judgment in favor of the carpenters funds in that case, the court found that the audit failed to establish that the hours claimed were covered by the CBA. The court also refused to ignore the CBA McKenzie had with the Operating Engineers that covered the same work, explaining that:

> On this record, McKenzie was contractually free to assign the Crescent Bridge work to either union, or part of the work to each union. Any union aggrieved by that assignment **[**29]** could invoke the inter-union jurisdictional dispute procedure, which results in a final work assignment decision prospectively binding on McKenzie. *See generally NLRB v. Radio & Television Broad. Eng'rs Union, 364 U.S. 573, 5 L. Ed. 2d 302, 81 S. Ct. 330* . . . (1961). Because Local 166 did not invoke that procedure, the Funds are not entitled to contributions for work assigned to members of a competing union within the jurisdiction of that union.

*Id. at 585*. Looking at the basis for the protections afforded to ERISA plans under § 515, nothing suggests that it was intended to afford ERISA fiduciaries a weapon against employers in undeclared jurisdictional disputes with competing unions. We conclude that plaintiffs have failed to demonstrate that OCP had a contractual obligation to pay contributions for the hours of T-M-T work performed by the carpenters union employees on the two Michigan jobs.

**AFFIRMED.**

**Concur by:** Gordon J. Quist

## Concur

**Gordon J. Quist, District Judge, Concurrence**. I concur in the result of this case for the reasons **[**30]** set forth in Part II B of the Opinion.

**AMERICAN ARBITRATION ASSOCIATION**

In the matter of arbitration between:                    AAA No. 01-16-000-39530

PRECISION ENVIRONMENTAL COMPANY,                    Mitchell B. Goldberg, Arbitrator
                         Claimant,

                                                        Date of Award:
         -v-                                            February 5, 2018

OHIO OPERATING ENGINEERS PENSION
FUND,
                         Respondent.

**OPINION AND AWARD**

Appearances:

For the Claimant:
Frank W. Buck, Neal B. Wainblat and Jeffrey J. Moyle,  Littler Mendelson, PC

For the Respondent:
Daniel J. Clark and Elizabeth B. Howard, Vorys, Sater, Seymour & Pease LLP

I.    <u>Introduction and Background.</u>

        This is an arbitration proceeding conducted under the American Arbitration Association's

Multi-employer Pension Plan Arbitration rules for Withdrawal Liability Disputes. Claimant

("Employer") is one of the employer participants in the Ohio Operating Engineers Pension Fund

("Fund").  Claimant is an employer as defined in the Multi-employer Pension Plan, and in the

Multi-employer Pension Plan Amendments Act ("MPPAA").    Claimant filed a pension plan claim

request for arbitration with AAA on September 14, 2016 after disputing the Respondent's

demand for withdrawal liability dated December 23, 2015 in the amount of $188,044.00, and the

amount of quarterly installments payments of $4,692.00 (and one final payment of $3,081.00)

for the reasons discussed below.  Claimant was a signatory to a collective bargaining

1

agreement ("CBA") under which it was obligated to make pension contributions to the Fund on behalf of the employees described in the CBA bargaining unit.

The Fund alleges that withdrawal liability was assessed against the Employer in accordance with 29 U.S.C. Section 1381(a). The Employer completely withdrew from the Fund when it or a trade or business under which it had a common control permanently ceased to have an obligation to contribute to the Fund. Alternatively, it alleges that under 29 U.S.C. Section 1383(b)(2),the Employer completely withdrew from the Fund when it ceased to have an obligation to contribute to the Fund and the Employer or a trade or business under which it shared common control continued performing work in the jurisdiction of the CBA for which contributions were previously required. Respondent contends that its withdrawal liability assessment against the Employer was properly and legally assessed under the MPPAA and that the amounts assessed are due under the Fund's schedule of payments.

The parties agreed, after conducting discovery with respect to their claims and defenses, to waive a formal hearing on the issues. They instead agreed to submit joint opposing motions for summary judgment on the disputed issues. Each party filed their respective briefs, responses and replies to the dispositive motions.

A multi-employer pension plan is a plan to which more than one employer contributes and which is maintained pursuant to one or more CBAs between the employers and the union. The plans are jointly trusteed and administered under Section 302 of the LMRA, 29 U.S.C. Section 186. Half of the trustees are appointed by the union and the other half by employers or employer associations. The applicable CBA in this dispute is between the Construction Employers Association, of which Precision was a member, and the International Union of Operating Engineers, Local 18. That CBA expired on April 30, 2015. Precision withdrew its recognition of the Operating Engineers and no longer remained as a party to any subsequent

2

CBA between the Construction Employers Association and the Operating Engineers. Claimant, at all relevant times, was engaged in the business of demolition and asbestos removal within the building and construction industry.

In 1980, Congress enacted MPPAA, amending ERISA and the Internal Revenue Code to further regulate the conduct of multiemployer plans and to protect the PBGC in its role as the guarantor of plan benefits. The MPPAA required plan trustees to collect withdrawal liability from employers whose operations terminated, or whose obligations to contribute terminated. In general, the amount of withdrawal liability is the employer's proportionate share of the plan's unfunded vested liabilities, as determined under a statutory formula. The plan's liability is the actuarial present value of the benefit obligations which have vested. A plan's unfunded vested liability is the difference between the vested liability and the value of the plan's assets at the point in time when the withdrawal liability is triggered.

Congress sought to cure the problems arising when an employer ceased making payments to a plan fund, leaving the plan with vested pension obligations which were only partially funded. A vested benefit is one that is guaranteed to the worker after a number of years of service. An employer who partially or completely withdraws from paying its contributions into a plan causes withdrawal liability to be calculated and paid in order to protect the other employers in the multiemployer plan from having to pay for those benefits. Congress believed that the added burdens upon employers who remained as plan participants might induce more of them to remove themselves from multiemployer plans. This would discourage the entry of new plan participants and precipitate the financial failure of less stable pans.[1]

The MPPAA established special industry rules, some of which apply to the building and construction industry. The building and construction industry rules, which apply in this dispute,

---

[1] *Laborers Pension Fund v. W.R. Weis Co.*, 180 F. Supp. 3d 540, 548-549 (2016) (Citing other Circuit cases and a Supreme Court decision).

3

generally provide that an industry employer is deemed to have withdrawn only if it ceases to have an obligation to contribute while continuing to perform the same type of work previously covered by the plan in the jurisdiction of the union as set forth in the applicable CBA.

Withdrawal liability has been found to occur in cases where the employer goes out of business, sells a business, downsizes, goes non-union by hiring subcontractors to perform the work, or when the subject union under a CBA is decertified. In such cases, courts have found that employers were legally obligated to pay contributions to the funds as required by the CBA, notwithstanding that the union was decertified prior to the end of the contract term. Under the MPPAA, the funds had an independent right to sue for delinquent contributions owed under the terms of the CBA, irrespective of whether a union could legally enforce the terms of the CBA.[2] Accordingly, the MPPAA authorizes multiemployer plans to sue for delinquent contributions owed under the terms of the plan and under the terms of a CBA.[3] Both parties agree that the Employer's obligation to make contributions to the Fund in this case ceased when the subject CBA expired by its terms on April 30, 2015. The relevance of the above cases regarding decertification to the case at hand is that in the above cases it is clear that withdrawal liability was triggered because the employers no longer had the obligation to make contributions after the expiration of those CBAs, and it was clear that the employers continued to perform the work in those jurisdictions of the type for which contributions were previously required.

II.   The Statutory Provisions.

Section 4203 of ERISA, 29 U.S.C. Section 1383(b)(2) states:

A withdrawal occurs under this paragraph if -

(A)      an employer ceases to have an obligation to contribute under the plan, and

---

[2] *Midwest Operating Engineers Welfare Fund v. Cleveland Quarry*, 844 F.3d 627 (7th Cir. 2016).
[3] *Central States, Southeast & Southwest Areas Pension Fund v. Schilli Corp*, 420 F.3d 663, 669-670 (7th Cir. 2005).

(B)   the employer -
    (i)  continues to perform the work in the jurisdiction of the [CBA] of the type
       for which contributions were previously required.

An "obligation to contribute" is defined as an obligation to contribute arising: (1) under one or more collective bargaining agreements; or (2) as a result of a duty under applicable labor-management relations law.  29 U.S.C. Section 1392(a).  Under 29 U.S.C. Section 1401(a)(3)(A), the Fund's assessment of withdrawal liability is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

III.   The Jurisdictional Dispute.

A jurisdictional dispute arose between the Operating Engineers union and the Laborers' union over the right to exclusively perform the work described as forklift and skid steer work. Both Unions had CBAs with the Employer that covered that particular type of work.  The dispute was ultimately resolved through an NLRB proceeding (Section 10(k) of the NLRA) and subsequent litigation over that jurisdictional issue.  The jurisdictional issue was resolved in favor of the Laborers Union of North America.  The Sixth Circuit in *Orrand v. Hunt* decided that the Employer's obligation to continue its contributions to the Fund ceased after the resolution of the jurisdictional issue.[4]  The issue remained as to whether the cessesson of forklift and skid steer work by the Operating Engineers employees that was performed before their CBA termination, coupled with the expiration of their CBA (April 30, 2015) triggered a withdrawal liability assessment under the MPPAA.  There is no question that the obligation for the Employer to make contributions to the Fund ceased, and that the Employer continued to perform the type of work that the Operating Engineers performed previously before the resolution of the jurisdictional issue.  This was forklift and skid steer work as set forth in its CBA with the

---

[4] 852 F.3d 592 (6th Cir. 2017).

5

Employer Association.  The Employer's assigned work to the Laborers Union was also within the geographic jurisdiction of the Operating Engineers' previous CBA. It was the type of work for which contributions were required from the Employer to the Fund, until the jurisdictional issue was resolved and the CBA expired..  Thereafter, that same type of work was performed by the Laborers, another union within the same jurisdiction (type of work and geographic location) set forth in the expired CBA.  That Union (Laborers) was a party to a different CBA with the Employer, that required contributions to be paid to a different pension fund.

A  fixed computed withdrawal liability that attempts to recover an amount of money that would be owed by the Employer to compensate the Plan for the Employer's proportionate share of the Plan's unfunded vested liabilities secures the Plan's ultimate ability to pay the defined benefits due to the Union's employees when the defined benefit retirement benefits are due to be paid.  This unfunded amount is determined on the date of exit from the plan.[5]  If the Fund cannot collect its withdrawal liability payments, the other employers within the multiemployer fund will under certain circumstances be required to make up the deficiency caused by the Fund's inability to collect the balance due of payments that consist of its unfunded vested benefits necessary to pay the defined pension benefits promised to the employees in the bargaining unit who have already earned their defined retirement benefits as expressed in the CBA and in the incorporated pension fund plan.  The withdrawing employer is paying its proportional share of the unfunded contribution amounts for work done prior to the employer's withdrawal, rather than for work done after its withdrawal.[6]  However, the Fund, under other circumstances, may receive substitute contributions from other employers within the multiemployer plan or from other plans if those employers hire Operating Engineers' employees for the subject work on other projects within the geographical jurisdiction under CBAs that

---

[5] 29 U.S.C., Section 1391.
[6] 29 U.S.C., Section 1391(b)(1)(A).

provide those employees with work that was lost to the Operating Engineers under this work jurisdiction dispute.

Notwithstanding the fact that forklift and skid steer work was in the described work jurisdiction of both the Laborers' CBA and the Operation Engineers' CBA, the work had for many years been assigned by the Employer to the Laborers, and not the Operating Engineers. However, in the Fall of 2011 the Employer, at the request of the Operating Engineers, assigned forklift and skid steer work on a demolition job at a Hospital in Cleveland. The Employer denied the request because it never in the past made contributions to the Fund for forklift and skid steer work that was performed by members of the Laborers' Union.[7] It had, however, assigned some of that work to Operating Engineers employees in the past and paid contributions to the Fund when it hired Operating Engineers to perform work under its CBA. The calculation of withdrawal liability to the Employer by the Fund is based upon some forklift and skid steer work or other CBA work that was in fact performed by its members before the withdrawal. Those were for hours of work for which contributions were made by the Employer, but not enough contributions to make up for the vested, but unfunded benefits that remained outstanding at the time of the withdrawal.

IV.    Analysis and Findings.

*The Stevens Cases*

The U.S. Court, for the Northern District of Ohio decided the case of *Stevens Engineers & Constructors, Inc. v Iron Workers Loc. 17 Pension Fd.*[8] Plaintiff is a contractor who is one of the employers in a multiemployer pension plan with the Defendant pension fund. The Plaintiff sought to enforce an arbitration award that prohibited the Defendant fund from collecting withdrawal liability. The Fund attempted to assess withdrawal liability under the above

---

[7] Tony Digeronimo Affidavit, Exhibit A to Employer's Motion for Summary Judgment.
[8] 2016 U.S. Dist. LEXIS 114028; L.R.R.M 3388 (2016).

7

construction industry withdrawal liability provisions of ERISA.  Stevens, between 1985 and 2013 was a party to a series of CBAs with the Ironworkers Fund.  It made contributions to the Fund when the Ironworkers performed work covered by the CBAs.  As in the instant case, Stevens, the employer, did not renew the Ironworkers' CBA after it expired on April 20, 2013.  Its obligation to contribute to the Fund ceased at that point.  Also like this case, after the CBA expired and after another union of millrights obtained the right to exclusively perform certain work that was in the stated jurisdictional provisions of both CBAs, the Ironworkers Fund sought withdrawal liability for the work performed by Ironworkers before the CBA expired and work for which Stevens had made pension fund contributions during the life of the CBA.  The Fund determined that Stevens had assigned ironworker work of the type for which Stevens had been required to contribute to the Fund.  Stevens demanded arbitration of the dispute.

The subject CBA recognized that jurisdictional disputes would arise due to the fact that various craft unions in their respective CBAs would claim the same work for its members.  In this case, both the Ironworkers CBA and the Laborers-Millrights unions both claimed the same jurisdictional work as described in each of their CBAs.  However, unlike the CBA in this case, the parties to the CBAs were also parties to a National Maintenance Agreement ("NMA") that recognized that various crafts may claim work assignments that are part of their respective CBAs.  Accordingly, as part of its responsibility under the NMA, Stevens agreed to conduct a pre-job conference to cover all craft work assignments for each project.  Stevens conducted the pre-job conference for a certain project after the above CBA with the Ironworkers expired. It assigned certain work to the Millrights instead of the Ironworkers.  The losing union, in this case, the Ironworkers, could challenge Stevens' assignment by first having the issue referred to the International Unions to resolve the dispute.  If the assignment dispute was not resolved at that level, either Stevens as the Employer or the Union could refer the issue to final and binding

arbitration. This contractual internal dispute resolution process would provide a speedier

process for the resolution of the dispute, and the unions agreed not to strike while this resolution

process was untaken. Stevens and the Ironworkers Union engaged in the NMA process to a

certain point, but it did not go to arbitration. The contested work went to the Millrights when the

Ironworkers Union decided not to go further with the NMA process.

The Ironworkers Union thereafter pursued a claim for withdrawal liability against

Stevens. Its claim was that Stevens stated that prior to the expiration of the Ironworkers' CBA,

Stevens used Ironworkers to perform certain Ironworkers work "on several occasions over the

years." Stevens also performed the same type of work in the same jurisdiction covering the

pension fund obligations in the CBA within 5 years after May 1, 2013, but because that work

was assigned to the Millrights and not the Ironworkers, Stevens would not have an obligation to

make pension contributions under the Ironworkers CBA to the Ironworkers pension fund,

thereby causing withdrawal liability to be triggered.

The Arbitrator in the withdrawal liability dispute conducted a hearing and issued his

findings and conclusions of law. He determined that the Ironworkers abandoned its claim of

contractual jurisdiction over the work that Stevens assigned to the Millrights. He further stated

that the disputed work Stevens assigned to the Mfillrights was not in the Ironworkers' craft

jurisdiction defined in its expired CBA and thus, Stevens did not assume such work within 5

years after April 30, 2013, the date on which it ceased to have an obligation to contribute to the

Fund. The Arbitrator stated:

> [Section] 1383 also requires such work to be work "of the type for
> which contributions were previously required," and concluded that
> because the work at issue was performed by millrights under Stevens'
> unchallenged assignment, that work is not work for which contributions
> had ever been required to the Iron Workers Local 17 Pension Fund. As
> such, he determined that the [Fund] Trustees determination to the

contrary was clearly erroneous.[9]

The Fund disagreed with the Arbitrator's findings and conclusions of law and sought to vacate the award before the District Court.  The Fund relied upon a decertification decision in the 7th Circuit that held that the decertification of the union did not terminate the employer's obligation to contribute for withdrawal liability purposes, by operation of law (Section 1145).[10] The Court, however, distinguished the decertification case by stating that the controlling issue is not when Stevens' obligation to contribute to the Fund ceased; instead, the question is whether "the special status enjoyed by multiemployer pension funds under [Section] 1145 applies to the assessment of withdrawal liability arising from an inter-union craft jurisdictional dispute."  It went further to discuss cases that make it clear that a Fund is not permitted under ERISA to collect employer contributions for work properly assigned to another union in a jurisdictional dispute, notwithstanding that the Fund's CBA also covers that work. An employer is not required to contribute to a plaintiff Fund unless it is contractually obligated to do so.  In other words, notwithstanding that two CBAs cover the same work, the work that was properly assigned to the winning union requires pension contributions to that fund for those workers, and not also for the losing union's fund, notwithstanding that both union CBAs cover the same work.

The Ironworkers Fund argued, as the Fund here argues, that prohibiting it to collect withdrawal liability for work previously performed under its CBA, and for work in which Stevens previously made contributions, would reduce its contribution base.  Even if the Union went through the NMA procedure and lost, instead of abandoning its claim, the Fund would still be entitled to collect withdrawal liability for the vested but unfunded contributions that needed to be

---

[9] The Arbitrator further stated that the Trustees' use of the withdrawal liability process to determine a work jurisdiction dispute between two NMA-party unions was unreasonable in the sense that Local 17 used the Fund as a "cat's paw in its turf war with the Millrights over craft jurisdiction and to punish Stevens for having terminated its Iron Workers [CBA]."

[10] *Cent. States, Se. & Sw. Areas Pension Fund v. Schilli Corp.*, 420 F.3d 663 (7th Cir. 2005).

10

added to the contributions it had already received for past Ironworkers work when previous

contributions were made to the Fund by Stevens.  However, the Court found that the work

assigned to the Millrights was not work for which contributions "had ever been required to the

Fund." In other words, notwithstanding that work in the past was assigned and performed by the

Ironworkers, and that work produced contributions to the Fund and was so required under the

Ironworkers CBA, the Court is not requiring any further recovery of withdrawal liability

contributions (payments) for that same work that would otherwise by due if the obligation to

contribute ceased due to a decertification or loss of union work.  The Court stated:

> The Court recognizes the circularity of this argument.  There is no
> dispute that Stevens has assigned . . .work to ironworkers instead
> of the millrights in the past.  Thus, "craft jurisdiction" changes from
> job to job.  The Court could find no case in which a pension fund
> sought to impose withdrawal liability based upon an employer's
> assignment of assignable work to another craft union.
> * * *
> Finally, while the Fund would have received additional [make-up]
> contributions if all the . . . work on the . . . project had been assigned
> to the Ironworkers, its contribution base was not reduced because it
> received contributions for all work within the Ironworkers' craft
> jurisdiction from Stevens' contractors who employed them.  No
> non-union labor was used on the project.
>
> Again, the level of any pension fund contributions will naturally change
> marginally from job to job based upon the assignment of assignable
> work.

The Sixth Circuit affirmed the District Court's decision finding that no withdrawal liability

is due to the Fund for the past Ironworker work that was performed during its CBA, and for

which contributions were made by Stevens.[11]  The Court expanded further upon the difference

between a situation where an employer "goes non-union," stays in the industry, but ceases

making payments to the plan, and a situation where the employer withdraws from work within

the jurisdiction of its CBA.  The Court states that the first situation *does* decrease the

---

[11] *Stevens Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund*, No. 16-4098/4099
(December 13, 2017).

contribution base of the plan because the employer is withdrawing from the plan when it goes non-union and stops making contributions.  The MPPAA provides that an employer must pay a proportional share of the unfunded amount to the Fund, determined based on the employer's share of contributions for work prior to the withdrawal, rather than after the withdrawal. However, under the second situation, the withdrawal of jurisdictional work does not pose an undue threat to a fund as long as contributions are made for whatever union work is done in the area.  This is because the construction industry as a whole does not necessarily shrink when a contributing contractor leaves the industry.  Employees are often dispatched to another contributing contractor who will make contributions to the same plan or another union pension fund plan.

The Court expanded its rationale that was explained by the Arbitrator and the District Court.  It acknowledged that the MPPAA expresses a general policy in favor of making employers who withdraw from an underfunded fund pay into it.  However, the MPPAA expressly limits the situations in which contributions are required, the specific provisions of the text control over the looser general principles that are also embodied in the MPPAA.  The particular rationale for the construction industry exception provides an incentive for employers to gain the benefit of work without the detriment of pension liability when an employer takes on a job that requires pension benefits.  The Court states:

> Before its withdrawal from the CBA, Stevens would not have owed contribution liability to Local 17 for work properly assigned to another union through the NMA.  It therefore causes no imbalance for Stevens to owe no liability for such work properly assigned after withdrawal either.

*The Weis Decision*

The Employer also relies upon the decision of the District Court for the Eastern Division of Illinois to support its position that no withdrawal liability was triggered in this case when the

*Weis* jurisdictional issue was resolved in favor of the Laborers Union as opposed to the

Briicklayers Union (BAC) for the disputed work.[12]  Weis stopped employing Laborers and

stopped contributing to the Fund in October 2009 under the Laborers CBA.  It ended its CBA

relationship with the Laborers in 2012.  The matter went to arbitration on the issue of whether

the Fund could assess withdrawal liability.  The Arbitrator found in favor of the Employer.  The

Fund went to Court to vacate the award and to have withdrawal liability assessed in accordance

with its calculation of withdrawal liability for payment of the unfunded vested benefits caused by

the withdrawal.  The Court affirmed the arbitration award.

Weis employed its last laborer in October 2009 after the CBA expired.  The Arbitrator

sustained the Fund's claim that after 2009, the Employer may have performed some tasks

within the general jurisdiction of the Laborer's CBA, notwithstanding that the work overlapped

with work under the  BAC and ICE CBAs.  Weis contributed to the BAC pension fund for these

hours.  The Laborers Fund claimed withdrawal liability.  Weis contested the claim, arguing that it

was entitled to an exception for the construction industry, in which an employer is deemed not to

have withdrawn, and thus is not subject to withdrawal liability. The Laborers Union revised its

demand letter and adjusted the withdrawal date back to October 2009 when its CBA expired.

Like the Stevens case, the disputed work was performed after that date by another union's

employees and contributions were made to that union's fund.

The Arbitrator, as in the Stevens decisions, ruled in *Weis'* favor, holding that it was not

liable for withdrawal payments because it did not continue to perform work in the jurisdiction of

the Laborer's CBA of the type for which contributions were previously required under

1383(b)(2)(B)(i).  The Arbitrator stated:

> In other words, even though Weis continued employing non-laborers
> to do some work covered by the laborers' CBA, Weis never had an
> obligation to contribute to the [Laborer's Fund] for non-laborers' work,

---

[12] *Laborer's Pension Fund v. W.R. Weis Co.*, 180 F.Supp.3d 540 (E.D. Illinois 2016).

when it had already contributed to the other workers' [BAC and ICE]
pension funds.[13]

The Court found, as did the Arbitrator, that in *Weis'* case, the history and custom showed
that the Laborers' CBA did not require contributions for work done by the other unions for its
work, when the employer had made pension contributions to a different union.  The Fund
argued, as in Stevens, that the legislative purpose of the MPPAA was not accomplished when
the Laborer's funding base was compromised due to *Weis* being excused from absorbing the
additional cost increases for unpaid unfunded vested benefits that were due over and above the
previous contributions that were made to the Laborer's fund for work done under its CBA before
the CBA expired in October 2009.  The Court applied the same reasoning as above, stating that
the construction industry as a whole does not necessarily shrink when a contributing contractor
leaves the industry.  Employees are often dispatched to another contributing contractor (with the
same union plan, or a different union plan).  The construction work is generally done on a
project-by-project basis.  An employer's covered employment may fluctuate drastically, and
when a project ends an employer's workers will normally remain in the labor pool available for
employment by other contributing union employers.  The Court concluded by stating that the
fluctuations are normal events that do not pose an undue threat to a plan as long as
contributions are made for whatever union work is done in the geographic area.

The Fund argued that it would be damaged in the sense that its contribution base would
be reduced if *Weis* could continue doing the same type of work, but change its workforce to a
different trade union, in this case from laborers to non-laborers.  The Court, however, held that
the legislative history did not support this view because the Fund's base did not encompass
work performed by other union members when Weis contributed to other pension funds for that

---

[13] The Arbitrator also held that Weis could assert an affirmative defense of equitable estoppel because
Weis reasonably relied to its detriment on the Fund previous assurances that it owed no additional
contributions to the Laborer's Fund.

14

subject work.  Weis was not escaping from its contribution obligations because it never had an obligation in the first place to contribute to the Fund for the other union's work.  As stated in the Stevens' rationale, this is not a situation where *Weis* stays in the industry but goes non-union and ceases making payments to the plan.  Instead, *Weis* continued making contributions to the BAC pension plan and it sustained that funding base.  Accordingly, the Court found that the Arbitrator's award did not undermine the legislative purpose of the statute.

*Findings*

The above judicial findings of a controlling legislative purpose that looks upon the effect of an employer withdrawal on industry-wide union employment in the geographic area instead of the specific effect of a withdrawal upon a single employer when that employer ceases to have an obligation to contribute to the plan due to the termination of its participation in the multiemployer collective bargaining agreement is not apparent from the plain reading of the statutory language.  Applying that statutory language in this case would seem to trigger withdrawal liability under a plain reading because Precision's obligation to contribute to the Operating Engineers' Fund ceased upon the termination of the CBA.  The Employer continued to perform the skid-steer and forklift work that was previously performed under the Union's work jurisdiction, under which contributions to the Fund were previously required.  Moreover, the contribution base was decreased by its inability to recover additional unpaid contributions for its unfunded vested benefits that related to the Employer contributions it made to the Fund for work performed by the Union in the past up to the point when the Employer's obligations ceased.

The damage to a single pension fund contribution base becomes evident when one considers the different financial conditions of various union pension funds.  If withdrawal liability is not triggered under the above facts for an employer that was obligated to contribute to a fund that was in poor financial condition, the loss of funding for its unfunded vested benefits could be

15

meaningful. The effects of its poor condition and the loss of funding for those unfunded vested benefits could result in the inability to meet its defined pension payments to its beneficiaries in the future for the retired union workers. Those workers who accumulated benefits through the contributions that were made to the financially stressed fund could be at risk to the point of a PBGC bailout that would produce a substantial reduction of pension benefits. The fact that some other pension fund gained contributions through a jurisdictional decision on some industry wide basis would not be of solace to the employees who performed the subject work and received less than the full contributions necessary to fund both for funding the vested benefits and the unfunded vested benefits that were provided under the terms of the CBA and the Fund.

The Respondent Fund highlights the losses to the single fund when a CBA is terminated without compensating a pension fund for the unfunded liability arising out of its participation. It makes no difference to the particular fund when a portion of the covered work is lost to non-union employees or union employees. When no compensation is provided to the Fund for the loss of payments or contributions for its vested, but unfunded benefits, the Fund has nevertheless lost a portion of its contribution base regardless of whether the lost work is performed by a union or non-union worker. This would necessarily place a burden upon the remaining employers in the multiemployer plan who are left with unfunded liabilities that must be met. It is foreseeable that in some instances the remaining employers in the multiemployer plans could be competitors of the employer who was relieved of the burden to pay withdrawal liability for those unfunded contributions.

Nevertheless, the above Courts have spoken on this precise issue. They have determined that for the construction industry there is some compelling congressional intent, as expressed through its legislative history, to treat employer withdrawals from CBAs and ceased contribution obligations differently for triggering withdrawal liability. Arbitrators must follow these

16

decisions that state the law on this issue, or risk having their decisions vacated, based upon a judicial finding that they have exceeded their power by manifestly disregarding the law.[14]

V.     Award.

The Claimant's motion for summary judgment is granted, and the Respondent's motion for summary judgment is denied for the above reasons.  No withdrawal liability is to be assessed against the Employer under Section 4203 of ERISA, 29 U.S.C. Section 1383(b)(2)(A) and (B).  Respondent shall refund to Claimant all assessed withdrawal liability payments received from Respondent.

Date of Award:  February 5, 2018                    /s/ *Mitchell B. Goldberg, Arbitrator*
                                                      Mitchell B. Goldberg, Arbitrator

---

[14] 9 U.S.C. Section 10(4) of the Federal Arbitration Act.  A manifest disregard of the law occurs when when an arbitrator understands and correctly states the law but proceeds to ignore it.  *See, e.g. Wilko v. Swan*, 346 U.S.427, 436 (1953); *San Martine Co. de Navegacion, S.A. v. Saguenay Terminals*, 293 F.2d 796,801 (9th Cir. 1961).

17

## *2017 NLRB LEXIS 269; 209 L.R.R.M. 1349; 365 NLRB No. 81*

National Labor Relations Board

May 19, 2017

Case 07-CD-182456

**Reporter**

2017 NLRB LEXIS 269 *; 209 L.R.R.M. 1349; 365 NLRB No. 81

## Local 876, International Brotherhood of Electrical Workers (IBEW), AFL-CIO and Newkirk Electric Associates, Inc. and Local 324, International Union of Operating Engineers, AFL-CIO.

**Subsequent History:**

Reconsideration denied by *Local 876, Ibew Ibew, 2017 NLRB LEXIS 398 (N.L.R.B., July 27, 2017)*

**Prior History:**

*In re Local 876, IBEW, 2016 NLRB LEXIS 880 (N.L.R.B., Dec. 21, 2016)*

**Notice:**
 [*1]

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

## Core Terms

tower, jurisdictional dispute, electric, arbitrator's, short form, skill, train, past practice, collective-bargaining, notice, perform work, proscribe, cease, bind

Synopsis

The National Labor Relations Board (NLRB) found that the dispute was properly before it for determination under Section 10(k) of the National Labor Relations Act because there was reasonable cause to believe that Section 8(b)(4)(D) of the Act was violated, and there was no agreed-upon method for the voluntary adjustment of the dispute. When two unions claimed the work in dispute, the NLRB, after considering the employer preference, current assignment, past practice, and efficiency of operations, found that the employees represented by the first union were entitled to perform the work.

**Panel:** By Philip A. Miscimarra, Chairman, Mark Gaston Pearce, Member, Lauren McFerran, Member

## Opinion

DECISION AND DETERMINATION OF DISPUTE

This is a jurisdictional dispute proceeding under *Section 10(k)* of the National Labor Relations Act. Newkirk Electric Associates, Inc. (the Employer) filed a charge on August 19, 2016, [1] alleging that Local 876, International Brotherhood of Electrical Workers, AFL-CIO (IBEW Local 876) violated *Section 8(b)(4)(D)* of the Act by threatening to engage in proscribed activity with an object of forcing the Employer to assign certain work to employees represented by IBEW Local 876 rather than to employees represented by Local 324, International Union of Operating Engineers, AFL-CIO (Operating Engineers Local 324). A hearing was held on October 13, 14, and 20 before Hearing Officer Mary Beth Foy. During the hearing, the hearing officer **[*2]** denied Operating Engineers Local 324's motion to quash the *Section 10(k)*notice of hearing, in which Operating Engineers Local 324 asserted that the parties had agreed upon a method for the voluntary adjustment of the dispute--namely, the Building and Construction Trades Department, AFL-CIO's Plan for the Settlement of Jurisdictional Disputes in the Construction Industry (the Plan). Thereafter, the Employer, IBEW Local 876, and Operating Engineers Local 324 filed posthearing briefs. Upon leave by the Board, amicus curiae Plan subsequently filed a brief arguing that the Board does not have jurisdiction to determine the dispute because all parties are stipulated to the Plan. The Employer and IBEW Local 876 subsequently filed briefs in response to the amicus brief.

The National Labor Relations Board affirms the hearing officer's rulings, finding them free from prejudicial error. On the entire record, the Board makes the following findings.

I. JURISDICTION

The parties **[*3]** stipulated that during the calendar year ending December 31, 2015, the Employer, a Michigan corporation, performed services valued in excess of $ 50,000 in states other than the State of Michigan. The parties also stipulated, and we find, that the Employer is an employer engaged in commerce within the meaning of *Section 2(6)* and *(7)* of the Act and is subject to the Board's jurisdiction, and that IBEW Local 876 and Operating Engineers Local 324 are labor organizations within the meaning of *Section 2(5)* of the Act.

II. THE DISPUTE

*A. Background and Facts of the Dispute*

The Employer is an electrical contractor that performs cell tower, substation, line, and tower work, industrial electrical work, high voltage electrical and engineering and maintenance work, and voice/data/video work. The Employer has performed tower work for utility companies for over 30 years, using IBEW Local 876--represented employees to complete the work. The Employer created a cell tower division in 1990. Cell tower sites require both ground and electrical work. The Employer generally uses two-person composite crews, comprised of an IBEW Local 876--represented employee and an IBEW Local 275--represented employee, **[*4]** to complete work on cell tower sites.

The Employer has had a collective-bargaining relationship with IBEW Local 876 since the 1970s. The most recent agreement of record, the Agreement Between American Line Builders Chapter of the National Electrical Contractors Association, and Local Unions No. 17 and 876, IBEW, Covering Teledata Work (the "C Agreement"), is effective through December 3, 2017. The C Agreement covers, in pertinent part, "all construction, installation, maintenance and removal of teledata facilities (voice, data and video), including outside plant, telephone and data inside wire." The C Agreement also includes classifications of IBEW Local 876--represented employees who perform cell tower work, including cell tower techs, operators, and groundsmen.

Since 1984, the Employer also has had a collective-bargaining relationship with Operating Engineers Local 324. The Employer is bound to several collective-bargaining agreements between Operating Engineers Local 324 and certain employer organizations via a short form agreement. The short form agreement incorporates various contracts, which cover, in pertinent part, "construction of . . . roads," "any work which requires excavation **[*5]** of

earth . . . including, but not limited to, . . . conduits [and] general excavation," "steel and metal erection work," and "erection, operation, and maintenance of all hoisting and portable equipment." In addition, the short form agreement states: "The parties hereto agree that in the event of a jurisdictional dispute with any other union or unions, the dispute shall be submitted to the Impartial Jurisdictional Disputes Board for settlement in accord with the plan adopted by the Building Trades Department of the AFL-CIO."

In approximately January, Operating Engineers Local 324 Business Representative Brandon Popps began to monitor the Employer's jobsites for nonunion employees. Over the course of approximately 6 months, Popps visited about 10 of the Employer's jobsites and allegedly witnessed nonunion and IBEW Local 876--represented employees operating earth moving/ dirt digging equipment and cranes, work believed by Operating Engineers Local 324 to be under its jurisdiction pursuant to the short form agreement. In a July 8 letter to the Employer, counsel for Operating Engineers Local 324's fringe benefits funds notified the Employer that the Funds had reason to believe they were [*6] entitled to contributions for work covered by the short form agreement but assigned to employees not represented by Operating Engineers Local 324. The Funds threatened a lawsuit over the contributions. On August 12, the Employer notified IBEW Local 876 that it would be reevaluating the assignment of the work at issue and that a reassignment to Operating Engineers Local 324 was possible. IBEW Local 876, through its counsel, responded by email on August 17 that a reassignment to Operating Engineers Local 324 "would subject [the Employer] . . . to actions by [IBEW] Local 876 including, but not limited to, the filing of unfair labor practices, picketing, and other applicable conduct directed to challenge any reassignment . . . ." The Employer then filed an unfair labor practice charge, alleging that IBEW Local 876 had made a threat in violation of *Section 8(b)(4)(D)* of the Act.

On August 30, Operating Engineers Local 324 Director of Jurisdiction Terry George filed a notice of violation with the Plan seeking resolution of the jurisdictional dispute. That same day, the Plan administrator, Richard Resnick, sent a letter to the Employer's vice president, Jim Anton, and IBEW President [*7] Lonnie Stephenson instructing the parties to cease the alleged violations and process the jurisdictional dispute through the Plan. On August 31, President Stephenson sent a letter to IBEW Local 876 Business Manager Chad Clark, which stated that "[p]ursuant to the attached communication from the Plan . . . you are hereby advised to take appropriate action to cease the alleged violations and any impediment to job progress in violation of the Plan [and to] instruct [the Employer] . . . to take appropriate action to cease their impediment to job progress by withdrawing their [Board] charge over the jurisdictional dispute. " On September 1, Clark emailed Anton asking the Employer to withdraw its Board charge. On September 2, Clark sent a letter to President Stephenson confirming receipt of Stephenson's August 31 request and stating that he had "fully complied with [the] directive." At no point, however, did Clark clearly disclaim the work in dispute or withdraw IBEW Local 876's threat of picketing. Resnick subsequently selected an arbitrator, who issued an interim ruling on September 9 that all the parties are stipulated to the Plan, despite IBEW Local 876's status as an "outside" [*8] local. [2]

*B. Work in Dispute*

The parties stipulated that the work in dispute is the use of earth moving/ dirt digging equipment, cranes, and other power-driven equipment in connection with the assembly, disassembly, erection, and modification of cell towers, including the hoisting of cell towers, clearing land, and constructing roads.

*C. Contentions of the Parties*

Operating Engineers Local 324 moves to quash [*9] the notice of hearing, arguing that the parties have agreed upon a method for the voluntary adjustment of the dispute. It argues that both Operating Engineers Local 324 and

---

[2] Pursuant to IBEW Constitution, Art. 26, Sec. 4, outside locals have jurisdiction over "operation, maintenance and repair of equipment owned or operated by utility employers[;] [a]ll electrical construction work outside of isolated plants and the property lines of any given property[; and a]ll line work consisting of . . . concrete or metal . . . poles or towers, including wires, cables or other apparatus supported therefrom." In sum, "outside" locals perform work outside buildings. See *Local 181, Operating Engineers (Service Electric Co.), 146 NLRB 483, 485 fn. 3 (1964)*.

IBEW Local 876 are stipulated to the Plan through the affiliation of their respective international unions with the Building and Construction Trades Department (BCTD), AFL-CIO. It argues in addition that the Employer is stipulated to the Plan through its short form agreement with Operating Engineers Local 324, in which the Employer agreed to abide by the Plan. It also contends that IBEW President Stephenson's letter and IBEW Local 876's affirmative response to that letter "undermine" IBEW Local 876's claim that it is not stipulated to the Plan.

Alternatively, if the notice of hearing is not quashed, Operating Engineers Local 324 asserts that the work in dispute should be awarded to employees it represents based on the Board's established factors of past practice, area and industry practice, relative skills and training, and economy and efficiency of operations.

Amicus Plan, like Operating Engineers Local 324, argues that all the relevant parties here--the Employer, IBEW Local 876, and Operating Engineers Local **[*10]** 324--are stipulated to the Plan pursuant to Plan procedures and the BCTD's Constitution and thus are bound to utilize the Plan, divesting the Board of jurisdiction to determine the dispute under *Section 10(k)*.

IBEW Local 876 and the Employer contend that the Board is authorized to determine the merits of this jurisdictional dispute because IBEW Local 876, as an "outside" local, is neither stipulated to the Plan nor party to an agreement binding it or its members to the Plan, and therefore not all parties have agreed on a method for the voluntary adjustment of the dispute pursuant to the requirement of *Section 10(k)*. Specifically, they argue that the Board has repeatedly found that the Plan does not apply to or bind "outside" IBEW locals in any manner. In its response to the brief of amicus Plan, the Employer also argues that it is not stipulated to the Plan because the short form agreement between the Employer and Operating Engineers Local 324 binds the Employer only to the "Impartial Jurisdictional Disputes Board" (the Plan's predecessor), not to any successor dispute resolution mechanisms and thus not to the Plan.

On the merits, IBEW Local 876 and the Employer assert that the work **[*11]** in dispute should be awarded to employees represented by IBEW Local 876 based on the factors of their collective-bargaining agreement, employer preference, current assignment, past practice, area and industry practice, relative skills and training, and economy and efficiency of operations.

The parties have stipulated that the jurisdictional award "should apply only in the geographical area . . . in which the jurisdiction of [IBEW] Local 876 and [Operating Engineers] Local 324 overlap."

*D. Applicability of the Statute*

The Board may proceed with a determination of a dispute under *Section 10(k)* of the Act only if there is reasonable cause to believe that *Section 8(b)(4)(D)* has been violated. This standard requires finding that there is reasonable cause to believe that there are competing claims to the disputed work and that a party has used proscribed means to enforce its claim to the work in dispute. *Operating Engineers Local 150 (R&D Thiel), 345 NLRB 1137, 1139 (2005)*. Additionally, there must be a finding that there is no agreed-upon method for voluntary adjustment of the dispute to which all parties are bound.

1. Competing claims for work

The parties **[*12]** stipulated, and we find, that Operating Engineers Local 324 and IBEW Local 876 both claim the work in dispute.

2. Use of proscribed means

There is reasonable cause to believe that IBEW Local 876 used means proscribed under *Section 8(b)(4)(D)* of the Act to enforce its claim to the work in dispute. As noted above, on August 17, counsel for IBEW Local 876 sent an email to the Employer's counsel threatening to subject the Employer to certain actions, including, but not limited to, the filing of unfair labor practices, picketing and other applicable conduct if the disputed work were reassigned to Operating Engineers Local 324. The Board has long considered this type of threat to be a proscribed means of enforcing claims to disputed work. See *Laborers Local 110 (U.S. Silica), 363 NLRB No. 42, slip op. at 3 (2015)*.

3. No voluntary method for adjustment of the dispute

We further find, in agreement with the Employer and IBEW Local 876, that there is no agreed-upon method for voluntary adjustment of the dispute to which all parties are bound. It is well settled that "all parties to the dispute must be bound if an agreement is to constitute an agreed method of voluntary adjustment. [*13] " *Laborers Local 1184 (High Light Electric), 355 NLRB 167, 169 (2010)* (internal quotations omitted). The Board carefully scrutinizes the agreements at issue in order to determine if the parties are bound. Id.

The agreement between IBEW Local 876 and the Employer does not contain any provision binding Local 876 to the Plan. While IBEW Local 876 is affiliated with the IBEW, which is bound to the Plan, IBEW Local 876 Business Manager Chad Clark testified without contradiction that only "inside" IBEW locals are bound to the Plan, that IBEW Local 876 is an "outside" local, and that IBEW Local 876 is not affiliated with the BCTD. Consistent with this testimony, the Board has long "recognized the distinction between 'inside' and 'outside' locals of the IBEW and taken official note of the fact that the latter are not subject to the procedures for the resolution of jurisdictional disputes established by the [BCTD]," i.e., the Plan. *Electrical Workers, Local 44 (Utility Builders), 233 NLRB 1099, 1100 (1977)*; *Electrical Workers Local 357 (Western Diversified Electric), 344 NLRB 1239, 1240 (2005)*; *Local 542, Operating Engineers (W. V. Pangborne & Co.), 213 NLRB 124, 126-127 (1974)* [*14] (citing cases).

Operating Engineers Local 324 argues that, regardless of any exemption from the Plan enjoyed by "outside" local unions in the past, the action of IBEW Local 876's parent body, via IBEW President Stephenson's letter, and IBEW Local 876's affirmative response to that letter undermine IBEW Local 876's current claim that it is not stipulated to the Plan. Operating Engineers Local 324 asserts that if IBEW Local 876, an "outside" local, were not stipulated to the Plan, IBEW President Stephenson would not have advised the Local to cease violating the Plan and IBEW Local 876 would have objected to Stephenson's "directive" rather than indicated that it had "complied." Contrary to Operating Engineers Local 324's argument, however, we find that President Stephenson's letter alone is insufficient, under the circumstances, to establish that IBEW Local 876 is bound to the Plan in light of the countervailing evidence set forth above. [3]

[*15]

Operating Engineers Local 324 also submitted into evidence a copy of the September 9 arbitrator's decision finding that the Employer, Operating Engineers Local 324, and IBEW Local 876 were all bound under the Plan. [4] Amicus Plan argues that although IBEW did not participate in the arbitration hearing, neither IBEW nor IBEW Local 876 is relieved of its obligations under the Plan. However, the arbitrator's decision cannot bind IBEW Local 876 to the

---

[3] In *Operating Engineers Local 4 (JDC Demolition), 363 NLRB No. 17, slip op. at 2-3 (2015)*, cited by Operating Engineers Local 324 in its posthearing brief, the Board held that Operating Engineers Local 4 and Laborers' Local 1421 were stipulated to the Plan through their respective parent unions' membership in the BCTD. There the Board noted that its finding was supported by the LIUNA president's invocation of the Plan in a letter directing Laborers' Local 1421 to "cease and desist from impeding job progress by filing charges with the Board and to submit its jurisdictional dispute to the Plan." *Id., slip op. at 3*. But *JDC Demolition* involved a jurisdictional dispute between an Operating Engineers local and a Laborers local--not, as here, between an Operating Engineers local and an "outside" IBEW local--and there was no evidence that either union in that case had established a longtime policy of excluding any of its sectors from the Plan's coverage. We read the Board's citation of the president's letter in *JDC Demolition* as only further confirming its immediately preceding finding that the Laborers and Operating Engineers locals involved were both stipulated to the Plan "through their respective parent unions' membership in the BCTD, the constitution of which requires submitting jurisdictional disputes to the Plan." Id. President Stephenson's letter to IBEW Local 876 and the Local's response, without more, are insufficient to establish that IBEW Local 876 is bound to the Plan in light of the historic exclusion from the Plan and its predecessors of "outside" IBEW locals, discussed above, and the Board's longstanding recognition of that exclusion.

[4] Operating Engineers Local 324 submitted both the arbitrator's "expedited Award and Order" of September 9 and his "full Award and Order" of September 11. In his "full Award and Order," the arbitrator found that "the evidence presented by [Operating Engineers Local 324] convinced [him] that IBEW Local 876 is stipulated to the Plan, as acknowledged in their respective correspondence by the IBEW International President and IBEW Local 876 Business Manager."

Plan inasmuch as IBEW Local 876 was not party to the arbitral proceeding and did not agree to be bound by its results. *High Light Electric, 355 NLRB at 169*. [5]

**[*16]**

In these circumstances, we find that Operating Engineers Local 324 has not established that IBEW Local 876 is bound under the Plan. [6]

Based on the foregoing, we find that there is reasonable cause to believe that *Section 8(b)(4)(D)* has been violated, and we further find that there is no agreed-upon method for the voluntary adjustment of the dispute. We accordingly find that the dispute is properly before the Board for determination, and we deny Operating Engineers Local 324's motion to quash the notice of hearing.

*E. Merits of the Dispute*

*Section 10(k)* requires **[*17]** the Board to make an affirmative award of disputed work after considering various factors. *NLRB v. Electrical Workers Local 1212 (Columbia Broadcasting), 364 U.S. 573, 577-579, 81 S. Ct. 330, 5 L. Ed. 2d 302 (1961)*. The Board's determination in a jurisdictional dispute is an act of judgment based on common sense and experience, reached by balancing the factors involved in a particular case. *Machinists Lodge 1743 (J. A. Jones Construction), 135 NLRB 1402, 1410-1411 (1962)*.

The following factors are relevant in making the determination of this dispute.

1. Certifications and collective-bargaining agreements

The parties stipulated that the Employer "is not failing to conform to an order or certification of the Board determining the bargaining representative for the employees performing the disputed work."

IBEW Local 876 and Operating Engineers Local 324 are each party to a collective-bargaining agreement with the Employer. The Employer and IBEW Local 876 are parties to a C Agreement, which "covers all construction, installation, maintenance and removal of teledata facilities (voice, data and video) . . . ." The Employer and Operating Engineers Local 324 are parties to a short form **[*18]** agreement, which consists of contract language across various agreements that pertains to the cell tower construction process, including hoisting equipment, building roads and performing heavy construction work. We find that IBEW Local 876 and Operating Engineers Local 324 both have language in their agreements arguably covering the work in dispute. We therefore find that this factor does not favor awarding the work to employees represented by either union. See Laborers Local 860 (Ronyak Paving, Inc.), 360 NLRB 236, 240 (2014).

2. Employer preference, current assignment, and past practice

"The factor of employer preference is generally entitled to substantial weight." Laborers Local 265 (Henkels & McCoy, Inc.), 360 NLRB 819, 824 (2014). Employer Vice President Anton testified that the Employer prefers that IBEW Local 876--represented employees perform the work in dispute, and those employees are currently performing this work. See *Laborers Local 265 (AMS Construction), 356 NLRB 306, 310 (2010)* (according weight to employer's stated preference and also considering its current assignment of work in dispute). The Employer's preference **[*19]** and current assignment are also consistent with its past practice of assigning this and similar work to IBEW Local 876--represented employees for the past 30 years. See *Utility Builders, 233 NLRB at 1102*.

---

[5] Even if the arbitrator's decision establishes that the International is bound under the Plan, it does not necessarily follow that IBEW Local 876 was so bound for the reasons stated above.

[6] We find it unnecessary to decide whether the Employer was bound under the Plan because all parties to the dispute must be bound if an agreement is to constitute an agreed-upon method of voluntary adjustment, *High Light Electric, 355 NLRB at 169*, and we find that IBEW Local 876 is not bound to the Plan. We also need not address IBEW Local 876's contention that the Plan's arbitration procedure was deficient in this instance.

Accordingly, we find that the factors of employer preference, current assignment, and past practice all favor an award of the disputed work to employees represented by IBEW Local 876.

3. Area and industry practice

IBEW Local 876 Bargaining Unit Foreman Nate Breen testified that he formerly worked as a cell tower technician for Kent Power, a union contractor subject to the same C Agreement between IBEW Local 876 and the Employer. Operating Engineers Local 324's Business Manager, Doug Stockwell, testified that Operating Engineers Local 324--represented employees perform the type of work in dispute here for several other companies. In view of the fact that both IBEW Local 876--represented employees and Operating Engineers Local 324--represented employees have performed the type of work in dispute here for other employers in the industry, we find that the factor of area and industry practice does not favor awarding the work to employees represented by either union. **[*20]** See *Plumbers, Local Union No. 741 (The Ashton Company), 256 NLRB 1022, 1025 (1981)*.

4. Relative skills and training

IBEW Local 876 presented testimony that the employees it represents possess specific skills and training relevant to the performance of the disputed work. IBEW Local 876--represented employees have been and are performing the work in dispute for the Employer, which confirms that they possess the requisite skills. In addition, Breen testified that IBEW Local 876--represented employees receive comtraining, which teaches cell tower climbing safety; radio frequency training, which teaches how to handle live antennas at cell tower sites; and railroad safety training, which teaches procedures for working at a railroad cell tower site.

Operating Engineers Local 324 also presented testimony that the employees it represents possess the requisite skills and training to perform the disputed work. Operating Engineers Local 324 Executive Director for Labor Management Lee Graham testified that Operating Engineers Local 324's extensive apprenticeship program provides instruction in the operation of heavy equipment. Moreover, Operating Engineers Local 324--represented **[*21]** employees perform the type of work in dispute here for several other companies, which further demonstrates that they possess the requisite skills.

In view of the fact that both IBEW Local 876--represented employees and Operating Engineers Local 324--represented employees possess the requisite skills and training to perform the work in dispute, we find that this factor does not favor awarding the work to employees represented by either union.

5. Economy and efficiency of operations

Employer Vice President Anton testified that it is more economical and efficient to assign the disputed work to employees represented by IBEW Local 876 because the Employer can use two-person composite crews, with one IBEW Local 876--represented employee performing the main tasks of digging, trenching, and cementing foundations while also assisting one IBEW Local 275--represented employee with pulling electrical wire. Anton further testified that if the Employer were forced to use an Operating Engineers Local 324--represented employee in place of an IBEW Local 876--represented employee, the Employer would have to add a third man to its composite crews, decreasing efficiencies and raising costs. Anton also **[*22]** testified that there would not be enough work for the Operating Engineers Local 324--represented employee, who could not be substituted for one of the existing crew members because he or she does not perform the same tasks. Accordingly, we find that the factor of economy and efficiency of operations favors awarding the disputed work to the employees represented by IBEW Local 876. See, e.g., *Seafarers District NMU (Luedtke Engineering Co.), 355 NLRB 302, 305 (2010)* (finding economy and efficiency favors awarding work to employees who can perform all aspects of work in dispute over employees who can perform only one aspect); *R&D Thiel, 345 NLRB at 1141* (considering additional costs associated with one group of employees sitting idle while another group works); *Laborers Local 113 (Michels Pipeline Construction), 338*

*NLRB 480, 484 (2002)* (observing that "[h]aving fewer employees accomplishing the same task . . . reduces costs in time, money, and personal safety"). [7]

**[*23]**

CONCLUSION

After considering all the relevant factors, we conclude that employees represented by IBEW Local 876 are entitled to perform the work in dispute. We reach this conclusion relying on the factors of employer preference, current assignment, past practice, and economy and efficiency of operations. In making this determination, we award the work to employees represented by IBEW Local 876, not to that labor organization or to its members.

Scope of Award

The Board customarily does not grant an award of the work in dispute beyond the specific jobsites involved when the charged party represents the employees to whom the work is awarded and to whom the employer contemplates continuing to assign the work. *Laborers Local 243 (A. Amorello & Sons), 314 NLRB 501, 503 (1994)*. Consistent with the Board's customary practice and with the fact that the parties have stipulated that the jurisdictional award should apply only in the geographical area in which their jurisdictions overlap, we so limit the scope of this award.

DETERMINATION OF DISPUTE

The National Labor Relations Board makes the following Determination of Dispute.

Employees of Newkirk Electric Associates, **[*24]** Inc. represented by International Brotherhood of Electrical Workers, Local 876, are entitled to use earth moving/ dirt digging equipment, cranes, and other power-driven equipment in connection with the assembly, disassembly, erection, and modification of cell towers, including the hoisting of cell towers, clearing land, and constructing roads, when working for the Employer in the geographical area where the jurisdictions of IBEW Local 876 and Operating Engineers Local 324 overlap.

---

**End of Document**

---

[7] Member Pearce relies on this factor only to the extent that the record shows that there would not be enough work for Operating Engineers Local 324--represented employees because they do not perform all the same tasks as employees represented by IBEW Local 876.

Q Questioned
As of: February 21, 2019 9:24 PM Z

## *Carter v. Welles-Bowen Realty, Inc.*

United States Court of Appeals for the Sixth Circuit

April 28, 2008, Argued; January 23, 2009, Decided; January 23, 2009, Filed

File Name: 09a0024p.06

No. 07-3965

### Reporter

553 F.3d 979 *; 2009 U.S. App. LEXIS 1288 **; 2009 FED App. 0024P (6th Cir.) ***

ERICK C. CARTER, et al., Plaintiffs-Appellants, UNITED STATES OF AMERICA, Intervenor, v. WELLES-BOWEN REALTY, INC., et al., Defendants-Appellees.

**Subsequent History:** Class certification denied by *Carter v. Welles-Bowen Realty, Inc., 2010 U.S. Dist. LEXIS 22476 (N.D. Ohio, Mar. 11, 2010)*

**Prior History: [**1]** Appeal from the United States District Court for the Northern District of Ohio at Toledo. No. 05-07427. Jack Zouhary, District Judge.

*Carter v. Welles-Bowen Realty, Inc., 493 F. Supp. 2d 921, 2007 U.S. Dist. LEXIS 41595 (N.D. Ohio, 2007)*

**Disposition:** The district court's judgment was reversed and the case was remanded.

## Core Terms

settlement, referral, overcharge, services, kickbacks, district court, real estate, providers, individuals, consumers, injury-in-fact, requirements, charges, damages, business arrangement, three times, provisions, persuasive authority, concrete, confer, rights, split

## Case Summary

### Procedural Posture

The United States District Court for the Northern District of Ohio granted a motion to dismiss filed by defendants, a real estate agency, a title company, and their shared co-owners, holding plaintiff home buyers lacked standing to bring a claim under *12 U.S.C.S. § 2607* of the Real Estate Settlement Procedures Act of 1974 because they did not allege any overcharge or other concrete injury. The buyers appealed. The United States intervened.

### Overview

The ordinary definition of "any " in *§ 2607(a)-(b)* indicated that charges were neither restricted to a particular type of charge (such as an overcharge) nor limited to a specific part. The term "overcharge" was conspicuously absent from the statute. "Such settlement services" referred to "settlement services involved in the violation." Thus, a defendant was liable for charges assessed for settlement services as a whole, not just for overcharges. The United States Department of Housing and Urban Development also favored the view that *§ 2607(d)(2)* did not impose an "overcharge requirement" on potential plaintiffs. By alleging both that the sole purpose for the creation of the title company was to enable one of the owners to provide the real estate agency with kickbacks in exchange for referrals, and that the buyers received a referral from the real estate agency, the buyers had adequately alleged that their own RESPA rights were violated and they had standing. Receiving a loan accompanied by an unlawful referral was an individualized injury.

### Outcome

The district court's judgment was reversed and the case was remanded.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Appellate Jurisdiction > General Overview

553 F.3d 979, *979; 2009 U.S. App. LEXIS 1288, **1; 2009 FED App. 0024P (6th Cir.), ***Cir.)

## HN1[⬇] Appeals, Appellate Jurisdiction

*28 U.S.C.S. § 1291* provides that the courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States.

> Civil Procedure > Appeals > Standards of Review > De Novo Review

> Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

## HN2[⬇] Standards of Review, De Novo Review

Where a district court rules on a *Fed. R. Civ. P. 12(b)(1)* motion to dismiss that attacks the claim of jurisdiction on its face, the appellate court reviews the decision de novo.

> Civil Procedure > ... > Justiciability > Standing > General Overview

> Constitutional Law > ... > Case or Controversy > Standing > General Overview

## HN3[⬇] Justiciability, Standing

U.S. Const. art. III requires that the party invoking federal jurisdiction have standing.

> Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

## HN4[⬇] Real Estate Settlement Procedures, Kickbacks & Prohibited Fees

Section 8 of the Real Estate Settlement Procedures Act of 1974, *12 U.S.C.S. § 2607*, prohibits kickbacks and unearned fees.

> Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

## HN5[⬇] Real Estate Settlement Procedures, Kickbacks & Prohibited Fees

See *12 U.S.C.S. § 2607(a)*, *(b)*.

> Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

## HN6[⬇] Real Estate Settlement Procedures, Kickbacks & Prohibited Fees

The Real Estate Settlement Procedures Act of 1974 provides that defendants who violate the prohibitions or limitations of *12 U.S.C.S. § 2607* shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service. *12 U.S.C.S. § 2607(d)(2)*.

> Civil Procedure > ... > Justiciability > Standing > General Overview

> Constitutional Law > ... > Case or Controversy > Standing > Elements

## HN7[⬇] Justiciability, Standing

Congress unequivocally has the power to create new interests the invasion of which will confer standing. When Congress has so acted, the requirements of U.S. Const. art. III remain: (1) injury-in-fact, (2) causation, and (3) redressability. Nevertheless, Congress cannot enact a statute that directly grants standing to a plaintiff who otherwise does not satisfy the U.S. Const. art. III requirements, and thus the court must conduct a detailed consideration of the statute at issue, to discern whether Congress created a statutory right or entitlement the alleged depravation of which can confer standing to sue.

> Governments > Legislation > Interpretation

## HN8[⬇] Legislation, Interpretation

According to traditional canons of statutory interpretation, remedial statutes should be construed broadly to extend coverage and their exclusions or exceptions should be construed narrowly. With this in mind, courts begin an interpretation by looking first to the plain language of the statute. If the language of the

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 71 of 212 PAGEID #: 2065

Page 3 of 11

553 F.3d 979, *979; 2009 U.S. App. LEXIS 1288, **1; 2009 FED App. 0024P (6th Cir.), ***Cir.)

statute is clear, then the inquiry is complete, and the court should look no further. In discerning legislative meaning, the court considers other persuasive authority only if the statute is "inescapably ambiguous." Persuasive authority includes other statutes, interpretations by other courts, legislative history, policy rationales, and the context in which the statute was passed.

Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

Governments > Legislation > Interpretation

*HN9*[⤓] **Real Estate Settlement Procedures, Kickbacks & Prohibited Fees**

There is little doubt as to the remedial nature of the Real Estate Settlement Procedures Act of 1974's (RESPA) provisions, given Congress's finding that significant reforms in the real estate settlement process are needed, and that it specifically enacted RESPA to effect certain changes in the settlement process for residential real estate that would result, in part, in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services. *12 U.S.C.S. § 2601(a)*, *(b)(1)*.

Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

*HN10*[⤓] **Real Estate Settlement Procedures, Kickbacks & Prohibited Fees**

The Real Estate Settlement Procedures Act of 1974 (RESPA) prohibits -- in no uncertain terms -- the payment of "any fee, kickback, or thing of value" from business referrals and also forbids that a portion, split, or percentage of any charge made or received for the rendering of real estate settlement be paid for services that are not actually rendered to the customer. *12 U.S.C.S. § 2607(a)-(b)*. Where a violation of these blanket prohibitions occur, the plain language of the statute provides that defendants are liable to the person or persons charged for the settlement service involved in the violation for an amount equal to three times the amount of any charge paid for such settlement service. *12 U.S.C.S. § 2607(d)(2)*. RESPA defines "settlement

services" as any service provided in connection with a real estate settlement including, but not limited to, title searches, title insurance, attorney services, appraisals, credit reports, pest and fungus inspections, real estate agent or broker services, loan processing, etc. *12 U.S.C.S. § 2602(3)*.

Governments > Legislation > Interpretation

*HN11*[⤓] **Legislation, Interpretation**

When the text of a statute contains an undefined term, that term receives its ordinary and natural meaning.

Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

Governments > Legislation > Interpretation

*HN12*[⤓] **Real Estate Settlement Procedures, Kickbacks & Prohibited Fees**

The ordinary definition of "any " as used in *12 U.S.C.S. § 2607(a)-(b)* indicates that charges are neither restricted to a particular type of charge (such as an overcharge) nor limited to a specific part. Further, there is a conspicuous absence of the term "overcharge" within the text of the statute, and the phrase "such settlement services" refers to the preceding phrase "settlement services involved in the violation." *12 U.S.C.S. § 2607(d)(2)*. A defendant is liable for the charges assessed the home buyer for settlement services as a whole, and not just for overcharges.

Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

*HN13*[⤓] **Real Estate Settlement Procedures, Kickbacks & Prohibited Fees**

The United States Department of Housing and Urban Development is the agency charged with administering and interpreting the Real Estate Settlement Procedures Act of 1974. *12 U.S.C.S. § 2617(a)*. As such, its regulations are instructive in discerning the meaning of the statute's provisions.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 72 of 212 PAGEID #: 2066

Page 4 of 11

553 F.3d 979, *979; 2009 U.S. App. LEXIS 1288, **1; 2009 FED App. 0024P (6th Cir.), ***Cir.)

Administrative Law > Judicial Review > Standards of Review > Deference to Agency Statutory Interpretation

Governments > Legislation > Interpretation

### HN14[↓] Standards of Review, Deference to Agency Statutory Interpretation

Even in the absence of a regulation elucidating a specific provision of a statute pursuant to an express delegation of authority, the views of an agency charged with applying a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.

Governments > Legislation > Interpretation

### HN15[↓] Legislation, Interpretation

As part of statutory interpretation, a court must consider the overall intent of the statute.

Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

Governments > Legislation > Interpretation

### HN16[↓] Real Estate Settlement Procedures, Kickbacks & Prohibited Fees

Injury in a Real Estate Settlement Procedures Act of 1974 (RESPA) case can be shown by harm other than allegations of overcharges, as the alleged 12 U.S.C.S. § 2607(a) violation presents the possibility for other harm, including a lack of impartiality in the referral and a reduction of competition between settlement service providers. Therefore, RESPA allows individuals to police the marketplace in order to ensure impartiality of referrals and competition between settlement service providers, thereby creating a market-wide deterrent against unnecessarily high settlement costs. Ultimately, the purpose of the statute is to prevent certain practices that are harmful to all consumers by establishing that consumers have a right not to be subject to those practices and providing both public and private remedies of that right.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or Controversy > Standing > Elements

### HN17[↓] Standing, Injury in Fact

Congress no doubt has the power to create new legal rights, and it generally has the authority to create a right of action whose only injury-in-fact involves the violation of that statutory right. But that congressional authority is not unlimited. Among other things, Congress may confer standing to redress injuries only on parties who actually have been deprived of the newly established statutory rights: the injury in fact test requires that the party seeking review be himself among the injured.

Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

### HN18[↓] Real Estate Settlement Procedures, Kickbacks & Prohibited Fees

The Real Estate Settlement Procedures Act of 1974 creates an individual right to receive referral services untainted by kickbacks or fee-splitting. 12 U.S.C.S. § 2607(a)-(b).

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or Controversy > Standing > Elements

### HN19[↓] Standing, Injury in Fact

Congress may empower individuals to sue based only on personal and individualized injuries. Standing does not exist, for example, to enforce an abstract, self-contained, noninstrumental "right" to have the Executive observe the procedures required by law. Even though an injury need not be economic in nature, it still must cause individual, rather than collective, harm.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 73 of 212 PAGEID #: 2067

Page 5 of 11

553 F.3d 979, *979; 2009 U.S. App. LEXIS 1288, **1; 2009 FED App. 0024P (6th Cir.), ***Cir.)

Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

**HN20**[⬇]  **Real Estate Settlement Procedures, Kickbacks & Prohibited Fees**

The Real Estate Settlement Procedures Act of 1974 does not authorize suits by members of the public at large; it authorizes suits only by individuals who receive a loan that is accompanied by an unlawful referral, which is plainly an individualized injury.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact

Constitutional Law > ... > Case or Controversy > Standing > Elements

**HN21**[⬇]  **Standing, Injury in Fact**

The actual or threatened injury required by U.S. Const. art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.

Banking Law > Consumer Protection > Real Estate Settlement Procedures > Kickbacks & Prohibited Fees

**HN22**[⬇]  **Real Estate Settlement Procedures, Kickbacks & Prohibited Fees**

Congress, in the Real Estate Settlement Procedures Act of 1974, created a private right of action to impose damages where kickbacks and unearned fees have occurred -- even where there is no overcharge.

**Counsel:** ARGUED: John T. Murray, MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellants.

Richard H. Carr, BALK, HESS & MILLER, Toledo, Ohio, Andrew S. Pollis, HAHN LOESER, Cleveland, Ohio, for Appellees.

ON BRIEF: John T. Murray, MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellants.

Richard H. Carr, BALK, HESS & MILLER, Toledo, Ohio, Stuart J. Goldberg, Barry W. Fissel, EASTMAN & SMITH, Toledo, Ohio, for Appellees.

Christine N. Kohl, Michael Jay Singer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.

**Judges:** Before: BATCHELDER and SUTTON, Circuit Judges; BARZILAY, Judge. *

**Opinion by:** BARZILAY

# Opinion

**[\*982]  [\*\*\*2]**  BARZILAY, Judge. This appeal involves the issue of whether an allegation that section 8 of the Real Estate Settlement Procedures Act of 1974 ("RESPA"), *12 U.S.C. § 2607*, has been violated confers standing even if the consumer does not allege an above-market rate charge for services, *i. e.* an "overcharge." The district court, in an opinion and order **[\*\*2]** granting the Defendants-Appellees' Motion to Dismiss, held Plaintiffs-Appellants lacked standing to bring a claim under *§ 2607* because they did not allege any overcharge or other concrete injury. *See Carter v. Welles-Bowen Realty, Inc., 493 F. Supp. 2d 921, 927 (N.D. Ohio 2007)* ("*Carter I*"). Appellants now appeal, arguing that this court should reject the district court's "overcharge approach" to standing. For the reasons stated below, the court reverses the decision of the district court and remands the matter to the district court for further proceedings consistent with this opinion.

## I. Background

On September 1, 2005, Appellants Erick and Whitney Carter ("the Carters") entered into a residential real estate purchase agreement for a home in Perrysburg, Ohio. The Carters were represented in this transaction by the real estate agency of Appellee Welles-Bowen Realty, Inc. ("WB Realty"). WB Realty is co-owned by Appellees Welles-Bowen Investors, LLC ("WB Investors") and Chicago Title Insurance Company ("Chicago Title"). [1] Based on WB Realty's referral, the Carters utilized WB Title at the close of their purchase agreement to perform real estate settlement services. WB Title charged the **[\*\*3]** Carters $ 946.28 for title

---

* The Honorable Judith M. Barzilay, Judge for the United States Court of International Trade, sitting by designation.

[1] The former owns a 49.9% share of Welles-Bowen Title Agency, LLC ("WB Title"), while the latter owns the remaining 51.1% share.

553 F.3d 979, *982; 2009 U.S. App. LEXIS 1288, **3; 2009 FED App. 0024P (6th Cir.), ***2

insurance, which consisted of $ 696.28 for an owner's policy, $ 75.00 for a title commitment or binder, $ 100.00 for survey coverage, and $ 75.00 for an Environmental Protection Lien ("EPL") endorsement. JA 221. Each **[***3]** of these charges was detailed in an Affiliated Business Arrangement Disclosure Statement, which the Carters reviewed prior to closing.

The Carters filed a complaint on November 9, 2005, alleging that the Appellees violated sections 8(a) and 8(b) of RESPA, codified at *12 U.S.C. § 2607 (a)* and *(b)*. Specifically, the Carters alleged that WB **[*983]** Title violates RESPA's anti-kickback and anti-fee-splitting provisions because the entity itself does not and can not provide settlement services. WB Title is allegedly a sham title company which does not perform any settlement work but still receives unearned revenues while the real settlement work is actually performed by Chicago Title. Further, the Carters claim that the Appellees' arrangement allows Chicago Title to provide illegal kickbacks to WB Realty in exchange for the referral **[**4]** of settlement work; WB Realty would receive kickbacks or splits in the form of their share of WB Title's profits, while Chicago Title would be paid for its work through its share of the ownership of WB Title. Crucially, the Carters do not allege that they were overcharged for the title insurance or settlement services. In December 2005, the Appellees responded that WB Title is permissible as an "affiliated business arrangement" as defined by *12 U.S.C. § 2602 (7)*. They further asserted that WB Title does not violate *§ 2607(a)* or *(b)* because it satisfies the safe-harbor provision laid out in *§ 2607(c)(4)*.

Nearly a year later, the Carters filed a Motion for Class Certification seeking to certify a class which would include any other similarly situated persons. The proposed class would consist of any individuals who paid WB Title for real estate settlement services if they were referred by WB Realty. In response to this motion, the Appellees filed a Motion to Dismiss, pursuant to *Fed.R.Civ.P. 12(b)(1)* and *12(b)(6)*, alleging that the court lacks subject matter jurisdiction because the Carters had suffered no injury-in-fact and thus have no standing.

The District Court granted the Motion to **[**5]** Dismiss for lack of subject matter jurisdiction. The court held that the Carters did not allege any concrete, particularized injury and thus lacked standing to bring a claim under *§ 2607(a)* or *(b)*. See *Carter I,* **[***4]** *493 F. Supp. 2d at 927.* In so ruling, the court also denied the Carters' Motion for Class Certification as moot. *Id.* The Carters

now appeal.

Although several United States district courts have addressed this issue -- and arrived at different conclusions -- no circuit court has squarely confronted the issue of standing in the absence of monetary injury. Even among the district courts, no consistent interpretation of the phrase "any charges paid" has emerged, with some courts finding that the plaintiff need not pay an overcharge in order to have standing to bring suit [2] and others concluding the opposite. [3] Consequently, as part of its deliberations on this issue, the court notified the U.S. Department of Housing and Urban Development ("HUD") and the Attorney General that this case involves an as-applied constitutional challenge to RESPA. See *28 U.S.C. § 2403(a)*; *Fed.R.App.P. 44(a).* Further, it solicited the government's views on whether consumers **[*984]** alleging a *§ 2607(a)-(b)* violation, **[**6]** absent an overcharge, have standing and whether RESPA, as applied in this case, violates Article III. The government, therefore, intervened in the case and filed a brief supporting Appellants' interpretation of the statute.

## II. Jurisdiction and Standard of Review

The Sixth Circuit has jurisdiction over this appeal pursuant to *HN1*[↑] *28 U. S. C. § 1291*, which provides that the courts of appeals "shall have jurisdiction of appeals from all final decisions of the district courts of the United States." *§ 1291.*

---

[2] See *Alexander v. Washington Mut., Inc., 2008 U.S. Dist. LEXIS 50523, 2008 WL 2600323, at *6 (E.D. Pa. June 30, 2008)*; *Capell v. Pulte Mortgage L.L.C., 2007 U.S. Dist. LEXIS 82570, 2007 WL 3342389, at *4-5 (E.D. Pa. Nov. 7, 2007)*; *Edwards v. First American Corp., 517 F. Supp. 2d 1199, 1204 (C.D. Cal. 2007)*; *Yates v. All American Abstract Co., 487 F. Supp. 2d 579, 582 (E.D. Pa. 2007)*; *Robinson v. Fountainhead Title Group Corp., 447 F. Supp. 2d 478, 488-89 (D. Md. 2006)*; **Kahrer v. Ameriquest Mortgage Co., 418 F. Supp. 2d 748, 756 (W.D. Pa. 2006)**; *Patton v. Triad Guar. Ins. Corp.,* No. CV100-132, at *5-6, 12 (S.D. Ga. Oct. 10, 2002)*; *Pedraza v. United Guar. Corp., 114 F. Supp. 2d 1347 (S.D. Ga. 2000)*.

[3] See *Carter I, 493 F. Supp. 2d at 927*; *Contawe v. Crescent Heights of America, Inc., 2004 U.S. Dist. LEXIS 20344, 2004 WL 2244538, *3-4 (E.D. Pa. Oct. 1, 2004)*; *Mullinax v. Radian Guaranty, Inc., 311 F. Supp. 2d 474, 486 (M.D.N.C. 2004)*; *Moore v. Radian Group, Inc., 233 F. Supp.2d 819, 825-26 (E.D. Tex. 2002)*; *Morales v. Attorneys' Title Ins. Fund, 983 F. Supp. 1418, 1427 (S.D. Fla. 1997)*; **[**7]** *Durr v. Intercounty Title Co. of Ill., 826 F. Supp. 259, 260-62 (N.D. Ill. 1993)*.

**HN2**[↑] Where a district court rules on a 12(b)(1) motion to dismiss that attacks the claim of jurisdiction on its face, this Court reviews the decision de novo. *Abbott v. Michigan,* **[\*\*\*5]** *474 F.3d 324, 328 (6th Cir. 2007); see Fed.R.Civ.P. 12(b)(1).* In arguing that the Carters do not have standing to sue because they do not meet the constitutional Article III requirement of injury-in-fact, Appellees challenged the court's jurisdiction over the case. *See Davis v. Federal Election Comm'n, 128 S. Ct. 2759, 2768, 171 L. Ed. 2d 737 (2008)* (**HN3**[↑]) Article III "requires that the party invoking federal jurisdiction have standing"). Accordingly, we review the district court's decision to dismiss the case de novo.

### III. Discussion

At the heart of this controversy lies a single question: whether a plaintiff must allege a concrete injury such as an overcharge in order to have standing **[\*\*8]** for a RESPA violation. The Carters contend that the district court erred in finding that they lack standing to sue under *§ 8 of RESPA* because they "do not allege any overcharge or other concrete injury." [4] *Carter I, 493 F. Supp. 2d at 927.* Specifically, the Carters argue that the district court's interpretation of *§ 8* does not accord with the plain meaning of the statutory language and is inconsistent with Congress' intent. Appellant Br. 7-8. Further, the Carters believe that the court should have followed the reasoning in *Kahrer. See Kahrer, 418 F. Supp. 2d at 753* (holding that an overcharge is not necessary for a plaintiff to bring suit on a RESPA violation).

---

[4] Appellees argued in the court below that the Carters did not have standing to sue under *§ 8 of RESPA* because they "have not met the 'injury-in-fact' requirement for Article III standing because they were not overcharged for settlement services." *Carter I, 493 F. Supp. 2d at 924.* The Carters, in turn, argued that RESPA "creates a right to a free and competitive marketplace, and [Appellees'] interference with this right constitutes an injury in fact." *Id.* (quotations and citation omitted). To reach its conclusion, the district **[\*\*9]** court relied on the logic of the decisions in *Morales* and *Moore. See id.* In *Morales,* the court concluded that the measure of damages for a RESPA violation consisted of three times the amount by which the plaintiff was overcharged as a result of the illegal kickback scheme. *See Morales, 983 F. Supp. at 1427.* The *Moore* court addressed this same issue and went further, holding that a plaintiff's private right of action under RESPA's kickback provision was limited to situations where the plaintiff was actually overcharged. *See Moore, 233 F. Supp. 2d at 825.*

In contrast, Appellees rely on the *Moore, Morales,* and *Durr* line of cases to argue that "Congress did not grant a right of action to private plaintiffs to seek recovery of damages when private plaintiffs have not suffered any harm in the form of economic damages or in the form of inflated services without providing any benefits to home buyers." Appellees Br. 12-13; *Moore, 233 F. Supp. 2d 819; Morales, 983 F. Supp. 1418; Durr, 826 F. Supp. 259.* Further, Appellees allege that because the Carters have not **[\*\*\*6]** alleged either economic **[\*985]** damages or an overcharge, they do not meet the Article III requirements of injury.

At issue in this case is **HN4**[↑] *§ 8 of RESPA* **[\*\*10]** which prohibits kickbacks and unearned fees. In relevant part, the statute states the following:

> **HN5**[↑] (a) Business referrals
> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.
> (b) Splitting charges
> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

*12 U.S.C. § 2607(a)-(b).* In addition, **HN6**[↑] RESPA provides that defendants "who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount *of any charge paid for such settlement service.*" *§ 2607(d)(2)* (emphasis added).

### A. Applicable Legal Standards

The court will first assess whether RESPA provides the plaintiffs a right **[\*\*11]** to relief and then examine whether they have standing to pursue their claims. **HN7**[↑] Congress unequivocally has the power to create new interests the invasion of which will confer standing. *See Jet Courier Serv. v. Fed. Res. Bank of Atlanta, 713 F.2d 1221, 1226 n.22 (6th Cir. 1983); see also Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S. Ct. 1146, 35 L. Ed. 2d 536 (1973).* When Congress has so acted,

the requirements of Article III remain: (1) injury-in-fact, (2) causation, and (3) redressability. *See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*; *Jet Courier Serv., 713 F.2d at 1226 n.22*. Nevertheless, "Congress cannot **[***7]** enact a statute that directly grants standing to a plaintiff who otherwise does not satisfy the Article III requirements," and thus the court must conduct a "detailed consideration of the statute at issue, to discern whether Congress create[d] a statutory right or entitlement the alleged depravation of which can confer standing to sue." *Am. Civil Liberties Union v. Nat'l Sec. Agency, 493 F.3d 644, 677 n.34* (quotations and citation omitted).

**HN8**[⬆] According to "traditional canons of statutory interpretation, remedial statutes should be construed broadly to extend coverage and their exclusions or exceptions **[**12]** should be construed narrowly." *Cobb v. Contract Transport, Inc., 452 F.3d 543, 559 (6th Cir. 2006)*; *see Sutton v. United Air Lines, Inc., 527 U.S. 471, 504, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999)* ("It has long been a 'familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.'" (quoting *Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S. Ct. 548, 19 L. Ed. 2d 564 (1967)*)). [5] With this in mind, **[*986]** the court begins its interpretation by looking first to the plain language of the statute. *See U.S. v. Turner, 465 F.3d 667, 671 (6th Cir. 2006)*. "If the language of the statute is clear, then the inquiry is complete, and the court should look no further." *Brilliance Audio, Inc. v. Haights Cross Commc'n, Inc., 474 F.3d 365, 371 (6th Cir. 2007)* (citations omitted). In discerning legislative meaning, the court considers other persuasive authority only if the statute is "inescapably ambiguous." *Id.* (citations omitted); *see Limited, Inc. v. C.I.R., 286 F.3d 324, 332 (6th Cir. 2007)* ("Resort to legislative history is not appropriate, however, if the text of the statute may be read unambiguously and reasonably."). Persuasive authority includes other statutes, interpretations by other courts, legislative **[**13]** history, policy rationales, and the context in which the statute was passed. *Brilliance*

*Audio, Inc., 474 F.3d at 372*; see *Crandon v. U.S., 494 U.S. 152, 158, 110 S. Ct. 997, 108 L. Ed. 2d 132 (1990)* ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.").

**[***8] B. Statutory Interpretation**

*1. Plain Language*

**HN10**[⬆] The statute prohibits -- in no uncertain terms -- the payment of "any fee, kickback, or thing of value" from business referrals and also forbids that a "portion, split, or percentage of any charge made or received for the rendering of real estate settlement" be paid for services that are not actually rendered to the customer. [6] *§ 2607(a)-(b)*. **[**14]** Where a violation of these blanket prohibitions occur, the plain language of the statute provides that defendants are liable to the "person or persons charged for the settlement service involved in the violation for an amount equal to three times the amount of *any charge paid* for such settlement service." *§ 2607(d)(2)* (emphasis added).

This Court has previously held that **HN11**[⬆] "[w]hen the text of a statute contains an undefined term, that term receives its ordinary and natural meaning." *Limited, Inc., 286 F.3d at 332*. According to *Webster's New Collegiate Dictionary*, the term "any " means "1: one or some indiscriminately of whatever kind" and "[2(b)]: all -- used to indicate a maximum or a whole." *Webster's Ninth New Collegiate Dictionary* 93 (9th ed. 1988). **HN12**[⬆] The ordinary definition of "any " indicates that charges are neither restricted to a particular *type* of charge **[**15]** (such as an overcharge) nor limited to a specific *part*. Further, the court notes not only the conspicuous absence of the term "overcharge" within the text of the statute, but also that the phrase "such settlement services" refers to the preceding phrase "settlement services involved in the violation." *§ 2607(d)(2)*; Intervenor Br. 12-13. Taking these factors into consideration, the court finds that a defendant is liable for the charges assessed the home buyer for settlement services *as a whole*, and not just for

---

[5] **HN9**[⬆] There is little doubt as to the remedial nature of RESPA's provisions given Congress's finding that "significant reforms in the real estate settlement process are needed," and that it specifically enacted RESPA "to effect certain changes in the settlement process for residential real estate" that would result, in part, "in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." *12 U.S.C. § 2601(a)*, *(b)(1)*.

---

[6] RESPA defines "settlement services" as "any service provided in connection with a real estate settlement" including, but not limited to, title searches, title insurance, attorney services, appraisals, credit reports, pest and fungus inspections, real estate agent or broker services, loan processing, etc. *See 12 U.S.C. § 2602(3)*.

overcharges.

**[***9]** *2. Persuasive Authorities*

Because of the varying views of other courts reviewing these provisions and the arguable ambiguity of the "any charges paid" phrase in the statute, [7] the court now turns to the various persuasive authorities available to help guide its analysis. *Brilliance* **[*987]** *Audio, Inc., 474 F.3d at 372*; *Limited, Inc., 286 F.3d at 332*.

*a. Legislative History*

The legislative history shows that RESPA's damages provision, as originally enacted, stated that a person who violates *§ 2607* is liable "for three times the amount of the *proscribed payment*, kickback or referral fee." S. Rep. No. 93-866, at 16 (1974), *as reprinted in* 1974 **[**16]** U.S.C.C.A.N. 6546, 6552 (emphasis added). Specifically, the 1974 version of the statute provided that

> [A]ny person or persons who violate the provisions of subsection (a) shall be jointly and severally liable to the person or persons whose business has been referred in an amount equal to three times the value or amount of the fee or *thing of value*, and any person or persons who violate the provisions of subsection (b) shall be jointly and severally liable to the person or persons charged for the settlement services involved in an amount equal to three times the amount of the portion, split, or percentage.

Real Estate Settlement Procedures Act of 1974, Pub. L. No. 93-533 § 8(D)(2), 88 Stat. 1724 (1974) (emphasis added). In the years following RESPA's enactment, however, it became clear that the provision "failed to account for 'controlled business arrangements' . . . whereby an entity could provide a referral without the direct payment of a referral fee." *Edwards, 517 F. Supp. 2d. at 1203*. Indeed, in 1982, a House Committee Report noted that such practices could result in harm to consumers beyond an increase in the cost of settlement services:

> [In controlled business arrangements] **[**17]** advice of the person making the referral may lose its impartiality and may not be based on his professional evaluation of the quality of service provided if the referror or his associates have a financial interest in the company being **[***10]**

recommended. . . . [Because the settlement service industry] almost exclusively rel[ies] on referrals . . . the growth of controlled business arrangements *effectively reduce the kind of healthy competition generated by independent settlement service providers.*

*Kahrer, 418 F. Supp.2d at 754* (quoting H.R. Rep. No. 97-532, at 52 (1982)) (emphasis added). Motivated by these fee-less situations, Congress amended RESPA's damages provision the following year, replacing the "thing of value" language with the phrase "any charge paid for such settlement services." *§ 2607(d)(2)*; *see Edwards, 517 F. Supp. 2d at 1204*.

*b. Agency Regulations*

As the government points out, **HN13[⬆]** HUD is the agency charged with administering and interpreting RESPA. *See 12 U.S.C. § 2617(a)*. As such, its regulations are instructive in discerning the meaning of the statute's provisions. *See Skidmore v. Swift & Co., 323 U.S. 134, 139, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944)*. Although it has not issued any regulation regarding **[**18]** who may bring an action under § 8(d)(2), it has announced its opinion that whether an overcharge occurs "is irrelevant in determining whether the act is prohibited" by RESPA. *24 C.F.R. § 3500.14(g)(2)*. As an *amicus curiae* in this case, it also has explained that the "language . . . of section 8(d)(2) . . . [indicates that] a person who violates section 8 is liable . . . , regardless of whether the consumer alleges that he was charged too much for the service." Govt. Br. at 21. **HN14[⬆]** Even in the absence of a regulation elucidating a specific provision of a statute pursuant to an express delegation of authority, the views of an agency charged with applying a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. *See United States v. Mead, 533 U.S. 218, 227-28, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001)* (quotations **[*988]** and citations omitted). Therefore, the views propounded by HUD, both in *24 C.F.R. § 3500.14(g)(2)* and in its role as an *amicus curiae* in this case, provide further counsel in favor of the view that § 8(d)(2) does not impose an "overcharge requirement" on potential plaintiffs.

**[***11]** *c. Statutory Purpose*

**HN15[⬆]** As part of statutory interpretation, the court must **[**19]** also consider the overall intent of the statute. *See Crandon, 494 U.S. at 158*. Generally

---

[7] *See* cases cited *supra* notes 2-3.

speaking, RESPA sought

to address Congress' concerns over "controlled business arrangements," whereby real estate settlement business is referred between two affiliated entities, which RESPA had not previously addressed. Under such circumstances, one entity is able to provide a benefit to its affiliate without the direct payment of a referral fee which . . . could result in harm to consumers beyond an increase in settlement charges . . . . Specifically, . . . the advice of the person making the referral *may lose its impartiality and may not be based on his professional evaluation of the quality of service provided* if the referror or his associates have a financial interest in the company being recommended. In addition, since the real estate industry is structured so that settlement service providers do not compete for a consumer's business directly, but almost exclusively rely on referrals from real estate brokers, lenders or their associates for their business, the growth of controlled business arrangements *effectively reduce the kind of healthy competition generated by independent settlement service* [**20] providers.

*Kahrer, 418 Fed. Supp. 2d. at 754* (quoting H.R. Rep. No. 97-532, at 52) (emphasis added). To address the negative effects on the real estate industry caused by these controlled relationships, *HN16*[⬆] "injury in a RESPA case can be shown by harm other than allegations of overcharges," as "the alleged § 8(a) violation presents the possibility for other harm, including a lack of impartiality in the referral and a reduction of competition between settlement service provide[r]s." *Robinson, 447 F. Supp. 2d at 489*. Therefore, "RESPA allows individuals to police the marketplace in order *to ensure impartiality of referrals and competition* between settlement service providers, thereby creating a market-wide deterrent against unnecessarily high settlement costs." *Capell, 2007 U.S. Dist. LEXIS 82570, 2007 WL 3342389, at *5* (emphasis added). Ultimately, "[t]he purpose of the statute is to prevent certain practices that are harmful to all consumers by establishing that consumers have a right *not to be subject to those practices and providing both public and private remedies of that right.*" *Kahrer, 418 F. Supp. 2d at 756* (quoting *Patton*, No. CV 100-132, at *5-6, 12).

**[***12] C. Article III Standing**

We have concluded that, by enacting [**21] RESPA, Congress meant to create a new legal right in favor of individuals like the plaintiffs, but we still must determine whether the vindication of that right through a federal-court lawsuit is consistent with the standing requirements of Article III. *HN17*[⬆] Congress no doubt has the power to create new legal rights, and it generally has the authority to create a right of action whose only injury-in-fact involves the violation of that statutory right. *Linda R.S., 410 U.S. at 617 n.3*. But that congressional authority is not unlimited. Among other things, Congress may confer standing to redress injuries only on parties who actually have been deprived of the newly established statutory rights: the "'injury in fact' test requires . . . that the party seeking review be himself among the injured." *Sierra Club v. Morton, 405 U.S. 727, 734-35, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972)*.

**[*989]** Here, Appellants allege that they have been injured by the deprivation of a right conferred by RESPA. *HN18*[⬆] The statute creates an individual right to receive referral services untainted by kickbacks or fee-splitting. *§ 2607(a)-(b)*. By alleging both that "the sole purpose for the creation of Welles-Bowen Title was to enable Fidelity and/or Chicago Title to [**22] provide Welles-Bowen Realty with kickbacks in exchange for [referrals]," and that they themselves received a referral from Welles-Bowen Realty, the Carters have adequately alleged that their own RESPA rights were violated. JA 3-5.

In addition, *HN19*[⬆] Congress may empower individuals to sue based only on "personal and individual[ized]" injuries. *Lujan, 504 U.S. at 560 n. 1*. Standing does not exist, for example, to enforce "an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law." *Id. at 572*. Even though an injury need not be economic in nature, it still must cause individual, rather than collective, harm. *Morton, 405 U.S. at 738*.

Appellants' claims fit within this condition as well. *HN20*[⬆] RESPA does not authorize suits by members of the public at large; it authorizes suits only by individuals who receive a loan that is accompanied by an unlawful referral, which is plainly an individualized injury. Under the Fair Housing Act, market "testers" have the right to [***13] receive "truthful information concerning the availability of housing." *Havens Realty Corp. v. Coleman, 455 U.S. 363, 373, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982)*. Yet the Supreme Court has held that standing exists to [**23] vindicate this right even when the testers "fully expect [to] receive false information,

and [have] no intention of buying or renting a home." *Id. at 373-374*. Just as a violation of the rights of "testers" to receive "truthful information" supports standing, so does a violation of the right to receive referrals untainted by conflicts of interest. *Id.*

*Morales*, it is true, determined that plaintiffs who do not allege that they paid more as a result of a RESPA violation cannot show an injury-in-fact. *983 F. Supp. at 1429*. But this reasoning overlooks the Supreme Court's teaching that injuries need not be financial in nature to be concrete and individualized. *See Lujan, 504 U.S. at 562-63*; *Havens Realty Corp., 455 U.S. at 373*. Because the Carters have pleaded that they themselves were given referrals sullied by kickbacks in violation of RESPA, they have Article III standing to bring these claims.

## IV. Conclusions

In light of the principle that *HN21*[⬆] "[t]he actual or threatened injury required by [Article] III may exist solely by virtue of statutes creating legal rights, *the invasion of which creates standing," Warth v. Seldin, 422 U.S. 490, 500, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)* (emphasis added) (quotations omitted), the court **[**24]** finds that the Carters's allegation that Appellees violated § 8 is an injury-in-fact, meets the requirements of Article III, and is sufficient to survive a 12(b)(1) and 12(b)(6) motion to dismiss. The plain meaning of the statutory language and the persuasive authorities examined by the court indicate that *HN22*[⬆] Congress created a private right of action to impose damages where kickbacks and unearned fees have occurred -- even where there is no overcharge. Accordingly, the district court's determination is **REVERSED**, and the case is remanded for action consistent with the conclusions herein.

**End of Document**



Tax Exempt and Government Entities
**EXEMPT ORGANIZATIONS**

# Charitable Contributions

## Substantiation and Disclosure Requirements



Publication 1771 (Rev. 3-2016) Catalog Number 20054Q Department of the Treasury **Internal Revenue Service** www.irs.gov

## Contents

Recordkeeping Rules........................................................ 2

Written Acknowledgment.................................................. 2

Unreimbursed Expenses .................................................. 5

Written Disclosure........................................................... 6

Further Information .......................................................... 7

> ### Are you an organization that receives contributions of $250 or more?
>
> ### or
>
> ### Are you an organization that provides goods or services to donors who make contributions of more than $75?
>
> ### or
>
> ### Are you a donor who makes contributions to a charity?

IRS Publication 1771, *Charitable Contributions–Substantiation and Disclosure Requirements,* explains the federal tax law for organizations, such as charities and churches, that receive tax-deductible charitable contributions and for taxpayers who make contributions.

The IRS imposes recordkeeping and substantiation rules on donors of charitable contributions and disclosure rules on charities that receive certain quid pro quo contributions.

- Donors must have a **bank record** or **written communication** from a charity for any monetary contribution before the donors can claim a charitable contribution on their federal income tax returns.

- Donors are responsible for obtaining a **written acknowledgment** from a charity for any single contribution of $250 or more before the donors can claim a charitable contribution on their federal income tax returns.

- Charitable organizations are required to provide a **written disclosure** to a donor who receives goods or services in exchange for a single payment in excess of $75.

More on recordkeeping, written acknowledgments and written disclosures is addressed in this publication. The rules in this publication do not apply to a donated motor vehicle, boat or airplane if the claimed value exceeds $500. For information on vehicle donations, see IRS Publication 4302, *A Charity's Guide to Vehicle Donation*, and IRS Publication 4303, *A Donor's Guide to Vehicle Donation.*

For information about organizations that are qualified to receive charitable contributions, see IRS Publication 526, *Charitable Contributions.* Publication 526 also describes contributions you can (and cannot) deduct, and it explains deduction limits. For assistance about valuing donated property, see IRS Publication 561, *Determining the Value of Donated Property.*

**1**

## Recordkeeping Rules

### Requirement

A donor cannot claim a tax deduction for any contribution of cash, a check or other monetary gift unless the donor maintains a record of the contribution in the form of either a bank record (such as a cancelled check) or a written communication from the charity (such as a receipt or letter) showing the name of the charity, the date of the contribution and the amount of the contribution.

### Payroll Deductions

For charitable contributions made by payroll deduction, the donor may use a pledge card prepared by or at the direction of the charitable organization, along with one of the following documents:

- a pay stub,
- Form W-2, Wage and Tax Statement, or
- other employer-furnished document that shows the amount withheld and paid to a charitable organization.

If a donor makes **a single contribution of $250 or more by payroll deduction,** the pledge card or other document from the organization must also include a statement to the effect that the organization does not provide goods or services in whole or partial consideration for any contributions made to the organization by payroll deduction.

**2**

Each payroll deduction amount of $250 or more is treated as a separate contribution for purposes of the $250 threshold requirement for written acknowledgments.

## Written Acknowledgment

### Requirement

A donor cannot claim a tax deduction for any single contribution of $250 or more unless the donor obtains a contemporaneous, written acknowledgment of the contribution from the recipient organization. An organization that does not acknowledge a contribution incurs no penalty; but, without a written acknowledgment, the donor cannot claim the tax deduction. Although it's a donor's responsibility to obtain a written acknowledgment, an organization can assist a donor by providing a timely, written statement containing:

1. the name of organization

2. the amount of cash contribution

3. a description (but not the value) of non-cash contribution

4. a statement that no goods or services were provided by the organization in return for the contribution, if that was the case

5. a description and good faith estimate of the value of goods or services, if any, that an organization provided in return for the contribution

6. a statement that goods or services, if any, that an organization provided in return for the contribution consisted entirely of intangible religious benefits (described later in this publication), if that was the case

It isn't necessary to include either the donor's Social Security number or tax identification number on the acknowledgment.

A separate acknowledgment may be provided for each single contribution of $250 or more, or one acknowledgment, such as an annual summary, may be used to substantiate several single contributions of $250 or more. There are no IRS forms for the acknowledgment. Letters, postcards or computer-generated forms with the above information are acceptable. An organization can provide either a paper copy of the acknowledgment to the donor, or an organization can provide the acknowledgment electronically, such as via an email addressed to the donor. A donor shouldn't attach the acknowledgment to his or her individual income tax return, but must retain it to substantiate the contribution. Separate contributions of less than $250 will not be aggregated. An example of this could be weekly offerings to a donor's church of less than $250 even though the donor's annual total contributions are $250 or more.

## Contemporaneous

Recipient organizations typically send written acknowledgments to donors no later than January 31 of the year following the donation. For the written acknowledgment to be considered contemporaneous with the contribution, a donor must receive the acknowledgment by the earlier of:

- the date on which the donor actually files his or her individual federal income tax return for the year of the contribution; or
- the due date (including extensions) of the return.

## Goods and Services

The acknowledgment must describe goods or services an organization provides in exchange for a contribution of $250 or more. It must also provide a good faith estimate of the value of the goods or services because a donor must generally reduce the amount of the contribution deduction by the fair market value of the goods and services provided by the organization. Goods or services include cash, property, services, benefits or privileges. However, there are important exceptions:

**Token Exception** — Insubstantial goods or services a charitable organization provides in exchange for contributions do not have to be described in the acknowledgment.

Good and services are considered to be insubstantial if the payment occurs in the context of a fund-raising campaign in which a charitable organization informs the donor of the amount of the contribution that is a deductible contribution, and:

1. the fair market value of the benefits received does not exceed the lesser of 2 percent of the payment or $106,* or

2. the payment is at least $53,* the only items provided bear the organization's name or logo (for example, calendars, mug or posters), and the cost of these items is within the limit for "low-cost articles," which is $10.60.*

*The dollar amounts are for 2016. Guideline amounts are adjusted for inflation. See IRS.gov for annual inflation adjustment information.

3

Free, unordered low-cost articles are also considered to be insubstantial.

**Example of a token exception:** If a charitable organization gives a coffee mug bearing its logo that costs the organization $10.60 or less to a donor who contributes $53 or more, the organization may state that no goods or services were provided in return for the $53 contribution. The $53 is fully deductible.

**Membership Benefits Exception** — An annual membership benefit is also considered to be insubstantial if it is provided in exchange for an annual payment of $75 or less and consists of annual recurring rights or privileges, such as:

1. free or discounted admissions to the charitable organization's facilities or events

2. discounts on purchases from the organization's gift shop

3. free or discounted parking

4. free or discounted admission to member-only events sponsored by an organization, where a per-person cost (not including overhead) is within the "low-cost articles" limits

**Example of a membership benefits exception:** If a charitable organization offers a $75 annual membership that allows free admission to all of its weekly events, plus a $20 poster, a written acknowledgment need only mention the $20 value of the poster, since the free admission would be considered insubstantial and, therefore, would be disregarded.

4

**Intangible Religious Benefits Exception** — If a religious organization provides only "intangible religious benefits" to a contributor, the acknowledgment does not need to describe or value those benefits. It can simply state that the organization provided intangible religious benefits to the contributor.

What are "intangible religious benefits"? Generally, they are benefits provided by a tax-exempt organization operated exclusively for religious purposes, and are not usually sold in commercial transactions outside a donative (gift) context. Examples include admission to a religious ceremony and a de minimis tangible benefit, such as wine used in a religious ceremony. Benefits that are not intangible religious benefits include education leading to a recognized degree, travel services and consumer goods.

## Unreimbursed Expenses

If a donor makes a single contribution of $250 or more in the form of unreimbursed expenses, for example, out-of-pocket transportation expenses incurred to perform donated services for an organization, then the donor must obtain a written acknowledgment from the organization containing a:

- description of the services provided by the donor
- statement of whether the organization provided goods or services in return for the contribution
- description and good faith estimate of the value of goods or services, if any, that the organization provided in return for the contribution
- statement that goods or services, if any, that the organization provided in return for the contribution consisted entirely of intangible religious benefits (described earlier in this publication), if that was the case

In addition, a donor must maintain adequate records of the unreimbursed expenses. See Publication 526, *Charitable Contributions,* for a description of records that will substantiate a donor's contribution deductions.

> **Example of an unreimbursed expense:** A chosen representative to an annual convention of a charitable organization purchases an airline ticket to travel to the convention. The organization doesn't reimburse the delegate for the $500 ticket. The representative should keep a record of the expenditure, such as a copy of the ticket. The representative should obtain from the organization a description of the services that the representative provided and a statement that the representative received no goods or services from the organization.

**5**

## Examples of Written Acknowledgments

- "Thank you for your cash contribution of $300 that (organization's name) received on December 12, 2015. No goods or services were provided in exchange for your contribution."
- "Thank you for your cash contribution of $350 that (organization's name) received on May 6, 2015. In exchange for your contribution, we gave you a cookbook with an estimated fair market value of $60."
- "Thank you for your contribution of a used oak baby crib and matching dresser that (organization's name) received on March 15, 2015. No goods or services were provided in exchange for your contribution."

The following is an example of a written acknowledgment when a charity accepts contributions in the name of one of its activities:

- Thank you for your contribution of $450 to (organization's name) made in the name of its Special Relief Fund program. No goods or services were provided in exchange for your contribution."

## Written Disclosure

### Requirement

Donors may only take a contribution deduction to the extent that their contributions exceed the fair market value of the goods or services the donors receive in return for the contributions; therefore, donors need to know the value of the goods or services. An organization must provide a written disclosure statement to a donor who makes a payment exceeding $75 partly as a contribution and partly for goods and services provided by the organization. A contribution made by a donor in exchange for goods or services is known as a quid pro quo contribution.

**Example of a quid pro quo contribution:** A donor gives a charitable organization $100 in exchange for a concert ticket with a fair market value of $40. In this example, the donor's tax deduction may not exceed $60. Because the donor's payment (quid pro quo contribution) exceeds $75, the charitable organization must furnish a disclosure statement to the donor, even though the deductible amount doesn't exceed $75.

A required written disclosure statement must:

- inform a donor that the amount of the contribution that is deductible for federal income tax purposes is limited to the excess of money (and the fair market value of property other than money) contributed by the donor over the value of goods or services provided by the organization
- provide a donor with a good-faith estimate of the fair market value of the goods or services

An organization must furnish a disclosure statement in connection with either the solicitation or the receipt of the quid pro quo contribution. The statement must be in writing and must be made in a manner that is likely to come to the attention of the donor. For example, a disclosure in small print within a larger document might not meet this requirement.

### Exception

A written disclosure statement is not required:

- where the goods or services given to a donor meet the "token exception," the "membership benefits exception" or the "intangible religious benefits exception" described earlier
- where there is no donative element involved in a particular transaction, such as in a typical museum gift shop sale

### Penalty

A penalty is imposed on charities that do not meet the written disclosure requirement. The penalty is $10 per contribution, not to exceed $5,000 per fundraising event or mailing. An organization may avoid the penalty if it can show that failure to meet the requirements was due to reasonable cause.

6

## Further Information

**written acknowledgment** — Detailed rules for contemporaneous written acknowledgments are contained in Section 170(f)(8) of the Internal Revenue Code and Section 1.170A-13(f) of the Income Tax Regulations. The "low-cost article" rules are in Code Section 513(h)(2).

**written disclosure** — Detailed rules for written disclosure statements are contained in Code Section 6115 and I.T. Regulations Section 1.6115-1. The penalty rules are contained in Code Section 6714.

**IRS publications** — Order publications by calling the IRS at (800) 829-3676. Download IRS publications at www.irs.gov.

**IRS customer service** — Telephone assistance for general tax information is available by calling IRS customer service toll-free at (800) 829-1040.

**EO customer service** — Telephone assistance specific to exempt organizations is available by calling IRS Exempt Organizations customer account services toll-free at (877) 829-5500.

**EO website** — Visit Exempt Organizations website at irs.gov/eo.

**EO Update** — Subscribe to IRS Exempt Organizations' EO Update, a regular email newsletter with information for tax-exempt organizations and tax practitioners who represent them.

**StayExempt** — An IRS interactive web-based training program covering tax compliance issues confronted by small and mid-sized tax-exempt organizations.

7

⚠️ Caution
As of: February 21, 2019 9:25 PM Z

# *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*

Supreme Court of the United States

December 1, 1992, Argued ; June 14, 1993, Decided

No. 91-904

**Reporter**

508 U.S. 602 *; 113 S. Ct. 2264 **; 124 L. Ed. 2d 539 ***; 1993 U.S. LEXIS 4053 ****; 61 U.S.L.W. 4611; 93 Cal. Daily Op. Service 4339; 93 Daily Journal DAR 7461; 16 Employee Benefits Cas. (BNA) 2265; 7 Fla. L. Weekly Fed. S 423

CONCRETE PIPE AND PRODUCTS OF CALIFORNIA, INC., PETITIONER v. CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA

**Prior History: [****1]** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** *936 F. 2d 576*, affirmed.

## Core Terms

Concrete, Pipe, withdrawal, arbitrator, benefits, sponsor, actuary, contributions, vested, clearly erroneous, multiemployer, assumptions, employees, terms, pension plan, Laborers, Pension, unfunded, actuarial assumptions, joined, preponderance of evidence, calculation, bias, provisions, plans, standard of review, determinations, requires, parties, factual determination

## Case Summary

### Procedural Posture

After a decision of the United States Court of Appeals for the Ninth Circuit affirming a motion by respondent pension trust to confirm an arbitrator's award, the Court granted petitioner's writ of certiorari. Petitioner, an employer, contended that the assessment and arbitration provisions of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 94 Stat. 1208, worked to deny it procedural due process.

### Overview

The employer, a former contributor to the pension trust, was assessed a "withdrawal liability" under the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C.S. §§ 1301-1461 (1988 ed. and Supp. III)*, and the MPPAA. The employer contended that the MPPAA's assessment and arbitration provisions violated the Due Process and *Takings Clauses*. The Court held that the employer voluntarily negotiated and maintained a pension plan within the structures of the ERISA, and that there was no substantive due process violation by virtue of the fact that the MPPAA imposed upon it a higher liability than its contract contemplated. Legislation readjusting rights and burdens was not unlawful solely because it upset expectations. The imposition of withdrawal liability was rationally related to the terms of the employer's participation in the plan. As to the *Takings Clause*, the employer had not shown that its withdrawal liability was out of proportion to its experience with the plan. The employer failed to show that any method or assumption unique to the calculation of withdrawal liability was so manipulable as to create a significant opportunity for bias to operate.

### Outcome

The Court affirmed the judgment of the court below, which affirmed a motion by respondent pension trust to confirm an arbitrator's award. Petitioner, an employer who voluntarily negotiated and maintained a pension plan within the structures of the Employee Retirement Income Security Act and who was assessed "withdrawal liability" was not deprived of procedural due process.

## LexisNexis® Headnotes

Pensions & Benefits Law > Employee Benefit Plans > Pension Benefit Plans > Defined Benefit Plans

Pensions & Benefits Law > Employee Benefit Plans > Pension Benefit Plans > Defined Contribution Plans

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans

**HN1[⬇]] Pension Benefit Plans, Defined Benefit Plans**

A "defined benefit plan" is one that does not qualify as an individual account plan or defined contribution plan, which provide, among other things, for an individual account for each covered employee and for benefits based solely upon the amount contributed to the covered employee's account.

Business & Corporate Compliance > ... > ERISA Pension Plan Qualification Requirements > Participation & Vesting > Vesting Requirements

Pensions & Benefits Law > ERISA > ERISA Effective Dates

Pensions & Benefits Law > ... > ERISA Pension Plan Qualification Requirements > Participation & Vesting > General Overview

Pensions & Benefits Law > Multiemployer Plans > General Overview

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Pensions & Benefits Law > Multiemployer Plans > Liability Calculations

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

**HN2[⬇]] Participation & Vesting, Vesting Requirements**

Under certain provisions of the Multiemployer Pension Plan Amendments Act of 1980, 94 Stat. 1208, if an employer withdraws from a multiemployer plan, it incurs "withdrawal liability" in the form of a fixed and certain debt to the pension plan. An employer's withdrawal liability is its proportionate share of the plan's "unfunded vested benefits," that is, the difference between the present value of vested benefits that are currently being paid to retirees and that will be paid in the future to covered employees who have already completed some specified period of service, *29 U.S.C.S. § 1053*, and the current value of the plan's assets. *29 U.S.C.S. §§ 1381,*

*1391.*

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

Tax Law > ... > Sales & Exchanges > Intangible Property > Distributor Agreements & Lease Cancellations

Business & Corporate Compliance > ... > ERISA > Funding Requirements > Pension Plan Funding

Pensions & Benefits Law > Multiemployer Plans > General Overview

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Tax Law > ... > Sales & Exchanges > Capital Gains & Losses > Small Business Investment Companies

Tax Law > ... > Sales & Exchanges > Intangible Property > General Overview

**HN3[⬇]] Multiemployer Plans, Liability for Withdrawals**

The Multiemployer Pension Plan Amendments Act of 1980, 94 Stat. 1208, provides the procedure for calculating and assessing withdrawal liability. The plan's actuary, who is subject to regulatory and professional standards, *29 U.S.C.S. §§ 1241, 1242; 26 U.S.C.S. § 7701(a)(35)*, must determine the present value of the plan's liability for vested benefits. In the absence of regulations promulgated by the Pension Benefit Guarantee Corporation, the actuary must employ actuarial assumptions and methods which, in the aggregate, are reasonable and which, in combination, offer the actuary's best estimate of anticipated experience under the plan. *29 U.S.C.S. § 1393(a)(1)*. The assumptions must cover such matters as mortality of covered employees, likelihood of benefits vesting, and, importantly, future interest rates. After settling the present value of vested benefits, the actuary calculates the unfunded portion by deducting the value of the plan's assets. *29 U.S.C.S. § 1393(c)*.

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

Pensions & Benefits Law > Multiemployer Plans > General Overview

## *HN4*[⬇] Multiemployer Plans, Complete Withdrawals

In order to determine a particular employer's withdrawal liability, the unfunded vested liability is allocated under one of several methods provided by law. *29 U.S.C.S. § 1391*. The presumptive method of *§ 1391(b)* bases withdrawal liability on the proportion of total employer contributions to the plan made by the withdrawing employer during certain 5-year periods. In essence, the withdrawal liability imposes on the withdrawing employer a share of the unfunded vested liability proportional to the employer's share of contributions to the plan during the years of its participation.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Collection of Liability

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Pensions & Benefits Law > Multiemployer Plans > General Overview

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

## *HN5*[⬇] Multiemployer Plans, Collection of Liability

Withdrawal liability is assessed in a notification by the "plan sponsor." The Multiemployer Pension Plan Amendments Act of 1980, 94 Stat. 1208, requires notification and demand to be made as soon as practicable after an employer's complete or partial withdrawal. *29 U.S.C.S. § 1399(b)(1)*.

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

## *HN6*[⬇] Multiemployer Plans, Complete Withdrawals

See *29 U.S.C.S. § 1383(a)*.

Pensions & Benefits Law > Multiemployer

Plans > Complete Withdrawals

## *HN7*[⬇] Multiemployer Plans, Complete Withdrawals

See *29 U.S.C.S. § 1383(e)*.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Pensions & Benefits Law > ERISA > Arbitration

Civil Procedure > ... > Alternative Dispute Resolution > Arbitration > General Overview

Pensions & Benefits Law > Multiemployer Plans > General Overview

Pensions & Benefits Law > Multiemployer Plans > Administrative Review

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Collection of Liability

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

## *HN8*[⬇] Standards of Review, Clearly Erroneous Review

The Multiemployer Pension Plan Amendments Act of 1980, 94 Stat. 1208, provides that if an employer objects after notice and demand for withdrawal liability, and the parties cannot resolve the dispute, *29 U.S.C.S. § 1399(b)(2)*, it shall be referred to arbitration. Two presumptions may attend the arbitration. First, any determination made by a plan sponsor under *29 U.S.C.S. §§ 1381-1399* and *1405 (1988 ed. and Supp. III)* is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous. *29 U.S.C.S. § 1401(a)(3)(A)*.

Pensions & Benefits Law > ERISA > Arbitration

Pensions & Benefits Law > Multiemployer Plans > General Overview

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

**HN9**[⬇] **ERISA, Arbitration**

See *29 U.S.C.S. § 1401(a) (3)(B)*.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Pensions & Benefits Law > ERISA > Arbitration

Pensions & Benefits Law > Multiemployer Plans > General Overview

**HN10**[⬇] **Alternative Dispute Resolution, Judicial Review**

The Multiemployer Pension Plan Amendments Act of 1980, 94 Stat. 1208, provides for judicial review of the arbitrator's decision by an action in the district court to enforce, vacate, or modify an award. In any such action there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct. *29 U.S.C.S. § 1401(c)*.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Arbitration Coverage Limits

**HN11**[⬇] **Labor Arbitration, Arbitration Coverage Limits**

Under § 302(c)(5)(B) of the Labor Management Relations Act of 1947 (LMRA), *29 U.S.C.S. § 186(c)(5)(B)*, when a union participates in management of a plan permitted by the LMRA, the plan must be administered jointly by representatives of labor and management.

Business & Corporate Law > Agency Relationships > Fiduciaries > Fiduciary Duties

Estate, Gift & Trust Law > ... > Trustees > Duties & Powers > Standards of Care

Governments > Fiduciaries

Business & Corporate Law > Agency Relationships > Fiduciaries > General Overview

Estate, Gift & Trust Law > Trusts > General Overview

Estate, Gift & Trust Law > ... > Private Trusts Characteristics > Trustees > General Overview

Pensions & Benefits Law > Employee Benefit Plans > Welfare Benefit Plans

**HN12**[⬇] **Fiduciaries, Fiduciary Duties**

Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties. To deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with "uncompromising rigidity." In sum, the duty of the management-appointed trustee of an employee benefit fund under § 302(c)(5) of the Labor Management Relations Act of 1947, *29 U.S.C.S. § 186(c)(5)*, is directly antithetical to that of an agent of the appointing party. The Employee Retirement Income Security Act of 1974, *29 U.S.C.S. §§ 1301-1461 (1988 ed. and Supp. III)*, essentially codified the strict fiduciary standards that a § 302(c)(5) trustee must meet. *29 U.S.C.S. § 1104(a)(1)* requires a trustee to discharge his duties solely in the interest of the participants and beneficiaries.

Civil Procedure > Judicial Officers > Judges > General Overview

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > General Overview

**HN13**[⬇] **Judicial Officers, Judges**

Due process requires a neutral and detached judge in the first instance, and the command is no different when a legislature delegates adjudicative functions to a private party. That officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule. Before one may be deprived of a protected interest,

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

whether in a criminal or civil setting, one is entitled as a matter of due process of law to an adjudicator who is not in a situation which would offer a possible temptation to the average man as a judge which might lead him not to hold the balance nice, clear and true. Even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > General Overview

*HN14*[⤓]  **Procedural Due Process, Scope of Protection**

Not all determinations affecting liability are adjudicative, and the "rigid requirements" designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity. Where an initial determination is made by a party acting in an enforcement capacity, due process may be satisfied by providing for a neutral adjudicator to conduct a de novo review of all factual and legal issues.

Administrative Law > ... > Hearings > Right to Hearing > General Overview

Civil Procedure > Appeals > Standards of Review > De Novo Review

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Collection of Liability

Administrative Law > Agency Adjudication > General Overview

Pensions & Benefits Law > Multiemployer Plans > General Overview

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

*HN15*[⤓]  **Hearings, Right to Hearing**

The Multiemployer Pension Plan Amendments Act of 1980, 94 Stat. 1208, requires the plan sponsor to notify the employer of the amount of withdrawal liability and to demand payment, *29 U.S.C.S. § 1399(b)(1)*, actions that bear the hallmarks of an assessment, not an adjudication. The trustees are not required to hold a hearing, to examine witnesses, or to adjudicate the disputes of contending parties on matters of fact or law. An employer excepting to a penalty is entitled to a de novo hearing before an administrative law judge.

Evidence > Inferences & Presumptions > General Overview

*HN16*[⤓]  **Evidence, Inferences & Presumptions**

The burden of showing something by a "preponderance of the evidence," the most common standard in the civil law, simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence. A finding is "clearly erroneous" when although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed. A showing of "unreasonableness" would require even greater certainty of error on the part of a reviewing body.

Evidence > Inferences & Presumptions > General Overview

*HN17*[⤓]  **Evidence, Inferences & Presumptions**

Before any such burden can be satisfied in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

*HN18*[⤓]  **Standards of Review, Clearly Erroneous Review**

Review under the "clearly erroneous" standard is significantly deferential, requiring a definite and firm conviction that a mistake has been committed. And

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

application of a reasonableness standard is even more deferential than that, requiring the reviewer to sustain a finding of fact unless it is so unlikely that no reasonable person would find it to be true, to whatever the required degree of proof.

Civil Procedure > Discovery & Disclosure > Discovery > Subpoenas

Pensions & Benefits Law > ERISA > Arbitration

International Trade Law > Dispute Resolution > International Commercial Arbitration > Arbitration

Labor & Employment Law > ... > Labor Arbitration > Arbitrators > Authority

Pensions & Benefits Law > Multiemployer Plans > General Overview

*HN19*[↓] **Discovery, Subpoenas**

The arbitrator is a reviewing body invested with the further powers of a finder of fact. The arbitrator may thus provide a dual sort of trial and review, ultimately empowered to draw his own conclusions.

Pensions & Benefits Law > ERISA > Arbitration

Pensions & Benefits Law > Multiemployer Plans > General Overview

*HN20*[↓] **ERISA, Arbitration**

The Multiemployer Pension Plan Amendments Act of 1980 (Act), 94 Stat. 1208, does not refer to different arbitrator's functions in language appropriate to each; it refers, rather, to one single conclusion that must be drawn about a determination previously made by a plan sponsor. By its terms the Act purports to provide a standard for reviewing the sponsor's findings, and it defines the nature of the conclusion the arbitrator must draw by using a combination of terms that are categorically ill-matched. They are also inconsistent with each other on any reading.

Governments > Legislation > Interpretation

*HN21*[↓] **Legislation, Interpretation**

In a case of statutory ambiguity, where an otherwise acceptable construction of a statute would raise serious constitutional problems, the court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress. Federal statutes are to be so construed as to avoid serious doubt of their constitutionality. When the validity of an act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Pensions & Benefits Law > ERISA > Arbitration

Pensions & Benefits Law > Multiemployer Plans > General Overview

*HN22*[↓] **Standards of Review, De Novo Review**

Because the Multiemployer Pension Plan Amendments Act of 1980, 94 Stat. 1208, does not foreclose any factual issue from independent consideration by the arbitrator, there is no constitutional infirmity in it. For the same reason, that an employer may avail itself of independent review by the concededly neutral arbitrator, there is no derivative constitutional defect infecting the further presumption that a district court must afford to an arbitrator's findings of fact.

Pensions & Benefits Law > Multiemployer Plans > General Overview

*HN23*[↓] **Pensions & Benefits Law, Multiemployer Plans**

The Multiemployer Pension Plan Amendments Act of 1980, 94 Stat. 1208, provides that in the absence of more particular Pension Benefit Guarantee Corporation regulations, the plan is required to use actuarial assumptions and methods which, in the aggregate, are reasonable and which, in combination, offer the actuary's best estimate of anticipated experience under the plan. *29 U.S.C.S. § 1393(a)(1)*.

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

Pensions & Benefits Law > ERISA > Arbitration

Pensions & Benefits Law > Multiemployer
Plans > General Overview

*HN24*[⬇] **ERISA, Arbitration**

See *29 U.S.C.S. § 1401(a)(3)(B)*.

Pensions & Benefits Law > ERISA > Plan
Amendments

Tax Law > ... > Sales & Exchanges > Intangible
Property > Distributor Agreements & Lease
Cancellations

Business & Corporate
Compliance > ... > ERISA > Funding
Requirements > Pension Plan Funding

Pensions & Benefits Law > Multiemployer
Plans > General Overview

Pensions & Benefits Law > Multiemployer
Plans > Liability for Withdrawals

Tax Law > ... > Sales & Exchanges > Capital Gains
& Losses > Small Business Investment Companies

Tax Law > ... > Sales & Exchanges > Intangible
Property > General Overview

*HN25*[⬇] **ERISA, Plan Amendments**

Actuaries are trained professionals subject to regulatory
standards. The technical nature of an actuary's
assumptions and methods, and the necessity for
applying the same assumptions and methods in more
than one context, as a practical matter limit the
opportunity an actuary might otherwise have to act
unfairly toward the withdrawing employer. The statutory
requirement is not unique to the withdrawal liability
context, for the Multiemployer Pension Plan
Amendments Act of 1980 (Act), 94 Stat. 1208, employs
identical language in *29 U.S.C.S. § 1082(c)(3)* to
describe the actuarial assumptions and methods to be
used in determining whether a plan has satisfied the
minimum funding requirements contained in the Act.
The use of the same language to describe the actuarial
assumptions and methods to be used in these different
contexts tends to check the actuary's discretion in each
of them.

Pensions & Benefits Law > ERISA > Arbitration

Pensions & Benefits Law > Multiemployer
Plans > General Overview

*HN26*[⬇] **ERISA, Arbitration**

*29 U.S.C.S. § 1401(a)(3)(B)* speaks of the aggregate
reasonableness of the assumptions and methods
employed by the actuary in calculating the dollar
liability figure. Because a "method" is not "accurate" or probably
"true" within some range, "reasonable" must be
understood here to refer to some different kind of
judgment, one that it would make sense to apply to a
review of methodology as well as of assumptions. An
employer's burden to overcome the presumption in
question is simply a burden to show that the
combination of methods and assumptions employed in
the calculation would not have been acceptable to a
reasonable actuary. In practical terms it is a burden to
show something about standard actuarial practice, not
about the accuracy of a predictive calculation, even
though consonance with professional standards in
making the calculation might justify confidence that its
results are sound.

Pensions & Benefits Law > Multiemployer
Plans > General Overview

*HN27*[⬇] **Pensions & Benefits Law, Multiemployer
Plans**

Under the Multiemployer Pension Plan Amendments Act
of 1980, 94 Stat. 1208, the employer merely has a
burden to show that an apparently unbiased
professional, whose obligations tend to moderate any
claimed inclination to come down hard on withdrawing
employers, has based a calculation on a combination of
methods and assumptions that falls outside the range of
reasonable actuarial practice.

Constitutional Law > Substantive Due
Process > Scope

*HN28*[⬇] **Constitutional Law, Substantive Due
Process**

Legislative acts adjusting the burdens and benefits of

economic life come to the court with a presumption of constitutionality, and the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Collection of Liability

Pensions & Benefits Law > Multiemployer Plans > General Overview

### HN29[↓] Multiemployer Plans, Collection of Liability

An employer's contributions are not solely for the benefit of its employees or employees who have worked for it alone.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Participation & Vesting

Labor & Employment Law > Employer Liability > Third Party Insurers

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

Pensions & Benefits Law > Multiemployer Plans > General Overview

### HN30[↓] Multiemployer Plans, Participation & Vesting

A multiemployer plan has features of an insurance scheme in which employers spread the risk that their employees will meet the plan's vesting requirements and obtain an entitlement to benefits. A rational employer hopes that its employees will vest at a rate above the average for all employees of contributing employers, and that, in this way, it will pay less than it would have by creating a single-employer plan. But the rational employer also appreciates the foreseeable risk that circumstances may produce the opposite result.

Governments > Federal Government > US Congress

### HN31[↓] Federal Government, US Congress

Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.

Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings

### HN32[↓] Fundamental Rights, Eminent Domain & Takings

Mere diminution in the value of property, however serious, is insufficient to demonstrate a taking.

## Lawyers' Edition Display

### Decision

Withdrawal liability provisions of Multiemployer Pension Plan Amendments Act held not to violate procedural due process, substantive due process, or *takings clause of Fifth Amendment*.

### Summary

Provisions of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) (29 USCS 1381-1399, 1405)--which amended the Employee Retirement Income Security Act of 1974 (ERISA)--require that an employer withdrawing from an multiemployer pension plan pay a fixed and certain debt to the plan, representing the employer's proportionate share of the plan's unfunded vested benefits. Withdrawal liability is to be assessed by the plan sponsor, which notifies the withdrawing employer and demands payment. If the employer objects and the parties cannot resolve the dispute, then the matter is to be referred to arbitration, in which (1) any determination made by the sponsor under pertinent provisions of the MPPAA is presumed correct unless the party contesting the determination "shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous" (29 USCS 1401(a)(3)(A)), and (2) the sponsor's calculation of the plan's unfunded vested benefits is presumed correct unless the party contesting the determination "shows by a preponderance of the evidence" that the actuarial

assumptions and methods used in the determination "were, in the aggregate, unreasonable" (*29 USCS 1401(a)(3)(B)*). A multiemployer pension plan notified a withdrawn employer of withdrawal liability claimed to amount to $ 268,168.81, and filed an action in a Federal District Court seeking the assessed liability, while the employer countersued to bar collection and claimed that (1) the employer's complete withdrawal from the plan had occurred prior to the effective date of the MPPAA, and (2) the MPPAA was unconstitutional. The actions were consolidated in the United States District Court for the Central District of California, which ordered the parties to arbitrate the employer's first claim, and the arbitrator determined that (1) the employer had not withdrawn prior to the effective date of the MPPAA, (2) the employer had not met its burden of showing that the actuarial assumptions and methods used in assessing liability had been unreasonable, and (3) the withdrawal liability would be reduced on other grounds to $ 190,465.57. The employer then filed another action in the District Court to set aside or modify the arbitrator's decision, and again challenged the validity of the MPPAA. The District Court, however, confirmed the award, and the District Court's judgment was affirmed by the United States Court of Appeals for the Ninth Circuit without published opinion (*936 F2d 576*).

On certiorari, the United States Supreme Court affirmed. In an opinion by Souter, J., joined by Rehnquist, Ch. J., and White, Blackmun, Stevens, and Kennedy, JJ., joined in part (except as to holding 5(c) below) by O'Connor, J., joined in pertinent part by Scalia, J., and joined in part (except as to holding 2 below) by Thomas, J., it was held that (1) the withdrawal liability provisions of the MPPAA do not violate the due process clause of the *Federal Constitution's Fifth Amendment* simply by placing the initial determination of withdrawal liability in the hands of the plan sponsor where that role is filled by a board of trustees, even if the possibility of bias would bar trustees as a matter of due process from serving as adjudicators, because in such a situation, the trustees function in an enforcement capacity and the first adjudication is the arbitration proceeding; (2) the presumption under 1401(a)(3)(A) does not deny an employer a fair adjudication in violation of the due process clause by limiting the arbitrator's autonomy to determine withdrawal liability and so preserving the alleged bias of plan trustees, assuming that the presumption is inapplicable to issues of law, since (a) the presumption as written incoherently mixes terms relating to burden of proof before an initial trier of fact with terms relating to standards of review, and (b) a substantial constitutional question can be avoided, while

still giving effect to Congress' intent, by a construction placing the burden on the employer to disprove a challenged factual determination by a preponderance of the evidence; (3) the presumption under 1401(a)(3)(B) does not violate due process, because (a) the assumptions and methods used in calculating withdrawal liability are selected in the first instance by actuaries, who are trained professionals subject to regulatory standards and are not vulnerable to suggestions of bias, and (b) an employer's burden in overcoming the presumption is simply to show that the methods and assumptions employed would not have been acceptable to a reasonable actuary; (4) the MPPAA as applied to the case at hand did not violate the employer's substantive due process rights; and (5) the MPPAA as applied did not effect a "taking" of the employer's property without just compensation, in violation of the *Fifth Amendment*, because (a) the Federal Government, through the provisions in question, did not physically invade or permanently appropriate any of the employer's assets for the government's own use, (b) the employer's withdrawal liability had not been shown to be out of proportion to the company's experience with the plan, and, even assuming that the company would in fact be required to pay out 46 percent of shareholder equity, a mere diminution in the value of property was insufficient to demonstrate a taking, and (c) since pension plans had long been subject to federal regulation when the employer began contributions to the plan in question, and the plan particularly had been subject to statutory provisions imposing a contingent liability of up to 30 percent of a withdrawing employer's net worth, the employer could have had no reasonable expectation that it would not be faced with liability for promised benefits, and could not rely on the 30 percent limit as there was no reasonable basis to expect that the legislative ceiling would never be raised.

O'Connor, J., concurred, expressing the view that (1) the court ought not to decide, without adversary briefing and argument, whether the former limitation of an employer's withdrawal liability to 30 percent of the employer's net worth under ERISA might prevent retroactive withdrawal liability above that limit for an employer like the one at issue, who joined a multiemployer pension plan after the passage of ERISA but before the passage of the MPPAA; and (2) an employer that joined a multiemployer plan before ERISA had been promulgated might have a strong constitutional challenge to retroactive withdrawal liability.

Thomas, J., concurred in part and concurred in the

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

judgment, expressing the view that (1) the presumption under 1401(a)(3)(A) is not an incoherent combination of burdens of proof and standards of review, but establishes a burden of proof requiring an employer to show by a preponderance of the evidence that the plan sponsor had made a determination that is (a) unreasonable, or (b) clearly erroneous in the nontechnical sense of an obvious error; (2) the court's reinterpretation of 1401(a)(3)(A) was plainly contrary to Congress' intent to shield the sponsor's factual determinations behind a presumption of correctness; and (3) 1401(a)(3)(A) did not deprive the employer of its right to procedural due process, because the arbitration proceedings, presumption and all, provided adequate process for the employer.

# Headnotes

CONSTITUTIONAL LAW §778.5 > PENSIONS AND RETIREMENT FUNDS §1 > due process -- liability for withdrawal -- trustee bias -- > Headnote:
*LEdHN[1A]*[⤓] [1A]*LEdHN[1B]*[⤓] [1B]*LEdHN[1C]*[⤓] [1C]

The provisions of the Multiemployer Pension Plan Amendments Act of 1980 (29 USCS 1381-1399, *1405*) which require an employer withdrawing from a multiemployer pension plan to pay a "withdrawal liability" assessed by the plan sponsor do not violate the due process clause of the *Federal Constitution's Fifth Amendment* simply by placing the initial determination of withdrawal liability in the hands of the plan sponsor where that role is filled by a board of trustees--even assuming that the possibility of bias stemming from the statutory role and fiduciary obligations of plan trustees would suffice as a matter of due process to bar the trustees from serving as adjudicators of the employer's withdrawal liability--because the trustees in such a situation function in an enforcement rather than an adjudicatory capacity, since (1) the statute (a) requires the plan sponsor to notify the employer of the amount of withdrawal liability and to demand payment, actions that bear the hallmarks of an assessment rather than an adjudication, and (b) does not require the trustees to hold a hearing, to examine witnesses, or to adjudicate disputed issues of fact or law; and (2) the first adjudication is the proceeding that occurs before an arbitrator under *29 USCS 1401* to resolve disputes between a plan sponsor and an employer regarding withdrawal liability.

CONSTITUTIONAL LAW §830.7 > PENSIONS AND RETIREMENT FUNDS §1 > due process -- statutory presumption -- withdrawal liability -- > Headnote:
*LEdHN[2A]*[⤓] [2A]*LEdHN[2B]*[⤓] [2B]*LEdHN[2C]*[⤓] [2C]*LEdHN[2D]*[⤓] [2D]*LEdHN[2E]*[⤓] [2E]*LEdHN[2F]*[⤓] [2F]*LEdHN[2G]*[⤓] [2G]

A provision of the Multiemployer Pension Plan Amendments Act of 1980 (*29 USCS 1401(a)(3)(A)*)-- that, for purposes of an arbitration proceeding to resolve disputes between an employer and a pension plan sponsor regarding the employer's withdrawal liability, certain determinations by the plan sponsor are presumed correct unless the party contesting the determination "shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous"--does not deny the employer a fair adjudication in violation of the due process clause of the *Federal Constitution's Fifth Amendment* by limiting the arbitrator's autonomy to determine withdrawal liability and so preserving the alleged bias of plan trustees in making liability determinations, assuming that the presumption is inapplicable to issues of law, where (1) the presumption as written incoherently mixes terms relating to burden of proof before an initial trier of fact with terms relating to standards of review, and (2) a substantial question of procedural fairness, which would be raised if the presumption were interpreted as requiring the arbitrator to accept the possibly biased trustees' findings absent a showing sufficient to instill a definite or firm conviction that a mistake had been made, can be avoided, while still giving effect to Congress' intent to shift the burden of persuasion to the employer, by a construction placing the burden on the employer to disprove a challenged factual determination by a preponderance of the evidence; because the presumption as so construed does not foreclose any factual issue from independent consideration by the concededly neutral arbitrator, there is no constitutional infirmity in the presumption, and for the same reason, there is no derivative constitutional defect in the further presumption of correctness which a Federal District Court, in a subsequent civil action, must afford to an arbitrator's findings of fact under *29 USCS 1401(c)*. (Thomas, J., dissented in part from this holding.)

CONSTITUTIONAL LAW §830.7 > PENSIONS AND

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

RETIREMENT FUNDS §1 > due process -- presumption -- withdrawal liability -- actuarial methods --  > Headnote:
*LEdHN[3A]*[🔽] [3A] *LEdHN[3B]*[🔽] [3B] *LEdHN[3C]*[🔽] [3C]

An employer is not deprived of its rights under the due process clause of the *Federal Constitution's Fifth Amendment* by a provision of the Multiemployer Pension Plan Amendments Act of 1980 (*29 USCS 1401(a)(3)(A)*)--that, for purposes of an arbitration proceeding to resolve disputes between an employer and a pension plan sponsor regarding the employer's withdrawal liability, the sponsor's calculation of the plan's unfunded vested benefits is presumed correct unless the party contesting the determination "shows by a preponderance of the evidence" that the actuarial assumptions and methods used in the determination "were, in the aggregate, unreasonable"--because (1) the assumptions and methods used in calculating withdrawal liability are selected in the first instance not by the trustees of a pension plan, but instead, under *29 USCS 1393(a)(1)*, by the plan actuary; (2) the actuary, unlike the trustees, is not vulnerable to suggestions of bias or the appearance of bias, since such actuaries, though employed by the plan sponsors, are trained professionals subject to regulatory standards, and since both the technical nature of an actuary's assumptions and methods and the necessity for applying the same assumptions and methods in more than one context limit the opportunity that an actuary might otherwise have to act unfairly toward a withdrawing employer; (3) although assumptions used in other contexts may be supplemented by several actuarial assumptions unique to withdrawal liability, it has not been shown that any such withdrawal-liability assumption is so manipulable as to create a significant opportunity for bias to operate; (4) an employer's burden to overcome the presumption is simply a burden to show that the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary, and is in practical terms a burden to show something about standard actuarial practice, not about the accuracy of a predictive calculation, although consonance with professional standards might justify confidence that the calculation's results are sound; (5) although the employer's burden is not simple, given that there are often several equally correct approaches to the technical actuarial matters involved, this difficulty is unavoidable due to the imprecision inhering in the choice of actuarial methods and assumptions; and (6) because this difficulty must fall on whichever party bears the burden of persuasion, at least where the interests at stake are no more substantial than those of the

employer in the case at hand, the allocation of the difficulty to one party or another does not raise an issue of due process.

CONSTITUTIONAL LAW §729 > substantive due process -- pension plan withdrawal liability --  > Headnote:
*LEdHN[4A]*[🔽] [4A] *LEdHN[4B]*[🔽] [4B] *LEdHN[4C]*[🔽] [4C] *LEdHN[4D]*[🔽] [4D] *LEdHN[4E]*[🔽] [4E]

Provisions of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) (29 USCS 1381-1399, *1405*) which require an employer withdrawing from such a plan to pay a "withdrawal liability" assessed by the plan sponsor do not, as applied to the case of a company which was assessed withdrawal liability despite a contention that the company's complete withdrawal from the plan had predated the MPPAA's effective date, violate the company's right to substantive due process under the *Federal Constitution's Fifth Amendment*, because (1) although some of the conduct on which the company's liability rests predates the MPPAA, since there would be no withdrawal liability without prewithdrawal contributions to the plan, this is not a sufficient basis for claiming a substantive due process violation; (2) the claim that the company did not contribute to the plan long enough for the company's employees to earn vested benefits by working for the company does not preclude a rational relationship between the company's payment of past contributions and the imposition of liability for a share of the unfunded vested benefits, since (a) employer contributions are not solely for the benefit of employees who have worked for a given employer alone, and employees of the company may have had vested benefits at the time of the company's withdrawal by virtue of their combined work for the company and others, (b) in any event, the relevant question is not whether a withdrawing employer's employees have vested benefits, but whether an employer has contributed to the plan's probable liability by providing employees with service credits, and (c) when the withdrawing employer's liability is based on the proportion of the plan's contributions-- and coincident service credits--provided by the employer during its participation in the plan, the imposition of withdrawal liability is rational; (3) although it is possible, depending on the future employment of the company's former employees, that the company's withdrawal liability may amount to more than the share of the plan's liability strictly attributable to employment of covered workers at the company, (a) this possibility is a

risk that the company accepted when it joined the plan, (b) since the MPPAA spreads the unfunded vested liability among employers in approximately the same manner that the cost would have been spread if all employers participating at the time of withdrawal had seen the venture through, the withdrawal liability is consistent with the risks assumed on joining a plan, and (c) in any event, the fit between justification and means need not be mathematically precise; (4) even if limitations on liability under the plan's 1962 trust agreement and under 1977-1980 labor agreements apply to the company, this does not strengthen the substantive due process claim, given that the rationality standard of due process review has been met; (5) the possibility that the plan's unfunded liability may have resulted from trustee decisions made before the company entered the plan, or may have been increased by later decisions over which the company had no control because it did not belong to any association represented among the trustees, does not affect the issue, since the company could have assessed such problems before its voluntary entry into the plan; and (6) thus, the imposition of withdrawal liability on the company is rationally related to the terms of the company's participation in the plan which the company joined.

EMINENT DOMAIN §103 > taking -- pension plan withdrawal liability -- > Headnote:

**LEdHN[5A]**[⬇] [5A] **LEdHN[5B]**[⬇] [5B] **LEdHN[5C]**[⬇] [5C] **LEdHN[5D]**[⬇] [5D] **LEdHN[5E]**[⬇] [5E] **LEdHN[5F]**[⬇] [5F] **LEdHN[5G]**[⬇] [5G]

A company's property is not "taken" without just compensation, in violation of the *Federal Constitution's Fifth Amendment*, by the application to the company of provisions of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) (29 USCS 1381-1399, *1405*) which require an employer withdrawing from such a plan to pay a "withdrawal liability" assessed by the plan sponsor, because (1) the claim of an illegal taking gains nothing from the fact that the company was protected by the terms of its contract with the plan from any liability beyond the specified contributions to which the company had agreed; (2) the Federal Government, through the provisions in question, does not physically invade or permanently appropriate any of the company's assets for the government's own use, but instead safeguards participants in a multiemployer pension plan, and this interference with the property rights of an

employer, an interference arising from a public program adjusting the benefits and burdens of economic life to promote the common good, does not constitute a taking requiring government compensation; (3) the company's property is not impermissibly taken for the sole purpose of protecting the Pension Benefit Guaranty Corporation (PBGC), a government body, from being forced to honor its pension insurance, as the fact that the solvency of a pension trust fund may ultimately redound to the benefit of the PBGC is merely incidental to the primary congressional objective of protecting covered employees and beneficiaries of pension trusts; (4) the fact that the company lacked control over investment and benefit decisions that may have increased the size of the plan's unfunded vested liability does not strengthen a takings claim, since the company voluntarily chose to participate in the plan even though the company was not a member of any association represented among the plan's trustees; (5) as to the severity of the economic impact, the company's withdrawal liability has not been shown to be out of proportion to the company's experience with the plan, and, even assuming that the company is correct in claiming that it will be required to pay out 46 percent of shareholder equity, it has been established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking; (6) as to the degree of interference with the company's reasonable investment-backed expectations, pension plans had long been subject to federal regulation when the company began contributions to the plan in question, and in particular the plan was already subject to statutory provisions imposing a contingent liability of up to 30 percent of a withdrawing employer's net worth, so the company could have had no reasonable expectation that it would not be faced with liability for promised benefits, and the company cannot rely on the 30 percent limit because there was no reasonable basis to expect that the legislative ceiling would never be raised; and (7) thus, in light of the relationship between the company and the plan, there is no basis to conclude that the company is being forced to bear a burden which, in all fairness and justice, should be borne by the public as a whole. (O'Connor, J., dissented in part from this holding.)

TRUSTS §34 > trustee -- duty of loyalty -- > Headnote:

**LEdHN[6]**[⬇] [6]

Under principles of equity, a trustee bears an

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties; to deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against trustees dividing their loyalties must be enforced with uncompromising rigidity.

**LABOR §12.5 > employee benefit fund -- duty of trustee -- > Headnote:**
*LEdHN[7][⬇]* [7]

The duty of the management-appointed trustee of an employee benefit fund under 302(c)(5) of the Labor Management Relations Act (*29 USCS 186(c)(5)*) is directly antithetical to that of an agent of the appointing party.

**CONSTITUTIONAL LAW §746 > due process -- neutral adjudicator -- nonjudicial proceedings -- civil and criminal matters -- > Headnote:**
*LEdHN[8A][⬇]* [8A] *LEdHN[8B][⬇]* [8B]

Under the Federal Constitution, due process requires a neutral and detached judge in the first instance, and the command is no different when a legislature delegates adjudicative functions to a private party; before one may be deprived of a protected interest, whether in a criminal or civil setting, one is entitled as a matter of due process of law to an adjudicator who is not in a situation which would offer a possible temptation to the average person as a judge that might lead that person not to hold the balance nice, clear, and true; justice must satisfy the appearance of justice, and this stringent rule may sometimes bar trial even by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties; this, too, is no less true where a private party is given statutory authority to adjudicate a dispute.

**JUDGES §7 > disqualification -- > Headnote:**
*LEdHN[9][⬇]* [9]

Officers acting in a judicial or quasi-judicial capacity generally are disqualified by their interest in the

controversy to be decided.

**CONSTITUTIONAL LAW §746 > neutral adjudicator -- civil or criminal -- > Headnote:**
*LEdHN[10][⬇]* [10]

In a criminal or civil setting, even an appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator in violation of the Federal Constitution's due process requirements.

**CONSTITUTIONAL LAW §751 > due process -- neutrality -- prosecutors or plaintiffs -- > Headnote:**
*LEdHN[11][⬇]* [11]

The Federal Constitution's rigid due process requirements of neutrality designed for officials performing judicial or quasi-judicial functions are not applicable to those acting in a prosecutorial or plaintiff-like capacity; where an initial determination is made by a party acting in an enforcement capacity, due process may be satisfied by providing for a neutral adjudicator to conduct a de novo review of all factual and legal issues.

**EVIDENCE §869.7 > Headnote:**
*LEdHN[12][⬇]* [12]

The burden of showing something by a preponderance of the evidence requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before the trier may find in favor of the party who has the burden to persuade the trier of the fact's existence.

**APPEAL §1464 > review of factual finding -- > Headnote:**
*LEdHN[13A][⬇]* [13A] *LEdHN[13B][⬇]* [13B]

On appeal, a factual finding is "clearly erroneous" when, although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed; an

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

"unreasonableness" standard is even more deferential and requires an even greater certainty of error on the part of a reviewing party, so that the reviewer must sustain a finding of fact unless it is so unlikely that no reasonable person would find it to be true, to whatever the required degree of proof.

EVIDENCE §88 > burdens of proof -- > Headnote:
**LEdHN[14][⬇]** [14]

Before any burden of proof before a trier of fact can be satisfied in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty.

ARBITRATION §11 > proceedings -- > Headnote:
**LEdHN[15][⬇]** [15]

In arbitration proceedings under *29 USCS 1401* to resolve disputes regarding the withdrawal liability of an employer under pertinent provisions of the Multiemployer Pension Plan Amendments Act of 1980 (29 USCS 1381-1399, *1405*), the arbitrator does not function simply as a reviewing body in the classic sense, for the arbitrator is not only obliged to enquire into the soundness of the pension plan sponsor's determinations as to withdrawal liability when those determinations are challenged, but may receive new evidence in the course of the arbitrator's review and may adopt the arbitrator's own conclusions of fact.

EVIDENCE §88 > burden of persuasion -- > Headnote:
**LEdHN[16][⬇]** [16]

Outside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment.

STATUTES §100 > purpose -- legislative history --

> Headnote:
**LEdHN[17][⬇]** [17]

In the usual case of a statute's textual ambiguity, a court will turn to the legislative purpose as revealed by the history of the statute, for such light as that purpose may shed.

STATUTES §107 > construction avoiding constitutional problem -- > Headnote:
**LEdHN[18A][⬇]** [18A]**LEdHN[18B][⬇]** [18B]

In a case of statutory ambiguity, where an otherwise acceptable construction of a statute would raise serious constitutional problems, courts will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress; this canon of construction applies with equal force when terminology renders a statute incoherent.

PENSIONS AND RETIREMENT FUNDS §1 > arbitration -- applying presumptions -- > Headnote:
**LEdHN[19][⬇]** [19]

Determining the date of an employer's complete withdrawal from a multiemployer pension plan in a particular case, for purposes of determining whether the withdrawal occurred prior to the effective date of the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 (29 USCS 1381-1399, *1405*), presents not a mere question of fact on which an arbitrator is required in the first instance to apply the presumption under *29 USCS 1401(a)(3)(A)* that any determination by the plan sponsor regarding withdrawal liability is correct, but rather presents a mixed question of fact and law; the relevant facts in the case at hand are about the closure of the employer's plant--such as the employer's intent with respect to the plant, the employer's expression of that intent, the employer's activities while the plant was not operating, and the circumstances under which the plant subsequently reopened--while the question whether these facts amount to a complete withdrawal is one of law.

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****1

APPEAL §1750 > question not to be decided -- > Headnote:
**LEdHN[20][⬇]** [20]

The United States Supreme Court--in reviewing on certiorari a Federal Court of Appeals' judgment upholding an arbitrator's award against an employer under the withdrawal liability provisions of the Multiemployer Pension Plan Amendments Act of 1980 (29 USCS 1381-1399, *1405*), where the arbitrator's decision fails to reveal the force with which factual conclusions by the trustees of the pension plan in question were presumed correct pursuant to *29 USCS 1401(a)(3)(A)*--will not reverse the judgment below for consideration of the extent to which the arbitrator's application of the presumption was contrary to the Supreme Court's construction of the incoherent language of 1401(a)(3)(A) regarding the force of the presumption, because (1) there were virtually no contested factual determinations by the trustees to which the arbitrator might have deferred, given that (a) the plan's letter to the employer claiming withdrawal liability in a particular amount contains no statement of facts justifying the trustee's demand, and (b) the parties entered into a factual stipulation in Federal District Court prior to commencing the arbitration; and (2) on the one question of fact that may have been disputed, the arbitrator made a finding that was favorable to the employer and that did not involve a misapplication of the presumption.

EVIDENCE §99 > Headnote:
**LEdHN[21][⬇]** [21]

Legislative acts adjusting the burdens and benefits of economic life come to the United States Supreme Court with a presumption of constitutionality.

EVIDENCE §101 > burden of showing invalidity -- > Headnote:
**LEdHN[22][⬇]** [22]

The burden is on one complaining that a legislative enactment violates due process to establish that the legislature has acted in an arbitrary and irrational way.

CONSTITUTIONAL LAW §89.5 > retrospective laws -- > Headnote:
**LEdHN[23A][⬇]** [23A]**LEdHN[23B][⬇]** [23B]

Legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations, even though the effect of the legislation is to impose a new duty or liability based on past acts.

CONSTITUTIONAL LAW §513 > due process -- economic legislation -- > Headnote:
**LEdHN[24][⬇]** [24]

Under the deferential standard of review applied in substantive due process challenges to economic legislation, there is no need for mathematical precision in the fit between justification and means.

CONSTITUTIONAL LAW §127 > impairment of contracts -- federal law -- > Headnote:
**LEdHN[25][⬇]** [25]

Federal economic legislation is not subject to constraints coextensive with those imposed upon the states by the Federal Constitution's contract clause (Art I, 10, cl 1).

CONSTITUTIONAL LAW §513 > due process -- economic legislation -- > Headnote:
**LEdHN[26][⬇]** [26]

Federal economic legislation is subject to due process review, under the *Federal Constitution's Fifth Amendment*, only for rationality.

CONSTITUTIONAL LAW §212 > impairment of contracts -- federal statutes -- > Headnote:
**LEdHN[27][⬇]** [27]

Contracts, however express, cannot fetter the authority of Congress; contracts may create rights of property, but

when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity; parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.

**EMINENT DOMAIN §75 > taking -- factors -- > Headnote:**
*LEdHN[28A]* [⬇] [28A] *LEdHN[28B]* [⬇]
[28B] *LEdHN[28C]* [⬇] [28C]

Three factors with particular significance in determining whether a governmental action "takes" private property, within the meaning of the *takings clause* of the *Federal Constitution's Fifth Amendment*, are (1) the nature of the governmental action, (2) the severity of the economic impact, and (3) the degree of interference with the property owner's reasonable investment-backed expectations.

**EMINENT DOMAIN §75 > taking -- physical occupation -- > Headnote:**
*LEdHN[29]* [⬇] [29]

In determining, for purposes of applying the *takings clause* of the *Federal Constitution's Fifth Amendment*, whether the appropriate analytical framework is the one employed in cases dealing with a permanent physical occupation or destruction of economically beneficial use of real property, the relevant question is whether the property taken is all or only a portion of the parcel of property in question; it is not sufficient to assert that the property which is taken is taken in its entirety.

**STATUTES §25.5 > right to challenge validity -- > Headnote:**
*LEdHN[30]* [⬇] [30]

Those who do business in a regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.

## Syllabus

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA) amended the Employee Retirement Income Security Act of 1974 (ERISA) to provide that in certain circumstances an employer withdrawing from a multiemployer plan incurs as "withdrawal liability" a share of the plan's unfunded vested benefits, *29 U.S.C. §§ 1381, 1391*. Withdrawal liability is assessed by means of a notification by the "plan sponsor" and a demand for payment. *§ 1399(b)*. An unresolved dispute is referred to arbitration, where (1) the sponsor's factual determinations are "presumed correct" unless a contesting party "shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous," *§ 1401(a)(3)(A)*; and (2) the sponsor's actuary's calculation **[****2]** of a plan's unfunded vested benefits is presumed correct unless a contesting party "shows by a preponderance of the evidence" that, *inter alia*, "the actuarial assumptions and methods" used in a calculation "were, in the aggregate, unreasonable," *§ 1401(a)(3)(B)*. Petitioner Concrete Pipe and Products of California, Inc., is an employer charged with withdrawal liability by the trustees of respondent, a multiemployer pension plan (Plan). After losing in arbitration, Concrete Pipe filed an action to set aside or modify the arbitrator's decision and raised a constitutional challenge to the MPPAA, but the District Court granted the Plan's motion to confirm the award. The Court of Appeals affirmed.

*Held:*

1. The MPPAA does not unconstitutionally deny Concrete Pipe an impartial adjudicator by placing the determination of withdrawal liability in the plan sponsor, here the trustees, subject to *§ 1401*'s presumptions. Pp. 616-636.

(a) Even assuming that the possibility of trustee bias toward imposing the greatest possible withdrawal liability would suffice to bar the trustees from serving as adjudicators of Concrete Pipe's withdrawal liability because of their fiduciary obligations **[****3]** to beneficiaries of the Plan, the Due Process Clause is not violated here because the first adjudication in this case was the arbitration proceeding, not the trustees' initial liability determination. The trustees' statutory notification and demand obligations are undertaken in an enforcement capacity. Pp. 616-620.

(b) Nor did the arbitrator's adjudication deny Concrete Pipe its right to procedural due process. While the *§ 1401(a)(3)(A)* presumption shifts the burden of persuasion to the employer, the statute is incoherent

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****3

with respect to the degree of certainty required to overturn a plan sponsor's factual determination. In light of the assumed bias, deference to a plan sponsor's determination would raise a substantial due process question. The uncertainty raised by this incoherent statute is resolved by applying the canon requiring that an ambiguous statute be construed to avoid serious constitutional problems unless such construction is plainly contrary to Congress's intent. Thus, the presumption is construed to place the burden on the employer to disprove an alleged fact by a preponderance permitting independent review by the arbitrator of the trustees' factual determinations. **[****4]** The approach taken by the arbitrator and courts below in this case is not inconsistent with this Court's interpretation of the first presumption. Pp. 621-631.

(c) The § 1401(a)(3)(B) presumption also raises no procedural due process issue. The assumptions and methods used in calculating withdrawal liability are selected in the first instance not by the trustees, but by the plan actuary, § 1393(c), who is a trained professional subject to regulatory standards. The technical nature of the assumptions and methods, and the necessity for applying the same ones in several contexts, limit an actuary's opportunity to act unfairly toward a withdrawing employer. Moreover, since § 1401(a)(3)(B) speaks not about the reasonableness of the trustees' conclusions of historical fact, but about the aggregate reasonableness of the actuary's assumptions and methods in calculating the dollar liability figure, an employer's burden to overcome the presumption is simply to show that an apparently unbiased professional, whose obligations tend to moderate any claimed inclination to come down hard on withdrawing employers, has based a calculation on a combination of methods and assumptions that falls outside **[****5]** the range of reasonable actuarial practice. Pp. 631-636.

2. The MPPAA, as applied, does not deny substantive due process in violation of the *Fifth Amendment*. The imposition of withdrawal liability is clearly rational here because Concrete Pipe's liability is based on a proportion of its contributions during its participation in the Plan. Pp. 636-641.

3. The MPPAA, as applied, did not take Concrete Pipe's property without just compensation. The application of a regulatory statute that is otherwise within Congress's powers may not be defeated by private contractual provisions, such as those protecting Concrete Pipe from liability beyond what was specified in its collective-bargaining and trust agreements. See *Connolly v.*

*Pension Benefit Guaranty Corporation, 475 U.S. 211, 223-224, 89 L. Ed. 2d 166, 106 S. Ct. 1018*. Examining Concrete Pipe's relationship with the Plan in light of the three factors the Court has said have particular significance for takings claims confirms this. First, the Government did not physically invade or permanently appropriate Concrete Pipe's assets for its own use. Second, Concrete Pipe has failed to show that having to pay out an estimated **[****6]** 46% of shareholder equity is an economic impact out of proportion to its experience with the Plan, since diminution in a property's value, however serious, is insufficient to demonstrate a taking. See, *e.g., Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 384, 71 L. Ed. 303, 47 S. Ct. 114* **[****7]** . Third, the conditions on its contractual promises did not give Concrete Pipe a reasonable expectation that it would not be faced with liability for promised benefits. At the time it began making payments to the Plan, pension plans had long been subject to federal regulation. Indeed, withdrawing employers already faced contingent liability under ERISA, and Concrete Pipe's reliance on ERISA's original limitation of contingent withdrawal liability to 30% of net worth is misplaced, there being no reasonable basis to expect that the legislative ceiling would never be lifted, see *Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 16, 49 L. Ed. 2d 752, 96 S. Ct. 2882*. Pp. 641-647.

**Counsel:** *Dennis R. Murphy* argued the cause for petitioner. With him on the briefs was *James M. Nelson*.

*John S. Miller, Jr.*, argued the cause and filed a brief for respondent.

*Carol Connor Flowe* argued the cause for the Pension Benefit Guaranty Corporation as *amicus curiae* urging affirmance. With her on the brief were *Jeffrey B. Cohen* and *Israel Goldowitz*. [*]

_____

[*] Briefs of *amici curiae* urging reversal were filed for the American Trucking Associations, Inc., by *Daniel R. Barney, Laurie T. Baulig*, and *William E. Ewing;* and for Midwest Motor Express, Inc., et al. by *Alan J. Thiemann, Charles T. Carroll, Jr.*, and *Thomas D. Wilcox*.

Briefs of *amici curiae* urging affirmance were filed for the American Academy of Actuaries by *Lauren M. Bloom;* for the American Federation of Labor and Congress of Industrial Organizations by *Robert M. Weinberg* and *Laurence Gold;* for the Central States, Southeast and Southwest Areas Pension

508 U.S. 602, *602; 113 S. Ct. 2264, **2264; 124 L. Ed. 2d 539, ***539; 1993 U.S. LEXIS 4053, ****7

**[****8]**

**Judges:** SOUTER, J., delivered the opinion of the Court, which was unanimous except insofar as O'CONNOR, J., did not join the statement to which n.28 is attached, SCALIA, J., did not join Part III-B-1-b, and THOMAS, J., did not join Part III-B-1. O'CONNOR, J., filed a concurring opinion, post, p. 647. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, post, p. 649.

**Opinion by:** SOUTER

# Opinion

**[*605] [***553] [**2270]**  JUSTICE SOUTER delivered the opinion of the Court. [1]

*LEdHN[1A]*[↑] ] [1A] *LEdHN[2A]*[↑] ] [2A] *LEdHN[3A]*[↑] ] [3A] *LEdHN[4A]*[↑] ] [4A] *LEdHN[5A]*[↑]
[5A]Respondent Construction Laborers Pension Trust for Southern California (Plan) is a multiemployer pension trust fund established under a Trust Agreement executed in 1962. Petitioner Concrete Pipe and Products of California, Inc. (Concrete Pipe), is an employer and former contributor to the Plan that withdrew from it and was assessed "withdrawal liability" **[****9]** under provisions of the Employee Retirement Income Security Act of 1974 (ERISA), *29 U.S.C. §§ 1301-1461 (1988 ed. and Supp. III)*, added by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub. L. 96-364, 94 Stat. 1208. Concrete Pipe contends that the MPPAA's assessment and arbitration provisions worked to deny it procedural due process. And, although we have upheld the MPPAA against constitutional challenge under the substantive component of the Due Process Clause and the *Takings Clause*, *Pension Benefit Guaranty Corporation v. R. A. Gray & Co., 467 U.S. 717, 81 L. Ed. 2d 601, 104 S. Ct. 2709 (1984)*; *Connolly v. Pension Benefit Guaranty Corporation, 475 U.S. 211, 89 L. Ed. 2d 166, 106 S. Ct. 1018 (1986)*, Concrete Pipe contends that, as applied to

it, the MPPAA violates these provisions as well. **[**2271]** We see merit in none of Concrete Pipe's contentions.

I

A pension plan like the one in issue, to which more than one employer contributes, is characteristically maintained to fulfill the terms of collective-bargaining agreements. The contributions made by employers participating in such a multiemployer **[****10]** plan are pooled in a general fund available to pay any benefit obligation of the plan. To receive benefits, an **[*606]** employee participating in such a plan need not work for one employer for any particular continuous period. Because service credit is portable, employees of an employer participating in the plan may receive such credit for any work done for any participating employer. An employee obtains a vested right to secure benefits upon retirement after accruing a certain length of service for participating employers; benefits vest under the Plan in this case when an employee accumulates 10 essentially continuous years of credit. See Brief for Petitioner 28.

Multiemployer plans like the one before us have features that are beneficial in industries where

> "there [is] little if any likelihood that individual employers would or could establish single-employer plans for their employees . . . [,] where there are hundreds and perhaps thousands of small employers, with countless numbers of employers going in and out of business each year, [and where] the nexus of employment has focused on the relationship of the workers to the union to which they belong, and/or the **[****11]** industry in which they are employed, rather than to any particular employer." Multiemployer Pension Plan Termination Insurance Program: Hearings before the Subcommittee on Oversight of the House Committee on **[***554]** Ways and Means, 96th Cong., 1st Sess., 50 (1979) (statement of Robert A. Georgine, Chairman, National Coordinating Committee for Multiemployer Plans).

Multiemployer plans provide the participating employers with such labor market benefits as the opportunity to offer a pension program (a significant part of the covered employees' compensation package) with cost and risk-sharing mechanisms advantageous to the employer. The plans, in consequence, help ensure that each participating employer will have access to a trained labor force whose members are able to move

---

Fund by *Thomas C. Nyhan* and *Terence G. Craig;* for the National Coordinating Committee for Multiemployer Plans by *Gerald M. Feder* and *David R. Levin;* and for the Teamsters Pension Trust Fund of Philadelphia & Vicinity et al. by *James D. Crawford, James J. Leyden, Thomas W. Jennings,* and *Kent Cprek.*

[1] JUSTICE SCALIA does not join Part III-B-1-b of this opinion.

from one employer and one job to another without [*607] losing service credit toward pension benefits. See _29 CFR § 2530.210(c)(1) (1991)_; accord, _Washington Star Co. v. International Typographical Union Negotiated Pension Plan, 582 F. Supp. 301, 304 (DC 1983)_.

Since the enactment of ERISA in 1974, the Plan has been subject to the provisions of the [****12] statute as _HN1_[↑] a "defined benefit plan." Such a plan is one that does not qualify as an "'individual account plan' or 'defined contribution plan,'" which provide, among other things, for an individual account for each covered employee and for benefits based solely upon the amount contributed to the covered employee's account. See _29 U.S.C. §§ 1002(35)_, _1002(34)_, _1002(7)_. Concrete Pipe has not challenged the determination that the Plan falls within the statutory definition of defined benefit plan, and no issue as to that is before the Court.

A

We have canvassed the history of ERISA and the MPPAA before. See _Pension Benefit Guaranty Corporation v. R. A. Gray & Co., supra_; _Connolly v. Pension Benefit Guaranty Corporation, supra._ ERISA was designed "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in [them] . . . . Congress wanted to guarantee that if a worker has been promised a defined pension benefit upon retirement -- and if he has fulfilled whatever conditions are required to obtain a [****13] vested benefit -- he will actually receive it." _475 U.S. at 214_ (citations [**2272] and internal quotation marks omitted). As enacted in 1974, ERISA created the Pension Benefit Guarantee Corporation (PBGC) to administer and enforce a pension plan termination insurance program, to which contributors to both single-member and multiemployer plans were required to pay insurance premiums. _29 U.S.C. §§ 1302(a)_, _1306 (1988 ed. and Supp. III)_. Under the terms of the statute as originally enacted, the guarantee of basic [*608] benefits by multiemployer plans that terminated was not to be mandatory until 1978, and for terminations prior to that time, any guarantee of benefits upon plan termination was discretionary with PBGC. _29 U.S.C. §§ 1381(c)(2)-(4) (1976 ed.)_. If PBGC did choose to extend a guarantee when a multiemployer plan terminated with insufficient assets to pay promised benefits, an employer that had contributed to the plan in the five preceding years was liable to PBGC for the shortfall in proportion to its share

of contributions during [***555] that 5-year period, up to 30 percent of the employer's net worth. [****14] _29 U.S.C. §§ 1362(b)_, _1364 (1976 ed.)_. "In other words, any employer withdrawing from a multiemployer plan was subject to a contingent liability that was dependent upon the plan's termination in the next five years and the PBGC's decision to exercise its discretion and pay guaranteed benefits." _Gray, 467 U.S. at 721_.

"As the date for mandatory coverage of multiemployer plans approached, Congress became concerned that a significant number of plans were experiencing extreme financial hardship." _Ibid._ Indeed, the possibility of liability upon termination of a plan created an incentive for employers to withdraw from weak multiemployer plans. _Connolly, 475 U.S. at 215_. The consequent risk to the insurance system was unacceptable to Congress, which in 1978 postponed the mandatory guarantee pending preparation by the PBGC of a report "analyzing the problems of multiemployer plans and recommending possible solutions." _Ibid._ PBGC issued that report on July 1, 1978. Pension Benefit Guaranty Corporation, Multiemployer Study Required by P. L. 95-214 (1978). "To alleviate the problem of employer withdrawals, the PBGC suggested new [****15] rules under which a withdrawing employer would be required to pay whatever share of the plan's unfunded liabilities was attributable to that employer's participation." _Connolly, 475 U.S. at 216_ (citation and internal quotation marks omitted).

[*609] Congress ultimately agreed, see _id., at 217_, and passed the MPPAA, which was signed into law by the President on September 26, 1980. _HN2_[↑] Under certain provisions of the MPPAA (which when enacted had an effective date of April 29, 1980, _29 U.S.C. § 1461(e)(2)(A) (1976 ed., Supp. V)_), if an employer withdraws from a multiemployer plan, it incurs "withdrawal liability" in the form of "a fixed and certain debt to the pension plan." _Gray, supra, at 725_. An employer's withdrawal liability is its "proportionate share of the plan's 'unfunded vested benefits,'" that is, "the difference between the present value of vested benefits" (benefits that are currently being paid to retirees and that will be paid in the future to covered employees who have already completed some specified period of service, _29 U.S.C. § 1053_) "and the current value of the plan's [****16] assets. _29 U.S.C. §§ 1381_, _1391_." _Gray, supra, at 725_. [2]

---

[2] In various places the statute uses the terms "participant" and "beneficiary," and these terms are defined at _29 U.S.C. §§_

508 U.S. 602, *609; 113 S. Ct. 2264, **2272; 124 L. Ed. 2d 539, ***555; 1993 U.S. LEXIS 4053, ****16

B

**HN3**[↑]] The MPPAA provides the procedure for calculating and assessing withdrawal liability. **[**2273]** The plan's actuary, who is subject to regulatory and professional standards, _29 U.S.C. §§ 1241_, _1242_; _26 U.S.C. § 7701(a)(35)_, must determine the present value of the plan's liability **[***556]** for vested benefits. [3] In the absence of regulations promulgated by the PBGC, the actuary must employ "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and **[****17]** which, in combination, offer the actuary's best estimate of anticipated experience under the plan." _29 U.S.C._ _[*610]_ _§ 1393(a)(1)_. [4] The assumptions must cover such matters as mortality of covered employees, likelihood of benefits vesting, and, importantly, future interest rates. After settling the present value of vested benefits, the actuary calculates the unfunded portion by deducting the value of the plan's assets. _§ 1393(c)_.

**HN4**[↑]] In order to determine a particular employer's withdrawal liability, the unfunded vested liability is allocated under one of several methods **[****18]** provided by law. _§ 1391_. In this case, the Plan used the presumptive method of _§ 1391(b)_, which bases withdrawal liability on the proportion of total employer contributions to the plan made by the withdrawing employer during certain 5-year periods. See _§§ 1391(b)(2) (E)(ii)_, _(b)(3)(B)_, _(b)(4)(D)(ii)_. In essence, the withdrawal liability imposes on the withdrawing employer a share of the unfunded vested liability proportional to the employer's share of contributions to the plan during the years of its participation.

**HN5**[↑]] Withdrawal liability is assessed in a notification by the "plan sponsor" (here the trustees, see _§ 1301(a)(10)(A)_) and a demand for payment. _§ 1399(b)_. The statute requires notification and demand to be made "as soon as practicable after an employer's

---

[1002(7)_, _1002(8)_. For simplicity, we will use the term "covered employee" to refer depending on context both to those earning service credits and to those entitled to benefits.

[3] Even if no employer withdraws, ERISA requires an assessment of the plan's liability at least annually. See _29 U.S.C. § 1082(c)(9) (1988 ed., Supp. III)_.

[4] While the PBGC is also authorized to promulgate regulations governing such assumptions under _29 U.S.C. § 1393(a)_, it has not done so. See Brief for Pension Benefit Guaranty Corp. as _Amicus Curiae_ 7, n.7.

---

complete or partial withdrawal." _§ 1399(b)(1)_. **HN6**[↑]] A "complete withdrawal"

"occurs when an employer --

"(1) Permanently ceases to have an obligation to contribute under the plan, or

"(2) permanently ceases all covered operations under the plan." § 1383(a). [5]

**[*611]** **HN7**[↑]] "The date of a complete withdrawal is the date of the cessation of the obligation to contribute or the cessation of covered operations. **[****19]** " § 1383(e).

**HN8**[↑]] The statute provides that if an employer objects after notice and demand for withdrawal liability, and the parties cannot resolve the dispute, _§ 1399(b)(2)_, it shall be referred to arbitration. See _§ 1401(a)(1)_. Two presumptions may attend the arbitration. First, "any determination made by a plan sponsor under [_29 U.S.C. §§ 1381-1399_ and _1405 (1988 ed. and Supp. III)_)] is presumed correct **[***557]** unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." _29 U.S.C. § 1401(a)(3)(A)_. Second, the sponsor's calculation of a plan's unfunded vested benefits

**HN9**[↑]] "is presumed correct unless a party contesting the determination shows by a preponderance of evidence that --

"(i) the actuarial **[****20]** assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or

"(ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods." _§ 1401(a) (3)(B)_.

**[**2274]** **HN10**[↑]] The statute provides for judicial review of the arbitrator's decision by an action in the district court to enforce, vacate, or modify the award. See _§ 1401(b)(2)_. In any such action "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." _§ 1401(c)_.

II

---

[5] There is an exception to this definition that applies to the building and construction industry, see § 1383(b), but neither party argues that it pertains in this case.

508 U.S. 602, *611; 113 S. Ct. 2264, **2274; 124 L. Ed. 2d 539, ***557; 1993 U.S. LEXIS 4053, ****20

The parties to the Trust Agreement creating the Plan in 1962 are the Southern California District Council of Laborers (Laborers) and three associations of contractors, the **[*612]** Building Industry of California, Inc., the Engineering Contractors Association, and the Southern California Contractors Association, Inc. App. 75, P 6 (stipulation of facts filed in the District Court). HN11[↑] Under § 302(c)(5)(B) of the Labor Management Relations Act, 1947 (LMRA), _29 U.S.C. § 186(c)(5)(B)_, when a union participates in management **[****21]** of a plan permitted by the LMRA, the plan must be administered jointly by representatives of labor and management. Accordingly, half of the Plan's trustees are selected by the Laborers, and half by these contractors' associations. Concrete Pipe has never been a member of any of the contractors' associations that are parties to the Trust Agreement.

In 1976, Concrete Pipe, which is a wholly owned subsidiary of Concrete Pipe and Products Co., Inc., purchased certain assets of another company, Cen-Vi-Ro, including a concrete pipe manufacturing plant near Shafter, California, which Concrete Pipe continued to operate much as Cen-Vi-Ro had done. Cen-Vi-Ro had collective-bargaining agreements with several unions including the Laborers, and Concrete Pipe abided by the agreement with the latter by contributing to the Plan at a specified rate for each hour worked by a covered employee. [6] In 1978, Concrete Pipe negotiated a new 3-year contract with the Laborers that called for continuing contributions to be made to the Plan based on hours worked by covered employees in the collective-bargaining unit. [7] The collective-bargaining agreement specified that it would remain in **[***558]** effect **[****22]** until June 30, 1981, and thereafter from year to year unless either Concrete Pipe or the Laborers gave notice of a desire to renegotiate or terminate it. "'Such written notice [was to] be given at least sixty (60) **[*613]** days prior to June 30 … [and if] no agreement [was] reached by June 30 … the Employer or the [Laborers might] thereafter give written notice to the other that on a specified date [at least] fifteen (15) days [thereafter] the Agreement [should] be considered terminated.'" App. 76.

In August 1979, Concrete Pipe stopped production at the Shafter facility. Although the details **[****23]** do not matter here, by October 1979, work by employees covered by the agreement with the Laborers had virtually ceased, and Concrete Pipe eventually stopped making contributions to the Plan. In the spring of 1981, Concrete Pipe and the Laborers each sent the other a timely notice of a desire to renegotiate the collective-bargaining agreement. Concrete Pipe subsequently bargained to an impasse and, on November 30, 1981, sent the Laborers a letter withdrawing recognition of that union as an employee representative, and giving notice of intent to terminate the 1978 collective-bargaining agreement. At about the same time, however, in November 1981, Concrete Pipe reopened the Shafter plant to produce 7,000 tons of concrete pipe needed to fill two orders for which it had successfully bid. It hired employees in classifications covered by **[**2275]** its prior agreement with the Laborers, but did not contribute to the Plan for their work.

In January 1982, the Plan notified Concrete Pipe of withdrawal liability claimed to amount to $ 268,168.81. See _id., at 89-94_. Although the demand letter did not specify the date on which the Plan contended that "complete withdrawal" from it had taken **[****24]** place, it referred to the failure of Concrete Pipe to make contributions to the Plan since February 1981, and stated that "we are further advised that you have not signed a renewal of a collective bargaining agreement obligating you to continue contributions to the Plan on behalf of the Construction laborers currently in your employ." _Id., at 90_.

The Plan filed suit seeking the assessed withdrawal liability. Concrete Pipe countersued to bar collection, contending **[*614]** that "complete withdrawal" had occurred when operations at the Shafter plant ceased in August 1979, a date prior to the effective date of the MPPAA, and challenging the MPPAA on constitutional grounds. These cases were consolidated in the United States District Court for the Central District of California, which _sua sponte_ ordered the parties to arbitrate the issue of whether withdrawal occurred prior to the effective date of the MPPAA. [8]

---

[6] The average rate for covered employees at which Concrete Pipe contributed to the Plan in 1977 was $ 1.14 per hour, and Concrete Pipe's contributions for 1977 totaled $ 29,337.71.

[7] The collective-bargaining agreement provided for contributions for each laborer at a rate of $ 1.20 per hour. In 1978 Concrete Pipe's total contribution to the Plan was $ 49,913.04, and in 1979 it was $ 20,826.60.

[8] The District Court concluded that the effective date of the withdrawal liability provisions of the MPPAA was September 26, 1980, in reliance on the Ninth Circuit's decision in _Shelter Framing Corp. v. Pension Benefit Guaranty Corporation, 705 F.2d 1502 (1983)_, which held the retroactivity provision of the MPPAA unconstitutional. App. 198. The decision in _Shelter_

[****25]  The arbitration took place in two [***559] phases. In the first, the arbitrator determined that Concrete Pipe had not withdrawn from the Plan prior to the effective date of the MPPAA. App. 216. In the second phase, explicitly applying the presumption of _29 U.S.C. § 1401(a)(3)(B)_, the arbitrator found that Concrete Pipe had failed to meet its burden of showing the actuarial assumptions and methods to be unreasonable in the aggregate. App. 400. For reasons not at issue here, the arbitrator did rule partially in Concrete Pipe's favor, and reduced the withdrawal liability from $ 268,168.81 to $ 190,465.57.

Concrete Pipe then filed a third action in the District Court, to set aside or modify the arbitrator's decision, and again raised its constitutional challenge. _Id., at 406_. The District Court treated Concrete Pipe's subsequent motion for summary judgment as a petition to vacate the arbitrator's award, which it denied, and granted a motion by the Plan to confirm the award. _Construction Laborers Pension Trust for Southern California_ v. _Cen-Vi-Ro Concrete Pipe_ [*615] _and Products_, CV-82-5184-HLH (CD Cal., July 5, 1989), App. 416-425. [9] On [****26] Concrete Pipe's appeal, the judgment of the District Court was affirmed. _Board of Trustees of Construction Laborers Pension Trust for Southern California v. Concrete Pipe and Products of California, Inc., 1991 U.S. App. LEXIS 14787_, No. 89-55854 (CA9, June 27, 1991), App. 431-432, judgt. order reported at _936 F.2d 576_. We granted certiorari limited to two questions presented, which are set out in the margin. _504 U.S. 940 (1992)_. [10]

_____

_Framing_ was reversed by this Court in _Pension Benefit Guaranty Corporation v. R. A. Gray & Co., 467 U.S. 717, 81 L. Ed. 2d 601, 104 S. Ct. 2709 (1984)_. Subsequent to this Court's decision in _Gray_, Congress amended the effective date of the MPPAA's withdrawal liability provisions. See _29 U.S.C. § 1461(e)(2)(a)_.

[9] In its motion to confirm the award, the Plan also asked that it be modified. The District Court treated this as a motion to vacate the arbitration award and denied it as well. See App. 416. The Plan did not appeal.

[10] Our grant of certiorari was limited to the questions: "Do the presumptions in _29 U.S.C. § 1401_ favoring multiemployer plans like Construction Laborers Pension Trust for Southern California … violate the due process rights of Concrete Pipe and Products by denying access to an impartial decisionmaker?" and "Do the provisions of the Multi-Employer Pension Plan Amendments Act … violate the **Fifth Amendment** rights of Concrete Pipe and Products, _as applied_, by retroactively imposing withdrawal liability on an employer who never had employees vested in the pension

[****27] [**2276]   III

Concrete Pipe challenges the assessment of withdrawal liability on several grounds, the first being that by placing determination of withdrawal liability in the trustees, subject to the presumptions provided by _§ 1401_, the MPPAA is unconstitutional because it denies Concrete Pipe an impartial adjudicator. This is not the first time this legal question has been before the Court. See _Pension Benefit Guaranty Corporation v. Yahn & McDonnell, Inc., 481 U.S. 735, 95 L. Ed. 2d 692, 107 S. Ct. 2171 (1987)_, aff'g by an equally divided Court _United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128 (CA3 1986)_.

[*616]   A

1

_LEdHN[6]_[⬆] [6] _LEdHN[7]_[⬆] [7]Concrete Pipe and its _amici_ point to several potential sources of trustee bias toward imposing the greatest possible withdrawal liability. The one they emphasize most [***560] strongly has roots in the fact that "all of the trustees, including those selected by employers, are fiduciaries of the fund, _29 U.S.C. § 1002 (21)_([A]), and thus owe an exclusive duty to the fund." [****28] _Id., at 139_ (emphasis omitted). As we said in another case discussing employee benefit pension plans permitted under LMRA:

_HN12_[⬆] ] "Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties. To deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with 'uncompromising rigidity.'

. . . .

"In sum, the duty of the management-appointed trustee of an employee benefit fund under § 302(c)(5) is directly antithetical to that of an agent of the appointing party . . . . ERISA essentially codified the strict fiduciary standards that a § 302(c)(5) trustee must meet. [Title _29 U.S.C. § 1104(a)(1)_] requires a trustee to 'discharge his duties . . . solely in the interest of the participants

_____

plan and whose collective bargaining agreements specifically limited liability to contributions made?" Pet. for Cert. i.

[*i.e.*, covered employees] and beneficiaries.'" *NLRB v. Amax Coal Co., 453 U.S. 322, 329-332, 69 L. Ed. 2d 672, 101 S. Ct. 2789 (1981)* (citations and footnote omitted).

The resulting tug away from the interest of the [****29] employer is fueled by the threat of personal liability for any breach of the trustees' fiduciary responsibilities, obligations, or duties, *29 U.S.C. § 1109*, which may be enforced by civil actions brought by the Secretary of Labor or any covered employee or beneficiary of the plan, § 1132(a)(2).

[*617] The trustees could act in a biased fashion for several reasons. The most obvious would be in attempting to maximize assets available for the beneficiaries of the trust by making findings to enhance withdrawal liability. The next would not be so selfless, for if existing underfunding was the consequence of prior decisions of the trustees, those decisions could, if not offset, leave the trustees open to personal liability. See Brief for American Trucking Associations, Inc., as *Amicus Curiae* 9. A risk of bias may also inhere in the mere fact that, fiduciary obligations aside, the trustees are appointed by the unions and by employers. Union trustees may be thought to have incentives, unrelated to the question of withdrawal, to impose greater rather than lesser withdrawal liability. Employer trustees may be responsive to concerns of those employers who continue [****30] to contribute, whose future burdens may be reduced by high withdrawal liability, and whose competitive position may be enhanced to boot. See Brief for Midwest Motor Express, Inc., et al. as *Amici Curiae* 8, citing Note, Trading Fairness for Efficiency: Constitutionality of the Dispute Resolution Procedures of the Multiemployer Pension Plan Amendments Act of 1980, *71 Geo. L. J. 161, 168 (1982)*.

[**2277] *LEdHN[8A]*[⬆] [8A] *LEdHN[9]*[⬆] [9] *LEdHN[10]*[⬆] [10]As against these supposed threats to the trustees' neutrality, *HN13*[⬆] due process requires a "neutral and detached judge in the first instance," *Ward v. Village of Monroeville, 409 U.S. 57, 61-62, 34 L. Ed. 2d 267, 93 S. Ct. 80 (1972)*, and the [***561] command is no different when a legislature delegates adjudicative functions to a private party, see *Schweiker v. McClure, 456 U.S. 188, 195, 72 L. Ed. 2d 1, 102 S. Ct. 1665 (1982)*. "That officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule." *Tumey v. Ohio, 273 U.S. 510, 522, 71 L. Ed. 749, 47 S. Ct. 437 (1927)*. [****31] Before one may be deprived of a protected interest, whether in a

criminal or civil setting, see *Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 64 L. Ed. 2d 182, 100 S. Ct. 1610, and n.2 (1980)*, one is entitled as a matter of due process of law to an adjudicator who is not in a situation "'which would offer a possible [*618] temptation to the average man as a judge . . . which might lead him not to hold the balance nice, clear and true . . . .'" *Ward, supra, at 60* (quoting *Tumey, supra, at 532*). Even appeal and a trial *de novo* will not cure a failure to provide a neutral and detached adjudicator. *409 U.S. at 61*.

*LEdHN[1B]*[⬆] ] [1B] *LEdHN[8B]*[⬆] ] [8B]"Justice," indeed, "must satisfy the appearance of justice, and this stringent rule may sometimes bar trial [even] by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." *Marshall v. Jerrico, Inc., supra, at 243* (citations and internal quotation marks omitted). This, too, is no less true where a private party is given statutory authority to adjudicate a dispute, [****32] and we will assume that the possibility of bias, if only that stemming from the trustees' statutory role and fiduciary obligation, would suffice to bar the trustees from serving as adjudicators of Concrete Pipe's withdrawal liability.

2

*LEdHN[11]*[⬆] ] [11]The assumption does not win the case for Concrete Pipe, however, for a further strand of governing law has to be applied. *HN14*[⬆] ] Not all determinations affecting liability are adjudicative, and the "'rigid requirements' . . . designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity." *446 U.S. at 248*. Where an initial determination is made by a party acting in an enforcement capacity, due process may be satisfied by providing for a neutral adjudicator to "conduct a *de novo* review of all factual and legal issues." Cf. *id., at 245*; see also *id., at 247-248*, and n.9; cf. *Withrow v. Larkin, 421 U.S. 35, 58, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975)* ("Clearly, if the initial view of the facts based on the evidence derived from nonadversarial processes as a practical or legal [****33] matter foreclosed fair and effective consideration at a subsequent adversary hearing leading to ultimate decision, a substantial due process question would be raised").

[*619] *LEdHN[1C]*[⬆] ] [1C]The distinction between adjudication and enforcement disposes of the claim that the assumed bias or appearance of bias in the trustees' initial determination of withdrawal liability alone violates the Due Process Clause, much as it did the similar claim

in *Marshall* v. *Jerrico.* Although we were faced there with a federal agency administrator who **[***562]** determined violations of a child labor law and assessed penalties under the statute, we concluded that the administrator could not be held to the high standards required of those "whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." *446 U.S. at 250*. Of the administrator there we said, "He is not a judge. He performs no judicial or quasi-judicial functions. He hears no witnesses and rules on no disputed factual or legal questions. The function of assessing a violation **[**2278]** is akin to that of **[****34]** a prosecutor or civil plaintiff." *Id., at 247*.

This analysis applies with equal force to the trustees, who, we find, act only in an enforcement capacity. HN15[↑] The statute requires the plan sponsor, here the trustees, to notify the employer of the amount of withdrawal liability and to demand payment, *29 U.S.C. § 1399(b)(1)*, actions that bear the hallmarks of an assessment, not an adjudication. The trustees are not required to hold a hearing, to examine witnesses, or to adjudicate the disputes of contending parties on matters of fact or law. [11] **[****35]** In *Marshall*, we observed that an employer "except[ing] to a penalty . . . is entitled to a *de novo* hearing before an administrative law judge," *446 U.S. at 247*, and we concluded that this latter proceeding was the **[*620]** "initial adjudication," *id., at 247, n.9*. Likewise here, we conclude that the first adjudication is the proceeding that occurs before the arbitrator, not the trustees' initial determination of liability. [12]

B

LEdHN[2B][↑] ] [2B] LEdHN[3B][↑] ] [3B]This does not

---

[11] While the employer "may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments," *29 U.S.C. § 1399(b)(2)*, and while the plan sponsor must then respond, *ibid.*, this hardly amounts to "adjudication." The statute does not require the employer to exhaust the avenue of making a request of the plan sponsor prior to initiating arbitration proceedings. See *§ 1401(a)(1)*.

[12] "We need not say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function," *Marshall, 446 U.S. at 250* (footnote omitted), as that issue is not within the scope of the questions on which we granted certiorari in this case.

end our enquiry, however, for Concrete Pipe goes on to argue that the statutory presumptions preserve the trustees' bias by limiting the arbitrator's autonomy to determine withdrawal liability, and thus work to deny the employer a fair adjudication.

1

LEdHN[2C][↑] ] [2C]Under the first provision at issue here, "any determination made by the plan sponsor under [*29 U.S.C. §§ 1381-1399* and *1405*] is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." *29 U.S.C. § 1401(a)(3)(A)*. Concrete Pipe argues that this presumption denied it an impartial adjudicator on the issue **[****36]** of its withdrawal date, thus raising a constitutional **[***563]** question on which the Courts of Appeals have divided. [13]

**[****37] [*621]** The parties apparently agree that this presumption applies only to factual determinations, see Reply Brief for Petitioner 17; Brief for Respondent 24 (deferring to brief for the PBGC as *amicus curiae*); Brief for Pension Benefit Guaranty Corporation as *Amicus Curiae* 10, and n.11, and this position is consistent with a PBGC regulation requiring the arbitrator "in reaching his **[**2279]** decision [to] follow applicable law, as

---

[13] The Courts of Appeals for the First, Second, Fourth, Ninth, and District of Columbia Circuits have found the provision at issue constitutional, while the Court of Appeals for the Third Circuit has struck it down. Compare *Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Indus. Pension Fund, Inc., 762 F.2d 1137, 1140-1143 (CA1 1985)* (en banc); *Board of Trustees of Western Conference of Teamsters Pension Trust Fund v. Thompson Bldg. Materials, Inc., 749 F.2d 1396, 1403-1404 (CA9 1984)*, cert. denied, *471 U.S. 1054, 85 L. Ed. 2d 481, 105 S. Ct. 2116 (1985)*; *Washington Star Co. v. International Typographical Union Negotiated Pension Plan, 235 U.S. App. D.C. 1, 10, 729 F.2d 1502, 1511 (1984)*; *Textile Workers Pension Fund v. Standard Dye & Finishing Co., 725 F.2d 843, 855* (CA2), cert. denied *sub nom. Sibley, Lindsay & Curr Co. v. Bakery, Confectionery & Tobacco Workers, 467 U.S. 1259, 82 L. Ed. 2d 856, 104 S. Ct. 3554 (1984)*; and *Republic Indus., Inc.* v. *Teamsters Joint Council No. 83 of Virginia Pension Fund, 718 F.2d 628, 639-641 (CA4 1983)*, cert. denied, *467 U.S. 1259, 82 L. Ed. 2d 855, 104 S. Ct. 3553 (1984)*, with *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d 128, 138-142 (CA3 1986)*, aff'd by an equally divided Court *sub nom. Pension Benefit Guaranty Corporation v. Yahn & McDonnell, Inc., 481 U.S. 735, 95 L. Ed. 2d 692, 107 S. Ct. 2171 (1987)*.

508 U.S. 602, *621; 113 S. Ct. 2264, **2279; 124 L. Ed. 2d 539, ***563; 1993 U.S. LEXIS 4053, ****37

embodied in statutes, regulations, court decisions, interpretations of the agencies charged with the enforcement of the Act, and other pertinent authorities," 29 CFR § 2641.4(a)(1) (1992). We will assume for purposes of this case that the regulation reflects a sound reading of the statute. [14]

[****38]   a

It is clear that the presumption favoring determinations of the plan sponsor shifts a burden of proof or persuasion to the employer. The hard question is what the employer must show under the statute to rebut the plan sponsor's factual determinations, that is, how and to what degree of probability the employer must persuade the arbitrator that the sponsor was wrong. The question is hard because the statutory text refers to three different concepts in identifying this burden: "preponderance," "clearly erroneous," and "unreasonable."

[*622]   *LEdHN[12]*[⬆] [12] *LEdHN[13A]*[⬆] [13A]*HN16*[⬆] The burden of showing something by a "preponderance of the evidence," the most common standard in the civil law, "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *In re Winship, 397 U.S. 358, 371-372, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970)* (Harlan, J., concurring) (brackets in original) (citation omitted). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [****39] [body] on the entire evidence is left with the [***564] definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 68 S. Ct. 525 (1948)*. A showing of "unreasonableness" would require even greater certainty of error on the part of a reviewing body. See, *e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

*LEdHN[14]*[⬆] [14]In creating the presumption at issue, these terms are combined in a very strange way. As our descriptions indicate, the first, "preponderance,"

is customarily used to prescribe one possible burden or standard of proof before a trier of fact in the first instance, as when the proponent of a proposition loses unless he proves a contested proposition by a preponderance of the evidence. The term thus belongs in the same category with "clear and convincing" and "beyond a reasonable doubt," which are also used to prescribe standards of proof (but when greater degrees of certainty are thought necessary). *HN17*[⬆] Before any such burden can be satisfied in the first instance, the factfinder must evaluate [****40] the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty.

The second and third terms differ from the first in an important way. They are customarily used to describe, not a degree of certainty that some fact has been proven in the first instance, but a degree of certainty that a factfinder in the first instance had made a mistake in concluding that a fact [*623] had been proven under the applicable standard of proof. They are, in other words, standards of review, and they are normally applied by reviewing courts to determinations of fact made at trial by courts that have made those determinations in an adjudicatory capacity (unlike the trustees here). See, *e.g., Fed. Rule Civ. Proc. 52(a)*. As the terms readily indicate, a reviewing body characteristically examines prior findings in such a way as to give the original factfinder's conclusions of fact some degree of deference. This makes sense because in many circumstances the costs of providing for duplicative [**2280] proceedings are thought to outweigh the benefits [****41] (the second would render the first ultimately useless), and because, in the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.

*LEdHN[13B]*[⬆] [13B]Thus, *HN18*[⬆] review under the "clearly erroneous" standard is significantly deferential, requiring a "definite and firm conviction that a mistake has been committed." And application of a reasonableness standard is even more deferential than that, requiring the reviewer to sustain a finding of fact unless it is so unlikely that no reasonable person would find it to be true, to whatever the required degree of proof.

*LEdHN[2D]*[⬆] [2D] *LEdHN[15]*[⬆] [15]The

---

[14] There is no utility in attempting to construe § 1401(a)(3)(A) finely to apply the "unreasonable" standard to certain determinations possible under §§ 1381-1399 and 1405, and the "clearly erroneous" formulation to others. These distinctions are not relevant in light of the relationship in this context of both of these terms to the statutory phrase requiring a showing "by a preponderance," which we explain below.

strangeness in the statutory language creating the first presumption arises from the combination of terms from the first category (burdens of proof) with those from the second (standards of [***565] review). It is true, of course, that this apparent confusion of categories may have resulted from the hybrid nature of the arbitrator's proceeding in which [****42] it is supposed to be applied. The arbitrator here does not function simply as a reviewing body in the classic sense, for he is not only obliged to enquire into the soundness of the sponsor's determinations when they are challenged, but may receive new evidence in the course of his review and adopt his own conclusions of fact. He may conduct proceedings in the [*624] same manner and with the same powers as an arbitrator may do under Title 9 of the United State Code, see 29 U.S.C. § 1401(b)(3), being authorized, for example, to hear (indeed to subpoena) witnesses and to take evidence. See 9 U.S.C. § 7; 29 U.S.C. § 1401(b)(3) (making specific reference to subpoena power). He is, then, a reviewing body (as is clear from his obligation, absent a contrary showing, to deem certain determinations by the plan sponsor correct), but HN19[⬆] a reviewing body invested with the further powers of a finder of fact (as is clear from his power to take evidence in the course of his review and from the presumption of correctness that a district court is bound to give his "findings of fact," § 1401(c)). The arbitrator may thus provide a [****43] dual sort of trial and review, ultimately empowered to draw his own conclusions, and it would make sense to describe his different functions respectively by the language of trial and the language of review.

It does not, however, make sense to use the language of trial and the language of review as the statute does, for HN20[⬆] the statute does not refer to different arbitrator's functions in language appropriate to each; it refers, rather, to one single conclusion that must be drawn about a determination previously made by a plan sponsor. By its terms the statute purports to provide a standard for reviewing the sponsor's findings, and it defines the nature of the conclusion the arbitrator must draw by using a combination of terms that are categorically ill-matched. They are also inconsistent with each other on any reading. As used here, as distinct from its more usual context, the statutory phrase authorizing the arbitrator to reject a factual conclusion upon proof by a "preponderance" implies review of the sponsor's determination on the basis of the record, supplemented by any new evidence, for simple error. If this statutory phrase were given effect, and the arbitrator concluded from a [****44] review of the record and of new evidence that a finding of fact was more

probably wrong than not, it would be rejected, and a different [*625] finding might be substituted. On the other hand, requiring a showing that the sponsor's determination was "clearly erroneous" or "unreasonable" would grant the plan sponsor's factual findings a great deal of deference. But to say in this context that one must demonstrate that something is more probably clearly erroneous than not or more probably than not unreasonable is meaningless. One might as intelligibly say, in a trial court, that a criminal prosecutor is bound to prove each [**2281] element probably true beyond a reasonable doubt. The statute is thus incoherent with respect to the degree of probability of error required of the [***566] employer to overcome a factual conclusion made by the plan sponsor. [15]

[****45] LEdHN[16][⬆] [16]The proper response to this incomprehensibility is obviously important in deciding this case. If it permitted an employer to rebut the plan sponsor's factual conclusions by a [*626] preponderance, merely placing a burden of persuasion on the employer, and permitting adjudication of the facts by the arbitrator without affording deference to the plan sponsor's determinations, the provision would be

---

[15] JUSTICE THOMAS reads the statute not to be about the standard of review of the plan sponsor's findings of fact at all. On his reading, "clearly erroneous" is not a term of art, but an attempt at independent literal description. Under his reading, if the arbitrator concludes a factual determination of a plan sponsor is probably wrong, it will nonetheless be permitted to stand, unless the error is "obvious, plain, gross, significant, or manifest." See post, at 652 (citation omitted). JUSTICE THOMAS does not adequately explain what purpose would be served by a statute that let some erroneous (and presumably material) factual determinations stand even when they were "clearly erroneous" in the legal sense or "unreasonable," merely because of the degree to which they happened to deviate from the true facts, even when the latter are supported by overwhelming evidence. He does refer to a possible congressional desire to avoid disputes over "insignificant errors," post, at 655, but under his reading a factual error could be significant, in the sense that it was both material and undeniably incorrect, and yet still stand because it was not that far different from the truth.

JUSTICE THOMAS cites the presumption of innocence for the proposition that the presumption at issue here does not imply a standard of review. See post, at 652. But just because some presumptions do not imply standards of review does not mean that this one does not. Here, by its terms, the statutory presumption says that factual findings of the plan sponsor will stand unless some showing is made, necessarily implying a standard of review of those findings.

constitutionally unremarkable. For although we have observed that "where the burden of proof lies on a given issue is, of course, rarely without consequence and frequently may be dispositive to the outcome of the litigation or application, … outside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment." *Lavine v. Milne, 424 U.S. 577, 585, 47 L. Ed. 2d 249, 96 S. Ct. 1010 (1976)* (footnote omitted). Concrete Pipe points to no special interest that would distinguish this from the normal case. It is indeed entirely sensible to burden the party more likely to have information relevant to the facts about its withdrawal from the Plan with the obligation **[****46]** to demonstrate that facts treated by the Plan as amounting to a withdrawal did not occur as alleged. Such was the rule at common law. W. Bailey, Onus Probandi 1 (1886) (citing Powell on Evidence 167-171) ("In every case the *onus probandi* lies on the party who wishes to support his case by a particular fact which lies more peculiarly within his knowledge, or of which he is supposed to be cognizant").

*LEdHN[2E]*[ ] [2E]On the other hand, if the employer were required to show the trustees' findings to be either "unreasonable or clearly erroneous," there would be a substantial question of procedural fairness under the Due Process Clause. In essence, the arbitrator provided for by the statute would be required to accept the plan sponsor's findings, even if they were probably incorrect, absent a showing at least sufficient to instill a definite or firm conviction that a mistake had been made. Cf. *Withrow v. Larkin, 421 U.S. at 58.* **[***567]** In light of our assumption of possible bias, the employer would seem to be deprived thereby of the impartial adjudication in the first instance to which it is entitled under the Due Process Clause. See *supra, at [****47] 617-618*.

**[*627]** b

*LEdHN[17]*[ ] [17]Having found the statutory language itself incoherent, we turn, as we would in the usual case of textual ambiguity, to the legislative **[**2282]** purpose as revealed by the history of the statute, for such light as it may shed. [16] Unsurprisingly, we have found no direct discussion in the legislative history of the degree of certainty on the part of the arbitrator required for the employer to overcome the

sponsor's factual conclusions. The Report of the House Committee on Education and Labor on the bill that became the MPPAA describes the presumption as applying to "a determination of withdrawal liability by a plan," and lumps it together with the statutory presumption, discussed below, that applies to the choice of actuarial assumptions and methods. See H. R. Rep. No. 96-869, pt. 1, p. 86 (1980); *29 U.S.C. § 1401(a)(3)(B)*. [17] The Report states that

**[*628]** "these rules are necessary in order to ensure the enforceability of employer liability. In the absence of these presumptions, employers could effectively nullify their obligation by refusing to pay and forcing the plan sponsor to prove every element **[****48]** involved in making an actuarial determination. The committee believes it is extremely important that a withdrawn employer begin making the annual payments even though the period of years for which payments must continue will be based on the actual liability allocated to the employer." H. R. Rep. 96-869, pt. 1, *supra, at 86*.

The only other comment that we have found in the legislative history occurs in a Report prepared by **[***568]** the Senate Committee on Labor and Human Resources, which first purports to speak about both statutory presumptions, but directs its brief discussion to problems unique to "technical actuarial matters." See *S.*

---

[16] The textual incomprehensibility concerns a very narrow matter, and we find nothing in the structure of the statutory scheme that provides elucidation.

[17] The presumption at issue here was included in a new § 4221 added by the MPPAA to ERISA. In the text of the version of the bill to which the House Report refers the presumption was contained in § 4203, and the provision began: "For purposes of this part, a determination made with respect to a plan under section 4201 [relating to employer withdrawals] is presumed correct unless the party contesting the determination shows . . . ." See H. R. Rep. No. 96-869, pt. 1, p. 17 (1980). As enacted, this text was replaced with "For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 4201 through 4219 and section 4225 is presumed correct unless the party contesting the determination shows . . . ." Pub. L. 93-406, title IV, § 4221, as added, Pub. L. 96-364, title I, § 104(2), Sept. 26, 1980, 94 Stat. 1239, *29 U.S.C. § 1401(a)(3)(A)*. The text of what was called § 4201 differs somewhat from the text of the sections to which the enacted bill refers, which are now codified at *29 U.S.C. §§ 1381-1399* and *1405*. Our concern with legislative history here goes only to the question of what degree of certainty of error Congress intended to require in this situation. While the change in referent that took place might have some implications for this question, we do not think anything relevant in the legislative history turns on the different scope of the earlier version of the bill.

508 U.S. 602, *628; 113 S. Ct. 2264, **2282; 124 L. Ed. 2d 539, ***568; 1993 U.S. LEXIS 4053, ****48

*1076:* The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration, 96th Cong., 2d Sess., 20-21 (Comm. Print 1980) (hereinafter Committee Print); see also *infra*, at 635, and n.20.

**[****49]** The legislative history thus sheds little light on the odd language chosen to describe the employer's burden. All it tells us is that the provision's purpose is to prevent the employer from "forcing the plan sponsor to prove every element involved in making an actuarial determination." Since this purpose would be served simply by placing the burden of proof as to historical fact on the employer, however light or heavy that burden may be, the legislative history does nothing to make sense of the drafter's failure to choose among the standards included in the text.

c

*LEdHN[18A]*[⬆] [18A]The only way out of the muddle is by a different rule of construction. It is a hoary one that, *HN21*[⬆] in a case of statutory ambiguity, "where an otherwise acceptable construction of a **[*629]** statute would raise serious constitutional **[**2283]** problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council, 485 U.S. 568, 575, 99 L. Ed. 2d 645, 108 S. Ct. 1392 (1988).* "Federal statutes are to be so construed as **[****50]** to avoid serious doubt of their constitutionality. 'When the validity of an act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' *Crowell v. Benson, 285 U.S. 22, 62, 76 L. Ed. 598, 52 S. Ct. 285* [(1932)]." *Machinists v. Street, 367 U.S. 740, 749-750, 6 L. Ed. 2d 1141, 81 S. Ct. 1784 (1961).* Cf. *Parsons v. Bedford, 28 U.S. 433, 448-449, 7 L. Ed. 732 (1830)* (Story, J.) (a construction that would render a statute unconstitutional should be avoided); *Murray v. Schooner Charming Betsy, 6 U.S. 64, 118, 2 L. Ed. 208 (1804)* (Marshall, C. J.).

*LEdHN[2F]*[⬆] [2F] *LEdHN[18B]*[⬆] [18B]Although we are faced here not with ambiguity within the usual degree, but with incoherence, we have a common obligation in each situation to resolve the uncertainty in favor of definite meaning, and the canon for resolving ambiguity applies with equal force when terminology renders a statute incoherent. In applying that **[****51]**

canon here, we must give effect to the one conclusion clearly supported by the statutory language, that Congress intended to shift the burden of persuasion to the employer in a dispute over a sponsor's factual determination. This objective can be realized without raising serious constitutional concerns simply by construing the presumption to place the burden on the employer to disprove a challenged factual determination by a preponderance. In so construing the statute we make no pretense to have read the congressional mind to perfection. We would not, indeed, even have this problem if an argument could not obviously be made that Congress intended greater deference than the preponderance standard extends. But one could hardly call the **[***569]** intent clear after wondering why the preponderance **[*630]** standard was also included. In these circumstances it is enough that the choice to attain coherence by obviating constitutional problems is not "plainly contrary to the intent of Congress." *DeBartolo, supra, at 575.*

*LEdHN[2G]*[⬆] [2G] **[****52]** *HN22*[⬆] Because the statute as we construe it does not foreclose any factual issue from independent consideration by the arbitrator (the presumption is, again, assumed by all to be inapplicable to issues of law), there is no constitutional infirmity in it. For the same reason, that an employer may avail itself of independent review by the concededly neutral arbitrator, we find no derivative constitutional defect infecting the further presumption that a district court must afford to an arbitrator's findings of fact. See *29 U.S.C. § 1401(c).*

d

*LEdHN[19]*[⬆] [19]Before applying the presumption to this case, one must recognize that in spite of Concrete Pipe's contention to the contrary, determining the date of "complete withdrawal" presents not a mere question of fact on which the arbitrator was required in the first instance to apply the *§ 1401(a)(3)(A)* presumption, but a mixed question of fact and law. The relevant facts are about the closure of the Shafter plant (such as the intent of Concrete Pipe with respect to the plant, its expression of that intent, its activities while the plant was not operating, and the circumstances of the plant's reopening), while the **[****53]** question whether these facts amount to a "complete withdrawal" is one of law.

*LEdHN[20]*[⬆] [20]As to the truly factual issues, the arbitrator's decision fails to reveal the force with which factual conclusions by the trustees here were presumed correct, and in such a case we would ordinarily reverse

508 U.S. 602, *630; 113 S. Ct. 2264, **2283; 124 L. Ed. 2d 539, ***569; 1993 U.S. LEXIS 4053, ****53

the judgment below for consideration of the extent to which the arbitrator's application of the presumption [**2284] was contrary to the construction we adopt today. But two reasons (urged upon us by neither party) persuade us not to take this course: the Plan's letter to Concrete Pipe contains no statement of facts justifying the trustees' [*631] demand, and the parties entered into a factual stipulation in the District Court prior to commencing the arbitration. Because of these two circumstances, there were virtually no contested factual determinations to which the arbitrator might have deferred. And, on the one question of fact that may have been disputed, the arbitrator found, apparently in the first instance, that Concrete Pipe's intent in closing the Shafter plant had been to cease operations permanently. App. 213-214. [18]

[****54]   While we express no opinion on whether the facts in this case constitute a "complete withdrawal" within the meaning of the statute, a question not before us today, the approach taken by the arbitrator and [***570] the courts below is not inconsistent with our interpretation of the first presumption. The determination of the date of withdrawal by the arbitrator did not involve a misapplication of the statutory presumption, and it did not deprive Concrete Pipe of its right to procedural due process.

2

*LEdHN[3C]*[⬆] ] [3C]The second presumption at issue attends the calculation of the amount of withdrawal liability. *HN23*[⬆] ] The statute provides that in the absence of more particular PBGC regulations, the plan is required to use "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." *29 U.S.C. § 1393(a)(1)*. The presumption in question arises under *§ 1401(a)(3)(B)*, which provides that

[*632] *HN24*[⬆] ] "the determination of a plan's

unfunded vested benefits for a [****55] plan year, [is] presumed correct unless a party contesting the determination shows by a preponderance of evidence that --

"(i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or

"(ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods."

Concrete Pipe's concern is with the presumptive force of the actuarial assumptions and methods covered by subsection (i).

While this provision is like its counterpart creating the presumption as to factual determinations in placing the burden of proof on the employer, the issues implicated in applying it to the actuary's work are not the same. As the text plainly indicates, the assumptions and methods used in calculating withdrawal liability are selected in the first instance not by the trustees, but by the plan actuary. For a variety of reasons, this actuary is not, like the trustees, vulnerable to suggestions of bias or its appearance. Although plan sponsors employ them, *HN25*[⬆] actuaries are trained professionals subject to regulatory standards. See *29 U.S.C. §§ 1241,* [****56] *1242*; *26 U.S.C. § 7701(a)(35)*. The technical nature of an actuary's assumptions and methods, and the necessity for applying the same assumptions and methods in more than one context, as a practical matter limit the opportunity an actuary might otherwise have to act unfairly toward the withdrawing employer. The statutory requirement (of "actuarial assumptions and methods -- which, in the aggregate, are reasonable . . .") is not unique to the withdrawal liability context, for the statute [**2285] employs identical language in *29 U.S.C. § 1082(c)(3)* to describe the actuarial assumptions and methods to be used in determining whether a plan has satisfied the minimum funding requirements contained in the statute. The use of the same language to describe the actuarial [*633] assumptions and methods to be used in these different contexts [***571] tends to check the actuary's discretion in each of them.

"Using different assumptions [for different purposes] could very well be attacked as presumptively unreasonable both in arbitration and on judicial review.

"[This] view that the trustees are required to act in a reasonably [****57] consistent manner greatly limits their discretion, because the use of assumptions overly favorable to the fund in one

---

[18] Despite this favorable finding, Concrete Pipe still lost, of course. The arbitrator treated subjective intent as irrelevant. See App. 213-215. While the District Court and the Court of Appeals, which relied on the District Court's reasoning, did not go so far, see *id., at 419-420*, any factual deference in their decisions would be to the arbitrator's finding, itself untainted by the force of any presumption. See *29 U.S.C. § 1401(c)*; *Fed. Rule Civ. Proc. 52(a)*.

context will tend to have offsetting unfavorable consequences in other contexts. For example, the use of assumptions (such as low interest rates) that would tend to increase the fund's unfunded vested liability for withdrawal liability purposes would also make it more difficult for the plan to meet the minimum funding requirements of § 1082." *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc., 787 F.2d at 146-147* (Seitz, J., dissenting in part).

This point is not significantly blunted by the fact that the assumptions used by the Plan in its other calculations may be "supplemented by several actuarial assumptions unique to withdrawal liability." Brief for Respondent 26. Concrete Pipe has not shown that any method or assumption unique to the calculation of withdrawal liability is so manipulable as to create a significant opportunity for bias to operate, and arguably the most important assumption (in fact, the only actuarial assumption or method that Concrete Pipe attacks in terms, see Reply [****58] Brief for Petitioner 18-20) is the critical interest rate assumption that must be used for other purposes as well. [19]

[****59] [*634] The second major difference attending the two presumptions lies in the sense of reasonableness that must be disproven by an employer attacking the actuary's methods and assumptions, as against the reasonableness of the trustees' determinations of historical fact. Following the usual presumption of statutory interpretation, that the same term carries the same meaning whenever it appears in

_____

[19] It may be that the trustees could, in theory, replace the actuary's assumptions with their own, but that would involve a different case from this, and while we are aware of at least one case in which a plan sponsor exercised decisive influence over an actuary whose initial assumptions it disliked, see *Huber v. Casablanca Industries, Inc., 916 F.2d 85, 93 (CA3 1990)*, we know of none in which a plan sponsor was found to have replaced an actuary's actuarial methods or assumptions with different ones of its own. Although we express no view on the question whether a plan sponsor must adopt the assumptions used by the actuary, we note that the legislative history of § 1082, which was enacted as part of ERISA in 1974, suggests that the actuarial assumptions must be "independently determined by an actuary," and that it is "inappropriate for an employer to substitute his judgment … for that of a qualified actuary" with respect to these assumptions. S. Rep. No. 93-383, p. 70 (1973); see also H. R. Rep. No. 93-807, p. 95 (1974).

the same Act, see *Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 76 L. Ed. 1204, 52 S. Ct. 607 (1932)*, we might expect "reasonable" in § 1401(a)(3)(B) to function here just as it did in § 1401(a)(3)(A), to denote a certain range of probability that a factual determination is correct. For several reasons, however, we think it clear that this second presumption of reasonableness functions quite differently.

First, of course, the statute does [***572] not speak in terms of disproving the reasonableness of the calculation of the employer's share of the unfunded liability, which would be the finding of future fact most obviously analogous to the findings of historical fact to which the § 1401(a)(3)(A) presumption applies. *Section 1401(a)(3)(B)* [****60] HN26[↑] speaks instead of the aggregate reasonableness of the assumptions [**2286] and methods employed by the actuary in calculating the dollar liability figure. Because a "method" is not "accurate" or probably "true" within some range, "reasonable" must be understood here to refer to some different kind of judgment, one that it would make sense to apply to a review of methodology as [*635] well as of assumptions. Since the methodology is a subject of technical judgment within a recognized professional discipline, it would make sense to judge the reasonableness of a method by reference to what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation. Accordingly, an employer's burden to overcome the presumption in question (by proof by a preponderance that the actuarial assumptions and methods were in the aggregate unreasonable) is simply a burden to show that the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary. In practical terms it is a burden to show something about standard actuarial practice, not about the accuracy of a predictive [****61] calculation, even though consonance with professional standards in making the calculation might justify confidence that its results are sound.

As thus understood, the presumption in question supports no due process objection. HN27[↑] The employer merely has a burden to show that an apparently unbiased professional, whose obligations tend to moderate any claimed inclination to come down hard on withdrawing employers, has based a calculation on a combination of methods and assumptions that falls outside the range of reasonable actuarial practice. To be sure, the burden may not be so "mere" when one considers that actuarial practice has been described as more in the nature of an "actuarial art" than a science,

508 U.S. 602, *635; 113 S. Ct. 2264, **2286; 124 L. Ed. 2d 539, ***572; 1993 U.S. LEXIS 4053, ****61

*Keith Fulton & Sons v. New England Teamsters, 762 F.2d 1137, 1143 (CA1 1985)* (en banc) (internal quotation marks omitted), and that the employer's burden covers "technical actuarial matters with respect to which there are often several equally 'correct' approaches," Committee Print 20-21. [20] But since imprecision [*636] inheres in the choice of actuarial methods and assumptions, the resulting difficulty is simply in the nature of the beast. Because it must fall [****62] on whichever party bears the burden of persuasion on such an issue, at least where the interests at stake are no more substantial than Concrete Pipe's are here, its allocation to one party or another does not raise an issue of [***573] due process. See *supra, at 625-626.*

IV

Concrete Pipe argues next that, as applied, the MPPAA [****63] violates substantive due process and takes Concrete Pipe's property without just compensation, both in violation of the *Fifth Amendment.* As to these issues, our decisions in *Gray* and *Connolly* provide the principal guidance.

A

*LEdHN[4B]*[⬆] [4B] *LEdHN[21]*[⬆] [21] *LEdHN[22]*[⬆] [22] *LEdHN[23A]*[⬆] [23A]In *Gray* we upheld the MPPAA against substantive due process challenge. Unlike the employer in *Gray*, Concrete Pipe here has no complaint that the MPPAA has been retroactively applied by predicating liability on a withdrawal decision made before passage of the statute. To be sure, since there would be no withdrawal liability without prewithdrawal contributions to the Plan, some of which were made before the statutory enactment, some of the conduct upon which Concrete Pipe's liability rests antedates [**2287] the statute. But this fact presents a far weaker premise for claiming a substantive due process violation even than the *Gray* employer raised,

and rejection of Concrete Pipe's contention is compelled by our decisions not only in *Gray*, but in *Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 49 L. Ed. 2d 752, 96 S. Ct. 2882 (1976)*, [****64] upon which the *Gray* Court relied.

[*637] "'It is by now well established that *HN28*[⬆] legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. See, *e.g., Ferguson v. Skrupa, 372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028 (1963)*; *Williamson v. Lee Optical Co., 348 U.S. 483, 487-488, 99 L. Ed. 563, 75 S. Ct. 461 (1955).*

. . . .

"'It may be that the liability imposed by the Act … was not anticipated at the time of actual employment. But our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. See *Fleming v. Rhodes, 331 U.S. 100, 91 L. Ed. 1368, 67 S. Ct. 1140 (1947)*; *Carpenter v. Wabash R. Co., 309 U.S. 23, 84 L. Ed. 558, 60 S. Ct. 416 (1940)*; *Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 79 L. Ed. 885, 55 S. Ct. 407 (1935)*; *Home Bldg. & Loan Assn. v. Blaisdell, 290 U.S. 398, 78 L. Ed. 413, 54 S. Ct. 231 (1934)*; [****65] *Louisville & Nashville R. Co. v. Mottley, 219 U.S. 467, 55 L. Ed. 297, 31 S. Ct. 265 (1911)*. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts. See *Lichter v. United States, 334 U.S. 742, 92 L. Ed. 1694, 68 S. Ct. 1294 (1948)*; *Welch v. Henry, 305 U.S. 134, 83 L. Ed. 87, 59 S. Ct. 121 (1938)*; *Funkhouser v. Preston Co., 290 U.S. 163, 78 L. Ed. 243, 54 S. Ct. 134 (1933).*'" *Gray, 467 U.S. at 729-730,* quoting *Turner Elkhorn, supra, at 15-16* (footnotes omitted).

To avoid this reasoning, Concrete Pipe relies not merely on a [***574] claim of retroactivity, but on one of irrationality. Since the company contributed to the plan for only 3 1/2 years, it argues, none of its employees had earned vested benefits through employment by Concrete Pipe at the time of its withdrawal. See Brief for Petitioner 28. Concrete Pipe argues that, consequently, no rational relationship exists between its payment of past contributions and the imposition of liability for a

---

[20] Indeed, our view of the problem of imprecision in reviewing actuarial methods and assumptions seems to have been the very reason for including the presumption in the statute. The Senate Committee Report states that "the [Senate] Committee [on Labor and Human Resources] includes the presumption to reduce the likelihood of dispute and delay over technical actuarial matters with respect to which there are often several equally 'correct' approaches. Without such a presumption, a plan would be helpless to resist dilatory tactics by a withdrawing employer -- tactics that could, and could be intended to, result in prohibitive collection costs to the plan." Committee Print 20-21.

share of the unfunded vested benefits.

[****66] *LEdHN[4C][↑]* [4C]But this argument simply ignores the nature of multiemployer plans, which, as we have said above, operate by [*638] pooling contributions and liabilities. *HN29[↑]* An employer's contributions are not solely for the benefit of its employees or employees who have worked for it alone. Thus, Concrete Pipe's presupposition that none of its employees had vested benefits at the time of its withdrawal may be wrong. An employee whose benefits had vested before coming to work for Concrete Pipe may have earned additional vested benefits by the subsequent covered service. Another may have had sufficient prior service credit to obtain vesting of benefits during employment at Concrete Pipe. A third may have attained vesting while working for other employers but based in part on service credits earned at Concrete Pipe.

But even if Concrete Pipe is correct and none of its employees had earned enough service credits for entitlement to vested benefits by the time of Concrete Pipe's withdrawal, as a Concrete Pipe employee each had earned service credits that could be built upon in future employment with any other participating employer. In determining whether the imposition of withdrawal liability [****67] is rational, then, the relevant question is not whether a withdrawing employer's employees have vested benefits, but whether an employer has contributed to the plan's probable liability by providing employees with service credits. When the withdrawing employer's [**2288] liability to the plan is based on the proportion of the plan's contributions (and coincident service credits) provided by the employer during the employer's participation in the plan, the imposition of withdrawal liability is clearly rational.

*LEdHN[4D][↑]* [4D] *LEdHN[24][↑]* [24]It is true that, depending on the future employment of Concrete Pipe's former employees, the withdrawal liability assessed against Concrete Pipe may amount to more (or less) than the share of the Plan's liability strictly attributable to employment of covered workers at Concrete Pipe. But this possibility was exactly what Concrete Pipe accepted when it joined the Plan. *HN30[↑]* A multiemployer plan has features of an insurance scheme in which employers spread the risk that their employees will meet the plan's vesting requirements [*639] and obtain an entitlement to benefits. A rational employer hopes that its employees will vest [****68] at a rate above the average for all employees of contributing employers, and that, in this way, it will pay less than it would have

by creating a single-employer plan. But the rational employer also appreciates the foreseeable risk that circumstances may produce the opposite [***575] result. [21] Since the MPPAA spreads the unfunded vested liability among employers in approximately the same manner that the cost would have been spread if all of the employers participating at the time of withdrawal had seen the venture through, the withdrawal liability is consistent with the risks assumed on joining a plan (however inconsistent that liability may be with the employer's hopes). In any event, under the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means. See *Turner Elkhorn, 428 U.S. at 19*.

[****69] *LEdHN[4E][↑]* [4E] *LEdHN[25][↑]* [25] *LEdHN[26][↑]* [26]Concrete Pipe's substantive due process claim is not enhanced by its argument that the MPPAA imposes obligations upon it contrary to limitations on liability variously contained in the 1962 Trust Agreement, [22] [****70] in a collective-bargaining [*640] agreement between the Laborers and multiemployer associations (the "1977-1980 Laborer's

---

[21] An employer's calculation whether to join a plan will include these factors as well as a determination of the other benefits it can hope to receive from its participation in the plan. See *supra, at 606-607*.

[22] The 1962 Trust Agreement states:

"'Section 4.07. Neither the Association or (sic) any officer, agent, employee or (sic) committee member of the Associations shall be liable to make Contributions to the Fund or with respect to the Pension Plan, except to the extent that he or it may be an Individual Employer required to make Contributions to the Fund with respect to his or its own individual or joint venture operations, or to the extent he may incur liability as a Trustee as hereinafter provided. The liability of any Individual Employer to the Fund, or with respect to the Pension Plan, shall be limited to the payments required by the Collective Bargaining Agreements with respect to his or its individual or joint venture operations, and in no event shall he or it be liable or responsible for any portion of the Contributions due from other Individual Employers with respect to the operations of such Individual Employers. The Individual Employers shall not be required to make any further payments or Contributions to the cost of operation of the Fund or of the Pension Plan, except as may be hereafter provided in the Collective Bargaining Agreements.

Craft Master Labor Agreement") [23] and in an appendix to the "Southern California Master Labor Agreements in 1977-1980." [24] Even assuming that [**2289] all these provisions [***576] apply to Concrete Pipe, [25] its argument runs against the holding in *Gray* that federal economic legislation, which is not subject to constraints [*641] coextensive with those imposed upon the States by the Contract Clause of Art. I, § 10, of the Federal Constitution, *Gray, 467 U.S. at 733*; *United States Trust Co. of N. Y. v. New Jersey, 431 U.S. 1, 17, n.13, 52 L. Ed. 2d 92, 97 S. Ct. 1505 (1977)*, is subject to due process review only for rationality, which, as we have said, is satisfied in the application of the MPPAA to Concrete Pipe.

[****71] Nor does the possibility that trustee decisions made "before [Concrete Pipe] entered [the Plan]" may have led to the unfunded liability alter the constitutional calculus. See Brief for Petitioner 31. Concrete Pipe's decision to enter the Plan after any such decisions were made was voluntary, and Concrete Pipe could at that time have assessed any implications for the Plan's

---

"'Section 4.08. Neither the Associations, any Individual Employer, the Union, any Local Union, nor any Employee shall be liable or responsible for any debts, liabilities or obligations of the Fund or the Trustees.'" App. 80-81, P 32.

[23] Article X, § E(4) of the 1977-1980 Laborers' Craft Master Labor Agreement provides:

"'The parties recognize and agree that the Pension Trust and Plan was created, negotiated, and is intended to continue to be if permitted by law under ERISA, a defined contribution plan and trust and that the individual Contractors' liability with regard to the pension has been and remains limited exclusively to payment of the contributions specified from time to time in collective bargaining agreements.'" *Id., at 82, P 34*.

[24] Appendix K to the Southern California Master Labor Agreements in 1977-1980 states:

"'IMPORTANT.

PENSION BENEFITS ARE NOT AND HAVE NEVER BEEN GUARANTEED. THEY ARE PAYABLE ONLY TO THE EXTENT THAT THE FUND HAS ASSETS TO PAY BENEFITS. NEITHER YOUR EMPLOYER NOR YOUR UNION HAS ASSUMED ANY LIABILITY, DIRECTLY OR INDIRECTLY, TO PROVIDE MONTHLY PENSION BENEFITS. YOUR EMPLOYER'S SOLE OBLIGATION IS TO MAKE THE CONTRIBUTIONS CALLED FOR IN ITS COLLECTIVE BARGAINING AGREEMENT. THE PENSION PLAN HAS ALSO BEEN CONSIDERED BY THE EMPLOYERS, THE UNION AND THE TRUSTEES TO BE A DEFINED CONTRIBUTION PLAN.'" *Id., at 81-82, P 33*.

---

future liability. Similarly, Concrete Pipe cannot rely on any argument based on the fact that, because it was not a member of any of the contractors' associations represented among the Plan's trustees, it had no control over decisions of the trustees after it entered the Plan that may have increased the unfunded liability. Again, Concrete Pipe could have assessed the implications for future liability of the identity of the trustees of the Plan before it decided to enter. [26] The imposition of withdrawal liability here is rationally related to the terms of Concrete Pipe's participation in the Plan it joined and that suffices for substantive due process scrutiny of this economic legislation.

[****72] B

*LEdHN[5B]*[↑] [5B]Given that Concrete Pipe's due process arguments are unavailing, "it would be surprising indeed to discover" the challenged statute nonetheless violating the *Takings Clause*. *Connolly, 475 U.S. at 223*. Nor is there any violation. Following the analysis in *Connolly*, we begin with the contractual provisions relied upon from the Trust Agreement and [*642] the collective-bargaining agreements, which we find no more helpful to Concrete Pipe than those adduced in the facial challenge brought in *Connolly*, as described in that opinion:

> "By the express terms of the Trust Agreement and the Plan, the employer's sole obligation to the Pension Trust is to pay the contributions required by the collective-bargaining agreement. The Trust Agreement clearly states that the employer's obligation for pension benefits to the employee is ended when the employer pays the appropriate contribution to the Pension Trust. This is true even though the contributions agreed [***577] upon are insufficient to pay the benefits under the Plan." *Id., at 218* (citations and footnotes omitted).

Indeed, one provision of the Trust Agreement [****73] on which Concrete Pipe primarily relies is substantially identical to the one at issue in *Connolly*. Compare n.22,

---

[25] The Plan contends that the record does not reflect that the appendix mentioned in the text was incorporated by reference into Concrete Pipe's own collective-bargaining agreement. See Brief for Respondent 10, n.7.

[26] Even if Concrete Pipe were represented, its representative, like all the trustees, would be bound to act consistently with the fiduciary duty owed by trustees to covered employees and beneficiaries of the plan. See *29 U.S.C. § 1104(a)(1)*.

*supra*, with *Connolly, supra, at 218, n.2*.

LEdHN[27][⬆] [27]We said in *Connolly* that

[**2290] "appellants' claim of an illegal taking gains nothing from the fact that the employer in the present litigation was protected by the terms of its contract from any liability beyond the specified contributions to which it had agreed. HN31[⬆] 'Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.'

"If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions." *475 U.S. at 223-224* (citations omitted).

[*643] Nothing has changed since these words were first written. [27]

[****74] LEdHN[5C][⬆] [5C] LEdHN[28A][⬆] [28A]Following *Connolly*, the next step in our analysis is to subject the operative facts, including the facts of the contractual relationship, to the standards derived from our prior *Takings Clause* cases. See *id., at 224-225*. They have identified three factors with particular significance for assessing the results of the required "ad hoc, factual inquiry into the circumstances of each particular case." *Id., at 224*. The first is the nature of the governmental action. Again, our analysis in *Connolly* applies with equal force to the facts before us today.

"The Government does not physically invade or permanently appropriate any of the employer's assets for its own use. Instead, the Act safeguards the participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan. This interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of

economic life to promote the common good and, under our cases, does not constitute a taking requiring Government [****75] compensation." *Id., at 225*.

LEdHN[29][⬆] [29]We reject Concrete Pipe's contention that the appropriate analytical framework is the one employed in our cases dealing with permanent physical occupation or destruction of economically beneficial use of real property. See *Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015, 120 L. Ed. 2d 798, [***578] 112 S. Ct. 2886 (1992)*. While Concrete Pipe tries to shoehorn its claim into this analysis by asserting that "the property of [Concrete Pipe] which is taken, is taken in its entirety," Brief for Petitioner [*644] 37, we rejected this analysis years ago in *Penn Central Transp. Co. v. New York City, 438 U.S. 104, 130-131, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978)*, where we held that a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable. To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, [****76] the parcel in question. Accord, *Keystone Bituminous Coal Assn. v. DeBenedictis, 480 U.S. 470, 497, 94 L. Ed. 2d 472, 107 S. Ct. 1232 (1987)* (" Our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, [and] one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction'") (citation omitted).

[**2291] LEdHN[5D][⬆] [5D]There is no more merit in Concrete Pipe's contention that its property is impermissibly taken "for the sole purpose of protecting the PBGC [a government body] from being forced to honor its pension insurance." Brief for Petitioner 38; see also Brief for Midwest Motor Express, Inc., et al. as *Amici Curiae* 12. That the solvency of a pension trust fund may ultimately redound to the benefit of the PBGC, which was set up in part to guarantee benefits in the event of plan failure, is merely incidental to the primary congressional objective of protecting covered employees and beneficiaries of pension trusts like the Plan. "Here, the United States has taken nothing for its own [****77] use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose." *Connolly, supra, at 224*.

---

[27] To the extent that Concrete Pipe's argument could be characterized as a challenge to the determination that, notwithstanding the contractual language, it is a "defined benefits plan" under the statute, this is a question on which Concrete Pipe did not seek review. See *supra, at 607*.

Nor is Concrete Pipe's argument about the character of the governmental action strengthened by the fact that Concrete Pipe lacked control over investment and benefit decisions that may have increased the size of the unfunded vested liability. The response to the same argument raised **[*645]** under the substantive Due Process Clause is appropriate here: although Concrete Pipe is not itself a member of any of the management associations that are represented among the trustees of the fund, Concrete Pipe voluntarily chose to participate in the Plan, notwithstanding this fact. See _supra, at 641,_ and n.26.

**LEdHN[5E]**⬆ [5E] **LEdHN[28B]**⬆ [28B]As to the second factor bearing on the taking determination, the severity of the economic impact of the Plan, Concrete Pipe has not shown its withdrawal liability here to be "out of proportion to its experience with the plan," _475 U.S. at 226,_ notwithstanding the claim that it will be required to pay out 46% of **[****78]** shareholder equity. As a threshold matter, the Plan contests this figure, arguing that Concrete Pipe, a wholly owned subsidiary of Concrete Pipe & Products Co., Inc., was simply "formed to facilitate the purchase . . . of certain assets of Cen-Vi-Ro," **[***579]** Brief for Respondent 2, and that the relevant issue turns on the diminution of net worth of the parent company, not Concrete Pipe. See Tr. of Oral Arg. 29. But this dispute need not be resolved, for even assuming that Concrete Pipe has used the appropriate measure in determining the portion of net worth required to be paid out, our cases have long established that **HN32**⬆ mere diminution in the value of property, however serious, is insufficient to demonstrate a taking. See, _e.g., Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 384, 71 L. Ed. 303, 47 S. Ct. 114 (1926)_ (approximately 75% diminution in value); _Hadacheck v. Sebastian, 239 U.S. 394, 405, 60 L. Ed. 348, 36 S. Ct. 143 (1915)_ (92.5% diminution).

**LEdHN[5F]**⬆ [5F] **LEdHN[23B]**⬆ [23B] **[****79]** **LEdHN[28C]**⬆ [28C] **LEdHN[30]**⬆ [30]The final factor is the degree of interference with Concrete Pipe's "reasonable investment-backed expectations." _475 U.S. at 226._ Again, _Connolly_ controls. At the time Concrete Pipe purchased Cen-Vi-Ro and began its contributions to the Plan, pension plans had long been subject to federal regulation, and "'those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.' _FHA v. The Darlington, Inc., 358 U.S. 84, 91, 3 L. Ed. 2d 132, 79 S. Ct. 141 (1958)._ See **[*646]** also _Usery v. Turner Elkhorn Mining Co., 428 U.S. at 15-16_ and cases cited therein." _Id., at 227._

Indeed, at that time the Plan was already subject to ERISA, and a withdrawing employer faced contingent liability up to 30% of its net worth. See _29 U.S.C. § 1364 (1976 ed.);_ see also _29 U.S.C. § 1362(b) (1976 ed.); Connolly, supra, at 226-227; Gray, 467 U.S. at 721._ Thus while Concrete Pipe argues that requiring it to pay a share of promised benefits **[****80]** "ignores express and bargained-for conditions on [its contractual] promises, " _Connolly, 475 U.S. at 235_ (O'CONNOR, J., concurring), it could have had no reasonable expectation that it would not be faced with liability **[**2292]** for promised benefits. _Id., at 227_ (opinion of the Court). Because "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations . . . even though the effect of the legislation is to impose a new duty or liability based on past acts," _Turner Elkhorn, 428 U.S. at 16,_ Concrete Pipe's reliance on ERISA's original limitation of contingent liability to 30% of net worth is misplaced, [28] **[****81]** there being no reasonable basis to expect that the legislative ceiling would never be lifted. [29]

**LEdHN[5G]**⬆ [5G] "The employer in the present litigation voluntarily negotiated and maintained a pension plan which was determined to be within **[***580]** the strictures of ERISA." _Connolly, supra, at 227._ In light of the relationship between Concrete Pipe and the Plan, we find no basis to conclude that Concrete Pipe is **[*647]** being forced to bear a burden "which, in all fairness and justice, should be borne by the public as a whole." _Armstrong v. United States, 364 U.S. 40, 49, 4 L. Ed. 2d 1554, 80 S. Ct. 1563 (1960)._

V

Having concluded that the statutory presumptions work no deprivation of procedural due process, and that the statute, as applied to Concrete Pipe, violates no substantive **[****82]** constraint of the _Fifth Amendment,_

---

[28] See Brief for Petitioner 36-37 ("The ERISA contingent liabilities were substantially different in scope from the liabilities of MPPAA so that [Concrete Pipe] had no reasonable notice that 46% of its net worth would be seized").

JUSTICE O'CONNOR does not join the statement to which this footnote is attached.

[29] Nor do the contractual provisions on which Concrete Pipe would rely provide the support it seeks. Indeed, one such provision, Article X, § E(4) of the 1977-1980 Laborers' Craft Master Labor Agreement, provides that liability will be limited to contributions specified in collective-bargaining agreements "if permitted by law under ERISA." App. 82, P 34.

we affirm the judgment of the Court of Appeals.

*It is so ordered.*

**Concur by:** O'CONNOR; THOMAS (In Part)

# Concur

JUSTICE O'CONNOR, concurring.

I join all of the Court's opinion, except for the statement that petitioner cannot "rely on ERISA's original limitation of contingent liability to 30% of net worth." *Ante*, at 646. The Court's reasoning is generally consistent with my own views about retroactive withdrawal liability, which I explained in *Connolly v. Pension Benefit Guaranty Corporation, 475 U.S. 211, 228-236, 89 L. Ed. 2d 166, 106 S. Ct. 1018 (1986)* (concurring opinion), and which I need not restate at length here. In essence, my position is that the "imposition of this type of retroactive liability on employers, to be constitutional, must rest on some basis in the employer's conduct that would make it rational to treat the employees' expectations of benefits under the plan as the employer's responsibility." *Id., at 229*.

The Court does not hold otherwise. Rather, it reasons that, although "the withdrawal liability assessed against Concrete Pipe may amount to more . . . **[****83]** than the share of the Plan's liability strictly attributable to employment of covered workers at Concrete Pipe," this possibility "was exactly what Concrete Pipe accepted when it joined the Plan." *Ante*, at 638. I agree that a withdrawing employer can be held responsible for its statutory "share" of unfunded vested benefits if the employer should have anticipated the prospect of withdrawal liability when it joined the plan. In such a **[*648]** case, the "basis in the employer's conduct that would make it rational to treat the employees' expectations of benefits under the plan as the employer's responsibility" would be the very act of joining the plan.

I am not sure that petitioner did in fact "accept" the prospect of withdrawal liability when it joined the Construction Laborers **[**2293]** Pension Trust (Plan) in 1976. As of that date, Congress had not yet promulgated the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA); the kind of "withdrawal liability" imposed on petitioner did not yet exist. Although the Employee Retirement Income Security Act of 1974 (ERISA) was in effect, and did

create a contingent liability for the employer that withdrew from a multiemployer **[****84]** defined benefit plan, such liability was limited to 30% of the employer's **[***581]** net worth. See *29 U.S.C. §§ 1364, 1362(b)(2) (1976 ed.)*. Petitioner's withdrawal liability under the MPPAA amounts to *46%* of its net worth. See *ante*, at 646, n.28. In addition, the Plan apparently is a hybrid "Taft-Hartley" plan, which provides for fixed employee benefits *and* fixed employer contributions. It remains an open question whether hybrid Taft-Hartley plans are indeed "defined benefit" rather than "defined contribution" plans, and therefore subject to withdrawal liability. See *Connolly, supra, at 230, 232-235* (O'CONNOR, J., concurring). We do not decide that question today. See *ante*, at 607, 643, n.27.

But petitioner has not argued that its withdrawal liability, even if otherwise permissible, cannot exceed the 30% cap that was in effect in 1976. Nor has petitioner claimed that the Plan is a defined contribution plan. In short, petitioner has failed to adduce the two features of this case that might have demonstrated why it did not "accept" the prospect of full withdrawal liability when it joined the Plan. I therefore agree with the **[****85]** Court's result as well as most of its reasoning.

I cannot, however, agree that petitioner is precluded from "rely[ing] on ERISA's original limitation of contingent liability to 30% of net worth." *Ante*, at 646. The Court seizes **[*649]** upon a passing reference in petitioner's brief, see *ante*, at 646, n.28, to justify issuing this unnecessary statement about a difficult issue that the parties essentially have ignored. I would not decide without adversary briefing and argument whether ERISA's 30% cap might prevent retroactive withdrawal liability above 30% of the employer's net worth for an employer that joined a multiemployer plan after the passage of ERISA but before the passage of the MPPAA. I also note that the Court's opinion should not be read to imply that employers may be subjected to retroactive withdrawal liability simply because "pension plans [have] long been subject to federal regulation." *Ante*, at 645. Surely the employer that joined a multiemployer plan before *ERISA* had been promulgated -- before Congress had made employers liable for unfunded benefits -- might have a strong constitutional challenge to retroactive withdrawal liability. The issue **[****86]** is not presented here -- again, petitioner joined the Plan *after* the passage of ERISA -- and the Court does not address it. It remains to be resolved in a future case.

JUSTICE THOMAS, concurring in part and concurring in

the judgment.

I join all of the Court's opinion except Part III-B-1 -- the portion of the opinion in which the Court grapples with the trustee presumption in *29 U.S.C. § 1401(a)(3)(A)*. The Court finds the presumption "incoherent with respect to the degree of probability of error required of the employer to overcome a factual conclusion made by the plan sponsor." *Ante*, at 625. And because, in the Court's view, "there would be **[***582]** a substantial question of procedural fairness under the Due Process Clause" if employers had to show that sponsors' findings were unreasonable or clearly erroneous, *ante*, at 626, the Court proceeds to interpret the statute as if it required an unconstrained evidentiary hearing into "any factual issue" concerning the employer's withdrawal liability, *ante*, at 630.

**[*650]** Until today, *§ 1401(a)(3)(A)* provided:

"For purposes of any [arbitration] proceeding under this section, any determination **[****87]** made by a plan sponsor under *sections **[**2294]** 1381 through 1399* of this title and *section 1405* of this title *is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.*" (Emphasis added.)

Now the statute provides, in effect, that "any factual determination made by a plan sponsor shall be rejected by the arbitrator if the party contesting the determination shows by a preponderance of the evidence that the determination was erroneous." There is no meaningful presumption of correctness and no examination for reasonableness or clear error. I decline to participate in this redrafting of a federal law.

As I see it, there are three missteps in the analysis. First, the Court believes the statutory text is "incomprehensible," *ante*, at 625, because it refers to three different, and mutually inconsistent, "degree[s] of certainty," *ante*, at 622, or of "probability," *ante*, at 625. This is incorrect -- in large part because the Court overlooks the grammatical structure of the statute. *Section 1401(a)(3)(A)* sets up no parallelism between the phrase "by a preponderance **[****88]** of the evidence," which establishes the standard of proof for the arbitration proceeding, and the critical terms "unreasonable" and "clearly erroneous." "*By* a preponderance of the evidence" (emphasis added) is an adverbial phrase that modifies the "show[ing]" required of the employer. "Unreasonable" and "clearly erroneous," on the other hand, are predicate adjectives

used to describe what it is the employer must show.

The incoherence identified by the Court follows from the assumption that Congress has "confus[ed]" burdens of proof with standards of review. *Ante*, at 623. The Court believes that the terms "clearly erroneous" and "unreasonable" must signify standards of review. *Ante*, at 622-623. Standards of proof and standards of review are entirely unrelated **[*651]** concepts (as the Court intimates, see *ante*, at 622-625). The Court's reading leads to the conclusion that *§ 1401(a)(3)(A)* is "meaningless," *ante*, at 625, because the statute (as so interpreted) "defines the nature of the conclusion the arbitrator must draw by using a combination of terms that are categorically ill-matched," *ante*, at 624. [*]

**[****89]** **[***583]** The Court's preoccupation with standards of review is understandable, at least with respect to "clearly erroneous," a term with an established legal usage. See *Anderson v. Bessemer City, 470 U.S. 564, 573-575, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985)*; *Fed. Rule Civ. Proc. 52(a)*. But such a reading is not compelled. As used in this statutory provision, "unreasonable" and "clearly erroneous" cannot signify standards applicable to the review of prior findings, since the arbitrator himself is undeniably a factfinder, not an appellate tribunal. See *§ 1401(c)* (establishing a presumption of correctness for "the findings of fact made by the arbitrator"). That the

------

[*] Regrettably, the Court compounds and further muddles the textual difficulty by suggesting that in some sense, "preponderance of the evidence," "unreasonable," and "clearly erroneous" are comparable -- that they all refer to relative "degree[s] of certainty." *Ante*, at 622. There is, in fact, no basis for comparing any particular standard of proof with any particular standard of review. An appellate tribunal could be required to determine whether it was "clearly erroneous" to find a disputed fact "by a preponderance of the evidence," or it could ask whether any "reasonable" factfinder could have found "probable cause" to believe, or "clear and convincing evidence" supporting, the fact in question. See, *e.g.,* *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* ("If the defendant in a . . . civil case moves for summary judgment or for a directed verdict . . ., [the inquiry is] whether *reasonable jurors* could find *by a preponderance of the evidence* that the plaintiff is entitled to a verdict") (emphasis added); *Jackson v. Virginia, 443 U.S. 307, 318-319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)* ("The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether [a] *rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt*") (emphasis added). Any combination of evidentiary and review standards is possible.

arbitrator is to undertake his examination "by a preponderance of the evidence" explicitly establishes his role as factfinder; **[**2295]** appellate review **[*652]** does not occur "by" a taking of "evidence." The Court sees the arbitrator as a "hybrid," who acts as both a trier of fact and a reviewer of facts found. *Ante*, at 623-624. But the presumption of correctness that applies to the plan sponsor's determinations does not make the arbitrator a **[****90]** "reviewing body," *ante*, at 624, any more than the presumption of innocence in a criminal trial renders the jury a reviewer, rather than a trier, of fact.

The way out of the conundrum is apparent. The terms "unreasonable" and "clearly erroneous" must refer to what are, in effect, *elements* of the employer's claim in the arbitration proceeding. To prevail in its action before the arbitrator, in other words, the employer must show by a preponderance of the evidence, first, that the plan sponsor has made a determination under one of the relevant provisions and, second, that that determination was either unreasonable or clearly erroneous. This construction requires us to put aside the technical definition of "clearly erroneous" and focus on the literal meaning of the phrase. "Clear" error can simply mean an obvious, plain, gross, significant, or manifest error or miscalculation. See Black's Law Dictionary 250 (6th ed. 1990). That may not be the most natural reading (for a court, that is) of this legal term of art, but if we do not drop the assumption that "clearly erroneous" must be a reference to the *Bessemer City* standard of review, we cannot avoid the incoherence that has **[****91]** trapped the majority. The term "unreasonable, " of course, is even more readily construed to refer to something other than a standard **[***584]** of review, since it can hardly be thought to have a sharply defined meaning that is limited to the context of appellate review. There is, for example, nothing unusual about requiring a party to show as an element of a substantive claim that something -- an interstate carrier's filed rate, for example, see *Reiter v. Cooper, 507 U.S. 258, 122 L. Ed. 2d 604, 113 S. Ct. 1213 (1993)* -- is "unreasonable." *Section 1401(a)(3)(A)* is thus susceptible of a reading that gives it a coherent meaning.

**[*653]** This interpretation also conforms neatly with the very similar language and structure of the actuarial presumption in *§ 1401(a)(3)(B)*, which the Court today finds unproblematic. See *ante*, at 631-636. That presumption provides that the actuary's determination of unfunded vested benefits will be presumed correct unless the employer shows "by a preponderance of the evidence" that the actuarial assumptions and methods

were "unreasonable" or that the actuary made a "significant error." The Court offers no persuasive explanation **[****92]** as to why this presumption does not suffer from the same incoherence. In addition, my reading of the term "clearly erroneous " in *§ 1401(a)(3)(A)* renders it virtually indistinguishable from the term "significant error" in *§ 1401(a)(3)(B)*.

The second false step in the Court's analysis is the use of the rule of construction applied in *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U.S. 568, 575, 99 L. Ed. 2d 645, 108 S. Ct. 1392 (1988)*. *Ante*, at 628-630. This rule, which requires a court to adopt a reasonable alternative interpretation of a statute when necessary to avoid serious constitutional problems, does not provide authority to construe the statute in a way that "is plainly contrary to the intent of Congress." *DeBartolo, supra, at 575*. The rule "cannot be stretched beyond the point at which [the alternative] construction remains 'fairly possible.'" *Public Citizen v. Department of Justice, 491 U.S. 440, 481, 105 L. Ed. 2d 377, 109 S. Ct. 2558 (1989)* (KENNEDY, J., concurring in judgment) (emphasis in original) (quoting *Crowell v. Benson, 285 U.S. 22, 62, 76 L. Ed. 598, 52 S. Ct. 285 (1932))*. **[****93]** " And it should not be given too broad a scope lest a whole new range of Government action be proscribed by interpretive shadows cast by constitutional provisions that might or might not invalidate it." *Public Citizen, supra, at 481*. **[**2296]** Here it is plain, in my view, that Congress intended to shield the plan sponsor's factual determinations behind a presumption of correctness and intended that withdrawing employers would have to show something more than simple error. The **[*654]** Court's construction is plainly contrary to this intent and is not "fairly possible" under the terms of the statute. Rather than a reasonable alternative reading, therefore, the interpretation adopted by the Court today is effectively a declaration that the statute as written is unconstitutional.

Which leads to my final, and perhaps most fundamental, disagreement with the Court. Before a court can appropriately invoke the *Crowell/DeBartolo* rule of construction, it must have a significantly higher degree of confidence that the statutory **[***585]** provision would be unconstitutional should the problematic interpretation be adopted. The potential due process problem troubling **[****94]** the Court is the supposed lack of a neutral or "impartial" arbitration hearing. *Ante*, at 626. This potential is based on an "assumption" about a "risk" or "possibility" of trustee bias, *ante*, at 617, 618 - - bias that, if it existed, might be "preserve[d]" during the

508 U.S. 602, *654; 113 S. Ct. 2264, **2296; 124 L. Ed. 2d 539, ***585; 1993 U.S. LEXIS 4053, ****94

arbitration proceeding by the presumption of correctness. *Ante*, at 620. Petitioner has not established that the trustees were biased in fact. And whatever structural bias may flow from the trustees' fiduciary obligations or from the fact that the trustees are appointed by interested parties, see *ante*, at 616-617, will likely be nullified by the elaborately detailed criteria that channel and cabin their exercise of discretion. See *29 U.S.C. §§ 1381-1399 (1988 ed. and Supp. III)*. Such bias may be checked, in particular, by the requirement of consistency that governs the trustees' choice of a method for calculating liability. See *Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking Industry Pension Fund, Inc., 762 F.2d 1137, 1142 (CA1 1985)* (en banc). And the very fiduciary duty the trustees owe to the fund should simultaneously prevent them from imposing [****95] excessive withdrawal liability that will discourage other employers from joining the fund in the future. *Id., at 1142-1143*. The Court does not consider these countervailing forces.

But even if there is a real risk that structural bias may distort the trustees' factual determinations, I am inclined [*655] to believe that the arbitration proceeding -- presumption and all -- provides adequate process for the employer. Cf. *Mathews v. Eldridge, 424 U.S. 319, 334-335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976)* (adequacy of specific procedures involves consideration of private and public interests and risk of erroneous deprivation). This conclusion rests principally on the nature of the particular statutory determinations to which the presumption applies (those described in §§ 1381-1399 and *1405*). Many of these determinations, such as the mathematical computations the trustees must perform under §§ 1386, 1388, and 1391, involve little or no discretion. As a result, the employer will have correspondingly little difficulty proving the existence of any significant error made by the trustees (either inadvertently or because of bias). The same can be said [****96] of withdrawal-date determinations under *§§ 1381* and *1383*, especially where all the information relevant to the determination is better known to the employer than to the trustees.

To me, the public interest is plain on the face of the statute: Congress did not want withdrawing employers to avoid their obligations by engaging in a lengthy arbitration over relatively insignificant errors. At the same time, the employer's interest in correcting miscalculations that are significant is adequately protected by the opportunity for arbitration afforded by *§ 1401*.

For these reasons, I concur only in the Court's judgment that the application of *§ 1401(a)(3)(A)* "did not deprive Concrete Pipe of its right to procedural due process." *Ante*, at 631.

## References

*16A Am Jur 2d, Constitutional Law 814*, *816*, *852*, *855*; *26 Am Jur 2d, Eminent Domain 157* [****97] ; *60A Am Jur 2d, Pensions and Retirement Funds 1113-1127*

27 Federal Procedure, L Ed, Pensions and Retirement Systems 61:157-61:161

4 Am Jur Proof of Facts 2d 709, Bias of Arbitrator

USCS, *Constitution, Amendment 5*; 29 USCS 1381-1399, *1401*, *1405*

Employment Coordinator B-25,540--B-25,548

Pension Coordinator 68,354

L Ed Digest, Constitutional Law 729, 778.5, 830.7; Eminent Domain 103; Pensions and Retirement Funds 1

L Ed Index, Arbitration and Award; Due Process; Eminent Domain; Pensions and Retirement; Presumptions and Burden of Proof

ALR Index, Arbitration and Award; Due Process; Eminent Domain; Pension and Retirement; Presumptions and Burden of Proof

      Annotation References:

Retroactive application of federal legislation as violating due process clause of *Federal Constitution's Fifth Amendment*--Supreme Court cases. *107 L Ed 2d 1105*.

Supreme Court's views as to what constitutes "taking," within meaning of *Fifth Amendment's* prohibition against taking of private [****98] property for public use without just compensation. *89 L Ed 2d 977*.

Validity, under Federal Constitution, of arbitration statutes-- Supreme Court cases. *87 L Ed 2d 787*.

When is taking of property for "public use" so as to be permissible under Federal Constitution if just compensation is provided-- Supreme Court cases. *81 L Ed 2d 931*.

Validity of presumptions of correctness under 4221(a)(3), (c) of Multiemployer Pension Plan

508 U.S. 602, *655; 113 S. Ct. 2264, **2296; 124 L. Ed. 2d 539, ***585; 1993 U.S. LEXIS 4053, ****98

Amendments Act of 1980 (*29 USCS 1401(a)(3)*, *(c)*). *78 ALR Fed 663*.

Constitutionality of arbitration statutes . *55 ALR2d 432*.

---

**End of Document**

 Cited
As of: February 21, 2019 9:26 PM Z

# *Structure Tone, Inc. v. New York City Dist. Council of Carpenters Pension Fund*

United States District Court for the Southern District of New York

March 30, 2018, Decided; March 30, 2018, Filed

No. 17-cv-2917 (RJS)

**Reporter**
2018 U.S. Dist. LEXIS 55919 *; 2018 WL 1633768

STRUCTURE TONE, INC., Petitioner, -v- NEW YORK CITY DISTRICT COUNCIL OF CARPENTERS PENSION FUND & DAVID STEWART, Respondents.

## Core Terms

withdrawal, subcontractors, opinion letter, construction industry, contributions, collective bargaining agreement, arbitration, exemption, deference, general contractor, perform work, signatory, multiemployer, make a contribution, subcontracted, pension, terminated, obligated, pension benefits, pension fund, employees, ceases, multiemployer pension plan, non-signatory, benefits, funding, parties, reasons, vacate

**Counsel:** **[*1]** For Structure Tone, Inc., Plaintiff: Aaron C. Schlesinger, Peckar & Abramson, P.C., New York, NY.

For New York City District Council of Carpenters Pension Fund, David Stewart, as Executive Director of the New York City District Council of Carpenters Pension Fund, Defendant: Marc Alan Tenenbaum, LEAD ATTORNEY, Virginia & Ambinder, LLP, New York, NY.

**Judges:** RICHARD J. SULLIVAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RICHARD J. SULLIVAN

## Opinion

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

Now before the Court is Petitioner Structure Tone's

motion to vacate an arbitration award (the "Award") entered in favor of Respondent the New York City District Council of Carpenters Pension Fund (the "Fund"). (Doc. No. 21.) For the reasons set forth below, the motion is DENIED.

I. BACKGROUND

A. STATUTORY SCHEME

This dispute concerns the Employee Retirement Income Security Act of 1974 ("ERISA"), *29 U.S.C. § 1001 et seq.*, which regulates private pension funds and, as amended by the *Multiemployer Pension Plan Amendments Act of 1980* ("MPPAA"), contains specific provisions relating to multiemployer pension plans. *See 29 U.S.C. §§ 1002(37)(A)*, *1381-1453*. As indicated by its title, a multiemployer pension plan is a pension plan to which multiple employers contribute pursuant to one or more collective bargaining agreements. *See id. § 1002(37)(A)* **[*2]** . In order to ensure that an employer's exit from a multiemployer plan does not undermine the plan's finances and place an undue burden on the employers remaining in the plan, the MPPAA created a regime of withdrawal liability. Specifically, if an employer withdraws from a multiemployer plan, that employer is assessed "withdrawal liability," calculated to equal that employer's portion of the plan's unfunded pension benefits. *See id. §§ 1381*, *1391*.

At issue here is whether Petitioner "withdrew" from the Fund. Generally, a withdrawal occurs "when an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." *29 U.S.C. § 1383(a)*.[1] However, while that provision applies to most

---

[1] Although the statute distinguishes between "complete" and "partial" withdrawals, that distinction is not at issue here. *See 29 U.S.C. § 1385(a)* (defining partial withdrawals).

employers, Congress created a special withdrawal scheme for employers engaged in the "building and construction industry." That provision, commonly referred to as the "construction industry exemption," effectively imposes withdrawal liability on employers in the building and construction industry only if:

> (A) an employer ceases to have an obligation to contribute under the plan, and
>
> (B) the employer —
>
>> (i) continues to perform work in the jurisdiction of the collective **[*3]** bargaining agreement of the type for which contributions were previously required, or
>>
>> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

29 U.S.C. § 1383(b)(2).

The MPPAA provides that when an employer withdraws from a multiemployer plan, the pension fund serving as the plan sponsor is responsible for determining the amount of withdrawal liability owed and collecting it. *See id.* § 1382. If the employer disagrees with the plan sponsor's assessment, the employer must first submit the dispute to arbitration. *See id.* § 1401. After arbitration, a party can bring an action in district court to enforce, vacate, or modify the arbitration award. *See id.* §§ 1401, 1451.

B. Factual Background

Petitioner is a New York corporation involved in the construction industry as a general contractor and construction management firm.[2] (Pet. ¶ 3; Pet. Decl., Ex. J at 3.) The Fund is a multiemployer pension benefit plan as defined by ERISA, *see* 29 U.S.C. §§ 1002(3), 1002(37)(A), and Respondent David Stewart is the Executive Director of the Fund and a fiduciary within the meaning of ERISA, *see id.* § 1002(21)(A).

Prior to June 30, 2015, Petitioner was party to a

---

[2] The facts are drawn from the Petition (Doc. No. 5 ("Pet.")), Respondents' Response (Doc. No. 13 ("Resp.")), Petitioner's memorandum of law in support of its motion (Doc. No. 22 ("Mem.")), the Declaration of Aaron C. Schlesinger in support of the motion (Doc. No. 23 ("Pet. Decl.")), Respondents' memorandum of law in opposition to the motion (Doc. No. 24 ("Opp'n")), the Declaration of Marc A. Tenenbaum in opposition to the motion (Doc. No. 25 ("Resp. Decl.")), and Petitioner's reply memorandum of law (Doc. No. 26 ("Reply")).

collective **[*4]** bargaining agreement (the "CBA") between the Building Contractors Association, Inc. and the District Council of New York City and Vicinity of the Brotherhood of Carpenters and Joiners of America, AFL-CIO (the "Union"). (*See* Pet. Decl., Ex. C ("CBA").) The CBA required Petitioner to make contributions to the Fund for all work performed by its employees in certain enumerated categories of construction work ("Covered Work") within the geographical territory of the CBA, which included the five boroughs of New York City and a portion of suburban Long Island. (*See id.*, arts. III, IX, XVI.) Although the CBA did not require Petitioner to make contributions on behalf of the employees of any subcontractors that it hired, the CBA nevertheless contained a subcontracting clause, which provided that "[a]ll work covered by this Agreement shall be contracted or subcontracted only to an Employer who is signatory to or agrees to become signatory to a collective bargaining agreement with the Union." (*Id.* at 62.)

The CBA expired on June 30, 2015, and Petitioner effectively terminated the agreement on that date. (Pet. ¶ 10.) Petitioner admits that it continues to operate as a general contractor in the jurisdiction **[*5]** of the CBA, but emphasizes that it does so exclusively through subcontractors. (Pet. ¶¶ 11, 12.) Some of these subcontractors are signatories to the CBA, but others are non-signatory subcontractors. (*Id.* ¶ 12.) On August 18, 2015, a Fund representative wrote to Petitioner, stating that the Fund had determined that Petitioner had completely withdrawn from the pension plan and that Petitioner was subject to withdrawal liability totaling $1,089,049. (*See* Pet. Decl., Ex. D.) In response, Petitioner requested that the Fund review its withdrawal liability determination, arguing that Petitioner was not subject to withdrawal liability under the construction industry exemption. (*See id.*, Ex. E.) When the Fund declined to revisit its assessment (*see id.*, Ex. F), Petitioner filed for arbitration.

On March 24, 2017, the arbitrator, Martin F. Scheinman (the "Arbitrator"), issued the Award, concluding in relevant part that the Fund had appropriately assessed withdrawal liability against Petitioner (*see id.*, Ex. J ("Award") at 42) and ordering Petitioner to pay $1,089,049 (*id.* at 4). Petitioner timely filed for review of the Award in this Court on April 21, 2017. (Doc. No. 1.) Petitioner's motion to vacate **[*6]** the Award was filed on July 14, 2017, and the motion was fully briefed by August 11, 2017. (Doc. Nos. 21-26.)

II. Legal Standard

The MPPAA authorizes district courts "to enforce, vacate, or modify" an arbitration award. *29 U.S.C. § 1401*. In a dispute regarding withdrawal liability, the Court reviews an arbitrator's conclusions of law *de novo*, *see HOP Energy, L.L.C. v. Local 553 Pension Fund, 678 F.3d 158, 160 (2d Cir. 2012)*, while the arbitrator's findings of fact are reviewed with "a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct[,]" *29 U.S.C. § 1401(c)*. Here, the facts are not in dispute and the sole issue before the Court involves the interpretation of the construction industry exemption. Accordingly, the Court reviews this question of statutory interpretation *de novo*.

III. DISCUSSION

The range of disagreement in this case is narrow, since the parties agree that the outcome turns on whether or not Petitioner's behavior constituted a withdrawal under the construction industry exemption. Moreover, there is no dispute that *Subsection (A)* of the statutory test has been satisfied — Petitioner has indeed "ceased to have an obligation to contribute" to the Fund. *29 U.S.C. § 1383(b)(2)(A)*. Nor do the parties argue that *Subsection (B)(ii)* applies. Accordingly, the only provision **[*7]** at issue here is *Subsection (B)(i)*, which allows the Fund to assess withdrawal liability if Petitioner "[1] continues to perform work [2] in the jurisdiction of the collective bargaining agreement [3] of the type for which contributions were previously required." *Id.* *§ 1383 (b)(2)(B)(i)*.

Petitioner does not expressly argue that it is no longer performing work in the jurisdiction of the CBA. Rather, Petitioner merely maintains that it "has not directly performed work covered by the collective bargaining agreement."' (Mem. at 3.) Accordingly, the Court assumes, as the parties appear to, that the Arbitrator correctly decided that "execution of the subcontracted work is reasonably viewed as performance by the general contractor" because "the subcontracted work was undertaken in furtherance of the Employer's performance obligation, owed to the project owner or developer as the case may be, to complete the work as a general contractor." (Pet. Decl., Ex. J at 30.)

Nevertheless, the parties *do* dispute what it means for work to be "of the type for which contributions were previously required." Specifically, Petitioner contends that "there is no withdrawal because the employer would not have been obligated to make contributions **[*8]** for work performed by subcontractors under the terminated agreement[.]" (Mem. at 10.) But this is simply incorrect

— for two reasons. First, although it is true that under the terminated agreement Petitioner would not have been obligated to make contributions for work performed by subcontractors *who were signatories to the CBA*, that is certainly not true with respect to non-signatory subcontractors. As noted above, the CBA is quite clear that "[a]ll work covered by this Agreement shall be contracted or subcontracted only to an Employer who is signatory to or agrees to become signatory to a collective bargaining agreement with the Union." (CBA at 62). The CBA further provides that a "[c]ontractor shall contract or subcontract [Covered Work] only to firms which observe the standards of wages and fringe benefits and working conditions established herein to insure the observance of the wages, benefits, hours, and other items and conditions of employment provided herein." (*Id.*) The logical inference is that the CBA did not require general contractors to make contributions on behalf of its subcontractors' employees because it assumed that the subcontractor would make those contributions.[3] The equally **[*9]** logical inference is that any general contractor bold enough to employ a non-signatory subcontractor would be in breach of the CBA and obligated to pay contributions, and penalties, associated with that improper employment. (*See id.* at 51-56, 64.) Indeed, the CBA expressly required that employers "not subcontract any work covered under this Agreement to any one in order to circumvent the payment of wages, fringe benefits, and working conditions provided herein."

_____

[3] Petitioner emphasizes that the CBA only requires that work under the agreement be subcontracted to an employer who is signatory to *a* collective bargaining agreement with the Union, and not "the exact same collective bargaining agreement at issue." (Mem. at 19.) However, this is a distinction without a difference. Even if Petitioner hired a subcontractor that was a signatory to a different collective bargaining agreement with the same Union, that subcontractor would be required to contribute pension payments on behalf of their employees under that collective bargaining agreement, since the CBA required subcontractors to "observe the standards of wages and *fringe benefits . . . established herein*[.]" (CBA at 62 (emphasis added).) Petitioner attempts to evade this logic by arguing, hypothetically, that a general contractor could conceivably hire a subcontractor who is a signatory to a *different* collective bargaining agreement with the Union that requires its signatories to contribute pension payments directly to individual workers rather than to the Fund, or even to a different fund. (*See* Mem. at 20.) The Court rejects this strained reading of the CBA and notes, with the Arbitrator, that "there is not a scintilla of evidence that this ever happened with respect to the work in question." (Pet. Decl., Ex. J at 34.)

(*Id.* at 27.) Accordingly, the Court concludes that, contrary to its assertions, Petitioner *would* have been obligated to make contributions for work performed by non-signatory subcontractors under the CBA.

But even if it could be argued that Petitioner is right about the obligations of employers under the CBA, Petitioner would still be subject to withdrawal liability for the simple reason that Petitioner misconstrues the language of *Section 1383(b)(2)*. Specifically, Petitioner argues that work is "of the type for which contributions were previously required" if "the employer would . . . have been obligated to make contributions for [that] work under the terminated agreement." (Mem. at 10.) But the language of Subsection **[*10]** B(i) is not so narrow, and does not turn on *who* was obligated to make contributions under the terminated plan; it merely requires that the work be of the type that *required* contributions. This word choice is telling, and distinct from the language of Subsection A, which immediately precedes it. That provision speaks to the employer's prior "obligation[s] to contribute under the plan." *29 U.S.C. § 1383(b)(2)(A)*. Logic suggests that if Congress had intended "work of the type for which contributions were previously required" to mean "work of the type for which" the employer previously -ha[d] an obligation to contribute under the plan," it would have said so and simply duplicated the language found in Subsection A. It did not, and the clear inference to be drawn from that distinction is that the language of Subsection B(i) was intended to be broader, capturing work for which contributions were previously required of *anyone* — whether subcontractors or employers directly.

In short, based on the text of *Section 1383(b)(2)*, the Court has little difficulty concluding that Petitioner's use of non-signatory subcontractors constitutes performance of "work in the jurisdiction . . . of the type for which contributions were previously required" **[*11]** by the CBA.

In addition to advancing what the Court believes to be the most natural reading of the statute (and the CBA), this conclusion finds support from available tools of statutory interpretation. In particular, the law is clear that "under longstanding principles of statutory construction, [a remedial act] should be given a liberal interpretation . . . and exemptions from its sweep should be narrowed and limited to effect the remedy intended." *Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 381, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)* (internal quotations omitted). In accordance with this principle, the Court construes the construction industry exemption narrowly,

with an eye towards effecting the remedial purpose of ERISA and the MPPAA, which are designed "to ensure that employees and their beneficiaries [are not] deprived of anticipated benefits from their private retirement pension plans." *T.I.M.E.-DC, Inc. v. Mgmt.-Labor Welfare & Pension Funds, of Local 1730 Int'l Longshoremen's Ass'n, 756 F.2d 939, 943 (2d Cir. 1985)*. This method of interpretation is particularly appropriate in the context of the construction industry exemption given that, at the time of the passage of the MPPAA, "[m]ore than half [of the multiemployer pension plans in the United States], covering almost 30 percent of all such participants, [were] in the construction industry." H.R. Rep. No. 96-869, Part I, 96th Cong., 2d Sess. **[*12]** 51 (1980) ("House Report"), reprinted in 1980 U.S. Code Cong. & Ad. News 2918, 2921.

As the Second Circuit has explained, the MPPAA "was enacted by Congress in September 1980 for the primary purpose of protecting retirees and workers who are participants in multiemployer plans against the loss of their pensions." *ILGWU Nat. Ret. Fund v. Levy Bros. Frocks, 846 F.2d 879, 880 (2d Cir. 1985)* (internal quotations omitted) (quoting House Report at 2919). Specifically, given the "serious defects in [ERISA before the MPPAA] which undermine[d] the benefit security of multiemployer plan participants[,] . . . [Congress wanted] to protect the interests of participants and beneficiaries in financially distressed multiemployer plans and to encourage the growth and maintenance of multiemployer plans." *Id.* Congress therefore created, among other things, a statutory scheme of withdrawal liability "to relieve the funding burden on the remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers." *Id.* It was in this context that Congress enacted the construction industry exemption.

The House Report cited by the Second Circuit in *ILGWU* clearly and succinctly discusses Congress's **[*13]** reasoning for enacting the construction industry exemption. According to the House Report:

> In the construction industry, the funding base of the plan is the construction projects in the area covered by the collective bargaining agreements through which the plan is maintained. An individual employee will typically work for tens or even hundreds of different employers over his or her working career, and the volume of work for a given employer will often fluctuate greatly from year to year. *These normal events do not pose an undue*

*threat to a plan as long as contributions are made for whatever work is done in the area. Therefore, the construction industry exception is designed to impose liability only on former contributors that continue to work within the plan's area.* It exempts from liability employers that cease contributions because they have no work in the area; *there is no liability when a company goes out of business, is sold, or is simply without work for a time.* Also, under this exception, an employer who comes into an area to do one project and then leaves would not be subject to liability. . . .

House Report at 2943-44 (emphasis added). *See also Multiemployer Pension Plan Amendments Act of 1979: Hearing on S. 1076 Before the S. Comm.* **[*14]** *on Labor and Human Res.*, 96th Cong. 140 (1980) (statement of Matthew Lind, Executive Director, Pension Benefit Guaranty Corp.) ("But the point is really only to attach withdrawal liability to an employer when that employer is taking work out of the jurisdiction of the plan. He continues to work in the area, using nonunion labor for example[;] that is what hurts the plan.").

In this case, as discussed above, before the CBA expired, Petitioner could only use its own employees or signatory subcontractors to perform work covered by the CBA, thus ensuring the funding base of the multiemployer plan in the area covered by the CBA. Under Petitioner's interpretation of the statute, however, Petitioner would be free to continue working as a general contractor in the geographical jurisdiction of the CBA and to use non-union labor without being assessed withdrawal liability simply by using the very subcontractors it was barred from using under the CBA. This is precisely the scenario that Congress sought to avoid - a withdrawal undermining the funding base of the plan and causing the burden of pension payments to fall disproportionately upon the employers remaining in the plan. Obviously, this is **[*15]** contrary to the purpose of both the statute and the construction industry exemption. In fact, the House Report explicitly contemplates that the exemption will "impose liability . . . on former contributors that continue to work within the plan's area." *Id.*

Petitioner nevertheless argues that its interpretation - which essentially amounts to an end-run around withdrawal liability for general contractors willing to hire nonunion subcontractors - has been endorsed by the Pension Benefit Guaranty Corporation ("PBGC") in two

opinion letters issued in the 1980s.[4] In the first letter, the PBGC wrote that a general contractor's employment of a subcontractor will be deemed work "of the type for which contributions were previously required" "only if the general contractor would have been obligated to contribute under the terms of its old contract for work performed by subcontractors: *i.e.*, if the old contract were still in force, the general contractor would be liable for contributions based on the subcontractor's work." Pension Benefit Guar. Corp., Opinion Letter 84-8 (Dec. 27, 1984), 1984 WL 23351, at *1 ("1984 Letter"). Similarly, in the second letter, the PBGC concluded that an employer who contracted with subcontractors after **[*16]** terminating a collective bargaining agreement would not incur withdrawal liability as long as it had no prior obligation under the collective bargaining agreement to make pension fund contributions for similarly retained subcontractors. *See* Pension Benefit Guar. Corp., Opinion Letter 85-5 (Jan. 30, I 985), 1985 WL 32705, at *1 ("1985 Letter").

Petitioner argues that these letters are entitled to substantial deference under the doctrine enumerated in *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*. Under *Chevron*, as interpreted by the Supreme Court in *United States v. Mead Corp. 533 U.S. 218, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001)*, a Court should defer to an agency's interpretation of a statute where "Congress delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead, 533 U.S. at 226-27*. The first factor of the *Mead* test is satisfied here: Congress delegated rulemaking authority to the PBGC in the MPPAA. *See, e.g.*, *29 U.S.C. § 1383(f)*. However, for the reasons discussed below, the Court determines that the opinion letters were not promulgated in the exercise of the PBGC's rulemaking authority.

While the Supreme Court has given conflicting indications as to the proper weight accorded to agency opinion letters, *compare Christensen v. Harris Cty., 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000)* (stating that **[*17]** "[i]nterpretations such as

---

[4] The PBGC is the wholly owned U.S. government corporation responsible for administering the MPPAA's withdrawal liability provisions. *See* *29 U.S.C. § 1302*; *Trs. of Local 138 Pension Tr. Fund v. F. W. Honerkamp Co. Inc., 692 F.3d 127, 134-35 (2d Cir. 2012)*.

those in opinion letters . . . lack the force of law" and "do not warrant *Chevron*-style deference"), *with NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 254-58, 115 S. Ct. 810, 130 L. Ed. 2d 740 (1995)* (holding, in an opinion later cited favorably by the Supreme Court in *Mead*, that an opinion letter was due *Chevron* deference), "[m]ost agency interpretations that have qualified for *Chevron* deference are rules that have been promulgated in 'regulations issued through notice and comment or adjudication, or in another format authorized by Congress for use in issuing legislative rules,'" *Estate of Landers v. Leavitt, 545 F.3d 98, 106 (2d Cir. 2008)* (quoting *Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir. 2002))*. In fact, as the Second Circuit has noted, the more "[r]ecent Supreme Court cases emphasize that [opinion letters] do not deserve broad deference[.]" *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 490 (2d Cir. 2001)* (holding that *Chevron* deference was not applicable to "several policy statements made in opinion letters and reports to Congress" by the EPA because "the EPA's position [was not] adopted in a rulemaking or other formal proceeding[.]"); *see also Wos v. E.M.A. ex rel. Johnson, 568 U.S. 627, 643, 133 S. Ct. 1391, 185 L. Ed. 2d 471 (2013)* (citing *Christensen* for the proposition that opinion letters are "not regulations with the force of law"); *Hill v. Delaware N. Companies Sportservice, Inc., 838 F.3d 281, 290 (2d. Cir. 2016)* (citing *Christensen* for the proposition that "opinion letters . . . do not warrant *Chevron*-style deference.").

Here, the opinion letters themselves imply that the **[*18]** interpretations contained therein are not intended to carry the force of law. Specifically, the letters make clear that the pension fund sponsor is responsible for making the preliminary withdrawal determination, and that any dispute must be submitted to an arbitrator pursuant to the statutory dispute resolution process, indicating that the agency did not anticipate having the final word. *See* 1985 Letter, 1985 WL 32705, at *1; 1984 Letter, 1984 WL 23351, at *1. And in 1987, the PBGC issued an opinion letter explicitly addressing the issue of how much deference a court should give to PBGC opinion letters. *See* Pension Benefit Guar. Corp., Opinion Letter 87-7 (July 21, 1987), 1987 WL 68408, at *1. According to that letter, PBGC opinion letters "are not intended to dispose of particular controversies between private parties. Moreover, because they are the PBGC's interpretations of [provisions of ERISA] and not substantive rules promulgated in accordance with the notice and comment requirements of the Administrative Procedure Act, they are not binding on the public or on the courts." *Id.* The letter ultimately concludes that the proper level of deference due to PBGC opinion letters is the level of deference set out in *Skidmore v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944)*. *See* **[*19]** *id.* Under *Skidmore*, the weight accorded an administrative interpretation "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Mead Corp., 533 U.S. at 228* (quoting *Skidmore, 323 U.S at 140*).

Accordingly, the Court concludes that the PBGC opinion letters should be given "respect according to [their] persuasiveness" pursuant to Skidmore. *Mead Corp., 533 U.S. at 221*. Here, for the reasons discussed above, the Court is not convinced by the reasoning of the PBGC in its opinion letters, which is both cursory and completely conclusory, because the PBGC reaches an outcome that is at odds with the most natural reading of the text of the statute, as well as the overall purpose of the MPPAA and the construction industry exemption. Accordingly, the Court holds that since Petitioner (1) performed work (2) in the territorial jurisdiction of the CBA (3) of the type for which contributions were previously required, the Fund properly assessed Petitioner withdrawal liability and the Arbitrator properly issued the Award.

IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED THAT Petitioner's motion **[*20]** to vacate the Award, and its corresponding request for fees, costs, and expenses, is DENIED. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 21 and to close this case.

SO ORDERED.

Dated: March 30, *2018*

New York, New York

/s/ Richard J. Sullivan

RICHARD J. SULLIVAN

UNITED STATES DISTRICT JUDGE

**End of Document**

◆ Positive
As of: February 21, 2019 9:27 PM Z

## *CenTra, Inc. v. Cent. States*

United States Court of Appeals for the Seventh Circuit

May 27, 2009, Argued; August 20, 2009, Decided

No. 08-4041

**Reporter**

578 F.3d 592 *; 2009 U.S. App. LEXIS 18723 **; 158 Lab. Cas. (CCH) P10,052; 47 Employee Benefits Cas. (BNA) 1713

CENTRA, INC. and DETROIT INTERNATIONAL BRIDGE CO., Plaintiffs-Counterdefendants-Appellants, v. CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Defendant-Counterplaintiff-Appellee.

**Subsequent History:** US Supreme Court certiorari denied by *Centra, Inc. v. Cent. States, 2010 U.S. LEXIS 2568 (U.S., Mar. 22, 2010)*

**Prior History: [**1]** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 07-C-6312--William T. Hart, Judge.

*CenTra, Inc. v. Cent. States, Southeast & Southwest Areas Pension Fund, 585 F. Supp. 2d 1017, 2008 U.S. Dist. LEXIS 94247 (N.D. Ill., 2008)*

## Core Terms

withdrawal, Truck, histories, calculated, merger, contributions, reorganization, subsidiaries, drop, controlled group, operations, successor, arbitrator, pension fund, ceased, stock, opinion letter, predecessor, Pension, assets and liabilities, asset sale, transferred, inherited, safe harbor provision, stock sale, liabilities, benefits, transactions, successor corporation, pension plan

## Case Summary

### Procedural Posture

An arbitrator reduced appellee multiemployer pension fund's assessment of withdrawal liability against appellant holding company under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *29 U.S.C.S. §§ 1381-1461*. The United States District Court for the Northern District of Illinois, Eastern Division,

vacated the arbitrator's award and reinstated the fund's assessment. The company appealed.

### Overview

The company owned two subsidiaries that conducted unionized trucking operations and contributed to the fund. The subsidiaries merged into the company, and the company "dropped down" certain assets and liabilities to two new subsidiaries. All of the union trucking operations and obligations to contribute to the pension fund were transferred to the new subsidiaries. The new subsidiaries' stock was sold to an affiliated purchaser, which subsequently ended its affiliation with the company. The subsidiaries ceased operations, and the purchaser was liquidated. The company later ended all participation in the fund, and the fund assessed withdrawal liability based on, inter alia, the trucking subsidiaries' contribution histories. The arbitrator found that the merger, drop-down, and stock sales met safe harbors of the MPPAA. The court of appeals disagreed. Under *29 U.S.C.S. §§ 1398* and *1369(b)*, the company inherited the old subsidiaries' contribution histories as a result of the merger. The drop-down did not operate to transfer the contribution histories to the new subsidiaries under *§ 1398*, so the histories did not transfer to the purchaser via the stock sale.

### Outcome
The district court's judgment was affirmed.

## LexisNexis® Headnotes

Pensions & Benefits Law > Multiemployer Plans > Liability Calculations

Pensions & Benefits Law > Multiemployer

578 F.3d 592, *592; 2009 U.S. App. LEXIS 18723, **1

Plans > Liability for Withdrawals

### *HN1*[⬇] Multiemployer Plans, Liability Calculations

The Multiemployer Pension Plan Amendments Act of 1980 amends Title IV of the Employee Retirement Income Security Act to require employers withdrawing from multiemployer pension plans to pay their proportionate share of the plans' unfunded vested benefits--the so-called "withdrawal liability." *29 U.S.C.S. § 1381(b)(1)*. The purpose of withdrawal liability is to protect the other employers in the plan from having to pay for the benefits earned in the withdrawing employer's employees. The pension plan calculates a withdrawing employer's withdrawal liability based in large part on the employer's history of contributions to the fund.

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals > Employers Under Common Control

### *HN2*[⬇] Liability for Withdrawals, Employers Under Common Control

Under the Multiemployer Pension Plan Amendments Act of 1980, all trades or businesses under common control are treated as a single employer or "controlled group." *29 U.S.C.S. § 1301(b)(1)*.

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

### *HN3*[⬇] Multiemployer Plans, Liability for Withdrawals

Title IV of the Employee Retirement Income Security Act imposes liability upon withdrawal by a substantial employer from a multiemployer plan, and the Multiemployer Pension Plan Amendments Act of 1980 imposes strict technical rules governing such withdrawals. *29 U.S.C.S. §§ 1381(b)(1)*, *1391*.

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

### *HN4*[⬇] Multiemployer Plans, Complete Withdrawals

There are at least three steps to a multiemployer pension plan's determination of withdrawal liability. First, the fund determines whether an employer has withdrawn from the plan. A complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan. *29 U.S.C.S. § 1383(a)(1)-(2)*. Often key to this determination are three sections of the Multiemployer Pension Plan Amendments Act of 1980 establishing that certain corporate level transactions do not count as a withdrawal. The first is *29 U.S.C.S. § 1398*, which provides that a withdrawal does not occur merely because of a change in business form.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Reorganizations

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

### *HN5*[⬇] Multiemployer Plans, Reorganizations

See *29 U.S.C.S. § 1398*.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Reorganizations

### *HN6*[⬇] Multiemployer Plans, Reorganizations

See *29 U.S.C.S. § 1369(b)(3)*.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Reorganizations

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

### *HN7*[⬇] Multiemployer Plans, Reorganizations

Taken together, *29 U.S.C.S. §§ 1398* and *1369(b)* specify that an employer does not "withdraw" from a multiemployer pension plan solely because it undergoes

578 F.3d 592, *592; 2009 U.S. App. LEXIS 18723, **1

a merger, consolidation, or division (terms that are, unfortunately, undefined). Following such reorganizations, the successor corporation or corporations are deemed the "original employer" for purposes of determining withdrawal liability, and withdrawal liability is not incurred until such time (if any) as the successor withdraws from the plan.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Limitations on Liability

*HN8*[⬇] **Multiemployer Plans, Limitations on Liability**

*29 U.S.C.S. § 1384* provides that asset sales meeting certain stringent requirements--the buyer must assume an obligation to make contributions to a multiemployer pension plan at substantially the same level as the seller's contribution, the seller must post a bond and assume secondary liability and the sale must be at arm's length to an unrelated entity--will not result in a withdrawal. *29 U.S.C.S. § 1384(a)*.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Limitations on Liability

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

*HN9*[⬇] **Multiemployer Plans, Limitations on Liability**

*29 U.S.C.S. §§ 1398*, *1369(b)*, and *1384* are most often given effect by courts addressing whether and when a withdrawal from a multiemployer pension plan has occurred, and they are treated as "safe harbors" exempting predecessor employers from withdrawal liability.

Pensions & Benefits Law > Multiemployer Plans > Liability Calculations

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

*HN10*[⬇] **Multiemployer Plans, Liability Calculations**

The second step under the Multiemployer Pension Plan Amendments Act of 1980 to determining withdrawal liability is the calculation of the amount owed by the withdrawing employer. The rules governing this calculation are complex, *29 U.S.C.S. §§ 1381*, *1391*, but the calculation is based largely on the withdrawing employer's contribution history over the five or ten years preceding the withdrawal. *29 U.S.C.S. § 1391(c)(2)*, *(5)(C)*

Pensions & Benefits Law > Multiemployer Plans > Liability Calculations

*HN11*[⬇] **Multiemployer Plans, Liability Calculations**

Under the Multiemployer Pension Plan Amendments Act of 1980, the amount of withdrawal liability is determined first by calculating a plan's unfunded vested benefits at the time of the withdrawal, defined by subtracting the value of the plan's assets from the present value of its nonforfeitable benefits. In the absence of regulations governing these valuations, pension plans may use actuarial assumptions so long as they are "reasonable." Second, the withdrawing employer's share of the unfunded vested benefits is determined according to one of the methods listed in *29 U.S.C.S. § 1391*, or by an alternative method adopted by an amendment to the pension plan, subject to approval of the Pension Benefit Guaranty Corporation. *29 U.S.C.S. § 1391*.

Pensions & Benefits Law > Multiemployer Plans > Liability Calculations

*HN12*[⬇] **Multiemployer Plans, Liability Calculations**

Unless otherwise provided for in a multiemployer pension plan, the amount of unfunded vested benefits allocable to an employer is calculated by the "presumptive method" described in *29 U.S.C.S. § 1391(b)*. Under this method, withdrawal liability is calculated by multiplying the plan's aggregate unfunded benefit liability from all employers by the fraction made up of the sum of all contributions required to have been made by the withdrawing employer, divided by the sum of all contributions by all employers in the plan during the same time period.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Limitations

578 F.3d 592, *592; 2009 U.S. App. LEXIS 18723, **1

on Liability

Pensions & Benefits Law > Multiemployer
Plans > Liability Calculations

Business & Corporate Compliance > ... > Pensions
& Benefits Law > Multiemployer
Plans > Reorganizations

### *HN13*[🔊]  Multiemployer Plans, Limitations on Liability

The Pension Benefit Guaranty Corporation (PBGC) has blessed a third and further step in the process of determining liability for withdrawal from a multiemployer pension plan, the allocation step. The fund looks to the safe harbor provisions under *29 U.S.C.S. §§ 1398, 1369(b)*, and *1384* to determine how to allocate the withdrawal liability calculated under *29 U.S.C.S. § 1391* among multiple employers. The PBGC has found that where an employer avoids withdrawal liability under one of the safe harbor provisions--by undergoing a merger, division or exempted asset sale, for instance--the successor employer "inherits" the contribution history of the predecessor for purposes of calculating liability for any subsequent withdrawal. If there is more than one successor employer, the PBGC has said that the contribution history of the predecessor should be apportioned among the successors on a "reasonable" basis.

Administrative Law > Judicial Review > Standards
of Review > General Overview

Administrative Law > Judicial Review > Standards
of Review > Rule Interpretation

### *HN14*[🔊]  Judicial Review, Standards of Review

Opinion letters are not entitled to Chevron deference, or even the deference a court accords an agency's interpretation of its own ambiguous regulation (an agency's interpretation of its regulation is controlling unless plainly erroneous or inconsistent with the regulation), but opinion letters are entitled to respect to the extent that they have the power to persuade.

Business & Corporate Compliance > ... > Pensions
& Benefits Law > Multiemployer
Plans > Reorganizations

Pensions & Benefits Law > Multiemployer
Plans > Liability Calculations

### *HN15*[🔊]  Multiemployer Plans, Reorganizations

The Pension Benefit Guaranty Corporation's method of apportioning liability for withdrawal from a multiemployer pension plan is a reasonable interpretation of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *29 U.S.C.S. §§ 1381-1461*. It respects the statute's purpose of ensuring that a plan's benefits will be adequately funded without overly burdening employers that have undergone changes in corporate structure covered by the MPPAA's safe harbors (and, therefore, without deterring such employers from engaging in beneficial reorganizations). The safe harbor provisions give structure to the MPPAA that comports with general corporate law principles. Looking to those provisions in allocating withdrawal liability therefore should respect parties' expectations regarding the effect of a corporate transaction on the corporation's obligations.

Business & Corporate Compliance > ... > Pensions
& Benefits Law > Multiemployer
Plans > Reorganizations

Mergers & Acquisitions Law > General Business
Considerations > Pension & Profit-Sharing Plans

Pensions & Benefits Law > Multiemployer
Plans > Liability for Withdrawals

Mergers & Acquisitions Law > Liabilities & Rights of
Successors > Successor Liability Doctrine

### *HN16*[🔊]  Multiemployer Plans, Reorganizations

*29 U.S.C.S. §§ 1398* and *1369(b)* treat mergers, consolidations and divisions one way for purposes of determining whether a withdrawal from a multiemployer pension plan has occurred, while asset sales are generally treated another way. This distinction is common to corporate law and to Title IV of the Employee Retirement Income Security Act (ERISA). It is axiomatic that a stock sale, merger, or consolidation has no effect on a corporation's contractual obligations. Similar principles have always applied under Title IV of ERISA. A successor corporation in a merger or stock sale inherits the predecessor's contribution history just as it assumes contractual liabilities.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Reorganizations

Mergers & Acquisitions Law > Sales of Assets > General Overview

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Mergers & Acquisitions Law > General Business Considerations > Pension & Profit-Sharing Plans

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals > Employers Under Common Control

*HN17*[ ] **Multiemployer Plans, Reorganizations**

In contrast to a stock sale, an asset sale generally does not result in assumption of liabilities by operation of law. The result under the Multiemployer Pension Plan Amendments Act of 1980, *29 U.S.C.S. §§ 1381-1461*, is congruent--an asset sale generally results in a complete withdrawal if the seller's controlled group no longer has covered operations or an obligation to contribute. By the same token, the buyer generally does not inherit the contribution history.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Limitations on Liability

Mergers & Acquisitions Law > Mergers > General Overview

Mergers & Acquisitions Law > General Business Considerations > Pension & Profit-Sharing Plans

Mergers & Acquisitions Law > Sales of Assets > General Overview

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Reorganizations

*HN18*[ ] **Multiemployer Plans, Limitations on Liability**

*29 U.S.C.S. § 1384*, a safe harbor provision under the

Multiemployer Pension Plan Amendments Act of 1980, creates "an elective relief rule" for buyers and sellers of assets, so that struggling companies will not be deterred from financially beneficial asset sales by the daunting prospect of withdrawal liability. *Section 1384*'s limited exemption for asset sales that meet its stringent requirements does not undercut the general distinction between mergers and divisions on the one hand (transactions that transfer contribution histories to the successor corporation) and asset sales on the other (transactions that generally do not transfer contribution histories to the purchaser). Because these provisions track typical distinctions in the law of corporate transactions, it is reasonable to apply them in determining the effect such transactions have on an employer's withdrawal liability.

Business & Corporate Compliance > ... > Pretrial Matters > Alternative Dispute Resolution > Judicial Review

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

*HN19*[ ] **Alternative Dispute Resolution, Judicial Review**

A district court reviews an arbitrator's decision regarding a multiemployer pension fund's assessment of withdrawal liability for clear error, and a court of appeals reviews the district court's decision under the same standard.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Reorganizations

*HN20*[ ] **Multiemployer Plans, Reorganizations**

Although "division" is not defined in the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *29 U.S.C.S. § 1381-1461*, the case law has never treated a "drop down" of assets and liabilities as a division under the statute. Rather, "division" generally means a sale of stock, rather than a transfer of assorted assets and liabilities. The sale of a subsidiary's stock is a form of corporate "division." Under the statute, the

contribution history of a subsidiary whose stock is sold automatically transfers to the buyer. While "division" is not a term of art with a widely established meaning, the term, as used in the MPPAA, appears to connote a transaction whereby the stock of a contributing corporation is "divided" away from its controlled group and acquired by or distributed to new owners.

Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine

**HN21**[⬇] **Liabilities & Rights of Successors, Successor Liability Doctrine**

A corporate successor is not a "successor" unless it succeeds to the predecessor corporation's obligations in the first place.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Reorganizations

Pensions & Benefits Law > Multiemployer Plans > Liability Calculations

**HN22**[⬇] **Multiemployer Plans, Reorganizations**

For purposes of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *29 U.S.C.S. §§ 1381-1461*, it is not quite right to characterize contribution histories as "accruing" until the occurrence of a reorganization covered by a safe harbor. They do not "accrue" so much as they form the basis for any eventual calculation of the employer's withdrawal liability. That means that if the employer never withdraws (i.e., if the employer engages in a transaction covered by one of the safe harbor provisions, or if the employer simply continues in operation indefinitely and continues contributing to the fund), that employer will never be assessed withdrawal liability. Therefore, no contribution histories have "accrued"; any liability is contingent on withdrawal.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Limitations on Liability

Mergers & Acquisitions Law > General Business Considerations > Pension & Profit-Sharing Plans

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Reorganizations

**HN23**[⬇] **Multiemployer Plans, Limitations on Liability**

The Pension Benefit Guaranty Corporation reasonably allows a multiemployer pension fund to look to the safe harbor provisions of the Multiemployer Pension Plan Amendments Act of 1980, *29 U.S.C.S. §§ 1381-1461*, to determine whether a successor employer or purchaser of assets has "inherited" contribution histories. This inheritance is similar to the means whereby an employer would assume other contractual liabilities.

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Limitations on Liability

Pensions & Benefits Law > Multiemployer Plans > Liability Calculations

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

**HN24**[⬇] **Multiemployer Plans, Limitations on Liability**

Where an employer engages in a transaction covered by one of the safe harbors of the Multiemployer Pension Plan Amendments Act of 1980, *29 U.S.C.S. §§ 1381-1461*, the successor employer is treated as the original employer for purposes of calculating the successor's subsequent withdrawal liability, and no liability is assessed against the predecessor. When a pension fund calculates the successor's withdrawal liability, it is therefore appropriate to consider the predecessor's contribution histories; the fund does not assess any liability against the predecessor.

**Counsel:** For CENTRA, INCORPORATED, DETROIT INTERNATIONAL BRIDGE COMPANY, Plaintiffs - Appellants: Richard Willard, Attorney, STEPTOE & JOHNSON, Washington, DC.

578 F.3d 592, *592; 2009 U.S. App. LEXIS 18723, **1

For CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Defendant - Appellee: Richard L. Fenton, Attorney, SONNENSCHEIN, NATH & ROSENTHAL, Chicago, IL; James P. Condon, Attorney, CENTRAL STATES, SOUTHEAST & SOUTHWEST AREAS PENSION FUND, Rosemont, IL.

**Judges:** Before CUDAHY, RIPPLE and WOOD, Circuit Judges.

**Opinion by:** CUDAHY

# Opinion

 **[*594]** Cudahy, *Circuit Judge.* CenTra, Inc. is a holding company that owns subsidiaries in trucking and real estate, as well as one that operates the Ambassador bridge between Detroit and Windsor, Ontario. In 1995, CenTra was reorganized to shed its unprofitable unionized trucking operations. Two years later, CenTra's last unionized subsidiary--the Detroit International Bridge Co. (DIBC)--withdrew from the Central States pension fund, and the fund assessed more than $ 14 million in withdrawal liability against CenTra under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), *29 U.S.C. §§ 1381-1461*. **[**2]** CenTra challenged the assessment in arbitration, and the arbitrator reduced the assessment to roughly $ 960,000. The district court vacated the arbitrator's award and reinstated the fund's assessment. We affirm.

I

*HN1*[↑] The MPPAA amended Title IV of ERISA to require employers withdrawing from multiemployer pension plans to pay their proportionate share of the plans' unfunded vested benefits--the so-called "withdrawal liability." *29 U.S.C. § 1381(b)(1)*. The purpose of withdrawal liability is to protect the other employers in the plan from having to pay for the benefits vested in the withdrawing employer's employees. *See, e.g., Santa Fe Pacific Corp. v. Central States, Southeast and Southwest Areas Pension Fund, 22 F.3d 725, 726-27 (7th Cir. 1994)*. The pension plan calculates a withdrawing employer's withdrawal liability based in large part on the employer's history of contributions to the fund. *See Central States, Southeast and Southwest Areas Pension Fund v. Nitehawk Express, Inc., 223 F.3d 483, 486 (7th Cir. 2000)*. Here, the "employer" withdrawing from the fund is the group made up of CenTra and its subsidiaries--a "controlled group" in the

argot of the MPPAA. [1] The question is whether CenTra's **[**3]** controlled group, which withdrew from the plan in 1997, was properly assessed withdrawal liability based on the contribution histories of two CenTra subsidiaries that disappeared in the 1995 reorganization.

A

Though the parties quibble about the details, the facts are not materially in dispute. In 1970, T.J. Moroun and his four children created CenTra as a holding company for various trucking subsidiaries the family had owned for decades. T.J. died in 1992; by 1994 his son Manuel (Matty), CenTra's first president, was also CenTra's principal owner and controlling shareholder. Matty's three sisters were minority owners.

From 1970 until 1995, two of CenTra's subsidiaries were Central Cartage Co. and Central Transport, Inc. (Old Subsidiaries or Old Subs). Central Cartage performed local pick-up and delivery services in cities across the Midwest and employed drivers and dockmen. Central Transport was an "over-the-road" line **[**4]** haul carrier that employed drivers who owned their own trucks. The Old Subsidiaries worked together to provide shippers door-to-door service. The dockmen, local drivers and over-the-road truckers that the Old Subs employed all belonged to local unions affiliated **[*595]** with the Teamsters. The Old Subs each had labor agreements with those unions under which they contributed to the Central States pension fund on behalf of their employees. In 1979, Central Cartage purchased DIBC, which owns and operates the Ambassador Bridge. DIBC was also a union employer and contributed to the Central States pension fund. Also relevant here is Crown Enterprises, Inc., a real estate firm that, prior to the 1995 reorganization, was owned by Central Transport. Crown never participated in the pension plan. Rounding out the relevant employers in the pre-1995 CenTra controlled group was U.S. Truck Company, Inc., another fund contributor. Matty's sister Agnes Anne (Anne) owned U.S. Truck. It was affiliated with CenTra by virtue of an agreement between Matty and Anne giving Matty an option to purchase U.S. Truck's stock. U.S. Truck also contributed to the fund.

---

[1] *HN2*[↑] Under the statute, all trades or businesses under common control are treated as a single employer or "controlled group." *29 U.S.C. § 1301(b)(1)*; *see Central States, Southeast and Southwest Areas Pension Fund v. Nitehawk Express, Inc., 223 F.3d 483, 486 (7th Cir. 2000)*.

Pre-1995, then, the CenTra controlled group looked like [**5] this:

[SEE DIAGRAM IN ORIGINAL]

Deregulation of the trucking industry in the 1980s led to increased competition, and CenTra began looking for ways to cut costs. In particular, CenTra sought to alleviate the burdens imposed by the unions' standard wage rates, which were higher than non-union rates. According to CenTra, the unions stood fast, and the Old Subs suffered financially. Matty wanted to reorganize in a way that would allow CenTra to get rid of the Old Subs' trucking operations while retaining DIBC and Crown, which were profitable. He also wanted the reorganization to be tax neutral. In 1987, CenTra obtained a favorable tax ruling from the Internal Revenue Service for a proposed reorganization, but it would be another eight years before the Moroun siblings reached an agreement allowing the reorganization to go forward. [2]

In 1995 the reorganization finally did go forward. In preparation, CenTra created two new subsidiaries, Central Cartage Co. of Michigan, Inc. and [**6] Central Transport of Michigan, Inc. (New Subsidiaries or New Subs), which were intended to take on CenTra's union trucking operations, and a third subsidiary, Central Transport International, Inc. (CTII), which was to engage in non-union trucking.

[*596] [SEE DIAGRAM IN ORIGINAL]

Then, on December 31, 1995, the Old Subs merged into CenTra and ceased to exist as such, leaving CenTra as the surviving corporation. At the same time or shortly thereafter (as discussed below, the timing is irrelevant to the analysis), CenTra contributed certain assets and assigned certain liabilities to the New Subs, and the New Subs were renamed to take on the names of the Old Subs (i.e., the "of Michigan, Inc." was dropped).

CenTra refers to the contribution of capital and assignment of liabilities to the New Subs as a "drop down." In particular, CenTra "dropped down" Old Transport's line haul operations, which constituted a portion of Old Transport's motor carrier division, to New Transport. CenTra also contributed $ 266,000 in common stock and paid-in capital to New Transport.

CenTra retained the remainder of Old Transport's motor carrier division, which included Crown Enterprises, the real estate business that [**7] had been a subsidiary of Old Transport and which had a book value of $ 44.5 million at the time of the merger. In addition, CenTra retained Old Transport's freight receivables and other receivables, as well as its other divisions, including a Mexico sales office, several terminal properties and some Canadian real estate, all of which appear to have been contributed by CenTra to CTII. CenTra Chief Financial Officer Robert Youngert testified that New Transport was to be a line haul carrier for CenTra only, and that CenTra retained Old Transport's freight receivables to avoid saddling New Transport with the risk that they would not be collectible.

The Old Transport assets and liabilities that CenTra dropped down to New Transport had a book value of about $ 6.8 million; those transferred to CTII or retained by CenTra were valued at roughly $ 104.2 million. With respect to Central Cartage, CenTra "dropped down" Old Cartage's freight division to New Cartage, and contributed $ 306,000 in common stock and paid-in capital. CenTra retained DIBC. The assets and liabilities dropped down to New Cartage were valued at roughly $ 23.5 million and those retained by CenTra were valued at approximately [**8] $ 29.9 million. [3]

All of the Old Subs' union trucking operations (including drivers and other employees) were transferred to the New Subs. The New Subs also assumed the Old Subs' labor agreements and their obligations to contribute to the pension fund. CenTra, [*597] however, retained the Old Subs' freight contracts and transferred those contracts to CTII. After the merger of the Old Subs into CenTra and the drop down to the New Subs, the CenTra controlled group looked like this:

[SEE DIAGRAM IN ORIGINAL]

On February 29, 1996, CenTra sold its stock in New Transport to U.S. Truck. On August 9, 1996, CenTra sold its stock in New Cartage to U.S. Truck. Then on August 19, 1996, Matty and Anne entered a settlement agreement in which Matty gave up his option to purchase U.S. Truck stock. This agreement ended CenTra's affiliation with U.S. Truck. Following the stock

---

[2] Throughout the 1980s and 1990s there was acrimony and litigation among the Moroun siblings regarding control of the family business. For the most part, that family dispute is irrelevant to the matters at issue here.

[3] The numbers vary depending on which balance sheet or journal entry is consulted in the record. Robert Youngert, CenTra's chief financial officer, testified that this might be because some of the financial documents in the record were audited and some were not.

578 F.3d 592, *597; 2009 U.S. App. LEXIS 18723, **8

sale and settlement agreement, there were two controlled groups, one headed **[\*\*9]** by CenTra and one headed by U.S. Truck:

[SEE DIAGRAM IN ORIGINAL]

U.S. Truck's controlled group did not fare well. In 1997, New Transport shut down. In 1999 New Cartage failed, and U.S. Truck filed for bankruptcy and was ultimately liquidated. The fund assessed withdrawal liability against U.S. Truck for a partial withdrawal in 1998, *29 U.S.C. § 1385*, and again for a complete withdrawal in 1999, *29 U.S.C. § 1383*.

Meanwhile, DIBC remained the last fund contributor in CenTra's controlled group. DIBC's labor agreement expired in November 1997, and Central States terminated DIBC's participation in the fund as of that date. DIBC, Crown and CTII are CenTra subsidiaries to the present day.

B

DIBC's withdrawal from the fund marked CenTra's "complete withdrawal" under *29 U.S.C. § 1383(a)*, and Central States assessed withdrawal liability. The fund calculated CenTra's withdrawal liability based on the contribution histories of the Old and New Subs up through August 1996, and based on DIBC's entire contribution history. The total amount of liability assessed was $ 14,761,082.66. CenTra objected that the contribution histories for the Old Subs and the New Subs should not have been used to calculate **[\*\*10]** its withdrawal liability. CenTra argued that as a result of the 1995 reorganization, U.S. Truck, not CenTra, was the employer responsible for those contribution histories if and when U.S. Truck withdrew from the plan. [4] Under **[\*598]** MPPAA procedure, CenTra paid the full amount assessed and then demanded arbitration. The arbitrator ruled for CenTra, finding that its withdrawal liability should have been calculated without regard to the Old and New Subs' contribution histories, and the fund's award was reduced to $ 959,332, representing DIBC's history of contributions to the fund.

The arbitrator found that the merger of the Old Subs into

CenTra, followed by the "drop down" to the New Subs, the stock sales to U.S. Truck and the ultimate separation of U.S. Truck from CenTra's controlled group **[\*\*11]** met certain statutory safe harbors under the MPPAA, *29 U.S.C. §§ 1398*, *1369(b)*, which prevented CenTra from incurring withdrawal liability at any point along the way. The upshot of the arbitrator's finding was that it meant the Old Subs' contribution histories traveled first to CenTra in the merger, then to the New Subs in the "drop down," and ultimately along with the New Subs in the stock sales to U.S. Truck. [5]

The district court vacated the arbitrator's award and reinstated the fund's assessment, finding that the Old Subs' contribution histories were assumed by CenTra in the merger and stayed with CenTra because none of the later steps in the reorganization met the MPPAA's statutory requirements for avoiding withdrawal liability. We agree with the district court's analysis and therefore affirm.

II

A

The MPPAA, the most extensive amendment of ERISA to date, "overhaul[ed]" ERISA's **[\*\*12]** Title 4, the plan termination insurance system. John H. Langbein, Susan J. Stabile & Bruce A. Wolk, *Pension and Employee Benefit Law* 92 (4th ed. 2006). In addition to protecting employers who remain in a plan, the MPPAA protects the Pension Benefit Guaranty Corporation (PBGC), the agency charged with implementing and interpreting the statute, from the enormous burden of insuring pension benefits, all in the interest of ensuring that employees will be able to collect their benefits upon retirement. Langbein, Stabile & Wolk, *Pension and Employee Benefit Law* at 69. Prior to the enactment of ERISA, an employer's liability to a multiemployer plan was governed by the terms of the collective bargaining agreement, which typically lacked any provision for contingent liability. *Id.* at 69-70. *HN3*[↑] ERISA Title 4 imposed liability upon withdrawal by a substantial employer from a multiemployer plan, and the MPPAA imposed strict technical rules governing such withdrawals. *Id.; see 29 U.S.C. §§ 1381(b)(1)*, *1391*.

---

[4] The fund filed an unsecured claim for withdrawal liability in U.S. Truck's bankruptcy proceeding, and noted that the amount of liability had been calculated on the assumption that the contribution histories for the Old and New Subs prior to September 1996 would be attributable to CenTra. The fund reserved the right to increase its claim against U.S. Truck, however, if that assumption proved to be incorrect.

[5] The arbitrator also found that the evidence was insufficient for a conclusion that a principal purpose of the reorganization was to evade or avoid withdrawal liability under *29 U.S.C. § 1392(c)*. Like the district court, we resolve the case under *§§ 1398* and *1369(b)*, and therefore we need not reach this question.

With respect to this case, *HN4*[↑] there are at least three steps to a pension plan's determination of withdrawal liability. [6] First, the fund determines whether an employer (here, CenTra's controlled group) **[**13]** has withdrawn from the plan. A complete **[*599]** withdrawal occurs when an employer "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." *29 U.S.C. § 1383(a)(1)-(2)*.

Often key to this determination are three sections of the MPPAA establishing that certain corporate level transactions do *not* count as a withdrawal. The first is *29 U.S.C. § 1398*, which provides that a withdrawal does not occur merely because of a change in business form. In particular, and *HN5*[↑] "[n]otwithstanding any other provision of this part,"

> an employer shall not be considered to have withdrawn from a plan solely because--
>
> (1) an employer ceases to exist by reason of--
>
> (A) a change in corporate structure described in *section 1369(b)* of this title, or
> (B) a change to an unincorporated form of business enterprise,
>
> if the change causes no interruption in employer contributions or obligations to contribute under the plan . . .

*Section 1369(b)*, in turn, provides that *HN6*[↑] "[i]f a person ceases to exist by **[**14]** reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the person to whom this subtitle applies." *29 U.S.C. § 1369(b)(3)*. *HN7*[↑] Taken together, *§§ 1398* and *1369(b)* specify that an employer does not "withdraw" from a plan solely because it undergoes a merger, consolidation, or division (terms that are, unfortunately, undefined). Following such reorganizations, the successor corporation "or corporations" are deemed the "original employer" for purposes of determining withdrawal liability, and withdrawal liability is not incurred until such time (if any) as the successor withdraws from the plan.

The third provision relevant to the question whether an employer has withdrawn is *HN8*[↑] *29 U.S.C. § 1384*, which provides that asset sales meeting certain stringent requirements--the buyer must assume an

obligation to make contributions to the plan at substantially the same level as the seller's contribution, the seller must post a bond and assume secondary liability and the sale must be at arm's length to an unrelated entity--will not result in a withdrawal. *See 29 U.S.C. § 1384(a)*; *Nitehawk Express, 223 F.3d at 488*.

*HN9*[↑] *Sections 1398*, *1369(b)* and *1384* are most **[**15]** often given effect by courts addressing *whether* and *when* a withdrawal has occurred, and they are treated as "safe harbors" exempting predecessor employers from withdrawal liability. *Central States, Southeast and Southwest Areas Health and Welfare Fund v. Cullum Cos., Inc., 973 F.2d 1333, 1337 (7th Cir. 1992)* (discussing *§ 1384* and quoting *I.A.M. National Pension Fund v. Clinton Engines, Corp., 825 F.2d 415, 420, 263 U.S. App. D.C. 278 (D.C. Cir. 1987)*); *Central States, Southeast and Southwest Areas Pension Fund v. Sherwin-Williams Co., 71 F.3d 1338, 1342 (7th Cir. 1995)* (calling *§ 1398* a "savings clause"). In the present case, there is no dispute about when CenTra withdrew from the plan. The withdrawal occurred in 1997, when DIBC terminated its obligation to the fund. The parties agree that the 1995 reorganization did not cause a withdrawal. Nevertheless, as will appear, the safe harbor provisions, and *§§ 1398* and *1369(b)* in particular, remain crucial to determining the *allocation* of the assessed withdrawal liability among the Old Subs' successors.

*HN10*[↑] The second step to determining withdrawal liability is the calculation of the amount owed by the withdrawing employer. The rules governing this calculation are **[**16]** complex, *29 U.S.C. §§ 1381*, *1391*, [7] but **[*600]** the calculation is based largely on

---

[6] Under *29 U.S.C. § 1382*, the plan sponsor determines the amount of withdrawal liability, notifies the employer of that amount and collects it from the employer.

---

[7] *HN11*[↑] The amount of withdrawal liability is determined first by calculating the plan's unfunded vested benefits at the time of the withdrawal, defined by subtracting the value of the plan's assets from the present value of its nonforfeitable benefits. Jayne E. Zanglein & Susan J. Stabile, *ERISA Litigation* 1478 (3d ed. 2008). In the absence of regulations governing these valuations, pension plans may use actuarial assumptions so long as they are "reasonable." *Id.* Second, the withdrawing employer's share of the unfunded vested benefits is determined according to one of the methods listed in *29 U.S.C. § 1391*, or by an alternative method adopted by an amendment to the pension plan, subject to approval of the Pension Benefit Guaranty Corporation. *29 U.S.C. § 1391*; *Central States, Southeast and Southwest Areas Pension Fund v. 888 Corp., 813 F.2d 760, 762 n.2 (6th Cir. 1987)* (citation omitted); *see also* Zanglein & Stabile, ERISA Litigation at 1481; **[**18]** 60A Am. Jr. 2d *Pensions* § 728 (2009).

the withdrawing employer's contribution history over the five or ten years preceding the withdrawal. *See 29 U.S.C. § 1391(c)(2)*, *(c)(5)(C)*; *Central States Southeast and Southwest Areas Pension Fund v. Safeway, Inc., 229 F.3d 605, 613 (7th Cir. 2000)*. The parties here do not dispute the *amount* of withdrawal liability so much as they dispute whether and how that amount is to be *allocated* to CenTra. To understand the distinction between the amount of the liability and its allocation, consider how the amount of the liability was calculated in this case. CenTra's withdrawal occurred in November 1997, and the fund calculated CenTra's withdrawal liability based on that date. To do so, the fund looked at the contribution histories of CenTra's controlled group going back ten years prior to the 1997 withdrawal date. In eight of those ten years, the Old Subs belonged to the CenTra controlled group. In fact, the Old Subs' contributions made up the bulk of the group's contributions during that period. If we calculated withdrawal liability merely according to *§ 1391*, then, arguably that calculation would *not* take into account **[**17]** or make adjustments for the 1995 reorganization: the CenTra controlled group's contribution history over the ten years preceding November 1997 included contributions by the Old Subs, and therefore those contributions would be included in the calculation under *§ 1391*. End of story.

The statute does not comment one way or the other about whether this method of calculation is appropriate. *HN13*[↑] The PBGC, however, has blessed a third and further step in the process, the allocation step. The fund looks to the safe harbor provisions discussed above to determine how to allocate the withdrawal **[**19]** liability calculated under *§ 1391* among multiple employers. The

---

*HN12*[↑] Unless otherwise provided for in the plan, the amount of unfunded vested benefits allocable to an employer is calculated by the "presumptive method" described in *29 U.S.C. § 1391(b)* . . . Under this method, withdrawal liability is calculated by multiplying the plan's aggregate unfunded benefit liability from all employers by the fraction made up of the sum of all contributions required to have been made by the withdrawing employer, divided by the sum of all contributions by all employers in the plan during the same time period.

*888 Corp., 813 F.2d at 762 n.2* (citing *Peick v. Pension Benefit Guaranty Corp., 724 F.2d 1247, 1256 (7th Cir. 1983))*; *see also Borden, Inc. v. Bakery & Confectionery Union & Industry Int'l Pension, 974 F.2d 528, 530 n.2 (4th Cir. 1992)*; *Park South Hotel Corp. v. New York Hotel Trades Council, 851 F.2d 578, 580 (2d Cir. 1988)*.

PBGC has found that where an employer avoids withdrawal liability under one of the safe harbor provisions--by undergoing a merger, division or exempted asset sale, for instance--the successor employer "inherits" the contribution history of the predecessor for purposes of calculating liability for any subsequent withdrawal. PBGC Opinion Letters 82-40 (Dec. 27, 1982), 92-1 (Mar. 30, 1992); *see Nitehawk Express, 223 F.3d at 491*; *Park South Hotel Corp. v. New York Hotel Trades Council, 851 F.2d 578, 583-84 (2d Cir. 1988)*. If there is more than one successor employer, the PBGC has said that the contribution history of the predecessor should be apportioned among the successors **[\*601]** on a "reasonable" basis. PBGC Opinion Letter 92-1; *see also Nitehawk Express, 223 F.3d at 491*.

We have previously relied on PBGC Opinion Letter 92-1 in determining how to allocate withdrawal liability among multiple employers, *Nitehawk Express, 223 F.3d at 491*, and we see no reason to depart from this practice here. We note, however, that the PBGC has not promulgated regulations on this question but has merely issued the above-cited opinion letters on the **[**20]** subject. *HN14*[↑] Opinion letters are not entitled to *Chevron* deference, or even the deference we accord an agency's interpretation of its own ambiguous regulation, *Auer v. Robbins, 519 U.S. 452, 461, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997)* (An agency's interpretation of its regulation is "controlling unless 'plainly erroneous or inconsistent with the regulation.'") (quoting *Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989))* (further quotation marks and citation omitted), but opinion letters are " 'entitled to respect' . . . to the extent that [they] have the 'power to persuade,'" *Christensen v. Harris County, 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000)* (quoting *Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944))*.

We remain persuaded that *HN15*[↑] the PBGC's method of apportioning withdrawal liability is a reasonable interpretation of the statute. It respects the statute's purpose of ensuring that the plan's benefits will be adequately funded without overly burdening employers that have undergone changes in corporate structure covered by the MPPAA's safe harbors (and, therefore, without deterring such employers from engaging in beneficial reorganizations). The safe harbor provisions give structure to the MPPAA that comports with general **[**21]** corporate law principles. Looking to those provisions in allocating withdrawal liability therefore should respect parties' expectations regarding

the effect of a corporate transaction on the corporation's obligations.

To be concrete, **HN16**[↑] *§§ 1398* and *1369(b)* treat mergers, consolidations and divisions one way for purposes of determining whether a withdrawal has occurred, while asset sales are generally treated another way. This distinction is common to corporate law and to Title IV of ERISA. "It is axiomatic that a stock sale, merger, or consolidation has no effect on a corporation's contractual obligations. Similar principles have always applied under Title IV of ERISA." Jayne E. Zanglein & Susan J. Stabile, *ERISA Litigation* 1474 (3d ed. 2008). A successor corporation in a merger or stock sale inherits the predecessor's contribution history just as it assumes contractual liabilities.

**HN17**[↑]] In contrast to a stock sale, an asset sale generally does not result in assumption of liabilities by operation of law. Again, the result under MPPAA is congruent --an asset sale generally results in a complete withdrawal if the seller's controlled group no longer has covered operations or an obligation to contribute. **[**22]** By the same token, the buyer generally does not inherit the contribution history.

*Id.* at 1476 (citing PBGC Opinion Letter 82-40).

However, **HN18**[↑]] *§ 1384*, the third MPPAA safe harbor provision, creates "an elective relief rule" for buyers and sellers of assets, *id.*, so that struggling companies will not be deterred from financially beneficial asset sales by the "daunting prospect of withdrawal liability," *Nitehawk Express, 223 F.3d at 487*. *Section 1384*'s limited exemption for asset sales that meet its stringent requirements does not undercut the general distinction between mergers and divisions on the one hand (transactions that transfer contribution histories to the successor corporation) and asset sales on the **[*602]** other (transactions that generally do not transfer contribution histories to the purchaser). Because these provisions track typical distinctions in the law of corporate transactions, it is reasonable to apply them in determining the effect such transactions have on an employer's withdrawal liability.

**B**

**HN19**[↑]] The district court reviewed the arbitrator's decision regarding the fund's assessment of withdrawal liability for clear error, and we review the district court's decision under the same **[**23]** standard. *Nitehawk Express, 223 F.3d at 488*. In assessing whether the fund reasonably allocated the Old Subs' contribution

histories to CenTra, we take CenTra's reorganization one step at a time. [8] The first step was the merger of the Old Subs into CenTra, which clearly caused the Old Subs to cease to exist and left CenTra as the surviving corporation. The record contains several merger documents to this effect, and the parties do not meaningfully dispute that this is the case. Under safe harbor provisions *§§ 1398* and *1369(b)*, CenTra inherited the Old Subs' contribution histories as a consequence of the merger. *See Nitehawk Express, 223 F.3d at 491* (citing PBGC Opinion Letter 92-1).

The second step was the "drop down" of assets and liabilities from CenTra to the New Subs. CenTra argues that this step was a "division" under *§ 1369(b)(3)*, and therefore that the New Subs inherited the Old **[**24]** Subs' contribution histories along with the other assets and liabilities "dropped down" by CenTra. We cannot agree. **HN20**[↑]] Although "division" is not defined in the MPPAA, *see Sherwin-Williams, 71 F.3d at 1339*, the case law has never treated a transaction such as the "drop down" of assets and liabilities at issue here as a division under the statute. Rather, "division" generally means a sale of stock, rather than a transfer of assorted assets and liabilities. *See id.* ("[The] sale of a subsidiary's stock is a form of corporate 'division.'") (citing PBGC Opinion Letters 82-4 (Feb. 10, 1982) and 84-7 (Dec. 20, 1984)); *Nitehawk Express, 223 F.3d at 491-92* ("[U]nder the statute, the contribution history of a subsidiary whose stock is sold *automatically* transfers to the buyer.") (citing PBGC Opinion Letter 92-1); *Bowers v. Andrew Weir Shipping Ltd., 27 F.3d 800, 805 (2d Cir. 1994)* ("While 'division' is not a term of art with a widely established meaning, the district court--relying on the scant legislative history and an opinion letter of the [PBGC]--concluded that the term, 'as used in the MPPAA, appears to connote a transaction whereby the stock of a contributing corporation is 'divided' away **[**25]** from its controlled group and acquired by or distributed to new owners.' . . . . We agree with this analysis . . .") (citation omitted).

CenTra urges us to follow its holistic approach and to find that the merger of the Old Subs into CenTra and the simultaneous "drop down" of the trucking operations to the New Subs is a division under *§ 1369(b)(3)*--that the

---

[8] CenTra appears to object to this approach, preferring to view the reorganization "holistically." But even were we to emphasize the whole over its parts--a position for which CenTra offers no authority--we know of no other way to talk about the reorganization than to discuss its constituent transactions.

merger and drop down were not separate transactions but rather were "an integrated division of the trucking operations from the Old Subsidiaries into the New Subsidiaries." In effect, CenTra wants us to treat its reorganization as though the Old Subs' were merged into CenTra and then dropped down unchanged into the New Subs (or, perhaps, as though the Old Subs were merged directly into the New Subs). If that were what happened, we might agree **[*603]** that the merger + drop down was a "division" under the statute. But that is not what happened. The Old Subs are not equivalent to the New Subs. The Old Subs disappeared into CenTra, and only pieces of the Old Subs were transferred to the New Subs. [9]

CenTra has derided this analysis, calling it a "substantial asset" requirement "grafted" onto the statute by the district court below, and argues that nothing in *§ 1398* suggests that the "successor to a covered change in corporate form" must retain "a certain level of its predecessor's assets." But this argument ignores the basic fact that *HN21*[↑] a successor is not a "successor" unless it succeeds to the predecessor corporation's obligations in the first place. Here, the successor to the Old Subs is CenTra, not the New Subs. CenTra has pointed to nothing in the record, and we have found nothing, supporting the assertion that CenTra turned around and transferred the Old Subs to the New Subs, contribution histories and all. What *are* in the record are balance sheets and financial journal entries showing how carefully CenTra picked out specific assets and liabilities and transferred *only those* assets and liabilities to the New Subs. There is no reason to believe that the Old Subs' contribution histories went with those assets and liabilities by fiat.

Moreover, CenTra ignores *§ 1398*'s requirement that the predecessor employer must "cease to exist" if the transaction is to be exempt from **[**27]** withdrawal liability. No corporate entity ceased to exist in the "drop down," as the Old Subs did in the merger with CenTra (as evidenced by the merger documents noting that the Old Subs' stock was dissolved and CenTra was the surviving corporation). It may be more in line with CenTra's framing of the argument to say that, rather than "ignoring" the *§ 1398* requirement, CenTra urges that we shoehorn the merger and the "drop down" into a single transaction by which the Old Subs ceased to exist

and their trucking operations and contribution histories (but not much else) were "divided" into the New Subs. But as stated above, this ignores the merger into CenTra and CenTra's retention of DIBC, Crown, and the various other valuable assets that CenTra failed to transfer to the New Subs.

A construction analogous to CenTra's was rejected in *Penn Central Corp. v. Western Conference of Teamsters Pension Fund, 75 F.3d 529 (9th Cir. 1996)*. In that case, the Ninth Circuit held that a successor corporation that purchased *one* of the companies in a controlled group became the "original employer" under *§§ 1398* and *1369(b)* of *that* company only, and did not inherit the contribution histories of other subsidiaries **[**28]** in the controlled group that had previously ceased operations. *Id. at 534*. "It would be unreasonable to interpret the last sentence in *29 U.S.C. § 1398* as requiring the successor corporation to assume additional withdrawal liability for each of the parent's subsidiaries, where, as here, only one of the subsidiaries is purchased by the successor and the other subsidiaries ceased operations long before the successor's purchase." *Id.* Here, U.S. Truck purchased the New Subs, not the Old Subs, which ceased operations prior to U.S. Truck's purchase. We can see no reason why U.S. Truck would have incurred withdrawal liability based on the Old Subs' contribution histories, even if the merger was simultaneous with the "drop down" and the New Subs continued making contributions to the fund on behalf of employees who formerly worked for the Old Subs. The drop down was not a division, nor did it meet **[*604]** the stringent requirements governing asset sales under *§ 1384*. Therefore the Old Subs' contribution histories were not inherited by the New Subs but remained with CenTra after the merger.

Because the Old Subs' contribution histories remained with CenTra, we need not consider whether the sale of the **[**29]** New Subs' stock to U.S. Truck constituted a "division." Even if it did, the Old Subs' contribution histories were not a part of the stock sale because they never made it into the New Subs in the first place. Likewise, we need not consider whether the settlement agreement ending the affiliation between CenTra and U.S. Truck constituted a statutory division.

That leaves one final matter to put to rest: CenTra's argument that this conclusion rests on a theory that withdrawal liability "accrues over time," a theory that CenTra correctly points out has been rejected by various courts. Our holding is not based on this theory,

---

[9] Less than half of Old Cartage's book value transferred to New Cartage, and only about 7 percent of Old Transport's book value made its way to New **[**26]** Transport.

which takes as its premise the idea that a parent *cannot* shed a subsidiary's contribution histories by engaging in a transaction covered by one of the safe harbor provisions discussed above. As should be clear from what we have said thus far, we agree entirely with CenTra and the courts that have considered this argument that it lacks merit. *See Teamsters Pension Trust Fund of Philadelphia v. Central Michigan Trucking, Inc., 857 F.2d 1107, 1109 (6th Cir. 1988)* (rejecting the fund's argument that a change in corporate structure under § 1398 did *not* relieve the predecessor **[**30]** parent company from withdrawal liability that had "accrued" during its ownership of the former subsidiary); *Godchaux v. Conveying Techniques, Inc., 846 F.2d 306, 310-11 & n.12 (5th Cir. 1988).* A parent *can* shed its subs' contribution histories (or, more correctly, a parent can avoid having those contributions used in the calculation of the parent's withdrawal liability) by engaging in such a transaction. CenTra simply failed to engage in the necessary transaction here.

CenTra ignores this thrust of the argument, as did the arbitrator below, both focusing instead on the notion of liability growing in a contributing employer with the passage of time. The arbitrator found that "Central States' case is premised on the theory that, at all times prior to the reorganization, the Old Subs were accruing withdrawal liabilities, and that these accruals never left the CenTra controlled group. . . . The evidence and arguments in this case, however, fail to persuade one that contribution histories are, or should be, treated as liabilities."

Setting aside the question whether contribution histories are appropriately treated as liabilities, [10] **HN22**[⬆] it is not quite right to characterize contribution histories **[**31]** as "accruing" until the occurrence of a reorganization covered by a safe harbor. They do not "accrue" so much as they form the basis for any eventual calculation of the employer's withdrawal liability. That means that if the employer never withdraws (i.e., if the employer engages in a transaction covered by one of the safe harbor provisions, or if the employer simply continues in operation indefinitely and continues contributing to the fund), that employer will

never be assessed withdrawal liability. Therefore, no contribution histories have "accrued"; any liability is contingent on withdrawal.

Again, **HN24**[⬆] where an employer engages in a transaction covered by one of the statute's **[**605]** safe harbors, the successor employer is treated as the original employer for purposes of calculating the successor's subsequent withdrawal liability, **[**32]** and no liability is assessed against the predecessor. In the present case, the Old Subs are the predecessor and CenTra is the successor. When the fund calculated CenTra's withdrawal liability, it was therefore appropriate to consider the Old Subs' contribution histories; the fund did not assess any liability against the Old Subs. Likewise, when the fund initially calculated U.S. Truck's withdrawal liability, it excluded the Old Subs' contribution histories on grounds elaborated here: CenTra's drop down of assets to the New Subs did not transfer the Old Subs' contribution histories to the New Subs, so those contribution histories stayed with CenTra instead of transferring to U.S. Truck in the sale of the New Subs' stock.

The district court's decision vacating the arbitration award and reinstating the fund's assessment of withdrawal liability is therefore

Affirmed.

---

**End of Document**

---

[10] As discussed, **HN23**[⬆] the PBGC reasonably allows the fund to look to the statute's safe harbor provisions to determine whether a successor employer or purchaser of assets has "inherited" contribution histories. This inheritance is similar to the means whereby an employer would assume other contractual liabilities, but we do not address whether the similarity extends further.

✚ Positive
As of: February 21, 2019 9:29 PM Z

## *Richland Industries, Ltd. v. Robbins*

United States District Court for the Northern District of Illinois, Eastern Division

September 4, 1985

No. 84 C 10105

**Reporter**
617 F. Supp. 639 *; 1985 U.S. Dist. LEXIS 16258 **

RICHLAND INDUSTRIES, LTD., Plaintiff, v. LORAN ROBBINS, et al., Defendants

## Core Terms

withdrawal, plans, vested, successor, Trustees', unfunded, contributions, benefits, termination, calculated, seller, effective date, employees, purchaser, provisions, pre-Act, cases, multiemployer, predecessors, liabilities, obligations, Pension, formula, ceased, purposes, terms

## Case Summary

### Procedural Posture

Plaintiff employer filed a motion for summary judgment in its action to recover withdrawal liability payments made under 29 U.S.C.S. § 4062 of the Employee Retirement Income Security Act of 1974, as amended by the Multiemployer Pension Plan Amendments Act of 1980 (Act), at *29 U.S.C.S. § 1362*, from defendant pension plan trustees.

### Overview

The employer sued to recover withdrawal liability payments it erroneously made on behalf of a corporation, the assets of which the employer had purchased, but which had withdrawn from the plan prior to the Act's effective date. In granting the motion for summary judgment, the court explained that the employer had no liability for the unfunded, vested liability of the withdrawn corporation. The court first noted that the concepts of "successor" and "predecessor" in National Labor Relations Act parlance were meaningless in calculating liability in this case. Instead, the result was squarely dictated by *29 U.S.C.S. § 1391(c)(2)*, which precluded consideration of the withdrawn corporation's unfunded, vested liability in

calculating the employer's liability. Nor did *29 U.S.C.S. § 1362(d)* transform these successive entities into a single "employer" for purposes of calculating withdrawal liability. The court finally rejected the trustees' policy and legislative-history based arguments, and held that the trustees' position was so bereft of merit as to assess the employer's costs and expenses against the trustees.

### Outcome

The court granted the employer's motion for summary judgment in its action to recover an erroneous withdrawal liability payment from the trustees.

## LexisNexis® Headnotes

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Limitations on Liability

Governments > Legislation > Effect & Operation > Retrospective Operation

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

Pensions & Benefits Law > Multiemployer Plans > General Overview

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

*HN1*[⤓] **Multiemployer Plans, Limitations on Liability**

One of the Multiemployer Pension Plan Amendments Act of 1980 (Act) provisions creates automatic withdrawal liability extending back even to an employer's pre-Act contribution history. But even though

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 150 of 212 PAGEID #: 2144

Page 2 of 9

617 F. Supp. 639, *639; 1985 U.S. Dist. LEXIS 16258, **16258

an employer may be held liable for its own pre-Act contribution history, it may not be held liable under most circumstances for the pre-Act contribution history of other employers. In particular, *29 U.S.C.S. § 1384* clearly establishes that a purchaser of assets may not be held liable for the seller's contribution history, absent a special arrangement with the seller by which the purchaser voluntarily assumes that liability.

Mergers & Acquisitions Law > General Business Considerations > Pension & Profit-Sharing Plans

Pensions & Benefits Law > Multiemployer Plans > Liability Calculations

Torts > Vicarious Liability > Corporations > Predecessor & Successor Corporations

Pensions & Benefits Law > Multiemployer Plans > General Overview

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

**HN2[⤓] General Business Considerations, Pension & Profit-Sharing Plans**

The Multiemployer Pension Plan Amendments Act of 1980 (Act), at *29 U.S.C.S. § 1391(c)*, establishes a formula that precludes any consideration of the unfunded vested liabilities of a predecessor corporation which withdrew from a multiemployer plan prior to the Act's effective date. Under that formulation, Act *29 U.S.C.S. § 1391(c)(2)* calls for calculation of the total amount of the plan's unfunded vested liabilities for its last fiscal year ended before April 29, 1980. The successor's liability is then computed by multiplying that figure by the following fraction, Act *29 U.S.C.S. § 1391(c)(2)(B)(ii)(I)* and *(II)*: the sum of all contributions required to be made by the employer under the plan for the last five plan years ending before April 28, 1980, divided by the sum of all contributions made for the last five plan years ending before April 29, 1980 by all employers who had an obligation to contribute under the plan. It is plain "the employer" referred to in the numerator means the current employer whose liability is being calculated. And the denominator deals only with employers participating in the plan after the effective date of the Act. Thus each part of the fraction by its terms excludes the predecessor's contribution history.

Mergers & Acquisitions Law > Liabilities & Rights of Successors > General Overview

Torts > Vicarious Liability > Corporations > Predecessor & Successor Corporations

Mergers & Acquisitions Law > General Business Considerations > General Overview

Mergers & Acquisitions Law > General Business Considerations > Labor Laws

Business & Corporate Compliance > ... > ERISA > Plan Termination > Liability for Termination

Pensions & Benefits Law > Multiemployer Plans > General Overview

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

**HN3[⤓] Mergers & Acquisitions Law, Liabilities & Rights of Successors**

There are explicit statutory provisions defining when successive employers can be considered a single "employer" for purposes of calculating withdrawal liability. The Employee Retirement Income Security Act of 1974, *29 U.S.C.S. § 1362(d)*, provides successor corporations will be liable for the contribution history of their predecessors after certain events: (d) For purposes of this section the following rules apply in the case of certain corporate reorganizations: (1) If an employer ceases to exist by reason of the reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the employer to whom this section applies. (2) If an employer ceases to exist by reason of a liquidation into a parent corporation, the parent corporation shall be treated as the employer to whom this section applies.(3) If an employer ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the employer to whom this section applies.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 151 of 212 PAGEID #: 2145

Page 3 of 9

617 F. Supp. 639, *639; 1985 U.S. Dist. LEXIS 16258, **16258

Business & Corporate Compliance > ... > Pensions & Benefits Law > Multiemployer Plans > Limitations on Liability

Criminal Law & Procedure > ... > Weapons Offenses > Trafficking in Weapons > Elements

Pensions & Benefits Law > Multiemployer Plans > Liability for Withdrawals

Family Law > ... > Classification > Retirement Benefits > Pensions

Pensions & Benefits Law > Multiemployer Plans > General Overview

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

*HN4*[⬇]  **Multiemployer Plans, Limitations on Liability**

The Multiemployer Pension Plan Amendments Act of 1980 explicitly treats asset sellers and purchasers as separate employers. *29 U.S.C.S. § 1384*, in tandem with *29 U.S.C.S. § 1383(a)*, establishes that an arms' length sale of assets normally occasions a complete withdrawal from the plan by the seller. That subjects the seller to full withdrawal liability. And the purchaser undertakes no liability at all for the seller's contribution history, unless the purchaser posts a special bond and the seller agrees contractually to assume secondary liability for its contribution history.

Pensions & Benefits Law > Multiemployer Plans > Complete Withdrawals

Pensions & Benefits Law > Multiemployer Plans > General Overview

*HN5*[⬇]  **Multiemployer Plans, Complete Withdrawals**

The Multiemployer Pension Plan Amendments Act of 1980 (Act), at *29 U.S.C.S. § 1397*, excludes from consideration in determining such an employer's liability: 1. contributions made under a collective bargaining agreement under which the contribution obligation expired before the Act; and2. contributions made for work performed at a facility if before the Act became effective; (a) the facility had ceased operations or(b) the contribution obligation with respect to the facility's

employees had ceased.

**Counsel:** **[**1]** Michael H. Auen, Foley & Lardner, Chicago, for Plaintiff.

Alan M. Levy, John E. Bardgett, Thomas J. Angell, Chicago, for Defendant.

**Judges:** Shadur, District Judge.

**Opinion by:** SHADUR

# Opinion

**[*639]** MEMORANDUM OPINION AND ORDER

Richland Industries, Ltd. ("Richland II") sues the Trustees ("Trustees") of the Central States, Southeast and Southwest Areas Pension Fund (the "Fund") to recover withdrawal liability payments made under Section 4062 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") **[*640]** or simply the "Act"), *29 U.S.C. § 1362*. [1] Richland II argues Trustees erroneously calculated the amount of withdrawal liability Richland II owed to the Fund by including the contribution history of Richland Industries, Inc. ("Richland I"), the corporation whose assets Richland II purchased.

**[**2]** Richland II and Trustees have filed cross-motions for summary judgment under *Fed. R. Civ. P. ("Rule") 56*. For the reasons stated in this memorandum opinion and order, Richland II's motion is granted and Trustees' is denied.

*Facts*

2

From February 1, 1975 through July 11, 1979 Richland I submitted contributions to the Fund pursuant to a series of collective bargaining agreements ("CBAs") with

---

[1] All citations to Title 29 will take the form "Act § --" or "ERISA § --" (in each instance using Title 29's numbering rather than the statute's internal numbering), depending on whether the provision was or was not modified or inserted anew by the Act.

[2] Because the parties have stipulated to the facts, there is no need to apply the familiar rule requiring the drawing of inferences in favor of the party opposing summary judgment.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 152 of 212 PAGEID #: 2146

Page 4 of 9

617 F. Supp. 639, *640; 1985 U.S. Dist. LEXIS 16258, **2

Teamsters Local 695 ("Local 695"). Richland I was a wholly-owned subsidiary of TSC Industries, Inc. ("TSC"), which was in turn owned and controlled by Fuqua Industries, Inc.

On July 12, 1979 -- before the Act became effective -- Dallman Investments, Inc. (the same corporation that later, by name change, became Richland II) purchased the operating assets (both tangible and intangible, including good will) of Richland I in a going-concern **[**3]** transaction. Before that time Richland II and Richland I had been entirely separate, independent corporate entities (no officers, directors or stockholders of Richland II had been employees, officers or directors of Richland I). Nor did either acquire any stock of the other as a result of the asset transaction. After the sale Richland I ceased its business activities, stopped contributing to the Fund and changed its name to R.I. Liquidating, Inc. In 1981 it merged into TSC.

As part of its asset purchase, Richland II acquired the right to use the trade name "Richland Industries." It changed its corporate name to Richland Industries, Ltd. and continued production of the same products as Richland I, in the same facility and with the same employees. Under the purchase agreement, Richland II assumed all Richland I's future obligations under its CBA with Local 695. It immediately began contributing to the Fund as required by the CBA.

On November 30, 1981 the CBA Richland II had inherited expired. When the parties failed to negotiate a new agreement, on February 6, 1982 Local 695 went out on strike. On December 10, 1982 the NLRB decertified Local 695. That decertification permanently terminated **[**4]** Richland II's obligation to contribute to the Fund, a cessation that constituted a "complete withdrawal" within the meaning of Act *§ 1383*.

In late December 1982 Richland II received from Trustees a request to file a "Statement of Business Affairs." Though the request was addressed to Richland I rather than Richland II, the latter timely filed the statement. It did so however on behalf of Richland I, at the same time advising Trustees Richland II was an employer different from Richland I.

In December 1983 Trustees sent Richland II a notice and "Demand For Payment of Withdrawal Liability." Again the notice was addressed to Richland I not Richland II. Trustees' "Demand" claimed a withdrawal liability in the amount of $35,378.69, based on the contribution history of Richland I dating back to 1975. Trustees later recalculated the liability to $37,717.97.

Richland II objected to the inclusion of Richland I's contribution history in the calculation of Richland II's withdrawal liability and filed a Request for Review. Trustees denied the request on the grounds that (Stip. Ex. G):

> (5) ERISA section 4204, as amended by MPPAA, contains successorship provisions for assets sales on **[**5]** and after the **[*641]** effective date of MPPAA but contains no provisions for pre-MPPAA assets sales.
> (6) With respect to pre-MPPAA assets sales involving labor law successors and the purchase of an on-going business, the Pension Fund has followed a consistent policy of including the seller's contributions in any determination of the buyer's withdrawal liability.
> * * * *
> For all of the reasons stated above, the Board of Trustees rejects the employer's position and reaffirms the policy with respect to pre-MPPAA assets sales involving on-going businesses.

Richland II paid the Fund (under protest) over $17,000 on the disputed liability. Trustees have denied Richland II's demands for a refund of those payments.

If Richland I's contribution history were not attributed to Richland II, the latter would face no withdrawal liability at all (any liability attributable solely to Richland II falls below the de minimis threshold established by the Act). And Richland II has not challenged Trustees' calculations except insofar as they include Richland I's contribution history. Thus the cross-motions pose a sole -- an all-or-nothing -- issue: whether Richland II may be held **[**6]** liable under the Act for unfunded vested liabilities that accrued during Richland I's regime.

*Relevance of NLRA Successorship Doctrines*

Trustees' contention is that:

> 1. Nothing in the Act speaks to a pre-Act asset purchaser's liability under the Act for the seller's contribution history.

> 2. That silence justifies decision of the issue by reference to successorship doctrines developed under the National Labor Relations Act ("NLRA").

But the NLRA cases and doctrines cited by Trustees really do not bear on the question here at all. Indeed, one of the cases Trustees themselves cite (Mem. 5), *Howard Johnson Co. v. Detroit Local Joint Executive Board, 417 U.S. 249, 262-63, 41 L. Ed. 2d 46, 94 S. Ct.*

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 153 of 212 PAGEID #: 2147

Page 5 of 9

617 F. Supp. 639, *641; 1985 U.S. Dist. LEXIS 16258, **6

2236 n.9 (1974)(citations omitted and adapted to this case) emphasizes that Gertrude Stein's "A rose is a rose is a rose" analysis does not apply here:

> The question whether [Richland II] is a "successor" is simply not meaningful in the abstract. [Richland II] is of course a successor employer in the sense that it succeeded to operation of a [business] formerly operated by [Richland I]. But the real question in each of these "successorship" cases is, on **[**7]** the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.

Trustees first cite a host of NLRA cases for the noncontroversial proposition that when a successor employer voluntarily assumes the predecessor's labor agreement, the successor is "fully responsible for the whole obligation" or "fully bound to every aspect of that agreement" (Trustees Mem. 7). That truism leads nowhere, for Richland II has concededly performed its only relevant obligation under the CBA: paying contributions into the Fund at a specified rate (Stip. Ex. A, Art. XXIV). No provision of the **[**8]** CBA even arguably deals with withdrawal liability payments. [3] As

---

[3] When Trustees advert to Richland II's contractual undertaking as to the CBA, they conveniently omit or pass over the relevant limitation (Stip. Ex. B, Acceptance and Assumption of Collective Bargaining Agreement, emphasis added):

> In consideration of the above Assignment, the undersigned, [Richland II] hereby represents and agrees that it has examined the Agreement, that it accepts this Assignment of the said Agreement, and that it hereby assumes and agrees to perform, discharge and keep all promises, covenants, conditions and agreements under said Agreement on the part of [Richland I] *to be performed, discharged and kept from and after the date hereof.*

Nothing in those future obligations spoke of, or even hinted at,

such cases **[*642]** as *Debreceni v. Healthco-D.G. Stoughton Co., 579 F. Supp. 296, 297-98 (D. Mass. 1984)* and *T.I.M.E.-DC, Inc. v. Trucking Employees of North Jersey Welfare Fund, Inc., 560 F. Supp. 294, 297 (E.D. N.Y. 1983)* have recognized, withdrawal liability arises from the statute, not the CBA.

**[**9]** Trustees attempt to avoid the force of the *Debrecini-T.I.M.E.-DC* line of cases by arguing NLRA also renders a successor liable for its predecessor's *statutory* obligations, citing cases in which successors have been required to implement remedies imposed on their predecessors for the latters' unfair labor practices. Richland II argues forcefully the NLRA policies motivating those decisions are inapplicable here. But there is an even more fundamental problem with Trustees' approach: Richland I had no statutory liability for withdrawal payments at all. And because it did not, there was no derivative liability to be imposed on Richland II.

Thus Trustees miscast the issue when they speak in terms of forcing Richland II to shoulder Richland I's obligations, for the latter had neither a statutory nor a contractual obligation to pay Fund any more than it did. Hence the current question is solely a matter of Richland II's *own* obligations under the Act's formulas, and that question can be decided only by reference to the Act itself and its legislative history.

### Pre-Act Employer Withdrawals

To understand the Act, it is necessary to look first at the provisions of ERISA that **[**10]** preceded it. *Pension Benefit Guaranty Corp. ["PBGC"] v. R.A. Gray & Co., 467 U.S. 717, 104 S. Ct. 2709, 2713-15, 81 L. Ed. 2d 601 (1984)* explained both the structure of ERISA and the transition to the Act as to employers' withdrawal liability.

ERISA was enacted in 1974, largely in response to the increasing number of terminations of pension plans before sufficient funds had been accumulated to pay vested benefits. One aspect of the legislation was the creation of PBGC, an insurer that collects premiums from covered plans and pays benefits to participants in those plans if the plans terminate with insufficient funds to cover guaranteed benefits.

---

withdrawal liability. And if they had, they would have embraced no more than an undertaking to pay *Richland I's* liability -- which the following text discussion explains was wholly nonexistent.

617 F. Supp. 639, *642; 1985 U.S. Dist. LEXIS 16258, **10

Although PBGC automatically provided benefits to single employer plans, ERISA deferred its effective date for comparable automatic coverage of multiemployer plans. In the interim PBGC had discretion whether to provide benefits to beneficiaries of underfunded multiemployer plans upon termination of those plans. Employers participating in such plans were not necessarily liable, after withdrawal from the plans, for the underfunding of their employees' vested benefits. For any withdrawing employer, such liability was contingent on: **[**11]**

> 1. the plan's termination within five years of the employer's withdrawal; and
> 2. PBGC's discretionary decision to make payments to the employees after termination.

Only if PBGC exercised its discretion to insure employees of the terminated plan would PBGC assess withdrawal liability against any employer who had participated in the plan at any time in the last five years of its existence. That meant an employer escaped withdrawal liability altogether under ERISA if either (1) the plan continued in existence for five years after the employer's withdrawal or (2) PBGC declined to provide benefits on plan termination. And in any event the employer's liability was limited to 30% of the employer's net worth.

**[*643]** Congress commissioned PBGC in 1978 to prepare a comprehensive report on the problems with ERISA's treatment of multiemployer plans, in the meantime further deferring the mandatory coverage of such plans. PBGC's July 1978 report, which provided the impetus for the Act, found ERISA failed adequately to protect plans from the adverse consequences of employer withdrawal. In fact ERISA actually *encouraged* early withdrawal from troubled plans because of:

> 1. the **[**12]** chance the contingent liability would never be triggered;
> 2. the fact the withdrawing employer could in any event defer liability until plan termination; and
> 3. the formulation under which the earlier an employer withdrew, the smaller its post-plan-termination liability would be.

And of course the 30%-of-net-worth cap on withdrawal liability also factored into the equation, for it allowed some employers to avoid paying even their otherwise-calculated share of unfunded vested liability.

On February 27, 1979 PBGC recommended to Congress a new system, under which an employer withdrawing from a multiemployer plan would be automatically liable for whatever share of the plan's unfunded vested liability was attributable to that employer's participation in the plan. Because Congress feared the prospect of such legislation would prompt a massive withdrawal from existing plans to avoid the proposed withdrawal liability, Congress early announced that whatever legislation it enacted would be retroactive to February 27, 1979, the date of PBGC's proposal. Ultimately that retroactive date was changed to April 29, 1980.

### Withdrawal Liability Under the Act

*HN1*[↑] One of the Act's provisions **[**13]** creates automatic withdrawal liability extending back even to an employer's pre-Act contribution history. That retroactive application was upheld in *Gray, 104 S. Ct. at 2717-20*. But even though an employer may be held liable for its *own* pre-Act contribution history, it may not be held liable under most circumstances for the pre-Act contribution history of *other* employers. In particular, Act *§ 1384* clearly establishes that a purchaser of assets may not be held liable for the seller's contribution history, absent a special arrangement with the seller by which the purchaser voluntarily assumes that liability. No such arrangement was made here. Under the unambiguous provisions of the statute, there is really no room to argue Richland II is liable for Richland I's contribution history.

#### 1. Application of the Act's Formula to Richland II

Trustees' basic position is that the Act's silence as to the treatment of a pre-Act asset sale represents a "gap" that must be filled in by the courts. Examination of the Act, however, discloses no gap at all in its prescribing how to compute the liability of an asset purchaser that withdraws *after* the effective date of the Act. Instead **[**14]** the Act provides crystal-clear (albeit complex) formulas for calculating that liability.

*HN2*[↑] Act *§ 1391(c)* establishes a formula that precludes any consideration of the unfunded vested liabilities of Richland I, which concededly withdrew from the Fund upon its sale of assets in 1979. Under that formulation, Act *§ 1391(c)(2)* calls for calculation of the total amount of the Fund's unfunded vested liabilities for its last fiscal year ended before April 29, 1980. Richland II's liability is then computed by multiplying that figure by the following fraction (Act *§ 1391(c)(2)(B)(ii)(I)* and *(II)*) (emphasis added):

617 F. Supp. 639, *643; 1985 U.S. Dist. LEXIS 16258, **14

the sum of all contributions required to be made by *the employer* under the plan for the last 5 plan years ending before April 28, 1980 [divided by]

the sum of all contributions made for the last 5 plan years ending before April 29, 1980 by all employers who had an obligation to contribute under the plan *for the first plan year ending after April* **[*644]** *29, 1980* and who had not withdrawn from the plan before such date.

It is plain "the employer" referred to in the numerator means the current employer whose liability is being calculated. And the denominator **[**15]** deals only with employers participating in the plan after the effective date of the Act. Thus each part of the fraction by its terms excludes Richland I's contribution history.

Trustees do not dispute that clear reading of the formula's language. Rather they seem to contend alternatively:

1. Richland I and Richland II should be considered a single "employer" for purposes of the formula.
2. General policy considerations behind the Act compel the inclusion of Richland I's liability in the calculations.

Those arguments will be dealt with in turn (although neither requires extended discussion).

*2. "Single Employer" Issue*

**HN3**[↑] ] There are explicit statutory provisions defining when successive employers can be considered a single "employer" for purposes of calculating withdrawal liability. ERISA *§ 1362(d)* (left *unchanged* by the Act, and made applicable to multiemployer plans by Act § 1398) provides successor corporations will be liable for the contribution history of their predecessors after certain events:

(d) For purposes of this section the following rules apply in the case of certain corporate reorganizations:

(1) If an employer ceases to exist by reason **[**16]** of the reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the employer to whom this section applies.
(2) If an employer ceases to exist by reason of a liquidation into a parent corporation, the parent corporation shall be treated as the

employer to whom this section applies.
(3) If an employer ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the employer to whom this section applies.

It would distort that statute, with its specific enumeration of the kinds of acquisitions (ERISA *§ 1362(d)(3)*) as well as the kinds of corporate restructurings (ERISA *§ 1362(d)(1)* and *(2)*) to which a "single employer" rule applies, to insert a sale-of-assets acquisition -- conspicuously absent from ERISA *§ 1362* and hence from Act § 1398.

In fact, **HN4**[↑] ] the Act explicitly treats asset sellers and purchasers as *separate* employers. *Section 1384* (in tandem with *Section 1383(a)*) establishes that an arms' length sale of assets normally occasions a complete withdrawal from the plan **[**17]** by the seller. That subjects the seller to full withdrawal liability. And the purchaser undertakes no liability at all for the seller's contribution history, unless the purchaser posts a special bond and the seller agrees contractually to assume secondary liability for its contribution history.

Although that statutory framework of Act *§ 1384* was not in effect at the time of the Richland I-Richland II asset sale, it is instructive for two reasons:

1. It wholly forecloses the possibility of considering Richland I and Richland II jointly as "the employer" under Act *§ 1391(c)(2)(B)(ii)(I)*.
2. It underscores just how implausible Trustees' position is.

That last point may need a bit of explication. Trustees must concede that had the Act never become law, Richland II would not have been liable for Richland I's unfunded vested liabilities under ERISA. And had the Act been enacted *before* the asset sale here, Act *§§ 1383* and *1384* would have protected Richland II from liability for Richland I's history (unless of course Richland II *voluntarily* assumed such liability, as it did not). It is thus wholly bizarre for Trustees to contend that although *neither* statute by **[**18]** its terms would saddle Richland II with Richland I's **[*645]** liability, the transition from one statute to the other somehow (sub silentio) rendered Richland II so liable.

*3. Policy Considerations*

Finding no support at all in the language of the Act, Trustees attempt to override the statute by resort to its

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 156 of 212 PAGEID #: 2150

Page 8 of 9

617 F. Supp. 639, *645; 1985 U.S. Dist. LEXIS 16258, **18

legislative history. That effort calls into play the reverse principle of statutory interpretation criticized by Justice Stevens in *Kosak v. United States, 465 U.S. 848, 104 S. Ct. 1519, 1531, 79 L. Ed. 2d 860* (Stevens, J., dissenting) (citation omitted):

Therefore, this is "a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute."

Trustees urge a primary purpose of the Act was to render each employer liable for its proportionate share of liability. From that they reason it would be unfair to saddle the Fund's other contributing employers with unfunded vested liability left by Richland II's predecessor. Such fairness considerations, however, cut both ways. It would be at least equally unfair to saddle Richland II with Richland I's liability, when it was the latter that obviously reaped **[**19]** the benefits of underfunding.

In all events, though, such policy considerations are far more appropriately addressed to Congress in the first instance than to the courts. And Congress specifically recognized, when it passed the Act, that plans would carry over unfunded vested liabilities from the ERISA withdrawal regime. When Congress moved the effective date of the Act forward from 1979 to 1980, it acknowledged that plans would necessarily bear the burden of swallowing the unfunded vested liability of employers (such as Richland I) who withdrew during that interim period ( *Gray, 104 S. Ct. at 2715*, quoting 126 Cong. Rec. 510101 (July 29, 1980) (statement of Sen. Javits)):

The committees decided in part to move up the date from February 27, 1979, the date contained in earlier versions of the bill, because the original purpose of a retroactive effective date -- namely, to avoid encouragement of employer withdrawals while the bill was being considered -- has been achieved. It should also be noted that the April 29 effective date is the product of strong political pressures by certain withdrawing employers who were caught by the earlier date. I realize that permitting these **[**20]** employers to avoid liability only increases the burdens of those employers remaining with the plans in question, but it appears necessary to accept the April 29 date in order to enact the bill before the August 1 deadline for action.

If any inference is to be drawn from legislative history, it is precisely the opposite of what Trustees claim.

Congress deliberately chose to remove transactions in the gap period -- February 27, 1979 to April 29, 1980 -- from the impact of the Act. It would be irresponsible, in policy terms as well as in terms of statutory construction, to subvert the effects of that legislative choice as Trustees would ask. Effectively Congress opted to let Richland I off the hook, and Richland II cannot be forced to pay the price.

Indeed Congress was even willing to release employers withdrawing *after* the Act's effective date from liability for certain of their own employees' unfunded vested benefits that had accrued before the Act took effect. Thus **HN5**[⬆] Act *§ 1397* excludes from consideration in determining such an employer's liability:

1. contributions made under a CBA under which the contribution obligation expired before the Act; and

2. contributions made **[**21]** for work performed at a facility if before the Act became effective:
(a) the facility had ceased operations or
(b) the contribution obligation with respect to the facility's employees had ceased.

Plainly, then, Congress did not intend that the Act immediately eliminate all unfunded vested liabilities then in existence. Rather, the Act's withdrawal liability provisions reflect a congressional attempt to **[*646]** institute a fair and prudent method for dealing with future withdrawals. And Trustees have failed to produce even a shred of evidence Congress intended to hold pre-Act arms' length asset purchasers liable for the contribution histories of their predecessors.

*4. Effect of Trustees' Construction*

One final point bears brief mention. Trustees try to engage in a bit of bootstrap-lifting by urging deference for their own reading (or as this opinion has demonstrated, misreading) of the operative rules of law. To that end they call on *Wardle v. Central States, Southeast and Southwest Areas Pension Fund, 627 F.2d 820, 823-24 (7th Cir. 1980)*. But *Wardle* simply gives strong credence to trustees' readings of the plans they administer, for purposes of granting **[**22]** or denying plan benefits. That unexceptional principle does not extend to the interpretation of statutes, a task for which trustees are scarcely suited as experts generally (and for which Trustees here have shown they are specifically unqualified).

*Conclusion*

617 F. Supp. 639, *646; 1985 U.S. Dist. LEXIS 16258, **22

There is no genuine issue of material fact, and Richland II is entitled to a judgment as a matter of law. Trustee's cross-motion for summary judgment is of course denied. This Court further finds Trustees' legal position to have been sufficiently empty to justify the award to Richland II of the costs and expenses incurred in this action, including reasonable attorneys' fees (Act § 1451(e)). Because the ultimate relief requested by the Complaint cannot be calculated from the Stipulation alone, this case is set for a further status report at 9:00 a.m. September 12, 1985.

**End of Document**

⚠ Caution
As of: February 21, 2019 9:30 PM Z

# *New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*

United States District Court for the Southern District of New York

March 26, 2018, Decided; March 26, 2018, Filed

17 Civ. 6178; 17 Civ. 6290

**Reporter**

303 F. Supp. 3d 236 *; 2018 U.S. Dist. LEXIS 49813 **; 2018 WL 1517201

THE NEW YORK TIMES COMPANY, Plaintiff, -against- NEWSPAPER AND MAIL DELIVERERS'- PUBLISHERS' PENSION FUND, Defendant.NEWSPAPER AND MAIL DELIVERERS'- PUBLISHERS' PENSION FUND AND THE BOARD OF TRUSTEES OF THE NEWSPAPER AND MAIL DELIVERERS'-PUBLISHERS' PENSION FUND, Plaintiffs, -against- THE NEW YORK TIMES COMPANY, Defendant.

**Subsequent History:** Appeal filed, 05/09/2018

## Core Terms

withdrawal, Arbitrator, partial, calculated, Interim, Blend, interest rate, contributions, shifts, actuary, provisions, requires, overpayments, ambiguity, employees, Pension, actuarial assumptions, regulation, purposes, plans, best estimate, benefits, courts, pension fund, assumptions, minimum funding, parties, argues, days, contends

**Counsel:** **[**1]** For The New York Times Company: Evan Miller, Esq., Yaakov M. Roth, Esq., Mark C. Savignac, Esq., JONES DAY, Washington, D.C.

For Newspaper and Mail Deliverers'—Publishers' Pension Fund and its Board of Trustees: Ronald E. Richman, Esq., Max Garfield, Esq., Adam B. Gartner, Esq., SCHULTE ROTH & ZABEL LLP, New York, NY.

**Judges:** ROBERT W. SWEET, United States District Judge.

**Opinion by:** ROBERT W. SWEET

## Opinion

**[*240]** OPINION and ORDER

**Sweet, D.J.**

In these consolidated actions, The New York Times Company (the "Times") and the Newspaper and Mail Deliverers'—Publishers' Pension Fund and Board of Trustees of the Newspaper and Mail Deliverers'— Publishers' Pension Fund (together, the "Fund") have cross-moved for summary judgment under *Federal Rule of Civil Procedure 56* on their respective requests to modify or vacate the arbitration award (the "Award") issued by assigned arbitrator Mark L. Irvings (the "Arbitrator") in American Arbitration Association ("AAA") Case No. 01-14-1433 on July 19, 2017, pursuant to the *Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.*, as amended by the *Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), 29 U.S.C. § 1381, et seq.*

The dispute arises out of a carefully-negotiated multiemployer collective bargaining agreement ("CBA") that governs certain aspects of the Newspaper and Mail Deliverers'—Publishers' **[**2]** Pension Fund applicable to many newspapers in New York City. The instant motions present a veritable Augean Stables of issues to be resolved, a cavalcade of sharp disputes that have been distilled down by the parties and their skilled counsel to four principal issues. Put simply, these issues are: (1) whether the Times incurred liability by partially withdrawing from the Fund for plan years ending May 31, 2012, and May 31, 2013; (2) whether the discount rate used by the Fund when assessing the Times' withdrawal liability was appropriate; (3) whether the Fund applied the proper statutory procedure to calculate liability for the second partial withdrawal; and (4) whether and to what extent the Times is entitled to interest on the repayment of overpaid withdrawal liability.

Based on the conclusions set forth below, the motions

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 159 of 212 PAGEID #: 2153

Page 2 of 20

303 F. Supp. 3d 236, *240; 2018 U.S. Dist. LEXIS 49813, **2

are determined as follows. First, the Times incurred withdrawal liability, and the Arbitrator's finding that the CBA's contribution base unit under *29 U.S.C. § 1301(a)(11)* ("CBU") was shifts has not been rebutted. Second, the Fund's use of the Segal Blend rate when assessing the Times' withdrawal liability was, in this instance, improper, and the Arbitrator's finding to the contrary is **[**3]** reversed. Third, the Fund's calculation of the Times' second partial liability was improper. Lastly, the Arbitrator correctly determined that the Times was entitled to interest on overpaid withdrawal liability, and his conclusion as to the applicable interest rate has not been rebutted.

## I. Statutory Background and Facts

### a. Statutory Background

Before delving into the facts, a brief overview of ERISA's statutory framework is appropriate.

"ERISA is a comprehensive statutory scheme regulating employee retirement plans." *Trs. of Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc., 692 F.3d 127, 128 (2d Cir. 2012)* (citing *29 U.S.C. § 1001, et seq.*). Part of ERISA's purpose is "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 214, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986)* (internal quotation marks omitted). CBAs create employer retirement plans and employer obligations to contribute to such plans. See *29 U.S.C. §§ 1002(37)(A), 1392(a)*. In addition, Congress created the Pension Benefit Guaranty Corporation ("PBGC"), "a wholly owned Government corporation, to administer an **[*241]** insurance program for participants in both single-employer and multiemployer pension plans." *Id.* (citation omitted); *see 29 U.S.C. § 1306*.

Multiemployer pension plans, like the one **[**4]** at issue here, are where "multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." *Trs. of Local 138 Pension Tr. Fund, 692 F.3d at 129*. Such plans are useful in "certain unionized industries" where companies often go "into and out of business, and . . . employees transfer[ ] among employers." *Id.* Looking to such plans, Congress passed the MPPAA to amend ERISA and "adequately protect plans from the adverse consequences that resulted when individual employers

terminate their participation in, or withdraw from, multiemployer plans." *Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 722, 104 S. Ct. 2709, 81 L. Ed. 2d 601 (1984)*.

The MPPAA implemented "new rules under which a withdrawing employer would be required to pay whatever share of the plan's unfunded vested liabilities was attributable to that employer's participation." *Pension Benefit Guar. Corp., 467 U.S. at 723* (citation omitted). "This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." *Id. at 725* (quoting *29 U.S.C. §§ 1381, 1391*). "[C]omplete withdrawal from a plan occurs when an employer (1) permanently **[**5]** ceases to have an obligation to contribute to a plan arising (a) under one or more collective bargaining or related agreements or (b) as a result of a duty under applicable labor-management relations law; or (2) permanently ceases all covered operations under a plan. Withdrawal liability may also be imposed for partial withdrawals." *ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, 846 F.2d 879, 881 (2d Cir. 1988)* (citing *29 U.S.C. §§ 1381, 1383, 1385, 1392*). The MPPAA defines a "partial withdrawal" if, in any plan year, there is a "70 percent contribution decline." *29 U.S.C. § 1385(a)(1)*.[1] Employers pay

---

[1] *ERISA Section 4205* defines a partial withdrawal, more fully, as follows:

   (a) Except as otherwise provided in this section, there is a partial withdrawal by an employer from a plan on the last day of a plan year if for such plan year —

      (1) there is a 70-percent contribution decline, or . . .

   (b) For purposes of *subsection (a)* of this section —

      (1)(A) There is a 70-percent contribution decline for any plan year if during each plan year in the 3-year testing period the employer's contribution base units do not exceed 30 percent of the employer's contribution base units for the high base year.

*29 U.S.C. § 1385*. A "3-year testing period" is "the period consisting of the plan year and the immediately preceding 2 plan years." *Id. § 1385(b)(1)(B)(i)*. An employer's "contribution base units for the high base year is the average number of such units for the 2 plan years for which the employer's contribution base units were the highest within the 5 plan years immediately preceding the beginning of the 3-year testing period." *Id. § 1385(b)(1)(B)(ii)*. A "contribution base unit" as "a unit with respect to which an employer has an

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 160 of 212 PAGEID #: 2154

Page 3 of 20

303 F. Supp. 3d 236, *241; 2018 U.S. Dist. LEXIS 49813, **5

withdrawal liability in annual installments, calculated based on an employer's historical contribution amount. See *29 U.S.C. §§ 1391(c)*, *1399(c)*.

Congress later authorized the PBGC to promulgate regulations to "provide for proper adjustments **[**6]** . . . so that the liability for any complete or partial withdrawal **[*242]** in any subsequent year . . . properly reflects the employer's share of liability with respect to the plan." *29 U.S.C. § 1386(b)(2)*. The PBGC obliged, creating a credit applicable to subsequent withdrawal liability based on payments already made, such that the "credit phases out over time, thereby roughly capturing the change in the composition of the liability pool and allocating withdrawal liability accordingly." *Cent. States, Se. & Sw. Areas Pension Fund v. Safeway, Inc., 229 F.3d 605, 612 (7th Cir. 2000)* (citing *29 C.F.R. § 4206.1, et seq.*); see also *29 C.F.R. § 4206.1(a)* ("The purpose of the [statutory] credit is to protect a withdrawing employer from being charged twice for the same unfunded vested benefits.").

After an employer withdraws from a plan, the plan sponsor is vested with the authority to determine the amount of withdrawal liability. See *29 U.S.C. §§ 1382, 1391*. The plan sponsor then informs the withdrawing employer of the liability, sets a payment schedule, and demands payment. Id. *§§ 1382(2)*, *1399(b)(1)*. Within 90 days of receiving the notice, the employer may request a review of the sponsor's determination of liability or the payment schedule. Id. *§ 1399(b)(2)(A)*. Either side may thereafter initiate arbitration proceedings within 60 days of the earlier of: (1) the date on which the employer was notified of the sponsor's **[**7]** withdrawal liability determination and demand for payment, or (2) 120 days after the date of the employer's request for review. Id. *§ 1401(a)(1)*. If the employer fails to request arbitration within the statutory time periods, the amount of withdrawal liability assessed by the plan sponsor in the notice becomes "due and owing." Id. *§ 1401(b)*. Regardless of whether an employer requests review or initiates an arbitration, the employer needs to pay the assessed withdrawal liability payments in accordance with the payment schedule set forth in the notice. Id. *§ 1399(c)(2)*.

Arbitral decisions over ERISA disputes are subject to judicial review by federal courts. *29 U.S.C. § 1401(b)(2)*.

b. The CBA and its Provisions

---

obligation to contribute under a multiemployer plan." Id. *§ 1301(a)(11)*.

The following facts are drawn from the parties' declarations, attached exhibits, and Rule 56.1 Statements submitted in connection with the instant cross-motions for summary judgment. See Fund's 56.1 Statement ("Fund's 56.1"), No. 17 Civ. 6178, Dkt. No. 26; the Times' 56.1 Statement ("Times' 56.1"), Dkt. No. 20; the Fund's Rule 56.1 Response ("Fund's 56.1 Response"), Dkt. No. 27; the Times' Rule 56.1 Response ("Times' 56.1 Response"), Dkt. No. 29; the Times' Rule 56.1 Reply ("Times' 56.1 Reply"), Dkt. No. 29; Declaration of Jacob M. Roth dated September 15, 2017 ("Roth Decl."), **[**8]** Dkt. No. 19; Declaration of Max Garfield dated October 20, 2017 ("Garfield Decl."), Dkt. No. 28. Unless otherwise noted, the facts are undisputed.

In 1981, the Newspaper and Mail Deliverers' Union of New York and Vicinity (the "NMDU") and the Times entered into a CBA. See Garfield Decl. Ex. 4 (the CBA). Of relevance here, the CBA contained provisions that required the Times to make contributions to the Fund, a multiemployer pension plan. While amended over the years, the CBA's provisions concerning pension contributions have remained the same and operative from then to the instant dispute.[2]

**[*243]** Section 13-I of the CBA, which describes the Times' contribution requirements to Fund, provides, in relevant part:

> The [Times] agrees it shall contribute 8% of each employee's pay rate per shift for each shift worked by each employee in the bargaining unit to the [Fund], but not in excess of five (5) shifts in any payroll week in any one office for any one employee. In addition contributions shall be made when an employee becomes eligible for worker's compensation benefits. Such payments shall be retroactive to the first day of absence.

CBA § 13-1.1. In addition to shifts worked, Section 13-K.3 required that the Times make contributions for "days of **[**9]** paid leave":

> Days of paid leave taken or not taken but paid for during the year or leave accumulated when taken or paid for under this Section shall be included in the schedule of days worked for which vacations and days of paid leave are allowed and for which welfare and pension contributions are made.

---

[2] For example, over the years, the NMDU and the Times have agreed to adjust the amounts that employees are paid. Fund's 56.1 ¶ 12. These changes are not relevant to the issues presented here.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 161 of 212 PAGEID #: 2155

Page 4 of 20

303 F. Supp. 3d 236, *243; 2018 U.S. Dist. LEXIS 49813, **9

CBA § 13-K.3. Section 13-K.5 further provided that: "Time spent on duty with the National Guard or on Reserve Duty, shall be included in the days worked for which paid leave is allowed, to a maximum of two (2) weeks." CBA § 13-K.5.

Section 5 of the CBA details "Shifts and Regular Working Time." Under the CBA, a "day shift" is "[a] regular day's work" that consists of "7 hours and 54 minutes or less consecutively between the period of 7:00 a.m. to 8:00 p.m." and a "night shift" as either "a result night's work" consistent of "seven (7) or fewer consecutive hours of work on short nights and eight (8) or fewer consecutive hours of work on one long night between the period of 6:00 p.m. and 10:00 a.m." or "seven and one-half (7 1/2) or fewer consecutive hours of work when the period shall begin at 4:00 p.m." on Saturday. CBA §§ 5-A, 5-B. Each type of shift had a different applicable wage rate, depending on whether the shift was "hourly," "daily," weekly," or "overtime." [**10] CBA § 13-A.

Under the CBA, employees working in particular positions are entitled to extra pay. For example, participating employees who drive a tractor-trailer receive an extra $2.25 for every shift, CBA § 2-E.2(j), and who operate a forklift receive an extra $0.25 per shift, CBA § 3-Q.

The CBA also included provisions that required the Times to contribute to the Publishers'-Newspaper and Mail Deliverers' Welfare Fund (the "Welfare Fund").[3] Section 13-H.1 required that:

> The [Times] agrees that it shall contribute 6 1/2% of each employee's rate per shift for each shift worked by each employee in the bargaining unit to the [Welfare Fund], but not in excess of five (5) shifts in any payroll week in any one office for any one employee. In addition to the above percentage contribution, for each shift worked by each employee who is not a regular situation holder . . . there shall be an additional contribution to the [Welfare Fund] of $6.00 per shift, but not in excess of five (5) shifts in any one payroll week in any one office for any one employee, in the first year of this Agreement. In the second year such additional contribution shall be increased to $7.00; in the third

year, to $8.00. In addition contributions shall be made when an [**11] employee becomes eligible for worker's compensation benefits. [*244] Such payments shall be retroactive to the first day of absence. . .

CBA § 13-H.1. In subsequent years, the Welfare Fund was amended. For example, in 1987, the parties agreed that "an additional $3.76 per shift from wages and after taxes (maximum of five shifts) shall be contributed to the Welfare Fund." Garfield Decl. Ex. 6 § 2(a). In 1992, the parties agreed to a provision that allowed reapportionment between the two funds:

> With respect to wage increases effect March 31, 1993 and thereafter, the Union may elect to reapportion the contributions due on those increases between its pension plan and its health and welfare plan the total (8%) and health and welfare (7.68%) plan contributions made by the Times, provided that: (i) the total contribution made by The Times to all plans does not exceed 15.68%; (ii) the Union notifies The Times at least ninety (90) days in advance of its intent to reapportion the contributions; and (iii) the reapportionment shall not, in any event, result in a contribution to the pension fund of less then [sic] the amount necessary to meet any minimum contribution requirements established by law.

Garfield Decl. Ex. 7 § 8(D) [**12] .

c. The Assessed Partial Withdrawals

In 2008, the Times closed its wholly-owned distribution business, City and Suburban Delivery Systems ("C&S"). Times' 56.1 ¶ 8; Fund's 56.1 ¶ 93. Under a separate CBA with nearly identical language to the Fund's CBA, the Times also contributed to the Fund for C&S employees. Fund's 56.1 ¶¶ 94-96. While initially planning to lay off C&S employees and pay the anticipated withdrawal liability, after negotiating with the NMDU, the Times decided to retain approximately 65 C&S employees. Times' 56.1 ¶ 10; Fund ¶ 98. The hired C&S employees were paid at the Times' wage rate, which was higher than the previously paid C&S rate of pay. Fund's 56.1 ¶ 104.

On September 13, 2013, however, the Fund informed the Times that the Fund had assessed the Times as having partially withdrawn from the Fund during the plan years ending May 31, 2012, and May 31, 2013, incurring $25.7 million in withdrawal liability. Times' 56.1 ¶ 11. The Fund made its assessment by calculating a 70% decline in CBUs, with shifts worked by employees as the applicable CBU. Fund's 56.1 ¶ 35. The Times

---

[3] ERISA defines an "obligation to contribute" as on arising "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a).

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 162 of 212 PAGEID #: 2156

Page 5 of 20

303 F. Supp. 3d 236, *244; 2018 U.S. Dist. LEXIS 49813, **12

had viewed the applicable CBU under the CBA as wages. Fund's 56.1 ¶ 36. During the Fund plan years **[\*\*13]** at issue, neither the dollar amounts of non-overtime pay the Times paid to covered employees nor total contributions to the Fund declined to the level that would constitute a partial withdrawal under ERISA. Times' 56.1 ¶ 12. It is undisputed that, if the opposing side's claims as to the applicable CBU is correct, that side's mathematical assessment with regard to whether the Times incurred partial liability withdrawal is also correct.

The Fund's actuary, Rosana Egan ("Egan") of The Segal Company ("Segal") assessed the Times' withdrawal liability for both plan years ending May 31, 2012, and May 31, 2013, and used shifts as the applicable CBU. Fund's 56.1 ¶¶ 37, 43-44. In calculating the Times' withdrawal liability, Egan used the "Segal Blend," which combined lower market interest rates published by the PBGC and the plan's generally used minimum funding investment return interest rate, 7.5%, to calculate the Fund's unfunded vested benefits. For all other purposes other than withdrawal liability, Egan used a minimum funding investment return assumption of 7.5%. Fund's 56.1 T 39. Fund's 56.1 ¶ 38; Times' 56.1 ¶ 18. Using the Segal Blend, Egan calculated **[\*245]** the Times' partial withdrawal liability **[\*\*14]** for the plan year ending May 31, 2012, to be $25,706,371 (the "First Assessment"), and for the plan year ending May 31, 2013, to be $7,849,772 (the "Second Assessment").[4] Fund's 56.1 ¶¶ 37, 43; Times' 56.1 ¶ 11.

The Second Assessment, which covered the Times' partial withdrawal liability for the plan ending May 31, 2013, was calculated using the following procedure: first, Egan subtracted the statutory credit provided by _29 U.S.C. § 1386(b)_ from the Times' allocable share of the Fund's unfunded vested benefits ("UVBs") calculated under _29 U.S.C. § 1386(a)(1)_ and, second, multiplied that difference by the partial withdrawal fraction described by _29 U.S.C. § 1386(a)(2)_. Times' 56.1 ¶ 26; see Garfield Decl. Ex. 19, at 27.

d. <u>The Arbitrator's Interim Opinion</u>

In April 2014, the Times initiated arbitration proceedings pursuant to _29 U.S.C. § 1401(a)(1)_. Before the Arbitrator, the Times disputed the Fund's determination that a partial withdrawal had occurred, the Fund's

computation of the liability, and the Fund's calculation of the Second Assessment. See Roth Decl. Ex. A ("Interim Op."), at 1-2.

The Arbitrator conducted six days of hearing between February 10, 2015 and October 7, 2015, which included admitted exhibits and testimony. The Arbitrator heard testimony from: Egan, **[\*\*15]** who served as the Fund's enrolled actuary from the mid-1990s until 2015; John Urbank ("Urbank"), the Fund's benefits consultant and client relationship manager from around 1995 through 2015; Mitchell Lewis ("Lewis"), the Fund's auditor at WeiserMazars LLP from 1997 through 2013; Morris Claffee ("Claffee"), the Times' senior payroll manager responsible for submitting contributions for Times employees covered by the NMDU's CBA to the Fund; Terry Hayes ("Hayes"), the Times' Director of Labor Relations and a Fund Trustee; Neal Schelberg ("Schelberg"), a Proskauer Rose partner in employee benefits who served as co-counsel for the Fund; Darren French ("French"), the Times' actuarial expert; and Ethan Emanuel Kra ("Kra"), the Fund's actuarial expert. <u>See generally</u> Garfield Decl. Ex. 3 ("Arbitration Transcript"). The parties submitted post-hearing briefing by February 20, 2016. Interim Op. 1.

On June 14, 2016, the Arbitrator issued an Interim Opinion that summarized the evidence received and made certain factual findings. Interim Op. 1. First, the Arbitrator found that "shifts" were the applicable CBU for the Times' contribution to the Fund "when viewed as a contextual whole," which included **[\*\*16]** reviewing different provisions' language in the CBA and the longtime understanding and actions of the parties involved with the Fund. <u>See id.</u> at 63. As such, the Arbitrator concluded that the Times had incurred the assessed partial withdrawal liability. <u>See id.</u> The Arbitrator also upheld the Fund's use of the Segal Blend, noting that it was "settled law" that "the Segal Blend is consistent with the requirements of § 4312(a)." <u>See id.</u> at 54-59. With regard to the Second Assessment, however, the Arbitrator found that the Fund had improperly calculated the amount of credit to which the Times was owed, terming the Fund's assessment of partial withdrawal liability for the May 2013 plan "convoluted" and, accordingly, reduced the partial withdrawal liability for the plan year ending May 31, 2013, from $7,849,772 to $375,100. <u>See id.</u> at 59-63. Lastly, the Arbitrator ordered that the **[\*246]** Fund repay the Times the amount the Times overpaid the Fund, including "appropriate interest." <u>Id.</u> at 63.

e. <u>The Arbitrator's Opinions on Interest</u>

---

[4] The Fund initially calculated the 2013 partial withdrawal liability as $0, but revised its calculations in December 2014 following receipt of final figures. See Interim Op. 27.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 163 of 212 PAGEID #: 2157

Page 6 of 20

303 F. Supp. 3d 236, *246; 2018 U.S. Dist. LEXIS 49813, **16

Following the Interim Opinion, the Times and the Fund disagreed as to the appropriate interest rate to be applied to the Fund's overpayment repayments. Back before the Arbitrator, the Times argued that an 18% interest **[**17]** rate was applicable because that was the rate the Times had been asked by the Fund to apply when the Times once made a late contribution payment. See Roth Decl. Ex. H ("Interim Interest Op."), at 5-8. The Fund argued that the 18% rate had not been formally adopted for withdrawal liability and, therefore, the interest rate set by the PBGC was applicable. See id. at 8-9.

On December 24, 2016, the Arbitrator issued an interim ruling and found that, while the Fund had not formally established an applicable rate, discovery was necessary to determine if the Fund had a "policy and practice regarding the imposition of interest for delinquent withdrawal liability payments, and the inclusion of interest on refunds of overpayments of withdrawal liability." Id. at 12-13.

On July 12, 2017, following discovery and the submission of briefing, the Arbitrator issued a Final Ruling on Interest. See Roth Decl. Ex. J ("Final Interest Op."). There, the Arbitrator rejected the Times' request for 18% interest, noting that there was only a single instance when the Fund imposed an 18% rate on a late withdrawal liability payment, which did not "establish that the Board [of the Fund] even adopted a uniform policy" of charging such **[**18]** an interest or that it was "charged on a consistent basis over a reasonable period of time." Id. at 18-21. Accordingly, the Arbitrator affirmed the Fund's use of the then-applicable PBGC interest rate, which was 3.25%. Id. at 21.

f. The Arbitrator's Final Award

On July 19, 2017, the Arbitrator issued the Award and stated that all issues involved in the arbitration were fully resolved. See Roth Decl. Ex. J. Following the Arbitrator's rulings, the Fund refunded the Times the overpayment of principal along with interest calculated pursuant to 29 C.F.R. § 4219.32(c). Fund's 56.1 ¶ 114.

II. Prior Proceedings

On August 15, 2017, the Times filed an action to vacate the Award in part. No. 17 Civ. 6178 (RWS), Dkt. No. 1. On August 18, 2017, the Fund also filed an action to vacate the Award in part. No. 17 Civ. 6290 (RWS), Dkt. No. 1. On September 11, 2017, the two actions were consolidated. No. 17 Civ. 6178 (RWS), Dkt. No. 17; No.

17 Civ. 6290 (RWS), Dkt. No. 17.

On September 15, 2017, the Times moved for summary judgment, and the Fund cross-moved for the same on October 20, 2017. No. 17 Civ. 6178 (RWS), Dkt. Nos. 18, 24; No. 17 Civ. 6290 (RWS), Dkt. No. 23. The motions were heard and marked fully submitted on December 6, 2017.

III. Applicable **[**19]** Standards

a. Summary Judgment

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The relevant inquiry on application for summary judgment **[*247]** is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. Westinghouse Elec. Corp. v. N.Y.C. Transit Auth., 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson, 477 U.S. at 249). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

b. Standards of Review of ERISA Arbitration Decisions

Under ERISA, courts reviewing decisions of an arbitrator apply different standards to questions of law and to questions of fact. When reviewing an arbitrator's legal conclusions apply courts apply a **[**20]** de novo standard of review. 666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emps. Pension Fund, 571 F. App'x 51, 52 (2d Cir. 2014); HOP Energy, L.L.C. v. Local 553 Pension Fund, 678 F.3d 158, 160 (2d Cir. 2012). When reviewing an arbitrator's factual findings, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." Nat'l Ret. Fund v. Metz Culinary Mgmt., No. 16 Civ. 2408 (VEC), 2017 U.S. Dist. LEXIS 44410, 2017 WL 1157156, at *5 (S.D.N.Y. Mar. 27, 2017) (quoting 29 U.S.C. § 1401(c)).

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 164 of 212 PAGEID #: 2158

Page 7 of 20

303 F. Supp. 3d 236, *247; 2018 U.S. Dist. LEXIS 49813, **20

For mixed questions of law and fact, in the absence of controlling Second Circuit precedent, courts generally adopt a clear error standard of review. See *666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emples. Pension Fund, No. 12 Civ. 1251 (PAE), 2013 U.S. Dist. LEXIS 112506, 2013 WL 4042614, at *5 (S.D.N.Y. Aug. 8, 2013)* (collecting cases), aff'd, *571 F. App'x 51 (2d Cir. 2014)*.

## IV. The Parties' Motions for Summary Judgment are Granted in Part and Denied in Part

### a. The Arbitrator's Decision that the Times Partially Withdrew from the Fund is Affirmed

The first issue presented is what constitutes the CBUs under the CBA. That answer—whether it is "shifts," the Fund's answer, or "wages," the Times' answer—is the fulcrum around which whether the Times partially withdrew from the Fund turns. As described above, the Arbitrator concluded that the answer was "shifts." Interim Op. 33.

The Times argues that the Arbitrator's conclusion was "legally flawed." Times' Mem. in Supp. of Mot. for Summ. J. ("Times' Mem.") 18, No. 17 Civ. 6178, Dkt. No. 20. To the Times, the question presented is one purely of law: how to apply ERISA's definition of a "contribution **[**21]** base unit," the "unit with respect to which an employer has an obligation to contribute," to the obligations created by the CBA. *29 U.S.C. § 1301(a)(11)*; see Times' Mem. 18. Principally, the Times points to parts of the CBA that require the Times to contribute for instances when employees do not actually work, such as various leaves of absence, and evidence presented to the Arbitrator that certain categories of employees, like foremen, received compensation not based on shifts to demonstrate that the "substance and reality" of the Times' pension obligations to the Fund. Times Mem. 18-19. Finally, the Times avers that, as a purely legal question, it is improper to consider the subjective understanding of and actions based on the CBU **[*248]** by those at the Fund and at the Times. Times Mem. 20.

In response, the Fund presents two arguments. First, the Fund contends that the CBA's language alone is what determines the Times' contribution obligations, and the CBA's terms unambiguously required that contributions be made "per shift for each shift worked" by covered employees. Fund's Mem. of Law in Supp. of Cross-Mot. for Summ. J. ("Fund's Mem.") 18 (quoting CBA § 13-1.1), No. 17 Civ. 6178, Dkt. No. 25. The Fund

supports this reading **[**22]** by pointing to other CBA provisions that define "day" and "night" shifts, as well as others which cap the Times' contributions to the Fund at five shifts in any given payroll week. See Fund's Mem. 19. As a secondary argument, the Fund contends that, given the Administrator considered extrinsic evidence in making his determination, his interpretation of the CBA is a factual finding entitled to a higher degree of deference. See Fund's Mem. 22-24.

Initially, it needs to be determined which standard of review is appropriate when reviewing the Arbitrator's finding of shifts as the CBU. The Interim Opinion does not afford a cut-and-dry answer.

The Arbitrator examined the language of the CBA and found that adopting the Times' reading would render the provision "'for each shift worked' wholly superfluous,". Interim Op. 33, which is the kind of language courts generally employ when construing a contract's "plain meaning." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005)* (citations omitted) ("[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."). Were this the exclusive, or even primary basis upon which the Arbitrator's decision **[**23]** rested, *de novo* review of this legal determination would be appropriate.

However, the Arbitrator's opening observation was that the CBA was "not without some ambiguity," Interim Op. 33, a comment repeated several other times, see id. at 33-34. Following a brief discussion of surplusage—itself a canon of construction used to resolve ambiguity—the Arbitrator dedicated the majority of his analysis to resolving "Whatever ambiguity in the provision exists [that] derives from the phrase 'shift worked.'" Interim Op. 33. In doing so, the Arbitrator considered other provisions of the CBA, see id. 33-36, and witness testimony, relying especially on evidence from the Fund's enrolled actuary and auditor, which the Arbitrator found truthful, see id. 36-38. Taken in its entirety, the CBU decision in the Interim Opinion is properly read as finding the CBA ambiguous and then resolving that unspecified amount of ambiguity in the CBA through consideration of intrinsic and extrinsic evidence.

"When courts interpret CBAs, traditional rules of contract interpretation apply as long as they are consistent with federal labor policies." *Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp., 230 F.3d 569, 576 (2d Cir. 2000)*. Whether or not a contract is

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 165 of 212 PAGEID #: 2159

Page 8 of 20

303 F. Supp. 3d 236, *248; 2018 U.S. Dist. LEXIS 49813, **23

ambiguous is a threshold question **[**24]** of law to be reviewed *de novo*. See, e.g., *Broder v. Cablevision Sys. Corp., 418 F.3d 187, 197 (2d Cir. 2005)*; *Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987)* ("The determination of whether a contract term is ambiguous is a threshold question of law for the court."). A contract is unambiguous when it has "'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable **[*249]** basis for a difference of opinion.'" *Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012)* (citation omitted); see *Walk-In Med. Ctrs., 818 F.2d at 263* (stating that language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business").

The Arbitrator's conclusion that the CBA was "not without some ambiguity" was proper. Reasonable bases exist to believe, from the language of the CBA's provision alone, that the CBU could be either shifts or wages. The Fund's argument that "shifts" avoids surplusage because Section 13-1.1 has language requiring payment "per shift for each shift" has merit. Also, in the same section, the CBA caps the number of payroll week shifts at five shifts. See **[**25]** CBA § 13-1.1. It is valid to wonder why that language be there if the CBA meant anything other than "shifts." However, the Times' arguments are not without their own weight. Paying "8% of each employee's pay rate per shift for each shift worked" could be reasonably read to mean monetary contribution rate of 8% of earnings or, in other words, the total payments over the total shifts. Moreover, as the Times identifies, the CBA requires 8% contributions to the Fund for paid leave, which amounts to employees' unworked time that is quantified in days-to implement a "shifts worked" approach requires a leap of interpretative logic that even the Arbitrator recognized.[5]See CBA § 13-K.3; Interim Op. 34

---

[5] In its submissions, the Times repeatedly cites to extrinsic evidence, such as testimony given during the Arbitration regarding contribution practices, even while arguing that de novo review is appropriate. The Times contends that such evidence is appropriate even while simultaneously stating that this is a question of law because "applicable labor-management relations law" obligations can arise from under ERISA law from "past practices." See Times Mem. 14

(emphasis added) ("Once one incorporates the notion that all time compensated . . . is treated as a 'shift worked,' any ambiguity in §13-1.1 is resolved."). Accordingly, the Arbitrator's consideration of extrinsic evidence to resolve what is an ambiguous contract was proper. See *Aeronautical Indus., 230 F.3d at 576-77* ("[W]e believe that extrinsic factors are relevant to determining the precise nature of the Company's duties . . . because the contested contractual language is not unambiguous on its face.").

**[*250]** The Arbitrator's factual finding that that CBA's CBU are shifts is presumptively correct except by a rebuttal showing of the clear preponderance of the evidence. See *29 U.S.C. § 1401(c)*. Under such a standard, the Arbitrator's finding must remain undisturbed.

As the Interim Opinion demonstrates, the Arbitrator considered a wide range of presented extrinsic evidence. He considered the Fund's Pension Plan, which detailed the Fund's operations and described employee compensation from contributing employers in terms of "credited service shifts." Interim Op. 34. After hearing days of witnesses, detailed above, the Arbitrator highlighted the testimony of Egan and Lewis, both of whom testified that "they always understood the CBU to be shifts," as credible. Interim Op. 36; see id. 37

---

(quoting, in part, *29 U.S.C. 1392(a)(2)*). This argument fails. To be sure, in addition to CBAs, employer obligations to contribute to plans can arise from "a duty under applicable labor-management relations law." *29 U.S.C. § 1392(a)*. However, the Supreme Court has clarified that that avenue of obligation refers to "any obligation imposed by the [*National Labor Relations Act of 1935*]." *Laborers Health & Welfare Tr. Fund For N. California v. Advanced Lightweight Concrete Co., 484 U.S. 539, 546, 108 S. Ct. 830, 98 L. Ed. 2d 936 & n.11 (1988)* (citing *29 U.S.C. § 1392(a)*). No such obligation has been put forth as relevant to the instant dispute. The Times' citation to *Bozetarnik v. Mahland, 195 F.3d 77, 82 (2d Cir. 1999)*, does not persuade that past practices amount to an ERISA-imposed duty. In *Bozetarnik*, the court rejected that certain alleged past practices could amount to implied terms of a CBA, particularly because that CBA contained an integration clause; nowhere did the court discuss past practices as creating duties arising under labor law. See *id. at 82-83*. Accordingly, any determination of the CBA's ambiguity requires looking only to the language of the CBA. See *Aeronautical Indus., 230 F.3d at 576* (citing *United Mine Workers v. LTV Steel Co. (In re Chateaugay Corp.), 891 F.2d 1034, 1038 (2d Cir. 1989)*) ("Only when provisions are ambiguous may courts look to extrinsic factors-such as bargaining history, past practices, and other provisions in the CBA-to interpret the language in question.")

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 166 of 212 PAGEID #: 2160

Page 9 of 20

303 F. Supp. 3d 236, *250; 2018 U.S. Dist. LEXIS 49813, **25

("[T]heir actions over the years demonstrated the truthfulness of their assertions."). The Arbitrator noted that the Welfare Fund's contribution language, which had "virtually identical **[\*\*26]** language" to the Fund's CBA and treated the contribution rate as shifts, supported the conclusion that shifts was the CBU. Interim Op. 36.

In reaching his conclusion, the Arbitrator considered the evidence put forward by the Times, and which are similar to the arguments raised by it on the instant motion. See Times' Mem. 18-20. Such facts included: that the Times' payroll software was set up to combine different shift-based pays into a single amount, entitled "Base MTD [Month to Date]," which was then multiplied by 8% to get the pension contributions; the fact that the Times made pension contributions for the differentials paid for shifts of employees entitled to higher pay, like forklift operators; and that the Times consistently reported to the Segal actuaries that the Times was using wages as its contribution rate. See Interim Op. 34-35, 37.

The Times' position is not meritless, and evidence adduced supports the contention that many employees at the Times who interacted with the Fund believed that the CBUs were wages. Assuredly, there was confusion between the parties. However, a contract can only mean one thing, and the "determination as to which of competing inferences to draw" **[\*\*27]** between compelling evidence "lies within the province of the trier of fact." In _Time Prods., Ltd. v. Toy Biz, Inc., 38 F.3d 660, 665 (2d Cir. 1994)_ (citations omitted). By statute, that trier was the Arbitrator. Particularly in the face of the weight given by the Arbitrator to the testimonies of Egan and Lewis, the Times' evidentiary showing today has not established by a clear preponderance of the evidence that the Arbitrator was incorrect in concluding that the terms of the CBA set the applicable CBUs as wages. See, e.g., _Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)_ ("Assessments of the credibility of witnesses are peculiarly within the province of the trier of fact and are entitled to considerable deference.").

Accordingly, the Arbitrator's factual finding is afforded deference, and his conclusion that the CBA's CBU is shifts is upheld. See _Sigmund Cohn Corp. v. District No. 15 Machinists Pension Fund, 804 F. Supp. 490, 493 (E.D.N.Y. 1992)_ (citing _Chi. Truck Drivers Pension Fund v. Louis Zahn Drug Co., 890 F.2d 1405, 1406 (7th Cir. 1989)_) ("Courts reviewing arbitration awards have consistently upheld the arbitrator's factual findings under

_[ERISA] section 4221(c)_'s _[29 U.S.C. § 1401(c)_] 'presumption of correctness.'").[6]

**[\*251]** b. The Arbitrator's Approval of the Segal Blend is Reversed

The second issue presented is whether the Fund's actuary, Egan, after concluding that the Times had partially withdrawn from the Fund, used the appropriate discount rate in calculating **[\*\*28]** the Times' withdrawal liability. Specifically, Egan used a discount rate of 6.5%, known in the industry as the Segal Blend, which was calculated by blending the Fund's investment-return rate of 7.5% with lower, risk-free rates published by the PBGC. Interim Op. 25. This rate was different than what the Fund used when calculating the Times' minimum funding requirements. As such, the parties dispute whether the asymmetrical application of the Segal Blend was legally permissible.

The Times contends that the Fund's actuary's use of the Segal Blend violated both ERISA and Supreme Court precedent. First, the Times argues that the rate the Fund used for calculating minimum funding requirements, 7.5%, needed to be the same that was used for any withdrawal liability calculations. In support, the Times identifies identical language in ERISA between the minimum funding rules and withdrawal liability calculations, both of which require an actuary to use rates that are "reasonable (taking into account the experience of the plan and reasonable expectations)" and which, "in combination, offer the actuary's best estimate of anticipated experience under the plan." _29 U.S.C. § 1084(c)(3)(A)-(B)_ (detailing permissible actuarial assumptions **[\*\*29]** for minimum funding for multiemployer plans); _29 U.S.C. § 1393(a)(1)_ (detailing permissible actuarial assumptions for withdrawal liability); see Times Mem. 24-25.[7] Congress' use of

---

[6] As the Arbitrator's decision that the CBUs were shifts is upheld, the Fund's argument that, even were the CBUs to be found as wages, that the Times still incurred liability because it attempted to "evade or avoid" withdrawal liability pursuant to _29 U.S.C. § 1392(c)_, need not be reached. See Fund's Mem. 24-27.

[7] _Section 1084(c)(3)_, which addresses actuarial assumption requirements for minimum funding as to ERISA plans, requires:

For purposes of this section, all costs, liabilities, rates **[\*\*30]** of interest, and other factors under the plan

303 F. Supp. 3d 236, *251; 2018 U.S. Dist. LEXIS 49813, **30

identical language, the Times contends, meant that the same assumptions-and, therefore, the same rates-were to be used in both cases. In addition, the Times points to the Supreme Court's decision in *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993)*, which discussed "the necessity" of a Fund actuary to apply "the same assumptions and methods in more than one context," particularly highlighting a Fund's interest rate assumption. *Id. at 632*; see *id. at 633* **[*252]** ("[T]he calculation of withdrawal liability is . . . arguably the most important assumption" and "is the critical interest rate assumption that must be used for other purposes as well."); Times Mem. 25-27. Based on those statements, the Times avers that Egan's use of the Segal Blend solely for the purpose of calculating withdrawal liability was wrong. Lastly, the Times argues that the Segal Blend's estimation were not the best estimate of the anticipated experience of the Fund, because a blend of risk-free rates does not represent the Fund's actual investment portfolio. *See* Times Mem. 28-30.

The Fund counters that Egan's use of the Segal Blend was proper. In response to the Times' statutory

---

shall be determined on the basis of actuarial assumptions and methods-(A) each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and (B) which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

*29 U.S.C. § 1084(c)(3)*.

*Section 1393(a)*, which addresses actuarial assumption requirements for withdrawal liability as to ERISA plans, requires:

The corporation may prescribe by regulation actuarial assumptions which may be used by a plan actuary in determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part. Withdrawal liability under this part shall be determined by each plan on the basis of-(1) actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or (2) actuarial assumptions and methods set forth in the corporation's regulations for purposes of determining an employer's withdrawal liability.

*29 U.S.C. § 1393(a)*.

arguments, the Fund notes that while ERISA **[**31]** language identified by the Times is the same between the two provisions, the minimum funding provision requires actuarial assumptions only to be "reasonable," *29 U.S.C. § 1084(c)(3)*, while withdrawal liability provisions require the assumptions be reasonable "in the aggregate," *29 U.S.C. § 1393(a)(1)*; see Fund's Mem. 28. Moreover, the minimum funding and withdrawal liability sections each require an actuary to take into account "reasonable expectations" and "anticipated expectations." Compare *29 U.S.C. § 1393(a)(1)*, with id. *§ 1084(c)(3)*. If Congress had intended the same assumptions to be used for contributions as with withdrawals, posits the Fund, Congress could and would have included a cross-reference, like in other sections. *See* Fund's Mem. 29. To the Fund, ERISA's expectation language demonstrates that, as withdrawal liability calculations are made after an employer has withdrawn from a fund and face no further risk connected to that fund's performance, it is reasonable and proper for an actuary to set a lower return rate based on a finding of lower risk.[8] *See* Fund's Mem. 27-30. Second, the Fund avers that *Concrete Pipe* does not foreclose this reading, noting that the Court only went so far as to state that "[u]sing different assumptions [for different purposes] **[**32]** could very well be attacked as presumptively unreasonable both in arbitration and on judicial review," which is not the same as explicitly forbidding different rates. *Concrete Pipe, 508 U.S. at 633* (second alteration in original) (citation omitted).

In his Interim Opinion, as noted above, the Arbitrator sided with the Fund in finding that Egan's use of the Segal Blend was legally acceptable. *See* Interim Op. 54-59. The Arbitrator acknowledged that the Times' reading of *Concrete Pipe* was not "implausible," but that the Supreme Court's language was also "not a definitive rejection . . . of using different assumptions for different purposes." Interim Op. 55. Rather, the *Concrete Pipe* Court "was leaving open the possibility an actuary could convincingly explain why it was appropriate and reasonable to use different interest rate assumptions for different purposes." *Id.* As to the Times' ERISA statutory

---

[8] Should a fund fail to meet it investment return assumption—for example, in the case of the Fund, a return of 7.5%—contributing employers are required to make up the shortfall. *See* Reply Mem. of Law in Further Supp. of the Fund's Mot. for Summ. J. ("Fund's Reply") 13, No. 17 Civ. 6178, Dkt. No. 29; Combined Reply Mem. in Supp. of the Times' Mot. for Summ. J. and Opp. to Cross-Mot. for Summ. J. ("Times' Opp.") 11, No. 17 Civ. 6178, Dkt. No. 30.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 168 of 212 PAGEID #: 2162

Page 11 of 20

303 F. Supp. 3d 236, *252; 2018 U.S. Dist. LEXIS 49813, **32

language arguments, the Arbitrator found that they were "not new" and had not been accepted by other arbitrators or federal courts; rather, the Arbitrator observed that "arbitration awards have expressly held that the Segal Blend . . . if found by the actuary to be the appropriate actuarial assumption, is appropriate [**33] under [*253] § 4312(a)." Id. at 56-57. As such, the Arbitrator upheld the use of the Segal Blend by the Fund, concluding that "[i]f the dominant case law is going to be reversed based on the Times' arguments, that action will not come in an arbitration decision, but rather through court review." Id. at 58.

Before reviewing the Arbitrator's opinion, a more fulsome review of Concrete Pipe is merited—or, as the opinion covers a wider range of topics, at least as to the part of the opinion implicated by the parties' dispute. Broadly-speaking, in Concrete Pipe, an arbitrator determined that Concrete Pipe and Products of California had incurred withdrawal liability because it did not pay enough into a CBA-created employee pension plan covered by ERISA. See Concrete Pipe, 508 U.S. at 614-15. On appeal, the Court affirmed the plan's assessment, concluding that the statutory regime created by the MPPAA under which employers made payments into pension funds did not create procedural due process or takings violations under the Fifth Amendment. See id. at 647.

Part of the Court's opinion addressing procedural due process is relevant to the present issue. One of Concrete Pipe's arguments was that the MPPAA created opportunities for trustee bias to influence the amount employers had to pay [**34] in withdrawal liability: because the MPPAA allowed determinations of a plan's trustees to be made without a hearing, and because those conclusions were then insulated by the MPPAA's presumptions of correctness on appeal before an arbitrator, the statute deprived employers the opportunity for a fair adjudication. See id. at 620. After concluding that the MPPAA needed to be read to permit employers to challenge factual determinations before an arbitrator by a preponderance of the evidence, the Court applied its determined presumption to factual issues raised by Concrete Pipe in its challenge. See id. at 630-32. One such issue was the amount of withdrawal liability assessed by the plan.

The Court concluded that a fund's calculation of withdrawal liability differed from other facts found by a fund. In part, the Court found this because withdrawal liability is calculated by an actuary, who is "not . . . vulnerable to suggestions of bias or its appearance" because "actuaries are trained professionals subject to regulatory standards." Id. at 632. In addition to external professional standards, the Court highlighted common language in ERISA regarding actuarial assumptions between two different contexts: withdrawal liability [**35] and minimum funding. Similar language itself created checks on the ability of a plan to be biased because:

> The use of the same language to describe the actuarial assumptions and methods to be used in these different contexts . . . check[s] the actuary's discretion in each of them. Using different assumptions [for different purposes] could very well be attacked as presumptively unreasonable both in arbitration and on judicial review. . . . For example, the use of assumptions (such as low interest rates) that would tend to increase the fund's unfunded vested liability for withdrawal liability purposes would also make it more difficult for the plan to meet the minimum funding requirements.

Id. at 632-33 (alteration in original) (internal quotation marks and citation omitted). Moreover, the Court did not find "any method or assumption unique to the calculation of withdrawal liability . . . so manipulable as to create a significant opportunity for bias to operate, and arguably the most important assumption . . . is the critical interest rate assumption [*254] that must be used for other purposes as well." Id. at 633. Before an arbitrator, an employer would need to rebut an actuary's conclusions by a preponderance that [**36] "the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary." Id. at 635. That presumption, however, did not support a procedural due process objection. Id.

Insofar as the Times wishes to argue that use of different interest rates in different contexts is always impermissible as a matter of law, that argument fails. Both the ERISA provisions and the language of Concrete Pipe discussed above indicate otherwise.

The ERISA provisions addressing actuarial assumptions as to minimum funding versus withdrawal liability, while similar, are meaningfully different. Specifically, the inclusion of the clause "in the aggregate" is an addition that cannot be ignored. 29 U.S.C. § 1393(a)(1). That clause's distinct inclusion in the withdrawal liability section, suggests that Congress envisioned the possibility that calculating withdrawal liability could combine many different assumptions and methods to result in something different than that found for the

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 169 of 212 PAGEID #: 2163

Page 12 of 20

303 F. Supp. 3d 236, *254; 2018 U.S. Dist. LEXIS 49813, **36

contribution requirements. See *Bates v. United States, 522 U.S. 23, 29-30, 118 S. Ct. 285, 139 L. Ed. 2d 215 (1997)* (citation omitted, alteration in original) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally **[**37]** presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"). That said, the overall similarity of language should not be ignored, and suggests that Congress expected that the rates used in the different situations would be, at minimum, similar, if not the same. See *Smith v. City of Jackson, Miss., 544 U.S. 228, 233, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005)* (plurality opinion) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

The conclusion reached from *Concrete Pipe* is the following. Actuarial bias against withdrawing employers was guarded against because there is no "significant opportunity for bias to operate" when "the most important assumption . . . is the critical interest rate assumption that must be used for other purposes as well." *Concrete Pipe, 508 U.S. at 632-33.* In the same breath, however, the Court stated that the "assumptions used by [a] Plan in its other calculations may be supplemented by several actuarial assumptions unique to withdrawal liability." *Id. at 633* (emphasis added, internal quotation marks omitted). The expectation is that a standard, uniform interest rate **[**38]** is applied in all contexts, and any deviation "could very well be attacked as presumptively unreasonable both in arbitration and on judicial review." *Id. at 633* (citation omitted). That does not mean, however, that deviation is, at all times, impermissible by law-were that the case, the Court would not have included the open-ended "could very well be" language rather than something more definitive. While few courts have delved into these murky mists of these particular ERISA provisions, this Court is not the first to read <u>Concrete Pipe</u> in this way. See *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc., 698 F.3d 346, 355 (7th Cir. 2012)* (Posner, J.) (discussing Concrete Pipe and observing that "the Court [in <u>Concrete Pipe</u>] had indicated that 'supplemental' **[*255]** assumptions that might cause the rates to diverge were permissible").

However, simply because the use of the Segal Blend uniquely in the context of calculating an employer's withdrawal liability is not prohibited as a matter of law does not mean that its application in the present context was proper. Rather, to the extent that the Times contends that the use of the Segal Blend in this instance violated ERISA law, that claim is merited.

The Arbitrator's decision that the Segal Blend's use was reasonable in the aggregate is a mixed **[**39]** question of fact and law and is reviewed for clear error. See *666 Drug, Inc., 2013 U.S. Dist. LEXIS 112506, 2013 WL 4042614, at *5* (collecting cases); accord *Plan Bd. of Sunkist Ret. Plan v. Harding & Leggett, Inc., 463 F. App'x 702, 703 (9th Cir. 2011)* (reviewing district court's review of withdrawal liability interest rate assumption for clear error).

As detailed above, ERISA requires that when determining an employer's withdrawal liability, "actuarial assumptions and methods" must, "in the aggregate, [be] reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." *29 U.S.C. § 1393(a)(1)* (emphasis added). Egan's testimony before the Arbitrator was that a 7.5% percent assumption was her "best estimate of how the Pension Fund's assets . . . will on average perform over the long term." Arb. Tr. 568:3-8; see Arb. Tr. 600:3-15 (observing that the Segal Blend was "lower" than Egan's best estimate of anticipated plan experience in the long term). If 7.5% was the Fund actuary's "best estimate," it strains reason to see how the Segal Blend, a 6.5% rate derived by blending that 7.5% "best estimate" assumption with lower, no-risk PBGC bond rates, can be accepted as the anticipated plan experience. This is especially when the blend includes interest **[**40]** rates for assets not included in the Fund's portfolio. The Segal Blend's applicability is further undermined by Egan's acknowledgment that she had used the Segal Blend as her "best estimate" when calculating withdraw liability "regardless of the particular pension plan's actual portfolio of assets." Arb. Tr. 585:10-586:5.

In defense of the Segal Blend, the Fund argues that there is less risk facing employers like the Times who withdraw because the liability of those employers becomes fixed; if the Fund underperforms, the withdrawer is not required to pay more, unlike an employer still part of the Fund's plan. See Fund Mem. 28-29. Because of this background, the Fund notes, not only did Egan, but also the Fund's actuarial expert, Kra, testified that the Segal Blend was, in the aggregate, reasonable. See Fund Mem. 33-34 (citing Arb. Tr. 695:12-16). On the other hand, the Times's rejoinder

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 170 of 212 PAGEID #: 2164

Page 13 of 20

303 F. Supp. 3d 236, *255; 2018 U.S. Dist. LEXIS 49813, **40

that a withdrawing employer also does not share in any over-performance by the Fund, which would reduce future contribution obligations, effectively nullifies the Fund's argument. See Times' Opp. 11. Accordingly, the inquiry returns to what the statute states it requires for an applicable return rate: **[\*\*41]** what is the best estimate of the "anticipated experience" under the plan." _29 U.S.C. § 1393(a)(1)_.

The Arbitrator's Interim Opinion did not actively engage with the issue of whether the Segal Blend's rate was a reasonable best estimate. Rather, after concluding that the Segal Blend was not foreclosed as a matter of law, he found that there was "no evidence to suggest that the decision to use the Segal Blend was part of a scheme to take advantage of the Times" and accepted that, because Egan had been using the "Segal Blend when calculating **[\*256]** withdrawal liability the entire time," the Times could not claim the Segal Blend's caused it to be "unfairly penalized." Interim Op. 58-59.[9] That reasoning does not support a finding that the Segal Blend's rate was the "best estimate" of the plan's "anticipated experience." A lack of duplicity does not, by itself, equate with a correct answer.

In sum, the actuary's testimony, combined with the untethered composition of the Segal Blend and paucity of analysis by the Arbitrator, create "a definite and firm conviction that a mistake has been made" in accepting the Segal Blend; as such, this Court will "set the findings aside even though there is evidence supporting them that, **[\*\*42]** by itself, would be considered substantial." _Wu Lin v. Lynch, 813 F.3d 122, 128 (2d Cir. 2016)_ (quoting 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2585 (3d ed. 2007)). Accordingly, the Arbitrator's decision that the Segal Blend was the appropriate rate to calculate the Times' partial withdrawal is reversed. In the absence of additional evidence sufficient to support a different rate, the Times' liability should be recalculated using the 7.5% assumption testified to as the "best estimate."

c. The Arbitrator's Reversal of the Fund's Calculations of the 2013 Partial Withdrawal is Affirmed

The third issue presented is which method for calculating successive partial liability withdrawal is appropriate. As found above, the Times incurred

---

[9] Earlier in the Interim Opinion, the Arbitrator did outline Egan, Kra, and French's testimony as to the Segal Blend, though without opining on the merits of the rate. See Interim Op. 31-33.

withdrawal liability for both plan years ending May 31, 2012 and May 31, 2013. Under ERISA, to "protect a withdrawing employer from being charged twice for the same unfunded vested benefits" when charged over multiple years, _29 C.F.R. § 4206.1(a)_, a credit mechanism computation was statutorily created to reduce a withdrawing employer's withdrawal liability by any liability incurred the previous year. See _29 U.S.C. § 1386_; see generally _29 C.F.R. § 4206.1, et seq._ The parties do not dispute that _Section 1386_ is the relevant statute, but rather how to read **[\*\*43]** and apply its computational directives to calculate the Times' 2013 partial withdrawal liability—or, in other words, an order of operations problem in the form of statutory interpretation.

_29 U.S.C. § 1386_, or _ERISA Section 4206_, is the portion relevant here, and describes with ERISA's typical simplicity how to calculate partial withdrawal liability. Because of its significance to the instant issue, the relevant portion of _Section 1386_ is presented here:

(a) The amount of an employer's liability for a partial withdrawal, before the application of _sections 1399(c)(1)_ and _1405_ of this title, is equal to the product of—

(1) the amount determined under _section 1391_ of this title, and adjusted under _section 1389_ of this title if appropriate, determined as if the employer had withdrawn from the plan in a complete withdrawal—

(A) on the date of the partial withdrawal, or

(B) in the case of a partial withdrawal described in _section 1385(a)(1)_ of this title (relating to 70-percent contribution decline), on the last day of the first plan year in the 3-year testing period, multiplied by

(2) a fraction which is 1 minus a fraction—

**[\*257]** (A) the numerator of which is the employer's contribution base units for the plan year following the plan year in which the partial withdrawal occurs, and

(B) the denominator of which **[\*\*44]** is the average of the employer's contribution base units for—

(i) except as provided in clause (ii), the 5 plan years immediately preceding the plan year in which the partial withdrawal

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 171 of 212 PAGEID #: 2165

Page 14 of 20

303 F. Supp. 3d 236, *257; 2018 U.S. Dist. LEXIS 49813, **44

occurs, or

(ii) in the case of a partial withdrawal described in *section 1385(a)(1)* of this title (relating to 70-percent contribution decline), the 5 plan years immediately preceding the beginning of the 3-year testing period.

(b)

(1) In the case of an employer that has withdrawal liability for a partial withdrawal from a plan, any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction of such liability) of the employer with respect to the plan for a previous plan year.

*29 U.S.C. § 1386(a)-(b)(1)*.

The Fund contends that the proper computational procedure was the way it initially calculated the Times' 2013 liability, which is as follows. First, the Fund calculated the Times' allocable share of the UVBs under *29 U.S.C. § 1386(a)(1)*, then subtracted from that number the statutory credit of the amount of the Times' partial withdrawal liability the previous year under *29 U.S.C. § 1386(b)*, and then multiplied that difference by a **[**45]** fraction which represents the decline of the partial withdrawal, described in *29 U.S.C. § 1386(a)(2)*. See Fund's Mem. 35-36; Second Assessment at 27. The Fund argues that the statute's language is unambiguous. Under *Section 1386*, the first element of the equation is "the amount determined under *section 1391* of this title [*ERISA Section 4211*], and adjusted under *section 1389* of this title [*ERISA Section 4209*] if appropriate, determined as if the employer had withdrawn from the plan in a complete withdrawal." *29 U.S.C. § 1386(a)(1)*. As *Sections 1391* and *1389* apply whether there is a full or partial withdrawal, the Fund argues, the only way not to render the "determined as if the employer had withdrawn from the plan in a complete withdrawal" directive superfluous requires applying *Section 1386(b)(1)* as part of *Section 1386(a)(1)*, which requires that any employer "for a partial or complete withdrawal from that plan in a subsequent plan year . . . be reduced by the amount of any partial withdrawal liability." Id. *§ 1386(b)(1)*; see Fund's Mem. 36. Because the ERISA provision is unambiguous, the Fund states, any extrinsic evidence, such as PBGC documents put forward by the Times and described below, are

irrelevant. See Fund's Mem. 36-38.

By contrast, the Times argues that the partial withdrawal calculation should go as follows. First, the employer's allocable share of the plan's UVBs is calculated **[**46]** as if it had been a complete withdrawal, pursuant to *29 U.S.C. § 1386(a)(1)*. That figure is then multiplied by the aforementioned partial withdrawal fraction laid out in *29 U.S.C. § 1386(a)(2)*. Then, that product is reduced by any partial liability from the previous plan year, pursuant to *29 U.S.C. § 1386(b)(1)*. See Times' Mem. 31. The Times supports this computational interpretation in three ways. Similarly pointing to the statute, the Times observes that *Section 1386(a)* first states how to calculate "an employer's liability for a partial withdrawal," and then, logically, [*258] *Section 1386(b)* states that an employer's "withdrawal liability for a partial withdrawal" is reduced by credit for the prior partial withdrawal. See Times' Mem. 32. Second, the Times identifies an Opinion Letter by the PBGC which states that the "plain language [of] *Section 4206(a)* precludes the prior use of *Section 4206(b)(1)* in this adjustment process" in the manner set-out by the Fund and that calculations as argued by the Fund are "clearly erroneous." PBGC Op. Letter 85-4 (Jan. 30, 1985); see Times' Mem. 33. Lastly, the Times contends that the Fund's mathematical proscription causes the Times to incur additional liability on subsequent partial withdrawals, even if nothing changes between the initial and successive partial withdrawals, which **[**47]** defeats the purpose of Congress granting the credit at all. See Times' Mem. 33.

The Arbitrator concluded, as a matter of law, that the Times' partial withdrawal liability adjustment calculations were correct. See Interim Op. 59-60. Without opining on what legal weight to apply to the PBGC Opinion Letter, the Arbitrator found the Opinion Letter to present a "more faithful reading and application of *§ 4206*." Id. Calling the Fund's statutory reading "convoluted," the Arbitrator concluded there was:

[N]o cogent reason to believe Congress intended that a fund is supposed to start the calculation following *§ 4206(a)(1)*, then skip the step set forth in *§ 4206(a)(2)* and go to the subtraction of prior partial withdrawal liability called for in *§ 4206(b)(1)*, and only then revert back to the multiplier of the partial withdrawal fraction described in *§ 4206(a)(2)*.

Id.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 172 of 212 PAGEID #: 2166

Page 15 of 20

303 F. Supp. 3d 236, *258; 2018 U.S. Dist. LEXIS 49813, **47

Reviewing the Arbitrator's statutory interpretations *de novo*, his conclusion is affirmed. This "review necessarily begins with the statutory text to determine whether the language, viewed in context, unambiguously reveals Congress's intent." *United States v. Colasuonno, 697 F.3d 164, 173 (2d Cir. 2012)* (citing *Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997))*.

Looking to the text of the statute itself, *Section 1386* is laid out in a two-part fashion. In *subsection (a)*, the "amount" of an employer's partial withdrawal liability **[**48]** is determined in *Section 1386(a)*, which requires multiplying the UVBs in *Section 1386(a)(1)* by the contribution-base decline fraction of *Section 1386(a)(2)*. Next, in *subsection (b)*, the liability determined in *Section 1386(a)* is reduced by the amount of any partial withdrawal liability from the previous plan year. Viewed this way-in other words, in the order the statute was written—the statutory calculations proceed in a logical, linear, and unambiguous fashion. "To be sure, Congress might have expressed itself more clearly, but . . . this is the most natural reading of the statute." *Shepherd v. Goord, 662 F.3d 603, 607 (2d Cir. 2011)*.

The Fund's contention that any other reading but theirs makes the "as if the employer had withdrawn from the plan in a complete withdrawal" language superfluous is unavailing.[10] Rather, this clause clarifies **[*259]** that, even though the overall section deals with partial withdrawal, the starting calculation at *Section 1386(a)(1)* is arrived at no differently than in a complete withdrawal. While perhaps overly cautious of ERISA's drafters, this reading does not necessarily render the clause superfluous. At minimum, the clause's inclusion does not warrant the statutory hop-scotch the Fund would otherwise have actuaries perform. See *Krause v. Titleserv, Inc., 402 F.3d 119, 127-28 (2d Cir. 2005)*

[10] Curiously, the Fund argues in its briefing that the statute is "unambiguous, as it is here because it has only one reading that gives effect to all of the words." Fund's Mem. 37. However, the preference of avoiding surplusage is itself a canon of construction. See, e.g., *Marx v. Gen. Revenue Corp., 568 U.S. 371, 386, 133 S. Ct. 1166, 185 L. Ed. 2d 242 (2013)* (discussing the "canon against surplusage"). Courts are instructed to use canons of statutory construction to help resolve any statutory ambiguity. *Colasuonno, 697 F.3d at 173*. By invoking an argument against surplusage, the Fund itself acknowledges the possibility of ambiguity. In any event, as described above, both the statutory text and extrinsic guidance point in the same direction: the Times' position.

(quoting *Hohn v. United States, 524 U.S. 236, 249, 118 S. Ct. 1969, 141 L. Ed. 2d 242 (1998)* and *Lamie v. United States Tr., 540 U.S. 526, 536, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004))* (second alteration in original) ("[W]e are reluctant to endorse **[**49]** an awkward reading of its words for no better reason than to satisfy the canon of construction . . . '[g]eneral principles of statutory construction are notoriously unreliable' and 'should not take precedence over more convincing reasons'" because the "'preference for avoiding surplusage constructions is not absolute.'").

Lastly, to whatever extent there were ambiguity as to *Section 1386*, it is squarely resolved by the 1985 PBGC Opinion Letter. The PBGC wrote the 1985 Opinion Letter after being presented with the same question here. There, the PBGC concluded the Times' reading "correct" and the Fund's reading "clearly erroneous." PBGC Op. Letter 85-4 (Jan. 30, 1985). The PBGC's opinion is instructive and a useful cross-check. See *Beck v. PACE Int'l Union, 551 U.S. 96, 104, 127 S. Ct. 2310, 168 L. Ed. 2d 1 (2007)* (alteration in original) (quoting *Mead Corp. v. Tilley, 490 U.S. 714, 722, 725-26, 109 S. Ct. 2156, 104 L. Ed. 2d 796 (1989))* ("We have traditionally deferred to the PBGC when interpreting ERISA, for 'to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to embar[k] upon a voyage without a compass.'"); *Trs. of Local 138 Pension Tr. Fund, 692 F.3d at 134-35* ("The PBGC, the agency charged with administering the withdrawal-liability provisions under ERISA, is traditionally afforded substantial **[**50]** deference in its reasonable interpretations of the statute."); *Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 48 (2d Cir. 2002)* (citing Opinion Letters from the Department of Labor and observing that "[w]hatever ambiguity there might be in ERISA on this point . . . we are supported in our conclusion by the . . . agency charged with interpretation and enforcement of the statute").

Accordingly, the Arbitrator's conclusion that the Second Assessment was incorrectly calculated and order that the Fund's calculations be redone was correct and is affirmed.

d. The Arbitrator's Approval of the Interest Rate the Fund Applied to the Times' Overpayment is Affirmed

The fourth and last issue presented pertains to the amount that the Fund needs to refund the Times for overpayments of partial withdrawal liability payments. As found above, the Times incurred partial withdrawal liability for plans ending May 31, 2012, and May 31,

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 173 of 212 PAGEID #: 2167

Page 16 of 20

303 F. Supp. 3d 236, *259; 2018 U.S. Dist. LEXIS 49813, **50

2013, but the Fund incorrectly computed that liability as to the Second Assessment, resulting in the Times overpaying. As such, the Fund needed to repay the Times. Vanquishing the question of repayments, however, created, like the Lernaean Hydra, two new questions to resolve.

The first question is whether interest needs to be included when [**51] repaying [*260] overpaid withdrawal liability. Imperfect overlap between the directives of ERISA's statutory language and PBGC regulations creates this problem. *29 U.S.C. § 1103(c)(1)*, *ERISA Section 403(c)(1)*, requires that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses in administering the plan." *29 U.S.C. § 1103(c)(1)*. ERISA's anti-inurement provision has certain exceptions, however, including: "In the case of a withdrawal liability payment which has been determined to be an overpayment, [the anti-inurement rule] shall not prohibit the return of such payment to the employer within 6 months after the date of such determination." *Id. § 1103(c)(3)*. "The purpose of the anti-inurement provision, in common with ERISA's other fiduciary responsibility provisions, is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 23, 124 S. Ct. 1330, 158 L. Ed. 2d 40 (2004)*. At the same time, PBGC regulation provides that: "If the plan sponsor or an arbitrator determines that payments made in accordance with the schedule of payments established by the plan [**52] sponsor have resulted in an overpayment of withdrawal liability, the plan sponsor shall refund the overpayment, with interest, in a lump sum." *29 C.F.R § 4219.31(d)*. The simultaneous existence of these provisions—one expressly referencing the payment of interest and the other conspicuously not—muddies the water.

If interest is owed, the second question is what should be the applicable rate. PBGC regulation proscribes that a fund must "credit interest on the overpayment . . . at the same rate as the rate for overdue withdrawal liability payments, as established under [*29 C.F.R.) § 4219.32* or by the plan pursuant to [*29 C.F.R.) § 4219.33*." *29 C.F.R. § 4219.31(d)*. The question here, therefore, is whether the Fund authorized an interest rate at a particular level or if the PBGC default interest rate under *Section 4219.32* is to apply.

The Times avers that payment of interest is necessary because of the PBGC's promulgations, which have been regularly followed by federal courts and prevent a potentially unconstitutional "interest-free loan" from an employer to a fund by an biased fund trustees prior to any arbitral review. Times' Mem. 35 (alteration in original) (quoting *Huber v. Casablanca Indus., Inc., 916 F.2d 85, 103 (3d Cir. 1990)*, abrogated on other grounds by *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co., 513 U.S. 414, 431, 115 S. Ct. 981, 130 L. Ed. 2d 932 (1995)* (holding that the "MPPAA calculates its installment schedule on the assumption that [**53] interest begins accruing on the first day of the year following withdrawal")). In addition, the Times contends that the PBGC regulation is not contrary to ERISA because the overpaid sums are not plan assets and therefore not covered by the anti-inurement provision. See id.

As to the applicable rate, the Times argues for 18%, pointing to the Section 9.5(b) of the Fund's Trust Agreement, which includes a provision entitled "Default in Payment" and provides: "A delinquent Employer shall be liable for any expenses incurred in effectuating such payment (including . . . interest at a rate of 18 percent per annum or such other interest rate that the Trustees deem appropriate given the circumstances)." Times' Mem. 36 (quoting Times' 56.1 ¶ 28); see also Garfield Decl. Ex. 64 ("Trust Agreement") art. IX. Outside of the Trust Agreement, the Times points to evidence it argues demonstrates a practice by the [*261] Fund of using 18%, including several instances when the Fund either informed the Times that payment delinquency incurred 18% per annum interest or sought that rate in litigation with other employers. See Times' Mem. 36; Times' Opp. 19-20.

In response, the Fund argues that it should not have to pay any interest. [**54] Pointing to ERISA's language and relying on *Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)*, the Fund contends that ERISA's language unambiguously and "directly" speaks on the issue of interest on overpayment returns, foreclosing the application of interest on such returns and making the PBGC's regulation an impermissible construction of ERISA entitled to no deference. *Id. at 842*; see Fund's Mem. 38-39. The Fud also rejects the argument that the overpayments are not an asset of the plan, stating that clear ERISA provisions expressly carving out an exception for such repayments foreclose that reading. See Fund's Reply 15-16.

303 F. Supp. 3d 236, *261; 2018 U.S. Dist. LEXIS 49813, **54

If it owes interest, the Fund argues the Arbitrator's factual findings and determination of 3.5% as the rate should be affirmed. The Fund notes that nothing in the Fund's Trust Agreement that expressly deals with withdrawal liability proscribes an interest rate, observing that Trust Agreement Section 9.10, which deals with withdrawal liability, does not mention interest rates, but that Section 9.4(a), which deals with "the failure of any Employer to make Employer contributions to the Trust Fund," expressly mentions Section 9.5(b), the provision relied upon by the Times. Trust Agreement art. XI; see Fund's Reply 18. Furthermore, the Fund avers, the evidence adduced [**55] in the arbitration demonstrated that, rather than a regular practice of requiring 18%, the Fund has used a variety of rates over the years; to the extent an 18% rate was used, it was either in error, such as with the Times, or as a matter of ERISA statutory requirement necessitating 18% for delinquent contributions. See Fund's Mem. 40; Fund's Reply 19-20.

The Arbitrator first determined that the PGBC regulation did not violate ERISA's anti-inurement rule and, therefore, the Fund needed to pay interest on any repayment to the Times for overpaid withdrawal liability at the same rate a charged for late payment of withdrawal liability. Interim Interest Op. 10; Final Interest Op. 17. The Arbitrator's decision was "assumed" and principally based on the Third Circuit's decision in Huber, which upheld the PGBC rule regarding interest and whose conclusions regarding the interplay between *Section 4219.31(d)* and the anti-inurement rule has never been overturned or questioned by any other court. Final Interest Op. 17; see Interim Interest Op. 10. Before deciding the applicable rate, however, the Arbitrator permitted additional discovery on Fund to see if the Fund had established a withdrawal liability interest rate [**56] either by policy or practice. See Interim Interest Op. 12-13.

Following discovery, the Arbitrator ultimately concluded that, in the absence of an established rate by the Fund, the set PGBC rate of 3.25% applied. Final Interest Op. 20-21. The Arbitrator did not find that the Fund trustees had unanimously adopted an express interest rate for late withdrawal fees, as the Arbitrator found required under the Fund's Trust Agreement Section 6.4(a), based in part on an affidavit submitted by a co-counsel to the Fund, even while noting that Fund Board meeting minutes had indicated past discussion about, but no actual vote on, such a policy.[11] See Interim Interest Op.

10; Final [*262] Interest Op. 10, 18. The Arbitrator also rejected the Times' argument that Section 9.5 was relevant to withdrawal liability payments, finding that that provision was part of the Trust Agreement to address employer contributions and, significantly, neither made a specific reference to withdrawal liability nor included a general statement as to "any payment" of an employer when discussing interest rates. Interim Interest Op. 10-11. As to any established practice or policy, the Arbitrator reviewed different instances of the Fund seeking interest on [**57] late withdrawal liability and found that the Fund had, on differing occasions, used a 0% rate, 3.25% rate, 5% rate, and 18% rate. Final Interest Op. 6-9, 19-20. After reviewing the marshalled evidence, the Arbitrator found that "the Fund has had a practice of assessing interest on late payments of withdrawal liability and contributions at a rate substantially below 18% and very close to the prevailing PBGC rate if payments were made for the Fund to initiate litigation." Final Interest Op. 20.

The first issue—whether interest is to be applied at all—requires resolution of a purely legal question. Namely, what is to be made of the PBGC's promulgated regulation interpreting ERISA in the context of ERISA's anti-inurement provision? While not binding, the Third Circuit's opinion in Huber is informative, as the court there faced the same issue as presented here. In Huber, the court determined that Congress had intended to consider overpayment funds part of a plan's assets, and that the absence of discussing interest in *Section 1103(c)(1)*, when Congress had included interest in other ERISA provisions, indicated the statute itself barred interest. See *Huber, 916 F.2d at 101-02*. However, as ERISA also required employers to pay assessed [**58] withdrawal liability upfront and only later dispute the payments before a neutral arbitrator to potentially recoup its monies—a "draconian interim payment procedure"—not applying the PBGC regulation would permit, "in effect[,] an interest free loan" to a fund. *Id. at 102*. Striking down the application of the anti-inurement clause with regard to interest on overpayments of withdrawal liability was, to that court, "the least intrusive means of adjusting the statute to preserve its constitutionality." Id.

The analysis in *Huber* and its outcome is adopted. While

---

[11] Fund Trust Agreement Section 6.4(a) provides: "All action of

the Board shall be taken by unanimous vote of the Trustees, as hereinafter provided. When voting, the Employer Trustees, as a unit, shall each have one vote. All action by the Board shall be by unanimous vote of the two units." Trust Agreemen art. XI.

303 F. Supp. 3d 236, *262; 2018 U.S. Dist. LEXIS 49813, **58

philosophically brow-raising to construe an employer's overpayments as part of the plan's assets, the language of *Section 1103(c)* indicates that Congress intended overpayments to be treated as such.[12] Had Congress not envisioned overpayments on withdrawal liability to be part of the plan's assets, there would have been no reason to have expressly included a carve-out for such sums. See *29 U.S.C. § 1103(c)(3)*. The anti-inurement provision is therefore appropriately applied here.

Unlike the Huber court's reading, however, it is not clear that the absence of an **[*263]** explicit provision to provide interest in the withdrawal liability section is so "telling" as to itself bar such interest **[**59]** payments. *Huber, 916 F.2d at 101* (citation omitted). As the Times notes, the Supreme Court has "since 1933 . . . consistently acknowledged that a monetary award does not fully compensate for an injury unless it includes an interest component." *Kansas v. Colorado, 533 U.S. 1, 10, 121 S. Ct. 2023, 150 L. Ed. 2d 72 (2001)* (collecting cases). This principle is as judicially established as it intuitively proper. Given this backdrop, ERISA's statutory language is best read as "silent" on the specific issue of interest, at which point the "question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, 467 U.S. at 843*. The PBGC regulation, which unobtrusively fills this statutory silence, is certainly such a reasonable construction.

Whether ERISA is ambiguous, and the PBGC regulation is applied, or is clear, and normally would not, in the present instance, however, is a distinction without a difference. The PBGC regulation must be applied because, were ERISA's statute be all there is, "the employer may deprived of (and the trustees allowed) the use of a considerable sum for a substantial period of time." *Huber, 916 F.2d at 102*. Such an arrangement only avoids constitutional due process concerns "so long as an employer has not been forced to overpay." Id.

---

[12] Put another way, if monies were assessed and charged to an employer by a fund, but later found to be collected improperly, it is curious to view those contested sum, under the law, as already subsumed by monies in the fund whose "exclusive purpose[ ]" is to benefit participants in the plan, as opposed to still the property of the employer, or perhaps, even, nobodies. *29 U.S.C. § 1103(c) (1)*. Of course, possession is nine-tenths of the law. Regardless, the statute is clear on this point and, naturally, controls, philosophical disagreements be they as they may.

The Fund is wrong to **[**60]** claim that the concerns raised by the Huber court—concerns regarding ensuring procedural safeguards against self-interested fund trustees—were resolved by the Supreme Court's decision in Concrete Pipe. As discussed above, the Concrete Pipe Court discussed at length the ways in which review by a neutral arbitrator would alleviate due process concerns created by various statutory presumptions favoring a fund's trustees. See supra at 39-41. However, sidestepping constitutional concerns with regard to presumptions of correctness does not address, and does not resolve, the risk of statutorily permitting interest-free loans to funds at the expense of employers. Review by a neutral arbitrator is not a panacea: while certainly a check on the risk of potentially abusive trustees, it nevertheless remains true that the "harm caused by the biased decisionmaker is alleviated" only when an improperly assessed payment is returned in a form that does not amount to an "interest-free loan." *Huber, 916 F.2d at 103*. This is acutely true in a regime known amongst the courts as a "pay now-fight later" system. See, e.g., *Amalgamated Lithographers of Am. v. Unz & Co. Inc., 670 F. Supp. 2d 214, 222 (S.D.N.Y. 2009)*. Procedural due process and fair adjudication require a balance to exist where there is no incentive to manipulate ERISA's **[**61]** rules and the system does not deprive a party of property without the opportunity for complete compensation down the line. See *id. at 102* (citing *First English Evangelical Lutheran Church v. Cnty. of L.A., 482 U.S. 304, 318-19, 107 S. Ct. 2378, 96 L. Ed. 2d 250 (1987)*) ("[T]he difference between permanent and temporary loss of the use of property is a matter of degree, not of kind.").

This Court is not the first to reach this conclusion, even in the wake of Concrete Pipe—including, notably, the Third Circuit. See *Bd. of Trs. of Trucking Emples. of N. Jersey Welfare Fund Inc. - Pension Fund v. Kero Leasing Corp., 377 F.3d 288, 304 & n.18 (3d Cir. 2004)* ("We are not persuaded that our conclusion in Huber regarding payment of interest was dealt a fatal blow by the Supreme Court's decision in Concrete Pipe."); accord *Mary Helen Coal Corp. v. Hudson, 235 F.3d 207, 214 (4th Cir. 2000)* (addressing *Coal Act* payment obligation claims, which the court **[*264]** held were treated like "an obligation to pay withdrawal liability under [Title IV of ERISA]," citing Huber approvingly, and holding that "[g]iven the pay first, dispute later framework, adopting the Trustees' interpretation of the anti-inurement clause would expose 'serious constitutional defects' in the application of the provision"). Thirty years after Huber, applying *29 C.F.R § 4219.31(d)* as a patch that remains the "least

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 176 of 212 PAGEID #: 2170

Page 19 of 20

303 F. Supp. 3d 236, *264; 2018 U.S. Dist. LEXIS 49813, **61

intrusive" way to resolve this ERISA issue. *Huber, 916 F.2d at 102*. Accordingly, the Fund owes the Times interest on repayments of overpaid **[**62]** withdrawal liability.

Given that the Times is owed interest on such overpayments, the rate of interest needs to be determined. The Arbitrator answered by concluding the applicable PBGC rate applied because the Fund had not adopted a set policy, either by statute or practice. See Final Interest Op. 18, 20; see also *29 C.F.R. § 4219.31(d)*. That conclusion is upheld.

First, the Arbitrator was correct when he construed that the 18% per annum interest rate established by Section 9.5 of the Trust Agreement, the section entitled "Default in Payment," applies only to late contributions by employers. See Interim Interest Op. 8. The Arbitrator's conclusions with regard to the Trust Agreement's provisions looked solely at the contract and, therefore, should be reviewed as a question of law. See Interim Interest Op. 10-11.

Trust Agreement Article Nine may be entitled "Payments to the Fund," but that does not mean that every subsection provision must necessarily bleed into the others. Trust Agreement art. IX. Looking at the agreement, Subsection 9.5(b) is nestled between provisions that discuss what happens when an employer fails to make a contribution to the Fund, see id. § 9.4, and permitted enforcement actions by the Fund when an employer fails to make required **[**63]** contributions, see id. § 9.6; directly above Section 9.5(b) is Section 9.5(a), which discusses the Fund's Board's authority to take action to pursue collection of employer contributions, see id. § 9.5(a). Discussion of withdrawal liability is at the very end of the section and focuses on the process for arbitrating disputes over withdrawal liability. See id. § 9.10. Section 9.10 does not discuss interest rates or details about payments of any sort. See id. Grafting the interest rate written in the context of and meant to be applied to delinquent payments by employers onto a section that discusses which offices of the AAA should hear cases and under which state's laws those cases should be heard is not the most "natural reading" of the Trust Agreement. *Shepherd, 662 F.3d at 607*; see generally Trust Agreement art. IX.

The Arbitrator's factual finding that the Fund had no policy or practice applying 18% to overdue withdrawal liability payments is similarly upheld. Final Interest Op. 20-21. The Times points to instances, both as to itself and in prior litigations involving the Fund, where the

Fund used 18% as the applicable interest rate for withdrawal liability.[13] As described above, the arbitration's discovery also revealed, **[*265]** and the Fund presented to the Arbitrator, other **[**64]** instances when the Fund applied interest rates to delinquent withdrawal liability payment sat were not 18%, and which ranged from 0% to 5%. Evidence from the Fund's Board meetings pulled in both directions: the Fund trustees indicated at one meeting that withdrawal liability interest rates should be the same as for delinquent contributions, but also that the trustees chose not to adopt a rule that explicitly relates to withdrawal liability. Final Interest Op. 10-11.

It is sufficient to observe that it has not been established by a preponderance of the evidence that the Arbitrator's finding was wrong.[14] For a plan to establish an applicable withdrawal liability rate, it needed to be pursuant to *29 C.F.R. § 4219.33*. See *29 C.F.R. § 4219.31(d)*. To accord with that provision, any rule adopted by the Fund needed generally to "operate and be applied uniformly with respect to each employer." Id. § 4219.33. The Arbitrator did not find a "consistently applied" rate, and the facts adduced at the arbitration could reasonably support that finding. Final Interest Op. 20. While some evidence pulled in the opposite direction, the possibility of a difference of opinion is not enough to rebut the Arbitrator's conclusion. See *Sigmund Cohn Corp., 804 F. Supp. at 493*; *Mangan v. Owens Truckmen, Inc., 715 F. Supp. 436, 439 (E.D.N.Y. 1989)* (citation omitted) **[**65]** ("Title *29 U.S.C. §*

---

[13] The Times also contends that because the Fund argued in briefings for prior legal proceedings for an 18% rate, the Fund is bound by that position under the doctrine of judicial estoppel. See Times' Mem. 38 (citing *Bates v. Long Island R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993)*). The Fund's explanation—that those prior lawsuits required an 18% interest rate pursuant to *ERISA Section 4301(b)*, which provides that withdrawal liability be treated like delinquent contributions—sufficiently supports the position that the Fund's posture in those instances was different than here, where an interest rate needed to have been established by the Fund to be applicable but was not. See Fund's Reply 20.

[14] In other words, the Court need not determine whether it was appropriate for the Arbitrator, after determining that there was no formal adoption by the Fund of an interest rate for withdrawal liability, to then proceed to look for a "*de facto* policy" by the Fund. Final Interest Op. 19; see Interim Interest Op. 11 (appearing to require the Fund to use the same rate established at its practice for assessing interest on delinquent withdrawal liability payments as for refunding overpayments as a matter of equity).

303 F. Supp. 3d 236, *265; 2018 U.S. Dist. LEXIS 49813, **65

1401(c) 'represents a considered decision by Congress that district courts not be authorized to second-guess arbitrators' decisions.'"). Accordingly, the Arbitrator's decision to apply the applicable PBGC rate of 3.25% interest on the refunded overpayments is affirmed.

## Conclusion

For the foregoing reasons, the Times and Fund's cross-motions for summary judgment are granted in part and denied in part.

Submit judgment on notice.

It is so ordered.

**New York, NY**

**March 26, 2018**

/s/ Robert W. Sweet

**ROBERT W. SWEET**

**U.S.D.J.**

No *Shepard's* Signal™
As of: February 21, 2019 9:32 PM Z

## *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*

United States District Court for the District of New Jersey

July 3, 2018, Decided; July 3, 2018, Filed

Civ. No. 17-5076 (KM)(MAH)

**Reporter**
331 F. Supp. 3d 365 *; 2018 U.S. Dist. LEXIS 111969 **

MANHATTAN FORD LINCOLN, INC., Plaintiff, v. UAW
LOCAL 259 PENSION FUND, Defendant.

## Core Terms

withdrawal, actuary, Pension, Arbitrator, funding,
calculation, actuarial assumptions, assumptions, Blend,
benefits, pension fund, minimum funding, purposes,
present value, liabilities, interest rate, vested, best
estimate, discount rate, aggregate, rates, anticipated
experience, multiemployer, requirements, summary
judgment, pension plan, cross-motion, summary
judgment motion, obligations, unfunded

**Counsel:** **[**1]** For MANHATTAN FORD LINCOLN,
INC., Plaintiff: JENNIFER LYNN DEL MEDICO, JONES
DAY, NEW YORK, NY.

For UAW LOCAL 259 PENSION FUND, Defendant:
WILLIAM T. JOSEM, LEAD ATTORNEY, CLEARY &
JOSEM, LLP, PHILADELPHIA, PA.

For UAW LOCAL 259 PENSION FUND, Counter
Claimant: WILLIAM T. JOSEM, LEAD ATTORNEY,
CLEARY & JOSEM, LLP, PHILADELPHIA, PA.

For MANHATTAN FORD LINCOLN, INC., Counter
Defendant: JENNIFER LYNN DEL MEDICO, JONES
DAY, NEW YORK, NY.

**Judges:** Kevin McNulty, United States District Judge.

**Opinion by:** Kevin McNulty

## Opinion

[*370] **KEVIN MCNULTY, U.S.D.J.**:

The plaintiff, Manhattan Ford Lincoln, Inc. ("Manhattan
Ford") brings this action against UAW Local 259
Pension Fund ("Pension Fund") pursuant to the
Employee Retirement Income Security Act of 1974

("ERISA"), *29 U.S.C. § 1001, et seq.* as amended by the
*Multi-Employer Pension Plan Amendment Act of 1980
("MPPAA"), 29 U.S.C. §§ 1381-1461.*[1] **[*371]** This
case arises from Manhattan Ford's withdrawal from the
Pension Fund, a multiemployer pension plan.[2] The
Arbitrator upheld the Pension Fund's calculation of
about $2.55 million in withdrawal liability. Manhattan
Ford now challenges that decision.

Two essential questions are raised:

(1) As a matter of ERISA law, must a pension plan's
actuary use identical actuarial assumptions to calculate
the plan's satisfaction of minimum funding
requirements **[**2]** and its unfunded vested benefits
("UVB") for withdrawal liability?

2) Assuming the answer to question 1 is "no," did the
Arbitrator err in this case when he found that the
discount rate applied by the Pension Fund's actuary to
determine Manhattan Ford's withdrawal liability, the
Segal Blend, did not render the actuarial assumptions
"in the aggregate, unreasonable (taking into account the
experience of the plan and reasonable expectations)"?
*See 29 U.S.C. § 1401(a)(3)(B)(i).*

Now before this Court are Manhattan Ford's motion for
summary judgment and the Pension Fund's cross-
motion for summary judgment. For the reasons
discussed below, the two questions raised in this case
are answered in the negative. Accordingly, Manhattan
Ford's motion for summary judgment is denied, and the

---

[1] The issues here turn largely on amendments contained in the
MPPAA. For simplicity, from time to time I will refer to the
statute generically as ERISA.

[2] *ERISA Section 1002(37)(A)* defines a multiemployer plan as
a plan "maintained pursuant to one or more collective
bargaining agreements" between a union or unions and
employers, "to which more than one employer is required to
contribute." *29 U.S.C. § 1002(37)(A).*

331 F. Supp. 3d 365, *371; 2018 U.S. Dist. LEXIS 111969, **2

Pension Fund's cross-motion for summary judgment is granted. I will therefore affirm the Arbitrator's Interim and Final Awards.[3]

[*372]  I. Background[4]

Manhattan Ford was a contributing employer to the Pension Fund, a multiemployer defined benefit pension plan.[5] (DSMF ¶ 1.) As such, it was required to make

contributions to fund the Pension Fund. In 2014, Manhattan Ford's contributions to the Pension Fund ceased. (*Id.*) This, everyone agrees, constituted a complete withdrawal from the Pension Fund. That withdrawal triggered Manhattan Ford's withdrawal liability—*i.e.*, its obligation to pay in to the Fund to ensure that any unfunded pension liabilities were covered, and that the employers who remained in the plan would not be unfairly burdened.

Pension funds, through their actuaries, necessarily make assumptions or predictions. These include estimates of future contributions, investment return, and liabilities, [**6] all of which depend on a number of actuarial factors. To simplify a bit, the Plan's estimated future liabilities are reduced to a present value using a

Ford's motion for summary judgment before the Arbitrator and authenticity stipulated [**3] in Joint Stip. of Facts ¶ 14 (ECF no. 6, Exh. A to Compl.)

"Interim Op." = The Arbitrator's July 25, 2016 Interim Award Opinion (ECF no. 6, Exh. B to Compl.)

"Final Op." = The Arbitrator's June 14, 2017 Final Award Opinion (ECF no. 6, Exh. C to Compl.)

"Ans."= Answer (ECF no. 17)

"Pl. Br."= Plaintiff Manhattan Ford's Memorandum in Support of its Motion for Summary Judgment (ECF no. 22-1)

"Arb. Hrg. Tr."= Transcript of December 6, 2016 Arbitration Hearing (ECF no. 22-2, Exh. A to Declaration of Jacob ("Yaakov") M. Roth, Esq.)

"Def. Opp."= Defendant Pension Fund's Memorandum in Opposition to Plaintiff Manhattan Ford's Motion for Summary Judgment, and in support of its Cross-Motion for Summary Judgment (ECF no. 23-3)

"ASOP No. 27"= Actuarial Standard of Practice No. 27, Selection of Economic Assumptions for Measuring Pension Obligations, Revised Edition, Adopted by the Actuarial Standards Board in September 2007, updated for deviation language effective May 1, 2011, admitted into evidence at the Arbitration Hearing as Exh. 2 (ECF no. 23-5, Exh. 1)

"Levy Report"-Report of Thomas Levy, considered part of the record at the Arbitration Hearing (ECF no. 23-6, Exh. 2 to Declaration of William T. Josem, [**4] Esq.) *See* (Arb. Hrg. Tr.at 8:19-9:9, 11:14-12:9) (stating that documents submitted with the parties' summary judgment motions would be considered part of the record).

"Levy Dep.". Transcript of Deposition of Thomas Levy, the Pension Fund's actuarial expert, considered part of the record at the Arbitration Hearing (ECF no. 23-7, Exh.

---

[3] In this Opinion, certain record items will be abbreviated as follows:

"Compl." = Complaint (ECF no. 1)

"W. L. Report"= The Pension Fund's Report on Manhattan Ford's Withdrawal Liability for withdrawal date of December 31, 2014, prepared by the Segal Consulting, submitted as Exh. 7 in support of Manhattan

331 F. Supp. 3d 365, *372; 2018 U.S. Dist. LEXIS 111969, **4

percentage discount rate (which is itself an actuarial assumption). The resulting figure is used to determine whether the Plan's assets are sufficient to meet its obligations.

## A. The 7.5% funding rate and the Segal Blend withdrawal rate

Diane Gleave of the Segal Company, the Pension Fund's actuary, calculated the minimum funding level of the plan and Manhattan Ford's withdrawal liability using the following discount rates:

*The Funding Rate* (used to calculate minimum required funding). To calculate the minimum required funding of the Pension Fund, Ms. Gleave used a funding discount rate of 7.5%. (*Id.* at ¶ 4.) That funding rate was developed by "employing the **[*373]** 'building block' method, looking to the asset mix of the [Pension] Fund's investment portfolio and analyzing the likely return for each asset class." (Final Op. at 7.[6] *See* Gleave Dep. 10:18-11:7, 11:14-:29.) Manhattan Ford does not

dispute, and indeed embraces, that 7.5% rate. Based on the 7.5% funding rate, the Segal firm reported that the Pension Fund was "fully funded-i.e. that, 'assuming **[**7]** experience is consistent' with its assumptions, the current value of [the Pension Fund's] assets plus future investment earnings and contribution income is projected to exceed benefit payments and administrative expenses." (2014 Actuarial Valuation at 8.)[7] Indeed, the Pension Fund's funded percentage for 2014 was 111.7%. (Final Op. at 7. *See* 2014 Actuarial Valuation at 7, 10.)

*The Segal Blend* (used to calculate withdrawal liability). To calculate the Pension Fund's UVB at the time of Manhattan Ford's withdrawal,[8] Ms. Gleave used a different discount rate, the Segal Blend.[9] (DSMF ¶ 3.) The Segal Blend has been used by the Pension Fund for purposes of calculating withdrawal liability for more than 25 years. (*Id.* ¶ 7; Joint Stip. of Facts ¶ 11.) It represents a blend of interest rates prescribed by the Pension Benefit Guaranty Corporation ("PBGC"),[10] and the **[*374]** 7.5% funding rate. More specifically, the

---

3 to Declaration of William T. Josem, Esq.) *See* (Arb. Hrg. Tr.at 8:19-9:9, 11:14-12:9) (stating that documents submitted with the parties' summary judgment motions would be considered part of the record).

"Gleave Dep.". Transcript of Deposition of Diane Gleave, the Pension Fund's actuary, admitted into evidence at the Arbitration Hearing as Exh. 4 (ECF no. 23-8, Exh. 4 to Declaration of William T. Josem, Esq.)

"2014 Actuarial Valuation"-Pension Fund Actuarial Valuation and Review as of January 1, 2014 by Segal Consulting, admitted into evidence at the Arbitration Hearing as Exh. 3 (ECF no. 23-9, Exh. 5)

"Joint Stip. of Facts" = Joint Stipulation of Facts, admitted into evidence at the Arbitration Hearing as Exh. 1 and incorporated into the Arbitrator's Final Opinion (ECF no. 23-10, Exh. 6 to Declaration of William T. Josem, Esq.)

"Pl. Reply"= Plaintiff Manhattan **[**5]** Ford's Reply Brief in Further Support of its Motion for Summary Judgment and in Opposition to Pension Fund's Cross-Motion for Summary Judgment (ECF no. 24)

"Def. Reply" = Defendant Pension Fund's Reply Brief in Further Support of its Cross-Motion for Summary Judgment (ECF no. 25)

"Pl. Letter"= Plaintiff Manhattan Ford's Letter regarding *New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, No. 17 CIV. 6178, 303 F. Supp. 3d 236, 2018 U.S. Dist. LEXIS 49813, 2018 WL 1517201 (S.D.N.Y. Mar. 26, 2018)* (ECF no. 26)

"Def. Letter"= Defendant Pension Fund's responsive letter (ECF no. 27)

4 For purposes of this motion, I consider Plaintiff Manhattan Ford's Statement of Undisputed Material Facts in support of its motion for summary judgment ("PSMF") (ECF no. 22-3), Defendant Pension Fund's Responsive Statement of Undisputed Material Facts ("DRSMF") (ECF no. 23), Pension Fund's Statement of Undisputed Material Facts in support of its cross-motion for summary judgment ("DSMF") (ECF no. 23-1), and Manhattan Ford's Responsive Statement of Undisputed Material Facts ("PRSMF") (ECF no. 24-1) pursuant to *Local Rule 56.1*, as well as the deposition testimony, arbitration hearing testimony, and documentary evidence. Facts not contested are assumed to be true.

5 *See* 29 U.S.C. § 1002(37)(A) (defining "multiemployer plan"); *id.* at § 1002(2)(A) (defining "pension plan").

6 Paragraph 13 of the Joint Stipulation of Facts incorporated paragraphs 1 through 16 of the Interim Opinion (as corrected) as stipulated facts. (*See* Joint Stip. of Facts ¶ 13.) Accordingly, the Arbitrator incorporated those paragraphs into his Final Opinion. (*See* Final Op. at 6-8.)

7 *See also* (Gleave Dep. at 20:23-21:3) (recognizing that the 111.7% indicates that the value of the assets is greater than the value of the liabilities under that measurement); 28:3-:5 (explaining that 111.7% is "the ratio of the actuarial value of assets to the PPA mandated calculation of the Plan's liabilities."). The actuarial value of assets was $87,890,792 and the liability was $78,672,878. (2014 Actuarial Valuation at

331 F. Supp. 3d 365, *374; 2018 U.S. Dist. LEXIS 111969, **7

Segal Blend "values vested benefit liabilities based on: 1) PBGC, or risk-free rates, to the extent that there are assets on hand that are attributable to the withdrawing employer; and 2) long-term funding assumptions used for minimum funding purposes to the extent such assets **[**8]** are not on hand." (DSMF ¶ 10.) In setting the Segal Blend rate, Ms. Gleave considered two sets of liabilities, and then blended the rates as to those liabilities. (Arb. Hrg. Tr. 92:10-:19.)[11] Gleave first valued a portion of the Pension Fund's liabilities using the long-term funding assumption of 7.5% (i.e., the same rate as the "funding rate" that was used to value the minimum funding). (DSMF ¶¶ 3, 10.) Gleave then valued another portion of the Pension Fund's liabilities using risk-free interest rates published by the PBGC.[12] (Id.)[13] "Mathematically, **[*375]** the Segal Blend is the equivalent of using an 'effective' discount rate that falls somewhere between the PBGC rates and the investment-return assumption used for funding purposes." (Final Op. at 8.) Using the Segal Blend rate, Ms. Gleave calculated the present value of vested plan benefits for withdrawal liability at about $117.8 million. (2014 Actuarial Valuation at 10).[14] That figure minus the market value of current assets ($86,105,701) yielded a $31,737,875 figure for UVB. (Id. at 8.) Of that UVB total, about $2.55 million was allocated to Manhattan Ford.[15]

---

10.)

Pursuant to the Pension Protection Act of 2006, the Pension Fund provided employers with an "Annual Funding Notice for Plan Year Beginning January 1, 2014 and Ending December 31, 2014" which advised participants of that percentage. (Id. at Section 3, Exh. E.) The 2014 Actuarial Valuation and Review Report further noted: "[t]he funded percentage is one measure of a plan's funded status. It is not indicative of how well funded a plan may be in the future, especially in the event of plan termination." (Id. at 36. See 2014 Actuarial Valuation at 10 (describing the "PPA '06 Liability and Annual Funding Notice" by stating [m]easures the present value of accrued benefits using the current participant census and financial data. As defined by the Pension Protection Act of 2006, based on long-term funding investment return assumption of 7.50% and the actuarial value of assets.").)

[8] As explained further herein, the actuary calculates the plan's UVB by subtracting the value of the plan's assets from the present value of vested benefits under the plan. 29 U.S.C. § 1393(c). After calculating the plan's UVB, the actuary must determine the withdrawn employer's allocable share of the UVB. See Dan M. McGill et al., Fundamentals of Private Pensions 582 (9th ed. 2010) (stating that "[d]eriving the actuarial present value of future benefit payments . . . is referred to as the valuation of the liabilities of the plan").

[9] See Section III.C., infra **[**9]** , for a more detailed discussion of discount rates and investment-return assumptions in actuarial calculations, and the relationship between them.

[10] Congress created the PBGC, "a wholly owned Government corporation, to administer an insurance program for participants in both single-employer and multiemployer pension plans." Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 214, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986) (citing 29 U.S.C. § 1302). In particular, "in 1974, ERISA created the Pension Benefit Guarantee Corporation (PBGC) to administer and enforce a pension plan termination insurance program, to which contributors to both single-member and multiemployer plans were required to pay insurance premiums." Concrete Pipe & Prods. v. Construction Laborers Pension Trust, 508 U.S. 602, 607, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993).

[11] See Gleave Dep. 22:19-:21 (stating "[w]e blended the liabilities at 7.5 with the liabilities on another Interest Rate."); 57:19-:22 (explaining that "Rio the extent that there is an effective Interest Rate, it is developed by blending the liabilities under the two interest rates that are used.").

[12] See Arb. Hrg. Tr. 95:19-:23 (agreeing with the description of PBGC rates as being "essentially a proxy for rates on a portfolio of investment-grade bonds or treasury instruments."); see also Gleave Dep. 49:23 to 50:4 (explaining that the PBGC rates are "promulgated by the PBGC for single-employer plan terminations and for multiemployer mass withdrawals."); id. at 51:13-:16 (recognizing that PBGC rates are "intended to approximate the cost of buying annuities to settle pension obligations."); (Levy Dep. 48:5-:21) (acknowledging that the PBGC rates are "a proxy for annuitization rates in the commercial marketplace."); id. at 49:7-:11 (explaining that "an annuity rate is a transfer of the risk to an insurance company and therefore settling that particular risk and not taking that risk anymore.").

[13] In particular, the Actuarial Valuation Report explained that Igor liabilities up to market value of assets," the following PBGC interest rates were used: a 3% rate was used for liabilities up to 20 years, and a 3.31% rate was used for liabilities beyond 20 years. (2014 Actuarial Valuation at 37.) "For liabilities in excess of market value of assets," the funding rate of 7.5% was used. (Id.)

At the arbitration hearing, Ms. Gleave explained how the Segal Blend works:

> We look at the market value of assets and we compare that to the present value of vested benefits at the PBGC interest rates. So to the extent that there are assets on hand to cover those liabilities, that's the portion that's valued using the PBGC rates. To the extent that there are not, the unfunded portion of the liabilities are valued using the 7-and-a-half percent.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 182 of 212 PAGEID #: 2176

Page 5 of 27

331 F. Supp. 3d 365, *375; 2018 U.S. Dist. LEXIS 111969, **9

See infra.

So, in effect, you're using the market value of assets as the rating between the PBGC interest rates and the long-term funding interest rates.

(Arb. Hrg. Tr. 94:5-:17.)

The Withdrawal Liability Report explains the valuation assumption as follows:

> The actuarial assumptions to be used [for withdrawal liability valuations] are the valuation assumptions used for plan funding, except for the investment return rate and the expense charge. To the extent the assets, valued at market, cover the vested benefits, benefits will be valued at an investment return rate consistent with current annuity rates; the portion of the benefit that is not yet funded will be valued on the interest assumptions used for plan funding.

Specifically, the withdrawal liability valuation assumptions and methods are:

1. Investment Return

a) To the extent the present value of vested benefits is matched by the market value of plan assets **[**10]** on hand: interest assumptions prescribed by the Pension Benefit Guaranty Corporation under 29 C.F.R., Part 4044, which are in effect for the applicable withdrawal liability valuation date.

b) The portion of the vested benefits that is not matched by plan assets (at market) will be valued on the interest assumption used for plan funding, as of the applicable withdrawal liability valuation date.

c) The portion of the vested benefits that is matched by assets will be determined by comparing the total present value of benefits — at the PBGC rates — with the total market value of assets; each vested benefit will be treated as covered by assets to the same extent as all other vested benefits . . .

(W. L. Report at 2) (emphasis added). The "Plan Funding investment return assumption" is listed as 7 1/2 %. (Id. at 7. See also 2014 Actuarial Valuation at 37-38.)

[14] Vested benefits are "benefits that are currently being paid to retirees and that will be paid in the future to covered employees who have already completed some specified period of service, 29 U.S.C. § 1053." Concrete Pipe, 508 U.S. at 609.

The market value of the assets for purposes of withdrawal liability was about $86.1 million. The Pension Fund's funded

## B. The Pension Fund's Assessment of $2.55 Million Withdrawal Liability

Based on Manhattan Ford's cessation of contributions in 2014, the Pension Fund found that Manhattan Ford had completely withdrawn from the Fund. On December 10, 2014, the Pension Fund issued a Notice and Assessment of Withdrawal Liability. (Compl. ¶ 25; Ans. ¶ 25.) Two months later, on February 20, 2015, the Pension Fund sent an Amended Notice to Manhattan Ford, assessing a withdrawal liability of $2,553,692 as of the December 31, 2014 withdrawal **[**11]** date. (Compl. ¶ 25, Ans. ¶ 25; DSMF ¶ 2.) Under that amended assessment, the $2,553,692 withdrawal liability was to be paid in quarterly payments of $99,640.50 over eight years, with a final payment of $78,662.04. (DSMF ¶ 2. See W. L. Report at 7.)

All seem to agree that if Gleave had used the 7.5% funding rate (rather than the Segal Blend) to value the Pension Fund's liability, Manhattan Ford's withdrawal liability would have been $0 (rather than $2.55 million). (Final Op. at 7.) On April 13, 2015, Manhattan Ford challenged the revised assessment on just that basis. The Pension Fund, said Manhattan Ford, was required to use the 7.5% funding rate, not the Segal Blend, to compute Manhattan Ford's withdrawal liability. (Compl. ¶ 26; Ans. ¶ 26.) See 29 U.S.C. § 1399(b)(2)(A). On May 26, 2015, the Pension Fund rejected Manhattan Ford's challenge. (Compl. ¶ 27; Ans. ¶ 27.) See 29 U.S.C. § 1399(b)(2)(B).

## C. Arbitration

On July 20, 2015, Manhattan Ford timely initiated arbitration proceedings pursuant to 29 U.S.C. § 1401(a)(1). (Compl. ¶ 28; Ans. ¶ 28.)

Before the Arbitrator, Michael D. McDowell, Esq., Manhattan Ford disputed the Pension Fund's

percentage for withdrawal liability as of January 1, 2014 was 73.1%. (See 2014 Actuarial Valuation at 10.) In other words, the assets represented about 73% of the liabilities.

[15] To determine the portion of the Pension Fund's UVB allocable to Manhattan Ford, Ms. Gleave used the "presumptive method" under 29 U.S.C. § 1391(b). (W. L. Report at 1; Joint Stip. of Facts ¶ 10.) That allocation does not seem to be at issue.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 183 of 212 PAGEID #: 2177

Page 6 of 27

331 F. Supp. 3d 365, *375; 2018 U.S. Dist. LEXIS 111969, **11

computation of withdrawal liability. On July 25, 2016, the Arbitrator issued an Interim Award denying both Manhattan Ford's **[\*\*12]** motion for summary judgment and the Pension Fund's cross-motion for summary judgment. (*See* Interim Op. at 18; Compl. ¶ 29; Ans. ¶ 29.) The matter went to a hearing on December 6, 2016. At that hearing, the Arbitrator **[\*376]** heard testimony from three witnesses: 1) Darren French, Manhattan Ford's actuarial expert; 2) Ms. Gleave, the Pension Plan's actuary from The Segal Company; and 3) Thomas Levy, the Pension Plan's actuarial expert from The Segal Company. *See* (Arb. Hr. Tr.) The parties also presented some seven exhibits. (*See* Final Op. at 4-5.)[16] On June 14, the Arbitrator issued a Final Award, rejecting Manhattan Ford's challenge to the Pension Fund's withdrawal liability determination. (Compl. ¶ 30; Ans. ¶ 30; Final Op.)


**D. This Action and the Cross-Motions for Summary Judgment**

On July 12, 2017, pursuant to *29 U.S.C. § 1401(b)(2)*, Manhattan Ford filed the present action, asking this Court to vacate the arbitrator's interim and final awards in their entirety. (Compl. 13.) On September 6, 2017, the Pension Fund filed its Answer, Affirmatives Defenses, and Counterclaim. (ECF no. 17.) On September 12, 2017, Manhattan Ford filed an Answer to the Pension Fund's Counterclaim. (ECF no. 19.)

On October 16, 2017, **[\*\*13]** Manhattan Ford filed a motion for summary judgment requesting that this Court vacate the Pension Fund's assessment of withdrawal liability and "the arbitration award that sustained it." (Pl. Brf. at 25.)[17] On November 20, 2017, the Pension Fund

---

[16] Additionally, by agreement of the parties, all of the documents submitted by the parties in support of their summary judgment motions were also deemed admitted without a question of authenticity. (Arb. Hrg. Tr. 8-9.) (*See* Joint Stip. of Facts ¶ 14) (stating that "[t]he parties stipulate[d] to the authenticity of each of the Exhibits submitted with their respective Motions for Summary Judgment in this case.").)

The parties submitted additional post-hearing briefing in lieu of oral argument. (Arb. Hrg. Tr. 186-87; Final Op. at 5.) Copies of the briefing related to the summary judgment motions and post-hearing briefing were not provided to this Court.

[17] Manhattan Ford's summary judgment motion and the Pension Fund's cross-motion are equivalent to motions to vacate or affirm the Arbitration Award, which is understood to encompass both the Interim and Final Awards.

filed its opposition and a cross-motion for summary judgment (ECF nos. 23-2, 23-3) asking this Court to affirm the assessment of withdrawal liability against Manhattan Ford and the arbitration award sustaining it. (Def. Brf. at 22.) On December 11, 2017, Manhattan Ford filed a reply in support of its own motion and its opposition to the Pension Fund's cross-motion. (Pl. Reply.) On December 29, 2017, the Pension Fund filed a reply in support of its cross-motion. (Def. Reply.)

On March 27, 2018, Manhattan Ford submitted a letter addressing a recent decision from the Southern District of New York, *New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Supp. 3d 236, 2018 U.S. Dist. LEXIS 49813, 2018 WL 1517201 (S.D.N.Y. 2018)*.[18] (Pl. Letter.) On March 29, 2018, the Pension filed a responding letter. (Def. Letter.) Briefing is complete, and the motions are poised for decision.


**II. Legal Standards Governing Review of Arbitration Award**

ERISA "provides the procedure for calculating and assessing withdrawal liability." *Concrete Pipe, 508 U.S. at 609*. Disputes regarding withdrawal liability from multiemployer **[\*\*14]** pension plans follow a four-step process:

   **[\*377]** [1] The plan sponsor has the responsibility of determining this withdrawal liability, notifying the employer, and collecting payment. *29 U.S.C. § 1382*.

   [2] If the employer disputes the amount set, it may ask the plan sponsor to conduct a reasonable review of the computed liability. *29 U.S.C. § 1399(b)(2)(A)*.

   [3] In the event the dispute is unresolved, either party may request arbitration. *29 U.S.C. § 1401(a)(1)*.

   [4] The arbitrator's award, in turn, may be challenged in federal court. *29 U.S.C. § 1401(b)(2)*.

*Galgay v. Beaverbrook Coal Co., 105 F.3d 137, 138-39 (3d Cir. 1997)* ([bracketed] numbers and line breaks

---

[18] That case is now on appeal to the United States Court of Appeals for the Second Circuit. As luck would have it, the plaintiff-employer in *N.Y. Times* was represented by two of the attorneys who now represent Manhattan Ford here.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 184 of 212 PAGEID #: 2178

Page 7 of 27

331 F. Supp. 3d 365, *377; 2018 U.S. Dist. LEXIS 111969, **14

added). *See also Steelworkers Pension Trust v. Renco Grp., Inc., 694 Fed. Appx. 69, 73 (3d Cir. 2017)*.[19] The dispute now before the Court followed that pattern.

## A. Presumptions and Burdens of Proof in Arbitration

In reviewing an arbitration award, the court must be mindful of two presumptions that govern an arbitration proceeding under ERISA. *See 29 U.S.C. §§ 1401(a)(3)(A)-(B).*

The first presumption is that any factual determinations made by a plan sponsor under *Sections 1381 through 1399* and *1405* are "presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." *Id. § 1401(a)(3)(A)*; *Concrete Pipe, 508 U.S. at 620-21*. "The Supreme Court has interpreted this language to place the burden of persuasion **[**15]** on the employer during arbitration to 'disprove a challenged factual determination by a preponderance.'" *Bd. of Trustees of Trucking Empls. of N. Jersey Welfare Fund, Inc.-Pension Fund v. Kero Leasing Corp., 377 F.3d 288, 307 (3d Cir. 2004)* (quoting *Concrete Pipe, 508 U.S. at 629*). The presumption's "purpose is to prevent the employer from 'forcing the plan sponsor to prove every element involved in making an actuarial determination.'" *Concrete Pipe, 508 U.S. at 628* (quoting H.R. Rep. No. 96-869, pt. 1, p. 86 (1980)).[20]

The second presumption applies specifically to challenges to determinations of UVB:

> In the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of evidence that-
>
> (i) the actuarial assumptions and methods used in the determination were, in the aggregate,

unreasonable (taking into account the experience of the plan and reasonable expectations),[21] or

**[*378]** (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

*29 U.S.C. § 1401(a)(3)(B)(i)-(ii)*.

The essential distinction between the two presumptions is that the first is directed to the Plan itself, whereas the second is directed to "the assumptions and **[**16]** methods used in calculating withdrawal liability[, which] are selected in the first instance not by the trustees, but by the plan actuary." *Concrete Pipe, 508 U.S. at 632*.

In addition to applying those two presumptions, an Arbitrator must of course "follow applicable law, as embodied in statutes, regulations, court decisions, interpretations of the agencies charged with the enforcement of ERISA, and other pertinent authorities" in reaching his or her decision. *29 C.F.R. § 4221.5(a)(1)*.

## B. Standard of Review of ERISA Arbitration Awards

Where, as here, an arbitrator has issued a final decision, ERISA provides that a party may bring suit in federal district court to "enforce, vacate, or modify an arbitrator's award." *29 U.S.C. § 1401(b)(2)*. A district court reviewing such an award must apply distinct standards of review to legal conclusions, factual findings, or mixed questions of law and fact.[22]

---

[19] ERISA mandates arbitration for disputes "concerning a determination made under *sections 1381 through 1399*." *29 U.S.C. § 1401(a)(1)*.

[20] *See Concrete Pipe, 508 U.S. at 626* (noting that "it is indeed entirely sensible to burden the party more likely to have information relevant to the facts about its withdrawal from the Plan with the obligation to demonstrate that facts treated by the Plan as amounting to a withdrawal did not occur as alleged").

[21] *Section 1401(a)(3)(B)(i)*'s language regarding the employer's burden at arbitration parallels that of *Section 1393*. Compare *29 U.S.C. § 1401(a)(3)(B)(i)* (requiring employer to prove by a preponderance of the evidence that the actuarial assumptions and methods used to determine a plan's UVB "were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations"), *with id. § 1393(a)(1)*(emphasis added) (requiring a plan to determine UVB on the basis of actuarial assumptions and methods "*which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations)* and which, in combination, offer the actuary's best estimate of anticipated experience under the plan").

[22] *See Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc., 698 F.3d 346, 349-50 (7th Cir. 2012)* (citing *Central States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc., 181 F.3d 799, 804-05 (7th Cir. 1999)*); *Bd. of Trs. v. BES Servs., 469*

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 185 of 212 PAGEID #: 2179

Page 8 of 27

331 F. Supp. 3d 365, *378; 2018 U.S. Dist. LEXIS 111969, **16

As to an arbitrator's factual findings, ERISA mandates a deferential standard of review. An arbitrator's findings of fact are presumed correct, and that presumption is "rebuttable only by a clear preponderance of the evidence." *29 U.S.C. § 1401(c)*. Thus, factual findings will be reversed only if "clearly erroneous." *Crown Cork & Seal Co. v. Cent States Se. & Sw. Areas Pension Fund, 982 F.2d 857, 860 (3d Cir. 1992)*. "A factual finding is clearly erroneous 'when although there is evidence **[**17**]** to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *See United States v. Murray, 821 F.3d 386, 391 (3d Cir.)*, cert. denied, 137 S. Ct. 244, 196 L. Ed. 2d 185 (2016) (quoting *United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948))*. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)*.

As to an arbitrator's legal conclusions, ERISA does not specify the applicable standard of review. The United States Court of Appeals for the Third Circuit, however, has held that legal conclusions must be reviewed de novo. *Crown Cork & Seal Co., 982 F.2d at 860*.

As to mixed questions of fact and law, ERISA does not expressly state a **[*379]** standard of review.[23] Under Third Circuit precedent, however, a district court must apply "a clearly erroneous standard to findings of fact and conduct plenary review of conclusions of law, applying the appropriate standard to each component." *Crown Cork & Seal Co., 982 F.2d at 861* (citing *Crown Cork & Seal Co. Inc. v. Central States Se. & Sw. Areas Pension Fund, 881 F.2d 11, 18 n.19 (3d Cir. 1989)*; *In re Sharon Steel Corp., 871 F.2d 1217, 1222 (3d Cir. 1989))*.

[Mixed questions of law and fact are] questions in which the historical facts are admitted or established, the rule of law is undisputed, and the

---

F.3d 369, 375 (4th Cir. 2006) (stating that ERISA arbitration decisions are subject to "judicial review similar in scope to appellate review of district court decisions").

[23] *Cf. Concrete Pipe, 508 U.S. at 630* (describing the date of "complete withdrawal" as a mixed question of fact and law, and explaining that "[t]he relevant facts are about the closure of the Shafter plant (such as the intent of Concrete Pipe with respect to the plant, its expression of that intent, its activities while the plant was not operating, and the circumstances of the plant's reopening), while the question whether these facts amount to a 'complete withdrawal' is one of law").

issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.

*Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19, 102 S. Ct. 1781, 72 L. Ed. 2d 66 (1982)*.

The Arbitrator's determination that **[**18**]** ERISA and *Concrete Pipe* do not always require the use of the same discount rate for funding and withdrawal liability calculations presents a pure conclusion of law. I will therefore review that determination de novo.

The Arbitrator's determination that the use of the Segal Blend rate was reasonable, when considered "in the aggregate" with the other actuarial methods and assumptions, presents a mixed question of law and fact. I will review the Arbitrator's interpretations of the law embedded within that determination de novo, but will apply a "clearly erroneous" standard to the Arbitrator's application of that legal standard to reach his findings of fact. *See Crown Cork & Seal Co., 982 F.2d at 861*; *N.Y. Times, 2018 U.S. Dist. LEXIS 49813, 2018 WL 1517201 at *7, *13* (in the context of mixed question review, applying clear error standard to the sub-issue of "[t]he Arbitrator's decision that the Segal Blend's use was reasonable in the aggregate").

## C. Summary Judgment Standard

The parties' contentions are presented in the form of cross-motions for summary judgment. *Federal Rule of Civil Procedure 56(a)* provides that the court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000)*. In deciding a motion **[**19**]** for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Hayes v. Harvey, 874 F.3d 98, 103 (3d Cir. 2017)*. The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 186 of 212 PAGEID #: 2180

Page 9 of 27

331 F. Supp. 3d 365, *379; 2018 U.S. Dist. LEXIS 111969, **19

there is an absence of evidence supporting the non-moving party's case." *Id. at 325*.

 [*380]  Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson, 477 U.S. at 248*; *see also Fed. R. Civ. P. 56(c)* (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorp., 912 F.2d 654, 657 (3d Cir. 1990)*; *see also Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001)* ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving **[**20]** party has failed "to make a showing sufficient to establish the existence of an element essential to that party's cases, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992)* (quoting *Celotex, 477 U.S. at 322-23*).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson, 477 U.S. at 249*. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)*.

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc., 835 F.3d 388, 401 (3d Cir. 2016)* (citing *Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987)*). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc., 622 F. Supp. 2d 168, 184 (D.N.J. 2009)*; *Williams v. Phila. Housing Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993)*, *aff'd, 27 F.3d 560 (3d Cir. 1994)*. That one of the cross-motions is denied does not necessarily imply that the other must be granted. For each motion, "the court construes the facts and draws inferences in

favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determination" because "these **[**21]** tasks are left for the fact-finder." *Pichler v. UNITE, 542 F.3d 380, 386 (3d Cir. 2008)* (internal quotation and citations omitted).

## III. Withdrawal Liability and the ERISA/MPPAA Scheme

### A. The Statutory Rationale

Under ERISA, as amended by the MPPAA, "if an employer withdraws from a multiemployer pension plan, it incurs 'withdrawal liability' in the form of 'a fixed and certain debt to the pension plan.'" *Concrete Pipe, 508 U.S. at 609* (quoting *Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 725, 104 S. Ct. 2709, 81 L. Ed. 2d 601 (1984))*. The MPPAA was enacted "out of a concern that ERISA did not adequately protect multiemployer pension plans from the adverse consequences that result when individual employers terminate their participation or withdraw." *SUPERVALU,  [*381]  Inc. v. Bd. of Trs. of the Southwestern Pa. & W. Md. Area Teamsters & Emplrs. Pension Fund, 500 F.3d 334, 336 (3d Cir. 2007)* (quoting *Warner-Lambert Co. v. United Retail & Wholesale Emp's. Teamster Local No. 115 Pension Plan, 791 F.2d 283, 284 (3d Cir. 1986)* (internal citation omitted)). It was "'designed to prevent employers from withdrawing from a multiemployer pension plan without paying their share of unfunded, vested benefit liability, thereby threatening the solvency of such plans.'" *Id.* (quoting *Mfrs. Indus. Relations Ass'n v. E. Akron Casting Co., 58 F.3d 204, 205-06 (6th Cir. 1995))*.[24] Accordingly, to "insure[] that the financial

---

[24] *See C & S Wholesale Grocers, 802 F.3d 534, 536 (3d Cir. 2015)* (footnote omitted) (recognizing that "Nile MPPAA was enacted to mitigate the incentives that employers would otherwise have to withdraw from multiemployer pension plans mired in financial difficulty"). *See also* Bruce Perlin & Ralph L. Landy, "Special Rules for Multiemployer Plans," in *ERISA Litigation* at 1394 (Jayne E. Zanglein et al. eds., 6th ed. 2017) (footnote omitted) (describing the unique characteristics of multiemployer plans and stating that those characteristics "may lead employers in financially troubled multiemployer plans, such as those suffering from industry-wide declines, to withdraw and attempt to leave the funding problem to the remaining employers and ultimately to participants and the Pension Benefit Guaranty Corporation (PBGC). Congress addressed this problem in the *Multiemployer Pension Plan*

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 187 of 212 PAGEID #: 2181

Page 10 of 27

331 F. Supp. 3d 365, *381; 2018 U.S. Dist. LEXIS 111969, **21

burden will not be shifted to the remaining employers," a withdrawing employer must pay its fair share of the plan's unfunded liability. *Id. at 337*.

## B. Calculation of Liability for UVB Upon Withdrawal

"When an employer withdraws from **[**22]** a multiemployer pension plan, . . . it incurs withdrawal liability corresponding to its pro rata share of the [UVB] due to the pension fund at the time of its withdrawal." *Renco Grp., Inc., 694 Fed. Appx. at 73*. When an employer has completely withdrawn[25] from a multiemployer pension plan, the employer "incurs withdrawal liability that corresponds to the value of the benefits in the plan that have vested and are attributable to its employees." *C & S Wholesale Grocers, 802 F.3d at 537* (footnote omitted).

In particular, a withdrawing employer is liable to the plan[26] for its allocable share of the plan's UVB, which is "'calculated as the difference between the present value of vested benefits and the current value of the plan's assets,'" as of a specific date. *In re Marcal Paper Mills, Inc., 650 F.3d 311, 316 (3d Cir. 2011)* (quoting *Gray, 467 U.S. at 725*). That means that the plan actuary must first determine the present value of the plan's future liability for vested benefits. *29 U.S.C. § 1393(c)(A)*. From that present value, the actuary must subtract the actual value of the plan's assets. *29 U.S.C. § 1393(c)*. The resulting figure is the UVB.

That determination of UVB for purposes of withdrawal liability is a forward-looking **[*382]** one. Future investment returns, life expectancies of employees, and so forth, cannot be known for certain. Thus in

---

*Amendments Act of 1980 (MPPAA)*. MPPAA, which added *subtitle E to Title IV of ERISA*, established withdrawal liability, an immediate and noncontingent liability that the employer owes to the plan when it withdraws from the plan").

[25] As relevant to this case, a "complete withdrawal" from a multiemployer plan occurs when an employer "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." *29 U.S.C. § 1383(a)*. A withdrawal may also be partial, but "partial withdrawal" is not implicated by this case. *See id. § 1385(a)* (defining "partial withdrawal").

[26] In the context of a single-employer plan, withdrawal liability is owed to the PBGC. In the context of a multiemployer plan, withdrawal liability is owed to the plan. *See 29 U.S.C. §§ 1362(b), 1381(a)*.

calculating the plan's UVB, the actuary must **[**23]** choose appropriate actuarial assumptions and methods.[27] The statute requires selection of "actuarial assumptions and methods, which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." *29 U.S.C. § 1393(a)(1)*.[28] Those actuarial assumptions "must cover such matters as mortality of covered employees, likelihood of benefits vesting, and, importantly, future interest rates." *Concrete Pipe, 508 U.S. at 610*. *See also CPC Logistics, 698 F.3d at 353* ("[Estimating the interest rate at which the pension fund's assets are likely to grow is required for determining withdrawal liability.").[29]

Judge Richard Posner (ret.) of the United States Court of Appeals for the Seventh Circuit **[**24]** has defined a plan's UVB in terms of a "shortfall," *i.e.*, "the difference between the present value of the pension fund's assets and the present value of its future obligations to employees covered by the pension plan." It follows that "[i]f the present value of the assets exceeds the present value of the plan's future obligations, there is no shortfall." *CPC Logistics, 698 F.3d at 347-48* (citing *29*

---

[27] Actuarial cost method is the process of assigning the cost of the promised benefits (and expenses) to individual plan years as an annual cost. The cost method determines a normal cost component and an accrued liability component.

> Actuarial assumptions are the assumptions used by the actuary to estimate the costs of the promised benefits under the cost method. The true cost of the plan is not known until the last participant or retiree dies; in the interim, actuaries use assumptions such as interest, mortality rates, turnovers, disability rates, and so forth to estimate the cost of the plan.

Kathryn J. Kennedy, *Pension Funding Reform: It's Time to Get the Rules Right (Part 1)*, 108 TAX NOTES 907, Appendix A (Aug. 22, 2005). *See also id.* at Section II ("Actuarial assumptions are used by actuaries to approximate the cost of the promised level of benefits under the plan. In contrast, actuarial cost methods are used by actuaries to allocate those costs over different periods of time, affording employers with discretion over the incidence of pension expenses.").

[28] *Subsection (a)(2)* provides that, as an alternative, the actuary may use assumptions provided for in PBGC regulations. To date, however, no such regulations have been promulgated.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 188 of 212 PAGEID #: 2182

Page 11 of 27

331 F. Supp. 3d 365, *382; 2018 U.S. Dist. LEXIS 111969, **24

U.S.C. §§ 1381, 1391).[30]

Once the plan actuary has estimated the plan's UVB, the actuary must calculate the employer's withdrawal liability. "In essence, the withdrawal liability imposes on the withdrawing employer a share of the unfunded vested liability proportional **[\*383]** to the employer's share of contributions to the plan during the years of its participation." Concrete Pipe, 508 U.S. at 610. "The employer's allocable share depends on the value of the plan's assets and benefits, which, in turn, depends on the date the assets and benefits are valued,[31] the actuarial assumptions and methods used to value the assets and benefits, and the withdrawal liability allocation formula[32] chosen by the plan." Employee Benefits Law at 17-4.[33]

## C. The Role of Discount Rates

The parties agree that a key actuarial assumption, whether for withdrawal liability or minimum funding levels, is the interest **[\*\*25]** rate or discount rate. That rate is used to reduce the fund's future obligations to a present dollar value. I therefore review some basic concepts as developed before the arbitrator and in the case law.

The long-term investment-return assumption is the interest rate that the pension plan uses to predict how much its current assets will grow through investments. (See Levy Dep. 7:8-:12) (describing the assumption as an estimate of "the expected long-term return on the invested assets, both present and future invested assets of the fund"). Based on such assumptions, an actuary will apply a rate to discount the projected benefits stream to a present value of plan liabilities as of the valuation date.[34] (See Arb. Hrg. Tr. **[\*384]** 80:19-:22, Gleave Dep. 14:22-15:7 (explaining that the terms "discount rate" and "investment-return assumption" are used interchangeably); Levy Dep. 9:9-:25 (explaining that a discount rate is a rate used "to take expected

---

one issue in dispute here is whether the actuary must use die identical actuarial assumptions, particularly the discount rate, for purposes of minimum funding and withdrawal liability.

[31] "The date of valuation is the last day of the plan year preceding the date of withdrawal." ABA Section of Labor and Employment Law, Employee Benefits Law 17-4 (4th ed. 2017) (footnote omitted). In the case of a complete withdrawal, the relevant date is that of "the cessation of the obligation to contribute or the cessation of covered operations." 29 U.S.C. § 1383(e).

[32] ERISA Section 1391 allows a plan to select one of four allocation formulas. 29 U.S.C. § 1391. "A plan can also develop its own allocation method, subject to PBGC approval." Employee Benefits Law at 17-4 (citing 29 U.S.C. § 1391). Here, the Pension Fund used the "presumptive method," which is one of the specified formulas in Section 1391. (See W. L. Report at 1.) This pro rata method allocates liability based on the employer's proportionate share of contributions. Employee Benefits Law at 17-4 to 17-5.

---

[29] Here, Manhattan Ford only challenges the Pension Fund actuary's use of the Segal Blend, the discount rate used by the Pension Fund's actuary to determine the present value of plan liabilities for purposes of calculating withdrawal liability. (Joint Stip. of Facts ¶ 12.) It does not challenge die actuary's other assumptions, including assumptions as to administrative expenses, mortality, and retirement rates. (Id. See also Final Op. at 5-6 (incorporating the Joint Stipulation of Facts into the "Factual Allegations" Section of the Opinion).)

[30] Such actuarial issues, of course, do not arise only at the stage of a withdrawal from the plan. Multiemployer plans must annually value their future liabilities to ensure compliance with minimum funding rules under ERISA and the Internal Revenue Code. See 29 U.S.C. § 1084; 26 U.S.C. § 431. To preview,

The MPPAA also provides several adjustments to the employer's allocable share of UVB, including a de minimis reduction, 29 U.S.C. § 1389(a), an adjustment for partial withdrawal, id. § 1386, and special forgiveness rules for employers that have sold their assets or are insolvent and liquidating, id. §§ 1405(a)-(b). See id. § 1381(b)(1). Here, the de minimis rule was applied in calculating Manhattan Ford's

331 F. Supp. 3d 365, *384; 2018 U.S. Dist. LEXIS 111969, **25

future events and bring them back to a present value" and is "necessary for an actuary to determine the value of plan benefits today that will be paid in the future").)[35] *See also* Kathryn L. Moore, Understanding Employee Benefits Law (2015) at 36 (explaining that "a dollar promised in the future must be discounted to its [**26] 'present value' today" and "[t]he present value is the amount that would have to be invested today at a specified interest rate in order to have a specified amount at some specified future date."); *id.* at n.42 (noting that the discounted present value is calculated by "discounting the future payment by the interest rate over the relevant period.").

---

withdrawal liability but seemingly did not affect the withdrawal liability allocable to Manhattan Ford. (*See* W. L. Report at 6.)

[33] In any case, however, the employer's withdrawal liability is not eternal. ERISA provides that any remaining balance is forgiven after the employer has made required annual payments for 20 years. *See* 29 U.S.C. § 1399(c)(1)(B) ("In any case in which the amortization period ... exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments....").

[34] "Actuarial cost methods generally divide the present value of future benefits into two parts, the part attributable to the past and die part attributable to the future. The part attributable to the past is the actuarial liability." Fundamentals of Private Pensions 599. (*See* Arb. Hr. Tr. 26:10-:22 (describing how an actuary measures die present value of a plan's liabilities as a two-step process, and stating that after using assumptions to determine what the pension fund is likely to pay out in the future, an actuary must "discount" those calculations "back to today, and that's what makes it a present value.").)

The actuarial present value of future benefits is the amount that, together with future interest earnings, is expected to be sufficient to pay those benefits. The term *actuarial present value* connotes that the derivation of such a value involves population decremental factors, salary scales, and other functions, in addition to an interest discount for the time value of money.

Fundamentals of Private Pensions at 599. *See* 29 U.S.C. § 1002(27) (defining "present value" "with respect to a liability" as "the value adjusted to reflect anticipated events").

[35] At his deposition, Mr. Levy also testified that a component of calculating minimum funding is calculating the present value of vested benefits. "That calculation is done by projecting for all current participants the expected future benefit payments each year into the future and discounting] those back to a present value." (Levy Dep. 14:3-:6.) That is typically done by using a discount rate that is equal to the investment-return assumption. (*Id.* at 14:7-:11.)

The most important assumption underlying such a discounting calculation is usually the interest rate:

The present value of a series of future contingent payments is a function of the rate of investment return or of interest at which the payments are discounted—the higher the interest assumption, the smaller the present value. Pension plan costs and liabilities are extremely sensitive to the interest assumption in the valuation formula because of the long time-lapse [**27] between the accrual of a benefit credit and its payment. . .'

Langbein et al., *supra*, at 167 (quoting Dan M. McGill, Kyle N. Brown, John J. Haley, & Sylvester J. Scheiber, Fundamentals of Private Pensions 611-12 (8th ed. 2005)).

It is elementary that a higher interest rate assumption requires a lower present investment to produce the necessary return, and a lower interest rate requires a higher present investment:

In computing an employer's withdrawal liability, a plan sponsor must calculate the present value of the vested benefits that are to be paid out in the future.[36] An interest rate, or rate of return, is applied in order to determine what present amount of investment will yield the future amounts required to satisfy those vested benefits. In other words, the future benefits are 'discounted' to present value. The higher the assumed rate of return, then the less present investment is needed to pay out the future benefits. After the present value of the vested benefits is determined, the asset value of the plan is deducted to come up with the amount of unfunded vested benefits, of which a withdrawing employer is assessed a share. Thus, a higher interest rate applied to discount future benefits will result in a lesser [**28] amount of withdrawal liability for the employer.

*Masters, Mates & Pilots Pension Plan v. USX Corp., 900 F.2d 727, 733 (4th Cir. 1990).* Those principles, as applied to withdrawal [*385] liability, mean that "[i]ncreasing the interest rate assumption decreases the

---

[36] As discussed above, withdrawal liability is based on the employer's proportionate share of the plan's UVB, "calculated as the difference between *the present value of vested benefits* and the current value of the plan's assets." *C & S Wholesale Grocers, 802 F.3d at 537* (quoting *Gray, 467 U.S. at 725*) (emphasis added). *See* 29 U.S.C. § 1393(c).

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 190 of 212 PAGEID #: 2184

Page 13 of 27

331 F. Supp. 3d 365, *385; 2018 U.S. Dist. LEXIS 111969, **28

employer's withdrawal liability," and vice versa. *Bd. of Trustees, Mich. United Food & Commercial Workers Union v. Eberhard Foods, Inc., 831 F.2d 1258, 1260 (6th Cir. 1987)*. Because of compounding over time, even "[a] small adjustment in the interest rate assumption can lead to a major change in the withdrawal liability calculation." *Id*. *See* Employee Benefits Law at 17-8 (stating that "[a] small change in the interest rate used to discount the plan's future benefit obligations can have a significant impact on the value of vested benefits, especially because the UVB are based on the difference between liabilities and assets.").[37]

Manhattan Ford argues that the court must construe withdrawal liability in parallel with minimum funding requirements, which I will touch on briefly here. Discount rates and other actuarial assumptions, of course, do not become relevant only at the stage of withdrawal: "Estimating the growth of the fund's assets is required not only for determining withdrawal liability but also for determining whether employers are contributing to the fund the minimum amount required by ERISA in order to reduce **[**29]** the probability that the [PBGC] may have to make up for the fund's not being able to pay vested benefits . . . ." *CPC Logistics, 698 F.3d at 353*. Just as in the case of withdrawal liability, then, "[t]he minimum required contributions to multiemployer defined benefit pension plans are based on long-term [actuarial] assumptions." *Fundamentals of Private Pensions* 638. To set funding levels, actuaries for multiemployer plans will select "an interest rate that reflects the long-term expectation of investment earnings given the plan's investment structure." *Id*. at 638-39. Actuaries perform such calculations to ensure that the employers' contributions are sufficient to fund the future promised level of benefits to employees, and to satisfy the minimum funding standards of ERISA and the Internal Revenue Code.[38]

---

[37] *See also* *Eberhard Foods, 831 F.2d at 1259* (stating that the calculation of UVB "requires a determination of the present value of the vested payments as they will come due over time" and in making that determination, "t]he plan actuary must select an appropriate interest rate to apply in making that determination"). *See* Pl. Br. at 4 (explaining that the "investment-return assumption is alternatively known as the 'discount rate,' because it allows for future obligations to be 'discounted' to present value").

[38] ERISA established minimum funding requirements to ensure that pension plans "'will accumulate sufficient assets within a reasonable time to pay benefits to covered employees when

## IV. Discussion

This case presents two interrelated issues regarding withdrawal liability.

The first issue, which I review de novo, is whether, as a matter of law, ERISA requires actuaries to use identical actuarial assumptions for purposes of calculating [*386] minimum funding and withdrawal liability. If so, then the actuary's use of a 7.5% rate for purposes of minimum funding and the **[**30]** lower Segal Blend rate for purposes of withdrawal liability would be erroneous on its face. If not, however, I must address a second issue.

The second issue is whether application of the Segal Blend in this case satisfied ERISA's requirement that the rate reflect the actuary's "best estimate of anticipated experience under the plan." That requires review of the Arbitrator's decision that Manhattan Ford did not meet its burden of proving by a preponderance of the evidence that the actuarial assumptions and methods used in the Pension Fund actuary's determination of UVB "were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations)." *29 U.S.C. § 1401(a)(3)(B)(i)*. The second issue has both a legal and a factual component.

I agree with the Arbitrator that an actuary's use of distinct rates to calculate minimum contribution and withdrawal liability is not prohibited as a matter of law. Additionally, after reviewing the Arbitrator's Final Award and the record as a whole, I uphold the Arbitrator's finding that Manhattan Ford failed to discharge its burden of demonstrating that the actuary's selection of the Segal Blend rate for purposes of withdrawal liability was unreasonable. **[**31]**

---

they retire.'" Employee Benefits Law at 2-29 (citing H.R. Rep. No. 93-1280, 2d Sess., at 283 (1974)(Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5038) (footnote omitted). "The contributing employers are responsible for the contributions to be made to the plan to satisfy the minimum funding requirements, unless the plan is in critical status and the trustees have adopted a rehabilitation plan." *Id*. at 16-65 (footnotes omitted).

*See also* John H. Langbein et al., *Pension and Employee Benefit Law* 165 (6th ed. 2015) ("A defined benefit plan envisions pension promises that may extend across four or five decades, . . An employee may begin to accrue benefits thirty or more years before benefit payments begin, which can be fifty or sixty years before the final benefit check is written. The plan sponsor's challenge is to devise a savings program appropriate to liabilities that are so distant and contingent").

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 191 of 212 PAGEID #: 2185

Page 14 of 27

331 F. Supp. 3d 365, *386; 2018 U.S. Dist. LEXIS 111969, **31

## A. Must the Actuarial Assumptions Underlying Minimum Funding and Withdrawal Liability be Identical?

In the arbitration, Manhattan Ford challenged the Pension Fund actuary's use of the Segal Blend rate to calculate the present value of the Pension Fund's UVB. (Interim Op. at 14.) According to Manhattan Ford, a pension plan, through its actuary, must use the same assumptions for calculating minimum funding requirements and withdrawal liability. (*Id.*) The minimum funding requirements had been calculated on the basis of a 7.5% rate. The use of the lower Segal Blend rate solely for the purpose of calculating withdrawal liability, it claimed, was therefore facially impermissible. (*Id.*) The Arbitrator rejected Manhattan Ford's arguments and determined that an actuary is not required to use the same assumptions for minimum funding and withdrawal liability calculations. (*Id.* at 17.)

I conclude that the Arbitrator was correct as to that narrow issue. The use of disparate rates is not precluded as a matter of statutory law.

### 1. Comparison of statutory language

By statute, actuarial assumptions that are used to determine adequacy of funding and withdrawal liability must satisfy certain requirements. Those requirements **[**32]** are phrased fairly generically in terms of reasonableness and the actuary's best estimate. They are similar, but not identical.

*Section 1084(c)(3)* addresses actuarial assumptions in the context of minimum funding, and *Section 1393(a)* addresses actuarial assumptions in the context of withdrawal liability. *See 29 U.S.C. §§ 1084(c)(3), 1393(a).*

Regarding actuarial assumptions in the context of minimum funding, *Section 1084(c)(3) of ERISA*, entitled "[a]ctuarial assumptions must be reasonable," provides as follows:

[f]or purposes of this section, all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods—
(A) each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and

**[*387]** (B) which, in combination, offer the

actuary's best estimate of anticipated experience under the plan.

*Id. § 1084(c)(3)*. *See also 26 U.S.C. §§ 412(a)(2)(C), 431(c)(3)* (using similar language regarding actuarial assumptions and minimum funding standards for multiemployer plans under the Internal Revenue Code).

Regarding actuarial assumptions in the context of withdrawal liability, *Section 1393(a) of ERISA*, entitled "[u]se by plan actuary in determining unfunded vested benefits of a plan for computing withdrawal liability of employer," provides as follows: **[**33]**

Withdrawal liability under this part shall be determined by each plan on the basis of—
(1) actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan . . . .[39]

*Id. § 1393(a)(1)*.

Manhattan Ford urges that under "ordinary principles of statutory interpretation," Congress's use of the same language in both Sections leads to the conclusion that a plan actuary must use identical assumptions and interest rates in the context of withdrawal liability and minimum funding. (Pl. Br. at 17 (citing *Smith v. City of Jackson, Miss., 544 U.S. 228, 233, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005)* (citing the canon of construction that "identical words used in different parts of the same act are intended to have the same meaning."))). To be sure, a comparison of the language in the withdrawal liability Section (*§ 1393*) and the minimum funding Section (*§ 1084*) reveals significant commonalities. Specifically, both Sections require actuaries to use assumptions that are "reasonable (taking into account

---

[39] The statute provides in the alternative for a UVB determination based on "(2) actuarial assumptions and methods set forth in [PBGC]'s regulations for purposes of determining an employer's withdrawal liability." *29 U.S.C. § 1393(a)(2)*. No such regulations have been promulgated, however.

In making the UVB determination, the actuary may also permissibly "rely on the most recent complete actuarial valuation used for purposes of *Section 412* of Title 26," the Section of the Internal Revenue Code governing calculation of a pension plan's compliance with minimum funding requirements. *29 U.S.C. § 1393(b)(1)*.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 192 of 212 PAGEID #: 2186

Page 15 of 27

331 F. Supp. 3d 365, *387; 2018 U.S. Dist. LEXIS 111969, **33

the experience of the plan and reasonable expectations)" and which, "in combination, offer the actuary's best estimate of anticipated experience [**34] under the plan." 29 U.S.C. §§ 1393(a)(1), 1084(c)(3). However, there is also a difference: While the withdrawal liability Section requires that the assumptions be reasonable "in the aggregate," § 1393(a)(1), the minimum funding Section requires that "each" assumption be reasonable, § 1084(c)(3)(A).

The minimum funding Section, then, requires actuarial assumptions and methods *each of which* is reasonable. The withdrawal liability Section differs in requiring that actuarial assumptions and methods be found reasonable *in the aggregate*. The former standard is tighter, more granular; it invites item-by-item comparison in a way the latter does not. Requiring that all assumptions, taken in the aggregate, be reasonable would seem to grant the actuary (and the Arbitrator) more latitude to craft a solution that is reasonable and fair *overall*, in light of the Plan's experience and expectations. And that is what the Arbitrator found that the actuary did. By focusing solely on the (admittedly important) discount rate number, to the exclusion of the **[*388]** differing contexts of the two calculations, Manhattan Ford fails to give sufficient scope to that standard.

Manhattan Ford recognizes of course that the statute has been amended. *See* Section IV.A.3 (discussing the **[**35]** amendment). It argues, however, that at least one aspect of its argument is untouched by the amendment. The reasonableness requirements, it says, are "*on top of the* mandate that both sets of assumptions must 'offer the actuary's best estimate of anticipated experience.'" (Pl. Reply at 13)(emphasis in original). It argues that the actuary's calculation here flunks that discrete test: "Two divergent assumptions may both be 'reasonable,' but they cannot both be the *same actuary*'s 'best estimate' of the *same thing*" (Id.) (emphasis in original).

As discussed below in Sections IV.A.4 and IV.B.1, these two statutory sections operate in distinct arenas: one in the context of ongoing funding and the other in the context of withdrawal. To adopt Manhattan Ford's terminology, those distinct contexts imply that these actuarial projections are not necessarily estimates of precisely "the same thing." The context of withdrawal liability differs from that of funding in ways that do justify, or at least may permissibly justify, a different approach. Whether that disparity is justified in a *particular* case may raise a factual question; for present purposes,

however, it is sufficient that the statute does **[**36]** not rule out such a disparity in *all* cases, as a matter of law.

*2. Legislative history*

Manhattan Ford also offers arguments that are to some degree anachronistic. One is its citation of the legislative history of Section 1082(c)(3), the predecessor of Section 1084(c)(3), the minimum funding provision.[40]

A relevant legislative report states, as to the "best estimate" language, that "'[t]he conferees intend that under this provision a single set of actuarial assumptions will be required *for all purposes (e.g., for the minimum funding standard, reporting to the Department of Labor and to participants and beneficiaries, financial reporting to stockholders, etc.).*'" (Def. Br. at 17) (quoting H.R. Rep. No. 93-1280, at 284-85 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5065) (emphasis added)).

That funding Section of ERISA, however, was enacted in 1974, six years prior to the enactment of the withdrawal liability section of MPPAA in 1980. "Congress enacted the MPPAA in particular because it found that existing legislation 'did not adequately protect plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." *Flying Tiger Line v. Teamsters Pension Tr. Fund of Phil, 830 F.2d 1241, 1243 (3d Cir. 1987)* (footnote **[**37]** omitted) (quoting *Gray, 467 U.S. at 722*). The legislature, stating in 1974 that actuarial assumptions should be uniform for all purposes, could not have been contemplating a withdrawal liability **[*389]** scheme whose enactment lay years in the future. In short, the Section 1082 funding formulation might just as plausibly be regarded as part of the problem that MPPAA was attempting to remedy.

---

[40] In 1974, Section 1082(c)(3) addressed the actuarial assumptions to be used in determining whether minimum funding standards had been met. It required the use of assumptions that "in the aggregate, are reasonable," and that reflect the actuary's "best estimate" of anticipated plan experience. 29 U.S.C. § 1082(c)(3) (1974). As a result of the *Pension Protection Act of 2006 ("PPA"), Pub. L. No. 109-280*, that language was moved to Section 1084(c)(3) and was also substantively amended in that the reasonableness-related language was changed from "in the aggregate" to "each of which." Section 1082(c)(3) still exists, but it no longer addresses actuarial assumptions. *See* n.41, *infra* (discussing the relevant legislative history in more detail).

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 193 of 212 PAGEID #: 2187

Page 16 of 27

331 F. Supp. 3d 365, *389; 2018 U.S. Dist. LEXIS 111969, **37

I note also that the list of "purposes" requiring a single set of actuarial assumptions, which though not presented as exclusive, does not include withdrawal liability. *See* H.R. Rep. No. 93-1280, quoted *supra* ("the minimum funding standard, reporting to the Department of Labor and to participants and beneficiaries, financial reporting to stockholders, etc."). This, too, may reflect nothing more than Congress's failure to comprehensively address withdrawal liability until the passage of the MPPAA in 1980.

### 3. *Concrete Pipe*

For the proposition that actuarial standards must be uniform, Manhattan Ford relies primarily on the 1993 case of *Concrete Pipe & Prods. v. Construction Laborers Pension Trust, 508 U.S. 602, 113 S. Ct. 2264, 124 L. Ed. 2d 539*. Indeed, Manhattan Ford asserts that in *Concrete Pipe*, the Supreme Court "squarely" adopted the proposition that actuaries must employ the same actuarial assumptions in calculating withdrawal liability and in calculating [**38] minimum funding. Not quite. While this argument has anachronism problems of its own, I also find that the *Concrete Pipe* case does not go as far as Manhattan Ford would wish.

The anachronism is this. The language that Manhattan Ford has quoted from *Concrete Pipe* rested on the proposition that ERISA used entirely "identical language" to describe the actuarial assumptions and methods that must be used in the "different contexts" of withdrawal liability and minimum funding:

> The statutory requirement (of 'actuarial assumptions and methods—which, in the aggregate, are reasonable ...') is not unique to the withdrawal liability context, for the statute employs identical language in *29 U.S.C. § 1082(c)(3)* to describe the actuarial assumptions and methods to be used in determining whether a plan has satisfied the minimum funding requirements contained in the statute.

*Concrete Pipe, 508 U.S. at 632-33* (emphasis added). In 1993, when *Concrete Pipe* was decided, that was true. It was only thirteen years later, in 2006, that the old funding provision was replaced by one which required that "each" actuarial assumption (not the assumptions "in the aggregate") be reasonable.[41] It was only then, in

2006, that the [*390] formerly identical language of these provisions [**39] first diverged as described in Section IV.A.1, *supra*. So *Concrete Pipe*'s discussion of the "identical" statutes must now, post-2006, be taken with a grain of salt.

That is not to say, however, that the case should be disregarded, and I do analyze it here. I conclude, however, that *Concrete Pipe* does not impose a statutory bar; it leaves open the possibility of separate actuarial assumptions being permissibly applied to funding and withdrawal liability.

In *Concrete Pipe,* the Court was not considering the issue presented here. Rather it was hearing a due process challenge to the presumption of correctness that an arbitrator must apply to the plan sponsor's calculation of a plan's UVB. *508 U.S. at 631*. Then, as now, a plan sponsor's calculation of a plan's UVB for a plan year was "presumed correct" unless proven to be unreasonable by a preponderance of evidence. *29 632-33*. At the time of die Court's 1993 decision, *Section 1082*, entitled "minimum funding standards," addressed actuarial assumptions. *Subsection (c)(3)* provided:

> (3) For purposes of this section, all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of *actuarial assumptions and methods*—
>
> (A) in the case of—
>
> (i) a plan other than a multiemployer plan, each of which is reasonable (taking into account the experience of the plan and reasonable expectations) or which, in the aggregate, result in a total contribution equivalent to that which would be determined if each such assumption and method were reasonable, or
>
> (ii) *a multiemployer plan, which, in the aggregate, are reasonable* (taking into account the experiences of the plan and reasonable expectations), and
>
> (B) which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

---

[41] In discussing the actuarial assumptions that must be used for minimum funding purposes, the Court in *Concrete Pipe* cited *ERISA Section 1082(c)(3)*. *Concrete Pipe, 508 U.S. at*

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 194 of 212 PAGEID #: 2188

Page 17 of 27

331 F. Supp. 3d 365, *390; 2018 U.S. Dist. LEXIS 111969, **39

*U.S.C. § 1401(a)(3)(B)(i).*[42] (See pp. 11-13, *supra*.) The

---

*29 U.S.C. § 1082(c)(3) (1993)* (emphasis added).

In 2006, however, *Section 1082* was amended by the PPA. *See C & S Wholesale Grocers, 802 F.3d at 538* (quoting *Trs. of the Local 138 Pension Tr. Fund v. F.W. Honerkamp Co., Inc., 692 F.3d 127, 130 (2d Cir. 2012))* (explaining that Congress "enacted the PPA 'to protect and restore multiemployer pension plans in danger of being unable to meet their pension distribution obligations in the near future.'").

Effective August 17, 2006, the PPA added *Section 1084*, "Minimum funding standards for multiemployer plans." Under the PPA, each actuarial assumption must be individually reasonable, thereby replacing the previous requirement that the assumptions be reasonable in the aggregate. *Section 1084* states, in relevant part:

(3) Actuarial assumptions must be reasonable

For purposes of this section, all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods—

(A) *each of which is reasonable* (taking [**40] into account the experience of the plan and reasonable expectations), and

(B) which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

*29 U.S.C. § 1084(c)(3) (2006)* (emphasis added). *Section 1082* still exists; however, it no longer addresses actuarial assumptions.

The PPA also amended and altered related sections of the Internal Revenue Code. *Inter alia*, it removed the actuarial assumption-related language from *Section 412(c)(3)* and placed it in the newly-created *Section 431(c)(3)*. *See 26 U.S.C. § 431(c)(3) (2006)* (including the same language as *ERISA Section 1084(c)(3)*).

More recently, "[o]n December 16, 2014, Congress passed the *Multiemployer Pension Reform Act of 2014 ("MPRA"). Pub. L. No. 113-235, Div. O, 128 Stat. 2130, 2773-2822* (amending the PPA, *29 U.S.C. §§ 1084-1085* and *26 U.S.C. §§ 431-432*, among other things)." *C&S Wholesale Grocers, 802 F.3d at 538*. *Section 1084(c)(3)* was not amended.

The main upshot, for our purposes, is that under current law, "each" actuarial assumption must be reasonable for the purpose of minimum funding, whereas they must be reasonable "in the aggregate" for purposes of withdrawal liability.

withdrawing employer claimed, however, that the presumption of reasonableness violated its procedural due process rights because the plan trustees were institutionally biased to impose the greatest possible withdrawal liability. The Court, however, upheld the presumption.

One key to the Court's analysis was the moderating effect of professional actuarial standards. Under the statute, the Court noted, "the assumptions and methods used in calculating withdrawal liability are selected in the first instance not by the trustees, but by the plan actuary." *508 U.S. at 632*.

For a variety of reasons, this actuary is not, like the trustees, vulnerable to suggestions of bias or its appearance. Although plan sponsors employ them, actuaries **[*391]** are trained professionals subject to regulatory standards. The technical nature of an actuary's assumptions and methods, and the necessity for applying the same assumptions and methods in more than one context, as a practical matter limit the opportunity an actuary might otherwise have to act unfairly toward the withdrawing employer.

*Id.* (internal citations omitted).

In support of its conclusion, the Court made a second observation, heavily relied on by Manhattan Ford here. Pointing out the (then) "identical language" in ERISA regarding actuarial assumptions for withdrawal liability and minimum funding, the Court found that these matched provisions would "tend[]to check the actuary's discretion in each of them":

Using different assumptions **[**42]** [for different purposes] could very well be attacked as presumptively unreasonable both in arbitration and on judicial review.

[This] view that the trustees are required to act in a reasonably consistent manner greatly limits their discretion, because the use of assumptions overly favorable to the fund in one context will tend to have offsetting unfavorable consequences in other contexts. For example, the use of assumptions (such as low interest rates) that would tend to increase the fund's unfunded vested liability for withdrawal liability purposes would also make it more difficult for the plan to meet the minimum funding requirements of *§ 1082*.

---

[42] *Concrete* **[**41]** *Pipe* also discussed the presumption in *Section 1401(a)(3)(A)*, which is not implicated here.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 195 of 212 PAGEID #: 2189

Page 18 of 27

331 F. Supp. 3d 365, *391; 2018 U.S. Dist. LEXIS 111969, **42

*508 U.S. at 632-33* (alterations in original; internal quotation marks omitted)

The Court concluded that actuarial standards and consistency were sufficient to stave off a due process challenge to the statutory presumption:

> [The withdrawing employer] has not shown that any method or assumption unique to the calculation of withdrawal liability is so manipulable as to create a significant opportunity for bias to operate, and arguably the most important assumption (in fact, the only actuarial assumption or method that [the employer] attacks in terms . . . ) is the critical [**43] interest rate assumption that must be used for other purposes as well.

*Id. at 633* (footnote omitted).[43] The Court did not lay down a requirement of strict uniformity, or deny that certain actuarial considerations might have particular application to withdrawal liability alone. Indeed, the Court pointed out that its point was "not significantly blunted by the fact that the assumptions used by the Plan in its other calculations may be 'supplemented by several *actuarial assumptions unique to withdrawal liability.*'" *508 U.S. at 633* (emphasis added).

There are, then, two answers to Manhattan Ford's argument that *Concrete Pipe* held that there was a statutory ban on divergent discount rates.

The more straightforward (if not quite dispositive) answer is that, as pointed out above, the two sections are no longer "identical," as they were in 1993. Intervening amendments have weakened the notion that today, the funding rate must be used for all "other purposes," including withdrawal liability.

The second, more complex answer is that the Supreme Court's comments were general, were not made in relation to the issue now before this Court, and did not in fact rule out non-identical actuarial assumptions. [*392] At most, the Court [**44] suggested that, under unspecified circumstances, the use of inconsistent assumptions "could very well be attacked as presumptively unreasonable," *id. at 633*—not that it was prohibited *per se*.

On that point, the sparse interpretive case law is in

accord. In *CPC Logistics*, Judge Posner, writing for the Seventh Circuit, seemingly endorsed the Fund's view of *Concrete Pipe*, and rejected that of Manhattan Ford:

> [*Concrete Pipe*] could be read to suggest that having two different interest-rate assumptions—one for withdrawal liability and one for avoiding the tax penalty—might make a plan vulnerable to claims that either or both were 'unreasonable' within the meaning of *29 U.S.C. § 1393(a)(1)*. The danger was remote; the Court had indicated that "supplemental" assumptions that might cause the rates to diverge were permissible. *508 U.S. at 633, 113 S. Ct. 2264*.

*698 F.3d at 354-55*. "Vulnerability" to a charge of "unreasonableness" is a far cry from "prohibited." And indeed, *CPC* upheld the arbitrator's disallowance of the plan's "questionable" decision to adopt the funding rate for withdrawal liability purposes, because it appeared that in fact the Segal Blend, not the funding rate, embodied the actuary's "best estimate." *698 F.3d at 356*. That, of course, is the opposite of the result sought by [**45] Manhattan Ford here.

In *N.Y. Times, supra*, District Judge Robert W. Sweet of the Southern District of New York acknowledged *Concrete Pipe*'s description of the funding rate assumption as one that "must be used for other purposes as well." *2018 U.S. Dist. LEXIS 49813, 2018 WL 1517201 at *13* (citing *508 U.S. at 633*). "In the same breath, however," he wrote, "the [*Concrete Pipe*] Court stated that the 'assumptions used by [a] Plan in its other calculations may be supplemented by several actuarial assumptions *unique* to withdrawal liability.'" *Id.* (quoting *508 U.S. at 633*) (emphasis added, internal quotation marks omitted). Thus Judge Sweet, like Judge Posner, rejected the interpretation that *Concrete Pipe* had imposed a *per se* ban on using different discount rates for purposes of funding and withdrawal liability:

> The expectation is that a standard, uniform interest rate is applied in all contexts, and any deviation 'could very well be attacked as presumptively unreasonable both in arbitration and on judicial review.' . . . That does not mean, however, that deviation is, at all times, impermissible by law— were that the case, the Court would not have included the open-ended 'could very well be' language rather than something more definitive.

*Id.* (internal citations omitted).

*Concrete Pipe*, [**46] the main authority cited by Manhattan Ford, therefore does not require adoption of

---

[43] The Court also discussed the employer's burden of proof under *Section 1401(a)(3)(B)(i)*. I will discuss that aspect of the opinion in Section IV.B.1, *infra*,

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 196 of 212 PAGEID #: 2190

Page 19 of 27

331 F. Supp. 3d 365, *392; 2018 U.S. Dist. LEXIS 111969, **46

the *per se* rule for which Manhattan Ford advocates. And the case law interpreting *Concrete Pipe* is in accord.

### 4. *Miscellaneous differences in context*

Finally, the differing contexts of funding and withdrawal support the idea that Congress did not mean to categorically rule out any divergence between them as to the actuarial assumptions used.

Both funding and withdrawal require actuarial predictions as to the fund's future; to that extent their concerns are parallel. And to be sure, Manhattan Ford is not wrong to cite the canon of construction that "identical words used in different parts of the same act are intended to have the same meaning." It is perhaps a bit facile to refer to "different parts of the same act" when we are actually talking about ERISA and MPAAA, statutory enactments separated by years, the latter of  **[*393]** which was intended to remedy gaps and deficiencies in the former. In any event, however, the presumption may be overcome when "there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act **[**47]** with different intent." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel Cybergenics Corp. v. Chinery, 330 F.3d 548, 559 (3d Cir. 2003)* (en banc) (quoting *Atl Cleaners & Dyers v. United States, 286 U.S. 427, 433, 52 S. Ct. 607, 76 L. Ed. 1204 (1932))*.

Minimum funding and withdrawal liability are different concepts under ERISA with different, although related, policy concerns. Moreover, one cannot ignore the limiting language in each Section. The withdrawal liability Section is prefaced with the language "[w]ithdrawal liability. . . under *this* part," *29 U.S.C. § 1393(a)* (emphasis added), while the minimum funding Section is prefaced with the phrase "[f]or purposes of *this* section," *id. § 1084(c)(3)* (emphasis added). This suggests that Congress viewed minimum funding and withdrawal liability as distinct calculations warranting the use of different assumptions by actuaries. If total parallelism were mandated, a cross-reference or a common definition would have been a more natural way to draft the statutes.

Furthermore, the Pension Fund correctly points out that in *Section 1393(a)(2), the PBGC* was given the authority to provide actuarial assumptions to be used in the calculation of withdrawal liability only. Such a delegation would have been unwarranted if *Section 1393* wholly precluded the use of assumptions that were not the minimum funding assumptions.

I consider also that funding and withdrawal invoke some disparate concerns, which I discuss further in section **[**48]** IV.B.2, *infra*. Funding is an ongoing process, subject to adjustment for an employer that is remaining in the plan. The Plan's needs and actuarial projections are reassessed annually, and a participating employer may be required to make additional contributions to make up for any shortfall. Withdrawal liability, however, is calculated once, as of the time of withdrawal. Should the unexpected occur after that employer's departure, the burden may unfairly fall on other plan employers (or ultimately the taxpayer, through PBGC). As discussed in more detail below, a responsible actuary might therefore opt to calculate that withdrawal liability on a more risk-averse or conservative basis. And it must always be remembered, of course, that ERISA is a remedial statute, which must be liberally construed to ensure that workers who were promised pension benefits will actually receive them.

For all of these reasons, I conclude that ERISA imposes no *per se* ban on the use of different actuarial assumptions for purposes of funding and withdrawal liability. I therefore move to the question of whether the Arbitrator erred in permitting application of the Segal Blend under the circumstances of this case. **[**49]**

### B. Did the Arbitrator Err in Upholding the Application of the Segal Blend?

Manhattan Ford argues that the Pension Fund's actuary violated *Section 1393(a)(1) of ERISA* by not using the 7.5% funding rate, which represented her "best estimate of anticipated experience under the plan," and instead using the Segal Blend, which did not. (Pl. Br. at 9-13.) The Segal Blend, recall, represents a combination of the 7.5% funding rate and the PBGC risk-free rate. The PBGC component of the Segal Blend does not satisfy the applicable standard, says Manhattan **[*394]** Ford, because "the Fund is not principally invested in risk-free assets" and "does not intend to use Manhattan's withdrawal liability payments to buy such assets." (Pl. Br. at 11.) Rather, an average annual investment return of 7.5% would be the "best estimate of anticipated experience under the plan." (*Id.* at 12.) As a result, says Manhattan Ford, the actuarial assumptions used in the withdrawal liability determination were unreasonable "in the aggregate."[44] (*Id.* at 24.) See *29 U.S.C. §*

---

[44] As noted above, Manhattan Ford does not challenge any

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 197 of 212 PAGEID #: 2191

Page 20 of 27

331 F. Supp. 3d 365, *394; 2018 U.S. Dist. LEXIS 111969, **49

1401(a)(3)(B)(i).

Manhattan Ford seeks to present this issue as a pure question of ERISA law. As I have already held, there is no legal mandate that funding and withdrawal be calculated on identical actuarial assumptions, which disposes [**50] of much of the legal issue. What remains is a mixed question of the application of the law to the facts. Because, as I find, the Arbitrator did not err as a matter of law, the issue here is not what another actuary would have done, or whether the court would have favored another approach, but rather whether the Arbitrator committed clear error.

In Section IV.B.1, I find that the Arbitrator did not err in his interpretation of the governing legal standard. In Section IV.B.2, I summarize the evidentiary record, and in Section IV.B.3, I conclude that the Arbitrator did not commit clear error in finding that Manhattan Ford failed to overcome the presumption of correctness of the actuary's best estimate.

*1. "Best estimate" as a procedural standard that defers to actuarial expertise*

ERISA does not define the phrase "best estimate of anticipated experience under the plan." *See* 29 U.S.C. § 1393(a)(1); § 1084(c)(3)(B). However, case law provides some guidance. Even in the context of minimum funding, "courts have generally accepted the view that the 'best estimate' standard is procedural only and that actuarial assumptions may properly err on the side of conservatism and overfunding." Jay Conison, Employee Benefit Plans in a Nutshell [**51] 441 (3d ed. 2003) (citing *Citrus Valley Estates, Inc. v. C.I.R., 49 F.3d 1410 (9th Cir. 1995)*; *Rhoades, McKee & Boer v. United States, 43 F.3d 1071 (6th Cir. 1995))*. *See also* Langbein, et al., *supra*, at 166 (stating that "[t]he courts have interpreted the 'best estimate' requirement (previously contained in *IRC § 412(c)(3)*) in a fashion that gives actuaries tremendous leeway in selecting assumptions").

In *Citrus Valley Estates*, for example, the United States Court of Appeals for the Ninth Circuit considered an appeal from the Tax Court regarding the then-current "best estimate" provision of *section 412(c)(3) of the Internal Revenue Code*.[45] Following the Second and

Fifth Circuits, it [*395] rejected the Commissioner of Internal Revenue's argument that "by endorsing the use of conservative actuarial assumptions, the Tax Court effectively read the 'best estimate' provision out of *section 412(c)(3)*." *49 F.3d at 1414*. In other words, the Commissioner's position was that "an assumption cannot be an actuary's 'best estimate' if it reflects a more conservative view of an anticipated plan experience than the actuary believes is likely." *Id.*

The Tax Court's review was too intrusive, [**52] said the Court of Appeals in *Citrus Valley*. Actually, the actuary retained great leeway:

> This statutory scheme serves the dual but sometimes conflicting goals of guaranteeing adequate plan funding while preventing taxpayer abuse. Within the range of reasonableness, Congress assigned the task of balancing these goals to actuaries. We will not narrow the statutory gap between the Scylla of underfunding and the Charybdis of tax penalties.' . . . So long as the actuary's funding decisions fall within the range of reasonableness, the substantive provisions of *section 412(c)(3)* are satisfied.

> This means that the 'best estimate' provision of *section 412(c)(3)*, properly construed, is essentially procedural in nature. . . The 'best estimate' language is 'principally designed to insure that the chosen assumptions actually represent the actuary's own judgment rather than the dictates of plan administrators or sponsors.'

*Id.* (internal citations omitted). It further noted that "[t]he

---

> required, as a prerequisite for deductibility, that the calculation of the minimum funding contribution

> be determined on the basis of actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

*26 U.S.C. § 412(c)(3)*. The 2006 PPA removed that Section; however, the PPA added *Section 431*, which incorporated similar language in *subsection (c)(3)*, and, as stated above, it also added *ERISA Section 1084*. Notably, the "best estimate of anticipated experience under the plan" provision is still in place. However, the Internal Revenue Code, like ERISA, now requires that for minimum funding, the actuarial assumptions and methods must "each" be reasonable rather than reasonable "in the aggregate."

---

actuarial assumption aside from the discount rate. (Joint Stip. of Facts ¶ 12.)

[45] At the time, *Section 412(c)(3) of the Internal Revenue Code*

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 198 of 212 PAGEID #: 2192

Page 21 of 27

331 F. Supp. 3d 365, *395; 2018 U.S. Dist. LEXIS 111969, **52

mere fact that the challenged assumptions fell on the conservative end of the acceptable range does not render them invalid as a matter of law. Conservative assumptions result in a higher level of initial plan funding, which helps ensure that IDB plans [**53] will be able to deliver the promised retirement benefit when due, clearly one of ERISA's most important goals." *Id. at 1414-15*.

Similarly, in *Vinson & Elkins v. C.I.R., 7 F.3d 1235, 1238 (5th Cir. 1993)*, the Fifth Circuit adopted the procedural view of the IRC "best estimate" provision, and rejected the Commissioner's assertion that it imposed an additional *substantive* hurdle:

> The statute refers to the *actuary's* best estimate, not that of a court or of outside experts. Further, by entrusting actuaries with the task of determining plan contributions, and by granting the latitude inherent in the statutory reasonableness test, Congress intended to give actuaries some leeway and freedom from second-guessing. *See* H.R. Rep. No. 807, 93d Cong., 2d Sess. 27 (1974) U.S. Code Cong. & Admin. News 4639, 4670, *reprinted in* 2 Subcomm. on Labor of the Senate Comm. on Labor 85 Public Welfare, 94th Cong., 2d Sess., *Legislative History of the Employee Retirement Income Security Act of 1974*, at 3115, 3147 (Comm. Print 1976) (rejecting imposition of uniform actuarial methods and assumptions): "[A]ny attempt to specify actuarial assumptions and funding methods for pension plans would in effect place these plans in a straitjacket ... and would be likely to result in [unreasonable] [**54] cost estimates." Adding a second, more rigorous level of substantive review via the best estimate test would frustrate that goal. Moreover, a second substantive test would render the reasonableness test superfluous.

*Id. See Wachtell, Lipton, Rosen & Katz v. C.I.R., 26 F.3d 291, 296 (2d Cir. 1994)* (citing *Vinson & Elkins* and stating that the "best estimate" requirement is "basically procedural in nature and is principally designed to insure that the chosen assumptions actually represent the actuary's own judgment rather than the dictates of plan administrators or sponsors").

[*396] Generally, it should not be difficult to establish that the actuary's stated conclusions represent the actual exercise of his or her best judgment. Of course, the case law leaves open the possibility of proof that an actuary succumbed to improper influence. *See Huber v. Casablanca Indus., 916 F.2d 85, 93 (3d Cir. 1990)*,

abrogated on other grounds by *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 115 S. Ct. 981, 130 L. Ed. 2d 932 (1995)* (noting that "an actuary selected and paid by the trustees" may be biased in favor of the pension fund, and finding that a withdrawal liability calculation was not the actuary's best estimate when there was evidence that the Board of Trustees pressured the actuary to revise his initial withdrawal liability calculation and instead calculate withdrawal liability based on assumptions that were in the [**55] best interests of the Fund). Here, however, there is not so much as an allegation, let alone proof, that this Plan's actuary was improperly influenced by the Plan trustees or anyone else.

Minimum funding cases, I recognize, must be applied with care in the separate context of withdrawal liability. On the limited issue of procedural deference to actuaries' professionalism, however, I find those cases persuasive. They are, moreover, consistent with *Concrete Pipe's* general discussion of the role of the actuary as a buffer between the Plan's natural low-rate bias and the selection of an appropriate rate.

The "best estimate" provision, then, does not embody a substantive standard so much as it commits the issue to the judgment of the actuary. The Arbitrator thus proceeded correctly in his deferential analysis of the question of whether the actuarial assumptions chosen were reasonable in the aggregate. And I think that the deference owed to the actuary extends to an actuary's determination, in a particular case, that a lower rate may be required at the withdrawal stage than is required at the funding stage.

I reiterate that in arbitration stage, Manhattan Ford had the burden of overcoming the [**56] presumption of correctness by proving by a preponderance of the evidence that the actuarial assumptions were, "in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations)." *29 U.S.C. § 1401(a)(3)(B)(i)*. Legislative history reveals that the intent was to avoid a case-by-case assessment in which the plan as decision-maker would have to prove the reasonableness of its own judgments:

> The series of presumptions prescribed by the Multiemployer Act were intended by Congress to 'ensure the enforceability of employer liability. In the absence of these presumptions, employers could effectively nullify their obligation by refusing to pay and forcing the plan sponsor to prove every element involved in making an actuarial

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 199 of 212 PAGEID #: 2193

Page 22 of 27

331 F. Supp. 3d 365, *396; 2018 U.S. Dist. LEXIS 111969, **56

determination.'

*Eberhard Foods, Inc., 831 F.2d at 1260* (quoting H.R. Rep. No. 869, pt. I, 96th Cong., 2d Sess. 1, 86, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2954). In discussing ERISA's presumption of correctness for a plan's determination of UVB, the *Concrete Pipe* Court emphasized the "technical nature of an actuary's assumptions and methods," and the fact that "[a]lthough plan sponsors employ them, actuaries are trained professionals subject to regulatory standards." *508 U.S. at 632*. Thereafter, **[**57]** the Court discussed the aggregate "sense of reasonableness that must be disproven by an employer attacking the actuary's methods and assumptions." *Id. at 634*.

> Since the methodology is a subject of technical judgment within a recognized professional discipline, it would make **[*397]** sense to judge the reasonableness of a method by reference to what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation. Accordingly, an employer's burden to overcome the presumption in question . . . is simply a burden to show that the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary. In practical terms it is a burden to show something about standard actuarial practice, not about the accuracy of a predictive calculation, even though consonance with professional standards in making the calculation might justify confidence that its results are sound.

*Id. at 635*. To phrase it differently, "[t]he employer merely has a burden to show that an apparently unbiased professional, whose obligations tend to moderate any claimed inclination to come down hard on withdrawing employers, has based a **[**58]** calculation on a combination of methods and assumptions that falls outside the range of reasonable actuarial practice."[46] *Id.*

---

[46] Over five and a half years before *Concrete Pipe*, the Sixth Circuit expressed a similar view in *Eberhard Foods, 831 F.2d at 1263*. It stated: "the employer is not entitled to what we as judges would say is the best or *most* reasonable method of calculating withdrawal liability. Rather, the employer is only entitled to complain if he proves that the actuarial assumptions applied by the trustees in the aggregate are *unreasonable*." *Id.* (emphasis in original). Furthermore, in *Combs v. Classic Coal Corp., 931 F.2d 96, 99-100, 289 U.S. App. D.C. 251 (D.C. Cir.*

### 2. The record before the Arbitrator

The Pension Fund actuary, Ms. Gleave, testified that under the Actuarial Standards of Practice ("ASOP"), "every actuary needs to look at the purpose **[**59]** of the measurement before you know what assumptions you can use."[47] (Arb. Hrg. Tr. 85:17-:20.) "For purposes of funding," she said, an investment-return assumption **[*398]** "represents the anticipated experience of the multiemployer plan's actual invested assets." (*Id.* at 87:24-88:5.) Ms. Gleave testified that "for purposes of the ERISA funding requirements," 7.5% represented her "best estimate of the anticipated experience" of the Pension Fund's assets. (*Id.* at 84:25-85:3, 89:22 to 90:2.)[48] At her deposition, she explained that for minimum funding, she would confine herself to a long-term interest-rate assumption because for purposes of minimum funding, the plan's assets are invested and expected to earn returns over the long-term. (Gleave Dep. 52:2-:10.)

---

*1991)*, also decided before *Concrete Pipe*, the District of Columbia Circuit adopted a similar view of the actuary's paramount role:

> Actuarial valuations are based upon and reflect the experience of the plan, the professional judgment of the actuary, and the theories and expectations to which the actuary ascribes. Great differences of opinion exist as to actuarial methods. Congress, tiierefore, created the statutory presumption in favor of witiidrawal determinations expressly to forestall endless disputes 'over technical actuarial matters with respect to which there are often several equally 'correct approaches.' S. 1076, *The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration*, 98th Cong., 2d Sess. 21 (1980). In the absence of this presumption, 'employers could effectively nullify their obligation by refusing to pay and forcing the plan sponsor to prove every element involved in making an actuarial determination.' H.R. Rep. No. 869, pt. I, 96th Cong., 2d Sess. 1, 86, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2954.

That standard, although deferential and procedural, is not toothless. At the hearing, the parties' witnesses agreed that the concept of a "best estimate" implies that an actuary is at least attempting to choose a figure where the likelihood that the investment return will be exceeded is equal to the likelihood that it will not—a 50/50 proposition. (Arb. Hr. Tr. 59:18-61:12, 66:5-:10, 118:4-:12.) However, they disagreed as to whether use of the Segal Blend struck that balance, a factual issue as to which the Arbitrator heard testimony. In the following section, I analyze the factual record compiled in the

331 F. Supp. 3d 365, *398; 2018 U.S. Dist. LEXIS 111969, **59

As to her withdrawal liability calculation, Ms. Gleave explained that she did not find it appropriate to use the 7.5% investment-return assumption as the discount rate for unfunded liabilities. (Arb. Hr. Tr. at 92:2-:9.) Instead, she used the Segal Blend, so called because it is a blend of the 7.5% and the PBGC rates. (*Id.* at 92:7-:19.) Ms. Gleave testified that the Segal Blend "reflects anticipated experience for the portion of the **[\*\*60]** liability that uses the funding interest rate" of 7.5%. (*Id.* at 99:3-:6.)[49] In other words, the 7.5% portion of the Segal Blend reflects "anticipated experience under the plan," (*id*, at 99:21-:24), while the PBGC portion of the Segal Blend "does not reflect the anticipated periods of experience under the plan." (*Id.* at 99:25-100:4.)[50] Accordingly, the discount rate that results from applying the Segal Blend reflects the "best estimate of anticipated experience under the plan," but only "in part." (Gleave Dep. 57:13-:17).[51]

The difference, Gleave explained, is explained by the differing purposes of the two calculations and the differing nature of the risk as to each. She stated that she viewed withdrawal liability, not as a simple actuarial forecast, but as a one-time "settlement" between the Pension Fund and the withdrawing employer:

[F]or purposes of ongoing funding, I use the 7-and-

a-half percent. For purposes of withdrawal liability, which I view to be a settlement with an employer at the point of withdrawal, I will use the Segal Blend assumptions, and that is my best estimate assumptions for withdrawal liability.

(Arb. Hr. Tr. 119:19-120:2.) She then elaborated on the concept of a "settlement **[\*\*61]** with the employer":

[In the context of withdrawal liability,] you have one shot to assess the employer, settlements, at the point of withdrawal. It's done using this blend, which is reflective of current market conditions, because you have no ability to go back to that [withdrawn] employer and get additional money should the plan incur losses. Likewise . . . on the upside as well. There's no ability, after the one assessment is done, that's the settlement at that point in time for that employer **[\*399]** as to what their obligations to the plan would be.

(*Id.* at 120:5 to :16; 122:24-:25.)

The Pension Fund's expert, Mr. Levy, elaborated on the concept of an employer's withdrawal as the equivalent of a final settlement, taking into account both funded and unfunded liabilities. Such settlements, he stated, are made in the United States at market value. (*Id.* at 135:13-23, 158:15-:18). Thus Levy fortified the rationale behind use of the Segal Blend rate:

We said, to the extent that [the plan is] funded, we could treat this as a settlement and what it would cost you to settle with regard to the assets that were already there, because you can only settle what you can - what you have assets to settle with. **[\*\*62]** You can't settle the liabilities that are going to be paid off over 15 or 20 years into the future.

So under the circumstances, admittedly, we came to the conclusion that we ought to use a market settlement, which is the PBGC rates and market value of assets, to the extent funded, and [for the unfunded portion] we could use the [investment-return] assumption as [a] long-term proxy over the next 20 years for what you could do when the money came in that wasn't coming in immediately, that was being paid by the employer over quarterly payments for up to 15 or 20 years.

(*Id.* at 136:16-137:9; *see also id.* at 139:19-:20; Levy Report ¶ 10 (explaining that "[t]he foundation of the Blend is that the portion that is already funded should be valued at market (because that portion could actually be

---

arbitration.

[47] Ms. Gleave was referring to ASOP No. 27, entitled "Selection of Economic Assumptions for Measuring Pension Obligations." Under Sections 3.3(a) and 3.6.3(a), ASOP recommends that actuaries consider the purpose of the measurement when selecting economic assumptions, including the investment-return assumption. (ASOP No. 27 at 4, 7.)

[48] *See also* Arb. Hrg. Tr. 87:11-:17 (acknowledging mat 7.5% represented her "best estimate of the potential return outcomes," considered "for purposes of the funding of the plan"); *id.* at 112:6-:12 (stating that for purposes of funding the plan, the 7.5% assumption was her "best estimate of the long-term returns on this fund's assets."); *id* at 117:18-:23 (recognizing that 7.5% is her best estimate of how the plan's assets will perform over the long term).

[49] Ms. Gleave was here referring to her deposition testimony. (Gleave Dep. 7:10-:12.)

[50] *See* (Gleave Dep. 58:2-:8.)

[51] Mr. Levy similarly testified that the Segal Blend takes into account the actuary's best estimate of future experience of the plan "[i]n effect, for the unfunded portion, which is the portion the . . . withdrawing employer is going to pay off over up to 20 years, we use the funding assumption." (Arb. Tr. 142:5-:8).

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 201 of 212 PAGEID #: 2195

Page 24 of 27
331 F. Supp. 3d 365, *399; 2018 U.S. Dist. LEXIS 111969, **62

settled), whereas the unfunded portion that will be funded over a period of years into the future should be valued on funding assumptions").) In short, the unfunded portion posed unique risks, requiring a conservative response from an actuary.

Levy explained that the withdrawal situation was unique in that it represented, not an ongoing funding relationship, but a one-time transfer of risk from the withdrawing **[**63]** employer to the continuing employers and participants.[52] For that transfer, he implied, a premium must be paid; the transfer of risk of the investments' performance "has a price." (Arb. Hrg. Tr. 141:19-:20, 143:11-:19. *See id.* at 160:11-:16.) The plan trustees may make various investment choices in the future; they may even hypothetically choose to pay a premium to offload the risk to a third party through an annuity or otherwise. Those possibilities, he explained, should not affect the actuary's choice of the Segal Blend, because as of the withdrawal date, the withdrawing **[*400]** employer has shed its own risk by transferring it to the Fund:

> Whether or not [the Plan trustees] choose to get rid of that risk by buying annuities doesn't affect the fact that the risk has been transferred. And the markets say, when you transfer a risk, there is a price to be paid for doing so. Somebody else is taking the risk for you, then the price is not the

---

[52] *See* Moore, Understanding Employee Benefits Law at 31 (stating that in a defined benefit plan, "the employer is said to bear the investment risk").

Mr. Levy's Report provided an explanation of settlements:

> Legally, there are only two ways that a multiemployer plan can settle a pension benefit obligation. One, payment to the participant of the lump sum present value of the obligation, **[**64]** is not available except with respect to small benefits, and therefore is inapplicable. The other is the purchase of an annuity from an insurance company. Thus, the market value of a plan's vested benefit obligations can only be determined by reference to the rates charged by insurance companies to pension plans that wish to settle some or all of their obligations. Unfortunately, insurance companies do not publish or otherwise make available their rates for assuming benefit obligations from pension plans. They do, however, furnish information on their actuarial basis for actual bids in the open, competitive marketplace to the Pension Benefit Guaranty Corporation (PBGC). PBGC then reviews this information and publishes interest rates consistent with the information provided by the insurance companies. (Levy Report ¶ 6.)

same as if you're taking it yourself.[53]

(*Id.* at 143:11-:24. *See also id.* at 144:7-:17.)

Mr. Levy therefore **[**65]** described the use of the Segal Blend as reflecting a "*risk-adjusted* expected experience." (*Id.* at 160:4-:5. Emphasis added.) The anticipated experience has been adjusted "to reflect the fact that the risk has been transferred," he explained:

> It's really a risk adjustment that says, this is a final settlement with the withdrawing employer, and to the extent that it is possible because the assets are there to make a final settlement of the withdrawing employer's obligation, that should be done at market value.
>
> Whether or not the trustees choose to, in fact, buy annuities or set those obligations, they are still taking the risks related to those obligations and the withdrawing employer is not.

(*Id.* at 153:3-:12. *See* Levy Report ¶ 8 (explaining the logic of the risk transfer theory).)

Manhattan Ford's expert, Mr. French, on the other hand, opined that use of the Segal Blend was unreasonable. Because the discount rate is "such an important assumption," he said, use of an incorrect rate was sufficient to render the assumptions "unreasonable in the aggregate." (Arb. Hrg. Tr. 50:13-:19, 55:24-57:7.) He reached that conclusion based on the language in Section 3.6 of ASOP No. 27 and his view that the "best estimate of **[**66]** anticipated experience under the plan" "has to be the [investment] return on the assets, because there is no other experience that you could be looking at." (*Id.* at 29:2-:6, 39:5-:18.) Under Section 3.6 of ASOP No. 27, he testified, the 7.5% investment-return assumption should have been used to calculate the Pension Fund's withdrawal liability:

> Because there is a pool of assets that is clearly dedicated and must be dedicated to it and because the statute doesn't point you to something other than this. It in fact says you must use the

---

[53] Mr. Levy further elaborated on the functioning of the Segal Blend:

> [It] is looking at what the market in the form of annuity purchase rates would charge you to transfer that obligation. It isn't looking at a portfolio as such. It's looking at what it would take to have somebody else take over the responsibility. That is what . . . the market would charge for transferring that liability from the plan to an insurance company.

(Arb. Hr. Tr. 159:17-:24.)

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 202 of 212 PAGEID #: 2196

Page 25 of 27

331 F. Supp. 3d 365, *400; 2018 U.S. Dist. LEXIS 111969, **66

anticipated experience under the plan, so the statute itself is directing you to the investment return.

(*Id.* at 39:12-:18.) Mr. French objected that the Segal Blend is not tied to the Plan's actual investment intentions for the future:

It doesn't even purport to represent the anticipated experience under the plan unless . . . the plan has said or represented that it is, in fact, going to purchase annuities or it is, in fact, going to take those withdrawal liability payments and put it into a separate investment vehicle that is only invested in corporate bonds, and I have never seen that situation.

(*Id.* at 49:10-:18.) Here, said Mr. French, the Pension Fund is "already overfunded **[**67]** on the actuary's best estimate assumptions" **[*401]** and Manhattan Ford "is making it even more overfunded" by having to make withdrawal liability payments. (*Id.* at 52:8-:10.) He admitted that he was aware that some actuaries use the Segal Blend or another form of blended rate to calculate withdrawal liability, but said that he was unaware of the justification for such use. (*Id.* at 72:6-:11.)

Mr. French rejected the Pension Fund experts' concept of withdrawal liability as a settlement, or the Segal Blend as reflecting a "risk-adjusted" approach to the Fund's experience. According to Mr. French, when an employer withdraws and therefore permanently ceases its obligation to contribute, it is not settling any benefit plan liability because it never had an obligation to pay the plan's benefit liabilities; that obligation belongs to the pension plan's trustees. (Arb. Hr. Tr. 172:17-:19, 173:19-174:1.) An employer "can't settle something he never had an obligation for," he testified. (*Id.* at 172:19-:21.) Mr. French did, however, recognize that if the plan does not perform as expected under his investment-return assumption, there may be consequences for those remaining in the Plan. These include increased **[**68]** contributions, reduced future benefit accruals, and so forth. (*Id.* at 175:10-:19.)[54] According to Mr. French, once the employer has withdrawn, the plan trustees have the option of using the employer's withdrawal liability payments to buy annuities; "They could go and put a separate fund and guarantee that this isn't a problem. But they've chosen not to do that.

They want the benefit of that extra return." (*Id.* at 182:25-183:5.)

### 3. Analysis

My analysis of the record starts from the premise that protection of Plan participants, so long as it reflects professional actuarial judgments and not the self-interested bias of the Plan itself, *see* Section IV.B.1, *supra*, is a permissible, indeed a paramount, goal. *See IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 127 (3d Cir. 1986)* ("Courts have indicated that because ERISA (and the MPPAA) are remedial statutes, they should be liberally construed in favor of protecting the participants in employee benefit plans."); *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs., Local Union No. 66, 580 F.3d 185, 194 (3d Cir. 2009)* (describing the purpose behind ERISA and the MPPAA as "ensuring that pension funds will be adequately funded, even when employers withdraw from them, and that the employees who are relying on those funds will be protected"). Based on the testimony, the Arbitrator upheld the Pension Fund actuary's **[**69]** "best estimate" that the context of withdrawal liability permitted application of the Segal Blend discount rate, not the funding rate. The evidence fully supported the Arbitrator's decision that the actuary permissibly took a conservative risk-adjusted stance. The Arbitrator permissibly accepted the actuary's position that withdrawal liability represents a one-time settlement of obligations, not an ongoing calculation of contribution rates. Of course there was expert testimony to the contrary, and another arbitrator could have found it persuasive. But "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson, 470 U.S. at 574*.

ERISA, to be sure, does not use the words "settlement" or "risk-adjusted expected experience." The statutory standard of "reasonableness," however, is **[*402]** open-textured and deferential. It is capacious enough to permit an actuary, in his or her professional judgment, to adopt such an approach. And the record was adequate to demonstrate that the Plan's actuary validly adopted such an approach here based on reasonable professional judgments. As the Arbitrator pointed out in his Final Award, a valuation is "a snapshot," **[**70]** but "[o]ne cannot rely on the fact that the Plan is fully funded now to say that the Plan will be fully funded for all time." (Final Op. at 14 (citing Arb. Hr. Tr. 120:17-122:23).) As emphasized by the Pension Fund, a withdrawn

---

[54] Mr. Levy similarly acknowledged that if the Pension Fund cannot meet its obligation of paying benefits, one possibility is that the employers may engage in a mass withdrawal (*id.* at 168:24-169:22)—the proverbial rush for the exits.

331 F. Supp. 3d 365, *402; 2018 U.S. Dist. LEXIS 111969, **70

employer's obligations are fixed as of the withdrawal date; the ongoing investment risk is transferred to the pension plan and the remaining employers. (Def. Brf. at 13, 15.) It was therefore not unreasonable, as found by the Arbitrator, for the actuary to use a conservative model that recognizes the different *nature* of future risks with respect to withdrawing employers and continuing employers. (*See* Levy Dep. 66:5-:20.)

The Arbitrator did not clearly err in finding that Manhattan Ford failed to meet its burden to rebut the reasonableness of the actuary's approach. I do not overlook Manhattan Ford's argument that the use of the Segal Blend results in a withdrawal liability figure that is expected to overfund[55] its share of the benefits. It may be true, moreover, that the PBGC-rate component will not turn out to correspond to actual fund investments. (For that matter, the Fund could someday decide to change its investment mix in a way that undermines the 7.5% rate **[**71]** as well.) The "best estimate of anticipated experience under the plan," however, may reflect factors other than the Plan's commitment to some future investment portfolio. The testimony of the Pension Fund's actuary, Ms. Gleave, and that of its expert, Mr. Levy, amply support the Arbitrator's finding that the actuary's use of the Segal Blend represents their professional judgment and satisfies professional standards.[56]

---

[55] At the hearing, Mr. French, Manhattan Ford's expert, testified that as of the snapshot at the time, the Pension Fund is "110 percent funded, and it's also got a very healthy contribution rate." (Arb. Hrg. Tr. 176:13-:15.) He opined that because die Pension Plan "is so well-funded and has such a good contribution rate, so much money coming into benefits" (*id.* at 176:18-:20), the likelihood that the 7.5% investment-return assumption would be achieved or exceeded is "probably better than" 50%. (*Id.* at 177:19.) However, as noted by the Arbitrator, he "did not opine on how much better tiiat likelihood was." (Final Op. at 14.) Furthermore, upon further questioning, Mr. French also acknowledged that the plan's funded state "absolutely" could change. (Arb. Hr. Tr. 177:20-:21).

[56] One such published standard, as the Arbitrator found, is Section 3.6 of ASOP No. 27. Section 3.6, entitled "Selecting an Investment Return Assumption and a Discount Rate," states in relevant part:

> The investment return assumption reflects anticipated returns on the plan's current and funded assets.

> The discount rate is used to determine the present value of expected future plan payments. Generally, the appropriate discount rate is the same as the investment

**[*403]** I am not persuaded by Manhattan Ford's characterization of the Arbitrator's reliance on the risk-transfer theory as "factually misguided." (Pl. Br. at 13.) The situation, says **[**72]** Manhattan Ford, is symmetrical; while the remaining employers bear the risk of underperformance, the withdrawn employer bears the opportunity risk of overperformance, and those risks are "equally likely to occur." (*Id.* at 13-14.)[57] One short answer to that contention is that ERISA, a remedial, pro-employee statute, may properly be regarded as *not* considering those risks to be equivalent; an actuary, and arbitrator, or a court might permissibly err on the side of safety for the plan participants.

At any rate, the Arbitrator could properly rely on the testimony regarding the withdrawn employer's transfer of its risk in a one-time settlement transaction. Viewed in light of the remedial purposes of ERISA, the symmetry is a false one; post-withdrawal, the Pension Fund

---

return assumption. But for some purposes, such as SFAS No. 87 or unfunded plan valuations, the discount rate may be selected independently of the plan's investment return assumption, if any. In such cases, the discount rate reflects anticipated returns on a hypodietical asset portfolio, rather than on the plan's expected investments.

(ASOP No. 27 at 5). The "best-estimate range" is defined in Section 2.1 of ASOP 27 as "the narrowest range within which the actuary reasonably anticipates that the actual results, compounded over the measurement period, are more likely than not to fall." (*Id.* at 2.)

Manhattan Ford argued that because the two specified exceptions did not apply, the Pension Fund actuary was required to use the same discount rate and investment-return assumption. There was no indication in the record that section 3.6 precluded the use of the Segal Blend, however, and a subsequent version of that ASOP explicitly stated that its list of examples was not exhaustive. (Final Op. at 15.)

[57] Manhattan Ford notes that in 1979, the American Academy of Actuaries "urged Congress to amend the pending withdrawal liability legislation to direct mat 'PBGC assumptions' be used to value vested benefits, because the normal investment-return assumption is "inappropriate" in this context." (Pl. Brf. at 15 (citing *Hr'gs on Multiemployer Pension Plan Amendments Act of 1979 (H.R. 3904) Before Task Force on Welfare & Pension Plans of Subcomm. on Labor-Mgmt. Relations ofH. Comm. on Educ. & Labor*, 96th Cong. 1498, 1502 (1979).) Manhattan Ford asserts that because Congress did not make that change, Congress "signal[ed]" its rejection of the risk-transfer theory. (*Id.*) Congress's failure to act is weak evidence, but at any rate it does not signal an intent to require use of the funding rate only.

Case: 2:19-cv-02238-ALM-KAJ Doc #: 11-8 Filed: 01/14/20 Page: 204 of 212 PAGEID #: 2198

Page 27 of 27

331 F. Supp. 3d 365, *403; 2018 U.S. Dist. LEXIS 111969, **72

remains responsible to pay benefits to the withdrawing employer's employees, but the withdrawing employer does not. The Fund must guard against the risk of capital loss, or at least of falling short of a 7.5% return, without the backstop of possible additional contributions from the withdrawing employer. The **[\*\*73]** Fund could offload some or all of that risk—for example by purchasing an annuity or investing in safe corporate or treasury bonds. (This may be referred to as a "risk-free" option, though the risk is not really zero.) That, however, would have a cost, and that hypothetical cost is a proxy for the dollar value of the risk that the Fund is taking on. The risk-free PBGC rate and the "settlement" theory espoused by the actuary here reflect that cost and that dollar value.[58]

The risk-transfer and settlement models of withdrawal liability recognize a more complicated reality than the one embodied in minimum funding levels. The Arbitrator did not have to accept those alternative models, and a different arbitrator could have decided the case differently. This Arbitrator, however, did not clearly err in accepting the risk-transfer theory and settlement-based concept behind the Segal Blend. The testimony of Ms. Gleave and Mr. Levy, their depositions, and Levy's Report, if accepted by the Arbitrator (as they were), provided a sufficient basis for the Arbitrator to find that there was a good faith application of reasonable actuarial assumptions and practices.

There was no error in the Arbitrator's **[\*\*74]** legal conclusions or clear error in his factual conclusions.

### [*404]  IV. Conclusion

For the reasons outlined above, Manhattan Ford's motion for summary judgment (ECF no. 22) is denied, and the Pension Fund's cross-motion for summary judgment (ECF no. 23-2) is granted. The Arbitrator's Interim and Final Awards are therefore affirmed in accordance with this Opinion.

An appropriate order follows.

---

[58] On that score, by the way, I note that the Pension Fund has used the Segal Blend for some 25 years, and consistency has a virtue of its own. *See* (Final Op. 6, 12-13; DSMF ¶ 7; Joint Stip. of Facts ¶ 11) Presumably if there were prior withdrawals (the record does not say), Manhattan Ford would benefited, at least indirectly, from those employers' pay-in of withdrawal liability in an amount dictated by the Segal Blend.

Dated: July 3, 2018

/s/ Kevin McNulty

**Kevin McNulty**

**United States District Judge**

[EDITOR'S NOTE: The following court-provided text does not appear at this cite in F. Supp. 3d.]

### [*none]  ORDER

THIS MATTER having come before the Court on the motion (ECF no. 22) of the plaintiff Manhattan Ford Lincoln, Inc. ("Manhattan Ford") and on the motion (ECF no. 23-2) of defendant UAW Local 259 Pension Fund ("Pension Fund") for summary judgment under *Fed. R. Civ. P. 56*; and the Pension Fund having filed a memorandum in opposition to Manhattan Ford's motion for summary judgment and in support of its cross-motion for summary judgment (ECF no. 23-3); and Manhattan Ford having filed a reply in support of its motion for summary judgment and in opposition to the Pension Fund's cross-motion for summary judgment (ECF no. 24); and the Pension Fund having filed a reply in support of its cross-motion for summary judgment (ECF no. 25); and Manhattan Ford **[\*\*75]** having filed a letter (ECF no. 26); and the Pension Fund having filed a letter in response (ECF no. 27); and the Court having considered the papers and decided the matter without oral argument, pursuant to *Fed. R. Civ. P. 78*; for the reasons set forth in the accompanying Opinion, and for good cause shown:

IT IS this 3rd day of July, 2018,

ORDERED that Manhattan Ford's motion for summary judgment (ECF no. 22) is DENIED, and the Pension Fund's cross-motion for summary judgment (ECF no. 23-2) is GRANTED.

The clerk shall close the file.

/s/ Kevin McNulty

**Hon. Kevin McNulty**

**United States District Judge**

---

## *356 N.L.R.B. 306; 2010 NLRB LEXIS 518; 189 L.R.R.M. 1482; 356 NLRB No. 57*

National Labor Relations Board

December 28, 2010

Case 9-CD-500

**Reporter**
356 N.L.R.B. 306 *; 2010 NLRB LEXIS 518 **; 189 L.R.R.M. 1482; 356 NLRB No. 57

## Laborers' District Council of Ohio, Local 265 and AMS Construction, Inc. and International Union of Operating Engineers, Local 18.

## Core Terms

drill, collective-bargaining, bore, grievance, pipe, machine, reasonable cause, pipeline, crew, competing claims, perform work, train, install, skill, underground, contractor, proscribe, energy, horizontal, sham

Synopsis

The NLRB proceeded with determination of a dispute under Section 10(k) of the National Labor Relations Act because there was reasonable cause to believe that there were competing claims of the first and second unions for the disputed work (DW) of operation of the directional drill machine and locator for the construction of gas pipelines, and that a violation of Section 8(b)(4)(D) had occurred. The NLRB found that the employees represented by the first union were entitled to perform the DW because of the factors of the collective-bargaining agreement and economy and efficiency of operations.

**Panel:** By Craig Becker, Member; Mark Gaston Pearce, Member; Brian E. Hayes, Member

## Opinion

[*306]   [**1]   DECISION AND DETERMINATION OF DISPUTE

This is a jurisdictional dispute  proceeding under *Section 10(k)* of the National Labor Relations Act (the Act). AMS Construction, Inc. (the Employer) filed a charge on March 11, 2010, alleging that Laborers' District Council of Ohio, Local 265 (Laborers) violated *Section 8(b)(4)(D)* of the Act by threatening to engage in proscribed  activity with an object of forcing the Employer to assign  certain work to employees represented by Laborers rather than to employees represented by International Union of Operating Engineers, Local 18 (Operating Engineers). The hearing was held on April 30, 2010, before Hearing Officer  Naima R. Clarke. After the hearing, Operating Engineers filed a motion to remand to the Regional Director for the taking of additional [**2]  evidence, accompanied by a supporting memorandum, and the Employer and Laborers each filed a memorandum in opposition to Operating Engineers' motion to remand. The Employer, Laborers, and Operating Engineers also filed posthearing briefs.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

356 N.L.R.B. 306, *306; 2010 NLRB LEXIS 518, **2

The Board affirms the hearing officer's rulings, finding them free from prejudicial error. On the entire record, the Board makes the following findings.

I. JURISDICTION

The parties stipulated that the Employer, a corporation with its principal place of business in Ohio, is engaged in the business of underground utility work. They also stipulated that during the 12-month period preceding the hearing, a representative period, the Employer derived gross revenues in excess of $ 50,000, and purchased and received at its Maineville, Ohio facility goods and materials valued in excess of $ 50,000 directly from suppliers located outside the State of Ohio. The parties further stipulated, and we find, that the Employer is engaged in commerce within the meaning of *Section 2(6)* and *(7)* of the Act and that Laborers and Operating Engineers are labor organizations **[**3]** within the meaning of *Section 2(5)* of the Act.

II. THE DISPUTE

*A. Background and Facts of the Dispute*

The Employer specializes in underground utility construction. The project at issue involves the construction and maintenance of gas pipelines for Duke Energy Corporation utilizing the directional boring method. Utilizing that method, a crew consisting of two employees--one operating a directional drill and the other operating a locator box-bore underground holes for utility piping. Directional boring allows for underground utility construction that limits environmental impact. The directional drill machine's main component is a drill that digs through the ground in a horizontal direction. The drill head contains a beacon that communicates with a locator box by radio signal. The employee operating the locator traces the underground movement of the drill, and, by radio, guides the drill operator. The locator ensures that the drill is following the correct path through the ground and also prevents its contact with obstacles, such as other pipes.

The Employer has had collective-bargaining agreements with Laborers since 1991. It also has had a collective-bargaining agreement with **[**4]** Operating Engineers since 2001. From about 1999, when the Employer first began using the directional drill, until 2004, the Employer assigned the directional drill machine work to employees represented by Laborers. In 2004, the Operating Engineers filed a grievance against the Employer, alleging that the assignment of the work violated the Operating Engineers' collective-bargaining agreement. At the time, the Employer employed three two-worker crews comprised entirely of Laborers-represented employees. The Employer resolved the grievance by converting three of its six Laborers-represented employees into Operating Engineers-represented employees, and it executed separate assignment letters with each union covering the directional boring work. [1] Subsequently, the directional boring work was performed by a crew of Laborers-represented employees, a crew of Operating Engineers-represented employees, or a mixed crew.

 **[**5]**

The Employer's most recent collective-bargaining agreement with Laborers Locals 265 and 534, effective August 7, 2006 to August 1, 2010, covers "all phases of the installation of any pipe including directional boring, horizontal drilling, locating of pipe, . . . [and] lining up of **[*307]** the pipe. " The agreement specifically includes the use of "directional boring machines. "

The Employer's collective-bargaining agreement with Operating Engineers, effective June 1, 2007 to May 31, 2010, covers "installation . . . of distribution pipeline (including work in conjunction with total energy plans) which transport natural gas, liquid gas or vapors . . . including portions of the work with private property boundaries or public streets, from the first metering station or connection at the main transmission line (consistent with this definition in the Mainline Pipeline Agreement) to the Consumer or User."

---

[1] crews no longer consisted of three Laborers and three Operating Engineers. Instead, the Employer's crews comprised three Laborers, two Operating Engineers, and one unaffiliated employee.

356 N.L.R.B. 306, *307; 2010 NLRB LEXIS 518, **5

In 2010, [2] the Employer began work on a gas pipeline project for Duke Energy Company at the Hyde Park module in Cincinnati, Ohio. [3] The Employer utilized the directional boring method with employees represented by Laborers. The Employer's superintendent, John Weber, testified that Foreman Russell [**6] Osborne informed him that, in January and February, business agents of Operating Engineers visited the Hyde Park jobsite. According to Osborne, upon learning that employees represented by Laborers were assigned the directional boring work, the Operating Engineers' representatives told workers at the site that this work should be assigned to employees represented by Operating Engineers, not Laborers. Additionally, Operating Engineers filed two pay-in-lieu grievances against the Employer, each for a different part of the Hyde Park area, seeking wages and fringe benefits for all hours worked on the project. The grievances claimed that the Employer was using "someone other than Operating Engineers to operate directional drill and locator on" the Hyde Park site. Weber testified that he and the Employer's owner, John Stephenson, met with Operating Engineers representatives Gary Marsh and Nate Brice to discuss resolution of the grievances. During that meeting, the Operating Engineers representatives maintained that the Employer had to remove all Laborers-represented employees from directional drilling assignments. Operating Engineers also demanded that any newly hired directional crew members [**7] come from the Operating Engineers' hiring hall. Further, Operating Engineers indicated that it wanted all of the directional boring work for employees it represents. The parties met on several occasions, but could not resolve the grievances.

While those grievances were pending, Laborers learned that the Employer might reassign the work to Operating Engineers. As a result, Laborers sent a letter to the Employer dated February 9. The letter stated:

> It has come to our attention that your company has assigned or may assign directional boring, min-excavating [sic] and related tasks to employees represented by the International Union of Operating Engineers. This work falls within our agreement and has been traditionally assigned to Laborers'. Accordingly, Local 265 will take any and all action necessary to preserve our work, including [**8] but not limited to picketing and work stoppages on the Project. [4]

Superintendent Weber testified that after the Employer received the letter, he spoke with Laborers representatives Tony Brice and John Phillips to resolve the issue. Laborers made it clear that it would not compromise on the assignment of work.

*B. Work in Dispute*

The parties did not stipulate to the work in dispute. The notice of hearing described the disputed work as "[t]he operation of the directional bore machine and the locator. " The Employer, Laborers, and Operating Engineers dispute this description, and the Employer and Laborers offered alternative descriptions. The Employer described the work as the operation of the [**9] directional bore machine and the locator on distribution pipeline construction. Laborers proposed that the work in dispute be described as the installation of any pipe, including directional boring, horizontal drilling, and locating of pipe on all distribution pipeline construction. We find, based on the record, that the work in dispute is as follows: The operation of the directional drill machine and locator for the construction of gas pipelines for Duke Energy Corporation at the Hyde Park module, Cincinnati, Ohio jobsite.

*C. Contentions of the Parties*

Operating Engineers contends that the notice of hearing should be dismissed because it has not claimed the disputed work. Relying on *Laborers (Capitol Drilling Supplies), 318 NLRB 809 (1995)* (union's action through

---

[2]  All dates refer to 2010 unless otherwise indicated.

[3]  Modules are geographic areas identified by Duke Energy as targets for underground utility line installation.

[4]  As noted above, Laborers Local 534 is also signatory to the Laborers' contract with the Employer. Local 534 sent a letter similar to that of Laborers Local 265 to the Employer. The Employer did not file a charge against Local 534, and no party contends that Local 534 is otherwise involved in the dispute.

grievance procedure to enforce claim against general contractor does not constitute claim against subcontractor for work in dispute), Operating Engineers argues that it has pursued only contractual grievances against the Employer for breaches of its collective-bargaining agreement. [*308] Operating Engineers also contends that Laborers' letter could not constitute a real or actual threat because Laborers' [**10] collective-bargaining agreement prohibits strikes or work stoppages. Finally, Operating Engineers contends that Laborers' threat was a "paper threat," contrived to create a jurisdictional dispute under *Section 10(k)* and obtain the work assignment preferred by the Employer. [5]

The Employer and Laborers [**11] contend that there is reasonable cause to believe that *Section 8(b)(4)(D)* has been violated because of the Laborers' letter. They further contend that there are competing claims to the disputed work, and therefore the notice of hearing should not be dismissed. In particular, they contend that representatives of Operating Engineers made multiple visits to the Employer's worksite and told Laborers employed on the project that they were performing Operating Engineers' work. Additionally, Laborers argues that Operating Engineers claimed the work by filing two pay-in-lieu grievances seeking wages and benefits paid on the Hyde Park project.

On the merits, the Employer and Laborers assert that the work in dispute should be awarded to employees represented by Laborers based on the factors of collective-bargaining agreements, employer preference, current assignment and past practice, area and industry practice, relative skills, and economy and efficiency of operations. [6] The Employer further contends that a broad award is warranted because the issue of its assignment of work on the directional drill machine and locator will arise on future projects.

[**12]

*D. Applicability of the Statute*

Before the Board may proceed with determining a dispute pursuant to *Section 10(k)* of the Act, there must be reasonable cause to believe that *Section 8(b)(4)(D)* has been violated. This standard requires finding that there is reasonable cause to believe that: (1) there are competing claims for the disputed work among rival groups of employees; (2) a party has used proscribed means to enforce its claim to the work in dispute; and (3) the parties have not agreed on a method of voluntary adjustment of the dispute. On this record, we find that this standard has been met.

1. Competing claims for the work

We find that there are competing claims for the work in dispute. Laborers has at all times claimed the work in dispute for the employees it represents, and those employees have been performing the work. Further, Laborers' February 9 letter claimed the work in dispute for employees represented by Laborers. Operating Engineers' claim to the disputed work is demonstrated by its filing of two pay-in-lieu grievances with the Employer, each effectively claiming the directional boring work. See *Carpenters Los Angeles Council (Swinerton & Walberg), 298 NLRB 412, 414 (1990)* [**13] (pay-in-lieu grievance may constitute a competing claim for work). See also *Local 30, United Slate, Tile & Composition Roofers v. NLRB, 1 F.3d 1419, 1427 (3d Cir. 1993)* (attempted distinction "between seeking the work and seeking pay for the work is ephemeral"). Additionally, to resolve these grievances, representatives from Operating Engineers met with the Employer on several occasions to discuss whether the

---

[5] At the hearing, the Operating Engineers excepted to the hearing officer's ruling that prohibited repetitive questioning of John Phillips, Laborers' business manager, regarding whether Laborers' motive in sending the February 9 letter to the Employer was to precipitate a 10(k) hearing. Operating Engineers renewed this exception in its motion to remand for the taking of additional evidence. Operating Engineers argues that the hearing officer erroneously sustained the Laborers' objection, and therefore Operating Engineers should be allowed a proper and adequate opportunity to develop its theory that the Laborers' threat to the Employer in its February 9 letter was a sham. As discussed below, we deny the motion.

[6] In its posthearing brief, Operating Engineers did not set forth any contentions regarding the merits of the dispute. Operating Engineers did, however, introduce some evidence relevant to the merits, and that evidence is considered below. See *U.S. Utility Contractor Co., 355 NLRB No. 59, slip op. at 2 fn. 3 (2010)*.

356 N.L.R.B. 306, *308; 2010 NLRB LEXIS 518, **13

disputed work should be assigned to Operating Engineers' represented employees, further evidencing Operating Engineers' claim to the disputed work. Finally, as set forth above, witnesses for the Employer and Laborers testified that representatives from Operating Engineers made several visits to the worksite, and each time these representatives claimed the disputed work on behalf of Operating Engineers. Although Operating Engineers disputes the validity of this testimony, we find that it is sufficient to establish reasonable cause to believe that the Operating Engineers made a claim for the disputed work. See *U.S. Utility Contractor, supra, 355 NLRB No. 59, slip op. at 3*; *J. P. Patti Co., 332 NLRB 830, 832 (2000)*. [7]

**[**14]**

**[*309]** In sum, we find that there is reasonable cause to believe that there are competing claims to the disputed work between rival groups of employees.

2. Use of proscribed means

We also find that there is reasonable cause to believe that Laborers used means proscribed under *Section 8(b)(4)(D)* to enforce its claim. Laborers' February 9 letter to the Employer, threatening it with picketing and work stoppages if it reassigned any of the disputed work to members of Operating Engineers, constituted a threat to take proscribed coercive action in furtherance of a claim to the work in dispute. Further, Laborers testified that it was planning to follow through on the threats made in this letter. Although Operating Engineers urges the Board to find that this threat was a sham in order to obtain the work assignment in this 10(k) proceeding and that Laborers' collective-bargaining agreement prohibits strikes or work stoppages, it offers no evidence that the threat was not genuine or that Laborers colluded with the Employer in this matter. [8] See *Operating Engineers Local 150 (R&D Thiel), 345 NLRB 1137, 1140 (2005)* ("In the absence of affirmative evidence that a threat to take proscribed **[**15]** action was a sham or the product of collusion, the Board will find reasonable cause to believe that the statute has been violated."). Moreover, the Board has rejected the argument that a strike threat was a sham simply because it would have violated a no-strike clause. See *Lancaster Typographical Union 70 (C.J.S. Lancaster), 325 NLRB 449, 451 (1998)* ("The existence of a no-strike clause in a union's collective-bargaining agreement does not provide a basis for a finding that a threat by that union is a sham. "). We therefore find reasonable cause to believe that *Section 8(b)(4)(D)* has been violated.

**[**16]**

3. No voluntary method for adjustment of dispute

---

[7] The Board need not rule on the validity of testimony in order to proceed to the determination of a 10(k) dispute because the Board need only find reasonable cause to believe that the statute has been violated. *U. S. Utility Contractor, 355 NLRB No. 59, slip op. at 3 fn. 9*. In any event, we note that Operating Engineers' second grievance, dated February 9, states that its business representative Brice spoke with Laborers-represented employee Mark Hedges, who was operating the equipment, to try to resolve the grievance.

Contrary to the Operating Engineers' contention, we find the Board's decision in *Laborers (Capitol Drilling Supplies), 318 NLRB 809 (1995)*, to be distinguishable. *Capitol Drilling* involved a union's grievance against a general contractor, alone, for subcontracting work in breach of a lawful union signatory clause. *Id. at 810*. Absent a direct claim against the subcontractor, the Board found no competing claims for the work and quashed the notice of 10(k) hearing. *Id. at 810-812*. Here, there is no subcontractor involved and both the Laborers and the Operating Engineers have made competing claims to the Employer for the work. See *Laborers' District Council of West Virginia, 325 NLRB 1058, 1059 fn. 2 (1998)*.

[8] As mentioned above, at the hearing, Operating Engineers questioned Phillips about the Laborers' motivation for sending the letter, and received Phillips' answers. When Operating Engineers began to repeat the same questions, the Laborers objected on the grounds that the questions had been asked and answered. The hearing officer sustained the objection. Based on the foregoing, we find that the hearing officer did not prohibit Operating Engineers from developing its case, but simply prevented repetitive questioning. Therefore, we find that the Operating Engineers was afforded a full opportunity to be heard, to examine and cross-examine witnesses, including Phillips, and to adduce evidence bearing on the issues in this case. Accordingly, we deny the Operating Engineers' motion to remand for the taking of additional evidence.

356 N.L.R.B. 306, *309; 2010 NLRB LEXIS 518, **16

The Employer and Laborers contend that there is no method for voluntary adjustment of the dispute to which all parties are bound. Operating Engineers asserts instead that article 17 of the Laborers' collective-bargaining agreement, which requires that Laborers attempt to seek settlement of disputes, constitutes a method for voluntary adjustment of the dispute. The dispute resolution mechanism in article 17, however, does not bind Operating Engineers, a party to this dispute. In order for an agreement to constitute an agreed-upon method for voluntary adjustment, all parties to the dispute must be bound to that agreement. *Operating Engineers Local 150 (Nickelson Industrial Service), 342 NLRB 954, 955 (2004)*. Thus, because not all the parties to the dispute are bound by article 17 or any other mechanism, we find that there is no voluntary method for adjustment of this dispute.

In view of the evidence above, we find reasonable cause  to believe that there are competing claims for the disputed  work and that a violation of *Section 8(b)(4)(D)* has occurred. We further find that no voluntary method exists for the adjustment **[**17]** of the dispute. Accordingly, we find that this dispute is properly before the Board for determination.

*E. Merits of the Dispute*

*Section 10(k)* requires the Board to make an affirmative award of disputed  work after considering various factors. *NLRB v. Electrical Workers IBEW Local 1212 (Columbia Broadcasting), 364 U.S. 573, 81 S. Ct. 330, 5 L. Ed. 2d 302 (1961)*. The Board has held that its determination in a jurisdictional dispute  is an act of judgment based on common sense and experience, reached by balancing the factors involved in a particular case. *Machinists Lodge 1743 (J.A. Jones Construction), 135 NLRB 1402, 1410-1411 (1962)*.

The following factors are relevant in making the determination of this dispute.

1. Certifications and collective-bargaining  agreements

There is no evidence of any Board certifications concerning the employees involved in this dispute.

The Employer and Laborers are parties to a collective-bargaining  agreement, effective  from August 7, 2006 to August 1, 2010. Article 2 of that agreement, entitled, "Scope," provides at paragraph 3:

> The work coming under the jurisdiction of the UNION and covered by terms of this Agreement includes, but is **[**18]** not limited to, all phases of the installation  of any pipe  including directional  boring,  horizontal drilling,  locating  of pipe,  preparation of the pipe  for joining, lining up of the pipe,  handling of the clamps, joining of the pipes  and cleanup after the pipe  has been installed. This agreement also includes the use of pipe bending **[*310]**  machines,  directional  boring  machines power winches, mini excavators, restoration tractors, skid steer loaders and all walk behind equipment. This Agreement excludes the joining of steel pipe.

We find, based on the above-quoted provision, that the work in dispute is explicitly covered by the Employer's collective-bargaining  agreement with Laborers.

The Employer and Operating Engineers are parties to a collective-bargaining  agreement effective  from June 1, 2007 to May 31, 2010. Article I, paragraph A of that agreement, entitled, "Coverage," provides:

> [W]ork coming under this Agreement is defined as follows:

> The construction, installation,  treating, repair and/or reconditioning of distribution pipeline  (including work in conjunction with total energy plants) which transport natural gas, liquid gas or vapors, crude oil, petroleum products **[**19]**  or other fuels, including portions of the work with private property boundaries or public streets, from the first metering station or connection at the main transmission line (consistent with this definition in the Mainline Pipeline  Agreement) to the Consumer or User.

Additionally, the contract's "working rules" state that Operating Engineers are to maintain and repair equipment under its jurisdiction, and will be assigned  "all operating configurations to the horizontal  directional  drill machine. "

356 N.L.R.B. 306, *310; 2010 NLRB LEXIS 518, **19

"In interpreting collective-bargaining agreements, the specific is favored over the general." *Laborers Local 1184 (Golden State Boring & Pipejacking), 337 NLRB 157, 159 (2001)* (operation of directional drilling machine awarded to employees represented by Laborers, not Operating Engineers), quoting *Steelworkers Local 392 (BP Minerals), 293 NLRB 913, 914-915 (1989)*. Here, the Laborers' contract specifically refers to the disputed directional drilling work and related work (locating the pipe) and equipment (directional boring machine) ; the Operating Engineers' contract is worded in more general terms. The factor of collective-bargaining agreements accordingly **[**20]** slightly favors an award of the disputed work to employees represented by Laborers.

2. Employer preference and current assignment

The Employer currently has assigned the disputed work to employees represented by Laborers, and it prefers to have the disputed work performed by employees represented by Laborers. Although the Employer stated that the Laborers-represented employees' superior relative skills and training was the reason for its preference, the Board does not generally examine the reasons for an employer's preference unless there is evidence that the employer was coerced. See, e.g., *Laborers Local 829 (Mississippi Lime Co.), 335 NLRB 1358, 1360 fn. 5 (2001)*. There is no evidence of coercion here, and thus the Employer's preference is a valid factor. Further, it is well established that the fact of employer preference is entitled to "substantial weight." See, e.g., *Iron Workers Local 1 (Goebel Forming), 340 NLRB 1158, 1163 (2003)*. Accordingly, we find this factor favors an award of the disputed work to employees represented by Laborers.

3. Past practice

On projects previous to the Hyde Park Project, the Employer assigned the directional **[**21]** drilling and related work to crews consisting either solely of Laborers, solely of Operating Engineers, or composite crews of employees represented by both unions. This practice has been in place since 2004, when the Employer executed letters of assignment assigning the directional drilling work to employees represented by both unions. Because the Employer's past practice was to assign directional drilling and related work to both Laborers-represented employees and Operating Engineers-represented employees, we find that this factor does not favor awarding the work in dispute to either group of employees.

4. Area and industry practice

No party introduced any evidence with respect to industry practice.

The Employer's foreman Russ Osborne testified that employees represented by Laborers have performed work of the kind in dispute in the past for the Brewer Company, one of the Employer's competitors. Additionally, the Brewer Company is a signatory, along with the Employer and RLA Investments, Inc., to the collective-bargaining agreement with Laborers. Further, Laborers Business Manager Phillips testified that Laborers have performed work of the kind in dispute since 1992.

Operating **[**22]** Engineers also offered evidence that its members have performed work of the kind in dispute. Operating Engineers introduced assignment letters for directional drilling work from dozens of area contractors, spanning from 2000 to 2006.

Based on the above, we find that this factor does not favor an award of the work in dispute to either group of employees.

4. Relative skills and training

The Employer and Laborers presented testimony that that Laborers' members possess the requisite skills and training to perform the disputed work and that they are experienced in doing so. Specifically, Foreman Osborne **[*311]** testified that Laborers-represented employees have the requisite skills and training to perform the work in dispute. He testified that every single worker performing the disputed work for the Employer was originally trained as a Laborer, including Operating Engineers who have previously been assigned this work. Employer Superintendent John Weber testified that Laborers-represented employees have the proper skills and training to

356 N.L.R.B. 306, *311; 2010 NLRB LEXIS 518, **22

perform the work, and can do so in a safe manner. Laborers presented evidence that Laborers-represented employees must participate in training that includes classroom **[\*\*23]** work and on-the-job training.

The record establishes that employees represented by Operating Engineers had been performing the work for a substantial period of time, and there is no evidence that the Employer considered unsatisfactory any of the work in dispute performed by these employees. Accordingly, we find that this factor favors neither group of employees. [9]

6. Economy and efficiency of operations

Weber, the Employer's Superintendent, testified that it is more efficient to have employees represented by Laborers perform the disputed work. He explained that Laborers are more capable of performing additional work that is associated with directional drill and locator work, such as digging holes or moving equipment. Weber further testified that Operating Engineers do not always complete tasks and are not always properly trained. For these reasons, the Employer testified that Laborers-represented employees **[\*\*24]** deliver better work product than Operating Engineers-represented employees. Operating Engineers did not present evidence with respect to this factor. Laborers-represented employees are thus better equipped to perform the necessary work that stems from directional drilling at Hyde Park than Operating Engineers-represented employees. Accordingly, the factor of economy and efficiency of operations favors an award of the work in dispute to employees represented by Laborers. See, e.g., *Operating Engineers Local 825 (Walters & Lambert), 309 NLRB 142, 145 (1992)* (factor of economy and efficiency of operations favored Laborers over Operating Engineers where evidence showed that, when not performing disputed work, Laborers possessed knowledge and skills necessary to perform additional craft work).

Conclusion

After considering all the relevant factors, we conclude that employees represented by Laborers are entitled to perform the work in dispute. We reach this conclusion relying on factors of collective-bargaining agreement, employer preference, employer current assignment, and economy and efficiency of operations. In making this determination, we are awarding the disputed **[\*\*25]** work to employees represented by Laborers, not to that labor organization or its members.

*F. Scope of the Award*

The Employer requests a broad, areawide award covering the work in dispute. The Board customarily does not grant an areawide award in cases where the charged party represents the employees to whom the work is awarded and to whom the employer contemplates continuing to assign the work. See, e.g., *Laborers Local 243 (A. Amorello & Sons), 314 NLRB 501, 503 (1994)*. Accordingly, we shall limit the present determination to the particular controversy that gives rise to this proceeding.

DETERMINATION OF DISPUTE

The National Labor Relations Board makes the following Determination of Dispute.

Employees of AMS Construction, Inc., represented by Laborers' District Council of Ohio, Local 265, are entitled to perform the operation of the directional drill machine and locator for the construction of gas pipelines for Duke Energy Corporation at the Hyde Park modules, Cincinnati, Ohio jobsite.

---

End of Document

---

[9] *Electrical Workers IBEW Local 486 (New England Power), 311 NLRB 1162, 1164 (1993)*.