## AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| **Sofco Erectors, Inc.,** | : | |
| | : | |
| Claimant, | : | AAA Case No. 01-18-0001-3790 |
| | : | |
| v. | : | Arbitrator John E. Sands |
| | : | |
| **Ohio Operating Engineers Pension Fund,** | : | |
| | : | |
| Respondent. | : | |

### OHIO OPERATING ENGINEERS PENSION FUND'S
### RESPONSE TO SOFCO ERECTORS, INC.'S MOTION FOR SUMMARY JUDGMENT

## I.    <u>INTRODUCTION</u>

The Ohio Operating Engineers Pension Fund's (the "Pension Fund") assessments of withdrawal liability against Sofco Erectors, Inc. ("Sofco") were warranted under the law and the facts.  The information and arguments presented to the Pension Fund by Sofco through its Requests for Review and the evidence produced by Sofco in this litigation are insufficient to allow Sofco to meet its burden to have the Fund's assessments set aside.  The two assessments of partial withdrawal liability and the assessment of complete withdrawal liability must be upheld and enforced in the amounts calculated by the Fund's actuaries at Segal.

Sofco's Motion for Summary Judgment ("Sopfco's Brief") fails to credibly challenged the assessments.  In support of its argument to avoid liability based upon pre-April 2004 contributions, Sofco provide little in the way of actual evidence.  It has provided inconsistent, incomplete and incomprehensible statements and affidavits supports by no real documentary evidence.  As the party that bears the burden of proof, Sofco's lack of evidence is fatal to is challenge.

## II.    <u>LAW AND ARGUMENT</u>

### A.  <u>The Fund Properly Assessed Complete Withdrawal Liability.</u>

Sofco acknowledges employing operating engineers to perform forklift and shop work

and making contributions to the Pension Fund on their behalf.   It concedes that it continues to perform the same work as it did prior to the termination of the CBA.   Sofco's sole argument to avoid compete withdrawal liability is that, while it made contributions for forklift and shop work, it was not "required" to make contributions for this work.  Specifically, Socfo contends that (1) the Union's conduct waived the Fund's right to require contributions for this work (Sofco Brief p. 13); (2) that Sofco had the option to choose whether to assign Operating Engineers or Ironworkers to the work (Sofco Brief p. 12); and (3) forklift work was within the jurisdiction of the Ironworkers Union (Sofco Brief p. 14).   Each of these arguments fail.

1. The Obligation to Make Contributions Is Established by the CBA

There is no dispute that the CBA repeatedly states that forklift operation is covered work. (Powell Dep. 37, Ex. 3, CBA pp. 53, 70, 73, 78, and 82).  Contributions are **required** for all hours paid to employees working under the agreement regardless of whether that work is "covered" under the CBA.  *See, e.g.*, *Bunn Enters. v. Ohio Operating Eng'rs. Fringe Benefit Programs*, 606 Fed. App'x 798, 804 (6th Cir. 2015) ("[W]e find that the CBA unambiguously requires employer signatories to contribute the appropriate benefits contributions for all hours worked by their employees, regardless of whether those hours are 'covered' under the contract.").

Sofco contends that it "voluntarily paid contributions" for individuals working "outside the CBA." (Sofco Brief p. 8).   Oddly, these contributions were paid for "individuals who happened to be Local 18 members."   To the extent Sofco is contending that its contributions to the Pension Fund for forklift or shop work was voluntary but not required, *Bunn Enterprises* established that contributions are a requirement for all hours paid.

Next, employers like Sofco are barred from contributing to benefit trusts designated by

2

employee representatives unless the payments are made "in accordance with a written agreement with the employer."  29 U.S.C. § 186(c)(5)(B).   The CBA does not allow for voluntary or optional contributions; contributions are required.   While the Pension Fund can enter into separate written agreements with employers to allow for voluntary contributions, no such agreement existed between Sofco and the Pension Fund.   All contributions were required contributions on behalf of employees performing working with the scope of the CBA.  Any other conclusion would violate the LMRA.

> a)  Local 18 Did Not Waive Sofco's Obligation to Make Contributions.

Sofco devotes a substantial portion of its Brief to arguing that the Union through its conduct "waived any claim" it had to forklift work and had somehow ceded forklift work to the Ironworkers.   To the contrary, Sofco repeatedly violated the CBA by assigning non-operating engineers to operate forklifts.   In response, Local 18 used the CBA's dispute resolution procedure and filed grievances against Sofco.  (Powell Dep. 20-23, 27, Ex. 2).  Those grievances were resolved in favor of Local 18, with Sofco agreeing to hire operating engineers.  (Powell Dep. 27, 100-101, Ex. 2; Deposition of Thomas Byers Dep. 80-93, Exs. Q-Y).[1]  Local 18 was so aggressive in its assertion of its contractual right to forklift work that it drove Sofco to terminate the CBA.

> Q:   And do you know why Sofco Erectors terminated its participation in the [the CBA] effective April 30, 2017?
> ***
> A:   I mean in Columbus the operators appeared to be ramping up their efforts to get a bigger percentage of our use of forklifts, and they started to be more aggressive.

 (Powell Dep. 21).  However, upon further questioning Powell conceded that Local 18 had for

---

[1] The final grievance filed by Local 18 on this topic was not taken to arbitration because Sofco had terminated the CBA.  (Byers Dep.  95)

years asserted the right to forklift operation.

> Q:    But prior to May 8, 2013 had Local 18 shown up and pushed Sofco
> Erectors to hire operators to operate forklifts.
>
> A:    Yes.

(Powell Dep. 23).  Local 18 had not waived anything.

Sofco also notes that Local 18 did not pursue a jurisdictional dispute against the Ironworkers Union.   Of course, there would be no reason to do so.   The Ironworkers never sought to take the work away from Operating Engineers.   The Ironworkers never filed a grievance when Sofco assigned forklift work to operating engineers.  (Powell Dep. 43).   The Ironworkers never filed an unfair labor practice charge or initiated a 10-k proceeding contending that forklift work should be assigned to Ironworkers.  (Powell Dep. 44).  Moreover, as between the two unions the question of assignment of forklift work had long been resolved.  (Powell Dep. Ex. 16; Byers Dep. 133, 136-139, Ex. EE.) ("*the operation of forklifts shall be the work of Operating Engineers.*").  Simply put, there was no dispute between the unions.  There was only an employer, Sofco, that repeatedly violated the CBA by assigned operating engineer work to ironworkers when it was convenient to do so.

> (b).    Local 18 Cannot Waive the Requirement to Make
> Contributions through its Conduct.

Sofco contends that, through its action or its inaction, the Union waived the requirement that Sofco contribute to the Pension Fund for forklift work.   This argument runs contrary to ERISA and must be rejected.

To avoid a complete withdrawal under 29 U.S.C. § 13832(b)(2)(B) Sofco contends that the Union's conduct altered the CBA such that contributions for forklift work, which were undeniably made, were not "previously required."  (Sofco Brief p. 11).   Courts have been clear

4

that the conduct of unions does not alter the obligation to make contributions to funds. The Sixth Circuit has explained:

"When collective bargaining agreements create pension or welfare benefit plans, those plans are subject to the rules established in ERISA. .. [ERISA] Section 515 provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement. 29 U.S.C. § 1145.

Because multiemployer plans may rely on the literal terms of written agreements between the employer and the union, any oral understandings or practices between the contracting parties are immaterial." Operating Eng'rs. Local 324 Health Care Plan v. G&W Constr. Co., 783 F. 3d 1045, 1051 (6th Cir. 2015)(citations omitted). "Multiemployer trust funds are entitled to rely on an employer's promises to make contributions to the funds, irrespective of any breach or omission by the union." Id. at 1053.

On this authority courts have repeatedly rejected defenses to contribution obligations reliant upon union conduct or the conduct between the union and the employer outside of the written text of the collective bargaining agreement. See e.g., Robbins v. Lynch, 836 F. 2d 330, 334 (7th Cir. 1988)("a claim that the union has promised not to collect a payment called for by the agreement is not a good answer to the trustees' suit."); Orrand v. Scassa Asphalt, Inc., 794 F. 3d 556, 563 (6th Cir. 2015) (finding that "because Congress chose to give the Funds 'the upper hand'" conversations between the union and employer were not relevant to alter the written terms of the collective bargaining agreement requiring contributions).

The CBA requires contributions for all hours paid to employees performing work

under the written agreement, which undeniably includes forklift work.  Had the CBA continued beyond April 30, 2017, the Fund would have required contributions to be paid by Sofco for all hours paid to forklift operators.   Given the above authorities, the actions, statements, or inaction of the Union are simply not relevant to determining Sofco's obligation to make contributions.

       2.   The Ironworkers Do Not Claim Forklift Operation.

Next, Sofco speculates that "had Local 18 sought a jurisdictional determination" the forklift work would have been awarded to the Ironworkers and that this would take forklift work outside of the scope of the CBA for which contributions were required. (Sofco Brief § 14).  On this conjecture and *Stevens Engineers & Contractors, Inc. v. Local 17 Ironworkers Pension Fund,* Sofco argues that "if not contributions were ever required (because the work belonged to a different union all along), there can be no withdrawal liability." (Sofco Brief p. 14).

There was no work jurisdictional dispute among Sofco, the Ironworkers, and Local 18 concerning the forklift work performed by Local 18 members for Sofco Erectors.  That fact alone distinguishes this withdrawal liability case from the following cases:

- *Stevens Engineers & Contractors, Inc. v. Local 17 Ironworkers Pension Fund*, 877 F.3d 663 (6th Cir. 2017);

- *Precision Environmental Company v. The Ohio Operating Engineers Pension Fund*, AAA No. 01-16-000-39530 (Mitchell B. Goldberg, February 5, 2018).

Contrary to the circumstances here, in *Stevens Engineers and Constructors*, there was a jurisdictional dispute between the Millwrights and the Ironworkers, 877 F.3d at 667-668.  The jurisdictional dispute was resolved under the applicable collective bargaining agreement.  *Id.*  The applicable collective bargaining agreement incorporated the jurisdictional dispute resolution

mechanism of the National Maintenance Agreement (NMA). The NMA covered various craft unions, including Ironworkers Local 17 ("Local 17") and Millwrights. *Id.* "The NMA provides that, where multiple unions can claim the same work, an employer must conduct a pre-job conference to assign work on a project." *Id.* "Once a job is assigned through a pre-job conference, it belongs to the assigned craft union. Where a dispute continues following a pre-job conference, the NMA provides for a neutral umpire to resolve the dispute. If not challenged under the NMA, a task stands as assigned, and does not fall within the purview of any other union." *Id.*

Under the NMA, Stevens had assigned power rigging tasks to Ironworkers on some projects and to the Millwrights on other projects. *Id.* In April 2013, Stevens terminated its agreement with Local 17. Stevens announced that where a project required Ironworkers, Stevens would hire subcontractors to complete that work. In September, 2013, Stevens won a contract and at the pre-job conference, assigned the power rigging task to the Millwrights. A Local 17 representative contacted Stevens to object to the assignment. Stevens responded that it would not change the assignment. Under the NMA, the next step was for Local 17 to submit its claim for dispute resolution: "However, the union did not pursue the dispute further." *Id.* Thus, Local 17 conceded the work to the Millwrights.

Under these facts, the Sixth Circuit concluded, "Stevens did not owe withdrawal liability to the Fund because the power rigging work it assigned to the millwrights through the NMA was not work within the jurisdiction of the Local 17 CBA, and it did not otherwise require contributions by Stevens." *Id.* at 669. Furthermore, the Sixth Circuit stated that Stevens had the right to assign a job to various unions, and only incurred pension liability to the craft when a task was so assigned, based on the collective bargaining agreement and the NMA. *Id.* at 672.

"Knowing that, in the past, Stevens had exercised an option it possessed does not rebut the point that Stevens was not prohibited from assigning jobs to other unions in the future." *Id.* For the Pension Fund to have prevailed, "Local 17's action through the NMA was a necessary prerequisite to create obligation to contribute to the fund and so the fund could not assess liability based on work never falling within its jurisdiction." *Id.*

Here, there was never a jurisdictional dispute between Local 18 and the Ironworkers concerning the forklift work performed for Sofco. The Ironworkers never asserted that the Sofco forklift work or shop work was work of the Ironworkers, and Sofco never initiated a jurisdictional dispute asserting that the work also belonged to the Ironworkers.

Moreover, the circumstances in *Precision Environmental Company* were strikingly different from that of Sofco. Contrary to the circumstances with Sofco, Precision Environmental involved a hotly contested jurisdictional dispute between the Laborers' Union and Local 18 concerning the operation of forklifts and skid steers. Charges were filed before the National Labor Relations Board under Section 10(k) of the National Labor Relations Act. This, of course, is the most formal process for resolving jurisdictional disputes over work assignments. The NLRB ultimately resolved the dispute in favor of the Laborers' Union, awarding the forklift and skid steer work to the Laborers. *International Union of Operating Engineers Local 18 and its Branches (Donley's Inc.)*, 360 N.L.R.B. 903, 199 LRRM 1557 (2014), *enf'd*, *Operating Engineers, Local 18 v. NLRB*, 712 Fed. Appx. 511, 210 LRRM 3038 (6th Cir. 2017). As both the NLRB and Arbitrator Goldberg found, the forklift and skid steer work "had for many years been assigned by the Employer to the Laborers, and not the Operating Engineers." Goldberg Decision at 7. The Sixth Circuit agreed:

> Granted, Local 18 members did similar work for Precision on some occasions,
> and for different Employers companies (not involved here) on others. That gave

Local 18 a claim to some forklift and skid-steer work under the agreements. Yet when Local 18 began striking, threatening strikes, and filing grievances, it was laying claim to more. A Local 18 representative said as much: the union wanted to "take back" what it "gave away," and to replace Laborers members in the process. But the record shows that, even if Local 18 members have done this sort of work under the agreements, they have never done it to the exclusion of other unions—and certainly not for the five companies involved here. Thus, a reasonable mind could find that the evidence adequately supports the Board's conclusion that Local 18 was not trying to preserve work, but to acquire more.

712 Fed. Appx. At 514.

A conclusion can be drawn from the *Stevens* and *Precision Environmental* cases that is not applicable to Sofco. That conclusion is: If there is a work jurisdictional dispute resolved by either the National Labor Relations Board or through the collective bargaining agreement mechanisms, the disputed work belongs to the prevailing union and the pension contributions belong to the pension fund of the prevailing union. Here, however, there was no jurisdictional dispute, and Sofco's forklift work was clearly defined as the work of Local 18. Powell Dep. Ex. 16; Byers Dep. at 133, 136-39, Ex. EE).

## B. The Partial Withdrawal Liability Assessments Were Not Clearly Erroneous.

The Pension Fund also assessed partial withdrawal liability for the plan years ending July 31, 2011 ($344,627) and July 31, 2012 ($111,358), based on the decline in contributions from Sofco over a three-year testing period. (Wilson Aff. ¶ Ex. 3; Ciner Dep. Ex. 11). Sofco's contribution history is established. (Wilson Aff. ¶¶ 7-9, Exs. 2 and 3. The Pension Fund's determination is "presumed correct," and Sofco bears the burden to prove the Fund's determination to have been "unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3).

Sofco's Brief, acknowledging its burden, contends that the partial withdrawal assessments were "clearly erroneous because the Fund used the incorrect statutory definition." (Sofco Brief p. 16). Ironically, Sofco and the Pension Fund's briefs set forth the same statutory

framework.

> 1. Sofco Cannot Meet Its Burden.

The Pension Fund agrees with Sofco's statement that the term "insubstantial portion ….must mean a decline in contributions greater than the 70% decline formula…applicable outside of the construction industry." (Sofco Brief p. 17; Pension Fund's Brief p. 12 ("any reasonable definition must allow for partial withdrawal when contributions continues at a level less than 30%.")). There is no dispute that Sopfco's contributions declined by more than 70% - in fact in some years the decline was greater than 95%.

Sofco describes the statute as ambiguous and notes that "neither the statute nor the PBGC have expressly defined what insubstantial portion means." (Sofco Brief p. 16). In the face of this ambiguity and offering no definition of its own, Sofco still have the nerve to call the Pension Fund's determination "clearly erroneous." Sofco's decline in contributions falls closer to 95% than to 70%. Sofco can point to no fact or legal authority to meet its burden to demonstrate that the Pension Fund's partial withdrawal assessments were unreasonable or clearly erroneous. Given the facts and the legal presumptions favoring the Fund, Sofco cannot meets its burden. The assessments of $344,627 and $111,358 must be upheld.

> 2. Sofco's alleged subcontracting of crane operation is no defense to partial withdrawal liability.

In an effort to merge two statutory provisions, Sofco attempts to import the construction industry exemption found 29 U.S.C. §1383(b)(2)(A)–(B) into its partial withdrawal argument.[2] The statute on its face applies to complete withdrawals; it is not included in the partial withdrawal statute. Indeed, as noted above the construction industry has a specialized statutory section governing partial withdrawals. 29 U.S.C. § 1388(d)(1). The reason for the decline in

---

[2] This argument was never asserted by Sofco in either of its Requests for Review.

contributions is irrelevant to the determination of partial withdrawal.   As fiduciaries, the Trustees must apply the statute as it exists not as Sofco would like it to be.   The Arbitrator should decline Sofco's invitation to combine the special rules for the construction industry to provide a defense where Congress offered none.

Moreover, Sofco has not even presented evidence to establish that the decline in contributions was attributable to subcontracting.   In fact, when asked to explain the basis for the substantial decline in contributions to the Pension Fund, Sofco's President attributed it to economic factors as opposed to a subcontracting:

> Q:     Can you think of anything that happened with Sofco Erectors business between 2008 and 2009 that would have led to a decline in Sofco's contributions to the pension fund?
>
> A:     I believe the financial meltdown was in 2008.  I'd say all of construction was significantly down to every pension fund.

(Powell Dep. 66).

### C.     SOFCO CANNOT IGNORE ITS PRE-2004 CONTRIBUTION HISTORY.

In an apparently desperate effort to avoid its obligations to the Pension Fund, Sofco submitted a Supplemental Request for Review arguing that contribution history prior to April 2004 should not be considered by the Fund because it became "New Sofco" on that date.

1.   Sofco Cannot Meet Its Burden By Submitting False and Contradictory Evidence.

Sofco Erectors, Inc. had a long history of participation in the Pension Fund.  (Wilson Aff. ¶ 2, Ex. 1.)   In an effort to persuade the Pension Fund to alter its assessments Sofco provided the following list of shareholders of the supposed predecessor:

LIST OF SHAREHOLDERS OF
SOUTHERN OHIO FABRICATORS, INC.

<u>Names of Shareholders</u>

Patricia Kling Ballman

Elizabeth Kling Mayotte

Christina Perry (Daughter of John Emerson Kling)

Josephine Kling Trippe

Susan Kling Worthington

Elizabeth Kling Mayotte, Susan Kling Worthington and
Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable
Trust FBO Christina Perry
With Life Estate for Margaret S. Kling

Elizabeth Kling Mayotte, Susan Kling Worthington and
Margaret S. Kling, Co-Trustees, of the J.J. Kling Irrevocable
Trust FBO Josephine Kling Trippe, Patricia Kling Ballman,
Elizabeth Kling Mayotte and Susan Kling Worthington
With Life Estate for Margaret S. Kling

Jerry T. Nickerson

Jerry T. Nickerson, Trustee, FBO Laurie A. Nickerson

Laurie A. Nickerson

Jennifer L. Nickerson

Anne Nickerson

<mark>Timothy J. Gates</mark>

Stephen R. Sundin

<mark>James W. Ludwig</mark>

(Sofco's Supplemental Rewquest for Review, Ex. 1)(highlighting added).

James Ludwig, identified as a shareholder, was the President of both Old Sofco and New Sofco.  (Powell Dep.  11, 46-47).   Sofco has submitted an Affidavit of Jim Ludwig in which he admits to being employed by Old Sofco, but denies ever owning a portion of Old Sofco.  (Ludwig Aff. ¶ 4).   Sofco is attempting to create an issue of fact by contradicting its own position.

The inconsistencies do not stop there.   Sofco also submits an Affidavit of Tim Gates, in which Mr. Gates swears that he "never owned a portion of Southern Ohio Fabricators, Inc."  (Gates Aff. ¶ 2, dated November 6, 2018).   First, the Mr. Gates statement that he never owned Southern Ohio Fabricators contradicts Sofco's Supplemental Request for Review, which lists

Timothy Gates as a shareholder (see above).   Moreover, this is not the first Gates Affidavit

produced by Sofco.   A prior Gates Affidavit was dated September 11, 2018.   It too was

inaccurate.   Mr. Powell testified that Gates' first affidavit inaccurately identified the owner of

Sofco after April 2004. (Powell Dep. 74).   It also failed to accurately describe Mr. Ludwig's role

before and after April 2004:

```
 3      Q.  And I think we've established that
 4   Mr. Ludwig both owned a percentage of and served
 5   for a time as president of the new Sofco entity
 6   which performed erection services after the
 7   asset sale, correct?
 8      A.  Yes.
 9      Q.  Do you know why Mr. Gates excluded
10   reference to Mr. Ludwig's continuation with the
11   new Sofco entity in this affidavit?
12      A.  No.
```

(Powell Dep. 76).  Sofco has produced no original documentation, shareholders agreements etc.

that accurately or consistently identify the owners of Sofco before and after April 2004.   They

claim none exists.  Sofco cannot expect the Trustees, as reasonable fiduciaries would revise an

assessment based upon inconsistent and shifting statements, supported by surprisingly little

documentation.   Having failed to disclose this alleged asset purchase to the Pension Fund for

almost 14 years, Sofco must be viewed with skepticism.

> 2.   The Asset Purchase Agreement Submitted by Sofco Should Not Be
> Considered By the Arbitrator.

Throughout the discovery process in this case, Sofco could produce only one document

evidencing a 2004 asset purchase – an asset purchase agreement signed by David Schmitt.

(Powell Dep. Ex 4.).   Sofco produced the Asset Purchase Agreement to the Fund in redacted

form with the purchase price redacted in every location.

> By way of example only, the above formula, using the November 30, 2003, balance sheet of Seller, would produce a purchase price equal REDACTED as described on the attached Exhibit 1.2. As of the Closing Date, the Purchase Price will initially be calculated using the balance sheet of Seller as of the last day of the month immediately preceding the month of the Closing Date (the "Estimated Purchase Price"). Approximately one month after the Closing Date, the Estimated

(Powell Dep. Ex. 4).

During discovery the Pension Fund requested that the Agreement be produced in

unreacted form.

> Given the burden of proof incumbent on Sofco in this matter, we would have expected Sofco to produce some actual documentation describing the owners of Southern Ohio Fabricators, Inc. and Sofco Erectors Inc. (both before and after 2004).  The asset purchase agreement indicates that your clients acquired the books and records of the predecessor. You indicate that documents reflective of the transaction are held by Southern Ohio Fabricator, Inc.'s law firm.  Please identify the firm from which these documents may be obtained.  We intend to ask Arbitrator Sands to issue a subpoena for these records.  Also, the asset purchase agreement should be produced in an unredacted format.  Sofco cannot claim it entered into an arm's length transaction without revealing the material terms of the transaction.  Finally, upon receipt of the documents related to Southern Ohio Fabricator, Inc. and Sofco's alleged asset purchase, we reserve the right to schedule a deposition.

(Letter to Gary Greenberg, Dated November 20, 2018)[3]  Sofco responded that the redacted

information was not needed in this matter.  (Ltr. to Daniel Clark, dated November 21, 2019 p.

2)("As it stands, Sofco believes the [Asset Purchase Agreement] as it was produced contains

sufficient information.").[4]

Now, and somewhat shamelessly, Sofco has submitted the unreacted APA as Exhibit A

to the Affidavit of John Hesford. (Hesford Aff. ¶ 2, Ex. A).   Relying on the APA, Sofco argues

---

[3] The November 20, 2018 correspondence is attached hereto as Exhibit A attached hereto.
[4] The November 21, 2018 correspondence is included in Exhibit B attached hereto.

that it "purchased its predecessors assets in an arm's length transaction and paid a fair price." (Sofco Brief p. 20)[5]  The Pension Fund's primary Brief explained that there was no arm's length transaction, but rather a transfer among insiders.  The Pension Fund had no ability to respond to the contention that a fair price was paid for the assets because (1) Sofco never produced any documents of the assets at issue and (2) would not disclose the purchase price.

Now, recognizing that it bears the burden of proof, Sofco has now shared the alleged purchase price.   Having intentionally and knowing withheld this key information from the Fund, it should not be permitted to use it now.   By withholding it, the Fund has been unable to investigate, challenge or responded to it.  It should be stricken, as should Sofco's argument that this was an arm's length transaction for a fair price.

### 3.  The Fund Properly Included Pre-April 2004 Contribution History.

The Fund's calculation correctly included Sofco's entire contribution history in calculating the withdrawal liability assessments.  Sofco argues that it should not be liable for the contribution history of Sofco before the 2004 asset sale.  However, this argument is unavailing because it completely ignores the fact that the new, "current Sofco" is clearly a successor employer of the pre-2004, "old Sofco."  Courts that have addressed this exact issue have regularly held that successor employers can be liable for the withdrawal liability of their predecessors, especially in cases like this where not finding Sofco liable as a successor employer would amount to fraud against the Fund.

Sofco is incorrect that it cannot be held liable for the contribution history of its predecessor; on the contrary, courts that have recently addressed this issue have held just the opposite.  The Sixth Circuit recently adopted successor liability in the context of ERISA defined

---

[5] No evidence regarding the meaning of "fair price" is provided.  This is a mere conclusory statement on a critical issue upon which Sofco bears the burden.

benefit cases.  "Adopting the federal common law of successor liability would best serve ERISA's purposes."  *Pension Ben. Guar. Corp. v. Findlay Indus., Inc.*, 902 F.3d 597, 611 (6th Cir. 2018).  "Refusing to apply successor liability would allow employers to fail to uphold promises made to employees and then engage in clever financial transactions to leave PBGC paying out millions in pension liabilities.  Holding the employers responsible, on the other hand, is a commonsense answer that fulfills ERISA's goals."  *Id.* at 613.  Thus, it is clear that the mere fact that Sofco purchased the assets of the company in 2004 is not enough to shield it from liability in this case.[6]

In general, courts have found a successor employer liability under the successor liability doctrine when: (1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale.  *See, e.g.*, *Tsareff v. Manweb Servs.*, 794 F.3d 841, 845 (7th Cir. 2015); *see also Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 99 (3d Cir. 2011); *Members of the Bd. of Admin. Of the Toledo Area Indus. UAW Ret. Income Plan v. OBZ, Inc.*, 2018 U.S. Dist. LEXIS 215926, at *15–16 (N.D. Ohio Dec. 26, 2018).  Further, successor liability is an equitable doctrine.  As such, it requires courts to balance the interests of both parties along with the goals of ERISA in light of the particular facts of the case.  *Findlay*, 902 F.3d at 611.

Sofco is liable as a successor employer under the successor liability doctrine.  First, Sofco clearly had notice of liability to Fund at the time of the asset sale in 2004.  All of its officers had worked for the company for decades, during which it contributed to the Pension Fund. Courts have found successor employers to have notice of potential liability in far less obvious circumstances.  For example, in *Tsareff*, the Seventh Circuit held that the successor employer had notice of withdrawal liability merely because it learned during due diligence that the

---

[6] This assumes that Sofco could meet its burden to prove a legitimate asset purchase took place in 2004.

predecessor employer was affiliated with a union and they "knew the risks associated with dealing with unions." *Tsareff*, 794 F.3d at 847. Additionally the Seventh Circuit noted that the asset purchase agreement explicitly stated that pension liabilities related to "any Benefit Plan" were excluded assets under that agreement. *Id.* at 848. The Court held that these facts were enough to constitute notice under the successor liability doctrine.

Under this standard, Sofco clearly had notice of potential withdrawal liability at the time of the asset sale. Sofco understood that the predecessor employer had obligations to make contributions to the Union. In fact, Sofco continued making those contributions using the same contractor number previously used before the 2004 asset sale. (Wilson Aff. ¶ 12, 15, Ex. 4). This means that Sofco knew that its predecessor was bound by the CBA. Sofco singed no CBA with the Union in April 2004. (Wilson Aff. ¶ 14). It stepped into the shoes of Old Sofco. Fifteen years later, Sofco cannot stick its head in the sand and state that it was unaware of the obligations.

Second, Sofco is liable as a successor employer because of the substantial continuity of operations before and after the sale. "To determine continuity of operations, the courts look to: continuity of workforce; management; equipment and location; completion of work orders begun by the predecessor; and constancy of customers." *OBZ, Inc.*, 2018 U.S. Dist. LEXIS at *26. Based on the totality of the circumstances, the court determines whether the purchaser "has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987).

It is clear that Sofco acquired the assets of its predecessor and then continued those operations without substantial change. Sofco continued employing the same employees both

before and after the asset sale. (Wilson Aff. ¶ 15). In fact, it continued submitting contribution reports to the Fund for these same employees under the exact same employer name and contractor number that the predecessor employer had used. (Wilson Aff. ¶ 12). Furthermore, the successor employer continued under the exact same collective bargaining agreement with the Union, similarly under the same name and contractor number. Sofco did not change its operations, and continued working with the same equipment and assets both before and after the 2004 sale. In fact, Sofco so did not want to interrupt its business operations that it did not change its name.[7] Particularly instructive is Sofco's jobs log book, attached as Exhibit 18 to Dan Powell's deposition. New Sofco did not even get a new book to record its jobs; it just built on the log book of Old Sofco. (Powell Dep. Ex. 18) All of these facts support the necessary conclusion that Sofco continued the same business operations of its predecessor after the assets sale.

Finally, the equities in this case clearly support applying the successor liability doctrine to Sofco. Sofco purchased the assets of its predecessor in 2004 without providing any notice to the Fund. (Powell Dep. 97; Wilson Aff. ¶ 14). It then continued making contributions to the Fund using the same contractor number for the same employees. (Wilson Aff. ¶¶ 12, 15). The Fund had no indication that the transaction had occurred and could not have protected itself against this exact result.

To quote the Seventh Circuit: "By making the switch in silence . . . and permitting [the predecessor employer] to slink into the night, [the successor employer] increased the Fund's risks and should not be surprised that the trust sought to lump the owners together." *Artistic Carton Co. v. Paper Industry Union Mgmt. Pension Fund*, 971 F.2d 1346, 1353 (7th Cir. 1992)

---

[7] Notably, it has been difficult distinguishing Sofco the former from Sofco the latter in this brief as they did not change their name and appear to be alter-egos.

(finding the successor employer liable for the withdrawal liability of the predecessor).

Additionally, the equities clearly are not in Sofco's favor.  Sofco did absolutely nothing to protect itself from this outcome, including failing to notify the Fund of the transaction.  The mere assessment of a financial liability does not skew the equities in its favor.  "Collection of [withdrawal liability] from [asset] buyers does not undermine any statutory objective.  To the contrary, the prospect of liability ensures that new owners will notify pension trusts of the change, the better to ensure that they pursue the departing owners for withdrawal liability.  [The successor employer] could have protected itself by telling the Fund about the shift and obtaining [the predecessor employer's] promise to pay up, fortified by a standing letter of credit."  *Artistic Carton*, 971 F.2d at 1353.  The Seventh Circuit properly pointed out the options for Sofco here.  Its failure to protect itself from successor liability does not mean that it should not be liable for this assessment.

Finally, assessing liability in this case is consistent with the policy objectives of ERISA and the MPPAA.  "ERISA's fundamental protections of employment benefits function in two ways: guaranteeing that employees receive the benefits they were promised and making sure that employers keep up their end of the deal."  *Findlay*, 902 F.3d at 609.  Like in *Findlay*, failing to apply successor liability in this case would "provide an incentive to find new, clever financial transactions to evade the technical requirements of ERISA and, thus, escape any liability – a result that flies in the fact of [ERISA] §1001(b)."  *Id.* at 612.  Sofco held itself out to the public and to the Fund as operating the same business both before and after the asset sale.  Allowing it to claim that it is an entirely different enterprise is merely an end-around the MPPAA.  It should not be permitted to escape the consequences of its business decisions.

### D.     The Segal Blend Was Properly Utilized by the Fund's Actuary.

The Pension Fund's actuary Dan Ciner prepared the assessments based upon the statute and his best judgment as an actuary versed in the history of the Pension Fund.  (Ciner Dep.  19-21).   As a part of that he testified that the use of the Segal Blend Method represented his judgment as to actuary as the most appropriate.[8]   (Ciner Dep. 23).  That determination is entitled to deference.  29 U.S.C. § 1401(a)(3)(B).

In attacking the assessments, Sofco has recycled an argument advance in New York Times v. Newspaper  & Mail Deliverers' Publishers Pension Fund,  303 F. Supp. 3d 236, (S.D.N.Y.  2018).  Sofco contends that Ciner "made the same mistake that the fund made in *New York Times.*  (Sofco Brief p. 21).

In challenging the withdrawal liability calculation, the Sofco must demonstrate that the calculation was "based . . . on a combination of methods and assumptions that falls outside the range of reasonable actuarial practice."  Concrete Pipe v. Constr. Laborers Pension Trust, 508 U.S. 602, 635 (1993); 29 U.S.C. § 1401(a)(3)(B); Bd. of Trustees, Michigan United Food & Commercial Workers Union v. Eberhard Foods, Inc., 831 F.2d 1258, 1261 (6th Cir. 1987) ("[T]he test is not which withdrawal determination is the most reasonable but rather whether the challenged determination is unreasonable or clearly erroneous."). Sofco cannot meet its burden to establish that the use of the Segal Blend was outside the range of reasonable actuarial practices.

Contrary to Sofco's contention, there is no requirement that the actuarial assumptions used to determine withdrawal liability be the same as those used for [minimum funding] purposes.  PBGC Op. Ltr. 86-24, 1986 WL 38802, at *1.   Accordingly, the Arbitrator should not set aside Ciner's decision to utilize the Segal Blend.  *Combs v. Classic Coal Corp.*, No. CIV. A.

---

[8] This argument was not contained in Sofco's Request for Review.

84-1562 TPJ, 1990 WL 66583, at *3, n.5 (D.D.C. Apr. 6, 1990), *aff'd*, 931 F.2d 96 (D.C. Cir.

1991).

Sofco's Brief tracks the district court's decision in *New York Times* – a decision that is a

clear outlier.  Notably, on appeal before the Second Circuit, the PBGC has filed an amicus brief

supporting the pension fund's reliance on the Sergal Blend.[9]   Given this clear endorsement

from the PBGC.  *Trustees of Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d

127, 134–35 (2d Cir. 2012)( "The PBGC, the agency charged with administering the withdrawal-

liability provisions under ERISA, is traditionally afforded substantial deference in its reasonable

interpretations of the statute.").  Here, the Arbitrator should reject Sofco's argument and follow

the position of the PBGC.

## III.    CONCLUSION

Sofco continues to perform work for which contributions were and would be required by

the CBA.  Complete withdrawal liability was properly assessed.

Sofco's challenge to the partial withdrawal liability assessments is equally lacking in

merit.   Sofco dramatically decreased its participation in the Fund, continuing to contribute for

only the above-referenced forklift and shop work.  Sofco admits that the forklift and shop work

was not a substantial part of its business.  As such the Fund reasonably determined that the

decline in contributions was significant enough to trigger partial withdrawals in 2011 and 2012.

Sofco cannot meet its burden to have these assessments set aside.  Sofco must pay each of the

three assessments in full for a total of $824,300.

---

[9] The PBGC's Amicus Brief is attached hereto as Exhibit C.

Respectfully submitted,

*/s/Daniel J. Clark*
Daniel J. Clark (0075125)
Allen S. Kinzer (0040237)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, OH 43216-1008
Direct Phone: (614) 464-6436
Direct Fax: (614) 719-4650
Email: djclark@vorys.com
        askinzer@vorys.com

## **CERTIFICATE OF SERVICE**

The undersigned does hereby certify that a true and accurate copy of the foregoing, *Response to Sofco Erectors, Inc's Motion for Summary Judgment,* was submitted to the AAA at JaniceHoldinski@adr.org to the Arbitrator John E. Sands, and served on this 1st day of March 2019, upon the following:

**By e-mail:**

Gary L. Greenberg
Mark Gerano
Jackson Lewis P.C.
PNC Center, 26th Floor
201 E. Fifth St.
Cincinnati, OH 45202
Gary.Greenberg@Jacksonlewis.com

*Attorneys for Sofco Erectors, Inc.*

<u>s/Daniel J. Clark</u>
Daniel J. Clark

3/01/2019 32374216



**VORYS**

Vorys, Sater, Seymour and Pease LLP
Legal Counsel

52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216-1008

614.464.6400 | www.vorys.com

Founded 1909

Daniel J. Clark
Direct Dial   (614) 464-6436
Direct Fax    (614) 719-4650
Email djclark@vorys.com

November 20, 2018

**<u>VIA E-MAIL AND U.S. MAIL</u>**

Gary L. Greenberg
Mark B. Gerano
Jackson Lewis P.C.
425 Walnut Street, Suite 2300
Cincinnati, OH 45202
Gary.Greenberg@jacksonlewis.com
Mark.Gerano@jacksonlewis.com

    Re: Sofco Erectors, Inc. v. Ohio Operating Engineers Pension Fund;
      AAA Case No. 01-18-0001-3790

Dear Counsel:

    I write in response to your correspondence dated November 7, 2018, Sofco Erector's Inc.'s supplemental discovery responses dated October 26, 2018, and Mr. Gerano's emails to me dated November 7 and 12, 2018.

    First, your November 7, 2018 email indicates that it is your "understanding" that the Segal reports for 2003-2007 related to the Fund's calculation of withdrawal liability. The Fund has previously produced many years' worth of reports, including the years of the assessments at issue. Please explain the basis of your understanding that these reports are relevant to this matter.

    Next, your November 7, 2018 correspondence purports to constitute a Supplemental Request for Review. Plainly the time for Sofco to request a review of the assessments has long passed. This correspondence is not a timely or proper request. Incredibly, this most recent letter indicates that Exhibit 1 to Sofco's original November 29, 2017 Request for Review was a false document.

    Sofco's original Request for Review contended that an arm's length asset purchase transaction took place on April 1, 2004. This transaction was anything but arm's length. Sofco's shifting statements regarding its prior ownership group have been combined with inaccurate sworn statements from Mr. Gates. Indeed, the November 29, 2017 Request for



**VORYS**

Legal Counsel

Gary L. Greenberg
Mark B. Gerano
November 20, 2018
Page 2

Review identified the purchasers of Old Sofco's assets as Messrs. Hesford and Powell.  No mention was made of the shares owned by Messrs. Schmitt and Ludwig.  This is notable because Mr. Ludwig was identified as an owner of "Old Sofco" in the same correspondence, a fact that is now apparently denied.

Given the burden of proof incumbent on Sofco in this matter, we would have expected Sofco to produce some actual documentation describing the owners of Southern Ohio Fabricators, Inc. and Sofco Erectors Inc. (both before and after 2004).  The asset purchase agreement indicates that your clients acquired the books and records of the predecessor. You indicate that documents reflective of the transaction are held by Southern Ohio Fabricator, Inc.'s law firm.  Please identify the firm from which these documents may be obtained.  We intend to ask Arbitrator Sands to issue a subpoena for these records.  Also, the asset purchase agreement should be produced in an unredacted format.  Sofco cannot claim it entered into an arm's length transaction without revealing the material terms of the transaction.  Finally, upon receipt of the documents related to Southern Ohio Fabricator, Inc. and Sofco's alleged asset purchase, we reserve the right to schedule a deposition.

In terms of the case schedule, we would hope that the documents can be produced and a deposition scheduled in short order.  We would propose that the discovery extend through the month of December with all the remaining case schedule dates extended in turn.  This additional effort is required given Sofco's shifting and inaccurate prior representations to the Fund.  On the other hand, if Sofco is willing to withdraw its argument that the assessments should be reduced by virtue of the 2004 asset purchase, the Fund would require no further discovery and we could propose a new case schedule starting with a new deadline for dispositive motions.

Sincerely,

*Daniel J Clark*

Daniel J. Clark

DJC/lm

cc:  Allen S. Kinzer *(via email)*

Representing Management Exclusively in Workplace Law and Related Litigation

# jackson|lewis
### Attorneys at Law

| | | | |
|---|---|---|---|
| Jackson Lewis P.C. | ALBANY NY | GREENVILLE SC | MONMOUTH COUNTY NJ | RALEIGH NC |
| PNC Center | ALBUQUERQUE NM | HARTFORD CT | MORRISTOWN NJ | RAPID CITY SD |
| 201 E. Fifth Street | ATLANTA GA | HONOLULU HI* | NEW ORLEANS LA | RICHMOND VA |
| 26th Floor | AUSTIN TX | HOUSTON TX | NEW YORK NY | SACRAMENTO CA |
| Cincinnati OH 45202 | BALTIMORE MD | INDIANAPOLIS IN | NORFOLK VA | SALT LAKE CITY UT |
| Tel 513 898-0050 | BIRMINGHAM AL | JACKSONVILLE FL | OMAHA NE | SAN DIEGO CA |
| Fax 513 898-0051 | BOSTON MA | KANSAS CITY REGION | ORANGE COUNTY CA | SAN FRANCISCO CA |
| www.jacksonlewis.com | CHICAGO IL | LAS VEGAS NV | ORLANDO FL | SAN JUAN PR |
| | CINCINNATI OH | LONG ISLAND NY | PHILADELPHIA PA | ST. LOUIS MO |
| | CLEVELAND OH | LOS ANGELES CA | PHOENIX AZ | SEATTLE WA |
| | DALLAS TX | MADISON, WI | PITTSBURGH PA | STAMFORD CT |
| | DAYTON OH | MEMPHIS TN | PORTLAND OR | TAMPA FL |
| | DENVER CO | MIAMI FL | PORTSMOUTH NH | WASHINGTON DC REGION |
| | DETROIT MI | MILWAUKEE WI | PROVIDENCE RI | WHITE PLAINS NY |
| | GRAND RAPIDS | MINNEAPOLIS MN | | |

*through an affiliation with Jackson Lewis P.C., a Law Corporation

My Direct Dial is: 513.719.5701
My Email Address is: mark.gerano@jacksonlewis.com

November 21, 2018

**VIA U.S. MAIL AND E-MAIL**
Daniel J. Clark
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216-1008
djclark@vorys.com

Re:     Sofco Erectors, Inc./Ohio Operating Engineers Pension Fund
        AAA Case No. 01-18-0001-3790
        JS Case No. 4510

Dear Dan:

This letter responds to your letter dated November 20, 2018.

You asked why Sofco believes the Segal reports from 2003-2007 are relevant. The Fund's actuary, Mr. Ciner, testified that when the unfunded liability reaches zero, "pools" of unfunded liability from prior years still remain. (Ciner Dep. 45.) He testified those pools can be eliminated slowly over time. Sofco's actuary, Mr. Libman, has explained that in order to make the calculations using Mr. Ciner's methodology, he needs the Segal reports from 2003-2007. Please produce the reports.

Next, Sofco disagrees with your characterization of its Amendment to its Supplemental Request for Review. Your letter indicates the document purports to be a "supplemental request for review." It is not. The document makes a simple amendment to Sofco's supplemental request for review to correct a document that contained inaccurate factual information about Southern Ohio Fabricators, Inc.'s shareholders. When Sofco noticed Jim Ludwig and Tim Gates were listed as shareholders it knew the document was incorrect. Since then, Sofco has provided sworn testimony from both Gates and Ludwig confirming that neither ever owned shares in Southern Ohio Fabricators, Inc. The document was not, as you suggest, a "false document." It contained incorrect information that Sofco overlooked initially, and immediately upon learning about the incorrect information Sofco corrected it.

Your letter requests an unredacted version of the asset purchase agreement. Please provide an explanation as to why the Fund requests an unredacted copy of the asset purchase agreement. Upon

# jackson | lewis
Attorneys at Law

Daniel J. Clark

Vorys, Sater, Seymour and Pease LLP

November 21, 2018

Page 2

receiving the Fund's reasons for why it needs to review the redacted information, Sofco will evaluate whether to produce it. As it stands, Sofco believes the document as it was produced contains sufficient information.

Next, Keating Muething & Klekamp ("KMK") may have information regarding Southern Ohio Fabricators, Inc.'s records. Sofco believes that firm formerly represented Southern Ohio Fabricators, Inc. KMK has never represented Sofco. Moreover, although your letter suggests Sofco may have possession of records from Southern Ohio Fabricators, Inc., it does not. Sofco purchased the books and records of its predecessor, Sofco Erectors, Inc., not Southern Ohio Fabricators, Inc. Regarding the documents Sofco does possess, we believe Sofco produced all documents responsive to the Fund's discovery requests. In an abundance of caution and to ensure all responsive documents are produced, Sofco will make an additional search for responsive documents and will produce any responsive documents it locates that it has not already produced.

Next, Sofco declines the Fund's invitation to abandon its argument that its predecessor's contribution history should not be considered. Sofco maintains it is inappropriate to consider its predecessor's contribution history.

Lastly, we agree in principle to your suggested schedule change. We believe a slight delay in the hearing date may be necessary if we continue discovery through the end of December. During our conference call with the Arbitrator we will discuss the dates and reach an agreement.

Sincerely,
JACKSON LEWIS P.C.

Mark B. Gerano

MBG

cc:    Gary Greenberg (via e-mail)
       Allen Kinzer (via e-mail)

4849-1507-0848, v. 1

# № 18·1140

№ 18-1408 (Cross-Appeal)

## United States Court Of Appeals For The Second Circuit

THE NEW YORK TIMES COMPANY,

*Plaintiff-Appellant-Cross-Appellee,*

v.

NEWSPAPER AND MAIL DELIVERERS'-PUBLISHERS' PENSION FUND, AND

THE BOARD OF TRUSTEES OF THE
NEWSPAPER AND MAIL DELIVERERS'- PUBLISHERS' PENSION FUND,

*Defendants-Appellees-Cross-Appellants.*

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE PENSION BENEFIT GUARANTY CORPORATION AS *AMICUS CURIAE* SUPPORTING CROSS-APPELLANTS

JUDITH STARR, *General Counsel*
ISRAEL GOLDOWITZ, *Deputy General Counsel*
JON CHATALIAN, *Acting Assistant General Counsel*
JOHN GINSBERG, *Attorney*

PENSION BENEFIT GUARANTY CORPORATION
1200 K Street, N.W.
Washington, DC 20005-4026
(202) 326-4020, ext. 3714 (telephone)
(202) 326-4112 (facsimile)
ginsberg.john@pbgc.gov

# TABLE OF CONTENTS

INTEREST OF THE *AMICUS CURIAE* ............................................................ 1

STATEMENT OF THE CASE ............................................................................. 4

    Legal Background ........................................................................................... 4

    The Present Controversy ............................................................................... 9

ARGUMENT ....................................................................................................... 15

    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR
    BY FAILING TO APPLY THE STATUTORY PRESUMPTION IN
    FAVOR OF THE PLAN AND IMPERMISSIBLY SHIFTING THE
    BURDEN OF PROOF ON THE REASONABLENESS OF
    ACTUARIAL ASSUMPTIONS ..................................................................... 15

    I.    The district court correctly held that MPPAA does not require
        a plan's actuary to value vested benefits for withdrawal liability
        purposes using her funding interest assumption, which should
        have resulted in a decision in favor of the Fund ............................ 15

    II.   The district court failed to apply MPPAA's presumption that
        the plan actuary's determination of the plan's unfunded vested
        benefits was correct, impermissibly shifted the burden of proof
        from the Times to the Fund, and, in so doing, contradicted its
        correct holding that the funding interest assumption need
        not be applied ................................................................................... 23

CONCLUSION ..................................................................................................... 32

# TABLE OF AUTHORITIES

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .................................................30

*Bazemore v. Friday,*
    478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986).....................................30

*Beck v. PACE International Union,*
    551 US. 96 (2007)...............................................................2

*Board of Trustees, Michigan United Food & Commercial Workers*
    *Union v. Eberhard Foods, Inc.,* 831 F.2d 1258 (6th Cir. 1987)..............................18

*Citrus Valley Estates, Inc. v. C.I.R.,*
    49 F.3d 1410 (9th Cir. 1995) ...........................................17

*Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent)*
    *Pension Fund v. CPC Logistics, Inc.,* 698 F.3d 346 (7th Cir. 2012)..........17, 21, 22

*Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent)*
    *Pension Fund v. Louis Zahn Drug Company,* 890 F.2d 1405 (7th Cir. 1989) .......30

*Combs v. Classic Coal Corporation,*
    No. 84-1562, 1990 WL 66583 (D.C.C. Apr. 6, 1990) ......................................25

*Combs v. Classic Coal Corporation,*
    931 F.2d 96 (D.C. Cir. 1991)..................................................23, 24, 25

*Concrete Pipe & Product of California, Inc. v. Construction Laborers Trust for*
    *Southern California,* 508 U.S. 602 (1993) ..................................4, 14, 19, 20, 24, 30

*Huber v. Casablanca Industries, Inc.,*
    916 F.2d 85 (3d Cir. 1990)...............................................................17

*Hughes Aircraft Co. v. Jacobson,*
    525 U.S. 432 (1999) ...........................................................4

*ILGWU National Retirement Fund v. Levy Brothers Frocks, Inc.,*
  846 F.2d 879 (2d Cir. 1988)...........................................................7, 25

*In re U.S. Airways Group, Inc.,*
  303 B.R. 784 (Bankr. E.D. Va. 2003)......................................... 11, 27

*Keith Fulton & Sons v. New England Teamsters & Trucking Industry Pension Fund,*
  762 F.2d 1137 (1st Cir. 1985)...........................................................24

*Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund,*
  No. 17-5076, 2018 U.S. Dist. LEXIS 111969 (D.N.J. July 3, 2018), *appeal dismissed by stipulation*, No. 18-2709 (3d Cir. Oct. 9, 2018) ............16, 17, 21, 22

*Masters, Mates & Pilots Pension Plan v. USX Corporation,*
  900 F.2d 727 (4th Cir. 1990) .............................................................18

*Mead Corporation v. Tilley,*
  490 U.S. 714 (1989) ...........................................................................2

*Mertens v. Hewitt Associates,*
  508 U.S. 248 (1993) ...........................................................................2

*Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.,*
  513 U.S. 414 (1995) .........................................................................17

*Nachman Corporation v. Pension Benefit Guaranty Corporation,*
  446 U.S. 359 (1980) ...........................................................................2

*National Retirement Fund v. Metz Culinary Management, Inc.,*
  No. 16-CV-2408, 2017 WL 1157156 (S.D.N.Y. Mar. 27, 2017) ....................27

*Perkin-Elmer Corporation v. Computervision Corporation,*
  732 F.2d 888 (Fed. Cir. 1984) ...........................................................30

*Plan Board of Sunkist Retirement Plan v. Harding & Leggett, Inc.,*
  463 F. App'x 702 (9th Cir. 2011).......................................................27

*Rhoades, McKee & Boer v. United States,*
  43 F.3d 1074 (6th Cir. 1995) ............................................................17

*Russello v. United States,*
   464 U.S. 16, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983) .......................................... 18

*Santa Fe Pacific Corporation v. Central States, Southeast & Southwest Areas*
   *Pension Fund,* 22 F.3d 725 (7th Cir. 1994) ......................................................25

*SUPERVALU, Inc. v. Board of Trustees of Southwest Pennsylvania & West*
   *Maryland Area Teamsters & Employers Pension Fund,*
   500 F.3d 334 (3d Cir. 2007).................................................................................25

*Trustees of the Pressman Local 72 Industry Pension Fund v. Judd & Detweiler, Inc.,*
   736 F. Supp. 1351 (D. Md. 1988)................................................................. 19, 22

*United States v. Naftalin,*
   441 U.S. 768 (1979) ............................................................................................18

*Vinson & Elkins v. C.I.R.,*
   7 F.3d 1235 (5th Cir. 1993) .................................................................................17

*Wachtell, Lipton, Rosen & Katz v. C.I.R.,*
   26 F.3d 291 (2d Cir. 1994).................................................................................17


<u>U.S. Code</u>

Title 26
   Section 404(a)(1)(A) ............................................................................................17
   Section 412...............................................................................................................5
   Section 412(c)(3)(1988 & 1994).............................................................. 17, 20, 22
   Section 412(c)(9)(1976 & Supp. III 1980).........................................................18
   Section 431...............................................................................................................5
   Section 431(c)(3) ...............................................................................................8, 15
   Section 431(c)(7) .................................................................................... 6, 18, 29
   Section 432...............................................................................................................2
   Section 4971.............................................................................................................5
   Section 6059 ............................................................................................................6
   Section 7701(a)(35) ..........................................................................................5, 29

Title 29
   Section 186(c)(5) ....................................................................................................4
   Section 1001a(a)(4)(A)........................................................................................25

Section 1002(16)(B)(iii) .................................................................. 4
Section 1002(34) .......................................................................... 4
Section 1002(35) .......................................................................... 4
Section 1082(c)(3) ................................................................. 20, 22
Section 1084(c)(3) .................................................................. 8, 15
Section 1084(c)(7)(A) ......................................................... 6, 18, 29
Section 1085 .............................................................................. 2
Section 1103(a) ........................................................................... 4
Section 1241 ........................................................................ 5, 29
Section 1242 ........................................................................ 5, 29
Sections 1301-1461 ...................................................................... 1
Section 1301(a)(3) ....................................................................... 4
Section 1301(a)(18) .................................................................... 11
Section 1302(b)(1) ....................................................................... 3
Section 1321 .............................................................................. 4
Section 1322a ....................................................................... 2, 7
Section 1322b ............................................................................ 2
Section 1361 .............................................................................. 2
Section 1362(a) ......................................................................... 11
Section 1362(b) ......................................................................... 11
Section 1381(a) ........................................................................... 7
Section 1383(a) ........................................................................... 6
Section 1393(a) ........................................................................... 8
Section 1393(a)(1) ...................................................................... 15
Section 1401(a)(1) ........................................................................ 9
Section 1401(a)(2) ........................................................................ 9
Section 1401(a)(3)(B) ............................................................ 10, 23
Section 1401(a)(3)(B)(i) ............................................................... 30
Section 1401(b)(2) ...................................................................... 13
Section 1401(c) .......................................................................... 30
Section 1431 .............................................................................. 2
Section 1461 .............................................................................. 7

Other Authorities

20 C.F.R. §§ 901.0-.72 ............................................................ 5, 29

26 C.F.R. § 301.6059-1 ................................................................ 6

29 C.F.R. pt. 4221 ....................................................................... 9

29 C.F.R. § 4281.13 ..................................................................................... 12

29 C.F.R. Pt. 4044 ...................................................................................... 11

Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364,
    94 Stat. 1208................................................................................................. 1

Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 ........ 20, 22

Valuation of Benefits, Mortality Assumptions,
    70 Fed. Reg. 72205 (Dec. 2, 2005) ............................................. 11, 27

Actuarial Standard of Practice,
    http://www.actuarialstandardsboard.org/standards-of-practice/.............5, 29

Actuarial Standard of Practice No. 27 §§ 3.8.3, 3.9 (Sept. 2013 ed.),
    *available at* http://www.actuarialstandsboard.org/wp-content
    /uploads/2014/02/asop027_172.pdf ............................................... 6

Actuarial Standard of Practice No. 27 § 3.6
    (Sept. 2007 ed. Updated May 1, 2011)................................................25

Actuarial Standard of Practice No. 27 § 3.6 (Sept. 2013 ed.) ...........................25

H.R. Rep. No. 96-869, pt. 1 (1980),
    *as reprinted in* 1980 U.S.C.C.A.N. 2918, 2935 ...................................26

Eric J. Magnuson & David F. Herr, *Federal Appeals Jurisdiction*
    *and Practice* § 5:3 (2018 ed. 2017)..........................................................30

Fed. R. App. P. 29 (a) ......................................................................................... 3

Amy Gallo, *A Refresher on Net Present Value*, Harv. Bus. Rev.
    (Nov. 19, 2014), https://hbr.og/2014/11/a-refresher-on-net-
    present-value.......................................................................................10

Judith Mazo & Susan Lee, *Multiemployer Pension Plan Withdrawal*
    *Liability*, 23 Ben. L. J., no. 4, 2010 ......................................................25

PBGC, FY2017 Projections Report 1, 7 (May 31, 2018),
    https://www.pbgc.gov/sites/default/files/fy-2017-
    projections-report.pdf ................................................................................. 2


PBGC Opin. Ltr. 86-24 (1986),
    https://www.pbgc.gov/sites/default/files/legacy/
    docs/oplet/86-24.pdf .................................................................................. 15

## INTEREST OF THE *AMICUS CURIAE*

This case presents issues under the Multiemployer Pension Plan Amendments Act of 1980 ("**MPPAA**"), Pub. L. No. 96-364, 94 Stat. 1208. The Pension Benefit Guaranty Corporation ("**PBGC**") is the federal agency responsible for administering Title IV of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), 29 U.S.C. §§ 1301-1461 (2012 & Supp. V 2018),[1] including provisions of MPPAA at issue.

ERISA is a "comprehensive and reticulated statute"[2] and "enormously complex and detailed."[3] As a unanimous Supreme Court said in *Beck v. Pace Int'l Union*, PBGC's views on the interpretation of Title IV of ERISA—expressed in that case as *amicus curiae*—warrant deference, "for 'to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to embar[k] upon a voyage without a compass.'"[4]

PBGC insures the payment of pension benefits to participants in insolvent

---

[1]   Unless otherwise specified, all citations to the United States Code refer to the 2012 edition and 2018 supplement. Parallel cites to ERISA are omitted.

[2]   *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361 (1980).

[3]   *Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993).

[4]   *Beck v. PACE Int'l Union*, 551 U.S. 96, 104 (2007) (quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 722, 725-726 (1989)).

multiemployer defined-benefit pension plans.[5]  Coverage extends to some ten million participants in some 1,400 multiemployer plans.  About one quarter of those plans are in "critical" status and must adopt a rehabilitation plan that may include reduced benefit accruals and increased employer contributions, and some 130 are expected to become insolvent within twenty years unless they reduce benefits to sustainable levels.[6]

The district court disregarded the statutory burden of proof in an employer's challenge to actuarial assumptions used to determine its liability upon withdrawal from a multiemployer plan.  Affirmance would likely increase the cost and uncertainty of arbitration and litigation over withdrawal liability, contrary to the statutory design. That in turn would tend to hasten plan insolvency, triggering PBGC's guarantee and participants' loss of benefits above the guaranteed level.

As an agency of the United States, PBGC may file an *amicus curiae* brief without leave of Court.[7]  Through its independent litigating authority, PBGC may represent itself.[8]

---

[5]  *See* 29 U.S.C. §§ 1322a, 1322b, 1361, 1431.

[6]  *See* 26 U.S.C. § 432; 29 U.S.C. § 1085; PBGC, *FY2017 Projections Report* 1, 7 (May 31, 2018), https://www.pbgc.gov/sites/default/files/fy-2017-projections-report.pdf.

[7]  *See* Fed. R. App. P. 29(a).

[8]  *See* 29 U.S.C. § 1302(b)(1).

Case: 18-4146 Document 65, Filed 07/2018, 2428296 Page: 110 of 74

# STATEMENT OF THE CASE

## Legal Background

A multiemployer plan is a defined benefit pension plan to which more than one employer is required to contribute and that is maintained pursuant to one or more collective bargaining agreements.[9] A multiemployer plan provides benefits for employees of all contributing employers. Multiemployer plans allow employers to provide portable pensions with advantageous cost- and risk-sharing mechanisms, which helps ensure a trained labor force.[10]

A multiemployer plan is administered by a board of trustees, half appointed by labor and half by management, with a tie-breaker mechanism.[11] Plan assets must be held in trust.[12] The board of trustees is the "plan sponsor."[13]

In a defined benefit pension plan, retirement benefits are defined by the plan— usually as a fixed amount or percentage of pay times years of service—rather than as the balance of a participant's individual account, as in a defined contribution plan. The employer therefore bears the shortfall risk.[14]

---

[9]  29 U.S.C. §§ 1301(a)(3), 1321.

[10]  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 605-07 (1993).

[11]  *See* 29 U.S.C. § 186(c)(5).

[12]  *See* 29 U.S.C. § 1103(a).

[13]  *See* 29 U.S.C. § 1002(16)(B)(iii).

[14]  *See* 29 U.S.C. § 1002(34)-(35); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432,

Multiemployer plans are funded by employer contributions, withdrawal liability payments (described below), and returns on investment of plan assets. A contributing employer's liability for contributions is determined by its collective bargaining agreement. That agreement provides the employer's contribution rate and defines the contribution base unit (such as an hour of service by an employee). The employer's liability for contributions is determined by multiplying its contribution rate by the number of contribution base units.

Multiemployer plans are subject to statutory minimum funding standards.[15] If those standards are not met, contributing employers are generally subject to an excise tax.[16]

Determining the minimum funding for a "plan year" (typically a calendar year) requires a determination of the present value of future liabilities for benefits and of the costs of plan administration. Each multiemployer plan must retain an enrolled actuary, who is subject to regulatory and professional standards,[17] to prepare an

---

439-40 (1999).

[15] *See* 26 U.S.C. §§ 412, 431.

[16] *See* 26 U.S.C. § 4971.

[17] *See* 29 U.S.C. §§ 1241-42; 26 U.S.C. § 7701(a) (35); 20 C.F.R. §§ 901.0-.72; Actuarial Standards of Practice, http://www.actuarialstandardsboard.org/standards-of-practice/.

annual valuation of the plan's liabilities,[18] and to annually calculate the total amount of contributions necessary to avoid a funding deficiency for the plan year.[19] That minimum funding amount is reported to the Internal Revenue Service.[20]

To value future benefit liabilities, the actuary must make certain assumptions, including turnover (*i.e.*, how many participants will vest in their benefits and in what amounts), and retirement age and mortality (*i.e.*, how long participants and their beneficiaries will receive benefits). The actuary also assumes an interest rate, which she uses to discount future plan liabilities to the present dollar equivalent ("**Funding Interest Assumption**"). The actuary may select a Funding Interest Assumption that reflects anticipated average investment returns on plan assets, considering the plan's investment policy.[21]

An employer completely withdraws from a multiemployer plan when it permanently ceases to have an obligation to contribute to the plan or to have operations covered by the plan.[22] The plan remains liable for the benefits of the

---

[18]  *See* 26 U.S.C. § 431(c)(7); 29 U.S.C. § 1084(c)(7)(A).

[19]  *See* 26 U.S.C. § 6059; 26 C.F.R. 301.6059-1.

[20]  *See id.*

[21]  *See* Actuarial Standard of Practice No. 27 ("**ASOP 27**") §§ 3.8.3, 3.9 (Sept. 2013 ed.), http://www.actuarialstandardsboard.org/wp-content/uploads/2014/02/asop027_172.pdf.

[22]  *See* 29 U.S.C. § 1383(a).

Case: 18-1140 Document 55, Filed: 2018, 1242528 Page: 10 of 41

withdrawn employer's employees.  ERISA protects plan participants and contributing employers by imposing withdrawal liability on the withdrawn employer.[23]  Because withdrawal liability is a source of plan funds, it also protects PBGC's multiemployer-plan insurance fund, which covers benefit payments upon plan insolvency.[24]  That insurance fund is projected to become insolvent by 2026.[25]

ERISA also imposes withdrawal liability on an employer that partially withdraws, which occurs when there is a 70% decline in the employer's contribution base units or a partial cessation of the employer's contribution obligation.[26]

Withdrawal liability is an employer's share of the plan's unfunded vested benefits.[27]  "Unfunded vested benefits" means the value of vested benefits minus the value of plan assets.[28]

The plan's enrolled actuary determines the present value of vested benefits.  To do so, the actuary must use actuarial assumptions, as when she values benefit liabilities in determining the plan's minimum funding.

---

[23]  *See* 29 U.S.C. § 1381(a); *ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 880-81 (2d Cir. 1988).

[24]  29 U.S.C. §§ 1322a, 1461.

[25]  PBGC, *FY2017 Projections Report* 1-2, 10-12 (May 31, 2018), https://www.pbgc.gov/sites/default/files/fy-2017-projections-report.pdf

[26]  *See* 29 U.S.C. §§ 1381, 1385.

[27]  *See* 29 U.S.C. § 1381(b)(1).

[28]  *See* 29 U.S.C. § 1393(c).

Separate legal standards govern the actuary's selection of actuarial assumptions for determining withdrawal liability and minimum funding. Under section 4213(a) of ERISA, a plan's actuary must value the plan's unfunded vested benefits for withdrawal liability purposes based on:

> (1) actuarial assumptions and methods which, *in the aggregate, are reasonable* (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or

> (2) actuarial assumptions and methods set forth in [PBGC] regulations for purposes of determining an employer's withdrawal liability.[29]

Until PBGC promulgates a regulation providing actuarial assumptions and methods that may be used under section 4213(a)(2), section 4213(a)(1) supplies the operative standard.

A plan's actuary must value the plan's liabilities for minimum funding purposes based on actuarial assumptions and methods:

> *each of which is reasonable* (taking into account the experience of the plan and reasonable expectations), and . . . which, in combination, offer the actuary's best estimate of anticipated experience under the plan."

26 U.S.C. § 431(c)(3); 29 U.S.C. § 1084(c)(3) (the "**Funding Assumptions Standard**") (emphasis added).

---

[29] 29 U.S.C. § 1393(a) (emphasis added).

## The Present Controversy

The Newspapers & Mail Deliverers'-Publishers' Pension Fund is a multiemployer plan maintained pursuant to collective bargaining agreements between the Newspaper and Mail Deliverers Union of New York and Vicinity and several newspaper publishers. The plan is sponsored and administered by a joint board of trustees. We will refer to both the plan and its board of trustees as the "**Fund**."

The New York Times Co. (the "**Times**") is a contributing employer to the Fund.

The Fund notified the Times that it had twice partially withdrawn from the Fund, in successive plan years ending May 31, 2012, and May 31, 2013. The Fund assessed withdrawal liability of $25.7 million for the first partial withdrawal and $7.8 million for the second.[30]

Withdrawal liability disputes are subject to mandatory arbitration under ERISA section 4221, conducted under "fair and equitable procedures . . . promulgated by [PBGC]."[31] In such a proceeding,

> the determination of a plan's unfunded vested benefits is presumed correct unless [the employer] shows by a preponderance of the evidence that—

---

[30] A.28-32. "**A.__**" refers to the Times's Appendix, ECF Nos. 37-38. "**SA.__**" refers to the Times's Special Appendix, ECF No. 36. "**FA.__**" refers the Fund's Supplemental Appendix, ECF No. 58.

[31] 29 U.S.C. § 1401(a)(1)-(2); *see* 29 C.F.R. pt. 4221.

> (i) the actuarial assumptions and methods used were in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or
>
> (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

29 U.S.C. § 1401(a)(3)(B).

The Times initiated arbitration, disputing its withdrawal liability assessments on several grounds, including that: (1) section 4213(a)(1) requires that, in determining withdrawal liability, vested benefits be valued using the plan actuary's Funding Interest Assumption; and (2) because the Fund's actuary assumed an interest rate lower than her Funding Interest Assumption, the Fund's unfunded vested benefits and the Times's withdrawal liability were overstated.[32]

In assessing the Times's withdrawal liability, the Fund relied on a valuation of the Fund's unfunded vested benefits prepared by enrolled actuary Rosana Egan ("**Egan**") of The Segal Company ("**Segal**"), who valued the Fund's vested benefits using the "**Segal Method**."[33]

Under the Segal Method: (1) vested benefits in excess of the value of plan assets are valued using the actuary's Funding Interest Assumption, and (2) vested

---

[32] FA.112-15; A.58-63. Using a lower discount rate to value future payments results in a higher present value. *See* Amy Gallo, *A Refresher on Net Present Value*, Harv. Bus. Rev. (Nov. 19, 2014), https://hbr.org/2014/11/a-refresher-on-net-present-value.

[33] SA.17-18; A.33-35.

benefits covered by the value of plan assets are valued using interest assumptions prescribed by PBGC under 29 C.F.R. Pt. 4044 ("**PBGC Close-Out Rates**").[34] That blend of interest assumptions (the "**Segal Blend**") yielded, in this case, an average interest assumption of approximately 6.5%.[35] Egan's Funding Interest Assumption was 7.5%.[36]

PBGC Close-Out Rates are used for valuing the liabilities of a terminated single-employer plan, which affects employer liability to PBGC for the plan's unfunded benefit liabilities.[37] PBGC values liabilities based on the average market price of a life annuity, which PBGC determines from a quarterly survey of insurance companies. Valuing benefits using PBGC Close-Out Rates and the other actuarial assumptions described in 29 C.F.R. pt. 4044 approximates the cost of purchasing annuities to cover those benefits.[38] Those assumptions must also be used to value

---

[34] A.29

[35] *Id.*

[36] *Id.* Because of the leveraging effect of discounting over long periods, the 100-basis-point difference resulted in a 33% increase in the Times's withdrawal liability, according to the Times's expert. A.144.

[37] *See* 29 U.S.C. §§ 1301(a)(18); 1362(a)-(b).

[38] *See* Valuation of Benefits; Mortality Assumptions, 70 Fed. Reg. 72205, 72205-06 (Dec. 2, 2005); *In re U.S. Airways Grp., Inc.*, 303 B.R. 784, 788-89 (Bankr. E.D. Va. 2003). Annuity prices are based on returns on high-quality corporate bonds. *See id.* at 795. When interest rates are high, as in the 1980s, PBGC Close-Out Rates are relatively high. Currently, they are relatively low.

benefits in multiemployer plans terminated because all employers have withdrawn.[39]

In the arbitration, the Fund called Egan, who testified that her use of the Segal Method is appropriate. She explained that, while contributing employers bear risk of plan investments underperforming the long-term average rate of return reflected in her Funding Interest Assumption (in that they may be called upon to increase their contributions), a withdrawn employer bears no such risk. It settles its liability once and for all in the fixed amount of its withdrawal liability. Therefore, it is appropriate to use PBGC Close-Out Rates, which approximate the market price of annuities, to value the funded portion of vested benefits (*i.e.*, the portion for which the plan could afford to purchase annuities).[40]

The Fund also called Dr. Ethan Kra, another enrolled actuary and a Fellow in the Society of Actuaries, as an expert witness. He opined that Egan's assumptions were reasonable in the aggregate.[41] The Times called Darren French, an enrolled actuary and an Associate in the Society of Actuaries, who asserted that only the Funding Interest Assumption was permissible, and who did not testify as to whether Egan's assumptions were reasonable in the aggregate.[42]

---

[39] *See* 29 C.F.R. § 4281.13.

[40] FA.28-29; A.35.

[41] FA.53, 118, 131-32; A.36.

[42] A.127 *et seq.* Mr. French is now employed as an actuary by the PBGC. He was

Arbitrator Mark L. Irvings found that Egan's actuarial assumptions were, in the aggregate, reasonable.[43]  He rejected the Times's argument that Egan's interest rate assumption violated ERISA, stating "the settled law is that the use of the Segal Blend is consistent with the requirements of [section 4213(a) of ERISA]."[44]  He noted that more than 250 multiemployer plans use the Segal Blend, including some plans not advised by Segal, that plans have done so for decades, and that "thousands of withdrawal liability assessments have been issued using the Segal Blend."[45]  He wrote:

> The consideration of a risk-free rate is within the range of actuarial reasonableness for an estimate of the anticipated experience under the plan. Particularly given investment results in recent years and the shrinking and endangered newspaper sector, protecting the Fund against the very real possibility that investment returns will be below what has been projected, is hardly unreasonable.

A.62.

When arbitration of a withdrawal liability dispute is complete, a party may bring an action to enforce, vacate, or modify the arbitral award.[46]  The Times sued to, *inter alia*, vacate that part of the arbitral award regarding Egan's interest rate assumption,

---

walled off from participation in this case.

[43]  A.58-63.

[44]  A.62.

[45]  A.34-35, 60.

[46]  *See* 29 U.S.C. § 1401(b)(2).

and for an order directing the Fund to recalculate the Times's withdrawal liability.[47]

District Judge Robert W. Sweet rejected the Times's argument that use of the Segal Blend was legally impermissible under section 4213(a)(1): "Insofar as the Times wishes to argue that use of different interest rates in different contexts is always impermissible as a matter of law, that argument fails. Both the ERISA provisions and *Concrete Pipe [& Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602 (1993)] . . . indicate otherwise.").[48]

Judge Sweet nevertheless held that Arbitrator Irvings clearly erred in concluding that Egan's use of the Segal Blend satisfied section 4213(a)(1) "in this instance," because "Egan's testimony before the Arbitrator was that a 7.5% percent [*sic*] assumption was her 'best estimate of how the . . . Fund's assets . . . will on average perform over the long term."[49] He ordered the Fund to recalculate the Times's withdrawal liability using the Fund's 7.5% Funding Interest Assumption.

The Fund, as cross-appellant, seeks reversal of the District Court's decision on Egan's use of the Segal Blend.

---

[47] Complaint ¶¶ 51, 63-84 & 1st request for relief, No. 17-6178 (S.D.N.Y. Aug. 15, 2017), ECF No. 1.

[48] SA.43-45.

[49] SA.45-49.

# ARGUMENT

**THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY FAILING TO APPLY THE STATUTORY PRESUMPTION IN FAVOR OF THE PLAN AND IMPERMISSIBLY SHIFTING THE BURDEN OF PROOF ON THE REASONABLENESS OF ACTUARIAL ASSUMPTIONS.**

**I.     The district court correctly held that MPPAA does not require a plan's actuary to value vested benefits for withdrawal liability purposes using her funding interest assumption, which should have resulted in a decision in favor of the Fund.**

Section 4213(a)(1) is similar, but not identical, to the Funding Assumptions Standard.  Both require "actuarial assumptions and methods . . . which, in combination, offer the actuary's best estimate of anticipated experience under the plan."  But while the Funding Assumptions Standard requires that the actuarial assumptions and methods used in determining a plan's minimum funding *each* be reasonable,[50] section 4213(a)(1) requires that the actuarial assumptions and methods used to determine withdrawal liability be reasonable *in the aggregate*.[51]

The Times contended: (1) that, because of the similarity of those two statutory standards, section 4213(a)(1) implicitly requires that withdrawal liability be determined using the plan actuary's Funding Interest Assumption (the "**Statutory Similarity Argument**"); and (2) that the Supreme Court "squarely held" in *Concrete Pipe* that

---

[50]  *See* 26 U.S.C. § 431(c)(3); 29 U.S.C. § 1084(c)(3).

[51]  *See* 29 U.S.C. § 1393(a)(1)

section 4213(a)(1) so requires.[52]  Judge Sweet correctly rejected both contentions,[53] as did the district court in *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, No. 17-5076, 2018 U.S. Dist. LEXIS 111969, at *31-48 (D.N.J. July 3, 2018), *appeal dismissed by stipulation,* No. 18-2709 (3d Cir. Oct. 9, 2018).[54]

The Statutory Similarity Argument is premised on two invalid propositions.

*First,* the Statutory Similarity Argument is valid only if section 4213(a)(1) sets a standard for the interest rate assumption considered in isolation.  But by its terms, section 4213(a)(1) applies to actuarial assumptions and methods only "in the aggregate" and "in combination."

*Second*, the Statutory Similarity Argument depends on the proposition that "actuarial assumptions and methods . . . , in combination, offer the actuary's best estimate of anticipated experience under the plan" means that the interest rate assumption must offer the actuary's best estimate of the long-term average rate of return on plan assets.  That proposition is inconsistent with precedent.  Courts have construed that requirement as "basically procedural in nature and . . . principally designed to ensure that the chosen assumptions actually represent the actuary's own

---

[52]  Times's Mem. in Supp. of M.S.J. at 24-25, No. 17-6178 (S.D.N.Y. Sept. 15, 2017), ECF No. 20.

[53]  SA.43-45 ("Both the ERISA provisions and *Concrete Pipe* . . . indicate otherwise.").

[54]  PBGC opined in 1986 that section 4213 does not require an actuary to use her funding assumptions.  *See* PBGC Opin. Ltr. 86-24 (1986), https://www.pbgc.gov/sites/default/files/legacy/docs/oplet/86-24.pdf.

judgment rather than the dictates of plan administrators or sponsors." *Wachtell, Lipton, Rosen & Katz v. C.I.R.*, 26 F.3d 291, 296 (2d Cir. 1994); *accord Citrus Valley Estates, Inc. v. C.I.R.,* 49 F.3d 1410, 1414-15 (9th Cir. 1995); *Rhoades, McKee & Boer v. United States*, 43 F.3d 1071, 1074-75 (6th Cir. 1995); *Vinson & Elkins v. C.I.R.*, 7 F.3d 1235, 1238 (5th Cir. 1993). Those decisions addressed the "actuary's best estimate" requirement under a predecessor Funding Assumptions Standard.[55] Courts have similarly construed the "actuary's best estimate" requirement under section 4213(a)(1).[56]

---

[55] The decisions followed a wave of IRS audits of defined benefit pension plans. At the time, both single- and multiemployer plans were subject to similar minimum funding requirements. The statutory minimum funding standard required "actuarial assumptions and methods . . . which, in combination, offer the actuary's best estimate of anticipated experience under the plan." *See* 26 U.S.C. § 412(c)(3) (1988 & 1994). Section 404 of the Internal Revenue Code limits tax-deductible contributions and requires that the actuarial assumptions used to determine maximum deductible contributions be those used for minimum funding. *See* 26 U.S.C. § 404(a)(1)(A). The IRS disallowed deductions of plan contributions because, the IRS asserted, the plan actuary's interest assumption was lower than his "best estimate of anticipated experience under the plan" and therefore overstated deductible contributions.

[56] *See Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 357 (7th Cir. 2012) (Posner, J.) ("[T]he plan's resolution directing Segal to switch from one method of estimating the interest rate to another and back again . . . violated the 'best estimate' requirement, which exists to maintain the actuary's independence."); *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, No. 17-5076, 2018 U.S. Dist. LEXIS 111969, at *51-55 (D.N.J. July 3, 2018); *see also Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 90-93 (3d Cir. 1990), *abrogated on other grounds by Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414 (1995) (upholding arbitrator's finding that actuary's valuation of plan assets for withdrawal liability purposes, "did not represent the best estimates of the actuary"

If Congress had wanted to require valuation of vested benefits for withdrawal liability purposes based on funding assumptions, Congress could easily have said so. "'The short answer is that Congress did not write the statute that way.'"[57] Rather, its use of disparate language in the same statute—here, in the Funding Assumptions Standard and section 4213(a)(1)—is presumed to be intentional.[58]

Section 4213(b)(1) does provide that, "for purposes of determining an employer's withdrawal liability . . . , the plan actuary may . . . rely on the most recent complete actuarial valuation used for purposes of section 412 of title 26 [the minimum funding standard] and reasonable estimates for the interim years of the unfunded vested benefits."[59] Courts have held that section 4213(b)(1) may *permit* use of funding assumptions for withdrawal liability purposes but *only if* the assumptions are reasonable for withdrawal liability purposes.[60]

---

but "had its genesis in the Board of Trustees . . . and has an objective . . . of inflating the withdrawal liability . . . .")

[57] *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Naftalin*, 441 U.S. 768, 773 (1979)).

[58] *See id.*

[59] When section 4213(b)(1) was enacted, ERISA's minimum funding provisions required a triennial actuarial valuation. *See* 26 U.S.C. § 412(c)(9) (1976 & Supp. III 1980). Now an annual valuation is required. *See* 26 U.S.C. § 431(c)(7); 29 U.S.C. § 1084(c)(7)(A).

[60] *See Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 731-32 (4th Cir. 1990); *Bd. of Trs., Michigan United Food & Commercial Workers Union v. Eberhard Foods, Inc.*, 831 F.2d 1258, 1262 (6th Cir. 1987); *Trs. of the Pressman Local 72 Indus. Pension Fund*

The Times incorrectly asserted that, in *Concrete Pipe,* the Supreme Court "squarely h[eld] that actuaries must employ the same rate in both [the withdrawal liability and funding] contexts."[61] The issue was whether the section 4221(a)(3)(B) presumption (that the actuary's determination of the plan's unfunded vested benefits was correct) shielded the actuary's assumptions from effective review in arbitration, denying the employer a neutral forum in violation of the Due Process Clause.[62] In holding that presumption constitutional, the Court reasoned that "the assumptions and methods used in calculating withdrawal liability are selected in the first instance not by the trustees [of the plan], but by the plan actuary," who, as a "trained professional[] subject to regulatory standards," "is not, like the trustees, vulnerable to suggestions of bias or its appearance."[63] To the extent that risk of bias remained despite actuaries' professional independence and the regulatory standards governing their profession, that risk was limited by the "necessity for applying the same assumptions and methods in more than one context"—that is, in determinations of both minimum funding and withdrawal liability.

---

*v. Judd & Detweiler, Inc.*, 736 F. Supp. 1351, 1354-55 (D. Md. 1988).

[61] Times's Mem. in Supp. of M.S.J. at 25, No. 17-6178 (S.D.N.Y. Sept. 15, 2017), ECF No. 20.

[62] *See Concrete Pipe*, 508 U.S. 602 at 631-36.

[63] *Id.*

At the time *Concrete Pipe* was decided, the Funding Assumption Standard used the same language as section 4213(a)(1).[64] "The use of the same language to describe the actuarial assumptions and methods to be used in these different contexts tends to check the actuary's discretion in each of them," although "the assumptions used by the [p]lan . . . *may be 'supplemented by several actuarial assumptions unique to withdrawal liability.'*"[65] Concrete Pipe had:

> not shown that any method or assumption unique to the calculation of withdrawal liability is so manipulable as to create a significant opportunity for bias to operate, and arguably the most important assumption (in fact, the only actuarial assumption or method that Concrete Pipe attacks . . .) is the critical interest rate assumption that must be used for other purposes as well.

*Concrete Pipe*, 508 U.S. at 633.

The Times extracted from the Supreme Court's reasoning that the interest rate assumption must be the same (ignoring what the Court said about supplemental actuarial assumptions unique to withdrawal liability). At least two courts have agreed with Judge Sweet, however, that *Concrete Pipe* does not require a plan's actuary to use

---

[64]  Prior to the Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780, ERISA's standard for the actuarial assumptions and methods that multiemployer plans used to value benefit liabilities for minimum funding purposes was identical to the section 4213(a)(1) standard. *See* 29 U.S.C. § 1082(c)(3); 26 U.S.C. § 412(c)(3) (1988 & 1994).

[65]  *Concrete Pipe*, 508 U.S. at 632-33 (quoting plan's brief) (emphasis added).

the same interest rate in withdrawal liability and funding determinations.  *See Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346 (7th Cir. 2012); *Manhattan Ford*, 2018 U.S. Dist. LEXIS 111969, at \*31-36.

In *CPC Logistics*, the plan's actuary had used the Segal Method to calculate withdrawal liability.  But Segal became concerned that withdrawal liability assessments might be susceptible to challenge if *Concrete Pipe* were interpreted to mean that determination of withdrawal liability using any interest assumption but the Funding Interest Assumption violated section 4213(a)(1).  Segal told plan trustees that they could direct the plan's actuary to use his Funding Interest Assumption to calculate withdrawal liability, but that Segal actuaries stood by the Segal Blend as their best estimate of anticipated experience under the plan in the withdrawal-liability context.[66] Plan trustees directed the actuary to use the funding rate from 1996 until 2004, when they directed reversion to the Segal Blend.  CPC Logistics's withdrawal liability was greater than it would have been had the Segal Blend been used consistently.[67]

The arbitrator ruled that use of the Funding Interest Assumption failed to satisfy section 4213(a)(1) based on the actuary's testimony that Segal Blend was at all times his "best estimate of anticipated experience under the plan" in the withdrawal-

---

[66]  *See CPC Logistics*, 698 F.3d at 354.

[67]  *See id.* at 355.

liability context.  The district court upheld the arbitrator's ruling.

The Seventh Circuit affirmed.  Judge Posner, writing for the Seventh Circuit, dismissed the proposition that, following *Concrete Pipe*, an interest assumption that was the plan actuary's "best estimate of anticipated experience under the plan" in the withdrawal-liability context must be the same as his Funding Interest Assumption. "[T]he Court [in *Concrete Pipe*] had indicated that 'supplemental' assumptions that might cause the rates to diverge were permissible."[68]

Section 4213(a)(1) and the Funding Assumptions Standard themselves diverged in 2006,[69] after the withdrawal at issue in *CPC Logistics*.  That reinforces the correctness of the Seventh Circuit's conclusion.[70]

Having correctly held that neither the statute nor the case law supports the Times' argument that the actuarial assumptions for funding and withdrawal liability must be identical, Judge Sweet should have held the Times to its burden of showing

---

[68]  *Id.* at 354-55 ; *see also Trs. of the Pressman Local 72 Indus. Pension Fund v. Judd & Detweiler, Inc.*, 736 F. Supp. 1351, 1356-57 (D. Md. 1988) (concluding that other actuarial assumptions may have borne on the actuary's interest assumption—which was, the withdrawn employer argued, unreasonably low—and on the reasonableness of the actuarial assumptions in the aggregate).

[69]  *See supra* note 64.

[70]  *See also Manhattan Ford*, 2018 WL 3528310, at *16 ("The language . . . quoted from *Concrete Pipe* rested on the proposition that ERISA used entirely "identical language" to describe the actuarial assumptions and methods that must be used in the "different contexts" of withdrawal liability and minimum funding . . . . In 1993, when *Concrete Pipe* was decided, that was true. . . .  *Concrete Pipe*'s discussion of the "identical" statutes must now, post-2006, be taken with a grain of salt.")

that the Fund's actuarial assumptions were unreasonable in the aggregate. Instead, he entirely disregarded the statutory presumption, and thereby committed reversible error.

## II. The district court failed to apply MPPAA's presumption that the plan actuary's determination of the plan's unfunded vested benefits was correct, impermissibly shifted the burden of proof from the Times to the Fund, and, in so doing, contradicted its correct holding that the funding interest assumption need not be applied.

Under section 4221(a)(3)(B) of ERISA, in a withdrawal liability dispute, the actuary's determination of the plan's unfunded vested benefits is presumed correct unless a party contesting the determination shows by a preponderance of the evidence that :

> (i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or

> (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

29 U.S.C. § 1401(a)(3)(B).

The D.C. Circuit has described the policy underlying the presumption:

> Actuarial valuations are based upon and reflect the experience of the plan, the professional judgment of the actuary, and the theories and expectations to which the actuary ascribes. Great differences of opinion exist as to actuarial methods. Congress, therefore, created the statutory presumption in favor of withdrawal determinations expressly to forestall endless disputes "over technical actuarial matters with respect to which there are often several equally 'correct approaches.'" S. 1076, The

> Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration, 98th Cong., 2d Sess. 21 (1980). In the absence of this presumption, "employers could effectively nullify their obligation by . . . forcing the plan sponsor to prove every element involved in making an actuarial determination." H.R. Rep. No. 869, pt. I, 96th Cong., 2d Sess. 1, 86, reprinted in 1980 [U.S.C.C.A.N.] 2918, 2954.

*Combs v. Classic Coal Corp.*, 931 F.2d 96, 99-100 (D.C. Cir. 1991); *accord Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 762 F.2d 1137, 1143 & n.7 (1st Cir. 1985).

The Supreme Court has described the employer's burden of proof:

> [A]n employer's burden to overcome the presumption in question (by proof by a preponderance that the actuarial assumptions and methods were in the aggregate unreasonable) is simply a burden to show that *the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary.* . . . The employer merely has a burden to show that an apparently unbiased professional, whose obligations tend to moderate any claimed inclination to come down hard on withdrawing employers, has based a calculation on *a combination of methods and assumptions that falls outside the range of reasonable actuarial practice.*

*Concrete Pipe*, 508 U.S. at 635 (emphases added).

That range is fairly wide. Actuaries serving multiemployer plans apply either:

(1) the Funding Interest Assumption, (2) PBGC Close-Out Rates, or (3) the Segal

Method.[71]  (PBGC's description of the range of actuarial practice is not an

endorsement of any particular practice.)

   The Actuarial Standards Board issues Standards of Practice governing the

actuarial profession.  Actuarial Standard of Practice No. 27, entitled "Selection of

Economic Assumptions for Measuring Pension Obligations," provides that: (1) the

economic assumptions selected by the actuary should be reasonable; and (2) to be

reasonable, an assumption must be "appropriate for the purpose of the

measurement."[72]  One purpose of withdrawal liability "is to protect the other

employers in the multi-employer plan from having to pay for" the withdrawn

employer's share of unfunded vested benefits.[73]

---

[71]  *See Combs v. Classic Coal Corp.*, No. 84-1562, 1990 WL 66583, at *3 n. 5 (D.D.C. Apr. 6, 1990), *aff'd*, 931 F.2d 96 (D.C. Cir. 1991) (describing those "three schools of thought among actuaries with respect to the selection of interest rate assumptions"); *see also* Judith Mazo & Susan Lee, *Multiemployer Pension Plan Withdrawal Liability*, 23 Ben. L. J., no. 4, 2010, at 36, 40 (describing Funding Interest Assumption and Segal Method as the "two main methodologies").

[72]  ASOP 27 § 3.6 (Sept. 2013 ed.), http://www.actuarialstandardsboard.org/wp-content/uploads/2014/02/asop027_172.pdf; *see also* ASOP 27 § 3.6 (Sept. 2007 ed. updated May 1, 2011), http://www.actuarialstandardsboard.org/wp-content/uploads/2014/10/asop027_145.pdf ("[F]or some purposes, . . . the discount rate [used to value plan liabilities] may be selected independently of the plan's investment return assumption. . . .  The purpose of the measurement is a primary factor.").

[73]  *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 726-27 (7th Cir. 1994); *accord SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 337 (3d Cir. 2007); *see also* 29 U.S.C. § 1001a(a)(4)(A); *cf. ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879, 881 (2d

Egan and Dr. Kra testified that, while contributing employers bear risk of plan investments underperforming the long-term average rate of return reflected in the Funding Interest Assumption (in that they may be called upon to increase their contributions), a withdrawn employer bears no such risk. It settles its liability once and for all in the fixed amount of its withdrawal liability.[74]  Dr. Kra testified:

> [T]he withdrawing employer is given a final number with no risk. If the investments underperform, you cannot go back to that withdrawing employer with another bill. If the investment is outperforming, the withdrawing employer gets no credit. . . .  [I]t is a final settlement of an obligation to provide for certain benefits. . . .  [A]ll of the ongoing employers share in the upside, share in the downside. If the fund underperforms, they pay more. If the fund overperforms, they pay less. They take the risk, they take the benefit.[75]

Some actuaries, including Dr. Kra, therefore believe that the withdrawn employer should be treated as purchasing a fixed rate of return rather than participating with the plan in its investment portfolio, with the attendant risk or

---

Cir. 1988) ("The purpose of withdrawal liability 'is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.'") (quoting H.R. Rep. No. 96-869, pt. 1, at 67 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2918, 2935).

[74]  *See* FA.28 (Egan's testimony), FA.53-55, 61 (Dr. Kra's testimony); *see also* FA.127-28 (Dr. Kra's Expert Report); A.35-36 (Arbitrator's Interim Opin & Award).

[75]  FA.53-54. Judge Sweet's statement (at SA.47-48) that the Times's ceasing to bear investment risk is offset by its ceasing to benefit from any upside ignores the thrust of the testimony that a risk premium goes to those who take risk.

reward.[76] The market price of a life annuity contract—that is, the price insurance companies charge to assume a pension-benefit-like liability—is the market price of a fixed rate of return. PBGC close-out assumptions approximate that market price.[77] As the withdrawn employer is relieved of investment risk, it forgoes any risk premium.

Egan testified that it is appropriate to use the Segal Method, under which PBGC Close-Out Rates are used in valuing the funded portion of vested benefits (for which the plan could afford to purchase annuities).[78] Many actuaries agree with her.[79]

Dr. Kra opined that Egan's assumptions were reasonable in the aggregate.[80] The Times's expert asserted that only the Funding Interest Assumption was permissible and did not testify as to whether Egan's assumptions were reasonable in the aggregate.[81]

---

[76] *See id.*; *cf. Plan Bd. of Sunkist Ret. Plan v. Harding & Leggett, Inc.*, 463 F. App'x 702, 703 (9th Cir. 2011) (affirming district court decision upholding withdrawal liability assessment based on PBGC Close-Out Rates); *Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc.*, No. 16-CV-2408, 2017 WL 1157156, at *3 (S.D.N.Y. Mar. 27, 2017) (noting calculation of withdrawal liability using PBGC Close-Out Rates by actuary from Horizon Actuarial Services LLC).

[77] *See supra* note 38 and accompanying text.

[78] FA.28-29; A.35.

[79] *See supra* note 45 and accompanying text.

[80] FA.53, 118, 131-32; A.36.

[81] *See* A.127 *et seq.*

Case 18-1140, Document 55, 11/30/2018, 2428258, Page59 of 74

Given the record, it is not surprising that Arbitrator Irvings concluded that the Times had not met its burden of proof.[82]

Perhaps recognizing the difficulty of meeting its statutory burden of proof, given the range of accepted actuarial practice, the Times attempted to sidestep the section 4221(a)(3)(B) presumption by arguing that section 4213(a)(1) requires a plan's actuary to value vested benefits for determination of withdrawal liability using his or her Funding Interest Assumption,[83] and therefore that Egan's use of the Segal Blend in determining the Times's withdrawal liability was "*legally* 'unreasonable,'" and her actuarial assumptions "were tainted 'in the aggregate.'"[84]

Judge Sweet accepted the Times's reframing of its burden of proof. He stated the issue on review as whether "the Segal Blend's use was reasonable in the aggregate."[85] He concluded that Arbitrator Irvings had clearly erred in finding that it was.[86] He reasoned:

> Egan's testimony before the Arbitrator was that a 7.5%

---

[82] *See* A58-63 (concluding that Egan's actuarial assumptions were, in the aggregate, reasonable).

[83] *See* Times's Mem. in Supp. of M.S.J. at 24, 26, No. 17-6178 (S.D.N.Y. Sept. 15, 2017), ECF No. 20 ("[I]nconsistency is impermissible as a matter of law. . . . [A] plan actuary must use for withdrawal liability purposes the same discount rate that she uses for minimum funding purposes.")

[84] Times's Reply in Supp. of M.S.J. at 13 n. 4, No. 17-6178 (S.D.N.Y. Nov. 3, 2017), ECF No. 29.

[85] SA.46.

[86] SA.46-49.

> percent [*sic*] assumption was her "best estimate of how the
> Pension Fund's assets . . . will on average perform over the
> long term." . . . If 7.5% was the Fund actuary's "best
> estimate," it strains reason to see how the Segal Blend, a
> 6.5% rate derived by blending that 7.5% "best estimate"
> assumption with lower, no-risk PBGC bond rates [*sic*], can
> be accepted as [her best estimate of] the anticipated plan
> experience. This is especially when [*sic*] the blend includes
> interest rates for assets not included in the Fund's portfolio.

SA.46-47.

That reasoning implies that Judge Sweet accepted the two flawed propositions

necessary to the Times's Statutory Similarity Argument: (1) that section 4213(a)(1) sets

a standard for the interest rate assumption considered in isolation; (2) that section

4213(a)(1)'s requirement that the "actuarial assumptions and methods . . . , in

combination, offer the actuary's best estimate of anticipated experience under the

plan" means that the interest rate assumption must offer the actuary's best estimate of

the long-term average rate of return on plan assets.[87]  In doing so, he contradicted his

own correct holding that funding and withdrawal liability interest assumptions need

not be identical.

Moreover, the issue is not whether "the Segal Blend's use was reasonable in the

aggregate," but whether "the actuarial assumptions and methods used in the

determination were, in the aggregate, *unreasonable* (taking into account the experience

---

[87]  *See supra* pp. 15-16.

of the plan and reasonable expectations).”[88]  That is, *the Times* had the burden of showing that Egan based her calculation of unfunded vested benefits “on a combination of methods and assumptions that falls outside the range of reasonable actuarial practice.”[89]  Section 4221(a)(3)(B) requires that the employer meet a preponderance-of-the-evidence burden on that issue, implying that it is a question of fact.  ERISA requires a court reviewing the arbitrator’s award to review the arbitrator’s findings of fact for clear error.[90]

Judge Sweet failed to take the section 4221(a)(3)(B) presumption into account. Determining whether a factfinder erred implicates the burden of proof that the factfinder was required to apply.[91]  Judge Sweet could conclude that Arbitrator Irvings

---

[88]  29 U.S.C. § 1401(a)(3)(B)(i) (emphasis added).

[89]  *Concrete Pipe*, 508 U.S. at 635.

[90]  *See* 29 U.S.C. § 1401(c); *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug. Co.*, 890 F.2d 1405, 1411 (7th Cir. 1989).

[91]  *See Bazemore v. Friday*, 478 U.S. 385, 397-98 (1986) (holding that district court’s determination that plaintiff had not proven racial discrimination by a preponderance is reviewed for clear error); *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984) (affirming denial of defendant’s motion for judgment notwithstanding the verdict in a patent infringement action, holding: “Where . . . there is a verdict of validity, the question is . . . whether the challenger’s evidence so met the burden [to overcome the presumption of a patent’s validity by proving invalidity by clear and convincing evidence] that reasonable jurors could not have concluded that the challenger failed to overcome that burden.”); Eric J. Magnuson & David F. Herr, Federal Appeals Jurisdiction and Practice § 5:3 (2018 ed. 2017); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (“[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive

clearly erred only if the arbitral record showed that the Times had proven, by a

preponderance of the evidence, that the combination of actuarial assumptions and

methods that Egan used in determining the Times's withdrawal liability was "outside

the range of reasonable actuarial practice."

Judge Sweet's opinion does not address that issue. Judge Sweet did not apply,

nor even mention, the presumption of correctness required by section 4221(a)(3)(B).

He reached his own conclusion about the reasonableness of Egan's actuarial

assumptions and methods, without reference to whether they were outside the range

of reasonable actuarial practice. That was reversible error.

---

evidentiary standard of proof that would apply at the trial on the merits.").

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's decision on the interest rate assumption.

November 7, 2018          Respectfully submitted,

                        /s/ John Holland Ginsberg

JUDITH STARR, *General Counsel*
ISRAEL GOLDOWITZ, *Deputy General Counsel*
JON CHATALIAN, *Acting Assistant General Counsel*
JOHN GINSBERG, *Attorney*

PENSION BENEFIT GUARANTY CORPORATION
1200 K Street, N.W.
Washington, DC 20005-4026
(202) 326-4020, ext. 3714 (telephone)
(202) 326-4112 (facsimile)
ginsberg.john@pbgc.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

I, John Holland Ginsberg, hereby certify, that the Brief for the Pension Benefit Guaranty Corporation as *Amicus Curiae* Supporting Cross-Appellants complies with the type-volume limitation as set forth in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 6,973 words. The Brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Garamond font.

Dated: November 7, 2018                        /s/ John Holland Ginsberg
                                                              John Holland Ginsberg

## **CERTIFICATE OF SERVICE**

I, John Holland Ginsberg, certify that on November 7, 2018, a true and correct

copy of the Brief for the Pension Benefit Guaranty Corporation as *Amicus Curiae*

Supporting Cross-Appellants was served via the Court's ECF system and by a third-

party carrier on:

Ronald E. Richman, Esq.
Max Garfield, Esq.
Adam B. Gartner, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
*Defendant-Appellee/Cross-Appellant Newspaper and Mail
Deliverers'-Publishers' Pension Fund and its Trustees*

Evan Miller, Esq.
Mark Christopher Savignac, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
*Plaintiff-Appellant/Cross-Appellee The New York Times Company*


/s/ John Holland Ginsberg
John Holland Ginsberg