EXHIBIT F

# THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT OF 1979

## HEARING

BEFORE THE

## COMMITTEE ON WAYS AND MEANS HOUSE OF REPRESENTATIVES

NINETY-SIXTH CONGRESS

SECOND SESSION

ON

## H.R. 3904

TO AMEND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 AND THE INTERNAL REVENUE CODE OF 1954, AS AMENDED, FOR THE PURPOSE OF IMPROVING RETIREMENT INCOME SECURITY UNDER PRIVATE MULTIEMPLOYER PENSION PLANS BY STRENGTHENING THE FUNDING REQUIREMENTS FOR THOSE PLANS, AUTHORIZING PLAN PRESERVATION MEASURES FOR FINANCIALLY TROUBLED MULTIEMPLOYER PENSION PLANS, AND REVISING THE MANNER IN WHICH THE PENSION PLAN TERMINATION INSURANCE PROVISIONS APPLY TO MULTIEMPLOYER PLANS

FEBRUARY 19, 1980

## Serial 96–74

Printed for the use of the Committee on Ways and Means



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1980

58–932 O

H 781 - 43

for single-employer plans is $2.60. Premiums may be increased by the PBGC with Congressional approval.

### Explanation of provisions

#### Duration of benefit

Under the bill, benefits (or benefit increases) in effect under a plan for fewer than 60 months before plan termination would not be guaranteed. Also, a benefit (or benefit increase) in effect for fewer than 60 months before the first day of a plan year in which a plan amendment reducing benefits (as permitted under the bill (see E. Employer Withdrawal Liability, *Explanation of provisions—Reorganization, F. Adjustments in accrued benefits*)) would not be guaranteed. For purposes of the 60-month test, (1) the date a benefit (or benefit increase) is first in effect is the later of the date the relevant documents are executed or the effective date of the benefit or benefit increase; (2) the time a benefit (or benefit increase) is in effect under a successor plan includes the time the benefit (or benefit increase) was in effect under a previously established plan; and (3) the 60-month period does not begin before the date the benefit guarantee provisions of ERISA first applied to the plan (September 2, 1974, for plans in existence on that date).

#### Level of guarantee

Generally, for each year of credited service under a multiemployer plan, the bill would limit the maximum guarantee for monthly base benefits to 100 percent of the first $5 of benefit accrual plus 70 percent [5] of the product of the lesser of $15 or the employee's accrual rate for monthly base benefits in excess of $5. The bill limits base benefits to retirement benefits which are otherwise subject to guarantee and which (1) are not greater than the plan benefit payable at normal retirement age as a life annuity (determined under PBGC regulations) and (2) are determined without regard to accrued benefit reductions permitted by the bill to be made on account of the cessation of contributions by an employer (see L. Minimum Vesting Requirements). Also, the bill provides that the accrual rate for base benefits is computed by dividing a participant's base benefit by the number of years of service credited to the participant under the plan for benefit accrual purposes (including years of past service taken into account, but without regard to years excluded because of the cessation of contributions by an employer (as permitted by the bill)). Where a benefit has been reduced because of the cessation of employer contributions as permitted by the bill, the guaranteed level of benefit is either the benefit determined as described above or the reduced benefit, whichever is less. In addition, the bill provides that benefits for a substantial owner under a multiemployer plan are not guaranteed if they would not be guaranteed under a single employer plan.

---

[5] The percentage is reduced to 60 percent in the case of a multiemployer plan which becomes insolvent before the year 2000 if the plan does not establish to the satisfaction of the PBGC that, for the last plan year beginning before 1976 and for the nine preceding plan years, the aggregate employer contributions to the plan were at least equal to the sum of (1) the normal cost for the plan year; and (2) interest on the amount of the unfunded past service liability as of the beginning of the plan year.

6

131

"voluntary" employer withdrawals or to specifically exclude withdrawal occasioned by either union conduct or employee decertification.

#### C. THE FIVE-YEAR RESUMPTION OF WORK

*Qualification of section 4201(b) (2) (B) is unworkable*

The imposition of withdrawal liability upon employer who ceases to contribute to a plan, but who within five years "continues to perform work in the jurisdiction of the collective-bargaining agreement of the type for which contributions were previously required" imposes substantial penalties upon a construction industry employer whose work at a particular project ceases. The provisions of the bill require that the employer not perform any further work in that area of a peiod of five years. Such a harsh result is not justified by current economic conditions or the reason for the PBGC's suggested changes in the plan termination insurance of the current law.

An employer who might not only provide jobs, but a further economic base for a particular geographic area, would be precluded from doing so to the detriment of both the potential workers that could be employed, and the service businesses in that geographic area. Giving up the right to perform work in a particular area will have harmful consequences to the local craftsmen, and local businesses as well as the particular employer involved. It is contrary to the objectives of Davis-Bacon.

The five-year "hindsight" rule is impractical. It requires an employer to speculate as to the future work it may perform in a certain geographic area, requires it to speculate into the future from the moment it "ceases to have an obligation to contribute under the plan" for a period of five years into the future, and imposes withdrawal liability, if near the end of that five-year period it, (for a reason that was not obvious before) again works in that area. We do not believe that Congress intends to force construction employers to speculate on the amount, type, or volume of work which they may perform in the future, or to violate Federal labor law in order to escape the imposition of withdrawal liability.

The choice of whether an employer is unionized is determined by employees under Federal labor law. Employer discrimination in employment such as hiring only union workers as against non-union workers, constitutes an unfair labor practice and is illegal. See, 29 U.S.C. section 158(a)(3). Hence, imposing withdrawal liability upon an employer simply because it does not prefer union workers over non-union workers and thus may not resume contributing to the plan if it returns to the geographic area to perform work within that five-year period encourages an employer, in order to avoid immediate withdrawal liability, to violate federal labor laws by executing illegal agreements and by illegal discrimination in its hiring. This direct conflict between contemplated federal pension policy and existing federal labor policy must be rectified.

We recommend that the "five-year" provision of section 4201(b)(2)(B) be modified by the insertion of the following phrase at the end thereof: "* * * as long as such resumption is in accord in applicable labor-management relations law."

#### D. THE PARTIAL WITHDRAWAL PROVISIONS OF SECTION 4201(C)(2)(6) SHOULD BE MODIFIED TO DEFINE THE WORDS "TOKEN OR INSUBSTANTIAL PORTION"..

Section 4201(c)(2)(6) imposes partial liability only if the construction employer's "unionized" work falls below a "token or insubstantial portion" of its work in the area of the collective-bargaining agreement. But, nowhere in the bill are those words defined, and for clarity's sake, we believe they should be. Construction employers should not be asked to guess at when their partial withdrawal liability may attach, if at all.

Moreover, if a construction employer is performing both "union" and "nonunion" work, partial withdrawal liability is imposed under these provisions simply because the employer's volume of "nonunion" work in an area may be higher than its volume of "union" work.

We suggest, therefore, that section 4201 (c)(6) be modified to exclude the eventuality of such work volume decline, and to define "token and insubstantial" as five percent of the work volume of the "unionized" employer.

In addition, since an employers "union" work may only be temporary and only a minor portion of the total normal work volume of the employer, we suggest that partial withdrawal liability should not be imposed at all if during the preceding

year the employer's "union" work volume under the collective-bargaining agreement did not exceed 25 percent of his total work volume.

#### E. A "CAP" SHOULD BE PLACED UPON WITHDRAWAL LIABILITY

The bill fails to include a maximum on the potential withdrawal liability an employer should expect. Because many plans are currently heavily under-funded, firms may be dissuaded from entering a plan because of the lack of a definable maximum liability figure upon withdrawal. Even existing contributing employers are entitled to know what maximum withdrawal liability they could be facing. Moreover, many construction employers contribute to more than one plan, as many as five or six in some areas of the industry; withdrawal from all plans would pose heavy and long-lasting financial burdens.

In view of the potentially heavy financial burden which withdrawal liability poses, we suggest that the Bill include a "cap" on withdrawal liability. The "cap" should be based upon the value of 30 percent of an employer's net worth, and should be a maximum as to all plans to which the employer is obligated to contribute, not each of them.

#### III. CONCLUSION

In sum, the bill's withdrawal liability provisions create potential for abuse in the construction industry, run counter to federal labor policy, and unjustifiably restrict a contractor's freedom to do business.

When ERISA was enacted in 1974, most employers who were party to multi-employer pension plans did not know or believe that such plans were to be considered "defined benefit plans" rather than "defined contribution plans." It was not until a few years later when the Courts indicated that Congress intended to cover such multi-employer plans into which employers make stated contributions as "defined benefit plans" that both employers and members of Congress became fully aware of the effect of the statute they had enacted.

In the construction industry, most, if not all, multi-employer pension plans are the result of collective-bargaining agreements negotiated by multi-employer trade assocations and national or regional unions. Such collective-bargaining agreements require no particular benefits; rather, they require the employer only to make particular contributions. Such programs are now considered "defined benefit plans," subject to Title IV of ERICA. The potentially devastating effect of the current plan termination insurance provisions of Title IV is the reason that PBGC has asked for the amendments.

If this Congress enacts H.R. 3904 in its present form, ABC respectfully admonishes the members of Congress that devastating labor law and financial consequences will occur to the surprise of many people, including the unions.

Thus, we urge that the withdrawal liability provisions be modified now so as to rectify the problems we have delineated. Failure to do so, would, in our view, be unwise national policy, which may in just a few short years need additional legislation to correct.

### STATEMENT OF RICHARD J. GRUNEWALD, PRESIDENT, NATIONAL CONSTRUCTION EMPLOYERS COUNCIL

Mr. GRUNEWALD. My name is Richard Grunewald and I am president of the National Construction Employers Council, NCEC. I am accompanied by counsel to the NCEC, Louis H. Diamond. And also as you know, Mr. Hall testified for the Associated General Contractors. AGC is one of NCEC's member associations. You found AGC is supportive of the NCEC position and has made several suggestions which we ask be considered as they are directed toward improving the bill.

The NCEC membership consists of 17 major employer trade associations representing all facets of the unionized construction industry and encompassing over 90,000 individual contractors. Construction accounts for over 50 percent of all the multiemployer pension plans.

We welcome the opportunity, Mr. Chairman, to appear before your committee today and make comments regarding H.R. 3904.