UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SOFCO ERECTORS, INC.,**

            **Plaintiff,**

      **v.**

**TRUSTEES OF THE OHIO
OPERATING ENGINEERS
PENSION FUND AND THE OHIO
OPERATING ENGINEERS
PENSION FUND,** *et al.,*

            **Defendants.**

**Case No. 2:19-cv-2238
Chief Judge Algenon L. Marbley
Magistrate Judge Jolson**

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Enforce Arbitration Award (Doc. 15) and Plaintiff's Motion for Summary Judgment (Doc. 17). These motions are fully briefed and ripe for disposition. For the following reasons, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. And Defendants' Motion to Enforce the Arbitration Award is **GRANTED IN PART AND DENIED IN PART.**

### I.      BACKGROUND

This action involves withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.*, which amended the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Plaintiff Sofco is a construction industry employer under ERISA. 29 U.S.C. § 1383(b). Construction industry employers' withdrawal liability is treated differently than that of non-construction industry

employers.   A construction industry employer does not incur withdrawal liability upon the termination of its obligation to contribute unless it: (a) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required; or (b) resumes such work within five years of the date upon which its obligation to contribute ended.  29 U.S.C. § 1383(b).  The statute also contains a separate provision for construction industry employers relating to partial withdrawal liability.  Partial withdrawal liability is assessable to a construction industry employer only when work continued for an "insubstantial portion" of the employer's work in the jurisdiction of the collective bargaining agreement.  29 U.S.C. §1388(d)(1).   In other words, a construction employer can only be assessed partial withdrawal liability when it contributes to a benefit fund only an "insubstantial portion" of what it contributed to that fund in prior years.

After an employer withdraws, the plan sponsor calculates the amount of any withdrawal liability.  29 U.S.C. §§ 1382, 1391.  In calculating the withdrawal liability, the statute requires the plan sponsor to use actuarial assumptions and methods that, "are reasonable (taking into account the experience of the plan and reasonable expectations)[.]"  29 U.S.C. §1393(a)(1).  Once the plan sponsor calculates and assesses any withdrawal liability, the employer may then request review of it.  29 U.S.C. § 1399(b)(2).  If the request for review is unsuccessful, the employer may initiate an arbitration proceeding to resolve the dispute.   29 U.S.C. § 1401(a)(1).   Under 29 U.S.C. § 1401(b)(2), the arbitral decision is subject to review by the district court.  Sofco brings this case under 29 U.S.C. § 1401(b)(2) to vacate entirely or modify the Arbitrator's award.

## A.     Sofco Erectors, Inc.

Sofco began operations on April 1, 2004, when it purchased its predecessor's (also called

Sofco Erectors, Inc. ("Old Sofco")) assets.[1] (Doc. 11-2, Hesford Aff. ¶ 2, PAGEID# 83). John Hesford ("Hesford"), Dan Powell ("Powell"), Dave Schmitt ("Schmitt") and Jim Ludwig ("Ludwig") owned Sofco when it formed. (*Id.* ¶ 4, PAGEID# 83). Hesford, Powell, and Ludwig all worked at Old Sofco, but none held any ownership interest in it. (*Id.* ¶ 5, PAGEID# 84). None of Sofco's ownership held any ownership interest in Old Sofco. (*Id.*; Doc. 11-2, Gates Nov. 6, 2018 Aff. ¶ 2, PAGEID# 118). The Asset Purchase Agreement did not include an assumption of Old Sofco's obligations to the Fund, or its contribution history. (Doc. 11-2, Hesford Aff. ¶ 3, Ex. A, PAGEID# 83, 87–108). No bond was posted, and Old Sofco did not agree to secondary liability to the Fund. (*Id.* ¶ 3, PAGEID# 83). Sofco was a new legal entity when it was formed at arms-length from Old Sofco even though it maintained the same name.

Sofco's business involves erecting steel and precast primarily for commercial buildings and hospitals. (*Id.* ¶ 6, PAGEID# 84). Members of the International Association of Bridge, Structural, Ornamental, and Reinforcing Ironworkers (the "Ironworkers") perform this work. (*Id.*). Sofco operates in three primary locations within Ohio: greater Cincinnati, greater Columbus, and greater Dayton. (*Id.* ¶ 7, PAGEID# 84). Hesford is the CEO and runs the Cincinnati and Dayton operations and Powell is the COO and runs the Columbus operation. (*Id.* ¶ 7, PAGEID# 84; Doc. 11-7, Powell Dep. at 10–11, PAGEID# 1628).

Since 2004, Sofco has been a signatory to collective bargaining agreements with three different Ironworkers locals that cover the Cincinnati, Dayton, and Columbus areas. (Doc. 11-2, Hesford Aff. ¶ 8, PAGEID# 84). Sofco was also a signatory to a series of collective bargaining agreements with Local 18, the last of which was effective from May 8, 2013 to April 30, 2017.

---

[1] The original owners formed an entity called Sofco Erectors Acquisition, Inc. to facilitate the purchase of Old Sofco's assets, including the name Sofco Erectors, Inc. Once the asset purchase was complete, the owners dissolved Sofco Erectors Acquisition, Inc. and formally adopted the name Sofco Erectors, Inc.

(*Id.* ¶ 9, PAGEID# 84). In accordance with the Local 18 bargaining agreement, Sofco made contributions to the Fund for its employees who were Local 18 members.

### 1. The work at issue

Sofco was originally a signatory to the Local 18 CBA because it employed Local 18 members to operate cranes both owned by Sofco and rented. (*Id.* ¶ 10, PAGEID# 84). Sofco contributed to the Fund for thousands of hours of crane operator work both directly and indirectly (when it used contractors that employed only Local 18 members to operate cranes). (*Id.*). In the mid to late 2000s, the crane contractors began to stop renting cranes "bare" (unoperated). (*Id.* ¶ 11, PAGEID# 84). They required their cranes be run by their employees who were Local 18 members. (*Id.*). By 2015, all rented cranes were operated by the crane contractors. (*Id.*). Sofco continued to operate its own cranes until 2016. (*Id.*). Local 18 members (on Sofco's payroll) operated the cranes before this change, and Local 18 members (on the crane companies' payroll) operated the cranes after the change. (Doc. 11-3, Byers Dep. at 18–19, PAGEID# 172). Accordingly, the Fund suffered no material change in contribution levels as the result of Sofco subcontracting the crane work; the Fund received the same contributions for the same hours from a different company.

Sofco also employs individuals to perform shop work. Shop duties are performed on or out of Sofco's facilities, and include cleaning, organizing, making deliveries, or any other duties management assigns. (Doc. 11-2, Hesford Aff. ¶ 14, PAGEID# 85; Doc. 11-7, Powell Dep. 88, PAGEID# 1647). The shop work is not within the exclusive jurisdiction of any collective bargaining agreement. Several individuals performing shop work for Sofco included members of the Laborers' union and several non-union individuals, including Local 18 members. (*Id.* ¶ 14, PAGEID# 85). Sofco understood this work to be outside the Local 18 CBA, but because some

4

individuals happened to be Local 18 members, Sofco voluntarily paid contributions to the Fund so those individuals could have benefits. (*Id.*).

Sofco utilizes many different methods and equipment to erect steel and precast including cranes, forklifts, roustabouts, duct hoists, chain falls, jacks, etc. (*Id.* ¶ 12, PAGEID# 84). Sofco prefers to assign the forklift work to Ironworkers for the purpose of efficiency, and its past practice has nearly always been to do so. (*Id.* ¶¶ 12, 17, PAGEID# 84–85, 86). In some instances, Sofco assigned forklift work to Local 18 members. (*Id.* ¶ 12, PAGEID# 84). One example of a situation where Sofco would assign a Local 18 member to operate a forklift would be where Sofco employed a Local 18 crane operator, but there was a gap between projects for the crane and Sofco wanted to keep the crane operator on its payroll. (*Id.* ¶ 12, PAGEID# 85). Sofco also occasionally assigned forklift work to Local 18 members when it did not have enough Ironworkers to do the work or to settle a grievance with Local 18. (*Id.*).[2]

Local 18 never sought a binding determination that forklift work belonged to it. (Doc. 11-3, Byers Dep. 80–91, PAGEID# 187–190; Doc. 11-7, Powell Dep. 100–101, PAGEID# 1650). Indeed, Local 18 settled the few grievances it filed against Sofco by agreeing that Sofco would assign some miniscule amount of forklift work to Local 18. (*Id.*).[3] Ultimately, though, Sofco insisted that its continuous practice of assigning forklift work to Ironworkers was correct, and

---

[2] From August 1, 2016 until July 31, 2017, out of the more than 18,608 estimated man hours that Sofco used forklifts (8,000 Sofco owned forklift hours + 10,608 rented forklift hours), Sofco only paid 48 hours to a member of Local 18. Sofco owns multiple forklifts, which are operated by Ironworkers on projects. When Sofco needs additional forklifts, Sofco rents them. If Sofco rents a forklift, it can be presumed that Sofco's forklifts are already being used (Sofco wouldn't spend money to rent a forklift when it had one sitting there to use). Sofco does track the number of hours it rents forklifts. (Hesford Aff. ¶ 13, Doc. 11-2, PAGEID# 85).

[3] Local 18 has never alleged until this case that shop work is within its jurisdiction and has never filed a grievance related to shop work that was performed by non-Local 18 members. (Doc. 11-2, Hesford Aff. ¶ 14, PAGEID# 85).

Local 18 abandoned its claim to the work and did not pursue the grievance.  (Doc. 11-2, Hesford Aff. ¶ 15, PAGEID# 85; Doc. 11-3, Byers Dep. 89–90, Ex. U, PAGEID# # 189–190).

Sofco terminated its collective bargaining agreement and relationship with Local 18 effective April 30, 2017.  (Doc. 11-3, Byers Dep. Ex. A, PAGEID# 195).  Since then, Sofco represents that all of their on-site construction work has been performed by the following: (1) Sofco employees covered by its collective bargaining agreements with Ironworkers Local Nos. 44, 172, and 290; (b) crane operators covered by the Local 18's CBA and its successors and employed by crane leasing companies that have contracted with Sofco to provide cranes and crane operators for these projects; and (c) licensed surveyors to establish building lines mainly for precast installations.  (Doc. 11-2, Hesford Aff. ¶ 16, PAGEID# 85–86).  Sofco represents that it did not perform any work within Local 18's jurisdiction after it terminated its CBA with Local 18.

### 2.    Fund's Assessment of Withdrawal Liability

In a letter dated August 31, 2017, the Fund alleged that Sofco's termination of its relationship with Local 18 resulted in liability for complete withdrawal, and it assessed complete withdrawal liability for the Plan year ending July 31, 2017, in the amount of $368,315 ($605,591 less credit for partial withdrawal assessments).  (*See* Doc. 11-2, August 31, 2017 Withdrawal Liability Assessment, PAGEID# 121).  In the same letter, the Fund also alleged that fluctuations in Sofco's Local 18 bargaining unit hours in previous plan years resulted in liability for partial withdrawals, and the Fund assessed partial withdrawal liability for the Plan year ending in July 31, 2011 in the amount of $244,627, partial withdrawal liability for the Plan year ending July 31, 2012 in the amount of $111,357, and partial withdrawal liability for the Plan year ending July 31, 2013 in the amount of $0 (after giving Sofco credit for partial withdrawal assessments in the prior years).  (*Id.*).  In assessing partial withdrawal liability, the Fund's actuary stated "[u]nder Section

6

4205(b)(1) of ERISA [29 U.S.C. § 1383(b)(1)] a partial withdrawal occurs when contribution hours in each of three consecutive years (the "three-year testing period") are at least 70% less than the average of the two highest years of contribution hours during the five years preceding the three-year testing period." (*See* Doc. 11-2, Segal's August 29, 2017 calculations in the August 31, 2017 Assessment, p.1, PAGEID# 123). The actuary then stated that under "Section 4208(d)(1) of ERISA [29 U.S.C. § 1388(d)(1)], for construction industry employers in construction industry plans, partial withdrawal liability is assessable when work continued for an insubstantial portion of the employer's work in the jurisdiction of the collective bargaining agreement." (*Id*., p. 2, PAGEID# 124). After it laid out the two standards for construction industry employers, the Fund's actuary "defer[red] to Fund's Counsel's interpretation as to whether partial withdrawal liability [was] assessable to [Sofco]." (*Id*.).

In calculating Sofco's alleged withdrawal liability, the Fund also considered Old Sofco's contribution history. (*Id*.). This raised Sofco's Preliminary Allocable Amount of Unfunded Vested Benefits from $451,061 to $605,591, which in turn raised the amount of withdrawal liability the Fund assessed Sofco. (*See* Doc. 11-2, Report of Michael Libman dated September 7, 2018, PAGEID# 147). Also, the Fund used the "Segal Blend" interest rate to calculate the withdrawal liability instead of the rate it used to determine its funding level for ERISA minimum funding requirements, which also resulted in a significantly higher withdrawal liability assessment. (Doc. 11-5, Ciner Dep. 20–25, PAGEID# 741–42). The Segal Blend is a lower rate than the rate the Fund uses to determine how well funded it is, so using it means the withdrawal liability amount is much higher. Indeed, had the Fund used the interest rate it used to determine funding, Sofco's withdrawal liability would be near zero. (*Id*.). Sofco timely requested review of the Fund's assessment and then initiated arbitration to set aside the Fund's withdrawal liability assessment.

7

Sofco now seeks to vacate the Arbitrator's award affirming both the assessment of withdrawal liability and the way it was calculated.

**B.** **The Arbitration**

On April 2, 2018, Sofco timely initiated arbitration pursuant to 29 U.S.C. § 1401. The parties engaged in pre-arbitration discovery and then filed cross motions for summary judgment. The Arbitrator issued his Opinion and Award on April 29, 2019. In the Arbitration Opinion and Award, the Arbitrator granted the Fund's motion for summary judgment and denied Sofco's. This lawsuit to vacate or modify the Arbitrator's Opinion and Award followed.

ERISA requires Sofco to make payments to the Fund for the disputed withdrawal liability while its challenge to the assessment is pending. 29 U.S.C. § 1401(d). Such payments can be made quarterly. 29 U.S.C. § 1399(C). Sofco made the required quarterly payments on all of the assessments from October 18, 2017 until July 17, 2019. (Hesford Aff. ¶ 2, Doc. 11-2, PAGEID# 85-86). On October 17, 2019, rather than continue to make quarterly payments, Sofco paid the remaining balance of $518,979.57, which constituted payment of the assessment in full. (*Id*. ¶ 4.)

Plaintiff commenced this action under on May 29, 2019. Plaintiff seeks to vacate or modify the Arbitrator's award and dismiss the Fund's counterclaims, pursuant to ERISA, 29 U.S.C. § 4221(b)(2) and 29 U.S.C. § 1401(b)(2). Defendants seek to enforce the arbitration award.

## II. STANDARD OF REVIEW

Plaintiff moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of

the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

Under 29 U.S.C. § 1401(b)(2), the arbitral decision is subject to review by the district court. The district court reviews the arbitrator's conclusions of law de novo. *Sherwin-Williams Co. v. New York State Teamsters Conf. Pension & Retirement Fund*, 158 F.3d 387, 396 (6th Cir. 1998).

## II.    DISCUSSION

Defendants moved to enforce the arbitration award and Plaintiff moves for summary judgment requesting the Court vacate or modify the Arbitrator's award and dismiss Defendants' counterclaims. Plaintiff also requests oral argument. The Court will address each of these arguments in turn.

### A.    Plaintiff's Request for Oral Argument

As a preliminary matter, Plaintiff requested oral argument on the Motion for Summary Judgment due to the complexity of ERISA's withdrawal liability provisions regarding multiemployer pension plans involved in this case. However, the Court does not find the legal or factual issues implicated by the motions are such that oral argument would aid the Court in its decision. Consequently, Plaintiff's Request for Oral Argument is **DENIED.**

### B.    Arbitration Decision

Pursuant to 29 U.S.C. § 1401(a), the dispute regarding Sofco's withdrawal liability was submitted to arbitration. Arbitrator John Sands found that the Fund properly assessed both complete and partial liability, and that the Fund properly calculated the withdrawal liability amounts due. Defendants now move pursuant to 29 U.S.C. § 1401(b)(2) to enforce the Arbitration Award.

The parties agreed during arbitration that there were no disputed issues of material fact. Thus, the Court will accept those facts as true. However, the Arbitrator's conclusions of law are subject to *de novo* review. *See Metallurgical Services, Inc. v. Plumbers and Pipefitters Nat.*

10

*Pension Fund*, 213 Fed. Appx. 268, 270 (where parties stipulate to the facts before the arbitrator, there remains only a question of law).

**C.      Plaintiff's Motion for Summary Judgment**

**1.      Complete Withdrawal Liability**

In 1980, Congress passed the Multiemployer Pension Plan Amendments Act (MPPAA), which modified and extended the coverage of ERISA.  Pub. L. 96-364, 94 Stat. 1208 (1980). ERISA had allowed collective bargaining agreements for employers in large, fragmented industries like construction to collect employer contributions for a single centralized industrywide pension fund, rather than for individual plans for each employer.  *See* 29 U.S.C. § 1301(a)(3).  To avoid incentives for employers to flee when a multiemployer plan became underfunded, the MPPAA imposes a provision for withdrawal liability, under which an employer leaving an industry or a plan would be responsible for paying additional contributions to that plan at the time of their exit.  29 U.S.C. § 1381.  An employer subject to withdrawal liability owes a proportionate share of the unfunded amount of the plan, determined on the date of exit from the plan.  29 U.S.C. § 1391.

The MPPAA also provides that a plan's sponsor, often an entity supported by the local union, is normally responsible for calculating withdrawal liability, pursuant to the collective bargaining agreement's terms.  29 U.S.C. § 1382.  Where an employer and a plan disagree about the existence or extent of such withdrawal liability, the MPPAA also imposes a scheme for resolution of disputes, primarily through arbitration.  29 U.S.C. § 1401.  The MPPAA states that, in civil actions to enforce an assessment of withdrawal liability, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."  *Id*. § 1401(c).

Although withdrawal liability attaches to most types of employers, a special withdrawal scheme— the one at issue in this case—covers the construction industry.  29 U.S.C. § 1383(b). Under this section, a complete withdrawal occurs only if an employer "ceases to have an obligation under the plan" and:

> (i) continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, or

> (ii) resumes such work within 5 years after the date on which the obligation to contribute under the plan ceases, and does not renew the obligation at the time of the resumption.

29 U.S.C. § 1383(b)(2)(B).

The parties agree that the construction industry exception and the deference to the Fund's determinations described above apply here.  (*See* Doc. 11-1 at 11, Sofco's Mot. for Summ. J. before the Arbitrator).  However, the parties dispute Sofco's obligation to contribute to the Fund after it terminated its agreement with Local 18 on April 30, 2017.  There is no dispute that prior to the termination, Sofco had an obligation and did contribute for forklift and shop work performed by Local 18 members.  Sofco argues that its primary practice was to assign forklift work to Ironworkers.  Sofco maintains that it assigned forklift work to Local 18 members under special circumstances, such as when Sofco employed a Local 18 crane operator and there was a gap in projects for the crane operator, then Sofco would keep the crane operator on its payroll to perform other roles.  Sofco argues that since the termination of the agreement with Local 18, it has assigned forklift work only to Ironworkers and such work is within the jurisdiction of each Ironworkers' agreement to which Sofco is a signatory:  Ironworkers Local 44 Agreement (Cincinnati, Ohio area); Ironworkers Local 290 Agreement (Dayton, Ohio area); and Ironworkers Local 172 Agreement (Columbus, Ohio area).

The Fund maintains that Sofco employees continued to perform that work, which was within the collective bargaining agreement's jurisdiction.  The Fund relies on the Arbitrator's findings set forth below.  The Fund argues that the above findings are subject only to clear error review and Plaintiff has failed to show any clear error.

- Sofco's collective bargaining agreement with Local 18 expressly covered forklift work. (Doc. 1-1, Arb. Op. at 4; *see also* Doc. 14-3, Powell Dep. Ex. 3, CBA Art. Case: 2:19-cv-02238-II ¶ 10; Doc. 12-1, Pension Fund Arb. Mot. Summ. J. at 3–4 (explaining internal reference to forklift work in CBA)).

- Sofco's collective bargaining agreement with the Ironworkers Local 172 did not expressly cover forklift work.  (Doc. 1-1, Arb. Op. at 4; *see also* Doc. 14-3, Powell Dep., Ex. 15).

- Sofco's obligation to contribute to the Fund ceased on April 30, 2017 when its collective bargaining agreement with Local 18 expired.  (Doc. 1-1, Arb. Op. at 5; *see also* Doc. 14-3, Powell Dep.).

- After April 30, 2017, Sofco continued to have its employees perform forklift work and continued to have a single employee perform shop work.  (Doc. 1-1, Arb. Op. at 5; *see also* Doc. 14-3, Powell Dep.).

- As a result, Sofco continued to perform covered work within Local 18's jurisdiction after it ceased contributing to the Fund.  (Doc. 1-1, Arb. Op. at 5; *see also* Doc. 14-3, Powell Dep.).

Plaintiff, relying on *Steven Eng'rs & Constructors, Inc. v. Local 17 Iron Workers Pension Fund*, 877 F.3d 663, 673 (6th Cir. 2017), argues that "where two unions both claim certain work and a union fails to submit its jurisdictional challenge to secure a determination as to which union the work belongs to, the union abandons its claim to the work."  (Doc. 17, Pl's Mot. for Summ. J. at 21).  Plaintiff argues that because no contributions were ever required, there can be no withdrawal liability.  The Court agrees that work may fall into overlapping jurisdictions of two separate unions and contributions would only be required to the union to whom the employer

assigned the work.  However, as the Fund correctly points out, in this case, "two unions" did not both claim the work.  Sofco has not offered any evidence to show clear error in the Arbitrator's finding that Sofco's collective bargaining agreement with the Ironworkers Local 172 did not cover forklift work.[4]  Further, Local 18 cannot waive the Fund's right to Sofco's contributions as Plaintiff argues by failing to challenge the contributions.  *See Operating Eng'rs Local 324 Health Care Plan*, 783 F.3d at 1051–53 (6th Cir. 2015) ("Multiemployer trust funds are entitled to rely on an employer's promises to make contributions to the funds, irrespective of any breach or omission by the union."). Finally, Local 18 asserted its right to forklift work via the CBA's dispute resolution procedures.  (*See, e.g.,* Doc. 11-7, Powell Dep. at 20–23, 27–28, Ex. 2 (noting the March 24, 2014 grievance settlement requiring Sofco to hire a Local 18 apprentice to conduct forklift work)).

Based on the aforementioned, the conclusions of the Arbitrator and the Local 18 CBA which sets forth rates for forklift operators (Doc. 12-3, Powell Dep. at 53, 70, 73, 78, and 82), forklift work is part of Local 18's jurisdiction under Article II Paragraph 10.4.  Therefore, Sofco was obligated to make contributions to the Fund for the forklift work.

Sofco also challenges the Fund's assessment of withdrawal liability for shop work.  Sofco argues that it was not obligated to contribute to the Fund for shop work, which consists of cleaning, organizing, making delivers, and other duties which management assigns.  (Doc. 11-2, Hesford Aff. ¶ 14, PAGEID# 85; Doc. 11-7, Powell Dep. at 88, PAGEID# 1647).  Sofco assets that "because some individuals happened to be Local 18 members, Sofco voluntarily paid contributions

---

[4]  Notably, the Ironworkers Union agrees that forklift work is within Local 18's jurisdiction, and the Ironworkers never sought to assert a right to forklift work.  (*See* Doc. 11-4, Byers Dep. at 133, 136–39, Ex. EE) (Local 18 and the Ironworkers' agreement that "the operation of forklifts shall be the work of [Local 18].")).

to the Fund so they could have benefits."  (Doc. 17, Pl's Mot. for Summ. J. at 20).  Sofco alleges that voluntary contributions are permitted by the pension plan.  (Doc. 11-6).

The Fund does not respond to this argument regarding shop work, other than referencing the findings of the Arbitrator regarding shop work.  The Arbitrator found that Jason Allen, an operating engineer, remains employed by Sofco performing the covered shop work as he had performed prior to the termination of the CBA.  (Doc. 1-1, Arb. Op. at 3).

The Arbitrator specifically references the portion of the CBA that covers forklift operators, however, noticeably absent is the finding that the Local 18 CBA covers shop work.  Accordingly, the Court finds that "shop work" was not within Local 18's jurisdiction and the portion of the Arbitrator's Award regarding shop work is hereby vacated.  The Fund must therefore refund Sofco the money paid for withdrawal liability with respect to the shop work, with interest.

       **a.**      **Segal Blend**

Plaintiff asserts that "[w]hen the Fund computed the withdrawal liability amount, it used the "Segal Blend" interest rate to determine the amount of the plan's unfunded vested benefits instead of using the 7.25% interest rate the Fund uses for determining the plan's funding levels." (Doc. 17, Pl's Mot. for Summ. J. at 12).  Plaintiff argues that this resulted in the withdrawal assessment being substantially higher than if the Fund had used its funding interest rate. Defendants respond that the Arbitrator found that the Fund's use of the Segal Blend interest rate was reasonable.  Specifically, the Arbitrator found that the Fund's use of the Segal Blend interest rate, which includes using a blend of the PBGC interest rates and long-term interest rates, (1) reflects accepted actuarial practice, (2) accords with PBGC Opinion Letter 86-24, and (3) "balances risk with respect to future investment performance . . ." (Doc. 1-1, Arb. Op. at 17).

The MPPAA sets forth the standard of review if an employer contests a fund's calculation of the amount of withdrawal liability:

> (B) In the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of the evidence that:
>
> (i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or
>
> (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

29 U.S.C. § 1401(a)(3)(B). ERISA requires when calculating an "employer's withdrawal liability, 'actuarial assumptions and methods' must, 'in the aggregate, [be] reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan.'" *New York Times Co. v. Newspaper & Mail Deliverers'-Publishers' Pension Fund*, 303 F. Supp. 3d 236, 255 (S.D.N.Y. 2018) (citing 29 U.S.C. § 1393(a)(1)).

Like the court in *New York Times*, the Court agrees that the Arbitrator's decision that the Segal Blend's use was reasonable is a mixed question of fact and law and is reviewed for clear error. 303 F. Supp. 3d at 255, *see also Stevens Eng'rs & Constructors, Inc. v. Iron Workers Local 17 Pension Fund*, 2016 U.S. Dist. LEXIS 114028, at *36 ("The use of the more deferential standard of review is based upon the recognition that 'the dominant theme in MPPAA's resolution process is deference to the person who hears the evidence, thus, an arbitrator's decision on mixed questions of fact and law may only be set aside for clear error.'" *Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994 (7th Cir.1993), Aff'd, 513 U.S. 414, 115 S. Ct. 981, 130 L. Ed. 2d 932 (1995); *Chicago Truck Drivers Pension Fund v. Louis Zahn Drug*

*Co.*, 890 F.2d 1405, 1410–11 (7th Cir.1989) (recognizing that substantial deference ought to be given to the decision of an arbitrator with special expertise in the area of labor and pension law).

In *New York Times*, the Fund actuary testified that a 7.5% assumption was her "best estimate of how the Pension Fund's assets . . . will on average perform over the long term." *Id*. The court stated that "if 7.5% was the Fund actuary's 'best estimate,' it strains reason to see how the Segal Blend, a 6.5% rate derived by blending that 7.5% 'best estimate' assumption with lower, no-risk PBGC bond rates, can be accepted as the anticipated plan experience." *Id*. The court ultimately concluded that use of the Segal Blend was unreasonable and reversed the arbitrator's decision approving the Fund's use of it. *Id*.

Sofco argues that this case presents the same issue as that in *New York Times*. Here, the Fund actuary testified that the 7.25% rate that the Fund uses to determine funding levels is based upon "a review of past experience and future expectations taking into account the plan's asset allocation and expected returns." (Ciner Dep. 19, Doc. 11-5, PAGEID# 741). But instead of using the rate it believed represented future expectations, it used the lower Segal Blend, resulting in nearly a million dollars in withdrawal liability.

The Fund argues that the Segal Blend has long been among the leading "schools of thought among actuaries with respect to the selection of [discount] rate assumptions," *Combs v. Classic Coal Corp.*, No. CIV. A. 84-1562 TPJ, 1990 WL 66583, at *3, n.5 (D.D.C. Apr. 6, 1990), aff'd, 931 F.2d 96 (D.C. Cir. 1991), and has been upheld by courts for decades. *See, e.g., Bassett Const. Co. v. Trustees of the Centennial State Carpenters Pension Tr. Fund*, No. 83–F–980, 1985 WL 1270583, at *6 (D. Colo. Feb. 25, 1985) ("The Court finds the Segal method is . . . based upon actuarial assumptions and methods which . . . are reasonable . . . . [The withdrawing employer] does not bear the burden of future actuarial losses and in turn is not entitled to benefit

from actuarial gains occurring subsequent to its withdrawal.").  The Fund also references PBGC Opinion Letter 86-24, which specifically addresses a fund's use of different interest rates in different contexts and finds that the use of multiple interest rates is permitted.

The Fund's actuary, Daniel Ciner, testified at his deposition that the Segal Blend rate was his "best estimate calculation" of anticipated experience under the plan.  (Doc. 11-5, Ciner Dep. at 23).  This differs from the testimony in the *New York Times* case where the fund's actuary testified that a 7.5% assumption, not the Segal Blend rate, was her best estimate.  The Fund contends that it would have been unreasonable for the Fund to ignore its actuary's best estimate and apply a different rate.

Here, the Court finds the analysis by the *New York Times* court instructive.  The "inquiry returns to what the statute states it requires for an applicable return rate:  what is the best estimate of the 'anticipated experience' under the plan." 29 U.S.C. § 1393(a)(1).  In this case, the testimony was that the 7.25% rate that the Fund uses to determine funding levels is based upon "a review of past experience and future expectations taking into account the plan's asset allocation and expected returns."  (Ciner Dep. 19, Doc. 11-5).  Based on the applicable testimony and evidence presented, the Arbitrator erred in applying the Segal Blend.  Instead, Plaintiff has shown that the 7.25% rate is mandated by ERISA.

Additionally, Sofco argues that ERISA does not permit the Fund to use different rates for funding and withdrawal liability.  Relying on a recent opinion, *Nat'l Ret. Fund v. Metz Culinary Mgmt.*, 2020 U.S. App. LEXIS 4, 13–14 (2d Cir. 2020), citing *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602 (1993), the court reasoned that "[t]he opportunity for manipulation and bias is particularly great where funds use different interest rate assumptions for withdrawal liability and minimum funding purposes."  The Fund counters that the aforementioned

caselaw does not hold that it is unlawful to use different rates in different contexts.  The Court agrees.  Like the court in *New York Times*, the Court finds that to the extent Sofco argues that "the use of different interest rates in different contexts is always impermissible as a matter of law, that argument fails."  *New York Times*, 303 F. Supp. 3d at 254–55 (referring to *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602 (1993)); *see also Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc*., 698 F.3d 346, 354–55 (7th Cir. 2012) ("Language in the Supreme Court's decision in *Concrete Pipe* . . . could be read to suggest that having two different interest-rate assumptions—one for withdrawal liability and one for avoiding the tax penalty—might make a plan vulnerable to claims that either or both were 'unreasonable' within the meaning of 29 U.S.C. § 1393(a)(1).  The danger was remote; the Court had indicated that 'supplemental' assumptions that might cause the rates to diverge were permissible."); *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365, 389–92 (D.N.J. 2018) (affirming arbitration award upholding a fund's use of the Segal Blend rate to calculate withdrawal liability where the fund used different rates in other contexts); PBGC Op. Ltr. 86-24 (Oct. 31, 1986) ("There is no requirement that the actuarial assumptions used to determine withdrawal liability be the same as those used for [minimum funding] purposes.").

Although not unlawful to use different rates for funding and withdrawal liability pursuant to *Concrete Pipe*, there are legal grounds to find that the Fund's use of the Segal Blend in this instance was erroneous.  Based on the aforementioned discussion, the Fund should recalculate Sofco's withdrawal liability based on the 7.25% interest rate the Fund uses for determining the Plan's funding levels and adjust any payments/refunds due accordingly, with interest.

### b.  Sofco's Contribution History

Sofco argues that the Fund incorrectly calculated its withdrawal liability based on both Sofco's contribution history and the contribution history of the company from whom Sofco purchased assets in 2004. This resulted in the assessment amount being much higher. The Fund contends that there was not truly a new entity formed. The Arbitrator concluded that the Fund correctly considered both Sofco and Old Sofco's contribution history because the two entities had the same names, operated in the same business, had some of the same employees, and had the same ID number on file with the Fund. (Doc. 13-5, Arbitrator's Award at 15).

There is no dispute that Sofco did not notify the Fund of any change in status in 2004, at the time of the change. Without notification, the Fund was unable to assess withdrawal liability to Old Sofco. Therefore, the Fund's position is that there was only one entity. Sofco's position that Old Sofco merely went out of business and incurred no withdrawal liability is not persuasive as the Sixth Circuit applies successor liability in this context, as "[r]efusing to apply successor liability would allow employers to fail to uphold promises made to employees and then engage in clever financial transactions to leave PBGC paying out millions in pension liabilities." *PBGC v. Findlay Indus., Inc.,* 902 F.3d 597, 611 (6th Cir. 2018). To the extent Sofco became a new entity in 2004, the new entity is a successor to the old entity's withdrawal liability, and the Fund's inclusion of the pre-2004 contribution history was appropriate, as the Arbitrator correctly found.

In general, courts have found that successor liability applies when: (1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale. *See Tsareff v. Manweb Servs.*, 794 F.3d 841, 845 (7th Cir. 2015); *see also Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 99 (3d Cir. 2011); *Members of the Bd. of Admin. of the Toledo Area Indus. UAW Ret. Income Plan v. OBZ, Inc.,* 348

20

F. Supp. 3d 635, 643 (N.D. Ohio 2018).  Sofco meets each of these requirements.  First, Sofco had notice of the potential withdrawal liability because all of its officers had worked for the company for decades, during which Sofco contributed to the Fund and was a party to the Local 18 CBA. Second, there was substantial continuity of operations after the sale, as Sofco used the same employer code, used the same equipment, assets, and personnel, and had nearly identical management and overlapping ownership.  Accordingly, the Arbitrator did not err in finding that Sofco is Old Sofco's successor employer with respect to its collective bargaining and employee benefit obligations.  Therefore, the Fund's inclusion of Sofco's pre-2004 contribution history in its withdrawal liability calculations was reasonable.

### 2. Partial Withdrawal Liability

Pursuant to 28 U.S.C. § 1388(d)(1), a construction industry employer is only liable for partial withdrawal "if the employer's obligation to contribute under the plan is continued for no more than an insubstantial portion of its work in the craft and area jurisdiction of the collective bargaining agreement of the type for which contributions are required."  A construction employer can only be assessed partial withdrawal liability when it contributes to a benefit fund only an "insubstantial portion" of what it contributed to that fund in prior years.  The dispute in this case turns on what the term "insubstantial portion" means.

In this case, the Fund determined that Sofco's contribution declines of 82% to 96% over the statutory three-year testing periods met the "insubstantial portion" standard and constituted a partial withdrawal from the Fund.  The Fund made the following findings for the plan years at issue:

- For plan year ending July 31, 2011, the ratio of hours to maximum average contribution base units during the three-year testing period of 9% in 2011, 4% in 2010, and 13% in 2009; and

- For plan year ending July 31, 2012, the ratio of hours to maximum average contribution base units during the three-year testing period of 18% in 2012, 9% in 2011, and 4% in 2010.

(Doc. 1-1, Arb. Op at 12–13).

What constitutes an insubstantial portion is left to the determination of the Fund and employers bear the burden to challenge that determination.  The Arbitrator determined that Sofco failed to meet its burden to show that the Fund's assessment of partial withdrawal liability was "unreasonable or clearly erroneous."  29 U.S.C. § 1401(a)(3)(A).

Sofco argues that the Arbitrator erred by failing to define "insubstantial portion."  The Arbitrator disagreed with Sofco's argument that insubstantial portion must mean less than 2% and concluded:

> I find Sofco's argument unpersuasive. A 2% figure would essentially write partial withdrawal liability for building and construction industry employers out of MPPAA, and Congress itself declined to specify a 5% figure. It appears to me that area of "insubstantial" must lie between ERISA Section 4205(b)(1)(A)'s 30% figure and the 5% figure that Congress declined to adopt. None of the figures on which the Fund based its determination, which range from a low of 4% to a high of 18%, exceed what I find to be the "insubstantial" threshold appropriate to the circumstances of this case. And Sofco has failed to bear its burden of convincing me otherwise by a preponderance of the evidence.

(Doc. 1-1, Arb. Op. at 14).

Sofco asserts that the "insubstantial portion" must mean something and suggests it means "a decline in contributions greater than the '70% decline' formula set forth in the provision applicable outside the construction industry."  (Doc. 17, Pl.'s Mot. for Summ. J. at 23, citing 29 U.S.C. § 1385(a)(1)).

The Court agrees that the lack of clear definition with respect to partial withdrawal liability is concerning.  However, like with complete withdrawal liability, the same presumption in favor of the Fund's determination applies.  "Any determination made by a plan sponsor under sections

4201 through 4219 [of the MPAA] and section 4225 is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A).  Though Sofco has raised a valid question with regard to the calculation of the assessment here, with the lack of clear guidelines on this issue, it has failed to establish that the Fund's determination was unreasonable or clearly erroneous.  Therefore, the Arbitrator did not err in upholding the Fund's assessment of partial withdrawal liability.

### 3. Attorneys' Fees and Costs

Plaintiff Sofco requests attorneys' fees and costs in pursuing this action.  Pursuant to 29 U.S.C. § 1451(e), the Court has discretion to award a prevailing party its attorneys' fees.  However, the Court does not find that either party should be awarded attorneys' fees and costs in this case.  This case presented very close arguments on complicated legal matters.  Accordingly, Plaintiff's request for attorneys' fees and costs is denied.

## D. Defendants' Counterclaims

Defendants seek to enforce the Arbitrator's Award and move for Attorneys' Fees and Costs.  As set forth above, with the exception of the reversal of the Arbitration Award on the complete withdrawal liability for the shop work and the Fund's use of the Segal Blend, Defendants' Motion to Enforce the Arbitration Award is granted.  And as discussed with respect to Plaintiff's request for attorneys' fees, this was a close case and both parties have prevailed on issues.  Therefore, no attorneys' fees and costs will be awarded.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART** and Defendants' Motion to Enforce the Arbitration Award is **GRANTED IN PART AND DENIED IN PART.**

Summary judgment is granted in favor of Plaintiff as to the complete withdrawal liability for the shop work and the Fund's use of the Segal Blend.  Defendants' Motion to Enforce the Arbitration Award is granted in part as to all other aspects of the Arbitration Award.

The Fund shall provide Sofco with a detailed accounting of the refund due for its review no later than June 19, 2020.  The parties shall discuss any potential disagreements over the accounting and work toward any agreeable amount due.  The Fund should then pay Sofco the refund due as soon as possible thereafter, but no later than July 31, 2020.

The Clerk shall remove Documents 15 and 17 from the Court's pending motions list and enter final judgment in this case.

**IT IS SO ORDERED.**

**Algenon L. Marbley**
**Chief Judge United States District Court**

**DATED:  May 19, 2020**